1

2

3

4

5

6                                                    The Honorable Richard A. Jones

7              **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF WASHINGTON**
8                        **AT SEATTLE**

9    STATE OF WASHINGTON; STATE OF              NO. 2:20-cv-00111-RAJ
     CALIFORNIA; STATE OF COLORADO;
10   STATE OF CONNECTICUT; STATE OF
     DELAWARE; DISTRICT OF COLUMBIA;
11   STATE OF HAWAII; STATE OF ILLINOIS;         **FIRST AMENDED COMPLAINT**
     STATE OF MAINE; STATE OF                    **FOR DECLARATORY AND**
12   MARYLAND; COMMONWEALTH OF                   **INJUNCTIVE RELIEF**
     MASSACHUSETTS; STATE OF
13   MICHIGAN; STATE OF MINNESOTA;
     STATE OF NEW JERSEY; STATE OF NEW
14   MEXICO; STATE OF NEW YORK; STATE
     OF NORTH CAROLINA; STATE OF
15   OREGON; COMMONWEALTH OF
     PENNSYLVANIA; STATE OF RHODE
16   ISLAND; STATE OF VERMONT;
     COMMONWEALTH OF VIRGINIA; and
17   STATE OF WISCONSIN,
18
                      Plaintiffs,
19
            v.
20
     UNITED STATES DEPARTMENT OF
21   STATE; MICHAEL R. POMPEO, in his
     official capacity as Secretary of State;
22   DIRECTORATE OF DEFENSE TRADE
     CONTROLS; MIKE MILLER, in his official
23   capacity as Acting Deputy Assistant Secretary
     of Defense Trade Controls; SARAH
24   HEIDEMA, in her official capacity as Director
     of Policy, Office of Defense Trade Controls
25

26

FIRST AMENDED COMPLAINT FOR                        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                              Complex Litigation Division
RELIEF                                                   800 5th Avenue, Suite 2000
NO. 20:2-cv-00111-RAJ                                     Seattle, WA 98104-3188
                                                            (206) 474-7744

1    Policy; UNITED STATES DEPARTMENT
     OF COMMERCE; WILBUR L. ROSS, in his
2    official capacity as Secretary of Commerce;
     BUREAU OF INDUSTRY AND SECURITY;
3    CORDELL HULL, in his official capacity as
     Acting Undersecretary for Industry and
4    Security; RICH ASHOOH, in his official
     capacity as Assistant Secretary of Commerce
5    for Export Administration,
6
7                    Defendants.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    JURISDICTION AND VENUE ......................................................................... 9

III.   PARTIES ............................................................................................................ 9

IV.  ALLEGATIONS .............................................................................................. 12

      A.    The Statutory and Regulatory Framework ............................................ 12

            1.    State Department: AECA, ITAR, and the Munitions List ............... 12

            2.    Commerce Department: ECRA, EAR, and the Commerce Control List ........ 15

      B.    Defense Distributed's Firearm Files ....................................................... 17

      C.    Defense Distributed's Lawsuit against the Federal Government ........... 19

      D.    The Government's Settlement Agreement with Defense Distributed ..................... 22

      E.    The Government's Actions in Accordance with the Settlement Agreement ........... 25

            1.    The Proposed Rules (which do not mention 3D-printed guns) ....................... 25

            2.    The Temporary Modification and Letter .......................................... 29

            3.    The Final Rules deregulating 3D-printed guns ................................ 31

      F.    Adverse Effects on the States' Public Safety Laws ................................ 37

            1.    Washington's Firearms Laws ........................................................... 38

            2.    California's Firearms Laws ............................................................... 41

                 a.    California's Unsafe Handgun Act ........................................... 42

                 b.    California regulates machine guns, assault rifles, and large-capacity magazines ............ 42

                 c.    California regulates the purchase, sale, and transfer of firearms .............. 43

                 d.    California law prohibits certain persons from possessing firearms .......... 43

            3.    Colorado's Firearms Laws ............................................................... 44

            4.    Connecticut's Firearms Laws ........................................................... 45

                 a.    Connecticut's regulation of all lawful firearm owners ........... 45

COMPLAINT FOR DECLARATORY
AND INJUCTIVE RELIEF

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

b.   Connecticut's regulation of sale, purchase, and transfer of possession of all firearms, even between lawful firearm owners ............................. 46

c.   Connecticut's prohibition on possession of a firearm by certain persons ................................................................................. 47

d.   Connecticut's regulation of assault weapons and machine guns.............. 48

e.   Connecticut's prohibition on the manufacture and transfer of ghost guns................................................................................. 48

5.   Delaware's Firearms Laws ................................................................. 49

6.   The District of Columbia's Firearms Laws ......................................... 50

7.   Hawaii's Firearms Laws ................................................................... 52

8.   Illinois's Firearms Laws ................................................................... 54

9.   Maine's Firearms Laws .................................................................... 56

10.  Maryland's Firearms Laws ............................................................... 59

11.  Massachusetts's Firearms Laws ......................................................... 61

12.  Michigan's Firearms Laws ............................................................... 63

13.  Minnesota's Firearms Laws .............................................................. 64

14.  New Jersey's Firearms Laws............................................................. 66

15.  New Mexico's Firearms Laws ........................................................... 68

16.  New York's Firearms Laws ............................................................... 70

17.  North Carolina's Firearms Laws ....................................................... 71

18.  Oregon's Firearms Laws .................................................................. 74

19.  Pennsylvania's Firearms Laws .......................................................... 75

20.  Rhode Island's Firearms Laws .......................................................... 78

21.  Vermont's Firearms Laws ................................................................ 80

22.  Virginia's Firearms Laws ................................................................. 82

23.  Wisconsin's Firearms Laws .............................................................. 84

V.   CAUSES OF ACTION ................................................................................. 85

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

VI.    PRAYER FOR RELIEF ................................................................................................. 91

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1    Plaintiffs the State of Washington, State of California, State of Colorado, State of

2    Connecticut, State of Delaware, District of Columbia, State of Hawaii, State of Illinois, State of

3    Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of

4    Minnesota, State of New Jersey, State of New Mexico, State of New York, State of North

5    Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of

6    Vermont, Commonwealth of Virginia, and State of Wisconsin (collectively, the States) bring

7    this lawsuit against Defendants the United States Department of State, Michael R. Pompeo, the

8    Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema (collectively, the "State

9    Department" or "State Department Defendants"), and the United States Department of

10   Commerce, Wilbur L. Ross, the Bureau of Industry and Security, Cordell Hull, and Rich Ashooh

11   (collectively, the "Commerce Department" or "Commerce Department Defendants").

## I.    INTRODUCTION

13   1.    This case addresses the renewed threat that downloadable guns, in the form of

14   software or technology for the production of a firearm or firearm parts—such as Computer Aided

15   Design (CAD) or similar files for the automated production of firearms using a 3D printer[1]—

16   will proliferate worldwide through global export and publication on the internet. 3D-printed guns

17   are functional weapons that are often undetectable by standard metal detectors because they are

18   made out of material other than metal (e.g., plastic) and untraceable because they contain no

19   serial numbers. Anyone with access to such files and a commercially available 3D printer could

20   readily manufacture, possess, or transfer such a weapon—even those persons statutorily

21   ineligible to possess firearms, such as violent felons, the mentally ill, and persons subject to

22   protection and no-contact orders. As the federal government currently recognizes, the global

23   dissemination of software and technology for the production of such weapons presents a "grave

24   concern for the United States." Control of Firearms, Guns, Ammunition and Related Articles the

---

[1] 3D printing refers to technology that allows a person to make a three dimensional product using a digital file or software in conjunction with a printer that is directed by the software. *See, e.g.*, https://3dprinting.com/what-is-3d-printing/ (last visited December 4, 2019).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

President Determines No Longer Warrant Control Under the United States Munitions List (USML), 84 Fed. Reg. 4136 (Jan. 23, 2020) (Commerce Final Rule).

2.      Despite this acknowledgement, the federal government has published two final agency rules that will remove technical data related to 3D-printed firearms, including software and technology for the production of a firearm or firearm parts ("Firearm Files") from the U.S. Munitions List (USML). The Arms Export Control Act (AECA) makes Munitions List items subject to federal export control and specifies how items can be removed from the Munitions List. 22 U.S.C. § 2778(a)(1), (a)(2), (f). Currently, Firearm Files are included on the Munitions List and subject to export control pursuant to AECA and the International Traffic in Arms Regulations (ITAR), which are administered by the Directorate of Defense Trade Controls (Directorate) within the State Department. The two Final Rules at issue—promulgated by the State and Commerce Departments, respectively, absent compliance with notice-and-comment requirements under the Administrative Procedure Act (APA)—will remove Firearm Files from the Munitions List and nominally transfer them to the Commerce Department's jurisdiction, where they will be exempt from any meaningful regulation and no longer subject to direct Congressional oversight. The Final Rules are scheduled to go into effect on March 9, 2020.

3.      If the Final Rules go into effect, Firearm Files will instantly become easily accessible both within the United States—including within the Plaintiff States' borders—and outside the United States. Such files can enable anyone with access to a commercially available 3D printer (or one that is free for public use) to automatically manufacture a working firearm out of plastic. Such undetectable weapons are illegal under the Undetectable Firearms Act, 18 U.S.C. § 922(g), as the federal government has repeatedly recognized. Yet the federal government's own actions will make these illegal weapons widely available, undermining its ability to enforce its own law. This will seriously compromise security in locations that rely on standard metal detectors, such as schools, courthouses, stadiums, concert halls, prisons, and airports. It will also impede law enforcement efforts to track and trace weapons used to commit

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

crimes, as homemade firearms (whether plastic or metal) lack manufacturers' serial numbers. The Final Rules' deregulation of Firearm Files will make it far easier for individuals ineligible to possess firearms under state or federal law to obtain a deadly weapon without undergoing a background check.

4.      The State Department has already attempted to deregulate 3D-printed gun technology once without observing procedural safeguards designed to guard against abuses of power by unelected federal agencies. Its actions were vacated and set aside by this Court in November 2019. *Washington, et al. v. U.S. Dep't of State, et al.*, No. C18-1115RSL, 2019 WL 5892505 (W.D. Wash. Nov. 12, 2019). As the Court explained:

> Congress granted the President and his designees the discretion to remove an item from the USML in light of certain considerations and factors. Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy. The State Department essentially concedes that, despite the specified statutory considerations, it evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Because the delisting was not 'based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute,' it must be invalidated under the APA[.]

*Id.* at *8.

5.      The Court found that the State Department's actions were arbitrary and capricious because, *inter alia*, the State Department failed to "consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy," as required by AECA. Furthermore, the Department failed to provide a "reasoned explanation" for reversing *sub silentio* its position as of April 2018 "that 3D-printed weapons posed unique threats" warranting regulation under AECA. *Washington*, 2019 WL 5892505, at *7–10; *see* 22 U.S.C. § 2778(a)(1) (AECA's purpose is to control exports "[i]n furtherance of world peace and the security and foreign policy of the United States").

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

6.      The Court further found that the State Department violated AECA's requirement that Congress receive 30 days' notice prior to the removal of any item from the Munitions List. *Washington*, 2019 WL 5892505, at *6–7.

7.      Now, the federal government acknowledges, as it must, that "maintaining controls over" the export of Firearm Files is "in the national security and foreign policy interests of the United States[.]" International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020) (State Final Rule). Nevertheless, the Final Rules would effectively deregulate Firearm Files—thereby accomplishing what the federal government was unable to do through a "temporary modification" removing Firearm Files from the Munitions List with no advance notice. The Final Rules suffer from substantially the same problems as the earlier deregulatory effort: they were promulgated absent adequate public notice and an opportunity to comment on the agencies' actions, they are contrary to AECA, and they represent an arbitrary and capricious reversal of the State Department's previous policy of controlling the export of Firearm Files under AECA for national security and related reasons. The federal government now purports to re-adopt that previous policy, while taking the position that the Final Rules adequately address national security and foreign policy concerns by retaining nominal export control over Firearm Files in certain limited circumstances. But in actuality, the Final Rules are toothless: they contain significant loopholes that will permit Firearm Files to be globally disseminated with ease, implicating all of the undisputed safety and security threats the government has acknowledged.

8.      On January 23, 2020, the State Department published a Final Rule, effective March 9, 2020, that—as promised in the same private Settlement Agreement that prompted the prior "temporary modification"—will permanently remove Firearm Files from the Munitions List. State Final Rule, 85 Fed. Reg. 3819. The same day, the Commerce Department published a companion Final Rule, also effective March 9, 2020, that purports to subject the items removed from the Munitions List (including Firearm Files) to Commerce's regulatory jurisdiction under

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

its Export Administration Regulations (EAR). Commerce Final Rule, 85 Fed. Reg. 4136. These Final Rules are the subject of the present lawsuit. True and correct copies of the Final Rules are submitted as **Attachments 1 and 2** hereto.

9.      The Final Rules effectively deregulate 3D-printable gun files entirely. Because the Commerce Department lacks jurisdiction over "published" items, the Final Rules create a self-executing loophole whereby anyone can automatically divest Commerce of jurisdiction over Firearm Files simply by disseminating them to members of the U.S. public (which is generally not prohibited by federal law). A private company known as Defense Distributed has already published some Firearm Files, rendering those files outside Commerce's jurisdiction pursuant to the Final Rule. "Publication" under the Commerce regulations does not require government pre-approval.

10.      The Commerce Final Rule acknowledges the "published" exception, and purports to create an exception to the exception to maintain control of Firearm Files. However, the exception to the exception is severely limited. Specifically, it purports to retain jurisdiction over:

> "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

Commerce Final Rule § 734.7(c).

11.      The exception to the exception fails to retain meaningful regulatory control over Firearm Files for a number of reasons, including the following:

a.      First, it generally allows anyone to export published Firearm Files, with no restrictions or oversight whatsoever, by any means *other than* "posting on the internet."[2] This means published Firearm Files can be transmitted *directly* to foreign entities and organizations,

---

[2] Under existing regulations, an "export" includes not only online posting, but also "sending or taking a defense article out of the United States in any manner" and "transferring technical data to a foreign person in the United States," among other activities. 22 CFR § 120.17.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

including known terrorist groups or other bad actors. For example, a company like Defense Distributed could advertise the availability of its already-published Firearm Files on the internet, then email the files to any foreign individual or organization that requests them (without ever making the files themselves "available by posting on the internet").

        b.     Second, once Firearm Files are lawfully exported in this way (thus placing them beyond U.S. jurisdiction), they can be posted on the internet from *outside* the United States—thus making them available both outside and inside the United States, with no ability to claw them back. The universal and permanent availability of Firearm Files on the internet will cause all the same irreparable harms established in the prior *Washington* litigation.

        c.     Third, the Final Rules only provide for export-control jurisdiction over a limited subset of Firearm Files: namely, those that are "ready for insertion" into a 3D printer or similar device. But Commerce will lack jurisdiction over files that can be easily *converted* to a readable format using readily available 3D-printing software. Such convertible files could be posted on the internet from inside the United States, without any direct transfer to a foreign individual or organization.

These and other glaring loopholes in the Commerce Final Rule are discussed further below.

        12.    In addition, the Final Rules violate fundamental APA procedural requirements. Though the Final Rules were ostensibly promulgated in accordance with a notice-and-comment rulemaking process, this process occurred *after* the federal government decided to deregulate Firearm Files pursuant to a Settlement Agreement with Defense Distributed. Defense Distributed's stated objective is to ensure global, unrestricted access to firearms by posting Firearm Files online so that virtually everyone will have access to a "downloadable gun." The Final Rules fulfill the promise in the Settlement Agreement to "fully pursue" a "final rule to remove the files at issue from ITAR jurisdiction." The Settlement Agreement was reached before the State and Commerce Departments had even published their Notices of Proposed Rulemaking (NPRMs) in the Federal Register, much less had the opportunity to consider any public

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

comments. Indeed, this Court found that public comments opposing the removal of Firearm Files from the Munitions List "were not considered by the agency when it issued the temporary modification and [related] letter." *Washington*, 2019 WL 5892505, at *3.

13.     Moreover, the NPRMs do not mention 3D-printed firearms at all. *See* 83 Fed. Reg. 24,198 (May 24, 2018) (State NPRM); 83 Fed. Reg. 24,166 (May 24, 2018) (Commerce NPRM). One must read between the lines of the 2018 NPRMs to understand that in combined effect, the proposed rules would permanently deregulate 3D-printable firearm files. As such, the NPRMs failed to provide adequate notice to the public that the proposed jurisdictional transfer would not only affect items that are "widely available" for commercial sale, as the NPRMs claim, but would also affect Firearm Files that enable virtually anyone to automatically manufacture illegal firearms that are undetectable and untraceable, and authorize their global dissemination. In fact, the Commerce NPRM misleadingly claims that "[t]his proposed rule does not deregulate the transferred items."

14.     The Commerce Final Rule's exception to the exception purporting to retain export jurisdiction over certain published Firearm Files likewise was not included in the NPRM, depriving the public of an opportunity to comment on the significant problems with that regulatory regime (including those discussed in Paragraph 11, *supra*). Thus, even though some commenters discussed the proposed rules' implications for 3D-printed guns in general, they had no opportunity to comment on the specific provisions revealed for the first time in the Commerce Final Rule. Tellingly, the Final Rules do not address the glaring problems with these specific provisions identified above, or any other issues with those provisions—because commenters had no opportunity to raise them.

15.     If the Final Rules go into effect, they will permit Defense Distributed and others to export Firearm Files anywhere, to anyone. As a direct result, such files will inevitably be posted on the internet, making downloadable guns available to anyone with access to a 3D printer

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   inside or outside the United States. That is exactly the result this Court previously issued an

2   injunction to prevent, and that the federal government now purportedly wishes to avoid.

3       16.     Not only do the Final Rules deregulate the files Defense Distributed currently has

4   in its possession, but they also deregulate Firearm Files categorically, including files for the

5   automatic manufacture of more technologically advanced weapons that may be developed in the

6   future. The Commerce Department will lack the flexibility to address such new technology on

7   an *ad hoc* basis because, under its own regulations, it lacks export-control jurisdiction once such

8   technology is "published."

9       17.     The Final Rules violate the APA, including for the following reasons:

10          a.     The Final Rules are procedurally improper because the public did not

11  receive adequate notice or an opportunity to comment on them, and they are not a logical

12  outgrowth of the agency's rulemaking process.

13          b.     Defendants violated AECA by taking action contrary to the statute's

14  stated purpose of regulating exports "[i]n furtherance of world peace and the security and foreign

15  policy of the United States[.]" 22 U.S.C. § 2778(a)(1). Removing Firearm Files from the

16  Munitions List (and transferring jurisdiction to an agency that lacks any meaningful ability to

17  regulate them) actively frustrates this purpose by facilitating the global proliferation of uniquely

18  dangerous weapons, as the administrative record shows.

19          c.     The Final Rules are the product of arbitrary and capricious rulemaking

20  and abuse of agency discretion. The State and Commerce Departments acted arbitrarily and

21  capriciously by *inter alia* (i) failing to meaningfully consider the factors Congress identified as

22  relevant to whether an item should remain on the Munitions List, including impacts on world

23  peace, national security, and foreign policy; (ii) drastically changing long-established practice

24  and policy regarding export control of Firearm Files, while failing to give due consideration to

25  the Final Rules' real-world implications in light of acknowledged issues related to safety and

26  security; and (iii) promulgating Final Rules that have a significant impact on the public pursuant

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

to a private settlement agreement, while treating the APA's notice-and-comment procedure as a *pro forma* exercise rather than an important information-gathering step that should *precede* an agency decision.

18.     Defendants' unlawful actions—if allowed to stand—will lead to the proliferation of downloadable guns overseas and domestically, threatening our national security. The proliferation of untraceable and undetectable weapons within the United States threatens to cripple the various States' extensive and comprehensive systems of firearms regulations designed to keep guns out of the wrong hands.

19.     For these reasons and others detailed below, Defendants violated the APA by promulgating Final Rules that are procedurally defective, contrary to law, and arbitrary and capricious. Pursuant to 5 U.S.C. § 706, the Plaintiff States ask the Court to enjoin, vacate, and set aside the Final Rules.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter and the parties hereto pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.

21.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because Plaintiff the State of Washington is located here and a substantial part of the events or omissions giving rise to the claim occurred or will imminently occur here. In particular, the dissemination of the Firearm Files in question will have an adverse impact on the public safety in the City of Seattle and King County, Washington, which are located in this district.

## III.     PARTIES

22.     The Plaintiff States, represented by and through their respective Attorneys General, are sovereign states of the United States of America. The security of the Plaintiff States is threatened by Defendants' deregulation of Firearm Files via the Final Rules. The States bring this action to redress harms to their sovereign authority, quasi-sovereign authority, proprietary interests, and interests as *parens patriae*.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

23.     The States have sovereign and quasi-sovereign interests in protecting the security and well-being of their residents. "The States . . . perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few—even though the Constitution's text does not authorize any government to do so. Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the 'police power.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535–36 (2012). Ensuring the safety of their residents from untraceable, undetectable weapons is one of the police powers of the States.

24.     Defendants' planned deregulation of Firearm Files harms the States' sovereign interests by seriously jeopardizing the States' ability to enforce their public safety laws, including those regulating who may possess firearms; what type of firearms and weapons they may possess; the manner in which firearms may be used; and the purchase and sale of firearms, including tracking serial numbers and ownership information. In addition, the imminent widespread availability of undetectable and untraceable weapons will make it far more difficult for the States to protect the safety of those within their borders, including through effective law enforcement measures that depend on the ability to track and forensically identify weapons, and the use of metal detectors in government buildings and other public places.

25.     The States have proprietary interests in their treasuries, the integrity of their borders, the safety of their jails and prisons, and the efficient performance of the work of their employees and officials. Defendants' actions harm these interests. Defendants' actions harm the States by making it far easier to bring undetectable and untraceable firearms across their borders. Their actions threaten state and county prison safety by facilitating the smuggling of undetectable weapons into prisons and jails. Their actions make the States' state, county, and local detective work solving crimes more difficult by increasing access to untraceable and undetectable guns. Defendants' actions also impede the States' executive protection responsibilities. Further, the States—and border states like Washington in particular—spend substantial sums of state

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

taxpayer money to protect their residents from terrorist attacks. Defendants' actions to deregulate Firearm Files enhance the risk of terrorist attacks. Indeed, the federal government currently acknowledges that "[i]n the absence of controls on the export, reexport, or in-country transfer of such technology and software, such items could be easily used in the proliferation of conventional weapons, the acquisition of destabilizing numbers of such weapons, or for acts of terrorism." Commerce Final Rule, 85 Fed. Reg. 4136.

26.     Defendant the United States Department of State (State Department) is the executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of AECA. The State Department is a party to the Settlement Agreement with Defense Distributed. The State Department promulgated the State Final Rule challenged in this suit.

27.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the State Department, including the operation and management of the Directorate of Defense Trade Controls and administration and enforcement of the ITAR. The Secretary of State is a party to the Settlement Agreement with Defense Distributed.

28.     Defendant Directorate of Defense Trade Controls is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The Directorate enacted the Temporary Modification and issued the Letter previously invalidated by this Court, and is a party to the Settlement Agreement with Defense Distributed.

29.     Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of Defense Trade Controls. The Acting Deputy Assistant Secretary is a party to the Settlement Agreement with Defense Distributed.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

30.     Defendant Sarah Heidema is sued in her official capacity as the Director, Office of Defense Trade Controls Policy. The Director, Office of Defense Trade Controls Policy is a party to the Settlement Agreement with Defense Distributed.

31.     Defendant the United States Department of Commerce (Commerce Department) is the executive agency of the United States government responsible for administering and enforcing the Export Administration Regulations (EAR) under the Export Control Reform Act (ECRA) and related statutes.

32.     Defendant Wilbur L. Ross is sued in his official capacity as the Secretary of Commerce. In this capacity, he is responsible for the operation and management of the Commerce Department, including the operation and management of the Bureau of Industry and Security (BIS) and administration and enforcement of the EAR.

33.     Defendant BIS is a subordinate unit within the Commerce Department responsible for administering and enforcing the EAR. BIS promulgated the Commerce Final Rule challenged in this suit.

34.     Defendant Cordell Hull is sued in his official capacity as Acting Undersecretary for Industry and Security.

35.     Defendant Rich Ashooh is sued in his official capacity as Assistant Secretary of Commerce for Export Administration.

## IV.     ALLEGATIONS

### A.     The Statutory and Regulatory Framework

#### 1.     State Department: AECA, ITAR, and the Munitions List

36.     The Arms Export Control Act authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). A central purpose of AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. Specifically, AECA provides:  "It shall be the policy of the United States to exert

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

leadership in the world community to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments." 22 U.S.C. § 2751. "United States programs for or procedures governing the export, sale, and grant of defense articles and defense services . . . shall be administered in a manner which will carry out this policy." *Id.* The approach must be to "maintain adherence to a policy of restraint in conventional arms transfers," and Congress directed that "full regard" should be "given to the security interests of the United States in all regions of the world and that particular attention should be paid to controlling the flow of conventional arms to the nations of the developing world." *Id.*

37.     Under AECA, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). Items designated as defense articles or services constitute the U.S. Munitions List. *Id.* at § 2778(a)(1). Category I of the Munitions List includes articles, services, and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

38.     Among other things, Category I of the Munitions List currently (prior to the Final Rules' effective date) includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a) and (i). "Technical data" is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a). Technical data includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *Id.* § 120.10.

39.     As former Director of the Office of Defense Trade Controls Management Lisa V. Aguirre stated in a 2015 declaration filed in federal court, "the 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML." *Defense Distributed v. U.S. Dept. of State,*

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

15-CV-372 RP, ECF No. 32-1 (Aguirre Decl.) ¶ 14(d). "Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR." *Id.*

40.     Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department. In turn, the State Department promulgated the ITAR, which are administered by the Directorate. *See* 22 C.F.R. §§ 120-130. Among other things, the Directorate is tasked with maintaining, reviewing, and clarifying the Munitions List.

41.     Pursuant to Executive Order 13637, section 1(n), "[d]esignations including changes in designations, by the Secretary of State of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 (22 U.S.C. § 2778) shall have the concurrence of the Secretary of Defense." When removing an item from the Munitions List, the Secretary must account for AECA's objectives: i.e., furthering "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Relatedly, "[d]ecisions on issuing export licenses . . . shall take into account whether the export of an article would . . . support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." *Id.* § 2778(a)(2).

42.     In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the Munitions List. 22 U.S.C. § 2778(f)(1). Such notification must be made in accordance with the procedures applicable to

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2394-1. *Id.*

43.     For situations where there is doubt that a particular item to be exported falls on the Munitions List, ITAR contains a commodity jurisdiction (CJ) procedure. 22 C.F.R. § 120.4. Upon written request, the Directorate will provide a determination as to whether a certain item, service, or data is within the jurisdiction of ITAR. *Id.*

44.     As Director Aguirre explained in her 2015 declaration, the CJ determination "entails consultation among the Departments of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases." Aguirre Decl. ¶ 19. Assessments are made on a case-by-case basis, evaluating whether the article is covered by the Munitions List, is functionally equivalent to an article on the Munitions List, or has substantial military or intelligence application. A determination made pursuant to the commodity jurisdiction process takes into account "(i) The form and fit of the article; and (ii) The function and performance capability of the article." *Id.* ¶ 20.

45.     22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case."

**2.      Commerce Department: ECRA, EAR, and the Commerce Control List**

46.     The Export Control Reform Act, 50 U.S.C. § 4801 *et seq.*, authorizes the President to regulate the export, reexport,[3] and in-country transfer of certain controlled commodities, software, and technology. *Id.* §§ 4801(7), 4812. A "controlled" item is one subject to the jurisdiction of the United States. *Id.* § 4801(1).

47.     ECRA's purpose is to ensure that export controls are used "only after full consideration of the impact on the economy of the United States and only to the extent necessary"

---

[3] "Reexport" means transmission of an item from one foreign country to another foreign country, or the release or transfer of technology to a foreign person outside the United States. 50 U.S.C. § 4801; 15 C.F.R. § 734.14.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

to fulfill the "national security," "foreign policy," or "international obligations" of the United States in certain enumerated respects. *Id.* § 4811.

48.     The Secretary of Commerce, in consultation with the Secretaries of State, Defense, and Energy, carries out ECRA on behalf of the President by establishing and maintaining a list of controlled items, known as the Commerce Control List. 50 U.S.C. § 4813. ECRA directs the Commerce Secretary to require licenses "as appropriate" for exports, reexports, and in-country transfers of controlled items. *Id.* § 4813.

49.     ECRA directs the Commerce Secretary to "establish a procedure to license or otherwise authorize" such exports pursuant to the statute. *Id.* § 4815(a). The Commerce Secretary is encouraged to process license applications within 30 days. *Id.* § 4815(b).

50.     ECRA provides that a Commerce license is required to export controlled items only in limited circumstances. For instance, a Commerce license is required for exports to countries which the Secretary of State has determined have "repeatedly provided support for acts of international terrorism"—and Congress must be notified 30 days prior to the issuance of any such license—but a license is not categorically required for exports to other countries. *Id.* § 4813(c). A license is also required to export nuclear explosive devices, missiles, chemical or biological weapons, whole plants for chemical weapons precursors, and foreign maritime nuclear projects that would pose a national security or foreign policy risk—but is not categorically required for other types of items (such as Firearm Files). *Id.* § 4813(d).

51.     The Commerce Department's Export Administration Regulations (EAR) (15 C.F.R. chapter VII, subchapter C) implement various legal authorities, including ECRA. *See* 15 C.F.R. § 730.2; Commerce Final Rule. Items subject to the EAR "include purely civilian items, items with both civil and military, terrorism or potential WMD[4]-related applications, and items that are exclusively used for military applications but do not warrant control under [ITAR]." *Id.* § 730.3.

---

[4] Weapons of mass destruction. 15 C.F.R. § 730.3.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

52.     "Published" technology and software is not subject to the EAR. 15 C.F.R. §§ 734.3(b)(3), 734.7(a). Thus, when technology or software "has been made available to the public without restrictions upon its further dissemination," the Commerce Department lacks export-control jurisdiction over it. 15 C.F.R. § 734.7(a); *see infra* ¶ 83.

53.     Consistent with ECRA, a "relatively small percentage of exports and reexports subject to the EAR" require a Commerce license. 15 C.F.R. § 730.7. "Many items are not on the Commerce Control List (CCL) . . . , or, if on the CCL, require a license to only a limited number of countries." *Id.* "Just because an item or activity is subject to the EAR does not mean that a license or other requirement automatically applies." *Id.* § 734.2(a)(3).

54.     Whether the Commerce Department chooses to require an export license may depend on various factors enumerated in the EAR, including the item's destination and whether there are applicable restrictions on the end-user or end-use of the item. *See* 15 C.F.R. § 736.2.

55.     License applications are reviewed by the Bureau of Industry and Security (BIS), a Commerce sub-agency. 15 C.F.R. § 750.3(a). Other departments may also participate in the review; for example, the State Department may (but may choose not to) review license applications involving items controlled for national security, regional stability, or anti-terrorism reasons. *Id.* § 750.3(b). Specific criteria for granting or denying a license application are not apparent from the applicable regulations. *See id.*

**B.     Defense Distributed's Firearm Files**

56.     Defense Distributed is a Texas corporation founded by Cody Wilson, a convicted sex offender[5] and self-described "crypto-anarchist" who believes that "governments should live in fear of their citizenry." His company's objective is for everyone in the world to have access to guns, and to make meaningful gun regulation impossible.

---

[5] According to news reports, Mr. Wilson was charged with having sex with a minor and pled guilty this year to injury to a child, which is a felony. He is prohibited from carrying a handgun in public and from buying and selling weapons at gun stores. Andrew Weber & Alain Stephens, *Despite His Criminal Record, Cody Wilson Is Back In The 3D-Printed Gun Business*, KUT (Nov. 20, 2019), https://www.kut.org/post/despite-his-criminal-record-cody-wilson-back-3d-printed-gun-business (last accessed Dec. 10, 2019).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO. 20:2-cv-00111-RAJ

17

ATTORNEY GENERAL OF WASHINGTON Complex Litigation Division 800 5th Avenue, Suite 2000 Seattle, WA 98104-3188 (206) 474-7744

57.     In or around early May 2013, Defense Distributed posted computer-aided design (CAD) files on DEFCAD.org, a website it created to serve as an open-source repository for weapons designs, including software code used to automatically manufacture the "Liberator" pistol. A 3D printer can create a functional Liberator almost entirely from plastic. Though the Liberator's design includes a 6-oz piece of steel, this component is non-functional and can be easily removed, enabling the Liberator to avoid detection in walk-through metal detectors.

58.     Defense Distributed described these CAD files as "essentially blueprints that can be read by CAD software." As the State Department stated in a court filing in April 2018, these files are "indispensable to a three-dimensional ('3D') printing process used to create firearms and their components."[6] Typically, all a user would need to do is download the CAD files, use commonly available software to convert and transmit them to a 3D printer, and enter a print command, in order to create a real, functional weapon within hours or minutes.

59.     On May 8, 2013, the Directorate's Office of Defense Trade Controls Compliance, which is responsible for compliance with and civil enforcement of AECA and ITAR, sent Defense Distributed a letter noting that "it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the [Directorate]." The letter explained that "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR." It requested that Defense Distributed remove ten specific CAD files from public access "immediately" and advised that Defense Distributed could submit a request for CJ determination for the files. Defense Distributed submitted a CJ determination request on June 21, 2015.

---

[6] Def. Mtn. to Dismiss Second Amended Complaint at 15, *Def. Distributed v. U.S. Dept. of State*, 15-CV-372 RP (W.D. Texas) (Dkt. # 92).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

60.     Separately, Defense Distributed submitted a CJ determination request for the "Ghost Gunner," an automated firearms metal milling machine.[7] In April 2015, the Directorate determined that the Ghost Gunner machine itself was not subject to ITAR, but that the "project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR regulation."

61.     The Directorate completed its review of Defense Distributed's original requests on June 4, 2015, and determined that six categories of those files were subject to ITAR control: (i) the Liberator pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD- 40 tactical slide assemble; (v) the sub-caliber insert; and (vi) the VZ-58 front sight. It also determined that "the project files, data files, or any form of technical data for producing a defense article, including an 80% AR-15 lower receiver," are subject to ITAR.

62.     In making its CJ determinations, the Directorate noted that the CAD files could be used to "automatically find, align, and mill" a defense article such as a firearm on a 3D printer or other manufacturing device, and that manufacturing a defense article in this way requires considerably less know-how than relying on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials.

C.     **Defense Distributed's Lawsuit against the Federal Government**

63.     In May 2015, Defense Distributed sued the federal government in a Texas federal district court, seeking an injunction to prevent the government from regulating Defense Distributed's dissemination of the CAD files. *Def. Distributed v. U.S. Dept. of State*, 15-CV-372 RP (W.D. Texas).

---

[7] Unregistered homemade weapons—known as "ghost guns"—have been used in several recent shootings. *See, e.g.*, Andrew Blankstein & Phil Helsel, *Student who opened fire at California high school, killing 2, used "ghost gun,"* NBC NEWS (Nov. 21, 2019), https://www.nbcnews.com/news/us-news/student-who-opened-fire-california-high-school-killing-2-used-n1089411 (last accessed Dec. 10, 2019).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

64.     In defending against that lawsuit, the federal government stated it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." As the government explained, the CAD files "are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations."

65.     Along with its opposition to Defense Distributed's preliminary injunction motion, the government submitted an affidavit from Lisa V. Aguirre, who was then the Director of the Office of Defense Trade Controls Management. Among other things, Director Aguirre stated that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]ccess to weapons technology coupled with the uncontrolled and increasingly ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35(c).

66.     The Honorable Robert L. Pitman denied Defense Distributed's motion for a preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through AECA. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015) (emphasis in original). The Fifth Circuit affirmed, finding that "the

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts" constitutes "a very strong public interest in national defense and national security." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016). As the Fifth Circuit stated:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim [if a preliminary injunction issued] would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . ***Because those files would never go away***, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim ***Thus, the national defense and national security interest would be harmed forever***.

*Id.* at 460 (5th Cir. 2016) (emphasis added).

67.     On January 8, 2018, the Supreme Court denied Defense Distributed's petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

68.     After the district court lifted the stay of proceedings that had been imposed pending the above-referenced appeals, the federal government in April 2018 moved to dismiss Defense Distributed's complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted."[8] If the government were not permitted to regulate the dissemination of the CAD files, it argued, they could be "easily used overseas to make firearms that are subject to U.S. export controls," where, "beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability."

---

[8] Def. Mtn. to Dismiss Second Amended Complaint at 15, *Def. Distributed v. U.S. Dept. of State*, 15-CV-372 RP (W.D. Texas) (Dkt. # 92).

**D.     The Government's Settlement Agreement with Defense Distributed**

69.     Mere weeks after the federal government moved to dismiss, Wilson and Defense Distributed abruptly announced that their case had settled. On July 27, 2018, the parties filed a stipulation of dismissal with prejudice.

70.     The Settlement Agreement was apparently finalized in April 2018, but was not executed by the parties until June 29, 2018.

71.     Pursuant to Paragraph 1 of the Settlement Agreement, the State Department Defendants committed to:

a.     "draft and . . . fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the [Defense Distributed] Action";

b.     "announce[ ], while the above-referenced final rule is in development, . . . a temporary modification, consistent with [ITAR], of USML Category I to exclude the technical data that is the subject of the Action . . . on or before July 27, 2018";

c.     "issu[e] . . . a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files[9] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR"; and

d.     "acknowledge[ ] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs

---

[9] These terms are defined as follows, by reference to Defense Distributed's complaint:
- "Published Files": "technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun";
- "Ghost Gunner Files": "files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts";
- "CAD Files": files which Defense Distributed has made requests to the Department of Defense Office of Prepublication Review and Security for prepublication review since September 2, 2014.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

72.     In the Settlement Agreement, the government seemingly consented to the dissemination of Firearm Files it never reviewed or evaluated for safety, national security, or other concerns. Paragraphs 1(a), (b), and (d) of the Settlement Agreement authorize the publication of "the technical data that is the subject of the Action," which is defined to include "Other Files," i.e., those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions."

73.     There is no indication in the Settlement Agreement (or elsewhere) that the State Department undertook any analysis, study or determination, in consultation with other agencies or otherwise, before agreeing to remove the subject files from the Munitions List. In fact, the Settlement Agreement states that it does not "reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

74.     Neither the House Committee on Foreign Relations nor the Senate Committee on Foreign Relations received the required 30 days' advance notice of the Temporary Modification referenced in Paragraphs 1(b) or (d) or the Letter referenced in Paragraph 1(c) of the Settlement Agreement. The Temporary Modification and Letter went into effect on July 27, 2018, without providing any such notice to Congress.

75.     After the Settlement Agreement became public, Cody Wilson and Defense Distributed repeatedly and adamantly claimed that the Temporary Modification and Letter would effectively negate all gun violence prevention efforts. Among other things, Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated: "All this Parkland stuff,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   the students,[10] all these dreams of 'common sense gun reforms'? No. The internet will serve

2   guns . . . No amount of petitions or die-ins or anything else can change that."

3       76.     Defense Distributed began advertising that its CAD files—including those for the

4   "Liberator" pistol—would soon become public:



17  Source: https://defcad.com (accessed July 28, 2018).

19      77.     According to news reports at the time,[11] Defense Distributed's repository of

20  downloadable-gun files was to also include "more exotic DIY semi-automatic weapons." "The

21  relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a

22  searchable, user-generated database of practically any firearm imaginable." According to

---

[10] On February 14, 2018, a gunman killed 17 people at Marjory Stoneman Douglas High School in Parkland, Florida. Students who survived the shooting gained national attention in advocating for legislative action on gun violence.

[11] Andy Greenberg, *A Landmark Legal Shift Opens Pandora's Box for DIY Guns*, WIRED (July 18, 2018), https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms."

78.    Though the Temporary Modification and Letter were ultimately enjoined and invalidated, as discussed below, Defense Distributed has disseminated at least some of its Firearm Files domestically to members of the public by mail. *See Washington*, 2019 WL 5892505, Dkt. # 155 (Pvt. Defs' Resp. to Mot. to Compel) at 3 ("Defense Distributed distributed the Subject Files via United States Postal Service mail.").

**E.    The Government's Actions in Accordance with the Settlement Agreement**

  **1.    The Proposed Rules (which do not mention 3D-printed guns)**

79.    Without notifying Congress or the public about the Defense Distributed Settlement Agreement, or revealing that 3D-printed guns would be implicated by forthcoming agency rules, the federal government surreptitiously moved forward with deregulating these weapons.

80.    On May 24, 2018, as promised, the federal government published two notices of proposed rulemaking by the State and Commerce Departments, which would remove all Category I items from the Munitions List and transfer them to Commerce's jurisdiction. *See International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III*, 83 Fed. Reg. 24,198 (May 24, 2018) (State NPRM); *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, 83 Fed. Reg. 24,166 (May 24, 2018) (Commerce NPRM).

81.    According to the State NPRM, the State Department "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." The NPRM states that the items to be removed from the Munitions List "do not meet this standard," primarily because such items purportedly are "widely available in retail outlets in the United States and abroad." For this reason, the State

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

NPRM proposed to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the Munitions List, and transfer jurisdiction over these items to the Commerce Department, which, due to its looser export controls,[12] does not typically take action to prohibit the publication of the data.

82.     The Commerce NPRM, published the same day, outlined how the EAR would apply to the transferred items, which it likewise described as "essentially commercial items widely available in retail outlets and less sensitive military items." Although Commerce would not comprehensively restrict the export of technology or software related to firearms, it would have general authority to impose a restriction on a case-by-case basis if it determined the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.

83.     Under the EAR, however, Commerce lacks jurisdiction to restrict the export of "published" technology or software. *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a). The EAR define "published" broadly. *See* 15 C.F.R. § 734.7. Notably, no government pre-approval is required to publicly release information under the EAR, though pre-approval is currently required to release Firearm Files under the ITAR. *See Washington*, 318 F. Supp. at 1262 (citing 22 C.F.R. §§ 120.10, 120.11). Thus, under the Commerce NPRM, publishing Firearm Files without pre-approval would create a self-executing loophole depriving the Commerce Department of all regulatory jurisdiction.

84.     The May 24, 2018 State and Commerce NPRMs make no mention whatsoever of 3D-printed firearms or Firearm Files. Indeed, despite the "published" loophole described above, the Commerce NPRM misleadingly claims that "[t]his proposed rule does not deregulate the transferred items." Public commenters never received formal notice of the June 29, 2018 Settlement Agreement, which reveals that the NPRMs apply to Firearm Files, and which was

---

[12] For example, the ITAR require any exporter of items on the Munitions List to register with the State Department, *see* 22 C.F.R. § 122.1(a), but the EAR include no similar registration requirement.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

not made public in any form until the end of the comment period. One must read between the lines to understand that the NPRMs' combined effect would be to permanently and almost entirely deregulate Firearm Files. Regardless, approximately 98% of commenters on the Commerce NPRM opposed the rule in general.

85. Despite the NPRMs' obfuscation and misrepresentation, some commenters recognized the government's true intentions. For example, Professor Susan Waltz of the University of Michigan's Gerald R. Ford School of Public Policy pointed out that the State NPRM "would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology . . . the firearms removed from USML." Professor Waltz suggested a few simple ways the State Department could address this glaring problem— none of which the Department adopted. Another comment, from the Brady Campaign to Prevent Gun Violence, warned that, "under the proposed rules," companies like Defense Distributed "would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States)." The State Department disregarded these comments, as well as comments from hundreds of individuals warning that "[t]he rule change would make the world a far more dangerous place" by "effectively enabling 3D printing of firearms in the U.S. and around the globe."

86. The public comment period for both NPRMs concluded on July 9, 2018. Only after the comment period closed did the extent of the government's surreptitious deregulatory effort become clear. The public reaction was swift and condemnatory. The supplemented Administrative Record in the prior *Washington* litigation includes samples of the more than 106,000 emails the federal government received from members of the public between July 23 and July 27, 2018, urging the government not to deregulate 3D-printed guns; multiple letters from Congressional leaders urging reconsideration of the planned deregulation; and detailed comment letters from U.S. Senators, U.S. Representatives, and public policy organizations.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

87.     The supplemented Administrative Record also includes State Department documents that shed light on the true basis of its decision to deregulate 3D-printed guns. On July 26, 2018—the day before the State Department issued the Temporary Modification and Letter—a Senate Foreign Relations staffer emailed State Department personnel to request an analysis as to why the Department had changed the position it took in the *Defense Distributed* litigation until April 2018. Joshua M. Paul of the State Department replied that this was a "technical legal question" that should be directed to the Department of Justice. In a following internal email exchange, Defendant Sarah Heidema—the Directorate official who previously certified an incomplete administrative record and inaccurately attested that the State Department "determined" that 3D-printable firearms "pose little national security concern"—argued that it was actually "a question for us [the State Department]" about "why we stopped arguing that the technology subject to the case, if released, would harm national security or foreign policy[.]" But Paul stated that the reason for the planned deregulation was "fundamentally a DOJ question" because "*nothing changed on our side*" as to those issues. (Emphasis added.)

88.     Paul's statements are consistent with contemporaneous remarks by then-State Department spokesperson Heather Nauert, who told the press on July 31, 2018, that the Department still had "equity" in the matter of 3D-printable guns, but that it "took the advice of the Department of Justice" to settle the *Defense Distributed* case by agreeing to deregulate them.

89.     Another email exchange between Paul and a Senate Foreign Relations staffer starkly reveals the State Department's failure to consider the particular problems posed by 3D-printed guns before issuing the Temporary Modification and Letter. On July 20, 2018, the Senate staffer wrote to Paul to ask about "the law enforcement and counter-terrorism implications of" the deregulation, noting that "[e]nabling the widespread acquisition of undetectable or largely undetectable firearms" would potentially undermine "protection of domestic and international airline flights from terrorist hijacking/attacks." The staffer further asked: "What changes will be required by TSA here and abroad to deal with this?" Paul was unable to answer these basic

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  questions. Instead, he admitted that the State Department "would need to refer you to TSA or

2  other law enforcement organizations on this question." Paul suggested that the State Department

3  could not answer these key national security questions because its "nexus on this issue was/is

4  limited to [its] role in controlling exports of tech data[.]" Paul's statements, made just a week

5  before the State Department issued the Temporary Modification, highlight the extent to which

6  the Department utterly failed to consider the national security implications of their plan to

7  deregulate 3D-printable guns.

8         **2.      The Temporary Modification and Letter**

9         90.     On July 27, 2018, as promised in the Settlement Agreement, the Directorate

10  published the Temporary Modification on its website. The Temporary Modification states that

11  "the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in

12  the interest of the security and foreign policy of the United States to temporarily modify United

13  States Munitions List (USML) Category I to exclude" the technical data described in the

14  Settlement Agreement. On the same date, as promised, the Directorate sent a letter to Defense

15  Distributed indicating that its files were approved for "unlimited distribution." Defense

16  Distributed posted a number of its Firearm Files on its website accordingly.

17         91.     On July 30, 2018, Plaintiff States filed the prior *Washington* litigation, asking this

18  Court to enjoin and invalidate the Temporary Modification and Letter.

19         92.     On July 31, 2018, this Court entered a temporary restraining order enjoining the

20  State Department Defendants from implementing or enforcing the Temporary Modification and

21  Letter. They rescinded those actions, and Defense Distributed removed its Firearm Files from its

22  website accordingly.

23         93.     On August 27, 2018, the Court converted the temporary restraining order into a

24  preliminary injunction against the State Department Defendants. The Court found a likelihood

25  of success on the merits, and concluded that the States were likely to suffer many different

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    categories of irreparable injury absent injunctive relief. *Washington v. U.S. Dep't of State*, 318

2    F. Supp. 3d 1247 (W.D. Wash. 2018).

3        94.    Specifically, the Court found that the online publication of Defense Distributed's

4    Firearm Files in accordance with the Temporary Modification and Letter "would subvert the

5    domestic laws of states with more restrictive firearm controls and threaten the peace and security

6    of the communities where these guns proliferate." *Id.* at 1261. As the Court noted, plastic 3D-

7    printed guns are "virtually undetectable in metal detectors and other security equipment intended

8    to promote public safety at airports, sporting events, courthouses, music venues, and government

9    buildings," and, furthermore, "[t]he portability and ease of a manufacturing process that can be

10   set up virtually anywhere would allow those who are, by law, prohibited from manufacturing,

11   possessing, and/or using guns to more easily evade those limitations." *Id.* The Court also

12   highlighted several of the States' "public safety, law enforcement, and proprietary interests" that

13   were likely to be irreparably harmed by the impending deregulation of Firearm Files. *Id.* These

14   included increased harm to residents based on the poor quality and "toy-like appearance" of 3D

15   printed guns, harm to law enforcement in the proliferation of undetectable weapons that foil

16   standard forensic investigative techniques, and increased security measures required by the

17   States "to maintain security if, as the private defendants advocate, every person owns a plastic

18   gun." *Id.*

19       95.    Ultimately, the Court invalidated the Temporary Modification and Letter on the

20   grounds that they were (1) contrary to AECA's congressional notice requirement and (2)

21   "arbitrary and capricious in two, independent respects." *Washington,* 2019 WL 5892505. "First,

22   the agency failed to consider aspects of the problem which Congress deemed important"—i.e.,

23   "how the proliferation of weaponry and related technical data would impact world peace,

24   national security, and foreign policy." *Id.* at *8, 10. "Second, the agency failed to identify

25   substantial evidence in the administrative record explaining a change of position that necessarily

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    contradicts its prior determinations and findings regarding the threats posed by the subject CAD

2    files and the need to regulate the same under the AECA." *Id.* at *10.

3        96.    As the Court found, notwithstanding the State Department's assertion in the

4    Temporary Modification that it "has determined that it is in the interest of the security and foreign

5    policy of the United States" to remove Firearm Files from the Munitions List, the State

6    Department in fact "evaluated the export controls on small caliber firearms only through the

7    prism of whether restricting foreign access would provide the United States with a military or

8    intelligence advantage"—without adequately considering world peace, national security, and

9    foreign policy pursuant to AECA. *Id.* at *8. Furthermore, "[l]ess than two months before the

10   NPRMs were published, the State Department had taken the position that 3D-printed weapons

11   posed unique threats to world peace, national security, and the foreign policy of the United

12   States," as documented in the administrative record. *Id.* at *9. The Court found that, by issuing

13   the Temporary Modification and Letter, and as shown in the NPRMs, "[t]he agency has simply

14   abandoned, without acknowledgement or analysis, its previous position and has sub silentio

15   found that delisting is consistent with world peace, national security, and U.S. foreign policy

16   despite explicit, recent findings to the contrary." *Id.*

17       **3.    The Final Rules deregulating 3D-printed guns**

18       97.    Despite all of the above, the federal government has continued its effort to fulfill

19   the Defense Distributed Settlement Agreement by removing Firearm Files from the Munitions

20   List and effectively deregulating them.

21       98.    On or about November 12, 2019—the same day this Court granted summary

22   judgment in the prior case—Defendants notified Congress of the Final Rules at issue.

23       99.    As promised in the *Defense Distributed* Settlement Agreement, the State Final

24   Rule removes all non-automatic firearms up to .50 caliber and any related, unclassified technical

25   data from the Munitions List. As proposed in the NPRMs, the Final Rules transfer jurisdiction

26   of all Category I Munitions List items from the State Department to the Commerce Department,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ                                   31                    ATTORNEY GENERAL OF WASHINGTON
                                                                                    Complex Litigation Division
                                                                                    800 5th Avenue, Suite 2000
                                                                                      Seattle, WA 98104-3188
                                                                                        (206) 474-7744

including Firearm Files. The Commerce Final Rule provides that those items will instead be subject to the EAR.

100.   Despite this Court's clear direction in the prior *Washington* litigation that the State Department cannot remove items from the Munitions List without considering how the proliferation of technical data for the automatic production of 3D-printed guns would impact world peace, national security, and foreign policy, the Department made no meaningful attempt to do so. Further, the Department once again failed to provide a reasoned explanation for its reversal of position on controlling the export of Firearm Files.

101.   The Commerce Final Rule is the first document in the formal rulemaking proceeding in which the federal government explicitly discloses that this jurisdictional transfer implicates Firearm Files. The Commerce Final Rule contains provisions specifically pertaining to Firearm Files that were not included in the Commerce NPRM.

102.   In particular, the Commerce Final Rule provides that, notwithstanding the general exception from jurisdiction for "published" items (*see supra* ¶ 83), the Commerce Department will retain jurisdiction over a narrow subset of Firearm Files: i.e., files "for the production of a firearm, or firearm frame or receiver" that are "made available by posting on the internet in electronic format" and are "ready for insertion" into a computer or other machine that "makes use" of the files "to produce the firearm frame or receiver or complete firearm." Commerce Final Rule § 734.7(c); *see also id.* § 732.2(b). **Attachment 3** hereto reflects the changes made by the Commerce Final Rule to 15 C.F.R. § 734.7.

103.   As noted above, the Commerce Department's lack of jurisdiction over "published" software and technology creates a self-executing loophole whereby anyone can largely deprive Commerce of jurisdiction over Firearm Files simply by publishing them. Defense Distributed has already published at least some of its Firearm Files, including the files for the Liberator pistol, by posting them on its public website. *See supra* ¶¶ 57, 90. Such posting does not require government pre-approval to constitute "publication"—whereas under ITAR, pre-

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

approval is required. Under the Commerce Final Rule, only a very narrow subset of published Firearm Files remains nominally subject to export control, while glaring loopholes make it easy to export and disseminate Firearm Files without a license and without any restrictions.

104.     First, the Final Rules authorize published Firearm Files to be exported by any means other than "posting on the internet"—such as, for example, email, direct file transfer, or transfer via a physical hard drive. Such exports will not be restricted in any way, as they will be entirely outside Commerce's jurisdiction. For example, a company like Defense Distributed could advertise the availability of its already-published CAD files on the internet, then email the files directly to any foreign individual or organization that requests them, without ever implicating Commerce's export-control jurisdiction (because the files are never "post[ed] on the internet"). Such foreign recipients of Firearm Files may have links to terrorism or organized crime, or otherwise pose security threats. This enables the very scenario the State Department feared as of April 2018: that if Firearm Files are exported "beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." The Commerce Department currently purports to share the same fears: "As the State Department noted in the *Defense Distributed* litigation, unrestricted export of such files abroad could have a potential detrimental effect on aspects of U.S. national security and foreign policy," warranting export control. State Final Rule, State Final Rule, 85 Fed. Reg. 3819.

105.     Second, once Firearm Files are lawfully exported as described above, they will be in the hands of foreign recipients and beyond the reach of U.S. export control, and such foreign recipients can post them on the internet at will. As established in the prior litigation, internet posting makes Firearm Files available worldwide (including *within* the United States), because "the fact is that the internet is both domestic and international." *Washington*, 318 F. Supp. at 1255. This simple end-run around Commerce's purported jurisdiction over Firearm Files will be the inevitable, direct result of the Final Rules.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

106.    Third, the Commerce Final Rule's toothless prohibition on internet posting is limited to Firearm Files in formats "such as AMF or G-code" that are "ready for insertion into . . . equipment" that uses the files "to produce the firearm frame or receiver or complete firearm." Commerce Final Rule § 734.7(c). This limited retention of jurisdiction excludes files that are technically *not* in a format readable by a 3D printer, but that can easily be converted to a readable format. CAD files, for instance, are typically design files that do not communicate directly with a 3D printer, but commercially available or free 3D-printing software can easily convert these design files into a format that can be read by a 3D printer. *See Washington*, 2019 WL 5892505, Dkt. # 43-2 at 58–64 (Decl. of Shwetak Patel, Ph.D) ¶¶ 10–13. Under the Commerce Final Rule's plain text, such files would be entirely outside Commerce's jurisdiction and could be posted on the internet by anyone, from anywhere. For example, Defense Distributed could its CAD files of "non-insertable" file types on the internet with no restrictions. In this way, the federal government will have fulfilled its promise in the Settlement Agreement to authorize the "unlimited distribution" of such files.

107.    Fourth, the Commerce Final Rule appears to limit export-control jurisdiction to certain published Firearm Files that are *already* "made available" by internet posting. *See* Commerce Final Rule § 734.7(c). The "made available" jurisdictional trigger—which is in the past or present tense—appears to limit the Commerce Department to after-the-fact regulation only, i.e., once the files are already posted online and the damage is done. Once Firearm Files are broadly released on the internet, they cannot feasibly be clawed back from everyone who has downloaded them.

108.    Fifth, the Commerce Final Rule's limited retention of jurisdiction only applies to Firearm Files "for the production of a firearm, or firearm frame or receiver," without retaining any jurisdiction over Firearm Files for the production of other key firearm "components"—such as the barrel or magazine. *See* Commerce Final Rule § 734.7(c). Currently, Category I of the Munitions List includes not only technical data related to controlled firearms, but also technical

34

data related to "[c]omponents, parts, accessories and attachments" for controlled firearms. 22 C.F.R. § 121.1. Under the Final Rules, the latter would nominally be transferred to Commerce's purview, but Commerce would not retain export-control jurisdiction over published Firearm Files for the production of "components" other than the frame or receiver.

109.   In addition to suffering from the severe limitations and loopholes described above, the Final Rules vest the Commerce Department with discretion to grant licenses permitting unrestricted internet posting from within the United States. Further, whereas items on the Munitions List cannot be removed absent 30 days' notice to Congress, *see* 22 U.S.C. § 2778(f)(1), items on the Commerce Control List are not subject to any such notice requirement.

110.   The Commerce Final Rule does not indicate what criteria the Commerce Department would apply, if any, in deciding whether to grant or deny a license application. Nor does it say what restrictions, if any, the Commerce Department would place on any licenses to export Firearm Files. For example, the EAR's provisions for end-user and end-use restrictions do not appear to apply to Firearm Files. *See* 15 C.F.R. § 736.2.

111.   In sum, if the Final Rules go into effect on March 9, 2020, as scheduled, the State Department will no longer have jurisdiction over downloadable gun files, Congress will no longer have direct oversight over such files, and the Commerce Department under its regulations will lack any meaningful jurisdiction to regulate the export of such files once they are published. In promulgating these two Final Rules together, the federal government is authorizing the circumvention of the very laws it is entrusted to enforce to protect U.S. national security and foreign policy interests.

112.   Despite this impending sea change in the regulation of Firearm Files, neither the State NPRM nor the Commerce NPRM gave adequate notice of their implications for 3D-printable gun files. Indeed, the Commerce NPRM misleadingly claims that "[t]his proposed rule does not deregulate the transferred items." (The Commerce Final Rule makes the same claim,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    despite the fact that it takes the unprecedented step of making published Firearm Files generally

2    exportable.)

3        113.    Moreover, the government failed to provide notice of the Commerce Final Rule's

4    provisions regarding Commerce's purported retention of limited jurisdiction over Firearm Files

5    "post[ed] on the internet . . . ." This deprived the public of an opportunity to comment on the

6    significant problems with that essentially meaningless retention of jurisdiction—namely, that the

7    new regulatory regime has so many loopholes and is so easily circumvented that it is essentially

8    meaningless.

9        114.    The Final Rules are an outgrowth of the same arbitrary and capricious process as

10   the agency actions at issue in the prior *Washington* litigation. Like the NPRMs and the State

11   Department's Temporary Modification and Letter, the Final Rules wholly reverse the federal

12   government's previous position that Firearm File exports should be prohibited in light of their

13   unique threats to world peace, national security, and foreign policy interests. The Final Rules are

14   based on the same or substantially the same administrative record previously before this Court,

15   which demonstrated arbitrary and capricious agency decisionmaking. And the Final Rules fulfill

16   the federal government's promise in the Settlement Agreement to "fully pursue" the rulemaking

17   that the Temporary Modification and Letter sought to preemptively implement.

18       115.    The federal government's decision to remove Firearm Files from the Munitions

19   List and deregulate them appears to have been made long ago, when it entered the *Defense*

20   *Distributed* Settlement Agreement in April 2018. In making its decision, the federal government

21   failed to consider public comments, failed to consider important aspects of the problem, and

22   failed to explain its change of position that contradicts previous factual findings. *See*

23   *Washington*, 2019 WL 5892505, at *3, 10.

24       116.    As with the Temporary Modification and Letter, the Final Rules fail to explain

25   the government's complete reversal of its previous policy that Firearm Files should be regulated

26   under AECA, *see* 22 U.S.C. § 2778(a)(1)—despite acknowledged concerns regarding their

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

impact on world peace and U.S. security and foreign policy. Previously, the State Department's policy of maintaining Firearm Files on the Munitions List was based on substantiated concerns that the widespread availability of untraceable, undetectable 3D-printed guns could be used in assassinations, hijacking, and terrorism, that 3D-printed guns could be used by rogue actors to evade embargos and create their own weapons using readily available materials, and that the international availability of 3D-printed guns would undermine the domestic laws of nations with more restrictive firearms laws, and thus undermine U.S. relationships with those nations. The prior policy is "well-documented in the administrative record." *Washington*, 2019 WL 5892505, at *9.

117.    Now, however, the State Department has removed Firearm Files from the Munitions List solely because it determined that they "do not confer a critical military or intelligence advantage and are not inherently military based on their function." State Final Rule, 85 Fed. Reg. 3819. The Court previously found that this rationale is inadequate. *See Washington*, 2019 WL 5892505, at *8.

118.    Meanwhile, the Commerce Final Rule nominally re-adopts the prior government policy reflecting the unique threats posed by Firearm Files, even as Commerce promulgates a deregulatory rule inconsistent with that policy.

119.    In sum, the Final Rules are the culmination of the federal government's covert agreement to deregulate Firearm Files, following the opaque NPRMs and the unlawful Temporary Modification and Letter. The Final Rules are final agency actions that failed to comply with APA procedural requirements, are contrary to law, and are arbitrary and capricious. The Final Rules have far-reaching implications for national security and the safety and security of the Plaintiff States and their residents.

F.    **Adverse Effects on the States' Public Safety Laws**

120.    The Plaintiff States in this matter have their own extensive and comprehensive statutory and regulatory schemes regarding firearms. The aim of the States' laws is the same: to

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    protect the public by keeping guns out of the hands of those who should not possess them—

2    minors, convicted felons, the mentally ill, and those subject to protective and no-contact orders.

3    The States' ability to protect the public will be seriously undermined if the Final Rules are

4    allowed to stand. This action will make it far easier for anyone—including foreign bad actors

5    and individuals ineligible to possess firearms—to easily obtain untraceable and undetectable

6    firearms with the click of a button.

7              **1.      Washington's Firearms Laws**

8          121.    The State of Washington has a comprehensive statutory scheme regulating the

9    possession, licensing, registration, and use of firearms and dangerous weapons—including,

10   specifically, 3D-printed firearms and Firearm Files. *See* Chapter 9.41 RCW.

11         122.    These laws promote public safety by keeping guns out of the hands of those who,

12   for various reasons, should not have access to them, including minors, persons convicted of

13   violent felonies, the mentally ill, and persons subject to various protection and no-contact orders.

14         123.    As noted, Defense Distributed's mission is to eviscerate *any* regulation of

15   firearms by providing to anyone—including the categories of persons just mentioned—the

16   ability to easily manufacture firearms that can evade metal detectors, are untraceable because

17   they carry no identifying markings, and shoot bullets that cannot be forensically linked to the

18   gun. Defendants' unlawful actions in effectively deregulating Firearm Files—including those

19   Defense Distributed will undoubtedly export and disseminate once the Final Rules go into

20   effect—and placing them instead under the aegis of an agency that effectively lacks jurisdiction

21   over them, will allow Cody Wilson and others like him to achieve their dream.

22         124.    Indeed, Defendants' unlawful actions will cripple Washington's ability to enforce

23   its firearm and dangerous weapons regulations—to the great detriment of the public and public

24   safety.

25         125.    Washington law expressly outlaws undetectable 3D-printed guns, providing that

26   it is unlawful for any person to "manufacture, own, buy, sell, loan, furnish, transport, or have in

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

possession or under control, any . . . undetectable firearm," and prohibiting the manufacture of any untraceable firearm with the intent to sell it. Wash. Rev. Code § 9.41.190.

126.    Washington law prohibits certain persons from obtaining or possessing firearms. For example, persons cannot possess firearms if they have been convicted or found not guilty by reason of insanity of crimes including serious felony offenses and certain crimes committed by one family member against another (e.g., stalking, reckless endangerment, coercion). Wash Rev. Code §§ 9.41.040(1), (2)(a)(i)-(ii). Persons subject to a variety of protection and no contact orders are also prohibited from possessing firearms.[13] Wash. Rev. Code § 9.41.040(2)(a)(iii). Persons who have been involuntarily committed for mental health treatment may not possess firearms. Wash. Rev. Code § 9.41.040(2)(a)(iv). Finally, persons under the supervision of the Washington Department of Corrections cannot possess firearms or ammunition. Wash. Rev. Code § 9.41.045.

127.    Washington law also has set up an extensive system of rules to ensure these persons cannot buy firearms. For example, a person who applies to buy a pistol from a dealer must provide a laundry list of information, including his or her name, residential address, date and place of birth, driver's license number or state identification card number, and statement that the buyer is eligible under Washington law to possess the gun, as well as a description of the gun, including the make, model, caliber and manufacturer's number. Wash Rev. Code § 9.41.090(5). The dealer cannot deliver the pistol to the buyer, even if he or she is eligible to possess the gun, unless the manufacturer's number for the gun is recorded on the application and transmitted to the local police chief or sheriff where the buyer lives. *Id.* § 9.41.090(6)(iv). The dealer must keep a record in a book of each pistol sold, including information about the person buying the weapon (e.g., name, address, etc.) and the weapon (e.g., caliber, make, model and manufacturer's number), and the book must be signed by both the buyer and the dealer in one

---

[13] These include sexual assault protection orders (Wash Rev. Code 7.90), stalking protection orders (Wash. Rev. Code 7.92), anti-harassment protection orders (Wash Rev. Code 10.14), and domestic violence protection orders (Wash. Rev. Code 26.50).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

39

another's presence. *Id.* § 9.41.110(9)(a). The dealer is also obligated to give to the buyer a copy of a pamphlet advising the buyer of legal restrictions on the use of firearms and firearms safety. *Id.* § 9.41.090(6)(b)(ii).

128.    One of the cornerstones of Washington's firearms regulatory structure is the use of background checks. [14] Wash. Rev. Code § 9.41.113(1). This includes not just sales by dealers, but also sales or transfers at gun shows and online. *Id.* Even sales or transfers between unlicensed parties must be run through a licensed dealer in order to ensure that a background check is completed. Wash Rev. Code § 9.41.113(3). The purpose of the background check is simple and obvious: to ensure that persons prohibited by law from possessing firearms are unable to do so. It is a crime under Washington law to "knowingly or recklessly allow, facilitate, aid, or abet the manufacture or assembly of an undetectable firearm or untraceable firearm" by a person ineligible to possess a firearm, such as by transferring Firearm Files to such a person absent a background check. Wash. Rev. Code 9.41.325.

129.    The Final Rules at issue will effectively authorize the global dissemination of Firearm Files for the automated production of 3D-printed weapons, making it far easier for individuals to evade Washington's laws prohibiting certain categories of persons from protecting firearms. Such persons will simply be able to print their own firearms without undergoing a background check or making a purchase from a licensed dealer.

130.    If the Final Rules go into effect, the State of Washington stands to suffer extreme and irreparable harm. Persons ineligible to possess firearms under Washington law will easily be able to obtain downloadable guns that they can produce at home using a 3D printer. Further, absent any meaningful restrictions on exporting Firearm Files, foreign persons who may reside in or may enter Washington will have unrestricted access to Firearm Files. Washington law

---

[14] The exceptions to this rule are extremely limited (e.g., transfers between immediate family members, antique firearms, to prevent imminent death or great bodily harm, etc.). RCW 9.41.113(4).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    enforcement will have no means of detecting such weapons using standard equipment such as

2    metal detectors, and no means of tracing such weapons because they have no serial numbers.

3        131.    3D printers are widely available to the general public in Washington. For

4    example, Amazon has hundreds of 3D printers on its website for sale to the public. In addition,

5    such printers are widely accessible at Washington colleges and universities, including the

6    University of Washington in Seattle. *See, e.g.*, https://itconnect.uw.edu/learn/workshops/3d-

7    printing-consultation/ (University of Washington); https://vcea.wsu.edu/fiz/3d-printing/

8    (Washington State University); https://www.cwu.edu/multimodal-education/3d-printing

9    (Central Washington University).

10       132.    In sum, the Final Rules will cripple the State of Washington's ability to exercise

11   its sovereign police powers and secure public safety.

12       **2.    California's Firearms Laws**

13       133.    California's Dangerous Weapons Control Law contains a comprehensive set of

14   statutes regulating firearms. Cal. Penal Code §§ 16580, 23500.

15       134.    Ghost guns are a source of growing concern in California. They have been used

16   in at least three mass shootings in the State: one at Saugus High School in November 2019, one

17   in Rancho Tehama Reserve in 2017, and one in Santa Monica in 2013. Recently, federal and

18   local law enforcement officials arrested ten suspects in a Hollywood ghost gun ring that was

19   supplying guns to criminals. One official involved in the arrests noted a trend among Southern

20   California gangs of making ghost guns, while an LAPD official noted that ghost guns are "ending

21   up in the hands of some of our most violent street gangs here in Los Angeles."

22       135.    The actions taken by the Government and Defense Distributed will exacerbate

23   this problem, undermining California's firearms laws and harming the public. The following

24   allegations provide examples of the laws that would be undermined.

25

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

### a.     California's Unsafe Handgun Act

136.     In 1999, the California Legislature enacted the Unsafe Handgun Act in response to the proliferation of low-cost, cheaply made handguns that are disproportionately used in crimes. *Fiscal v. City and Cty. of San Francisco*, 158 Cal. App. 4th 895, 912 (2008). Before a handgun may be manufactured, imported, sold, or transferred in California, it must pass a test by an independent, certified laboratory establishing that the gun satisfies certain safety requirements. Cal. Penal Code § 32010. For instance, revolvers and pistols must pass a drop-safety test and satisfy certain firing requirements. Cal. Penal Code §§ 31900, 31905. In general and barring specific exemptions, pistols that have not been grandfathered in under the Act must come equipped with chamber load indicators, magazine disconnects, and microstamping technology that imprints identifying information on expended cartridge casings. Cal. Penal Code § 31910(b)(4), (7). Pistols that do not satisfy these requirements may not be manufactured, imported, sold, or transferred in California. Cal. Penal Code § 32000. It is improbable that any 3D printed pistol would come under an exemption or be grandfathered in, meaning it would have to comply with these requirements before it could be lawfully possessed in the State.

137.     Firearm Files allow criminals to easily thwart these requirements. And law abiding citizens who use those files to make a handgun using a 3D printer run the risk of violating state law, since any handgun printed and assembled (i.e., manufactured) would be illegal unless it was made for submission and testing purposes to comply with the Unsafe Handgun Act.

### b.     California regulates machine guns, assault rifles, and large-capacity magazines

138.     California prohibits the manufacture and possession of military-style firearms and large capacity magazines. It is a felony to manufacture a machinegun or assault rifle or convert a firearm into a machinegun or assault weapon. Cal. Penal Code § 30600, 32625;

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

42

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    *see also* Cal. Penal Code §§ 30510, 30515. It is also a crime to manufacture magazines that hold

2    more than ten rounds. Cal. Penal Code §§ 16740, 16150, 32310.

3         139.    The Final Rules will effectively deregulate Firearm Files that, upon information

4    and belief, would allow these prohibited military-style weapons to be manufactured within

5    California in contravention of California law.

6              **c.    California regulates the purchase, sale, and transfer of firearms**

7         140.    California also addresses gun violence and crime through a comprehensive

8    scheme regulating the sale and transfer of firearms. These laws ensure that firearms sales and

9    transfers are overseen by licensed firearms dealers. Cal. Penal Code §§ 26500, 28050.

10   Employees of these firearms dealers must pass a background check, and the dealers must

11   conducted business in designated buildings (with exceptions for gun shows). Cal. Penal Code §§

12   26915, 26805. Among other important laws, licensed firearms dealers implement California's

13   ten-day waiting period laws. Cal. Penal Code §§ 26815, 27540. These laws prevent prohibited

14   persons from acquiring firearms and ensure that purchasers have a cooling-off period, which

15   reduces violent crime and suicide.

16        141.    Firearm Files that will soon be deregulated promote evasion of these protections.

17             **d.    California law prohibits certain persons from possessing firearms**

18        142.    California law prohibits many classes of people from possessing firearms. By

19   way of illustration, minors may not possess handguns or live ammunition. Cal. Penal Code

20   §§ 29610, 29650. Those convicted of a felony, or who have an outstanding warrant for a felony,

21   may not possess any firearm. Cal. Penal Code § 29800. Those convicted of certain

22   misdemeanors, including domestic violence and threatening public officials, may not possess

23   firearms. Cal. Penal Code § 29805. And those who are receiving inpatient treatment for a mental

24   disorder or who have communicated a threat of physical violence to their licensed

25   psychotherapist may not possess firearms. Cal. Welf. & Inst. Code § 8100.

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

43

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

143.   The Final Rules effectively deregulating 3D-printable gun files will remove regulatory barriers in place that prevent these prohibited classes from obtaining firearms.

### 3.   Colorado's Firearms Laws

144.   Colorado regulates the possession, sale, and transfer of firearms within the state, including by requiring background checks for firearms transfers between private individuals and at gun shows. Colo. Rev. Stat. §§ 18-12-11; 12-26.1-101. The state also bans certain dangerous weapons and prohibits certain categories of persons from purchase or possession of a firearm. Colo. Rev. Stat. §§ 18-12-102(1); 18-12-108.5(1); 18-12-108(1).

145.   Like many states, Colorado prohibits concealed carry of firearms without a permit, Colo. Rev. Stat. § 18-12-105, and also prohibits members of the general populace from carrying firearms on school grounds, Colo. Rev. Stat. §§ 18-12-105.5, 18-12-214(3), or from carrying firearms in public buildings equipped with security screening. § 18-12-214(4). Because they have few metal parts, can be acquired by ineligible individuals without a background check, and are virtually untraceable, printable firearms can be used to evade all of these statutory restrictions.

146.   Colorado prohibits outright the possession of firearm silencers, machine guns, short shotguns, short rifles, and ballistic knives. Colo. Rev. Stat. § 18-12-102(1).

147.   Under Colorado law, individuals under the age of eighteen are generally prohibited from possessing handguns, Colo. Rev. Stat. § 18-12-108.5(1)(a), and certain previous offenders are generally barred from firearm possession altogether. Colo. Rev. Stat. § 18-12-108(1). Individuals subject to civil protection orders may not possess or attempt to purchase or receive a firearm while the protection order is in effect, Colo. Rev. Stat. § 18-6-803.5(1)(c), and in fact must generally surrender any firearms in their possession within 24 hours of being served with a qualifying order. Colo. Rev. Stat. § 18-1-1001(9).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

44

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

148.   To effectuate these provisions and other similar restrictions on firearm possession, Colorado requires virtually all private firearms sales, including those at gun shows, to be preceded by a background check. Colo. Rev. Stat. §§ 18-12-112; 12-26.1-101.

149.   The Final Rules will undermine Colorado's efforts to prevent the proliferation of dangerous weapons and to ensure that those ineligible to possess firearms under state law are not able to obtain them. Rather than purchasing a firearm from a dealer or private individual, which transfer would generally require a background check, an individual ineligible to legally possess a firearm could simply purchase a 3D printer, download the plans, and manufacture an untraceable firearm at home within a matter of hours. This safety risk is of particular concern to Colorado, in light of the history of tragic mass shootings in the State, including shootings that have taken place on school grounds. Examples include the shooting at Columbine High School in 1999, which claimed the lives of 12 students and one teacher, as well as the lives of the two shooters. In 2012, a mass shooting at an Aurora, Colorado movie theater claimed the lives of 12 additional victims. Hundreds more innocent victims have been killed or injured in other shooting events in Colorado's recent history.

### 4.   Connecticut's Firearms Laws

150.   Connecticut comprehensively regulates the possession, sale and transfer of all firearms within and into the state and bans the most dangerous military-style firearms completely. It also regulates the classes of people who may lawfully possess otherwise lawful firearms and prohibits individuals from possessing firearms who pose the most serious threat to public safety, and in some instances, themselves.

### a.   Connecticut's regulation of all lawful firearm owners

151.   In Connecticut, people who wish to possess handguns—pistols or revolvers—are required to have a valid pistol permit; an eligibility certificate to purchase pistols or revolvers; an eligibility certificate to purchase long guns, or be a police officer or one of the exemptions listed in law. Not everyone who wishes to have a pistol permit in Connecticut is granted one; he

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

or she must be a suitable person to receive such permit. Conn. Gen. Stat. § 29-28. Individuals who wish to possess a pistol or revolver must satisfy basic safety training requirements. Conn. Gen. Stat. § 29-36f(b); Conn. Gen. Stat. § 29-28 (b).

> **b.  Connecticut's regulation of sale, purchase, and transfer of possession of all firearms, even between lawful firearm owners**

152.    Connecticut closely regulates the sale and transfer of all firearms, even between lawful firearm owners. In Connecticut, no person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver to any person who is prohibited from possessing a pistol or revolver. Conn. Gen. Stat. § 29-33(a). The purchaser of a pistol or revolver must have a valid permit to carry a pistol or revolver. Conn. Gen. Stat. § 29-33(b). Compliance with these requirements is ensured by requiring all sales or transfers of pistols or revolvers in Connecticut be made through a process established by the Connecticut Department of Emergency Services and Public Protection. Conn. Gen. Stat. § 29-33(c).

153.    Similarly, Connecticut regulates the sale and transfer of long guns such as rifles and shotguns. All parties to such transfers must ensure, through a process established by the Connecticut Department of Emergency Services and Public Protection, that the purchaser of the long gun has a valid long gun eligibility certificate that has not been revoked or suspended. Conn. Gen. Stat. § 29-36*l*(f).

154.    Connecticut regulation also restricts how many firearms a person can sell a year without becoming a federally licensed firearm dealer or obtaining a permit. Conn. Gen. Stat. § 29-28.

155.    Unlike many states, Connecticut's firearm regulations extend to the sales, transfers or exchanges taking place at "gun shows." Connecticut requires that gun show sellers obtain an authorization number from the Connecticut Special Licensing and Firearms Unit. Conn. Gen. Stat. § 29-37g(c).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
2

        **c.**    **Connecticut's prohibition on possession of a firearm by certain persons**

3
4
5
6
7
8
9

156.    Connecticut prohibits certain persons from obtaining or possessing firearms. For example, persons cannot possess firearms if they have been convicted or found not guilty by reason of insanity of crimes including serious felony offenses and certain crimes committed by one family member against another. Conn. Gen. Stat. § 53a-217. No person convicted for a felony or a misdemeanor crime of domestic violence involving the use or threatened use of physical force or a deadly weapon may possess any firearms in Connecticut. Conn. Gen. Stat. § 29-36f(b); Conn. Gen. Stat. § 29-28 (b).

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

157.    The types of crimes that render someone ineligible to possess a firearm in Connecticut are wide ranging and include: 1) illegal possession of narcotics or other controlled substances; 2) criminally negligent homicide; 3) assault in the third degree; 4) assault of a victim 60 or older in the third degree; 5) threatening; 6) reckless endangerment in the first degree; 7) unlawful restraint in the second degree; 8) riot in the first degree; 9) riot in the second degree; 10) inciting to riot; 11) stalking in the second degree; or 12) anyone who has been convicted as a delinquent for the commission of a serious juvenile offense, 13) anyone who has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect; 14) anyone who has been confined in a hospital for persons with psychiatric disabilities within the preceding sixty months by order of a probate court; 15) anyone who has been voluntarily admitted to a hospital for persons with psychiatric disabilities within the preceding six months for care and treatment of a psychiatric disability and not solely for alcohol or drug dependency; 16) anyone who is subject to a firearms seizure order issued pursuant to Connecticut General Statute Section 29-38c after notice and an opportunity to be heard has been provided to such person; 17) anyone who is an alien illegally or unlawfully in the United States; 18) anyone who satisfies any of the federal disqualifiers listed in Title 18 U.S.C. Chapter 44. *See* Conn. Gen. Stat. § 29-28(b); Conn. Gen. Stat. § 29-36f(b).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

158.   Connecticut also prohibits a person under the age of 21 years of age from obtaining a pistol or revolver. Conn. Gen. Stat. § 29-36f(a).

### d.   Connecticut's regulation of assault weapons and machine guns

159.   Connecticut prohibits the possession of an assault weapon or any "part or combination of parts" that can be readily assembled into an assault weapon, Conn. Gen. Stat. § 53-202c unless the owner obtained a Certificate of Possession prior to January 1, 2014. Conn. Gen. Stat. § 53-202d.

160.   Any Connecticut resident who owns a fully automatic weapon or machine gun is required to complete a state form registering that firearm with Connecticut immediately upon receiving it, and upon an annual basis. Conn. Gen. Stat. § 53-202(g).

161.   The Final Rules effectively deregulating 3D-printable gun files will nullify the State of Connecticut's laws prohibiting certain categories of persons from possessing firearms.

162.   If the Final Rules enter into effect, the State of Connecticut stands to suffer extreme and irreparable harm. Persons ineligible to possess firearms under Connecticut law will easily be able to obtain downloadable guns that they can produce at home using a 3D printer. Connecticut law enforcement will have no means of detecting such weapons using standard equipment such as metal detectors, and no means of tracing such weapons because they have no serial numbers.

163.   In sum, the Government's actions are an extreme infringement on the State of Connecticut's sovereign right to enact and enforce its public safety laws.

### e.   Connecticut's prohibition on the manufacture and transfer of ghost guns

164.   In 2019, Connecticut passed legislation to address the growing problem of untraceable and undetectable firearms. *See generally,* Conn. Public Act 19-6, "*An Act Concerning Ghost Guns,*" (effective October 1, 2019). Connecticut now expressly prohibits anyone from manufacturing a firearm without engraving it with a unique serial number or marking that is

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

obtained from and registered with Connecticut law enforcement. *Id* at § 2(a). Connecticut also prohibits the manufacturing of firearms that can evade metal detectors, or assisting prohibited persons from manufacturing them. *Id* at § 4(a).

### 5.   Delaware's Firearms Laws

165.   Delaware protects the public by prohibiting machine guns, the irresponsible sales of firearms, and the unauthorized possession and use of firearms by certain categories of persons who constitute dangerously high levels of risk to others. Delaware's scheme to provide this protection will be rendered entirely ineffective if the Final Rules enter into effect. Delaware will be substantially and irreparably harmed if it is unable to enforce its laws to protect individuals in Delaware from these risks and ensure public safety and security.

166.   Delaware restricts the possession of firearms by several categories of individuals through the crime Possession of a Deadly Weapon by a Person Prohibited, with some narrow exceptions. *See* 11 *Del. C.* § 1448. Persons convicted of felony offenses in Delaware or elsewhere, persons who have been civilly committed due to a serious mental illness and are a danger to themselves or others, those convicted of drug offenses, those convicted of crimes of domestic violence or who are subjects of a Protection from Abuse Order, those who fail to appear for court when charged with a felony, and those who possess illegal drugs and firearms at the same time are all prohibited from possessing firearms by Delaware law. Delaware has determined that each of these categories of individuals create an unreasonably high risk of danger if permitted to possess a firearm. A conviction under this statute, where the person's prohibited status is based on a violent prior conviction, requires a mandatory minimum period of incarceration of 3 years or longer in prison. 11 *Del. C.* § 1448 (e). Defendants' actions subvert Delaware's judgment and ignores the high risk to people living, working, and visiting Delaware.

167.   Delaware requires criminal history background checks as a precondition, again with narrow exceptions, to the sale of any firearm in the State of Delaware by licensed or unlicensed sellers or transferors. 11 *Del. C.* §§ 1448A, 1448B. This requirement will be entirely

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

49

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

frustrated if the Government's course of action is permitted to proceed. Defendants' actions assist with transfers in violation of Delaware law and therefore substantially undermines Delaware's compelling state interests.

168.     In Delaware, it is also a crime to give a firearm to a person prohibited, 11 *Del. C.* § 1454, to unlawfully permit a minor access to a firearm, 11 *Del. C.* § 1456, and to possess a machine gun or any weapon adaptable for use as a machine gun, 11 *Del. C.* § 1444. The Government's actions obviate Delaware's statutory protections, muddles an important enforcement paradigm, and creates an unnecessary conflict with state law.

169.     Each of these vital, protective measures designed to keep the Delaware public safe and secure are vitiated if Defendants' actions are implemented. Long-standing regulations designed to foster community safety are rendered meaningless if any person can turn on a computer and 3D printer in the privacy of their home and cheaply and quickly manufacture a fully-functioning firearm. Lacking any serial number, Delaware will be unable to trace these firearms. Because they are made of non-metallic components, these firearms will easily evade detection in public spaces. Defendants' actions in encouraging and facilitating the violation of Delaware laws not only constitutes a gross encroachment on Delaware's constitutional and sovereign authority to exercise reasonable and long-respected police powers, it puts people in Delaware at unacceptable levels of unjustified risk.

### 6.     The District of Columbia's Firearms Laws

170.     The District of Columbia, like the States, has a comprehensive statutory scheme regulating the possession, licensing, and registration of firearms. Certain types of weapons are prohibited entirely.

171.     District of Columbia law prohibits certain persons from registering firearms.[15] For example, persons cannot register firearms if they have been acquitted by reason of insanity

---

[15] Registration is a prerequisite to firearm possession and carrying in the District of Columbia. D.C. Code § 7-2502.01(a). *See also* D.C. Code § 22-4504 (license required to carry firearm within the District "either openly or concealed").

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

50

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

within the last five years, or have been voluntarily or involuntarily committed to a mental hospital or institution in that time. D.C. Code § 7-2502.03. Other persons prohibited from registering firearms include persons convicted of a felony, persons with a history of violent behavior, under indictment for a crime of violence or a weapons offense, or convicted within the previous five years of: (a) use, possession, or sale of any narcotic or dangerous drug; (b) assault or threats; (c) two or more impaired driving offenses; (d) intrafamily offenses punishable as misdemeanors; or (e) stalking. D.C. Code § 7-2502.03(a)(2)–(4).

172.    The District of Columbia also prohibits the registration of certain types of firearms, including "unsafe" pistols, assault weapons, and .50 caliber firearms. D.C. Code §§ 7-2502.02, 7-2501.01(3A)(A) (defining "assault weapon").

173.    One of the cornerstones of the District of Columbia's firearms regulatory structure is the use of background checks. All persons seeking to register a firearm (or obtain a license to carry concealed) are subject to background checks. D.C. Code § 7-2502.04(a); § 22-4506. The purpose of the background check is simple and obvious: to ensure that persons prohibited by law from possessing firearms are unable to do so.

174.    The Final Rules effectively deregulating 3D-printable gun files quite literally nullify the District of Columbia's laws prohibiting certain categories of persons from possessing firearms.

175.    If the Final Rules enter into effect, the District of Columbia stands to suffer extreme and irreparable harm. Persons ineligible to possess firearms under District of Columbia law will easily be able to obtain downloadable guns that they can produce at home using a 3D printer, and even produce guns which are explicitly prohibited in the District because they are assault weapons such as the AR-15. See D.C. Code Sec. 7-2501.01(3A)(A) (defining assault weapons). District of Columbia law enforcement will have no means of detecting such weapons using standard equipment such as metal detectors, and no means of tracing such weapons

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO. 20:2-cv-00111-RAJ

51

ATTORNEY GENERAL OF WASHINGTON Complex Litigation Division 800 5th Avenue, Suite 2000 Seattle, WA 98104-3188 (206) 474-7744

because they have no serial numbers. In sum, the Government's actions are an extreme infringement on the District of Columbia's right to enact and enforce its public safety laws.

176.    Since the filing of the complaint in the prior *Washington* matter, the District enacted the Firearms Safety Omnibus Amendment Act of 2018, codified at D.C. Code Sec. 7-2502.03 *et seq.* (eff. May 10, 2019), which, in addition to prohibiting the possession of "bump stocks," created a judicial process to allow persons to petition the Superior Court of the District of Columbia for an "extreme risk protection order," which would prohibit the possession of firearms by anyone "who poses a significant danger of causing bodily injury to self or others."

177.    The Council of the District of Columbia has also introduced, but not yet passed, the Ghost Guns Prohibition Amendment Act of 2019, Bill 23-0018, which would prohibit the manufacture, sale, or possession of firearms that cannot be detected by metal detectors.

### 7.    Hawaii's Firearms Laws

178.    Hawaii's firearm death rate—2.5 deaths per 100,000 persons in 2017—is very low compared to other states, and Hawaii's extensive scheme of firearm regulation is likely part of the reason. *See* National Center for Health Statistics, Firearm Mortality by State, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm.    Hawaii    law requires persons to obtain a permit prior to acquiring a firearm by purchase, gift, inheritance, bequest, or in any other manner. Hawaii Revised Statutes ("HRS") § 134-2(a) (2011 & Supp. 2018). The process to obtain a permit involves a 14-day waiting period, a criminal background check, fingerprinting and photographing, disclosure of the applicant's name, address, sex, height, weight, date of birth, place of birth, country of citizenship, social security number, alien or admission number, and information regarding the applicant's mental health history. HRS § 134-2(b) & (e). The applicant must sign a waiver allowing access to the applicant's mental health records. HRS § 134-2(c). The applicant generally must be 21 years of age or more. HRS § 134-2(d). Prior to receiving a permit for a pistol or revolver, the applicant must complete an approved hunter education course or a firearm safety or training course. HRS § 134-2(g).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

52

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

179.    Hawaii law also requires firearms brought into the state and firearms acquired in-state pursuant to HRS § 134-2 to be registered within five days of arrival or acquisition. HRS § 134-3(a) & (b). The following information must be provided during registration: the name of the manufacturer and importer; model; type of action; caliber or gauge; serial number; and source, including name and address of the prior registrant. HRS § 134-3(b). If the firearm does not have a serial number, the permit number must be engraved upon the receiver portion of the firearm. *Id.* The person registering is subject to fingerprinting and photographing, as well as a criminal background check. HRS § 134-3(a).

180.    Hawaii law prohibits possession of firearms and ammunition by certain classes of individuals, including: fugitives from justice; persons prohibited from possessing firearms or ammunition under federal law; persons under indictment or complaint; convicted felons; persons convicted of a crime of violence or illegal sale of drugs; persons under treatment for addiction to drugs or alcohol; persons acquitted of a crime by reason of mental disease, disorder, or defect; persons diagnosed with a significant behavioral, emotional, or mental disorder, or treated for organic brain syndromes; certain persons under age 25 who were adjudicated by the family court; minors under treatment for addiction to drugs or alcohol, who are fugitives from justice, or who were found not responsible due to mental disease, disorder, or defect; and persons subject to a restraining order or order for protection. HRS § 134-7(a)-(e).

181.    Hawaii law also prohibits certain classes of firearms and firearm components, including: assault pistols, automatic firearms, short-barreled rifles, sawed-off shotguns, mufflers, silencers, bump stocks, multiburst trigger activators, trigger cranks, and large capacity magazines for pistols in excess of 10 rounds. HRS §§ 134-8 & 134-8.5.

182.    Hawaii law further enables the seizure of firearms upon disqualification: HRS § 134-13 (revocation of any permit or license by issuing authority or by a court for good cause); HRS § 134-7(f) (restraining order may include immediate surrender of firearms); HRS § 134-7.3 (seizure upon admission to psychiatric facility or emergency or involuntary hospitalization);

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

53

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   HRS § 134-7.5 (immediate seizure of firearms in domestic abuse situations by responding police

2   officers).  Hawaii law also authorizes issuance of gun violence protective orders.  2019 Haw.

3   Sess. Laws Act 150, § 2 at 527-33 (effective Jan. 1, 2020).

4       183.   All of these regulations could be circumvented and effectively nullified if Firearm

5   Files to produce firearms on 3D printers proliferate. Hawaii's strong interest in protecting public

6   safety will be severely harmed.  Hawaii's sovereign interest in enforcing its own laws will also

7   be impaired.

8       **8.    Illinois's Firearms Laws**

9       184.   The State of Illinois recognizes that regulation of the possession, carriage, sale,

10   transfer, and manufacture of firearms is vital to promote and protect the health, safety, and

11   welfare of the public. *See Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015) ("[I]t is clear

12   that Illinois has an important and compelling interest in its citizens' safety" and in "protecting

13   the public from firearms violence."). Illinois has exercised its police power and enacted a

14   comprehensive regulatory and criminal scheme governing the possession and acquisition of

15   firearms, *see* 430 ILCS 65/0.01 *et seq*., 720 ILCS 5/24-1; the public carriage of firearms, *see* 430

16   ILCS 66/1 *et seq*., 720 ILCS 5/24-1; the sale, delivery, or manufacture of firearms, *see* 720 ILCS

17   5/24-1, 24-3; and reporting of information regarding the use of firearms in crimes, *see* 5 ILCS

18   830/10-5.

19       185.   The Illinois Firearm Owner's Identification Card Act establishes a licensure

20   system that identifies persons who are not qualified to possess firearms within the State. Among

21   other reasons, an individual is ineligible for a license to possess a firearm if he has been convicted

22   of a felony, has been a patient in a mental health facility within the past five years, is subject to

23   an existing order of protection prohibiting him from possessing a firearm, has been convicted of

24   battery, assault, or aggravated assault within the last five years, has been convicted of domestic

25   battery, has been involuntarily admitted into a mental health facility, is a person with an

26   intellectual or developmental disability, or is prohibited from possessing or acquiring firearms

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

54

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    by any Illinois or federal statute. 430 ILCS 65/4, 65/8. If an individual becomes ineligible during

2    the licensure period, the Illinois State Police shall revoke his license and require him to disclose

3    and dispose of the firearms in his possession. 430 ILCS 65/8, 65/9.5. To ensure continued

4    compliance with these eligibility requirements, Illinois imposes notification requirements on

5    circuit court clerks, medical professionals, law enforcement officers, certain state officials, and

6    school administrators. 430 ILCS 65/8.1.  Furthermore, the Illinois Firearms Restraining Order

7    Act authorizes courts to issue emergency and six-month firearms restraining orders to

8    temporarily limit individuals' access to firearms whenever someone has been shown to "pose[ ] a

9    significant danger of personal injury to himself, herself, or another by having in his or her

10   custody or control, purchasing, possessing, or receiving a firearm." 430 ILCS 67/40(e)–(g).

11        186.    The Illinois Firearm Concealed Carry Act is a comprehensive statutory licensure

12   regime for public carriage of firearms. In addition to satisfying enumerated eligibility

13   requirements, applicants for this license must not pose a danger to themselves, others, or the

14   public safety, and law enforcement agencies may submit objections to applicants on these

15   grounds. 430 ILCS 66/10, 66/15, 66/25. As part of the licensure process, the applicant must

16   complete a firearms training course and the Illinois State Police conducts a comprehensive

17   background search of the applicant. 430 ILCS 66/35, 66/75. Additionally, Illinois will issue a

18   concealed carry license to nonresidents only if their home States have a regulatory scheme

19   governing ownership, possession, and carriage that is substantially similar to the regime

20   established in Illinois. 430 ILCS 66/40(b). As part of its comprehensive scheme, Illinois law

21   restricts the places where a firearm may be legally carried by a licensee. 225 ILCS 10/7; 430

22   ILCS 66/65; 720 ILCS 5/24-1(a)(10); 89 Ill. Admin. Code § 402.8(i).

23        187.    Illinois also regulates the sale and delivery of firearms, requiring a waiting period

24   after an application to purchase a firearm has been made; restricting the sale of firearms to

25   minors, individuals with certain criminal convictions, individuals addicted to narcotics,

26   individuals who have been a patient in a mental health institution in the last five years, and

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

55

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

individuals with an intellectual disability; and prohibiting the sale of firearms containing parts from certain nonhomogeneous metals. 720 ILCS 5/24-3.  Illinois also licenses firearm dealers, who must provide annual training to employees, 430 ILCS 68/5-30, have video surveillance in gun stores, 430 ILCS 68/5-50(a), and submit to unannounced inspection by the State Police and local law enforcement, 430 ILCS 68/5-35. Dealers must also copy a buyer's or transferee's photo identification card whenever a firearm sale transaction takes place and record the sale. 430 ILCS 68/5-20(a).

188.    Illinois law further provides that it is a felony to manufacture machine guns, rifles and shot guns of a certain length, and certain types of ammunition. 720 ILCS 5/24-1(a)(7), 24-2.2.

189.    Additionally, Illinois promotes public health, safety, and welfare by requiring public reporting on "key information related to firearms used in the commission of crimes in this State, including, but not limited to: reports on crimes committed with firearms, locations where the crimes occurred, the number of persons killed or injured in the commission of the crimes, the state where the firearms used originated, the Federal Firearms Licensee that sold the firearm, and the type of firearms used." 5 ILCS 830/10-5.

190.    Defendants' actions severely undermine Illinois's ability to enforce this comprehensive regulatory and criminal regime regarding the possession, carriage, sale, and manufacture of firearms. Persons currently prohibited from acquiring and possessing firearms would be able to circumvent Illinois law by printing a gun on a 3D printer, seriously harming Illinois's interest in a well-regulated firearms market and posing an unacceptable risk to Illinois public health, safety, and welfare.

### 9.    Maine's Firearms Laws

191.    The State of Maine, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

56

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

as its chief legal officer with general charge, supervision, and direction of the State's legal business. Me. Const. art. IX, Sec. 11; 5 M.R.S. §§ 191 *et seq*. (2018). The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

192.    Maine's statutory framework of firearm regulation imposes reasonable restrictions on the possession of firearms in order to protect public safety consistent with the rights of law-abiding citizens to possess and use firearms. Maine attempts to ensure consistency in its firearms regulation across the state by largely preempting the field of firearms regulation within the State.  25 M.R.S. § 2011. Maine promotes public safety by prohibiting the possession of firearms by persons who, for various reasons, should not have access to them.

193.    Prohibitions resulting from convictions. Maine prohibits possession by persons convicted of felony-level crimes in the courts of Maine, its sister states, and the federal court. Maine also prohibits possession based on convictions in state, federal or tribal courts of misdemeanor-level crimes involving the use of a firearm or other dangerous weapon against a person. 15 M.R.S. § 393(1)(A-1)(5). A finding of not criminally responsible on any of these crimes also results in prohibition. 15 M.R.S. § 393(1)(A-1), (E). Maine prohibitions based on domestic violence convictions go beyond those of the federal statute, which prohibit possession based on conviction of domestic violence assault, in that Maine's statute also creates a five-year prohibition based on convictions for domestic violence stalking, terrorizing, criminal threatening and reckless conduct.  In addition, a person who is on deferred disposition status for any of these crimes is prohibited from possessing firearms. 15 M.R.S. § 393(1-B).

194.    Juvenile Adjudications. Maine's prohibitions based on juvenile adjudications may be permanent or temporary (non-violent felony-level adjudications), and thus again go

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

57

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   beyond those of federal law, which require a conviction. 15 M.R.S. § 393(1)(C), (1-A); 18 U.S.C

2   § 922(g).

3        195.   <u>Mental Health-Related Prohibitions</u>. Maine's prohibitions based on mental health

4   adjudications are comprehensive. In addition to the prohibition based on "insanity" findings in

5   criminal proceedings, Maine has established prohibitions for criminal defendants determined

6   incompetent to stand trial, 15 M.R.S. § 393(1)(E)(3);  persons involuntarily committed through

7   the civil process, 15 M.R.S. § 393(1)(E)(3); persons ordered to involuntary treatment as part of

8   a "progressive treatment program," P.L. 209, c. 411, 15 M.R.S. § 393(1)(E-2) (effective July 1,

9   2020); and persons taken into protective custody and prohibited pursuant to the extreme risk

10  protection order process. P.L. 2019, c. 411, 15 M.R.S. § 393(1)(E-1) (effective July 1, 2020).

11       196.   <u>Status Prohibitions</u>. In addition, Maine tracks federal prohibitions against

12  possession, including those based on fugitive status, whether a person is an unlawful user or

13  addicted to controlled substances or illegally in the United States, or has been dishonorably

14  discharged or renounced citizenship. 15 M.R.S. § 393 (1)(F)-(J). Maine prohibits possession for

15  persons subject to qualifying protection from abuse orders.  15 M.R.S. § 393(1)(D); 19-A M.R.S.

16  §§ 4006, 4007, 4011. Possession of a firearm in violation of a bail condition prohibiting

17  possession, where premised on an underlying felony-level offense, is itself a Class C (felony-

18  level) crime. 15 M.R.S. § 1092(1)(B).

19       197.   <u>Regulation of Transfer and Location</u>. Generally, it is a crime to transfer a firearm

20  to a minor under 16 or to transfer a handgun to a minor under 18, with some limited exceptions.

21  17-A M.R.S. §§ 554-A, 554-B. Again, with very limited exceptions, firearms may not be

22  possessed on school property, 20-A M.R.S. § 6552, in courthouses. 17-A M.R.S. § 1058, or at

23  the site of a labor dispute. 32 M.R.S. § 9412. While Maine does not generally require permits to

24  carry, a concealed handgun permit is required to carry in certain locations, including Maine State

25  Parks, 12 M.R.S. § 1803, and Acadia National Park. 12 M.R.S. § 756. The qualifications for

26  obtaining a concealed handgun permit, 25 M.R.S. § 2003, are more stringent than the law

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

58

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

governing possession and open carry. 15 M.R.S. § 393. Federally licensed firearms dealers must provide safety brochures and make available information about trigger locks and firearms safety programs. 25 M.R.S. § 2012.

198.     Maine's regulatory framework would be seriously circumvented if the Final Rules are permitted to stand. Persons ineligible to possess firearms under Maine law will easily be able to obtain downloadable plans for guns that they can produce at home using a 3D printer. Such firearms easily sidestep the Maine law criminalizing removal of serial numbers to prevent identification by simply not having serial numbers in the first place. 17-A M.R.S. § 705(1)(E). Further, absent any meaningful restrictions on exporting Firearm Files, foreign persons who may reside in or may enter Maine through its approximately two dozen border crossings stretching across its 611-mile land border with Canada or two international airports will have unrestricted access to Firearm Files. It will be increasingly difficult for Maine law enforcement and Border Patrol agents to detect and trace weapons constructed from such plans because they have no serial numbers and lack metal components typically detectable by security screening equipment.

### 10.     Maryland's Firearms Laws

199.     The State of Maryland has one of the most robust firearms regulatory regimes in the country. For instance, Maryland prohibits certain categories of persons from buying or possessing a firearm. This includes minors under the age of 21, and persons previously convicted of certain serious crimes, including crimes of violence. Md. Code Ann., Pub. Safety § 5-133. Persons who have been involuntarily committed to a mental health facility, or are under the protection of a court-appointed guardian, or have been found incompetent to stand trial, or are addicted to a controlled dangerous substance, or are subject to a protective order are all prohibited from possessing a firearm as well. *Id.*

200.     Sales and other transfers of firearms in Maryland are extensively regulated to ensure that prohibited persons are unable to obtain a weapon. A person seeking to purchase, rent, or receive a handgun must first obtain a handgun qualification license. Md. Code Ann., Pub.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

59

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Safety § 5-117.1. To obtain such a license, applicants must, among other things, make a sworn statement that they are not prohibited under federal or State law from possessing a handgun, pass a fingerprint-based background check, and complete an approved firearms safety training course. *Id*. Further, a person must submit a firearm application before the person purchases, rents, or transfers a handgun in Maryland. Md. Code Ann., Pub. Safety §§ 5-117, 5-118. That transaction must be executed within 90 days of the application's approval and must be reported to the State Police, including a description of the firearm and its serial number. Md. Code Ann., Pub. Safety § 5-123. Firearm dealers are required to maintain records of every transaction, including the name and address of the purchaser, a precise description, including make, model, caliber, and serial number of each firearm acquired or sold, and the date of sale. Md. Code Ann., Pub. Safety § 5-145. Further, persons moving to Maryland from out-of-state must register their firearms with the State Police, which requires the applicant to submit information such as their name, address, and Social Security number, as well as the make, model, and manufacturer's serial number of the firearm. Md. Code Ann., Pub. Safety § 5-143.

201.    Maryland also prohibits the possession of certain types of firearms. Enumerated assault weapons, including assault pistols, may not be bought, possessed, sold, or transported into the State. Md. Code Ann., Crim. Law § 4-303. Detachable magazines with a capacity of more than ten rounds of ammunition are also prohibited from being manufactured, bought, or sold. Md. Code Ann., Crim. Law § 4-305.

202.    Maryland's carefully constructed regulatory regime will be upended if the Final Rules are permitted to go into effect. Persons currently prohibited from possessing firearms would be able to easily circumvent Maryland law by simply manufacturing a gun on a 3D printer. The firearms thus produced will be unregistered, unmarked, and virtually untraceable, directly harming Maryland's interest in a well-regulated firearms market and potentially leading to an increase in violent crime.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

60

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

**11.    Massachusetts's Firearms Laws**

203.    Massachusetts carefully regulates the possession, licensing, and use of firearms and other inherently dangerous weapons. Among the goals of these laws is limiting access to deadly weapons by persons who may inflict harm—be it negligently or intentionally—on themselves or others. These laws also recognize that criminal use of firearms is a significant problem, that guns should be registered and traceable in the event of theft or criminal misuse, and that possession of firearms should be limited to responsible persons who meet all requirements for licensure. *See, e.g.*, *Commonwealth v. Reyes*, 464 Mass. 245, 250 (2013); *Jupin v. Kask*, 447 Mass. 141, 153-154 (2006).

204.    Under Massachusetts law,[16] a person may not possess or carry a firearm without obtaining a license from the appropriate licensing authority. Persons may not obtain a license to carry a firearm if they: (1) have committed certain offenses, including violent crimes and violations of laws regulating the use, possession, or sale of a controlled substance; (2) have been committed to a hospital or institution for mental illness, or alcohol or substance misuse, subject to limited exceptions; (3) were younger than 21 years old at the time of submitting an application; (4) are currently subject to an order for suspension or surrender of firearms in connection with an abuse prevention order; (5) have an outstanding arrest warrant in any state or federal jurisdiction; (6) have been dishonorably discharged from the armed forces of the United States; (7) are a fugitive from justice; or (8) have renounced their United States citizenship. Mass. Gen. Laws ch. 140, § 131(d).

205.    A licensing authority also may deny a person a license to carry firearms if the licensing authority determines that the person is unsuitable for a license based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or

---

[16] The Massachusetts-specific allegations contained herein constitute a summary of some of the most relevant provisions of Massachusetts law. It is not an exhaustive or complete list of all relevant statutes, regulations, or other provisions.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

61

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a

2    risk to public safety. Mass. Gen. Laws ch. 140, § 131(d).

3          206.   Anyone who wishes to sell, rent, or lease firearms must apply for and obtain a

4    license. Such licenses are valid for three years. No license may issue until an investigation into

5    the applicant's criminal history has been completed. A licensee must record all sales of firearms

6    to include a complete description of the firearm (including the make and type of firearm) and the

7    person purchasing the firearm (including the person's sex, residence, and occupation). The police

8    may inspect the premises of a licensee at all times. Mass. Gen. Laws ch. 140, §§ 122-124.

9    Reports of all transactions must be made by licensees to Massachusetts's Department of Criminal

10   Justice Information Services with detailed information about the firearm and the purchaser's

11   license. 803 Mass. Code Regs. § 10.07.

12         207.   It is unlawful to manufacture a firearm in Massachusetts, or to deliver a firearm

13   to a dealer in Massachusetts, without a serial number permanently inscribed on a visible metal

14   surface of the firearm. Mass. Gen. Laws ch. 269, § 11E.

15         208.   Anyone who purchases or obtains a firearm from any source other than a licensed

16   dealer must, within seven days of receiving the firearm, report in writing to the Commissioner

17   of the Massachusetts Department of Criminal Justice Information Services the name and address

18   of the seller or donor and the buyer or donee, together with a complete description of the firearm,

19   including the caliber, make, and serial number. Mass. Gen. Laws ch. 140, § 128B.

20         209.   Only handguns that meet the safety and performance standards expressed in state

21   law and regulations, including protection against accidental discharge and explosion upon firing,

22   may be sold. Mass. Gen. Laws ch. 140D, § 123, clauses 18 to 20. The Secretary of the

23   Massachusetts Executive Office of Public Safety and Security has compiled an approved

24   firearms roster, pursuant to Mass. Gen. Laws ch. 140, § 131-3/4 and 501 Mass. Code Regs. 7.00.

25         210.   It is unlawful to sell, offer for sale, transfer, or possess any weapon, capable of

26   discharging a bullet or shot, that is not detectable as a weapon or potential weapon by x-ray

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

62

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   machines commonly used at airports or walk-through metal detectors. Mass. Gen. Laws ch. 140,

2   § 131N.

3       211.    The sale, transfer, or possession of an "Assault weapon," as defined in Mass. Gen.

4   Laws ch. 140, § 121, is prohibited. Mass. Gen. Laws ch. 140, § 131M.

5       212.    All firearms that are used in the commission of a crime must be traced by the

6   licensing authority for the city or town in which the crime took place. Mass. Gen. Laws ch. 140,

7   § 131Q.

8       **12.    Michigan's Firearms Laws**

9       213.    Michigan regulates the sale, purchase, possession, and carrying of certain

10  firearms within the state. As a general rule, a person may not purchase, carry, possess, or

11  transport a pistol in Michigan without first obtaining a license for the firearm. Mich. Comp. Laws

12  § 28.422(2).

13      214.    Before issuing a license to purchase or possess a pistol, the issuing agency must

14  determine through the federal National Instant Criminal Background Check System that the

15  applicant is not prohibited under federal law from possessing a firearm and is not an illegal or

16  nonimmigrant alien. Mich. Comp. Laws § 28.426(1). An applicant for licensure must be a legal

17  resident of Michigan; a United States citizen or lawfully admitted alien; and at least 21 years of

18  age, or at least 18 years old if the seller is a federally licensed dealer. Mich. Comp. Laws

19  § 28.422. An applicant must not be prohibited from possessing a firearm under Michigan's felon-

20  in-possession statute; must not have a pending felony or enumerated misdemeanor charge; must

21  not be subject to an involuntary hospitalization or commitment order, personal protection order,

22  or order finding the individual is legally incapacitated; and must not have been adjudged insane

23  or legally incapacitated unless adjudged restored to sanity or capacity by court order. *Id.*

24      215.    In addition to prohibiting certain individuals from possessing firearms, the State

25  of Michigan prohibits certain types of weapons. For example, it generally is illegal in Michigan

26  to manufacture or possess a machine gun, muffler, or silencer. Mich. Comp. Laws

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

63

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

§ 750.224(1). Michigan law also makes it a felony to manufacture or possess a device to convert a semiautomatic into a fully automatic firearm, or to demonstrate to another person how to manufacture or install such a device.  Mich. Comp. Laws § 750.224e. Michigan law similarly prohibits the manufacture or possession of short-barreled shotguns and rifles, except in compliance with federal law. Mich. Comp. Laws § 750.224b. Further, a person may lawfully possess a pistol greater than 26 inches in length only if the firearm was continuously registered since January 1, 2013. Mich. Comp. Laws § 28.421.

### 13.    Minnesota's Firearms Laws

216.    In the exercise of its police powers, the State of Minnesota has regulated firearms in the interest of public safety.

217.    For example, Minnesota law prohibits some people from using or possessing firearms, including certain individuals who have been convicted of a felony; have a mental illness or developmental disability; have been convicted of controlled substance crimes; have been committed to a treatment facility due to chemical dependency; have been convicted of domestic-violence-related crimes; or are subject to an order for protection. Minn. Stat. § 624.713, subd. 1. It is also unlawful to knowingly transfer a firearm to such persons. Minn. Stat. §§ 624.7133, 624.7141.

218.    Minnesota similarly regulates the sale or transfer of certain firearms. For example, an individual seeking to acquire a firearm may apply for a transferee permit by providing personal information to local law enforcement. Minn. Stat. § 624.7131, subd. 1. Local law enforcement then conducts a background check to ensure that the individual is not prohibited from possessing a firearm. *Id.*, subd. 2, 4. Within seven days, law enforcement will either issue a transferee permit or provide written notification that the application has been denied with the specific reason for the denial. *Id.*, subd. 5.

219.    If the proposed purchaser of certain firearms does not have a transferee permit, the proposed seller and the prospective buyer must submit a report to local law enforcement with

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

64

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    personal information of the proposed transferee and the address of the seller's business. Minn.

2    Stat. §624.7132, subd. 1. Local law enforcement then conducts a background check to ensure

3    that the individual is not prohibited from possessing a firearm. *Id.*, subd. 2-3. The seller may not

4    transfer the firearm to the buyer for at least five business days after the report is delivered to

5    local law enforcement. *Id.*, subd. 4.

6        220.    Minnesota also regulates the carrying of firearms in public. For example, subject

7    to some exceptions, rifles, shotguns, and semiautomatic military-style assault weapons cannot

8    be carried in public places. Minn. Stat. § 624.7181. And pistols may not be carried in public

9    without a permit to carry. Minn. Stat. § 624.714, subd. 1. Applications for permits to carry are

10   submitted in person to local law enforcement. *Id.*, subd. 2-3. The applicant must be at least 21

11   years old, trained in the safe use of a pistol, not prohibited from possessing a firearm, not listed

12   in the criminal gang investigative data system, and not a danger to themselves or the public. *Id.*;

13   Minn. Stat. § 624.714, subd. 6(a)(3). The applicant must also provide personal information, a

14   photocopy of their training certificate, and a photo identification. *Id.*, subd. 3(a), (c). Local law

15   enforcement then conducts a background check to ensure that the individual is not prohibited

16   from possessing a firearm. *Id.*, subd. 4.

17       221.    Even with a permit to carry, an individual carrying a firearm may not remain in a

18   private establishment if they know that the establishment has made a reasonable request that

19   firearms not be brought onto the premises. *Id.*, subd. 17. Employers and educational institutions

20   may also restrict the carrying or possession of firearms. *Id.*, subd. 18. Individuals also may not

21   carry while under the influence of alcohol or controlled substances. Minn. Stat. § 624.7142.

22       222.    In addition, Minnesota prohibits certain firearms, like for example, machine guns,

23   short-barreled shotguns, and Saturday night special pistols, which are pistols made with material

24   that has a melting point of less than 1,000 degrees Fahrenheit, material that has an ultimate tensile

25   strength of less than 55,000 pounds per square inch, or powdered metal having a density of less

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

65

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

than 7.5 grams per cubic centimeter. Minn. Stat. § 609.67; Minn. Stat. § 624.712, subd. 4; Minn. Stat. § 624.716.

223.    Proliferation of untraceable, undetectable 3D printed guns is a threat to public safety in Minnesota. By allowing this proliferation, Defendants undermine Minnesota's firearm laws and the safety of Minnesota residents.

### 14.    New Jersey's Firearms Laws

224.    New Jersey not only has statutes related to the purchase and possession of guns, but also laws relating to who can manufacture firearms. In New Jersey, under N.J. Stat. Ann. § 2C:39-9, it is illegal to manufacture a weapon without being registered or licensed to do so. And N.J. Stat. Ann. § 2C:39-10 makes it a crime to knowingly violate the regulatory provision relating to the manufacturing of firearms in N.J. Stat. Ann. § 2C:58-1, which provides that every manufacturer of firearms shall register with the proper State authorities.

225.    New Jersey's firearms regulatory regime expressly restricts both the use of 3D printers to produce firearms and the distribution of digital instructions to facilitate such production. New Jersey recently amended its firearms laws to prohibit the distribution of "digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component" to any person in New Jersey who is not a licensed firearms manufacturer. N.J. Stat. Ann. § 2C:39-9(*l*)(2). It is also now illegal in New Jersey for a person who is not a licensed firearms manufacturer "to use a three-dimensional printer or similar device to manufacture or produce a firearm, firearm receiver, magazine, or firearm component." N.J. Stat. Ann. § 2C:39-9(*l*)(1). And under N.J. Stat. Ann. §§ 2C:39-9(n) and 2C:39-3(n), it is illegal in New Jersey to transport or knowingly possess a firearm manufactured or otherwise assembled using a firearm frame or firearm receiver which is not marked with a serial number registered to a federally licensed manufacturer.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

66

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

226.   New Jersey also has an extensive system of rules for people purchasing firearms. A person must obtain a firearms purchaser identification card before purchasing, receiving, or otherwise acquiring a firearm. Under N.J. Stat. Ann. § 2C:58-3(c), the following people are prohibited from obtaining a purchaser identification card, and thus prohibited from purchasing firearms: those who have been convicted of crimes and disorderly persons offenses involving acts of domestic violence (N.J. Stat. Ann. § 2C:58-3(c)(1)); those who are drug dependent (N.J. Stat. Ann. § 2C:58-3(c)(2)); those who are confined for mental disorders to hospitals, mental institutions or sanitariums (N.J. Stat. Ann. § 2C:58-3(c)(2)); those who suffer from a physical defect or disease that would make it unsafe for him to handle firearms (N.J. Stat. Ann. § 2C:58-3(c)(3)); those who have been confined for a mental disorder (N.J. Stat. Ann. § 2C:58-3(c)(3)); those who are alcoholics and are unable to produce proof demonstrating that they no longer suffer from that particular disability in a manner that would interfere with or handicap them in the handling of firearms (N.J. Stat. Ann. § 2C:58-3(c)(3)); juveniles (N.J. Stat. Ann. § 2C:58-3(c)(4)); those for whom the issuance of a permit to purchase a handgun or firearms purchaser identification card would not be in the interests of the public health, safety, or welfare (N.J. Stat. Ann. § 2C:58-3(c)(5)); those who are subject to restraining orders issued pursuant to the "Prevention of Domestic Violence Act" prohibiting them from possessing firearms (N.J. Stat. Ann. § 2C:58-3(c)(6)); those who were adjudicated delinquent for offenses which, if committed by an adult, would constitute a crime involving the unlawful use or possession of weapons, explosives, or destructive devices (N.J. Stat. Ann. § 2C:58-3(c)(7)); those who had a firearm seized pursuant to the Prevention of Domestic Violence Act (N.J. Stat. Ann. § 2C:58-3(c)(8)); and those who are named on the consolidated Terrorist watchlist maintained by the Terrorist Screening Center administered by the Federal Bureau of Investigation (N.J. Stat. Ann. § 2C:58-3(c)(9)). And New Jersey bans all assault weapons. N.J. Stat. Ann. § 2C:39-5(f).

227.   Finally, New Jersey law prohibits "certain persons" from purchasing, owning, possessing, or controlling any and all firearms under N.J. Stat. Ann. § 2C:39-7(b)(1), due to their

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

67

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    prior convictions for aggravated assault, arson, burglary, escape, extortion, homicide,

2    kidnapping, robbery, aggravated sexual assault, sexual assault, bias intimidation, carjacking,

3    gang criminality, racketeering, terroristic threats, unlawful possession of a machine gun,

4    handgun, or assault firearm, leading a firearms trafficking network, endangering the welfare of

5    a child, stalking, or a crime involving domestic violence, or for an attempt or conspiracy to

6    commit any of these offenses. Those persons face a mandatory term of imprisonment with at

7    least five years of parole ineligibility if they purchase, own, possess, or control a firearm. N.J.

8    Stat. Ann. § 2C:39-7(b)(1).

9        228.    The Final Rules at issue will permit the unchecked dissemination of Firearm Files

10   in New Jersey, and thus effectively sanction conduct that is specifically prohibited by New Jersey

11   law. The Final Rules will also facilitate the unlicensed production of 3D-printed firearms in

12   direct violation of New Jersey law. Further, the Final Rules will enable any individual with

13   access to a 3D printer to easily circumvent New Jersey laws which require every firearms

14   manufacturer to register with the State and every person to obtain a firearms purchase

15   identification card before acquiring a firearm. The Final Rules will also make it easier for certain

16   convicted felons to evade New Jersey's prohibition against their purchasing, owning, possessing,

17   or controlling any firearm. The Final Rules likewise will make it easier for persons convicted of

18   acts of domestic violence, persons confined for certain mental illnesses, juveniles, persons from

19   whom firearms have been seized under the Prevention of Domestic Violence Act, and persons

20   named on the consolidated Terrorist watchlist to evade New Jersey's prohibitions on their

21   purchasing firearms. In short, the Final Rules help to effect a complete end-run around New

22   Jersey restrictions on the manufacture, sale, purchase, and possession of firearms which are

23   designed to trace and detect firearms and to prevent gun violence in New Jersey.

24        **15.    New Mexico's Firearms Laws**

25        229.    New Mexico has a suite of firearm regulations designed to keep the public safe

26   that would be jeopardized by the Final Rules. These laws include restrictions on who may

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

68

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

possess a firearm. New Mexico prohibits people under the age of nineteen from possessing handguns in most circumstances, N.M. Stat. Ann. § 30-7-2.2, as well as prohibiting felons, people convicted of certain domestic violence crimes, and people subject to domestic violence protection orders from receiving, transporting, or possessing firearms. N.M. Stat. Ann. § 30-7-16.

230.    New Mexico also restricts the locations where people may possess firearms, including generally prohibiting firearms at schools and universities, N.M. Stat. Ann. §§ 30-7-2.1, -2.4, in certain establishments that sell alcohol, N.M. Stat. Ann. § 30-7-3, and on buses. N.M. Stat. Ann. § 30-7-13.

231.    New Mexico also prohibits the concealed carry of firearms without a permit. N.M. Stat. Ann. § 30-7-2(A)(5). To obtain a permit, a person must (among other things) be 21 years old, lack certain criminal history, and complete a firearms training course. N.M. Stat. Ann. § 29-19-4. Even with such a permit, there are restrictions on where a person may carry a firearm, including tribal land, courthouses, and private property where the owner prohibits firearms. N.M. Stat. Ann. §§ 29-19-10, -11; N.M. Admin. Code § 10.8.2.16(F).

232.    To help ensure that these laws are not circumvented, New Mexico prohibits the sale of firearms without a background check. N.M. Stat. Ann. § 30-7-7.1.

233.    The Final Rules will undermine New Mexico's efforts to ensure that firearms are not obtained by people and carried in places that would jeopardize public safety and put New Mexico's residents in danger. Individuals who cannot purchase firearms under New Mexico law, such as children and people with domestic violence protection orders, could avoid background checks and use a 3D printer to manufacture a firearm at home. Likewise, firearms created with a 3D printer and made of plastic could be smuggled past metal detectors into locations where firearms are prohibited, such as courthouses or schools. New Mexico will suffer irreparable harm by the resulting undermining of its firearm laws and threats to the safety of New Mexicans.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

69

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

16.     **New York's Firearms Laws**

234.    For over a century, in order to promote public safety, New York law has regulated the possession and use of guns and has prohibited certain persons from obtaining or possessing firearms. *See* N.Y. Penal Law §§ 265.00, 265.01, 265.20(a)(3), 400.00; *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 84 (2012), cert. denied, 133 S. Ct. 1806 (2013). For example, New York licenses the possession of "firearms," which are defined, as a general matter, as any pistol or revolver; a shotgun having one or more barrels less than eighteen inches in length; a rifle having one or more barrels less than sixteen inches in length; and any assault weapon. *See* N.Y. Penal Law §§ 265.01, 265.20(a)(3), 400.00. These measures remain the law today.

235.    Licenses are limited "to those over twenty-one years of age, of good moral character, without a history of crime or mental illness, and 'concerning whom no good cause exists for the denial of the license.' " *Kachalsky v. County of Westchester*, 701 F.3d 81, 86 (quoting PL § 400.00(1).); N.Y. Penal Law §§ 265.00, 265.01, 265.20(a)(3), 400.00. Persons subject to a variety of protection orders are also prohibited from maintaining licenses. N.Y. Penal Law § 400.00(1); NY Criminal Procedure Law § 530.14; Family Court Act §842-a.

236.    Every license application triggers an investigation into the applicant by local law enforcement, including an investigation into the applicant's mental health history. PL § 400.00(4); *Kachalsky*, 701 F.3d at 87. Firearms subject to licensure must be disclosed to and registered with licensing officials. N.Y. Penal Law § 400.00(7) (mandating that each license "specify the weapon covered by calibre, make, model, manufacturer's name and serial number, or if none, by any other distinguishing number or identification mark . . . .").

237.    New York has also enacted specific criminal prohibitions on the possession of rifles and shotguns by certain mentally ill individuals. N.Y. Penal Law §§ 265.01(6), 265.00(16). Penal Law § 265.01(6), enacted in 1974, provides that "a person who has been certified not suitable to possess a rifle or shotgun . . . and refuses to yield possession of such rifle or shotgun upon the demand of a police officer" is guilty of criminal possession of a weapon in the fourth

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

70

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   degree. Id. § 265.01(6). Law enforcement is authorized to take firearms "possessed by such

2   person."

3          238.    New York's Secure Ammunition and Firearms Enforcement Act of 2013 (SAFE

4   Act) generally restricts the transfer and possession of "assault weapons"—defined, as a general

5   matter, as rifles, shotguns, and pistols that are (1) semiautomatic, (2) in the case of a pistol or

6   rifle, able to accept a detachable ammunition magazine, and (3) equipped with at least one feature

7   on an enumerated list of military style features. N.Y. Penal Law § 265.00(22).[1] Possession of

8   a prohibited assault weapon constitutes the Class D felony of Criminal Possession of a Weapon

9   in the Third Degree. Id. § 265.02(7)-(8)[17].

10         239.    The Final Rules effectively deregulating 3D-printable gun files nullify New

11  York's laws prohibiting certain categories of persons from possessing firearms. If the Final Rules

12  go into effect, New York stands to suffer extreme and irreparable harm. Persons ineligible to

13  possess firearms under New York law will easily be able to obtain downloadable guns that they

14  can produce at home using a 3D printer. New York law enforcement will have no means of

15  detecting such weapons using standard equipment such as metal detectors, and no means of

16  tracing such weapons because they have no serial numbers.

17         **17.    North Carolina's Firearms Laws**

18         240.    North Carolina has a broad statutory scheme to regulate firearms that is intended

19  to keep firearms out of the hands of persons ineligible to possess them. Unlike other states, North

20  Carolina also has specific laws precluding the manufacture and possession of a variety of

21  automatic firearms and firearms that do not have serial numbers or identifying marks. These

22  firearms are of the type that can be produced on a 3D printer.

23

24         _____

           [17] The Act does not prohibit possession of any firearm that was lawfully possessed before the law's
25  effective date of January 15, 2013. See N.Y. Penal Law § 265.00(22)(g)(v). Persons who lawfully possessed a
    banned assault weapon at that time may continue to do so, but must register the weapon with the Superintendent of
26  the State Police. *Id*. § 400.00(16-a).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

71

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

241.    Under North Carolina law, it is unlawful for any person, firm, or corporation to sell, give away, transfer, purchase, or receive, at any place within the state, any pistol, unless the purchaser or receiver obtains a license or permit from the sheriff of the county in which the purchaser or receiver resides, or the purchaser or receiver possesses a valid North Carolina issued concealed carry permit. This requirement to obtain a permit prior to the transfer of a pistol applies not only to a commercial transaction, but also between private individuals or companies throughout North Carolina. A permit expires after five years, and a violation of the pistol permit law is a Class 2 misdemeanor under North Carolina law. N.C.G.S. § 14-402(a).

242.    North Carolina law also requires permits to receive or purchase a handgun. N.C.G.S. § 14-402. The county sheriff is only authorized to issue a permit after a county resident submits an application establishing that the applicant is of good moral character and that the person, firm, or corporation wants to possess the weapon for one of the following purposes:

   a.   The protection of the applicant's home, business, person, family, or property;

   b.   Target shooting;

   c.   Collecting; or

   d.   Hunting

Additionally, the sheriff must conduct a background check to verify, before the issuance of a permit, that the person is not ineligible to purchase or possess a handgun. N.C.G.S. §14-404(a).

243.    A handgun permit cannot be issued if the applicant, *inter alia*: (1) has been convicted in any state or federal court of a felony or has currently pending felony charges; (2) is a fugitive from justice; (3) is addicted to drugs; (4) has been adjudicated incompetent or committed to a mental institution; (5) is an alien illegally or unlawfully in the United States; (6) has been dishonorably discharged from the U.S. armed forces; or (7) is subject to certain restraining and no-contact orders. N.C.G.S §14-404(c).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

72

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

244.    A court in any domestic violence protective order can also prohibit a party from possessing, purchasing, or receiving a firearm for a time fixed in the order, the violation of which is a felony. N.C.G.S. § 50B-3.1.

245.    Every dealer in pistols and other weapons mentioned in Article 52A of the N.C. General Statutes must keep accurate records of all sales, including the name, place of residence, date of sale, etc., of each person, firm, or corporation to whom sales are made. N.C.G.S. § 14-406, N.C.G.S. § 14-408.

246.    It is unlawful for any person, firm, or corporation to manufacture, sell, give away, dispose of, use or possess machine guns, submachine guns, or other like weapons. A machine gun or submachine gun means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. This includes the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person. N.C.G.S. § 14-409.

247.    It is unlawful for any person to manufacture, assemble, possess, store, transport, sell, offer to sell, purchase, offer to purchase, deliver, give to another, or acquire any weapon of mass death and destruction. A weapon of mass death and destruction includes any firearm capable of fully automatic fire; any shotgun with a barrel length less than eighteen inches, or an overall length of twenty-six inches; a rifle with a barrel length of less than sixteen inches or an overall length of less than twenty six inches; any muffler or silencer for any firearm, any combination of parts designed or intended for use in converting a device into any weapon described above, and from which a weapon of mass death and destruction may readily be assembled. A device which could convert a semi-automatic firearm into one capable of full automatic fire would be in violation of this statute. N.C.G.S. § 14-288.8.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

73

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

248.     It is unlawful for any person to alter, deface, destroy, or remove the permanent serial number, manufacturer's identification plate, or other permanent distinguishing number or identification mark from any firearm with the intent to conceal or misrepresent the identity of the firearm. Additionally, it is unlawful for any person to knowingly sell, buy, or be in possession of any firearm on which the permanent serial number, manufacturer's identification plate, or other permanent distinguishing number or identification mark has been altered, defaced, destroyed, or removed for the purpose of concealing or misrepresenting the identity of the firearm. Such a violation is punishable as a felony. N.C.G.S. § 14-160.2.

249.     North Carolina's compelling state interests in keep the public safe by keeping guns out of the hands of those ineligible to possess them and to restrict the manufacture and possession of automatic and untraceable weapons would be irreparably harmed if the federal government's actions are allowed to stand.

**18.     Oregon's Firearms Laws**

250.     Oregon law also limits the availability and manufacture of firearms to protect the public safety and in the exercise of its police powers. Or. Rev. Stat. § 166.170(1) provides: "[e]xcept as expressly authorized by state statute, the authority to regulate in any matter whatsoever the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition, is vested solely in the Legislative Assembly." Under this authority, the Oregon Legislature enacted Or. Rev. Stat. § 166.410, which states that "[a]ny person who manufactures or causes to be manufactured within this state, or who imports into this state, or offers, exposes for sale, or sells or transfers a handgun, short-barreled rifle, short-barreled shotgun, firearms silencer or machine gun, otherwise than in accordance with [the Oregon statutes] is guilty of a Class B felony."

251.     Thus, Oregon law prohibits certain persons from obtaining or possessing firearms. For example, Oregon law prohibits certain felons, certain individuals under the

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

74

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  jurisdiction of juvenile court, certain individuals with mental illnesses and certain persons

2  subject to stalking orders from possessing firearms. Or. Rev. Stat. § 166.250; Or. Rev. Stat.

3  § 166.255. Under Or. Rev. Stat. § 166.470(1), it is unlawful to knowingly and intentionally sell,

4  deliver or otherwise transfer a firearm to such persons.

5       252.    Oregon law also has set up an extensive system of rules to ensure unauthorized

6  persons cannot buy firearms. For example, with certain exceptions (for example, transfers to

7  family members), only a gun dealer may transfer a firearm. Or. Rev. Stat. § 166.435(2). A person

8  who applies to buy a handgun from a dealer must provide valid government identification

9  bearing a photograph and date of birth, and the dealer must complete a transaction record with

10  the signature of the purchaser. This transaction record much include the federal firearms license

11  number of the dealer, the business name of the dealer, the place of transfer, the name of the

12  person making the transfer, the make, model, caliber and manufacturer's number of the handgun

13  and the type, the social security number of the purchaser, and the issuer and identification

14  number of the identification presented by the purchaser. The dealer must also obtain the

15  thumbprints of the prospective purchaser and contact the Department of State Police

16  ("Department") to conduct a criminal background check. Or. Rev. Stat. § 166.412; Or. Rev. Stat.

17  § 166.418.

18       253.    Oregon law also requires a request for a criminal background check to transfer a

19  gun at a gun show. Or. Rev. Stat. § 166.433(2); Or. Rev. Stat. § 166.438.

20       **19.    Pennsylvania's Firearms Laws**

21       254.    Pennsylvania, like the other states, also has a robust system of state firearms laws

22  designed to keep the public safe and that would be undermined if the federal government's

23  actions are allowed to stand. Section 6105 of the Pennsylvania's Firearms Act mandates that any

24  person who has been convicted of certain enumerated offenses inside or outside of Pennsylvania

25  "regardless of the length of sentence" or whose conduct meets certain specified criteria "shall

26  not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

75

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

sell, transfer or manufacture a firearm in this Commonwealth." 18 Pa. C.S. § 6105(a). The definition of "firearm" in section 6105 "shall include" any weapons which are "designed to or may readily be converted to" expel any projectile by the action of an explosive or the frame or receiver of any such weapon. 18 Pa. C.S. § 6105(i). The "downloadable guns" that Defense Distributed promises to make available constitutes a "firearm" under this section of the Firearms Act because it is a weapon that is designed and, by 3D printing, "may readily be converted to" expel bullets by an explosive. *Id.* Depending on the underlying offense or criteria, violation of section 6105, by individuals who shall not possess, use, control, sell, transfer or manufacture such a firearm in the Commonwealth is a second degree felony or first or third degree misdemeanor. 18 Pa. C.S. § 6105(a)(1). Each firearm wrongly possessed by a felon constitutes a separate offense.

255.    By law, the State Police "shall have the responsibility to administer the provisions of" Pennsylvania's Uniform Firearms Act, and are assigned certain specific duties thereunder. 18 Pa. C.S. § 6111.1.(a), (b). Among these duties, the State Police must: (1) review criminal histories, delinquency histories, and mental health histories of potential firearms' purchasers or transferees; (2) make all reasonable efforts to identify the legal owner of any firearm confiscated or recovered by law enforcement; (3) establish a telephone number for inquires by licensed firearms manufacturer, importers, and dealers; and (4) provide information regarding the firearms laws and firearms safety. 18 Pa. C.S. § 6111.1.

256.    Section 6106 of the Firearms Act mandates, with limited exceptions, that, outside of one's home or "fixed place of business," firearms may not be carried in the Commonwealth "without a valid and lawfully issued license." 18 Pa. C.S. § 6106(a). Violation of this section constitutes a third degree felony unless the unlawful carrier of the firearm is "eligible" to have a valid license, in which case the violation is a first degree misdemeanor. *Id.*

257.    Under section 6109 of the Firearms Act, a "license to carry a firearm" is required to carry a concealed firearm "on or about one's person or in a vehicle throughout this

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

76

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Commonwealth." 18 Pa. C.S. § 6109(a). In order to apply for a concealed carry license, you must be "21 years of age or older" and the application itself must be "uniform throughout this Commonwealth" and only "on a form prescribed by the Pennsylvania State Police." 18 Pa. C.S. § 6109(b),(c). In filling out the application, the licensee must identify one of the following reasons for applying for a firearm license: "self-defense, employment, hunting and fishing, target shooting, gun collecting or another proper reason." 18 Pa. C.S. § 6109(c).

258.   Applicants must also sign and date the following statement under penalty of perjury, certifying that they have "never been convicted of a crime that prohibits [them] from possessing or acquiring a firearm under Federal or State law," are "of sound mind," and "have never been committed to a mental institution." *Id.* Applicants must also authorize the relevant law enforcement officials to research all records necessary to verify the certification and promise to "promptly notify" them if they are issued a license but later "knowingly become ineligible to legally possess or acquire firearms." *Id.*

259.   Then, before a license is issued, the sheriff must "conduct [an] investigation" of the applicant including an investigation of the applicant's "record of criminal conviction," whether or not the applicant "is under indictment for or has ever been convicted of a crime punishable by imprisonment exceeding one year," and has a "character and reputation" such that the applicant "will not be likely to act in a manner dangerous to public safety." 18 Pa. C.S. § 6109(d). The sheriff must also "conduct a criminal background, juvenile delinquency and mental health check." *Id*

260.   As can be seen, these various requirements and background checks serve to keep Pennsylvanians safe by keeping guns out of the hands of those who should not have access to them. This system, however, will be effectively nullified if those ineligible to buy or possess firearms can avoid the legal prerequisites for lawful possession by simply printing an untraceable gun at home or elsewhere.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

77

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

### 20. Rhode Island's Firearms Laws

2      261.   Rhode Island law establishes procedures for the lawful possession of firearms as

3   well as certain restrictions regarding the manufacturing and possession of firearms. These

4   procedures and restrictions are designed "to prevent criminals and certain other persons from

5   acquiring firearms generally and handguns in particular without at the same time making unduly

6   difficult such acquisition for other members of society." *Gadomski v. Tavares*, 113 A.3d 387,

7   298 (R.I. 2015) (quoting *State v. Storms*, 308 A.2d 463, 466 (R.I. 1973)).

8      262.   In Rhode Island, with certain exceptions, "[n]o person shall, without a license or

9   permit . . . carry a pistol or revolver in any vehicle or conveyance or on or about his or her person

10  whether visible or concealed . . . ." R.I. Gen. Laws § 11-47-8.

11     263.   The licensing authorities of any city or town in Rhode Island shall issue a license

12  or permit to a person over the age of twenty-one (21) to carry a concealed firearm upon his or

13  her person, provided the applicant has "good reason to fear an injury to his or her person or

14  property or has any other proper reason for carrying a pistol or revolver, and that he or she is a

15  suitable person to be so licensed." R.I. Gen. Laws § 11-47-11(a). In such a case, the applicant

16  must comply and satisfy certain qualifications. *See* R.I. Gen. Laws § 11-47-15. Furthermore, the

17  Attorney General of Rhode Island "may issue a license or permit to any person twenty-one (21)

18  years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person

19  upon a proper showing of need . . . ." R.I. Gen. Laws § 11-47-18(a).

20     264.   Rhode Island General Laws § 11-47-5(a) also provides that "[n]o person shall

21  purchase, own, carry, transport, or have in his or her possession any firearm," if that person has

22  been convicted of a "crime of violence," is a fugitive from justice, been convicted or pled nolo

23  contendere to an offense punishable as a felony, or has been convicted or pled nolo contendere

24  to certain other enumerated offenses. *See* R.I. Gen. Laws § 11-47-5(a)(4)(i)-(iv). In addition,

25  "[n]o person shall purchase, carry, transport, or have in his or her possession any firearm" if that

26  person is subject to a domestic abuse restraining order, *see* R.I. Gen. Laws § 11-47-5(b), nor

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

78

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

shall any person subject to community confinement or subject to electronic surveillance or monitoring as a condition of parole "purchase, carry, transport, or have in his or her possession any firearm." R.I. Gen. Laws § 11-47-5(c). Upon pleading nolo contendere or upon conviction of certain enumerated offenses, a defendant must "surrender all firearm(s) owned by the defendant, or in the defendant's possession, care, custody, or control . . . ." R.I. Gen. Laws § 11-47-5.3(a).

265.    In addition to the above paragraph, Rhode Island law also provides that "[n]o person who is under guardianship or treatment or confinement by virtue of being a mental incompetent, or who has been adjudicated or is under treatment or confinement as a drug addict, shall purchase, own, carry, transport, or have in his or her possession or under his or her control any firearm." R.I. Gen. Laws § 11-47-6.

266.    A person, firm or corporation in Rhode Island may make and sell a machine gun or parts for the same only if issued a license by the Attorney General of Rhode Island. R.I. Gen. Laws § 11-47-19.

267.    Rhode Island law also provides that "[n]o person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number . . . [or] other mark of identification on any firearm." R.I. Gen. Laws § 11-47-24(a). Additionally, "[n]o person shall, absent recertification paperwork, knowingly receive, transport, or possess any firearm which has had the name of the maker or manufacturer's serial number removed, altered, or obliterated, or if there is no name of the maker, model, or manufacturer's number then any other mark of identification on any firearm." R.I. Gen. Laws § 11-47-24(b). Violation of these provisions is a felony. R.I. Gen. Laws § 11-27-24(g).

268.    Rhode Island also recently enacted a so-called "red flag" law, which provides a procedure where a petition may be filed in a court of law "requesting an extreme risk protection order that shall enjoin the respondent from having in their possession, custody or control any

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

79

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

firearms and shall further enjoin the respondent from purchasing, receiving or attempting to purchase or receive any firearms while the order is in effect." *See* R.I. Gen. Laws § 8-8.3-3.

269. The Rhode Island General Assembly has also introduced, but not yet passed, legislation that, if enacted, would prohibit the sale, transfer, purchase, or possession of ghost guns, firearms that cannot be detected by metal detectors, and any firearm produced by a 3D printing process. *See* R.I. Sen. Bill No. S2004 (Introduced Jan. 8, 2020). Violation of these provisions would be a felony. *See* R.I. Sen. Bill No. S2004; *see also* R.I. Gen. Laws 11-27-24.

270. The Final Rules effectively deregulating 3D-printable gun files obfuscate, hinder, and contravene Rhode Island law regarding the regulation of firearms. Persons currently prohibited from possessing firearms—or persons allowed to possess a firearm(s) after proper licensing, qualification, and/or medical review—will be able to circumvent and violate Rhode Island law by manufacturing such a weapon on a 3D printer. Moreover, by virtue of their production on a 3D printer, these weapons will be unmarked, without identifying marks, and untraceable in violation of Rhode Island law. Defendants' actions will cause irreparable injury to Rhode Island and its citizens if allowed to stand.

**21.    Vermont's Firearms Laws**

271. Vermont also has a comprehensive statutory scheme for regulating the possession and sale of firearms.

272. Vermont prohibits certain persons from possessing firearms, including persons who have been convicted of a violent crime, persons who have been adjudicated to pose "an extreme risk of causing harm to himself or herself or another person," and persons under 21 years of age who are not law enforcement officers, active or veteran members of the military, or who have not satisfactorily completed an approved hunter safety course and been approved by the state Commissioner of Fish and Wildlife. 13 Vt. Stat. Ann. §§ 4017, 4020, 4053. Moreover, a person in Vermont who is adjudicated to be in need of treatment, under the State's mental health laws, is barred by federal law from possessing a firearm. *See* 13 Vt. Stat. Ann., tit. 13, §

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

80

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

4824; tit. 18, § 7617a; 18 U.S.C. § 922(g)(4). A mental health based prohibition on firearm ownership cannot be removed absent a judicial ruling that the person is no longer in need of treatment under Vermont law. *See* Vt. Stat. Ann., tit. 13, § 4825. And courts in Vermont routinely impose prohibitions on firearm ownership as conditions of probation for released adult and juvenile offenders. *See* Vt. Stat. Ann., tit. 28, § 252(b)(8); tit. 33, § 5262(b)(4).

273.   Vermont recently enacted a universal background check system which requires nearly all firearm transfers to be facilitated by a licensed firearms dealer who must determine that the proposed transferee is not prohibited by state or federal law from possessing a firearm. Vt. Stat. Ann., tit. 13, § 4019.

274.   Vermont law also authorizes law enforcement officers to remove any firearms in the immediate possession or control of a person being arrested or cited for domestic assault if removal is necessary to protect the safety of the officer, the alleged victim, the arrestee, or a family member of the arrestee or alleged victim. 13 Vt. Stat. Ann., tit. 13, § 1048.

275.   Vermont law also imposes significant record-keeping requirements related to the transfer of firearms. Firearms retailers are required to "record the sale . . . of all revolvers and pistols, and the purchase by them of all secondhand revolvers and pistols . . . [which] shall include the date of the transaction, the marks of identification of the firearm, including the manufacturer's name, the caliber, model and manufacturer's number of the firearm." Vt. Stat. Ann., tit. 13 § 4006. These records must be preserved for six years and made available for inspection by "all enforcement officers to inspect the same at all reasonable times." *Id.*

276.   These laws were enacted to protect the people of Vermont by keeping deadly weapons out of the hands of persons who are most likely to use them to cause others harm and to facilitate law enforcement investigations into gun-related crime. The Final Rules will cause Vermont irreparable harm by undermining the State of Vermont's ability to enforce these laws and protect its residents.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

81

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

### 22.   Virginia's Firearms Laws

2    277.    While Virginia's system of firearm regulation is not as comprehensive as that of

3    some of her sister states, even Virginia's regulatory framework would be compromised under

4    the Government's position. There are entire categories of persons that Virginia has determined

5    are prohibited from possessing various firearms. These categories would be obviated if the Final

6    Rules effectively deregulate 3D-printable gun files.

7    278.    For example, it is a violation of Virginia law for any person who has been

8    acquitted on a charge of any felony and certain misdemeanors and ordinances by reason of

9    insanity and committed to the custody of the Commissioner of Behavioral Health and

10   Developmental Services to purchase, possess, or transport any firearm. Va. Code § 18.2-308.1:1.

11   Such an individual may never again possess a firearm unless he successfully petitions the court

12   for the restoration of that right. *Id.* Similarly, it is unlawful for any person who has been

13   adjudicated incapacitated from purchasing, possessing, or transporting a firearm. Va. Code

14   § 18.2-308.1:2. Again, such an individual may never again possess a firearm unless he

15   successfully petitions the court for the restoration of that right. *Id.* It is unlawful for any person

16   who has been involuntarily admitted to a facility or ordered to mandatory outpatient treatment

17   for a myriad of reasons from ever again purchasing, possessing, or transporting a firearm unless

18   he successfully petitions the court for the restoration of that right. Va. Code § 18.2-308.1:3.

19   279.    Nor is mental acuity the only basis for restricting firearm possession. Virginia

20   prohibits those persons convicted of felonies, certain misdemeanors, and those adjudicated

21   delinquent of certain offenses from knowingly and intentionally possessing or transporting any

22   firearm. Va. Code § 18.2-308.2. With limited exceptions, these are lifetime bans unless one

23   successfully petitions the court for restoration of that right. *Id.*

24   280.    There are other, more limited circumstances in which firearm possession is

25   restricted, but the context of these circumstances demonstrates the importance of ensuring that

26   certain individuals do not have access to firearms. Individuals subject to protective orders may

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

82

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

not transport firearms. Va. Code § 18.2-308.1:4. Perhaps most importantly, those subject to protective orders arising from family abuse may not even possess a firearm while the order is in effect. *Id.* Further, those convicted of two misdemeanor drug possession offenses within 36 months are prohibited from transporting handguns until they complete a conviction-free period of five years. Va. Code § 18.2-0308.1:5. It is also unlawful, and subject to an enhanced penalty, to be in possession of a firearm while simultaneously in unlawful possession of a controlled substance. Va. Code § 18.2-308.4.

281.    In addition to possession, Virginia also prohibits an individual from bartering, giving, or furnishing a firearm to those whom he knows are prohibited from possessing or transporting a firearm. Va. Code § 18.2-308.2:1. Likewise, Virginia prohibits individuals from furnishing handguns to minors. Va. Code § 18.2-309(B). These statutes evidence Virginia's public policy of ensuring that others not facilitate prohibited persons from obtaining firearms that they may not lawfully possess. The authorized release of Firearm Files under the Final Rules at issue runs completely contrary to that public policy.

282.    Restrictions also exist on the types of firearms allowable in Virginia. Of particular relevance is the restriction against the manufacture, transfer, possession, or transportation of plastic firearms. Va. Code § 18.2-308.5. "A 'plastic firearm' means any firearm . . . containing less than 3.7 ounces of electromagnetically detectable metal in the barrel, slide, cylinder, frame or receiver of which, when subjected to inspection by X-ray machines commonly used at airports, does not generate an image that accurately depicts its shape." *Id.*

283.    If the Final Rules go into effect, the Commonwealth of Virginia—home to such national security institutions as the Pentagon, the headquarters of the Central Intelligence Agency, and the Norfolk Naval Base—will be irreparably harmed, as firearms manufactured from Firearm Files will upend Virginia's public safety regime. Those prohibited from possessing and transporting firearms will be able to manufacture their own untraceable guns with no accountability in short order.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

83

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

### 23. Wisconsin's Firearms Laws

2   284.   Wisconsin has laws regulating the possession, sale and transfer of firearms within

3   the state. Wisconsin prohibits certain categories of persons from purchasing or possessing a

4   firearm. Wis. Stat. § 941.29(1m). For example, persons cannot possess a firearm if they have

5   been convicted of a felony in the state, convicted of a crime elsewhere that would be a felony if

6   committed in Wisconsin, been found not guilty by reason of mental disease or defect, have been

7   involuntary committed for mental health treatment, or are subject to certain orders not to possess

8   a firearm. *Id.* Wisconsin generally prohibits those under 18 years of age from possessing a

9   firearm, with exceptions such as target practice under supervision of an adult, firearm safety

10   instruction under the supervision of an adult, or hunting under the supervision of an adult. Wis.

11   Stat. § 948.60.

12   285.   Wisconsin law prohibits a person from carrying a concealed and dangerous

13   weapon, which includes firearms, unless they meet certain exceptions, including obtaining a

14   concealed carry license from the Wisconsin Department of Justice. Wis. Stat. § 941.23(2).

15   Wisconsin law also prohibits a person from going armed with a firearm in any building owned

16   or leased by the state or any political subdivision of the state. Wis. Stat. § 941.235(1).

17   286.   Wisconsin law prohibits the sale and possession of certain types of firearms and

18   firearm-related equipment. The state prohibits the sale, possession, use or transport of any

19   machine gun or other fully automatic firearm. Wis. Stat. § 941.26(1g). Wisconsin also prohibits

20   the sale, transportation, purchase and possession of short-barreled shotguns and short-barreled

21   rifles. Wis. Stat. § 941.28(2). The state likewise prohibits the sale, delivery and possession of a

22   firearm silencer. Wis. Stat. § 941.298(2).

23   287.   Wisconsin shares background check duties with the federal government. The

24   Wisconsin Department of Justice conducts background checks for all sales of handguns made

25   by firearms dealers within the state, Wis. Stat. § 175.35(2), while the Federal Bureau of

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

84

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   Investigation conducts similar background checks for the sales of long guns and rifles in the

2   state.

3       288.    The Final Rules will undermine Wisconsin's efforts to prevent the proliferation

4   of dangerous weapons and to prevent persons ineligible to possess firearms under state law from

5   obtaining them. Persons currently prohibited from acquiring and possessing firearms would be

6   able to circumvent Wisconsin law by printing a gun on a 3D printer. Further, because guns

7   printed on a 3D printer are made of non-metallic components, these firearms will easily evade

8   detection in public buildings.

9                    **V.    CAUSES OF ACTION**
                          <u>**Count I**</u>
10        **Violation of the Administrative Procedure Act:**
11   **Agency Action Not in Accordance with Law—Notice and Comment**

12      289.    All of the foregoing allegations are repeated and realleged as though fully set

13   forth herein.

14      290.    Under the APA, a court must set aside agency action that is "not in accordance

15   with law." 5 U.S.C. § 706(2)(A).

16      291.    The APA requires federal agencies engaged in rulemaking to comply with notice-

17   and-comment procedures. 5 U.S.C. § 553(b). Among other things, agencies must publish notices

18   of proposed rulemaking describing "either the terms or substance of the proposed rule or a

19   description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

20      292.    To comply with the APA, NPRMs must give fair notice of the proposed rules'

21   effects. That is, they must permit interested members of the public to read the proposed rules

22   and understand their essential attributes, without having to "guess" at the agency's "true intent."

23   *State of California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700, 707 (9th Cir. 2003).

24      293.    Following publication of adequate notice, agencies must then give interested

25   persons at least 30 days to comment on the proposed rule. "A decision made without adequate

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

85

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    notice and comment is arbitrary or an abuse of discretion." *NRDC v. U.S. EPA*, 279 F.3d 1180,

2    1186 (9th Cir. 2002).

3          294.    Defendants failed to give adequate notice of the import of their proposed rules.

4    Although the Final Rules are contemplated by the Settlement Agreement with Defense

5    Distributed promising to deregulate Firearm Files, the NPRMs make no mention whatsoever of

6    3D-printable gun files.

7          295.    The NPRMs not only failed to apprise interested persons of the "essential

8    attributes" of the proposed rules—i.e., the effective deregulation of 3D-printable gun files—they

9    *actively concealed* that such deregulation was the agencies' "true intent." The NPRMs

10   misleadingly claim that the rules will only affect commonly commercially available items,

11   without mentioning undetectable and untraceable weapons. And, contrary to the clear

12   deregulatory purpose and effect of the proposed rules, the Commerce Department's NPRM

13   misleadingly claims that "[t]his proposed rule does not deregulate the transferred items."

14         296.    Moreover, the government failed to provide notice of the Commerce Final Rule's

15   modification of the self-executing loophole, creating an exception to the exception that retains

16   jurisdiction only over certain published Firearm Files "made available by posting on the internet

17   . . . ." Thus, even commenters who realized the proposed rules would affect Firearm Files had

18   no notice of the specific provisions revealed for the first time in the Commerce Final Rule,

19   depriving them of any opportunity to comment on the significant loopholes in that regulatory

20   scheme, including those discussed above.

21         297.    The Final Rules are not a logical outgrowth of the rulemaking process because

22   the public did not receive fair notice of their terms or substance through the proposed rules. A

23   new round of notice and comment "would provide the first opportunity for interested parties to

24   offer comments that could persuade the agency to modify its rule." *Nat. Res. Def. Council v. U.S.*

25   *Nuclear Regulatory Comm'n*, 279 F.3d 1180, 1186 (9th Cir. 2002).

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

86

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

298.    For these reasons, the Plaintiff States are entitled to a declaration that the Final Rules are invalid, and an injunction prohibiting them from going into effect. Absent such relief, the Plaintiff States and their residents will continue to be harmed by Defendants' illegal actions.

**Count II**
**Violation of the Administrative Procedure Act:**
**Agency Action Not in Accordance with Law—AECA**

299.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

300.    "'In order to be valid regulations must be consistent with the statute under which they are promulgated.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 772 (9th Cir. 2018) (brackets omitted) (quoting *United States v. Larionoff*, 413 U.S. 864, 873 (1977)). Regulations "inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement" are invalid. *F.E.C. v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981).

301.    AECA's purpose is to control the import and export of defense articles and defense services "[i]n furtherance of world peace and the security and foreign policy of the United States[.]" 22 U.S.C. § 2778(a)(1). This includes reducing the international trade in arms and avoiding destabilizing effects abroad through arms exports. *Id.* § 2751.

302.    The State Final Rule is contrary to the purpose of AECA because its removal of Firearm Files from the Munitions List is not "[i]n furtherance of world peace and the security and foreign policy of the United States[.]" In fact, it frustrates these objectives by giving up State Department control of Firearm Files that can be used to automatically produce untraceable, undetectable firearms, and transferring control of these items to the Commerce Department, which will not retain meaningful export-control jurisdiction over such files. As the record reflects, and as the federal government apparently agrees, global dissemination of untraceable

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

87

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

and undetectable firearms will actively jeopardize world peace and the security and foreign policy of the United States.

303.     As this Court has instructed, it is insufficient for the State Department to remove Firearm Files from the Munitions List while evaluating the issue "only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage." *Washington*, 2019 WL 5892505, at *8. But, yet again, the State Department's sole basis for removing Firearm Files from the Munitions List is that they "do not confer a critical military or intelligence advantage and are not inherently military based on their function." 85 Fed. Reg. 3823. Its assertion that national security and foreign policy interests are adequately addressed by the Commerce Rule rings hollow, since the Commerce Department lacks any meaningful authority to regulate Firearm Files.

304.     For these reasons, the Plaintiff States are entitled to a declaration that the Final Rules are invalid, and an injunction prohibiting them from going into effect. Absent such relief, the Plaintiff States and their residents will continue to be harmed by Defendants' illegal actions.

## Count III
### Violation of the Administrative Procedure Act:
### Arbitrary and Capricious Agency Action

305.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

306.     Under the APA, a court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

307.     Agency action is arbitrary and capricious where, *inter alia*, the agency has (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

88

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency reverses a prior policy, it must (1) "display awareness that it *is* changing position," (2) "show that there are good reasons for the new policy," including disclosing the details of any "factual findings that contradict those which underlay its prior policy," and (3) account for "serious reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

308.    The Final Rules, each independently and when construed together, are an outgrowth of the same arbitrary and capricious agency decisionmaking process that gave rise to the NPRMs and the unlawful Temporary Modification and Letter, and do not reflect considered agency decisionmaking.

309.    The Final Rules, each independently and when construed together, are an illogical means of achieving the federal government's stated goal of continuing to regulate the export and internet publication of Firearm Files. Even though the preambles of both Final Rules acknowledge that the global dissemination of Firearm Files will harm national security and foreign policy interests, the combined effect of the Final Rules is to permit such dissemination and ensure that the Commerce Department lacks jurisdiction to control it.

310.    The State Final Rule is arbitrary and capricious because it removes Firearm Files from the Munitions List entirely, without giving adequate consideration to the important issues Congress directed the agency to consider: namely, world peace, national security, and foreign policy. The State Final Rule is also arbitrary and capricious because it reverses the agency's prior position of controlling the export of Firearm Files by maintaining such files on the Munitions List, absent an adequate basis in the administrative record for the reversal. The State Department's asserted position that Firearm Files will be adequately controlled by the Commerce Department is unsubstantiated and disregards the limitations of the Commerce Department's authority, including the loopholes discussed below.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

89

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

311.     The Commerce Final Rule is arbitrary and capricious because it contains glaring loopholes that will permit Firearm Files to be exported and disseminated easily without a license. In general, the Commerce Department lacks jurisdiction over "published" items. 15 C.F.R. §§ 734.3(b)(3), 734.7. Defense Distributed has already published at least some of its Firearm Files, including the files for the Liberator pistol. Firearm Files could also be easily published through the means established by existing regulations, which do not require government pre-approval. 15 C.F.R. § 734.7. Under the Final Rules, such published files remain largely outside the Commerce Department's export jurisdiction.

312.     The Commerce Final Rule purports to create an exception whereby Commerce retains jurisdiction over files "made available by posting on the internet in an electronic format, such as AMF or G-code, and [that are] ready for insertion into . . . equipment" that uses the files to "produce the firearm frame or receiver or complete firearm." However, this limited retention of jurisdiction is essentially meaningless in light of glaring loopholes that make it easy to evade. *See supra* ¶¶ 102–112. For example, Commerce will lack jurisdiction over the export of published files by any means *other* than "posting on the internet," including direct transmission to foreign recipients by mail or email. Once Firearm Files are exported lawfully, they are likely to be posted on the internet, making them broadly available worldwide. Commerce will also lack jurisdiction over files that are not "ready for insertion" into a 3D printer or other device, but that can be easily converted to a readable format—such as CAD files that can be converted using commonly available software.

313.     Moreover, transferring Firearm Files to the Commerce Department's jurisdiction removes them from Congressional oversight and vests the Department with effectively unreviewable discretion to grant licenses to post Firearm Files on the internet, where they could be accessed by anyone throughout the world with no restrictions on the end-use or end-user.

314.     The Final Rules, each independently and when construed together, are also arbitrary and capricious because they infringe on the Plaintiff States' sovereign rights to exercise

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

90

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

their police power by enacting and enforcing public safety laws that restrict certain persons' possession of firearms and provide for licensing and tracking gun ownership.

315.    For these reasons, the Plaintiff States are entitled to a declaration that the Final Rules are invalid, and that they are vacated and set aside. The Plaintiff States are also entitled to an injunction prohibiting the Final Rules from going into effect. Absent such relief, the Plaintiff States and their residents will continue to be harmed by Defendants' illegal actions.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States request that the Court enter a judgment against Defendants and award the following relief:

a.    Issue a preliminary and a permanent injunction prohibiting Defendants from implementing or enforcing the Final Rules;

b.    Vacate and set aside the Final Rules;

c.    Award the Plaintiff States their costs and reasonable attorneys' fees; and

d.    Award such additional relief as the interests of justice may require.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

91

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

DATED this 6th day of February, 2020.

ROBERT W. FERGUSON
Attorney General of Washington

*s/ Kristin Beneski*
KRISTIN BENESKI, WSBA #45478
Assistant Attorney General

*s/Jeffrey Rupert*
JEFFREY RUPERT, WSBA #45037
Division Chief

*s/Brendan Selby*
BRENDAN SELBY, WSBA #55325
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 474-7744
kristin.beneski@atg.wa.gov
jeffrey.rupert@atg.wa.gov
brendan.selby@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California

*s/ John W. Killeen*
JOHN W. KILLEEN
Deputy Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6045
John.killeen@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHILIP J. WEISER
Attorney General of Colorado

*s/ Grant T. Sullivan*
GRANT T. SULLIVAN
Assistant Solicitor General
1300 Broadway, 6th Floor

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

92

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    Denver, CO 80203
     (720) 508-6349
2    Grant.sullivan@coag.gov
3    *Attorneys for Plaintiff State of Colorado*

4    WILLIAM TONG
     Attorney General of Connecticut
5
     *s/ Maura Murphy Osborne*
6    MAURA MURPHY OSBORNE
     Assistant Attorney General
7    KIMBERLY MASSICOTTE
     JOSEPH RUBIN
8    55 Elm St.
     P.O. Box 120
9    Hartford, CT 06141-0120
     (860) 808-5318
10
     *Attorneys for Plaintiff State of Connecticut*
11

12   KATHLEEN JENNINGS
     Attorney General of Delaware
13
     *s/ Christian Douglas Wright*
14   CHRISTIAN DOUGLAS WRIGHT
     Director of Impact Litigation
15   JILLIAN A. LAZAR
     DAVID J. LYONS
16   Deputy Attorneys General
     Carvel State Building
17   820 N. French St.
     Wilmington, DE 19801
18   (302) 577-8400
19   Christian.wright@deleware.gov
     Jillian.lazar@deleware.gov
20   David.lyons@deleware.gov
21   *Attorneys for Plaintiff State of Delaware*

22   KARL A. RACINE
     Attorney General of the District of Columbia
23
     *s/ Kathleen Konopka*
24   KATHLEEN KONOPKA
25   Deputy Attorney General, Public Advocacy
     Division
26

1

2  ANDREW J. SAINDON
   Senior Assistant Attorney General
3  441 Fourth Street, N.W., Sixth Floor South
   Washington, D.C. 20001
4  (202) 741-0770
   Andy.saindon@dc.gov
5  *Attorneys for Plaintiff District of Columbia*

6  CLARE E. CONNORS
   Attorney General of Hawaii
7
   *s/ Robert T. Nakatsuji*
8  ROBERT T. NAKATSUJI
   Deputy Attorney General
9  425 Queen Street
   Honolulu, HI 96813
10 (808) 586-1360
   Robert.t.nakatsuji@hawaii.gov
11 *Attorneys for Plaintiff State of Hawaii*

12

13 KWAME RAOUL
   Attorney General of Illinois
14
   *s/ Kathryn Hunt Muse*
15 KATHRYN HUNT MUSE
   Deputy Chief, Public Interest Division
16 DARREN KINKEAD
   Assistant Attorney General
17 100 West Randolph Street
   Chicago, IL 60601
18 (312) 814-3000
   kmuse@atg.state.il.us
19 dkinkead@atg.state.il.us
20 *Attorneys for Plaintiff State of Illinois*

21 AARON M. FREY
   Attorney General of Maine
22
   *s/ Susan P. Herman*
23 SUSAN P. HERMAN
   Chief Deputy Attorney General
24 6 State House Station
   Augusta, Maine 04333-0006
25 (207) 626-8814

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

94

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland

*s/ Jeffrey P. Dunlap*
JEFFREY P. DUNLAP
STEVEN M. SULLIVAN
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6325
ssullivan@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts

*s/ Phoebe Fischer-Groban*
PHOEBE FISCHER-GROBAN
Assistant Attorney General
1 Ashburton Place, 20th Floor
Boston, MA 02108
(617) 727-2200
Phoebe.fischer-groban@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan

*s/ Joseph T. Froehlich*
JOSEPH T. FROEHLICH
Assistant Attorney General
525 West Ottawa Street
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
Froehlichj1@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

95

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

2                                 *s/ Jacob Campion*

                                JACOB CAMPION

3                                 Assistant Attorney General

                                445 Minnesota Street, Suite 1100

4                                 St. Paul, MN 55101

5                                 (651) 757-1459

                                Jacob.campion@ag.state.mn.us

6                                 *Attorneys for Plaintiff State of Minnesota*

7                                 GURBIR S. GREWAL

                                Attorney General of New Jersey

8

9                                 *s/ Glenn J. Moramarco*

                                GLENN J. MORAMARCO

10                                 Assistant Attorney General

                                Richard J. Hughes Justice Complex

11                                 25 Market Street

12                                 Trenton, NJ 08625

                                (609) 376-3235

13                                 Glenn.moramarco@law.njoag.gov

                                *Attorneys for Plaintiff State of New Jersey*

14                                 HECTOR BALDERAS

15                                 Attorney General of New Mexico

16                                 *s/ Nicholas M. Sydow*

                                NICHOLAS M. SYDOW*

17                                 Civil Appellate Chief

18                                 201 Third St. NW, Suite 300

                                Albuquerque, NM 87102

19                                 (505) 717-3571

                                nsydow@nmag.gov

20                                 *Attorneys for Plaintiff State of New Mexico*

21                                 LETITIA JAMES

22                                 Attorney General for New York

23                                 *s/ Matthew Colangelo*

                                MATTHEW COLANGELO

24                                 Chief Counsel for Federal Initiatives

                                DANIELA NOGUEIRA

25                                 Assistant Attorney General

                                STEVEN C. WU

26                                 Deputy Solicitor General

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

96

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

28 Liberty Street
New York, NY 10005
(212) 416-6057
Matthew.colangelo@ag.ny.gov
Daniela.Nogueira@ag.ny.gov
steven.wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

JOSHUA H. STEIN
Attorney General of North Carolina

*s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*s/ Carla Scott*
CARLA SCOTT
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1915
carla.a.scott@doj.state.or.us
MICHAEL KRON
Special Counsel
1162 Court Street NE
Salem, OR 97301-4096
(503) 378-4400
Michael.c.kron@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

JOSHUA SHAPIRO
Attorney General of Pennsylvania

*s/ Jacob B. Boyer*
JACOB B. BOYER
Deputy Attorney General
1600 Arch Street, Suite 300

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

97

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Philadelphia, PA 19103
(215) 560-2171
jboyer@attorneygeneral.gov
mfischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island

*s/ Justin J. Sullivan*
JUSTIN J. SULLIVAN
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2007
jjsullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

T.J. DONOVAN
Attorney General of Vermont

*s/ Benjamin D. Battles*
BENJAMIN D. BATTLES
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-5944
Benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of Virginia

*s/ Samuel T. Towell*
SAMUEL T. TOWELL
Deputy Attorney General, Civil Litigation
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071
STowell@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of
Virginia*

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

98

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Brian P. Keenan*
BRIAN P. KEENAN*
Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

*\*PRO HAC VICE APPLICATION*
*FORTHCOMING*

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF
NO. 20:2-cv-00111-RAJ

99

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744