# Attachment 1

has reviewed this action for factors and circumstances in which a normally categorically excluded action may have a significant environmental impact requiring further analysis. The FAA has determined no extraordinary circumstances exist that warrant preparation of an environmental assessment or environmental impact study.

## List of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

\* \* \* \* \*

Issued in Washington, DC, on January 15, 2020.

**Scott M. Rosenbloom,**

*Acting Manager, Rules and Regulations Group.*

[FR Doc. 2020–00995 Filed 1–22–20; 8:45 am]

**BILLING CODE 4910–13–P**

## The Amendment

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.11D, Airspace Designations and Reporting Points, dated August 8, 2019, and effective September 15, 2019, is amended as follows:

*Paragraph 6011  United States Area Navigation Routes.*

\* \* \* \* \*

### T–217  LEXINGTON, KY (HYK) TO BONEE, OH [AMENDED]

| Lexington, KY (HYK) | VORTAC | (Lat. 37°57′58.86″ N, long. 84°28′21.06″ W) |
| BOSTR, OH | FIX | (Lat. 38°53′08.13″ N, long. 84°04′58.02″ W) |
| HEDEN, OH | FIX | (Lat. 39°16′44.88″ N, long. 84°02′02.37″ W) |
| PRUDE, OH | FIX | (Lat. 39°25′44.92″ N, long. 83°56′58.60″ W) |
| Springfield, OH (SGH) | DME | (Lat. 39°50′11.55″ N, long. 83°50′41.84″ W) |
| BONEE, OH | FIX | (Lat. 40°03′08.85″ N, long. 83°56′56.15″ W) |

\* \* \* \* \*

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

[Public Notice: 10603]

**RIN 1400–AE30**

### International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**AGENCY:** Department of State.

**ACTION:** Final rule.

**SUMMARY:** The Department of State (the Department) amends the International Traffic in Arms Regulations (ITAR) to revise Categories I—firearms, close assault weapons and combat shotguns, II—guns and armament, and III—ammunition/ordnance of the U.S. Munitions List (USML) to describe more precisely the articles that provide a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant export and temporary import control on the USML. These revisions complete the initial review of the USML that the Department began in 2011. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the Export Administration Regulations.

**DATES:** This final rule is effective March 9, 2020.

**FOR FURTHER INFORMATION CONTACT:** Sarah Heidema, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2809; email *DDTCPublicComments@state.gov.* ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). On May 24, 2018, DDTC published a proposed rule, 83 FR 24198, for public comment regarding proposed revisions to Categories I, II, and III of the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). After review of received comments and with the revisions to the proposed rule further described below, DDTC now publishes this final rule to amend the ITAR.

The articles and related technical data subject to the jurisdiction of the ITAR, *i.e.,* "defense articles," are identified on the USML. With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the USML under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1 of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of jurisdiction from the ITAR's USML to the EAR's

CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule adds two new paragraphs, (b)(2)(vii) and (viii), to § 129.2 to update the enumerated list of actions that are not brokering. This change is a conforming change and is needed to address the transfer from the USML to the CCL of USMIL defense articles that remain subject to the brokering controls, and to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport, or retransfer of such items subject to the EAR or continue to require registration with the Department solely based on activities related to the manufacture of these items.

The Department of State is engaged in an effort, described more fully below, to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, have an inherently military function. The Department has undertaken these revisions pursuant to the President's delegated discretionary statutory authority in section 38(a)(1) of the AECA to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States and to designate those items which constitute the USML. The Department determined that the articles in USML Categories I, II, and III that are removed from the USML under this final rule do not meet this standard, including many articles that are widely available in retail outlets in the United States and abroad (such as many firearms previously described in Category I, paragraph (a), including, for example, a .22 caliber rifle).

The descriptions below describe the status of the subject categories of the USML and CCL as of the effective date of this rule and the companion rule published by the Department of Commerce in this **Federal Register** issue. Any reference in the preamble to this final rule to transfer from the USML to the CCL reflects the combined effects of removal of the defense article from the controls of the ITAR by virtue of the removal of an item (*i.e.,* enumerated control text) from the USML by this rule and the corresponding adoption of the former defense article as an item subject to the EAR by action of the companion rule. Comments regarding the overall rule are addressed immediately below, while comments specific to a Category or amended section of the ITAR are addressed in the relevant discussion of revisions to Categories I, II, or III, or in the discussion under the title of "Conforming ITAR Changes."

**Comments of General Applicability**

The Department believes that a restatement of the overall principles behind the multi-year review of the USML and the efforts to better harmonize the ITAR and the EAR and the larger U.S. government's export control system is applicable to many of the comments received and to the reasoning behind this rule. Therefore, before addressing individual comments, the Department reiterates that it, along with its interagency partners, is engaged in a years-long effort to revise the USML to limit its scope to those items that provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function. Review of the USML is statutorily required by section 38(f) of the AECA, and the Department conducts this review in accordance with, and in full recognition of, the President's authority, conferred in section 38(a) of the Act, to control the import and export of defense articles and defense services in furtherance of world peace and the security and foreign policy of the United States, and to designate those items that constitute the USML. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories, removing less sensitive items from the USML. While a wide range of interagency stakeholders review and clear the **Federal Register** notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML. As required by Executive Order 13637, the Department obtains the concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML. The engagement with the Department of Commerce is further intended to ensure that the jurisdictional posture of a given item is clear, and that the application of ITAR or EAR controls to that item can be discerned and understood by the public.

The Department underscores that this rule constitutes an important part of a nine-year program of revisions that has streamlined the USML. From the beginning, the Department has repeatedly stated its goals for that program (*see e.g.,* 76 FR 68694 (Nov. 7, 2011), 76 FR 76097 (Dec. 6, 2011), 80 FR 11313 (Mar. 2, 2015), 82 FR 4226 (Jan. 13, 2017)). First, that it is seeking to better focus its resources on protecting those articles and technologies that provide the United States with a critical military or intelligence advantage. As applied to this rule, for example, firearms and firearms technology that are otherwise readily available do not provide such an advantage, whereas an M134 Minigun or the next generation squad automatic rifle continues to warrant USML control even if there is some limited civil availability for either. Second, to resolve jurisdictional confusion between the ITAR and EAR among the regulated community through revision to "bright line" positive lists. Third, to provide clarity to the regulated community thereby making it easier for exporters to comply with the regulations and enable them to compete more successfully in the global marketplace. Finally, to develop a regulatory system that supports enhanced interoperability between the United States and its allies and partners and thereby better supports our ability to address shared security challenges.

With respect to revisions of Categories I–III, the review was focused on identifying the defense articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States. If a defense article satisfies one or both of those criteria, it remained on the USML. For example, while the U.S. military supplies some of its service members with sidearms for military use, a sidearm also has many uses outside of the military, such that its function is not inherently military and therefore it does not warrant control on the USML. Alternatively, squad automatic weapons do not generally have such non-military uses and remain controlled on the USML in this final rule. Any single non-military use, however, does not negate such a weapon's inherently military function. In summary, the Department analyzes the patterns, both current and anticipated, of use and availability of the defense articles and the utility they provide to the U.S. military or intelligence community to inform the ultimate determination as to whether control is merited on the USML.

The Department recognizes the sensitivities and foreign policy implications associated with the sale

and export of small arms, light weapons, and associated equipment and ammunition as expressed in the President's National Security Policy Memorandum Regarding U.S. Conventional Arms Transfer Policy of April 19, 2018 (Conventional Arms Transfer Policy). Those sensitivities and foreign policy implications will continue to be addressed through the licensing and enforcement requirements of the Department of Commerce. All export license applications for the items transitioning to Commerce jurisdiction are subject to review by the interagency, specifically the Departments of State, Defense, and Energy, as appropriate. The Department will continue to advance its foreign policy mission by reviewing all license applications submitted to the Department of Commerce for the export of firearms and related technology.

Multiple commenters took issue with the proposed transfer from the USML to the CCL of weapons that the Department determined, in conjunction with its interagency partners, are not inherently for military end-use, citing the fact that military and law enforcement personnel regularly use them. As previously noted, the fact that a military uses a specific piece of hardware is not a dispositive factor when determining whether it has an inherently military function. Given that the majority of the items referenced in these comments that will transfer to the CCL through this rule are widely available in retail outlets in the United States and abroad, and widely utilized by the general public in the United States, it is reasonable for the Department to determine that they do not serve an inherently military function, absent specific characteristics that provide military users with significantly enhanced utility, such as automatic weapons, sound suppressors, and high capacity magazines.

Several commenters disputed that the U.S. market should be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. The Department recognizes that there are variations in commercial availability of firearms not only between nations, but also within the domestic market itself; however, this variation in availability does not overcome the Department's assessment that the subject firearms do not provide a critical military or intelligence advantage such that they warrant control under the ITAR. In addition, all exports of firearms are subject to the laws of the importing country, and the U.S. government does not issue licenses for exporters to ship firearms to countries where the end-use is illegal.

Several commenters predicted that the rule will make it easier for foreign manufacturers to obtain U.S.-origin components and proprietary technology, thereby causing U.S. firearms manufacturers to lose global market share. The Department refers the commenters to the above-stated objectives of this review effort, which include making it easier for exporters to comply with export control regulations and enabling them to compete more successfully in the global marketplace. The Department further notes that this rule is expected to provide certain key advantages that will substantially benefit domestic manufacturers by: (1) Amending the regulatory burden on the U.S. commercial firearms and ammunition industry; (2) clarifying the regulatory requirements for independent gunsmiths; and (3) enabling foreign manufacturers to source from small- and medium-sized U.S. companies more easily.

Several commenters predicted that this rule will diminish the United States' ability to set global normative standards for arms transfers and non-proliferation. The Department strongly disagrees and remains fully committed to the goals outlined in the AECA. In particular, the Department takes seriously its responsibility to implement the AECA's declaration that: "It shall be the policy of the United States to exert leadership in the world community to bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments" (22 U.S.C. 2751). The Department will continue to meet this responsibility, in part, by reviewing export license applications for items subject to the EAR that were formerly controlled by the ITAR, including those on the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies (Wassenaar Arrangement) control lists. The Department will continue to take into account the considerations of Section 3 of the Conventional Arms Transfer Policy, such as the national security and foreign policy interests of the United States, when making arms transfer decisions, both for firearms that remain subject to the ITAR and firearms that are subject to the EAR.

Other commenters suggested that this rule contravenes international commitments the United States has made through mechanisms such as the Wassenaar Arrangement. The transfer of the concerned items to the CCL does not contravene U.S. international commitments, as the U.S. government will continue to apply a high level of control to these items and require U.S. government authorization for all exports of firearms and major components.

Multiple commenters raised concerns about the role and function of the Department of Commerce regarding the items that are transferred from the USML to the CCL. Some commenters expressed concerns that the Department of Commerce has neither the appropriate resources nor the appropriate expertise or mission to process associated applications for export. Other commenters asserted that because the Department of Commerce, unlike the Department of State, does not charge registration or licensing fees, the transfer to the CCL constitutes an unnecessary burden on taxpayers. As stated previously, the Department is engaged in an effort to revise the USML so that its scope is limited to those defense articles that warrant the U.S. government's highest level of export control because those defense articles offer a critical military or intelligence advantage or, in the case of weapons, have an inherently military function. The revisions implemented by the Department are necessary in order to focus our resources on such defense articles. This effort in general, and this rule in particular, were developed in close consultation with other departments and agencies, including the Department of Commerce. While the Department of Commerce is best suited to address the specific details of the implementation of its regulations and its allocation of appropriated resources, the Department is confident that the framework for control of firearms, and parts and components thereof, across the EAR and the ITAR is sufficient to address the concerns of the U.S government and does not diminish or damage the national security or foreign policy interests of the United States. The Department does not share the concerns expressed about the Department of Commerce's expertise or mission, and the Department further notes that the Department of Commerce has been licensing shotguns and shotgun ammunition, as well as various firearms-related articles such as sighting devices and a range of other similar articles and technologies, for decades. Additionally, the Department of Commerce has investigated and disrupted numerous diversion rings related to EAR-controlled items and will apply its years of export control enforcement expertise to the items this rule transfers to its jurisdiction.

Multiple commenters expressed a general concern that the transfer to the

CCL increases the risk of overseas trafficking, proliferation, or diversion. Multiple commenters also raised concerns about the Department of Commerce's end-use monitoring (EUM) capabilities and the impact this rule has on the Department of State's EUM programs. This rule does not deregulate the export of firearms. All firearms and major components being transferred to the CCL will continue to require export authorization from the Department of Commerce. Further, the Department of Commerce has both a robust EUM program and a law enforcement division sufficiently capable of monitoring foreign recipients' compliance with their obligations regarding the transfer, use, and protection of items on the CCL. Additionally, the Federal Bureau of Investigation and the Department of Homeland Security will continue to investigate and enforce criminal violations of the export control laws as appropriate. This rule also will not impact the Department's ability to execute the Blue Lantern EUM program required by section 40A of the AECA, 22 U.S.C. 2785. Finally, this rule will not affect existing federal or state public safety laws that address domestic criminal conduct.

Several commenters expressed concern that the Department of Commerce will not have access to the same databases and background information that the Department of State uses to evaluate license applications. Similarly, some commenters expressed concern that as a result of this rule some exporters will no longer be subject to U.S. government registration requirements, thereby depriving regulators of an important source of information and decreasing transparency and reporting regarding firearms exports. The Department considered these concerns and determined that the interagency license review process maintains appropriate oversight of the articles at issue. The Department of Commerce's export licensing requirements and process are calibrated both to the sensitivity of the article and the proposed destination. Additionally, all requests for export licenses for firearms remain subject to interagency review, including by the Department of State.

Several commenters suggested that the Department create a registration exemption or reduce registration fees for small volume non-exporting firearms manufacturers. Multiple commenters similarly suggested modifying ITAR § 122.1 to include a minimum size requirement for registration. Modification of the requirements of part 122 is outside the scope of this rulemaking; however, the Department highlights that the Department of Commerce does not have a registration requirement for manufacturers and exporters of the items under its jurisdiction. Therefore, gunsmiths that do not manufacture, export, or broker articles that remain subject to the ITAR after this rule's effective date will no longer need to determine if they are required to register under the ITAR. They may, however, still be required to comply with ATF licensing requirements. Any additional changes to the ITAR related to the registration requirement would be addressed in a separate rulemaking.

On the issue of registration, one commenter noted that as a result of this rule some U.S. manufacturers may no longer have to register with the Department of State and be subject to the requirements in ITAR § 122.4(b) for advance notification of intended sales or transfers to foreign persons of ownership or control of the registrant. The commenter asserted that without the advance notification requirement foreign entities could potentially influence the sales and marketing activities of U.S. manufacturers in a manner that would be detrimental to U.S. national security. The Department notes in response that its regulatory authorities are limited to export-related activities for defense articles and services, and highlights that other federal regulatory regimes, such as the Committee on Foreign Investment in the United States, have the ability to address potential foreign ownership or control issues that may impact national security.

Multiple commenters expressed concerns that this rule would reduce congressional oversight of arms transfers since the Department of Commerce does not have to notify Congress of firearms sales in excess of $1 million as the Department of State does. The Department acknowledges those concerns and notes that those firearms that the U.S. government deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to congressional notification requirements in conformity with section 36 of the AECA and Executive Order 13637.

A number of commenters suggested the proposed rule, if made final, may have a negative impact on human rights in foreign countries. As stated previously, the Department of Commerce will continue its longstanding end-use monitoring efforts, including vetting of potential end-users, to help prevent human rights abuses. Similarly, as part of the aforementioned continuing interagency review of export licenses for firearms, the Departments of Defense and State will review export license applications on a case-by-case basis for national security and foreign policy reasons, including the prevention of human rights abuses.

One commenter expressed concern that foreign law enforcement personnel in particular are at risk of having the transferred CCL items used against them. These concerns are mitigated by the fact that, as stated previously: (1) These articles remain subject to the Department of Commerce's EUM programs that vet potential end-users of concern, and (2) license applications for CCL items will be approved only if their end-use is permitted under the laws of the importing country.

Multiple commenters expressed concerns that, as a result of the revision of the USML to remove items from Category I, the rule will also remove from the USML the technical data directly related to these items, thereby lifting a purported block on the domestic dissemination of computer-aided design (CAD) files for the three-dimensional (3–D) printing or CAD-enabled production of firearms. Commenters suggested that use of these files in the United States could lead to a potential increase in the number of unserialized firearms in circulation, or the manufacture or distribution of a non-metal firearm otherwise prohibited under federal law. Some commenters also expressed concerns that foreign dissemination of such files could provide adversaries with a military or intelligence advantage.

The Department considered the concerns of the commenting parties. While the Department concluded that these concerns do not warrant modification to the controls on the USML, the Department of Commerce, as described below, determined that certain modifications to its companion rule are warranted to address similar concerns expressed by commenters to its proposed rule.

As an initial matter, the Department reiterates that the scope of this rulemaking is limited to the Department's delegated authority under the AECA. Neither the AECA nor ITAR expressly provide the Department with authority to regulate the distribution of technical data in the United States to U.S. persons. This applies to all technical data subject to the ITAR, regardless of whether it is for the manufacture of ITAR-controlled firearms or any other defense article. Furthermore, the Department notes that the AECA does not provide the

Department with the authority to (1) prohibit the domestic manufacture or possession of firearms, whether produced from CAD files with a 3–D printer or otherwise, or (2) regulate the domestic distribution among U.S. persons of any defense article, including firearms. Domestic activities that do not involve release to foreign persons are generally left to other federal agencies— and the states—to regulate. The manufacture, import, sale, shipment, delivery, transfer, receipt, or possession of firearms that are undetectable as provided in federal law is a federal crime, punishable by fine and/or up to five years in prison. 18 U.S.C. 924(f). Among other statutes, the Undetectable Firearms Act of 1988 prohibits the manufacture, possession, sale, import, shipment, delivery, receipt, or transfer of undetectable firearms. *See* 18 U.S.C. 922(p).

When determining whether nonautomatic and semi-automatic firearms to .50 caliber (12.7mm) inclusive should be removed from the USML, and the technical data directly related thereto, the Department evaluated whether the hardware and its directly related technical data would confer a critical military or intelligence advantage or whether they are inherently military based on their function. The Department made a determination that neither the hardware nor its directly related technical data met these criteria. In response to the specific comments related to the potential uses for CAD files that can be used to 3–D print firearms, the Department confirms that it did consider the potential uses for these CAD files in its review. The Department determined, in consultation with the Department of Defense and other interagency partners, that these CAD files do not confer a critical military or intelligence advantage and are not inherently military based on their function. This determination took into account the effect that a transfer to the CCL would have on the national security and foreign policy interests of the United States, consistent with the AECA and ITAR, to include the degree to which it would limit the ability of a foreign person to obtain CAD files, publish them on the internet, and subsequently manufacture CCL-controlled firearms, including those that are unserialized or manufactured from a non-metallic material.

Although the Department determined that such hardware and its directly related technical data do not confer a critical military or intelligence advantage or perform an inherently military function for purposes of maintaining inclusion on the USML, the Department agrees with the Department of Commerce that maintaining controls over such exports under the EAR remains in the national security and foreign policy interests of the United States. The Department of Commerce has recognized in its companion rule that concerns raised over the possibility of widespread and unchecked availability of 3–D printing technology and software, the lack of government visibility into production and use, and the potential damage to U.S. counter-proliferation efforts warrant making certain technology and software capable of producing firearms subject to the EAR when posted on the internet, as described in the Department of Commerce's companion rule. The Department agrees that EAR controls on technology and software for firearms previously controlled in USML Category I(a)—and for all other items this rule removes from the USML—sufficiently address the U.S. national security and foreign policy interests relevant to export controls. In sum, while Commerce controls over such items and technology and software are appropriate, continued inclusion of them on the USML is not.

This rule is consistent with broader USML to CCL review efforts. During the multi-year process of reviewing and revising the USML, the Department has exercised its discretion, authorized by delegation in section 38(a)(1) of the AECA, to determine which national security and foreign policy interests warrant consideration within the context of export controls. Under its current standard, the Department assesses the national security and foreign policy interests against factors, such as those discussed above and in other **Federal Register** notices, in assessing whether items merit inclusion on the USML; this analysis has resulted in a number of items previously included in other USML categories being transferred to the EAR (*see, e.g.,* 78 FR 22740 (Apr. 16, 2013), 81 FR 70340 (Oct. 12, 2016)). Through this rule, the Department is now applying this standard to Categories I, II, and III of the USML. As previously noted, the AECA requires periodic review of the USML, and the Department will continue to evaluate technological advancements, including those related to 3–D printing, to inform future revisions to the USML.

One commenter predicted that the rule's effect of removing licensing requirements for temporary imports of the items removed from the USML would create another channel for criminal elements to obtain weapons in the United States. The Department did not receive any further information to support the assertion that the hypothetical diversion of temporary imports of firearms from foreign countries would appreciably bolster criminal access to such items. The Department additionally notes that other departments and agencies possess enforcement capabilities relevant to criminal acquisition of firearms within the United States.

One commenter recommended coordinating proposed changes with ATF so that the corresponding changes are made to the U.S. Munitions Import List (USMIL) at the same time, which would prevent businesses from having to consult both the USML and USMIL when deciding whether a transaction involves brokering. The USML and the USMIL are separate lists of AECA defense articles with both shared as well as different AECA objectives, and as such warrant the retention as separate lists for AECA defense article and control purposes.

**Effective Date**

The Department has determined that the appropriate effective date for this final rule is March 9, 2020. The Department notes that the Department has previously articulated a policy of providing a 180-day transition period between the publication of the final rule for each revised USML category and the effective date of the transition to the CCL for items that will undergo a change in export jurisdiction. *See* 78 FR 22,740, 22,747 (Apr. 16, 2013). In addition, some commenters suggested that the final rule should have a delayed effective date or a split effective date for companies of a particular size. However, in consultation with interagency partners, the Department has determined that, based on the nature of the items at issue, a 180-day transition period or a delayed or a split effective date for certain companies is not necessary.

**Revision of Category I**

This final rule renames Category I as ''USML Category I—Firearms and Related Articles'' (formerly ''Category I—Firearms, Close Assault Weapons and Combat Shotguns'') and amends the category to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the amended category does not include non-automatic and semi-automatic firearms to .50 caliber (12.7mm) inclusive, formerly controlled under paragraph (a), and all of the parts, components, accessories, and attachments for those

articles. Such items are subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E504, and 0E505, which also includes the items moved from Category II described below. Such controls in Category 0 of the CCL are being published in the companion rule by the Department of Commerce.

Paragraph (a) of amended USML Category I covers firearms that fire caseless ammunition. Paragraph (b) continues to cover fully automatic firearms, which are firearms that shoot more than one bullet by a single function of the trigger, to .50 caliber (12.7mm) inclusive. Paragraph (c) covers firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all weapons previously described in paragraph (c) that remain on the USML are now covered by paragraphs (a), (b) or (c) of this category or by Category II. Specially designed parts and components for the defense articles that remain in paragraph (c) are moved to Category I paragraph (h) of this final rule. This change from the proposed rule is necessary to allow for the designation of the end-item defense articles in paragraph (c) as Significant Military Equipment (SME) whereas the specially designed parts and components therefor are not. Paragraph (d) covers fully automatic shotguns. Paragraph (e) continues to cover silencers, mufflers, and sound suppressors. However, for the same reason as paragraph (c) above, specially designed parts and components for those defense articles in paragraph (e) are moved to paragraph (h) so as not to be designated SME. Flash suppressors are removed from paragraph (e) and are transferred to the CCL. The text of paragraph (f) is removed and the subsection is reserved, thereby removing as a controlled item "[r]iflescopes manufactured to military specifications." However, any firearms sighting device (including riflescopes) that fits within the controls in USML Category XII (*see e.g.,* XII(c)(2) regarding night vison or infrared capabilities) remains subject to the ITAR under that category. Other riflescopes are transferred to the CCL. Paragraph (g) continues to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms that remain in Category I. Paragraph (h) covers high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. In a change from the proposed rule, this final rule paragraph (h) includes a new paragraph (h)(3) to control parts and components specially designed for defense articles in (c) and (e) as described above. This addition necessitated the renumbering of proposed paragraph (h)(3) to (h)(4) in this final rule. Paragraph (i) covers the technical data and defense services directly related to all of the defense articles in the category as well as classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. This is a change from the proposed rule, in which defense articles in paragraph (c) were inadvertently omitted from the technical data paragraph.

This rule adds a new (x) paragraph to USML Category I, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The text of the note to Category I is removed and replaced with a note containing a slightly revised interpretation of the term "firearm," (formerly included at (j)(1)) and to add interpretations of the terms "fully automatic" and "caseless ammunition."

Several commenters requested clarification regarding the proposed Note 1 to USML Category I. The Department determined that the control text of the category sufficiently describes the defense articles to be controlled, and, as a result, the final rule removes the proposed Note 1 to Category I in order to avoid possible confusion.

One commenter recommended changes to the text of paragraph (b) in an effort to avoid potential overlap with other paragraphs in the category. The Department believes these changes are unnecessary because the control text adequately differentiates the controlled defense articles to allow for self-determination. If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction request to DDTC.

Several commenters expressed concern about the designation of certain parts and components in USML Category I as SME. The Department recognizes these concerns, and, in response, the final rule revises the proposed rule by moving the specially designed parts and components for paragraphs (c) and (e) to (h) where they are not designated as SME.

Multiple commenters suggested that the rule should remove firearm sound suppressors (silencers) from paragraph (e) and transfer them to the CCL. The Department recognizes that sound suppressors (silencers) are sold commercially in some jurisdictions, often for use at ranges or for hunting in certain environments, although their availability in retail markets varies significantly within the United States as well as foreign countries. However, sound suppressors (silencers) provide the capability to muffle the sound of weapons fire, which can degrade the ability of an adversary to localize the source of the incoming rounds and return fire or raise an alarm. The Department has determined, in coordination with the interagency, that silencers continue to warrant control on the USML.

One commenter requested clarification regarding paragraph (g) and the barrels, receivers (frames), bolts, bolt carriers, slides, or sears that are common to semi-automatic and automatic firearms on the civilian market. The commenter noted that the lack of clarity arises from the difference between the control text in USML Category I(g) and Note 1 to Category I in the proposed rule. The commenter also requested clarification about which specially designed articles are controlled under this paragraph. The commenter's concerns can be resolved by applying the definition of "specially designed" in ITAR § 120.41(b)(3), as any article that is common to a non-automatic or semiautomatic firearm that is on the CCL (*i.e.,* not on the USML) is not specially designed and thus is not subject to the ITAR (but is subject to the EAR).

One commenter suggested amending the Canadian exemptions located in ITAR § 126.5 to allow exports of receivers and breech mechanisms under paragraph (g). The Department is not revising Supplement No. 1 to ITAR § 126 or the provisions of the Canadian exemptions through this rulemaking. However, the Department is currently undertaking a review of Supplement No. 1 to ITAR Part 126 and any changes will be the subject of a separate rulemaking.

Multiple commenters suggested that paragraph (h)(1) under this rule should exclude high-capacity magazines, *i.e.,* drums or magazines for firearms with a capacity of greater than 50 rounds. The Department recognizes that civilians can purchase magazines and drums with a

capacity of greater than 50 rounds; however, these high-capacity magazines provide an inherently military function and warrant continued control on the USML due to their utility in enabling effective use of automatic weapons and combat tactics.

One commenter requested clarification regarding paragraph (h)(3) in order to differentiate the terms ''automatic targeting'' and ''automatic tracking'' or ''automatic firing.'' However, the comment did not identify any specific confusion. The Department believes that the control text appropriately describes the capabilities that warrant control, so the final rule does not make any changes to this provision.

One commenter noted that the technical data and defense service control in paragraph (i) did not apply to USML Category I(c) and suggested that the Department include paragraph (c) in the list of paragraphs to which the technical data and defense service controls applies. This was an oversight and final rule paragraph (i) is revised to exclude the paragraph identifiers in the proposed rule. Excluding the paragraph identifiers clarifies that technical data and defense services for all USML Category I articles are controlled.

**Revision of Category II**

This final rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, amended paragraph (j), controlling parts and components, is revised to enumerate the items controlled therein. In a change from the proposed rule explained below, proposed paragraph (j)(10) is revised to clarify that the control applies only to recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms. When reviewing proposed paragraph (j) for this final rule, the Department noted that proposed paragraphs (10) and (13) described related defense articles, as did proposed paragraphs (j)(9) and (j)(11). In order to keep related articles in consecutive paragraphs within the category, the Department reorganized the paragraphs such that the control text of paragraph (10) of the proposed rule is found at paragraph (14) of the final rule and the control text of paragraphs (9) and (11) of the proposed rule are found at paragraphs (10) and (9) of the final rule, respectively. In addition, a new paragraph (12) is added to (j) to clarify that systems and equipment for the defense articles in the category for programming ammunition are controlled on the USML. Where necessary, paragraphs are renumbered to accommodate movement of proposed paragraphs (j)(10) and (9) and the addition of new paragraph (12). The Note to proposed paragraph (j)(9) is also revised from the proposed rule to include reference to mounts for surface vessels and special naval equipment controlled in Category VI.

Amended paragraph (a) enumerates the items controlled in that paragraph. The item formerly covered in paragraph (c) (*i.e.,* apparatus and devices for launching or delivering ordnance) is removed, and defense articles still warranting control on the ITAR are described in new paragraph (a)(4). A new paragraph (a)(5) is added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those items. The item formerly controlled in paragraph (f), (*i.e.,* engines specifically designed or modified for the self-propelled guns and howitzers controlled in paragraph (a)), is removed from the USML and placed on the CCL in ECCN 0A606 pursuant to the companion rule. Tooling and equipment specifically designed or modified for the production of items controlled in USML Category II, formerly in paragraph (g), is also removed from the USML and transferred to the CCL in ECCN 0B602 through the Commerce rule. Test and evaluation equipment and test models, formerly in paragraph (h), is removed from the USML and transferred to the CCL in ECCN 0B602 through the Commerce rule. Certain autoloading systems formerly controlled in paragraph (i) are moved to paragraphs (j)(9) and components therefor to (j)(10) (paragraph (j)(11) of the proposed rule). In a change from the proposed rule explained below, final paragraph (j)(11) now contains a specific reference to ''ammunition feeder systems.''

This rule adds a new (x) paragraph to USML Category II, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

One commenter recommended defining the term ''gun'' as it is used in both the category title and in paragraph (a)(1). The control text in the proposed rule appropriately described the capabilities that warrant control, and so the final rule does not make any changes in this regard.

One commenter pointed out that U.S law classifies firearms as antique if they were made on or before 1898 and took issue with the usage of the year 1890 in Note 1 to paragraph (a). The Gun Control Act of 1968 does define antique firearms for domestic purposes, in part, as any firearm manufactured in or before 1898. *See* 18 U.S.C. 921(a)(16)(A). However, as this rule is regarding the export of firearms, it uses the year 1890 in order for the United States to remain consistent with its international export control commitments under the Wassenaar Arrangement, which uses 1890 as the cutoff year to identify many firearms and armaments that are not on the control list.

One commenter requested clarification regarding what is considered to be part of the firing mechanisms listed in paragraph (j)(4) and inquired whether the rule controls electronic firing mechanisms. The language in the rule appropriately describes the capabilities that warrant control and confirms that the control does include electronic firing mechanisms.

One commenter requested a note be added to proposed paragraph (j)(9) (final paragraph (j)(10)) to clarify what constitutes an independently powered ammunition handling system and platform interface components. The control text appropriately describes the capabilities of concern that warrant control and confirms that an independently-powered ammunition handling system need not be external to the gun or platform for the control to apply.

One commenter expressed concern that proposed paragraphs (j)(9) and (j)(11) (final paragraphs (j)(10) and (j)(9), respectively) may capture the same parts and components and recommended deleting proposed paragraph (j)(11) if the paragraphs are redundant. These paragraphs are distinct, as proposed (j)(9) identifies certain components for the end-item ammunition handling system that are controlled and proposed (j)(11) controls the end-item independent ammunition handling system itself. Because these paragraphs are not redundant, the final rule retains both of them. The Department revised proposed paragraph (j)(11) (final paragraph (j)(9)) to clarify its scope in response to this comment.

Proposed paragraph (j)(10) (final paragraph (j)(14)) is revised in this final rule with language limiting recoil systems to those specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms. This revision was made in response to a commenter who

highlighted that the language in the proposed rule would have controlled recoil systems solely due to end-use platform and not due to the performance capability.

One commenter suggested that the Department reconcile proposed paragraphs (j)(10) and (j)(13) (final paragraphs (j)(14) and (j)(13), respectively) to prevent an overlap in the control text. Proposed (j)(10) and (j)(13) are adequately differentiated to allow for self-determination. If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction request to DDTC.

One commenter submitted a question about whether specific ammunition containers that are independent of a cannon system would be controlled under the proposed paragraph (j)(12) (final paragraph (j)(11)). Although absent a commodity jurisdiction request the Department cannot make a definitive determination, it is unlikely that the ammunition container is controlled because proposed paragraph (j)(12) requires that the ammunition container be specially designed for the gun or armament, not for the ammunition. The control text appropriately describes the capabilities that warrant control, and so the final rule does not make any changes to this provision.

One commenter also recommended adding clarifying language to proposed paragraph (j)(12) (final paragraph (j)(11)) regarding whether "conveyor elements" are intended to relate to large caliber ammunition or medium caliber ammunition. As the control is not limited, it applies to all such systems. To clarify the scope of the control, the Department adds "ammunition feeder systems" to the text of final paragraph (j)(11).

**Revision of Category III**

This final rule renames Category III as "USML Category III—Ammunition and Ordnance" (formerly "Category III—Ammunition/Ordnance") and revises its content to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) are revised to remove broad catch-alls and enumerate the articles controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, is amended to specifically list the ammunition that it controls. In a change from the proposed rule, paragraph (a)(7) regarding ammunition for automatic and superposed (or stacked) guns and firearms is revised to clarify the control text. A new paragraph (a)(10) is added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. In a change from the proposed rule, the SME designator is moved from paragraph (a) in its entirety to only those paragraphs of III(a) warranting control as SME and the SME designation is removed from paragraph (a)(10), to be consistent with the controls on developmental defense articles funded by the Department of Defense in other categories of the USML. Ammunition formerly controlled in paragraph (a) that is not now specifically enumerated in paragraph (a) or captured by paragraph (a)(10) is transferred to the CCL pursuant to the companion rule. Likewise, revised paragraph (d), which controls parts and components, enumerates the items it controls; those parts and components previously captured via the catch-all and not now enumerated are transferred to the CCL.

Additionally, paragraph (c) is removed and placed into reserve. The production equipment and tooling formerly controlled in that paragraph is now controlled by the CCL pursuant to the companion rule.

In a change from the proposed rule, the references to steel tipped ammunition, and hardened core or solid projectiles made of tungsten, steel, or beryllium copper alloys are moved from (d)(1) to paragraph (d)(6) for additional clarity.

This rule adds a new (x) paragraph to USML Category III, allowing ITAR licensing for all commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

In addition, in this final rule, DDTC revised the format of the notes to Category III from the proposed rule in order to make them consistent with concluding notes to other categories (*see, e.g.,* notes to Category VII). In place of three notes within one heading of "Notes to Category III" as in the proposed rule, this final rule identifies each clearly as Note 1, Note 2, and Note 3.

One commenter highlighted that the placement of the asterisk beside paragraph (a) in the proposed rule created inconsistencies with other USML category provisions concerning developmental defense articles funded by the Department of Defense (DoD). The Department agrees, and the final rule revises the category in order to clarify that DoD-funded developmental ammunition is not SME. In particular, the final rule adds a specific SME identifier to each relevant subcategory and removes one from paragraph (a)(10).

One commenter suggested removing paragraph (a)(2) on the grounds that the underlying commodity does not fundamentally change when it is incorporated into an ammunition link. The control appropriately identifies the object that warrants control (linked or belted ammunition) which are used primarily for automatic weapons. Consequently, the final rule makes no changes to the text of paragraph (a)(2).

One commenter suggested revising proposed paragraph (a)(4) to remove the language "manufactured with smokeless powder" on the grounds that the rule could be interpreted to mean caseless ammunition manufactured with anything besides smokeless powder, which is controlled on the CCL. The Department disagrees because the control text accurately describes the defense article to be controlled. Caseless ammunition that is not manufactured with smokeless powder is not controlled by the subcategory. The Department controls ammunition in paragraph (a)(4) because smokeless powder has higher energy than other propellants and is more readily adapted to a sustained fire.

One commenter suggested removing the articles under paragraphs (a)(5) and (a)(8) and transferring them to the CCL. The Department disagrees, as lightweight and railgun ammunition offer a significant military advantage because lightweight ammunition significantly improves battlefield activities and railguns are a uniquely military capability in which the United States enjoys a critical advantage, in part due to our projectiles, and therefore warrant control on the USML.

One commenter recommended revising paragraph (a)(6) to address the potential redundancy with (a)(1) and to clarify whether the ammunition control parameters in the paragraph are based on the pyrotechnic material, the tracer materials, or the specification that it must be able to be seen by night vision optical systems. While it is possible that there may be some overlap between these controls for specific articles, each control correctly identifies a capability that warrants control on the USML. To clarify the control text, the Department replaces the word "and" in paragraph (a)(6) of the proposed rule with "or" in this final rule to identify that these are separate articles. If an exporter or

manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction determination request to DDTC.

One commenter highlighted that paragraph (a)(7) in the proposed rule could be interpreted to cover all ammunition for fully automatic firearms, which could take ammunition currently controlled by the Department of Commerce and change it into SME if for use in a fully automatic firearm. The Department notes this concern and has revised the control to limit the scope of the control to ammunition that is not used with semi or non-automatic firearms (*i.e.,* firearms not on the USML).

One commenter suggested changing the description of ''primers'' in paragraph (d)(10) to ''cap type primers'' on the grounds that the provision as written is overly broad. The Department disagrees, as the final rule appropriately reflects the primers that warrant control on the USML. The final rule does not make any changes to this provision.

One commenter assessed that certain production equipment previously controlled on the USML would not be captured by the revised USML Category III or by the corresponding Department of Commerce rule. The Department of Commerce's companion rule to this final rule expands the relevant ECCNs 0B505.a as a control for all production equipment specially designed for USML Category III, and 0B501.e, for all production equipment specially designed for USML Category I.

One commenter expressed concern that paragraph (d)(1) appears to overlap with the control text in paragraphs (a)(1) and (6) and (d)(2) and (6). While it is possible that there may be some overlap between these controls for specific articles, each correctly identifies a capability that warrants control on the USML. To add additional clarity, the Department is removing the reference to steel tipped and core or solid projectiles made from tungsten, steel, or beryllium copper alloys, and addressing those fully in (d)(6). If an exporter or manufacturer requires a definitive determination of category, they may submit a commodity jurisdiction determination request to DDTC.

One commenter suggested deleting the word ''tracer'' from paragraph (d)(2) on the grounds that that would make the provision consistent with (d)(1). Because certain tracer shotgun shells are non-pyrotechnic and warrant control on the USML, no change is made in this final rule.

One commenter suggested deleting ''specially designed parts and components'' from paragraph (d)(4) on the basis that the language adds duplicative controls on parts that are also subject to the controlled parts in paragraphs (d)(7) and (d)(11). The Department believes that the paragraphs are not duplicative and the language appropriately describes the capabilities that warrant control, so the final rule does not make any changes to this provision.

One commenter recommended adding language to paragraph (d)(6) in the proposed rule to clarify whether the paragraph is intended to capture all armor piercing rounds. The Department did not adopt this recommendation, as the control text adopted in this rule provides objective criteria that more effectively identifies the ammunition types that warrant control on the USML.

Multiple commenters recommend revising paragraph (d)(7). One commenter suggested adding ''specially designed for items controlled in USML Category II'' to ensure that articles common to those used with non-USML items are not described. The Department agrees and made this change.

One commenter suggested modifying the wording in paragraph (d)(11) to capture all artillery and ammunition fuses and to delete ''specially designed parts therefor'' to align with bomb fusing wording in Category IV(h)(25). The control correctly identifies a capability warranting control on the USML; fuses and arming and safing devices for Category III articles cover a wider range of sensitive devices that provide the United States with a critical military advantage, separate and apart from the control in Category IV(h)(25), for fuses specific to that category, so the Department is not implementing any change to paragraph (d)(11).

One commenter noted that paragraph (e) controls technical data and defense services directly related to the defense articles controlled in paragraphs (a), (b), and (d) and that technical data and defense services in these areas would not be controlled on the USML as they are already in the public domain. Information that is in the public domain (*see* ITAR § 120.11), is not controlled; however, defense services remain controlled, as would any controlled technical data.

**Conforming ITAR Changes**

Additionally, this final rule makes conforming changes to several sections of the ITAR that referred to the control of articles formerly in USML Category I(a). These sections are amended because they all refer to firearms that are now controlled on the CCL. The firearms exemptions formerly at § 123.17(a) through (e) are removed and the subsections reserved as a consequence of the removal from the USML of non-automatic and semi-automatic firearms and their transfer to the CCL. Section 123.17 is renamed ''Exemption for personal protective gear'' (formerly ''Exports of firearms, ammunition, and personal protective gear'') to accurately reflect the articles permitted for export without a license by that section. Sections 123.16(b)(2) and (6) are amended to make conforming changes to reflect the removal of the § 123.17 firearms exemptions, as is the policy guidance on Zimbabwe found at § 126.1(s). The text of § 123.18 is removed, as it described exemptions for firearms that are now controlled for export by the Department of Commerce, and the section placed into reserve. The text of § 123.16(b)(7) referencing the removed § 123.18 exemption is also removed and the subsection placed in reserve. In addition, § 124.14(c)(9) is amended to remove the example of ''sporting firearms for commercial resale.''

Section 129.1(b) of the ITAR is amended to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR is also amended to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The articles that are transferred to the CCL for export control purposes, yet are on the USMIL for permanent import control purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture abroad, permanent import, transfer, reexport, or retransfer. In a change from the proposed rule, this final rule revises slightly the proposed language of § 129.2(b)(2)(vii), renumbers it as (viii), and adds a new paragraph (b)(2)(vii) to that section, in order to definitively exclude from the definition of brokering activities certain domestic activities related to the manufacture of EAR controlled items and their export. The revisions to § 129.4 also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

One commenter asserted that this rule's revisions to § 123.15 will unnecessarily expand congressional notification requirements to parts, components, and accessories under Categories I(e) and I(g). The commenter recommended that § 123.15 be revised to limit the notification requirements to ''USML Category I paragraphs (a) through (d).'' Contrary to the

commenter's assertion, this rule does not extend congressional notification requirements to parts, components, and accessories. Department practice is, and has been, to notify Congress of the proposed exports of all Category I(e) and (g) articles that meet the threshold value requirement of $1,000,000.

One commenter expressed concern that the proposed rule's removal and placement of ITAR § 123.16(b)(7) in reserve could potentially affect the exemption at ITAR § 123.18 regarding firearms for personal use by civilian and active duty members of the U.S. Armed Forces. The Department notes in response that amendatory instruction number 5 of the proposed rule directed the removal and reserving of paragraph (b)(7) of § 123.16. In order to eliminate any confusion regarding this action, the final rule includes exemplary text showing the subsection as reserved.

Several commenters suggested raising the value of the low value shipment exemption in ITAR § 123.17(a) from $100 to $500 because although the rule's changes increase the eligible amount, they then reduce it by shifting the definition of value from wholesale to selling price. The Department appreciates this suggestion, but notes in response that amendatory instruction 6 of the proposed and final rules directs the removal of ITAR § 123.17(a).

One commenter noted that the current language in ITAR § 125.4(b)(6) refers to ". . . firearms not in excess of caliber .50 and ammunition for such weapons . . ." and suggested a review to ensure consistency with language in other areas of the ITAR. The Department appreciates the commenter's suggestion and directs the commenter's attention to the Note to Category I of the final rule, paragraph (1), which uses a similar description to the one in ITAR § 125.4(b)(6) and which has been present since the 2003 CFR. The Department believes the regulated community clearly understands caliber demarcation and declines to make changes at this time. The Department notes the commenter's concern for future consideration.

Multiple commenters expressed concerns that this rule would remove license requirements for brokers, or potentially relinquish enforcement authority over brokers. The Department asserts that this rule makes no changes to the statutory requirements for the registration and licensing of brokers, which remain the same under section 38(b)(1)(A)(ii) of the AECA (*see* 28 U.S.C. 2778) and are implemented through ITAR part 129, which will continue to apply to all firearms listed on the USMIL in addition to those on the USML. Regarding enforcement, the Department retains its civil enforcement capacity for violations of the ITAR, including all articles subject to the brokering regulations, and the Department of Commerce retains its civil enforcement authority over items subject to its jurisdiction. Additionally, the Department of Justice retains the ability under separate authorities to prosecute persons criminally for violations involving firearms on the CCL or for brokering violations under the AECA.

One commenter expressed concern that this rule will create a double licensing requirement because the scope of ''brokering activities'' requiring registration, fee payments, and licensing under ITAR part 129 includes many types of activities that occur before the Department of Commerce will issue a license. The Department does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. Therefore, the Department is revising the proposed § 129.2(b)(2)(vii) and adding a new (b)(2)(viii) to clarify that activities to facilitate the domestic manufacture or export of items subject to the EAR are not brokering under the ITAR and do not require authorization or registration.

One commenter requested clarification regarding whether ''brokering activities'' as defined in § 129.2(b)(2) apply to activities to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of items designated on the USMIL. The Department directs the commenter to the preambles of the proposed rule and this final rule, which state the regulations in part 129 apply to both USML and USMIL defense articles and defense services.

One commenter requested clarification regarding whether the proposed rule's revision to § 129.2(b)(2)(vii) would apply not only to items currently controlled in USML Categories I, II, and III, or to all items on the USMIL that are currently subject to the EAR (*i.e.,* to include 600 series items previously transferred to the EAR). The commenter also recommended specifying whether the paragraph (b)(2)(vii) exclusion would apply to activities related to exports, reexports, or transfers of an items subject to the EAR that does not require use of an EAR license or license exception (*i.e.,* No License Required (NLR)). The commenter assessed that the language at (b)(2)(vii) appears to provide a broad carve-out to the brokering activities definition. The commenter also requested clarification regarding whether the language was intended to convey that any ITAR or EAR approval for the items in question is sufficient to meet this criteria and that the approvals do not have to list the specific consignees or end-users for the future export, reexport, or transfer. The Department confirms that new provisions in § 129.2(b)(2)(vii) and (viii) apply to all items subject to the EAR, not just those that transitioned from USML Categories I, II or III, to the extent that other items subject to the EAR are also included on the USMIL. These provisions also clarify the use of the NLR designation and revise the scope of the exclusion from brokering activities to include those activities that are controlled by the Department of Commerce.

**Regulatory Analysis and Notices**

*Administrative Procedure Act*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a military or foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this final rule is exempt from the rulemaking provisions of the APA, the Department published this rule as a proposed rule (83 FR 24198) with a 45-day provision for public comment and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this final rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rulemaking has been found not to be a major rule within the meaning

of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action,'' although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this rule will decrease the number of license applications submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department are eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions require an individual validated license. The Department of Commerce collects the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that each manual or electronic response to that information collection takes approximately 43.8 minutes. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection.

The Department estimates a reduction in burden of 10,000 hours due to the transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce is 4,380 burden hours. Therefore, the net burden is reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80.

In addition to the reduction in burden hours, there are direct cost savings to the State Department that result from the 10,000 license applications no longer required under the ITAR for items transferred to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce will incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR will result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they will no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

### Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this final rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this rule is an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce.

The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

### Executive Order 12988

The Department of State reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

### Executive Order 13175

The Department of State determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

### Paperwork Reduction Act

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there will be a reduction in burden for the following forms: OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data; OMB control number 1405–0092, Application for Amendment of a DSP–5 License;

OMB control number 1405–0013, Application/License for Temporary Import of Unclassified Defense Articles; OMB control number 1405–0092, Application for Amendment to a DSP–61 License ; OMB control number 1405–0023, Application/License for Temporary Export of Unclassified Defense Articles; OMB control number 1405–0092, Application for Amendment to a DSP–73 License ; OMB control number 1405–0022, Application/License for Permanent/Temporary Export or Temporary Import of Classified Defense Articles and Related Classified Technical Data; OMB control number 1405–0174, Request for Advisory Opinion; and OMB control number 1405–0173, Request To Change End User, End Use and/or Destination of Hardware. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866.

The proposed version of this rule referenced only the first of these forms. However, subsequent its release, the Department of State submitted the remaining eight forms for public notice via **Federal Register** Public Notice 10646 on February 12, 2019. As such, this final rule is being amended to reflect all nine forms associated with the changes reflected in this rule.

**List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129**

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are amended as follows:

## PART 121—THE UNITED STATES MUNITIONS LIST

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§ 121.1   The United States Munitions List.**

\*   \*   \*   \*   \*

**Category I—Firearms and Related Articles**

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms).

*Note 1 to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e) of this category; or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm):

(a) in production;

(b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or

(c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 to pargraph (a)(5) does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated January 23, 2021, or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their

carrier (*e.g.,* surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note 1 to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.,* muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;
(ii) Carriages;
(iii) Gun pallets;
(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note 1 to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:
(i) Is classified;
(ii) Contains classified software; or
(iii) Is being developed using classified information.

*Note 1 to paragraph (j)(17):* ''Classified'' means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note 1 to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition:
(a) in production;
(b) determined to be subject to the EAR via a commodity jurisdiction

determination (*see* § 120.4 of this subchapter); or

(c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated January 23, 2021, or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note 1 to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.,* bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.,* fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.,* bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.,* M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: Tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note 1 to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

*Note 1 to paragraph (d)(15):* "Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*   \*   \*   \*   \*

**PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES**

■ 3. The authority citation for part 123 continues to read as follows:

   **Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

**§ 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.**

(a) \* \* \*

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

\*   \*   \*   \*   \*

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

**§ 123.16   Exemptions of general applicability.**

\*   \*   \*   \*   \*

(b) \* \* \*

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

\*   \*   \*   \*   \*

(6) For exemptions for personal protective gear, refer to § 123.17.

(7) [Reserved]

\*   \*   \*   \*   \*

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

**§ 123.17   Exemption for personal protective gear.**

\*   \*   \*   \*   \*

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of

this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

* * * * *

### § 123.18   [Removed and Reserved]

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

### § 124.14   Exports to warehouses or distribution points outside the United States.

* * * * *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.,* cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: ''Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained.''

* * * * *

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph (s) to read as follows:

### § 126.1   Prohibited exports, imports, and sales to or from certain countries.

* * * * *

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

### § 129.1   Purpose.

* * * * *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:
■ a. In paragraph (b)(2)(v), removing the word ''or'' at the end of the paragraph;
■ b. Removing the ''.'' at the end of paragraph (b)(2)(vi) and adding '';'' in its place; and
■ c. Adding paragraphs (b)(2)(vii) and (viii).

The addition reads as follows:

### § 129.2   Definitions.

* * * * *

(b) * * *
(2) * * *

(vii) Activities by persons to facilitate the manufacture in the United States or export of an item subject to the EAR; or

(viii) Activities by persons to facilitate the reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license, license exception, or no license required authorization under the EAR or a license or other approval under this subchapter.

* * * * *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

### § 129.4   Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (*see* § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (*see* 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

### § 129.6   Procedures for obtaining approval.

* * * * *

(b) * * *
(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

**Michael R. Pompeo,**
*Secretary of State.*
[FR Doc. 2020–00574 Filed 1–17–20; 11:15 am]
**BILLING CODE 4710–25–P**

---

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 1**

**[TD 9891]**

**RIN 1545–BM95**

### Transfers of Certain Property by U.S. Persons to Partnerships With Related Foreign Partners

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final regulations and removal of temporary regulations.

**SUMMARY:** This document contains final regulations that provide guidance applicable to transfers of appreciated property by U.S. persons to partnerships with foreign partners related to the transferor. Specifically, when a U.S. person transfers appreciated property to a partnership with a foreign partner related to the transferor, the regulations override the general nonrecognition rule unless the partnership adopts the remedial allocation method and certain other requirements are satisfied. The