1

2

3

4

5

6
                                              The Honorable Richard A. Jones

7               **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF WASHINGTON**
8                         **AT SEATTLE**

9   STATE OF WASHINGTON; STATE OF          NO. 2:20-cv-00111-RAJ
    CALIFORNIA; STATE OF COLORADO;
10  STATE OF CONNECTICUT; STATE OF
    DELAWARE; DISTRICT OF COLUMBIA;        PLAINTIFF STATES' MOTION FOR
11  STATE OF HAWAII; STATE OF ILLINOIS;    PRELIMINARY INJUNCTION
    STATE OF MAINE; STATE OF
12  MARYLAND; COMMONWEALTH OF              NOTE ON MOTION CALENDAR:
    MASSACHUSETTS; STATE OF                FEBRUARY 28, 2020
13  MICHIGAN; STATE OF MINNESOTA;
    STATE OF NEW JERSEY; STATE OF NEW      **ORAL ARGUMENT REQUESTED**
14  MEXICO; STATE OF NEW YORK; STATE
    OF NORTH CAROLINA; STATE OF
15  OREGON; COMMONWEALTH OF
    PENNSYLVANIA; STATE OF RHODE
16  ISLAND; STATE OF VERMONT;
    COMMONWEALTH OF VIRGINIA and
17  STATE OF WISCONSIN,
18
19                      Plaintiffs,

20         v.

21  UNITED STATES DEPARTMENT OF
    STATE, et al.,
22
23                      Defendants.

24

25

26

## I.  INTRODUCTION AND RELIEF REQUESTED

The federal government has already attempted to deregulate downloadable 3D-printed guns once, in violation of the Administrative Procedure Act (APA) and the Arms Export Control Act (AECA). In 2018, this Court preliminarily enjoined that effort, finding that publishing downloadable guns online "would subvert the domestic laws of states with more restrictive firearm controls and threaten the peace and security of the communities where these guns proliferate." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1261 (W.D. Wash. 2018) (*Washington I*). In November 2019, this Court rendered a final judgment vacating the deregulatory actions because they violated the AECA and were arbitrary and capricious. *See Washington v. U.S. Dep't of State*, No. C18-1115-RSL, 2019 WL 5892505, at *7, 10 (W.D. Wash. Nov. 12, 2019) (*Washington II*). The federal government did not appeal.

Now, Defendants have promulgated two final agency rules (the "Final Rules") that, unless enjoined, will effectively accomplish the same deregulation of 3D-printed guns that this Court ruled unlawful. The Final Rules will permit the global dissemination of untraceable, undetectable weapons that pose all the same threats the Court issued an injunction to prevent. The Final Rules are unlawful for largely the same reasons as the prior agency actions: they were promulgated without adequate notice and an opportunity for public comment, they violate the AECA, and they are the result of the same arbitrary and capricious agency decisionmaking process—a process that began with the federal government's agreement to settle litigation with private parties whose mission is to eviscerate *any* regulation of firearms by enabling anyone, anywhere to automatically manufacture their own deadly weapons using a 3D printer.

In stark contrast to the current regulatory regime preserved by this Court's prior rulings, the Final Rules will (1) remove computer files for 3D-printed guns from the U.S. Munitions List; (2) grant the Commerce Department jurisdiction *only* over (a) unpublished files and (b) a subset of published files that are "made available by posting on the internet"—limitations that can and will be easily circumvented; and, as a result, (3) generally allow the export of such files, with no

meaningful government oversight. Some files for functional 3D-printed weapons have already been "published." Under the Final Rules, "crypto-anarchists" like Cody Wilson and his company, Defense Distributed, will be free to transmit their published files *directly* to any foreign person or organization, including known terrorist groups or other bad actors, without "posting [them] on the internet." Once that happens, the federal government will be powerless to stop foreign recipients from disseminating the files globally or using them to harm U.S. persons or interests. Because of the "published" loophole and other significant flaws, the Final Rules' purported regulation of the files under the Commerce Department's purview is essentially meaningless and amounts to an unjustified policy reversal that will cause irreparable harm.

## II.     FACTUAL AND STATUTORY BACKGROUND

The relevant provisions of the AECA, the International Traffic in Arms Regulations (ITAR), and other background is set forth in *Washington I* and *II* and briefly summarized below, followed by an overview of the Final Rules. *See also* Dkt. #54 (FAC) Part IV §§ A–E.

### A.     The Arms Export Control Act and ITAR

The Arms Export Control Act authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). A central purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. *See* 22 U.S.C. § 2751; FAC ¶ 36. The AECA authorizes the President "to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The designated items "constitute the United States Munitions List," *id.*, which is maintained by the State Department, *see* 22 C.F.R. § 121.1.

Category I of the Munitions List includes "Firearms, Close Assault Weapons and Combat Shotguns." 22 C.F.R. § 121.1. "Nonautomatic and semi-automatic firearms to caliber .50 inclusive," their "components, parts, accessories and attachments," and related "technical data"

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

are currently within Category I. *Id.* § 121.1(a), (h), (i). Computer software for the production of a Category I firearm or its components using a 3D printer ("Firearm Files"), such as computer aided design (CAD) files, are "technical data" subject to the AECA and ITAR. *See Washington II*, 2019 WL 5892505, at *1. Firearm Files are thus subject, currently, to strict export controls.

As discussed below, Defendants have now issued two Final Rules that remove Category I items (including Firearm Files) from the Munitions List and transfer them to the jurisdiction of the Commerce Department. Those Final Rules are the subject of this lawsuit.

**B.    The Federal Government's Prior Regulation of Firearm Files and the *Defense Distributed* Settlement**

Since at least 2013, the federal government has restricted the export of Firearm Files. *Washington II*, 2019 WL 5892505, at *1. In 2013, the State Department notified Defense Distributed—a private company with the stated objective of facilitating global, unrestricted access to firearms and evading gun-safety laws—that posting CAD files[1] for 3D-printed guns on the internet is an export subject to the AECA and ITAR. *Id.*; *see* Ex.[2] A (Aguirre Decl.) ¶¶ 24–25 & Ex. 2 (DOSWASHINGTONSUP00453, 467–470).[3] In ensuing litigation brought by Defense Distributed, the State Department successfully argued that such exports would endanger U.S. national security and foreign policy interests. *See Washington II*, 2019 WL 5892505, at *2 (quoting *Def. Distributed v. U.S. Dep't of State*, C15-0372RP, Dkt. #32 at 19–20 (W.D. Tex.)).

But in a June 29, 2018 settlement agreement (Ex. B) with Defense Distributed, the State Department "changed course, abandoning its prior regulatory and litigation positions" by allowing Defense Distributed to publish Firearm Files on the internet. *Id.* The Department agreed "[i] to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ('USML') that would allow the distribution of the CAD files, [ii] to announce a

---

[1] CAD design files come in a variety of file formats. *See infra* at 10, 14 (citing Patel Decl. ¶¶ 10–14). The 2013 notification did not distinguish among different CAD file types. *See* Ex. 2 to Ex. A (Aguirre Decl.).

[2] Unless otherwise indicated, lettered exhibits are to the Declaration of Kristin Beneski filed herewith.

[3] The Defense Distributed files the State Department reviewed included .stl files for the production of a fully functional 3D-printed pistol known as the "Liberator" and CAD files for the production of an 80% AR-15 lower receiver. *See* Ex. A (Aguirre Decl.) Exs. 5, 6 (DOSWASHINGTONSUP00487–492).

3

temporary modification of the USML to allow immediate distribution while the final rule was in development, and [iii] to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution." *Id.* The federal government has now fulfilled each of these terms, culminating with the Final Rules at issue here.

On May 24, 2018, the State Department published a notice of proposed rulemaking (NPRM) to remove small-caliber weapons and related technical data (which includes Firearm Files) from the Munitions List. *Id.* at *3. "Although the NPRM did not explicitly mention 3D-printed firearms or their related technical data, approximately 12% [of the comments] did, and all of them opposed" the deregulation. *Id.* Also on May 24, 2018, the Commerce Department published a companion NPRM proposing to undertake regulatory responsibility for items removed from the Munitions List, subject to the existing jurisdictional exception for "published" software and technology under section 734.7 of its Export Administration Regulations (EAR). *See* 83 Fed. Reg. 24,166, 24,167; FAC Part IV § E. The day after the NPRMs' comment periods closed, the settlement agreement was made public, revealing the NPRMs' connection to 3D-printed guns. *Washington II*, 2019 WL 5892505, at *3. Once the State Department's plan to deregulate these weapons became clear, the Department received over *106,000 emails* from concerned members of the public, as well as several letters from members of Congress, urging reconsideration.[4] The public comments opposing deregulation "were not considered by the agency" when it issued the temporary modification and letter prescribed by the settlement agreement. *Washington II*, 2019 WL 5892505, at *3.

On July 27, 2018, the State Department published the temporary modification and issued the agreed letter to Defense Distributed. *Id.* These actions would have allowed the "unlimited distribution" of Firearm Files through internet posting. *See id.* at *2. A coalition of states sued and immediately sought a temporary restraining order, which this Court granted on July 31, 2018. *See Washington II*, 2019 WL 5892505, at *3. On August 27, 2018, the Court converted

---

[4] *Washington*, No. C18-1115RSL, Dkt. # 186 (States' MSJ Reply) at 3, 7–8 and accompanying citations.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

the TRO to a preliminary injunction. *Washington I*, 318 F. Supp. 3d at 1264. As the Court found, the States were likely to succeed on the merits, extensive evidence established that "the States will likely suffer irreparable injury" if downloadable guns were disseminated by internet publication, and the balance of harms and public interest tipped "sharply in plaintiffs' favor." *Washington I*, 318 F. Supp.3d at 1254, 1261.

In that prior related case, Defendants submitted a thrice-supplemented administrative record that included, *inter alia*, briefing and evidence submitted in the *Defense Distributed* case; the State and Commerce NPRMs; over 3,000 public comments submitted during the comment period; over 106,000 later-received comments; and internal State Department documents. Because the Final Rules are the culmination of the *Defense Distributed* settlement agreement and of the formal rulemaking process that began with the NPRMs, the same administrative record applies to this case.[5] Based on that extensive administrative record, the Court granted summary judgment to the States and vacated the temporary modification and letter. *Washington II*, 2019 WL 5892505, at *11. The federal defendants did not appeal.

**C.     The Final Rules**

On January 23, 2020, Defendants published both Final Rules in the Federal Register. The Final Rules will go into effect on March 9, 2020. 85 Fed. Reg. 3819 (State Rule); 85 Fed. Reg. 4136 (Commerce Rule). As proposed, the State Rule revises Category I of the Munitions List to remove small-caliber firearms and related technical data. These items will no longer be subject to ITAR control. State Rule at 3823. The Commerce Rule provides that all items removed from the Munitions List will be added to the Commerce Control List (CCL) and will be subject to Commerce's EAR controls. Commerce Rule at 4173.

The Commerce Rule's preamble recognizes that "plaintiffs in *Washington v. Dep't of State* raised concerns about risks to public safety" if Firearm Files were released on the internet,

---

[5] The administrative record is found at *Washington,* C18-1115RSL, Dkt. ##116, 158, 174, and 184; *see also* Dkt. ##133, 172, 186-3 (Williams Declarations summarizing same).

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   and states that the Department "shares the concerns raised over the possibility of widespread and

2   unchecked availability of the software and technology internationally, the lack of government

3   visibility into production and use, and the potential damage to U.S. counter proliferation efforts."

4   *Id.* at 4141. The preamble further recognizes that "[i]n the absence of controls on the export,

5   reexport, or in-country transfer of such technology and software, such items could be easily used

6   in the proliferation of conventional weapons, the acquisition of destabilizing numbers of such

7   weapons, or for acts of terrorism." *Id.* at 4140. The State Department "agrees with the

8   Department of Commerce that maintaining controls over such exports under the EAR remains

9   in the national security and foreign policy interests of the United States." State Rule at 3823.

10      Under the new Commerce Rule, small-caliber firearms and related technical data will be

11   added to the Commerce Control List under Category 0 ("Nuclear Materials, Facilities, and

12   Equipment [and Miscellaneous Items]"). These items will be subject to the EAR controls.

13   Commerce Rule at 4141, 4180; 15 C.F.R. § 774, Supp. 1, Cat. 0.

14      There is, however, a jurisdictional exception to the EAR for unclassified technology or

15   software that has been "published." 15 C.F.R. § 734.7(a). To be "published" means to be "made

16   available to the public without restrictions upon its further dissemination." *Id.* Notably,

17   publication can occur without any government pre-approval or pre-authorization. *See id.* Such

18   "published" technology or software is **not** subject to the EAR's export control regime. *See id.*

19   Federal law generally does not restrict the domestic "publication" of Firearm Files (though some

20   state laws do; *e.g.*, FAC ¶¶ 125, 128). Federal law currently prohibits the unlicensed *export* of

21   published Firearm Files (including internet posting). But the Final Rules will generally *permit*

22   the export of published Firearm Files, subject *only* to a limited exception.

23      The Commerce Rule creates this "exception to the exception" by adding a new

24   subsection (c) to 15 C.F.R. § 734.7:

25      The following remains subject to the EAR: "software" or "technology" for the
       production of a firearm, or firearm frame or receiver, controlled under ECCN

26

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

Commerce Rule at 4172–73; *see* FAC Attch. 3 (showing text to be added to § 734.7). Notably, the exception to the exception permits the export of published Firearm Files by any means *other than* internet posting. In addition, Commerce will only regulate files in a format that is "ready for insertion" into a manufacturing device, such as a 3D printer. Firearm Files in other common formats (some of which are readily convertible to AMF or G-code) can be freely posted online. In sum, under the Commerce Rule, "published" Firearm Files are *not* subject to EAR export controls at all, *unless* they fall under the exception to the exception above.

Defense Distributed has already published some of its Firearm Files by briefly posting them online in 2013, Ex. A (Aguirre Decl.) ¶ 24, and again in 2018 pursuant to the temporary modification and letter (before those actions were enjoined and rescinded). *See Washington I*, 318 F. Supp. 3d at 1262–63; 15 C.F.R. § 734.7(a)(4) (publication can occur through "posting on the Internet on sites available to the public" absent government pre-approval).

## III.    ARGUMENT

### A.    Standard for Preliminary Injunctive Relief

To obtain a preliminary injunction, the States must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in their favor; and (4) an injunction is in the public interest. *California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 423–24 (9th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In the Ninth Circuit, courts may alternatively consider the first two factors on a sliding scale whereby "serious questions going to the merits" are sufficient where the balance of hardships "tips sharply toward

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

the plaintiff" and the remaining two factors weigh in plaintiffs' favor.[6] *Id.* Here, there is no need to apply the sliding scale standard because all four factors strongly support the States.

**B.     The States Have Standing**

The Court found the States had constitutional and prudential standing in the prior related matter. *See Washington I*, 318 F. Supp. 3d at 1255–56; *Washington II*, 2019 WL 5892505, at *4. Nothing has changed: the Final Rules—which will effectively permit unlimited global dissemination of Firearm Files—will have the same effect on the States' interests as the previous deregulatory actions. And as previously established, the States are within the AECA's "zone of interests." *Washington II*, 2019 WL 5892505, at *4. The States have standing here.

**C.     The Final Rules Will Permit the Global Dissemination of Firearm Files, Contrary to the Government's Assertions Otherwise**

Commerce's assertion that its rule "does not deregulate the transferred items," Commerce Rule at 4136, is inaccurate. *See, e.g.*, *Pac. Coast Fed'n of Fishermen's Assocs. v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1092 (9th Cir. 2005) (agency would "withstand all scrutiny" if court simply took its word as to effect of agency action). As explained above, Commerce lacks jurisdiction over "published" Firearm Files. *See* 15 C.F.R. §§ 734.7(a), 734.2(a)(1). Under the old regulatory regime, Firearm Files were on the Munitions List and could not be freely exported (regardless of whether they had been published), whereas under the new regime, Firearm Files *can* be freely exported once published. The Commerce Rule creates a narrow exception to the publication exception, retaining jurisdiction only over published Firearm Files that are "made available by posting on the internet in an electronic format, such as AMF or G-code, and [are] ready for insertion into" a 3D printer. Commerce Rule at 4172. This purported retention of jurisdiction is essentially meaningless for several reasons.

---

[6] As in the prior related case, the Plaintiff States seek a prohibitory injunction that maintains the status quo, i.e., "the last, uncontested status which preceded the present controversy." *Washington I*, 318 F. Supp. 3d at 1251 n.3 (citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). Enjoining Defendants from effectuating the Final Rules on the scheduled date of March 9, 2020, will preserve the current status quo.

*First*, it generally allows anyone to export published Firearm Files, with no restrictions or oversight whatsoever, by any means *other than* posting on the internet.[7] This means that, once published, the files could be sent *directly* to foreign entities and organizations, including known terrorist groups or other bad actors. For example, a company like Defense Distributed could advertise the availability of its already-published CAD files on the internet, then email the files to any foreign individual or organization that requests them (without ever "posting [the files] on the internet"). Defense Distributed has "published" many of its files by (briefly) posting them online in 2013 and 2018. *Supra* at 7. It has also disseminated its files by mail. FAC ¶ 78. Other filed can be "published" with relative ease, without the government pre-approval that is required to distribute ITAR-controlled items.[8] 15 C.F.R. § 734.7(a).[9]

*Second*, once Firearm Files are lawfully exported in the manner described above (placing them beyond U.S. jurisdiction), foreign recipients could post them online at will. That end-run around Commerce's purported retention of jurisdiction vitiates the Final Rules. And it presents exactly the scenario the State Department feared, as expressed in its April 2018 brief: that Firearm Files will be "shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." *Washington II*, 2019 WL 5892505, at *2. The universal and permanent availability of Firearm Files on the internet will cause all the same irreparable harms established in the prior case.

*Third*, the Final Rules only provide for export-control jurisdiction over a limited and

---

[7] An "export" includes not only online posting, but also "[s]ending or taking a defense article out of the United States in any manner" and "transferring technical data to a foreign person in the United States," among other activities. 22 C.F.R. § 120.17.

[8] The Court ruled in the prior related case that Defense Distributed's internet postings did not place the files into the "public domain" for purposes of ITAR absent government pre-approval. *Washington I*, 318 F. Supp. 3d. at 1262. There is no such pre-approval requirement to "publish" files under the EAR. *See* 15 C.F.R. § 734.7(a). In short, there is a higher standard to place items into the "public domain" than to "publish" them.

[9] *See also* Bureau of Industry and Security, U.S. Department of Commerce, "Revisions to Definitions in the Export Administration Regulations: FAQs" at 1–3, *available at* https://www.bis.doc.gov/index.php/documents/compliance-training/export-administration-regulations-training/1554-ear-definitions-faq/file.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

arbitrary subset of Firearm Files. Specifically, Commerce will only retain jurisdiction over files that are "ready for insertion" into a 3D printer or similar device (a phrase not defined by the agency), but will lack jurisdiction over files that can be converted to a readable format using readily available 3D-printing software. *See* Patel Decl. ¶¶ 10–14. For example, some of Defense Distributed's files—including technical data for assault rifles—were in CAD file formats that are not "ready for insertion," but can be easily converted into an insertable format. *Id.* ¶ 20.[10] Such files evidently fall outside of subsection (c), so they can be posted on the internet with no restrictions whatsoever (regardless of whether they have ever been published before).

These and other glaring loopholes in the Commerce Rule are discussed at length in the States' complaint. *See* FAC ¶¶ 103–112. Defendants either do not realize, or do not care, that such loopholes will permit the global dissemination of Firearm Files they purport to oppose. In either case, the Final Rules effectively—and unlawfully—deregulate Firearm Files entirely.

**D.     The States Are Likely to Succeed on the Merits**

The Plaintiff States are likely to succeed on the merits of their APA claims because the administrative record shows Defendants (1) failed to give adequate notice and an opportunity to comment on the Final Rules; (2) violated the AECA's purposes in promulgating the Final Rules; and (3) acted arbitrarily and capriciously in effectively deregulating Firearm Files without adequately justifying this total reversal of position, considering aspects of the problem Congress deemed important, or thinking through the Final Rules' real-world implications.

**1.     The Final Rules violated APA notice-and-comment procedures.**

Section 553 of the APA requires agencies to publish a notice of proposed rulemaking in the Federal Register that includes "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Afterward, the agency "shall give interested persons an opportunity to participate in the rule making through submission of written

---

[10] *See also Def. Distributed v. Grewal*, 3:19-cv-04753 (D.N.J.), Dkt. #1-40, ¶ 5 (Feb. 5, 2019) (Defense Distributed's Director stating company's Firearm Files include CAD files from SoLiDworks, STEP, and SketchUp).

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

data, views, or arguments . . . ." 5 U.S.C. § 553(c). The agency may only promulgate a final rule "[a]fter consideration of the relevant matter presented" during the comment period. *Id.* "A decision made without adequate notice and comment is arbitrary or an abuse of discretion" as a matter of law. *Nat. Res. Def. Council v. U.S. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (*NRDC*).

> ### a.   There was no adequate notice or opportunity to comment on the Final Rules' provisions related to Firearm Files.

"To meet the rulemaking requirements of section 553 of the APA, an agency must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (citation and internal quotation marks omitted). "[I]nterested parties are entitled to be fairly apprised of the subjects and issues before the agency" and must receive notice of any issues that are "'on the table.'" *NRDC*, 279 F.3d at 1188 (in part quoting *Am. Med. Ass'n v. United States*, 887 F.2d 760, 768 (7th Cir. 1989)). The Ninth Circuit has held that, even when the components of a rule "are technically present in the Federal Register notice published by the [agency]," the presentation is deficient where it "obscures the intent of the agency and allows for broad [impacts] through the back door." *Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 975 (9th Cir. 2005). The court further explained that it is inappropriate to omit information about the specific intended application of a rule in a manner that "allows potentially controversial subject matter . . . to go unnoticed buried deep in a non-controversial publication[.]" *Id.* at 976. To the contrary, the publication should "alert[] a reader to the stakes." *Id.* (quoting *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1322–23 (D.C. Cir. 1988)).

Here, Defendants provided no notice *whatsoever* that their proposed rules would implicate 3D-printed firearms in any way—even though the NPRMs were published pursuant to an (as-yet-undisclosed) settlement agreement pertaining *specifically* to such weapons. The NPRMs do not mention 3D-printed firearms anywhere in their combined 38 pages of dense text. *See* 83 Fed. Reg. 24,198–24,205; 83 Fed. Reg. 24,166–24,195. In fact, the Commerce NPRM

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

misleadingly claims that "[t]his proposed rule does not deregulate the transferred items," 83 Fed. Reg. 24,166—when in fact, the rule as proposed would have deregulated all "published" technical data formerly controlled under Category I of the Munitions List, including published Firearm Files. *See* FAC ¶¶ 13, 84, 112. The Commerce NPRM also misleadingly claims that the exception for "published" information applies in a "well-established and well understood" manner, using the relatively innocuous example of a "firearm's operation and maintenance manual" to illustrate how the "published" exception would apply. 83 Fed. Reg. 24,167. Further, both NPRMs were billed as the culmination of a years-long "Export Control Reform Initiative" (ECRI) that began in 2010,[11] which an Obama Administration official in 2012 described as having "literally absolutely nothing to do with domestic gun control . . . ."[12] In other words, regulators did not have 3D-printed guns in mind when they initially proposed removing certain items from the Munitions List under ECRI; any suggestion that deregulating 3D-printed guns aligns with ECRI is unsupported by the administrative record.

The general public had no meaningful notice that the proposed rules would affect 3D-printed guns. Only an expert who had carefully studied the applicable regulations independent of the NPRMs—or who was aware of the State Department's determination that Defense Distributed's Firearm Files constituted controlled technical data[13]—would realize that the NPRMs' obscure references to "technical data" referred in part to computer files that can be used to automatically produce a working plastic firearm using a 3D printer. The import of this omission is borne out by the administrative record, which reveals an enormous public outcry *after* the comment period ended—once Defendants revealed the settlement agreement that connected the dots between the NPRMs and 3D-printed guns. *See* FAC ¶ 86.[14] To be sure, some expert commenters did recognize the NPRMs' true import. *Id.* ¶ 85. However, the fact that some

[11] *Washington*, No. C18-1115RSL, Dkt. # 173 (Fed Defs' MSJ Resp.) at 5 n.1.
[12] *Washington*, No. C18-1115RSL, Dkt. # 186-2 (States' MSJ Reply Ex. Y) (WASHAR0035627).
[13] *Washington*, No. C18-1115RSL, Dkt. # 171-1 (States' MSJ Ex. A) (Aguirre Decl), Exs. 5, 6.
[14] *See also Washington*, No. C18-1115RSL, Dkt. # 186 (States' MSJ Reply) at 7–8.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

commenters understood the hidden intent behind the NPRMs does not cure Defendants' failure to provide adequate notice: an agency "cannot bootstrap notice from a comment." *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983); *see also Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1023 (D.C. Cir. 1986) ("[T]he comments of other interested parties do not satisfy an agency's obligation to provide notice.").

Defendants' error was far from harmless.[15] The failure to provide any notice of how the rule treats technical data for producing 3D-printed guns deprived the States of their "concrete interest to have the public participate in the rulemaking." *See Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005). Specifically, because the settlement agreement with Defense Distributed was not revealed until after the public comment period closed, interested parties were denied their right "to participate in the rulemaking process" with regard to the hidden-but-intended effect of the rules. *Id.* at 1007. Thus, Defendants cannot meet the high standard of showing that the agency's mistake "*clearly* had no bearing on the procedure used or the substance of decision reached." *California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (emphasis added); *see id.* (courts "must exercise great caution in applying the harmless error rule in the administrative rulemaking context"). Given the rules' broad public safety implications and Defendants' own misleading statements about their effects, as discussed below, this procedural harm is significant.

The substance of the Final Rules demonstrates how the failure to allow public input has harmed the rulemaking process. For example, the Commerce Department claims to have "taken into account" the "concerns raised . . . by the plaintiffs in *Washington v. Dep't of State*, No. 2:18-cv-01115-RSL (W.D. Wash.)." Commerce Rule at 4141. But there are specific issues with these new rules that were not raised or discussed in the prior litigation, because they were not publicly revealed prior to the Final Rules' publication in January 2020. For example, the Commerce Department has not explained why, under 15 C.F.R. § 734.7, it only retained export-control jurisdiction of published Firearm Files "made available by posting on the internet," but not those

---

[15] The APA provides that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

exported by other means. Nor has it explained why it only retained jurisdiction over Firearm Files in a format "such as AMF or G-code" that "is ready for insertion" into a 3D printer, but not CAD files that can be converted into AMF-type files within minutes. *See* Patel Decl. ¶¶ 10–14. Indeed, it is not entirely clear what the "ready for insertion" language means, precisely, and whether the agency fully understands the 3D-printing process and the real-world implications of its Rule. AMF and G-code are different types of files. G-code can be "read" directly by a 3D printer to print an object, whereas AMF and .stl files must be "translated" into something like G-code by the 3D-printing software. *Id.* ¶¶ 11–12. Questions abound, such as: Does "ready for insertion" into the *software* mean the same as "ready for insertion" into the machine or equipment itself? To what extent do Defense Distributed's already-published Firearm Files include file types the agency does not consider "ready for insertion"? Why is the agency's retention of jurisdiction limited to certain files "made available by posting on the internet," but not other file types made available by other means? If the agency interprets subsection (c) in some other way, it has not explained this or clarified how the new regulation is supposed to work. In short, while paying lip service to the national security and foreign policy concerns posed by Firearm Files, the agency has not "taken into account" or addressed the fact that the Final Rules are essentially a roundabout way of permitting "unlimited distribution," in contravention of this Court's prior ruling. Commenters had no opportunity to weigh in on these issues.

"Notice and comment" does not mean that an agency takes notice of a prior litigation and comments selectively on some of the issues raised in it. The *public* must be given the requisite notice and a meaningful opportunity to raise and identify issues with new agency actions. That did not occur here, rendering the Final Rules unlawful under 5 U.S.C. § 553.

### b. The Final Rules are not a logical outgrowth of the NPRMs.

The lack of meaningful notice is underscored by the disconnect between the Final Rules and the NPRMs. In the Ninth Circuit, "a final rule which departs from a proposed rule must be a logical outgrowth of the proposed rule." *NRDC*, 279 F.3d at 1186 (9th Cir. 2002) (internal

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   quotation marks omitted). "The essential inquiry focuses on whether interested parties

2   reasonably could have anticipated the final rulemaking from the [proposed rule]." *Id.* (internal

3   quotation marks omitted). "The object, in short, is one of fair notice." *Long Island Care at Home,*

4   *Ltd. v. Coke*, 551 U.S. 158, 174 (2007). An agency's failure to provide adequate notice and an

5   opportunity to comment is "comparable" to an agency's adoption of a final rule that is not a

6   "logical outgrowth" of a proposed rule. *Azar*, 911 F.3d at 580. The exception to the notice

7   requirement for provisions that are a logical outgrowth of the proposed rule "does not extend to

8   a final rule that finds no roots in the agency's proposal," because "something is not a logical

9   outgrowth of nothing." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)

10  (citation and internal quotation marks omitted).

11        Here, Defendants provided no notice that the rules would apply to 3D-printed guns. The

12  final Commerce Rule's addition of subsection (c) to 15 C.F.R. § 734.7 is the first and only

13  publication in the Federal Register indicating that the rules will have *any* impact on 3D-printed

14  guns. This consequential addition is impermissible on its own, and moreover, clearly signals how

15  the NPRMs employed generalized language and subtle cross-references to conceal sweeping

16  changes with regard to exporting Firearm Files. *See McLouth*, 838 F.2d at 1323 ("An agency

17  may not introduce a proposed rule in . . . crabwise fashion."); *see also Louis*, 419 F.3d at 975 (it

18  is unlawful for agency to introduce broad and controversial changes through the "back door").

19        Section 734.7(c) is not a logical outgrowth of the NPRM because it is a brand-new

20  addition addressing 3D-printed guns that, moreover, reveals just how ineffective the Commerce

21  Department will be in overseeing these former Munitions List items. The only thing the NPRM

22  said about section 734.7 was that subsection (a) would continue to operate to exempt data like

23  "the operation and maintenance information" in a firearm manual. 83 Fed. Reg. 24,167; *see* FAC

24  Attch. 3. To be clear, the new subsection (c) was nowhere to be found in the NPRM. Therefore,

25  the "something" of subsection (c) was an impermissible "outgrowth of nothing." *Envt'l Integrity*

26  *Project*, 425 F.3d at 996. Out of nowhere, it establishes a deeply flawed regulatory regime,

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

creating an extremely narrow and ultimately meaningless exception to the exception that deprives Commerce of jurisdiction over "published" items. The public never had any notice of this provision, nor any opportunity to bring its significant flaws or ambiguities to the agency's attention. This defeated the entire purpose of notice-and-comment procedures. *See, e.g.*, *Safe Air For Everyone v. U.S. EPA*, 488 F.3d 1088, 1098 (9th Cir. 2007) (notice-and-comment procedure is meant to "infuse a measure of public accountability into administrative practices") (quoting *Exportal Ltda v. United States*, 902 F.2d 45, 50–51 (D.C. Cir. 1990)).

As the Ninth Circuit recently instructed, the "eleventh-hour addition" of an entirely new regulatory provision is "not the sort of deviation from the proposed rule that is allowed under the APA as a 'logical outgrowth of the proposals on which the public had the opportunity to comment.'" *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 639 (9th Cir. 2018) (citation and internal quotation marks omitted). The court explained that it is improper for an agency, "months after the notice-and-comment period end[s]," to promulgate a regulation introducing a "never-before-seen concept" that was "never hinted at" in the proposed rule. *Id.* That is exactly what happened here:  the Commerce Department slid a new provision concerning 3D-printed guns into a rule that did not hint at *any* regulatory shift on this controversial issue. *See id.* at 639 (criticizing addition of provision that signaled "a slow but certain erosion of [a prior] rule").

Defendants might respond that subsection (c) makes the Final Rules more restrictive than the proposed rules. Such restrictions are illusory, but in any case, this response would be a red herring: the logical outgrowth test concerns defective *process*. Defendants' failure to include any reference or discussion of the rules' effect on Firearm Files before publishing the final Commerce Rule impermissibly hides a regulatory sea change from the public. Indeed, if given the opportunity, commenters may well have advocated for a *far* more restrictive regulation.

### 2.     The Final Rules Are Contrary to the AECA

"'In order to be valid regulations must be consistent with the statute under which they are promulgated.'" *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1248 (9th Cir. 2018)

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

(brackets omitted) (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977)). Courts will not "rubber-stamp" rules "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *A.T.F. v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97 (1983); *accord FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981); 5 U.S.C. § 706(2) (courts must hold unlawful and set aside agency action contrary to law).

The AECA specifies the circumstances under which items may be removed from the Munitions List. "Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy." *Washington II*, 2019 WL 5892505, at *8. Maintaining Firearm Files on the Munitions List was "in keeping with the goals of the [AECA] . . . based on [such files'] characteristics and functionality, which make them especially dangerous to U.S. national security and foreign policy interests." *Id.* at *4.

The agency may not remove such files from the Munitions List while evaluating the issue "only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage." *Id.* at *8. Despite this Court's clear instruction, that is *exactly* what the State Department has done yet again: its sole asserted basis for removing Firearm Files from the Munitions List is that they "do not confer a critical military or intelligence advantage and are not inherently military based on their function." State Rule at 3823.

The State Department seeks to rehabilitate this plainly inadequate rationale by claiming that it "took into account the effect that a transfer to the CCL would have on the national security and foreign policy interests of the United States," and by stating that it "agrees" that "maintaining controls over such exports . . . remains in the national security and foreign policy interests of the United States." *Id.* These perfunctory statements ring hollow: first, because they fail to give any notion of *how* these important issues were accounted for; and second, because the Commerce Rule fails to establish any meaningful "control" over Firearm Files, as discussed herein. *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

F.3d 80, 588 (7th Cir. 2011) ("[agency's] explanation may not be superficial or perfunctory"). They appear designed merely to forestall litigation and shed no light on the agency's reasoning.

Removing Firearm Files from the Munitions List (and transferring them to an agency whose regulatory authority is significantly more circumscribed) is contrary to the AECA's purposes of furthering "world peace and the security and foreign policy of the United States" by reducing the international trade in arms. 22 U.S.C. §§ 2751, 2778(a)(1). As such, Plaintiffs are likely to succeed on the merits of their claim that the Final Rules are contrary to the AECA.

### 3.   The Final Rules Are Arbitrary and Capricious

Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Reviewing courts must not substitute their judgment for the agency's, but "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* Courts must hold unlawful and set aside rulemaking that fails to meet these standards. 5 U.S.C. § 706(2)(A).

The facially illogical Final Rules are a backdoor way of implementing the April 2018 decision to deregulate 3D-printed guns. They fulfill the settlement agreement's promise to "fully pursue" a "final rule to remove the files at issue from ITAR jurisdiction." Ex. B. Tellingly, the agencies have once again tried to bypass the APA's notice-and-comment procedures to accomplish their foreordained goal, as discussed above.[16] In addition to all its other flaws, this renewed deregulatory effort is arbitrary and capricious for the same reasons the Court previously

---

[16] Such an *ex ante* adoption of a new policy is highly improper: "agencies may not treat § 553 [notice-and-comment requirements] as an empty formality." *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 860 (N.D. Cal. 2018) (granting TRO), *approved by* 932 F.3d 742 (9th Cir. 2018) (denying motion to stay TRO). "It is . . . 'antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later.'" *Id.* (quoting *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010)).

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

found: Defendants failed to consider important aspects of the problem, and they failed to justify their *de facto* reversal of position based on substantial evidence in the record. *Washington II*, 2019 WL 5892505, at \*7–10. The Final Rules are a second bite at a bad apple.

a.    **The Final Rules are not a logical means of implementing Defendants' stated policy of continuing to regulate 3D-printed guns**

The agencies purport to agree with "concerns raised over the possibility of widespread and unchecked availability of 3-D printing technology and software, the lack of government visibility into production and use, and the potential damage to U.S. counter-proliferation efforts." State Rule at 3823. The Commerce Department states that the "unrestricted export" of files for printing firearms "could have a potential detrimental effect on aspects of U.S. national security and foreign policy." Commerce Rule at 4142; *see also, e.g.*, *id.* at 4141 ("appropriate controls must be in place to protect U.S. national security and foreign policy interests").

Unfortunately, the Final Rules fly in the face of these findings because, as discussed, their actual effect will be to deregulate Firearm Files and cripple federal export controls over them. For example, while the State Department claims that previously controlled USML Category I(a) technology and software should continue to be controlled by its sister agency, the publication loophole effectively deprives Commerce of regulatory jurisdiction. Files like Defense Distributed's that have already been "published" are deregulated *ab initio*. The agencies' approach is therefore not a rational one in light of their own stated objectives and assessments of what technology should be controlled. The "facts found"—the dangers posed by widespread availability of 3-D printing technology and software—do not remotely align with the "choice made" with respect to how much of this technology and software will actually continue to be regulated. *State Farm*, 463 U.S. at 43. The approach taken by the Final Rules is therefore irrational and "runs counter to the evidence before the agency." *See id.*

b.    **Defendants once again failed to explain their reversal of position or substantiate it based on the record**

The Court previously recognized that "given the agency's prior position regarding the

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

need to regulate 3D-printed firearms and the CAD files used to manufacture them, it must do more than simply announce a contrary position." *Washington II*, 2019 WL 5892505, at *8 (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).

Until April 2018, the State Department's position was that Firearm Files should remain on the Munitions List because their unrestricted export could "cause serious harm to U.S. national security and foreign policy interests," as the files are capable of "'automatically' generating" an untraceable, undetectable "lethal firearm." *Washington II*, 2019 WL 5892505, at *2 (quoting *Def. Distributed v. U.S. Dep't of State*, C15-0372RP (W.D. Tex.), Dkt. #32 at 19–20). The State Department was "particularly concerned" that such weapons "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." *Id.* When the State Department abruptly reversed its position and sought to delist Firearm Files, the Court found that the agency had "failed to identify substantial evidence in the administrative record explaining a change of position," that contradicted "its prior determinations and findings." *Id.* at *10. That same record applies to this case, and it still fails to substantiate Defendants' reversal of their original position.

The Final Rules do not cure these defects. In fact, this time, each agency has failed to "display awareness that it *is* changing position." *Fox*, 556 U.S. at 515. Moreover, agencies may not disregard the "facts and circumstances that underlay or were engendered by the prior policy" absent a "reasoned explanation[.]" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015). Here, Defendants purport to embrace the prior policy of strictly regulating the export of 3D-printable guns, and acknowledge that global dissemination presents serious national security and foreign policy concerns, even as they have promulgated Final Rules that will inevitably permit such dissemination. In particular, Defendants do not address the loopholes that will allow the "published" exception in 15 C.F.R. § 734.7 to effect backdoor deregulation, nor do they explain why their retention of jurisdiction in subsection (c) is so limited despite their

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

acknowledged concerns about the dangers of unrestricted export. Particularly given the public's lack of notice and opportunity to comment, Defendants have not provided "good reasons" for what still amounts to a significant policy reversal. *Kake*, 795 F.3d at 966.

### c.   Defendants once again failed to meaningfully consider national security, foreign policy, and world peace as Congress directed

The Court also previously ruled that the agency's prior delisting attempt was "not 'based on consideration of the relevant factors and within the scope of the authority delegated to the agency by statute.'" *Washington II*, 2019 WL 5892505, at *8 (quoting *State Farm*, 463 U.S. at 42). As the Court recognized, "Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy." *Id.* at *4, 8 (citing 22 U.S.C. § 2778(a)(1)).

Again, because Defendants do not acknowledge the regulatory loopholes created by the Final Rules or discuss the significant differences between EAR and ITAR regulation, they have failed to adequately consider the relevant national security and foreign policy impacts. The agencies' statements that they "took into account the effect that a transfer to the CCL would have on the national security and foreign policy interests of the United States," State Rule at 3823, are perfunctory and unsupported by any substantive analysis. They display no recognition or awareness of the real-world effects the transfer will have. (The agencies may have overlooked these effects because they denied the public the ability to point them out, as discussed above.) To take one example, the Commerce Department claims the possibility of proliferation of firearm designs "warrants the control of the export of *certain files* for the 3D printing of firearms set forth in this rule." Commerce Rule at 4142 (emphasis added). The limitation to "certain" files is not explained, other than a vague reference to First Amendment concerns that led that agency to "tailor[]" its rule to a subset of files. *See id.* at 4141. But the agency fails to state whether or how these concerns are actually valid, nor does it discuss the national security or foreign policy implications of its "tailor[ing]," which seems to have been done with a machete rather than

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

scissors. Because the agencies have "entirely failed" to consider "important aspect[s] of the problem" Congress expressly identified, the Final Rules must be set aside.

**E.      The States Will Suffer Irreparable Harm in the Absence of Preliminary Relief**

Irreparable harm is not seriously disputable. If the Final Rules take effect on March 9, 2020, the States will suffer the same irreparable harms the Court already recognized when enjoining the federal government's first attempt to deregulate 3D-printed guns. *See Washington I*, 318 F. Supp. 3d at 1261–63. The States incorporate the evidence and arguments supporting their motion for a preliminary injunction in that prior case,[17] and also submit 15 declarations herewith, including new declarations of Mary B. McCord and Dr. Shwetak Patel. In light of this evidence, "[i]t takes virtually no imagination to perceive the direct connection between removing [Firearm Files] from the USML, the internet publication of the technical data, and the likelihood of the irreparable injuries plaintiffs have identified." *Id.* at 1262. Thus, "the States will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3D printer are published on the internet." *Id.* at 1261–63. Indeed, Defendants now agree that regulation is warranted for precisely these reasons. *Supra* at 5–6, 19.

As before, the evidence shows that once Firearm Files become available on the internet, anyone with access to a commercially available 3D printer—regardless of their age, mental health status, or criminal history—will be able to download and instantly use them to make functional weapons. For example, Defense Distributed's Liberator pistol can be printed using a 3D printer that can be purchased for as little as $300, using materials that cost around $20.[18] A functional Liberator capable of shooting deadly bullets can be made almost entirely of plastic.[19] 3D-printed weapons will only become deadlier as the technology continues to evolve.[20]

As the Court previously found, "[a] gun made from plastic is virtually undetectable in

---

[17] *Washington*, No. C18-1115RSL, Dkt. # 43 (States' Mot. for PI) at 19–24; Dkt ## 43-1, 43-2 (Index and Appendix of Declarations).
[18] Patel Decl., ¶¶ 9, 18–19, 28.
[19] *Id.* ¶¶ 16–17; McCord Decl., ¶ 10; Graham Decl., ¶ 35.
[20] *See* Patel Decl., ¶¶ 23–28.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings." *Washington I*, 318 F. Supp. 3d at 1261.[21] Metal detectors are also critical for prison security[22] and increasingly in schools.[23] If 3D-printed guns proliferate, States that rely on metal detectors will "have to expend additional time or money in an effort to maintain security[.]" *Washington I*, 318 F. Supp. 3d at 1261. Further, "[t]he portability and ease of a manufacturing process that can be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing, possessing, and/or using guns to more easily evade those limitations." *Id.* Making Firearm Files available on the internet will make it easy to circumvent the States' gun-safety laws, such as laws restricting possession by violent felons, the mentally ill, persons subject to no-contact orders, and minors;[24] laws requiring background checks to obtain a firearm;[25] and laws specifically prohibiting "ghost guns" and undetectable weapons. *See* FAC Part IV § F (summarizing state gun-safety laws).

3D-printed firearms pose unique challenges for law enforcement. "Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts" within the States. *Washington I*, 318 F. Supp. 3d at 1261.[26] Widely available 3D-printed guns may increase criminal activity because they are easy to obtain and difficult to trace and detect.[27] Untraceable "ghost guns" of the non-3D-printed variety are already increasingly popular—and increasingly being used to commit horrific crimes, including multiple

---

[21] *See also* McCord Decl. ¶¶ 7–13, 18–21; Camper Decl. ¶ 7; Ferreira Decl. ¶¶ 6–10; Price Decl. ¶¶ 11–13. The Liberator's design file also calls for one metal nail, which can evade detection. 18 U.S.C. § 922(p) (firearms must include 3.7 ounces of steel to ensure detection); *see* Ex. C (3D-printed gun smuggled into Israeli parliament).

[22] *See generally* Herzog Decl. (the availability of undetectable weapons would "fundamentally undermine" the Washington Department of Corrections' efforts to prevent serious contraband from being introduced into prison facilities; smuggled weapons could be used to harm or kill staff, visitors, or incarcerated persons, or aid in escapes); *see also* Liberty Decl. (similar); Darling Decl. (similar).

[23] McCord Decl. ¶ 8; Kyes Decl. ¶¶ 16–17.

[24] Rickard Decl. ¶¶ 6–10; Price Decl. ¶¶ 5–7; Goldstein Decl. ¶¶ 13–15; *Graham Decl.* ¶¶ 31–34.

[25] Rickard Decl. ¶¶ 6–10; McCord Decl. ¶ 40; Camper Decl. ¶ 6; Price Decl. ¶ 4.

[26] *See also* McCord Decl. ¶¶ 29–41; Camper Decl. ¶¶ 8, 12; Kyes Decl. ¶¶ 8–20; Price Decl. ¶¶ 4–13; Graham Decl. ¶¶ 33, 38.

[27] *See* Graham Decl. ¶¶ 33–38; Kyes Decl. ¶¶ 11–15.

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

mass shootings in California.[28] The latest was a deadly school shooting in November 2019.[29]

Permitting the export of Firearm Files also significantly increases the risk that undetectable and untraceable firearms could be used by foreign terrorist organizations for attacks within the United States, including against persons residing in or visiting the States.[30] The Court previously recognized that many of the States have endured actual and attempted assassinations, mass shootings, and/or terrorist attacks, and that "adding undetectable and untraceable guns to the arsenal of weaponry already available will likely increase the threat of gun violence they and their people experience." *Washington I*, 318 F. Supp. 3d at 1262.

3D-printed firearms also pose grave threats to children. Their "toy-like appearance increases the risk of unintentional discharge, injury, and/or death." *Id.* at 1261. The availability of Firearm Files on the internet will also make it possible for students to manufacture their own weapons that could be used in a school shooting (evading school metal detectors).[31] 3D-printed weapons can even be dangerous to the shooter because they are unstable and prone to misfiring.[32]

## F. The Balance of Equities and Public Interest Sharply Favor Preliminary Relief

"When the government is a party, the last two factors merge." *Azar*, 911 F.3d at 575. As before, Defendants will suffer no hardship from a preliminary injunction. *Washington I*, 318 F. Supp. 3d at 1263. The balance of equities and public interest continue to strongly favor the States. As before, no bond should be required. *See* 315 F. Supp. 3d 1202, 1206 (W.D. Wash. 2018).

### IV.   CONCLUSION

For the foregoing reasons, the States ask the Court to preliminarily enjoin the Final Rules from going into effect, to preserve the status quo pending review on the merits.

---

[28] Graham Decl., ¶¶ 18–19, 26, 31, 34; *see also* Ex. D (news article re increasing "ghost guns" in D.C.).
[29] Ex. E (news article re November 2019 school shooting involving "ghost gun").
[30] McCord Decl. ¶¶ 14–22; *see* Lanier Decl. (former Chief of Police describing particularly salient concerns of the District of Columbia, a densely populated urban district filled with high-ranking officials and diplomats). This declaration was originally filed in *Heller v. District of Columbia*, No. 1:08-cv-01289-JEB (D.D.C.) (Dkt. # 73-8) and is resubmitted here for the Court's convenience.
[31] 3D printers are available to all students at the University of Washington in Seattle. Patel Decl. ¶ 18. They are also widely available to Massachusetts public school students. Scott Decl., ¶¶ 5–6; Racine Decl., ¶¶ 4–7.
[32] Camper Decl., ¶¶ 12–13; Kyes Decl. ¶ 18.

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1    DATED this 6th day of February, 2020.

2

3                                        ROBERT W. FERGUSON
                                         Attorney General of Washington
4
                                         s/ Kristin Beneski
5                                        KRISTIN BENESKI, WSBA #45478
                                         Assistant Attorney General
6                                        JEFFREY RUPERT, WSBA #45037
                                         Division Chief
7                                        BRENDAN SELBY, WSBA #55325
                                         Assistant Attorneys General
8                                        800 Fifth Avenue, Suite 2000
                                         Seattle, WA 98104
9                                        (206) 474-7744
                                         kristin.beneski@atg.wa.gov
10                                       jeffrey.rupert@atg.wa.gov
                                         brendan.selby@atg.wa.gov
11                                       Attorneys for Plaintiff State of Washington
12
                                         XAVIER BECERRA
13                                       Attorney General of California

14                                       /s/ John W. Killeen
                                         JOHN W. KILLEEN
15                                       Deputy Attorney General
                                         P.O. Box 944255
16                                       Sacramento, CA 94244-2550
                                         (916) 210-6045
17                                       John.killeen@doj.ca.gov
                                         Attorneys for Plaintiff State of California
18
                                         PHILIP J. WEISER
19                                       Attorney General of Colorado

20                                       /s/ Grant T. Sullivan
                                         GRANT T. SULLIVAN
21                                       Assistant Solicitor General
                                         1300 Broadway, 6th Floor
22                                       Denver, CO 80203
                                         (720) 508-6349
23                                       Grant.sullivan@coag.gov
                                         Attorneys for Plaintiff State of Colorado
24

25

26

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

WILLIAM TONG
Attorney General of Connecticut

*/s/ Maura Murphy Osborne*
MAURA MURPHY OSBORNE
Assistant Attorney General
KIMBERLY MASSICOTTE
JOSEPH RUBIN
55 Elm St.
P.O. Box 120
Hartford, CT 06141-0120
(860) 808-5318
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
DAVID J. LYONS
Deputy Attorneys General
Carvel State Building
820 N. French St.
Wilmington, DE 19801
(302) 577-8400
Christian.wright@deleware.gov
Jillian.lazar@deleware.gov
David.lyons@deleware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General of the District of Columbia

*/s/ Kathleen Konopka*
KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy
Division
ANDREW J. SAINDON
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1      (202) 741-0770
       Andy.saindon@dc.gov
2      *Attorneys for Plaintiff District of Columbia*

3
       CLARE E. CONNORS
4      Attorney General of Hawaii

5      *s/ Robert T. Nakatsuji*
       ROBERT T. NAKATSUJI
6      Deputy Attorney General
       425 Queen Street
7      Honolulu, HI 96813
       (808) 586-1360
8      Robert.t.nakatsuji@hawaii.gov
       *Attorneys for Plaintiff State of Hawaii*
9

10     KWAME RAOUL
       Attorney General of Illinois
11

12     */s/ Kathryn Hunt Muse*
       KATHRYN HUNT MUSE
13     Deputy Chief, Public Interest Division
       DARREN KINKEAD
14     Assistant Attorney General
       100 West Randolph Street
15     Chicago, IL 60601
       (312) 814-3000
16     kmuse@atg.state.il.us
       dkinkead@atg.state.il.us
17     *Attorneys for Plaintiff State of Illinois*

18
       AARON M. FREY
19     Attorney General of Maine

20     */s/ Susan P. Herman*
       SUSAN P. HERMAN
21     Chief Deputy Attorney General
       6 State House Station
22     Augusta, Maine 04333-0006
       (207) 626-8814
23     susan.herman@maine.gov
       *Attorneys for Plaintiff State of Maine*
24

25
       BRIAN E. FROSH
26

Attorney General of Maryland

*/s/ Jeffrey P. Dunlap*
JEFFREY P. DUNLAP
STEVEN M. SULLIVAN
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6325
ssullivan@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Phoebe Fischer-Groban*
PHOEBE FISCHER-GROBAN
Assistant Attorney General
1 Ashburton Place, 20th Floor
Boston, MA 02108
(617) 727-2200
Phoebe.fischer-groban@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan

*/s/ Joseph T. Froehlich*
JOSEPH T. FROEHLICH
Assistant Attorney General
525 West Ottawa Street
P.O. Box 30754
Lansing, MI 48909
(517) 335-7573
Froehlichj1@michigan.gov
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION
Assistant Attorney General

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1459
Jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Glenn J. Moramarco*
GLENN J. MORAMARCO
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico

/s/ Nicholas M. Sydow
NICHOLAS M. SYDOW*
Civil Appellate Chief
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 717-3571
nsydow@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

LETITIA JAMES
Attorney General for New York

*/s/ Matthew Colangelo*
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
DANIELA NOGUEIRA
Assistant Attorney General
STEVEN C. WU
Deputy Solicitor General
28 Liberty Street
New York, NY 10005
(212) 416-6057
Matthew.colangelo@ag.ny.gov

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1
    Daniela.Nogueira@ag.ny.gov

2
    steven.wu@ag.ny.gov
    *Attorneys for Plaintiff State of New York*

3

4
    JOSHUA H. STEIN
    Attorney General of North Carolina

5
    */s/ Sripriya Narasimhan*

6
    SRIPRIYA NARASIMHAN
    Deputy General Counsel

7
    North Carolina Department of Justice
    114 W. Edenton Street
    Raleigh, NC 27603

8
    SNarasimhan@ncdoj.gov

9
    *Attorneys for Plaintiff State of North Carolina*

10
    ELLEN F. ROSENBLUM
    Attorney General of Oregon

11
    */s/ Carla Scott*

12
    CARLA SCOTT
    Senior Assistant Attorney General

13
    100 SW Market Street
    Portland, OR 97201

14
    (971) 673-1915

15
    carla.a.scott@doj.state.or.us
    MICHAEL KRON

16
    Special Counsel

17
    1162 Court Street NE
    Salem, OR 97301-4096

18
    (503) 378-4400

19
    Michael.c.kron@doj.state.or.us
    *Attorneys for Plaintiff State of Oregon*

20
    JOSHUA SHAPIRO
    Attorney General of Pennsylvania

21

22
    *s/ Jacob B. Boyer*

23
    JACOB B. BOYER
    Deputy Attorney General

24
    1600 Arch Street, Suite 300
    Philadelphia, PA 19103

25
    (215) 560-2171
    jboyer@attorneygeneral.gov

26
    mfischer@attorneygeneral.gov

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin J. Sullivan*
JUSTIN J. SULLIVAN
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2007
jjsullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

T.J. DONOVAN
Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-5944
Benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL
Deputy Attorney General, Civil Litigation
202 North Ninth Street
Richmond, VA 23219
(804) 786-2071
STowell@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of Virginia*

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Brian P. Keenan*
BRIAN P. KEENAN*

MOTION FOR PRELIMINARY INJUNCTION
No. 2:20-cv-00111-RAJ

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
keenanbp@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

*\*PRO HAC VICE APPLICATION*
*FORTHCOMING*

MOTION FOR PRELIMINARY
INJUNCTION
No. 2:20-cv-00111-RAJ

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744