# INDEX

## Declarations Cited in Support of Motion for Preliminary Injunction

| Declarant | Appendix Page Range |
|---|---|
| Shwetak Patel | 1-7 |
| Mary McCord | 8-18 |
| Blake Graham | 19-36 |
| John S. Camper | 37-43 |
| Kathleen Ferreira | 44-46 |
| Lt. Col. Scott C. Price | 47-51 |
| Robert Herzog | 52-58 |
| Randall A. Liberty | 59-62 |
| Andrew Darling | 63-65 |
| Brian Kyes | 66-69 |
| Dean M. Rickard | 70-72 |
| Adi Goldstein | 73-77 |
| Thomas Scott | 78-80 |
| Mark Racine | 81-82 |
| Cathy Lanier | 83-93 |

1                                              The Honorable Richard A. Jones

2

3

4

5

6                     **UNITED STATES DISTRICT COURT**

7               **WESTERN DISTRICT OF WASHINGTON**
                                **AT SEATTLE**

8   STATE OF WASHINGTON, et al.          NO. 2:20-cv-00111-RAJ

9
                 Plaintiffs,

10      v.                      DECLARATION OF SHWETAK
                                   PATEL, Ph.D

11   UNITED STATES DEPARTMENT OF
   STATE, et al.,

12

13                Defendants.

14

15   I, Shwetak Patel, Ph.D, declare as follows:

16       1.      I am over the age of 18 and have personal knowledge of all the facts stated

17   herein.

18                     **Qualifications and Expertise**

19       2.      I am a professor of computer science and engineering, as well as electrical

20   engineering, at the University of Washington in Seattle.

21       3.      I received my Ph.D in Computer Science from the Georgia Institute of

22   Technology in 2008, and my B.S. in Computer Science in 2003.

23       4.      I am the recipient of a MacArthur "Genius" Fellowship (2011), Microsoft

24   Research Faculty Fellowship (2011), Sloan Fellowship (2012), MIT TR-35 Award (2009),

25   World Economic Forum Young Global Scientist Award (2013), NSF Career Award (2013),

26

DECLARATION OF SHWETAK PATEL,       1
Ph.D
No. 2:20-cv-00111-RAJ
Appendix                                      Page 1 of 93

1    Presidential PECASE Award (2016), and the ACM Prize in Computing (2018)—the second-

2    highest award in all of computer science.

3        5.      I have taught a number of classes at the University of Washington that

4    incorporate 3D printing instruction, including how to use 3D printing software, design objects,

5    and create them using a 3D printer. I also direct my research lab, the Ubicomp Lab, which uses

6    3D printing extensively in its research. In addition, I direct a graduate program that has one of

7    the largest "makerspaces" on campus, with scores of 3D printers available for students to use.

8    I have purchased many 3D printers on behalf of the University of Washington. I also do my

9    own 3D printing as a hobby, and I personally own a 3D printer. As such, I am familiar with a

10   broad range of 3D printers, from low-end to high-end.

11       6.      In sum, based on my education, research, and experience, I have expertise in

12   3D printing technology.

13                            **3D Printing Technology**

14       7.      A 3D printer is essentially a device that can be used to "print" an object in three

15   dimensions. Like a two-dimensional computer printer prints from Microsoft Word or other

16   computer files, 3D printers print three-dimensional objects, also from computer files.

17       8.      The vast majority of 3D printers available today use fuse deposition modeling

18   (FDM) technology to print with "filament" rather than ink. Filament is typically made of

19   plastic—either acrylonitrile butadiene styrene (ABS), a common type of sturdy plastic, or

20   polylactic acid (PLA), a biodegradable plastic. FDM printers create objects via an additive

21   process that deposits filament through a nozzle. The nozzle head moves along all three axes

22   (x, y, and z)—left and right, up and down, forward and backward—depositing filament one

23   layer at a time to print in three dimensions.

24       9.      An FDM printer for home use typically costs about $500–1000, though I have

25   seen FDM printers available for as little as $300. ABS filament is normally sold in 1-kilogram

26   spools that cost roughly $20–30 each.

DECLARATION OF SHWETAK PATEL,                    2
Ph.D
No. 2:20-cv-00111-RAJ

1          10.    The process of creating an object using 3D printing begins with a computer

2    assisted design (CAD) program, which can be used to draw shapes and create the design of the

3    object. The resulting initial CAD file is only a design and cannot be used directly for 3D

4    printing, because a 3D printer only understands directions telling it "where to go" as it

5    completes the printing job. Examples of common CAD software programs include Solid

6    Works (file extension .sldasm), Rhino (file extension .3dm), and AutoCad (file extension

7    .dwg).

8          11.    The most common file extension for a 3D printable file is .stl, which stands for

9    stereolithography. Most CAD software programs allow you to save the design as a .stl file.

10   This type of CAD file can be loaded into a 3D printer's software, which converts the file into

11   instructions telling the 3D printer where to move along each of the three axes in order to

12   produce an object with specified dimensions. The converted file format is commonly G-code,

13   which is directly readable and understandable by a 3D printer. G-code provides the tool path

14   movements for how the machine actually builds a 3D-printed part. After the G-code is sent to

15   the 3D printer, you simply select "Print" and the 3D printer begins printing if it is properly

16   loaded with material.

17         12.    CAD files are distinguishable from computer assisted manufacturing (CAM)

18   files. CAM files provide the manufacturing or tool paths that actually perform a 3D printing

19   operation. G-code is the most common type of CAM file for 3D printing. Meanwhile, .stl and

20   AMF files are types of intermediary CAD files that can be converted by the 3D-printer software

21   directly into a CAM file, like G-code, that provides instructions to the printer. G-code is also

22   human readable in the sense that an expert could open up and read the file and tell what the

23   tool path instructions are, but G-code typically contains vast amounts of instructions.

24         13.    There are commercially available software programs (such as Solid Works),

25   and some free programs (such as Onshape, which has a free version, or Blender, an open source

26   tool) that can be used to convert other CAD design file types into .stl files that are capable of

DECLARATION OF SHWETAK PATEL,     3
Ph.D
No. 2:20-cv-00111-RAJ

1  communicating directly with 3D printer software and, through conversion into a CAM file, the

2  printer itself.

3      14.    Virtually no expertise is required to print an item from an .stl file using the

4  default printer settings and assuming the printer is already loaded with materials. You simply

5  open the file in the printer software and send it to the printer and click "Print."

6                              **Defense Distributed's Files**

7      15.    I have reviewed and tested 3D printing files that I downloaded from Defense

8  Distributed's DEFCAD.com website on July 30, 2018. These included a .zip file containing

9  the "complete" .stl files for a gun called the "Liberator," which the site indicated had been

10 uploaded on July 27, 2018.  The .zip file downloaded from DEFCAD.com included a total of

11 fifteen .stl files for the individual component parts of the Liberator.

12     16.    I determined that all of the .stl files for the Liberator were functional (including

13 that they were printable) and not corrupted. I was able to open the files in my CAD software

14 program, where I could see the complete design for the gun. I was then able to print the

15 component parts from the .stl files using an Ultimaker 2+ 3D printer.

16     17.    In addition to the .stl files, the Liberator .zip file also contains a "readme" text

17 file with written instructions recommending that the user epoxy a metal part to attach to the

18 gun in order to comply with the Undetectable Firearms Act. However, based on my review of

19 the design files referenced above, the readme text, and online videos showing how the gun

20 works, the Liberator is fully functional without this added metal part. It is separate from the

21 gun's firing mechanism and is simply attached to a part of the frame that performs no function.

22 The assembly instructions also call for an ordinary metal nail. Aside from that, all the gun

23 needs to function is a bullet.

24     18.    All of the Liberator's primary component parts can easily be printed on a

25 commonly available FDM printer. The main reasons for the price differential among FDM

26 printers are speed, resolution, and ability to print using different types of materials, but the

1    Liberator's design does not require a high level of precision and can be printed out of ordinary
2    ABS filament using a low-end FDM printer. This type of printer is available at the University
3    of Washington for any UW student to use, and is also widely available for purchase, as I stated
4    above.

5           19.    A single spool of ABS filament is more than enough to print all the component
6    parts of the Liberator. I estimate that one could print two complete guns using a single spool.
7    My understanding is that if ABS filament is used, the barrel of the gun typically must be
8    replaced after a couple of shots, as the material cannot withstand the heat generated by firing
9    many shots.

10          20.    In addition to the Liberator files, I also reviewed other files downloaded from
11   the DEFCAD.com website for other types of guns, including an AR-10 and an AR-15, among
12   others. The site also included references to where to find accessories such as bump stocks. For
13   the AR weapons, the available files were not .stl files, but were .sldprt and .stp files, which are
14   CAD design files of the type described above that cannot communicate directly with a 3D
15   printer's software.  However, these files can easily be converted to .stl using the free version
16   of the Onshape software. Not all of the files for these other guns were complete as of July 30,
17   2018; some were simply high-level designs or scanned images that would not create a
18   functional weapon if converted to .stl format and printed.

19          21.    The AR-10 and other weapons require parts that must be milled out of metal.
20   There are 3D printers available today that can print using metal instead of plastic, though they
21   are expensive. Carbon-fiber filament is commercially available as well. University of
22   Washington has a Desktop Metal 3D printer that can print "metal parts."

23          22.    I have not had access to or reviewed any of Defense Distributed's 3D printing
24   files since 2018, and I am unaware of what types of files it may have acquired since that time.

25

26

1

**The Future of 3D Printing Technology**

2       23.     It is not currently possible to print an entire AR-10 or similar weapon using

3   metal, but the technology is evolving rapidly. Metal filament and compatible 3D printers are

4   currently expensive and relatively rare, but I expect they will be ubiquitous in approximately

5   three years. They are already starting to appear at universities and fabrication shops.

6       24.     Emerging materials such as carbon-fiber filament or plastic filament containing

7   metal particles could also be used to print the Liberator. It is widely understood in the 3D

8   printing field and as a matter of basic physics that carbon-fiber or metallic filament is better

9   able to dissipate heat than plastic filament. As such, using carbon-fiber or metallic filament

10  may enable the gun to be fired many times without replacing the barrel.

11      25.     Emerging fabrication technologies will also expand the possibilities for 3D

12  printing weapons. For example, additive 3D printing technology is the norm today, but laser

13  cutting technology that whittles material down is also becoming available. Milling technology

14  will make it easier to use laser cutting to produce components of weapons that cannot be made

15  as easily with an additive process. Some of this technology is available today—our university

16  has mills and other fabrication technologies capable of, for example, printing concrete.

17  Emerging fabrication technologies could be used to complete a gun that cannot be made

18  entirely using a 3D printer.

19      26.     I anticipate that 3D printers will become increasingly accessible to the public,

20  both in terms of price and availability. I understand there is a movement toward putting 3D

21  printers in libraries for public use; the Seattle Public Library has held 3D printing workshops

22  that are free and open to the public. 3D printers and filament are available for purchase on

23  websites like MatterHackers.com and Amazon.com.

24      27.     I believe 3D printers will become ubiquitous in the near future, both for home

25  and commercial use. 3D printing files are like hardware that you can carry in your pocket.

26  These files allow you to make a tangible item on demand with little more than the click of a

DECLARATION OF SHWETAK PATEL,          6
Ph.D
No. 2:20-cv-00111-RAJ

1   button. This technology could be used to reduce waste and save money, because household

2   items and consumer goods could be printed only as needed. For example, when the technology

3   develops sufficiently, a car manufacturer will not need to incur the cost of housing a large

4   inventory; they will be able to simply receive a customer's order and print a car that meets

5   their specifications. I expect that increased demand for this type of technology will drive its

6   development.

7       28.     In sum, currently, anyone who has the .stl files (or CAD design files that can be

8   converted to .stl files) and access to an FDM printer, which can cost as little as $300, could

9   easily print the primary components of a functional weapon. Moreover, 3D printing and other

10  fabrication technologies are advancing rapidly and will become more and more accessible,

11  opening up the possibilities for creating other types of weapons with essentially one click.

12      I declare under penalty of perjury under the laws of the State of Washington and the

13  United States of America that the foregoing is true and correct.

14

15      DATED this ___ day of January 2020, at Seattle, Washington.

16

17      _____

18      Shwetak Patel, Ph.D

19

20

21

22

23

24

25

26

DECLARATION OF SHWETAK PATEL,
Ph.D
No. 2:20-cv-00111-RAJ

7

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON, et al.

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

Defendants.

NO. 2:20-cv-00111-RAJ

DECLARATION OF
MARY B. McCORD

I, Mary B. McCord, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated in this declaration.

2.      I am currently Legal Director and Visiting Professor of Law at the Institute for Constitutional Advocacy and Protection at Georgetown University Law Center in Washington, D.C.  I have held this position since July 1, 2017.  In this position, I have represented cities, businesses, and individuals in lawsuits raising a variety of constitutional and statutory issues. I have also authored or co-authored several amicus briefs on behalf of current and former federal, state, and local prosecutors and law enforcement officials, and have co-authored letters to government officials on behalf of former national security officials.

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

1

3.     Prior to holding my current position, I was the Acting Assistant Attorney General for National Security at the Department of Justice from October 2016 through mid-May 2017, and the Principal Deputy Assistant Attorney General for National Security at the Department of Justice from May 2014 through mid-May 2017.  In those roles, I oversaw all federal counterterrorism, espionage, and export-control prosecutions.  These included prosecutions of terrorists brought to the United States from abroad for terrorist acts committed overseas, as well as prosecutions of terrorism-related offenses committed within the United States.  It also included prosecution of cases arising from violations of the Arms Export Control Act (AECA), 22 U.S.C. § 2751 *et seq.*, and the International Trafficking in Arms Regulations (ITAR), 22 C.F.R. §§ 120-130.  In addition, my responsibilities included representing the Department of Justice at interagency policy meetings, including Deputies Committee meetings, held by the National Security Staff of the Executive Office of the President, on a full range of national security issues including counterterrorism policy, terrorist threats to aviation, border security, export control policy, arms control policy, intelligence collection, cyber threats to national security, and foreign attempts to influence the U.S. elections, among others.  My work put me in close contact with officials from all of the national security departments and agencies, including the Departments of Defense, Homeland Security, State, and the Treasury, and the intelligence community, among others.

4.     Prior to my position in the National Security Division at the Department of Justice, I was an Assistant United States Attorney (AUSA) for the District of Columbia from October 1994 to May 2001 and July 2002 through May 2014.  During my tenure as an AUSA, in addition to prosecuting at trial and litigating on appeal in cases arising under federal and District of Columbia criminal law, I served as a Deputy Chief of the Sex Offense Section for one year, Deputy Chief of the Appellate Division for six years, and Chief of the Criminal Division for two years.  As Chief of the Criminal Division, I supervised all federal violent and organized crime prosecutions, including narcotics and gun trafficking; all federal white collar offenses; and all prosecutions of federal national security offenses (in conjunction with the

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                    Page 9 of 93

officials at the National Security Division of the Department of Justice).  My work put me in close contact with law enforcement officials at the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Department of Homeland Security, among others.

5.      This declaration is submitted in support of the request for an injunction filed by the States of Washington, California, Connecticut, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Wisconsin, the Commonwealths of Virginia, Massachusetts, and Pennsylvania, and the District of Columbia ("plaintiff States").

6.      I have considered the likely impacts of the largely unrestricted export and dissemination of files for the production of 3D-printed firearms to any interested person, entity, or foreign power, and have concluded that the likely effect would be detrimental to the national security, foreign relations, and public safety interests of the United States and the plaintiff States.

**Export Would Threaten To Defeat Existing Security Protocols on Which Public Safety Depends**

7.      A plastic firearm that is both fully operable and virtually undetectable by conventional security measures would threaten to defeat existing security protocols on which public safety depends.  Such a device would rarely, if ever, be detected by metal detectors, which form the backbone of well-developed protocols used across the United States and around the world for public safety.

8.      Metal detectors stand between those carrying firearms and boarding airplanes, entering packed stadiums and arenas, attending concerts, visiting courthouses and other government buildings, and—increasingly—going to school.

9.      A plastic firearm, including a 3D-printed plastic firearm, would evade this well-honed system because there would be no current-conducting metal on which the detector would alert.

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

10.     Although the federal Undetectable Firearms Act, 18 U.S.C. § 922(p), requires firearms to include enough metal to be detectable by a walk-through metal detector, this requirement easily could be evaded by bad actors who seek to smuggle 3D-printed plastic firearms through such metal detectors.  For example, it is my understanding that the Defense Distributed CAD files for the "Liberator" 3D-printed plastic firearm include the insertion of a six-ounce piece of metal to comply with this requirement, but that the metal piece can be removed without rendering the firearm inoperable.

11.     Although most firearms ammunition should be detectable by metal detectors, depending on the sensitivity and calibration of the equipment used, a single bullet might be undetectable.

12.     The law enforcement and national security community, of which I was a part for more than 20 years, has consistently expressed concerns about the development of plastic weapons—whether firearms or improvised explosive devices—that can evade detection by metal detectors.

13.     Allowing widespread private manufacture and access to operable 3D-printed plastic firearms would seriously undermine the utility of one of the primary currently available forms of protection for sensitive and/or crowded sites nationwide and worldwide.

**Export Would Pose Serious National Security Risks**

14.     The export of CAD files for the manufacturing of 3D-printed plastic firearms would mean that the files will be available not only to U.S. persons (U.S. citizens and Lawful Permanent Residents (LPRs)), but also to foreign persons both inside and outside of the United States.  *See* 15 C.F.R. § 734.13 (defining "export" for purposes of the Export Administration Regulations to include "transmission" of technical data "out of the United States . . . in any manner" and "[r]eleasing or otherwise transferring "technology" . . . to a foreign person in the United States").

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

4

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

15.     Export of these CAD files would mean that bad actors, including members of foreign terrorist organizations and those inspired by them, both inside and outside of the United States, would be able to make undetectable and untraceable firearms that could be used to inflict harm on persons residing in or visiting the State of Washington and other plaintiff States.

16.     Foreign terrorist organizations like al-Qa'ida and ISIS have long encouraged the use of firearms to commit acts of terrorism on U.S. soil in the name of those groups.  Such terrorist organizations call on individuals to cause as much bloodshed as possible in the hope of spreading fear, gaining notoriety, and attracting additional followers.  Individuals such as Omar Mateen, the shooter at Orlando's Pulse Nightclub who killed 49 people, and Syed Farook and Tashfeen Malik, the shooters at a county government training event in San Bernardino, California, who killed 14, have, regrettably, answered that call.

17.     Thus far, those in the United States who have been susceptible to terrorists' call to violence have in some instances been limited in the bloodshed that they are able to cause with firearms.  That appears due, at least in part, to the security protocols, and in particular the metal detectors, that hinder them from being able to bring firearms into crowded, heavily-attended places.  Would-be terrorists know that they currently would likely fail if they tried to enter, for example, Seattle's CenturyLink Field with a metal firearm, due to the stadium's use of walk-through metal detectors.

18.     With the export of files facilitating the private manufacture of 3D-printed plastic firearms, the 72,000 fans who pack CenturyLink for a Seahawks game suddenly would become much more vulnerable to terrorists who seek to cause as much bloodshed as possible.  The ability to bring firearms undetected to public spaces and then open fire as widely and indiscriminately as possible is a longstanding tactical objective for groups such as al-Qa'ida and ISIS.

19.     With the availability of the CAD files for the manufacturing of 3D-printed plastic firearms, members of foreign terrorist organizations abroad, and those inspired by them, may travel to the United States for the purpose of making such weapons and using them to

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                   Page 12 of 93

commit a terrorist attack in one of the plaintiff States.  In addition, members of foreign terrorist organizations outside the United States, and those inspired by them, may manufacture 3D-printed plastic firearms abroad and attempt to smuggle them into the United States, whether by land, air, or sea.  These plastic firearms would prove more difficult to detect than conventional metal firearms, depending on the screening systems used at the various entry points.

20.     In addition, in my experience, foreign terrorist organizations have made a priority of targeting commercial aviation and aggressively pursue innovative methods to undertake attacks, including by smuggling undetectable explosives onto commercial airplanes. The availability of the CAD files for manufacturing 3D-printed plastic firearms increases the risk that members of foreign terrorist organizations and those inspired by them will successfully be able to bring such weapons onto a commercial airplane bound for the United States.  Even if foreign airports that are the last points of departure for the United States utilize security screening devices such as millimeter wave imaging technology, designed to detect metallic and non-metallic items, vulnerabilities in those systems and the persons who operate them increase the risk of 3D-printed plastic firearms being used to commit an in-air attack, including a hijacking.  They also increase the risk that 3D-printed plastic firearms made abroad could be transported in the checked baggage of passenger planes or on cargo planes bound for the United States, for use in a possible terrorist attack in one of the plaintiff States.

21.     In addition to the above, metal detectors represent the principal means of protecting prominent federal, state, and local officials in their frequent public appearances. One goes through a metal detector before entering the White House, the Supreme Court, and the Capitol in Washington D.C., as well as iconic buildings in many state capitals—and even at many campaign events and rallies for candidates not yet elected to public office.

22.     There are numerous foreign adversaries intent on causing chaos and confusion in the United States.  Increasing the ability to bypass existing security protocols with an

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

6

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 13 of 93

1
2

undetectable firearm would provide an assassination option for hostile foreign actors that is currently much more difficult, and thus presents a serious national security risk.

3

**Export Would Harm Foreign Relations**

4
5
6
7
8

23.     The United States and other countries rely on international arms embargoes, export controls, and other measures to restrict the availability of defense articles, including firearms, sought by foreign terrorist organizations.  Unrestricted access to the CAD files for manufacturing 3D plastic firearms would allow these organizations and those inspired by them to readily manufacture and use such weapons in foreign countries, harming U.S. foreign relations with those countries.

9
10
11
12
13

24.     Wide international access to the CAD files would likewise provide armed insurgent groups, transnational criminal organizations, and foreign countries subject to U.S. or U.N. arms embargoes (such as North Korea and Iran) with technology allowing for the ready manufacture of 3D-printed plastic firearms and components.  This would undermine global export control and non-proliferation regimes designed to prevent the dangerous spread and accumulation of weapons and related technologies, damaging U.S. leadership in this area.

14
15
16

25.     Even if IP addresses located in hostile foreign countries such as North Korea and Iran were blocked from accessing the CAD files, there are multiple ways to defeat an IP block, including through the use of proxies and virtual private networks.

17
18
19
20
21

26.     Easy internet access to the CAD files also could contribute to increased armed conflict and crime in countries with which the United States seeks to maintain good relations, causing destabilizing effects on economies and societies.  Such destabilization would negatively impact U.S. foreign relations with those countries and could result in damage to the economies of the plaintiff States and their citizens who have family members and business interests in those countries.

22
23
24

27.     If the CAD computer files were used to assemble an undetectable 3D-printed plastic firearm in a foreign country, and that weapon were then used to commit an act of terrorism, piracy, or other serious crime, this sequence of events, and the foreign country's

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

7

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                        Page 14 of 93

likely interest in holding the United States accountable, could cause very serious and lasting harm to the foreign relations interests of the United States.

28.     That risk is particularly great because many foreign countries, including critical allies like Canada, the United Kingdom, and Japan, have more restrictive firearms laws than those in the United States.  Export of the CAD files for use in manufacturing 3D-printed firearms would undercut the domestic laws of those countries and increase the risk of violence there, thereby damaging U.S. foreign relations with those countries.

**Export Would Undermine Law Enforcement's Ability to Investigate and Solve Crimes Committed with Firearms**

29.     The ready availability of the CAD files would mean that 3D-printed plastic firearms may be privately manufactured and put into the marketplace with no serial numbers, making them untraceable by law enforcement, which would seriously impede the ability to investigate and solve crimes committed with firearms.

30.     Under federal law, all firearms manufactured for commercial sale in the United States are required to bear a serial number which, along with other required markings on the firearm, generally allow it to be uniquely identified.  When a law enforcement agency recovers a firearm, it can submit the serial number and other identifying details to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to "trace" the gun to the federal firearm licensee who made the first retail sale of the firearm, thus leading to the identity of the first retail purchaser of the firearm.

31.     In individual cases, a successful firearms trace can lead to the perpetrator of a crime or to a person who may have relevant information about a particular crime.  In my experience as a federal prosecutor, firearms trace information frequently led to information relevant to solving violent crimes, including by revealing "straw" purchasers, or those who purchased a gun for someone legally prohibited from buying or possessing a firearm.

32.     Firearms trace information can also be helpful in discerning meaningful patterns in gun trafficking, for example, by identifying gun buyers who are responsible for

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

8

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                    Page 15 of 93

purchasing a disproportionate share of firearms recovered from crime scenes in certain areas or gun sellers who supply a disproportionate share of firearms used in crime and may wittingly or unwittingly be fueling illegal gun trafficking.

33.     Although federal law requires all firearms manufactured for commercial sale in the United States to have serial numbers, bad actors who download the CAD files for the manufacture of 3D-printed plastic firearms readily could evade this requirement and produce undetectable and untraceable firearms.

34.     Law enforcement agencies in the plaintiff States that locate 3D-printed plastic guns that have no serial numbers will have no information from which to seek a firearms trace from the ATF, reducing their ability to solve crimes in their jurisdictions.  This is so even if the 3D-printed plastic gun is in compliance with the Undetectable Firearms Act.

35.     In addition, it is my understanding that the plastic barrel of a 3D-printed plastic gun does not contain grooves called "rifling" that leave unique striations on the soft outer metal of bullets fired from it.  This means that law enforcement agencies and prosecutors will not be able to rely on forensic experts to match bullets used to commit crimes with the firearms from which they were shot.

36.     When a gun is fired and the bullet speeds down the barrel, it encounters ridges and grooves that cause it to spin, increasing the accuracy of the shot.  Those ridges dig into the soft metal of the bullet, leaving striations.  At the same time that the bullet is blasted forward, the cartridge case explodes backward with equal force against the mechanism that absorbs the recoil, stamping an impression into the soft metal at the base of the cartridge case, which is then ejected from the gun.

37.     When a law enforcement agency recovers bullets or cartridge cases from a crime scene, forensic examiners can test-fire a suspect's gun to see if it produces striations and impressions that match the evidence.  When there is a match, prosecutors may rely on a firearms identification expert to testify that the microscopic striations and impressions left on

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

9

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                  Page 16 of 93

bullets and cartridge cases are unique, reproducible, and therefore, like "ballistic fingerprints" that can be used to identify a gun.

38.     In my experience, firearms identification has produced valuable evidence to support prosecutions of violent crimes committed with firearms.  Law enforcement agencies that locate bullets shot from 3D-printed plastic firearms will not be able to rely on firearms identification to prove that the bullets were shot from a suspect's 3D-printed plastic firearm, reducing the ability of law enforcement agencies in the plaintiff States to solve crimes committed with such weapons.

**Federal and State Laws Do Not Adequately Protect Americans from the Threat Posed by Plastic Guns**

39.     Federal and state regulation of the manufacture and sale of firearms is based on the premise that commercial firearms production and distribution require an investment of resources that makes it feasible only for commercial entities, which must comply in order to maintain their licenses.  The wide availability of the CAD files for the production of 3D-printed plastic handguns in the home, and the ubiquity and relative low cost of 3D printers, would up-end the entire regulatory regime.

40.     Bad actors who seek to make or sell 3D-printed firearms for criminal purposes have no motivation to comply with federal or state firearms laws, and can easily evade them because of the ready ability to make the weapons cheaply and with minimal equipment. Although bad actors today can purchase firearms on the black market, or through straw purchasers, obtaining firearms from such illicit sources increases the costs to the purchasers, who still bear the risk that those firearms might be traced back to them by law enforcement. That risk is minimal for 3D-printed plastic firearms that contain no serial numbers and are not distributed by licensed firearms dealers.  Moreover, by bypassing licensed firearms dealers, purchasers of 3D-printed plastic firearms also bypass background checks required under current federal law.

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

10

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

41.     Laws such as the Undetectable Firearms Act, while laudable, do little to deter bad actors—whether terrorists, drug dealers, or domestic abusers—from making 3D-printed plastic weapons such as the Liberator without the non-functional piece of metal required to comply with the Act.  This is especially so where the weapons will never pass through the hands of a licensed firearms dealer whose livelihood depends on compliance with federal and state regulations.

42.     In my judgment, the entry of an injunction in this matter would help to prevent the further dissemination of any CAD files for the manufacture of 3D-printed plastic firearms that may have been made available via the internet, thereby decreasing the risk of harm to the national security and foreign relations interests of the United States and to the public safety and law enforcement interests of the plaintiff States.

43.     I am not receiving compensation for offering my opinion in this case.  I am serving pro bono because of my grave concerns about the dangers of the unchecked global release of CAD files for the manufacture of 3D-printed plastic firearms.

I declare under penalty that the foregoing is true and correct.

DATED this 4th day of February, 2020, at Washington, District of Columbia.

_____
Mary B. McCord

DECLARATION OF
MARY B. McCORD
2:20-cv-00111-RAJ

11

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | DECLARATION OF BLAKE GRAHAM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | Noting Date: February 28, 2020 |
| Defendants. | |

I, Blake Graham, declare as follows:

1.    I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.    I am a Special Agent in Charge for the California Department of Justice, Bureau of Firearms.

### BACKGROUND AND QUALIFICATIONS

3.    I received a Bachelor of Science degree in May 1992, in Criminal Justice from the California State University, Sacramento.   My coursework included forensics, corrections, and a number of classes in criminal-justice related topics.

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 19 of 93

4.     Since 1994, I have worked as either as an Investigator for the California Department of Alcoholic Beverage Control (ABC), or in the Special Agent series for the California Department of Justice (DOJ).  My job responsibilities in all of these positions have at least partially required the recovery, investigation, and identification of firearms.

5.     My work as an Investigator for ABC between 1994 and 1999 included the recovery of firearms and ammunition, which would be catalogued and booked into evidence.

6.     Between 1999 and 2002, I worked as a Special Agent for DOJ, and was assigned to the Violence Suppression Program in the Bureau of Narcotic Enforcement.  In this job, I investigated violent crimes and various violations occurring at California gun shows.  As a gun show agent, I attended gun shows in the San Francisco Bay Area to monitor—and if necessary, seize—firearms, ammunition, and magazines sold illegally to felons, parolees, and probationers.

7.     From October 2002 to March 2019, I was a Special Agent and Special Agent Supervisor, for the DOJ's Bureau of Firearms (BOF).  In this capacity, I was assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons, machine guns, and illegal possession of ammunition.  From April 2019 to the present, I have been a Special Agent in Charge for the BOF.  In this capacity, I supervise teams of Special Agents who are assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons and machine guns, and illegal possession of various magazines and ammunition.

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 20 of 93

8.      Since 2008, I have been responsible for reviewing handguns that are submitted by manufacturers for inclusion on California's roster of handguns certified for sale.  Through this process, I have become familiar with the components and calibers of numerous handguns currently and previously on the roster.  As of February 4, 2020, there were 809 handguns on the roster.  A copy of the roster, which can change daily, can be found on the DOJ website:  https://oag.ca.gov/firearms/certguns?make=All.

9.      In my career, I have attended at least 40 gun shows and visited over one hundred gun stores and have become knowledgeable on current laws pertaining to the sales and licensed manufacture of firearms, and unlicensed manufacture of unserialized firearms (sometimes called "ghost guns") in the State of California.

10.     I have been trained and qualified to carry several different types of firearms, including:  Glock Model 17 (9 mm semi-automatic pistol), multiple Glock .40 caliber semi-automatic pistols, Heckler & Koch MP5 (9 mm submachine gun), Smith & Wesson, Model 60 (.38 Special revolver), multiple .45 caliber semi-automatic pistols, and a Colt, Model M4 (5.56 mm machine gun).  I have access to other Department-owned handguns, shotguns, submachine guns, machine guns, rifles, shotguns and 40 mm "less lethal" launchers.

11.     Throughout my career, I have conducted training programs in the identification and handling of firearms.  I have trained other Special Agents in BOF on assault weapons and firearms identification.  I also have given firearms identification classes to members of California District Attorney's offices and Law Enforcement Agencies.

12.     I have also completed at least 15 firearms training courses since 1994.  These courses included the assembly and use of specific firearms, cartridge composition (bullet, the propellant, and the casing), common calibers used by law enforcement, and training on rifle

DECLARATION OF BLAKE GRAHAM                    3                    ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                                          800 Fifth Avenue. Suite 2000
                                                                                           Seattle, WA  98104-3188
                                                                                           (206) 464-7744

Appendix                                                                                   Page 21 of 93

1  and handgun ammunition.  I have been certified as a California Peace Officer Standards and

2  Training approved Firearms Instructor/Range Master since 2002.

3          13.     During the course of my career, I have become proficient in the use and

4  disassembly of various revolvers, pistols, submachine guns, shotguns, and rifles.  I have made

5  or assisted in the arrest of at least 30 persons for violations involving illegal weapons possession.

6  In the course of my employment I have participated in excess of 30 search warrants that involved

7  the illegal possession of firearms.

8          14.     I have been qualified as an expert witness regarding the use of firearms in 16

9  cases in both federal and state court since 2007.

10                                      **GHOST GUNS**

11          15.     Under California Law, a firearm is "a device, designed to be used as a weapon,

12  from which is expelled through a barrel, a projectile by the force of an explosion or other form

13  of combustion."  Cal. Penal Code § 16520(a).  For rifles and shotguns (long guns), the basic

14  unit that most other parts attach to is called a receiver.  Long guns can have single-part

15  receivers (most common) or multipart receivers (the AR-15 series and its derivatives),

16  depending on the type of firearm.  For handguns, the basic unit is called a frame.  Frames

17  are single-part or multipart designs (the AR-15 handgun series, for example).  A receiver or

18  frame is "the" firearm for purposes of ownership, possession, and background checks.

19          16.     Once an unfinished receiver or frame has been machined or manufactured

20  beyond a certain point, it will be deemed a firearm under Federal law.  The Bureau of

21  Alcohol, Tobacco, Firearms and Explosives (ATF) has ruled from time to time that a device

22  either was or was not yet a firearm.  In general, firearms industry slang terms such as "80%

23  receiver," "80% blanks," "80% frames," and "80% lowers" have developed and are now in

24

DECLARATION OF BLAKE GRAHAM                    4          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                      800 Fifth Avenue, Suite 2000
                                                                        Seattle, WA  98104-3188
                                                                            (206) 464-7744

common use among firearms enthusiasts and the media.  The idea behind the "80%" slang is that, while the vast majority of the work on the receiver or frame was complete, the device is not yet a firearm.  Regarding the AR-15 series of firearms, some crucial areas must be left unfinished, or the device might be deemed a firearm.  The areas on an unfinished frame or receiver that need to remain un-machined to retain non-firearm status are the fire control pocket, the trigger hole, the trigger pin hold, the hammer pin hole, and the selector-lever hole.

17.    Over the past several years, the term "ghost gun" has been also used to identify firearms without serial numbers or other identifying marks that are manufactured by non-licensed persons.  For purposes of this declaration, a licensed person is someone licensed to manufacture firearms by ATF or the State of California.

18.    After the mass shooting in Sandy Hook, Connecticut, in 2012, I noticed a spike in non-licensed firearms manufacturing.  Based on my experience as a law enforcement officer attending gun shows, visiting gun stores, and reading firearms websites, it seemed that there was a general fear among a certain segment of firearms owners in California that the State or Federal government might pass restrictive firearms laws because of the shooting.

19.    In general, until about two years ago, roughly 90% of the ghost-gun market, in my estimation, was for AR-15 and AK-47 based models.  Based on my experience, some handguns and other long guns were being made, but the vast majority of ghost guns were either AR-15 or AK-47 based designs and builds.  In the past couple of years or so, kits allowing a purchaser to build semi-automatic handgun designs have become widely available.  These kits are mainly polymer type plastic frames with Glock internal parts and

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 23 of 93

1   Glock-like slides.  (Glock is a Federal Firearms Licensee that makes handguns in Austria

2   and the United States.  These semi-automatic handguns are relatively inexpensive, reliable,

3   and very popular.)  Video tutorials on how to build these self-built handguns are widely

4   available on the Internet.  If a person uses a kit to manufacture a semi-automatic handgun,

5   they risk criminal liability under California's Unsafe Handgun Act, unless they are

6   manufacturing the gun for testing and approval under the Act.  Among other things, the Act

7   requires that pistols include certain features, such as chamber-load indicators, magazine

8   disconnects, and microstamping technology. Cal. Penal Code § 31910(b). (Pistols that have

9   been grandfathered in under the Act or that satisfy certain other requirements do not have

10  to include these features.)

11  **GHOST GUNS IN CALIFORNIA**

12      20.    The firearms industry often outpaces state and federal laws.  Firearms accessories

13  are constantly being developed that might be legal in one state and not legal in California.

14  California has numerous unique firearms laws.  Not only has there been increased interest in

15  manufacturing ghost guns in recent years, but developments, including the use of types of

16  plastics to manufacture frames and receivers, have made ghost guns more accessible.  Ghost-

17  gun-related crime is a significant source of concern in the law-enforcement community in

18  California, and I have come to the conclusion that ghost guns, including 3D printed guns, are a

19  significant public safety concern.  I base this conclusion on my own investigative and law-

20  enforcement duties and experience, as well as information available to me in my capacity as a

21  Special Agent Supervisor for BOF.

22  / / /

23  / / /

24

DECLARATION OF BLAKE GRAHAM      6
2:20-cv-00111-RAJ

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    **I.**      **Personal Involvement in Ghost Gun Investigations**

2          21.      To my knowledge, the first California Department of Justice investigation

3 that involved the unlicensed manufacturing of un-serialized firearms occurred sometime in

4 2004 to 2005. From that point until 2013, the number of investigations involving unlicensed

5 and un-serialized firearms manufacturing that the Department was involved in grew slowly.

6 Then, beginning in early 2013, I became aware of relatively large numbers of individuals in

7 California building firearms from unfinished firearm receivers or unfinished firearm frames.

8          22.      In March 2013, I served as part of a joint task force between the BOF and ATF,

9 investigating Luis Cortez-Garcia and Emiliano Cortez-Garcia for selling manufactured-to-order

10 firearms that did not have manufacturer markings or serial numbers, making them untraceable.

11 They and their co-conspirators would sell customers, who paid in cash, all the working parts of

12 a firearm and an incomplete lower receiver. They would have the customer visit Emiliano

13 Cortez-Garcia, who would have the customer initially drill a few holes into the fire control pocket

14 and then Emiliano himself would complete the machining process of making the unfinished

15 receiver into a finished lower receiver. Emiliano and Luis—both of whom were prohibited from

16 possessing firearms—would assemble the parts into completed AR-15-style ghost guns. As a

17 result of this investigation, law-enforcement agents seized almost 350 guns from ten locations

18 in the 200-mile span from Fresno to Auburn, California. Emiliano and Luis were indicted,

19 convicted, and sentenced for multiple firearms violations.

20          23.      During the Cortez-Garcia investigation, we learned of another location making

21 ghost guns in a machine shop equipped with computer numeric control (CNC) machines. The

22 owner of this machine shop was Daniel Crowninshield, who had given himself the nickname

23 "Dr. Death" on a firearms enthusiast website and who was prohibited by state and federal law

24

DECLARATION OF BLAKE GRAHAM        7        ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                          800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                          Page 25 of 93

1   from owning, possessing, or manufacturing firearms.   As a result of this investigation,

2   Crowninshield was later indicted by a federal grand jury and ultimately convicted and sentenced

3   to prison.

4   24.   Since the investigations into the Cortez-Garcia brothers and Crowninshield, I

5   have participated in or consulted on several investigations involving ghost guns not described in

6   this declaration.

7   **II.   An Overview of Several Significant Ghost Gun Investigations in California**

8   25.   As part of my duties, I collect information about ghost-gun related crime in the

9   State and across the United States.   This information comes primarily from news reports and

10   press releases from various law-enforcement agencies, but also from my contacts in the law-

11   enforcement community.   In addition, BOF's current record keeping generates some information

12   about the use of ghost guns in crime.

13   26.   While my research is ongoing, I have assembled a chronology of significant

14   ghost-gun crimes in the State:

15   a.   **June 2013.**   John Zawahri, of Santa Monica, California, killed five people and

16   wounded three others using a ghost gun—a homemade AR-15-style assault rifle.

17   Several months earlier, BOF had stopped him from purchasing a firearm when a

18   background check showed that he was a prohibited person because of a

19   commitment in a mental-health institution.

20   b.   **February 2014.**   A federal grand jury indicted brothers Luis Cortez-Garcia and

21   Emiliano Cortez-Garcia, who operated an unlicensed firearms business in

22   Sacramento, on charges of unlawful manufacturing and sales of firearms (arising

23

24

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

8

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1     from the investigation that I participated in, discussed in ¶ 22, above).  They were

2     later convicted and sentenced for these crimes.

3   c.  **March 2014.**  Federal agents from ATF served a search warrant on an unlicensed

4     firearms-accessory store in San Diego County and recovered about 6,000 un-

5     serialized polymer AR-15 lower receivers that had been fabricated to eliminate

6     the need for precise machining to make them functional.  The search also

7     uncovered information showing that more than 5,000 customers had purchased

8     these receivers with no background checks associated to the sales of these

9     receivers.

10  d.  **June 2014.**  Daniel Crowninshield, of Sacramento, California, was indicted for

11    various firearms crimes, including operating a scheme designed to sell ghost guns

12    by having customers participate in a trivial step in the manufacturing process

13    (arising from the investigation that I participated in, discussed in ¶ 23, above).

14  e.  **July 2014.**  Three Norteño gang members used an AK-47-style ghost gun and

15    several handguns in an attempted bank robbery in Stockton, California.  They

16    kidnapped three patrons and led law enforcement on an hour-long chase, firing

17    hundreds of shots.  Two of the gang members and one of the hostages died during

18    the shootout.

19  f.  **May 2015.**  Clay Bautista-Marquez pleaded guilty to firearms trafficking.  He

20    and three other men were making and selling illegal ghost guns from un-serialized

21    AR-15 style lower receivers.  More than 50 firearms were seized during the

22    investigation.  Some of the ghost guns were short-barrel rifles and assault

23    weapons.

24

DECLARATION OF BLAKE GRAHAM                    9                    ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                          800 Fifth Avenue, Suite 2000
                                                                            Seattle, WA  98104-3188
                                                                                (206) 464-7744

g. **July 2015.** Scott Bertics murdered his former girlfriend and then killed himself in Walnut Creek, California, using a ghost gun.

h. **October 2015.** Federal officials indicted eight men in Northern California for running an illegal gun-selling ring. Many of the firearms seized were un-serialized ghost-gun, short-barrel rifles and un-serialized ghost-gun assault weapons.

i. **January 2016.** Craig Mason of Grass Valley, CA was indicted for unlawful dealing of firearms and unlawful manufacture of firearms. Mason helped manufacture two AR-15-style ghost guns for a confidential informant who told Mason he was a felon.

j. **February 2016.** A Federal Firearms Licensee, Christopher Cook of Bakersfield, California, forfeited 3,800 polymer lower receivers for AR-15-style guns. He had illegally manufactured those firearms with no serial numbers and sold 33 of them to ATF agents without conducting a background check or completing legally required paperwork. It is unknown how many of these ghost guns were sold to members of the public before the ATF investigation closed this operation down.

k. **November 2016.** ATF agents and LAPD officers purchased seven ghost guns in an investigation that ultimately led to 17 gang members, felons, and their associates being arrested on firearms and narcotics charges.

l. **March 2017.** James Smallwood and John Smallwood of Sacramento, California, were indicted for illegal firearms sales, including 17 AR-15-style ghost guns. At

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

10

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the time of his arrest, James Smallwood was arrested en-route to sell 14 more ghost guns.

m. **March 2017.** Scott Coyle of Redlands, California, was arrested by ATF and local police for dealing firearms without a license. He sold five ghost gun rifles to an informant that openly claimed he was a felon and that he intended to take the guns to Mexico.

n. **May 2017.** Paul Holdy, of La Jolla, California, was indicted for federal gun and narcotics crimes, including selling ghost guns.

o. **November 2017.** Kevin Neal of Rancho Tehama, California, used a ghost gun to kill his wife and four other people, and wound ten more. He was shot and killed in a stand-off with local law-enforcement officers. Neal had been served with a restraining order and had no known firearms in the California Department of Justice Automated Firearms System. At the time of the spree, he was on bail pending trial for crimes including two felonies.

p. **February 2018.** A federal court sentenced David Guevara-Pimentel for firearms crimes, including selling ghost guns in 2014 and 2015.

q. **March 2018.** Axel Galvez was sentenced for federal firearms violations. Galvez manufactured ghost guns at a South Los Angeles machine shop where he worked. He sold five assault rifles to an undercover agent, whom Galvez believed was a convicted felon. In discussions with the undercover agent, Galvez negotiated the sale of another 100 homemade assault rifles, offering a bulk discount.

r. **June 2018.** BOF Agents, working with ATF agents and local police, seized ghost guns and ghost-gun components from the residence of a convicted felon.

DECLARATION OF BLAKE GRAHAM        11        ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                      800 Fifth Avenue. Suite 2000
                                                                       Seattle, WA  98104-3188
                                                                       (206) 464-7744

Appendix                                                       Page 29 of 93

s. **June 2018.**  Joe Darwish ambushed two San Diego police officers using a ghost-gun AR-15-style rifle and two polymer-based ghost-gun pistols.  Darwish wounded both officers, who survived.  He was killed in the confrontation.  At the time, Darwish, who had a history of violence, criminal convictions, and mental-health problems, was prohibited from possessing a firearm.

t. **July 2018.**  ATF agents and LAPD officers seized more than 45 ghost guns from a Los Angeles-based gang and arrested several of its members.  The gang was manufacturing and selling ghost-gun pistols and AR-15-style assault rifles.  At a press conference following the arrests and seizure, ATF Special Agent in Charge Bill McMullan said "[s]earch warrants at the end of the investigation resulted in the seizing of firearms manufacturing tools and materials used to build AR-style rifles and pistols from unfinished lower receiver kits.  This is a common trend ATF is seeing in SoCal amongst gangs.  Criminals building their own guns since they are prohibited from buying guns legally."

u. **June 2019.** Sacramento Police Officer Tara O'Sullivan was killed by a suspect who shot her with an assault rifle while responding to a domestic disturbance. https://apnews.com/a3ead15ad1dd4559ae6d1730a0fc6473

v. **August 2019.**  California Highway Patrol (CHP) Officer Andre Moye was killed by a convicted felon armed with a ghost gun AR-15 style assault weapon.  Two other CHP officers were also shot by the same felon during this gun battle. https://www.latimes.com/california/story/2019-08-14/rifle-used-in-deadly-riverside-shooting-was-untraceable-ghost-gun-sources-say

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ

12

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 30 of 93

1          https://www.nbclosangeles.com/news/assault-style-rifle-used-in-chp-shooting-

2          likely-assembled-from-unregulated-parts-sources-say/130773/

3     w.   **November 2019.** A sixteen-year-old student killed two students and injured three

4          others at Saugus High School.   https://www.cnn.com/2019/11/21/us/saugus-

5          shooting-ghost-gun/index.html

6     27.    In addition to keeping track of reports of ghost gun crimes in California, I have

7   access to data showing local law-enforcement encounters with ghost guns.  Under California

8   law, local law-enforcement agencies are required to submit descriptions of "serialized property"

9   to the California Department of Justice.  Cal. Penal Code § 11108(a).  In the case of firearms,

10  that information is submitted into a database called the Automated Firearms System (AFS).  *See*

11  *id.* § 11108(b).  California law gives local law-enforcement agencies the discretion to report "all

12  available information necessary to identify and trace the history of all recovered firearms that

13  are illegally possessed, have been used in a crime, or are suspected of having been used in a

14  crime."  *Id.* § 11108.3(a).  BOF oversees the AFS and provides guidance and assistance to local

15  law-enforcement agencies on submitting information into the system.

16    28.    As noted above, ghost guns do not have serial numbers.  Many local law-

17  enforcement agencies, however, attempt to report un-serialized firearms.  (These firearms may

18  include, for example, guns manufactured before 1968, when federal law started requiring that

19  new firearms bear serial numbers.)  In 2015, BOF started to receive enough reports of ghost

20  guns, and inquiries on how to report them, that it developed a way to code them in AFS.  As a

21  result, the AFS provides a source of data on ghost guns recovered by local law-enforcement

22  agencies in California.  This data is not complete and does not represent a comprehensive source

23  for all ghost guns encountered by law enforcement in the State.  It also does not include ghost

24

DECLARATION OF BLAKE GRAHAM                    13          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                     800 Fifth Avenue. Suite 2000
                                                                     Seattle, WA  98104-3188
                                                                         (206) 464-7744

Appendix                                                                  Page 31 of 93

1   guns recovered by federal agencies.  It does not include pre-1968 firearms manufactured by

2   Federal Firearms Licensees such as un-serialized long guns, since they were not manufactured

3   by unlicensed subjects.  And not all local law-enforcement agencies may choose to report a ghost

4   gun into the AFS.

5          29.    As part of my preparation of this declaration, I have reviewed the AFS for

6   available data on ghost guns, which are coded in the system by BOF with serial numbers

7   beginning with "FMBUS," or firearm manufactured by unlicensed subject.  A series of numbers

8   will follow each FMBUS type serial number.  These FMBUS identifiers do not repeat and are

9   unique to one weapon.  The first entry occurs on December 9, 2015, when BOF started using the

10  code.  From that date to the end of 2015, the system lists 26 guns.  The system lists 169 guns for

11  2016, 344 guns for 2017, 707 guns for 2018, 1,621 guns for 2019, and 182 guns for 2020 through

12  January 31, 2020.

13         30.    As noted above, this data does not include ghost guns seized by federal

14  authorities, and several local law-enforcement agencies may not be reporting, or may not have

15  reported, the seizure of ghost guns in the years listed above.  These limitations mean that it is

16  theoretically possible that the increase in reports from 2016 through this year is attributable to a

17  growing awareness among local law-enforcement that they can report ghost guns in the AFS,

18  rather than an increase in the prevalence of ghost guns in California, but I believe that this is

19  unlikely.  The more likely explanation for the data, based on my personal knowledge and

20  experience, is that ghost guns are becoming more common.  I see this in my own investigations,

21  and I hear it from the federal and local law-enforcement agencies I work with.  In fact, I believe

22  these numbers understate the prevalence of ghost-gun crime in California.

23

24

DECLARATION OF BLAKE GRAHAM                    14          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                      800 Fifth Avenue. Suite 2000
                                                                       Seattle, WA  98104-3188
                                                                       (206) 464-7744

Appendix                                                                      Page 32 of 93

31.     The numbers also correspond to another disturbing trend:   an increase in prohibited persons who possess ghost guns.   BOF conducts investigations at California gun shows to enforce firearms laws.   During recent gun-show investigations in Sacramento and Solano Counties, BOF Special Agents have encountered multiple felons purchasing kits to build ghost guns.   BOF Sacramento Special Agents have arrested three subjects to date, and the criminal cases are ongoing for these individuals.   One of the most common problems we see at these gun shows are the ghost-gun kits being sold to anyone with enough money.   No background checks are being conducted for the unfinished receivers or frames.

32.     BOF also conducts investigations of persons who once lawfully purchased firearms and later became firearms prohibited.   The database that contains the personal information of these subjects is called the Armed Prohibited Persons System or APPS.   The APPS has been used by BOF since 2006.   There are currently more than 7,800 active subjects in the system.   BOF Special Agents work each week to recover firearms from the subjects in the database, but each week more are added.   Some of the subjects that BOF Special Agents contact looking for serialized firearms also have un-serialized ghost guns as well.   Since December of 2015, BOF Agents have seized at least 77 ghost guns identified by APPS.   In 2015, they seized 2 ghost guns; in 2016, they seized 18; in 2017, they seized 1; in 2018, they seized 8; in 2019, they seized 43; and in 2020 they have seized 3 to date.

**III.     The Widespread Availability of Computer Files That Allow for the Easy Manufacture of Ghost Guns Poses a Threat to California Firearms Laws and Californians**

33.     Ghost guns pose a public-safety issue because they allow people to circumvent California's laws governing the purchase and sale of firearms.   The example in paragraph 26.c above helps show the scope of the problem.   In that case, a non-licensed store in San Diego sold

DECLARATION OF BLAKE GRAHAM
2:20-cv-00111-RAJ                              15                ATTORNEY GENERAL OF WASHINGTON
                                                                          800 Fifth Avenue. Suite 2000
                                                                          Seattle, WA  98104-3188
                                                                          (206) 464-7744

Appendix                                                                                Page 33 of 93

AR-15 polymer receivers to more than 5,000 customers.  That means that potentially more than 5,000 people were able to obtain AR-15-style guns without going through a licensed firearms dealer and without a background check or cooling-off period.  Cal. Penal Code § 26815, 27540.  If any of those guns are used in a violent crime, it will be exceedingly difficult, if not impossible, to track them back to their source.  They also were not entered into the AFS, meaning if law enforcement officers execute a search or arrest warrant on one of those 5,000 or more customers in the future, those officers will not know that they may have an AR-15-style firearm at their disposal.

34.    As a law-enforcement officer, my most significant concern is with these firearms falling in the hands of prohibited persons who will use them in violent crimes.  California has already witnessed a prohibited person use polymer-based ghost guns to attack police officers (¶ 26.t).  It has also witnessed multiple mass shootings by people who could not have purchased the ghost guns they used from a licensed firearms dealer (¶¶ 26.a and 26.o).  And I believe the 2014 case of the three Norteño gang members, described above in paragraph 26.e, would have been more deadly if they had three AK-47-style ghost guns instead of just one.

35.    3D printed guns have the potential to pose an even greater threat.  3D printing of firearms and later assembly of them can take at least two paths.  First, a 3D printer can be used to manufacture multiple plastic pieces of a firearm.  Those pieces would then need to be assembled to make a working firearm.  (Although federal law requires 3D printed guns to have a 3.7 ounce piece of stainless steel embedded in the frame, this requirement can easily be ignored.)  This kind of production would probably have a limited lifespan—given the current state of the technology—due to breakage issues, but it is still a viable threat.  A second possible use for 3D printers would be to print out just a frame or receiver of a firearm and then assemble

DECLARATION OF BLAKE GRAHAM                16                ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                                800 Fifth Avenue. Suite 2000
                                                                                   Seattle, WA  98104-3188
                                                                                        (206) 464-7744

Appendix                                                                                Page 34 of 93

1   a working weapon from commercially available and uncontrolled firearms parts (using a metal

2   barrel and slide for example).

3       36.     3D printers can make the process for obtaining a ghost gun much simpler.  Instead

4   of going through a middleman, like the Cortez-Garcia family (¶¶ 22, 26.b) or Dr. Death (¶¶ 23,

5   26.d), firearms-prohibited persons and those persons who do not wish the government to be

6   aware of their firearms ownership will have an additional method to make guns on their own.

7   This will make ghost guns harder to keep off the streets, because law enforcement will not be

8   able to monitor them through gun stores and gun shows.

9       37.     Concerns about ghost guns prompted the California Legislature to pass Assembly

10  Bill 857 in 2016, which requires persons already in possession of ghost guns to report them to

11  BOF, seek a BOF-issued serial number, apply the number to the firearm and then report back to

12  BOF that the firearm has been serialized.  Cal. Penal Code §§ 29180-84.  Additionally, the law

13  requires that after July 1, 2018, if a person wants to manufacture a firearm for themselves, they

14  must pass a background check before BOF will issue them a serial number to be applied to their

15  firearm.

16      38.     I do not anticipate that prohibited persons will follow the California ghost-gun

17  serialization law and report existing ghost guns or request a serial number from BOF before

18  building a ghost gun in the future, because it is a crime for a prohibited person to possess or

19  manufacture a firearm.

20      39.     Wider availability of 3D printed guns would impair BOF's ability to implement

21  California's firearms safety laws.  As a result, prohibited persons and violent criminals will have

22  greater access to firearms, including AR-15 style guns and potentially some guns that cannot be

23

24

DECLARATION OF BLAKE GRAHAM          17          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                        800 Fifth Avenue. Suite 2000
                                                         Seattle, WA  98104-3188
                                                         (206) 464-7744

Appendix                                                                Page 35 of 93

1    detected by metal detectors, increasing the risk that more Californians will be injured or killed.

2

3        I declare under penalty of perjury that the foregoing is true and correct.

4        DATED this 6th day of February, 2020 at _Sacramento_____, California.

5

6                                                    _Blake Graham_____
                                                         BLAKE GRAHAM
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF BLAKE GRAHAM          18          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                        800 Fifth Avenue. Suite 2000
                                                         Seattle, WA  98104-3188
                                                         (206) 464-7744

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9 | STATE OF WASHINGTON, et al.

NO. 2:20-cv-00111-RAJ

10 |                     Plaintiffs,

DECLARATION OF JOHN S. CAMPER

11 |        v.

12 | UNITED STATES DEPARTMENT OF
STATE, et al.,

13 |                     Defendants.

14

15        I, John S. Camper, declare as follows:

16        1.        I am over the age of 18 and have personal knowledge of all the facts stated

17 herein.

18        2.        I am the Director of the Colorado Bureau of Investigation ("CBI").  I have held

19 this position since January 2, 2018.  I am the chief administrative officer of the CBI and an

20 agent.  I supervise and direct the administration and all other activities of the CBI.

21        3.        Attached hereto as **Exhibit 1** is a true and correct copy of my declaration dated

22 August 8, 2018, filed in support of plaintiffs' motion for preliminary injunction in the matter of

23

24

DECLARATION OF JOHN S. CAMPER                    1

1 | *State of Washington, et al. v. United States Department of State, et al.*, No. 2:18-cv-1115-RSL,

2 | at Dkt. # 43-2.

3 |     4.    As of the date of this declaration, all the information in Exhibit 1 is true and

4 | correct, and remains my testimony under penalty of perjury.

5 |     I declare under penalty of perjury under the laws of the State of Washington and the United

6 | States of America that the foregoing is true and correct.

7 |     DATED this   3   day of February, 2020, at Lakewood, Colorado.

8 |

9 |     *s/ John S. Camper*

10 |     JOHN S. CAMPER

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

DECLARATION OF JOHN S. CAMPER     2

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:18-cv-01115-RSL |
| Plaintiffs, | DECLARATION OF JOHN S. CAMPER |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | |

I, John S. Camper, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.      I am the Director of the Colorado Bureau of Investigation ("CBI"). I have held this position since January 2, 2018. I am the chief administrative officer of the CBI and an agent. I supervise and direct the administration and all other activities of the CBI.

3.      For the reasons outlined below, the Temporary Modification of Category I of the United States Munitions List ("Temporary Modification") will undermine Colorado's efforts to prevent the proliferation of dangerous weapons, allow individuals ineligible to

DECLARATION OF JOHN S. CAMPER          1

1  possess firearms under state or federal law to easily obtain them without a background check,

2  and hinder law enforcement's ability to investigate criminal activity involving firearms,.

3        4.      Colorado law prohibits several categories of individuals from possessing

4  firearms.  In addition to restrictions imposed by federal law, *see* 18 U.S.C. § 922(g) and (n),

5  those under the age of eighteen are generally prohibited from possessing handguns, Colo. Rev.

6  Stat. § 18-12-108.5(1)(a), and certain previous offenders are generally barred from firearm

7  possession altogether. Colo. Rev. Stat. § 18-12-108(1).  Individuals subject to civil protection

8  orders may not possess or attempt to purchase or receive a firearm while the protection order is

9  in effect, Colo. Rev. Stat. § 18-6-803.5(1)(c), and must generally surrender any firearms in

10  their possession within 24 hours of being served with a qualifying order. Colo. Rev. Stat. § 18-

11  1-1001(9).

12        5.      Pursuant to Colo. Rev. Stat. § 24-33.5-424(2), the CBI serves as the state point

13  of contact for implementation of 18 U.S.C. § 922(t), all federal regulations and applicable

14  guidelines adopted pursuant thereto, and the NICS system.  The CBI is responsible for

15  conducting nearly universal background checks related to the transfer of a firearm, including

16  private transfers and transfers at gun shows utilizing ATF Form 4473, which mandates the

17  inclusion of the firearm's serial number.

18        6.      The Temporary Modification undermines CBI's ability to ensure Colorado's

19  compliance with these mandates.  3D printed firearms can be printed and possessed by anyone

20  with suitable equipment regardless of eligibility to possess firearms under federal or state law.

21  Because home-printed 3D firearms never enter the stream of commerce through a Federal

22  Firearms Licensee ("FFL"), no background check is ever performed.  The CBI thus cannot

23  verify that an individual who has home-printed a firearm is legally entitled to possess it.

24

7. Nor is ensuring the eligibility of firearm owners the only problem. Because they are made primarily of composites, 3D printed firearms can be used to evade security measures such as magnetometers in place throughout public facilities in Colorado, including airports, courthouses, music and sporting venues, and governmental offices, thereby jeopardizing private citizens and law enforcement

8. Proliferation of 3D-printed firearms will also hamper law enforcement's ability to investigate crimes. For example, the CBI relies upon manufacturing data, including the serial number, of firearms used in crime as part of its criminal investigative duties. Because 3D printed firearms lack this information, the chain of ownership is essentially untraceable.

9. The CBI performs forensic laboratory analysis for Colorado law enforcement agencies, including firearms analysis. § 24-33.5-402(1)(c), C.R.S. Data from recent analyses establish that the unique characteristics of 3D printed firearms render many existing forensic techniques ineffective.

10. In 2017, the CBI participated in research on forensic testing of 3D printed firearms. CBI analysts, working in concert with a private laboratory, printed five 3D firearms from open-source plans similar to those offered by Defense Distributed, and applied standard forensic techniques to those firearms after they were fired. The five 3D firearms tested were

- Reprringer .22 Long Rifle caliber derringer
- Grizzly .22 Long Rifle caliber pistol
- Liberator .380 Auto caliber pistol
- Pepperbox Liberator .380 auto revolver
- Washbear .22 Long Rifle caliber revolver

DECLARATION OF JOHN S. CAMPER                    3

2:18-cv-01115-RSL

EXHIBIT 1

11.     Forensic analysts examined the 3D printed firearms and projectiles for DNA and serology, latent fingerprints, GSR (gunshot residue), and firearm characteristics.  In its limited sample size, the CBI determined 3D printed firearms and factory manufactured firearms yielded comparable data for latent print and DNA/Serology.  GSR from the 3D firearms tested was atypical because it contained the polymer from the composite material used in the 3D printing process creating the firearm.

12.     Most importantly, the CBI's analysis of 3D printed firearms established that standard forensic techniques cannot be applied to link a particular projectile or bullet to a particular 3D printed firearm.  There are at least three reasons for this.  First, the barrel of a 3D printed firearm is not rifled and as a consequence does not contain unique lands and grooves that transfer to the projectile when it is fired.  Second, even if a 3D printed firearm left unique markings on a projectile, due to the lack of durability of the composites used, the firing conditions cannot be replicated from one shot to the next.  Finally, the very instability of the 3D printed firearm causes unsafe firing conditions, even in a controlled laboratory setting.

13.     This instability in construction is not only of concern in a controlled laboratory setting.  The guns tested frequently misfired and the force of the gunshot broke some of the firearms apart.  These conditions, coupled with the inaccurate trajectory that was common to each of the firearms tested, would cause significant risk to the shooter and bystanders.

Dated this __8th___ day of August, 2018.

s/ *John S. Camper*_____
JOHN S. CAMPER

1     I declare under penalty of perjury under the laws of the State of Washington and the

2   United States of America that the foregoing is true and correct.

3        DATED this __8th__ day of August, 2018, at _Lakewood, Colorado_____.

4

5                                    _s/ John S. Camper_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF JOHN S. CAMPER                    5

2:18-cv-01115-RSL

EXHIBIT 1

The Honorable Richard A. Jones

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
|---|---|
| Plaintiffs, | DECLARATION OF KATHLEEN FERREIRA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | Noting Date: February 28, 2020 |
| Defendants. | |

I, Kathleen Ferreira, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.      I am the Airport Certification, Security, and Safety Specialist in the Airports Division of the Department of Transportation of the State of Hawaii. I have held this position since May 11, 2018.

3.      Prior to working at the Airports Division, I was a Metropolitan Police Officer for the Honolulu Police Department and retired at the rank of Lieutenant after 32 years of service.

DECLARATION OF KATHLEEN
FERREIRA
2:20-cv-00111-RAJ

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue  Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                 Page 44 of 93

1      4.      The Department of Transportation is responsible for planning, designing,

2  constructing, operating, and maintaining State facilities in all modes of transportation,

3  including air, water, and land.   The Department is an agency of the State of Hawaii.  The

4  Department, through its Airports Division, directs the management, operation, maintenance,

5  and construction of all State airports and aviation facilities in the State of Hawaii.

6      5.      As the Airport Certification, Security, and Safety Specialist, my work involves

7  oversight, in these subject areas, over all the State airports.  Further, this involves working with

8  the Transportation Security Administration (TSA) and the Federal Aviation Administration

9  (FAA) on the safety and security of Hawaii airports and the traveling public.

10      6.      Air travel is particularly important to Hawaii since most travel to Hawaii from

11  foreign countries and from the U.S. mainland is by air.  *See* Hawaii Tourism Authority, 2018

12  Annual Visitor Research Report, http://files.hawaii.gov/dbedt/visitor/visitor-research/2018-

13  annual-visitor.pdf (compare arrivals by air with arrivals by cruise ship).  Most interisland

14  travel, between Hawaii's four counties, is also by air.

15      7.      Hawaii has strong state firearm laws that supplement the security regulations

16  mandated by federal agencies, such as the FAA and the TSA.

17      8.      The Department of Transportation is concerned that the technology that allows

18  3D printers to manufacture firearms could be used to create plastic firearms that could be used

19  to evade the metal detectors and x-ray machines that are used at Hawaii's airports.

20      9.      Not only would plastic 3D firearms ordinarily be undetectable through x-ray

21  screening machines, but if someone is carrying one of these firearms on their person, it would

22  not be detectable by a "metal detector wand."  And if the 3D firearm is capable of being

23

24

DECLARATION OF KATHLEEN
FERREIRA
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue  Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 45 of 93

1   transported in parts, as in a carry-on bag, on the person's body, or via another traveler's bag or

2   person, reassembling the firearm on the aircraft would be very easy.

3        10.    I believe that 3D printed guns, and the technology used to create them, represent

4   a threat to public safety, at airports, to passengers, and in our communities in general.  I believe

5   that strong federal regulation of 3D printed guns and the associated technology continues to be

6   necessary to prevent their proliferation.

7        I declare under penalty of perjury that the foregoing is true and correct.

8        DATED this 4th day of February, 2020 at Honolulu, Hawaii.

9

10                                                KATHLEEN FERREIRA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF KATHLEEN              3          ATTORNEY GENERAL OF WASHINGTON
FERREIRA                                              800 Fifth Avenue  Suite 2000
2:20-cv-00111-RAJ                                        Seattle, WA  98104-3188
                                                           (206) 464-7744

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | DECLARATION OF LT. COL. SCOTT C. PRICE, |
| v. | PENNSYLVANIA STATE POLICE, IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | Noting Date: February 28, 2020 |

I, Lt. Col. Scott C. Price, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.      I am currently employed by the Pennsylvania State Police (PSP) as the Deputy Commissioner of Operations.  I have been an enlisted member of the PSP for 32 years.

3.      Prior to assuming my current position with PSP, I was the Deputy Commissioner of Administration & Professional Responsibility.  Prior to that, I was the Director of the Bureau of Records & Identification. I served the Bureau in both the major and captain ranks for five years. One of the responsibilities of the Bureau is to administer the Pennsylvania Instant Check System (PICS), as part of the Pennsylvania Uniform Firearms Act (UFA).

DECLARATION OF LT. COL. SCOTT
PRICE

1

1    4.  Because Pennsylvania is a "full point of contact" state, the PICS system checks

2 for both federal and state prohibitions against possession a firearm whenever a person attempts

3 to buy a firearm through a licensed firearms dealer in Pennsylvania.

4    5.  Both federal and state law prohibit certain persons from possessing firearms.

5 These persons include: felons, and persons who have committed certain other enumerated

6 offenses; persons under 18 years of age; fugitives from justice; persons who have been

7 adjudicated as incompetent or who have been involuntarily committed to a mental institution;

8 aliens; persons who are subject to active protection from abuse orders; persons who have been

9 adjudicated delinquent as a juvenile offender under certain sections; persons who have

10 committed certain domestic abuse offenses; and persons who are users of or addicted to

11 controlled substances, among other categories. (See 18 Pa. C.S. § 6105; 18 U.S.C. § 922.)

12    6.  "Downloadable guns," if printed and made functional, constitute firearms under

13 the Pennsylvania Uniform Firearms Act and the Federal Gun Control Act.   Therefore, if

14 individuals who are prohibited from possessing a firearm under state and federal law download

15 and manufacture these downloadable guns, it would constitute a violation of Pennsylvania and

16 Federal law.

17    7.  Nothing prevents an individual from owning a 3-D printer under Pennsylvania

18 law and while it may be illegal for prohibited persons to possess a firearm, there is currently no

19 way to absolutely prevent an individual from gaining access to the computer files necessary to

20 make these downloadable guns in the Commonwealth.

21    8.  Downloadable guns are a substantial threat to public safety due to the fact that

22 the firearms are made completely of plastic using a 3-D printer, almost certainly rendering them

23 undetectable to metal detection equipment, and making them virtually impossible to trace since

24

DECLARATION OF LT. COL. SCOTT     2     ATTORNEY GENERAL OF WASHINGTON
PRICE                     800 Fifth Avenue. Suite 2000
                            Seattle. WA  98104-3188

Appendix                            Page 48 of 93

1  they are not conventionally made by a firearms manufacturer and are not subject to the strict

2  recordkeeping requirements imposed upon those companies by federal law and do not even have

3  a serial number affixed to them.

4        9.     Pennsylvania law requires, with few exceptions, that handguns be transferred

5  through a licensed firearms dealer, even for most private transactions, and those handgun

6  transfers are reported to the PSP, where the transfer record, including serial number of the

7  handgun, is maintained in a database which is searchable and accessible to law enforcement, in

8  accordance with 18 Pa. C.S. § 6111(b) & (c), as well as other applicable law and regulations.

9  Pennsylvania law also requires that certain firearms recovered by law enforcement be traced via

10  the ATF e-trace system, 18 Pa. C.S. § 6127, and be reported to PSP.  The use of these various

11  systems has often allowed law enforcement in the Commonwealth to quickly and efficiently

12  solve crimes and remove perpetrators and their firearms from the street.  Without a serial number,

13  a firearm cannot be traced via these means, making it more difficult, if not impossible, for law

14  enforcement to solve gun crimes within the Commonwealth, as well as identify broader criminal

15  patterns, including intrastate and interstate firearms trafficking.

16        10.    The danger of untraceable guns is not mere conjecture or fearmongering by law

17  enforcement.  The danger has been made starkly clear by the recent proliferation of "80%

18  receivers," which are not considered a firearm under federal law, and which can be readily

19  converted to a functional firearm.  While they are different in many respects from a

20  downloadable gun, like a downloadable gun they generally do not have a serial number,

21  rendering them effectively untraceable in most instances.  I am aware from my discussions with

22  law enforcement colleagues in the Commonwealth that a number of these untraceable firearms

23  made from 80% receivers have been recovered from crime scenes, including homicides, in

24

DECLARATION OF LT. COL. SCOTT
PRICE

3

1   Philadelphia with increasing regularity over the last 12-18 months.   It is further my

2   understanding that such weapons have also been recovered with some frequency in Baltimore,

3   Maryland, another major population center close to the Commonwealth.

4         11.   In addition to being untraceable, downloadable guns are also effectively

5   undetectable because they are made of plastic.  Pennsylvania is home to many major venues,

6   including sports stadiums and conventions centers, particularly in Harrisburg, Pittsburgh, and

7   Philadelphia.  Philadelphia alone has major sports venues including Lincoln Financial Field,

8   home of the Eagles, Citizens Bank Park, home of the Phillies, and the Wells Fargo Center, home

9   of the Flyers, as well as many museums, Independence National Historic Park, the Reading

10  Terminal Market, and Philadelphia Convention Center, among other attractions.  This is in

11  addition to government facilities (such as 67 county courthouses and the State Capitol Complex

12  in Harrisburg), prison facilities, and other sensitive locations like airports.  In fact, Pennsylvania

13  has over 100 public use airports, including six international airports (Erie International,

14  Harrisburg International, Lehigh Valley International, Philadelphia International, Pittsburgh

15  International, and Wilkes-Barre/Scranton International) and approximately 500 school districts.

16  In many of these places, Pennsylvania and/or Federal law prohibits or restricts the presence of

17  firearms.

18        12.   The inability to detect downloadable guns made completely of plastic using metal

19  detection equipment presents an immediate and substantial threat to public safety in these

20  venues, many of which rely on metal detection equipment as the only reasonable means to

21  quickly and discreetly screen large numbers of individuals for prohibited weapons, particularly

22  firearms.  Many of these venues are often under threat from domestic and /or international

23  sources, due to their public nature and the high profile, well attended events they host, often with

24

DECLARATION OF LT. COL. SCOTT       4        ATTORNEY GENERAL OF WASHINGTON
PRICE                                           800 Fifth Avenue. Suite 2000
                                                      Seattle. WA  98104-3188

1    the presence of major public figures and sometimes national and international leaders, such as

2    the Papal Visit to Pennsylvania in 2015, and 2016 Democratic National Convention in

3    Philadelphia.

4        13.    Downloadable firearms are no different from traditional firearms in that they are

5    capable of firing conventional ammunition in a variety of calibers and to deliver that bullet(s) to

6    its intended target with potentially deadly consequences.  However, as laid out herein, the fact

7    that they are plastic, unserialized, and downloadable, makes them dramatically different from

8    traditional firearms, and eminently more dangerous to public safety in many ways, for the

9    reasons detailed herein.

10

11       I declare under penalty of perjury that the foregoing is true and correct.

12

     DATED this 5th day of February, 2020, at Harrisburg, Pennsylvania.
13

14                              LTC _____

15                              Lt. Col. Scott C. Price
                                Deputy Commissioner of Operations
16                              Pennsylvania State Police

17

18

19

20

21

22

23

24

DECLARATION OF LT. COL. SCOTT                5        ATTORNEY GENERAL OF WASHINGTON
PRICE                                                        800 Fifth Avenue. Suite 2000
                                                              Seattle. WA  98104-3188

Appendix                                                          Page 51 of 93

1

2

3

4

5

6

7     **UNITED STATES DISTRICT COURT**

      **WESTERN DISTRICT OF WASHINGTON**

8     **AT SEATTLE**

9     STATE OF WASHINGTON, et al.              NO. _____

10                    Plaintiffs,

11        v.                                   DECLARATION OF ROBERT HERZOG

12    UNITED STATES DEPARTMENT OF
      STATE, et al.,
13
                      Defendants.
14

15

16        I, ROBERT HERZOG, declare as follows:

17        1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

18        2.      I am the Assistant Secretary for Prisons for the Washington State Department of

19    Corrections (DOC). I also serve on DOC Secretary Stephen Sinclair's Executive Strategy Team.

20        3.      Attached hereto as **Exhibit 1** is a true and correct copy of my declaration dated

21    August 3, 2018, filed in support of plaintiffs' motion for preliminary injunction in the matter of

22    *State of Washington, et al. v. United States Department of State, et al.*, No. 2:18-cv-1115-RSL,

23    at Dkt. # 43-2.

24        4.      As of the date of this declaration, all the information in Exhibit 1 is true and

25    correct, and remains my testimony under penalty of perjury.

26

DECLARATION OF ROBERT HERZOG                    1                 ATTORNEY GENERAL OF WASHINGTON
                                                                       Complex Litigation Division
                                                                      800 Fifth Avenue, Suite 2000
                                                                          Seattle, WA 98104
                                                                            (206) 464-7744

1        I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3        DATED this _17_ day of December, 2019, at Tumwater, Washington.

4

5

6                                              _____

7                                              ROBERT HERZOG

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ROBERT HERZOG              2              ATTORNEY GENERAL OF WASHINGTON
                                                            Complex Litigation Division
                                                          800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104
                                                               (206) 464-7744

THE HONORABLE ROBERT S. LASNIK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary of Defense Trade Controls; and SARAH HEIDEMA, in her official capacity as Director of Policy, Office of Defense Trade Controls Policy; DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INC.; and CONN WILLIAMSON<br><br>Defendants. | NO. 2:18-cv-01115-RSL<br><br>DECLARATION OF ROBERT HERZOG IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br><br>**Noting Date: August 10, 2018** |

I, ROBERT HERZOG, declare as follows:

1.    I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.    The Washington State Department of Corrections (DOC or Department) houses approximately 19,500 incarcerated individuals in 12 prisons and 13 work release facilities across

DECLARATION OF ROBERT HERZOG
IN SUPPORT OF PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
2:18-cv-01115-RSL

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  the state. DOC also supervises over 19,000 individuals in the community pursuant to community

2  custody terms ordered by sentencing courts. I began with the Washington State Department of

3  Corrections in April 1982. In my 36-year career with the Department, I have served in many

4  capacities, including 19 years as uniformed custody staff, where I was tasked with maintaining

5  the safety and security of prisoners, staff, and visitors. I also have served as an Associate

6  Superintendent, Deputy Superintendent, and Superintendent of several DOC facilities, including

7  the Monroe Correctional Complex, one of the state's largest prisons. In 2015, I became a Deputy

8  Director of Prisons, with oversight of half of the state's correctional facilities, along with

9  responsibility for our Intelligence and Investigations Units and all restricted housing operations

10  (secure housing placements for dangerous individuals). In April 2017, DOC Secretary Stephen

11  Sinclair appointed me Assistant Secretary for Prisons, a position I hold today. As Assistant

12  Secretary, I am responsible for the overall leadership, direction, oversight, and safety and

13  security of all Washington prisons. I also serve on the Secretary's Executive Strategy Team, and

14  in that capacity frequently interact with leaders of other divisions within the Department on

15  matters of importance to the operation of the state's correctional system.

16      3.    The Department's mission is to improve public safety. We do this by safely and

17  humanely incarcerating individuals sentenced to prison terms by the courts, by providing

18  education and other reentry-focused programming during incarceration, and by providing

19  community supervision and support to high-risk individuals sentenced to community custody

20  following release from confinement. Critical to achieving this mission is maintaining safety and

21  security within the Department's prisons and work release facilities.

22      4.    While most incarcerated individuals serve their sentences without incident, DOC

23  houses the state's most violent convicted felons, who committed horrific crimes in the

24

DECLARATION OF ROBERT HERZOG        2
IN SUPPORT OF PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue  Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    community and can continue to act out violently in prison when given the opportunity. The

2    Department, therefore, has strict policies and procedures designed to limit the items that may be

3    brought into correctional facilities, to avoid the introduction of weapons and other contraband.

4    This includes the use of walk-through and hand-held metal detectors for visitors and x-ray

5    scanning of all incoming packages and hand-carried items. Unfortunately, despite the

6    Department's vigilance, some contraband evades screening and detection and makes it into the

7    facilities. The Department continually discovers new methods of introducing serious contraband

8    into facilities, with contraband disguised or hidden by various means.

9        5.    A few examples of these methods may help illustrate the challenge: cell

10   phones are dismantled to avoid obvious visual detection and sent to incarcerated individuals

11   in packages with authorized items; visitors have worn the same shoes as those provided to

12   incarcerated persons—shoes packed with contraband—and the shoes are swapped under the

13   visiting table; incoming letters and envelopes are soaked in methamphetamine; strips of

14   suboxone are hidden behind stamps, flaps of envelopes, or hidden among pages of fake

15   incoming legal mail; hand-fashioned edged weapons are discovered hidden in many places,

16   including most recently in an incarcerated person's body cavity; and most notably, over the

17   past two years visual and electronic searches of incoming hand carried items resulted in the

18   discovery of 12 loaded firearms that otherwise would have made it into the secure perimeter

19   of the prisons.

20       6.    Prisons employees rely upon their experience and knowledge of the various

21   types of contraband to aid in their visual and electronic methods of discovery. As new ways

22   are designed to disguise contraband, or new designs of common items that previously would

23

24

DECLARATION OF ROBERT HERZOG                3              ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF PLAINTIFF'S MOTION                                  800 Fifth Avenue. Suite 2000
FOR PRELIMINARY INJUNCTION                                          Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                      (206) 464-7744

1  have been be easy to identify and detect, discovery becomes much more challenging and the
2  risk significantly increases.

3  7.  It is a crime to bring a firearm onto prison grounds. Wash. Rev. Code §
4  9.41.300. Contraband in the form of firearms would present an extreme risk to institutional
5  safety and security. The Department successfully mitigates this risk through scanners and
6  other equipment designed to detect metal weapons. The existence of 3-D printed plastic
7  firearms, weapons that are undetectable using metal detectors, would fundamentally
8  undermine our ability to maintain safe and secure correctional facilities. The challenge
9  presented by these weapons would be particularly difficult because they evidently are
10  assembled from separately "printed" pieces that would not necessarily be recognizable could
11  therefore be smuggled into facilities, or otherwise passed to individuals on escorted leave or
12  work crews in the community, in ways that are not necessarily detectable. Community work
13  crews comprised of incarcerated individuals often attempt to smuggle contraband back into
14  our prisons. Persons not incarcerated can know the locations where our crews work and hide
15  contraband for work crew members. Often this contraband is either swallowed or inserted
16  into a body cavity to aid in the introduction into the prison.

17  8.  The safety risks presented by 3-D printed firearms are not limited to prisons
18  and work release facilities. As noted, DOC supervises over 19,000 individuals in the
19  community. DOC Community Corrections Officers (CCOs) do this work, which can be
20  dangerous. CCOs are limited authority peace officers and have arrest authority. They enforce
21  conditions of community custody imposed by the court and by the Department, including the
22  statutorily mandated prohibition that felons not possess firearms. Although other law
23  enforcement agencies can speak more generally about the public safety risk of undetectable

24

DECLARATION OF ROBERT HERZOG             4                ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF PLAINTIFF'S MOTION                              800 Fifth Avenue, Suite 2000
FOR PRELIMINARY INJUNCTION                                    Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                (206) 464-7744

1   and untraceable 3-D printed weapons, it is difficult to overstate the danger they would

2   present in the hands of high risk, violent felons DOC CCOs are responsible for supervising

3   in the community.

4         9.     In summary, the Washington Department of Corrections is gravely concerned

5   that the existence and availability of 3-D printed firearms would substantially undermine its

6   ability to protect the public. Plastic firearms would be difficult to detect when smuggled into

7   prisons and work release facilities, and once inside, could be used to harm or kill staff,

8   visitors, and incarcerated individuals, and aid in the escape of incarcerated persons.

9   Additionally, the availability of 3-D printed firearms to felons on community custody would

10   present an unacceptable risk of harm to CCOs and the public.

11        I declare under penalty of perjury under the laws of the State of Washington and the

12   United States of America that the foregoing is true and correct.

13        DATED this _3_ day of August 2018, at Tumwater, Washington.

14

15                                 ROBERT HERZOG

16

17

18

19

20

21

22

23

24

DECLARATION OF ROBERT HERZOG         5             ATTORNEY GENERAL OF WASHINGTON
IN SUPPORT OF PLAINTIFF'S MOTION                     800 Fifth Avenue. Suite 2000
FOR PRELIMINARY INJUNCTION                       Seattle, WA 98104-3188
2:18-cv-01115-RSL                                 (206) 464-7744

The Honorable Richard A. Jones

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | |
| v. | DECLARATION OF RANDALL A. LIBERTY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants. | Noting Date: February 28, 2020 |

I, RANDALL LIBERTY, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.      I am the Commissioner of the Maine Department of Corrections ("DOC") and have held that position since January of 2019.  Prior to my appointment as DOC Commissioner, I served as the Warden of the Maine State Prison, located in Warren, Maine, for approximately three years.

3.      Prior to 2015, I served as the Sheriff of Kennebec County for nine years and as the Chief for five. I managed the Kennebec County Jail for those fourteen years. From 2012-

DECLARATION OF RANDALL A.
LIBERTY
2:20-cv-00111-RAJ

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 59 of 93

2014, I served as the president of the Maine Sheriff's Association and on the Board of Corrections, managing all 15 County jails in the State of Maine.

4.      As DOC Commissioner, I am responsible for the direction and general administrative supervision, guidance and planning of both adult and juvenile correctional facilities within the State of Maine.  As Commissioner, I am responsible for the leadership, direction, oversight and for the safe and secure confinement of all offenders sentenced to the Maine Department of Corrections by the Judiciary.

5.      The State of Maine, Department of Corrections houses a population of approximately 2200 incarcerated individuals in correctional facilities, including those on work release, across the State.  DOC also supervises over 7,000 individuals in probationary status in the community.

6.      DOC's overall mission is to reduce the likelihood that juvenile and adult offenders will reoffend, by providing practices, programs and services which are evidence-based and which hold offenders accountable. Critical to this mission is to ensure safety and security within all DOC facilities.

7.      While most inmates serve their sentences without incident, DOC's Maine State Prison houses the state's most violent convicted felons, who committed serious crimes in the community and who have the potential to act violently while incarcerated if given the opportunity.  DOC has strict policies and procedures designed to limit the items that may be brought into correctional facilities, to avoid the introduction of weapons and other contraband. This includes the use of walk-through and hand-held metal detectors for visitors to the facilities and x-ray scanning of all incoming packages and hand-carried items.  Unfortunately, despite DOC's vigilance, some contraband evades screening and detection and makes it into the

DECLARATION OF RANDALL A.
LIBERTY
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                                                          Page 60 of 93

facilities.  DOC continually discovers new methods of introducing contraband into facilities, with contraband disguised or hidden by various means.

8.      A few examples of these methods are illustrative: incoming letters and envelopes are soaked in illicit substances; strips of suboxone are hidden behind stamps, flaps of envelopes, or hidden among pages of fake incoming legal mail; hand-fashioned edged weapons are discovered hidden in many places; most notably, in recent years, visual and electronic searches of incoming hand-carried items resulted in the discovery of two loaded firearms that otherwise would have made it into the secure perimeter of the facility.

9.      DOC employees rely upon their experience and knowledge of the various types of contraband to aid in their visual and electronic methods of discovery.  As new ways are designed to disguise contraband, or new designs of common items that previously have been easy to identify and detect, discovery becomes much more challenging and the risk significantly increases.

10.      Trafficking in prison contraband is a crime.   17-A M.R.S. § 757 (2019). Contraband is defined as including a dangerous weapon. *Id.*  Contraband in the form of firearms would present an extreme risk to institutional safety and security.  DOC successfully mitigates this risk through scanners and other equipment designed to detect metal weapons.

11.      The existence of 3-D printed plastic firearms, weapons that are undetectable using metal detectors, would fundamentally undermine DOC's ability to maintain safe and secure correctional facilities.  The challenge presented by these weapons would be particularly difficult because they evidently are assembled from separately "printed" pieces that would not necessarily be recognizable and could therefore be smuggled into correctional facilities, or otherwise passed to individuals on escorted leave or work crews in the community, in ways that are not necessarily

DECLARATION OF RANDALL A.
LIBERTY
2:20-cv-00111-RAJ

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 61 of 93

detectable.  Community work crews comprised of inmates often attempt to smuggle contraband back into our facilities.

12.     The safety risks presented by 3-D printed firearms are not limited to prisons and work release crews.  DOC supervises over 7,000 individuals in the community.  DOC Probation Officers do this work, which can be dangerous.  They enforce conditions of probation established by the court, including the statutorily mandated prohibition that felons not possess firearms.  The danger that 3-D printed weapons would present in the hands of high risk felons with a history of violence is high.

13.     In summary, the Maine DOC is gravely concerned that the existence and availability of 3-D printed firearms would substantially undermine its ability to protect individuals committed to its custody, DOC employees, and the public.  Plastic firearms would be difficult to detect when smuggled into a correctional facility and work release areas, and once inside, could be used to harm or kill staff, visitors, and inmates, and aid in the escape of incarcerated persons.   Additionally, the availability of 3-D printed firearms to felons on probation would present an unacceptable risk of harm to probation officers and to the public. I declare under penalty of perjury that the foregoing is true and correct.

DATED this 5 day of February 2020 at Augusta.


_____ */s/ Randall Liberty*_____
Randall Liberty, Commissioner


DECLARATION OF RANDALL A.
LIBERTY
2:20-cv-00111-RAJ

4

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 62 of 93

The Honorable Richard A. Jones

1

2

3

4

5

6

7        **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8                          **AT SEATTLE**

9   STATE OF WASHINGTON, et al.          NO. 2:20-cv-00111-RAJ

10                    Plaintiffs,          DECLARATION OF
ANDREW DARLING IN SUPPORT
11          v.                             OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
12   UNITED STATES DEPARTMENT OF
STATE, et al.,                       Noting Date: February 28, 2020
13
Defendants.
14

15        I, Andrew Darling, declare as follows:

16        1.       I am over the age of 18 and have personal knowledge of all the facts stated

17   herein.

18        2.       I have worked for the Minnesota Department of Corrections ("MN DOC") since

19   1994. The MN DOC houses approximately 9,400 inmates in 11 facilities across the State. The

20   MN DOC's mission is to reduce recidivism by promoting change through proven strategies

21   during safe and secure incarceration and effective community supervision. A key component

22   of that mission is providing a safety-conscious environment for staff and inmates.

23

24

Declaration of Andrew Darling                  1        ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                       800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

3.    During my 25-year career with the MN DOC, I have held a variety positions where I was responsible for the safety and security of inmates, staff, and the public, including as a correctional officer at a maximum security facility; as a Sergeant in the Segregation Unit and Security Squad; as a Watch Commander; as Segregation Unit Supervisor; Discipline Unit Supervisor; and as a Lieutenant in multiple facilities.  I was also a member of the MN DOC's Security Audit Team for 13 years.  The Security Audit Team evaluates the programs, policies and security procedures at MN DOC facilities.

4.    I am currently the Captain of Security at the Minnesota Correctional Facility in Stillwater.  MCF-Stillwater is Minnesota's largest close-security institution for adult male felons.  It houses approximately 1,600 inmates, including individuals who have been convicted of violent crimes.  As Captain, I am responsible for all security-related decisions, as well as supervising the security operations of the facility.

5.    Firearms are a major safety and security concern at MN DOC facilities.  If firearms were brought into a prison, it would seriously threaten the safety of staff, inmates, and visitors.  Firearms could also be used by inmates to escape, which undermines public safety.

6.    One of the main tools we use to prevent firearms from being brought into our facilities are metal detectors.  But metal detectors do not identify plastic firearms created with a 3D-printer.  This presents a major safety and security risk at our facilities.  If 3D-printed firearms become widely-available, the MN DOC would need to invest significant resources in body scanners and additional security measures in order to consistently identify plastic firearms.  These additional security efforts would likely divert resources from positive inmate programing designed to assist them in their transition back into the community.

I declare under penalty of perjury that the foregoing is true and correct.

Declaration of Andrew Darling
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix                                                                Page 64 of 93

1       DATED this 5th day of February 2020, at Stillwater, Minnesota.

2

3                                        02-05-2020

                                ANDREW DARLING

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Declaration of Andrew Darling            3            ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                    800 Fifth Avenue. Suite 2000
                                                    Seattle, WA  98104-3188
                                                       (206) 464-7744

The Honorable Richard A. Jones

1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | DECLARATION OF BRIAN KYES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | Noting Date: February 28, 2020 |
| Defendants. | |

I, Brian Kyes, declare as follows:

1.     I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.     I am the Chief of Police of the Chelsea Police Department.  I was originally appointed as a Patrol Officer for the Chelsea Police Department in 1987 and was promoted to the rank of Sergeant in 1994, Lieutenant in 1996, and Captain in 2002.  I have served in my current position as Chief of Police since 2007.

3.     I serve as the President of the Massachusetts Major City Chiefs of Police Association, Inc. (the "MMCC").   MMCC's members include chiefs of police from approximately forty communities in Massachusetts.  MMCC is committed to reducing and

1

1    preventing crime and has a special focus on stopping gun violence.  In addition, I serve on the

2    Municipal Police Training Committee, which establishes and enforces training standards for

3    municipal police officers in the Commonwealth.

4          4.      I hold a bachelor's degree from Framingham State College, a master's degree

5    from Anna Maria College, and a Juris Doctor degree from Suffolk University Law School.  I

6    have also attended numerous professional development certification programs, including

7    programs with the FBI National Academy, the Naval Postgraduate School, and Harvard

8    University.

9          5.      As Chief of the Police of the Chelsea Police Department, I oversee over 100

10   sworn officers.

11         6.      During my career, I have investigated and supervised hundreds of cases involving

12   firearms.

13         7.      Individuals who can locate Defense Distributed's computer-aided design (CAD)

14   codes and who have access to an internet connection and 3D printer are able to click and print a

15   lethal "ghost gun" that is unregulated and untraceable.  The easier it is to find these codes, the

16   easier it is to print a firearm.

17         8.      The plastic firearms made using 3D printers do not have serial numbers or other

18   identifiable marks and can easily be made to evade metal detectors and wands.

19         9.      This development is very concerning.  Serial numbers on firearms serve an

20   important public safety function.  If someone uses a firearm to commit a crime, federal, state,

21   and local law enforcement agencies can access the Bureau of Alcohol, Tobacco, Firearms and

22   Explosives' National Tracing Center (the "NTC") to track the serial number to determine who

23   may have owned or possessed the firearm at the time of the crime.

24

DECLARATION OF BRIAN KYES                    2              ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                   800 Fifth Avenue. Suite 2000
                                                                    Seattle, WA  98104-3188
                                                                        (206) 464-7744

10.     Using the serial number, the NTC is able to track the movements of a firearm from its manufacturer or importer through the distribution chain until it finds the gun dealer.  The gun dealer is required to keep a record of who purchased the gun, and with that information law enforcement can attempt to locate and interview the purchaser and anyone involved in a subsequent transfer.

11.     Firearms produced using 3D printers without serial numbers are untraceable under current systems.   These "ghost guns" are off-the-grid and will evade government oversight.  It will be difficult, if not impossible, to determine who manufactured, purchased, or owned any such firearm used to commit a crime.

12.     Approximately half of the firearms recovered by the Chelsea Police Department during investigations already have obliterated serial numbers.  When the serial number is fully obliterated, a successful trace through the NTC is not possible.   Police departments in Massachusetts's other major cities face similar challenges.

13.     The proliferation of unregulated and untraceable firearms significantly hampers law enforcement's ability to stop and apprehend individuals involved in acts of violence committed with firearms. The Chelsea Police Department and others around Massachusetts trace thousands of firearms every year. These traces are a critical tool to help solve crimes and prevent future gun violence.

14.     Police in Massachusetts further rely on the results of gun traces to identify ways in which firearms enter the illegal market, and to inform strategies to combat the illegal trafficking of firearms.

15.     If there is a sudden increase in the number of untraceable guns, more crimes will go unsolved and bad actors will be emboldened to commit more crimes and acts of violence.

DECLARATION OF BRIAN KYES
2:20-cv-00111-RAJ

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 68 of 93

1       16.     Firearms made using 3D printers present additional challenges for security.

2 Because these guns are made from plastic, some are capable of evading metal detectors and

3 wands.  For  example, the "Liberator" firearm included in Defense Distributed's CAD files

4 presents a unique public safety risk, because it is operable and can be undetectable.

5       17.     Any type of weapon that can fire a bullet and is built specifically to evade security

6 is hugely problematic.  These types of 3D-printed firearms endanger the public in venues that

7 rely on metal detectors and wands, such as arenas, schools, airports, and courthouses.

8       18.     Aside from the danger 3D-printed firearms present if intentionally fired at an

9 individual or into a crowd, they are also prone to misfiring and exploding.

10       19.     The concerns regarding 3D-printed firearms are heightened in cities where there

11 are more arenas and government buildings that rely on metal detectors and wands to prevent

12 dangerous individuals from bringing firearms into crowded areas.

13       20.     Widespread access to blueprints and other CAD codes needed for producing 3D

14 weapons, coupled with increasing proliferation of 3D printers, undermines Massachusetts's

15 extensive efforts to reduce gun violence and undercuts the effectiveness of our current laws.

16

17      I declare under penalty of perjury that the foregoing is true and correct.

18      DATED this _6th_ day of February, 2020 at _19 Park Street Chelsea, MA_

19

20

21      Brian Kyes

22

23

24

DECLARATION OF BRIAN KYES         4       ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                      800 Fifth Avenue. Suite 2000
                                 Seattle, WA  98104-3188
                                 (206) 464-7744

Appendix                                              Page 69 of 93

The Honorable Richard A. Jones

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8                                    **AT SEATTLE**

9    STATE OF WASHINGTON, et al.              NO. 2:20-cv-00111-RAJ

10                Plaintiffs,                 DECLARATION OF
                                             DEAN M. RICKARD IN SUPPORT OF
11          v.                               PLAINTIFFS' MOTION FOR
                                             PRELIMINARY INJUNCTION
12   UNITED STATES DEPARTMENT OF
     STATE, et al.,                          Noting Date: February 28, 2020
13
                Defendants.
14

15          I, Dean M. Rickard, declare as follows:

16          1.      I am over the age of 18 and have personal knowledge of all the fact stated

17   herein.

18          2.      I have been the Deputy Chief of Police for the Maui Police Department since

19   2014.

20          3.      I have been employed as a police officer with the Maui Police Department for

21   32 years.  During my time with the Maui Police Department, I have been assigned to many

22   different divisions within the department.

23

24

DECLARATION OF DEAN M. RICKARD                    1          ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                   800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104-3188
                                                                         (206) 464-7744

4. The Maui Police Department is responsible for law enforcement within the County of Maui. The Maui Police Department is an agency of the County of Maui, State of Hawaii.

5. As the Deputy Chief of Police with 32 years of law enforcement experience, I am familiar with Hawaii's laws regulating firearms.

6. Hawaii has an extensive scheme of firearm regulation that includes: permits to acquire, registration, waiting periods, background checks, fingerprinting and photographing, waiver of privacy of mental health records, training courses, prohibitions on certain people owning or possessing firearms, prohibitions on certain classes of firearms and their components, seizure of firearms upon disqualification and gun violence protective orders.

7. I understand technology exists that allows the manufacture of firearms through the use of commercially available 3D printers. It is my understanding that this technology would allow someone to produce firearms anywhere, including in the privacy of one's home. I also understand that the firearms made in this manner can be constructed out of metal or plastic and, generally, bear no identifying serial number or manufacturer's mark. I further understand that 3D printed guns made out of plastic are generally not detectable by metal detectors, which are commonly used at places such as courthouses, prisons, other government buildings, and airports in Hawaii.

8. I believe that, if the technology that allows 3D printers to print firearms (such as the software, computer files, and computer code) were to become readily available to the public, via the internet, public safety in Hawaii would be severely harmed. These "ghost guns" are a serious threat to public safety and would adversely affect the ability of law enforcement to investigate and prevent violent crime in Hawaii.

DECLARATION OF DEAN M. RICKARD
2:20-cv-00111-RAJ

2

1    9.    This technology would also enable people to circumvent and effectively nullify

2   Hawaii's state firearms regulations.

3    10.    I believe that strong federal regulation of 3D printed guns and the technology

4   used to produce them continues to be necessary to protect the interest of states and their

5   citizens in maintaining safe communities free from gun violence.  I also believe it is necessary

6   to protect the sovereign interest of states in enforcing their own firearms laws.

7    I declare under penalty of perjury that the foregoing is true and correct.

8    DATED this 4th day of February, 2020 at Wailuku, Maui, Hawaii.

9

10   _____

    DEAN M. RICKARD

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF DEAN M. RICKARD         3         ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA  98104-3188
                                                              (206) 464-7744

Appendix                                                        Page 72 of 93

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | DECLARATION OF<br>ADI GOLDSTEIN IN SUPPORT OF<br>PLAINTIFFS' MOTION FOR<br>PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF<br>STATE, et al., | Noting Date: February 28, 2020 |
| Defendants. | |

I, Adi Goldstein, declare as follows:

1.     I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.     I have served as the Deputy Attorney General since January 1, 2019.

3.     As Deputy Attorney General, I serve as the Chief Deputy to the Rhode Island Attorney General. I report directly to the Rhode Island Attorney General on all matters involving the Office of the Rhode Island Attorney General, including but not limited to matters occurring within our Criminal Division and our Civil Division.

4.     I understand that the technology exists for the automated manufacturing of firearms through the use of Computer Aided Design ("CAD") software and CAD files ("Firearm Files"). I further understand that, through the use of commercially available 3-D printers and CNC devices, these Firearm Files would enable virtually any person to manufacture "ghost guns" easily and anonymously.

DECLARATION OF ADI GOLDSTEIN
2:20-cv-00111-RAJ

1

ATTORNEY GENERAL OF RHODE ISLAND
150 South Main Street
Providence, RI 02903
(401) 274-4400

5.     I understand that "ghost guns" bear no identifying serial number or manufacturer's mark and are an extreme risk to public safety that disrupt the ability of law enforcement to investigate, solve, and prevent violent crimes.

6.     In addition, 3-D printed guns can be manufactured from a variety of materials, including plastics, polymers, fibers, and metal. In addition, I understand that 3-D printed guns made wholly or almost wholly from plastics, polymers, or fibers may not be detectable by metal-detectors used at places such as courthouses and airports.

7.     I have great concern for public safety if the technology (e.g., software, computer files, computer code) that would allow 3-D printers to be used to print guns were to become publicly available, including via the Internet.

8.     Among the duties of the Office of Attorney General is to "draw and present all informations and indictments, or other legal or equitable process, against any offenders, as by law required, and diligently, by a due course of law or equity, prosecute them to final judgment and execution." See R.I. Gen. Laws § 42-9-4 (a).

9.     Within the Office of the Attorney General is the Bureau of Criminal Investigation ("BCI"). Pursuant to statute, the Bureau is charged with initiating criminal investigations for violations of law at the direction of the Attorney General and coordinating efforts in investigating criminal activity with existing federal, state, and local law enforcement officials. See R.I. Gen. Laws § 42-9-8.1(2).

10.     Rhode Island uses a variety of approaches to enforce its statutory codes and ensure the safety and physical well-being of its residents with respect to firearms, including but not limited to using metal detectors at government facilities and T.F. Green Airport. The production of functional weapons made out of materials other than metal, such as those made by a 3-D printer, will in all likelihood be unrecognizable by standard metal detectors, thereby nullifying Rhode Island's efforts to protect the safety of its residents at government facilities and T.F. Green Airport.

11.     Rhode Island further enforces its statutory codes by issuing licenses or permits to persons to carry pistols or revolvers (whether concealed or not concealed). Rhode Island General Laws § 11-47-8 provides that, with certain exceptions, "[n]o person shall, without a license or permit … carry a pistol or revolver in any vehicle or conveyance or on or about his or her person whether visible or concealed…." For example, Rhode Island law provides that the Attorney General "may issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person upon a proper showing of need[.]" See R.I. Gen. Laws § 11-47-18(a).

DECLARATION OF ADI GOLDSTEIN
2:20-cv-00111-RAJ

2

12.     Further, the licensing authorities of any city or town in Rhode Island shall issue a license or permit to a person over the age of twenty-one (21) to carry a concealed firearm only if the applicant has "good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed." See R.I. Gen. Laws § 11-47-11(a).

13.     Rhode Island General Laws § 11-47-5(a) also provides that "[n]o person shall purchase, own, carry, transport, or have in his or her possession any firearm," if that person has been convicted of a "crime of violence," "is a fugitive from justice," has been convicted or pled nolo contendere to an offense punishable as a felony, or has been convicted or pled nolo contendere to certain other enumerated offenses. See R.I. Gen. Laws § 11-47-5(a)(4)(i)-(iv).

14.     The Attorney General of Rhode Island is additionally vested with the discretionary authority to "issue to any person, firm, or corporation, engaged in manufacturing in this state, a license or permit to manufacture and sell machine guns and any or all machine gun parts[.]" See R.I. Gen. Laws § 11-47-19. Under Rhode Island law, "[n]o person shall manufacture, sell, purchase, or possess a machine gun…" except for enumerated law enforcement, military personnel, and persons licensed by the Attorney General. R.I. Gen. Laws § 11-47-8. Rhode Island's authority as it relates to a licensing and permitting scheme pertaining to the manufacture of machine guns could be easily circumvented and undermined if persons can use Firearm Files to produce machine guns with 3-D printers or CNC devices, whether for sale or personal use.

15.     In 2018, Rhode Island enacted  "extreme risk protection order" legislation (commonly referred to as the "red flag" law), which provides a procedure where a petition may be filed by a law enforcement agency, in a court of law "requesting an extreme risk protection order that shall enjoin the respondent from having in their possession, custody or control any firearms and shall further enjoin the respondent from purchasing, receiving or attempting to purchase or receive any firearms while the order is in effect." See R.I. Gen. Laws § 8-8.3-3(b). Rhode Island's "red flag" law could be severely undermined if individuals prohibited from purchasing or possessing firearms, are able to produce functional weapons on a 3-D printer or CNC device. Consequently, Rhode Island's strong interest in protecting public safety will be severely harmed.

16.     The Government's Final Rules will transfer jurisdiction of all Category I Munitions List Items from the State Department to the Commerce Department, where Firearms Files will instead be subject to the Export Administration Regulations ("EAR"). Furthermore, by using 15 C.F.R. §§ 734.3(b)(3) and 734.7(a) as a self-executing loophole and allowing the unrestricted public dissemination of Firearms Files over the Internet, the Commerce Department will permanently divest itself of all regulatory jurisdiction under the Export Control Reform Act ("ECRA"), with respect to Firearm Files.

DECLARATION OF ADI GOLDSTEIN                    3                    ATTORNEY GENERAL OF RHODE ISLAND
2:20-cv-00111-RAJ                                                                                          150 South Main Street
                                                                                                                     Providence, RI 02903
                                                                                                                     (401) 274-4400

Appendix                                                                                              Page 75 of 93

17.     The widespread availability of Firearm Files for the automated manufacturing of firearms—especially nonmetal ghost guns that can pass unseen and unrecognized through metal detectors—greatly increases the likelihood that persons who are ineligible to possess firearms will be able to obtain firearms.

18.     Due to the unique dangers that 3D printed guns and ghost guns pose to public safety, the Rhode Island General Assembly has introduced legislation, that, if enacted, would prohibit the sale, transfer, purchase, or possession of ghost guns, firearms that cannot be detected by metal detectors, and any firearm produced by a 3D printing process. *See* R.I. Sen. Bill No. S2004 SUB A as amended (Introduced Jan. 8, 2020) (the "Ghost Gun Bill"). The Rhode Island Senate passed the Ghost Gun Bill on January 29, 2020 and referred it to the House Judiciary Committee, where it is currently pending. If signed into law, the Ghost Gun Bill would make the manufacture or possession of a ghost gun (or 3-D printed gun) a felony, punishable by up to ten (10) years in prison or a fine up to ten thousand dollars ($10,000). *See* R.I. Sen. Bill No. S2004 SUB A as amended.

19.     The permanent deregulation of Firearm Files, hinders and contravenes Rhode Island laws regarding firearm regulation, among others and will enable persons currently prohibited from possessing firearms to circumvent Rhode Island law. If the Government's Final Rules are left in place, Rhode Island will suffer extreme and irreparable harm, as persons ineligible to possess firearms under Rhode Island General Laws §§ 11-47-18(a), 11-47-11(a), and 11-47-5(a)(4)(i)-(iv) will easily be able to obtain downloadable ghost guns that can be anonymously manufactured at home using a 3-D printer or CNC device.

*[SIGNATURE ON FOLLOWING PAGE]*

DECLARATION OF ADI GOLDSTEIN                    4                    ATTORNEY GENERAL OF RHODE ISLAND
2:20-cv-00111-RAJ                                                                    150 South Main Street
                                                                                    Providence, RI 02903
                                                                                    (401) 274-4400

1

2      I declare under penalty of perjury that the foregoing is true and correct.

3      DATED this ___6___ day of February, 2020 at ___9 am, 150 South Main St; Providence RI___

4

5                                          _____
                                           ADI GOLDSTEIN
6                                          Deputy Attorney General
                                           Office of the Rhode Island Attorney General
7

8    STATE OF RHODE ISLAND
     COUNTY OF PROVIDENCE
9
          Subscribed and sworn to before me on this ___6th___ day of February, 2020.
10

11
        ┌─────────────────────────────┐   _Teresa A Letourneau_
12      │     TERESA A. LETOURNEAU     │   Notary Public
        │ Notary Public, State of Rhode Island │   My Commission Expires: ___8/22/2023___
13      │      Commission # 378-88     │
        └─────────────────────────────┘

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF ADI GOLDSTEIN                5          ATTORNEY GENERAL OF RHODE ISLAND
2:20-cv-00111-RAJ                                              150 South Main Street
                                                              Providence, RI 02903
                                                                (401) 274-4400

Appendix                                                        Page 77 of 93

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ |
| Plaintiffs, | DECLARATION OF THOMAS SCOTT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| UNITED STATES DEPARTMENT OF STATE, et al., | Noting Date: February 28, 2020 |
| Defendants. | |

I, Thomas Scott, declare as follows:

1.     I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.     I am the Executive Director of the Massachusetts Association of School Superintendents ("MASS"), a membership organization comprised of 277 superintendents and 163 assistant superintendents.

3.     MASS seeks to provide strategic leadership for the continuous improvement of public education for all children.

4.     As part of this mission, MASS promotes appropriate and deep integration of technology in instruction to enhance effective teaching.

DECLARATION OF THOMAS SCOTT
2:20-cv-00111-RAJ

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Appendix

Page 78 of 93

5.      Three dimensional ("3D") printers are widely available to students in schools across Massachusetts.  Many schools include instruction on the use of such printers as part of the curriculum.

6.      Based on a brief survey of MASS members, it is evident that most districts provide students easy access to 3D printers.  In most cases students have unsupervised access.  As examples, one school district provides 3D printers as part of their engineering program, another provides multiple 3D printers in all schools for a variety of school projects, a third provides full access of 3D printers for their senior project, and a fourth district provides summer camp specifically on the use of 3D printers related to their curriculum.  3D printers have become a regular tool in school programs and curriculum.

7.      Given the already heightened concerns for student safety in schools today, MASS and its members are alarmed by the prospect of online posting of technical data which would allow children and others who should not have access to weapons to print plastic guns that could do harm in our schools.

8.      This would be a direct threat to school safety and add additional burdens to schools in their free and open use of technology in school programs and activities.

9.      It would also threaten the psychological well-being of Massachusetts students, who have increased anxiety about the possibility of school shootings due to the highly publicized school shooting events in recent years.

DECLARATION OF THOMAS SCOTT
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    I declare under penalty of perjury that the foregoing is true and correct.

2        DATED this 31 day of January, 2020 at Bedford, MA.

3

4

5                                    _____

6

7                                    Thomas Scott

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF THOMAS SCOTT                    3                    ATTORNEY GENERAL OF WASHINGTON
2:20-cv-00111-RAJ                                                        800 Fifth Avenue. Suite 2000
                                                                         Seattle, WA  98104-3188
                                                                         (206) 464-7744

1

The Honorable Richard A. Jones

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8 **AT SEATTLE**

9 STATE OF WASHINGTON, et al. | NO. 2:20-cv-00111-RAJ

10              Plaintiffs, | DECLARATION OF
              | MARK RACINE IN SUPPORT OF
11      v. | PLAINTIFFS' MOTION FOR
              | PRELIMINARY INJUNCTION
12 UNITED STATES DEPARTMENT OF |
STATE, et al., | Noting Date: February 28, 2020
13              Defendants. |

14

15     I, Mark Racine, declare as follows:

16     1.    I am over the age of 18 and have personal knowledge of all the facts stated herein.

17     2.    I am the Chief Information Officer ("CIO") for the Boston Public Schools

18 ("BPS"), a school system serving more than 56,000 students in 125 schools from prekindergarten

19 through grade 12.

20     3.    As the CIO, I am responsible for BPS' technology equipment, hardware,

21 software, systems and related services.

22     4.    Three dimensional ("3D") printers are available to students in many BPS schools,

23 and students are learning, as part of the curriculum, to operate these technologies.

24

DECLARATION OF MARK RACINE          1
2:20-cv-00111-RAJ

5.      The declining price of 3D printers, coupled with the inclusion in our Computer Science pathways, has increased the accessibility of 3D printers in many of our schools.  We currently support over 100 3D printers in BPS with over 50 teachers trained on the use of 3D printers this last spring.

6.      Moreover, 3D printers are becoming more prevalent and available outside of school, as more advanced and affordable models come to the market.

7.      Many of our teachers-and students are acquiring 3D printers on their own as the cost continues to drop, with some models already on the market for under $100.  We feel strongly that our students must be prepared to learn and work with technology such as 3D printers, but the availability of downloadable plans for firearms sends the wrong message about the role of this technology to our students.

8.      The safety of our students, both in and out of school, is the highest priority for the Boston Public Schools and we strongly discourage the distribution of electronic blueprints for the construction of firearms.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this  3rd   day of February, 2020 at  Boston, MA                    .

Mark Racine

DECLARATION OF MARK RACINE
2:20-cv-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DICK ANTHONY HELLER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 08-01289 (JEB)

## DECLARATION OF CATHY L. LANIER

Pursuant to 28 U.S.C. § 1746, I, Cathy L. Lanier, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information, including information provided to me by other District of Columbia employees in the course of my official duties.

2.      I submitted an expert report in this matter on April 19, 2013, and was deposed by plaintiffs' counsel on June 12, 2013. The views I state herein are drawn from my professional experience, my previous report, and deposition testimony.

3.      I testified before the Council of the District of Columbia Committee on the Judiciary in 2008 and 2012 concerning Bill 17-843 (the "Firearms Amended Act of 2008") and Bill 19-614 (the "Firearms Amendment Act of 2012"), respectively, and before the United States House of Representatives Committee on Oversight & Government Accountability in 2008 concerning H.R. 6691 (the "Second Amendment Enforcement Act").  My opinions in this case elaborate and expand upon the above-referenced testimony.

1

## BACKGROUND AND QUALIFICATIONS

4.      I am the Chief of Police of the Metropolitan Police Department of the District of Columbia ("MPD"), a position I have held since 2007.  I have worked in the MPD for my entire law enforcement career, dating back to 1990.

5.      During my tenure as Chief, I have overseen MPD's efforts to develop and implement better strategies to prevent gun violence, and arrest and prosecute violent criminal offenders.  In November 2007, I reinstituted the Gun Recovery Unit, which had been disbanded in the 1990s, and staffed it with officers with enhanced training on identifying and recovering illegal guns.  In March 2008, the District began a collaborative information-sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, and the Court Services and Offender Supervision Agency ("CSOSA") and the D.C. Pretrial Services Agency.  The collaboration tracks gun cases from arrest to prosecution, allowing these agencies to identify repeat offenders, follow trends, and create law-enforcement strategies to prevent gun-related crimes.  During my tenure as Chief, MPD has continued its long-running efforts to get illegal guns off of the street, and, as of early October, 2013, has successfully recovered more than 13,000 illegal firearms since 2007.

6.      Prior to serving as Chief, I served in a number of positions within MPD that gave me extensive experience analyzing terrorist threats in and to the District and developing ways to combat them.  Between 2002 and 2006, I served as Commander of MPD's Special Operations Division ("SOD"), where I managed the Special Events/Dignitary Protection Branch, Emergency Response Team, Aviation and Harbor Units, Horse Mounted and Canine Units, and Civil Disturbance Units. During my tenure as SOD Commander, I established the agency's first

2

Homeland Security/Counter-Terrorism Branch and created an agency-wide chemical, biological, radiological response unit known as the Special Threat Action Team.

      7.     In 2006, I was named the first Commanding Officer of MPD's Office of Homeland Security and Counter-Terrorism ("OHSCT"). In this role, I worked extensively with a multi-agency taskforce of local and federal law enforcement agencies to plan and implement security for critical events like the Presidential Inaugural. In addition, I took the lead role in developing and implementing coordinated counter-terrorism strategies for all units within the MPD and launched Operation TIPP ("Terrorist Incident Prevention Program").

      8.     Prior to these positions, I served in uniformed patrol, including as Commander of the Fourth District, one of the largest and most diverse residential patrol districts in the city. I have also served as the Commanding Officer of the Department's Major Narcotics Branch and Vehicular Homicide Units.

      9.     I am a graduate of the FBI National Academy and the federal Drug Enforcement Administration's Drug Unit Commanders Academy. I have Bachelor's and Master's Degrees in Management from Johns Hopkins University, and a Master's Degree in National Security Studies from the Naval Postgraduate School in Monterey, California.

**MATERIALS REVIEWED**

      10.    In preparing to present my opinions here, I reviewed the following materials:

    a. Plaintiffs' Third Amended Complaint (For Declaratory Judgment, Injunctive Relief, and Writ of Mandamus) July 31, 2012.

    b. The parties' written responses and documents provided in discovery in this case.

    c. D.C. Official Code §§ 7-2501.01 *et seq.* (2012 Supp.), as amended.

    d. Title 24, D.C. Municipal Regulations, Ch. 23, as amended.

    e. The materials found at the Metropolitan Police Department's website regarding firearms registration, *http://mpdc.dc.gov/service/firearm-registration-district-columbia*, including the Online Firearms Safety Training Course and "Firearms

3

Registration: General Requirements and Study Guide" (available at *http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/firear ms_reg_req.pdf*).

f. Steven A. Sumner, *et al.*, "Firearm Death Rates and Association with Level of Firearm Purchase Background Check," Am. J. Prev. Med. (July 2008); 35(1) 1-6.

g. Metropolitan Police Department, *Annual Report 2011*, available at http://mpdc.dc.gov/sites/default/files/dc/ sites/mpdc/publication/attachments/ar_2011_0.pdf.

h. D. WEIL, R. KNOX, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759-1761 (1996).

## EXPERT FINDINGS

### *The District Presents Unique Law Enforcement Challenges*

11.     Washington, D.C., poses unique security challenges for law enforcement given its status as the Nation's Capital. Protecting government officials and infrastructure is a challenge for every city in the United States, but in the District – where the likelihood of terrorist attack is higher – the challenges to law enforcement are even greater.

12.     The District's high concentration of iconic structures – such as the national monuments, the White House, and the Capitol – provide obvious targets for would-be terrorists, both foreign and domestic. In addition, the District hosts 187 foreign embassies with facilities at more than 500 locations, as well as the headquarters of many international organizations, trade unions, non-profit organizations, lobbying groups, and professional associations. As we have learned from the bombing of the Murrah Federal Building in Oklahoma City and the 1993 shootings outside of CIA headquarters at Langley, Virginia, any Federal building or career public servant can be a potential target. Indeed, just since I've been a member of MPD, there have been no less than three incidents in which multiple shots have been fired at the White House (in 1994, 2001, and 2011), at least two of which involved a semi-automatic rifle.

4

13.     Further, the District offers no shortage of high-profile human targets, including the President, members of Congress, and Supreme Court justices.  In addition to members of the U.S. government, approximately 3,000 foreign dignitaries spend time in the District each year, including more than 400 who make official visits each year.  Moreover, approximately 8,000 delegates come to Washington from around the world each Fall for a meeting of the Boards of Governors of the International Monetary Fund and World Bank.  Indeed, the sheer volume of secure motorcades traveling in Washington on any given day – including the daily movement of the President, Vice President, and their families – present a substantial security challenge, distinct from other American cities.

14.     In addition to assisting in the secure movement of government officials and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually, including the Fourth of July celebration on the National Mall, the National and Marine Corps Marathons, large demonstrations involving hundreds of thousands of participants and frequently counter protests, and the Presidential Inauguration.

15.     As a law enforcement officer, my immediate concern is to protect the public.  In the District, where a terrorist incident, no matter how small, would garner world-wide attention and could have significant international implications, the stakes are even higher. Moreover, as Chief, the safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously.

16.     In my professional opinion, the District's firearms-registration laws significantly aid MPD's efforts to prevent violent crime, ensure the security of the Nation's Capital, and protect the safety of law enforcement officers and members of the public.

5

***The District's Firearms Registration Laws Aid MPD's Law Enforcement Efforts***

17.     The District's firearm-registration process serves four key objectives:
(i) verifying the eligibility of the owner to legally possess the firearm; (ii) ensuring that owners
have a common body of knowledge of firearms laws, responsibilities, and safety; (iii) providing
law enforcement with the information necessary to readily identify legal firearms and their
rightful owners; and (iv) preventing the illegal trafficking of firearms into or out of the District.

*Verifying Eligibility*

18.     The first objective of the District's firearms regulations is to keep firearms out of
the hands of individuals who, experience has shown, pose the greatest threat to the public, such
as felons and the mentally ill. For example, the assault on Congresswoman Gabrielle Gifford in
January 2011, in Arizona, during which six individuals were killed, the Virginia Tech massacre,
during which 33 people were killed, and the 2012 shooting at a movie theater in Aurora,
Colorado, during which 12 were killed, were all committed by individuals with a history of
mental illness.  In the District, an attempt was made on the life of the President as recently as
2011 by a man with a history of mental illness who used a high-powered rifle to shoot at the
White House.  More famously, John Hinkley – whose mental health issues are now well known –
nearly succeeded in assassinating President Reagan outside of the Washington, D.C., Hilton in
1981.

In-Person Registration and Fingerprinting

19.     In my professional opinion, the District's requirement of an initial in-person
registration and background check, which includes a local-level check of the applicant's criminal
and mental health history, is the best means to verify an applicant's eligibility to possess a
firearm.  Indeed, a 2008 study found that states that use local-level agencies—such as local

6

police or sheriff's departments—to perform background checks for firearms have lower rates of homicide and suicide than states that simply rely on a federal background check.[1]

20.     Further, the criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number.  Identity theft is rampant, and gun dealers are not necessarily well trained in identifying false documents.  The use of fingerprints provides MPD with a means of biometric identification, which ensures that the applicant is who he says he is and that MPD is performing a background check on the correct person.

Registration

21.     In addition to verifying eligibility at the time of registration, law enforcement has a strong interest in ensuring that a registrant does not become ineligible to possess a firearm over time.  For example, if a registrant is convicted of a felony or domestic violence, or is committed by the court for mental health treatment, the District needs to know where the firearm is so that, if the registrant does not voluntarily surrender the firearm as required by law, police can take possession of it.

22.     MPD currently is in the process of finalizing its procedures with respect to the re-registration requirement, and expects to implement those procedures in January 2014.

*Ensuring a Common Body of Knowledge*

23.     Anyone who possesses and registers a firearm should be aware of the laws and requirements for responsible gun ownership, as well as key safety principles.  Even if a firearm is only kept in the home, the government has an interest in reducing accidental discharges, ensuring that guns are safely stored, and ensuring that owners are aware of the laws governing firearms.

---

[1] Steven A. Sumner, *et al.*,"Firearm Death Rates and Association with Level of Firearm Purchase Background Check," Am. J. Prev. Med. (July 2008); 35(1) 1-6, *available at* http://download.journals.elsevierhealth.com/pdfs/journals/0749-3797/PIIS0749379708003103.pdf.

Training with respect to the safe handling and storage of a firearm is a requirement in most every law enforcement profession that requires the carrying of a firearm. Safe handling is one of the very first components of training, to reduce accidental discharges by police, who handle firearms every day.

24.     Moreover, in order to make registrants more clearly accountable under the law, it is important to be able to demonstrate that they were taught and aware of the requirements. These are common-sense requirements that have been adopted elsewhere. Currently, California, Connecticut, Hawaii, Massachusetts, and Michigan all have laws requiring some sort of training or safety certification as part of the registration process, and other jurisdictions are considering instituting similar requirements.

25.     The District's requirement that an applicant provide evidence of the completion of a firearms training and safety class, which can be completed online, and demonstrate knowledge of the District's laws pertaining to firearms, "in particular, the safe and responsible use, handling, and storage of the same" is, in my opinion, a reasonable and effective means of reducing gun-related accidents.

*Providing Law Enforcement Officers With Critical Information*

26.     More law enforcement officers are killed by firearms than any other single cause. In 2011, 71 officers were fatally shot, the highest single-year total in the past decade. The District's firearms-registration requirements also serve to provide law enforcement officers with critical information needed to protect their safety and the safety of the public.

27.     For example, a registration certificate with photo identification, as required by District law, is critical to protecting the safety of police officers and the public. Individuals who legally register their firearms are much less likely to use those firearms for criminal purposes. As

8

a result, an individual with a legally registered firearm may pose less danger to an officer than someone with an illegal firearm. A certificate with a photo helps to quickly and safely communicate a registrant's legal status to a law enforcement officer. Without this, in many instances it would be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone transporting an illegal firearm. This photo identification, in turn, helps to keep both the officer and the registrant safe.

28.     In addition, the requirement that a registrant notify the Chief when a registered weapon is lost, stolen, sold, transferred, or otherwise disposed of, provides law enforcement officers with important information. The notification provides law enforcement with the opportunity to investigate and potentially recover the weapon before it is used in a crime. At the very least, the notification requirement can help protect the registrant from being associated with a crime that is later committed with that firearm.

*Preventing Gun Trafficking*

29.     In addition to tracing legal guns used in crime, the District has a strong interest in preventing the trafficking of illegal firearms into or out of the District. Firearms recovered in the District are traced overwhelmingly to neighboring states, such as Maryland or Virginia. In 2011, these two neighboring states accounted for 63% of the total number of successful traces.[2] Studies have shown that laws restricting the registration or purchase of multiple firearms in a given period are effective in disrupting illegal interstate trafficking of firearms.[3]

---

[2] Metropolitan Police Department, *Annual Report 2011*, at 27, available at http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/ar_2011_0.pdf.

[3] *See* D. WEIL, R. KNOX, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275:22 JAMA 1759-1761 (1996).

9

30.     In my opinion, the District's prohibition on registering more than one newly acquired handgun per month provides important benefits in terms of deterring and controlling the trafficking of firearms into or out of the District.

### *Long guns v. Handguns*

31.     In my professional opinion, the objectives of the District's firearm registration laws are just as applicable to long guns as they are to handguns.  Particularly in light of the District's unique security concerns, I believe that long guns in the District should be subject to the same regulations as handguns.

32.     Historically, high-powered rifles have been the preferred tool of political assassins, as they typically are more accurate over a longer range.  Indeed, as discussed above, a high-powered rifle was used by Oscar Ortega in 2011 to make an attempt on the life of the President by shooting at the White House from the National Mall.  Also, in 2009, a man used a .22 caliber rifle in a fatal shooting at the Holocaust Museum.

33.     Although handguns may be a more frequent weapon of choice for criminals on the street (and for homeowners), for their easier use and concealability, long guns can also be used with deadly precision.  And if an assailant is traveling by vehicle, as the shooters in the above examples were, there is no need to try to hide a gun in a pocket.

34.     It is not just "lone-wolf" gunmen who use long guns.  Although they are less commonly used in the commission of crimes in the District than handguns, they are used, and in this urban environment, their longer range can make them even more dangerous than a handgun.  In the city, when you miss your target with a long gun, it is very likely to hit an unintended target.  For example, the March 2010 South Capitol Street shooting, in which 10 young people

10

were wounded and four were killed, was committed with an AK-47 shot from within a moving vehicle.

35.     There are few, if any, areas of the city that have the open space for which long guns are typically used in more rural areas, such as for recreational target shooting. Moreover, hunting has been illegal in the District since 1906. While fewer criminals may choose to use long guns as opposed to handguns, they are still dangerous and potentially deadly weapons, and should be regulated accordingly.

36.     In summary, I think that the District's firearm-registration process is vital to MPD's efforts to secure the Nation's Capital, and it clearly enhances the safety of both law enforcement and the public.


_____          **OCT – 7 2013**
Cathy L. Lanier                          _____
Chief of Police                          DATE
Metropolitan Police Department

Appendix                                                    Page 93 of 93