Exhibit 3



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to* [DDTCPublicComments@state.gov](mailto:DDTCPublicComments@state.gov); *electronically via*
[http://www.regulations.gov](http://www.regulations.gov)

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are national leaders in strengthening, supporting and expanding gun laws, policies, and practices in the United States.  Our complimentary missions are to significantly decrease the number of gun deaths and injuries in America.  We achieve this by amplifying the voice of the American public; changing social norms through public health and safety programs; and holding the gun industry accountable for dangerous and irresponsible practices and products.[1]  These comments are submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use and transfer of legal firearms within and outside of the United States by advocating for appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"), which seek comments on the transfer of certain firearms and related items from the International Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including those used by the military, (along with their components and ammunition) from USML Categories I, II, and III, where they are classified as significant military equipment, to the CCL, where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the military (and related items) from the stringent control of the USML to the more permissive regime administered by the Commerce Department would be contrary to Congressional intent and would undermine U.S national security interests, international stability and the protection of human rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see [www.bradycampaign.org](http://www.bradycampaign.org).

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale.  The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms.  The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers.   Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change.  Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict.  In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions.  Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates.   In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight.  To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale.  As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors.  Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States.  The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.   Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

### 2.  The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.  The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors. Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses. It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3. The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3] The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons. By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4.  Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5.  The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

**6.**   **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11] Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules.  *See* EAR §§ 743.5.; 772.1.

**<u>7.</u>   The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS.  *See* EAR § 734.3(b)(3).  Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical.  In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR.  In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS.  If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code.  However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls.  *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR.  *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**<u>8.</u>   The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9.** **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.