The Honorable Richard Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | ) | No. 2:20-cv-0111-RAJ |
| | ) | |
| Plaintiffs, | ) | **FEDERAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) | |
| | ) | **NOTED FOR: FEB. 28, 2020** |
| Defendants. | ) | |

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-00111-RAJ) –

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

TABLE OF ABBREVIATIONS.........................................................................................xii

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................2

I.  The Arms Export Control Act and International Traffic in Arms Regulations. .................. 2

II. The Export Control Reform Act. ..................................................................................... 4

III. The Export Control Reform ("ECR") Initiative............................................................. 5

IV. The Challenged Rules. ................................................................................................... 7

STANDARD OF REVIEW .................................................................................................9

ARGUMENT......................................................................................................................10

I.  There Is No Likelihood of Success On The Merits Because Plaintiffs' Challenge To
    Export Control Decisions Is Not Reviewable. ............................................................. 10

    A.  The Rules Are Exempt From the APA. ................................................................. 10

        1. The Commerce Rule is Exempt From the APA's Notice-and-Comment and
           Other Requirements. ..................................................................................... 10

        2. The State Rule is Exempt From the APA's Notice-and-Comment and Other
           Requirements............................................................................................... 10

        3. The State Rule is Exempt From Judicial Review Under the APA. ....................... 11

    B.  Plaintiffs' Claims Present A Non-Justiciable Political Question.................................. 13

    C.  Plaintiffs Fall Outside the Zone of Interests of the AECA and ECRA...................... 16

    D.  Plaintiffs Lack Article III Standing To Challenge The Rules. ..................................... 17

II. Even if Plaintiffs' Claims Can Be Reviewed, There Is No Likelihood of Success under
    the APA...................................................................................................................... 20

    A.  Plaintiffs' Arguments Are Based On Misunderstandings Of ITAR and the EAR. ...... 20

    B.  The Rules Do Not Violate the APA's Notice-and-Comment Standards. ................... 23

    C.  The Rules Are Not Arbitrary and Capricious. ......................................................... 26

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1

      D.  The Rules Are Not Contrary To Law. ........................................................... 29

III.  Defendants And The Public Interest Would Be Harmed By An Injunction. .................... 30

IV.  Plaintiffs Have Not Established a Likelihood of Irreparable Harm. ............................... 32

V.  Plaintiffs Have Requested Relief That Goes Far Beyond a Remedy for Their Claimed

    Irreparable Harms. ........................................................................................................ 34

CONCLUSION ................................................................................................................34

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# TABLE OF AUTHORITIES

**CASES**

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..................................................................................10

*Am. Trucking Ass'ns, Inc. v. Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...................................................................................9

*Ashley Creek Phosphate Co. v. Norton*,
    420 F.3d 934 (9th Cir. 2005) .....................................................................................16

*ASSE Int'l v. Kerry*,
    803 F.3d 1059 (9th Cir. 2015) ...................................................................................30

*Aziz v. Trump*,
    231 F. Supp. 3d 23 (E.D. Va. 2017) ..........................................................................18

*Baker v. Carr*,
    369 U.S. 186 (1962) ..................................................................................................14

*Barnhart v. Walton*,
    535 U.S. 212 (2002) ..................................................................................................30

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................................................16

*Bernstein v. DOJ*,
    176 F.3d 1132 (9th Cir. 1999), *withdrawn,* 192 F.3d 1308 (9th Cir. 1999) ........................22

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ..................................................................................................11

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018), *cert denied* 139 S. Ct. 2716 (2019) ............................34

*California Citizens Band Association v. United States*,
    375 F.2d 43 (9th Cir. 1967) .......................................................................................25

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – iii

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  *Clapper v. Amnesty, Int'l,*

2    568 U.S. 398 (2013) ................................................................................................ 19, 20

3  *Corrie v. Caterpillar, Inc.,*

4    503 F.3d 974 (9th Cir. 2007) .......................................................................................... 13, 14

5  *Ctr. for Biological Divers. v. Mattis,*

6    868 F.3d 803 (9th Cir. 2017) ..................................................................................................... 19

7  *Def. Distributed v. Dep't of State ("DD I"),*

8    121 F. Supp. 3d 680 (W.D. Tex. Aug. 4, 2015) ...................................................................... 18

9  *Def. Dist. v. Dep't of State ("DD II"),*

10    838 F.3d 451 (5th Cir. 2016) (Jones, J., dissenting) ................................................... 12, 21

11  *DISH Network Corp. v. FCC,*

12    653 F.3d 771 (9th Cir. 2011) ..................................................................................................... 10

13  *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,*

14    774 F.2d 1371 (9th Cir. 1985) ..................................................................................................... 33

15  *E. Bay Sanctuary Cov. v. Barr,*

16    934 F.3d 1026 (9th Cir. 2019) ..................................................................................................... 34

17  *Earth Island Inst. v. Christopher,*

18    6 F.3d 648 (9th Cir. 1993) ..................................................................................................... 15

19  *El-Shifa Pharm. Indus. v. United States,*

20    607 F.3d 836 (D.C. Cir. 2010) ..................................................................................................... 15

21  *Exxon Mobil v. EPA,*

22    217 F.3d 1246 (9th Cir. 2000) ..................................................................................................... 28

23  *Fla. Keys Citizens Coalition, Inc. v. Army Corps of Eng'rs,*

24    374 F. Supp. 2d 1116 (S.D. Fla. 2005) .................................................................................... 30

25  *Fox Television Stations, Inc. v. Aereokiller, LLC,*

26    851 F.3d 1002 (9th Cir. 2017) ............................................................................................. 28, 30

27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Gill v. Whitford,*

    138 S. Ct. 1916 (2018) ................................................................................34

*Gonzales v. Oregon,*

    546 U.S. 243 (2006) ...................................................................................28

*Ground Zero Ctr. for Nonviolent Action v. Dep't of Navy,*

    918 F. Supp. 2d 1132 (W.D. Wash. 2013)..................................................31

*Haig v. Agee,*

    453 U.S. 280 (1981) ...................................................................................31

*Health Ins. Ass'n of Am. v. Shalala,*

    23 F.3d 412 (D.C. Cir. 1994) ....................................................................26

*Hodge v. Dalton,*

    107 F.3d 705 (9th Cir. 1997) ............................................................... 25, 26

*In re DD Settlement,*

    318 F. Supp. 3d 1247 (W.D. Wash. 2018)..................................................19

*Jaber v. United States,*

    861 F.3d 241 (D.C. Cir. 2017)...................................................................15

*Karn v. Dep't of State,*

    925 F. Supp. 1 (D.D.C. 1996) ............................................................*passim*

*Kisor v. Wilkie,*

    139 S. Ct. 2400 (2019) ...............................................................................23

*Leyse v. Clear Channel Broad., Inc.,*

    545 Fed. App'x 444 (6th Cir. 2013) ..........................................................23

*Lujan v. Defs. of Wildlife,*

    504 U.S. 555 (1992) ............................................................................. 17, 18

*Madsen v. Women's Health Ctr., Inc.,*

    512 U.S. 753 (1994) ...................................................................................34

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ..................................................................................................19

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) ..................................................................................................18

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ..................................................................................................16

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ....................................................................................................9

*Mingtai Fire & Marine Ins. Co. v. UPS,*
  177 F.3d 1142 (9th Cir. 1999) ...................................................................................15

*Native Vill. of Chickaloon v. NMFS,*
  947 F. Supp. 2d 1031 (D. Alaska 2013) .....................................................................28

*Neighborhood Assistance Corp. of Am. v. CFPB,*
  907 F. Supp. 2d 112 (D.D.C. 2012) .....................................................................23, 24

*Nixon v. United States,*
  506 U.S. 224 (1993) ..................................................................................................14

*Nken v. Holder,*
  556 U.S. 418 (2009) ..................................................................................................30

*NRDC v. FAA,*
  564 F.3d 549 (2d Cir. 2009)......................................................................................30

*Pacific Rivers Council v. USFS,*
  942 F. Supp. 2d 1014 (E.D. Cal. 2013)....................................................................32

*Paradissiotis v. Rubin,*
  171 F.3d 983 (5th Cir. 1999) ....................................................................................23

*People ex rel. Hartigan v. Cheney,*
  726 F. Supp. 219 (C.D. Ill. 1989)............................................................................17

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  *Portland Gen. Elec. Co. v. Bonneville Power Admin.*,

2      501 F.3d 1009 (9th Cir. 2007) .............................................................................28

3  *Rybachek v. EPA*,

4      904 F.2d 1276 (9th Cir. 1990) ....................................................................... 25, 26

5  *Sampson v. Murray*,

6      415 U.S. 61 (1974) ............................................................................................33

7  *Sierra Forest Legacy v. Sherman*,

8      646 F.3d 1161 (9th Cir. 2011) ......................................................................18-19

9  *Stagg, P.C. v. Dep't of State*,

10     354 F. Supp. 3d 448 (S.D.N.Y. 2019) .............................................................21

11 *State of Washington et al. v. United States Dept. of State et al.*, ("*In re DD Settlement*")

12     No. C18-1115-RSL, 2019 WL 5892505 (W.D. Wash. Nov. 12, 2019) ....................................... 1, 16

13 *Town of Chester v. Laroe Estates, Inc.*,

14     137 S. Ct. 1645 (2017) ......................................................................................34

15 *United States v. Alavi*,

16     No. 07-CR-429, 2008 WL 1989773 (D. Ariz. May 5, 2008) .............................14

17 *United States v. Chi Mak*,

18     683 F.3d 1126 (9th Cir. 2012) .........................................................................17

19 *United States v. Helmy*,

20     712 F. Supp. 1423 (E.D. Cal. 1989) ................................................................14

21 *United States v. Mandel*,

22     914 F.2d 1215 (9th Cir. 1990) ............................................... 13, 14, 16, 29

23 *United States v. Martinez*,

24     904 F.2d 601 (11th Cir. 1990) .........................................................................14

25 *United States v. Mead Corp.*,

26     533 U.S. 218 (2001) ..........................................................................................28

27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1    *United States v. Moller-Butcher*,

2      560 F. Supp. 550 (D. Mass. 1983) ...................................................................14

3    *United States v. Posey*,

4      864 F.2d 1487 (9th Cir. 1989) .........................................................................17

5    *United States v. Pulungan*,

6      569 F.3d 326 (7th Cir. 2009) ...........................................................................12

7    *United States v. Spawr Optical Research, Inc.*,

8      864 F.2d 1467 (9th Cir.1988), *cert. denied,* 493 U.S. 809 (1989).........................14

9    *Universal City Studios, Inc. v. Corley*,

10      273 F.3d 429 (2d Cir. 2001)...........................................................................22

11    *Washington v. Chimei Innolux Corp.*,

12      659 F.3d 842 (9th Cir. 2011) ..........................................................................18

13    *WildEarth Guardians v. Provencio*,

14      923 F.3d 655 (9th Cir. 2019) ..........................................................................23

15    *Winter v. Nat. Res. Def. Council, Inc.*,

16      555 U.S. 7 (2008) .........................................................................................32

17   **CONSTITUTION**

18   U.S. Const. art. I.........................................................................................15

19   **STATUTES**

20   5 U.S.C. §§ 553(a), 701(a)(2) ........................................................................10

21   5 U.S.C. § 706 .......................................................................................10, 23

22   18 U.S.C. § 922(g)......................................................................................18

23   22 U.S.C. § 2751 ..........................................................................................2

24   22 U.S.C. § 2778 ...................................................................................*passim*

25   50 U.S.C. § 4811 .....................................................................................4, 17

26   50 U.S.C. § 4812 ..........................................................................................4

27   50 U.S.C. § 4813(a)(1)...................................................................................4

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1   50 U.S.C. § 4821 ............................................................................................................10

2   50 U.S.C. §§ 4801-52 .......................................................................................................4

3   Pub. L. No. 83-665............................................................................................................11

4   **ADMINISTRATIVE AND EXECUTIVE MATERIALS**

5   15 C.F.R. § 134.7 .............................................................................................................20

6   15 C.F.R. § 734.7 ......................................................................................................*passim*

7   Department of State, Revisions to the United States Munitions List,

8       22 C.F.R. Part 121, https://go.usa.gov/xdmEd .......................................................... 3, 6

9   22 C.F.R. § 75.195 (1955)...............................................................................................11

10  22 C.F.R. § 120.10(a)(1) ............................................................................................... 3, 4

11  22 C.F.R. § 120.11..................................................................................................3, 4, 20

12  22 C.F.R. § 120.17 ............................................................................................................3

13  22 C.F.R. § 120.3(b) .........................................................................................................3

14  22 C.F.R. § 121.1 ....................................................................................................... 4, 13

15  22 C.F.R. § 128.1 ..................................................................................................... 10, 11

16  22 C.F.R. §§ 120-130 .......................................................................................................2

17  Department of State,

18      20 FR 6250 (Aug. 26, 1955) ...........................................................................................11

19  Republic of Part,

20      22 FR 11107 (Dec. 31, 1957) .........................................................................................11

21  42 FR 42853 (Aug. 25, 1977)...........................................................................................11

22  Revision of the International Traffic in Arms Regulations,

23      49 FR 47706 (Dec. 6, 1984) ...........................................................................................11

24  Amendments to the International Traffic in Arms Regulations,

25      58 FR 39320 (July 22, 1993)...........................................................................................11

26  Bureau of Political-Military Affairs; Amendments to the International Traffic in Arms Regulations,

27      61 FR 48831 (Sept. 17, 1996) ................................................................................... 10, 11

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Revisions to the United States Munitions List,

    75 FR 76935 (Dec. 10, 2010) ...................................................................6, 28, 29, 31

Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List

    Category XV,

    79 FR 27180 (May 13, 2014) ...........................................................................................7

Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List

    Category XII,

    81 FR 70340 (Oct. 12, 2016) ...........................................................................................7

Control of Firearms, Guns, Ammunition and Related Articles the President Determines No

    Longer Warrant Control Under the United States Munitions List (USML),

    83 FR 24166 (May 24, 2018) ...........................................................................................7

International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III,

    83 FR 24198 (May 24, 2018) ..................................................................................... 7, 10

International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III,

    85 FR 3819 (Jan. 23, 2020) ....................................................................................*passim*

Control of Firearms, Guns, Ammunition and Related Articles the President Determines No

    Longer Warrant Control Under the United States Munitions List (USML),

    85 FR 4136 (Jan. 23, 2020) ....................................................................................*passim*

Administration of Reformed Export Controls,

    Exec. Order 13637, 78 FR 16129 (Mar. 8, 2013) ...........................................................2

**OTHER AUTHORITIES**

Press Release, The White House: President Obama Lays the Foundation for a New Export

    Control System to Strengthen National Security and the Competitiveness of Key U.S.

    Manufacturing and Technology Sectors (Aug. 30, 2010),

    https://go.usa.gov/xdNe4 ..................................................................................................6

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – x

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Thomas B. McVey, Camden R. Webb & Charles E. "Chuck" James, Jr., *ITAR Guide For the Firearms Industry* (Jan. 13, 2017),

   https://www.williamsmullen.com/news/itar-guide-firearms-industry-0 ..........................................7

$7 12-Gauge Zip Gun Homemade Shotgun (Sept. 23, 2010),

   http://www.youtube.com/watch?v=n1wV3lmbSv4..........................................................33

How To Machine a 80% Lower Receiver (AR15) Quick and Easy (Oct. 20, 2017),

   https://www.youtube.com/watch?v=U9zio3k3eVk ......................................................33

Does an Individual Need a License To Make a Firearm (last reviewed Nov. 6, 2017),

   https://go.usa.gov/xdDGv .................................................................................................33

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

## TABLE OF ABBREVIATIONS

Each of the following abbreviations is also identified in a parenthetical at the point of introduction in the text.  Defendants provide this additional reference for the convenience of the reader.

| | |
|---|---|
| **AECA** | **Arms Export Control Act** |
| **ANPRM** | **Advance Notice of Proposed Rulemaking** |
| **BIS** | **Bureau of Industry and Security (Dep't of Commerce)** |
| **CCL** | **Commerce Control List** |
| **DAS** | **Deputy Assistant Secretary** |
| **DD** | **Defense Distributed** |
| **DDTC** | **Directorate of Defense Trade Controls (Dep't of State)** |
| **EAR** | **Export Administration Regulations** |
| **ECCN** | **Export Control Classification Number** |
| **ECR** | **Export Control Reform** |
| **ECRA** | **Export Control Reform Act of 2018** |
| **ITAR** | **International Traffic in Arms Regulation** |
| **MSA** | **Mutual Security Act of 1954** |
| **NPRM** | **Notice of Proposed Rulemaking** |
| **USML** | **United States Munitions List** |

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

# INTRODUCTION

Plaintiffs in this action are various States that challenge the manner in which the United States Government regulates the export of the functional files used to 3-D print firearms ("3-D firearms files"). This action follows prior litigation in *State of Washington et al. v. United States Dept. of State et al.*, No. C18-1115-RSL, 2019 WL 5892505 (W.D. Wash. Nov. 12, 2019) (*"In re DD Settlement"*) involving a single, temporary modification of the United States Munitions List ("USML") to deregulate certain files (pursuant to a settlement agreement in other litigation). Plaintiffs now challenge two newly-issued final rules published by the Department of State ("State"), 85 Fed. Reg. ("FR") 3819 (2020) ("State Rule") and the Department of Commerce ("Commerce") 85 FR 4136 (2020) ("Commerce Rule") which, consistent with the court's prior rulings in *In re DD Settlement*, actually *maintain* export controls on such files. The crux of Plaintiffs' motion for a preliminary injunction is that the Commerce Department's regulatory regime will permit widespread dissemination of these 3-D firearms files in a manner not previously permitted when regulation was maintained by the State Department under the International Traffic in Arms Regulations ("ITAR"). Yet Plaintiffs are simply wrong; the export controls that will be in place at Commerce for 3-D firearm files are equivalent to the export controls that existed under the prior State regime. Plaintiffs' entire case turns on their attempt to interpret how the Commerce Rule operates as contrasting sharply with how they contend the prior ITAR regulations function. But as explained below, several basic misunderstandings about how the respective regimes operate negate the Plaintiffs' claims and any basis for preliminary injunctive relief. Most notably, both regulatory systems historically carved out exceptions for controls on the export of technical data that is in the public domain ("technology" that is "published," in Commerce's parlance), in deference to First Amendment concerns governing public expression. The Commerce Rule will now create a new and distinct restriction on the export of functional 3-D firearm files that closes any gap with the prior ITAR controls. Thus, in response to Plaintiffs' motion, the Government submits declarations from export control authorities at the Departments of State and Commerce who explain how the rules work, and why Plaintiffs' interpretation of the Rules, which actually address Plaintiffs' stated policy concerns, is wrong. *See* Decl. of Deputy Assistant Sec'y of State Michael Miller ("Miller Decl."); Decl.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

of Deputy Assistant Sec'y of Commerce Matthew Borman ("Borman Decl."). Plaintiffs therefore cannot show the likelihood of success on the merits needed to obtain a preliminary injunction.

Before those issues are addressed, Plaintiffs' motion should fail on threshold grounds, however. Notably, Plaintiff's principal claims that the Rules fail on procedural grounds under the Administrative Procedure Act ("APA") for lack of an opportunity for notice and comment ignores the fact that Congress has expressly exempted such rules from the APA notice-and-comment requirement. And even if the APA were applicable, the Rules satisfy those standards and the Commerce Rule is in fact a logical outgrowth of the proposed rule that addresses the concerns raised by Plaintiffs and other commentators. Plaintiffs also fail to establish their standing to challenge the Rules or that they fall within the zone of interests of the statutes governing their issuance. Lastly, Plaintiffs' merits-based challenges to the Rules—that they do not further the national security and foreign policy interests of the United States—are foreclosed from judicial review as a threshold matter, and in any event fail.

In sum, there is no basis for the Court to enter preliminary injunctive relief here with respect to the 3-D firearm files provision of the Commerce Rule at issue, and certainly no basis to enjoin both Rules in their entirety. Indeed, those rules govern the export of a vast array of firearms, technologies, and data that have nothing to do with this case and such an injunction would cause significant harm to the national security and foreign policy interests of the United States.

## BACKGROUND

## I.   The Arms Export Control Act and International Traffic in Arms Regulations

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services" and to promulgate regulations accordingly. 22 U.S.C. § 2778(a)(1). The President has delegated this authority to State, in part, which has set forth the ITAR.[1] *See* EO 13637, 78 FR 16129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130. One essential part of the ITAR is the USML, an extensive listing of defense articles and defense services that "provide a critical military or intelligence advantage," 22 C.F.R. § 120.3(b), the export controls

---

[1] The Department of State's Directorate of Defense Trade Controls ("DDTC") administers the ITAR.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

for which State administers.  *See* 22 C.F.R. Part 121.  The USML also covers "technical data" that is "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification" of USML-controlled items, such as "blueprints, drawings, photographs, plans, instructions or documentation" for those items.  *Id.* § 120.10(a)(1).  The export controls on technical data exist to "prevent[] foreign adversaries, terrorist groups, and other bad actors from accessing the means to develop, produce, or counter items that provide a critical military or intelligence advantage to the United States."  Miller Decl. ¶ 13.

The AECA's overall statement of purpose, *see* 22 U.S.C. § 2778(a), and several specific provisions of the AECA and ITAR are at the heart of the challenge to the State Rule.  Under 22 U.S.C. § 2778(f), the President is directed to "periodically review the items on the [USML] to determine what items, if any, no longer warrant export controls."  Separately, 22 U.S.C. § 2778(h) bars judicial review of the Executive Branch's decisions regarding what items should appear on the USML.  Within the ITAR, 22 C.F.R. § 120.17 makes clear that the ITAR does not regulate any transfers of defense articles except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons.  22 C.F.R. §§ 120.10 and 120.11 enumerate the "significant exclusions" from the definition of "technical data."  Miller Decl. ¶ 14.  For instance, technical data does not include "public domain" information or matters of "general scientific, mathematical, or engineering principles."  *Id.*  "Public domain" is defined, in part, as "information which is published and generally accessible or available to the public," including through: "(1) sales at newsstands and bookstores"; (2) "subscriptions . . . available" to the public; (3) "second class mail[]"; (4) "libraries"; (5) "patents"; (6) "unlimited distribution at a conference, meeting, seminar, trade show, or exhibition, generally accessible to the public"; (7) "public release (i.e., unlimited distribution" through any other manner after "approval by [a] U.S. government department or agency"); and (8) "[u]niversity research."

Under the AECA and the ITAR, State has regulated exports of 3-D firearms files as a slice of its regulation of other items in Category I.  *See* Miller Decl. ¶¶ 16-17.  USML Category I enumerates a broad array of defense articles at a high level of generality, such as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," or "[r]iflescopes manufactured to military specifications."  22 C.F.R.

§ 121.1.  And State regulates exports of many different kinds of "technical data" for these items, as defined above and subject to exceptions, including that for "public domain" material.  *See* 22 C.F.R. §§ 120.10, 120.11.  Files used in manufacturing by means of a 3-D printer are one of the innumerable types of "technical data" that State has regulated when associated with firearms in USML Category I.[2]

## II.  The Export Control Reform Act

The Department of Commerce regulates exports pursuant to the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-52 ("ECRA"), which directs that export controls be used to "further significantly the foreign policy of the United States," to "fulfill [the] declared international obligations" of the United States, or to limit exports that would make a "significant contribution to the military potential of any other country or . . .  would prove detrimental to . . .  national security."  50 U.S.C. § 4811(1)(A)-(B).  In adopting ECRA, Congress explicitly recognized that the overregulation of exports can "negatively affect[] [American] leadership" in "science, technology, engineering, and manufacturing," and that "[s]uch leadership" may require limits on export controls to ensure technological innovation and "competitive[ness] in global markets."  50 U.S.C. § 4811(3).

To carry out these purposes, ECRA directs that Commerce shall "establish and maintain a list of items that are controlled"—the Commerce Control List ("CCL")—and "prohibit unauthorized exports, reexports, and in-country transfers of controlled items."  50 U.S.C. § 4813(a)(1), (3).  ECRA explicitly provides that Commerce's export-control functions "shall not be subject to sections 551, 553 through 559, and 701 through 706 of Title 5," *i.e.*, the APA.  The Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774, implement ECRA, identifying the items and activities subject to the jurisdiction of the EAR as well as items not subject to the EAR.  The EAR's definition of "export" is comprehensive, and extends to, *inter alia*, "(1) An actual shipment or transmission out of the United States, including the sending or taking of an item out of the United States, in any manner;" or "(2) Releasing or otherwise transferring 'technology' or source code (but not object code)

---

[2] "The USML does not specifically describe individual pieces of technical data.  Thus, neither the files used to 3D-print firearms, nor any other specific type of computer file, blueprint, drawing, or photograph is specifically described as being covered."  Miller Decl. ¶ 17.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

to a foreign person in the United States (a 'deemed export')." 15 C.F.R. § 734.13(a).[3]

The CCL is set forth in Supplement No. 1 to Part 774 of the EAR as a specific list of controlled items.  Each regulated commodity is assigned an Export Control Classification Number ("ECCN") indicating the controlled commodity's characteristics, its functions, the reasons for its controls, and its export-licensing requirements. A license may be required for the export of items on the CCL depending on the nature of the items, the specific end use and the end user or destination.  The CCL is periodically reviewed and updated to reflect technological advancements.

As relevant here, 15 C.F.R. § 734.7 defines "published" information that falls outside the scope of the EAR when otherwise covered by the CCL, identifying categories of information similar to those defined in the ITAR as "public domain."  *See* Borman Decl. ¶ 49(b).  That includes information available through: (1) subscriptions; (2) libraries; (3) distribution at conferences, meetings, seminars, trade shows, or exhibitions generally accessible to the public; (4) "[p]ublic dissemination (*i.e.*, unlimited distribution) . . . including posting on the Internet"[4]; and (5) submission for publication in journals, magazines, newspapers, trade publications, or to researchers, or conferences.

Under the new Commerce Rule, Commerce will regulate small-caliber, non-automatic firearms previously included in USML Category I as part of the CCL's ECCN 0A501.  *See* 85 FR 4180-81. Commerce will also regulate technology required for the production of such firearms, including 3-D firearms files, under ECCN 0E501.  *See* 85 FR 4185.  And the Commerce Rule will modify the definition of "published" to ensure that "posting on the Internet" does not render 3-D firearms files "published."  85 FR 4172.

## III.  The Export Control Reform ("ECR") Initiative

On August 31, 2010, then-President Obama announced a "major step . . . to fundamentally reform the export control system" by changing "what we control, how we control it, [and] how we enforce those controls."  *Press Release*, The White House (Aug. 30, 2010), https://go.usa.gov/xdNe4

---

[3] Commerce's Bureau of Industry and Security ("BIS") controls the export, reexport and in-country transfer of all items subject to the EAR, and maintains, reviews, and clarifies the CCL.
[4] As noted below, under the Commerce Rule, 3-D firearms files will not qualify as "published" based on a "posting on the internet."  *See* 85 FR 4172.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

(last visited Feb. 21, 2020); *see* Miller Decl. ¶ 31.  This effort reflected a Presidential determination that the United States must "strengthen our national security by focusing our efforts on controlling the most critical products and technologies and by enhancing the competitiveness of key U.S. manufacturing and technology sectors." *Id.*   Henceforth, the most important national security considerations for export control decisions are the "military or intelligence advantage to the United States" provided by an item, particularly whether that advantage is "critical." *Id.* Focusing on "military or intelligence advantage . . . improve[s] the nation's national security." *Id.* The initiative reflected the execution of the AECA's direction that the President regularly determine what items, if any, no longer warrant control under the ITAR.  *See* 22 U.S.C. § 2778(f).

Within months of that policy announcement, State sought public comment on the ECR initiative, announcing that ECR would "review and revise both the ITAR and the CCL to enhance national security," and confirming that the initiative was "necessary to better focus [U.S. Government] resources on protecting those items that need to be protected." *Revisions to the USML*, 75 FR 76935 (Dec. 10, 2010) ("2010 ANPRM").  The subjects of the solicitation of comments included the approach for determining which items would be regulated on the ITAR, *i.e.,* the "critical military or intelligence advantage" criteria. *Id.* at 76939.  The 2010 ANPRM also laid out the goal of "creat[ing] a 'bright line' between the" USML and CCL (so that items appear on only one list or the other), *id.* at 76935, and defined the term "critical" in the context of "military or intelligence advantage." *Id.* at 76939.  During the comment period, State received comments supportive of approaching export-control decisions based on "military or intelligence advantage," and did not receive any comments that criticized this approach.  *See generally* https://go.usa.gov/xdmEd (last visited Feb. 21, 2020).  Over the ensuing decade, State and Commerce have regularly published requests for comment and final rules concerning each category of defense articles on the USML.  Throughout this process, the analysis of whether items "provided the United States with a critical military or intelligence advantage" served as the touchstone for the updating of the lists of controlled items.  *See* Miller Decl. ¶¶ 33-34. Accordingly, between 2013 and January 2017, State published 26 final, or interim final, rules revising 18 of the 21 USML categories, removing less sensitive items from the USML, which were concurrently

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1  added by Commerce to the CCL.  *See id.* at ¶ 34.[5]

2  **IV.  The Challenged Rules.**

3        As of 2017, the only USML categories for which the ECR review had not yet been completed

4  were Categories I, II, and III.[6]  As a U.S. House of Representatives committee recognized nearly a

5  year before the *Defense Distributed* settlement, "draft regulations to revise this category were developed"

6  in 2015 and awaited only "final interagency approval" as of 2017.  H. Rep. No. 115-200 (2017); *see also*

7  Williams   Mullen,   *ITAR   Guide   For   the   Firearms   Industry*   (Jan.   13,   2017)   https://

8  www.williamsmullen.com/news/itar-guide-firearms-industry-0 (last visited Feb. 21, 2020) ("the State,

9  Commerce and Defense Departments have considered transferring a large portion of firearms

10 products that are currently listed on the USML to be regulated under the EAR. . . [R]eaders . . . should

11 confirm if such amendments have occurred").[7]

12       The process of reviewing USML Categories I, II, and III for Commerce and State's separate

13 NPRMs began with the Department of State engaging with the Departments of Defense and

14 Commerce regarding the military and intelligence uses of the listed items.  *See* Miller Decl. ¶ 38.

15 Together, State, Defense, and Commerce determined that many of the items controlled by those

16 categories do not provide the United States with a critical military or intelligence advantage, and

17 therefore do not warrant control on the USML.  *Id.*  This decision was informed by the Defense

18 Department's assessment that the items proposed for transfer are already commonly available and not

19 inherently for military end-use, such as non-automatic firearms (.50 caliber or under) that were

20 described in USML Category I(a).  *Id.*  Indeed, such arms are in common use in the United States for

21

22 [5] *See e.g.*, 79 FR 27180 (May 13, 2014) ("Amendment to the ITAR: Revision of USML Category XV"); 79 FR 37535 (Jul. 1, 2014) ("Amendment to the ITAR: USML Category XI (Military Electronics), and Other

23 Changes"); 81 FR 49531 (Jul. 28, 2016) ("Amendment to the ITAR: Revision of USML Categories XIV and XVIII"); 81 FR 70340 (Oct. 12, 2016) ("Amendment to the ITAR: Revision of USML Category XII"); 81 FR, 83126 (Nov. 21, 2016) ("Amendment to the ITAR: Revision of USML Categories VIII and XIX").

24 [6] In the specific case of the proposed revisions to USML Categories I-III, State interpreted this standard to focus on whether defense articles in these categories are inherently for military use. *See* 83 FR 24198.

25 [7] State briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate

26 Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018, just weeks after the parties in *DD I* opened settlement talks pursuant to that court's order.  *Compare Def.*

27 *Dist. v. State*, No. 1:15-cv-372 (W.D. Tex.) ("*DD I*"), ECF No. 81 (scheduling order) *with* 83 FR 24198 (May 24, 2018); 83 FR 24166 (May 24, 2018).

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

lawful purposes, are readily available both through regulated firearms dealers and through less-regulated private transactions.  *See id.*  Further, such arms are widely available throughout the world to private individuals from both lawful and unlawful sources, as well as to government personnel in virtually every country on the globe, American allies and adversaries alike.

As with the preceding USML reviews, the review of Categories I, II, and III took place pursuant to the ECR initiative.  *See* Miller Decl. ¶ 38.  Review continued in light of State's ongoing awareness that inclusion of these categories in the USML was diverting State's resources from those activities most focused on advancing the national security and foreign policy of the United States by requiring the use of resources to regulate defense articles of low importance to national security.  *See id.*  ¶ 100.  State obtained concurrence from the Department of Defense in this decision, and the adoption of State's final rule completes the cycle of creating a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses State's resources on those items most critical to national security.  *See id.* at ¶¶ 38, 40.

State received more than 3,000 comments in response to its NPRM, including numerous comments related to 3-D firearms files.  *See* Miller Decl. ¶ 51.  Commerce also received numerous comments related to 3-D firearms files.  Given that the domestic distribution of such files is unregulated by the federal government, the comments generally focused on the same concerns raised by Plaintiffs in *In re DD Settlement, i.e.,* the possible impacts if a change in export controls led to greater domestic dissemination.[8]  *See* 85 FR 3822; Miller Decl. ¶ 51; Borman Decl. ¶¶ 32, 38.  In light of, *inter alia,* such comments from the public and Congress, public direction received from the President, and the concerns expressed by Plaintiffs previously, State and Commerce engaged in discussions regarding how to treat 3-D firearms files in the final rules.  Miller Decl. ¶¶ 63-66, 72-73.  This led to the amended definition of "published" in Section 734.7 of the EAR to maintain jurisdiction over software and

---

[8] In *In re DD Settlement*, many of these same Plaintiffs challenged the substantive provisions of the settlement agreement arrived at in *DD I*, background on which is provided in DAS Miller's declaration.  *See* Miller Decl. at ¶¶ 41-58.  For the reasons explained in its briefs in *In re DD Settlement*, the United States does not agree with this Court's conclusions in that case.  However, as explained in this brief, this Court can and should reach the results urged here by Defendants even if it accords the decision in *In re DD Settlement* substantial weight in how it approaches the issues currently presented.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

technology related to 3-D printing of certain firearms.  That provision will read:

> The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

85 FR 4172.

As a result, under the Commerce Rule, a license is required to post on the Internet 3-D printing files for items described in ECCN 0A501, *i.e.*, the firearms being transferred to the CCL, and no EAR license exceptions would authorize such files to be posted without a license.  *See* Borman Decl. ¶ 45.

The Rules—which Plaintiffs seek to enjoin in their entirety—transfer not only regulatory authority for 3-D firearms files, but authority to regulate all types of non-automatic, small caliber firearms themselves, as well as all other types of technical data associated with those arms.  The Rules leave in Categories I, II, and III of the USML only those items that State and other agencies have determined provide a critical military or intelligence advantage.  The Rules were published in the Federal Register on January 23, 2020, with a scheduled effective date of March 9, 2020.

### STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as . . . there is a likelihood of irreparable injury and . . . the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citations omitted).  Plaintiffs bear the burden of demonstrating that each of the four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

**ARGUMENT**

I.   **There Is No Likelihood of Success on the Merits Because Plaintiffs' Challenge to Export Control Decisions Is Not Reviewable.**

    A.   **The Rules Are Exempt From the APA.**

        1.   **The Commerce Rule is Exempt from the APA's Notice-and-Comment and Other Requirements.**

Plaintiffs bring claims solely under the APA. *See* Mot. for Prelim. Inj. 10-21, ECF No. 55 ("Mot."); First Am. Compl. at pp. 85-90, ECF No. 54. However, Commerce's ECRA "functions . . . shall not be subject to §§ 551, 553 through 559, and 701 through 706 of Title 5," *i.e.*, the APA and its judicial review provisions. 50 U.S.C. § 4821. In other words, actions taken pursuant to ECRA are exempt from the APA.[9] Plaintiffs therefore cannot challenge the Commerce Rule as a violation of the APA's notice-and-comment procedures, as arbitrary and capricious under the APA, or as contrary to law under the APA, because such claims arise under provisions from which Congress has specifically excepted Commerce's actions in ECRA's text. Nor can Plaintiffs obtain judicial review of the Commerce Rule under the APA at all, because Congress has specifically excepted Commerce's ECRA actions from the APA's judicial review procedures, including 5 U.S.C. § 706. *See id.*[10]

        2.   **The State Rule is Exempt from the APA's Notice-and-Comment and Other Requirements.**

"The administration of the AECA is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the APA and is thereby expressly exempt" from the provisions of the APA that Plaintiffs seek to enforce in this action. 22 C.F.R. § 128.1; *see* Miller Decl. ¶ 9; 5 U.S.C. §§ 553(a), 701(a)(2); *see also* 61 FR 48831 (Sept. 17, 1996). The applicability of this exemption is explicitly set forth in State's NPRM, *see* 83 FR 24198, as it has been in the numerous similar NPRMs issued over the last decade to carry out the ECR initiative. *See* Miller Decl. ¶ 37 (explaining that such NPRMs reflect State's "discretionary authority to inform regulated parties and the public about Department actions"). Plaintiffs cannot enforce that which does not apply.

---

[9] Reviewing a similar provision in ECRA's predecessor statute, the Ninth Circuit explained that it "explicitly excluded from judicial review and from the protections of the APA," "all functions exercised under the" statute. *U.S. v. Bozarov*, 974 F.2d 1037, 1039 (9th Cir. 1992).

[10] ECRA became law on August 13, 2018, nearly 3 months after the Commerce NPRM issued. Congress is thus presumed specifically aware of the Commerce Rule, and this timing serves as strong evidence that Congress intended to bar judicial review of claims like those raised by Plaintiffs in this action.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

In nearly-identical form, this regulation has been part of State's regulations since shortly after the enactment of the AECA's predecessor, the Mutual Security Act of 1954 ("MSA"), *see* Pub. L. No. 83-665, 68 Stat. 832, 848, which resulted in the first USML in 1955. For example, State explained in 1955 that its actions related to the administration of the USML are "excluded from the operation of the APA." *See* 20 FR 6250, 6256 (Aug. 26, 1955) (22 C.F.R. § 75.195 (1955)); 22 FR 11107, 11024 (Dec. 31, 1957). Thus, that the USML is a military or foreign affairs function exempt from the APA has been established for 65 years, since the USML was created, and nearly as long as the APA has existed.[11] Congress has repeatedly ratified that interpretation by re-enacting the MSA, enacting the AECA, and then re-enacting the AECA without substantial change. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). On its face, § 128.1 exempts State from the APA in its actions to issue the State Rule.

### 3. The State Rule is Exempt from Judicial Review under the APA.

In Section 2778(h) of the AECA, Congress specified that "[t]he designation . . . in regulations issued under this section, of items as defense articles or defense services for purposes of this section *shall not be subject to judicial review*." 22 U.S.C. § 2778(h) (emphasis added). The language of Section 2778(h) clearly and unambiguously precludes the APA review of the regulations that Plaintiffs seek to have the Court undertake here. Section 2778(h) reflects Congress's recognition that "regulations issued under" the AECA are an appropriate method by which the Executive Branch can update the listings on the USML, and that, once such regulations are issued, they should not be reviewed by courts at all. Courts have read this provision broadly, to preclude not only review of determinations found "in regulations," but other USML decision-making "as well." *Karn v. Dep't of State*, 925 F. Supp. 1, 6-7 (D.D.C. 1996) (rejecting argument that "the Court should construe this provision . . . narrowly"); *accord Def. Dist. v. Dep't of State* ("*DD II*"), 838 F.3d 451, 465 (5th Cir. 2016) (Jones, J., dissenting) ("Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing]

---

[11] The current version of 22 C.F.R. § 128.1 was promulgated by 61 FR 48831 (Sept. 17, 1996). Prior to that, the antecedent section read almost identically. *See* 58 FR 39320 (July 22, 1993)). And the version before that, dating to 1984, read that "functions conferred by section 38 of the AECA are excluded from 5 U.S.C. [§§] 553 and 554," 49 FR 47706 (Dec. 6, 1984)), as did the very first regulations after enactment of the AECA. *See* 42 FR 42853 (Aug. 25, 1977)). During that time, Congress amended § 2778 twenty-one times, never once disagreeing with the agency's interpretation that administration of the AECA falls within the APA's military and foreign affairs exemption, and even adding the exemption from judicial review under § 2778(h) in 1989.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1    . . . items as defense articles or defense services") (citations omitted).

2        That Congress intended to bar judicial review of claims like those brought by Plaintiffs—

3    asserting that State, not Commerce, should regulate exports of certain items—is further confirmed by

4    the provision's legislative history.  Senators explained that the legislation of which § 2778(h) was a part

5    was "designed to combat international terrorism and further the national security and foreign policy

6    interests of the United States." 135 Cong. Rec. 31346 (1989) (remarks of Sen. Riegle).  In a discussion

7    of an amendment to § 2778(h), Senator Riegle elaborated that Congress sought to ensure that

8    "whether an item should be on the munitions list or the commodity control list [is] settled among the

9    administering agencies and ultimately the President." *Id.*  And Senator Kerry further explained that

10   the statute "broadens the President's discretion" while "holding him to a reasonable standard of

11   accountability *to Congress.*" 135 Cong. Rec. 31347 (emphasis added); *see* 22 U.S.C. § 2778(f) (providing

12   for 30 days of review by Congress prior to publication of changes in the USML).  The text and history

13   of § 2778(h) make clear that Plaintiffs' proper recourse for disagreements about whether State or

14   Commerce should regulate exports is through the political branches, not this Court.

15       Plaintiffs do not address § 2778(h) in their filings, but to the extent they may contend that the

16   decision in *In re DD Settlement* should be read to hold that § 2778(h) does not apply here, that would

17   read the Court's prior decision far too broadly.  As noted, *In re DD Settlement* presented only questions

18   about the "temporary removal" of specific files from the USML pursuant to a settlement agreement,

19   not the wholesale promulgation of future USML categories, like those set forth in the State Rule.  *See*

20   *supra* n.8.  Further, Plaintiffs in *In re DD Settlement* did not challenge "regulations issued under" the

21   AECA, and thus, their challenge fell outside the plain-text scope of § 2778(h); *see U.S. v. Pulungan*, 569

22   F.3d 326, 328 (7th Cir. 2009) (placing weight on the phrase "in regulations" to limit § 2778(h)).  To

23   the extent the court in *In re DD Settlement* reached any broader conclusion about the application of §

24   2778(h), that conclusion could only be dicta. Significantly, the United States did *not* take the position

25   in *In re DD Settlement* that § 2778(h) barred review, and so the Court in that case did not have the

26   benefit of Government briefing on that question.  *See In re DD Settlement* at *5 (noting that its discussion

27   of § 2778(h) responded to "private defendants['] argu[ment]").  The current case arises in a markedly

different posture: Plaintiffs' challenge is to "regulations issued under [the AECA]" and thus plainly falls within the text of the statutory review bar in § 2778(h), even in its narrowest interpretation.

Moreover, the Court in *In re DD Settlement* did not have before it a challenge to an actual regulation, allowing the Court to posit that the "removal of an item from the USML" might be an agency action distinct from a "designation . . . in regulations." *Compare In re DD Settlement* at *5 *with* 22 U.S.C. § 2778(h). No such distinction exists here. Plaintiffs specifically seek to enjoin 22 C.F.R. § 121.1, the USML, Categories I, II, and III, as it will read on the effective date of March 9, 2020. That regulation plainly constitutes a revised "designation . . . of items as defense articles," and thus, the statute explicitly precludes the judicial review Plaintiffs seek. Relatedly, as the *In re DD Settlement* opinion explained, Plaintiffs challenged a "temporary modification" designating certain files as outside of the USML and the Court was able to conduct its analysis in *In re DD Settlement* by reviewing "whether the agency complied with clear procedural requirements," *i.e.*, whether the Government had provided required notice to Congress, and *whether* or not it had "considered [statutory] factors." 2019 WL 5892505 at *5. Here, by contrast, Plaintiffs attack the substance of Defendants' decisions, contending that the Rules "threaten U.S. national security, U.S. foreign policy interests, or international peace and stability," Mot. at 9, and § 2778(h) precludes judicial review of such a claim.

**B.    Plaintiffs' Claims Present a Non-Justiciable Political Question.**

It is well-established that "executive discretion" under "the purpose of the [AECA] . . . to maintain and foster . . . international peace and security" presents a "non-justiciable" political question. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982, 984 (9th Cir. 2007); *id.* at 980 ("[D]isputes involving political questions lie outside of the Article III jurisdiction of federal courts"). The Ninth Circuit has also squarely held that there are "no meaningful standards of judicial review" that can be applied to decisions about the contents of the USML and CCL, and that such decisions are political questions for this reason as well. *United States v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990). As the Ninth Circuit explained, these decisions turn on "such things as whether the imposition of export controls would be detrimental to the foreign policy or national security interests of the United States," as well as "whether the export of a given commodity would make a significant contribution to the military

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

potential of other countries." *Id.* These "are quintessentially matters of policy entrusted by the Constitution to the Congress and the President," and courts therefore have no jurisdiction to review them. *Id.* at 1223; *see also United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1473 (9th Cir. 1988), *cert. denied*, 493 U.S. 809 (1989); *accord United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) ("No satisfactory or manageable standards exist for judicial determination of . . . [t]he question" of "whether a particular item should have been placed on the Munitions List"). District courts in this Circuit and elsewhere have not hesitated to follow this controlling precedent. *See, e.g.*, *United States v. Helmy*, 712 F. Supp. 1423, 1430 (E.D. Cal. 1989); *United States v. Alavi*, No. 07-CR-429, 2008 WL 1989773 (D. Ariz. May 5, 2008) ("Whether a specific item is on the CCL is a political question delegated exclusively to the Department of Commerce"); *United States v. Hudak*, No. 02-CR-1574 (D.N.M. Oct. 8, 2003) ("the determination of which items should be subject to the export controls contained in the ITAR involves policy . . . foreign affairs and national security . . . political questions that are incapable of resolution by any judicially discoverable or manageable standard"); *Karn*, 925 F. Supp. 11 ("The Court will not scrutinize the President's foreign policy decision" regarding whether "proliferation of cryptographic [software] will harm the United States"); *United States v. Moller-Butcher*, 560 F. Supp. 550, 554 (D. Mass. 1983) ("Whether particular items make a significant contribution to a country's military potential and hurt our own national security is the quintessential political question").

Plaintiffs here present a political question thrice over. *First*, it is well settled that when the Constitution makes a "textually demonstrable commitment" of an issue to a branch of the government other than the judiciary that issue presents a non-justiciable political question. *Baker v. Carr*, 369 U.S. 186, 217 (1962). *Second*, a question is political and exceeds "the constitutional limitations of a court's jurisdiction" if there is "a lack of judicially discoverable and manageable standards for resolving it." *Corrie*, 503 F.3d at 980; *see Nixon v. United States*, 506 U.S. 224, 228 (1993). *Third*, a political question exists when the challenge presents "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Corrie*, 503 F.3d at 980. Because "[t]he question whether a particular item" belongs on the USML "possesses nearly every trait that the Supreme Court has enumerated traditionally renders a question 'political'," there is no jurisdiction to

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1    hear Plaintiffs' claims.  *Martinez*, 904 F.2d at 602.

2        Plaintiffs are explicit in their attempt to present this Court with a political question in requesting

3    that this Court find that the Rules do not "further[] 'world peace and the security and foreign policy

4    of the United States.'"  Mot. at 18 (quoting provisions of the AECA).  *Corrie* and *Martinez* make clear

5    that this Court may not hear such claims, consistent with the Ninth Circuit's repeated holdings that

6    "the conduct of foreign relations is committed by the Constitution to the political departments of the

7    Federal Government," and that "the propriety of the exercise of that power is not open to judicial

8    review." *Mingtai Fire & Marine Ins. Co. v. UPS*, 177 F.3d 1142, 1144 (9th Cir. 1999); *accord Earth Island*

9    *Inst. v. Christopher*, 6 F.3d 648, 652 (9th Cir. 1993) ("the foreign affairs function . . . rests with the

10   exclusive province of the Executive Branch under Article II, section 2 of the United States

11   Constitution"); *Jaber v. U.S.*, 861 F.3d 241, 246 (D.C. Cir. 2017) ("matters of foreign policy or national

12   security [are] constitutionally committed" to the discretion of the political branches). Plaintiffs have

13   "call[ed] into question the prudence of the political branches" in a "matter[] of foreign policy or

14   national security," *Repub. of Marshall Islands v. U.S.*, 865 F.3d 1187, 1201 (9th Cir. 2017) (quoting *El-*

15   *Shifa Pharm. Indus. v. U.S.*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc)), and, thus, the political

16   question doctrine bars judicial review.  Further, resolution of the merits of whether export control

17   regulations are sufficiently effective would transgress on the exclusive power to regulate imports and

18   exports textually committed by the Constitution to Congress.[12]  This textual commitment includes

19   the express authority to overrule State "inspection Laws" regarding imports and exports, such as those

20   implicated by Plaintiffs' claims that 3-D firearms files, once exported, will re-enter their borders and

21   damage the enforcement of their state laws.  U.S. Const. art. I, § 10.

22       Although *In re DD Settlement* concluded that jurisdiction over that case was not barred as a

23   political question, that case again did not involve a challenge to the wholesale promulgation of listings

---

24   [12] *See* art. I, § 8, cl. 1 ("Congress shall have Power to lay and collect . . . Duties"); *id.* § 10 ("No State shall,
     without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports," and such duties and
25   State "inspection Laws" regarding imports and exports "shall be subject to the Revision and Controul of the
     Congress"); art. I, § 9 (prohibiting Congress from imposing a duty . . . on Articles exported from any State").
26   Collectively, these provisions make clear that, in a federal system comprising separate sovereigns and
     branches of Government, it is Congress that has been given final authority over laws and taxes governing
27   imports and exports.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

of items to be controlled on the USML and CCL, as the challenged Rules do here.  *See supra* Part I.A.3.

In this action, Plaintiffs attack the substance of State and Commerce's determination that "world peace," "national security," and "foreign policy," *see In re DD Settlement* at *8, are best advanced by focusing State's enforcement efforts on items of critical military and intelligence advantage, and Commerce's enforcement efforts on items that are commercially available in the United States.  *See* 85 FR at 3820; 85 FR at 4136.  The Court cannot reach the conclusion urged by Plaintiffs, that the Rules "threaten U.S. national security, U.S. foreign policy interests, or international peace and stability," Mot. at 9, without making "policy choices and value determinations . . . not subject to judicial review." *Mandel*, 914 F.2d 1222.

### C.   Plaintiffs Fall Outside the Zone of Interests of the AECA and ECRA.

Plaintiffs also fall outside the zone of interests of the AECA and ECRA.  While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012); *see Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) (court examines whether 'a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit.'" (citation omitted)); *see generally Patchak v. Salazar*, 632 F.3d 702, 704 (D.C. Cir. 2011).  While Plaintiffs summarily assume that *In re DD Settlement* establishes that they are "within the AECA's zone of interests," Mot. at 8, respectfully, *In re DD Settlement* incorrectly analyzed the question.  Plaintiffs' interests are to be measured against "the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).  Instead, the court in *In re DD Settlement* analyzed whether the "impacts" identified in briefing in *DD I* "would likely arise within the United States."  *In re DD Settlement* at *4.  This analysis misses the point.  The AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States," *U.S. v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012); *see U.S. v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989) (the AECA "is designed to protect against the national security threat created by the

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1    unrestricted flow of military information abroad"). It "cannot reasonably be assumed that Congress

2    intended to permit" a lawsuit by States second-guessing the President's determinations about world

3    peace, national security, and foreign policy. *Pottawatomi* at 225.

4         Plaintiffs likewise fall outside the zone of interests protected by ECRA, which effectuates "the

5    policy of the United States . . . to restrict the export of items which would make a significant

6    contribution to the military potential of any other country . . . [or] if necessary to further significantly

7    the foreign policy of the United States," 50 U.S.C. § 4811(1), policies which are not the States' to

8    enforce. *See People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within

9    zone of interest of the Base Closure Act, because, as here, the state "is not the subject of the . . .

10   action" and "states have no constitutional or statutory role in federal military policy").

11       **D.    Plaintiffs Also Lack Article III Standing To Challenge The Rules.**

12       The "irreducible constitutional minimum of standing" has three elements: that a plaintiff suffer

13   a concrete injury-in-fact, that the injury be fairly traceable to the challenged action of the defendant,

14   and that it be likely (as opposed to speculative) that the injury will be redressed by a favorable decision.

15   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs lack a cognizable injury and their alleged

16   injuries, even if cognizable, are not traceable to Defendants.

17       As to the requirement of a concrete injury-in-fact, Plaintiffs claim to assert the "same" theories

18   of standing as in *In re DD Settlement*, *see* Mot. at 8, which involved purported injuries to their sovereign,

19   proprietary, and quasi-sovereign interests. *See In re DD Settlement*, ECF No. 43 at 7. But Plaintiffs fail

20   to carry their burden with respect to each of these theories. Under the sovereign interest rubric,

21   Plaintiffs in *In re DD Settlement* claimed these involved their "abilities to enforce their statutory codes,"

22   their "border integrity," and their "ability to protect their residents from injury and death." *Id.* at 8.

23   However, neither the removal of firearms files from State's export-control authority, nor Commerce's

24   exercise of authority over such files, prevents States from exercising or enforcing their own laws to

25   protect their residents. Indeed, 3-D firearms files are currently available on the Internet, *see* Miller

26   Decl. ¶¶ 86, 88(c), and the *domestic* distribution (*i.e.*, between U.S. persons within the U.S.) of firearms

27   files is not an export and is thus permitted under the ITAR. *See* Miller Decl. ¶ 19; *accord Def. Distributed*

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1   *v. State ("DD I")*, 121 F. Supp. 3d 680, 695 (W.D. Tex. Aug. 4, 2015) (anyone may "free[ly] . . .

2   disseminat[e] the computer files at issue domestically in public or private forums").  What is more,

3   based on a review of Plaintiffs' declarations describing their State laws, no State Plaintiff appears to

4   have adopted its own law prohibiting its residents from creating or possessing 3-D firearms files. A

5   claim that a change to the regulation of *exports* will shatter the systems the States currently use to

6   address whatever threats *already* exist from 3-D firearms files cannot reasonably be credited.[13]

7        Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign interests.  In *In

8   re DD Settlement*, Plaintiffs alleged they suffered proprietary injury because the 3-D firearms files at

9   issue therein could "make state, county, and municipal jails and prisons more dangerous for guards

10  and inmates."  ECF No. 43 at 8.  But these injuries were based on the specific claim that the

11  *particular files* at issue in *In re DD Settlement* would produce undetectable firearms.  No particular set of

12  files is at issue here.  Moreover, despite the unlimited domestic distribution of 3-D firearms files,

13  Plaintiffs have not pointed to any evidence that such files have been used by wrongdoers to produce

14  undetectable firearms in violation of federal law (or applicable state laws), let alone to smuggle such

15  arms into prisons.  They have thus not articulated a "concrete" injury to proprietary interests.  *See*

16  *Lujan*, 504 U.S. 560; *Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state asserting injury to

17  its proprietary interest is "subject to the same law of standing as any other party in federal court").

18  As to quasi-sovereign interests, Plaintiffs' assertions in *In re DD Settlement* involved an alleged harm

19  to "the safety and physical well-being of the States' residents."  *In re DD Settlement*, ECF No. 43 at 9.

20  This type of injury falls squarely within the *parens patriae* doctrine, *see Wash. v. Chimei Innolux Corp.*,

21  659 F.3d 842, 847 (9th Cir. 2011), and it is well established that a state "does not have standing as

22  *parens patriae* to bring an action against the Federal Government."  *Sierra Forest Legacy v. Sherman*, 646

23  F.3d 1161, 1178 (9th Cir. 2011); *see also Mass. v. Mellon*, 262 U.S. 447, 485-86 (1923).

24        Plaintiffs also assert that *In re DD Settlement* is persuasive authority for standing here, alleging

---

25  [13] Further, for many of the harms identified by Plaintiffs, such as the acquisition of firearms by felons or
26  the creation of "undetectable" firearms, the federal government is committed to vigorously enforcing federal
    prohibitions on such persons and such arms (*see, e.g.*, 18 U.S.C. § 922(g), (p)) as it does now, *i.e.*, regardless of
27  whether such weapons are manufactured at home using conventional techniques, acquired from others, or
    created with 3-D printers.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

that "[n]othing has changed." Mot. at 8.  Not so.  Plaintiffs there argued at the preliminary injunction

stage that the *In re DD Settlement* court should employ a "relaxed" traceability analysis based on the

"possibility that . . . relief will prompt . . . reconsider[ation] of the decision" by the agency.  *See In re*

*DD Settlement*, ECF No. 43, at 7 (quoting *Mass. v. EPA*, 549 U.S. 497, 518 (2007)).[14]  In turn, this

became the court's principal analysis on standing.  *See In re DD Settlement*, 318 F. Supp. 3d 1247, 1255-

56 (W.D. Wash. 2018) (preliminary injunction holding that compliance with congressional notice

requirement and other procedures may "generate . . . regulations . . . necessary to address the regulatory

void" for firearms files); 2019 WL 5892505 at n.4 (affirming standing ruling).  Now that the agency

has reconsidered its decision and adopted a rule that explicitly addresses the regulatory void that *In re*

*DD Settlement* identified, the reasons for applying a relaxed traceability analysis no longer apply.

Further, the speculative chain required for Plaintiffs here to suffer their alleged harms is both

longer and less plausible than in *In re DD Settlement*.  There, the required steps involved a malfeasor

determining that a 3-D printed firearm would better serve his needs than a firearm acquired

elsewhere;[15] acquiring a 3-D printer; visiting a website to download files; properly constructing a

firearm (in violation of law, if that person were a felon or other prohibited person); and then using

that firearm to commit a crime.  This series of events "rest[s] on speculation about" a lengthy chain

of "decisions of independent actors," for which there is no standing, although the court disagreed.

*Clapper v. Amnesty, Int'l*, 568 U.S. 398, 414 (2013).  In the current case, that chain has grown even more

speculative and attenuated because, unlike in *In re DD Settlement* (where the government had authorized

Internet publication of specific files), Plaintiffs now must rely on an independent actor circumventing

Commerce's efforts to restrict exports before even beginning the previous chain of events.  *Compare*

*In re DD Settlement*, ECF No. 43 at 8 *with* Mot. at 9.  Here, before even getting to the series of steps in

*In re DD Settlement*: 1) someone must transmit firearms files to a foreign person; 2) that person must

upload the plans to the Internet; and 3) a malfeasor must select those plans—and not any of the

---

[14] Defendants disagree that *Mass. v. EPA*, 549 U.S. 497 (2007) "relax[es]" traceability, as it discusses only "immediacy" and "redressability," *compare In re DD Settlement*, ECF No. 43, at 7 *with Mass.*, 549 U.S. at 517-18, but admit that the Ninth Circuit has held otherwise. *See CBD v. Mattis*, 868 F.3d 803, 817 (9th Cir. 2017).

[15] *I.e.*, purchased lawfully from a firearms dealer, unlawfully on the street, or manufactured at home using widely-disseminated, conventional techniques.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

numerous files already published on the Internet—for download.  These additional "decisions of independent actors" extend the causal chain beyond the breaking point.  *Clapper*, 568 U.S. 414.[16]

## II.    Even if Plaintiffs' Claims Can Be Reviewed, There Is No Likelihood of Success under the APA.

Plaintiffs' merits challenges involve second-guessing the determinations of the political branches with regard to policies concerning foreign policy, national security, and world peace.  As explained above, jurisdiction over such suits is barred by the political question doctrine, explicit statutory bars on review, and the lack of standing.  However, Plaintiffs' APA claims also fail on their merits.

### A.    Plaintiffs' Arguments Are Based on Misunderstandings of ITAR and the EAR.

Plaintiffs' APA claims all arise out of the same  "misunderstanding of the relevant ITAR and EAR export controls and their practical consequences," *i.e.*, Plaintiffs' mistaken view that the State and Commerce Rules "effectively deregulate" firearms files, particularly the files that Defense Distributed sought to publish and that were the subject of prior litigation.  Miller Decl. ¶ 77; Borman Decl. ¶ 49.  To the contrary, as DAS Miller explains, "[t]o the extent the Department of State was able to control the publication of such files, the Department of Commerce will be able to control their publication as effectively."  Miller Decl. ¶ 85; *see id.* ¶ 77.  The major errors in Plaintiffs' understanding are set forth below.

- Plaintiffs misread the relative scope of the EAR's exemptions of "published" information and the ITAR's exemption of "public domain" information.  Plaintiffs conclude that the exemption to the EAR for "published" material reflects a substantial change from the ITAR, asserting that even published files "could not be freely exported" prior to the new Rules.  *See* Mot. at 6, 8.  But the ITAR contains "significant exclusions" and exempts a swath of "public domain" information comparable to "published" material under the EAR from export controls.  Miller Decl. ¶ 14. For example, "posting on the Internet 'information that is in the public domain' is not an export of technical data controlled under the ITAR,'" *id.* ¶ 20.  Read as a whole, the ITAR "public domain" exceptions in 22 C.F.R. § 120.11 dovetail closely with the EAR "publication" exceptions in 15 C.F.R. § 734.7.  *See id.* ¶¶ 78-82;

---

[16] Plaintiffs' apparent alternative theory, that someone may publish firearms files in another medium (*e.g.*, in a library or at a trade show), those files are subsequently placed on the Internet, and then a malfeasor in a Plaintiff State chooses those files rather than others for download, is no less indirect.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

Borman Decl. ¶ 49(b)(i)-(iii).  That is understandably so, as any such regulations are written with the First Amendment as a backdrop.  *See* Miller Decl. ¶ 78; Borman Decl. ¶ 49(f)(i); *Stagg, P.C. v. Dep't of State*, 354 F. Supp. 3d 448, 463-64 (S.D.N.Y. 2019), *reconsideration denied* 2019 WL 1863418; *but see DD II*, 838 F.3d at 468-69 (Jones, J., dissenting) (rejecting argument that ITAR controls on 3-D firearms files satisfy First Amendment).  Application of the post-Rule "published" exception in the EAR to 3-D firearms files—including new 15 C.F.R. § 734.7(c), which addresses the main difference between the two regimes—will reflect little change from the status quo of regulation under the ITAR.

- Plaintiffs misapprehend the functioning of new 15 C.F.R. § 734.7(c) with respect to the specific files at issue in <u>In re DD Settlement</u>.  Plaintiffs contend that provision will treat as "published" the prior posting of files by Defense Distributed on the Internet (a temporary posting that ceased after the ruling in *In re DD Settlement*).  *See* Mot. at 9.  However, under § 734.7(c), such "posting on the internet" does *not* make a file "published," including as to the specific files at issue in *In re DD Settlement*.  *See* 85 FR at 4172; Borman Decl. ¶49(a)(i)-(ii).  As DAS Miller explains, "the Department of Commerce effectively closed" any gap between ITAR and EAR treatment of files posted on the Internet by adopting 15 C.F.R. § 734.7(c).  Miller Decl. ¶ 79.

- Plaintiffs wrongly contend that EAR jurisdiction over 3-D firearms files is limited to Internet postings.  Plaintiffs suggest that "a company like Defense Distributed could advertise the availability" of firearms files, and then "email the files to any foreign individual or organization that requests them."  Mot. at 7.  However, "Commerce will maintain jurisdiction over Defense Distributed's files that were controlled under the ITAR," Borman Decl. ¶ 49(a)(ii).  Further, all "'technology' [such as 3-D firearms files] 'required' for the 'development' or 'production'" of firearms transferred to Commerce control under ECCN 0A501 will be controlled under ECCN 0E501, providing controls "equivalently effective as the existing ITAR controls" over technical data.  Miller Decl. ¶ 87; *see* 85 FR at 4185.  Commerce's EAR jurisdiction extends to transfers "via email, direct file transfer, or transfer via a physical hard drive," and continues as to U.S. origin-items even after they have been transferred and re-transferred internationally, belying Plaintiffs' conclusions that such transfers would be unregulated.  Borman Decl. ¶ 49(a)(iii), (c)(i), (c)(ii).

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

- Plaintiffs incorrectly conclude the EAR's "ready for insertion" language in § 734.7(c) defines a category narrower than under past ITAR regulation. Plaintiffs' motion assumes the ITAR regulates, but the EAR does not regulate, the Internet posting of firearms files apart from those "ready for insertion into a 3D printer." Mot. at 10. As DAS Miller explains, however, the EAR's treatment of 3-D firearms files in § 734.7(c) closely resembles State's treatment of Defense Distributed's 3-D firearms files under the ITAR, where State determined that only Defense Distributed's "files that could be used to automatically generate defense articles" as subject to ITAR jurisdiction, Miller Decl. ¶ 44, a reasonable choice that regulated only Defense Distributed's "functional" 3-D firearms files, consistent with First Amendment principles. *See* Miller Decl. ¶ 78; Borman Decl. ¶ 49(d), (e); *Universal City Studios v. Corley*, 273 F.3d 429, 445-452 (2d Cir. 2001) ("The functionality of computer code properly affects the scope of its First Amendment protection"); *Bernstein v. DOJ*, 176 F.3d 1132, 1141-42, 1145-46 (9th Cir. 1999), *withdrawn* 192 F.3d 1308 (9th Cir. 1999).[17] 15 C.F.R. § 734.7(c) reasonably takes into account the same First Amendment principles.

Plaintiffs also neglect that the "ready for insertion" language is tailored to provide Commerce with flexibility to reflect the fact that "the underlying technology[,] software, . . . [and] devices used for production may evolve." Borman Decl. ¶ 49(e). Contrary to Plaintiffs' assertion, the plain text of that language does *not* exclude Commerce from regulating files that can be automatically "converted to a readable format using readily available 3D-printing software." Mot. at 10. Thus, there is little difference between the two regulatory regimes in this regard. *See id.*; Miller Decl. ¶ 84.

- Plaintiffs incorrectly "conflate stringency with effectiveness" in their assessment of export controls over 3-D firearms files. Miller Decl. ¶ 85. Contrary to what Plaintiffs implicitly assume, and even if Plaintiffs were correct that there is an appearance of "slightly more stringent" export controls over 3-D firearms files under the ITAR, *id.*, that does not mean that EAR export controls will be less effective. Plaintiffs fail to recognize that State necessarily concentrates its enforcement efforts on

---

[17] Beyond the context of functional 3-D firearms files, information related to the manufacture of the firearms and components being transferred from the USML to the CCL is publicly available and has been widely disseminated, including through published books and magazines, materials found in most public libraries, information readily located at trade shows, and basic academic and engineering research. *See* 85 FR at 4140.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

violations that pose the greatest potential to harm U.S. national security or foreign policy, and so enforcement efforts related to 3-D firearms files have been "rare."  Miller Decl. ¶ 86.  In contrast, Commerce has robust enforcement resources, including over 136 BIS enforcement special agents who will engage in enforcement with respect to its final Rule after it goes into effect.  *See* Decl. of Deputy Ass't Sec'y of Commerce Douglas Hassebrock ("Hassebrock Decl.") ¶ 26.

In sum, Plaintiffs' entire case turns on their attempt to contrast State's past regulation of 3-D firearms files with Commerce's prospective regulation of such files, but their arguments stem from misinterpretations, and not any material differences in the two regulatory regimes.[18]  As a result, even if Commerce or State had violated the APA in some way, there would be no "prejudicial error," because the agencies would simply have explained the errors in Plaintiffs' analysis.  5 U.S.C. § 706; *see WildEarth Guardians v. Provencio*, 923 F.3d 655, 678 (9th Cir. 2019).[19]

**B.    The Rules Do Not Violate the APA's Notice-and-Comment Standards**.

Even if Section 553 of the APA applied to the State and Commerce Rules—it does not—Plaintiffs are demonstrably wrong in arguing that State's NPRM did not provide "meaningful notice" of the transfer of export authority over 3-D firearms files from State to Commerce.  Mot. at 12.  First, "the number of comments and content . . . received [make] apparent that commenters understood that as a result of the May 2018 NPRMs, [3-D firearms files] posted on the Internet would not be subject to export controls" following issuance of final rules.  Miller Decl. ¶ 51.  Thus, the actual comments received demonstrate that commenters did have meaningful notice.  *See Leyse v. Clear Channel Broad., Inc.*, 545 Fed. App'x. 444, 454 (6th Cir. 2013) ("comments that address the issue resolved in the Final Rule provide evidence that the notice was adequate"); *Neighborhood Assistance Corp. of Am. v. CFPB*, 907 F. Supp. 2d 112, 125 (D.D.C. 2012) ("[T]he volume and substance of the

---

[18] In their Reply, Plaintiffs may continue to contend erroneously that State and Commerce's regulatory regimes should be understood differently.  However, in matters "which involve foreign policy and national security, [courts] are particularly obliged to defer to . . . agencies['] interpret-[ations] [of] their governing law and regulations." *Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999).  Such deference extends well beyond the *Auer* deference—providing that agencies' "construction of their own regulation . . . govern[s] unless plainly erroneous—that would limit the Court's inquiry outside the national security and foreign policy context. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2409, 2414-18 (2019).

[19] Any failure of notice affecting the receipt of comments from the amicus is harmless for the same reason, given that their brief, ECF No. 80, repeats Plaintiffs' errors of analysis.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

comments support the . . . contention that notice was indeed adequate."). State's Rule includes nearly three full-page columns (and Commerce's Rule, eight full-page columns) of text describing (and addressing) comments received about 3-D printing of firearms and 3-D firearms files. *See* 85 FR at 3822-23, 4139-41.

State and Commerce responded to each major category of comments. State observed that many of the commenters focused on "use of these files in the United States," and properly noted that the AECA does not regulate domestic distribution of any type of defense article or its technical data. *See* 85 FR at 3822-34. State also engaged with Commerce, developed an understanding of the revisions being made to Commerce's Rule, and determined, in response to the comments, that the final Commerce Rule provided equivalently effective regulation of exports of 3-D firearms to the regulation State provided under the ITAR. *See* Miller Decl. ¶ 87.

Moreover, Commerce's Rule provides evidence that the public had meaningful notice of the combined regulatory effect of the two rules. As the Commerce Rule explains, the comments received "reflected the commenters' understanding of [the] differences between the ITAR and EAR control structures[, including] . . . many comments expressing concerns about 3D printing of firearms and whether appropriate controls would be in place under the EAR." 85 FR at 4140. For example, "[s]everal commenters cited [the] *Defense Distributed* . . . lawsuit" as an example of such regulation, while others expressed concern about "internet dissemination" of 3-D printing information. 85 FR 4140. Comments also addressed 3-D printing information in relationship to "U.S. efforts to counter proliferation" internationally. *Id.* Collectively, this wide array of comments about 3-D printing of firearms illustrate the "wide range of interested parties who read the proposed rule, saw the possibility of new [regulatory requirements], and wrote to the agency requesting them," which indicates that there was "no violation of the APA's notice and comment requirements." *Neighborhood Assistance Corp.*, 907 F. Supp. 2d at 125.

The structure of the USML and the scope of the State and Commerce Rules also belie Plaintiffs' claim that the NPRMs were improper because they failed to specifically single out 3-D firearms files. Neither Categories I, II, III, any other USML category, or the definition of "technical data" under the

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

USML make any reference to "3-D printing" or "3-D firearms files." Such technical data is regulated to reinforce the USML listing of the underlying firearms, and the USML does not even list particular brands or models of firearms. A rulemaking that listed every specific firearm or type of file being transferred to the CCL would be unwieldy, which is why the State Rule makes no mention of a .357 Magnum, an AK-47, an AR-15, or any specific type of technical data related to those arms as well.

Nor is this a case where the agencies should have known that the rulemaking courted controversy over 3-D firearms files and therefore singled out those files for discussion in the NPRMs, as Plaintiffs suggest, *see* Mot. at 11. Although State had contended from the start of the *DD I* litigation that neither the ITAR nor any other provision of federal law restricted distribution of 3-D firearms files within the United States, this occasioned no high-profile debate over whether to regulate the creation, possession, or distribution of such files inside the U.S., no successful effort to enact federal legislation to do so, and few efforts to enact legislation regulating such files even among the Plaintiff States. The agencies likewise did not single out for discussion specific models of firearms that incur public interest (*e.g.*, rifle models such as the AR-15) or other specific types of technical data, consistent with the fact that such specifics do not appear in the text of the USML.

In the alternative, Plaintiffs contend that the Commerce Rule violates the APA's notice-and-comment standards because Commerce's decision to add regulatory requirements to 3-D firearms files in the Commerce Rule is not a "logical outgrowth" of the NPRM.[20] However, the Commerce Rule "'is in character with the original proposal and a logical outgrowth of the notice and comments,' and was therefore validly promulgated." *Hodge v. Dalton*, 107 F.3d 705, 712 (9th Cir. 1997) (quoting *Rybachek v. EPA*, 904 F.2d 1276, 1288 (9th Cir. 1990). Indeed, as noted above, both State and Commerce received comments concerning 3-D firearm files, which shows that "a reasonable commenter should have anticipated" that the rules would affect regulation of 3-D firearms files. *First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). The APA "does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule." *California*

---

[20] Plaintiffs make no claim that the State Rule is not a "logical outgrowth" of the State NPRM. Nor could they. As Plaintiffs recognize, such a claim is limited to allegations that "a final rule . . . departs from a proposed rule," Mot. at 14-16, and the State Rule does not depart from the NPRM.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1   *Citizens Band Association v. United States*, 375 F.2d 43, 48 (9th Cir. 1967).  Rather, "[i]nformed changes

2   and distinctions are the very raison d'etre of the notice-and-comment period," *Rybachek*, 904 F.2d at

3   1288, which means "[a] new opportunity for comment is not generated every time the agency reacts

4   to comments that it receives."  *Hodge*, 107 F.3d at 712.  Agencies are entitled to adopt entirely new

5   regulatory subdivisions in response to comments and concerns—particularly when those form a minor

6   part of a larger regulatory scheme.  *See Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 421 (D.C. Cir.

7   1994) (subsection "added in response to comments" that "hence appeared for the first time in the

8   final rule" did not offend APA); *State of Ohio v. EPA*, 997 F.2d 1520, 1547 (D.C. Cir. 1993).

9       **C.   The Rules Are Not Arbitrary and Capricious**.

10      The State and Commerce Rules are the product of reasoned decision-making through a decade-

11  long process of focusing State's export control resources on protecting the articles and technologies

12  that are most critical to national security.  *See* Miller Decl. ¶¶ 32, 38, 88.  The Rules explain why the

13  new USML listings advance world peace, national security, and the foreign policy interests of the

14  United States.  *See* 85 FR at 3820, 3823.  The Rules also directly address the concerns raised in

15  comments to the NPRMs, as well as those raised in Plaintiffs' previous lawsuit, and explain, in light

16  of those comments and consultation between Commerce and State, that CCL control of 3-D firearms

17  files is consistent with the interests served by USML control of such files.  *See* 85 FR at 3821-23; Miller

18  Decl. ¶¶ 72, 75.  As noted above, Plaintiffs' claims rest largely on misinterpretations of the ITAR and

19  EAR regimes, and for these reasons, Plaintiffs' arbitrary and capricious claims are unavailing.

20      Plaintiffs first argue that the "agencies' approach is . . . not a rational one in light of their own

21  stated objectives," Mot. at 19, but this argument is of no moment.  The agencies' declarations and the

22  text of the rules explain that the transfer of regulation from State to Commerce is "necessary to better

23  focus" enforcement resources on "defense articles [that] offer a critical military or intelligence

24  advantage or . . . have an inherently military function" because such a focus is "in furtherance of world

25  peace and the security and foreign policy of the United States."[21]  85 FR 3820-21; *see* Miller Decl. ¶¶

26  _____

27  [21] The analysis supporting these statements also refutes Plaintiffs' claim that the agencies did not "consider
    . . . impacts" on world peace, national security, and foreign policy. Mot. at 21. For example, the State Rule
    specifically explains that: 1) State agrees with Commerce "that EAR controls on technology and software . . .

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

34, 75, 100-01. Plaintiffs' argument also fails to take into account the limited enforcement attention available by State for 3-D firearms files, and the fact that Commerce enforcement of the Rules will provide a marked increase in the available enforcement resources following the Rules' effective date. *See* Miller Decl. ¶¶ 85-87; Hassebrock Decl. ¶ 26 (highlighting the "136 BIS enforcement special agents" that would be added "to the existing list of law enforcement agents already responsible for enforcement of [export] controls" under the EAR). In light of these considerations and the relative scope of the EAR and ITAR regulations described above, State and Commerce reasonably concluded that "the new EAR controls over [3-D firearms files] that Plaintiffs seek to enjoin would be equivalently effective in regulating the dissemination of firearms files as the existing ITAR controls." Miller Decl. ¶ 99.

Plaintiffs also contend that Defendants have "abruptly reversed [] position" and abandoned their view that "unrestricted export" is not in the interests of the United States. This is certainly not the case—the text of the final rules makes clear that both State and Commerce have concluded that exports of 3-D firearms files *should* be regulated. Plaintiffs' argument rests entirely on their misapprehension of the operation of the ITAR and EAR, *see supra* Part II.A, and thus, their conclusion that the Rules "deregulate" such files is erroneous. Nor is it the case that the agencies did not "display awareness" of their prior positions. Mot. at 20. The Commerce Rule explicitly discusses the differences in the agency's thinking between "the time of the proposed rule" and the present, and credits the role of "commenters" and others for revisions to the Rule. 85 FR at 4141-42. The State Rule likewise describes the evolution of State's views, discussing whether small-caliber non-automatic arms "confer a critical military or intelligence advantage" as well as whether "maintaining controls . . . under the EAR remains in [U.S.] national security and foreign policy interests." 85 FR at 3823.[22]

---

sufficiently address the U.S. national security and foreign policy interests relevant to export controls." 85 FR at 3823. In making its determination, State specifically considered "the degree to which it would limit the ability of a foreign person to obtain" 3-D firearms files, as well as issues such as "unserialized" and "non-metallic" firearms. *Id.*; *see also* Miller Decl. at ¶ 88 (explaining that State specifically determined that the "proposed controls would facilitate the maintenance of global export control and non-proliferation regimes . . . to the extent feasible" and "would reassure other countries . . . that the United States is regulating exports" of 3-D firearms files).

[22] Plaintiffs contend that the "same record applies to this case" as applied in *In re DD Settlement*. Mot. at 20. To the contrary, the Final Rules establish that new decisions were made to adopt the Final Rules, *see* 85 FR at

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 27

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

1    For the same reason, the Rules are not "a backdoor way," Mot. at 18, of implementing the settlement

2    enjoined in *In re DD Settlement*.  To the contrary, the "settlement was explicitly designed not to prejudge

3    the content" of the final Rules.  Miller Decl. ¶ 55.

4            Finally, it is not the case that application of the "critical military or intelligence advantage" and

5    "inherently military" criteria is arbitrary or capricious.  In 2010, State announced many of the standards

6    guiding the ECR initiative.  *See* 75 FR 76939-40.  State explained therein how the "critical military or

7    intelligence advantage" criteria advances the interests of national security and foreign policy set forth

8    in the AECA.  *See* 75 FR 76940.  These criteria promote the AECA's purposes by ensuring the highest

9    degree of control for items for which export would lead to "[a]rmed hostilities against the United

10   States or its allies; disruption of foreign relations vitally affecting the national security; the compromise

11   of vital national defense plans or complex cryptologic and communications intelligence systems; the

12   revelation of sensitive intelligence operations; the disclosure of scientific or technological

13   developments vital to national security; or critical assistance to foreign development and/or

14   acquisition of WMD."  *Id.*  No commenters raised an objection to this standard, and any such

15   objection has been waived.[23]  *See Native Vill. of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031, 1053 (D.

16   Alaska 2013).

17           State's interpretation that these criteria fulfill the AECA's statutory criteria is entitled to at least

18   *Skidmore* deference, if not *Chevron* deference.  *See Gonzales v. Oregon*, 546 U.S. 243, 258-60, 268-69

19   (2006).  Under *Skidmore*, a court must defer to an agency's interpretation of the statute provided it is

20   "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity

21   _____

22   3823, 4142, and Plaintiffs' own "logical outgrowth" claim concedes that the Commerce Rule is revised from
     the proposed rule in the NPRM.  Thus, the records may well overlap, but cannot be assumed to be identical.

23   [23] Neither Plaintiffs nor other commenters critiqued this standard in comments in response to the 2010
     Federal Register notice, or in the later notices regarding export control reform, or in the comments to the

24   2018 NPRM (which again announced that it would employ this standard, this time in conjunction with an
     alternative, "inherently military" standard).  Parties "waive[] their right to judicial review" of a specific

25   argument when that argument was "not adequately raised before the agency."  *Portland Gen. Elec. Co. v.
     Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007); *see Exxon Mobil v. EPA*, 217 F.3d 1246, 1249 (9th

26   Cir. 2000).  "The waiver rule protects the agency's prerogative to apply its expertise [and] to correct its own
     errors" in the administrative process.  *Id.* at 1024.  In this Circuit, the waiver rule does not require a party to

27   raise the issue *itself* in comments, but it does require that "the agency had an opportunity to consider it"
     during notice-and-comment.  *Native Vill.*, 947 F. Supp. 2d at 1053.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 28

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).   Here, all of these factors require deference.   The 2010 ANPRM persuasively explains why these criteria, which State then proposed and later adopted, are the appropriate means of revising the USML to advance the AECA's broad statutory language regarding "world peace," "foreign policy," and national security, and why inherently military items that would benefit adversaries in, *inter alia*, "[a]rmed hostilities against the United States or its allies" should be distinguished from lesser items (such as those that would "compromise . . . scientific or technological developments relating to national security").   *Id.* at 76940.   These criteria have been employed consistently for nearly a decade through repeated regulatory actions, including in the announcement of this rulemaking in the 2018 NPRMs and in the final Rules.   Further, the question of how best to advance the AECA's objectives is "quintessentially [a] matter[] of policy" for executive branch discretion.   *Mandel*, 914 F.2d at 1223.

   **D.   The Rules Are Not Contrary to Law**.

   Plaintiffs contend that State's Rule is "contrary to the AECA's purposes of furthering world peace and the security and foreign policy of the United States," alleging that the agency improperly assessed whether the items to be retained on the USML "confer a critical military or intelligence advantage and are not inherently military." Mot. at 17-18 (quotations omitted).[24]   This claim puts into stark relief the extent to which Plaintiffs ask this Court to substitute its judgment for that of the Departments of State, Commerce, and Defense on matters of national security and foreign policy, a political question over which the Court lacks jurisdiction.   *See Mandel* at 1223.   In any event, assuming, *arguendo*, this question were reviewable, Plaintiffs are wrong for at least four separate reasons.

   *First*, as Plaintiffs concede, State *did* consider whether "maintaining controls over such exports . . . [is] in the national security and foreign policy interests of the United States." Mot. at 17 (quoting 85 FR at 3823).   As explained above and by DAS Miller and DAS Borman, this is because EAR regulation will be at least as effective as ITAR regulation of these items, and the overall rulemaking

---

[24] Plaintiffs' motion presents no argument that the Commerce Rule is contrary to ECRA.

will significantly advance the national security and foreign policy interests of the United States by ensuring State has the capacity to keep "higher walls" around the items most significant to U.S. interests.   Miller Decl. ¶ 102; *see also* Borman Decl. ¶¶ 51, 54 (discussing national security considerations related to manufacturing technology).   *Second*, State's assessment properly took into account the views of other agencies, including those of the Department of Commerce and a "national security review . . . by the Department of Defense," Miller Decl. ¶ 36.   *See NRDC v. FAA*, 564 F.3d 549, 560 (2d Cir. 2009) (reasonable for agency to consider "consultation with other agencies" in developing its own plans); *Fla. Keys Citizens Coalition, Inc. v. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1147 (S.D. Fla. 2005).   *Third*, State reasonably took into account the President's direction to the agency that it must "strengthen our national security by focusing" export controls on items "that provide a critical military or intelligence advantage," White House Policy at 2, as well as the view of Members of Congress.   *See* H. Rep. No. 115-200 at 155 (House Committee Report stating "support[]" for application of the "critical military or intelligence advantage" criteria); *see also* Miller Decl. ¶ 93.   *Fourth*, Plaintiffs' "contrary to law" argument ignores other provisions of the AECA, which make clear that Congress has encouraged State to remove items from the USML by "periodically review[ing] the items" and removing those that "no longer warrant export controls." 22 U.S.C. § 2778(f)(1); *see* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . ."). This congressional affirmation "provide[s] further evidence" that Congress intended the Executive Branch to exercise its judgment in removing items from the USML and understood transfers from the USML to the CCL "as statutorily permissible."   *Fox Television*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

## III.   Defendants and the Public Interest Would Be Harmed by an Injunction.

As described in the declarations of DAS Miller and DAS Borman, the broad preliminary injunction requested against the whole of the State and Commerce Rules would occasion significant harms to U.S. national security, and a variety of harms to other public interests represented by Defendants. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (public interest and balance of equities factors "merge" when federal government is the defendant).   As a result, the balance of equities tips sharply

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 30

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

against the requested injunction, which alone is enough for the Court to deny the motion.

The stakes are straightforward: the requested injunction against the "rules would cause significant harm to the national security and foreign policy interests of the United States." Miller Decl. ¶ 98; *see also* Borman Decl. ¶¶ 51, 54-55. In assessing the balance of equities and public interest factors at the preliminary injunction stage, "national security" is a "powerful public interest." *Ground Zero Ctr. for Nonviolent Action v. Dep't of Navy*, 918 F. Supp. 2d 1132, 1155 (W.D. Wash. 2013). "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citations omitted). Here, "national security" is not a "mere[] recit[ation]," *Ground Zero*, 918 F. Supp. 2d at 1155, but has been articulated in specific, logical terms by two experienced agency declarants, and this conclusion is reinforced by the fact that the underlying rules reflect the national-security based judgments of senior Executive Branch officials. *See* Miller Decl. ¶ 96; Borman Decl. ¶¶ 44, 51-55.

As DAS Miller explains, the "effect of [the] overly broad USML that sweeps in items that do not provide a critical military or intelligence advantage . . . is to make it more difficult for the Department of State to focus its export control resources on . . . sensitive weapons and cutting-edge military technology." Miller Decl. ¶ 100. Such "crown jewel[]" items, such as "warships, nuclear submarines, battle tanks, stealth fighter jets, attack helicopters, lethal drones, rockets, ballistic missiles, missile tracking systems, torpedoes, mines, directed energy weapons, [etc.]," "provid[e] a capability with respect to which the United States cannot afford to fall to parity," and the uncontrolled export of these items would "pose a grave threat to national security." 75 FR at 76940; Miller Decl. ¶ 102. The requested injunction against the whole of both Rules would therefore cause harm to national security by "preventing the implementation and enforcement of final rules that will enhance U.S. national security and foreign policy and better utilize our export licensing and enforcement resources to focus on those items, destinations, and end-uses of greatest concern and improve interoperability with allies and partners." Miller Decl. ¶ 102. It would also harm national security by limiting Commerce's deployment of enforcement resources to control exports of the transferred items, including 3-D firearms files. Hassebrock Decl. ¶¶ 26, 28.

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 31

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

The requested injunction would cause other harms to important United States and public interests as well. Delay of the State and Commerce Rules "would significantly disrupt U.S. exporters," "damage the reputation of the United States as a predictable and reliable exporter," and "provide a strategic advantage to foreign competitors." Miller Decl. ¶ 104-05; *see* Borman Decl. ¶ 54. This harm is not merely economic, but encompasses national-security harms related to military exports, because "foreign competitors in places like China and Russia . . . would likely seize the opportunity to close deals, build relationships, and improve their strategic position" relative to the United States. Miller Decl. ¶ 105. This would, in turn, mean a loss of "vital U.S. oversight and [licensing] conditions . . . pertaining to who may obtain such weaponry and how it is ultimately used," creating "a greater risk that these weapons could be used in a manner inconsistent with U.S. national security and foreign policy interests." *Id.* In short, the requested "injunction in this case undoubtedly would[] undermine[] the national security and foreign policy of the United States and the AECA's ultimate goals of a safer country and a safer world." Miller Decl. ¶ 106. This would be compounded by the uncertainty that would be created for the export control system if the Court were to ignore the *explicit statutory preclusion of judicial review* that Congress established precisely to protect these interests. These serious harms alone preclude issuance of an injunction under the controlling legal standard.[25] *See Winter v. NRDC*, 555 U.S. 7, 19 (2008).[26]

## IV. Plaintiffs Have Not Established a Likelihood of Irreparable Harm.

Plaintiffs' assertions of irreparable harm, meanwhile, cannot be given heavy weight. First, Plaintiffs' irreparable harm analysis is tied to their multiple misunderstandings of the ITAR and EAR. Miller Decl. ¶¶ 77, 83; *see* Borman Decl. ¶ 49. A party fails in its "attempt to demonstrate irreparable harm" when its allegations "demonstrate[] a misunderstanding" of the agency's actions. *Pacific Rivers Council v. USFS*, 942 F. Supp. 2d 1014, 1026 (E.D. Cal. 2013). Second, Plaintiffs' claims of irreparable

---

[25] Plaintiffs fall well short of showing that the balance of the equities and public interest tip in their favor. They do not address the government's equities or interests. Instead, in a two sentence paragraph, they merely cite the prior litigation without any reference to the Rules at issue here. Such a presentation, on an issue that Plaintiffs must carry to obtain an injunction, is insufficient.

[26] As set forth below, even if the Court were inclined to consider relief at this stage, it should tailor any such relief to the particular matter in dispute.

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

harm "conflate stringency with effectiveness," neglecting the fact that State does not focus its ITAR

enforcement efforts on exports of 3-D firearms files.  Miller Decl. ¶ 85.  An injunction to preserve a

status quo of limited enforcement, rather than substitute enforcement by a federal agency that can

enhance enforcement, would make little sense.  Third, Plaintiffs' claims of irreparable harm have a

distinct implausibility.  There should be no dispute that the Government seeks effectively to continue

the current regulation of the export of 3-D firearm files.  There also is no dispute that federal law does

not restrict the non-commercial manufacture of firearms at home by those entitled to possess them,

whether the firearm is improvised from simple parts available at a hardware store, *see, e.g.*,

http://www.youtube.com/watch?v=n1wV3lmbSv4 (last visited Feb. 21, 2020); created by obtaining

a partial receiver and finishing it into a working gun, *see, e.g.*, https://www.youtube.com/

watch?v=U9zio3k3eVk (last visited Feb. 21, 2020); or made by using a 3-D printer.  *See Bureau of

Alcohol, Tobacco, Firearms, and Explosives*, "Does an Individual Need a License To Make a Firearm,"

*available at*: https://go.usa.gov/xdDGv (last visited Feb. 21, 2020).  There is also no federal law

restricting the distribution of 3-D firearms files to U.S. persons, although federal law does prohibit

the possession of firearms themselves by criminals, the mentally ill, juveniles, and other prohibited

persons.  Thus, Plaintiffs' allegation of irreparable harm requires concluding that the transfer of export

controls alone over 3-D firearm files from State to Commerce will cause demonstrable, irreparable

harm not arising at present in absence of laws that prohibit distributing such files to U.S. persons.

Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will be

available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs retain the full authority to enforce their public safety laws, including lawful restrictions on

firearms possession and transfer, against any and all violators of the law.  And as discussed above

other federal public safety laws regulating, *inter alia*, the possession of firearms by felons and the

mentally ill, and federal laws requiring that firearms contain sufficient metal to be detectable, remain

in force and unchanged by these rules.  Such laws—which, unlike the AECA and ITAR, address

domestic conduct by U.S. persons—provide "other corrective relief" on an ongoing basis.   "An

essential prerequisite" before granting preliminary relief is a showing that irreparable injury is likely in

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 33

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

the absence of an injunction, and Plaintiffs cannot make this showing. *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985).

### V.   Plaintiffs Have Requested Relief that Goes Far Beyond a Remedy for Their Claimed Irreparable Harms.

Were the Court to order a preliminary injunction here—which it should not—such an injunction should be limited to redressing only any established injuries and irreparable harms that Plaintiffs have identified. Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Equitable principles likewise require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Here, Plaintiffs' requested injunction of the entirety of the State and Commerce Rules would "affect a huge number of exports that are completely unrelated to firearms files." Miller Decl. ¶ 98; *see* Borman Decl. ¶¶ 52-53. State, Commerce, and thousands of private parties have prepared at length for the transfer of authority that Plaintiffs' requested relief would enjoin. Miller Decl. ¶¶ 103-04; Borman Decl. ¶¶ 52-53. But Plaintiffs have pointed to no injury, and no irreparable harm, that would befall them from any part of these Rules other than the purported effect of the Rules on 3-D firearms files. "All injunctions . . . must be 'narrowly tailored to remedy the specific harm shown'," *E. Bay Sanctuary Cov. v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019), and accordingly, any injunction should be limited in scope to requiring Defendants to maintain the efficacy of the regulation of 3-D firearms files. *See Calif. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018), *cert denied* 139 S. Ct. 2716 (2019).

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 24, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 12002
Washington, DC 20530
202-353-0533

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

MATTHEW J. GLOVER
CHRISTOPHER A. BATES
Counsel, Civil Division

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12002
Washington, D.C. 20530
(202) 353-0533 (telephone)
(202) 616-8460 (facsimile)
eric.soskin@usdoj.gov

*Attorneys for Federal Defendants*

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on February 24, 2020, I electronically filed the foregoing brief using the

3   Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5   Dated: February 24, 2020                          */s/ Eric J. Soskin*
                                                        Eric J. Soskin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:20-cv-111-RAJ) – 36