UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 2:20-cv-00111 |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

## DECLARATION OF MICHAEL F. MILLER

I, Michael F. Miller, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.     I am the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of

Political-Military Affairs (PM) at the Department of State (the Department). I have held this

position since February 2, 2020. I previously held the same position in an Acting capacity,

serving as the Acting Deputy Assistant Secretary of State for Defense Trade Controls since

January 2, 2018. My responsibilities in both roles included oversight of all Directorate of

Defense Trade Controls (DDTC) activities and providing policy guidance on the export of

defense articles. I previously served as the Director of the Office of Regional Security and Arms

Transfers within the PM Bureau and have held a variety of positions covering arms transfer

issues within the Department. My varied positions have afforded me considerable knowledge of

the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR)

as they relate to DDTC activities.

2.     I submit this declaration in support of the Defendants' opposition to the motion for a

preliminary injunction filed by Plaintiffs in the above-captioned case. The information contained

herein is based on my personal knowledge and on information provided to me in my official

capacity. In this declaration, I explain that Plaintiffs' effort to enjoin the implementation and

1

enforcement of the final rules is based on their own misunderstanding of the export control

regulations at issue.  As I further explain, Plaintiffs' requested injunction would cause significant

harm to the national security and foreign policy interests of the United States and would

undermine the Department of State's ability to effectively regulate the export of sensitive

weaponry and cutting edge military technology, while failing to achieve their purported goal of

limiting the dissemination of files used to 3D-print firearms.

### A. The Directorate of Defense Trade Controls

3.      DDTC is part of the Department's PM Bureau, which is headed by an Assistant Secretary

who reports to the Under Secretary for Arms Control and International Security and, through that

office, to the Secretary of State.  DDTC controls the export, temporary import, and brokering of

defense articles and defense services covered by the United States Munitions List (USML), in

accordance with 22 U.S.C. §§ 2778-2780 of the AECA and ITAR (22 C.F.R. parts 120-130).

4.      DDTC's mission is to ensure that commercial exports of defense articles and defense

services on the USML advance U.S. national security and foreign policy.  DDTC also seeks to

ensure that the ITAR keeps pace with innovation, that U.S. industry and their foreign partners

comply with applicable policies and requirements, and that the munitions export process is

reliable and predictable.  DDTC also serves as a resource to the U.S. Government, industry, and

foreign counterparts on defense trade matters.

5.      As part of its responsibilities, DDTC licenses the export, temporary import, and

brokering of defense articles and defense services and seeks to ensure appropriate compliance

with, and enforcement of, these regulations.  DDTC also maintains the ITAR and its USML and

oversees the Commodity Jurisdiction (CJ) process.

6.      In my role as the Deputy Assistant Secretary for Defense Trade Controls, I lead DDTC

and report to the Assistant Secretary for Political-Military Affairs.  DDTC consists of four

offices that advance the mission of DDTC:

    a.  The Office of Defense Trade Controls Policy (DTCP) oversees the development

        of policy and guidance related to exports of defense articles and services on the

        USML.  DTCP manages the interagency CJ process, which determines whether

        certain items are controlled on the USML and consequently whether an item is

        subject to the licensing jurisdiction of the Department of State.   DTCP also

        develops and drafts all changes to the ITAR, which are published in the *Federal*

        *Register*, manages bilateral defense trade agreements, such as the United

        Kingdom and Australia Defense Trade Cooperation Treaties, and provides export

        control policy and regulatory guidance to exporters, importers, defense

        manufacturers, and foreign allies and partners.

    b.  The Office of Defense Trade Controls Licensing (DTCL) reviews, staffs,

        adjudicates, and provides the final U.S. Government response on license

        applications and ensures that licensing decisions are consistent with U.S. national

        security and foreign policy interests.  DTCL also coordinates and conducts

        licensing-related outreach to U.S. defense industry, other government agencies,

        and U.S. security partners.

    c.  The Office of Defense Trade Controls Compliance (DTCC) reviews matters

        related to civil enforcement investigations and institutes formal administrative

        proceedings related to AECA violations, reviews license applications for

        ineligibility and debarment-related issues and provides direct support to the

        Departments of Justice and Homeland Security in their criminal investigations

and prosecutions of AECA violations.  DTCC also reviews overall industry compliance with the AECA and ITAR and manages the Company Visit Program by conducting on-site visits to U.S. defense companies, defense labs, and universities.

d.   The Office of Defense Trade Controls Management (DTCM) provides management and operational support to the three other DDTC offices, which includes budget, IT planning, personnel support, and professional development.

**B. Statutory and Regulatory Background: AECA and ITAR**

7.      The AECA authorizes the President "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).  The AECA also authorizes the President "to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services.  The items so designated shall constitute the [USML]." *Id.*

8.      The statutory authority of the President to promulgate regulations for the export, temporary import, and brokering of defense articles and defense services has been delegated to the Secretary of State by section 1(n) of Executive Order 13637, 78 Fed. Reg. 16,127 (Mar. 13, 2013).  This delegation requires that "[d]esignations, including changes in designations, by the Secretary of State of items or categories of items that shall be considered as defense articles and defense services subject to export control under section 38 (22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense." Executive Order 13637, § 1(n)(i).

9.      The Department promulgated the ITAR to implement the AECA and govern the export,

4

temporary import, and brokering of defense articles and defense services. As the Department has long recognized in its regulations, and restated in its rulemakings, the control of the brokering, temporary import, and export of defense articles and services is a foreign affairs function of the U.S. Government, and rules implementing this function are therefore considered to be exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act. *See* 22 C.F.R § 128.1, 61 Fed. Reg. 48,831 (Sept. 17, 1996).

10.    Part 121 of the ITAR sets out those "articles, services, and related technical data" that are designated as defense articles or defense services pursuant to the AECA. These items make up the USML. The items enumerated on the USML are those that "provide a critical military or intelligence advantage." 22 C.F.R. § 120.3(b). Section 120.3(b) was revised in April 2013 to "more accurately describe the policy used in completing the revisions to the USML" and to describe the items that would be added to the USML moving forward. 78 Fed. Reg. 22,740, 22,751 (Apr. 16, 2013). The Department adopted this definition in section 120.3(b) after publication in the Federal Register for notice and comment, *see* 77 Fed. Reg. 36,428 (June 19, 2012), and did so following a determination by the Executive Branch, working at the direction of the President, that limiting the USML to items that "provide a critical military or intelligence advantage" is necessary to further world peace and the foreign policy and national security of the United States.

11.    The USML comprises 21 categories that enumerate items that provide a critical military or intelligence advantage to the United States. These include, for example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades," 22 C.F.R. § 121.1, Category IV(a); "[a]ttack helicopters," 22 C.F.R. § 121.1, Category VIII(a)(4); spacecraft meeting described characteristics, 22 C.F.R. § 121.1, Category XV(a); and

"[c]hemical warfare agents . . . adapted for use in war to produce casualties in humans or animals, degrade equipment, or damage crops or the environment." 22 C.F.R. § 121.1, Category XIV(a)(5).

12.    The USML also controls "technical data" "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); 22 C.F.R. § 121.1, Category XI(d).

13.    Export controls on "technical data" advance the purposes of the AECA by preventing foreign adversaries, terrorist groups, and other bad actors from accessing the means to design, develop, produce, or counter items that provide a critical military or intelligence advantage to the United States.

14.    Recognizing the importance of safeguarding free speech and communication and of ensuring that the ITAR is carefully drawn to advance U.S. national security and foreign policy interests, the ITAR definition of "technical data" includes significant exclusions.  "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain.  22 C.F.R. § 120.10.  ITAR § 120.11 defines "public domain," in relevant part, as information which is published and which is generally accessible or available to the public in the following manner:

      a.  Through sales at newsstands and bookstores;

      b.  Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

      c.  Through second class mailing privileges granted by the U.S. Government;

    d.  At libraries open to the public or from which the public can obtain documents;

    e.  Through patents available at any patent office;

    f.  Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

    g.  Through public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. Government department or agency; or

    h.  Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community.

15.    Where information is both published and generally accessible or available to the public in a manner specified under any one of the subsections of § 120.11(a), the information falls within the definition of "public domain" in § 120.11 and therefore is not "technical data" controlled for export under the ITAR.  For example, if information is published and is generally accessible or available to the public at libraries open to the public, the information falls within the definition of "public domain" in § 120.11 and therefore is not "technical data" controlled for export under the ITAR.

16.    To the extent that the files to which Plaintiffs refer in this litigation, *i.e.*, "computer files for 3D-printed guns," are regulated as part of the USML, they would be regulated as "technical data" directly related to defense articles in Category I of the USML, *Firearms, Close Assault Weapons and Combat Shotguns*.  Prior to the effective date of the Department's final rule (85 Fed. Reg. 3819) published on January 23, 2020 (effective March 9, 2020), Category I provides that the following items are designated as defense articles:

a. Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

b. Fully automatic firearms to .50 caliber inclusive (12.7 mm).

c. Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

d. Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

e. Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

f. Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

g. Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

h. Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

i. Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

j. The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

i. A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

ii. A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

iii. A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

iv. A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

v. A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

vi. A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

17.     The USML controls the "technical data" directly related to the defense articles described in the category, which would include blueprints, drawings, photographs, plans, instructions or documentation, but only insofar as such items do not fall within an exclusion enumerated in paragraph 14 above. The USML does not specifically describe individual pieces of technical data. Thus, neither the files used to 3D-print firearms, nor any other specific type of computer file, blueprint, drawing, or photograph is specifically described in the language of the USML.

   C. Exports of Technical Data and the Public Domain Exception

18.     The ITAR requires a license or other approval for the export of defense articles, including technical data. 22 C.F.R. § 123.1(a). Section 120.17 of the ITAR defines the term "export" to

9

mean:

    a.  An actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner;

    b.  Releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export");

    c.  Transferring registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR by a U.S. person to a foreign person;

    d.  Releasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States;

    e.  Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad; or

    f.  A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter.  However, for certain limited purposes . . . the controls of this subchapter may apply to any sale, transfer, or proposal to sell or transfer defense articles or defense services.

19.    Although releasing or otherwise transferring technical data to a foreign person, including through oral or visual disclosures, is an export under the ITAR, *see* 22 C.F.R. § 120.17(a)(2), releasing or transferring technical data to U.S. persons in the United States is not an export and is not governed by the ITAR.  Consequently, posting technical data on a website that prevents access by foreign persons or sharing technical data between U.S. persons in the United States using a USB drive are not activities subject to the ITAR.

20.    In contrast, the unrestricted public dissemination of technical data in a manner that allows

access by foreign persons—including by posting the technical data on the Internet without any limitations on access by foreign persons—results in an ITAR-controlled export. Importantly, however, the term "technical data" is defined to exclude "information that is in the public domain," and thus, posting on the Internet "information that is in the public domain" is not an export of technical data controlled under the ITAR because the information is not considered ITAR-controlled technical data.

### D. AECA and ITAR Enforcement

21.    The AECA and ITAR provide for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.10. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty and/or debarment from participating in activities subject to the ITAR. *See* 22 C.F.R. §§ 127.3, 127.7, 127.10.

22.    The Department focuses its enforcement efforts on those violations that harm, or have the potential to harm, U.S. national security or foreign policy. Whether a violation harms, or has the potential to harm, U.S. national security may depend, among other things, on the nature of the item or technical data involved, including whether the item or technical data provides a critical military or intelligence advantage to the United States or has an inherently military function.

### E. The Commodity Jurisdiction (CJ) Process

23.    Commodity jurisdictions, commonly referred to as "CJs," are determinations made by the Department that identify the export control jurisdiction of goods, services, and information.

24.    The purpose of these determinations is to reach a formal written conclusion where there

are questions as to whether, for purposes of export controls, certain goods, services, or information are under the jurisdiction of the Department pursuant to the ITAR or under the export jurisdiction of another U.S. Government agency, including the Department of Commerce, which administers the Export Administration Regulations (EAR).[1]

25.     Section 120.4 of the ITAR establishes the CJ procedure,[2] which "is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List.  It may also be used for consideration of a re-designation of an article or service currently covered by the U.S. Munitions List."  As described in section 120.4, the determination "entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases."  The CJ process is typically initiated when a person submits a CJ request to the Department.

26.     Section 120.4(d)(2) of the ITAR sets forth the criteria for making a CJ determination: "A designation that an article or service meets the criteria of a defense article or defense service, or provides the equivalent performance capabilities of a defense article on the U.S. Munitions List set forth in this subchapter, is made on a case-by-case basis by the Department, taking into account:"

      a.   "The form and fit of the article; and"[3]

---

[1] A few categories of goods, services, or information are under the jurisdiction of the Department of Energy or another Executive Branch agency.  Goods, services, or information may also be within the public domain and not subject to export controls at all.

[2] *See* 58 Fed. Reg. 39,283 (Jul. 22, 1993), as amended at 71 Fed. Reg. 20,536 (Apr. 21, 2006); 75 Fed. Reg. 46,843 (Aug. 4, 2010); 78 Fed. Reg. 22,753 (Apr. 16, 2013); 79 Fed. Reg. 8084 (Feb. 11, 2014).

[3] The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it.  The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity.  *See* 22 C.F.R. § 120.4 note 1 to paragraph (d).

      b.  "The function and performance capability of the article."[4]

27.    Section 120.4(f) further requires that "State, Defense and Commerce will resolve

commodity jurisdiction disputes in accordance with established procedures.  State shall notify

Defense and Commerce of the initiation and conclusion of each case."

28.    Section 120.4(g) provides an avenue for appeal of a CJ determination: "A person may

appeal a commodity jurisdiction determination by submitting a written request for

reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls.  If

desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant

Secretary for Political-Military Affairs."

29.    The Department considers a variety of information in its review of CJ requests, including

the information attached to the request (such as product brochures, technical specifications

and/or blue prints, sales information, etc.), the USML category in which an item most likely may

fit, and previous CJs on the item or related matters.

30.    After the Department prepares a preliminary analysis, the CJ request and preliminary

analysis are circulated to the relevant interagency partners for consultation.

**F.  USML Review Efforts**

31.    The AECA provides that "[t]he President shall periodically review the items on the

[USML] to determine what items, if any, no longer warrant export controls . . . ."  22 U.S.C.

§ 2778(f).  Since 2010,[5] and at the specific direction of the President, the Department of State has

---

[4] The function of a commodity is the action or actions it is designed to perform.  Performance capability is the
measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in
terms of speed, durability, reliability, pressure, accuracy, efficiency).  *See* 22 C.F.R. § 120.4 note 1 to paragraph (d).
[5] *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the
United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML)
that would make it a 'positive list' of controlled defense articles").  The Department did not publish a Notice of
Inquiry in the *Federal Register* for the initial review of each category of the USML as part of this effort because it
was determined at the outset that each USML category would be reviewed and revised.  Nonetheless, the

engaged in an interagency effort to review and revise the entire USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, have an inherently military function.  An outline of the new export control system was announced by the President in August 2010, and these changes sought to "help strengthen our national security by focusing our efforts on controlling the most critical products and technologies and by enhancing the competitiveness of key U.S. manufacturing and technology sectors."  *See* https://obamawhitehouse.archives.gov/the-press-office/2010/08/30/president-obama-lays-foundation-a-new-export-control-system-strengthen-n. This effort grew from a broad-based interagency review of the U.S. export control system directed by the President that "determined that the current export control system is overly complicated, contains too many redundancies, and, in trying to protect too much, diminishes our ability to focus our efforts on the most critical national security priorities."  *See id.*

32.   As part of this effort, the Department sought to revise the USML to make it a "positive list" of controlled defense articles—that is, a list that describes controlled items using objective criteria—and to create a simpler, more robust export control system.  In doing so, this effort was, among other goals, intended to allow the Department to focus its resources on those items most critical to U.S. national security and foreign policy.

33.   On December 10, 2010, the Department published an Advance Notice of Proposed Rulemaking (ANPRM) at the outset of the President's initiative, which announced that the initiative would "review and revise both the ITAR and the CCL to enhance national security," and explained that the initiative was "necessary to better focus [U.S. Government] resources on

---

Department did publish NPRMs as part of this effort.  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").  The Department published its last final rule as part of this effort for Categories I-III on January 23, 2020.  *See* 85 Fed. Reg. 3819 (Jan. 23, 2020).

protecting those items that need to be protected." 75 Fed. Reg. 76,935 (Dec. 10, 2010).  In the

ANPRM, the Department introduced and sought comment on the approach of assessing the

"critical military or intelligence advantage," provided by items on the USML, and defined the

term "critical" in the context of "military or intelligence advantage." *Id.* at 76,940. As part of the

President's initiative as originally contemplated, each of the items on the USML and CCL would

be categorized into the types of items that should be controlled at different levels for different

types of destinations, end-uses, and end-users." *Id.* at 76,935. One such category would apply to

items almost exclusively available from the United States that provide a critical military or

intelligence advantage. *See id.* at 76,939.  Ultimately, after the receipt of comments and further

analysis in the Executive Branch, the cornerstone of this reform effort became the revision of the

USML and CCL to prioritize those items that provide the United States with a critical military or

intelligence advantage or, in the case of weapons, have an inherently military function—by

maintaining them on the USML and transferring those items that do not meet this standard to the

CCL.

34.    In connection with this effort, prior to the publication of the Department's final rule on

January 23, 2020 revising USML Categories I-III, the Department had published 26 final rules or

interim final rules revising 18 of the 21 USML categories.[6]  These final rules or interim final

rules ultimately resulted in the removal of items that do not merit inclusion on the USML, and

these items were concurrently controlled by the Department of Commerce in its CCL.

---

[6] *See, e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (July 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (July 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

35.    To implement these changes, the Department worked collaboratively with its interagency

partners to evaluate and revise each category of items on the USML.  While a wide range of

interagency stakeholders reviewed and cleared the *Federal Register* notices that revised the

USML, the Department worked particularly closely with the Departments of Defense and

Commerce to solicit their views on the appropriate composition of the USML.  The engagement

with the Department of Commerce was further intended to ensure that the final jurisdictional

posture of a given item was clear, and so that the application of ITAR or EAR controls to that

item could be discerned and understood by the public.  Additionally, the Department coordinated

with the Department of Commerce to publish rules in parallel where updates to the USML

required conforming changes to the CCL to ensure the appropriate level of control over the item.

36.    With respect to the Department of Defense, as required by Executive Order 13637, the

Department obtained the concurrence of the Department of Defense for designations, including

changes in designations, of items or categories of items that are defense articles and defense

services enumerated on the USML.  *See* Executive Order 13637, § 1(n)(i).  Throughout this

effort to revise the USML, the Department followed a regular process for revising the USML

categories and obtaining the Department of Defense's concurrence.  This process began with an

interagency review, including an internal national security review conducted by the Department

of Defense,[7] to assess which items in the category continue to warrant control on the USML.

The Department of Defense discussed the results of its review in interagency meetings and, if

warranted by continuing interagency discussion, conducted and reported on further internal

national security assessments.

37.    Although the control of the temporary import and export of defense articles and services

---

[7] Within the Department of Defense, the Defense Technology Security Administration (DTSA) has the lead in
engaging with the Department and the interagency on this effort.

is a military and foreign affairs function of the U.S. Government and rules implementing this function are considered to be exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act, *see* paragraph 9 above, the Department has nevertheless generally provided the public notice and accepted public comment throughout the USML revision effort begun in 2010. In each case, the Department made clear that the Department's publications were not being carried out pursuant to the Administrative Procedure Act, but rather, pursuant to its discretionary authority to inform regulated parties and the public about Department actions. Public comments for this revision of the USML were accepted and reviewed by the Department.

**G. Interagency Review and Publication of NPRMs for Categories I-III of the USML**

38.     As part of the effort to review and revise the USML, the Department sought to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament), and III (ammunition and ordnance). Through the ongoing interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce and the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives to develop revisions to the USML and CCL, the Department determined that certain items controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, do not have an inherently military function, and therefore do not warrant control on the USML. This decision was informed by the Department of Defense's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in USML Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale

at sporting goods stores and other retailers throughout the United States. The Department has processed license applications for the export of Beretta M9 pistols to commercial retailers and other end-users around the world.

39.     The AECA provides that the Department "may not remove any item from the [USML] until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate." 22 U.S.C. § 2778(f). The AECA also provides that "[s]uch notice shall describe the nature of any controls to be imposed on that item under any other provision of law." *Id.* Accordingly, the Departments of State, Defense, and Commerce briefed the outcome of this review of Categories I-III to the staff of the Senate Foreign Relations Committee, the Senate Committee on Banking, Housing, and Urban Affairs, and the House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Departments of State and Commerce each published NPRMs in the *Federal Register* (May 2018 NPRMs), 83 Fed. Reg. 24,198; 83 Fed. Reg. 24,166, proposing to transfer oversight of certain articles in Categories I-III from the Department of State to the Department of Commerce.

40.     The Department requested and received concurrence from the Department of Defense in the decision to remove these articles, including non-automatic and semi-automatic firearms under .50 caliber and associated technical data, from the USML, as described in the Department's May 2018 NPRM.

**H. Defense Distributed's CJ Request and Subsequent Litigation**

41.     While the Department continued its efforts to revise the USML, in early May 2013, the Department became aware that a Texas-based nonprofit named Defense Distributed ("DD") had placed executable Computer-Aided Design (CAD) files on an unrestricted website that enabled

the manufacture of firearm components, accessories, and attachments with a 3D printer. The Department requested that Defense Distributed remove the files from its website and submit CJ requests to determine whether the files were controlled by the ITAR, and Defense Distributed did so in June 2013. These data files instruct 3D printers to create a variety of items, most notably, sixteen parts and components which could be assembled, to form a .380 caliber firearm.

42.     In addition to conferring with other agencies in accordance with 22 C.F.R. § 120.4, DDTC sought to better understand additive manufacturing and 3D-printing hardware and technology and its evolution and diffusion, the impact of the availability of firearms data files on the enforcement of export controls, and the application of multilateral export control regimes to such files and technologies. DDTC consulted other Department of State offices and U.S. Government agencies to benefit from their expertise and consideration of these technologies and issues. In addition, DDTC organized a U.S. Government conference on additive manufacturing/3D-printing technology in March 2014.

43.     In January 2015, while the Department continued to review Defense Distributed's June 2013 CJ requests, Defense Distributed submitted a new CJ request for the "Ghost Gunner," a computer numerically controlled (CNC) press for milling metal firearms components. On April 15, 2015, the Department responded by providing a CJ determination to Defense Distributed, finding that the Ghost Gunner is not subject to the jurisdiction of the Department, and Defense Distributed has at all times remained free to export the "Ghost Gunner" without being subject to the ITAR.

44.     On June 4, 2015, the Department provided CJ determinations for Defense Distributed's June 2013 CJ requests and determined that those of Defense Distributed's files that could be used to automatically generate defense articles were subject to ITAR jurisdiction as technical

19

data.

45.    Classification of Defense Distributed's files as falling within the jurisdiction of the ITAR was not an outright prohibition on the export of these files.  Rather, as noted in the June 2015 CJ determination, the ITAR requirement was that Defense Distributed obtain a "license or other approval . . . pursuant to the ITAR prior to any export" of these files.  Furthermore, any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data, and so Defense Distributed was not and is not today restricted by the Department or the ITAR from distributing that technical data to U.S. persons in the United States.

46.    Rather than submit an application seeking DDTC approval to export its files, Defense Distributed, together with the Second Amendment Foundation, brought a lawsuit against the Department in the Western District of Texas claiming that the requirement to obtain authorization prior to publishing the files on its website violated its rights under the First, Second, and Fifth Amendments.  Plaintiffs named the Department, its agencies, and individuals, seeking damages for alleged constitutional violations under the cause of action identified in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

47.    In May 2015, Defense Distributed sought a preliminary injunction against the Department, seeking to suspend enforcement of the prepublication approval requirement under the ITAR pending final resolution of the case.  In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. In September 2016, the Fifth Circuit affirmed that decision, with one dissenting judge concluding that the Department's export controls violated the First Amendment as a content-based regulation and a prior restraint.  Defense Distributed's petition for rehearing *en banc* was denied

20

in March 2017 (nine judges voting against rehearing and five judges voting in favor) and the

U.S. Supreme Court denied Defense Distributed's petition for certiorari in January 2018.  After

the interlocutory appeal concluded, the district court ordered the parties to exchange written

settlement demands.

### I.   Defense Distributed's Files and the May 2018 NPRMs

48.     By early 2017, Congress was aware that draft regulations to revise Categories I, II, and

III of the USML and the CCL were in development and the likelihood of such regulations were

publicly discussed in industry publications. *See, e.g.*, H. Rep. No. 115-200, at 155 (July 6,

2017); Thomas B. McVey, et al., ITAR Guide For the Firearms Industry, Williams Mullen (Jan.

13, 2017), https://www.williamsmullen.com/news/itar-guide-firearms-industry-0.  In May 2018,

those draft regulations were published as the May 2018 NPRMs.

49.     The May 2018 NPRMs proposed transferring jurisdictional control of, *inter alia*, the

technical data directly related to firearms that are widely available for commercial sale and

controlled under Category I of the USML. The May 2018 NPRMs would change the export

jurisdiction and classification of the Defense Distributed files that were the subject of the

Department's earlier June 2015 CJ determination, if made effective through final rules.

50.     As a result, the proposed transfer in the May 2018 NPRMs would have altered the

controls regulating Defense Distributed's ability to post its files on the Internet.  These files

would have become subject to EAR jurisdiction and control.  As the Department of Commerce

explained in its NPRM, the EAR includes criteria in 15 C.F.R. § 734 that would exclude certain

"technology" and "software" (which are EAR-defined terms, *see* 15 C.F.R. § 772, that would

encompass Defense Distributed's files) from control. *See* 83 Fed. Reg. 24,166, 24,167.  In

particular, the Department of Commerce has historically taken the approach (with limited

21

exceptions) that unclassified technology or software is not subject to export control if it has been
"published" within the meaning of 15 C.F.R. § 734.7, and 15 C.F.R. § 734.7 includes "posting
on the Internet on sites available to the public" within the definition of "published."  At that time,
this approach would have meant that Defense Distributed's files and any other files used to 3D-
print firearms would not be subject to export controls under the EAR if "published" within the
meaning of 15 C.F.R. § 734.7.

51.     The comment period for the May 2018 NPRMs closed on July 9, 2018.  The Department
received more than 3,000 comments in response to its NPRM, including a large number of
comments related to 3D-printed firearms and the proposed controls over the associated technical
data.  Based on the number of comments and content of the comments received, it was apparent
that commenters understood that as a result of the May 2018 NPRMs, the files used to 3D-print
firearms, if posted on the Internet, would not be subject to export controls under the EAR under
the Department of Commerce's NPRM.

52.     These potential changes to the export controls governing Defense Distributed's files and
any other files used to 3D-print firearms were well underway when the Department participated
in the court-ordered settlement negotiations with Defense Distributed—which occurred at the
same time as the Departments of State and Commerce were finalizing the May 2018 NPRMs.
At the time, the files at issue would not have been subject to EAR controls if posted on the
Internet and if as then expected, the terms of the May 2018 NPRM became final.  Thus, the May
2018 NPRMs were not an outgrowth of the settlement with Defense Distributed.  To the
contrary, the settlement with Defense Distributed was an outgrowth of the USML revision
process.

**J.   The Defense Distributed Settlement Agreement and the Washington Litigation**

53.   The Department and Defense Distributed reached a settlement agreement on June 29,

2018.  *See* Exhibit A.  The Department agreed, in relevant part, to:

    a.   "[D]raft and to fully pursue, to the extent authorized by law (including the

        Administrative Procedure Act), the publication in the Federal Register of a

        notice of proposed rulemaking and final rule, revising USML Category I to

        exclude the technical data that is the subject of the Action."

    b.   "[Announce], while the above-referenced final rule is in development, . . .

        a temporary modification, consistent with the [ITAR], 22 C.F.R. § 126.2,

        of USML Category I to exclude the technical data that is the subject of the

        Action.  The announcement will appear on the DDTC website,

        www.pmddtc.state.gov, on or before July 27, 2018."

    c.   "[Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the

        Deputy Assistant Secretary for Defense Trade Controls, advising that the

        Published Files, Ghost Gunner Files, and CAD Files are approved for

        public release (i.e., unlimited distribution) in any form and are exempt

        from the export licensing requirements of the ITAR because they satisfy

        the criteria of 22 C.F.R. § 125.4(b)(13).  For the purposes of 22 C.F.R. §

        125.4(b)(13) the Department of State is the cognizant U.S. Government

        department or agency, and the Directorate of Defense Trade Controls has

        delegated authority to issue this approval."

    d.   "[Acknowledge and agree] that the temporary modification of USML

        Category I permits any United States person, to include [Defense

Distributed's] customers and [Second Amendment Foundation's]

members, to access, discuss, use, reproduce, or otherwise benefit from the

technical data that is the subject of the Action, and that the letter to

Plaintiffs permits any such person to access, discuss, use, reproduce or

otherwise benefit from the Published Files, Ghost Gunner Files, and CAD

Files."

54.     The settlement agreement was not an admission by the Department of any fault, or of any

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra*

*vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United

States Constitution.

55.     By describing the scope of the Department's commitment to engage in rulemaking as

limited "to the extent authorized by law," the scope of the settlement was explicitly designed not

to prejudge the content of the final Department rule regarding USML Categories I, II, and III,

and the treatment of Defense Distributed's files under that rule.  The settlement also did not bind

the Department in any way with regard to its input to the Department of Commerce or other

government agencies regarding future regulation of technical data, including Defense

Distributed's files.

56.     The Department complied with the actions required by the settlement agreement, and the

case was dismissed on July 30, 2018.

57.     On July 30, 2018, a group of States and the District of Columbia filed suit against, *inter*

*alia*, the Department and Defense Distributed in the Western District of Washington alleging that

the actions the Department took pursuant to the settlement agreement violated the Administrative

Procedure Act and the Tenth Amendment of the United States Constitution.  *See Washington, et*

*al. v. State, et al.*, Case No. 2:18-cv-1115 (W.D. Wash.) ("*In re DD Settlement*"). The Department disagrees with the allegations in that lawsuit.

58.     The U.S. District Court for the Western District of Washington entered a temporary restraining order on July 31, 2018, followed by a preliminary injunction on August 27, 2018. The Court's preliminary injunction enjoined the Department from implementing or enforcing the temporary modification of Category I of the USML and the Department's July 27, 2018 letter to Defense Distributed and required the Department to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. The Department has complied with that injunction. The States moved for summary judgment in February 2019, and the Department and Defense Distributed subsequently filed cross-motions for summary judgment. On November 12, 2019, the Court granted summary judgment to the States and denied summary judgment to the Department and Defense Distributed. On January 14, 2020, Defense Distributed appealed that decision to the Ninth Circuit.

### K. Congressional Notification of Draft Final Rules for Categories I-III of the USML

59.     While litigating the case against the several State-government plaintiffs, the Department continued to prepare for the publication of a final rule transferring certain items in Categories I-III of the USML to the jurisdictional control of the Department of Commerce. Following the publication of the May 2018 NPRMs, the Department reviewed the public comments responding to its May 2018 NPRM and developed a draft final rule for purposes of notifying Congress pursuant to 22 U.S.C. § 2778(f). The Department of Commerce also reviewed the public comments responding to its May 2018 NPRM and developed a draft final rule for inclusion in the Department's congressional notification package.

60.     On January 3, 2019, the Department provided "informal" notice of the proposed removal

of items from USML Categories I-III to the Committee on Foreign Affairs of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Banking, Housing and Urban Affairs of the Senate. The Department's notice to these congressional committees included unsigned cover letters, the draft revised USML regulatory text of Categories I-III, a line-in/line-out comparison of the current and draft revised USML regulatory text of Categories I-III, the Department of Commerce's draft companion regulatory text, and a summary of the control for major defense equipment. The Department provided these documents to the congressional committees to inform them of the items it intended to remove from the USML and to describe the nature of the controls that would be imposed on such items following their removal from the USML.

61.     After the 30-day "informal" notification period expired, the Department provided "formal" notice to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate pursuant to 22 U.S.C. § 2778(f) on February 4, 2019. The Department's "formal" notice to these congressional committees included signed cover letters and a summary of the revisions to the USML, which supplemented the documents provided as part of the "informal" notice.

62.     During the "informal" and "formal" notification periods, the Department briefed and answered questions from the relevant congressional committees.

63.     On February 22, 2019, the Department received a letter from Senator Robert Menendez, the Ranking Member on the Committee on Foreign Relations of the Senate, purporting to place a "hold" on the congressional notification of the proposed transfer relating to the items in Categories I-III. *See* Exhibit B. I understand the purported "hold" was not binding on the Department and the transfer could proceed 30 days after congressional notification, as per 22

U.S.C. § 2778(f).  However, the letter from Senator Menendez served to communicate to the Department his substantial concerns about the proposed action.  As reason for his "hold," Senator Menendez expressed concern, *inter alia*, about the "serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests." Exhibit B.

### L.  Other Sources Expressing Concerns About 3D-Printed Firearms

64.    The question of whether and how to control the publication of the files used to 3D-print firearms generated substantial comment and concerns from advocates and opponents of controls on the files used to 3D-print firearms and was the subject of further consideration by the Department, in conjunction with other agencies.

65.    In addition to the concerns expressed by Senator Menendez in his February 2019 letter, the Department heard concerns from various other sources regarding the Defense Distributed settlement and the manner in which the Department of Commerce should control the files used to 3D-print firearms.  Many of these concerns focused on the potential consequences of the unrestricted export of the files used to 3D-print firearms through posting on the Internet.

66.    Some examples of these concerns include, but are not limited to, the following:

> a.   In July 2018, the Department received a letter from nine Senators— Edward Markey, Bill Nelson, Richard Blumenthal, Christopher Murphy, Dianne Feinstein, Elizabeth Warren, Patrick Leahy, Richard Durbin, and Benjamin Cardin—arguing that the settlement with Defense Distributed will allow felons and terrorists in the United States and abroad to access 3D-printed firearms and urging the Department not to allow Defense Distributed to publish online

blueprints for 3D-printed firearms. *See* Exhibit C.

b.  Commenters to the Department's May 2018 NPRM argued that the transfer of
jurisdictional control of the relevant items in USML Categories I-III could, *inter
alia*, increase foreign dissemination of the files used to 3D-print firearms, and
thereby provide adversaries with a military or intelligence advantage against the
United States.

c.  In May 2019, various public interest organizations wrote to Congress arguing
against the proposed transfer of jurisdictional control of certain items in USML
Categories I-III because, *inter alia*, "[t]he proposal would . . . transfer control of
the technical information and blueprints for potentially undetectable 3D-printed
guns from State to Commerce, a move that could facilitate printing of 3D guns
worldwide, make these weapons readily available to terrorist groups and other
criminal elements, and endanger American embassies, military bases, and
passenger aircraft at home and abroad." Exhibit D.

67.  Certain members of Congress also sought to take legislative action based on concerns
related to the proposed transfer.  On February 8, 2019, Representative Norma Torres, together
with 17 cosponsors, including Representative Eliot Engel, the Chairman of the Committee on
Foreign Affairs of the House of Representatives, introduced the *Prevent Crime and Terrorism
Act*, *see* H.R. 1134, 116th Cong. (2019), which would prohibit the President from removing from
the USML certain "items included in category I, II, or III of the United States Munitions List, as
in effect on August 31, 2017." This bill, however, has not been passed into law.

68.  Similarly, on February 12, 2019, Senator Menendez, together with Senators Christopher
Murphy, Edward Markey, Benjamin Cardin, and Dianne Feinstein as cosponsors, introduced the

*Stopping the Traffic in Overseas Proliferation of Ghost Guns Act, see* S. 459, 116th Cong. (2019), which would, *inter alia*, prohibit the President from "remov[ing] any firearm, or technical information relating to such firearm, from the United States Munitions List." It would also prohibit the President and Secretary of State from amending any requirement under the ITAR "relating to the export of firearms controlled on the United States Munitions List, as such regulations and munitions list were composed as of January 1, 2018." This bill also includes the congressional finding that "[f]irearms manufactured with 3D printers could be untraceable and undetectable by conventional means, making it easier for criminals, terrorists, and other bad actors to commit violent crimes." This bill also has not been passed into law.

69.     The House of Representatives adopted an amendment to the draft National Defense Authorization Act for Fiscal Year 2020 (FY 2020 NDAA) proposed by Representatives Eliot Engle and Norma Torres on July 10, 2019 (H. Amdt. 512 to H.R. 2500) that would prohibit the President from removing from the USML "any item that was included in category I, II, or III of the United States Munitions List, as in effect on August 31, 2017." According to the Conference Report for the FY 2020 NDAA, however, the House amendment was not included in the FY 2020 NDAA conference bill, and the amendment was ultimately not enacted as part of the FY 2020 NDAA, which was signed into law by the President on December 20, 2019.

70.     The Department was also familiar with the arguments against controlling the publication of the files used to 3D-print firearms from litigating against Defense Distributed and the States and from public comments received from the Department's May 2018 NPRM, including arguments that such controls amount to censorship of speech and prevent individuals from exercising their right to possess firearms.

## M. **Changes to Draft Final Rules After First Congressional Notification**

71.    Following congressional notification in February 2019, the Departments of State and

Commerce continued to prepare for publication of their final rules in the *Federal Register*.

Although the Department will typically publish its final rule shortly after the expiration of

statutorily mandated 30-day "formal" notification period, in this case, various factors, including

discussion of the advisability of controlling the technology and software that can be used to

produce 3D-printed firearms, delayed the typical timeline.

72.    As a result of discussions among the Departments of Commerce, State, and Defense and

other members of the Executive Branch, in coordination with the National Security Council,

about controlling the technology and software that can be used to produce 3D-printed firearms,

the Executive Branch determined that the transfer of firearms, ammunition, and other related

items subject to the draft final rules should include appropriate regulatory mechanisms to control

the publication of certain technology and software used to 3D-print firearms.  Although the

Department of State previously determined, in consultation with the Department of Defense and

other interagency partners, that nonautomatic and semi-automatic firearms to .50 caliber

(12.7mm) inclusive and the directly-related technical data do not confer a critical military or

intelligence advantage and are not inherently military based on their function—and thus should

be removed from the USML—the Departments of State and Defense agreed with the Department

of Commerce that maintaining appropriate controls under the EAR over certain technology and

software for producing firearms subject to the EAR remained in the national security and foreign

policy interests of the United States.

73.    The Department of Commerce, in consultation with the Departments of State and

Defense and other interagency partners, therefore took steps to revise its draft final rule to add

controls relating to the publication of technology and software that can be used to produce 3D-printed firearms. The Department of State, in consultation with the Departments of Commerce and Defense and other interagency partners, also made corresponding changes to the preamble of its draft final rule.

74.     While reconsidering the 3D-printed firearm controls with the interagency, as well as in drafting the Department of State's draft final rule and reviewing the Department of Commerce's draft final rule, the Department of State was mindful of the *In re DD Settlement* Court's preliminary injunction order finding that serious questions were raised regarding the Department of State's prior steps to settle the Texas litigation with Defense Distributed. The Department of State, together with the Department of Commerce, followed all appropriate procedures before publication of the final rules.

75.     The Department of State reviewed the proposed controls over technology and software related to 3D-printed firearms in the Department of Commerce's draft final rule—which were the same as those ultimately published in the Department of Commerce's final rule—and considered how those controls would impact world peace, national security, and foreign policy. The Department of State also considered all aspects of the *Defense Distributed* and *Washington* cases, including the arguments made by plaintiffs, the orders issued by the courts, and the determinations and statements made by the Department of State in both cases. The Department also considered the significant number of public comments received related to this matter.

   N.   **The Impact of the State and Commerce Final Rules on National Security, Foreign Policy, World Peace, and Other Considerations**

76.     After a careful analysis of the national security and foreign policy considerations, the Department of State concluded, as stated in the Department of State's final rule, that the Department of Commerce's proposed controls over technology and software related to 3D-

printed firearms address U.S. national security and foreign policy concerns related to "the possibility of widespread and unchecked availability of 3-D printing technology and software, the lack of government visibility into production and use, and the potential damage to U.S. counter-proliferation efforts." 85 Fed. Reg. 3819, 3823 (Jan. 23, 2020).

77.     I disagree with the claim in Plaintiffs' Motion for Preliminary Injunction that the final rules "effectively" deregulate 3D-printable gun files "entirely" and thereby "permit the global dissemination of Firearms files" via the Internet (Pls. Mtn. at 10). To the contrary, the final rules maintain a similar level of control over the Internet publication of files used to 3D-print firearms that has existed under the previous status quo. The Plaintiffs' brief reflects a misunderstanding of the relevant ITAR and EAR export controls and their practical consequences.

78.     The exclusions under the ITAR's "public domain" provision in 22 C.F.R. § 120.11 and the EAR's "published" provision in 15 C.F.R. § 734.7 overlap in many areas, including those relevant to this litigation. Both provisions reflect a recognition of the importance of safeguarding free speech and communication and of ensuring that the regulations are carefully drawn to advance U.S. national security and foreign policy interests. Accordingly, both provisions carve out information available through subscriptions; information available in libraries or other public collections; information available at conferences, meetings, seminars, trade shows, or exhibitions; and other similar scenarios. The Department of State's and the Department of Commerce's authority to impose controls over the export of information is, therefore, limited in much the same way.

79.     One area where the ITAR and EAR do not overlap is that the EAR's "published" provision excludes "public dissemination (*i.e.*, unlimited distribution) in any form (*e.g.*, not necessarily in published form), including posting on the Internet on sites available to the public."

15 C.F.R. § 734.7(a)(4).  A similar exclusion does not exist in the ITAR's "public domain" provision.  However, the Department of Commerce effectively closed this gap with respect to the files used to 3D-print firearms through 15 C.F.R. § 734.7(c) of its final rule, which provides that certain technology and software capable of producing 3D-printed firearms are subject to the EAR even if posted on the Internet.  85 Fed. Reg. 4136 (Jan. 23, 2020).

80.     The Department of State also concluded that the scope of 15 C.F.R. § 734.7(c) was appropriate in addressing the risk to U.S. national security and foreign policy interests posed by the export of files used to 3D-print firearms.  As the Department of Commerce states in its final rule, "the harm identified with unrestricted dissemination has been tied to the easy and untraceable distribution in electronic format the internet provides."  85 Fed. Reg. 4136, 4156.

81.     The Plaintiffs' Motion for Preliminary Injunction appears to contrast the purported requirement for "government pre-approval" in 22 C.F.R. § 120.11(a)(7) with the purported absence of a "government pre-approval" requirement in 15 C.F.R. § 734.7(a)(4) to argue that "there is a higher standard to place items into the 'public domain' [under the ITAR] than to 'publish' them [under the EAR]" (Pls. Mtn. at 9, note 8).  This argument fails to account for the limited ways in which a person could "publicly disseminate" the files used to 3D-print firearms to foreign persons.  The Department of State previously assessed—and continues to assess—that posting on the Internet is the primary means by which a person would likely publicly disseminate the files used to 3D-print firearms to foreign persons.  Accordingly, the Department of Commerce's controls in 15 C.F.R. § 734.7(c) of its final rule effectively create the same standard to control public dissemination of files used to 3D-print firearms as that which exists under the ITAR.  For this reason, the Department of State concluded that 15 C.F.R. § 734.7(c) was appropriately tailored to address the relevant U.S. national security and foreign policy interests

with respect to the export of files used to 3D-print firearms.

82.     The principal other means of public dissemination of files used to 3D-print firearms are treated comparably under the ITAR and the EAR.  As described in paragraph 78 above, the ITAR's "public domain" provision in 22 C.F.R. § 120.11 and the EAR's "published" provision in 15 C.F.R. § 734.7 overlap in many areas.  While some areas may differ, they may capture much of the same activity and fill gaps that might otherwise exist.  Thus, the existing ITAR controls and the new EAR controls apply an effectively equivalent standard to place files used to 3D-print firearms into the "public domain" under the ITAR and to 'publish' them under the EAR.

83.     The Plaintiffs' Motion for Preliminary Injunction also claims that Defense Distributed (or "a company like" it) could email its "already-published" files to a foreign person, which would allow that foreign person to "post them online at will."  This argument reflects multiple misunderstandings that result in an incorrect conclusion.  First, under the Commerce Rule, Defense Distributed did not render its files "published . . . by (briefly) posting them online in 2013 and 2018" because 15 C.F.R. § 734.7(c) excludes such "posting on the internet" from the definition of "published."  Second, a transfer of Defense Distributed's files to a foreign person by email would, like other means of transferring such files to a foreign person, be subject to Commerce licensing requirements as an export.  Third, it is not the case that a transfer of files abroad "plac[es] them beyond U.S. jurisdiction," because EAR jurisdiction continues to exist over the re-export of U.S.-origin files after their export, and so a foreign person would continue to require authorization to post these files onto the Internet in the Plaintiffs' scenario.  Finally, as explained above, the Commerce definition of "published" overlaps extensively with the Department's definition of "public domain," so that distinction does not lead to a significant

difference in treatment under Commerce's Rule. For these reasons, the Department understood at the time the final rules were published, and continues to understand, that the factual scenario set forth by the Plaintiffs would result in multiple violations of the new EAR controls, just as it would violate the existing ITAR controls.

84.    The Plaintiffs' Motion for Preliminary Injunction also claims that the Department of Commerce's final rule creates a glaring loophole in the controls over the files used to 3D-print firearms because it limits the exclusion in the new 15 C.F.R. § 734.7(c) to files "ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or other equipment that makes use of the 'software' or 'technology' to produce the firearm frame or receiver or complete firearm" (Pls. Mtn. at 10-11). This formulation is not a loophole but a measure to provide the Department of Commerce with appropriate flexibility to determine when a file is "ready for insertion" and to provide the public with reasonable certainty as to the meaning of the provision. This formulation also reflects the Department of Commerce's efforts to ensure that the provision is carefully drawn to apply to functional files, and directly addresses U.S. national security and foreign policy interests.

85.    Although the Plaintiffs identify certain areas where the existing ITAR controls over the files used to 3D-print firearms appear slightly more stringent than the new EAR controls, the Plaintiffs conflate stringency with effectiveness and fail to appropriately analyze the effectiveness of the new EAR controls in limiting the proliferation of the files used to 3D-print firearms. The Department of Commerce has the authorities and tools to address the challenge posed by the proliferation of the U.S.-origin files used to 3D-print firearms on the Internet. To the extent the Department of State was able to control the publication of such files, the Department of Commerce will be able to control their publication as effectively.

86.     In this regard, the Department of State focuses its ITAR enforcement efforts on violations that harm, or have the potential to harm, U.S. national security or foreign policy.  As explained in paragraph 22 above, evaluating the severity of such harm or potential harm in a given situation may depend on the nature of the item or technical data involved, including whether it confers a critical military or intelligence advantage to the United States or has an inherently military function.   The Department of State is aware that foreign-hosted websites make available numerous files used to 3D-print firearms available for download online, and persons in foreign countries continue to develop, and post to the Internet, files for the 3D printing of firearms. Department of State enforcement actions would take into account the availability for download from foreign-hosted websites of similar files used to 3D-print firearms, and enforcement efforts related to files for the 3D printing of firearms have been rare.

87.     In light of the above considerations, including both the relative scope of regulatory authority under the ITAR and EAR and the agencies' relative enforcement focus and available resources, in drafting the final rules, the Departments of State and Commerce assessed that the new EAR controls over the files used to 3D-print firearms would be equivalently effective as the existing ITAR controls over such files.

88.     Given this assessment, the Department of State determined that the new EAR controls over 3D-printed firearm technology and software would support the national security and foreign policy interests of the United States.  Specifically, the Department of State determined:

    a.  The Department of Commerce's proposed controls would not permit the unrestricted export of the files used to 3D-print firearms to foreign persons;

    b.  The proposed controls would not permit the unrestricted export of the complete firearm and receiver CAD files included in Defense Distributed's CJ submission;

c.  The proposed controls would facilitate the maintenance of global export control and non-proliferation regimes designed to prevent the spread and accumulation of weapons and sensitive technologies, to the extent feasible given that the files used to 3D-print firearms for small arms are already widely available globally on the Internet; and

d.  The proposed controls would reassure other countries, including important U.S. allies, that the United States is regulating exports of the files used to 3D-print firearms.

**O. Second Congressional Notification**

89.     On November 12, 2019, the Department provided a new "formal" notice to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate pursuant to 22 U.S.C. § 2778(f).  Although no changes were made to the draft regulatory text of the Department's draft final rule as notified to these congressional committees in February 2019—the technical data related to nonautomatic and semi-automatic firearms to .50 caliber (12.7mm) would continue to be removed from the USML—the Department of Commerce made changes to the regulatory text of its final rule to impose controls on the publication of technology and software to produce certain 3D-printed firearms in certain circumstances.  The Department re-notified the relevant congressional committees to explain these changes and ensure that Congress was fully informed about these proposed controls.

90.     The only amendments to the regulatory text of the draft rules were the new Department of Commerce controls on the files used to 3D-print firearms that addressed specific concerns raised by Senator Menendez and other members.

91.     The Department's formal notice to Congress on November 12, 2019 included signed

cover letters, the draft revised USML regulatory text of Categories I-III, a line-in/line-out comparison of the current and draft revised USML regulatory text of Categories I-III, the Department of Commerce's draft companion regulatory text, a summary of the controls for major defense equipment, and a summary of the revisions to the USML.

92.     During this formal notification period, the Department, together with the Departments of Commerce and Defense, provided briefings to and answered questions from congressional committee staff.

93.     On December 10, 2019, the Department received a letter from Senator Robert Menendez purporting to place another "hold" on the congressional notification of the proposed transfer relating to the items in Categories I-III. *See* Exhibit E.  In his letter, Senator Menendez acknowledged that the Department of Commerce's controls on the technology and software that can be used to produce 3D-printed firearms in its draft final rule seek to address his previous concern about the "serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests." Exhibit E.  He confirmed that he would not request any further regulatory changes related to 3D-printed firearms.  However, Senator Menendez stated that his purported "hold" would remain in place until certain concerns with other aspects of the regulation not related to 3D-printed firearms are "satisfactorily addressed." The "formal" notification period expired on December 12, 2019, but the Department continues as part of its regular outreach to Congress to engage with Senator Menendez and his staff about his other concerns.

   **P.  Outreach to Public Advocacy Groups**

94.     Prior to publishing the final rules, the Departments of State and Commerce sought to

further engage with public advocacy groups and other interested parties, irrespective of their mission or whether they would support or oppose the transfer, to ensure that such organizations and individuals understood the scope of the final rules.

95.    On November 20, 2019, the Departments of State, Commerce, and Defense held a roundtable discussion with participants from the National Shooting Sports Foundation, Congressional staffers from the Senate Foreign Relations Committee and House Foreign Affairs Committee, and private practitioners.  Similarly, on December 12, 2019, the Departments of State, Commerce, and Defense held a roundtable discussion with non-governmental organizations (NGOs) and firearm-related advocacy organizations, including Amnesty International USA, the Arms Control Association, the American Bar Association, Transparency International Defence and Security, the Brady Campaign, and the Stimson Center.  The purpose of both roundtables was to explain the draft final rules (including the provisions related to the files used to 3D-print firearms) and answer questions.

**Q. Publication of Final Rules**

96.    On January 10, 2020, the Secretary of State approved the publication of the Department's final rule in the *Federal Register* after careful consideration of the national security and foreign policy interests at stake.

97.    On January 23, 2020, the Departments of State and Commerce published their final rules in the *Federal Register*.  *See* 85 Fed. Reg. 3819; 85 Fed. Reg. 4136.  On the same day, Plaintiffs filed this lawsuit, seeking an order vacating and setting aside the final rules and requesting a preliminary and permanent injunction prohibiting the Departments of State and Commerce from implementing and enforcing the final rules.

**R.  Likely Effects of the Preliminary Injunction Sought by Plaintiffs**

98.     The entry of the requested preliminary injunction prohibiting the Departments of State

and Commerce from implementing and enforcing the final rules would cause significant harm to

the national security and foreign policy interests of the United States.  Such an injunction would

broadly prevent the transfer of all firearms, ammunition, and other related items subject to the

final rules, nearly all of which are entirely unrelated to the Plaintiffs' causes of action.  Such an

injunction would therefore affect a huge number of exports that are completely unrelated to the

technical data for the 3D printing of firearms and frustrate U.S. Government efforts to reform

export controls to more effectively prevent harmful exports while facilitating useful ones.

99.     For the reasons explained above, the new EAR controls over the files used to 3D-print

firearms that Plaintiffs seek to enjoin would be equivalently effective in regulating the

dissemination of such files as the existing ITAR controls.  This conclusion is based on the

assessments of the Departments of State and Commerce in the rulemaking process, my review of

Plaintiffs' specific claims, and my knowledge of the scope and nature of the Department of

State's past and current activities to exercise its authority over exports of the files used to 3D-

print firearms.  Because the two sets of controls are equivalently effective with respect to the

files to 3D-print firearms, there would be no reason to expect greater harms as a result of

Commerce's new controls than from the Department of State's existing controls.

100.    The transfer of the firearms, ammunition, and related items from the Department of State

to the Department of Commerce, as effectuated through the final rules, would further U.S.

national security and foreign policy interests by allowing the Department of State to better focus

its resources on protecting those items that provide a critical military or intelligence advantage

or, in the case of weapons, perform an inherently military function.  The effect of an overly

broad USML that sweeps in items that do not provide a critical military or intelligence advantage or, in the case of weapons, do not perform an inherently military function, is to make it more difficult for the Department of State to focus its export control resources on the sensitive weapons and cutting-edge military technology remaining on the USML.[8]

101.     The USML and CCL reform effort—of which these final rules are an essential component—has sought for almost a decade to create a more effective and dynamic export control system that prevents adversaries from getting access to sensitive weapons and cutting-edge military technology that could be used against the United States, while facilitating exports to allies and partners to better fight alongside the United States in coalition operations and secure their own territory.  By transferring those items that do not provide a critical military or intelligence advantage or, in the case of weapons, do not perform an inherently military function to the Department of Commerce—such as the firearms, ammunition, and other related items being transferred to the CCL under the final rules—the Department of State will be better able to monitor and enforce controls on the weapons and technology that pose the greatest national security threats, while ensuring that our export control regime is capable of quickly licensing and facilitating the delivery of weapons and technology to our military allies and partners to assist them in confronting shared threats and challenges.

102.     The USML and CCL reform effort creates "a system where higher walls are placed around fewer, more critical items."  Secretary of Defense Robert M. Gates, Remarks to Business Executives for National Security (Apr. 20, 2010),

---

[8] As noted above, the Department has sought to accomplish this goal within the current means available by focusing its discretionary allocation of enforcement resources on items that provide a critical military or intelligence advantage.  However, many of the Department's regulatory activities are not discretionary, but rather, involve responding to applications and inquiries submitted by regulated parties.  This means that, until the final rules go into effect, the Department continues to dedicate significant resources to activities that do not involve items that provide a critical military or intelligence advantage.

https://archive.defense.gov/Speeches/Speech.aspx?SpeechID=1453 (explaining the need to

"concentrate on controlling those critical technologies and items – the 'crown jewels' – that are

the basis for maintaining our military technology advantage, especially technologies and items

that no foreign government or company can duplicate"). These critical items that remain on the

USML include warships, nuclear submarines, battle tanks, stealth fighter jets, attack helicopters,

lethal drones, rockets, ballistic missiles, missile tracking systems, torpedoes, mines, directed

energy weapons, biological and chemical warfare agents, nuclear weapons related articles, and

many other items. An injunction would therefore cause harm to national security by preventing

the implementation and enforcement of final rules that will enhance U.S. national security and

foreign policy and better utilize our export licensing and enforcement resources to focus on

those items, destinations, and end-uses of greatest concern and improve interoperability with

allies and partners.

103.    An injunction would also create a less predictable business environment for the U.S.

defense industrial base and would undermine transition preparations implemented by the

Departments of State and Commerce to avoid harming the competitiveness of U.S. defense

companies. Because export license applications currently take an average of 42 days to process,

U.S. exporters of firearms, ammunition, and other related items have already begun to shift their

procedures and processes. They are starting to wind down submissions to the Department of

State and beginning to pre-position license applications with the Department of Commerce.

Issuing an injunction shortly before the effective date would impose additional burdens on U.S.

defense exporters and their customers.

104.    U.S. national security and foreign policy interests are linked to a vigorous U.S. defense

industrial base, and the Departments of State and Commerce undertook substantial preparations

in planning this final chapter of the broader USML and CCL reform efforts to ensure that the
business environment would not be unduly disrupted and U.S. national security and foreign
policy interests would be protected.  These preparations reached every aspect of export control
administration, implementation, and enforcement, including registration, licensing, brokering,
compliance, public outreach, and end-use monitoring.  With no transition plan and no ability to
provide guidance or perform public outreach before an injunction is issued, an injunction would
significantly disrupt U.S. exporters who are making good faith efforts to comply with applicable
regulations and would inject substantial uncertainty and unpredictability into the U.S. export
controls system.

105.    Any such uncertainty or delay in our regulatory and licensing processes would severely
damage the reputation of the United States as a predictable and reliable exporter of munitions. It
would also provide a strategic advantage to foreign competitors.  The net effect would likely be
that potential customers turn to foreign competitors in places like China and Russia.  Adversaries
of the United States would likely seize the opportunity to close deals, build relations, and
improve their strategic position and economic standing at the expense of the United States.  U.S.
exporters would then not only lose business to foreign competitors, but those foreign-competitor
exports and their defense industrial bases would be strengthened vis-à-vis the United States. At
the same time, vital U.S. oversight and conditions attached to a license pertaining to who may
obtain such weaponry and how it is ultimately used would be lost.  In such circumstances, there
is a greater risk that these weapons could be used in a manner inconsistent with U.S. national
security and foreign policy interests.

106.    Finally, as set forth above, I disagree with the Plaintiffs' conclusion in their Motion for
Preliminary Injunction (p. 18) that removing the files used to 3D-print firearms from the USML

"is contrary to the AECA's purposes in furthering 'world peace and the security and foreign policy of the United States" because it fails to achieve Plaintiffs' apparent objective of "reducing the international trade in arms." While the United States should not lose sight of the aspirational goal of "a world which is free from the scourge of war and dangers and burdens of armament," 22 U.S.C. § 2751, U.S. export controls must evolve to ensure that the United States is best able to prevent adversaries from gaining access to dangerous weapons or sensitive technology, enable allies and partners to advance our shared national security objectives, and assist the U.S. defense industrial base to innovate and maintain our technological advantage. U.S. national security and foreign policy objectives in reforming the USML and CCL, as developed by U.S. national security and foreign policy experts at the Departments of State and Defense, seek to address real world challenges, which are far more complex and multifaceted that simply "reducing the international trade in arms." To hinder the evolution our export control regimes, as an injunction in this case undoubtedly would, undermines the national security and foreign policy of the United States and the AECA's ultimate goals of a safer country and a safer world.

107. The transfer of the firearms, ammunition, and related items subject to the final rules is a critical step in advancing the objectives of the AECA. It represents the culmination of a nearly decade-long process of reforming the USML and CCL and the restructuring of how the United States controls exports, which required careful planning and coordination between the Departments of State, Commerce, and Defense. Plaintiffs seek to undo this substantial governmental effort, dating back to its initiation nearly a decade ago, by requesting a broad injunction to enjoin the implementation and enforcement of the final rules based on their own misunderstanding of the export control regulations at issue and a desire to impose their own evaluation of the national security and foreign policy interests at stake. Accordingly, in my

44

judgment, the entry of the requested preliminary injunction in this matter would cause significant harm to the national security and foreign policy interests of the United States and would undermine the Department of State's ability to effectively regulate the export of sensitive weaponry and cutting edge military technology.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 21, 2020.

Michael F. Miller

Exhibit A

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)    Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)    Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
     of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
     agreement or understanding, oral or written, which is not contained therein, shall be
     recognized or enforced. Plaintiffs acknowledge and agree that no promise or
     representation not contained in this Settlement Agreement has been made to them and
     they acknowledge and represent that this Settlement Agreement contains the entire
     understanding between Plaintiffs and Defendants and contains all terms and conditions
     pertaining to the compromise and settlement of the disputes referenced herein. Nor does
     the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
     other than the desire of the Parties to reach a full and final conclusion of the Action, and
     to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an
     instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
     be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the
     benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
     assigns and personal representatives, including any persons, entities, departments or
     agencies succeeding to the interests or obligations of the Parties.

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this

    Settlement Agreement with their counsel, who has explained these documents to them

    and that they understand all of the terms and conditions of this Settlement Agreement.

    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand

    the contents thereof, and execute this Settlement Agreement of their own free act and

    deed. The undersigned represent that they are fully authorized to enter into this

    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,

    each of which shall be deemed an original, and all of which together constitute one and

    the same instrument, and photographic copies of such signed counterparts may be used in

    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly

    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax

    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and

    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,

    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this
Settlement Agreement without reliance on any representation by Defendants as to the
application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of
  Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of
  Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs'
  Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of
  Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for
  firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds,
  regardless of jurisdiction of the firearm, and specially designed parts and
  components therefor; (2) Parts and components specially designed for conversion
  of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or
  attachments specially designed to automatically stabilize aim (other than gun
  rests) or for automatic targeting, and specially designed parts and components
  therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the
  Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other
  Files insofar as those files regard items exclusively: (a) in Category I(a) of the
  United States Munitions List (USML), as well as barrels and receivers covered by
  Category I(g) of the USML that are components of such items; or (b) items.

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

Exhibit B

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons.  Congressional oversight must be retained.

2) Proliferation of 3D Gun Printing Technical Information
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests.  The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally.  This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law.  Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950.  3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge.  Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control.  Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months.  By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives.  It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily.  Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012.  Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control.  Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

Exhibit C

# United States Senate

WASHINGTON, DC 20510

July 26, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).



Secretary Pompeo
Page 2 of 4

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound
determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations
Committee, you committed to reviewing the decision to allow Defense Distributed to publish its
blueprints online. In accordance with this commitment, we ask that you suspend the special
treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State
Department provide us with a written explanation and briefing on the reasoning behind the
decision to settle this litigation in the manner it did. The American people have a right to know
why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for
   the 3-D printing of firearms is a violation of federal export controls? If so, when did this
   reversal of opinion occur and why? Was there a change in the law or the facts that
   prompted this change? If so, please explain the change in either the law or facts that
   prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to
   amend Categories I, II, and III of the USML, and transfer from the State Department to
   the Commerce Department oversight over export of certain firearms, ammunition, and
   related items. What role did the Defense Distributed litigation play in deciding to publish
   these proposed rules? What analysis, if any, did the State and Commerce Departments
   undertake to evaluate the potential risks of the proposed rules changes on export controls
   on the online publication of blueprints for 3-D printed firearms? If the State Department
   did evaluate the risks, what risks were identified? Please identify the individuals involved
   in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the
   design, production, or use of semi-automatic or military-style firearms is transferred to
   the Commerce Department, the release into the public domain of instructions for printing
   3-D firearms will be permissible. Does the State Department have concerns about the
   dangerous consequences of this rules change? Did the State Department make the
   Commerce Department aware of the litigation between it and Defense Distributed and the
   Second Amendment Foundation, the terms of the settlement, or the consequences of
   online publication of blueprints for 3-D printed firearms? If so, please identify to whom
   and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of
   blueprints for 3-D printed firearms, why did the State Department agree to move forward
   with the rulemaking? How does the State Department plan to mitigate these risks?

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints: Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Secretary Pompeo
Page 4 of 4

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator

Exhibit D

May 14, 2019

Dear Member of Congress:

The undersigned organizations write in strenuous opposition to the Administration's proposal to significantly weaken regulation and oversight of firearms exports. The transfer of export controls of semi-automatic pistols, assault-style firearms, sniper rifles, and ammunition from the United States Munitions List under the authority of the Department of State to the less-stringent controls of the Department of Commerce[1] will thwart congressional oversight and create new and unacceptable risks of exacerbating gun violence, human rights abuses, and armed conflict.

The Administration's proposal guts Congress' authority to provide oversight of firearms exports. Currently, Congress is notified of firearms sales authorized by the State Department valued at $1 million or more. No such notification requirements will exist if these weapons are transferred to Commerce control. In recent years, Congressional notification has been an important backstop, helping forestall firearms transfers to repressive forces, such as those in Turkey and the Philippines.[2]

The proposal would also transfer control of the technical information and blueprints for potentially undetectable 3D-printed guns from State to Commerce, a move that could facilitate printing of 3D guns worldwide, make these weapons readily available to terrorist groups and other criminal elements, and endanger American embassies, military bases, and passenger aircraft at home and abroad.[3]

Although proponents of the proposed changes argue that small arms are "less dangerous" because many can be bought in U.S. retail outlets, the fact is that armies are built from these firearms. Small arms are the weapons of mass destruction in countries and regions such as Congo, Burma, Mexico, and Central America. AR- and AK-type rifles and their ammunition that would be transferred to Commerce control are weapons of choice for criminal organizations in Mexico and other Central American countries, contributing to the humanitarian catastrophe that drives many migrants north as guns flow south.[4]

Under the proposed changes, fully automatic firearms would properly remain under State Department control, but semi-automatic weapons would move to the Commerce Department's control. Practically, however, the difference between these types of weapons is meaningless. For example, soldiers in Cameroon last summer – in two separate incidents captured on video – used semi-automatic rifles to execute several men, two women, and two small children.[5] In Mexico, local police in Guerrero State responsible for the forced disappearance of 43 students in 2014 were armed with semi-automatic rifles.[6] Many sniper rifles and semiautomatic firearms that would be moved to the Commerce Department's control are currently in active use by the U.S. military, and many semi-automatic firearms can also easily be converted to fully automatic weapons, further illustrating the false dichotomy of arguments in support of this change.

The proposal will also increase the risk of exports to unauthorized end users and conflict zones as the Commerce Department, charged with promoting sales, will gather less information about those engaged in the arms trade and rely on post-shipment monitoring, rather than pre-license checks. Overall, Congress already has a robust framework for arms transfers, embedding important human rights and other critical provisions in two central statutes: the Arms Export Control Act and the Foreign Assistance Act. The provisions of these laws, generally speaking, apply to defense articles listed on the U.S. Munitions List. Removing weapons from this list exempts them from related statutory constraints.[7]

Ultimately, the weapons and ammunition that currently are controlled under U.S. Munition List Categories I-III belong there and should stay there. The best way to move forward is to prohibit transfer of these weapons out of the U.S. Munitions List and maintain congressional oversight, as is currently proposed in H.R. 1134 and S. 459.[8] A prohibition on transfers out of the U.S. Munitions List could be included in other legislation, such as the National Defense Authorization Act. We urge you to support these measures.

Sincerely,

Alianza Americas
Alliance for Gun Responsibility
Alliance of Baptists
American Federation of Teachers
American Friends Service Committee
American Medical Student Association
Americans for Democratic Action
Amnesty International-USA
Arizonans for Gun Safety
Arms Control Association
Baptist Peace Fellowship of North America
BAYAN USA
Blue Future
Brady
The Campaign to Keep Guns off Campus
Center for American Progress
Center for Civilians in Conflict (CIVIC)
Center for International Policy
Church of the Brethren Office of
    Peacebuilding and Policy
Coalition Against Gun Violence
Coalition for Peace Action
Coalition to Stop Gun Violence
Colorado Ceasefire Legislative Action

Committee in Solidarity with the People of
    El Salvador (CISPES)
Congregation of Our Lady of Charity of the
    Good Shepherd, US Provinces
CT Against Gun Violence
Delaware Coalition Against Gun Violence
    Educational Fund
Desert Southwest Conference UMC, Board
    of Church and Society
Episcopal Peace Fellowship
Fellowship of Reconciliation
Franciscan Action Network
Friends Committee on National Legislation
Friendship Office of the Americas
Georgians for Gun Safety
Giffords Law Center to Prevent Gun
    Violence
Global Exchange
Global Justice Institute, Metropolitan
    Community Churches
Granite State Progress
Grey Nuns of the Sacred Heart
Gun Violence Prevention Center of Utah
Hoosiers Concerned About Gun Violence

Humanity & Inclusion
Interfaith Council for Peace and Justice
International Coalition for Human Rights in
  the Philippines-United States
Jewish Center for Justice
Joint Action Committee
Jr Newtown Action Alliance
Just Foreign Policy
Latin America Working Group
Leadership Conference of Women Religious
Maryknoll Office for Global Concerns
Million Hoodies Movement for Justice
MomsRising
Monmouth Center for World Religions and
  Ethical Thought
National Advocacy Center of the Sisters of
  the Good Shepherd
National Coalition Against Domestic
  Violence
National Council of Churches
National Lawyers Guild, International
  Committee
Network in Solidarity with the People of
  Guatemala
New Mexicans to Prevent Gun Violence
Newtown Action Alliance
Nicaragua Center for Community Action
North Carolina Council of Churches
Oakland Catholic Worker
One Pulse for America
Orange Ribbons for Gun Safety
Pax Christi USA
Pax Christi International
Pax Christi Metro Washington, DC and
  Baltimore
Pax Christi Pacific Northwest
Philippines-U.S. Solidarity Organization -
  Southern California

Presbyterian Church (USA)
San Diegans for Gun Violence Prevention
School of Americas Watch
School of Americas Watch - East Bay
Sister Parish, Inc.
Sisters of Charity of the Blessed Virgin Mary
Sisters of St. Francis of the Neumann
  Communities
States United to Prevent Gun Violence
Stop Handgun Violence
Survivors Empowered Action Fund
Survivors Lead
Task Force on the Americas
The United Methodist Church – General
  Board of Church and Society
United Nations Association of the National
  Capital Area
Violence Policy Center
Vision Quilt
War Resisters League
Washington Office on Latin America
WAVE Educational Fund
We the People for Sensible Gun Laws
Win Without War
Women Against Gun Violence
Women's Action for New Directions
Woman's National Democratic Club

Non-US groups:
Action on Armed Violence
Center for Ecumenical Studies
Colombian Campaign To Ban LandMines
Corruption Watch UK
Human Security Network in Latin American
  and the Caribbean (SEHLAC)
Igarapé Institute
Public Policy Association (APP)

---

[1] Department of Commerce, Industry and Security Bureau, "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)," *Federal Register*, May 24, 2018, p. 24181, at: https://www.federalregister.gov/documents/2018/05/24/2018-10367/control-of-firearms-guns-ammunition-and-related-articles-the-president-determines-no-longer-warrant;

and Government Accountability Office, "EXPORT CONTROLS: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized," GAO-19307, March 1, 2019, at https://www.gao.gov/products/GAO-19-307.

[2] Joe Gould, "US lawmakers balk at arms sales to Saudi Arabia, Turkey and Nigeria," *Defense News*, September 26, 2017, at: https://www.defensenews.com/congress/2017/09/26/us-lawmakers-balk-at-arms-sales-to-saudi-arabia-turkey-and-nigeria/.

[3] Emily Dreyfuss, "3D Printed Gun Blueprints Are Back, And Only New Laws Can Stop Them," *Wired*, August 29, 2018, at: https://www.wired.com/story/3-d-printed-gun-blueprints-return-laws-injunction/.

[4] Violence Policy Center, "Cross-Border Gun Trafficking," at www.vpc.org/indicted; Alex Yablon, "Trump is Sending Guns South as Migrants Flee North," *Foreign Policy*, March 8, 2019, at: https://foreignpolicy.com/2019/03/08/trump-guns-honduras-central-america/.

[5] Susan Waltz, testimony before House Foreign Affairs Subcommittee on Oversight and Investigations, March 26, 2019, at: https://www.forumarmstrade.org/uploads/1/9/0/8/19082495/3-26_testimony_waltz.pdf.

[6] Mexican Commission for the Defense and Promotion of Human Rights, *Gross Human Rights Violations: The Legal and Illegal Gun Trade in Mexico*, 2018, p. 16, at: https://stopusarmstomexico.org/gross-human-rights-abuses-the-legal-and-illegal-gun-trade-to-mexico/.

[7] Susan Waltz testimony, *op.cit*, and Colby Goodman, Christina Arabia, and William Hartung, "Proposed Firearms Export Changes: Key Challenges for U.S. Oversight," Center for International Policy, July 9, 2018, at: https://securityassistance.org/publication/proposed-firearms-export-changes-key-challenges-us-oversight.

[8] See legislative texts at: https://www.congress.gov/bill/116th-congress/house-bill/1134 and https://www.congress.gov/bill/116th-congress/senate-bill/459/.

Exhibit E

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

December 10, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C.

Dear Secretary Pompeo:

On February 4, 2019, I received congressional notification from the Department, pursuant to the authority of section 38(f) of the Arms Export Control Act (AECA), for the proposed transfer of responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I wrote to inform you on February 22 that I was placing a hold on that congressional notification. On November 12, 2019, the Department submitted a new 38(f) notification in response to a proposed regulatory change by the Department of Commerce. I write to inform you that I am placing a hold on the November 12, 2019 notification for the reasons detailed below.

As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely in-use by military and security services - are uniquely dangerous.  They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more rigorous export controls and oversight, not less.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

My hold will remain in place until such time as the issue identified below is sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA provides for congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests.  As you know, Congress took action in 2002 to ensure that the sale and export of these weapons would receive closer scrutiny and oversight, including by amending the AECA to set a lower congressional reporting threshold (from $14 million to $1 million) specifically for firearms on the USML.  Moving such firearms from the USML to the CCL would effectively eliminate congressional oversight of exports of these weapons by eliminating this congressional reporting requirement, and would be directly contrary to congressional intent.

To that end, I reiterate my demand from my previous letter: the Senate Foreign Relations and House Foreign Affairs committees must be immediately informed of any proposed license to export firearms formerly controlled on the USML at the appropriate dollar threshold mandated in the Arms Export Control Act. This concern must be satisfactorily addressed before I will lift my hold.

2) Proliferation of 3D Gun Printing Technical Information

In my February letter, I expressed that there is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claimed that it could not, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. I wrote that:

> *Ultimately, the specific provision of the Export Administration Regulations that is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.*

I understand that the Department of Commerce has now decided to alter its regulations to address this concern; technical information related to the manufacture of firearms, to include 3D-printing information, proposed for transfer to the CCL will be prohibited from publication or Internet posting without a license. That does seek to address my previously-expressed concern, and I will not insist on this to lift my hold. However, I note that this improvement could easily be undone through a simple regulatory change in the future that would not even require congressional notification or review; a statutory authority to maintain such licensing, or better yet, an outright prohibition, may be required. Moreover, Commerce must maintain a policy of "presumption of denial" for any license application sought to publish or post such information, and pursue any violations vigorously.

Sincerely,

Robert Menendez
Ranking Member