UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 2:20-cv-00111 |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

**DECLARATION OF MATTHEW S. BORMAN**

I, Matthew S. Borman, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Deputy Assistant Secretary for Export Administration, United States Department of Commerce. I have held this position since January 2001. My roles and responsibilities in this position include implementing the Bureau of Industry and Security's (BIS) controls on the export of dual-use and military items for national security and foreign policy reasons, including nonproliferation reasons. In addition, I oversee BIS's programs to ensure that industrial resources are available to meet national and economic security requirements, BIS's implementation of the Chemical Weapons Convention, and BIS's implementation of the Additional Protocol to the US-International Atomic Energy Agency Agreement. I am also responsible for overseeing the administration of U.S. unilateral export controls, including exports of items controlled for protection of human rights and export controls associated with international sanctions, such as terrorist-supporting destinations.

2. Since joining Commerce in 1992, I have served continuously in roles involving export control. Prior to my appointment as Deputy Assistant Secretary, I served as Acting Chief of the Enforcement and Litigation Division of the Office of Chief Counsel for Export

1

Administration.  As division chief, I was responsible for providing legal advice to the

Export Enforcement unit of BIS, including the adjudication of administrative

enforcement actions.  I entered the Commerce Department in 1992 as an attorney in the

Office of Chief Counsel for Export Administration.  As an attorney in that office, I was

responsible for a variety of matters, including General Accounting Office and Office of

Inspector General investigations and studies, Freedom of Information Act requests, and

export control cooperation with other countries.

3.   In these capacities at BIS, I have become familiar with the application of the export

controls for controlled commodities, software and technology.

4.   This declaration is submitted in support of the Government's Response to the Plaintiffs'

Motion for Preliminary Injunction in the above-captioned case.  In particular, I describe

the harm to the export control activities of the Department of Commerce if the

preliminary injunction requested by the Plaintiffs to halt the effectiveness of the Final

Rules[1] issued by the Departments of Commerce and State were to be granted.  The

information contained herein is based on my personal knowledge and on information

provided to me in my official capacity.

**Bureau of Industry and Security**

5.   BIS is an agency within the Department of Commerce headed by the Under Secretary for

Industry and Security.  BIS controls the export, reexport and in-country transfer of all

items subject to the Export Administration Regulations (EAR or Regulations) in

---

[1] *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (85 Fed. Reg. 4136) (Commerce final rule) and *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* (85 Fed. Reg. 3819) (State final rule), (collectively, the "Final Rules").

accordance with the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852

(ECRA), the successor statute to the Export Administration Act of 1979, as amended, 50

U.S.C. §§ 4601-4623 (Supp. III 2015) (EAA), most of which has now been repealed.

Among other authorities, BIS also regulates certain activities of U.S. persons, wherever

located, such as those related to nuclear proliferation.

6.  BIS's mission is to advance the U.S. national security, foreign policy, and economic

objectives by ensuring an effective export control and treaty compliance system and

promoting continued U.S. strategic technology leadership.

7.  As part of its responsibilities, BIS licenses the export, reexport and in-country transfer of

items subject to the EAR and seeks to ensure appropriate compliance with and

administration of the Regulations.  BIS also maintains, reviews and clarifies the

Commerce Control List (CCL) to ensure the appropriate administration of export

controls.

8.  Advising BIS's Under Secretary are the Assistant Secretary for Export Administration

and the Assistant Secretary for Export Enforcement.  Relevant to this litigation, the

Assistant Secretary for Export Administration assists and advises the Under Secretary on

the development of policies pertaining to Export Administration issues; provides overall

direction to and management of the national security, nonproliferation, foreign policy,

national defense, and strategic industrial resource functions delegated to BIS, including

the issuance of related regulations.  Department Organization Order (DOO) 50-1, Section

5.01.  The Deputy Assistant Secretary for Export Administration serves as the principal

deputy to the Assistant Secretary for Export Administration; performs such duties as the

Assistant Secretary for Export Administration may assign; and performs the duties of the

3

Assistant Secretary for Export Administration during the latter's absence.  DOO 50-1,

Section 5.02.  Similarly, the Deputy Assistant Secretary for Export Enforcement serves as

the principal deputy to the Assistant Secretary for Export Enforcement and performs such

duties as the Assistant Secretary for Export Enforcement may assign and performs the

duties of the Assistant Secretary for Enforcement during the latter's absence.  DOO 50-1,

Section 6.01-.02.

**Statutory Authority**

9.  Before August 13, 2018, BIS operated under the legal authority of the EAA.  Although

the EAA had been in lapse since August 2001, successive administrations kept the EAA

and the EAR in effect by executive action.  Specifically, the President, through Executive

Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which was

extended by successive Presidential Notices continued the Regulations in full force and

effect under the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et

seq. (2012) (IEEPA).

10.  On August 13, 2018, the President signed into law the John S. McCain National Defense

Authorization Act for Fiscal Year 2019, which included ECRA, providing the legal basis

for BIS's principal authorities.  ECRA repealed all but Sections 11A, 11B and 11C of the

EAA and allows for ongoing agency operations based on a transition provision in Section

1768 of ECRA.  Those sections were continued in effect through a Presidential Notice.

*See* 84 Fed. Reg. 41,881 (Aug. 15, 2019).

11. Specifically, Section 1768 of ECRA provides that all delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the EAA and as continued in effect pursuant to IEEPA and the related Executive Orders and Federal Register notices or the EAR, and were in effect as of August 13, 2018, continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of ECRA.

12. ECRA includes a number of stated policies of the United States in the context of export controls. These include using export controls only to the extent necessary to restrict the export of items that would make a "significant contribution to the military potential of any other country... which would prove detrimental to the national security of the United States" or "further significantly the foreign policy of the United States or [its ability] to fulfill its declared international obligations." 50 U.S.C. § 4811(1)(A)-(B). Further, ECRA states that the "national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled" "[t]o carry out the foreign policy of the United States, including the protection of human rights and the promotion of democracy" and "[t]o ensure national security controls are tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States." 50 U.S.C. § 4811(2)(D), (G).

13. In addition, ECRA also recognizes as part of the statement of policy that "[t]he national security of the United States requires that the United States maintain its leadership in the science, technology, engineering, and manufacturing sectors, including foundational

technology that is essential to innovation. Such leadership requires that United States

persons are competitive in global markets. The impact of the implementation of this part

on such leadership and competitiveness must be evaluated on an ongoing basis and

applied in imposing controls…to avoid negatively affecting such leadership." 50 U.S.C.

§ 4811(3).

14. To achieve these goals, among others, ECRA authorizes the President to control the

"export, reexport and in-country transfer of items subject to the jurisdiction of the United

States whether by United States persons or by foreign persons." 50 U.S.C. § 4812(a)(1).

ECRA further directs that, on behalf of the President, the Secretary of Commerce, in

consultation with other agencies as appropriate, shall "establish and maintain a list of

items that are controlled" and "prohibit unauthorized exports, reexports and in-country

transfers of controlled items, including to foreign persons in the United States or outside

the United States." 50 U.S.C. § 4813(a)(1), (a)(3).

15. The principles described above in ECRA could also be found in the policies of its

predecessor statute the EAA and of its implementing regulations and thus have been a

longstanding part of the administration of export controls. For example, the EAA

recognized that it is the policy of the United States "to sustain vigorous scientific

enterprise. To do so involves sustaining the ability of scientists and other scholars freely

to communicate research findings, in accordance with the applicable provision of law, by

means of publication, teaching, conferences, and other forms of scholarly exchange." 50

U.S.C. § 4602 (Supp. III 2015).

16. In addition, with limited exceptions, ECRA provides that the functions exercised under

Commerce's authority to administer export controls "shall not be subject to sections 551,

553 through 559, and 701 through 706 of title 5." 50 U.S.C. § 4821(a). Thus, by statute,

Commerce's rulemaking process is not subject to the Administrative Procedure Act, and

it is not subject to judicial review. *Id.* A similar exemption existed under the EAA, the

predecessor statute to ECRA that served as the principal authority for the EAR at the time

the Commerce proposed rule was issued on May 24, 2018. EAA, 50 U.S.C. § 4615(a)

(Supp. III 2015).

**Regulatory Framework**

17. The EAR defines the scope of the Regulations in Part 734, identifying the items and

   activities subject to the jurisdiction of the Regulations as well as identifying items not

   subject to the Regulations. For example, "items subject to the EAR" include all items in

   the United States and all U.S.-origin items, wherever located. It does not include items

   within the exclusive jurisdiction of another agency, such as defense articles and services

   controlled under the International Traffic in Arms Regulations (ITAR) administered by

   the State Department's Directorate of Defense Trade Control.

18. Consistent with the consideration of free speech and free expression, the EAR describes

   activities and items that are not subject to the EAR to include unclassified technology and

   software meeting the criteria for "published" as described in 15 C.F.R. § 734.7. This

   includes, among others, the information available in libraries or other public collections

   that are open and available to the public, and from which the public can obtain tangible or

   intangible documents and unlimited distribution at a conference, meeting, seminar, trade

   show, or exhibition, generally accessible to the interested public.

19. Specifically, as set forth in the definition of "published" in the EAR, Section 734.7(a)

   currently includes:

(1) Subscriptions available without restriction to any individual who desires to obtain or purchase the published information;

(2) Libraries or other public collections that are open and available to the public, and from which the public can obtain tangible or intangible documents;

(3) Unlimited distribution at a conference, meeting, seminar, trade show, or exhibition, generally accessible to the interested public;

(4) Public dissemination (*i.e.,* unlimited distribution) in any form (*e.g.,* not necessarily in published form), including posting on the Internet on sites available to the public; or

(5) Submission of a written composition, manuscript, presentation, computer-readable dataset, formula, imagery, algorithms, or some other representation of knowledge with the intention that such information will be made publicly available if accepted for publication or presentation:

> (i) To domestic or foreign co-authors, editors, or reviewers of journals, magazines, newspapers or trade publications;
>
> (ii) To researchers conducting fundamental research; or
>
> (iii) To organizers of open conferences or other open gatherings.

20. Limited exception to the Section 734.7(a) exclusions has been made for encryption as the agency controls encryption for its functional capability rather than expression as set forth in Section 734.7(b) in the current regulations.

21. For items subject to the EAR, the Regulations define what particular activities constitute an export. With limited exceptions, Section 734.13(a) defines "export" to include:

(1) An actual shipment or transmission out of the United States, including the sending or

taking of an item out of the United States, in any manner;

(2) Releasing or otherwise transferring "technology" or source code (but not object code)

to a foreign person in the United States (a "deemed export");

22. As also set forth in Section 734.13(b) of the EAR, the definition of export also includes

"[a]ny release in the United States of 'technology' or source code to a foreign person is a

deemed export to the foreign person's most recent country of citizenship or permanent

residency."

23. The EAR also includes a specific list of controlled items.  Supplement No. 1 to Part 774

of the EAR sets out the CCL, which describes the technical parameters of commodities,

software and technology (collectively referred to as "items") controlled for export,

reexport or in-country transfer.  A license may be required for the export, reexport, or in-

country transfer of items on the CCL depending on the nature of the items, the specific

end use and the end user or destination.  The CCL is organized in categories numbered 0

through 9, which generally correspond with the numbering structure of Wassenaar

Arrangement's control list, a multilateral regime of which the United States is a member.

Items are identified with an Export Control Classification Number (ECCN), which is an

alphanumerical code that helps identify the origin of the control and the restrictions that

may apply.

24. It is important to note, however, that Commerce's jurisdiction extends beyond just the

CCL.  Specifically, Commerce's jurisdiction under the EAR extends to all items "subject

to the EAR."  This includes, among other bases for jurisdiction, all items in the United

States, all U.S.-origin items, wherever located, and certain foreign-made commodities

incorporating controlled U.S.-origin content.  15 C.F.R. § 734.3.  Commerce's broad

reach over items subject to the EAR allows the agency to implement controls related to

U.S. sanctions and embargoes as well as end use and end user restrictions on items not on

the CCL.  For example, the U.S. implements a comprehensive embargo against Cuba,

meaning all items subject to the EAR require U.S. Government authorization for export,

reexport or in-country transfer to Cuba.  Similarly, individuals and entities placed on the

Entity List may require a Commerce license for "all items subject to the EAR,"

depending on the scope of the license requirement.  *See* Supplement No. 4 to Part 744 of

the EAR.

25. With limited exception, EAR jurisdiction extends only to the export, reexport and in-

country transfer of items subject to the EAR and the release of technology to foreign

nationals in the United States, often referred to as "deemed exports."  15 C.F.R. § 734.13-

15.  The EAR does not regulate transactions between U.S. persons (generally including a

U.S. citizen, permanent resident or protected individual/asylee) within the United States

for domestic use.  *See* 15 C.F.R. § 734.18(a)(2).

26. The EAR may require a license or other authorization for the export, reexport or in-

country transfer of controlled items, including technology and software.  Although

revealing technology to a foreign person, including through oral or visual disclosure, is

an export under the EAR, transmitting or otherwise transferring technology or software to

U.S. persons in the United States is not an export and is not governed by the EAR.  15

C.F.R. § 734.18(a)(2).

27. Where a license is required from Commerce, the license application is subject to a

thorough interagency review process as set forth under ECRA as well as the EAR and

consistent with Executive Order 12981.  50 U.S.C. § 4814(c); 50 U.S.C. § 4822(c);

Executive Order 12981, as amended (60 Fed. Reg 62,981, December 8, 1995).  *See also*

15 C.F.R. part 750.  Consistent with these authorities, the Departments of State, Defense

and Energy are authorized to review licenses submitted to Commerce, which allows

Commerce to supplement its technical expertise with that of its interagency partners on

matters of national security and foreign policy, including regional stability and human

rights. The well-established interagency review process ensures that a variety of

perspectives and expertise from these U.S. Government agencies, including the

intelligence community, are able to inform the Commerce license review process to

ensure only those exports that are consistent with U.S. national security and foreign

policy interests will be approved.  BIS also has flexibility in how it approves licenses and

can include additional safeguards as may be warranted, such as through license

conditions.

28. In relation to enforcement, ECRA and the EAR provide for criminal and civil penalties

for violations of the Regulations, including for unauthorized exports, reexports and in-

country transfers.  EAR enforcement decisions are made on a case-by-case basis

depending on the particular facts of a case.  Civil penalties may include a monetary

penalty, denial of export privileges and other remedial actions.

**Addition of Certain Firearms and Related Items to the CCL**

29. On May 24, 2018, in conjunction with the Department of State's Directorate of Defense

Trade Controls, BIS issued a notice of proposed rulemaking (Commerce proposed rule or

NPRM), describing the transfer of certain firearms and related items from the jurisdiction

of the U.S. Munitions List (USML) to the CCL.  The proposed rule was entitled "Control

11

of Firearms, Guns, Ammunition and Related Articles the President Determines No

Longer Warrant Control under the United States Munitions List (USML)," (83 Fed. Reg.

24,166) and was issued under the legal authority of the EAA, as kept in effect by IEEPA

and successive Presidential notices.  On the same day, the State Department published a

companion proposed rule entitled "International Traffic in Arms Regulations: U.S.

Munitions List Categories I, II, and III."  83 Fed. Reg. 24,198 (May 24, 2018)) (State

proposed rule or NPRM).

30. As set forth in the Commerce proposed rule, BIS noted that the EAR included existing

criteria for what falls within the scope of "subject to the EAR" as set forth in Part 734.  It

also identified that there were existing criteria for what falls outside of control, citing the

fact that a gun manufacturer posting a firearm's operation and maintenance manual on

the internet, making it publicly available to anyone interested in accessing it and without

restriction on dissemination, would make the manual no longer subject to the EAR.  83

Fed Reg. 24,167.  BIS explicitly highlighted this provision to put the public on notice of

the framework for understanding the definition of "published."  In general, BIS includes

such information to give the public specific notice and an opportunity to comment.

31. Commerce has historically taken the approach (with limited exceptions) that technology

or software is not subject to export control if it has been "published" within the meaning

of 15 C.F.R. § 734.7, including through posting on the internet.  *Id.*  Commerce followed

this approach in the proposed rule.  *Id.*

32. State and Commerce accepted comments on their proposed rules through July 9, 2018.

BIS received nearly 3,000 comments, including many comments expressing concerns

over 3D printing of firearms and whether appropriate controls would be in place under

the EAR.  It also received a small number of comments that supported maintaining the existing Part 734 criteria.  85 Fed. Reg. at 4137 and 4140.

33. Of the comments received on the Commerce proposed rule, the vast majority were from individuals rather than organizations.  Individual commenters expressed a familiarity with the issue of 3D printing of guns and the Defense Distributed litigation, expressing their position on controls in this area.

34. Following a review of the comments and interagency discussions, State and Commerce developed draft final rules.  On February 4, 2019, the State Department formally notified Congress pursuant to 22 U.S.C. § 2778(f) of its intention to transfer certain items in Categories I, II and III to Commerce.  The Commerce rule at the time included no changes to the scope of items "subject to the EAR" as set forth in Part 734, consistent with the Commerce proposed rule.

35. Following the statutorily mandated 30-day notification period to Congress, State and Commerce did not publish the rules that were notified to Congress on February 4, 2019. Instead, both agencies continued consideration of the draft final rules with input from interagency partners and the Administration to determine the appropriate course in regulation of technology and software for the 3D printing of firearms.

**Consideration of 3D Printing of Firearms**

36. The views and concerns of both those who support and those who oppose the regulation of 3D printing of firearms were set forth in comments to the Commerce and State proposed rules, letters from members of Congress, filings by parties to the litigation in the *Washington* and *Defense Distributed* cases, and other sources.  *See Washington, et al. v. State, et al.*, Case No. 2:18-cv-1115 (W.D. Wash.) ("*Washington I*"). *Defense*

13

*Distributed v. State*, No. 1:15-cv-372 (W.D. Tex.) ("*In re DD Settlement*")  Some of these

considerations include those described below.

37. Commerce was made aware that the Secretary of State received a letter dated July 26,

2018, from nine Senators— Edward Markey, Bill Nelson, Richard Blumenthal,

Christopher Murphy, Dianne Feinstein, Elizabeth Warren, Patrick Leahy, Richard

Durbin, and Benjamin Cardin—arguing that the settlement with Defense Distributed

would allow felons and terrorists in the United States and abroad to access 3D-printed

firearms and urging the Departments not to allow Defense Distributed to publish online

files for the 3D printing of firearms.  Exhibit A.

38. Commenters to the May 24, 2018 Commerce proposed rule also raised various arguments

in support and in opposition to the regulation of 3D printing of firearms.  These

arguments are summarized and reviewed in the Commerce final rule as published, but

they included: 1) concerns over the widespread and openly sanctioned circulation of open

source, non-proprietary instructions for producing operable firearms through 3D printing

or computer numerically-controlled (CNC) milling; 2) concerns over the ease of access to

firearms in the U.S. and abroad that would assist bad actors in enhancing their

capabilities to inflict atrocities around the world; 3) concerns that unregulated 3D printing

would undermine U.S. efforts, as well as governments overseas, to vet parties obtaining

firearms, and to track 3D-printed firearms; and 4) concerns that the transfer of control of

these items to the CCL would undermine longstanding U.S. efforts to counter

proliferation of small arms in the world.  In opposition to the regulation of 3D printing of

firearms, some commenters emphasized that the information is so widely available in

various formats that trying to control it would not be practical.  Some of these
commenters raised concerns related to First Amendment rights.  85 Fed. Reg. at 4136.

39. Following interagency discussions in 2019, which included the Departments of
Commerce, State and Defense as well as coordination with National Security Council
staff regarding controls related to 3D printing of firearms, the Executive Branch
determined that the draft final rules should include appropriate regulatory mechanisms to
control the publication of certain technology and software used to 3D print firearms.

40. Accordingly, BIS, in consultation with interagency partners, reconsidered whether
additional regulatory mechanisms were necessary to ensure control over 3D printing of
firearms.  As noted above, BIS took into account various viewpoints, including those
expressed in public comments on the proposed rule, letters received from members of
Congress, and the litigation related to the 3D printing of firearms in the *In re DD
Settlement* and *Washington I* cases.

**Second Notification to Congress**

41. On November 12, 2019, the State Department provided a new notice to the Committee on
Foreign Affairs of the House of Representatives and the Committee on Foreign Relations
of the Senate pursuant to 22 U.S.C. § 2778(f), including both State and Commerce's draft
final rules.  Although no changes related to the removal of firearms and related items
were made to the draft regulatory text of State's final rule as notified to these
congressional committees in February 2019, Commerce made changes to its draft final
rule to impose controls on the publication of technology and software to produce 3D-
printed firearms in certain circumstances.

**Publication of Final Rules**

42. On January 23, 2020, BIS issued its final rule titled "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)" 85 Fed. Reg. 4136 (effective March 9, 2020). The State Department issued its companion rule on the same date with the same effective date. 85 Fed. Reg. 3819. The Final Rules remove certain firearms and related items from the USML and add them to BIS's CCL in the relevant ECCNs. The Commerce final rule also included an additional provision related to the control of certain technology and software for the 3D printing of firearms and firearm receivers or frames.

43. As relevant to this litigation, the items removed from the USML and placed on the CCL by the Final Rules include:

a. Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less. *Note 1 to paragraph 0A501.a: 'Combination pistols' are controlled under ECCN 0A501.a. A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).*

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I (g) or (h)): barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts"

16

or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.  Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

*Note 2 to paragraph 0A501.d: Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.*

e.  Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

44. Such items would be subject to the export control jurisdiction of Commerce and require U.S. Government authorization for export, reexport and in-country transfer effective March 9, 2020.  The Commerce final rule makes changes to license exceptions to limit their availability, including adding new general restrictions for the use of license exceptions for these firearms and related items moving to the CCL.  The Commerce final rule also makes changes to licensing review policies to ensure U.S. national security and foreign policy interests are protected.

45. BIS also amended the definition of "published" in Section 734.7 of the EAR to maintain jurisdiction over software and technology for the 3D printing of certain firearms.  The relevant text provides as follows:

> The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically

17

controlled machine tool, additive manufacturing equipment, or any other

equipment that makes use of the "software" or "technology" to produce the

firearm frame or receiver or complete firearm.

As a result, under the Commerce final rule, a license will be required to post on the

internet the software and technology for items described in Section 734.7(c) of the EAR

made available for export or otherwise released to foreign nationals.  No EAR license

exceptions will be available to authorize such postings, so a BIS license will need to be

obtained prior to posting on the internet the software and technology for items described

in Section 734.7(c) of the EAR.  As posting on the internet would make such files

available worldwide, license applications would be reviewed with the scope of the

authorization in mind, including newly set forth controls in 15 C.F.R. § 742.6(b)(1) of the

Commerce final rule that set forth considerations of promoting human rights.  85 Fed.

Reg. at 4163.  *See also* 15 C.F.R. part 742 (outlining the various controls for items on the

CCL).

**Background on 3D Printing**

46. As described in the Commerce final rule, 3D printing is a type of additive manufacturing

based on the principle of combining numerous, extremely thin layers of a physical

material (including plastics, metals, and even living cells) in a controlled build process

and joining them to gradually build up a physical, three-dimensional object.  Computer

controlled manufacturing may be either subtractive or additive.  Subtractive

manufacturing includes traditional manufacturing methods such as turning, grinding or

milling, where metal or other material is removed from the base shape to form the final

product.  For example, one could take a steel block and remove material until it becomes

18

the final item.  In additive manufacturing, which is often referred to as 3D printing,
material such as metal or plastic is laid down in very thin layers one upon the other fusing
together until the final net shape is achieved.  In both instances, the adding or removing
of the material is controlled by a computer without human intervention.  3D printers
utilize electronic digital files to process the materials into a physical object, and these
files can be distributed over the internet.  A 3D printer or CNC equipment uses Computer
Aided Manufacturing (CAM) files in G-code or AMF format as executable code to
produce certain items.  There are currently technological limitations for the effectiveness
of 3D printing of firearms, but the concept has been demonstrated and the ability to
manufacture commercially viable firearms is likely given the increasing improvements of
3D printing equipment and 3D printing materials. 85 Fed. Reg. at 4139.

47. Like 3D printing, CNC milling or machining is an automated manufacturing process
controlled by technology and software.  CNC milling/turning/grinding are all subtractive
manufacturing processes in which the computerized equipment removes layers of
material from a base—known as the workpiece or the blank—to produce a manufactured
part or item. 85 Fed. Reg. at 4140.

48. In the Commerce final rule, the new Section 734.7(c) focused on maintaining controls
over the files for the 3D printing of a firearm and firearm frames or receivers because of
their functional capability.  As noted in the preamble, "[g]iven concerns regarding First
Amendment restrictions the control is appropriately tailored to only impact technology
and software in an electronic format" limited the provision to files with a functional
capability.   85 Fed. Reg. at 4141.

**The Motion for Preliminary Injunction Includes Inaccurate Descriptions of the Operation of EAR Provisions**

49. A number of paragraphs in Plaintiffs' motion do not accurately describe the operation of export controls under the EAR.  The following paragraphs address those inaccuracies:

    a. Plaintiffs' Motion for Preliminary Injunction states that "[f]or example, a company like Defense Distributed could advertise the availability of its already-published CAD files on the internet, then email the files to any foreign individual or organization that requests them." Pls. Mtn. at 9.   The motion asserts that "Defense Distributed has 'published' many of its files by (briefly) posting them online in 2013 and 2018." *Id.*

        i   15 C.F.R. § 734.7(c) specifically excludes posting on the Internet from the definition of "published" under the EAR.  Based on Commerce's review of State's 2015 Commodity Jurisdiction determination of Defense Distributed's files, it is Commerce's understanding that those Defense Distributed files that State determined were subject to the ITAR at the time.  Throughout the subsequent events, including the court's order in the *Washington I* litigation, the technology and software was determined to remain subject to ITAR jurisdiction.  As a result, when Defense Distributed's files that are State controlled transfer to the jurisdiction of Commerce, they will become subject to the EAR and subject to EAR licensing requirements, including for posting on the internet.

ii   On March 9, 2020, Commerce will maintain jurisdiction over Defense
Distributed's files that were controlled technical data under the ITAR.
For example, a Defense Distributed file for the 3D printing of a firearm,
currently controlled under the ITAR, will be controlled under the EAR
and subject to licensing requirements under ECCN 0E501.  Such an item
would also require a license for posting on the internet.  Separately, the
firearm produced from such a file will also be controlled for export and
reexport and will require Commerce authorization.

iii  Commerce has jurisdiction over controlled technology and software that
is exported or reexported via email, direct file transfer, or transfer via a
physical hard drive that are exported or reexported.  Such a transfer to a
foreign person is subject to licensing requirements under State
Department regulations and will continue to be subject to licensing
requirements under Commerce Department regulations.

iv   It is important to note that some of the Defense Distributed files
included in the 2015 State Commodity Jurisdictions (CJ) determination
were determined not to be controlled on the USML.  Instead, some files
were determined to be under the jurisdiction of the Commerce
Department and designated as "EAR99." This means that no license
was required to export those specific files, except in limited
circumstances (involving an embargoed or sanctioned destination, or a
prohibited end use or end user).

21

b.  Plaintiffs' motion states that "[o]ther files can be 'published' with relative ease, without the government pre-approval that is required to distribute ITAR-controlled items."  Pls. Mtn. at 9.

  i   As noted in its preamble, the Commerce final rule recognized that libraries and academic institutions within the United States carry books or other materials for firearms manufacturing, and "BIS does not seek to regulate this existing landscape of activity."  85 Fed. Reg. at 4142. State's current definition of "public domain" includes information which is published and which is generally accessible or available to the public through sales at newsstands and bookstores, through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information, through second class mailing privileges granted by the U.S. Government, at libraries open to the public or from which the public can obtain documents, through parents available at any patent office, through unlimited distribution at a conference, meeting, seminar, trade show or exhibition generally accessible to the public in the United States, and through public release in any form after approval by the cognizant U.S. Government department or agency.  Commerce's definition of "published" contains equivalent language to many of these methods of entering the public domain, except that Commerce's definition of "published" does not specifically include availability through sales at newsstands and bookstores, second-class mail, or patents.

ii   State's definition of "public domain" includes materials that have been

placed in the public domain through "public release (i.e., unlimited

distribution) in any form (e.g., not necessarily in published form)," but

to fall within this category of "public domain," such release must occur

"after approval by the cognizant U.S. government department or

agency," 22 C.F.R. § 120.11(a)(7).  The risk identified with the Defense

Distributed files was the likelihood that posting them on the Internet

would result in an inevitable unauthorized export to foreign persons.

While Commerce's current Section 734.7(a) does not include a pre-

approval requirement as found in State's public domain definition in 22

C.F.R. § 120.11(a)(7), Commerce effectively closed the gap by

extending Commerce jurisdiction as set forth in 15 C.F.R. § 734.7(c) in

the Commerce final rule to the software and technology for the 3D

printing of firearms.  This new licensing requirement in the context of

posting technology and software for the production of a firearm, or

firearm frame or receiver, controlled under ECCN 0A501 ensures that

the EAR maintains largely equivalent controls over such files.  This

addresses the harm identified in connection with the Commerce NPRM

of "unrestricted dissemination . . . tied to the easy and untraceable

distribution in electronic format that the internet provides."  85 Fed.

Reg. at 4142.  By ensuring that ITAR-equivalent controls over 3D

firearms files are maintained, the Commerce final rule thereby addresses

the specific threat to U.S. national security and foreign policy that has

23

been identified with software and technology for the 3D printing of
firearms.  85 Fed. Reg. at 4142.

iii  Thus, the scope of controls over the software and technology required to
3D-print guns when transferred from State Department jurisdiction to
Commerce Department jurisdiction is equivalent.

c.  Plaintiffs' motion states that once files are lawfully exported, "foreign recipients
could post them online at will."  Pls. Mtn. at 9.

i  This is a risk that exists regardless of which agency controls the
technology or whether the files are lawfully exported (as they could be
under ITAR regulation) – any foreign recipient could post a file.
However, just because the file was posted by a person outside the United
States (whether foreign or not) does not make the activity "beyond U.S.
jurisdiction" as Plaintiffs suggest.  In fact, Commerce still exercises
jurisdiction over such U.S.-origin files and has a history of regularly
enforcing its regulations beyond persons in the United States, including
against foreign procurement networks.  These authorities and activities
are set forth in Commerce's companion declaration from its Deputy
Assistant Secretary for Export Enforcement. *See* Hassebrock
Declaration.

ii  Because Commerce retains jurisdiction over U.S.-origin technology and
software that has been exported, any subsequently controlled event
would require authorization from Commerce.  Thus, posting files subject
to Commerce jurisdiction on the Internet would continue to require

authorization, even by a foreign person located abroad. This activity is still within the jurisdiction of Commerce, and Commerce has the authority to bring an enforcement action. For example, Commerce could bring an enforcement action against the foreign person for violation of U.S. law and impose monetary penalties as well as deny the foreign person's access to U.S. products and markets, among other remedies.

d.   Plaintiffs' motion argues that Commerce's final rule only exercises jurisdiction "over a limited and arbitrary subset" of firearms files. Pls. Mtn. at 9-10. Again, as set forth in the Commerce final rule preamble, Commerce aligned its controls with existing statutory concepts set forth in the definition of "firearm" under the Gun Control Act (GCA), 18 U.S.C. § 921(a)(3). The scope was not an "arbitrary subset" but focused on the critical functional elements of the firearm (the firearm frame or the firearm receiver) and the complete firearm.

e.   Plaintiffs' motion further argues that Commerce's regulatory text for controls over 3D printing is "limited" because it uses phrases like "ready for insertion" into a 3D printer or similar device. Pls. Mtn. at 9-10. Rather than being limiting, this language provides the agency discretion, recognizing that the underlying technology and software may evolve and that the devices used for production may evolve. The language is intended to provide flexibility to the regulatory agency, including for determining whether something is "ready for insertion," while at the same time providing the public sufficient notice of controls to seek a license in appropriate circumstances. The language allows for fact-specific analysis that is

critical to a regulatory agency where the underlying technology may still be developing.  Further, the use of "ready for insertion" is intended to reflect the fact that free speech and free expression principles are taken into consideration when regulating materials, such as files, that are not "functional."

f.   Plaintiffs' motion mischaracterizes the scope of Commerce's jurisdiction and the text of the regulation to control 3D printing as "glaring loopholes."

    i   As stated in the preamble to the Commerce final rule, the existing framework of the definition of "published" recognizes longstanding principles of freedom of expression, including the public's access to libraries and ability to exchange ideas through other fora, just as the framework of "public domain" does under the ITAR.  There are constitutional and statutory considerations that inform the regulation of information in these spaces, regardless of whether they are regulated by State or by Commerce.  These are not "loopholes," as Plaintiffs describe them, but the means by which the federal government seeks to respect free expression while protecting U.S. national security and foreign policy interests.

    ii  In sum, firearms and related items, as transferred by the Final Rules, are subject to licensing requirements based on the control status of the items that account for U.S. national security and foreign policy, including human rights consideration.  Software and technology for certain firearms and firearms frames or receivers, as described in Section 734.7(c) of the EAR as set forth in the Commerce final rule, remain

subject to the EAR and subject to a worldwide license requirement because posting such files on the internet is treated as a worldwide release under the EAR. *See generally* 15 C.F.R. part 742; 15 C.F.R. § 742.6(b). A thorough interagency review process affords more executive branch agencies with visibility into the licensing of firearms and related items under the Commerce final rule.

**Commerce and State Do Not Regulate Domestic Transfers**

50. Commerce and State acknowledged in the preamble to the Commerce final rule that as export control agencies, neither agency has jurisdiction over purely domestic transfers, including domestically disseminating files by mail. Specifically, the preamble states "...nothing in this rule prohibits persons within the United States from developing, discussing, or transferring by hand or mail (*e.g.*, by the U.S. Postal Service or a common carrier) CAM files related to 3D-printing technology and software. The domestic transfer of commodities is outside the scope of BIS jurisdiction and would be within the purview of domestic law. The release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (*i.e.*, release to a foreign person). This means transfers between U.S. persons within the United States are not regulated under the EAR so long as there is no release to a foreign national." 85 Fed. Reg. at 4141. However, because transfers between U.S. persons within the United States are also not regulated under the ITAR, there is no change in controls over the dissemination of technology or software by mail (or other domestic means) among U.S. persons as the result of the Final Rules.

27

**Likely Effects of the Preliminary Injunction Sought by Plaintiffs**

51. The entry of an order granting the preliminary injunction sought by the Plaintiffs – to halt the effective date of the Final Rules issued by both the Departments of State and Commerce – would unnecessarily delay the transfer of items from the USML to the CCL and would have substantial potential implications on U.S. national security and foreign policy as the relevant items being transferred have already been determined by State and Defense as not to warrant control under the ITAR.  State and Commerce have taken all necessary steps to effectuate the transfer and thus further delay is unwarranted.

52. Commerce has begun the process of outreach to the affected communities to raise awareness of the transfer of jurisdiction and related compliance issues.  Delaying the effective date of the rule will create compliance uncertainty and confusion in relation to licensing and enforcement of USML Categories I, II, and III items.  For example, during the 45-day delayed effective period, Commerce has engaged in a number of outreach and education events.  This includes training for the public and training for interagency partners involved in implementing the regulations.

53. In anticipation of changes, members of the regulated community have begun undertaking the expense of reclassifying items and updating compliance programs to align with the transfer of jurisdiction, which potentially comes at considerable cost.  Any uncertainty as to jurisdiction only compounds expenses for such businesses, including manufacturers and small businesses, undercutting the intended regulatory relief.  As of February 23, 2020, Commerce had received more than 200 submissions, including classification requests and licensing applications, from parties seeking to pre-position in anticipation of jurisdictional changes.

28

54. Further, the export control reform effort had been designed to strengthen national security by enhancing the competitiveness of American manufacturers and developers of technology in the areas being transferred to Commerce control.  Thus, an injunction that prevents the transfer of authority from occurring would cause harms to manufacturing and technological competitiveness to the detriment of national security.

55. In my judgment, the entry of a preliminary injunction sought by the Plaintiffs in this matter to halt the effect of the Final Rules would increase the risk of all of the foregoing harms.  Indeed, such an injunction could lead to confusion as to the control status of firearms and related items to the detriment of U.S. national security and foreign policy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2020.

Matthew S. Borman

# Exhibit A

# United States Senate

WASHINGTON, DC 20510

July 26, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

Secretary Pompeo
Page 2 of 4

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound
determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations
Committee, you committed to reviewing the decision to allow Defense Distributed to publish its
blueprints online. In accordance with this commitment, we ask that you suspend the special
treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State
Department provide us with a written explanation and briefing on the reasoning behind the
decision to settle this litigation in the manner it did. The American people have a right to know
why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for
   the 3-D printing of firearms is a violation of federal export controls? If so, when did this
   reversal of opinion occur and why? Was there a change in the law or the facts that
   prompted this change? If so, please explain the change in either the law or facts that
   prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to
   amend Categories I, II, and III of the USML and transfer from the State Department to
   the Commerce Department oversight over export of certain firearms, ammunition, and
   related items. What role did the Defense Distributed litigation play in deciding to publish
   these proposed rules? What analysis, if any, did the State and Commerce Departments
   undertake to evaluate the potential risks of the proposed rules changes on export controls
   on the online publication of blueprints for 3-D printed firearms? If the State Department
   did evaluate the risks, what risks were identified? Please identify the individuals involved
   in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the
   design, production, or use of semi-automatic or military-style firearms is transferred to
   the Commerce Department, the release into the public domain of instructions for printing
   3-D firearms will be permissible. Does the State Department have concerns about the
   dangerous consequences of this rules change? Did the State Department make the
   Commerce Department aware of the litigation between it and Defense Distributed and the
   Second Amendment Foundation, the terms of the settlement, or the consequences of
   online publication of blueprints for 3-D printed firearms? If so, please identify to whom
   and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of
   blueprints for 3-D printed firearms, why did the State Department agree to move forward
   with the rulemaking? How does the State Department plan to mitigate these risks?

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledge[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation.  Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints: Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Secretary Pompeo
Page 4 of 4

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator