UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., Plaintiffs, | § § § § |
| v. | §   No. 2:20-cv-00111 § |
| U.S. DEPARTMENT OF STATE, et al., Defendants. | § § § |

# DECLARATION OF DOUGLAS R. HASSEBROCK

I, Douglas R. Hassebrock, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Deputy Assistant Secretary for Export Enforcement, United States Department of Commerce. I have held this position since November 2019. I am the senior career law enforcement official within the Department's Bureau of Industry and Security (BIS). In that role, I oversee BIS's Office of Export Enforcement (EE), which consists of the Office of Export Enforcement (OEE), the Office of Enforcement Analysis (OEA), and the Office of Antiboycott Compliance (OAC). Together with BIS's licensing officers and policy staff, EE personnel apply risk-analysis, targeting, law enforcement expertise, and export control knowledge to prevent and deter illegal exports to focus on three core areas: stopping the proliferation of weapons of mass destruction and missile delivery systems, diversion of dual-use goods to terrorists or state sponsors of terrorism, and preventing dual-use and sensitive military items from being used for unauthorized military end-use. In these capacities, I have become familiar with the application and enforcement of export controls for controlled commodities, software and technology.

2. Prior to my current position, I served as Director of OEE for nine years. Before joining BIS in December 2010, I served as the Assistant Director, Investigations, Recovery

1

Accountability and Transparency Board where I led the oversight of over $787 billion in economic stimulus spending. I also served as the Special Agent in Charge of the Eastern Region, U.S. Department of the Interior - Office of Inspector General, and Assistant Special Agent in Charge, Technology Crimes Section at the U.S. Department of Energy - Office of Inspector General.

3. I started my career in law enforcement in 1993, with the U.S. Air Force Office of Special Investigations (OSI) where I worked in many different areas including special access programs, counterintelligence, white-collar crime, crimes against persons, and environmental crime. I remain a Special Agent with OSI in a reserve military officer capacity in the rank of Colonel. In that role, I am the senior reserve officer for OSI serving as the Individual Mobilization Augmentee to the Commander, of U.S. Air Force OSI. I am also a graduate of the U.S. Air Force Air War College and the U.S. Air Force Air Command and Staff College.

4. This declaration is submitted in support of the Government's Response to the Plaintiffs' Motion for Preliminary Injunction in the above-captioned case. In particular, I describe the harm to the law enforcement export control activities of the Department of Commerce if the preliminary injunction requested by the Plaintiffs to halt the effectiveness of the Final Rules[1] issued by the Departments of Commerce and State were to be granted. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

---

[1] *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (85 Fed. Reg. 4136) and *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* (85 Fed. Reg. 3819) (collectively, the "Final Rules").

**Summary of Export Control Authorities**

5. BIS administers and enforces export controls on a broad spectrum of dual-use and certain sensitive munitions items for the Department of Commerce through the Export Administration Regulations (EAR) under the authority of the Export Control Reform Act of 2018 (ECRA).[2]

6. Dual-use items are commodities, software, or technology that have both commercial and military or proliferation applications. Some examples of dual-use items include things such as: smoke bombs, spiked batons, certain shotguns, shotgun shells and buckshot, rocket fuel, space launch vehicles, radiation hardened integrated circuits, turbines for use in nuclear reactors, integrated navigation systems designed or modified for use in missiles, chemical warfare precursors, biological containment facilities, radio frequency modules, triggered spark gaps, and carbon fiber.

7. Munitions items include military flight instrument trainers, lightweight turbojet engines, medical facilities for surface or submersible vessels of war, demolition blocks and detonators for military explosives, thrust or combustion chambers, armor plate for hard body armor, discrete microwave transistors, military concealment and deception equipment, smoke or obscuration equipment and simulators, submarine or torpedo nets,

---

[2] The Regulations originally issued under the Export Administration Act of 1979, as amended, 50 U.S.C. §§ 4601-4623 (Supp. III 2015) ("the EAA"), which lapsed on August 21, 2001. The President, through Executive Order 13,222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which was extended by successive Presidential Notices, continued the Regulations in full force and effect under the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq. (2012) ("IEEPA"). On August 13, 2018, the President signed into law the John S. McCain National Defense Authorization Act for Fiscal Year 2019, which includes the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852 ("ECRA"). While Section 1766 of ECRA repeals the provisions of the EAA (except for three sections which are inapplicable here), Section 1768 of ECRA provides, in pertinent part, that all rules and regulations that were made or issued under the EAA, including as continued in effect pursuant to IEEPA, and were in effect as of ECRA's date of enactment (August 13, 2018), shall continue in effect until modified, superseded, set aside, or revoked through action undertaken pursuant to the authority provided under ECRA.

rebreathing apparatus specially designed for military use, submersible military vessels, thermal batteries, and telecommunications equipment for a military application.

**Export Enforcement**

8. BIS is the sole agency with exclusive authority to investigate violations of the EAR and ECRA. That singular focus allows for the development of the requisite subject matter expertise to effectively enforce a broad regulatory regime in the United States and abroad. The Office of Export Enforcement (OEE) maintains Special Agents at offices across the United States, including its headquarters in Washington, DC, eight field offices located in Boston, Chicago, Dallas, Los Angeles, Miami, New York, Northern Virginia, and San Jose as well as resident offices in Atlanta, Houston and Portland. In addition, OEE Special Agents have been deployed to FBI field offices in Charlotte, Cincinnati, Denver, Huntsville, Minneapolis, Phoenix, Salt Lake City, San Diego, and Savannah, as well as to the Defense Criminal Investigative Service (DCIS) office in San Antonio, Texas, to provide enhanced coverage for investigating export violations.

9. OEE Special Agents are sworn federal law enforcement officers with authority to bear firearms, make arrests, execute search warrants, serve subpoenas, detain and seize items about to be illegally exported, and order the redelivery to the United States of items exported in violation of U.S. law. OEE's work is enhanced and bolstered by sister divisions in BIS.

10. BIS's International Operations Division screens BIS license applications and reviews export documentation to select candidates for pre-license checks (PLCs) and post-shipment verifications (PSVs), collectively referred to as end-use checks (EUCs). This work gives BIS direct visibility into transactions and enable BIS to validate information

on BIS export license applications, including end-user reliability, prior to shipment, and strengthens assurances that the parties comply with the terms of export licenses and the EAR. This end-use monitoring program supports the export licensing process and generates information about possible export violations for further investigation by OEE. This division, working with regional Export Control Officers described below, supports Export Enforcement's role in the bilateral negotiations with, inter alia, Hong Kong, Singapore and the United Arab Emirates on export control cooperation and coordination to increase capacity to prevent the diversion of U.S.-origin items.

11. BIS's Export Control Officer Program consists of Special Agents on detail to the Department of Commerce's Foreign Commercial Service in seven strategic overseas locations critical to BIS's mission: Beijing, China; Hong Kong, China; Dubai, United Arab Emirates; New Delhi, India; Frankfurt, Germany; Istanbul, Turkey; and Singapore. All of these positions have regional responsibilities that extend their reach to more than 50 additional countries. End-use checks are also conducted by OEE Sentinel Program trips, conducted by domestically-based OEE Special Agents and U.S. Embassy personnel.

12. Finally, BIS's Investigative Analysis Division is responsible for producing investigative leads relating to potential export violations for outreach and investigation by OEE Special Agents. Investigative leads are developed from unfavorable end-use checks, review of export and license data, and classified and open sources of information. In addition, OEA's Investigative Analysis Division provides research and analytical case support to OEE investigations.

13. BIS Export Enforcement has evolved over the past 38 plus years into a sophisticated law enforcement agency, with criminal investigators and enforcement analysts who are

singularly focused on export enforcement and work closely together with licensing officers within a single bureau of the government. Using its subject matter expertise in the area of export controls, coupled with its unique administrative and other enforcement tools, Export Enforcement leverages its relationships with partner law enforcement agencies and industry to maximize its impact. To complement that expertise, BIS has a unique range and combination of administrative enforcement authorities including the imposition of civil penalties, denial of export privileges, and placement of individuals and entities on lists that restrict or prohibit their involvement in export and reexport transactions.

**BIS Tools to Further U.S. National Security and Foreign Policy Interests**

14. One of the more significant tools in the BIS arsenal is our administrative authorities, which enable the agency to take action to further protect U.S. national security and foreign policy interests. The Department of Commerce maintains three screening lists which advise the public that listed persons are subject to export restrictions. BIS takes actions where appropriate to place parties on the BIS Entity List, Unverified List, and Denied Persons List. In the event an entity or individual on one of the following lists appears to match a potential party in an export transaction, additional due diligence is required before proceeding to ensure the transaction does not violate the EAR. These lists are available on the BIS website at http://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern. They are also included in the U.S. Government Consolidated Screening List, a comprehensive screening system managed by the Departments of State, Treasury and Commerce, available at https://www.export.gov/article?id=Consolidated-Screening-List.

*Denied Persons List*

15. The Denied Persons List contains the names and addresses of individuals and entities located in the United States and overseas subject to a denial of export privileges. Any dealings with a person or entity on this list that would violate the terms of the denial order are prohibited under the EAR.

16. Denial of export privileges may be imposed as part of an administrative penalty. In addition, in the event of a criminal conviction for violations of the EAR, IEEPA, Section 38 of the Arms Export Control Act (or any regulation, license, or order issued thereunder), or one of the several espionage, conspiracy and smuggling-related statutes, BIS may impose a denial of export privileges for up to ten years from the date of a person's conviction. In cases where administrative charges are brought, there is no limit to the period of export denial.

17. In addition, the Assistant Secretary for Export Enforcement may issue a Temporary Denial Order denying any, or (typically) all, of the export privileges of a company or individual to prevent an imminent or ongoing export control violation. These orders are issued ex parte for a renewable 180-day period and deny not only the right to export from the United States, but also the right to receive or participate in exports from the United States.

18. BIS also maintains two other screening lists which advise the public that listed persons are subject to export, reexport, and in-country transfer restrictions. In the event an entity or individual on one of the following lists appears to match a potential party in an export, reexport, or in-country transfer transaction, additional due diligence is required before proceeding to ensure the transaction does not violate the EAR.

*Entity List*

19. The BIS Entity List has evolved into a formidable administrative tool that prohibits unlicensed exports, reexports, or transfers of some or all items subject to the EAR to listed foreign entities. Those on the Entity List were placed there because of the risk they pose of diversion of U.S.-origin items to weapons of mass destruction (WMD) programs, destabilizing accumulations of conventional weapons, terrorism, or other activities contrary to U.S. national security or foreign policy interests. These license requirements are in addition to any license requirements imposed on the transaction by other provisions of the EAR. As a general rule, BIS applies a policy of denial for license applications involving listed entities.

*Unverified List*

20. The Unverified List (UVL) contains the names and addresses of foreign persons that have been parties or intended parties to transactions subject to the EAR whose bona fides could not be confirmed as a result of an end-use check, including the U.S. Government's inability to conduct such an end-use check. The presence of a person listed on the UVL in a proposed export transaction creates three consequences: all export transactions must be reported in the Automated Export System; license exception-eligibility is suspended; and for all other EAR transactions not subject to a license requirement, the exporter must obtain a statement from the UVL party agreeing to abide by the EAR, including to permit an end-use check prior to export. Once BIS confirms the bona fides of the foreign party, including through completion of an end-use check, a party may be removed from the UVL. Similar to the Entity List, the UVL provides an incentive for foreign companies to comply with the EAR, including the EAR's end-use check requirements.

**Criminal and Administrative Penalties**

21. In addition to the preventative measures described above, BIS may seek criminal and administrative penalties in the event of a violation. In cases involving a willful violation of the EAR, violators may be subject to both criminal fines and administrative penalties. Administrative penalties may also be imposed when there is no willful intent, which means that administrative cases can be brought in a much wider variety of circumstances than criminal cases. Under ECRA, criminal penalties can reach 20 years imprisonment and $1 million per violation. Administrative monetary penalties can reach up to just over $300,000 per violation (subject to adjustment in accordance with U.S. law, e.g., the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Pub. L. 114 -74, sec. 701)) or twice the value of the transaction, whichever is greater.

22. Administrative and criminal cases are the result of OEE investigations initiated on information and intelligence obtained from a variety of sources, including routine review of export documentation, overseas end-use monitoring, and industry information. OEE investigates both export violations by U.S. persons and the unauthorized reexport or transfer by foreign persons of items subject to the EAR to prohibited end uses, end users, or destinations.

23. Since 2015, BIS has levied $1.85 billion in civil penalties and taken administrative enforcement action against more than 200 individuals and businesses. In that same period, BIS investigations led to 160 convictions, penalties of more than $445.7 million in criminal fines, more than $340.5 million in forfeitures, and over 3,400 months of imprisonment.

**Interagency Partnerships and Cooperation to Prevent and Investigate Violations**

24. BIS Export Enforcement protects and promotes U.S. national security, foreign policy and economic interests by investigating violations, interdicting illegal exports, conducting end-use checks, educating parties to export transactions on how to improve export compliance practices and identify suspicious inquiries, supporting the licensing process by evaluating the bona fides of transaction parties, and aggressively pursuing violators of export control laws for criminal prosecution or administrative penalties. That work is made possible through the assistance and participation of a number of federal agency partners that work together to ensure the protection of dual use and sensitive military items.

25. Other federal agencies with a role in administering U.S. export controls include the Department of State, which controls the export of defense articles and defense services subject to the International Traffic in Arms Regulations (ITAR), the Department of Energy, which controls exports and reexports of technology related to the production of special nuclear materials, the Nuclear Regulatory Commission, which controls the export of certain nuclear materials and equipment, and the Department of the Treasury, which administers economic sanctions programs. In addition, while the Export Enforcement arm of BIS is the only agency that exclusively investigates violations of the EAR and ECRA, a wide array of partner agencies, including the Federal Bureau of Investigation, Customs and Border Protection, Homeland Security Investigations, are authorized to pursue and assist in such violations as well.

26. In relation to the enforcement of items that transferred from the USML to the CCL, including firearms and related items, Commerce will be adding over 136 BIS

enforcement special agents to the existing list of law enforcement agents already responsible for enforcement of controls over these items. Thus, in addition to partner agencies described above, the U.S. Government will have the specialized training of Commerce federal law enforcement agents who have extensive experience in the investigation and enforcement of cases involving firearms and other sensitive military items.

**Likely Effects of the Preliminary Injunction Sought by Plaintiffs**

27. I understand that the Plaintiffs in this case have requested a preliminary injunction that would enjoin the Final Rules issued by the Commerce Department and the State Department on January 23, 2020, *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (85 Fed. Reg. 4136) and *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* (85 Fed. Reg. 3819), respectively, from going into effect, to preserve the status quo pending review on the merits. If the entry of an order granting the requested preliminary injunction were to delay the transfer of items from the USML to the CCL, such an order would have substantial potential implications on the enforcement of controls over these items by creating unnecessary confusion about which agency has authority to investigate and enforce potential violations.

28. Relevant to Plaintiffs' motion, many of the significant administrative enforcement tools described above, including Temporary Denial Orders, will be unavailable to the U.S. Government if the requested preliminary injunction is put in place to halt the effectiveness of the Final Rules. Those tools, which are exclusively available to the

Commerce Department in the area of export controls, underscore Commerce's ability to retain jurisdiction over U.S.-origin files beyond persons in the United States. For example, just last month, BIS issued a Temporary Denial Order against ten foreign persons based on evidence showing their involvement in an international procurement scheme to illegally obtain U.S.-origin items on behalf of two foreign entities tied to nuclear and missile proliferation activities. *See* 85 Fed. Reg. 2471 (January 24, 2020). That action exhibited Commerce's long-held position that its jurisdiction follows the item, and that future unlicensed exports, reexports, or in-country transfers violate the EAR. Similarly, the Entity List was specifically designed to prevent and prohibit listed foreign persons from receiving U.S.-origin items without a license from BIS. *See* 15 C.F.R. § 744.11. Neither of those tools would be available to the U.S. Government if the requested preliminary injunction were put in place to halt the effectiveness of the Final Rules.

29. In my judgment, the entry of the preliminary injunction requested by the Plaintiffs to halt the effectiveness of the Final Rules in this matter would increase the risk of all of the foregoing harms. Indeed, such an injunction could lead to confusion as to the control status of firearms and related items to the detriment of U.S. national security and foreign policy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2020.

Douglas R. Hassebrock