1

2

3

4

5

6

7

8

9

10

The Honorable Richard A. Jones

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WISCONSIN, | NO.  2:20-cv-00111-RAJ STATES' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

                              Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
STATE; et al.,

                              Defendants.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## I.       INTRODUCTION

The parties agree 3D-printed guns are a national security threat but diverge on whether the Final Rules, by their plain text, will effectively deregulate those items notwithstanding that threat. The Government seeks to evade a ruling on this legal question by raising numerous procedural and standing issues that were correctly rejected by Judge Lasnik in the prior related case. As for the substance of the Final Rules, the Government is incorrect that they "do[ ] not deregulate the transferred items." Their arguments that the States "misinterpret[ed]" the rules are based on their own atextual, informal, and vague "interpretations" advanced for the first time here, which are not entitled to any deference and will not prevent irreparable harm to the States.

## II.      ARGUMENT

### A.    The Final Rules Will Not Prevent the Global Dissemination of Firearm Files

*First*, under 15 C.F.R. § 734.7(c), Commerce will only retain jurisdiction over published files that are "ready for insertion" into a 3D printer or similar device, but will lack jurisdiction over files that can be converted to a readable format using readily available 3D-printing software. *See* Patel Decl. ¶¶ 10–14. As a result, anyone could post such CAD design files, along with a link to free, readily-available 3D-printing software that can promptly convert them into a "ready for insertion" format. The result will be widespread, easy access to 3D-printable Firearm Files with no restrictions. This is no idle threat. Some of Defense Distributed's export-controlled files— including technical data for assault rifles—were in CAD file formats that are *not* ready for insertion, but can be easily converted into an insertable format. *Id.* ¶ 20.[1] Defense Distributed could also de-convert its insertable files into a non-insertable format and post them online with instructions how to convert them back. Defendants do not appear to dispute any of this. If this is not deregulation, what is?

*Second*, in contrast to the ITAR—which requires government pre-approval to place an

---

[1] *See also Def. Distributed v. Grewal*, 3:19-cv-04753 (D.N.J.), Dkt. #1-40, ¶ 5 (Feb. 5, 2019) (Defense Distributed's Director stating company's Firearm Files include CAD files from SoLiDworks, STEP, and SketchUp).

1

item into the "public domain"—Commerce's new Rule allows "publication" with no pre-approval. Even if the Court were to accept the Government's unnatural, *ad hoc* reading of § 734.7(c) to retroactively exempt certain internet-posted files from the definition of "published" (*see infra* at II.A), publication can easily occur by any of the other means outlined in § 734.7(a). Once the files are "published" in such a way, they are "not . . . subject to the EAR" and can be exported via any method besides posting on the internet, including email. One could even advertise on the internet that published "ready for insertion" files are available to anyone in the world, and then deliver those files via email. Again, this is not an idle threat. Defense Distributed very likely has already "published" Firearm Files via 15 C.F.R. § 734.7(a)(4) by mailing its files to members of the public without any government pre-approval. Assuming such files were "published," Defense Distributed could then export the files to anyone in the world via any method *other than* posting a "ready for insertion" file on the internet. The government does not appear to dispute this. If this is not deregulation, what is?

If either or both of the above occur, the reservation of EAR jurisdiction over "ready for insertion" files "made available by posting on the internet" is meaningless.

The Government's response amounts to claiming that the States' reading is wrong based on a *post hoc* analysis by the agencies, while avoiding the central interpretive issues in the case. For example, they claim that "Plaintiffs wrongly contend that EAR jurisdiction over 3-D firearm files is limited to Internet postings." Gov't Opp. at 21. But they omit that the States are talking about "published" files. *See* Mot. at 9. Section 734.7(a) plainly says that "published" technology is "not . . . subject to the EAR," and § 734.7(c) only retains jurisdiction over certain published files "made available by posting on the internet," not files made available by other means.

Nor does the Government support its curious suggestion that "public domain" as used in the ITAR has an equivalent meaning as "published" in the EAR. *See* Gov't Opp. at 20–21. These distinct terms have distinct meanings and are subject to different requirements. Most significantly, "publication" under the EAR does not require government pre-approval. *See* 15 CFR § 734.7 (no

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

pre-approval requirement). Placing an item in the "public domain" under ITAR *does* require pre-approval. Mot. at 9; *see* Gov't Opp. at 3 (citing 22 C.F.R. §§ 120.10(b), 120.11(a)(7) and quoting express pre-approval requirement); *Washington v. United States Dep't of State,* 318 F. Supp. 3d 1247, 1262 (W.D. WA 2018) (*Washington I*), (files published without approval under ITAR "are not in the 'public domain' for purposes of the AECA."); *see also* 80 Fed. Reg. 31,528 (Jun. 3, 2015) (ITAR has long required "that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled 'technical data,' as defined in § 120.10"). Removing Firearm Files from ITAR control removes the pre-approval safeguard against their unrestricted dissemination.

Nor does the Government explain its *post hoc* interpretation of § 734.7(c) to retroactively exempt internet-posted files from the existing definition of "published." *See* Gov't Opp. at 21 (asserting, without explanation, that "prior posting of files" does not make them "published"); *contra* 15 C.F.R. § 734.7(a)(4) (software or technology is "published" when it "has been made available" by "posting on the Internet on sites made available to the public"). While § 734.7(c) retains EAR jurisdiction over certain 3D-printed firearm software or technology that "is made available by posting on the internet," the most natural reading is that this provision does *not* apply to items that have *long ago* been "published" by internet posting—such as Defense Distributed's files that were posted on the internet years before these rules were finalized. *See* Mot. at 7, 9. The Government's interpretation reads additional language into § 734.7(c), i.e., they would read "is made available" to mean "is *or has ever been* made available."[2]

The Government relies on a number of other vague and unsupported assertions, namely: (1) claiming without explanation that the "ready for insertion" provision "closely resembles" the

---

[2] This reading is doubly confusing because the Commerce Department already interprets the distinct phrase "has been made available" in 15 C.F.R. § 734.7(a) to mean "is or has ever been made available." *See* Bureau of Industry and Security, U.S. Department of Commerce, "Revisions to Definitions in the [EAR]: FAQs" at 2 (cited in Mot. at 9 n.9) ("The EAR do not cover technology that is already published or technology that is made public by the transaction in question (§§ 734.3 and 734.7)."). *See, e.g., Collins v. Univ. of Notre Dame Du Lac,* 929 F.3d 830, 841 (7th Cir. 2019) (different language to address parallel issues creates inference of different meaning).

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

ITAR regime, even though ITAR broadly regulates the export of "technical data" "related to" Category I firearms (22 C.F.R. § 121.1) whereas § 734.7(c) is far more limited; (2) claiming without explanation that the "ready for insertion" provision is "tailored to provide Commerce with flexibility," even though § 734.7 *strips Commerce of jurisdiction* over non-"ready for insertion" published files; and (3) attempting to equate "ready for insertion" files with "functional" files, even though the term "functional" appears nowhere in § 734.7(c), neither term is defined anywhere, and Defendants offer no reason to read them as synonymous. *See* Gov't Opp. at 22 and declarations cited therein.

In fact, the Government appears to seek deference generally for its broad assertion that there are "not any material differences in the two regulatory regimes." *See* Gov't Opp. at 23 n.18. Such deference is not warranted. "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). It is not ambiguous, for example, that Commerce will lack jurisdiction over published technology exported by means other than the Internet. *See* 15 C.F.R. § 734.7. And the States have relied on the analysis of a leading expert in the field as well as a common-sense, plain-text reading of § 734.7(c) to interpret the phrase "ready for insertion" to exclude files such as CAD design files that cannot be directly "inserted" into or read by a 3D printer. *See* Patel Decl. ¶¶ 10–14; Mot. at 9–10. Second, "Plaintiffs are wrong" is not a position susceptible to deference, particularly where, as with the "ready for insertion" language, no positive interpretation of the relevant language is offered. Third, even where an agency's interpretation of a "genuinely ambiguous" rule is "reasonable," courts must "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, 139 S. Ct. at 2416. For example, the interpretation "must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement"; and it must reflect the agency's "fair and considered judgment"— not a "convenient litigating position," a "*post hoc* rationalization," or an interpretation that creates "unfair surprise" to regulated parties. *Id.* at 2416–18. Here, the Final Rules' significant procedural

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

flaws (*see* Mot. at 10–16) mean the interpretations advanced by the Government fail the *Auer* test multiple times over. There is nothing "official" or "authoritative" about a position advanced for the first time in declarations filed with a court. And those interpretations are obviously an "unfair surprise" because the *Final Rules themselves* are an unfair surprise, having been promulgated without adequate notice.

The Government's responses to the States' readings of the Final Rules either miss the mark or avoid the issue. Either way, they are not entitled to deference.

## B.  As Previously Established, the Court Has Jurisdiction to Review Agency Actions Deregulating Firearm Files

The Court has jurisdiction to conduct judicial review under the APA because the Final Rules *deregulate* Firearm Files—they are not an exercise of export-control authority that Congress decided to make unreviewable. Moreover, the State and Commerce Rules cannot be viewed in isolation: it is the *removal* of the files from the Munitions List and the *transfer* of jurisdiction that is challenged here, and the agencies' joint decision in how to effect such transfer.

### 1.  22 U.S.C. § 2778(h) does not apply to this case

As this Court ruled in the prior related case, the AECA's provision excluding certain agency actions from judicial review applies to "one type of decision": "the decision to designate an item as a defense article or defense service." *Washington v. United States Dep't of State*, No. 18-1115RSL, 2019 WL 5892505, at *5 (W.D. Wash. Nov. 12, 2019) (*Washington II*) (citing 22 C.F.R. § 2778(h)).[3] "The decision at issue here, however, is the *removal* of an item from the [Munitions List]," which "Congress did not expressly make . . . unreviewable." *Id.* (emphasis added).[4] Here, for the exact same reason, the State Rule's removal of Firearm Files from the Munitions List is judicially reviewable. So too is what happens concurrently with such removal,

---

[3] The Government's citations to the Congressional Record are pulled misleadingly out of context. *See* Gov't Opp. at 12. Senator Riegel was addressing the resolution of interagency disputes. 135 Cong. Rec. 31346. Senator Kerry acknowledged that the law "broadens the President's discretion" but only "in some cases," i.e., in the designation decision. *Id.* at 31346.

[4] The Government never disputed this in the prior case. *See* Gov't Opp. at 12.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    i.e., the transfer of jurisdiction to Commerce, under the terms of the Commerce Rule. The
2    situation is analogous to one person handing over a fragile object to another. If the first person
3    has reason to know the second is liable to drop the object under the circumstances, this knowledge
4    is highly relevant to the first person's decision of whether and how to transfer.

5         *Washington II* is squarely on point. *Contra* Gov't Opp. at 12. First, the Court's decision
6    was not based on whether the removal of an item occurred in a regulation or not. It was based on
7    a reading of the plain language of the statute, which states that only the decision to *designate* an
8    item is committed to agency discretion. *See Washington II*, 2019 WL 5892505, at *5. Second, the
9    facts of that case are not different in any relevant respect. *Contra* Gov't Opp. at 12. In particular,
10   Defendants cannot avoid scrutiny of the deregulation of 3D-printed gun technology merely by
11   embedding it within a larger regulatory overhaul. Third, the Court's ruling with regard to
12   designation versus removal was not dicta. The applicability of 22 U.S.C. § 2778(h) was squarely
13   raised by a party in the case. *See Washington II*, 2019 WL 5892505, at *5. The Court considered
14   the central argument Defendants are making, and rejected it. *See id.* That ruling was necessary to
15   the case because it concerned the Court's jurisdiction.

16        The Government's attempt to re-brand the removal of items as a "revised 'designation'"
17   holds no water. As the Court ruled, removal is removal, not designation. Webster's defines
18   "designate" in relevant part as "to indicate and set apart *for a specific purpose . . .*" (emphasis
19   added).[5] Here, Congress's narrowly crafted language is limited to the designation of items "as
20   defense articles . . . for purposes of this section [of the AECA.]" 22 U.S.C. § 2778(h); *see*
21   *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279, 1289 (N.D. Cal. 1996) ("[T]he AECA makes
22   the *initial designation* of items as defense articles unreviewable.") (emphasis added); *see also*
23   *United States v. Chi Mak*, 683 F.3d 1126, 1131 (9th Cir. 2012) ("*After* an item is designated on
24   the USML, the AECA and ITAR require any person wishing to export that item to apply for a

25

26   _____
     [5]   "Designate." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/designate?src=search-dict-hed. Last accessed Feb. 24, 2020.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    license") (emphasis added). The States are not challenging the initial designation of *any* items "as

2    defense articles." And removing an item from the Munitions List is in no sense a designation

3    under the AECA—it is a de-designation. The Government's broad reading of "designation" is

4    also at odds with the canon that "as a matter of the interpretive enterprise itself, the narrower

5    construction of a jurisdiction-stripping provision is favored over the broader one." *ANA Int'l, Inc.*

6    *v. Way*, 393 F.3d 886, 891 (9th Cir. 2004); *see also, e.g.*, *Ctr. for Biological Diversity v.*

7    *Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019) ("clear and convincing evidence" of congressional

8    intent needed to foreclose judicial review).

9         **2.    The Agencies' joint decision to transfer jurisdiction is reviewable**

10        Even assuming the Commerce Rule (at least when construed in isolation, separate from

11   the State Rule) reflects "functions exercised under" the ECRA that are excluded from judicial

12   review under 50 U.S.C. § 4821, the actions at issue here—removing items from the Munitions

13   List and transferring jurisdiction—are *not* ECRA actions. They are reviewable, at a minimum,

14   through review of the State Rule, which is the primary mechanism for the removal and is

15   necessary to the transfer.[6] The State Rule, by its own internal logic, incorporates and depends

16   upon the reasoning and substance of the Commerce Rule. *See, e.g.*, State Rule at 3823. Both

17   simultaneously issued rules work in concert: as the State Rule explains, the "combined effects"

18   of these "companion" rules is a "transfer" of Firearm Files from the Munitions List to the

19   Commerce Control List. *Id.* at 3820. This means that in reviewing the State Rule, the Court must

20   review the referenced provisions and reasoning of the Commerce Rule as well. *See Motor Vehicle*

21   *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 30–31 (1983) ("a court

22   must consider whether the decision was based on a consideration of the relevant factors and

23   whether there was a clear error of judgment"). In brief, because the State Rule is reviewable, the

24   Commerce Rule is as well.

25

26        [6] Indeed, 50 U.S.C. § 4821 shows the heightened stakes here: this may be the States' last chance to have
     their input on this issue considered by either agency.

### 3.    22 C.F.R. § 128.1 does not exempt the State Rule from the APA

The Government argues that the State Department has exempted itself, under 22 C.F.R. § 128.1, from using notice-and-comment procedures to remove 3D-printed gun technology from the Munitions List. That argument lacks merit, as § 128.1 pertains only to the "administration" of the AECA—not to the *removal* of items from the AECA's purview and *transfer* of those items elsewhere. *See* 22 C.F.R. § 128.1 (focusing on the agency's licensing and approval decisions). Even on its own terms, the regulation does not apply here.

Even if that were not the case, § 128.1 would be invalid as applied. The provision purports to interpret and apply "the military and foreign affairs exclusion of the Administrative Procedure Act," which is codified at 5 U.S.C. § 553(a)(1).[7] This exclusion from judicial review is "narrowly construed and only reluctantly countenanced." *See Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (citation and quotation marks omitted). The Ninth Circuit recently noted that courts have approved its application only where "the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule" absent a notice-and-comment process, but not where "the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018) (citing, *inter alia*, cases involving the Iran hostage crisis); *see also, e.g.*, *State of N. J., Dep't of Envtl. Prot. v. U.S. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980) (citing S.Doc. No. 248, 79th Cong., 2d Sess. 200 (1946)). Even where a subject typically "implicate[s] foreign affairs," the test in this Circuit is whether application of the APA's notice-and-comment provisions would "provoke definitely undesirable international consequences." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).

The Final Rules obviously fail that test, since the agency in fact engaged in a long, drawn-out (albeit deficient) notice-and-comment rulemaking process. Tellingly, the Government makes

---

[7] The provision states in relevant part that the general APA notice-and-comment procedures apply "except to the extent that there is involved—(1) a military or foreign affairs function of the United States."

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION  --
NO.  2:20-CV-00111-RAJ

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

no effort to argue that § 553(a)(1)'s narrow and rarely invoked exception applies here, nor does it cite a single case addressing the validity of its purportedly "longstanding" blanket approach to § 553(a)(1), which stands directly at odds with the case-by-case approach prescribed by recent case law. The States are unaware of a case that supports the Government's position. Instead, the Government relies solely on 22 C.F.R. § 128.1 itself. That regulation is entitled to no deference whatsoever. *See, e.g.*, *Dandino, Inc. v. U.S. Dep't of Transp.*, 729 F.3d 917, 920 n.1 (9th Cir. 2013) (it is "well-established" that an agency's position on a court's jurisdiction is not entitled to deference); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (agency not entitled to *Chevron* deference for interpretation of APA, a statute it does not administer). Unlike *Bragdon v. Abbott*, 524 U.S. 624 (1998), cited by the Government, there is no "unwavering line of administrative *and judicial* interpretation" of the APA with respect to the AECA. *Id.* at 645 (emphasis added). Nor does the Government cite evidence that Congress was specifically aware of § 128.1. *See id.* (citing such evidence with respect to agency position in that case). Furthermore, the agency's interpretation of the APA's applicability to the AECA is unsustainable because it would render Congress's express language of 22 U.S.C. § 2778(h) superfluous by carving out a far broader exclusion from administrative review. *See supra* at II.B.1. In sum, the agency's self-interested attempt to deprive the Court of jurisdiction may be longstanding (though untested), but it is clearly invalid under the circumstances here.

The Government's other arguments that this matter is nonjusticiable (on standing and political question grounds) likewise lack merit and were rejected in the prior case, as discussed *infra* at II.E.

**C.    The Government's Substantive Arguments Flowing from the Interpretive Errors Discussed Above Are Meritless**

All parties agree that 3D-printed guns are a national security threat. Whether the Final Rules are arbitrary and capricious and contrary to law largely turns on the parties' conflicting interpretations of the rules. *See* Gov't Opp. at 26–34. Having addressed the Government's

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

interpretive errors above, the States have established likelihood of success on the merits of these claims, *see* Mot. at 16–22, and have amply established irreparable harm and that the equities and public interest weigh strongly in their favor. *See id.* at 22–24 and accompanying citations.

A few additional points are worth making. First, the States are not inherently opposed to moving jurisdiction over Firearm Files from State to Commerce, so long as such files are controlled at a similar level as under the ITAR. However, the justification cited by DAS Miller— "that the items proposed for transfer are already commonly available and not inherently for military end-use"—plainly does not apply to technical data related to 3D-printed guns, as all parties agree that such weapons are *not* commonly available and that it is illegal to possess one. Judge Lasnik rejected this rationale when offered as a basis for deregulating 3D-printed guns in *Washington I* and *II*. The States also take issue with the suggestion in Defendants' briefing that the jurisdictional transfer of 3D-printed firearm files has been in the works since 2010. As is extensively discussed in *Washington I* and *II*, the Government long maintained that 3D-printed firearm files were a national security threat and ITAR-controlled, until abruptly changing its position in 2018 with the clandestine settlement with Defense Distributed that led to the Final Rules now at issue. Once the public learned of this settlement—which was after the comment period for the Rules closed—the agencies received over 105,000 opposition emails in less than a week. *See* Mot. at 4. In addition, contrary to the Government's suggestion otherwise, an agency's statement that a factor was considered is not a substitute for actually considering it. *Beno v. Shalala*, 30 F.3d 1057, 1075 (9th Cir. 1994). The Final Rules' preambles reveal that while the agencies paid lip service to the concepts of national security and foreign policy, they failed to explain—as required under *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)—how the removal, transfer, and toothless regulation of Firearm Files under § 734.7's publication loophole actually furthers those interests. *See* Mot. at 17–18, 20–21. It does not.

As to irreparable harm, the Government's assertion that national security and foreign policy will be "significant[ly] harm[ed]" by *any* delay in implementing the Final Rules—which

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

were promulgated at the tail end of a decade-long export-control reform process—strains credibility. Gov't Opp. at 30–32. From an equitable standpoint, any delay is primarily a result of the agencies' failure to provide notice and an opportunity to comment on the Final Rules' treatment of 3D-printed firearm files, the fact that they did not publish those rules until late January 2020, and that they drafted the rules in a way that makes severing the relevant provisions impossible, as discussed below. At any rate, a mere implementation delay cannot outweigh the irreparable harm that *permanent* deregulation of Firearm Files—thus allowing for the first time their unlimited distribution on the internet—will cause to the States and their residents if the Final Rules go into effect on March 9. *See* Mot. at 22–24.

**D.    The Agencies Were Required to Comply with the APA, but Failed to Satisfy Its Notice and Comment Requirements**

The Government is in an awkward position. On the one hand, it argues that commentators had meaningful notice of the Final Rules' changes regarding 3D-printed gun technology and that the agencies effectively responded to such comments. *See* Gov't Opp. at 23–24. On the other, it argues that the States have misinterpreted the regulatory regime and relies primarily on over 100 pages of litigation-generated declarations, rather than its analysis from the rulemaking, to respond. *See, e.g.*, Gov't Opp. at 20. It is therefore clear that the Government's rulemaking did *not* address the specific issues raised by the States and amici, which they were deprived of the opportunity to raise in the rulemaking.[8]

The Government's primary defense is that *some* commentators addressed *some* aspects of the rules' *potential* effects on 3D-printed gun technology. *See* Gov't Opp. at 8–9, 24–26. But, as noted, the agency would not need to rely so heavily on *ad hoc* declarations had it already responded to the issues raised by the States. The Government is trying to "bootstrap notice" from

---

[8] Because the Government failed to provide notice of the Final Rules' effect on 3D-printed firearms, *see* Mot. at 11–13, its assertion that objections to the "critical military or intelligence advantage" standard were "waived" has no merit. *See* Gov't Opp. at 28. The *application* of this standard to 3D-printed Firearm Files is at issue here. 3D printed firearms are unique items to which "military or intelligence" considerations do not apply in the same way they apply to traditional munitions items. It is the public—not the Government—that was deprived of an "opportunity to consider" the issue. *See id.* at 28 n.23.

11

comments that do not even address the specific issues raised here. *See* Mot. at 12–13 (citing cases).

3D-printed guns are a novel and controversial[9] technology that the agency knew posed a unique "Pandora's box" situation because of its prior litigation with Defense Distributed. *See, e.g.*, FAC ¶ 68. Nor do the States claim that agencies cannot add "new regulatory subdivisions in response to comments and concerns." *See* Gov't Opp. at 26. But such additions must be "a 'logical outgrowth *of the proposals on which the public had the opportunity to comment*." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 421 (D.C. Cir. 1994) (emphasis added). Here, the State Department's position on 3D-printed guns has whipsawed several times between April 2018, when it expressed its commitment to regulate the CAD files at issue, to June 2018 (after the NPRMs were published), when it sought to allow publication of Defense Distributed's files, to earlier this year, when it professed to share the concerns raised by the plaintiffs seeking to prevent such publication. *See* FAC ¶¶ 63–70; Commerce Rule at 4141. Commerce even suggested that its new provision on 3D-printed guns was included partly in response to the prior litigation, Commerce Rule at 4141, even though the litigants (many of whom are plaintiffs here) were never given notice of how the rules might deregulate the relevant technology.[10]

The procedural harm is underscored by the Government's claim to strong administrative deference in its interpretation of how the regulations would operate with respect to issues about which no notice was given. *See* Gov't Opp. at 23 n.18. The Government's position is that it did not need to provide any notice of how the rules would affect 3D-printed gun technology about

_____

[9] To merit notice, a subject of regulation does not need to make the national news (as the prior lawsuit did) or spawn immediate federal legislation. *Contra* Gov't Opp. at 25. It is enough that at the time the NPRMs were issued the Government knew it was engaged in confidential settlement negotiations concerning high-profile litigation that directly related to the regulatory scheme, which eventually led to multi-state litigation. *See* FAC ¶¶ 63–70; *see also Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 976 (9th Cir. 2005).

[10] The Government incorrectly states that "Plaintiffs make no claim that the State Rule is not a 'logical outgrowth' of the State NPRM." Gov't Opp. at 25 n.20. As discussed *supra*, the two rules were jointly developed and inextricably intertwined, so the effects of the Commerce Rule are part of State's decision to transfer jurisdiction. And like the Commerce NPRM, the State NPRM gave no indication it would have *any* effect on 3D-printed guns. *See* Mot. at 11, 15.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION  --
NO.  2:20-CV-00111-RAJ

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   which it was already negotiating behind the scenes with Defense Distributed. Now it seeks

2   deference for any interpretation of the regulatory scheme it wants so long as that interpretation is

3   not "plainly erroneous." This is a caricature of the regulatory process.

4   **E.    The Government's Standing and Political Question Challenges Fail**

5          The Government renews its attacks on the States' constitutional and prudential standing,

6   Gov't Opp. at 16–20, which were raised and rejected in the prior case. *See Washington I*, 318 F.

7   Supp. at 1255–56; *Washington II*, 2019 WL 5892505, at *4.

8          As before, deregulating Firearm Files in a manner that permits them to be posted publicly

9   on the internet—thus making them readily and *universally* available both domestically and

10  abroad—will drastically harm the States' sovereign, quasi-sovereign, and proprietary interests in

11  enforcing their gun-safety laws; ensuring the safety and security of their residents and visitors;

12  and protecting their treasuries, borders, and state facilities. *See* FAC ¶¶ 22–25. The purported lack

13  of a causal connection between export-control deregulation and the States' domestic concerns,

14  *see* Gov't Opp. at 17–18, 19–20, is "so myopic and restrictive as to be unreasonable." *Washington*

15  *I*, 318 F. Supp. at 1255. As before, preserving the status quo under which Firearm Files are subject

16  to effective export-control regulations prevents the "proliferation of untraceable and undetectable

17  weapons, assassinations, aviation and other security breaches, and violations of gun control laws

18  both abroad and at home." *Id.* Such concerns are far from "speculative" or "attenuated," Gov't

19  Opp. at 19–20: as explained above, the Commerce Rule's purported retention of jurisdiction is

20  easily circumvented with just a few clicks of a computer mouse. *Supra* at II.A.

21         The conclusory assertion that *some* files are available *somewhere* on the internet, Gov't

22  Opp. at 17, does not demonstrate a lack of injury or redressability. *See Washington I*, 318 F. Supp.

23  at 1262 ("[T]he possibility that a cybernaut with a BitTorrent protocol will be able to find a file

24  in the dark or remote recesses of the internet does not make the posting to Defense Distributed's

25  site harmless."). In fact, if Firearm Files were widely available online, there would be little sense

26  in the Commerce Department purporting to continue regulating their posting. Likewise, a party

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   "need not sit idly by and wait for . . . harm to befall it" to have standing. *Pennsylvania v. Trump*,

2   281 F. Supp. 3d 553, 567 (E.D. Pa. 2017), *aff'd*, 930 F.3d 543 (3d Cir. 2019); *contra* Gov't Opp.

3   at 18 (suggesting that Firearm Files "have [not] been used" to commit crimes).[11] "An allegation

4   of future injury may suffice if . . . there is a substantial risk that the harm will occur." *Susan B.*

5   *Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Such risks are well established by the

6   evidence here. *See* Mot. at 22–24 & accompanying citations.

7   There is no merit to the Government's effort to distinguish the two cases on the grounds

8   that the prior case involved "particular files" whereas this one does not. Gov't Opp. at 18. The

9   relevance of this distinction is doubtful, but in any case, the scope of the two challenges is the

10   same: in the prior case, the States challenged an action removing from the Munitions List not only

11   Defense Distributed's existing Firearm Files, but also "similar 3D printing files related to

12   firearms" that "they or others" have already created or will "continue to create" in the future.[12]

13   Nor can the cases be distinguished on traceability grounds. Gov't Opp. at 19. As in the prior case,

14   here, the Final Rules were adopted by the agency absent notice and comment, and this litigation

15   was the very first opportunity to point out their flaws to the agencies. As a result of the prior case,

16   the agencies did in fact change their position, and could well do so again here to close the

17   loopholes the States have identified.

18   The argument that this case presents a nonjusticiable political question is likewise

19   meritless. As Judge Lasnik explained, "whether the agency complied with clear procedural

20   requirements and considered factors Congress deemed relevant when removing an item from the

21   [Munitions List] is neither a political question nor one committed to the agency's discretion as a

22   matter of statute or case law." *Washington II*, 2019 WL 5892505, at *5. The Government errs in

23

24   [11] In fact, there is evidence of criminal activity with 3D-printed guns. *See, e.g.*, Amanda Milkovits, *Couple charged with killing mother in Pawtucket with 3D-printed gun*, Boston Globe (Jan. 2, 2020),

25   https://www.bostonglobe.com/2020/01/02/metro/couple-accused-killing-mother-pawtucket-with-3d-gun/.   Such crimes will undoubtedly increase if Firearm Files become widely available on the internet.

26   [12] *Def. Distributed*, C15-0372RP (W.D. Tex.), Dkt. # 44-1 (Second Amended Complaint) ¶ 44; *see Washington*, C18-1115RSL, Dkt.# 171-2 at 2 (defining removed files by reference to Second Amended Complaint).

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   asserting that the States are asking this Court to find that regulating Firearm Files is in the interest

2   of national security. *See* Gov't Opp. at 13–16. The agencies have *already* made that finding. The

3   only dispute is whether the multiple regulatory loopholes identified by the States exist; the

4   Government does not dispute harm to national security assuming those loopholes *do* exist.

5          Nor do the States fall outside the relevant zones of interests. The zone of interests test for

6   claims brought under the APA's judicial review provision is "lenient" and "not especially

7   demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)

8   (internal quotation omitted). It is satisfied if the plaintiff's interests are "arguably" protected.

9   *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)

10  (internal quotation omitted). The word "arguably" "indicate[s] that the benefit of any doubt goes

11  to the plaintiff." *Id.*at 225; *see Washington II*, 2019 WL 5892505, at *4 (reciting the generous

12  zone of interests standard under APA review).

13         The AECA grants the Executive powers "[i]n furtherance of world peace *and the security*

14  and foreign policy *of the United States*." 22 U.S.C. § 2778(a)(1) (emphases added); *see also id.*

15  § (a)(2). The Government appears to read this language to exclude any notion of domestic

16  security. But in fact the States' interests "are aligned and not in any way inconsistent" with the

17  statute's national security focus, so "the States' grievance arguably falls within the zone of

18  interests protected or regulated by the AECA*." Washington II*, 2019 WL 5892505, at *4.

19  Moreover, Congress's decision to shield only the initial designation from judicial review suggests

20  by negative implication that Congress did *not* intend to prohibit APA review of other decisions.

21         The Court's prior reasoning applies equally to ECRA. That statute proclaims the same

22  type of security interests, declaring in relevant part that "[t]he national security . . . of the United

23  States require[s]" that export of items should be controlled to prevent, among other things: "(i)

24  the proliferation of . . . conventional weapons," "(ii.) the acquisition of destabilizing numbers or

25  types of conventional weapons," and "(iii.) acts of terrorism." 50 U.S.C. § 4811(2)(A). These

26  purposes do not merely parallel the State's interests: they effectively *describe* those interests.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**F.    The Relevant Provisions Are Not Severable, Especially at This Preliminary Stage**

The States agree that ideally, only those portions of the Final Rules that affect Firearm Files would be enjoined. However, given the way the rules are framed and written, the States see no way of severing the relevant provisions of the rules consistent with the standards below.

The purpose of a preliminary injunction is "to preserve the status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016). Severability is better addressed upon a full record, with the benefit of comprehensive briefing, at the merits-review stage. Particularly where (as here) no party would be appreciably harmed by a relatively brief delay in implementing the Final Rules—which were proposed two years ago, as part of an export-reform initiative that began ten years ago—there is no urgency in determining whether relevant portions of the Final Rules may be severable. There is great urgency, however, in preventing the rules from going into effect on March 9.

If the Court does consider severability, it must grapple with the legal and practical obstacles to that relief. "Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). Courts should refrain from altering regulatory language to "produce a rule strikingly different from any the [agency] has ever considered or promulgated . . . ." *Id.* at 23. Firearm Files are currently regulated under the ITAR as "technical data" that is "related to" "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)." 22 C.F.R. § 121.1 (Munitions List Category I(a), (i)). The State Rule strikes Category I(a) from the Munitions List in its entirety—removing with a single stroke a host of small-caliber firearms and related technical data, including the Firearm Files at issue. The State Rule contains *no* language specific to Firearm Files that could simply be stricken. By contrast, the Commerce Rule does contain language specific to Firearm Files—but severing that language would remove the limited protections the rules *do* provide. No party wants that outcome.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    Because it is impossible to sever the rules by striking certain language, any relief that

2    pertains exclusively to the Firearm Files at issue would necessarily entail *adding* new language

3    to the Final Rules (e.g., to exempt Firearm Files from the removal and transfer of Category I

4    items). The Supreme Court has cautioned against "devis[ing] a judicial remedy" that entails such

5    "quintessentially legislative work[.]" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S.

6    320, 329–30 (2006). Notably, neither Intervenors nor the Government have made a workable

7    proposal for severing any portions of the rules. Intervenors' proposed order (Dkt.# 83-1) fails to

8    specify what language the Government must remove from or add to the Final Rules' text prior to

9    March 9. The proposed order fails to comply with Rule 65(d)'s requirement to "describe in

10   reasonable detail—and not by referring to the complaint or other document—the act or acts

11   restrained or required." Even if the Court were to devise a way of severing relevant portions of

12   the Final Rules, there are practical obstacles at this preliminary stage, particularly given the fast-

13   approaching effective date. The only feasible means of preventing irreparable harm prior to the

14   Final Rules' effective date is to preliminarily enjoin them in full.

### III.    CONCLUSION

16   For the reasons above and in the State's Motion, the Court should preliminarily enjoin the

17   Final Rules to preserve the status quo pending review of the merits.

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION  --
NO.  2:20-CV-00111-RAJ

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

DATED this 27th day of February, 2020.

ROBERT W. FERGUSON
Attorney General of Washington

*s/ Kristin Beneski*
KRISTIN BENESKI, WSBA #45478
Assistant Attorney General
JEFFREY RUPERT, WSBA #45037
Division Chief
BRENDAN SELBY, WSBA #55325
Assistant Attorney General
(206) 474-7744
kristin.beneski@atg.wa.gov
jeffrey.rupert@atg.wa.gov
brendan.selby@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California

*/s/ John W. Killeen*
JOHN W. KILLEEN
Deputy Attorney General
(916) 210-6045
John.killeen@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Grant T. Sullivan*
GRANT T. SULLIVAN
Assistant Solicitor General
(720) 508-6349
Grant.sullivan@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Maura Murphy Osborne*
MAURA MURPHY OSBORNE
Assistant Attorney General

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

KIMBERLY MASSICOTTE
JOSEPH RUBIN
(860) 808-5318
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
JILLIAN A. LAZAR
DAVID J. LYONS
Deputy Attorneys General
(302) 577-8400
Christian.wright@deleware.gov
Jillian.lazar@deleware.gov
David.lyons@deleware.gov
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General of the District of Columbia

*/s/ Kathleen Konopka*
KATHLEEN KONOPKA
Deputy Attorney General, Public Advocacy
Division
ANDREW J. SAINDON
Senior Assistant Attorney General
(202) 741-0770
Andy.saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii

*s/ Robert T. Nakatsuji*
ROBERT T. NAKATSUJI
Deputy Attorney General
(808) 586-1360
Robert.t.nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

KWAME RAOUL

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Attorney General of Illinois

*/s/ Kathryn Hunt Muse*
KATHRYN HUNT MUSE
Deputy Chief, Public Interest Division
DARREN KINKEAD
Assistant Attorney General
(312) 814-3000
kmuse@atg.state.il.us
dkinkead@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

AARON M. FREY
Attorney General of Maine

*/s/ Susan P. Herman*
SUSAN P. HERMAN
Chief Deputy Attorney General
(207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Jeffrey P. Dunlap*
JEFFREY P. DUNLAP
STEVEN M. SULLIVAN
(410) 576-6325
ssullivan@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Massachusetts

*/s/ Phoebe Fischer-Groban*
PHOEBE FISCHER-GROBAN
Assistant Attorney General
(617) 727-2200
Phoebe.fischer-groban@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

2

DANA NESSEL
Attorney General of Michigan

3

4

5

6

*/s/ Joseph T. Froehlich*
JOSEPH T. FROEHLICH
Assistant Attorney General
(517) 335-7573
Froehlichj1@michigan.gov
*Attorneys for Plaintiff State of Michigan*

7

8

KEITH ELLISON
Attorney General of Minnesota

9

10

11

12

*/s/ Jacob Campion*
JACOB CAMPION
Assistant Attorney General
(651) 757-1459
Jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

13

14

GURBIR S. GREWAL
Attorney General of New Jersey

15

16

17

*/s/ Glenn J. Moramarco*
GLENN J. MORAMARCO
Assistant Attorney General
(609) 376-3235
Glenn.moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

18

19

HECTOR BALDERAS
Attorney General of New Mexico

20

21

22

*/s/ Nicholas M. Sydow*
NICHOLAS M. SYDOW
Civil Appellate Chief
(505) 717-3571
nsydow@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

23

24

LETITIA JAMES
Attorney General for New York

25

26

*/s/ Matthew Colangelo*
MATTHEW COLANGELO

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Chief Counsel for Federal Initiatives
DANIELA NOGUEIRA
Assistant Attorney General
STEVEN C. WU
Deputy Solicitor General
(212) 416-6057
Matthew.colangelo@ag.ny.gov
Daniela.Nogueira@ag.ny.gov
steven.wu@ag.ny.gov

*Attorneys for Plaintiff State of New York*

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Carla Scott*
CARLA SCOTT
Senior Assistant Attorney General
(971) 673-1915
carla.a.scott@doj.state.or.us
MICHAEL KRON
Special Counsel
(503) 378-4400
Michael.c.kron@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

JOSHUA SHAPIRO
Attorney General of Pennsylvania

*s/ Jacob B. Boyer*
JACOB B. BOYER
Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
(215) 560-2171
jboyer@attorneygeneral.gov

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO.  2:20-CV-00111-RAJ

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

mfischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin J. Sullivan*
JUSTIN J. SULLIVAN
Special Assistant Attorney General
(401) 274-4400 ext. 2007
jjsullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

T.J. DONOVAN
Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES
Solicitor General
(802) 828-5944
Benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL
Deputy Attorney General, Civil Litigation
(804) 786-2071
STowell@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of
Virginia*

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Brian P. Keenan*
BRIAN P. KEENAN
Assistant Attorney General
(608) 266-0020
keenanbp@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

STATES' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION --
NO. 2:20-CV-00111-RAJ

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744