HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON; et al.,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE; et al,

        Defendants.

Case No. 2:20-cv-00111-RAJ

**ORDER GRANTING IN PART
PLAINTIFF STATES' MOTION
FOR PRELIMINARY
INJUNCTION**

## I.   INTRODUCTION

      This matter comes before the Court on the Plaintiff States' Motion for Preliminary Injunction ("Motion").  Dkt. # 55.  For the reasons below, the Court **GRANTS IN PART** the Motion.

ORDER – 1

## II.   BACKGROUND

Plaintiffs are seventeen States challenging companion regulations promulgated by the Department of State and the Department of Commerce.  This action is the latest in a series of litigation over export controls on technical data related to 3-D printed firearms. The Court examines the statutory framework and prior litigation before turning to its analysis.

### A.   Arms Export Control Act ("AECA")

The AECA regulates the export of arms, ammunition, and other military and defense technology.  22 U.S.C. § 2778(a)(1).  It delegates to the President the task of creating the United States Munitions List ("Munitions List"), which designates certain items as defense articles and defense services.  Id.  The term "defense articles" specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List.  22 C.F.R. § 120.6.  Category I of the Munitions List includes "Firearms, Close Assault Weapons and Combat Shotguns."  22 C.F.R. § 121.1. "Nonautomatic and semi-automatic firearms to caliber .50 inclusive," their "components, parts, accessories and attachments," and related "technical data" are currently within Category I.  Id. § 121.1(a), (h), (i).

The AECA also tasks the President with promulgating regulations for the import and export of such defense articles and services.  22 U.S.C. § 2778(a)(1).  The President has delegated his authority to promulgate implementing regulations to the Secretary of State.  Those regulations, the International Traffic in Arms Regulations ("ITAR"), are administered by the DDTC [Directorate of Defense Trade Controls] and its employees.  22 C.F.R. § 120.1(a).  Under ITAR, persons who want to export items on the Munitions List must first obtain a license from the Department of State ("State Department").

### B.   Export Control Reform Act

The Department of Commerce ("Commerce") regulates exports pursuant to the

ORDER – 2

Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-52 ("ECRA"), which directs that export controls be used to "further significantly the foreign policy of the United States," to "fulfill [the] declared international obligations" of the United States, or to limit exports that would make a "significant contribution to the military potential of any other country or . . . would prove detrimental to . . . national security." Id. § 4811(1)(A)-(B).

To carry out these purposes, the ECRA directs that Commerce shall "establish and maintain a list of items that are controlled"—the Commerce Control List ("CCL")—and "prohibit unauthorized exports, reexports, and in-country transfers of controlled items." 50 U.S.C. § 4813(a)(1), (3). The Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774, implement the ECRA, identifying the items and activities subject to the jurisdiction of the EAR as well as those not subject to the EAR. The EAR's definition of "export" is comprehensive, and extends to, *inter alia*, "(1) An actual shipment or transmission out of the United States, including the sending or taking of an item out of the United States, in any manner;" or "(2) Releasing or otherwise transferring 'technology' or source code (but not object code) to a foreign person in the United States (a 'deemed export')." 15 C.F.R. § 734.13(a).

## C.     Prior Litigation

Computer software for the production of a Category I firearm or its components using a 3-D printer ("3-D gun files"), such as computer aided design (CAD) files, is "technical data" subject to the AECA and ITAR. Since about 2013, it had been the government's position that posting 3-D gun files on the internet was an "export" subject to the AECA and ITAR. Defense Distributed, a private company with the stated objective of facilitating global, unrestricted access to firearms and evading gun-safety laws, challenged the government's authority in a lawsuit filed in the United States District Court for the Western District of Texas. Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). The company alleged that the government's prepublication approval requirements under ITAR were unconstitutionally applied to its gun-related speech. Id. Defense Distributed

ORDER – 3

sought an injunction so that it could post its 3-D gun files on the internet without restriction to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment.

Throughout the litigation, the government argued that the export of certain Defense Distributed 3-D gun files could "cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing regime." Dkt. # 32 at 19-20 (W.D. Tex.). The government specifically expressed that the 3-D gun files could be modified to create lethal firearms that were "virtually undetectable" by conventional security measures such as metal detectors. Additionally, the government contended that permitting unrestricted access to the 3-D gun files on the internet would increase the risk of their use in assassinations, in manufacturing spare component parts by embargoed nations, terrorist groups, or guerrilla groups, or in compromising aviation security overseas in a manner specifically directed at U.S. persons or interests. Id. The government also argued that "the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology." Dkt. # 92 at 27 (W.D. Tex.). The district court ultimately denied Defense Distributed's motion for preliminary injunction and the Fifth Circuit affirmed. Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016). The Fifth Circuit highlighted the State Department's very strong public interest in national defense and national security, noting that the unregulated export of the 3-D gun files could cause permanent harm. Id. at 458.

In April 2018, Defense Distributed and the federal government reached a tentative agreement to settle the dispute. Dkt. # 57 at 75-83. Pursuant to the settlement, the State Department reversed its prior regulatory and litigation positions on publishing 3-D gun files. It now agreed to (i) publish a notice of proposed rulemaking and final rule that removes certain 3-D gun files from the Munitions List; (ii) announce a temporary modification of the Munitions List to allow immediate distribution while the final rule was in development; and (iii) issue a letter to Defense Distributed and others advising that 3-D

ORDER – 4

gun files were approved for public release and unlimited distribution.  Id.

One month later, on May 24, 2018, the State Department published a notice of proposed rulemaking that implicated the technical data at issue in the Defense Distributed litigation.  83 Fed. Reg. 24,198 (May 24, 2018).  By the proposed rule, the State Department would no longer have the authority to control the export of certain 3-D gun files, but instead Commerce would control such exports under a companion regulation. See 83 Fed. Reg. 24,166 (May 24, 2018).  During the comment period, some members of the public recognized the regulation implicated 3-D gun files and raised concerns that Commerce lacked authority to control the export of "published" items.  Dkt. # 80-2; Dkt. # 85-1, ¶ 51.  They argued that these regulations would ineffectively guard against the proliferation of 3-D gun files posted on the internet.  Id.  The public comment on the proposed rules ended on July 9, 2018.  The Defense Distributed settlement agreement was made public the following day.  As contemplated by the settlement agreement, the temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

The temporary modification of the Munitions List was the subject of a 2018 lawsuit filed by eight States in this Court.  State of Washington v. United States Department of State, No. C18-1115RSL (W.D. Wash.) ("State of Washington").  Addressing the government's jurisdictional challenges, this Court ruled that issues concerning the State Department's process for removing items from the Munitions List, its compliance with the standards furnished by AECA, and the adequacy of the agency's analysis of and explanation for its decision were subject to judicial review under the Administrative Procedure Act ("APA").  State of Washington, 318 F.Supp.3d 1247, 1255 (W.D. Wash. 2018).  The Court later concluded that the government's decision to modify the Munitions List was arbitrary and capricious and procedurally improper in violation of the APA. 2019 WL 6892505 (W.D. Wash. Nov. 12, 2019).

On January 23, 2020, the State Department published its final rule revising the

ORDER – 5

Munitions List.  85 Fed. Reg. 3819 (Jan. 23, 2020) ("State Rule").  The State Rule confirmed the removal of "all non-automatic firearms up to .50 caliber" and "related technical information" from Category I.  The removed items would again be subject to a companion Commerce regulation.  <u>See</u> 85 Fed. Reg. 4136 (Jan. 23, 2020) ("Commerce Rule").  Collectively, the Final Rules also announced a new jurisdictional change pertaining to 3-D gun files:  Notwithstanding Commerce's jurisdictional exemption for "published" technology or software, it would now retain jurisdiction over files "for the production of a firearm, or firearm frame or receiver" that are "made available by posting on the internet in electronic format" and are "ready for insertion" in a 3-D printer or similar equipment.  <u>Id.</u>  The Final Rules are set to go into effect on March 9, 2020.

On January 23, 2020, the States filed this lawsuit challenging the Final Rules under the APA.  Dkt. # 1.  The States contend that the Final Rules amount to a toothless prohibition on 3-D gun files that will lead to their widespread proliferation, including on the internet.  After amending their complaint, the States filed this motion for a preliminary injunction.  Dkt. # 55.  On February 11, 2020, the National Shooting Sports Foundation, Inc. and Fredric's Arms & Smiths, LLC jointly moved to intervene as defendants.  Dkt. # 63.  The Court considered and granted their motion for the reasons indicated in their briefing.  On February 24, 2020, the federal defendants, including Commerce and the State Department, and the intervenor defendants filed their oppositions.  On February 27, 2020, the States filed their reply.  Dkt. # 87.  On February 28, 2020, the Court held oral argument.  Dkt. # 88.  By March 5, 2020, the parties filed post-hearing briefing on the scope of injunctive relief.  Dkt. ## 89-92.  The Court has considered all submissions and argument to date.

### III.  LEGAL STANDARD

To issue a preliminary injunction, the Court must determine whether plaintiffs (1) are likely to succeed on the merits of their claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in

ORDER – 6

their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).  In the alternative, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).

## IV.  DISCUSSION

The States bring three claims under APA.  First, they claim that the federal defendants failed to abide by the APA's notice-and-comment requirements.  Second, they claim that the federal defendants' actions were "arbitrary and capricious" in failing to consider relevant national security and foreign policy interests.  Their final claim argues that the State Rule is contrary to the AECA.

### A.    Standing

As they did in State of Washington, the federal defendants challenge the Court's jurisdiction over this matter.  The basis for the challenge remains the same: the States cannot meet prudential standing requirements and present a non-justiciable political question.  The Court agrees with the States that the analysis is no different here than it was in State of Washington.

To present a justiciable case or controversy under Article III, plaintiffs must demonstrate an "injury in fact" that is "fairly traceable" to the defendants' actions and will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 204 U.S. 555, 560 (1992).  In an APA action, a state alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision allegedly causing harm. Mass. v. EPA, 549 U.S. 497, 517 (2007).  In addition, a

ORDER – 7

State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation.  Dep't of Fair Emp't & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

This Court in State of Washington ruled that the States sufficiently alleged harm to their legally protectable sovereign interests under the traditional standing analysis. Specifically, the Court found that the government's alleged failure to provide notice or make a reasonable evaluation of the risks and benefits of the proposed action would greatly impact aviation and other security breaches, as well as gun control laws both abroad and at home.  318 F.Supp.3d at 1255-56.  The Court also concluded that the States had standing to bring a procedural APA claim because there was a possibility that compelling compliance with the specified procedures would impact the decision-making process: "Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the [Munitions List]."  Id.

The federal defendants try to distinguish the States' case for standing here but fall short in doing so.  They again disclaim any possible connection between a shift in the government's export-control regulations and domestic injury to States—an argument made and rejected in State of Washington.  318 F.Supp.3d at 1255 (describing this argument as "so myopic and restrictive as to be unreasonable").  That argument still fails now as neither the global nature of the internet nor the substantial risk of harm alleged has changed.[1]  The federal defendants also argue that, since the State Department has already reconsidered its decision to remove items from Munitions List and issued final rules to that effect, the States cannot show traceability.  Dkt. # 82 at 32.  However, claims resting

---

[1] The government also contends that the States' injury in State of Washington was based on "particular files" that would produce undetectable firearms whereas the injury alleged here is not.  Dkt. # 84 at 31.  However, the States allege that those files and similar ones will be impacted by the Final Rules.  See Dkt. # 54 at ¶¶ 103, 106.

ORDER – 8

on a procedural injury, including failure to provide notice and comment, relax some standing requirements. <u>Ctr. for Biological Diversity v. Mattis</u>, 868 F.3d 803, 817 (9th Cir. 2017). There is also little to suggest that further reconsideration could not prompt change of the agency's decisions—*e.g.*, changing the adequacy of Commerce's jurisdiction over the 3-D gun files. <u>See</u> <u>Massachusetts</u>, 549 U.S. at 518. Accordingly, the Court finds that States have shown Article III standing.

Plaintiffs suing under the APA must also show their interests fall "arguably within the zone of interests" protected or regulated by the violated statute. <u>Match-E-Be-Nash-She Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 224 (2012). This is met here. The States' interest in curbing violence, assassinations, terrorist threats, aviation and other security breaches, and violations of gun control laws within their borders is at least marginally related to the national security interests protected or regulated by the AECA and the ECRA. 22 U.S.C. § 2778(a)(1) (declaring the security of the United States as an objective underlying the AECA); 50 U.S.C. § 4811 (same as to the ECRA).

**B.    Political Question**

While the political question doctrine raises both jurisdictional and prudential concerns, "it is at bottom a jurisdictional limitation imposed on the courts by the Constitution, and not by the judiciary itself." <u>Corrie v. Caterpillar</u>, 503 F.3d 974, 981 (9th Cir. 2007). "[J]udicial restraint in the area of foreign affairs is often appropriate because such cases 'frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature.'" <u>Harbury v. Hayden</u>, 522 F.3d 413, 419 (D.C. Cir. 2008) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 211 (1962)).

The Court is not persuaded that this case lies beyond judicial cognizance. The federal defendants have framed this dispute as the States attacking whether a particular item is on the Munition List, a matter of policy entrusted to Congress and the President. Dkt. # 84 at 27 (citing <u>United States v. Mandel</u>, 914 F.2d 1215, 1223 (9th Cir. 1990)).

ORDER – 9

This is incorrect.  The States again are challenging whether federal agencies complied with the APA in promulgating the Final Rules.  "This is neither a political question nor one committed to the agency's discretion."  <u>State of Washington</u>, 2019 WL 5892505, at *5.

## C.   Likelihood of Success on the Merits

The APA sets forth the extent of judicial authority to review executive agency action.  Under the APA, the district court may not set aside an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." 5 U.S.C. § 706(2)(A); <u>Safari Aviation Inc. v. Garvey</u>, 300 F.3d 1144, 1150 (9th Cir. 2002).  Review under this standard is narrow, and the court must not substitute its judgment for that of the agency.  <u>Id.</u> at 1150.

### 1.   Exemptions Under the AECA and ECRA –

The federal defendants argue that the States cannot succeed on the merits because the Final Rules are explicitly exempt from judicial review under the APA.  Although the APA embodies a "basic presumption of judicial review," such review is not available "to the extent that" a relevant statute precludes it, § 701(a)(1), or the agency action is "committed to agency discretion by law," § 701(a)(2).

The federal defendants point specifically to § 4821 of the ECRA and § 2778(h) of the AECA.  Section 4821(a) exempts the "functions exercised" under the ECRA from the judicial review provisions of the APA.  The States' challenge to the Commerce Rule, when viewed in isolation, appears to fall within this exemption.  Insofar as § 4821 bars judicial review of the Commerce Rule, however, the States argue that the agencies' "joint action" of removing items from the Munitions List and transferring jurisdiction to Commerce is still reviewable via the State Rule.[2]  Dkt. # 87 at 8.  This Court has

---

[2] The State Department referred to the process as an ongoing interagency effort in which the Department coordinated principally with the Departments of Defense and Commerce and the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives to develop revisions to the Munitions List and CCL.  Dkt. # 85-1 at ¶ 38.

ORDER – 10

1   acknowledged that § 2778(h)'s prohibition on judicial review does not apply to removals

2   from the Munitions List.  See State of Washington, 318 F.Supp.3d at 1260 ("The decision

3   at issue here, however, is the removal of an item from the [Munitions List], which

4   Congress chose not to make unreviewable.").  Accordingly, the Court will evaluate joint

5   actions to the extent that they are reflected in the decision to remove the 3-D gun files

6   from the Munitions List.

7       **2.  Foreign Affairs Exemption**

8       The federal defendants argue separately that the APA's foreign affairs exemption

9   exempts the State Rule from the notice-and-comment requirement.  Under the foreign

10  affairs exception, the APA's notice-and-comment procedures do not apply "to the extent

11  that there is involved—a ... foreign affairs function of the United States."  5 U.S.C. §

12  553(a)(1); E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 775 (9th Cir. 2018).  The

13  purpose of the exemption is to allow more cautious and sensitive consideration of those

14  matters which "so affect relations with other Governments that, for example, public rule-

15  making provisions would provoke definitely undesirable international consequences."

16  H.Rep. No. 1980, 69th Cong., 2d Sess. 23 (1946); see also, S.Rep. No. 752, 69th Cong.,

17  1st Sess. 13 (1945).  Courts have required the government to do more than merely say that

18  a rule "implicates" foreign affairs and have disapproved use of the exception where the

19  Government has failed to offer evidence of consequences that would result from

20  compliance with the APA's procedural requirements.  E. Bay Sanctuary Covenant, 932

21  F.3d 742 at 776.

22      The federal defendants state that the Final Rules are part of a decade-long reform to

23  the export-control system.  Since 2010, the State Department has published 26 final or

24  interim rules with the goal of removing "less sensitive items from the [Munitions List]."

25  Dkt. # 85-1 at ¶¶ 33-34.  With this history, the evidence of undesirable international

26  consequence needed to invoke the foreign affairs exemption is missing.  E.g., Rajah v.

27  Mukasey, 544 F.3d 427, 437 (2d Cir. 2008) (rule responding to September 11, 2001

28  ORDER – 11

attacks). "The court is simply unwilling to apply the exception without some evidence to support its application." Doe v. Trump, 288 F. Supp. 3d 1045, 1076 (W.D. Wash. 2017).

The federal defendants argue that 22 C.F.R. § 128.1, an AECA regulation, demonstrates that the exemption applies. Section 128.1 acknowledges the Secretary of State's power under the AECA "to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used," and "to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action deemed advisable." The section goes onto say the "administration" of the AECA is a foreign affairs function within the meaning of the APA. Id. The federal defendants claim that removing an item from the Munitions List falls within § 128.1's purview. However, nothing in the language of § 128.1, or in the AECA's predecessor statute, supports the federal defendants' expansive reading. See Pub. L. No. 83-665, 68. Stat. 832, 848 (1954) (granting authority to designate defense articles for munitions control to the President); 20 Fed. Reg. 6250, 6256 (Aug. 26, 1955) (excluding the designation of such articles and subsequent registration and licensing decisions from APA review). The Court concludes that the foreign affairs exception is inapplicable.

### 3.  Notice and Comment

The Court turns to whether the federal defendants complied with notice-and-comment procedures in promulgating the State Rule. The APA requires an agency to notify the public of—and provide the public with an opportunity to comment on—the agency's intention to change an existing regulation or to promulgate a new regulation. See 5 U.S.C. §§ 553(b), 553(c), 551(5). Adequate notice is crucial to "ensure that agency regulations are tested via exposure to diverse public comment," "to ensure fairness to affected parties," and "to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 626

ORDER – 12

F.3d 84, 95 (D.C. Cir. 2010) (citation omitted).

The Ninth Circuit has held that when a court considers whether an agency has satisfied the APA's notice requirement, the "essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft [proposal]." Nat. Res. Def. Council v. EPA, 279 F.3d 1180, 1186 (9th Cir. 2002). In determining this, courts should consider "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." Id. (quoting Am. Water Works Ass'n v. EPA, 40 F.3d 1266, 1274 (D.C. Cir. 1994)). While a final rule need not be identical to the draft proposal, it must be a logical outgrowth of the proposed rule. Id. The States argue that the federal defendants gave no notice of their intent to regulate 3-D guns files. Dkt. # 55 at 14. Specifically, the States complain that the notices of proposed rulemaking ("NPRMs") failed to mention 3-D printed guns at all and otherwise gave no indication that 3-D gun files would be subject to unique jurisdiction under Commerce. Moreover, because the settlement agreement with Defense Distributed was not revealed until after the public comment period closed, the States argue that they were denied a right to comment on the "hidden-but-intended" effect of the Rules. Id. at 14.

Binding case law instructs that where a final rule's substance is "not foreshadowed in proposals and comments advanced during the rulemaking," it will not be considered a "logical outgrowth" because it may catch interested parties by surprise. Nat. Res. Def. Council, 279 F.3d at 1186. Prior to the publication of the Final Rules, neither agency gave any indication that a specific regulation would apply to the online dissemination of 3-D gun files.[3] The State Department's proposed rule only said that "removed items" would be subject to controls published in Commerce's proposed companion rule. 83 Fed. Reg.

---

[3] Commerce all but acknowledges this fact in the notice of final rulemaking. 85 Fed. Reg. 4136, 4141–42 (explaining that the framework of Commerce's regulations as described in the proposed rule did not "adequately address the issue of regulating the unlimited access to certain files for the 3D printing of firearms").

ORDER – 13

24,198-01.  Commerce's proposal confirmed "[i]tems that would move to the CCL would be subject to *existing* EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'"  83 Fed. Reg. 24,166-01 (emphasis added).  The substantive change in the Final Rules—that Commerce would retain now jurisdiction over 3-D gun files "made available by posting on the internet" and "ready for insertion" into a 3-D printer—seemingly comes out of left field.

The federal defendants say the State Department received an array of comments about 3-D firearm files which demonstrate the public had meaningful notice of the combined regulatory effect of the two rules.  Dkt. # 84 at 37.  This argument is blunted by the fact that the NPRMs fail to mention 3-D gun files at all.  See CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1080 (D.C. Cir. 2009) (holding that a final rule "violates the APA's notice requirement where 'interested parties would have had to divine [the agency's] unspoken thoughts'"(alteration in original) (quoting Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 407 F.3d 1250, 1259–60 (D.C. Cir. 2005))).  Additionally, the State Department's notice of proposed rulemaking purports to keep defense articles "not otherwise widely available for commercial sale" within its jurisdiction while transferring to Commerce "many items which are widely available in the United States and abroad."  83 Feg. Reg. 24198-01.  Omissions that would permit potentially controversial subject matter to go unnoticed fail to "fairly apprise interested persons of the subjects and issues before the Agency."  See Natural Res. Def. Council, 279 F.3d at 1186; Louis v. U.S. Dep't of Labor, 419 F.3d 970, 975–76 (9th Cir. 2005).

Of course, not every violation of the APA invalidates an agency action.  The failure to provide notice and comment is harmless only where the agency's mistake "clearly had no bearing on the procedure used or the substance of decision reached." Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764–65 (9th Cir. 1986); see Hodge v. Dalton, 107 F.3d 705 (9th Cir. 1997) (rule merely made explicit what was already implicit in the

ORDER – 14

legislative history of the EEOC's authority).  Here, the States say they had no opportunity to comment on a scheme that applies specifically to 3-D gun files, including the potential public safety implications that would occur from implementing the Final Rules in their current form.  On the current record, the States are likely to succeed on the merits with respect to their notice-and-comment claim.

### 4.  Arbitrary and Capricious

The States allege that the federal defendant's decision to remove 3-D gun files from the Munitions List was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the 3-D gun files.  An agency decision is "arbitrary and capricious" within the meaning of the APA, 5 U.S.C. § 706(2)(A), where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Motor Vehicle Mfr. Ass'n v. State Farm Ins., 463 U.S. 29, 44 (1983).  The Court's scope of review is "narrow" and focused on determining whether the agency "examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." Dep't of Commerce v. New York, 139 S.Ct. 2551, 2569 (2019) (citing State Farm, 463 U.S. at 43 (internal quotation marks omitted)); Beno v. Shalala, 30 F.3d 1057, 1074 (9th Cir. 1994).

In State of Washington, the Court determined that the federal defendants' previous decision to remove the 3-D gun files from the Munitions List was arbitrary and capricious. The administrative record gave no indication that the State Department considered the unique characteristics and qualities of plastic guns, or certain statutory requirements. 2019 WL 5892505 at *7.  In its analysis, the Court specifically referenced the State Department's 2018 conclusion that the worldwide publication of computerized

ORDER – 15

instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.  Id. at *9.  These findings, the Court found, went unaddressed by the State Department in making the change to remove 3-D gun files from the Munitions List.  Id.  Additionally, Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy, but the Court found that the State Department "evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage."  Id. at *8.

The record at the time of the Final Rules demonstrates that the States have raised serious questions going to the merits of their claim.  The State Rule again focuses on its conclusion that the 3-D gun files "do not confer a critical military or intelligence advantage," which purportedly took into account "the effect that a transfer to CCL would have on national security."[4]  As this Court stated previously, the agency's determination that small-caliber firearms do not provide "critical military or intelligence advantages" does not explain why those previously-controlled items were removed from the list.  State of Washington, 2019 WL 5892505 at *8.  Articles and services that provide a "military or intelligence advantage" "shall be" included on the Munitions List, but they are not the only items that can be included.  Id. at *8 (citing 22 C.F.R. § 120.3(b)).  There is evidence to support the States' contention that the federal defendants again failed to make their decision based on consideration of the relevant Congressional factors, such as the impact on world peace and national security.  See id.

The same is true on the issue of whether the State Department addressed its earlier, contrary findings.  In mid-2018, the State Department had taken the position that

---

[4] The multi-year review upon which the decision was apparently based focused on small caliber firearms generally, not 3-D printed guns specifically.

ORDER – 16

significant national security concerns warranted subjecting 3-D gun files to ITAR.  The record before the Court shows no analysis addressing these findings or otherwise supporting the federal defendants' conclusion that removing the 3-D gun files is now consistent with the AECA's goals of world peace, national security, and U.S. foreign policy.[5]  See State Farm, 463 U.S. at 46-51 (agency's actions arbitrary and capricious because the agency did not address its prior, contrary factual findings); accord Asarco, Inc. v. U.S.E.P.A., 616 F.2d 1153, 1162 (9th Cir. 1980) (decision arbitrary and capricious where there was evidence agency had considered issues but did so in a manner which was insufficient and abstract).  The federal defendants claim their position is not contrary to its previous findings because they now concur with regulating the 3-D gun files, but aver that it should be done by Commerce.[6]  Even granting this change in philosophy, there are serious questions going to the merits of whether the agency action at the time was arbitrary and capricious.  There is little evidence in the record that explains why regulating 3-D gun files under ITAR is no longer necessary considering its previous findings.

### 5.  Contrary to the AECA

The States also contend that the State Rule is contrary to the AECA's purpose of

---

[5] The federal defendants also assert that Commerce's jurisdiction simply mimics what is currently the status quo under ITAR. Dkt. # 84 at 34-36. The language provided in the Commerce Rule does not comport with the language from the relevant ITAR provisions (even considering the "public domain" exemption) and appears narrower in scope, only excluding from § 734.7's definition of "published" those 3-D gun files "made available by posting on the internet in an electronic format and that may be directly loaded without further modification by the machine operator." Dkt. # 54 at 28. Additionally, the States allege that the Final Rules would permit the unrestricted export of published 3-D gun files by means other than "posting on the internet," which departs from the status quo under existing regulations. Dkt. # 54 at ¶11.

[6] The federal defendants attempt to bolster their rationale in declarations opposing the motion. See, e.g., Dkt. # 85-1 at ¶ 100 (referencing the enforcement resources available in Commerce Department). "However, district courts are not to rely upon litigation affidavits and 'post hoc' rationalizations for agency action." Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1164–65 (9th Cir. 1998); Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).

ORDER – 17

furthering "world peace and the security and foreign policy of the United States." 22 U.S.C. §§ 2751, 2778(a)(1). "'In order to be valid regulations must be consistent with the statute under which they are promulgated.'" <u>E. Bay Sanctuary Covenant</u>, 909 F.3d at 1248.

In response, the federal defendants say that the AECA explicitly permits the State Department to "periodically review" items on the Munitions List and remove those that no longer warrant export controls. Dkt. # 84 at 43 (citing 22 U.S. 2778(f)(1)). This congressional affirmation certainly supports the federal defendants' position that the actions here are "statutorily permissible." <u>Fox Television Stations, Inc. v. Aereokiller, LLC</u>, 851 F.3d 1002, 1013 (9th Cir. 2017). This is likely true, in particular, for the categories of items that lack any recent assessment as to their national security risk and are otherwise commercially available. Nonetheless, there are serious questions going to the merits as applied to 3-D guns. Again, the record evidence fails to explain the deviation from the State Department's prior determination that controlling certain 3-D gun files under ITAR was necessary to further world peace and national security.

**D.    Irreparable Harm**

As they did in <u>State of Washington</u>, the States again submit evidence, including declarations and the federal defendants' prior findings, showing that they will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3-D printer become widely available on the internet. Dkt. ## 56, 57. Analysis of irreparable harm is well-documented in the prior litigation. The effect on nationwide public safety, law enforcement, and propriety interests as highlighted in <u>State of Washington</u> bears repeating:

> The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns

that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if ... every person owns a plastic gun.

318 F.Supp.3d at 1261-62.

The States also provide evidence that "virtually no expertise" is required to print a 3-D gun even where the files reach the user in a format initially unreadable by a 3-D printer.  Dkt. # 56 at 5-6.  Thus, it takes little to connect the removal of certain 3-D gun files from the Munitions List and the likelihood of the irreparable injuries plaintiffs have identified.  See State of Washington, 318 F.Supp.3d 1247, 1262 (finding irreparable harm because the publication of the technical data online would threaten the peace and security of the communities where these guns proliferate). The federal defendants argue once again that the availability of ongoing corrective relief—i.e., state and federal laws prohibiting certain firearm possession and transfer—prevents finding irreparable harm.  However, this ignores the unique danger presented by undetectable 3-D guns as demonstrated in the record.  Consistent with those findings, the States have shown the likelihood of irreparable harm here.

**E.      The Balance of Equities and the Public Interest**

The final factors in the preliminary injunction analysis require considering the effects of an injunction on both parties and the public.  Winter, 555 U.S. at 24.  When the government is a party, these factors merge because the government represents the public interest.  Nken v. Holder, 556 U.S. 418 (2009).

The federal defendants argue that national security will be harmed if an injunction issues because the State Department will be unable to focus its export-control resources on sensitive weapons and military technology.  Dkt. # 85-1 at ¶ 100.  Citing two executive

ORDER – 19

branch officials, they also argue that enjoining the Final Rules would cause other harms to important United States and public interests, including disruption to U.S. exporters and reputational damage. Id. at ¶ 104-05; see Dkt. # 85-2 at ¶ 54.

Although the government undoubtedly has a "compelling" interest in national security, see Haig v. Agee, 453 U.S. 280 (1981), it cannot simply rely on unspecified security concerns, Ziglar v. Abbasi, 137 S.Ct. 1843, 1862 (2017). To be sure, the Final Rules have yet to go into effect and allowing current regulations on 3-D gun files to stay in place will, in effect, maintain the status quo. It also strains reason that an injunction would create, in the government's words, "a greater risk that these weapons could be used in a manner inconsistent with U.S. national security and foreign policy interests." Dkt. # 84 at 45. This is at least true when it comes to the 3-D gun files given the government's previous findings. See Trump, 284 F.Supp. 3d at 1180 (government's own actions undermined the position that the public interest will be harmed in the face of injunctive relief).

The Court must acknowledge the grave reality that is likely to occur without injunctive relief. As the agency's specific findings in the record show, the proliferation of 3-D gun files on the internet likely renders ineffective arms embargoes, export controls, and other measures used to restrict the availability of uniquely dangerous weapons sought by those seeking to commit acts of terrorism or other serious crime—implicates serious national security and public interests. See Defense Distributed, 121 F. Supp. 3d at 690 (acknowledging the public's "keen interest" in restricting the export of defense articles). After considering the parties' competing interests on the issue of 3-D gun files, the Court finds that the balance of equities and the public interests tip sharply in the States' favor. Feldman, 843 F.3d at 375.

## F.    Remedy

Having found that the States established the elements necessary for a preliminary injunction, the Court turns to the scope of relief. Both the federal and intervenor

ORDER – 20

1
2
3
4
5
6
7
8
9

defendants argue that the scope of any injunction should be limited to redressing only the established injuries and irreparable harms identified by the States. Both point out that the contents of the Final Rules clearly reflect the agencies' focus on countless matters unrelated to 3-D printed firearms. See Dkt. # 85-1 at ¶ 98; Dkt. # 85-2 at ¶¶ 52-53. Indeed, the Final Rules transfer regulatory jurisdiction over products affecting an estimated 10,000 State Department licenses. 85 Fed. Reg. at 413. For example, intervenors must register with DDTC and pay the $2,250 annual registration fee—even though the business does not export firearms outside the United States. See Dkt. # 65 at ¶¶ 6–9.

10
11
12
13
14
15
16
17
18
19
20
21

     The Court raised concerns about the scope of relief at oral argument.[7] Equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994). Following oral argument, the States narrowed their request for relief in light of the parties' discussions that a narrower injunction than the one initially requested might be feasible and sufficient to prevent irreparable harm and preserve the status quo with respect to the 3-D gun files. Dkt. # 89. The federal defendants reiterated their position that this Court has no jurisdiction and no injunction should order, but conceded it is possible to implement the Final Rules and maintain the same level of regulation on the export of 3-D gun files. See Dkt. # 91. The intervenor defendants, who argue that the application of the Final Rules to 3-D gun files is severable, do not object to maintaining the status quo as to 3-D gun files. Dkt. # 92.

22
23

     "Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent."

24
25
26
27
28

---

[7] During oral argument, the Court also inquired about the need of a separate hearing given the nationwide effect of the States' request for a preliminary injunction. See California v. Azar, 911 F.3d 558, 583 (stating that courts "must require a showing of nationwide impact" and that injunctive relief "must be narrowed to redress only the injury show as to the plaintiff states"); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1140 (9th Cir. 2009). The parties agreed that a separate hearing was unnecessary.

ORDER – 21

Davis Cnty. Solid Waste Mgmt. v. EPA, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (quoting North Carolina v. FERC, 730 F.2d 790, 795–96 (D.C. Cir. 1984)).  There is no indication in the text of the NPRMs, for example, that the regulation would not have been passed but for their application to 3-D gun files, or that the regulation of 3-D gun files is so "intertwined" with the effect of the Final Rules on unrelated products.  See Davis Cnty., 108 F.3d at 1459 (vacating the EPA's emissions standards as applied to small municipal waste combustor units but leaving in place guidelines as applied to large units).  By all accounts, the Final Rules are part of a decade-long reform to the export-control system and there is no indication, other than the Defense Distributed litigation, that any special attention was paid to 3-D gun files.

Having considered the parties' arguments, the Court **ORDERS** the following injunction, which shall take effect immediately and shall remain in effect pending trial in this action or further order of the Court:

The federal defendants and their respective officers, agents, servants, employees, and attorneys, and any persons in active concern or participation with them, are **ENJOINED** from implementing or enforcing the regulation entitled International Traffic In Arms Regulations: U.S. Munitions List Categories I, II, and III, 85 Fed. Reg. 3819 (Jan. 23, 2020) insofar as it alters the status quo[8] restrictions on technical data[9] and software[10] directly related to the production of firearms or firearm parts using a 3D-printer or similar equipment.  No bond shall be required.

---

[8] In this case, the status quo preserves the restrictions on the relevant technical data and software currently covered by the Munitions List and subject to ITAR control.  Such items shall be maintained on the Munitions List and regulated under ITAR.  This injunction is not intended to modify any existing regulations.
[9] As defined in 22 C.F.R. § 120.10.
[10] As defined in 22 C.F.R. § 120.45.

ORDER – 22

1

## V.   CONCLUSION

2        For the reasons stated above, the Court **GRANTS IN PART** the Motion.  Dkt. #

3   55.

4        Dated this 6th day of March, 2020.

5

6

7

8        The Honorable Richard A. Jones
         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   ORDER – 23