UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

―――――――――――――――――――――――――――――――――

STATE OF WASHINGTON; STATE OF      )
CALIFORNIA; STATE OF COLORADO;     )
STATE OF CONNECTICUT; STATE OF     )
DELAWARE; DISTRICT OF COLUMBIA;    ) CASE NO. C20-00111-RAJ
STATE OF HAWAII; STATE OF          )
ILLINOIS; STATE OF MAINE; STATE    ) SEATTLE, WASHINGTON
OF MARYLAND; COMMONWEALTH OF       )
MASSACHUSETTS; STATE OF            ) February 28, 2020
MICHIGAN; STATE OF MINNESOTA;      ) 9:00 a.m.
STATE OF NEW JERSEY; STATE OF      )
NEW MEXICO; STATE OF NEW YORK;     ) MOTION FOR PRELIMIINARY
STATE OF NORTH CAROLINA; STATE     ) INJUNCTION HEARING
OF OREGON; COMMONWEALTH OF         )
PENNSYLVANIA; STATE OF RHODE       )
ISLAND; STATE OF VERMONT;          )
COMMONWEALTH OF VIRGINIA and       )
STATE OF WISCONSIN,                )
                                   )
                Plaintiffs,        )
                                   )
v.                                 )
                                   )
UNITED STATES DEPARTMENT OF        )
STATE, et al.,                     )
                                   )
                Defendants.        )
                                   )

―――――――――――――――――――――――――――――――――

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD A. JONES
UNITED STATES DISTRICT JUDGE

―――――――――――――――――――――――――――――――――

APPEARANCES:

```
For the Plaintiff          KRISTIN BENESKI
STATE OF WASHINGTON:       JEFFREY GEORGE RUPERT
                           BRENDAN C. SELBY
                           State of Washington AG's Office
                           800 Fifth Avenue, Suite 2000
                           Seattle, WA 98104




For the Defendant          ERIC SOSKIN
UNITED STATES:             MATTHEW J. GLOVER
                           Department of Justice
                           Civil Division
                           Federal Programs Branch
                           20 Massachusetts Avenue NW
                           Washington, D.C.  20002

For the Intervenors        PRATIK SHAH
NSSF                       RACHEL BAYEFSKY
and Fredric's Arms:        ROSS SILER
                           Akin Gump Strauss Hauer & Feld
                           2001 K Street NW
                           Washington, D.C.  20006
```

Appearing Telephonically for the Plaintiffs:

Jeffrey Dunlap for the State of Maryland
John Killeen for the State of California
Darren Kinkead for the State of Illinois
Nicholas Sydow for the State of New Mexico
Christian Wright for the State of Delaware

Appearing Telephonically for the Intervenors:

Lawrence Keen

```
Reported by:               NANCY L. BAUER, CCR, RPR
                           Federal Court Reporter
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101
                           (206) 370-8506
                           nancy_bauer@wawd.uscourts.gov
```

```
 1                        PROCEEDINGS
 2    _____

 3            THE CLERK:  We are here in the matter of the State of

 4    Washington, et al. v. United States Department of State, et

 5    al., Cause No. C20-111, assigned to this court.

 6        If counsel in the courtroom could please rise and make

 7    your appearances for the record.

 8            MR. RUPERT:  Jeffrey Rupert, assistant attorney

 9    general for the State of Washington.

10            THE COURT:  Good morning.

11            MS. BENESKI:  Kristin Beneski, assistant attorney

12    general for the State of Washington.

13            THE COURT:  Good morning.

14            MS. BENESKI:  Good morning.

15            MR. SELBY:  Brenden Selby, assistant attorney general

16    for the State of Washington.

17            THE COURT:  Good morning.

18        And on the telephone?

19            MR. WRIGHT:  Good morning, Your Honor.  This is

20    Christian Douglas Wright with the Delaware Department of

21    Justice for the State of Delaware.

22            THE COURT:  Good morning.

23            MR. DUNLAP:  Good morning, Your Honor.  This is

24    Jeffrey Dunlap appearing on behalf of plaintiff, State of

25    Maryland.
```

1          THE COURT:  Good morning.

2          MR. KINKEAD:  Good morning, Your Honor.  This is

3   Darren Kinkead for the Illinois Attorney General.

4          THE COURT:  Good morning to you as well.

5          MR. SYDOW:  Good morning, Your Honor.  Nicholas Sydow

6   on behalf of the State of New Mexico.

7          THE COURT:  Good morning.

8          MR. KILLEEN:  Good morning, Your Honor.  John Killeen

9   on behalf of the State of California.

10          THE COURT:  Good morning.

11      Is Mr. Boyer on the line?

12          MR. KEEN:  Lawrence Keen from the National Shooting

13   Sports Foundation.

14          THE COURT:  Good morning, sir.

15      Now, those on the telephone, if, at any point in time, you

16   can't hear the court, would you immediately alert the court?

17   I'd also ask that everyone present in the courtroom turn your

18   cell phones completely off.  Just as it was before Judge

19   Lasnik, I have the same system here.  It interferes with the

20   ability for transmission to take place.

21      Also, there's absolutely no recordings to take place of

22   the proceedings that are going on this morning.  That would

23   require court permission, and I'm certainly not giving that

24   permission.

25      My understanding is the plaintiffs in this matter,

 1    Mr. Rupert and Ms. Beneski, will be arguing; is that correct,

 2    counsel?

 3              MR. RUPERT:  Yes, Your Honor.

 4              THE COURT:  All right.

 5         Now, for the defendants?

 6              MR. SOSKIN:  Good morning, Your Honor.  Eric Soskin,

 7    Senior Trial Counsel, Civil Division, Federal Programs

 8    Branch, U.S. Department of Justice for the federal

 9    defendants.

10              THE COURT:  Good morning.

11              MR. GLOVER:  Good morning, Your Honor.  Matthew

12    Glover, counsel to the Assistant Attorney General Civil

13    Division, also for the federal defendants.

14              THE COURT:  Good morning, both of you.

15              MR. SILER:  Good morning, Your Honor.  Ross Siler on

16    behalf of the intervenor defendants.

17              THE COURT:  Good morning.

18              MR. SHAH:  Good morning, Your Honor.  Pratik Shah on

19    behalf of the intervenor defendants.

20              THE COURT:  Good morning.

21              MS. BAYEFSKY:  Good morning, Your Honor.  Rachel

22    Bayefsky for the intervenor defendants.

23              THE COURT:  And my understanding is that there will

24    be split time between Mr. Soskin and Mr. Glover; is that

25    correct?

1          MR. SOSKIN:  Yes, Your Honor.

2          THE COURT:  And then for the intervenors, just

3     Mr. Shah will be arguing; is that correct?

4          MR. SHAH:  Yes, Your Honor.

5          THE COURT:  And I take it there are no other

6     individuals on the phone that are appearing on behalf of the

7     intervenors or the defendants; is that correct?

8        All right.  That being the case, the court is going to

9     take the following approach:  Now, I know all of you came

10    prepared to begin with your remarks, but there's a number of

11    questions that I have that I'd like to have clearly answered

12    before we begin.  I'll certainly give you the opportunity to

13    make your comments and arguments to the court, but I want to

14    make sure that the court gets the answers to the questions

15    that I have.

16        I'm not sure who is going to go first, Mr. Rupert or

17    Ms. Beneski.  Who is going first?

18          MR. RUPERT:  It was my intention to go first, but

19    your questions may dictate a different order.  I was going to

20    cover the merits and severability, and Ms. Beneski is going

21    to do jurisdictional issues.

22          THE COURT:  Why don't we begin -- if you need to

23    tag-team or tap-out, whichever you prefer to do, you'll

24    certainly have the opportunity to do that.  I want to make

25    sure that both of you have a chance to address the court.

1    My first question to the plaintiffs in this case is that

2   NSSF is joined in this proceeding, and I trust, because

3   there's nothing in the briefing to indicate, that there isn't

4   any opposition to their intervention; is that correct?

5         MR. RUPERT:  That's correct, Your Honor.

6         THE COURT:  Now, my next question is with respect to

7   the issues of standing and jurisdiction.  What's different

8   now compared to the last time you were here before

9   Judge Lasnik?

10        MR. RUPERT:  I'm just going to turn my colleague over

11   to that, but, I think, the short answer we're going to say is

12   no, but I'll let her give a more full one, and if you have

13   follow-up.

14        THE COURT:  Okay.  That's fine.

15        MS. BENESKI:  Yes, Your Honor.  The answer to that

16   question is no, there's no substantial difference in the

17   posture here.

18    The prior case involved the removal of 3D-printed gun

19   files from the U.S. Munitions List, and, here, we also have a

20   removal from the Munitions List.  The only difference is that

21   there is an accompanying transfer of those items to an agency

22   that, as we read the regulations, will not effectively

23   regulate them.

24        THE COURT:  My next question is, why does harm,

25   quote, likely to arise within the United States, closed

1  quote, fall outside the scope of the AECA?  In other words,

2  the statutory language of the AECA seems to explicitly put

3  forth such harm within its purview.

4        MS. BENESKI:  I'm sorry, Your Honor.  I'm not sure

5  that I understand your question.

6        THE COURT:  Well, I'm trying to get to the specifics

7  of -- there's reference to "likely to arise within the United

8  States" in terms of the harm, and I'm trying to find why does

9  that fall outside the scope of the AECA, or does it?

10        MS. BENESKI:  I would say that the AECA is concerned,

11  primarily, with matters of national security and foreign

12  policy, and national security overlaps a great deal with

13  domestic security.

14      Just to take the example of international terrorism.  If

15  these rules were to go into effect, it will allow the global

16  dissemination of these firearm files, making it easy for

17  terrorists to access weapons that are undetectable in a metal

18  detector.  So they could potentially smuggle those through

19  TSA security, bring them on an airplane where they can be

20  used to harm U.S. citizens, including the citizens and

21  residents of plaintiff states.

22        THE COURT:  My next question, counsel, is the Export

23  Control Reform Act seems to explicitly remove the functions

24  they're under from judicial review, including its CCL

25  regulations, does it not?

 1          MS. BENESKI:  What the ECRA exemption from judicial

 2    review does is it exempts functions exercised under the ECRA.

 3    And what we're challenging here is not exactly a function

 4    exercised under the ECRA; rather, it is the combined effect

 5    of these two intertwined and interrelated agency rules.

 6        If the State rule is reviewable, which we think that it

 7    clearly is, the Commerce rule is also reviewable for the same

 8    reason.  And I'd be happy to go into more detail on that.

 9          THE COURT:  Why don't you go into more detail on that

10    one, counsel.

11          MS. BENESKI:  Sure.

12        So, again, if the ECRA exemption applies to anything, it

13    applies only to the Commerce rule, not to the State rule.

14        But looking at each rule in isolation is not really the

15    best way of understanding them, because of the way the rules

16    are written.  They are so intertwined, by design, that if the

17    State rule is reviewable, again, it means that the Commerce

18    rule has to be reviewed as well, because they're all part of

19    the same -- they're both accomplishing the same function,

20    which is a transfer of jurisdiction from the State Department

21    to the Commerce Department.  And I'll make a couple of points

22    on that.

23        The rules are self-described companion rules.  To quote

24    the State rule:  The, quote, combined effect of the two rules

25    is to, quote, transfer the items from State to Commerce.

 1          And the rules incorporate each other's reasoning, and they
 2     extensively reference each other in the preambles.  So we
 3     think that the ECRA exemption cannot foreclose review of
 4     these intertwined rules.
 5          Again, the key here is the combined effect, which is the
 6     transfer of jurisdiction, and that transfer is not an ECRA
 7     function; it's, rather, these two companion rules working
 8     together.
 9          And I'd also like to point out the case law on this is
10     very clear.  There was a strong presumption in favor of
11     judicial review, and in order to overcome that presumption,
12     you need clear and convincing evidence that Congress meant to
13     foreclose judicial review in a particular scenario.  That is
14     not the case here.
15          This is not an ordinary, run-of-the-mill export control
16     function being performed by the Commerce Department; rather,
17     it's a massive regulatory overhaul through two intertwined
18     rules, as I mentioned.
19          And it's also important to emphasize that no one had
20     notice that this massive regulatory overhaul was going to
21     affect 3D-printed firearm files at all, at all, and certainly
22     not in the particular way that these rules do.
23          This lawsuit, Your Honor, is the first and only
24     opportunity for any member of the public to weigh in on this
25     jurisdictional transfer of these extremely dangerous computer

1    files.

2        And I hope that answers your question.

3            THE COURT:  It does, counsel.  I'm going to come back

4    to that, but I want to get through my questions.

5        The provisions of the AECA permits the President or its

6    agents to remove items from the Munitions List, subject to

7    Congressional notice, and I don't think there's any dispute

8    about that.

9        So how is it that the State rule is contrary to law when

10   the AECA provides the check for the abuse you're claiming?

11   That is, that the State Department did not heed congressional

12   direction in its evaluation of what should be subject to the

13   USML.

14           MS. BENESKI:  I think I'll let Mr. Rupert go into

15   more detail on that question, but I believe the short answer

16   is, because this is done by a regulation, that regulation has

17   to comply with the Administrative Procedure Act, and that

18   includes notice and comment, but I'll let Mr. Rupert discuss

19   that.

20           THE COURT:  The court always likes shorter answers as

21   opposed to longer answers, counsel, so is this going to be a

22   better answer than the one she's provided?

23           MR. RUPERT:  No.  She's succinctly given one there.

24           THE COURT:  All right.

25       The AECA appears to specifically require notice to

1    Congress when an item is removed.  So shouldn't that be where

2    plaintiffs should be taking this issue?  In other words,

3    shouldn't this be going to Congress as opposed to the courts?

4         MS. BENESKI:  No, Your Honor.  Because, again, in

5    order to comply with the Administrative Procedure Act, the

6    State Department had to comply with notice and comment

7    procedures before promulgating a regulation that takes this

8    action.  And, again, no one had any notice that these

9    companion rules were going to affect 3D-printed firearm

10   files.

11        THE COURT:  Well, I read through a lot of the

12   materials, and I can't give you a precise, pinpoint

13   designation, but it appears that there were some formal

14   comments that resulted as a result of this change.

15       So what's your understanding of the extent of any comments

16   that did occur or do exist?

17        MS. BENESKI:  Again, I think Mr. Rupert can

18   potentially speak more to that, but I will do my best to

19   answer the court's question.

20       What happened here is, after the notice and comment period

21   closed back in 2018, then it was revealed that the federal

22   government had entered a settlement agreement with Defense

23   Distributed, and when that settlement agreement became

24   public, that's when it became clear that the rules were

25   removing 3D-printed firearm files from the Munitions List,

1    and at that point, there was a massive outcry, and the State

2    Department received over 106,000 emails, informal comments

3    because the comment period was closed, but emails from

4    concerned members of the public.

5              THE COURT:  But other than that, no other formal

6    record, that you're aware of, of public-comment

7    participation?

8              MS. BENESKI:  There were some comments in the

9    original rulemaking record that noted the fact that, by

10   removing technical data related to Category 1 firearms from

11   the Munitions List could affect 3D-printed guns, but those

12   comments were speculating on the way these rules might

13   ultimately work; in other words, no one had notice of the way

14   the final rules that have been promulgated would actually

15   regulate or, rather, not regulate 3D-printed firearms.

16             THE COURT:  Mr. Rupert, do you want to supplement

17   that answer?

18             MR. RUPERT:  No.  It's the perfect answer.

19             THE COURT:  Where does the court need to draw the

20   line in terms of the amount of notice required?  In other

21   words, is it notice of the USMIL?  Aren't those categories

22   sufficient on the issue of notice?

23             MS. BENESKI:  No, Your Honor.  The notice in this

24   case was beyond deficient.  For one thing, the original

25   notices of proposed rulemaking, the NPRMs, did not even

1   mention 3D-printed firearms, and we think that's extremely

2   significant because the files we're talking about here are so

3   unique and so dangerous that notice of the fact that they

4   would be affected by this deregulation was required.  And

5   then to add on to that, there was no notice whatsoever of how

6   the Commerce Department would purport to regulate these items

7   because, under the original proposed rules, it wouldn't have.

8   There was no subsection c of 734.7 of the Commerce rule -- no

9   notice was ever provided of that provision.  It's an

10  extremely complex, confusing new provision.

11          THE COURT:  So when would have been the first

12  notification that that existed?

13          MS. BENESKI:  The very first time the public learned

14  of that was when these final rules were published at the end

15  of last month.

16          THE COURT:  All right.

17      Counsel, what I'd like to do is talk to you about the

18  scope of relief.  And, again, I'm not cutting off the

19  additional argument you'll be able to make, but I just want

20  to cover certain areas.

21          MS. BENESKI:  I think, for this line of questioning,

22  I will go ahead and turn it over to Mr. Rupert, if that's all

23  right with the court.

24          THE COURT:  That's fine.

25      One of the things I want to know, counsel, is -- I want to

1    talk about the scope of the injunctive relief.

2        Are plaintiffs, in effect, requesting a nationwide ban on

3    the rules?  Here's what my concern is:  There's 17 states

4    which have joined.  There's 17 parties from the plaintiffs'

5    perspective, but wouldn't the effect of this type of relief,

6    because it's Internet publication, result in a nationwide

7    ban?

8            MR. RUPERT:  It would, Your Honor.  That's the whole

9    nature of this, because these rules, actually, are designed

10   to regulate exports.  But as Judge Lasnik found, the Internet

11   is not a domestic and international situation; rather, it's

12   everywhere.  But we're mindful of the court's concerns,

13   seeing how the Supreme Court has reacted, but we just don't

14   see a way to limit it just to the plaintiff states.

15           THE COURT:  And do you see the need or justification

16   for a separate hearing if the impact of a preliminary

17   injunction would go beyond the scope of the 17 named

18   plaintiffs?

19           MR. RUPERT:  I don't see the need for a separate

20   hearing, but we're happy to do as you'd like.

21           THE COURT:  In other words, you have 17 states here.

22   We have no idea the impact that this will have on any other

23   jurisdiction or any other state.

24       Do you think it would be justified for the court to

25   postpone the effect of the nationwide impact?  I know the

1   rules go into effect on March 9, but my concern is, there are

2   several other states that aren't participating, so you're,

3   basically, speaking on behalf of unrepresented individuals or

4   states.

5          MR. RUPERT:  We're more than happy, if you have a

6   concern there, to invite other states to appear.

7          THE COURT:  I'm asking you, do you believe that there

8   is a necessitation?

9          MR. RUPERT:  I do not believe there is a

10  necessitation, Your Honor.

11         THE COURT:  Well, let's talk about the scope of the

12  rule, counsel.

13     The intervenors contend -- and I'm referring to their

14  brief -- that the vast majority of rules have nothing to do

15  with 3D-firearms files, yet the plaintiffs seek preliminary

16  injunctive relief against the rules in their entirety.

17     If the court grants a relief on the specific claims, what

18  is the basis for an order enjoining implementation of the

19  rules on a wholesale basis?

20         MR. RUPERT:  Just the lack of severability, Your

21  Honor.  We've had discussions offline about how could you

22  narrow this injunction, or, frankly, to narrow even a final

23  order to vacating just portions of the rule.  But the case

24  law is pretty clear that the court can't be rewriting

25  regulations, and that, frankly, in our opinion, is what needs

1    to occur.

2        Again, our main issue is and only issue is 3D-printed

3    guns.  That's been well known to the government since 2018,

4    but yet the rule that was drafted -- and, again, as

5    Ms. Beneski said, we've just seen some of these rules for the

6    first time a month ago -- doesn't appear, on its face, to be

7    severable to just the 3D-gun issue, but we're more than

8    willing to work with parties to try to accomplish that,

9    because, as we said in our brief, our issue is 3D guns and

10   making sure that those are rightfully restricted due to the

11   severe national security interests.

12            THE COURT:  One point the intervenors make,

13   counsel -- and it's on page 9 in their briefing, it says --

14   references Fredric's Arms, and the point that they make is,

15   with the regulation, they're required to register with EDTC,

16   and they have to pay $2,250 annual registration fee, even

17   though they don't export firearms outside of the United

18   States.

19       So isn't that something that could be or should be carved

20   out, as opposed to a wholesale, overarching approach?

21            MR. RUPERT:  Again, Your Honor, we're open to that,

22   but we're just looking at the remedies that the court has

23   about, you know, what portions of the rule would you vacate

24   to accomplish that.

25       Again, if a way can be crafted to accomplish that while

1   also making sure that the national security concerns related

2   to 3D guns are covered, we're more than open to anything of

3   that nature.  But the reason we put it the way we did is, we

4   didn't see how you could sever the rule to accomplish, you

5   know, the issue that you just identified.  Because we have

6   nothing against Fredric's Arms, as far as I know a very

7   upstanding, fine Washington business, but just given the way

8   this rule was written, as I stand here, I don't know how to

9   sever it.

10          THE COURT:  Has there been any discussion or

11  negotiation with the states -- the state regarding an attempt

12  to try and craft a resolution as you propose as it relates

13  just to 3D guns?

14          MR. RUPERT:  We met and conferred before filing this

15  motion, Your Honor, but here we are.  I mean, we're more than

16  willing to do that.  And I think -- well, I don't want to

17  speak for the government.  But we and, I believe, the

18  intervenors are willing to try to craft a more narrow scope.

19  But at the end of the day, the government would need to take

20  action to rewrite parts of these rules.  And there's varying

21  ways they can do that, and the intervenors have proposed

22  some, in their brief, different, creative ways that could

23  occur, but it really doesn't need to have the government

24  invested in that approach, and they'll speak for themselves

25  on that.

1          THE COURT:  Do you think the settlement with the

2     defense organization prohibits or restricts the government --

3     again, they may have the answer to this question -- do you

4     think that that's the roadblock that we face right now?

5          MR. RUPERT:  I don't believe so, Your Honor.  It

6     doesn't seem like it would restrict them, but, again, they'll

7     have to speak on that issue.

8          THE COURT:  Okay.  I'm almost done, counsel.  Let me

9     double-check.  One last question.

10       Can you take up the government's contention that the

11    domestic distribution is already permitted under ITAR, and,

12    thus, domestic distribution can't constitute as irreparable

13    harm here?

14         MR. RUPERT:  Well, I guess I would -- several

15    comments.

16       I mean, you are permitted to distribute these files in

17    person, and I believe one group has done them by mail, but

18    you're not able to post them on the Internet.

19       And I think the Fifth Circuit said it best when they

20    said that -- let me find the quote here -- "The world may be

21    awash in small arms but it's not yet awash with the ability

22    to make untraceable firearms anywhere with virtually no

23    technical skill."  And that's what posting these things on

24    the Internet will do.  That's why we believe this, in fact,

25    is deregulation and that -- you know, when you then have the

 1    combination of it being exported, as well as, frankly,

 2    available in the states, that's when this becomes widely

 3    available, and it's just the issue the Fifth Circuit

 4    identified.

 5           THE COURT:  Counsel, I believe that covers all the

 6    questions that I had for the plaintiffs in this case, and now

 7    I'll give you the opportunity to address any other issues

 8    that you wanted to bring to the court's attention.

 9           MR. RUPERT:  Sure.  We're flexible, Your Honor.  If

10    you wanted to ask the same questions to them first, and then

11    for us to go, we will...

12           THE COURT:  No, I'll come back to them.  I want to

13    give you the chance to go first.

14           MR. RUPERT:  Okay.  Thank you.

15       Your Honor, this rule will give access to untraceable and

16    undetectable firearms to any terrorist, felon, or domestic

17    abuser with a laptop and a 3D printer.  3D guns work, they

18    are deadly, and they are undetectable via a common metal

19    detector, and that's why we're here.

20       You know, we all had to go through a metal detector to get

21    into this courtroom today.  Metal detectors are commonly used

22    in courtrooms, prisons, even CenturyLink Field, where many of

23    us, locally, go to watch sporting events.  This technology

24    will defeat most common metal detectors.

25       And here's what the government said -- the State

 1   Department said, in June of 2015, in the *Defense Distributed*

 2   litigation:  "The State Department is particularly concerned

 3   that plaintiff's" -- that's Defense Distributed -- "proposed

 4   export of undetectable firearms technology could be used in

 5   an assassination, for the manufacture of spare parts by

 6   embargoed nations, by terrorist groups or guerilla groups, or

 7   to compromise aviation security overseas."  All those

 8   concerns exist today, and nobody is disputing that the

 9   national security demands that these weapons be regulated.

10        Given the limited time, I was going to focus on one of the

11   major loopholes we've identified in our briefs, and then go

12   through each of the government's responses to demonstrate why

13   we believe that major loophole exists.

14        To foreshadow, we believe that this issue of are there

15   major loopholes or not is the key factor in the case, because

16   it's going to heavily factor into likelihood of success on

17   the merits, as well as irreparable harm.

18        I was going to talk about the ready-for-insertion issue

19   that we have identified and is highlighted as the first

20   argument in Section 2 of our reply brief.

21        The ITAR has a broad definition of technical data, and

22   there is a number of CFRs that go through that, from 121.1 to

23   120.10 to yet another definition of software.

24        The rule would take all the things that are on the ITAR,

25   including this technical data that we're talking about, it

1    would move it over to Commerce.

2         The issue with Commerce is that Commerce has an exception

3    to its jurisdiction, the published exception, and that's in

4    15 CFR 734.7.  So once an item is published, then Commerce no

5    longer has jurisdiction over it.

6         Now, under commerce's rules, it's quite easy to publish an

7    item.  Frankly, all you need to do is it put it on the

8    Internet, then it's published, and then Commerce has no

9    jurisdiction over that.

10        Well, what happened here, in the final rule, which none of

11   us saw until the final rule came out a month ago, Commerce

12   said, "Well, wait a minute.  We recognize that that's going

13   to leave a big hole, because what we originally proposed

14   would allow 3D-printed gun technology to be published at will

15   on the Internet."

16        So Commerce tried to claw some of that back by

17   promulgating 734.7(c).  And it's a rather bit of a mouthful

18   of a statement, but I'll read it here, and then I'll kind of

19   go through and explain some of the terms that we believe lead

20   to the glaring loophole.

21        734.7(c) talks about technology that's made available by

22   posting on the Internet in an electronic format -- and they

23   list two possibilities, such as AMF or G-code, which I'll

24   explain in a moment -- and is ready for insertion into a

25   computer-machine-controlled tool to produce the firearm or

1    the firearm frame.

2        Let me back up and say, you know, what are we talking

3    here?  Because we've got AMF-code, we've got G-code, but then

4    where does a CAD file come into that?  And that's what we've

5    identified in our briefing.

6        "CAD" is short for "computer-aided design."  That's how

7    you go about designing quite a few things.  A lot of people

8    use CAD software, and it's also used here to design the

9    pieces that are going to make the gun.  The CAD software

10   itself, or a CAD file, you could not put it into a machine

11   and print a 3D gun.  You couldn't print anything, for that

12   matter.  Rather, there are some steps that go to converting

13   what's in CAD into something that a machine can read.

14       Specifically, there are two steps.  There's AMF -- and AMF

15   is just one type of code -- and then there's G-code.  I'm

16   going to go to G-code first, because that's what's

17   specifically telling the machine what to do.  That's what's

18   telling the coordinates where to go and where to print the

19   item, or if it's a different type of machine, where to cut.

20   So that's G-code.

21       What we have in the intermediary is AMF, and there's

22   another popular file called STL, and we believe the rule

23   covers that, although it doesn't mention it, so it's a little

24   unclear.

25       But what AMF does is it takes a CAD file and converts it

1   into something that, at least, the machine software can read.

2       So you have three steps.  You have CAD, you have AMF, and

3   then you have the G-code.  So what we focused on is the CAD,

4   because the rule clearly, under its plain meaning, does not

5   cover CAD files.

6       CAD files, as I mentioned before, if you put it into a

7   machine, nothing is going to happen; rather, it needs to be

8   converted to AMF, which is easy to do.  You can do it with

9   free software, or there are some proprietary programs.  It

10  just takes a few minutes.  It's a few clicks here and there.

11  It's very easy to do.  And then with AMF -- I'm just using

12  that as an example -- that machine itself often will have

13  software that converts that to G-code.

14      Now, I'll refer you to the declaration of Dr. Patel from

15  the University of Washington.  He's a computer science

16  professor that works with 3D printing regularly.  He's won

17  many awards, including a MacArthur Genius fellowship.  So he

18  goes through and explains what I just tried to do as well, if

19  you want further guidance there.  And it's perfectly

20  appropriate for the court to consider that, particularly at

21  the preliminary injunction stage, as well as when we get to

22  the larger issue, because the Ninth Circuit has held that --

23  typically for technical matters -- the record can be

24  supplemented to address these type of items, and that's what

25  we're seeking to do with Dr. Patel's declaration.

1        So now let me go apply what I've just talked about here.

2    Here, we've got a rule that does not apply to CAD files.

3    Well, what does that mean?  We know Defense Distributed has

4    CAD files.  Frankly, some of them are already on the ITAR.

5    Also, for the items where they moved to AMF or G-code -- I

6    think it's, actually -- AMF is the ones that I have seen --

7    they easily can go backwards as well.

8        So the situation you could have, quite easily, is that

9    they post the CAD files online, publish it -- again, that's

10   not covered by Commerce -- then, because there's no

11   jurisdiction whatsoever once you publish something -- so you

12   put it online.  You can have instructions right next to it,

13   as well as a link for free conversion software.  You have the

14   AMF and G-code.  In a matter of minutes -- which they said

15   they're trying to regulate, but yet they have no jurisdiction

16   over it at that point.  So we see it as a glaring loophole.

17       And all the issues that we talked about at the outset,

18   from Commerce that they identified in 2015 -- excuse me --

19   State identified in 2015, of, you know, the possibility of

20   assassinations, compromising overseas air travel.  They

21   become very, very real.

22       Now, let's look at the government response to this.  They

23   have three general responses, other than just broadly saying,

24   Hey, you're wrong.

25       They claim -- well, first, their approach has been

1    tailored to provide Commerce with flexibility.  But we don't

2    understand what that means, because when you look at the

3    plain meaning of the regulation they drafted, 734.7(c), the

4    plain meaning does not cover CAD files.  So whatever they

5    mean by "tailored to provide with flexibility," perhaps it's

6    a thought that they later tried to attain some deference in

7    interpreting it, it's not going to even get there because you

8    need an ambiguity to even be able to interpret it.  And this

9    rule, unambiguously, does not apply to CAD files.

10       Second, there's a very slim suggestion.  It's, like, one

11   sentence in the declarations and I believe one sentence in

12   the preamble to the Commerce rule that says they're trying to

13   limit it to files that are not functional.  Well, we don't

14   know what they mean by "functional," because "functional" is

15   not a term of art.  It's not defined.

16       But moreover, you know, getting back to the point, it

17   doesn't change the plain meaning of the rule that we're

18   interpreting.  That may have been their goal, but when we

19   look at the plain meaning of the CFR at issue, it does not

20   cover CAD files.

21       So, again, if they think they're going to be able to come

22   back later and interpret some ambiguous provision, which,

23   frankly, with, you know, post-hoc declarations, it's going to

24   be quite difficult to get any deference to that.  They're

25   just not going to be able to accomplish that, because,

1   unambiguously, CAD files are not covered.

2        And the final argument that we seem to get in response to

3   our identification of this glaring loophole is that, "Well,

4   wait a minute.  It's the same as the ITAR.  What are you

5   complaining about?  You had this issue before.  You had that

6   issue with the ITAR, too."  Well, not so.

7        First of all, if you look at the definitions in the ITAR

8   of "technical data," they're very, very broad.  I'm

9   specifically referring to 120.10(a)(4).  That's where

10  "software" is defined.

11       Moreover, under 120.10(a)(1), they pick up anything that

12  may not be software, which, here -- I'll just read it here.

13  "Information other than software, which is required for

14  design, development, production, manufacture, assembling,

15  operation, repair, testing, maintenance, or modification."

16  So the ITAR has a very broad definition.

17       But let me even go further.  I'll apply it.  Because, in

18  *Defense Distributed*, some of the ITAR files that they -- some

19  of the files that they regulate or that they were asked to

20  review are CAD files that are on the ITAR.

21       And, specifically, when I get to that, I'm referring to

22  the declaration of Lisa Aguirre that was filed in the Texas

23  case.  Now, we filed that same declaration in our case, the

24  last case from 2018, and that's at -- the document is 1-1.

25  It's Exhibit 4 of that, which is page 31.

 1          Now, Ms. Aguirre was one of the four directors of the

 2     Defense Trade Control at the time.  In her declaration, if

 3     you look at Exhibit 3 -- so it's a little confusing.  You go

 4     from Exhibit 4 to Exhibit 3 --

 5               THE COURT:  I've got it, counsel.

 6               MR. RUPERT:  Okay.  It's on page 65.  Page 65 is a

 7     request for commodity jurisdiction from Defense Distributed,

 8     where they go through and identify the files that they think

 9     should not be on the ITAR.  And you'll see in that

10     description, in Exhibit 3, a listing of the files that

11     they're requesting not be on there and the file types.  There

12     are three file types on there that are listed as CAD files.

13          So if you then go to Exhibit 6, which is page 85 of the

14     Aguirre dec- -- page 85 our of our declaration.  I'm not sure

15     what it is of the Aguirre one.  It's just a very brief letter

16     that says that all the items that were listed here, the

17     files, are ITAR-controlled.  So when we get this idea that,

18     "Hey, what are you complaining about?  This is the same as

19     the ITAR," first, if you look at the regulations, it's

20     clearly not the case, and, second, when you apply it to some

21     of the very files at issue, they're ITAR-controlled.  So it's

22     difficult for us to believe that that's going to convince a

23     court that there's not a major loophole here.

24          Before I move on, there's just a final point that I want

25     to make.

 1        You know, one of the reasons that, you know, we have these

 2    regulations is that, if you violate them, there are criminal

 3    sanctions.  Can you imagine a prosecutor moving forward under

 4    this type of regulation, going after CAD files with this,

 5    frankly, known vagueness that even the Department admits was

 6    frankly, perhaps, somewhat intentional, to give them

 7    discretion to regulate it later?  No prosecutor would go

 8    forward on that.

 9        And the result of this -- and again -- is that anyone with

10    a computer and access to a 3D printer can make a gun out of

11    plastic.

12        Now, we identify a few more in the brief, and I'm not

13    going to go through those in any detail, unless Your Honor

14    has questions, but, frankly, any one of these glaring

15    exceptions -- if any one of them is correct, and we believe

16    all of them are, the elements don't matter, because once --

17    the Fifth Circuit said once this becomes ubiquitous, then

18    what's the point of trying to regulate it further?

19        We have a moment now where we can control it, we have been

20    controlling it.  Is it on the dark web in some locations?  It

21    probably is, but there's so many things out there.  But it's

22    not widely available, and that is what we're trying to

23    prevent.

24        I'm not going to turn specifically to the success on the

25    merits or likelihood of success on the merits.

1        Ms. Beneski started going into the notice and comment

2    issue and kind of laid the groundwork for kind of how we got

3    here, but I'll just briefly go through that again and then

4    kind of move through this argument quickly.

5        The NPRMs that came out don't mention 3D guns at all.

6    Now, we believe that's particularly significant, because

7    right when they were finalizing these NPRMs, the *Defense*

8    *Distributed* litigation was going on, and they settled the

9    case, agreeing to make rule changes.  So, again, they know

10    it's an issue.  They're settling the case with these rules,

11    and they don't tell the public about it at all.  There's nary

12    a mention of 3D guns in this NPRM anywhere.

13        Now, to be sure, Ms. Beneski identified and as the court

14    is familiar, some expert commenters did notice; go, "Wait a

15    minute here.  If you do this, you seem to be regulating --

16    deregulating 3D guns, but it wasn't widely known because it

17    wasn't clear.  Were they going to make an exception to that

18    so 3D guns did not apply?

19        Well, in the way it happened, it leads to further

20    suspicion because the settlement agreement with Defense

21    Distributed is announced the day after the comment period

22    closes, a day after.  And once it does, as Ms. Beneski

23    identified, a flood of emails come in, over a hundred

24    thousand, even after the comment period is closed.

25        And when you look at what you have to do for rulemaking,

1   it's pretty well known, the standards.  You've got to provide

2   sufficient factual detail and a rationale to permit

3   interested parties to comment meaningfully.  And if you're

4   going to make changes, they need to be a logical outgrowth.

5   We don't think either are met, for the reasons Ms. Beneski

6   said.

7       I mean, nobody truly knew that 3D guns were going to be

8   part of this rule, and they clearly knew it was an issue,

9   because they were trying to settle, and they didn't want

10  anybody to know about the settlement until after the rule

11  period -- the comment period closed.  That's an issue right

12  there.

13      And then, you know, frankly, if they had just put the

14  734.7(c) out for comment, we might not be here.  I mean, if

15  they truly believe now that these are a national security

16  risk, you know, that's what we have notice and comment for,

17  to identify problems with the approach.

18      You know, that's what -- we've also been talking with

19  other parties.  If the court were to entertain an injunction,

20  how do we craft this so that, you know, the correct interests

21  are covered, but yet the other parts of the rule are not?

22  But, again, that's what notice is and comment is for.

23      I'm now going to move on to arbitrary and capricious, not

24  in accordance with law, kind of combine those two together,

25  because I think they really boil down to these loopholes

1    we've identified.  If you agree with the States that there

2    are glaring loopholes here, I think these rules are arbitrary

3    and capricious.  If you agree with the government, that they

4    are not glaring loopholes, then we lose.  It's pretty much as

5    simple as that.

6         Judge Lasnik kind of had a further analysis on arbitrary

7    and capricious, and we would defer to that, unless the court

8    has questions.

9         I'm just going to move on to irreparable harm.

10        Now, again, if you agree with the States that there are

11   glaring loopholes, all the harms that the State Department

12   itself identified in 2015 are still present.

13        We've also got in the record, you know, numerous

14   declarations -- from Mary McCord, to others in our state

15   prison systems, to even the Boston Public Schools system --

16   that 3D printers are ubiquitous and kind of identifying that

17   irreparable harm, and I'll also point to Judge Lasnik's

18   decision.

19        Next, I was going to go into one of the other elements

20   necessary for injunction -- or, actually, two elements:

21   Public interest and balancing of the equities.

22        Because this is unique -- this threw me a bit because --

23   I've done a number of these cases, but to see the government

24   claim in the public-interest section that if this court were

25   to grant an injunction, it would harm national security.

 1   With all due respect to the government, it's hard, on its

 2   face, to take that seriously.  I mean, these rules -- if

 3   they're so important, these rules were proposed in 2018, and

 4   they sat on them for two years.  If it was so important,

 5   why'd you take two years?

 6        And then, moreover, you know, this declaration seems to be

 7   myopic as we look to balance the equities.  Yeah, I

 8   understand that they want to help some of these -- you know,

 9   people that are regulated, you know, to have to have, maybe,

10   perhaps, a more balanced regulatory approach, and, you know,

11   we don't dispute that.  But on the other hand, we have

12   widespread dissemination of 3D-printed guns, and the very

13   problems that the State Department itself identified.  So as

14   we look to balance that, you know, it just -- it seems, to

15   us, you know, it's very clear which way the balancing of the

16   equities leads in that situation.

17        The final thing I was going to discuss was severability,

18   and through your questioning, you, I think, really cut to the

19   heart of it.

20        We're open to the concept.  We just don't see, in

21   practice, how a court can sever portions of this.  You know,

22   if the court were to enjoin this, we're more than willing to

23   try to meet and confer to find solutions to this, but, you

24   know, we do need the government to take action, because

25   they're the ones that write regulations, not any of us.

```
 1              THE COURT:  So the bottom line is, your approach is
 2    all or nothing?
 3              MR. RUPERT:  Unfortunately so.
 4              THE COURT:  Okay.
 5              MR. RUPERT:  Unless the court has any questions, I
 6    was going to turn it over to Ms. Beneski to cover and briefly
 7    go through any justiciability issues to the extent that we
 8    haven't covered them before.
 9              THE COURT:  Okay.  Thank you, counsel.
10              MR. RUPERT:  Thank you.
11              THE COURT:  Ms. Beneski?
12              MS. BENESKI:  Thank you, Your Honor.
13         We covered much of what I wanted to discuss through your
14    questioning, so I'll keep my further comments brief.
15         The government raises three exemptions from judicial
16    review that it contends apply here.  We've already talked
17    about the ECRA exemption.  In addition, there's a State
18    Department regulation, which is based on a provision of the
19    Administrative Procedure Act, and then there's also the AECA
20    exemption from judicial review.
21         The AECA exemption clearly, on its face, only applies to
22    designations of items for inclusion on the Munitions List,
23    and that's, obviously, not what we're looking at here.
24         What we're dealing with here, of course, is a removal from
25    the Munitions List.  And Judge Lasnik was correct when he
```

1   ruled that a removal is not the same as a designation, and

2   all of the cases that the government cites in its brief are

3   consistent with that interpretation.

4        So I think it's quite clear that the AECA exemption does

5   not apply here.

6        I'll also briefly address the exemption from the

7   Administrative Procedure Act under the State Department's

8   regulations, which are the 22 CFR, Section 128.1.

9        This regulation says that the administration of the AECA

10  is exempt from certain provisions of the Administrative

11  Procedure Act.

12       I just want to point out, for one thing, that the

13  government did not raise Section 128.1 in the prior case, and

14  I suspect that's because it, pretty clearly, doesn't apply

15  here.

16       We discuss Section 128.1 in detail in our reply brief, but

17  I just want to quickly highlight two points about that.

18       One is that the regulation is, apparently, much broader

19  than the statute that it's purporting to implement.  The

20  statute is part of the APA.  It's 5 U.S.C., Section

21  553(a)(1).  That's the military and foreign affairs

22  exception, and the government does not argue in their brief

23  that that exception should apply.

24       There's, actually, quite a bit of case law on this

25  exemption from the APA, and controlling case law in this

1    circuit makes very clear that it's narrowly construed and

2    reluctantly countenanced.  I think it's very significant that

3    the government did not cite any case law or other authority

4    for why that exception should apply here.

5         That's all I have, Your Honor.

6         Oh, I suppose one final comment is that the other

7    justiciability issues raised by the government:  Standing,

8    political question, and zone of interests.  We covered some

9    of that earlier, but all of those justiciability issues were

10   raised in the prior case and rejected by Judge Lasnik.  So I

11   would refer the court to our briefing on those issues and to

12   Judge Lasnik's rulings.

13        THE COURT:  Counsel will have the obvious opportunity

14   to respond to any argument made on behalf of the government,

15   but, at this point, I want to hear from the government.

16        Counsel, I'm going to begin with several questions for you

17   as well.

18        MR. SOSKIN:  Thank you, Your Honor.

19        Before you get to those questions, may I just address the

20   issue of time for a moment?  The parties have requested 30

21   minutes each, and I don't know how strictly the court intends

22   to adhere to that, but I do want to mention that the

23   plaintiffs have had approximately 45 minutes, at this point,

24   to answer your questions.

25        THE COURT:  Well, counsel, I didn't put the clamp

1   down on you of 20 minutes, as Judge Lasnik did.  So I'm

2   trying to be a little bit more liberal in terms of making

3   sure the parties have the opportunity to fully address the

4   issues.  If it starts to get too extensive, the court will

5   certainly cut you off at that point, but right now, I want to

6   make sure you have a full chance to respond.  All right?

7           MR. SOSKIN:  Thank you, Your Honor.

8           THE COURT:  So with that, counsel, the first question

9   I have for the plaintiffs in this case is, from my

10  understanding of your briefing, there is no opposition to the

11  intervention of the NSSF; is that correct?

12          MR. SOSKIN:  That's right, Your Honor.

13          THE COURT:  All right.  And with respect to the

14  issues of standing and jurisdiction, what's different now

15  compared to when you were before Judge Lasnik?  Same question

16  I asked counsel for the plaintiffs.

17          MR. SOSKIN:  Yes, Your Honor.  The reality is, there

18  are numerous differences between this case and the *Defense*

19  *Distributed* settlement case.  It is true that they are

20  related under the local rules, but the provisions of the

21  local rules that indicate they are related are not

22  dispositive of questions like standing and jurisdiction.

23      The two key differences here are that, one, that case

24  involved a challenge to a discrete settlement agreement that

25  involved no process, public or otherwise, other than the

1   settlement agreement between the parties.  And Judge Lasnik

2   was understandably concerned, and it is reflected in his

3   opinions, although we disagree with those opinions, that

4   there was no notice to Congress under the removal provision

5   of the AECA, that there was no public notice and comment, and

6   that the agency had not issued a public analysis of the

7   effect on national security and those types of interests.

8       All of those things have occurred here.  It is clear from

9   those opinions that what Judge Lasnik anticipated was the

10  U.S. government would go back, and it would consider these

11  under the appropriate process, which has now been done.

12      The second key difference is that, there, all the parties

13  agreed that the effect of the settlement was to deregulate

14  Defense Distributed files.  Here, the government has

15  regulated those files.  So the disagreement is stark, and it

16  is about this underlying legal question of whether the files

17  are now regulated in the new rule, and that implicates all of

18  the issues of APA preclusions and preclusion of judicial

19  review and political question that the plaintiffs try to

20  bypass simply by saying that Judge Lasnik didn't find those

21  present.  But the reason he didn't find those present is that

22  the circumstances were very different.

23      For example, the 2778(h) preclusion of judicial review

24  provision in the AECA says that precludes judicial review of

25  designations in regulations.  There were no regulations at

1   issue in the *Defense Distributed* settlement case, and so,

2   therefore, that statutory provision wasn't one that the

3   United States sought to rely on and wasn't one that the

4   United States briefed.

5       That case also did not involve the ECRA/APA exclusion,

6   which you asked a question about earlier.  And so the

7   question of whether a review of the Commerce Department's

8   conclusions could be conducted under the APA, consistent with

9   the ECRA's APA exclusion of ECRA functions from the APA, was

10  simply not at issue.

11          THE COURT:  All right.  Let's transition a little

12  bit, counsel.  I want to talk to you about public comment, a

13  topic I've already addressed with plaintiffs in this matter.

14      Do you have totals on the number of public comments

15  received related to 3D guns before and after the settlement

16  agreement was revealed?  I'm trying to get a number of public

17  comments.  There's been representations of a large volume of

18  emails, essentially, protesting, which was over 100,000.  But

19  I'm trying to get from you, from your perspective from the

20  record, what is the volume of public comments received.

21          MR. SOSKIN:  Your Honor, I don't have those numbers,

22  but the public comment numbers during the public comment

23  period on the NPRM, the public comments were significant, and

24  they included comments from organizations like the amicus

25  here, the Brady folks, who, I believe, specifically addressed

 1  in their comment, the regulation of 3D-firearm files issue.

 2  But as to numbers, I don't know what those numbers are.

 3      I do know the 110,000 emails, I believe, included a large

 4  number of, essentially, identical emails that you submitted

 5  by clicking a button on a website to send a form email, and

 6  then, in fact, the parties in the *Defense Distributed*

 7  settlement case reached an agreement to not produce tens and

 8  tens and tens of thousands of identical emails as part of the

 9  administrative record.

10          THE COURT:  Counsel, since you raised the amicus

11  brief, one of the things pointed out in the submissions is,

12  they referenced a case called *Natural Resource Defense*

13  *Council v. EPA* regarding the notice requirements of EPA.

14  And, there, they say the essential inquiry focused on whether

15  interested parties could have anticipated the final

16  rulemaking from the draft proposal.

17      Now, with this consideration of the new provision, which

18  will be codified under 15 CFR, Section 734.7(a), where does

19  the substance or text of 734.7(c) appear in the State and

20  Commerce's rulemaking?

21      Now, these are points which were raised in the amicus

22  brief, so I just wanted to give you a chance to respond.

23          MR. SOSKIN:  So to go to the question of notice, it

24  is black letter law -- and we cite the cases in our brief --

25  that a final rule that addresses comments raised in response

 1   to the NPRM may introduce new provisions that are designed to

 2   address those comments, as the rule did here.  Comments, as

 3   well as commentators, Congress, the plaintiffs here in the

 4   prior litigation, raised concerns about the publication of

 5   3D-firearms files on the Internet.  And between those outside

 6   commentators and the comments themselves, it is a reasonable

 7   response, under that case law, for the agency to adopt a

 8   provision to address those concerns, as 734.7(c) does here.

 9       The specific text was not available for public comment,

10   and the United States does not dispute that that public text

11   was not available.

12           THE COURT:  Where does notice of proposed rules

13   reference 3D guns anyplace?

14           MR. SOSKIN:  Your Honor, the regulation of technical

15   data has always been understood to be a function of the

16   regulation of the underlying -- the underlying items

17   themselves.

18       So when, in earlier rounds of the Export Control Reform

19   Initiative, defense articles were transferred from State

20   control to Commerce control, the technical data for those

21   items, along with 3D files for printing those items, was

22   transferred.

23       The United States Munitions List simply

24   doesn't make distinctions and doesn't make references to

25   various methods of manufacturing the articles on the list.

```
 1    And the commentators who commented on the 3D firearms, as a
 2    result of the NPRMs, correctly identified this principle,
 3    which is an overarching principal in the USML, and it's
 4    apparent to anyone who is involved with the regulation of
 5    exports of arms and defense articles under the USML, that
 6    technical data, such as files for 3D printing, goes with and
 7    is part and parcel of the regulation of the underlying items.
 8              THE COURT:  Again, counsel, I point to the amicus
 9    brief.  They reference the fact that you can't point to
10    anywhere where, prior to the publication of the final rules,
11    the agencies gave any indication it would develop specific
12    regulations to address online dissemination of technical
13    information related to 3D-printed guns.
14              MR. SOSKIN:  Because those were a response to the
15    public comments that were received by commentators who
16    correctly identified the issue, because that is how the
17    USMIL, in its nature, works.
18              THE COURT:  And, counsel, if I asked you to cite
19    public comments regarding the new 734.7(c), what record could
20    you make?
21              MR. SOSKIN:  For public comments about the new
22    734.7(c)?
23              THE COURT:  Yes.
24              MR. SOSKIN:  I believe that's implicit in my earlier
25    answer; that that text was not made available.
```

1      THE COURT:  All right.  Let me see if I have more

2  questions for you, counsel.

3     I know you cross-referenced this a little bit, counsel,

4  and it's dealing specifically with your brief at Footnote 22.

5      You contend that the same administrative record applies as

6  it was in the previous case before the court.  Even if you

7  disagree, are you saying that the government's prior findings

8  therein should be afforded less weight?

9      MR. SOSKIN:  Your Honor, I'm not sure I understand

10 your question.  It was plaintiffs who contended that the same

11 administrative record would apply, not defendants.

12      THE COURT:  What is your position on that argument,

13 counsel?

14      MR. SOSKIN:  The administrative record that was

15 produced before may well be a portion of the administrative

16 record here.  However, there is reason to think it may not be

17 so limited.

18     We have not developed an administrative record here, but

19 these are new -- these are the final rules, and in the

20 development of those final rules, there have, obviously, been

21 changes versus the NPRMs, otherwise we would not be here

22 today, and so the administrative record would not be

23 identical, we would expect.

24      THE COURT:  And counsel has already referenced this

25 to some degree.

 1        Less than two months before the NPRMs were published, the

 2   State Department had taken the position that 3D-printed

 3   weapons posed unique threats to world peace, national

 4   security, and the foreign policy of the United States.  The

 5   agency's specific concerns regarding the proliferation of

 6   these weapons are well documented in the administrative

 7   record.

 8        Now, you say new decisions were made to adopt the final

 9   rules.  My specific question deals with what specific

10   findings were made that the 3D files no longer posed the same

11   national threat risk that caused the government to repeatedly

12   say it warranted control under ITAR?

13           MR. SOSKIN:  Respectfully, Your Honor, I believe the

14   premise of your question suggests that there was a finding

15   made by the government that was not made.

16        In fact, the final rules reflect that the State Department

17   and the Commerce Department concluded not that there was no

18   impact on national security of 3D-firearm files being posted

19   on the Internet, but rather that Commerce, by regulating the

20   dissemination of such files on the Internet by retaining EAR

21   jurisdiction over the posting of such files, would address

22   the national security concerns that did exist.

23           THE COURT:  What evidence or findings were made at

24   the time of the final rules to contradict or disprove these

25   prior findings as warranting control under ITAR?

 1            MR. SOSKIN:  Well, Your Honor, I, again, have a

 2   similar answer, which is that the findings that were made by

 3   the State Department, the Commerce Department, and I should

 4   mention the Defense Department in this process were that the

 5   EAR controls that were implemented in the final rule would

 6   address those national security concerns, not that they

 7   would -- that those national security concerns did not exist.

 8   There's nothing contradictory about that position.

 9            THE COURT:  What evidence or findings were made --

10   and, again, I keep coming back to the issue of findings were

11   made -- at the time of the final rules, that this new scheme,

12   under Commerce, would facilitate the maintenance of global

13   export controls and nonproliferation regimes as it pertained

14   to these particular files?

15            MR. SOSKIN:  Well, Your Honor, those findings are, on

16   their face, in the final rule themselves, which contain State

17   and Commerce's high-level evaluation of those items.  The

18   senior decision-makers in the agencies made the decision to

19   proceed with this transfer, as modified, and in the process,

20   they reviewed available information and concluded that the

21   final rules would maintain world peace and facilitate

22   national security and foreign policy.

23        And, of course, those decisions about how the final rules

24   would affect world peace, national security, and foreign

25   policy are precisely the kinds of questions that, in our

1    threshold arguments, both statutory and constitutional, we

2    suggest are not open to judicial review.

3            THE COURT:  Is it not true that the incentives of the

4    two agencies differ?  In other words, one of the amicus

5    briefs points out the Commerce Department weights commercial

6    interests more heavily than does the State Department.  So

7    how is it, despite divergent policy goals, that enforcement

8    will be the same?

9            MR. SOSKIN:  Well, Your Honor, as the declarations of

10   the three deputy assistant secretaries, two at State and one

11   at Commerce, explain, as a practical matter, enforcement will

12   be at least as effective, if not more effective under

13   Commerce control, and that is because State, understandably,

14   focuses its enforcement efforts on items of critical military

15   or intelligence advantage, on aircraft carriers and the

16   coatings for submarines and ICBM guidance assistance.

17       Commerce is much more experienced in maintaining and

18   enforcing regulations as to the kinds of items that are found

19   domestically among the public in the United States.  And to

20   that end, Commerce has domestic, United States, has federal

21   law enforcement officers who enforce the EAR.  State does not

22   have its own law enforcement officers enforcing the ITAR and

23   must rely on other federal law enforcement agencies to do it.

24       So through transfer, there is ample reason to believe that

25   enforcement will be at least as effective, if not more

 1   effective, and there's more detail on that in Deputy

 2   Assistant Secretary Hassebrock's declaration.

 3            THE COURT:  Now, currently under ITAR, those who

 4   engage in manufacturing defense articles are required to

 5   register and undergo a background check, et cetera.  These

 6   protections are not afforded at Commerce.

 7       If that's correct, doesn't it stand to reason that the

 8   government would lose valuable information about who is

 9   engaged in exporting these items?

10            MR. SOSKIN:  Your Honor, the licensing arrangements

11   are not an issue that, I believe, plaintiffs have raised in

12   this litigation, and the focus here has been on the

13   unrestricted Internet posting of 3D-firearm files.

14       There are a lot of details to licensing arrangements, but

15   one thing I would note about export licensing under the EAR

16   is that the EAR continues to maintain jurisdiction over

17   U.S.-origin items, even after they have been exported, and is

18   able to maintain and enforce post-export regulations very

19   effectively through the kinds of conditions it puts on other

20   exports under the EAR.

21       So if someone to whom a 3D-firearms file was exported

22   under a license or otherwise were to post it on the Internet,

23   Commerce would still have the ability to enforce 734.7(c)

24   against them through the mechanism of making them, for

25   example, ineligible for future exports of EAR-regulated

 1   items.

 2        THE COURT:  I think counsel for the plaintiffs'

 3   argument was that, essentially, once this publication occurs,

 4   Commerce loses control.

 5        MR. SOSKIN:  Your Honor, that goes to the principal

 6   misunderstanding that the plaintiffs show of the ITAR and EAR

 7   regimes.

 8      Once an item is in the public domain under the ITAR, the

 9   ITAR does not control that item.  And the definition of

10   public domain, in the ITAR itself, references -- includes the

11   word "published," and as the declarants explain here, the

12   scope of the exception for published information, under the

13   EAR, and public domain information, under the ITAR, is

14   coextensive once the new regulation on Internet posting of

15   3D-firearm files is taken into account; that is, the

16   principal gap before the new addition to the EAR was simply

17   that items could be published on the Internet -- could become

18   published by posting on the Internet without prior approval.

19   In the State regime, that would not place them in the public

20   domain.  Under the EAR, it would have placed them in the

21   public domain.  But now, because of the new subpart that has

22   been added to 734, that has changed.  They would no longer be

23   considered published when in that posture.

24      Plaintiffs, in their reply brief, posit that any kind of

25   placement into the public domain requires government

1    pre-approval, and that's simply not true.

2        There is one specific subpart in the ITAR's public domain

3    definition that refers to pre-approval by a relevant

4    government agency.  None of the other subparts do, and

5    because they do not, the public domain and published

6    exceptions are coextensive.

7            THE COURT:  Counsel, just out of curiosity, were

8    there any studies conducted on prior transfers from the USML

9    to CCL?  Were there any prior studies?

10           MR. SOSKIN:  I'm sorry.  I don't really understand

11   what you're asking for.

12           THE COURT:  Were there any studies conducted about

13   transfers?

14           MR. SOSKIN:  Do you mean were there NPRMs that were

15   published before they were done?

16           THE COURT:  Yes.

17           MR. SOSKIN:  Yes, in many of the cases.  I believe

18   there were 21 NPRMs and 26 final rules that have been

19   published as part of the ten-year process.

20           THE COURT:  Counsel, I'm referring now to your brief,

21   specifically at page 27, note 21.

22       What evidence is there to support your statement in the

23   briefing that the existence of more enforcement agents under

24   Commerce would result in a non-proliferation of arms,

25   especially in light of the prior concerns that these types of

1   arms would be virtually undetectable?

2         MR. SOSKIN:  Well, Your Honor, as I think I answered

3   in your previous question, having a domestic law enforcement

4   agency who is tasked with enforcing, among other things, the

5   EAR, gives Commerce a capability to monitor and enforce

6   against unregulated exports in a manner that State doesn't

7   have a comparable capability to.  And so those law

8   enforcement agents are a resource that would be available

9   under the final rule for enforcement against precisely the

10  kinds of harms that plaintiffs posit would occur and that are

11  not available under continued ITAR regulations.

12        THE COURT:  Counsel, you say "law enforcement

13  agents."  Help me visualize what the enforcement would look

14  like and under what the circumstances would be.

15        MR. SOSKIN:  Your Honor, I don't have familiarity

16  with precisely how Commerce's law enforcement agents do their

17  job.  I know there is a general description of Commerce's

18  enforcement activities that can be found in the Hassebrock

19  declaration.

20        THE COURT:  And I've talked you to about findings

21  before, and if you've already answered this question, you can

22  just merely represent that to the court.

23      What findings are there that the types of 3D files here

24  are or were available before the agency deregulated them on

25  July 27, 2018, or is it just that these underlying types of

 1  firearms are widely available?

 2          MR. SOSKIN:  Well, Your Honor, again, I do want to

 3  make clear that there is a nuance in your question here, and

 4  your question supposes that, on July 27, 2018, they were

 5  actually deregulated.  However, our understanding of the

 6  effect of Judge Lasnik's temporary restraining order, then

 7  preliminary judgment, then final judgment in that action is

 8  that those Defense Distributed files have never been

 9  deregulated, and that is how State treats them under ITAR,

10  and that point is addressed by both Deputy Assistant

11  Secretary Borman and Deputy Assistant Secretary Miller.

12          THE COURT:  And wouldn't the final Commerce rule, as

13  the States contend, permit publishing by other means that

14  would take it out of Commerce's jurisdiction before it could

15  then be published online?

16          MR. SOSKIN:  Well, Your Honor, the EAR is no

17  different than the ITAR in that regard; that if a matter is

18  published in a book, it becomes outside the jurisdiction of

19  the ITAR, and it becomes outside the jurisdiction of the EAR.

20      If a matter is published in the public library, a library

21  accessible to the public, it falls outside the jurisdiction

22  of the ITAR and outside the jurisdiction of the EAR, and I

23  could go through the list of how those exemptions are

24  comparable.

25          THE COURT:  All right.

1        Where in the record is the justification for Commerce

2   treating online publication of 3D files differently than

3   other forms of publication as it relates to national

4   security?

5            MR. SOSKIN:  Your Honor, the treatment of online

6   posting of files on the Internet is motivated by the agency's

7   response to the public comments, and the interest of other

8   commentators that were expressed during the rulemaking, that

9   posting on the Internet was something that Commerce should

10  seek to address in its final rule, and it did.

11           THE COURT:  Now, counsel, I want to talk about

12  irreparable harm and injunctive relief.  These are the last

13  area of questions I have before I give you the opportunity to

14  add to the record that you've already made.

15       My first question, same as I asked counsel for the

16  plaintiffs.  I'm concerned about the scope of injunctive

17  relief that's being requested, and my concern is, is there a

18  need for a separate hearing to address the scope of any type

19  of injunctive relief, if the court were to grant an

20  injunction?

21           MR. SOSKIN:  Well, Your Honor, if the court were to

22  conclude that there is some infirmity in the scope of

23  coverage of the final rule, such that an injunction was

24  warranted, we would welcome the opportunity to submit to the

25  court a description of how such an injunction could be more

1   narrowly tailored than to the entirety of the rules.

2       I don't think that a hearing would necessarily advance

3   that process.

4           THE COURT:  Okay.

5       And the government argues that it's going to suffer harm

6   to national security if an injunction issues.  Wouldn't an

7   injunction just maintain the status quo?

8           MR. SOSKIN:  Your Honor, there is an ongoing harm, as

9   Deputy Assistant Secretary Miller describes, from having the

10  focus of State's activities to enforce the ITAR, diverted to

11  the large number of license applications by, for example,

12  members of National Shooting Sports Foundation and by all

13  sorts of other exporters, and that diversion and focus

14  prevents the Department of State from fully carrying out the

15  mission of the Export Control Reform Initiative, which is to

16  focus on protecting those items critical to the military or

17  to intelligence.  And the President and the Secretary of

18  Defense, as reflected in our declarations at the time this

19  initiative was begun, recognized that that diversion was

20  harming national security by preventing our ability to

21  protect crown-jewel items.

22      That harm remains as long as this large category of items

23  in Categories 1, 2, and 3 remain regulated by State.

24          THE COURT:  And how would the U.S. suffer harm if the

25  rules aren't even in effect yet, counsel?

1          MR. SOSKIN:  Your Honor, the rules themselves will

2    mitigate the harm to national security that is caused by an

3    overly broad USML that requires State to spend its precious

4    enforcement efforts and its licensing efforts focused on

5    low-value items that do not cause -- that do not represent a

6    critical military or intelligence advantage; items like a

7    Smith & Wesson revolver that can be widely purchased in the

8    United States, and, in fact, items like the barrels for

9    firearms, which are completely unregulated as a matter of

10   federal law, and that, as a matter of the Gun Control Act,

11   can even be purchased by felons and the mentally ill and

12   children because they're not considered even firearms at all

13   under federal law.

14          THE COURT:  And, counsel, just a couple more

15   questions.

16      You argue on the one hand that it doesn't spend much time

17   monitoring technical data, but that national security would

18   suffer if the rules aren't implemented.

19      Aren't these inconsistent positions?

20          MR. SOSKIN:  So, Your Honor, there is a footnote in

21   Deputy Assistant Secretary Miller's declaration that

22   addresses this precise point.  I believe it is Footnote 20,

23   and that distinguishes between those enforcement activities

24   where State has discretion of what to pay attention to and

25   its licensing activities where it must act on the license

1    applications that come to it.

2        And so the mandatory activities to respond to licenses,

3    particularly in this area, an area that is a major United

4    States industry that has numerous players in it and which has

5    hundreds of millions of dollars of exports literally sitting,

6    awaiting licenses to be issued by Commerce under the new

7    rules, all of those mandatory activities have to be carried

8    out by State, no matter how they focus their enforcement.

9        However, as to enforcing unregulated exports, unlicensed

10   exports, that is an area where State must choose how to

11   dedicate its attention.

12            THE COURT:  Last question, counsel.

13       Would the modified injunction that is covering technical

14   data for arms capable of 3D printing pose the same risk to

15   national security?

16            MR. SOSKIN:  Is your question would there be national

17   security harms to a modified injunction?

18            THE COURT:  Yes.

19            MR. SOSKIN:  I think that would depend on what the

20   scope of the modified injunction would be, and so I can't

21   address that in the abstract.

22       Obviously, the greater the burden, the more things State

23   is required to do under an injunction, the less the purpose

24   of the transfer can be fulfilled and the greater the harm to

25   national security.

1           THE COURT:  All right.  Counsel, let me make sure

2      I've asked all my questions.

3           Okay, counsel, I'll give you the opportunity to make your

4      arguments to the court and supplement the answers you've

5      already provided.

6           MR. SOSKIN:  There are a few points that I would like

7      to highlight to the court, because I think they're important

8      for the court to understand in considering this case.

9           First, there are, really, three questions here before the

10     court.  These are, will there be any significant change in

11     the regulation of 3D-firearm files when the new rules go into

12     effect?  And the answer the government proffers is no.

13          The second question is, are the State and Commerce rules

14     subject to the APA?  And we think, plainly, the answer is no.

15          And third is, if they are subject to the APA, does the

16     court have jurisdiction to hear plaintiffs' challenge?  And

17     the answer there is also no.

18          And if the court agrees with us on any of those questions,

19     plaintiffs' motion must be denied.

20          As to the first question, will there be any significant

21     change to the regulations?  Plaintiffs' reply, I think, is

22     particularly important because it shows the extent to which

23     plaintiffs are bereft of understanding about the ITAR system

24     and the EAR regime.

25          What they don't seem to understand is that, under both

1   systems, export controls are not being applied to 3D-firearm

2   files that do not automatically generate defense articles,

3   and second, that under both systems, ready-to-use 3D-firearm

4   files will be subject to controls and can't be published on

5   the Internet.

6        To understand that involves looking at both the comparison

7   between the published and public domain exceptions, which I

8   think we discussed before in answer to one of your questions,

9   and, there, I want to focus the court's attention on their

10  biggest error, as reflected in their reply brief.

11       Plaintiffs appear to believe that the ITAR requires

12  government pre-approval before any technical data goes into

13  the public domain.  In their world, the government must

14  pre-approve every newspaper and magazine article that

15  discusses a technical or scientific subject under the ITAR.

16       In their world, government approval is required to place a

17  book into the public library, unless that library is closed

18  to foreigners.  And governmental approval is required to

19  present on technical matters at every conference and trade

20  show in America, and that simply is not a correct reading of

21  22 CFR 120.11(a)(7), the place where the government-approval

22  requirement appears.  That is only one subsection of the

23  public domain requirement.

24       And as to this point, the plaintiff, in one of the cases

25  we cite, the *Stagg* case out of the Southern District of New

 1   York, made the same claim, and it was roundly rejected there.

 2   I encourage the court to look at the analysis by the *Stagg*

 3   court.  It explains why this is not a correct reading of

 4   120.11, and the court -- and State follows the reading that

 5   the court applied to that provision.

 6       In the real world, which State and Commerce know about

 7   because they have expertise in how their regulations are

 8   applied and administered, published and public domain have

 9   been coextensive, except for the

10   published-by-virtue-of-posting-on-the-Internet exception that

11   appears in the EAR and does not appear in the ITAR.

12       And the explanation for many of the questions the

13   plaintiffs have raised and that the court has raised of why

14   that is the solution that is introduced in the final rule is

15   that when commentators raised concerns about posting on the

16   Internet, they pointed to the fact that items would become

17   published if posted on the Internet under the existing

18   Commerce provision.

19       So Commerce crafted and adopted the new subsection C that

20   prevents publishing -- prevents posting on the Internet from

21   making something published.  And because posting on the

22   Internet does not make something published, it does not

23   matter when the posting on the Internet occurred under the

24   plain-text reading of that subsection.

25       So the mere fact that Defense Distributed published its

1    files on the Internet for a couple of days before Judge

2    Lasnik entered his injunction does not defeat the application

3    of the rule.

4        And the declaration of Deputy Assistant Secretary Borman

5    explains precisely that and says those Defense Distributed

6    files will continue to be regulated under the new rule.

7        One more point on public domain versus published.  Here is

8    the definition of public domain as written in the ITAR before

9    the enumeration of things like newsstands, bookstores,

10   libraries, et cetera.

11       It says, "Information which is published and generally

12   accessible or available to the public."  It could not be made

13   more clear than by that piece of the ITAR how closely

14   "published" and "public domain" parallel each other, and yet

15   the largest issue on which plaintiffs point to is this

16   question of a pre-approval for publication.

17       The other key piece is 734.7(c) itself.  They claim that

18   the text is -- the text is unambiguous and limited to AMF and

19   G files.  But in their reading, they are reading out the two

20   keywords, "such as."  734.7 (c) says that it applies to files

21   that are in "an electronic format such as AMF files or G

22   files," and then it says, "that are ready for insertion."

23       So AMF and G files do not limit it in such a way that they

24   exclude CAD files.  That is a reading of the statute that is

25   not compelled by the statute and is not correct.  As the

1    declaration of Deputy Assistant Secretary Borman makes clear,

2    CAD files are well within the scope of what 734.7(c) permits

3    Commerce to treat not as published, based on posting on the

4    Internet.

5        Now, in their brief, they argue about what the plain

6    meaning of the word "ready" is, and I believe they cite to --

7    well, I'm not sure what they cite to, but here is the

8    relevant portion of the definition of "ready" from the Oxford

9    English Dictionary:  Ready as to a process or event, like

10   "ready for insertion" means it happens quickly or easily.

11       And so plaintiffs' hypotheticals, which involve files that

12   are in some format that come with instructions right

13   alongside them on how to turn them into files that

14   automatically generate a 3D firearm, easily fall within the

15   interpretive scope of "ready for insertion," just as they

16   fall into the category of "electronic format such as."

17       Plaintiffs eloquently describe a laundry list of things

18   that are regulated as part of the technical data definition

19   of the ITAR, but what is important to understand is that the

20   instructions for how to make a firearm or firearm components

21   or firearm receiver, in general, are widely available, widely

22   known, and in the public domain, as ITAR treats them.

23       So the key thing to look at is not the definition in ITAR;

24   it's to look at how State has treated similar circumstances.

25   For example, how has State treated 3D-firearm files that were

1    brought before it?  And when Defense Distributed submitted a

2    batch of 3D-firearm files for a commodity jurisdiction

3    determination, State concluded that only those files that

4    could be used to automatically generate 3D firearms were

5    subject to ITAR jurisdiction.

6        I don't know about you, but "used to automatically

7    generate" sounds very similar to "ready for insertion," and,

8    in fact, I believe that "ready for insertion" is plausibly

9    broader than "used to automatically generate," bearing in

10   mind that "automatically generate" doesn't necessarily set

11   some outer bound, it's how State described what it was doing

12   with respect to Defense Distributed's files.

13       And, again, as the agency declarants make clear, those

14   same files, whether you label them "CAD files" or "used to

15   automatically generate files" will be regulated under the new

16   EAR provision.  They are not being treated as published, and

17   thereby exempt from Commerce jurisdiction.

18       Why did State limit to "files that could be used to

19   automatically generate"?  Because the key step that Defense

20   Distributed's files had was that.  That is the only way in

21   which State assessed they had gone beyond what was previously

22   available in the public domain or that should be regulated.

23       There's one more piece of 734.7(c) that I want to point

24   you to.

25       Plaintiffs have focused heavily on 3D-printed firearms

1    files, and they make light of our response, which is that

2    734.7(c) is intended to provide flexibility for new

3    innovations in technology.  I point you to the fact that that

4    exception specifically addresses computer numerically

5    controlled manufacturing, which can involve, essentially, the

6    opposite of 3D printing; an automated computer-generated

7    device that takes a block of metal and cuts it down to make a

8    firearm instead of a technology that is building something up

9    layer by layer.  Those kinds of tools are also

10   specifically -- the files for those tools that can be used --

11   that are ready for insertion into those tools, are also being

12   covered by the new 734.7(c) rule here and is a way in which

13   it is effectively addressing a threat that plaintiffs don't

14   bother to really address in their briefing or in their

15   complaint.

16       There's one other example worth looking to, and that is in

17   the *Karn* case, Your Honor, and I think this helps highlight

18   the ready-for-insertion issue.

19       In that case, which is from D.D.C, and I believe it's

20   1996 -- it's cited in our briefs -- State, there, was

21   presented with the opportunity -- the commodity jurisdiction

22   question under the ITAR of how to regulate cryptographic

23   source code.  And, there, a book was presented, I believe, in

24   the request.  There was a book, and there was a diskette in

25   the back, and in the book was written out, in text

1  characters, the source code for cryptography, a method of

2  encrypting files, and exactly the same text appeared on the

3  diskette, and State said the text, as it's found in the book,

4  is in the public domain.  The same text, because it's on a

5  diskette, is regulated by the ITAR, and it rejected, in the

6  question of whether this was covered by the ITAR, the

7  possibility that, because you could take a computer scanner

8  and scan the pages from the book into a PDF and then copy

9  them into an electronic file, State said, Well, as we

10  understand the ITAR and its exemptions, that's not enough.

11  Those additional steps mean that it is not something that

12  falls into ITAR jurisdiction.

13       The importance of that is to show that, although

14  plaintiffs posit that there is this vast universe of

15  3D-printing information that State is regulating under the

16  ITAR, the actual examples of how State regulates files like

17  these are very close to how Commerce will be regulating them

18  under the new rule.

19       I just want to touch briefly on a couple of the APA-review

20  arguments.

21            THE COURT:  Counsel, how much additional time do you

22  think you need to do this?

23            MR. SOSKIN:  I believe I can cover this in about

24  three to five minutes, Your Honor.

25            THE COURT:  Please proceed, and then we'll take our

1   morning recess.

2        MR. SOSKIN:  The court does not need to look beyond

3   the text of the statutes, which are unambiguous here.

4   50 U.S.C., 4821 exempts all ECRA functions from the APA's

5   provisions, and it uses the language "shall not be subject to

6   those provisions of the APA," and it has two specific

7   exceptions in there, neither of which exception is, Well, if

8   an agency action is blended together with an action of the

9   State Department, then you can review Commerce's actions

10  through some applicable exemption under State.

11      No.  The approach that plaintiffs posit this court

12  applying would subject Commerce's decisions to the APA in

13  direct derogation of that provision of the ECRA.  And this is

14  not -- this is a -- if Congress intended that result, it

15  would be a meaningful oversight, because Congress enacted the

16  ECRA in 2018, fully aware of the fact these joint rules to

17  transfer items from ITAR to -- from the USML to the CCL have

18  been going on -- at that point had been going on for eight

19  years and that they had not been subject to judicial review,

20  and that doing so was specific to -- was in furtherance of a

21  specific congressional command that, in the administration of

22  the ITAR, State is commanded to review -- well, the President

23  is, but it's been delegated to State -- to review and propose

24  for removal those items that no longer belong.

25      And that gets to the 22 CFR 128.1 interpretation, a

1    textual interpretation that plaintiffs raise.  They say,

2    Well, that exception is only about the administration of the

3    ITAR.  But the administration of the ITAR includes that

4    provision, 20, I believe it's sub-provision F, which says you

5    shall review and propose for removal those items that

6    shouldn't be there.

7         The one other point I want to make on this is that

8    "designate" doesn't mean what plaintiffs would have you

9    believe it means.

10        Their brief cites to an online version of Webster's

11   Dictionary, but I took a look at *Webster's New Collegiate*

12   *Dictionary* from 1987, the print version that is

13   contemporaneous to the enactment of 2778(h).  And in the

14   contemporaneous dictionary, it says that "designate" means

15   not to add, as plaintiffs would have you believe, but to mark

16   or point out, to indicate, to show, or to specify.  These

17   mean, if you follow their definitions, to enumerate, as in

18   the items contained in a list, and that's what this

19   regulation that they are challenging on the State side is.

20   It is an enumeration of the new listing of what is on the

21   USML.

22        And the fact that Congress intended this to be precluded

23   from judicial review is made clear by the legislative history

24   that we cite, that they never respond to, where, in enacting

25   2778(H), Senator Riegle said that this is specifically

1   intended to preclude review of the question whether an item

2   should be on the USML or on the CCL.

3       That is the gravamen of plaintiffs' complaint, that this

4   should be on the USML, not on the CCL.  Congress intended to

5   exclude precisely this challenge in 2778(h).

6           THE COURT:  All right.  Thank you, counsel.

7       We're going to take our morning recess, and when we return

8   back, I'll give the intervenors an opportunity to make any

9   supplemental argument beyond what I think has already been

10  covered by the questioning of the court to plaintiffs and

11  defense, but I do want to give you the opportunity to make

12  brief remarks, and then I'll come back to counsel for the

13  petitioners.

14      And, counsel, just so you know that I didn't short shrift

15  you, you had about 48 minutes in your presentation to the

16  court, so I think that's as close to a generous

17  balance-of-time allocation that the court can provide.

18          MR. SOSKIN:  Thank you, Your Honor.  I appreciate the

19  time.

20          THE COURT:  We'll take our recess for 15 minutes, and

21  then we'll resume.

22                  (Court in recess.)

23          THE COURT:  Mr. Glover, I didn't mean to sidestep

24  your opportunity, but I assume your co-counsel made all the

25  points you were going to make?

1              MR. GLOVER:  Your Honor, with your leave, I need

2     about 60 seconds.

3              THE COURT:  I have lawyers tell me all the time.

4     What's realistic?

5              MR. GLOVER:  Maybe 60, possibly 90, unless you have

6     questions for me.

7              THE COURT:  Go ahead.

8              MR. GLOVER:  My colleague referenced Mr. Miller's

9     declaration for the effect that Commerce has certain things

10    they have to do, so all -- sorry -- State has certain things

11    they have to do, so all they need to do is make

12    registrations.  That's in the declaration at paragraph 100,

13    Footnote 8, the declaration of Mr. Miller.

14             THE COURT:  Okay.

15             MR. GLOVER:  As then as to Commerce's law enforcement

16    functions, I would also point you to the declaration of

17    Mr. Hassebrock at paragraph 26.

18             THE COURT:  At page 26?

19             MR. GLOVER:  At paragraph 26.

20             THE COURT:  Okay.  All right.

21             MR. GLOVER:  And then the only point I was going to

22    make:  You asked my colleague about how the government would

23    be harmed if the injunction merely kept the status quo, and I

24    just wanted to point out that the proper, I guess,

25    perspective to look at it would be, if you allow the rule to

1    go into effect, the power transfers, and that's why there's

2    some efficiencies by State not having to address all of the

3    items that will be transferred to Commerce, and Commerce

4    being able to --

5              THE COURT:  Slow down.

6              MR. GLOVER:  -- law enforcement --

7              THE COURT:  I know you're trying to get it done,

8    counsel, but you need to slow down.

9              MR. GLOVER:  Apologies.

10       So the proper perspective would be, what's the harm to the

11   government from today or from the issuance of an injunction

12   as compared to letting the rules go into effect?

13       That was all I had.

14             THE COURT:  Okay.

15             MR. GLOVER:  Thank you.

16             THE COURT:  I didn't want you to fly all the way back

17   to D.C., counsel, without you having the opportunity to, at

18   least, say something in court.  You can justify your plane

19   ticket with 90 seconds, counsel.

20       All right.  Mr. Shah?

21             MR. SHAH:  Good morning, Your Honor.  May it please

22   the court.  Pratik Shah for the intervenors.

23       I think the one thing that's become crystal clear after

24   the briefing, and certainly after the argument today, is that

25   plaintiffs' claims are limited exclusively to the rules'

1    treatment of files for 3D-printing of firearms, a tiny, tiny

2    slice of a pretty massive regulatory transfer of many items.

3         In the event the court finds merit in the plaintiffs'

4    claims, the remedies should be similarly limited.

5         The three remedial doctrines that we address in our

6    brief -- severability, equitable principles governing

7    preliminary injunctions, and Article III of the

8    Constitution -- each independently compels the same

9    commonsense result; that is, any remedy should go no farther

10   than enjoining the change in treatment of 3D-firearm files,

11   and should permit the rest of the rules, which everyone here

12   agrees have nothing to do with 3D printing, to go into effect

13   as scheduled.

14        Now, plaintiffs concede their harms are limited to

15   3D-firearm files, and in their brief, at reply 16, they say

16   the ideal remedy in fact would be an injunction limited to

17   3D-firearm files, and they've, at least, expressed openness

18   today to having a narrower remedy, yet it sounds like their

19   bottom-line conclusion in response to your question was it

20   could be all or nothing.

21        So to the extent they continue to seek a preliminary

22   injunction that would block the rules in their entirety, we

23   think that's legally infirm.

24        And to the extent they contend that the court lacks

25   ability to craft such a narrow remedy, that's wrong as both a

1   legal and practical matter.

2       Now, on the legal side, this court has both the authority

3   and, in fact, the obligation to tailor relief to alleged

4   harms.  That's particularly true when you're talking about

5   the extraordinary remedy of a preliminary injunction.  And

6   courts routinely offer preliminary injunctions as to just

7   part of a statute or part of a rule, and it does not turn on

8   how many subcategories the agency includes in its rule, or

9   how it defines particular categories, such that you can use

10  your pen to strike out just a particular provision.

11      There are lots of cases.  We cite several in our brief on

12  pages 12 and 13.  The State doesn't address any of them.

13  I'll just mention the leading case from the D.C. Circuit,

14  which tends to have the most of these APA sort of cases, just

15  because they have jurisdiction over those.  That's the

16  *Yeutter* case, and at pages 977 to 978, the court gives a

17  discussion --

18              THE COURT:  Counsel, you need to slow down.

19              MR. SHAH:  Oh, sure.

20      So what that case involved was a Department of Agriculture

21  rule relating to drug testing of Department employees.  And

22  it had a reasonable-suspicion standard in one part of the

23  rule that was at issue.  And what it said is, look, if you

24  want to test any Department employee, they can be tested

25  subject to reasonable suspicion.  And what the court said is,

1    Well, that -- and the plaintiff challenged that on Fourth

2    Amendment grounds -- and what the court said is, Look, I'm

3    going to give you an injunction that blocks enforcement of

4    that rule with respect to most employees at the Department of

5    Agriculture, but I'm going to carve out certain employees

6    that engage in safety-sensitive functions because, there, the

7    agency had more of an interest to test them.

8        That was not a category that was within the

9    reasonable-suspicion part of the rule.  The court simply does

10   what court did -- what courts do all the time, which is craft

11   a preliminary injunction that is tailored to the harm.  So

12   the court said, This rule will be preliminarily enjoined with

13   respect to all employees, except those engaged in

14   safety-sensitive functions.

15       So the court just drew its own category within the larger

16   rule, even though it couldn't take a pen and cross out a

17   portion of the rule.  That happens all the time.

18       *Davis County* is another case that we cited.  That wasn't

19   even a preliminary injunction case.  That was just a straight

20   severability of the rule.  That was involving an EPA rule

21   which imposed regulations on certain municipal waste

22   facilities.  And what the court said is, Well, we're going to

23   vacate that rule except with respect -- I'm sorry -- We're

24   going to permit that rule, except with respect to cement kiln

25   facilities.

1          Cement kiln facilities were not even mentioned in the

2     rule, but it turned out, during argument and briefing, that

3     the parties agreed -- or the parties convinced the court that

4     cement kilns were a special subcategory, and the court simply

5     vacated the result, except with respect to cement kilns.

6          That's exactly the sort of same thing that we're asking

7     here; that the court can allow these rules to go into effect,

8     but simply enjoin it with respect to the 3D-firearm files,

9     and then leave it to the agencies to comply with an

10    injunction, which is what agencies do, when courts issue

11    injunctions, all the time.

12         Now, on the balance of equities, Your Honor, which,

13    obviously, is a part of a preliminary injunction, as to the

14    scope of the preliminary injunction, I think the State draws

15    a false dichotomy.

16         You are not weighing the harms from 3D-firearm files

17    versus the harms to the regulated entities that would not

18    benefit from this new regulatory scheme.  Under our proposal,

19    you would be enjoining the change in treatment of 3D-firearm

20    files.  So, by definition, there wouldn't be any harm on

21    3D-firearm files.  So there's nothing on that side of the

22    balancing to do under this narrower injunction.

23         All of the harms from the broader injunction that the

24    State seems to seek enjoining the ruling wholesale, those

25    fall on thousands of businesses throughout the company [sic],

1    including NSSF members like Fredric's Arms, a small, solo gun

2    shop that has to pay this fee to the State Department that

3    would not have to pay it otherwise under the rules.

4        On the legal side, the last point I would make is, there

5    are Article III limits here, and so just using normal

6    principles of constitutional avoidance, the court should

7    avoid crafting a remedy that runs afoul -- potentially runs

8    afoul of Article III.

9        You explained the concern about a nationwide injunction,

10   that's a concern, but I think the even bigger concern is

11   about issuing a remedy that knocks out a rule -- two rules in

12   their entirety, when there is one -- only one tiny sliver of

13   the rule, which everyone agrees is causing the problem.  That

14   is a such bigger Article III concern that it doesn't map onto

15   the injury-in-fact, and, of course, the Supreme Court has

16   been particularly sensitive about overbroad injunctions.

17             THE COURT:  Counsel, let me ask you a practical

18   question.

19             MR. SHAH:  Yes.

20             THE COURT:  Have you gone through the rule to look

21   and see if -- if I gave you the power to go through and

22   strike out portions or provisions so it would be narrowly

23   crafted, what does this look like in the final analysis?

24             MR. SHAH:  Sure, Your Honor.

25        So I think it's just like in the *Yeutter* case.  I can't --

1  you can't take a pen and just say I'm going to cross out

2  these words.  But just like in the *Yeutter* case, the court

3  said, Look, you, agency, you can implement this rule, except

4  with respect to this category of employees.

5      Your injunction, I think, could read very simply, just

6  like that.

7      So to be concrete, you can simply order the federal

8  agencies to maintain the same level of regulation or

9  effectiveness that currently exists on 3D-firearm files, and

10  then leave it to the agencies to figure out what they have to

11  do to implement that.  Maybe that means -- to the extent that

12  you find there is some gap between the ITAR and the EAR,

13  maybe that means that Commerce will implement your injunction

14  by applying the same restrictions on publication that are

15  present in the ITAR.  That would be one potential solution.

16      So the agencies have a lot of ways to implement a very

17  straightforward injunction, which is, the rules go into

18  effect as scheduled, but the agencies should maintain the

19  same level of regulatory restrictions on 3D-firearm files, or

20  to use the State's term, to close the gap between any -- and

21  to the extent any gap exists, if you find there's a gap, you

22  can order the agencies to close the gap.

23      And, again, the federal agencies, we would leave it to

24  them.  And courts don't usually rewrite regulations.  They

25  leave it or implement -- prescribe specific ways to implement

1    an injunction.

2        You set forth the injunction, Here's what you need to do

3    to remedy the violation, and then the agencies can come back

4    with you, Okay, here is how we're going to do it.  Commerce

5    is going to apply the State Department standards for

6    publication.  That would be one simple way to do it.  Or the

7    State Department is going to continue to regulate 3D-firearm

8    files as if they appear on the USML.  That would be another

9    way to do it.

10       I don't think you need to prescribe, Your Honor, exactly

11   how it needs to be done.  You just need to tell them, You

12   can't allow these 3D-firearm files, you can't keep any gap in

13   regulatory restrictions that might otherwise exist, if you

14   find that such a gap exists.

15       So I think, for all of those reasons -- and, again, courts

16   do this all the time, day in and day out, so there is no

17   legal problem, and I think there is an easy injunction for

18   you to write, and then, practically, there are many ways for

19   the agencies to enforce it, and courts should leave the

20   federal agencies to figure out a way to do it, and if there

21   are any problems, of course, the parties will come back to

22   you, and it can be worked out at that point.

23           THE COURT:  Counsel, when you say "if there are any

24   problems," then come back to me and work things out, doesn't

25   that, then, reposition the court into rewriting the rules?

1           MR. SHAH:  No, Your Honor.  I mean, I think -- again,

2  as I envision it, you would set out -- if you find that there

3  is a gap, say, between how the State Department was

4  regulating the publication of 3D-firearm files and how

5  Commerce is regulating, and then I realize that the parties

6  are disputing whether there's a gap or not, but let's say you

7  agree with the plaintiff that there is a gap, and you say, in

8  your injunction --

9           THE COURT:  Slow down.

10          MR. SHAH:  Sorry.

11      And then you say, in your injunction, federal agencies

12  take steps to close that gap.  You have to continue to

13  regulate 3D-firearm files as you were before.

14      I think agencies, as they said here -- Mr. Soskin said

15  they would like an opportunity to tell you how they would

16  implement that injunction, and so it would be in front of all

17  of the parties, and if you signed off on it, they would

18  implement it, and I think that would be a straightforward way

19  to proceed.

20          THE COURT:  Thank you, counsel.

21          MR. SHAH:  Thank you, Your Honor.

22          THE COURT:  Counsel for the plaintiffs?

23          MR. RUPERT:  Sure.

24          THE COURT:  Counsel, there are two areas I want you

25  to, at least, touch upon.  I'm confident that you will.  One

1  is, government's counsel made reference to the *Stagg* case,

2  and then second is to address the narrowly prescribed scope

3  of, essentially, the court adopting Mr. Shah's approach of

4  sending it back and directing the agencies to reformulate

5  their game plan.

6        MR. RUPERT:  I'll address that one first, because I'm

7  struggling to remember which one was the *Stagg* case.

8        THE COURT:  D.C. Circuit, I think.

9        MR. RUPERT:  Yeah, okay.

10     The second question is an easy one.  I think if it were

11  the approach where it was sent back to the agencies and the

12  court retained jurisdiction, we would be comfortable with

13  that approach.

14     Bear with -- if counsel could remind me of the *Stagg* case.

15        THE COURT:  Counsel, go with the balance of your

16  rebuttal.

17        MR. RUPERT:  Oh, this, I guess -- I tried to remember

18  exactly how counsel used *Stagg*, and I apologize for not

19  addressing that.  But I believe that was -- *Stagg* related to

20  the functionality with the First Amendment as a backdrop.  At

21  least that's what their brief is --

22        THE COURT:  They're making a reference to 120.11.

23        MR. RUPERT:  Oh, it's a First Amendment case here.  I

24  guess I'm just trying to remember that quickly here, and I'm

25  losing the details of the case, having read too many of them,

1   Your Honor.

2            THE COURT:  That's okay, counsel.

3            MR. RUPERT:  But on the larger point of this claim,

4   you know, that the ITAR and the -- and these new proposals in

5   the AR on the published part of it and public domain are the

6   same, I would just point to the court to, you know, our reply

7   brief, where we cite a rule -- or a proposed rule from State

8   interpreting the ITAR that said you need pre-approval for --

9   for coming out with items.

10       And I think that -- just to back up a moment, too.  I

11  think I jumped into too much detail.

12       One of the things that we're talking about here is

13  jurisdiction as well.  So I think we're mixing and mashing

14  jurisdictions of the agencies and, perhaps, their discretion

15  about what to enforce.

16       You know, under Commerce's stripping provision, that I

17  discussed at length in my opening, they're going to lose

18  jurisdiction over items that are published here, and, you

19  know, we think that there is clear loopholes with that.

20       You know, what we think is the rules under the ITAR are

21  much more broad.  Now, if -- you know, like, they're saying

22  that they don't review every item that a researcher is going

23  to go forward and produce, I mean, that's a discretionary

24  decision by them about how to enforce their rules, but they

25  have jurisdiction is the real question here, so I think

1    that's a major point that we would make.

2         But the one thing I wanted to emphasize in rebuttal -- I

3    think, you know, through your questions and through

4    everybody's presentations, we've covered most of the items --

5    is something that the government mentioned there; that if

6    there was an injunction, you know, they're willing to submit

7    a proposal about how to keep these items regulated, and

8    that's what we want.

9         Now, in their declarations, in their argument, they're

10   making statements that things are covered, and we think those

11   are post-hoc declarations that aren't going to have the force

12   of law.  But if we could get -- if we could craft -- or if

13   the government could craft regulations where those did have

14   the force of law, I think that solves the issue.  Because it

15   seems like all parties want to regulate these items.  Some of

16   these declarations suggest that they thought they were doing

17   some things that we don't think that they've accomplished,

18   but it does feel like there's a way that the parties can come

19   together and craft regulations -- or the government is the

20   crafting party, but we could, perhaps, assist -- that gives

21   the necessary protections for export controls, as well as the

22   public, while at the same time, you know, allowing us to

23   craft something narrowly so it's not going to affect the

24   intervenors and the other parties that would be affected by

25   the transfer of these items.

1          Any other questions or issues you'd like me to address?

2               THE COURT:  No other questions, counsel.

3               MR. RUPERT:  Thank you.

4               THE COURT:  All right.  Thank you.

5          Counsel, I've given more than ample opportunity for all

6     the parties to raise all the issues that they wanted to

7     raise.  You've answered, dutifully, all the questions I've

8     posed, and I deeply appreciate the detailed explanations and

9     the thoroughness of all your briefing.  Lord knows you've

10    submitted a lot of material for the court to consider.

11         The court recognizes that we have deadlines that we have

12    to meet, and the court will do its best to meet that

13    deadline.

14         Now, one thing I do want to encourage, because it sounds

15    like there may be some opportunity for the parties to

16    continue to work together, and that's certainly strongly

17    encouraged by the court.

18         The plaintiffs in this matter have made some concessions,

19    essentially, to basically say, Judge if you go ahead with

20    Mr. Shah's argument, we'd be comfortable with that, and

21    that's different from the all-or-nothing approach that we

22    began with.

23         So I'm not here to mediate resolution; I'm here to make a

24    final determination.  But what I strongly encourage the

25    parties is, as opposed to keeping that "V" separating the

```
 1   parties, to work dutifully to try and see if you can come to

 2   a resolution among yourselves.  You'll be far happier if the

 3   parties can come to a resolution as opposed to the court

 4   imposing an edict that says this is the court's final

 5   determination.

 6        So I leave these words with you and strongly encourage the

 7   parties to get together to see if you can come up with

 8   something that makes reasonable sense and that all parties

 9   can live with.

10        Thank you, all, again, and safe travels in your return

11   back home.

12        We'll be in recess.

13

14             (The proceedings concluded at 11:17 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


          I, Nancy L. Bauer, CCR, RPR, Court Reporter for

the United States District Court in the Western District of

Washington at Seattle, do hereby certify that I was present

in court during the foregoing matter and reported said

proceedings stenographically.

          I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction

and that the foregoing pages are a true and accurate

transcription to the best of my ability.



          Dated this 10th day of March 2020.



                    /S/  Nancy L. Bauer

                    Nancy L. Bauer, CCR, RPR
                    Official Court Reporter