# PUBLIC SUBMISSION

**As of:** 7/17/18 10:41 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9431-6oiy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1487
Public Comment 1156. Individual. HENRY PARADIS. 7-4-18

## Submitter Information

**Name:** HENRY PARADIS

## General Comment

Save the world, limit the guns sold!

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 10:42 AM |
| **Received:** July 04, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-9431-fi5u |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1488
Public Comment 1157. Individual. Emma Bradshaw. 7-4-18

---

## Submitter Information

**Name:** Emma Bradshaw
**Address:**
    2868 Valley Forge Road
    Lisle,  IL,  60532
**Email:** emmabradshaw@comcast.net
**Phone:** 6309612868
**Fax:** 60532

---

## General Comment

Control of firearms, guns, ammunition, and related articles continue to warrant control under the USML. Keep the U.S.
State Department in control, not the Department of Commerce. Thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:43 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9431-3g3b
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1489
Public Comment 1158. Individual. Helen Yeomans. 7-4-18

## Submitter Information

**Name:** Helen Yeomans

## General Comment

No gun sales without security check!

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** | 7/17/18 10:43 AM |
| **Received:** | July 04, 2018 |
| **Status:** | Posted |
| **Posted:** | July 17, 2018 |
| **Tracking No.** | 1k2-9432-z32j |
| **Comments Due:** | July 09, 2018 |
| **Submission Type:** | Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1490
Public Comment 1159. Individual. Judith Greenberg. 7-4-18

---

## Submitter Information

**Name:** Judith Greenberg
**Address:**
   1800 Clairmont Lake Unit 101
   Decatur,  GA,  30033
**Email:** jgreenb@bellsouth.net
**Phone:** 4043251504
**Fax:** 30033

---

## General Comment

I oppose this rule change that would switch regulation of firearms from the U.S. State Department to the U.S.
Commerce Dept.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:32 PM |
| **Received:** July 04, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-9432-22ws |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1551
Public Comment 1160. Individual. Rochelle La Frinere. 7-4-18

## Submitter Information

**Name:** Rochelle La Frinere

## General Comment

The regulation of firearms export must remain with the State department, not Commerce.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:33 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-rym9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1553
Public Comment 1161. Individual. Mike M. 7-4-18

---

## Submitter Information

**Name:** Mike M

---

## General Comment

Here are more details on how the rule change would make the world a far more dangerous place:
1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.[5]
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.[7]

[1] Trump move would make it easier for U.S. gun manufacturers to export firearms, The Washington Times,
May 14, 2018.

[2] Trump wants to make foreign arms sales easier, The Boston Globe, June 23, 2018.

[3] Ibid., The Boston Globe

[4] American Guns Drive the Migrant Crisis That Trump Wants to Fix With a Wall, The Trace, May 25, 2017.

[5] The Trump administration proposes making gun exports easier. Heres how to submit your public comment on
this dangerous proposal, Violence Policy Center.

[6] Ibid., Violence Policy Center.

[7] "U.S. requires group to remove 3-D gun instructions from its website," CNN.com, May 13, 2013.

# PUBLIC SUBMISSION

<table>
<tr><td><strong>As of:</strong> 7/17/18 12:34 PM</td></tr>
<tr><td><strong>Received:</strong> July 04, 2018</td></tr>
<tr><td><strong>Status:</strong> Posted</td></tr>
<tr><td><strong>Posted:</strong> July 17, 2018</td></tr>
<tr><td><strong>Tracking No.</strong> 1k2-9432-o2id</td></tr>
<tr><td><strong>Comments Due:</strong> July 09, 2018</td></tr>
<tr><td><strong>Submission Type:</strong> Web</td></tr>
</table>

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1555
Public Comment 1162. Individual. Shari Draayer. 7-4-18

---

## Submitter Information

**Name:** Shari Draayer
**Address:**
  437 W Valley Forge Rd
  King Of Prussia,  19406
**Email:** shari.draayer@eastern.edu
**Phone:** 2158696249
**Fax:** 19406

---

## General Comment

I am writing to you to formally oppose this dangerous rule change switching the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Firearms are dangerous; they are intended to be deadly. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. In a sane and just world they would be subject to more controls, not less! Forget making America great again; could we make it sane and just first?!

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 12:35 PM |
| **Received:** July 04, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-9432-ravi |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1557
Public Comment 1163. Individual. Laura Meisler. 7-4-18

## Submitter Information

**Name:** Laura Meisler

## General Comment

I oppose switching regulation of sales of firearms from the State Department to the Commerce Department. Do
not make this proposed change!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-4yc3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1558
Public Comment 1164. Individual. Sybil Schlesinger. 7-4-18

---

## Submitter Information

**Name:** Sybil Schlesinger
**Address:**
    22 Rockland Street
    Natick,  MA,  01760
**Email:** sybil.sch@gmail.com
**Phone:** 5084048192

---

## General Comment

Please do not enact this rule change. This proposed rule change eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.

It would remove licensing requirements for brokers, increasing the risk of trafficking.

It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

There are enough weapons in the world now. We do not need to enrich gun manufacturers at the expense of all the rest of humanity. Do not change this rule.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-wjtl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1560
Public Comment 1165. Individual. John McAllister. 7-4-18

---

## Submitter Information

**Name:** John McAllister

---

## General Comment

I am against the transfer of control of international firearms sales to the Commerce Department Bureau of Industry and Security. To do so would needlessly endanger the international community with lack of appropriate regulation.J

WASHSTATEB006428

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:37 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-jmw7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1562
Public Comment 1166. Individual. Linda Curtin. 7-4-18

---

## Submitter Information

**Name:** Linda Curtin

---

## General Comment

The Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of
Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large
caches of American guns and ammunition.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-pgv3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1565
Public Comment 1167. Individual. Judith Fardig. 7-4-18

---

## Submitter Information

**Name:** Judith Fardig
**Address:**
    1066 SW Westwood Dr
    Portland,  97239-2747
**Email:** pjfardig@comcast.net

---

## General Comment

I am a retired nurse-midwife, very concerned about the public health impacts in the U.S. and globally of too many guns in the hands of dangerous people. Let's not export our lethal problem to other countries.

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migrations.

Keep the regulation in the State Department with stronger safeguards and a history of trained personnel to enforce them.

The N.R.A. is becoming a toxic brand, so they are looking to develop a new money stream for U.S. guns and ammunition manufacturers. Do not be cowed by their pressure.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:40 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-bp7x
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1567
Public Comment 1168. Individual. Philip Tobias. 7-4-18

---

## Submitter Information

**Name:** Philip Tobias
**Address:**
    1750 30th St. #603
    Boulder,  CO,  80301
**Email:** philtobias@aol.com
**Organization:** Philip Tobias Enterprises (and various clients or other companies)

---

## General Comment

Please reject the proposed rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Firearms have caused the deaths of several people I knew, in several different incidents. Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

Switching regulation of gun exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration, such as our country is currently experiencing on our southern border.

To protect human safety and societal stability, please reject this rule change.

Thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:42 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-xcrw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1568
Public Comment 1169. Individual. Lynn Mignola. 7-4-18

---

## Submitter Information

**Name:** Lynn Mignola

---

## General Comment

I oppose any rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. A rule change like this would increase the likelihood of large weapons caches
getting into the hands of violent and dangerous agents and decrease safeguards for American Citizens. Arms
sales are not about commerce and should not be treated as such.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:42 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-fway
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1569
Public Comment 1170. Individual. Pauline Alama. 7-4-18

## Submitter Information

**Name:** Pauline Alama

## General Comment

I oppose this rule change, which would transfer the regulation of firearms export from the U.S. State Department to the U.S. Commerce Department. I don't want my country to be the arms dealer to the world. What the world needs now is not more guns. More guns going around the world, possibly getting in the hands of terrorists, do not make our country or our world safer.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:43 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-v609
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1570
Public Comment 1171. Individual. William Larson. 7-4-18

## Submitter Information

**Name:** William Larson
**Address:**
   304 A N Hillcrest Dr
   Goldsboro,  NC,  27534-4332
**Email:** larson266@aol.com
**Phone:** 9197509592

## General Comment

The sale of firearms should remain with the US Department of State. There is too big a risk that weapons could fall into the hands of terrorists. The US Department of State is better equipped to vet where and to who these weapons are sold.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:44 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-x00l
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1571
Public Comment 1172. Individual. Jessica Donato. 7-4-18

---

## Submitter Information

**Name:** Jessica Donato

---

## General Comment

I am writing to you because I oppose this rule change that would switch the regulations of firearms export from
the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:45 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-i9iv
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1572
Public Comment 1173. Individual. Joan Farber. 7-4-18

---

## Submitter Information

**Name:** Joan Farber

---

## General Comment

I am writing in opposition to the proposed change in regulations regarding the export of firearms. I believe that this change endangers this country in serious ways. My concerns are as follows:

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.[5]

It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]

It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.[7]

I believe that in the interest of national security we must not change the existing regulations.

Yours truly,
Joan C. Farber, Ph.D.

WASHSTATEB006436

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:46 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-falg
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1573
Public Comment 1174. Individual. Gania Barlow. 7-4-18

---

## Submitter Information

**Name:** Gania Barlow

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. The rule change would make the world a far more dangerous place.

WASHSTATEB006437

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:47 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-o57s
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1574
Public Comment 1175. Individual. LORI BUNTON. 7-4-18

---

## Submitter Information

**Name:** LORI BUNTON

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Firearms exports are classified as military. This is why they are under the
regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign
countries.[2] With the rule change, Congress would no longer be automatically informed about sizable weapons
sales that it could stop in the name of national security, even to countries where there are serious human rights
concerns, such as the Philippines and Turkey.[3]

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition. This new regulation is wrong and dangerous not only for U.S.
national security but for global security as we know that the greed of firearm manufacturers will surely trump
their aversion to selling arms to dangerous countries.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-sswp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1575
Public Comment 1176. Individual. Douglas Godfrey. 7-4-18

---

## Submitter Information

**Name:** Douglas Godfrey

---

## General Comment

I oppose this or any other rule change that would transfer authority to grant licenses for the export of firearms
from the U.S. State Department to the U.S. Commerce Department.

Firearms in international trade are used as weapons of war. Neither the US State Department, nor the US
Commerce Department should not be in the business or promoting War.

The United States should not be exporting our problems with automatic and semi-automatic weapons to the rest
of the world.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-4r80
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1576
Public Comment 1177. Individual. Linda Murphy. 7-4-18

---

## Submitter Information

**Name:** Linda Murphy
**Address:**
  Hyattsville,  MD,  20782
**Email:** linda56k@verizon.net
**Phone:** 3012776544

---

## General Comment

Switching the regulation of firearms exports from the State Department to the Commerce Department would
make it easier for the export of firearms to oppressive regimes; it would remove safeguards that help keep
organized crime and terrorist organizations from obtaining weapons; it would increase the kind of violence that
destabilizes countries and causes mass migration, which is already occurring at alarming rates due to wars, and
criminal gang activity.

The rule change would eliminate the State Departments Blue Lantern program, which carries out hundreds of
pre-license and post-shipment inspections and publicly reports on them. This would be devastating to civilian
populations.

The rule change would remove: (1) the licensing requirements for brokers, expanding the risk of trafficking; (2)
the blocking ability of the State Department on the 3D printing of firearms. Without this capability, the State
Department would lose an important tool for charging individuals, who use 3D printers to print firearms, with
violating arms export laws. The rule switch would remove this block, and expose civilians everywhere to an
exponentially larger risk of dying from the expanded use of these lethal weapons.

Please do NOT make this rule change, which will endanger innocent people's lives worldwide.

WASHSTATEB006440

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:49 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9432-znjn | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1577
Public Comment 1178. Individual. Victoria DeSarno. 7-4-18

## Submitter Information

**Name:** Victoria DeSarno

## General Comment

I oppose the rule change that would switch the control of weapons from the State Department to the Commerce Department

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:50 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-ebiu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1578
Public Comment 1179. Individual. christine maciel. 7-4-18

---

## Submitter Information

**Name:** christine maciel
**Address:**
    258 riley road
    new windsor,,  12553
**Email:** ticketpockets@gmail.com
**Phone:** 8455646972
**Fax:** 12553

---

## General Comment

Please do not accept the regulation of firearm exports to be changed from the State Department to the Commerce Dept.
This kind of business requires oversight from Congress, our elected representatives. The exports of firearms is too important to be considered just commerce, there are dangerous consequences to exporting firearms; we cannot consider this 'business as usual'. Oversight is required. No change!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9432-84ys
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1579
Public Comment 1180. Individual. Timothy Bailey. 7-4-18

---

## Submitter Information

**Name:** Timothy Bailey
**Address:**
   P.O.Box 261
   John Day,  OR,  97845
**Email:** ktsk@ortelco.net
**Phone:** (541) 792-0569

---

## General Comment

I strongly oppose this rule change that would change the regulations of firearms export from U.S. State
Department to U.S.Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-mg7k
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1580
Public Comment 1181. Individual. Lyn Bober. 7-4-18

---

## Submitter Information

**Name:** Lyn Bober
**Address:**
    500 N.Portahe Path
    Akron,  OH,  44303-1222
**Email:** lynbober@aol.com
**Phone:** 3307014421

---

## General Comment

I am very concerned about this. I strongly oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. The safety of our country, its people AND the world, depends upon keeping this under the governance & control of our State Department. Thank you for your consideration.

WASHSTATEB006444

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:52 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-3t9x | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1581
Public Comment 1182. Individual. Marge Schwartz. 7-4-18

---

## Submitter Information

**Name:** Marge Schwartz

---

## General Comment

Gun sales should remain under the Jurisdiction of the State Dept. The Commerce Dept. would enable guns to be sold to enemies of the U.S. because their job is to promote sales.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:56 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-hvki
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1585
Public Comment 1183. Individual. E Luckring. 7-4-18

## Submitter Information

**Name:** E Luckring
**Address:**
3641 Lavell Drive
Los Angeles, CA, 90065

## General Comment

I oppose the proposed rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department.

I believe firearms exports should stay under the regulation of the State Department and that Congress should
have the power to block sales of large batches of firearms to foreign countries. With the rule change, Congress
would no longer be automatically informed about sizable weapons sales that it might see reason to stop in the
name of national security, or to prohibit sales to countries where there are serious human rights concerns.

Moreover, the Commerce Department does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.

This proposed change would make our country less safe by fueling terrorism and organized crime around the
world.

Please keep firearms exports under the regulation of the State Department.

Thank You,

Eve Luckring
3641 Lavell Drive

Los Angeles, CA 90065

WASHSTATEB006447

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:57 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-kbzi
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1587
Public Comment 1184. Individual. karyn barry. 7-4-18

---

## Submitter Information

**Name:** karyn barry

---

## General Comment

I STRONGLY oppose the switching of firearms exports from the State Department to the Commerce
Department!

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce
Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal
agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that
destabilizes countries and causes mass migration.

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds
of pre-license and post-shipment inspections and publicly reports on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder
Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged
him with violating arms export laws, since his open-source posting made it possible for anyone with access to a
3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling
3D printing of firearms in the U.S. and around the globe.

We do not need to PROFIT from the selling of guns around the world!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:59 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-zq4s
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1589
Public Comment 1185. Individual. James Melloh. 7-4-18

## Submitter Information

**Name:** James Melloh
**Address:**
   S Portland,  ME,  04106
**Email:** jmelloh@roadrunner.com
**Phone:** 2077862346
**Organization:** maine psr

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Weapons of war, now used to massacre children in our country, should not be sold for profit overseas. This in now way makes us more secure. It makes us sorry souls who would sell the lives of children for profit.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:59 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-e9ng
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1590
Public Comment 1186. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I am very much opposed to this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

Thank you for considering the safety of the citizens and not the profits of the gun industry.

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:00 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-u1wo
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1592
Public Comment 1187. Individual. Nancy Chismar. 7-4-18

---

## Submitter Information

**Name:** Nancy Chismar

---

## General Comment

A rule change that would move the handling of export licenses of semiautomatic assault weapons and other
powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce
Department (focused on promoting American business) would open new floodgates for arms sales
internationally, with serious implications for our national security. This is NOT acceptable.

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:01 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-zfe0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1594
Public Comment 1188. Individual. Thomasin Willard. 7-4-18

---

## Submitter Information

**Name:** Thomasin Willard

---

## General Comment

I strongly oppose this rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department. This transfer of authority would open new floodgates for arms
sales internationally, with serious implications for our national security. Right now, firearms exports are
classified as military. This is why they are under the regulation of the State Department, and why Congress can
block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be
automatically informed about sizable weapons sales that it could stop in the name of national security, even to
countries where there are serious human rights concerns, such as the Philippines and Turkey. Meanwhile, the
Commerce Department just does not have the resources to adequately enforce export controls. This means that
firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face
far fewer hurdles to obtaining large caches of American guns and ammunition.

Please keep these regulations under the authority of the State Department - the proposed rule change benefts the
NRA and arms profiteers, and no one else.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 1:01 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-zt8i | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1595
Public Comment 1189. Individual. Ursula Cohrs. 7-4-18

---

## Submitter Information

**Name:** Ursula Cohrs
**Address:**
    PO Box 40065
    Bay Village,  OH,  44140
**Email:** ursulacohrs@gmail.com
**Phone:** 4408350355

---

## General Comment

I m writing because I am against moving the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department which is focused on safeguarding our nation, to the U.S. Commerce Department which is focused on promoting American business.

This transfer of authority would open floodgates for arms sales internationally, with serious implications for our national security.

- It would eliminate the State Departments Blue Lantern program (in place since 1940) which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
- It would also remove licensing requirements for brokers, increasing the risk of trafficking.
- And it would remove the State Departments block on the 3D printing of firearms.

As an example to the last comment: When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

We all know that firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations.

WASHSTATEB006453

This is why fireamrs should be subject to more controls, not less!

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:02 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-njqg
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1596
Public Comment 1190. Individual. James Klein. 7-4-18

---

# Submitter Information

**Name:** James Klein
**Address:**
   3501 Monterrey St.
   Corpus Christi, 78411
**Email:** jeklein64@yahoo.com
**Phone:** 361-334-3908

---

# General Comment

I strongly Oppose a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department.

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

The rule change would make the world a far more dangerous place.

Common sense gun safety measures, like numerous other issues (climate change, food labeling, immigration reform, prison reform, education reform, short-term lending regulation, healthcare reform, banking regulation, opioid regulation) remains a vexing problem primarily due to corporations' ability to curry favor with elected officials. The corrupting influence of money in our political system is undermining our democratic traditions and discouraging Americans from voting and/or running for office. This ominous development may well end our experiment in representative democracy unless we alter this decades-long trend. For the sake of the republic, we must amend the US Constitution to state that corporations are not people (and do not have constitutional rights) and money is not speech (and thus can be regulated by state and/or federal campaign finance laws). Short of accomplishing this, no other reform of significance will be achieved. The moneyed interests will turn any reform to their benefit, often at the expense of the nation as a whole.

WASHSTATEB006455

WASHSTATEB006456

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:04 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-tphs
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1597
Public Comment 1191. Individual. Cindy Ware. 7-4-18

---

## Submitter Information

**Name:** Cindy Ware
**Address:**
    5100 Peyton Chapel
    Haymarket,  20169
**Email:** sheltiemom47@gmail.com
**Phone:** 919-360-0546

---

## General Comment

I oppose this rule change that would switch the regulation of firearms export from the US State Dept. to to US
Commerce Dept.

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-5uth
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1598
Public Comment 1192. Individual. Therese Wilson. 7-4-18

---

## Submitter Information

**Name:** Therese Wilson

---

## General Comment

I am writing to say that I am absolutely opposed to the rule change
that would transfer the regulation of firearms export licenses of semiautomatic weapons and other powerful weapons
from the State Department to the Department of Commerce.
Congressional oversight of the movement of these weapons must remain intact and be strengthened.
We need more oversight, not less! This rule change could mean that congress is no longer automatically informed
about sizeable weapons sales that it could stop in the interest of national security,
even to countries where there are serious human rights issues.


The Department of Commerce lacks the resources to adequately enforce export controls.
Its Bureau of Industry and Security does not have the staff it would need for this important work.
It is completely unacceptable to me
that firearms traffickers, organized crime, terrorist organizations and other violent, dangerous agents
would have their way facilitated by a lack of vigilance on our part.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:43 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-s99e
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1620
Public Comment 1193. Individual. Kimberly Thompson. 7-4-18

---

# Submitter Information

**Name:** Kimberly Thompson
**Address:**
   6400 Christie Ave.#5302
   Emeryville,  94608-1047
**Email:** kmt6401@yahoo.com
**Phone:** 5104200917
**Fax:** 94608

---

# General Comment

Right now, firearms exports are classified as military. This is why they are under the regulation of the State
Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule
change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in
the name of national security, even to countries where there are serious human rights concerns, such as the
Philippines and Turkey. President Trump and his administration don't seem to care about America's standing
with other countries or preserving life and health of anyone who's not a billionaire. America needs to remain a
safe, diverse country to keep functioning.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 3:44 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-2ipy | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1621
Public Comment 1194. Individual. Karen Cohen. 7-4-18

---

## Submitter Information

**Name:** Karen Cohen

---

## General Comment

My family and I have just learned the the NRA is lobbying to move regulations of sales from US gun
manufacturers from this Department to that of Commerce Dept. This UTTERLY UNACCEPTABLE!

No other nation in the world has a civilian population that is armed as ours is here. Who are the customers for
these weapons? Terrorists, paramilitary groups and criminals. Will US weapons be used to kill our own military
personnel? To kill our allies and friends? To kill vulnerable population groups? To kill American tourists?
Without a doubt!

Putting regulation of weapons sales in the hands of Commerce is a complete renunciation of every effort to
control the flow of weapons that can and will be used against Americans ( and other humans)! This is such
insanity, it crossed the line to treason, as it aids and abets the enemies of the United States of America.

You must use everything in your power to stop this descent into chaos.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:45 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-8msg
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1622
Public Comment 1195. Individual. Damon Mills. 7-4-18

---

## Submitter Information

**Name:** Damon Mills

---

## General Comment

The state department should continue the regulation of fire arms exports. I am against the department of commerce handling this important and supposedly secure job.

WASHSTATEB006461

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:46 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-agzw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1623
Public Comment 1196. Individual. Suzy Clarkson Holstein. 7-4-18

## Submitter Information

**Name:** Suzy Clarkson Holstein
**Address:**
   Shorewood,  WI,  53211
**Email:** clarkson@wi.rr.com
**Phone:** 4143323517

## General Comment

I oppose the rule change which would put international fire arms sales under the jurisdiction of the Commerce Department. In an era when we are concerned about terrorism and weapons availability, it seems very wrong to move gun sales into a sphere where buying and selling would be the chief concern rather than national security. Please leave arms sales under the oversight of Defense.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 3:47 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-ntp8 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1624
Public Comment 1197. Individual. Gary Korengel. 7-4-18

---

## Submitter Information

**Name:** Gary Korengel
**Address:**
　13921 Raie Ave
　Hudson,  FL,  34667
**Email:** garydkorengel@yahoo.com
**Phone:** 727-378-7169

---

## General Comment

Do not transfer the responsibility of regulating and approving the export of US guns to the US Department of
Commerce.

Company's goals are to increase sales and shareholder dividends, not screen if their weapons are being shipped to
Terrorist Nations or Terrorist Organizations.

The US Department of State is much better equipped to assure that US guns are not used in the future against US
Soldiers and Citizens.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:47 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-9dsk
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1625
Public Comment 1198. Individual. Frank Wissler. 7-4-18

---

## Submitter Information

**Name:** Frank Wissler
**Address:**
    695 Hillcrest Trl
    Spring Branch,  TX,  78070
**Email:** destinys1stmate@hotmail.com
**Phone:** 2108704010
**Organization:** 695 Hillcrest Trl

---

## General Comment

The president is wrong. Again. He is pandering to weapons manufacturers because fascism believes corporate profits trump (pun intended) everything else. Including the security of the nation. Less control over arms sent to questionable locations (Mexico anyone?) results in those arms being used against Americans. There are important issues to be resolved in this country and this one is so far from the top it doesn't deserve any consideration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-7xoa
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1626
Public Comment 1199. Individual. James Krist. 7-4-18

---

## Submitter Information

**Name:** James Krist
**Address:**
   1420 Gilbert Rd
   Arnold,  21012
**Email:** jtkrist@gmail.com
**Phone:** 410-212-4585

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. THE US SHOULD NOT BE EXPORTING MILITARY FIREARMS!!!

WASHSTATEB006465

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:49 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-pjkj
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1627
Public Comment 1200. Individual. Jessica Livingston. 7-4-18

---

## Submitter Information

**Name:** Jessica Livingston

---

## General Comment

Keep firearms classified as "military" to keep Americans safe. Switching the regulation of firearms exports from
the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes,
remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from
obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

WASHSTATEB006466

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-sd9v
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1628
Public Comment 1201. Anonymous. 7-4-18

## Submitter Information

**Name:** anonymous Anonymous

## General Comment

There should be no transfer from the US State Dept. to the US Commerce Dept. of the regulation and supervision of firearms
exports.

WASHSTATEB006467

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-r45r
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1629
Public Comment 1202. Individual. Brad Johnson. 7-4-18

## Submitter Information

**Name:** Brad Johnson

## General Comment

This is horrible. The consequences will be dire.

WASHSTATEB006468

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:52 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-uzk1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1630
Public Comment 1203. Individual. Cheryl Ritch. 7-4-18

## Submitter Information

**Name:** Cheryl Ritch

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. I do not believe that this proposed change is in the best interest of the people of
this country or the people in the world at large.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:53 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-7fjl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1631
Public Comment 1204. Individual. Kim Kensler-Prager. 7-4-18

---

## Submitter Information

**Name:** Kim Kensler-Prager
**Address:**
    2700 PELHAM RD
    Apt 320
    Toledo,  43606
**Email:** kkensler@msn.com
**Phone:** 4194918268
**Fax:** 43606

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. We need gun safety in our country not pandering to the NRA.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:53 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-dono
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1632
Public Comment 1205. Individual. Pamela Elliott. 7-4-18

## Submitter Information

**Name:** Pamela Elliott

## General Comment

The control of firearm sales should always be under the warrant control of USML and never Commerce department. These are not toys or produce. These are military weapons of death and destruction never meant to be out of the hands of the military! The regulations on sales need to be kept as is and tightened even more per states so we have a trail of each weapon sold by whom.
I do not agree with changing the control of firearms, guns, ammunition & related articles like the President wants to in this rule!
Selling guns like candy to the highest bidder! OMG!

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 3:54 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-v0kp | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1633
Public Comment 1206. Individual. Ruth Neifeld. 7-4-18

---

## Submitter Information

**Name:** Ruth Neifeld
**Address:**
  7218 Lincoln Drive
  Phila., PA, 19119
**Email:** jacneif@gmail.com
**Phone:** 215-247-8608

---

## General Comment

I am writing to express my strong opposition to the proposal that firearms exports be moved from the US State Department to the Commerce Department. These sales should be closely monitored; weaponry should not be regarded as exports like wheat or autos.
Thanks for your consideration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:55 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-fedf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1634
Public Comment 1207. Individual. Patricia Copenhaver. 7-4-18

---

## Submitter Information

**Name:** Patricia Copenhaver
**Address:**
   710 Union St.
   Iowa Falls,  IA,  50126
**Email:** patcope@ymail.com
**Phone:** 641-640-0754

---

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S> Commerce Department, which does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.

In addition, this rule change would mean that Congress would no longer be able to watch for guns going to
countries guilty of human rights violations. This is something that Commerce, frankly, would not especially care
about. They would only care about sales.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:56 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-4ghq
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1635
Public Comment 1208. Individual. Janet Anonymous. 7-4-18

## Submitter Information

**Name:** Janet Anonymous
**Address:** United States,

## General Comment

As a concerned American and member of the world's human race, I urge you to do whatever is necessary to reject the move of international sale of American firearms to your department. Your goal is to increase access to the world for American business, and while it is a worthy mission, to move weapon sales flips the focus from safety and peace to making money. This is where our wonderful capitalist system can easily run amok because, all too often, with money as a motivator, it's much easier for deals to be made that may not be in our country's - or the world's - best interests.

Please reject the pressures of the NRA and gun manufacturers and, instead, stand up for humanity rather than for money-making. Thank you for doing the right thing.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:57 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-8atl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1636
Public Comment 1209. Individual. Lisa Holm. 7-4-18

## Submitter Information

**Name:** Lisa Holm
**Address:**
    143 Northpark Dr
    Vacaville, CA, 95688
**Email:** Lisah2olm@comcast.net

## General Comment

I am writing to oppose the transfer of gun export permitting from the State Department to the Department of Commerce. State and Congress must continue its efforts to keep large scale gun sales out of the hands of tyrants, human rights abusers, and terrorists. Please support State retaining this important responsibility. Otherwise, Commerce will be complicit with the NRA and gun manufacturers in widespread violence, abuse, and terrorism around the world.

WASHSTATEB006475

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 3:58 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9433-9kn2 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1637
Public Comment 1210. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous
**Address:**
    17560 SW 29th Ct.
    Miramar,  FL,  33029

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It would remove licensing requirements for brokers, increasing the risk of trafficking. It would also remove the State Departments block on the 3D printing of firearms. Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:58 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9433-qh3f
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1638
Public Comment 1211. Individual. Steven Winston. 7-4-18

---

## Submitter Information

**Name:** Steven Winston

---

## General Comment

I'm a teacher. I was teaching 30 minutes away from Newtown, CT when the Sandy Hook massacre occurred. I
had students who knew murdered first graders. There was an active shooter situation near a college campus 30
minutes from my current house this week in which a New York State Trooper was killed. The gun violence in
this country needs to be reigned in. In the interests of National Security, arms regulations must be regulated by a
department interested in national security, NOT commerce. Please, we are failing to protect our citizens from
firearms badly enough as it is.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:59 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-2oey
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1639
Public Comment 1212. Individual. Janet Pecci. 7-4-18

---

## Submitter Information

**Name:** Janet Pecci
**Address:**
   3704 Swift Drive
   Raleigh,  NC,  27606
**Email:** jpecci@att.net
**Phone:** 919-851-1112

---

## General Comment

I oppose moving export license oversight for firearms from the Department of State to the Department of Commerce. The proposed rule treats semi-automatic weapons as non-military when they are, in fact, used by the military. We need Congressional oversight for important gun export deals. The Commerce Department promotes trade at the expense of public safety.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:00 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-y0sn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1640
Public Comment 1213. Individual. Beverly Railsback. 7-4-18

## Submitter Information

**Name:** Beverly Railsback
**Address:**
   103 N Franklin St
   Lambertville,  NJ,  08530
**Email:** bdrailsback@yahoo.com
**Phone:** 6093972658

## General Comment

I oppose this rule change which would switch the regulation of firearms exports from the US State Department to the US Department of Commerce. This would remove any congressional oversight of firearms exports and potentially allowing exports to dangerous foreign parties.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:01 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-gyp9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1641
Public Comment 1214. Individual. Lily Lau-Enright. 7-4-18

---

## Submitter Information

**Name:** Lily Lau-Enright
**Address:**
    5321 Spilman Ave
    Sacramento,  CA,  95819
**Email:** lilomama@gmail.com
**Phone:** 9164575818

---

## General Comment

I oppose in the strongest voice this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Our world is already in an unsafe and perilous state with rampant uncontrolled gun violence here and abroad. Allow the State Dept to continue its authority to oversee the sale and transfer of firearms. Do not transfer this authority to the Dept of Commerce that has no experience with national security and does not have adequate staff to enforce these new functions. This rule change would hugely threaten the safety and security of our own country as well as internationally.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:02 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-sqoo
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1642
Public Comment 1215. Individual. Amy Posner. 7-4-18

---

## Submitter Information

**Name:** Amy Posner
**Address:**
   2 Royat St
   Lido Beach,  11561
**Fax:** 11561

---

## General Comment

To Whom It Concerns:

I oppose this rule switching the responsibility for regulatory oversight of firearms exports from the U.S. State Department to the U.S. Commerce Department. Diplomacy not weapons should be our chief export.

If the switch is made, the DOC will have to fulfill its charter to US businesses. Avoid having to aid the distribution of more weapons abroad! Imagine if we retained credibility to solve through diplomacy conflicts around the world. Not only have we been ceding that ground, but now will we increase our presence through even more weaponry? Is my beloved country becoming an evil empire? Please, please, please do not allow this change! Save yourselves from that burden!

Patriotically yours,

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:02 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-q1qw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1643
Public Comment 1216. Individual. Katherine Slawinski. 7-4-18

## Submitter Information

**Name:** Katherine Slawinski

## General Comment

I am opposed to the rule change that would allow the management of export licenses to be regulated by the U.S. Commerce Department. This function should remain with the U.S. State Department, to discourage trade in high-powered firearms.

Thank You.

WASHSTATEB006482

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:03 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-8srn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1644
Public Comment 1217. Individual. Ann Rogers. 7-4-18

---

## Submitter Information

**Name:** Ann Rogers

---

## General Comment

This gives freedom to all who trade in guns, and will foster violence on both sides of the border.
The drug war will never be one until we quit selling guns to Mexico, and reduce the violence involved.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:04 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-6i1m
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1645
Public Comment 1218. Individual. Gail Fleischaker. 7-4-18

---

## Submitter Information

**Name:** Gail Fleischaker
**Address:**
   62 W Pelham Rd
   Shutesbury,  MA,  01072
**Email:** gailflei1@gmail.com
**Phone:** 4132530565

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. It is a naked attempt to allow greater export, hence greater production -- all for
the interests of U.S. arms manufacturers and against the interests of U.S. safety and security.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-wda7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1646
Public Comment 1219. Individual. Deborah Doane. 7-4-18

## Submitter Information

**Name:** Deborah Doane

## General Comment

Commerce Department.

You should not have control over the sale of firearms. The State Department will protect us against terrorism. We do not want to enable anti-American factions to arm themselves and attack us.

Don't do it!

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-5rx3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1647
Public Comment 1220. Individual. A.M. Hess. 7-4-18

## Submitter Information

**Name:** A.M. Hess

## General Comment

I oppose changing the rules to change regulations of firearms exports from the U.S. State Department to the U.S. Commerce Department. U.S. weapons already flood the globe, fueling deadly conflicts worldwide, and I do not want Commerce pushing weapons as a business interest. The State Department's job is protecting our country, and they need to oversee firearms exports in order to do so.

Keep firearms exports under the purview of the U.S. State Department. Thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:07 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-o5qm
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1648
Public Comment 1221. Individual. Ann Thryft. 7-4-18

---

## Submitter Information

**Name:** Ann Thryft

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. With this rule change, Congress would no longer be able to block sales of large
batches of firearms to foreign countries, because it would no longer be automatically informed about sizable
weapons sales that it could stop in the name of national security, even to countries where there are serious human
rights concerns, such as the Philippines and Turkey. The Commerce Department does not have the resources to
adequately enforce export controls and its Bureau of Industry and Security does not have staff everywhere.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:08 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-s24g
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1649
Public Comment 1222. Individual. Karl Sklar. 7-4-18

---

## Submitter Information

**Name:** Karl Sklar

---

## General Comment

How incredibly immoral; do we stand for nothing but commerce any more? Were rapidly becoming a ghastly
parody of banana republics; decency, responsibility, moral stature, going, going, gone, to the highest bidders.

WASHSTATEB006488

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:09 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-jors
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1650
Public Comment 1223. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

This absolutely and incredibly absurd!

WASHSTATEB006489

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:09 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-ml48
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1651
Public Comment 1224. Individual. Karen Resciniti. 7-4-18

## Submitter Information

**Name:** Karen Resciniti

## General Comment

I am opposed to switching the regulation of firearms exports from the State Department to the Commerce Department because it would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and it would further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:10 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-fsn7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1652
Public Comment 1225. Individual. Robert Handelsman. 7-4-18

## Submitter Information

**Name:** Robert Handelsman
**Address:**
    2643 Central Park
    EVanston,  IL,  60201
**Email:** trtfmnlwr@aol.com
**Phone:** 847-491-1950

## General Comment

Keep arms export licenses in the State Department

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:13 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-7ph8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1653
Public Comment 1226. Individual. Dave Batten. 7-4-18

---

## Submitter Information

**Name:** Dave Batten

---

## General Comment

It would be a colossal mistake to treat firearms, particularly semi-automatic weapons, as commodity for export. Providing lethal weapons abroad requires thoughtful review and followup that should remain with the State Department. Let's not export violence to the world in the name of making a buck for weapons manufacturers.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:14 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-pbua
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1654
Public Comment 1227. Individual. Eve Gregg. 7-4-18

---

# Submitter Information

**Name:** Eve Gregg
**Address:**
    3307 Briarwood Ln
    Safety Harbor,  34695
**Email:** evefgregg@gmail.com
**Phone:** 7274176680
**Fax:** 34695

---

# General Comment

Why does the government allow itself to be bullied by the NRA?!?! Regulating arms sales is the job of the State
department. Gun manufacturers already profit enough from guns terrorizing U.S. citizens--don't open new
floodgates for arms sales internationally and further jeopardize our national security.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:15 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-8td5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1655
Public Comment 1228. Individual. Elizabeth Milliken. 7-4-18

---

## Submitter Information

**Name:** Elizabeth Milliken
**Address:**
    1256 Hudson Avenue
    St. Helena,  CA,  94574
**Email:** beth@spottswoode.com
**Phone:** 7079638754
**Fax:** 94574

---

## General Comment

I write this to let you know that I strongly oppose this rule change that would switch the regulations of firearms
export from the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:16 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-jtqp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1656
Public Comment 1229. Individual. Caitlin Johnston. 7-4-18

## Submitter Information

**Name:** Caitlin Johnston

## General Comment

I am against any change to the regulations governing the international sale/export/import of fire arms!

WASHSTATEB006495

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** | 7/17/18 4:16 PM |
| **Received:** | July 04, 2018 |
| **Status:** | Posted |
| **Posted:** | July 17, 2018 |
| **Tracking No.** | 1k2-9434-4aev |
| **Comments Due:** | July 09, 2018 |
| **Submission Type:** | Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1657
Public Comment 1230. Individual. Robert Hanson. 7-4-18

## Submitter Information

**Name:** Robert Hanson

## General Comment

Let's work for a world with less guns...not more.

Please reject the proposed changes.

Bob Hanson, Professor-Emeritus
San Diego State University

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:17 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-xlrh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1659
Public Comment 1231. Individual. Mary Jane Engh. 7-4-18

---

## Submitter Information

**Name:** Mary Jane Engh
**Address:**
    PO Box 97
    Garfield,  WA,  99130
**Email:** enghmje@frontier.com
**Phone:** 5096351402
**Fax:** 99130

---

## General Comment

I strongly oppose changing the control of arms exports from the State Department to the Commerce Department. This would deprive Congress and the State Department of the ability to prevent U.S. gun manufacturers from arming dictators, rebels, civil wars, criminals, and enemy regimes around the world, all in the name of profit.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:18 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-xugx
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1660
Public Comment 1232. Individual. Sr. Margaret Ann Arnold. 7-4-18

## Submitter Information

**Name:** Sr. Margaret Ann Arnold
**Address:** United States,

## General Comment

I oppose the rule change that would switch regulations of firearms from the US State Dept to the US Commerce Dept.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:19 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-1uoy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1661
Public Comment 1233. Individual. Vanna Cleary. 7-4-18

---

## Submitter Information

**Name:** Vanna Cleary

---

## General Comment

I am totally against switching the regulation of gun sales and munitions to international buyers from the State Department to the Commerce Department. This move would make weapons of war just money-making opportunities for selected businessmen while substantially increasing the risk of war and death in the receiving countries. Guns and other munitions should not be made equivalent to clothing, farm implements and other exports. These exports kill people.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:19 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-amr6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1662
Public Comment 1234. Individual. Raven Deerwater. 7-4-18

---

## Submitter Information

**Name:** Raven Deerwater
**Address:**
     PO Box 1786
     Mendocino,  CA,  95460
**Email:** raven@taxpractitioner.com
**Phone:** 7079371099

---

## General Comment

On this Independence day, please do not shift the exporting of military grade firearms to the Commerce
Department -- all it will do is fuel terrorism and make the world less safe. Do not trifle with US Security so gun
manufacturers can get more sales.

WASHSTATEB006500

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:20 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-y5b2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1663
Public Comment 1235. Individual. Jeannette Stokols. 7-4-18

---

## Submitter Information

**Name:** Jeannette Stokols
**Address:**
    1 Butler St
    Irvine, CA, 92612-2724
**Email:** jstokols@gmail.com

---

## General Comment

I strongly oppose any change in regulation of firearms from the State Department to the Commerce Department.
There are so many countries and non-state actors that would take advantage of any laxity in this regulation and
this could create more violence, chaos, repression in countries around the world. There is already enough
violence in the world without making it even easier to enact it.

Switching the regulation of firearms exports from the State Department to the Commerce Department would
facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration.[4]

All of the effects below would be highly detrimental to safety around the world and ultimately, hurtful as well for
U.S. citizens:

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds
of pre-license and post-shipment inspections and publicly reports on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder
Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged
him with violating arms export laws, since his open-source posting made it possible for anyone with access to a
3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling
3D printing of firearms in the U.S. and around the globe.

WASHSTATEB006502

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:21 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9434-hj1l
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1664
Public Comment 1236. Individual. Jud Lawrie. 7-4-18

## Submitter Information

**Name:** Jud Lawrie

## General Comment

It makes no sense to transfer the regulation of firearms export from the U.S. State Department to the U.S. Commerce Department. Firearms exports need to be regulated, not promoted. American-made guns do enough damage here at home. We dont want to become responsible for exporting the carnage caused by firearms to other parts of the world. This is wrong-headed and immoral, and I strongly oppose it.

# PUBLIC SUBMISSION

<div style="border">

**As of:** 7/17/18 4:22 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-2ax4
**Comments Due:** July 09, 2018
**Submission Type:** Web

</div>

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1665
Public Comment 1237. Individual. David Besser. 7-4-18

## Submitter Information

**Name:** David Besser

## General Comment

You can write in something like: I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Turning firearm sales into a commodity is not the way to address gun violence; it would just be another score for the NRA and the gun industry.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:22 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-57d7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1666
Public Comment 1238. Individual. Don Hunter. 7-4-18

---

## Submitter Information

**Name:** Don Hunter
**Address:**
 686 Meadow Wood Cir NW
 Arab,  35016
**Email:** donchunter@comcast.net
**Phone:** 2569314350

---

## General Comment

I believe the U.S. should strictly regulate the sale of firearms to other countries. The State Department is more
appropriate than Commerce to oversee the sales. Further, the U.S. government should not encourage sales of
firearms to other countries. The gun industry has shown that it will go to extreme lengths to promote firearm
sales, without consideration for the societal impacts of doing so.

WASHSTATEB006505

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:23 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-vez0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1667
Public Comment 1239. Individual. Robert Kuning. 7-4-18

## Submitter Information

**Name:** Robert Kuning
**Address:**
   Albuquerque,  NM,  87114
**Email:** bobkuning@comcast.net
**Phone:** 5058988184

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. The NRA is supporting and pushing this legislation to enable gun manufacturers to reap more profits at the cost of more innocent lives.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 4:23 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9435-a3fh | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1668
Public Comment 1240. Individual. Leslie Herman. 7-4-18

## Submitter Information

**Name:** Leslie Herman

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

This rule change would make the world a far more dangerous place:

- It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.[1]
- It would remove licensing requirements for brokers, increasing the risk of trafficking.[2]
- It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.[3]

[1] The Trump administration proposes making gun exports easier. Heres how to submit your public comment on
this dangerous proposal, Violence Policy Center.

[2] Ibid., Violence Policy Center.

[3] "U.S. requires group to remove 3-D gun instructions from its website," CNN.com, May 13, 2013.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 4:24 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9435-tecr | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1669
Public Comment 1241. Individual. Michael Loewenstein. 7-4-18

---

## Submitter Information

**Name:** Michael Loewenstein

---

## General Comment

1. Do not eliminate the Blue Lantern Program.
2. Do not eliminate licensing for brokers.
3. Do not remove block on 3d printing of firearms.

Firearms are dangerous. Most people know how to use them, what the don't know is WHEN to use them if ever.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 4:25 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9435-4t3m | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1670
Public Comment 1242. Individual. Janet Muir. 7-4-18

---

## Submitter Information

**Name:** Janet Muir
**Address:**
   2679 Dunbar Woods Rd
   Marcellus, NY, 13108
**Email:** jmmuir66@twcny.rr.com
**Phone:** 3156737013

---

## General Comment

I oppose this rule change that would switch the regulation of firearms export from the U.S. State Department to the U.S. Commerce Department. If this change is made, Congress would no longer be informed of large arms sales or be able to block them. Military-style weapons, such as semiautomatic assault weapons and other powerful firearms, could be exported to dangerous foreign countries, threatening our national security.

Furthermore, the Commerce Department is focused on promoting the U.S. business interests, not national security. It does not have the resources to adequately enforce export controls, so firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

This change would also eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It would remove licensing requirements for brokers, increasing the risk of trafficking. And it would remove the State Departments block on the 3D printing of firearms, allowing anyone to make unlimited numbers of weapons.

This administration has claimed that our national security is risked by immigrants at our borders, but this change -- initiated only for motives of profit -- would have the effect of increasing civil wars and gang violence in foreign countries that would bring more people seeking asylum to our borders. Our non-stop wars on terrorism would be made more difficult and costly if our enemies can purchase military-style weapons with impunity.

For all these reasons, this change of regulatory control would be serving the arms makers, but hurting the country as a whole. I oppose it and I hope you will too.

WASHSTATEB006510

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:25 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-1bs6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1671
Public Comment 1243. Individual. Sandra Rohde. 7-4-18

---

## Submitter Information

**Name:** Sandra Rohde
**Address:**
   W3059 Pinecrest Ct
   Appleton,  WI,  54915-8197
**Email:** rohde.sandi@gmail.com
**Phone:** 9208502012
**Fax:** 54915-8197

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.
I want to keep our country safe & the world safe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:26 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-6ajw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1672
Public Comment 1244. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I oppose the proposed rule change that would put the regulation of exports of firearms in the hands of the Commerce Department rather than the State Department. Terrorists could buy these weapons. I see this rule change as opening up massive sales of firearms throughout the world. This would be a threat to both our national security and the security of the world. Again, I oppose this rule change.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:27 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-lrsy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1673
Public Comment 1245. Individual. Marianne Ludwig. 7-4-18

---

## Submitter Information

**Name:** Marianne Ludwig
**Address:**
   1420 Saint Clair Avenue
   Saint Paul,  55105
**Email:** marianneludwig1420@gmail.com
**Phone:** 2165980259

---

## General Comment

If in some alternate universe the Department of State thinks a foreign country needs more automatic weapons, they are far better able to assess that need than the commerce department. Please dont change this rule. We have enough problems with the guns we already have. We dont need to ruin someone rlses Homeland by selling them more unnecessary weapons.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:28 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-9p72
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1674
Public Comment 1246. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

With this rule change, Congress would no longer be automatically informed about sizable weapons sales that it
could stop in the name of national security, even to countries where there are serious human rights concerns,
such as the Philippines and Turkey.

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds
of pre-license and post-shipment inspections and publicly reports on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder
Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged
him with violating arms export laws, since his open-source posting made it possible for anyone with access to a
3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling
3D printing of firearms in the U.S. and around the globe.

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime,
political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:29 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9435-onet
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1675
Public Comment 1247. Individual. Leslee McPherson. 7-4-18

---

## Submitter Information

**Name:** Leslee McPherson
**Address:**
   3200 Monterey St.
   San Mateo,  CA,  94403
**Email:** lesleemcp@att.net
**Phone:** 6505706836
**Fax:** 94403

---

## General Comment

I oppose changing oversight of gun sales from the State Department to the Commerce Department. Commerce does not have the resources to take on this job.

WASHSTATEB006515

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:17 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-942z-uwrp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1411
Public Comment 1090. Individual. Denise Kline. 7-4-18

---

## Submitter Information

**Name:** Denise Kline

---

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. The U.S. State Department must remain focused on safeguarding our nation
while the U.S. Commerce Department should continue promoting American business. This proposed rule change
will have profound impact on our national security as well as the security of nations around the world as new
avenues are opened for the worldwide sale of arms. We must work to make our nation and the world safer. This
proposed rule will only increase danger here and around the world.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 4:17 PM |
| **Received:** July 04, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-9434-9mtz |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1658
Public Comment 1230. Individual. Esther Diamondstone. 7-4-18

---

## Submitter Information

**Name:** Esther Diamondstone

---

## General Comment

Haven't we already had enough of Americans being killed abroad with American weaponry in someone else's hands? I oppose moving the regulation of firearms exports from the State Department to the Commerce Department.

WASHSTATEB006517

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:52 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-4f10
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1707
Public Comment 1250. Individual. Patricia Malone. 7-4-18

---

## Submitter Information

**Name:** Patricia Malone
**Address:**
    STONE RIDGE,  NY,  12484-5249
**Email:** uncertaintyguru@joimail.com
**Phone:** 8456878707

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Help keep our nation safer from groups who would rapidly take advantage of
this change to stockpile more arms.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-9e4w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1706
Public Comment 1251. Individual. Bertino Marro. 7-4-18

---

# Submitter Information

**Name:** Bertino Marro
**Address:**
    578 10th St.
    Brooklyn, NY 11215-4402,  NY,  11215
**Email:** bertmarro@hotmail.com
**Phone:** 7188323018

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Currently, firearms exports are classified as military and are under the regulation of the State Department, enabling Congress to block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that should be stopped in the name of national security - even to countries where there are serious human rights concerns.

Furthermore, the Commerce Department does not have adequatel resources to enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. Thus firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:50 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-10dr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1705
Public Comment 1252. Individual. Elizabeth Russell. 7-4-18

---

## Submitter Information

**Name:** Elizabeth Russell

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. We can't even keep our own citizens from using firearms on one another. Why on earth would we want to make it easier to arm the world, just for a buck? Please don't let this insanity move forward.

WASHSTATEB006520

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:49 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-40vp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1704
Public Comment 1253. Individual. Amy Schneider. 7-4-18

---

## Submitter Information

**Name:** Amy Schneider
**Address:**
    48 Oxford RD
    Newton,  MA,  02459
**Email:** amyshome@yahoo.com
**Phone:** 6173324380

---

## General Comment

Do not let the NRA push a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business)

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.[4]

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.[5]
It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:47 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-fsnr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1703
Public Comment 1254. Individual. Carol Emrick. 7-4-18

---

## Submitter Information

**Name:** Carol Emrick

---

## General Comment

This president does not speak for me. We have lax gun laws and too may Americans are killed or injured
seriously on a daily basis.Until gun owners are responsible for their actions and trained properly on gun
ownership this is a ridiculous request.Do not relinquish this control.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:46 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-5icj
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1702
Public Comment 1255. Individual. Paula H. 7-4-18

## Submitter Information

**Name:** Paula H.
**Address:**
    Richmond,  CA,  94801

## General Comment

I am appalled and outraged by the fact that congress no longer declares war in order for US involvement to take place. I want congress to decide on weapons sales to foreign countries and forces. To have weapons manufacturers benefiting from foreign wars is a paving stone toward fascism. Our president should not be a dictator deciding upon these sales on his own. Congressional debate and decision making must be the process we follow.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:44 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-s6zc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1701
Public Comment 1256. Individual. Katherine Wood. 7-4-18

## Submitter Information

**Name:** Katherine Wood
**Address:**
   19 Maka Hou Loop
   Wailuku,  HI,  96793
**Email:** ka.wood2011@gmail.com
**Phone:** 808-344-0472

## General Comment

The control of guns, ammunition, and related articles DOES still BELONG under the Control of US Munitions List. We need the US State Dept. responsible for national security responsible for who gets to buy large batches of weapons, etc. It makes no sense to have the Dept. of Commerce whose primary goal is to promote business & profits to "really" care about protection of the country over profit.

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

Sometimes changes can be good BUT this places the entire country at risk.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:43 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-5i03
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1700
Public Comment 1257. Individual. Elaine Fisher. 7-4-18

---

## Submitter Information

**Name:** Elaine Fisher

---

## General Comment

I oppose this change. Don't make it easier to get guns.

WASHSTATEB006525

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:42 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-upk9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1699
Public Comment 1258. Individual. Elizabeth McCloskey. 7-4-18

---

# Submitter Information

**Name:** Elizabeth McCloskey
**Address:**
    1602 Michigan Avenue
    LaPorte,  IN,  46350
**Email:** tmconservation@csinet.net

---

# General Comment

Switching the regulation of firearms exports from the State Department to the Commerce Department would
facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration. The Commerce Department does not have the resources to adequately
enforce export controls. This means that firearms traffickers, organized crime, terrorist organizations, and other
violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and
ammunition.

The proposed rule would eliminate the State Departments Blue Lantern program, in place since 1940, which
carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It would remove
licensing requirements for brokers, increasing the risk of trafficking. And it would remove the State Departments
block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions
for how to 3D print weapons, the State Department successfully charged him with violating arms export laws.
The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the
globe.

The world does not need any more weapons and the U.S. does not need this rule change. I strongly oppose this
proposed rule to change U.S. international arms regulations.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:41 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-o9p7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1698
Public Comment 1259. Individual. Gay Kramer-Dodd. 7-4-18

---

## Submitter Information

**Name:** Gay Kramer-Dodd

---

## General Comment

I am quite disturbed to learn that our government wants to contribute to greater violence, instability, and war in
the world. Yet that is what this rule would do, by moving the handling of export licenses of semiautomatic
assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department.
This transfer of authority would open new floodgates for arms sales internationally, with serious implications for
our national security.

I can see why the National Rifle Association is promoting this -- they want to encourage more gun sales. But
other than arms manufacturers profits, there is only detriment, not benefit, to everyone else.

This rule change would It would eliminate the State Departments Blue Lantern program, in place since 1940,
which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It would
remove licensing requirements for brokers, increasing the risk of trafficking. It would remove the State
Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted
online instructions for how to 3D print weapons, the State Department successfully charged him with violating
arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer,
anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing
of firearms in the U.S. and around the globe.

In the interest of our national security and the safety of people in the US and all over the world, please reject this
rule change.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:40 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-4oxq
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1697
Public Comment 1260. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less! Right now, firearms exports are classified as military. This is why they are under the regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.
I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-wrwn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1696
Public Comment 1261. Individual. Joe Veltri. 7-4-18

## Submitter Information

**Name:** Joe Veltri

## General Comment

This is insanity! Please don't allow more weapons in this violent world. Think about humanity. I strongly oppose this change.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:37 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-r8ha
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1695
Public Comment 1262. Individual. Julia Knight. 7-4-18

---

## Submitter Information

**Name:** Julia Knight

---

## General Comment

I oppose the firearms rule change!

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-ct3i
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1694
Public Comment 1263. Anonymous. 7-4-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I strongly oppose relaxing rules to make it easier for U.S. firearm manufacturers to export assault rifles and other
guns, with less oversight and accountability. With gun violence killing 1,000 people around the world every day,
I support saving lives as a priority. Thank you for considering my views.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:35 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-lyqn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1693
Public Comment 1264. Individual. Susan Singh. 7-4-18

---

## Submitter Information

**Name:** Susan Singh

---

## General Comment

Under no circumstances should the sale of firearms abroad by put under the Commerce Department. Then we
will clearly have the situation we have now in the U.S. - the burgeoning and unregulated sale of deadly weapons
to mentally ill people, criminals, youth, against the will and welfare of the majority of people in the U.S. Now,
already the biggest arms sales purveyor in the world, we want to sell more arms around the world, so other
cultures will have our problem of way too many very dangerous firearms in the hands of the wrong people. I am
not opposed to all business, just opposed to businesses that harm people such as weapons manufacturers.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:34 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-ho5w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1692
Public Comment 1265. Anonymous. 7-4-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

As a US Citizen I do not approve of this change in regulations.

WASHSTATEB006533

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:33 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-6h0w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1691
Public Comment 1266. Individual. Tina McKim. 7-4-18

## Submitter Information

**Name:** Tina McKim

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. International arm sales should absolutely be under state control, not controlled
by profit margins. Treating international gun sales as a commodity to be ever increased will increase global
violence and threaten national security. It would put so many guns into the wrong hands and would be disastrous.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:32 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-zsl2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1690
Public Comment 1267. Individual. Marietta Carter. 7-4-18

---

## Submitter Information

**Name:** Marietta Carter

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.

Here are more details on how the rule change would make the world a far more dangerous place:

1) It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
2) It would remove licensing requirements for brokers, increasing the risk of trafficking.
3) It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:31 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-upyx
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1689
Public Comment 1268. Individual. Jennifer Loudon. 7-4-18

---

## Submitter Information

**Name:** Jennifer Loudon
**Address:**
    54 Tryon Farm Lane
    Michigan City,  46360

---

## General Comment

I absolutely oppose this change. These are weapons of war, and their regulation belongs fully and permanently
under the authority of the State Department.

WASHSTATEB006536

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:30 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-119p
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1688
Public Comment 1269. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

My husband and I oppose the rule change that would switch the regulations of firearms export from the U.S.
State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:29 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-5gmr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1687
Public Comment 1270. Individual. Nancy Roberts-Moneir. 7-4-18

---

## Submitter Information

**Name:** Nancy Roberts-Moneir

---

## General Comment

As long as the export of firearms is under the regulation of the State Department, Congress can block sales of
large batches of firearms to foreign countries. A rule change that would move the handling of export licenses of
semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S.
Commerce Department, would eliminate the State Departments Blue Lantern program, in place since 1940,
which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. With a
change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in
the name of national security, even to countries where there are serious human rights concerns, such as the
Philippines and Turkey.
In addition, the Commerce Department just does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have adequate staff available at the multiple locations necessary.
Without adequate controls, firearms traffickers, organized crime, terrorist organizations, and other violent and
dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.
The obvious security nightmare such a change would create far outweighs financial benefits to private American
weapons manufacturers, and the plan should be not just shelved, but tossed out permanently.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:25 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-sqyl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1686
Public Comment 1271. Anonymous. 7-4-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I oppose the rule change switching the regulation of gun exports from State Dept. to Commerce.

The Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of
Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large
caches of American guns and ammunition.

The safety and security of American citizens requires that large gun sales continue to be classed as "military" and
overseen by the State Dept. and Congress.

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:27 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-uwop
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1685
Public Comment 1272. Anonymous. 7-4-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The NRA and gun manufacturers want guns everywhere, for everyone, not just here in the United States, but
around the world. If a rule change occurs that would move the handling of export licenses of semiautomatic
assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our
nation) to the U.S. Commerce Department (focused on promoting American business), it would open new
floodgates for arms sales internationally, with serious implications for our national security.
Now, firearms exports are classified as military. This is why they are under the regulation of the State
Department, and why Congress can block sales of large batches of firearms to foreign countries. With the insane
rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop
in the name of national security, even to countries where there are serious human rights concerns, such as the
Philippines and Turkey.
The rule change would make the world a far more dangerous place:
1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

The Commerce Department does not have the resources or mission to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. Firearms traffickers, organized crime, terrorist
organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of
American guns and ammunition.
Firearms are used to kill people every day around the world in acts of organized crime, political violence,

terrorism, and human rights violations. They should be subject to more controls, not less!
I vigorously oppose this rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department. I demand that rule change die before human beings do.

WASHSTATEB006541

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:21 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-ubb6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1684
Public Comment 1273. Individual. Nancy Morimoto. 7-4-18

---

## Submitter Information

**Name:** Nancy Morimoto
**Address:**
  115 Whits Road
  Mountain View,  CA,  94040
**Email:** nancy94040@gmail.com

---

## General Comment

I oppose switching the regulation of firearms exports from the State Department to the Commerce Department.
Guns are clearly in a very separate category from other commercial products. Toasters are not used by terrorists,
organized crime, or for political violence.

The United States needs to maintain or even increase strict export controls and rigorous enforcement of firearms
trade. The proposed change would remove licensing requirements for brokers, resulting in increased firearms
trafficking. This will put many more lives around the world in danger from the unscrupulous use of firearms.

This change would also result in the elimination of the State Department's Blue Lantern program, which carries
out hundred of pre-license and post-shipment inspections and publicly reports on them.

The oversight of the export of items with clear potential military or illegal use should remain with the State
Department.

WASHSTATEB006542

# PUBLIC SUBMISSION

**As of:** 7/17/18 5:22 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-guxz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1683
Public Comment 1274. Individual. Henriet Nadler Cohen. 7-4-18

## Submitter Information

**Name:** Henriet Nadler Cohen
**Address:**
    2727 Palisade Ave.
    Bronx, NY, 10463
**Email:** henrietcohen22@gmail.com

## General Comment

To Whom It May Concern,
I am a mother, grandmother and Social Worker. In my work with children, I saw first hand the devastating effects of gun violence on families. I am writing because the spread of guns, automatic assault rifles is a truly an assault on civil society.

This is why I am writing in opposition to moving export license oversight for firearms from the Department of State to the Department of Commerce because the proposed rule change treats semi automatic assault rifles as non-military". This is despite the fact that U.S troops routinely use their military rifles in semi automatic mode, these weapons are used by state and non-state groups in armed conflicts, and the civilian possesssion of such weapons is prohibited in many countries. The proposed rule also: eliminates Congressional oversight for important gun export deals; transfers the cost of processing licenses from gun manufacturers to taxpayers; and, enables unchecked gun production in the U.S and exports abroad by removing the block on 3D printing of firearms. The proposal reduces transparency and reporting on gun exports and transfers gun export licensing from an agency with a mission to promote stability, conflict reduction, and human rights, to an agency with a mission to promote trade and which lacks the resources to adequately enforce export controls.
This is why I am opposed to moving oversight for firearms from the State Department.
Firearms unnecessarily kill a thousand people every day in acts of organized crime, political violence, terrorism and human rights violations. They should be subject to MORE CONTROLS, not fewer.
Respectfully,
Henriet Nadler Cohen

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:46 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-xsa1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1682
Public Comment 1275. Individual. Jean Grattet. 7-4-18

---

## Submitter Information

**Name:** Jean Grattet

---

## General Comment

Allowing unregulated sale of weapons to foreign countries is an obvious ploy by the NRA representing Gun Manufacturers would be a disastrous action. It is difficult to understand how any moral person would support this.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:45 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-dvzf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1681
Public Comment 1276. Individual. DeeDee Tostanoski. 7-4-18

---

## Submitter Information

**Name:** DeeDee Tostanoski
**Address:**
  400 Madison St
  #901
  Alexandria,  VA,  22314
**Email:** ddtmagnolia@gmail.com
**Phone:** 703-548-9060

---

## General Comment

I strongly oppose the removal of international arms regulation from the State Dept to the Commerce Dept. State
is in the unique position to evaluate the international impact of arms sales to particular individuals and areas of
the world, as well as to identify likely bad actors in this exchange. Arms dealers around the world have been
contributing to making the world a more dangerous place, and State has been able to limit some of that impact.
The mission of the Department of Commerce is to promote commerce, not to secure the safety of the world's
citizens. This shift in responsibility is ill-advised and will have dangerous repercussions.

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:44 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-u3yz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1680
Public Comment 1277. Individual. Emma Houseman. 7-4-18

---

## Submitter Information

**Name:** Emma Houseman

---

## General Comment

Please refuse to accept the regulation of semiautomatic guns and similar devices to foreign countries or
individuals. This can only lead to far greater danger to our country and its people. This regulation must remain
under the US State Department whose mandate is to protect our countrry's safety, rather than your's whose
mandate is to increase foreign sales.

WASHSTATEB006546

# PUBLIC SUBMISSION

**As of:** 7/17/18 4:42 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-cgdx
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1679
Public Comment 1278. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

To whom it may concern - as a U.S. resident in the state of Texas, I oppose this rule change that would enable gun sales to other countries. Our own current state of gun mania and lax regulations is killing too many young Americans, we have a moral obligation not to perpetuate this problem in other countries for the sake of corporate greed.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-r0if
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1619
Public Comment 1279. Individual. Judith Herzfeld. 7-4-18

## Submitter Information

**Name:** Judith Herzfeld

## General Comment

Increasing international commerce in guns will just increase violence in receiving countries and drive more refugees to our borders. Don't we have more than enough of that already?

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-m564
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1618
Public Comment 1280. Individual. George Fuller. 7-4-18

---

## Submitter Information

**Name:** George Fuller
**Address:**
    4624 SW 333rd Ct
    Federal Way,  WA,  98023
**Email:** george-fuller@att.net
**Phone:** 2538785638

---

## General Comment

I oppose the proposed rule for the following reasons:
The proposed rule treats semi-automatic assault rifles as non-military. But many state and non-state groups in
importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use
rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of
firearms, about which comment has been requested, many countries prohibit civilian possession of semi-
automatic rifles and handguns, as well as of any larger caliber firearm. Because military-style assault rifles
clearly have substantial military utility, transfer of these firearms to Commerce Department control is
inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.
The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no
longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on
related human rights concerns, as it recently did on the Philippines and Turkey.[2] Congressional action in 2002
required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to
Congress. Items moved to Commerce control would no longer be subject to such notification. In a September 15,
2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move
would violate Congressional intent and effectively eliminate Congress proper role.
The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration
fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing
weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge
any fee for licensing. So the government i.e., taxpayers will absorb the cost of reviewing applications and
processing licenses.

WASHSTATEB006549

The rule reduces end-use controls for gun exports. It would eliminate the State Departments Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Governments information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporters history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

The Commerce Department does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce.[4] Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

This rule would transfer gun export licensing to an agency the Commerce Department whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:47 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-bmzk
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1617
Public Comment 1281. Individual. Ruth Sheldon. 7-4-18

---

## Submitter Information

**Name:** Ruth Sheldon

---

## General Comment

Please do not make this rule change. We need the tightest possible control on the sale of firearms, in our country and in the world and putting control under the Dept of Commerce will just encourage more sales. The State Department's function is to help create a more peaceful world. The Department of Commerce is just interested in selling more stuff.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:46 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9438-clsf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1616
Public Comment 1282. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

this should be unconstitutional due to the liabilities to our own military abroad and us police agencies involved with the drug trade.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:45 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-f1ng
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1615
Public Comment 1283. Individual. Elizabeth Songalia. 7-4-18

---

## Submitter Information

**Name:** Elizabeth Songalia
**Address:**
   649 Waseca St.
   St. Paul,  MN,  55107
**Email:** reinsong@q.com
**Phone:** 6512243718

---

## General Comment

Firearms exports must continue to be classified as military. They must remain under the regulation of the State Department so Congress can block sales of large batches of firearms to foreign countries.

I am opposed to switching the regulation of firearms exports from the State Department to the Commerce Department because this change would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

The State Departments Blue Lantern program must not be eliminated.

Licensing requirements for brokers must not be eliminated.

The State Departments block on the 3D printing of firearms must not be eliminated.

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:44 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-42gd
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1614
Public Comment 1284. Individual. Nydia Leaf. 7-4-18

---

# Submitter Information

**Name:** Nydia Leaf
**Address:**
    46 West 95 Street
    #3B
    New York,  NY,  10025-6718
**Email:** nyleaf13@gmail.com
**Phone:** 2128657875

---

# General Comment

To the U.S. Commerce Department - To Whom It May Concern:

My family and I oppose this rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department. It is a matter of national security - we must not and cannot
permit any change that will open the floodgates of weapons trading.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:43 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-4tmz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1613
Public Comment 1285. Individual. Randall Potts. 7-4-18

---

# Submitter Information

**Name:** randall potts

---

# General Comment

I strongly oppose the Rule change in International Traffic in Arms Regulation. This is a terrible change to longstanding and effective regulation of international arms sales from the USA that will not only harm our standing in the civilized western world, but also help arm the worst war criminals who oppress their own people.

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

Here are more details on how the rule change would make the world a far more dangerous place:

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.

It would remove licensing requirements for brokers, increasing the risk of trafficking.

It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

The only beneficiaries of this rule change are gun manufactures, arms dealers and the vermin they arm. This makes the USA less safe and compromises our moral standing and values. This change is totally against the interests of USA citizens. Please do not do it.

WASHSTATEB006556

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:41 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-rcze
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1612
Public Comment 1286. Individual. Lois Feuer. 7-4-18

---

## Submitter Information

**Name:** Lois Feuer

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. The rule change would make such sales a matter of money rather than one of
national/international defense and security. We do harm to our own and other nations when we supply deadly
weapons to terrorists and lawless governments.

This kind of sale alienates law-abiding nations (of which we should be the leader), betrays international
agreements, and foments violence around the world.

For these reasons I oppose the change.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:41 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-5ker
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1611
Public Comment 1287. Individual. Mary Duerksen. 7-4-18

## Submitter Information

**Name:** Mary Duerksen

## General Comment

I oppose moving the regulation of firearms exports from the Department of State to Department of Commerce. This change would make the world a more dangerous place:
-It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
-It would remove licensing requirements for brokers, increasing the risk of trafficking.
-It would remove the State Departments block on the 3D printing of firearms. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-xh95
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1610
Public Comment 1288. Individual. Nancy O Byrne. 7-4-18

---

# Submitter Information

**Name:** Nancy O'Byrne
**Address:**
   5308 2nd Street
   St. Augustine, FL, 32080
**Email:** obyrnen@bellsouth.net
**Phone:** 9044223618
**Fax:** 32080

---

# General Comment

This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. I oppose this proposed rule.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-7ebt
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1609
Public Comment 1289. Individual. Adina Parsley. 7-4-18

## Submitter Information

**Name:** Adina Parsley
**Organization:** none

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey. Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

Leave firearm export regulations with the State Department whose primary interest is national security and not with the Commerce Department whose primary interest is promoting American business.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:37 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-mj3b
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1608
Public Comment 1290. Individual. Concerned Citizen. 7-4-18

## Submitter Information

**Name:** Concerned Citizen

## General Comment

I strongly oppose this rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department. It would make the world a more dangerous place and increase
the number of firearms thereby increasing crime and adding to the unsafe conditions that can cause increased
migration. Firearms are definitely munitions that need to stay.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-f4l4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1607
Public Comment 1291. Individual. Kathryn Rose. 7-5-18

---

# Submitter Information

**Name:** Kathryn Rose
**Address:**
   2749 N Lafayette St
   Denver,  CO,  80205-4448
**Email:** mizkate52@msn.com
**Phone:** 720-312-7032
**Fax:** 80205-4448

---

# General Comment

I oppose the rule change that would place weapons sales under the oversight of the Department of Commerce
rather than the U.S. Department of State. There is no need to change the current review system.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:35 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-nk5l
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1606
Public Comment 1292. Individual. Mary Starr. 7-4-18

---

## Submitter Information

**Name:** Mary Starr

---

## General Comment

I oppose switching oversight on gun sales from the State Department to the Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:34 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-nu23
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1605
Public Comment 1293. Individual. Cheryl Pressgrove. 7-4-18

---

## Submitter Information

**Name:** Cheryl Pressgrove
**Address:**
    TX,
**Email:** cpressgrove@sbcglobal.net

---

## General Comment

We do not need to allow the greed of the NRA and gunmakers to flood the world with more guns. We have a huge problem with gun violence in our country and immigrants fleeing even greater gun violence in their countries. Our borders are overwhelmed with people seekin asylum. We as a nation have a moral obligation not to help spread violence to other countries. The poor in most countries would not have the means to buy weapons but they could be purchased and used against the poor in fledgling democracies!

WASHSTATEB006564

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:33 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9439-4q41
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1604
Public Comment 1294. Individual. Alicia Shapinsky. 7-4-18

---

## Submitter Information

**Name:** Alicia Shapinsky

---

## General Comment

I oppose this rule change switching the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Such a switch would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. Firearms exports should remain under the regulation of the U.S. State Department. Thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:32 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-2iiu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1603
Public Comment 1295. Individual. Patrizia Lazzeri. 7-4-18

---

## Submitter Information

**Name:** Patrizia Lazzeri
**Address:**
    1138 Veranda Court
    Leland, NC, 28451
**Email:** lazgang@aol.com
**Phone:** 919 619-0562

---

## General Comment

Right now, firearms exports are classified as military. This is why they are under the regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

You MUST do everything in your power to never allow this to happen! You MUST keep ALL Americans safe in our own country! Thank you!

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:31 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-1mk4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1602
Public Comment 1296. Individual. Carole Katz. 7-4-18

---

## Submitter Information

**Name:** Carole Katz
**Address:**
   306 Heritage Hills
   Somers, NY,  10589
**Email:** dori12@aol.com
**Phone:** 212 831 3001

---

## General Comment

There are too many firearms in this country already- more than for everyone of us to have them. Children are
being murdered in their schools. We need more not less oversight. How much is the NRA encouraging this
change. There only interest is making money & spreading fear. They arent really trying to protect us. The spread
of fire arms has only increased the number of deaths by firearms contrary to popular information spread by them.
Stop the killing. Stop this change. Thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:30 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-mjnw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1601
Public Comment 1297. Individual. Suzanne Heidemann. 7-4-18

---

# Submitter Information

**Name:** Suzanne Heidemann
**Address:**
    57250 721 RD
    Jansen, NE, 68377
**Email:** dheidemann@diodecom.net
**Phone:** 4026564817
**Fax:** 68377

---

# General Comment

I strongly disagree with giving the US Commerce Department regulartory control over the export of firearms to foreign countries. I feel this would put our national security at risk. This department does not have the resoures found at the State Department and could put weapons in the hands of terrorists and crimminal elements. Why as a country would we want to risk this happening?

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:29 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-84dm
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1600
Public Comment 1298. Individual. R Catania. 7-4-18

---

## Submitter Information

**Name:** R catania
**Address:**
   scituate,  RI,  02857
**Email:** greenhills12345@gmail.com
**Phone:** 4014750000

---

## General Comment

I vehemently DO NOT agree with the proposed rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department. This is a dangerous proposal, as It would eliminate the State Departments Blue Lantern program on inspections and reports.
It would also remove licensing requirements for brokers, increasing the risk of trafficking tremendously. DO NOT CHANGE THE RULE.

# PUBLIC SUBMISSION

**As of:** 7/17/18 2:28 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-476g
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1599
Public Comment 1299. Individual. Chris Saia. 7-4-18

## Submitter Information

**Name:** Chris Saia

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

It would remove licensing requirements for brokers, increasing the risk of trafficking.

It would remove the State Departments block on the 3D printing of firearms.

When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

Changing any of these rules, at this point, would be bat-shit crazy.

# PUBLIC SUBMISSION

**As of:** 7/17/18 1:00 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-5fmc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1593
Public Comment 1300. Individual. RJ Cooper. 7-4-18

## Submitter Information

**Name:** RJ Cooper

## General Comment

Limit arms exports. Do not move jurisdiction to Commerce! If that is done, almost anyone, anywhere can purchase military grade weopons.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:59 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-9ok1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1591
Public Comment 1301. Individual. Rita Carter. 7-4-18

## Submitter Information

**Name:** Rita Carter

## General Comment

I oppose the proposed rule changes that would result in less regulation of weapon & ammunition sales that would increase the danger of violent acts occurring in the US, as well as other countries.

Currently firearms exports are classified as military. This is why they are under the regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:58 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943a-yf26
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1588
Public Comment 1302. Individual. Paul Runion. 7-4-18

## Submitter Information

**Name:** paul runion

## General Comment

i oppose the rule change which would switch the regulations of firearms export from the U.S Dept. of State
to the U.S. Dept. of Commerce

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:57 PM |
| **Received:** July 04, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943b-qxhy |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1586
Public Comment 1303. Individual. Pam Pouchot. 7-4-18

---

## Submitter Information

**Name:** Pam Pouchot
**Address:**
   103 Kimberly Ct
   Yorktown,  VA,  23692
**Email:** plpouchot@cox.net
**Phone:** 757-898-8453

---

## General Comment

Aren't there enough armed terrorists in the world without the US providing an unlimited amount of deadly
weapons to them?
In the past the US has had enough common sense to ban the unfettered sales of firearms/ammunition to foreign
countries.
Apparently there are those in our government who feel arming those who may eventually use those weapons to
kill Americans
as well as our allies is a good position to hold as long as the firearms industry can make a buck. I value innocent
life more
than they do. I strongly urge you to retain the existing rules to keep the world a slightly safer place.

WASHSTATEB006574

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:56 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943b-w2nd
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1584
Public Comment 1304. Individual. Carolyn Knoll. 7-4-18

---

## Submitter Information

**Name:** Carolyn Knoll
**Address:**
    2 Irwin Way, Apt. 208
    Orinda,  CA,  94563-2552
**Email:** clk5356@gmail.com
**Fax:** 94563-2552

---

## General Comment

As a citizen of the United States, I am very concerned about gun violence and our exporting of this violence by selling guns to other countries. I oppose the proposed rule for the following reasons:

1. The proposed rule treats semi-automatic assault rifles as non-military. But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of firearms, about which comment has been requested, many countries prohibit civilian possession of semi-automatic rifles and handguns, as well as of any larger caliber firearm. Many semi-automatic rifles are also easily converted to fully automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.
2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns.In a September 15, 2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate Congressional intent and effectively eliminate Congress proper role.
3. The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government -- i.e., taxpayers -- will absorb the cost of reviewing

applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

4. National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking.

5. The rule reduces end-use controls for gun exports. It would eliminate the State Departments Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Governments information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporters history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

6. The Commerce Department does not have resources to enforce export controls, even before the addition of 30,000 firearms export licenses as a result of this rule predicted by Commerce. The BISs enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

7. The proposed change will reduce transparency and reporting on gun exports. The rule would eliminate Congressional and public awareness of the total amount (dollar value and items) of firearms sales authorizations and deliveries around the world, since the Commerce Department annual reports currently only cover about 20 countries.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:55 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943b-jx9n
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1583
Public Comment 1305. Individual. Sharon Tuttle. 7-4-18

---

# Submitter Information

**Name:** Sharon Tuttle
**Address:**
   Arcata,  CA,  95521
**Email:** smtuttle@alumni.rice.edu
**Phone:** +11234567890

---

# General Comment

I am writing to strongly oppose this rule change that would switch the regulation of firearms exports from the
U.S. State Department to the U.S. Commerce Department.

This rule change has the potential to harm both national security and international human rights. For example,
with the rule change, Congress would no longer be automatically informed about sizable weapons sales that it
could stop in the name of national security, even to countries where there are serious human rights concerns,
such as the Philippines and Turkey.

The Commerce Department simply does not have the resources to adequately enforce export controls. Its Bureau
of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large
quantities of American guns and ammunition.

Thus, switching the regulation of firearms exports from the State Department to the Commerce Department
would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration.

This rule change would be dangerous and irresponsible, and must not go forward.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:54 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943b-sjpg
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1582
Public Comment 1306. Individual. Stephanie Johnson. 7-6-18

---

## Submitter Information

**Name:** Stephanie Johnson

---

## General Comment

I am opposed to the proposal to shift the handling of export licenses for semi-automatic firearms from the Department of State to the Department of Commerce. I believe that this change would weaken our national security, and make it easier for firearms to get into the hands of dangerous people who have no business possessing firearms. The State Department is better equipped to determine national security issues.

WASHSTATEB006578

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:53 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943b-jt64 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1566
Public Comment 1307. Individual. Toby Kutler. 7-4-18

---

## Submitter Information

**Name:** toby kutler

---

## General Comment

Why in the world would The Bureau of Industry and Security would even Determines No Longer Warrant Control Under the UNited States Munitions. How is that possible??????????????????????????????????????

have enough people (children and innocent people died going about their normal days and being killed by someone with a gun for no reason.

I f anything more background and the black market should be heavy regulated and maybe someone lives can be safed!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943b-g0g1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1564
Public Comment 1308. Individual. Cindy Kuenzi. 7-4-18

---

## Submitter Information

**Name:** Cindy Kuenzi

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. The firearms we export will likely be used against our own citizens abroad or
those of our allies. Enough.

WASHSTATEB006580

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:38 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943b-xa97
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1563
Public Comment 1309. Individual. Daniel Blum. 7-4-18

---

## Submitter Information

**Name:** Daniel Blum

---

## General Comment

I am writing in opposition to moving export license oversight for firearms from the Department of State to the Department of Commerce because the proposed rule change treats semiautomatic assault rifles as non-military. This is despite the fact that U.S. troops routinely use their military rifles in semiautomatic mode, these weapons are used by state and non-state groups in armed conflicts, and the civilian possession of such weapons is prohibited in many countries. The proposed rule also: eliminates Congressional oversight for important gun export deals; transfers the cost of processing licenses from gun manufacturers to taxpayers; and, enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. The proposal reduces transparency and reporting on gun exports and transfers gun export licensing from an agency with a mission to promote stability, conflict reduction, and human rights, to an agency with a mission to promote trade and which lacks the resources to adequately enforce export controls.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not fewer. Please do not forget that immigrants are entering America through its southern border requesting asylum from their home countries due to gang violence. Remember these gangs and other violent people are receiving their guns from America more often than from any other country. Hence, the only reason for more easily allowing guns made in America to be shipped across its border is because there is no perceived threat to America's border security by your department. Until the State department declares that there is no increased security threat to America's southern border and vigorously denounce any actions to increase funding for border security, including for more personal or for building more walls on America's southern border, your department should refuse to take over regulations that have more than just civi commerce implications.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:37 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943c-zthr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1561
Public Comment 1310. Individual. Marjel Zaldivar. 7-4-18

---

## Submitter Information

**Name:** Marjel Zaldivar

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. This transfer of authority would open new floodgates for arms sales
internationally, with serious implications for our national security. This is not just about business. This is more
importantly about people's safety, and ultimately, America's safety.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943c-zco4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1559
Public Comment 1311. Individual. Elaine Pinches. 7-4-18

---

## Submitter Information

**Name:** Elaine Pinches
**Address:**
    49 Marion St Apt 3B
    Brookline,  02446
**Email:** elainepinches2003@yahoo.com
**Phone:** 6179356866
**Fax:** 02446

---

## General Comment

Please don't change the regulations! Thank you!

_____

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:35 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943c-rtst
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1556
Public Comment 1312. Individual. James Phelps 7-4-18

## Submitter Information

**Name:** James Phelps

## General Comment

I am a registered gun owner and I oppose placing the export of firearms under the aegis of the Commerce Department. They are correctly classified as military and belong under the purview of the State Department.

WASHSTATEB006584

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 12:34 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943c-wwyr | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1554
Public Comment 1313. Individual. Lewise Busch. 7-4-18

---

## Submitter Information

**Name:** Lewise Busch
**Address:**
   750 Weaver Dairy Rd. 1223
   Chapel Hill,  NC,  27514-4900
**Email:** lewisebusch@gmail.com
**Phone:** 9199183510

---

## General Comment

Dear sir or madame:

I heartily oppose the transition of control over the export of firearms to the Department of Commerce from the Department of State. The state department has more knowledge of the world situations in which more arms could exacerbate violence and reduce protections of civil rights and liberties. It also has more experience than Commerce in assessing the likelihoods that criminal enterprises or rogue sources of violence could be fueled by such arms transfers. It is set up to help reduce the pressure on peace by terrorists. It can help ameliorate the pressures on borders from mass immigration.

I hope not to see pictures on TV of what happens when we open the floodgates of weapons even further.

Sincerely,

Lewise Busch

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:33 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943d-wooc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1552
Public Comment 1314. Individual. Dawn Albanese. 7-4-18

## Submitter Information

**Name:** Dawn Albanese

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Once the almighty dollar becomes involved, all morality & common sense fly out the window.

Thank you for your time & consideration on this important matter.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:20 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943d-76v2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1549
Public Comment 1315. Individual. James Bachman. 7-4-18

---

# Submitter Information

**Name:** James Bachman
**Address:**
  70 White Oak Cir
  Saint Charles,  IL,  60174
**Email:** jbachman1190@sbcglobal.net
**Phone:** 6305841190
**Fax:** 60174

---

# General Comment

I object to the international trade in firearms shifting from the Department of State to the Commerce Department. We need to keep control of where the arms and what type of arms are going, what they will be used for, and whether the the use is consistent with US values. The Commerce Department is charged with selling the US commerce, not in making value judgements on our exports. Do not transfer our arms sales to the Commerce Department.

# PUBLIC SUBMISSION

<table>
<tr><td><b>As of:</b> 7/17/18 12:19 PM</td></tr>
<tr><td><b>Received:</b> July 04, 2018</td></tr>
<tr><td><b>Status:</b> Posted</td></tr>
<tr><td><b>Posted:</b> July 17, 2018</td></tr>
<tr><td><b>Tracking No.</b> 1k2-943d-7n2t</td></tr>
<tr><td><b>Comments Due:</b> July 09, 2018</td></tr>
<tr><td><b>Submission Type:</b> Web</td></tr>
</table>

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1548
Public Comment 1316. Individual. Jeanne Hogan. 7-4-18

---

# Submitter Information

**Name:** Jeanne Hogan
**Address:**
   4 Merrick Place
   Pennington,  NJ,  08534
**Email:** jdh3011@aol.com
**Fax:** 08534

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. I do not want to see firearms exported to oppressive regimes, removal of safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and do not want to further & fuel violence that destabilizes countries and causes mass migration.[4]

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:07 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-1221
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1547
Public Comment 1317. Individual. Marie Braga. 7-4-18

## Submitter Information

**Name:** Marie braga

## General Comment

Please STOP. Do not sell guns internationally. There are too many guns! Stop promoting guns to make money.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-c7at
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1546
Public Comment 1318. Individual. Barbara Matthews. 7-4-18

---

## Submitter Information

**Name:** Barbara Matthews

---

## General Comment

Please do not change the control of sale of firearms from the State Department to the Department of Commerce. Firearms exports should be continued to be classified as military", so that Congress can block sales of large batches of firearms to foreign countries.With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey. Unacceptable!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:05 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-1s63
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1545
Public Comment 1319. Individual. Jean Ross. 7-4-18

## Submitter Information

**Name:** Jean Ross
**Address:**
    3624 Bryant Ave. S.
    Minneapolis,  MN,  55409
**Email:** jfross@umn.edu
**Phone:** 6128242080

## General Comment

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. This is unacceptable and should not be allowed so that the NRA and gun manufacturers can sell more arms.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:04 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-1r9t
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1544
Public Comment 1320. Individual. Jessica R Semon. 7-4-18

## Submitter Information

**Name:** Jessica R Semon
**Address:**
   PO Box 124
   Brockport,  NY,  14420

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. It would endanger human lives, including those of US citizens.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:03 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-ljml
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1543
Public Comment 1321. Individual. Glen Anderson. 7-5-18

---

## Submitter Information

**Name:** Glen Anderson
**Address:**
    5015 15th Ave SE
    Lacey,  WA,  98503
**Email:** glenanderson@integra.net
**Phone:** 360.491.9093

---

## General Comment

I STRONGLY OPPOSE Trump's proposal to move export license oversight for firearms from the Department of State
to the Department of Commerce THAT WOULD PROMOTE TERRORISM by making firearms seem like just another
commercial commodity for the Dept. of Commerce to rubber-stamp.

The Dept. of State knows what's going on in other countries, so the Dept. of State should continue its oversight
power.


Trump's proposed rule change treats semiautomatic assault rifles as non-military. WHAT BALONEY!!!!!
U.S. troops routinely use their military rifles in semiautomatic mode.
Foreign militaries and TERRORISTS use them.
TRUMP WANTS FOREIGN DICTATORS AND TERRORISTS TO GET EASIER ACCESS TO
GUNS!!!!!!!!!!!!!!!!!!!

The proposed rule also eliminates Congressional oversight for important gun export deals. WE NEED
OVERSIGHT!

The rule IMPOSES COSTS UPON TAXPAYERS that gun manufacturers should pay (costs of processing

licenses).

The rule allows unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.

PROTECT HUMAN RIGHTS!!!!! PREVENT TRUMP FROM ARMING TERRORISTS!!!!!

STOP THIS INCREDIBLY RECKLESS AND STUPID RULE!!!!!

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:01 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-74w5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1542
Public Comment 1322. Individual. Nicole Taylor. 7-4-18

---

## Submitter Information

**Name:** Nicole Taylor

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Dept. to the U.S. Commerce Dept. because it would undermine the safety of the United States and its citizens. The Commerce Dept. cannot appropriately keep guns out of the hands of gun traffickers, terrorists, or human rights abusers, among others.

WASHSTATEB006595

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:59 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943e-tba7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1541
Public Comment 1323. Individual. Barbara Hicks. 7-4-18

---

## Submitter Information

**Name:** Barbara Hicks
**Address:**
    921 Ell Way
    Sarasota,  FL,  34243
**Email:** bhicks_ee@hotmail.com
**Phone:** 9417526940

---

## General Comment

I am writing against the proposed rule change to switch the regulation of firearms exports from the State Department to the Commerce Department. This change would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

More specifically, the rule change would weaken the control of arms shipments by doing the following:
1) eliminating the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them;
2) removing licensing requirements for brokers, increasing the risk of trafficking; and
3) removing the State Departments block on the 3D printing of firearms.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:58 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943f-s0kw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1540
Public Comment 1324. Individual. Maurine Canarsky. 7-4-18

## Submitter Information

**Name:** Maurine Canarsky
**Address:**
  P.O. Box 82207
  Portland, OR, 97282
**Email:** canarskyyomo@gmail.com
**Phone:** 5037197332

## General Comment

I am writing to express my strong and vehement opposition to this rule change.

Switching the regulation of firearms exports from the State Department to the Commerce Department facilitates firearms exports to oppressive regimes, removes much-needed safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuels violence that destabilizes countries and causes mass migration.

This rule change eliminates the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
It removes licensing requirements for brokers, increasing the risk of trafficking.
It removes the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch removes this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

We need a safer world, not a more dangerous one. This rule change enables the proliferation of weapons world wide. This is at best a misguided proposal and at worse an unconscionable action. Stop it now.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:57 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943f-xskm
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1539
Public Comment 1325. Individual. Betty Chernansky. 7-4-18

## Submitter Information

**Name:** Betty Chernansky

## General Comment

I oppose the rule that would switch the regulation of fire arms export from the State Department to the department of Commerce. switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:56 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943f-1509
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1538
Public Comment 1326. Individual. Maria Grazia Bruschi. 7-4-18

---

# Submitter Information

**Name:** Maria Grazia BRUSCHI
**Address:**
   200 E 57TH ST
   APT 19D
   NEW YORK,  10022
**Email:** mgbruschi@cs.com
**Fax:** 10022

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.[4]

The rule change would make the world a far more dangerous place:

1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms, effectively enabling 3D printing of firearms in the U.S. and around the globe.

WASHSTATEB006599

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:54 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943f-o2ob
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1537
Public Comment 1327. Individual. Jesus Bustos. 7-5-18

---

## Submitter Information

**Name:** Jesus Bustos
**Address:**
    5614 Palo Verde
    Corpus Christi,  TX,  78417
**Email:** jbustos58@msn.com
**Phone:** 361-232-2309

---

## General Comment

I oppose the change that would switch the regulations of firearms export from the U.S. State Department
to the U.S. Commerce Department for I think this would open the flood gates to fire arms around the world
There is no good reason to make this change other then to aid an industry that has little regard for the finality
of it's product and will have serious repercussions that would not be understood until it's too late. Again we ask
the
department please use all it's resources to oppose this move.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:54 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943g-z0r5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1536
Public Comment 1328. Individual. Kenneth Loehlein. 7-5-18

---

## Submitter Information

**Name:** Kenneth Loehlein
**Address:**
    8608 NE 13th Place
    Vancouver,  WA,  98665
**Email:** kenloehlein@yahoo.com
**Phone:** 920-737-2388

---

## General Comment

I oppose the transfer of firearms and ammunitions exports from the U.S. Dept. of State to the U.S. Dept. of Commerce. The safety and security of the United States will be better served if firearms and ammunitions exports remain under the U.S. Dept. of State.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:53 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943g-uhof
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1535
Public Comment 1329. Individual. Jennifer Schultz. 7-5-18

---

# Submitter Information

**Name:** jennifer schultz
**Address:**
    56 edgebrook estates #7
    buffalo, NY, 14227
**Email:** firls4eva@roadrunner.com
**Phone:** 716-683-2628

---

# General Comment

This is a horrible idea. There is adequate sales of weapons right here in the united states. The chamber of commerce has too much influence. I don't understand how people don't see that this will make our world less safe; not just here in the united states but for those countries that are already in states of violence.

WASHSTATEB006602

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:52 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943g-20ox
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1534
Public Comment 1330. Individual. Peter Rogan. 7-5-18

---

## Submitter Information

**Name:** Peter Rogan
**Address:**
    4062 W 13 Mile Rd Apt B
    Royal Oak,  MI,  48073
**Email:** progan01@yahoo.com
**Phone:** 2485889591

---

## General Comment

I can think of no greater danger to the world and its peace than for the United States to treat the world as simply one gigantic single-person gun market. Somebody apparently thinks that an armed society is a polite society, and has forgotten South Sudan and Ethiopia.

WASHSTATEB006603

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:50 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943g-h5ad
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1533
Public Comment 1331. Individual. Angela Kelly. 7-5-18

---

## Submitter Information

**Name:** Angela Kelly
**Address:**
   1817 Adams St SE
   Olympia,  WA,  98501
**Email:** angiesfemail@yahoo.com
**Phone:** 360-357-7692

---

## General Comment

I am entirely opposed to any rule change that would declassify firearms as military and/or that would result in a change of the regulation of firearms exports from the U.S. Department of State to the U.S. Commerce Department. This proposed change would dramatically endanger our national and international security.

The safeguards that are in place, including the Blue Lantern program, licensing and inspection policies, a block on the 3D printing of firearms, along with congressional and public oversight that exists because the U.S. Department of State oversees the export of firearms cannot be underestimated in our global security.

It is important to keep the regulations of firearms within the jurisdiction of the U.S. Department of State and to continue to classify the export of firearms as military.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:49 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943h-en96
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1532
Public Comment 1332. Individual. Dian Lopez. 7-5-18

---

## Submitter Information

**Name:** Dian Lopez
**Address:**
    5770 Burkeys LN NW
    Alexandria,  MN,  56308
**Email:** lopezdr@morris.umn.edu
**Phone:** 3202871517

---

## General Comment

Export licenses for powerful firearms should be handled by the state department not the commerce department. The object is NOT to make more money but to protect our national security.

WASHSTATEB006605

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:49 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943h-cxde
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1531
Public Comment 1333. Individual. Susan P. Walp. 7-5-18

---

## Submitter Information

**Name:** Susan P. Walp
**Address:**
    Cranbrook,  BC,  V1C 2V9
**Email:** susanwalp@gmail.com

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Firearms regulation must be fully funded, and the State Department already has many mechanixms in place.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:48 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943h-exrq
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1530
Public Comment 1334. Individual. Charles Toll. 7-5-18

## Submitter Information

**Name:** CHARLES TOLL
**Address:**
  VERO BEACH,  FL,  32960
**Email:** chucktoll@hotmail.com
**Phone:** 7725840658

## General Comment

I strongly oppose the proposed rule change that would switch the regulations of firearms export from the U.S.
State Department to the U.S. Commerce Department.

At present, firearms exports are classified as military. This is why they are under the regulation of the State
Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule
change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in
the name of national security, even to countries where there are serious human rights concerns, such as the
Philippines and Turkey. This transfer of authority would open new floodgates for arms sales internationally, with
serious implications for our national security, and for the security of numerous nations around the world.

The Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of
Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large
caches of American guns and ammunition. Switching the regulation of firearms exports from the State
Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove
safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining
weapons, and further fuel violence that destabilizes countries and causes mass migration This would be an
extremely wrong-minded and harmful change.

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime,
political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

WASHSTATEB006607

Thank you for taking action to help make our country and our world a safer place. Vote against the proposed new rule!

CharlesToll
Concerned Citizen

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:46 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943h-dds5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1529
Public Comment 1335. Individual. R C. 7-5-18

---

## Submitter Information

**Name:** R C

---

## General Comment

Firearms, Guns, Ammunition, and Related Articles, like the human beings who use them, remain unchanged over
the past two centuries, except for their capacity to cause harm. Control belongs under the USML now more than
ever.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:45 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943k-sng5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1528
Public Comment 1336. Individual. Miriam Burstein. 7-5-18

---

## Submitter Information

**Name:** Miriam Burstein
**Address:**
    27 East Central
    Paoli,  PA,  19301
**Email:** punkin5170@gmail.com
**Phone:** 610-725-1085
**Organization:** NA

---

## General Comment

I oppose switching the regulation of firearms exports from the State Department to the Department of Commerce. I fear that doing so would make it easier for weapons to get into the hands of organized crime and terrorist organizations around the world and would remove congressional oversight from the practice of selling weaponry. Decisions about weapons sales need to take into account issues of human rights violations, as well as problems of uncontrolled violence in countries where peaceful civilian life has broken down. These are matters for the State Department and Congress to investigate and assess, and are not mere business concerns.

# PUBLIC SUBMISSION

**As of:** 7/17/18 12:31 PM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943m-qhjp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1550
Public Comment 1337. Individual. Sheri Wells-Jensen. 7-5-18

---

## Submitter Information

**Name:** Sheri Wells-Jensen

---

## General Comment

Export of weapons should be controlled by the state department. This is not like selling books, lamps or toasters. We cannot allow gun manufacturers to inject weaponry into any potentially dangerous situation they please simply for money.

WASHSTATEB006611

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:42 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943m-qrj6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1527
Public Comment 1338. Anonymous. 7-5-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security and the Commerce Department just does not have the resources to adequately enforce export controls.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:40 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943n-5r6i
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1526
Public Comment 1339. Individual. Barbara Kelly-Greco. 7-5-18

---

## Submitter Information

**Name:** Barbara Kelly-Greco

---

## General Comment

Regulations of firearms exports belongs with the State Department not the Commerce Dept. This move would allow automatic and semi-automatic weapons to be sold more easily and with less regulations to terrorists and oppressive regimes around the world.

Why would you think exporting Americas gun violence problem to the entire world is a good idea? I believe the reason is corporate profit and greed. The State Department must maintain control of the exports of firearms and the Commerce Department should NOT be given this area to oversee. American lives will be put at risk and this is not acceptable!

Barbara Kelly-Greco
Medford, NJ

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:36 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943n-1r4v
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1525
Public Comment 1340. Individual. Kristine Moore. 7-5-18

---

## Submitter Information

**Name:** Kristine Moore

---

## General Comment

Please do not switch firearms exports from the State Department to the Commerce Department. This would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.[4]

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:35 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943n-kf1u
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1524
Public Comment 1341. Individual. Alexis Ladd. 7-5-18

---

## Submitter Information

**Name:** Alexis Ladd

---

## General Comment

Please act to prevent the sale of semi-automatic and similar guns to foreign bodies. The U.S. needs to stop being
an exporter of violence and these guns do just that. As the overseeing body, you have the opportunity to block
the transfer of the oversight of selling arms to the U.S. Commerce Department. As you know, the Commerce
Department applies the lens of business development. This approach will work to boost the sales of guns and not
regulate them, ultimately putting U.S. citizens in more danger. Creating an environment where people around the
word can gain access to these weapons puts more people at risk, including Americans. We're seeing this across
the United States with mass shootings happening every day -- so prevalent that they're not making national news
anymore. Making more money at the expense of peoples' lives and our national security is wrong. Let the State
Department continue to do their job of limiting access to these dangerous weapons.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:34 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943n-8nmx
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1523
Public Comment 1342. Individual. Ryan Houlette. 7-5-18

---

# Submitter Information

**Name:** Ryan Houlette
**Address:**
  11 Newman St
  Cambridge,  MA,  02140
**Email:** houlette@gmail.com
**Phone:** 6179993201
**Fax:** 02140

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Moving the regulation of firearms exports from the State Department to the
Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help
keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel
violence that destabilizes countries and causes mass migration. This will make the world and the United States
less safe.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:38 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-jiz3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1522
Public Comment 1343. Anonymous. 7-5-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I strongly oppose the shift of international arms sales from state to commerce department. Please don't do this.

WASHSTATEB006617

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:41 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-n3je
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1521
Public Comment 1344. Individual. David Greenberg. 7-5-18

---

## Submitter Information

**Name:** David Greenberg

---

## General Comment

I am against this rule change for a number of reasons. First, the Commerce Department just does not have the
resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff
everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and
dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.
Furthermore, the rule change would:
1. Eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of
pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 11:31 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943o-j140 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1520
Public Comment 1345. Individual. Janis M Soma. 7-5-18

---

## Submitter Information

**Name:** Janis M Soma
**Address:**
   Needham,  MA,  02492
**Email:** somajanis@comcast.net
**Phone:** 7814442735

---

## General Comment

I oppose a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business). This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. At this time firearms exports are classified as military. This is why they are under the regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey. Deadly firearms should not be sold to whoever can pay for them. Our county's priority needs to be human safety, not profitability for firearms manufacturers.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:30 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-a9pm
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1519
Public Comment 1346. Anonymous. 7-5-18

---

## Submitter Information

**Name:** anonymous anonymous

---

## General Comment

Disgusting. Now the criminal NRA supported by president #45 wants to see more murders and expand them
worldwide. Don't we have enough death at their hands.
the NRA needs to be disbanded and made a terrorist group because that is what it is.
I don't support lay public having guns, they are for the police and military and need to be extremely restricted.
so NO NO NO NO NO gun exports.
stop the insanity now.

WASHSTATEB006620

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:27 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-8vvy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1518
Public Comment 1347. Individual. Jack Epling. 7-5-18

## Submitter Information

**Name:** Jack epling

## General Comment

This is a bad idea. What are they thinking!

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:23 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-9r9k
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1517
Public Comment 1348. Individual. Julie Anonymous. 7-5-18

---

## Submitter Information

**Name:** Julie Anonymous

---

## General Comment

I am writing to you today to express my strong opposition to the proposed rule to transfer oversight of small arms exports from the State Department to the Commerce Department. The Commerce Department prioritizes doing business over safeguarding national security which would make this change far more dangerous for Americans.

We know the US gun industry is faring poorly in today's domestic market, which is why the NRA and the National Shooting Sports Foundation has been lobbying hard to remove congressional oversight of commercial weapon sales of $1 million or more. No one else asked for it or wanted it.

The NSSF, a gun industry trade group, has already boasted the rule would lead to a 20% increase in American gun exports. We see the gun lobby's influence in the rule's description of semiautomatic assault rifles like the AR-15 as "civilian" products. These weapons were not designed for household use, the were designed to kill en masse on the battlefield. That is why they are the weapons of choice for mass shooters.

If you go forwar with this disastrous policy, I will do everything in my power-peacefully and democratically- to hold your leadership accountable for the resulting global bloodshed. That will include advocating against your budget priorities across-the-board until a new, non-corrupt administration can come in and drain the swamp.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:21 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-g0en
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1516
Public Comment 1349. Individual. Martina Leinz. 7-5-18

---

## Submitter Information

**Name:** Martina Leinz

---

## General Comment

I strongly oppose a rule change switching the regulation of firearms exports from the U.S. Department of State to
the U.S. Department of Commerce. This would adversely affect our national security and would destabilize
countries around the globe.

The rule change would mean that Congress would no longer be automatically informed about sizable weapons
sales that it could stop in the name of national security, even to countries with serious human rights violations
such as the Philippines and Turkey. (The Boston Globe:
https://www.bostonglobe.com/news/politics/2018/06/23/donald-trump-wants-make-foreign-arms-sales-
easier/CbCdWIizroV6DjlCIXEVML/story.html). It is a blatant effort to enrich the U.S. gun manufacturing
industry at the expense of public safety in the United States and around the world.

Martina Leinz
Burke, Virginia

WASHSTATEB006623

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:20 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-8ht1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1515
Public Comment 1350. Individual. Margaret Dragonette. 7-5-18

## Submitter Information

**Name:** Margaret Dragonette

## General Comment

I oppose the rule change that would switch the regulations of firearm exports from the US State Department to the US Commerce Department. The State Department enforces rigorous restrictions on gun sales overseas because their main purpose is to safeguard our nation. I believe that changing this responsibility to the Commerce Department, whose main purpose is to promote business, would greatly increase the risk of selling guns to terrorists and put American citizens at great risk.

WASHSTATEB006624

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:19 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943o-h17r
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1514
Public Comment 1351. Individual. Dawn Lyons. 7-5-18

---

## Submitter Information

**Name:** Dawn Lyons
**Address:**
    22 Kellogg Street
    Ridgefield,  CT,  06877
**Email:** dawnlyons@mac.com
**Phone:** 513-258-1847

---

## General Comment

The rule change could generate a 20 percent increase in exports, sending another 70,000 arms annually into the global marketplace. Please stop this from happening, as we can't afford more gun deaths in this country.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:18 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943p-bvoj
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1513
Public Comment 1352. Individual. Donna W. 7-5-18

---

## Submitter Information

**Name:** Donna W.

---

## General Comment

I oppose changing fire arms regulations from the State Department, which protects our country, to the Commerce Department,
which promotes American businesses. We need security!

WASHSTATEB006626

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:17 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943p-zsje
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1512
Public Comment 1353. Individual. Julie Fischer. 7-5-18

---

## Submitter Information

**Name:** Julie Fischer
**Address:**
   712 W Main St
   DECORAH,  52101
**Email:** piscatrix@gmail.com
**Phone:** 5633825695
**Fax:** 52101

---

## General Comment

I oppose the proposed rule change that would switch regulation of firearms exports from US State Dept to US
Commerce Dept. Such a change would facilitate arms exports to oppressive regimes, open the doors to criminal
and terrorist organizations, and further fuel the violence that causes mass migrations. It would enable 3-D gun
fabrication with impunity. We need more gun control not less.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:16 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943p-9xdq
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1511
Public Comment 1354. Individual. Jay McCahill. 7-5-18

---

## Submitter Information

**Name:** Jay McCahill
**Address:**
    219 Scottdale Rd
    Lansdowne,  19050-2328
**Email:** jaymccahill@yahoo.com

---

## General Comment

I am vehemently opposed to the proposed transfer of authority for regulating firearms exports from the State Department to the Commerce Department. The sale of weapons has national security and human rights implications that Commerce CANNOT manage, and Congress MUST be informed of and have the ability to block such sales, as they do in the current structure.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 11:15 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943p-hytd |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1510
Public Comment 1355. Individual. Sally Gibbs. 7-5-18

---

# Submitter Information

**Name:** Sally Gibbs
**Address:**
  6560 Mockingbird lane
  Manssas,  20110 4312
**Email:** Sallygibbs26@gmail.com

---

# General Comment

I oppose the transfer of authority for Arms Sales from US State Dept. to the US commerce Dept. This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:14 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943p-nhoc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1509
Public Comment 1356. Individual. Yolanda Mitts. 7-5-18

## Submitter Information

**Name:** Yolanda Mitts
**Address:**
    5045 Green Meadow Rd
    Kalamazoo,  49009
**Email:** ymitts@yahoo.com
**Phone:** 2693231017
**Fax:** 49009

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Dept to the U.S. Commerce Dept. Firearms exports are classified as "miltary" and should stay that way. This change would endanger all the citizens of the world.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:13 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-gfvu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1508
Public Comment 1357. Individual. William Skirbunt-Kozabo. 7-5-18

## Submitter Information

**Name:** William Skirbunt-Kozabo

## General Comment

Right now, firearms exports are classified as military. This is why they are under the regulation of the State Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.
Here are more details on how the rule change would make the world a far more dangerous place:
1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe
I strongly urge you to oppose this rule.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:12 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-7g5c
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1507
Public Comment 1358. Individual. Lisa Graham. 7-5-18

---

## Submitter Information

**Name:** Lisa Graham
**Address:**
   1821 windemere ave
   madison Heights,  48071
**Email:** lgraham@medcerts.com
**Phone:** 2488843524
**Fax:** 48071

---

## General Comment

switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. Please keep the current regulations and make them stronger not weaker

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:09 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-tfe9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1506
Public Comment 1359. Anonymous. 7-5-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Let's not make it easier for U.S. gun manufacturers to export more firearms into a dangerous world filled with terrorists anxious to use them against us.

WASHSTATEB006633

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:08 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-o5y9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1505
Public Comment 1360. Individual. Mary McCullough. 7-5-18

## Submitter Information

**Name:** Mary McCullough

## General Comment

Opposed to proposed rule:
I'm extremely concerned about the rollback of these regulations. In particular the ease it would ability to use a
3D printer to create firearms. Although, criminals can do it now, it would remove prohibitions and provide easy
access making traveling unsafe as they are not visible going through TSA.

WASHSTATEB006634

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:07 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-ezp9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1504
Public Comment 1361. Individual. Robert Duke. 7-5-18

---

## Submitter Information

**Name:** Robert Duke

---

## General Comment

Please stop this rule, it puts civilians in danger of being shot and killed.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:22 PM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943q-luf1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1503
Public Comment 1362. Individual. Alana DeJoseph. 7-5-18

## Submitter Information

**Name:** Alana DeJoseph

## General Comment

I strongly oppose the rule change which would move the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Congress no longer being automatically informed about sizable weapons sales so that it could monitor or stop them in the name of national security, (especially in the case of sales to countries where there are serious human rights concerns, such as the Philippines and Turkey), is unconscionable, short-sighted, and greedy, at the expense of the security for future generations.
The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:05 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943r-396u
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1502
Public Comment 1363. Individual. Howard Mielke. 7-5-18

---

# Submitter Information

**Name:** Howard Mielke
**Address:**
  3233 DeSoto Street
  New Orleans,  LA,  70119
**Email:** howard.mielke@gmail.com
**Phone:** 5049883889
**Fax:** 70119

---

# General Comment

For the following reasons I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department:
*It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.
*It would remove licensing requirements for brokers, increasing the risk of trafficking.
*It would remove the State Departments block on the 3D printing of firearms, effectively enabling 3D printing of firearms in the U.S. and around the globe.

WASHSTATEB006637

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 11:04 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943r-uuos |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1501
Public Comment 1364. Individual. Jacqueline Eliopoulos. 7-5-18

## Submitter Information

**Name:** Jacqueline Eliopoulos

## General Comment

Please reject this rule change entirely. It would only serve to make our violent world more dangerous and put our own nation as well as all others at even greater risk of harm. It is a stupid and reckless choice that will only serve to put all humanity in greater danger. For the sake of all humanity reject this proposal.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:03 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943r-4bq4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1500
Public Comment 1365. Individual. Ana Santoyo. 7-5-18

## Submitter Information

**Name:** Ana Santoyo
**Address:**
    1230 Astor St
    Norristown,  PA,  19401
**Email:** Anasan19119@yahoo.com
**Phone:** 2157049715

## General Comment

Do not change the regulation of firearms exports from the State Department to the Commerce Department to facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

If anything we need to reduce the number of guns and other weapons available in the US and the world.

# PUBLIC SUBMISSION

**As of:** 7/17/18 11:02 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943r-ddgz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1499
Public Comment 1366. Individual. Randall Wayne. 7-5-18

---

## Submitter Information

**Name:** Randall Wayne
**Address:**
   2720 Onyx St.
   Eugene,  OR,  97403
**Email:** rushwayne@aol.com
**Phone:** 5413426144

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

Firearms exports are currently classified as military. They are under the regulation of the State Department,
allowing Congress to block sales of large batches of firearms to foreign countries. With the rule change,
Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name
of national security, even to countries where there are serious human rights concerns, such as the Philippines and
Turkey.

Moreover, the Commerce Department does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 11:01 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943r-t568 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1498
Public Comment 1367. Individual. Lauren Hayman. 7-5-18

---

## Submitter Information

**Name:** Lauren Hayman
**Address:**
   Brooklyn,  NY,

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. This rule change will make the U.S. and the World a MUCH more dangerous
place.

As a new mother, I do not want my child growing up in fear. I currently have faith in the State Departments Blue
Lantern program that carries out hundreds of pre-license and post-shipment inspections and publicly reports on
them. This new rule will remove those licensing requirements for brokers, increasing the risk of trafficking.

It is also frightening that it will remove the State Departments block on the 3D printing of firearms. When
Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State
Department successfully charged him with violating arms export laws, since his open-source posting made it
possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would
remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

Please DO NOT change this rule. The current rules keep us safe in this already very dangerous world of guns and
firearms.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:55 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943r-6ja5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1497
Public Comment 1368. Individual. Cecile Heatley.7-5-18

## Submitter Information

**Name:** Cecile Heatley
**Address:**
    1905 Youngblood street
    McLean,  22101-5531
**Email:** cecileheatley@gmail.com
**Phone:** 7034488790
**Fax:** 22101-5531

## General Comment

I strongly protest against switching the regulations of firearms export from the U.S. State Department to the U.S.
Commerce Department. With the rule change, Congress would no longer be automatically informed about
sizable weapons sales that it could stop in the name of national security, even to countries where there are serious
human rights concerns, such as the Philippines and Turkey.

The Commerce Department does not have the resources to effectively enforce export controls. This means that
firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face
fewer hurdles to getting large quantities of American guns and ammunition.

Switching the regulation of firearms exports from the State Department to the Commerce Department would
facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration.

Changing oversight and regulation of firearms would eliminate the State Departments Blue Lantern program, in
place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports
on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D-printing of firearms. When Defense Distributed founder

Cody Wilson posted online instructions for how to 3D-print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

This is a dangerous, ill-considered, profit-driven move that produces revenues for the NRA and increases the likelihood of injuries and deaths.

WASHSTATEB006643

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:54 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943r-xhgu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1496
Public Comment 1369. Individual. Allison Canning. 7-5-18

## Submitter Information

**Name:** Allison Canning

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. I believe it would make the US & other countries less safe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:52 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943s-xc35
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1495
Public Comment 1370. Individual. Stanley Swiercz. 7-5-18

## Submitter Information

**Name:** Stanley Swiercz

## General Comment

Too many enemies of the United States already have powerful weapons to use against our soldiers and citizens. Exports are not just a commercial concern, they are a security and diplomatic concern. Please keep export decisions under the control of the State Department with it's multidimensional perspective.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:51 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943s-o9t3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1494
Public Comment 1371. Individual. Stephanie Angelo. 7-5-18

---

# Submitter Information

**Name:** Stephanie Angelo

---

# General Comment

The only sensible thing is to ban bump stocks and military style weapons from the general public! Please. It won't solve everything thing but it WILL solve a lot.

Please do the right thing. Not the money thing.

WASHSTATEB006646

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 10:50 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943s-6yk3 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1493
Public Comment 1372. Individual. Erin Orozco. 7-5-18

---

# Submitter Information

**Name:** Erin Orozco

---

# General Comment

Right now, firearms exports are classified as military, putting them under the regulation of the State Department
and allowing Congress to block large sales of firearms to foreign countries. Under the Bureau of Industry and
Security's (BIS's) proposed rule change, the handling of export licenses of semiautomatic assault weapons and
other powerful firearms would shift from the State Department (focused on safeguarding our nation) to the
Commerce Department (focused on promoting American business). This means Congress would no longer be
automatically informed about sizable weapons sales that it could stop in the name of national security, even to
countries where there are serious human rights concerns, such as the Philippines and Turkey, which would open
new floodgates for arms sales internationally with serious implications for our national security.

The Commerce Department simply does not have the resources to adequately enforce export controls. BIS does
not have appropriate staffing levels to monitor and regulate firearms exports on the level that they deserve, given
their import to our national security. This means that firearms traffickers, organized crime, terrorist
organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of
American guns and ammunition. Here are more details on how the rule change would make the world a far more
dangerous place:

1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 10:49 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943s-l6jo | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1492
Public Comment 1373. Individual. Lauri Elliot. 7-5-18

---

## Submitter Information

**Name:** Lauri Elliot
**Address:**
     221 Tupelo Rd.
     Naples,  FL,  34108
**Email:** laurielliot@aol.com
**Phone:** 239-272-9117

---

## General Comment

I oppose this rule change which would switch the regulating of the exporting of firearms from the U.S. State Department to the U.S. Commerce Department.

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

In short, such a rule change would make the world a far more dangerous place and this should be avoided at all costs!

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:48 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943s-ds5n
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1491
Public Comment 1374. Individual. Anita Lendway. 7-5-18

---

## Submitter Information

**Name:** ANITA LENDWAY
**Address:**
    6155 W. Warwick Ave.
    CHICAGO,  IL,  60634
**Email:** alendway6155@comcast.net
**Phone:** 7735457544
**Fax:** 60634

---

## General Comment

I OPPOSE the rule change that would switch regulation of firearm exports from the U.S. State Department to the
US. Commerce Department. The Commerce Department doesn't have the resources to enforce export controls.
Congress needs to be informed about large firearm sales to foreign countries. We must protect national security.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 9:37 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943s-7qp2 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1440
Public Comment 1375. Individual. Jan Weisel. 7-5-18

---

# Submitter Information

**Name:** Jan Weisel
**Address:**
   18513 NE 159th ST
   Woodinville,  WA,  98072
**Email:** weiscon@comcast.net
**Phone:** 206 714-4904

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.
It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.[5]I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.
It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

Because of these reasons, this rule change must not be implemented.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 9:34 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-943s-tlrs |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1438
Public Comment 1376. Individual. Herschell Emery. 7-5-18

---

## Submitter Information

**Name:** Herschell Emery

---

## General Comment

I oppose strongly this rule change, which would (I believe most intentionally!) weaken US regulation of firearm exports. Weapons of war are far from just an issue to be monitored weakly by a Commerce Department uninformed of what international impacts arms sale overseas will have. Is the world no longer dangerous...just a fertile sales ground for the arms industry? Do we want the NRA setting policy for where we ship arms? Do we want a department without strong arms enforcement capabilities to be the only agency watching for arms traffickers? Leave arms classified as such--"military"--so that the State Department and Congress will retain oversight!!

WASHSTATEB006652

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:33 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943s-ihcw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1437
Public Comment 1377. Individual. Valerie Wald. 7-5-18

---

## Submitter Information

**Name:** Valerie Wald

---

## General Comment

This rule change would make the world a far more dangerous place.

With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it
could stop in the name of national security, even to countries where there are serious human rights concerns,
such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.

More specifically, this rule change would:

- Eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-
license and post-shipment inspections and publicly reports on them.
- Remove licensing requirements for brokers, increasing the risk of trafficking.
- Remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody
Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him
with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D
printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D
printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:32 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-xbcm
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1435
Public Comment 1378. Individual. Fred Fall. 7-5-18

---

## Submitter Information

**Name:** Fred Fall
**Address:**
   106 Uxbridge
   Cherry Hill,  NJ,  08034
**Email:** fred08034@gmail.com

---

## General Comment

The State Department should continue to exercise their authority in this matter.It is essential to public safety and
security that firearms continue to be controlled under the United States Munitions List.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 9:31 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943t-ltp2 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1434
Public Comment 1379. Individual. Carolyn Roney. 7-5-18

## Submitter Information

**Name:** Carolyn Roney

## General Comment

I strongly oppose the proposed rule to move regulation and oversight of firearms (small arms) exports from the
State Department to the Commerce Department. An agency that prioritizes doing business over safeguarding
national security has no business controlling the sale of small arms. In addition, it's truly crazy to eliminate
congressional oversight of commercial weapons sales of $1 million or less. The obvious intent here is to increase
sales for the faltering U.S. gun industry, at the expense of our national security. This is completely unacceptable.
If this dangerous policy is implemented, U.S. national security is in jeopardy, as well as the safety of people
around the world. Please think through the long-term implications of this change, none of which are good.

Thank you for your time and attention.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:30 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-p5c0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1421
Public Comment 1380. Individual. Lucy Krasnor. 7-5-18

---

## Submitter Information

**Name:** Lucy Krasnor
**Address:**
    Riverside,  CT,  06878
**Email:** lucy@strategymortgage.com
**Phone:** 2036184144

---

## General Comment

I strongly urge the Commerce Dept ad the State Dept to oppose relaxing rules that would make it easier for US firearm manufacturers to export assault rifles and other guns with less oversight and accountability. we should be making it harder and not easier to get guns- guns are meant to kill people in war and war alone. please do not change the regulations to relax the sale of guns abroad. thank you.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:21 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-sjj7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1419
Public Comment 1381. Individual. Patricia Johnson. 7-5-18

---

## Submitter Information

**Name:** Patricia Johnson

---

## General Comment

The Commerce Department has no way of checking on these sales. Why should gun sales be allowed to any single person, companies or countries by private gun companies? There would be no check on these. Does our country want terrorists having more weapons against us? Remember the Fast and Furious Program where guns were sold to suspected marijuana bandits and ATF agents lost track of them. As a result a Border Patrol agent was killed with one of those same guns. If the ATF knowing who they sold these guns to lost track, how would the Commerce Department keep track of who is purchasing guns? How would our allies look at this? We could be selling guns that would cause more killings in their countries. Is this a proposal to increase profits for gun companies? What has happened to common sense and morality?

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:20 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-16js
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1417
Public Comment 1382. Individual. SHanti Toll. 7-5-18

---

## Submitter Information

**Name:** SHanti Toll

---

## General Comment

Guns allow for more killing and violence toward all people and USA. PLEASE place people over profit.

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:19 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-spmr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1415
Public Comment 1383. Individual. Sadie Sullivan-Greiner. 7-5-18

---

## Submitter Information

**Name:** Sadie Sullivan-Greiner

---

## General Comment

The NRA is a corporate organization focused on one thing only: How much profit they can make from the sale of weapons. As it happens, I spent part of my career working in the ordnance world at DoD. I also live on the southern border.

The notion that ANY foreign military sales should be released to the Dept of Commerce is ludicrous. Much of the gun violence we deal with is a direct result of US weapons going over the border, to arm the drug cartels, who then create the violence in our cities associated with the drug trade. No sane person would want to increase that.

Weapons sales of any sort need to be housed in the State Dept. To do otherwise is self-defeating.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:18 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-zmod
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1412
Public Comment 1384. Individual. Peggy Walsh. 7-5-18

---

## Submitter Information

**Name:** Peggy Walsh
**Address:**
    444 Stockham Ave
    Morrisville, PA, 19067
**Email:** peggywalsh65@gmail.com
**Phone:** 2673046353

---

## General Comment

Comment:I am deeply opposed to this proposed change to arms and traffic regulation. It is the last thing this
country or the worlds needs. It is scam to line more pockets.

1.It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.[5]
2.It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]
3.It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.[7]

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:17 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-q13c
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1410
Public Comment 1385. Anonymous. 7-5-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. We need safe guards in place to ensure that large quantities of weapons are not
being shipped to countries with dangerous regimes. Congress must continue to be notified when large quantities
of weapons are sold and shipped and where they are going. The Commerce Department lacks the controls
necessary to ensure that the United States remains a conscientious global citizen.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:15 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-qy7c
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1409
Public Comment 1386. Anonymous. 7-5-18

---

# Submitter Information

**Name:** Anonymous Anonymous

---

# General Comment

To Whom it May Concern,

I'm deeply concerned about the Proposed Rule change that would move the handling of export licenses of
semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S.
Commerce Department.

The State Department's focus is safeguarding our nation
The Commerce Department's focus is on promoting American business

While the current administration has made it abundantly clear that US exports, and supporting large business is a
TOP priority, the same administration has also named national security as a TOP priority, making MASSIVE
changes to immigration policies and imports/tarrifs under that guise. I fail to see how reducing regulations on
exporting firearms DOESN'T affect national security.

This transfer of authority would open new floodgates for arms sales internationally, with serious implications for
our national security: facilitate firearms exports to oppressive regimes, remove safeguards that help keep
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration. How are any of those things in the best interest of our country? And doesn't
nation security always come first? For example, the Defense Department has the largest slice of the US budget!
And the president has tremendous powers to act in the name of national security (e.g., current travel ban), that
are not available to promote business for a reason. So again, I fail to see how this proposed rule protects the
national interests of this country. So while I understand that gun and weapons manufacturers would 'win' with
this change, it does NOT put our security first, nor does it put the American people first.

With respect,

D

WASHSTATEB006663

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:14 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943t-6rhb
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1408
Public Comment 1387. Individual. Kathleen Green. 7-5-18

---

# Submitter Information

**Name:** Kathleen Green
**Address:**
   12545 Wedgwood Circle
   Tustin,  CA,  92780
**Email:** kathleenrgreen7@gmail.com
**Phone:** 949-862-7334

---

# General Comment

I am against the rule change that would move the handling of export licenses of semiautomatic assault weapons and other
powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department
(focused on promoting American business).[1] This transfer of authority would open new floodgates for arms sales
internationally, with serious implications for our national security.
The Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry
and Security does not have staff everywhere. This means that firearms traffickers organized crime, terrorist organizations
and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.
Is the Trump Administration ready to support terrorist and organized crime in this manner? Is Trump ready to see more people
die to serve his NRA masters?
The world needs less guns not more and much, much stricter regulations and safety laws.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:13 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-9v4n
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1405
Public Comment 1388. Individual. Julia Michalak. 7-5-18

---

## Submitter Information

**Name:** Julia Michalak
**Address:**
   209 NW 48th St
   Seattle,  98107
**Email:** jmichalak@gmail.com
**Phone:** 2024868782
**Fax:** 98107

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Exporting military grade weapons without congressional or diplomatic review opens the door to allowing US companies to provide arms to authoritarian governments, terrorists and other unethical entities. The sale of semi-automatic weapons of war is not simply a business decision, it is 100% an ethical and diplomatic decision that requires oversight from US government - and not just the commerce department, which does not have the expertise or resources to adequately evaluate these sales. The United States absolutely should not be selling weapons of war without substantial oversight from elected officials and staff with the expertise to evaluate the human rights and diplomatic implications of these sales.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:12 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-2dgv
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1404
Public Comment 1389. Individual. Margaret Hasselman. 7-5-18

## Submitter Information

**Name:** Margaret Hasselman

## General Comment

Firearms, guns and ammunitions MUST be regulated, and must NOT be pushed for export. There are too many guns finding their way into the wrong hands already. Stop this horrible trade now!

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:11 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-5vju
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1402
Public Comment 1390. Individual. Donna Whitehead. 7-5-18

---

## Submitter Information

**Name:** Donna Whitehead
**Address:**
    4540 Village Dr SE
    Olympia,  WA,  98501
**Email:** whiteheaddz2@gmail.com
**Phone:** 360 481-1983

---

## General Comment

The NRA is pushing hard for a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department. This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. Please do not cave to this request.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:10 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-7jer
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1400
Public Comment 1391. Individual. Mary Harrison. 7-5-18

---

## Submitter Information

**Name:** Mary Harrison

---

## General Comment

I strongly oppose changing the regulation of exporting firearms from the State Department to the Commerce
Department. The exporting of firearms should remain a "military" concern overseen by the State Department,
because the sale of firearms to other countries can easily become a danger to the security of our own country and
of other countries in the world through the acquisition of firearms by firearms traffickers, terrorist organizations,
and organized crime.

The State Department has more comprehensive resources than the Commerce Department to enforce export
controls on firearms.

It's clear in our own country that easy access to firearms now threatens all children in our schools. It makes no
sense to make it easier for firearms from our country to be used against us, or against other countries, because of
lax enforcement of controls. Keep the regulation of exporting firearms under the control of the State Department,
where it can be monitored more closely.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:09 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-wanw
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1399
Public Comment 1392. Individual. Jeanine Moyer.7-5-18

## Submitter Information

**Name:** Jeanine Moyer
**Address:**
    22 Long Ave
    Buffalo,  NY,  14225
**Email:** alianna2018@yahoo.com

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. The U.S. State Department is focused on safeguarding our nation, while the U.S. Commerce Department is focused on promoting American business. This transfer of authority could open new floodgates for arms sales internationally, with serious implications for our national security. Switching the regulation of firearms exports from the State Department to the Commerce Department would could lead to firearms exports to oppressive regimes, removing safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:07 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-obhn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1397
Public Comment 1393. Individual. Yvonne Greenbaum. 7-5-18

---

# Submitter Information

**Name:** Yvonne Greenbaum
**Address:**
　1168 garraty
　Terrell Hills,  TX,  78209
**Email:** greenbaumyvonne@yahoo.com
**Phone:** 2103255781

---

# General Comment

This is a backdoor attempt by the NRA to make gun movement easier and less transparent. This should not be
allowed to happen. This is another wrong policy change by a totally corrupt administration.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:06 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-qpmp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1396
Public Comment 1394. Individual. Alyce Dodge. 7-5-18

---

## Submitter Information

**Name:** Alyce Dodge

---

## General Comment

I oppose switching the regulation of firearms exports from the U. S. Department of State to the U. S. Department of Commerce.

There are many good reasons why firearms exports are classified as military and are closely regulated under the Department of State, with Congress given notifications of sizable weapons sales to foreign countries and the ability to block these sales for national security.

The Department of State provides needed gun export oversight, which the Department of Commerce does not have the resources to do. Enforcing the current regulations prevents firearms traffickers, terrorist groups, organized crime, and oppressive regimes from obtaining large caches of American guns and ammunition.

However, if gun export licensing is moved to the Department of Commerce, Congress would not be informed automatically of notable arms sales, and safeguards would be removed so that dangerous agents could more easily obtain semiautomatic assault weapons and other powerful firearms, and this opens the floodgates for destabilizing violence around the world.

The handling of export licenses of assault weapons is properly under the Department of State, which is focused on safeguarding our nation. The Department of Commerce, with its focus on promoting American business, is not the suitable agency for regulating arms exports.

I read somewhere Those who live by the sword, die by the sword. Exporting weapons around the world is not an ordinary business like exporting food or solar technology. For the sake of children everywhere, lets do all we can to prevent violence and the suffering it causes.

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:05 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943u-ue91
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1395
Public Comment 1395. Individual. Christine Zimmerman. 7-5-18

## Submitter Information

**Name:** Christine zimmerman

## General Comment

I am very concerned about this Proposed rule change. This has the potential to have serious impact our national security. Business should not be the priority over the safety of Americans.

WASHSTATEB006672

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:04 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943v-9my0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1394
Public Comment 1396. Individual. K. Young. 7-5-18

---

## Submitter Information

**Name:** K. Young

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Firearms are not traditional commercial goods and shouldn't be treated as such.
There is no good reason to make it easier for manufacturers to export firearms to other countries, to remove
licensing requirements for brokers or to remove the block on the 3D printing of firearms. This is a dangerous rule
change and it should be rejected.

WASHSTATEB006673

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:03 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943v-iwr9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1393
Public Comment 1397. Individual. Bill Chockla. 7-5-18

---

## Submitter Information

**Name:** Bill Chockla

---

## General Comment

Hello,
I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department! It is bad enough this country leads the way in allowing "poison for profit" in so many of our consumer goods. All in the name of capitalism, greed, ignorance, arrogance. Now we want to add firearms world wide?! This is pure insanity! Just look at how sick the domestic terrorist murders are in the states today. This will open the door for ALL countries to "enjoy" the murders while the "good, rich, white, conservative christians" roll in more profits! Pro-life? I think not! Pro CULT is all they really are! Studying the ORIGINS of their cult PROVES they are the ones we need to STOP! NOW! So, PLEASE! Do NOT allow these regulation changes!!
Regards,
Bill

# PUBLIC SUBMISSION

**As of:** 7/17/18 9:02 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943v-p7ny
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1392
Public Comment 1398. Individual. Loren Kollmar. 7-5-18

---

## Submitter Information

**Name:** Loren Kollmar
**Address:**
  1801 Taylor St NE
  Minneapolis,  MN,  55418
**Email:** verucht@yahoo.com
**Phone:** 5074090067
**Fax:** 55418

---

## General Comment

I am in opposition to this proposed change. I am not anti gun, but I don't think flooding the world with more guns is responsible or sensible. There are enough loop holes currently existing to negate this change.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 9:00 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943v-byed | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1391
Public Comment 1399. Individual. Rahel Ruiz. 7-5-18

---

## Submitter Information

**Name:** Rahel Ruiz

---

## General Comment

I am writing to oppose the move of weapons sales and licensing from the State Department to the Department of
Commerce.
Here are several reasons:
1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

In addition, the Commerce department does not have the resources to effectively enforce export controls.
This transfer is bad for the U.S. and is bad for the world.

Thank you,

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:59 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943v-6gsb
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1390
Public Comment 1400. Individual. Suzanne Lander. 7-5-18

---

## Submitter Information

**Name:** Suzanne Lander
**Address:**
   445 Surrey Run
   Casselberry,  FL,  32707
**Email:** selander1@earthlink.net

---

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. This transfer of authority would open new floodgates for arms sales
internationally, with serious implications for our national security. Don't we have enough people dying from
these killing machines???

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:58 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-861g
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1389
Public Comment 1401. Individual. John Douglas. 7-5-18

## Submitter Information

**Name:** John Douglas

## General Comment

I strongly oppose this proposed Bureau of industry and Security rule change.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:57 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-aub6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1388
Public Comment 1402. Individual. Carolyn Scoppettone. 7-5-18

---

# Submitter Information

**Name:** Carolyn Scoppettone
**Address:**
    11 Foster Street
    Montpelier,  05602
**Email:** ccoryvt@yahoo.com
**Phone:** 8022291350
**Fax:** 05602

---

# General Comment

I strongly oppose this change. Clearly recent events have demonstrated that we need stricter control of firearms.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 8:56 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943w-7hxq | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1387
Public Comment 1403. Individual. Rina Schneur. 7-5-18

---

## Submitter Information

**Name:** Rina Schneur

---

## General Comment

I am writing in strong opposition to moving export license oversight for firearms from the Department of State to
the Department of Commerce. The proposed rule change treats semiautomatic assault rifles as non-military.
Firearms are used to kill thousands of people every day around the world in acts of organized crime, street crime,
political violence, terrorism, and myriad human rights violations. They should be subject to more controls, not
fewer.
Injecting military used firearms into our everyday life puts all of us, and especially our youth and children into
greater unneccesary danger.
Rina Schneur

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:55 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-4d5q
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1386
Public Comment 1404. Individual. Genne and Rita Collins. 7-5-18

---

# Submitter Information

**Name:** Genne and Rita Collins

---

# General Comment

I strongly OPPOSE changing regulation of firearms exports from the State Department to the Department of
Commerce. This change would make our country and the world more dangerous in many ways:

It could result in more weapons on the street - certainly we have enough illicit use guns. I believe it would result
in increased weapons at home and abroad and restrict The State Department's oversight of many current
activities.more weapons domestically and internationally.

It would remove licensing requirements for brokers.

It stops the program that inspects pre-license guns and issues reports.

We do not see the need switch control of firearms exports unless it is to pay for firearms lobbyists. Please do not
approve this move

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:55 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-npk0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1385
Public Comment 1405. Individual. Elisabeth King. 7-5-18

## Submitter Information

**Name:** Elisabeth King
**Address:**
  23 Greymre Rd
  Brighton,  MA,  02135
**Email:** bking32@aol.com
**Phone:** 617-787-0165

## General Comment

To Secretary of Commerce Mr. Wilbur Ross:

I am registering my dismay at any efforts to increase export of munitions, especially to Mexico, Central America and to any nation that is at all politically unstable. Mexico is the country that I know most about because I volunteer with Greater Boston Trade Justice, a group of citizens in eastern MA working to improve NAFTA. However the dynamics in all these countries are similar.

Access to weapons is critical to the survival of drug cartels, so they love America's current lax gun laws. 70% of guns recovered in crimes in Mexico can be traced to the USA. High caliber rifles are preferred. (Ingraham,Christopher. Why Mexico's Drug Cartels Love America's Gun Laws. Washington Post. Jan. 14th 2016)

At present guns and cash are transported illegally overland along the same routes that drugs are transported north. How much easier would it be if the money obtained from drug sales were to be spent on guns legally imported into their own country? Given the cartels' level of infiltration into local and even federal government, laws regulating legal sales are very weak. (McKibbon,Cameron. Council on Hemispheric Affairs research associate, NAFTA and Drug Trafficking: Perpetuating Violence and the Illicit Supply Chain. COHA publication. March 20, 2015)

Violence related to drug trafficking is currently a huge cause of fear for life in Mexico and Central America.

WASHSTATEB006682

Thus the problem of aliens illegally crossing the border into USA is exacerbated.

Given these facts,how does increasing firearms exports even make sense if you at the same time want to decrease illegal immigration?

In addition, how is this deregulation different than the Fast and Furious program, in which Border Patrol Agent Brian Terry was killed in December 2010? That program was rightly criticized, especially by politicians on the right side of the aisle. But that program at least tried to actually fight criminal activity. Deregulating gun exports would only increase it.

Please reconsider this deregulation.
Sincerely,
Elisabeth King
23 Greymere Rd. Brighton, MA 02135

Sent from AOL Desktop
Liz King 617-787-0165, 857-225-0396 Bking32@aol.com

Greater Boston Trade Justice FB: Greater Boston Trade Justice

Ezekiel cried out to the King of Tyre, in the abundance of your trade you were filled with violence and you sinned (28:16)

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:53 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-t2ac
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1384
Public Comment 1406. Individual. Jane Knight. 7-5-18

---

## Submitter Information

**Name:** Jane Knight
**Address:**
   1770 North St.
   East Montpelier,  VT,  05602
**Email:** jane@bearpondbooks.com
**Fax:** 05602

---

## General Comment

This is an NRA-backed action that would overload the Commerce Dept, and potentially have far-ranging destabilizing effects around the world, since large weapons sales to countries that commit human rights violations would no longer be watched by Congress. This is a very dangerous potential rule change. Do NOT give in to our traitorous and homegrown terrorist organization-- the NRA!!!

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:53 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-33jp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1383
Public Comment 1407. Anonymous. 7-5-18

---

## Submitter Information

**Name:** anonymous Anonymous

---

## General Comment

I oppose the rule change that would switch the regulations of firearms export from the US State Department to
the US Commerce Department.

Now, firearms exports are classified as "military." That is why they are under the regulation of the State
Department and why Congress can block sales of large batches of semiautomatic assault weapons and other
powerful firearms to foreign countries.

If you change the rule and allow Commerce to handle this--Congress will no longer be automatically informed
about sizable weapons sales, the kind that should be stopped for reasons of national security. The Commerce
Dept. does not have the resources to adequately enforce export controls. Your Bureau of Industry and Security
does not have the necessary staff in place to provide oversight.

This will mean that firearms traffickers, organized crime and terrorist organizations, as well as many other
violent and dangerous groups will face far fewer hurdles to their obtaining of large caches of American gun and
ammunition. Transferring of export licenses of weapons to the Dept of Commerce will open the floodgates for
arms sales internationally, and this will have serious implications for our national security.


I don't think the Department of Commerce should be in charge of the export licenses for guns, for reasons of
American safety and security.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:51 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-jyzj
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1382
Public Comment 1408. Individual. Jay Unger. 7-5-18

## Submitter Information

**Name:** Jay Unger

## General Comment

Automatic and Semi-Automatic Weapons whether currently available in the U.S. from commercial dealers are
primarily weapons of war designed to kill people with maximum efficiency. Reclassifying these exports as non-
military and subjecting them to less scrutiny when sold outside the U.S. is dangerous both to human life and the
U.S. foreign policy interests. Imagine the outrage that will be levied at the U.S. by allies and/or others if such
weapons become as easily and inexpensively available abroad as they are presently in the U.S. where they have
been shown to encourage gun violence and even mass murder in schools, shopping centers, concert venues, etc.
Continuing to apply more scrutiny and higher export registration fees will discourage U.S. manufacturers of such
weapons from offering them commercially abroad.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:50 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-nc0t
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1381
Public Comment 1409. Individual. Katherine Cote. 7-5-18

---

## Submitter Information

**Name:** Katherine Cote

---

## General Comment

Firearms exports must continue to be classified as military so that they are under the regulation of the State
Department, and so that Congress can block sales of large batches of firearms to foreign countries. If firearms are
not classified as "military", Congress would no longer be automatically informed about sizable weapons sales
and could not stop them in the name of national security, even to countries where there are serious human rights
concerns, such as the Philippines and Turkey.

The Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of
Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large
caches of American guns and ammunition.

This would be dangerous to the US and to the world.

WASHSTATEB006687

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:49 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-4vvo
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1380
Public Comment 1410. Individual. Mark Anderson. 7-5-18

---

## Submitter Information

**Name:** Mark Anderson

---

## General Comment

Dear Sir or Madam:

I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

As you likely know, this rule change would, among other things:

(a) eliminate the State Department's Blue Lantern program, in place since 1940, which carries out hundreds of
pre-license and post-shipment inspections and publicly reports on them.

(b) remove licensing requirements for brokers, increasing the risk of trafficking.

(c) remove the State Department's block on the 3D printing of firearms. When Defense Distributed founder Cody
Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him
with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D
printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D
printing of firearms in the U.S. and around the globe.

Please do not move forward with this rule change.

Sincerely,

Mark and Candace Anderson

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:48 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-f3qd
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1379
Public Comment 1411. Individual. Mary Canales. 7-5-18

---

## Submitter Information

**Name:** Mary Canales

---

## General Comment

I oppose the proposed rule change that would move the handling of export licenses of semiautomatic assault
weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the
U.S. Commerce Department (focused on promoting American business). This transfer of authority would open
new floodgates for arms sales internationally, with serious implications for our national security. Currently,
firearms exports are classified as military. This is why they are under the regulation of the State Department, and
why Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress
would no longer be automatically informed about sizable weapons sales that it could stop in the name of national
security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.
Meanwhile, the Commerce Department does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.
The rule change would make the world a far more dangerous place:
It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds
of pre-license and post-shipment inspections and publicly reports on them.
It would remove licensing requirements for brokers, increasing the risk of trafficking.
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder
Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged
him with violating arms export laws, since his open-source posting made it possible for anyone with access to a
3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling
3D printing of firearms in the U.S. and around the globe.
Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime,
political violence, terrorism, and human rights violations. They should be subject to more controls, not less! As a
public health nurse and a citizen concerned about human rights and global health, I strongly oppose the proposed
rule change.

WASHSTATEB006690

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:47 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-tlfl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1378
Public Comment 1412. Individual. Jen Manders. 7-5-18

---

## Submitter Information

**Name:** Jen Manders
**Address:**
    1990 Ellis
    Dubuque,  52001
**Email:** jlmanders@aol.com
**Phone:** 5635565713

---

## General Comment

Please keep ITAR governance under the US State department.

# PUBLIC SUBMISSION

<div style="border:1px solid black;">

**As of:** 7/17/18 8:46 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-tzcr
**Comments Due:** July 09, 2018
**Submission Type:** Web

</div>

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1377
Public Comment 1413. Individual. Karen Anonymous. 7-5-18

## Submitter Information

**Name:** Karen Anonymous

## General Comment

I object to control over firearm sales being, essentially, relegated to the industry. We need more oversight and stricter controls, not less control and weakened oversight. Please do not let the profit motives overcome common sense, and vote down this proposed rule.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:45 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-dsf2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1376
Public Comment 1414. Individual. Rev. Phoenix Hawelu-Hills. 7-5-18

---

## Submitter Information

**Name:** Rev. Phoenix Hawelu-Hills

---

## General Comment

Why would we change how guns are handled by our government? We need to keep the U.S. State Department in charge of
the selling and exporting of dangerous things like guns and weapons because it is the job of the U.S. State Department to
safeguard our country! Changing the department that safeguards our country to the U.S. Commerce Department would be
outrageous and unsafe!

Firearms are dangerous!! They are used to kill people every day around the world in acts of organized crime, political
violence, terrorism, and human rights violations. They are used to kill U. S. citizens daily. We need MORE controls on how
these weapons are acquired!

They should be subject to far more controls, not less!

The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department
would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized
crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes
mass migration.

Do not change how guns and weapons are classified! They are classified as "military" because that is how we

keep our
country safe! This is why they are under the regulation of the State Department!!

Please keep us safe. Don't let big business control how many of our enemies have weapons because they don't care about
our lives!!

WASHSTATEB006694

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:44 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-mtwo
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1375
Public Comment 1415. Individual. Rita Kain. 7-5-18

---

## Submitter Information

**Name:** Rita Kain
**Address:**
    219 Bates Street
    Earlville,  IL,  60518-8133
**Email:** tasc88@sbcglobal.net
**Phone:** 815-246-9370
**Fax:** none

---

## General Comment

I don't feel your department has the qualifications nor the ability to make sure these weapons don't end up in terrorists, or enemy government hands. Yours is an agency tasked with improving commerce between countries. NOT securing the people of the United Staes!

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:43 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943x-hgzc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1374
Public Comment 1416. Individual. Vicki Shelton. 7-5-18

## Submitter Information

**Name:** Vicki Shelton

## General Comment

Guns must be limited. The Department of State will do a better job than the department of Commerce.

WASHSTATEB006696

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:42 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-mwk0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1373
Public Comment 1417. Individual. Rebecca B. Wilk. 7-5-18

---

## Submitter Information

**Name:** Rebecca B. Wilk
**Address:**
  P.O. Box 1395
  Woodstock, NY, 12498
**Email:** rbw4peaceandfreedom@gmail.com
**Phone:** (845) 679-4712

---

## General Comment

Please do NOT promote gun manufacturers' profits at the expense of people's lives.

WASHSTATEB006697

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 8:40 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943y-wzc9 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1372
Public Comment 1418. Individual. Kerry Wiessmann. 7-5-18

## Submitter Information

**Name:** Kerry Wiessmann
**Address:**
    162 Limerock Terrace
    State College,  PA,  16801
**Email:** kgw11@scasd.org
**Phone:** 814-238-1764

## General Comment

I oppose the proposed rule for the following reasons:

The proposed rule treats semi-automatic assault rifles as non-military. But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns, as it recently did on the Philippines and Turkey.[2] Congressional action in 2002 required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to Congress. Items moved to Commerce control would no longer be subject to such notification. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government i.e., taxpayers will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State

Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking. That will make it easier for unscrupulous dealers to escape attention.[3]

The rule reduces end-use controls for gun exports. It would eliminate the State Departments Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Governments information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s.

The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

The Commerce Department does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce.[4]

The proposed change will reduce transparency and reporting on gun exports. The rule would eliminate Congressional and public awareness of the total amount (dollar value and items) of firearms sales authorizations and deliveries around the world, since the Commerce Department annual reports currently only cover about 20 countries.

This rule would transfer gun export licensing to an agency the Commerce Department whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.
Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries.[5] The export of these weapons should be subject to more controls, not less.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:39 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-7jgr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1371
Public Comment 1419. Individual. Michael Monroe. 7-5-18

---

## Submitter Information

**Name:** Michael Monroe
**Address:**
   15 Weybridge Rd.
   Brookline,  02445
**Email:** mmonroe@bidmc.harvard.edu
**Phone:** 6177844836

---

## General Comment

The State Department must continue to regulate the export of firearms. The role of the State Department is to interact with other countries in a way that protect American interests and the interests of other nations. As possible agents of death, firearms can compromise both American and foreign security. The State Department has a compelling interest in preventing, or at the very least overseeing, the sale of firearms. Please do not turn over this authority to the Department of Commerce, whose focus is business, not security or diplomacy. Furthermore, the Department of Commerce does not have the resources to police the sale of firearms adequately.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 8:38 AM | |
| **Received:** July 05, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-943y-4cai | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1370
Public Comment 1420. Individual. Darien Gardner. 7-5-18

---

## Submitter Information

**Name:** Darien Gardner
**Address:**
    51 Pilgrim Dr.
    Northampton,  MA,  01060
**Email:** darien@crocker.com
**Phone:** (413) 586-7697

---

## General Comment

To the U.S. Commerce Department,

I am writing to express my opposition to any rule change that would switch the regulations of firearms export
from the U.S. State Department to the U.S. Commerce Department.

I believe such a rule change would be extremely unwise because the State Department has the facilities needed to
prevent guns from falling into falling into the hands of organized criminals, political extremists, terrorists and
human rights violators around the world. The Commerce Department is much less well equiped to do this.

Sincerely,
Darien Gardner

Darien Gardner
51 Pilgrim Dr.
Northampton, MA 01060

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:37 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-9eir
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1369
Public Comment 1421. Individual. A. Pierce. 7-5-18

---

## Submitter Information

**Name:** A. Pierce

---

## General Comment

oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. This change in the administration of gun sales will create a fundamentally more violent and unsafe world both inside and outside of the U.S.
This change would:
1.eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them
2.remove licensing requirements for brokers, increasing the risk of trafficking
3.remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe

For these reasons I strongly oppose this regulatory change in arms sales.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:36 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-l1x0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1368
Public Comment 1422. Individual. Mark Schumerth. 7-5-18

## Submitter Information

**Name:** Mark Schumerth

## General Comment

I oppose transferring arms regulation to the Dept. of Commerce. This would open the door to even more arms trafficking than we already have. I find it stupefying that POTUS Trump, who spends most of his time complaining about arms trafficking across the border, would support such a move. It must be stopped!

WASHSTATEB006703

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:34 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-45md
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1367
Public Comment 1423. Individual. Jodi-Beth McCain. 7-5-18

## Submitter Information

**Name:** Jodi-beth McCain

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Please do not make any changes.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:33 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943y-26ej
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1366
Public Comment 1424. Individual. Matthias Hess. 7-5-18

---

## Submitter Information

**Name:** Matthias Hess
**Address:** United States,

---

## General Comment

I strongly oppose any rule changes to give authority over arms exports to the U.S. Commerce Department. I
worry that the Commerce Department would push weapons sales abroad, driving deadly conflicts even more than
they already do. The State Department's mission is to protect our country, and they authority over firearms
exports in order to do so effectively.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:32 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943z-tdaz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1365
Public Comment 1425. Anonymous. 7-5-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

The NRA and gun manufacturers should not push guns in the United States or anywhere else in the world. I am a US citizen and voter and I oppose a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business). This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. I object to this rule change and transfer of authority. Please do not implement it. Thank you

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:31 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943z-g5d4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1364
Public Comment 1426. Individual. John Sanders. 7-5-18

---

## Submitter Information

**Name:** john sanders

---

## General Comment

I am in opposition to any change in the sales and deportation of firearms listed as category I,II, or III, Doing so
may, no, will endanger the security of the nation. Running arms to terrorist and drug gangs is limited now but
would only escalate arming these thugs under Commerce Dept rules. Again I am in opposition to this change

WASHSTATEB006707

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:30 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943z-4qbu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1363
Public Comment 1427. Individual. Edna Montague. 7-5-18

---

## Submitter Information

**Name:** Edna Montague
**Address:**
  P.O. Box 6534
  OCEAN VIEW,  96737
**Email:** ednamontague@gmail.com
**Phone:** 8089297208
**Fax:** 96737

---

## General Comment

The sale of fire arms and weapons should stay under the State Department to ensure that weapons do not get into the hands of terrorist or enemies of this counrty. The State Department has been doing a good job of monitoring the sales so they can be stopped before it is to late. The Commerce Department does not have the personnel or experience to monitor the sales of weapons. This change will seriously jeopardize our national security . I ask that there be no rule change regarding the sales of weapons.

WASHSTATEB006708

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:29 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943z-ed2g
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1362
Public Comment 1428. Anonymous. 7-5-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Don't allow semi-automatic weapons to be exported. It could put them into the hands of our enemies or people with mental health problems, putting many innocent people in danger.

WASHSTATEB006709

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:28 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9440-1p5h
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1361
Public Comment 1429. Individual. Susan Herting. 7-5-18

## Submitter Information

**Name:** Susan Herting

## General Comment

I do oppose the new rule change that would switch the regulations of firearms export sales from the U.S. State Department to the U.S. Commerce Department. That only provide less hurdles for firearms traffickers, organized crime and other violent agents. Thank you

WASHSTATEB006710

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:27 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9440-p8ci
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1360
Public Comment 1430. Individual. Bruce Beese. 7-5-18

---

## Submitter Information

**Name:** Bruce Beese
**Address:**
  1172 Portland Ave
  St. Paul,  MN,  55104
**Email:** bandmbeese@msn.com
**Phone:** 651-659-0379

---

## General Comment

I am against the movement of oversight of firearms exports from the State Department to the Commerce Department.
Please do not make this change. Firearms regulations are just fine under State.
Thank you,
Bruce Beese

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:26 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9440-ii6c
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1359
Public Comment 1431. Individual. Marjory Keenan. 7-5-18

## Submitter Information

**Name:** Marjory Keenan
**Address:**
    1816 Vine Street
    Berkeley,  CA,  94703
**Email:** marjkeenan44@gmail.com
**Phone:** 5105252649
**Fax:** 94703

## General Comment

I oppose the proposed rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business). This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. Insure our safety by not changing this rule.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:20 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9440-42ht
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1358
Public Comment 1432. Individual. Joy Hamby. 7-5-18

## Submitter Information

**Name:** Joy Hamby

## General Comment

I believe the regulation of firearms should remain under the US Dept of State because the Congress needs to have veto power.
Checks and balances are always necessary to protect our government and country and taxpayer's money.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:22 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9442-3spb
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1357
Public Comment 1433. Individual. David Lemon. 7-5-18

---

## Submitter Information

**Name:** David Lemon
**Address:**
    2744 Eleki Pl
    Lihue,  HI,  96766-9605
**Email:** typenerd@mindspring.com
**Phone:** 4086743341

---

## General Comment

Moving regulation of firearms export from the Department of State to the Department of Commerce seems like a misguided idea, and is likely to decrease our country's security. Without treating firearms as a military export, the risks of accidentally enabling terrorists and arms traffickers are simply too high.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/17/18 8:23 AM |
| **Received:** July 05, 2018 |
| **Status:** Posted |
| **Posted:** July 17, 2018 |
| **Tracking No.** 1k2-9442-aoym |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1356
Public Comment 1434. Individual. Anna Gladstone. 7-5-18

---

## Submitter Information

**Name:** Anna Gladstone
**Address:**
    542 W Grand Blvd
    Detroit,  MI,  48216
**Email:** acedeuceanna@gmail.com

---

## General Comment

The proposed rule to loosen regulations on firearm exportation is terrifying. Why would we want to arm the rest of the world? So that they can attack? So that they can build militias and guerilla warfare? So that these guns can end up in the hands of terrorist groups? Stop arming terrorists! Dont implement this change, it is too dangerous for our country and the world.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:23 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9442-8bh0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1355
Public Comment 1435. Individual. Chad Reddick. 7-5-18

## Submitter Information

**Name:** Chad Reddick
**Address:**
    50 Cherry Lane
    Durham,  CT,  06422
**Email:** reddick.chad@gmail.com
**Phone:** 8603491768

## General Comment

I am deeply concerned with the proposed plan to switch regulation of firearms exports from the State Department to the Commerce Department. Anything that can make it easier to sell more guns overseas compromises United States security. Please take whatever steps are necessary to tightly regulate overseas firearms sales in order to keep people in America, and around the world, safer.

WASHSTATEB006716

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:16 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9443-df96
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1354
Public Comment 1436. Individual. B Dudney MD. 7-5-18

---

## Submitter Information

**Name:** B Dudney, MD
**Address:**
   Forestville,  CA,  95436-9604
**Email:** kosmicdollop@saber.net
**Phone:** +11234567890

---

## General Comment

Opposed to shifting regulation of firearms export to U.S. Commerce Department.

Would stop Congress being automatically informed of weapons sales it could stop in the name of national
security, especially to countries with serious human rights abuses, such as the Philippines and Turkey.

Commerce Department lacks resources to enforce export controls: Bureau of Industry and Security does not have
staff everywhere. Hence, firearms traffickers, organized crime, terrorist organizations, and other violent and
dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

It would eliminate:
..the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and
post-shipment inspections and publicly reports on them.
..licensing requirements for brokers, increasing the risk of trafficking.
..State Departments block on 3D printing of firearms.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:15 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9443-24dt
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1353
Public Comment 1437. Individual. Warren Wilkins. 7-5-18

---

## Submitter Information

**Name:** Warren Wilkins
**Address:**
   Seattle,  WA,  98118
**Email:** concerned-voter@wwxyz.com
**Phone:** 2067257100
**Organization:** Warren Wilkins Designer

---

## General Comment

Gun money is blood money. I oppose this rule change that would switch the regulations of firearms export from
the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:14 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9443-szd5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1352
Public Comment 1438. Individual. Ivan Rhudick. 7-6-18

---

## Submitter Information

**Name:** Ivan Rhudick
**Address:**
   251 5th Avenue
   San Francisco,  94118
**Email:** ivan.rhudick@gmail.com
**Phone:** 510-414-4500

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Congress should continue to monitor the sales of large amounts of weapons to other nations in the interest of national security.

# PUBLIC SUBMISSION

**As of:** 7/16/18 11:01 PM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9443-3xau
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1351
Public Comment 1439. Individual. Linda Massey. 7-6-18

---

# Submitter Information

**Name:** Linda Massey

---

# General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. This is a dangerous and irresponsible action that must be stopped. The NRA
and gun manufacturers want guns everywhere, for everyone, not just here in the United States, but around the
world. They have been pushing hard for a rule change that would move the handling of export licenses of
semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S.
Commerce Department. This transfer of authority would open new floodgates for arms sales internationally with
serious implications for our national security.

Firearms exports are classified as military under the regulation of the State Department, and why Congress can
block sales of large batches of firearms to foreign countries. With having firearms sales regulated by the U.S.
Commerce Department, Congress would no longer be automatically informed about sizable weapons sales that it
could stop in the name of national security, even to countries where there are serious human rights concerns.

The reality is - this is not only dangerous for other countries, but our country as well. This is truly an insane
proposition that would turn ugly and deadly fast. The NRA has already proven that they don't care about
anyone's life and that they will go to great lengths to get what they want. This must be stopped because they don't
care how many people will die in other countries or this one as long as they make their billions. They just don't
care.

# PUBLIC SUBMISSION

**As of:** 7/16/18 11:00 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9444-yk0p
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1350
Public Comment 1440. Individual. Rosalind Bresnahan. 7-6-18

---

## Submitter Information

**Name:** Rosalind Bresnahan
**Address:**
   500 Edgerton Dr.
   San Bernardino,  CA,  92405
**Email:** rosalind568@gmail.com

---

## General Comment

I strongly oppose the rule change that would transfer the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

Arms are not just another US export to promote and arms sales should be subject to review for non-commercial implications such as use in human rights violations. These are foreign policy issues and should be treated accordingly.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:59 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9444-9o2u
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1349
Public Comment 1441. Individual. Derek Benedict. 7-6-18

---

## Submitter Information

**Name:** Derek Benedict

---

## General Comment

I strongly oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. We truly do NOT need to export more weapons of death around this planet.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:58 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9445-dtcl
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1348
Public Comment 1442. Individual. Robert Sanford. 7-6-18

---

## Submitter Information

**Name:** Robert Sanford
**Address:**
   Camas,  WA,  98607
**Email:** rhsanford@gmail.com
**Phone:** 2537223694
**Organization:** Northwest Freethought Alliance

---

## General Comment

I'm a retired police officer and academy instructor.

I could hardly oppose this end-run around decency more strongly.

There are more guns in the US than almost anywhere.

Why do the gun manufacturers want to spread the cancer of gun violence around the world?

Could it be for money?

Unconscionable.

But not no surprise.


Robert Sanford
Camas, WA

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:56 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9445-aslp
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1347
Public Comment 1443. Anonymous, 7-6-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

For Gods sake, do NOT allow the switching of the regulation of firearms exports from the State Department to the Commerce Department!

Without question, it would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel the violence that destabilizes countries and causes mass migration.

Although Putin would like the way it would further undermine the reputation of standing for world peace that the USA has nurtured since its foundation, even he wouldnt approve of this if it meant his citizens could buy the guns.

Please, please do not let the NRA get away with this dangerous, greedy, thoughtless move. Keep gun control and the control of export licenses of semiautomatic assault weapons and other powerful firearms within the State Department!!

Our national security and, to a large extent, that of the world, depends upon it!

I would ordinarily leave my contact info but I'm afraid of NRA repercussions.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:53 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9445-t3ll
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1346
Public Comment 1444. Individual. Charlene Kahn. 7-6-18

---

## Submitter Information

**Name:** Charlene Kahn
**Address:**
  2308 48TH AVE SW
  SEATTLE,  98116
**Email:** charlenefk@gmail.com
**Phone:** 2062958396

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

The U.S. State Department is focused on safeguarding our nation. The U.S. Commerce Department is focused on
promoting American business. This transfer of authority would open new floodgates for arms sales
internationally, with serious implications for our national security.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:52 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-9447-qd5p
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1345
Public Comment 1445. Individual. Violet Young. 7-6-18

---

## Submitter Information

**Name:** Violet Young

---

## General Comment

I think this is a terrible idea and should not be allowed to go forward.

WASHSTATEB006726

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:51 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944a-9yfn
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1344
Public Comment 1446. Individual. Sheila Stone. 7-6-18

---

## Submitter Information

**Name:** Sheila Stone

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

Firearms are dangerous and there needs to be more control, not less, to prevent acts of organized crime, political violence, terrorism, and human rights violations around the world.

I strongly oppose this rule that would make the world a more dangerous place.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** | 7/16/18 10:50 PM |
| **Received:** | July 06, 2018 |
| **Status:** | Posted |
| **Posted:** | July 16, 2018 |
| **Tracking No.** | 1k2-944c-24by |
| **Comments Due:** | July 09, 2018 |
| **Submission Type:** | Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1343
Public Comment 1447. Individual. Em W. 7-6-18

---

## Submitter Information

**Name:** Em W

---

## General Comment

The NRA and gun manufacturers want guns everywhere, for everyone, not just here in the United States, but around the world. They are pushing hard for a rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department. This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security.

Therefore, I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:49 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944c-dum9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1342
Public Comment 1448. Individual. L.J. Coburn. 7-6-18

## Submitter Information

**Name:** L.J. Coburn

## General Comment

I oppose the proposed move of firearm exports from the State Department. For our and everyone's safety, we must not help arm the world further. Bad actors are a fact of life and they will ensure greater numbers of efficient killing devices will go to those intent on killing Americans, as well as their fellow citizens and others, thus supporting actions against our personal and national interest.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/16/18 10:48 PM | |
| **Received:** July 06, 2018 | |
| **Status:** Posted | |
| **Posted:** July 16, 2018 | |
| **Tracking No.** 1k2-944c-9qss | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1341
Public Comment 1449. Individual. Mary Jo DuRivage. 7-6-18

## Submitter Information

**Name:** Mary Jo DuRivage
**Address:**
  21540 Morley Ave.
  Dearborn,  MI,  48124

## General Comment

I oppose the proposed rule to transfer oversight on small arms (firearms) exports from the State Dept. to the Commerce Dept. Commerce means business. These weapons should continue to be regulated by the State Dept. We are not talking about normal household goods. I also oppose the elimination of Congressional oversight of commercial weapons sales of 1 million dollars or more.

WASHSTATEB006730

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:47 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944d-bu41
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1340
Public Comment 1450. Individual. Mary H. 7-6-18

---

## Submitter Information

**Name:** Mary H

---

## General Comment

If we're serious about terrorism, we need to keep the regulation of firearms export licenses in the State
Department. I have the unique vantage point of being a New Yorker who lived through 9-11 and as someone
whose hometown has had two school shootings, so I take this issue seriously and I'm concerned that the
Department of Commerce will have more lax enforcement than the State Department.

Thanks!
Mary

WASHSTATEB006731

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/16/18 10:45 PM |
| **Received:** July 06, 2018 |
| **Status:** Posted |
| **Posted:** July 16, 2018 |
| **Tracking No.** 1k2-944d-x896 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1339
Public Comment 1451. Anonymous. 7-6-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I usually try to avoid using comments that are written for masses because I worry they won't be taken seriously. I am disappointed that just about anybody in the United States can legally buy a gun that can kill multiple civilians or LEO in a matter of minutes. The idea that a rule is being considered to spread this irresponsible behavior to other countries over which we have no control and no ability to change laws is appalling. I am attaching a letter that I think should be taken very seriously because I agree with it and want to keep the world safer even as our own country goes up in flames: I am submitting this comment in strong opposition to the proposed rule to transfer oversight of small arms (firearms) exports from the State Department to the Commerce Department. This rule would make U.S. exports of small arms far more dangerous by transferring controls to an agency that prioritizes doing business over safeguarding national security. The rules elimination of congressional oversight of commercial weapons sales of $1 million or more is also reckless. This rule has one purpose only: to garner profits for a U.S. gun industry that is faring poorly in the domestic market. It comes after years of lobbying by the NRA and National Shooting Sports Foundation. No one else asked for it or wanted it. The NSSF, the trade group for the gun industry, has already boasted the rule would lead to a 20% increase in American gun exports. We see the gun lobbys influence in the rules description of semiautomatic assault rifles like the AR-15 as civilian products. These weapons were not designed for household use, they were designed to kill en masse on the battlefield. That is why they are the weapons of choice for mass shooters. If you go forward with this disastrous policy, I will do everything in my powerpeacefully and democraticallyto hold your leadership accountable for the resulting global bloodshed. That will include advocating against your budget priorities across-the-board until a new, non-corrupt administration can come in and clean house.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:44 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944e-6ior
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1338
Public Comment 1452. Individual. Susan Lasswell. 7-6-18

## Submitter Information

**Name:** Susan Lasswell

## General Comment

This move raises the threat of gun violence and danger in the US and across the world.
Without State Department oversight and regulatory authority, firearms will be exported to anyone with money and fuel increased organized crime and terrorism. The children and innocents of the world will suffer while gun lobbyists, manufacturers and the NRA will profit. I strongly oppose this unnecessary change and ask you to not approve it. Thank you.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:42 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944e-fzz5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1337
Public Comment 1453. Individual. Concerned Citizen. 7-6-18

---

## Submitter Information

**Name:** Concerned Citizen

---

## General Comment

I am strongly opposed to the proposed rule to transfer oversight of small arms (firearms) exports from the State
Department to the Commerce Department. This rule would make U.S. exports of small arms far more dangerous
by transferring controls to an agency that prioritizes doing business over safeguarding national security and
eliminate congressional oversight of commercial weapons sales of $1 million or more. This rule has one purpose
only: to garner profits for a U.S. gun industry at the expense of safety for communities abroad and, potentially,
our own armed service members. It comes after years of lobbying by the NRA and National Shooting Sports
Foundation. No one else asked for it or wanted it. One can see the gun lobbys influence in the rules description
of semiautomatic assault rifles like the AR-15 as civilian products. These weapons were not designed for civilian
use; they were designed to kill on the battlefield. Please do not move forward with this disastrous policy that
eliminates reasonable oversight that balances commerce with international diplomacy and national security.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:41 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944e-5trx
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1336
Public Comment 1454. Individual. Julia Cechvala. 7-6-18

## Submitter Information

**Name:** Julia Cechvala

## General Comment

As a mother and citizen I am alarmed at the amount of gun violence in this nation and at the complete failure of the government to prevent it. It's past time to stand up to the NRA and protect our children. I oppose the rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

WASHSTATEB006735

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:39 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944e-ow5a
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1335
Public Comment 1455. Individual. Aaron Karp. 7-6-18

---

## Submitter Information

**Name:** Aaron Karp
**Address:**
    BAL 7006
    Old Dominion University
    Norfolk,  VA,  23529
**Email:** akarp@odu.edu
**Phone:** 17576835700

---

## General Comment

The proposed ITAR revision for firearms and ammunition promises little, and risks much. As an analyst of the global arms trade and weapons proliferation for thirty years, I recognize the transformative power of regulatory reform. But this is something else. The proposed revisions promise short-term benefits, which seem unlikely to amount to much in an already competitive global market. That makes this deregulation for the sake of deregulation itself. Meanwhile, the change unleashes forces certain to accelerate long turn American industrial decline and loss of influence over global consequences.

First, they show that the United States no longer will set global normative standards for all form of arms transfers and non-proliferation. Previously the United States Government has shown it will not further tighten restrictions. As the first outright relaxation of oversight standards in arms exports in over fifty years, the change marks a switch in policy dating from the Kennedy Administration.

Second, as the dominant player in global small arms trade, the United States has the most to lose from further loosening. As other countries emulate Americas relaxation of restrictions, not only will there be more firearms reaching more hotspots, but we can be certain the United States will see its share of a more competitive market decline. Other manufacturing countries, with lower wages and more aggressive export subsidies, are more likely to reap the seeds sown here.

Third, the change marks a fundamental shift in the nature of arms export oversight. By reducing the role of the

US Government, it leaves regulation exclusively to the recipient government. This shifts the burden of proof in international human rights and state oppression, from outside powers with no direct interest in the outcome, to the recipient governments, governments that are often guilty of using imported weapons in appalling or frightful ways, ways that would be completely illegal in the United States.

WASHSTATEB006737

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/16/18 10:38 PM |
| **Received:** July 06, 2018 |
| **Status:** Posted |
| **Posted:** July 16, 2018 |
| **Tracking No.** 1k2-944e-p2i3 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1334
Public Comment 1456. Individual. Stair Calhoun. 7-6-18

---

## Submitter Information

**Name:** Stair Calhoun

---

## General Comment

I strongly oppose a rule change switching the regulation of firearms exports from the U.S. Department of State to
the U.S. Department of Commerce. This would adversely affect our national security and would destabilize
countries around the globe

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:37 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944f-o156
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1333
Public Comment 1457. Individual. Patricia Sammann. 7-6-18

---

## Submitter Information

**Name:** Patricia Sammann
**Address:**
    404 E. George Huff Drive
    Urbana,  IL,  61801
**Email:** new2pat_s@comcast.net
**Phone:** 2173442114

---

## General Comment

I oppose changing the regulation of firearms export from the U.S. State Department to the U.S. Commerce
Department. This would remove these exports from the oversight of Congress and would threaten our national
security. It would facilitate exports to oppressive regimes, remove safeguards that prevent organized crime and
terrorists from obtaining weapons, and fuel destabilizing violence around the world. Do NOT make this
unnecessary change, which will put America at grave risk.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:35 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944f-2p3o
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1332
Public Comment 1458. Individual. Rosemary Gordon. 7-6-18

## Submitter Information

**Name:** Rosemary Gordon

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. It would promote the sale of more guns in the world, thereby making the world less safe for all.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:34 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944f-z955
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1331
Public Comment 1459. Individual. Sue Mancino. 7-6-18

## Submitter Information

**Name:** Sue Mancino
**Address:**
    OH,

## General Comment

As a former Vietnam Era military spouse I oppose anything which endangers our troops.
Therefore I oppose switching the regulation of firearms export from the U.S. State Department to the Commerce Department.

WASHSTATEB006741

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:33 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-y1ij
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1330
Public Comment 1460. Anonymous. 7-6-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

We need more gun regulation not less, I oppose this rule change.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:32 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-ri2z
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1329
Public Comment 1461. Individual. Don Hayler. 7-6-18

---

## Submitter Information

**Name:** Don Hayler

---

## General Comment

I oppose shifting the responsibility for gun exports from the State Department to the Commerce Department. As we've seen in recent years, armed groups around the world can cause global instability that can affect American safety. The State Department is in the best position to ensure that firearm exports do not exacerbate military situations or humanitarian crises. Thank you.

WASHSTATEB006743

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:31 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-bjq6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1328
Public Comment 1462. Individual. T. Katz. 7-6-18

## Submitter Information

**Name:** T. Katz
**Address:**
    274 Pine St.
    Deerfield,  IL,  60015
**Email:** katz.t@nb27.org
**Phone:** 8472361006

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. The sale of more guns is not the answer, not the solution.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:29 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-j6q7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1327
Public Comment 1463. Individual. Harvey Liszt. 7-6-18

---

## Submitter Information

**Name:** Harvey Liszt
**Address:**
  1922 Greenbrier Drive
  CHARLOTTESVILLE,  VA,  22901-2915
**Email:** hliszt@nrao.edu
**Phone:** 4342276356
**Organization:** National Radio Astronomy Observatory

---

## General Comment

I oppose the proposed rule that allows the freer export of dangerous arms.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:28 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-jjio
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1326
Public Comment 1464. Individual. Mary O Neill. 7-6-18

---

## Submitter Information

**Name:** Mary O'Neill
**Address:**
    6400 Gilmet Drive
    Presque Isle,  MI,  49777
**Email:** moneill16@excite.com
**Phone:** 9895952448

---

## General Comment

We do noty need more guns out there...there are already too many as shown by the number of people killed daily!

WASHSTATEB006746

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:26 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944g-r09r
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1325
Public Comment 1465. Individual. Suzanne Abrams. 7-6-18

## Submitter Information

**Name:** Suzanne Abrams
**Address:**
    5688 N. 6th St.
    Fresno,  CA,  93710
**Email:** sabrams7337@gmail.com
**Phone:** (559) 435-0612

## General Comment

PLEASE of not allow guns to proliferate! PLEASE do not allow guns to proliferate!

WASHSTATEB006747

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:24 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-7pyd
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1324
Public Comment 1466. Anonymous. 7-6-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The proposed rule is, put bluntly, a disastrous mistake that would cause the Bureau to exceed its statutory
authority and intrude on matters beyond the purview of the Department.

The international export of arms and ammunition is a matter of foreign policy and international relations. U.S.
sales of weapons and other ordnance abroad directly impact our relationships with other nations and our own
national security. The question of whether such exports would arm our enemies and/or antagonize our allies is
not a commercial one, nor is it one that should be left to the discretion of arms manufacturers and their lobbyists.
It is therefore well beyond the realm of the Department of Commerce and belongs where it presently lies, with
the Department of State.

Arms manufacturers would be the sole beneficiaries of the proposed rule, which would present significant risks
to U.S. national interests and the public welfare. The proposed rule should therefore be abandoned.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:22 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-fc4c
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1323
Public Comment 1467. Individual. Lynn Winston 7-6-18

---

## Submitter Information

**Name:** Lynn Winston

---

## General Comment

I strongly oppose the proposed rule and urge you to abandon the proposal that will make it easier to export semi-automatic weapons and ammunition, eliminate Congressional oversight of these sales, weaken end-use controls, and enable production of 3D weapons anywhere

WASHSTATEB006749

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:21 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-iuiy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1322
Public Comment 1468. Individual. Todd Thurwachter. 7-6-18

## Submitter Information

**Name:** Todd Thurwachter
**Address:**
    2437 Villanova Drive
    Vienna,  VA,  22180
**Email:** toddthurwachter@hotmail.com

## General Comment

As a 25-year veteran of the U.S. Commercial Service, charged with promoting the export of U.S. products &
services, I strongly PROTEST against this change in the approval of the export of U.S. munitions.
from
It is absolutely critical the the U.S. Department of State retain this authority, in order to balance the financial gain
from export sales against our other important foreign policy concerns, such as a country's treatment of its own
citizens, its commitment to human rights, rule of law, and basic, fundamental democratic principles.

Any short-term gain in export sales is not worth the wholesale abrogation of the very principles which America -
- the shining city on the hill and the world's beacon of democracy -- represents to the world and for which
Americans have died.

Todd Thurwachter
Foreign Commercial Service Officer, U.S. Foreign & Commercial Service, Department of Commerce (1984-
2008)

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:20 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-jonh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1321
Public Comment 1469. Anonymous. 7-6-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I oppose any rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Please find something else to do with your busy day.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:19 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-fkv5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1320
Public Comment 1470. Individual. Martha Sammartano. 7-6-18

## Submitter Information

**Name:** Martha Sammartano
**Address:**
   CO,  803014123
**Email:** sammartanomr@gmail.com
**Phone:** 3035169833

## General Comment

I am writing in opposition to the rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. Currently, firearms exports are classified as military. For this reason, they are under the regulation of the State Department, and Congress can block sales of large batches of firearms to foreign countries. With the rule change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of national security, even to countries where there are serious human rights concerns.

The Commerce Department does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

This rule change would have the following negative consequences:

1. It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of

pre-license and post-shipment inspections and publicly reports on them.
2. It would remove licensing requirements for brokers, increasing the risk of trafficking.
3. It would remove the State Departments block on the 3D printing of firearms.

Firearms are used to kill people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:17 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-uhbe
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1319
Public Comment 1471. Anonymous. 7-6-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I OPPOSE any legislation that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business). This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security. In addition, the Commerce Department just does not have the resources to adequately enforce export controls. Its Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition. DO NOT ALLOW THIS TO HAPPEN.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:15 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-6ra0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1318
Public Comment 1472. Anonymous. 7-6-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

SDEMI-AUTOMATIC RIFLES ARE MILITARY AND SHOULD NEVER BE EXPORTED NO MATTER
WHAT THE NRA SAYS

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/16/18 10:14 PM | |
| **Received:** July 06, 2018 | |
| **Status:** Posted | |
| **Posted:** July 16, 2018 | |
| **Tracking No.** 1k2-944h-4cec | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1317
Public Comment 1473. Individual. Malcolm Kenton. 7-6-18

---

## Submitter Information

**Name:** Malcolm Kenton

---

## General Comment

I write to express strong opposition to a proposed rule change that would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from the U.S. State Department to the U.S. Commerce Department. This rule change would endanger our national security and set a dangerous precedent.

This transfer of authority would open new floodgates for arms sales internationally, with serious implications for our national security.It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.

It would also remove licensing requirements for brokers, increasing the risk of trafficking. It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

I look forward to seeing this proposed change scrapped.

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:13 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944h-5d68
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1316
Public Comment 1474. Individual. Cynthia Tuthill. 7-6-18

---

## Submitter Information

**Name:** Cynthia Tuthill

---

## General Comment

I am submitting this comment in strong opposition to the proposed rule to transfer oversight of small arms
(firearms) exports from the State Department to the Commerce Department. This rule would make U.S. exports
of small arms far more dangerous by transferring controls to an agency that prioritizes doing business over
safeguarding national security. The rules elimination of congressional oversight of commercial weapons sales of
$1 million has one purpose only: to garner profits for a U.S. gun industry that is faring poorly in the domestic
market. The NSSF, the trade group for the gun industry, has already boasted the rule would lead to a 20%
increase in American gun exports. We see the gun lobbys influence in the rules description of semiautomatic
assault rifles like the AR-15 as civilian products. These weapons were not designed for household use, they were
designed to kill en masse on the battlefield. That is why they are the weapons of choice for mass shooters.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/16/18 10:12 PM |
| **Received:** July 06, 2018 |
| **Status:** Posted |
| **Posted:** July 16, 2018 |
| **Tracking No.** 1k2-944h-x4km |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1315
Public Comment 1475. Individual. Nancy Bekavac. 7-6-18

---

## Submitter Information

**Name:** Nancy Bekavac
**Address:**
    2737 Devonshire Pl. NW
    Apt. 218
    Washington,  DC,  20008
**Email:** nancy.bekavac@gmail.com
**Phone:** 202 450 1547

---

## General Comment

I am writing to OPPOSE the transfer of authority over arms exports to the Department of Commerce from the State Department. As a resident of the District of Columbia, I have no voting representative in the Congress, so I am making my voice heard directly, here and now.

Firearms are the instrumentalities of war: war is evil, and the best way to avoid it is to undertake to understand and combat the sources of war. Treating the export of firearms as a mere form of commerce is shortsighted, stupid and vile. The bottom line is that switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

I have seen war in Vietnam as a journalist; I have tired to combat its aftereffects in the Balkans. Particularly in the latter, control of arms would have limited, to some extent, the predations on the civilian populations. I am utterly opposed to this change: keep firearms export controls in the hands of diplomats, not salesmen.

WASHSTATEB006758

# PUBLIC SUBMISSION

**As of:** 7/16/18 10:10 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-axjh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1314
Public Comment 1476. Individual. Bonnie Jaskolka. 7-6-18

---

## Submitter Information

**Name:** Bonnie Jaskolka

---

## General Comment

Assault weapons and other powerful war toys have no place in public hands.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:51 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-o02y
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1270
Public Comment 1477. Individual. Ann Anonymous. 7-6-18

## Submitter Information

**Name:** Ann Anonymous

## General Comment

The NRA is proving that it is an International Terrorist Organization. Do not leave it up to other Nations to curb these munition sales.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/16/18 3:50 PM |
| **Received:** July 06, 2018 |
| **Status:** Posted |
| **Posted:** July 16, 2018 |
| **Tracking No.** 1k2-944i-w7jt |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1269
Public Comment 1478. Individual. Brittany Olsen. 7-6-18

## Submitter Information

**Name:** Brittany Olsen

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Maintaining national security and individual safety not just here but in all
countries of the world is more important than making money off of violence.

WASHSTATEB006761

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:49 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-672p
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1268
Public Comment 1479. Individual. Michelle Geiger. 7-6-18

## Submitter Information

**Name:** Michelle Geiger
**Address:**
    7245 N Bergen Rd
    Bergen,  NY,  14416
**Email:** geiger3778@gmail.com
**Phone:** 5857973795

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. We do not need easier access to firearms.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:48 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-h0q8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1267
Public Comment 1480. Individual. Kathleen Sewright. 7-6-18

## Submitter Information

**Name:** Kathleen Sewright

## General Comment

More guns in this country will NOT make us safer.

WASHSTATEB006763

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:43 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-5yax
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1266
Public Comment 1481. Individual. George Bond. 7-6-18

---

## Submitter Information

**Name:** George Bond
**Address:**
    2417 Milan St
    New Orleans,  LA,  70115
**Email:** gdbondii@cox.net
**Phone:** 5047025961

---

## General Comment

We have far too many guns in this country. We dont need more.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:44 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-zt42
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1265
Public Comment 1482. Anonymous. 7-6-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Dangerous weapons absolutely need to be regulated.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:30 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-tce8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1235
Public Comment 1483. Individual. Barb Evans. 7-6-18

---

## Submitter Information

**Name:** Barb Evans

---

## General Comment

I am demanding that you do NOT change current rules for regulation of firearm exports from US State
Department to Commerce Department.

There are too many damn guns and military weapons in the world already - even the police are out-gunned!

Regulation of firearm exports needs to stay in the State Department - it should NOT be handled by the
Commerce Department!

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:15 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-sn98
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1234
Public Comment 1484. Individual. Gunnar Madsen. 7-6-18

---

## Submitter Information

**Name:** Gunnar Madsen

---

## General Comment

Firearms are military, and their export and oversight should be governed by the State Department, which has the knowledge and expertise to know when and where exports are acceptable.

WASHSTATEB006767

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:14 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-yhso
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1232
Public Comment 1485. Individual. Elizabeth ODear. 7-6-18

---

## Submitter Information

**Name:** Elizabeth ODear
**Address:** United States,
**Email:** ekodear@gmail.com

---

## General Comment

The U.S. Commerce Department is focused on promoting American business not safeguarding our nation. This
handling of export licenses belongs with the U.S. State Department to ensure that people who are not friendly to
our country are not given Licenses.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:12 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-znll
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1228
Public Comment 1486. Individual. Jill Acree. 7-6-18

## Submitter Information

**Name:** Jill Acree

## General Comment

I am writing to oppose changing international gun sales to the Commerce Department. Keep international guns sales regulations with the State Department.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:10 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-bthh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1226
Public Comment 1487. Individual. Mary Cato. 7-6-18

## Submitter Information

**Name:** Mary Cato
**Address:**
  Arlington,  TX,  76012
**Email:** mary.e.cato@gmail.com
**Phone:** 8172990194

## General Comment

I oppose the proposed rule. Control of firearms, buns, ammunition and related articles definitely warrant control under the USML, to provide some protection to the public.

WASHSTATEB006770

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:09 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-teqt
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1223
Public Comment 1488. Individual. David Joyner. 7-6-18

## Submitter Information

**Name:** David Joyner

## General Comment

The NRA is one of the most powerful and destructive entities in the US, and look at what it has done to this country. Please do not allow the NRA to expand its influence and destructiveness to the global scene by allowing their shift to the Dept. of Commerce.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:08 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-s568
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1221
Public Comment 1489. Individual. Pamela Joyner. 7-6-18

---

## Submitter Information

**Name:** PAMELA JOYNER

---

## General Comment

THE UNREGULATED FLOW OF ARMS, AS PROPOSED BY THE NRA (YES, IT IS!), IS INSANE...KINDLY DO YOUR JOB AND LET THE ARMS BE REGULATED BY THE STATE DEPT, NOT COMMERCE.

WASHSTATEB006772

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:05 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944i-qiy7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1217
Public Comment 1490. Individual. William O Brien. 7-6-18

---

## Submitter Information

**Name:** William O'Brien

---

## General Comment

I oppose this rule change that would switch the regulation of overseas firearm sales from the US State Dept to the US Commerce Dept.

WASHSTATEB006773

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:04 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-rylz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1215
Public Comment 1491. Individual. Judi Poulson. 7-6-18

---

## Submitter Information

**Name:** Judi Poulson
**Address:**
   1881 Knollwood Drive
   Fairmont,  56031
**Email:** judpeace@gmail.com
**Phone:** 5072355288

---

## General Comment

Stop the floodgates for new gun sales. Thanks

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:03 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-ypvr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1213
Public Comment 1492. Individual. Dorothy Glew. 7-6-18

---

## Submitter Information

**Name:** Dorothy Glew

---

## General Comment

We badly need tighter gun control laws. How many more people need to be shot to death before we do something???????
I ache for the relatives of people (many of them children) who have lost their lives because of the accessibility of guns.

WASHSTATEB006775

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/16/18 3:02 PM |
| **Received:** July 06, 2018 |
| **Status:** Posted |
| **Posted:** July 16, 2018 |
| **Tracking No.** 1k2-944j-ty2b |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1211
Public Comment 1493. Individual. Reese Forbes.7-6-18

---

## Submitter Information

**Name:** Reese Forbes
**Address:**
    4225 West Pine Blvd #14
    Saint Louis,  63108-2869
**Email:** wiselion@att.net

---

## General Comment

I am an Army Veterans and I definately know we strict controll of guns and all other types of firearms.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:01 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-tl1k
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1210
Public Comment 1494. Individual. Gail Craig. 7-6-18

---

## Submitter Information

**Name:** Gail Craig

---

## General Comment

I vehemently oppose this rule change to switch the regulation of firearms export from the U.S. State Department to the U.S. Commerce Department.

# PUBLIC SUBMISSION

**As of:** 7/16/18 3:00 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-y381
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1209
Public Comment 1495. Individual. Nina Riddel. 7-6-18

---

## Submitter Information

**Name:** Nina Riddel

---

## General Comment

Stop making it easier for domestic abusers and mentally ill people to harm & kill!

WASHSTATEB006778

# PUBLIC SUBMISSION

**As of:** 7/16/18 2:59 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-vqdz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1208
Public Comment 1496. Individual. Barbara Francisco. 7-6-18

---

## Submitter Information

**Name:** Barbara Francisco

---

## General Comment

I am writing to oppose this rule change. I oppose switching the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.
I am concerned that the Commerce Department does not have the resources to adequately enforce export controls.

WASHSTATEB006779

# PUBLIC SUBMISSION

**As of:** 7/16/18 2:57 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-x166
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1207
Public Comment 1497. Anonymous. 7-6-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

The easy availability and rampant proliferation of guns, guns, guns in our society are insane and need to be stopped with sensible regulation, not with the rollback of regulations.

# PUBLIC SUBMISSION

**As of:** 7/16/18 2:56 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-hd3d
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1206
Public Comment 1498. Individual. Paul Petruccelli. 7-6-18

## Submitter Information

**Name:** Paul Petruccelli
**Address:**
   Coram,  NY,  11727
**Email:** ppetrucc@optonline.net
**Phone:** 5555555555
**Organization:** Cablevision

## General Comment

Have you actually READ the Second Amendment?

Having trouble decoding a clear COMPOUND SENTENCE?

Have you read up on the historical realities that prevailed when it was written?

Why not just transfer enforcement authority to the NRA and GET IT OVER WITH?

# PUBLIC SUBMISSION

**As of:** 7/16/18 2:55 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944j-jxv5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1205
Public Comment 1499. Individual. Frank Evelhoch II. 7-6-18

---

## Submitter Information

**Name:** Frank Evelhoch, II

---

## General Comment

First let me say that this is a totally crazy idea that's proposed. I personally like the fact that with the State
Department in control of the the semi-automatic assault and other powerful weapons export licenses that
Congress is always notified of sales of large numbers of these types of weapons to foreign countries and can
override the sale if needed.

Here are 3 ways that I see this rule change as being harmful to the welfare of all US citizens:
1) It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-
license and post-shipment inspections and publicly reports on them.
2) It would remove licensing requirements for brokers, increasing the risk of trafficking.
3) It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

On top of all this the Commerce Department is prepared in any way to handle this licensing process the way the
State Department does. The US should not be looking to see how it can sell the most military type weapons
possible.

# PUBLIC SUBMISSION

**As of:** 7/16/18 2:53 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 16, 2018
**Tracking No.** 1k2-944k-w158
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1204
Public Comment 1500. Individual. Mary Cato. 7-6-18

---

## Submitter Information

**Name:** Mary Cato
**Address:**
    Arlington,  TX,  76012
**Email:** mary.e.cato@gmail.com
**Phone:** 8172990194

---

## General Comment

I oppose the proposed rule for the State Department to relinquish control of firearms, guns, ammunition & related articles to the Department of Commerce. On May 24, the Trump administration proposed to make it easier to export U.S. guns and ammunition globally, even though U.S.- exported firearms are already used in many crimes, attacks and human rights violations in many other nations. Action under the rule if it is enacted will endanger lives merely to enrich munitions dealers. The Trump administration proposal applies to assault weapons and other powerful firearms, moving export licenses from the State Department to the Commerce Department. The U.S. gun lobby has advocated for these policies. The Department of Commerce estimates that the transfer of authority will increase the number of export applicants by 10,000 annually, but the Commerce Department does not have the resources to enforce export controls, even now.

The proposed rule change:

1. Treats semi-automatic assault rifles as non-military, despite their use by U.S. troops, their use by state and non-state groups in armed conflicts, and their prohibition for civilian possession in many countries.
2. Eliminates Congressional oversight for important gun export deals.
3. Transfers the cost of processing licenses from gun manufacturers to taxpayers.
4. Removes statutory license requirements for brokers, increasing risk of trafficking.
5. Reduces or eliminates end-use controls, such as State Depts Blue Lantern program, and by eliminating registration of firearms exporters, a requirement since the 1940s.
6. Enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.

7.Reduces transparency and reporting on gun exports.
8.Transfers gun export licensing from an agency with mission to promote stability, conflict reduction, and human rights, to an agency with mission to promote trade.

WASHSTATEB006784

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:02 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-veve
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1708
Public Comment 1501. Individual. Hattie Gerrish. 7-6-18

## Submitter Information

**Name:** Hattie Gerrish

## General Comment

I am opposed to these anti-security rule changes.

WASHSTATEB006785

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:05 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-6o7k
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1709
Public Comment 1502. Individual. Phoebe Farag. 7-4-18

---

## Submitter Information

**Name:** Phoebe Farag

---

## General Comment

I am against switching the regulation of firearms exports from the State Department to the Commerce
Department. A switch like this would facilitate firearms exports to oppressive regimes, remove safeguards that
help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further
fuel violence that destabilizes countries and causes mass migration.

The export of firearms should be done by experts in diplomacy, not experts in business. The United States is
already a huge exporter of arms to the world, and changing this rule would make the world even MORE
dangerous than it is:

1- It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them.

2- It would remove licensing requirements for brokers, increasing the risk of trafficking.

3- It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed
founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully
charged him with violating arms export laws, since his open-source posting made it possible for anyone with
access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block,
effectively enabling 3D printing of firearms in the U.S. and around the globe.

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9437-trwa
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1710
Public Comment 1503. Individual. Richard Crooker. 7-4-18

---

# Submitter Information

**Name:** Richard Crooker
**Address:**
    7928 Woodsbluff Run
    Fogelsville,  PA,  18051
**Email:** rcrooker@ptd.net

---

# General Comment

The sale of weapons to other countries (or entities therein) should be in a manner which respects said country's laws. It should
be done in a manner which supports, not aggravates, our foreign policy, and therefore oversight belongs with the State Dept.
To shift this responsibility to the Commerce Dept. is to put business first; it makes the U.S. no better than gun runners.

The last thing we need is to export our problems (e.g., assault weapons for individuals, large magazines) to other countries, and
make it harder to work diplomatically with them.

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:06 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-hwy1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1711
Public Comment 1504. Individual. Andrew Kistler. 7-4-18

---

## Submitter Information

**Name:** Andrew Kistler

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. This idea is dangerous and irresponsible.

WASHSTATEB006788

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:07 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-jl4m
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1712
Public Comment 1505. Individual. Daniel Giesy. 7-4-18

---

## Submitter Information

**Name:** Daniel Giesy
**Address:**
    4706 Chestnut Fork Road
    Gloucester,  VA,  23061
**Email:** dpgiesy@netscape.net
**Phone:** 8048242829

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime,
political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

In particular, the interests of the citizens of the United States are better served by the status quo than by the
proposed change.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 6:08 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9436-e1jq | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1713
Public Comment 1506. Individual. Valerie Klauscher. 7-4-18

---

## Submitter Information

**Name:** Valerie Klauscher
**Address:**
    623 Prospect Street
    Crescent Township,  PA,  15046
**Email:** klauschers@verizon.net
**Phone:** 7244577412

---

## General Comment

I am adamantly opposed to allowing export licenses of semiautomatic assault weapons and other powerful
firearms to be overseen by the U.S. Commerce Department rather than the U.S. State Department. This transfer
of authority would open new floodgates for arms sales internationally, with serious implications for our national
security.

I also demand that you vet all comments that are posted on both the DOS and BIS sites for bot traffic. I am an
actual citizen of the Commonwealth of Pennsylvania, USA.

# PUBLIC SUBMISSION

**As of:** 7/17/18 6:09 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-n2gh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1714
Public Comment 1507. Individual. Ann Gillespie. 7-4-18

---

# Submitter Information

**Name:** Ann Gillespie
**Address:**
    239 Virginia Ave
    Audubon,  08106
**Email:** jakgillespie@gmail.com
**Phone:** 8569793016
**Fax:** 08106

---

# General Comment

This is a dangerous game you are playing if this goes through. This is just a ploy to increase arms profits for gun manufacturers at the expense of common sense. This rule change will decrease oversight and control. Please reconsider.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:32 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-knn1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1715
Public Comment 1508. Individual. Patricia Keefe. 7-4-18

---

## Submitter Information

**Name:** Patricia Keefe
**Address:**
    1001 14th St. NW
    Rochester,  55901
**Email:** patricia.keefe@rochesterfranciscan.org
**Phone:** 5072827441
**Fax:** 55901

---

## General Comment

Violence (from weapons) begets violence. The U.S. sells huge amounts of weaponry to areas where death and destruction follow. There are oganizations (Nonviolent Peaceforce) prepared to solve conflicts without weapons. Nonviolent solutions would work but the sale of weapons prevents solutions in increase death and destruction and long term conflict.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:34 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-wlrf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1716
Public Comment 1509. Individual. Jason Magidson. 7-4-18

## Submitter Information

**Name:** Jason Magidson

## General Comment

I oppose the proposed gun exports rule change for the following reasons:

It treats semi-automatic assault rifles as non-military, despite their use by U.S. troops, their use by state and non-state groups in armed conflicts, and their prohibition for civilian possession in many countries.

It eliminates Congressional oversight for important gun export deals.

It transfers the cost of processing licenses from gun manufacturers to taxpayers.

It removes statutory license requirements for brokers, increasing risk of trafficking.

It reduces or eliminates end-use controls, such as State Depts Blue Lantern program, and by eliminating registration of firearms exporters, a requirement since the 1940s.

It enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.

The Commerce Department does not have the resources to enforce export controls, even now.

It reduces transparency and reporting on gun exports.

It transfers gun export licensing from agency with mission to promote stability, conflict reduction, and human rights, to an agency with mission to promote trade.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political

violence, terrorism, and human rights violations. They should be subject to more controls, not less.

WASHSTATEB006794

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:35 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-st6w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1717
Public Comment 1510. Individual. Anne Dugaw. 7-4-18

---

## Submitter Information

**Name:** Anne Dugaw

---

## General Comment

I am strongly opposed to switching the regulation of firearms exports from the State Department to the Commerce Department. This would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration. It is shameful that this switch is even being considered.

WASHSTATEB006795

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:36 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-b3qq
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1718
Public Comment 1511. Individual. Bonnie Gorman. 7-4-18

---

# Submitter Information

**Name:** Bonnie Gorman
**Address:**
   222 Rock Island Rd
   Quincy,  MA,  02169
**Email:** bonniegorman1@yahoo.com
**Phone:** 6144724498
**Fax:** 02169

---

# General Comment

gun manufacturers are pushing hard for a rule change that would move the handling of export licenses of
semiautomatic assault weapons and other powerful firearms from the U.S. State Department (focused on
safeguarding our nation) to the U.S. Commerce Department (focused on promoting American business). This
transfer of authority would open new floodgates for arms sales internationally, with serious implications for our
national security.

Please OPPOSE this transfer on grounds of national security.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:37 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-fzdr
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1719
Public Comment 1512. Individual. Katie Barnett. 7-4-18

---

## Submitter Information

**Name:** Katie Barnett

---

## General Comment

I oppose the proposed rule: Control of Firearms, Guns, and Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).

Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.[1]

Here are more details on how the rule change would make the world a far more dangerous place:

It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.[2]

It would remove licensing requirements for brokers, increasing the risk of trafficking.[3]

It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.[4]

[1] American Guns Drive the Migrant Crisis That Trump Wants to Fix With a Wall, The Trace, May 25, 2017.

[2] The Trump administration proposes making gun exports easier. Heres how to submit your public comment on this dangerous proposal, Violence Policy Center.

WASHSTATEB006797

[3] Ibid., Violence Policy Center.

[4] "U.S. requires group to remove 3-D gun instructions from its website," CNN.com, May 13, 2013.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:39 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-oqrf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1720
Public Comment 1513. Individual. Suzanne Byron. 7-4-18

---

## Submitter Information

**Name:** Suzanne Byron

---

## General Comment

Right now, firearms exports are classified as military. This is why they are under the regulation of the State
Department, and why Congress can block sales of large batches of firearms to foreign countries. With the rule
change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in
the name of national security, even to countries where there are serious human rights concerns, such as the
Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its
Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized
crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining
large caches of American guns and ammunition.

Firearms are dangerous. They are used to kill people every day around the world in acts of organized crime,
political violence, terrorism, and human rights violations. They should be subject to more controls, not less!

Thank you for taking action to help make our country and our world a safer place.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:41 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-m2zz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1721
Public Comment 1514. Individual. Marilyn Britton. 7-4-18

---

## Submitter Information

**Name:** Marilyn Britton
**Address:**
    16 Long Hill Estates
    Peterborough,  NH,  03458
**Email:** mbrittons@comcast.net
**Phone:** 6039246898

---

## General Comment

I VERY STRONGLY oppose this rule change that would switch the regulations of firearms export from the U.S. State
Department to the U.S. Commerce Department. As firearms exports are classified as "military" and therefore are under the
regulation of the State Department, Congress can block sales of large batches of firearms to foreign countries.With the rule
change, Congress would no longer be automatically informed about sizable weapons sales that it could stop in the name of
national security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey. And if
weapons were shipped to these countries, they could be sold to our enemies.

It is my understanding that the Commerce Department does not have the resources to adequately enforce export controls and
the Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of
American guns and ammunition.

In the name of safety for EVERYONE, this rule change is a very dangerous one and should NOT happen.

WASHSTATEB006801

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:42 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-ump5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1722
Public Comment 1515. Individual. Mary T. 7-4-18

## Submitter Information

**Name:** Mary T

## General Comment

I strongly oppose switching the regulation of firearms exports from the State Department to the Commerce
Department. The Commerce Department is not equipped to do this work, is already understaffed as it is, and is
carrying too much of a burden already with the mission-related work it has to do. This would a very irresponsible
move that would haunt the U.S. down the road.

Removing this responsibility from the State Department would facilitate firearms exports to oppressive regimes,
remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from
obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

Beware of the snake that will end up biting its own tail and eating itself alive.

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:44 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-bf3t
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1723
Public Comment 1516. Individual. Amy Jones. 7-4-18

---

## Submitter Information

**Name:** Amy Jones

---

## General Comment

Please don't change firearms export regulations. America is already unsafe for the average citizen due to lax firearms regulations. Don't export the dangers of firearms to other countries.Switching the regulation of firearms exports from the State Department to the Commerce Department would facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes countries and causes mass migration.

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 7/17/18 10:45 PM | |
| **Received:** July 04, 2018 | |
| **Status:** Posted | |
| **Posted:** July 17, 2018 | |
| **Tracking No.** 1k2-9436-myc5 | |
| **Comments Due:** July 09, 2018 | |
| **Submission Type:** Web | |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1724
Public Comment 1517. Individual. Amy Assael. 7-4-18

## Submitter Information

**Name:** AMY ASSAEL

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Why are we making it easier to spread gun violence??

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:47 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-8xrv
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1725
Public Comment 1518. Anonymous. 7-4-18

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S.
Commerce Department. This transfer of authority would open new floodgates for arms sales internationally, with serious
implications for our national security. Congress would no longer be automatically informed about sizable weapons
sales that it could stop in the name of national security, even to countries where there are serious human rights concerns,
such as the Philippines and Turkey.

Meanwhile, the Commerce Department just does not have the resources to adequately enforce export controls. Its

Bureau of Industry and Security does not have staff everywhere. This means that firearms traffickers, organized crime,
terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of
American guns and ammunition. It would eliminate the State Departments Blue Lantern program, in place since 1940,
which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It would remove
licensing requirements for brokers, increasing the risk of trafficking.It would remove the State Departments block on the
3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print
weapons, the State Department successfully charged him with violating arms export laws, since his open-source

posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch
would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.
Thanking you for taking the appropriate action against this switch to make our country and our world a safer place.

WASHSTATEB006806

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:48 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-38kb
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1726
Public Comment 1519. Individual. Linda Szurley. 7-4-18

---

## Submitter Information

**Name:** Linda Szurley

---

## General Comment

Please keep classifying these gun sales as "military" or the NRA will send them all over the world, probably even

to use them against ourselves. it is bad enough that guns can be bought by anyone here, what will happen when
they are sold to anyone, anywhere, with no checks at all!!!

WASHSTATEB006807

# PUBLIC SUBMISSION

**As of:** 7/17/18 10:51 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-9436-pxll
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1727
Public Comment 1520. Momsrising.org. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** Mom'srising.org

## General Comment

"I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.
Safeguarding our nation to putting it up for sale is UnAmerican. This new ruling transfers the authority from the
US State Department whose focus is safeguarding our nation to the US Commerce Department whose focus is
promoting business. Of course, the NRA and gun manufacturers want this as it will open new floodgates for arms
sales internationally with serious implications for our national security. Thus democracy is sabotaged for both
our country and we the people--all for the sake of fulfilling corporate and individualistic self interests.
The following are details on how the rule change would make the world a far more dangerous place:
It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds
of pre-license and post-shipment inspections and publicly reports on them.[5]
It would remove licensing requirements for brokers, increasing the risk of trafficking.[6]
It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder
Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged
him with violating arms export laws, since his open-source posting made it possible for anyone with access to a
3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling
3D printing of firearms in the U.S. and around the globe.[7]
Kindly refrain from supporting this ruling as it will not serve the common good nor the values and culture that
formed the United States of America.

Respectfully yours,

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:53 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-un9m
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1738
Public Comment 1531. Individual. Kristina Cliff-Evans. 7-4-18

## Submitter Information

**Name:** Kristina Cliff-Evans

## General Comment

Do not agree to this horrendous plan by the NRA to increase the revenues of the gun manufacturers.

WASHSTATEB006809

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:55 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-x658
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1739
Public Comment 1532. Individual. Pamela couch. 7-4-18

---

## Submitter Information

**Name:** Pamela couch
**Address:** United States,

---

## General Comment

Come on. What are we going to do about all the gun violence.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:56 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-897q
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1740
Public Comment 1533. Individual. CAROL MARSH. 7-4-18

## Submitter Information

**Name:** CAROL MARSH

## General Comment

The proposed rule change that would move the handling of export licenses of semiautomatic assault weapons and
other powerful firearms from the U.S. State Department to the U.S. Commerce Department is a horrific idea.
Assault weapons have no purpose except to kill human beings, and if the United States starts selling guns around
the world to anyone who has the money, the only possible effect would be a massive increase in violent death
everywhere.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:56 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-t30y
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1741
Public Comment 1534. Individual. Philip Freidenreich. 7-4-18

---

## Submitter Information

**Name:** Philip Freidenreich

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. Firearms exports should continue to be classified as military so that Congress
can block sales of large batches of firearms to foreign countries, if it sees fit. With the rule change, Congress
would no longer be automatically informed about sizable weapons sales that it could stop in the name of national
security, even to countries where there are serious human rights concerns, such as the Philippines and Turkey.
This means that firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous
agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:57 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-pisd
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1742
Public Comment 1535. Individual. Marilyn Guterman. 7-4-18

---

## Submitter Information

**Name:** Marilyn Guterman
**Address:**
    Bowie, MD, 20715-1426
**Email:** mgute@hotmail.com
**Phone:** 3012625408

---

## General Comment

The idea of moving the regulation of firearms from the state department to the commerce department is truly a
bad idea. To cite just a few reasons it will make it easier for dictators, organized crime, and terrorists to obtain
guns in large quantities. It would remove the state department block on the 3D printing of firearms which will
only make matters worse. It will allow for the destabilization of countries with resulting unrest and deaths.
Please, in the name of peace and sanity do not allow this to happen.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:58 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-g7g3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1743
Public Comment 1536. Individual. Teresa Allen. 7-4-18

---

## Submitter Information

**Name:** Teresa Allen
**Address:**
  6184 North Fork Rd.
  Deming, WA, 98244
**Email:** allenterri@comcast.net
**Phone:** 3605924208

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department. The regulation of firearms should not be about maximizing profit but about the
protection of U.S. citizens.

WASHSTATEB006814

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:58 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-7vxv
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1744
Public Comment 1537. Individual. D Jessop. 7-4-18

---

## Submitter Information

**Name:** D Jessop
**Address:**
    Santa Fe, NM, 87502
**Email:** darshanmay14@yahoo.com
**Phone:** 5057535013

---

## General Comment

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department. The purchase of guns should be a much more rigorous process with regular (i.e. yearly) mental evaluation and many other requirements. It's ridiculous that any person - sane or otherwise - can purchase a gun in our country.

# PUBLIC SUBMISSION

**As of:** 7/18/18 9:59 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-z4jz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1745
Public Comment 1538. Individual. Mark Williams. 7-4-18

## Submitter Information

**Name:** Mark Williams
**Address:**
  2275 NE 9th Ave
  Wilton Manors, FL, 33305
**Email:** markdavidw@gmail.com

## General Comment

I oppose the rule change that would switch the regulations of firearms export -- including semiautomatic assault
weapons and other powerful firearms -- from the U.S. State Department to the U.S. Commerce Department. This
transfer of authority would open the floodgates for arms sales internationally, which will seriously undermine our
national security when they flow back through our borders illegally and without background checks. The
interests of the members of the gun lobby should never be more important than the safety of the American
homeland.

# PUBLIC SUBMISSION

**As of:** 7/18/18 10:00 AM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 18, 2018
**Tracking No.** 1k2-9435-p8b8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1746
Public Comment 1539. Individual. Juliette Blount. 7-4-18

---

## Submitter Information

**Name:** Juliette Blount
**Address:** United States,
**Email:** juliegrant@earthlink.net

---

## General Comment

Switching the regulation of firearms exports from the State Department to the Commerce Department would
facilitate firearms exports to oppressive regimes, remove safeguards that help keep extra-legal agents like
organized crime and terrorist organizations from obtaining weapons, and further fuel violence that destabilizes
countries and causes mass migration. This is ridiculous and we need to stop pretending that our government is
powerless to improve this situation. We know better. It is time to do better!

# PUBLIC SUBMISSION

**As of:** 7/19/18 8:28 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 19, 2018
**Tracking No.** 1k2-946n-p5uc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1748
Public Comment 1540. Individual. Russell Paty. 7-9-18

## Submitter Information

**Name:** Russell Paty
**Address:**
    1409 Wren Ln
    Beeville, TX, 78102
**Email:** rcpaty@msn.com
**Phone:** 361.542.9393

## General Comment

I am Russell Paty and have traveled around the world three times. One of my sons stood at the DMZ in Korea and the other watched the border between Egypt and Israel. I am a voter and have been for years. I support the second amendment but this is not a constitutional issue.

This rule change will make it possible for violent gangs to purchase, made in the USA, firepower. It is possible, even likely, our failure to control sales weapons for the gangs to take over Mexico and threaten our southern border.

I oppose the proposed rule

## Attachments

Weapon Export

WASHSTATEB006818

I oppose the proposed rule for the following reasons:

1. The proposed rule treats semi-automatic assault rifles as "non-military." But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of firearms, about which comment has been requested, many countries prohibit civilian possession of semi-automatic rifles and handguns, as well as of any larger caliber firearm. Six U.S. states, the District of Columbia, and several large retail chains also prohibit retail sale of semi-automatic assault rifles. Many semi-automatic rifles are also easily converted to fully automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns, as it recently did on the Philippines and  Turkey.[2] Congressional action in 2002 required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to Congress. Items moved to Commerce control would no longer be subject to such notification. In a September 15, 2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate Congressional intent and effectively eliminate Congress' proper role.

3. The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government — i.e., taxpayers — will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

4. National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking.   That will make it easier for  unscrupulous dealers  to escape attention.[3]

5. The rule reduces end-use controls for gun exports. It would eliminate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Government's information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

6. The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printing weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with

access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is unlikely to make the same argument once those weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

7. The Commerce Department does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce.[4] The BIS's enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

8. The proposed change will reduce transparency and reporting on gun exports. The rule would eliminate Congressional and public awareness of the total amount (dollar value and items) of firearms sales authorizations and deliveries around the world, since the Commerce Department annual reports currently only cover about 20 countries.

9. This rule would transfer gun export licensing to an agency – the Commerce Department – whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

10. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries.[5] The export of these weapons should be subject to more controls, not less.

UNCLASSIFIED
Official

## Heifferon, Christina M

| | |
|---|---|
| **From:** | Heidema, Sarah J |
| **Sent:** | Thursday, January 3, 2019 8:59 AM |
| **To:** | Tom_Callahan@foreign.senate.gov; Doug.Anderson@mail.house.gov; Fite, David; Rice, Edmund; Stacie_Oliver@foreign.senate.gov |
| **Cc:** | Miller, Michael F; String, Marik A; Paul, Joshua M; Lorman, Amanda L; Laychak, Michael R SES DTSA EO (US); Matthew Borman |
| **Subject:** | Informal notification for removal of items from the U.S. Munitions List |
| **Attachments:** | USML Cat I-III 38(f) - MDE List.pdf; USML Cat I-III 38(f) - Line-in Line-out Comparison.pdf; USML Cat I-III 38(f) - Commerce control text.pdf; USML Cat I-III 38(f) - Notification Letters.pdf; USML Cat I-III 38(f) - Revised Control Text.pdf |

This email provides the documents that begin the 30-day informal notification period for the removal of items from the U.S. Munitions List (USML) Categories I-III.  This notification proceeds the statutorily required 30-day notification period for removals of items from the USML pursuant to AECA section 38(f).  This package of documents contains the draft letters that will transmit the formal notification, a summary of the revisions to USML Categories I-III, copies of the revised USML Category I-III; line-in/line-out comparisons of the current USML Categories I-III and the revised version; and a copy of the Department of Commerce's companion regulatory text describing new or revised Export Control Classification Numbers (ECCNs) that will control the transitioning items.

Department of State personnel, along with our interagency colleagues, are available to answer any questions you may have related to the attached and would be please to provide you a briefing on the changes outlined in these rules.

Regards,

Sarah Heidema
Director
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
Department of State
202-663-2809

**Official**
**UNCLASSIFIED**

*[December 20, 2018]*

Billing Code: 3510-33-P

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No.    ]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

**AGENCY:**  Bureau of Industry and Security, Department of Commerce.

**ACTION:**  Final rule.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774 of the Export Administration Regulations (15 CFR parts 730-774) are amended as follows:

**PART 736 – GENERAL PROHIBITIONS**

1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017);  Notice of May 9, 2018, 83 FR 21839 (May 10, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

**SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS**

\* \* \* \* \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for

*[December 20, 2018]*

purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

## PART 740 – LICENSE EXCEPTIONS

3. The authority citation for 15 CFR part 740 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

4. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

## § 740.2 Restrictions on all license exceptions.

(a) \*  \*  \*

(21)  The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2)(*i.e.*, parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm.  (*See* USML Category I(h)(2)).  In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

5. Section 740.9 is amended by:

a.  Adding five sentences at the end of paragraph (a) introductory text;

*[December 20, 2018]*

b. Adding one sentence at the end of paragraph (b)(1) introductory text;

c. Adding paragraph (b)(5); and

d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\* \* \* \* \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this section, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4),

*[December 20, 2018]*

or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter

*[December 20, 2018]*

or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (b)(5):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

6. Section 740.10 is amended by:

a. Adding one sentence at the end of paragraph (b)(1); and

b. Adding paragraph (b)(4).

The additions read as follows:

## § 740.10 Servicing and replacement of parts and equipment (RPL)

\* \* \* \* \*

**(b)** \* \* \*

(1) \*   \*   \* The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraphs (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

\* \* \* \* \*

(4) *Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement.*  This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraphs (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740;

*[December 20, 2018]*

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (b)(4):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

7. Section 740.11 is amended by:

a. Adding two sentences at the end of the introductory text;

b. Adding Note 2 to paragraph (b)(2); and

c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

*[December 20, 2018]*

## § 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \*   Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section.  Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

\* \* \* \* \*

*Note 2 to paragraph (b)(2):*  *Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (e.g., contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.*

\* \* \* \* \*

8. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

## § 740.14 Baggage (BAG).

\* \* \* \* \*

(b) \* \* \*

(4) *Tools of trade*. Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section.  For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section.  For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

(e) *Special provisions for firearms and ammunition*. \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or

*[December 20, 2018]*

"attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception.  All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

\*   \*   \*   \*   \*

## § 740.16 [AMENDED]

9.  Section 740.16 is amended by:

a.  Revising paragraph (a)(2);

b.  Revising paragraphs (b)(2)(iv) and (v); and

*[December 20, 2018]*

c.  Adding paragraph (b)(2)(vi);

The revisions and addition read as follows:

## § 740.16 Additional permissive reexports (APR).

\*  \*  \*  \*  \*

(a)  \*  \*  \*

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003, 6A990; or commodities classified under a 0x5zz ECCN; and

\*  \*  \*  \*  \*

(b)  \*  \*  \*

(2)  \*  \*  \*

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCNs 6A002 or 6A990; or

(vi) Commodities classified under a 0x5zz ECCN.

\*  \*  \*  \*  \*

10.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

## § 740.20 License Exception Strategic Trade Authorization (STA).

\*  \*  \*  \*  \*

(b)  \*  \*  \*

(2)  \*  \*  \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*  \*  \*  \*  \*

11.  Add Supplement No. 4 to part 740 to read as follows:

## SUPPLEMENT NO. 4 TO PART 740 - ANNEX A FIREARM MODELS

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.

(2) IZH 34M, .22 Target pistol.

*[December 20, 2018]*

(3) IZH 35M, .22 caliber Target pistol.

(4) Mauser Model 1896 pistol = SMCR.

(5) MC-57-1 pistol.

(6) MC-1-5 pistol.

(7) Polish Vis Model 35 pistol = SMCR.

(8) Soviet Nagant revolver = SMCR.

(9) TOZ 35, .22 caliber Target pistol.

(10) MTs 440.

(11) MTs 57-1.

(12) MTs 59-1.

(13) MTs 1-5.

(14) TOZ-35M (starter pistol).

(15) Biathlon-7K.

(b) *Rifles.*

(1) BARS-4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K =SMCR.

(6) German model G41 = SMCR.

(7) German model G43=SMCR.

(8) IZH-94.

(9) LOS-7, bolt action.

(10) MC-7-07.

(11) MC-18-3.

(12) MC-19-07.

(13) MC-105-01.

(14) MC-112-02.

(15) MC-113-02.

(16) MC-115-1.

(17) MC-125/127.

*[December 20, 2018]*

(18) MC-126.

(19) MC-128.

(20) Saiga.

(21) Soviet Model 38 carbine=SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle=SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle=SMCR.

(30) Sever – double barrel.

(31) IZH18MH single barrel break action.

(32) MP-251 over/under rifle.

(33) MP-221 double barrel rifle.

(34) MP-141K.

(35) MP-161K.

(36) MTs 116-1.

(37) MTs 116M.

(38) MTs 112-02.

(39) MTs 115-1.

(40) MTs 113-02.

(41) MTs 105-01.

(42) MTs 105-05.

(43) MTs 7-17 combination gun.

(44) MTs 7-12-07 rifle/shotgun.

(45) MTs 7-07.

(46) MTs 109-12-07 rifle.

(47) MTs 109-07 rifle.

(48) MTs 106-07 combination.

*[December 20, 2018]*

(49) MTs 19-97.

(50) MTs 19-09.

(51) MTs 18-3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut-2.

(56) Berkut-2M1.

(57) Berkut-3.

(58) Berkut-2-1.

(59) Berkut-2M2.

(60) Berkut-3-1.

(61) Ots-25.

(62) MTs 20-07.

(63) LOS-7-1.

(64) LOS -7-2.

(65) LOS-9-1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars-4-1.

(69) Saiga.

(70) Saiga-M.

(71) Saiga 308.

(72) Saiga-308-1.

(73) Saiga 308-2.

(74) Saiga-9.

(75) Korshun.

(76) Ural-5-1.

(77) Ural 6-1.

(78) Ural-6-2.

(79) SM-2.

*[December 20, 2018]*

(80) Biatlon-7-3.

(81) Biatlon-7-4.

(82) Rekord-1.

(83) Rekord-2.

(84) Rekord-CISM.

(85) Rekord-1-308.

(86) Rekord-2-308.

(87) Rekord-1-308-CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioneer.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44-1.

(94) TOZ 78-01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99-01.

(98) TOZ 55-01 Zubr.

(99) TOZ 55-2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

**PART 742 – CONTROL POLICY—CCL BASED CONTROLS**

12. The authority citation for part 742 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210;

*[December 20, 2018]*

Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

13.  Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

**§742.6 Regional stability.**

\*   \*   \*   \*   \*

(b)  \*   \*   \*

(1)  \*   \*   \*

(i)  Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \*   \*   \* When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*   \*   \*   \*   \*

14.  Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

**§ 742.7 Crime control and detection.**

(a)  \*   \*   \*

*[December 20, 2018]*

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

(c)  *Contract sanctity*.  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

15.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a); and

b. Revising paragraph (f) to read as follows:

*[December 20, 2018]*

## § 742.17  Exports of firearms to OAS member countries.

(a)  *License requirements*. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  \*   \*   \*

  \*   \*   \*   \*   \*

(f) *Items/Commodities*.   Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No. 1 to part 774 of the EAR).

\*   \*   \*   \*   \*

## § 742.19 [AMENDED]

16. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

## PART 743 – SPECIAL REPORTING AND NOTIFICATION

17. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

18. Section 743.4 is amended by:

a. Adding four sentences to the end of paragraph (a);

b. By redesignating Note to paragraph (a) as Note 1 to paragraph (a);

c. Revising paragraph (b);

d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

e. By redesignating Note to paragraph (e)(1)(ii) as Note 2 to paragraph (e)(1)(ii);

e. Revising paragraph (h); and

f. Adding paragraph (i) to read as follows:

## § 743.4 Conventional arms reporting.

(a) \*   \*   \*  This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section.  The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(10).

*[December 20, 2018]*

Because of the requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method. The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

*Note 1 to paragraph (a):* \*   \*   \*

(b) *Requirements*. You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

(c) \*   \*   \*

(1) \*   \*   \*

    (i) ECCN 0A501.a and .b.

\*   \*   \*   \*   \*

(2) \*   \*   \*

    (i) ECCN 0A501.a and .b.

\*   \*   \*   \*   \*

(h) *Alternative submission method*. This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section. The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(10), to include the six character ECCN classification (*i.e.*, 0A501.a or 0A501.b) as the first text to appear in the Commodity description block. If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S. Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting. An exporter that complies with the requirements in § 758.1(g)(4)(ii) does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482-0092, Fax: (202) 482-4094. Information concerning the reporting

*[December 20, 2018]*

requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482-4188, Fax: (202) 482-4145.

## PART 744 – CONTROL POLICY: END-USER AND END-USE BASED

19.  The authority citation for 15 CFR part 744 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of September 19, 2018, 83 FR 47799 (September 20, 2018).

## § 744.9 [AMENDED]

20.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

## PART 746 – EMBARGOES AND OTHER SPECIAL CONTROLS

21.  The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2018, 83 FR 21839 (May 10, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

## § 746.3 [AMENDED]

22.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

*[December 20, 2018]*

## § 746.7 [AMENDED]

23.  Section 746.7 is amended in paragraph (a)(1) by:

a. Adding "0A503," immediately before "0A980"; and

b. Removing "0A985,".

## PART 748 – APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

24.  The authority citation for 15 CFR part 748 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

25.  Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text;

c. Revising paragraphs (a) introductory text and (a)(1);

d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

e. Adding paragraph (e).

The revisions and additions read as follows.

## § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1)  *Items subject to requirement*. Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

*[December 20, 2018]*

\* \* \* \* \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states*. If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).**  *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

26. Supplement No. 2 to part 748 (Unique Application and Submission Requirements) is amended by adding paragraph (z) to read as follows:

## SUPPLEMENT NO. 2 TO PART 748 - UNIQUE APPLICATION AND SUBMISSION REQUIREMENTS

\* \* \* \* \*

(z) *Exports of firearms and certain shotguns temporarily in the United States.*

(1) *Certification*.  If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.*, for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in

Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740.  I and the parties to this transaction will comply with the requirements specified in paragraph (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements*.  Each approved license for commodities described under paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (z):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

*[December 20, 2018]*

## PART 758 – EXPORT CLEARANCE REQUIREMENTS

27.  The authority citation for part 758 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

28.  Section 758.1 is amended by:

   a. Revising paragraphs (b)(7), (8), and (9) and adding paragraph (b)(10);

   b. Revising paragraph (c)(1);

   c. Adding Note 1 to paragraph (c)(1);

   c. Adding paragraph (g)(4); and

   d. Redesignating Note to paragraph (h)(1) as Note 2 to paragraph (h)(1); to read as follows:

## § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

*  *  *  *  *

(b)  *  *  *

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports, except for exports authorized under License Exception BAG, as set forth in §740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c)  *  *  *

(1) License Exception Baggage (BAG), as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

*[December 20, 2018]*

**Note 1 to paragraph (c)(1):** *See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in §740.14 of the EAR.*

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* This paragraph (g)(4) includes two separate requirements under paragraph (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR. Paragraph (g)(4)(i) is limited to certain EAR authorizations. Paragraph (g)(4)(ii) applies to all EAR authorizations that require EEI filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES.* For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items. The requirements of this paragraph also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.*, 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. (*See* § 743.4(h) for the use of this information for conventional arms reporting).

**Note 3 to paragraph (g)(4):** *If a commodity described in paragraph (g)(4) is exported under License Exception TMP under § 740.9(a)(6) for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity*

*[December 20, 2018]*

*must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii). For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned. If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization. The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.*

\*   \*   \*   \*   \*

    29.  Add § 758.10 to read as follows:

**§ 758.10  Entry clearance requirements for temporary imports.**

(a) *Scope*.  This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21), except for firearms "subject to the EAR" that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these firearms "subject to the EAR").  These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.  Items that are temporarily exported under the EAR must have met the export clearance requirements specified in § 758.1 of the EAR.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL.  Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

 (2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports*.  To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

*[December 20, 2018]*

(i) Provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

(A) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States;

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

***Note 1 to paragraph (b)(1):*** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740), or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from*

*[December 20, 2018]*

*Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).*

***Note 2 to paragraph (b)(1):*** *In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740), or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR.*

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported.  *See* also the additional requirements in § 758.1(g)(4).

   30.  Add § 758.11 to read as follows:

**§ 758.11  Export clearance requirements for firearms and related items.**

(a)  *Scope*.  The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in §740.14.

(b) *Required form*.  Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to the U.S. Customs  and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

*[December 20, 2018]*

(1) Where to obtain the form?  The CBP Certification of Registration Form 4457 can be found on the following CBP website:

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

(2) Required "description of articles" for firearms to be included on the CBP Form 4457.  For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457*?

*See* the following CBP website page for additional information:

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

(d) *Return of items exported pursuant to this section*.  The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section of the EAR.

**PART 762 – RECORDKEEPING**

31.  The authority citation for part 762 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

32.  Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a)  *  *  *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been

*[December 20, 2018]*

exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

33.  Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) * * *

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772 – DEFINITIONS OF TERMS

34.  The authority citation for part 772 is revised to read as follows:

**Authority:**  Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

**§ 772.1 – [AMENDED]**

35.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c"; and the definition of "complete breech mechanisms" is added as set forth below:

**§ 772.1 Definitions of terms as used in the Export Administration Regulations (EAR).**

* * * * *

*Complete breech mechanisms*.  The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

* * * * *

## PART 774 - THE COMMERCE CONTROL LIST

36. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:**  Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

*[December 20, 2018]*

37.  In Supplement No. 1 to part 774, Category 0, remove Export Control Classification Number (ECCN) 0A018.

**Supplement No. 1 to Part 774 – The Commerce Control List**

\* \* \* \* \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

No items currently are in this ECCN.  See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b.

38.  In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*  $500 for 0A501.c, .d, and .x.

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

*[December 20, 2018]*

be used for any item in this entry.

**List of Items Controlled**

> *Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. Also see ECCN 0A502 for shot-pistols. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

> *Related Definitions*: N/A

> *Items:*

a.     Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

> ***Note 1 to paragraph 0A501.a:*** *'Combination pistols' are controlled under ECCN 0A501.a. A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).*

b.     Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c.     The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.     Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

> ***Note 2 to paragraph 0A501.d:*** *Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.*

e.     Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x.     "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or

*[December 20, 2018]*

CCL.

y.      Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

      y.1.      Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

      y.2.      Scope mounts or accessory rails;

      y.3.      Iron sights;

      y.4.      Sling swivels;

      y.5.      Butt plates or recoil pads;

      y.6.      Bayonets; and

      y.7.      Firearms manufactured from 1890 to 1898 and reproductions thereof.

      ***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

      ***Note 3 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

      ***Note 4 to 0A501:*** *Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.*

**0A502 Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

      *Reason for Control*:   RS, CC, FC, UN, AT, NS

*[December 20, 2018]*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes, "complete breech mechanisms" if the ultimate destination is Canada.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*[December 20, 2018]*

*Related Controls*:  Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** *Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.*

**Technical Note:** *Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502.  Slug guns are also controlled under ECCN 0A502.*

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:*  CC, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to

*[December 20, 2018]*

enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

    *Related Definitions*: N/A

    *Items*: The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

    *Reason for Control:* FC, RS, CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g, and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

    *LVS:* $500 for 0A504.g.

    *GBS:* N/A

    *CIV:* N/A

**List of Items Controlled**

    *Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

    *Related Definitions:* N/A

    *Items:*

a.    Telescopic sights.

b.    Holographic sights.

*[December 20, 2018]*

c.     Reflex or "red dot" sights.

d.     Reticle sights.

e.     Other sighting devices that contain optical elements.

f.     Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f: 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g.     Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h.     [Reserved]

i.     Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

*Note 2 to paragraph i:*  For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

**0A505  Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d,  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing |

WASHSTATEB006856

*[December 20, 2018]*

| | requirements for this entry.  See §742.19 of the EAR for additional information. |
|---|---|

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b. (*i.e.*, "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR."  (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

*Items*:

a.      Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b.      Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.      Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

*Note 1 to 0A505.c:*  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

*[December 20, 2018]*

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

> ***Note 2 to 0A505.x:*** *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

> ***Note 3 to 0A505.x:*** *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

> ***Note 4 to 0A505:*** *Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, i.e., contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.*

39.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*[December 20, 2018]*

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.  (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.

*Related Definitions*:  N/A

*Items*:

a.    Guns and armament manufactured between 1890 and 1919.

b.    Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.    "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

**Note 1 to 0A602.x:** *Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.*

**Note 2 to 0A602:** *"Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

**Note 3 to 0A602:** *Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.*

**Supplement No. 1 to Part 774 – [AMENDED]**

40.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

41.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988  Conventional military steel helmets.**

*[December 20, 2018]*

No items currently are in this ECCN.  See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

42.  In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

*[December 20, 2018]*

d.    Small arms spill boring machines.

e.    Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs  .a, .d, and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.    Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are

*[December 20, 2018]*

"specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w   [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

      43.   In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

      *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

      *LVS:* $3000

      *GBS:* N/A

      *CIV:* N/A

**Special conditions for STA**

      *STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*[December 20, 2018]*

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.    The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

    a.1.    Gun barrel rifling and broaching machines and tools therefor;

    a.2.    Gun barrel rifling machines;

    a.3.    Gun barrel trepanning machines;

    a.4.    Gun boring and turning machines;

    a.5.    Gun honing machines of 6 feet (183 cm) stroke or more;

    a.6.    Gun jump screw lathes;

    a.7.    Gun rifling machines; and

    a.8.    Barrel straightening presses.

b.    Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.    Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.    Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774 – [AMENDED]**

    44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

    45. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or | NS Column 1 |

*[December 20, 2018]*

| | |
|---|---|
| equipment in ECCN 0B501 for commodities in ECCN 0A501.y | |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

   *CIV*:  N/A

   *TSR*:  N/A

**Special conditions for STA**

   *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

   *Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".

   *Related Definitions*:  N/A

   *Items*: The list of items controlled is contained in this ECCN heading.

**0D505  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

   *Reason for Control*: NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |

*[December 20, 2018]*

| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV*:  N/A

    *TSR*:  N/A

**Special conditions for STA**

    *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

    *Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".

    *Related Definitions*:  N/A

    *Items*: The list of items controlled is contained in this ECCN heading.

    46. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

    *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV*:  N/A

    *TSR*:  N/A

*[December 20, 2018]*

**Special conditions for STA**

   *STA*:   Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

   *Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR".   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

   *Related Definitions*:  N/A

   *Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

   47.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

   48.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

**License Requirements**

   *Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

   *CIV*:  N/A

   *TSR*:  N/A

**Special conditions for STA**

   *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

*[December 20, 2018]*

be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

 *Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

 *Related Definitions*: N/A

 *Items*:

a. "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502  "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.**

**License Requirements**

 *Reason for Control*:  CC, UN

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

 *CIV:* N/A

 *TSR:* N/A

**List of Items Controlled**

 *Related Controls*: Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

 *Related Definitions*: N/A

 *Items*: The list of items controlled is contained in the ECCN heading.

**0E504 "Technology" "required" for the "development" or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

 *Reason for Control:* RS, UN, AT

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |

*[December 20, 2018]*

| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
|---|---|
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV:*   N/A

    *TSR:*   N/A

**List of Items Controlled**

    *Related Controls*: N/A

    *Related Definitions*: N/A

    *Items*: The list of items controlled is contained in the ECCN heading.

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.**

**License Requirements**

    *Reason for Control:* NS, RS, UN, CC, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505 | RS Column 1 |

*[December 20, 2018]*

| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
|---|---|
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

   *CIV*:  N/A

   *TSR*:  N/A

**Special conditions for STA**

   *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

   *Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".

   *Related Definitions*: N/A

   *Items*: The list of items controlled is contained in this ECCN heading.

   49.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

   *Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

*[December 20, 2018]*

| RS applies to entire entry | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774 – [AMENDED]**

50.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

51.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

*Reason for Control:*   CC

| Control(s) |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information.) |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*  N/A

*TSR:*  N/A

*[December 20, 2018]*

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774 – [AMENDED]**

52. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

53. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

54. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items**

*[December 20, 2018]*

**Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS*:  N/A

*GBS*:  N/A

*CIV:*  N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009.  (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

*[December 20, 2018]*

**Technical Note:**  *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

55.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018  Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

56.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

57.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items | NS Column 1 |

*[December 20, 2018]*

| | |
|---|---|
| controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to

*[December 20, 2018]*

the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: See also 2E101, 2E201, and 2E301

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

58.   In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control*: NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009 | NS Column 1 |
| MT applies to "technology"   for   equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, | NP Column 1 |

*[December 20, 2018]*

| 2B209, 2B225 to 2B233 for NP reasons | |
|---|---|
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

59. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*[December 20, 2018]*

*Reason for Control*: NS, MT, RS, AT, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738).* |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $1500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls*: (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are

WASHSTATEB006877

*[December 20, 2018]*

"specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

      y.1 [RESERVED]

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**§ 121.1 The United States Munitions List.**

* * * * *

**Category I—Firearms** and Related Articles, **Close Assault Weapons and Combat Shotguns**

\*(a) Firearms using caseless ammunition Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

\*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm) inclusive.

\*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms) or other weapons (e.g. insurgency counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

\*(d) Fully automatic shotguns regardless of gauge. Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

\*(e) Silencers, mufflers, and sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified

~~or adapted components and parts~~.

(f) [Reserved]~~Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)~~

*(g) Barrels, ~~cylinders,~~ receivers (frames) bolts, bolt carriers, slides, or sears~~or complete breech mechanisms~~ specially designed for the articles in paragraphs (a) through (d) of this category.

(h) ~~Components, p~~Parts, components, accessories, and attachments~~, as follows:~~for the articles in paragraphs (a) through (g) of this category.

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (~~as defined in~~see §120.10 of this subchapter) and defense services (~~as defined in~~see §120.9 of this subchapter) directly related to the defense articles described in ~~paragraphs (a) through (h) of~~ this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)~~Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are~~

2

designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

(x) Commodities, software, and technology subject to the EAR (see § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*: Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

3

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit. This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

**Category II—Guns and Armament**

*(a) Guns and armament greater than over caliber .50 (*i.e.,* 12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

4

*(4) Grenade launchers; or~~whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers~~

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

5

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with an effective range greater than or equal to 20 meters.specifically designed or modified for military application.

(c) [Reserved]Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.

*(d) Kinetic energy weapon systems specially specifically designed or modified for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment specially specifically designed, developed, configured, adapted or modified to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro-optical, acoustic) of for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices)defense articles controlled by this category.

6

WASHSTATEB006884

*(f) – (i) [Reserved]Engines specifically designed or modified for the self-propelled guns and howitzers in paragraph (a) of this category.

(g) Tooling and equipment specifically designed or modified for the production of defense articles controlled by this category.

(h) Test and evaluation equipment and test models specifically designed or modified for the articles controlled by this category. This includes but is not limited to diagnostic instrumentation and physical test models.

(i) Autoloading systems for electronic programming of projectile function for the defense articles controlled in this Category.

(j) All other components, pParts, components, accessories, and attachments, as follows: and associated equipment specifically designed or modified for the articles in paragraphs (a) through (i) of this category. This includes but is not limited to mounts and carriages for the articles controlled in this category.

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

7

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

WASHSTATEB006886

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see*as defined in §120.10 of this subchapter) and defense services (*see*as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and through (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that

9

WASHSTATEB006887

are designated as Significant Military Equipment (SME) shall itself be designated SME.

(l) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:

(1) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:

(i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;

(ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel handling equipment; and the electrical interfaces between power supply gun and other turret electric drive function;

(iii) Target acquisition, tracking fire control or damage assessment systems; and

(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(3) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application.

10

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition/ and Ordnance

*(a) Ammunition/, as follows:ordnance for the articles in Categories I and II of this section.

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

11

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

(b) Ammunition/ordnance handling equipment specially ~~specifically~~ designed ~~or modified~~ for the articles controlled in this category, as follows:~~, such as, belting, linking, and de-linking equipment.~~

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

WASHSTATEB006890

(c) [Reserved]~~Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.~~

(d) ~~Components, p~~Parts and components~~, accessories, attachments and associated equipment specifically designed or modified~~ for the articles in this category, as follows:

*(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive~~Guidance and control components for the articles in paragraph (a) of this category~~;

*(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;~~Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category~~; ~~and~~

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;~~All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.~~

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

13

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

14

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see*as defined in §120.10 of this subchapter) and defense services (*see*as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), and through (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(f) – (w) [Reserved] The following explains and amplifies the terms used in this category and elsewhere in this subchapter:

(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions therefor), boosters, firing components therefor, primers, and other detonating devices for the defense articles controlled in this category.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

15

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* (2) This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting or popping.

(3) Equipment and tooling in paragraph (e) of this category does not include equipment for hand-loading ammunition.

(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been designed or manufactured using technical data and defense services controlled by this category.

(5) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

16

WASHSTATEB006894

Categories I, II, and III MDE Transitioning to the CCL

| ITEM DESCRIPTION | CCL CONTROL | |
|---|---|---|
| Cartridge, 5.56mm M855A1 | CCL | ECCN 0A505.a |

The Honorable
Robert P. Corker, Jr., Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III;, the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs

Enclosure:
    As stated.

The Honorable
Robert Menendez
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs

Enclosure:
As stated.

The Honorable
Edward R. Royce, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,


Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs


Enclosure:
    As stated.

The Honorable
Eliot L. Engel
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Engel:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,




Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs


Enclosure:
    As stated.

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.


**§ 121.1 The United States Munitions List.**

* * * * *

**Category I—Firearms and Related Articles**

   *(a) Firearms using caseless ammunition.

   *(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

   *(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms).

   *Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

   *(d) Fully automatic shotguns regardless of gauge.

   *(e) Silencers, mufflers, and sound suppressors.

   (f) [Reserved]

   (g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

   (h) Parts, components, accessories, and attachments, as follows:

   (1) Drum and other magazines for firearms to .50 caliber (12.7 mm)

inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

2

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

\*(1) Guns, howitzers, artillery, and cannons;

\*(2) Mortars;

\*(3) Recoilless rifles;

\*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE**

3

**ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

4

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

5

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

6

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

7

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c)

8

WASHSTATEB006907

identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

9

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

10

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the

11

possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

12



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

FEB 0 4 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
   As stated.



United States Department of State

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



United States Department of State

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Michael McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

FEB 0 4 2019

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
        As stated.

<u>Summary of Revisions to USML Categories I, II, and III</u>

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape. This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL). A key strategy in the reform effort is to construct the lists so they positively identify the items they control. Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories). All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the jurisdiction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories. In May 2018, the Department of State published proposed revisions of the final three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls. Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

**Category I—Firearms and Related Articles**

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use

1

WASHSTATEB006916

caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN 0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category

2

WASHSTATEB006917

XII and are described in the purchase documentation submitted with the application.

### Category II— Guns and Armament

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

3

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category III— Ammunition and Ordnance**

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

4

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will *not* be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii). Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom). Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception. However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement. Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request. If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future. If the

5

departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

6

WASHSTATEB006921

May 14, 2019

Dear Member of Congress:

The undersigned organizations write in strenuous opposition to the Administration's proposal to significantly weaken regulation and oversight of firearms exports. The transfer of export controls of semi-automatic pistols, assault-style firearms, sniper rifles, and ammunition from the United States Munitions List under the authority of the Department of State to the less-stringent controls of the Department of Commerce[1] will thwart congressional oversight and create new and unacceptable risks of exacerbating gun violence, human rights abuses, and armed conflict.

The Administration's proposal guts Congress' authority to provide oversight of firearms exports. Currently, Congress is notified of firearms sales authorized by the State Department valued at $1 million or more. No such notification requirements will exist if these weapons are transferred to Commerce control. In recent years, Congressional notification has been an important backstop, helping forestall firearms transfers to repressive forces, such as those in Turkey and the Philippines.[2]

The proposal would also transfer control of the technical information and blueprints for potentially undetectable 3D-printed guns from State to Commerce, a move that could facilitate printing of 3D guns worldwide, make these weapons readily available to terrorist groups and other criminal elements, and endanger American embassies, military bases, and passenger aircraft at home and abroad.[3]

Although proponents of the proposed changes argue that small arms are "less dangerous" because many can be bought in U.S. retail outlets, the fact is that armies are built from these firearms. Small arms are the weapons of mass destruction in countries and regions such as Congo, Burma, Mexico, and Central America.  AR- and AK-type rifles and their ammunition that would be transferred to Commerce control are weapons of choice for criminal organizations in Mexico and other Central American countries, contributing to the humanitarian catastrophe that drives many migrants north as guns flow south.[4]

Under the proposed changes, fully automatic firearms would properly remain under State Department control, but semi-automatic weapons would move to the Commerce Department's control. Practically, however, the difference between these types of weapons is meaningless. For example, soldiers in Cameroon last summer – in two separate incidents captured on video – used semi-automatic rifles to execute several men, two women, and two small children.[5] In Mexico, local police in Guerrero State responsible for the forced disappearance of 43 students in 2014 were armed with semi-automatic rifles.[6] Many sniper rifles and semiautomatic firearms that would be moved to the Commerce Department's control are currently in active use by the U.S. military, and many semi-automatic firearms can also easily be converted to fully automatic weapons, further illustrating the false dichotomy of arguments in support of this change.

WASHSTATEB006922

The proposal will also increase the risk of exports to unauthorized end users and conflict zones as the Commerce Department, charged with promoting sales, will gather less information about those engaged in the arms trade and rely on post-shipment monitoring, rather than pre-license checks. Overall, Congress already has a robust framework for arms transfers, embedding important human rights and other critical provisions in two central statutes: the Arms Export Control Act and the Foreign Assistance Act. The provisions of these laws, generally speaking, apply to defense articles listed on the U.S. Munitions List. Removing weapons from this list exempts them from related statutory constraints.[7]

Ultimately, the weapons and ammunition that currently are controlled under U.S. Munition List Categories I-III belong there and should stay there. The best way to move forward is to prohibit transfer of these weapons out of the U.S. Munitions List and maintain congressional oversight, as is currently proposed in H.R. 1134 and S. 459.[8] A prohibition on transfers out of the U.S. Munitions List could be included in other legislation, such as the National Defense Authorization Act. We urge you to support these measures.

Sincerely,

Alianza Americas
Alliance for Gun Responsibility
Alliance of Baptists
American Federation of Teachers
American Friends Service Committee
American Medical Student Association
Americans for Democratic Action
Amnesty International-USA
Arizonans for Gun Safety
Arms Control Association
Baptist Peace Fellowship of North America
BAYAN USA
Blue Future
Brady
The Campaign to Keep Guns off Campus
Center for American Progress
Center for Civilians in Conflict (CIVIC)
Center for International Policy
Church of the Brethren Office of
    Peacebuilding and Policy
Coalition Against Gun Violence
Coalition for Peace Action
Coalition to Stop Gun Violence
Colorado Ceasefire Legislative Action

Committee in Solidarity with the People of
    El Salvador (CISPES)
Congregation of Our Lady of Charity of the
    Good Shepherd, US Provinces
CT Against Gun Violence
Delaware Coalition Against Gun Violence
    Educational Fund
Desert Southwest Conference UMC, Board
    of Church and Society
Episcopal Peace Fellowship
Fellowship of Reconciliation
Franciscan Action Network
Friends Committee on National Legislation
Friendship Office of the Americas
Georgians for Gun Safety
Giffords Law Center to Prevent Gun
    Violence
Global Exchange
Global Justice Institute, Metropolitan
    Community Churches
Granite State Progress
Grey Nuns of the Sacred Heart
Gun Violence Prevention Center of Utah
Hoosiers Concerned About Gun Violence

Humanity & Inclusion
Interfaith Council for Peace and Justice
International Coalition for Human Rights in
   the Philippines-United States
Jewish Center for Justice
Joint Action Committee
Jr Newtown Action Alliance
Just Foreign Policy
Latin America Working Group
Leadership Conference of Women Religious
Maryknoll Office for Global Concerns
Million Hoodies Movement for Justice
MomsRising
Monmouth Center for World Religions and
   Ethical Thought
National Advocacy Center of the Sisters of
   the Good Shepherd
National Coalition Against Domestic
   Violence
National Council of Churches
National Lawyers Guild, International
   Committee
Network in Solidarity with the People of
   Guatemala
New Mexicans to Prevent Gun Violence
Newtown Action Alliance
Nicaragua Center for Community Action
North Carolina Council of Churches
Oakland Catholic Worker
One Pulse for America
Orange Ribbons for Gun Safety
Pax Christi USA
Pax Christi International
Pax Christi Metro Washington, DC and
   Baltimore
Pax Christi Pacific Northwest
Philippines-U.S. Solidarity Organization -
   Southern California

Presbyterian Church (USA)
San Diegans for Gun Violence Prevention
School of Americas Watch
School of Americas Watch - East Bay
Sister Parish, Inc.
Sisters of Charity of the Blessed Virgin Mary
Sisters of St. Francis of the Neumann
   Communities
States United to Prevent Gun Violence
Stop Handgun Violence
Survivors Empowered Action Fund
Survivors Lead
Task Force on the Americas
The United Methodist Church – General
   Board of Church and Society
United Nations Association of the National
   Capital Area
Violence Policy Center
Vision Quilt
War Resisters League
Washington Office on Latin America
WAVE Educational Fund
We the People for Sensible Gun Laws
Win Without War
Women Against Gun Violence
Women's Action for New Directions
Woman's National Democratic Club

Non-US groups:
Action on Armed Violence
Center for Ecumenical Studies
Colombian Campaign To Ban LandMines
Corruption Watch UK
Human Security Network in Latin American
   and the Caribbean (SEHLAC)
Igarapé Institute
Public Policy Association (APP)

---

[1] Department of Commerce, Industry and Security Bureau, "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)," *Federal Register*, May 24, 2018, p. 24181, at: https://www.federalregister.gov/documents/2018/05/24/2018-10367/control-of-firearms-guns-ammunition-and-related-articles-the-president-determines-no-longer-warrant;

and Government Accountability Office, "EXPORT CONTROLS: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized," GAO-19307, March 1, 2019, at https://www.gao.gov/products/GAO-19-307.

[2] Joe Gould, "US lawmakers balk at arms sales to Saudi Arabia, Turkey and Nigeria," *Defense News*, September 26, 2017, at: https://www.defensenews.com/congress/2017/09/26/us-lawmakers-balk-at-arms-sales-to-saudi-arabia-turkey-and-nigeria/.

[3] Emily Dreyfuss, "3D Printed Gun Blueprints Are Back, And Only New Laws Can Stop Them," *Wired*, August 29, 2018, at: https://www.wired.com/story/3-d-printed-gun-blueprints-return-laws-injunction/.

[4] Violence Policy Center, "Cross-Border Gun Trafficking," at www.vpc.org/indicted; Alex Yablon, "Trump is Sending Guns South as Migrants Flee North," *Foreign Policy*, March 8, 2019, at: https://foreignpolicy.com/2019/03/08/trump-guns-honduras-central-america/.

[5] Susan Waltz, testimony before House Foreign Affairs Subcommittee on Oversight and Investigations, March 26, 2019, at: https://www.forumarmstrade.org/uploads/1/9/0/8/19082495/3-26_testimony_waltz.pdf.

[6] Mexican Commission for the Defense and Promotion of Human Rights, *Gross Human Rights Violations: The Legal and Illegal Gun Trade in Mexico*, 2018, p. 16, at: https://stopusarmstomexico.org/gross-human-rights-abuses-the-legal-and-illegal-gun-trade-to-mexico/.

[7] Susan Waltz testimony, *op.cit*, and Colby Goodman, Christina Arabia, and William Hartung, "Proposed Firearms Export Changes: Key Challenges for U.S. Oversight," Center for International Policy, July 9, 2018, at: https://securityassistance.org/publication/proposed-firearms-export-changes-key-challenges-us-oversight.

[8] See legislative texts at: https://www.congress.gov/bill/116th-congress/house-bill/1134 and https://www.congress.gov/bill/116th-congress/senate-bill/459/.

**Implications of Proposed Changes to Firearms Export Regulations[1]**

The Administration has notified Congress of its intent to change firearms export regulations by reclassifying several kinds of firearms and ammunition – from their current designation as military weapons (defense articles) to commercial items.  Semi-automatic and non-automatic firearms are the main items slated for change.[2]  Included in this class of weapons are the high-powered assault rifles–including the semi-automatic AR-15--that have been used in several mass shootings in the US, as well as armor-piercing sniper rifles and sidearms used by the US military.[3]

The proposed regulatory change involves moving items from one list (the US Munitions List) to another (the Commerce Control List), but the two lists are subject to different statutory provisions and the implications are significant.   Legislative action is needed to ensure that stringent rules remain in place to regulate the export of these lethal firearms and suspend further sales to individuals or governments who misuse US weapons or transfer them to criminal or terrorist organizations.

Why the proposed changes matter:

1. **Failure to appreciate the military significance of semi-automatic weapons**
   At the heart of the proposed changes is a faulty proposition that semi-automatic weapons are fundamentally a commercial product.  Semi-automatic rifles such as the AR-15 are currently classified within the US export regime as "assault rifles."  (The key difference between a fully automatic and a semi-automatic weapon is that for semi-automatic firearms, the trigger must be continuously activated to release bullets, whereas a fully automatic weapon only requires a single pull of the trigger to fire a continuous stream.  In practical reality, there may be little difference between the two, inasmuch as a semi-automatic weapon can typically fire 45 rounds per minute and soldiers in combat often elect to use fully automatic weapons in a semi-automatic mode.)   Category I on the US Munitions List (USML) is currently titled "Firearms, Close Assault Rifles and Combat Shotguns," but if the proposed changes go forward, the sanitized title will become simply "Firearms and Related Articles."   Assault rifles as a category – on either list – will disappear, marking a significant change in the way we think about, and categorize, military-style weapons.

   <span style="color:red">What Congress should do:  Enact legislation such as H.R. 1134 or S. 459 to prevent the transfer of assault rifles and other semi-automatic weapons from the US Munitions List (USML) to the Commerce Control List (CCL).</span>

2. **Certain Assault Rifles will no longer be subject to the human rights provisions of the Foreign Assistance Act**
   Under the current system, Congress is notified when large sales of semi-automatic weapons are proposed for countries such as the Philippines, where government forces have used such weapons in extrajudicial killings or where there is a history of diversion from local security forces to cartels, such as Guatemala.  After the proposed rule is adopted, there will be no legal barrier to transferring these weapons to countries with a consistent pattern of gross violations of human rights.[4]

---

[1] Prepared by Susan Waltz, Professor, Gerald R. Ford School of Public Policy, University of Michigan swaltz@umich.edu February 2019.  Thanks to Brittany Benowitz, Chief Counsel, American Bar Association for Human Rights, for reviewing a draft.

[2] Items scheduled to remain on the military control list include automatic firearms and firearms that use caseless ammunition, silencers, high-capacity magazines, belted ammunition, mortars, cannons, recoilless rifles, and grenade launchers.  Flame throwers with a range exceeding 20 feet would also be explicitly controlled by the munitions list.   In addition to semi-auto and non-auto firearms, grenades containing non-lethal or less lethal projectiles will be under CCL jurisdiction as 500-series items.

[3] See "Comments of the Brady Center and Brady Campaign to Prevent Gun Violence on the Department of State Proposed Rule to Amend the International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III and the Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List," 2018, for a detailed list of firearms that would be released from USML controls.

[4] For further details, see American Bar Association Center for Human Rights, WHITE PAPER: Proposals to Relax Export Controls for Significant Military Equipment January 14, 2013; Comments from the Center for International Policy Re: Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), RIN 0694–AF47 (2018); and Comments by Susan Waltz on ITAR Amendment Categories I, II and III and EAR Amendment RIN 0694-AF47.

This is one of the provisions that derives from a statutory definition of terms such as *defense article*, *security assistance*, or *military equipment*. Where such terms are defined by statute, they are usually linked to the presence of an item on the USML.   Congress recently expanded the definition of defense article to include "600-series" items previously moved to the CCL [22 USC 2304(d)(2)(C)], but no provision has been made regarding the items under consideration here, which are intended to be designated as "500-series" items. Moving an item off the USML now could still affect the scope of the various laws that refer to defense articles or security assistance.

Of greatest concern in this regard are the links to human rights conditionality on security assistance and provision of military equipment [22 USC 2304(d)(2)(C) and 10 USC 362]; vetting of foreign military units that receive training and equipment (22 USC 2378d); provisions for third-party transfer of grant-supplied defense articles (22 USC 2314); and various reports to Congress (22 USC 2776 and 22 USC 2415).   If the changes go forward without adjustment, arms deals involving the sale or transfer of semi-automatic weapons would escape various statutory constraints.

What Congress should do:
- Continue to hold implementation of the new rule until the Government Accountability Office has completed its review of the current oversight regime and the Congress has had the opportunity to hold hearings.
- To ensure that **human rights protections** remain in place with regard to the potential sale or transfer of semi-automatic weapons, Congress should either enact legislation to ensure that weapons and ammunition currently listed in Categories I-III of the USML remain on the USML, or amend the definition of "security assistance" and "defense article" (22 USC 2304) to include weapons transferred to Commerce Department control (i.e. the "500 Series").
- Further, to **prevent the diversion to unauthorized users or those engaged in atrocities**, Congress should ensure that such security assistance is subject to relevant oversight provisions, including Sections 2314 (diversion), 2378d (vetting) and 2776 (Congressional notification of proposed sales).
- To ensure that Congress continues to receive **a comprehensive annual report on US arms sales**, the Arms Export Control Act (22 USC 2778) should be amended to clarify that "defense articles" includes any 500-series items on the CCL.[5]

## 3.   Retaining authority to monitor end use and block further sales if equipment is misused

What's in an asterisk?  Some of the items included on the US Munitions List are marked with an asterisk (*) to signify that they are considered significant military equipment (SME), defense articles "for which special export controls are warranted because of the capacity of such articles for substantial military utility or capability."[6]  Semi-automatic firearms are currently classified as SME, but that would change if the current proposals go forward.  All of the provisions covering defense articles (discussed above) apply to SME.  In addition, there are a few statutory provisions that apply specifically to SME.   The most relevant of these applies to end use controls, which could be significantly weakened by the proposed changes.   As provided by 22 USC 2753, re-transfers of SME require explicit authorization.  A special form for end-use control (DSP-83) is currently required for SME weapons transfers (22 CFR 123.10), and suppliers must provide precise information about the transferred equipment along with a certification by the foreign government at destination that the equipment will not be re-transferred without prior written approval of the US government.  Under current law, if significant military equipment is re-transferred without permission or used against anything other than a legitimate military target, the President must notify the Congress and suspend further transfers.  The proposed rule would eliminate these oversight provisions.

---

[5] The BIS regulatory proposal includes several changes to Export Administration Regulations (EAR) that affect record keeping on firearms transactions (namely EAR parts 743, 748, 758, and 762).   If the proposed regulations go forward, AECA reporting provisions (22 USC 2776) should be amended to ensure that statistical information about firearms transactions collected for other purposes, including compliance with multilateral agreements, should also be supplied directly to Congress.
[6] 22 USC 2794(9).

What Congress should do if the proposal moves forward:  Amend the Arms Export Control Act (notably 22 USC 2753) to ensure that all items currently designated as significant military equipment remain subject to end use monitoring and retain the prohibition on further sales or deliveries in the event of a violation of an end use agreement.

4.   **Risk of Diversion via unscrupulous brokering.**

In 2010, 24-year old Efraim Diveroli was arrested for efforts to arrange munitions shipments to Afghanistan without proper authorization.[7] Because the middle men who arrange arms deals are a significant source of diversion of weapons to criminal and terrorist organizations, Congress has imposed strict requirements for registration and licensing of brokers who supply defense articles (22 USC 2778).  The State Department has asserted that it will continue to claim jurisdiction over such activities but if the proposed changes are enacted it would no longer have a statutory basis for doing so and therefore may face significant legal challenges to the assertion of this authority. Further, one provision of the changes proposed in May 2018 anticipates a regulatory modification [specifically, 129.2(b)(2)(vii)], which by narrowing the interpretation of "brokering activities" would open the door to lawful transactions that bypass scrutiny of the middlemen who ship, finance, or possibly transship semi-automatic rifles.[8]

In addition to these concerns about the increased risk of diversion, the capacity for monitoring sale and delivery of firearms may be jeopardized by the proposed changes.  End use monitoring of such weapons is currently overseen by the State Department's Blue Lantern program, which reports annually to Congress. Although the Commerce Department checks on export compliance through its Sentinel Program, relatively little is known about the operations or effectiveness of this program.  It is unclear what resources the Commerce Department would be able to devote to monitoring transfers of 500-series weapons listed on the CCL.

What Congress should do if the proposed regulations are put in place:  Adopt legislation making clear that the current statutory definition of brokering activity will remain applicable for middle men involved in the transfer of items formerly controlled by the State Department, and ensure that all brokers of such items are required to register and secure licenses pursuant to Section 2778.

5.   **Criminal Prosecution.**

The Department of Justice's January 2018 summary of major US export enforcement cases includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international buyers on the dark net, and another similar case from Kansas.[9]  If semi-automatic weapons and other non-automatic firearms are removed from the US Munitions List, where they are now considered defense articles and significant military equipment, it will impact the ability of law enforcement to charge weapons traffickers with the serious offense of violating the Arms Export Control Act.

What Congress should do:  Keep all weapons with substantial military utility – including semi-automatic weapons – on the US Munitions List where they are subject to provisions of the AECA.

---

[7] See "Supplier Under Scrutiny on Arms for Afghans," New York Times, March 27, 2008, and "Arms Dealer Faces New Charges," New York Times, August 23, 2010.  The arms brokering adventures of Diveroli and his partner David Packouz are the story behind the 2016 film *War Dogs*.

[8] As of February 2019 it is not clear whether those changes are being advanced, because they are not referenced in available documents.

[9] Department of Justice, "Summary of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018.

WASHSTATEB006928

6.   **3-D Printed Weapons.**
By moving non-automatic and semi-automatic weapons oversight to the Commerce Department, individuals will no longer need prior approval before publishing or posting designs to produce plastic and untraceable guns using 3D-printing technology or CNC milling.

What Congress should do: Enact legislation, such as S. 459, which would extend restrictions on the publication of plans for printing untraceable 3-D printed weapons.


7.   **Weakening Control Procedures (Registration and Licensing).**
Procedures to authorize the export of weapons on the USML are overseen by the Department of State and involve two steps: registration and licensing.  This system was put in place by Congress several decades ago to ensure adequate oversight of weapons transfers.   The two-step procedure allows background scrutiny and close review of transactions before they are made – to ensure that unscrupulous deals do not go forward.   While the Commerce Department will require licensing on items transferred, it does not have any way to track manufacturers of these weapons, removing an important opportunity to ensure that those required to obtain licenses are in fact doing so.

What Congress should do if the proposed regulatory changes are implemented:  Require the concurrence of the Secretary of State for exports of articles and services that were previously controlled by the State Department.

11/12/2019                                          Don't Ease Gun Export Rules - Bloomberg

Editorial Board

# Don't Ease Gun Export Rules

The Trump administration has a dangerous plan to sell guns with less oversight.

By <u>Editorial Board</u>
April 17, 2019, 9:30 AM EDT



Sold in America. *Photographer: Spencer Platt/Getty Images North America*

President Donald Trump, who has received <u>unprecedented</u> support from America's gun lobby, seems determined to make it easier to export firearms and harder to keep track of whether they're destined for terrorists or rogue regimes. He proposes to do this by shifting oversight of the export of semi-automatic and non-automatic firearms, as well as of various gun components and some types of ammunition, from the Department of State to the Department of Commerce.

The change threatens to undermine national security and public safety around the world. Congress should stop it from taking effect.

WASHSTATEB006930

The U.S. is already the world's biggest firearms exporter, shipping roughly $7.5 billion worth of guns, artillery and ammunition from 2013 to 2017. Some of this equipment has ended up with al-Qaeda fighters and other terrorists, undermining the struggle to keep lethal weapons out of the hands of America's enemies.

Under the current system, State Department licensing officers too often approve export applications that lack required information, a department inspector general has found. In one instance, approval was granted to sell 400,000 rifles, along with more than 500 million rounds of ammunition and other equipment, to the Philippines Bureau of Customs – without notification to Congress, as required by law. Subsequent investigation found that licensing information was missing and the transaction's intermediary had "disappeared."

If licensing responsibility shifts to the Commerce Department, such lapses stand to become more frequent. Commerce lacks the specialized staff and expertise to vet arms sales, and has no plan to acquire them. Commerce officials have already indicated they will not feel obligated to notify Congress, as the State Department must, when gun exports are valued at more than $1 million. It's unclear whether the Commerce Department would even suspend sales to a buyer found to be operating illegally or in contravention of U.S. foreign policy aims.

The Trump administration also plans to end State Department oversight of the publication of computer code enabling 3-D printable guns. That would make it easier for people inside and outside the U.S. to make untraceable firearms at home and, like the change to gun-export authority, make guns more plentiful and difficult to regulate.

Democratic Representatives Eliot Engel and Norma Torres are proposing legislation to block the changes to oversight of weapons for export and 3-D printable guns. Congress should pass it without delay.

To contact the senior editor responsible for Bloomberg Opinion's editorials: David Shipley at davidshipley@bloomberg.net .

COMMENTS

 17

WASHSTATEB006931

Terms of Service Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices      Contact Us Help

WASHSTATEB006932

LAWFARE

TRADE AND SECURITY

# Assessing the Trump Administration's Proposed Changes to the Small-Arms Export Regime

By **Eric Halliday**, **Rachael Hanna**      Monday, December 2, 2019, 9:16 AM

The National Defense Authorization Act (NDAA) for fiscal 2020 is currently in House-Senate Conference Committee reconciliation negotiations. Among the several differences between the House and Senate versions is an amendment that could decide whether a Trump administration proposal to loosen export controls on firearms goes into effect. On Nov. 21, the Trump administration gave formal notification to Congress of the proposed rule changes, which could go into effect as early as Dec. 20 if Congress does not block the initiative within 30 days.

The United States exports firearms and related technology on a massive scale. During fiscal 2013 to 2017, the State Department reviewed approximately 69,000 commercial export license applications for firearms, artillery and ammunition reported at a value of $7.5 billion. Roughly two-thirds of these applications were for firearms, mostly nonautomatic and semiautomatic guns.

The Trump administration's proposal would transfer control over the export of firearms and related technology from the State Department to the Commerce Department. The differences between the current and proposed regimes—which are discussed below—could have significant implications for the global trade in small arms, particularly in conflicts across Latin America and the Middle East.

**Current Small-Arms Export Control Regime**

Under the current export control regime, the State Department oversees the export of weapons included in the United States Munitions List (USML). Established by the Arms Export Control Act (AECA) of 1976, the list outlines 21 different categories of weapons, ranging from small arms like handguns and shotguns (Category I) to chemical agents (Category XIV).

The AECA dictates that weapons and related technology included on the USML be designated as "defense articles" and "defense services"—technology that has national security implications. The purpose of the USML is to ensure that the federal government keeps a tight leash on all sales of sensitive military technology or other weapons that could threaten national security if found in the wrong hands.

The AECA empowers the president to regulate the export of defense articles and services, but presidents have historically delegated that power to the State Department.

The State Department has implemented an extensive series of regulations governing the export of items included on the USML. First, manufacturers that wish to export any defense article or service must register with the State Department's Directorate of Defense Trade Controls (DDTC) and pay an annual fee. Then, registered exporters must apply for and receive a license from the DDTC before they can proceed with any proposed sales. The licenses are valid for four years. Finally, before receiving approval, the manufacturer must provide extensive information about the proposed sale. The information required depends on whether or not the design of the defense article is classified but includes, at a bare minimum, complete purchase documentation, identifying information of the end user (the ultimate recipient of the weapons), and identifying information of any foreign entities that will assist in the transfer of the export to the end user.

If, for any reason, the defense article will be transferred to an end user other than the one included in the application, the DDTC must approve that change before the transfer is made.

Exporters who avoid the export requirements imposed by the State Department or provide false information on their application paperwork face strict criminal penalties: a fine of up to $1,000,000 and a maximum prison sentence of 20 years.

Finally, the AECA requires the State Department to notify Congress of any proposed sale of $1,000,000 or more of firearms included in Category I of the USML. Examples of Category I weapons include nonautomatic and fully automatic handguns and rifles, combat shotguns, silencers, and rifle scopes. The congressional oversight requirement is discussed in more detail below.

This regime is already porous in practice. In February 2019, the State Department's Office of the Inspector General (OIG) released an audit report on the department's DDTC Export Licensing Process, which reviews and approves export licenses for defense articles covered by the USML. Over the course of the audit, OIG reviewed 21 firearms export license applications filed with the DDTC in the previous year. Of those, 20 had been approved despite the applications lacking required information. Most notably, 62 percent of the audited applications were submitted with purchase orders that did not have required information on the end use or end user of the firearms. Congressional Democrats have also raised concerns that shifting firearms export control to Commerce will mean even fewer end-user checks on firearms exports.

**Congressional and Agency Oversight Under the Current Regime**

Beyond the enforcement mechanisms enforced by State, perhaps the most powerful check in the current regime is the ability of Congress to oversee and, to a certain extent, control small-arms sales. As noted above, under the AECA (22 U.S.C. § 2776(c)) and the current arms classification regime, State is required to notify Congress only when it is set to approve firearm sales of $1,000,000 or more. For sales to most countries, State must provide Congress with formal notification 30 days prior to the transaction being executed. Only 15 days' prior notice is required for sales to NATO members, Japan, Australia, South Korea, Israel and New Zealand. Upon receiving formal notification of the pending sale, Congress must take legislative action, either by joint resolution or by other legislation, before the arms are delivered if it wants to block the sale. In many cases, such legislation will need to have the support of two-thirds of Congress to override a likely presidential veto.

Given the logistical challenges of drafting and passing legislation in fewer than 30 days and the political implications of blocking a sale for bilateral relationships, an informal, classified notification process has also been in place since 1976. Under that informal system, the executive branch notifies the House and Senate foreign affairs committees to gauge if there is any pushback on large firearms sales. In 2012, the State Department implemented a revised version of this informal notification process that provides the foreign affairs committees with notice of 20–40 calendar days, depending on the arms and destination, before triggering the formal notification process.

State includes the proposed seller's license applications for commercial arms sales as part of its informal notification to the committees. This allows the administration and the committees to address any concerns confidentially to protect the relevant bilateral relationship. If any concerns cannot be resolved, State will often cancel the sale before triggering the formal notification process in order to avoid a fight with Congress.

In emergency scenarios, the president has the authority to waive the statutory review periods under the AECA. By formally notifying Congress, the president can state that an emergency situation requires the firearms sale to be executed without delay to protect national security interests. Under 22 U.S.C. § 2776(c)(2)(C), the president's notification must include a "detailed justification for his determination, including a description of the emergency circumstances" that necessitated immediate action and a "discussion of the national security interests involved."

In two recent episodes, Congress has used its oversight authority to block controversial small-arms deals. In 2016, Sen. Ben Cardin, ranking member of the Senate Foreign Relations Committee, opposed a proposed sale of approximately 26,000 assault rifles to the Philippines National Police, causing the State Department to abort the transaction. Cardin cited concerns about human rights abuses by the Philippines government in its war on drugs as the reason for blocking the sale. In 2017, the State Department informally notified Congress of a $1.2 million proposed sale of Sig Sauer semiautomatic handguns to the Turkish government a day before Turkish President Recep Erdogan's bodyguards violently attacked protesters outside the White House during Erdogan's state visit. In response, Cardin and Rep. Edward Royce, chairman of the House Foreign Affairs Committee, voiced their opposition to selling the 1,600 handguns to Turkey, and the State Department promptly scuttled the sale.

**The Trump Administration's Proposed Small-Arms Export Regime**

The Trump administration's proposal—announced through rule changes simultaneously released by the Commerce Department and the State Department in May 2018— would substantially overhaul the current regime. The centerpiece of the proposal is the transfer of most defense articles included in Categories I, II and III from the USML to the Commerce Control List (CCL). Category I covers small arms like semiautomatic handguns and rifles, fully automatic weapons up to .50 caliber in size, assault rifles, combat shotguns, silencers, rifle scopes, and other related small-arms technology. Category II includes weapons over .50 caliber such as howitzers, mortars and grenade launchers. Category III covers all ammunition and ordnance for the defense articles included in Categories I and II. Under the proposal, only fully automatic firearms, shotguns, and their ammunition and related technology would remain under State's control.

The goal of the proposal is to "limit the items that State controls to those that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." Items that do not meet these criteria, including firearms, will be transferred to Commerce's control.

Under the Commerce Department, exports of these weapons will be subject to a less rigorous approval process. At the request of Congress, the U.S. Government Accountability Office (GAO) issued a report in March 2019 detailing how this shift from State to Commerce would impact export controls, including licensing, registration, end-use monitoring and congressional notification requirements currently in place.

According to the GAO, items in Commerce's jurisdiction are subject to different AECA requirements for registration, licensing and end-use monitoring than are those in State's jurisdiction. The AECA mandates that manufacturers, exporters and brokers of USML items register with the State Department's DDTC, but it does not contain a similar registration requirement for manufacturers, exporters and brokers of items on the CCL. Commerce does not have its own registration requirements for those entities either.

With regard to licensing, State and Commerce rely on different internal watch lists to screen applicants, and Commerce has noted that it does not have access to the relevant State watchlists, which are likely to be more comprehensive because State had been responsible for maintaining negative information about exporters and end users of these items. Consequently, the GAO report warns that "critical information needed to effectively screen applicants and target licenses for end use monitoring may be unavailable to Commerce unless State shares its watch list data."

Moreover, while State allows license exceptions only for certain exports to Canada, the United Kingdom, and Australia, Commerce has license exceptions—called Strategic Trade Authorization (STA) exemptions—for exports to numerous countries. Commerce organizes countries that receive STA benefits into different tiers; within each tier are different sublevels, all of which denote the array of trade benefits the selected countries receive. The highest range of STA benefits are awarded to the countries listed on level A:5 of the Tier 1 List, which includes NATO partners and other close allies, a total of 37 countries. Level A:5 provides the broadest range of STA benefits, including exports of items that would otherwise be controlled for reasons of national security, regional stability and crime control. Commerce estimates that several hundred license applications for items transferred from State's to Commerce's oversight would be approved under STA exemptions. As a NATO ally, Turkey is automatically on the Tier 1 list; notably, Argentina is also included in the Tier 1 list. Those exemptions would not apply under the current regime. As noted above, Congress recently used its oversight powers to terminate an arms sale to Turkey. Without congressional oversight and with the benefits of Tier 1 STA benefits, such a sale would have been more likely to go through.

State and Commerce also conduct end-use monitoring of selected controlled exports differently. State relies primarily on embassy staff to conduct end-use checks, while Commerce typically assigns that duty to export control officers (ECOs) based overseas. However, the ECOs do not provide global coverage like that provided by U.S. embassy staff. Commerce, for example, has no ECOs positioned in the Western Hemisphere, where from 2013 to 2017 the State Department conducted more than 40 percent of its firearms-related end-use checks. Moreover, Commerce does not plan to create a new ECO position or assign a current ECO responsibility for the Western Hemisphere. Instead, Commerce will rely primarily on its Bureau of Industry and Security special agents to travel to countries outside of ECO coverage to conduct end-use checks. Also, no ECO is responsible for Afghanistan, where end-use control is extremely difficult.

Finally, Commerce's end-user certification requirements are less systematic than the equivalent required by State. For firearms and ammunition, State's export controls require applicants to provide a written certification from end users that they will not reexport, resell or otherwise dispose of the commodity outside of the designated country on the license. In comparison, Commerce does not require end-user certification for items on the CCL unless it has not verified an end user's legitimacy or on a case-by-case basis.

Echoing the concerns of other critics and congressional Democrats with the proposed changes, Rep. Ami Bera, chairman of the House Foreign Affairs Subcommittee on Oversight and Investigations, noted that while the current regime "is not perfect, the State Department is more equipped to ensure that our national security interests come first when it comes to firearm exports," and that elimination of congressional notification of "certain weapons exports that raise national security or human rights concerns" will undermine Congress's ability to "conduct effective oversight."

### Background and Legislative History of the Trump Administration's Proposal

President Obama originally floated a similar proposal during his presidency, but Secretary of State John Kerry shelved it in 2016 after pushback from Senate Democrats, who wanted export control to remain under State's control.

With its different view on gun control, the Trump administration has signaled that it would pursue such changes since 2017. In its proposal, the administration argues that the weapons that would be switched from the Munitions List to the Commerce List are "essentially commercial items widely available in retail outlets and less sensitive military items." The administration has explained the rule change by touting the economic benefits of increased exports, with one anonymous official telling Reuters in 2017 that its proposal would allow "more leeway to do arms sales" and "turn the spigot [of small-arms sales] on if you do it the right way."

Secretary of State Mike Pompeo formally notified Congress of the proposed rule change on Feb. 4. In response, Sen. Robert Menendez, the ranking member of the Senate Foreign Relations Committee, placed a 30-day hold on the proposal beginning on Feb. 26 by refusing to accept formal congressional notification, a procedural move that temporarily halted the shift of control from the Department of State to the Department of Commerce.

During the congressional negotiations in July over the NDAA for fiscal 2020, the House of Representatives passed a version with an amendment that would prevent the Trump administration from transferring firearms export control from the State Department to the Commerce Department. The amendment's sponsor, Rep. Norma Torres, stated that the purpose of trying to prevent the oversight transfer was to keep "deadly weapons from falling into the hands of drug cartels and terrorists." No senators have specifically addressed the issue in the NDAA. It remains unclear whether the final version of the fiscal 2020 bill will include this amendment or similar language. However, the Trump administration succeeding in giving formal congressional notification on Nov. 21, which triggered the 30-day period Congress has to take legislative action to prevent the changes from going into effect.

### Potential Downstream Impacts

Many international observers, including the United Nations, have repeatedly noted the widespread availability of small arms as a "key enabler" of conflicts around the world. Despite calls for states to exercise tighter arm controls, the Trump administration is proposing to do just the opposite. In light of the potential opening of the "spigot," to quote the anonymous Trump official in 2017, it is worth exploring the potential downstream effects of the proposal with regard to organized crime in Latin America and terrorism in the Middle East and Central Asia, regions that have been flooded with U.S. guns during recent periods of protracted violence.

*Gun Violence in Latin America*

The Trump administration's proposal has potentially enormous implications for organized crime in Latin America. Mexican drug cartels, street gangs like MS-13 and Barrio 18 in El Salvador, and Brazilian narco-trafficking groups all rely on firearms to carry out their illegal activities. There is a strong correlation between such groups and high crime rates in those countries. After years of widespread violence and instability, Mexico's homicide rate rocketed to an all-time high of an average of 91 murders a day in 2018, with much of that violence attributable to cartels battling for territory. Similarly, a 2016 study of global gun deaths found that El Salvador had the highest rate, with 39.2 firearm deaths per 100,000 residents, while Mexico was 15th, with a rate of 10.2 per 100,000.

The surprising truth hidden among these statistics is that, on the whole, Latin American countries have strict gun control regimes. A 2003 Brazilian law restricted the carrying of firearms to members of law enforcement agencies, the armed forces and certain private security companies. In Mexico, there is only one gun store in the entire country, and it's located on a military base in Mexico City, where potential customers must first provide six different identification documents before entering the premises.

The bridge between those tight gun control regulations and high rates of homicide by firearm is often American-made guns. A 2016 GAO study determined that, from 2009 to 2014, 70 percent of all firearms (73,684 in total) seized in Mexico were U.S.-made. In fact, an American gun is more likely to be used in a homicide in Mexico than in the U.S. In 2018, the Brazilian Federal Police pointed to the United States as the largest source of illegal small arms seized by police. A 2016 report by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives noted that 49 percent of all guns seized in El Salvador were manufactured in the U.S.

A large portion of the U.S.-made weapons found in Latin America are smuggled illegally out of the country. For example, in June 2019 Argentinian officials captured a massive arsenal of illegal weapons, including 2,500 firearms, the bulk of which had been smuggled out of the U.S. Yet many other weapons are legally exported to Latin American governments, only for corrupt officials to then sell them to organized criminal groups. The nonprofit group ATT Monitor, which studies issues relating to the global Arms Trade Treaty (ATT), has documented the forging of end-use agreements by corrupt officials in the region who then pass on the arms to unapproved users.

Even with the flow of American-made weapons into Latin American countries, these nations do not have comparatively high gun ownership rates. A 2017 study by the Graduate Institute of International and Development Studies in Geneva found that the rate of guns—legally and illegally owned—per 100 civilians was low throughout the region. Mexico had a rate of 12.7 guns per 100 civilians, Honduras was similarly situated at 14.1, while Brazil's rate was even lower, at 8.3. For comparison, Serbia's rate was 39.1 and Canada's was 34.7; the United States was overwhelmingly first, at 120.5.

Low gun ownership rates throughout Latin America—even with the current flow of American arms into the region—could leave the region vulnerable to the flood of legally available weapons envisioned by the Trump administration's proposal. Because the U.S. is the largest single supplier of guns in the world, including to Latin American countries, the expected increase in those exports, which a gun industry lobbying group has estimated could hit 20 percent, could cause a corresponding jump in the historic rates of gun ownership and firearms violence plaguing those states with unstable security situations. Should the Trump administration's proposal be enacted, analysts will be watching to see if increased gun sales to Latin American countries result in even more guns falling into the hands of organized criminal groups that are already responsible for hundreds of thousands of homicides every year.

*Armed Conflict in the Middle East and Central Asia*

Independent observers have voiced similar concerns about an increase in de facto unsupervised weapons exports to countries in the Middle East and Central Asia that are wracked by terrorist and armed rebel groups. In countries marked by terrorism and insurgency, easier access to weapons manufactured and exported by the U.S. would increase the capacity of armed groups to continue fighting.

The status of the United States as the leading global small-arms exporter is also relevant to the Middle East because a significant portion of its annual exports are sent to the region. From 2017 to 2018, total U.S. firearms exports increased by more than 12 percent, from $662 million to $759 million. Saudi Arabia alone accounted for $579 million and the United Arab Emirates (UAE) for another $32 million in firearm sales.

In the Arabian Peninsula, both Saudi Arabia and the UAE have violated end-user agreements with the United States by transferring legally exported U.S. weapons, including assault rifles, to militias they support in Yemen. Meanwhile, as militias backed by the Saudi-coalition have created alliances with al-Qaeda in the Arabian Peninsula (AQAP), American weapons have landed in the hands of U.S. enemies. The demand for American guns on the Yemeni black market is high, with arms dealers selling to AQAP, the Houthi rebels and other groups.

In the fight against the Islamic State, the United States attempted to bolster both Iraqi security forces and moderate Syrian rebel groups with funds and arms. However, between 2014 and 2018, many U.S. M16 assault rifles that were exported to Iraq as part of security assistance programs fell into the hands of various jihadist groups. In 2018, al-Qaeda-linked militants in Syria were selling U.S. assault rifles to other jihadists in the country.

According to a 2016 study by Action on Armed Violence, over the course of 14 years, the United States has supplied the military and police forces of Iraq and Afghanistan with almost 1 million assault rifles, 266,000 pistols and nearly 112,000 machine guns—a total of 1.45 millions small arms. At the time of the study, the Pentagon could account for fewer than half, highlighting the shortcomings of existing end-user controls.

In Afghanistan, significant numbers of those missing guns have ended up in the hands of Afghan and Pakistani Taliban militants. A major portion of U.S. weapons for American and Afghan troops are delivered into the country over land from Karachi, Pakistan. Long-standing ties between the Pakistani security services and Taliban militants result in the theft of many U.S. guns in transit. As a result, U.S. M4s are commonly sold on the open market in the Pakistani cities of Quetta and Peshawar and in the Federally Administered Tribal Areas, where both the Pakistani and Afghan Taliban have a significant presence.

With Congress's oversight capacity eliminated and Commerce's limited capacity to run end-user checks, critics warn the proposed rule change will likely increase the flow of American guns into protracted conflicts in the Middle East and Central Asia and, ultimately, the number of those arms that end up in the hands of some of the United States's most deadly enemies.

*Editor's Note: A previous version of this article mistakenly categorized Mexico as a Central American country.*

**Topics: Trade and Security**

**Tags: firearms, Trump Administration**

---

Eric Halliday is a student at Harvard Law School. Before law school, Eric worked for two years at Mintz Levin, where he focused on white collar, anti-money laundering, and pro bono domestic violence matters. He graduated from Tufts University with a B.A. in Political Science and Italian Studies.

Rachael Hanna is a student at Harvard Law School. Prior to law school, Rachael spent two years working at Mintz Levin, where she focused on white collar and anti-money laundering matters. She holds an A.B. in Government from Harvard College.

/

WASHSTATEB006937



✕

**Donald J. Trump** ✔
@realDonaldTrump

Follow ⌄

I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!

5:03 AM - 31 Jul 2018

**9,120** Retweets  **48,349** Likes

💬 **19K**      ↺ **9.1K**        **48K**

**Christopher Zullo** @ChrisJZullo · 31 Jul 2018          ⌄
Replying to @realDonaldTrump
Republican philosophy of more guns creating less civilian gun violence is just asinine. Don't let criminals, domestic abusers or mentally ill pass background checks. Limit high capacity military style weaponry. Invest in medicaid and social service programs

💬 **143**      ↺ **129**        **1.3K**

**Christopher Zullo** @ChrisJZullo · 31 Jul 2018          ⌄
When a kid on the playground throws a rock at another kid do you arm all the kids with rocks expecting less to be thrown? Republican policy of more guns creating less gun violence isn't just asinine but why United States has highest rate of civilian gun deaths

💬 **111**      ↺ **209**        **1.2K**

**Christopher Zullo** @ChrisJZullo · 31 Jul 2018          ⌄
Why I #RESIST

Tax Scam Bill
Net Neutrality
Trade Wars
Pre-Existing Conditions
SCOTUS
Russia
March For Our Lives
No Tolerance ICE
Environment

WASHSTATEB006938



116TH CONGRESS
1ST SESSION **H. R. 2500**

_____

# AN ACT

To authorize appropriations for fiscal year 2020 for military
activities of the Department of Defense, for military
construction, and for defense activities of the Depart-
ment of Energy, to prescribe military personnel strengths
for such fiscal year, and for other purposes.

WASHSTATEB006954

993

1    (1) The term "unaccompanied alien children"
2    has the meaning given such term in section 462 of
3    the Homeland Security Act of 2002 (6 U.S.C. 279)).
4    (2) The term "Flores settlement agreement"
5    means the stipulated settlement agreement filed on
6    January 17, 1997, in the United States District
7    Court for the Central District of California in Flores
8    v. Reno, CV 85–4544–RJK.

**SEC. 1050. UNITED STATES MUNITIONS LIST.**

10   The President may not remove from the United
11   States Munitions List any item that was included in cat-
12   egory I, II, or III of the United States Munitions List,
13   as in effect on August 31, 2017.

**SEC. 1050A. LIMITATION ON USE OF FUNDS FOR REIM-
        BURSEMENT OF EXPENSES AT CERTAIN
        PROPERTIES.**

17   (a) LIMITATION.—None of the funds made available
18   for the Department of Defense may be obligated or ex-
19   pended to the following properties or to an entity with an
20   ownership interest in such property:
21       (1) Trump Vineyard Estates.
22       (2) Trump International Hotel & Tower, Chi-
23   cago.
24       (3) Mar-A-Lago Club.
25       (4) Trump Grande Sunny Isles.

WASHSTATEB006955

REVIEWED|10-18-2019|S reviewed 10/18.



201921859
**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                          October 18, 2019
<u>DELIBERATIVE PROCESS/PRE-DECISIONAL</u>


☐ Read by _____

**INFORMATION MEMO FOR THE SECRETARY**

FROM:       PM – R. Clarke Cooper
            H – Mary Elizabeth Taylor

SUBJECT:    (SBU) Providing Regulatory Relief with Rules Transferring Controls for Exports
            of Certain Firearms and Ammunition from State to Commerce

**BLUF:**    (SBU) The Departments of State and Commerce will proceed with final steps
            toward publication of rules transferring controls for exports of certain firearms
            and ammunition from State to Commerce.  The rules will include Commerce
            controls on 3D-printed firearm files.

(SBU) In the near future, State and Commerce will proceed to complete the steps for publication
of final rules revising the International Traffic in Arms Regulations (ITAR) and Export
Administration Regulations to transfer firearms and related items that do not confer a "critical
military or intelligence advantage" from State to Commerce.  Because the Commerce proposed
rule has changed, the Administration will resubmit a formal 30-day notification to Congress on
the transfer of Categories I, II, and III from State to Commerce prior to publication.  The new
notification will effectively replace the February formal notification and, in a change from the
previously notified version, will include Commerce controls on the publication of 3D-printed
firearm files (i.e., computer files that enable a 3D printer to produce components of an operable
firearm) under its regulations.  The publication of the rules had been paused ████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████████████  Publication of the final rules that transfer control of certain firearms and
ammunition from State to Commerce will be greeted with relief by many small manufacturers
around the country, but is also likely to elicit strong political objections and legal challenges.

(SBU) **Export Control Implications and Regulatory Relief:**  Publication of the final rule will
complete the first comprehensive review of the ITAR's U.S. Munitions List (USML), which
commenced a decade ago.  Review of the USML to remove those items that no longer merit the
stringent controls of the ITAR continues to be a key line of effort for the Implementation Plan
under the President's Conventional Arms Transfer (CAT) Policy.  This effort enjoys broad
support from the U.S. defense, space, electronics, and other export-oriented industries.  This rule
in particular will impact a large number of small manufacturers and gunsmiths around the

country, most of whom are non-exporting, who will no longer have to register with State and pay the annual $2,250 fee with these regulatory changes.

(SBU) **Path Forward and Congressional Implications:**  When State notified Congress of intent to publish the firearms rules, Senator Menendez (D-NJ) requested the Department hold until two issues are "sufficiently addressed":  (1) congressional oversight of exports of firearms over specified value thresholds is maintained, and (2) the public release of 3D gun printing technical information remains controlled.  In addition, the House adopted an amendment offered by HFAC Chairman Engel (D-NY) to FY 2020 National Defense Authorization Act (NDAA) that would prevent the Department from shifting controls over firearms to Commerce, perhaps reflecting broader concerns that the rule will result in the global proliferation of U.S.-origin guns.

(SBU) The process for congressional notification of rules that would remove items from the USML typically involves a 30-day informal consultation with Congress and a formal 30-day congressional notification as required by Section 38(f) of the AECA.  In this case, however, after we notified Congress of the firearm rules in February, Commerce changed its draft rule to establish controls over the publication of 3D gun files.



The current congressional rollout plan includes a briefing for SFRC and HFAC staff prior to delivering the formal notification.

(SBU)

(SBU) At the expiration of the 30-day notification period, absent congressional holds, State and Commerce plan to publish our rules simultaneously, with an effective date that is 45 days after publication in order to allow for an orderly transition of the items from State to Commerce.  In

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL

-3-

the likely event the committees seek to assert a basis to "hold" this action, ███████████
███████████████████████████████████████ When the rules are final, State and
Commerce must forward them to the House, the Senate, and GAO pursuant to the Congressional
Review Act. ███████████████████████████████████████████████████
████████████████████████████████████████████████

(SBU) **Litigation Implications:** In 2018, State settled a lawsuit, *Defense Distributed v.
U.S. Department of State*, in which the plaintiff asserted a First, Second, and Fifth Amendment
challenge to the control of certain technical data for the 3D printing of firearms under the ITAR.
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████ After the Department entered into a settlement agreement, which permitted
publication of Defense Distributed's data on the internet, a number of states then sued the
Department to block implementation of the settlement agreement (*Washington v.
U.S. Department of State*), arguing that the Department's temporary amendment of the ITAR
called for by the settlement agreement was not properly notified to Congress pursuant to section
38(f) of the Arms Export Control Act (AECA). The court in *Washington* entered a preliminary
injunction enjoining the Department from complying with the settlement agreement in *Defense
Distributed*, and the court is currently considering cross motions for summary judgment.
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

(SBU) **Messaging and Engagement:** PM is working with colleagues in the Department and
interagency partners to prepare for the rollout of the rules, as amended, as well as any potential
litigation challenges. █████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL
WASHSTATEB006958

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL
-4-

Approved:    PM – R. Clarke Cooper    [RCC]
                 H – Mary Elizabeth Taylor    [MET]

Drafted:      PM/CPA:  Josh Paul, ext. 7-7878 and cell: ██████████

Cleared:

| | | |
|---|---|---|
| PM/FO | Stan Brown | OK |
| PM/DDTC | Michael Miller | OK |
| D | Brett Eggleston | OK |
| P | Melanie Carter | OK |
| M | Lareina Ockerman | OK |
| S/P | Michael Urena | OK |
| L | Josh Dorosin | OK |
| T | Maureen Tucker | OK |
| H | Tamara Darrach | OK |

REC1|APPROVE|11-12-2019|S approved



201922930
**United States Department of State**

*Washington, D.C.   20520*

<u>UNCLASSIFIED</u>                                                         November 8, 2019

## ACTION MEMO FOR THE SECRETARY

FROM:       PM – R. Clarke Cooper
            H – Mary Elizabeth Taylor

SUBJECT:    (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
            Control Act (AECA), of the Transfer of Certain Items from the U.S. Munitions
            List (USML)

BLUF:       (SBU) PM seeks to notify Congress of changes in the nature of controls over
            technical data being removed from the USML and transferred to control on the
            Commerce Control List (CCL).

## Recommendations
(SBU) That you authorize H to transmit the attached letters to Congress to provide a new
notification, pursuant to Section 38(f)(1) of the AECA, of the Department's intent to remove
certain items from the USML that no longer warrant State control under this Act.
(Approve/Disapprove by 11/19/19)


## Background
(U) Since 2010, the Department engaged in revising the USML into a "positive" list that
describes export controlled items using objective criteria, rather than broad, open-ended,
subjective, or design intent-based criteria.  Items not providing the United States with critical
military advantage and determined to no longer warrant USML control are being transferred to
the Department of Commerce.  As the most recent step in this effort, PM seeks your approval to
formally re-notify Congress of the proposed transfer of certain items from Categories I
(Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armaments), and III
(Ammunition/Ordnance) from the USML to the CCL.  Section 38(f) of the AECA requires the
Department, as delegated from the President, to report to the Speaker of the House of
Representatives and to the Committee of Foreign Relations and the Committee on Banking,
Housing, and Urban Affairs of the Senate, items that no longer warrant State continued control
under the International Traffic in Arms Regulation (ITAR), including a description of the nature
of any controls to be imposed on such items under any other provision of law.  After the
Congressional Notification (CN) is complete, we will seek approval to publish the final rule, to
be effective 45 days after publication.  Commerce would publish their final rule simultaneously.

(SBU) PM previously notified Congress of the Department's intent to transfer jurisdictional
control over these items on February 4.  We are submitting a new notification because the
Commerce amended its draft companion rule to provide controls over 3-D printing technology
and software for certain items.  AECA Section 38(f)(1) requires that CNs regarding the removal

of items from the USML "describe the nature of any controls to be imposed on that item under any other provision of law."

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML.  The President delegated this authority to the Secretary of State in E.O. 13637.

Attachments:

        Tab 2:  Revised USML Categories I, II, and III
        Tab 3:  Line-in/Line-out Comparison of Current USML Categories I, II, and III with these USML Categories as Revised
        Tab 4:  Revised Commerce Companion Control Text
        Tab 5:  Summary of Revisions to USML Categories I, II, and III
        Tab 6:  Proposed Controls for Major Defense Equipment in Category III
        Tab 7:  AM to T, Notification to Congress, dated 4 February 2019
        Tab 8:  Summary of Conclusions for Small Group Meeting on Transfer of Categories I-III, 18 September 2019
        Tab 9:  Summary of Conclusions for Small Group Meeting on Transfer of Categories I-III, 27 September 2019
        Tab 10: Reuters Article on Gun Exports

Approved:     PM – R. Clarke Cooper

Drafted:      PM/DTCP:  Rick Koelling, ext. 3-2828 and cell: ███████

| Clearances: | D | Brett Eggleston – OK |
|---|---|---|
| | P | Melanie Carter – OK |
| | S/P | Michael Urena – OK |
| | PM/DDTC | Michael Miller – OK |
| | PM/DTCP | Sarah Heidema – OK |
| | PM/DTCC | Julia Tulino – OK |
| | PM/DTCL | Catherine Hamilton – OK |
| | L/PM | Joe Khawam – OK |
| | L/M | Alice Kottmyer – OK |
| | PM/CPA | Josh Paul – OK |
| | ISN/CATR | Thomas Krueger – OK |
| | T | Maureen Tucker – OK |
| | H | Tamara Darrach – OK |

REC1|APPROVE|1-3-2019
REC2|APPROVE|1-3-2019



201837662
**United States Department of State**



*Washington, D.C.   20520*

SENSITIVE BUT UNCLASSIFIED                                    December 18, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:          PM – Marik String, Senior Bureau Official

SUBJECT:     (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
                      Control Act, of the Removal of Certain Items from the U.S. Munitions List.

BLUF:           (SBU) PM seeks to notify Congress of removals from the United States Munitions
                      List (USML) as part of the on-going effort to ensure the USML includes only
                      items that merit the most stringent export control.  Notification will consist of an
                      informal 30 calendar-day period initiated by the PM/DTCP Office Director,
                      followed by a 30 calendar-day period formally notified by H.

**Recommendations**
(SBU) That you:
   (1) Approve the PM/DTCP Office Director to electronically transmit to House Foreign
        Affairs and Senate Foreign Relations Committees the draft attached letters to initiate
        informal notification of a removal from the USML, pursuant to the Department's
        arrangement with the Congress.  (Approve/Disapprove by 12/19/18)

   (2) Approve H, upon notice from PM/DTCP that the informal period initiated in paragraph
        (1) is concluded, to transmit the signed copies of the attached letters to the Congress in
        order to provide formal notification, as required by Section 38(f)(1) of the Arms Export
        Control Act, of the State Department's intent to remove certain items from the USML
        that no longer warrant control under this Act.  (Approve/Disapprove by 12/19/18)

**Background**
(U) Since 2009, the Department has been engaged in an effort to review the U.S. export control
system and revise the USML into a "positive" list that describes controlled items using objective
criteria, rather than broad, open-ended, subjective, or design intent-based criteria.  As part of this
effort, items determined to no longer warrant control on the USML are being transferred to the
Department of Commerce's Commerce Control List (CCL).  Those non-objective criteria are
still found in three of the 21 categories of the USML, the only remaining tranche of USML
reforms that have been delayed for years due to political sensitivities surrounding firearms.

(U) After consultation with the Departments of Defense and Commerce, solicitation and review
of public comments, and interagency review, the Department of State has drafted a final rule to
revise the three USML Categories that have yet to be reformed:  I (firearms and related articles),
II (guns and armaments), and III (ammunition and ordnance).  Through this review, the

Department identified and will continue to control on the USML those items that provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML. The result of the review is that certain items currently on the USML not meeting this standard will transition to the CCL. This reform has also been a key element of the President's Conventional Arms Transfer Policy Implementation Plan. ███████████████████████████████████ ██████

(U) The items that will transition to the CCL include: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic to a fully automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces. Section 38(f)(1) of the Arms Export Control Act provides that the President may not remove items from the USML until 30 days after the date on which notice of the proposed removal is provided to the House Committee on Foreign Affairs and the Senate Foreign Relations Committee.

(SBU) Pursuant to a process communicated to Congress in 2011, the Department provides the draft final rules and a summary of the resulting removals to the Committees for a 30-day informal review period. Congress has not attempted to stop or slow down previous removals from the USML through the Congressional notification process, unlike the Congressional holds that are commonly placed on arms sale notifications. However, a Member could request that State not proceed with the formal notification or publication of this rule removing items from the USML. ████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

(SBU) Our oversight committees were previously briefed on the proposed State and Commerce rules to revise USML Categories I-III and move certain items to the CCL, and additional briefings will be offered upon the start of informal Congressional Notification of the rule change. ██████████████████████████████████████████
████████████████████████████████████ he Department continues to defend a legal challenge to the public release of technical data to enable 3-D printing of firearms and has sought a stay of the litigation, pending completion of this rulemaking process. This rule would transition certain technical data, including the data for semi-automatic and non-automatic firearms, to the CCL, where it can be publically released without authorization under Commerce rules. The lawsuit and the movement of firearms and ammunition from the USML to the CCL have generated substantial public and congressional interest, which may result in additional scrutiny of this notification.

(U) 

(U) Once these items are removed from the USML, they will be controlled by the Department of Commerce in new Export Control Classification Numbers (ECCNs) on the CCL in the Export Administration Regulations (EAR). Most of the physical items that are removed, including all of the firearms (with the exception of firearms manufactured prior to 1898), will have a world-wide Commerce Department license requirement, and the State Department will continue to review all export license applications for firearms for policy concerns.

(U) One defense article to be removed from the USML is designated as Major Defense Equipment (which requires separate notification and higher scrutiny under the ITAR), the M855A1 cartridge, the lead-free replacement for the 5.56x45 mm NATO, M855 standard ball cartridge. Therefore, the notification package will include a table delineating the proposed controls of Major Defense Equipment.

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML. The President delegated this authority to the Secretary of State in Executive Order 13637. This authority may be exercised by the Undersecretary of State for Arms Control and International Security Affairs pursuant to Delegation of Authority 293-2.

Attachments:
      Tab 1: Notification Letters to the Congress
      Tab 2: Revised USML Categories I, II, and III
      Tab 3: Line-in/Line-out Comparison of Current USML Categories I, II, and III with
          these USML Categories as Revised;
      Tab 4: Revised Department of Commerce Companion Control Text;
      Tab 5: Summary of Revisions to USML Categories I, II, and III; and
      Tab 6: Proposed Controls for Major Defense Equipment in Category III
      Tab 7: Roll-Out Plan

WASHSTATEB007101

SENSITIVE BUT UNCLASSIFIED

Approved:     PM – Marik String, SBO     MS

Drafted:      PM/DTCP:  Rob Monjay, ext. 3-2817 and cell: ███████

Clearances:

| | | |
|---|---|---|
| | D | Jamie Shufflebarger – OK |
| | P | Jamie Gusack – OK |
| | S/P | Michael Urena – OK |
| | PM/DDTC | Michael Miller – OK |
| | PM/DTCP | Sarah Heidema – OK |
| | PM/DTCC | Jae Shin – OK |
| | PM/DTCL | Catherine Hamilton – OK |
| | PM/DTCM | Anthony Dearth – OK |
| | L/PM | Shana Rogers – OK |
| | L/M | Alice Kottmyer – OK |
| | PM/CPA | Dave McKeeby – OK |
| | ISN/CATR | Thomas Kruger – OK |
| | T | Ed Abisellan – OK |
| | H | Collin Christopherson – OK |

# Exclusive: Trump administration moves closer to easing gun exports

WASHINGTON (Reuters) - The Trump administration has passed a key milestone in a long-delayed rule change that would make it easier to sell U.S. firearms outside the United States, including assault rifles and ammunition, people briefed on the matter told Reuters.

FILE PHOTO: AR-15 rifles are displayed for sale at the Guntoberfest gun show in Oaks, Pennsylvania, U.S., October 6, 2017. REUTERS/Joshua Roberts/File Photo

The proposed rule changes, which would move oversight of commercial firearm exports from the U.S. Department of State to the Department of Commerce, could be enacted as soon as the end of this year, the sources said late on Wednesday.

The move by President Donald Trump's administration may generate business for gun makers such as American Outdoor Brands (AOBC.O) and Sturm Ruger & Company (RGR.N) while increasing the sale of deadly weapons abroad. A relaxing of rules could increase foreign gun sales by as much as 20%, the National Shooting Sports Foundation (NSSF) has estimated.

While the State Department is primarily concerned with international threats to stability and maintains tight restrictions on weapons deals, the Commerce Department typically focuses on making it easier for U.S. companies to sell products overseas.

Since taking office, Trump has been a far more outspoken booster of U.S. weapons sales abroad than his recent predecessors, acting almost as a salesman for the U.S. defense industry, analysts have said. Any move that would boost arms sales is also likely to earn enthusiastic support from the influential National Rifle Association as Trump's re-election campaign heats up.

Critics, including some lawmakers and arms control advocates, have expressed concern that any easing of export rules could make powerful weapons of the type often used in U.S. mass shootings more accessible to criminal gangs and militant groups that Trump has vowed to fight.

"This change will undermine congressional oversight, exacerbate the risk of international gun violence, human rights abuses, and armed conflict, and put U.S. servicemen and women at risk from U.S. weapons that have fallen into the wrong hands," Rachel Stohl, a managing director at the Washington think tank the Stimson Center, said in a statement.

A review of the rules by multiple U.S. agencies including the Pentagon and the Department of Homeland Security concluded this week, the people said. Government records show the final rule was formally transmitted to the White House Office of Management and Budget on Oct. 23.

This week's close of the interagency comment period was a key milestone that enables the Trump administration to put lawmakers on notice of the intent to transfer formal oversight to the weapons sales from State to Commerce. Top officials at both departments still need to sign off on the issue before legislators can be notified.

Reuters first reported on the Trump administration's interest in the oversight shift in 2017 here The action is part of a broader Trump administration overhaul of weapons export policy here

The effort to streamline U.S. small arms export controls dates back to an Obama administration initiative begun in 2009 that was never translated into policy.

"The move would reduce the regulatory burden and make industry members more competitive in the global marketplace with out reducing oversight," said Lawrence Keane, head of government and public affairs for the NSSF trade group, adding "there is more oversight at the Commerce Department."

Representatives from the Commerce Department and budget office declined to comment.

## BEAT THE CLOCK

"The Administration continues to work through the interagency process with the Departments of State, Commerce, Homeland Security, Justice, and other stakeholders to reexamine longstanding polices and regulations to ensure that U.S. industries have every advantage in the global marketplace," a State Department spokesman said.

The U.S. House of Representatives has passed legislation that would prohibit the transfer of firearms export oversight to the Department of Commerce. But the bill containing the language, an annual defense policy bill called the National Defense Authorization (NDAA), has not passed the Senate and is not yet law.

If the Trump administration moves to notify legislators of the planned change in the coming weeks, it could be enacted before passage of the NDAA, one of the people said.

The Senate's version of the NDAA does not contain the same language as the House bill. The measure is being discussed by legislative staffs, the person said.

Domestic gun sales have risen in the past three months, according to estimates released on Tuesday by research consultancy Small Arms Analytics & Forecasting. Sales are flat at 10.8 million units when compared to the same period a year earlier, SAAF said in the estimate.

Reporting by Mike Stone and David Shapardson in Washington, D.C.; Editing by Chris Sanders and Bill Berkrot

Our Standards:The Thomson Reuters Trust Principles.



United States Department of State

*Washington, D.C. 20520*

The Honorable
James E. Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, D.C. 201510

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
As stated.



United States Department of State

*Washington, D.C. 20520*

The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

NOV 1 2 2019

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the
Department is transmitting herewith notification of the intention to transfer jurisdictional control
of certain classes of item currently on the United States Munitions List (USML) to the
Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the
USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the
current and revised USML Categories I, II and III; the Department of Commerce's revised
companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
 As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Michael T. McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
    As stated.

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**§ 121.1 The United States Munitions List.**

\* \* \* \* \*

**Category I—Firearms and Related Articles**

   \*(a) Firearms using caseless ammunition.

   \*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

   \*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms).

   *Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

   \*(d) Fully automatic shotguns regardless of gauge.

   \*(e) Silencers, mufflers, and sound suppressors.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter

2

for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

3

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

4

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire

5

modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

6

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

7

WASHSTATEB007118

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

8

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

9

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

10

WASHSTATEB007121

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

11

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

12

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

13

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

14

WASHSTATEB007125

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

15

SENSITIVE BUT UNCLASSIFIED

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.


**§ 121.1 The United States Munitions List.**

* * * * *

**Category I—Firearms  and Related Articles**

  **, Close Assault Weapons and Combat Shotguns**

  *(a) Firearms using caseless ammunition Nonautomatic and semi-

automatic firearms to caliber .50 inclusive (12.7 mm).


  *(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms)~~or other weapons (e.g. insurgency counterinsurgency, close assault weapons systems) having a special military application regardless of caliber~~.

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

~~Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.~~

*(e) Silencers, mufflers, and sound ~~and flash~~ suppressors ~~for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts~~.

(f) [Reserved]

~~Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)~~

*(g) Barrels, ~~cylinders,~~ receivers (frames) bolts, bolt carriers, slides, or sears~~or complete breech mechanisms~~ specially designed for the articles in paragraphs (a), (b), and ~~through~~ (d) of this category.

2

(h) ~~Components, p~~Parts, components, accessories, and attachments ~~.~~, as follows:

~~for the articles in paragraphs (a) through (g) of this category.~~

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (~~as defined in~~see §120.10 of this subchapter) and defense services (~~as defined in~~see §120.9 of this subchapter) directly related to the defense articles described in ~~paragraphs (a) through (h) of~~ this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)

3

Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

(x) Commodities, software, and technology subject to the EAR (see

4

§ 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*: Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

~~: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not~~

5

manufactured to military specifications. It also excludes accessories and
attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for
firearms that do not enhance the usefulness, effectiveness, or capabilities of
the firearm, components and parts. The Department of Commerce regulates
the export of such items. See the Export Administration Regulations (15
CFR parts 730-799). In addition, license exemptions for the items in this
category are available in various parts of this subchapter (e.g., §§123.17,
123.18 and 125.4).

**Category II—Guns and Armament**


\*(a) Guns and armament greater than over caliber .50 (*i.e.,* 12.7 mm), as
follows:

   \*(1) Guns, howitzers, artillery, and cannons;

   \*(2) Mortars;

   \*(3) Recoilless rifles;

   \*(4) Grenade launchers; or whether towed, airborne, self-propelled, or
fixed, including but not limited to, howitzers, mortars, cannons, recoilless
rifles, and grenade launchers

   (5) Developmental guns and armament greater than .50 caliber (12.7 mm)
funded by the Department of Defense and specially designed parts and

6

components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the

7

CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

 (b) Flame-throwers with an effective range greater than or equal to 20 meters.specifically designed or modified for military application.

(c) [Reserved]Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.

*(d) Kinetic energy weapon systems specially specifically designed or modified for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

SENSITIVE BUT UNCLASSIFIED
WASHSTATEB007134

(e) Signature reduction devices ~~control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment~~ specially ~~specifically~~ designed~~, developed, configured, adapted or modified to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro-optical, acoustic) of~~ for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices)~~defense articles controlled by this category~~.

\*(f) – (i) [Reserved]~~Engines specifically designed or modified for the self-propelled guns and howitzers in paragraph (a) of this category.~~

~~(g) Tooling and equipment specifically designed or modified for the production of defense articles controlled by this category.~~

~~(h) Test and evaluation equipment and test models specifically designed or modified for the articles controlled by this category. This includes but is not limited to diagnostic instrumentation and physical test models.~~

~~(i) Autoloading systems for electronic programming of projectile function for the defense articles controlled in this Category.~~

(j) ~~All other components, p~~Parts, components, accessories, and attachments, as follows: ~~and associated equipment specifically designed or modified for the articles in paragraphs (a) through (i) of this category. This~~

9

includes but is not limited to mounts and carriages for the articles controlled in this category.

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

10

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

11

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see*as defined in §120.10 of this subchapter) and defense services (*see*as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a)-, (b), (d), (e), and through

12

(j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

 (l) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:

 (1) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:

 (i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;

 (ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel-handling equipment; and the electrical interfaces between power supply gun and other turret electric drive function;

13

(iii) Target acquisition, tracking fire control or damage assessment systems; and

(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(3) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application.

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition/ and Ordnance**

\*(a) Ammunition/, as follows: ordnance for the articles in Categories I and II of this section.

14

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

15

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

16

SENSITIVE BUT UNCLASSIFIED
WASHSTATEB007142

(b) Ammunition/ordnance handling equipment specially ~~specifically~~ designed ~~or modified~~ for the articles controlled in this category, as follows:~~,~~ ~~such as, belting, linking, and de-linking equipment.~~

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]~~Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.~~

(d) ~~Components, p~~Parts and components~~, accessories, attachments and associated equipment specifically designed or modified~~ for the articles in this category, as follows:

*(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive~~Guidance and control components for the articles in paragraph (a) of this category~~;

*(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;~~Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category~~; ~~and~~

17

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium; ~~All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.~~

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

18

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or

19

predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see*as defined in §120.10 of this subchapter) and defense services (*see*as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), and through (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(f) – (w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles. The following explains and amplifies the terms used in this category and elsewhere in this subchapter:

(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or

~~other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions therefor), boosters, firing components therefor, primers, and other detonating devices for the defense articles controlled in this category.~~

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* ~~(2)~~ This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting or popping.~~(3) Equipment and tooling in paragraph (c) of this category does not include equipment for hand-loading ammunition.~~

~~(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been~~

21

designed or manufactured using technical data and defense services controlled by this category.

(5) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

* * * * *

22

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 191107-0079]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Final rule.

1. The authority citation for 15 CFR part 732 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq*.; 50 U.S.C. 1701 *et seq*.; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

2. Section 732.2 is amended by adding one sentence to the end of the paragraph (b) introductory text to read as follows:

**§ 732.2 Steps regarding scope of the EAR.**

* * * * *

1

(b) *  *  *   The following also remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c).

*   *   *   *   *

## PART 734 – SCOPE OF THE EXPORT ADMINISTRATION REGULATIONS

3. The authority citation for 15 CFR part 734 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

4. Section 734.7 is amended by:

a. Revising paragraph (a) introductory text; and

b. Adding paragraph (c) to read as follows:

## § 734.7 Published.

(a) Except as set forth in paragraph (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

2

\* \* \* \* \*

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

\* \* \* \* \*

## PART 736 – GENERAL PROHIBITIONS

5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

WASHSTATEB007151

**SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS**

\* \* \* \* \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

**PART 740 – LICENSE EXCEPTIONS**

7. The authority citation for 15 CFR part 740 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*;  22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228;  E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

8. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

4

**§ 740.2 Restrictions on all license exceptions.**

(a) *  *  *

(21)  The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2)(*i.e.*, parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm.  (*See* USML Category I(h)(2)).  In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

    9. Section 740.9 is amended by:

    a.  Adding five sentences at the end of paragraph (a) introductory text;

    b.  Adding one sentence at the end of paragraph (b)(1) introductory text;

5

c. Adding paragraph (b)(5); and

d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

## § 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\*   \*   \*   \*   \*

(a)  \*   \*   \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair").  In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment.  In accordance with the requirements in § 758.1(b)(9) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES.  In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this section, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country,, or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan

6

(except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740);); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

7

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License cException TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

WASHSTATEB007156

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\*   \*   \*   \*   \*

10. Section 740.10 is amended by:

a.  Adding one sentence at the end of paragraph (b)(1); and

b.  Adding paragraph (b)(4).

The additions read as follows:

## § 740.10 Servicing and replacement of parts and equipment (RPL)

\*   \*   \*   \*   \*

*(b)* \*  \*  \*

(1) \*   \*   \* The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for

WASHSTATEB007157

servicing and replacement may be exported under paragraphs (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

*  *  *  *  *

(4) *Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement.*  This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraphs (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740;

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

WASHSTATEB007158

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (b)(4):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

11.  Section 740.11 is amended by:

a. Adding two sentences at the end of the introductory text;

b. Adding Note 2 to paragraph (b)(2); and

11

c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

## § 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

*   *   *   Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section.  Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

*   *   *   *   *

*Note 2 to paragraph (b)(2):*  *Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (e.g., contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.*

*   *   *   *   *

12. Section 740.14 is amended by revising paragraph (b)(4) introductory text, revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

## § 740.14 Baggage (BAG).

12

\* \* \* \* \*

   (b) \*  \*  \*

   (4) *Tools of trade*. Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section.  For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section.  For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

   (e) *Special provisions for firearms and ammunition*. \*  \*  \*

   (3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

   (i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

13

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception.  All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

WASHSTATEB007162

* * * * *

## § 740.16 [AMENDED]

13.  Section 740.16 is amended by:

a.  Revising paragraph (a)(2);

b.  Revising paragraphs (b)(2)(iv) and (v); and

c.  Adding paragraph (b)(2)(vi);

The revisions and addition read as follows:

## § 740.16 Additional permissive reexports (APR).

* * * * *

(a)  * * *

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003; or commodities classified under a 0x5zz ECCN; and

* * * * *

(b)  * * *

(2)  * * *

15

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCN 6A002; or

(vi) Commodities classified under a 0x5zz ECCN.

*  *  *  *  *

14.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

§ 740.20 License Exception Strategic Trade Authorization (STA).

*  *  *  *  *

(b)  *  *  *

(2)  *  *  *

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

*  *  *  *  *

15. Add Supplement No. 4 to part 740 to read as follows:

SUPPLEMENT NO. 4 TO PART 740 - ANNEX A FIREARM MODELS

16

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.

(2) IZH 34M, .22 Target pistol.

(3) IZH 35M, .22 caliber Target pistol.

(4) Mauser Model 1896 pistol = SMCR.

(5) MC-57-1 pistol.

(6) MC-1-5 pistol.

(7) Polish Vis Model 35 pistol = SMCR.

(8) Soviet Nagant revolver = SMCR.

(9) TOZ 35, .22 caliber Target pistol.

(10) MTs 440.

(11) MTs 57-1.

(12) MTs 59-1.

(13) MTs 1-5.

(14) TOZ-35M (starter pistol).

(15) Biathlon-7K.

17

(b) *Rifles.*

(1) BARS-4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K =SMCR.

(6) German model G41 = SMCR.

(7) German model G43=SMCR.

(8) IZH-94.

(9) LOS-7, bolt action.

(10) MC-7-07.

(11) MC-18-3.

(12) MC-19-07.

(13) MC-105-01.

(14) MC-112-02.

(15) MC-113-02.

(16) MC-115-1.

18

(17) MC-125/127.

(18) MC-126.

(19) MC-128.

(20) Saiga.

(21) Soviet Model 38 carbine=SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle=SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle=SMCR.

(30) Sever – double barrel.

(31) IZH18MH single barrel break action.

(32) MP-251 over/under rifle.

(33) MP-221 double barrel rifle.

WASHSTATEB007167

(34) MP-141K.

(35) MP-161K.

(36) MTs 116-1.

(37) MTs 116M.

(38) MTs 112-02.

(39) MTs 115-1.

(40) MTs 113-02.

(41) MTs 105-01.

(42) MTs 105-05.

(43) MTs 7-17 combination gun.

(44) MTs 7-12-07 rifle/shotgun.

(45) MTs 7-07.

(46) MTs 109-12-07 rifle.

(47) MTs 109-07 rifle.

(48) MTs 106-07 combination.

(49) MTs 19-97.

(50) MTs 19-09.

20

(51) MTs 18-3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut-2.

(56) Berkut-2M1.

(57) Berkut-3.

(58) Berkut-2-1.

(59) Berkut-2M2.

(60) Berkut-3-1.

(61) Ots-25.

(62) MTs 20-07.

(63) LOS-7-1.

(64) LOS -7-2.

(65) LOS-9-1.

(66) Sobol (Sable).

(67) Rekord.

21

(68) Bars-4-1.

(69) Saiga.

(70) Saiga-M.

(71) Saiga 308.

(72) Saiga-308-1.

(73) Saiga 308-2.

(74) Saiga-9.

(75) Korshun.

(76) Ural-5-1.

(77) Ural 6-1.

(78) Ural-6-2.

(79) SM-2.

(80) Biatlon-7-3.

(81) Biatlon-7-4.

(82) Rekord-1.

(83) Rekord-2.

(84) Rekord-CISM.

22

(85) Rekord-1-308.

(86) Rekord-2-308.

(87) Rekord-1-308-CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioneer.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44-1.

(94) TOZ 78-01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99-01.

(98) TOZ 55-01 Zubr.

(99) TOZ 55-2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

23

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742 – CONTROL POLICY—CCL BASED CONTROLS

16.  The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

17.  Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

## §742.6 Regional stability.

*   *   *   *   *

24

(b)  *  *  *

(1)  *  *  *

(i)  Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world.  *   *   * When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

 *   *   *   *   *

18.  Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

**§ 742.7 Crime control and detection.**

(a)  *  *  *

25

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in

each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

(c)  *Contract sanctity*.  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

19.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a); and

b. Revising paragraph (f) to read as follows:

## § 742.17  Exports of firearms to OAS member countries.

(a)  *License requirements*. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  *   *   *

*   *   *   *   *

(f) *Items/Commodities*.   Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No. 1 to part 774 of the EAR).

*   *   *   *   *

WASHSTATEB007175

**§ 742.19 [AMENDED]**

20. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

**PART 743 – SPECIAL REPORTING AND NOTIFICATION**

21. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*;  50 U.S.C. 1701 *et seq.*; E.O.

13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014

Comp., p. 223; 78 FR 16129; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

22. Section 743.4 is amended by:

a. Adding four sentences to the end of paragraph (a);

b. By redesignating Note to paragraph (a) as Note 1 to paragraph (a);

c. Revising paragraph (b);

d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

e. By redesignating Note to paragraph (e)(1)(ii) as Note 2 to paragraph (e)(1)(ii);

e. Revising paragraph (h); and

WASHSTATEB007176

f. Adding paragraph (i) to read as follows:

## § 743.4 Conventional arms reporting.

(a) *   *   *   This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section.   The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(9).   Because of the requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method.   The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

*Note 1 to paragraph (a):* *   *   *


(b) *Requirements*.   You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:


(c) *   *   *

29

(1) * * *

    (i) ECCN 0A501.a and .b.

* * * * *

(2) * * *

    (i) ECCN 0A501.a and .b.

* * * * *

(h) *Alternative submission method.* This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section. The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(9), to include the six character ECCN classification (*i.e.*, 0A501.a or 0A501.b) as the first text to appear in the Commodity description block. If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S. Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting. An exporter that complies with the requirements in § 758.1(g)(4)(ii) does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482-0092, Fax: (202) 482-4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the

WASHSTATEB007178

Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482-4188, Fax: (202) 482-4145.

## PART 744 – CONTROL POLICY: END-USER AND END-USE BASED

23.  The authority citation for 15 CFR part 744 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4582; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of September 19, 2018, 83 FR 47799 (September 20, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of January 16, 2019, 84 FR 127 (January 18, 2019).

## § 744.9 [AMENDED]

24.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

## PART 746 – EMBARGOES AND OTHER SPECIAL CONTROLS

25.  The authority citation for 15 CFR part 746 is revised to read as follows:

31

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

## § 746.3 [AMENDED]

26.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

## § 746.7 [AMENDED]

27.  Section 746.7 is amended in paragraph (a)(1) by:

a. Adding "0A503," immediately before "0A980"; and

b. Removing "0A985,".

## PART 748 – APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

28.  The authority citation for 15 CFR part 748 is revised to read as follows:

32

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

29.  Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text;

c. Revising paragraphs (a) introductory text and (a)(1);

d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

e. Adding paragraph (e).

The revisions and additions read as follows.

## § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraph (e) of this section.

33

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

\* \* \* \* \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states*.  If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

WASHSTATEB007182

(ii) If the country to which the commodities are being exported does not require an import

certificate or permit for firearms imports, that fact must be noted on any license application for

ECCN 0A501 or 0A505 commodities.

*Note 2 to paragraph (e).* *Obtaining a BIS Statement by Ultimate Consignee and*

*Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the*

*requirement to obtain a certification pursuant to paragraph (a) of this section because that*

*statement is not issued by a government.*

30. Supplement No. 2 to part 748 (Unique Application and Submission Requirements) is

amended by adding paragraph (z) to read as follows:

## SUPPLEMENT NO. 2 TO PART 748 - UNIQUE APPLICATION AND SUBMISSION REQUIREMENTS

\* \* \* \* \*

(z) *Exports of firearms and certain shotguns temporarily in the United States.*

(1) *Certification.*  If you are submitting a license application for the export of firearms controlled

by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN

0A502 that will be temporarily in the United States, *e.g.*, for servicing and repair or for intransit

shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in

Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or

WASHSTATEB007183

Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740.  I and the parties to this transaction will comply with the requirements specified in paragraph (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements*.  Each approved license for commodities described under paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

36

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (z): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

## PART 758 – EXPORT CLEARANCE REQUIREMENTS

31.  The authority citation for part 758 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

32.  Section 758.1 is amended by:

a. Revising paragraphs (b)(7) (8), and adding paragraph (b)(9);

b. Revising paragraph (c)(1);

c. Adding Note 1 to paragraph (c)(1);

c. Adding paragraph (g)(4); and

37

d. Redesignating Note to paragraph (h)(1) as Note 3 to paragraph (h)(1); to read

as follows:

## § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as

described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement

No. 6 to part 744 of the EAR), regardless of value or destination; or

 (9) For all exports, except for exports authorized under License Exception BAG, as set forth in

§740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel

length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under

ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), as set forth in §740.14 of the EAR. See 15 CFR 30.37(x)

of the FTR;

*Note 1 to paragraph (c)(1): See the export clearance requirements for exports of*

*firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18*

WASHSTATEB007186

*inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in §740.14 of the EAR.*

\*   \*   \*   \*   \*

(g) \*   \*   \*

(4) *Exports of Firearms and Related Items*.  This paragraph (g)(4) includes two separate requirements under paragraph (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR.  Paragraph (g)(4)(i) is limited to certain EAR authorizations.  Paragraph (g)(4)(ii) applies to all EAR authorizations that require EEI filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES*.  For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items.  The requirements of this paragraph also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES*.  For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other

39

required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.*, 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES.  (*See* § 743.4(h) for the use of this information for conventional arms reporting).

     *Note 2 to paragraph (g)(4): If a commodity described in paragraph (g)(4) is exported under License Exception TMP under § 740.9(a)(6) for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii).  For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned.  If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization.  The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.*

\*  \*  \*  \*  \*

    33.  Add § 758.10 to read as follows:

## § 758.10  Entry clearance requirements for temporary imports.

(a) *Scope*.  This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR

WASHSTATEB007188

447.21), except for firearms "subject to the EAR" that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these firearms "subject to the EAR").  These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.  Items that are temporarily exported under the EAR must have met the export clearance requirements specified in § 758.1 of the EAR.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

 (2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports*.  To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

WASHSTATEB007189

(A) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States;

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

42

*Note 1 to paragraph (b)(1):* In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740;); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

*Note 2 to paragraph (b)(1):* In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740;); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured inin Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR.

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(9) of the EAR file the export information with CBP by filing EEI in AES, noting the

applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported.  *See* also the additional requirements in § 758.1(g)(4).

34.  Add § 758.11 to read as follows:

**§ 758.11  Export clearance requirements for firearms and related items.**

(a)  *Scope*.  The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in §740.14.

(b) *Required form*.  Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

(1) Where to obtain the form?  The CBP Certification of Registration Form 4457 can be found on the following CBP website:

WASHSTATEB007192

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

(2) Required "description of articles" for firearms to be included on the CBP Form 4457.  For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457*?

*See* the following CBP website page for additional information:

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

(d) *Return of items exported pursuant to this section*.  The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section of the EAR.

**PART 762 – RECORDKEEPING**

35.  The authority citation for part 762 is revised to read as follows:

WASHSTATEB007193

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

36.   Section 762.2 is amended by removing "and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a)  *  *  *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

*  *  *  *  *

37.   Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a)  *  *  *

WASHSTATEB007194

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

* * * * *


## PART 772 – DEFINITIONS OF TERMS

38.  The authority citation for part 772 is revised to read as follows:

**Authority:**  50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

## § 772.1 – [AMENDED]

39.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c"; and the definition of "complete breech mechanisms" is added as set forth below:

**§ 772.1 Definitions of terms as used in the Export Administration Regulations (EAR).**

* * * * *

*Complete breech mechanisms*.  The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

* * * * *

WASHSTATEB007195

**PART 774 - THE COMMERCE CONTROL LIST**

40. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

41. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

**Supplement No. 1 to Part 774 – The Commerce Control List**

\* \* \* \* \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

No items currently are in this ECCN.  See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b.

48

WASHSTATEB007196

42.   In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x.

WASHSTATEB007197

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  Also see ECCN 0A502 for shot-pistols.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items:*

a.      Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

WASHSTATEB007198

*Note 1 to paragraph 0A501.a:* '*Combination pistols' are controlled under ECCN 0A501.a.  A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).*

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

*Note 2 to paragraph 0A501.d: Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.*

e.      Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

WASHSTATEB007199

x.      "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y.      Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

y.1.      Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

y.2.      Scope mounts or accessory rails;

y.3.      Iron sights;

y.4.      Sling swivels;

y.5.      Butt plates or recoil pads;

y.6.      Bayonets; and

y.7.      Firearms manufactured from 1890 to 1898 and reproductions thereof.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

WASHSTATEB007200

*Note 3 to 0A501:* Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.

*Note 4 to 0A501:* Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.

**0A502 Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control*:   RS, CC, FC, UN, AT, NS

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel | RS Column 1 |

WASHSTATEB007201

| | |
|---|---|
| length less than 18 inches (45.72 cm) | |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes, "complete breech

54

mechanisms" if the ultimate destination is Canada.

*GBS:*  N/A

*CIV:*  N/A


**List of Items Controlled**

*Related Controls*:  Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** *Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.*

**Technical Note:** *Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502.  Slug guns are also controlled under ECCN 0A502.*


**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**


**License Requirements**

*Reason for Control:*  CC, UN

55

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

WASHSTATEB007204

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g, and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A504.g.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in

WASHSTATEB007205

0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

**Note 1 to 0A504.f:** *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

WASHSTATEB007206

*Note 2 to paragraph i:* For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

**0A505**  **Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d,  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

59

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b. (*i.e.*, "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR."  (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

60

*Items*:

a.        Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b.        Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.        Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

*Note 1 to 0A505.c:*  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d.        Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.        "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

*Note 2 to 0A505.x:*  *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

61

*Note 3 to 0A505.x:* The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*Note 4 to 0A505:* Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, i.e., contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.

43. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEB007210

| RS applies to entire entry | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.  (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.

63

*Related Definitions*:  N/A

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.        "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

> *Note 1 to 0A602.x: Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.*

> *Note 2 to 0A602:  "Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

> *Note 3 to 0A602:  Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.*

**Supplement No. 1 to Part 774 – [AMENDED]**

WASHSTATEB007212

44.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

45.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988  Conventional military steel helmets.**

No items currently are in this ECCN.  See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

46.  In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment | NS Column 1 |

WASHSTATEB007213

| for ECCN 0A501.y | |
|---|---|
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

66

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

d.      Small arms spill boring machines.

e.      Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs  .a, .d, and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of |

WASHSTATEB007215

| | these items to North Korea for anti-terrorism reasons. |
|---|---|

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

    *LVS:* $3000

    *GBS:* N/A

    *CIV:* N/A


**Special conditions for STA**

    *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.


**List of Items Controlled**

    *Related Controls*: N/A

    *Related Definitions*: N/A

    *Items*:

a.    Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.


b.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

WASHSTATEB007216

c.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w    [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

47.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEB007217

| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.      The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

a.1.      Gun barrel rifling and broaching machines and tools therefor;

a.2.      Gun barrel rifling machines;

WASHSTATEB007218

a.3.    Gun barrel trepanning machines;

a.4.    Gun boring and turning machines;

a.5.    Gun honing machines of 6 feet (183 cm) stroke or more;

a.6.    Gun jump screw lathes;

a.7.    Gun rifling machines; and

a.8.    Barrel straightening presses.

b.    Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.    Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.    Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774 – [AMENDED]**

48. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

49. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

71

**0D501  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

72

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in

USML Category I is "subject to the ITAR".

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

**0D505  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
|  |  |

WASHSTATEB007221

| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
|---|---|
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

WASHSTATEB007222

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

50. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

WASHSTATEB007223

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:    Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR".   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

76

WASHSTATEB007224

51.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

52.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

WASHSTATEB007225

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a.      "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.      "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

WASHSTATEB007226

**0E502  "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.**

**License Requirements**

*Reason for Control*:  CC, UN

| *Controls* | *Country Chart (See Supp. No. 1 part 738)* |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

79

**0E504 ''Technology'' ''required'' for the ''development'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image**

**intensifier tube.**

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

80

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.**

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in | RS Column 1 |

81

| | |
|---|---|
| 0B505 and for "software" for those commodities and that equipment in 0D505 | |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

WASHSTATEB007230

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

53.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEB007231

| RS applies to entire entry | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

84

**Supplement No. 1 to Part 774 – [AMENDED]**

54.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

55.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

*Reason for Control:*   CC

| Control(s) |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information.) |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

85

WASHSTATEB007233

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774 – [AMENDED]**

56.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

57.  In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less;**

86

smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

87

WASHSTATEB007235

58.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS*:   N/A

*GBS*:   N/A

88

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 0B501, 0B602, 0B606, 1B003, 9B004, and 9B009.  (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

89

WASHSTATEB007237

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

*Technical Note:* *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

59. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018  Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602.  Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of

90

the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

60.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

61.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

WASHSTATEB007239

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | NS Column 1 |
| MT applies to "technology"  for items controlled by 2B004, 2B009, 2B104, 2B105, 2B119, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology"  for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | CB Column 2 |

92

| AT applies to entire entry | AT Column 1 |
|---|---|

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

93

**List of Items Controlled**

*Related Controls*: See also 2E101, 2E201, and 2E301

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

62.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment | NS Column 1 |

94

| | |
|---|---|
| controlled by 2A001, 2B001 to 2B009 | |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

WASHSTATEB007244

63. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, MT, RS, AT, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738).* |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

97

*LVS:* $1500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls*:  (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR.  (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103.  (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment.  (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

WASHSTATEB007246

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated:

**Richard E. Ashooh**

*Assistant Secretary for Export Administration.*

WASHSTATEB007247

Summary of Revisions to USML Categories I, II, and III

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape.  This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL).  A key strategy in the reform effort  has been to construct the lists so they positively identify the items they control.  Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories).  All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the jurisdiction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising 18 of the 21 USML categories.  In May 2018, the Department of State published proposed revisions of the remaining three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls.  Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

In February 2019, the Department of State formally notified Congress of the transfer of jurisdictional control of certain classes of items in Categories, I, II, and III. The Department of State is submitting a new notification to Congress because the Department of Commerce has amended certain controls in its draft companion rule. In particular, in order to address concerns raised by some members of Congress and the public regarding certain access to 3D printing technology and

1

software for firearms, the Department of Commerce has revised its draft final rule to make certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances. The Department of State has not made any changes to the classes of items in Categories I, II, or III that it is proposing to remove from the USML from the time that the Department of State notified Congress in February 2019.

### Category I—Firearms and Related Articles

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN

2

0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

### Category II— Guns and Armament

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being

3

for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category III— Ammunition and Ordnance**

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

SENSITIVE BUT UNCLASSIFIED

WASHSTATEB007251

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will *not* be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii).  Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada,

5

Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom).  Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception.  However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement.  Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request. If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future.  If the departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

6

UNCLASSIFIED

Categories I, II, and III MDE Transitioning to the CCL

| ITEM DESCRIPTION | CCL CONTROL | |
|---|---|---|
| Cartridge, 5.56mm M855A1 | CCL | ECCN 0A505.a |

| 116TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT 116–xxx |
|---|---|---|

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

————

## CONFERENCE REPORT

TO ACCOMPANY

## S. 1790



DECEMBER XX, 2019.—Ordered to be printed

NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

| 116TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>116–xxx |
|---|---|---|

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

---

## CONFERENCE REPORT

TO ACCOMPANY

## S. 1790



DECEMBER xx, 2019.—Ordered to be printed

---

U.S. GOVERNMENT PUBLISHING OFFICE

38–396

WASHINGTON : 2019

*Transfer of certain items included in categories I, II, and III of the United States Munitions List to the Commerce Control List*

The House amendment contained a provision (sec. 1050) that would prohibit the President from removing from the United States Munitions List any item that was included in category I, II, or III of the United States Munitions List, as in effect on August 31, 2017.

Senate bill contained no similar provision.

The House recedes.

*Limitation on use of funds for reimbursement of expenses at certain properties*

The House amendment contained a provision (sec. 1050A) that would prohibit the obligation or expenditure of funds made available for the Department of Defense at a list of properties or to an entity with an ownership interest in such properties.

The Senate bill contained no similar provision.

The House recedes.

*Limitation on use of funds for exhibition of parade of military forces and hardware for review by the President*

The House amendment contained a provision (sec. 1050B) that would prohibit the use of funds authorized by this Act or otherwise appropriated for Fiscal Year 2020 for the Department of Defense from being obligated or expended for any exhibition or parade of military forces and hardware, with the exception of ceremonial honors and customary ceremonial duties, for review by the President outside authorized military operations.

The Senate bill contained no similar provision.

The House recedes.

*Prohibition on use of DOD equipment, personnel, and facilities for ICE detention*

The House amendment contained a provision (sec. 1050C) that would prohibit the use of facilities, equipment, or personnel of the Department of Defense to house or to construct housing for foreign nationals in the custody of U.S. Immigration and Customs Enforcement.

The Senate bill contained no similar provision.

The House recedes.

*Report on joint force plan for implementation of strategies of the Department of Defense for the Arctic*

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every

kind, nature or description, whether currently known or unknown, which Plaintiffs may

have had, may now have, or may hereafter discover that were or could have been raised

in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed

as an admission by Defendants of the truth of any allegation or the validity of any claim

asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an

admission of any fault or omission in any act or failure to act. Nor is it a concession or

admission as to whether the monetary or equitable relief, attorneys' fees, costs, and

expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the

terms of the Settlement Agreement may be offered or received in evidence or in any way

referred to in any civil, criminal, or administrative action other than proceedings

permitted by law, if any, that may be necessary to consummate or enforce this Settlement

Agreement. The terms of this Settlement Agreement shall not be construed as an

admission by Defendants that the consideration to be given hereunder represents the

relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires*

actions, deny that they violated the First Amendment, Second Amendment, or Fifth

Amendment of the United States Constitution, and maintain that all of the actions taken

by Defendants with respect to Plaintiffs comply fully with the law, including the United

States Constitution.

4

WASHSTATEB007262

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

<center>5</center>

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018


Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*


Dated: June 29, 2018


Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB007266

121 F.Supp.3d 680
United States District Court,
W.D. Texas,
Austin Division.

DEFENSE DISTRIBUTED, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF STATE, et al., Defendants.

No. 1–15–CV–372 RP.
|
Signed Aug. 4, 2015.

**Synopsis**
**Background:** Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms brought action against Department of State, Secretary of State, Directorate of Defense Trade Controls (DDTC) and DDTC employees, alleging that prepublication approval requirement for technical data organization published on internet violated their rights to free speech under the First Amendment, their right to keep and bear arms under the Second Amendment, and their due process rights under the Fifth Amendment, seeking preliminary injunction enjoining DDTC from enforcing the requirement.

**Holdings:** The District Court, Robert L. Pitman, J., held that:

[1] plaintiffs failed to meet burden of showing substantial threat that failure to grant preliminary injunction outweighed damage that injunction would cause and that injunction would not disserve public interest;

[2] plaintiffs were unlikely to succeed on merits of claim that DDTC acted beyond scope of its authority;

[3] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirements violated right to free speech;

[4] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirement violated association members' Second Amendment rights;

[5] term "defense articles" was not void for vagueness; and

[6] term "export" was not void for vagueness.

Motion denied.

West Headnotes (37)

**[1]    Injunction**
    👈 Extraordinary or unusual nature of remedy
    A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

    Cases that cite this headnote

**[2]    Injunction**
    👈 Grounds in general;  multiple factors
    A party seeking a preliminary injunction may be granted relief only if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest; the party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief.

    Cases that cite this headnote

**[3]    Injunction**
    👈 Prima facie showing
    To show a substantial likelihood of success on the merits, as required to be granted a preliminary injunction, a plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment.

    Cases that cite this headnote

**[4]    Injunction**

🔑 Weapons and explosives

**Weapons**

🔑 Violation of right to bear arms

Second Amendment protects intangible and unquantifiable interests and a deprivation of Second Amendment rights is thus considered an irreparable injury justifying a grant of a preliminary injunction. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

**[5]   Injunction**

🔑 Weapons and explosives

**War and National Emergency**

🔑 Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted right to keep and bear arms failed to meet burden of showing substantial threat that failure to grant preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that organization intended to publish on internet, which DDTC alleged were "defense articles," as defined under the Arms Export Control Act (AECA), outweighed any damage that the injunction would cause and that the injunction would not disserve the public interest; public had interest in restricting export of defense articles, and President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

1 Cases that cite this headnote

**[6]   United States**

🔑 Necessity of waiver or consent

A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit.

Cases that cite this headnote

**[7]   Public Employment**

🔑 Sovereign immunity, and relation of official immunity thereto

**United States**

🔑 Sovereign immunity, and relation of official immunity thereto

The "ultra vires exception" to sovereign immunity provides that, where an officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions, or ultra vires his authority, and thus not protected by sovereign immunity.

Cases that cite this headnote

**[8]   Public Employment**

🔑 Sovereign immunity, and relation of official immunity thereto

**United States**

🔑 Sovereign immunity, and relation of official immunity thereto

To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must do more than simply allege that the actions of a government officer are illegal or unauthorized; rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority.

Cases that cite this headnote

**[9]   Injunction**

🔑 Weapons and explosives

**War and National Emergency**

🔑 Export restrictions

Non-profit organization that promoted right to keep and bear arms was unlikely to succeed on merits of claim that Directorate of Defense Trade Controls (DDTC) acted beyond scope of its authority in imposing requirement that group obtain approval from DDTC prior to publishing technical information on printing machine that

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEB007268

could be used to manufacture firearm parts, on internet, as required to be entitled to preliminary injunction enjoining enforcement of the prepublication approval requirement; DDTC had authority, under Arms Export Control Act (AECA), to regulate export of defense articles, based on inter alia, consideration of increase of possibility of escalation of conflict, and organization's purpose of facilitating global access to three-dimensional printing of arms increased possibility of outbreak or escalation of conflict. Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. § 120.1(a).

Cases that cite this headnote

**[10]    Constitutional Law**
    👈 Freedom of Speech, Expression, and Press

**Constitutional Law**
    👈 Property and Events

In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[11]    Constitutional Law**
    👈 Freedom of Speech, Expression, and Press

First Amendment protection is broad, covering works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[12]    Constitutional Law**
    👈 Presumption of invalidity

Prior restraints on speech face a presumption against their constitutionality. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[13]    Constitutional Law**
    👈 Prior Restraints

A system of prior restraints on speech avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[14]    Constitutional Law**
    👈 Prior Restraints

The heavy presumption against the constitutional validity of prior restraint on speech is not a standard of review, and judicial decisions analyzing prior restraints apply different standards of review depending on the restraint at issue. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[15]    Constitutional Law**
    👈 Narrow tailoring requirement; relationship to governmental interest

**Constitutional Law**
    👈 Existence of other channels of expression

Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[16]    Constitutional Law**
    👈 Strict or exacting scrutiny; compelling interest test

Content-based restrictions on speech are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. U.S.C.A. Const.Amend. 1.

**[17]    Constitutional Law**
  🖝   Content-Based Regulations or Restrictions

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[18]    Constitutional Law**
  🖝   Content-Based Regulations or Restrictions

A regulation on speech is not content based merely because the applicability of the regulation depends on the content of the speech; rather, determination of whether regulation of speech is content-based requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[19]    Constitutional Law**
  🖝   Government information

International Traffic in Arms Regulation (ITAR), which regulates disclosure of technical data relating to "defense articles," was a content-neutral regulation of speech, and was thus subject to intermediate scrutiny, rather than strict scrutiny, since regulation did not regulate disclosure of technical data based on the message that was communicated, but rather was intended to satisfy a number of foreign policy and national defense goals related to preventing arms races, aiding in the development of weapons of mass destruction, and an increase in the possibility of outbreak of escalation of conflict. U.S.C.A. Const.Amend. 1; Arms Export Control Act, § 38(a)(1, 2), 22 U.S.C.A. § 2778(a)(1, 2); 22 C.F.R. § 120.1(a).

2 Cases that cite this headnote

**[20]    Civil Rights**
  🖝   Preliminary Injunction

Cases that cite this headnote

**War and National Emergency**
  🖝   Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted right to keep and bear arms were unlikely to succeed on merits of claim that requirement, under International Traffic in Arms Regulation (ITAR), that organization obtain approval from Directorate of Defense Trade Controls (DDTC) prior to publishing technical information on printing machine that could be used to manufacture firearm parts, on internet, violated organization's right to free speech, as required to be entitled to preliminary injunction enjoining enforcement of the prepublication approval requirement; requirement furthered substantial government interest in regulating dissemination of military information outside national borders and did not impose insurmountable burden on organization's ability to disseminate information domestically, and ITAR provided method for determining whether information was subject to its export control. U.S.C.A. Const.Amend 1; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[21]    Federal Courts**
  🖝   Case or Controversy Requirement

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[22]    Federal Civil Procedure**
  🖝   In general;  injury or interest
**Federal Courts**
  🖝   Injury, harm, causation, and redress

One element of the case-or-controversy requirement of Article III of the Constitution is that plaintiffs, based on their complaint, must establish that they have standing to sue; this requirement, like other jurisdictional requirements, is not subject to waiver and

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

demands strict compliance. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[23]    **Federal Civil Procedure**
        👈 In general; injury or interest

        **Federal Civil Procedure**
        👈 Causation; redressability

        To meet Constitutional standing requirement a plaintiff must show: (1) she has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision; the party invoking federal jurisdiction bears the burden of establishing these elements. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        Cases that cite this headnote

[24]    **Federal Civil Procedure**
        👈 In general; injury or interest

        A litigant is generally limited to asserting standing only on behalf of himself. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        Cases that cite this headnote

[25]    **Associations**
        👈 Actions by or Against Associations

        Standing for an association to bring suit on behalf of its members requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. U.S.C.A. Const. Art. 3, § 2, cl. 1.

        Cases that cite this headnote

[26]    **Weapons**
        👈 Violation of right to bear arms

Inability of members of association that promoted the right to keep and bear arms to download computer files from internet containing technical information on printing machine that could be used to manufacture firearm parts constituted injury in fact that was clearly traceable to Directorate of Defense Trade Controls (DDTC) enforcement of requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing the information on the internet, and association thus had standing to assert a claim for violation of the Second Amendment on its members behalf. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

[27]    **Weapons**
        👈 Violation of right to bear arms

        The first step in addressing a claim under the Second Amendment is to determine whether the challenged law impinges upon a right protected by the Second Amendment, i.e., whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee, and the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. U.S.C.A. Const.Amend. 2.

        Cases that cite this headnote

[28]    **Weapons**
        👈 Violation of right to bear arms

        The appropriate level of scrutiny in evaluating the constitutionality of a firearms regulation depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the Second Amendment right. U.S.C.A. Const.Amend. 2.

        Cases that cite this headnote

WASHSTATEB007271

**[29]**   **Weapons**
  🔑 Violation of right to bear arms

Intermediate scrutiny, rather than strict scrutiny, applied in evaluating Directorate of Defense Trade Controls' (DDTC) enforcement requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts on internet, violated Second Amendment rights of members of association that promoted right to keep and bear arms; enforcement did not prohibit association members from manufacturing their own firearms or from keeping and bearing those firearms, and members were not prohibited from acquiring the computer files at issue directly from the non-profit organization. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[30]**   **Injunction**
  🔑 Weapons and explosives
  **War and National Emergency**
  🔑 Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms were unlikely to succeed on merits of claim that requirement, under International Traffic in Arms Regulation (ITAR), that organization obtain approval from Directorate of Defense Trade Controls (DDTC) prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts, on internet, violated association members' Second Amendment rights, as required to be entitled to preliminary injunction enjoining enforcement of requirement; regulatory scheme of Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) advanced legitimate

governmental interest regulating dissemination of military information outside national borders in a not unduly burdensome fashion. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[31]**   **Constitutional Law**
  🔑 Certainty and definiteness;  vagueness

An enactment is void for vagueness under the Fifth Amendment if its prohibitions are not clearly defined. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[32]**   **Constitutional Law**
  🔑 Vagueness

The Fifth Amendment prohibits the enforcement of vague criminal laws. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[33]**   **Constitutional Law**
  🔑 Certainty and definiteness;  vagueness

The threshold for declaring a law void for vagueness, in violation of the Fifth Amendment, is high. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[34]**   **Constitutional Law**
  🔑 Certainty and definiteness;  vagueness

A statute is not void for vagueness under the Fifth Amendment if it sets out an ascertainable standard. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[35]**   **Constitutional Law**
  🔑 Certainty and definiteness;  vagueness

A statute is void for vagueness under the Fifth Amendment only if it wholly fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

WASHSTATEB007272

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

standardless that it authorizes or encourages seriously discriminatory enforcement. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[36]   **Constitutional Law**
    ☞  War and National Security

**War and National Emergency**
    ☞  Constitutional and statutory provisions

Term "defense articles" as used in the Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was specifically defined to include items on AECA's Munitions List, which contained 21 categories of governed articles, as well as information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, and did not include any subjective terms, but rather identified items with significant specificity. U.S.C.A. Const.Amend. 5; Arms Export Control Act, § 38(a)(1), 22 U.S.C. § 2778(a)(1); 22 C.F.R. §§ 120.1(a), 120.4, 120.6.

1 Cases that cite this headnote

[37]   **Constitutional Law**
    ☞  War and National Security

**War and National Emergency**
    ☞  Export restrictions

Term "export" as used in the International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was defined to include disclosing or transferring technical data to a foreign person, whether in the United States or abroad, and persons of ordinary intelligence were clearly on notice that posting, on the internet, for free download, of files which included directions for the 3-D printing of firearms, would fall within definition of export. U.S.C.A. Const.Amend. 5; 22 C.F.R. § 120.17(a)(4).

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*686**  Alan Gura, Gura & Possessky, PLLC, Alexandria, VA, David S. Morris, W. Thomas Jacks, Fish & Richardson, P.C., Austin, TX, Joshua Michael Blackman, Josh Blackman LLC, Houston, TX, Matthew A. Goldstein, Matthew A. Goldstein, PLLC, Washington, DC, William B. Mateja, Fish & Richardson, Dallas, TX, for Plaintiffs.

Eric J. Soskin, Stuart Justin Robinson, U.S. Department of Justice, Civil Division, Washington, DC, Zachary Carl Richter, United States Attorney's Office, Austin, TX, for Defendants.

### *ORDER*

ROBERT L. PITMAN, District Judge.

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 8) and the responsive pleadings thereto. The Court conducted a hearing on the motion on July 6, 2015. Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

### I. BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines

WASHSTATEB007273

and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute **\*687** the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir.2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related items (the "Published Files"). (Compl. ¶¶ 22–24). Plaintiffs allege that, on May 8, 2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its

3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id.* ¶¶ 26–29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files"). [1] Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the **\*688** Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR–15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28–33).

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Defense Distributed has

sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34–36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II. STANDARD OF REVIEW

**[1]  [2]  [3]**  A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir.1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* 710 F.3d 579, 582 (5th Cir.2013). *See also Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir.2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed.

1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985).

## *689  III. ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims.

### A. Injury and Balancing of Interests

**[4]**  Defendants suggest Plaintiffs' contention that they face irreparable injury absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.,* 579 F.3d 502, 506 (5th Cir.2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir.2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

**[5]**  The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir.2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir.2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir.2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" **\*690** ); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir.2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp contrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

**B. Ultra Vires**

[6]  [7]  [8]   Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones,* 652 F.3d 577, 581 (5th Cir.2011) (citing *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos,* 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEB007276

regulations for the import and export
of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs argue this definition falls outside Congressional **\*691** intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

 **[9]**    Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles. Further, under the AECA, decisions are required to

take into account whether the export
of an article would contribute to an
arms race, aid in the development of
weapons of mass destruction, support
international terrorism, increase the
possibility of outbreak or escalation of
conflict, or prejudice the development
of bilateral or multilateral arms control
or nonproliferation agreements or
other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms." (Compl. ¶ 1) (emphasis added). Facilitating global access to firearms 8 undoubtedly "increase[s] the possibility of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

## C. First Amendment

 **[10]**    Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the

second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

 **[11]**    As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California,* 413 U.S. 15, 34, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See also Brown v. Entm't Merchants Ass'n,* ––– U.S. ––––, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli,* 228 F.3d 94, 111 (2nd Cir.2000).

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2nd Cir.2001).[2] The court made clear the fact that **\*692** computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonetheless be speech. Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id.* at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment). Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming ... it is protected by the First Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley,* 209 F.3d 481, 485 (6th Cir.2000).

WASHSTATEB007277

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

2        Defendants are correct that the *Corley* court did not
         overrule the decision in *Vartuli.* However, the *Corley*
         court itself distinguished the decision in *Vartuli* as
         limited, because it was based on the manner in which
         the code at issue was marketed. That is, the defendants
         themselves marketed the software as intended to be used
         "mechanically" and "without the intercession of the mind
         or the will of the recipient." *Corley,* 273 F.3d at 449
         (quoting *Vartuli,* 228 F.3d at 111). Plaintiffs here have not
         so marketed or described the files at issue.

Although the precise technical nature of the computer files
at issue is not wholly clear to the Court, Plaintiffs made
clear at the hearing that Defense Distributed is interested in
distributing the files as "open source." That is, the files are
intended to be used by others as a baseline to be built upon,
altered and otherwise utilized. Thus, at least for the purpose
of the preliminary injunction analysis, the Court will consider
the files as subject to the protection of the First Amendment.

**[12]**    **[13]**    In challenging Defendants' conduct, Plaintiffs
urge this Court to conclude the ITAR's imposition of a
prepublication requirement constitutes an impermissible prior
restraint. Prior restraints "face a well-established presumption
against their constitutionality." *Marceaux v. Lafayette City–
Parish Consol. Gov't,* 731 F.3d 488, 493 (5th Cir.2013). *See
also Organization for a Better Austin v. Keefe,* 402 U.S.
415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) ("Any prior
restraint on expression comes ... with a 'heavy presumption'
against its constitutional validity"); *Shuttlesworth v. City of
Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d
162 (1969) (noting "the many decisions of this Court over
the last 30 years, holding that a law subjecting the exercise of
First Amendment freedoms to the prior restraint of a license
without narrow, objective, and definite standards to guide the
licensing authority, is unconstitutional"). "[A] system of prior
restraint avoids constitutional infirmity only if it takes place
under procedural safeguards designed to obviate the dangers
of a censorship system." *Collins v. Ainsworth,* 382 F.3d 529,
539 (5th Cir.2004) (quoting *Southeastern Promotions, Ltd. v.
Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448
(1975)).

**[14]**    The "heavy presumption" against constitutional
validity of prior restraint is not, however, "a standard of
review, and judicial decisions analyzing prior restraints
have applied different standards of review depending on
the restraint at issue." *Catholic Leadership Coal. of Tex.
v. Reisman,* 764 F.3d 409, 438 (5th Cir.2014). *See, e.g.,*

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct.
2199, 81 L.Ed.2d 17 (1984) (order prohibiting dissemination
of discovered information before trial "is not the kind of
classic prior restraint that requires exacting First Amendment
scrutiny"); **\*693** *Perry v. McDonald,* 280 F.3d 159, 171 (2nd
Cir.2001) (context in which prior restraint occurs affects level
of scrutiny applied); 192 F.3d 742, 749 (7th Cir.1999) ("We
note initially that the [plaintiff] is simply wrong in arguing
that all prior restraints on speech are analyzed under the same
test.").

**[15]**    **[16]**    No party suggests posting of information on
the Internet for general free consumption is not a public
forum. The next inquiry is thus the applicable level of
protection afforded to the files at issue. Content-neutral
restrictions on speech are examined under intermediate
scrutiny, meaning they are permissible so long as they are
narrowly tailored to serve a significant governmental interest
and leave open ample alternative channels for communication
of the information. *Turner Broad. Sys. v. FCC,* 520 U.S. 180,
213–14, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); *Ward v.
Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105
L.Ed.2d 661 (1989). Content-based restrictions are examined
under strict scrutiny, meaning they must be narrowly drawn
to effectuate a compelling state interest. *Perry Educ. Ass'n v.
Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948,
74 L.Ed.2d 794 (1983).

**[17]**    **[18]**    Not surprisingly, the parties disagree as
to whether the ITAR imposes content-based restrictions.
"Government regulation of speech is content based if a law
applies to particular speech because of the topic discussed or
the idea or message expressed." *Reed v. Town of Gilbert,* ––––
U.S. ––––, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015).
Plaintiffs here argue, because the regulations restrict speech
concerning the entire topic of "defense articles" the regulation
is content-based. "A regulation is not content-based, however,
merely because the applicability of the regulation depends on
the content of the speech." *Asgeirsson v. Abbott,* 696 F.3d
454, 459 (5th Cir.2012). Rather, determination of whether
regulation of speech is content-based "requires a court to
consider whether a regulation of speech 'on its face' draws
distinctions based on the message a speaker conveys." *Reed,*
135 S.Ct. at 2227. *See also Ward,* 491 U.S. at 791, 109 S.Ct.
2746 (principal inquiry in determining content-neutrality, "is
whether the government has adopted a regulation of speech
because of disagreement with the message it conveys").

WASHSTATEB007278

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley,* —— U.S. ——, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans,* 753 F.3d 560, 562 (5th Cir.2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 1403, 191 L.Ed.2d 361 (2015) (upholding regulation **\*694** requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson,* 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson,* 696 F.3d at 460.

**[19]** The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak,* 683 F.3d 1126, 1135 (9th Cir.2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny 13 standard. *Compare Ward,* 491 U.S. at 798, 109 S.Ct. 2746 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), *with Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner,* 520 U.S. at 189, 117 S.Ct. 1174 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Circuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson,* 667 F.3d 630, 641 (5th Cir.2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest **\*695** otherwise. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not

sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking necessary approval. *Chi Mak,* 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project,* 561 U.S. at 29, 130 S.Ct. 2705 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)). [3]

[3]   The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.,* 579 F.2d 516, 521 (9th Cir.1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

[20]   Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private

forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data **\*696** that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey,* 864 F.2d 1487, 1496–97 (9th Cir.1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesting expedited processing. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed.Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

WASHSTATEB007280

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

**D. Second Amendment**

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

**a. Standing**

**[21]** **[22]** **[23]** Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines,* 521 U.S. at 819, 117 S.Ct. 2312; *Lewis v. Casey,* 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.,* 499 F.3d 382, 385 (5th Cir.2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n,* 274 F.3d 924, 929 (5th Cir.2001) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

**[24]** Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising ***697*** its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally

limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer,* 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("vendors and those in like positions ... have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle,* 517 F.3d 738, 743 (5th Cir.2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

5    Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public,* such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

**[25]** Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous.*

WASHSTATEB007281

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

*Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc.* **\*698** *v. Tex. Med. Bd.,* 627 F.3d 547, 550–51 (5th Cir.2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 191 (5th Cir.2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right. Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future. In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme. (Plf. Reply Exs. 3–4). This testimony satisfies the "injury in fact" portion of the standing inquiry.

[26]  Defendants further contend any injury is not fairly traceable to their conduct. They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed. But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing. *See Davis v. United States,* 564 U.S. 229, 131 S.Ct. 2419, 2434, n. 10, 180 L.Ed.2d 285 (2011) (one must not "confus [e] weakness on the merits with absence of Article III standing"). In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants. The Court therefore finds SAF

has standing to assert a claim of a violation of the Second Amendment. *See Nat'l Rifle Ass'n,* 700 F.3d at 192 (NRA had standing, on behalf of its members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18–to–20–year–olds); *Ezell v. City of Chicago,* 651 F.3d 684, 696 (7th Cir.2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city); *Mance v. Holder,* 74 F.Supp.3d 795, 802–03 (N.D.Tex.2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

[27]  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n,* 700 F.3d at 194.

**\*699**  In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller,* 554 U.S. at 577–628, 128 S.Ct. 2783). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins

WASHSTATEB007282

of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintiffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller,* the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

6      Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 582, 128 S.Ct. 2783.

[28]      The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n,* 700 F.3d at 195 (emphasis added).

[29]      The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id.* at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using guns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205–07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense

Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw,* 719 F.3d 338, 347–48 (5th Cir.2013), *cert. denied* **\*700** ‗‗‗ U.S. ‗‗‗, 134 S.Ct. 1365, 188 L.Ed.2d 297 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18–20–year–olds from carrying handguns in public).

[30]      As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw,* 719 F.3d at 348 (statute limiting under 21–year–olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n,* 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

**E. Fifth Amendment**

[31]   [32]   [33]   [34]   [35]   Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu,* 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu,* 364 F.3d 192, 198 (4th Cir.2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project,* 561 U.S. at 20, 130 S.Ct. 2705 (quoting *Williams,* 553 U.S. at 306, 128 S.Ct. 1830). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

 **\*701** [36]   To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the 23 term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical

data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R. § 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

 [37]   The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the definition of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

## IV. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. # 7) is hereby **DENIED.**

**All Citations**

121 F.Supp.3d 680

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEB007284

838 F.3d 451
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment
Foundation, Incorporated, Plaintiffs–Appellants

v.

UNITED STATES DEPARTMENT OF STATE; John
F. Kerry, In His Official Capacity as the Secretary
of the Department of State; Directorate of Defense
Trade Controls, Department of State Bureau of
Political Military Affairs; Kenneth B. Handelman,
Individually and in His Official Capacity as the
Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political–Military
Affairs; C. Edward Peartree, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division; Sarah
J. Heidema, Individually and in Her Official
Capacity as the Division Chief, Regulatory and
Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and
in His Official Capacity as the Senior Advisor, Office
of Defense Trade Controls, Defendants–Appellees

No. 15–50759
|
Filed September 20, 2016

**Synopsis**

**Background:** Non-profit organization that designed firearms
that could be downloaded from internet and printed with
a 3-D printer and association that promoted the right to
keep and bear arms brought action against Department
of State, Secretary of State, Directorate of Defense Trade
Controls (DDTC) and DDTC employees, alleging that
prepublication approval requirement for technical data
organization published on internet violated their rights to
free speech under the First Amendment, their right to keep
and bear arms under the Second Amendment, and their
due process rights under the Fifth Amendment, seeking
preliminary injunction enjoining DDTC from enforcing the
requirement. The United States District Court for the Western
District of Texas, Robert L. Pitman, J., 121 F.Supp.3d 680,
denied motion. Plaintiffs appealed.

**Holdings:** The Court of Appeals, W. Eugene Davis, Circuit
Judge, held that:

[1] public interest, when compared with plaintiffs' private
interests, weighed against entry of injunction, and

[2] balance of harms weighed against entry of injunction.

Affirmed.

Jones, Circuit Judge, issued dissenting opinion.

West Headnotes (3)

[1] **War and National Emergency**
     🔑 Export restrictions
     **War and National Emergency**
     🔑 Import restrictions

The United States "Munitions List," as found in
the Arms Export Control Act (AECA), is not
a compendium of specific controlled items, but
rather, is a series of categories describing the
kinds of items qualifying as "defense articles"
subject to import and export control by the
President. 22 U.S.C.A. § 2778(a)(1).

2 Cases that cite this headnote

[2] **Injunction**
     🔑 Weapons and explosives

Non-profit organization that designed firearms
which can be downloaded from internet and
printed with a 3-D printer, as well as association
that promoted right to keep and bear arms,
failed to show that a failure to grant preliminary
injunction enjoining enforcement of requirement
that Directorate of Defense Trade Controls
(DDTC) approve computer files containing
technical data on firearms that could be printed
on 3-D printers that organization intended to
publish on internet, which DDTC alleged were
"defense articles" as defined under the Arms
Export Control Act (AECA), outweighed any
damage that the injunction would cause to

public's interest in restricting export of defense articles, and, thus, entry of injunction was not appropriate; in addition, President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

7 Cases that cite this headnote

[3]   **Injunction**
      🔑 Weapons and explosives

Balance of harms weighed against entry of preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that non-profit organization, which designed firearms downloadable from Internet and printable with 3-D printer, intended to publish on Internet, as DDTC alleged files were "defense articles" as defined under the Arms Export Control Act (AECA); although organization's constitutional rights might be temporarily harmed by denial of injunction, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim, thereby harming forever government's interest in national defense and national security. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

8 Cases that cite this headnote

**\*453** Appeal from the United States District Court for the Western District of Texas, Robert L. Pitman, J.

**Attorneys and Law Firms**

Alan Gura, Gura & Possessky, P.L.L.C., Alexandria, VA, Joshua Michael Blackman, Houston, TX, Matthew Goldstein, Washington, DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX, David Scott Morris, Fish & Richardson, P.C., Austin, TX, for Plaintiffs–Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of Justice, Michael S. Raab, U.S. Department of Justice, Civil Division,

Appellate Section, Eric J. Soskin, U.S. Department of Justice, Civil Division Federal Programs Branch, Washington, DC, for Defendants–Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the Press, Washington, DC, for Amici Curiae Reporters Committee for Freedom of the Press, Thomas Jefferson Center for the Protection of Free Expression.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute, Washington, DC, for Amicus Curiae Cato Institute.

Raffi Melkonian, Wright & Close, L.L.P., Houston, TX, for Amici Curiae Representative Thomas Massie, Representative Brian Babin, Representative K. Mike Conaway, Representative Jeff Duncan, Representative Blake Farenthold, Representative John Fleming, Representative Paul Gosar, Representative Walter Jones, Mike Kelly, Representative Steve King, Representative Raul Labrador, Representative Jeff Miller, Representative Bill Posey, Representative Todd Rokita, Representative Daniel Webster.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David T. Hardy, Tucson, AZ, for Amicus Curiae Madison Society Foundation, Incorporated.

Kit Walsh, Electronic Frontier Foundation, San Francisco, CA, for Amicus Curiae Electronic Frontier Foundation.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank Rome, L.L.P., New York, NY, for Amicus Curiae Brady Center to Prevent Gun Violence.

Robert E. Henneke, Joel Stonedale, Texas Public Policy Foundation, Austin, TX, for Amicus Curiae Texas Public Policy Foundation.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs–Appellants Defense Distributed and Second Amendment Foundation, Inc. have sued Defendants–Appellees, the United States Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs–Appellants' interest in

WASHSTATEB007286

protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

### *454   I. Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR–15 rifles. [1]  The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

[1]     The district court capably summarized the facts in its memorandum opinion and order. See *Def. Distributed v. U.S. Dep't of State*, 121 F.Supp.3d 680, 686–88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically in .stl format; for CNC machines, text files setting out coordinates  **\*455**  and functions to direct a drill. [2]

[2]     Plaintiffs–Appellants' Original Brief on Appeal.

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR–15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR–15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published

Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

[1] The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ––– U.S. ––––, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC **\*456** "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.* [3]

[3]       *See Def. Distributed v. U.S. Dep't of State,* 121 F.Supp.3d 680, 687–88 (W.D. Tex. 2015).

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR–15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

### District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs–Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online. [4] They also claim violations of the Second and Fifth Amendments. Plaintiffs–Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval was needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

[4]       The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR–15

WASHSTATEB007288

lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

Plaintiffs–Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs–Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction **\*457** is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[6]

[5]   *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6]   *Id.*

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In

other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

[7]   *Id.* at 187–88.

The district court concluded that the preliminary injunction should be denied because Plaintiffs–Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs–Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time, constitutes

WASHSTATEB007289

irreparable injury.[8]) In extensive **\*458** dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs–Appellants failed to show a likelihood of success on the merits. Plaintiffs–Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs–Appellants continue to bear the burden of persuasion on appeal.

[8]    See *Def. Distributed*, 121 F.Supp.3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

### Analysis

Because the district court held that Plaintiffs–Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs–Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs–Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs–Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

[9]    *Id.* at 689.

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals —including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs–Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs–Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n **\*459** this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority— of the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v.*

*Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.] [11]

[10]  *Id.*

[11]  *Id.* at 689–90.

**[2]** Plaintiffs–Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs–Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs–Appellants. We cannot say the district court abused its discretion on these facts.

**[3]** Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs–Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs–Appellants argue that this result is absurd **\*460** because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs–Appellants would allow them to share online not only the Published Files but also any new, previously unpublished

files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs–Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR–15 lower receivers and additional 3D–printed weapons and weapon parts. Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs–Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs–Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs–Appellants have demonstrated a substantial likelihood of success on the merits. [12]

[12]  The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs–Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."
We note the following: (1) If Plaintiffs–Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that

it would be legal. The question presented in this case is whether Plaintiffs–Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs–Appellants previously made available online. Plaintiffs–Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs–Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs–Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs–Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs–Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

 **\*461** We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs–Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

## I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle–15 magazine, [1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different than technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

[1]    The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR–15, a registered trademark of Colt's Inc. AR–15, Registration No. 0,825,581.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology drew considerable press attention [2]  **\*462** and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

WASHSTATEB007292

DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Pursuant to § 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

2      According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties, [3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took the government entities two years to refuse to exempt most of the files from the licensing regime.

3      Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint [4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet

publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

4      To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–99 (5th Cir. 2012). **463** Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry. [5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

5      *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we

WASHSTATEB007293

may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

## II.

### A. Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services ... and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

*464 The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain." 22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community." 22 C.F.R. § 120.11(a). [6]

[6] This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id.*

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). [7]

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in

WASHSTATEB007294

Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release **\*465** (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely

failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] ... items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

[8]    While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action ... and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, ––– U.S. ––––, 136 S.Ct. 2131, 2142, 195 L.Ed.2d 423 (2016) (Agency "shenanigans" are "properly reviewable ... under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60–day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who attempted to deliver WMD materials to North Korea, who sought to

distribute drone and missile schematics to China, and who attempted to **466** license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See, e.g., United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

[9]    *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO–RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/documents/OngoingExportCaseFactSheet.pdf.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See, e.g.,* Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

## B. Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

[10]    For simplicity only, I do not here address plaintiffs' vagueness claim.

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export*, *Black's Law Dictionary* (10th ed. **467** 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country"). As the court explained in *Ehsan*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145, 23 S.Ct. 702, 47 L.Ed. 984 (1903) (the "legal notion...of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsan* court explicitly held that "export" is unambiguous. *Id. at 859–60*.

[11]    It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S.Ct. 2164, 2171–72, 150 L.Ed.2d 292 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly

WASHSTATEB007296

as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, ––– U.S. ––––, 135 S.Ct. 2480, 2495, 192 L.Ed.2d 483 (2015) (internal quotation omitted). Pursuant to *Chevron*, where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the **\*468** "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is

potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. Cf. *Bond v. United States*, ––– U.S. ––––, 134 S.Ct. 2077, 2090, 189 L.Ed.2d 1 (2014) ("[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see also id.* at 574–75, 108 S.Ct. 1392 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance] ... is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout

the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if it does *469 not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S.Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S.Ct. 2705, 2723–24, 177 L.Ed.2d 355 (2010), in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S.Ct. at 2724.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items—jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation. [12]

[12]  The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S.Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

*470 The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [ ] interference with

WASHSTATEB007298

ingress or egress, [ ] visual clutter, or [ ] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters.* 485 U.S. 312, 321, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department: its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's preplublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S.Ct. 501, 511, 116 L.Ed.2d 476 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that citizens have no intention of assisting foreign enemies directly, communications **\*471** about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project.* Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations ... [or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S.Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information

would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones. [13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

[13]     *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

 **\*472** The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The

possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis...." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment—Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S.Ct. 2395, 2402–03, 120 L.Ed.2d 101 (1992).

Second, content-based [14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a  **\*473** specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir.

2003) (citing *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

14    As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

15    Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S.Ct. at 2150–51. Like the "illusory 'constraints' " in *Lakewood, id.* at 769, 108 S.Ct. 2138, 2144, the ITAR prepublication review scheme

offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770, 108 S.Ct. 2138, 2144. *Cf. Humanitarian Law Project,* 130 S.Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45–day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly **\*474** brief. *See Teitel Film Corp. v. Cusack,* 390 U.S. 139, 141, 88 S.Ct. 754, 756, 19 L.Ed.2d 966 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D–4, LLC,* 541 U.S. 774, 781, 124 S.Ct. 2219, 2224, 159 L.Ed.2d 84 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman 's* "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C. The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's

mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730, 91 S.Ct. 2140 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

> the protection as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.... [n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S.Ct. 2766, 2781–82, 69 L.Ed.2d 640 (1981) (holding that the Secretary of State's revocation of Agee's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security). No such exceptional circumstances have been presented in this case. Indeed, all that the majority can muster to support the government's position here is that

the State Department's stated interest in preventing foreign nationals— including **\*475** manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require republication approval of all USML-related technical data. This is clearly not what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H–Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

[16]   The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists. The Liberator, however, requires a metal firing pin.

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

[17]   The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project* ) is dangerous and unprecedented.

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for

the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information. [18]

[18]    DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, **\*476** or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F.Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure) ... to a foreign person ... in the United States or abroad." *Id.* § 120.17(a)(4).

\* \* \*

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML. This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

**All Citations**

838 F.3d 451

---

          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

865 F.3d 211
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment
Foundation, Incorporated, Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; John
F. Kerry, In His Official Capacity as the Secretary
of the Department of State; Directorate of Defense
Trade Controls, Department of State Bureau of
Political Military Affairs; Kenneth B. Handelman,
Individually and in His Official Capacity as the
Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political-Military
Affairs; C. Edward Peartree, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division; Sarah
J. Heidema, Individually and in Her Official
Capacity as the Division Chief, Regulatory and
Multilateral Affairs, Office of Defense Trade
Controls Policy; Glenn Smith, Individually and in
His Official Capacity as the Senior Advisor, Office
of Defense Trade Controls, Defendants-Appellees

No. 15-50759
|
Filed March 15, 2017

Appeal from the United States District Court for the Western
District of Texas

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

**Attorneys and Law Firms**

Alan Gura, Gura, P.L.L.C., Alexandria, VA, Joshua Michael
Blackman, Houston, TX, Matthew Goldstein, Washington,
DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX,
David Scott Morris, Fish & Richardson, P.C., Austin, TX, for
Plaintiffs-Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of
Justice, Michael S. Raab, U.S. Department of Justice,
Civil Division, Appellate Section, Washington, DC, for
Defendants-Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the
Press, Washington, DC, Amicus Curiae for REPORTERS
COMMITTEE FOR FREEDOM OF THE PRESS, THOMAS
JEFFERSON CENTER FOR THE PROTECTION OF FREE
EXPRESSION.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute,
Washington, DC, Amicus Curiae for CATO INSTITUTE.

Raffi Melkonian, Wright & Close, L.L.P.,
Houston, TX, Amicus Curiae for REPRESENTATIVE
THOMAS MASSIE, REPRESENTATIVE BRIAN
BABIN, REPRESENTATIVE K. MIKE CONAWAY,
REPRESENTATIVE JEFF DUNCAN, REPRESENTATIVE
BLAKE FARENTHOLD, REPRESENTATIVE **\*212**
JOHN FLEMING, REPRESENTATIVE PAUL GOSAR,
REPRESENTATIVE WALTER JONES, MIKE KELLY,
REPRESENTATIVE STEVE KING, REPRESENTATIVE
RAUL LABRADOR, REPRESENTATIVE JEFF MILLER,
REPRESENTATIVE BILL POSEY, REPRESENTATIVE
TODD ROKITA, REPRESENTATIVE DANIEL
WEBSTER.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David
T. Hardy, Tucson, AZ, Amicus Curiae for MADISON
SOCIETY FOUNDATION, INCORPORATED.

Kit Walsh, Electronic Frontier Foundation, San Francisco,
CA, Amicus Curiae for ELECTRONIC FRONTIER
FOUNDATION.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank
Rome, L.L.P., New York, NY, Amicus Curiae for BRADY
CENTER TO PREVENT GUN VIOLENCE.

Robert E. Henneke, Texas Public Policy Foundation,
Austin, TX, Amicus Curiae for TEXAS PUBLIC POLICY
FOUNDATION.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, UNITED STATES CIRCUIT JUDGE

The Court having been polled at the request of one of its
members, and a majority of the judges who are in regular
service and not disqualified not having voted in favor (Fed.
R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing
En Banc is DENIED. In the en banc poll, five judges voted in
favor of rehearing (Judges Jones, Smith, Clement, Owen and

WASHSTATEB007304

Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing en banc.

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits —which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits—calling it "arguably the most important factor." *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *213 Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (en banc); *see also N.Y. Times*, 403 U.S. at 730, 91 S.Ct. 2140 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively ... operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569–70, 96 S.Ct. 2791. The Government contends that the gun designs at issue could potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing

such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to *214 Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead,

as Judge Jones's panel dissent notes, because of the lack of a preliminary injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, 838 F.3d at 463 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719, 91 S.Ct. 2140 (Black, J., concurring). Unfortunately, that is exactly what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

**All Citations**

865 F.3d 211 (Mem)

---

End of Document
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**Defense Distributed v. Department of State, 138 S.Ct. 638 (Mem) (2018)**

199 L.Ed.2d 527, 86 USLW 3323, 86 USLW 3330

138 S.Ct. 638
Supreme Court of the United States

DEFENSE DISTRIBUTED, et al., petitioners,

v.

DEPARTMENT OF STATE, et al.

No. 17–190.
|
Jan. 8, 2018.

**Synopsis**

Case below, 838 F.3d 451.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

138 S.Ct. 638 (Mem), 199 L.Ed.2d 527, 86 USLW 3323, 86 USLW 3330

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEB007307

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq*. ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

action focusing on the constitutional right to privately own and possess firearms, and the

consequences of gun control. SAF brings this action on behalf of its members.

3.     Conn Williamson is a natural person and a citizen of the United States and the

State of Washington.

4.     Defendant the United States Department of State is an executive agency of the

United States government responsible for administering and enforcing the ITAR under the

authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.     Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of

State. In this capacity, he is responsible for the operation and management of the United States

Department of State, and this includes the operation and management of the Directorate of

Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.     Defendant DDTC is a subordinate unit within the Department of State Bureau of

Political and Military Affairs responsible for administering and enforcing the ITAR.

7.     Defendant Mike Miller is sued in his official capacity as the Acting Deputy

Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military

Affairs. In his official capacity, Miller is responsible for the operation and management of

DDTC, and this includes administration and enforcement of the ITAR.

8.     Defendant Sarah Heidema is sued in her official capacity as the Acting Director

of the Office of Defense Trade Controls Policy Division. In her official capacity, she is

responsible for administration of the ITAR, including ITAR's commodity jurisdiction

procedures; implementation of regulatory changes as a result of defense trade reforms; and

providing guidance to industry on ITAR requirements.

WASHSTATEB007310

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id.*

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

WASHSTATEB007311

15.     The scope of technical data subject to ITAR control, as described on the U.S.

Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants

constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity

jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the

ITAR imposed a prepublication approval requirement on publications of privately generated

ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S.

Government approval for the publication of technical data falling within the definition in §

125.01, including such data as may be developed under other than U.S. Government contract, is

on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel

issued a series of written opinions advising Congress, the White House, and the Department of

State that the use of the ITAR to impose a prior restraint on publications of privately generated

unclassified information into the public domain violated the First Amendment of the United

States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to

Defendant DDTC, issued official guidance providing that "[a]pproval is not required for

publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to

Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR,

expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHSTATEB007312

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHSTATEB007314

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015—nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case—Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHSTATEB007315

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHSTATEB007316

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a).  For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

WASHSTATEB007317

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

### *Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

### COUNT ONE

### ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

WASHSTATEB007318

COUNT TWO

RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

WASHSTATEB007319

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW—U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

WASHSTATEB007320

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

WASHSTATEB007321

6.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                    Respectfully submitted,

/s/ Alan Gura                                          /s/ William B. Mateja
Alan Gura                                              William B. Mateja
Virginia Bar No. 68842*                                Texas State Bar No. 13185350
Gura PLLC                                              POLSINELLI P.C.
916 Prince Street, Suite 107                           2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                             Dallas, Texas 75201
703.835.9085/Fax 703.997.7665                          214.397.0030/Fax 214.397.0033
alan@gurapllc.com                                      Mateja@polsinelli.com

/s/ Matthew Goldstein                                  /s/ Josh Blackman
Matthew Goldstein                                      Josh Blackman
D.C. Bar No. 975000*                                   Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                             1303 San Jacinto Street
1875 Connecticut Avenue, N.W.                          Houston, Texas 77002
10th Floor                                             202.294.9003/Fax: 713.646.1766
Washington, DC 20009                                   joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                                         *Admitted pro hac vice

WASHSTATEB007322

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al.,<br>    Plaintiffs, | § | |
| v. | § | No. 1:15-cv-372-RP |
| U.S. DEPARTMENT OF STATE, et al.,<br>    Defendants. | § | |

**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

WASHSTATEB007323

## TABLE OF CONTENTS

BACKGROUND ...............................................................................................................1

ARGUMENT ...................................................................................................................2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed................................2

    A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ..............................................................................................2

    B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. .................................................................................5

    C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad................8

    D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint....................10

II.   Plaintiffs' Second Amendment Claims Should Be Dismissed.................................13

    A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge.............................13

        1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.................................................................14

        2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts..........................................15

    B.    Plaintiffs' Second Amendment Challenge Fails on the Merits......................16

III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. .........................19

CONCLUSION.................................................................................................................20

WASHSTATEB007324

**TABLE OF AUTHORITIES**

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
　　627 F.3d 547 (5th Cir. 2010) ........................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
　　192 F.3d 1308 (9th Cir. 1999) .......................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
　　176 F.3d 1132 (9th Cir. 1999) .......................................................................4

*Bonds v. Tandy*,
　　457 F.3d 409 (5th Cir. 2006) ........................................................................14

*Broadrick v. Oklahoma*,
　　413 U.S. 601 (1973) ................................................................................ 8, 9

*Brockett v. Spokane Arcades*,
　　472 U.S. 491 (1985) ...................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
　　564 U.S. 786 (2011) ..................................................................................17

*Brown v. Livingston*,
　　524 F. Appx. 111 (5th Cir. 2013) .................................................................15

*Bullfrog Films v. Wick*,
　　646 F. Supp. 492 (C.D. Cal. 1986) .................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
　　740 F. Supp. 1007 (S.D.N.Y. 1990) ...............................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
　　764 F.3d 409 (5th Cir. 2014) ........................................................................10

*CFTC v. Vartuli*,
　　228 F.3d 94 (2d Cir. 2000) ........................................................................ 3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
　　486 U.S. 750 (1988) ...........................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
　　541 U.S. 774 (2004) ..............................................................................11, 12

WASHSTATEB007325

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ................................................................3

*Def. Distributed v. Dep't of State*,
121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ...........................*passim*

*Def. Distributed v. Dep't of State*,
838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
*certiorari* denied, 138 S. Ct. 638 (2018) ..........................................*passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .............................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ..........................................................16

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ..........................................................13, 14

*Fontenot v. McCraw*,
777 F.3d 741 (5th Cir. 2015) ...............................................................14

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) .............................................................................11

*Freedman v. State of Md.*,
380 U.S. 51 (1965) ...............................................................................11

*FW/PBS v. City of Dallas*,
493 U.S. 215 (1990) .............................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) .............................................................................10

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..........................................................................4, 5, 6

*Hotze v. Burwell*,
784 F.3d 984 (5th Cir. 2015) ...............................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ...............................................................................3

*Junger v. Daley*,
209 F.3d 481 (6th Cir. 2000) .................................................................5

iii

*Karn v. U.S. Dept. of State,*
  925 F.Supp. 1 (D.D.C. 1996) ..................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
  604 F. Supp. 280 (D.D.C. 1984)...............................................................................4

*Lewis v. Casey,*
  518 U.S. 343 (1996) ................................................................................................14

*Mance v. Sessions,*
  880 F.3d 183 (5th Cir. 2018) ............................................................................*passim*

*Matal v. Tam,*
  137 S. Ct. 1744 (2017).............................................................................................6

*Mather v. Central Pac. Bank,*
  2014 WL 5580963 (D. Haw. 2014) .........................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) ..................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
  192 F.3d 742 (7th Cir. 1999) ...................................................................................10

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ...................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
  487 U.S. 1 (1988) ......................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
  700 F.3d 185 (5th Cir. 2012) ........................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
  283 U.S. 697 (1931) ...........................................................................................11, 12

*New York Times Co. v. United States,*
  403 U.S. 713 (1971) ................................................................................................11

*Oller v. Roussel,*
  609 F. App'x 770 (5th Cir. 2015) ............................................................................12

*Petro-Chem Processing v. EPA,*
  866 F.2d 433 (D.C. Cir. 1989) ................................................................................16

*Prometheus Radio Project v. FCC,*
  373 F.3d 372 (3d Cir. 2004) ................................................................................8, 18

WASHSTATEB007327

*Pub. Citizen, Inc. v. Bomer,*
    274 F.3d 212 (5th Cir. 2001) ............................................................. 14, 15

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ........................................................................ 5, 6

*S. Utah Wild. Alliance v. Palma,*
    2011 WL 2565198 (D. Utah 2011) ............................................................ 15

*Sec'y of State of Md. v. Munson,*
    467 U.S. 947 (1984) .................................................................................. 9

*Second Amendment Arms v. City of Chicago,*
    135 F. Supp. 3d 743 (N.D. Ill. 2015) ......................................................... 14

*Shelby Cty. v. Holder,*
    133 S. Ct. 2612 (2013) ............................................................................. 17

*Se. Promotions v. Conrad,*
    420 U.S. 546 (1975) ................................................................................. 12

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ............................................................................. 14

*Stagg P.C. v. U.S. Dep't of State,*
    158 F. Supp. 3d 203 (S.D.N.Y. 2016),
    *aff'd,* 673 F. App'x 93 (2d Cir. 2016),
    *cert. denied,* 138 S. Ct. 721 (2018) ......................................................... 6, 9

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ......................................................... 13, 14, 17

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................................... 2

*U.nited States v. Hicks,*
    980 F.2d 963 (5th Cir. 1992) .................................................................... 8, 9

*United States v. Hsu,*
    364 F.3d 192 (4th Cir. 2004) ..................................................................... 20

*United States v. Chi Mak,*
    683 F.3d 1126 (9th Cir. 2012) ............................................................ *passim*

*United States v. Edler Indus., Inc.,*
    579 F.2d 516 (9th Cir. 1978) ................................................................. 6, 11

WASHSTATEB007328

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990) ................................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989) ...............................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008) ..............................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013) ............ 2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) ....................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982) ..............................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ................................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) ........................................................................... 3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015) ............................................................................................8

**STATUTES**

18 U.S.C. § 2339B ..........................................................................................................5

22 U.S.C. § 2778……………….....................................................................................*passim*

**REGULATIONS**

22 C.F.R. § 120.1 *et seq.*.................................................................................................2

22 C.F.R. § 120.4...................................................................................................... 2, 8

22 C.F.R. § 120.6...................................................................................................2, 7, 20

22 C.F.R. § 120.10...................................................................................................*passim*

WASHSTATEB007329

22 C.F.R. § 120.11 ................................................................................................ 7, 11

22 C.F.R. § 120.17 .................................................................................................. 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) ...................................................................... 8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
    5 Op. O.L.C. 202 (1981)………………………………………………………13

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
  Plaintiffs,

v.            No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
  Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

### BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7.  On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

*P*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138 S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1]  This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.     Plaintiffs' First Amendment Claims Should Be Dismissed.**

   A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

_____

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

    To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

WASHSTATEB007334

manufacturing firearms and defense articles.[6]

    B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

    "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

    The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

    In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227.  *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants'
interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the
commodity jurisdiction request process for determining whether information is subject to its export
controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding
statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as
here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative
term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply
associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively
narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis,
concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion
incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported
distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-
71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not
dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d
372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness
can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla.
Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's
regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C.  ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See*
SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may
only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In
circumstances where a regulation is alleged to be so broad that it is incapable of any permissible
application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper,
as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb
'export.'" *DD II*, 838 F.3d at 466-67. But the underlined noun "export" is defined as "[a] product or service
created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th
ed. 2014) (emphasis added).

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

    D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

    Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

    The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

WASHSTATEB007341

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

WASHSTATEB007342

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

**II.  Plaintiffs' Second Amendment Claims Should Be Dismissed.**

A.  Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

WASHSTATEB007343

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing).[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

    2.   SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

       Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

       Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

       Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

      B.   Plaintiffs' Second Amendment Challenge Fails on the Merits.

      In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

      The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

WASHSTATEB007346

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

### III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20.  This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHSTATEB007350

Dated: April 6, 2018                                Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

WASHSTATEB007351

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

           Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

           Defendants.

NO. C18-1115RSL

PRELIMINARY INJUNCTION

      This matter comes before the Court on the "Plaintiff States' Motion for Preliminary Injunction." Dkt. # 43. A temporary restraining order was entered on July 31, 2018, enjoining the federal defendants[1] from implementing or enforcing a "Temporary Modification of Category I of the United States Munitions List" and a July 27, 2018, letter issued by the U.S. Department of State to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation. The order also required the federal defendants to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. Pursuant to the limitations set forth in Fed. R. Civ. P. 65, the matter was set for hearing on August 10, 2018, but the restraining order was extended by agreement of the parties to August 28, 2018, to accommodate an August

---

      [1] The federal defendants are the United States Department of State, Michael R. Pompeo, the Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema.

PRELIMINARY INJUNCTION - 1

21, 2018, hearing date.

Having considered the memoranda, declarations, and exhibits submitted by the parties, as well as the amicus curiae submissions of the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Electronic Frontier Foundation,[2] and having heard the arguments of counsel, the Court finds as follows:

## PRELIMINARY INJUNCTION STANDARD

The standard for issuing a preliminary injunction is identical to the standard the Court used when granting the temporary restraining order in this case. Thus, for purposes of the current motion, the Court considers the more developed record to determine whether plaintiffs (1) are likely to succeed on the merits of their APA claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). In the alternative, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).[3]

---

[2] The requests for leave to file amicus curiae briefs (Dkt. # 46, # 47, and # 58) are GRANTED.

[3] The Court finds that the injunction plaintiffs seek is prohibitory in nature, rather than mandatory. A prohibitory injunction maintains the status quo, which is generally described as the last, uncontested status which preceded the present controversy. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). In this case, the status quo existed before the federal defendants issued

PRELIMINARY INJUNCTION - 2

## BACKGROUND AND PROCEDURAL HISTORY

Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of computer aided design ("CAD") data files that would allow the creation of guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

_____

the temporary modification and letter on July 27, 2018.

PRELIMINARY INJUNCTION - 3

system of prior restraints that was applied in an arbitrary manner in violation of Defense Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed wanted to publish on the internet were technical data subject to the ITAR.

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

> !    "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"
>
> !    Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"
>
> !    "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and
>
> !    both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-

PRELIMINARY INJUNCTION - 4

Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The Honorable Robert L. Pitman denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or

PRELIMINARY INJUNCTION - 5

terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defense Distributed v. U.S. Dep't of State, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex.). Later that month, the parties reached a tentative settlement agreement. Pursuant to the settlement, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On May 24, 2018, the federal defendants published the promised rulemaking notice, with the public comment period ending on July 9, 2018. 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed.

PRELIMINARY INJUNCTION - 6

Reg. 24,166 (May 24, 2018). The settlement agreement was signed on June 29, 2018, in the midst of the public comment period, but not made public until July 10, 2018. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the United States Constitution.[4] After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the temporary modification resulted in the removal of one or more items from the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018, and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor.

## DISCUSSION

Plaintiffs' request for a preliminary injunction is centered on its claim that the federal defendants violated the APA. The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a

---

[4] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

PRELIMINARY INJUNCTION - 7

temporary modification were procedurally defective in that the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1) and failed to obtain the concurrence of the Secretary of Defense as required by the President when he delegated his removal authority to the Secretary of State in Executive Order 13637, § 1(n)(i).[5] Plaintiffs also argue that, to the extent the temporary modification permits "any United States person" to use the CAD files at issue, the federal government's action impermissibly conflicts with state and federal laws limiting access to guns. Finally, plaintiffs challenge the decision to allow the CAD files to be published on the internet as arbitrary and capricious because the State Department failed to articulate any explanation for its decision to allow the publication of the CAD files on the internet or to alter its earlier factual findings and representations regarding the harms such publication will likely cause.

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States lack standing, while the private defendants argue that this lawsuit is an impermissible collateral attack on the outcome of the litigation in the Western District of Texas.[6]

---

[5] Plaintiffs, citing a presidential tweet and a White House press briefing, also suggest that the State Department exceeded its authority over the USML because the President disagrees with the way in which that authority was exercised. Plaintiffs acknowledge, however, that the President has delegated USML designations to the State Department. That delegation was not conditioned on obtaining the President's prior approval of or subsequent acquiescence to a listing decision. To the extent the President believes that allowing printable gun files to be published on the internet is not sensible, he has the power to influence, if not outright direct, the State Department's decision-making in this matter. He has not yet done so.

[6] The private defendants' § 701 argument is discussed below.

PRELIMINARY INJUNCTION - 8

**1. Standing**

In order to present a justiciable case or controversy under Article III of the U.S. Constitution, plaintiffs must have standing to challenge defendants' conduct and pursue the relief requested.

> [The] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted). In an APA action, a State alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision that is allegedly causing harm. Mass. v. Envt'l Protection Agency, 549 U.S. 497, 517 (2007). In addition, a State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation. Dep't of Fair Emp't  & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

Plaintiffs allege that the federal defendants failed to provide notice of their intent to remove technical data related to the manufacture of 3D guns from the USML and have made a wholly unsupported - and therefore arbitrary and capricious - decision which, in the State Department's own words, will make anyone in possession of a commercially-available 3D printer capable of automatically generating a lethal firearm that would be virtually undetectable

PRELIMINARY INJUNCTION - 9

in metal detectors and other security equipment. The federal defendants assert that the alleged failures are harmless or are causally unrelated to any harm the States might suffer because the federal government's regulatory authority under the AECA is limited to exports and the plaintiffs' concerns are purely domestic. Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well.

The Court finds that plaintiffs have not only alleged harm to their legally protectable sovereign interests under the traditional standing analysis, but have also alleged a procedural APA claim where there is a possibility that compelling compliance with the specified procedures will prompt the agency to reconsider its decision. Forcing the federal defendants to give Congress thirty days' notice of the removal of the CAD files from the USML and to seek the concurrence of the Department of Defense would afford other executive branch entities (including the President) an opportunity to impact the decisionmaking process and would give both Congress and the States a chance to generate any statutes or regulations deemed necessary to address the regulatory void the delisting would create. Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the

PRELIMINARY INJUNCTION - 10

USML. There is, at the very least, a possibility that the States would benefit from the relief requested in this litigation.

Plaintiffs have standing to pursue the relief requested in the amended complaint. Plaintiffs have alleged an injury in fact that is directly threatened by the federal defendants' proposed delisting of the technical data contained in Defense Distributed's CAD files and that could be ameliorated, if not avoided entirely, as a result of this litigation.

**2. Collateral Attack**

The private defendants argue that this lawsuit is an impermissible collateral attack on the dismissal with prejudice of the Western District of Texas litigation. They reason that, had the States moved to intervene in the prior litigation in order to object to the proposed settlement or to seek a preliminary injunction precluding its execution, the motion would have been denied and the States cannot, therefore, obtain such relief here. The conclusion does not follow from the premise. The reasons the States would likely not have been permitted to intervene in the prior litigation is that they were not necessary parties, they had no right to appear simply because they were interested in its outcome, their claim had nothing to do with the facts or law at issue between the existing parties, and their APA-based objections could be heard and their interests protected in a separate litigation with the federal defendants. See Fed. R. Civ. P. 19 and 24. The district court's likely refusal to allow plaintiffs to appear and/or intervene in the Western District of Texas litigation is not relevant to, much less dispositive of, plaintiffs' right to seek relief in this litigation.

If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. If the remedy afforded in this litigation impinges on the federal

PRELIMINARY INJUNCTION - 11

defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are challenging the adequacy of agency action. Defendants offer no case law suggesting that violations of the APA can be shielded from judicial review by simply incorporating them into a private settlement agreement.

**B. Likelihood of Success on the Merits**

    **1. Congressional Notice**

        The AECA authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The President has the power to designate "defense articles and defense services:" the items so designated constitute the USML. Id. The USML identifies categories of defense articles and services that are subject to export controls. The list is "organized by paragraphs and subparagraphs" that "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments; and technical data and defense services directly related to the defense articles of that USML category." 22 C.F.R. § 121.1(a). The USML, Category I, includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the CAD files Defense Distributed seeks to publish are subject to the export controls of ITAR. The Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has

PRELIMINARY INJUNCTION - 12

provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." 22 U.S.C. § 2778(f)(1).

Plaintiffs have shown a likelihood of success on the merits of their APA claim because the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.[7] Assuming that is the case, the federal defendants acknowledge that the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of the review be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

The Department of State argues that its decision to allow the publication of previously-regulated CAD files does not trigger the Congressional notice requirement because it has not removed an "item" from the USML. Defendants argue that the notice requirement applies only

---

[7] The federal defendants refused to produce the administrative record of the agency's decision (Dkt. # 49) and instead rely on the declaration of the Director of the Office of Defense Trade Control Policy within the DDTC (Dkt. # 64-1) to explain how and why the decision was made to reverse the CJ determination regarding the CAD files at issue. This tactic has placed plaintiffs and the Court at a decided disadvantage in evaluating what the government relied upon when concluding that the State Department's prior findings regarding the national security risks posed by plastic, untraceable, undetectable guns should be overruled. For purposes of the procedural APA claim, however, the declaration confirms that notice to Congress will be given as required by 22 U.S.C. § 2778(f) if and only if a final rule is issued. Dkt. # 64-1 at ¶ 24.

PRELIMINARY INJUNCTION - 13

WASHSTATEB007365

1    when a whole group or category of defense articles described in the USML, such as

2    "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R.

3    § 121.1(I)(a), is removed and that that has not yet happened. This argument conflates "category"

4    with "item." As described in the statute, the USML is a list of items designated by the President

5    as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an

6    exhaustive list of every individual article or service that is subject to export control under the

7    AECA, the Department of State opted to populate the USML with generally descriptive

8    categories. Those categories describe end-items, however, and it is those items that are the

9    "defense articles and defense services" that are subject to export control under the AECA. 22

10   C.F.R. § 121.1. See also Fact Sheet on President's Export Control Reform Initiative (April 20,

11   2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-

12

13   control-reform-initiative (visited August 21, 2018) (noting that the United States' system of

14   export control involved an "extensive list of controlled items which resulted in almost 130,000

15   licenses" in 2009). The congressional review and notice requirements specifically apply to items,

16   not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms

17

18   that it is the removal of a particular article or service - i.e., an item rather than a category - that

19   triggers the review and notice requirements. The Department describes the CJ procedure as a

20   means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions

21   List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions

22   List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations

23   reiterate that the "Department must provide notice to Congress at least 30 days before any item

24

25   is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the

26   statute and implementing regulations, the Court finds that plaintiffs are likely to prevail on their

27

28   PRELIMINARY INJUNCTION - 14

argument that the terms "item" and "category" are distinct and that Congressional notice is required whenever a previously-designated defense article or service is to be removed from the AECA's reach.

As noted above, the DDTC made an express determination that certain CAD files that can be used with a 3D printer to manufacture guns and/or their components are "defense articles" or "defense services" under the USML. Defendants attempted to revoke that designation through the issuance of the "temporary modification" described in the settlement agreement in the Western District of Texas litigation, thereby removing the CAD files from the USML and lifting all export controls.[8] Congress was not notified prior to the removal. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of any final rule removing firearms up to .50 caliber from the USML. The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[9]

**2. Concurrence of the Secretary of Defense**

When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense

_____

[8] The Court rejects the private defendants' attempt to distinguish the terms "remove" and "exclude" in this context.

[9] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification, its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

PRELIMINARY INJUNCTION - 15

services subject to export control have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures. Plaintiffs are not likely to succeed on the merits of this aspect of its claim, however, because the relevant executive order expressly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Executive Order 13637, § 6(c).

### 3. Abrogation of State and Federal Law

In response to the States' objections regarding the scope of the purported authorization for "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from the CAD files at issue, both the federal and private defendants disavow any intent to alter or in any way impact existing federal prohibitions or limitations on the possession of firearms. The federal defendants also recognize the continuing viability of state law gun control measures. Plaintiffs do not address this argument in their reply memorandum.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the files. The federal defendants state that the change was the result of a multi-year review process which led to the determination that firearms up to .50 caliber "do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML." Dkt. # 64-1 at ¶ 24. Even if the Court accepts that the

PRELIMINARY INJUNCTION - 16

undisclosed administrative record will support this argument,[10] there is no indication that the Department considered the unique properties of 3D plastic guns or evaluated the factors Congress deemed relevant when the Department decided to authorize the posting of the CAD files on the internet as of July 27, 2018.

Until April 2018, the federal government took the position that technical data related to the design and production of weapons using a commercially-available 3D printer posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic. Because they were virtually undetectable in metal detectors and other security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.

Against these findings related to the specific defense articles at issue in this litigation, the federal defendants state only that restricting the international availability of firearms up to .50 caliber will not provide the United States with a critical military or intelligence advantage. There

---

[10] Plaintiffs' motion to strike arguments based on the administrative record is DENIED.

PRELIMINARY INJUNCTION - 17

is no indication that the Department evaluated the unique characteristics and qualities of plastic guns when it was considering the deletion of the small firearms category from the USML. Statements made at oral argument affirmatively suggest that it did not do so prior to July 27, 2018. Nor is there any reasoned explanation for its change in position regarding the harms that publication of the regulated technical data will engender. The State Department also appears to have evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Congress, however, directed the Department to consider how the proliferation of technical data and related weaponry would impact world peace, national security, and foreign policy. When President Obama initiated the multi-year review of the export control system on which defendants rely, the stated goals of the review included "enhanc[ing] U.S. national security" and updating the Cold War era system "to address the threats we face today and the changing economic and technological landscape." Fact Sheet on the President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export -control-reform-initiative (visited August 21, 2018). Based on the existing record, plaintiffs have raised serious questions regarding the merits of their claim that the federal defendants failed to consider aspects of the problem which Congress deemed important, failed to articulate a reasonable explanation for this particular decision in light of its prior findings and representations, and engaged in arbitrary and capricious agency action.

**5. Agency Discretion**

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to

PRELIMINARY INJUNCTION - 18

agency discretion as a matter of law: the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML, which Congress chose not to make unreviewable.

"Over the years, [the Supreme Court has] read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 191 (1993). Thus, an express legislative bar such as that found in § 2778(h) is not a prerequisite to a finding that an action is committed to agency discretion by law. The Supreme Court has found that an agency's decision not to initiate enforcement proceedings, not to grant reconsideration of agency action, or how to allocate funds from a lump-sum budget allocation are presumptively unreviewable because those decisions often involve complicated balancing of factors within the agency's expertise, Congress imposed no relevant requirements or restrictions, and there is no adequate standard by which the judiciary could evaluate the agency action. Id. at 191-93. Those factors do not apply here. Plaintiffs are challenging the federal defendants' failure to comply with certain procedures that Congress and the courts have imposed when making removal decisions under AECA. "The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable." Batalla Vidal v. Duke, 295 F. Supp.3d 127, 148 (E.D.N.Y. 2017).

**6. First Amendment**

The private defendants argue that the CAD files are protected speech under the First Amendment, that restrictions on their ability to publish the files constitute a prior restraint that is presumed to be unconstitutional, and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the

PRELIMINARY INJUNCTION - 19

1    publication of technical data under the authority granted by the AECA is not relevant to the

2    merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal

3    defendants failed to follow prescribed procedures and acted in an arbitrary and capricious

4    manner when they issued the temporary modification and letter authorizing the immediate

5    publication of the CAD files. The State Department has not attempted to justify its action as

6    compelled by the First Amendment, nor have the private defendants shown that their First

7    Amendment interests are a defense to or otherwise invalidate plaintiffs' claims against the

8    federal defendants. To the extent the private defendants' speech is impacted, their First

9    Amendment interests are considered in the balancing of hardships and public interest section

10   below.

11

12   **C. Irreparable Harm**

13           Plaintiffs have submitted evidence, including declarations and the federal defendants'

14   prior findings, showing that the States will likely suffer irreparable injury if the technical data for

15   designing and producing undetectable weapons using a commercially-available 3D printer are

16   published on the internet. Many of the same concerns that prompted the DDTC to conclude that

17   the CAD files are "defense articles" within the scope of the USML apply with equal force to the

18   States. A gun made from plastic is virtually undetectable in metal detectors and other security

19   equipment intended to promote public safety at airports, sporting events, courthouses, music

20   venues, and government buildings. The portability and ease of a manufacturing process that can

21   be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing,

22   possessing, and/or using guns to more easily evade those limitations. The publication of the

23   technical data would subvert the domestic laws of states with more restrictive firearm controls

24   and threaten the peace and security of the communities where these guns proliferate.

25

26

27

28   PRELIMINARY INJUNCTION - 20

In addition, the States have certain public safety, law enforcement, and proprietary interests that were not of particular concern to the United States when considering the effects the technical data would have if exported to other countries. The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if, as the private defendants advocate, every person owns a plastic gun.

The plaintiff States and the District of Columbia, as sovereigns, represent more than160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding

PRELIMINARY INJUNCTION - 21

undetectable and untraceable guns to the arsenal of weaponry already available will likely

increase the threat of gun violence they and their people experience.

Defendants do not argue that any of these injuries are reparable. Rather, defendants argue

that the injuries are not causally connected to the State Department's decision to overturn its

prior CJ determination and remove the CAD files from the USML. The federal defendants assert

that, because the AECA regulates the export of defense articles, a change in their regulatory

stance cannot be the cause of the domestic effects of which plaintiffs complain. As discussed in

the standing analysis, this argument ignores reality and is wholly unpersuasive. The inclusion of

the CAD files on the USML prevented the technical data from being posted on the internet.

Because there is no "domestic" internet, the ban had the collateral effect of making it more

difficult to locate and download instructions for the manufacture of plastic firearms both

domestically and internationally. It takes virtually no imagination to perceive the direct

connection between removing the CAD files from the USML, the internet publication of the

technical data, and the likelihood of the irreparable injuries plaintiffs have identified.

The private defendants, for their part, argue that the causal connection is broken because

nine[11] of the CAD files at issue are already on the internet (Defense Distributed posted them

again for good measure on July 27, 2018, as soon as the temporary modification and authorizing

letter were issued, but took them down when the temporary restraining order was entered).

Nevertheless, plaintiffs have shown that they are likely to suffer irreparable harm in the absence

of an injunction. First, it is not clear how available the nine files are: the possibility that a

---

[11] In their memorandum and at oral argument, the private defendants state that they published ten CAD files pursuant to the authorizations they received as part of the settlement. The file pertaining to the Ghost Gunner 2 assembly files were not covered by the USML and not subject to ITAR control. Dkt. # 29-1 at 82 and # 63-1 at 8.

PRELIMINARY INJUNCTION - 22

cybernaut with a BitTorrent protocol will be able to find a file in the dark or remote recesses of the internet does not make the posting to Defense Distributed's site harmless. Second, there is no information regarding when these files were posted and whether they were posted with the approval of the relevant government agency. Absent such approval, the files remain "technical data" subject to ITAR control because they are not in the "public domain" for purposes of the AECA. 22 C.F.R. § 120.10(b) and § 120.11(a)(7). Third, many of the files have not yet been released, including files created by third parties and any files Defense Distributed will develop in the future. Fourth, the private defendants' dogged pursuit of the right to publish these files - and the evident alarm with which the proposed publication has been met in the Congress, in the White House, amongst advocacy groups, and in state houses all over the country - suggest that further publication is not harmless.

Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are

PRELIMINARY INJUNCTION - 23

likely to befall the States if an injunction is not issued.

**D. Balance of Hardships and Public Interest**

Against the likelihood that the States will suffer the various harms discussed above, the federal defendants identify no hardship of their own, but argue that the public interest in allowing the Executive to exercise its discretion in determining how best to promote national security weighs against preliminary injunctive relief. That discretion must, however, be exercised through the procedures established by Congress and not in an arbitrary and capricious manner.

The private defendants raise the more substantive argument that a preliminary injunction will impair their First Amendment rights, a loss which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). The First Amendment argument raises a number of challenging issues. Is computer code speech? If yes, is it protected under the First Amendment? To answer those questions, one would have to determine what the nature of the files at issue here is: are they written and designed to interact solely with a computer in the absence of the intercession of the mind or will of the recipient or is it an expressive means for the exchange of information regarding computer programming and/or weapons manufacturing? Are the export controls of the ITAR a prior restraint giving rise to a presumption that they are unconstitutional? Is the AECA a general regulatory statute not intended to control the content of speech but only incidentally limiting its unfettered exercise? Or is the government attempting to regulate distribution of the CAD files because of the message they convey? Depending on which level of scrutiny applies, does the regulation advance important governmental interests unrelated to the suppression of free speech and avoid burdening more speech than necessary or is the regulation narrowly tailored to promote a

PRELIMINARY INJUNCTION - 24

1  compelling Government interest?

2      The Court declines to wade through these issues based on the limited record before it and

3  instead presumes that the private defendants have a First Amendment right to disseminate the

4  CAD files. That right is currently abridged, but it has not been abrogated. Regulation under the

5  AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed,

6  securely transmitted, or otherwise published within the United States. The Court finds that the

7  irreparable burdens on the private defendants' First Amendment rights are dwarfed by the

8  irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that,

9  overall, the public interest strongly supports maintaining the status quo through the pendency of

10  this litigation.

11

12

13

14      For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is

15  GRANTED. The federal defendants and all of their respective officers, agents, and employees

16  are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I

17  of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and

18  the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018,

19  and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter

20  had not been issued until further order of the Court.

21

22

23      Dated this 27th day of August, 2018.

24  

25

26      Robert S. Lasnik
        United States District Judge
27

28  PRELIMINARY INJUNCTION - 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

Defendants.

NO. C18-1115RSL

ORDER INVALIDATING JULY 27,
2018, TEMPORARY
MODIFICATION AND LETTER

This matter comes before the Court on the parties' cross-motions for summary judgment.
Dkt. #170, #173, and #174. Plaintiffs seek a summary determination that the federal defendants
violated the Administrative Procedures Act ("APA") when they modified the United States
Munitions List ("USML") and issued a letter authorizing the on-line publication of certain
computer aided design ("CAD") data files in July 2018. They request that the Court vacate the
agency action and permanently enjoin the federal defendants from removing the CAD files at
issue from the USML unless and until they comply with the statutory procedural requirements.

**BACKGROUND AND PROCEDURAL HISTORY**

Since at least 2013, the federal government had taken the position that the Arms Export
Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 1

CAD files that allow users to create guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a system of prior restraints that was applied in an arbitrary manner in violation of Defense Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed wanted to publish on the internet were technical data subject to the AECA and ITAR.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 2

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. #32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of these articles to enemies of the United

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 3

States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. #32-1 at ¶ 35.

The Honorable Robert L. Pitman denied Defense Distributed's motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. #43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's claims in the Texas litigation, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." C15-0372RP, Dkt. #92 at 1 (W.D. Tex). Later that month, the parties reached a

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 4

tentative settlement agreement. Pursuant to the settlement, which was not signed until July 29, 2018, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D-printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") that would allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the settlement agreement that address, much less invalidate, the federal government's prior analysis regarding the likely impacts of publication on national security or world peace or that otherwise explain the federal government's change of position.

On May 24, 2018, the Department of State published a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in the litigation. The NPRM proposed an amendment to the ITAR to, *inter alia*, remove certain Category I items (primarily small caliber weapons and their related technical data) from the USML, thereby lifting the requirement to obtain a license for their export. 83 Fed. Reg. 24,198 (May 24, 2018). Although the NPRM did

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 5

not explicitly mention 3D-printed firearms or their related technical data, approximately 12% of the comments received in response to the NPRM did, and all of them opposed lifting the license requirement. The public comment period end on July 9, 2018. The settlement agreement was made public the following day. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018. The temporary modification contains an assertion that the DDTC "has determined that it is in the interest of the security and foreign policy of the United States" to immediately modify Category I of the USML to exclude the technical data at issue in the Texas litigation. Dkt. #171-2 at 2. The public comments opposing exclusion were not considered by the agency when it issued the temporary modification and letter. Dkt. #179-2 at ¶ 7.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the APA and the Tenth Amendment to the United States Constitution.[1] In response to plaintiffs' motion for preliminary injunctive relief, the federal defendants justified the deregulation of the CAD files (along with the delisting of other items within Category I of the USML) by pointing to a Department of Defense determination that the items "do not provide the United States with a critical military or intelligence advantage" and "are already commonly available and not inherently for military end-use." Dkt. #64-1 at 10. After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their APA claim insofar as the temporary modification resulted in the removal of one or more items from

---

[1] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 6

the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018,[2] and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor. The federal defendants were enjoined from implementing or enforcing the temporary modification of the USML and/or the July 27th letter and were required to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. Dkt. #23 and #95.

In the context of the States' challenge to the issuance of the temporary modification and letter, the federal defendants produced and supplemented the administrative record on which the decision to issue the temporary modification and letter was based.[3] Plaintiffs now seek an order invalidating the temporary modification and letter under the APA and permanently enjoining the federal defendants from removing the computer files at issue from the USML unless and until they comply with the governing procedural requirements. The federal and private defendants oppose plaintiffs' motion and request judgment in their favor.

## DISCUSSION

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States cannot meet prudential standing

---

[2] The private defendants now assert that they published the subject CAD files to the internet immediately upon receipt of the letter and the issuance of the temporary modification. Dkt. #174-1 at 5-6. The publication does not change the following analysis.

[3] Plaintiffs do not concede that the record, as supplemented, is complete or that defendants' various claims of privilege are proper.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 7

WASHSTATEB007384

1  requirements. The private defendants argue that the issuance of the temporary modification and

2  letter are "committed to agency discretion by law" and not subject to judicial review under 5

3  U.S.C. § 701(a)(2) and 22 U.S.C. § 2278(h), that listing on the USML is a political question over

4  which the Court lacks subject matter jurisdiction, and that the claims are barred by the Tucker

5  Act.[4]

6

7        **1. Zone of Interests**

8        The question of standing involves both constitutional limitations imposed by Article III of

9  the U.S. Constitution and prudential limitations imposed by the judiciary to limit the exercise of

10  federal jurisdiction. See Warth v. Seldin, 422 U.S. 490, 498 (1975); Allen v. Wright, 468 U.S.

11  737, 751 (1984). To present a justiciable case or controversy under Article III, plaintiffs must

12  demonstrate an "injury in fact" that is "fairly traceable" to the actions of the defendants and that

13  will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S.

14  555, 560 (1992). The prudential limitations are "founded in concern about the proper - and

15  properly limited - role of the courts in a democratic society." Warth, 422 U.S. at 498. The

16  prudential requirement at issue here is that a plaintiff's grievance must arguably fall within the

17  zone of interests protected or regulated by the statutory provision on which the claim is based.

18  See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).

19

20        The zone-of-interests test is a standing requirement of general applicability, but "the zone

21  of interests of a statute for purposes of obtaining judicial review of administrative action under

22

23

24  _____

25        [4] Defendants also incorporate by reference arguments made in the preliminary injunction context
    regarding Article III standing and this lawsuit being an impermissible collateral attack on the outcome
26  of the litigation in the Western District of Texas. Those arguments are again rejected. See Dkt. #95 at 9-
    12.
27

28  ORDER INVALIDATING TEMPORARY
    MODIFICATION AND LETTER - 8

WASHSTATEB007385

the generous review provisions of the APA" is fairly expansive. <u>Bennett v. Spear</u>, 520 U.S. 154, 163 (1997) (internal quotation marks and citations omitted). The test "is not meant to be especially demanding" in the APA context, and the Supreme Court applies "the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012) (internal quotation marks and citations omitted). Plaintiffs need not establish a congressional purpose to benefit them through passage of the underlying statute, they need simply have interests that relate to and are not inconsistent with the purposes implicit in the statute. <u>Id.</u> The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." <u>Id.</u>

The AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States." <u>U.S. v. Chi Mak</u>, 683 F.3d 1126, 1134 (9th Cir. 2012) (quoting 22 U.S.C. § 2778(a)(1)). In keeping with the goals of the statute, the federal government has, in the past, justified subjecting the CAD files at issue to ITAR's export licensing scheme based on their characteristics and functionality, which make them especially dangerous to U.S. national security and foreign policy interests. The agency properly focused its analysis on the factors specified in the AECA and deemed it important to keep plastic, undetectable firearms out of foreign hands where they were not subject to U.S. laws and controls. The agency's focus on exports, national security, and world peace does not, however, mean that the States' domestic interests are unrelated or marginally related to the AECA's purposes. The State Department found that the firearms generated by the subject CAD files "can be easily modified to be

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 9

virtually undetectable in metal detectors and other security equipment," could be used in assassinations or terrorist activities "specifically directed at U.S. persons," and could lead to violent regional conflicts that implicate the security of the United States. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. #32 at 19-20 (W.D. Tex). Given that the CAD files and the resulting weapons can be transported, undetected, virtually anywhere in the world, these same impacts would likely arise within the United States even if the plastic weapons are manufactured abroad. The States' interests in curbing violence, assassinations, terrorist threats, aviation and other security breaches, and violations of gun control laws within their borders are at least marginally related to the interests protected or regulated by the AECA. The state and federal interests, while not identical, are aligned and not in any way inconsistent. Because the States' grievance arguably falls within the zone of interests protected or regulated by the AECA, there is no judicially-imposed limit on the Court's exercise of jurisdiction in this matter.

### 2. Agency Discretion and Judicial Review

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to agency discretion, namely the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML. Plaintiffs are challenging the federal defendants' failure to comply with statutory procedures and/or to consider certain congressionally-specified factors when making removal decisions under AECA. Congress did not expressly make such removal decisions unreviewable.

Even absent a statutory bar to judicial review, certain agency decisions have traditionally

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 10

1  been considered wholly discretionary and beyond review. To be sure, the AECA confers broad

2  discretion on the President when determining whether to add or remove items from the USML,

3  but that discretion is not unbounded: Congress has imposed both procedural and substantive

4  benchmarks to guide the agency's action. In order to honor the "basic presumption of judicial

5  review" embodied in the APA and to "give effect to the command that courts set aside agency

6  action that is an abuse of discretion," the Supreme Court has "read the § 701(a)(2) exception for

7  action committed to agency discretion quite narrowly, restricting it to those rare circumstances

8  where the relevant statute is drawn so that a court would have no meaningful standard against

9  which to judge the agency's exercise of discretion" and has "generally limited the exception to

10 certain categories of administrative decisions that courts traditionally have regarded as

11 committed to agency discretion, . . . such as a decision not to institute enforcement proceedings .

12 . . or a decision by an intelligence agency to terminate an employee in the interest of national

13 security . . . ." Dep't of Commerce v. N.Y., __ U.S. __, 139 S. Ct. 2551, 2567-68 (2019)

14 (internal quotation marks and citations omitted).

15       The procedural and substantive requirements at issue in this case are clearly stated, and

16 whether the agency complied with those requirements can be judicially evaluated without fear of

17 treading on any matter that implicates agency expertise, involves a complicated balancing of

18 factors, or has been traditionally regarded as beyond judicial review. The Court finds that the

19 process through which defendants removed items from the USML in July 2018, defendants'

20 compliance with the standards furnished by the AECA, and the adequacy of the agency's

21 analysis of and explanation for its decision are subject to judicial review under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 11

### 3. Political Question

The private defendants also argue that the regulation or deregulation of defense articles or services under the AECA is a political question that is nonjusticiable under the separation of powers doctrine. This argument fails for much the same reasons as the agency discretion and judicial review arguments. While the decision to include an item on the USML or to grant or deny an export license for a listed item is statutorily excluded from judicial review and/or requires an exercise of discretion within the agency's expertise, whether the agency complied with clear procedural requirements and considered factors Congress deemed relevant when removing an item from the USML is neither a political question nor one committed to the agency's discretion as a matter of statute or case law.

### 4. Tucker Act

Finally, the private defendants assert that the Court of Federal Claims has exclusive jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Plaintiffs seek to invalidate agency action under the APA because it violates the procedural requirements of the AECA and/or is arbitrary and capricious. These claims are statutory and, as plaintiffs point out, the Tucker Act has no application in this context. Dkt. #186 at 22. The private defendants abandoned this argument in reply.

### B. Administrative Procedures Act Claims

The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 12

excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a temporary modification and letter were not in accordance with law and were without observance of procedure required by law insofar as the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1). Plaintiffs also seek to invalidate the decision to allow the CAD files to be published on the internet on the ground that the temporary modification violates the limitations on federal power imposed by the Tenth Amendment. Finally, plaintiffs argue that the agency action was arbitrary and capricious because the agency failed to consider the factors identified by Congress and because the delisting is not supported by substantial evidence in the administrative record.

**1. Congressional Notice**

The AECA requires that the President or his designee periodically review the items on the USML to ensure that export controls are warranted. 22 U.S.C. § 2778(f)(1). The results of the review must be reported to Congress, and the Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." Id. The federal defendants argue that the Congressional notice requirement does not apply because the CAD files at issue here are not specifically enumerated on the USML and are therefore not "items" for purposes of § 2778(f)(1). This argument was rejected at the preliminary injunction stage, and the Court sees no reason to reconsider its decision.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 13

The President has the power to designate "defense articles and defense services" and to control their import and export "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The articles and services (*i.e.*, items) so designated constitute the USML. Id. See also 22 C.F.R. § 121.1(a) (describing the organization of the USML and noting each USML category is composed of related defense articles). Category I of the USML includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the subject CAD files are subject to the export controls of ITAR.

The Department of State argues that its decision to immediately allow the unlicensed export of previously-regulated items does not trigger the Congressional notice requirement because the temporary modification did not deregulate a whole group or category of defense articles described in the USML, such as "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R. § 121.1(I)(a). This argument conflates "category" with "item." As described in the statute, the USML is a list of items designated by the President as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an exhaustive list of every individual article or service that is subject to export control under the AECA, the Department of State opted to populate the USML with generally descriptive categories. Those categories describe actual items, however, and it is those items that are the "defense articles and defense services" subject to export control under the AECA. 22 C.F.R. § 121.1.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 14

1    The congressional review and notice requirements specifically apply to items, not

2    categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms that it

3    is the removal of a particular article or service - an item rather than a category - that triggers the

4    review and notice requirements. The Department describes the CJ procedure as a means of

5    resolving doubts "as to whether an article or service is covered by the U.S. Munitions List" and

6    to seek "redesignation of an article or service currently covered by the U.S. Munitions List." 22

7    C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations reiterate that

8    the "Department must provide notice to Congress at least 30 days before any item is removed

9    from the U.S. Munitions List." Id. Given the language, structure, and purpose of the statute and

10   implementing regulations, the Court finds that the attempt to revoke the listing of an item

11   previously covered by the USML through the issuance of a "temporary modification," thereby

12   lifting all export controls under the AECA and ITAR, triggers the congressional notice

13   requirement of the statute.

14       It is undisputed that Congress was not notified prior to the removal of the subject CAD

15   files from the USML. This procedural failure cannot be rectified by providing Congressional

16   notice thirty days in advance of making the "temporary" removal "final:" the temporary

17   modification implemented the removal immediately, without waiting for the proposed rule to

18   become final and without giving Congress notice and an opportunity to exercise its oversight

19   role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent

20   notice is obviously not timely under the statute.[5]

_____

[5] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification (see Dkt. #173 at 6), its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 15

1
2
3
4
5
6

The Court finds that the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. Because the agency action was "without observance of procedure required by law," it must be held unlawful and set aside under § 706 of the APA.

7

**2. Tenth Amendment Claim**

8
9
10
11
12
13
14
15
16
17
18
19

As part of the settlement agreement in the Texas litigation, the federal defendants agreed that the temporary modification that would be issued on or before July 27, 2018, would permit "any United States person" including the private defendants' customers and members, "to access, discuss, use, reproduce, or otherwise benefit from the technical data" contained in the CAD files at issue. Dkt. #171-2 at 6. Plaintiffs argue that this provision exceeds the limits imposed on the federal government by the Tenth Amendment in that it conflicts with, and presumably abrogates, state laws restricting certain persons from possessing, manufacturing, owning, and/or using firearms in general or 3D-printed firearms in particular. Plaintiffs therefore argue that the temporary modification must be invalidated as "otherwise not in accordance with law" under the APA.

20
21
22
23
24

Both the federal and private defendants have, at various times during this litigation, disavowed any intent to alter or in any way impact existing prohibitions or limitations on the possession of firearms, and the federal defendants recognize the continuing viability of state law gun control measures. Plaintiffs find no comfort in these statements "given the plain language of

25
26
27

statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

28

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 16

1    the operative Temporary Modification and Letter." Dkt. #186 at 14. A review of the notice of

2    temporary modification and letter shows, however, that neither communication expressly

3    permits "any United States person" to "use" the CAD files or 3D-printed firearms. Nor do they

4    contain a reference incorporating the settlement agreement or the promises set forth therein.

5    Without assistance from the parties, the Court declines to determine whether a contractual

6    provision regarding the intended meaning of a promised, future statement would have any effect

7    on state law or be otherwise enforceable when the statement, when finally issued, contains no

8    language regarding the subject matter.

9        **4. Arbitrary and Capricious**

10       Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to

11   upload to the internet CAD files containing 3D printing instructions for the manufacture of

12   undetectable weapons was arbitrary and capricious because the State Department failed to

13   consider the factors set forth in the AECA, failed to offer an explanation supported by

14   substantial evidence in the administrative record, and/or has asserted justifications that are

15   pretextual. In determining whether agency action was arbitrary and capricious, the Court's scope

16   of review is "narrow" and focused on determining whether the agency "examined the relevant

17   data and articulated a satisfactory explanation for [its] decision, including a rational connection

18   between the facts found and the choice made." Dep't of Commerce, 139 S. Ct. at 2569 (citing

19   Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

20   (1983) (internal quotation marks omitted). In order for the Court to be able to determine whether

21   the agency has acted within the bounds imposed by the governing statute, the agency is required

22   to disclose the basis for its action, making the findings necessary to support the decision, and

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 17

1    produce an administrative record that substantially supports those findings. <u>Burlington Truck</u>

2    <u>Lines, Inc. v. U.S.</u>, 371 U.S. 156, 168 (1962).

3         The federal defendants, citing 22 C.F.R. § 120.3(b), argue that only items that "provide[]

4    a critical military or intelligence advantage" belong on the USML and that a multi-year, inter-

5    agency review process led to the determination that firearms up to .50 caliber do not satisfy that

6    standard. There are a number of problems with this argument. First, the regulation cited states

7    that articles or services that provide "a critical military or intelligence advantage" "shall be"

8    included on the USML. Items that fit that description must be on the USML, but they are not the

9    only items that can be included. Thus, an agency determination that small-caliber firearms do not

10   provide critical military or intelligence advantages does not explain why those previously-

11   controlled items were removed from the list.

12

13

14        Second, Congress granted the President and his designees the discretion to remove an

15   item from the USML in light of certain considerations and factors. Congress directed the agency

16   to consider how the proliferation of weaponry and related technical data would impact world

17   peace, national security, and foreign policy. The State Department essentially concedes that,

18   despite the specified statutory considerations, it evaluated the export controls on small caliber

19   firearms only through the prism of whether restricting foreign access would provide the United

20   States with a military or intelligence advantage. Because the delisting was not "based on

21   consideration of the relevant factors and within the scope of the authority delegated to the

22   agency by the statute," it must be invalidated under the APA. <u>Motor Vehicle Mfrs.</u>, 463 U.S. at

23   42.

24

25        Third, given the agency's prior position regarding the need to regulate 3D-printed

26

27   ORDER INVALIDATING TEMPORARY

28   MODIFICATION AND LETTER - 18

firearms and the CAD files used to manufacture them, it must do more than simply announce a

contrary position.

> [T]he requirement that an agency provide reasoned explanation for its action
> would ordinarily demand that it display awareness that it *is* changing position. . . .
> [T]he agency need not always provide a more detailed justification than what
> would suffice for a new policy created on a blank slate . . . [But s]ometimes it must
> - when, for example, its new policy rests upon factual findings that contradict
> those which underlay its prior policy . . . . It would be arbitrary or capricious to
> ignore such matters. In such cases it is not that further justification is demanded by
> the mere fact of policy change; but that a reasoned explanation is needed for
> disregarding facts and circumstances that underlay . . . the prior policy.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009) (emphasis in original).

Until April 2018, the federal government regulated technical data related to the design and

production of weapons using a 3D printer because the data and weapons posed a threat to world

peace and the security and foreign policy of the United States. Some of its concerns related

specifically to the undetectable nature of a gun made from plastic: because they could slip

through conventional security equipment, the State Department feared that they could be used in

assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the

portability and ease of a manufacturing process that would allow terrorist groups and embargoed

nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional

conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert

the domestic laws of nations with restrictive firearm controls, impairing the United States'

foreign relations with those nations. Overall, the Department of State concluded that the

worldwide publication of computerized instructions for the manufacture of undetectable firearms

was a threat to world peace and the national security interests of the United States and would

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 19

1    cause serious and long-lasting harm to its foreign policy. Against these findings, the federal

2    defendants offer nothing: no analysis of the potential impacts of removing the CAD files for 3D-

3    printed firearms from the USML, no response to the public comments raising concerns about

4    such a removal, no acknowledgment in the NPRMs of its change in position with regards to the

5    CAD files, and no justification in the temporary modification, the letter, or the administrative

6
7    record for the change.[6]

8        The federal defendants argue that the agency appropriately evaluated whether import and

9    export restrictions on small caliber firearms were warranted and that the results of the multi-year

10   inter-agency review apply to 3D-printed guns and the technical data related to them. The only

11   parts of the administrative record cited in support of this argument are the NPRMs issued by the

12   Departments of State and Commerce regarding the delisting of certain items in Category I of the

13   USML. A review of those documents shows that:

14
15       ● the goal of the proposed revisions is to limit Category I to only those items "that
16         provide the United States with a critical military or intelligence advantage or, in

17
18   _____

19       [6] The private defendants point to a PowerPoint presentation made at an Additive Manufacturing
20   Symposium in February 2014 and a law review article written by their former counsel that same year as
     support for the agency's 2018 decision to remove the subject CAD files from the USML. The law
21   review article merely raises constitutional arguments against the regulation of 3D-printed guns and is
     seemingly unrelated to any justification the agency has offered for its action. The symposium
22   presentation includes two slides related to 3D-printed guns, one displaying a picture of a 3D-printed gun
     (courtesy of Cody Wilson) and another including text stating that export controls offer no benefit to U.S.
23   manufacturing or national security. Dkt. #116-1 at 32. There is no indication that the agency actually
     relied on this document when issuing the temporary modification in 2018: in fact, it tacitly concedes that
24   it did not because the multi-year review upon which the decision was apparently based focused on small
     caliber firearms generally, not 3D-printed guns specifically. Just as importantly, the slides do not reflect
25   consideration of the factors Congress intended the agency to consider or constitute a "reasoned
     explanation" for disregarding the agency's prior findings regarding the impact of 3D-printed weapons
26   on world peace, national security, and foreign policy. Fox Television Stations, 556 U.S. at 516.

27   ORDER INVALIDATING TEMPORARY
28   MODIFICATION AND LETTER - 20

the case of weapons, are inherently for military end use" (83 Fed. Reg. 24,198);[7]

● the revised Category I will no longer cover small-caliber non-automatic and semi-automatic firearms (Id.);

● the revised Category I will no longer cover "commercial items widely available in retail outlets and less sensitive military items" (83 Fed. Reg. 24,166);

● the proposed changes are based on an inter-agency review (Id.).

These statements are merely descriptions of the changes proposed and the process used, not an analysis of or justification for the changes. The Department of Commerce goes on to say that it believes that, unless an item provides a critical military or intelligence advantage to the United States or is generally unavailable at retail outlets for civil and recreational activities, the burdens of subjecting U.S. manufacturers to the obligations of the ITAR are not warranted by any proportionate benefits to national security or foreign policy objectives. 83 Fed. Reg. 24,167.

Whatever the merits of this analysis with regards to the rim fire rifles, pistols, and other popular shooting implements specifically mentioned in the NPRMs, it does not provide a "reasoned explanation" for the action with regards to the CAD files and 3D-printed weapons at issue here. Less than two months before the NPRMs were published, the State Department had taken the position that 3D-printed weapons posed unique threats to world peace, national

---

[7] The descriptions of what will be covered by the revised Category I vary in the NPRMs. The Department of State asserts that the revised Category I will cover "only defense articles that are inherently military or that are not otherwise widely available for commercial sale." 83 Fed. Reg. 24, 198. The Department of Commerce describes Category I items under the amended USML as those which are "inherently military and otherwise warrant control on the USML" or "possess parameters or characteristics that provide a critical military or intelligence advantage to the United States[] and are almost exclusively available from the United States." 83 Fed. Reg. 24,166.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 21

security, and the foreign policy of the United States: the agency's specific concerns regarding the proliferation of these weapons are well-documented in the administrative record. The NPRMs neither display an awareness that the agency is changing its position with regards to the data files, nor provide a reasoned explanation for a new policy that necessarily "rests upon factual findings that contradict those which underlay its prior policy." Fox Television Stations, 556 U.S. at 515-16. The agency has simply abandoned, without acknowledgment or analysis, its previous position and has sub silentio found that the delisting is consistent with world peace, national security, and U.S. foreign policy despite explicit, recent findings to the contrary. See Motor Vehicles Mfrs. Ass'n, 463 U.S. at 46-51 (acknowledging that an agency need not consider and reject all policy alternatives when reaching a decision, but noting that where an alternative is within the ambit of the existing standard or policy, "it may not be abandoned without any consideration whatsoever").[8] Because it is arbitrary and capricious to ignore the contradiction in these circumstances, the agency action must be invalidated.

The Court finds that the agency action is arbitrary and capricious in two, independent respects. First, the agency failed to consider aspects of the problem which Congress deemed important before issuing the temporary modification and letter on July 27, 2018. Second, the agency failed to identify substantial evidence in the administrative record explaining a change of position that necessarily contradicts its prior determinations and findings regarding the threats posed by the subject CAD files and the need to regulate the same under the AECA. Because the agency action was arbitrary and capricious, it is unlawful and must be set aside under § 706 of

---

[8] In addition, there are no findings (and no evidence in the administrative record) that the CAD files at issue here were widely available before the agency abruptly deregulated them on July 27, 2018.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 22

the APA.[9]

## C. The Private Defendants' Other Arguments

### 1. Motion to Dismiss

The private defendants incorporate by reference a motion to dismiss that was denied almost a year ago. Having offered no reason to reconsider the prior ruling and no explanation for the delay in seeking reconsideration, the motion is denied.

### 2. Personal Jurisdiction

Defense Distributed argues that the Court lacks jurisdiction over its person. Such a defense can be, and has been, waived. Although Defense Distributed asserted a personal jurisdiction defense in its answer, it omitted it from the motion to dismiss it filed on October 11, 2018, and has therefore waived the defense under Fed. R. Civ. P. 12(h)(1)(A).

### 3. First Amendment Justification for Agency Action

The private defendants argue that the CAD files are protected speech under the First Amendment and assert that the files were removed from the USML in order to avoid constitutional problems. The agency, however, has not relied on the First Amendment as justification for its action, and neither the Court nor the private defendants may supply a basis for the decision that the agency itself did not rely upon. Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 683-84 (2007).

### 4. First Amendment Violation

The private defendants again assert that restrictions on their ability to publish the files

---

[9] Because the agency action must be invalidated on other grounds, the Court has not considered whether the agency's justifications were pretextual or whether such a finding would warrant invalidation under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 23

constitute a prior restraint that is presumed to be unconstitutional and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to plaintiffs' claims or a talisman that excuses the federal defendants' failures under the APA.

**D. Remedy**

The presumptive remedy for unlawful agency action is vacatur and remand. All. for the Wild Rockies v. United States Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018). Plaintiffs also seek an injunction preventing the federal defendants from again issuing a temporary modification purporting to deregulate the subject CAD files with no warning. Plaintiffs have not shown that the harm they fear is likely to occur, however. There is no indication that the federal defendants are poised to immediately modify the USML as soon as their previous efforts are invalidated or are otherwise inclined to ignore the procedural and substantive requirements of the AECA discussed in this order. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 24

1

**CONCLUSION**

2

For all of the foregoing reasons, plaintiffs' motion for summary judgment (Dkt. #170) is

3

GRANTED in part and DENIED in part. The July 27, 2018, "Temporary Modification of

4

Category I of the United States Munitions List" and letter to Cody R. Wilson, Defense

5

Distributed, and the Second Amendment Foundation were unlawful and are hereby VACATED.

6

Defendants' motions for summary judgment (Dkt. #173 and #174) are DENIED.

7

8

9

Dated this 12th day of November, 2019.

10

11

*MRS Lasnik*

12

Robert S. Lasnik
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 25

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF WASHINGTON**
8                            **AT SEATTLE**

9    STATE OF WASHINGTON; STATE OF              NO. 2:18-cv-01115-RSL
     CALIFORNIA; STATE OF COLORADO;
10   STATE OF CONNECTICUT; STATE OF
     DELAWARE; DISTRICT OF COLUMBIA;
11   STATE OF HAWAII; STATE OF ILLINOIS;        **PLAINTIFF STATES' MOTION FOR**
     STATE OF IOWA; STATE OF                     **SUMMARY JUDGMENT**
12   MARYLAND; COMMONWEALTH OF
     MASSACHUSETTS; STATE OF                     **NOTE ON MOTION CALENDAR:**
13   MINNESOTA; STATE OF NEW JERSEY;             **APRIL 19, 2019**[1]
     STATE OF NEW YORK; STATE OF
14   NORTH CAROLINA; STATE OF OREGON;
     COMMONWEALTH OF PENNSYLVANIA;
15   STATE OF RHODE ISLAND; STATE OF
     VERMONT and COMMONWEALTH OF
16   VIRGINIA,
17
                    Plaintiffs,
18
             v.
19
     UNITED STATES DEPARTMENT OF
20   STATE, et al.,
21
                    Defendants.
22

23

24

25

26   ───────────────────
         [1] The briefing schedule for this motion is set by the Case Management Order (Dkt. # 115).

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007403

***TABLE OF CONTENTS***

I.    INTRODUCTION AND RELIEF REQUESTED ................................................................. 1

II.   STATEMENT OF UNDISPUTED FACTS ......................................................................... 2

      A.   AECA and ITAR Govern Export Control of Weapons and Related Technical
           Data ...................................................................................................................... 2

      B.   The Subject Files Can Produce Functional Weapons Using a 3D Printer ................ 2

      C.   The State Department Defends Its Regulation of the Subject Files, Defeating
           Defense Distributed at Every Stage of the Litigation ............................................. 3

      D.   Reversing Its Position, the State Department Settles with Defense Distributed
           by Agreeing to Remove the Subject Files from the U.S. Munitions List ................. 5

      E.   This Court Preliminarily Enjoins the Temporary Modification and Letter ............... 7

      F.   The State Department Offers Shifting, Unsupported Rationales for Its Actions ....... 7

      G.   Final Rules Are Forthcoming, According to the Federal Defendants ....................... 8

III.  ARGUMENT ................................................................................................................... 9

      A.   Legal Standard ...................................................................................................... 9

      B.   The State Department Failed to Provide the Required 30 Days' Notice to
           Congress and Exceeded Its Regulatory Authority ................................................. 10

      C.   The State Department's Actions Were Arbitrary and Capricious .......................... 12

           1.   The administrative record fails to explain or support the agency's
                asserted rationales for abruptly reversing its position. .................................. 12

           2.   The agency failed to consider the specific properties of 3D-printed guns
                and disregarded the unique threats they pose. ............................................... 15

           3.   The agency's stated rationales are pretextual as applied to 3D-printable
                firearm files. ................................................................................................ 18

      D.   The Court Should Vacate the State Department's Actions and Enjoin It from
           Further Attempts to Unlawfully Deregulate the Files ........................................... 20

IV.   CONCLUSION .............................................................................................................. 24

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007404

## I.   INTRODUCTION AND RELIEF REQUESTED

1
2    This lawsuit challenges the State Department's "temporary" deregulation of 3D-printable
3    computer files for the automatic production of undetectable, untraceable plastic firearms. The
4    subject files include specific files that Defense Distributed plans to release on the internet if they
5    are exempted from federal export control, as well as files that may be created in the future and
6    other unknown, unreviewed files. If the files are allowed to be published online, they will be
7    permanently available to virtually anyone inside or outside the United States—including
8    terrorists, assassins, violent criminals, mentally ill persons, and unsupervised children.

9    The State Department, which has regulated the subject files for years by including them
10   on the U.S. Munitions List pursuant to the Arms Export Control Act (AECA), abruptly attempted
11   to deregulate the files via a "Temporary Modification of Category I" of the Munitions List
12   ("Temporary Modification") and a letter to Defense Distributed ("Letter"). It did so pursuant to
13   a private settlement agreement, without following statutorily mandated procedures or providing
14   any public notice, as a *fait accompli* before promulgating any final rule (or even considering
15   public comments on a proposed rule). It also did so without considering the unique properties of
16   3D-printable firearms or the national and domestic security implications of permitting their
17   "unlimited" release. The State Department's actions were unlawful, *ultra vires*, arbitrary and
18   capricious, and unconstitutional, as established by the administrative record and other undisputed
19   evidence. Its reckless and covert deregulation evaded Congress's "particularly rigorous oversight
20   of the Munitions List" and public scrutiny as to an issue of national significance.

21   The Plaintiff States ask the Court to enter summary judgment in their favor, vacate the
22   Temporary Modification and Letter, and permanently enjoin the Federal Defendants from
23   removing the subject files from the Munitions List without following AECA's procedural
24   requirements. The only potentially lawful way to remove the files is to comply with all
25   mandatory procedures. In fact, the Federal Defendants say a compliant final rule is forthcoming,
26   implicitly conceding the point even as they continue to defend the indefensible.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007405

## II.   STATEMENT OF UNDISPUTED FACTS

The filed administrative record is consistent with the undisputed facts alleged and established by the States at earlier stages of this litigation, as set forth below.

**A.    AECA and ITAR Govern Export Control of Weapons and Related Technical Data**

The Arms Export Control Act (AECA) authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Items he designates as "defense articles and defense services" constitute the U.S. Munitions List. *Id.* The President delegated his authority to designate Munitions List items to the State Department, *see* Executive Order 13637 § 1(n)(i), and the Department promulgated the International Traffic in Arms Regulations (ITAR), which are administered by its Directorate of Defense Trade Controls.[2] 22 C.F.R. §§ 120–130; *see* Dkt. # 64 (Fed. Defs' Opp. to PI) at 2.

Category I of the Munitions List includes all firearms up to .50 caliber and related "technical data," 22 C.F.R. § 121.1(I)(a), i.e., data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms, *id.* § 120.10(a). In cases where it is unclear whether a particular item is a defense article subject to ITAR, the Department makes an individualized "commodity jurisdiction" (CJ) determination using a procedure set forth in the ITAR. *See id.* § 120.4; Dkt. # 64 at 3.[3]

**B.    The Subject Files Can Produce Functional Weapons Using a 3D Printer**

The files at issue in this case are Defense Distributed's 3D-printable Computer Aided Design (CAD) files that can be used to produce the "Liberator" pistol and other defense articles, plus other unidentified files that Defense Distributed "has and will continue to create and

---

[2] The Department, the Directorate, Michael R. Pompeo, Mike Miller, and Sarah Heidema are collectively referred to as the "State Department" or the "Federal Defendants."

[3] *See also* Declaration of Kristin Beneski, Ex. A (Aguirre Declaration), ¶¶ 19–20 (describing the CJ determination procedure).

2

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007406

possess" in the future and any "similar files generated by its members and others."[4] A functional

Liberator pistol can be made almost entirely of plastic using the CAD files and a commonly

available 3D printer, with "considerably less know-how" than is needed to manufacture a firearm

using "conventional technical data."[5] As then-Director of the Office of Defense Trade Controls

Management Lisa V. Aguirre stated in a 2015 declaration, the "'Liberator' firearm included in

DD's CAD designs presents a specific and unique risk to the national security and foreign policy

interests of the United States" because it "is a plastic firearm which can be produced in a way as

to be both fully operable and virtually undetectable by conventional security measures such as

metal detectors."[6] In addition to being undetectable, privately manufactured 3D-printed weapons

can be untraceable by law enforcement because they lack serial numbers.[7]

From 2013 to April 2018, the Department considered the Liberator files and other 3D-

printable firearm files to be "ITAR-controlled technical data" that cannot be exported (including

by posting on the borderless internet) without prior authorization.[8] In 2015, the Directorate

conducted an individualized CJ review of Defense Distributed's files and confirmed that they

are "technical data under Category I(i) of the [Munitions List]" and subject to ITAR regulation.[9]

## C.   The State Department Defends Its Regulation of the Subject Files, Defeating Defense Distributed at Every Stage of the Litigation

In May 2015, Defense Distributed sued the State Department in a Texas federal district

court, seeking to enjoin it from regulating the files. *Def. Distributed v. U.S. Dep't of State*, Case

---

[4] Ex. L (*Def. Distributed*: Second Amended Complaint), ¶¶ 25, 36, 40, 44–45 (referenced in Ex. B (Temporary Modification) and Ex. C (Settlement Agreement), ¶ 12).

[5] Ex. A (Aguirre Declaration), ¶ 29(b).

[6] *Id.* ¶ 35; *see also id.* n.9 (the Liberator's detectable metal component "can be removed without rendering it inoperable"); Ex. D (*Def. Distributed*: Opp. to Mot. for PI) at 10 n.6 ("the Liberator remains operable without the inserted metal"); Ex. E (*Def. Distributed*: Mot. to Dismiss) at 1 (Defense Distributed's CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms . . ."); Dkt. # 112 (Answer), ¶ 39 (admitting that "the Liberator is a plastic firearm" that is undetectable by walk-through metal detectors when it does not contain a removable piece of steel); *infra* at 22–23 & n.57.

[7] *See* Dkt. # 43-2 at 29–39 (McCord Decl.), ¶¶ 29–30, 33; *id.* at 40–44 (Kyes Decl.), ¶ 8; *id.* at 4–18 (Graham Decl.), ¶ 35.

[8] Ex. A, Ex. 2 (CJ letter dated 5/8/13); *see* Ex. E (filed 4/6/18).

[9] Exs. F, G (CJ determinations).

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007407

No. 15-cv-372-RP (W.D. Tex.). In opposing Defense Distributed's motion for a preliminary injunction, the State Department argued that its regulation of the files was proper (and furthermore, vital) because, *inter alia*:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."[10]

In a supporting declaration, then-Director Aguirre explained that the unrestricted export of Defense Distributed's CAD files would result in the production of fully operable and undetectable plastic firearms, that their use to commit terrorism, piracy, assassinations, or other crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that their export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer.[11]

The district court denied Defense Distributed's motion for a preliminary injunction, noting that the company's avowed purpose is to facilitate "*global* access to, and the collaborative

---

[10] Ex. D at 10–11.
[11] Ex. A, ¶ 35.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  production of, information and knowledge related to the three-dimensional ('3D') printing of

2  arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation

3  of conflict" and are of the type Congress authorized the President to regulate through AECA.[12]

4  The Fifth Circuit affirmed, citing both the national security implications of the CAD files and

5  the permanent nature of the internet, and found the State Department had "asserted a very strong

6  public interest in national defense and national security."[13]

7        On April 6, 2018, the State Department moved to dismiss Defense Distributed's lawsuit,

8  reiterating that what was at stake was "the United States' ability to control the export of

9  weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare

10  or terrorism are not shipped from the United States to other countries (or otherwise provided to

11  foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to

12  threaten U.S. national security, U.S. foreign policy interests, or international peace and

13  stability."[14] According to the State Department, the CAD files "unquestionably direct the

14  functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation

15  of such firearms by those abroad" and the Department "has consistently and reasonably

16  concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if

17  unfettered access to technical data essential to the production of those arms is permitted."[15]

18  **D.    Reversing Its Position, the State Department Settles with Defense Distributed by
19         Agreeing to Remove the Subject Files from the U.S. Munitions List**

20        By April 30, 2018, the State Department had "reached a tentative settlement agreement"

21  with Defense Distributed,[16] which was ultimately approved by Department officials.[17] Pursuant

22  to the Settlement Agreement, the State Department changed course, abandoning its prior

23  regulatory and litigation positions and permitting Defense Distributed to post the subject files on

24        [12] Ex. H (*Def. Distributed*: Order denying PI) at 8–9.
         [13] Ex. I (*Def. Distributed*: 5th Cir Opinion) at 10, 12–13.
25        [14] Ex. E at 1.
         [15] *Id.* at 1, 3, 7.
         [16] Ex. M (*Def. Distributed*: Mot. to Stay) (filed 4/30/18).
26        [17] Ex. N (*Def. Distributed*: Joint Settlement Status Rpt.) (filed 6/28/18).

5

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007409

1    the internet and distribute them to "any United States person." Specifically, the Department

2    agreed to: (a) "draft and . . . fully pursue" a notice of proposed rulemaking (NPRM) and final

3    rule revising Munitions List Category I to exclude the "technical data that is the subject of the

4    Action"; (b) announce a "temporary modification" of Category I to exclude the data while the

5    final rule is "in development"; (c) issue a letter to Defense Distributed advising that its files are

6    "approved for public release (i.e., unlimited distribution)" and exempt from ITAR; and (d)

7    acknowledge and agree that the Temporary Modification "permits any United States person" to

8    "access, discuss, use, reproduce, or otherwise benefit from" the data, and that the Letter "permits

9    any such person to access, discuss, use, reproduce or otherwise benefit from" Defense

10   Distributed's files.[18] The Settlement Agreement contains no findings of fact or other information

11   that could explain the Department's change of position or invalidate its prior analysis as to the

12   security implications of "unlimited distribution" of the files.[19]

13        The State Department fulfilled each of these terms. On May 24, 2018, it published the

14   promised NPRM in the Federal Register, with a public comment period ending on July 9. 83 Fed.

15   Reg. 24,198. The NPRM does not specifically mention 3D-printed guns. *See id.* The Settlement

16   Agreement was signed on June 29, in the midst of the comment period, but was not made public

17   until July, when the comment period ended.[20] On July 27, the Department issued the Temporary

18   Modification and the Letter. The Temporary Modification states that the Department "has

19   determined that it is in the interest of the security and foreign policy of the United States to

20   temporarily modify United States Munitions List (USML) Category I to exclude" the subject

21   files. The "temporary" removal of these files was to "remain in effect while the final rule

22   referenced in paragraph 1(a) of the Settlement Agreement is in development."[21] The Letter states

23   _____

24       [18] Ex. C, ¶ 1(a)–(d).
         [19] *See generally* Ex. C. The Settlement Agreement expressly states that it does not "reflect any agreed-
     upon purpose other than the desire of the Parties to reach a full and fair conclusion of the Action, and to resolve the

25   Action without the time and expense of further litigation." *Id.* ¶ 5.
         [20] Dkt. # 95 (Preliminary Injunction) at 7; Dkt. # 112 (Answer), ¶ 53 (admitting the Settlement Agreement

26   was "made public in July 2018").
         [21] Ex. B.

                                                              6                    ATTORNEY GENERAL OF WASHINGTON
                                                                                        Complex Litigation Division
     PLAINTIFF STATES' MOTION FOR                                                          7141 Cleanwater Drive SW
     SUMMARY JUDGMENT                                                                             PO Box 40111
     2:18-cv-01115-RSL                                                                      Olympia, WA 98504-0111
                                                                                                (360) 709-6470

1  that the Department "approve[s]" Defense Distributed's files "for public release (i.e., unlimited

2  distribution)," but offers no rationale for this.[22] Those actions prompted this lawsuit.

3  **E.     This Court Preliminarily Enjoins the Temporary Modification and Letter**

4          The Court granted the States' motion for a temporary restraining order, then converted

5  the order to a preliminary injunction.[23] The Court ruled that the States had standing to challenge

6  the Temporary Modification and Letter, were likely to succeed on the merits of their APA claim

7  that the Department removed items from the Munitions List "without the required Congressional

8  notice," "raised serious questions regarding the merits" of their claim that the Department's

9  actions were arbitrary and capricious, and established that the public interest "strongly supports"

10 an injunction to prevent irreparable harm caused by the files' public release on the internet.[24]

11 **F.     The State Department Offers Shifting, Unsupported Rationales for Its Actions**

12         In this litigation, the Federal Defendants offered a new and different reason for the State

13 Department's deregulation of the subject files. Contrary to the Temporary Modification's

14 assertion that the deregulation was "in the interest of the security and foreign policy of the United

15 States,"[25] the Federal Defendants conceded at oral argument that "undetectable plastic firearms

16 are a serious security threat."[26] Their new rationale is that "the Department determined" that non-

17 automatic and semi-automatic firearms under .50 caliber and related technical data "do not

18 provide the United States with a critical military or intelligence advantage" because these items

19 are "already commonly available," as stated in the August 15, 2018 Declaration of Sarah J.

20 Heidema.[27] But at oral argument, the Federal Defendants conceded as follows:

21         THE COURT: Of course you cannot buy a 3D-printed gun in any firearms

22

23 [22] Ex. J (Letter) at 2.
   [23] Dkt. # 23 (TRO); Dkt. # 95.
   [24] Dkt. # 95 at 9–11, 12–15, 16–18, 20–24, 25.
24 [25] Ex. B.
   [26] Ex. K (Verbatim Report of Proceedings on Aug. 21, 2018) at 35:4–8; *see also id.* at 24:12–14 ("The
25 federal government agrees that undetectable plastic firearms pose a significant risk to domestic public safety.").
   [27] Dkt. # 64-1 (Heidema Decl.) ¶¶ 19, 21; Dkt. # 64 (Fed. Defs' Opp. to PI) at 22. The "critical military or
26 intelligence advantage" rationale also appears in the preamble to the 2018 NPRM, which is part of the Supplemental
   Record, but the NPRM does not specifically mention 3D-printed guns or the subject files.

7

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    store in the United States that's undetectable and untraceable, can you?

2              MR. MYERS: No, Your Honor, if it were undetectable and untraceable, that
     would be a violation of the Undetectable Firearms Act.[28]
3

4          On October 19, 2018, the Federal Defendants submitted their designated "Administrative

5    Record."[29] The States challenged the sufficiency of that record and moved to supplement it.[30] In

6    response, the Federal Defendants agreed to partially supplement the record as requested,[31] and

7    they filed supplemental materials (the "Supplemental Record") on December 20, 2018.[32]

8          Neither the Administrative Record nor the Supplemental Record contains any evidence

9    to support either of the State Department's purported "determin[ations]" regarding the subject

10   files.[33] The Supplemental Record contains over 3,000 public comments on the May 24, 2018

11   NPRM.[34] Although the NPRM does not specifically mention 3D-printed firearms, approximately

12   386 of the public comments do; of those, all are opposed to the NPRM.[35] The Federal Defendants

13   represented in this litigation that they did not consider the 2018 NPRM comments in enacting

14   the Temporary Modification and Letter.[36]

15   **G.    Final Rules Are Forthcoming, According to the Federal Defendants**

16         The State Department's May 24, 2018 NPRM proposes to remove all non-automatic and

17   semi-automatic firearms under .50 caliber and related technical data from the Munitions List,

18   which would instead be governed by the Commerce Department's Export Administration

19   Regulations (EAR). 83 Fed. Reg. 24,198. Unlike the ITAR, the EAR do not allow for regulation

20   of items that have been posted on the internet—even for national security reasons. *See* 15 C.F.R.

21   §§ 734.3(b)(3), 734.7(a)(4) (excluding from EAR regulatory jurisdiction any "published"

22         [28] Ex. K at 32:5–21.
23         [29] Dkt. # 116.
           [30] Dkt. # 132. The Motion to Supplement is pending as of the filing of this motion.
           [31] *See* Dkt. # 152 at 3.
24         [32] Dkt. # 158.
           [33] *See generally id.*
25         [34] *See* Declaration of Jennifer D. Williams ¶ 4(25); Dkt. ## 158-5, 158-6, 158-7.
           [35] Williams Decl. ¶ 4(25).
26         [36] *See* Dkt. # 152 at 6–7 (arguing that the original Administrative Record was "complete" and there was
     "no reason" for the Department to have considered the 2018 NPRM comments).

                                                    8              ATTORNEY GENERAL OF WASHINGTON
                                                                         Complex Litigation Division
     PLAINTIFF STATES' MOTION FOR                                       7141 Cleanwater Drive SW
     SUMMARY JUDGMENT                                                          PO Box 40111
     2:18-cv-01115-RSL                                                    Olympia, WA 98504-0111
                                                                             (360) 709-6470

1    information and software, including that made available for "[p]ublic dissemination (i.e.,

2    unlimited distribution) in any form . . . including posting on the Internet on sites available to the

3    public . . . ."). The Commerce Department's May 24, 2018 companion NPRM explains that, for

4    example, "if a gun manufacturer posts a firearm's operation and maintenance manual on the

5    internet," the "manual would no longer be 'subject to the EAR.'" 83 Fed. Reg. 24,166, 24,167

6    (May 24, 2018) (citing 15 C.F.R. §§ 734.3(b), 734.7(a)).

7         As of the filing of this brief, neither State nor Commerce has issued a final rule. The

8    Federal Defendants have represented in this litigation that final rules are forthcoming, Dkt.

9    # 131, but offered "no details regarding the substance" of these rules, Dkt. # 169 (Order) at 2,

10   including whether they will be consistent with the NPRMs as applied to the subject files.

11                                  **III.    ARGUMENT**

12   **A.    Legal Standard**

13        Under the APA, courts "shall . . . hold unlawful and set aside agency action" that is

14   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

15   § 706. Where the material facts are not genuinely disputed and the questions before the Court

16   are purely legal, the Court can resolve an APA challenge on a motion for summary judgment.

17   Fed. R. Civ. P. 56; *King County v. Azar*, 320 F. Supp. 3d 1167, 1171 (W.D. Wash. 2018), *appeal*

18   *dismissed*, 2018 WL 5310765 (9th Cir. Sept. 20, 2018) (citing *Fence Creek Cattle Co. v. U.S.*

19   *Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)).

20        "[I]n APA cases, the Court's role is to determine whether, as a matter of law, evidence

21   in the administrative record supports the agency's decision." *King County*, 320 F. Supp. 3d at

22   1171 (citing *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Review

23   is based on "the whole record," 5 U.S.C. § 706, which "consists of all documents and material

24   directly or *indirectly* considered by the agency decision-makers and includes evidence contrary

25   to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

26   Courts may also consider extra-record evidence when necessary to determine whether the agency

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007413

1    has considered all relevant factors and explained its decision, has relied on documents not in the

2    filed record, or has acted in bad faith. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d

3    971, 992 (9th Cir. 2014); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

4    **B.    The State Department Failed to Provide the Required 30 Days' Notice to Congress
        and Exceeded Its Regulatory Authority**

5

6            AECA prohibits the State Department from removing any item from the Munitions List

7    "until 30 days after the date on which [it] has provided notice of the proposed removal to the

8    Committee on International Relations of the House of Representatives and the Committee on

9    Foreign Relations of the Senate" in accordance with established notification procedures. 22

10   U.S.C. § 2778(f)(1). The notice requirement furthers Congress's "particularly rigorous oversight

11   of the Munitions List," *United States v. Zheng*, 590 F. Supp. 274, 278–79 (D.N.J. 1984), *vacated

12   on other grounds*, 768 F.2d 518 (3d Cir. 1985), and was strengthened in 2002 in response to

13   perceived attempts to evade that oversight, *see* H.R. Rep. No. 107-57, at 86–87 (2001).

14           The Federal Defendants concededly failed to provide this 30-day notice before issuing

15   the Temporary Modification and Letter.[37] This failure is confirmed by the Administrative Record

16   and the Supplemental Record, which contain no evidence that such notice was given.[38] Based on

17   this statutory violation alone, the Court should invalidate the Temporary Modification and

18   Letter. *See* 5 U.S.C. § 706(2)(A), (C), (D) (a reviewing court "shall . . . hold unlawful and set

19   aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction,

20   authority, or limitations," or "without observance of procedure required by law").

21           The Federal Defendants previously sought to justify their failure to provide notice by

22   claiming that the Temporary Modification did not remove an "item" from the Munitions List,

23   but the Court has already correctly ruled as a matter of law that the subject files at issue here are

24       [37] *See* Dkt. # 95 (Preliminary Injunction) at 12–13 & n.7 (noting that Federal Defendants "acknowledge"
         the notice requirement and that the Heidema Declaration "confirms" the notice was not given); Dkt. # 64-1 ¶ 30
25       (stating that "Congress will receive the necessary notifications" only in connection with a final rule).
         [38] *See generally* Dkt. # 116 (Admin. Record); Dkt. # 133 (Williams Decl.) ¶ 4 (summarizing contents of
26       Administrative Record); Dkt. # 158 (Supp. Record); Second Williams Decl.) ¶ 4 (summarizing contents of
         Supplemental Record).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007414

1   "items" or "articles" to which the notice requirement applies. Dkt. # 95 at 14–15; *see* 22 U.S.C.

2   § 2778(a)(1) (designated "defense articles" are "items" that "constitute the United States

3   Munitions List"); 22 C.F.R. § 121.1 (Munitions List does not enumerate every controlled

4   "article" or "item," but describes "categories" of items); *United States v. Zhen Zhou Wu*, 711

5   F.3d 1, 12 (1st Cir. 2013) (the Munitions List is "a series of categories describing the kinds of

6   items that qualify as 'defense articles'"). AECA's 30-day notice requirement therefore applies,

7   and was not followed in this case. The Temporary Modification and Letter are procedurally

8   defective and must be set aside for this reason alone.

9           In addition to violating AECA's procedural requirements, the Temporary Modification

10   and Letter exceeded the State Department's delegated authority under AECA and violated the

11   limits on federal power established by the Tenth Amendment by purporting to authorize "*any*

12   United States person" to "use" the files to print their own undetectable and untraceable weapons,

13   and to permit "unlimited distribution" of the files.[39] The States have numerous laws restricting

14   the possession and use of firearms by "United States persons" and others, including laws

15   prohibiting ineligible persons from possessing firearms, requiring background checks as a

16   condition of acquiring firearms, and regulating the manufacture of firearms. *See* Dkt. # 29

17   (FAC), ¶¶ 68–217 (citing state gun-safety laws). Several of the Plaintiff States have also enacted

18   or proposed laws that specifically regulate 3D-printed guns. *See* N.J. SB 2465; Wash. SB 5061;

19   D.C. B23-0018; R.I. S0084; Md. SB 8. The Department's overly broad authorization well

20   exceeds the scope of its authority under AECA to regulate exports, and on its face purports to

21   abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth

22   Amendment. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the

23   Constitution . . . are reserved to the States respectively, or the people."); *Bond v. United States*,

24   572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public

25   good—what we have often called a 'police power.'"); *cf. District of Columbia v. Heller*, 554

26

---

[39] Ex. C, ¶ 1(d) (emphasis added); Ex. J at 2.

11

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007415

1    U.S. 570, 626–27 (2008) (acknowledging validity of "longstanding prohibitions on the

2    possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms

3    in sensitive places such as schools and government buildings, or laws imposing conditions and

4    qualifications on the commercial sale of arms"). The States' ability and authority to enforce their

5    gun-safety laws is undermined by the State Department's purported authorization of "any United

6    States person" to "use" the files to print their own undetectable and untraceable weapons.

7    **C.     The State Department's Actions Were Arbitrary and Capricious**

8              In addition to violating both AECA and the U.S. Constitution, the Temporary

9    Modification and Letter are arbitrary and capricious, and should be invalidated for that

10   independent reason. Agency action is "arbitrary and capricious," and must be set aside, if the

11   agency "entirely failed to consider an important aspect of the problem, offered an explanation

12   for its decision that runs counter to the evidence before the agency, or is so implausible that it

13   could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

14   *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency

15   action is also arbitrary and capricious if it is not based on a "reasoned analysis" that indicates

16   the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

17   including a rational connection between the facts found and the choice made." *Id.* at 42–43

18   (citation and internal quotation marks omitted). When an agency reverses position, it must

19   provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or

20   were engendered by the prior policy," *F.C.C. v. Fox Television Studios, Inc.*, 556 U.S. 502, 516

21   (2009), and "must show that there are good reasons for the new policy," *id.* at 515. In short, to

22   survive arbitrary-and-capricious review, agency action must be demonstrably "logical and

23   rational." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

24            **1.      The administrative record fails to explain or support the agency's asserted
                        rationales for abruptly reversing its position.**
25
              Judicial review of agency action "is based on the administrative record and the basis for
26

                                                        12

PLAINTIFF STATES' MOTION FOR                              ATTORNEY GENERAL OF WASHINGTON
SUMMARY JUDGMENT                                                    Complex Litigation Division
2:18-cv-01115-RSL                                                      7141 Cleanwater Drive SW
                                                                             PO Box 40111
                                                                         Olympia, WA 98504-0111
                                                                            (360) 709-6470

WASHSTATEB007416

1    the agency's decision must come from the record." *Ass'n of Irritated Residents v. E.P.A.*, 790

2    F.3d 934, 942 (9th Cir. 2015); *see also, e.g.*, *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp.

3    3d 440, 443 (D.D.C. 2018) (to survive APA review, "the facts on which the agency purports to

4    have relied" must "have some basis in the record") (internal quotation marks omitted). Absent

5    compliance with this basic requirement, a reviewing court would be unable to measure agency

6    action against the relevant governing standard. *See, e.g.*, *U.S. Lines, Inc. v. Fed. Mar. Comm'n*,

7    584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the

8    final agency decision reflect[ed] the rational outcome of the agency's consideration of all

9    relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact

10   considered by the agency").

11         Here, the Temporary Modification itself is the *only* document in the filed administrative

12   record that reflects any reason for the State Department's reversal of its position on 3D-printable

13   firearm files.[40] Neither the Letter nor the Settlement Agreement, nor any other part of the filed

14   record, memorializes the Department's "determin[ation]" or offers any reasoning to support it.[41]

15   The Temporary Modification asserts, with no explanation or elaboration, that the State

16   Department "has determined that it is in the interest of the security and foreign policy of the

17   United States to temporarily modify the United States Munitions List to exclude" the subject

18   files. Simply stating that the Department "has determined" that permitting dissemination via the

19   internet is somehow "in the interest" of U.S. national security and foreign policy is insufficient

20   to survive judicial review. The Department must explain *why* it made this determination,

21   demonstrating a "rational connection between the facts found and the choice made." *State Farm*,

22   463 U.S. at 43. But the filed record is completely devoid of any relevant "facts found," much

23   less a "rational connection" to the decision to deregulate the subject files.

24         ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [40] *See* Ex. B; *see generally* Dkt. ## 116 (Admin. Record), 158 (Supp. Record).
25       [41] *See* Ex. J; Ex. C; Dkt. # 95 at 6 ("No findings of fact or other statements are provided in the agreement
     that could explain the federal government's dramatic change of position or that address, much less invalidate, its
26   prior analysis regarding the likely impacts of publication on the United States' national security interests."); *see
     generally* Dkt. ## 116, 158.

                                                        13                    ATTORNEY GENERAL OF WASHINGTON
                                                                                    Complex Litigation Division
     PLAINTIFF STATES' MOTION FOR                                                   7141 Cleanwater Drive SW
     SUMMARY JUDGMENT                                                                      PO Box 40111
     2:18-cv-01115-RSL                                                               Olympia, WA 98504-0111
                                                                                          (360) 709-6470

1    The absence of evidence or explanation is unsurprising, since the Federal Defendants

2  conceded in this litigation that 3D-printable firearms *do* pose a "serious security threat," and

3  offered a *different* explanation for the deregulation: that the subject files do not provide a "critical

4  military or intelligence advantage" because they are "already commonly available[.]"[42] This new

5  explanation, which is supported only by the *post hoc* Heidema Declaration, merits no

6  consideration because "[t]he focal point for judicial review should be the administrative record

7  already in existence, not some new record made initially in the reviewing court." *Fla. Power &*

8  *Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *San Luis & Delta-Mendota Water Auth. v. Jewell*,

9  747 F.3d 581, 602 (9th Cir. 2014) (same). In any case, neither the Heidema Declaration itself

10  nor any part of the administrative record provides a reasoned explanation for the new rationale

11  as applied to the subject files. In fact, the Federal Defendants conceded in these proceedings that

12  undetectable and untraceable 3D-printable firearms are *not* commonly available.[43]

13    Furthermore, far from acknowledging that the Temporary Modification and Letter

14  represent a reversal of its regulatory position or offering a rational explanation for this (as is

15  required), the State Department concealed the reversal until it was a *fait accompli*. *See Fox*

16  *Television Stations*, 556 U.S. at 515 ("the requirement that an agency provide reasoned

17  explanation for its action would ordinarily demand that it display awareness that it *is* changing

18  position"); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) ("To

19  provide a satisfactory explanation, an agency must acknowledge and explain any departure from

20  its precedents."). The State Department privately reached the tentative settlement in the *Defense*

21  *Distributed* case in April 2018, which became final on June 29. Meanwhile, the comment period

22  for the NPRM (which does not even mention 3D-printed firearms) was still open through July

23  9. The Settlement Agreement was not publicly disclosed until July. The Department issued the

24  Temporary Modification and Letter on July 27 without the required notice to Congress or any

25

26    [42] Dkt. # 64 at 22; Dkt. # 64-1 ¶¶ 19, 21.
     [43] *See* Ex. K at 32:5–21.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    other advance warning or opportunity for public input on the reversal.

2            In sum, neither the original rationale asserted in the Temporary Modification, nor the

3    new rationale asserted in this case, finds any factual support or rational explanation in the record.

4    Instead of acknowledging or explaining its reversal, the Department concealed it, and would

5    have entirely evaded oversight and review if not for this lawsuit. These basic failures render the

6    Temporary Modification and Letter arbitrary and capricious.

7            **2.    The agency failed to consider the specific properties of 3D-printed guns and
             disregarded the unique threats they pose.**

8            Not only are the State Department's shifting rationales entirely unsupported, but the

9    administrative record also demonstrates that the Department failed to consider the specific

10   properties of 3D-printed guns and their unique threats to world peace, national security, and

11   foreign policy. In ignoring these issues, the Department disregarded the factors Congress deemed

12   relevant to export control, as well as the evidence supporting the Department's previous

13   regulation of the subject files to further AECA's stated purposes.

14           An agency's action is arbitrary and capricious where it "entirely failed to consider an

15   important aspect of the problem" or "offered an explanation for its decision that runs counter to

16   the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. The agency must consider all

17   "relevant factors," *id.* at 42—in particular, the factors "Congress intended" the agency to

18   consider, *id.* at 55. And the agency cannot pick and choose what evidence to rely on and disregard

19   the rest; judicial review is based on the "whole" record, i.e., "all documents and material directly

20   or *indirectly* considered by the agency decision-makers," including "evidence contrary to the

21   agency's position." *Thompson*, 885 F.2d at 555.

22           Congress directed that export regulation under AECA must be "[i]n furtherance of world

23   peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The

24   State Department based its previous regulation of the subject files squarely on fulfilling these

25   purposes, invoking threats to "U.S. national security, U.S. foreign policy interests, or

26

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007419

1    international peace and stability" in its April 6, 2018 motion to dismiss in the *Defense*

2    *Distributed* case.[44] Elsewhere in its briefing, the Department emphasized the unique dangers

3    posed by the subject files, which "constitute the functional equivalent of defense articles" and

4    can be used to "automatically" generate a "lethal firearm" that is "virtually undetectable in metal

5    detectors and other security equipment."[45] The Department expressed its particular concern that

6    such "undetectable firearms technology could be used in an assassination, for the manufacture

7    of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise

8    aviation security overseas in a manner specifically directed at U.S. persons."[46] The Supplemental

9    Record amply supports the conclusion that the subject files pose unique threats to U.S. national

10    security and foreign policy, as reflected in the Department's own CJ determinations, the Aguirre

11    Declaration, and the Department's briefing in the *Defense Distributed* case.[47] Moreover,

12    hundreds of the public comments on the 2018 NPRM, which the Department received before

13    issuing the Temporary Modification and letter on July 27, 2018 (but admittedly did not consider),

14    oppose the rule on the grounds that it would deregulate 3D-printable firearms.[48]

15        Despite this evidence, the Department decided to deregulate the subject files sometime

16    during a three-week period in April 2018, providing no "reasoned explanation" for disregarding

17    the facts and circumstances supporting its previous position. *Fox Television Studios*, 556 U.S. at

18    516; *see also SNR Wireless*, 868 F.3d at 1029 (D.C. Cir. 2017); *City of Kansas City, Mo. v. Dep't*

19    *of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual

20    premise that is flatly contradicted by the agency's own record does not constitute reasoned

21    administrative decisionmaking, and cannot survive review under the arbitrary and capricious

22    standard."). As of April 6, 2018, the Department's position was that distributing the subject files

23    on the internet would "threaten U.S. national security, U.S. foreign policy interests, or

24

25

26

---

[44] Ex. E at 1.
[45] Ex. D at 10.
[46] *Id.*
[47] *See* Exs. A, D, E, F, G.
[48] *See* Williams Decl., ¶ 4(25).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007420

1   international peace and stability." By April 30, 2018, the Department had reached the settlement

2   agreement that resulted in the Temporary Modification and Letter, which deregulated the subject

3   files and approved them for "unlimited distribution."

4           Even though the Department was well aware of the characteristics and qualities of

5   undetectable firearms that render them uniquely dangerous, as reflected in its own CJ

6   determinations and its position in the *Defense Distributed* proceedings, there is no indication in

7   the record that it considered them in connection with the deregulation. This is consistent with

8   the Federal Defendants' statements at oral argument indicating that they did not consider these

9   unique factors until they took a "further look" at the issue in light of this Court's TRO:

10          MR. MYERS: Your Honor, since Your Honor entered the TRO, the
            government has been further studying and further looking into this issue, as the
11          press secretary I think indicated she was -- or the President was welcoming that
            opportunity. That further look has concluded. And the government's position on
12          this issue has not changed.[49]

13   Further, the Department admitted it did not consider the public comments on the 2018 NPRM—

14   even the hundreds of comments that oppose the rule due to its implications for 3D-printed guns,

15   which merit a meaningful response. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36

16   (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to

17   significant points raised by the public.").

18          As noted above, the Federal Defendants' *post hoc* rationale for deregulating the subject

19   files—that they do not provide a "critical military or intelligence advantage"—need not be

20   considered because it is not reflected or supported anywhere in the filed record. But even taking

21   it at face value, this explanation fails to account for all of the factors Congress directed the

22   Department to consider. A defense article can threaten "world peace and the security and foreign

23   policy of the United States"—as the subject files do—regardless of whether it provides a "critical

24   military or intelligence advantage." Yet as the Court previously noted, the Department "appears

25   to have evaluated the export controls on small caliber firearms only through the prism of whether

26
    ---
    [49] Ex. K at 34:3–8.

                                                17

PLAINTIFF STATES' MOTION FOR                          ATTORNEY GENERAL OF WASHINGTON
SUMMARY JUDGMENT                                             Complex Litigation Division
2:18-cv-01115-RSL                                              7141 Cleanwater Drive SW
                                                                    PO Box 40111
                                                               Olympia, WA 98504-0111
                                                                   (360) 709-6470

WASHSTATEB007421

1   restricting foreign access would provide the United States with a military or intelligence

2   advantage." Dkt. # 95 at 18. This is borne out by the filed record, which contains no evidence

3   whatsoever that any other factors were considered. The Department's asserted rationale fails to

4   account for the national security and foreign policy factors Congress directed it to consider.

5   "Such a failure to address 'an important aspect of the problem' that is factually substantiated in

6   the record is unreasoned, arbitrary, and capricious decisionmaking." *Humane Soc'y of U.S. v.*

7   *Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43)).

8           **3.    The agency's stated rationales are pretextual as applied to 3D-printable**
              **firearm files.**

9

10          The available evidence strongly suggests that the State Department's asserted rationales

11  for deregulating the subject files are pretextual. "[C]ourts have not hesitated to find that reliance

12  on a pretextual justification violates the APA." *New York v. U.S. Dep't of Commerce*, --- F. Supp.

13  3d ----, 2019 WL 190285, at *112 (S.D.N.Y. Jan. 15, 2019) (citing, *inter alia*, *Woods Petroleum*

14  *Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action

15  because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior

16  motive")). Because the basis for the agency's action must be disclosed in the record, "[i]t follows

17  that a court cannot sustain agency action founded on a pretextual or sham justification that

18  conceals the true 'basis' for the decision." *Id.* The *New York* court concluded, based on a number

19  of factors, that the Commerce Department's rationale for adding a citizenship question to the

20  U.S. Census was pretextual. *See id.* at *112–115. Many similar factors are also present here.

21          First, the Temporary Modification and Letter were highly procedurally irregular. As

22  discussed above, they were issued without the required notice to Congress, or any other advance

23  notice that would have afforded an opportunity for public scrutiny, and they partially effectuated

24  a non-final proposed rulemaking. This concealed the deregulation from public view until it was

25  complete, and deprived Congress of its right to exercise its "particularly rigorous oversight" of

26  the Munitions List. *See New York*, 2019 WL 190285, at *112 ("conspicuous procedural

18

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007422

1    irregularities" supported finding of pretext, as did a "failure to disclose" that prevented subject

2    matter experts from "conducting rigorous testing").

3    Second, the evidence shows that the State Department decided to deregulate the subject

4    files abruptly, sometime during the three-week period from April 6 to April 30, 2018, in

5    connection with the *Defense Distributed* settlement. Even if the global state of affairs had

6    somehow changed drastically during the three-week period in which the reversal occurred—an

7    improbable scenario for which there is no evidence—this short period would not have afforded

8    enough time to reach a reasoned "determin[ation]" that permanent deregulation no longer

9    presented a national security or foreign policy threat. The Federal Defendants have sought to

10   justify the Temporary Modification and Letter by asserting they are of a piece with the May 24,

11   2018 NPRM, but this only underscores their irregularity, since the NPRM was not (and as of this

12   filing, still is not) final, and the deregulation decision was made months before the NPRM

13   comment period closed. *See New York*, 2019 WL 190285, at *112 (finding pretext where

14   decision was made before the alleged basis for the decision occurred).

15   Third, evidence outside the filed record indicates that the Department's decision was

16   based on a reason not disclosed in the record. Heather Nauert, then the State Department

17   spokesperson, stated at a July 31, 2018 press briefing that the "Department of Justice suggested

18   that the State Department and the U.S. Government settle this [*Defense Distributed*] case, and

19   so that is what was done. . . . We took the advice of the Department of Justice, and here we are

20   right now."[50] This "following DOJ's advice" rationale does not appear anywhere in the filed

21   record. At the same time, Ms. Nauert acknowledged that the State Department still had "equity"

22   in the matter of 3D-printed guns because it "wants to prevent the wrong people from acquiring

23   weapons overseas."[51] This is inconsistent with deregulation being "in the interest of" U.S.

24   national security and foreign policy and is further evidence of pretext. *See New York*, 2019 WL

25

26   [50] Dkt. # 35-1 at 5 of 46.
     [51] *Id.*

19

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007423

1   190285, at *112 (extra-record statements by Commerce Department official contradicted

2   agency's stated rationale for its decision, supporting finding that this rationale was pretextual);

3   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (consideration of extra-

4   record evidence is appropriate where the record "does not disclose the factors that were

5   considered" or the agency's "construction of the evidence").

6         Fourth, the original Administrative Record filed by the State Department failed to include

7   evidence that was before it when it made its decision, including the Department's own CJ

8   determinations related to the subject files, the Aguirre Declaration, and complete records from

9   the *Defense Distributed* litigation in which the Department's regulation of the files was directly

10   at issue. *See New York*, 2019 WL 190285, at *113, *48 ("curated and highly sanitized nature"

11   of initial administrative record suggested intent to conceal true basis for decision).

12         In sum, the stated bases for the State Department's deregulation of the subject files—that

13   deregulation is "in the interest of" U.S. national security and foreign policy, or that the subject

14   files "do not provide a critical military or intelligence advantage"—are pretextual. "Because [the

15   State Department's] stated rationale was not [its] actual rationale, [it] did not comply with the

16   APA's requirement that [it] 'disclose the basis of [its] decision.'" *New York*, 2019 WL 190285,

17   at *115 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–168 (1962)).

18
19   **D.**    **The Court Should Vacate the State Department's Actions and Enjoin It from Further Attempts to Unlawfully Deregulate the Files**

20         The Temporary Modification and Letter should be vacated. When agency action is found

21   to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the

22   APA provides that the reviewing court "shall . . . hold unlawful and set aside" the agency action.

23   5 U.S.C. § 706(2). Vacatur is the "normal remedy" for unlawful agency action. *Allina Health

24   Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Failure to provide required notice of

25   the agency action is a "fundamental flaw," *id.*, and failure to address important aspects of the

26   problem and ignoring relevant evidence are "major shortcomings," *Humane Soc'y*, 865 F.3d at

20

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007424

1    614, that make vacatur the appropriate remedy. Here, the Temporary Modification and Letter

2    suffer from all of these fatal deficiencies and more. Further, this is not a case in which "the egg

3    has been scrambled," *Allina*, 746 F.3d at 1110–1111; vacatur would simply restore the status

4    quo and "allow the [pending final rule] to take effect," *Nat'l Venture Capital Ass'n v. Duke*, 291

5    F. Supp. 3d 5, 21 (D.D.C. 2017)—assuming a final rule is lawfully promulgated.[52]

6        The States additionally ask the Court to enjoin the Federal Defendants from issuing any

7    subsequent "temporary modification" or otherwise removing the subject files from the Munitions

8    List or permitting their export without providing congressional notice as required by AECA.[53]

9    Where vacatur of a deregulation decision is not "sufficient to redress [plaintiffs'] injury," a court

10   may issue an injunction that has a "meaningful practical effect independent of its vacatur."

11   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Here, absent a permanent

12   injunction prohibiting further procedurally defective agency actions, the State Department may

13   attempt another end-run around AECA's requirements before any final rule goes into effect. *See*

14   *New York*, 2019 WL 190285, at *122 (permanent injunction was "necessary to make . . . vacatur

15   effective, as it prevents [the agency] from arriving at the same decision *without* curing the

16   problems" with its initial action). The States could once again face an abrupt final deregulation

17   that threatens immediate, serious, and irreparable harm, and leaves them with no remedy aside

18   from seeking another emergency TRO. Notably, the Department's position is that congressional

19   notice was not required, *see* Dkt. # 64 at 18–20, and it has continued to defend this lawsuit

20   without ever acknowledging the impropriety of its use of ITAR's "temporary modification"

21

22   _____

     [52] The States anticipate that any final rule that removes the subject files from the Munitions List would be
23   arbitrary and capricious for many of the same reasons discussed herein. Of course, the issue is not ripe at this time,
     since no final rule has been published.

24       [53] The Private Defendants have previously opposed the entry of injunctive relief. *See* Dkt. ## 8, 11, 63.
     Their theories regarding the constitutionality of regulating the subject files are at best tangential to this case, in
25   which the States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require
     the State Department to follow the law in making regulatory changes that affect the subject files. Federal regulation
     of Munitions List items has repeatedly survived constitutional challenge, *see United States v. Chi Mak*, 683 F.3d
26   1126, 1136 (9th Cir. 2012), but to the extent there are any constitutional implications with respect to the subject
     files, they are not squarely presented here and the Court need not consider them.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007425

1    procedure to bypass the notice requirement and prematurely effectuate a non-final rule. *See*

2    *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ("defendant's recognition of

3    the wrongful nature of its conduct" is a factor in whether a permanent injunction should issue).

4    Even if a final rule that complies with the notice requirement is published in the near future, it

5    may not go into effect until six months later. *See* 83 Fed. Reg. 24,200 (May 24, 2018) (rules

6    revising Munitions List categories typically have a "delayed effective date of 180 days").

7    Another procedurally improper deregulation in the meantime would again leave the states with

8    no option other than filing yet another complaint and seeking yet another TRO.

9          The standards for permanent and preliminary injunctions are "essentially the same,"

10   except that to obtain permanent relief, the plaintiff must show "actual success" on the merits

11   rather than a likelihood of success. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

12   Success on the merits, including as to procedural defectiveness, is established above. The

13   irreparable harm the States will suffer if the files are permitted to be published online, and the

14   strong public interest in preventing this, is also well established in the record of these

15   proceedings. *See* Dkt. # 95 at 20–25; Dkt. # 43 at 19–24 & accompanying citations. Anyone with

16   access to a public or commercially available, relatively inexpensive 3D printer[54]—regardless of

17   their age, mental health status, or criminal history—would be able to download and instantly use

18   the files to make functional weapons, fulfilling Defense Distributed co-founder Cody Wilson's

19   "crypto-anarchist" vision of "evading and disintermediating" gun-safety regulations.[55] 3D-

20   printed weapons will only become deadlier as the technology continues to evolve.[56]

21         3D-printable firearms pose substantial threats to public health and safety. The Liberator

22   and other weapons made of plastic can evade metal detectors,[57] which are one of the most

23   ──────────────

24   [54] Patel Decl., ¶¶ 9, 17–18, 26; Scott Decl., ¶¶ 4–5; Racine Decl., ¶¶ 3–6. Unless otherwise indicated, all declarations cited in this section are filed at Dkt. # 43-2. An index of these declarations is filed at Dkt. # 43-1.

25   [55] *See* Dkt. # 44 (Rupert Decl.), Ex. 16.
     [56] *See* Patel Decl., ¶¶ 21–26 (discussing emerging materials and technology that could be used to make deadlier weapons).

26   [57] McCord Decl., ¶¶ 11–13; Hosko Decl., ¶ 14; Bisbee Decl., ¶ 18; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 7; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 7; Coyne Decl., ¶ 4; Camper Decl., ¶ 7; Kyes Decl., ¶ 17.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007426

1    significant forms of protection for public facilities such as airports, stadiums, courthouses and

2    other government buildings, schools,[58] and prisons.[59] For example, 3D-printable weapons will

3    make it possible for students to manufacture their own weapons that could be used in a school

4    shooting (and could evade metal detectors that some schools are installing to prevent such

5    shootings).[60] 3D-printed weapons such as the Liberator do not always look like conventional

6    firearms, and children may mistake them for toys and play with them—a common reason for

7    accidental gun deaths among children.[61]

8         3D-printable firearms would compromise law-enforcement efforts. They can be privately

9    manufactured with no serial numbers,[62] hampering law enforcement's ability to "trace" a firearm

10   to its original seller and subsequent purchasers, which can be used to solve crimes and combat

11   gun trafficking.[63] Untraceable "ghost guns" of the non-3D-printed variety are already

12   increasingly popular[64]—and increasingly being used to commit horrific crimes, including

13   multiple mass shootings in California.[65] 3D-printed weapons would also undermine law

14   enforcement efforts to forensically match bullets used to commit crimes with the gun from which

15   they are shot, both because plastic weapons do not leave "ballistic fingerprints" on a bullet or

16   casing,[66] and because the firing conditions cannot be reliably or safely replicated since the gun

17   is unstable and dangerous even to the shooter.[67] For many of these reasons, 3D-printed weapons

18   may be particularly attractive to criminal enterprises, which would likely embrace the technology

19

20        [58] McCord Decl., ¶¶ 7–8, 13, 18–21; Camper Decl., ¶ 7; Rivara Decl., ¶ 7; Hemenway Decl., ¶ 21;
     Wintemute Decl., ¶ 14.

21        [59] See generally Herzog Decl.
          [60] Rivara Decl., ¶ 7; see also Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.

22        [61] Rivara Decl., ¶ 6; Hemenway Decl., ¶ 20; Wintemute Decl., ¶ 13.
          [62] McCord Decl., ¶¶ 29–30, 33; Kyes Decl., ¶ 8; Graham Decl., ¶ 35.

23        [63] Hosko Decl., ¶¶ 11, 11; McCord Decl., ¶¶ 30–32, 34, 40; Bisbee Decl., ¶¶ 17–18; Camper Decl., ¶¶ 6,
     8; Kyes Decl., ¶¶ 8, 11, 13, 15–16; Graham Decl., ¶¶ 16, 32; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 8.

24        [64] Graham Decl., ¶¶ 17–18; id. ¶ 30 (noting increase in prohibited persons who possess ghost guns).
          [65] Id., ¶¶ 25(a)–(t), 33.

25        [66] Camper Decl., ¶ 12; see also McCord Decl., ¶ 35 ("law enforcement agencies and prosecutors will not
     be able to rely on forensic experts to match bullets used to commit crimes with [3D-printed] firearms").

26        [67] Camper Decl., ¶¶ 12–13; see Dkt. # 29, ¶¶ 74, 95, 109–10, 126, 131, 142, 150, 154, 157–58, 165,
     170–71, 180–82, 207 (citing States' laws establishing background-check requirements).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   for use in engaging in the violence, proceeds-collection, and retaliation that commonly attends

2   the work of those organizations.[68]

3        3D-printable firearms also create a heightened risk of terrorist attacks, as the State

4   Department has acknowledged.[69] Undetectable and untraceable firearms could be used by

5   foreign terrorist organizations for attacks within the United States, including against persons

6   residing in or visiting the Plaintiff States.[70] The apparent effectiveness of metal detectors in

7   hindering such attacks would become meaningless if undetectable weapons became widely

8   available; for example, "the 72,000 fans who pack CenturyLink for a Seahawks game suddenly

9   become much more vulnerable to terrorists who seek to cause as much bloodshed as possible."[71]

10        Such "ongoing and concrete harm to [the States'] law enforcement and public safety

11   interests . . . constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts,

12   C.J., as Circuit Justice). In opposing entry of a preliminary injunction, the Federal Defendants

13   "d[id] not argue that any of these injuries are reparable." Dkt. # 95 at 22. The Federal Defendants

14   would be unharmed by entry of a permanent injunction, which will merely prevent them from

15   circumventing AECA's procedural requirements and ensure that any future agency action

16   affecting export control of the subject files is AECA-compliant.

17                **IV.**    **CONCLUSION**

18        For the reasons above, the Plaintiff States respectfully request that the Court enter

19   summary judgment in their favor, vacate and set aside the Temporary Modification and Letter,

20   and permanently enjoin the State Department from taking any other action to permit export of

21   the subject files absent compliance with AECA.

22

23          [68] Hosko Decl., ¶¶ 15–16; McCord Decl., ¶¶ 39–41; Graham Decl., ¶ 37.

24          [69] Ex. D at 10–11.

             [70] McCord Decl., ¶¶ 14–22; *see also* Dkt. # 44-1, Ex. 9 (Sen. Menendez letter 8/8/2018). These concerns
25   are perhaps particularly salient for the District of Columbia, which is entirely urban, densely populated, hosts
   hundreds of heavily attended events each year, including numerous political marches and protests, and is filled with
26   thousands of high-ranking federal officials and diplomats from around the world. *Id.*, Ex. 20 (Lanier Decl.), ¶¶ 13–
   15; *see also id.*, Ex. 21 (Op-ed by former Chief of U.S. Capitol Police and Senate Sergeant at Arms).
             [71] McCord Decl., ¶¶ 17–18, 22.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007428

1          DATED this 15th day of February, 2019.

2

3                                    ROBERT W. FERGUSON
                                     Attorney General of Washington
4
                                     /s/ Jeffrey Rupert
5                                    JEFFREY RUPERT, WSBA #45037
                                     Division Chief
6                                    TODD BOWERS, WSBA #25274
                                     Deputy Attorney General
7                                    KRISTIN BENESKI, WSBA #45478
                                     JEFFREY T. SPRUNG, WSBA #23607
8                                    ZACHARY P. JONES, WSBA #44557
9                                    Assistant Attorneys General
                                     JeffreyR2@atg.wa.gov
10                                   ToddB@atg.wa.gov
                                     JeffS2@atg.wa.gov
11                                   KristinB1@atg.wa.gov
                                     ZachJ@atg.wa.gov
12
                                     Attorneys for Plaintiff State of Washington
13
                                     XAVIER BECERRA
14                                   Attorney General of California

15                                   /s/ Nelson R. Richards
                                     NELSON R. RICHARDS, admitted pro hac vice
16                                   Deputy Attorney General
                                     Nelson.Richards@doj.ca.gov
17                                   Attorneys for Plaintiff State of California

18
                                     PHIL WEISER
19                                   Attorney General of Colorado

20                                   /s/ Matthew D. Grove
                                     MATTHEW D. GROVE, admitted pro hac vice
21                                   Assistant Solicitor General
22                                   Matt.Grove@coag.gov
                                     Attorneys for Plaintiff State of Colorado
23
                                     WILLIAM TONG
24                                   Attorney General of Connecticut

25                                   /s/ Maura Murphy Osborne
26                                   MAURA MURPHY OSBORNE, admitted pro hac vice

                                   25
PLAINTIFF STATES' MOTION FOR                    ATTORNEY GENERAL OF WASHINGTON
SUMMARY JUDGMENT                                    Complex Litigation Division
2:18-cv-01115-RSL                                    7141 Cleanwater Drive SW
                                                          PO Box 40111
                                                    Olympia, WA 98504-0111
                                                        (360) 709-6470

1   Assistant Attorney General
    Maura.MurphyOsborne@ct.gov
2   *Attorneys for Plaintiff State of Connecticut*

3
    KATHLEEN JENNINGS
4   Attorney General of Delaware

5   */s/ Ilona M. Kirshon*
    _____
6   ILONA M. KIRSHON, *admitted pro hac vice*
    Deputy State Solicitor
7   PATRICIA A. DAVIS, *admitted pro hac vice*
    Deputy Attorney General
8   Ilona.Kirshon@state.de.us
    PatriciaA.Davis@state.de.us
9   *Attorneys for Plaintiff State of Delaware*

10  KARL A. RACINE
11  Attorney General for the District of Columbia

12  */s/ Robyn Bender*
    _____
    ROBYN BENDER, *admitted pro hac vice*
13  Deputy Attorney General
    JIMMY ROCK, *admitted pro hac vice*
14  Assistant Deputy Attorney General
    ANDREW J. SAINDON, *admitted pro hac vice*
15  Senior Assistant Attorney General
    Robyn.Bender@dc.gov
16  Jimmy.Rock@dc.gov
    Andy.Saindon@dc.gov
17  *Attorneys for Plaintiff District of Columbia*
18
    CLARE E. CONNORS
19  Attorney General of Hawaii

20  */s/ Robert T. Nakatsuji*
    _____
21  ROBERT T. NAKATSUJI, *admitted pro hac vice*
    Deputy Attorney General
22  Robert.T.Nakatsuji@hawaii.gov
23  *Attorneys for Plaintiff State of Hawaii*

24  KWAME RAOUL
    Attorney General of Illinois
25
    */s/ Brett E. Legner*
26  _____

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007430

BRETT E. LEGNER, *admitted pro hac vice*
Deputy Solicitor General
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
BLegner@atg.state.il.us
ERobersonYoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathanael Blake*
NATHANAEL BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

BRIAN E. FROSH
Attorney General of Maryland

*/s/ Julia Doyle Bernhardt*
JULIA DOYLE BERNHARDT, *admitted pro hac vice*
JEFFREY PAUL DUNLAP, *admitted pro hac vice*
Assistant Attorneys General
JBernhardt@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

*/s/ Jonathan B. Miller*
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007431

| | |
|---|---|
| 1 | |
| 2 | KEITH ELLISON<br>Attorney General of Minnesota |
| 3 | */s/ Jacob Campion* |
| 4 | JACOB CAMPION, *admitted pro hac vice* |
| 5 | Jacob.Campion@ag.state.mn.us<br>*Attorneys for Plaintiff State of Minnesota* |
| 6 | GURBIR GREWAL |
| 7 | Attorney General of New Jersey |
| 8 | */s/ Jeremy M. Feigenbaum* |
| 9 | JEREMY M. FEIGENBAUM, *admitted pro hac vice*<br>Assistant Attorney General |
| 10 | Jeremy.Feigenbaum@njoag.gov<br>*Attorneys for Plaintiff State of New Jersey* |
| 11 | LETITIA JAMES |
| 12 | Attorney General of New York |
| 13 | */s/ Steven Wu* |
| 14 | STEVEN WU, *admitted pro hac vice*<br>Deputy Solicitor General |
| 15 | Steven.Wu@ag.ny.gov |
| 16 | *Attorneys for Plaintiff State of New York* |
| 17 | JOSH SHAPIRO<br>Attorney General of Commonwealth of Pennsylvania |
| 18 | */s/ Jonathan Scott Goldman* |
| 19 | JONATHAN SCOTT GOLDMAN, *admitted pro hac vice* |
| 20 | Executive Deputy Attorney General<br>MICHAEL J. FISCHER, *admitted pro hac vice* |
| 21 | Chief Deputy Attorney General |
| 22 | JGoldman@attorneygeneral.gov<br>MFischer@attorneygeneral.gov |
| 23 | *Attorneys for Plaintiff Commonwealth of Pennsylvania* |
| 24 | JOSHUA H. STEIN |
| 25 | Attorney General of North Carolina |
| 26 | */s/ Sripriya Narasimhan* |

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007432

1                SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel

2                SNarasimhan@ncdoj.gov

3                *Attorneys for Plaintiff State of North Carolina*

4                ELLEN F. ROSENBLUM
Attorney General of Oregon

5

6                */s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377

7                Scott.Kaplan@doj.state.or.us

8                *Attorneys for Plaintiff State of Oregon*

9                PETER F. NERONHA
Attorney General of Rhode Island

10               */s/ Justin Sullivan*

11               JUSTIN SULLIVAN, *admitted pro hac vice*
Assistant Attorney General

12               JJSullivan@riag.ri.gov

13               *Attorneys for Plaintiff State of Rhode Island*

14               THOMAS J. DONOVAN, JR.
Attorney General of Vermont

15

16               */s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac vice*

17               Solicitor General
Benjamin.Battles@vermont.gov

18               *Attorneys for Plaintiff State of Vermont*

19               MARK R. HERRING
Attorney General of the Commonwealth of Virginia

20

21               */s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*

22               Deputy Attorney General
STowell@oag.state.va.us

23               *Attorney for Plaintiff Commonwealth of Virginia*

24

25

26

<div align="center">29</div>

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEB007433

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION** |
| UNITED STATES DEPARTMENT OF STATE, et al., | **FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | **NOTED FOR: April 19, 2019** |

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007434

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

Indeed, this case is not about the regulation of U.S. persons who wish to utilize a 3D printer to produce their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provide a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

Plaintiffs' Amended Complaint, as well as their motion for summary judgment, misunderstands the nature of the Department of State's authority. But the Court need not reach Plaintiffs' claims under the Administrative Procedure Act ("APA") or the Tenth Amendment because Plaintiffs lack standing to assert their claims and fall outside the relevant statute's zone of interests. And in any event, Plaintiffs' claims fail on the merits. Accordingly, and for the reasons set forth below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

**BACKGROUND**

I.     **Statutory And Regulatory Background**

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 1
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007435

States" to "control the *import* and the *export* of defense articles and defense services" and to promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President has delegated this authority to the Department of State ("Department") in relevant part, and the Department has accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec. Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).  Section 2778 of the AECA authorizes the President to (1) designate those defense articles and services to be included on the USML; (2) require licenses for the export of items on the USML; and (3) promulgate regulations for the import and export of such items on the USML.  22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States," *id.* § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

In certain cases where it is unclear whether a particular item is a defense article or defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide applicants with a determination as to whether the article, service, or data is within the scope of

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007436

the ITAR.  These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article, service, or data is covered by the USML, provides the equivalent performance capabilities of a defense article on the USML, or has a critical military or intelligence advantage.  *See id.* § 120.4(d).

While the AECA and ITAR do not provide the Department with authority to prohibit the domestic manufacture or possession of 3D-printed guns, another federal statute deals with this topic.  The Undetectable Firearms Act bars the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No. 113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United States must generally be capable of being detected by metal detectors and by x-ray machines.  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions challenged in this case, nor are the separate federal prohibitions on the possession of firearms by felons, persons subject to restraining orders, or the mentally ill.  *See id.* § 922(g)(1) (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders); *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce these laws in order to address domestic safety issues related to undetectable firearms.  The Department's determination under the ITAR at issue here will not affect those enforcement efforts.

**II.     The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical information regarding a number of gun-related items."  *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007437

1   publishing the subject files on its website violated plaintiffs' rights under the First, Second, and

2   Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

3       In August 2015, the U.S. District Court for the Western District of Texas denied

4   Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the

5   preliminary injunction analysis, the district court considered the files to be subject to the

6   protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court

7   concluded that "because the AECA and ITAR do not prohibit domestic communications" and

8   plaintiffs remained "free to disseminate the computer files at issue domestically," they had not

9   shown a substantial likelihood of success on the merits.  *Id.* at 695.

10      The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016).

11  Focusing narrowly on the question of the non-merits requirements for preliminary relief, the

12  panel majority concluded that the "Department's stated interest in preventing foreign nationals

13  . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed

14  plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d]

15  to address the merits" because the failure by plaintiffs to meet any single requirement for a

16  preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A

17  dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting).

18  "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

19  that "the State Department's application of its 'export' control regulations to this domestic

20  Internet posting appears to violate the governing statute, represents an irrational interpretation

21  of the regulations, and violates the First Amendment as a content-based regulation and a prior

22  restraint."  *Id.* at 463-64.

23      After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

24  S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

25  district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

26  complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

27  court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007438

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[1]

(b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . [ITAR], 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d) Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied

with (b) and (c) on July 27, 2018.  *See* Declaration of Sarah Heidema ("Heidema Decl."), Dkt.

---

[1] *See* Section III, *infra*.  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007439

No. 64-1, ¶¶ 27, 29.  The Settlement Agreement states that Defendants deny that they violated plaintiffs' constitutional rights.  *See id.* ¶ 28.

### III.    The Government's Rulemaking

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  As proposed, the items removed from the USML—which encompass the technical data at issue in *Defense Distributed* and this litigation—would no longer be subject to the ITAR's authorization requirements, i.e., no license from the Department of State would be required for their export.  *See* Heidema Decl. ¶ 21; *see generally* 83 Fed. Reg. at 24,198.  The Department of State "received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms."  Heidema Decl. ¶ 23.

### IV.    Procedural History

On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed.  Compl., Dkt. No. 1.  Plaintiffs alleged that the Government's settlement with Defense Distributed adversely affected their public safety laws, in violation of the APA and the Tenth Amendment.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court granted on July 31, 2018, Dkt. No. 23 ("Order").  Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43.  The Court granted Plaintiffs' motion on August 27, 2018.  Dkt. No. 95 ("Prelim. Inj.").  Pursuant to the preliminary injunction issued by the Court, the Government is enjoined from "implementing or enforcing the

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007440

'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and the Federal Defendants must "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court." *Id.* at 25.

The Federal Defendants produced the administrative record on October 19, 2018, Dkt. No. 116, and filed supplementary materials on December 20, 2018, Dkt. No. 158. Plaintiffs moved for summary judgment on February 15, 2019. Dkt. No. 170 ("Pls.' MSJ").

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based." *Partridge v. Reich*, 141 F.3d 920, 926 n.4 (9th Cir. 1998). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). "[I]n a case involving review of a final agency action under the [APA] . . . summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011) (citation omitted).

### A.   Plaintiffs Are Not Within The AECA's Zone Of Interests.[3]

"[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe*

---

[3] The Court did not previously address the Federal Defendants' zone-of-interests argument. *See* Prelim. Inj. at 8-12. Moreover, for the reasons provided in the Federal Defendants' opposition to Plaintiffs' motion for a preliminary injunction, the Federal Defendants maintain that Plaintiffs lack Article III standing to assert their claims. *See* Dkt. No. 64 ("Defs.' PI Opp.") at 13-16.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 7
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007441

*v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted).  While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, Plaintiffs—whose Amended Complaint focuses on the Federal Defendants' compliance with the AECA's congressional notification provision, 22 U.S.C. §2778(f)(1)—do not fall within the zone of interests protected by the statute.  *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect against the national security threat created by the unrestricted flow of military information abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C. § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports").  The primary concerns of the statute are thus national security and foreign relations. In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees. As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—states who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters unrelated to foreign relations, fail to meet the zone of interests test. *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 8
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007442

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

**B.  Plaintiffs' APA Claims Fail.**

According to Plaintiffs, the Department exceeded its statutory authority in not providing advance notice to Congress about the actions undertaken in connection with the settlement agreement.  Pls.' MSJ at 10-11.  But as the Federal Defendants have previously explained, Defs.' PI Opp. at 18-19, the statutory provision on which Plaintiffs rely requires such notice only with respect to the *removal* of *items* from the USML.  *See* 22 U.S.C. § 2778(f)(1) (providing that "the President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees).  Because the subject files are not specifically enumerated on the USML and therefore are not items, and because the Department effectuated only a temporary modification, not a removal, the Department's actions were in accord with its delegated authority.  *But see* Prelim. Inj. at 12-15.

The Court should also reject Plaintiffs' claim that the Temporary Modification and Letter were arbitrary and capricious.  As the Federal Defendants explained in their opposition to Plaintiffs' preliminary injunction motion, items belong on the United States Munitions List if they "provide[] a critical military or intelligence advantage."  22 C.F.R. § 120.3(b).  Here, the administrative record reveals that the government had determined that small-caliber firearms do not satisfy that standard.  *See generally* Defs.' PI Opp. at 22 (citing State and Commerce NPRMs).[4]

Defendants acknowledge that the Court previously suggested that Defendants failed to sufficiently "consider[] the unique properties of 3D plastic guns," Prelim. Inj. at 17, or to provide a "reasoned explanation for its change in position," *id.* at 18.  Defendants nonetheless respectfully maintain that they satisfied their obligations.  *See generally* Defs.' PI Op. at 21-22.

---

[4] Plaintiffs' suggestion that "the Temporary Modification is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearms files," Pls.' MSJ at 13, is therefore not correct. When an agency's decision is properly before the Court, it "review[s] the entire administrative record."  *Epsilon Elec., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control*, 857 F.3d 913, 924 (D.C. Cir. 2017).

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 9
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007443

1
2
3

Specifically, Defendants maintain that it sufficed to consider the need to regulate small-caliber firearms generally, as undetectable firearms are separately regulated by other agencies under the Undetectable Firearms Act. *See id.* at 10.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

In any case, even if the Court were to find the Federal Defendants' rationale inadequate, it should reject Plaintiffs' contention that the Federal Defendants' rationale was pretextual. Plaintiffs suggest that the Temporary Modification and Letter were procedurally irregular because they were issued without notice to Congress, but Defendants respectfully maintain that no such notice was required. *See id.* at 18-19; *but see* Prelim. Inj. at 12-15. While Plaintiffs further suggest that the Department's decision was made "abruptly, sometime during the three-week period from April 6 to April 30, 2018," Pls.' MSJ at 19, the Federal Defendants have explained that the decision was made following the District Court of the Western District of Texas's instruction to the parties to exchange written settlement demands, *see* Defs.' PI Opp. at 5; it is no secret that the Temporary Modification and Letter arose from a settlement of the *Defense Distributed* litigation. *Cf.* Pls.' MSJ at 19. Last, Plaintiffs complain that certain documents were initially omitted from the administrative record, *see* Pls.' MSJ at 20, but those documents were omitted from the record because they were not among the documents considered by the agency decision-maker. *See generally* Defs.' Opp. at Pls.' Mot. to Compel, Dkt. No. 152. In any case, Defendants agreed to supplement the record with these documents for the Court's convenience in determining whether to rely on the materials as extra-record evidence and the convenience of the parties. *See* Dkt. No. 158.

21

C.     **Plaintiffs' Tenth Amendment Claim Fails.**

22
23
24
25
26
27
28

Plaintiffs fare no better in arguing that the Department's actions constitute a violation of the Tenth Amendment to the Constitution. *See* Pls.' MSJ at 11-12. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Under the Tenth Amendment, 'the Federal Government may not compel States to implement, by legislation or executive action, federal regulatory programs.'" *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (quoting *Printz v. United States*,

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 10
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007444

521 U.S. 898, 925 (1997)).  "The crucial proscribed element is coercion; the residents of the State or municipality must retain 'the ultimate decision' as to whether or not the State or municipality will comply with the federal regulatory program."  *Id.* (quoting *New York v. United States*, 505 U.S. 144, 168 (1992)).

Here, Plaintiffs claim that "[t]he Department's overly broad authorization well exceeds the scope of its authority under AECA to regulate exports, and on its face purports to abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth Amendment."  Pls.' MSJ at 11; *see also id.* at 12 (arguing that "[t]he States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of 'any United States person' to 'use' the files to print their own undetectable and untraceable weapons").  To be abundantly clear, however, the Government does not suggest, and has never suggested, that the settlement agreement conflicts with or otherwise preempts such state laws.  To the contrary, the Department has consistently emphasized that its actions are taken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity.  *See Def. Distributed*, 121 F. Supp. 3d at 695.  The protections for state law legislated by Congress in the Gun Control Act remain in force, *see* 18 U.S.C. § 927, as well as the laws invoked by Plaintiffs, remain unaffected by the settlement agreement.  Nor is there any basis to substitute Plaintiffs' understanding of the agreement for the far more reasonable interpretation of the Government.

Moreover, Plaintiffs fall well short of establishing any element of a violation of the Tenth Amendment.  "[T]here is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program.  Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals."  *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015).  Absent such a program or compulsion, the Court should reject Plaintiffs' Tenth Amendment claim.  *See id.*; *see also, e.g.*, *Envtl. Def. Ctr.*, 344 F.3d at 845 (holding agency action "does not violate the Tenth Amendment, because it directs no unconstitutional coercion").

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 11
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007445

1
2
3
4
5
6
7
8
9
10
11
12
13

The two cases cited by Plaintiffs are not to the contrary.  *See* Pls.' MSJ at 11-12.  First, Plaintiffs point to the Supreme Court's general statement in *Bond v. United States* that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.'"  572 U.S. 844, 854 (2014).  But the Federal Defendants do not even purport to infringe upon that power, let alone coerce Plaintiffs into complying with a federal program. Likewise, in *District of Columbia v. Heller*, the Supreme Court noted that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful[.]"  554 U.S. 570, 626-27 & n.26 (2008).  Yet *Heller* concerned the Second Amendment, not the Tenth, and nothing in *Heller* indicates that the Department's exercise of its export authority, which does not involve commandeering State funds or entities, can give rise to a Tenth Amendment violation.

14

> **D.     An Injunction Is Unwarranted.**

15
16
17
18
19
20
21
22
23
24
25

As Plaintiffs correctly note, Pls.' MSJ at 20, in the APA context, "[v]acatur is the standard remedy for unlawful agency decisions," *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1239 (N.D. Cal. 2015); *see* 5 U.S.C. § 706(2)(A) (requiring court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Nevertheless, in the event the Court finds that the challenged agency actions were inconsistent with the APA, Plaintiffs "additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent 'temporary modification' or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA."  Pls.' MSJ at 21.  Plaintiffs' request is unfounded and should be denied.

26
27
28

"A court's decision to issue an injunction constitutes an unwarranted 'extraordinary remedy' if a less drastic remedy, such as vacatur, could sufficiently redress plaintiff's injury. *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1247 (quoting *Monsanto Co. v. Geertson*

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 12
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007446

1    *Seed Farms*, 561 U.S. 139, 165-66 (2010)).  Here, there is no basis to conclude that vacatur

2    would be insufficient to redress Plaintiffs' alleged injuries.  Plaintiffs' Amended Complaint and

3    motion for summary judgment make clear that at issue are not the substantive policies

4    underlying the challenged actions, but rather the procedures used by the agency in taking those

5    actions.  *See* Am. Compl. ¶¶ 230-40 (alleging failure to provide congressional notification and

6    failure to adequately explain basis for actions); Pls.' MSJ at 10-18 (same).  Vacatur and remand

7    would appropriately allow the Federal Defendants to cure any deficiencies with respect to those

8    procedures.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007)

9    ("[I]f the EPA's action was arbitrary and capricious, . . . the proper course would have been to

10   remand to the Agency for clarification of its reasons."); *Se. Ak. Conservation Council v. U.S.*

11   *Army Corps of Engineers*, 486 F.3d 638, 654-55 (9th Cir. 2007), *rev'd and remanded on other*

12   *grounds sub nom. Coeur Ak., Inc. v. Se. Ak. Conservation Council*, 557 U.S. 261 (2009)

13   ("Under the APA . . . a court should 'vacate the agency's action and remand to the agency to

14   act in compliance with its statutory obligations.'" (citation omitted)).

15          The rationale underlying Plaintiffs' request confirms that an injunction is not

16   appropriate.  According to Plaintiffs, such relief is warranted to "prohibit[] further procedurally

17   defective agency actions."  Pls.' MSJ at 21; *see also id.* at 21 n.53 ("[T]he States merely ask the

18   Court to invalidate procedurally defective and unlawful agency actions and require the State

19   Department to follow the law in making regulatory changes that affect the subject files.").  Yet

20   "[t]he Supreme Court has warned against 'sweeping injunctions to obey the law' and has

21   cautioned courts about their 'duty to avoid' such orders."  *InfoSpan, Inc. v. Emirates NBD Bank*

22   *PJSC*, No. 11-cv-1062, 2016 WL 8861712, at *7 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F.

23   App'x 1 (9th Cir. 2018) (quoting *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905));

24   *accord Cuviello v. City of Oakland*, No. 06-cv-5517, 2009 WL 734676, at *3 (N.D. Cal. Mar.

25   19, 2009) (explaining that "courts have held that not only vague injunctions but also injunctions

26   that simply require a defendant to 'obey the law' fail to comply with Rule 65(d)").[5]

27   _____

28   [5] Indeed, based on Plaintiffs' request, it is difficult to discern the marginal relief provided by an injunction, as
     vacatur itself would involve setting aside the challenged actions, and any future challenges would be considered in
     light of a new administrative record.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 13
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007447

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The cases relied on by Plaintiffs do not compel a different result.  For instance, in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), cited in Pls.' MSJ at 21, the district court "enjoin[ed] Defendants from adding a citizenship question to the 2020 census questionnaire based on Secretary Ross's March 26, 2018 memorandum or based on any reasoning that is substantially similar to the reasoning contained in that memorandum." *Id.* at 676-77.  The court entered this injunction in part because "an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion," which the court found necessary "given the looming [census] printing deadline." *Id.* at 676.  Here, however, no similar temporal constraints exist to justify injunctive relief, and in any event the Department should be permitted to address any concerns the Court might have without the need for an injunction.  *Cf. Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005) ("[T]he usual rule is that, with or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand.").  Plaintiffs likewise cannot persuasively rely on *United States v. Laerdal Manufacturing Corp.*, 73 F.3d 852 (9th Cir. 1995), cited in Pls.' MSJ at 22, as that case did not involve a challenge to government action under the APA, and therefore did not discuss whether vacatur would be an adequate remedy.

Nor have Plaintiffs demonstrated that the injunction factors weigh in their favor.  "The equitable remedy of an injunction—whether preliminary or permanent−is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *JPMorgan Chase Bank, N.A. v. Yamassee Tribal Nation*, No. 1:17-cv-00759, 2018 WL 3629940, at *6 (E.D. Cal. July 30, 2018) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  Plaintiffs fall short of meeting this standard.  All of the concerns identified are harms that might result from the domestic availability of 3D-printed guns in the United States, but such concerns have little to do with whether particular files should be regulated for foreign export on national security grounds.  Further, their relation to the Department's exercise of authority and the settlement agreement is speculative.  At best, Plaintiffs have only identified harms that may result from

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 14
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007448

3D-printed guns *generally*, not from the challenged actions regulating foreign exports.  But there are already laws aimed at domestic conduct that seek to prevent such harms.  And as the Ninth Circuit has made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is relevant for the injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially when there are separate statutes governing domestic manufacture, possession, and sale that remain unaffected by the challenged actions.  *See also* Defs.' PI Opp. at 9-13.

The single case Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), cited in Pls.' MSJ at 24—is inapposite.  In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari.  567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries[.]"  *Id.*  Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 15
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007449

1    Dated:  March 15, 2019                    Respectfully submitted,

2

3                                             JOSEPH H. HUNT
                                              Assistant Attorney General

4
                                              BRETT A. SHUMATE
5                                             Deputy Assistant Attorney General

6                                             JOHN R. GRIFFITHS
                                              Director, Federal Programs Branch
7
                                              ANTHONY J. COPPOLINO
8                                             Deputy Director, Federal Programs Branch

9                                             */s/ Stuart J. Robinson*
10                                            STUART J. ROBINSON
                                              STEVEN A. MYERS
11                                            ERIC J. SOSKIN
                                              Trial Attorneys
12                                            U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
13                                            450 Golden Gate Ave.
14                                            San Francisco, CA 94102
                                              (415) 436-6635 (telephone)
15                                            (415) 436-6632 (facsimile)
                                              stuart.j.robinson@usdoj.gov
16

17                                            *Attorneys for the Federal Defendants*

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 16
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007450

1

## CERTIFICATE OF SERVICE

2

3

    I hereby certify that on March 15, 2019, I electronically filed the foregoing brief using

the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5

Dated: March 15, 2019                              /s/ Stuart J. Robinson
                                                   Stuart J. Robinson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 17
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007451

1

2

3

4

5

6

7

8

                              The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF CONNECTICUT; STATE OF MARYLAND; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; COMMONWEALTH OF MASSACHUSETTS; COMMONWEALTH OF PENNSYLVANIA; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MINNESOTA; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; and COMMONWEALTH OF VIRGINIA. | NO. 2:18-cv-01115-RSL **PLAINTIFF STATES' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT** NOTED FOR CONSIDERATION: JUNE 7, 2019[1] |
|               Plaintiffs, v. UNITED STATES DEPARTMENT OF STATE, et al.,               Defendants. | |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

[1] *See* Dkt. # 183.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

          i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007452

*TABLE OF CONTENTS*

I.     INTRODUCTION ........................................................................................ 1

II.    SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS ..................... 1

       A.   The Federal Defendants Supplement the Record in Response to the Court's
            Order ............................................................................................... 1

       B.   The Revised Second Supplement Reveals That "Nothing Changed" from the
            State Department's Perspective Regarding 3D-Printable Guns ................ 3

       C.   The State Department Admittedly Failed to Consider Public Comments on the
            NPRMs *and* the Challenged Actions Themselves .................................... 5

       D.   No Final Rules Have Been Published ..................................................... 8

III.   ARGUMENT ............................................................................................. 8

       A.   The Plaintiff States Have Standing, as the Court Already Ruled .............. 9

       B.   The Temporary Modification and Letter Are Contrary to Law ............... 10

            1.   The Temporary Modification and Letter violate AECA. ................. 10

            2.   The Temporary Modification and Letter violate the Tenth Amendment. ... 11

       C.   The Temporary Modification and Letter Are Arbitrary and Capricious ............ 12

       D.   Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief ...... 17

       E.   The Private Defendants' Arguments Do Not Require a Different Result .............. 18

            1.   The Private Defendants' jurisdictional arguments lack merit. ................... 19

            2.   The Private Defendants' constitutional theories do not preclude the Court
                 from setting aside unlawful agency actions. ..................................... 20

            3.   The Private Defendants' APA arguments do not explain, let alone justify,
                 the Federal Defendants' abrupt regulatory about-face. ..................... 23

IV.    CONCLUSION ......................................................................................... 24

PLAINTIFF STATES' COMBINED                    ii                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                              Complex Litigation Division
JUDGMENT AND OPP TO                                                        800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                     Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                (206) 474-7744

WASHSTATEB007453

1    This brief is a combined reply in support of the States' Motion for Summary Judgment

2    (Dkt. # 170) ("SMSJ") and opposition to the Federal Defendants' Cross-Motion for Summary

3    Judgment (Dkt. # 173) ("FDMSJ") and the Private Defendants' Motion for Summary Judgment

4    (Dkt. # 174) ("PDMSJ").

5                          **I.    INTRODUCTION**

6    The Temporary Modification and Letter deregulating 3D-printed firearm files violate

7    AECA's congressional notice provisions and must be vacated as contrary to law. In addition,

8    these actions are arbitrary and capricious and were pretextually rationalized after the fact in

9    violation of the APA. After multiple supplementations of the administrative record in this case,

10   including the most recent Revised Second Supplementation on May 6, 2019, the evidence shows

11   that the State Department failed to consider the national security implications of deregulation in

12   light of the unique properties of untraceable, undetectable, 3D-printable plastic firearms, and did

13   not independently "determine" that deregulation was "in the interest of the security and foreign

14   policy of the United States," as asserted. It is now more clear than ever that the State

15   Department's abrupt reversal of its longstanding regulation of the subject files—as President

16   Trump tweeted on July 31, 2018—"doesn't seem to make much sense!" Dkt. # 15-2.

17   The Court should grant summary judgment in the States' favor, vacate and set aside the

18   unlawful Temporary Modification and Letter, and enjoin the Federal Defendants from

19   attempting any further "temporary" deregulation of 3D-printable firearms that illegally evades

20   Congress's oversight.

21                 **II.    SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS**

22   Much of the relevant background is set forth in the States' Motion for Summary

23   Judgment (Dkt. # 170, Part II). This section covers factual developments since February 2019.

24   **A.    The Federal Defendants Supplement the Record in Response to the Court's Order**

25   On March 19, 2019, the Court granted the States' Motion to Supplement the

26   Administrative Record; incorporated Dkt. # 158 (First Supplement) into the administrative

PLAINTIFF STATES' COMBINED                           1                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                   Complex Litigation Division
JUDGMENT AND OPP TO                                                              800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                         Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                    (206) 474-7744

WASHSTATEB007454

1   record; and ordered the Federal Defendants to (1) certify the production of a *complete*

2   administrative record that includes "all materials [the State Department] considered, directly or

3   indirectly" in taking the challenged actions and (2) supplement the administrative record with a

4   privilege log and with settlement-related communications and materials generated in *Defense*

5   *Distributed v. U.S. Dep't of State*, Case No. 15-cv-372-RP (W.D. Tex.).[2] The Court also granted

6   the States "leave to take discovery aimed at establishing whether the pre-July 27, 2018,

7   comments to the NPRMs were directly or indirectly considered when issuing the temporary

8   modification and letter."[3] As discussed below (Part II.C), this discovery revealed that the State

9   Department did *not* consider the comments.

10      On April 16, 2019, the Federal Defendants filed a Second Supplement (Dkt. # 179),[4] and

11   on May 6, 2019, they filed a Revised Second Supplement (Dkt. # 184) of the administrative

12   record. According to the Certifications, these supplemental materials consist of 4,150 previously

13   unfiled documents, of which 904 are filed publicly and 3,246 are logged as privileged and

14   withheld in full.[5] The revised privilege log (Dkt. ## 184-13 & 184-14) reflects documents with

15   a number of questionable redactions. For example, an email from New Hampshire Governor

16   Chris Sununu to State Department officials lobbying on behalf of a New Hampshire-based

17   multinational firearms manufacturer was redacted, purportedly under the deliberative process

18   privilege,[6] as were numerous post-decisional communications and communications with internal

19   public relations staff. Because of these and other irregularities and omissions, the States do not

20   concede that the record is complete or that the privilege claims are proper. Nevertheless, because

21   the record in its current form amply demonstrates that the Federal Defendants' covert

---

[2] Dkt. # 175 at 8.

[3] *Id.* at 7. By way of response to the States' discovery request pursuant to the Order, the Federal Defendants submitted the Declaration of Michael F. Miller and the Declaration of Robert Monjay. *See* Dkt. # 179 at 2.

[4] The original privilege log filed on April 16, 2019 was deficient, as hundreds of pages' worth of entries did not indicate any basis for withholding whatsoever. Second Declaration of Kristin Beneski, Ex. O (Ltr. dated April 25, 2019); Dkt. # 184-1, ¶ 11.

[5] Dkt. # 179-1 (Certification of Second Supplement), ¶ 21 (3,240 documents withheld; 910 produced); Dkt. # 184-1 (Certification of Revised Second Supplement), ¶¶ 5–10 (30 additional privilege claims, 6 withheld in full).

[6] Ex. P (WASHAR0035756); Dkt. No. 184-14 at 606.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

deregulation of 3D-printable guns was unlawful for multiple reasons, this case is ripe for determination by summary judgment.

**B.    The Revised Second Supplement Reveals That "Nothing Changed" from the State Department's Perspective Regarding 3D-Printable Guns**

Despite the questionable validity of the withholding and redactions, the Revised Second Supplement is far more complete than the cherry-picked record the Federal Defendants initially filed in October 2018. Among other documents, it includes samples of the *more than 106,000 emails* from members of the public between July 23 and July 27, 2018, urging the Department not to exempt 3D-printable guns from regulation via the "temporary" modification; multiple letters from Congressional leaders urging reconsideration of the deregulation of 3D-printable gun files; detailed comment letters from U.S. Senators and public policy organizations; and approximately 155 documents and communications related to the settlement of the *Defense Distributed* litigation.[7]

One document in the Revised Second Supplement in particular sheds new light on the decision to deregulate 3D-printable firearms: on July 26, 2018—the day before the State Department issued the Temporary Modification and Letter—a Senate Foreign Relations staffer emailed State Department personnel to request an analysis as to why the Department had changed the position it took in its April 4, 2018 motion to dismiss in the *Defense Distributed* case.[8] Joshua M. Paul of the State Department replied that this was a "technical legal question" that should be directed to the Department of Justice.[9] In a following internal email exchange, Defendant Sarah Heidema—the Director within DDTC who in this case certified that the original, cherry-picked administrative record filed was "complete" and asserted, absent any record evidence, that the State Department "determined" that 3D-printable firearms "pose little national security concern"[10]—argued that it was actually "a question for us [the State

---

[7] *See* Second Declaration of Jennifer D. Williams, ¶ 4.
[8] Ex. Q (WASHAR0000212).
[9] *Id.*
[10] Dkt. # 64-1 (Heidema Decl.), ¶ 19; Dkt. # 116 (Certification), ¶ 4; *see also* Dkt. # 175 (Order) at 3–6.

PLAINTIFF STATES' COMBINED                                   3                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                           Complex Litigation Division
JUDGMENT AND OPP TO                                                                      800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                                  Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                              (206) 474-7744

1   Department]" about "why we stopped arguing that the technology subject to the case, if released,

2   would harm national security or foreign policy[.]"[11] But Paul stated that the reason for the

3   planned deregulation was "fundamentally a DOJ question" because "nothing changed on our

4   side" as to those issues.[12] Paul's statements are consistent with contemporaneous remarks by

5   Heather Nauert, who told the press that the State Department still had "equity" in the matter of

6   3D-printable guns, but that it "took the advice of the Department of Justice" to settle the case by

7   agreeing to deregulate them.[13] Paul's and Nauert's statements are *inconsistent* with the Federal

8   Defendants' assertion in this case that the Department "determined" that deregulating 3D-

9   printable firearms was "in the interest of" U.S. national security and foreign policy. *See* SMSJ

10  at 19.

11          Another email exchange between Paul and a Senate Foreign Relations staffer starkly

12  reveals the Federal Defendants' failure to consider the particular problems posed by 3D-printed

13  guns before issuing the Temporary Modification and Letter. On July 20, 2018, the staffer wrote

14  to Paul to ask about "the law enforcement and counter-terrorism implications of" the

15  deregulation, noting that "[e]nabling the widespread acquisition of undetectable or largely-

16  undetectable firearms" would potentially undermine "protection of domestic and international

17  airline flights from terrorist hijacking/attacks."[14] The staffer further asked: "What changes will

18  be required by TSA here and abroad to deal with this?"[15] Paul was unable to answer these basic

19  questions. Instead, he admitted that the State Department "would need to refer you to TSA or

20  other law enforcement organizations on this question."[16] Paul suggested that the State

21  Department could not answer these key national security questions because its "nexus on this

22  issue was/is limited to [its] role in controlling exports of tech data[.]"[17] Paul's statements, made

23  _____

24      [11] Ex. Q (WASHAR0000211).
        [12] *Id.*

25      [13] SMSJ at 19 (citing Dkt. # 35-1 at 5 of 46).
        [14] Ex. R (WASHAR0000221).

26      [15] *Id.*
        [16] *Id.* (WASHAR0000220).
        [17] *Id.*

PLAINTIFF STATES' COMBINED                          4                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                  Complex Litigation Division
JUDGMENT AND OPP TO                                                            800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                      Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                   (206) 474-7744

1  just a week before the Federal Defendants issued their Temporary Modification, highlight the

2  extent to which they utterly failed to consider the national security implications of their plan to

3  deregulate 3D-printable guns.

4         Yet another email from Paul undermines one of the Federal Defendants' *post hoc*

5  arguments concerning the deregulation of 3D-printable guns. In a July 25, 2018, email thread

6  discussing public talking points on the Defense Distributed settlement, a staffer notes that the

7  Department of Justice has requested language indicating that the "3-D files at issue" do not

8  violate the Undetectable Firearms Act because Defense Distributed's "design . . . requires adding

9  metal after printing."[18] In response, Paul states: "I think that's legally valid but not particularly

10 useful in a public/Congressional context, as the pin can be removed and put in your other

11 pocket."[19] Paul's response confirms the obvious: the State Department is well aware that

12 allowing the unlimited distribution of 3D-printable gun files will make it much easier for anyone

13 who wants to evade the Undetectable Firearms Act to do so.

14 **C.     The State Department Admittedly Failed to Consider Public Comments on the
15         NPRMs *and* the Challenged Actions Themselves**

16         In addition to the revelations discussed above, the Miller Declaration (Dkt. # 179-2)

17 shows that the decision to enact the Temporary Modification and Letter was taken *solely*

18 "pursuant to an action memorandum recommending to the Under Secretary of State for Arms

19 Control and International Security that she approve the temporary modification to the ITAR."[20]

20 The redacted "action memo" states that approval of the Temporary Modification and Letter is

21 "required to comply with the Defense Distributed settlement agreement."[21] No other rationale is

22 provided. *See also* SMSJ at 5–6, 16–17, 19; FDMSJ at 10 ("[I]t is no secret that the Temporary

23 Modification and Letter arose from a settlement of the *Defense Distributed* litigation."). Despite

24         [18] Ex. S (WASHAR0035889–90).
25         [19] *Id.*
           [20] Dkt. # 179-2 (Miller Decl.) ¶ 7.
26         [21] *Id.*, Ex. 1. The action memo's redactions are for "Deliberative - Predecisional Intra-agency Discussion"
    and "Attorney-Client Privilege." Dkt. # 184-13 at 1 of 47 (Privilege Log).

PLAINTIFF STATES' COMBINED                    5          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                              Complex Litigation Division
JUDGMENT AND OPP TO                                       800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                 Seattle, WA 98104-3188
2:18-cv-01115-RSL                                        (206) 474-7744

the Court's statement that it "seems likely that a reasonable decisionmaker would be interested in reviewing comments regarding a related rule change proposal before announcing a temporary modification of the same rule,"[22] the Miller Declaration confirms that State Department staff **"did not rely on the comments to the NPRM in preparing the memorandum."**[23] This means that the Department failed to consider or account for over 3,600 public comments, including the nearly 400 that specifically opposed the new rule on the ground that it would deregulate 3D-printable gun files. Dkt. # 170 at 8.

Some of the comments the State Department ignored came from key experts—including several that were significant enough to merit special mention by the State Department staffer in charge of comment review[24]—warning of the dangerous sweep of the Federal Defendants' covert deregulation of 3D-printable guns. For example, Professor Susan Waltz of the University of Michigan's Gerald R. Ford School of Public Policy pointed out that the State Department's proposed rule "would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology . . . the firearms removed from USML."[25] Professor Waltz suggested a few simple ways the State Department could address this glaring problem— none of which the Department adopted.[26] Another comment, from the Brady Campaign to Prevent Gun Violence, warned that, "under the proposed rules," companies like Defense Distributed "would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States)."[27] The State Department also disregarded comments from hundreds of individuals warning that "[t]he rule change would make the world a far more dangerous place" by

---

[22] Dkt. # 175 at 7.
[23] Dkt. # 179-2 (Miller Decl.) ¶ 7 (emphasis added).
[24] Dkt. # 179-3 (Monjay Decl.) ¶ 4.
[25] Dkt. # 179-3 at 14 of 44 (Monjay Decl. Ex. B at 5).
[26] *Id.*
[27] Dkt. # 179-3 at 39 of 44 (Monjay Decl. Ex. D (part 2) at 8).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

"effectively enabling 3D printing of firearms in the U.S. and around the globe."[28] The Federal Defendants concede that all of these comments and more were ignored entirely.

Not only did the State Department ignore comments received during the formal rulemaking comment period, but it also admittedly failed to consider public input *specifically opposing the challenged actions themselves* during the week prior to July 27, 2018, once word of their impending issuance had gotten out.[29] These additional materials included letters from members of Congress and over 106,000 emails from individuals. For example:

- A July 20, 2018, letter from then-Ranking Member (now Chairman) of the House Foreign Affairs Committee, Rep. Eliot Engel,[30] urging Secretary Pompeo not to deregulate 3D-printable gun files. As Rep. Engel warned, deregulation was "exceptionally dangerous," as it would make "undetectable" weapons "available to anyone with a laptop and a 3-D printer," and "defeat[] US laws which require background checks on the sale of weaponry." Rep. Engel further noted that the State Department was "mis-using authority under Section 126.2 of the [ITAR] to 'temporarily' remove this technical information from the [USML]" when, "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it." This misuse of Section 126.2 "suggests the Department officials sought a way to avoid complying with Section 38(f) of the [AECA], which requires advance notification to Congress for any removal from the USML."

- A July 25, 2018, letter from Ranking Member of the Senate Foreign relations Committee, Sen. Robert Menendez,[31] urging Secretary Pompeo to halt the "worldwide release" of 3D-printable gun files, which "would allow any foreign or domestic persons, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively 'download' a gun." As Senator Menendez noted, the State Department's "temporary" deregulation "appears to evade statutory requirements and skirts an ongoing regulatory review process." Moreover, echoing AECA's statutory standards, Senator Menendez's letter pointed out that it was "hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States."

---

[28] *See, e.g.*, Ex. T; *see generally* Second Williams Decl. ¶ 4(1) & n.1.
[29] FDMSJ at 10 ("[D]ocuments . . . initially omitted from the administrative record . . . were not among the documents considered by the agency decision-maker.").
[30] Ex. U (CWASHAR0000413–14).
[31] Ex. V (WASHAR0003424-25). On July 23, 2018, five Senators sent a similar letter to then-Attorney General Jeff Sessions, urging dismay with the Department's settlement of the *Defense Distributed* suit. Ex. W.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007460

"This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks."

- Hundreds of individual emails[32] from Americans who were "deeply disturbed" by the State Department's decision to allow "blueprints . . . online [that] will be used by criminals and terrorists to easily and cheaply mass-manufacture all-plastic weapons that can defeat security checkpoints" and "are difficult if not impossible to trace";[33] who urged the Department to "[s]top the special exemption for downloading printable 3D guns" which "will, without a doubt, be used in illegal, violent activity";[34] and who were "begging [the Department] to use common sense" and prevent "individuals who can't pass background checks —terrorists, felons, and domestic abusers" from obtaining "functioning guns . . . on demand."[35]

- 105,555 emails received from visitors to Everytown.org in a single five-day period,[36] urging the Department to "stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers."

The Revised Second Supplementation also includes a breakdown of comments on the Commerce Department's companion NPRM. Of the roughly 3,000 comments received by the Department, 2,945—98%—opposed the rule.[37] It appears the State Department did not consider these comments, either.

**D.   No Final Rules Have Been Published**

As a further factual update, as of this filing, neither the State Department nor the Commerce Department has issued the final rules that they indicated would be forthcoming.[38]

### III.   ARGUMENT

The Federal Defendants mostly repeat arguments that the Court has already correctly rejected, pointing to nothing in the several-times-supplemented administrative record to support

---

[32] Dkt. # 184-12 at WASHAR0036607–37068.
[33] *Id.* at WASHAR0036611.
[34] *Id.* at WASHAR0036612.
[35] *Id.* at WASHAR0036621.
[36] *Id.* at WASHAR0037069–74. The States agreed that the 105,555 emails referenced in this "Summary of Duplicative Materials" could be incorporated into the administrative record by reference.
[37] Ex. X (WASHAR0000903–04).
[38] *See* SMSJ at 9; Dkt. # 131 (Fed. Defs' Mot. to Stay).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    their position, and otherwise offering no valid reason why they should prevail. The Court should

2    vacate the Temporary Modification and Letter and permanently enjoin any future attempt to

3    "temporarily" deregulate 3D-printable guns that bypasses congressional review and oversight.

4    **A.**    **The Plaintiff States Have Standing, as the Court Already Ruled**

5          The Court has already correctly ruled that the States have standing. The Federal

6    Defendants ask the Court to revisit that conclusion, but offer no new reason to do so: instead,

7    they rehash and incorporate meritless arguments made in opposing preliminary injunctive relief.

8    FDMSJ at 7–9 & n.3.[39] The Court should reject these recycled arguments and find that the States

9    have standing for the same reasons it did so previously. *See* Dkt. # 95 (Preliminary Injunction)

10    at 9–11.

11          The Federal Defendants argue that the States are not within the "zone of interests"

12    protected by AECA. FDMSJ at 7–9. This test, which "is not meant to be especially demanding,"

13    asks whether the plaintiff is "arguably within the zone of interests to be protected or regulated

14    by the statute" at issue. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

15    567 U.S. 209, 224–25 (2012) (citations and quotations omitted). Its purpose is to "exclude those

16    plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives."

17    *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987). Thus, "[t]he test forecloses suit only when

18    a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the

19    statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-*

20    *E-Be-Nash-She-Wish*, 567 U.S. at 225; *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155,

21    1166 n.5 (9th Cir. 2018) (same). The test is applied "in keeping with Congress's evident intent

22    when enacting the APA to make agency action presumptively reviewable," and requires no

23    "indication of congressional purpose to benefit" the plaintiff. *Match-E-Be-Nash-She-Wish*, 567

24

25

26

---

[39] *Compare* Dkt. # 64 (Fed. Defs' Opp. to Mot. for PI) at 16–18. To the extent the Federal Defendants incorporate their prior briefing on the motion for preliminary injunction by reference, the States likewise incorporate their own prior briefing. *See* Dkt. # 43 (Mot. for PI) at 9–10; Dkt. # 68 (Reply ISO Mot. for PI) at 11–12. The States' previous briefing also addresses the Private Defendants' already-rejected challenges to standing. *Compare* PDMSJ at 7–8 *with* Dkt. # 63 (Pvt. Defs' Opp. to Mot. for PI) at 12–13.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    U.S. at 225. Any doubts about zone-of-interests standing must be resolved in the plaintiff's favor.

2    *Id.* ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that

3    the benefit of any doubt goes to the plaintiff.").

4        The States easily satisfy this test: their significant safety and security interests are not

5    only consistent with, but fall *squarely within*, AECA's purpose of protecting "the security . . . of

6    the United States." 22 U.S.C. § 2778(a)(1); *see* FDMSJ at 8 (acknowledging that "national

7    security" is a "primary concern" of AECA). The States' domestic security concerns are part and

8    parcel of "national security." *See, e.g.*, *United States v. U.S. Dist. Court*, 407 U.S. 297, 321

9    (1972) (recognizing the "domestic aspects of national security"); *Hodges v. Abraham*, 253 F.

10   Supp. 2d 846, 868 (D.S.C. 2002) (federal government using "national" and "domestic" security

11   interchangeably). Because the States seek to "vindicate some of the same concerns that underlie"

12   AECA—namely, concerns about security and safety—their claims fall squarely "within the

13   statute's zone of interests." *Havasupai Tribe*, 906 F.3d at 1167.

14       Not only are the States' interests fully consistent with AECA's purpose, but this lawsuit

15   expressly seeks to enforce the statute's terms. In contrast to *Cheney* (FDMSJ at 8–9), in which

16   the State of Illinois challenged the validity of a statute governing the closure of military

17   installations in furtherance of interests "completely inconsistent" with that statute, the States here

18   do not seek to usurp any authority that properly "rests with Congress." *People ex rel. Hartigan*

19   *v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989). Rather, the States seek to *vindicate* the statute

20   and Congress's intent by challenging *ultra vires* executive actions that unlawfully bypassed the

21   statute's congressional notice requirement. This lawsuit furthers AECA's purposes in every

22   sense; it is the Federal Defendants, not the States, who sought to "frustrate" AECA by evading

23   congressional review and oversight of their deregulatory effort.

24   **B.    The Temporary Modification and Letter Are Contrary to Law**

25       **1.    The Temporary Modification and Letter violate AECA.**

26   As with standing, the Federal Defendants recycle their meritless argument that the State

PLAINTIFF STATES' COMBINED                           10            ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                            Complex Litigation Division
JUDGMENT AND OPP TO                                                      800 5th Avenue, Suite 2000
                                                                         Seattle, WA 98104-3188
DEFENDANTS' CROSS-MOTIONS                                                     (206) 474-7744
2:18-cv-01115-RSL

WASHSTATEB007463

1    Department did not violate AECA's congressional notice requirement because the subject files

2    are not "items," and can therefore be removed from the Munitions List without notice. FDMSJ

3    at 9. But as the Court has already correctly ruled, this argument conflates "category" with "item,"

4    contrary to the "language, structure, and purpose of the statute and implementing regulations[.]"

5    Dkt. # 95 at 14; *see also* Dkt. # 43 at 11–13; Dkt. # 68 at 4–5. Furthermore, the challenged actions

6    were not "only" a "temporary" modification, as asserted (FDMSJ at 9); rather, the Temporary

7    Modification was to "remain in effect while the final rule . . . is in development"—leapfrogging

8    the entire notice-and-comment rulemaking process. *See* Dkt. # 95 at 15 ("The temporary

9    modification was an effort to implement the removal immediately, without waiting for the rule

10   to become final and without giving Congress notice and an opportunity to exercise its oversight

11   role."). Moreover, as the Court has already found, even a "temporary" deregulation would allow

12   "immediate" distribution of the subject files and cause "irreparable" harms to the States. *Id.* at

13   13, 20–25. Public commenters (whom the State Department ignored) pointed this out as well.[40]

14   As for the Letter, it was not "temporary" even by its own terms, as it purported to approve the

15   subject files for "public release (i.e., unlimited distribution)" immediately and with no time

16   limitation.[41] The State Department's failure to comply with AECA's 30-day congressional notice

17   requirement before issuing the Temporary Modification and Letter, on its own, renders these

18   actions unlawful and requires that they be set aside. *See* SMSJ at 10–11.[42]

19          **2.      The Temporary Modification and Letter violate the Tenth Amendment.**

20          The Federal Defendants' litigation position that the Temporary Modification and Letter

21   do not "conflict[] with or otherwise preempt[]" state laws is belied by the text of those

22   documents, which on their face expressly authorize "any United States person" to "use" the

23

24          [40] *See, e.g.*, Ex. U (Rep. Eliot Ltr.) (modification of the Munitions List was not "temporary" because "as
     anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently

25   available to all who seek it").
            [41] Ex. J.

26          [42] The Private Defendants argue that Congress received notice after the fact. PDMSJ at 18. The Court has
     already correctly rejected this argument, ruling that *post hoc* notice does not satisfy AECA. Dkt. # 95 at 15.

PLAINTIFF STATES' COMBINED                    11              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                          Complex Litigation Division
JUDGMENT AND OPP TO                                                      800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                               Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                           (206) 474-7744

WASHSTATEB007464

1    subject files to 3D-print untraceable and undetectable weapons, and expressly authorize the

2    "unlimited distribution" of such files. SMSJ at 11–12; *cf. Price v. Stevedoring Serv. of Am., Inc.*,

3    697 F.3d 820, 830 (9th Cir. 2012) (no deference owed to agency's *post hoc* litigation position;

4    agency actions must be adjudged on the record). These federal authorizations are inconsistent

5    with, and on their face purport to preempt and undermine, state gun-safety laws that *restrict*

6    certain persons from possessing and manufacturing firearms and/or that regulate the distribution

7    of CAD files for 3D-printed firearms. SMSJ at 11–12. Such laws are concededly within the

8    police powers reserved to the States and protected by the Tenth Amendment. *Id.*; FDMSJ at 12.

9    That the Federal Defendants disavow any preemptive intent for litigation purposes is small

10   comfort given the plain language of the operative Temporary Modification and Letter.

11        The anti-commandeering cases on which the Federal Defendants rely (FDMSJ at 10–11)

12   confirm that the Tenth Amendment has the force of law and meaningfully protects states from

13   interference that exceeds the limits of the federal government's powers. Commandeering state

14   officials to enforce federal laws is by no means the only way in which the federal government

15   can violate the Tenth Amendment, and the Federal Defendants cite no support for that view.

16   Their authority is distinguishable, as this is not a case in which the federal government is merely

17   encouraging (but not coercing) states to implement federal programs, as in *Environmental

18   Defense Center, Inc. v. U.S. E.P.A.*, 344 F.3d 832 (9th Cir. 2003), *Printz v. United States*, 521

19   U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). Here, the State Department

20   is intruding into the States' sphere of authority by exercising a power it does not have—the

21   power to authorize any adult or child in the United States to access and "use" 3D-printable files

22   to produce illegal and dangerous weapons—in a way that deprives the States of their ability to

23   exercise their sovereign police powers and enforce their gun-safety laws. This federal usurpation

24   of state authority is unconstitutional.

25   **C.    The Temporary Modification and Letter Are Arbitrary and Capricious**

26        The States' Motion details *numerous* ways in which the Temporary Modification and

---

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    Letter are arbitrary and capricious as a matter of law. SMSJ at 12–20. This is substantiated by

2    the Revised Second Supplement, which reveals that the State Department's decision to

3    deregulate 3D-printable guns was made *solely* to settle a lawsuit, without any apparent

4    consideration for how the proliferation of undetectable, untraceable guns would affect "world

5    peace and the security and foreign policy of the United States." 22 U.S.C. § 2278(a)(1).

6        The Federal Defendants have little to say in response: they argue that the challenged

7    actions are lawful because (1) "the government had determined that small-caliber firearms" do

8    not provide a "critical military or intelligence advantage"; and (2) untraceable, undetectable, 3D-

9    printable firearms are no different than "small-caliber firearms generally" for purposes of export

10   regulation. FDMSJ at 9–10. These conclusory arguments are fatally flawed for several reasons.

11       First of all, the exclusive focus on "critical military or intelligence advantage" ignores

12   the "important aspect[s] of the problem" that the State Department "entirely failed to consider":

13   namely, the specific properties of 3D-printed guns and the unique threats they pose to world

14   peace, national security, and foreign policy. SMSJ at 15–18. The Federal Defendants do not

15   address these issues at all; this tacitly conceded failure to consider them alone renders the

16   Department's actions arbitrary and capricious. *See id*; *Motor Vehicle Mfrs. Ass'n of U.S. v. State*

17   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 1983) (agency must consider all "relevant factors,"

18   particularly those "Congress intended" the agency to consider); *Humane Soc'y of U.S. v. Zinke*,

19   865 F.3d 585, 606 (D.C. Cir. 2017) (failure to address record evidence on an "important aspect

20   of the problem" renders agency action arbitrary and capricious); *see also Jenkins v. Cty. of*

21   *Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (noting that a party "abandoned . . . claims by

22   not raising them in opposition to [a] . . . motion for summary judgment"). Furthermore, the Miller

23   Declaration confirms that the Department failed to consider or account for hundreds of public

24   comments that opposed the 2018 NPRMs *precisely* because they would deregulate 3D-printed

25   guns, and therefore threaten safety and security in the United States. The Department concededly

26   failed to consider these or the remainder of the 3,600 comments opposing the NPRMs, or the

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   desperate pleas of over 106,000 members of the public and Congress seeking to stop the

2   "temporary" deregulation in the final days before it was effectuated. The Department completely

3   failed to fulfill its obligation to "'consider and respond to significant comments received during

4   the period for public comment.'" *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1251

5   (9th Cir. 2018) (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)); *see also*

6   *Tesoro Alaska Petrol. Co. v. F.E.R.C.*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency

7   answers objections that on their face appear legitimate, its decision can hardly be said to be

8   reasoned.").

9        Second, merely reiterating the Department's conclusory "determin[ation]" (FDMSJ at 9)

10   is far from adequate: to survive judicial review, the Federal Defendants must show that the

11   determination was a *reasoned* one that is "logical and rational" and supported by the

12   administrative record. SMSJ at 12–15. Otherwise, judicial review would be meaningless, for an

13   agency would always be able to defend an irrational decision by stating the tautology that it

14   "determined" the decision was justified. *See id.* This is not what the APA prescribes. A reviewing

15   court's "'inquiry into the facts is to be searching and careful,'" *ASSE Int'l, Inc. v. Kerry*, 803

16   F.3d 1059, 1072 (9th Cir. 2015) (quoting *Overton Park v. Volpe,* 401 U.S. 402 at 416), and courts

17   "shall" invalidate arbitrary and capricious agency actions. 5 U.S.C. § 706. Here, the only asserted

18   basis for the State Department's "determination" is the 2018 NPRMs. FDMSJ at 9. That rationale

19   is circular: the NPRMs are *proposed* rules published at the beginning of the rulemaking process,

20   before the agencies received any public comments, and they do not even mention 3D-printed

21   guns. Yet the "temporary" modification purported to implement the NPRMs before the

22   rulemaking process was complete, and the State Department admittedly did not consider *any* of

23   the public comments. Remarkably, even as they ignore a mountain of comments and evidence

24   that contradict their position, the Federal Defendants point to *nothing* in the filed administrative

25   record that would support a determination that 3D-printable firearms somehow no longer pose

26   unique risks or that authorizing their publication on the internet poses no problems. Even after

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    multiple supplementations, the record contains no such support.

2         Third, the notion that 3D-printable guns are no different than "small-caliber firearms

3    generally" (FDMSJ at 10) cannot be credited because it lacks any support in the record. *See*

4    SMSJ at 12–13 (citing case law explaining that "the basis for the agency's decision must come

5    from the record"). In fact, although the Federal Defendants have repeatedly characterized the

6    Temporary Modification and Letter as an outgrowth of a decade-long export reform effort,[43] the

7    Revised Second Supplement confirms that the federal government did not consider 3D-printable

8    firearms or the export of CAD files via the domestic/international internet *at all* when it

9    developed the proposed rules. Specifically, in a news article circulated within the State

10   Department on May 24, 2018, the Commerce Department official who was leading the

11   development of those regulations as of 2012 stated that the NPRMs **"have literally absolutely**

12   **nothing to do with domestic gun control . . ."**[44] The Federal Defendants' *post hoc* litigation

13   position also contradicts thousands of public comments opposing the rules on the grounds that

14   they would deregulate 3D-printable firearms—comments that the Department admittedly did not

15   consider and failed to address.[45] Likewise, Department official Joshua M. Paul admitted that he

16   could not answer basic questions regarding how TSA or other law enforcement agencies would

17   deal with a proliferation of 3D-printed firearms because the State Department's consideration

18   "was/is limited to [its] role in controlling exports of tech data[.]"[46] Moreover, the Federal

19   Defendants' *post hoc* litigation position contradicts the Department's *own admissions*—both

20   before and after the *Defense Distributed* settlement, and in this litigation—that 3D-printable

21   firearms *do* pose unique security threats. *See* SMSJ at 14, 15–16, 17, 19–20. State Department

22   communications recently filed as part of the Revised Second Supplement make this strikingly

23   clear: on July 27, 2018, Paul stated that **"nothing changed on our side"** regarding the national

---

24      [43] FDMSJ at 5 n.1; Dkt. # 64 at 5 n.1; Dkt. # 131 at 1.
25      [44] Ex. Y (WASHAR0035627) (emphasis added).
        [45] Dkt. # 179-2 (Miller Decl.) ¶ 7; *see also* FDMSJ at 10 ("[D]ocuments . . . initially omitted from the
26   administrative record . . . were not among the documents considered by the agency decision-maker.").
        [46] Ex. R (WASHAR0000220).

PLAINTIFF STATES' COMBINED                     15              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                        Complex Litigation Division
JUDGMENT AND OPP TO                                                   800 5th Avenue, Suite 2000
                                                                      Seattle, WA 98104-3188
DEFENDANTS' CROSS-MOTIONS                                                 (206) 474-7744
2:18-cv-01115-RSL

1    security and foreign policy threats posed by 3D-printable firearms.[47]

2          Further, the idea that 3D-printed firearms may be regulated by "other agencies" (FDMSJ

3    at 10) does not make it rational for the State Department to unilaterally authorize functional CAD

4    files to be exported and published on the internet, allowing anyone in the world to download and

5    use them to create untraceable and undetectable weapons that could drastically threaten safety

6    and security. *See* Dkt. # 95 at 23 ("Promising to detect the undetectable while at the same time

7    removing a significant regulatory hurdle to the proliferation of these weapons—both

8    domestically and internationally—rings hollow and in no way ameliorates, much less avoids, the

9    harms that are likely to befall the States . . ."). Indeed, the State Department has privately

10   conceded that allowing for the distribution of 3D-printable guns will make it easy to evade the

11   Undetectable Firearms Act.[48]

12         A finding of pretext or bad faith is not necessary for the States to prevail on their claim

13   that the challenged actions are arbitrary and capricious. But the evidence that the Department's

14   stated rationale was pretextual is overwhelming; its shifting and inconsistent explanations are

15   well documented in the record. SMSJ at 7–8, 13–14, 18–20. The Revised Second Supplement—

16   which contains documents that were improperly withheld for over six months after the Federal

17   Defendants certified an incomplete administrative record—provides further evidence that the

18   real reason for the deregulation of 3D-printable firearms was a directive from the Department of

19   Justice, not a rational and evidence-based determination by the State Department. The Revised

20   Second Supplement reveals the State Department's understanding that **"nothing changed on

21   our side"** with respect to the national security implications of 3D-printable guns, and that the

22   reason for the *Defense Distributed* settlement was "fundamentally a DOJ question[.]"[49]

23         In sum, the Temporary Modification and Letter are both contrary to law and arbitrary

24   and capricious, and should be set aside. 5 U.S.C. § 706.

25   ――――――――――――――
         [47] Ex. Q.
26       [48] Ex. S (WASHAR0035889–90) (discussed *supra*, Part II.B).
         [49] Ex. Q.

PLAINTIFF STATES' COMBINED                    16          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                     Complex Litigation Division
JUDGMENT AND OPP TO                                               800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                          Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                     (206) 474-7744

**D.    Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief**

The Federal Defendants agree that vacatur is the appropriate remedy in the event the Court finds the Temporary Modification and Letter to be contrary to law and/or arbitrary and capricious. FDMSJ at 12. Remand *without* vacatur, as discussed in *National Association of Home Builders* (FDMSJ at 13), is inappropriate because this is not a case in which "clarification" would resolve the issues with the State Department's actions; rather, the Temporary Modification and Letter are fundamentally deficient because they are contrary to law and arbitrary and capricious, as discussed above. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 657–58 (2007) (courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but must vacate agency actions that violate the APA).

The Federal Defendants disagree that injunctive relief is warranted. FDMSJ at 12–15. But the States are not improperly seeking a "vague" or "sweeping injunction[] to obey the law," as the Federal Defendants suggest. *Id.* at 13. The States are seeking to prevent the same type of "temporary" deregulation with no warning as occurred in July 2018, which required the States to act swiftly to file this lawsuit and obtain emergency relief to prevent irreparable harm. Thus, this case in fact presents "temporal constraints" similar to those supporting the injunction in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019). FDMSJ at 14. The Federal Defendants appear to raise the possibility of addressing the States' concern by some means other than a permanent injunction, but have not proposed any such solution to the States or the Court. *See id.* (suggesting that "the Department should be permitted to address any concerns the Court might have without the need for an injunction," but making no proposal).

The Federal Defendants also argue that the *Winter* factors are not met. FDMSJ at 14–15. But their contention that the States' evidence of irreparable harm caused by the international and domestic availability of 3D-printed guns is somehow unrelated to the State Department's deregulation of 3D-printable gun files fails for the same reasons the Court has already articulated. The Court found that "Defendants' argument is so myopic and restrictive as to be unreasonable.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    Whatever defendants' statutory authority, the fact is that the internet is both domestic and

2    international. . . . Thus, the alleged failures to provide notice and to make a reasonable evaluation

3    of the risks and benefits of the proposed action not only impact national security but have

4    domestic repercussions as well." Dkt. # 95 at 10; *see also id.* at 20–24 (discussing likelihood of

5    irreparable harm and balance of hardships weighing in favor of the States and the public).

6        The Private Defendants, for their part, rely on Justice Thomas' concurring opinion in

7    *Trump v. Hawaii*, which every other justice declined to join, to argue against the concept of

8    nationwide injunctions generally. PDMSJ at 23–24 (citing *Trump v. Hawaii*, 138 S. Ct. 2392,

9    2424–29 (2018) (Thomas, J., concurring)). But injunctions against unlawful federal agency

10   actions are "commonplace in APA cases" and supported by an "uncontroverted line of

11   precedent." *E. Bay Sanctuary Covenant*, 909 F.3d at 1256; *see also New York*, 351 F. Supp. 3d

12   at 677 ("Because the Secretary's *decision* was universal, APA relief directed at that decision

13   may—indeed, arguably must—be too.") (citing 5 U.S.C. § 706(2) and *Califano v. Yamasaki*, 442

14   U.S. 682, 702 (1979)). The Private Defendants fail to explain how a less-than-nationwide

15   injunction—one that somehow prohibits the Federal Defendants from attempting another

16   unconstrained "temporary" deregulation of export-controlled items as to some areas of the

17   United States but not others—would even function. Practically speaking, such an injunction

18   would quickly become obsolete, because once files are posted on the internet from *any* location,

19   they can be accessed virtually anywhere. Moreover, an injunction without regard to location is

20   appropriate because *any* "temporary" modification of the Munitions List "would almost certainly

21   run afoul" of AECA. *New York*, 351 F. Supp. 3d at 678.

22   **E.    The Private Defendants' Arguments Do Not Require a Different Result**

23       The Private Defendants oppose summary judgment in the States' favor for a host of

24   meritless reasons: from an asserted lack of personal jurisdiction (which was waived long ago) to

25   novel constitutional theories that have little relevance to this case and have never been accepted

26   by any court. This Court has already rejected many of these theories, and should do so again.

PLAINTIFF STATES' COMBINED                    18          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                     Complex Litigation Division
JUDGMENT AND OPP TO                                              800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                          Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                     (206) 474-7744

1          **1.      The Private Defendants' jurisdictional arguments lack merit.**

2          The Private Defendants challenge both the Court's personal jurisdiction over them and

3   its subject matter jurisdiction over this case. PDMSJ at 4–12. Their challenge to personal

4   jurisdiction is waived because they failed to preserve it when they filed a motion under Rule 12.

5   *See* Fed. R. Civ. P. 12(h)(1)(A) (a party waives the defense of lack of personal jurisdiction by

6   "omitting it from a motion" under Rule 12). Plaintiffs' Rule 12(c) motion (Dkt. # 114) did not

7   assert any lack of personal jurisdiction, and their convoluted non-waiver theory misreads Rule

8   12(h)(1)(A) by conflating it with Rule 12(g)(2). *See* PDMSJ at 8 n.7. The Court may disregard

9   the Private Defendants' lengthy argument against personal jurisdiction (*id.* at 8–12), since they

10  have waived that defense. *See Schnabel v. Lui*, 302 F.3d 1023, 1034 (9th Cir. 2002) (declining

11  to examine personal jurisdiction over defendant that "waived any defense of lack of personal

12  jurisdiction . . . by failing to raise the defense in its first motion" under Rule 12). The Private

13  Defendants' objections to personal jurisdiction lack merit in any event. Defense Distributed's

14  website is not "passive" (PDMSJ at 9), but instead actively invites visitors to download CAD

15  files. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("If

16  the defendant enters into contracts with residents of a foreign jurisdiction that involve the

17  knowing and repeated transmission of computer files over the Internet, personal jurisdiction is

18  proper."). And the Private Defendants' contention that any downloads of Defense Distributed's

19  files are purely conjectural is patently inconsistent with their claims that the files have been

20  downloaded "millions" of times. *Compare* PDMSJ at 10–11 *with* PDMSJ at 2 n.2.

21         The Private Defendants' multi-pronged challenge to subject matter jurisdiction—which

22  the Federal Defendants notably have never joined—fails for the same reasons it failed

23  previously. *Compare* PDMSJ at 4–7 *with* Dkt. # 63 at 10–12 *and* Dkt. # 69 (Pvt. Defs' Notice of

24  Supp. Auth. re Tucker Act). Their assertion that executive actions under AECA are *never*

25

26

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEB007472

1   reviewable (PDMSJ at 4, 5–6) relies on the same inapposite case law they cited previously[50] and

2   ignores cases that *have* reviewed agency action under AECA. Dkt. # 68 at 12 & nn. 26–27. Their

3   observation that the *designation* of Munitions List items is not subject to judicial review under

4   22 U.S.C. § 2778(h) (PDMSJ at 4) has no applicability to the *removal* of items from the

5   Munitions List at issue here. *See* Dkt. # 68 at 12; Dkt. # 95 at 13 ("the temporary modification

6   . . . constitutes the *removal* of one or more items from the USML . . .") (emphasis added).[51] And

7   the Tucker Act (PDMSJ at 6–7) plainly doesn't apply to the *statutory* (not contractual) challenges

8   to agency action in this case. *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985);

9   *contra Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (Tucker

10  Act bars claims that are "contractually-based, not statutorily-based"). As the Private Defendants

11  have already acknowledged, this is not a contract case: "the [*Defense Distributed*] settlement

12  agreement is not this action's true subject and this action will neither assail nor protect the Private

13  Defendants' interest therein." Dkt. # 114 at 5; *see* Dkt. # 95 at 11–12 (this lawsuit is not a

14  "collateral attack" on the dismissal of the *Defense Distributed* lawsuit pursuant to the settlement

15  agreement).

16          **2.      The Private Defendants' constitutional theories do not preclude the Court
                      from setting aside unlawful agency actions.**

17

18          The Private Defendants argue that setting aside the unlawful agency actions at issue

19  would offend the First Amendment. PDMSJ at 19–23. This argument is doubly flawed because

20  (i) the First Amendment is inapposite to the merits of this APA case and (ii) the Private

21  Defendants' novel and expansive First Amendment theory fails on its merits.

22          (i)     *The First Amendment is irrelevant.*

23          It is a "simple but fundamental" rule of administrative law that the propriety of agency

24  ───────────────────────
         [50] *Corrie v. Caterpillar, Inc.* (PDMSJ at 6) is likewise inapposite, as it did not involve a challenge to agency

25  action, but was a private lawsuit against a supplier of equipment to the Israeli Defense Forces. 503 F.3d 974 (9th
    Cir. 2007). As *Corrie* itself cautions, "it is 'error to suppose that every case or controversy which touches foreign
    relations lies beyond judicial cognizance.'" *Id.* at 982 (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

26          [51] For the same reasons, their argument that the State Department's actions here are unreviewable under
    the APA (PDMSJ at 12) lack merit.

PLAINTIFF STATES' COMBINED                       20          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                         Complex Litigation Division
JUDGMENT AND OPP TO                                                    800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                               Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                          (206) 474-7744

1  action is judged "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S.

2  194, 196 (1947). Neither the court nor the other parties may "supply a reasoned basis . . . that

3  the agency itself has not given." *Id.* at 196. However emphatically the Private Defendants invoke

4  the First Amendment, the Federal Defendants have never asserted it as a basis for the Temporary

5  Modification or the Letter. To the contrary, they have consistently maintained—both in this case

6  and throughout the *Defense Distributed* proceedings in Texas—that the Department's regulation

7  of the subject files under ITAR never violated Defense Distributed's First Amendment rights.[52]

8  The Private Defendants may wish to inject the First Amendment into these proceedings, but the

9  Federal Defendants have never invoked it as a basis for the challenged actions. It therefore does

10  not bear on the legal merits of this APA case.

11      The Private Defendants' dogged efforts to be dismissed from this case at multiple stages

12  further undercuts any notion that their purported First Amendment rights are directly

13  implicated.[53] *See* PDMSJ at 4–12 (seeking dismissal on jurisdictional grounds); Dkt. # 114 at 4–

14  7 (seeking dismissal on the grounds that "The Private Defendants Have No Interest Protected By

15  this Action").[54] While the Private Defendants are wrong on the merits for the many reasons

16  discussed herein, they are right about one thing: they have "no interest" directly at issue in this

17  APA case.  The Private Defendants' issue, at bottom, is not with the States' challenge to unlawful

18  agency action, but with federal export regulation of the subject files. They challenged such

19  regulation by suing the regulator in the *Defense Distributed* case. The State Department prevailed

20  at every stage.  Then, the Private Defendants chose to settle in exchange for the State

21

22      [52] *See, e.g.*, Heidema Decl. (Dkt. # 64-1), ¶ 28.

23      [53] If, on the other hand, the Private Defendants are making constitutional arguments in the abstract, they
    lack standing to effectively seek to block judicial enforcement of AECA on such grounds. *See Hein v. Freedom
    From Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) ("The federal courts are not empowered to seek out and

24  strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit
    solely, to decide on the rights of individuals, and must refrain from passing upon the constitutionality of an act

25  unless obliged to do so . . . when the question is raised by a party whose interests entitle him to raise it." (internal
    citations and markings omitted)).

26      [54] The Court ruled that, contrary to the Private Defendants' disclaimer of interest, "their actions show
    otherwise." Dkt. # 130 (Order Denying 12(c) MTD) at 3.

PLAINTIFF STATES' COMBINED                          21                  ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                   Complex Litigation Division
JUDGMENT AND OPP TO                                                              800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                        Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                    (206) 474-7744

1   Department's agreement to deregulate 3D-printable firearm files—subject to the express caveat

2   that such deregulation would proceed only "to the extent authorized by law (including the

3   Administrative Procedure Act) . . ."[55] Now that the caveat is in play, the Private Defendants

4   renew their dubious constitutional arguments in this Court—curiously, even as they seek to

5   escape its jurisdiction. As the Private Defendants' own actions underscore, this lawsuit, with the

6   parties positioned as they are, is an improper place for a constitutional challenge.

7          (ii) *The First Amendment does not require the Court to uphold the unlawful deregulation*.

8          The Private Defendants' constitutional arguments are meritless in any event. First,

9   although the First Amendment's inapplicability to the subject files was briefed previously (*see*

10  Dkt. # 43 at 17–18; Dkt. # 47-1), the Private Defendants fail to point to *any* case in *any*

11  jurisdiction in which a court has *ever* held that click-and-print firearm files are "speech" entitled

12  to any level of constitutional protection. On the other hand, courts have held that computer files

13  that "induce action without the intercession of the mind or the will of the recipient"—as the

14  subject files do[56]—are not entitled to any level of constitutional protection. *CFTC v. Vartuli*, 228

15  F.3d 94, 111 (2d Cir. 2000) (no First Amendment protection for automatic stock trading system

16  that used language to operate "in an entirely mechanical way"; "The point was not to convey

17  information or to assert values," so "[n]one of the reasons for which speech is thought to require

18  protection above and beyond that accorded to non-speech behavior" were implicated) (brackets

19  and ellipses removed); *see generally* Dkt. # 47-1 (*Amicus* Br. of Everytown for Gun Safety) at

20  4–9 (extensively analyzing why the subject files "lack any expressive value for the First

21  Amendment to protect"). Notably, although the subject files themselves are not protectable

22  speech, the Private Defendants are not and have never been restricted in any way from speaking

23  *about* 3D-printed guns, including advocating for policy changes related to 3D-printed guns or

24  criticizing gun-safety laws that apply to the subject files.

25  _____

26      [55] Ex. C, ¶ 1(a).
        [56] *See* SMSJ at 22 & nn. 54–56.

PLAINTIFF STATES' COMBINED                    22            ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                               Complex Litigation Division
JUDGMENT AND OPP TO                                        800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                  Seattle, WA 98104-3188
2:18-cv-01115-RSL                                          (206) 474-7744

WASHSTATEB007475

1    Even if the Court were to find some merit in the Private Defendants' novel constitutional

2    theories, the Private Defendants fail to show that the Constitution precludes the relief requested

3    here. Again, the States merely ask the Court to set aside unlawful agency action, as required by

4    the APA. The Temporary Modification and Letter are procedurally defective in violation of

5    AECA's plain language, among other flaws. Preventing these unlawful agency actions from

6    taking effect does not permanently deprive the Private Defendants of any purported rights: it

7    simply requires the State Department to follow AECA's mandatory procedures and comply with

8    the APA if it wishes to remove 3D-printable firearm files from the Munitions List. Moreover,

9    federal law does not prohibit the Private Defendants from distributing the subject files in a

10   manner that does not involve export. Now as before, correcting the State Department's unlawful

11   power grab does not abrogate any rights of the Private Defendants. *See* Dkt. # 95 at 25.

12   The Private Defendants try to spin a constitutional argument from the alleged fact that

13   others are (illegally) distributing 3D-printable gun files via the internet. PDMSJ at 2–3, 23. But

14   even if others are violating federal law at their peril, that does not somehow create a violation of

15   the Private Defendants' First Amendment rights. *Cf. Wayte v. United States*, 470 U.S. 598 (1985)

16   (upholding conviction for failure to register for selective service against First Amendment and

17   Equal Protection challenges to government's "passive enforcement policy," under which it

18   prosecuted only those reported as having violated the law, generally the draft's most vocal

19   opponents). Nor does the widespread violation of federal law alleged—but not proven—by the

20   Private Defendants somehow justify the Federal Defendants' broad, unlawful deregulation (and

21   certainly the Federal Defendants do not make this argument). In short, the Private Defendants'

22   novel constitutional arguments do not provide a reasoned basis for the unlawful deregulation of

23   3D-printable guns via the Temporary Modification and Letter.

24       **3.    The Private Defendants' APA arguments do not explain, let alone justify, the
              Federal Defendants' abrupt regulatory about-face.**

25   Since 2013 (when the Federal Defendants apparently became aware of Defense

26

PLAINTIFF STATES' COMBINED                                 23                    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                         Complex Litigation Division
JUDGMENT AND OPP TO                                                                    800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                               Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                           (206) 474-7744

1   Distributed's 3D-printable gun files) until April 2018 (when the *Defense Distributed* case was

2   abruptly settled), the Federal Defendants consistently maintained their position that 3D-printable

3   gun files were and ought to be subject to regulation under AECA and ITAR. Dkt # 95 at 3–4;

4   *see also* Dkt. # 29 (FAC) ¶¶ 39–41 & Dkt. # 112 (Fed Defs' Answer) ¶¶ 39–41. As explained

5   above and in the States' Motion for Summary Judgment, the Federal Defendants have failed

6   adequately to explain their total regulatory about-face, failed to consider the specific dangers of

7   3D-printable gun files, and offered only pretextual rationales for their sudden reversal. *See S*MSJ

8   at 12–20. The Private Defendants fare no better in trying to defend the indefensible.

9        The Private Defendants' argument relies primarily on memoranda from the Department

10   of Justice discussing various potential limits of ITAR. PDMSJ at 14–16. As an initial matter, the

11   Federal Defendants have not purported to rely on any of these statements, so they cannot possibly

12   "supply a reasoned basis" for the Federal Defendants' decision. *Chenery Corp.*, 332 U.S. at 196.

13   Moreover, these general statements about the limits of ITAR do not contemplate the subject files,

14   which were not made public until late 2012,[57] and which are not protected speech, as discussed

15   above. The Private Defendants also try to rely on a "legal analysis . . . performed by Defense

16   Distributed's legal counsel" as evidence of the Federal Defendants' supposed basis for its

17   regulatory about-face. PDMSJ at 17. But obviously, the mere fact that the government's files

18   contained Defense Distributed's self-serving analysis does not prove the government based its

19   decision on that analysis, particularly where the government has never claimed to do so.

20                                **IV.    CONCLUSION**

21        For the reasons above and in their Motion for Summary Judgment, the States respectfully

22   request that the Court grant summary judgment in their favor, deny Defendants' motions for

23   summary judgment, and grant the States' requests for vacatur and a permanent injunction.

24

25        [57] The Private Defendants assert the Federal Defendants' initial action to regulate the files came in response to the devastating December 2012 murder of 26 people, mostly children, at Sandy Hook Elementary School. PDMSJ at 14. In fact, the timing was driven by when Defense Distributed posted its files online—December 2012, the same month as the Sandy Hook massacre. PDMSJ at 2 n.2; *see* Ex. A (Aguirre Decl.) ¶¶ 24–25 (DDTC initiated regulatory action "[a]s a result" of media reports that Defense Distributed had posted executable CAD files online).

26

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1      DATED this 24th day of May, 2019.

2

3                                        ROBERT W. FERGUSON
                                         Attorney General of Washington
4
                                         /s/ Jeffrey Rupert
5                                        JEFFREY RUPERT, WSBA #45037
                                         Division Chief
6                                        TODD BOWERS, WSBA #25274
                                         Deputy Attorney General
7                                        JEFFREY T. SPRUNG, WSBA #23607
                                         KRISTIN BENESKI, WSBA #45478
8                                        ZACHARY P. JONES, WSBA #44557
                                         Assistant Attorneys General
9                                        JeffreyR2@atg.wa.gov
10                                       ToddB@atg.wa.gov
                                         JeffS2@atg.wa.gov
11                                       KristinB1@atg.wa.gov
                                         ZachJ@atg.wa.gov
12                                       Attorneys for Plaintiff State of Washington
13

14                                       WILLIAM TONG
                                         Attorney General of Connecticut
15
                                         /s/ Maura Murphy Osborne
16                                       MAURA MURPHY OSBORNE, admitted pro
                                         hac vice
17                                       Assistant Attorney General
                                         Maura.MurphyOsborne@ct.gov
18                                       Attorneys for Plaintiff State of Connecticut
19

20                                       BRIAN E. FROSH
                                         Attorney General of Maryland
21
                                         /s/ Julia Doyle Bernhardt
22                                       JULIA DOYLE BERNHARDT, admitted pro
                                         hac vice
23                                       JEFFREY PAUL DUNLAP, admitted pro hac
                                         vice
24                                       Assistant Attorneys General
                                         JBernhardt@oag.state.md.us
25

26

PLAINTIFF STATES' COMBINED                    25          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                    Complex Litigation Division
JUDGMENT AND OPP TO                                             800 5th Avenue, Suite 2000
                                                                 Seattle, WA 98104-3188
DEFENDANTS' CROSS-MOTIONS                                            (206) 474-7744
2:18-cv-01115-RSL

WASHSTATEB007478

1     jdunlap@oag.state.md.us
2     *Attorneys for Plaintiff State of Maryland*

3     GURBIR GREWAL
4     Attorney General of New Jersey

5     */s/ Jeremy M. Feigenbaum*
       JEREMY M. FEIGENBAUM, *admitted pro hac*
6     *vice*
       Assistant Attorney General
7     Jeremy.Feigenbaum@njoag.gov
8     *Attorneys for Plaintiff State of New Jersey*

9     LETITIA JAMES
10    Attorney General of New York

11    */s/ Steven Wu*
       STEVEN WU, *admitted pro hac vice*
12    Deputy Solicitor General
13    Steven.Wu@ag.ny.gov
       *Attorneys for Plaintiff State of New York*
14

15    MAURA HEALEY
16    Attorney General of Commonwealth of
       Massachusetts
17    */s/ Jonathan B. Miller*
18    JONATHAN B. MILLER, *admitted pro hac*
       *vice*
19    Assistant Attorney General
       Jonathan.Miller@state.ma.us
20    *Attorneys for Plaintiff Commonwealth of*
21    *Massachusetts*

22    JOSH SHAPIRO
23    Attorney General of Commonwealth of
       Pennsylvania
24
25    */s/ Jonathan Scott Goldman*
       JONATHAN SCOTT GOLDMAN, *admitted*
26    *pro hac vice*

PLAINTIFF STATES' COMBINED           26         ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                   Complex Litigation Division
JUDGMENT AND OPP TO                         800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                     Seattle, WA 98104-3188
2:18-cv-01115-RSL                                 (206) 474-7744

1    Executive Deputy Attorney General
     MICHAEL J. FISCHER, *admitted pro hac vice*
2    Chief Deputy Attorney General
     JGoldman@attorneygeneral.gov
3    MFischer@attorneygeneral.gov
     *Attorneys for Plaintiff Commonwealth of*
4    *Pennsylvania*

5

6    KARL A. RACINE
     Attorney General for the District of Columbia
7

8    */s/ Robyn Bender*
     ROBYN BENDER, *admitted pro hac vice*
9    Deputy Attorney General
     JIMMY ROCK, *admitted pro hac vice*
10   Assistant Deputy Attorney General
     ANDREW J. SAINDON, *admitted pro hac vice*
11   Senior Assistant Attorney General
     Robyn.Bender@dc.gov
12   Jimmy.Rock@dc.gov
     Andy.Saindon@dc.gov
13   *Attorneys for Plaintiff District of Columbia*

14

15   ELLEN F. ROSENBLUM
     Attorney General of Oregon
16

17   */s/ Scott J. Kaplan*
     SCOTT J. KAPLAN, WSBA #49377
18   Senior Assistant Attorney General
     scott.kaplan@doj.state.or.us
19   *Attorneys for Plaintiff State of Oregon*

20

21   XAVIER BECERRA
     Attorney General of California
22

     */s/ Nelson R. Richards*
23   NELSON R. RICHARDS, *admitted pro hac
     vice*
24   Deputy Attorney General
     Nelson.Richards@doj.ca.gov
25   *Attorneys for Plaintiff State of California*

26

PLAINTIFF STATES' COMBINED            27        ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                         Complex Litigation Division
JUDGMENT AND OPP TO                                   800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                               Seattle, WA 98104-3188
2:18-cv-01115-RSL                                          (206) 474-7744

PHIL J. WEISER
Attorney General of Colorado

/s/ Matthew D. Grove
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
matt.grove@coag.gov
*Attorneys for Plaintiff State of Colorado*


KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Ilona M. Kirshon
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*


CLARE E. CONNORS
Attorney General of Hawaii

/s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*


KWAME RAOUL
Attorney General of Illinois

/s/ Elizabeth Roberson-Young
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
erobersonyoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Minnesota Attorney General's Office
Solicitor General's Division
jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Special Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*


THOMAS J. DONOVAN, JR.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   Attorney General of Vermont

2   */s/ Benjamin D. Battles*

3   BENJAMIN D. BATTLES, *admitted pro hac vice*

4   Solicitor General
    benjamin.battles@vermont.gov

5   *Attorneys for Plaintiff State of Vermont*

6

7   MARK R. HERRING
    Attorney General of the Commonwealth of

8   Virginia

9   */s/ Samuel T. Towell*

10  SAMUEL T. TOWELL, *admitted pro hac vice*
    Deputy Attorney General, Civil Litigation

11  STowell@oag.state.va.us

12  *Attorney for Plaintiff Commonwealth of Virginia*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, et al.,

    Plaintiffs,

             v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

    Defendants.

   )
   )
   )
   )
   )
   )
   )
   )
   )
   )
   )
   )

No. 2:18-cv-1115-RSL

**FEDERAL DEFENDANTS'
REPLY IN SUPPORT OF
MOTION FOR SUMMARY
JUDGMENT**

**NOTED FOR: June 7, 2019**

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEB007484

1
2

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT**

3
4
5
6

In their motion for summary judgment, the Federal Defendants explained that Plaintiffs lack standing to challenge the actions undertaken by the Department of State in connection with the Government's settlement with Defense Distributed, and that in any event Plaintiffs' claims under the Tenth Amendment and the Administrative Procedure Act ("APA") fail on the merits.

7
8
9
10
11

Federal Defs.' Consolidated Opp'n to Pls.' Mot. for Summ. J. & Cross-Mot. for Summ J., ECF No. 173 ("Fed. Defs.' MSJ"), at 7-12.  Plaintiffs' opposition brief, which raises the same points previously litigated in this case, does not compel a different conclusion.  Pls.' Combined Reply in Support of Mot. for Summ. J. & Opp'n to Defs.' Cross-Mots. for Summ. J., ECF No. 186 ("Pls.' Opp'n").

12
13
14
15
16
17

In light of the parties' extensive prior briefing and the Court's familiarity with the issues presented in this matter, the Federal Defendants incorporate the arguments previously advanced in their prior briefing.  The Federal Defendants acknowledge that the Court has rejected some of those arguments, but respectfully maintain their position and disagreement with the Court's earlier rulings.  For present purposes, the Federal Defendants emphasize only the following points.

18
19
20
21
22
23
24
25
26
27
28

First, Plaintiffs fail to establish that they fall within the zone of interests of the relevant provision of the Arms Export Control Act ("AECA").  Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing. Pls.' Opp'n at 10.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents. No authority supports such a sweeping proposition; to the contrary, "[t]he national security . . . is the primary responsibility and purpose of the Federal Government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting).  Moreover, Plaintiffs fail to address the legislative history regarding 22 U.S.C. § 2778(f)(1), which establishes that Congress enacted that provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation."  H.R. Rep. No. 97-58, at 21-22

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 1
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

1    (1981).  As Plaintiffs appear to agree that they neither exercise congressional oversight of the

2    Department of State nor function as would-be exporters—but instead raise purely domestic,

3    non-military concerns unrelated to foreign relations, Pls.' Opp'n at 10—their claims do not fall

4    within the zone of interests of the AECA, and they therefore lack standing to assert their claim.

5    *See* Fed. Defs.' MSJ at 8-10.

6            Second, Plaintiffs continue to contend that the Federal Defendants acted in "bad faith"

7    and have misrepresented or provided "pretext[ual]" justifications for the Government's

8    settlement with Defense Distributed.  Pls.' Opp'n at 16.  This argument is plainly meritless.

9    The mere fact that Plaintiffs "may disagree with the policy and process" is not "enough to

10   justify a claim of bad faith."  *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (Mem.), 202 L. Ed. 2d

11   306 (2018) (Gorsuch, J., concurring).  Nor do Plaintiffs' allegations of "inconsistent

12   explanations," Pls.' Opp'n at 16, suffice for the "strong showing" of "willful misconduct"

13   required to establish that an agency acted in bad faith.  *United States v. Iron Mountain Mines,

14   Inc.*, 987 F. Supp. 1250, 1260-61 (E.D. Cal. 1997) (quoting *Citizens to Preserve Overton Park,

15   Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).   Even if the Federal Defendants had made

16   "inconsistent" statements in representing that the challenged decision was made as part of a

17   court-initiated settlement process in litigation in the District Court of the Western District of

18   Texas (culminating in a June 29, 2018 settlement agreement), "[a] change of position is not

19   enough," as a legal matter, to meet the bad-faith standard.  *See Guidiville Rancheria of Cal. v.

20   United States*, 2013 WL 6571945 at *8 (N.D. Cal. Dec. 13, 2013).  Nor are public comments

21   received after this settlement agreement was reached, *see* Pls.' Opp'n at 13-14, indicative of

22   pretext or bad faith.  *Cf. Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001) ("An

23   agency is not required to consider issues and evidence in comments" received after its decision

24   has been made).[1]  In short, Plaintiffs' allegation of bad faith in either the settlement agreement

25   ───────────────
     [1] In making this argument, and elsewhere, Plaintiffs conflate the comments received regarding
26   the decision to enter into a settlement agreement with Defense Distributed (which Plaintiffs
     acknowledge was "temporary" in scope) and the comments received regarding the Notice of
27   Proposed Rulemaking, which sets forth plans for permanent changes in agency regulations.
     Even if Plaintiffs were correct—and the Federal Defendants respectfully maintain otherwise—
28   that the agency was required to provide notice or take into account public comments on the

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

or the compilation of the administrative record should be rejected as a matter of both fact and law.[2]

Third, Plaintiffs fault the Federal Defendants for failing to consider various comments contending that the Department of State should continue to regulate 3D-printed firearms.  Yet many of the comments were not addressing the temporary modification and letter challenged in this litigation, but rather a distinct notice of proposed rulemaking proposing to amend the United States Munitions List, 83 Fed. Reg. 24,198 (May 24, 2018).  *See* Pls.' Opp'n at 6-7 (citing comments on the proposed rule submitted by Professor Susan Waltz and the Brady Campaign to Prevent Gun Violence).  In addition, while Plaintiffs accuse the Federal Defendants of failing to consider certain comments specifically urging the Federal Defendants not to issue the temporary modification and letter, they neglect to mention that those comments were submitted after the Department of State executed the June 29, 2018 settlement agreement obligating it to take those steps.  *See* Pls.' Opp'n at 7 (citing comments from members of Congress, submitted on July 20 and 25, 2018); *id*. at 8 (citing "[h]undreds of individual emails," all of which were submitted in late July 2018); *id*. (citing "105,555 emails received from visitors to Everytown.org" between July 23 and July 27, 2018).  By the time these comments were received, the Department of State had already committed to issuing the temporary modification and letter.

Fourth and finally, Plaintiffs have failed to demonstrate that the Federal Defendants' actions conflict with the Tenth Amendment.  Notably, Plaintiffs offer no support for their vague theory that "the State Department is intruding into the States' sphere of authority by exercising a power it does not have."  Pls.' Opp'n at 12.  The fact remains that "there is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program.

---

temporary modification, any comments the agency received regarding the NPRM would not be relevant to a finding of pretext or bad faith.

[2] Plaintiffs also acknowledge that their argument regarding "pretext or bad faith is not necessary" if the Court continues to reject, as it has previously, the Federal Defendants' arguments that the agency's rationale was adequate.  Pls.' Opp'n at 16; *see* Fed. Defs.' MSJ at 9-10 (explaining that the Federal Defendants maintain the decision was proper, but acknowledging that the Court previously concluded otherwise).

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007487

1   Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of

2   federal statutes regulating private individuals."  *See City of Tombstone v. United States*, No. 11-

3   cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015).  Nor can Plaintiffs salvage

4   their argument by mischaracterizing the Government's actions undertaken in connection with

5   the settlement agreement as a "*post hoc* litigation position."  Pls.' Opp'n at 12.  As the Federal

6   Defendants have previously explained, Fed. Defs.' MSJ at 11, the Government has never

7   suggested that the settlement agreement conflicts with or otherwise preempts any state laws,

8   but rather was undertaken only pursuant to its authority to regulate the United States' system of

9   export controls, not domestic activity, *see Def. Distributed v. U.S. Dep't of State*, 121 F. Supp.

10   3d 680, 695 (N.D. Text. 2015).  *See also* Prelim. Inj., ECF No. 95, at 16 ("The federal

11   defendants also recognize the continuing viability of state law gun control measures.").

12       For the foregoing reasons, the Court should deny Plaintiffs' motion for summary

13   judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in

14   favor of the Federal Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEB007488

1    Dated:  June 7, 2019                    Respectfully submitted,

2

3                                        JOSEPH H. HUNT
Assistant Attorney General

4                                        JOHN R. GRIFFITHS
Director, Federal Programs Branch

5

6                                        ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

7

8                                        */s/ Stuart J. Robinson*
STUART J. ROBINSON

9                                        STEVEN A. MYERS
ERIC J. SOSKIN

10                                     Trial Attorneys
U.S. Department of Justice

11                                    Civil Division, Federal Programs Branch
450 Golden Gate Ave.

12                                   San Francisco, CA 94102
(415) 436-6635 (telephone)

13                                 (415) 436-6632 (facsimile)

14                                 stuart.j.robinson@usdoj.gov

15                                 *Attorneys for Federal Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on June 7, 2019, I electronically filed the foregoing reply using the

3

Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5

Dated: June 7, 2019                                    /s/ Stuart J. Robinson

6                                                      Stuart J. Robinson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

UNCLASSIFIED

**Readout:  Cats I-III Roundtable with NGOs/Advocacy Organizations**
**Thursday, December 12, 2019**

As part of the Cats I-III rollout plan, PM/CPA organized an off-the-record roundtable discussion with NGOs/advocacy organizations concerned about the proposed changes.  Acting DAS Mike Miller led the engagement, which included representatives from the Departments of State, Commerce and Defense (DTSA).  Topics included identifying and halting problematic firearms exports, pre and post end use monitoring, human rights concerns, and public transparency.

**Participants**

**USG**
A/DAS Mike Miller, PM/DDTC, State
Sarah Heidema, Director, PM/DTCP, State
Douglas R. Hassebrock, Acting Assistant Secretary for Export Enforcement, Commerce
Timothy Mooney, Senior Export Policy Analyst, Commerce
Steven Clagett, Director of the Nuclear and Missile Technology Controls Division, Commerce
Michael Laychak, Deputy Director, DTSA
Tracy Minnifield, Director of Licensing, DTSA

**NGOs/Advocacy Organizations**
Amnesty International USA
Arms Control Association
American Bar Association
Transparency International Defence and Security
Brady Campaign
Stimson Center

**Key Points:  NGOs/Advocacy Groups**

Identifying and Halting Problematic Firearms Exports
- NGOs are concerned about the misuse of items by intended users.
- Many mercenaries are still operating globally and are looking for opportunities.
- NGOs are glad to see DTSA is involved but are still concerned about the loss of the Department of State's tools in the licensing process.
- Concern exists about the government possessing limited pre-end use intelligence on potential bad actors; planning from INR on patterns of misuse could be used to focus enforcement efforts.
- NGOs would like to see a DIA assessment on diversion of licensed AR15s.
- NGOs questioned why the changes are being proposed now.  "What has changed?  We sat around the same table three years ago having the same conversation.  It wasn't the right time then, so what has changed to make it the right time now?"
- NGOs view the proposed changes as a "de-control" of potentially very lethal items.
- "This is different than every other USML category and it translates into:  The U.S. wants to sell more guns."

UNCLASSIFIED

Pre and Post End Use Monitoring
- Concern that following the transfer to Commerce not enough focus will be placed on pre-end use monitoring.
- Concern that Commerce does not possess as much intelligence as State regarding potential bad actors.
- Concern that Commerce's lack of a registration process will result in limited data on foreign affiliates.
- Concern about limited reporting on end use monitoring and that a reduction in registration fees will result in less resources available to provide oversight.
- NGOs request a more robust report from Commerce focused on the end use monitoring of firearms.

Public Transparency
- Public transparency regarding firearms sales will be reduced.  Commerce isn't mandated to complete similar reporting as State or Congressional Notifications—though reporting by international organizations will continue.
- NGOs use defense trade reports to help identify arms trafficking trends and networks—and are hamstrung without them.
- NGOs recommended establishing a plan to assess the impact of the transfer one year after implementation; and to also wait a year to identify registration trends as companies might continue to register with State during the transition period.

Senator Menendez's Hold
- NGO's expressed concern that not all of Senator Menendez's hold concerns have been fully addressed.
- Understanding exists that Senator Menendez will place another hold, but this information has not been made public.

Human Rights
- There are consequences and impact with regards to diversion and human rights abuses.
- The feeling is that this is a step in the wrong direction.
- It is alarming that the United States has withdrawn from the ATT.
- This drives a lot of the civil society groups' concerns.

**Key Points:  State, Commerce and Defense (DTSA)**

**State** noted Senator Menendez's initial letter and that many of the concerns have been addressed. (Also, briefings have been held, amendments made, etc.)  State commented that the Hill is encouraged to see the Department's reaction on 3-D printing concerns and on diminished Congressional oversight.  They also noted that Congress hasn't legislated oversight for these types of transfers for Commerce but could do so if they deem it necessary.  State agreed that systems evolve, and actors are looking for loopholes.  "There's always room for improvement, and we want your input."  In response to the GAO report recommendation earlier this year, State confirmed they are in the process of sharing the Watchlist with Commerce (and Commerce will share with State).  "The paperwork has been signed and State is now working on the first data

UNCLASSIFIED

transfer to Commerce, to make sure it's working.  State is trying to make changes in areas where people have identified things could be done better."

**Commerce** provided specific updates and clarification on changes in the recently notified text (compared to the original) and reassured that appropriate oversight would continue.  Moving Categories I-III is part of an ongoing effort to rationalize export controls and group "like" products.  They underscored that it is their Export Enforcement Office's job to make sure laws are enforced.  "No one wants anything bad to happen."  They reaffirmed licensing officers can take information from all sources.  The bona fides for applicants are checked, and the data is kept forever.  Each person applying for a license is given a unique number and information is collected and added.  Anyone can provide information.  The Watchlist includes derogatory data, and Commerce has a robust monitoring program.  The Commerce "Entity List" serves as a powerful deterrent for any potential bad actors, as once an applicant is placed on the list, they can suffer significant economic consequences.  With regards to more robust end use monitoring reporting, Commerce indicated they were open to it and would bring the idea back to look at it further.

**DTSA** stressed that they are not talking about opening loopholes.  They explained that a level playing field exists between the Departments, and there is a licensing requirement and policy review.  "There are multiple sources of information used in the clearance process and we reserve the right to ask more questions as needed."  They noted that there may be even more law enforcement analysis.   DTSA said they are very interested in hearing where the system of export review has failed and where a diversion has happened.  "We want this information.  If you are aware of gaps or diversions, let us know."

UNCLASSIFIED

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons.  Congressional oversight must be retained.

2)  Proliferation of 3D Gun Printing Technical Information
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests.  The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally.  This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law.  Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950.  3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily.  Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control.  Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

REC1|APPROVE|1-3-2019
REC2|APPROVE|1-3-2019



201837662
**United States Department of State**

*Washington, D.C. 20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                December 18, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:        PM – Marik String, Senior Bureau Official

SUBJECT:     (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
             Control Act, of the Removal of Certain Items from the U.S. Munitions List.

BLUF:        (SBU) PM seeks to notify Congress of removals from the United States Munitions
             List (USML) as part of the on-going effort to ensure the USML includes only
             items that merit the most stringent export control. Notification will consist of an
             informal 30 calendar-day period initiated by the PM/DTCP Office Director,
             followed by a 30 calendar-day period formally notified by H.

**Recommendations**
(SBU) That you:
   (1) Approve the PM/DTCP Office Director to electronically transmit to House Foreign
       Affairs and Senate Foreign Relations Committees the draft attached letters to initiate
       informal notification of a removal from the USML, pursuant to the Department's
       arrangement with the Congress. (Approve/Disapprove by 12/19/18)

   (2) Approve H, upon notice from PM/DTCP that the informal period initiated in paragraph
       (1) is concluded, to transmit the signed copies of the attached letters to the Congress in
       order to provide formal notification, as required by Section 38(f)(1) of the Arms Export
       Control Act, of the State Department's intent to remove certain items from the USML
       that no longer warrant control under this Act. (Approve/Disapprove by 12/19/18)

**Background**
(U) Since 2009, the Department has been engaged in an effort to review the U.S. export control
system and revise the USML into a "positive" list that describes controlled items using objective
criteria, rather than broad, open-ended, subjective, or design intent-based criteria. As part of this
effort, items determined to no longer warrant control on the USML are being transferred to the
Department of Commerce's Commerce Control List (CCL). Those non-objective criteria are
still found in three of the 21 categories of the USML, the only remaining tranche of USML
reforms that have been delayed for years due to political sensitivities surrounding firearms.

(U) After consultation with the Departments of Defense and Commerce, solicitation and review
of public comments, and interagency review, the Department of State has drafted a final rule to
revise the three USML Categories that have yet to be reformed: I (firearms and related articles),
II (guns and armaments), and III (ammunition and ordnance). Through this review, the

Department identified and will continue to control on the USML those items that provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML.  The result of the review is that certain items currently on the USML not meeting this standard will transition to the CCL.  This reform has also been a key element of the President's Conventional Arms Transfer Policy Implementation Plan. ███████████████████████████████████████
███████

(U) The items that will transition to the CCL include: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic to a fully automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces.  Section 38(f)(1) of the Arms Export Control Act provides that the President may not remove items from the USML until 30 days after the date on which notice of the proposed removal is provided to the House Committee on Foreign Affairs and the Senate Foreign Relations Committee.

(SBU) Pursuant to a process communicated to Congress in 2011, the Department provides the draft final rules and a summary of the resulting removals to the Committees for a 30-day informal review period.  Congress has not attempted to stop or slow down previous removals from the USML through the Congressional notification process, unlike the Congressional holds that are commonly placed on arms sale notifications.  However, a Member could request that State not proceed with the formal notification or publication of this rule removing items from the USML. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

(SBU) Our oversight committees were previously briefed on the proposed State and Commerce rules to revise USML Categories I-III and move certain items to the CCL, and additional briefings will be offered upon the start of informal Congressional Notification of the rule change. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ The Department continues to defend a legal challenge to the public release of technical data to enable 3-D printing of firearms and has sought a stay of the litigation, pending completion of this rulemaking process.  This rule would transition certain technical data, including the data for semi-automatic and non-automatic firearms, to the CCL, where it can be publically released without authorization under Commerce rules.  The lawsuit and the movement of firearms and ammunition from the USML to the CCL have generated substantial public and congressional interest, which may result in additional scrutiny of this notification.

(U) 

(U) Once these items are removed from the USML, they will be controlled by the Department of Commerce in new Export Control Classification Numbers (ECCNs) on the CCL in the Export Administration Regulations (EAR). Most of the physical items that are removed, including all of the firearms (with the exception of firearms manufactured prior to 1898), will have a world-wide Commerce Department license requirement, and the State Department will continue to review all export license applications for firearms for policy concerns.

(U) One defense article to be removed from the USML is designated as Major Defense Equipment (which requires separate notification and higher scrutiny under the ITAR), the M855A1 cartridge, the lead-free replacement for the 5.56x45 mm NATO, M855 standard ball cartridge. Therefore, the notification package will include a table delineating the proposed controls of Major Defense Equipment.

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML. The President delegated this authority to the Secretary of State in Executive Order 13637. This authority may be exercised by the Undersecretary of State for Arms Control and International Security Affairs pursuant to Delegation of Authority 293-2.

Attachments:
      Tab 1: Notification Letters to the Congress
      Tab 2: Revised USML Categories I, II, and III
      Tab 3: Line-in/Line-out Comparison of Current USML Categories I, II, and III with
            these USML Categories as Revised;
      Tab 4: Revised Department of Commerce Companion Control Text;
      Tab 5: Summary of Revisions to USML Categories I, II, and III; and
      Tab 6: Proposed Controls for Major Defense Equipment in Category III
      Tab 7: Roll-Out Plan

SENSITIVE BUT UNCLASSIFIED

Approved:      PM – Marik String, SBO        MS

Drafted:       PM/DTCP:  Rob Monjay, ext. 3-2817 and cell: ███████

Clearances:

| | | |
|---|---|---|
| | D | Jamie Shufflebarger – OK |
| | P | Jamie Gusack – OK |
| | S/P | Michael Urena – OK |
| | PM/DDTC | Michael Miller – OK |
| | PM/DTCP | Sarah Heidema – OK |
| | PM/DTCC | Jae Shin – OK |
| | PM/DTCL | Catherine Hamilton – OK |
| | PM/DTCM | Anthony Dearth – OK |
| | L/PM | Shana Rogers – OK |
| | L/M | Alice Kottmyer – OK |
| | PM/CPA | Dave McKeeby – OK |
| | ISN/CATR | Thomas Kruger – OK |
| | T | Ed Abisellan – OK |
| | H | Collin Christopherson – OK |

201821361



**MAURA HEALEY**
ATTORNEY GENERAL

# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

(617) 727-2200
www.mass.gov/ago

July 30, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C. Street, N.W.
Washington, D.C. 20520

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Secretary Pompeo and Attorney General Sessions:

We, the undersigned Attorneys General, write to express our serious concern about the Department of State's settlement with Defense Distributed and the proposed rules (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) published by the Department of State and the Department of Commerce to amend the International Trafficking in Arms Regulations. As the Chief Law Enforcement Officers of our states, we believe the settlement terms and proposed rules are deeply dangerous and could have an unprecedented impact on public safety. In addition to helping arm terrorists and transnational criminals, the settlement and proposed rules would provide another path to gun ownership for people who are prohibited by federal and state law from possessing firearms. Federal courts have recognized the danger of allowing these guns to be publicly available on the Internet, and this Administration has abruptly disregarded those rulings. We urge you to withdraw from the settlement and withdraw the proposed rules immediately, and allow full and fair consideration of any future proposed rules on these issues.

We believe the settlement and proposed rules will facilitate violations of federal and state laws, and will make Americans less safe from both domestic and international threats. For example, individuals who access the files posted by Defense Distributed (and similar files posted by others in the future) and use those files will be circumventing laws that regulate the manufacture, sale, transfer, possession, and export of firearms. The Arms Export Control Act requires the federal government to reduce the international trade in, and lessen the burden of,

arms abroad. Domestically, many of our states have carefully crafted regulatory regimes geared at preventing gun violence and protecting public safety. The Department of State's abrupt change in position seriously undermines the efficacy of those laws and creates an imminent risk to public safety.

As a result of the Department of State's settlement with Defense Distributed, terrorists, criminals, and individuals seeking to do harm would have unfettered access to print and manufacture dangerous firearms. Some of these weapons may even be undetectable by magnetometers in places like airports and government buildings and untraceable by law enforcement. Illegal trafficking of these guns across state and national borders could also increase, and self-made, unregistered, and untraceable firearms could easily wind up in the hands of (or simply be produced directly by) dangerous individuals.

The proposed rules would also transfer oversight of certain weapons and ammunition – which have long been considered "military grade" and are currently on the United States Munitions List – from the Department of State to the Department of Commerce. The settlement and proposed rules would facilitate the upload of files and other information sufficient to build unsafe and untraceable guns to the Internet. There would be unrestricted access, domestically and abroad, to large amounts of technical data that had previously been regulated to promote serious national security interests.

We agree with the argument that the Department of Justice and Department of State asserted for years in the lawsuit brought by Defense Distributed, before this abrupt reversal: that the release of these computer files of firearms would threaten national security and put our residents in danger.[1] For example, the Department of Justice wrote in its brief to the Fifth Circuit Court of Appeals, "[t]he computer data files at issue here, if made publicly available without restriction, would allow anyone with a 3-D printer (or related device) to create, at the touch of a button, parts and components for an operational firearm that is untraceable and undetectable by metal detectors. Because such printers are readily available, allowing the distribution of the computer files at issue here is tantamount to permitting the dissemination of firearms themselves."[2] The settlement and the related proposed rules are inconsistent with the government's longstanding position and recklessly disregard public safety and security.

These rules, if finalized, and the settlement, if implemented, set a precedent that would endanger the lives of civilians, law enforcement, and members of the armed forces at home and abroad. We urge you to withdraw from the settlement immediately. The status quo – which currently ensures public safety and national security by prohibiting publication of firearm design

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. April 6, 2018).

[2] Brief for Federal Appellees, 2016 WL 614088, Case No. 15-50759, at *7 (5th Cir. 2016). In the same brief, the Department of Justice also wrote "[t]he availability of such firearms to foreign nationals, particularly if...attributable to the United States, could raise significant foreign policy and national security concerns...." *Id.* at *1. The Department of Justice additionally asserted, "[i]f such a firearm were produced and 'then used to commit an act of terrorism, piracy, assassination, or other serious crime,' the United States could be held accountable, causing 'serious and long-lasting harm to the foreign policy and national security interests of the United States.'" *Id.* at *23 (quoting Aguirre Decl. ¶ 35(a) [ROA.571).

2

WASHSTATEB007713

files on the Internet – should be maintained.  Any rulemaking on these issues should not be tied to a specific settlement agreement and should be subject to full and fair rulemaking proceedings, so that all stakeholders may provide input into the rules in the interest of public safety.

Sincerely,

Maura Healey
Attorney General of Massachusetts

Xavier Becerra
Attorney General of California

Cynthia Coffman
Attorney General of Colorado

George Jepsen
Attorney General of Connecticut

Matthew P. Denn
Attorney General of Delaware

Karl A. Racine
Attorney General of the District of Columbia

Russell A. Suzuki
Attorney General of Hawaii

Lisa M. Madigan
Attorney General of Illinois

Thomas J. Miller
Attorney General of Iowa

Janet T. Mills
Attorney General of Maine

Brian E. Frosh
Attorney General of Maryland

Lori Swanson
Attorney General of Minnesota

3

Gurbir S. Grewal
Attorney General of New Jersey

Hector Balderas
Attorney General of New Mexico

Barbara D. Underwood
Attorney General of New York

Ellen Rosenblum
Attorney General of Oregon

Josh Shapiro
Attorney General of Pennsylvania

Peter F. Kilmartin
Attorney General of Rhode Island

Thomas J. Donovan, Jr.
Attorney General of Vermont

Mark R. Herring
Attorney General of Virginia

Bob Ferguson
Attorney General of Washington

4

201821260
**United States Department of State**

*Washington, D.C.   20520*

SENSITIVE BUT UNCLASSIFIED                    July 27, 2018

☐ Read by _____

**INFORMATION MEMO FOR THE SECRETARY**

**FROM:**      PM – Tina Kaidanow

**SUBJECT:**  (SBU) Executing Settlement Terms for *Defense Distributed* Litigation

**BLUF:**      (SBU) On June 29, 2018 the Department entered into a settlement agreement,
               concluded today, in the matter of *Defense Distributed, et al. v. Dep't of State* that
               allows the posting on the Internet certain files that facilitate the 3D-printing of
               specific firearms and related components.

(SBU) Defense Distributed (DD) is a Texas-based nonprofit corporation that makes available via
the internet computer-aided design (CAD) files for the three-dimensional printing of firearms
and related components.  In May 2013, PM's Directorate of Defense Trade Controls (DDTC)
sent a letter to DD stating that certain files it had posted on the internet appeared to be defense
articles controlled pursuant to the International Traffic in Arms Regulations (ITAR) and
requesting that DD remove the files from the Internet and submit a commodity jurisdiction (CJ)
request to DDTC.  DD complied with the letter, and DDTC concluded in the CJ that some, but
not all, of the files were subject to the ITAR because they conveyed information required to
produce defense articles described in Category I of the ITAR's U.S. Munitions List (USML).

(SBU) In September 2014, DD submitted requests to the DoD's Defense Office of
Prepublication and Security Review (DOPSR) to request approval for public release of the
ITAR-controlled files pursuant to ITAR § 125.4(b)(13).  DOPSR stated that review of the CAD
files was beyond its purview, and DD approached DDTC regarding public release.  However,
before DDTC responded, DD sued the Department, claiming that the Department had subjected
DD's free speech rights to an unconstitutional prior restraint by preventing it from posting files
on the internet.  DD failed to obtain a preliminary injunction.  When the case was remanded for
proceedings on the merits, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

(U) ███████████████████████████████████████████████████, the settlement's
proposed release of the files is consistent with the national security and foreign policy review
that underpinned a recent State Department notice of proposed rulemaking, which if finalized
would move many nonautomatic firearms and associated parts, components, accessories, and
technical data, including the technical data that is the subject of this case, from the USML to the

Commerce Department's export licensing jurisdiction.  The Department of Commerce does not restrict the release of privately-generated information into the public domain.  The Department expects the final rule to be published near the end of 2018.

(U) Given these factors, on June 29, 2018 the parties reached a settlement agreement that placed three substantive obligations on the Department:

1. To pursue publication in the Federal Register of a final rule revising USML Category I that excludes specified technical data at issue in the DD litigation;
2. To issue via a DDTC website announcement a temporary modification to USML Category I that excludes enumerated technical data at issue in the litigation pursuant to ITAR § 126.2; and
3. To issue a letter to DD that, consistent with ITAR § 125.4(b)(13), advises that the State Department is a cognizant U.S. government agency with authority to approve technical data for public release and grants approval for the technical data enumerated in the letter to be released into the public domain.

(SBU) The settlement agreement requires the Department to take the second and third actions by Friday, July 27.  Three organizations that pursue gun control filed court documents on July 25, 2018, seeking a temporary restraining order (TRO) prohibiting the Department's compliance with the settlement.  During a hearing on July 26, DOJ represented that the Department will not take the second or third actions before the court rules on the TRO.  The court denied the TRO late Friday afternoon, and there is therefore no legal obstacle to implementing the settlement today.

(U) This settlement is controversial in certain Congressional and public spheres, due in large part to its intersection with the debate over domestic access to firearms, even though the ITAR does not control domestic access by U.S. persons to firearms or technical data.  Some House and Senate Minority Members expressed concerns that the Department exceeded its authorities though this settlement, claiming the settlement utilized a temporary mechanism to achieve a permanent solution, and that Congress was not notified of the removal of the files in question from the USML.  State does not agree with this view of the legislative requirements.  We understand that congressional staff are exploring legislative solutions to prevent the authorized public release of DD's information.  Majority Members have not expressed this degree of concern and have indicated support for the proposed removal from the USML of many firearms and related items.

(U) At your recent hearing, Senators Menendez and Markey raised this matter, and the Department received letters from Senators Menendez and Engel that are critical of the settlement, while Judiciary Committee Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.  Opposition to the Department's decision to settle has spread beyond Washington, as evidenced by statements from the Manhattan and Los Angeles District Attorneys, a Washington Post op-ed by the Maricopa County, AZ, sheriff, and advocacy efforts by a number of nongovernmental organizations (including an online petition that has achieved 40,000 signatures this week).  This attention has driven over 50,000 emails and 5,000 phone calls to the Directorate of Defense Controls over the previous week.

<u>SENSITIVE BUT UNCLASSIFIED</u>
-3-

<u>Attachment</u>:
      Tab 1 - *Defense Distributed* Settlement Agreement
      Tab 2 – Letters from Sens. Markey and Menendez
      Tab 3 – Letter from PM to Defense Distributed

Approved:     PM:  Tina Kaidanow, Acting (TK)

Drafted:       PM/DTCP – Rob Hart, ext. 6-9221, cell ██████████

Cleared:

| | | |
|---|---|---|
| PM/FO: | Lee Litzenberger | ok |
| PM/DDTC: | Mike Miller | ok |
| PM/DTCP: | Sarah Heidema | ok |
| PM/DTCC: | Jae Shin | ok |
| PM/DTCL: | Terry Davis | ok |
| PM/CPA: | Joshua Paul | ok |
| D: | Jamie Shufflebarger | ok |
| P: | Sunil Ravi | ok |
| S/P: | Michael Urena | ok |
| H: | Tamara Darrach | ok |
| T: | Eduardo Abisellan | ok |
| L/FO: | Josh Dorosin | ok |

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

STATE OF WASHINGTON, et al.,

11

Plaintiffs,

v.

12

UNITED STATES DEPARTMENT OF
STATE, et al.,

13

Defendants.

14

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:18-cv-1115-RSL

**FEDERAL DEFENDANTS'
BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**NOTED FOR:** August 21, 2018

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007724

**INTRODUCTION**

1

2       The manufacture or possession of plastic guns that are undetectable is a serious federal

3   crime, punishable by up to five years in prison.  Among other statutes, the Undetectable

4   Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable

5   firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces

6   that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor

7   the prohibition itself is affected in any way by the actions challenged in this case.

8       This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to

9   manufacture their own small-caliber firearms.  Rather, this case concerns the Department of

10  State's delegated authority to control the export of defense articles and services, or technical

11  data related thereto, that raise military or intelligence concerns.  The Department is tasked with

12  determining what technology and weaponry provides a critical military or intelligence

13  advantage such that it should not be shipped without restriction from the United States to other

14  countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could

15  be used to threaten U.S. national security, foreign policy, or international peace and stability.

16  Domestic activities that do not involve providing access to foreign persons, by contrast, are left

17  to other federal agencies—and the states—to regulate.

18      In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the

19  fundamental limit on the State Department's authority.  According to Plaintiffs, the

20  Government's export-related determinations—specifically with respect to the export of

21  technical data developed by Defense Distributed—have jeopardized their ability to protect the

22  safety and health of their residents.  But the domestic harms about which Plaintiffs are

23  allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs'

24  allegations of harm are not reasonably attributable to the Department's regulation of exports,

25  but rather focus on the possibility that third parties will commit violations of the Undetectable

26  Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have

27  failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   merits of their claims, or that it is in the public interest for the Court to second-guess the

2   national security determinations of the Executive Branch.

3          Accordingly, Plaintiffs' motion should be denied.

4                                    **BACKGROUND**

5   **I.      Statutory And Regulatory Background**

6          The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the

7   President, "[i]n furtherance of world peace and the security and foreign policy of the United

8   States" to "control the *import* and the *export* of defense articles and defense services" and to

9   promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24         The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007726

1    "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2    subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3    § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4    in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5        In certain cases where it is unclear whether a particular item is a defense article or

6    defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7    a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8    applicants with a determination as to whether the item, service, or data is within the scope of

9    the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10   process, evaluating whether the item, service, or data is covered by the USML, provides the

11   equivalent performance capabilities of a defense article on the USML, or has a critical military

12   or intelligence advantage.  *See id.* § 120.4(d).

13       While the AECA and ITAR do not provide the State Department with authority to

14   prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15   statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16   manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17   § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18   113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19   States must generally be capable of being detected by metal detectors and by x-ray machines.

20   *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21   challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22   by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23   (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24   *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25   these laws in order to address domestic safety issues related to undetectable firearms.  The

26   Department's determination under the ITAR at issue here will not affect those enforcement

27   efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007727

**II.       The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization. *See id.* Defense Distributed removed the technical data and submitted a CJ request. *Id.* The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. *Id.* at 701. For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment. *Id.* at 691-92. Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits. *Id.* at 695.

The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights. *Id.* at 458-59. The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court. *See id.* at 456-58. A dissent from the panel opinion did address the merits. *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court. In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint. *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92. Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)   Defendants' commitment to draft and to fully pursue, to the extent
      authorized by law (including the Administrative Procedure Act), the
      publication in the Federal Register of a notice of proposed rulemaking and
      final rule, revising USML Category I to exclude the technical data that is
      the subject of the Action.[1]

(b)   Defendants' announcement, while the above-referenced final rule is in
      development, of a temporary modification, consistent with the . . . (ITAR),
      22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
      is the subject of the Action. The announcement will appear on the DDTC
      website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra.* At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued. *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically"). Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013). By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1
2
3
4

(c)      Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

5
6
7
8

(d)      Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

9       The parties executed the agreement on June 29, 2018, and the Government complied

10   with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.")

11   ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated

12   Plaintiffs' constitutional rights.  *See id.* ¶ 28.

13   **III.      The Government's Proposed Rulemaking**

14       On May 24, 2018—after the initial exchange of settlement offers but more than one

15   month prior to the settlement with Defense Distributed—the Departments of State and

16   Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the

17   technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

18   Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the

19   ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns

20   and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely

21   the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at

22   24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would

23   no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the

24   Department of State would be required for their export.

25       The Commerce NPRM explains both the rationale for the proposed transfer as well as

26   the review process undertaken by the Government.  As it explained, the process included a

27   "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007730

1   of State and Commerce in preparing the amendments." 83 Fed. Reg. at 24,166. The review

2   was intended to ensure that items remaining on the USML are either "inherently military or

3   otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4   applications, possess parameters or characteristics that provide a critical military or intelligence

5   advantage to the United States, and are almost exclusively available from the United States."

6   *Id.* Put simply, the goal was to ensure that items remaining on the USML in the categories in

7   question, and therefore subject to export controls under the ITAR, are military weapons and

8   related items that could present a critical military or intelligence advantage.

9   **IV.    Procedural History**

10          On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11   the Secretary of State, DDTC, and Defense Distributed. Compl., ECF No. 1. Plaintiffs alleged

12   that the Government's settlement with Defense Distributed adversely affected their public

13   safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14   Amendment to the U.S. Constitution. *Id.* at 21-41. Also on July 30, 2018, Plaintiffs moved for

15   a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16   granted on July 31, 2018, Dkt. No. 23 ("Order").

17          In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18   "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19   will have many of the negative impacts on a state level that the federal government once feared

20   on the international stage." Order at 7. Further, the Court determined that Plaintiffs were

21   likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22   to entering into the settlement agreement, the Government either provided 30-day notice to

23   Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24   Defense pursuant to Executive Order 13637. *Id.* at 6.

25          The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26   order." *Id.* at 6 n.2. The Court based this determination on the "clear and reasonable fear"

27   expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   between domestic and international audiences." *Id.* Finally, the Court found that "the balance

2   of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7. Consequently, the

3   Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

4   of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

5   Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

6   July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

7   modification had not occurred and the letter had not been issued." *Id.* The Court did not enjoin

8   Defense Distributed in any manner. *Id.*

9       Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

10  moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot."). As agreed

11  to by the parties, the TRO remains in effect until August 28, 2018. *See* Order, Dkt. No. 30.

12                                  **ARGUMENT**

13      "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

14  be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

15  *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). A plaintiff "must

16  establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

17  the absence of preliminary relief, that the balance of equities tips in his favor, and that an

18  injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19  1046, 1052 (9th Cir. 2009) (citation omitted). Alternatively, "'serious questions going to the

20  merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

21  a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

22  irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

23  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

24  967-68 (9th Cir. 2011). Plaintiffs bear the burden of demonstrating that each of these four

25  factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

26      Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

27  by the Government pursuant to its obligations under the settlement agreement. *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007732

1    at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2    not to "maintain the status quo" pending litigation, but to place themselves in a better position

3    than they were in before the onset of the current controversy through an award of "the exact

4    same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5    (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6    preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7    978 (9th Cir. 1992).[3]

8

9    **I.    Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.**

10        A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12   U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13   relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14   *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15   *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16        Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17   settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18   claim that the settlement agreement "will make it significantly easier to produce undetectable,

19   untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20   employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21   and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22   items at issue in this motion fall well short of irreparable harm.

23        First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24   lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25   unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27        [3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2    irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3    regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4    will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5    and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6    fundamental misconception of the relevant law and the authority of the Department as the

7    federal agency that administers it.  The AECA and ITAR have not conferred upon the

8    Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9    articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27      [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not
     only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007734

1    occur, it will be because individuals have violated separate domestic prohibitions, such as the

2    Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3           For this reason, the types of harms that Plaintiffs identify do not support the granting of

4    injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5    might result from the domestic availability of 3D-printed guns in the United States, but such

6    concerns have little to do with whether particular files should be regulated for foreign export on

7    national security grounds.  Their relation to the State Department's exercise of authority and

8    the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9    questionable "age, mental health, or criminal history" may procure the necessary equipment,

10   download files made specifically available as a result of the Department's settlement, assemble

11   an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12   violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13   files at issue for their availability to U.S. persons in the United States, and it is speculative to

14   claim that these domestic consequences would follow from the Department of State's actions

15   under the ITAR.

16          Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17   printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18   shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19   3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20   purports to permit the domestic production of undetectable firearms.  Such production is illegal

21   due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22          Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23   enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24   bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25   would result from a decision by the Department of State not to regulate the export of the

26

27   ───────────
     confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
     Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Defense Distributed's files for national security reasons.

2            Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13           At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

21
22           [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
     F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23   Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
     petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24   appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
     interests." *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25   arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
     Collection Act] to help prevent [serious] injuries." *Id.*  Here, by contrast, the Department's settlement has not
26   prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
     There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
27   After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
     the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
     gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007736

1    remain unaffected by the challenged actions.

2            Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3    be available," in which case temporary relief is unavailable. *Sampson v. Murray*, 415 U.S. 61,

4    90 (1974). Plaintiffs retain the full authority to enforce their public safety laws, including

5    lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6    And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7    firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8    sufficient metal to be detectable, remain in force. These laws—which, unlike the AECA and

9    ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10   basis.

11   **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12           Although their Amended Complaint asserts claims under both the APA and the Tenth

13   Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14   only their APA claims, Pls.' Mot. at 10-19. As to either category of claims, Plaintiffs have

15   failed to establish that "the law and the facts clearly favor" their position, as required under the

16   heightened mandatory injunction standard. *See Stanley*, 13 F.3d at 1320.

17           **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18           "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19   'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20   'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21   *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). Standing,

22   "which is built on separation-of-powers principles, serves to prevent the judicial process from

23   being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568

24   U.S. 398, 408 (2013). The "irreducible constitutional minimum of standing" has three

25   elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26   challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-
2  61 (1992).

3           Plaintiffs claim they satisfy the requirements of Article III standing because the
4  Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.
5  Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.
6  First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their
7  "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect
8  their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor
9  the challenged settlement agreement, prevents states from acting to enforce their own laws or
10 protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are
11 "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504
12 U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized
13 safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of
14 the States' own employees and residents [] are caused by the Government's sudden decision to
15 deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments
16 are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the
17 settlement of Defense Distributed's claims.  As the Government has previously explained, it
18 regulates the transfer of items constituting exports and temporary imports pursuant to the
19 AECA and ITAR, and it has no authority to regulate the transmission of technical data
20 exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22       [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel
23 [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.
24       [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged
25 procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the
26 'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest
27 protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007738

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695. Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7          Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns. It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1). Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15         Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests. Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18. According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates." Pls' Mot. at 8. As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae. Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26         [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    imminent and concrete and would not be prevented by domestic laws regulating undetectable

2    firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3    injury to its proprietary interest is "subject to the same law of standing as any other party in

4    federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5    (supporting allegations of proprietary injury by identifying individuals prevented from

6    attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7    *sub. nom*, *Golden v. Washington*, 138 S. Ct. 448 (2017).

8            Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9    doctrine of *parens patriae*.  *See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae*.  *See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III.'" (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26           **B.      Plaintiffs Lack Prudential Standing.**

27           Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007740

1  'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2  Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3  876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4  interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5  regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6  *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7  examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8  which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9  "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10  related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11  assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12  *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13      Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14  particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15  154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16  particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17  against the national security threat created by the unrestricted flow of military information

18  abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19  *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20  to control the import and export of defense articles and defense services in 'furtherance of

21  world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22  § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23  to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24  exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25  _____

26  [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing. *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27  no authority to support such a position. *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007741

1   President may not remove any item from the Munitions List until 30 days after the date on

2   which the President has provided notice of the proposed removal to" certain congressional

3   committees.  As the legislative history makes clear, Congress enacted this provision in response

4   to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5   export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6   exercise congressional oversight of the Department nor function as would-be exporters, and

7   whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8   interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9   (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

      **C.**      **Plaintiffs' APA Claims Are Meritless.**

            **1.**      **The Department's Actions Accord With Its Delegated Authority.**

14  Plaintiffs cannot establish likely success on the merits of any of their claims. First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007742

1    Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a

2    compendium of specific controlled items,' rather it is a 'series of categories describing the

3    kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711

4    F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any

5    "item" of the USML.  The Department's settlement regarding the files at issue in *Defense*

6    *Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

7           To the extent the Court finds the AECA's reference to "item" or "remove" to be

8    ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore*

9    deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is

10   "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the

11   validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox*

12   *Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting

13   *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))).  The Department has consistently

14   held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories

15   or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl.

16   ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the

17   original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to

18   remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the

19   executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has

20   been aware of the Department's interpretation and yet has not addressed it in amendments to

21   the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These

22   circumstances provide further evidence—if more is needed—that Congress intended the

23   Agency's interpretation, or at least understood the interpretation as statutorily permissible."

24   *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220

25   (2002)).

26          To the extent the Court concludes that notice to Congress was required under 22 U.S.C.

27   § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007743

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3         Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16        Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007744

1    preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2    concurrence specific as to subject files).

3         The Court should also reject Plaintiffs' argument that the Department, in settling

4    *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5    Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239.  Specifically, Plaintiffs claim that the temporary

6    modification, which "permits any United States person" to use the subject files, "conflicts with

7    many of the States' respective laws regulating firearms," as well as provisions of the Gun

8    Control Act, 18 U.S.C. § 922(g), (x).  Pls.' Mot. at 14.  Yet the Government does not suggest,

9    and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10   such laws.  To the contrary, the Department has consistently emphasized that its actions are

11   taken only pursuant to its authority to regulate the United States' system of export controls, not

12   domestic activity.  *See Def. Distributed*, 121 F. Supp. 3d at 695.  The provisions of the Gun

13   Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14   Congress in the Gun Control Act.  *See* 18 U.S.C. § 927.  Thus, the laws invoked by Plaintiffs

15   remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16   understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17              **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18        Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19   because they constitute an unexplained reversal of the agency's prior position concerning

20   whether the subject files are ITAR controlled.  *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21   Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22   decision to enter into a settlement to resolve that litigation, such decisions are committed to

23   agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2).  *See*

24   *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26        [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to circumvent the law, Pls.' Mot. at 14; *see also id.* at 4 (suggesting the Government settled "covert[ly]").  *United*

27   *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017) ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2    authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3    judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4    2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5    cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6    authority," such claims are reviewable).[11]

7          Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8    control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9    Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10   Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11   1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12   explains that the "review was focused on identifying the types of articles that are now

13   controlled on the USML that are either (i) inherently military and otherwise warrant control on

14   the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15   or characteristics that provide a critical military or intelligence advantage to the United States,

16   and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17   the scope of the items described in this proposed rule is essentially commercial items widely

18   available in retail outlets and less sensitive military items.").  This case is only about the

19   determination of the Government that the technical data at issue would not give a military or

20   intelligence advantage and is therefore not properly subject to export controls.  Only those

21   weapons of a type that is inherently military or that is not otherwise widely available for

22   commercial sale are properly subject to such controls.  The Government has not made any

23   determination that 3D-printed guns should not be regulated domestically, and indeed the

24   Government intends to apply those authorities that regulate such firearms and supports

25

26        [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal
     authority.  As explained in the balance of this memorandum, that is not accurate.

27        [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release
     "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger
     rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007746

1    Plaintiffs' efforts to do so as well.

2

3    **III.   The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4            Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16           Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                  **CONCLUSION**

23           For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                          Respectfully submitted,

25
                                                      CHAD A. READLER
26                                                    Acting Assistant Attorney General

27                                                    ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007747

Acting United States Attorney

KERRY KEEFE
Civil Chief

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB007748

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018                              */s/ Steven A. Myers*
                                                    Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

EXHIBIT 1

WASHSTATEB007750

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.    I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department"). I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles. I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security. My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.    I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.    The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services. The items so designated shall constitute the "United States Munitions List"

(USML). *Id.* The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML. The items enumerated on the USML are those that "provide a critical military or

intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously.  At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories.  If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

3

8.      The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.      The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

<center>4</center>

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria.  The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change.  The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions.  At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4.  The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce.  The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information.  The CJ process typically takes 45-55 business days.  If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

WASHSTATEB007755

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.      The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.      ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided:  "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1.  ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case.  Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage.  In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018).  This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB007757

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report

on further internal national security assessments. The iterative process generates rules for

publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and

export of defense articles and services is a foreign affairs function of the U.S. government, and

that rules implementing this function are exempt from sections 553 (rulemaking) and 554

(adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The

Department, nevertheless, accepted public comment through a notice of proposed rulemaking

prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final

rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault

weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the

interagency review process described above, in which the Department coordinated principally

with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the

Department determined that certain items now controlled by USML Categories I-III do not

provide the United States with a critical military or intelligence advantage, and therefore do not

warrant control on the USML. This decision was informed by DoD's assessment that the items

proposed for transfer are already commonly available and not inherently for military end-use,

such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an

example, a specific make and model meeting the description of this subparagraph is the Beretta

M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the

United States, and has been licensed by the Department for export to commercial retailers and

militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.　　The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.　　As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.　　The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.　　The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files available for download during the pendency of the *Defense Distributed* litigation. Any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data; the Department has no jurisdiction over sharing technical data between U.S. persons in the United States, unless such sharing also provides access to foreign persons.

27.    The parties entered into a settlement agreement on June 29, 2018, a true and correct copy of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)    [D]raft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

> (b)    [Announce], while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

> (c)    [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

28.    The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

WASHSTATEB007763

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.    *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.    *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHSTATEB007769

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

<center>5</center>

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEB007772

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018

_Matthew A. Goldstein_
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_ , 2018

_Eric J. Soskin_
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

NO DISCERNIBLE CLASSIFICATION

## Heifferon, Christina M

| | |
|---|---|
| **From:** | Abisellan, Eduardo |
| **Sent:** | Tuesday, August 7, 2018 12:13 PM |
| **To:** | Thompson, Andrea L |
| **Cc:** | Tucker, Maureen E; Brechwald, Matthew J (T) |
| **Subject:** | IM to S 3 D printing |
| **Attachments:** | IM to S- Update on 3D Printing (V2).docx |

Ma'am,

Draft IM to S providing update on the Defense Distributed case.

Recommend approval.

Vr/Ed

------------------------------------------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------------------

☐ Read by _____

## INFORMATION MEMO FOR THE SECRETARY

███████     █████████████████████████████

███████     █████████████████████████████

██████     ████████████████████████████████████
           ███████████████████████████████████
           ████████████████████████████

████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

██████████████████████████████████████████████
███████████████████████████████████████████████

**NO DISCERNIBLE CLASSIFICATION**



**Official - SBU**
**UNCLASSIFIED**

## Heifferon, Christina M

| | |
|---|---|
| **From:** | Tucker, Maureen E |
| **Sent:** | Tuesday, August 6, 2019 8:08 AM |
| **To:** | Thompson, Andrea L |
| **Cc:** | Abisellan, Eduardo; Brechwald, Matthew J (T) |
| **Subject:** | FW: USML Cats I-III Rule |

Fysa.

**Official - SBU**
**UNCLASSIFIED**

**From:** Kovar, Jeffrey D
**Sent:** Monday, August 05, 2019 6:59 PM
**To:** Monjay, Robert; Miller, Michael F; Windecker, Melissa A; Hart, Robert L; Koelling, Richard W; Tucker, Maureen E; Khawam, Joseph N; Darrach, Tamara A; Paul, Joshua M; Hamilton, Catherine E; Davis, Terry L; Kottmyer, Alice M; Minarich, Christine M
**Subject:** RE: USML Cats I-III Rule

Rob — ███████████████████████████████████
███████████████████████████ - Jeff

Sensitive
This email is UNCLASSIFIED.

**From:** Monjay, Robert
**Sent:** Monday, August 05, 2019 6:13 PM
**To:** Miller, Michael F; Windecker, Melissa A; Hart, Robert L; Koelling, Richard W; Tucker, Maureen E; Khawam, Joseph N; Kovar, Jeffrey D; Darrach, Tamara A; Paul, Joshua M; Hamilton, Catherine E; Davis, Terry L; Kottmyer, Alice M
**Subject:** USML Cats I-III Rule

All,

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████

Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*
*JWICS: RMonjay@state.ic.gov*

**Official - SBU**
**UNCLASSIFIED**