**From:**          Monjay, Robert
**Sent:**          Thu, 2 Aug 2018 20:43:23 -0400
**To:**            Rogers, Shana A
**Subject:**       Paragraph re comments


With respect to the proposed rule (83 FR 24198) setting out potential revisions to categories I, II and III of the United States Munitions List, the public comment period closed on July 9, 2018.  The Department received over 3,500 public comments, many of which addressed the issues related to the public release of computer aided design files for firearms used in additive manufacturing (also know as 3-D printers) and computer numerical control (CNC) machines.  The Department is reviewing these public comments and will respond to all of them in any final rule in this rulemaking.


*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Email: MonjayR@state.gov*

████████████████████████
████████████████████

**Official**
**UNCLASSIFIED**

**From:**          Rogers, Shana A
**Sent:**          Fri, 3 Aug 2018 12:34:54 -0400
**To:**            Davidson-Hood, Simon;Heidema, Sarah J
**Subject:**       FW: Paragraph re comments

Sensitive
This email is UNCLASSIFIED.

From: Monjay, Robert
Sent: Thursday, August 02, 2018 8:43 PM
To: Rogers, Shana A
Subject: Paragraph re comments

        With respect to the proposed rule (83 FR 24198) setting out potential revisions to categories I, II and III of the United States Munitions List, the public comment period closed on July 9, 2018.  The Department received over 3,500 public comments, many of which addressed the issues related to the public release of computer aided design files for firearms used in additive manufacturing (also know as 3-D printers) and computer numerical control (CNC) machines.  The Department is reviewing these public comments and will respond to all of them in any final rule in this rulemaking.

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Email: MonjayR@state.gov*

███████████████████

**Official**
**UNCLASSIFIED**

**From:** Davidson-Hood, Simon
**Sent:** Fri, 3 Aug 2018 12:56:23 -0400
**To:** Rogers, Shana A
**Subject:** RE: Paragraph re comments

Hi Shana,

That I have as it was in the body of the AG letter.  My error.  I thought we were referring to something else.

Best,
SDH

**Official**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 03, 2018 12:35 PM
To: Davidson-Hood, Simon; Heidema, Sarah J
Subject: FW: Paragraph re comments

Sensitive
This email is UNCLASSIFIED.

From: Monjay, Robert
Sent: Thursday, August 02, 2018 8:43 PM
To: Rogers, Shana A
Subject: Paragraph re comments

With respect to the proposed rule (83 FR 24198) setting out potential revisions to categories I, II and III of the United States Munitions List, the public comment period closed on July 9, 2018.  The Department received over 3,500 public comments, many of which addressed the issues related to the public release of computer aided design files for firearms used in additive manufacturing (also know as 3-D printers) and computer numerical control (CNC) machines.  The Department is reviewing these public comments and will respond to all of them in any final rule in this rulemaking.

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*

*Phone: 202.663.2817*
*Email: MonjayR@state.gov*

**Official**
<span style="color:green">**UNCLASSIFIED**</span>

| | |
|---|---|
| **From:** | Davidson-Hood, Simon |
| **Sent:** | Mon, 6 Aug 2018 13:40:19 -0400 |
| **To:** | Hart, Robert L |
| **Subject:** | IM to S |
| **Attachments:** | IM to S- Update on 3D Printing.docx |

Hi Rob,

Here you go.

Best,
SDH
**Official - SBU**
**UNCLASSIFIED**

**From:**         Hart, Robert L
**Sent:**         Mon, 6 Aug 2018 13:49:30 -0400
**To:**           Davidson-Hood, Simon
**Subject:**      RE: IM to S
**Attachments:**  IM to S- Update on 3D Printing RLH.docx

Thanks, just a few things in the attached, only one of them really requires more than 5 seconds of attention (reaching back to Dave for a little more info)

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Monday, August 06, 2018 1:40 PM
To: Hart, Robert L
Subject: IM to S

Hi Rob,

Here you go.

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

**From:**           Davidson-Hood, Simon
**Sent:**           Mon, 6 Aug 2018 16:02:01 -0400
**To:**             PM-Staffers Mailbox
**Cc:**             Hart, Robert L
**Subject:**        RE: New PM Tasker: Update on 3D Printing
**Attachments:**    IM to S- Update on 3D Printing.docx


Hi Alicia,

Here's the draft, minus comment from CPA/H on the letter (you'll see).

Best,
SDH


**Official - SBU**
**UNCLASSIFIED**

---

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.

Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found here.

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**

UNCLASSIFIED

| | |
|---|---|
| **From:** | PM-Staffers Mailbox |
| **Sent:** | Mon, 6 Aug 2018 16:29:34 -0400 |
| **To:** | Kaidanow, Tina S |
| **Cc:** | PM-Staffers Mailbox;Carter, Rachel;Litzenberger, Earle D |
| **Subject:** | For Preclearance: Update on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |

Ambassador,

DTDTC's IM to S providing an update on the 3D printing issues is attached for your pre-clearance.

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Monday, August 06, 2018 4:02 PM
To: PM-Staffers Mailbox
Cc: Hart, Robert L
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Alicia,

Here's the draft, minus comment from CPA/H on the letter (you'll see).

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.

WASHSTATEB008039

Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found here.

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Litzenberger, Earle D |
| **Sent:** | Mon, 6 Aug 2018 16:43:03 -0400 |
| **To:** | Kaidanow, Tina S |
| **Cc:** | Carter, Rachel;PM-Staffers Mailbox |
| **Subject:** | IM to S- Update on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |

I made a few suggestions and edits to fix some glitches.

**Official - SBU**

**UNCLASSIFIED**

**From:**            PM-Staffers Mailbox
**Sent:**            Mon, 6 Aug 2018 17:19:54 -0400
**To:**              Davidson-Hood, Simon;PM-Staffers Mailbox
**Cc:**              Hart, Robert L;Carter, Rachel
**Subject:**         RE: New PM Tasker: Update on 3D Printing
**Attachments:**     IM to S- Update on 3D Printing.docx

Hi Simon,

FO edits tracked and attached.

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Monday, August 06, 2018 4:02 PM
To: PM-Staffers Mailbox
Cc: Hart, Robert L
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Alicia,

Here's the draft, minus comment from CPA/H on the letter (you'll see).

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.

Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found [here](#).

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
[PM/FO SharePoint](#)
X76604


**Official - SBU**
**UNCLASSIFIED**

**From:**       Davidson-Hood, Simon
**Sent:**       Tue, 7 Aug 2018 10:39:08 -0400
**To:**         Hart, Robert L
**Subject:**    FW: New PM Tasker: Update on 3D Printing
**Attachments:** IM to S- Update on 3D Printing.docx

Hi Rob,

I accepted the edits from Tina and made two changes (in track changes).

Once you're content, I'll get this into clearance.

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 5:20 PM
To: Davidson-Hood, Simon; PM-Staffers Mailbox
Cc: Hart, Robert L; Carter, Rachel
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Simon,

FO edits tracked and attached.

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Monday, August 06, 2018 4:02 PM
To: PM-Staffers Mailbox
Cc: Hart, Robert L
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Alicia,

Here's the draft, minus comment from CPA/H on the letter (you'll see).

Best,
SDH


**Official - SBU**
**UNCLASSIFIED**

---

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.


Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found here.

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**
**UNCLASSIFIED**

**From:**          Davidson-Hood, Simon
**Sent:**          Tue, 7 Aug 2018 11:12:56 -0400
**To:**            Abisellan, Eduardo;PM-CPA-DL;Sundlof, Meredith E;Rogers, Shana A;Negrea,
Dan;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A
**Cc:**            Hart, Robert L;Loucks, Alicia N
**Subject:**       CLEARANCE: IM to S
**Attachments:**   IM to S- Update on 3D Printing (V2).docx

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

**From:**            McKeeby, David I
**Sent:**            Tue, 7 Aug 2018 12:00:59 -0400
**To:**              Davidson-Hood, Simon;Abisellan, Eduardo;PM-CPA-DL;Sundlof, Meredith
E;Rogers, Shana A;Negrea, Dan;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A;Fabry, Steven F
**Cc:**              Hart, Robert L;Loucks, Alicia N
**Subject:**         RE: CLEARANCE: IM to S
**Attachments:**     IM to S- Update on 3D Printing (V2).docx


Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

---

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S


+ Steve Fabry


**Official**
**UNCLASSIFIED**

---

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S


Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

WASHSTATEB008066

**Official - SBU**
UNCLASSIFIED

**From:**          Sundlof, Meredith E
**Sent:**          Tue, 7 Aug 2018 12:26:16 -0400
**To:**            McKeeby, David I;Davidson-Hood, Simon;Abisellan, Eduardo;PM-CPA-DL;Rogers, Shana A;Negrea, Dan;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A;Fabry, Steven F
**Cc:**           Hart, Robert L;Loucks, Alicia N
**Subject:**      RE: CLEARANCE: IM to S
**Attachments:**   IM to S- Update on 3D Printing (V2).docx

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
███████████████
sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Carter, Rachel |
| **Sent:** | Tue, 7 Aug 2018 13:51:16 -0400 |
| **To:** | PM-Staffers Mailbox;Davidson-Hood, Simon;Dearth, Anthony M |
| **Cc:** | Hart, Robert L |
| **Subject:** | RE: New PM Tasker: Update on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |

Gents of DDTC,
Could you please address these FO edits and comments, so that Staffers can send to S staff quickly and meet Acting DAS Miller's deadline of Wednesday?

Thanks!

Rachel


**Official**
This message is **UNCLASSIFIED** when separated from **SECRET** attachment(s)
Classified By: Tina Kaidanow - PDAS, Office:Bureau of Political-Military Affairs, Agency:U.S. Department of State
Declassify On: 8/7/2043
Reasons: Derived Per DSCG.

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 5:20 PM
To: Davidson-Hood, Simon; PM-Staffers Mailbox
Cc: Hart, Robert L; Carter, Rachel
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Simon,

FO edits tracked and attached.

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Monday, August 06, 2018 4:02 PM
To: PM-Staffers Mailbox
Cc: Hart, Robert L
Subject: RE: New PM Tasker: Update on 3D Printing

Hi Alicia,

Here's the draft, minus comment from CPA/H on the letter (you'll see).

Best,
SDH


**Official - SBU**
**UNCLASSIFIED**

---

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.


Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found here.

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**
**UNCLASSIFIED**

**From:**         Rogers, Shana A
**Sent:**          Wed, 8 Aug 2018 09:01:17 -0400
**To:**            Sundlof, Meredith E;McKeeby, David I;Davidson-Hood, Simon;Abisellan,
Eduardo;PM-CPA-DL;Negrea, Dan;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A;Fabry, Steven F
**Cc:**            Hart, Robert L;Loucks, Alicia N
**Subject:**       RE: CLEARANCE: IM to S
**Attachments:**   IM to S- Update on 3D Printing (V2).docx

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. ███████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
███████████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry


**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official - SBU**

UNCLASSIFIED

**From:**        Rogers, Shana A
**Sent:**        Wed, 8 Aug 2018 09:44:52 -0400
**To:**          Wall, Amanda J;Dorosin, Joshua L
**Cc:**           Fabry, Steven F
**Subject:**      FW: CLEARANCE: IM to S
**Attachments:**  IM to S- Update on 3D Printing (V2).docx

Amanda and Josh,
I provided the attached edits to this IM to S on the 3D-printed gun case.  It is a status update on the litigation.  I let PM know that the IM is with the L/FO for review.  If you have any further edits, comments, or concerns, please let me know.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative record that Plaintiff States filed last night. ████████████████████████
████████████████████████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
████████████████
sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Davidson-Hood, Simon |
| **Sent:** | Wed, 8 Aug 2018 10:59:37 -0400 |
| **To:** | Hart, Robert L |
| **Subject:** | FW: IM to S 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing (V3).docx |

FYI

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Wednesday, August 08, 2018 10:59 AM
To: Dearth, Anthony M; Koelling, Richard W
Subject: IM to S 3D Printing

Morning Tony and Rick,

I'm currently awaiting the last two clearances from L/FO and H.  Once I have these, the IM will come to you Tony.  The hard stop for the IM is 1300, as Tina is keen to brief S and she has not updated him in a few days.  Thus, the IM is the update.

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Wed, 8 Aug 2018 12:17:54 -0400 |
| **To:** | Wall, Amanda J;Dorosin, Joshua L |
| **Cc:** | Fabry, Steven F |
| **Subject:** | FW: New PM Tasker: Update on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing (V2).docx |
| **Importance:** | High |

Hi Amanda and Josh,
PM is saying they have a hard deadline on the IM of **1 PM** today.  Let me know if I can help with anything.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Hart, Robert L
Sent: Wednesday, August 08, 2018 11:43 AM
To: Rogers, Shana A
Cc: Davidson-Hood, Simon
Subject: FW: New PM Tasker: Update on 3D Printing
Importance: High

Shana, FYSA regarding the IM to S that's with the L/FO. I expect this is a hard deadline given the content and the fact that the next PCC is tomorrow morning.


**Official**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 08, 2018 10:46 AM
To: PM-Staffers Mailbox; PM-DTCP-Tasking-DL
Cc: Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: RE: New PM Tasker: Update on 3D Printing
Importance: High


All,

This due date has been updated to 1PM TODAY.

Alicia Loucks, Staff Assistant
PM/FO SharePoint

X76604

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 06, 2018 7:24 AM
To: PM-DTCP-Tasking-DL
Cc: PM-Staffers Mailbox; Carter, Rachel; PM-CPA-DL; PM-Strategy
Subject: New PM Tasker: Update on 3D Printing

Colleagues:

Please see new PM tasker for Update on 3D Printing.

Please submit to PM-Staffers Mailbox by Friday, August 10 at 1000.  **Please provide a version for pre-clearance to PM staffers (prior to requesting clearances outside of PM) as soon as possible.  Cleared version due to PM staffers Aug 10 at 1000.**

Please follow instructions in the tasker and use proper templates.

All ClassNet taskers can be found here.

Please notify staffers if you have any questions or concerns.

Best,

Alicia Loucks, Staff Assistant
PM/FO SharePoint
X76604


**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Wed, 8 Aug 2018 12:35:13 -0400 |
| **To:** | Davidson-Hood, Simon;Darrach, Tamara A |
| **Cc:** | Hart, Robert L;Loucks, Alicia N;Fabry, Steven F |
| **Subject:** | RE: CLEARANCE: IM to S |
| **Attachments:** | IM to S- Update on 3D Printing (V2) (LFO).docx |

Clear for L with an addition in the attached version, highlighted for easy identification.  Please list Josh Dorosin as L/FO clearer.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Davidson-Hood, Simon
Sent: Wednesday, August 08, 2018 10:29 AM
To: Rogers, Shana A; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Morning Team,

Can you use your best endeavors to get me your edits this morning please (in L's case, meaning L/FO), as the FO is looking to put this up to S this afternoon, and in anticipation of Friday's PCC.

Best,
SDH


**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative record that Plaintiff States filed last night. ██████████████████████████
████████████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
**Strategic Coordinator**
**Bureau of Political-Military Affairs**
**Department of State**
██████████████████████
sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

WASHSTATEB008115

**From:** Davidson-Hood, Simon
**Sent:** Wed, 8 Aug 2018 12:56:52 -0400
**To:** PM-Staffers Mailbox
**Cc:** Hart, Robert L
**Subject:** RE: CLEARANCE: IM to S
**Attachments:** IM to S- Update on 3D Printing (V3).docx

Hi Alicia,

Here you so.  As discussed, H has not responded.  They indicated a concern with the final paragraph.

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

**From:**       Hart, Robert L
**Sent:**       Wed, 8 Aug 2018 13:06:15 -0400
**To:**         Koelling, Richard W
**Subject:**    FW: CLEARANCE: IM to S
**Attachments:** IM to S- Update on 3D Printing (V3).docx

IM to S is away.

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Wednesday, August 08, 2018 12:57 PM
To: PM-Staffers Mailbox
Cc: Hart, Robert L
Subject: RE: CLEARANCE: IM to S

Hi Alicia,

Here you so.  As discussed, H has not responded.  They indicated a concern with the final paragraph.

Best,
SDH

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP

202-663-2811

**Official - SBU**
**UNCLASSIFIED**

**From:**          Davidson-Hood, Simon
**Sent:**          Wed, 8 Aug 2018 13:22:28 -0400
**To:**            Carter, Rachel
**Cc:**             PM-Staffers Mailbox;Hart, Robert L
**Subject:**       IM to S - 3D Update
**Attachments:**   IM to S- Update on 3D Printing (V3).docx


Hi Rachel,

Please find attached the final version cleared by H.  I have incorporated their edits (which were two only).

Best,
SDH
**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Freeman, Jeremy B |
| **Sent:** | Thu, 9 Aug 2018 17:20:29 -0400 |
| **To:** | Darrach, Tamara A |
| **Cc:** | Rogers, Shana A;Fabry, Steven F |
| **Subject:** | FW: CLEARANCE: IM to S |
| **Attachments:** | IM to S- Update on 3D Printing (V2) (4).docx |

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



That said, Shana is tracking this more closely than I am, so she may have further ideas tomorrow morning.

Jeremy

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

Thanks!
Tamara


This email is UNCLASSIFIED.


---

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers

Cc: Sandel, Jessika
Subject: FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara


This email is UNCLASSIFIED.


From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;

Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator

Bureau of Political-Military Affairs
Department of State

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

**From:**          Darrach, Tamara A
**Sent:**          Fri, 10 Aug 2018 09:27:53 -0400
**To:**            Freeman, Jeremy B
**Cc:**            Rogers, Shana A;Fabry, Steven F;McKeeby, David I;Dearth, Anthony M
**Subject:**       FW: CLEARANCE: IM to S
**Attachments:**   IM to S- Update on 3D Printing (V2) (4).docx


Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara


This email is UNCLASSIFIED.


**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara —

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



That said, Shana is tracking this more closely than I am, so she may have further ideas tomorrow morning.

Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

███████████████████████████████████

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers
**Cc:** Sandel, Jessika
**Subject:** FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Wednesday, August 08, 2018 12:25 PM
**To:** H_Staffers
**Subject:** FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Wednesday, August 08, 2018 12:04 PM
**To:** Sandel, Jessika; Jensen, Aaron W
**Subject:** FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:43 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative record that Plaintiff States filed last night. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.

From: Sundlof, Meredith E
Sent: Tuesday, August 07, 2018 12:26 PM
To: McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State

sundlofm@state.gov
202-647-3214


**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry


**Official**

**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official - SBU**
**UNCLASSIFIED**

WASHSTATEB008146

| | |
|---|---|
| **From:** | Dearth, Anthony M |
| **Sent:** | Fri, 10 Aug 2018 15:23:44 -0400 |
| **To:** | PM-Staffers Mailbox |
| **Cc:** | Carter, Rachel;Hart, Robert L |
| **Subject:** | FW: CLEARANCE: IM to S |
| **Attachments:** | IM to S- Update on 3D Printing (V2) (4).docx, RE: CLEARANCE: IM to S |

Rachel,

Here is where the memo stood as of this morning.  If you compare the content of this memo to the content of the response to the AGs and the Action Memo (which H cleared), it is the same content.  The point is the information in the IM is already to the line in the AM.  In the attached email, L confirms the same to H but has had no luck in them responding.

With this in mind, L suggests you call H and make this point and ask if they could clear so the IM can go up to S by COB today.

v/r, Tony

Anthony M. Dearth
DDTC Chief of Staff

From: Darrach, Tamara A
Sent: Friday, August 10, 2018 9:28 AM
To: Freeman, Jeremy B
Cc: Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
Subject: FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara


This email is UNCLASSIFIED.


From: Freeman, Jeremy B
Sent: Thursday, August 09, 2018 5:20 PM
To: Darrach, Tamara A
Cc: Rogers, Shana A; Fabry, Steven F
Subject: FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.

████████████████████████████████████████████████████████████████

That said, Shana is tracking this more closely than I am, so she may have further ideas tomorrow morning.

Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

████████████████████████████████████████████████████████████

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers
**Cc:** Sandel, Jessika
**Subject:** FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. █████████████████████████████████████████████
██████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
███████████████

sundlofm@state.gov
202-647-3214

**Official**
UNCLASSIFIED

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**
UNCLASSIFIED

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Fri, 10 Aug 2018 15:01:15 -0400 |
| **To:** | Darrach, Tamara A;Freeman, Jeremy B |
| **Cc:** | Fabry, Steven F;McKeeby, David I;Dearth, Anthony M |
| **Subject:** | RE: CLEARANCE: IM to S |

Hi Tamara,
I just cleared on an AM to S (for the letter to the states attorneys general) that had largely the same content as the IM. ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

Thanks,
Shana


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Friday, August 10, 2018 9:28 AM
**To:** Freeman, Jeremy B
**Cc:** Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
**Subject:** FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara


This email is UNCLASSIFIED.


**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

This email is UNCLASSIFIED.

Thanks!
Tamara

This email is UNCLASSIFIED.

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers
**Cc:** Sandel, Jessika
**Subject:** FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana

Sensitive

This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. █████████████████████████

████████████████████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
████████████████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry


**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official - SBU**

**UNCLASSIFIED**

**From:**            Hart, Robert L
**Sent:**            Mon, 13 Aug 2018 09:51:38 -0400
**To:**              Heidema, Sarah J
**Subject:**         FW: CLEARANCE: IM to S
**Attachments:**     IM to S- Update on 3D Printing (V2) (4).docx, RE: CLEARANCE: IM to S

This was the last email I was on regarding the information memo. TK mentioned at the Friday morning meeting that she talked to her H counterpart about it that morning, but I haven't seen anything to suggest it made it through H yet (and this email below went out close to COB on Friday, so perhaps not).

**Official**
**UNCLASSIFIED**

From: Dearth, Anthony M
Sent: Friday, August 10, 2018 3:24 PM
To: PM-Staffers Mailbox
Cc: Carter, Rachel; Hart, Robert L
Subject: FW: CLEARANCE: IM to S

Rachel,

Here is where the memo stood as of this morning.  If you compare the content of this memo to the content of the response to the AGs and the Action Memo (which H cleared), it is the same content.  The point is the information in the IM is already to the line in the AM.  In the attached email, L confirms the same to H but has had no luck in them responding.

With this in mind, L suggests you call H and make this point and ask if they could clear so the IM can go up to S by COB today.

v/r, Tony

Anthony M. Dearth
DDTC Chief of Staff

From: Darrach, Tamara A
Sent: Friday, August 10, 2018 9:28 AM
To: Freeman, Jeremy B
Cc: Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
Subject: FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara

WASHSTATEB008212

This email is UNCLASSIFIED.

**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,



Thanks!
Tamara

This email is UNCLASSIFIED.

From: Darrach, Tamara A
Sent: Thursday, August 09, 2018 4:51 PM
To: H_Staffers
Cc: Sandel, Jessika
Subject: FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara


This email is UNCLASSIFIED.

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:43 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative record that Plaintiff States filed last night. ██████████████████████████
██████████████████████████████████████████████

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State

██████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official - SBU**
**UNCLASSIFIED**

**From:**       Rogers, Shana A
**Sent:**       Fri, 10 Aug 2018 15:01:15 -0400
**To:**         Darrach, Tamara A;Freeman, Jeremy B
**Cc:**         Fabry, Steven F;McKeeby, David I;Dearth, Anthony M
**Subject:**    RE: CLEARANCE: IM to S

Hi Tamara,
I just cleared on an AM to S (for the letter to the states attorneys general) that had largely the same content as the IM. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Thanks,
Shana


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Friday, August 10, 2018 9:28 AM
**To:** Freeman, Jeremy B
**Cc:** Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
**Subject:** FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara


This email is UNCLASSIFIED.


**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers
**Cc:** Sandel, Jessika
**Subject:** FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara

This email is UNCLASSIFIED.

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!

This email is UNCLASSIFIED.

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara

This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana

Sensitive

This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. ███████████████████

███████████████████████████████████████████
███████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
███████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry


**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official - SBU**

UNCLASSIFIED

WASHSTATEB008227

**From:**        Hart, Robert L
**Sent:**        Mon, 13 Aug 2018 10:01:47 -0400
**To:**          Litzenberger, Earle D
**Cc:**          Heidema, Sarah J;Paul, Joshua M
**Subject:**     FW: CLEARANCE: IM to S
**Attachments:** IM to S- Update on 3D Printing (V2) (4).docx, RE: CLEARANCE: IM to S

Lee, forwarding the attached and the below email chain per Sarah Heidema's request.

Thanks,
Rob


**Official**
**UNCLASSIFIED**

From: Dearth, Anthony M
Sent: Friday, August 10, 2018 3:24 PM
To: PM-Staffers Mailbox
Cc: Carter, Rachel; Hart, Robert L
Subject: FW: CLEARANCE: IM to S

Rachel,

Here is where the memo stood as of this morning.  If you compare the content of this memo to the content of the response to the AGs and the Action Memo (which H cleared), it is the same content.  The point is the information in the IM is already to the line in the AM.  In the attached email, L confirms the same to H but has had no luck in them responding.

With this in mind, L suggests you call H and make this point and ask if they could clear so the IM can go up to S by COB today.

v/r, Tony

Anthony M. Dearth
DDTC Chief of Staff

From: Darrach, Tamara A
Sent: Friday, August 10, 2018 9:28 AM
To: Freeman, Jeremy B
Cc: Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
Subject: FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

WASHSTATEB008228

Best,
Tamara

This email is UNCLASSIFIED.

---

**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



Jeremy

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,



Thanks!
Tamara

This email is UNCLASSIFIED.

From: Darrach, Tamara A
Sent: Thursday, August 09, 2018 4:51 PM
To: H_Staffers
Cc: Sandel, Jessika
Subject: FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!


This email is UNCLASSIFIED.


From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to
review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as
possible.

Thanks!
Tamara


This email is UNCLASSIFIED.

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:43 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM.  I have not included anything on the motion to compel an administrative
record that Plaintiff States filed last night. ████████████████████████████
████████████████████████████████████████████████████████

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State

███████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

---

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

---

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

---

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811


**Official – SBU**
**UNCLASSIFIED**

**From:**         Rogers, Shana A
**Sent:**         Fri, 10 Aug 2018 15:01:15 -0400
**To:**          Darrach, Tamara A;Freeman, Jeremy B
**Cc:**          Fabry, Steven F;McKeeby, David I;Dearth, Anthony M
**Subject:**    RE: CLEARANCE: IM to S

Hi Tamara,
I just cleared on an AM to S (for the letter to the states attorneys general) that had largely the same content as the IM.

Thanks,
Shana


This email is UNCLASSIFIED.


---

**From:** Darrach, Tamara A
**Sent:** Friday, August 10, 2018 9:28 AM
**To:** Freeman, Jeremy B
**Cc:** Rogers, Shana A; Fabry, Steven F; McKeeby, David I; Dearth, Anthony M
**Subject:** FW: CLEARANCE: IM to S

Thanks, Jeremy!  The memo has not been sent to S.  Please let me know if L plans on updating the memo.  I will relay the court deadline information to my A/S.

Best,
Tamara


This email is UNCLASSIFIED.


---

**From:** Freeman, Jeremy B
**Sent:** Thursday, August 09, 2018 5:20 PM
**To:** Darrach, Tamara A
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** FW: CLEARANCE: IM to S

Hi Tamara –

Has the memo already gone up to S?  If not, it may make sense to update it based upon discussions at a PCC today.



Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 5:14 PM
**To:** Freeman, Jeremy B
**Subject:** FW: CLEARANCE: IM to S

Hi Jeremy,

Thanks!
Tamara


This email is UNCLASSIFIED.


**From:** Darrach, Tamara A
**Sent:** Thursday, August 09, 2018 4:51 PM
**To:** H_Staffers
**Cc:** Sandel, Jessika
**Subject:** FW: CLEARANCE: IM to S

Hi colleagues,

Would you please send me the latest version of the memo?

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:25 PM
To: H_Staffers
Subject: FW: CLEARANCE: IM to S

Staffers – Sending to you per Jessika's request.  Thanks!

This email is UNCLASSIFIED.

---

From: Darrach, Tamara A
Sent: Wednesday, August 08, 2018 12:04 PM
To: Sandel, Jessika; Jensen, Aaron W
Subject: FW: CLEARANCE: IM to S

Hi Jessika and Aaron,

Has Charles had a chance to review the attached IM?  I told PM it's on hold until H/FO gets a chance to review.  L has it on hold too because their FO also wants to review.  PM does need this back as soon as possible.

Thanks!
Tamara

This email is UNCLASSIFIED.

---

From: Rogers, Shana A
Sent: Wednesday, August 08, 2018 9:43 AM
To: Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Apologies, please note that this is with the L/FO.  Any additional edits from them will be passed along.

Thanks,
Shana

Sensitive

This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, August 08, 2018 9:01 AM
**To:** Sundlof, Meredith E; McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Edits attached from L/PM. I have not included anything on the motion to compel an administrative record that Plaintiff States filed last night. ███████████████████

████████████████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Sundlof, Meredith E
**Sent:** Tuesday, August 07, 2018 12:26 PM
**To:** McKeeby, David I; Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Rogers, Shana A; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
**Cc:** Hart, Robert L; Loucks, Alicia N
**Subject:** RE: CLEARANCE: IM to S

Clear with edits.

Thanks,
Meredith

**Meredith Sundlof**
Strategic Coordinator
Bureau of Political-Military Affairs
Department of State
████████████████

sundlofm@state.gov
202-647-3214

**Official**
**UNCLASSIFIED**

From: McKeeby, David I
Sent: Tuesday, August 07, 2018 12:01 PM
To: Davidson-Hood, Simon; Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A;
Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

Clear for CPA with suggestions to take or leave as you wish.

Best,
Dave

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:30 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A; Fabry, Steven F
Cc: Hart, Robert L; Loucks, Alicia N
Subject: RE: CLEARANCE: IM to S

+ Steve Fabry

**Official**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Tuesday, August 07, 2018 11:13 AM
To: Abisellan, Eduardo; PM-CPA-DL; Sundlof, Meredith E; Rogers, Shana A; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Hart, Robert L; Loucks, Alicia N
Subject: CLEARANCE: IM to S

Morning Colleagues,

Could you please clear on the attached IM to S by **NLT 1300hrs Thursday, 9th August.**

The IM has already been edited and pre-cleared by Amb. Kaidanow and Lee Litzenberger.

Should you have any follow up questions, please advise.

Best,
SDH
PM/DTCP
202-663-2811

**Official - SBU**

**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Mon, 13 Aug 2018 13:01:16 -0400
**To:** Kaidanow, Tina S
**Cc:** PM-Staffers Mailbox;Carter, Rachel
**Subject:** For review: IM to S : Update on 3D Printing
**Attachments:** IM to S- Update on 3D Printing.docx

Ambassador,

Please see attached DDTC's IM to S on 3D printing for your review. H/FO cleared.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

From: Litzenberger, Earle D
Sent: Monday, August 13, 2018 12:52 PM
To: PM-Staffers Mailbox
Cc: Carter, Rachel
Subject: RE: For Lee: IM to S : Update on 3D Printing

I clear

**Official - SBU**
**UNCLASSIFIED//NOFORN**

From: PM-Staffers Mailbox
Sent: Monday, August 13, 2018 11:27 AM
To: Litzenberger, Earle D
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For Lee: IM to S : Update on 3D Printing

Hi Lee,

Please see DDTC's IM to S on the 3D printing update for your review.  H has cleared. You and Ambassador pre-cleared this last week.

Best,

Samantha Sison

[PM/FO SharePoint](#)
X70561

**Official - SBU**
**UNCLASSIFIED**

From: Wells, Yvonne
Sent: Monday, August 13, 2018 10:44 AM
To: Carter, Rachel; PM-Staffers Mailbox
Cc: H_Staffers; Darrach, Tamara A
Subject: Attaching the H front office ( Mary K Waters) approved IM to S : Update on 3D Printing for you
to upload to Everest

Yvonne Wells
Staff Assistant
Legislative Affairs
X71807

**Official**
**UNCLASSIFIED**

**From:**          PM-Staffers Mailbox
**Sent:**          Mon, 13 Aug 2018 15:23:45 -0400
**To:**            Heidema, Sarah J;Hart, Robert L
**Cc:**            PM-Staffers Mailbox
**Subject:**       For Sarah/Rob: IM to S : Update on 3D Printing
**Attachments:**   IM to S- Update on 3D Printing.docx
**Importance:**    High


Sarah, Rob,

Per earlier meeting today with Amb. Kaidanow, please see attached IM to S to update and re-clear with L and H. Ambassador would like to get this up by COB today if possible.

Thanks,

Samantha Sison
PM/FO SharePoint
X70561



**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 13, 2018 1:01 PM
To: Kaidanow, Tina S
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For review: IM to S : Update on 3D Printing

Ambassador,

Please see attached DDTC's IM to S on 3D printing for your review. H/FO cleared.

Best,

Samantha Sison
PM/FO SharePoint
X70561


**Official - SBU**
**UNCLASSIFIED**

From: Litzenberger, Earle D
Sent: Monday, August 13, 2018 12:52 PM
To: PM-Staffers Mailbox

Cc: Carter, Rachel
Subject: RE: For Lee: IM to S : Update on 3D Printing

I clear


**Official - SBU**
**UNCLASSIFIED//NOFORN**

From: PM-Staffers Mailbox
Sent: Monday, August 13, 2018 11:27 AM
To: Litzenberger, Earle D
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For Lee: IM to S : Update on 3D Printing

Hi Lee,

Please see DDTC's IM to S on the 3D printing update for your review.  H has cleared. You and
Ambassador pre-cleared this last week.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

From: Wells, Yvonne
Sent: Monday, August 13, 2018 10:44 AM
To: Carter, Rachel; PM-Staffers Mailbox
Cc: H_Staffers; Darrach, Tamara A
Subject: Attaching the H front office ( Mary K Waters) approved IM to S : Update on 3D Printing for you
to upload to Everest



Yvonne Wells
Staff Assistant
Legislative Affairs
X71807


**Official**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Mon, 13 Aug 2018 15:53:48 -0400
**To:** Darrach, Tamara A;Rogers, Shana A;Fabry, Steven F
**Cc:** Paul, Joshua M;Carter, Rachel;Hart, Robert L
**Subject:** FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter
**Attachments:** IM to S- Update on 3D Printing SJH edits.docx


At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Carter, Rachel |
| **Sent:** | Mon, 13 Aug 2018 16:04:38 -0400 |
| **To:** | Heidema, Sarah J;Darrach, Tamara A;Rogers, Shana A;Fabry, Steven F |
| **Cc:** | Paul, Joshua M;Hart, Robert L;PM-Staffers Mailbox |
| **Subject:** | RE: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter |
| **Attachments:** | IM to S- Update on 3D Printing SJH edits.docx |

+ PM Staffers

**Official - SBU**
**UNCLASSIFIED**

From: Heidema, Sarah J
Sent: Monday, August 13, 2018 3:54 PM
To: Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
Cc: Paul, Joshua M; Carter, Rachel; Hart, Robert L
Subject: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP

**Official**
**UNCLASSIFIED**

**From:**        Carter, Rachel
**Sent:**        Mon, 13 Aug 2018 16:12:37 -0400
**To:**          Kaidanow, Tina S
**Cc:**          PM-Staffers Mailbox
**Subject:**     FW: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter
**Attachments:** IM to S- Update on 3D Printing SJH edits.docx

Amb,
Per your request, here is Sarah Heidema's edited IM to S on 3D printing.

We will incorporate your edits and have Lee clear for PM.

Thanks,
Rachel

**Official - SBU**
**UNCLASSIFIED**

From: Heidema, Sarah J
Sent: Monday, August 13, 2018 3:54 PM
To: Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
Cc: Paul, Joshua M; Carter, Rachel; Hart, Robert L
Subject: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I
have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Mon, 13 Aug 2018 16:20:34 -0400 |
| **To:** | Fabry, Steven F |
| **Subject:** | FW: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter |
| **Attachments:** | IM to S- Update on 3D Printing SJH LPM edits.docx |

Here are my thoughts. ███████████████████████████████
████████████████████████

Sensitive
This email is UNCLASSIFIED.

---

**From:** Heidema, Sarah J
**Sent:** Monday, August 13, 2018 3:54 PM
**To:** Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
**Cc:** Paul, Joshua M; Carter, Rachel; Hart, Robert L
**Subject:** FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Carter, Rachel |
| **Sent:** | Mon, 13 Aug 2018 16:28:39 -0400 |
| **To:** | Heidema, Sarah J;Darrach, Tamara A;Rogers, Shana A;Fabry, Steven F |
| **Cc:** | Paul, Joshua M;Hart, Robert L;PM-Staffers Mailbox;Litzenberger, Earle D |
| **Subject:** | RE: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter |
| **Attachments:** | IM to S- Update on 3D Printing SJH edits.docx |

Colleagues,
Please see Ambassador Kaidanow's edits on the attached; she requests L and PM/DTCC's review for accuracy.

Best regards,
Rachel


**Official**
**UNCLASSIFIED**

From: Heidema, Sarah J
Sent: Monday, August 13, 2018 3:54 PM
To: Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
Cc: Paul, Joshua M; Carter, Rachel; Hart, Robert L
Subject: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP


**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Paul, Joshua M |
| **Sent:** | Mon, 13 Aug 2018 16:54:57 -0400 |
| **To:** | Carter, Rachel;Heidema, Sarah J;Darrach, Tamara A;Rogers, Shana A;Fabry, Steven F |
| **Cc:** | Hart, Robert L;PM-Staffers Mailbox;Litzenberger, Earle D;PM-CPA-DL |
| **Subject:** | RE: FLASH CLEARANCE: by 430 today: Updated memo to S on 3D Gun matter |
| **Attachments:** | IM to S- Update on 3D Printing SJH edits.docx |

Clear for CPA with one edit to the last line – H, please take a look. ████████████
███████████████████████████████████████████████
███████████

Sensitive
This email is UNCLASSIFIED.

---

**From:** Carter, Rachel
**Sent:** Monday, August 13, 2018 4:29 PM
**To:** Heidema, Sarah J; Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
**Cc:** Paul, Joshua M; Hart, Robert L; PM-Staffers Mailbox; Litzenberger, Earle D
**Subject:** RE: FLASH CLEARANCE: by 430 today: Updated memo to S on 3D Gun matter

Colleagues,
Please see Ambassador Kaidanow's edits on the attached; she requests L and PM/DTCC's review for accuracy.

Best regards,
Rachel

**Official**
**UNCLASSIFIED**

---

**From:** Heidema, Sarah J
**Sent:** Monday, August 13, 2018 3:54 PM
**To:** Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
**Cc:** Paul, Joshua M; Carter, Rachel; Hart, Robert L
**Subject:** FLASH CLEARANCE: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached. I have also deleted on un-needed word to make it 2 pages again. Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP

**Official**
<span style="color:green">**UNCLASSIFIED**</span>

WASHSTATEB008286

**From:**         Rogers, Shana A
**Sent:**         Mon, 13 Aug 2018 17:44:38 -0400
**To:**           Heidema, Sarah J
**Cc:**           Fabry, Steven F
**Subject:**      RE: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter
**Attachments:**  IM to S- Update on 3D Printing SJH edits (LPM).docx

Sarah,
Here are some thoughts for your consideration.  Steve has not reviewed, and needs to before this is finalized.  I made substantive edits and then several minor edits throughout to keep the memo to 2 pages.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.

---

From: Heidema, Sarah J
Sent: Monday, August 13, 2018 3:54 PM
To: Darrach, Tamara A; Rogers, Shana A; Fabry, Steven F
Cc: Paul, Joshua M; Carter, Rachel; Hart, Robert L
Subject: FLASH Clearance: by 430 today: Updated memo to S on 3D Gun matter

At the Acting A/S's request I have revised the memo to include one point highlight in the attached.  I have also deleted on un-needed word to make it 2 pages again.  Please Clear by 430 today!

Thank you,
Sarah

Sarah Heidema
Director
PM/DTCP

**Official**
UNCLASSIFIED

**From:**          Heidema, Sarah J
**Sent:**          Tue, 14 Aug 2018 08:37:15 -0400
**To:**            Darrach, Tamara A
**Cc:**            Paul, Joshua M;Carter, Rachel;Rogers, Shana A;Fabry, Steven F
**Subject:**       Need clearance by 930 am today: IM to S- Update on 3D Printing SJH edits
(LPM)
**Attachments:**   IM to S- Update on 3D Printing SJH edits (LPM).docx
**Importance:**    High


Tamara-

You received this yesterday from me.  The attached is the current state of play and needs to move to S
this morning as the court begins action tomorrow.  The relevant changes are tracked in and the new text
is highlighted and minimal.

Thanks in advance
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Heidema, Sarah J |
| **Sent:** | Tue, 14 Aug 2018 10:40:36 -0400 |
| **To:** | PM-Staffers Mailbox |
| **Cc:** | Carter, Rachel;Hart, Robert L |
| **Subject:** | IM to S- Update on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing SJH edits (LPM) (2).docx |

Attached please find the IM for S.

**Official**

**UNCLASSIFIED**

**From:**          PM-Staffers Mailbox
**Sent:**          Wed, 15 Aug 2018 13:06:56 -0400
**To:**            String, Marik A
**Subject:**       RE: Aug 13 2018 Documents Signed
**Attachments:**   (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2).docx


Hello DAS String,

Attached is the version in Everest.

Best,

Samantha Sison
PM/FO SharePoint
X70561


**Official - SBU**
**UNCLASSIFIED**

From: String, Marik A
Sent: Wednesday, August 15, 2018 1:02 PM
To: PM-Staffers Mailbox
Subject: RE: Aug 13 2018 Documents Signed

Team - Could you send me the final version of the below document?  Thanks, Marik

IM to S - Update on 3D Printing (Defense Distributed)


**Official**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 15, 2018 11:10 AM
To: PM-All-Users-DL
Subject: FW: Aug 13 2018 Documents Signed



**Official - SBU**
**UNCLASSIFIED**

From: Scott, Tamara L
Sent: Wednesday, August 15, 2018 10:44 AM

To: H_Documents_Signed
Subject: Aug 13 2018 Documents Signed

**Official**
**UNCLASSIFIED**

**From:**          PM-Staffers Mailbox
**Sent:**          Wed, 15 Aug 2018 17:24:43 -0400
**To:**            Fabry, Steven F;Rogers, Tanya E
**Cc:**            PM-Staffers Mailbox
**Subject:**       IM to S: Defense Distributed
**Attachments:**   (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2).docx

Steve,

Per phone conversation, please see Everest version of IM to S on Defense Distributed attached.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Fabry, Steven F |
| **Sent:** | Wed, 15 Aug 2018 18:22:14 -0400 |
| **To:** | Wall, Amanda J;Rogers, Shana A |
| **Subject:** | FW: IM to S: Defense Distributed |
| **Attachments:** | (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2).docx |

This is the version that was uploaded to Everest.

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 15, 2018 5:25 PM
To: Fabry, Steven F; Rogers, Tanya E
Cc: PM-Staffers Mailbox
Subject: IM to S: Defense Distributed

Steve,

Per phone conversation, please see Everest version of IM to S on Defense Distributed attached.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | PM-Staffers Mailbox |
| **Sent:** | Thu, 16 Aug 2018 12:41:27 -0400 |
| **To:** | Heidema, Sarah J;Davidson-Hood, Simon;Hart, Robert L |
| **Cc:** | PM-Staffers Mailbox;Carter, Rachel |
| **Subject:** | For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision |
| **Attachments:** | (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2).docx |
| **Importance:** | High |

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
**PM/FO SharePoint**
X70561

**From:** SES-Line_Only
**Sent:** Thursday, August 16, 2018 12:09 PM
**To:** Everest_PM; Everest_H
**Cc:** SES-Line_Only
**Subject:** Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: <mark>Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:</mark> ███████████████████████████████████████████ Please retain all
Line edits when resubmitting. Thank you.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:**  PM
**CO-DRAFTER BUREAU:**  H
**COPY TO:**
**SUBJECT:**  Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DELIVERY DATE:**  14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY: PM**

**LINK:** [201822013 Package](201822013 Package)

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

**From:**          Hart, Robert L
**Sent:**          Thu, 16 Aug 2018 14:35:03 -0400
**To:**          Paul, Joshua M;Rogers, Shana A
**Cc:**          Heidema, Sarah J
**Subject:**          RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
**Attachments:**          (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH.docx

Over to you for any revisions (noting that the current version is exactly two pages…)


**Official**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
Importance: High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561


From: SES-Line_Only
Sent: Thursday, August 16, 2018 12:09 PM
To: Everest_PM; Everest_H
Cc: SES-Line_Only
Subject: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:

████████████████████████████████████████████████ Please retain all
Line edits when resubmitting. Thank you.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:**  PM
**CO-DRAFTER BUREAU:**  H
**COPY TO:**
**SUBJECT:**  Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DELIVERY DATE:**  14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:**  PM

**LINK:**  201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

**From:**          Heidema, Sarah J
**Sent:**          Thu, 16 Aug 2018 14:58:00 -0400
**To:**            Hart, Robert L
**Cc:**            Paul, Joshua M;Rogers, Shana A
**Subject:**       (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH
**Attachments:**   (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH.docx


My edits. I think we should attach yesterday's brief.  I've put in a place holder for it
**Official**
**UNCLASSIFIED**

**From:**           Paul, Joshua M
**Sent:**           Thu, 16 Aug 2018 14:58:20 -0400
**To:**              Hart, Robert L;Rogers, Shana A
**Cc:**              Heidema, Sarah J
**Subject:**      RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

I don't have anything to contribute – ███████████████████████████████████
███████

Sensitive
This email is UNCLASSIFIED.

---

From: Hart, Robert L
Sent: Thursday, August 16, 2018 2:35 PM
To: Paul, Joshua M; Rogers, Shana A
Cc: Heidema, Sarah J
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

Over to you for any revisions (noting that the current version is exactly two pages…)

**Official**
**UNCLASSIFIED**

---

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
Importance: High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**From:** SES-Line_Only
**Sent:** Thursday, August 16, 2018 12:09 PM
**To:** Everest_PM; Everest_H
**Cc:** SES-Line_Only
**Subject:** Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Please retain all Line edits when resubmitting. Thank you.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DELIVERY DATE:** 14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** 201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official – SBU**
**UNCLASSIFIED**

**From:**          Hart, Robert L
**Sent:**          Thu, 16 Aug 2018 15:03:22 -0400
**To:**            Paul, Joshua M;Rogers, Shana A
**Cc:**            Heidema, Sarah J
**Subject:**       RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense
Distributed (DD) has been returned for revision


Sarah's edits struck that section, so I'll stand by for L/PM and then send it back up.


**Official**
**UNCLASSIFIED**
_____

From: Paul, Joshua M
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L; Rogers, Shana A
Cc: Heidema, Sarah J
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD)
has been returned for revision

I don't have anything to contribute – ███████████████████████████████████
██████████████


Sensitive
This email is UNCLASSIFIED.

_____

From: Hart, Robert L
Sent: Thursday, August 16, 2018 2:35 PM
To: Paul, Joshua M; Rogers, Shana A
Cc: Heidema, Sarah J
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD)
has been returned for revision


Over to you for any revisions (noting that the current version is exactly two pages…)


**Official**
**UNCLASSIFIED**
_____

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has

been returned for revision
**Importance:** High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**From:** SES-Line_Only
**Sent:** Thursday, August 16, 2018 12:09 PM
**To:** Everest_PM; Everest_H
**Cc:** SES-Line_Only
**Subject:** Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:

Please retain all Line edits when resubmitting. Thank you.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:**  PM
**CO-DRAFTER BUREAU:**  H
**COPY TO:**
**SUBJECT:**  Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DELIVERY DATE:**  14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:**  PM

**LINK:**  201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
<span style="color:green">**UNCLASSIFIED**</span>

**From:** Rogers, Shana A
**Sent:** Fri, 17 Aug 2018 07:54:27 -0400
**To:** Fabry, Steven F
**Subject:** FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH
**Attachments:** (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH.docx

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further edits/comments?  I'll run it back by the FO after your feedback.

Shana

Sensitive
This email is UNCLASSIFIED.

From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it

**Official**
**UNCLASSIFIED**

**From:**        Fabry, Steven F
**Sent:**        Fri, 17 Aug 2018 10:43:16 -0400
**To:**        Rogers, Shana A
**Subject:**        RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH
**Attachments:**        (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH.docx

Thanks, Shana, a couple of comments in the attached.  I'm not wedded to any of the words if you think any of it can be improved.  Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 17, 2018 7:54 AM
To: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further edits/comments?  I'll run it back by the FO after your feedback.

Shana

Sensitive
This email is UNCLASSIFIED.

From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it.

**Official**
**UNCLASSIFIED**

WASHSTATEB008351

**From:** Davidson-Hood, Simon
**Sent:** Fri, 17 Aug 2018 16:27:23 -0400
**To:** Fabry, Steven F;Rogers, Shana A
**Cc:** PM-Staffers Mailbox;Hart, Robert L
**Subject:** RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
**Attachments:** (R_467693) IM to S- Update on 3D Printing (V4).docx

Hi Steve and Shana,

Could I ask you to respond to the questions regarding updating this memo please?  My apologies for the delay in sending it to you.  I was out yesterday afternoon, and hadn't seen any traffic on this today.

Best,
SDH
202-663-2811

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
Importance: High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561

From: SES-Line_Only
Sent: Thursday, August 16, 2018 12:09 PM
To: Everest_PM; Everest_H
Cc: SES-Line_Only
Subject: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:
Please retain all Line edits when resubmitting. Thank you.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DELIVERY DATE:** 14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** 201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

**From:**        Rogers, Shana A
**Sent:**        Fri, 17 Aug 2018 16:44:44 -0400
**To:**          Wall, Amanda J;Dorosin, Joshua L
**Cc:**          Fabry, Steven F
**Subject:**     FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH
**Attachments:** (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH (LPM).docx

Amanda, Josh,
PM has revised the IM to S with an update on the 3D gun case.  Steve and I have edited the attached but
wanted to give the L/FO opportunity to review again before we clear.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

From: Fabry, Steven F
Sent: Friday, August 17, 2018 10:43 AM
To: Rogers, Shana A
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Thanks, Shana, a couple of comments in the attached.  I'm not wedded to any of the words if you think
any of it can be improved.  Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 17, 2018 7:54 AM
To: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect
he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further
edits/comments?  I'll run it back by the FO after your feedback.

Shana

Sensitive
This email is UNCLASSIFIED.

---

From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it

**Official**
**UNCLASSIFIED**

**From:**          PM-Staffers Mailbox
**Sent:**          Mon, 20 Aug 2018 09:37:18 -0400
**To:**            Fabry, Steven F;Rogers, Shana A
**Cc:**            Hart, Robert L;Davidson-Hood, Simon;PM-Staffers Mailbox
**Subject:**       RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
**Importance:**    High


Steve, Shana –

AA/S Kaidanow is looking for this IM to come up as soon as possible. Please provide a status update.

Thank you,

Samantha Sison
PM/FO SharePoint
X70561


**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Friday, August 17, 2018 4:27 PM
To: Fabry, Steven F: Rogers, Shana A
Cc: PM-Staffers Mailbox; Hart, Robert L
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

Hi Steve and Shana,

Could I ask you to respond to the questions regarding updating this memo please?  My apologies for the delay in sending it to you.  I was out yesterday afternoon, and hadn't seen any traffic on this today.

Best,
SDH
202-663-2811


**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has

been returned for revision
**Importance:** High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**From:** SES-Line_Only
**Sent:** Thursday, August 16, 2018 12:09 PM
**To:** Everest_PM; Everest_H
**Cc:** SES-Line_Only
**Subject:** Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: <mark>Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:</mark>

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Please retain all Line edits when resubmitting. Thank you.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:**  PM
**CO-DRAFTER BUREAU:**  H
**COPY TO:**
**SUBJECT:**  Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DELIVERY DATE:**  14-Aug-2018 12:30:00 PM
**EVENT DATE:**
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:**  PM

**LINK:**  201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

**From:**          PM-Staffers Mailbox
**Sent:**          Mon, 20 Aug 2018 13:10:14 -0400
**To:**            Heidema, Sarah J
**Cc:**            PM-Staffers Mailbox
**Subject:**       FW: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
**Importance:**    High

Sarah,

AA/S Kaidanow has asked that you keep pushing Steve Fabry on this. We haven't heard back from L.

Best,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Monday, August 20, 2018 9:37 AM
To: Fabry, Steven F; Rogers, Shana A
Cc: Hart, Robert L; Davidson-Hood, Simon; PM-Staffers Mailbox
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
Importance: High

Steve, Shana –

AA/S Kaidanow is looking for this IM to come up as soon as possible. Please provide a status update.

Thank you,

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

From: Davidson-Hood, Simon
Sent: Friday, August 17, 2018 4:27 PM
To: Fabry, Steven F; Rogers, Shana A

Cc: PM-Staffers Mailbox; Hart, Robert L
Subject: RE: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD)
has been returned for revision

Hi Steve and Shana,

Could I ask you to respond to the questions regarding updating this memo please?  My apologies for the
delay in sending it to you.  I was out yesterday afternoon, and hadn't seen any traffic on this today.

Best,
SDH
202-663-2811


**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Thursday, August 16, 2018 12:41 PM
To: Heidema, Sarah J; Davidson-Hood, Simon; Hart, Robert L
Cc: PM-Staffers Mailbox; Carter, Rachel
Subject: For drafter updates: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has
been returned for revision
Importance: High

Hello  DTCP colleagues,

Please update the attached IM to S on 3D printing  as referenced below as soon as possible.

Best,

Samantha Sison
PM/FO SharePoint
X70561

From: SES-Line_Only
Sent: Thursday, August 16, 2018 12:09 PM
To: Everest_PM; Everest_H
Cc: SES-Line_Only
Subject: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for
revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this
paper for resubmission through Everest. If your bureau does not wish to resubmit this package,
you may remove it from your workspace by opening the package and clicking the 'OBE/Save'
button. Please contact us at 7-8879 with any questions.

**NOTES:** 8/16 12PM MJR: Colleagues ---Per PM Special Rachel Carter, returning to PM at PM's
request as landscape has changed necessitating revisions. Deputy Exec Sec as also requested:

███████████████████████████████████████████ Please retain all
Line edits when resubmitting. Thank you.

**CLASSIFICATION:** U – Unclassified

**FOR:** S

**ORGANIZATION:** PM

**CO-DRAFTER BUREAU:** H

**COPY TO:**

**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)

**REQUESTED ACTION:** Information Memo

**CLEARANCES:**

**DELIVERY DATE:** 14-Aug-2018 12:30:00 PM

**EVENT DATE:**

**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)


**CREATED BY:** PM


**LINK:** 201822013 Package


*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons. If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*


**Official – SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Tue, 21 Aug 2018 08:41:08 -0400 |
| **To:** | Wall, Amanda J;Dorosin, Joshua L |
| **Cc:** | Fabry, Steven F |
| **Subject:** | RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH |
| **Attachments:** | (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH |

(LPM).....docx

Hi Amanda and Josh,
Is it OK for us to clear on this AM?  Sorry if I missed a response yesterday.  If clients can't get it to S today it may be kicked back again as out-of-date because the hearing is today.

Thanks,
SHana

Sensitive
This email is UNCLASSIFIED.

---

From: Rogers, Shana A
Sent: Friday, August 17, 2018 4:45 PM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Amanda, Josh,
PM has revised the IM to S with an update on the 3D gun case.  Steve and I have edited the attached but wanted to give the L/FO opportunity to review again before we clear.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

From: Fabry, Steven F
Sent: Friday, August 17, 2018 10:43 AM
To: Rogers, Shana A
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Thanks, Shana, a couple of comments in the attached.  I'm not wedded to any of the words if you think any of it can be improved.  Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 17, 2018 7:54 AM
To: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further edits/comments?  I'll run it back by the FO after your feedback.

Shana

Sensitive
This email is UNCLASSIFIED.

From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it

**Official**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Thu, 23 Aug 2018 07:17:19 -0400
**To:** Wall, Amanda J;Dorosin, Joshua L
**Cc:** Fabry, Steven F
**Subject:** RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH
**Attachments:** (R_467693) IM to S- Update on 3D Printing (LPM 20180823).docx

Hi Josh,
Flagging this again for you—can we clear for L?  I've updated the text to reflect that the hearing occurred on Aug. 21.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Tuesday, August 21, 2018 8:41 AM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Hi Amanda and Josh,
Is it OK for us to clear on this AM?  Sorry if I missed a response yesterday.  If clients can't get it to S today it may be kicked back again as out-of-date because the hearing is today.

Thanks,
SHana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Friday, August 17, 2018 4:45 PM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Amanda, Josh,
PM has revised the IM to S with an update on the 3D gun case.  Steve and I have edited the attached but wanted to give the L/FO opportunity to review again before we clear.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Fabry, Steven F
Sent: Friday, August 17, 2018 10:43 AM
To: Rogers, Shana A
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Thanks, Shana, a couple of comments in the attached.  I'm not wedded to any of the words if you think any of it can be improved.  Thanks,

-- Steve


**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 17, 2018 7:54 AM
To: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further edits/comments?  I'll run it back by the FO after your feedback.

Shana


Sensitive
This email is UNCLASSIFIED.


From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Fabry, Steven F |
| **Sent:** | Fri, 24 Aug 2018 08:50:55 -0400 |
| **To:** | Dorosin, Joshua L;Wall, Amanda J |
| **Cc:** | Rogers, Shana A |
| **Subject:** | FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH |
| **Attachments:** | (R_467693) IM to S- Update on 3D Printing (LPM 20180823).docx |

Per my low-side email.

**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Thursday, August 23, 2018 7:17 AM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Hi Josh,
Flagging this again for you—can we clear for L?  I've updated the text to reflect that the hearing occurred on Aug. 21.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Tuesday, August 21, 2018 8:41 AM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Hi Amanda and Josh,
Is it OK for us to clear on this AM?  Sorry if I missed a response yesterday.  If clients can't get it to S today it may be kicked back again as out-of-date because the hearing is today.

Thanks,
SHana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Friday, August 17, 2018 4:45 PM
To: Wall, Amanda J; Dorosin, Joshua L
Cc: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Amanda, Josh,
PM has revised the IM to S with an update on the 3D gun case.  Steve and I have edited the attached but wanted to give the L/FO opportunity to review again before we clear.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Fabry, Steven F
Sent: Friday, August 17, 2018 10:43 AM
To: Rogers, Shana A
Subject: RE: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Thanks, Shana, a couple of comments in the attached.  I'm not wedded to any of the words if you think any of it can be improved.  Thanks,

-- Steve


**Official - SBU**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Friday, August 17, 2018 7:54 AM
To: Fabry, Steven F
Subject: FW: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

Steve,
PM is trying to push the IM on DD back to S.  I'm not sure what purpose it serves at this point (I suspect he knows all of this by now after Wed. night).  I've edited the attached.  Do you have further edits/comments?  I'll run it back by the FO after your feedback.

Shana


Sensitive

This email is UNCLASSIFIED.

From: Heidema, Sarah J
Sent: Thursday, August 16, 2018 2:58 PM
To: Hart, Robert L
Cc: Paul, Joshua M; Rogers, Shana A
Subject: (R_467693) IM to S- Update on 3D Printing SJH edits (LPM) (2) RLH

My edits. I think we should attach yesterday's brief.  I've put in a place holder for it

**Official**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Fri, 24 Aug 2018 09:05:31 -0400
**To:** Chandler, Karen R;PM-Staffers Mailbox
**Cc:** Rogers, Shana A;Miller, Michael F;Heidema, Sarah J
**Subject:** IM on 3D Printing
**Attachments:** (R_467693) IM to S- Update on 3D Printing (LPM 20180823).docx

PM colleagues – this IM has been cleared by Josh Dorosin in the L/FO with edits as attached.  Thanks,

-- Steve

*Steven F. Fabry*
*Assistant Legal Adviser for*
  *Political-Military Affairs (L/PM)*
*U.S. Department of State*
*(202) 647-9288*
*fabrysf@state.gov*

███████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Fri, 24 Aug 2018 09:05:55 -0400
**To:** Dorosin, Joshua L;Wall, Amanda J;Williams, Veronica X
**Cc:** Rogers, Shana A
**Subject:** FW: IM on 3D Printing
**Attachments:** (R_467693) IM to S- Update on 3D Printing (LPM 20180823).docx

For your records.

**Official - SBU**
UNCLASSIFIED

---

From: Fabry, Steven F
Sent: Friday, August 24, 2018 9:06 AM
To: Chandler, Karen R; PM-Staffers Mailbox
Cc: Rogers, Shana A; Miller, Michael F; Heidema, Sarah J
Subject: IM on 3D Printing

PM colleagues – this IM has been cleared by Josh Dorosin in the L/FO with edits as attached.  Thanks,

-- Steve

*Steven F. Fabry*
*Assistant Legal Adviser for*
  *Political-Military Affairs (L/PM)*
*U.S. Department of State*
*(202) 647-9288*
*fabrysf@state.gov*
██████████████

**Official - SBU**
UNCLASSIFIED

**From:**            PM-Staffers Mailbox
**Sent:**            Fri, 24 Aug 2018 09:47:26 -0400
**To:**              String, Marik A
**Cc:**              Chandler, Karen R;PM-Staffers Mailbox
**Subject:**         For Marik: IM on 3D Printing - PLEASE CLEAR ASAP
**Attachments:**     (R_467693) IM to S- Update on 3D Printing (LPM 20180823).docx
**Importance:**      High


Dear Marik,

Please see attached IM on 3D printing for your review.  Note that this was held up in L/FO for several weeks so S has not been updated on the issue.  I know the Ambassador was hoping to get this out asap and the ruling on the latest court action is Monday so it would be best to get this out this morning to guarantee the line processes it.

All the Best,

Kurosh Massoud Ansari
Staff Assistant
PM/FO SharePoint
202-647-5104


**Official**
UNCLASSIFIED

---

From: Fabry, Steven F
Sent: Friday, August 24, 2018 9:06 AM
To: Chandler, Karen R; PM-Staffers Mailbox
Cc: Rogers, Shana A; Miller, Michael F; Heidema, Sarah J
Subject: IM on 3D Printing

PM colleagues – this IM has been cleared by Josh Dorosin in the L/FO with edits as attached.  Thanks,

-- Steve

*Steven F. Fabry*
*Assistant Legal Adviser for*
*   Political-Military Affairs (L/PM)*
*U.S. Department of State*
*(202) 647-9288*
*fabrysf@state.gov*

███████████████████
███████████████


**Official - SBU**
UNCLASSIFIED

WASHSTATEB008441

**From:**           PM-Staffers Mailbox
**Sent:**           Fri, 24 Aug 2018 11:46:51 -0400
**To:**             String, Marik A
**Cc:**             Chandler, Karen R
**Subject:**        RE: For Marik: IM on 3D Printing - PLEASE CLEAR ASAP
**Attachments:**    64 - State PI Opp.pdf

DAS String,

Attached is Tab 1 of the IM.

Samantha Sison
PM/FO SharePoint
X70561


**Official - SBU**
**UNCLASSIFIED**

---

From: PM-Staffers Mailbox
Sent: Friday, August 24, 2018 9:47 AM
To: String, Marik A
Cc: Chandler, Karen R; PM-Staffers Mailbox
Subject: For Marik: IM on 3D Printing - PLEASE CLEAR ASAP
Importance: High

Dear Marik,

Please see attached IM on 3D printing for your review.  Note that this was held up in L/FO for several weeks so S has not been updated on the issue.  I know the Ambassador was hoping to get this out asap and the ruling on the latest court action is Monday so it would be best to get this out this morning to guarantee the line processes it.

All the Best,

Kurosh Massoud Ansari
Staff Assistant
PM/FO SharePoint
202-647-5104

**Official**
**UNCLASSIFIED**

---

From: Fabry, Steven F
Sent: Friday, August 24, 2018 9:06 AM
To: Chandler, Karen R; PM-Staffers Mailbox

Cc: Rogers, Shana A; Miller, Michael F; Heidema, Sarah J
Subject: IM on 3D Printing

PM colleagues – this IM has been cleared by Josh Dorosin in the L/FO with edits as attached.  Thanks,

-- Steve

*Steven F. Fabry*
*Assistant Legal Adviser for*
*  Political-Military Affairs (L/PM)*
*U.S. Department of State*
*(202) 647-9288*
*fabrysf@state.gov*

██████████████████

**Official - SBU**
**UNCLASSIFIED**

1            The Honorable Robert S. Lasnik

2

3

4

5

6

7     UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
8        AT SEATTLE

9           )

10 STATE OF WASHINGTON, et al.,  )  No. 2:18-cv-1115-RSL
             )
11   Plaintiffs,     )  **FEDERAL DEFENDANTS'**
             )  **BRIEF IN OPPOSITION TO**
     v.     )  **PLAINTIFFS' MOTION FOR**
             )  **PRELIMINARY INJUNCTION**
12 UNITED STATES DEPARTMENT OF )
  STATE, et al.,      )
13           )  **NOTED FOR:** August 21, 2018
   Defendants.     )
14           )

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008448

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority.  According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents.  But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008449

1   merits of their claims, or that it is in the public interest for the Court to second-guess the

2   national security determinations of the Executive Branch.

3        Accordingly, Plaintiffs' motion should be denied.

**BACKGROUND**

5   **I.      Statutory And Regulatory Background**

6        The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

7   President, "[i]n furtherance of world peace and the security and foreign policy of the United

8   States" to "control the *import* and the *export* of defense articles and defense services" and to

9   promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24        The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008450

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5       In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10  process, evaluating whether the item, service, or data is covered by the USML, provides the

11  equivalent performance capabilities of a defense article on the USML, or has a critical military

12  or intelligence advantage.  *See id.* § 120.4(d).

13      While the AECA and ITAR do not provide the State Department with authority to

14  prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15  statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16  manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17  § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18  113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19  States must generally be capable of being detected by metal detectors and by x-ray machines.

20  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21  challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22  by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23  (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24  *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25  these laws in order to address domestic safety issues related to undetectable firearms.  The

26  Department's determination under the ITAR at issue here will not affect those enforcement

27  efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

**II.     The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items."  *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)     Defendants' commitment to draft and to fully pursue, to the extent
        authorized by law (including the Administrative Procedure Act), the
        publication in the Federal Register of a notice of proposed rulemaking and
        final rule, revising USML Category I to exclude the technical data that is
        the subject of the Action.[1]

(b)     Defendants' announcement, while the above-referenced final rule is in
        development, of a temporary modification, consistent with the . . . (ITAR),
        22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
        is the subject of the Action. The announcement will appear on the DDTC
        website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice
of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing
that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR
amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and
pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an
Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's
Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-
sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg.
16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories
IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the
temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the
security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008453

1      (c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018,
2   signed by the Deputy Assistant Secretary for Defense Trade Controls,
    advising that the Published Files, Ghost Gunner Files, and CAD Files are
3   approved for public release (i.e., unlimited distribution) in any form and
    are exempt from the export licensing requirements of the ITAR because
4   they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

5      (d)     Defendants' acknowledgment and agreement that the temporary
    modification . . . permits any United States person, to include DD's
6   customers and SAF's members, to access, discuss, use, reproduce, or
    otherwise benefit from the technical data that is the subject of the Action,
7   and that the letter to Plaintiffs permits any such person to access, discuss,
    use, reproduce or otherwise benefit from the Published Files, Ghost
8   Gunner Files, and CAD Files.

9        The parties executed the agreement on June 29, 2018, and the Government complied

10   with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.")

11   ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated

12   Plaintiffs' constitutional rights.  *See id.* ¶ 28.

13   **III.**    **The Government's Proposed Rulemaking**

14        On May 24, 2018—after the initial exchange of settlement offers but more than one

15   month prior to the settlement with Defense Distributed—the Departments of State and

16   Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the

17   technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

18   Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the

19   ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns

20   and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely

21   the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at

22   24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would

23   no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the

24   Department of State would be required for their export.

25        The Commerce NPRM explains both the rationale for the proposed transfer as well as

26   the review process undertaken by the Government.  As it explained, the process included a

27   "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008454

1    of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2    was intended to ensure that items remaining on the USML are either "inherently military or

3    otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4    applications, possess parameters or characteristics that provide a critical military or intelligence

5    advantage to the United States, and are almost exclusively available from the United States."

6    *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7    question, and therefore subject to export controls under the ITAR, are military weapons and

8    related items that could present a critical military or intelligence advantage.

9    **IV.    Procedural History**

10            On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11   the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12   that the Government's settlement with Defense Distributed adversely affected their public

13   safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14   Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15   a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16   granted on July 31, 2018, Dkt. No. 23 ("Order").

17            In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18   "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19   will have many of the negative impacts on a state level that the federal government once feared

20   on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21   likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22   to entering into the settlement agreement, the Government either provided 30-day notice to

23   Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24   Defense pursuant to Executive Order 13637.  *Id.* at 6.

25            The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26   order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27   expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008455

between domestic and international audiences." *Id.*  Finally, the Court found that "the balance of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin Defense Distributed in any manner.  *Id.*

Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008456

1   at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2   not to "maintain the status quo" pending litigation, but to place themselves in a better position

3   than they were in before the onset of the current controversy through an award of "the exact

4   same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5   (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6   preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7   978 (9th Cir. 1992).[3]

8

9   **I.      Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable
          Harm.**

10          A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11  positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12  U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13  relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14  *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15  *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16          Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17  settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18  claim that the settlement agreement "will make it significantly easier to produce undetectable,

19  untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20  employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21  and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22  items at issue in this motion fall well short of irreparable harm.

23          First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24  lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25  unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27          [3] The Government leaves to the private party Defendants the question of whether and how their individual
    rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2   irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3   regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4   will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5   and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6   fundamental misconception of the relevant law and the authority of the Department as the

7   federal agency that administers it.  The AECA and ITAR have not conferred upon the

8   Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9   articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27       [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008458

1   occur, it will be because individuals have violated separate domestic prohibitions, such as the

2   Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3        For this reason, the types of harms that Plaintiffs identify do not support the granting of

4   injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5   might result from the domestic availability of 3D-printed guns in the United States, but such

6   concerns have little to do with whether particular files should be regulated for foreign export on

7   national security grounds.  Their relation to the State Department's exercise of authority and

8   the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9   questionable "age, mental health, or criminal history" may procure the necessary equipment,

10  download files made specifically available as a result of the Department's settlement, assemble

11  an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12  violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13  files at issue for their availability to U.S. persons in the United States, and it is speculative to

14  claim that these domestic consequences would follow from the Department of State's actions

15  under the ITAR.

16       Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17  printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18  shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19  3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20  purports to permit the domestic production of undetectable firearms.  Such production is illegal

21  due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22       Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23  enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24  bullets.  Pls.' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25  would result from a decision by the Department of State not to regulate the export of the

26
27  confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
    Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008459

1   Defense Distributed's files for national security reasons.

2          Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3   attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4   transferring certain items in USML Category I, which encompass Defense Distributed's files,

5   only because it has determined that such a transfer would not injure the national security

6   interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7   Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8   national security that exist quite apart from the challenged actions and even that the

9   Government has considered and rejected.  Moreover, concerns that children "may mistake

10  [these weapons] for toys" exist apart from export control requirements, and it is at best

11  conjecture that the modification of export control requirements would have any effect on the

12  alleged harm.[5]

13         At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14  *generally*, not from the challenged actions regulating foreign exports.  But there are already

15  laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16  made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17  relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18  *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19  fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20  when there are separate statutes governing domestic manufacture, possession, and sale that

21

22         [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
    F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23  Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
    petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24  appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
    interests." *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25  arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
    Collection Act] to help prevent [serious] injuries." *Id.*  Here, by contrast, the Department's settlement has not
26  prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
    There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
27  After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
    the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
    gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction                United States Department of Justice
(No. 2:18-cv-1115-RSL) – 12                                     Civil Division, Federal Programs Branch
                                                               20 Massachusetts Ave. NW
                                                               Washington, DC 20530
                                                               202-305-8648

WASHSTATEB008460

1   remain unaffected by the challenged actions.

2          Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3   be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4   90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5   lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6   And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8   sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9   ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12         Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17         **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18         "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-
2   61 (1992).

3           Plaintiffs claim they satisfy the requirements of Article III standing because the
4   Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.
5   Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.
6   First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their
7   "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect
8   their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor
9   the challenged settlement agreement, prevents states from acting to enforce their own laws or
10   protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are
11   "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504
12   U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized
13   safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of
14   the States' own employees and residents [] are caused by the Government's sudden decision to
15   deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments
16   are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the
17   settlement of Defense Distributed's claims.  As the Government has previously explained, it
18   regulates the transfer of items constituting exports and temporary imports pursuant to the
19   AECA and ITAR, and it has no authority to regulate the transmission of technical data
20   exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22           [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
     Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel
23   [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
     Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.
24           [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
     are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged
25   procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
     Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the
26   'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
     his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest
27   protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008462

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7         Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns.  It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1).  Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15        Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests.  Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18.  According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates."  Pls' Mot. at 8.  As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26        [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.

27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008463

1    imminent and concrete and would not be prevented by domestic laws regulating undetectable

2    firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3    injury to its proprietary interest is "subject to the same law of standing as any other party in

4    federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5    (supporting allegations of proprietary injury by identifying individuals prevented from

6    attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7    *sub. nom, Golden v. Washington*, 138 S. Ct. 448 (2017).

8           Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9    doctrine of *parens patriae.  See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae.  See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III." (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26          **B.**      **Plaintiffs Lack Prudential Standing.**

27          Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2  Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3  876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4  interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5  regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6  *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7  examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8  which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9  "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10 related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11 assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12 *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13       Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14 particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16 particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17 against the national security threat created by the unrestricted flow of military information

18 abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19 *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20 to control the import and export of defense articles and defense services in 'furtherance of

21 world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22 § 2778(a)(1)); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23 to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24 exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25

26       [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national
security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by

27 the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer
no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008465

1   President may not remove any item from the Munitions List until 30 days after the date on

2   which the President has provided notice of the proposed removal to" certain congressional

3   committees.  As the legislative history makes clear, Congress enacted this provision in response

4   to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5   export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6   exercise congressional oversight of the Department nor function as would-be exporters, and

7   whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8   interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9   (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10   the state "is not the subject of the Secretary's action" and "states have no constitutional or

11   statutory role in federal military policy").

12       **C.    Plaintiffs' APA Claims Are Meritless.**

13            **1.    The Department's Actions Accord With Its Delegated Authority.**

14       Plaintiffs cannot establish likely success on the merits of any of their claims. First,

15   Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16   requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17   Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18   betray their misunderstanding of the governing law.  The statutory provision they invoke

19   provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20   after the date on which the President has provided notice of the proposed removal" to the

21   appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22   the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23   "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24   specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25   authorized to designate those items which shall be considered as defense articles and defense

26   services for the purposes of this section and to promulgate regulations for the import and export

27   of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008466

1  Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a

2  compendium of specific controlled items,' rather it is a 'series of categories describing the

3  kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711

4  F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any

5  "item" of the USML.  The Department's settlement regarding the files at issue in *Defense*

6  *Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

7          To the extent the Court finds the AECA's reference to "item" or "remove" to be

8  ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore*

9  deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is

10  "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the

11  validity of its reasoning, [and] its consistency with earlier and later pronouncements.'"  *Fox*

12  *Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting

13  *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))).  The Department has consistently

14  held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories

15  or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl.

16  ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the

17  original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to

18  remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the

19  executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has

20  been aware of the Department's interpretation and yet has not addressed it in amendments to

21  the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These

22  circumstances provide further evidence—if more is needed—that Congress intended the

23  Agency's interpretation, or at least understood the interpretation as statutorily permissible."

24  *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220

25  (2002)).

26          To the extent the Court concludes that notice to Congress was required under 22 U.S.C.

27  § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008467

1  days so that the State Department can consider providing the notice to Congress—rather than

2  entering the more sweeping preliminary injunction that Plaintiffs seek.

3       Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4  Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5  That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6  constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7  Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8  claiming that its national security determination "is not the sort of emergency stopgap measure

9  contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10  entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11  *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12  pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13  Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14  (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15  decisions of the Executive Branch that relate to national security.").

16       Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17  designations or changes in designations "of items or categories of items that shall be considered

18  as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19  § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20  § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21  not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22  fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23  13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24  (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25  described in this proposed rule and in the State Department's companion proposed rule on

26  Categories I, II, and III of the USML are based on a review of those categories by the

27  Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008468

1    preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2    concurrence specific as to subject files).

3           The Court should also reject Plaintiffs' argument that the Department, in settling

4    *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5    Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6    modification, which "permits any United States person" to use the subject files, "conflicts with

7    many of the States' respective laws regulating firearms," as well as provisions of the Gun

8    Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9    and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10   such laws. To the contrary, the Department has consistently emphasized that its actions are

11   taken only pursuant to its authority to regulate the United States' system of export controls, not

12   domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13   Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14   Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15   remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16   understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17          **2.      The Department's Actions Were Not Arbitrary And Capricious.**

18          Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19   because they constitute an unexplained reversal of the agency's prior position concerning

20   whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21   Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22   decision to enter into a settlement to resolve that litigation, such decisions are committed to

23   agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24   *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26          [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
     circumvent the law, Pls.' Mot. at 14; *see also id.*at 4 (suggesting the Government settled "covert[ly]"). *United*

27   *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
     ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008469

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7          Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10  Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11  1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12  explains that the "review was focused on identifying the types of articles that are now

13  controlled on the USML that are either (i) inherently military and otherwise warrant control on

14  the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15  or characteristics that provide a critical military or intelligence advantage to the United States,

16  and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17  the scope of the items described in this proposed rule is essentially commercial items widely

18  available in retail outlets and less sensitive military items.").  This case is only about the

19  determination of the Government that the technical data at issue would not give a military or

20  intelligence advantage and is therefore not properly subject to export controls.  Only those

21  weapons of a type that is inherently military or that is not otherwise widely available for

22  commercial sale are properly subject to such controls.  The Government has not made any

23  determination that 3D-printed guns should not be regulated domestically, and indeed the

24  Government intends to apply those authorities that regulate such firearms and supports

25  _____

        [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal
26  authority.  As explained in the balance of this memorandum, that is not accurate.
        [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release
27  "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger
    rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  Plaintiffs' efforts to do so as well.

2

3  **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4          Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5  which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6  1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7  injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8  from sharing these files with other U.S. persons within the United States, the harms identified

9  by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10  Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11  public interest is not served by restraining the ability of the Executive Branch to exercise its

12  discretion to determine whether harm to national security requires export controls on particular

13  items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14  of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15  to courts).

16          Further, the Government notes that the possibility of manufacturing small-caliber

17  firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18  ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19  the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20  submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21  demonstrates that the balance of equities weighs in Defendants' favor.

22                                         **CONCLUSION**

23          For the foregoing reasons, the motion for a preliminary injunction should be denied.

24  Dated:  August 15, 2018                         Respectfully submitted,

25

26                                                 CHAD A. READLER
                                                   Acting Assistant Attorney General

27                                                 ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008471

1                         Acting United States Attorney

2                         KERRY KEEFE
Civil Chief

3

4                         JOHN R. GRIFFITHS
Director, Federal Programs Branch

5                         ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

6

7                         */s/ Steven A. Myers*
STEVEN A. MYERS

8                         ERIC J. SOSKIN
STUART J. ROBINSON

9                         Attorneys
U.S. Department of Justice

10                      Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW

11                      Washington, D.C. 20530

12                      (202) 305-8648 (telephone)
(202) 616-8460 (facsimile)

13                      steven.a.myers@usdoj.gov

14

15                      *Attorneys for Federal Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

WASHSTATEB008472

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using

3

the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5

Dated: August 15, 2018                    */s/ Steven A. Myers*
                                          Steven A. Myers

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008473

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.       I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.       I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.       The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).  The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services.  The items so designated shall constitute the "United States Munitions List"

(USML). *Id.*  The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute.  *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML.  The items enumerated on the USML are those that "provide a critical military or

intelligence advantage."  22 C.F.R. § 120.3(b).  The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations.  *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example:  certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ."  22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f). The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously. At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories. If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

3

WASHSTATEB008477

8.     The Department continuously engages with its interagency partners and industry to evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80 Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently published a Notice of Inquiry requesting comments from the public to inform, in part, its review of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb. 12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR 37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its interagency partners are reviewing the public comments submitted in response to the 2018 Notice of Inquiry, and the Department intends to publish an NPRM for public comment implementing any revisions to the categories that are warranted.

9.     The AECA states that the Department "may not remove any item from the [USML] until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has interpreted "item" within the meaning of this provision to refer to the specifically enumerated text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria.  The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change.  The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions.  At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4.  The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce.  The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information.  The CJ process typically takes 45-55 business days.  If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.


**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.     The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.     ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided:  "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

7

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

WASHSTATEB008482

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report
on further internal national security assessments. The iterative process generates rules for
publication in the *Federal Register*.

18.      The Department has long taken the position that controlling the temporary import and
export of defense articles and services is a foreign affairs function of the U.S. government, and
that rules implementing this function are exempt from sections 553 (rulemaking) and 554
(adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The
Department, nevertheless, accepted public comment through a notice of proposed rulemaking
prior to adding, removing, or amending the description of any item on the USML.

19.      As part of the most recent review of the USML, the Department has not published final
rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault
weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the
interagency review process described above, in which the Department coordinated principally
with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the
Department determined that certain items now controlled by USML Categories I-III do not
provide the United States with a critical military or intelligence advantage, and therefore do not
warrant control on the USML. This decision was informed by DoD's assessment that the items
proposed for transfer are already commonly available and not inherently for military end-use,
such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an
example, a specific make and model meeting the description of this subparagraph is the Beretta
M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the
United States, and has been licensed by the Department for export to commercial retailers and
militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.    The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.    In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.    I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

WASHSTATEB008485

website.[5] I also understand that internationally hosted websites continued to make those files

available for download during the pendency of the *Defense Distributed* litigation. Any

restrictions imposed by the Department on the technical data that was the subject of the action

were limited to the export of that technical data; the Department has no jurisdiction over sharing

technical data between U.S. persons in the United States, unless such sharing also provides

access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy

of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

   (a)     [D]raft and to fully pursue, to the extent authorized by law (including the
   Administrative Procedure Act), the publication in the Federal Register of a notice
   of proposed rulemaking and final rule, revising USML Category I to exclude the
   technical data that is the subject of the Action.

   (b)     [Announce], while the above-referenced final rule is in development, of a
   temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of
   USML Category I to exclude the technical data that is the subject of the Action.
   The announcement will appear on the DDTC website, www.pmddtc.state.gov, on
   or before July 27, 2018.

   (c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy
   Assistant Secretary for Defense Trade Controls, advising that the Published Files,
   Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited
   distribution) in any form and are exempt from the export licensing requirements of
   the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the
   purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S.
   Government department or agency, and the Directorate of Defense Trade Controls
   has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's
first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times.
That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech
gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's
Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at
https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-
two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.   The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.   In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.   Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

WASHSTATEB008489

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be

provided in settlement of the Action, including all damages or other monetary relief,

equitable relief, declaratory relief, or relief of any form, including but not limited to,

attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. §

1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d),

and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement,

Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an

original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P.

41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation

and file it with the Court in the Action, no sooner than 5 business days after the

publication of the announcement described in Paragraph 1(b) of this Settlement

Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement

Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives,

successors, or assigns, hereby waive, release and forever discharge Defendants, and all of

their components, offices or establishments, and any officers, employees, agents, or

successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHSTATEB008494

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this

Settlement Agreement with their counsel, who has explained these documents to them

and that they understand all of the terms and conditions of this Settlement Agreement.

Plaintiffs further acknowledge that they have read this Settlement Agreement, understand

the contents thereof, and execute this Settlement Agreement of their own free act and

deed. The undersigned represent that they are fully authorized to enter into this

Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,

each of which shall be deemed an original, and all of which together constitute one and

the same instrument, and photographic copies of such signed counterparts may be used in

lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly

drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax

requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and

Defendants agree that nothing in this Settlement Agreement waives or modifies federal,

state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEB008496

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB008497

**From:**            PM-Staffers Mailbox
**Sent:**            Fri, 24 Aug 2018 17:36:09 -0400
**To:**              Heidema, Sarah J;Hart, Robert L;Koelling, Richard W;Davidson-Hood, Simon
**Cc:**              PM-Staffers Mailbox;Chandler, Karen R;Paul, Joshua M;Miller, Michael F;PM-CPA-DL;String, Marik A
**Subject:**         FW: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision
**Attachments:**     (R_470020) (R_467693) IM to S- Update on 3D Printing (LPM 20180823) clean.docx, (S_470021) Tab 1 - 64 - State PI Opp.pdf
**Importance:**      High


All,

3D printing IM bounced. Please address Eva's comments in the attached and see additional comments highlighted below.

Best,

Samantha Sison
PM/FO SharePoint
X70561

From: SES-Line_Only
Sent: Friday, August 24, 2018 5:05 PM
To: Everest_PM; Everest_H
Cc: SES-Line_Only
Subject: Package 201822013 Update on 3D Printing – Defense Distributed (DD) has been returned for revision

S/ES is returning this package to your bureau for revision. The deadline for you to resubmit this package is: 8/27/2018 10:00:00 AM. Please contact the Line at 7-8879 with any questions.

**NOTES:** Per deps: this memo has plenty of background S already knows about the 3D gun issue. Please be more clear about the implications for the Department and what our next steps and plan of action are.
**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DUE DATE:** 27-Aug-2018 10:00:00 AM
**EVENT DATE:**
**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** [201822013 Package](#)

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the* **Advanced Search** *to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7        UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
8               AT SEATTLE

9                                    )
   STATE OF WASHINGTON, et al.,      )    No. 2:18-cv-1115-RSL
10                                   )
         Plaintiffs,                 )    **FEDERAL DEFENDANTS'**
11                                   )    **BRIEF IN OPPOSITION TO**
                 v.                  )    **PLAINTIFFS' MOTION FOR**
12                                   )    **PRELIMINARY INJUNCTION**
   UNITED STATES DEPARTMENT OF       )
   STATE, et al.,                    )    **NOTED FOR:** August 21, 2018
13                                   )
         Defendants.                 )
14 _____  )

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008509

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority.  According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents.  But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008510

1   merits of their claims, or that it is in the public interest for the Court to second-guess the

2   national security determinations of the Executive Branch.

3        Accordingly, Plaintiffs' motion should be denied.

**BACKGROUND**

**I.        Statutory And Regulatory Background**

6        The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

7   President, "[i]n furtherance of world peace and the security and foreign policy of the United

8   States" to "control the *import* and the *export* of defense articles and defense services" and to

9   promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24       The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2  subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3  § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4  in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5      In certain cases where it is unclear whether a particular item is a defense article or

6  defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7  a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8  applicants with a determination as to whether the item, service, or data is within the scope of

9  the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10  process, evaluating whether the item, service, or data is covered by the USML, provides the

11  equivalent performance capabilities of a defense article on the USML, or has a critical military

12  or intelligence advantage.  *See id.* § 120.4(d).

13      While the AECA and ITAR do not provide the State Department with authority to

14  prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15  statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16  manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17  § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18  113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19  States must generally be capable of being detected by metal detectors and by x-ray machines.

20  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21  challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22  by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23  (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24  *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25  these laws in order to address domestic safety issues related to undetectable firearms.  The

26  Department's determination under the ITAR at issue here will not affect those enforcement

27  efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008512

**II.      The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization. *See id.* Defense Distributed removed the technical data and submitted a CJ request. *Id.* The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. *Id.* at 701. For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment. *Id.* at 691-92. Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits. *Id.* at 695.

The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights. *Id.* at 458-59. The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court. *See id.* at 456-58. A dissent from the panel opinion did address the merits. *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)    Defendants' commitment to draft and to fully pursue, to the extent
authorized by law (including the Administrative Procedure Act), the
publication in the Federal Register of a notice of proposed rulemaking and
final rule, revising USML Category I to exclude the technical data that is
the subject of the Action.[1]

(b)    Defendants' announcement, while the above-referenced final rule is in
development, of a temporary modification, consistent with the . . . (ITAR),
22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
is the subject of the Action. The announcement will appear on the DDTC
website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice
of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing
that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR
amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and
pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an
Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's
Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-
sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg.
16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories
IV through XX.
[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the
temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the
security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008514

1
2
3
4

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

5
6
7
8

(d)    Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

9    The parties executed the agreement on June 29, 2018, and the Government complied

10   with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.")

11   ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated

12   Plaintiffs' constitutional rights.  *See id.* ¶ 28.

13   **III.    The Government's Proposed Rulemaking**

14   On May 24, 2018—after the initial exchange of settlement offers but more than one

15   month prior to the settlement with Defense Distributed—the Departments of State and

16   Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the

17   technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

18   Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the

19   ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns

20   and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely

21   the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at

22   24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would

23   no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the

24   Department of State would be required for their export.

25   The Commerce NPRM explains both the rationale for the proposed transfer as well as

26   the review process undertaken by the Government.  As it explained, the process included a

27   "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008515

1    of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2    was intended to ensure that items remaining on the USML are either "inherently military or

3    otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4    applications, possess parameters or characteristics that provide a critical military or intelligence

5    advantage to the United States, and are almost exclusively available from the United States."

6    *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7    question, and therefore subject to export controls under the ITAR, are military weapons and

8    related items that could present a critical military or intelligence advantage.

9    **IV.    Procedural History**

10        On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11   the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12   that the Government's settlement with Defense Distributed adversely affected their public

13   safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14   Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15   a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16   granted on July 31, 2018, Dkt. No. 23 ("Order").

17        In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18   "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19   will have many of the negative impacts on a state level that the federal government once feared

20   on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21   likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22   to entering into the settlement agreement, the Government either provided 30-day notice to

23   Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24   Defense pursuant to Executive Order 13637.  *Id.* at 6.

25        The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26   order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27   expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008516

between domestic and international audiences." *Id.*  Finally, the Court found that "the balance of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin Defense Distributed in any manner.  *Id.*

Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008517

1    at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2    not to "maintain the status quo" pending litigation, but to place themselves in a better position

3    than they were in before the onset of the current controversy through an award of "the exact

4    same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5    (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6    preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7    978 (9th Cir. 1992).[3]

8

9    **I.     Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable**
     **Harm.**

10           A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12   U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13   relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14   *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15   *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16           Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17   settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18   claim that the settlement agreement "will make it significantly easier to produce undetectable,

19   untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20   employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21   and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22   items at issue in this motion fall well short of irreparable harm.

23           First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24   lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25   unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27          [3] The Government leaves to the private party Defendants the question of whether and how their individual
     rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008518

be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

irreparable harm is that they are not caused by, and cannot be traced to, the Department's

regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

fundamental misconception of the relevant law and the authority of the Department as the

federal agency that administers it.  The AECA and ITAR have not conferred upon the

Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

*generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

defense articles among U.S. persons within the United States.  Therefore, the Department has

never prohibited Defense Distributed, or any other company or individual, from providing their

files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

public or private forums, including via the mail or any other medium that does not provide the

ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

extent Defense Distributed and others have not previously disseminated the computer files at

issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

Government's settlement regarding Defense Distributed's foreign export of its files has harmed

or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

---

[4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    occur, it will be because individuals have violated separate domestic prohibitions, such as the

2    Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3         For this reason, the types of harms that Plaintiffs identify do not support the granting of

4    injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5    might result from the domestic availability of 3D-printed guns in the United States, but such

6    concerns have little to do with whether particular files should be regulated for foreign export on

7    national security grounds.  Their relation to the State Department's exercise of authority and

8    the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9    questionable "age, mental health, or criminal history" may procure the necessary equipment,

10   download files made specifically available as a result of the Department's settlement, assemble

11   an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12   violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13   files at issue for their availability to U.S. persons in the United States, and it is speculative to

14   claim that these domestic consequences would follow from the Department of State's actions

15   under the ITAR.

16        Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17   printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18   shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19   3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20   purports to permit the domestic production of undetectable firearms.  Such production is illegal

21   due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22        Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23   enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24   bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25   would result from a decision by the Department of State not to regulate the export of the

26

27   confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
     Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008520

1    Defense Distributed's files for national security reasons.

2         Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13        At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

21

22        [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.  There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.  After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  remain unaffected by the challenged actions.

2        Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3  be available," in which case temporary relief is unavailable. *Sampson v. Murray*, 415 U.S. 61,

4  90 (1974). Plaintiffs retain the full authority to enforce their public safety laws, including

5  lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6  And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7  firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8  sufficient metal to be detectable, remain in force. These laws—which, unlike the AECA and

9  ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12        Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19. As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard. *See Stanley*, 13 F.3d at 1320.

17        **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18        "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013). The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008522

1  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2  61 (1992).

3        Plaintiffs claim they satisfy the requirements of Article III standing because the

4  Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5  Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6  First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7  "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8  their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor

9  the challenged settlement agreement, prevents states from acting to enforce their own laws or

10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14  the States' own employees and residents [] are caused by the Government's sudden decision to

15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17  settlement of Defense Distributed's claims.  As the Government has previously explained, it

18  regulates the transfer of items constituting exports and temporary imports pursuant to the

19  AECA and ITAR, and it has no authority to regulate the transmission of technical data

20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22      [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'

23  Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24      [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008523

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695. Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7            Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns. It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1). Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15           Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests. Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18. According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates." Pls' Mot. at 8. As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26           [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.

27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    imminent and concrete and would not be prevented by domestic laws regulating undetectable

2    firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3    injury to its proprietary interest is "subject to the same law of standing as any other party in

4    federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5    (supporting allegations of proprietary injury by identifying individuals prevented from

6    attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7    *sub. nom, Golden v. Washington*, 138 S. Ct. 448 (2017).

8         Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9    doctrine of *parens patriae.  See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae.  See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III." (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26        **B.    Plaintiffs Lack Prudential Standing.**

27        Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2    Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3    876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4    interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5    regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6    *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7    examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8    which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9    "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10   related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11   assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12   *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13        Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14   particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15   154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16   particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17   against the national security threat created by the unrestricted flow of military information

18   abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19   *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20   to control the import and export of defense articles and defense services in 'furtherance of

21   world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22   § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23   to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24   exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25   ─────────────────

26   [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27   no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  President may not remove any item from the Munitions List until 30 days after the date on

2  which the President has provided notice of the proposed removal to" certain congressional

3  committees.  As the legislative history makes clear, Congress enacted this provision in response

4  to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5  export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6  exercise congressional oversight of the Department nor function as would-be exporters, and

7  whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8  interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9  (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

12      **C.     Plaintiffs' APA Claims Are Meritless.**

13           **1.     The Department's Actions Accord With Its Delegated Authority.**

14           Plaintiffs cannot establish likely success on the merits of any of their claims. First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008527

Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))). Thus, the Department's settlement agreement did not affect any "item" of the USML. The Department's settlement regarding the files at issue in *Defense Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

To the extent the Court finds the AECA's reference to "item" or "remove" to be ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore* deference. Under *Skidmore*, a court must defer to an agency's interpretation provided it is "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))). The Department has consistently held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories or subcategories of the USML, implicate the 30-day notice requirement. *See* Heidema Decl. ¶¶ 9, 30, 32. Further, the Department's position accords with both the AECA's text and the original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to remove items from the USML. *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . ."). Additionally, Congress has been aware of the Department's interpretation and yet has not addressed it in amendments to the AECA. *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9. "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

To the extent the Court concludes that notice to Congress was required under 22 U.S.C. § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008528

1   days so that the State Department can consider providing the notice to Congress—rather than

2   entering the more sweeping preliminary injunction that Plaintiffs seek.

3        Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4   Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5   That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6   constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7   Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8   claiming that its national security determination "is not the sort of emergency stopgap measure

9   contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10  entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11  *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12  pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13  Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14  (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15  decisions of the Executive Branch that relate to national security.").

16       Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17  designations or changes in designations "of items or categories of items that shall be considered

18  as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19  § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20  § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21  not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22  fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23  13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24  (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25  described in this proposed rule and in the State Department's companion proposed rule on

26  Categories I, II, and III of the USML are based on a review of those categories by the

27  Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008529

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3       The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10  such laws. To the contrary, the Department has consistently emphasized that its actions are

11  taken only pursuant to its authority to regulate the United States' system of export controls, not

12  domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13  Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14  Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15  remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16  understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17          **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18      Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19  because they constitute an unexplained reversal of the agency's prior position concerning

20  whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21  Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22  decision to enter into a settlement to resolve that litigation, such decisions are committed to

23  agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24  *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26          [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
    circumvent the law, Pls.' Mot. at 14; *see also id.*at 4 (suggesting the Government settled "covert[ly]"). *United*
27  *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
    ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008530

759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

authority," such claims are reviewable).[11]

       Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

control of such technical data is not warranted. *See generally* 83 Fed. Reg. 24,198; 83 Fed.

Reg. at 24,166. These NPRMs have not been withdrawn and remain the official position of the

Government.[12] *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

1982). Further, the rationale for this determination is provided in the Commerce NPRM, which

explains that the "review was focused on identifying the types of articles that are now

controlled on the USML that are either (i) inherently military and otherwise warrant control on

the USML or (ii) if of a type common to non-military firearms applications, possess parameters

or characteristics that provide a critical military or intelligence advantage to the United States,

and are almost exclusively available from the United States." 83 Fed. Reg. at 24,166 ("Thus,

the scope of the items described in this proposed rule is essentially commercial items widely

available in retail outlets and less sensitive military items."). This case is only about the

determination of the Government that the technical data at issue would not give a military or

intelligence advantage and is therefore not properly subject to export controls. Only those

weapons of a type that is inherently military or that is not otherwise widely available for

commercial sale are properly subject to such controls. The Government has not made any

determination that 3D-printed guns should not be regulated domestically, and indeed the

Government intends to apply those authorities that regulate such firearms and supports

---

[11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal authority. As explained in the balance of this memorandum, that is not accurate.

[12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger rulemaking effort. *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4            Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16           Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                    **CONCLUSION**

23           For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                    Respectfully submitted,

25                                              CHAD A. READLER

26                                              Acting Assistant Attorney General

27                                              ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1

Acting United States Attorney

2

KERRY KEEFE
Civil Chief

3

4

JOHN R. GRIFFITHS
Director, Federal Programs Branch

5

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

6

7

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

8

9

10

11

12

13

14

*Attorneys for Federal Defendants*

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008533

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018                    */s/ Steven A. Myers*
                                          Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008534

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services. The items so designated shall constitute the "United States Munitions List"

(USML). *Id.* The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML. The items enumerated on the USML are those that "provide a critical military or

intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or

documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d).

"Technical data" does not include information concerning general scientific, mathematical, or

engineering principles commonly taught in schools, colleges, and universities, or information

that is in the public domain.  *See* 22 C.F.R. § 120.10.  ITAR § 120.11 defines "public domain,"

in relevant part, as information which is published and generally accessible or available to the

public, and provides a list of information that has been made available to the public, including

"[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in

any form (e.g., not necessarily in published form) after approval by the cognizant U.S.

government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of

hardware, technical data, and services described on the USML—to determine what items, if any,

no longer warrant control under the ITAR and conveys the results of such reviews to Congress.

*See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the

Departments of Defense and Commerce to determine the categories most appropriate for review,

and this consultation is informed by inquiries received from the general public, internal feedback

from licensing officers and Commodity Jurisdiction analysts, and the period of time since the

categories under consideration were reviewed previously.  At the onset of the review process the

Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories

under consideration for review and to solicit comment on potential improvements to those

categories.  If warranted, based on the feedback received, the Department will then initiate an

ordinary rulemaking process, beginning with the publication of a Notice of Proposed

Rulemaking (NPRM).

3

8.      The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.      The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate." 22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

WASHSTATEB008539

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria. The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change. The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions. At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10. The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4. The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce. The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information. The CJ process typically takes 45-55 business days. If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11. The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.


**Relevant Statutory and Regulatory Framework: Licenses and Authorizations**

12.    The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a). Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17. Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1] Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.    ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review." Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided: "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . . Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations. Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR." https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

WASHSTATEB008541

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1.  ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case.  Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.


**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage.  In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018).  This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security.  In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

7

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public.  Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

WASHSTATEB008543

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files available for download during the pendency of the *Defense Distributed* litigation. Any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data; the Department has no jurisdiction over sharing technical data between U.S. persons in the United States, unless such sharing also provides access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)     [D]raft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.
>
> (b)     [Announce], while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.
>
> (c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.      The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.　*Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

　　(a)　Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

　　(b)　Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to
exclude the technical data that is the subject of the Action. The announcement
will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27,
2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by
the Deputy Assistant Secretary for Defense Trade Controls, advising that the
Published Files, Ghost Gunner Files, and CAD Files are approved for public
release (i.e., unlimited distribution) in any form and are exempt from the export
licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. §
125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of
State is the cognizant U.S. Government department or agency, and the Directorate
of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of
USML Category I permits any United States person, to include DD's customers
and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from
the technical data that is the subject of the Action, and that the letter to Plaintiffs
permits any such person to access, discuss, use, reproduce or otherwise benefit
from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and
is the only payment that will be made to Plaintiffs or their counsel by Defendants
under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.
The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.     *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.     *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.     *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

WASHSTATEB008555

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEB008557

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018


Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_, 2018


Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB008558

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
8                                     AT SEATTLE

9                                              )
   STATE OF WASHINGTON, et al.,                )    No. 2:18-cv-1115-RSL
10                                             )
        Plaintiffs,                            )    **FEDERAL DEFENDANTS'**
11                     v.                      )    **BRIEF IN OPPOSITION TO**
                                               )    **PLAINTIFFS' MOTION FOR**
12  UNITED STATES DEPARTMENT OF                )    **PRELIMINARY INJUNCTION**
    STATE, et al.,                             )
13                                             )    **NOTED FOR:** August 21, 2018
        Defendants.                            )
14  _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008565

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority.  According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents.  But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

merits of their claims, or that it is in the public interest for the Court to second-guess the

national security determinations of the Executive Branch.

Accordingly, Plaintiffs' motion should be denied.

**BACKGROUND**

**I.      Statutory And Regulatory Background**

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the United

States" to "control the *import* and the *export* of defense articles and defense services" and to

promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

has delegated this authority to the Department in relevant part, and the Department has

accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

information that "is required for the design, development, production, manufacture, assembly,

operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

services to be included on the USML; (2) to require licenses for the export of items on the

USML; and (3) to promulgate regulations for the import and export of such items on the

USML.  22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute

"exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008567

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5          In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10   process, evaluating whether the item, service, or data is covered by the USML, provides the

11   equivalent performance capabilities of a defense article on the USML, or has a critical military

12   or intelligence advantage.  *See id.* § 120.4(d).

13          While the AECA and ITAR do not provide the State Department with authority to

14   prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15   statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16   manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17   § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18   113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19   States must generally be capable of being detected by metal detectors and by x-ray machines.

20   *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21   challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22   by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23   (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24   *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25   these laws in order to address domestic safety issues related to undetectable firearms.  The

26   Department's determination under the ITAR at issue here will not affect those enforcement

27   efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008568

**II.      The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)     Defendants' commitment to draft and to fully pursue, to the extent
        authorized by law (including the Administrative Procedure Act), the
        publication in the Federal Register of a notice of proposed rulemaking and
        final rule, revising USML Category I to exclude the technical data that is
        the subject of the Action.[1]

(b)     Defendants' announcement, while the above-referenced final rule is in
        development, of a temporary modification, consistent with the . . . (ITAR),
        22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
        is the subject of the Action. The announcement will appear on the DDTC
        website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra*.  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)     Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.") ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated Plaintiffs' constitutional rights.  *See id.* ¶ 28.

**III.     The Government's Proposed Rulemaking**

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the Department of State would be required for their export.

The Commerce NPRM explains both the rationale for the proposed transfer as well as the review process undertaken by the Government.  As it explained, the process included a "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008571

1   of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2   was intended to ensure that items remaining on the USML are either "inherently military or

3   otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4   applications, possess parameters or characteristics that provide a critical military or intelligence

5   advantage to the United States, and are almost exclusively available from the United States."

6   *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7   question, and therefore subject to export controls under the ITAR, are military weapons and

8   related items that could present a critical military or intelligence advantage.

9   **IV.    Procedural History**

10          On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11   the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12   that the Government's settlement with Defense Distributed adversely affected their public

13   safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14   Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15   a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16   granted on July 31, 2018, Dkt. No. 23 ("Order").

17          In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18   "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19   will have many of the negative impacts on a state level that the federal government once feared

20   on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21   likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22   to entering into the settlement agreement, the Government either provided 30-day notice to

23   Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24   Defense pursuant to Executive Order 13637.  *Id.* at 6.

25          The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26   order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27   expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008572

1  between domestic and international audiences." *Id.*  Finally, the Court found that "the balance

2  of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the

3  Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

4  of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

5  Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

6  July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

7  modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin

8  Defense Distributed in any manner.  *Id.*

9      Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

10  moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed

11  to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

12                                **ARGUMENT**

13      "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

14  be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

15  *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must

16  establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

17  the absence of preliminary relief, that the balance of equities tips in his favor, and that an

18  injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19  1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the

20  merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

21  a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

22  irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

23  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

24  967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

25  factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

26      Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

27  by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2   not to "maintain the status quo" pending litigation, but to place themselves in a better position

3   than they were in before the onset of the current controversy through an award of "the exact

4   same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5   (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6   preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7   978 (9th Cir. 1992).[3]

8

9   **I.      Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable
            Harm.**

10          A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11  positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12  U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13  relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14  *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15  *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16          Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17  settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18  claim that the settlement agreement "will make it significantly easier to produce undetectable,

19  untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20  employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21  and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22  items at issue in this motion fall well short of irreparable harm.

23          First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24  lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25  unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27          [3] The Government leaves to the private party Defendants the question of whether and how their individual
rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008574

1   be posted on the internet." Pls.' Mot. at 20. But the core inadequacy of Plaintiffs' claims of

2   irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3   regulatory actions or the challenged settlement agreement. Rather, if these harms occur at all, it

4   will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5   and other relevant domestic laws. Indeed, Plaintiffs' claim of irreparable harm is based on a

6   fundamental misconception of the relevant law and the authority of the Department as the

7   federal agency that administers it. The AECA and ITAR have not conferred upon the

8   Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9   articles and services by U.S. persons or domestic communications to U.S. persons. *See*

10  *generally* 22 U.S.C. § 2778. Rather, as noted above, the agency's only relevant authority

11  pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12  data. *Id.* § 2778(a)(1). Critically, neither the AECA nor ITAR prohibits the transmission of

13  defense articles among U.S. persons within the United States. Therefore, the Department has

14  never prohibited Defense Distributed, or any other company or individual, from providing their

15  files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16  mail, distributing DVDs containing such data, or other means. *See Def. Distributed*, 121 F.

17  Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18  public or private forums, including via the mail or any other medium that does not provide the

19  ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12. To the

20  extent Defense Distributed and others have not previously disseminated the computer files at

21  issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22  to the Department's regulatory authority. Plaintiffs therefore cannot plausibly suggest that the

23  Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24  or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25  crimes, or protect public health.[4] Should any of the harms about which Plaintiffs are concerned

26

27   ───────────────
     [4] The declarations submitted by Plaintiffs do not address these deficiencies. *See generally* Dkt. No. 43-2. Not
     only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008575

occur, it will be because individuals have violated separate domestic prohibitions, such as the Undetectable Firearms Act. *See* 18 U.S.C. § 922(p)(1).

For this reason, the types of harms that Plaintiffs identify do not support the granting of injunctive relief in the circumstances of this case. All of the concerns identified are harms that might result from the domestic availability of 3D-printed guns in the United States, but such concerns have little to do with whether particular files should be regulated for foreign export on national security grounds. Their relation to the State Department's exercise of authority and the settlement agreement is speculative. For example, Plaintiffs contend that someone of questionable "age, mental health, or criminal history" may procure the necessary equipment, download files made specifically available as a result of the Department's settlement, assemble an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20. But such actions would violate domestic prohibitions on the use of firearms. The Department does not regulate the files at issue for their availability to U.S. persons in the United States, and it is speculative to claim that these domestic consequences would follow from the Department of State's actions under the ITAR.

Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-printing process fail for the same reasons. *See id.* at 20-24. For instance, they assert shortcomings in the ability of metal detectors to discern the presence of firearms made from a 3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case purports to permit the domestic production of undetectable firearms. Such production is illegal due to separate authority that regulates domestic conduct. *See* 18 U.S.C. § 922(p)(1).

Plaintiffs also argue that 3D-printed firearms "present unique challenges to law enforcement," particularly with respect to tracing weapons and conducting forensic testing on bullets. Pls.' Mot. at 21-22. Again, Plaintiffs can only speculate as to whether such a harm would result from a decision by the Department of State not to regulate the export of the

---

confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts. Camper Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   Defense Distributed's files for national security reasons.

2          Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3   attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4   transferring certain items in USML Category I, which encompass Defense Distributed's files,

5   only because it has determined that such a transfer would not injure the national security

6   interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7   Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8   national security that exist quite apart from the challenged actions and even that the

9   Government has considered and rejected.  Moreover, concerns that children "may mistake

10  [these weapons] for toys" exist apart from export control requirements, and it is at best

11  conjecture that the modification of export control requirements would have any effect on the

12  alleged harm.[5]

13         At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14  *generally*, not from the challenged actions regulating foreign exports.  But there are already

15  laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16  made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17  relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18  *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19  fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20  when there are separate statutes governing domestic manufacture, possession, and sale that

21

22         [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.  There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.  After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    remain unaffected by the challenged actions.

2            Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3    be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4    90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5    lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6    And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7    firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8    sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9    ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10   basis.

11   **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12           Although their Amended Complaint asserts claims under both the APA and the Tenth

13   Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14   only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15   failed to establish that "the law and the facts clearly favor" their position, as required under the

16   heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17           **A.       Plaintiffs Lack Article III Standing To Assert Their Claims.**

18           "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19   'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20   'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21   *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22   "which is built on separation-of-powers principles, serves to prevent the judicial process from

23   being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24   U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25   elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26   challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008578

1   injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-
2   61 (1992).

3   Plaintiffs claim they satisfy the requirements of Article III standing because the
4   Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.
5   Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.
6   First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their
7   "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect
8   their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor
9   the challenged settlement agreement, prevents states from acting to enforce their own laws or
10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are
11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504
12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized
13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of
14  the States' own employees and residents [] are caused by the Government's sudden decision to
15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments
16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the
17  settlement of Defense Distributed's claims.  As the Government has previously explained, it
18  regulates the transfer of items constituting exports and temporary imports pursuant to the
19  AECA and ITAR, and it has no authority to regulate the transmission of technical data
20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22      [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
    Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel
23  [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
    Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.
24      [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
    are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged
25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
    Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the
26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
    his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest
27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008579

1   Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2   ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3   disseminat[ing] the computer files at issue domestically in public or private forums," including

4   within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

5   plausibly assert that the Government's "deregulation" has affected—let alone seriously

6   jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7         Moreover, separate laws aimed at domestic conduct continue to address domestic public

8   safety concerns.  It remains that case that any person who might obtain the necessary

9   equipment and materials, download the files from Defense Distributed's website, properly

10  construct an operable firearm, and render the firearm undetectable would be engaging in an

11  action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1).  Thus, Plaintiffs cannot establish

12  that the challenged actions, which concern whether an item must be regulated for export from

13  the United States, restrict their ability or authority to protect public safety in their states. *See*

14  *Clapper*, 568 U.S. at 409.

15        Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16  interests.  Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18.  According to Plaintiffs, they have suffered

17  proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18  and prisons more dangerous for guards and inmates."  Pls' Mot. at 8.  As an initial matter, they

19  offer no support that such an injury is properly asserted under the doctrine of proprietary

20  interests rather than as *parens patriae*.  *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21  1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22  people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23  But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24  harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26        [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.

27  592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008580

1   imminent and concrete and would not be prevented by domestic laws regulating undetectable

2   firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3   injury to its proprietary interest is "subject to the same law of standing as any other party in

4   federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5   (supporting allegations of proprietary injury by identifying individuals prevented from

6   attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7   *sub. nom, Golden v. Washington*, 138 S. Ct. 448 (2017).

8        Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9   doctrine of *parens patriae.  See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae.  See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III." (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26        **B.     Plaintiffs Lack Prudential Standing.**

27        Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008581

1  'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2  Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3  876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4  interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5  regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6  *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7  examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8  which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9  "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10  related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11  assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12  *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13     Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14  particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15  154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16  particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17  against the national security threat created by the unrestricted flow of military information

18  abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19  *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20  to control the import and export of defense articles and defense services in 'furtherance of

21  world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22  § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23  to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24  exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25
26     [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national
    security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by
    the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer
27  no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
    dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008582

1   President may not remove any item from the Munitions List until 30 days after the date on

2   which the President has provided notice of the proposed removal to" certain congressional

3   committees.  As the legislative history makes clear, Congress enacted this provision in response

4   to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5   export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6   exercise congressional oversight of the Department nor function as would-be exporters, and

7   whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8   interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9   (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

   **C.     Plaintiffs' APA Claims Are Meritless.**

   **1.     The Department's Actions Accord With Its Delegated Authority.**

14          Plaintiffs cannot establish likely success on the merits of any of their claims.  First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8468

WASHSTATEB008583

Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))). Thus, the Department's settlement agreement did not affect any "item" of the USML. The Department's settlement regarding the files at issue in *Defense Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

To the extent the Court finds the AECA's reference to "item" or "remove" to be ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore* deference. Under *Skidmore*, a court must defer to an agency's interpretation provided it is "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001))). The Department has consistently held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories or subcategories of the USML, implicate the 30-day notice requirement. *See* Heidema Decl. ¶¶ 9, 30, 32. Further, the Department's position accords with both the AECA's text and the original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to remove items from the USML. *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . ."). Additionally, Congress has been aware of the Department's interpretation and yet has not addressed it in amendments to the AECA. *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9. "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

To the extent the Court concludes that notice to Congress was required under 22 U.S.C. § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008584

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3          Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16         Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3       The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10  such laws. To the contrary, the Department has consistently emphasized that its actions are

11  taken only pursuant to its authority to regulate the United States' system of export controls, not

12  domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13  Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14  Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15  remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16  understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17          **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18      Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19  because they constitute an unexplained reversal of the agency's prior position concerning

20  whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21  Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22  decision to enter into a settlement to resolve that litigation, such decisions are committed to

23  agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24  *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26          [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
    circumvent the law, Pls.' Mot. at 14; *see also id.*at 4 (suggesting the Government settled "covert[ly]"). *United*

27  *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
    ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008586

1  759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2  authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3  judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4  2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5  cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6  authority," such claims are reviewable).[11]

7          Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8  control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9  Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10 Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11 1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12 explains that the "review was focused on identifying the types of articles that are now

13 controlled on the USML that are either (i) inherently military and otherwise warrant control on

14 the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15 or characteristics that provide a critical military or intelligence advantage to the United States,

16 and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17 the scope of the items described in this proposed rule is essentially commercial items widely

18 available in retail outlets and less sensitive military items.").  This case is only about the

19 determination of the Government that the technical data at issue would not give a military or

20 intelligence advantage and is therefore not properly subject to export controls.  Only those

21 weapons of a type that is inherently military or that is not otherwise widely available for

22 commercial sale are properly subject to such controls.  The Government has not made any

23 determination that 3D-printed guns should not be regulated domestically, and indeed the

24 Government intends to apply those authorities that regulate such firearms and supports

25

26      [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal authority.  As explained in the balance of this memorandum, that is not accurate.

27      [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4    Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16   Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                    **CONCLUSION**

23   For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                    Respectfully submitted,

25                                              CHAD A. READLER

26                                              Acting Assistant Attorney General

27                                              ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008588

Acting United States Attorney

KERRY KEEFE
Civil Chief

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008589

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using

3   the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5   Dated: August 15, 2018                    */s/ Steven A. Myers*
                                             Steven A. Myers

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008590

EXHIBIT 1

WASHSTATEB008591

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).  The AECA also authorizes the President "to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services.  The items so designated shall constitute the "United States Munitions List" (USML). *Id.*  The President delegated this authority to the Department with respect to exports, temporary imports, and brokering, and the Department has promulgated the ITAR to implement those portions of the statute.  *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains the USML.  The items enumerated on the USML are those that "provide a critical military or intelligence advantage." 22 C.F.R. § 120.3(b).  The AECA prohibits the export or import of defense articles and defense services without a license, except as specifically provided in regulations.  *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for example:  certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see* 22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22 C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances specifically developed, configured, adapted, or modified for the purpose of increasing their capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or

documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d).

"Technical data" does not include information concerning general scientific, mathematical, or

engineering principles commonly taught in schools, colleges, and universities, or information

that is in the public domain. *See* 22 C.F.R. § 120.10.   ITAR § 120.11 defines "public domain,"

in relevant part, as information which is published and generally accessible or available to the

public, and provides a list of information that has been made available to the public, including

"[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in

any form (e.g., not necessarily in published form) after approval by the cognizant U.S.

government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of

hardware, technical data, and services described on the USML—to determine what items, if any,

no longer warrant control under the ITAR and conveys the results of such reviews to Congress.

*See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the

Departments of Defense and Commerce to determine the categories most appropriate for review,

and this consultation is informed by inquiries received from the general public, internal feedback

from licensing officers and Commodity Jurisdiction analysts, and the period of time since the

categories under consideration were reviewed previously.  At the onset of the review process the

Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories

under consideration for review and to solicit comment on potential improvements to those

categories.  If warranted, based on the feedback received, the Department will then initiate an

ordinary rulemaking process, beginning with the publication of a Notice of Proposed

Rulemaking (NPRM).

3

8.      The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.      The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate." 22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria.  The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change.  The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions.  At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4.  The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce.  The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information.  The CJ process typically takes 45-55 business days.  If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.


### Relevant Statutory and Regulatory Framework:  Licenses and Authorizations

12.   The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.   ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided: "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . . Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.


**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB008598

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public.  Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files available for download during the pendency of the *Defense Distributed* litigation. Any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data; the Department has no jurisdiction over sharing technical data between U.S. persons in the United States, unless such sharing also provides access to foreign persons.

27.    The parties entered into a settlement agreement on June 29, 2018, a true and correct copy of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

   (a)    [D]raft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)    [Announce], while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

   (c)    [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

28.    The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.      The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.      In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.      Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

WASHSTATEB008604

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h). The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM. Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release. *See* 22 C.F.R §§ 120.11, 125.4(b)(13). In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification. As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

 (a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

 (b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHSTATEB008608

counsel with all information necessary to effectuate this payment.
The items set forth in subparagraphs (a) through (e) above constitute all relief to be
provided in settlement of the Action, including all damages or other monetary relief,
equitable relief, declaratory relief, or relief of any form, including but not limited to,
attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. §
1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d),
and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement,
Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an
original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P.
41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation
and file it with the Court in the Action, no sooner than 5 business days after the
publication of the announcement described in Paragraph 1(b) of this Settlement
Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement
Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives,
successors, or assigns, hereby waive, release and forever discharge Defendants, and all of
their components, offices or establishments, and any officers, employees, agents, or
successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

WASHSTATEB008611

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10.    *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11.    *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB008614

**From:**          Heidema, Sarah J
**Sent:**          Wed, 29 Aug 2018 11:49:58 -0400
**To:**            Hart, Robert L
**Subject:**       (R_470020) (R_467693) IM to S- Update on 3D Printing (LPM 20180823) clea.._
**Attachments:**   (R_470020) (R_467693) IM to S- Update on 3D Printing (LPM 20180823)
clea.._.docx


**Official - SBU**
**UNCLASSIFIED**

**From:**              Hart, Robert L
**Sent:**              Wed, 29 Aug 2018 11:56:47 -0400
**To:**                Miller, Michael F;Paul, Joshua M;Rogers, Shana A;Fabry, Steven F;Abisellan,
Eduardo;Negrea, Dan;Urena, Michael A;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A
**Cc:**                PM-Staffers Mailbox;Heidema, Sarah J
**Subject:**           FLASH CLEARANCE: IM to S on 3D Printing
**Attachments:**       IM to S- Update on 3D Printing.docx
**Importance:**        High


Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense
Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet
the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221
**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Miller, Michael F |
| **Sent:** | Wed, 29 Aug 2018 12:41:58 -0400 |
| **To:** | Hart, Robert L;Rogers, Tanya E;Paul, Joshua M;Fabry, Steven F;Heidema, Sarah J |
| **Subject:** | FW: FLASH CLEARANCE: IM to S on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |
| **Importance:** | High |

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that ExecSec had said was duplicative of prior info sent to S…looking at our last memo on this to S (July 27), I think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC readout bit in green.

That would make space for:

████████████████████████████████████████████████ Perhaps
Josh can help with a few lines on that at the end.

MM


**Official - SBU**
**UNCLASSIFIED**


**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, August 29, 2018 11:57 AM
**To:** Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
**Cc:** PM-Staffers Mailbox; Heidema, Sarah J
**Subject:** FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

296 of 680

| | |
|---|---|
| **From:** | Rogers, Tanya E |
| **Sent:** | Wed, 29 Aug 2018 12:49:27 -0400 |
| **To:** | Rogers, Shana A |
| **Subject:** | FW: FLASH CLEARANCE: IM to S on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |
| **Importance:** | High |

Hi Shana,
I think this is for you---your name is on the clearance line (and I don't have anything to do with this issue...thank goodness!).

Best,
Tanya


**Official - SBU**
**UNCLASSIFIED**

---

**From:** Miller, Michael F
**Sent:** Wednesday, August 29, 2018 12:42 PM
**To:** Hart, Robert L; Rogers, Tanya E; Paul, Joshua M; Fabry, Steven F; Heidema, Sarah J
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that ExecSec had said was duplicative of prior info sent to S...looking at our last memo on this to S (July 27), I think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC readout bit in green.

That would make space for:

████████████████████████████████████████████████████  Perhaps
Josh can help with a few lines on that at the end.

MM


**Official - SBU**
**UNCLASSIFIED**


**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Wednesday, August 29, 2018 11:57 AM

To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea,
Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense
Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet
the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Hart, Robert L |
| **Sent:** | Wed, 29 Aug 2018 13:12:38 -0400 |
| **To:** | Tucker, Maureen E |
| **Subject:** | FW: FLASH CLEARANCE: IM to S on 3D Printing |
| **Attachments:** | IM to S- Update on 3D Printing.docx |
| **Importance:** | High |

Maureen, just forwarding to you while Ed's away. Thanks.


**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 11:57 AM
To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

| From: | Hart, Robert L |
|---|---|
| Sent: | Wed, 29 Aug 2018 13:31:16 -0400 |
| To: | Carter, Rachel;PM-Staffers Mailbox |
| Cc: | Heidema, Sarah J |
| Subject: | RE: FLASH CLEARANCE: IM to S on 3D Printing |
| Attachments: | IM to S- Update on 3D Printing.docx |

Current version is attached.


**Official - SBU**
**UNCLASSIFIED**

From: Carter, Rachel
Sent: Wednesday, August 29, 2018 1:31 PM
To: Hart, Robert L; PM-Staffers Mailbox
Cc: Heidema, Sarah J
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Rob,
I need the actual memo to process next steps.

Thanks,
Rachel


**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 1:29 PM
To: PM-Staffers Mailbox; Carter, Rachel
Cc: Heidema, Sarah J
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Rachel/staffers, here's where we are at the moment:

| Cleared: | PM/DDTC: | Mmiller | ok |
|---|---|---|---|
| | PM/DTCP: | SHeidema | ok |
| | PM/CPA: | JPaul | ok |
| | L/PM: | SRogers | |
| | L/FO: | SFabry | |
| | T: | EAbisellan | |
| | S/P: | MUrena | ok |
| | D: | JShufflebarger | ok |
| | P: | SRavi | ok |
| | H: | TDarrach | |

I reached out to the outstanding clearance points individually (and forwarded to Maureen for T) about 20 minutes ago, but please let us know how you'd like to proceed.

Thanks,
Rob


**Official - SBU**
**UNCLASSIFIED**

---

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 11:57 AM
To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

**From:**   Tucker, Maureen E
**Sent:**   Wed, 29 Aug 2018 13:39:14 -0400
**To:**    Brechwald, Matthew J (T)
**Cc:**    Abisellan, Eduardo;Hart, Robert L;Miller, Michael F;Paul, Joshua M;Rogers,
Shana A;Negrea, Dan;Urena, Michael A;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A
**Subject:**   FW: FLASH CLEARANCE: IM to S on 3D Printing
**Attachments:**  IM to S- Update on 3D Printing.docx
**Importance:**  High

Matt – please review in Ed's absence.  Thank you, Maureen

**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 1:13 PM
To: Tucker, Maureen E
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Maureen, just forwarding to you while Ed's away. Thanks.

**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 11:57 AM
To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea,
Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense
Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet
the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart

[hartrl@state.gov](mailto:hartrl@state.gov) | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

**From:**          Hart, Robert L
**Sent:**          Wed, 29 Aug 2018 14:02:33 -0400
**To:**            Abisellan, Eduardo
**Subject:**       updated IM
**Attachments:**   IM to S- Update on 3D Printing.docx


As discussed just now, thanks.
**Official - SBU**
**UNCLASSIFIED**

**From:** Abisellan, Eduardo
**Sent:** Wed, 29 Aug 2018 14:04:37 -0400
**To:** Hart, Robert L
**Cc:** Brechwald, Matthew J (T)
**Subject:** FW: updated IM
**Attachments:** IM to S- Update on 3D Printing.docx

Rob,

Clear for T.

Thanks, Ed

**Official**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 2:03 PM
To: Abisellan, Eduardo
Subject: updated IM

As discussed just now, thanks.

**Official - SBU**
**UNCLASSIFIED**

**From:**          Hart, Robert L
**Sent:**          Wed, 29 Aug 2018 14:15:56 -0400
**To:**            Carter, Rachel;PM-Staffers Mailbox
**Cc:**            Heidema, Sarah J
**Subject:**       RE: FLASH CLEARANCE: IM to S on 3D Printing
**Attachments:**   IM to S- Update on 3D Printing.docx


Updated clearance sheet:

Cleared:      PM/DDTC: MMiller          ok
              PM/DTCP: SHeidema         ok
              PM/CPA:  JPaul            ok
              L/PM:    SRogers
              L/FO:    SFabry
              T:       EAbisellan       ok
              S/P:     MUrena           ok
              D:       JShufflebarger   ok
              P:       SRavi            ok
              H:       TDarrach         ok


**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 1:31 PM
To: Carter, Rachel; PM-Staffers Mailbox
Cc: Heidema, Sarah J
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Current version is attached.


**Official - SBU**
**UNCLASSIFIED**

From: Carter, Rachel
Sent: Wednesday, August 29, 2018 1:31 PM
To: Hart, Robert L; PM-Staffers Mailbox
Cc: Heidema, Sarah J
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Rob,
I need the actual memo to process next steps.

Thanks,

Rachel

**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 1:29 PM
To: PM-Staffers Mailbox; Carter, Rachel
Cc: Heidema, Sarah J
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Rachel/staffers, here's where we are at the moment:

Cleared:     PM/DDTC: Mmiller              ok
             PM/DTCP: SHeidema            ok
             PM/CPA:  JPaul               ok
             L/PM:      SRogers
             L/FO:      SFabry
             T:          EAbisellan
             S/P:        MUrena            ok
             D:          JShufflebarger    ok
             P:          SRavi             ok
             H:          TDarrach

I reached out to the outstanding clearance points individually (and forwarded to Maureen for T) about 20 minutes ago, but please let us know how you'd like to proceed.

Thanks,
Rob

**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 11:57 AM
To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
UNCLASSIFIED

**From:**          Rogers, Shana A
**Sent:**          Wed, 29 Aug 2018 16:19:16 -0400
**To:**             Fabry, Steven F
**Cc:**             Carter, Rachel
**Subject:**      FW: FLASH CLEARANCE: IM to S on 3D Printing
**Attachments:**   20180829 IM to S.docx
**Importance:**   High

Steve,
Here is the latest draft of the IM to S on 3D printing.  I've updated the dates to include the information from DOJ. ███████████████████████████████████
Rachel is anxious to get this cleared and to the Line tonight.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

From: Rogers, Tanya E
Sent: Wednesday, August 29, 2018 12:49 PM
To: Rogers, Shana A
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Hi Shana,
I think this is for you---your name is on the clearance line (and I don't have anything to do with this issue...thank goodness!).

Best,
Tanya

**Official - SBU**
**UNCLASSIFIED**

---

From: Miller, Michael F
Sent: Wednesday, August 29, 2018 12:42 PM
To: Hart, Robert L; Rogers, Tanya E; Paul, Joshua M; Fabry, Steven F; Heidema, Sarah J
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that ExecSec had said was duplicative of prior info sent to S...looking at our last memo on this to S (July 27), I

think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC readout bit in green.

That would make space for:

██████████████████████████████████████████████████████████
██████████████████████████████████████████████  Perhaps
█████
Josh can help with a few lines on that at the end.

MM


**Official - SBU**
**UNCLASSIFIED**


**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Wednesday, August 29, 2018 11:57 AM
**To:** Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
**Cc:** PM-Staffers Mailbox; Heidema, Sarah J
**Subject:** FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Fabry, Steven F |
| **Sent:** | Wed, 29 Aug 2018 17:05:01 -0400 |
| **To:** | Carter, Rachel;Rogers, Shana A |
| **Subject:** | RE: FLASH CLEARANCE: IM to S on 3D Printing |
| **Attachments:** | 20180829 IM to S.docx |

Thanks, Rachel, just emerged from a meeting.  My tweaks to one paragraph are in the attached. ▮

███████████████████████████████████████████████████████  Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

**From:** Carter, Rachel
**Sent:** Wednesday, August 29, 2018 4:24 PM
**To:** Rogers, Shana A; Fabry, Steven F
**Subject:** RE: FLASH CLEARANCE: IM to S on 3D Printing

Steve,
My leadership wants to send this up as soon as possible.  Appreciate your urgent review.

Thanks,
Rachel

**Official**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Wednesday, August 29, 2018 4:19 PM
**To:** Fabry, Steven F
**Cc:** Carter, Rachel
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Steve,
Here is the latest draft of the IM to S on 3D printing.  I've updated the dates to include the information from DOJ. ██████████████████████████████████████
Rachel is anxious to get this cleared and to the Line tonight.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Tanya E
**Sent:** Wednesday, August 29, 2018 12:49 PM
**To:** Rogers, Shana A
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Hi Shana,
I think this is for you---your name is on the clearance line (and I don't have anything to do with this issue...thank goodness!).

Best,
Tanya

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Miller, Michael F
**Sent:** Wednesday, August 29, 2018 12:42 PM
**To:** Hart, Robert L; Rogers, Tanya E; Paul, Joshua M; Fabry, Steven F; Heidema, Sarah J
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that ExecSec had said was duplicative of prior info sent to S...looking at our last memo on this to S (July 27), I think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC readout bit in green.

That would make space for:

████████████████████████████████████████████████████████ Perhaps
Josh can help with a few lines on that at the end.

MM

**Official - SBU**
**UNCLASSIFIED**

**Official - SBU**
**UNCLASSIFIED**

From: Hart, Robert L
Sent: Wednesday, August 29, 2018 11:57 AM
To: Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea,
Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: PM-Staffers Mailbox; Heidema, Sarah J
Subject: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense
Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet
the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Carter, Rachel |
| **Sent:** | Wed, 29 Aug 2018 17:10:59 -0400 |
| **To:** | String, Marik A |
| **Cc:** | PM-Staffers Mailbox;Hart, Robert L;Heidema, Sarah J |
| **Subject:** | FW: FLASH CLEARANCE: IM to S on 3D Printing |
| **Attachments:** | 20180829 IM to S.docx |

DAS String,
Steve Fabry with L just sent a few edits (attached).  I will confer with Rob and Sarah to see if we can get a consolidated version reflecting the Markey hold to you soonest.

Thanks,
Rachel


**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Wednesday, August 29, 2018 5:05 PM
**To:** Carter, Rachel; Rogers, Shana A
**Subject:** RE: FLASH CLEARANCE: IM to S on 3D Printing

Thanks, Rachel, just emerged from a meeting.  My tweaks to one paragraph are in the attached. █

█                                                                    Thanks,

-- Steve


**Official - SBU**
**UNCLASSIFIED**

**From:** Carter, Rachel
**Sent:** Wednesday, August 29, 2018 4:24 PM
**To:** Rogers, Shana A; Fabry, Steven F
**Subject:** RE: FLASH CLEARANCE: IM to S on 3D Printing

Steve,
My leadership wants to send this up as soon as possible.  Appreciate your urgent review.

Thanks,
Rachel


**Official**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Wednesday, August 29, 2018 4:19 PM
To: Fabry, Steven F
Cc: Carter, Rachel
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Steve,
Here is the latest draft of the IM to S on 3D printing.  I've updated the dates to include the information
from DOJ. ████████████████████████████████████
Rachel is anxious to get this cleared and to the Line tonight.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Tanya E
Sent: Wednesday, August 29, 2018 12:49 PM
To: Rogers, Shana A
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Hi Shana,
I think this is for you---your name is on the clearance line (and I don't have anything to do with this
issue...thank goodness!).

Best,
Tanya

**Official - SBU**
**UNCLASSIFIED**

From: Miller, Michael F
Sent: Wednesday, August 29, 2018 12:42 PM
To: Hart, Robert L; Rogers, Tanya E; Paul, Joshua M; Fabry, Steven F; Heidema, Sarah J
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that
ExecSec had said was duplicative of prior info sent to S...looking at our last memo on this to S (July 27), I
think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC
readout bit in green.

That would make space for:

████████████████████████████████████████████████████ Perhaps
Josh can help with a few lines on that at the end.

MM


**Official - SBU**
**UNCLASSIFIED**


**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Wednesday, August 29, 2018 11:57 AM
**To:** Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
**Cc:** PM-Staffers Mailbox; Heidema, Sarah J
**Subject:** FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
hartrl@state.gov | 202.736.9221

**Official - SBU**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Wed, 29 Aug 2018 17:23:47 -0400
**To:** String, Marik A
**Cc:** Carter, Rachel;PM-Staffers Mailbox;Hart, Robert L;Heidema, Sarah J
**Subject:** For DAS String: FLASH CLEARANCE: IM to S on 3D Printing
**Attachments:** 20180829 IM to S (4).docx

DAS String,

Please clear the attached version. This one has both all L's and Rob's edits incorporated.

Thanks!

Samantha Sison
PM/FO SharePoint
X70561

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Carter, Rachel
**Sent:** Wednesday, August 29, 2018 5:11 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Hart, Robert L; Heidema, Sarah J
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing

DAS String,
Steve Fabry with L just sent a few edits (attached).  I will confer with Rob and Sarah to see if we can get a consolidated version reflecting the Markey hold to you soonest.

Thanks,
Rachel

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Fabry, Steven F
**Sent:** Wednesday, August 29, 2018 5:05 PM
**To:** Carter, Rachel; Rogers, Shana A
**Subject:** RE: FLASH CLEARANCE: IM to S on 3D Printing

Thanks, Rachel, just emerged from a meeting.  My tweaks to one paragraph are in the attached. █

                                                                                                    Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

From: Carter, Rachel
Sent: Wednesday, August 29, 2018 4:24 PM
To: Rogers, Shana A; Fabry, Steven F
Subject: RE: FLASH CLEARANCE: IM to S on 3D Printing

Steve,
My leadership wants to send this up as soon as possible.  Appreciate your urgent review.

Thanks,
Rachel

**Official**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Wednesday, August 29, 2018 4:19 PM
To: Fabry, Steven F
Cc: Carter, Rachel
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Steve,
Here is the latest draft of the IM to S on 3D printing.  I've updated the dates to include the information from DOJ. ███████████████████████████████████████████
Rachel is anxious to get this cleared and to the Line tonight.

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

From: Rogers, Tanya E
Sent: Wednesday, August 29, 2018 12:49 PM
To: Rogers, Shana A
Subject: FW: FLASH CLEARANCE: IM to S on 3D Printing
Importance: High

Hi Shana,

I think this is for you---your name is on the clearance line (and I don't have anything to do with this issue...thank goodness!).

Best,
Tanya


**Official - SBU**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, August 29, 2018 12:42 PM
**To:** Hart, Robert L; Rogers, Tanya E; Paul, Joshua M; Fabry, Steven F; Heidema, Sarah J
**Subject:** FW: FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High

Thanks Rob, reads very well.  I made a couple non-subs edits.  The text includes verbiage up top that ExecSec had said was duplicative of prior info sent to S...looking at our last memo on this to S (July 27), I think you can delete or just refer to the bit in yellow highlight, and perhaps collapse down the PCC readout bit in green.

That would make space for:

Perhaps
Josh can help with a few lines on that at the end.

MM


**Official - SBU**
**UNCLASSIFIED**


**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, August 29, 2018 11:57 AM
**To:** Miller, Michael F; Paul, Joshua M; Rogers, Shana A; Fabry, Steven F; Abisellan, Eduardo; Negrea, Dan; Urena, Michael A; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
**Cc:** PM-Staffers Mailbox; Heidema, Sarah J
**Subject:** FLASH CLEARANCE: IM to S on 3D Printing
**Importance:** High


Colleagues,

Attached for your review and clearance is an IM to S on the current state of play in the Defense Distributed matter. Please provide clearance or comments by **1 pm today** so that we can meet the Line's deadline to get this to S today.

Apologies for the short turnaround request, please let me know if you have any questions.

Thanks,

Rob Hart
[hartrl@state.gov](mailto:hartrl@state.gov) | 202.736.9221

**Official - SBU**
UNCLASSIFIED

**From:**          PM-Staffers Mailbox
**Sent:**          Wed, 29 Aug 2018 18:57:26 -0400
**To:**            Hart, Robert L;Heidema, Sarah J;Miller, Michael F
**Cc:**             Carter, Rachel;PM-CPA-DL;String, Marik A;Davidson-Hood, Simon;Fabry, Steven
F;PM-Staffers Mailbox
**Subject:**       FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD)
has been resubmitted
**Attachments:**   (R_471189) 20180829 IM to S (4).docx, (S_470021) Tab 1 - 64 - State PI Opp.pdf

Package resubmitted. Everest versions attached.

Samantha Sison
PM/FO SharePoint
X70561

From: EverestMail
Sent: Wednesday, August 29, 2018 6:53 PM
To: SES-Line_Only
Cc: Everest_PM: Everest_H
Subject: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been
resubmitted

A PM Package has been resubmitted.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DUE DATE:** 29-Aug-2018 03:00:00 PM
**EVENT DATE:**
**NOTES:** Per deps: this memo has plenty of background S already knows about the 3D gun
issue. Please be more clear about the implications for the Department and what our next steps
and plan of action are.
**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** 201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this
link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID
number.*

**Official - SBU**
**UNCLASSIFIED**

WASHSTATEB008747

The Honorable Robert S. Lasnik

1

2

3

4

5

6

7   UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8   AT SEATTLE

9                                              )
STATE OF WASHINGTON, et al.,           )   No. 2:18-cv-1115-RSL
10                                             )
    Plaintiffs,                        )   **FEDERAL DEFENDANTS'**
11              v.                      )   **BRIEF IN OPPOSITION TO**
                                        )   **PLAINTIFFS' MOTION FOR**
12  UNITED STATES DEPARTMENT OF         )   **PRELIMINARY INJUNCTION**
    STATE, et al.,                      )
13                                             )   **NOTED FOR:** August 21, 2018
    Defendants.                         )
14  _____ )

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008751

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority.  According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents.  But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    merits of their claims, or that it is in the public interest for the Court to second-guess the

2    national security determinations of the Executive Branch.

3            Accordingly, Plaintiffs' motion should be denied.

4                                    **BACKGROUND**

5    **I.       Statutory And Regulatory Background**

6            The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

7    President, "[i]n furtherance of world peace and the security and foreign policy of the United

8    States" to "control the *import* and the *export* of defense articles and defense services" and to

9    promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10   has delegated this authority to the Department in relevant part, and the Department has

11   accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12   administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13   Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14   of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15   that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16   As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17   technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18   information that "is required for the design, development, production, manufacture, assembly,

19   operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20   Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21   services to be included on the USML; (2) to require licenses for the export of items on the

22   USML; and (3) to promulgate regulations for the import and export of such items on the

23   USML.  22 U.S.C. § 2778.

24           The ITAR does not regulate any transfers of defense articles except those that constitute

25   "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26   imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27   defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5        In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR. *See id.* § 120.4. Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR. These assessments are made on a case-by-case basis through an inter-agency

10   process, evaluating whether the item, service, or data is covered by the USML, provides the

11   equivalent performance capabilities of a defense article on the USML, or has a critical military

12   or intelligence advantage. *See id.* § 120.4(d).

13        While the AECA and ITAR do not provide the State Department with authority to

14   prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15   statutes that deal with this topic. Most significantly, the Undetectable Firearms Act bars the

16   manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C.

17   § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18   113-57, 127 Stat. 656 (2013). Under that statute, firearms manufactured or sold in the United

19   States must generally be capable of being detected by metal detectors and by x-ray machines.

20   *See* 18 U.S.C. § 922(p)(1). Those requirements are not in any way affected by the actions

21   challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22   by felons, persons subject to restraining orders, or the mentally ill. *See* 18 U.S.C. § 922(g)(1)

23   (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24   *id.* § 922(g)(4) (persons adjudicated as mentally ill). The Government continues to enforce

25   these laws in order to address domestic safety issues related to undetectable firearms. The

26   Department's determination under the ITAR at issue here will not affect those enforcement

27   efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

**II.      The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)    Defendants' commitment to draft and to fully pursue, to the extent
       authorized by law (including the Administrative Procedure Act), the
       publication in the Federal Register of a notice of proposed rulemaking and
       final rule, revising USML Category I to exclude the technical data that is
       the subject of the Action.[1]

(b)    Defendants' announcement, while the above-referenced final rule is in
       development, of a temporary modification, consistent with the . . . (ITAR),
       22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
       is the subject of the Action. The announcement will appear on the DDTC
       website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Rag. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008756

1
2
3
4

     (c)       Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

5
6
7
8

     (d)       Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

9     The parties executed the agreement on June 29, 2018, and the Government complied

10    with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.")

11    ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated

12    Plaintiffs' constitutional rights.  *See id.* ¶ 28.

13    **III.**    **The Government's Proposed Rulemaking**

14     On May 24, 2018—after the initial exchange of settlement offers but more than one

15    month prior to the settlement with Defense Distributed—the Departments of State and

16    Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the

17    technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

18    Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the

19    ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns

20    and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely

21    the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at

22    24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would

23    no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the

24    Department of State would be required for their export.

25     The Commerce NPRM explains both the rationale for the proposed transfer as well as

26    the review process undertaken by the Government.  As it explained, the process included a

27    "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

WASHSTATEB008757

1    of State and Commerce in preparing the amendments." 83 Fed. Reg. at 24,166.  The review

2    was intended to ensure that items remaining on the USML are either "inherently military or

3    otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4    applications, possess parameters or characteristics that provide a critical military or intelligence

5    advantage to the United States, and are almost exclusively available from the United States."

6    *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7    question, and therefore subject to export controls under the ITAR, are military weapons and

8    related items that could present a critical military or intelligence advantage.

9    **IV.     Procedural History**

10          On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11   the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12   that the Government's settlement with Defense Distributed adversely affected their public

13   safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14   Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15   a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16   granted on July 31, 2018, Dkt. No. 23 ("Order").

17          In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18   "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19   will have many of the negative impacts on a state level that the federal government once feared

20   on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21   likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22   to entering into the settlement agreement, the Government either provided 30-day notice to

23   Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24   Defense pursuant to Executive Order 13637.  *Id.* at 6.

25          The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26   order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27   expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008758

1    between domestic and international audiences." *Id.*  Finally, the Court found that "the balance

2    of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the

3    Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

4    of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

5    Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

6    July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

7    modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin

8    Defense Distributed in any manner. *Id.*

9         Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

10   moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed

11   to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

12                                **ARGUMENT**

13        "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

14   be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

15   *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must

16   establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

17   the absence of preliminary relief, that the balance of equities tips in his favor, and that an

18   injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19   1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the

20   merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

21   a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

22   irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

23   *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

24   967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

25   factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

26        Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

27   by the Government pursuant to its obligations under the settlement agreement. *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2    not to "maintain the status quo" pending litigation, but to place themselves in a better position

3    than they were in before the onset of the current controversy through an award of "the exact

4    same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5    (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6    preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7    978 (9th Cir. 1992).[3]

8
9    **I.    Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable**
     **Harm.**

10       A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12   U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13   relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14   *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15   *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16       Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17   settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18   claim that the settlement agreement "will make it significantly easier to produce undetectable,

19   untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20   employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21   and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22   items at issue in this motion fall well short of irreparable harm.

23       First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24   lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25   unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26
27       [3] The Government leaves to the private party Defendants the question of whether and how their individual
     rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008760

1    be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2    irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3    regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4    will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5    and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6    fundamental misconception of the relevant law and the authority of the Department as the

7    federal agency that administers it.  The AECA and ITAR have not conferred upon the

8    Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9    articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27   _____

[4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008761

1   occur, it will be because individuals have violated separate domestic prohibitions, such as the

2   Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3       For this reason, the types of harms that Plaintiffs identify do not support the granting of

4   injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5   might result from the domestic availability of 3D-printed guns in the United States, but such

6   concerns have little to do with whether particular files should be regulated for foreign export on

7   national security grounds.  Their relation to the State Department's exercise of authority and

8   the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9   questionable "age, mental health, or criminal history" may procure the necessary equipment,

10  download files made specifically available as a result of the Department's settlement, assemble

11  an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12  violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13  files at issue for their availability to U.S. persons in the United States, and it is speculative to

14  claim that these domestic consequences would follow from the Department of State's actions

15  under the ITAR.

16      Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17  printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18  shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19  3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20  purports to permit the domestic production of undetectable firearms.  Such production is illegal

21  due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22      Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23  enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24  bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25  would result from a decision by the Department of State not to regulate the export of the

26

27  confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
    Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   Defense Distributed's files for national security reasons.

2           Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3   attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4   transferring certain items in USML Category I, which encompass Defense Distributed's files,

5   only because it has determined that such a transfer would not injure the national security

6   interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7   Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8   national security that exist quite apart from the challenged actions and even that the

9   Government has considered and rejected.  Moreover, concerns that children "may mistake

10  [these weapons] for toys" exist apart from export control requirements, and it is at best

11  conjecture that the modification of export control requirements would have any effect on the

12  alleged harm.[5]

13          At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14  *generally*, not from the challenged actions regulating foreign exports.  But there are already

15  laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16  made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17  relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18  *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19  fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20  when there are separate statutes governing domestic manufacture, possession, and sale that

21  ───────────────

22          [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
    F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23  Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
    petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24  appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
    interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25  arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
    Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not
26  prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
    There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
    After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
27  the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
    gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   remain unaffected by the challenged actions.

2          Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3   be available," in which case temporary relief is unavailable. *Sampson v. Murray*, 415 U.S. 61,

4   90 (1974). Plaintiffs retain the full authority to enforce their public safety laws, including

5   lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6   And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8   sufficient metal to be detectable, remain in force. These laws—which, unlike the AECA and

9   ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12         Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19. As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard. *See Stanley*, 13 F.3d at 1320.

17         **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18         "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013). The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008764

1  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2  61 (1992).

3        Plaintiffs claim they satisfy the requirements of Article III standing because the

4  Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5  Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6  First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7  "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8  their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor

9  the challenged settlement agreement, prevents states from acting to enforce their own laws or

10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14  the States' own employees and residents [] are caused by the Government's sudden decision to

15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17  settlement of Defense Distributed's claims.  As the Government has previously explained, it

18  regulates the transfer of items constituting exports and temporary imports pursuant to the

19  AECA and ITAR, and it has no authority to regulate the transmission of technical data

20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22        [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel

23  [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24        [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008765

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695. Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7          Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns. It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1). Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15         Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests. Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18. According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates." Pls' Mot. at 8. As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26         [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

imminent and concrete and would not be prevented by domestic laws regulating undetectable

firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

injury to its proprietary interest is "subject to the same law of standing as any other party in

federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

(supporting allegations of proprietary injury by identifying individuals prevented from

attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

*sub. nom*, *Golden v. Washington*, 138 S. Ct. 448 (2017).

Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

doctrine of *parens patriae.  See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

sufficiently substantial segment of its population, articulates an interest apart from the interests

of particular private parties, and expresses a quasisovereign interest").  But to the extent

Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

"actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

*Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae.  See also*

*Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

requirements of Art. III." (citation omitted)).  It is also well established that a state "does not

have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

*Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

*Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

*EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

**B.      Plaintiffs Lack Prudential Standing.**

Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008767

1    'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2    Constitution, that the plaintiff have suffered an injury in fact.'" *Havasupai Tribe v. Provencio*,

3    876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4    interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5    regulated by the statute that he says was violated." *Id.* (citation omitted); *see also Ashley Creek*

6    *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7    examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8    which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9    "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10   related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11   assumed that Congress intended to permit the suit.'" *Match–E–Be–Nash–She–Wish Band of*

12   *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13         Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14   particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15   154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16   particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17   against the national security threat created by the unrestricted flow of military information

18   abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19   *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20   to control the import and export of defense articles and defense services in 'furtherance of

21   world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22   § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23   to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24   exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25   _____

26   [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national
     security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by
     the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27   no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
     dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008768

President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees.  As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

> **C.    Plaintiffs' APA Claims Are Meritless.**

> **1.    The Department's Actions Accord With Its Delegated Authority.**

Plaintiffs cannot establish likely success on the merits of any of their claims. First, Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again betray their misunderstanding of the governing law.  The statutory provision they invoke provides that "the President may not *remove* any *item* from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*, "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8468

Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any "item" of the USML.  The Department's settlement regarding the files at issue in *Defense Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

To the extent the Court finds the AECA's reference to "item" or "remove" to be ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore* deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))).  The Department has consistently held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl. ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has been aware of the Department's interpretation and yet has not addressed it in amendments to the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

To the extent the Court concludes that notice to Congress was required under 22 U.S.C. § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3           Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16          Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008771

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3        The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10  such laws. To the contrary, the Department has consistently emphasized that its actions are

11  taken only pursuant to its authority to regulate the United States' system of export controls, not

12  domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13  Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14  Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15  remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16  understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17            **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18        Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19  because they constitute an unexplained reversal of the agency's prior position concerning

20  whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21  Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22  decision to enter into a settlement to resolve that litigation, such decisions are committed to

23  agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24  *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26        [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
    circumvent the law, Pls.' Mot. at 14; *see also id.* at 4 (suggesting the Government settled "covert[ly]"). *United*
27  *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
    ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008772

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7        Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10  Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11  1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12  explains that the "review was focused on identifying the types of articles that are now

13  controlled on the USML that are either (i) inherently military and otherwise warrant control on

14  the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15  or characteristics that provide a critical military or intelligence advantage to the United States,

16  and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17  the scope of the items described in this proposed rule is essentially commercial items widely

18  available in retail outlets and less sensitive military items.").  This case is only about the

19  determination of the Government that the technical data at issue would not give a military or

20  intelligence advantage and is therefore not properly subject to export controls.  Only those

21  weapons of a type that is inherently military or that is not otherwise widely available for

22  commercial sale are properly subject to such controls.  The Government has not made any

23  determination that 3D-printed guns should not be regulated domestically, and indeed the

24  Government intends to apply those authorities that regulate such firearms and supports

25  ───────────────

26      [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal authority.  As explained in the balance of this memorandum, that is not accurate.

27      [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  Plaintiffs' efforts to do so as well.

2

3  **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4          Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5  which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6  1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7  injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8  from sharing these files with other U.S. persons within the United States, the harms identified

9  by Plaintiffs cannot be prevented by an injunction in this case. *See Def. Distributed*, 121 F.

10  Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11  public interest is not served by restraining the ability of the Executive Branch to exercise its

12  discretion to determine whether harm to national security requires export controls on particular

13  items. *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14  of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15  to courts).

16          Further, the Government notes that the possibility of manufacturing small-caliber

17  firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18  ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19  the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20  submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21  demonstrates that the balance of equities weighs in Defendants' favor.

22                                    **CONCLUSION**

23          For the foregoing reasons, the motion for a preliminary injunction should be denied.

24  Dated:  August 15, 2018                      Respectfully submitted,

25                                                CHAD A. READLER
26                                                Acting Assistant Attorney General

27                                                ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008774

1

Acting United States Attorney

2

KERRY KEEFE
Civil Chief

3

4

JOHN R. GRIFFITHS
Director, Federal Programs Branch

5

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

6

7

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

8

9

10

11

12

13

14

*Attorneys for Federal Defendants*

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008775

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018                     */s/ Steven A. Myers*
                                            Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

WASHSTATEB008776

EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).  The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services.  The items so designated shall constitute the "United States Munitions List"

(USML). *Id.*  The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute.  *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML.  The items enumerated on the USML are those that "provide a critical military or

intelligence advantage."  22 C.F.R. § 120.3(b).  The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations.  *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example:  certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ."  22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously.  At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories.  If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

3

8.     The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.     The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria.  The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change.  The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions.  At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4.  The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce.  The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information.  The CJ process typically takes 45-55 business days.  If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

WASHSTATEB008782

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.


**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.      The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.      ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided:  "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports.  *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1.  ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case.  Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR.  *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage.  In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use.  *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018).  This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB008784

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.

**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files

available for download during the pendency of the *Defense Distributed* litigation. Any

restrictions imposed by the Department on the technical data that was the subject of the action

were limited to the export of that technical data; the Department has no jurisdiction over sharing

technical data between U.S. persons in the United States, unless such sharing also provides

access to foreign persons.

27. The parties entered into a settlement agreement on June 29, 2018, a true and correct copy

of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)    [D]raft and to fully pursue, to the extent authorized by law (including the
> Administrative Procedure Act), the publication in the Federal Register of a notice
> of proposed rulemaking and final rule, revising USML Category I to exclude the
> technical data that is the subject of the Action.
>
> (b)    [Announce], while the above-referenced final rule is in development, of a
> temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of
> USML Category I to exclude the technical data that is the subject of the Action.
> The announcement will appear on the DDTC website, www.pmddtc.state.gov, on
> or before July 27, 2018.
>
> (c)    [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy
> Assistant Secretary for Defense Trade Controls, advising that the Published Files,
> Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited
> distribution) in any form and are exempt from the export licensing requirements of
> the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the
> purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S.
> Government department or agency, and the Directorate of Defense Trade Controls
> has delegated authority to issue this approval.

28. The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's
first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times.
That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech
gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's
Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at
https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-
two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

WASHSTATEB008789

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

WASHSTATEB008792

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHSTATEB008797

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEB008799

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB008800

| | |
|---|---|
| **From:** | Fabry, Steven F |
| **Sent:** | Wed, 29 Aug 2018 19:06:32 -0400 |
| **To:** | Rogers, Shana A |
| **Subject:** | FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted |
| **Attachments:** | (R_471189) 20180829 IM to S (4).docx, (S_470021) Tab 1 - 64 - State PI Opp.pdf |

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 29, 2018 6:57 PM
To: Hart, Robert L; Heidema, Sarah J; Miller, Michael F
Cc: Carter, Rachel; PM-CPA-DL; String, Marik A; Davidson-Hood, Simon; Fabry, Steven F; PM-Staffers Mailbox
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

Package resubmitted. Everest versions attached.

Samantha Sison
PM/FO SharePoint
X70561

From: EverestMail
Sent: Wednesday, August 29, 2018 6:53 PM
To: SES-Line_Only
Cc: Everest_PM; Everest_H
Subject: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

A PM Package has been resubmitted.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DUE DATE:** 29-Aug-2018 03:00:00 PM
**EVENT DATE:**

**NOTES:** Per deps: this memo has plenty of background S already knows about the 3D gun issue. Please be more clear about the implications for the Department and what our next steps and plan of action are.

**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** [201822013 Package](#)

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **BRIEF IN OPPOSITION TO** |
| | **PLAINTIFFS' MOTION FOR** |
| UNITED STATES DEPARTMENT OF | **PRELIMINARY INJUNCTION** |
| STATE, et al., | |
| | **NOTED FOR:** August 21, 2018 |
| Defendants. | |

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008806

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority. According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents. But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law. Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case. Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   merits of their claims, or that it is in the public interest for the Court to second-guess the

2   national security determinations of the Executive Branch.

3         Accordingly, Plaintiffs' motion should be denied.

**BACKGROUND**

5   **I.       Statutory And Regulatory Background**

6         The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the

7   President, "[i]n furtherance of world peace and the security and foreign policy of the United

8   States" to "control the *import* and the *export* of defense articles and defense services" and to

9   promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id*. § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id*. § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24        The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008808

1    "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2    subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3    § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4    in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5        In certain cases where it is unclear whether a particular item is a defense article or

6    defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7    a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8    applicants with a determination as to whether the item, service, or data is within the scope of

9    the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10   process, evaluating whether the item, service, or data is covered by the USML, provides the

11   equivalent performance capabilities of a defense article on the USML, or has a critical military

12   or intelligence advantage.  *See id.* § 120.4(d).

13       While the AECA and ITAR do not provide the State Department with authority to

14   prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15   statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16   manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17   § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18   113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19   States must generally be capable of being detected by metal detectors and by x-ray machines.

20   *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21   challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22   by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23   (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24   *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25   these laws in order to address domestic safety issues related to undetectable firearms.  The

26   Department's determination under the ITAR at issue here will not affect those enforcement

27   efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008809

**II.      The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016).  Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting).  "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  that "the State Department's application of its 'export' control regulations to this domestic

2  Internet posting appears to violate the governing statute, represents an irrational interpretation

3  of the regulations, and violates the First Amendment as a content-based regulation and a prior

4  restraint." *Id.* at 463-64.

5      After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

6  S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

7  district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

8  complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

9  court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

10 initiating a process under which the parties were able to reach a settlement before briefing on

11 the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

12      Pursuant to the settlement and as relevant here, the Government agreed to the following:

13  (a)  Defendants' commitment to draft and to fully pursue, to the extent
         authorized by law (including the Administrative Procedure Act), the

14       publication in the Federal Register of a notice of proposed rulemaking and

15       final rule, revising USML Category I to exclude the technical data that is
         the subject of the Action.[1]

16

17  (b)  Defendants' announcement, while the above-referenced final rule is in
         development, of a temporary modification, consistent with the . . . (ITAR),

18       22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
         is the subject of the Action. The announcement will appear on the DDTC

19       website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

20

21

22      [1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice
    of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing

23  that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR
    amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and
    pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an

24  Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's
    Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-

25  sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg.
    16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories

26  IV through XX.
        [2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the

27  temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the
    security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1
2
3
4

(c)    Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

5
6
7
8

(d)    Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

9       The parties executed the agreement on June 29, 2018, and the Government complied

10   with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.")

11   ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated

12   Plaintiffs' constitutional rights.  *See id.* ¶ 28.

13   **III.**     **The Government's Proposed Rulemaking**

14       On May 24, 2018—after the initial exchange of settlement offers but more than one

15   month prior to the settlement with Defense Distributed—the Departments of State and

16   Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the

17   technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83

18   Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the

19   ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns

20   and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely

21   the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at

22   24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would

23   no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the

24   Department of State would be required for their export.

25       The Commerce NPRM explains both the rationale for the proposed transfer as well as

26   the review process undertaken by the Government.  As it explained, the process included a

27   "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008812

1  of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2  was intended to ensure that items remaining on the USML are either "inherently military or

3  otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4  applications, possess parameters or characteristics that provide a critical military or intelligence

5  advantage to the United States, and are almost exclusively available from the United States."

6  *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7  question, and therefore subject to export controls under the ITAR, are military weapons and

8  related items that could present a critical military or intelligence advantage.

9  **IV.   Procedural History**

10        On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11  the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12  that the Government's settlement with Defense Distributed adversely affected their public

13  safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14  Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15  a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16  granted on July 31, 2018, Dkt. No. 23 ("Order").

17        In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18  "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19  will have many of the negative impacts on a state level that the federal government once feared

20  on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21  likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22  to entering into the settlement agreement, the Government either provided 30-day notice to

23  Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24  Defense pursuant to Executive Order 13637.  *Id.* at 6.

25        The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26  order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27  expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008813

1  between domestic and international audiences." *Id.*  Finally, the Court found that "the balance

2  of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the

3  Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

4  of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

5  Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

6  July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

7  modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin

8  Defense Distributed in any manner. *Id.*

9       Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

10  moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed

11  to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

12                                     **ARGUMENT**

13       "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

14  be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

15  *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must

16  establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

17  the absence of preliminary relief, that the balance of equities tips in his favor, and that an

18  injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19  1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the

20  merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

21  a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

22  irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

23  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

24  967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

25  factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

26       Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

27  by the Government pursuant to its obligations under the settlement agreement. *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2   not to "maintain the status quo" pending litigation, but to place themselves in a better position

3   than they were in before the onset of the current controversy through an award of "the exact

4   same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5   (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6   preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7   978 (9th Cir. 1992).[3]

8

9   **I.      Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.**

10          A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11  positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12  U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13  relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14  *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15  *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16          Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17  settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18  claim that the settlement agreement "will make it significantly easier to produce undetectable,

19  untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20  employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21  and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22  items at issue in this motion fall well short of irreparable harm.

23          First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24  lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25  unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27          [3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008815

1    be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2    irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3    regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4    will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5    and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6    fundamental misconception of the relevant law and the authority of the Department as the

7    federal agency that administers it.  The AECA and ITAR have not conferred upon the

8    Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9    articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27        [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not
     only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   occur, it will be because individuals have violated separate domestic prohibitions, such as the

2   Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3        For this reason, the types of harms that Plaintiffs identify do not support the granting of

4   injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5   might result from the domestic availability of 3D-printed guns in the United States, but such

6   concerns have little to do with whether particular files should be regulated for foreign export on

7   national security grounds.  Their relation to the State Department's exercise of authority and

8   the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9   questionable "age, mental health, or criminal history" may procure the necessary equipment,

10  download files made specifically available as a result of the Department's settlement, assemble

11  an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12  violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13  files at issue for their availability to U.S. persons in the United States, and it is speculative to

14  claim that these domestic consequences would follow from the Department of State's actions

15  under the ITAR.

16       Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17  printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18  shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19  3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20  purports to permit the domestic production of undetectable firearms.  Such production is illegal

21  due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22       Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23  enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24  bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25  would result from a decision by the Department of State not to regulate the export of the

26

27  confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
    Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008817

1    Defense Distributed's files for national security reasons.

2         Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13        At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

21
       _____

22        [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
     F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23   Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
     petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24   appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
     interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25   arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
     Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not
26   prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
     There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
27   After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
     the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
     gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12                                          United States Department of Justice
                                                                     Civil Division, Federal Programs Branch
                                                                     20 Massachusetts Ave. NW
                                                                     Washington, DC 20530
                                                                     202-305-8648

WASHSTATEB008818

1  remain unaffected by the challenged actions.

2         Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3  be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4  90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5  lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6  And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7  firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8  sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9  ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10 basis.

11 **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12        Although their Amended Complaint asserts claims under both the APA and the Tenth

13 Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14 only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15 failed to establish that "the law and the facts clearly favor" their position, as required under the

16 heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17        **A.     Plaintiffs Lack Article III Standing To Assert Their Claims.**

18        "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19 'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20 'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21 *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22 "which is built on separation-of-powers principles, serves to prevent the judicial process from

23 being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24 U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25 elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26 challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2   61 (1992).

3           Plaintiffs claim they satisfy the requirements of Article III standing because the

4   Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5   Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6   First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7   "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8   their residents from injury and death." *Id.* at 8.  But neither U.S. export controls generally, nor

9   the challenged settlement agreement, prevents states from acting to enforce their own laws or

10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14  the States' own employees and residents [] are caused by the Government's sudden decision to

15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17  settlement of Defense Distributed's claims.  As the Government has previously explained, it

18  regulates the transfer of items constituting exports and temporary imports pursuant to the

19  AECA and ITAR, and it has no authority to regulate the transmission of technical data

20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22      [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel

23  [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24      [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008820

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7         Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns.  It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1).  Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15        Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests.  Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18.  According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates."  Pls' Mot. at 8.  As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*.  *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26        ---
          [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
          state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27        592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
          and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   imminent and concrete and would not be prevented by domestic laws regulating undetectable

2   firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3   injury to its proprietary interest is "subject to the same law of standing as any other party in

4   federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5   (supporting allegations of proprietary injury by identifying individuals prevented from

6   attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7   *sub. nom, Golden v. Washington*, 138 S. Ct. 448 (2017).

8        Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9   doctrine of *parens patriae.  See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae.  See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III.'" (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26        **B.     Plaintiffs Lack Prudential Standing.**

27        Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2   Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3   876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4   interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5   regulated by the statute that he says was violated." *Id.* (citation omitted); *see also Ashley Creek*

6   *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7   examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8   which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9   "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10  related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11  assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12  *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13      Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14  particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15  154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16  particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17  against the national security threat created by the unrestricted flow of military information

18  abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19  *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20  to control the import and export of defense articles and defense services in 'furtherance of

21  world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22  § 2778(a)(1)));  *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23  to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24  exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25

26      [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national
    security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by
    the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27  no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
    dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

WASHSTATEB008823

President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees.  As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

### C.    Plaintiffs' APA Claims Are Meritless.

#### 1.    The Department's Actions Accord With Its Delegated Authority.

Plaintiffs cannot establish likely success on the merits of any of their claims. First, Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again betray their misunderstanding of the governing law.  The statutory provision they invoke provides that "the President may not *remove* any *item* from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*, "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8468

WASHSTATEB008824

1    Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a

2    compendium of specific controlled items,' rather it is a 'series of categories describing the

3    kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711

4    F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any

5    "item" of the USML.  The Department's settlement regarding the files at issue in *Defense*

6    *Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

7         To the extent the Court finds the AECA's reference to "item" or "remove" to be

8    ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore*

9    deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is

10   "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the

11   validity of its reasoning, [and] its consistency with earlier and later pronouncements.'"  *Fox*

12   *Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting

13   *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001))).  The Department has consistently

14   held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories

15   or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl.

16   ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the

17   original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to

18   remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the

19   executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has

20   been aware of the Department's interpretation and yet has not addressed it in amendments to

21   the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These

22   circumstances provide further evidence—if more is needed—that Congress intended the

23   Agency's interpretation, or at least understood the interpretation as statutorily permissible."

24   *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220

25   (2002)).

26        To the extent the Court concludes that notice to Congress was required under 22 U.S.C.

27   § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008825

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3          Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16         Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008826

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3       The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10   such laws. To the contrary, the Department has consistently emphasized that its actions are

11   taken only pursuant to its authority to regulate the United States' system of export controls, not

12   domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13   Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14   Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15   remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16   understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17       **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18       Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19   because they constitute an unexplained reversal of the agency's prior position concerning

20   whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21   Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22   decision to enter into a settlement to resolve that litigation, such decisions are committed to

23   agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24   *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26       [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to

27   circumvent the law, Pls.' Mot. at 14; *see also id.*at 4 (suggesting the Government settled "covert[ly]"). *United States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017) ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

WASHSTATEB008827

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7           Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10  Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11  1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12  explains that the "review was focused on identifying the types of articles that are now

13  controlled on the USML that are either (i) inherently military and otherwise warrant control on

14  the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15  or characteristics that provide a critical military or intelligence advantage to the United States,

16  and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17  the scope of the items described in this proposed rule is essentially commercial items widely

18  available in retail outlets and less sensitive military items.").  This case is only about the

19  determination of the Government that the technical data at issue would not give a military or

20  intelligence advantage and is therefore not properly subject to export controls.  Only those

21  weapons of a type that is inherently military or that is not otherwise widely available for

22  commercial sale are properly subject to such controls.  The Government has not made any

23  determination that 3D-printed guns should not be regulated domestically, and indeed the

24  Government intends to apply those authorities that regulate such firearms and supports

25
26          [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal
    authority.  As explained in the balance of this memorandum, that is not accurate.

27          [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release
    "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger
    rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008828

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A
         Preliminary Injunction**

4           Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16          Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                      **CONCLUSION**

23          For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                    Respectfully submitted,

25
                                               CHAD A. READLER
26                                             Acting Assistant Attorney General

27                                             ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008829

Acting United States Attorney

KERRY KEEFE
Civil Chief

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008830

### CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018                    */s/ Steven A. Myers*
                                          Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008831

# EXHIBIT 1

WASHSTATEB008832

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.       I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.       I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.       The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services. The items so designated shall constitute the "United States Munitions List"

(USML). *Id.* The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML. The items enumerated on the USML are those that "provide a critical military or

intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f). The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously. At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories. If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

3

8.      The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.      The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria. The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change. The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions. At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4. The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce. The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information. The CJ process typically takes 45-55 business days. If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.     The ITAR requires a license, in relevant part, for the *export* of "technical data."  *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR.  *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.     ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided:  "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.    The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.    Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB008839

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency

partners to evaluate and revise categories of items on the USML.  While a wide range of

interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the

Department works particularly closely with the Departments of Defense and Commerce to solicit

their views on the appropriate composition of the USML.  The engagement with the DOC is

further intended to ensure that the jurisdictional posture of a given item is clear, and the

application of ITAR or EAR controls to that item can be discerned and understood by the public.

Additionally, the Department coordinates with the DOC to publish rules in parallel where

updates to the USML require conforming changes to the CCL to ensure the appropriate level of

control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order

13637, the Department obtains concurrence of the Secretary of Defense for designations,

including changes in designations, of items or categories of items that are defense articles and

defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this

effort to revise the USML, which began in 2010,[3] the Department has followed a consistent

process for revising the USML categories and obtaining DoD concurrence.  This process begins

with an internal national security review conducted by the DoD[4] to assess which items in the

category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.    The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.    As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.    The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.    The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files

available for download during the pendency of the *Defense Distributed* litigation.  Any

restrictions imposed by the Department on the technical data that was the subject of the action

were limited to the export of that technical data; the Department has no jurisdiction over sharing

technical data between U.S. persons in the United States, unless such sharing also provides

access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy

of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)     [D]raft and to fully pursue, to the extent authorized by law (including the
> Administrative Procedure Act), the publication in the Federal Register of a notice
> of proposed rulemaking and final rule, revising USML Category I to exclude the
> technical data that is the subject of the Action.
>
> (b)     [Announce], while the above-referenced final rule is in development, of a
> temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of
> USML Category I to exclude the technical data that is the subject of the Action.
> The announcement will appear on the DDTC website, www.pmddtc.state.gov, on
> or before July 27, 2018.
>
> (c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy
> Assistant Secretary for Defense Trade Controls, advising that the Published Files,
> Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited
> distribution) in any form and are exempt from the export licensing requirements of
> the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the
> purposes of 22 C.F.R. § 125.4(b)(13) the Department  of State is the cognizant U.S.
> Government department or agency, and the Directorate of Defense Trade Controls
> has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

WASHSTATEB008845

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

WASHSTATEB008847

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.
The items set forth in subparagraphs (a) through (e) above constitute all relief to be
provided in settlement of the Action, including all damages or other monetary relief,
equitable relief, declaratory relief, or relief of any form, including but not limited to,
attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. §
1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d),
and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement,
Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an
original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P.
41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation
and file it with the Court in the Action, no sooner than 5 business days after the
publication of the announcement described in Paragraph 1(b) of this Settlement
Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement
Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives,
successors, or assigns, hereby waive, release and forever discharge Defendants, and all of
their components, offices or establishments, and any officers, employees, agents, or
successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
Settlement Agreement with their counsel, who has explained these documents to them
and that they understand all of the terms and conditions of this Settlement Agreement.
Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
the contents thereof, and execute this Settlement Agreement of their own free act and
deed. The undersigned represent that they are fully authorized to enter into this
Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
each of which shall be deemed an original, and all of which together constitute one and
the same instrument, and photographic copies of such signed counterparts may be used in
lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHSTATEB008853

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

| | |
|---|---|
| **From:** | Carter, Rachel |
| **Sent:** | Thu, 30 Aug 2018 11:21:57 -0400 |
| **To:** | Kaidanow, Tina S |
| **Subject:** | FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted |
| **Attachments:** | (R_471189) 20180829 IM to S (4).docx, (S_470021) Tab 1 - 64 - State PI Opp.pdf |

Ambassador,
Per your request, here is the final version of the submitted Defense Distributed IM update. Still no bounce from the line, but will keep you posted if that changes.

Thanks,
Rachel

**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 29, 2018 6:57 PM
To: Hart, Robert L; Heidema, Sarah J; Miller, Michael F
Cc: Carter, Rachel; PM-CPA-DL; String, Marik A; Davidson-Hood, Simon; Fabry, Steven F; PM-Staffers Mailbox
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

Package resubmitted. Everest versions attached.

Samantha Sison
PM/FO SharePoint
X70561

From: EverestMail
Sent: Wednesday, August 29, 2018 6:53 PM
To: SES-Line_Only
Cc: Everest_PM; Everest_H
Subject: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

A PM Package has been resubmitted.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)

**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DUE DATE:**  29-Aug-2018 03:00:00 PM
**EVENT DATE:**
**NOTES:**  Per deps: this memo has plenty of background S already knows about the 3D gun issue. Please be more clear about the implications for the Department and what our next steps and plan of action are.
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:**  PM

**LINK:** [201822013 Package](201822013 Package)

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

The Honorable Robert S. Lasnik

1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
8                                   AT SEATTLE

9                                              )
   STATE OF WASHINGTON, et al.,                )   No. 2:18-cv-1115-RSL
10                                             )
        Plaintiffs,                            )   **FEDERAL DEFENDANTS'**
11                          v.                 )   **BRIEF IN OPPOSITION TO**
                                               )   **PLAINTIFFS' MOTION FOR**
12   UNITED STATES DEPARTMENT OF               )   **PRELIMINARY INJUNCTION**
     STATE, et al.,                            )
13                                             )   **NOTED FOR:** August 21, 2018
        Defendants.                            )
14   _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008861

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison.  Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C. § 922(p).  The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously.  Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms.  Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns.  The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability.  Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority.  According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents.  But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law.  Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case.  Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    merits of their claims, or that it is in the public interest for the Court to second-guess the

2    national security determinations of the Executive Branch.

3            Accordingly, Plaintiffs' motion should be denied.

4                                    **BACKGROUND**

5    **I.      Statutory And Regulatory Background**

6            The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

7    President, "[i]n furtherance of world peace and the security and foreign policy of the United

8    States" to "control the *import* and the *export* of defense articles and defense services" and to

9    promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10   has delegated this authority to the Department in relevant part, and the Department has

11   accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12   administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13   Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14   of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15   that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16   As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17   technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18   information that "is required for the design, development, production, manufacture, assembly,

19   operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20   Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21   services to be included on the USML; (2) to require licenses for the export of items on the

22   USML; and (3) to promulgate regulations for the import and export of such items on the

23   USML.  22 U.S.C. § 2778.

24           The ITAR does not regulate any transfers of defense articles except those that constitute

25   "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26   imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27   defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008863

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5       In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR. *See id.* § 120.4.  Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10  process, evaluating whether the item, service, or data is covered by the USML, provides the

11  equivalent performance capabilities of a defense article on the USML, or has a critical military

12  or intelligence advantage.  *See id.* § 120.4(d).

13      While the AECA and ITAR do not provide the State Department with authority to

14  prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15  statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16  manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17  § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18  113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19  States must generally be capable of being detected by metal detectors and by x-ray machines.

20  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21  challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22  by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23  (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24  *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25  these laws in order to address domestic safety issues related to undetectable firearms.  The

26  Department's determination under the ITAR at issue here will not affect those enforcement

27  efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008864

**II.       The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    that "the State Department's application of its 'export' control regulations to this domestic

2    Internet posting appears to violate the governing statute, represents an irrational interpretation

3    of the regulations, and violates the First Amendment as a content-based regulation and a prior

4    restraint."  *Id.* at 463-64.

5         After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

6    S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

7    district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

8    complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

9    court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

10   initiating a process under which the parties were able to reach a settlement before briefing on

11   the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

12        Pursuant to the settlement and as relevant here, the Government agreed to the following:

13   (a)   Defendants' commitment to draft and to fully pursue, to the extent
           authorized by law (including the Administrative Procedure Act), the
14         publication in the Federal Register of a notice of proposed rulemaking and
           final rule, revising USML Category I to exclude the technical data that is
15         the subject of the Action.[1]

16

17   (b)   Defendants' announcement, while the above-referenced final rule is in
           development, of a temporary modification, consistent with the . . . (ITAR),
18         22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
           is the subject of the Action. The announcement will appear on the DDTC
19         website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

20

21

22        [1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice
     of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing
23   that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR
     amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and
24   pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an
     Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's
     Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-
25   sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg.
     16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories
26   IV through XX.
         [2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the
27   temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the
     security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008866

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)     Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.") ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated Plaintiffs' constitutional rights.  *See id.* ¶ 28.

**III.     The Government's Proposed Rulemaking**

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the Department of State would be required for their export.

The Commerce NPRM explains both the rationale for the proposed transfer as well as the review process undertaken by the Government.  As it explained, the process included a "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  of State and Commerce in preparing the amendments." 83 Fed. Reg. at 24,166.  The review

2  was intended to ensure that items remaining on the USML are either "inherently military or

3  otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4  applications, possess parameters or characteristics that provide a critical military or intelligence

5  advantage to the United States, and are almost exclusively available from the United States."

6  *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7  question, and therefore subject to export controls under the ITAR, are military weapons and

8  related items that could present a critical military or intelligence advantage.

9  **IV.   Procedural History**

10       On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11 the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12 that the Government's settlement with Defense Distributed adversely affected their public

13 safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14 Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15 a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16 granted on July 31, 2018, Dkt. No. 23 ("Order").

17       In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18 "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19 will have many of the negative impacts on a state level that the federal government once feared

20 on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21 likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22 to entering into the settlement agreement, the Government either provided 30-day notice to

23 Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24 Defense pursuant to Executive Order 13637.  *Id.* at 6.

25       The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26 order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27 expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8640

WASHSTATEB008868

1   between domestic and international audiences." *Id.*  Finally, the Court found that "the balance

2   of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the

3   Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

4   of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

5   Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

6   July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

7   modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin

8   Defense Distributed in any manner.  *Id.*

9       Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

10   moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed

11   to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

12                                **ARGUMENT**

13       "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

14   be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

15   *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must

16   establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

17   the absence of preliminary relief, that the balance of equities tips in his favor, and that an

18   injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

19   1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the

20   merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

21   a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

22   irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

23   *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

24   967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

25   factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

26       Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

27   by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2   not to "maintain the status quo" pending litigation, but to place themselves in a better position

3   than they were in before the onset of the current controversy through an award of "the exact

4   same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5   (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6   preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7   978 (9th Cir. 1992).[3]

8

9   **I.**    **Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.**

10       A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12   U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13   relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14   *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15   *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16       Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17   settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18   claim that the settlement agreement "will make it significantly easier to produce undetectable,

19   untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20   employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21   and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22   items at issue in this motion fall well short of irreparable harm.

23       First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24   lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25   unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27       [3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008870

1     be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2     irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3     regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4     will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5     and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6     fundamental misconception of the relevant law and the authority of the Department as the

7     federal agency that administers it.  The AECA and ITAR have not conferred upon the

8     Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9     articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10    *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11    pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12    data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13    defense articles among U.S. persons within the United States.  Therefore, the Department has

14    never prohibited Defense Distributed, or any other company or individual, from providing their

15    files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16    mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17    Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18    public or private forums, including via the mail or any other medium that does not provide the

19    ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20    extent Defense Distributed and others have not previously disseminated the computer files at

21    issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22    to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23    Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24    or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25    crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27    ─────────────────
         [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008871

1   occur, it will be because individuals have violated separate domestic prohibitions, such as the

2   Undetectable Firearms Act. *See* 18 U.S.C. § 922(p)(1).

3        For this reason, the types of harms that Plaintiffs identify do not support the granting of

4   injunctive relief in the circumstances of this case. All of the concerns identified are harms that

5   might result from the domestic availability of 3D-printed guns in the United States, but such

6   concerns have little to do with whether particular files should be regulated for foreign export on

7   national security grounds. Their relation to the State Department's exercise of authority and

8   the settlement agreement is speculative. For example, Plaintiffs contend that someone of

9   questionable "age, mental health, or criminal history" may procure the necessary equipment,

10  download files made specifically available as a result of the Department's settlement, assemble

11  an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20. But such actions would

12  violate domestic prohibitions on the use of firearms. The Department does not regulate the

13  files at issue for their availability to U.S. persons in the United States, and it is speculative to

14  claim that these domestic consequences would follow from the Department of State's actions

15  under the ITAR.

16       Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17  printing process fail for the same reasons. *See id.* at 20-24. For instance, they assert

18  shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19  3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20  purports to permit the domestic production of undetectable firearms. Such production is illegal

21  due to separate authority that regulates domestic conduct. *See* 18 U.S.C. § 922(p)(1).

22       Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23  enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24  bullets. Pls' Mot. at 21-22. Again, Plaintiffs can only speculate as to whether such a harm

25  would result from a decision by the Department of State not to regulate the export of the

26

27  confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts. Camper
    Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008872

1    Defense Distributed's files for national security reasons.

2          Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13         At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

21

22         [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
     F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23   Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
     petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24   appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
     interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25   arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
     Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not
26   prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
     There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
27   After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
     the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
     gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008873

1   remain unaffected by the challenged actions.

2          Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3   be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4   90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5   lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6   And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8   sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9   ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12         Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17         A.      **Plaintiffs Lack Article III Standing To Assert Their Claims.**

18         "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2  61 (1992).

3  Plaintiffs claim they satisfy the requirements of Article III standing because the

4  Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5  Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6  First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7  "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8  their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor

9  the challenged settlement agreement, prevents states from acting to enforce their own laws or

10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14  the States' own employees and residents [] are caused by the Government's sudden decision to

15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17  settlement of Defense Distributed's claims.  As the Government has previously explained, it

18  regulates the transfer of items constituting exports and temporary imports pursuant to the

19  AECA and ITAR, and it has no authority to regulate the transmission of technical data

20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22  [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'

23  Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel
[the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24  [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008875

1   Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2   ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3   disseminat[ing] the computer files at issue domestically in public or private forums," including

4   within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

5   plausibly assert that the Government's "deregulation" has affected—let alone seriously

6   jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7        Moreover, separate laws aimed at domestic conduct continue to address domestic public

8   safety concerns.  It remains that case that any person who might obtain the necessary

9   equipment and materials, download the files from Defense Distributed's website, properly

10  construct an operable firearm, and render the firearm undetectable would be engaging in an

11  action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1).  Thus, Plaintiffs cannot establish

12  that the challenged actions, which concern whether an item must be regulated for export from

13  the United States, restrict their ability or authority to protect public safety in their states. *See*

14  *Clapper*, 568 U.S. at 409.

15       Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16  interests.  Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18.  According to Plaintiffs, they have suffered

17  proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18  and prisons more dangerous for guards and inmates."  Pls' Mot. at 8.  As an initial matter, they

19  offer no support that such an injury is properly asserted under the doctrine of proprietary

20  interests rather than as *parens patriae*.  *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21  1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22  people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23  But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24  harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26       [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
    state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27  592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
    and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008876

1    imminent and concrete and would not be prevented by domestic laws regulating undetectable

2    firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3    injury to its proprietary interest is "subject to the same law of standing as any other party in

4    federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5    (supporting allegations of proprietary injury by identifying individuals prevented from

6    attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7    *sub. nom*, *Golden v. Washington*, 138 S. Ct. 448 (2017).

8           Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9    doctrine of *parens patriae*.  *See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10   659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11   sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12   sufficiently substantial segment of its population, articulates an interest apart from the interests

13   of particular private parties, and expresses a quasisovereign interest").  But to the extent

14   Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15   ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16   "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17   *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae*.  *See also*

18   *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19   on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20   federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21   requirements of Art. III.'" (citation omitted)).  It is also well established that a state "does not

22   have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23   *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24   *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25   *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26          **B.      Plaintiffs Lack Prudential Standing.**

27          Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2    Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3    876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4    interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5    regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6    *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7    examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8    which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9    "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10   related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11   assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12   *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13        Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14   particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15   154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16   particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17   against the national security threat created by the unrestricted flow of military information

18   abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19   *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20   to control the import and export of defense articles and defense services in 'furtherance of

21   world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22   § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23   to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24   exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25

26   _____

     [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national
     security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by
     the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27   no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
     dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8640

WASHSTATEB008878

1   President may not remove any item from the Munitions List until 30 days after the date on

2   which the President has provided notice of the proposed removal to" certain congressional

3   committees.  As the legislative history makes clear, Congress enacted this provision in response

4   to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5   export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6   exercise congressional oversight of the Department nor function as would-be exporters, and

7   whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8   interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9   (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

12      **C.      Plaintiffs' APA Claims Are Meritless.**

13          **1.      The Department's Actions Accord With Its Delegated Authority.**

14          Plaintiffs cannot establish likely success on the merits of any of their claims.  First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008879

1   Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a

2   compendium of specific controlled items,' rather it is a 'series of categories describing the

3   kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711

4   F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any

5   "item" of the USML.  The Department's settlement regarding the files at issue in *Defense*

6   *Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

7         To the extent the Court finds the AECA's reference to "item" or "remove" to be

8   ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore*

9   deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is

10  "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the

11  validity of its reasoning, [and] its consistency with earlier and later pronouncements.'"  *Fox*

12  *Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting

13  *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001))).  The Department has consistently

14  held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories

15  or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl.

16  ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the

17  original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to

18  remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the

19  executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has

20  been aware of the Department's interpretation and yet has not addressed it in amendments to

21  the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These

22  circumstances provide further evidence—if more is needed—that Congress intended the

23  Agency's interpretation, or at least understood the interpretation as statutorily permissible."

24  *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220

25  (2002)).

26        To the extent the Court concludes that notice to Congress was required under 22 U.S.C.

27  § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008880

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3         Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16        Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008881

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3          The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10  such laws. To the contrary, the Department has consistently emphasized that its actions are

11  taken only pursuant to its authority to regulate the United States' system of export controls, not

12  domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13  Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14  Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15  remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16  understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17          **2.     The Department's Actions Were Not Arbitrary And Capricious.**

18          Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19  because they constitute an unexplained reversal of the agency's prior position concerning

20  whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21  Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22  decision to enter into a settlement to resolve that litigation, such decisions are committed to

23  agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24  *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26          [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to circumvent the law, Pls.' Mot. at 14; *see also id.* at 4 (suggesting the Government settled "covert[ly]"). *United*

27  *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017) ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008882

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7         Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted. *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166. These NPRMs have not been withdrawn and remain the official position of the

10   Government.[12] *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11   1982). Further, the rationale for this determination is provided in the Commerce NPRM, which

12   explains that the "review was focused on identifying the types of articles that are now

13   controlled on the USML that are either (i) inherently military and otherwise warrant control on

14   the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15   or characteristics that provide a critical military or intelligence advantage to the United States,

16   and are almost exclusively available from the United States." 83 Fed. Reg. at 24,166 ("Thus,

17   the scope of the items described in this proposed rule is essentially commercial items widely

18   available in retail outlets and less sensitive military items."). This case is only about the

19   determination of the Government that the technical data at issue would not give a military or

20   intelligence advantage and is therefore not properly subject to export controls. Only those

21   weapons of a type that is inherently military or that is not otherwise widely available for

22   commercial sale are properly subject to such controls. The Government has not made any

23   determination that 3D-printed guns should not be regulated domestically, and indeed the

24   Government intends to apply those authorities that regulate such firearms and supports

25

26      [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal authority. As explained in the balance of this memorandum, that is not accurate.

27      [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger rulemaking effort. *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4          Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16         Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                **CONCLUSION**

23         For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                    Respectfully submitted,

25

                                              CHAD A. READLER
26                                            Acting Assistant Attorney General

27                                            ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23                              United States Department of Justice
                                                         Civil Division, Federal Programs Branch
                                                         20 Massachusetts Ave. NW
                                                         Washington, DC 20530
                                                         202-305-8648

WASHSTATEB008884

1

Acting United States Attorney

2

KERRY KEEFE
Civil Chief

3

4

JOHN R. GRIFFITHS
Director, Federal Programs Branch

5

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

6

7

*/s/ Steven A. Myers*
STEVEN A. MYERS

8

ERIC J. SOSKIN
STUART J. ROBINSON

9

Attorneys

10

U.S. Department of Justice
Civil Division, Federal Programs Branch

11

20 Massachusetts Ave. NW
Washington, D.C. 20530

12

(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)

13

steven.a.myers@usdoj.gov

14

15

*Attorneys for Federal Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008885

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018

*/s/ Steven A. Myers*
Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB008886

# EXHIBIT 1

WASHSTATEB008887

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also authorizes the President "to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the "United States Munitions List" (USML). *Id.* The President delegated this authority to the Department with respect to exports, temporary imports, and brokering, and the Department has promulgated the ITAR to implement those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains the USML. The items enumerated on the USML are those that "provide a critical military or intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of defense articles and defense services without a license, except as specifically provided in regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see* 22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22 C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances specifically developed, configured, adapted, or modified for the purpose of increasing their capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d). "Technical data" does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information that is in the public domain. *See* 22 C.F.R. § 120.10. ITAR § 120.11 defines "public domain," in relevant part, as information which is published and generally accessible or available to the public, and provides a list of information that has been made available to the public, including "[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of hardware, technical data, and services described on the USML—to determine what items, if any, no longer warrant control under the ITAR and conveys the results of such reviews to Congress. *See* 22 U.S.C. § 2778(f). The review process begins with Department engagement with the Departments of Defense and Commerce to determine the categories most appropriate for review, and this consultation is informed by inquiries received from the general public, internal feedback from licensing officers and Commodity Jurisdiction analysts, and the period of time since the categories under consideration were reviewed previously. At the onset of the review process the Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories under consideration for review and to solicit comment on potential improvements to those categories. If warranted, based on the feedback received, the Department will then initiate an ordinary rulemaking process, beginning with the publication of a Notice of Proposed Rulemaking (NPRM).

3

8.     The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.     The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria.  The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change.  The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions.  At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.    The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4.  The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce.  The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information.  The CJ process typically takes 45-55 business days.  If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.    The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.      The ITAR requires a license, in relevant part, for the *export* of "technical data."  *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR.  *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.      ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided:  "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

WASHSTATEB008893

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB008894

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency

partners to evaluate and revise categories of items on the USML.  While a wide range of

interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the

Department works particularly closely with the Departments of Defense and Commerce to solicit

their views on the appropriate composition of the USML.  The engagement with the DOC is

further intended to ensure that the jurisdictional posture of a given item is clear, and the

application of ITAR or EAR controls to that item can be discerned and understood by the public.

Additionally, the Department coordinates with the DOC to publish rules in parallel where

updates to the USML require conforming changes to the CCL to ensure the appropriate level of

control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order

13637, the Department obtains concurrence of the Secretary of Defense for designations,

including changes in designations, of items or categories of items that are defense articles and

defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this

effort to revise the USML, which began in 2010,[3] the Department has followed a consistent

process for revising the USML categories and obtaining DoD concurrence.  This process begins

with an internal national security review conducted by the DoD[4] to assess which items in the

category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing
advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment
on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense
articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed.
Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation
of Export Control Reform").
[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the
Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.      The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.      As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

WASHSTATEB008896

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms.  The Department is reviewing these public comments and will respond if it publishes a final rule.  None of the Plaintiff States submitted comments in response to the NPRM.

24.    The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication.  The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer.  The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.    In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer.  The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization.  Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.    I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files

available for download during the pendency of the *Defense Distributed* litigation.  Any

restrictions imposed by the Department on the technical data that was the subject of the action

were limited to the export of that technical data; the Department has no jurisdiction over sharing

technical data between U.S. persons in the United States, unless such sharing also provides

access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy

of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)     [D]raft and to fully pursue, to the extent authorized by law (including the
> Administrative Procedure Act), the publication in the Federal Register of a notice
> of proposed rulemaking and final rule, revising USML Category I to exclude the
> technical data that is the subject of the Action.
>
> (b)     [Announce], while the above-referenced final rule is in development, of a
> temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of
> USML Category I to exclude the technical data that is the subject of the Action.
> The announcement will appear on the DDTC website, www.pmddtc.state.gov, on
> or before July 27, 2018.
>
> (c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy
> Assistant Secretary for Defense Trade Controls, advising that the Published Files,
> Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited
> distribution) in any form and are exempt from the export licensing requirements of
> the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the
> purposes of 22 C.F.R. § 125.4(b)(13) the Department  of State is the cognizant U.S.
> Government department or agency, and the Directorate of Defense Trade Controls
> has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's
first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times.
That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech
gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's
Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at
https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-
two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

### SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.  *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

> (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

> (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHSTATEB008903

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a),
excluding Military Equipment.

Dated: _June 29_, 2018

Dated: _June 29_, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _June 29_, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

**From:**         Rogers, Shana A
**Sent:**         Fri, 7 Sep 2018 16:03:58 -0400
**To:**           IT Service Center
**Subject:**      Send to self on open net
**Attachments:**  20180907 IM to D appeal recommendation.docx


Hello,
Will you please send the this email and the attachment to me on opennet (rogerssa2@state.gov)?

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

**From:**          Rogers, Shana A
**Sent:**          Fri, 7 Sep 2018 16:25:33 -0400
**To:**            Cavnar, Anna
**Subject:**       20180907 IM to D appeal recommendation.docx
**Attachments:**   20180907 IM to D appeal recommendation.docx


Preliminary IM on the appeal.  I've done no editing, it is incomplete, and is largely stream of consciousness.  I asked to have a version sent to the low side and will forward from there if I ever get it. Thoughts are much appreciated.  To the extent they are big picture ideas, please send them on open net as I may try to work on this over the weekend.

Many many thanks.

Sensitive
This email is UNCLASSIFIED.

**From:** Taylor, Laquita R
**Sent:** Mon, 10 Sep 2018 11:13:19 -0400
**To:** Rogers, Shana A
**Subject:** FW: Urgent request to send to high side
**Attachments:** 20180910 IM to D appeal recommendation (clean).docx

REQ000009660397

This email is UNCLASSIFIED.

From: Rogers, Shana A
Sent: Monday, September 10, 2018 10:58 AM
To: IT Service Center
Subject: Urgent request to send to high side

Hello,
Will you please send the attached document to my ClassNet account as soon as possible? I need the document in Word format to continue working on it there. D staff has requested to have this document as an AM today if possible.

Many thanks,
Shana

**Official**
**UNCLASSIFIED**

**From:**        Cavnar, Anna
**Sent:**        Mon, 10 Sep 2018 16:55:38 -0400
**To:**          Dorosin, Joshua L
**Cc:**          Rogers, Shana A
**Subject:**     Defense Distributed draft
**Attachments:** 20180910 IM to D appeal recommendation (AC edits).docx

Josh – As just discussed, here's a redline version of the AM as edited today.

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

**From:** Cavnar, Anna
**Sent:** Mon, 10 Sep 2018 17:17:31 -0400
**To:** Miller, Michael F;Heidema, Sarah J;Paul, Joshua M;Abisellan, Eduardo;Negrea, Dan;Shufflebarger, Jamie L;Ravi, Sunil K;Darrach, Tamara A
**Cc:** Dorosin, Joshua L;Wall, Amanda J;Rogers, Shana A
**Subject:** AM to D on Defense Distributed appeal
**Attachments:** 20180910 AM to D appeal recommendation.docx

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

**From:**       Miller, Michael F
**Sent:**       Mon, 10 Sep 2018 18:19:02 -0400
**To:**         Heidema, Sarah J;Hart, Robert L
**Cc:**         String, Marik A
**Subject:**    FW: AM to D on Defense Distributed appeal
**Attachments:** 20180910 AM to D appeal recommendation.docx
**Importance:** High


Sarah – for your review in the AM – some tracked proposed edits and comments from me.

MM


**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

**From:**          Shufflebarger, Jamie L
**Sent:**          Tue, 11 Sep 2018 09:05:28 -0400
**To:**            Cavnar, Anna;Miller, Michael F;Heidema, Sarah J;Paul, Joshua M;Abisellan, Eduardo;Negrea, Dan;Ravi, Sunil K;Darrach, Tamara A
**Cc:**            Dorosin, Joshua L;Wall, Amanda J;Rogers, Shana A
**Subject:**       RE: AM to D on Defense Distributed appeal
**Attachments:**   20180910 AM to D appeal recommendation.docx

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

WASHSTATEB008963

**From:**          Abisellan, Eduardo
**Sent:**          Tue, 11 Sep 2018 09:15:24 -0400
**To:**            Heidema, Sarah J
**Cc:**            Brechwald, Matthew J (T)
**Subject:**       FW: AM to D on Defense Distributed appeal
**Attachments:**   20180910 AM to D appeal recommendation.docx


Hi Sarah,

I want to make sure PM is good with this.

Vr/Ed


**Official - SBU**
This message is **UNCLASSIFIED** when separated from **SECRET** attachment(s)
Classified By: Andrea L. Thompson - U/S , Office:T, Agency:U.S. Department of State
Declassify On: 9/11/2043
Reasons: Derived Per DSCG.

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

WASHSTATEB008973

| | |
|---|---|
| **From:** | Cavnar, Anna |
| **Sent:** | Tue, 11 Sep 2018 12:09:25 -0400 |
| **To:** | Shufflebarger, Jamie L;Miller, Michael F;Heidema, Sarah J;Paul, Joshua M;Abisellan, Eduardo;Negrea, Dan;Ravi, Sunil K;Darrach, Tamara A;D Senior Advisor;Brechwald, Matthew J (T) |
| **Cc:** | Dorosin, Joshua L;Wall, Amanda J;Rogers, Shana A |
| **Subject:** | RE: AM to D on Defense Distributed appeal |
| **Attachments:** | 20180911 AM to D appeal recommendation (2 page AM clean).docx, 20180911 AM to D appeal recommendation (2 page AM redline).docx |

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations. I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it without removing existing language. If you have significant additional content to add, please try to put it in the background.

Sensitive
This email is UNCLASSIFIED.

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.

WASHSTATEB008980

This email is UNCLASSIFIED.

---

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

---

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

WASHSTATEB008982

**From:** Cavnar, Anna
**Sent:** Tue, 11 Sep 2018 12:10:01 -0400
**To:** Heidema, Sarah J
**Subject:** FW: AM to D on Defense Distributed appeal
**Attachments:** 20180911 AM to D appeal recommendation (2 page AM clean).docx, 20180911 AM to D appeal recommendation (2 page AM redline).docx

In particular looking for DDTC clearance, without which we definitely can't move this forward. Thanks!

Sensitive
This email is UNCLASSIFIED.

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:09 PM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor; Brechwald, Matthew J (T)
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations. I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it without removing existing language. If you have significant additional content to add, please try to put it in the background.

Sensitive
This email is UNCLASSIFIED.

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.

This email is UNCLASSIFIED.

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand

we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

**From:**          Rogers, Shana A
**Sent:**          Tue, 11 Sep 2018 12:32:29 -0400
**To:**            Cavnar, Anna
**Subject:**       20180911 AM to D appeal recommendation (2 page AM clean).docx
**Attachments:**   20180911 AM to D appeal recommendation (2 page AM clean).docx

This looks great, very impressed.  I have a few minor edits (and a few more then to keep it to 2 pages).

Sensitive
This email is UNCLASSIFIED.

**From:**      Heidema, Sarah J
**Sent:**      Tue, 11 Sep 2018 12:49:03 -0400
**To:**        Cavnar, Anna
**Subject:**   RE: AM to D on Defense Distributed appeal

I clear.  Thanks!


**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:10 PM
To: Heidema, Sarah J
Subject: FW: AM to D on Defense Distributed appeal

In particular looking for DDTC clearance, without which we definitely can't move this forward. Thanks!


Sensitive
This email is UNCLASSIFIED.


From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:09 PM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo;
Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor; Brechwald, Matthew J (T)
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations.
I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not
already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it
without removing existing language. If you have significant additional content to add, please try to put it
in the background.


Sensitive
This email is UNCLASSIFIED.


From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan;
Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor

Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237


**Official**
**<span style="color:green">UNCLASSIFIED</span>**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.


This email is UNCLASSIFIED.


From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237


**Official**
**<span style="color:green">UNCLASSIFIED</span>**

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

**From:**          Cavnar, Anna
**Sent:**          Tue, 11 Sep 2018 12:56:55 -0400
**To:**            Heidema, Sarah J
**Subject:**       RE: AM to D on Defense Distributed appeal

Thanks! Does Mike Miller need to clear separately or does this cover DDTC?

This email is UNCLASSIFIED.

---

From: Heidema, Sarah J
Sent: Tuesday, September 11, 2018 12:49 PM
To: Cavnar, Anna
Subject: RE: AM to D on Defense Distributed appeal

I clear.  Thanks!

**Official**
**UNCLASSIFIED**

---

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:10 PM
To: Heidema, Sarah J
Subject: FW: AM to D on Defense Distributed appeal

In particular looking for DDTC clearance, without which we definitely can't move this forward. Thanks!

Sensitive
This email is UNCLASSIFIED.

---

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:09 PM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo;
Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor; Brechwald, Matthew J (T)
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations.
I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not
already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it
without removing existing language. If you have significant additional content to add, please try to put it
in the background.

Sensitive
This email is UNCLASSIFIED.

---

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

---

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.

This email is UNCLASSIFIED.

---

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

---

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

**From:**                Abisellan, Eduardo
**Sent:**               Tue, 11 Sep 2018 13:04:34 -0400
**To:**                  Cavnar, Anna;Shufflebarger, Jamie L;Miller, Michael F;Heidema, Sarah J;Paul, Joshua M;Negrea, Dan;Ravi, Sunil K;Darrach, Tamara A;D Senior Advisor;Brechwald, Matthew J (T)
**Cc:**                  Dorosin, Joshua L;Wall, Amanda J;Rogers, Shana A
**Subject:**           RE: AM to D on Defense Distributed appeal

Clear for T.


**Official - SBU**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:09 PM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor; Brechwald, Matthew J (T)
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations. I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it without removing existing language. If you have significant additional content to add, please try to put it in the background.


Sensitive
This email is UNCLASSIFIED.


From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237


**Official**

UNCLASSIFIED

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.


This email is UNCLASSIFIED.


From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237


**Official**
UNCLASSIFIED

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger, Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

**From:**  Cavnar, Anna
**Sent:**  Tue, 11 Sep 2018 13:37:46 -0400
**To:**  String, Marik A
**Cc:**  PM-Staffers Mailbox;Miller, Michael F;Heidema, Sarah J;Wall, Amanda J;Rogers, Shana A
**Subject:**  AM to D on Defense Distributed settlement appeal
**Attachments:**  20180911 AM to D appeal recommendation (2 page AM clean).docx

Marik,

Attached please find an AM to D on ███████████████████████████████ We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P). Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

**From:**           Negrea, Dan
**Sent:**           Tue, 11 Sep 2018 13:57:01 -0400
**To:**              Cavnar, Anna;Shufflebarger, Jamie L;Miller, Michael F;Heidema, Sarah J;Paul, Joshua M;Abisellan, Eduardo;Ravi, Sunil K;Darrach, Tamara A;D Senior Advisor;Brechwald, Matthew J (T)
**Cc:**              Dorosin, Joshua L;Wall, Amanda J;Rogers, Shana A
**Subject:**       RE: AM to D on Defense Distributed appeal

Clear for SP

Dan Negrea
Member, Policy Planning Staff
Office of the Secretary
U.S. Department of State
Telephone 202-647-9842

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 12:09 PM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor; Brechwald, Matthew J (T)
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

All – Attached is a new draft of the AM, which is now 2 pages, including the appeal recommendations. I've attached a redline and clean copy. Please provide final review and clearance ASAP, if you have not already done so. Note that the AM is exactly 2 pages, so no additional content can be added to it without removing existing language. If you have significant additional content to add, please try to put it in the background.

Sensitive
This email is UNCLASSIFIED.

From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 10:46 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A; D Senior Advisor
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Let's try to keep it to two pages, but realize that may too much to ask.

Jamie Shufflebarger

Special Assistant
Office of the Deputy Secretary of State
202-647-6237

**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 10:27 AM
To: Shufflebarger, Jamie L; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo;
Negrea, Dan; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Jamie – How long can the AM itself be? Thanks.


This email is UNCLASSIFIED.


From: Shufflebarger, Jamie L
Sent: Tuesday, September 11, 2018 9:05 AM
To: Cavnar, Anna; Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan;
Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: RE: AM to D on Defense Distributed appeal

Edits attached. I think this can be slimmed down a bit, as the background is repetitive. I'm not wed to
pulling the options into the AM if L wants to keep it separate, but think the DoJ's position definitely
needs to be within the AM.

Jamie Shufflebarger
Special Assistant
Office of the Deputy Secretary of State
202-647-6237


**Official**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Monday, September 10, 2018 5:18 PM
To: Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Abisellan, Eduardo; Negrea, Dan; Shufflebarger,
Jamie L; Ravi, Sunil K; Darrach, Tamara A
Cc: Dorosin, Joshua L; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed appeal

All,

Attached for your review and clearance is a draft AM to D on the appeal of the preliminary injunction in the Defense Distributed case (3D printed guns). With apologies for the short turnaround, I understand we need to get this to the Line tomorrow so D has sufficient time to make a decision, so please clear by **10am** tomorrow (Tuesday).

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | String, Marik A |
| **Sent:** | Tue, 11 Sep 2018 15:27:30 -0400 |
| **To:** | Cavnar, Anna |
| **Cc:** | PM-Staffers Mailbox;Miller, Michael F;Heidema, Sarah J;Wall, Amanda J;Rogers, Shana A |
| **Subject:** | RE: AM to D on Defense Distributed settlement appeal |
| **Attachments:** | 20180911 AM to D appeal recommendation (2 page AM clean).docx |

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

████████████████████████████████████████████████████

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar

Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

**From:** Cavnar, Anna
**Sent:** Tue, 11 Sep 2018 15:58:15 -0400
**To:** Dorosin, Joshua L;Wall, Amanda J
**Cc:** Rogers, Shana A
**Subject:** FW: AM to D on Defense Distributed settlement appeal
**Attachments:** 20180911 AM to D appeal recommendation (2 page AM clean).docx

Josh, Amanda –



I can try to address Marik's other comments and questions, but let me know your thoughts on the overarching issue. Also, I've been sick since last night and so likely won't be able to stay late tonight to work on this; I will be out tomorrow at an ICRC off-site, but Shana should be back.

Sensitive
This email is UNCLASSIFIED.

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Privileged/Confidential – Attorney-Client Privilege

Anna, attached are some edits with a few questions/comments for L and DDTC.



I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
UNCLASSIFIED

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 1:38 PM
To: String, Marik A
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the
Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is
still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review.
Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to
the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as
well as any edits from H and S/P)  Just let me know what you'd prefer once you've had a chance to
review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Cavnar, Anna |
| **Sent:** | Tue, 11 Sep 2018 16:46:44 -0400 |
| **To:** | Dorosin, Joshua L;Wall, Amanda J |
| **Cc:** | Rogers, Shana A |
| **Subject:** | RE: AM to D on Defense Distributed settlement appeal |
| **Attachments:** | 20180911 AM to D appeal recommendation (2 page AM clean) (MS edits).docx |

New version attached, with my edits in response to Marik's edits/questions and ███████ ████████████████████████████████████████████████████ Let me know if you and/or Jennifer needs to review this or if you would like me to simply send it back to Marik now.

Sensitive
This email is UNCLASSIFIED.

---

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 3:58 PM
**To:** Dorosin, Joshua L; Wall, Amanda J
**Cc:** Rogers, Shana A
**Subject:** FW: AM to D on Defense Distributed settlement appeal

Josh, Amanda – 

I can try to address Marik's other comments and questions, but let me know your thoughts on the overarching issue. Also, I've been sick since last night and so likely won't be able to stay late tonight to work on this; I will be out tomorrow at an ICRC off-site, but Shana should be back.

Sensitive
This email is UNCLASSIFIED.

---

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

WASHSTATEB009060

**From:** Cavnar, Anna
**Sent:** Tue, 11 Sep 2018 17:54:54 -0400
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox;Miller, Michael F;Heidema, Sarah J;Wall, Amanda J;Rogers, Shana A;Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal
**Attachments:** 20180911 AM to D appeal recommendation (2 page AM clean) (MS edits).docx

Thanks, Marik. ████████████████████████████████████████████

███████████████████████████████ I believe Jennifer is still reviewing, but Amanda, cc'd, should be able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.


Sensitive
This email is UNCLASSIFIED.


---

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Privileged/Confidential – Attorney-Client Privilege

Anna, attached are some edits with a few questions/comments for L and DDTC.

███████████████████████████████████████████████████████

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik


**Official - SBU**

**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 1:38 PM
To: String, Marik A
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | PM-Staffers Mailbox |
| **Sent:** | Tue, 11 Sep 2018 18:00:25 -0400 |
| **To:** | String, Marik A |
| **Subject:** | FW: AM to D on Defense Distributed settlement appeal |
| **Attachments:** | 20180911 AM to D appeal recommendation (2 page AM clean) (MS edits).docx |

Dear Marik,

Just FYI that Bill commented earlier today when he saw this chain that since this is an L-drafted paper, L should submit this up through Everest via their channel.

All the Best,

Kurosh Massoud Ansari
Staff Assistant
PM/FO SharePoint
202-647-5104

**Official**
**UNCLASSIFIED**

---

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ██████████████████████████████████████████████
██████████████████████████ believe Jennifer is still reviewing, but Amanda, cc'd, should be able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.

Sensitive
This email is UNCLASSIFIED.

---

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna

**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P). Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

WASHSTATEB009077

| From: | Cavnar, Anna |
|-------|-------------|
| Sent: | Tue, 11 Sep 2018 18:09:03 -0400 |
| To: | Dorosin, Joshua L;Wall, Amanda J |
| Cc: | Rogers, Shana A |
| Subject: | FW: AM to D on Defense Distributed settlement appeal |
| Attachments: | 20180911 AM to D appeal recommendation (2 page AM clean) (MS edits).docx |

Unfortunately it looks like Shana is going to be out tomorrow as well (her daughter is sick), so I really hope this is in good enough shape to go up. If there's anything I can do via phone tomorrow, you can always call me at 646-265-1006. I'll also be on blackberry at the off-site. Thanks.

Sensitive
This email is UNCLASSIFIED.

---

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ███████████████████████████████████████████████████
███████████████████████ I believe Jennifer is still reviewing, but Amanda, cc'd, should be able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.

Sensitive
This email is UNCLASSIFIED.

---

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

| From: | String, Marik A |
|---|---|
| Sent: | Tue, 11 Sep 2018 19:25:18 -0400 |
| To: | Cavnar, Anna |
| Cc: | PM-Staffers Mailbox;Miller, Michael F;Heidema, Sarah J;Wall, Amanda J;Rogers, Shana A;Dorosin, Joshua L |
| Subject: | RE: AM to D on Defense Distributed settlement appeal |
| Attachments: | 20180911 AM to D appeal recommendation (2 page AM clean) (MS edits).docx |

**Privileged/Confidential – Attorney-Client Privilege**

I clear with a few minor tweaks attached.  L can go ahead and submit when you have Jennifer's clearance.

Thanks for everyone's work on this.

Marik


**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ███████████████████████████████████████████
███████████████████████████████ believe Jennifer is still reviewing, but Amanda, cc'd, should be able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.


Sensitive
This email is UNCLASSIFIED.


**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna

**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P). Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

WASHSTATEB009098

**From:**  Wall, Amanda J
**Sent:**  Tue, 11 Sep 2018 19:37:08 -0400
**To:**  Cavnar, Anna;Fabry, Steven F
**Cc:**  Rogers, Shana A;Dorosin, Joshua L
**Subject:**  RE: AM to D on Defense Distributed settlement appeal
**Attachments:**  20180911 AM to D appeal recommendation (2 page AM clean) (MS edits) (JGN edits).docx

L-only.  Jennifer cleared this version with two minor edits (on top of Marik's). ███████████████
███████████████████████████████████████████████████████

Additionally, Shana/Anna — ██████████████████████████████████████████████
█████████████████████████

Best,
Amanda

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 7:25 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

I clear with a few minor tweaks attached.  L can go ahead and submit when you have Jennifer's clearance.

Thanks for everyone's work on this.

Marik

Official - SBU
UNCLASSIFIED

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ████████████████████████████████████████████████████
██████████████████████████████ I believe Jennifer is still reviewing, but Amanda, cc'd, should be

able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.


Sensitive
This email is UNCLASSIFIED.


**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik


**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L – but in the interests of time, we wanted to get this to you now for your review.

Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Wall, Amanda J |
| **Sent:** | Wed, 12 Sep 2018 11:08:49 -0400 |
| **To:** | Cavnar, Anna;Fabry, Steven F |
| **Cc:** | Rogers, Shana A;Dorosin, Joshua L |
| **Subject:** | RE: AM to D on Defense Distributed settlement appeal |
| **Attachments:** | 20180911 AM to D appeal recommendation.docx |

All – A clean version with the two additional edits from this morning's call is attached.

Best,
Amanda

---

**From:** Wall, Amanda J
**Sent:** Tuesday, September 11, 2018 7:37 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

L-only.  Jennifer cleared this version with two minor edits (on top of Marik's). ███████████
████████████████████████████████████████████████

Additionally, Shana/Anna – ████████████████████████████████████
████████████████████

Best,
Amanda

---

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 7:25 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Privileged/Confidential – Attorney-Client Privilege

I clear with a few minor tweaks attached.  L can go ahead and submit when you have Jennifer's clearance.

Thanks for everyone's work on this.

Marik


**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ███████████████████████████████████████████████████

███████████████████████████████ I believe Jennifer is still reviewing, but Amanda, cc'd, should be able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.

Sensitive
This email is UNCLASSIFIED.

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik

**Official - SBU**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 1:38 PM
To: String, Marik A
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review. Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Wall, Amanda J |
| **Sent:** | Thu, 13 Sep 2018 07:46:42 -0400 |
| **To:** | String, Marik A;Cavnar, Anna |
| **Cc:** | PM-Staffers Mailbox;Miller, Michael F;Heidema, Sarah J;Rogers, Shana |

A;Dorosin, Joshua L
| | |
|---|---|
| **Subject:** | RE: AM to D on Defense Distributed settlement appeal |
| **Attachments:** | (R_474027) 20180911 AM to D appeal recommendation (FINAL).docx, Tab 1 - |

Background on Defense Distributed Litigation and Settlement Agreement.docx

Marik and all –

Jennifer approved last night with only very minor tweaks, which I'm attaching here.  I sent it up in
Everest last night, and the finals are attached.

Best,
Amanda

**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 7:25 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin,
Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

I clear with a few minor tweaks attached.  L can go ahead and submit when you have Jennifer's
clearance.

Thanks for everyone's work on this.

Marik

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin,
Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ███████████████████████████████████████
███████████████████████████  I believe Jennifer is still reviewing, but Amanda, cc'd, should be

able to send any additional edits that she has.  If we can get a cleared version together tonight, then I believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this evening.


Sensitive
This email is UNCLASSIFIED.


**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

I'll review once more after these comments are addressed (and Jennifer should see the next turn as well).

Thanks,

Marik


**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 1:38 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review.

Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965

Sensitive
This email is UNCLASSIFIED.

**From:**          String, Marik A
**Sent:**          Thu, 13 Sep 2018 11:45:57 -0400
**To:**            Brechwald, Matthew J (T);Abisellan, Eduardo;Tucker, Maureen E
**Subject:**       FW: AM to D on Defense Distributed settlement appeal
**Attachments:**   (R_474027) 20180911 AM to D appeal recommendation (FINAL).docx, Tab 1 -
Background on Defense Distributed Litigation and Settlement Agreement.docx


FYI.


**Official - SBU**
**UNCLASSIFIED**

From: Wall, Amanda J
Sent: Thursday, September 13, 2018 7:47 AM
To: String, Marik A; Cavnar, Anna
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Rogers, Shana A; Dorosin, Joshua L
Subject: RE: AM to D on Defense Distributed settlement appeal

Marik and all —

Jennifer approved last night with only very minor tweaks, which I'm attaching here.  I sent it up in
Everest last night, and the finals are attached.

Best,
Amanda

From: String, Marik A
Sent: Tuesday, September 11, 2018 7:25 PM
To: Cavnar, Anna
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin,
Joshua L
Subject: RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

I clear with a few minor tweaks attached.  L can go ahead and submit when you have Jennifer's
clearance.

Thanks for everyone's work on this.

Marik


**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, September 11, 2018 5:55 PM
**To:** String, Marik A
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A; Dorosin, Joshua L
**Subject:** RE: AM to D on Defense Distributed settlement appeal

Thanks, Marik. ████████████████████████████████████████████████
██████████████████████████████████████ I believe Jennifer is still reviewing, but Amanda, cc'd, should be
able to send any additional edits that she has.  If we can get a cleared version together tonight, then I
believe Amanda is happy to submit to Everest this evening. Otherwise, L can submit it first thing in the
morning or PM can submit, if you prefer.

I need to leave soon, so please make sure Amanda is copied on any response you send back this
evening.


Sensitive
This email is UNCLASSIFIED.


**From:** String, Marik A
**Sent:** Tuesday, September 11, 2018 3:28 PM
**To:** Cavnar, Anna
**Cc:** PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
**Subject:** RE: AM to D on Defense Distributed settlement appeal

**Privileged/Confidential – Attorney-Client Privilege**

Anna, attached are some edits with a few questions/comments for L and DDTC.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

I'll review once more after these comments are addressed (and Jennifer should see the next turn as
well).

Thanks,

Marik


**Official - SBU**
**UNCLASSIFIED**

From: Cavnar, Anna
Sent: Tuesday, September 11, 2018 1:38 PM
To: String, Marik A
Cc: PM-Staffers Mailbox; Miller, Michael F; Heidema, Sarah J; Wall, Amanda J; Rogers, Shana A
Subject: AM to D on Defense Distributed settlement appeal

Marik,

Attached please find an AM to D on our recommendation to appeal the preliminary injunction in the
Defense Distributed *Washington* case. We are still waiting for clearance from H and S/P – and Jennifer is
still reviewing for L –  but in the interests of time, we wanted to get this to you now for your review.
Once you have reviewed, we are happy to combine your edits with anything from Jennifer and submit to
the Line this evening. Or, if PM would prefer to submit, we can send you Jennifer's edits later today (as
well as any edits from H and S/P).  Just let me know what you'd prefer once you've had a chance to
review.

Best,
Anna

Anna Cavnar
Attorney Adviser
Office of the Legal Adviser
Political and Military Affairs (L/PM)
202-647-7965


Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | PM-Staffers Mailbox |
| **Sent:** | Thu, 13 Sep 2018 14:35:13 -0400 |
| **To:** | Heidema, Sarah J;Dearth, Anthony M |
| **Cc:** | PM-Staffers Mailbox;Carter, Rachel;Miller, Michael F;PM-CPA-DL |
| **Subject:** | FW: Package 201824914 Decision to appeal preliminary injunction in Washington v. State (3D printing firearms) has been returned for revision |
| **Attachments:** | (R_474027) 20180911 AM to D appeal recommendation (FINAL).docx, (S_474028) Tab 1 - Background on Defense Distributed Litigation and Settlement Agreement.docx |

DDTC,

Heads up, L's package was bounced. See requested edits below.

Samantha Sison
PM/FO SharePoint
X70561

**From:** SES-Line_Only
**Sent:** Thursday, September 13, 2018 1:55 PM
**To:** Everest_L; Everest_PM
**Cc:** SES-Line_Only
**Subject:** Package 201824914 Decision to appeal preliminary injunction in Washington v. State (3D printing firearms) has been returned for revision

S/ES is returning this package to your bureau. If your bureau would like to, it may revise this paper for resubmission through Everest. If your bureau does not wish to resubmit this package, you may remove it from your workspace by opening the package and clicking the 'OBE/Save' button. Please contact us at 7-8879 with any questions.

**NOTES:** Please address the following concerns before resubmitting: 1. Shorten the action memo to fit the two page limit. 2. Confirm the paragraphs missing portion markings in the action memo are in fact SBU. 3. The background paper needs an overall classification header/footer and paragraph portion markings. 4. Confirm the acronyms were expanded correctly in the background. Please retain Line edits. Thanks.
**CLASSIFICATION:** U – Unclassified
**FOR:** D
**ORGANIZATION:** L
**CO-DRAFTER BUREAU:** PM
**COPY TO:**
**SUBJECT:** Decision to appeal preliminary injunction in Washington v. State (3D printing firearms)
**REQUESTED ACTION:** Action Memo
**CLEARANCES:**
**DELIVERY DATE:** 12-Sep-2018 08:35:00 PM
**EVENT DATE:**
**DESCRIPTION:**

**CREATED BY:** L

**LINK:** [201824914 Package](201824914 Package)

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons. If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official – SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Mon, 1 Oct 2018 15:55:39 -0400
**To:** Capistrano, Norm
**Cc:** Sciandra, Salvatore;Cressey, Laura E;Jost, Aaron W
**Subject:** 20181001 - AA - DAS String's Participation in CAT Policy PCC on Oct. 2 LC
**Attachments:** 20181001 - AA - DAS String's Participation in CAT Policy PCC on Oct. 2 LC.docx

Thanks Norm.  Here are my updates.
**Official**
This message is **UNCLASSIFIED** when separated from **SECRET** attachment(s)
Classified By: er - er, Office:er, Agency:U.S. Department of State
Declassify On: 10/1/2043
Reasons: Derived Per DSCG.

**From:** Rogers, Shana A
**Sent:** Tue, 9 Oct 2018 12:55:29 -0400
**To:** Cavnar, Anna
**Subject:** IM to D on PI appeal (non) decision
**Attachments:** IM to D -- Update on PI Decision.docx

Anna,
Do you have a few minutes to take a look at this for me? ███████████████

███████████████████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Cavnar, Anna |
| **Sent:** | Tue, 9 Oct 2018 14:28:08 -0400 |
| **To:** | Rogers, Shana A |
| **Subject:** | RE: IM to D on PI appeal (non) decision |
| **Attachments:** | IM to D -- Update on PI Decision (LPM).docx |

A few suggested edits from me!

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Tuesday, October 09, 2018 12:55 PM
**To:** Cavnar, Anna
**Subject:** IM to D on PI appeal (non) decision

Anna,
Do you have a few minutes to take a look at this for me? ████████████
████████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

**From:** Rogers, Shana A
**Sent:** Tue, 9 Oct 2018 15:16:13 -0400
**To:** Heidema, Sarah J;Hart, Robert L
**Subject:** IM to D on the PI appeal
**Attachments:** IM to D -- Update on PI Decision (LPM).docx

Hi Sarah and Rob,
This isn't in formal clearance yet but I wanted to run it by you if you have time to give it a read.  Edits are welcome.

Shana

Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Tue, 9 Oct 2018 16:04:40 -0400 |
| **To:** | Dorosin, Joshua L |
| **Cc:** | Cavnar, Anna |
| **Subject:** | IM to D on appeal recommendation update |
| **Attachments:** | IM to D -- Update on PI Decision (LPM).docx |

Hi Josh,

Here is a draft of the IM to D ████████████████████████████. I sent it to DDTC for a preliminary review but do not have their feedback yet. Will you please review and let me know if it isn't what you wanted?

██████████████████████████████████████████
██████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Wed, 10 Oct 2018 10:35:54 -0400 |
| **To:** | PM-Staffers Mailbox |
| **Subject:** | FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted |
| **Attachments:** | (R_471189) 20180829 IM to S (4).docx, (S_470021) Tab 1 - 64 - State PI Opp.pdf |

Hi PM Staffers,
Do you have the final version of this IM indicating that S read it?  If so, will you please send it to me?

Thanks,
Shana


This email is UNCLASSIFIED.


From: Fabry, Steven F
Sent: Wednesday, August 29, 2018 7:07 PM
To: Rogers, Shana A
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted


**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 29, 2018 6:57 PM
To: Hart, Robert L; Heidema, Sarah J; Miller, Michael F
Cc: Carter, Rachel; PM-CPA-DL; String, Marik A; Davidson-Hood, Simon; Fabry, Steven F; PM-Staffers Mailbox
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

Package resubmitted. Everest versions attached.

Samantha Sison
PM/FO SharePoint
X70561

From: EverestMail
Sent: Wednesday, August 29, 2018 6:53 PM
To: SES-Line_Only
Cc: Everest_PM; Everest_H

Subject: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

A PM Package has been resubmitted.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:** H
**COPY TO:**
**SUBJECT:** Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:** Information Memo
**CLEARANCES:**
**DUE DATE:** 29-Aug-2018 03:00:00 PM
**EVENT DATE:**
**NOTES:** Per deps: this memo has plenty of background S already knows about the 3D gun issue. Please be more clear about the implications for the Department and what our next steps and plan of action are.
**DESCRIPTION:** Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:** PM

**LINK:** 201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
8                            AT SEATTLE

9                                          )
     STATE OF WASHINGTON, et al.,          )   No. 2:18-cv-1115-RSL
10                                         )
          Plaintiffs,                      )   **FEDERAL DEFENDANTS'**
11                                         )   **BRIEF IN OPPOSITION TO**
                    v.                     )   **PLAINTIFFS' MOTION FOR**
12                                         )   **PRELIMINARY INJUNCTION**
     UNITED STATES DEPARTMENT OF           )
13   STATE, et al.,                        )   **NOTED FOR:** August 21, 2018
                                           )
14        Defendants.                      )
     _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009419

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority. According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents. But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law. Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case. Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   merits of their claims, or that it is in the public interest for the Court to second-guess the

2   national security determinations of the Executive Branch.

3        Accordingly, Plaintiffs' motion should be denied.

4   **BACKGROUND**

5   **I.    Statutory And Regulatory Background**

6        The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq*., authorizes the

7   President, "[i]n furtherance of world peace and the security and foreign policy of the United

8   States" to "control the *import* and the *export* of defense articles and defense services" and to

9   promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id*. § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24       The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009421

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5         In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR. *See id.* § 120.4.  Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10  process, evaluating whether the item, service, or data is covered by the USML, provides the

11  equivalent performance capabilities of a defense article on the USML, or has a critical military

12  or intelligence advantage.  *See id.* § 120.4(d).

13        While the AECA and ITAR do not provide the State Department with authority to

14  prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15  statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16  manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17  § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18  113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19  States must generally be capable of being detected by metal detectors and by x-ray machines.

20  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21  challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22  by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23  (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24  *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25  these laws in order to address domestic safety issues related to undetectable firearms.  The

26  Department's determination under the ITAR at issue here will not affect those enforcement

27  efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009422

**II.      The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items."  *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)  Defendants' commitment to draft and to fully pursue, to the extent
     authorized by law (including the Administrative Procedure Act), the
     publication in the Federal Register of a notice of proposed rulemaking and
     final rule, revising USML Category I to exclude the technical data that is
     the subject of the Action.[1]

(b)  Defendants' announcement, while the above-referenced final rule is in
     development, of a temporary modification, consistent with the . . . (ITAR),
     22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
     is the subject of the Action. The announcement will appear on the DDTC
     website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra.*  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)     Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.") ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated Plaintiffs' constitutional rights.  *See id.* ¶ 28.

**III.     The Government's Proposed Rulemaking**

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the Department of State would be required for their export.

The Commerce NPRM explains both the rationale for the proposed transfer as well as the review process undertaken by the Government.  As it explained, the process included a "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009425

1  of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2  was intended to ensure that items remaining on the USML are either "inherently military or

3  otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4  applications, possess parameters or characteristics that provide a critical military or intelligence

5  advantage to the United States, and are almost exclusively available from the United States."

6  *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7  question, and therefore subject to export controls under the ITAR, are military weapons and

8  related items that could present a critical military or intelligence advantage.

9  **IV.    Procedural History**

10        On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11  the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12  that the Government's settlement with Defense Distributed adversely affected their public

13  safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14  Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15  a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16  granted on July 31, 2018, Dkt. No. 23 ("Order").

17        In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18  "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19  will have many of the negative impacts on a state level that the federal government once feared

20  on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21  likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22  to entering into the settlement agreement, the Government either provided 30-day notice to

23  Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24  Defense pursuant to Executive Order 13637.  *Id.* at 6.

25        The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26  order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27  expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

between domestic and international audiences." *Id.*  Finally, the Court found that "the balance of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the Court enjoined the Government "from implementing or enforcing the 'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin Defense Distributed in any manner.  *Id.*

Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2    not to "maintain the status quo" pending litigation, but to place themselves in a better position

3    than they were in before the onset of the current controversy through an award of "the exact

4    same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5    (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6    preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7    978 (9th Cir. 1992).[3]

8

9    **I.    Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.**

10       A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11    positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12    U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13    relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14    *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15    *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16       Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17    settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18    claim that the settlement agreement "will make it significantly easier to produce undetectable,

19    untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20    employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21    and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22    items at issue in this motion fall well short of irreparable harm.

23       First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24    lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25    unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27       [3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009428

1    be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2    irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3    regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4    will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5    and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6    fundamental misconception of the relevant law and the authority of the Department as the

7    federal agency that administers it.  The AECA and ITAR have not conferred upon the

8    Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9    articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27        [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not
     only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009429

1   occur, it will be because individuals have violated separate domestic prohibitions, such as the

2   Undetectable Firearms Act. *See* 18 U.S.C. § 922(p)(1).

3           For this reason, the types of harms that Plaintiffs identify do not support the granting of

4   injunctive relief in the circumstances of this case. All of the concerns identified are harms that

5   might result from the domestic availability of 3D-printed guns in the United States, but such

6   concerns have little to do with whether particular files should be regulated for foreign export on

7   national security grounds. Their relation to the State Department's exercise of authority and

8   the settlement agreement is speculative. For example, Plaintiffs contend that someone of

9   questionable "age, mental health, or criminal history" may procure the necessary equipment,

10  download files made specifically available as a result of the Department's settlement, assemble

11  an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20. But such actions would

12  violate domestic prohibitions on the use of firearms. The Department does not regulate the

13  files at issue for their availability to U.S. persons in the United States, and it is speculative to

14  claim that these domestic consequences would follow from the Department of State's actions

15  under the ITAR.

16          Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17  printing process fail for the same reasons. *See id.* at 20-24. For instance, they assert

18  shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19  3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20  purports to permit the domestic production of undetectable firearms. Such production is illegal

21  due to separate authority that regulates domestic conduct. *See* 18 U.S.C. § 922(p)(1).

22          Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23  enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24  bullets. Pls.' Mot. at 21-22. Again, Plaintiffs can only speculate as to whether such a harm

25  would result from a decision by the Department of State not to regulate the export of the

26
27  confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts. Camper
    Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009430

1   Defense Distributed's files for national security reasons.

2         Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3   attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4   transferring certain items in USML Category I, which encompass Defense Distributed's files,

5   only because it has determined that such a transfer would not injure the national security

6   interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7   Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8   national security that exist quite apart from the challenged actions and even that the

9   Government has considered and rejected.  Moreover, concerns that children "may mistake

10  [these weapons] for toys" exist apart from export control requirements, and it is at best

11  conjecture that the modification of export control requirements would have any effect on the

12  alleged harm.[5]

13        At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14  *generally*, not from the challenged actions regulating foreign exports.  But there are already

15  laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16  made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17  relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18  *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19  fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20  when there are separate statutes governing domestic manufacture, possession, and sale that

21  

22        [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
    F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as

23  Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
    petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was

24  appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
    interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm

25  arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
    Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not

26  prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
    There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.

27  After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
    the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
    gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

WASHSTATEB009431

1   remain unaffected by the challenged actions.

2          Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3   be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4   90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5   lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6   And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8   sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9   ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12         Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17         **A.      Plaintiffs Lack Article III Standing To Assert Their Claims.**

18         "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009432

1    injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2    61 (1992).

3           Plaintiffs claim they satisfy the requirements of Article III standing because the

4    Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5    Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6    First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7    "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8    their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor

9    the challenged settlement agreement, prevents states from acting to enforce their own laws or

10   protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11   "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12   U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13   safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14   the States' own employees and residents [] are caused by the Government's sudden decision to

15   deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16   are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17   settlement of Defense Distributed's claims.  As the Government has previously explained, it

18   regulates the transfer of items constituting exports and temporary imports pursuant to the

19   AECA and ITAR, and it has no authority to regulate the transmission of technical data

20   exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22           [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
     Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel

23   [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
     Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24           [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
     are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25   procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
     Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26   'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
     his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27   protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

     Opposition to Motion for Preliminary Injunction
     (No. 2:18-cv-1115-RSL) – 14

WASHSTATEB009433

1   Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2   ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3   disseminat[ing] the computer files at issue domestically in public or private forums," including

4   within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695.  Plaintiffs therefore cannot

5   plausibly assert that the Government's "deregulation" has affected—let alone seriously

6   jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7          Moreover, separate laws aimed at domestic conduct continue to address domestic public

8   safety concerns.  It remains that case that any person who might obtain the necessary

9   equipment and materials, download the files from Defense Distributed's website, properly

10  construct an operable firearm, and render the firearm undetectable would be engaging in an

11  action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1).  Thus, Plaintiffs cannot establish

12  that the challenged actions, which concern whether an item must be regulated for export from

13  the United States, restrict their ability or authority to protect public safety in their states. *See*

14  *Clapper*, 568 U.S. at 409.

15         Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16  interests.  Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18.  According to Plaintiffs, they have suffered

17  proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18  and prisons more dangerous for guards and inmates." Pls' Mot. at 8.  As an initial matter, they

19  offer no support that such an injury is properly asserted under the doctrine of proprietary

20  interests rather than as *parens patriae*.  *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21  1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22  people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23  But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24  harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26        [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   imminent and concrete and would not be prevented by domestic laws regulating undetectable

2   firearms.  *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert

3   injury to its proprietary interest is "subject to the same law of standing as any other party in

4   federal court").  *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)

5   (supporting allegations of proprietary injury by identifying individuals prevented from

6   attending, teaching at, or participating in the educational mission of state schools), *cert. denied*

7   *sub. nom*, *Golden v. Washington*, 138 S. Ct. 448 (2017).

8         Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the

9   doctrine of *parens patriae*.  *See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*,

10  659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a

11  sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a

12  sufficiently substantial segment of its population, articulates an interest apart from the interests

13  of particular private parties, and expresses a quasisovereign interest").  But to the extent

14  Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl.

15  ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any

16  "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v.*

17  *Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae*.  *See also*

18  *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit

19  on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary

20  federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing

21  requirements of Art. III." (citation omitted)).  It is also well established that a state "does not

22  have standing as *parens patriae* to bring an action against the Federal government."  *Sierra*

23  *Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also*

24  *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v.*

25  *EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

26        **B.    Plaintiffs Lack Prudential Standing.**

27        Plaintiffs fail to satisfy prudential requirements of standing as well.  "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2   Constitution, that the plaintiff have suffered an injury in fact.'" *Havasupai Tribe v. Provencio*,

3   876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4   interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5   regulated by the statute that he says was violated." *Id.* (citation omitted); *see also Ashley Creek*

6   *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7   examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8   which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9   "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10  related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11  assumed that Congress intended to permit the suit.'" *Match–E–Be–Nash–She–Wish Band of*

12  *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13          Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14  particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15  154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16  particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17  against the national security threat created by the unrestricted flow of military information

18  abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19  *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20  to control the import and export of defense articles and defense services in 'furtherance of

21  world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22  § 2778(a)(1)); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23  to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24  exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25  ───────────────

26          [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing. *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27  no authority to support such a position. *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009436

1   President may not remove any item from the Munitions List until 30 days after the date on

2   which the President has provided notice of the proposed removal to" certain congressional

3   committees.  As the legislative history makes clear, Congress enacted this provision in response

4   to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5   export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6   exercise congressional oversight of the Department nor function as would-be exporters, and

7   whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8   interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9   (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

12      **C.      Plaintiffs' APA Claims Are Meritless.**

13          **1.      The Department's Actions Accord With Its Delegated Authority.**

14      Plaintiffs cannot establish likely success on the merits of any of their claims. First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a

2   compendium of specific controlled items,' rather it is a 'series of categories describing the

3   kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711

4   F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any

5   "item" of the USML.  The Department's settlement regarding the files at issue in *Defense*

6   *Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

7           To the extent the Court finds the AECA's reference to "item" or "remove" to be

8   ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore*

9   deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is

10  "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the

11  validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox*

12  *Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting

13  *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001))).  The Department has consistently

14  held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories

15  or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl.

16  ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the

17  original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to

18  remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the

19  executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has

20  been aware of the Department's interpretation and yet has not addressed it in amendments to

21  the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These

22  circumstances provide further evidence—if more is needed—that Congress intended the

23  Agency's interpretation, or at least understood the interpretation as statutorily permissible."

24  *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220

25  (2002)).

26          To the extent the Court concludes that notice to Congress was required under 22 U.S.C.

27  § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009438

1    days so that the State Department can consider providing the notice to Congress—rather than

2    entering the more sweeping preliminary injunction that Plaintiffs seek.

3            Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4    Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5    That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6    constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7    Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8    claiming that its national security determination "is not the sort of emergency stopgap measure

9    contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10   entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11   *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12   pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13   Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14   (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15   decisions of the Executive Branch that relate to national security.").

16           Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17   designations or changes in designations "of items or categories of items that shall be considered

18   as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19   § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20   § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21   not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22   fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23   13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24   (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25   described in this proposed rule and in the State Department's companion proposed rule on

26   Categories I, II, and III of the USML are based on a review of those categories by the

27   Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009439

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3         The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10  such laws. To the contrary, the Department has consistently emphasized that its actions are

11  taken only pursuant to its authority to regulate the United States' system of export controls, not

12  domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13  Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14  Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15  remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16  understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17            **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18         Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19  because they constitute an unexplained reversal of the agency's prior position concerning

20  whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21  Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22  decision to enter into a settlement to resolve that litigation, such decisions are committed to

23  agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24  *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26         [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
   circumvent the law, Pls.' Mot. at 14; *see also id.*at 4 (suggesting the Government settled "covert[ly]"). *United*
27  *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
   ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7          Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10  Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11  1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12  explains that the "review was focused on identifying the types of articles that are now

13  controlled on the USML that are either (i) inherently military and otherwise warrant control on

14  the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15  or characteristics that provide a critical military or intelligence advantage to the United States,

16  and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17  the scope of the items described in this proposed rule is essentially commercial items widely

18  available in retail outlets and less sensitive military items.").  This case is only about the

19  determination of the Government that the technical data at issue would not give a military or

20  intelligence advantage and is therefore not properly subject to export controls.  Only those

21  weapons of a type that is inherently military or that is not otherwise widely available for

22  commercial sale are properly subject to such controls.  The Government has not made any

23  determination that 3D-printed guns should not be regulated domestically, and indeed the

24  Government intends to apply those authorities that regulate such firearms and supports

25  ───────────────

    [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal
26  authority.  As explained in the balance of this memorandum, that is not accurate.

    [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release
27  "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger
    rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009441

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A
         Preliminary Injunction**

4         Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16        Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                    **CONCLUSION**

23        For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                      Respectfully submitted,

25
                                                  CHAD A. READLER
26                                                Acting Assistant Attorney General

27                                                ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009442

Acting United States Attorney

KERRY KEEFE
Civil Chief

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009443

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using

3   the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

Dated: August 15, 2018                                    */s/ Steven A. Myers*

5                                                              Steven A. Myers

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009444

# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services. The items so designated shall constitute the "United States Munitions List"

(USML). *Id.* The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML. The items enumerated on the USML are those that "provide a critical military or

intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or

documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d).

"Technical data" does not include information concerning general scientific, mathematical, or

engineering principles commonly taught in schools, colleges, and universities, or information

that is in the public domain. *See* 22 C.F.R. § 120.10.  ITAR § 120.11 defines "public domain,"

in relevant part, as information which is published and generally accessible or available to the

public, and provides a list of information that has been made available to the public, including

"[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in

any form (e.g., not necessarily in published form) after approval by the cognizant U.S.

government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of

hardware, technical data, and services described on the USML—to determine what items, if any,

no longer warrant control under the ITAR and conveys the results of such reviews to Congress.

*See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the

Departments of Defense and Commerce to determine the categories most appropriate for review,

and this consultation is informed by inquiries received from the general public, internal feedback

from licensing officers and Commodity Jurisdiction analysts, and the period of time since the

categories under consideration were reviewed previously.  At the onset of the review process the

Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories

under consideration for review and to solicit comment on potential improvements to those

categories.  If warranted, based on the feedback received, the Department will then initiate an

ordinary rulemaking process, beginning with the publication of a Notice of Proposed

Rulemaking (NPRM).

3

8.     The Department continuously engages with its interagency partners and industry to evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80 Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently published a Notice of Inquiry requesting comments from the public to inform, in part, its review of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb. 12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR 37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its interagency partners are reviewing the public comments submitted in response to the 2018 Notice of Inquiry, and the Department intends to publish an NPRM for public comment implementing any revisions to the categories that are warranted.

9.     The AECA states that the Department "may not remove any item from the [USML] until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has interpreted "item" within the meaning of this provision to refer to the specifically enumerated text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria. The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change. The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions. At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4. The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce. The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information. The CJ process typically takes 45-55 business days. If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework:  Licenses and Authorizations**

12.     The ITAR requires a license, in relevant part, for the *export* of "technical data."  *See* 22 C.F.R. § 123.1(a).  Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR.  *See* 22 C.F.R. § 120.17.  Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1]  Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.     ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review."  Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided: "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . .  Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations.  Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR."  https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1. ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage. In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018). This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

WASHSTATEB009452

Control List (CCL).

16.    To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.    With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

WASHSTATEB009454

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms.  The Department is reviewing these public comments and will respond if it publishes a final rule.  None of the Plaintiff States submitted comments in response to the NPRM.

24.      The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication.  The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer.  The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.      In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer.  The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization.  Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.      I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files available for download during the pendency of the *Defense Distributed* litigation. Any restrictions imposed by the Department on the technical data that was the subject of the action were limited to the export of that technical data; the Department has no jurisdiction over sharing technical data between U.S. persons in the United States, unless such sharing also provides access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

(a)     [D]raft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b)     [Announce], while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times. That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

Sarah J. Heidema

14

# Exhibit A

WASHSTATEB009460

### SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.  *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d) Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e) Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHSTATEB009465

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB009468

**From:**          Rogers, Shana A
**Sent:**          Wed, 10 Oct 2018 10:40:14 -0400
**To:**            IT Service Center
**Subject:**       File Transfer
**Attachments:**   (F_463399) 201821192-FD.PDF, (FT_463400) 201821192-FD_Tab-1.pdf,
(FT_463401) 201821192-FD_Tab-2.pdf, (FT_463402) 201821192-FD_Tab-3.pdf, (F_475531) 201824914-
FD.PDF, (FT_475532) 201824914-FD_Tab-1.pdf, (R_471189) 20180829 IM to S (4).docx


Hello,
Will you please send the attached files to my OpenNet account (rogerssa2@state.gov)?  Many thanks,

Shana

This email is UNCLASSIFIED.

```
REC1|APPROVE|7-26-2018
REC2|APPROVE|7-26-2018
REC3|APPROVE|7-26-2018
REC4|APPROVE|7-26-2018
```



201821192

**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                                         July 26, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

**FROM:**        PM – Tina Kaidanow, Acting Assistant Secretary

**SUBJECT:**     (U) Concluding the Department's Settlement with Defense Distributed

**BLUF:**        (SBU) The below actions are required to comply with the Defense Distributed
                 settlement agreement.

**Recommendations**
(U) That in order for the Department of State to comply with its obligations in its settlement
agreement with Defense Distributed you:

  (1) Approve a temporary modification pursuant to International Traffic in Arms
      Regulations §126.2 to exclude specified Defense Distributed litigation-related
      technical data from U.S. Munitions List (USML) Category I.  (Approve/Disapprove
      by 07/26/2018)

  (2) Approve the posting of the attached DDTC website notice to announce the above-
      referenced temporary modification to USML Category I.  (Approve/Disapprove by
      07/26/2018)

  (3) Direct Acting Deputy Assistant Secretary for Defense Trade Controls, Michael
      Miller, to sign the attached letter informing Defense Distributed that, pursuant to
      ITAR § 125.4(b)(13), the Department is a cognizant U.S. government agency with
      authority to approve technical data for public release and that it hereby grants
      approval for the enumerated technical data in the letter to be released into the public
      domain.  (Approve/Disapprove by 07/26/2018)

  (4) Direct that actions (2) and (3) take place on July 27, 2018, unless the Department is
      enjoined from doing so or Defense Distributed agrees to postpone the deadline.
      (Approve/Disapprove by 07/26/2018)

**Background**
(SBU) Defense Distributed (DD) is a Texas-based nonprofit corporation that makes available via
the Internet computer-aided design (CAD) files for the three-dimensional printing of firearms

and firearm components.  In May 2013, PM's Directorate of Defense Trade Controls (DDTC) sent a letter to DD stating that certain files it had posted on the Internet appeared to be defense articles controlled pursuant to the International Traffic in Arms Regulations (ITAR) and requested that DD remove the files from the Internet and submit a commodity jurisdiction (CJ) request to DDTC.  DD complied with the letter and DDTC concluded in the CJ that some, but not all, of the files were subject to the ITAR because they conveyed information required to produce defense articles described in Category I of the ITAR's USML.

(SBU) Beginning in September 2014, DD submitted several requests to the DoD's Defense Office of Prepublication and Security Review (DOPSR) to request a review and approval for public release of the ITAR-controlled files pursuant to ITAR § 125.4(b)(13).  DOPSR stated that review of the CAD files was beyond its purview and referred DD to DDTC regarding the request for approval for public release.  DD did so in January 2015.  Before DDTC responded, DD sued the Department.  DD's primary claim was that the Department had subjected its free speech rights to an unconstitutional prior restraint by preventing it from posting files on the Internet. DD failed to obtain a preliminary injunction.

(U) On June 29, 2018 the parties reached a settlement agreement that placed three substantive obligations on the Department:

1. To pursue publication in the Federal Register of a final rule revising USML Category I that excludes specified technical data at issue in the DD litigation;
2. To issue via a DDTC website announcement a temporary modification to USML Category I that excludes enumerated technical data at issue in the litigation pursuant to ITAR § 126.2; and
3. To issue a letter to DD that, consistent with ITAR § 125.4(b)(13), advises that the Department is a cognizant U.S. government agency with authority to approve technical data for public release and grants approval for the technical data enumerated in the letter to be released into the public domain.



SENSITIVE BUT UNCLASSIFIED
-3-

Three organizations that pursue gun control filed court documents yesterday seeking a temporary restraining order prohibiting the Department's compliance with the settlement.  A hearing is being held today.

Attachments:
        Tab 1 – DDTC Website Announcement
        Tab 2 – Letter to Defense Distributed
        Tab 3 – Settlement Agreement

SENSITIVE BUT UNCLASSIFIED
-4-

Approved:     PM - Tina Kaidanow, Acting          TK

Drafted:      Sarah Heidema, x3-2809

Cleared:      PM/FO:      Lee Litzenberger      ok
              PM/DDTC:    Mike Miller           ok
              PM/DTCC:    Jae Shin              ok
              PM/DTCL:    Terry Davis           ok
              PM/CPA:     Joshua Paul           ok
              D:          Jamie Shufflebarger   ok
              P:          Sunil Ravi            ok
              S/P:        Michael Urena         ok
              H:          Tamara Darrach        ok
              T:          Eduardo Abisellan     ok
              L/PM:       Shana Rogers          ok

**From:**          PM-Staffers Mailbox
**Sent:**          Wed, 10 Oct 2018 10:47:26 -0400
**To:**            Rogers, Shana A
**Cc:**            PM-Staffers Mailbox
**Subject:**       RE: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted
**Attachments:**   (F_475003) 201822013-FD.pdf, (FT_475004) 201822013-FD_Tab-1.pdf

Dear Shana,

Please attached what we have in Everest and below screen shot indicating S saw this.

WASHSTATEB009497



≥ **Green Tag**

## 201822013:  Update on 3D Printing – Defense Distributed (DD)

| | |
|---|---|
| **S/ES ID** | 201822013 |
| **Everest ID** | EV2018106191 |
| **Classification** * | U – Unclassified |
| **Document Type** * | Information Memo |
| **For** * | S |
| **Organization** * | PM |
| **Co-Drafter Bureau** | H |
| **Due Date** | 08/29/2018 03:00 PM |
| **Event Date** | |
| **Subject** * | Update on 3D Printing – Defense Distributed (DD) |
| **Description** * | Update on 3D Printing – Defense Distributed (DD) |
| **Notes/Special Instructions** 🔍 | KDG 8/29 - per Duty Officer, not a blue tag. |
| **Final Distribution** | C; D; E; H; INR; J; L; M; P; PA; PM; R; S; S/ES; S/ES-S; S/P; T |

## Documents

[ InfoLink ]

| | | Title | Document Type |
|---|---|---|---|
| 📝 | (U) | (R_471189) 20180829 IM to S (4).docx | Information Memo |
| 📝 | (U) | (S_470021) Tab 1 - 64 - State PI Opp.pdf | Briefing Memo |
| 📝 | (U) | (F_475003) 201822013-FD.pdf | Information Memo |
| 📝 | (U) | (FT_475004) 201822013-FD_Tab-1.pdf | Briefing Memo |

**Official**
**UNCLASSIFIED**

From: Rogers, Shana A
Sent: Wednesday, October 10, 2018 10:36 AM
To: PM-Staffers Mailbox
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

Hi PM Staffers,
Do you have the final version of this IM indicating that S read it?  If so, will you please send it to me?

Thanks,
Shana


This email is UNCLASSIFIED.


From: Fabry, Steven F
Sent: Wednesday, August 29, 2018 7:07 PM
To: Rogers, Shana A
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted


**Official - SBU**
**UNCLASSIFIED**

From: PM-Staffers Mailbox
Sent: Wednesday, August 29, 2018 6:57 PM
To: Hart, Robert L; Heidema, Sarah J; Miller, Michael F
Cc: Carter, Rachel; PM-CPA-DL; String, Marik A; Davidson-Hood, Simon; Fabry, Steven F; PM-Staffers Mailbox
Subject: FW: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

Package resubmitted. Everest versions attached.

Samantha Sison
PM/FO SharePoint
X70561


From: EverestMail
Sent: Wednesday, August 29, 2018 6:53 PM

To: SES-Line_Only
Cc: Everest_PM; Everest_H
Subject: Package S/ES 201822013 Update on 3D Printing – Defense Distributed (DD) has been resubmitted

A PM Package has been resubmitted.

**CLASSIFICATION:** U – Unclassified
**FOR:** S
**ORGANIZATION:**  PM
**CO-DRAFTER BUREAU:**  H
**COPY TO:**
**SUBJECT:**  Update on 3D Printing – Defense Distributed (DD)
**REQUESTED ACTION:**  Information Memo
**CLEARANCES:**
**DUE DATE:**  29-Aug-2018 03:00:00 PM
**EVENT DATE:**
**NOTES:**  Per deps: this memo has plenty of background S already knows about the 3D gun issue. Please be more clear about the implications for the Department and what our next steps and plan of action are.
**DESCRIPTION:**  Update on 3D Printing – Defense Distributed (DD)

**CREATED BY:**  PM

**LINK:** 201822013 Package

*Please note that this link will expire 2 weeks after the e-mail is sent, for security reasons.  If this link is expired, please use the **Advanced Search** to find the package by typing in the S/ES ID number.*

**Official - SBU**
**UNCLASSIFIED**

1

The Honorable Robert S. Lasnik

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
8                                    AT SEATTLE

9                                          )
   STATE OF WASHINGTON, et al.,            )    No. 2:18-cv-1115-RSL
10                                         )
        Plaintiffs,                        )    **FEDERAL DEFENDANTS'**
11                                         )    **BRIEF IN OPPOSITION TO**
                    v.                     )    **PLAINTIFFS' MOTION FOR**
12                                         )    **PRELIMINARY INJUNCTION**
   UNITED STATES DEPARTMENT OF             )
13  STATE, et al.,                         )    **NOTED FOR:** August 21, 2018
                                           )
14      Defendants.                        )
   _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – i

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009504

**INTRODUCTION**

The manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

In bringing their motion for a preliminary injunction, Plaintiffs misunderstand the fundamental limit on the State Department's authority. According to Plaintiffs, the Government's export-related determinations—specifically with respect to the export of technical data developed by Defense Distributed—have jeopardized their ability to protect the safety and health of their residents. But the domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law. Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case. Likewise, Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 1

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1  merits of their claims, or that it is in the public interest for the Court to second-guess the

2  national security determinations of the Executive Branch.

3          Accordingly, Plaintiffs' motion should be denied.

4                                      **BACKGROUND**

5  **I.       Statutory And Regulatory Background**

6          The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

7  President, "[i]n furtherance of world peace and the security and foreign policy of the United

8  States" to "control the *import* and the *export* of defense articles and defense services" and to

9  promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1) (emphasis added).  The President

10  has delegated this authority to the Department in relevant part, and the Department has

11  accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are

12  administered by the Department's Directorate of Defense Trade Controls ("DDTC").  *See* Exec.

13  Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130.  At the heart

14  of the AECA is the United States Munitions List ("USML"), an extensive listing of materials

15  that constitute "defense articles and defense services" under the ITAR.  *See* 22 C.F.R. Part 121.

16  As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all

17  technical data directly related to such firearms.  *Id.* § 121.1(I)(a), (i).  Technical data is

18  information that "is required for the design, development, production, manufacture, assembly,

19  operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a)(1).

20  Section 2778 of the AECA authorizes the President (1) to designate those defense articles and

21  services to be included on the USML; (2) to require licenses for the export of items on the

22  USML; and (3) to promulgate regulations for the import and export of such items on the

23  USML.  22 U.S.C. § 2778.

24          The ITAR does not regulate any transfers of defense articles except those that constitute

25  "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary

26  imports."  The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a

27  defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2)

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 2

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or

2   subdivisions, such as a diplomatic mission or consulate, in the United States," *id.*

3   § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person

4   in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

5   In certain cases where it is unclear whether a particular item is a defense article or

6   defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using

7   a procedure set forth in the ITAR.  *See id.* § 120.4.  Upon written request, DDTC will provide

8   applicants with a determination as to whether the item, service, or data is within the scope of

9   the ITAR.  These assessments are made on a case-by-case basis through an inter-agency

10  process, evaluating whether the item, service, or data is covered by the USML, provides the

11  equivalent performance capabilities of a defense article on the USML, or has a critical military

12  or intelligence advantage.  *See id.* § 120.4(d).

13  While the AECA and ITAR do not provide the State Department with authority to

14  prohibit the domestic manufacture or possession of 3D-printed guns, there are other federal

15  statutes that deal with this topic.  Most significantly, the Undetectable Firearms Act bars the

16  manufacture, possession, sale, import, or transfer of undetectable firearms.  *See* 18 U.S.C.

17  § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No.

18  113-57, 127 Stat. 656 (2013).  Under that statute, firearms manufactured or sold in the United

19  States must generally be capable of being detected by metal detectors and by x-ray machines.

20  *See* 18 U.S.C. § 922(p)(1).  Those requirements are not in any way affected by the actions

21  challenged in this case, nor are the separate federal prohibitions on the possession of firearms

22  by felons, persons subject to restraining orders, or the mentally ill.  *See* 18 U.S.C. § 922(g)(1)

23  (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders);

24  *id.* § 922(g)(4) (persons adjudicated as mentally ill).  The Government continues to enforce

25  these laws in order to address domestic safety issues related to undetectable firearms.  The

26  Department's determination under the ITAR at issue here will not affect those enforcement

27  efforts.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 3

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

**II.     The Government's Settlement With Defense Distributed**

In 2012, Defense Distributed published on the Internet "privately generated technical data regarding a number of gun-related items." *Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015).  In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization.  *See id.*  Defense Distributed removed the technical data and submitted a CJ request.  *Id.*  The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority.  *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction.  *Id.* at 701.  For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment.  *Id.* at 691-92.  Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits.  *Id.* at 695.

The Fifth Circuit affirmed in a split decision.  *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights.  *Id.* at 458-59.  The panel majority "decline[d] to address the merits" because plaintiffs' failure to meet any single requirement for a preliminary injunction would require affirmance of the district court.  *See id.* at 456-58.  A dissent from the panel opinion did address the merits.  *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 4

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

that "the State Department's application of its 'export' control regulations to this domestic

Internet posting appears to violate the governing statute, represents an irrational interpretation

of the regulations, and violates the First Amendment as a content-based regulation and a prior

restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138

S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in

district court.  In April 2018, the Government moved to dismiss plaintiffs' second amended

complaint.  *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92.  Meanwhile, the district

court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

initiating a process under which the parties were able to reach a settlement before briefing on

the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a)    Defendants' commitment to draft and to fully pursue, to the extent
authorized by law (including the Administrative Procedure Act), the
publication in the Federal Register of a notice of proposed rulemaking and
final rule, revising USML Category I to exclude the technical data that is
the subject of the Action.[1]

(b)    Defendants' announcement, while the above-referenced final rule is in
development, of a temporary modification, consistent with the . . . (ITAR),
22 C.F.R. § 126.2, of USML Category I to exclude the technical data that
is the subject of the Action. The announcement will appear on the DDTC
website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

---

[1] *See* Section III, *infra*.  At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued.  *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically").  Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013).  By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 5

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

(c)      Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d)      Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018.  *See* Ex. A, Declaration of Sarah Heidema ("Heidema Decl.") ¶¶ 27, 29.  The Settlement Agreement provides that Defendants deny that they violated Plaintiffs' constitutional rights.  *See id.* ¶ 28.

**III.      The Government's Proposed Rulemaking**

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*.  *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018).  In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML."  83 Fed. Reg. at 24,198.  If the NPRM is finalized as contemplated, the items removed from the USML would no longer be subject to the ITAR's authorization requirements, *see id.*, *i.e.*, no license from the Department of State would be required for their export.

The Commerce NPRM explains both the rationale for the proposed transfer as well as the review process undertaken by the Government.  As it explained, the process included a "review of those categories by the Department of Defense, which worked with the Departments

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 6

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   of State and Commerce in preparing the amendments."  83 Fed. Reg. at 24,166.  The review

2   was intended to ensure that items remaining on the USML are either "inherently military or

3   otherwise warrant[ing] control on the USML" or "of a type common to nonmilitary firearms

4   applications, possess parameters or characteristics that provide a critical military or intelligence

5   advantage to the United States, and are almost exclusively available from the United States."

6   *Id.*  Put simply, the goal was to ensure that items remaining on the USML in the categories in

7   question, and therefore subject to export controls under the ITAR, are military weapons and

8   related items that could present a critical military or intelligence advantage.

9   **IV.    Procedural History**

10          On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department,

11  the Secretary of State, DDTC, and Defense Distributed.  Compl., ECF No. 1.  Plaintiffs alleged

12  that the Government's settlement with Defense Distributed adversely affected their public

13  safety laws, in violation of the Administrative Procedure Act ("APA") and the Tenth

14  Amendment to the U.S. Constitution.  *Id.* at 21-41.  Also on July 30, 2018, Plaintiffs moved for

15  a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court

16  granted on July 31, 2018, Dkt. No. 23 ("Order").

17          In its Order, the Court held that Plaintiffs had demonstrated irreparable injury because

18  "[i]f an injunction is not issued and the status quo alters . . . , the proliferation of these firearms

19  will have many of the negative impacts on a state level that the federal government once feared

20  on the international stage."  Order at 7.  Further, the Court determined that Plaintiffs were

21  likely to succeed on the merits of their APA claim because "[t]here is no indication" that, prior

22  to entering into the settlement agreement, the Government either provided 30-day notice to

23  Congress pursuant to 22 U.S.C. § 2278(f)(1) or obtained the concurrence of the Secretary of

24  Defense pursuant to Executive Order 13637.  *Id.* at 6.

25          The Court also found that Plaintiffs have standing "[f]or purposes of this temporary

26  order."  *Id.* at 6 n.2.  The Court based this determination on the "clear and reasonable fear"

27  expressed by Plaintiffs, as well as the Court's finding that "there is no separation of the internet

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 7

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

between domestic and international audiences." *Id.*  Finally, the Court found that "the balance

of hardships and the public interest tip sharply in plaintiffs' favor." *Id.* at 7.  Consequently, the

Court enjoined the Government "from implementing or enforcing the 'Temporary Modification

of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense

Distributed, and Second Amendment Foundation issued by the U.S. Department of State on

July 27, 2018," and required that the Government "preserve the status quo *ex ante* as if the

modification had not occurred and the letter had not been issued." *Id.*  The Court did not enjoin

Defense Distributed in any manner.  *Id.*

Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and

moved for a preliminary injunction on August 9, 2018, Dkt. No. 43 ("Pls.' Mot.").  As agreed

to by the parties, the TRO remains in effect until August 28, 2018.  *See* Order, Dkt. No. 30.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek*

*v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  A plaintiff "must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

1046, 1052 (9th Cir. 2009) (citation omitted).  Alternatively, "'serious questions going to the

merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of

a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v.*

*Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962,

967-68 (9th Cir. 2011).  Plaintiffs bear the burden of demonstrating that each of these four

factors is met.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs here ask the Court to suspend and enjoin enforcement of actions already taken

by the Government pursuant to its obligations under the settlement agreement.  *See* Pls.' Mot.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 8

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009512

1    at 1; *see also* Pls.' Proposed Order, Dkt. No. 43-3.  Through this requested relief, Plaintiffs seek

2    not to "maintain the status quo" pending litigation, but to place themselves in a better position

3    than they were in before the onset of the current controversy through an award of "the exact

4    same ultimate relief" they seek.  *Taiebat v. Scialabba*, No. 17-0805, 2017 WL 747460, at *2-3

5    (N.D. Cal. Feb. 27, 2017).  "In general, that kind of judgment on the merits in the guise of

6    preliminary relief is a highly inappropriate result."  *Senate of Cal. v. Mosbacher*, 968 F.2d 974,

7    978 (9th Cir. 1992).[3]

8

9    **I.      Plaintiffs Have Not Shown That The Department's Action Will Cause Irreparable Harm.**

10   A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative

11   positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

12   U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting preliminary

13   relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar*

14   *Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*

15   *v. Nat. Res. Def. Council*, 555 U.S. 7, 19 (2008).

16   Plaintiffs argue that the "threat to public safety" allegedly caused by the Department's

17   settlement agreement constitutes irreparable harm.  Pls.' Mot. at 19-24.  Specifically, they

18   claim that the settlement agreement "will make it significantly easier to produce undetectable,

19   untraceable weapons, pos[e] unique threats to the health and safety of the States' residents and

20   employees, and compromis[e] the States' ability to enforce their laws and keep their residents

21   and visitors safe."  *Id.* at 19.  These harms alleged by Plaintiffs with respect to the specific

22   items at issue in this motion fall well short of irreparable harm.

23   First, Plaintiffs contend that removal of Defense Distributed's files from the USML will

24   lead to the "proliferation of downloadable guns."  Pls.' Mot. at 19.  They refer further to "the

25   unique threats of irreparable harm to the States posed by permitting 3D-printed weapons files to

26

27   _____
     [3] The Government leaves to the private party Defendants the question of whether and how their individual rights should be considered in this analysis.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 9

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009513

1    be posted on the internet." Pls.' Mot. at 20.  But the core inadequacy of Plaintiffs' claims of

2    irreparable harm is that they are not caused by, and cannot be traced to, the Department's

3    regulatory actions or the challenged settlement agreement.  Rather, if these harms occur at all, it

4    will be because individuals violate the separate prohibitions of the Undetectable Firearms Act

5    and other relevant domestic laws.  Indeed, Plaintiffs' claim of irreparable harm is based on a

6    fundamental misconception of the relevant law and the authority of the Department as the

7    federal agency that administers it.  The AECA and ITAR have not conferred upon the

8    Department the authority to regulate or otherwise prohibit the domestic acquisition of defense

9    articles and services by U.S. persons or domestic communications to U.S. persons.  *See*

10   *generally* 22 U.S.C. § 2778.  Rather, as noted above, the agency's only relevant authority

11   pursuant to the AECA and ITAR is limited to *exports* of defense articles and related technical

12   data.  *Id.* § 2778(a)(1).  Critically, neither the AECA nor ITAR prohibits the transmission of

13   defense articles among U.S. persons within the United States.  Therefore, the Department has

14   never prohibited Defense Distributed, or any other company or individual, from providing their

15   files to U.S. persons on U.S. soil, including by, *e.g.*, providing such technical data through the

16   mail, distributing DVDs containing such data, or other means.  *See Def. Distributed*, 121 F.

17   Supp. 3d at 695 ("Plaintiffs are free to disseminate the computer files at issue domestically in

18   public or private forums, including via the mail or any other medium that does not provide the

19   ability to disseminate the information internationally."); *see also* Heidema Decl. ¶ 12.  To the

20   extent Defense Distributed and others have not previously disseminated the computer files at

21   issue within Plaintiffs' boundaries, such inaction is attributable to their own decisions and not

22   to the Department's regulatory authority.  Plaintiffs therefore cannot plausibly suggest that the

23   Government's settlement regarding Defense Distributed's foreign export of its files has harmed

24   or imminently harm Plaintiffs' ability to enforce their statutory schemes, prevent or solve

25   crimes, or protect public health.[4]  Should any of the harms about which Plaintiffs are concerned

26

27        [4] The declarations submitted by Plaintiffs do not address these deficiencies.  *See generally* Dkt. No. 43-2.  Not
     only are the harms described equally speculative as those presented in Plaintiffs' motion, but these declarations

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 10

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    occur, it will be because individuals have violated separate domestic prohibitions, such as the

2    Undetectable Firearms Act.  *See* 18 U.S.C. § 922(p)(1).

3            For this reason, the types of harms that Plaintiffs identify do not support the granting of

4    injunctive relief in the circumstances of this case.  All of the concerns identified are harms that

5    might result from the domestic availability of 3D-printed guns in the United States, but such

6    concerns have little to do with whether particular files should be regulated for foreign export on

7    national security grounds.  Their relation to the State Department's exercise of authority and

8    the settlement agreement is speculative.  For example, Plaintiffs contend that someone of

9    questionable "age, mental health, or criminal history" may procure the necessary equipment,

10   download files made specifically available as a result of the Department's settlement, assemble

11   an operable firearm, and commit a crime, *see* Pls.' Mot. at 19-20.  But such actions would

12   violate domestic prohibitions on the use of firearms.  The Department does not regulate the

13   files at issue for their availability to U.S. persons in the United States, and it is speculative to

14   claim that these domestic consequences would follow from the Department of State's actions

15   under the ITAR.

16          Plaintiffs' claims regarding the "unique threats" posed by firearms made by a 3D-

17   printing process fail for the same reasons.  *See id.* at 20-24.  For instance, they assert

18   shortcomings in the ability of metal detectors to discern the presence of firearms made from a

19   3D printer, *see id.* at 20-21, but nothing in the State Department actions challenged in this case

20   purports to permit the domestic production of undetectable firearms.  Such production is illegal

21   due to separate authority that regulates domestic conduct.  *See* 18 U.S.C. § 922(p)(1).

22          Plaintiffs also argue that 3D-printed firearms "present unique challenges to law

23   enforcement," particularly with respect to tracing weapons and conducting forensic testing on

24   bullets.  Pls' Mot. at 21-22.  Again, Plaintiffs can only speculate as to whether such a harm

25   would result from a decision by the Department of State not to regulate the export of the

26

27   confirm the domestic availability of the subject files notwithstanding the Department's regulatory efforts.  Camper
     Decl. ¶ 10, Dkt. No. 43-2; Patel Decl. ¶ 14, Dkt. No. 43-2.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 11

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009515

1    Defense Distributed's files for national security reasons.

2         Similarly conjectural are Plaintiffs' assertions about a "[h]eightened risk of terrorist

3    attacks." *Id.* at 23.  As reflected in the State and Commerce NPRMs, the Government proposed

4    transferring certain items in USML Category I, which encompass Defense Distributed's files,

5    only because it has determined that such a transfer would not injure the national security

6    interests of the United States.  *See* 83 Fed. Reg. at 24,198; 83 Fed. Reg. at 24,166; *see also*

7    Heidema Decl. ¶ 19.  So Plaintiffs here seek to base injunctive relief on speculative harms to

8    national security that exist quite apart from the challenged actions and even that the

9    Government has considered and rejected.  Moreover, concerns that children "may mistake

10   [these weapons] for toys" exist apart from export control requirements, and it is at best

11   conjecture that the modification of export control requirements would have any effect on the

12   alleged harm.[5]

13        At best, Plaintiffs have only identified harms that may result from 3D-printed guns

14   *generally*, not from the challenged actions regulating foreign exports.  But there are already

15   laws aimed at domestic conduct that seek to prevent such harms.  As the Ninth Circuit has

16   made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is

17   relevant for the preliminary injunction analysis.  *See Park Vill. Apartment Tenants Ass'n v.*

18   *Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).  Plaintiffs simply cannot tie their

19   fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially

20   when there are separate statutes governing domestic manufacture, possession, and sale that

21   _____

22        [5] The two cases Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), and *United States v. Ressam*, 679
     F.3d 1069 (9th Cir. 2012)—are inapposite.  *See* Pls.' Mot. at 19, 24.  In *Maryland*, Chief Justice Roberts, sitting as
23   Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's
     petition for a writ of certiorari.  *Maryland*, 567 U.S. at 1301.  Chief Justice Roberts wrote that a stay was
24   appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety
     interests."  *Id.*  As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm
25   arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA
     Collection Act] to help prevent [serious] injuries."  *Id.*  Here, by contrast, the Department's settlement has not
26   prevented any of Plaintiffs from employing their public safety statutes.  *Ressam* is also readily distinguishable.
     There a terrorist brought explosives into the United States in the trunk of a rental car.  *Ressam*, 679 F.3d at 1073.
     After a U.S. customs inspector detected Ressam's nervousness, she sent the car for a secondary inspection, where
27   the contraband was located.  *Id.*  Thus not only does *Ressam* involve a weapon wholly distinct from a 3D-printed
     gun, but it only demonstrates that existing law enforcement measures are able to thwart such attempted attacks.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 12

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   remain unaffected by the challenged actions.

2   　　　Finally, Plaintiffs have overlooked "[t]he possibility that . . . other corrective relief will

3   be available," in which case temporary relief is unavailable.  *Sampson v. Murray*, 415 U.S. 61,

4   90 (1974).  Plaintiffs retain the full authority to enforce their public safety laws, including

5   lawful restrictions on firearms possession and transfer, against any and all violators of the law.

6   And as discussed above other federal public safety laws regulating, *inter alia*, the possession of

7   firearms by felons and the mentally ill, and federal laws requiring that firearms contain

8   sufficient metal to be detectable, remain in force.  These laws—which, unlike the AECA and

9   ITAR, address domestic, criminal conduct—provide "other corrective relief" on an ongoing

10  basis.

11  **II. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits**

12  　　　Although their Amended Complaint asserts claims under both the APA and the Tenth

13  Amendment, Am. Compl. ¶¶ 218-47, Plaintiffs' motion for a preliminary injunction discusses

14  only their APA claims, Pls.' Mot. at 10-19.  As to either category of claims, Plaintiffs have

15  failed to establish that "the law and the facts clearly favor" their position, as required under the

16  heightened mandatory injunction standard.  *See Stanley*, 13 F.3d at 1320.

17  　　　**A.　　Plaintiffs Lack Article III Standing To Assert Their Claims.**

18  　　　"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and

19  'Controversies,'" and "[t]he doctrine of standing gives meaning to these constitutional limits by

20  'identify[ing] those disputes which are appropriately resolved through the judicial process.'"

21  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).  Standing,

22  "which is built on separation-of-powers principles, serves to prevent the judicial process from

23  being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568

24  U.S. 398, 408 (2013).  The "irreducible constitutional minimum of standing" has three

25  elements: that a plaintiff suffer a concrete injury-in-fact, that the injury be fairly traceable to the

26  challenged action of the defendant, and that it be likely (as opposed to speculative) that the

27

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 13

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009517

1  injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

2  61 (1992).

3          Plaintiffs claim they satisfy the requirements of Article III standing because the

4  Department's settlement has injured their sovereign, proprietary, and quasi-sovereign interests.

5  Pls.' Mot. at 7-9.  Plaintiffs fail to carry their burden with respect to each of these theories.

6  First, Plaintiffs assert that the settlement agreement has injured their sovereign interests in their

7  "abilities to enforce their statutory codes," their "border integrity," and their "ability to protect

8  their residents from injury and death."  *Id.* at 8.  But neither U.S. export controls generally, nor

9  the challenged settlement agreement, prevents states from acting to enforce their own laws or

10  protect state residents.[6]  Thus, Plaintiffs cannot demonstrate that the injuries they allege are

11  "fairly traceable" to the Department's settlement with Defense Distributed.  *See Lujan*, 504

12  U.S. at 560.[7]  Plaintiffs repeatedly assert that the Government's "deregulation" has jeopardized

13  safety and security.  *See* Pls.' Mot. at 8; *see also id.* at 10 (claiming "threats to . . . the safety of

14  the States' own employees and residents [] are caused by the Government's sudden decision to

15  deregulate the posting of 3D-printed gun files on the internet").  Again, Plaintiffs' arguments

16  are premised on a misconception of the AECA and ITAR, and the state of affairs prior to the

17  settlement of Defense Distributed's claims.  As the Government has previously explained, it

18  regulates the transfer of items constituting exports and temporary imports pursuant to the

19  AECA and ITAR, and it has no authority to regulate the transmission of technical data

20  exclusively from U.S. persons to U.S. persons within the United States under those authorities.

21

22          [6] Plaintiffs find no support in *California v. Sessions*, 284 F. Supp. 3d 1015, 1029 (N.D. Cal. 2018), *see* Pls.'
Mot. at 8 n.25, where the court found injury-in-fact based on allegations that the Government "seeks to compel

23  [the State] to change its policies" and threatened loss of funds that were promised under federal law.  Here, the
Department does not seek a change in Plaintiffs' laws or policies, nor has it threatened to withhold any funds.

24          [7] Although Plaintiffs claim the requirement to establish this second standing factor is "relaxed" because they
are "vested with a procedural right," Pls.' Mot. at 7, they have failed to explain the nexus between their alleged

25  procedural rights and the interests they assert.  *See Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th
Cir. 2005) ("[A] plaintiff asserting a procedural injury does not have standing absent a showing that the

26  'procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of
his standing'. . . .  A free-floating assertion of a procedural violation, without a concrete link to the interest

27  protected by the procedural rules, does not constitute an injury in fact." (citation omitted)).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 14

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Thus, during the entire pendency of Defense Distributed's lawsuit against the Government, the

2    ITAR did not limit Defense Distributed—or any other entity—from "free[ly] . . .

3    disseminat[ing] the computer files at issue domestically in public or private forums," including

4    within Plaintiffs' borders. *Def. Distributed*, 121 F. Supp. 3d at 695. Plaintiffs therefore cannot

5    plausibly assert that the Government's "deregulation" has affected—let alone seriously

6    jeopardized—their ability to protect their interests. *See* Pls.' Mot. at 8; Am. Compl. ¶ 17.

7          Moreover, separate laws aimed at domestic conduct continue to address domestic public

8    safety concerns. It remains that case that any person who might obtain the necessary

9    equipment and materials, download the files from Defense Distributed's website, properly

10   construct an operable firearm, and render the firearm undetectable would be engaging in an

11   action forbidden by federal law. *See* 18 U.S.C. § 922(p)(1). Thus, Plaintiffs cannot establish

12   that the challenged actions, which concern whether an item must be regulated for export from

13   the United States, restrict their ability or authority to protect public safety in their states. *See*

14   *Clapper*, 568 U.S. at 409.

15         Plaintiffs fare no better in invoking their alleged proprietary or quasi-sovereign

16   interests. Pls.' Mot. at 8-9; Am. Compl. ¶¶ 15-18. According to Plaintiffs, they have suffered

17   proprietary injury insofar as "[t]he deregulation . . . make[s] state, county, and municipal jails

18   and prisons more dangerous for guards and inmates." Pls' Mot. at 8. As an initial matter, they

19   offer no support that such an injury is properly asserted under the doctrine of proprietary

20   interests rather than as *parens patriae*. *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir.

21   1976) ("The alleged injuries to the state's economy and the health, safety, and welfare of its

22   people clearly implicate the parens patriae rather than the proprietary interest of the state.").[8]

23   But even if such interests were "proprietary," Plaintiffs have failed to demonstrate that any

24   harm based on the possibility of 3D-printed guns infiltrating prisons and injuring persons is

25

26         [8] The cases cited by Plaintiffs, *see* Pls.' Mot. at 8 n.29, do not involve jails or prisons but instead discuss a
     state as land owner or "participa[nt] in a business venture," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S.
27   592, 601 (1982); as operator of a public university, *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017);
     and licensing activities, *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015).

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 15

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

imminent and concrete and would not be prevented by domestic laws regulating undetectable firearms. *See Aziz v. Trump*, 231 F. Supp. 3d 23, 33 (E.D. Va. 2017) (state seeking to assert injury to its proprietary interest is "subject to the same law of standing as any other party in federal court"). *Compare Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (supporting allegations of proprietary injury by identifying individuals prevented from attending, teaching at, or participating in the educational mission of state schools), *cert. denied sub. nom, Golden v. Washington*, 138 S. Ct. 448 (2017).

Plaintiffs' assertions about their quasi-sovereign interests unquestionably sound in the doctrine of *parens patriae*. *See* Pls.' Mot. at 8-9; *see also Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (explaining that the "doctrine of *parens patriae* allows a sovereign to bring suit on behalf of its citizens when the sovereign alleges injury to a sufficiently substantial segment of its population, articulates an interest apart from the interests of particular private parties, and expresses a quasisovereign interest"). But to the extent Plaintiffs seek to vindicate the interests of private citizens, *see* Pls.' Mot. at 8-9; Am. Compl. ¶ 16 (referring to need to "[e]nsur[e] the safety of their residents"), they fail to create any "actual controversy between the State[s] and the defendant[s]," *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982), and so lack standing as *parens patriae*. *See also Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009) (allowing a state to "bring suit on behalf of its citizens solely by virtue of its interest that its citizens benefit from voluntary federal grants" would "make the *parens patriae* doctrine 'too vague to survive the standing requirements of Art. III.'" (citation omitted)). It is also well established that a state "does not have standing as *parens patriae* to bring an action against the Federal government." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (citation omitted); *see also Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 676 (7th Cir. 2008).

**B.**     **Plaintiffs Lack Prudential Standing.**

Plaintiffs fail to satisfy prudential requirements of standing as well. "The APA imposes

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 16

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009520

1   'a prudential standing requirement in addition to the requirement, imposed by Article III of the

2   Constitution, that the plaintiff have suffered an injury in fact.'"  *Havasupai Tribe v. Provencio*,

3   876 F.3d 1242, 1253 (9th Cir. 2017) (citation omitted).  Prudential standing requires that an

4   interest asserted by a plaintiff be "arguably within the zone of interests to be protected or

5   regulated by the statute that he says was violated."  *Id.* (citation omitted); *see also Ashley Creek*

6   *Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005) ("The prudential standing analysis

7   examines whether 'a particular plaintiff has been granted a right to sue by the statute under

8   which he or she brings suit.'" (citation omitted)).  While the zone of interests test is not

9   "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally

10  related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

11  assumed that Congress intended to permit the suit.'"  *Match–E–Be–Nash–She–Wish Band of*

12  *Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

13          Here, Plaintiffs do not fall within the zone of interests protected by the AECA,

14  particularly with respect to the provision on which they rely.  *See Bennett v. Spear*, 520 U.S.

15  154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the

16  particular provision of law upon which the plaintiff relies").  The AECA "is designed to protect

17  against the national security threat created by the unrestricted flow of military information

18  abroad."  *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v.*

19  *Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President

20  to control the import and export of defense articles and defense services in 'furtherance of

21  world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C.

22  § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is

23  to reduce the international trade in arms and avoid destabilizing effects abroad through arms

24  exports").[9]  In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he

25  ───────────────

26      [9] Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing.  *See* Pls.' Mot. at 9.  By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents.  Yet they offer

27  no authority to support such a position.  *See id.*; *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) ("The national security . . . is the primary responsibility and purpose of the Federal Government.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 17

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009521

1  President may not remove any item from the Munitions List until 30 days after the date on

2  which the President has provided notice of the proposed removal to" certain congressional

3  committees.  As the legislative history makes clear, Congress enacted this provision in response

4  to "legitimate industry concerns" and cautioned the Executive Branch to "avoid unnecessary

5  export regulation."  H.R. Rep. No. 97-58, at 21-22 (1981).  Thus Plaintiffs—who neither

6  exercise congressional oversight of the Department nor function as would-be exporters, and

7  whose alleged harms concern purely domestic, non-military matters, fail to meet the zone of

8  interests test.  *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989)

9  (Illinois not within zone of interest of the Base Closure and Realignment Act, because, as here,

10  the state "is not the subject of the Secretary's action" and "states have no constitutional or

11  statutory role in federal military policy").

12      **C.**   **Plaintiffs' APA Claims Are Meritless.**

13          **1.**   **The Department's Actions Accord With Its Delegated Authority.**

14        Plaintiffs cannot establish likely success on the merits of any of their claims. First,

15  Plaintiffs claim that the Government has failed to comply with the AECA's 30-day notice

16  requirement to Congress.  *See* Pls.' Mot. at 11-12; *see also id.* at 13-14 (challenging

17  Department's reliance on 22 C.F.R. § 126.2); Am. Compl. ¶¶ 220-22, 231.  But Plaintiffs again

18  betray their misunderstanding of the governing law.  The statutory provision they invoke

19  provides that "the President may not *remove* any *item* from the Munitions List until 30 days

20  after the date on which the President has provided notice of the proposed removal" to the

21  appropriate congressional committees.  22 U.S.C. § 2778(f)(1) (emphases added).  Pursuant to

22  the plain text of the AECA, an "item" refers to the USML's categories or subcategories—*e.g.*,

23  "Fully automatic firearms to .50 caliber inclusive (12.7 mm)," 22 C.F.R. § 121.1—and not

24  specific articles or commodities related thereto.  22 U.S.C. § 2778(a)(1) ("The President is

25  authorized to designate those items which shall be considered as defense articles and defense

26  services for the purposes of this section and to promulgate regulations for the import and export

27  of such articles and services.  The items so designated shall constitute the United States

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 18

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8464

WASHSTATEB009522

Munitions List."); *see Def. Distributed*, 121 F. Supp. 3d at 687 ("The Munitions List 'is not a compendium of specific controlled items,' rather it is a 'series of categories describing the kinds of items' qualifying as 'defense articles.'" (quoting *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013))).  Thus, the Department's settlement agreement did not affect any "item" of the USML.  The Department's settlement regarding the files at issue in *Defense Distributed* does not implicate the 30-day notice requirement of 22 U.S.C. § 2778(f)(1).

To the extent the Court finds the AECA's reference to "item" or "remove" to be ambiguous, the Department's interpretation of these terms is entitled to at least *Skidmore* deference.  Under *Skidmore*, a court must defer to an agency's interpretation provided it is "persuasive and reasonable," considering "'the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements.'" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013 (9th Cir. 2017) (quoting *United States v. Mead Corp*., 533 U.S. 218, 228 (2001))).  The Department has consistently held the view since at least 2011 that only the permanent removal of items, *i.e.*, the categories or subcategories of the USML, implicate the 30-day notice requirement.  *See* Heidema Decl. ¶¶ 9, 30, 32.  Further, the Department's position accords with both the AECA's text and the original purpose of 22 U.S.C. § 2778(f)(1), which was to encourage the Executive Branch to remove items from the USML.  *See* H.R. Rep. No. 97-58, at 22 ("[T]he committee expects the executive branch will avoid unnecessary export regulation . . . .").  Additionally, Congress has been aware of the Department's interpretation and yet has not addressed it in amendments to the AECA.  *See* Pub. L. No. 113-296, 128 Stat. 4075 (2014); Heidema Decl. ¶ 9.  "These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." *Fox Television Stations*, 851 F.3d at 1014 (quoting *Barnhart v. Walton*, 535 U.S. 212, 220 (2002)).

To the extent the Court concludes that notice to Congress was required under 22 U.S.C. § 2278(f)(1), Defendants request that the Court simply extend the TRO for an additional 45

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 19

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   days so that the State Department can consider providing the notice to Congress—rather than

2   entering the more sweeping preliminary injunction that Plaintiffs seek.

3       Similarly, Plaintiffs' misreading of 22 C.F.R. § 126.2 is fatal to their argument that the

4   Department has "[m]isuse[d]" the temporary modification regulation.  *See* Pls.' Mot. at 13-14.

5   That regulation, by definition, effectuates only a "temporary" modification, and thus does not

6   constitute a "removal" such that a 30-day notice is required.  *See* 22 C.F.R. § 126.2.  Nor can

7   Plaintiffs cast doubt on the reasonableness of the Department's interpretation of § 126.2 by

8   claiming that its national security determination "is not the sort of emergency stopgap measure

9   contemplated by 22 C.F.R. § 126.2."  Pls.' Mot. at 14.   It is well established that an agency is

10  entitled to "substantial deference" in interpreting its regulations.  *E.g.*, *Lezama-Garcia v.*

11  *Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  And Plaintiffs' purported national security

12  pronouncements, *see* Pls.' Mot. at 14; *see also id.* at 18, offer no basis to challenge the

13  Department's findings in this regard.  *E.g.*, *United States v. Hawkins*, 249 F.3d 867, 873 n.2

14  (9th Cir. 2001) ("[C]ourts have long recognized that the Judicial Branch should defer to

15  decisions of the Executive Branch that relate to national security.").

16       Plaintiffs also cannot state a claim related to Executive Order 13637, pursuant to which

17  designations or changes in designations "of items or categories of items that shall be considered

18  as defense articles and defense services subject to export control under section 38 (22 U.S.C.

19  § 2778) shall have the concurrence of the Secretary of Defense."  Exec. Order No. 13637

20  § 1(n)(i).  *See* Pls.' Mot. at 13; Am. Compl. ¶¶ 221-22, 231, 246.  Again, the Department has

21  not changed the designations "of items or categories of items."  Further, Plaintiffs' argument

22  fails because the Executive Order creates no rights for Plaintiffs to enforce.  Exec. Order No.

23  13637 § 6(c); *cf. Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011)

24  (Exec. Order No. 13186).  Most importantly, as stated in the Commerce NPRM, "[t]he changes

25  described in this proposed rule and in the State Department's companion proposed rule on

26  Categories I, II, and III of the USML are based on a review of those categories by the

27  Department of Defense, which worked with the Departments of State and Commerce in

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 20

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1   preparing the amendments." 83 Fed. Reg. at 24,166; *see also* Heidema Decl. ¶ 31 (discussing

2   concurrence specific as to subject files).

3        The Court should also reject Plaintiffs' argument that the Department, in settling

4   *Defense Distributed*, engaged in an "unlawful attempt to abrogate state and federal law." Pls.'

5   Mot. at 14-15; Am. Compl. ¶¶ 227, 233, 239. Specifically, Plaintiffs claim that the temporary

6   modification, which "permits any United States person" to use the subject files, "conflicts with

7   many of the States' respective laws regulating firearms," as well as provisions of the Gun

8   Control Act, 18 U.S.C. § 922(g), (x). Pls.' Mot. at 14. Yet the Government does not suggest,

9   and has never suggested, that the settlement agreement conflicts with or otherwise preempts

10   such laws. To the contrary, the Department has consistently emphasized that its actions are

11   taken only pursuant to its authority to regulate the United States' system of export controls, not

12   domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The provisions of the Gun

13   Control Act cited by Plaintiffs remain in force, as do the protections for state law legislated by

14   Congress in the Gun Control Act. *See* 18 U.S.C. § 927. Thus, the laws invoked by Plaintiffs

15   remain unaffected by the settlement agreement, and there is no basis to substitute Plaintiffs'

16   understanding of the agreement for the far more reasonable interpretation of the Government.[10]

17        **2.    The Department's Actions Were Not Arbitrary And Capricious.**

18        Finally, Plaintiffs claim that the Department's actions were arbitrary and capricious

19   because they constitute an unexplained reversal of the agency's prior position concerning

20   whether the subject files are ITAR controlled. *See* Pls.' Mot. at 15-17; Am. Compl. ¶¶ 238-39.

21   Insofar as Plaintiffs challenge the Government's litigation strategy in *Defense Distributed* or its

22   decision to enter into a settlement to resolve that litigation, such decisions are committed to

23   agency discretion by law and thus not subject to judicial review, 5 U.S.C. § 701(a)(2). *See*

24   *Heckler v. Chaney*, 470 U.S. 821 (1985); *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d

25

26        [10] Similarly, the Court should not accept Plaintiffs' accusations of deliberate efforts by the Government to
    circumvent the law, Pls.' Mot. at 14; *see also id.* at 4 (suggesting the Government settled "covert[ly]"). *United*
27   *States v. Boyce*, 38 F. Supp. 3d 1135, 1151 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017)
    ("Government officials are presumed to carry out their duties in good faith.").

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 21

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009525

1   759, 761 (4th Cir. 1993) ("[T]he Attorney General has broad discretion and even plenary

2   authority to control litigation under 28 U.S.C. 516 and 519, and [] such decisions are not

3   judicially reviewable."); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir.

4   2008) (recognizing Attorney General's plenary discretion to settle litigation, but noting that in

5   cases—unlike this one—where plaintiffs allege that Attorney General has "exceeded [his] legal

6   authority," such claims are reviewable).[11]

7          Moreover, as the relevant NPRMs indicate, the Department has concluded that ITAR

8   control of such technical data is not warranted.  *See generally* 83 Fed. Reg. 24,198; 83 Fed.

9   Reg. at 24,166.  These NPRMs have not been withdrawn and remain the official position of the

10  Government.[12]  *Cf. Pennzoil Co. v. Dep't of Energy*, 680 F.2d 156, 171 (Temp. Emer. Ct. App.

11  1982).  Further, the rationale for this determination is provided in the Commerce NPRM, which

12  explains that the "review was focused on identifying the types of articles that are now

13  controlled on the USML that are either (i) inherently military and otherwise warrant control on

14  the USML or (ii) if of a type common to non-military firearms applications, possess parameters

15  or characteristics that provide a critical military or intelligence advantage to the United States,

16  and are almost exclusively available from the United States."  83 Fed. Reg. at 24,166 ("Thus,

17  the scope of the items described in this proposed rule is essentially commercial items widely

18  available in retail outlets and less sensitive military items.").  This case is only about the

19  determination of the Government that the technical data at issue would not give a military or

20  intelligence advantage and is therefore not properly subject to export controls.  Only those

21  weapons of a type that is inherently military or that is not otherwise widely available for

22  commercial sale are properly subject to such controls.  The Government has not made any

23  determination that 3D-printed guns should not be regulated domestically, and indeed the

24  Government intends to apply those authorities that regulate such firearms and supports

25

26     [11] Plaintiffs contend that in accepting the settlement agreement, Defendants agreed to exceed their legal
       authority.  As explained in the balance of this memorandum, that is not accurate.

27     [12] Further, Plaintiffs cite no authority for the proposition that the APA requires the Department to release
       "reports, studies, or analyses" in support of its decision regarding a temporary modification pending a larger
       rulemaking effort.  *See* Pls.' Mot. at 16.

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 22

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

1    Plaintiffs' efforts to do so as well.

2

3    **III.    The Balance of Equities And The Public Interest Weigh Against Entry Of A Preliminary Injunction**

4        Finally, Plaintiffs cannot show the balance of equities and public interest factors—

5    which are merged when the Government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

6    1073, 1092 (9th Cir. 2014)—tips sharply in their favor, particularly given the mandatory

7    injunction they seek.  First, because the Department has no authority to restrict U.S. persons

8    from sharing these files with other U.S. persons within the United States, the harms identified

9    by Plaintiffs cannot be prevented by an injunction in this case.  *See Def. Distributed*, 121 F.

10   Supp. 3d at 687 (files previously available on Defense Distributed's website).  Moreover, the

11   public interest is not served by restraining the ability of the Executive Branch to exercise its

12   discretion to determine whether harm to national security requires export controls on particular

13   items.  *Cf. Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme

14   of Congress "is in itself a declaration of public interest and policy which should be persuasive"

15   to courts).

16       Further, the Government notes that the possibility of manufacturing small-caliber

17   firearms from a 3D-printing process has been publicly discussed since 2013.  Heidema Decl.

18   ¶ 26 n.5.  Yet Plaintiffs allege no efforts on their part to enact additional legislation regarding

19   the manufacture of such firearms, *see* Am. Compl. ¶¶ 68-217, and not a single Plaintiff

20   submitted comments in response to the NPRMs, Heidema Decl. ¶ 23.  This further

21   demonstrates that the balance of equities weighs in Defendants' favor.

22                                  **CONCLUSION**

23       For the foregoing reasons, the motion for a preliminary injunction should be denied.

24   Dated:  August 15, 2018                     Respectfully submitted,

25                                               CHAD A. READLER

26                                               Acting Assistant Attorney General

27                                               ANNETTE L. HAYES

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 23

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009527

Acting United States Attorney

KERRY KEEFE
Civil Chief

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Steven A. Myers*
STEVEN A. MYERS
ERIC J. SOSKIN
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
(202) 305-8648 (telephone)
(202) 616-8460 (facsimile)
steven.a.myers@usdoj.gov

*Attorneys for Federal Defendants*

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 24

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009528

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: August 15, 2018                    */s/ Steven A. Myers*
                                          Steven A. Myers

Opposition to Motion for Preliminary Injunction
(No. 2:18-cv-1115-RSL) – 25

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202-305-8648

WASHSTATEB009529

# EXHIBIT 1

WASHSTATEB009530

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | No. 2:18-cv-1115-RSL |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

### DECLARATION OF SARAH J. HEIDEMA

I, Sarah J. Heidema, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.      I am the Director of the Office of Defense Trade Controls Policy, within the Directorate

of Defense Trade Controls (DDTC), in Bureau of Political-Military Affairs at the Department of

State (the "Department").  I have held this position since April 2018, and my responsibilities

include maintaining the International Traffic in Arms Regulations and providing policy guidance

on the export of defense articles.  I previously served as the Division Chief for Regulatory and

Multilateral Affairs within the Office of Defense Trade Controls Policy and prior to that I held a

variety positions covering export control issues within the Directorate of Defense Trade Controls

and at the Department of Commerce, Bureau of Industry and Security.  My varied positions

afford me extensive knowledge of the Arms Export Control Act (AECA) and the International

Traffic in Arms Regulations (ITAR) as it relates to DDTC activities.

2.      I submit this declaration in support of the Federal Defendants' opposition to the motion

for a preliminary injunction filed by Plaintiffs in the above-captioned case. The information

contained herein is based on my personal knowledge and on information provided to me in my

official capacity.

### Relevant Statutory and Regulatory Framework:  AECA and ITAR

3.      The AECA authorizes the President "in furtherance of world peace and the security and

1

foreign policy of the United States . . . to control the import and the export of defense articles and

defense services and to provide foreign policy guidance to persons of the United States involved

in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA also

authorizes the President "to designate those items which shall be considered as defense articles

and defense services . . . and to promulgate regulations for the import and export of such articles

and services. The items so designated shall constitute the "United States Munitions List"

(USML). *Id.* The President delegated this authority to the Department with respect to exports,

temporary imports, and brokering, and the Department has promulgated the ITAR to implement

those portions of the statute. *See* Executive Order 13637(n)(i); 22 C.F.R. parts 120-130.

4.      Within the Department, DDTC administers the ITAR, including part 121, which contains

the USML. The items enumerated on the USML are those that "provide a critical military or

intelligence advantage." 22 C.F.R. § 120.3(b). The AECA prohibits the export or import of

defense articles and defense services without a license, except as specifically provided in

regulations. *See* 22 U.S.C. § 2778(b)(2).

5.      The USML comprises twenty-one categories that enumerate items including, for

example: certain "[r]ockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth

charges, mines, and grenades," *see* 22 C.F.R. § 121.1 Category IV(a); "[a]ttack helicopters," *see*

22 C.F.R. § 121.1 Category VIII(a)(4); spacecraft meeting described characteristics, *see* 22

C.F.R. § 121.1 Category XV(a); and "[b]iological agents and biologically derived substances

specifically developed, configured, adapted, or modified for the purpose of increasing their

capability to produce casualties in humans . . . ." 22 C.F.R. § 121.1 Category XIV(b).

6.      The USML also includes "technical data" "required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or modification of

2

defense articles," such as "blueprints, drawings, photographs, plans, instructions or

documentation." 22 C.F.R. § 120.10(a)(1); *see e.g.*, 22 C.F.R. § 121.1 Category XI(d).

"Technical data" does not include information concerning general scientific, mathematical, or

engineering principles commonly taught in schools, colleges, and universities, or information

that is in the public domain. *See* 22 C.F.R. § 120.10.  ITAR § 120.11 defines "public domain,"

in relevant part, as information which is published and generally accessible or available to the

public, and provides a list of information that has been made available to the public, including

"[t]hrough sales at . . . bookstores" and "[t]hrough public release (*i.e.*, unlimited distribution) in

any form (e.g., not necessarily in published form) after approval by the cognizant U.S.

government department or agency . . . ."

7.      As required by the AECA, the Department periodically reviews the items—classes of

hardware, technical data, and services described on the USML—to determine what items, if any,

no longer warrant control under the ITAR and conveys the results of such reviews to Congress.

*See* 22 U.S.C. § 2778(f).  The review process begins with Department engagement with the

Departments of Defense and Commerce to determine the categories most appropriate for review,

and this consultation is informed by inquiries received from the general public, internal feedback

from licensing officers and Commodity Jurisdiction analysts, and the period of time since the

categories under consideration were reviewed previously.  At the onset of the review process the

Department publishes a Notice of Inquiry in the *Federal Register* to announce the categories

under consideration for review and to solicit comment on potential improvements to those

categories.  If warranted, based on the feedback received, the Department will then initiate an

ordinary rulemaking process, beginning with the publication of a Notice of Proposed

Rulemaking (NPRM).

3

WASHSTATEB009533

8.     The Department continuously engages with its interagency partners and industry to

evaluate the USML.  For example, in 2015 the Department published a Notice of Inquiry

requesting comments to inform its review, in part, of USML Categories VIII and XIX, Aircraft

and Related Articles and Gas Turbine Engines and Associated Equipment, respectively.  *See* 80

Fed. Reg. 11,313 (Mar. 2, 2015).  In 2016, the Department published an NPRM proposing to

revise the categories, *see* 81 Fed. Reg. 6,797 (Feb. 9, 2016), and a final rule implementing

revisions later that year, *see* 81 Fed. Reg. 83,126 (Nov. 21, 2016).  The Department also recently

published a Notice of Inquiry requesting comments from the public to inform, in part, its review

of the controls on Categories V, X, and XI implemented in 2014.  *See* 83 Fed. Reg. 5,970 (Feb.

12, 2018); 79 Fed. Reg. 34 (Jan. 2, 2014) (final rule revising, in part, Categories V and X); 79 FR

37,535 (Jul. 1, 2014) (final rule revising, in part, Category XI).  The Department and its

interagency partners are reviewing the public comments submitted in response to the 2018

Notice of Inquiry, and the Department intends to publish an NPRM for public comment

implementing any revisions to the categories that are warranted.

9.     The AECA states that the Department "may not remove any item from the [USML] until

30 days after the date on which the President has provided notice of the proposed removal to the

Committee on International Relations of the House of Representatives and to the Committee on

Foreign Relations of the Senate."  22 U.S.C. § 2778(f).  Since at least 2011, the Department has

interpreted "item" within the meaning of this provision to refer to the specifically enumerated

text of the USML.  For example, the "item" controlled in Category VII(a)(1) is "(a) Armored

combat ground vehicles as follows:  (1)  Tanks." 22 C.F.R. 121.1, in Category VII(a)(1).  The

Department would notify as required under 22 U.S.C. § 2778(f) prior to removing armored

combat tanks from the USML, or otherwise circumscribing the text of this entry in a way that

4

would remove a class of tanks from the USML, *e.g.*, by revising the control only to cover those tanks that meet defined performance criteria. The Department formalized its adoption of this interpretation in 2011 after considering the statutory context, AECA legislative history, agency past practice, and the impracticality of notifying removal of every individual model, part, or component that might be impacted by a regulatory change. The Department informed Congress in 2011 that the Department would provide a formal 30-day notification, pursuant to 22 U.S.C. § 2778(f), for the removal of "items" from the USML related to category revisions. At that time the Department also volunteered to provide an informal review of removals of items from the USML beginning 30 days prior to the formal notification.

10.     The Department also makes commodity jurisdiction (CJ) determinations, following a procedure described in the ITAR, to identify the export control jurisdiction of specific goods, services, and information. *See* 22 C.F.R. § 120.4. The purpose of the process is to determine whether—for purposes of export controls—specific goods, services, or information are subject to the ITAR and therefore under the jurisdiction of the Department or are subject to the Export Administration Regulations (EAR) and therefore under the jurisdiction of the Department of Commerce. The vast majority of all jurisdictional determinations are self-determined either by the original equipment manufacturer (OEM) or via a third party. The Department makes CJ determinations upon request by persons, most often the OEM, unable to self-determine the jurisdiction of a specific good, service, or information. The CJ process typically takes 45-55 business days. If after 45 days the Department has not provided a final CJ, the applicant may request in writing that the determination be given expedited processing. *See* 22 C.F.R. § 120.4(e).

11.     The ITAR authorizes the Deputy Assistant Secretary for Defense Trade Controls to

5

"order a temporary suspension or modification of any or all of the [ITAR] in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

**Relevant Statutory and Regulatory Framework: Licenses and Authorizations**

12.     The ITAR requires a license, in relevant part, for the *export* of "technical data." *See* 22 C.F.R. § 123.1(a). Although revealing "technical data" to a foreign person, including through oral or visual disclosures, is an export under the ITAR, disclosing or transferring "technical data" to U.S. persons in the United States is not an export and is not governed by the ITAR. *See* 22 C.F.R. § 120.17. Consequently, forums in the United States where "technical data" is discussed normally limit participants to U.S. persons.[1] Because there are no unauthorized foreign persons in attendance, presenting "technical data" at such a conference would not result in an "export" within the meaning of the ITAR, and would not require a license from the Department. Similarly, while releasing "technical data" electronically to foreign persons is an ITAR-controlled export, posting "technical data" on a website that prevents access by foreign persons or sharing "technical data" between U.S. persons in the United States using a USB drive would not be ITAR-controlled exports.

13.     ITAR § 125.4(b)(13) reinforces the public domain provision by exempting from the ITAR licensing requirements "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review." Thus, when the U.S. government authorizes the public

---

[1] For example, the admittance policy for the American Institute of Aeronautics and Astronautics 2013 Propulsion and Energy Event provided: "If you plan to attend any presentations restricted by ITAR, you must bring proof of citizenship . . . . Please note that only U.S. Citizens and U.S. Resident Aliens can be considered for attendance at these restricted presentations. Admittance to restricted sessions and access to restricted technical papers is implemented and controlled by the rules of ITAR." https://www.aiaa.org/Secondary.aspx?id=14287 (last visited Jul. 11, 2018).

6

release of "technical data," that information does not require a license from DDTC for export.

14.     The AECA provides for criminal and civil penalties for violations involving controls imposed on the export of defense articles and defense services, including for unauthorized exports. *See* 22 U.S.C. § 2778(c), (e); 22 C.F.R. § 127.1.  ITAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case.  Civil penalties may include a monetary penalty or debarment from participating in activities subject to the ITAR. *See* 22 CFR §§ 127.3, 127.10, 127.7.

**Interagency Review of the USML**

15.     Since 2010, the Department of State has been engaged in an interagency effort to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage.  In the specific case of the Department's proposed revisions to USML Categories I-III, the Department interpreted this standard to focus on whether the defense articles at issue are inherently for military end-use. *See* 83 Fed. Reg. 24,198, 24,198 (Jul. 9, 2018).  This ongoing effort is intended to create a simpler, more robust export control system that simplifies industry compliance, supports interoperability with allies and partners, and focuses the Department's resources on those technologies most critical to U.S. national security. In connection with this effort, the Department has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories,[2] removing less sensitive items from the USML, that are concurrently added by the Department of Commerce (DOC) to the Commerce

---

[2] *See e.g.,* 79 Fed. Reg. 27,180 (May 13, 2014) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV"); 79 Fed. Reg. 37,535 (Jul. 1, 2014) ("Amendment to the International Traffic in Arms Regulations: United States Munitions List Category XI (Military Electronics), and Other Changes"); 81 Fed. Reg. 49,531 (Jul. 28, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories XIV and XVIII"); 81 Fed. Reg. 70,340 (Oct. 12, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XII"); 81 Fed. Reg. 83,126 (Nov. 21, 2016) ("Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories VIII and XIX"); 82 Fed. Reg. 2,889 (Jan. 10, 2017) ("International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV").

7

WASHSTATEB009537

Control List (CCL).

16.     To implement these changes, the Department works collaboratively with its interagency partners to evaluate and revise categories of items on the USML.  While a wide range of interagency stakeholders review and clear the *Federal Register* notices that revise the USML, the Department works particularly closely with the Departments of Defense and Commerce to solicit their views on the appropriate composition of the USML.  The engagement with the DOC is further intended to ensure that the jurisdictional posture of a given item is clear, and the application of ITAR or EAR controls to that item can be discerned and understood by the public. Additionally, the Department coordinates with the DOC to publish rules in parallel where updates to the USML require conforming changes to the CCL to ensure the appropriate level of control.

17.     With respect to the Department of Defense (DoD), as required by Executive Order 13637, the Department obtains concurrence of the Secretary of Defense for designations, including changes in designations, of items or categories of items that are defense articles and defense services enumerated on the USML.  *See* Executive Order 13637(n)(i).  Throughout this effort to revise the USML, which began in 2010,[3] the Department has followed a consistent process for revising the USML categories and obtaining DoD concurrence.  This process begins with an internal national security review conducted by the DoD[4] to assess which items in the category continue to warrant control on the USML.  The DoD presents the results of this review

---

[3] The interagency effort to revise the USML began in 2010.  *See* 75 Fed. Reg. 76,935 (Dec. 10, 2010) (publishing advanced notice of proposed rulemaking, "Revisions to the United States Munitions List," seeking public comment on "revisions to the United States Munitions List (USML) that would make it a 'positive list' of controlled defense articles").  The Department published its first final rule revising the USML as part of this effort in 2013.  *See* 78 Fed. Reg. 22,740 (Apr. 16, 2013) ("Amendment to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reform").

[4] Within the DoD, the Defense Technology Security Administration (DTSA) has the lead in engaging with the Department and the interagency on this effort.

8

in an interagency meeting, and, if warranted by interagency discussion, will conduct and report on further internal national security assessments. The iterative process generates rules for publication in the *Federal Register*.

18.     The Department has long taken the position that controlling the temporary import and export of defense articles and services is a foreign affairs function of the U.S. government, and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). *See* 22 C.F.R § 128.1. The Department, nevertheless, accepted public comment through a notice of proposed rulemaking prior to adding, removing, or amending the description of any item on the USML.

19.     As part of the most recent review of the USML, the Department has not published final rules revising Categories I, II, or III, which enumerate respectively: firearms, close assault weapons and combat shotguns; guns and armament; and ammunition/ordnance. Through the interagency review process described above, in which the Department coordinated principally with the Departments of Defense and Commerce to develop revisions to the USML and CCL, the Department determined that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant control on the USML. This decision was informed by DoD's assessment that the items proposed for transfer are already commonly available and not inherently for military end-use, such as semi-automatic firearms under .50 caliber currently described in Category I(a). As an example, a specific make and model meeting the description of this subparagraph is the Beretta M9 pistol, which is available for sale at sporting goods stores and other retailers throughout the United States, and has been licensed by the Department for export to commercial retailers and militaries around the world. The assessment that the items proposed for removal pose little

9

WASHSTATEB009539

national security concern is highlighted by the fact that DoD does not generally review export license applications for the physical items described in Category I, as DoD does for license applications in other categories.

20.     The Department briefed the outcome of this review to the staff of the Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on May 14, 2018.  Subsequently, on May 24, 2018, the Department published in the *Federal Register* a NPRM (May 2018 NPRM), 83 Fed. Reg. 24,198, proposing to transfer oversight from the Department of State to the DOC certain articles in these categories, including firearms widely available for commercial sale.

21.     As part of the May 2018 NPRM, the Department proposed to revise USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, if the rule is finalized as contemplated in the NPRM, the revised Category I will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the components, parts, accessories, and attachments for those articles.  If finalized as contemplated in the NPRM, technical data related to the firearms that are removed from the USML will no longer be subject to the ITAR.

22.     The May 2018 NPRM proposed that the Department would retain jurisdiction of certain firearms considered to provide a critical military or intelligence advantage, such as:  firearms that fire caseless ammunition; fully automatic firearms to caliber .50 (12.7mm) inclusive; and firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems.

23.     The comment period on the May 2018 NPRM closed on July 9, 2018.  The Department

10

received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms. The Department is reviewing these public comments and will respond if it publishes a final rule. None of the Plaintiff States submitted comments in response to the NPRM.

24.     The Department has not withdrawn the May 2018 NPRM and is actively preparing a final rule for publication. The national security determination that informed the NPRM—that certain items now controlled by USML Categories I-III do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML—remains the Department's position with respect to the items proposed for transfer. The Department intends to notify Congress, in accordance with 22 U.S.C. § 2778(f), at least 30 days in advance of any final rule removing items from USML Categories I-III.


**Defense Distributed Settlement Agreement**

25.     In early May 2013, the Department became aware that Defense Distributed had placed on an unrestricted website executable Computer-Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer. The Department informed Defense Distributed that, as a result of this unrestricted posting, Defense Distributed may have released ITAR-controlled technical data to foreign persons without the required authorization. Defense Distributed removed the published files and, with the Second Amendment Foundation, eventually brought a lawsuit against, *inter alia*, the Department claiming that the requirement to obtain authorization prior to publishing the files on the website violated the plaintiffs' rights under the First, Second, and Fifth Amendments.

26.     I understand that the various files, including those that were the subject of the *Defense Distributed* litigation, were downloaded repeatedly while available on the Defense Distributed

11

website.[5] I also understand that internationally hosted websites continued to make those files

available for download during the pendency of the *Defense Distributed* litigation. Any

restrictions imposed by the Department on the technical data that was the subject of the action

were limited to the export of that technical data; the Department has no jurisdiction over sharing

technical data between U.S. persons in the United States, unless such sharing also provides

access to foreign persons.

27.     The parties entered into a settlement agreement on June 29, 2018, a true and correct copy

of which is attached hereto as Exhibit A, in which the Government agreed, in relevant part, to:

> (a)     [D]raft and to fully pursue, to the extent authorized by law (including the
> Administrative Procedure Act), the publication in the Federal Register of a notice
> of proposed rulemaking and final rule, revising USML Category I to exclude the
> technical data that is the subject of the Action.

> (b)     [Announce], while the above-referenced final rule is in development, of a
> temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of
> USML Category I to exclude the technical data that is the subject of the Action.
> The announcement will appear on the DDTC website, www.pmddtc.state.gov, on
> or before July 27, 2018.

> (c)     [Issue] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy
> Assistant Secretary for Defense Trade Controls, advising that the Published Files,
> Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited
> distribution) in any form and are exempt from the export licensing requirements of
> the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the
> purposes of 22 C.F.R. § 125.4(b)(13) the Department  of State is the cognizant U.S.
> Government department or agency, and the Directorate of Defense Trade Controls
> has delegated authority to issue this approval.

28.     The settlement agreement was not an admission by the Department of any fault, or of any

---

[5] For example, Forbes reported in 2013 that "[i]f gun control advocates hoped to prevent blueprints for the world's
first fully 3D-printable gun from spreading online, that horse has now left the barn about a hundred thousand times.
That's the number of downloads of the 3D-printable file for the so-called 'Liberator' gun that the high-tech
gunsmithing group Defense Distributed has seen in just the last two days . . . ." Forbes, *3D-Printed Gun's
Blueprints Downloaded 100,000 Times in Two Days (With Some Help from Kim Dotcom)*, available at
https://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-
two-days-with-some-help-from-kim-dotcom/ (last visited Aug. 3, 2018).

12

WASHSTATEB009542

omission in any act or failure to act, and the Department denied, and continues to deny, any *ultra vires* actions, as well as any violation of the First, Second, or Fifth Amendments of the United States Constitution.

29.     The Department complied with the actions required by the settlement agreement, and the case was dismissed on July 30, 2018.

30.     In accordance with longstanding Department policy in effect since at least 2011, the temporary modification of the ITAR pursuant to ITAR § 126.2, described in paragraph 1(b) of the settlement agreement, was not notified to Congress under 22 U.S.C. § 2778(f).  During the effort to revise the USML, described in paragraph 15 above, the Department has provided 30-day notice to Congress prior to modifying the USML text to remove classes of hardware, technical data, and services described on the USML.  These revisions of USML text announced the transfer to the CCL of groups or categories of articles meeting broad descriptions, rather than specific models, types or specific parts and components that may be captured within the groups or categories.  Here, the temporary modification did not propose to remove, even temporarily, classes of hardware or technical data from the USML within the Department's interpretation of "item" for 22 U.S.C § 2778(f) purposes.  Consequently, if the Department removes classes of hardware, technical data, or services described on the USML, such as in connection with the May 2018 NPRM, Congress will receive the necessary notifications.  The Department's interpretation of "item" makes practical sense because it would be difficult, if not impossible, to comprehensively identify and enumerate each article or commodity captured by the regulatory text.

31.     Similarly, the Department obtains concurrence from the Secretary of Defense when the Department makes changes in designations of items—classes of hardware, technical data, and

13

services described on the USML—such as for the proposed removal of certain non-automatic and semi-automatic firearms to caliber .50 inclusive, described in USML Category I(a), and the associated technical data, as described in USML Category I(h).  The Department requested and received concurrence from DoD in the policy decision to remove all non-automatic and semi-automatic firearms, and associated technical data, from the United States Munitions List, as described in detail in the May 2018 NPRM.  Furthermore, the Department requested and received concurrence from DoD, through the Defense Technology Security Administration, before sending the letter, described in paragraph 1(c) of the settlement agreement, advising Defense Distributed that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR.

32.     The ITAR contemplates release of technical data into the public domain and provides an exemption from the licensing requirements for technical data that cognizant U.S. government agencies or departments have approved for public release.  *See* 22 C.F.R §§ 120.11, 125.4(b)(13).  In accordance with the Department's interpretation of 22 U.S.C. § 2778(f) described in paragraphs 9 and 30, the Department does not consider the release of information into the public domain to be the removal of an "item" from the USML requiring notification.  As such, the Department does not notify Congress when such release is authorized, such as occurred with the letter that the Department sent to Defense Distributed pursuant to paragraph 1(c) of the settlement agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2018.

_____
Sarah J. Heidema

14

# Exhibit A

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)  Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)  Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)  Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHSTATEB009549

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

WASHSTATEB009550

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
Settlement Agreement with their counsel, who has explained these documents to them
and that they understand all of the terms and conditions of this Settlement Agreement.
Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
the contents thereof, and execute this Settlement Agreement of their own free act and
deed. The undersigned represent that they are fully authorized to enter into this
Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
each of which shall be deemed an original, and all of which together constitute one and
the same instrument, and photographic copies of such signed counterparts may be used in
lieu of the original.

10.    *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
drafted agreement and shall not be construed against any party as the drafter.

11.    *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEB009552

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEB009553

**From:** Jost, Aaron W
**Sent:** Fri, 12 Oct 2018 08:27:57 -0400
**To:** Heidema, Sarah J
**Subject:** CAT IP
**Attachments:** 20180711 - CAT Policy Implementation Plan.pdf

Regards,
Aaron

‒ ‒ ‒ ‒ ‒ ‒ ‒
Aaron W. Jost
Deputy Director
Office of Regional Security and Arms Transfers
Bureau of Political-Military Affairs
U.S. Department of State

| | |
|---|---|
| **From:** | Rogers, Shana A |
| **Sent:** | Fri, 12 Oct 2018 10:42:40 -0400 |
| **To:** | Dorosin, Joshua L |
| **Cc:** | Cavnar, Anna |
| **Subject:** | FW: IM to D on appeal recommendation update |
| **Attachments:** | IM to D -- Update on PI Decision (LPM).docx |

Hi Josh,

I just wanted to flag this for you.  Does Jennifer still need this?

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Tuesday, October 09, 2018 4:05 PM
**To:** Dorosin, Joshua L
**Cc:** Cavnar, Anna
**Subject:** IM to D on appeal recommendation update

Hi Josh,

Here is a draft of the IM to D ███████████████████████████████.  I sent it to DDTC for a preliminary review but do not have their feedback yet.  Will you please review and let me know if it isn't what you wanted?

████████████████████████████████████████████
████████████████████████████████████

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

**From:** Heidema, Sarah J
**Sent:** Fri, 12 Oct 2018 10:58:28 -0400
**To:** Capistrano, Norm;Jost, Aaron W;Sciandra, Salvatore
**Cc:** Cressey, Laura E
**Subject:** updates to Cat IP 2.1 and 2.2.
**Attachments:** Document1.docx

Here is my updated text per the SOC
**Official**
**UNCLASSIFIED**

**From:**         Rogers, Shana A
**Sent:**         Fri, 12 Oct 2018 11:05:59 -0400
**To:**           Wall, Amanda J
**Subject:**      FW: IM to D on appeal recommendation update
**Attachments:**  IM to D -- Update on PI Decision (LPM).docx

Amanda,
Here is the draft IM.

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Rogers, Shana A
Sent: Friday, October 12, 2018 10:43 AM
To: Dorosin, Joshua L
Cc: Cavnar, Anna
Subject: FW: IM to D on appeal recommendation update

Hi Josh,
I just wanted to flag this for you.  Does Jennifer still need this?

Thanks,
Shana


Sensitive
This email is UNCLASSIFIED.


From: Rogers, Shana A
Sent: Tuesday, October 09, 2018 4:05 PM
To: Dorosin, Joshua L
Cc: Cavnar, Anna
Subject: IM to D on appeal recommendation update

Hi Josh,
Here is a draft of the IM to D ███████████████████████████.  I sent it to DDTC for a
preliminary review but do not have their feedback yet.  Will you please review and let me know if it isn't
what you wanted?

Thanks,
Shana

Sensitive
This email is UNCLASSIFIED.

**From:**       Wall, Amanda J
**Sent:**       Tue, 23 Oct 2018 18:43:12 -0400
**To:**         Dorosin, Joshua L;Johnson, Clifton M;Kottmyer, Alice M
**Subject:**    This has been sent upstairs!
**Attachments:** OMB - AM on EO 13771 Compliance (10-23) - D comments (003).docx, Tab 1 -
OMB - Memo to OMB on EO 13771 Compliance (10-22 0920).docx, Tab 2 - EO 13771.pdf, Tab 3 - OMB
13771 guidance April 2017.pdf

**Official**
**UNCLASSIFIED**

# Presidential Documents

**Executive Order 13771 of January 30, 2017**

## Reducing Regulation and Controlling Regulatory Costs

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Budget and Accounting Act of 1921, as amended (31 U.S.C. 1101 *et seq.*), section 1105 of title 31, United States Code, and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1.** *Purpose.* It is the policy of the executive branch to be prudent and financially responsible in the expenditure of funds, from both public and private sources. In addition to the management of the direct expenditure of taxpayer dollars through the budgeting process, it is essential to manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations. Toward that end, it is important that for every one new regulation issued, at least two prior regulations be identified for elimination, and that the cost of planned regulations be prudently managed and controlled through a budgeting process.

**Sec. 2.** *Regulatory Cap for Fiscal Year 2017.* (a) Unless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed.

(b) For fiscal year 2017, which is in progress, the heads of all agencies are directed that the total incremental cost of all new regulations, including repealed regulations, to be finalized this year shall be no greater than zero, unless otherwise required by law or consistent with advice provided in writing by the Director of the Office of Management and Budget (Director).

(c) In furtherance of the requirement of subsection (a) of this section, any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations. Any agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law.

(d) The Director shall provide the heads of agencies with guidance on the implementation of this section. Such guidance shall address, among other things, processes for standardizing the measurement and estimation of regulatory costs; standards for determining what qualifies as new and offsetting regulations; standards for determining the costs of existing regulations that are considered for elimination; processes for accounting for costs in different fiscal years; methods to oversee the issuance of rules with costs offset by savings at different times or different agencies; and emergencies and other circumstances that might justify individual waivers of the requirements of this section. The Director shall consider phasing in and updating these requirements.

**Sec. 3.** *Annual Regulatory Cost Submissions to the Office of Management and Budget.* (a) Beginning with the Regulatory Plans (required under Executive Order 12866 of September 30, 1993, as amended, or any successor order) for fiscal year 2018, and for each fiscal year thereafter, the head of each agency shall identify, for each regulation that increases incremental cost, the offsetting regulations described in section 2(c) of this order, and provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation.

WASHSTATEB009623

(b) Each regulation approved by the Director during the Presidential budget process shall be included in the Unified Regulatory Agenda required under Executive Order 12866, as amended, or any successor order.

(c) Unless otherwise required by law, no regulation shall be issued by an agency if it was not included on the most recent version or update of the published Unified Regulatory Agenda as required under Executive Order 12866, as amended, or any successor order, unless the issuance of such regulation was approved in advance in writing by the Director.

(d) During the Presidential budget process, the Director shall identify to agencies a total amount of incremental costs that will be allowed for each agency in issuing new regulations and repealing regulations for the next fiscal year. No regulations exceeding the agency's total incremental cost allowance will be permitted in that fiscal year, unless required by law or approved in writing by the Director. The total incremental cost allowance may allow an increase or require a reduction in total regulatory cost.

(e) The Director shall provide the heads of agencies with guidance on the implementation of the requirements in this section.

Sec. 4. *Definition.* For purposes of this order the term ''regulation'' or ''rule'' means an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency, but does not include:

(a) regulations issued with respect to a military, national security, or foreign affairs function of the United States;

(b) regulations related to agency organization, management, or personnel; or

(c) any other category of regulations exempted by the Director.

Sec. 5. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

WASHSTATEB009624

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 30, 2017.*

[FR Doc. 2017–02451
Filed 2–2–17; 11:15 am]
Billing code 3295–F7–P



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

April 5, 2017

M-17-21

MEMORANDUM FOR: REGULATORY POLICY OFFICERS AT EXECUTIVE
DEPARTMENTS AND AGENCIES AND MANAGING
AND EXECUTIVE DIRECTORS OF CERTAIN AGENCIES
AND COMMISSIONS

FROM:  Dominic J. Mancini, Acting Administrator
Office of Information and Regulatory Affairs

SUBJECT:  Guidance Implementing Executive Order 13771, Titled "Reducing
Regulation and Controlling Regulatory Costs"

## I.  Introduction

This guidance, in the form of Questions and Answers (Q&As), addresses the requirements of
Executive Order (EO) 13771, titled "Reducing Regulation and Controlling Regulatory Costs." It
applies to Fiscal Years (FY) 2017 and beyond. This guidance supplements the Office of
Management and Budget (OMB) interim guidance issued on February 2, 2017, titled "Interim
Guidance Implementing Section 2 of the EO of January 30, 2017, Titled 'Reducing Regulation
and Controlling Regulatory Costs.'" While OMB's Office of Information and Regulatory Affairs
(OIRA) believes this guidance largely treats the subjects covered in the February 2, 2017 interim
guidance in a consistent manner, where these two memoranda are in conflict, this guidance
supersedes the previous guidance. It reflects OIRA's consideration of the comments received in
response to the February 2, 2017, interim guidance. Comments sent by members of the public are
available on Regulations.gov in docket ID OMB-2017-0002.

## II.  General Requirements

The guidance explains, for purposes of implementing Section 2, the following requirements:

- "Unless prohibited by law, whenever an executive department or agency . . . publicly
proposes for notice and comment or otherwise promulgates a new regulation, it shall
identify at least two existing regulations to be repealed." Sec. 2(a).
- "For fiscal year 2017 . . . the heads of all agencies are directed that the total incremental
cost of all new regulations, including repealed regulations, to be finalized this year shall be
no greater than zero, unless otherwise required by law or consistent with advice provided in
writing by the Director of the Office of Management and Budget . . . ." Sec. 2(b).
- "In furtherance of the requirement of subsection (a) of this section, any new incremental
costs associated with new regulations shall, to the extent permitted by law, be offset by the
elimination of existing costs associated with at least two prior regulations." Sec. 2(c).

In general, executive departments or agencies ("agencies") may comply with those requirements by issuing two EO 13771 deregulatory actions (described below) for each EO 13771 regulatory action (described below). The incremental costs associated with EO 13771 regulatory actions must be fully offset by the savings of EO 13771 deregulatory actions.

In addition, agencies planning to issue one or more EO 13771 regulatory actions on or before September 30, 2017, should for each such EO 13771 regulatory action:

- Identify two existing regulatory actions the agency plans to eliminate or propose for elimination on or before September 30, 2017 in a reasonable period of time before the agency issues the EO 13771 regulatory action; and
- Fully offset the total incremental cost of such EO 13771 regulatory action as of September 30, 2017.

Guidance on the requirements of Section 3(a) is forthcoming.

Beginning with FY 2018, Section 3(d) requires the Director of OMB to identify to agencies a total amount of incremental costs (or "regulatory cap" as stated in Section 2) for all EO 13771 deregulatory and EO 13771 regulatory actions finalized during the fiscal year. The total incremental cost imposed by each agency should not exceed the agency's allowance for that fiscal year, unless required by law or approved by the Director. The total incremental cost allowance may be an increase or reduction in total regulatory cost, and will be informed by agencies' draft submissions for the *Regulatory Plan*.

Please consult with OIRA if you have any particular questions regarding the applicability or interpretation of EO 13771 not addressed in these Q&As.

Agencies should continue to comply with all applicable laws and requirements. In addition, EO 12866 remains the primary governing EO regarding regulatory planning and review. Accordingly, among other requirements, except where prohibited by law, agencies must continue to assess and consider both the benefits and costs of regulatory actions, including deregulatory actions, when making regulatory decisions, and issue regulations only upon a reasoned determination that benefits justify costs.

## III.    **Definitions**

This section provides definitions for terms used in this guidance. The definitions should not necessarily be applied to other sections of EO 13771 that this guidance does not cover, and do not replace definitions used in other EOs or statutes.

WASHSTATEB009627

***Q1.    What is an "agency"?***

A: An "agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5). A cabinet department is considered a single agency for purposes of EO 13771 compliance.

***Q2.    What is an "EO 13771 regulatory action"?***

A: An "EO 13771 regulatory action" is:

> (i) A significant regulatory action as defined in Section 3(f) of EO 12866 that has been finalized and that imposes total costs greater than zero; or

> (ii) A significant guidance document (*e.g.,* significant interpretive guidance) reviewed by OIRA under the procedures of EO 12866 that has been finalized and that imposes total costs greater than zero.

For example, EO 13771 regulatory actions include negotiated rulemakings that are significant as defined in Section 3(f) of EO 12866, that have been finalized, and that impose total costs greater than zero.

***Q3.    What is a "significant guidance document"?***

A: As defined in OMB's *Final Bulletin for Agency Good Guidance Practices,* a "significant guidance document" is a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to:

> (i) Lead to an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;
> (ii) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;
> (iii) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or
> (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in EO 12866, as further amended.

A significant guidance document does not include legal advisory opinions for internal Executive Branch use and not for release (such as Department of Justice Office of Legal Counsel opinions); briefs and other positions taken by agencies in investigations, pre-litigation, litigation, or other enforcement proceedings; speeches; editorials; media interviews; press materials; Congressional correspondence; guidance documents that pertain to a military or foreign affairs function of the United States (other than guidance on procurement or the import or export of non-defense articles and services); grant solicitations;

3

WASHSTATEB009628

warning letters; case or investigatory letters responding to complaints involving fact-specific determinations; purely internal agency policies guidance documents that pertain to the use, operation or control of a government facility; internal guidance documents directed solely to other Federal agencies; and any other category of significant guidance documents exempted by an agency in consultation and concurrence with the OIRA Administrator. In the list above, "internal" policies and guidance documents do not include those that materially affect an agency's interactions with non-Federal entities, even if nominally directed only to agency personnel. For example, an internal directive to field staff on how to implement a regulatory requirement could be a significant guidance document if it satisfied any of (i) through (iv) above.

If they satisfy the definition above, modifications to existing guidance and interpretative documents would be considered significant guidance documents.

### *Q4.   What is an "EO 13771 deregulatory action"?*

A:  An "EO 13771 deregulatory action" is an action that has been finalized and has total costs less than zero. An EO 13771 deregulatory action qualifies as both: (1) one of the actions used to satisfy the provision to repeal or revise at least two existing regulations for each regulation issued, and (2) a cost savings for purposes of the total incremental cost allowance. EO 13771 deregulatory actions are not limited to those defined as significant under EO 12866 or OMB's *Final Bulletin on Good Guidance Practices.*

An EO 13771 deregulatory action may be issued in the form of an action in a wide range of categories of actions, including, but not limited to:

- Informal, formal, and negotiated rulemaking;
- Guidance and interpretative documents;
- Some actions related to international regulatory cooperation; and
- Information collection requests that repeal or streamline recordkeeping, reporting, or disclosure requirements.

Significant proposed rules issued before noon on January 20, 2017, that are formally withdrawn by notice in the *Federal Register* and removed from the *Unified Agenda of Regulatory and Deregulatory Actions* may qualify as repeal actions, but do not qualify for cost savings.

Please consult with OIRA regarding other actions your agency believes should qualify as an EO 13771 deregulatory action.

### *Q5.   What does "offset" mean?*

A:  The term "offset" means at least two EO 13771 deregulatory actions have been taken per EO 13771 regulatory action and that the incremental cost of the EO 13771 regulatory action has been appropriately counterbalanced by incremental cost savings from EO 13771 deregulatory actions, consistent with the agency's total incremental cost allowance.

WASHSTATEB009629

***Q6.   What is a "statutorily or judicially required" rulemaking?***

A: A statutorily required rulemaking is one for which Congress has provided by statute an explicit requirement and explicit timeframe for rulemaking. For example, a statute that states, an agency "shall issue nutrition labeling requirements within 10 years" of the statute's enactment date would be considered a statutorily required rule.

A judicially required rulemaking is one for which there is a judicially established binding deadline for rulemaking, including deadlines established by settlement agreement or consent decree.

Agencies should consult with OIRA to determine whether a rule falls within the definition of a statutorily or judicially required rulemaking.

***Q7.   What is a rule issued with respect to a "national security function" of the United States?***

A: For the purposes of EO 13771, a regulation issued with respect to a national security function is a regulation that satisfies the two following requirements:

   (1) The benefit-cost analysis demonstrates that the regulation is anticipated to improve national security as its primary direct benefit; and
   (2) (A) For regulations the agency considers legislative rules: OIRA and the agency agree the regulation qualifies for a "good cause" exception under 5 U.S.C. 553(b)(3)(B); or (B) For other regulations (including significant guidance) the agency and OIRA agree that applying the requirements of EO 13771 to the regulation would be impracticable or contrary to public interest.

***Q8.   What is "total incremental cost"?***

A: The term "total incremental cost" means the sum of all costs from EO 13771 regulatory actions minus the cost savings from EO 13771 deregulatory actions.

**IV.     Scope Questions**

***Q9.   Which new regulations as defined in EO 13771 must be offset?***

A: Agencies are required to offset EO 13771 regulatory actions issued after noon on January 20, 2017. This includes those EO 13771 regulatory actions that are rules finalizing a Notice of Proposed Rulemaking (or in certain instances an interim final rule; see Question 11 for a further discussion) issued before noon on January 20, 2017.

Agencies should use the existing significance determination process outlined in EO 12866 for determining whether an action is an EO 13771 regulatory action. Agencies should not assume that actions that appear, or have appeared, in the *Unified Agenda of Regulatory and*

5

*Deregulatory Actions* as nonsignificant have been determined by OIRA to be nonsignificant. Agencies should obtain an affirmative significance determination from OIRA before publishing regulatory actions.

**Q10.   How are interim and direct final rules treated?**

A: In general, significant interim and direct final rules must be offset. However, a significant interim final rule or direct final rule may qualify for an exemption with respect to the timing for identifying and issuing the EO 13771 deregulatory actions.

**Q11.   How are significant rules that finalize interim final rules (IFR) treated?**

A: If the final rule neither increases nor decreases the cost of the IFR, then the action does not need to be offset nor does it qualify as an EO 13771 deregulatory action. If the final rule includes changes that increase the cost of the IFR, then the final rule must be offset (however, if the final rule imposes only *de minimis* costs relative to the IFR, the final rule may qualify for an exemption). If the final rule reduces the cost of the IFR, then the rule and the cost savings relative to the IFR may qualify as an EO 13771 deregulatory action.

**Q12.   Must agencies identify EO 13771 deregulatory actions for significant advance notices of proposed rulemaking (ANPRM)?**

A: No. With respect to rulemaking, the requirements of EO 13771 do not apply to pre-notice of proposed rulemaking activities such as ANPRMs.

**Q13.   How are regulatory actions that implement Federal spending programs or establish fees and penalties treated?**

A: In general, Federal spending regulatory actions that cause only income transfers between taxpayers and program beneficiaries (*e.g.*, regulations associated with Pell grants and Medicare spending) are considered "transfer rules" and are not covered by EO 13771. Additionally, an action that establishes a new fee or changes the existing fee for a service, without imposing any new costs, does not need to be offset; nor does an action that establishes new penalties or fines or changes those already in existence.

However, in some cases, such regulatory actions may impose requirements apart from transfers, or transfers may distort markets causing inefficiencies. In those cases, the actions would need to be offset to the extent they impose more than *de minimis* costs. Examples of ancillary requirements that may require offsets include new reporting or recordkeeping requirements or new conditions, other than user fees, for receiving a grant, a loan, or a permit. Analogously, if an action reduces the stringency of requirements or conditions for transfer recipients or permit holders, the action may qualify as an EO 13771 deregulatory action. Also, an action that causes transfers that, for example, induce moral hazard or other inefficient behavior may need to be offset and an action that reduces such transfers may qualify as an EO 13771 deregulatory action.

6

Please consult with OIRA on these actions, especially with regards to potential distortionary costs due to transfers. See OMB Circular A-4 for a discussion of the distinction between transfers and costs generally.

**Q14.** *How are activities treated that are associated with regulatory cooperation or international standards?*

A: Regulatory activities associated with regulatory cooperation with foreign governments that reduce costs to entities or individuals within the United States, including at the border, or otherwise lower the cost of regulations on the United States economy, may qualify as EO 13771 deregulatory actions. Activities associated with standard-setting that reduce costs to entities or individuals within the United States may also qualify as EO 13771 deregulatory actions. However, agency actions to harmonize with the standards of an international body or foreign government that increase costs on United States entities or individuals may need to be offset. OIRA recognizes such harmonization could also lead to operating efficiencies for businesses that agencies may be able to capture in their analysis of the benefits and costs of EO 13771 actions.

Agencies should consult OIRA on how to treat specific regulatory activities related to regulatory cooperation or international standard-setting.

**Q15.** *Do regulatory actions overturned by subsequently enacted laws qualify for savings?*

A: Generally, yes. OIRA considers Acts of Congress that overturn final regulatory actions, such as disapprovals of rules under the Congressional Review Act, to operate in a similar manner as agency EO 13771 deregulatory actions.

**Q16.** *Do regulatory actions that are vacated or remanded by a court qualify as EO 13771 deregulatory actions?*

A: If a regulatory action issued before noon on January 20, 2017, is vacated by a judicial order for which all appeals have been resolved, OIRA will consider on a case-by-case basis whether the regulatory action being vacated qualifies as an EO 13771 deregulatory action.

If an EO 13771 regulatory action was issued on or after noon on January 20, 2017, any judicial order for which all appeals have been resolved vacating the regulatory action, and any related subsequent agency action (such as a withdrawal of a vacated regulation from the Code of Federal Regulations in order to comply with the order), will not qualify as an EO 13771 deregulatory action. Any EO 13771 deregulatory actions used to offset a vacated EO 13771 regulatory action, however, would be available to offset other EO 13771 regulatory actions (after accounting for any sunk costs incurred in complying with the vacated action).

If a court permits a regulatory action to remain in effect after a judicial remand for further agency proceedings, such as through remand without vacatur, the remanded action remains in effect. Therefore, there is no action at the time of remand that could qualify as an EO 13771

7

deregulatory action. In the same way that an agency complies with EO 12866 when issuing a subsequent agency action to revise a remanded regulatory action, an agency will similarly need to comply with EO 13771. A subsequent agency action may qualify as an EO 13771 deregulatory action if the subsequent agency action is deregulatory in nature, or may need to be offset if the action is a significant regulatory action that is final and that imposes costs (*i.e.,* an EO 13771 regulatory action).

Agencies should notify OIRA of any judicial decisions that affect regulatory actions subject to EO 13771.

**Q17.   *What happens if an EO 13771 deregulatory action is remanded or vacated by a court?***

A: As in the answer to the previous question, OIRA recognizes the inherent case-by-case nature of the issues raised by the potential remand or vacatur of an EO 13771 deregulatory action. For example, such decisions may happen years after a rule is finalized, and may affect compliance with both the cost allowances and the repeal provisions established pursuant to EO 13771. The agency should contact OIRA to determine how a remand or vacatur of an EO 13771 deregulatory action affects the agency's obligations under EO 13771.

**Q18.   *Does EO 13771 apply to significant regulatory actions in which the law prohibits the consideration of costs in determining a statutorily required standard?***

A: Because EO 13771 applies only to the extent permitted by law, agencies are still required to comply with their statutory obligations. Accordingly, if a statute prohibits consideration of cost in taking a particular regulatory action, EO 13771 does not change the agency's obligations under that statute. However, agencies will generally be required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs. Because each agency's obligations will differ depending on the particular statutory language at issue, these issues must be addressed on a case-by-case basis.

Please consult with OIRA regarding questions about particular statutory language and its relationship to EO 13771.

**Q19.   *How do the requirements of EO 13771 apply to significant regulatory actions issued by one agency that do not have the force and effect of law until adopted, with or without change, by another agency?***

A: Because the agency authorities that establish such sequential or otherwise overlapping regulatory responsibilities differ by program, these actions will need to be handled on a case-by-case basis. However, agencies in these circumstances should always work together to avoid double-counting costs and cost savings; they should also work together as closely as possible when developing regulatory approaches for such programs. In cases where one agency's action does not qualify as an EO 13771 regulatory action because it is not a significant regulatory action under EO 12866, associated actions by other agencies may still be covered by EO 13771.

8

WASHSTATEB009633

*Q20.   Does EO 13771 apply to regulatory actions of independent regulatory agencies?*

A: No. EO 13771 applies only to those agencies that meet the definition of "agency" in this guidance. Nevertheless, independent regulatory agencies are encouraged to identify existing regulations that, if repealed or revised, would achieve cost savings that would fully offset the costs of significant regulatory actions while continuing to meet the agency's statutory obligations.

## V.      Accounting Questions

*Q21.   How should costs and cost savings be measured?*

A: Except where noted in other portions of this guidance, costs should be estimated using the methods and concepts appearing in OMB Circular A-4. There are several types of impacts that, under OMB Circular A-4, could be reasonably categorized as either benefits or costs, with the only difference being the sign (positive or negative) on the estimates. In most cases where there is ambiguity in the categorization of impacts, agencies should conform to the accounting conventions they have followed in past analyses. For example, if medical cost savings due to safety regulations have historically been categorized as benefits rather than reduced costs, they should continue to be categorized as benefits for EO 13771 regulatory actions. Identifying cost savings, such as fuel savings associated with energy efficiency investments, as benefits is a common accounting convention followed in OIRA's reports to Congress on the benefits and costs of Federal regulations.

Cost savings estimates for EO 13771 deregulatory actions should follow the same conventions, but in reverse. Only those impacts that have been traditionally estimated as costs when taking a regulatory action should be counted as cost savings when taking an EO 13771 deregulatory action. For example, the medical cost savings described above as historically being counted as benefits when regulating should not then be counted as "negative cost savings" when deregulating.

An agency that has used different accounting conventions across different past analyses should consult with OIRA regarding the categorization of ambiguous impacts. In general, when faced with ambiguity, OIRA will attempt to achieve greater consistency in the categorization of similar types of costs and benefits across different agencies.

OIRA notes that rules that cause an increase in the resources used by Federal agencies to accomplish their programmatic goals may need to be offset, and rules that reduce the real resources used by Federal agencies to accomplish their goals may qualify as EO 13771 deregulatory actions. These types of impacts have long been considered regulatory costs under OMB Circular A-4, and are a component of the costs OIRA includes in its reports to Congress on the benefits and costs of Federal regulations.

For EO 13771 deregulatory actions that revise or repeal recently issued rules, agencies generally should not estimate cost savings that exceed the costs previously projected for the

9

relevant requirements, unless credible new evidence show that costs were previously underestimated. On the other hand, a less recent regulatory impact analysis (RIA) may need revision to reflect, among other things, the fact that only costs occurring after the effective date of the regulatory repeal should be the basis for the cost savings estimate (*i.e.,* agencies should not count sunk costs). Where an agency believes it can significantly improve upon a prior cost estimate, especially a recent one, through methodological enhancements, the agency should first discuss those methodologies with OIRA.

### Q22.   How should cost savings be determined for regulatory actions that expand consumption and/or production options?

A: For regulatory actions that expand consumption and/or production options—sometimes referred to as "enabling" regulatory actions or regulations—cost savings should include the full opportunity cost of the previously forgone activities. Opportunity cost in this context would equal the sum of consumer and producer surplus, minus any fixed costs. See OMB Circular A-4 for a more detailed discussion of these concepts.

Generally, "one-time" regulatory actions (*i.e.,* those actions that are not periodic in nature) that expand consumption and/or production options would qualify as EO 13771 deregulatory actions.

There may be situations where this approach for determining the cost offsets generated by an enabling regulatory action is inappropriate. For instance, this approach may not be appropriate in certain circumstances where, if an agency were to fail to issue a regulatory action, a significant existing and ongoing economic activity would be prohibited. See Question 26. Cost offsets for such regulatory actions will be determined on a case-by-case basis.

Please consult with OIRA on all such non-routine regulations.

### Q23.   How does Executive Order 13771 apply to routine hunting and fishing regulatory actions?

A. Routine hunting and fishing regulatory actions that establish annual harvest limits are not required to be offset, and are not eligible to be used as cost savings. This includes migratory bird hunting frameworks under the Migratory Bird Treaty Act and fishery management plans and amendments under the Magnuson-Stevens Fishery Conservation and Management Act. This exemption does not apply to regulatory actions that affect hunting and fishing activity that are not routine regulatory actions.

### Q24.   What base year should agencies use?

A: Agencies should adjust all estimates to 2016 dollars using the GDP deflator, as released on March 30, 2017, until further guidance is provided by OIRA.

WASHSTATEB009635

***Q25.   How should agencies calculate cost and cost savings for the purpose of EO 13771
accounting?***

A: Agencies should calculate the present value (as of 2016) of costs for EO 13771 regulatory
actions and cost savings for EO 13771 deregulatory actions over the full duration of the
expected effects of the actions using both 7 percent and 3 percent end-of-period discount
rates.

***Q26.   In determining costs and cost savings under EO 13771, how should regulatory
baselines be determined?***

A: For the most part, agencies should follow the guidance about regulatory baselines provided in
OMB Circular A-4. However, there can be uncertainty, which is recognized in OMB Circular
A-4, regarding how best to capture the directive to assess impacts against the state of the
world in the absence of the regulation. Provided below are two cases in which this
uncertainty, or other challenges arising in the context of OMB Circular A-4, have often been
addressed by performing analyses with multiple baselines.  In each of these cases, OIRA has
also provided guidance about how to determine costs or cost savings for the purposes of
EO 13771:

   (1) When a regulatory action finalizes an interim final rule (IFR), agencies are typically
       encouraged to present two sets of estimates: the overall regulatory impacts and the
       incremental impacts relative to the IFR. For purposes of determining costs or
       available cost savings under EO 13771, agencies finalizing an IFR should include
       only the incremental impacts of the final rule, relative to the IFR.
   (2) There are multiple Federal programs and policies—such as discharge general
       permitting under the Clean Water Act or Medicare quality performance tracking—
       that are updated or renewed at regular intervals via rulemaking. Because these
       updates reliably occur, an assessment of the incremental changes between the
       previous and updated programs is often much more informative than a comparison of
       the updated programs against hypothetical discontinuance. Although
       multiple-baseline analysis is likely to continue to be encouraged in such cases for
       analysis conducted under EO 12866, for purposes of EO 13771, costs or cost savings
       should be determined by the incremental changes between previous and updated
       programs. For example, if an agency is statutorily or judicially required to issue a
       regulation every five years to permit or prohibit an activity, and the agency previously
       issued a regulation to address the requirement, the appropriate baseline to use for
       estimating the costs or cost savings of the new regulation under EO 13771 is likely
       the existing regulation (or interim operating conditions if there is temporarily no
       regulation in effect).

Please consult with OIRA if you have questions regarding the appropriate baseline upon
which to calculate costs or cost savings.

WASHSTATEB009636

*Q27.   How should agencies treat unquantified costs and cost savings?*

A: As stated in OMB Circular A-4, agencies should use their best efforts to monetize the effects of both regulatory actions and deregulatory actions and, in some cases, significant guidance documents. Depending on the likely magnitude of the effects, such efforts may include conducting or sponsoring studies to develop monetized estimates. In proposed/draft regulatory actions expected to lead to EO 13771 regulatory actions or EO 13771 deregulatory actions agencies should, at a minimum, clearly identify any non-monetized costs or cost savings, explain the key reason(s) why monetization is not possible, discuss any information the agency has that is relevant to estimating such costs, and request information from the public to monetize such costs at the final stage.

The weight assigned to unquantified effects will depend on their significance and degree of certainty, and will be handled on a case-by-case basis. See OMB Circular A-4 for more information on unquantified costs.

*Q28.   How should agencies treat EO 13771 regulatory actions and EO 13771 deregulatory actions published by multiple agencies?*

A: These will be handled on a case-by-case basis. Agencies should consult OIRA as early as possible to determine the appropriate treatment of the action.

*Q29.   Can agencies "bank" cost savings and deregulatory actions?*

A: Yes. Agencies may bank both EO 13771 deregulatory actions and the associated cost savings for use in the same or a subsequent fiscal year towards EO 13771's requirement to identify at least two existing regulations to be repealed (unless prohibited by law) and, separately, to comply with the total incremental cost allowance. Surplus EO 13771 deregulatory actions and cost savings do not expire at the end of a fiscal year and can be used in subsequent fiscal years.

For example, if an agency issues four EO 13771 deregulatory actions, the agency may apply them to up to two subsequent EO 13771 regulatory actions, including those occurring in a future fiscal year. Regardless, at the end of each fiscal year, an agency must be able to identify, and should have finalized, twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions.

Similarly, if an agency issues two EO 13771 deregulatory actions with total cost savings of $200 million to offset the cost of an EO 13771 regulatory action with a cost of $150 million, the agency may bank the surplus cost savings of $50 million to offset the cost of another EO 13771 regulatory action, regardless of when the latter action is issued. See Questions 24 and 25 for accounting conventions that allow for appropriate comparison of costs and cost savings experienced at different time periods.

WASHSTATEB009637

*Q30.  Can EO 13771 deregulatory actions (and associated cost savings) be transferred within an agency?*

A:  Yes. The requirements of EO 13771 apply agency-wide. An EO 13771 deregulatory action issued by a component in one agency can be used to offset an EO 13771 regulatory action issued by a different component in that same agency.

*Q31.  Can EO 13771 deregulatory actions (and associated cost savings) be transferred between agencies?*

A:  An agency that is not able to identify sufficient EO 13771 deregulatory actions for an EO 13771 regulatory action it intends to issue may submit a written request to the Director of OMB to assess whether the transfer of EO 13771 deregulatory action credits (after consultation with the supplying agency) would be appropriate before submitting the EO 13771 regulatory action to OMB for review under EO 12866. However, if the transfer is not appropriate, the agency must identify adequate offsets absent an exemption.

**VI.    Process Questions**

*Q32.  How does EO 13771 affect the consideration of regulatory benefits or other requirements under EO 12866?*

A:  EO 13771 does not change the requirements of EO 12866, which remains the primary governing EO regarding regulatory review and planning. In particular, EO 13771 has no effect on the consideration of benefits in informing any regulatory decisions. For all EO 13771 regulatory actions and EO 13771 deregulatory actions, except where prohibited by law, agencies must continue to assess and consider both benefits and costs and comply with all existing requirements and guidance, including but not limited to those in EO 12866 and OMB Circular A-4.

*Q33.  Which EO 13771 regulatory actions might qualify for a full or partial exemption from EO 13771 requirements?*

A:  The following categories of EO 13771 regulatory actions may qualify for a full or partial exemption from EO 13771's requirements: 1) expressly exempt actions; 2) emergency actions; 3) statutorily or judicially required actions; and 4) *de minimis* actions. These categories are not exhaustive. For any EO 13771 regulatory action an agency believes qualifies for an exemption under any of the circumstances provided below, agencies should submit exemption requests to OIRA prior to submitting the action to OMB for review under EO 12866 or prior to publication of the EO 13771 regulatory action if it was not subject to EO 12866 review.

- Expressly exempt – EO 13771 expressly exempts regulations issued with respect to a military, national security (see Question 7 above), or foreign affairs function, and regulations related to agency organization, management, or personnel. These actions qualify for a full exemption. See 5 USC 553.

13

- Emergencies – EO 13771 regulatory actions addressing emergencies such as critical health, safety, financial, non-exempt national security matters, or for some other compelling reason, may qualify for an exemption. In most cases, exemptions for such rules will be granted with respect to the timing of required offsets, allowing the agency to address the emergency before identifying and issuing EO 13771 deregulatory actions. Agencies will generally still be required to offset such actions. If necessary, the costs of such actions, and the requirement to identify for repeal at least two existing regulations, will be moved to the subsequent fiscal year for purposes of determining EO 13771 compliance.
- Statutorily or judicially required – EO 13771 does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory or judicial deadline, even if they are not able to satisfy EO 13771's requirements by the time of issuance. However, agencies will be required to offset any such EO 13771 regulatory actions as soon as practicable thereafter. In addition, this flexibility may not apply to discretionary provisions attached to EO 13771 regulatory actions required to comply with statutory or judicial deadlines.
- *De minimis* – EO 13771 regulatory actions with *de minimis* costs may qualify for an exemption. For example, if OIRA designates a proposed rule as significant under EO 12866 because it raises novel legal or policy issues, and the agency estimates the action would have present value costs of $50,000 spread over a large number of persons and/or entities, OIRA may exempt the action from some or all of the requirements of EO 13771.

### *Q34. Is a significant final regulatory action exempt from the requirements of EO 13771 if the action was designated not significant at a prior stage?*

A: Generally, no. Any regulatory action that is identified as significant at the final rule stage that imposes total costs greater than zero would need to be offset to comply with EO 13771, regardless of the determination in an earlier phase. Therefore, the agency should consult OIRA as soon as possible if it believes an action that was not determined to be significant at the draft or proposed rule stage may now be determined to be significant, perhaps due to substantive issues identified through public comment or further agency analysis.

### *Q35. How should agencies prioritize existing requirements to repeal or revise?*

A: Agencies should follow the requirements in EO 13777 for prioritizing existing requirements to repeal or revise. EO 13777 establishes Regulatory Reform Task Forces in agencies, and directs those task forces to evaluate existing regulations and make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law. EO 13777 directs each Regulatory Reform Task Force to identify regulations that:

- Eliminate jobs, or inhibit job creation;
- Are outdated, unnecessary, or ineffective;
- Impose costs that exceed benefits;
- Create a serious inconsistency or otherwise interfere with regulatory reform initiatives and policies;

14

- Are inconsistent with the requirements of section 515 of the Treasury and General Government Appropriations Act, 2001 (44 U.S.C. 3516 note), or the guidance issued pursuant to that provision, in particular those regulations that rely in whole or in part on data, information, or methods that are not publicly available or that are insufficiently transparent to meet the standard for reproducibility; or
- Derive from or implement EOs or other Presidential directives that have been subsequently rescinded or substantially modified.

EO 13777 further directs each Regulatory Reform Task Force to seek input and other assistance, as permitted by law, from entities significantly affected by Federal regulations, including State, local, and tribal governments, small businesses, consumers, non-governmental organizations, and trade associations. Input from such public engagement may be used to prioritize recommendations to repeal or revise.

Finally, where the costs of an EO 13771 regulatory action will be incurred entirely or to a large degree by a certain sector or geographic area, the agency should prioritize EO 13771 deregulatory actions that affect the same sector or geographic area, to the extent feasible and permitted by law.

### Q36. Can regulatory and deregulatory actions be bundled in the same action?

A: Yes, under certain circumstances. Many actions submitted to OIRA for review under EO 12866 consist of logically connected changes to multiple but related sections of the Code of Federal Regulations. For example, a rule exempting some categories of regulated entities from compliance with a previously issued regulation may also require eligible entities to submit additional documentation to demonstrate eligibility for the exemption. In these cases, it may be legitimate and appropriate to pursue such changes through a single "bundled" action, and this guidance is not meant to materially change agency decision making in this area. Where an agency combines such provisions, the cost impact (the difference between costs imposed and cost savings, per Question 21) of such rules will generally determine whether such actions are EO 13771 regulatory actions that need to be offset, or EO 13771 deregulatory actions. Agencies, however, should avoid artificially bundling provisions that are not logically connected in a single regulatory action. OIRA may determine that the regulatory and deregulatory portions of the rule should be considered separately for purposes of EO 13771 compliance.

Agencies should consult with OIRA when considering bundling regulatory and deregulatory actions.

### Q37. When and how should agencies identify EO 13771 deregulatory actions?

A: The agency's *Unified Agenda of Regulatory and Deregulatory Actions* should reflect compliance with the requirements of EO 13771, and should include, to the extent practicable, EO 13771 deregulatory actions that, when combined with EO 13771 deregulatory actions that are not regulations (such as Paperwork Reduction Act information collection reforms), are sufficient to offset those actions appearing in the Agenda that are or are expected to result

15

in EO 13771 regulatory actions. At a minimum, the agency should identify all EO 13771 deregulatory actions, along with cost savings estimates, by the time it submits to OMB for review under EO 12866 the corresponding EO 13771 regulatory action. In the rare event that an agency is unable to identify sufficient EO 13771 deregulatory actions, OIRA will address such a situation on a case-by-case basis.

While each *Federal Register* notice should identify whether the regulation is an EO 13771 regulatory action, there is no need to discuss specific offsetting EO 13771 deregulatory actions within the same *Federal Register* entry. Additionally, offsetting the costs of regulatory actions to comply with the requirements of EO 13771 should not serve as the basis or rationale, in whole or in part, for issuing an EO 13771 deregulatory action.

### *Q38.   When must identified EO 13771 deregulatory actions be finalized?*

A: To the extent practicable, agencies should issue EO 13771 deregulatory actions before or concurrently with the EO 13771 regulatory actions they are intended to offset. By the end of each fiscal year, including any carryover from previous fiscal years, agencies should have: (1) issued at least twice the number of EO 13771 deregulatory actions as EO 13771 regulatory actions; and (2) appropriately offset the cost of all final EO 13771 regulatory actions issued. The offset should be consistent with their respective total incremental cost allowance for future fiscal years, and agencies are expected to maintain compliance, to the extent practicable, throughout the year. These requirements exclude those EO 13771 regulatory actions issued during the year for which either law prohibits compliance with EO 13771 or the agency received an exemption from OIRA. When an agency receives a partial exemption from OIRA (*e.g.,* with respect to the timing of EO 13771 deregulatory actions), the requirements should be addressed as soon as practicable. Agencies should plan in advance and leave sufficient time, if necessary, for OIRA to complete its review under EO 12866 or the Paperwork Reduction Act, and for agencies to publish in the *Federal Register* any EO 13771 deregulatory actions needed to comply with EO 13771 before the end of each fiscal year.

### *Q39.   What happens if an agency is not in full compliance with the requirements of EO 13771 at the end of a fiscal year?*

A: If, by the end of a fiscal year, an agency does not finalize at least twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions issued during the fiscal year, or has not met its total incremental cost allowance for that fiscal year, the agency must, within 30 days of the end of the fiscal year, submit for the OMB Director's approval, a plan for coming into full compliance with EO 13771 that addresses each of the following:

   (1) The reasons for, and magnitude of, non-compliance;
   (2) How and when the agency will come into full compliance; and
   (3) Any other relevant information requested by the Director.

This excludes EO 13771 regulatory actions that are exempt or where compliance with EO 13771 is prohibited by law.

16

OMB may recommend that an agency take additional steps to achieve compliance, such as publishing a notice in the *Federal Register* requesting ideas from the public on EO 13771 deregulatory actions to pursue. OMB may also request that agencies post plans approved by the Director.

This guidance is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

17

**From:**          Heidema, Sarah J
**Sent:**          Tue, 30 Oct 2018 12:56:03 -0400
**To:**            Cressey, Laura E
**Subject:**       NSC CAT Policy Update 20181029.pptx
**Attachments:**   NSC CAT Policy Update 20181029.pptx


I've updated 2.2 and 2.4
**Official**
This message is **UNCLASSIFIED** when separated from **SECRET** attachment(s)
Classified By: asfd - sd, Office:sd, Agency:U.S. Department of State
Declassify On: 10/30/2043
Reasons: Derived Per DSCG.

| | |
|---|---|
| **From:** | Hart, Robert L |
| **Sent:** | Fri, 9 Nov 2018 11:32:32 -0500 |
| **To:** | Heidema, Sarah J |
| **Subject:** | TWAR draft |



**Official**
**UNCLASSIFIED**