Message

| | |
|---|---|
| **From**: | Gary Stanley [gstanley@glstrade.com] |
| **Sent**: | 7/29/2018 10:21:30 PM |
| **To**: | Michael F.Miller [MillerMF@state.gov] |
| **Subject**: | Defense and Export-Import Update (July 27, 2018) |

**Dear All,**

**Good Day!**

*Gary Stanley's EC Tip of the Day:* **ITAR § 124.1(a) provides that its requirements regarding authorization of defense servies apply whether or not technical data is to be disclosed or used in the performance of the defense services described in ITAR §120.9(a) (*e.g.*, all the information relied upon by the U.S. person in performing the defense service is in the public domain or is otherwise exempt from ITAR licensing requirements pursuant to ITAR § 125.4). The requirements also apply to the training of any foreign military forces, regular and irregular, in the use of defense articles.**

**Today's Items:**

1. **DDTC Temporarily Excludes Certain Technical Data from USML Category I**
2. **DDTC Posts Public Comments on Proposed Changes to USML Categories I-III**
3. **BIS Seeks Public Comment on Section 232 National Security Investigation of Imports of Uranium**
4. **The United States and France Take Coordinated Action on Global Procurement Network for Syria's Chemical Weapons Program**
5. **State Dept. Continues Designations of al-Shabaab as a Foreign Terrorist Organization**
6. **UK Government's Export Control Joint Unit Issues Notice to Exporters 2018/19 on Launch of Consultation on the National Security and Investment White Paper**
7. **3M Company Agrees to Pay $9.1 Million to Resolve Allegations That it Supplied the United States with Defective Dual-Ended Combat Arms Earplugs**
8. **DoD/DSCA Notifies Congress of Possible FMS to Bahrain of Follow-On Technical Support (FOTS) for the Royal Bahrain Navy Ship SABHA (FFG-90)**
9. **DoD/DSCA Updates Security Assistance Management Manual and Policy Memos**
10. **Commerce/ITA Seeks Participants for Annual U.S. Industry Program at the IAEA General Conference**
11. **WTO News**
12. **U.S. Government Contracting**
13. **U.S. Customs and U.S. Census/AES Updates**
14. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
15. **GAO Reports, Testimony, and Correspondence of Interest**
16. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

17. **Congress to Ease Russia Sanctions amid Clamor for Tougher Measures**
18. **U.S. Technology Sent to Chinese Police Was within Rules, Commerce Department Says**
19. **Mattis Makes New Plea to HASC for Russian Sanctions Relief**
20. **House OKs More Subs, Pumps $250M More into Industrial Base**
21. **The Fate of DISA and Other Org Chart Changes in the New Defense Policy Bill**
22. **Talking Trade with Former BIS Chief Eric Hirschhorn**
23. **US Acts to Release $195M in Suspended Military Aid to Egypt**
24. **Trump, E.U. Announce Deal to Avert Escalation of Trade Tensions**
25. **Trump's Pact With Europe Points to Tactical Shift on 'America First'**
26. **Trump Relents on EU Car Tariffs, as U.S.-China Fight Derails Qualcomm Deal**
27. **Chinese Deals Lose Luster for Officials across the U.S.**
28. **Visa Restrictions for Chinese Students Alarm Academia**
29. **The Morning Risk Report: Security Concerns Quash Sale of German Company**
30. **DoD, Industry Sparring Over New Cyber Rules, Ellen Lord Says**
31. **Air Force to Establish New Rapid Sustainment Office**
32. **Lockheed Tees Up MDC2 Wargame; Sells AI C2 System**
33. **The U.S. Navy's Fighter Woes Are Boosting Boeing's Bottom Line**
34. **Boeing's KC-46 Penalties Now Up to $3.4B Thanks to New $426M Charge**
35. **Airbus CEO Denies Seeking Fighter-Unit Merger with BAE Systems**
36. **Thanks to Inflation, Airbus Takes Major Financial Hit, Again, on Largest Military Program**
37. **Pentagon Hopes JEDI Contract Good for the Force**
38. **The Company Astronaut**
39. **Salient CRGT Wins $34M Task Order to Deliver IT Support to the Defense Technology Security Administration**
40. **Opinion: When the World Opened the Gates of China**

**Upcoming Export Control and Other Trade Compliance Conferences -** *NEW EVENTS ADDED!*

# 1. DDTC Temporarily Excludes Certain Technical Data from USML Category I

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website a notice that consistent ITAR § 126.2, the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List (USML) Category I to exclude the following technical data identified in the Settlement Agreement for

the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (hereinafter "Defense Distributed"): -

- "Published Files," i.e., the files described in paragraph 25 of the Second Amended Complaint in Defense Distributed.

- "Ghost Gunner Files," i.e., the files described in paragraph 36 of the Second Amended Complaint in Defense Distributed.

- "CAD Files," i.e., the files described in paragraph 40 of the Second Amended Complaint in Defense Distributed.

- "Other Files," i.e., the files described in paragraphs 44-45 of the Second Amended Complaint in Defense Distributed, insofar as those files regard items exclusively: (a) in Category I(a) of the USML, as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment. Military Equipment means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

This temporary modification will remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development. Please see the Settlement Agreement and the Second Amended Compliant for additional information. See also this Harvard Law School case analysis.

## 2. DDTC Posts Public Comments on Proposed Changes to USML Categories I-III

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website public comments it has received to the changes it proposed to Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament), and III (ammunition and ordnance) of the U.S. Munitions List (USML) in its proposed rule published at 83 Fed. Reg. 24197 (May 24, 2018).

## 3. BIS Seeks Public Comment on Section 232 National Security Investigation of Imports of Uranium

(83 Fed. Reg. 35204) - The U.S. Department of Commerce's Bureau of Industry and Security has officially announced that the Secretary of Commerce has initiated an investigation to determine the effects on the national security of imports of uranium. This investigation has been initiated under section 232 of the Trade Expansion Act of 1962, as amended. Interested parties are invited to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce's Bureau of Industry and Security. This notice identifies issues on which the Department is especially

WASHSTATEC000003

interested in obtaining the public's views. Interested persons must submit their comments by September 10, 2018.

## 4. The United States and France Take Coordinated Action on Global Procurement Network for Syria's Chemical Weapons Program

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has designated 13 persons pursuant to Executive Order (E.O.) 13382 of June 28, 2005, "Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters." These five entities and eight individuals are allegedly key components of a vast network procuring electronics on behalf of Syria's Scientific Studies and Research Center (SSRC), the agency responsible for the development of Syria's chemical weapons. In a coordinated action earlier this week, the Government of France renewed an asset freeze on 24 entities and individuals from this same procurement network for providing an array of support to the SSRC. As a result of OFAC's action, many of the entities and individuals previously targeted by the French government will now be added to OFAC's Specially Designated Nationals and Blocked Persons List. Consequently, all property and interests in property of those designated today subject to U.S. jurisdiction are blocked, and U.S. persons are generally prohibited from engaging in transactions with them.

## 5. State Dept. Continues Designations of al-Shabaab as a Foreign Terrorist Organization

(83 Fed. Reg. 35307) - Based upon a review of the Administrative Record assembled pursuant to Section 219(a)(4)(C) of the Immigration and Nationality Act, as amended (8 U.S.C. 1189(a)(4)(C)) ("INA"), and in consultation with the Attorney General and the Secretary of the Treasury, Secretary of State Michael Pompeo has concluded that the circumstances that were the basis for the designation of the aforementioned organization as a Foreign Terrorist Organization have not changed in such a manner as to warrant revocation of the designation and that the national security of the United States does not warrant a revocation of the designation.

## 6. UK Government's Export Control Joint Unit Issues Notice to Exporters 2018/19 on Launch of Consultation on the National Security and Investment White Paper

The U.K. Government's Export Control Joint Unit (ECJU) has issued Notice to Exporters 2018/19 regarding the consultation launched on the national security and investment white paper. On 24 July 2018 the government published a white paper, national security and investment: proposed legislative reforms, and launched a public consultation. The white paper sets out how the government will address the risks that can arise from hostile actors acquiring ownership of, or control over, businesses or other entities and assets that have national security implications. It follows the national security and infrastructure investment review green paper published in October 2017. The government has reflected carefully on the feedback provided by a wide variety of stakeholders, including businesses, investors and law firms and a summary of responses is published alongside this white paper. Only a small number of investment activities, mergers and transactions in the UK economy pose a risk to our national security. For the cases that pose a risk to our national security it is vital that the government is able to intervene in order to prevent or mitigate those risks. The white paper sets out:

WASHSTATEC000004

- That the government will encourage parties to submit 'valid notifications' of transactions and other events that may give rise to national security risks

- The ability for the government to 'call in' investments and other events which may raise national security concerns in whichever sector they occur, including those events which have not been notified

- If the 'call-in' power is used, the government will undertake a full national security assessment which can take up to 30 working days, with the option of extending for a further 45 working days, or longer by agreement

- At the end of the full national security assessment, if the government concludes that national security is at risk, it has the power to impose necessary and proportionate remedies - this could include, in rare circumstances, blocking or unwinding a deal

The government has also published a statement of policy intent alongside the white paper. This seeks to provide maximum certainty and clarity to business and investors by setting out how the 'call-in' power is expected to be used. The ECJU welcomes your views on our proposals. Read the white paper and statement of policy intent.

## 7. 3M Company Agrees to Pay $9.1 Million to Resolve Allegations That it Supplied the United States with Defective Dual-Ended Combat Arms Earplugs

The U.S. Department of Justice (DOJ) has announced that 3M Company (3M), headquartered in St. Paul, Minnesota, has agreed to pay $9.1 million to resolve allegations that it knowingly sold the dual-ended Combat Arms Earplugs, Version 2 (CAEv2) to the United States military without disclosing defects that hampered the effectiveness of the hearing protection device. The settlement resolves allegations that 3M violated the False Claims Act by selling or causing to be sold defective earplugs to the Defense Logistics Agency. Specifically, the United States alleged that 3M, and its predecessor, Aearo Technologies, Inc., knew the CAEv2 was too short for proper insertion into users' ears and that the earplugs could loosen imperceptibly and therefore did not perform well for certain individuals. The United States further alleged that 3M did not disclose this design defect to the military. The allegations resolved by the settlement were brought in a lawsuit filed under the qui tam, or whistleblower, provisions of the False Claims Act. The act permits private parties to sue on behalf of the government when they believe that defendants submitted false claims for government funds and to share in any recovery. As part of today's resolution, the whistleblower will receive $1,911,000.

## 8. DoD/DSCA Notifies Congress of Possible FMS to Bahrain of Follow-On Technical Support (FOTS) for the Royal Bahrain Navy Ship SABHA (FFG-90)

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has notified the Congress that the Government of Bahrain has requested to buy items and services in support of Follow-On Technical Support (FOTS) for the Royal Bahrain Navy Ship SABHA (FFG-90), formerly the USS Jack Williams (FFG-24), transferred as Excess Defense Article on September 13, 1996. Also includes engineering, technical, and logistics services, documentation, and modification material for U.S. Navy supplied systems and equipment

and other related elements of logistics and program support. The estimated program value is $70 million. There is no prime contractor involved in this proposed sale. There are no known offset agreements proposed in connection with this potential sale.

## 9. DoD/DSCA Updates Security Assistance Management Manual and Policy Memos

The U.S. Department of Defense's Defense Security Cooperation Agency (DSCA) has made the following updates to its Security Assistance Management Manual (SAMM) and Policy Memorandums:

- DSCA Policy Memo 18-35 Revision of Section 2.8 of Letter of Offer and Acceptance (LOA) Standard Terms and Conditions has been posted.

  In correspondence with Defense Procurement Acquisition Policy's (DPAP) revision of the DFARS, the DSCA 18-35 will amend Standard Terms and Conditions (STC) 2.8 by removing specific reference to the DFARS by clause and referring to the general USG offset policy that "although offset agreements, as defined in the Defense Federal Acquisition Regulation Supplement, are not within the scope of the DoD contracts entered into to fulfill the requirements of this LOA, offsets may be reimbursed through such contracts." STCs will continue to reflect the USG law and policy on offsets and direct the foreign partner to seek information from Industry.

## 10. Commerce/ITA Seeks Participants for Annual U.S. Industry Program at the IAEA General Conference

(83 Fed. Reg. 35612) - The U.S. Department of Commerce's International Trade Administration (ITA), with participation from the U.S. Departments of Energy and State, is organizing the 11th Annual U.S. Industry Program at the International Atomic Energy Agency (IAEA) General Conference, to be held September 16-19, 2018, in Vienna, Austria. The IAEA General Conference is the premier global meeting of civil nuclear policymakers and typically attracts senior officials and industry representatives from all 162 Member States. The U.S. Industry Program is part of the U.S. Department of Commerce's (DOC) Civil Nuclear Trade Initiative, a U.S. Government effort to help U.S. civil nuclear companies identify and capitalize on commercial civil nuclear opportunities around the world. The purpose of the program is to help the U.S. nuclear industry promote its services and technologies to an international audience, including senior energy policymakers from current and emerging markets as well as IAEA staff. Representatives of U.S. companies from across the U.S. civil nuclear supply chain are eligible to participate. In addition, organizations providing related services to the industry, such as universities, research institutions, and U.S. civil nuclear trade associations, are eligible for participation. The mission will help U.S. participants gain market insights, make industry contacts, solidify business strategies, and identify or advance specific projects with the goal of increasing U.S. civil nuclear exports to a wide variety of countries interested in nuclear energy. Participant recruitment will run until August 3, 2018. Applications received after August 3, 2018, will be considered only if space and scheduling permit.

## 11. WTO News

WASHSTATEC000006

- MONITORING REPORT SHOWS INCREASE OF NEW TRADE RESTRICTIONS FROM WTO MEMBERS: WTO members introduced more trade-restrictive measures from mid-October 2017 to mid-May 2018 compared to the previous review period (mid-October 2016 to mid-October 2017), according to the Director-General's mid-year report on trade-related developments presented to members on 25 July at a meeting of the Trade Policy Review Body. While WTO members continued to implement more trade-facilitating than trade-restrictive measures, the value of trade covered by the restrictive measures rose and the value covered by facilitating measures fell. The report draws attention to this shift, and to the fact that it is taking place at a time of heightened trade tensions and associated rhetoric, which should be of concern to the international community.

- KAZAKHSTAN TO HOST WTO'S NEXT MINISTERIAL CONFERENCE: WTO members have accepted Kazakhstan's invitation to host, in Astana, the organization's Twelfth Ministerial Conference (MC12) to be held in 2020. The decision was taken by consensus at today's General Council meeting (26 July 2018) and marks the first time a Ministerial Conference is to be organized in Central Asia.

- WTO MEMBERS TAKE UP DISCIPLINES ON SUBSIDIES TO IUU FISHING AT JULY MEETINGS: WTO members in the Negotiating Group on Rules exchanged views and information on disciplines to prohibit subsidies to illegal, unreported and unregulated (IUU) fishing at their 24-26 July cluster of meetings on fisheries subsidies (the third such cluster this year). Members also discussed how to organize the negotiating work in September-December, with a mix of activities including technical sessions, brainstorming, text-based discussions and time for bilateral meetings among delegations.

## 12. U.S. Government Contracting

- DoD/DSS: OMB Information Collection Submission - Certificate Pertaining to Foreign Interest; SF328 - Deadline for Public Comment: Aug. 27, 2018

- DoD/Navy: Notice of Availability of Government-Owned Inventions; Available for Licensing

## 13. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - CSMS #18-000454 Title: PRODUCTION ACE Protest & CQ Deployment, Thurs July 26, 2018 @0500ET

- U.S. Customs - CSMS #18-000455 Title: AESTIR Appendix C – ISO Country Codes update - Swaziland has been changed to Eswatini

- U.S. Customs - CSMS# 18-000456 - ACE PRODUCTION Scheduled Maintenance, Sat. Jul 28, 2018 @ 2200 to 0200 ET Sunday, Jul 29

- U.S. Customs - CSMS #18-000457 Title: Additional item for Prod ACE Truck Manifest deployment this weekend

- U.S. Customs - CBP to adjust hours at ports of Danville and Metaline Falls

- U.S. Customs - CBP Welcomes a New Federal Inspection Station inaugurated at the Luis Muñoz Marin International Airport

- U.S. Customs - Detroit Trade Day 2018

- U.S. Customs - ICE removes British man convicted in conspiracy to illegally export sensitive technologies to Syria

- U.S. Customs - Section 301 Trade Remedies Frequently Asked Questions

- U.S. Customs - Antidumping and Countervailing Duties (AD/CVD) Update Summer 2018

- U.S. Customs - COAC Quarterly Meeting (Webinar) August 1, 2018 - Washington, DC

- U.S. Customs - August 1 2018 COAC TERC Subcommittee Trade Executive Summary

- U.S. Customs - August 1 2018 COAC Export Subcommittee Trade Executive Summary

- U.S. Customs - August 1 2018 COAC Trusted Trader Subcommittee Trade Executive Summary

- U.S. Customs - August 1 2018 COAC Trade Modernization Trade Executive Summary

- U.S. Customs - Customs Bulletin and Decisions - Vol. 52, July 25, 2018, No. 30

  Index

  General Notices

  U.S. Court of International Trade Slip Opinions

- U.S. Census/Global Reach Blog - U.S. Exports by Metropolitan Area

- U.S. Census - Preliminary: U.S. Imports for Consumption of Steel Products June 2018 - The U.S. Census Bureau has announced that preliminary June steel imports were $2.2 billion (2.2 million metric tons) compared to the preliminary May totals of $2.7 billion (2.6 million metric tons).

- U.S. Census - The Advance International Trade in Goods Deficit Increased in June 2018

## 14. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Aluminum Extrusions From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No

Shipments; 2016-2017

- Commerce/E&C - Aluminum Extrusions From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016

- Commerce/E&C - Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order

- Commerce/E&C - Certain New Pneumatic Off-the-Road Tires From India: Notice of Rescission of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Certain New Pneumatic Off-The-Road Tires From Sri Lanka: Notice of Court Decision Not in Harmony With Final Affirmative Countervailing Duty Determination, Notice of Amended Final Determination and Revocation of Countervailing Duty Order

- Commerce/E&C - Certain Preserved Mushrooms From the People's Republic of China: Rescission of Antidumping Duty Administrative Review; 2017-2018

- Commerce/E&C - Citric Acid and Certain Citrate Salts From Belgium, Colombia and Thailand: Antidumping Duty Orders

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016

- Commerce/E&C - Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Notice of Partial Rescission of Antidumping Duty Administrative Review; 2016-2017

- Commerce/E&C - Drawn Stainless Steel Sinks From the People's Republic of China: Final Results of the Expedited First Sunset Review of the Countervailing Duty Order

- Commerce/E&C - Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016

- Commerce/E&C - Multilayered Wood Flooring From the People's Republic of China: Notice of Court Decision Not in Harmony With the Second Amended Final Determination and Notice of Third Amended Final Determination of the Antidumping Duty Investigation

- Commerce/E&C - Seamless Refined Copper Pipe and Tube From the People's Republic of China: Rescission of Antidumping Duty Administrative Review; 2016- 2017

- Commerce/E&C - Steel Wire Garment Hangers From Taiwan: Rescission of Antidumping Duty Administrative Review; 2016-2017

- USITC - Certain Lithography Machines and Systems and Components Thereof (I): Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public

WASHSTATEC000009

Interest

- USITC - Certain Lithography Machines and Systems and Components Thereof (II): Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

- USITC - Certain Load Supporting Systems, Including Composite Mat Systems, and Components Thereof: Commission Determination Not To Review an Initial Determination Granting a Joint Motion To Terminate the Investigation Based on Consent Orders and a Settlement Agreement; Issuance of Consent Orders; Termination of the Investigation

- USITC - Certain Toner Cartridges and Components Thereof: Commission Determination Not To Review an Initial Determination Amending the Complaint and Notice of Investigation

## 15. GAO Reports, Testimony, and Correspondence of Interest

- HIGH-RISK SERIES: Urgent Actions Are Needed to Address Cybersecurity Challenges Facing the Nation: GAO-18-645T: Published: Jul 25, 2018. Publicly Released: Jul 25, 2018.

- AVIATION SECURITY: Basic Training Program for Transportation Security Officers Would Benefit from Performance Goals and Measures GAO-18-552: Published: Jul 26, 2018. Publicly Released: Jul 26, 2018.

- GAO WatchBlog: Cybersecurity—New Risks and Threats

## 16. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(83 Fed. Reg. 35210) - Agency: U.S. Dept. of Commerce/International Trade Administration (ITA) - Title: Swiss-U.S. Privacy Shield; Invitation for Applications for Inclusion on the Supplemental List of Arbitrators - Agency Form No.: None - Type of Review: Regular submission - Deadline for Public Comment: Sept. 24, 2018

(83 Fed. Reg. 35674) - Agency: U.S. Dept. of Homeland Security/U.S. Customs and Border Protection (CBP) - Title: Visa Waiver Program Carrier Agreement - Agency Form No.: CBP Form I-775 - Type of Review: Extension (without change) - Deadline for Public Comment: Sept. 25, 2018

## Other Headlines

## 17. Congress to Ease Russia Sanctions amid Clamor for Tougher Measures

Washington Post.com, July 24 - Bowing to pressure from the Trump administration, lawmakers unveiled a sweeping defense policy bill Tuesday that would give the president greater power to forgo certain Russia-related penalties. The move to scale back sanctions

WASHSTATEC000010

stands in sharp contrast to mounting bipartisan fervor in the Senate to get tougher on Russia after a summit between President Trump and Russian President Vladimir Putin that was roundly decried as an embarrassment and a missed opportunity to deal harshly with the Kremlin over election interference. Lawmakers have unleashed a flurry of bills, resolutions and other initiatives to try to force Trump to step up penalties against Russia. There is also pressure to take steps before Putin can make good on an invitation from Trump to visit the United States this fall — though at this juncture, the State Department is unaware of any formal invitation, and Russian authorities say they are making no formal preparations for a second summit.

## 18. U.S. Technology Sent to Chinese Police Was within Rules, Commerce Department Says

Wall Street Journal.com, July 26 - The U.S. Commerce Department deflected a Congressional committee's concerns that it is doing an insufficient job stopping U.S.-made technology from playing a role in oppressive policing in China. The department, in a letter from Commerce Secretary Wilbur Ross, also said DNA sequencers used by Chinese police and made by Waltham, Mass.-based Thermo Fisher Scientific Inc. were not subject to U.S. licensing rules that control the sale of crime-busting equipment to foreign countries. The devices were described in a Wall Street Journal article last December that highlighted the ways that Chinese police gather DNA samples from many citizens who aren't criminal suspects, sometimes resorting to trickery. The Journal story followed a report by Human Rights Watch that identified Thermo Fisher as a supplier of some DNA sequencers to police in China's restive Xinjiang province. "The items are low-technology products that are available from worldwide sources, including indigenous Chinese sources, and have numerous legitimate end-uses," including in education, medical research and forensics, according to Mr. Ross's letter, which is dated June 11 and has not been previously reported.

## 19. Mattis Makes New Plea to HASC for Russian Sanctions Relief

Breaking Defense.com, July 25 - Defense Secretary James Mattis fired off a new letter to House Armed Services leadership on Tuesday, asking lawmakers again to vote in favor of waivers for certain countries Washington is trying to sway into its orbit, but who continue to do business with Russian defense firms. The letter was delivered to HASC chairman Rep. Mac Thornberry and Ranking Member Rep. Adam Smith on Tuesday, a day before the full House was set to vote on the 2019 National Defense Authorization Act containing language broadly supporting the waivers. In the missive (which can be found here) obtained by Breaking Defense, Mattis asked for the Secretary of State to be given the ability to waive sanctions so the United States could "sell military equipment and enable countries pulling away from the Russian orbit." He wrote that the waivers "would not benefit Russia; it will only benefit the U.S. and countries willing to pursue a security relationship with us."

## 20. House OKs More Subs, Pumps $250M More into Industrial Base

Breaking Defense.com, July 26 - In the drama-free weeks leading up to Thursday's overwhelming passage of the compromise $716 billion defense policy bill by the House of Representatives, lawmakers sent a pretty clear signal to the White House: we want more submarines. With concerns rising over the growing prowess of Russian and Chinese undersea capabilities, and standoff air and sea defenses shutting off access to the littoral for large surface ships and many aircraft, both lawmakers and the Navy have said that they'll need more subs — and more quickly — than previous plans allocated. . . . The bill also

authorizes about $237 million more than the White House requested –$3.2 billion — to continue work on new Columbia-class submarines. It also plumps down an additional $250 million to strengthen the submarine industrial base as it scrambles to replace the current Ohio-class subs. That extra money for the base is meant to ensure that smaller second- and third-tier suppliers can meet increased production demands for both the Columbia and Virginia class submarine programs.

## 21. The Fate of DISA and Other Org Chart Changes in the New Defense Policy Bill

DefenseNews.com, July 25 - The Defense Information Systems Agency and other so-called "fourth estate" agencies were spared the ax, but a potpourri of Pentagon organizational changes have made it into this year's massive, must-pass defense authorization bill. The Senate and House came together Monday on a $716 billion bill that softened House-passed language to eliminate DISA and other agencies in the name of efficiency. But what survived could drive future efforts to slash Pentagon bureaucracy: a series of high-stakes reviews by DoD's chief management officer aimed at cutting costs DoD-wide. The report for the sweeping 2019 National Defense Authorization Act is expected to come to a vote in the House this week and the Senate next week. The annual must-pass bill covers military hardware, personnel and a wide swath of hot-button national security issues. Earlier drafts of the bill, spearheaded by House Armed Services Committee Chairman Mac Thornberry, targeted DISA and six other offices by name. But the conference report eliminates the direct mention of the agency — which oversees a huge swath of DoD networks and IT, has a total budget of nearly $10 billion and employs more than 12,000 people.

## 22. Talking Trade with Former BIS Chief Eric Hirschhorn

American Shipper.com, July 10 - From April 2, 2010 to Jan. 20, 2017, Eric L. Hirschhorn served as undersecretary of commerce for industry and security and headed the U.S. Commerce Department's Bureau of Industry and Security (BIS), a federal agency with responsibility for ensuring that the country's most sensitive commercial technologies do not end up in the hands of adversary nations or terrorist organizations for potential misuse. However, his work in both the private and public sectors within the area of U.S. export control regulations spans four decades and seven presidential administrations. The Adam Smith Project recently sat down with Hirschhorn, who remains active in various Washington, D.C.-based legal and international affairs activities, to discuss the recent evolution of the country's export controls and where he believes they're headed.

## 23. US Acts to Release $195M in Suspended Military Aid to Egypt

DefenseNews.com, July 25 - The United States has decided to release $195 million in military aid to Egypt after withholding the assistance last year over human rights concerns, the State Department announced Wednesday. The department said the decision follows steps Egypt has taken in response to specific U.S. concerns, and it cited stronger U.S.-Egypt ties in security and counterterrorism while also acknowledging remaining areas of concern about human rights and governance. Independent monitoring groups have documented continued human rights abuses in Egypt over the past year. The New York-based Human Rights Watch describes the situation in Egypt as the "worst human rights crisis in the country in decades." Egyptian police, the group said, systematically use "torture, arbitrary arrests and enforced disappearances to silence political dissent," according to a recent assessment. Amnesty International reported an escalation in Egypt's crackdown on civil

society and pointed to routine "grossly unfair" trials of government critics, peaceful protesters, journalists and human rights defenders.

## 24. Trump, E.U. Announce Deal to Avert Escalation of Trade Tensions

Washington Post.com, July 25 - The United States and the European Union stepped back from the brink of an escalating trade war Wednesday, with the unexpected announcement of a process to ease tensions and avoid further tariffs. In an appearance in the White House Rose Garden, President Trump and European Commission President Jean-Claude Juncker said they had agreed to hold off on proposed car tariffs, and work to resolve their dispute on steel and aluminum tariffs, while pursuing a bilateral trade deal. "While we are working on this, we will not go against the spirit of this agreement unless either party terminates the negotiation," Trump said. "We also will resolve the steel and aluminum tariff issues, and we will resolve retaliatory tariffs." While Washington and Brussels pursue those aims, the E.U. will import more U.S. soybeans and liquefied natural gas, or LNG, although Juncker suggested that that agreement came with conditions.

## 25. Trump's Pact With Europe Points to Tactical Shift on 'America First'

Wall Street Journal.com, July 26 - President Trump's truce with the European Union signals a tactical shift in his "America First" trade policy, as he scrambles to show successes after an intensifying revolt from Republican lawmakers and American businesses. But beyond a shift in rhetoric, the concrete results so far remain minimal. Europeans touted Wednesday's joint statement as reaffirming a trans-Atlantic free-trade relationship that Mr. Trump had openly questioned, without forcing them to make concessions to Washington's demands. Mr. Trump and European Commission President Jean-Claude Juncker, in their hastily arranged White House ceremony, pledged to work toward negotiating a broad reduction in tariffs on industrial goods and to cooperate against unfair Chinese trade practices. The U.S. agreed not to impose tariffs on European autos as long as negotiations are ongoing, while the EU also said it would try to boost purchases of U.S. liquefied natural gas and soybeans.

## 26. Trump Relents on EU Car Tariffs, as U.S.-China Fight Derails Qualcomm Deal

Reuters.com, July 25 - In what the EU chief called a "major concession," U.S. President Donald Trump agreed on Wednesday to refrain from imposing car tariffs while the two sides launch negotiations to cut other trade barriers, easing the threat of a transatlantic trade war. After a meeting at the White House, Trump and European Commission President Jean-Claude Juncker said the talks would also seek to "resolve" U.S. tariffs on steel and aluminum and Europe's retaliatory duties - marking a step back from Trump's signature import protections for American metals producers. The breakthrough came as the bitter trade dispute between the United States and China appeared to claim a major casualty, with China not approving U.S. chipmaker Qualcomm Inc's takeover of NXP Semiconductors, likely shutting the door on the $44 billion deal. Qualcomm needed Beijing's okay because China accounts for nearly two-thirds of its revenue, but a deadline at midday on Thursday in Asia passed without word from China's regulator. Qualcomm had said on Wednesday it was dropping the bid.

WASHSTATEC000013

## 27. Chinese Deals Lose Luster for Officials across the U.S.

Wall Street Journal.com, July 25 - Some states and cities in the U.S. are growing wary of Chinese investment after a deal boom that raised national-security concerns and failed to deliver promised jobs. Chinese developer Tan Zhixing rolled into rural Tyler, Texas, last September with a plan to spend $1.6 billion on a housing complex that promised to bring thousands of Chinese students to attend local schools and create more than 1,000 jobs for the surrounding county. But local officials and their constituents are now raising concerns— including potential security risks, doubts about Mr. Tan's ability to fund the project, and the cost to taxpayers of new infrastructure. City officials haven't approved necessary zoning changes, and it's unclear if Mr. Tan will try to move forward. A spokeswoman for Mr. Tan didn't respond to requests for comment. Critics have singled out Chinese deals as national-security risks on the grounds the companies may be directed and subsidized by the government of China, an economic and military rival.

## 28. Visa Restrictions for Chinese Students Alarm Academia

New York Times.com, July 25 - President Trump's confrontation with China is beginning to ripple through American academic and research institutions, as a crackdown on visas for certain Chinese citizens has left the higher education community wondering how it will adapt to the administration's effort to stop intellectual property theft and slow China's push for technological supremacy. Educators and academic groups fear that the additional scrutiny could hinder scientific innovation, alienate talented applicants or intensify aggressions toward Chinese scientists already in the country. Academics are already wrestling with the increased attention. At an aerospace conference in Georgia last month, Ella Atkins, a University of Michigan professor, recalled a colleague approaching her with a dilemma. The colleague, an assistant professor at another university, had recently led and submitted a research proposal for a federal grant. But he worried that because he was Chinese, the judges would be biased against his team.

## 29. The Morning Risk Report: Security Concerns Quash Sale of German Company

Wall Street Journal.com, July 27 - The German government has decided to ban for the first time the sale of a German company to a Chinese suitor on security grounds, an official from the German ruling coalition parties said Thursday. The decision to block the sale of machine tool company Leifeld Metal Spinning AG to a Chinese investor came after an extensive review that led the government to the conclusion such a transaction would be a "risk to public order and safety," WSJ's Andrea Thomas reports, citing the official, who declined to be named. The move illustrates how concerned Germany is about growing appetite for German technology, which analysts say is a key factor behind the strength of Germany's export-reliant economy. The veto was made possible after the German government adopted legislation last year to make it easier to veto takeovers of strategically important companies if the investment puts the public order or safety at risk. The move effectively—though not nominally—targets China's attempt to acquire key technology. The new rules apply mainly to targets in the defense sector and developers of critical software powering financial and telecommunications services, public transport or power grids.

## 30. DoD, Industry Sparring Over New Cyber Rules, Ellen Lord Says

Breaking Defense.com, July 27 - The Defense Department is working on a "do not buy" list of software vendors who may have been compromised by foreign governments, but is still in the early stages of formulating a plan to ensure the defense industry follows suit. Ellen Lord, the Pentagon's chief weapons buyer, told a small group of reporters here Friday morning that her office is trying to put rules in place to protect against buying "software that has Russian or Chinese provenance, for instance, and quite often that's difficult to tell at first glance because of holding companies," that move the software through the open market. The concern over compromised technology has been heightened after a series of high-profile hacking incidents where U.S. shipbuilding plans and other programs have been compromised by Chinese hackers. Pentagon leadership is especially sensitive to the issue as they rush to keep ahead of Chinese and Russian military modernization programs in areas like hypersonics, satellites, drones, and submarine warfare. Last month, the Pentagon's deputy secretary for intelligence, Kari Bingen, told the House Armed Services Committee that the military needs to "establish security as a fourth pillar in defense acquisition," joining cost, schedule, and performance, while making security "a major factor in competitiveness for U.S. government business."

## 31. Air Force to Establish New Rapid Sustainment Office

National Defense Magazine.org, July 25 - The Air Force is setting up a new Rapid Sustainment Office to help keep aircraft flying, the service's top official announced July 25. Seventy percent of the lifecycle cost of an aerial platform stems from maintenance requirements, Air Force Secretary Heather Wilson noted during remarks at an event in Washington, D.C., hosted by the Washington Post. The Rapid Sustainment Office will "drive down the cost" of replacement parts and mitigate bottlenecks in the supply chain, she said. "There are new technologies in manufacturing that mean [that] we don't have to go out to a supplier, some of whom are no longer in business," she said. "Just in the first quarter of this year, we had 10,000 requests for parts … [where] there wasn't even a single bidder because the company is no longer in business [or] there's no business case for one part," she added. To illustrate her point, Wilson pointed to a trim wheel for the rudder of a KC-135 aerial refueling tanker. "It's a vital piece of equipment," she said. "The company that makes them is no longer in business, [so] we reversed engineered this and 3D-printed it."

## 32. Lockheed Tees Up MDC2 Wargame; Sells AI C2 System

Breaking Defense.com, July 24 - From the first, Lockheed Martin has been out front discussing Multi-Domain Operations. The company has set up something like an Integrated Product Team to coordinate work across the world's biggest defense company and bring the right products together for the US military as it tries to build a global network of sensors, communications devices and data fusion engines — all of it made useful by Artificial Intelligences made useful by machine learning. The man leading those efforts, Rob Smith, sat down with me at the air show. The video includes the first few minutes of our conversation. The rest you need to read! Perhaps the biggest news is that a new command and control system Lockheed is selling to an unnamed international customer includes automated "enemy intent analysis." So, the Diamond Shield system takes the enormous amount of data gathered by the system, uses Artificial Intelligence to analyze it and tells commanders what it thinks the enemy will do. It also, Smith told me, automatically generates air task orders for pilots and bombers to use.

## 33. The U.S. Navy's Fighter Woes Are Boosting Boeing's Bottom Line

DefenseNews.com, July 27 - The Navy's ongoing aviation readiness crisis has been a boon for Boeing as the Navy looks to make its Super Hornet fleet healthy again after years of hard use in the war on terror. Boeing's Super Hornets are helping push its Defense operation's sales in a positive direction, contributing to a more than 10 percent year-to-date sales growth, according to analysts and company executives speaking on a quarterly earnings call this week. A total of 46 new Super Hornets – 18 for the U.S. Navy and 28 for Kuwait – are leading the way, but the company is also making a lot of money on the Navy's quest to modernize and extend the life of its workhorse jets. All told, the Navy is planning to modernize all its current jets and buy dozens more in its quest to dig out of a severe readiness hole. Boeing Defense has seen an 11 percent year-over-year sales boost so far this year, said defense analyst Jim McAleese, and company executives said the cash flow from the Navy's F/A-18 recapitalization isn't slackening any time soon.

## 34. Boeing's KC-46 Penalties Now Up to $3.4B Thanks to New $426M Charge

DefenseNews.com, July 26 - nother financial quarter meant another financial hit for Boeing, which disclosed $426 million in cost overruns to the KC-46 tanker program during an earnings call Wednesday. The newest charge brings Boeing up to $3.4 billion in pretax overruns on the program, and — due to its fixed-price contract with the U.S. Air Force — the company is required to foot the bill. The price growth was attributed to delays in the certification process as well as "higher estimated costs" for incorporating needed modifications to six flight test and two early-build aircraft. After tax, the charges come down to about $334 million, said Boeing CEO Dennis Muilenburg during the July 25 earnings call. "We continue to make steady progress towards final certification for the KC-46 tanker and recently completed all flight tests required to deliver the first aircraft, which is expected to be in October of this year, as now agreed upon with the U.S. Air Force," he said. "This is a significant milestone for us and our customer, representing the culmination of three years of testing and over 3,300 flight hours." Now that the flight testing needed for first delivery is complete and the final configuration of each KC-46 has been defined, Boeing can move ahead on wrapping up the manufacture of the first eight aircraft, Muilenburg said.

## 35. Airbus CEO Denies Seeking Fighter-Unit Merger with BAE Systems

Reuters.com, July 26 - Airbus Chief Executive Tom Enders sought on Thursday to clarify recent comments about fighter consolidation in Europe, saying he did not see a corporate merger of the combat jet activities of Airbus, BAE Systems or others any time soon. Enders, who was quoted earlier this week as raising the prospect of a merger, told reporters in an earnings conference call that he had been talking instead about the need for European nations to co-operate on competing fighter projects. "Of course, I was not suggesting that we should merge the military aircraft activities of BAE, Airbus and whoever else rightaway," said Enders, who had failed to win political support for a full merger of Airbus and BAE in 2012. "What I was suggesting was that it makes a lot of sense, as we have two projects in Europe - a Franco-German and a British-led project - that politicians as well as industrialists try to converge those, and that there is time to do that because the developments are still some years away." Enders had been quoted in the Sunday Times as saying he was open to the idea of a merger of his firm's jet fighter business with that of BAE Systems.

## 36. Thanks to Inflation, Airbus Takes Major Financial Hit, Again, on

## Largest Military Program

DefenseNews.com, July 26 - Airbus took a further financial hit on the A400M military airlifter program, booking €98 million (U.S. $115 million) of provisions in results for teh first half the year. The hit mainly stems from price escalation, the company said in a statement on the first-half results, reported July 26. For the A400M, Airbus saw price increases in labor and equipment above those agreed in the production contract. Those provisions add to previous provisions totaling €7.2 billion — all thank to this reality, stated by Sash Tusa, an analyst with an equity research firm, Agency Partners: "Costs in the aeronautical industry escalate, but Airbus has not been able to reclaim these under the current situation. In the U.S. there are producer price indices for the aeronautics sector, but the A400M reflects price increases in the euro zone. Airbus carries a heavy burden of financial risk under the present contract, even as the company adds capabilities to the aircraft and continues talks with the core seven client nations for easing the production contract.

## 37. Pentagon Hopes JEDI Contract Good for the Force

Breaking Defense.com, July 26 - The JEDI cloud computing contract may be one of the most controversial deals the Pentagon hasn't even awarded. Worth up to $10 billion over a decade, the Pentagon's attempt to build its first true enterprise-wide cloud has sparked charges that the deal is designed to go straight to Amazon, who already supplies the CIA with its cloud services. The RFP, approved by Ellen Lord, the head of Pentagon acquisition on July 19, includes an initial two-year base, two consecutive three-year options and a final two-year option. Those first two years are designed to test the system and make sure it meets security and other operational standards. In a clear signal to companies who've been complaining that the deal looked cooked to serve up Amazon, Lord's approval includes this sentence: "The contract will be awarded pursuant to full and open competition." It seems pretty clear that the Pentagon is issuing this first contract to test cloud service and figure out how the services use them. Lt. Gen. VeraLinn "Dash" Jamieson, head of Air Force ISR, said this morning that she doesn't want her service to depend on one cloud provider in the long run. "If I have a multi-cloud, I've given him (the enemy) a targeting problem," she said.

## 38. The Company Astronaut

Washington Post.com, July 24 - He still looks every bit the NASA astronaut he once was. Same chest-out posture. Same Top Gun instincts. Same American flag on the left shoulder of his flight suit. Chris Ferguson even has a call sign, "Fergy." There is one small detail that sets Ferguson apart from the NASA astronauts he is training alongside. Where they have the space agency's red-white-and-blue logo on their spacesuits, he wears Boeing's corporate insignia — a small accessory that symbolizes what the space agency hopes is a new era in space travel. Ferguson retired from NASA after serving as the commander of the last space shuttle mission in 2011. Today, he's a corporate astronaut who is hoping to make history as the first private citizen to launch to orbit on a commercially operated rocket. As a test pilot of the inaugural flight of Boeing's Starliner spacecraft, he would serve alongside NASA's astronauts. But NASA hopes his presence on the mission to the International Space Station augurs a long-awaited next chapter in America's human spaceflight program, one where commercial ventures have ended the government's long-held monopoly in space with the hope of making it accessible to civilians.

WASHSTATEC000017

## 39. Salient CRGT Wins $34M Task Order to Deliver IT Support to the Defense Technology Security Administration

PR Newswire.com, July 25 - Salient CRGT, Inc. was awarded a new task order under its CIO-SP3 contract vehicle to provide enterprise IT support to the Defense Technology Security Administration (DTSA). This 5-year (1-year base, 4-year options) task order has an anticipated ceiling of $34.5 million. Salient CRGT has been supporting the Defense Technology Security Administration (DTSA) Security Policy Automation Systems since 1980. This task order also supports USXPORTS, an interagency program to support the Department of Defense's (DoD) Presidential Initiative for Export Control Reform to reduce license processing times by providing more flexibility and automation in staffing across multiple agencies. Team Salient CRGT will provide software development, project management, and operations and maintenance support to the DTSA Security Policy Automation Network (SPAN) and the USXPORTS interagency program. The team will streamline the current USXPORTS system through enhancements to best meet the business needs for the interagency Export Control Adjudication processes.

## 40. Opinion: When the World Opened the Gates of China

Wall Street Journal.com, July 27 - With a congressional vote looming in the spring of 2000, President Bill Clinton mustered his best arguments for why lawmakers should approve his proposed deal for China to join the World Trade Organization. Adding China would link Beijing to Western economies and reduce the government's ability to control its vast population, he said in a speech that March at Johns Hopkins's School of Advanced International Studies. "By joining the WTO, China is not simply agreeing to import more of our products, it is agreeing to import one of democracy's most cherished values, economic freedom," Mr. Clinton said. "When individuals have the power not just to dream, but to realize their dreams, they will demand a greater say." Mr. Clinton's idealistic rhetoric played well among most of Washington's elites, but a trade lawyer often dismissed as a protectionist, Robert Lighthizer, was skeptical. As he had warned in a New York Times op-ed a few years earlier, if admitted to the WTO, mercantilist China would become a "dominant" trading nation. "Virtually no manufacturing job in [the U.S.] will be safe," he wrote. Mr. Lighthizer is now the U.S. Trade Representative, President Donald Trump's chief negotiator on global trade.

## Upcoming Export Control and Other Trade Compliance Conferences - *NEW EVENTS ADDED!*

**July 30–31 - National Customs Brokers & Forwarders Association of America, Inc. - GTEC - Global Trade Educational Conference 2018 - Dallas - Hilton Dallas Lincoln Center**

**Aug. 14–15 - U.S. Dept. of Homeland Security/U.S. Customs and Border Protection (CBP) - 2018 Trade Symposium - Atlanta - Marriott Marquis Hotel**

**Aug. 14–15 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) and Professional Association of Exporters and Importers - Complying with U.S. Export Controls - Milpitas, California - Crowne Plaza Hotel, 777 Bellew Dr.**

WASHSTATEC000018

**Aug. 16 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) and Professional Association of Exporters and Importers - Encryption Controls - Milpitas, California - Crowne Plaza Hotel, 777 Bellew Dr.**

**Sept. 5 - IDEEA, Inc. - ComDef 2018 - Washington, DC - National Press Club -** *Gary Stanley, Editor of Defense and Export-Import Update, will again moderate the panel "Export Control Update" at this annual conference for the defense industry.*

**Sept. 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) - Complying with U.S. Export Controls - Smithfield, Rhode Island - Bryant University, 1150 Douglas Pike**

**Sept. 13-17 - International Compliance Professionals Association (ICPA) -2018 ICPA@SEA - Galveston, TX to Cozumel**

**Sept. 19-20 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & Southern California District Export Council - Complying with U.S. Export Controls, LA 2018 - Los Angeles - Westin Los Angeles Airport Hotel**

**Sept. 19-20 - SMi Group - Defence Exports 2018 - Rome - Crowne Plaza Rome St. Peter's Hotel & Spa -** *Gary Stanley, Editor of Defense and Export-Import Update, is proud to be once again chairing this event and conducting a related Sept. 18 workshop on "Jurisdiction, Classification, and Licensing: How to Police Your U.S. Suppliers"*

**Sept. 25-26 - American Conference Institute - 11th West Coast Conference on FCPA Enforcement and Compliance - San Francisco - Marines' Memorial Club and Hotel**

**Sept. 25-26 - American Conference Institute - 4th Canadian Forum on Global Economic Sanctions Compliance & Enforcement - Toronto**

*NEW* **- Sept. 28 - Society for International Affairs - 2018 Fall Golf Outing - Woodbridge, Virginia - Old Hickory Golf Club**

**Oct. 1 - Chatham House (The Royal Institute of International Affairs) - Illicit Financial Flows 2018 - London - 10 St James's Square London SW1Y 4LE**

**Oct. 16-18 - Partnerships International, inc. - "Partnering for Compliance™" West 2018 - Fort Worth - Dallas-Fort Worth Marriott South Airport Hotel**

**Oct. 21-23 - International Compliance Professionals Association (ICPA) - 2018 ICPA Fall Conference - Grapevine, TX - Embassy Suites DFW Airport North**

*NEW* **- Oct. 22-23 - Society for International Affairs - 2018 Fall Advanced Conference - Arlington, Virginia - Crystal Gateway Marriott Hotel**

**Oct. 30 - American Conference Institute - 4th Asia Pacific Economic Sanctions Compliance and Enforcement - Singapore - Marriott Singapore Tang Plaza Hotel**

**Oct. 31 - Nov. 1 - American Conference Institute - 7th Asia Pacific Summit on Anti-Corruption Compliance and Risk Management - Singapore - Marriott Singapore Tang Plaza Hotel**

WASHSTATEC000019

**Nov. 8-9 – International Compliance Professionals Association (ICPA) – 2018 Annual China Conference – Shanghai – Four Seasons Hotel**

**Nov. 27-30 – American Conference Institute – 35th International Conference on the Foreign Corrupt Practices Act – Washington, DC – Gaylord Natonal Resort & Convention Center**

*NEW* **– Dec. 7 – Society for International Affairs – 2018 Holiday Party – Washington, DC – Nationals Park, 1500 South Capitol St., S.E.**

*NEW* **– March 4-6 – Society for International Affairs – 2019 Winter Back to Basics Conference – Savannah, Georgia – Savannah Marriott Riverfront Hotel**

*NEW* **– March 24-27 – International Compliance Professionals Association (ICPA) – 2019 ICPA Annual Conference – Orlando, Florida – Disney Coronado Springs Resort**

*NEW* **– May 15-17 – International Compliance Professionals Association (ICPA) – 2019 ICPA Canada Conference – Toronto – Hyatt Regency Toronto Hotel**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. +1 (202) 686-4854
Fax +1 (202) 686-2624
Mobile +1 (202) 352-3059
E-mail gstanley@glstrade.com

**Message**

| | |
|---|---|
| **From:** | Monjay, Robert [MonjayR@state.gov] |
| **Sent:** | 7/30/2018 5:00:16 PM |
| **To:** | Timothy Mooney [Timothy.Mooney@bis.doc.gov] |
| **CC:** | Heidema, Sarah J [HeidemaSJ@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **Subject:** | RE: Comments on Cat I-III rule. How are you guys coming on your comments? |
| **Attachments:** | Public Comments for Interagency Discussion.pdf |

Tim,

Thanks
Rob

**Official - SBU**
UNCLASSIFIED

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Monday, July 30, 2018 9:42 AM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** Comments on Cat I-III rule. How are you guys coming on your comments?

Hi Rob,



Thanks,
Tim

WASHSTATEC000022

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-944e-n1fc
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-2430
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Aaron Karp
**Address:**
   BAL 7006
   Old Dominion University
   Norfolk,  VA,  23529
**Email:** akarp@odu.edu
**Phone:** 17576835700

## General Comment

The proposed ITAR revision for firearms and ammunition promises little, and risks much. As an analyst of the global arms trade and weapons proliferation for thirty years, I recognize the transformative power of regulatory reform. But this is something else. The proposed revisions promise short-term benefits, which seem unlikely to amount to much in an already competitive global market. That makes this deregulation for the sake of deregulation itself. Meanwhile, the change unleashes three forces certain to accelerate long turn American industrial decline and loss of influence over global consequences.

First, they show that the United States no longer will set global normative standards for all form of arms transfers and non-proliferation. Previously the United States Government has shown it will not further tighten restrictions. As the first outright relaxation of oversight standards in arms exports in over fifty years, the change marks a switch in policy dating from the Kennedy Administration.

Second, as the dominant player in global small arms trade, the United States has the most to lose from further loosening. As other countries emulate Americas relaxation of restrictions, not only will there be more firearms reaching more hotspots, but we can be certain the United States will see its share of a more competitive market decline. Other manufacturing countries, with lower wages and more aggressive export subsidies, are more likely to reap the seeds sown here.

Third, the change marks a fundamental shift in the nature of arms export oversight. By reducing the role of the US Government, it leaves regulation exclusively to the recipient government. This shifts the burden

WASHSTATEC000023

of proof in international human rights and state oppression, from outside powers with no direct interest in the outcome, to the recipient governments, governments that are often guilty of using imported weapons in appalling or frightful ways, ways that would be completely illegal in the United States.

WASHSTATEC000024

**From:** Josh Rowe
**To:** DDTCPublicComments
**Subject:** ITAR Amendment – Categories I, II, and III
**Date:** Friday, May 18, 2018 6:15:24 PM

To whom it may concern,

 I would like to submit my opinion concerning the proposed regulatory changes that would facilitate the move of select firearms and related items from the purview of the DDTC/ITAR to the Department of Commerce. I fully support the proposed changes although I do believe they should go further. In my opinion, there is no reason for a business to register with DDTC as a manufacturer of military goods at all unless said business is actually a) actively doing business with a military entity or b) in the business of, and actively engaged in, import and export activities.

 The purpose of the ITAR is to allow the DDTC to limit the export of proprietary or sensitive military technologies and to establish a chain of custody for such information and products. The purpose of requiring registration of certain companies is to have a ready listing of those businesses engaged in the manufacture of goods whose likely end user is a military or other foreign customer whom DDTC/DoS finds qualified to possess such items. While there is no doubt having the ability to track these items is of the utmost importance to our national security, the overwhelming majority of licensed firearms manufacturers in the US do not, and likely will never produce a single item for export. Should a foreign customer become interested in acquiring an item, an export permit from DoS would be needed regardless of registration status and I see no reason why registration could not be completed on an as-needed basis. Requiring manufacturers of even limited types of firearms to pay the more than $2k per year tax (registration fee) simply for the privilege of being on a list of companies that may possibly make a product that might at some point be of interest to a military or foreign entity is absurd. Moreover, there is already a full listing of every Federal Firearms Licensee (FFL) posted and available, for free, on the BATF website; a clear duplication of government services. In short, I completely support the proposed changes and very much hope that even more progress can be made to limit the needless expense of maintaining a duplicate registration for both the government and the businesses in question.

 As a concerned US citizen and a registered voter in the state of Pennsylvania, I do hope sensibility prevails and that we, as a Nation, continue toward a smaller, more efficient government. Thank you for your time.

Regards,

Joshua D. Rowe, Gunsmith

Allegheny Arms & Gun Works
http://alleghenyarms.com
412-409-2925

WASHSTATEC000026

| From: | Americans Against Gun Violence |
| To: | DDTCPublicComments |
| Subject: | ITAR Amendment—Categories I, II, and III. |
| Date: | Monday, July 9, 2018 11:32:48 AM |

Dear State Department:

Americans Against Gun Violence opposes the transfer of oversight for regulation of firearms exports from the State Department to the Commerce Department, as proposed by the Trump Administration in the ITAR amendment, categories I, II, and III. The new proposed changes would have numerous adverse effects, including, but not limited to, the following:

- Reclassifies semi-automatic assault rifles as "non-military", despite their use by U.S. troops, their use by state and non-state groups in armed conflicts, and their prohibition for civilian possession in many countries.
- · Eliminates Congressional oversight for important gun export deals.
- · Transfers the cost of processing licenses from gun manufacturers to taxpayers.
- · Removes statutory license requirements for brokers, increasing risk of trafficking.
- · Reduces or eliminates end-use controls, such as State Dept's Blue Lantern program, and by eliminating registration of firearms exporters, a requirement since the 1940s.
- · Enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.
- · The Commerce Department does not have the resources to enforce export controls, even now.
- · Reduces transparency and reporting on gun exports.
- · Transfers gun export licensing from agency with mission to promote stability, conflict reduction, and human rights, to an agency with mission to promote trade.
- Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to *more controls, not less*.

The ITAR amendments proposed by the Trump Administration are clearly an effort to boost lagging domestic gun sales without regard to the safety of civilians in other countries. The epidemic of gun violence in the United States is a national disgrace. We should not be in the business of exporting this epidemic abroad.

Yours truly,

Bill Durston, MD

President, Americans Against Gun Violence

WASHSTATEC000027

(916) 668-4160 / (888) 286-8122

WASHSTATEC000028



DATE: June 14, 2018

TO:    Directorate of Defense Trade Controls
       U.S. Department of State
       DDTCPublicComments@state.gov

       and

       Regulatory Policy Division
       Bureau of Industry and Security
       U.S. Department of Commerce
       Room 2099B
       14th Street and Pennsylvania Avenue NW
       Washington, DC 20230

FROM: Adotei Akwei, Amnesty International USA, Washington DC

I am writing on behalf of Amnesty International-USA to comment on proposed changes to the *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* issued by the Department of State and proposed regulations for the *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, both of which were published in the Federal Register on May 24, 2018.

As a global civil society organization focused on the promotion and protection of human rights, Amnesty International does not oppose the arms trade per se but calls for strong legally-binding controls to prevent arms being used for serious violations of international human rights and humanitarian law.  We do document

WASHSTATEC000029

the human rights impact of the irresponsible arms trade, raising concerns or calling for specific transfers that pose significant human rights risks to be halted.

Our comments and questions about the proposed changes to International Traffic in Arms Regulations and the Export Administration Regulations, thus, are all conveyed with potential human rights consequences in mind.  In particular, we are concerned that some of the proposed changes weaken existing controls on transfers, increasing the risk that irresponsible brokers of small arms and light weapons could evade regulation, and arms will be diverted to states or non-state actors with poor human rights records.  There is further risk of undermining US laws restricting transfers to foreign military units that have committed gross violations of human rights. Amnesty International has for many years called attention to the risks associated with untrammeled export of small arms and light weapons around the world. These arms have been associated with the deployment of child soldiers and the rise of insurgent groups.  They are easier to divert than larger weapons and often end up in the illicit market.

The proposed changes to Categories I-III of the ITAR introduced as part of the Export Control Reform Initiative would transfer some specific and completely operable military-style semi-automatic weapons from the USML to the CCL and thereby affect some statutory controls on what are now considered defense articles.  We do not believe that the line drawn between automatic and semi-automatic is as clear as the proposed regulations would suggest, and accordingly we are concerned that the changes would significantly diminish Congressional oversight of the transfer of these weapons.

Below we have elaborated and itemized our concerns for each set of proposed changes.

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

WASHSTATEC000030

**Comment on changes to ITAR proposed by Department of State and relevant to the changes proposed for the EAR/CCL.**

1. Our principal concern here is with the risk of proliferation and diversion that could be exacerbated by the transfer of semi-automatic weapons to the CCL from the USML, where such weapons currently meet the statutory definition of "defense article" and are subject to a number of oversight mechanisms. The term "defense article" is used explicitly in several statutes to require controls on brokering, Congressional notification, and inclusion of an item on the US Munitions Import List controlled by the Bureau of Alcohol, Tobacco and Firearms.  In addition, semi-automatic weapons are currently included as defense articles in Directorate of Defense Trade Control's annual 655 report and are currently included, as defense articles, in the definition of security assistance (22USC 2014 and 22 USC 2304). The explanatory text accompanying the rules proposed by the State Department did not comment on the ancillary effect of removing semi-automatic weapons from the USML, but the implied changes are of concern to us. Several of these concerns are elaborated below.

2. Brokering Laws.  The proposed changes to Categories I, II and III mean that brokers of semi-automatic weapons and related ammunition will be exempt from registration and licensing that is currently triggered by their inclusion as defense articles on the USML.  On many occasions over the past two decades, human rights advocates have called attention to national brokering laws as a weak link in the chain of efforts to curtail illicit market transfers of small arms and light weapons. [See Amnesty International's 2010 report, "Deadly Movements."]

   Since 1996, US brokering laws have been seen among the strongest in the world.  They apply to US agents wherever they are located as well as to foreign nationals operating from within the US; and they cover the full range of facilitating activity--including finance, insurance, transport and

WASHSTATEC000031

trans-shipment (freight-forwarding).  The US statutory provisions on brokering are robust, but their application is directly and specifically linked to the USML.  Regulatory authority over brokers in the Export Administration Regulations that house the CCL is without a clear statutory basis.  Consequently, we are concerned that moving semi-automatic weapons and related ammunition to the CCL – and simultaneously *removing* them from the USML – will lead to the US government relinquishing its regulatory authority over brokers of these weapons.  This is of particular concern because many of the proposed changes to Categories I-III pertain to completely operable weapons or ammunition, and not simply components or software.

We agree with the State Department's past assessment that establishing controls over brokering activity is a major step towards blocking unauthorized and illicit arms transfers that have fueled so many conflicts and serious human rights violations around the world.  In some well-known cases, states have been unable to prosecute notorious arms traffickers because local brokering laws were insufficiently robust.  We strongly support the current requirement for arms brokers to be registered and licensed before arranging deals to transfer these small but still deadly weapons.  For that reason, we oppose transferring semi-automatic weapons and ammunition to the CCL until and unless the continuing application of this requirement can be assured.

3.  The proposed changes do not appear to be in line with established Wassenaar Categories I-III.  Semi-automatic weapons are included in Wassenaar ML1 explicitly as munitions, with exceptions for smooth bore weapons used in hunting and sporting.  From descriptions in the Wassenaar Munitions List, it seems clear that the intention was to differentiate between military and security items, on one hand, and dual-use items on the other.  Semi-automatic weapons used by peacekeepers, military, and

WASHSTATEC000032

police are intended to be controlled as munitions. The proposal to move semi-automatic firearms and large caliber rifles to the 500-series on CCL does not appear to be in line with this designation.

Moreover, we are concerned that the proposed changes may result in increased circulation of plans for non-automatic weapons produced by 3D printing technology, and this may be at odds with Wassenaar expectations, at least with regards to Wassenaar Best Practices Guidelines on Small Arms and Light Weapons. We are concerned about possible weapons proliferation from 3D printing. We took note of the well-publicized 2012 case where the State Department invoked ITAR (and by extension the USML) to oblige a manufacturer to remove plans for a 3D printable gun from the internet. The Fifth Circuit Court upheld the State Department's view that the device in question was a "defense article" covered by ITAR, but we are concerned that the case might have ended differently if the 3D gun were considered a CCL-500 item rather than a defense article included on the US Munitions List. From our perspective, this story illustrates the grave dangers of uncontrolled arms proliferation. The combination of internet dissemination and do-it-yourself 3D production is problematic in that the government has no knowledge of or control over the producer or end-user or the purpose to which the weapons will be put. Permitting such transactions would be a significant step backwards in normative development and contrary to US policy over past 25 years.

4. Registration and End Use Controls (Blue Lantern). The fact that manufacturers (and brokers) of semi-automatic weapons would no longer be required to register before applying for a license presents an additional concern. As we understand it, registration documents often provide regulators with important information during the licensing phase, and we are concerned that under the new rules the regulators at Commerce would not have access to the same background information that DDTC now uses

WASHSTATEC000033

in the early stages of its monitoring and investigation.  Moreover, we are concerned that Blue Lantern investigations would exclude transfers of semi-automatic weapons.

5.  Waiting period before implementation.  A sufficient amount of time should be allowed for Congress to enact statutory changes to address gaps noted above.

**Additional comments on CCL rules proposed by Department of Commerce.**

6.  It appears that the new 500-series number would add specificity to reports required by the UN and the Wassenaar Arrangement, and that would be welcome.  However, Amnesty International has concerns about changing the designation of semi-automatic weapons so as to exclude them from consideration as "defense articles," elaborated in comments to the State Department above.

7.  While some of the weapons that are proposed for inclusion on the CCL are commercially available in the US, that is not the case globally and – increasingly—state governments in the US seek to limit their sale. In recent months many commercial outlets have discontinued sales of semi-automatic assault weapons, and the proposed rule goes in the opposite, and wrong, direction. Seventeen American states have proposed a total of 56 bills to regulate or ban the sale of assault weapons in the 2018 legislative season.

AMNESTY INTERNATIONAL USA | 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR | WASHINGTON, DC 20003
T 202.544.0200 | F 202.546.7142 | WWW.AMNESTYUSA.ORG

8.  Amnesty International generally supports strong oversight measures for arms transfers and from that perspective, we welcome detailed digital record-keeping requirements (serial number, model, caliber, and manufacturer) and increased enforcement of end-use controls.  However, given the increase in license applications shifted to Commerce combined with the absence of information currently gained through the registration procedure, we are concerned at the likelihood that increased workload without commensurate resources will actually result in less oversight than at present under authority of the State Department.

Thank you for your attention to our concerns.

Sincerely,

Adotei Akwei
Deputy Director Advocacy and Government Relations
Amnesty International USA
600 Pennsylvania Avenue SE Suite 500
Email: aakwei@aiusa.org
Tel: (202) 509-8148

WASHSTATEC000035

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 08, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-9460-ro78
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-2899
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

After reviewing the proposed regulations under the Federal Register for the revision of Category 1, we have noticed some irregularities in the overall objective of the transition.

Industry has been told that the shift from USML to CCL would be beneficial for the following reasons.

1. No export fees
2. Less Documentation For Exports of Commercial Type products

The issues, which are not clearly addressed in the Federal Register, are listed below.

In the proposal on Page 24198, titled Revision of Category 1, the FR indicates that items, which are inherently military will continue to be controlled under the USML. One could argue that inherently military can be applicable to any modern firearm depending on the End Use of the defense article. An End User in country X for example can use a commercial product for military applications regardless of original design and manufacture of the product. What will be the determination for the split between USML and CCL for an inherently military firearm?

Secondly, is Category I(G). I(G) will continue to cover many parts for commercial firearms such as Bolt Carriers, Slides, and Sears, which can be interchangeably used by commercial and military firearms. If a commercial customer wants to order a semi-automatic rifle and parts, such as replacement bolt carrier group or a upper receiver, barrel etc., then the applicant has to file an application with Commerce and State Department. This is a huge cost on industry and major cost to Commerce and the State Department. Right now the applicant could just file one application with State Department. The proposal would force applicants to get two different sets of documentation from the Consignee and then submit two applications. The cost associated to submit an application has now doubled since manpower is required to submit two licenses, and the cost to the US Government has increased since two applications now need to

WASHSTATEC000036

be reviewed by two different organizations. What about firearms such as Glock, Sig Sauer or Beretta etc.? Who will cover the parts since the United States military has used these products in the past? Will third party aftermarket accessories be considered as inherently Military parts and require a State Department license?

DDTC has certain threshold guidelines for case processing times. What is the current, and projected processing times for Commerce to process applications? It is not uncommon for Commerce to staff out cases back to State Department for Referral further adding to the total time for processing. There is little to benefit industry if the average processing time for a case takes longer than current DDTC performance.

In addition, presently DDTC will RWA a case with explanation if there are certain factors contained within the case that may jeopardize national security interests. This allows industry to take corrective measures. What will be the RWA measure with Commerce? One major benefit of having a case RWA with explanation is the case officer has acted as a subject matter expert to accurately decide if a defense article contains features that will not be allowed for export to a certain country or individual. This safety net limits the liability of the applicant. When a case officer can act as a secondary set of eyes, it always is in the benefit of the applicant.

In the proposal on page 24200 under Regulatory Analysis and Notices there is little to indicate if Commerce will implement fees at a later date for applications of export. Although there will be a cost savings to the State Department what will be the cost implications to Commerce? How will Commerce accommodate the influx of applications without charging a fee to hire new personnel? Specifically, on page 24201 the Department of Commerce indicates it is unable to estimate the increase in costs. How will this impact case applications and timelines?

Perhaps, State Department could adopt a sliding fee structure for organizations that do not export or export very little. Under the proposal most manufacturers will still have to register with State Department.

In summation, as the proposal stands, there is blurred lines between inherently military items, many applicants will need to file two export licenses for parts and firearms with Commerce and State, increase in processing times, liability, and potential fees later on. We support changes in making the process more efficient, more effective and giving US Companies more advantageous positions to be competitive internationally. Many companies will benefit but many companies will also be significantly disadvantaged by the proposed changes.

WASHSTATEC000037

# PUBLIC SUBMISSION

| |
|---|
| **As of:** July 10, 2018 |
| **Received:** July 09, 2018 |
| **Status:** Posted |
| **Posted:** July 10, 2018 |
| **Tracking No.** 1k2-946n-hlo4 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3126
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am an individual who happens to work for a USML I firearms manufacturer, & am one of the principal members of its Compliance Department. I am not authorized to speak on behalf of my company, but will comment as an individual who has had "direct contact" with the ITAR, 7 days a week for the past 6 years. In the years that I have interfaced with the firearms licensing unit of the DDTC for my applications, I have had relatively few problems and have been witness to some amendments which have resulted in positive changes. In terms of the everyday reality of working within this system, the ability to track the status of licenses in ELISA and if need be communicate directly with the licensing agent assigned to the application has been a productive process. I have also learned a great deal from working with the personnel of the DDTC unit charged with handling Category I firearms and accessories applications. The unit has proven to be both knowledgeable and helpful in achieving my licensing goals. Other than the occasional EAR99 shipment, my involvement with the BIS regulations has been minimal and I have yet to utilize the SNAP-R system, so I cannot directly judge exactly what real improvements would result from this migration, if any. The devil you know is often preferable to the one you don't.

Given that the licensing process under this proposed migration from DDTC to Commerce will still involve inter-agency review and the same staffing out to DOD and State Dept. Agencies, I don't see a clear indication of improvement, especially not in terms of processing times. This change represents a shift from one entity receiving an application to another. (Yes, we will save a few thousand dollars in registration fees.) The metric cited of 43.8 minutes for a BIS application vs. 60 minutes for DDTC application and the extrapolations of that metric to conclude a result of major savings fails to capture the true cost of the existing process or any nuances of how the process actually works. It certainly does not address the substantial burden created by the proposed the data capture for AES filing which will be amended to include make, model, and serial number.

The migration of non and semi-automatic firearms from USML I to BIS 0A501 will also initially create a substantial burden in terms of time and money for reclassifying product, retraining personal and revising all the SOPs associated with our exporting processes. I am not seeing a demonstrated case of either paperwork reduction or person-hour savings. Complicating the AES process at the end of the exporting

WASHSTATEC000038

chain is going to increase burdens for companies and place more burden on an already overloaded CBP. I do see areas where relief could and should be granted. While the change from the fee-based registration and licensing structure of State to the no-fee structure of Commerce, will provide much needed relief for smaller companies, I have to believe that simply changing the definition of a manufacturer by including a minimum size requirement for registration could easily produce the same result and reduce the number of small businesses which are currently being caught in the net of the existing manufacturing definition and its fees which they cannot easily afford.

Also, major improvement could be easily achieved by raising value of the exemption in 123.17(a) from $100 to $500. While the proposed changes within LVS do increase this amount, they then reduce it by shifting the definition of value from wholesale to selling price, thus giving with one hand while taking away with the other. Permitting the export of receivers and breech mechanisms could be achieved by simply amending the "Canadian Exemption" within the ITAR. Also helpful, would be an increase in wholesale value from $500 to $1000 for Canada. The proposed LVS change with its "selling price" definition is not genuine relief.

I appreciate the reduced controls on technical data and the elimination of the concept of defense services which would be achieved by the migration, but given that there has been relatively little substantive change in basic firearms technology over the decades, a simple amendment to or exemption from the existing controls for firearms technology within the ITAR could likely achieve the same result without having to totally move to a new process. (I have watched competitors place manuals online-which we believe to be in violation of ITAR regulations-without repercussion.) A change in this area would level the playing field and eliminate an unfair competitive advantage and also improve our ability to market and repair firearms. Likely this type of improvement could be achieved without a major overhaul of the entire system.

In conclusion, speaking as someone who deals with ITAR functionality, I am quite certain positive relief could be achieved by judicious and minimal amendment to what already exists as opposed to a major overhaul which is certain to create a messy transition.

WASHSTATEC000039

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-9435-9eeg
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-1762
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

No, this change in arms regulations must not be approved. For gunsmiths to have to fill out a little paperwork and pay fees is merely inconvenient and a small price to pay to keep military style weapons out of the hands of terrorists and crazies who like to shoot up schools and public places. We need MORE regulation, not less.

WASHSTATEC000040

| From: | Steve Baker |
|-------|-------------|
| To: | DDTCPublicComments |
| Subject: | Re: ITAR Amendment – Categories I, II, and III |
| Date: | Friday, May 18, 2018 6:37:01 AM |
| Attachments: | The Hearing Protection Act and Silencers.pdf |
| | Options to Reduce or Modify Firearms Regulations.pdf |

A few minor corrections to my email below.

1. A Special Occupational Taxpayer stamp is not required to manufacture or sell magazines over 50+ rounds nor is a FFL required as it is an accessory, not a firearm.  The SOT and FFL are required only for manufacturing or selling NFA firearms and suppressors.
2. By extrapolation, there are likely over one million suppressors (silencers) lawfully in civilian hands per the ATF's NFA registry database (the NFRTR).  The attached Washington Post article is focused on civilian use of firearms suppressors and their history in the US and in Europe.  It should further illuminate the fact that firearms suppressors are definitely "not inherently for military end use."  Their wide availability in civilian markets in European countries further negates any claim that suppressors somehow contain any critical military or intelligence advantaged technology that would justify continued inclusion on the USML.

On May 18, 2018, at 3:23 AM, Steve Baker <sbaker@thebakerfamily.org> wrote:

Suppressors and 50+ round magazines are not inherently for military end use and are commonly available in commercial retail gun stores that have paid the Special Occupational Tax Stamp.  These stores are common in the over 40 states that do not have Prohibition-era laws prohibiting silencers. It is unclear why the Department of State would remove semi-automatic firearms from the USML but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines - many of which DO NOT export any of their products. In aggregate, civilian sales of these items over the last couple of decades far outnumber contract sales of these accessories to the US military or the militaries of other countries.  In fact, most small companies that manufacture these items sell them exclusively into domestic markets for lawful use by private parties.  Sound suppressors are becoming widely accepted by civilian gun owners and despite the current $200 transfer tax and burdensome paperwork, they are in common use at rifle ranges in the above 40+ states.  They are also legal in a growing number of states for use in hunting since they reduce the likelihood of hearing loss in hunters and in their animal companions afield.

The decision to retain 50+ round magazines and sound suppressors on the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

President Trump has required federal agencies to take a long, hard look at the efficacy of their regulations and to take action to roll back or eliminate unnecessary or obsolete regulations.  To this end, the Bureau of Alcohol,

WASHSTATEC000041

Tobacco, Firearms and Explosives put forth a framework white paper for firearm deregulation options that the Bureau views as not compromising its public safety mission.  Part of the deregulation framework outlined in the ATF's white paper is a long overdue proposal relating to firearm suppressors -  removing them from the purview of the National Firearms Act and regulating their manufacture and transfer the same as ordinary Title I firearms under the 1968 Gun Control Act.
 The following attached document is authored by Ronald Turk, Associate Deputy Director (Chief Operating Officer) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  For relevant input related to the proposed ITAR Amendment and firearms suppressors, refer to section 8 as it outlines the ATF's deregulation proposal to treat firearm sound suppressors (silencers) the same as ordinary Title I firearms - the same firearms that the ITAR Amendment proposes to transfer from the USML to the Department of Commerce EAR regime.

Steve Baker
Arvada, CO

WASHSTATEC000042

July 6, 2018

To:     Office of Defense Trade Controls Policy, U.S. Department of State
        Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce

In Reference to **FRN 2018-10366** (State) and **83 FR 24166** (Commerce).
--------------------------------------------------------------------------------------------------------------------

I am writing to express my opposition to the proposed regulatory changes published in the Federal Register on May 24, 2018, as "International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III" **(**DOS_FRDOC_0001-4527) and "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)" (83 FR 24166). The proposed changes raise significant concerns for me as a parent, as an American citizen and taxpayer, and as someone who has studied and wrote my graduate thesis on the international small arms trade.

As a parent of a young child, I am deeply concerned about the impact that these changes will have on both global and domestic security for the foreseeable future. The proposed changes would greatly diminish oversight of the export of semi-automatic assault weapons, high capacity ammunition clips and training on such military equipment. The suggested changes would make it more likely that these dangerous weapons will end up in the hands of traffickers, terrorists or cartels and used against US service members.  This increases the likelihood for greater destabilization and conflict worldwide as well as for these weapons to be trafficked back into the U.S. for nefarious uses here.  The new rule also removes the block on 3D printing of firearms. This will facilitate unregulated gun production in the U.S. and abroad by making it possible for anyone, anywhere, with access to a 3D printer to produce a lethal weapon. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, these changes could generate many preventable tragedies. These proposed changes will create a world that is less safe for my son and other children to grow up in and to live; and therefore should not be adopted.

As an American citizen, I believe that these proposed changes diminish U.S. credibility in the eyes of the international community and compromise our global leadership. The proposed changes call for transfering gun export licensing from the State Department, an agency with a mission to promote stability, conflict reduction, and human rights, to the Commerce Department, an agency with mission to promote trade. In doing this, we are retreating on our global commitment to human rights and acting as though the export of firearms is just another commodity when the impact of these weapons is far more consequential and deadly. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research shows that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are sought out weapons used by criminal organizations in Mexico and other Latin American countries to perpetrate most of the increasing and record levels of homicides in those countries. The U.S. should not be adopting policies like the proposed changes which amplify this. Rather, we should be working collaboratively, as we have under previous administrations, to find ways to prevent and reduce firearms from being used to carry out human rights violations and crime.

As a U.S. taxpayer, I also find these proposed changes to be fiscally irresponsible. The new rule would transfer the cost of processing licenses from gun manufacturers to U.S. taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of

WASHSTATEC000043

tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and the Commerce Department does not charge any fee for licensing. This means that U.S. taxpayers, such as me, will absorb the cost of reviewing applications and processing licenses rather than the gun exporters that benefit from these sales. In addition, U.S. taxpayers also will need to shoulder the costs of having to build the capacity and expertise of the Commerce Department to properly administer the proposed changes. The Commerce Department currently does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce (see Department of Commerce Budget in Brief FY2017, p. 57, http://www.osec.doc.gov/bmi/budget/FY17BIB/AllFilesWithCharts2.pdf ). The Commerce Department's Bureau of Industry and Security's enforcement office, who would be charged to oversee the new changes, does not have staff in Latin America, Africa, or many other parts of the world and is not equipped to take the same level of preventive measures for end-use controls. In stark contrast, the State Department, who oversees these items while they reside on the USML, has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. The Commerce Department does not have these resources and developing them will come at a substantial cost to U.S. taxpayers.

Finally, as someone who has studied and researched the international small arms trade, I can confidently say that greater regulation, not less as the proposed rule would enable, is needed to curb the disproportionate impact that these weapons have on fueling conflict, terrorism, and crime around the world. One particularly troubling part of the new rule is its reduction of end-use controls for gun exports. It would eradicate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department within State that compiles the U.S. Government's information on human rights violations, decreasing the ability to effectively stop weapons licenses from going to international human rights violators. End-use controls also are weakened by removing the registration of firearms exporters, a requirement since the 1940s. Under the current rules, registration of exporters lets the State Department check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. Migrating the licensing to the Commerce Department will remove new exporters and brokers of these firearms from the State Department database, losing an important part of the evidentiary trail that enables the prosecution of arms traffickers.

It is for all the reasons listed above that I urge you to reject the proposed changes and to keep the items currently listed on the State Department-administered US Munitions List (USML) intact.

Thank you for your time and consideration.

Sincerely,

Beth Katz
Omaha, Nebraska

WASHSTATEC000044

June 11, 2018

From:       Bill Root, billroot23@gmail.com; tel 517 333 8707
To:         DDTCPublicComments@state.gov; and
            BISPublicComments@bis.doc.gov

Subject:    ITAR Amendment Categories I, II, and III and
            Related EAR Amendment RIN 0694-AF47

These comments relate the combined ITAR and EAR amendments to USG commitments to multilateral controls. Each of 33 numbered topics is listed in the order that topic appears in the Wassenaar Munitions List (WML). It is then subdivided into three parts, with the following number of examples:
a       27 US and multilateral texts are either identical or substantially equivalent;
b       74 US controls omit what WML controls (or WML omits US decontrols); and
c       165 WML omits what US controls (or US omits WML decontrols).
Part b should either be added to US controls or the US should seek removal from WML controls.
Part c should either be deleted from US controls or be proposed by the US to be added to WML.

These three parts omit second order impacts. For example, the number of differences between WML and US would increase exponentially if each difference in a weapon item was counted again when tallying the differences for ammunition, each of the types of components, production equipment, software, and technology related to that weapon difference.

The above a,b,c differences omit 16 examples of "and specially designed components therefor," which should be deleted from the proposed revised USML for consistency with the Export Control Reform intent to transfer insignificant items to the CCL (identified in topic 31 below).

These comments assume deletion of "specially designed" wherever it appears; use of "required" for software and technology; and a definition of "components" to include parts, accessories, attachments, and associated equipment.

WASHSTATEC000045

**1. Caliber**

WML 1        Smooth-bore weapons with a caliber of less than 20 mm, other arms and
             automatic weapons with a caliber of 12.7 mm (caliber 0.50 inches) or less, as
             follows

*Note: WML 1 does not apply to:*
*a        Firearms for dummy ammunition incapable of discharging a projectile;*
*b        Firearms to launch tethered projectiles having no high explosive charge or*
*         communications link, to a range of less than or equal to 500 m;*
*c        Weapons using non-center fire cased ammunition not fully automatic;*
*d        Deactivated weapons*

a        Rifles and combination guns, handguns, machine, sub-machine and volley guns
         *Note: WML 1.a does not apply to:*
*a        Rifles and combination guns, manufactured earlier than 1938;*
*b        Reproductions of rifles and combination guns, the originals of which were manufactureed*
*         earlier than 1890;*
*c        Handguns, volley guns and machine guns, manufactured earlier than 1890 and their*
*         reproductions;*
*d        Rifles or handguns to discharge an inert projectile by compressed air or CO2.*

b        Smooth bore weapons as follows::
b1       for military use
b2       other smooth-bore weapons as follows:
b2a      fully automatic;
b2b      semi-automatic or pump-action
*Note: WML 1.b.2 does not apply to weapons to discharge an inert projectile by compressed air*
*or CO2*
*Note: WML 1.b does not apply to:*
*a        Smooth-bore weapons manufactured earlier than 1938;*
*b        Reproductions of smooth-bore weapons, the originals of which were manufactured*
*         earlier than 1890;*
*c        Smooth-bore weapons used for hunting or sporting purposes. These weapons must not be*
*         for military use or of the fully automatic firing type;*
*d        Smooth-bore weapons for:*
*d1       Slaughtering of domestic animals;*
*d2       Tranquilizing of animals;*
*d3       Seismic testing;*
*d4       Firing of of industrial projectiles; or*
*d5       Disrupting Improvised Explosive Devices (IEDs).*
*N.B. For disruptors, see WML 4 and I.A.6 on the Dual-Use List.*

3

WML 2      Smooth-bore weapons with a caliber of 20 mm or more, other weapons or
           armament with a caliber greater than 12.7 mm (caliber 0.50 inches), projectors ...
           as follows
a          Guns, howitzers, cannon, mortars, anti-tank wapons, projectile launchers, ... rifles,
           recoilless rifles, smooth-bore weapons ...
*Note 2: WML 2.a does not apply to weapons as follows:*
*a*        *Rifles, smooth-bore weapons and combination guns, manufactured earlier than 1938;*
*b*        *Reproductions of rifles, smooth-bore weapons and combination guns, the originals of*
           *which were manufactured earlier than 1890;*
*c*        *Guns, howitzers, cannons, mortars, manufactured earlier than 1890;*
*d*        *Smooth-bore weapons used for hunting or sporting purposes. These weapons must not be*
           *for military use or of the fully automatic firing type;*
*e*        *Smooth-bore weapons for any of the following:*
*e1*       *Slaughtering of domestic animals;*
*e2*       *Tranquilizing animals;*
*e3*       *Seismic testing;'*
*e4*       *Firing of industrial projectiles;*
*e5*       *Disrupting Improvised Explosive Devices (IEDs);*
*NB*       *For disruptors, see WML 4 and 1.A.6 on the Dual-Use List.*

USML I.b   Fully automatic firearms to .50 caliber (12.7 mm) inclusive
USML 1.d   Fully automatic shotguns regardless of gauge.
USML II.a  Guns and armament greater than .50 caliber (12.7 mm), as follows:
a1         Guns, howitzers, artillery, and cannons;
a2         Mortars;
a3         Rexoiloless rifles;
a4         Grenade launchers; or
a5         Development guns and armament greater than .50 caliber (12.7 mm) funded by DOD
*Note 1: a5 does not control greater than .50 caliber*
*a*        *in production;*
*b*        *subject to EAR; or*
*c*        *being developed for both civil and military applications*
*Note 2: Note 1 to a5 does not apply to USML items, whether in production or deve;lopment.*

WASHSTATEC000047

| | |
|---|---|
| 0A501.a | Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm) |
| 0A501.b | Non-automatic and non-semi-automatic rifles, carbines, revolvers, or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm) |
| 0A602.a | Guns and armament manufactured between 1890 and 1919. |

## 1a Caliber US identical to WML

1-5   WML 2.a/USML II.a1-3 guns, howitzers, cannon, mortars, and recoilless rifles greater than .50 caliber

## 1b Caliber US Omissions from Multilateral Controls

1       US omits WML 1 semi-automatic smooth bore caliber from 12.7 mm to 20 mm.
2       US omits WML non-automatic smooth bore caliber from 18 mm to 20 mm.

      WML 2a rifles greater than .50 caliber is broader than:
3       0A501.b, which is limited to non-automatic and non- semi-automatic rifles, carbines, revolvers, or pistols between caliber .50 and .72;
4,5    USML II.a5 (and Notes 1 and 2) which applies to developmental guns funded by DOD but not if in production or being developed for both civil and military application;

6-10   US omits explicit WML 1.a mention of combined guns, handguns, machine, sub-machine and volley guns

      WML covers more than US by the following differences in decontrols in:
11     WML 1a Note b or 1b2 Note *vs.* Note 1 to 0A501
      (Rifles or handguns) (weapons) specially designed to discharge an inert projectile by compressed air or CO2 omit portions of BB guns, pellet rifles, paint ball, and all other air rifles
12-14  WML 1b Note a and b and 2a Note 2 a and b *vs.* 0A501 Note 1
a       (Smooth bore weapons) (Rifles, smooth-bore weapons and combination guns) manufactured earlier than 1938;
b       Reproductions of (smooth-bore weapons) (rifles, smooth-bore weapons and combination guns), the originals of which were manufactured earlier than 1890
      omit portions of "antique firearms manufactured before 1890 and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design"

15,16  WML 2.a anti-tank weapons and projectile launchers.

5

## 1c Caliber Multilateral Omissions from US Controls

1       WML omits USML I(d) fully automatic shotguns more than .50 caliber.
2-4     WML omits 0A501.b explicit mention of carbines, revolvers, or pistols
5-17    US covers more than WML by omission of decontrols in Notes for WML1, WML 1.a,
        WML 1.b.2, WML 1.b, including US covers more than WML by the following
        differences in deconrrols in:
a       0A501 Note 1 vs. WML 1a Note b or 1b2 Note:
        (BB guns, pellet rifles, paint ball, and all other air rifles omit portions of (rifles or
        handguns) (weapons) to discharge an inert projectile by compressed air or CO2
b       0A501 Note 1 plus 0A602.a vs. WML 1b Note a and b:
        US decontrol of antique firearms manufactured before 1890 and reproductions thereof,
        muzzle loading black powder firearms except weapons of a post 1937 design;
c       0A602.a guns and armament manufactured between 1890 and 1919 omits portions of
        WML decontrol of
        1       Smooth bore weapons manufactured earlier than 1938;
        2       Reproductions of smooth-bore weapons, the originals of which were
                manufactured earlier than 1890

## 2. Firearms using caseless ammunition

WML 1.c     weapons using caseless ammunition
USML I.a    firearms using caseless ammunition

## 2a Firearms using caseless ammunition substantially equivalent

6       WML 1./USML I.a

## 3. Firearms to integrate

USML 1.c Firearms to integrate fire control, automatic tracking, or automatic firing

## 3c Firearms to integrate  Multilateral Omissions from US Controls

18      WML omits USML I.c

6

## 4. Detachable

WML 1.d     detachable cartridge magazines
WML 2.d     detachable cartridge magazines

USML III.a7  Ammunition for fully automatic firearms or guns that fire superposed or stacked
            projectiles
0A501.d      Detachable magazines with a capacity of greater than 16 rounds for 0A501.a or .b

## 4b Detachable US Omissions from Multilateral Controls

17     WML 1.d and 2.d are broader than USML III.a7 or 0A501.d.

## 4c Detachable Multilateral Omissions from US Controls

19     WML omits USML III.a7

## 5. Sound suppressors

WML 1.d     ... sound suppressors or moderators ... for WML 1.a, b, c.

USML I.e     Silencers, mufflers, and sound suppressors ...

WASHSTATEC000050

## 5a. Sound suppressors US Omissions from Multilateral Controls

7       WML 1.d/USML I.e Sound suppressors

## 5b. Sound suppressors US Omissions from Multilateral Controls

18      WML 1.d Sound moderators

## 5c. Sound suppressors Multilateral Omissions from US Controls

20      USML I.e Silencers, mufflers
21      USML 1.e Sound suppressors for other than USML I

## 6. Mounts

WML 1.d        ... gun mountings for WML 1.a,b,c,
WML 2.c        ... weapon sight mounts for military use and for WML.2a;
WML 2.d        Mountings ... for WML 2.a,

USML II.h3     ... automatically stabilize aim (other than gun rests).
USML II.j9i    Mounts for independently powered ammunition handling systems
0A501.c        ... mounting blocks (trunnions) ...

## 6b. Mounts US Omissions from Multilateral Controls

19-21 WML 1.d, 2.c, 2d are broader than USML II.h3, j9i, and 0A501.c

## 6c. Mounts Multilateral Omissions from US Controls

22-23   USML II.h3, j9i, and 0A501c omit for I or II or military use.,

WASHSTATEC000051

### 7. **Optical weapon sights**

| | |
|---|---|
| WML 1.d | ... optical weapon-sights ... for WML 1.a,b,c, except without electronic image processing, with a magnification of 9 times or less, provided not for military use or incorporate any reticles for military use. |
| WML 2.c | Weapons sights ... for military use and for ML 2.a |

| | |
|---|---|
| USML II. j2 | Sights to orient indirect fire weapons |
| 0A501,y3 | Iron sights |

0A504 Optical sighting devices for firearms and components as follows:

| | |
|---|---|
| a | Telescopic sights; |
| b | Holographic sights; |
| c | Reflex or "red dot" sights; |
| d | Rericle sights; |
| e | Other sighting devices that contain optical elements; |
| f | Laser aiming devices or laser illuminators for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm, except laser boresighting devices that must be placed in the bore or chamber to provide a refernce for aligning the firearms sights. |
| g | Lenses, other optial elements and adjustment mechanisms for articles in a,b,c,d,e, or i. |
| i | Riflescopes that were not "subject to the EAR" as of (DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE) and are for use in firearms that are "subject to the EAR." |

### 7b. Sights US Omissions from Multilateral Controls

22,23   WML 1.d and 2.c omit technical limits in USMLII.j2, 0A501.y3, or 0A504.a-i

### 7c. Sights Multilateral Omissions from US Controls

25-34   USML II.j2, 0A501.y3, and 0A504.a-1 omit WML 1.d for WML 1.a,b,c or WML 2.c for WML 2.a

### 8. Flash suppressors

| | |
|---|---|
| WML 1.d | ... flash suppressors |
| USML II.e | muzzle flash suppression devices |

### 8b. Flash suppressors US Omissions from Multilateral Controls

24      WML 1.d omits USML II.e "muzzle"

9

**9. Flame throwers**

WML 2.a          ... military flame throwers

USML II.b          Flame throwers with a minimum effective range of 20 meters (i.e., whether or not
                   military) plus

0A602.b          Military flame throwers with an effective range less than 20 meters

**9c Flame throwers Multilateral Omissions from US Controls**

35          US is broader by covering non-military with minimum 20m range.

10

**10. Discharge type and administer electric shock**

0A503  Discharge type arms, non-lethal or less-lethal grenades and projectiles, ... and devices to administer electric shock

**10c. Discharge type and administer electric shock Multilateral Omissions from US Controls**

36      WML omits 0A503

**11. Signature reduction**

WML 2.a       ... signature reduction devices for 2.a
USML II.e:    Signature reduction devices for II a, b, or d

**11a Signature reduction substantially equivalent**

8       WML 2.a/USML II.e

**12. Liquid propelling charges**

WML 2.a Note 1:    WML 2.a includes injectors, metering devices, storage tanks and other components for liquid propelling charges for WML 2.a

**12b. Liquid propelling charges US Omissions from Multilateral Controls**

25-28   US omits WML 2.a Note 1

**13. Smoke and flares**

WML 2.b       Smoke ... projectors or generators for military use

III.d14       Illuminating flares ...
1A984         ... non-irritant smoke flares

**13b. Smoke and flares US Omissions from Multilateral Controls**

29,30   US omits WML 2.b smoke projectors or generators

**13c Smoke and flares Multilateral Omissions from US Controls**

37      WML omits III.d14 illminating flares
28      WML omits 1A984 non-irritant smoke flares

11

## 14. Gas

WML 2.b        ... gas ... projectors or generators and
WML 7.e        Equipment ... for the dissemination of ... chemical agents

USML XIV.f1 Equipment for the dissemination of chemical agents.
1A607.c        Equipment for dissemination of riot control agents

## 14a Gas identical

WML 7.e/USML XIV.f1 and 1A607.c

## 14b Gas US Omissions from Multilateral Controls

31,32   US omits WML 2.b projectors or generators

## 15. Pyrotechnic

WML 2.b        ... pyrotechnic projectors or generators for military use

USML III.a6   Ammunition employing pyrotechnic material in the projectile base ...
        d1     Projectiles that use pyrotechnic tracer materials that incorporate any material
               having peak radiance above 710 nm ...;
1A984          ... pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain
               only chemical irritants) having dual military and commercial use;

## 15b Pyrotechnic US Omissions from Multilateral Controls

WML 2.b is broader than 1A984 because:
33      WML omits US exclusion from pyrotechnic articles; and
34      US crime control reason is less restrictive than US national security reason applied to
        other WML- controlled items.

## 15c Pyrotechnic Multilateral Omissions from US Controls

1A984 is broader than WML 2.b because:
39      articles is broader than projectors or generators; and
40      dual military and commercial use is broader than military use
41,42   pyrotechnic material omitted from WML

WASHSTATEC000055

12

**16. Signal**

WML 2.b Note WML 2.b does not apply to signal pistols
0A503            decontrol arms solely for signal ...use

**16b Signal US Omissions from Multilateral Controls**

35      0A503 "solely" decontrol is narrower than WML 2.b Note decontrol

**17. Kinetic energy**

WML III.a      Ammunition for weapons specified by ... WML 12
WML 12.a      Kinetic energy weapon systems for destruction or effecting mission abort of a
                target
USML II.d      kinetic energy weapon systems for destruction or rendering mission-abort of a
                target .

WML 12 Note 1.c.      WML 12 includes ... target acquisition, tracking, fire control or damage
                assessment systems
USML II.j15      Kinetic energy weapon target acquisition, tracking fire control, and
                damage assessment systems

**17a Kinetic energy substantially equivalent**

10      WML 12.a/USML II.d
11      WML 12 Note 1.c/USML II.j15

WASHSTATEC000056

13

## 18. Metal or plastic

WML 3 Note 1a          WML 3 includes metal or plastic fabrications ...

USML III.a5   Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance
    d1   Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;
    d6   Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;
    d8   Non-metallic cases, including cases that have only a metallic base, for III.a5;
0A505.x Note 2     0A505.x includes ... metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

## 18b. Metal or plastic parts US Omissions from Multilateral Controls

36,37   WML 3 Note 1.a omits limits in USML III.a5, d1, d6, d8

## 18c. Metal or plastic parts Multilateral Omissions from US Controls

43,44   USML III.a5 and d8 non-metallic is broader than WML 3 Note 1a plastic

## 19. Primer

WML 3 Note 1.a ...WML 3 components include primer anvils

USML III.d10 Primers other than Boxer, Bordan, or shotshell types
        Note: III.d10 does not control caps or primers of any type in use prior to 1890.
0A505.x Note 2 05A505.x includes Bordan and boxer primers.

## 19b. Primer Multilateral Omissions from US Controls

38     US omits primer WML 3 primer anvils

## 19c. Primer US Omissions from Multilateral Controls

45,46   WML omits USML III.d10 and 0A505.x primers

WASHSTATEC000057

## 20. Cartridge links and belts

WML 3 Note 1.a WML 3 includes ...cartridge links for WML 1, 2, or 12

USML III.a2   Ammunition preassembled into links or belts;
USML III.d9   Cartridge links and belts for fully automatic firearms controlled in USML I or II

## 20b. Cartridge links and belts US Omissions from Multilateral Controls

39,40   US omits cartridge links for non-automatic or semi-automatic firearms...

## 20c. Cartridge links and belts Multilateral Omissions from US Controls

47        WML omits ammunition preassembled into liks or belts

## 21. Anvils, bullet cups, rotating bands

WML 3 Note 1.a        anvils, bullet cups, rotating bands

## 21b. Anvils, bullet cups, rotating bands US Omissions from Multilateral Controls

41-43   US does not control anvils, bullet cups, or rotating bands

## 22 Safing

WML 3.a Note 1.b      Safing and arming devices, fuzes, sensor and initiation devices
MTCR 2A1f   Weapon or warhead safing, arming, fuzing, and firing mechanisms ...

USML III.d11 Safing, arming, and fuzing components (to include target detection and proximity
                sensing devices) for the ammunitions in this category
USML IV.h9 Missile and rocket safing, arming, fuzing, and firing (SAFF) components (to
                include target detection and proximity sensing devices)

## 22a Safing substantially equivalent

12-15   safing, arming, fuzing, firing WML 3a Note 1b, MTCR 2A1f/USML III.d11, IV.h9

## 22c. Safing Multilateral Omissions from US Controls

48,49   WML and MTCR omit US target detection and proximity sensing devices

WASHSTATEC000058

15

## 23. Power supplies

WML 3 Note 1.c power supplies with high one-time operational output

| USML II.j14 | Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components of II.d kinetic weapons |
| 3A226 | High-power direct current power supplies producing over 8 hours 100 V or greater with current output of 500 A or greater and current or voltage stability better than 0.1% over 8 hours |
| 3A227 | High-voltage direct current power supplies producing over 8 hours 20 kV or greater with current output of 1A or greater and current or voltage stability better than 0.1% over 8 hours. |

## 23b. Power supplies US Omissions from Multilateral Controls

44      WML 3 Note 1.c is broader than USML II.j14 and 3A226 and 3A227 by omitting US limits on one time operational output

## 23c. Power supplies Multilateral Omissions from US Controls

50      USML II.j14 includes power supply features other than WML 3 Note 1.c output

## 24. Combustible cases

WML 3 Note 1.d combustible cases for charges

USML III.d7 ... combustible cases for USML II

## 24b. Combustible cases US Omissions from Multilateral Controls

WML 3 Note 1.d for charges is broader than USML III.d7for USML II

16

## 25. Submunitions and terminal guidance

WML 3 Note 1.e       Submunitions including bomblets, minelets and terminally guided
                     projectiles for WML 1, 2, or 12

USML III.d4   Projectiles ... guided or unguided for USML II
USML III,d5   ... sub-munitions (e.g., bomblets or minelets) ...for USML II
USML III.j13  Terminal seeker assemblies for category III

7A611  Military fire control, laser, imaging , and guidance equipment, as follows:
a      Guidance or navigation systems, not elsewhere specified on the USML, that are for a
       defense article on the USML or a 600 series item;
x      Components, including accelerometers, gyros, angular rate sensors, gravity meters
       (gravimeters), and inertial measurement units (IMUs), that are for USML XII or 7A611,
       and that are NOT:
x1     in the USML or elsewhere within 7A611;
x2     Described in 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or
x3     Elsewhere specified in 7A611,y or 3A611,y.

## 25a Submunitions and terminal guidance substantially equivalent

16-18   WML 3 Note 1.e for WML 2 or 12/USML III.d4,5 for II

## 25b Submunitions and terminal guidance US Omissions from Multilateral Controls

       WML 3 Note 1.e terminally guided projectiles for WML 1, 2, or 12 is broader than
       USML III.d4,5 only for II or 7A611 only for USML or 600 series. .

## 26. Electromagnetic

USML III.a8   Electromagnetic armament projectiles or billets for weapons with a design muzzle
              energy exceeding 5 MJ

## 26.b Electromagnetic US Omissions from Multilateral Controls

50      WML omits USML III.a8

### 27 Useless cartridge and shell casings

USML III Note 2 decontrol cartridge and shell casings rendered useless

### 27b Useless cartridge and shell casings US Omissions from Multilateral Controls

51      WML omits USML III Note 2 (WML 1 Note 1.d"Deactivated Firearms" does not apply
        to ammunition)

### 28 Shotgun shells

0A505.b        Buckshot (No.4 .24" diameter and larger) shotgun shells
0A505.c        Shotgun shells (including less than lethal rounds) that do not contain buckshot
1A984          Shotgun shells that contain chemical irritants

### 28c Shotgun shells Multilateral Omissions from US Controls

51-53   WML omits 0A505.b,c and 1A984 shotgun shells

### 29 Blank and dummy ammunition

WML 3 Note 2 c      decontrol blank and dummy ammunition not incorporating components for
                    live ammunition
0A505.d      Blank ammunition for 0A501

### 29c Blank and dummy ammunitions Multilateral Omissions from US Controls

54      US omits WML 3 Note 2.c decontrol
55      WML omits 0A505.d

### 30 Fuse setting devices

WML 3b        Fuse setting devices for WML 3a ammunition for WML 1, 2, or12

USML III.b2   Fuze setting devices for USML III ammunition

### 30a Fuse setting devices substantially equivalent

19      WML 3.b/USML III.b2

18

## 31 Other Components

WML 1, 2, 3 headings each control specially designed components for 1, 2, 3 sub-tems. These are matched by 0A501.x, 0A505.x, and 0A602.x, except for the following 16 examples of specially designed parts and components in proposed USML I, II, III: I.e, I.h1, 1.h3, II.a5, II.j4, II.j5, II.j10 II.j13, II.j14, II.j15, III.a10, III.d4, III,d5, III.d11, III.d12, III.d13.
It is recommended that "and specially designed parts and components therefor" be deleted from I.e, I.h1, 1.h3, II.a5, II.j4, II.j5, II.j10 II.j13, II.j14, II.j15, III.a10, III.d4, III,d5, III.d11, III.d12, and III.d13

## 31a Other components substantially equivalent

20-22   WML 1, 2, 3/0A501.x, 0A505.x, 0A602.x (after 16 deletions from USML recommended above)

**31c Other components Multilateral Omissions from US Controls**

56-124 The other USML I, II, III and 0A501-0A505 components not examined above are:

| | | |
|---|---|---|
| USML I.g | Barrels, receivers (frames), bolts, bolt carriers, slides, or sears for USML I....b ...; |
| | h1 | Drum and other magazines for firearms to .50 caliber with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm; |
| | h2 | Parts and components for conversion of a semi-automatic firearm to a fully automatic firearm; |
| USML II.j1 | Gun barrels, rails, tubes, and receivers ...; |
| | j3 | Breech blocks; |
| | j4 | Firing mechanisms; |
| | j6 | Servo-electronic and hydraulic elevation adjustment; |
| | j7 | Muzzle brakes; |
| | j8 | Bore evacuators; |
| | j9 | Independently powered ammunition handling and platform interface as follows: |
| | j9i | Carriages; |
| | j9iii | Gun pallets; |
| | j9iv | Hydro-pneumatic equilibration cylinders; or |
| | j9v | Hydro-pneumatic systems scavanging recoil energy to power howitzer functions; |
| | j10 | Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms; |
| | j11 | Independent ammunition handling; |
| | j12 | Ammunition containers/drums, chutes, conveyor elements, and ammunition container/drum entrance and exit units; |
| | j13 | Aircraft/gun interface units with rate of fire greater than 100 rounds per minute; |
| | j16 | Classified |
| USML III.d3 | projectiles of any calbier produced from depleted uranium; |
| | d6 | Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy; |
| | d15 | Classified |
| 0A501.c | Barrels, cylinders, barrel extensions, ... bolts, bolt carriers, operating rods, gas pistons trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control parts or components (e.g., triggers, hammers, sears, disconnectors) and buttstocks that contain fire control parts or components for 0A501.a or .b or USML I unless listed in I.g or .h |
| | e | Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof for 0A501.a or .b |
| 0A502 | Shotguns, complete trigger mechanisms, magazines and magazine extension tubes, complete breech mechanisms, except equipment used exclusively to treat or tranquilize animals |
| 0A505.x | Note 3 The controls on parts and components in 0A505.x include those parts and components that are common to ammunition and ordnance described in 0A505.x and to USML III |

WASHSTATEC000063

**32 Production**

| | |
|---|---|
| WML 18.a | ... equipment for the production of WML 1, 2, 3 |
| WML 18.b | ... environmental test facilities and equipment therefor, for the certification, qualification or testing of WML |
| Note | WML 18.a and .b include: |
| a | Continuous nitrators |
| b | Centrifugal testing ... |
| c | Dehydration presses |
| d | Screw extruders for military explosive extrusion |
| e | Cutting machines for sizing of extruded propellants |
| f | Sweetie barrels (tumblers) 1.85 m or more in diameteer and having over 227 kg product capacity |
| g | Continuous mixers for solid propellants |
| h | Fluid energy mills for grinding or milling the ingredients of military explosives |
| i | Equipment to achieve both sphericity and uniform particle size in metal powder listed in WML 8.c.8 (aluminum powder particle size 60 micrometer or less) |
| J | Convection current converters for the conversion of maerials listed in WML 8.c.3 (carboranes, decaborane, pentaboranes and their derivatives) |

| | |
|---|---|
| 0B501 | Test, inspection, and production commodities for development or production of 0A501 or USML I, as follows: |
| a | Small arms chambering machines |
| b | Small arms deep hole drilling machines and drills therefor |
| c | Small arms rifling machines |
| d | Small arms spill boring machines |
| e | Dies, fixtures, and other tooling |

| | |
|---|---|
| 0B505 | Test, inspection, and production commodities for development or production of 0A505 or USML III, as follows: |
| a | Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not USML III* for production of 0A505.a or .x  or USML III <br> * No such items in proposed USML III |
| b | Equipment for production of 0A505.b |
| c | Equipment for production of 0A505.c |
| d | Equipment for production of 0A505.d |
| x | components for 0B505.a |

WASHSTATEC000064

0B602 Test, inspection, and production commodities for development or production of 0A602 or USML II
a1    Gun barrel rifling and broaching machines and tools therefor
a2    Gen barrel rifling machines
a3    Gun barrel trepanning machines
a4    Gun boring and turning mcahines
a5    Gun honing machines of 6 feet stroke or more
a6    Gun jump scew lathes
a7    Gun rifling machines
a8    Gun straightening presses
b     Jigs and fixtures and other metal-working implements for manufacture of 0A602 or USML II
c     Other tooling and equipment for production of 0A602 or USML II
d     Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models for 0A602 or USML II

1B608.c        Environmental test facilities for certification, qualification, or testing of 1C608 or USML V

## 32a Production substantially equivalent

23      WML 18.a for WML 2/0B602.c
24      WML 18.b/1B608.c

## 32b Production US Omissions from Multilateral Controls

52, 53   WML 18.a for WML 1 and 3 is broader than 0B501, 0B505, because "include" in WML 18.a Note makes a-j only non-definitive examples, whereas 0B501 controls only a-e and 0B505 controls only a-d and x.
54-63   US omits WML 18.a Note a-j
64-66   US omits WML 18.b for WML 1, 2, 3

## 32c Production Multilateral Omissions from US Controls

125-164     WML omits:
            test and inspection in 0B501, 0B505, 0B602
            development in 0B501 and 0B505
            0B501.a-e, 0B505.,a-d, x, 0B602.a1-8, b, d

## 33 Software and Technology

WML 21 Software for:
a1     development, production, operation, or maintenance of WML equipment
a2     development or production of WML material
a3     development, production, operation or maintenance of WML software
b1     military use and modelling, simulating or evaluating military weapon systems
b2     military use and modeling or simulating military operational scenarios
b3     determining the effects of conventional ... weapons
c      enabling equipment not WML-controlled to perform military functions of WML-controlled equipment.

WML 22 Technology for
a      development, production, operation, installation, maintenance (checking), repair, overhaul, or refurbishing of WML-controlled items.
       *Note 1: development, production, operation, installation, maintenance (checking), repair, overhaul, or refurbishing of WML-controlled items remains under control even when applicable to any item not WML-controlled.*
b1     design, assembly, operation, maintenance, or repair of complete installations for WML-controlled items, even if the components of such production installations are not  WML-controlled
b2     development or production of small arms, even if used to produce reproductions of antique small arms
       *Note 2 WML 22 does not apply to:*
*a*      *Technology that is the minimum necessary for the installation, operation, maintenance (checking), or repair of items not WML-controlled or whose export has been authorized*
*b*      *Technlogy that is "in the public domain," "basic scientific research," or the minimum necessary information for patent applications.*

USML I.i     Technical data and defense services for I.a,b,d,e,g,h or classified 0A501, 0B501, 0D501, 0E501
USML II.k    Technical data and defense services for II.a,b,d,e,f  or classified 0A602, 0B602, 0D602, 0E602
USML III.e   Technical data and defense serivces for III.a,b,d or classified 0A505, 0B505, 0D505, 0E505.

0D501 Software for development, production, operation, or maintenance of 0A501 or 0B501.
0D505 Software for development, production, operation, or maintenance of 0A505 or 0B505.
0D602 Software for development, production, operation, or maintenance of 0A602 or 0B602.

0E501 Technology for development, production, operation, installation, maintenance, repair, or overhaul of 0A501 or 0B501, as follows:
a      Technology for development or production of 0A501 (other than 0A501.y) or 0B501;
b      Technology for operation, installation, maintenance, repair, or overhaul of 0A501 (other than 0A501.y) or 0B501.
0E502 Technology for development or production of 0A502.
0E504 Technology for development or production of 0A504 that incorporate a focal plane array or image intensifier tube.
0E505 Technology for development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of 0A505.
0E602 Technology for development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of 0A602 or 0B602, or 0D602
0E982 Technology for development or production of ... 0A503

**33a Software and technology substantially equivalent**

25-27   WML21a1,2, WML 22a/USML Ii,IIk,IIIe. 0D501,5, 602, 0E501,2,5, 602, 982

**33b Software and technology US Omissions from Multilateral Controls**

67-74   WML21a3,b1-3,c, WML22aNote 1, b1,2

**33c Software and technology Multilateral Omissions from US Controls**

165    0E504

WASHSTATEC000067

# PUBLIC SUBMISSION

| |
|---|
| **As of:** July 10, 2018 |
| **Received:** July 09, 2018 |
| **Status:** Posted |
| **Posted:** July 10, 2018 |
| **Tracking No.** 1k2-946r-fhig |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3179
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Joel VanderHoek
**Organization:** BORDERVIEW International Firearm Logistics

---

## General Comment

BORDERVIEW appreciates the opportunity to comment on the long-awaited transition of firearms and related items from the jurisdiction of the Department of State to the Department of Commerce. We have closely followed the efforts since the early days of the Obama administration to complete this phase of Export Control Reform, and applaud the publishing of these proposed rules.

Broadly speaking, we are very supportive of the proposal and would like to underscore the well-laid justifications made in your proposed rule, and the companion Department of Commerce proposed rule, in addition to the 'Myths vs. Facts' release posted on your website. BORDERVIEW looks forward to your publishing of the Final Rule and completion of these longstanding and bipartisan efforts to simplify our nation's export control infrastructure to better control the most military-sensitive items, while maintaining appropriate controls on Dual Use items such as firearms.

We submitted a detailed comment letter to the U.S. Department of Commerce as their proposed rules would cover a supermajority of our sporting firearm export activity going forward. Nonetheless, we offer here our affirmation of the broad transition affected by these companion rules. Furthermore, we encourage a split effective date where a delayed effective date of 180 days is given so larger companies can align IT systems, etc, and an immediate effective date is allowed for smaller companies or those prepared to make the immediate shift to the EAR. This would directly impact smaller companies and especially those non-exporting companies such as gunsmiths required to register under the ITAR, who may be facing costly renewals during an extended delayed effective period. While not standard practice, there is precedent in the July 2014 notice of FR 79 37535, which gave two effective dates for that Final Rule.

Regardless of the effective date published in the Final Rule, we respectfully request that DDTC and BIS complete their review of comments and publish a Final Rule as soon as is reasonably possible. Given the

WASHSTATEC000068

long-awaited nature of these rules, prompt publishing of the Final Rule after appropriate review and consideration of all relevant comments by impacted parties would be greatly appreciated and beneficial to both industry and government.

The justification provided is clear and absolutely sensible. This is not a de-controlling as some are wrongly asserting. Regardless of recent politicization by some in Congress and the media, this has truly been an historic bipartisan effort over many years, starting in the earliest days of the Obama administration and now coming to fruition under the current administration.

Thank you for your consideration and we look forward to review of the final rule.

WASHSTATEC000069



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via*
*http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are national leaders in strengthening, supporting and expanding gun laws, policies, and practices in the United States.  Our complimentary missions are to significantly decrease the number of gun deaths and injuries in America.  We achieve this by amplifying the voice of the American public; changing social norms through public health and safety programs; and holding the gun industry accountable for dangerous and irresponsible practices and products.[1]  These comments are submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use and transfer of legal firearms within and outside of the United States by advocating for appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"), which seek comments on the transfer of certain firearms and related items from the International Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including those used by the military, (along with their components and ammunition) from USML Categories I, II, and III, where they are classified as significant military equipment, to the CCL, where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the military (and related items) from the stringent control of the USML to the more permissive regime administered by the Commerce Department would be contrary to Congressional intent and would undermine U.S national security interests, international stability and the protection of human rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

WASHSTATEC000070

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

2

WASHSTATEC000071

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.   Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |

| Sidearms Used by Armed Forces | | |
|---|---|---|
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |

| Semi-automatic Assault Rifles | | |
|---|---|---|
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |

| Semiautomatic Assault Pistols | | |
|---|---|---|
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

**2.**  **The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR**

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.   The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

4

WASHSTATEC000073

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors.  Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses.  It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

### 3.  The Firearms at Issue are not Widely Available for Commercial Sale

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.   Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] Id.

[5] Id.

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

5

WASHSTATEC000074

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

**4.  Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements**

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

**5.  The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight**

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHSTATEC000075

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### **6.**  **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11]  Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHSTATEC000076

**7.** **The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS. *See* EAR § 734.3(b)(3). Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical. In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR. In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS. If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code. However, while the EAR control technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls. *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR. *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**8.** **The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

8

WASHSTATEC000077

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency.  Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS).  This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment.  While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation.  The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous.  Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations.  This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation.  Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales.  It is through this method that approximately at least one in five guns are sold in the United States today without a background check.  Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports).  While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States.  Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9.   The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies.  The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial.  As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHSTATEC000079

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 08, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-945z-wwsk
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-2887
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Constance Anderson

## General Comment

I want all guns to be regulated just like cars. All have to take a mental stability test and use of firearm tests. All need to be insured and close all the loop holes at gun shows. No one should sell a gun with out a paper trail. The data base will be paid for by gun owners through their fees and this data base is live, all law enforcement and courts should see complete history from every state. No more guns in public places or schools. End open carry, no one needs to take a gun to the movies or to concerts.

WASHSTATEC000080

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-9433-8zm7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-1608
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** David Forbes
**Address:**
   9078 Stump Point Rd
   Hayes, VA, 23072-4604
**Email:** dforbes@icec.org
**Phone:** 8042232073

---

## General Comment

The words below, taken from Defense News dot com, echo my own views on this matter. Please take these words under consideration.

There are five key dangers of shifting oversight of firearms exports to the Commerce Department.

First, there is an increased risk of exports to unauthorized end users and conflict zones. Under the Commerce Department system, companies can generally use several broad license exemptions to export military equipment without U.S. government approval. When the U.S. government shifts oversight of firearms exports to companies, it loses the ability to identify key warning signs, including risky middlemen, unusual routes and mismatched weapons systems, of a possible diversion of U.S. guns to terrorists, criminals or conflict zones. Without U.S. oversight, the government also couldnt stop the sale of firearms to foreign security force units accused of serious human rights violations or corruption.

Second, a shift to the Commerce Department could compromise the United States ability to investigate and prosecute arms smugglers. The Trump administrations proposal would likely eliminate the current requirement that individuals receive government approval before attempting to broker a deal to non-NATO countries for firearms controlled by the Commerce Department. The proposal might also remove the requirement that companies first register with the U.S. government before engaging in arms exports, which U.S. law enforcement has used to build investigations against illegal arms traffickers. Furthermore, the proposal could create greater legal ambiguity about restrictions on firearms exports and, thus, impede U.S. law enforcements efforts to prosecute cases of illegal arms trafficking. Indeed, if an arms exporter

WASHSTATEC000081

can show that a reasonable person would be confused by U.S. regulations, the illegal exporter could escape prosecution.

Third, the proposal risks losing key legal restrictions on dangerous arms transfers. Commerce Department regulations, unlike the State Departments, are not tied to all federal laws that regulate security assistance, including the commercial export of defense articles to foreign governments that support terrorism, violate internationally recognized human rights norms or interfere with humanitarian operations as well as country-specific controls imposed on nations of concern, such as China. A shift to the Commerce Department would likely complicate, if not end, State Department reviews of a recipient's human rights violations, as the State Department bureau in charge of human rights may face greater difficulties in pressing for restraint on risky firearms exports. Such a shift would thereby dilute the State Departments ability to prevent high-risk transfers.

Fourth, the Trump proposal risks eroding global norms on firearms exports. Over the past two decades, through bilateral and multilateral agreements, the United States has successfully encouraged governments around the world to adopt better laws and policies to stop irresponsible and illegal arms transfers. Many of these agreements note the need to review export licenses on a case-by-case basis, highlight the importance of brokering registration and licensing and contain other key controls. If the United States decides to reduce or remove some of these controls, many other countries may choose to do so as well, particularly if it allows them to better compete with the United States.

Finally, a shift would likely result in less transparency in arms sales. The proposal could eliminate both Congresss and the publics view of U.S. firearms sales authorizations and deliveries around the world because the Commerce Departments annual reports cover only about 20 countries. Furthermore, there are no public end-use reports on arms exports authorized by the Commerce Department such as those for exports authorized by the State Department. The reports are useful to identify key trafficking patterns that can help avoid risky arms transfers.

Sincerely,

David Forbes

WASHSTATEC000082



**Esterline Corporation**
500 108th Avenue NE
Suite 1500
Bellevue, WA 98004

Tel: 425-453-9400
Fax: 425-453-2916
www.esterline.com
NYSE symbol: ESL

July 9, 2018

Sarah Heidema, Director
Office of Defense Trade Controls Policy
Bureau of Political-Military Affairs
U.S. Department of State
2401 E Street NW
Washington, D.C.

ATTN: Request for Comments Regarding Reform of USML Categories I, II, and III
Public Notice 10094, RIN 1400–AE30, 83 FR 24198

Dear Ms. Heidema:

Esterline Technologies Corporation supports the goals and objectives of the Export
Control Reform (ECR) Initiative, and submits the following comments on the reform of
USML Categories I, II, and III:

## Summary of Comments and Recommendations

This section outlines our main comments, each of which is explained more fully in the
remainder of this letter.

1. Keep the Commerce Control List free of AECA brokering.

2. Coordinate changes to USML Categories I, II, and III with changes to the United
   States Munitions Import List.

3. Clarify classification of propellant containers and combustible ordnance components.

4. Address conflict with companion rule 83 FR 24166.

## Comments and Recommendations

### 1. Keep CCL free of AECA brokering

One of the main advantages of ECR is that items on the CCL are not subject to the
brokering requirements in section 38(a)(1) of the Arms Export Control Act (AECA) and
22 CFR 129. This advantage has been highlighted by the U.S. Government in public

WASHSTATEC000083

remarks, such as Under Secretary Hirschorn's address to the BIS Update 2014 Conference.

Absence of brokering controls for CCL items has more significance than the absence of double licensing. Currently, items subject to the CCL do not require registration or licensing under 22 CFR 129, period. Once an item is determined to be on the CCL, it is clear that it is not subject to brokering, so there is no need to review the USMIL or the requirements in 22 CFR 129 before engaging in business. Knowledge that items on the CCL are not subject to brokering simplifies and streamlines transactions. Addition of brokering requirements for any item on the CCL would be an unwelcome development as it would introduce a significant complicating factor.

Esterline recommends DDTC reform USML Categories I, II, and III without introducing brokering controls to items in the CCL.

### 2. Coordinate changes to USML Categories I, II, and III with USMIL

The proposed rule would add the need to review the USMIL for activities that are not imports to the United States. Classifying items against multiple control lists for a single transaction increases the cost and complexity of U.S. export controls.

Esterline recommends DDTC coordinate its change to USML Categories I, II, and III with the Bureau of Alcohol, Tobacco, Firearms, and Explosives so that a corresponding change is made to the USMIL at the same time. This would eliminate the need to consider both the USML and the USMIL when deciding whether a transaction involves brokering.

### 3. Clarify classification of both combustible and consumable case components.

With regard to the proposed paragraph III(d)(7), Esterline suggests changing the text from

> (7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II

to

> (7) Cartridge cases, powder bags, charges, propellant containers, or combustible cases for the items controlled in USML Category II, or "specially designed" parts and components therefor.

Alternately, include an explanatory note:

> Note to paragraph (d)(7): combustible cases include propellant containers for mortar systems and artillery charges, consumable case sets that include both combustible and inert parts and components, and their parts such as closure tabs and interfaces.

This change would more clearly describe the range of articles that DDTC appears to be intending to capture in this paragraph, and would simplify the classification of their parts and components which are inherently for military end use.

## 4. Address conflict with companion rule 83 FR 24166

The proposed rule is in conflict with the companion Commerce Department proposed rule, 83 FR 24166, Docket No. 111227796-5786-01, RIN 0694-AF47. This leaves items transferred from the USML to the CCL potentially without a controlling ECCN.

Esterline recommends DDTC coordinate with BIS to resolve this conflict.

The BIS proposed rule states:

> Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor.

The State Department proposed rule states with respect to USML Category III:

> Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

In effect, the BIS proposed would receive specific production and test equipment for conventional ammunition into ECCN 0B505, while the State Department proposed rule would move all production and test equipment for ammunition and ordnance to the CCL, conventional or otherwise.

ECCN 0B505 would only control equipment specially designed for the production of ammunition and ordnance that is controlled in USML Category III if it falls within the list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment." This list is less than the scope of production equipment that will no longer be controlled in USML Category VIII(c) by the proposed companion rule, 83 FR 24198.

Similarly, ECCN 0E505 would not control technology for the technology for equipment specially designed for the production of ordnance, or technology for the software specially designed for such equipment.

A number of the articles proposed for USML Category III by 83 FR 24198 are not conventional ammunition, and their specially designed production equipment exceeds the specific list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment."

WASHSTATEC000085

For example, production of combustible ordnance requires specialized production machines that do not fall within the list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment." Under the proposed rules, these specialized machines would fall outside both the USML and ECCN 0B505.

**Summary**

Thank you for the opportunity to comment on the proposed reform of USML Categories I, II, and III. Please feel free to contact me if you have any questions about the comments and recommendations provided.

Regards,

Richard R. Baldwin
Director, Trade Compliance Technology
Esterline Technologies Corporation



**F.A.I.R.**
**Firearms & Ammunition Import/Export Roundtable**

July 9, 2018

Attn: Robert Monjay
Directorate of Defense Trade Controls
U.S. Department of State
PM/DDTC, SA-1, 12th Floor
2401 E Street, NW
Washington, D.C. 20226

      Subject:      ITAR Amendment—Categories I, II, and III

Dear Mr. Monjay:

The purpose of this letter is to provide comments to the proposed rule to amend the International Traffic in Arms Regulations (ITAR) U.S. Munitions List (USML) Categories I, II, and III, which published in the *Federal Register* on May 24, 2018 (RIN 1400–AE30; 83 FR 24198).

The F.A.I.R. Trade Group ("F.A.I.R.") is a nonprofit organization dedicated to protecting the interests of the firearms and ammunition import and export communities. F.A.I.R. works with many U.S. government agencies, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the U.S. Department of State, Directorate of Defense Trade Controls (DDTC), and the Department of Commerce, Bureau of Industry and Security (BIS) to provide solutions to the concerns of F.A.I.R. members. Our membership includes importers and exporters of firearms, ammunition, and other defense and dual-use articles who rely on licenses issued by ATF, DDTC, and BIS. Many members also hold Type 07 or Type 10 licenses as manufacturers of firearms. Members provide equipment to domestic law enforcement agencies and the U.S. military who require such items to carry out their public safety and national security missions and sell the articles they import to distributors for general commercial sale. A number of our members also produce firearms and ammunition that are exported to foreign governments for their national defense, consistent with the foreign policy of the United States.

F.A.I.R. welcomes the opportunity to provide comment on the proposed revisions to USML Categories I, II, and III, and applauds the continuing efforts by DDTC and BIS to revise the USML so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or are inherently for military end use, and to remove those items that are widely available in retail outlets in the United States and abroad.

Overall, the proposed revisions to USML Categories I, II, and III are a positive move to a more rational control of firearms and ammunition, and related parts, components, accessories, and attachments. The transition of certain items to the control of the Export Administration Regulations (EAR) will serve to right-size license requirements while still maintaining necessary oversight of exports of these items. Additionally, by moving such items to the EAR, many domestic

WASHSTATEC000087

Mr. Monjay
ITAR Amendment—Categories I, II, and III
July 9, 2018
Page 2 of 3

manufacturers who do not conduct exports will be relieved of the financial burden of registering under the ITAR.

We provide the following comments for DDTC's consideration, and are available should DDTC or BIS require additional information or wish to discuss our comments further:

1. **Implementation Period**.

   As DDTC notes in the proposed rule, the Department has adopted a delayed effective date of 180 days for previous rules revising entire categories of the USML and moving items to the CCL. DDTC has requested comments from industry as to whether this implementation period should be applied to the revised Categories I, II, and III.

   Recommendation: **Split implementation period**. We wish to support the continued delayed effective date of 180 days for those industry members who need make changes to IT systems, technology controls plans, and other business processes necessary to implement the rule. However, there will be a number of domestic companies who, for example, do not export but manufacture firearms parts and components for firearms that transition to the EAR who will wish to immediately implement the new rules in order to be relieved of the financial burden of ITAR registration. Therefore, we recommend that DDTC allow for a split implementation period to allow those companies whose entire operations transition to the EAR to immediately shift to those controls while allowing those companies whose operations either remain under the ITAR or are now split between the EAR and the ITAR adequate time to make necessary changes to their businesses. There is precedent for a split implementation period as it was done in the *Federal Register* notice implementing of revisions to USML Category XI and corrections to USML Category VIII (See 79 FR 37536).

2. **Transition Silencers to the CCL**.

   DDTC's proposed rule indicates that "[USML Category I] Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components." The proposed rule further indicates that its objective, after the proposed revisions, is to capture only those articles in USML Categories I, II, and III, that provide the United States with a critical military or intelligence advantage, or are inherently for military end use. The items proposed for transition to the EAR do not meet this standard, "including many items which *are widely available in retail outlets in the United States and abroad* [emphasis added]." Firearm suppressors (silencers) do not provide a critical military or intelligence advantage and are not inherently for military end use. Moreover, the hardware and associated technology is widely available throughout the world. Therefore, based on the litmus test identified in the proposed rule, firearm suppressors (silencers) should not be listed on the USML and should be more appropriately controlled on the CCL in the EAR.

   Recommendation: **Remove firearm suppressors (silencers) from USML Category I(e) and add them as a controlled item under ECCN 0A501.**

WASHSTATEC000088

Mr. Monjay
ITAR Amendment—Categories I, II, and III
July 9, 2018
Page 3 of 3

3. **USML Cat. III**

**(a)(7) - Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles.**

The phrase "ammunition for fully automatic firearms" should be removed entirely or revised and clarified. As drafted, this portion of the paragraph could be interpreted to capture almost every caliber of small arms ammunition as most common cartridges are suitable for use in semi-automatic and fully automatic firearms.

**(d)(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys.**

The use of the word "core" should be further defined. How much of the projectile is considered the core? What about projectiles that use a combination of lead and other material, such as dual core or multi core rounds popular in hunting? Furthermore, what is meant by the phrase "produced from?"

In addition to popular hunting rounds that contain multiple core materials, this classification will capture a broad range of cartridges that have been exempted from the so-called "Armor Piercing Ammunition" classification under the Gun Control Act, 18 U.S.C. 921(a)(17)(B)(i), such as .556mm (.223) SS109 and M855 "green tip" ammunition. This ammunition has been considered "sporting" for almost 30 years.

\* \* \* \* \*

F.A.I.R. thanks the Departments of State and Commerce for the opportunity to participate in the regulatory revision process. We hope that our comments provide assist the government in reducing jurisdictional ambiguities and clarifying the articles that will remain subject to the ITAR. For your information, we also provide a copy of the comments submitted in response to the BIS proposed rule. Should you have any questions, or require additional information as you review public comments received, please do not hesitate to contact me at 202-587-2709 or execdir@fairtradegroup.org.

Sincerely,

Johanna E. Reeves
Executive Director

Enclosure:  Comments to BIS Proposed Rule (RIN 0694–AF47)

# ATTACHMENT

# COPY OF F.A.I.R. COMMENT TO

# BIS PROPOSED RULE (RIN 0694-AF47)

WASHSTATEC000090



**F.A.I.R.**
**Firearms & Ammunition Import/Export Roundtable**

July 9, 2018

Attn: Steven Clagett
Office of Nonproliferation Controls and Treaty Compliance
Nuclear and Missile Technology Controls Division

Regulatory Policy Division
Bureau of Industry and Security
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230.

      Subject:     RIN 0694–AF47: Control of Firearms, Guns, Ammunition and Related
                 Articles the President Determines No Longer Warrant Control Under the
                 United States Munitions List (USML)

Dear Mr. Clagett:

The purpose of this letter is to provide comments to the proposed rule to amend the *Export
Administration Regulations* (EAR) to control those items identified to no longer warrant control
under United States Munitions List (USML) Category I - Firearms, Close Assault Weapons and
Combat Shotguns; Category II - Guns and Armament; and Category III - Ammunition/Ordnance
U.S. Munitions List (USML), which the Bureau of Industry and Security (BIS) published in the
*Federal Register* on May 24, 2018 (RIN 0694–AF47; 83 FR 24166).

The F.A.I.R. Trade Group ("F.A.I.R.") is a nonprofit organization dedicated to protecting the
interests of the firearms and ammunition import and export communities. F.A.I.R. works with
many U.S. government agencies, including the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), the U.S. Department of State, Directorate of Defense Trade Controls (DDTC),
and the Department of Commerce, Bureau of Industry and Security (BIS) to provide solutions to the
concerns of F.A.I.R. members. Our membership includes importers and exporters of firearms,
ammunition, and other defense and dual-use articles who rely on licenses issued by ATF, DDTC,
and BIS. Many members also hold Type 07 or Type 10 licenses as manufacturers of firearms.
Members provide equipment to domestic law enforcement agencies and the U.S. military who
require such items to carry out their public safety and national security missions and sell the articles
they import to distributors for general commercial sale. A number of our members also produce
firearms and ammunition that are exported to foreign governments for their national defense,
consistent with the foreign policy of the United States.

F.A.I.R. welcomes the opportunity to provide comment on the proposed revisions to the EAR to
capture those items moving from USML Categories I, II, and III. We applaud the continuing efforts
by BIS and DDTC to revise the USML so that its scope is limited to those defense articles that

**1775 I STREET, N.W., SUITE 1150, WASHINGTON, DC 20006**

WASHSTATEC000091

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 2 of 6

provide the United States with a critical military or intelligence advantage or are inherently for military end use, and to remove those items that are widely available in retail outlets in the United States and abroad.

Overall, the proposed revisions to the EAR and USML Categories I, II, and III are a positive move to a more rational control of firearms and ammunition, and related parts, components, accessories, and attachments. The transition of certain items to the control of the EAR will serve to right-size license requirements while still maintaining necessary oversight of exports of these items. Additionally, by moving such items to the EAR, many domestic manufacturers who do not conduct exports will be relieved of the significant financial burden of registering under the ITAR.

We provide the following comments for BIS consideration, and are available should BIS or DDTC require additional information or wish to discuss our comments further:

1. **Implementation Period**.

    As noted in the proposed rule, BIS has adopted a delayed effective date of 180 days for previous rules revising entire categories of the USML and moving items to the CCL. BIS has requested comments from industry as to whether this implementation period should be applied to the revised Categories I, II, and III.

    Recommendation: **Split implementation period**. We wish to support the continued delayed effective date of 180 days for those industry members who need make changes to IT systems, technology controls plans, and other business processes necessary to implement the rule. However, there will be a number of domestic companies who, for example, do not engage in the business of exporting but engage in certain gunsmith activities or manufacture firearms parts and components for firearms that transition to the EAR who will wish to immediately implement the new rules in order to be relieved of the financial burden of ITAR registration. Therefore, we recommend DDTC allow for a split implementation period to allow those companies whose entire operations transition to the EAR to immediately shift to those controls while allowing those companies whose operations either remain under the ITAR or are now split between the EAR and the ITAR adequate time to make necessary changes to their businesses. There is precedent for a split implementation period as it was done in the *Federal Register* notice implementing of revisions to USML Category XI and corrections to USML Category VIII (See 79 FR 37536).

2. **Transition Firearm Suppressors (Silencers) to the CCL**.

    DDTC's proposed rule indicates that "[USML Category I] Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components." The proposed rule further indicates that its objective, after the proposed revisions, is to capture only those articles in USML Categories I, II, and III that provide the United States with a critical military or intelligence advantage, or are inherently for military end use. The items proposed for transition to the EAR do not meet this standard, "including many items which *are widely available in retail outlets in the United States and abroad* [emphasis

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 3 of 6

added]." Firearm suppressors (silencers) do not provide a critical military or intelligence advantage and are not inherently for military end use. Moreover, the hardware and associated technology is widely available throughout the world. Therefore, based on the litmus test identified in the proposed rule, firearm suppressors (silencers) should not be listed on the USML and should be more appropriately controlled on the CCL in the EAR.

<u>Recommendation</u>: **Remove Firearm suppressors (silencers) from USML Category I(e) and add them as a controlled item under ECCN 0A501.**

3. <u>**Use of "Combat Shotguns"**</u>.

DDTC proposes to revise USML Category I(d) to read as follows: "*(d) Fully automatic shotguns regardless of gauge." This proposed revision removes the words "combat shotguns." While we welcome this change due to the long-standing confusion over this undefined term, the words "combat shogun" are used in the proposed revisions to the EAR, specifically in the Related Controls of proposed ECCN 0A502, which reads: "This entry does not control *combat shotguns* [emphasis added] and fully automatic shotguns. Those shotguns are "subject to the ITAR." The Related Control to ECCN 0A502 does not go on to provide a definition for "combat shotgun." The lack of definition and the removal of the reference in the revised USML Category I(d) causes confusion as to what type of firearm is being referenced.

<u>Recommendation</u>: **Remove the reference to "combat shotguns" in ECCN 0A506 and have the Related Control to reflect the language used in the ITAR.** The Related Control would read as follows: *"This entry does not control fully automatic shotguns regardless of gauge. Those shotguns are "subject to the ITAR."*

4. <u>**Automated Export System.**</u>

Currently, when exporting firearms, there is no requirement to enter serial numbers of firearms to be exported into the Automated Export System (AES). However, in the BIS proposed rule, there is a proposal to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement is overly burdensome and will exponentially lengthen the time required for filing AES entries. Contrary to the proposed rule, this is not a mere "carrying over" of existing CBP filing requirements for items transferred from the USML to the CCL. The cited reference to information Department of Homeland Security currently collects under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) applies only to personal firearms temporarily exported. However, the proposed rule would apply to all exports of items controlled under ECCN 0A501.a or .b and shotguns with a barrel length less than 18 inches controlled under ECCN 0A502. Consequently, there is a significant change to the information being collected and to the burden hours as a result of this proposed rule.

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 4 of 6

Recommendation: **Remove the expansion of data elements required as part of an AES filing for firearms.** The serial numbers, make, model and caliber of firearms exported, as well as the reference to the export vehicle (*e.g.*, export license, exception) will be maintained by the exporter as part of its acquisition and disposition records required under the Gun Control Act and ATF regulations (27 C.F.R. Pt. 478, Subpart H), which are the same records currently maintained for firearm exports subject to the ITAR. Therefore, there is no loss of oversight or information by transitioning these items to the EAR and thus no need for adding data fields to AES entries. This is not required under the ITAR, and therefore should not now be required under the EAR.

5. <u>**ECCN 0A501**</u>

The BIS proposed rule states in "*Related Controls*" that magazines with a capacity of 50 rounds or greater are "subject to the ITAR." However, the proposed USML Category I(h)(1) references only magazines and drums with a capacity *greater than* 50 rounds (emphasis added).

Recommendation: **Revise ECCN 0501 "Related Controls" so that the capacity round description is consistently with USML Cat. I(h)(1).**

6. <u>**ECCN 0A501.d**</u>

This paragraph includes a reference to "complete breech mechanisms" with no further explanation or note to define the terms. It is unclear what would constitute a complete breech mechanism that is distinct from other parts specifically identified in paragraph .c.

Recommendation: **Revise ECCN 0A501 .d to include a definition or explanation of what constitutes a "complete breech mechanism," and to ensure there is no redundancy with any of the parts referenced in paragraph .c.**

7. <u>**ECCN 0A501.y.**</u>

The proposed rule explains this paragraph would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components." The paragraph indeed lists such items in specifically enumerated subparagraphs .y.1 - .6. Does this mean the .y paragraph controls only those items enumerated in the following subparagraphs .1-.6, or does the umbrella language in .y. serve to capture other parts, components, or attachments that are not specifically enumerated in subparagraphs .y.1 - .6., and not elsewhere specified (such as magazines for less than 16 rounds)? In other words, does the .y. paragraph itself serve as a catch-all for "parts", "components", "accessories" and "attachments"?

Recommendation: **Revise paragraph .y by replacing the period at the end of the paragraph with the phrase "including" or "as follows:" so as to clarify whether .y is limited to the enumerated subparagraphs, or itself is a control paragraph in which**

WASHSTATEC000094

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 5 of 6

**items can be controlled.** 0A501.y would read as follows: *"Specific ''parts,'' ''components,'' ''accessories'' and ''attachments'' ''specially designed'' for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL, as follows [or including]:"*

8. **ECCN 0A502**.

The proposed rule states that this ECCN would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). However, the items included in the ECCN header are separated by semicolons and there is no clear statement that the parts and components listed in the header are specific to shotguns. For example, because it is not clear that the enumerated items are specific to shotguns, there could be confusion as to whether 10 round magazines are controlled in ECCN 0A502, ECCN 0A501.y., or would such items fall to EAR99?

Recommendation: **Revise ECCN 0A502 to specify the parts and components enumerated in the ECCN header are SHOTGUN parts and components. We also recommend defining or explaining what constitutes "complete breech mechanism" (see comment for ECCN 0A501.d above).**

9. **ECCN 0A505**.

The proposed rule states that ammunition parts and components would be eligible for license exception LVS with a limit of $100 net value per shipment. This is a reduction in value compared to the ITAR license exemption currently available under 22 C.F.R. § 123.16(b)(2), which is capped at $500. It is unclear why the transition to the EAR would result in a reduction in the license exception value limit.

Recommendation: **Revise ECCN 0A505 to increase the value limit for the LVS license exception for ammunition parts and components in paragraph .x to $500.**

10. **ECCN 0A606**.

The DDTC proposed rule states that "the articles currently controlled in [Category II] paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606." However, there are no proposed corresponding changes to ECCN 0A606 in the BIS proposed rule.
Recommendation: **Revise ECCN 0A606 to clearly identify that engines for self-propelled guns and howitzers are controlled therein.**

WASHSTATEC000095

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 6 of 6

11. **§ 758.10 Entry clearance requirements for temporary imports**.

The proposed rule fails to take into consideration temporary imports by nonresident aliens who are subject to ATF regulations under 27 C.F.R. § 478.115(d).  Although the license exception BAG references ATF's jurisdiction with these types of imports, proposed section 758.10 is silent, except for ATF's regulation of *permanent imports* (paragraph (2)).

Recommendation: **Add language to 758.10(a)(2) carving out from the entry clearance requirements for temporary imports by nonresident aliens who temporarily import firearms under the provisions of 27 C.F.R. § 478.115(d).**

12. **§ 762.2 Records to be retained**.

The proposed rule indicates that BIS wishes to make changes to EAR recordkeeping requirements for firearms being moved to the CCL.  Specifically, BIS proposes to "add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502."  This additional recordkeeping requirement is unnecessary as it is duplicative of the information that is required to be retained in a company's ATF bound books pursuant to the Gun Control Act and ATF regulations.  In other words, the information that BIS seeks to retain is already being maintained by companies under ATF rules and regulations.

Recommendation: **Remove the proposal to add paragraph (a)(11).**

* * * * *

F.A.I.R. thanks the Departments of State and Commerce for the opportunity to participate in the regulatory revision process.  We hope that our comments assist the government in reducing jurisdictional ambiguities and clarifying the articles that will remain subject to the ITAR.  For your information, we also provide a copy of the comments submitted in response to the DDTC proposed rule.  Should you have any questions, or require additional information as you review public comments received, please do not hesitate to contact me at 202-587-2709 or execdir@fairtradegroup.org.

Sincerely,

Johanna E. Reeves
Executive Director

Enclosure: Comments to DDTC Proposed Rule (RIN 1400–AE30)



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats.  In sum, we are concerned about potential loss of life.  We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHSTATEC000097



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security
[2] Ibid.

WASHSTATEC000098



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR."  While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).
[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHSTATEC000099



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHSTATEC000100



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6] With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra.*

**5**   giffordslawcenter.org

WASHSTATEC000101



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.

Sincerely,

Lindsay Nichols
Giffords Federal Policy Director

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHSTATEC000102

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 10, 2018
**Tracking No.** 1k2-946i-2fw6
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3038
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** John Lindsay-Poland
**Address:** United States,
**Email:** johnlindsaypoland@gmail.com

---

## General Comment

Comment on Proposed Rules on Categories i-ii-iii by Depts. of State and Commerce
John Lindsay-Poland, Global Exchange

The below comment on the proposed rules by the Departments of State and Commerce supplements the comments submitted by the American Bar Association/Security Assistance Monitor and by Amnesty International USA, which we support. Please see the attached version for complete comment, sources, and notes.

The State Department proposed rule states that those weapons that would stay on the USML are inherently for military end use, adding that the items to be removed from the USML do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad. One State Department official reportedly said: We kind of refer to it as the Walmart rule. If its like something you can buy at a Walmart, why should we have control?

The Commerce Departments description of criteria for items to be moved off of the USML concludes: Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items. (p. 4) It adds that: There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. However, the examples given here are not from prospective importing nations, but from the United States: Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their parts, components, accessories and attachments.

Retail availability in the U.S. should not be a criterion, since this is not the market to which exports treated by the

WASHSTATEC000103

proposed rule will be directed. Moreover, the U.S. retail firearms market is qualitatively and quantitatively different from nearly every market in the world: with 4.4% of the worlds population, the U.S. comprises more than 45% of the worlds firearms in civilian possession.

In addition, the statement neglects another significant portion of the worldwide market for firearms: criminal organizations, illegal armed groups, and armed security forces that commit human rights violations.

In many countries, retail availability of all firearms is substantially limited. In Mexico, for example, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm. In the vast majority countries, there is a presumption against civilians owning firearms unless certain conditions and requirements are met. (S. Parker, Small Arms Survey, 2011)

Many nations either do not permit or highly restrict civilian use of some or all types of semi-automatic firearms and high-capacity magazines proposed for removal from the USML, and so cannot be said to have any retail availability of these prohibited firearms. Within the United States, semi-automatic rifles and high-capacity magazines are prohibited for retail sale in six states and the District of Columbia. Certain types of handguns and certain calibers of firearms that are included in Category I are also prohibited and not available for retail purchase in some countries.

That purchase and possession of certain types firearms and ammunition are permitted under national legislation does not necessarily indicate that these items are either widely available or feasible for most people to obtain. Many countries deeply restrict retail availability of all firearms through licensing requirements, which are often extensive and time-consuming.

States impose limitations on the retail availability, types of firearms that may be legally purchased, and licensing process for parties seeking to purchase a firearm because they recognize that guns are not like ordinary commercial items that can be purchased at a store. In many countries, legal markets for firearms blend with illegal markets in vast grey areas of stolen and diverted weapons. The potential and actual negative consequences of the ill use of such firearms are devastating. A coherent, ethical, and politically strategic approach to firearm exports would increase controls to help reduce violent harm by both state and non-state actors that will more easily acquire them under the proposed rules.

The proposed rules do not articulate any requirement for a review by State Department experts on human rights and criminal organizations. If that is the proposers intent, the rule should state it clearly, and spell out the scope of license applications subject to such review, concurrences required, specifying from which bureaus and agencies, and the competencies of experts who shall conduct reviews.

# Attachments

GlobalExchange comment 9july2018

WASHSTATEC000104

**Comment on Proposed Rules on Categories i-ii-iii by Depts. of State and Commerce**
John Lindsay-Poland, Global Exchange

The below comment on the proposed rules by the Departments of State and Commerce supplements the comments submitted by the American Bar Association/Security Assistance Monitor and by Amnesty International USA, which we support. This comment focuses on the proposed criterion of wide retail availability for firearms and munitions proposed for transfer from the USML to the Commerce Department, and includes brief comments about inter-agency review and about risks of criminal use.

The State Department proposed rule states that those weapons that would stay on the USML "are inherently for military end use," adding that the items to be removed from the USML "do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad." (p. 5) One State Department official was quoted in a press report about the proposed rule: "We kind of refer to it as the Walmart rule. If it's like something you can buy at a Walmart, why should we have control?"[1]

The Commerce Department's description of criteria for items to be moved off of the USML concludes: "Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items." (p. 4) It adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities." (pp. 6-7) However, the examples given here are not from prospective importing nations, but from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'" (p. 7)

The retail availability in the United States should not be a criterion, since <u>this is not the market to which exports treated by the proposed rule will be directed</u>. Moreover, the U.S. retail firearms market is qualitatively and quantitatively different from nearly every market in the world: the United States, with 4.4% of the world's population,[2] comprises more than 45% of the world's firearms in civilian possession.[3]

In addition, the statement neglects another significant portion of the "worldwide market for firearms": criminal organizations, illegal armed groups, and armed security forces that commit human rights violations.

In many countries, the retail availability of all firearms is substantially limited. In Mexico, for example, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm.[4] In China, firearm purchases are banned for most people, and private gun ownership is almost unheard of.[5] In the vast majority countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning

firearms unless certain conditions and requirements are met."[6]

Belize, Colombia, Israel, Japan, Kenya, Turkey, and United Kingdom do not permit any civilian use of some or all types of semi-automatic firearms proposed for removal from the USML, and so cannot be said to have any retail availability of these prohibited firearms.[7] Other nations, including Australia, Canada, Croatia, India, Lithuania, New Zealand, South Africa, Switzerland apply special restrictions to civilian possession of semi-automatic firearms, such as proof that they are needed for self-defense, and so it cannot be said that these firearms are "widely available in retail outlets" there. We emphasize that these examples are from only a selected sample of 28 countries; a full accounting of countries where there is only limited or any retail availability of semi-automatic firearms would certainly show many more.[8] Brazil also prohibits "assault weapons" for civilian purchase, while Chile and Colombia prohibit civilian possession of semi-automatic weapons entirely.[9]

Moreover, within the United States, semi-automatic rifles and high-capacity magazines such as those proposed to be removed from the USML are prohibited for retail sale in six states and the District of Columbia.

Magazines with a capacity of more than 10 rounds are not permitted for civilians in Australia.[10] Brazil, France, Romania, Slovenia, Spain, and Turkey do not permit purchase by ordinary civilians of high-capacity magazines.[11] DDTC policy has reportedly excluded export of high-capacity magazines except to military and law enforcement end users,[12] but nothing in the proposed rule indicates that the Department of Commerce would enact such a policy.

Certain types of handguns and certain calibers of firearms that are included in Category I are also prohibited and not available for retail purchase in some countries. In the Dominican Republic, for example, "certain firearms are considered 'war weapons' and can only be used by government forces, including .45 calibre pistols [and] rifles," according a Small Arms Survey study,[13] while Spain prohibits civilian purchase of firearms with a caliber of 20 mm or higher, which are considered to be "designed for war use."[14] More types – in some cases all types - of handguns are prohibited for civilian purchase in Belize, Canada, Colombia, Japan, Kazakhstan, the Russian Federation, the United Kingdom, and Venezuela.[15]

That purchase and possession of certain types firearms and ammunition are permitted under national legislation does not necessarily indicate that these items are either widely available or feasible for most people to obtain. In addition to prohibitions or restrictions on retail availability of types of firearms, many countries deeply restrict retail availability of all firearms through licensing requirements, which are often extensive and time-consuming. In India, for example, obtaining a license to acquire a firearm requires the applicant to demonstrate training in use of a gun, and often takes years.[16] Japan requires gun buyers to go through 12 processes before purchasing any type of firearm.[17]

States impose limitations on the retail availability, types of firearms that may be legally

WASHSTATEC000106

purchased, and licensing process for parties seeking to purchase a firearm because they recognize that guns are not like ordinary commercial items that can be purchased at a store. In many countries, legal markets for firearms blend with illegal markets in vast grey areas of stolen and diverted weapons, and of private security companies. The potential and actual negative consequences of the ill use of such firearms are devastating.[18] A coherent, ethical, and politically strategic approach to firearm exports would increase controls to help reduce violent harm by both state and non-state actors that will more easily acquire them under the proposed rules.

Processes for gun exports reflect substantive priorities and as such are integral to policy. The National Sports Shooting Foundation (NSSF) claims that under the proposed rule, "Applications would go through the same interagency review process, including by the Defense Department and the State Department's human rights and other experts."[19] However, the proposed rules do not articulate any requirement for such a review by State Department experts on human rights and criminal organizations. If that is the proposers' intent, the rule should state it clearly, and spell out the scope of license applications subject to such review, concurrences required, specifying from which bureaus and agencies, and the competencies of experts who shall conduct reviews.

---

[1] David Sherfinski, "Trump officials to roll back rules on some gun exports," *The Washington Times*, May 1, 2018, https://m.washingtontimes.com/news/2018/may/1/trump-officials-to-roll-back-rules-on-some-gun-exp/. It should also be noted that Walmart does not operate in more than 100 nations (see: https://corporate.walmart.com/our-story/our-locations and that in the United States Walmart does not sell semi-automatic assault rifles, high capacity magazines, or even (except in Alaska) handguns. See: https://news.walmart.com/2018/02/28/walmart-statement-on-firearms-policy.

[2] https://www.census.gov/popclock/

[3] Aaron Karp, *Estimating Global Civilian-Held Firearms Numbers,* Small Arms Survey, June 2018, at: http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf

[4] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" *The Los Angeles Times*, May 24, 2018, https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html.

[5] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters, October 2, 2015, at: https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002.

[6] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," chapter 9 in *States of Security: Small Arms Survey 2011*, Small Arms Survey, Geneva, p. 6, at: http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf.

[7] Parker, pp. 9-13; Law Library of Congress, *Firearms-Control Legislation and Policy*, 2013, at: http://www.loc.gov/law/help/firearms-control/firearms-control.pdf.

[8] Parker, pp. 2, 9-13.

[9] Lisandra Paraguassu, Ricardo Brito, "U.S. biggest source of illegal foreign guns in Brazil – report," *Reuters*, January 10, 2018, https://af.reuters.com/article/worldNews/idAFKBN1EZ2M3. David Gacs, Rachel Glickhouse, and Carin Zissis, "Gun Laws in Latin America's Six Largest Economies," Americas Society, January 11, 2013, https://www.as-coa.org/articles/explainer-gun-laws-latin-americas-six-largest-economies.

[10] Law Library of Congress, p. 20.

[11] "Overview of gun laws by nation," at: https://en.wikipedia.org/wiki/Overview_of_gun_laws_by_nation. France: https://www.service-public.fr/particuliers/vosdroits/F2242. Romania: http://www.gandul.info/reportaj/exclusiv-20-000-de-romani-s-au-inarmat-in-2011-fostul-sef-de-la-arme-din-politie-stii-cat-e-valabil-avizul-psihologic-pana-iesi-pe-usa-cabinetului-9375494.

[12] Clif Burns, "High Capacity Magazines Exported from U.S. to Norway Shooter," *ExportLaw Blog*, July 28, 2011, at: https://www.exportlawblog.com/archives/3315.

[13] Parker, p. 8.

[14] Law Library of Congress, p. 219.

[15] Parker, pp. 9-13; Gacs, Glickhouse and Zissis.

[16] Rama Lakshmi, "India already had some of the world's strictest gun laws. Now it's tightened them," *Washington Post*, August 1, 2016, https://www.washingtonpost.com/world/asia_pacific/india-had-the-one-of-the-strictest-gun-laws-in-the-world-it-just-got-tighter/2016/08/01/affd9422-51da-11e6-b652-315ae5d4d4dd_story.html?utm_term=.f69ad52bfffc.

[17] 1. Take a firearm class and pass a written exam, which is held up to three times a year. 2. Get a doctor's note saying you are mentally fit and do not have a history of drug abuse. 3. Apply for a permit to take firing training, which may take up to a month. 4. Describe in a police interview why you need a gun. 5. Pass a review of your criminal history, gun possession record, employment, involvement with organized crime groups, personal debt and relationships with friends, family and neighbors. 6. Apply for a gunpowder permit. 7. Take a one-day training class and pass a firing test. 8.Obtain a certificate from a gun dealer describing the gun you want. 9. If you want a gun for hunting, apply for a hunting license. 10. Buy a gun safe and an ammunition locker that meet safety regulations. 11. Allow the police to inspect your gun storage. 12. Pass an additional background review. Audrey Carlsen and Sahil Chinoy, "How to Buy a Gun in 15 Countries," *The New York Times*, March 2, 2018, https://www.nytimes.com/interactive/2018/03/02/world/international-gun-laws.html.

[18] Brazil provides an important example. See Rogert Muggah, "Where do Rio de Janeiro's crime guns come from?" openDemocracy, August 8, 2016, https://www.opendemocracy.net/democraciaabierta/robert-muggah/where-do-rio-de-janeiros-crime-guns-come-from.

[19] Larry Keane, "Why export control reform makes security and business sense," National Shooting Sports Foundation, July 6 2018, https://www.nssf.org/why-export-control-reform-makes-security-and-business-sense/.

WASHSTATEC000108



10 July 2018

*Via Email*

Mr. Robert Monjay
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E Street, NW
SA-1, 12th Floor
Washington, DC 20037

Email:       DDTCPublicComments@state.gov

Reference:   RIN 1400–AE30

Subject:     International Traffic in Arms Regulations: U.S. Munitions List Categories I, II,
             and III

Dear Mr. Monjay:

Goforth Trade Advisors LLC (GTA) respectfully submits the following comments on various
proposed revisions to the International Traffic in Arms Regulations (ITAR) in response to the
*International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III*, 83 Fed.
Reg. 101 (May 24, 2018).  We greatly appreciate the Directorate of Defense Trade Controls'
(DDTC) efforts in continuing to move forward with the changes envisioned by Export Control
Reform.  Based upon our previous government service and recent experience in assisting industry
with the implementation of Export Control Reform, we would like to draw the attention of DDTC
to certain issues and concerns with the proposed revisions to the ITAR.

Please see our detailed comments below.

**ITAR § 123.15(a)(3) – The proposed revision expands current Congressional threshold**

> One commenting party expressed concern that the proposed revisions to ITAR §
> 123.15(a)(3) expands the scope of Congressional notification for USML Category
> I articles by including paragraphs (e) and (g) in the proposed revised language.  The
> commenting party recommended the revised language read "Category I paragraphs
> (a) through (d)."

The current language of ITAR §123.15(a)(3) requires Congressional notification of firearms in the
amount of $1,000,000 without the designation of specific USML paragraphs. This has not been an

WASHSTATEC000109

issue since the current USML I(j)((1) provides a definition of firearm which limits such notification to articles controlled in USML I(a) through (d). The proposed Note 2 to Category I provides a new definition for firearm that maintains the intent of the current definition. In using either definition, the inclusion of articles controlled in paragraphs (e) and (g) in ITAR §123.15(a)(3) expands the current scope of Congressional notification which only applies to firearms.

This change was addressed in the preamble to the proposed rule. If expansion was intended and this section remains unchanged, GTA recommends providing an explanation in the preamble to the final rule.

To address these concerns, GTA recommends revising the proposed language as follows:

> *"(3) A license for export of defense articles controlled under Category I paragraphs (a) through (d) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more."*

**ITAR §123.18 – The removal of this exemption requires a conforming change to ITAR §123.16(b)(7)**

> One commenting party noted that the removal of the exemption at ITAR §123.18 requires a conforming change at ITAR §123.16(b)(7). The commenting party recommended placing ITAR §123.16(b)(7) in Reserve as the referenced exemption – ITAR §123.18 – has been removed and placed in reserve.

The language at ITAR §123.16(b)(7) points to the exemption at ITAR §123.18 for firearms for personal use of members of the U.S. Armed Forces and civilian employees. This proposed rule removes that exemption and places the section in reserve.

To address these concerns, GTA recommends placing ITAR §123.16(b)(7) in Reserve.

**Other Areas for Considerations for Final Rule**

GTA commends DDTC on the comprehensive review of the ITAR to identify conforming changes resulting from the proposed revisions to these USML categories. To further assist DDTC, GTA provides two additional sections of the ITAR which may require revision.

The first section is Supplement 1 to Part 126. The language in Supplement 1 refers to the current control language for USML Categories I, II and III, and several of these paragraphs have been revised or placed in Reserve due to transition the jurisdiction of the Export Administration Regulations (EAR). GTA suggests reviewing revising the language therein.

The other section is the technical data exemption at ITAR §125.4(b)(6). The current language refers to "…firearms not in excess of caliber .50 and ammunition for such weapons…" This section may not require revision however, GTA suggests a review is needed to ensure consistency with language in other areas of the ITAR.

WASHSTATEC000110

Thank you for the opportunity to present GTA's views concerning the proposed revisions to the ITAR.

If you have any questions concerning this submission, please contact the undersigned at (703) 722-8116 ext 101 or by e-mail at candace@goforthandexport.com.

Sincerely,

Candace M. J. Goforth
Managing Director

WASHSTATEC000111

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** June 25, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Category:** NA
**Tracking No.** 1k2-93x1-f0mz
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-0340
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** j dubya

## General Comment

The Firearms Commerce in the United States Annual Statistical Update 2017 by The United States Department of Justice BATFE shows 1,360,023 suppressors owned by American civilians.

I own and use suppressors. I applaud anyone shooting next to me willing to navigate the red tape of suppressor ownership. A close family member that has lost his hearing from hunting since he was 5 could still be living without hearing aids if more of us sportsman had a muffler on the front of our barrels. NO 33 YEAR OLD SHOULD HAVE HEARING AIDS!

Suppressors are common and simple accessories to American gun owners and the fact that suppressor are NOT planned on being removed from the ITAR list is UNACCEPTABLE! No small business should be forced to pay ITAR fees just because that business manufactured one suppressor in a year.

Maybe businesses that want to sell their suppressors internationally should pay ITAR fees.

Maybe every income tax paying individual should pay for these ITAR fees...Every income tax paying individual is being protected from the International Traffic in Arms Regulations (ITAR). Americans are not required to pay extra for police protection just because that American requires more protection from the Police. Firefighters do not collect more taxes from an individual whose house burns down versus someone that needs their cat taken out of a tree. The firearms industry should not be required to pay for the protection of every American citizen; that protection is a burden that every American Citizen should be required to pay.

The bottom line is this:

-IF ITAR taxes are being used to keep citizens safe then we need to have citizens foot the bill.

WASHSTATEC000112

BUT

-IF ITAR taxes are in place to deter small business owners operating withing the firearms industry then ITAR needs to be removed from the laws of this country.

WASHSTATEC000113

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 10, 2018
**Tracking No.** 1k2-946n-qha4
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3114
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Jack Cook
**Address:**
   46 Nexsen Road
   Kingstree,  SC,  29556
**Email:** jscookjr@icloud.com
**Phone:** 8433822209

---

## General Comment

As the owner of a small gunsmithing operation in rural SC I urge you to transfer control of small firearms and ammunition from the State Department to the Commerce Department. It is imperative to my business that we roll-back the horrible rules that you updated in July, 2016. Effective 22 July 2016, gunsmiths suddenly found themselves subject to the regulatory authority of the Arms Export Control Act (AECA) as administered by the State Departments Directorate of Defense Trade Controls (DDTC). Regulators suddenly determined that traditionally routine gun repair and enhancement services now constitute firearms "manufacturing" and mandatory registration of my small, home-based business under International Traffic in Arms Regulations (ITAR). Tis ITAR directive advises gunsmiths to stop what they are doing and pay up or face fines and prison! (Violations under the ITAR can bring civil penalties of $500,000 per violation and criminal penalties of up to $1 million per violation along with up to 20 years in prison).

These rules are terribly confusing. I submitted some very direct questions to you and have never received a reply. I developed a list of typical customer service requests that raise concern with respect to ITAR registration. Specifically, I requested your determination on these examples:

1) Drilling, threading and installing sling swivels on rifle forend (and buttstock) for sling and/or bipod (requires drill press and screw threading)
2) Fabricating replacement parts - such as firing pins for rifles and pistols (requires lathe turning, milling, grinding, and polishing)
3) Installation of Cominolli safety special option on Glock pistols (requires cutting of frame slot with

WASHSTATEC000114

Foredom tool and fixture)

4) Rifle barrel setback - to correct headspace and service misfire issues (requires lathe and chambering reamer)

5) Slide and frame milling and cuts adding cocking serrations for improved handling, chamfering and dehorning for concealed carry, and enhanced eye appeal (requires mill, surface grinder)

6) Installation of gunsmith fit barrel - for accuracy upgrade or to address headspace issues (requires milling and/or TIG welding of hood and foot to precise fit)

7) Installation of scope mount on early rifles - for hunting, competitive shooting, and sporterizing (requires drilling and tapping of mounting holes)

8) Re-crowning barrel - to improve or repair rifle accuracy (using lathe)

9) Installing 1911 Beavertail - to improve comfort and aim (requires precision cutting of frame, typically with mill)

10) Installing Sako-style extractor on Remington Model 700 rifle - primarily for improved reliability (requires milling and drilling of rifle bolt)

The above are, I think, a typical sampling of services that might reasonably be encountered in any gunsmith practice. Under State Department export control rulings all the above would likely constitute manufacturing and are illegal under ITAR absent payment of a large export fee. I urge you to transfer administration over to the Department of Commerce.

Obviously, the ITAR fee is a significant burden on a small gunsmith shop and will be an important factor in determining the viability and directions of my planned endeavor. I am hopeful that you will properly transfer administration and governance to the Commerce Department.

WASHSTATEC000115

Comments re: ITAR Amendment - Categories I II, and III; EAR Amendment - RIN 0694-AF47
Jeff Abramson
July 9, 2018

I have worked in the nonprofit sector for more than a decade in efforts to promote more responsible trade in conventional weapons and find these proposed regulatory changes to be irresponsible and dangerous. They continue the wrong-minded approach of the Trump administration to treat weapons as any other trade commodity, threatening to undermine long-term global security and true U.S. national security interests. While my comments below are as an individual concerned U.S. citizen, they are informed by my work as a senior fellow at the Arms Control Association, coordinator of a global network of professionals engaged on these issues –the Forum on the Arms Trade--, and former leader within the international Control Arms campaign that championed the creation and now implementation of the Arms Trade Treaty.

In addition to these comments, I commend to reviewers the comments by experts listed by the Forum on the Arms Trade, including: Colby Goodman, William Hartung, Christina Arabia; Adotei Akwei (on behalf of Amnesty International USA); and John Lindsay-Poland, which delve into many of these points in much greater detail.

Specific concerns include:

**Loss of Congressional oversight**

In 2002 Congress amended its notification threshold so that it would be informed of potential commercial sales of firearms under USML category I when they were valued at just $1 million, as opposed to $14 million for other major weapons sales. Such notifications have been instrumental in forestalling unwise sales, including last year to Turkey and the Philippines. No similar statutory requirement of congressional notification exists for most arms sales under the CCL, meaning Congress would lose its oversight role on these weapons.

**Public reporting should be improved, not weakened**

The public gains some insight into the transfer of weapons via Congressional notifications, and also through the State Department's 655 report and Blue Lantern investigations report. Those reports could provide much more detail, such as the number of specific weapons involved and other data, rather than broad categorical details (655 report). Commerce reporting provides even less data, with similar reports covering around 20 countries per year. We deserve better transparency, not worse. If this transfer of authority moves forward, the Commerce department should be required to improve its reporting.

**Non-sensical to no longer consider these military weapons/defense articles**

The transfer of regulatory authority to the Commerce Department is claimed to be wise because these weapons no longer "provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use," and further because many "are widely available in retail outlets in the United States and abroad."

Applying this general approach--taken from the larger export reform initiation--falls apart when we are looking at firearms and their ammunition. These weapons are and should be controlled because a

significant amount of violence that occurs, including against U.S. military and law enforcement personnel, is inflicted by small arms. Research indicates that the types of weapons being transferred to Commerce control—AR-15s and AK-47 style assault rifles and their ammunition—are "weapons of choice" of drug trafficking organizations in Mexico and other Latin American countries. Many can also be easily converted to fully automatic weapons, which will remain under USML control. U.S. military members often operate their fully-automatic-capable weapons in a semi-automatic or less-than-automatic mode. Plus, many sniper rifles to be moved to Commerce control are in U.S. military use.

In addition, in many of the countries where these weapons are likely to be marketed, they are considered military weapons and tightly controlled. As currently proposed, they would also remain on the US Munitions Import List (USMIL), which is proper. Why they would therefore not remain on a similar export list is illogical.

Being commercially available in the United States is not a good indicator of whether these weapons merit the oversight of the State Department, which is better tasked with weighing non-commercial concerns. Nor is it proper to consider these weapons somehow safer than others on the USML.

**Upsetting norms on human rights as relates to the arms trade**

The United States maintains strong laws against the provision of arms where certain human rights abuses are of concern (even if we do not always live up to those laws). Some of those laws may not apply to items in the 500 series. And although the State Department will be consulted in licensing decisions, it is difficult to see how this new approach would strengthen the ability of DRL and others concerned about human rights to forcefully insert human rights into arms sales decisions.

At a time where the global community must make the arms trade more responsible, these proposed changes would make its largest arms dealer, the United States, appear less responsible and less concerned about the human rights implications of the arms trade.

**Making 3-D printing easier is dangerous**

It is unfathomable how allowing untraceable 3-D printing of firearms serves U.S.-recognized goals to combat illicit trafficking of firearms. Our country has agreed to support the Program of Action (PoA) on small arms and light weapons and the International Tracing Instument (ITI), has signed accords on arms transfers and tracing in the Americas, and argued for why these efforts are so important. The United States also is the world's largest donor, as I understand it, to helping countries build their ability to trace weapons, secure weapons stockpiles, and to destroy those stocks when warranted. Yet, this transfer of authority to Commerce appears to open the door to unfettered 3D printing, which threatens to undermine nearly all those efforts.

**Overall**

At a fundamental level, U.S. arms are not like any other commodity and should not be treated as such. These are first and foremost killing machines. The over-emphasis on economic security threatens to jeopardize higher priorities, including peace and security concerns. If more weapons flow to countries with poor human rights records, norms around responsible weapons use and transfer will be harder to build and uphold.

WASHSTATEC000117

This analysis is built upon documents and comments currently available at
https://www.forumarmstrade.org/catitoiii.html

Including:

- "Proposed Firearms Export Changes: Key Challenges for U.S. Oversight," (see also attached 14 page document), Center for International Policy, William Hartung, Colby Goodman, Christina Arabia
- Arguments against retail availability criterion (pdf), public comment by John Lindsay-Poland, Global Exchange
- "Examples of Firearms Transferred to Commerce Under New Export Rules (pdf)," Violence Policy Center, contact Kristen Rand
- "Business with A Bang:How the Proposal to Loosen Arms Export Regulations Threatens Human Rights," Nate Smith, Amnesty USA, June 15, 2018 and Public Comment 41 from Adotei Akwei (pdf)
- "Trump Favors Arms Industry in Effort to Loosen Export Controls," Jeff Abramson, Issue Brief, Arms Control Association, June 7, 2018.

| | |
|---|---|
| **From:** | DDTCPublicComments |
| **To:** | DDTCPublicComments |
| **Subject:** | FW: Two Gun Issue Papers |
| **Date:** | Tuesday, May 29, 2018 9:47:26 AM |

Mr. Koelling: Thank you very much for keeping me in the loop. I did open the proposed "Final" rule ( 146 pages if I opened the right one ?? ). It looks like most of these proposed Regs have to do with re-classification of guns and components with a lot of narrative on export/import which small, local gun smiths have nothing to do with. They just fix our guns at the local level. If these new Regs do save the Government money and time, we appreciate this effort.

Is there any way to obtain a narrative in lay person's language that just says in common language what these Regs will do and the practical effect on those of us who own guns ?  I found the Regs very technical with a lot of acronyms the lay person, ( me ) will not understand.

I also noted that the date in these Regs that spoke to the date for what is an "antique" gun is incorrect. These Regs say a gun manufactured on or before 1890 is an "antique" but the Federal Law that says what is or is not an "antique" gun says any gun made on or before 1898 is an "antique ?? Could you please change that part of the proposed Regs to be consistent with the Federal law and BATF Regs on this subject ?

I never did find in these proposed "Final" Regs the answer to my original question which was, and still is, are small business gun smiths being classified as "gun manufacturers" or not and if yes, why ?

Thanks again. I really do appreciate your working with me on this subject. Those of us who like "antique" guns will more than appreciate a change to the 1898 date and I'd sure like an answer to my original question if at all possible. - Dick Loper

**Official**

UNCLASSIFIED

**Comment on Proposed Rule for "International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III"**

**RIN 1400–AE30**

Comment on Proposed Cat. I(g) and Cat. I Note 1

This law firm, Mark Barnes & Associates, submits this comment on behalf of our clients engaged in the manufacture of firearms and associated parts. The purpose of this comment is to request that the final rule clarifies Cat. I(g)'s applicability to parts such as machinegun barrels that are commonly used in both semiautomatic and fully automatic firearms.

The proposed Cat. I(g) would list: "Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category." The articles in paragraphs (a), (b), and (d) of Category I would encompass firearms that use caseless ammunition, fully automatic firearms to .50 caliber inclusive, and fully automatic shotguns. In other words, Cat. I(g) would control barrels, receivers, bolt carriers, slides, or sears ("Parts") specially designed for fully-automatic firearms.

The proposed rule includes Note 1 to Category I which clarifies that "Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: . . . parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category *that are common to non-automatic firearms* and shotguns. The Department of Commerce regulates the export of such items." (emphasis added).

Aside from a sear and receiver, it is extremely rare for any part or component of a fully-automatic firearm to not be common to a non-automatic firearm. Almost all fully automatic firearms have semi-automatic variants available on the commercial market. For example, FN USA manufactures and sells to the public a semi-automatic variant of the belt fed M249 Squad Automatic Weapon (SAW) with the only distinction from the fully automatic version being the receiver and fire control group. (https://fnamerica.com/products/rifles/fn-m249s/ "Semi-auto replica of the government-issue FN M249 SAW"). The barrel is identical to the fully automatic version. Accordingly, it would follow that a military M249 barrel would be controlled by the Department of Commerce.

Many companies will buy fully automatic firearms with destroyed receivers ("parts kits") from the military or police departments to construct and sell semi-automatic variants to the public. These parts kits generally consist of all parts other than the receiver (which is usually cut into three parts with a torch). Additionally, Mil-spec M4 and M16 fully automatic bolt carriers as well as barrels specially designed for fully automatic fire, are often sold with and made for civilian AR-15s.

Based upon the plain reading of the proposed Cat. I Note, some clarification is needed as to whether barrels, receivers (frames), bolts, bolt carriers, slides, or sears are non-ITAR simply because they are incorporated in semi-automatic variants on the civilian market, as almost all firearms parts, especially barrels, can be common to both semi-automatic and fully automatic firearms. We think that unless a part converts a firearm to fully automatic functionality, it should be controlled by the Department of Commerce.

Should you have any questions on this comment, please do not hesitate to contact Michael Faucette at (202) 626-0085 or michael.faucette@mbassociateslaw.com.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** July 10, 2018 |
| **Received:** July 09, 2018 |
| **Status:** Posted |
| **Posted:** July 09, 2018 |
| **Tracking No.** 1k2-946c-5077 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories
I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-2964
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Martha Hill

## General Comment

I am a retired person concerned about the cost shift that will happen with these changes. The new rules
would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that
since the 1940s have been used to offset the costs to the government of tracking who is manufacturing
weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not
charge any fee for licensing. So the government i.e., taxpayers will absorb the cost of reviewing
applications and processing licenses. Gun exporters that benefit from these sales should shoulder this
cost.

WASHSTATEC000121

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-944k-r92r
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-2520
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Mary Cato
**Address:**
    Arlington, TX, 76012
**Email:** mary.e.cato@gmail.com
**Phone:** 8172990194

---

## General Comment

I oppose the DOS proposed rule on international traffic in arms regulations for US munitions list categories I, II & III. On May 24, the Trump administration proposed to make it easier to export U.S. guns and ammunition globally, even though U.S.- exported firearms are already used in many crimes, attacks and human rights violations in many other nations. Action under the rule if it is enacted will endanger lives merely to enrich munitions dealers. The Trump administration proposal applies to assault weapons and other powerful firearms, moving export licenses from the State Department to the Commerce Department. The U.S. gun lobby has advocated for these policies. The Department of Commerce estimates that the transfer of authority will increase the number of export applicants by 10,000 annually, but the Commerce Department does not have the resources to enforce export controls, even now.

The proposed rule change:

1.Treats semi-automatic assault rifles as non-military, despite their use by U.S. troops, their use by state and non-state groups in armed conflicts, and their prohibition for civilian possession in many countries.
2.Eliminates Congressional oversight for important gun export deals.
3.Transfers the cost of processing licenses from gun manufacturers to taxpayers.
4.Removes statutory license requirements for brokers, increasing risk of trafficking.
5.Reduces or eliminates end-use controls, such as State Depts Blue Lantern program, and by eliminating registration of firearms exporters, a requirement since the 1940s.
6.Enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms.

WASHSTATEC000122

7.Reduces transparency and reporting on gun exports.

8.Transfers gun export licensing from an agency with mission to promote stability, conflict reduction, and human rights, to an agency with mission to promote trade.

WASHSTATEC000123

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 10, 2018
**Tracking No.** 1k2-946i-fy6p
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3025
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Maureen Brennan
**Address:**
     690 Laurel St
     Mayfield,  PA,  18433
**Email:** mdbgjp@echoes.net
**Phone:** 5708764205

## General Comment

I work for a company that makes military life support equipment (helmets, masks). These items are protected under ITAR / EAR regulations - so that they don't fall into the wrong hands. How can we consider GUNS (any!) to be non-military items and not controlled by ITAR? The proposed rules would eliminate Congressional oversight for important gun export deals - Congress would not longer be automatically informed about sizable sales of these weapons. On top of that, the new rules would make taxpayers pay for "licenses" via the Commerce Department- not the manufacturers via the State Department. And depending on the size of the sale- this is a lot of money. In summary: the proposed change will reduce transparency and reporting on gun exports - Congress and the public will not be aware of the total dollar value of firearms sales and where they are delivered.

WASHSTATEC000124

# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 5th, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Secretary Wilbur Ross
Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department. Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments. Exporters must be registered with the State Department and end-users are monitored under the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers. Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking. Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

WASHSTATEC000125

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.

Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

WASHSTATEC000126

| | |
|---|---|
| **From:** | mark.levin@mountainxs.com |
| **To:** | DDTCPublicComments |
| **Subject:** | ATTN: Regulatory Change, USML Categories I, II, and III |
| **Date:** | Saturday, May 26, 2018 1:16:49 PM |

The proposed regulatory changes are a good step in the right direction, but do not go far enough.

I am concerned primarily with the burdensome ITAR registration requirements in 22 CFR 122.1 and onerous annual fees ($2250 per year for Tier 1, the lowest tier! ) in 22 CFR 122.3 that apply to small business "Manufacturers" of firearms, especially for those Manufacturers of "NFA" firearms (machine guns, silencers, short barreled rifled and shotguns, etc.) who do not export and which have no intention of exporting.

This fee is entirely unreasonable, especially in the context of the BATFE firearms manufacturing license fee which is $150 for a 3-year period and the fact that a small volume NFA firearms manufacturer already is paying a $500 per year Special Occupational Tax.

Several options could and should be considered:

- The best option would be to remove fully automatic, small caliber (12.7 mm and below) firearms and silencers from the USML – export of those items from the US certainly could be adequately controlled via the EAR control categories of the Bureau of Industry and Security in the Commerce Department and the manufacturing processes for those types of items are well known and available even in the most primitive of nations, so this is hardly sensitive technology.

- Another good option would be to offer an exemption from registration and a fee waiver for domestic NFA firearms manufacturers who do not export,  or offer to export,  automatic firearms and silencers, but which manufacture machine guns wholly for domestic sales.  This could be done by simply adding a new exemption category in 122.1 (b).  (This could be in addition to the delisting of small caliber machine guns and silencers from the USML, or as a standalone change which would address the registration and fee burden concern.)

- Finally, a third option would be to provide a greatly reduced fee, well below the current Tier 1 fee set forth in 22 CFR 122.3, for small volume non-exporting NFA firearms manufacturers. This option would help somewhat, but is not as desirable because it would still require burdensome and unnecessary ITAR registration paperwork for wholly domestic manufacturers and continue the practice of requiring fees for non-exporters, which makes no sense.

No matter what is done with ITAR registration and fees for small manufacturers and the treatment of fully automatic small caliber firearms,  Silencers and similar articles should be de-regulated completely from the USML.  They are now commonly used for recreational and sporting purposes in civilian use,  both in the US and in many other countries, and the technology to make them is quite simple.  In fact, in many countries, silencers are unregulated, even when firearms are highly restricted.  And, in the past decade, numerous US states have legalized silencers for hunting.

WASHSTATEC000127

Thank you,

**Mark Levin**
General Manager
Office:  (303) 567-4174



P.O. Box 1511, Idaho Springs, CO 80452
***www.MountainXS.com***

*This electronic message transmission contains information which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic message transmission in error, please immediately notify the sender and delete the message. Thank you.*

WASHSTATEC000128



**NATIONAL SHOOTING SPORTS FOUNDATION, INC.**

Headquarters: 11 Mile Hill Road, Newtown, CT 06470-2359

400 N. Capitol Street NW, Suite 490, Washington, D.C. 20001

202-220-1340 ext. 249    lkeane@nssf.org

**Lawrence G. Keane**
SVP Gov't & Public Affairs
Assistant Secretary & General Counsel

July 6, 2018

By E-mail:
DDTCPublicComments@state.gov  subject line, "ITAR Amendment – Categories I, II, and III"

By Internet:
Federal eRulemaking Portal: www.regulations.gov - Docket DOS-2017-0046

By Federal Mail:

Robert Monjay
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E. Street, N.W.
Washington, DC 20226

RE:    Comments on Proposed Rule – International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 FR 24198 (May 24, 2018).

Dear Mr. Monjay:

The National Shooting Sports Foundation (NSSF) respectfully submits the following comments to the above-referenced Federal Register Notice.  NSSF is the trade association for America's firearm and ammunition industry.[1]  Formed in 1961, NSSF membership includes more than 12,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations, and publishers.  We seek to promote, protect, and preserve hunting and the shooting sports, and we offer the following public comments.

**Summary of High-Level Comments**

The policy justifications for the proposed rule and the corresponding proposed rule by the Commerce Department are described well on Commerce and State Department web pages at: https://www.bis.doc.gov/index.php/forms-documents/federal-register-notices-1/2220-cats-i-iii-myths-v-facts-posted-5-24-18/file and https://www.state.gov/t/pm/rls/fs/2018/282485.htm

---

[1] For additional information on NSSF, please see www.nssf.org.

WASHSTATEC000129

We encourage all those reviewing the proposed rules and the public comments to read these fact sheets to learn what the proposed regulatory rationalizations of U.S. controls on the export of commercial firearms and related ammunition are and, as importantly, are not. So that the policy objectives behind the proposed changes, as well as the "myths" associated with them, are knowable to all those reviewing the proposed rules, we ask the State Department to republish their essential content in the preamble to its final rule. In this way, they will be part of the official record and help inform comments on final agency decisions made regarding the proposed rules.

As better described by these fact sheets and in the preambles to the proposed rules, commercial firearms and related items that are widely available in retail outlets that are now subject to the export control licensing jurisdiction of the State Department under the International Traffic in Arms Regulations (ITAR) on its U.S. Munitions List (USML) Categories I, II, and III would be transferred to the licensing jurisdiction of the Commerce Department's Export Administration Regulations (EAR) in a series of new and coherently organized Export Control Classification Numbers (ECCNs). These proposed rules are the logical continuation of an effort began in 2010 under the Obama Administration to modernize the administration of U.S. export control regulations "to create a simpler, more robust system that eases industry compliance, improves enforceability, and better protect America's most sensitive technologies." We agree with the objectives of these bipartisan and widely supported changes. The proposed changes merely align the regulations with the nature of the items at issue, thus more efficiently accomplishing the national security and foreign policy objectives of the controls. Such changes reduce unnecessary burdens for both the U.S. Government and U.S. industry.

We have reviewed the proposed rule thoroughly with our membership. Except with respect to several of our comments set forth below, most members have told us that the final versions of the rules would eventually be beneficial because they would significantly reduce the overall burden and cost of complying with controls on the export of commercial firearms and ammunition. All who responded told us that there would be an initial short-term increase in burden and cost because of the need to re-classify thousands of commodity, software, and technology line items and SKUs affected by the new rules, but that the long-term regulatory burden reduction would significantly outweigh the short-term need to adjust internal compliance programs and practices. There would also be significant short-term costs and burdens associated with the need to become familiar with the nuances of the EAR and new BIS licensing officers. However, this burden, we believe, would be largely addressed by BIS's long-standing commitment of industry outreach and training resources, which we appreciate. We also believe that DDTC staff will continue their robust outreach and training efforts as well.

Our members understand that there would be no change to the licensing policies for end item firearms and related ammunition. If a gun required a license to export when it was regulated by the State Department then it would require a license to export when it is regulated by the Commerce Department. If an export to a particular destination or end user would have been denied or approved before, it would be denied or approved in the same manner under the new rules. Applications would go through the same interagency review process, including by the Defense Department and also the State Department's human rights and other experts. Under the new rules, no approvals would be converted to denials or denials to approvals.

Nonetheless, most of our members, particularly the small- and medium-sized companies, believe that the changes will be economically beneficial for them because the eventual regulatory simplification and cost reductions will allow them to consider exporting when they might not have otherwise. Those that already export believe they will be able to expand sales of exports that would have otherwise been approved. They hold these views because BIS and the EAR are simply better able to regulate commercial items than are DDTC and the ITAR. This is not meant to be a slur of DDTC staff, which is excellent. It is merely a reflection of the fact that the ITAR exists to regulate the export of defense articles that provide a significant military or intelligence advantage in a "one size fits all" type approach with regulatory requirements that are more relevant to the export of a fighter aircraft than something that can be purchased at a retail outlet. The EAR exists to regulate dual-use, commercial, and less sensitive military items that warrant control, but in more tailored ways to fit the specific national security and foreign policy, including human rights, issues posed by the items.

These conclusions have been proven thousands of times through the application of similar export control reforms for other sensitive commercial or less sensitive military items that have been transferred to Commerce's jurisdiction over the course of the last eight years. For example, under the Commerce system, there are no fees to apply for licenses. There are no redundant registration requirements for domestic manufacturers. There are no fees for registration. Such fees are bearable for large companies, but often not for small- and medium-sized companies. The license application forms are vastly simpler. Controls on less sensitive and widely available and basic parts, components, and technology are more tailored and allow for less burdensome trade with close allies through license exceptions. Sales with regular customers can be combined in to fewer license applications, thus reducing overall paperwork to achieve the same policy objectives. **There are many other benefits to the proposed changes as well described in the proposed rules' preambles, but our essential conclusion is that, particularly with the changes recommended below, they will lead to growth for U.S. companies, more jobs in the United States, and related economic benefits for the cities and states where the members reside while accomplishing the same national security and foreign policy objectives they have always had.**

Notwithstanding our overall approval of the proposed rules, we have the following comments and suggested edits that would make the rules even more efficient and consistent with the overall objectives of the effort.

## Specific Comments

### I.  Proposed Changes to Brokering Provisions in ITAR Part 129

The proposed rule would add "a new paragraph (b)(2)(vii) to §129.2 to update the enumerated list of actions that are not considered brokering [activities]. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government **does not impose a double licensing requirement** on the export, reexport or retransfer of such items." (emphasis supplied). The text of the proposed exception is: "(vii) Activities by persons to facilitate the export,

WASHSTATEC000131

reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter."

The policy goal of not imposing double licensing obligations – i.e., the need to get a license from both State and from Commerce for the same essential transaction – is perfect.  The rationalization benefits of the reform effort and the proposed rule would, of course, be ruined if, after the regulatory change, the parties involved in the same essential transaction would need authorizations from two agencies instead of one without the reform.  Indeed, State created the entire paragraph (x) concept for each of its USML categories to avoid the need to get a license from State and a license from Commerce for exports that had EAR-controlled items for use in or with ITAR-controlled items in the same shipment.

The proposed (b)(2)(vii) exception text, however, would, in most cases, not eliminate the creation of a double licensing requirement because the scope of "brokering activities" requiring registration, fee payments, and licensing under part 129 includes many types of activities that occur *before* Commerce (or State under a paragraph (x) authority) would issue a license.  Such activities include, with respect to the export, reexport, or retransfer of defense services, U.S.- and foreign-origin defense articles, (i) facilitating their manufacture, (ii) financing, (iii) or insuring.  With respect to their purchase, sale, transfer, loan, or lease, pre-license brokering activities include (i) soliciting, (ii) promoting, (iii) negotiating, (iv) contracting for, (v) arranging, or (vi) otherwise assisting.

Thus, for example, one wanting to *promote* or *negotiate* the possible sale of a U.S.-origin firearm that transitioned to the EAR (but which would also be identified in USMIL category I(a)) would need to go through the process of registering as a broker with DDTC, pay a registration fee, and get approval from DDTC to do so.  This would be a time-consuming and expensive process – and an effort that would become completely moot under the new (b)(2)(vii) exception if and when Commerce later issued a license to the exporter to allow the export of the firearm being promoted or subject to the negotiations.

We can infer why DDTC proposed this provision, which is to ensure that it is able to review and approve brokering activities before an application is submitted because it will not necessarily know then that the license would be approved later.  We recognize that brokering activities are separate controlled events from the act of exporting, reexporting, or retransferring an article.  Nonetheless, we respectfully submit that for items that would become subject to the EAR (and also identified on the relevant USMIL categories), maintaining this distinction is over-cautious, creates unnecessary regulatory redundancies, and does not advance the policy objectives of the control.

First, the vast majority of licenses for the export of commercial firearms and related items are and would likely continue to be approved without issue. With respect to those licenses that are not approved, the U.S. Government would still get the final say in the act that really matters from a policy and control point of view, which is the actual shipment of the firearm or other controlled item.  Thus, the double burden the proposed approach would impose does not seem warranted because the U.S. government will be able to accomplish its ultimate policy objectives at the end of the day by approving, denying, or approving with conditions the actual movement of the

WASHSTATEC000132

firearm or related item.  This would not be the case for items that would not be subject to the EAR.

RECOMMENDATION I:  Thus, to accomplish DDTC's policy objectives without creating the possibility of authorization requirements from two agencies, we suggest that the scope of the brokering obligations over items no longer described on the USML but still described on the relevant USMIL categories (i.e., I(a)-(c), II(a), and III(a)) apply only to such items that are not "subject to the EAR." In this way, DDTC would have control over brokering activities over such items in situations where the U.S. Government would not otherwise have jurisdiction over their later reexport or transfer, such as non-U.S. origin items meeting the description of items proposed to move from USML Categories I-III that would also meet the description of items currently on the USMIL's Category I-III. (Again, for all items that are "subject to the EAR," the US government will still be able to regulate the transaction.)  To accomplish this relatively simple solution, a suggested edit to the proposed exception paragraph (b)(2)(vii) is:

> "(vii) Activities that would or could result in the export, reexport, or transfer of an item 'subject to the EAR.'"

An even simpler approach would be:

> "(vii) Activities that involve items 'subject to the EAR.'"

If there were a violation of the EAR later, such as a violation of the terms of a license, then that would be prosecuted in the ordinary course.  If DDTC also wanted enforcement authority over brokering violations in connection with a later export in violation of the EAR, it could insert at note along the lines of the following:

> "Note to paragraph (b)(2)(vii): This exclusion from brokering activities for items subject to the EAR does not apply if the activities were part of a conspiracy to violate of the EAR."

We are confident that DDTC and the other agencies reviewing this comment may come up with other ideas.  We would be open to them so long as they would eliminate the need for parties to get both a State and a Commerce authorization for the same basic transaction.  Otherwise, the new rules would largely defeat one of the primary benefits of the proposed regulatory change, which is the consolidation within the Commerce system of control over the commercial firearms and related items that no longer warrant control on the USML.

## II.  USML Category III Ammunition – Projectiles – Pyrotechnic and Steel Tipped

The revised Category III enumerates pyrotechnic material in several subparagraphs. Subparagraph (a)(1) controls "Ammunition that **incorporates a projectile controlled in paragraph (d)(1)** or (3) of this category," and subparagraph **(d)(1)** controls "Projectiles that use **pyrotechnic tracer materials** that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one

or a combination of the following: tungsten, steel, or beryllium copper alloys." (emphasis supplied).

The revised category is specific in that it only controls ammunition or projectiles with pyrotechnic material "having peak radiance above 710 nm". This indicates that the control is limited to tracer compositions meant for use with night vision optics rather than controlling all tracers. We agree with this approach. Bright tracers have been used for sporting purposes for years to assist shooters in targeting and marksmanship, and therefore as a dual use item are more correctly controlled on the CCL.

However, there is confusion and possible overlap of controls with regard to subparagraph (a)(6), which controls **"Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems**." (emphasis supplied).

The first half of this sentence does not include reference to the radiance parameter of "above 710 nm" and indicates control of **any** ammunition with pyrotechnic material in the base. Since all tracer ammunition is manufactured with "pyrotechnic material in the projectile base," it is not necessary to designate a separate control for ammunition with pyrotechnic material in the base. And, subparagraphs (a)(1) and (d)(1) already control these articles and include the radiance parameter of "above 710 nm."

The second half of the sentence articulates controls on "any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems." Since peak radiance above 710 nm is required for tracer ammunition to be suitable for use in night vision devices, having another control separately enumerated in (a)(6) seems redundant.

RECOMMENDATION II.A.: We request DDTC to review subparagraph (a)(6) for possible deletion for the reasons stated above.

Subparagraph (a)(3) controls "Shotgun ammunition that **incorporates a projectile controlled in paragraph (d)(2)** of this category, and subparagraph (d)(2) controls "Shotgun projectiles that are flechettes, incendiary, tracer, or explosive."

Subparagraph (d)(2) does not include any reference to the parameters included in (a)(6) and (d)(1) i.e. "pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm". Shotgun ammunition with tracer material is being produced for sporting use by a Sporting Arms and Ammunition Manufacturers' Institute member company.

RECOMMENDATION II.B.: We recommend that subparagraph (d)(2) be revised to delete the word "tracer" and replace it with the phrase "that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm" for the reasons explained above and to make subparagraph (d)(2) consistent with the parameters in subparagraph (d)(1).

WASHSTATEC000134

Subparagraph (d)(1) also controls "Projectiles that ….. are incendiary, explosive, **steel tipped**, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys." (emphasis supplied).

Steel tipped projectiles are used in armor piercing ammunition. Unlike the federal definition of "armor piercing ammunition," the revised Category III does not exempt ammunition that the ATF has found is primarily intended to be used for "sporting purposes" per the below definition:

In 18 USC 918(a)(17)(A), the term ''ammunition'' means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.
>   (B) The term ''armor piercing ammunition'' means—
>   (i) a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or (ii) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.
>   (C) The **term ''armor piercing ammunition'' does not include** shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting**, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes,** or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

RECOMMENDATION II.C.: We recommend that subparagraph (d)(1) be revised to delete the term "steel tipped." Export controls of articles enumerated in the revised Category III should be consistent with definitions in other parts of federal law. Therefore control of steel tipped projectiles which have been determined to be intended for sporting purposes correctly belongs under the EAR.


## III.    Recommendations for Effective Date of Final Rule and Allowance for Manufacturing Registrations

RECOMMENDATION III.A. NSSF recommends a 180-day effective date for the final rule. Throughout the Export Control Reform initiative and during transition from the USML to the CCL, the final rule for many other categories had an effective date of 180 days after publication. This gave exporters of those commodities sufficient time to reclassify their products and implement changes in their enterprise systems to become compliant with the EAR. The later effective date also allowed those companies to continue to obtain export licenses from DDTC without loss of business in the interim. The regulatory change for firearms and ammunition will impact many exporters and involve a significant number of export licenses. Most of these companies have had no exposure to the EAR and will require significant training and outreach to understand the new regulations. The extended effective date will allow these firearm and

ammunition exporters sufficient time to learn and implement EAR-centric processes and procedures while still continuing to do business.

RECOMMENDATION III.B.  Although the extended period will be beneficial to exporters, it may present issues for small manufacturers and gunsmiths that do not export but are nonetheless required to register with DDTC.  Some of these companies may have registration expiration dates within the period prior to the effective date, forcing them to renew a registration which would no longer be required a short time later.  Therefore, we also request DDTC make allowance for registration renewal during the 180-day period by extending the expiration dates until after the effective date of the final rule.

## IV. Recommendation for Transition of Sound Suppressors to the CCL

NSSF respectfully requests DDTC consider transitioning control of sound suppressors from the USML to the CCL.  At a minimum, NSSF requests DDTC to reconsider the current restrictive policy and allow for commercial exports of these items. The proposed rule retains control of silencers, mufflers, and sound suppressors under USML Category I(e).  The current DDTC policy restricts exports of these articles to government and law enforcement agencies only.  This policy has been in place for more than 15 years, and is largely out of date with the current worldwide sale and use of suppressors for commercial, sporting and hunting purposes.

Suppressors are a simple design consisting of a casing which contains material to absorb some of the gases from escaping from behind the projectile once it leaves the barrel.  Suppressors have only a very limited and specialized military utility.  The benefit of a suppressor is that it muffles the sound of the shot to a certain extent.  The detriment of using a suppressor is that the projectiles lose both range and penetration.  And the more effective the sound suppression is, then the less effective the projectile.  In fact, government and law enforcement usage of suppressors is limited to special operating units and such.

However, sporting and hunting use of suppressors has been growing for many years.  The largest international commercial suppressor markets are the United Kingdom and New Zealand, with smaller markets throughout Europe.  In these countries, there are restrictions on how suppressors can be used.  For example, in Norway suppressors can be used for hunting only when hunters are a certain distance away from residential areas.  In the UK, suppressors are used with 99% of rifles and are considered a good solution to the problem of noise pollution.   There were 154,958 firearm certificates on issue by the end of March 2017, representing a total of 559,302 firearms, which is an increase of 4% compared with the previous year.  In New Zealand, suppressor ownership and use is legal with no special permit required.  Most .22LR rimfire rifles are sold with threaded muzzles for suppressor use.  The majority of rimfire suppressors are sourced from China which sells these items for approximately US$6.00 with an estimated landed cost of US$10 each.  Suppressors for centerfire rifles are gaining in popularity, and local production in NZ is increasing with one-third of NZ produced suppressors being exported to the UK and Europe.  The average price for these centerfire suppressors is approx. US$360.

Within the US, the sporting and hunting use of suppressors has kept to the same trend as the international markets.  There are 1.4 million suppressors registered in the U.S. as of April 2017.  Our source is the ATF's annual Firearms Commerce in the U.S. publication exhibit 8, page 15: https://www.atf.gov/resource-center/docs/undefined/firearms-commerce-united-states-annual-statistical-update-2017/download   The 2017 figure is triple the number of registered suppressors as of April of 2013 which was 494,452 units. And the movement of suppressors from the USML to the CCL will have no effect on domestic registration which will still be required.

Based on the above data regarding the predominant commercial use of suppressors both in the US and overseas, and in comparison to the limited use of suppressors by select groups in the military or LE, we estimate that there are more suppressors being used now for hunting and sporting purposes than for military or law enforcement purposes.  These articles can no longer be considered as having a critical military advantage with such widespread foreign availability.  The only effect of restricting U.S. exports of suppressors to government or law enforcement agencies is to block U.S. manufacturers and exporters from participating in these legal and growing foreign markets.  This is unfair for U.S. manufacturers who are not allowed to compete with foreign producers. If these articles are legal to own and to use commercially in the foreign country, then DDTC should allow for their export from the U.S.

In addition, there is no technology required or in use that warrants the stricter protections of the AECA. Because of the growing dual-use nature of these articles, export controls more correctly belong under the CCL.  Controls on suppressors on the EAR would include both "NS" (national security) and "CC" (crime control), and licensing would still be required, but with allowance for exports intended for sporting and hunting purposes.

* * *

We appreciate your consideration of our comments.  We would be happy to respond to any questions or concerns, or provide additional information.  I can be reached at lkeane@nssf.org.

Sincerely,

Lawrence G. Keane

**From:**       gailsnorman4@gmail.com
**To:**         DDTCPublicComments
**Subject:**    ITAR Amendment, Categories I, II and III
**Date:**       Saturday, July 7, 2018 1:14:00 PM

I strongly oppose the proposed rule that would move oversight from the State Department to the Department of Commerce Department of export licenses for Categories I, II, and III of the ITAR.  I urge you to abandon the proposal that will make it easier to export semi-automatic weapons and ammunition, eliminate Congressional oversight of these sales, weaken end-use controls, and enable production of 3D weapons anywhere.

Gail E Norman
142 N. Ridgeland Ave
Oak Park, IL  60303

Sent from Mail for Windows 10



Northrop Grumman Corporation
Corporate Office

**Global Trade Management**
2980 Fairview Park Drive
Falls Church, VA 22042

July 9, 2018

Department of State
Bureau of Political-Military Affairs
Department of Defense Trade Controls
2401 E Street, N.W.
12th Floor, SA-1
Washington, D.C. 20522

ATTN: Ms. Sarah Heidema
        Director, Defense Trade Controls Policy

SUBJECT: RIN 1400-AE30, Request for Comments Regarding Review of USML Categories I, II, & III.

Dear Ms. Heidema:

Northrop Grumman Corporation wishes to thank the Department of State (DOS) for the opportunity to submit comments in review of USML Categories I, II, and III. In response, we provide the following recommendations:

**General:**  We recommend the DOS harmonize categories and entries with those in the USMIL as best as possible. For example silencers, mufflers, and sound suppressors are USML I(e) but are USMIL I(d).  Revising the USML is an opportunity for better correlation; however the proposed rule offers greater divergence.

**Category I:**

**Paragraph (a):**  Proposed paragraph (a) controls firearms using caseless ammunition. Note 1 to Cat 1 states "…exclude: any nonautomatic or semi-automatic firearms…."  We recommend the Department clarify in Note 1 whether paragraph (a) is intended to control  nonautomatic or semi-automatic firearms that fire caseless ammunition. If DOS wishes to control all caseless firearms, then Note 1 to Category I will have to be amended.

**Paragraph (b):**   Recommend changing text to "Fully automatic firearms to .50 caliber (12.7mm) inclusive not elsewhere described in this category." This recommendation is intended to prevent potential overlaps or confusion that may exist with proposed paragraphs (a), (c), and (d).

**Paragraph (c):**   Recommend amending entry to "Firearms specially designed to integrate defense articles enumerated in Category XII (e.g. Precision Guided Firearms)."  This entry should not include parts and components therefor.   Specially designed parts and components of Category XII fire control systems, wind-sensing, and weapon aiming systems are not SME controlled.

**Paragraph (e):**      Recommend amending entry by moving specially designed parts and components of silencers, mufflers, and sound suppressors to a new non-SME paragraph (h).

WASHSTATEC000139

**Paragraph (h)(3):**    Recommend USG add clarification language/notes to differentiate the terms "automatic targeting" in this entry as well as "automatic tracking" or "automatic firing" in paragraph (a)(3).

**Paragraph (i):**  Recommend amending entry for Category I(i) to say "Technical data (see § 120.10 of this subchapter) and defense services (see § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (c), (d), (e), (g), and (h)…"  As written, Category I(i) does not cover technical data or defense services related to Category I(c) firearms.

## Category II:

**Paragraph (a)(1):**    Recommend defining "gun" as it is used in the category title, paragraph (a), but then is also enumerated in paragraph (a)(1).

**Paragraph (j)(4):**  Recommend adding language on what is considered to be part of the firing mechanisms.  For example, the clarification should include whether this paragraph controls electronic firing mechanisms.  Recommend adding language to read: "Firing mechanisms, including electronic gun control units, for the weapons controlled in paragraphs (a) and (d) of this category, and specially designed parts and components therefor;"

**Paragraph (j)(9):**  Recommend adding to the note what constitutes an independently powered ammunition handling system and platform interface components.  For example: "Independently powered ammunition handling systems are external to the gun and can be powered on their own without being attached the gun."

**Paragraph (j)(10):**  Recommend revising this paragraph to clarify if the recoil systems called out are those that are attached to, or those that are built into, the cannon.  Most cannon systems have the same recoil system internal to the cannon regardless of the platform it is ultimately mounted on.  This will cause the recoil systems to be controlled solely due to end use platform and not due to the performance capability.

Recommended language for recoil systems to be for specific attachment to air platforms:  "Recoil systems that are specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;"

In addition, we recommend the Department reconcile items covered under paragraph (j)(10) and (j)(13) to ensure no overlap in control

**Paragraph (j)(11):**  Recommend adding a note clarifying the differences between paragraph (j)(9) and paragraph (j)(11) as they appear to capture the same parts and components, or recommend deleting paragraph (j)(11) if the paragraphs are redundant.

**Paragraph (j)(12):**  This paragraph controls "ammunition containers/drums…specially designed for the guns and armament controlled in paragraph (a), (b), and (d)."  We have received an EAR99 determination for an ammunition container that is independent of the cannon system, as have others in industry, and we do not believe it would be affected by this paragraph as those are just carrying cases for ammunition.  However, in order to avoid confusion, we would recommend adding the clarifying language "ammunition containers/drums that are specially designed to attach to systems controlled in paragraphs (a), (b), and (d) of this category."

We recommend adding additional language to clarify whether "conveyor elements" is intended to relate to large caliber ammunition or medium caliber ammunition.  Medium caliber conveyor elements typically relate to feeder systems while large caliber ammunition conveyer elements typically would be seen in a naval gun system where rounds have a long distance to travel.  If this language is intended to capture feeder systems, we recommend adding "ammunition feeder systems" to the control paragraph.

**Additional Subparagraph**:  We recommend adding an additional subparagraph under (j) for setter coils and programmable ammunition implements.  This ammunition is controlled on the USML, and some categories in (j) may control parts of this equipment; however in reviewing the proposed regulations this equipment would fall to EAR99.  We recommend the following language: "systems and equipment for programming ammunition within the gun or cannon, and specially designed parts and components therefor."

<u>Category III:</u>

**Paragraph (a):**  We recommend removing the asterisk from paragraph (a), and placing asterisks next to subparagraphs (a)(1-10) as only necessary and consistent in comparison with SME items in other USML categories.  For example, as written, the developmental ammunition described in subparagraph (a)(10) would be considered SME, which is inconsistent with other USML category entries for developmental defense articles funded by the Department of Defense.

**Paragraph (a)(2):**  We recommend removing this paragraph.  The proposed paragraph (a)(2) would take a Commerce controlled item, unlinked ammunition, and change it to an SME item when combined with a non-SME category item, as links are enumerated under paragraph (d)(9).  The underlying commodity does not fundamentally change when it is incorporated into an ammunition link, it is just added for a specific function and that is to be used in a fully automatic firearm.

**Paragraph (a)(4):**  We recommend revising to say "Caseless ammunition." As written, wording could be interpreted to mean caseless ammunition manufactured with anything besides smokeless powder is Commerce controlled.

**Paragraph (a)(6):**  We recommend revising this paragraph.  It is unclear if the ammunition control parameters in the paragraph are based on the pyrotechnic material, the tracer materials, or the specification that this must be able to be seen by night vision optical systems.  For example, there are training rounds that have tracer material, but would not have pyrotechnic material in them, and in reverse has pyrotechnic material but does not have tracer material in it.  If these items are intended to be two separate items of control, recommended language is:

"Ammunition employing pyrotechnic material in the projectile base or ammunition employing a projectile that incorporates tracer materials of any type where the tracer or pyrotechnic material has a peak radiance above 710nm and is designed to be observable primarily with night vision optical systems."

**Paragraph (a)(7):**  We recommend revising to clarify whether the subparagraph is for ammunition for fully automatic firearms, and ammunition for guns that fire superposed or stacked projectiles, or whether it is for ammunition for fully automatic firearms that fire superposed or stacked projectiles, and ammunition for guns that fires superposed or stacked projectiles. As written, the subparagraph could be interpreted to cover all ammunition for fully automatic firearms, which

WASHSTATEC000141

could take Commerce controlled ammunition and change it to an SME item if for use in a fully automatic firearm.

**Paragraph (d)(4):**  Proposed paragraph (d)(4) controls projectiles not specified above for items controlled in USML Category II, and specially designed parts and components (e.g. fuzes, rotating bands, cases, lines, fins, boosters).  However paragraphs III(d)(1)-(3) do not control specially designed parts and components for those projectiles. Paragraph III(d)(7) controls cartridge cases, powder bags, and combustible cases of items in Category II.  Paragraph III(d)(11) controls safing, arming and fuzing components for ammunition in this category and their specially designed parts.  The inclusion of specially designed parts and components in paragraph III(d)(4) adds duplicative controls on those parts also controlled in paragraph III(d)(7) and paragraph III(d)(11).   We recommend deleting "specially designed parts and components" from paragraph III(d)(4).

**Paragraph (d)(6):**  We recommend adding clarifying language to paragraph (d)(6) in the proposed rule to clarify if the paragraph is intended to capture all armor piecing rounds.

**Paragraph (d)(7):**  We recommend revising paragraph III(d)(7) to state "Cartridge cases, powder bags, combustible cases, rotating bands, cases, liners, fins and boosters, specially designed for items controlled in USML Category II."

**Paragraph (d)(11):**  We recommend changing the wording in paragraph III(d)(11) to capture all artillery and ammunition fuzes and to delete "specially designed parts therefor" to align with bomb fuzing wording in Category IV(h)(25).  Note that specially designed parts for bomb fuzes are controlled under a variety of USML Categories for electronics as well as 600 series ECCNs for electronics and parts not otherwise enumerated in USML Category IV or another 600 series.  As electronic artillery fuzes and electronic bomb fuzes contain very similar technologies, the recommended change would align the jurisdiction/classification of these items.  Our recommend wording for paragraph (d)(11) is "Safing, arming and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category"

## ITAR §123.15:

**Paragraph (a)(3):**  We recommend revising the language to state: "A license for export of firearms controlled under Category I paragraphs (a) through (d) of the United States Munitions List, 121.1 of this subchapter, in the amount of $1,000,000 or more." Section 36(c) of the AECA requires certification to Congress only for exports of "a firearm controlled under Category I of the USML." The Department's proposed revisions would extend the certification requirement to items that are not firearms, including parts, components, and accessories such as barrels, sears, and mufflers.

## ITAR §129.2:

**Paragraph (b)(2)(vii):**  As proposed, paragraph (b)(2)(vii) would remove from the definition of brokering activities those facilitation activities that are related to a transfer that is authorized by an EAR license, EAR license exception, or ITAR license.  The carve-out would apply to items that are subject to the EAR yet that remain designated on the USMIL.  We seek clarification regarding whether proposed (b)(2)(vii) would apply not only to items currently controlled in USML Categories I-III, but to all items on the USMIL that are currently subject to the EAR (i.e., to include 600 series items previously transferred to the EAR pursuant to Export Control Reform).  We also recommend specifying whether the paragraph (b)(2)(vii) exclusion would apply to activities related to exports,

reexports, or transfers of an items subject to the EAR that does not require use of an EAR license or license exception (NLR).

**Paragraph (b)(2):**  As currently worded, ITAR paragraph 129.1(b) specifies that the brokering activities identified in the ITAR apply to those "defense articles" identified in either the USML or the USMIL, and current ITAR paragraph 129.2(b) defines "brokering activities" with respect to "defense articles."  As proposed, ITAR paragraph 129.1(b) would specify that the brokering activities identified in the ITAR apply to "defense articles" designated in the ITAR as well as "those items" designated on the USMIL.  However, DOS does not propose to amend the definition of "brokering activities" in paragraph 129.2(b), such that "brokering activities" would continue to be defined with respect to only "defense articles."  We seek clarification regarding whether DOS intends "brokering activities" to also apply to activities to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of items designated on the USMIL.

<u>Administrative:</u>  We recommend adopting a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL.

Should clarification or subsequent technical discussions be necessary, please contact either Steve Headley at james.headley@ngc.com, (703-280-4806), or myself at thomas.p.donovan@ngc.com (703-280-4045).

Sincerely,

*Thomas P. Donovan*

Thomas P. Donovan
Director, Export Management
Global Trade Management

WASHSTATEC000143

NATIONAL RIFLE ASSOCIATION OF AMERICA
**INSTITUTE FOR LEGISLATIVE ACTION**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



July 6, 2018

Mr. Robert Monjay
Office of Defense Trade Controls
United States Department of State
2401 E Street, Northwest
Washington, District of Columbia 20226

Via Online Submission: https://www.regulations.gov/docket?D=DOS-2017-0046

Re:     **Docket No. DOS-2017-0046; RIN 1400-AE30; International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

Dear Mr. Monjay:

I am writing on behalf of the National Rifle Association (NRA) to provide the association's comments on the above proposed rule (the proposal). With some six million dues-paying members, the NRA is America's premier defender of the civil right protected by the Second Amendment. Our members include individuals and businesses that would be directly affected by the changes in the proposal, including gunsmiths, firearm instructors, journalists and writers covering firearm technology and development, hunters, competitive shooters, and manufacturers.

The NRA is very pleased to see that the project of Export Reform has finally circled back to the place where it began, with proposed amendments to Categories I, II, and III of the U.S. Munitions List (USML). These were among the first of the changes planned for the large-scale undertaking to update export controls on dual-use items, and rightly so. The Second Amendment protects an individual right to possess and carry firearms in case of confrontation, extending to

2

arms in common use among the population for lawful purposes.[1] America boasts hundreds of millions of privately-owned firearms[2] and a robust "gun culture" that has produced countless books, magazine articles, videos, websites, online forums, etc., that exhaustively detail firearm technology and use. It is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain. This same information is commonly available overseas, as are the types of firearms and ammunition the proposal would move off the USML and onto the Commerce Control List (CCL). Meanwhile, the might and sophistication of the U.S. military – as well as America's armed populace – ensure that no foreign enemy wielding the type of arms at issue in these proposed amendments to the USML could pose a serious threat to this nation's security.

Of course, movement of commonly-available firearms and ammunition to the CCL would not leave their export unregulated. America already has one of the most well-established and closely-administered systems of regulation for commercial production and distribution of firearms and ammunition in the world, and the proposal would not change that. It is clear from the companion rulemaking published by the Commerce Department that items moving off the USML would remain closely controlled, with the necessity of export licenses remaining the norm. Foreign individuals' access to firearms and ammunition would also remain regulated under the federal Gun Control Act and the National Firearms Act. Furthermore, the Commerce Department has long regulated exports of various shotguns, as well as their parts, components, accessories, and ammunition. Thus, it has existing knowledge of and relationships with many of the entities the proposal will affect. Those entities, in turn, will also have some familiarity with the Department's regulatory environment and procedures.

The NRA believes that, on the whole, the proposal correctly balances the imperatives of national and global security, allocation of oversight resources, and promotion of American industry, innovation, and competiveness. We do, however, think it could be improved in several particulars. We also believe that the timing for the implementation of the rule deserves careful consideration.

Specifically, our concerns involve the following:

- **The retention of firearm sound suppressors on the USML is contrary to the guiding principles of Export Reform and does not serve it purposes.** Suppressors should also be moved to the CCL, unless they are specifically designed for use only with firearms that remain on the USML.

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 592, 624-25 (2008). *See also McDonald v. Chicago*, 561 U.S. 742 (2010) (Second Amendment right to keep and bear arms is fully incorporated against state and local action by virtue of the Fourteenth Amendment).

[2] The Small Arms Survey estimates that as of the end of 2017, there were 121 firearms for every 100 residents in the U.S., for a total of some 393.2 million guns. The program director for the Small Arms Survey Institute notes, however, that "there is no direct correlation at the global level between firearm ownership and violence." *See* Edith M. Lederer, "Global survey shows more than 1 billion small arms in world, mostly owned by civilians and mostly in the U.S.," ChicagoTribune.com, June 18, 2018, http://www.chicagotribune.com/news/nationworld/ct-survey-small-arms-world-civilians-20180618-story.html.

WASHSTATEC000145

3

- **The designation of "high capacity magazines" that would remain on the USML is based on an arbitrary number, rather than any qualitative difference in the technology or military character of the item.** The governing consideration should be whether they are specifically designed for use only with firearms that remain on the USML, not their capacity.

- **Where manufacturers and exporters need to implement new compliance procedures for items moving from the USML to the CCL, the final rule should have a delayed implementation date; where requirements that once pertained under the International Traffic in Arms Regulations (ITAR) have no analogues under the Export Administration Regulations (EAR), the changes should take effect immediately.**

For these reasons, and as detailed below, the NRA supports the proposal but advocates for minor revisions before its publication as a final rule.

I.   **Firearm Sound Suppressors, As Such, Do Not Meet the Prerequisites for Control on the USML Articulated by the Proposal and Therefore Should be Controlled Under the CCL.**

As noted in its supplementary information, the proposal is part of a longstanding effort to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." Whether or not sound suppressors for firearms are characterized as "weapons," there is no plausible argument that the devices meet these standards.

A firearm sound suppressor is basically a metal cylinder surrounding internal baffles that slow and cool escaping gas to decrease the volume of the firearm's muzzle report. The devices reduce, but do not eliminate, the sound of gunshots.[3] Suppressor have been commercially available since the first decade of the 1900s.[4] The technology necessary to produce them is simple and well-understood throughout the developed world. Detailed design, development, production, and manufacturing information for firearm sound suppressors is pervasively available in the public domain, including on the Internet.[5] Similar devices are used to moderate the sound of various other consumer products powered by internal combustion, including automobiles, chainsaws, and lawnmowers.

---

[3] Glenn Kessler, "Are firearms with a silencer 'quiet'?" WashingtonPost.com, March 20, 2017, https://www.washingtonpost.com/news/fact-checker/wp/2017/03/20/are-firearms-with-a-silencer-quiet/?noredirect=on&utm_term=.301e14951dd4.

[4] Stephen Halbrook, "Firearm Sound Moderators: Issues of Criminalization and the Second Amendment," 46 Cumb. L. Rev. 33, 42 (2015)

[5] A quick web browser search will reveal numerous webpages and videos offering detailed instructions on constructing suppressors of various levels of sophistication, from products produced with lathes and other machine tools to improvised models made from such materials as PVC, flashlight tubes, oil filters, and solvent traps. There's even a detailed suppressor schematic on the ATF's own website: https://www.atf.gov/file/silencer-cut-away.

WASHSTATEC000146

4

Suppressors do not provide the United States with any critical military or intelligence advantage. They are not unique to the United States and are in fact the rare type of firearm-related product that historically has been regulated more closely in this country than in a number of other countries with otherwise relatively strict gun control laws. In some foreign countries, there are no special requirements to acquire or possess firearm suppressors; in certain others, they are presumptively available to those with a firearm license.[6] Firearm suppressors are already in use by military forces, law enforcement agencies, and civilian firearm owners across the world. Simply put, any country sophisticated enough to produce firearms is sophisticated enough to produce firearm sound suppressors.

Firearm sound suppressors, by themselves, are harmless and cannot accurately be classified as "weapons." They are only useful when actually attached to a firearm. Even then, they do not make the firearm any more lethal. Their primary advantage is to protect the hearing of the firearm's user and to decrease the sound signature of firearms so their use is less noticeable and has fewer collateral effects on those in vicinity of the firearm's discharge.

And even assuming, for the sake of argument, suppressors could be characterized as "weapons," they are not "inherently military." Suppressors are regulated and taxed under U.S. law,[7] but they are readily available to those who are legally eligible to own firearms. They are lawful for private possession in 42 states and may be lawfully used for hunting in 40 states.[8] Suppressors adorn the firearms of plinkers, hunters, competitors, and law enforcement officers. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), there were 1,297,670 suppressors registered under the National Firearms Act as of February 3, 2017, with nearly 400,000 such registrations occurring in the 12 months preceding that date alone.[9] As previously mentioned, suppressors are also commonly used by law enforcement agencies and private firearm owners in other countries as well.

In its current form, the proposal does not differentiate between suppressors for use on firearms that would be regulated under the USML and those that would not. This could mean that firearms that would otherwise be regulated under the CCL will remain on the USML because they have integrated suppressors. It could also mean that firearm instructors would have to refrain from allowing suppressors to be used in their classes for fear of providing unauthorized "defense services." This is contrary to the spirit and intent of Export Reform and does nothing to further U.S. or international security interests.

Given that there is no special military or national security significance to firearm sound suppressors, there is no convincing argument for retaining them on the USML. Like flash suppressors, they should be generally subject to the CCL. If they are going to be retained on the USML at all, it should only be to the extent that they are "specially designed" for the firearms

---

[6] 46 Cumb. L. Rev. at 72-4.

[7] *See* National Firearms Act, 26 U.S.C. §§ 5801-5872; Gun Control Act, 18 U.S.C. §§ 921-931.

[8] American Suppressor Association, Education Webpage, https://americansuppressorassociation.com/education/ (last visited July 6, 2018).

[9] Stephen Gutowski, "ATF: 1.3 Million Silencers in U.S. Rarely Used I Crimes," FreeBeacon.com, Feb. 17, 2017, http://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/.

that would also continue to be so controlled. Because that distinction would be difficult to administer as a practical matter, however, the best option is simply to control the general category of firearm sound suppressors under the CCL.

## II.     The Proposal's Treatment of Magazines is Arbitrary and Capricious.

The proposal treats magazines as "high capacity" and therefore subject to the USML if they have a capacity of greater than 50 rounds, "regardless of jurisdiction of the firearm." It offers no explanation for this threshold. Whatever the thinking behind it may be, a 51-round magazine provides no greater critical military or intelligence advantage than a magazine of lesser capacity, nor is it any more inherently for military end use.

Magazines, whatever their capacity, are among the most simple and utilitarian of firearm-related items. In typical form, they consist of a metal box or tube with a floor plate that contains a spring with a follower at the top. A firearm that can accept a detachable magazine can accept a magazine of virtually any size. All that is necessary to create a magazine of greater capacity is a longer box and spring. Drum magazines typically utilize a cylindrical chamber and a wound spring or ratcheting mechanism to allow for greater capacity in a more compact unit, but neither configuration uses sophisticated or closely-held technology. Like firearm sound suppressors, technical data for magazines with capacities above and below 51 rounds is available in the public domain, including online, and has been since at least the early 20th Century.[10]

United States law does not limit the capacity of magazines for any sort of firearm available to private citizens (a handful of states, however, do impose magazine capacity limits, typically of 10 rounds). Magazines with capacities in excess of 50 rounds are readily available on the commercial market. They are used by practical shooting competitors, as well as by many gun owners who appreciate the versatility and convenience they provide. Even BB guns for the youth market that use springs or compressed air often have reservoirs that hold hundreds of rounds. While these non-powder guns obviously are not and would not be defense articles under the proposal, their capacity demonstrates the fact that marksmen of all types appreciate the ability to operate their guns without frequent reloading.

Demonstrating the arbitrary nature of controlling magazines based on their capacity is the fact that they can easily be clipped, taped, or otherwise attached to one another, with reloads accomplished in mere moments.

As with sound suppressors, it makes no sense that a given curriculum of firearm instruction that would otherwise be uncontrolled under the proposal could potentially be re-characterized as a "defense service" if it happened to involve a "large capacity" magazine.

---

[10] *See, e.g.*, European Patent Office Patent No. 8172, "A New or Improved Cartridge Magazine for Small Arms and Machine Guns," Accepted March 6, 1919 (providing detailed specifications for a drum-type magazine), *available at* https://worldwide.espacenet.com/publicationDetails/originalDocument?CC=GB&NR=191508172A&KC=A&FT=D &ND=3&date=19190306&DB=EPODOC&locale= (last visited July 6, 2018).

WASHSTATEC000148

6

For these reasons, we recommend that firearm magazines be controlled under the CCL. If they are controlled under the USML at all, it should only be to the extent they "specially designed" solely for firearms that remain on the USML.

**III.     The Final Rule Should Take Effect Immediately to the Extent Requirements Are Eliminated and Phase in Other Changes to Allow Regulated Entities Time to Adapt.**

When the final rule governing Categories I, II, and III of the USML is published, certain changes should take effect immediately, while others should be phased in to allow regulated entities time to adapt.

Changes that merely eliminate requirements altogether should take effect immediately. For example, there is no justification for continuing to make "manufacturers" of articles that would be moved off the USML register with the Department of State.

On the other hand, where control of an item changes from the USML to the CCL, necessitating new procedures by the regulated entity, implementation of the final rule's effective date should be delayed to allow for new compliance systems to be established.

Licenses granted under the ITAR should also be grandfathered for all outstanding transactions.

The NRA does not have any specific recommendations for a timeline of implementation for enforcing new requirements and procedures. We will defer to the entities whose day-to-day operations will be directly affected by the changes in the final rule.

**Conclusion**

The NRA is very pleased to see Export Reform finally turn its attention to Categories I, II, and III of the USML. The proposal charts a positive course that will contribute to national security, enhance the competitiveness of U.S. businesses, and benefit ordinary gun owners by mitigating the potential for the ITAR to burden innocent conduct that does not implicate national security. We hope you will take the suggestions offered herein seriously to further promote the worthy goals of this effort, and we appreciate the opportunity to provide input.

We have also included our submission on the Bureau of Industry and Security's companion rulemaking and incorporate those comments herein by this reference.

Sincerely,

*C. Zmf*

Christopher Zealand
Senior Research Attorney
NRA-ILA

NATIONAL RIFLE ASSOCIATION OF AMERICA
**INSTITUTE FOR LEGISLATIVE ACTION**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



July 6, 2018

Regulatory Policy Division
Bureau of Industry and Security
United States Department of Commerce
14th Street and Pennsylvania Avenue, Northwest
Washington, District of Columbia 20230

<u>Via Online Submission</u>: https://www.regulations.gov/document?D=BIS-2017-0004-0001

Re:     **Docket No. BIS-2017-0004; RIN 0694-AF47; Control of Firearms, Guns,
        Ammunition and Related Articles the President Determines No Longer Warrant
        Control Under the United States Munitions List (USML)**

Greetings:

        I am writing on behalf of the National Rifle Association (NRA) to provide the
association's comments on the above proposed rule (the proposal). With some six million dues-
paying members, the NRA is America's premier defender of the civil right protected by the
Second Amendment. Our members include individuals and businesses that would be directly
affected by the changes in the proposal, including gunsmiths, firearm instructors, journalists and
writers covering firearm technology and development, hunters, competitive shooters, and
manufacturers.

        The NRA is very pleased to see that the project of Export Reform has finally circled back
to the place where it began, with proposed amendments to Categories I, II, and III of the U.S.
Munitions List (USML). These were among the first of the changes planned for the large-scale
undertaking to update export controls on dual-use items, and rightly so. The Second Amendment
protects an individual right to possess and carry firearms in case of confrontation, extending to

WASHSTATEC000150

arms in common use among the population for lawful purposes.[1] America boasts hundreds of millions of privately-owned firearms[2] and a robust "gun culture" that has produced countless books, magazine articles, videos, websites, online forums, etc., that exhaustively detail firearm technology and use. It is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain. This same information is commonly available overseas, as are the types of firearms and ammunition the proposal would regulate under the Commerce Control List (CCL). Meanwhile, the might and sophistication of the U.S. military – as well as America's armed populace – ensure that no foreign enemy wielding the types of arms at issue in these proposed regulations could pose a serious threat to this nation's security.

Of course, movement of commonly-available firearms and ammunition to the CCL would not leave their export unregulated. America already has one of the most well-established and closely-administered systems of regulation for commercial production and distribution of firearms and ammunition in the world, and the proposal would not change that. It is clear from the proposal that items moving off the USML would remain closely controlled, with the necessity of export licenses remaining the norm. Foreign individuals' access to firearms and ammunition would also remain regulated under the federal Gun Control Act and the National Firearms Act. Furthermore, the Commerce Department has long regulated exports of various shotguns, as well as their parts, components, accessories, and ammunition. Thus, it has existing knowledge of and relationships with many of the entities the proposal will affect. Those entities, in turn, will also have some familiarity with the Department's regulatory environment and procedures.

The NRA believes that, on the whole, the proposal correctly balances the imperatives of national and global security, allocation of oversight resources, and promotion of American industry, innovation, and competiveness. We do, however, think that it could be improved in several particulars. We also believe that the timing for the implementation of the rule deserves careful consideration.

Specifically, our concerns involve the following:

- **§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP) and § 758. 10 Entry clearance requirements for temporary imports – The use of the Automated Export System (AES) is impractical and inappropriate for private travelers exporting a personal firearm they temporarily imported into the U.S. for**

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 592, 624-25 (2008). *See also McDonald v. Chicago*, 561 U.S. 742 (2010) (Second Amendment right to keep and bear arms is fully incorporated against state and local action by virtue of the Fourteenth Amendment).

[2] The Small Arms Survey estimates that as of the end of 2017, there were 121 firearms for every 100 residents in the U.S., for a total of some 393.2 million guns. The program director for the Small Arms Survey Institute notes, however, that "there is no direct correlation at the global level between firearm ownership and violence." *See* Edith M. Lederer, "Global survey shows more than 1 billion small arms in world, mostly owned by civilians and mostly in the U.S.," ChicagoTribune.com, June 18, 2018, http://www.chicagotribune.com/news/nationworld/ct-survey-small-arms-world-civilians-20180618-story.html.

WASHSTATEC000151

**lawful purposes.** The current system, which relies upon the ATF Form 6NIA, should be maintained without modification for such persons.

- **§ 740.14 Baggage (BAG) and § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES) – The use of the AES is impractical and inappropriate for private travelers temporarily exporting a personal firearm for lawful purposes.** The current system, which relies upon the CBP Form 4457, should be maintained without modification for such persons until such time as U.S. Customs and Border Protection engages in a public rulemaking process to resolve the current problems.

- **§ 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES) and § 762.2 Records to be retained – Expanding the data elements necessary for AES filings would exacerbate the problems for private travelers temporarily exporting a personal firearm and violate the spirit of Congressional prohibitions against federal firearm registries.** Private travelers temporarily exporting personal firearms should continue to be able to use the CPB Form 4457 without the firearm's information being captured by a federal database.

- **Where manufacturers and exporters need to implement news compliance procedures for items moving from the USML to the CCL, the final rule should have a delayed implementation date; where requirements that once pertained under the International Traffic in Arms Regulations (ITAR) have no analogues under the Export Administration Regulations (EAR), the changes should take effect immediately.**

For these reasons, and as detailed below, the NRA supports the proposal but advocates for revisions before its publication as a final rule.

I.   **The AES System is Impractical and Inappropriate for Use by Private Travelers.**

   A.   The AES requirement was introduced without sufficient or accurate notice to the public.

The International Traffic in Arms Regulations historically had included an exemption under 22 CFR §123.17(c) that allowed U.S. persons to temporarily export without a license up to three nonautomatic firearms and not more than 1,000 cartridges therefor.  This exemption was geared toward hunters, sportsmen, competitors, and others who travel overseas with firearms to be used for sporting and other lawful purposes.

In 2011, DDTC published a Federal Register notice of proposed rulemaking entitled International Traffic in Arms Regulations: Exemption for Temporary Export of Chemical Agent Protective Gear. [3] The supplementary information to that rulemaking focused on amendments to 22 CFR §123.17 pertaining to "the temporary export of chemical agent protective gear for

---

[3] 76 Fed. Reg. 16353 (March 23, 2011).

WASHSTATEC000152

4

exclusive personal use ... ." It also mentioned that "an exemption for firearms and ammunition is clarified by removing certain extraneous language that does not change the meaning of the exemption."[4]

In fact, the proposed change to the firearms and ammunition exemption was a material and substantial change to the status quo. It would require for the first time that "the individual must ... present the Internal Transaction Number (ITN) from submission of the Electronic Export Information in the Automated Export System per § 123.22(b)" to use the exemption.[5]

But because the notice only printed the amendments to 22 CFR §123.17 and omitted the existing text of that section, it was not clear from the face of that notice what the context of this new requirement was. The notice's inaccurate portrayal of the change as a mere "clarification" further contributed to obscuring the significance of this new language. Thus, the new requirement for temporary firearms and ammunition exports went largely unnoticed by relevant stakeholders.

The final rule was published on May 2, 2012.[6] Its supplementary information included a similarly inaccurate description of the firearm exemption amendment. "Section (c)(3) is revised to remove what is in practice extraneous language," it stated.[7] "Subject to the requirements of (c)(1)–(3), the exemption applies to all eligible individuals (with the noted exceptions). Thus, while the text is revised, the meaning of (c)(3) is not changed."[8]

Unlike the notice for the proposed rule, however, the notice of the final rule included the full text of subsection (c), which made clear the AES filing requirement pertained to those claiming the licensing exemption for temporary firearm and ammunition exports. Of course, it was by then too late for stakeholders to object to these changes, as the rule had been finalized.

For three years, the changes to 22 CFR §123.17 as they pertained to temporary firearm and ammunition exports appeared to be ignored and unenforced by the federal government. Then, in 2015, U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) suddenly changed their websites to indicate the AES filing requirements would be enforced against travelers temporarily exporting firearms and ammunition, with penalties that could include seizure of improperly declared items and criminal prosecution.[9]

---

[4] *Id.*

[5] *Id.* at 16354.

[6] Amendment to the International Traffic in Arms Regulations: Exemption for Temporary Export of Chemical Agent Protective Gear, 77 Fed. Reg. 25865-01 (May 2, 2012).

[7] *Id.*

[8] *Id.*

[9] *See* NRA-ILA, "Rule Change May Devastate International Travel for Hunters and Shooters," https://www.nraila.org/articles/20150320/rule-change-may-devastate-international-travel-for-hunters-and-shooters (March 20, 2015).

5

B.     <u>The AES was not designed for use by private persons for non-business purposes.</u>

The AES was designed around the needs of commercial exporters and government officials, not private travelers. As CBP's "Introduction" to the AES states:

> *During AES development, a Trade Resource Group convened regularly. To ensure that all voices were heard, the group was comprised of large and small exporters, carriers, freight forwarders, port authorities, and non-vessel operating common carriers (NVOCC). At the trade's request, separate coalitions for exporters and software vendors were formed.*[10]

It continues, "Whatever aspect of the export community you represent - exporter, carrier, freight forwarder, port authority, service center, non-vessel operating common carrier, consolidator - AES has advantages for you."[11] Nowhere does this summary recognize that private individuals would also have to navigate a system designed by and for industry compliance specialists.

Individuals attempting to use the AES will need to have compatible hardware and software systems or to enlist the services of an authorized agent. Those who do not wish to purchase or write their own software, or hire someone to complete the filing process for them, have the option of using AESDirect, an online version administered by the U.S. Census Bureau.

That agency, in turn, has a webpage with various resources to acquaint users with the intricacies of the system.[12] Browsers can start, for example, with the 39-page *AESDirect User Guide*[13] or with any of the one-hour-plus webinars that cover various aspects of the system.

Navigating the filing process requires individuals to create an account and then fill in data fields with various codes that are neither intuitive nor easily reconcilable with the context of an individual traveling with his or her own private property. For example, the system requires the parties to an export to be identified, with required fields that include the U.S. Principal Party in Interest, which must be identified by "Company Name" and an acceptable ID type. Likewise, the Ultimate Consignee also must be specified, again with reference to "Company Name" and an authorized form of identification.

Nowhere does the User Guide or the screens of the system itself explain how these categories are supposed to translate for private individuals declaring temporary exports of their

---

[10] U.S. Customs and Border Protection, "AES: An Introduction," https://www.cbp.gov/trade/aes/introduction (last visited July 6, 2018).

[11] *Id.*

[12] U.S. Census Bureau, "ACE AESDirect – Resources," https://www.census.gov/foreign-trade/aes/aesdirect/transitiontoace.html?eml=gd&utm_medium=email&utm_source=govdelivery (last visited July 6, 2018).

[13] *Available at* https://www.census.gov/foreign-trade/aes/aesdirect/AESDirect-User-Guide.pdf (last visited July 6, 2018).

WASHSTATEC000154

own property. Such persons are not just an afterthought in the system's design. Rather, it appears that the design has not thought of them at all.

The acceptable forms of identification, for example, are an Employer Identification Number (EIN), a Dun and Bradstreet Number, or a foreign passport number (if the foreign entity is in the U.S. at the time the goods are purchased or obtained for export). U.S. individuals making temporary exports cannot use their own passport numbers, nor can they use their Social Security numbers.[14]

Using AESDirect, moreover, requires an individual to apply for an account with the Secure Data Portal of the Automated Commercial Environment. The application for an ACE Exporter Account[15] requires users to list "Corporate Information," including an EIN and Company Name.

The Internal Revenue Service (IRS) is responsible for issuing EINs. The IRS website that explains the process for applying online clearly states: "Employer Identification Numbers are issued for the purpose of tax administration and are not intended for participation in any other activities."[16] The online application requires the applicant to identify the "legal structure" associated with the EIN. None of the available options corresponds with a private individual who simply wishes to make an AES filing. The applicant then must specify why he or she is requesting an EIN, with the limited menu choices again offering no option for the private AES filer. Finally, the applicant must certify under penalties of perjury that he or she has "examined this application, and to the best of my knowledge and belief, it is true, correct, and complete."[17]

Private individuals using the online application form, in other words, must make a false certification to the IRS about their business need for an EIN as a prerequisite to complying with the legally-mandated AES filing requirement. These individuals are also potentially creating an expectation with the IRS that they are creating a business that should have associated tax filings.

C.    The relevant agencies have been aware of the problems private individuals have using the AES, and there has been no apparent progress in resolving them.

In 2015, representatives of the NRA – as well as representatives of hunting and firearm industry associations – met with officials from CBP, the Census Bureau, the Department of

---

[14] *See* U.S. Customs and Border Protection, "Change in Automated Export System (AES) exporter ID filing requirement," https://help.cbp.gov/app/answers/detail/a_id/1145/kw/EIN%20number%20needed%20for%20export (last visited July 6, 2018).

[15] *Available at* https://ace.cbp.dhs.gov/acexpub/acexpub_Apps/ExporterAccountApplication/expForm.php (last visited July 6, 2018).

[16] IRS, "Apply for an Employer Identification Number (EIN) Online," https://www.irs.gov/businesses/small-businesses-self-employed/apply-for-an-employer-identification-number-ein-online (last visited July 6, 2018).

[17] *See* IRS Form SS-4, available at https://www.irs.gov/pub/irs-pdf/fss4.pdf (last visited July 6, 2018). Note the PDF of the SS-4 has options for "Other (specify)" not available on the IRS's online application form. It does not, however, indicate that EINs may be obtained solely for AES filing purposes.

WASHSTATEC000155

Homeland Security (DHS), and ICE to discuss the above problems.[18] These discussions emphasized the need for a simple, straightforward, and legal means for private travelers to comply with their AES filing requirements. The discussions also touched on concerns about creating a federal firearm registry via AES filings (a topic that is explored below in greater depth).

Shortly after that meeting, and after additional intervention from members of Congress, CBP announced that it would return to the status quo practice of using the paper CBP Form 4457 to track firearms for temporary export.[19] In this procedure, travelers report to a CBP office during their trip or beforehand at a Port of Entry and present the firearms (and ammunition, if applicable) to be recorded on the 4457. Upon return to the U.S., the traveler will declare the property, which can be checked, if necessary, against the 4457 to ensure the same firearms that left the country have returned. The ATF has also indicated that this procedure will satisfy the re-importation of firearms under its importation jurisdiction.[20]

We understand that this remains the procedure for temporary firearm exports by private travelers to the present day and that the AES filing requirement is not being enforced against these individuals.

Between 2015 and the present, NRA representatives have had repeated contacts with officials from CBP and the Census Bureau to inquire about any changes or updates to the above-described state of affairs. To date, we have neither seen nor heard of any evidence that the AES system has been in any way modified to alleviate the problems it presents for private travelers. Our review of the applicable websites during the preparation of these comments confirms this impression. The AES remains a complex application geared toward the needs of industry and government, not private persons traveling with their own property for non-business purposes.

D.   <u>BIS should omit the AES filing requirement for private persons temporarily exporting their own firearms and ammunition for lawful purposes and codify the Form 4457 procedure.</u>

The NRA is pleased to see that BIS' current proposal is handling the AES issue in a much more transparent and forthright manner than the 2012 DDTC rulemaking that introduced it in the first place. The background information included with the proposal acknowledges:

> *BIS is aware that U.S. Customs and Border Protection (CBP) has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to*

---

[18] *See* NRA-ILA, "You Can't Get There from Here: Obama Administration Shrugs Off Woes of International Travelers," https://www.nraila.org/articles/20150417/you-cant-get-there-from-here-obama-administration-shrugs-off-woes-of-international-travelers (April 17, 2015).

[19] *See, e.g.,* P.J. Reilly, "U.S. Government withdraws confusing new gun rules for traveling hunters," LancasterOnline, April 27, 2015, https://lancasteronline.com/news/local/u-s-government-withdraws-confusing-new-gun-rules-for-traveling/article_e2991fcc-ecec-11e4-8e21-3b622f277d23.html.

[20] *See* 27 C.F.R. § 478.115(a).

WASHSTATEC000156

*operational challenges related to implementation. ... Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.*

As explained above, the CBP and the other relevant agencies have not updated their processes to allow for individuals to easily file Electronic Export Information in the AES. Given that they are aware of the issues, have had more than three years to fix them, and have made no discernable progress in that direction, there is no reason to believe they will do so by the time the proposal is published as a final rule.

The NRA is unaware of any compelling security need to change the status quo. The very fact that the systems have not been updated to address the outstanding issues would seem to indicate CBP and DHS agree. Simply put, there has been no urgency to facilitate AES filings by private travelers. The Form 4457 procedure has proven to be a workable system both before and since the 2012 rule change, and it can continue to suffice for the near term.

The paper Form 4457 also serves an important function for some U.S. travelers to foreign countries that require a valid "firearm license" from visitors' home countries. Neither the U.S. government nor most U.S. states generally license the acquisition or simple possession of firearms, especially long guns. But foreign officials in these countries have historically accepted the Form 4457 as fulfilling this requirement.

It is also relevant that BIS has throughout the relevant time period always allowed for the temporary export of shotguns and shotgun shells under its jurisdiction via the baggage exemption of 15 C.F.R. § 740.14 without requiring a declaration to be filed in the AES. Indeed, that exemption currently does not specifically require the use of the Form 4457 procedure, either. Codifying the Form 4457 procedure would therefore help promote consistency and understanding across the different agencies involved in enforcing the nation's export rules and with the traveling public. The president's determination that certain additional firearms and ammunition no longer warrant control under the USML more strongly argues in favor of BIS adopting its own procedures for their temporary export than for importing procedures from the ITAR into the EAR.

CBP can also issue its own rulemaking on procedures for temporary exports by private travelers, should the state of play change with respect to the practical and technological issues of the AES. The issue could then be fully vetted in its own right. There is no reason, however, to inject this thorny issue into the larger project of Export Reform. It is not necessary nor helpful to the objectives of Export Reform, and it would perpetuate a problem one solution to which has already been identified (i.e., the paper Form 4457 procedure).

E.   Private travelers exporting a personal firearm they temporarily imported into the U.S. for lawful purposes should not be required to use AES for this purpose.

The same problems that arise from requiring U.S. persons to file declarations through the AES to take advantage of the BAG exemption apply to requiring foreign visitors traveling to the U.S. with their own firearms to use the AES to avail themselves of the TMP exception. This is not necessary under the current version of 15 C.F.R. § 740.9, and it should not be added to that section or to § 758.1.

Currently, foreign visitors traveling to the U.S. with their own firearms must apply for an import permit from the Bureau of Alcohol, Tobacco, Firearms & Explosives using ATF Form 6NIA. The individual will also have to substantiate his or her eligibility to possess a firearm in the United States as a non-U.S. person (for example, by obtaining a hunting license from a U.S. state). The travelers must then declare their firearms at the border, provide CBP officials with any required documents, and maintain the required documents during the duration of their stay. Customs officials in the country of re-importation can use the ATF Form 6NIA to confirm that the individual is returning with the same firearms that were brought to the U.S.

We are unaware of any attempt on DDTC's part to enforce a requirement that foreign visitors (including from Canada) declare the "export" of firearms they temporary brought to the U.S. for lawful purposes through the AES when the visitor returns home. Indeed, it is difficult to understand how doing so would contribute to national security. Thanks the Second Amendment and America's unique commitment to individual liberty, the U.S. has by far the largest civilian stock of firearms in the world.[21] Given the ready availability of firearms in the U.S. as compared to the rest of the world, there is little chance that America's interests are seriously threatened by foreign visitors bringing their own lawfully obtained guns into the country. At the very least, they are not threatened enough to impose a bureaucratic requirement for private foreign travelers that has already proven unworkable for their U.S. counterparts.

For these reasons, we urge BIS to omit from §§ 740.2 and 758. 10 the AES declaration requirement as applied to private foreign travelers temporarily bringing personal firearms into the U.S. Foreign hunters and competitive shooters help contribute to the U.S. economy, and these proposed changes would discourage them from doing so. Meanwhile, reports of foreign travelers committing crimes in the U.S. with firearms they lawfully brought with them are vanishingly rare.

II.   The expanded data elements necessary for AES filings exacerbate the problems for private travelers forced to use the system and violate the spirit of Congressional prohibitions against federal firearm registries.

The proposal would "expand the data elements required as part of an AES filing for [firearms transferred from the USML] to include serial numbers, make, model and caliber," including for those wishing to use the BAG and TMP exemptions. This makes the previously mentioned problems with AES filing that much worse. It also runs counter to the spirit of clearly

---

[21] Lederer, *supra* note 2.

established Congressional policy against using bureaucratic record-keeping requirements to establish firearms registries.

Firearm registries have long been anathema to gun owners as a tool that can be used to target them for discrimination and for the eventual seizure of their firearms. History is rife with examples of tyrants who used civilian disarmament to further their despotic ends,[22] and America's own Revolutionary War began in earnest after a British raid on Colonial arms caches. Against this backdrop, federal gun control laws have consistently maintained a policy against national registries of the sorts of common arms with which Americans typically exercise their Second Amendment rights.[23]

Congress, in enacting the Gun Control Act of 1968 (GCA), specifically declined to create a federal firearm registry, despite the urging of President Lyndon B. Johnson to do so.[24] Both the House and the Senate voted down proposals to require registration of guns as the legislation made its way through Congress.[25] As Sen. James McClure later stated,

> The central compromise of the Gun Control Act of 1968—the sine qua non for the entry of the Federal Government into any form of firearms regulation was this: Records concerning gun ownership would be maintained by dealers, not by the Federal Government and not by State and local governments.[26]

Congress then amended the GCA in 1986 to prohibit any rule or regulation enacted under its auspices from using the records that federal firearm licensees must keep to establish "any system of registration of firearms, firearms owners, or firearms transactions or dispositions ...."[27]

When the Brady Handgun Violence Protection Act of 1993[28] created the authority for the National Instant Criminal Background Check System (NICS), Congress took pains to ensure the system would not circumvent the GCA's policy against firearm registration. The Act states that if the NICS determines receipt of a firearm would not be in violation of law, it shall "destroy all records of the system with respect to the call (other than the identifying number and the date the

---

[22] *See, e.g.*, STEPHEN HALBROOK, GUN CONTROL IN THE THIRD REICH, DISARMING THE JEWS AND "ENEMIES OF THE STATE" (Independent Inst. 2013).

[23] The National Firearms Act, 26 U.S.C. §§ 5801-5872, requires federal registration of limited categories of arms, but to the extent it covers firearms, those guns– which include machineguns, short-barreled shotguns, short-barreled rifles, and non-sporting firearms greater than .50 caliber – are comparatively rare among the U.S. civilian firearm stock.

[24] *See* Lyndon B. Johnson, "Remarks Upon Signing the Gun Control Act of 1968," Oct. 22, 1968, *available at* http://www.presidency.ucsb.edu/ws/?pid=29197 (last visited July 6, 2018).

[25] 114 Cong. Rec. H22267 (daily ed. July 19, 1968); 114 Cong. Rec. S27420-421 (daily ed. Sept. 18, 1968).

[26] 131 Cong. Rec. S9163-64 (July 9, 1985).

[27] 18 U.S.C. § 926(a).

[28] Pub. L. No. 103–159, 107 Stat. 1536 (1993).

WASHSTATEC000159

number was assigned) and all records of the system relating to the person or the transfer."[29] Section 103(i) of the Act contains additional prohibitions against the use of the system to create a federal firearms registry:

> *No department, agency, officer, or employee of the United States may—*

>> *(1) require that any record or portion thereof generated by the system established under this section may be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or*

>> *(2) use the system established under this section to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions except with respect to person, prohibited by section 922 (g) or (n) of title 18, United Stated Code State law, from receiving a firearm.*[30]

Beginning in 1979, the annual appropriations bills that funded the ATF and its predecessor agency prohibited the Department of Justice from centralizing the records of federal firearm licensees (FFLs), until the prohibition was made permanent in 2011.[31] Also made permanent in that 2011 appropriations bill was another rider that prohibited the ATF from compiling a searchable registry of gun buyers' names from business records transferred to the agency by FFLs who ceased dong business.[32] A third provision in the same bill permanently created a 24-hour deadline for the destruction of identifying information on those who successfully undergo a NICS check.[33]

Even Obamacare contains a number of provisions that prohibit information collected under its authority from being used to create firearm registries.[34]

Meanwhile, there is no express authority in the enabling act under which this rulemaking is promulgated for BIS to collect and retain detailed information on the firearms owned by law-abiding Americans. Yet BIS is proposing to compel Americans to enter identifying information about themselves and their firearms into a federal database as a precondition of engaging in lawful travel with firearms. Individuals forced to comply with this requirement are given no assurances about how the information will be retained or protected or whether it will be available to other entities, and if so, under what circumstances. This clearly runs contrary to the spirit of congressional policy governing the handling of firearm owner information.

---

[29] 18 U.S.C. 922(t)(2)(C).

[30] 107 Stat. at 1542.

[31] Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).

[32] 125 Stat. 552, 610.

[33] *Id.* at 632.

[34] Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, 884-5 (2010).

WASHSTATEC000160

12

The *de facto* federal firearm registry that would be created by forcing private gun owners to make detailed declarations about themselves and their firearms via the AES is another argument in favor of retaining the current procedure utilizing the paper Form 4457. That procedure vindicates the government's legitimate interest in monitoring the firearms that move and in and out of the country but does not require the government to maintain a central registry of firearm owner information.

Going forward, any further attempt to automate the information private travelers must provide about their personal firearms should include express privacy provisions. At a minimum, these should prevent the dissemination or transfer of the information to other entities and require its complete destruction once CBP has verified that the firearms which were temporarily exported have been returned to the U.S.

For all these reasons, the NRA objects to the proposal's use of expanded data elements for private travelers seeking to utilize the BAG or TMP exceptions and urges that those requirements be omitted from the final rule.

### III.   The Final Rule Should Take Effect Immediately to the Extent Requirements Are Eliminated and Phase in Other Changes to Allow Regulated Entities Time to Adapt.

When the final rule governing Categories I, II, and III of the USML is published, certain changes should take effect immediately, while others should be phased in to allow regulated entities time to adapt.

Changes that merely eliminate requirements altogether should take effect immediately. For example, there is no justification for continuing to make "manufacturers" of articles that would be moved off the USML register with the Department of State.

On the other hand, where control of an item changes from the USML to the CCL, necessitating new procedures by the regulated entity, implementation of the final rule's effective date should be delayed to allow for new compliance systems to be established.

Licenses already granted under the ITAR should also be grandfathered for all outstanding transactions.

The NRA does not have any specific recommendations for a timeline of implementation for enforcing new requirements and procedures. We will defer to the entities whose day-to-day operations will be directly affected by the changes in the final rule.

### Conclusion

The NRA is very pleased to see Export Reform finally turn its attention to Categories I, II, and III of the USML. The proposal charts a positive course that will contribute to national security, enhance the competitiveness of U.S. businesses, and benefit ordinary gun owners by mitigating the potential for export regulations to burden innocent conduct that does not implicate national security. We hope you will take the suggestions offered herein seriously to further promote the worthy goals of this effort, and we appreciate the opportunity to provide input.

WASHSTATEC000161

13

We have also included our submission on the Directorate of Defense Trade Control's companion rulemaking and incorporate those comments herein by this reference.

.

Sincerely,

Christopher Zealand
Senior Research Attorney
NRA-ILA

WASHSTATEC000162

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** June 07, 2018
**Status:** Posted
**Posted:** June 13, 2018
**Category:** NA
**Tracking No.** 1k2-93l6-fdi1
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-0049
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** Patrick Hiller

## General Comment

Dear Ladies and Gentlemen,

I oppose the proposed rule for the following reasons:
1. The proposed rule treats semi-automatic assault rifles as non-military. But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. Regarding wide retail availability of firearms, about which comment has been requested, many countries, including Mexico, prohibit civilian possession of semi-automatic rifles and handguns, as well as of any larger caliber firearm. Six U.S. states, the District of Columbia, and several large retail chains also prohibit retail sale of semi-automatic assault rifles.
2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns, as it recently did on the Philippines and Turkey.
3. National brokering laws are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. The switch from State to Commerce will mean that the brokers and financiers who arrange shipments of semiautomatic firearms will no longer have a statutory requirement to register and obtain a license, increasing risk of trafficking. That will make it easier for unscrupulous dealers to escape attention.
4. The rule reduces end-use controls for gun exports. It would eliminate the State Departments Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Governments information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.
5. End-use controls are weakened by eliminating registration of firearms exporters, a requirement since the 1940s.
6. The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on

WASHSTATEC000163

3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printing weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is unlikely to make the same argument once those weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

7. The Commerce Department does not have resources to enforce export controls, even before the addition of 30,000 firearms export licenses as a result of this rule predicted by Commerce. The BISs enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

8. The proposed change will reduce transparency and reporting on gun exports.

9. This rule would transfer gun export licensing to an agency the Commerce Department - whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

10. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries. The export of these weapons should be subject to more controls, not less.

WASHSTATEC000164

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** June 16, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-93r8-f2cf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-0074
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Phil Steinschneider
**Address:**
    201 Autumn Olive Way
    Sterling, VA, 20164-2802
**Email:** phil@coolfx.us
**Phone:** 7034080261

---

## General Comment

Amendments to the International Traffic in Arms Regulations are very welcome. As a Type 01 Federally Licensed Firearms dealer, our company has been waiting for this change to happen for several years. It will allow us to expand our operations into manufacturing and export, which will potentially make it possible for us to create new jobs and new opportunities for workers within our company, as well as the various vendors that supply us.

On the other hand, several proposed changes fall short of what we were expecting.

Why are suppressors not being placed on the CCL? These are in common use throughout the United States and in Europe. In some European countries, silencers are not regulated at all, or much less regulated than in the US. Put suppressors on the CCL in order to stimulate innovation among US-based manufacturers. This makes even more sense if suppressors are eventually removed from the National Firearms Act, which is quite possible in the future.

Although automatic weapons are no longer in common use by civilians, this is only due to the Hughes Amendment of the Firearm Owners Protection Act of 1986. This amendment has never been challenged, but is certainly unconstitutional.

It makes no sense to continue leaving firearm technologies that have been around for over 100 years under ITAR. This appears to be a political decision rather than a logical one. Move common automatic weapons to the CCL.

WASHSTATEC000165

Due to their heavily-regulated nature, automatic firearms will be still difficult to export. Leaving them under ITAR will only hurt the US, as it will continue to constrain less well-heeled small arms manufacturers, who might develop the next Thompson SMG, M1 Garand, or M16. Does no one wonder why automatic firearm technology has been at a standstill essentially for over 60 years?

All of Category I should be moved to the CCL. Items of likely greater concern fall under Category II and Category III. The revisions to those sections will of course depend on the items enumerated in the changes.

As a Type 01 FFL, we are looking forward to these reforms in order to acquire a Type 07 license. Because we are a small concern, the ITAR fee has have been a barrier to entry for us. We will still feel constrained by the omission of suppressors and commonly-available automatic weapons from these changes, however. If these had been placed on the CCL, we would have become a Type 07/SOT. Under the current proposal, an 07/SOT will be required still to pay the ITAR fee.

These rules have always been complex, so simplification and clarification are appreciated. Those who would violate them will do it despite these regulations, however. The only companies that benefit from any remaining complex technologies not moved to the CCL are those with the capital and resources to hire entire compliance departments at the expense of productive activity. The time and money wasted complying with ITAR could be so much more effectively used for the development of new technologies and new jobs for Americans.

Nonetheless, these changes are certainly welcome, and will go a long way to help make the American defense industry more competitive in the worldwide defense article marketplace.

WASHSTATEC000166

As a domestic violence prevention advocate, I know full well the toll gun violence takes on women across the world.  Abusers' use of firearms to threaten, control, injure, and kill knows no borders or boundaries.  I oppose the proposed rule for the following reasons:

1. The proposed rule treats semi-automatic assault rifles as "non-military." But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of firearms, about which comment has been requested, many countries prohibit civilian possession of semi-automatic rifles and handguns, as well as of any larger caliber firearm. Six U.S. states, the District of Columbia, and several large retail chains also prohibit retail sale of semi-automatic assault rifles. Many semi-automatic rifles are also easily converted to fully automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns, as it recently did on the Philippines and Turkey.[i] Congressional action in 2002 required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to Congress. Items moved to Commerce control would no longer be subject to such notification. In a September 15, 2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate Congressional intent and effectively eliminate Congress' proper role.

3. The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government -- i.e., taxpayers -- will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

4. National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking.  That will make it easier for unscrupulous dealers to escape attention.[ii]

5. The rule reduces end-use controls for gun exports. It would eliminate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Government's information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

6. The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printing weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is

unlikely to make the same argument once those weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

7. The Commerce Department does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce.[iii] The BIS's enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

8. The proposed change will reduce transparency and reporting on gun exports. The rule would eliminate Congressional and public awareness of the total amount (dollar value and items) of firearms sales authorizations and deliveries around the world, since the Commerce Department annual reports currently only cover about 20 countries.

9. This rule would transfer gun export licensing to an agency – the Commerce Department - whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

10. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries.[iv]  The export of these weapons should be subject to more controls, not less.

---

[i] "US lawmakers balk at arms sales to Saudi Arabia, Turkey and Nigeria," *DefenseNews*, Sept. 26, 2017, https://www.defensenews.com/congress/2017/09/26/us-lawmakers-balk-at-arms-sales-to-saudi-arabia-turkey-and-nigeria/
[ii] "Arms Dealer Faces New Charges," *New York Times*, Aug. 23, 2010, https://www.nytimes.com/2010/08/24/us/24arms.html
[iii] Department of Commerce Budget in Brief FY2017, p. 57, http://www.osec.doc.gov/bmi/budget/FY17BIB/AllFilesWithCharts2.pdf
[iv] Ongoing resource on "Cross Border Gun Trafficking: An Ongoing Analysis of the Types of Firearms Illegally Trafficked from the United States to Mexico and Other Latin American and Caribbean Countries as Revealed in U.S. Court Documents," by the Violence Policy Center, http://www.vpc.org/indicted/

July 3, 2018

U.S. Department of State
Directorate of Defense Trade Controls
PM / DDTC, SA-1 12th Floor
2401 E Street, NW
Washington, DC 20522
*Via: www.regulations.gov*

Subject:    **Raytheon Company Comments on USML Categories I, II, and III**
                     **Ref: 83 Fed. Reg. 24198 (May 24, 2018)**
                     **Docket ID: DOS-2017-0046**

On May 24, 2018 the Department of State, Directorate of Defense Trade Controls ("DDTC") requested comments from the public on the proposed rule to amend United States Munitions List ("USML") Categories I, II, and III. Below please find comments from Raytheon.

## USML Category II

Raytheon strongly supports the addition of Note 2 to paragraph (a) and the Note to paragraph (j)(9) because they help distinguish Category II items from items more appropriately controlled in other USML Categories. Regarding Note 2 to paragraph (a), we recommend the modifications underlined below to utilize the same language from Category VII (i.e. add the words "and trailers") to direct that guns and armament when affixed to trailers that are armed or are specially designed to be used as a firing or launch platform to deliver munitions or otherwise destroy or incapacitate targets are otherwise controlled under Category VII. Directly similar to the concept currently embodied in the Note 2 to paragraph (a), we recommend that language be added to this Note to clearly indicate that active protection systems specifically defined in categories associated with the carrier are controlled under those other categories.

Note 2 to paragraph (a): Guns and armament when integrated into their carrier (e.g., ships, ground vehicles and trailers, or aircraft) are controlled in the category associated with the carrier. Similarly, guns and armament when integrated into an active protection system described in the category associated with the carrier are controlled in the active protection system category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

Regarding the Note to paragraph (j)(9), we recommend the following modification (underlined below) to continue the drive for clarity:

Note to paragraph (j)(9): For weapons mounts specially designed for ground vehicles, see Category VII. For weapons mounts specially designed for vessels, see Category VI.

Raytheon Company Comments on Proposed Rule - USML Categories I, II, and III
July 3, 2018
Page 2 of 2

**Brokering**

The conforming change proposed for 22 C.F.R. § 129.1(b) improves readability. The proposed language for 22 C.F.R. § 129.2(b)(2)(vii) appears to provide a broad carve-out to the brokering activities definition. It would be helpful for DDTC to clarify whether this language was intended to convey that any ITAR or EAR approval for the items in question is sufficient to meet this criteria and that the approvals do not have to list the specific consignees or end users as the future export, reexport, or transfer. If this was not what was intended, then the proposed language for 22 C.F.R. § 129.2(b)(2)(vii) should be modified to indicate this, such as (additions underlined):

> (vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter <u>involving only parties approved under that license or other approval</u>.

**Effective Date**

Raytheon strongly supports using a delayed effective date of 180 days as has been done for other USML to CCL transitions. Such transitions require updates to IT systems, policies, processes, and training which require time to complete. Based on experiences in performing these tasks during previous transitions, the full 180 days is necessary.

We appreciate the ability to comment and thank you for your partnership.

\* \* \*

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-942t-d74r
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-1144
Comment on DOS-2017-0046-0001

## Submitter Information

**Name:** RedLion York
**Address:**
    2001 Creekwood Dr
    Fort Collins,  80525
**Email:** redyork@gmail.com
**Phone:** 9702215929

## General Comment

Howdy,

Switching the responsibility for overseeing weapons sales from the State Dept to the Commerce Dept is a bad idea for these reasons:

a) It would eliminate the State Departments Blue Lantern program, in place since 1940, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them.

b) It would remove licensing requirements for brokers, increasing the risk of trafficking.

c) It would remove the State Departments block on the 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for how to 3D print weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The rule switch would remove this block, effectively enabling 3D printing of firearms in the U.S. and around the globe.

The world is dangerous enough. We don't need this change.

WASHSTATEC000171



July 9, 2018

Via http://www.regulations.gov

Office of Defense Trade Controls Policy
Department of State
DDTCPublicComments@state.gov

Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce,
Room 2099B,
14th Street and Pennsylvania Avenue NW,
Washington, DC 20230.

> **Re:** **Safari Club International Comments on Proposed Amendment to the International Traffic in Arms Regulations:  Revision of U.S. Munitions List Categories, I, II and III, Docket RIN 1400 AE30, DOS-2017-0046; and Proposed Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), RIN 0694-AF47, Docket No. 111227796-5786-01.**

Dear Sirs:

Safari Club International (SCI) submits these comments in support of the U.S. Department of State's proposed amendments to the International Traffic in Arms Regulations (ITAR) to revise Categories I, II, and III of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML.  SCI also supports the Department of Commerce, Bureau of Industry and Security's proposed determination that these items no longer warrant control under the U.S. Munitions List (collectively referred to as "proposed regulations").

SCI does not support the proposed regulations' finalization and implementation of a modified procedure for the temporary export of firearms and ammunition by individuals who wish to travel outside the U.S. for recreational hunting and shooting purposes.  The procedure requires travelers to use the Automated Export System (AES) to register their personal firearms and ammunition.  This is an inappropriate and unworkable system for the individual who wishes to temporarily export his/her firearms.  As an alternative, SCI requests that the proposed regulations be modified so that they delete the AES registration requirement and formalize and codify the Form 4457 process to ensure its consistency and use by all Customs and Border Protection (CBP) officials.

WASHSTATEC000172

Case 2:20-cv-00111-RAJ   Document 106-7   Filed 09/23/20   Page 173 of 514
SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 2 of 6

**Safari Club International**

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately 50,000 members worldwide, many of whom are U.S. residents who travel with their firearms for hunting and recreational shooting around the world.  They are individuals, not businesses, who seek only to bring their own property with them when they travel and return to the U.S. with that same property.  Their activities are legal and are regulated by the countries they visit to hunt and shoot.

**The Origin of the AES Registration Requirement**

The export of firearms is controlled under the ITAR, which is administered by the U.S. Department of State, Directorate of Defense Trade Controls (DDTC).  ITAR regulations have historically included an exemption under 22 CFR §123.17(c) allowing U.S. persons to temporarily export without a license up to three nonautomatic firearms and not more than 1,000 cartridges.  This exemption is widely used by hunters and other sportsmen, who travel overseas with firearms to be used for sporting and other legal purposes.  To use the exemption, the U.S. person must declare the firearms and/or ammunition to CBP, carry the firearms as part of their baggage, and not transfer ownership while abroad.

In 2011, DDTC published a Federal Register notice of proposed rulemaking that principally revised the exemption related to personal protective equipment, but also included a requirement that those traveling with firearms register through the Automated Export System (AES): "The person. . . presents the Internal Transaction Number from submission of the Electronic Export Information in the Automated Export System per §123.22 of this subchapter…." 76 Fed. Reg. 16353, 163534 (Mar. 23, 2011).

The system required those registering to provide an Employer Identification Number (EIN), available only to commercial enterprises.  The registration system also involved procedures far too complicated and burdensome than necessary for individuals seeking only to travel with their personal equipment.  Because the registration system imposed registration obligations that would have forced hunters and shooters to make false representations to the Internal Revenue Service, jeopardized their ability to obtain permits to import the wildlife they successfully hunted, and imposed burdensome obligations unnecessary and inappropriate for non-commercial importers, CBP agreed to postpone the implementation of the registration requirements and to continue the use of Form 4457 as the mechanism to facilitate temporary firearms export.  Even that solution presented problems.  Due to the inconsistencies in the way that CBP personnel issued the forms, U.S. residents have encountered difficulties in taking their firearms to foreign countries (e.g. South Africa) that attribute much greater significance to Form 4457 than does the U.S.

**Collection of Data Through AES Registration is Inappropriate**

Without good reason, the proposed regulations would reactive the AES registration requirement for individuals seeking to temporarily export their firearms and ammunition.

> Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, [Bureau

WASHSTATEC000173

Case 2:20-cv-00111-RAJ   Document 106-7   Filed 09/23/20   Page 174 of 514
SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 3 of 6

of Industry and Security ("BIS")] is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG.

83 Fed. Reg. 24174. The purpose of the registration system is not to facilitate the temporary export and reimport of firearms and ammunition. According to CBP, the collection of export data through the registration is designed to help with the "compilation of the U.S. position on merchandise trade" and is an "essential component of the monthly totals provided in the U.S. International Trade in Goods and Services (FT900) press release, a principal economic indicator and a primary component of the Gross Domestic Product." https://www.census.gov/foreign-trade/aes/aesdirect/AESDirect-User-Guide.pdf

The government has no need to collect this data. The data, provided by individuals who wish to temporarily export and then re-import the same personally owned equipment, has nothing to do with the "U.S. position on merchandise trade" or the "Gross Domestic Product."

The only purpose for the collection of data from individual hunters who travel with their firearms is likely to enable the government to maintain records on these individuals and their legal activities abroad. In the proposed regulations, the BIS acknowledges that the intention of the AES filing system was to "track such temporary exports of personally-owned firearms and ammunition." SCI strongly opposes this attempt to "follow" and retain records of the individuals who travel with their firearms for hunting purposes. These individuals have taken no actions meriting the government's desire or need to collect and maintain data on their activities. The government should remove the requirement to collect such data.

**The Proposed Regulations Recognize Flaws in the Registration System**

The proposed regulations provide the public with the opportunity to comment on whether CBP has been able to remedy the problems identified when CBP first attempted to activate and implement the new requirement. The drafters also condition the reactivation of the AES registration requirement on CBP's success in remedying the problems that plagued the introduction:

> Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as

WASHSTATEC000174

SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 4 of 6

comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

83 Fed. Reg. 24174.  AES registration should not be required as CBP has not remedied the problems that plagued the initial attempted implementation of the system.

**The AES Registration System Requires Individuals to Provide False Information to the Internal Revenue Service**

The AES registration system continues to require persons temporarily exporting firearms or ammunition to present "the Internal Transaction Number from submission of the Electronic Export Information in the Automated Export System."  The AES system requires an EIN before a user can submit any data.  The Census Bureau administers the AES system, and their website still includes the following FAQ:

> **The Internal Revenue Service (IRS) site states that an Employer Identification Number (EIN) is for use in connection with business activity only. It further states, do not use your EIN in place of a Social Security Number. The information provided by the Census Bureau and the IRS is conflicting.**
>
> The IRS publication titled "Understanding Your EIN" which is located on their webpage (http://www.irs.gov/pub/irs-pdf/p1635.pdf [external link]) states that "…Employer Identification Number (EIN) is for use in connection with business activity only, do not use your EIN in place of a Social Security Number"…. However, for the purposes of registering or filing in the AES you can and should use your EIN. While it is not specifically stated, an EIN can be obtained for government reporting purposes when a person does not own a business."

https://www.census.gov/foreign-trade/regulations/ssnfaqs.html.  The Census Bureau site expressly tells individual exporters to ignore the IRS's instructions and to misrepresent themselves as businesses, in order to obtain an EIN.  The IRS site contains no instructions providing such an exception.

The Census guidelines instruct individuals to select "Sole Proprietorship" as the "type of legal structure applying for an EIN," which is explained by IRS as: "sole proprietor includes individuals who are in business for themselves, or household employers."  The individual is further required to select "started a new business" as the reason why the sole proprietor is requesting an EIN.  For an individual seeking to travel overseas with their firearms, this information is confusing, false and entered only to obtain the EIN.

As nothing has changed to remedy this problem since the AES registration requirement was originally imposed, the regulations should not include this requirement.

**The AES Registration System is Designed for Commercial Operations and Is Overly Complicated for the Individual Exporter**

WASHSTATEC000175

SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 5 of 6

Despite the years that have passed since CBP's attempt to require individuals to register through the AES system for the temporary export of their firearms, the agency has not made meaningful progress in reducing the overly complicated process for registration. The system is designed for businesses whose repeated use of the system merits the time and patience required for registration. The online AES Direct Users' Guide (which contains no reference to individuals, temporary export, or firearms) is a 39-page manual that an individual would be required to learn in order to register with the system. The registration mechanism is unnecessarily burdensome and complicated for the private individual who does not wish to participate in commercial trade but merely wants to temporarily take his own firearm with him outside the U.S. for a recreational hunt or shoot.

**Individuals Identifying Themselves as a Commercial Enterprise Could Jeopardize Their Ability to Import Legally Hunted Animals**

The requirement that individual hunters obtain an EIN, recognized by the IRS for business purposes only, could potentially jeopardize the ability of hunters to import some sport-hunted trophies from abroad. The U.S. Fish and Wildlife Service (FWS) prohibits the importation of many sport-hunted species for commercial purposes. A hunter who registers as a business for the purpose of leaving the country and exporting the firearms he plans to use to hunt outside the United States, risks the FWS prohibiting the hunter from importing his trophies and otherwise penalizing the hunter.

**The AES Registration System Does Not Replace the Use of Form 4457**

As mentioned above, the proposed regulations did not intend the AES registration requirement to replace CBP Form 4457 for the temporary export and reimport of personally owned firearms. Even with the AES registration requirement, temporary exporters of firearms and ammunition will still need to obtain and complete Form 4457 and display it upon re-entry into the U.S. to prove that they did not acquire the firearms abroad. Because (1) the AES registration requirement and its purpose of tracking the activities of law-abiding hunters and recreational shooters are neither necessary nor appropriate for the temporary export activities of hunters and shooters, and (2) these individuals will continue to need to obtain and display Form 4457, the logical solution would be to abandon the AES registration requirement, retain the Form 4457 practice, and improve the mechanisms for issuing the latter.

**Future Use of Form 4457 Needs to Reflect the Greater Significance of the Document Outside the U.S.**

While CBP has used Form 4457 as primarily a mechanism for determining whether the firearm being imported into the U.S. is the same property the individual exported when he or she left the country, other governments attribute greater significance to the document.

South Africa, for example, treats the form as a pseudo license of a U.S. resident traveling with a firearm. South African police have conditioned import of firearms into their country on the U.S. resident's possession of what South Africa considers to be a valid Form 4457. In 2017, this led

WASHSTATEC000176

SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 6 of 6

to problems for hunters traveling to South Africa when the CBP began issuing Form 4457s with already expired expiration dates.  Although CBP explained that the agency attributes little meaning to the form's expiration date, South African officials considered the forms expired and prohibited hunters from entering the country with their firearms due to the apparent expired appearance of the forms.

The problem was exacerbated by different offices of CBP issuing different versions of the form, which also did not match the form available from CBP's website.  After representatives of SCI and other organizations engaged in numerous discussions on the issue with CBP personnel, CBP adopted a temporary solution of issuing new forms with a future expiration date.  CBP needs to adopt a more permanent solution that addresses the significance of the form in other countries, such as issuing forms without any expiration date.

**SCI's Recommended Resolution and Revision of the Proposed Rules**

SCI recommends that the drafters delete the AES registration requirement entirely for individuals and make it clear that registration is not required for those who wish to temporarily export their firearms from the United States.  No tracking of the legal activities of these hunters and shooters should be conducted and no compilation of data about these individuals should be permitted.  Instead, the drafters should formally codify the use of Form 4457 for individuals and should identify a single consistent standard for the form that contains no date that could be interpreted or misinterpreted by anyone as an expiration date.

Thank you for the opportunity to comment on these proposed regulations, and in particular to advocate for the removal of a process that should not be applied to individuals who wish only to temporarily export their firearms in order to engage in legal activities outside of the United States.  If you have any questions or need anything further, please contact Anna Seidman, Director of Legal Advocacy Resources and International Affairs, aseidman@safariclub.org.

Sincerely,

Paul Babaz
President, Safari Club International

WASHSTATEC000177

# PUBLIC SUBMISSION

| |
|---|
| **As of:** July 10, 2018 |
| **Received:** July 09, 2018 |
| **Status:** Posted |
| **Posted:** July 10, 2018 |
| **Tracking No.** 1k2-946o-2whj |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3131
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Robert Menendez

---

## General Comment

We support the Export Control Reform Initiative reforms that have been implemented to date. These changes have rationalized and streamlined a cumbersome and opaque U.S. Munitions List (USML) in ways that make it more useful for American exporters and make non-militarily-sensitive exports easier to process and more competitive internationally.

However, the Department of State has published draft regulations that would remove small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regulations, to be subject instead to the Commerce Control List (CCL) of the Department of Commerce. This will result in less rigorous oversight of the export of these deadly weapons.

Small arms and associated ammunition are uniquely lethal; they are easily spread and easily modified, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more not less rigorous export controls and oversight. We strongly oppose any changes to Categories I, II, and III that do not adequately reflect the life-and-death impact such changes will have, including by maintaining congressional oversight over these sales before export. Specifically, combat rifles, including those commonly known as sniper rifles should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50) caliber. Semi-automatic firearms should also not be removed, and neither should related equipment or ammunition or associated manufacturing equipment, technology, or technical data.

The Arms Export Control Act (AECA) enables congressional review of exports of these articles to ensure that they comport with U.S. foreign policy goals and values. Congress took action in 2002 to ensure that the sale and export of these weapons would receive close scrutiny and oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL, as is being proposed, would be directly

WASHSTATEC000178

contrary to congressional intent, made clear in 2002, and would effectively eliminate congressional oversight of exports of these weapons.

Congressional oversight has proven important on multiple occasions. Over the last several years, the Executive branch has considered and proposed sales to countries and foreign entities that have engaged in human rights abuses and atrocities. In May 2017, for example, the Administration sought to sell semi-automatic pistols to the bodyguard unit of President Erdogan of Turkey, despite the fact that members of that unit had viciously attacked peaceful protestors near the Turkish Embassy in Washington, DC. The sale was only halted because congressional notification was required by law. In addition to the proposed Turkey sale, State proposed the export of 27,000 automatic rifles to the Philippine National Police in August 2016, some members of which have been credibly alleged to have committed extrajudicial killings as part of President Dutertes so-called war on drugs, which has targeted mostly low-level drug users.

The Departments of State and Commerce have noted that State will still review the sales for human rights concerns if licensing is moved to the CCL. However, as demonstrated by the above examples, State has at times fallen short of its responsibility to prioritize such concerns in its consideration of such sales. Therefore, while we oppose this transfer of licensing authority to the Department of Commerce, we will also seek to ensure that congressional oversight is maintained if the proposal is implemented.

SEN. ROBERT MENENDEZ
Ranking Member, Committee on Foreign Relations, U.S. Senate

BENJAMIN L. CARDIN
United States Senator

DIANNE FEINSTEIN
United States Senator

WASHSTATEC000179



SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC.
SINCE 1926

July 6, 2018

By E-mail: DDTCPublicComments@state.gov  subject line, "ITAR Amendment – Categories I, II, and III"
By Internet: Federal eRulemaking Portal: www.regulations.gov - Docket DOS-2017-0046

Directorate of Defense Trade Controls
U.S. Department of State
2401 E. Street, N.W.
Washington, DC 20226

REFERENCE: Proposed Rule – International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III,

Dear Sir:

The Sporting Arms and Ammunition Manufacturers' Institute (SAAMI) respectfully submits the following comments to the above referenced Federal Register notice of proposed rulemaking 83 FR 24198, dated May 24, 2018. SAAMI is an association of the nation's leading manufacturers of firearms, ammunition and components, and an American National Standards Institute (ANSI) accredited standards developer. SAAMI was founded in 1926 at the request of the federal government and tasked with creating and publishing industry standards for safety, interchangeability, reliability and quality, coordinating technical data and promoting safe and responsible firearms use.

As the organization responsible for creating manufacturing standards for the firearm and ammunition industry, SAAMI is uniquely qualified to provide technical expertise on this matter. We have reviewed the proposed rule, and agree in general with the transition of the majority of firearms and ammunition to the Commerce Control List.   Export controls of commercial firearms and ammunition which are not inherently military, have no critical military or intelligence advantage, and have predominant commercial applications correctly belong under the Export Administration Regulations (EAR).

We would like to raise the following points regarding several items enumerated in the revised Category III — Ammunition and Ordnance and ask for revision or reconsideration.

## Pyrotechnic Tracer Materials

1. Subparagraph (a)(1) controls "Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category," and subparagraph (d)(1) controls "Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance

1

WASHSTATEC000180

above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys."

Subparagraph (a)(6) controls "**Ammunition employing pyrotechnic material in the projectile base** and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems".

By including the peak radiance parameter of "above 710 nm", we note DDTC's intention to control only tracer compositions that emit primarily in infrared which are for use with night vision devices. Such dim tracers, with infrared wavelengths from 710 nm to 1 millimeter, burn very dimly but are clearly visible through night vision equipment. This differentiates from bright tracers, which are the most common type of tracer, or subdued tracers, both of which can overwhelm night vision devices, rendering them useless.

Small arms tracer ammunition that includes pyrotechnic material below peak radiance of 710 nm has been sold commercially for sporting purposes for many years. For example, it is used as a training aid for marksmanship proficiency. We agree with the proposed rule which would maintain control on the USML of dim tracer ammunition with peak radiance above 710nm.

However, we wish to comment on the following:

a.  In subparagraph (a)(6) the radiance parameter of "above 710 nm" is not applied to the first part of the control sentence. As currently written, the phrase "ammunition employing pyrotechnic material in the projectile base" would be interpreted to include all tracer ammunition because the radiance parameter "above 710 nm" is not present in the phrase. Also, pyrotechnic tracer material is only employed in the projectile base, and therefore it is not necessary to enumerate a separate control specifying "pyrotechnic material in the projectile base".

b.  We note some overlap in controls in subparagraphs (a)(1) and (a)(6). Subparagraph (a)(1) controls ammunition with projectiles controlled in subparagraph (d)(1) which includes "projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm", i.e. tracer projectiles. Subparagraph (a)(6) controls "....any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm" which is already controlled in (a)(1) with reference to (d)(1). The only differentiation we note would be reference to ammunition "designed to be observed primarily with night vision optical systems".

RECOMMENDATION: We recommend subparagraph (a)(6) be revised to delete the phrase "ammunition employing pyrotechnic material in the projectile base". First, it is not necessary to articulate pyrotechnic material in the projectile base, and deletion of this phrase would remove the confusion that (a)(6) controls all ammunition with pyrotechnic

WASHSTATEC000181

material including that with peak radiance below 710 nm. Second, the phrase is redundant since such ammunition with pyrotechnic material is controlled under (a)(1). We also request DDTC to provide clarification on which articles would be individually controlled under subparagraphs (a)(1) and (a)(6) since both control ammunition with pyrotechnic/tracer projectiles with a radiance parameter intended for use with night vision devices.

2. Subparagraph (a)(3) controls "Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category", and subparagraph (d)(2) controls "Shotgun projectiles that are flechettes, incendiary, tracer, or explosive."

    We note that this paragraph does not include the parameter "pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm". A SAAMI member company is currently producing shotgun ammunition with tracer projectiles for commercial use.

    RECOMMENDATION: We reiterate our comments above regarding tracer ammunition, and recommend subparagraph (d)(2) be revised as follows: "Shotgun projectiles that are flechettes, incendiary, explosive, or that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm." This change would make subparagraph (d)(2) consistent with the parameters in subparagraph (d)(1).

**Non-metallic Cases**

Subparagraph (a)(5) lists "Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance." Subparagraph (d)(8) controls "Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category."

This control would include plastic cartridge cases that fit the mass parameters shown. Polymer-cased ammunition (PCA) is currently sold to consumers in the commercial market, and is increasing in popularity. It is considered an alternative to reduce cost and weight in ammunition. This type of ammunition has a significant benefit to the environment and to firearm ranges by reducing both waste and the environmental impact and footprint of hunters and shooters. Controlling PCA under the ITAR would hinder further technological development in this area.

We recommend that control for non-metallic ammunition be removed from the USML and transitioned to the CCL to be controlled with similar metallic cartridge ammunition. Non-metallic cased ammunition is in development by several SAAMI members for sporting and hunting purposes. PCA meets SAAMI specifications for ballistic performance. Revised Category III should only include articles which are inherently military, and PCA does not meet that definition. New ECCN 0A505 on the CCL will control metallic cartridge ammunition (e.g. .308 Winchester) regardless of whether it is used in semi-automatic rifles for sporting use, or in

3

full-automatic rifles for military use. Therefore, controls for non-metallic cartridges should be the same. To effect this change, we recommend deletion of subparagraphs (a)(5) and (d)(8).

## Primers

Subparagraph (d)(10) controls "Primers other than Boxer, Berdan, or shotshell types."

This description appears to except all primers used by SAAMI members. We believe DDTC's intent here is to control tubular primers used in medium or large caliber ammunition, which SAAMI members do not use in the manufacture of ammunition for sporting arms. We suggest that the designation of primer types could be simplified. Boxer, Berdan, shotshell and muzzleloading percussion caps are all called "cap type" primers by the Department of Transportation, and are classified as UN 0044, "Primers, cap type." We recommend DDTC consider using this description to define primers which would not be controlled on the USML.

## Technical Data

Subparagraph (e) controls technical data and defense services directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category.

This exemplifies the need to make the changes we recommend above regarding pyrotechnic tracer material and non-metallic cases. Technical data related to these items is already in the public domain and well-known. Therefore, it should not be controlled on the USML.

We appreciate your consideration of our recommendations. Due to the technical nature of the above, please let us know if you need any further information or clarification for your review.

Thank you.

Richard Patterson
Executive Director

4

WASHSTATEC000183

30 June 2018

To:       DDTCPublicComments@state.gov
          Office of Defense Trade Controls Policy, Department of State
                and
          Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of
          Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington DC
          20230

Subject:  ITAR Amendment - Categories I  II, and III
          EAR Amendment - RIN 0694-AF47

I am writing to submit comments on the proposed changes to ITAR (USML) and EAR (CCL) recently published in the Federal Register. I write in a personal capacity but the views expressed are informed by my research, policy analysis, and teaching as a professor at the University of Michigan, Gerald R. Ford School of Public Policy.

By way of a few introductory remarks, I am familiar with the complexities of US arms export laws and policy, as well as the regulatory framework. There is a legitimate need for periodic updates of the USML and—in view of the labyrinth of entangled laws, regulations, and agencies involved in the current system—I am supportive of the reform initiative. I am generally more concerned about keeping weapons out of the hands of those who would misuse them than in making them easier to procure, but that end is not at odds with the objective of putting in place a single control list and a single administrative agency. The reform effort has not progressed to that point, however, and I am wary about these proposed regulatory changes as an interim step. I will also add that I have been following the export control reform project since it was announced in 2009 and this is the only time I have felt the need to express concerns about the proposed changes. That is largely due to the particular, complete and recognizable, weapons that are being considered for change.

**1.      I urge you to delay the effective date of the proposed changes until the Government Accounting Office or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to "defense articles."**

If enacted, the changes would have implications for several provisions of law. From my reading of both sets of proposed regulations, I am not reassured that the implications have been fully considered. The USML is formally defined in the AECA (22 USC 2778) as a definitive list of defense articles,[1] and from a quick search of US statutes the term "defense article" appears in some 45 sections,[2] in many instances (but

---

[1] 22 USC 2778(a)(1).

[2] Office of the Law Revision Counsel, United States Code, http://www.uscode.house.gov.

WASHSTATEC000184

not always) explicitly linked to the USML. In addition, several provisions of the AECA itself are explicitly linked to an item's presence on the USML (without necessarily referring to "defense articles"). On a separate statutory track, the Foreign Assistance Act was recently amended to include CCL 600 series items as defense articles, along with all items contained on the USML [22 USC 2304.(d)(2)(C)], but the legislation did not anticipate the new 500 series so there is likely a gap there with regards to Congressional intentions. To complicate things further, the US Munitions Import List (USMIL) makes liberal use of the term "defense article," defined as articles on the USMIL–which currently include the same items that are slated to lose the "defense article" designation that extends from inclusion on the USML – so that items designated as defense articles on the USMIL will not be considered defense articles for purposes of export.[3]

It is very challenging to sort out the tangle.  Some of the instances where terms and definitions are at variance may not prove significant, but others may have far-reaching implications. Due to the disparate definitions and linkages, the proposal to remove specified firearms from the USML raises some important questions about the continuing applicability of provisions of law that refer to "defense articles," a term that currently encompasses such firearms.  In numerous situations the current statutory treatment of non-automatic firearms would be altered – or at least become ambiguous—as a result simply of moving these weapons from Category I of the USML to the 500-series on CCL. Statutory provisions that could be affected by the proposed change range from Export-Import Bank financing of defense article sales to human rights conditionality on security assistance, to the provisions for third-party transfer of grant-supplied defense articles, and various reports to Congress.  (See references in the footnote below.[4]) In some cases, the law in question is not directly linked to arms exports, but the relevant statute refers to defense articles and links the definition to items on the USML. In this way, removing specified firearms from the USML is likely to have a host of unintended and unanticipated repercussions.

Further, if semi-automatic weapons and other non-automatic firearms are removed from the USML it will impact the ability of law enforcement to charge weapons traffickers with violating the AECA as was done in several of the cases cited in a recent report from the Department of Justice on export enforcement.[5]

---

[3] 27 CFR 447.11 and 27 CFR 447.21.

[4] The numerous places where the meaning of "defense article" would be called into question by the proposed rules include:
  • Export-Import Bank financing of defense article sales, including multiple end use considerations and other conditions (12 USC 635);
  • Requirement to give Congress notice of commercial firearms sales of $1,000,000 or more (22 USC 2776)
  • Annual report to Congress on military assistance, and specifically on transfers of USML Category I firearms (22 USC 2415)
  • Provisions for supplying defense articles on a grant-basis, and multiple restrictions (22 USC 2314)
  • Conditions for third-party transfer of defense articles provided on a grant basis (22 USC 2314)
  • Certification of end use as a condition of sale or lease of defense article (22 USC 2753)
  • Post-delivery verification of credible reports of misuse of weapons (22 USC 2753)
  • Brokers of items included on the USML are required to register and activity must be licensed; exporters of USML items must identify all consignees and freight forwarders in license application (22 USC 2778)

[5] Department of Justice, "Summary Of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018, https://www.justice.gov/nsd/page/file/1044446/download .

WASHSTATEC000185

As Acting Assistant Secretary for Political-Military Affairs Tina Kaidanow explained to the House Foreign Affairs Committee last June,[6] the US arms export architecture is very complex and involves what her predecessors have described as "cradle to grave" oversight of exported US *defense articles*. Removing that designation *defense article* from weapons that are not fully automatic has the effect of detaching them from the US Munitions List and the regulatory framework built around it: there may well be significant unintended consequences.

In the event that consideration of the proposals is not delayed, I would recommend several other changes to the proposed ITAR and EAR revisions.

**2.      Retain existing USML I(a) and (d) unchanged; retain the existing coverage of USML II(a) unchanged; delete proposed 0A501.a and .b; and limit proposed 0A502 to renumbering existing 0A984.**

My concern here is based on principle and definition. Several of the weapons that would be moved to CCL are military-style weapons that are either used in battlefield situations or are substantially comparable to weapons as used in battlefield situations – including semi-automatic assault rifles and bolt-action sniper rifles. All of USML I(a), I(d), and II(a) are currently designated "significant military equipment" due to "their capacity for substantial military utility or capability," per the ITAR definition.[7] The prevalence of armed extremists and insurgents who depend on weapons currently included in USML Categories I and II makes the military utility or capability of these weapons as relevant as ever. Due to their size and long shelf life, firearms are easily diverted and resold on black markets around the world. The Department of Justice's January 2018 summary of major US export enforcement cases noted above includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international on the dark net, and another similar case from Kansas.[8]

While the US military may not derive great advantage from most of these weapons, they still have the military utility and capability of threatening the lives and welfare of many people around the world.   It is in the interest of the US and American citizens to keep the tightest control on them. Indeed, it is for that very reason that the same weapons being proposed for removal from the US Munitions List are expected to remain on the US Munitions *Import* List, where their entry into the US will remain tightly controlled. It is also for that reason that a growing number of states are imposing limitations on the retail availability of these weapons and many retailers are voluntarily removing them from their shelves.  They should remain where they are, on the USML.

---

[6] "Foreign Military Sales: Process and Policy," testimony from Tina S. Kaidanow, Acting Assistant Secretary, Bureau of Political-Military Affairs, Statement Before the Subcommittee on Terrorism, Nonproliferation and Trade, House Foreign Affairs Committee, June 2017. https://www.state.gov/t/pm/rls/rm/2017/271928.htm.

[7] 22 CFR 120.7 at https://www.gpo.gov/fdsys/pkg/CFR-2004-title22-vol1/pdf/CFR-2004-title22-vol1-sec120-7.pdf .

[8] Department of Justice, op. cit..

**3.     Before proposed regulatory changes are adopted, an opinion should be obtained from the Department of Justice concerning the legality of applying ITAR brokering restrictions to exports of firearms transferred from the USML to the CCL.  Furthermore, Congress and the public should be informed as to how the proposed arrangements will address the risk of diversion.**

There are several reasons to be concerned about the proposed rules pertaining to brokering.
From their origin in the 1930s, a major intent of efforts to regulate arms exports has been to curtail illicit and undesirable trafficking in weapons. In the 1980s and 1990s, illicit flows of small arms flooded international markets, with calamitous effects in every region of the world. The rate of flow may have slowed since the 1990s, but as the 2018 Justice Department report attests, the efforts to supply contraband firearms are very much alive in our own time. From a global perspective, brokering laws are considered a weak link in the regulatory apparatus, to the extent that in the 1990s there was some talk of negotiating an international treaty focused entirely on arms brokering. Provisions written into US law around that time were considered some of the strongest in the world. With the transfer of specified semi-automatic and non-automatic weapons to CCL, the brokering laws would no longer be applied to these weapons (or would be applied only in a much-weakened version) and they would not be available to law enforcement for prosecution purposes.

**My specific concerns with the proposal to apply existing AECA/ITAR brokering rules to items intended for transfer to the CCL are twofold, related to the dubious statutory underpinnings of the proposed rule change and to its practical implications.**

(a) The first concern is a matter of statutory coherence and proper statutory authority. The brokering clauses of the AECA require commercial brokers involved in the transfer of defense articles to register with the State Department and apply for their transactions to be licensed (22 USC 2778).[9] The AECA brokering provisions are explicitly linked to defense articles on the USML (and by implication, ITAR). Because the proposed changes to ITAR and CCL would remove specified non-automatic and semi-automatic firearms from the USML, on the face of it, it would seem that commercial brokers of these items would be released from ITAR registration and brokering requirements. To prevent this outcome, the State Department proposes a patch, by asserting that the AECA brokering provisions will also apply to the US Munitions *Import* List (which, as noted above, will continue to include the items that—for export purpose—are deemed no longer to warrant control under the USML). The intended effect is that brokers wanting to *export* items included on the list of items controlled as defense articles for *import* (but not for export) will be subject to the rules pertaining to the export of such items. The logic is convoluted at best, and it raises questions about the statutory grounding for requiring brokers who are exporting items "no longer warranting control under USML" to register with the State Department and comply with related ITAR requirements. Given the complexity of the issue and the risks associated with brokering activities, it would seem advisable and prudent to seek a legal opinion within the Executive Branch to ensure that the provisions of the AECA pertaining to brokers—including the registration requirement-- can be applied

---

[9] Per 22 USC 2778 (b)(1)(A)(i), "…every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President under subsection (a)(1), or in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense service (as defined in subclause (IV)), shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.

WASHSTATEC000187

robustly to all involved in the wide range of brokering activities associated with the *export* of items on the US Munitions Import List.[10] Such a legal opinion should be obtained and considered before the regulatory changes are adopted.

(b) The second issue about brokering rules relates to the practical effects of the numerous proposed changes to ITAR section 129. It is hard to imagine, in the first place, the steps by which the licensing of a transaction will be handled by Commerce and any brokering aspects (including completion of information required by 22 CFR 129.6) will be handled by State. It boggles the mind to consider how this might actually amount to a time-saving simplification of rules. I am primarily concerned about the proposed amendment 129.2(b)(2)(vii), however, which appears to negate the controls on brokering for transactions subject to EAR and open a significant loophole for unscrupulous brokers. If I have understood the proposed changes to Section 129.2 correctly, if a Michigan-based retail sports outlet licensed to sell firearms in the US wanted to sell, say, AR-15 semi-automatic rifles to clients in another country, then so long as the Michigan retailer could secure approval via the BIS licensing process, the various parties involved in shipment, financing, and possibly transshipment would be exempt from any registration and approval requirements. Nor would they necessarily be known to licensing and enforcement agents based in the Commerce Department. What in this scenario would deter an unknown and independent handler from diverting the weapons to unauthorized end-users? I would like to assume that government officials in the State and Commerce Departments have thought through the implications of the proposed rules as they might be bent for nefarious purpose as well as their service for industry cost and convenience, but the published rules do not provide assurance in that regard. **More clarification is needed about how the brokering regulations will be applied, how the inter-agency process will be managed, and the extent to which the proposed arrangements for registering and licensing brokers involved in acquiring, financing and transporting exported firearms will address the risk of diversion to non-authorized end-users.** One effect of transferring non-automatic firearms from the USML to the CCL is to remove them from the remit of the State Department's Blue Lantern program, which otherwise might be engaged to make post-shipment checks. It is not clear whether Commerce has a comparable program or what resources it will assign to monitoring the commerce in semi-automatic firearms.

4.      **Amend proposals for EAR Section 734.**

BIS has indicated that items moving "to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'" This approach would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology, or text files to produce via CNC milling the firearms removed from USML. Until now, this development has been blocked in the courts via application of ITAR provisions requiring export license. **Either the Department of Commerce should clarify that it views any software instructions for producing controlled firearms already to be within the ambit of the EAR, or EAR Section 734.7 should be amended to bring circulation of open-source, non-proprietary CAD and other electronic files under EAR control - possibly by establishing that electronic files for producing functional firearms are subject to EAR control as production technology.**

---

[10] When questions arose in 1996 as to the authority of the President to restrict munitions imports under the AECA, the Office of Legal Counsel in the Justice Department was asked to provide an opinion. A similar request for opinion is warranted here. See https://www.justice.gov/sites/default/files/olc/opinions/1996/02/31/op-olc-v020-p0049_0.pdf .

WASHSTATEC000188

5.      **Amend provisions for License Control – Crime Control**

Shotguns controlled under 0A502 are subject to the Crime Control because they are not controlled by Wassenaar. It is not evident, however, why items 0A501a are controlled for Regional Security but not Crime Control, as firearms are a main element of crime control equipment used by police and security forces. Moreover, federal statutes explicitly prohibit the export of crime control equipment to police and security forces in countries whose governments have a consistent pattern of gross violations of internationally recognized human rights, with exceptions requiring Presidential certification. **To bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 USC 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], items in 0A501A should be subject to Crime Control.**


6.      **Include information from enhanced reporting on certain firearms exports in annual 655 Report.**

Enhanced reporting of items in the 501 series is potentially one bright spot in the proposed regulations. Several proposed changes are welcome, including: proposed changes in EAR part 748 requiring information about required import licenses; proposed changes in reporting mandated in EAR part 758; the required use of EEI filing for 0A501.a firearms; and the proposed recordkeeping requirement in part 762.

If the proposed rules are ultimately accepted, the information provided to the Wassenaar Arrangement and the UN Register of Conventional Arms will provide more granular information about US commercial exports of firearms, which seemingly could be included without significant additional effort in the annual 655 report mandated by the Foreign Assistance Act, 22 USC 2415.


**7. The balance of costs and benefits significantly favors industry over the taxpayer.**

The two sets of proposed rules include calculations of expected costs and benefits of the changes. Having invested several hours parsing the proposed rules, I suspect that one major benefit of the changes will accrue to the attorneys who help clients wend their way through federal regulations. The registration system as it was initially set up was intended to pay for itself, via modest registration and licensing fees that covered the costs of recording and updating information on US arms manufacturers and reviewing details for proposed transactions. In some sense, it has been a fee-for-service arrangement. The proposed changes significantly alter that approach with regards to firearms proposed for transfer to the CCL.

Except for the presumably few brokers unable to qualify for the firearms registration exemption outlined in proposed changes to ITAR section 129.2, no registration or license fees will be collected. Some of the transactions may be straightforward, but the workload promises to be substantial, with 4000-10,000 applications and virtually every 0A501 transaction subject to at least regional security controls, with no license exceptions available. **Whereas under the current system fees paid by industry and brokers help offset the costs of processing the license applications, under the proposed system the expenses associated with reviewing license applications will be charged to the taxpayer.** In the current political environment where government hiring is anathema, unless a streamlined new process delivers extraordinary returns, it is difficult to imagine how the tally could come out in the taxpayer's favor without

WASHSTATEC000189

significant sacrifice of quality control. With respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers. **In my view as a taxpayer, the ITAR fee structure is yet one more reason for retaining non-automatic and semi-automatic firearms on the USML, and should these weapons ultimately be transferred to the CCL, I urge public officials at the Commerce Department to explore charging a service fee for processing export license applications.**

## Conclusion

I appreciate the opportunity to comment on these rules. I am disappointed, however, that by and large they downplay the lethality of the weapons currently controlled in ITAR categories I and III. I realize that these documents were prepared for a different purpose than the materials posted to inform the global public about US government programs and policy, but **the difference between the tone and emphasis of the proposed rules and the public presentation of US policy on the export of small arms and light weapons over the past twenty years is striking**. By contrast to the public statements and documents, including the 2017 Congressional testimony by a State Department official, the emphasis in these regulations is on reducing transaction costs for industry rather than promoting the public good, including national security and public safety.

In response to public comments on the proposed regulatory changes, I hope that the Departments of State and Commerce will reconsider the proposal to transfer any complete weapons from the USML to CCL. In the event that the proposed regulations go forward substantially unchanged, I can only hope that other countries will tighten and strictly enforce their own import restrictions to reduce the risk of diversion and misuse.

Thank you,

Susan Waltz
Professor
Gerald R. Ford School of Public Policy
University of Michigan
Ann Arbor, Michigan

swaltz@umich.edu

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** July 03, 2018
**Status:** Posted
**Posted:** July 09, 2018
**Tracking No.** 1k2-942o-k2sh
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories
I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-0481
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Tiffany Hiranaka

---

## General Comment

I am writing this comment in support of the this proposed rule. I feel that this proposed rule will be very
beneficial to the U.S. I support this proposed rule for a few different reasons. I feel that if the ITAR and
EAR imposes license requirements on exports and reexports, there will be a better handle of all items on
the U.S. Munitions List (USML). Having a better handle on this situation could help to keep weapons and
ammunition out of the hands of people who should not posses those items. This will also help the
government to maintain the list of all individuals that holds a license, ensuring that applications are
correctly completed, and the proper background checks are conducted prior to issuing the license.
Another things that I support about this proposed rule is the requirements of Section 38(b)(1)(A)(ii). The
requirements to this section will ensure that all business owners engaged in brokering activities are
registered and licensed with the Arms Export Control Act (AECA). I feel that this is another benefit of the
proposed revision because it ensure that all business are properly registered to conduct such brokering
activities. I feel that this is important because our government will be able to closely maintain all business
conducting such activities. This will ensure that these items dont get into the hands of groups or
individuals that should not possess them.
I think that this rule will greatly impose on businesses and individuals If adopted. I think that businesses
may feel that this is another way for government to charge them for something else. This in turn may
cause businesses to shut down due to the costs being greater than the profits. Although this may cost
people more, I feel that it would have a better regulation over all of the items on the USML that are
imported and exported. This will also impact individuals who hunt for recreation purposes. This will
make it a little more challenging for them to attain weapons and ammunition. Again, although these
proposed change will affect business and individuals, I feel that the benefits outweighs the costs. Making
this a rule that I feel should be passed, not to make things more difficult for people; but to ensure the
safety of others.

WASHSTATEC000191

United Lens Company
259 Worcester Street
Southbridge, MA 01550
July 9, 2018

**Response to Request for Comments**

83 FR 24166
RIN 0694–AF47
Emailed to *DDTCPublicComments@state.gov*

United Lens Company is a small, build-to-print (or "job shop") manufacturer of optical elements designed and used by its customers in a wide array of end-use applications—including military hardware.  We would like to offer the following comments in strong support of *keeping* items controlled by the USML:

**General Comments on Costs of Compliance**

The supplementary statement *Categories I-III Rules Myths versus Facts* released on May 24, 2018 suggests that the spirit of this rule change may be in order to alleviate licensing and other fees incurred by small business owners when exporting hardware controlled by the USML.

*"Myth: Even after this change, small U.S. gunsmiths will continue to be burdened by registration and requirement fees.*

*Fact: Most gunsmiths are not required to register as manufacturers under the International Traffic in Arms Regulations (ITAR) today. Commerce does not have a registration requirement for manufacturers and exporters of the items under its jurisdiction. Therefore, small gunsmiths who do not manufacture, export, or broker the automatic weapons and other sensitive items that remain on the USML will no longer need to determine if they are required to register under the ITAR, but they may still be required to comply with Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) licensing requirements."*

Whether intentional or otherwise, this statement seems to make a key implication:  businesses that *do* export products and who will stand to benefit *most* from this reform either: *(a)* are the design authority on their exported product lines, and are easily able to identify how their products are controlled, or *(b)* are *not* the design authority but have a single or very few key product lines which they consistently manufacture.  It is important to point out that businesses that find themselves in scenario *(a)* are not necessarily small ones, especially when it comes to military hardware.

Alternatively, job shops like United Lens Company fabricate products *without* the benefit of having design authority.  Since each new part number brings another analysis to determine its classification, ITAR controlled items are an eventuality we have to remain prepared for.  In point of fact, our eligibility as a vendor sometimes relies on our ability to make ITAR controlled exports, which is in direct disagreement with the following supporting argument (also from *Myths Versus Facts*):

*"As a result, foreign manufacturers will enjoy a greater opportunity to source from small U.S. companies. This is good for: U.S. manufacturing, the defense industrial base, security of supply to the U.S. military, and interoperability with allies, to name but a few benefits."*

In our experience, the most common requirements flowed down to us from our military customers are:  *(1)* the letter validating our registration with the DDTC and *(2)* a signed statement insuring a cybersecurity policy as outlined by NIST Special Publication 800-171.  Failure to produce these documents would mean compromising our eligibility as a vendor to these types of customers.  Ultimately, registration costs and licensing are inextricably linked to the requirements of our customer base and the particular type of build-to-print production work that we—and other fabricators—perform.

WASHSTATEC000192

RIN 0694-AF47
7/9/18 Page 2

We believe that this reform is unsuited to change the circumstances of these costs, particularly when it comes to its most significant cost driver:  mitigating risk.  Most directly, the potential fees that may be incurred from an export violation easily represent what would be considered our highest cost for maintaining our export or military-related business.  In a day-to-day context, this cost is represented by the care required to insure correct classification and shipment of parts—because in these circumstances, we bear the primary responsibility as the exporter, and therefore the primary risk.

**"Mitigating Risk" and Proposed ECCN 0A504**

As a build-to-print manufacturer, our process of mitigating those violation risks means working diligently to collect what information we can from purchasing agents or other representatives of our customers.  At its most challenging, the information we receive from these individuals can be somewhat lacking *or* subject to outright debate over the interpretation of the CFR, especially when navigating the very technical language of the Commerce Control List.  The simplest cases are those where we can identify a clear military application substantial enough to license and ship a product controlled by the USML, just by way of a *layperson* representative of our customer filling out an End-User Statement.

Since our business is focused on the fabrication of optical elements, the proposed ECCN 0A504 for "Optical sighting devices" is of particular concern.  For example, consider a hypothetical scenario where United Lens Company (or any other third party American manufacturer) is enlisted to fabricate a single optical component for installation into a Specter DR (Dual Role) Combat Sight[1].  This product comes in a number of configurations and is fabricated outside of the United States by Raytheon ELCAN--our customer for the purposes of this example.  Although we are not responsible for the fully assembled product, we first must learn or otherwise determine the classification of that product in order to correctly classify the element we are fabricating.

To further expand on this scenario, the appointed representatives at our Canadian customer have determined that this would be an appropriate circumstance to classify their Specter DR product under 0A504, and have sent an End User Statement and Purchase Order directing us to follow suit.  In order to confirm their decision, we would observe that the Specter DR products are specifically designed to combine multiple combat requirements into a single, versatile weapon sight, and to this effect it has a number of features:

- With magnifications available up to 6x, does this qualify under proposed 0A504.a "Telescopic sights"?
- Being swappable to low magnification and including a selectable "red dot", does this qualify under proposed 0A504.c "Reflex or 'red dot' sights"?
- Since these products also have a reticle, do they qualify under proposed 0A504.d "Reticle sights"?

What is most important here is this:  as the exporter of this theoretical component, we would need either *agree* with our customer's determination outright, or--more responsibly--make an effort to make sure the determination is accurate.  If we agree with their decision AND are able to support it with reasonable evidence, then the component fabricated for these products would surely fall into 0A504.g subcategory:  "Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i".  Based on our experience, the average  customer representative is not necessarily able to provide guidance regarding the interpretation of specific language used in a subcategory, or the

---

[1] To the best of our knowledge at this time, United Lens Company does not fabricate any component relevant to the production of any of the ELCAN Specter products.

WASHSTATEC000193

language of "Specially Designed"--a 'prime' defense contractor like Raytheon could, perhaps, but they represent a minority of our export customers.  These conversations are is especially difficult if our customers are not the design authority themselves--circumstances where we end up three or more degrees separated from the producers or authority on the final product.  In this sense, the complexity of the Commerce Control List can pose difficulties not just to third-party contractors like United Lens, but also to those enlisting their services.

In order to understand the preferred, alternative (and USML-oriented) approach we cite a recent[2] compliance seminar by the Massachusetts Export Center.  At this event Timothy Mooney, Senior Export Policy Analyst, fielded a question regarding suppressors falling under ITAR control; to oversimplify Mr. Mooney's response, he suggested that the very obvious military nature of the silencer is what maintained their position on the USML.  This provides a much more straightforward litmus test for classifying our previous example of a Specter DR Combat Sight:  the product's ability to switch "between CQB (close combat battle mode) and precision ranged fire mode – in the blink of an eye"[3] is difficult to picture as something the average deer hunter truly requires, so we could more easily assume the product is controlled on the USML.

The proposed rule notice, page 24166, states that:

*"The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to nonmilitary firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML."*

The proposed rule, as written, will likely place an undue burden on small American build-to-print manufacturers like ourselves, who are producing parts and components for high-grade military equipment. It seems that it would reduce the burden on small businesses like ours, foreign parties and prime contractors sourcing from those businesses, as well as the State Department, if *(a)* all "inherently military" articles were maintained under the original categories of the USML, or *(b)* these articles were reclassified into another appropriate place within the USML intended to catch items where the above "litmus test" would identify "inherently military" items that would otherwise be missed or difficult to accurately place under the CCL.  It would greatly benefit our business to *keep* items under the USML for the reasons outlined above and as such we oppose the proposed rule. However, if the proposed rule is adopted, it is particularly important that we are able to provide clear justification and documentation to our international customers for the classification of a final product either under the USML or the appropriate category or subcategory of the CCL.  The most likely avenue to obtain that documented justification will continue to be the pursuit of Commodity Jurisdictions for *many* of these circumstances..

**Further Notes**

On possible political interpretations of these comments:  these comments are submitted *purely* to outline the difficulties of the Commerce Control List when it comes to third party, job shop-like manufacturers and their export obligations.   We do not believe our comments will have any impact on the availability of these products inside the United States—especially considering that our chosen

---

[2] Hosted in Boston on June 14th, 2018
[3] Raytheon website, Accessed July 9, 2018: https://www.raytheon.com/capabilities/products/dualrole_ws/

WASHSTATEC000194

RIN 0694-AF47
7/9/18 Page 4

example is a weapons sight that we have *assumed* is ITAR controlled, yet still commercially available for purchase within the United States.

On cost-oriented policy that *has* benefitted United Lens Company:  the fact that registration with the DDTC has a cost "floor" for companies that use less than ten licenses a year is something we believe has been a huge benefit to our small business—we have never actually exceeded this limit.  If the spirit of export reform is cost, we would suggest that further developing this "sliding scale" approach to registration and license costs in order to subsidize small businesses may be an effective strategy.

For comments or questions, please feel free to contact the undersigned at mlannon@unitedlens.com.

Sincerely,

Maxwell Lannon
Director of Engineering
Export Control Officer

WASHSTATEC000195

**COMMENTS OF THE VIOLENCE POLICY CENTER TO THE U.S. DEPARTMENT OF STATE**

**RE: ITAR Amendment—Categories I, II, and III**

<u>**SUBMITTED VIA EMAIL**</u>

The Violence Policy Center (VPC) is a national non-profit educational organization working to reduce gun violence through research, public education, and advocacy. The VPC has a particular expertise in researching and monitoring the gun industry and we regularly issue reports and analyses regarding the industry and its products. The VPC has also done extensive research on cross-border gun trafficking.

The VPC has serious concerns regarding the rules proposed by the U.S. Departments of Commerce and State to transfer non-automatic and semi-automatic firearms and ammunition, as well as parts and related defense services currently controlled by Category I, II, or III of the U.S. Munitions List under the International Traffic in Arms Regulations (ITAR), to the control of the Export Administration Regulations (EAR). The proposed transfer would significantly weaken controls on small arms and ammunition and will result in a higher volume of export sales with less transparency and oversight. The ability to prosecute violations will also be impaired. The changes will enhance the risks that lethal weapons widely used for military purposes will end up in the hands of criminal organizations, human rights abusers, and terrorist groups.

The proposed rules treat semi-automatic assault rifles as "non-military." But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. VPC research clearly demonstrates that the types of semi-automatic rifles, handguns, sniper rifles, large-capacity ammunition magazines, receivers, and other parts subject to the new rules are the types of weapons and accessories preferred by cross-border gun traffickers.[1] Moreover, many of the sniper rifles subject to the transfer are in use by military forces.[2] One particularly problematic rifle is the 50 caliber anti-armor sniper rifle that is capable of downing

---

[1]      *An Ongoing Analysis of the Types of Firearms Illegally Trafficked from the United States to Mexico and Other Latin American and Caribbean Countries as Revealed in U.S. Court Documents*, Violence Policy Center: http://www.vpc.org/indicted/.

[2]      "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon: 5 guns no one wants to go to war against," *The National Interest*, March 11, 2018: http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851.

WASHSTATEC000196

aircraft on take-off and landing and can pierce light armor.[3] In addition, these rifles have been identified as a national security threat by a number of experts and entities.[4]

The devastation that semi-automatic firearms equipped with large-capacity ammunition magazines can inflict is demonstrated by their common use in mass shootings in the United States.[5]

Regarding whether the items described in the proposed rules are widely available in commercial outlets, an issue about which comment has been requested, many of the items are rapidly becoming less available in the United States. Six U.S. states and the District of Columbia prohibit retail sale of semi-automatic assault rifles. Eight states and the District of Columbia ban large-capacity ammunition magazines. Several large retail chain stores have acted to stop the sales of semi-automatic firearms and large-capacity ammunition magazines. For example, Walmart does not sell semi-automatic assault weapons. The store does not sell handguns, except in Alaska. They also do not sell large-capacity ammunition magazines.[6]

Other large retail outlets, such as Dick's Sporting Goods, have recently acted to stop the sales of semi-automatic assault weapons (which the gun industry euphemistically calls "modern sporting rifles"). Dick's is even destroying its unsold inventory of assault weapons.[7] Finally, many countries prohibit civilian possession of semi-automatic rifles and handguns and the trend is toward prohibiting such weapons. For example, Norway is moving to ban semi-automatic firearms as of 2021. In 2011, Norway experienced one of the worst mass shootings outside of the U.S. The shooter used a Sturm Ruger Mini-14 semi-automatic rifle and a Glock semi-automatic handgun to kill 69 people at a youth camp. Both of these weapons are examples of those that will be transferred to Commerce's control under the proposed rules.

---

[3]     For more information on the capabilities of 50 caliber sniper rifles, see the Violence Policy Center's resource page: http://www.vpc.org/regulating-the-gun-industry/50-caliber-anti-armor-sniper-rifles/.

[4]     *National Security Experts Agree: 50 Caliber Anti-Armor Sniper Rifles Are Ideal Tools for Terrorists*, Violence Policy Center, 2005: http://www.vpc.org/fact_sht/snipersecurityexperts.fs.pdf.

[5]     See, for example, Violence Policy Center list of mass shootings involving high-capacity ammunition magazines: http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

[6]     Walmart Statement on Firearms Policy, accessed on July 3, 2018: https://news.walmart.com/2018/02/28/walmart-statement-on-firearms-policy.

[7]     "Dick's Sporting Goods plans to destroy all the assault rifles it pulled off its shelves," *CNN*, April 19, 2018: https://www.cnn.com/2018/04/19/us/dicks-sporting-goods-guns-trnd/index.html.

WASHSTATEC000197

Many semi-automatic rifles are also easily converted to fully-automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

The rules will enable the production and distribution of 3D-printed firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printed firearms, the State Department successfully charged him with violating arms export laws since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is unlikely to take similar action once such weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. This change alone could generate many preventable tragedies while changing the landscape of firearm manufacture, distribution and regulation.

The proposed rules would revise License Exception BAG to allow U.S. citizens and permanent resident aliens temporarily leaving the U.S. to take up to three non-automatic and semi-automatic firearms and up to 1,000 rounds of ammunition for such firearms for personal use while abroad (License Exception BAG). Currently, BAG applies only to non-automatic firearms. The proposed rules create a new exception for semi-automatic firearms and also revise the current rule to allow nonresident aliens leaving the U.S. to take firearms "accessories," "attachments," "components," "parts," and ammunition controlled by 0A501 or 0A505, provided that these were lawfully brought into the U.S.

The revision to the License Exception BAG is highly problematic considering that semi-automatic weapons can inflict catastrophic damage. If such a weapon is stolen or lost, there will little that can be done to recover the weapon. It will also be much easier for smugglers to take advantage of these exceptions to facilitate trafficking.

No justification is offered for changes to the current BAG framework. As described previously, semi-automatic weapons are prized by criminal organizations and the proposed change is likely to increase the risk of crime and violence.

The proposed rules would eliminate Congressional oversight for important gun export sales. Congress will no longer be automatically informed about sizable sales of these weapons. This change will limit the ability of Congress to comment on related human rights concerns, as it recently did on the Philippines and Turkey. In 2002, Congress acted to require it be notified of sales of firearms regulated by the U.S. Munitions List valued at $1 million or more. Items moved to Commerce's control would no longer be subject to such notification. In a September 15,

WASHSTATEC000198

2017, letter, Senators Ben Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate congressional intent and effectively eliminate congressional oversight.[8]

The rules reduce end-use controls for gun exports. It would eliminate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Government's information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators. End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

Gun manufacturers are extolling the new rules as an opportunity for increased profits in a climate of declining domestic sales.[9] At the same time, the new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking weapons production would no longer apply to manufacturers of semi-automatic firearms. The government and taxpayers will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

**CONCLUSION**

The proposed rules would transfer gun export licensing to an agency – the Commerce Department – the principal mission of which is to promote trade. Firearms are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the

---

[8]      Letter to Secretary of State Rex Tillerson, September 15, 2017.

[9]      "Trump State Department Looks to Stream Line Firearms Exports & Open US Markets," *Ammoland*, May 15, 2018: https://www.ammoland.com/2018/05/trump-state-department-looks-to-stream-line-firearms-exports-open-us-markets/#axzz5KDSk0Jdz.

types of weapons being transferred to the Commerce Department's control – including AR-15, AK-47, and other military-style assault rifles such as 50 caliber sniper rifles as well as their ammunition – are weapons of choice for criminal organizations in Mexico and other Latin American countries and are responsible for most of the increasing and record levels of homicide in those countries. The rules are certain to increase the volume of exports of these firearms. The export of these weapons should be subject to more controls, not fewer.

The proposed rules would significantly weaken export controls and oversight of many military firearms highly prized by terrorists, drug-trafficking organizations, and common criminals. Semi-automatic assault rifles, high-capacity ammunition magazines, sniper rifles (especially 50 caliber sniper rifles), and high-caliber firearms should remain on the United States Munitions List (USML).

The requirement that Congress be notified of all sales of former and USML-controlled firearms of more than $1 million should be retained.

The provision authorizing license-free exports of semi-automatic rifles by citizens and legal permanent residents should be removed.

Respectfully submitted,

Kristen Rand
Legislative Director
Violence Policy Center
1025 Connecticut Ave NW
Suite 1210
Washington, DC 20036



By E-mail: DDTCPublicComments@state.gov subject line, "ITAR Amendment – Categories I, II, and III"

Robert Monjay
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E. Street, N.W.
Washington, DC 20226

RE:    Comments on Proposed Rule – International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 FR 24198 (May 24, 2018).

Dear Mr. Monjay:

Vista Outdoor Inc., (Vista) is a leading global designer, manufacturer and marketer of consumer products in the growing outdoor sports and recreation markets. We serve these markets through our diverse portfolio of well-recognized brands that provide consumers with a range of performance-driven, high-quality and innovative products, including sporting ammunition and firearms, outdoor products, outdoor cooking solutions, outdoor sports optics, hydration systems, golf rangefinders, and accessories. We serve a broad range of end consumers, including outdoor enthusiasts, hunters and recreational shooters, professional athletes, as well as law enforcement and military professionals.

The majority of Vista brands exported that require BIS or DDTC authorizations are: Federal Premium®, CCI®, Speer ®; Firearms: Savage Arms™, Bushnell®, BLACKHAWK!®, Night Optics®, all which will be directly impacted by the proposed rules changes. As requested in the proposed rule contained in Federal Register Notice, 83 FR 24198, May 24, 2018, Vista respectfully submits the following comments:

**Specific Comments**

I.    **USML Category III Ammunition – Projectiles –Steel Tipped**

The revised Category III enumerates **projectiles, specifically, sub paragraph** (d)(1) controls "Projectiles that ….. are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys."
The revised Category III does not exempt ammunition that the ATF has found is primarily intended to be used for "sporting purposes" per the below definition:

WASHSTATEC000201

In 18 USC 918(a)(17)(A), the term ''ammunition'' means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.

(B) The term ''armor piercing ammunition'' means—
(i) a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

(ii) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

(C) The term **"armor piercing ammunition"** does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

Comment: We recommend that subparagraph (d)(1) be revised to delete the term "steel tipped." Export controls of articles enumerated in the revised Category III should be consistent with definitions in other parts of federal law. Therefore control of steel tipped projectiles which have been determined to be intended for sporting purposes correctly belongs under the EAR.


## II.    Recommendations for Effective Date of Final Rule

Throughout the reform effort and during transitions of items from the USML to the CCL, the final rules for other categories had an effective date of 180 days after publication.

Comment:  Vista recommends a 180-day effective date for the final rule.

*****

Thank you for the consideration and opportunity to provide comments to the proposed rules. Vista commends the joint effort among the Directorate of Defense Trade Controls, Bureau of Industry and Security, and the other reviewing agencies in this endeavor and we look forward to the final rules being released.

Vista would be happy to respond to any questions or concerns, or provide additional information, please contact Julia Mason via phone (571) 343-7005 or via email at itoshootingsports@vistaoutdoor.com.

Sincerely,
Vista Outdoor Inc.

Julia Mason
Director, International Trade Operations
Vista Outdoor Inc.

WASHSTATEC000202

# PUBLIC SUBMISSION

**As of:** July 10, 2018
**Received:** May 29, 2018
**Status:** Posted
**Posted:** June 04, 2018
**Tracking No.** 1k2-93fa-nitu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-0021
Comment on DOS_FRDOC_0001-4527

## Submitter Information

**Name:** WILLIAM HANGEN

## General Comment

I support the proposed rule as written, but with a few minor changes:

1) the referenced magazine capacity restriction of 50 rounds should be doubled, to 100 rounds. There are several magazine manufacturers in the United States producing magazines of greater than 50 rounds that would benefit from this change, and such manufacture and enabling technology for magazines greater than 50 rounds is found worldwide. Limiting this magazine capacity to 50 rounds does not protect any special US or allied military advantage, but magazines of greater than 50 rounds are commonly found worldwide. Drum type magazines for the Kalashnikov family of weapons are a prime example.

2) the proposed rule does not address sound suppressors. Sound suppressors are readily available in the US and overseas, and the technical know-how to produce them is found worldwide. There are a plethora of US manufacturers fabricating sound suppressors that would benefit from this rule change, and the use of sound suppressors does not confer any special US or allied military advantage. Inclusion of sound suppressor deregulation would benefit US manufacturing interests without harming our military position.

Thank you for your time and attention regarding this matter. Have a great day!

WASHSTATEC000203

William A. Root
2700 Burcham Drive, Apt 234
East Lansing, MI 48823
billroot23@gmail.com

Erick Williams, JD
1209 Old Hickory
East Lansing, MI 48823
willnielsen@sysmatrix.net

June 27, 2018

US Department of State
Bureau of Political Military Affairs
Directorate of Defense Trade Control
DDTCPublicComments@state.gov
http://www.regulations.gov

Re:  ITAR Amendment—Categories I, II, and III DDTC

Greetings:

These are comments on the Department of State's proposed rule to amend the
International Traffic in Arms Regulations (ITAR) and categories I, II and III of the
US Munitions List (USML).  83 Federal Register 24166, May 24, 2018.

**Background**

The ITAR amendment should be revised to better support the rule of law.

The Arms Control and Disarmament Act, at 22 USC 2551, declares:

> An ultimate goal of the United States is a world … in which the use of force
> has been subordinated to the rule of law …

No profession is more closely identified with the rule of law than the police
profession.  Peace officers are the street-level keepers of the law, all over the
world.  If the United States is committed to "subordinating the use of force to the

1

rule of law", it must protect the environment in which peace officers do their work. When armed gangs can overpower local peace officers, local communities become war zones where the rule of law is subordinated to the use of force.

We fail to protect peace officers when we put highly destructive weapons in the hands of civilians who target the police.

The ITAR amendment, as proposed, will make it easier to put firearms in the hands of civilians and armed gangs that are superior to those carried by local peace officers, thus threatening the rule of law in local communities.  In several parts of the world, armed gangs are impairing the rule of law, and their activities cross borders.  Notorious examples of the adverse effects of firearm proliferation can be seen in Africa and the Middle East, as well as closer to home – in Central America and Mexico, with adverse effects along the southern border of the United States.

See: Alec MacGillis, *"America's Wild-West Gun Laws Are Helping Fuel The Border Crisis: The Unwanted Traffic Between The US And Central America Goes Both Ways"* (New Republic, July 21, 2014), https://newrepublic.com/article/118759/nra-and-gun-trafficking-are-adding-fuel-border-migrant-crisis

Robert Muggah and Steven Dudley, Op-Ed: *"The Latin American Gun Leak"*, (Los Angeles Times, January 16, 2015), http://www.latimes.com/opinion/op-ed/la-oe-muggah-arming-latin-america-20150118-story.html

*"Attacks against Peacekeepers"* (United Nations OHCHR, May 2017), https://www.ohchr.org/Documents/Countries/CF/Mapping2003-2015/Factsheet7-EN.pdf

*"Attacks against civilians and MINUSCA peacekeepers in the town of Bangassou in the Central African Republic"* (Office of the Spokesperson for the UN Secretary-General, May 14, 2017) https://www.un.org/sg/en/content/statement/2017-05-14/statement-attributable-spokesman-secretary-general-attacks-against

Alex Yablon, *"American Guns Drive the Migrant Crisis that Trump Wants to Fix with a Wall"* (Trace, May 25, 2017) https://www.thetrace.org/2017/05/gun-trafficking-central-america-immigrant-crisis-trump-wall/

Jonathan Blitzer, *"The Link Between America's Lax Gun Laws and the Violence That Fuels Immigration"* (New Yorker, March 22, 2018),

2

https://www.newyorker.com/news/news-desk/the-link-between-americas-lax-gun-laws-and-the-violence-that-fuels-immigration

See: *"Clear and Present Danger: National Security Experts Warn about the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians"* (Violence Policy Center, July 2005), http://www.vpc.org/studies/50danger.pdf

ITAR should focus more attention on the security needs of local communities where firearms are proposed to be exported.

The Department of State is liberalizing its rules on firearm exports partly because the Department of Defense has determined that so-called semi-automatic firearms are of diminished importance in military conflicts. DoD's determination may well be valid, but it misses the point. Military analysts worry, as they should, about the impact of weapons on the battlefield. But evaluating the impact of firearms on the battlefield gives short shrift to the security needs of civilian communities. To support the rule of law we must consider the impact of firearms on public safety, peace officer safety, crime control, and the prevention and management of civil disturbances. Firearms that "no longer warrant control" by the military may nonetheless overwhelm police patrols and threaten the rule of law in local communities.

ITAR should not treat the US firearms market as the global standard. The United States is proposing to liberalize its rules on firearm exports grounded partly on the false premise that firearms are "widely available in retail outlets ... abroad." That is not true. The US firearms market is unique. Mexico, for example, has more restrictive gun laws than the United States.

See: Topher McDougal, David A. Shirk, Robert Muggah and John H. Patterson, *"The Way of the Gun: Estimating Firearms Traffic Across the US-Mexico Border"* (Trans-Border Institute, University of San Diego, March 2013), https://igarape.org.br/wp-content/uploads/2013/03/Paper_The_Way_of_the_Gun_web2.pdf

Zachary Elkins, Tom Ginsburg & James Melton, "*US Gun Rights Truly Are American Exceptionalism*", (Bloomberg, March 7, 2013), https://www.bloomberg.com/view/articles/2013-03-07/u-s-gun-rights-truly-are-american-exceptionalism

The United States risks alienating friendly foreign nations by projecting its permissive domestic gun laws abroad.

3

The Department of State has access to information about what kinds of weapons are typically carried by patrol officers in foreign countries. The Department has the wherewithal to judge whether a firearm proposed for export is likely to outmatch the firearms carried by local police forces. The Department should use that knowledge -- and make that judgment -- as it evaluates firearm export applications.

In evaluating the suitability of firearm exports, the ITAR should set a maximum limit on the destructive potential of firearms exportable to civilians. Firearms with muzzle energies higher than, for example, 5,000 Joules should be barred from export to non-government end-users. (In ballistics, muzzle energy, commonly expressed in Joules or foot-pounds, is a measure of the destructive potential of a firearm or cartridge.) The risk that a firearm poses to life and property – and the danger it poses to police officers -- depends rather more on the firearm's destructive potential and rather less on whether the firearm is automatic, semi-automatic, non-automatic, not-fully-automatic, or over- or under .50-caliber.

Highly destructive weapons should be off-limits for export to civilians. Whatever short-term economic benefit those exports may generate is outweighed by the risk those weapons pose to the safety of peace officers and the rule of law. No firearm with a muzzle energy of 5,000 J belongs on a street anywhere in the world.

## Policy Recommendations

The following changes should be incorporated in ITAR:

1. Applications for firearm export licenses should be denied when the firearm proposed for export is of such destructive potential as to threaten the safety of local law enforcement officers.

2. Prohibit exports of firearms with muzzle energies less than 5,000 J, to civilian end-users, world-wide, if the firearm is likely to outmatch weapons carried by local peace officers or otherwise impair the efforts of peace officers to control crime and civil disturbance.

3. Prohibit export of firearms with muzzle energies above 5,000 J to civilian end-users world-wide.

4

# Technical Language

The recommendations above may be translated into the ITAR framework using the technical language below.

## (1)

## 22 CFR 120.4

Add a Note 3 to 22 CFR 120.4 as follows:

> FOR FIREARMS AND AMMUNITION, PERFORMANCE CAPABILITY INCLUDES DESTRUCTIVE POTENTIAL, AS MEASURED BY MUZZLE ENERGY, COMMONLY EXPRESSED IN JOULES OR FOOT-POUNDS.

## (2)

## 22 CFR 121.1, Category I

Add Note 3 to Category I of 22 CFR 121.1 as follows:

> (a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM

5

WASHSTATEC000208

SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR A FIREARM OR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(c) A FIREARM, AND AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS), AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

(3)

22 CFR 121.1, category II

Add a Note 3 to category II of 22 CFR 121.1, paragraph (a), as follows:

(a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY

6

RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR A FIREARM OR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(c) A FIREARM, AND AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS), AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

(4)

22 CFR 121.1, category III

Add a new paragraph 4 to notes to category III of 22 CFR 121.1, as follows:

(a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL

7

WASHSTATEC000210

GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(c) AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS) MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

8

WASHSTATEC000211

(5)

15 CFR 124.14 (c) (9)

Amend 15 CFR 124.14 (c) (9) as follows:

(a)  Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: ''Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained.

(b) SUBJECT TO (c) AND (d), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(c) A LICENSE APPLICATION FOR A FIREARM OR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED

9

WASHSTATEC000212

EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(d) A FIREARM, AND AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS), AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

(6)

22 CFR Part 126, Supplement No. 1

In 22 CFR Part 126, Supplement No. 1, category I (a-e) (firearms and related articles), mark all three country boxes with an X.

In 22 CFR Part 126, Supplement No. 1, category II (a) (guns and armament), mark all three country boxes with an X.

In 22 CFR Part 126, Supplement No. 1, category III (ammunition and ordinance), mark all three country boxes with an X.

10

WASHSTATEC000213

(7)

22 CFR 129.7 (b)

Amend 22 CFR 129.7 (b) to add the following:

(b) No person may engage in or make a proposal to engage in brokering activities that involve any country, area, or person referred to in § 126.1 of this subchapter without first obtaining the approval of the Directorate of Defense Trade Controls.  NO PERSON MAY ENGAGE IN OR MAKE A PROPOSAL TO ENGAGE IN BROKERING ACTIVITIES THAT INVOLVE EXPORTING OR TRANSFERRING, TO A NON-GOVERNMENT PERSON, A FIREARM OR AMMUNITION WITH MUZZLE ENERGY GREATER THAN 5,000 JOULES (3,688 FOOT-POUNDS), OR ASSOCIATED EQUIPMENT.  NO PERSON MAY ENGAGE IN OR MAKE A PROPOSAL TO ENGAGE IN BROKERING ACTIVITIES THAT INVOLVE EXPORT OR TRANSFER, TO A NON-GOVERNMENT PERSON, OF A FIREARM OR AMMUNITION WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS) OR ASSOCIATED EQUIPMENT IF THE ITEM IS LIKELY TO OUTMATCH LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE ARTICLE WOULD BE AUTHORIZED FOR USE.

Thank you for the opportunity to submit comments on the ITAR amendment.

Sincerely,

William A. Root
Erick Williams

11

WASHSTATEC000214

**Message**

| | |
|---|---|
| **From**: | Timothy Mooney [Timothy.Mooney@bis.doc.gov] |
| **Sent**: | 7/30/2018 5:23:56 PM |
| **To**: | Monjay, Robert [MonjayR@state.gov] |
| **CC**: | Heidema, Sarah J [HeidemaSJ@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **Subject**: | RE: Comments on Cat I-III rule. How are you guys coming on your comments? (1 of 4) |
| **Attachments**: | Tab 1_Detailed supportive_Commerce firearms comments.pdf |

Thanks, Rob.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Tim

**From:** Monjay, Robert <MonjayR@state.gov>
**Sent:** Monday, July 30, 2018 1:00 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Comments on Cat I-III rule. How are you guys coming on your comments?

Tim,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Thanks
Rob

**Official - SBU**
UNCLASSIFIED

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Monday, July 30, 2018 9:42 AM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** Comments on Cat I-III rule. How are you guys coming on your comments?

Hi Rob,

███████████████████████████████████████████████████████████



Thanks,

WASHSTATEC000216

Tim

WASHSTATEC000217

# PUBLIC SUBMISSION

**As of:** 7/10/18 2:34 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 10, 2018
**Tracking No.** 1k2-944p-jl1q
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0188
Public comment 109 . NRA C. Zealand 7-6-18

---

## Submitter Information

**Name:** NRA ILA
**Address:**
    11250 Waples Mill Rd
    Fairfax, VA, 22030

---

## General Comment

See attached file(s)

---

## Attachments

Export-Reform_Cats. I-III_Final

WASHSTATEC000218

NATIONAL RIFLE ASSOCIATION OF AMERICA
**INSTITUTE FOR LEGISLATIVE ACTION**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



July 6, 2018

Mr. Robert Monjay
Office of Defense Trade Controls
United States Department of State
2401 E Street, Northwest
Washington, District of Columbia 20226

Via Online Submission: https://www.regulations.gov/docket?D=DOS-2017-0046

Re:   **Docket No. DOS-2017-0046; RIN 1400-AE30; International Traffic in Arms
      Regulations: U.S. Munitions List Categories I, II, and III**

Dear Mr. Monjay:

I am writing on behalf of the National Rifle Association (NRA) to provide the
association's comments on the above proposed rule (the proposal). With some six million dues-
paying members, the NRA is America's premier defender of the civil right protected by the
Second Amendment. Our members include individuals and businesses that would be directly
affected by the changes in the proposal, including gunsmiths, firearm instructors, journalists and
writers covering firearm technology and development, hunters, competitive shooters, and
manufacturers.

The NRA is very pleased to see that the project of Export Reform has finally circled back
to the place where it began, with proposed amendments to Categories I, II, and III of the U.S.
Munitions List (USML). These were among the first of the changes planned for the large-scale
undertaking to update export controls on dual-use items, and rightly so. The Second Amendment
protects an individual right to possess and carry firearms in case of confrontation, extending to

2

arms in common use among the population for lawful purposes.[1] America boasts hundreds of millions of privately-owned firearms[2] and a robust "gun culture" that has produced countless books, magazine articles, videos, websites, online forums, etc., that exhaustively detail firearm technology and use. It is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain. This same information is commonly available overseas, as are the types of firearms and ammunition the proposal would move off the USML and onto the Commerce Control List (CCL). Meanwhile, the might and sophistication of the U.S. military -- as well as America's armed populace -- ensure that no foreign enemy wielding the type of arms at issue in these proposed amendments to the USML could pose a serious threat to this nation's security.

Of course, movement of commonly-available firearms and ammunition to the CCL would not leave their export unregulated. America already has one of the most well-established and closely-administered systems of regulation for commercial production and distribution of firearms and ammunition in the world, and the proposal would not change that. It is clear from the companion rulemaking published by the Commerce Department that items moving off the USML would remain closely controlled, with the necessity of export licenses remaining the norm. Foreign individuals' access to firearms and ammunition would also remain regulated under the federal Gun Control Act and the National Firearms Act. Furthermore, the Commerce Department has long regulated exports of various shotguns, as well as their parts, components, accessories, and ammunition. Thus, it has existing knowledge of and relationships with many of the entities the proposal will affect. Those entities, in turn, will also have some familiarity with the Department's regulatory environment and procedures.

The NRA believes that, on the whole, the proposal correctly balances the imperatives of national and global security, allocation of oversight resources, and promotion of American industry, innovation, and competiveness. We do, however, think it could be improved in several particulars. We also believe that the timing for the implementation of the rule deserves careful consideration.

Specifically, our concerns involve the following:

• **The retention of firearm sound suppressors on the USML is contrary to the guiding principles of Export Reform and does not serve it purposes.** Suppressors should also be moved to the CCL, unless they are specifically designed for use only with firearms that remain on the USML.

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 592, 624-25 (2008). *See also McDonald v. Chicago*, 561 U.S. 742 (2010) (Second Amendment right to keep and bear arms is fully incorporated against state and local action by virtue of the Fourteenth Amendment).

[2] The Small Arms Survey estimates that as of the end of 2017, there were 121 firearms for every 100 residents in the U.S., for a total of some 393.2 million guns. The program director for the Small Arms Survey Institute notes, however, that "there is no direct correlation at the global level between firearm ownership and violence." *See* Edith M. Lederer, "Global survey shows more than 1 billion small arms in world, mostly owned by civilians and mostly in the U.S.," ChicagoTribune.com, June 18, 2018, http://www.chicagotribune.com/news/nationworld/ct-survey-small-arms-world-civilians-20180618-story.html.

WASHSTATEC000220

- **The designation of "high capacity magazines" that would remain on the USML is based on an arbitrary number, rather than any qualitative difference in the technology or military character of the item.** The governing consideration should be whether they are specifically designed for use only with firearms that remain on the USML, not their capacity.

- **Where manufacturers and exporters need to implement new compliance procedures for items moving from the USML to the CCL, the final rule should have a delayed implementation date; where requirements that once pertained under the International Traffic in Arms Regulations (ITAR) have no analogues under the Export Administration Regulations (EAR), the changes should take effect immediately.**

For these reasons, and as detailed below, the NRA supports the proposal but advocates for minor revisions before its publication as a final rule.

I.   **Firearm Sound Suppressors, As Such, Do Not Meet the Prerequisites for Control on the USML Articulated by the Proposal and Therefore Should be Controlled Under the CCL.**

As noted in its supplementary information, the proposal is part of a longstanding effort to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." Whether or not sound suppressors for firearms are characterized as "weapons," there is no plausible argument that the devices meet these standards.

A firearm sound suppressor is basically a metal cylinder surrounding internal baffles that slow and cool escaping gas to decrease the volume of the firearm's muzzle report. The devices reduce, but do not eliminate, the sound of gunshots.[3] Suppressor have been commercially available since the first decade of the 1900s.[4] The technology necessary to produce them is simple and well-understood throughout the developed world. Detailed design, development, production, and manufacturing information for firearm sound suppressors is pervasively available in the public domain, including on the Internet.[5] Similar devices are used to moderate the sound of various other consumer products powered by internal combustion, including automobiles, chainsaws, and lawnmowers.

---

[3] Glenn Kessler, "Are firearms with a silencer 'quiet'?" WashingtonPost.com, March 20, 2017, https://www.washingtonpost.com/news/fact-checker/wp/2017/03/20/are-firearms-with-a-silencer-quiet/?noredirect=on&utm_term=.301e14951dd4.

[4] Stephen Halbrook, "Firearm Sound Moderators: Issues of Criminalization and the Second Amendment," 46 Cumb. L. Rev. 33, 42 (2015)

[5] A quick web browser search will reveal numerous webpages and videos offering detailed instructions on constructing suppressors of various levels of sophistication, from products produced with lathes and other machine tools to improvised models made from such materials as PVC, flashlight tubes, oil filters, and solvent traps. There's even a detailed suppressor schematic on the ATF's own website: https://www.atf.gov/file/silencer-cut-away.

WASHSTATEC000221

4

Suppressors do not provide the United States with any critical military or intelligence advantage. They are not unique to the United States and are in fact the rare type of firearm-related product that historically has been regulated more closely in this country than in a number of other countries with otherwise relatively strict gun control laws. In some foreign countries, there are no special requirements to acquire or possess firearm suppressors; in certain others, they are presumptively available to those with a firearm license.[6] Firearm suppressors are already in use by military forces, law enforcement agencies, and civilian firearm owners across the world. Simply put, any country sophisticated enough to produce firearms is sophisticated enough to produce firearm sound suppressors.

Firearm sound suppressors, by themselves, are harmless and cannot accurately be classified as "weapons." They are only useful when actually attached to a firearm. Even then, they do not make the firearm any more lethal. Their primary advantage is to protect the hearing of the firearm's user and to decrease the sound signature of firearms so their use is less noticeable and has fewer collateral effects on those in vicinity of the firearm's discharge.

And even assuming, for the sake of argument, suppressors could be characterized as "weapons," they are not "inherently military." Suppressors are regulated and taxed under U.S. law,[7] but they are readily available to those who are legally eligible to own firearms. They are lawful for private possession in 42 states and may be lawfully used for hunting in 40 states.[8] Suppressors adorn the firearms of plinkers, hunters, competitors, and law enforcement officers. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), there were 1,297,670 suppressors registered under the National Firearms Act as of February 3, 2017, with nearly 400,000 such registrations occurring in the 12 months preceding that date alone.[9] As previously mentioned, suppressors are also commonly used by law enforcement agencies and private firearm owners in other countries as well.

In its current form, the proposal does not differentiate between suppressors for use on firearms that would be regulated under the USML and those that would not. This could mean that firearms that would otherwise be regulated under the CCL will remain on the USML because they have integrated suppressors. It could also mean that firearm instructors would have to refrain from allowing suppressors to be used in their classes for fear of providing unauthorized "defense services." This is contrary to the spirit and intent of Export Reform and does nothing to further U.S. or international security interests.

Given that there is no special military or national security significance to firearm sound suppressors, there is no convincing argument for retaining them on the USML. Like flash suppressors, they should be generally subject to the CCL. If they are going to be retained on the USML at all, it should only be to the extent that they are "specially designed" for the firearms

---

[6] 46 Cumb. L. Rev. at 72-4.

[7] *See* National Firearms Act, 26 U.S.C. §§ 5801-5872; Gun Control Act, 18 U.S.C. §§ 921-931.

[8] American Suppressor Association, Education Webpage, https://americansuppressorassociation.com/education/ (last visited July 6, 2018).

[9] Stephen Gutowski, "ATF: 1.3 Million Silencers in U.S. Rarely Used I Crimes," FreeBeacon.com, Feb. 17, 2017, http://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/.

5

that would also continue to be so controlled. Because that distinction would be difficult to administer as a practical matter, however, the best option is simply to control the general category of firearm sound suppressors under the CCL.

## II.    The Proposal's Treatment of Magazines is Arbitrary and Capricious.

The proposal treats magazines as "high capacity" and therefore subject to the USML if they have a capacity of greater than 50 rounds, "regardless of jurisdiction of the firearm." It offers no explanation for this threshold. Whatever the thinking behind it may be, a 51-round magazine provides no greater critical military or intelligence advantage than a magazine of lesser capacity, nor is it any more inherently for military end use.

Magazines, whatever their capacity, are among the most simple and utilitarian of firearm-related items. In typical form, they consist of a metal box or tube with a floor plate that contains a spring with a follower at the top. A firearm that can accept a detachable magazine can accept a magazine of virtually any size. All that is necessary to create a magazine of greater capacity is a longer box and spring. Drum magazines typically utilize a cylindrical chamber and a wound spring or ratcheting mechanism to allow for greater capacity in a more compact unit, but neither configuration uses sophisticated or closely-held technology. Like firearm sound suppressors, technical data for magazines with capacities above and below 51 rounds is available in the public domain, including online, and has been since at least the early 20th Century.[10]

United States law does not limit the capacity of magazines for any sort of firearm available to private citizens (a handful of states, however, do impose magazine capacity limits, typically of 10 rounds). Magazines with capacities in excess of 50 rounds are readily available on the commercial market. They are used by practical shooting competitors, as well as by many gun owners who appreciate the versatility and convenience they provide. Even BB guns for the youth market that use springs or compressed air often have reservoirs that hold hundreds of rounds. While these non-powder guns obviously are not and would not be defense articles under the proposal, their capacity demonstrates the fact that marksmen of all types appreciate the ability to operate their guns without frequent reloading.

Demonstrating the arbitrary nature of controlling magazines based on their capacity is the fact that they can easily be clipped, taped, or otherwise attached to one another, with reloads accomplished in mere moments.

As with sound suppressors, it makes no sense that a given curriculum of firearm instruction that would otherwise be uncontrolled under the proposal could potentially be re-characterized as a "defense service" if it happened to involve a "large capacity" magazine.

---

[10] *See, e.g.*, European Patent Office Patent No. 8172, "A New or Improved Cartridge Magazine for Small Arms and Machine Guns," Accepted March 6, 1919 (providing detailed specifications for a drum-type magazine), *available at* https://worldwide.espacenet.com/publicationDetails/originalDocument?CC=GB&NR=191508172A&KC=A&FT=D&ND=3&date=19190306&DB=EPODOC&locale= (last visited July 6, 2018).

For these reasons, we recommend that firearm magazines be controlled under the CCL. If they are controlled under the USML at all, it should only be to the extent they "specially designed" solely for firearms that remain on the USML.

### III. The Final Rule Should Take Effect Immediately to the Extent Requirements Are Eliminated and Phase in Other Changes to Allow Regulated Entities Time to Adapt.

When the final rule governing Categories I, II, and III of the USML is published, certain changes should take effect immediately, while others should be phased in to allow regulated entities time to adapt.

Changes that merely eliminate requirements altogether should take effect immediately. For example, there is no justification for continuing to make "manufacturers" of articles that would be moved off the USML register with the Department of State.

On the other hand, where control of an item changes from the USML to the CCL, necessitating new procedures by the regulated entity, implementation of the final rule's effective date should be delayed to allow for new compliance systems to be established.

Licenses granted under the ITAR should also be grandfathered for all outstanding transactions.

The NRA does not have any specific recommendations for a timeline of implementation for enforcing new requirements and procedures. We will defer to the entities whose day-to-day operations will be directly affected by the changes in the final rule.

### Conclusion

The NRA is very pleased to see Export Reform finally turn its attention to Categories I, II, and III of the USML. The proposal charts a positive course that will contribute to national security, enhance the competitiveness of U.S. businesses, and benefit ordinary gun owners by mitigating the potential for the ITAR to burden innocent conduct that does not implicate national security. We hope you will take the suggestions offered herein seriously to further promote the worthy goals of this effort, and we appreciate the opportunity to provide input.

We have also included our submission on the Bureau of Industry and Security's companion rulemaking and incorporate those comments herein by this reference.

Sincerely,

C. M

Christopher Zealand
Senior Research Attorney
NRA-ILA

NATIONAL RIFLE ASSOCIATION OF AMERICA
**INSTITUTE FOR LEGISLATIVE ACTION**
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030



July 6, 2018

Regulatory Policy Division
Bureau of Industry and Security
United States Department of Commerce
14th Street and Pennsylvania Avenue, Northwest
Washington, District of Columbia 20230

Via Online Submission: https://www.regulations.gov/document?D=BIS-2017-0004-0001

Re:     **Docket No. BIS-2017-0004; RIN 0694-AF47; Control of Firearms, Guns,
        Ammunition and Related Articles the President Determines No Longer Warrant
        Control Under the United States Munitions List (USML)**

Greetings:

I am writing on behalf of the National Rifle Association (NRA) to provide the association's comments on the above proposed rule (the proposal). With some six million dues-paying members, the NRA is America's premier defender of the civil right protected by the Second Amendment. Our members include individuals and businesses that would be directly affected by the changes in the proposal, including gunsmiths, firearm instructors, journalists and writers covering firearm technology and development, hunters, competitive shooters, and manufacturers.

The NRA is very pleased to see that the project of Export Reform has finally circled back to the place where it began, with proposed amendments to Categories I, II, and III of the U.S. Munitions List (USML). These were among the first of the changes planned for the large-scale undertaking to update export controls on dual-use items, and rightly so. The Second Amendment protects an individual right to possess and carry firearms in case of confrontation, extending to

WASHSTATEC000225

arms in common use among the population for lawful purposes.[1] America boasts hundreds of millions of privately-owned firearms[2] and a robust "gun culture" that has produced countless books, magazine articles, videos, websites, online forums, etc., that exhaustively detail firearm technology and use. It is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain. This same information is commonly available overseas, as are the types of firearms and ammunition the proposal would regulate under the Commerce Control List (CCL). Meanwhile, the might and sophistication of the U.S. military – as well as America's armed populace – ensure that no foreign enemy wielding the types of arms at issue in these proposed regulations could pose a serious threat to this nation's security.

Of course, movement of commonly-available firearms and ammunition to the CCL would not leave their export unregulated. America already has one of the most well-established and closely-administered systems of regulation for commercial production and distribution of firearms and ammunition in the world, and the proposal would not change that. It is clear from the proposal that items moving off the USML would remain closely controlled, with the necessity of export licenses remaining the norm. Foreign individuals' access to firearms and ammunition would also remain regulated under the federal Gun Control Act and the National Firearms Act. Furthermore, the Commerce Department has long regulated exports of various shotguns, as well as their parts, components, accessories, and ammunition. Thus, it has existing knowledge of and relationships with many of the entities the proposal will affect. Those entities, in turn, will also have some familiarity with the Department's regulatory environment and procedures.

The NRA believes that, on the whole, the proposal correctly balances the imperatives of national and global security, allocation of oversight resources, and promotion of American industry, innovation, and competiveness. We do, however, think that it could be improved in several particulars. We also believe that the timing for the implementation of the rule deserves careful consideration.

Specifically, our concerns involve the following:

- **§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP) and § 758. 10 Entry clearance requirements for temporary imports – The use of the Automated Export System (AES) is impractical and inappropriate for private travelers exporting a personal firearm they temporarily imported into the U.S. for**

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 592, 624-25 (2008). *See also McDonald v. Chicago*, 561 U.S. 742 (2010) (Second Amendment right to keep and bear arms is fully incorporated against state and local action by virtue of the Fourteenth Amendment).

[2] The Small Arms Survey estimates that as of the end of 2017, there were 121 firearms for every 100 residents in the U.S., for a total of some 393.2 million guns. The program director for the Small Arms Survey Institute notes, however, that "there is no direct correlation at the global level between firearm ownership and violence." *See* Edith M. Lederer, "Global survey shows more than 1 billion small arms in world, mostly owned by civilians and mostly in the U.S.," ChicagoTribune.com, June 18, 2018, http://www.chicagotribune.com/news/nationworld/ct-survey-small-arms-world-civilians-20180618-story.html.

WASHSTATEC000226

3

**lawful purposes.** The current system, which relies upon the ATF Form 6NIA, should be maintained without modification for such persons.

- **§ 740.14 Baggage (BAG) and § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES) – The use of the AES is impractical and inappropriate for private travelers temporarily exporting a personal firearm for lawful purposes.** The current system, which relies upon the CBP Form 4457, should be maintained without modification for such persons until such time as U.S. Customs and Border Protection engages in a public rulemaking process to resolve the current problems.

- **§ 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES) and § 762.2 Records to be retained – Expanding the data elements necessary for AES filings would exacerbate the problems for private travelers temporarily exporting a personal firearm and violate the spirit of Congressional prohibitions against federal firearm registries.** Private travelers temporarily exporting personal firearms should continue to be able to use the CPB Form 4457 without the firearm's information being captured by a federal database.

- **Where manufacturers and exporters need to implement news compliance procedures for items moving from the USML to the CCL, the final rule should have a delayed implementation date; where requirements that once pertained under the International Traffic in Arms Regulations (ITAR) have no analogues under the Export Administration Regulations (EAR), the changes should take effect immediately.**

For these reasons, and as detailed below, the NRA supports the proposal but advocates for revisions before its publication as a final rule.

I.      **The AES System is Impractical and Inappropriate for Use by Private Travelers.**

        A.      The AES requirement was introduced without sufficient or accurate notice to the public.

The International Traffic in Arms Regulations historically had included an exemption under 22 CFR §123.17(c) that allowed U.S. persons to temporarily export without a license up to three nonautomatic firearms and not more than 1,000 cartridges therefor.  This exemption was geared toward hunters, sportsmen, competitors, and others who travel overseas with firearms to be used for sporting and other lawful purposes.

In 2011, DDTC published a Federal Register notice of proposed rulemaking entitled International Traffic in Arms Regulations: Exemption for Temporary Export of Chemical Agent Protective Gear.[3] The supplementary information to that rulemaking focused on amendments to 22 CFR §123.17 pertaining to "the temporary export of chemical agent protective gear for

---

[3] 76 Fed. Reg. 16353 (March 23, 2011).

WASHSTATEC000227

4

exclusive personal use … ." It also mentioned that "an exemption for firearms and ammunition is clarified by removing certain extraneous language that does not change the meaning of the exemption."[4]

In fact, the proposed change to the firearms and ammunition exemption was a material and substantial change to the status quo. It would require for the first time that "the individual must … present the Internal Transaction Number (ITN) from submission of the Electronic Export Information in the Automated Export System per § 123.22(b)" to use the exemption.[5]

But because the notice only printed the amendments to 22 CFR §123.17 and omitted the existing text of that section, it was not clear from the face of that notice what the context of this new requirement was. The notice's inaccurate portrayal of the change as a mere "clarification" further contributed to obscuring the significance of this new language. Thus, the new requirement for temporary firearms and ammunition exports went largely unnoticed by relevant stakeholders.

The final rule was published on May 2, 2012.[6] Its supplementary information included a similarly inaccurate description of the firearm exemption amendment. "Section (c)(3) is revised to remove what is in practice extraneous language," it stated.[7] "Subject to the requirements of (c)(1)–(3), the exemption applies to all eligible individuals (with the noted exceptions). Thus, while the text is revised, the meaning of (c)(3) is not changed."[8]

Unlike the notice for the proposed rule, however, the notice of the final rule included the full text of subsection (c), which made clear the AES filing requirement pertained to those claiming the licensing exemption for temporary firearm and ammunition exports. Of course, it was by then too late for stakeholders to object to these changes, as the rule had been finalized.

For three years, the changes to 22 CFR §123.17 as they pertained to temporary firearm and ammunition exports appeared to be ignored and unenforced by the federal government. Then, in 2015, U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) suddenly changed their websites to indicate the AES filing requirements would be enforced against travelers temporarily exporting firearms and ammunition, with penalties that could include seizure of improperly declared items and criminal prosecution.[9]

---

[4] *Id.*

[5] *Id.* at 16354.

[6] Amendment to the International Traffic in Arms Regulations: Exemption for Temporary Export of Chemical Agent Protective Gear, 77 Fed. Reg. 25865-01 (May 2, 2012).

[7] *Id.*

[8] *Id.*

[9] *See* NRA-ILA, "Rule Change May Devastate International Travel for Hunters and Shooters," https://www.nraila.org/articles/20150320/rule-change-may-devastate-international-travel-for-hunters-and-shooters (March 20, 2015).

5

    B.    <u>The AES was not designed for use by private persons for non-business purposes.</u>

The AES was designed around the needs of commercial exporters and government officials, not private travelers. As CBP's "Introduction" to the AES states:

> *During AES development, a Trade Resource Group convened regularly. To ensure that all voices were heard, the group was comprised of large and small exporters, carriers, freight forwarders, port authorities, and non-vessel operating common carriers (NVOCC). At the trade's request, separate coalitions for exporters and software vendors were formed.*[10]

It continues, "Whatever aspect of the export community you represent - exporter, carrier, freight forwarder, port authority, service center, non-vessel operating common carrier, consolidator - AES has advantages for you."[11] Nowhere does this summary recognize that private individuals would also have to navigate a system designed by and for industry compliance specialists.

Individuals attempting to use the AES will need to have compatible hardware and software systems or to enlist the services of an authorized agent. Those who do not wish to purchase or write their own software, or hire someone to complete the filing process for them, have the option of using AESDirect, an online version administered by the U.S. Census Bureau.

That agency, in turn, has a webpage with various resources to acquaint users with the intricacies of the system.[12] Browsers can start, for example, with the 39-page *AESDirect User Guide*[13] or with any of the one-hour-plus webinars that cover various aspects of the system.

Navigating the filing process requires individuals to create an account and then fill in data fields with various codes that are neither intuitive nor easily reconcilable with the context of an individual traveling with his or her own private property. For example, the system requires the parties to an export to be identified, with required fields that include the U.S. Principal Party in Interest, which must be identified by "Company Name" and an acceptable ID type. Likewise, the Ultimate Consignee also must be specified, again with reference to "Company Name" and an authorized form of identification.

Nowhere does the User Guide or the screens of the system itself explain how these categories are supposed to translate for private individuals declaring temporary exports of their

---

[10] U.S. Customs and Border Protection, "AES: An Introduction," https://www.cbp.gov/trade/aes/introduction (last visited July 6, 2018).

[11] *Id.*

[12] U.S. Census Bureau, "ACE AESDirect – Resources," https://www.census.gov/foreign-trade/aes/aesdirect/transitiontoace.html?eml=gd&utm_medium=email&utm_source=govdelivery (last visited July 6, 2018).

[13] *Available at* https://www.census.gov/foreign-trade/aes/aesdirect/AESDirect-User-Guide.pdf (last visited July 6, 2018).

6

own property. Such persons are not just an afterthought in the system's design. Rather, it appears that the design has not thought of them at all.

The acceptable forms of identification, for example, are an Employer Identification Number (EIN), a Dun and Bradstreet Number, or a foreign passport number (if the foreign entity is in the U.S. at the time the goods are purchased or obtained for export). U.S. individuals making temporary exports cannot use their own passport numbers, nor can they use their Social Security numbers.[14]

Using AESDirect, moreover, requires an individual to apply for an account with the Secure Data Portal of the Automated Commercial Environment. The application for an ACE Exporter Account[15] requires users to list "Corporate Information," including an EIN and Company Name.

The Internal Revenue Service (IRS) is responsible for issuing EINs. The IRS website that explains the process for applying online clearly states: "Employer Identification Numbers are issued for the purpose of tax administration and are not intended for participation in any other activities."[16] The online application requires the applicant to identify the "legal structure" associated with the EIN. None of the available options corresponds with a private individual who simply wishes to make an AES filing. The applicant then must specify why he or she is requesting an EIN, with the limited menu choices again offering no option for the private AES filer. Finally, the applicant must certify under penalties of perjury that he or she has "examined this application, and to the best of my knowledge and belief, it is true, correct, and complete."[17]

Private individuals using the online application form, in other words, must make a false certification to the IRS about their business need for an EIN as a prerequisite to complying with the legally-mandated AES filing requirement. These individuals are also potentially creating an expectation with the IRS that they are creating a business that should have associated tax filings.

C.    The relevant agencies have been aware of the problems private individuals have using the AES, and there has been no apparent progress in resolving them.

In 2015, representatives of the NRA – as well as representatives of hunting and firearm industry associations – met with officials from CBP, the Census Bureau, the Department of

---

[14] *See* U.S. Customs and Border Protection, "Change in Automated Export System (AES) exporter ID filing requirement," https://help.cbp.gov/app/answers/detail/a_id/1145/kw/EIN%20number%20needed%20for%20export (last visited July 6, 2018).

[15] *Available at* https://ace.cbp.dhs.gov/acexpub/acexpub_Apps/ExporterAccountApplication/expForm.php (last visited July 6, 2018).

[16] IRS, "Apply for an Employer Identification Number (EIN) Online," https://www.irs.gov/businesses/small-businesses-self-employed/apply-for-an-employer-identification-number-ein-online (last visited July 6, 2018).

[17] *See* IRS Form SS-4, available at https://www.irs.gov/pub/irs-pdf/fss4.pdf (last visited July 6, 2018). Note the PDF of the SS-4 has options for "Other (specify)" not available on the IRS's online application form. It does not, however, indicate that EINs may be obtained solely for AES filing purposes.

WASHSTATEC000230

Homeland Security (DHS), and ICE to discuss the above problems.[18] These discussions emphasized the need for a simple, straightforward, and legal means for private travelers to comply with their AES filing requirements. The discussions also touched on concerns about creating a federal firearm registry via AES filings (a topic that is explored below in greater depth).

Shortly after that meeting, and after additional intervention from members of Congress, CBP announced that it would return to the status quo practice of using the paper CBP Form 4457 to track firearms for temporary export.[19] In this procedure, travelers report to a CBP office during their trip or beforehand at a Port of Entry and present the firearms (and ammunition, if applicable) to be recorded on the 4457. Upon return to the U.S., the traveler will declare the property, which can be checked, if necessary, against the 4457 to ensure the same firearms that left the country have returned. The ATF has also indicated that this procedure will satisfy the re-importation of firearms under its importation jurisdiction.[20]

We understand that this remains the procedure for temporary firearm exports by private travelers to the present day and that the AES filing requirement is not being enforced against these individuals.

Between 2015 and the present, NRA representatives have had repeated contacts with officials from CBP and the Census Bureau to inquire about any changes or updates to the above-described state of affairs. To date, we have neither seen nor heard of any evidence that the AES system has been in any way modified to alleviate the problems it presents for private travelers. Our review of the applicable websites during the preparation of these comments confirms this impression. The AES remains a complex application geared toward the needs of industry and government, not private persons traveling with their own property for non-business purposes.

D.  <u>BIS should omit the AES filing requirement for private persons temporarily exporting their own firearms and ammunition for lawful purposes and codify the Form 4457 procedure.</u>

The NRA is pleased to see that BIS' current proposal is handling the AES issue in a much more transparent and forthright manner than the 2012 DDTC rulemaking that introduced it in the first place. The background information included with the proposal acknowledges:

*BIS is aware that U.S. Customs and Border Protection (CBP) has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to*

---

[18] *See* NRA-ILA, "You Can't Get There from Here: Obama Administration Shrugs Off Woes of International Travelers," https://www.nraila.org/articles/20150417/you-cant-get-there-from-here-obama-administration-shrugs-off-woes-of-international-travelers (April 17, 2015).

[19] *See, e.g.,* P.J. Reilly, "U.S. Government withdraws confusing new gun rules for traveling hunters," LancasterOnline, April 27, 2015, https://lancasteronline.com/news/local/u-s-government-withdraws-confusing-new-gun-rules-for-traveling/article_e2991fcc-ecec-11e4-8e21-3b622f277d23.html.

[20] *See* 27 C.F.R. § 478.115(a).

*operational challenges related to implementation. ... Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.*

As explained above, the CBP and the other relevant agencies have not updated their processes to allow for individuals to easily file Electronic Export Information in the AES. Given that they are aware of the issues, have had more than three years to fix them, and have made no discernable progress in that direction, there is no reason to believe they will do so by the time the proposal is published as a final rule.

The NRA is unaware of any compelling security need to change the status quo. The very fact that the systems have not been updated to address the outstanding issues would seem to indicate CBP and DHS agree. Simply put, there has been no urgency to facilitate AES filings by private travelers. The Form 4457 procedure has proven to be a workable system both before and since the 2012 rule change, and it can continue to suffice for the near term.

The paper Form 4457 also serves an important function for some U.S. travelers to foreign countries that require a valid "firearm license" from visitors' home countries. Neither the U.S. government nor most U.S. states generally license the acquisition or simple possession of firearms, especially long guns. But foreign officials in these countries have historically accepted the Form 4457 as fulfilling this requirement.

It is also relevant that BIS has throughout the relevant time period always allowed for the temporary export of shotguns and shotgun shells under its jurisdiction via the baggage exemption of 15 C.F.R. § 740.14 without requiring a declaration to be filed in the AES. Indeed, that exemption currently does not specifically require the use of the Form 4457 procedure, either. Codifying the Form 4457 procedure would therefore help promote consistency and understanding across the different agencies involved in enforcing the nation's export rules and with the traveling public. The president's determination that certain additional firearms and ammunition no longer warrant control under the USML more strongly argues in favor of BIS adopting its own procedures for their temporary export than for importing procedures from the ITAR into the EAR.

CBP can also issue its own rulemaking on procedures for temporary exports by private travelers, should the state of play change with respect to the practical and technological issues of the AES. The issue could then be fully vetted in its own right. There is no reason, however, to inject this thorny issue into the larger project of Export Reform. It is not necessary nor helpful to the objectives of Export Reform, and it would perpetuate a problem one solution to which has already been identified (i.e., the paper Form 4457 procedure).

WASHSTATEC000232

      E.        <u>Private travelers exporting a personal firearm they temporarily imported into the</u>
                  <u>U.S. for lawful purposes should not be required to use AES for this purpose.</u>

The same problems that arise from requiring U.S. persons to file declarations through the AES to take advantage of the BAG exemption apply to requiring foreign visitors traveling to the U.S. with their own firearms to use the AES to avail themselves of the TMP exception. This is not necessary under the current version of 15 C.F.R. § 740.9, and it should not be added to that section or to § 758.1.

Currently, foreign visitors traveling to the U.S. with their own firearms must apply for an import permit from the Bureau of Alcohol, Tobacco, Firearms & Explosives using ATF Form 6NIA. The individual will also have to substantiate his or her eligibility to possess a firearm in the United States as a non-U.S. person (for example, by obtaining a hunting license from a U.S. state). The travelers must then declare their firearms at the border, provide CBP officials with any required documents, and maintain the required documents during the duration of their stay. Customs officials in the country of re-importation can use the ATF Form 6NIA to confirm that the individual is returning with the same firearms that were brought to the U.S.

We are unaware of any attempt on DDTC's part to enforce a requirement that foreign visitors (including from Canada) declare the "export" of firearms they temporary brought to the U.S. for lawful purposes through the AES when the visitor returns home. Indeed, it is difficult to understand how doing so would contribute to national security. Thanks the Second Amendment and America's unique commitment to individual liberty, the U.S. has by far the largest civilian stock of firearms in the world.[21] Given the ready availability of firearms in the U.S. as compared to the rest of the world, there is little chance that America's interests are seriously threatened by foreign visitors bringing their own lawfully obtained guns into the country. At the very least, they are not threatened enough to impose a bureaucratic requirement for private foreign travelers that has already proven unworkable for their U.S. counterparts.

For these reasons, we urge BIS to omit from §§ 740.2 and 758. 10 the AES declaration requirement as applied to private foreign travelers temporarily bringing personal firearms into the U.S. Foreign hunters and competitive shooters help contribute to the U.S. economy, and these proposed changes would discourage them from doing so. Meanwhile, reports of foreign travelers committing crimes in the U.S. with firearms they lawfully brought with them are vanishingly rare.

**II.      The expanded data elements necessary for AES filings exacerbate the problems for private travelers forced to use the system and violate the spirit of Congressional prohibitions against federal firearm registries.**

The proposal would "expand the data elements required as part of an AES filing for [firearms transferred from the USML] to include serial numbers, make, model and caliber," including for those wishing to use the BAG and TMP exemptions. This makes the previously mentioned problems with AES filing that much worse. It also runs counter to the spirit of clearly

---

[21] Lederer, *supra* note 2.

established Congressional policy against using bureaucratic record-keeping requirements to establish firearms registries.

Firearm registries have long been anathema to gun owners as a tool that can be used to target them for discrimination and for the eventual seizure of their firearms. History is rife with examples of tyrants who used civilian disarmament to further their despotic ends,[22] and America's own Revolutionary War began in earnest after a British raid on Colonial arms caches. Against this backdrop, federal gun control laws have consistently maintained a policy against national registries of the sorts of common arms with which Americans typically exercise their Second Amendment rights.[23]

Congress, in enacting the Gun Control Act of 1968 (GCA), specifically declined to create a federal firearm registry, despite the urging of President Lyndon B. Johnson to do so.[24]  Both the House and the Senate voted down proposals to require registration of guns as the legislation made its way through Congress.[25] As Sen. James McClure later stated,

> *The central compromise of the Gun Control Act of 1968—the sine qua non for the entry of the Federal Government into any form of firearms regulation was this: Records concerning gun ownership would be maintained by dealers, not by the Federal Government and not by State and local governments.*[26]

Congress then amended the GCA in 1986 to prohibit any rule or regulation enacted under its auspices from using the records that federal firearm licensees must keep to establish "any system of registration of firearms, firearms owners, or firearms transactions or dispositions ...."[27]

When the Brady Handgun Violence Protection Act of 1993[28] created the authority for the National Instant Criminal Background Check System (NICS), Congress took pains to ensure the system would not circumvent the GCA's policy against firearm registration. The Act states that if the NICS determines receipt of a firearm would not be in violation of law, it shall "destroy all records of the system with respect to the call (other than the identifying number and the date the

---

[22] *See, e.g.*, STEPHEN HALBROOK, GUN CONTROL IN THE THIRD REICH, DISARMING THE JEWS AND "ENEMIES OF THE STATE" (Independent Inst. 2013).

[23] The National Firearms Act, 26 U.S.C. §§ 5801-5872, requires federal registration of limited categories of arms, but to the extent it covers firearms, those guns– which include machineguns, short-barreled shotguns, short-barreled rifles, and non-sporting firearms greater than .50 caliber – are comparatively rare among the U.S. civilian firearm stock.

[24] *See* Lyndon B. Johnson, "Remarks Upon Signing the Gun Control Act of 1968," Oct. 22, 1968, *available at* http://www.presidency.ucsb.edu/ws/?pid=29197 (last visited July 6, 2018).

[25] 114 Cong. Rec. H22267 (daily ed. July 19, 1968); 114 Cong. Rec. S27420-421 (daily ed. Sept. 18, 1968).

[26] 131 Cong. Rec. S9163-64 (July 9, 1985).

[27] 18 U.S.C. § 926(a).

[28] Pub. L. No. 103–159, 107 Stat. 1536 (1993).

WASHSTATEC000234

number was assigned) and all records of the system relating to the person or the transfer."[29] Section 103(i) of the Act contains additional prohibitions against the use of the system to create a federal firearms registry:

> *No department, agency, officer, or employee of the United States may—*
>
>> *(1) require that any record or portion thereof generated by the system established under this section may be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or*
>>
>> *(2) use the system established under this section to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions except with respect to person, prohibited by section 922 (g) or (n) of title 18, United Stated Code State law, from receiving a firearm.*[30]

Beginning in 1979, the annual appropriations bills that funded the ATF and its predecessor agency prohibited the Department of Justice from centralizing the records of federal firearm licensees (FFLs), until the prohibition was made permanent in 2011.[31] Also made permanent in that 2011 appropriations bill was another rider that prohibited the ATF from compiling a searchable registry of gun buyers' names from business records transferred to the agency by FFLs who ceased dong business.[32] A third provision in the same bill permanently created a 24-hour deadline for the destruction of identifying information on those who successfully undergo a NICS check.[33]

Even Obamacare contains a number of provisions that prohibit information collected under its authority from being used to create firearm registries.[34]

Meanwhile, there is no express authority in the enabling act under which this rulemaking is promulgated for BIS to collect and retain detailed information on the firearms owned by law-abiding Americans. Yet BIS is proposing to compel Americans to enter identifying information about themselves and their firearms into a federal database as a precondition of engaging in lawful travel with firearms. Individuals forced to comply with this requirement are given no assurances about how the information will be retained or protected or whether it will be available to other entities, and if so, under what circumstances. This clearly runs contrary to the spirit of congressional policy governing the handling of firearm owner information.

---

[29] 18 U.S.C. 922(t)(2)(C).

[30] 107 Stat. at 1542.

[31] Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 609 (2011).

[32] 125 Stat. 552, 610.

[33] *Id.* at 632.

[34] Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, 884-5 (2010).

WASHSTATEC000235

12

The *de facto* federal firearm registry that would be created by forcing private gun owners to make detailed declarations about themselves and their firearms via the AES is another argument in favor of retaining the current procedure utilizing the paper Form 4457. That procedure vindicates the government's legitimate interest in monitoring the firearms that move and in and out of the country but does not require the government to maintain a central registry of firearm owner information.

Going forward, any further attempt to automate the information private travelers must provide about their personal firearms should include express privacy provisions. At a minimum, these should prevent the dissemination or transfer of the information to other entities and require its complete destruction once CBP has verified that the firearms which were temporarily exported have been returned to the U.S.

For all these reasons, the NRA objects to the proposal's use of expanded data elements for private travelers seeking to utilize the BAG or TMP exceptions and urges that those requirements be omitted from the final rule.

**III.   The Final Rule Should Take Effect Immediately to the Extent Requirements Are Eliminated and Phase in Other Changes to Allow Regulated Entities Time to Adapt.**

When the final rule governing Categories I, II, and III of the USML is published, certain changes should take effect immediately, while others should be phased in to allow regulated entities time to adapt.

Changes that merely eliminate requirements altogether should take effect immediately. For example, there is no justification for continuing to make "manufacturers" of articles that would be moved off the USML register with the Department of State.

On the other hand, where control of an item changes from the USML to the CCL, necessitating new procedures by the regulated entity, implementation of the final rule's effective date should be delayed to allow for new compliance systems to be established.

Licenses already granted under the ITAR should also be grandfathered for all outstanding transactions.

The NRA does not have any specific recommendations for a timeline of implementation for enforcing new requirements and procedures. We will defer to the entities whose day-to-day operations will be directly affected by the changes in the final rule.

**Conclusion**

The NRA is very pleased to see Export Reform finally turn its attention to Categories I, II, and III of the USML. The proposal charts a positive course that will contribute to national security, enhance the competitiveness of U.S. businesses, and benefit ordinary gun owners by mitigating the potential for export regulations to burden innocent conduct that does not implicate national security. We hope you will take the suggestions offered herein seriously to further promote the worthy goals of this effort, and we appreciate the opportunity to provide input.

WASHSTATEC000236

13

We have also included our submission on the Directorate of Defense Trade Control's companion rulemaking and incorporate those comments herein by this reference.

.

Sincerely,

Christopher Zealand
Senior Research Attorney
NRA-ILA

# PUBLIC SUBMISSION

**As of:** 7/10/18 2:37 PM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 10, 2018
**Tracking No.** 1k2-946k-ylsq
**Comments Due:** July 09, 2018
**Submission Type:** API

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0189
Public comment 110. Esterline. R. Baldwin. 7-9-18

---

## Submitter Information

**Name:** Richard Baldwin
**Address:**
   500 108th Ave NE
   Suite 1500
   Bellevue,  WA,  98004
**Email:** rich.baldwin@esterline.com
**Phone:** 4255191874
**Organization:** Esterline Technologies Corp.

---

## General Comment

See attached file(s)

---

## Attachments

Esterline_Comment_DOC_RIN_0694-AF47

WASHSTATEC000238



**Esterline Corporation**
500 108th Avenue NE
Suite 1500
Bellevue, WA 98004

Tel: 425-453-9400
Fax: 425-453-2916
www.esterline.com
NYSE symbol: ESL

July 9, 2018

Richard E. Ashooh
Assistant Secretary for Export Administration
Bureau of Industry and Security
U.S. Department of Commerce
14th and Pennsylvania Avenue NW
Room 2099B
Washington, D.C. 20230

ATTN: Request for Comments Regarding Reform of USML Categories I, II, and III, Docket No. 111227796-5786-01, RIN 0694-AF47, 83 FR 24166

Dear Mr. Ashoosh:

Esterline Technologies Corporation supports the goals and objectives of the Export Control Reform (ECR) Initiative, and submits the following comments respecting the proposed transfer of items from Categories I, II, and III from the USML to the CCL, with focus on the appropriateness of the corresponding license requirements and licensing policies.

**Summary of Comments and Recommendations**

This section outlines our main comments, each of which is explained more fully in the remainder of this letter.

1.  Keep the Commerce Control List free of AECA brokering.

2.  Coordinate changes to USML Categories I, II, and III with changes to the United States Munitions Import List.

3.  Address conflict with companion rule 83 FR 24198.

**Comments and Recommendations**

**1.  Keep CCL free of AECA brokering**

One of the main advantages of ECR is that items on the CCL are not subject to the brokering requirements in section 38(a)(1) of the Arms Export Control Act (AECA) and 22 CFR 129. This advantage has been highlighted by the U.S. Government in public

WASHSTATEC000239

remarks, such as Under Secretary Hirschorn's address to the BIS Update 2014 Conference.

Absence of brokering controls for CCL items has more significance than the absence of double licensing. Currently, items subject to the CCL do not require registration or licensing under 22 CFR 129, period. Once an item is determined to be on the CCL, it is clear that it is not subject to brokering, so there is no need to review the USMIL or the requirements in 22 CFR 129 before engaging in business. Knowledge that items on the CCL are not subject to brokering simplifies and streamlines transactions. Addition of brokering requirements for any item on the CCL would be an unwelcome development as it would introduce a significant complicating factor.

Esterline recommends BIS and DDTC reform USML Categories I, II, and III without introducing brokering controls to items in the CCL.

## 2.  Coordinate changes to USML Categories I, II, and III with USMIL

The proposed rule would add the need to review the USMIL for activities that are not imports to the United States and involve items on the CCL. Classifying items against multiple control lists for a single transaction increases the cost and complexity of U.S. export controls.

Esterline recommends BIS and DDTC coordinate the change to USML Categories I, II, and III with the Bureau of Alcohol, Tobacco, Firearms, and Explosives so that a corresponding change is made to the USMIL at the same time. This would eliminate the need to consider both the USML and the USMIL when deciding whether a transaction involves brokering.

## 3.  Address conflict with companion rule 83 FR 24198

The proposed rule is in conflict with the companion State Department proposed rule, 83 FR 24198, Public Notice 10094, RIN 1400–AE30. This leaves items transferred from the USML to the CCL potentially without a controlling ECCN.

Esterline recommends BIS coordinate with DDTC to resolve this conflict.

The BIS proposed rule states:

> Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor.

The State Department proposed rule states with respect to USML Category III:

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

In effect, the BIS proposed would receive specific production and test equipment for conventional ammunition into ECCN 0B505, while the State Department proposed rule would move all production and test equipment for ammunition and ordnance to the CCL, conventional or otherwise.

ECCN 0B505 would only control equipment specially designed for the production of ammunition and ordnance that is controlled in USML Category III if it falls within the list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment." This list is less than the scope of production equipment that will no longer be controlled in USML Category VIII(c) by the proposed companion rule, 83 FR 24198.

Similarly, ECCN 0E505 would not control technology for the technology for equipment specially designed for the production of ordnance, or technology for the software specially designed for such equipment.

A number of the articles proposed for USML Category III by 83 FR 24198 are not conventional ammunition, and their specially designed production equipment exceeds the specific list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment."

For example, production of combustible ordnance requires specialized production machines that do not fall within the list "tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment." Under the proposed rules, these specialized machines would fall outside both the USML and ECCN 0B505.

**Summary**

Thank you for the opportunity to comment on this proposed rule. Please feel free to contact me if you have any questions about the comments and recommendations provided.

Regards,

Richard R. Baldwin
Director, Trade Compliance Technology
Esterline Technologies Corporation

# PUBLIC SUBMISSION

**As of:** 7/11/18 10:28 AM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 11, 2018
**Tracking No.** 1k2-944i-qsol
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0261
Public comment 115. SAAMI. R. Patterson. 7-6-18

## Submitter Information

**Name:** Richard Patterson
**Organization:** Sporting Arms and Ammunition Manufacturers" Institute

## General Comment

See attached file(s)

## Attachments

BIS Letter Docket BIS-2017-0004 6 July 2018

WASHSTATEC000242



SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC.
SINCE 1926

July 6, 2018

By Internet: Federal eRulemaking Portal: www.regulations.gov - Docket BIS-2017-0004

By mail or delivery:

Steven Clagett
Office of Nonproliferation Controls and Treaty Compliance
Nuclear and Missile Technology Controls Division

Bureau of Industry and Security
U.S. Department of Commerce
14th Street and Pennsylvania Avenue, NW, Room 2099B
Washington, DC 20230

REFERENCE: Comments on Proposed Rule – Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML) -- RIN 0694-AF47

Dear Mr. Clagett:

The Sporting Arms and Ammunition Manufacturers' Institute (SAAMI) respectfully submits the following comments to the above referenced Federal Register Notice 83 FR 24166, dated May 24, 2018. SAAMI is an association of the nation's leading manufacturers of firearms, ammunition and components. SAAMI was founded in 1926 at the request of the federal government and tasked with creating and publishing industry standards for safety, interchangeability, reliability and quality, coordinating technical data and promoting safe and responsible firearms use.

As the organization responsible for creating manufacturing standards for our industry, SAAMI is uniquely qualified to provide technical expertise particularly related to ammunition. We have reviewed the proposed rule, and agree in general with the transition of the majority of firearms and ammunition to the Commerce Control List. Export controls of commercial firearms and ammunition which are not inherently military, have no critical military or intelligence advantage, and have predominant commercial applications correctly belong under the Export Administration Regulations (EAR).

We would like to raise the following points regarding several items enumerated in the proposed rule:

WASHSTATEC000243

**Alignment of Terms Describing Caliber Between USML and CCL**

In our review of both the DDTC and BIS proposed rules, we note an inconsistency in the way calibers are described in the control lists. In USML Categories I and II, firearms and guns are described "caliber .50 inclusive (12.7 mm)" and "greater than .50 caliber (12.7 mm)", respectively. In new ECCN 0A501, firearms are described in subparagraphs .a and .b as "of caliber less than or equal to .50 inches (12.7 mm)" and "with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm)", respectively. The measurement in inches does not correlate exactly into caliber size, i.e. .50 caliber is not .50". For example, .50 BMG caliber is actually 0.51" in diameter, not 0.50". In commerce, .50 BMG ammunition is controlled with smaller calibers such as 300 Win Mag, and is separated from larger diameter calibers such as 600 Nitro Express. This could also impact other calibers such as 500 S&W Magnum or 50AE.

The caliber terms are not aligned between the control lists, and this could cause confusion and misinterpretation of the controls between the USML and CCL particularly in regard to the ammunition controls which follow the respective firearm controls.

The USML threshold of ".50 caliber" controls 50 BMG firearms in current Category I and related ammunition in current Category III. New ECCN 0A501 with the ".50 inches" threshold would put 50 BMG firearms under subparagraph b. However, 0A501.b does not control semi-automatic firearms "with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm)". Control of these semi-automatic firearms would be retained on the revised USML Category II. Because of the misaligned terms, controls on semi-automatic firearms currently designated USML Category I(a) would move to control under revised USML Category II. This is inconsistent with the transition of all other firearms currently controlled under USML Category I(a) to new ECCN 0A501.a.

In addition, revised USML Category III includes four subparagraphs which control related ammunition and components for "guns and armaments **controlled in Category II**": subparagraphs (a)(9) ammunition, (d)(4) projectiles, (d)(7) cartridge cases, powder bags, or combustible cases, and (d)(14) target practice projectiles. Because 50 BMG, 50AE, and 500 S&W Magnum ammunition could be used in either semi-automatic or non-semi-automatic firearms, there is confusion on how these items will be controlled. If these calibers were classified under 0A501.a, then it would be clear that the related ammunition would be controlled under ECCN 0A505.

As currently written in the proposed rule, ECCN 0A505 controls ammunition for all firearms in 0A501. The proposed revised USML Category III includes control of ammunition for all guns and armament controlled in revised Category II. With the proposed description of caliber in inches in ECCN 0A501, ammunition for 50 BMG firearms would be controlled under both 0A505 and USML Category III. This needs clarification to rectify the overlapping controls.

RECOMMENDATION: For clarity of controls, there needs to be consistency in the expression of terms between the two control lists for items transitioning from one control list to the other. This can be accomplished in two ways. One would be for BIS to revise the terms in ECCN

2

0A501.a and .b to read "caliber" instead of "inches". The other alternative would be for BIS and DDTC to describe caliber as .510 inches instead of .50 inches, and make the corresponding changes in USML Category II, and ECCN 0A505.

## Deletion of ECCN 0A018.b and Revision of ECCN 0A505

In reviewing new ECCN 0A505 against other CCL entries, we note an inconsistency. Currently, ECCN 0A018 includes subparagraph .b, which controls the following:

> "b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR.");
> Note: 0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:
> > a. Ammunition crimped without a projectile (blank star);
> > b. Dummy ammunition with a pierced powder chamber;
> > c. Other blank and dummy ammunition, not incorporating components designed for live ammunition"

The items listed in subparagraph .b have been revised and rewritten into the proposed changes to USML Category III and the new ECCN 0A505. Leaving ECCN 0A018.b unchanged will cause confusion due to the overlap of controlled items as listed in new ECCN 0A505.

In particular, we note that while 0A505.d indicates AT-only and UN controls for blank ammunition, the ECCN does not address controls for dummy ammunition which are the subject of the note to 0A018.b. Dummy ammunition is inert. It does not include powder or primer mix. It consists of only the metal components of the cartridge, with a hole drilled in the cartridge case to mark it as inert.

RECOMMENDATION: In keeping with the reorganization of firearm and ammunition ECCNs, we recommend BIS review 0A018.b against 0A505 and delete redundancies such as 0A018.b ""Specially designed" components and parts for ammunition" versus 0A505.x ""Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN...".

We also request BIS revise 0A505 to include a Note similar to the Note to 0A018.b making a provision for dummy ammunition. Currently under 0A018.b, dummy ammunition is not controlled (EAR99) and we would request the same treatment under 0A505. If dummy ammunition can no longer be classified as EAR99 due to policy reasons, then at a minimum, we would request the same controls on dummy ammunition as for blank ammunition under 0A505.d, i.e. UN and AT-only controls.

## Exception LVS Value Allowance

3

We note that proposed ECCN 0A505 includes an allowance for license exception LVS of $100 for subparagraph .x "parts" and "components". We also note that firearm parts and components under proposed ECCN 0A501 have an LVS allowance of $500. Our members feel this is an inconsistency in the treatment of related items. In recent years, costs related to ammunition components have been increasing, with the largest increases affecting larger caliber cartridges. The proposed $100 limit on LVS will be quickly met with small amounts of components, making this exception not as useful as intended. This will impact the smaller companies who will have increased license burden because the $100 LVS limit will be too low to be of use.

RECOMMENDATION: We request BIS raise the value limit for the LVS exception to $500 to match the allowance for firearm parts. We believe this is reasonable since the controls in place now under ECCN 0A018.b have an LVS allowance of $3000 for "specially designed" components and parts for ammunition, and this allowance is much higher than the $500 we are requesting. We also recommend BIS consider pegging the LVS value to inflation which would allow for incremental increases to match price increases over time.

We appreciate your consideration of our recommendations. Please let us know if you have questions or need any further information or clarification.

Thank you,

Richard Patterson
Executive Director

4

WASHSTATEC000246

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:40 AM
**Received:** July 03, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-942h-2tw1
**Comments Due:** July 09, 2018
**Submission Type:** API

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0338
Public Comment 128. American Entertainment Armories Association. Michael Faucette. 7-3-18

## Submitter Information

**Name:** Michael Faucette
**Address:**
    1350 I St. NW Suite 260
    Washington,  DC,  20005
**Email:** michael.faucette@mbassociateslaw.com
**Phone:** 2026260089
**Organization:** Mark Barnes & Associates on behalf of the American Entertainment Armories Association

## General Comment

See attached file(s)

## Attachments

ECR TMP Comment

WASHSTATEC000247

**AEAA Comment on Proposed Rule for "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML"**

**RIN 0694-AF47**

This law firm, Mark Barnes & Associates, submits this comment on behalf of our client, the American Entertainment Armories Association ("AEAA"). The AEAA is a trade group comprised of several companies and over 100 individual armorers who provide weapons in support of film and theatrical productions.[1]

Unlike many other items that have transitioned from the USML to the CCL, firearms are subject to unique restrictions on the permanent import side under the jurisdiction of the ATF.  The State Department's jurisdiction over temporary exports and temporary imports has played an important role in the firearms industry by providing companies (movie armorers in particular) with a viable method of bringing their guns back into the U.S. without running afoul of ATF's strict importation prohibitions under 18 U.S.C. § 922(l) and § 925(d)(3). While we support Export Control Reform's transition of these items from the USML to the CCL, we also urge the Department of Commerce to maintain a temporary export and temporary import process that allows an alternative to ATF's vigorous import restrictions.

We are concerned that BIS's proposed rule does not provide a mechanism, such as a DSP-73, for certain firearms to be temporarily exported and subsequently returned to the United States, given the firearm importation prohibitions under 18 U.S.C. § 922(l) and § 925(d)(3).

Accordingly, for the reasons stated below, we respectfully request the following:
- TMP exemption be expanded beyond paragraphs (a)(5) and (a)(6) to also allow for use in film production;
- To remove the 75 firearm limit when in furtherance of a film production;
- **Most importantly, in situations where the TMP exemption is unavailable, we request that BIS consider a procedure or license, similar to a DSP-73, that will allow for the temporary export and re-importation of firearms. Without such a measure, movie armorers will be significantly restricted in their ability to temporarily export and import non-automatic and semiautomatic firearms for film use.**

**CURRENT PRACTICE**
Individual companies within the AEAA are regularly contracted by major film production companies to temporarily supply weapons needed for various film projects worldwide. All of these companies hold Federal Firearms Licenses, are registered with DDTC, and are subject to audit by the ATF. When a movie is filmed overseas that requires firearms and ammunition, these armorers are required to obtain DSP-73 temporary export licenses from DDTC. The practice has become so

---

[1] The question is often asked why movies need to use real firearms. The performance of the actors, especially method actors, are directly associated with having the feel, weight, recoil, muzzle flash, ejection, etc. of the real thing. Thus, actors will oftentimes prefer to handle the real thing. Aside from that, there is the visual of the gun itself and the flash it creates that give film makers their desired effect which cannot be duplicated otherwise.

WASHSTATEC000248

routine that in 2013 DDTC published firearms guidelines which included requirements for the following documentation to be uploaded with all DSP-73 applications for overseas movie productions:

- Import permit issued by foreign government;
- Plot summary;
- A security plan that details who will maintain dominion and control of the firearms and the procedures in place to prevent diversion;
- Manifest;
- A statement that any unfired blank ammunition would be returned to the US; and

A DSP-73 license is vital because it covers both the US export and US import requirements. If the armorers were only able to obtain a DSP-5 permanent export license, the return of the exported firearms would be subject to ATF's permanent import process which restricts many types of firearms pursuant to federal law. For example, ATF policy is to deny the following three types of firearms pursuant to 18 U.S.C. § 925(d)(3):

1. Firearms not generally recognized as particularly suitable for or readily adaptable to sporting purposes ("non-sporting" firearms) – in a 1998 policy paper, ATF interpreted this in include any firearms that have certain cosmetic features;
2. Military surplus firearms; or
3. Firearms regulated under the National Firearms Act (machineguns, short barreled rifles, short barreled shotguns, destructive devices, and certain other weapons).

In order to comply with the above restrictions, ATF requires each firearm model be submitted for evaluation to determine if the above criteria is met. If ATF concludes that a particular firearm is not captured by one of the above three disqualifiers, the importer will be allowed to apply for a Form 6.  Even if given the go ahead to apply, a Form 6 import permit application can take several months to process.

Clearly, the ATF Form 6 process is not intended to be used for firearms that leave the United States on a temporary basis. Moreover, most firearms temporarily exported for the movie industry are either military surplus, non-sporting, or National Firearms Act weapons, of which importation is prohibited.

The EAR's current regulation of shotguns under ECCN 0A984 has already presented the movie industry with significant problems when attempting to use the EAR's temporary export ("TMP") exemption. Because this ECCN 0A984 is subject to the Crime Control restrictions, there are very few countries where the TMP exemption can be used. *See* 15 C.F.R. § 740.2(a)(4). For example, there has recently been a large influx of movies being filmed on location in Colombia. Because TMP is unavailable for Crime Control countries such as Colombia, the armorer would need a BIS export license to export non-sporting shotguns. However, once the non-sporting shotguns were exported, § 925(d)(3) would prohibit their return to the United States. As such, shotguns are routinely removed from movie story lines because of the inability to return them to the United States without going through the burdensome ATF import process. In several instances, the production company has even contemplated having the armorers shorten the shotgun barrels to

WASHSTATEC000249

below 18 inches, thereby placing them under ITAR jurisdiction so that they could be exported and returned all under one DSP-73. As explained below, the proposed rule only exacerbates this problem by offering TMP as the only temporary export/import mechanism.

## PROPOSED RULES

As mentioned, when the TMP exemption is unavailable and a BIS license is required, it is impossible for movie armorers to return to the United States with the firearms they exported for film use. It is additionally not clear that movie production would even fit within one of the two approved uses of TMP in the proposed rules.

### Approved TMP Uses

The proposed rules block the use of the TMP exemption for ECCN 0A501.a or .b firearms and shotguns with barrels under 18 inches in length (ECCN 0A502) under TMP *unless* such a transaction is in furtherance of

- "Exhibition and demonstration" under § 740.9(a)(5); or
- "Inspection, test, calibration, and repair" under § 740.9(a)(6).

The plain language of paragraphs (a)(5) and (a)(6) indicates that overseas movie production would not be a valid use of the TMP movie exemption. Paragraph (a)(5) envisions either display at a trade show or demonstration for a prospective buyer in anticipation of a sale. Furthermore, it requires "that the exporter, an employee of the exporter, or the exporter's designated sales representative retains 'effective control' over the commodities … while they are abroad." In many cases, foreign laws will not allow firearms to be under the "effective control" of private parties. As such, foreign governments will often mandate that their police or military maintain secure possession of the firearms while not on the film set, further preventing us from complying with paragraph (a)(5). Paragraph (a)(6) which allows "Commodities to be inspected, tested, calibrated, or repaired abroad" under the TMP exemption, is consonantly inapplicable to film production.

### 75 Gun Limit

We understand why TMP is limited to 75 firearms per shipment. However, this restriction further limits our ability to claim TMP as an exemption. Larger film productions such as war movies, will oftentimes require well beyond 75 firearms. Productions such as Warner Bros. / Dreamwork's *Flags of Our Fathers* and *Letters from Iwo Jima* required US armorers to temporarily export over 700 non-automatic or semiautomatic firearms. Had BIS's proposed rules been in place at that time, there would have been no way to export those vintage military surplus firearms and subsequently bring them back into the United States.

## CONCLUCSION

For the aforementioned reasons, we respectfully request that TMP be broadened for film use, and where TMP is not available, that a mechanism be available to return the firearms to the United States. Should you have any questions on this comment, please do not hesitate to contact Michael Faucette at (202) 626-0085 or michael.faucette@mbassociateslaw.com.

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:50 AM
**Received:** July 03, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-942i-787t
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0342
Public Comment 131. Raytheon Company. Karri Allen. 7-3-18

## Submitter Information

**Name:** Karri Allen
**Address:**
　　1100 Wilson Blvd
　　Suite 1600
　　Arlington,  VA,  22209
**Email:** karri.n.allen@raytheon.com
**Phone:** 703-284-4303
**Organization:** Raytheon Company

## General Comment

Please see attached.

## Attachments

Raytheon Company Comments BIS Firearms and Ammo ECCNs (83 Fed Reg 24166) (filed 2018-07-03)

WASHSTATEC000251

July 3, 2018

U.S. Department of Commerce
Bureau of Industry and Security
Regulatory Policy Division
Room 2009B, 14th Street NW
Washington, DC 20230
*Via: www.regulations.gov*

| Subject: | **Raytheon Company Comments on Firearms, Guns, Ammunitions, and Related Articles**<br>**Ref: 83 Fed. Reg. 24166 (May 24, 2018)**<br>**Docket ID: BIS-2017-0004** |
|---|---|

On May 24, 2018, the Department of Commerce, Bureau of Industry and Security ("BIS") requested comments from the public on the proposed rule to transition certain items from United States Munitions List ("USML") Categories I, II, and III to the Commerce Control List ("CCL"). Below please find comments from Raytheon.

**License Exception TMP and New § 758.10**

The temporary import and subsequent export exception and clearance rules proposed in 15 C.F.R. §§ 740.9 and 758.10 appear to seek to introduce mechanisms currently available to temporarily import certain items controlled on the USML after they transition to the CCL. Currently, permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") whereas temporary imports are regulated by the Department of State, Directorate of Defense Trade Controls ("DDTC"). Under the International Traffic in Arms ("ITAR"), approval for temporary imports and subsequent exports is accomplished through a DSP-61 (temporary import license) or exemptions such as 22 C.F.R. §123.4. The ITAR draws a clear distinction between permanent and temporary import jurisdiction in 22 C.F.R. §120.18, although certain items regulated under the Gun Control Act or National Firearms Act, if authorized for import under those laws, continue to require transactional import approval from ATF for temporary imports unless ATF Ruling 2004-2 (April 7, 2004) permits the DSP-61 or ITAR exemption to substitute for this approval.

Existing mechanisms such as the DSP-61, the 22 C.F.R. §123.4 exemption, and the related ATF Ruling 2004-2 allow for temporary imports to be subsequently exported from the U.S. for a period of up to four years. It is unclear whether ATF Ruling 2004-2 will be amended to account for this USML to CCL transition but assuming it will be, as that would be necessary to keep industry in the same position as currently, the method proposed in the BIS proposed rule would permit temporary import and subsequent export within a period of only one year compared to four years under the current setup. We recommend that the period in 15 C.F.R. § 740.9(b)(5) be extended to four years as certain activities for which a temporary import is

WASHSTATEC000252

Raytheon Company Comments – Firearms, Guns, and Ammunition
July 3, 2018
Page 2 of 2

required cannot always be accomplished within one year and a four year period is necessary to keep industry in the same position as it currently is.

Additionally, under DDTC's current practice, if a temporary import originally intended to be exported within four years later needs to stay in the U.S. for a period of longer than four years, industry can request a replacement DSP-61 or General Correspondence from DDTC to extend the period of time. It is unclear what mechanism BIS would use to administer similar requests so we request clarification on this issue. If the TMP exception temporary import time period remains at one year, the need for this mechanism will be increasingly important.

Finally, the proposed additions to 15 C.F.R. § 740.9 include an instruction directing temporary importers and exporters to contact CBP at the port of temporary import or export, or at the CBP website, for the proper procedures to provide any data or documentation required by BIS. Raytheon recommends that BIS and CBP coordinate to create standardized instructions for all ports that can be made available online so that each shipment does not have to be specially coordinated.

**Effective Date**

Raytheon strongly supports using a delayed effective date of 180 days as has been done for other USML to CCL transitions. Such transitions require updates to IT systems, policies, processes, and training which require time to complete. Based on experiences in performing these tasks during previous transitions, the full 180 days is necessary.

We appreciate the ability to comment and thank you for your partnership.

\* \* \*

# PUBLIC SUBMISSION

**As of:** 7/13/18 7:49 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946n-tap5
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0478
Public comment 958. Individual. Jack Cook. 7-9-18

## Submitter Information

**Name:** Jack Cook
**Address:**
  46 Nexsen Road
  Kingstree,  SC,  29556
**Email:** jscookjr@icloud.com
**Phone:** 8433822209
**Fax:** 8433824881

## General Comment

As the owner of a small gunsmithing operation in rural SC I urge the Commerce Department to assume control of small firearms and ammunition from the State Department. It is imperative to my business that we fix the horrible framework that is in place now. Effective 22 July 2016, gunsmiths suddenly found themselves subject to the regulatory authority of the Arms Export Control Act (AECA) as administered by the State Departments Directorate of Defense Trade Controls (DDTC). Regulators suddenly determined that traditionally routine gun repair and enhancement services now constitute firearms "manufacturing" and mandatory registration of my small, home-based business under International Traffic in Arms Regulations (ITAR). Tis ITAR directive advises gunsmiths to stop what they are doing and pay up or face fines and prison! (Violations under the ITAR can bring civil penalties of $500,000 per violation and criminal penalties of up to $1 million per violation along with up to 20 years in prison).

These rules are terribly confusing. I submitted some very direct questions to DDTC and have never received a reply. I developed a list of typical customer service requests that raise concern with respect to ITAR registration. Specifically, I requested their determination on these straightforward examples:

1) Drilling, threading and installing sling swivels on rifle forend (and buttstock) for sling and/or bipod (requires drill press and screw threading)
2) Fabricating replacement parts - such as firing pins for rifles and pistols (requires lathe turning, milling, grinding, and polishing)

3) Installation of Cominolli safety special option on Glock pistols (requires cutting of frame slot with Foredom tool and fixture)

4) Rifle barrel setback - to correct headspace and service misfire issues (requires lathe and chambering reamer)

5) Slide and frame milling and cuts adding cocking serrations for improved handling, chamfering and dehorning for concealed carry, and enhanced eye appeal (requires mill, surface grinder)

6) Installation of gunsmith fit barrel - for accuracy upgrade or to address headspace issues (requires milling and/or TIG welding of hood and foot to precise fit)

7) Installation of scope mount on early rifles - for hunting, competitive shooting, and sporterizing (requires drilling and tapping of mounting holes)

8) Re-crowning barrel - to improve or repair rifle accuracy (using lathe)

9) Installing 1911 Beavertail - to improve comfort and aim (requires precision cutting of frame, typically with mill)

10) Installing Sako-style extractor on Remington Model 700 rifle - primarily for improved reliability (requires milling and drilling of rifle bolt)

The above are, I think, a typical sampling of services that might reasonably be encountered in any gunsmith practice. I think that common sense will inform that this sort of everyday incidental activity for repair of firearms cannot constitute exportable manufacturing. Under State Department export control rulings all the above would likely constitute manufacturing and are illegal under ITAR absent payment of a large export fee. I urge you to assume administration at the Department of Commerce.

Obviously, the ITAR fee is a significant burden on a small gunsmith shop and will be an important factor in determining the viability and directions of my life endeavor. I am hopeful that the Commerce Department will take over administration and governance of small arms and ammunition manufacturing and repair.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/12/18 5:26 PM |
| **Received:** July 02, 2018 |
| **Status:** Posted |
| **Posted:** July 12, 2018 |
| **Tracking No.** 1k2-948l-e44b |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Unknown |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0457
Public Comment 979. Individual. Andrew Hill. 7-2-18

## Submitter Information

## General Comment

See Attached

## Attachments

Public Comment 979. Individual. Andrew Hill. 7-2-18

WASHSTATEC000256

# Andrew W Hill
## 849 Hawks Bridge Road
## Salem N.J. 08079

July 2, 2018

Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce,
Room 2099B,
14th Street and Pennsylvania Avenue NW,
Washington, DC 20230.

Re: RIN 0694-AF47

In the matter of the proposed changes to how ITAR is implemented I would like to raise several points of concern.

First let me say that I welcome nearly all the changes as proposed. My professional background is in ammunition manufacturing. I have patented my own invention and am called upon to act in the capacity of an expert witness in legal matters. In addition to the 20+ years experience I have spent 12 years running the local 4-H Shooting Sports Program in my county. During that time youth from my club have competed in many local and national events. Many have medaled in big matches including one national champion in air rifle.

Concern #1.

The dollar value placed on exporting bullets (not loaded ammunition) seems impossible to actually kick in and out of skew with the rest of the proposed levels for other items. In many cases this would limit the buyer to only a single box of bullets. Many boxes of bullets, especially ones that are not made in but one or two countries are quite expensive. For example the following is the cost for a box of just 50 bullets.

.348 250 gr = $43.50
.33 200 gr = $41.00
38-55 255 gr = $41.00
.408 350 gr = $46.00
.404 350 gr = $59.00
.425 400 gr = $66.00
43 Spanish 400 gr = $46.00
.475 #2 500 gr = $106.50
50-110 450 gr = $54.50
50-70 450 gr = $54.00
.505 500 gr = $72.00
.577 650 gr = $83.50

Also many common caliber bullets made as a premium hunting bullet in a special weight are equally expensive per bullet.

30 cal 250 gr = $45.50
32 Rem 170 gr = $40.00 w/ minimum of 3 boxes
.358 300 gr = $63.50 w/ minimum of 3 boxes
.416 400 gr = $50.50
.458 500 gr = $111.50
50 cal 500 gr = $68.00

Based upon the other covered items in ITAR it would seem that the $100.00 is just too low and should be $300.00 minimum to allow someone with a small purchase of 200 – 300 bullets to reload for an older or odd hunting rifle. This is applicable to brass cartridge cases as well. And both are often purchased together. In all fairness ammunition components should be equal to the $500.00 level assigned to gun parts.

Concern #2.

International competition in small bore rifle may be hurt with the 1,000 round limits on ammunition. Many matches require 100 or 200 shots for record. Usually the event has several days of competition. The match starts with sighters and if conditions are difficult (wind, lighting, and mirage) the rounds fired as sighters in a match can approach the number needed for record. Usually long distance travelers are given the day ahead to check everything and practice before the actual event. A junior shooter competed in Europe then visited the MEC shooting complex for one on one training before returning to the states. The days training was valuable and worth using double the amount of ammunition used in a two day competition. Certain unusual matches require many more record shots. The metric prone event is two days long and consists of 600 record shots. For these reasons I recommend making an exception for small bore 22 rimfire ammunition and allowing 2,000 rounds when traveling out of the country.

I am not aware of the requirements for shotgun competitions but thing they are in a similar situation. Gold medalist Kim Rhode practices with 800 shots a day. Perhaps the exemption can be specified for competitors.

Sincerely

Andrew W Hill

# PUBLIC SUBMISSION

**As of:** 7/12/18 11:53 AM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-944h-6hej
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0375
Public Comment 983. National Shooting Sports Foundation. Lawrence Keane. 7-6-18

## Submitter Information

**Name:** Lawrence Keane

## General Comment

See attached file(s)

## Attachments

LGK Ltr - BIS - Proposed Rule Cats I-II-III 6 July 2018



**NATIONAL SHOOTING SPORTS FOUNDATION, INC.**

Headquarters: 11 Mile Hill Road, Newtown, CT 06470-2359

400 N. Capitol Street NW, Suite 490, Washington, D.C. 20001

202-220-1340 ext. 249    lkeane@nssf.org

**Lawrence G. Keane**
SVP Gov't & Public Affairs
Assistant Secretary & General Counsel

July 6, 2018

By Internet:
Federal eRulemaking Portal: www.regulations.gov - Docket BIS-2017-0004

By mail or delivery:

Steven Clagett
Office of Nonproliferation Controls and Treaty Compliance
Nuclear and Missile Technology Controls Division
Bureau of Industry and Security
U.S. Department of Commerce
14th Street and Pennsylvania Avenue, NW
Washington, DC 20230

RE:    Comments on Proposed Rule – Control of Firearms, Guns, Ammunition and Related
Articles the President Determines No Longer Warrant Control Under the United States
Munitions List (USML) -- RIN 0694-AF47

Dear Mr. Clagett:

The National Shooting Sports Foundation (NSSF) respectfully submits the following comments
to the above-referenced Federal Register Notice (83 FR 24166, May 24, 2018). NSSF is the trade
association for America's firearm and ammunition industry.[1]  Formed in 1961, NSSF
membership includes more than 12,000 manufacturers, distributors, firearms retailers, shooting
ranges, sportsmen's organizations, and publishers.  We seek to promote, protect, and preserve
hunting and the shooting sports, and we offer the following public comments.

**Summary of High-Level Comments**

The policy justifications for the proposed rule and the corresponding proposed rule by the State
Department are described well on Commerce and State Department web pages at:
https://www.bis.doc.gov/index.php/forms-documents/federal-register-notices-1/2220-cats-i-iii-
myths-v-facts-posted-5-24-18/file and https://www.state.gov/t/pm/rls/fs/2018/282485.htm
We encourage all those reviewing the proposed rules and the public comments to read these fact
sheets to learn what the proposed regulatory rationalizations of U.S. controls on the export of

---

[1] For additional information on NSSF, please see www.nssf.org.

WASHSTATEC000260

commercial firearms and related ammunition are and, as importantly, are not. So that the policy objectives behind the proposed changes, as well as the "myths" associated with them, are knowable to all those reviewing the proposed rules, we ask the Commerce Department to republish their essential content in the preamble to Commerce's final rule. In this way, they will be part of the official record and help inform comments on final agency decisions made regarding the proposed rules.

As better described by these fact sheets and in the preambles to the proposed rules, commercial firearms and related items that are widely available in retail outlets that are now subject to the export control licensing jurisdiction of the State Department under the International Traffic in Arms Regulations (ITAR) on its U.S. Munitions List (USML) Categories I, II, and III would be transferred to the licensing jurisdiction of the Commerce Department's Export Administration Regulations (EAR) in a series of new and coherently organized Export Control Classification Numbers (ECCNs). These proposed rules are the logical continuation of an effort began in 2010 under the Obama Administration to modernize the administration of U.S. export control regulations "to create a simpler, more robust system that eases industry compliance, improves enforceability, and better protect America's most sensitive technologies." We agree with the objectives of these bipartisan and widely supported changes. The proposed changes merely align the regulations with the nature of the items at issue, thus more efficiently accomplishing the national security and foreign policy objectives of the controls. Such changes reduce unnecessary burdens for both the U.S. Government and U.S. industry.

We have reviewed the proposed rule thoroughly with our membership. Except with respect to several of our comments set forth below, most members have told us that the final versions of the rules would eventually be beneficial because they would significantly reduce the overall burden and cost of complying with controls on the export of commercial firearms and ammunition. All who responded told us that there would be an initial short-term increase in burden and cost because of the need to re-classify thousands of commodity, software, and technology line items and SKUs affected by the new rules, but that the long-term regulatory burden reduction would significantly outweigh the short-term need to adjust internal compliance programs and practices. There would also be significant short-term costs and burdens associated with the need to become familiar with the nuances of the EAR and new BIS licensing officers. However, this burden, we believe, would be largely addressed by BIS's long-standing commitment of industry outreach and training resources, which we appreciate.

Our members understand that there would be no change to the licensing policies for end item firearms and related ammunition. If a gun required a license to export when it was regulated by the State Department then it would require a license to export when it is regulated by the Commerce Department. If an export to a particular destination or end user would have been denied or approved before, it would be denied or approved in the same manner under the new rules. Applications would go through the same interagency review process, including by the Defense Department and also the State Department's human rights and other experts. Under the new rules, no approvals would be converted to denials or denials to approvals.

Nonetheless, most of our members, particularly the small- and medium-sized companies, believe that the changes will be economically beneficial for them because the eventual regulatory

WASHSTATEC000261

simplification and cost reductions will allow them to consider exporting when they might not have otherwise.  Those that already export believe they will be able to expand sales of exports that would have otherwise been approved.  They hold these views because BIS and the EAR are simply better able to regulate commercial items than are DDTC and the ITAR.  This is not meant to be a slur of DDTC staff, which is excellent.  It is merely a reflection of the fact that the ITAR exists to regulate the export of defense articles that provide a significant military or intelligence advantage in a "one size fits all" type approach with regulatory requirements that are more relevant to the export of a fighter aircraft than something that can be purchased at a retail outlet. The EAR exists to regulate dual-use, commercial, and less sensitive military items that warrant control, but in more tailored ways to fit the specific national security and foreign policy, including human rights, issues posed by the items.

These conclusions have been proven thousands of times through the application of similar export control reforms for other sensitive commercial or less sensitive military items that have been transferred to Commerce's jurisdiction over the course of the last eight years.  For example, under the Commerce system, there are no fees to apply for licenses.  There are no redundant registration requirements for domestic manufacturers.  There are no fees for registration.  Such fees are bearable for large companies, but often not for small- and medium-sized companies. The license application forms are vastly simpler.  Controls on less sensitive and widely available and basic parts, components, and technology are more tailored and allow for less burdensome trade with close allies through license exceptions.  Sales with regular customers can be combined in to fewer license applications, thus reducing overall paperwork to achieve the same policy objectives.  **There are many other benefits to the proposed changes as well described in the proposed rules' preambles, but our essential conclusion is that, particularly with the changes recommended below, they will lead to growth for U.S. companies, more jobs in the United States, and related economic benefits for the cities and states where the members reside while accomplishing the same national security and foreign policy objectives they have always had.**

Notwithstanding our overall approval of the proposed rules, we have the following comments and suggested edits that would make the rules even more efficient and consistent with the overall objectives of the effort.

**Specific Comments**

I.     **ECCN 0A501 – Firearms (except 0A502 shotguns) and related commodities as follows (See List of Items controlled)**

   A.  Subparagraph .e  -- Define "Complete Breech Mechanism"

ECCN 0A501.e includes "complete breech mechanisms," which is a term carried over from the current USML Category I(g).  Neither State nor Commerce has defined this term and industry has struggled over the years with varying, informal definitions of the term.  Are they individual bolts or bolt carriers? Are they assembled units of the bolt including all the other minor parts? Or are they firearm actions that include the receiver, all the breech and fire control parts, but without the barrel or stock?

WASHSTATEC000262

RECOMMENDATION I.A.:  To reduce regulatory burden and enhance compliance with the control, we request that BIS define the term in a manner consistent with industry standards, such as "complete breech mechanism, which is defined as an assembled unit consisting of the breech block, plug or bolt, including all parts and components necessary for operation of the mechanism."

B.  Subparagraphs y.2, y.3, and y.4 – Maintain EAR99 Status

We understand the objective of this and other .y subparagraphs created as part of the reform effort, which is to list in one place extraordinarily basic, widely available items that are nonetheless specially designed for controlled items and would otherwise get caught in and over-controlled by .x paragraphs. This is a rational approach and we are not objecting to it in general. However, another equally core and rational element of the reform effort is to not change the classification status of items that have been previously determined to be EAR99 items in formal determinations.  ECCN 0A501.y contains the following three types of items we know to have been officially determined to be EAR99 for many years:  (i) subparagraph y.2 - Scope mounts and accessory rails; (ii) subparagraph y.3 - Iron sights; and (iii) subparagraph y.4 - Sling swivels.

Converting these types of items to a .y control would thus be inconsistent with the reform effort in general, past practice, and several statements in the proposed rule's Supplemental Information. For example, the proposed rule states that "for purposes of new ECCN 0A501 and the rest of the new ECCNs described [in the proposed rule], items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State **that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule.** This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." (emphasis supplied).  The Supplemental Information section goes on to state, with respect to General Order No. 5, that "items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL.  "**For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be 'subject to the ITAR' and designated as EAR99.  The classification of such 'parts' would not be changed, provided the 'part' was not subsequently changed, which would require a separate jurisdiction and classification analysis."**  83 FR at 24172.

The commodity jurisdiction and classification determinations of which our members are aware for mounts, rails, sights, and swivels over the years have concluded that they are EAR99 items, except in specific cases where the part replaces a component of the firearm and is no longer an independent attachment that can be easily removed, or is integrated into a component of the firearm. These conclusions were reflected in the following BIS answer on its FAQ website for firearms:  "Q: What is the ECCN for mounts for optical sighting devices for firearms?  A: Mounts, bases, rings and rails are EAR99."

RECOMMENDATION I.B.:  We request that the parts in subparagraphs .y.2, .y.3, and .y.4 be removed from ECCN 0A501 and that a Note be added to the ECCN confirming that they remain EAR99 items.  The parts are extraordinarily low technology items and widely available throughout the world.  If BIS nonetheless determines that controls are needed for certain types of mounts and rails, then we recommend changing the description for subparagraph .y.2 to "scope mounts and accessory rails that are integral to a firearm part or otherwise replace a firearm part necessary for the operation of the firearm."  This revision and split between EAR99 and .y paragraph will allow for the same controls DDTC placed on different types of individual parts.

     C.     Note 1 to 0A501 – Rationalize Controls Over Antique Firearms and Muzzle Loading Black Powder Firearms

The proposed note states that "Antique firearms (i.e. those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball and all other air rifles are EAR99 commodities."  We appreciate the note, but it would lead to increases in controls on several types of items.

     1.     Antique Firearms

The Note defines antique firearms as "those manufactured before 1890 and reproductions thereof."  Under the current ITAR controls, antique firearms are controlled under USML Category I(a), but a license exemption exists under 22 CFR § 123.17(b) that allows exports without a license of "firearms covered by Category I(a) . . . if they were manufactured in or **before 1898**, or replicas."  BIS's proposed definitional change of antique firearm from the ITAR's 1898 point to 1890 is significant because it will require BIS licensing of certain antique rifles now exempt from license requirements under the ITAR.  For example, early Winchester rifle Models 1892, 1894, and similar would be controlled far more strictly than is the case now.  There is a significant collector market worldwide for such antique American rifles.  U.S. companies and others have used the ITAR exemption to satisfy that demand for years without any threats to American national security or foreign policy objectives.

In addition, both of these controls are more restrictive than the Wassenaar controls which are pre-1890 for antique handguns, but actually are pre-1938 for antique rifles.  See https://www.wassenaar.org/app/uploads/2018/01/WA-DOC-17-PUB-006-Public-Docs-Vol.II-2017-List-of-DU-Goods-and-Technologies-and-Munitions-List.pdf  (page 175 ML1.a, note A).

RECOMMENDATION I.C.1.:  We request BIS to revise Note 1 so that the definition of antique firearms is aligned with the Wassenaar controls.  If BIS is not willing to consider this change, we request BIS change the date threshold in the definition of antique firearm in Note 1 from 1890 to 1898 so that it is consistent with the ITAR's exemption.

     2.     Muzzle Loading Black Powder Firearms

The proposed Note 1 states that "muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design."  This wording is a revision of what is

WASHSTATEC000264

currently controlled under ECCN 0A018.c, which is "Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 and that are not reproductions of firearms manufactured earlier than 1890." A note to current 0A018.c states that **"0A018.c does not control weapons used for hunting or sporting purposes that were not "specially designed" for military use** and are not of the fully automatic type, but see ECCN 0A984 concerning shotguns." (emphasis supplied).

The Note clearly states that those firearms that are used for hunting and sporting purposes are not controlled under that entry. This policy has been in effect for decades with no apparent harm to national security or foreign policy objectives. In the proposed Note 1 to 0A501, however, the statement regarding control of weapons used for hunting and sporting purposes has been removed. The proposed rule also does not state why such a change is necessary. The change is more than a housekeeping edit because it will cause a number of muzzle loading rifles that are now EAR99 items to be controlled as regular firearms under 0A501.a. The new wording also adds confusion by saying muzzle loaders are EAR99 "except those designs based on centerfire weapons of a post 1937 design." This would add controls to modern muzzle loading rifles that operate with bolt mechanisms but that look like regular centerfire rifles (e.g. Savage ML10), but have completely unique parts that are not compatible with a centerfire rifle that fires conventional cartridges.

RECOMMENDATION I.C.2.: We request BIS to revise Note 1 to delete the phrase "except those designs based on centerfire weapons of a post 1937 design."

### 3. Combination Firearms

Neither ECCN 0A501 (firearms) nor ECCN 0A502 (shotguns) refer to firearms that are a combination of shotgun and rifle, i.e., that have two barrels. Such combination firearms normally include one rifled barrel which fires conventional cartridges and one smooth-bore barrel that fires shot shells. Some types of combo firearms may be based on shotgun actions, while others may be based on rifle actions.

RECOMMENDATION I.C.3.: We request that BIS state where on the CCL such combination firearms should be controlled.

**II.     0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

### A. Align Availability of License Exception LVS with 0A501

Unlike ECCN 0A501 (firearms), ECCN 0A502 does not include any list-based license exceptions. The export of, for example, a 0A501 trigger or magazine would be eligible for License Exception LVS but the export of a 0A502 trigger or magazine would not. Thus, the entry, as proposed, would control more strictly without any obvious policy benefit the basic low-value parts and components in 0A502 that would be eligible for LVS exports under 0A501.

WASHSTATEC000265

RECOMMENDATION II.A.:  In order to have consistent controls and exceptions for similar items, we request that BIS allow the use of License Exception LVS for 0A502 parts and components to the same extent proposed for 0A501 for the same types of items, such as shotgun trigger mechanisms, magazines, and magazine extensions.  This could be done with the following edits to the proposed rule:

      i.      Change the ECCN heading to "Shotguns and related commodities as follows (See List of Items controlled), except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use."

      ii.     Include in the List of Items Controlled new subparagraphs to separately list breech mechanisms, and the remaining components (e.g., "including complete trigger mechanisms; magazines and magazine extension tubes") with a corresponding Reason for Control which allows for use of exception LVS to the same extent as proposed for 0A501.

  B.  Define "Complete Breech Mechanism"

The ECCN 0A502 heading includes the term "complete breech mechanisms" as part of the control.  As discussed above, the U.S. government has not defined the term and there is significant industry confusion regarding its meaning.

RECOMMENDATION II.B.:  We request that BIS define the term in a manner identical to a definition that would be applicable to 0A501.

  C.  Resolve Inconsistency Regarding Use of Term "Combat Shotgun"

The "Related Controls" part of ECCN 0A502 states that "This entry does not control combat shotguns and fully automatic shotguns.  Those shotguns are 'subject to the ITAR.'"  State's proposed rule, however, would remove references to "combat shotguns" and use the phrase "Fully automatic shotguns regardless of gauge" instead.

RECOMMENDATION II.C.:  We request that the reference in 0A502's "Related Controls" note be made consistent with how such shotguns are referred to in the revised USML Category I.

**III.    0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled)**

  A.  Make License Exception LVS Available for 0A504.g Items

Unlike parts and components for many 0A501 items, the proposed 0A504.g ("Lenses, other optical elements and adjustment mechanisms") does not allow for the use of License Exception LVS.

RECOMMENDATION III.A.: To align the availability of the exception for similarly significant items on 0A501, we ask that License Exception LVS be available for 0A504.g components, which are insignificant relative to the other items in 0A501. Given the sensitivity of the other optical items in 0A504, we are not requesting such a change for other items in the entry.

B. Note 1 to 0A504.f

The proposed Note 1 to 0A504.f states that "0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights." There are, however, a variety of bore sighting devices that are placed over the muzzle of the barrel instead of inside the bore or chamber. Such devices perform the same function as those described in the proposed note.

RECOMMENDATION III.B.: We request that this Note be revised to read as follows: "0A504.f does not control laser boresighting devices that provide a reference for aligning the firearms sights. This includes any laser boresighting device, regardless of how it attaches to the firearm (e.g. boresights that fit over the muzzle of the barrel), which performs the same function."

**IV. 0A505 Ammunition as follows (see List of Items Controlled)**

A. Remove 0A018 and Transfer Controls to 0A505

One of the organizational changes inherent in the reform effort is the movement of military items once controlled in –018 entries into new 600 or 500 series entries. With this change, similar items are clumped together in the same places on the CCL. If an exporter wants to identify the military items on the CCL, it would look to the 600 series entries. The proposed rule follows a similar approach by combining all the various commercial firearm, ammunition, and related items in a new set of 500 series ECCNS. Such changes increase compliance by reducing the risk of an exporter missing a control in a stray ECCN.

RECOMMENDATION IV.A.: We request that all commercial firearm, ammunition, and related items be in one of the series of new 500 series ECCNs and not left behind in legacy -018 entries. Once the items to be controlled in the proposed 0A018.b are moved to 0A505, and controlled in the same manner, then 0A018 could be removed because all its other subparagraphs have already been consolidated with other new ECCNs.

B. Resolve Inconsistencies between Proposed 0A018.b and 0A505

The items described in proposed 0A018.b have been revised and rewritten into the proposed changes to USML Category III and the new ECCN 0A505. Leaving ECCN 0A018.b unchanged would cause confusion and potential compliance mistakes due to the overlap of controlled items as listed in new ECCN 0A505. For example, 0A505.d states that AT-only and UN controls apply to blank ammunition but does not refer to the note in 0A018.b that excludes dummy ammunition for control.

WASHSTATEC000267

RECOMMENDATION IV.B.:  When consolidating the controls of 0A018.b into 0A505, redundancies and inconsistencies should be removed. For example, 0A018.b's control over specially designed components should become part of the standard .x specially designed catch-all provision that is in 0A505. We also request that the de-control note in 0A018.b be transferred to 0A505 so that the current EAR99 status of such items is maintained.  If there are policy reasons to remove dummy ammunition from its EAR99 status, we ask that the reasons for control provisions applicable to dummy ammunition in 0A505.d be limited to existing UN and AT-only controls for blank ammunition.

   C.   Allow for Use of License Exception LVS

Proposed ECCN 0A505 includes an allowance for license exception LVS of $100 for subparagraph .x "parts" and "components."  As discussed, the proposed 0A501 would have an LVS allowance of $500 for firearm parts and components.  This difference will cause additional licensing burden, especially for small and mid-sized ammunition exporters.  Ammunition components have seen major increases in cost over the last 10 years.  In addition, the higher cost big bore and precision loads are becoming more popular with foreign buyers.  This will make the $100 LVS allowance too low to be relevant to BIS's objectives in proposing it.  For example, Norma .470 Nitro Express empty brass is priced at approximately $4 per unit, or $100 per box of 25. Under the proposed LVS limit of $100, only one small box could be exported under the exception.  For two boxes, a license would be required.

RECOMMENDATION IV.C.: We request BIS to raise the value limit for the LVS exception to $500 to match that allowed for firearm components.  We believe this is reasonable since the controls in place now under ECCN 0A018.b have an LVS allowance of $3000 for "specially designed" components and parts for ammunition, and this allowance is much higher than the $500 we are requesting.

RELATED RECOMMENDATION IV.C.2.:  As this example indicates, inflation can alter the policy judgments made with respect to the first allowance for the use of License Exception LVS for items. Thus, we ask BIS to consider pegging and periodically revising License Exception LVS amounts to roughly scale with inflation over time for the items at issue.

**V.  740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP)**

   A.   Allow for Use of License Exception TMP to Transfer Items to Affiliates

Revised paragraph 740.9(a) restricts use of License Exception TMP for firearms under 0A501.a and .b, and shotguns with barrel length less than 18" under 0A502.  It states: "The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair")."  The revision thus excludes the possible use of paragraph (a)(10) for temporary exports to a U.S. Person's foreign subsidiary, affiliate, or facility abroad if for manufacturing, assembling, testing, producing, or modifying the item.  There are a number of US firearm and ammunition manufacturers with foreign parent companies or that have foreign subsidiaries or facilities that would use TMP for the purposes set out in paragraph

(a)(1).  Many of these companies use DDTC DSP-73 Temporary Export Licenses in order to send commodities back and forth with their foreign parent or subsidiary particularly since many new products are jointly engineered and require input from both parties.  Prohibiting the use of paragraph (a)(10) for transactions between affiliates will cause an unnecessary burden to these companies and one in excess of current burdens under State's existing licensing practices for affiliate transactions.

RECOMMENDATION V.A.:  We request BIS to allow for the use of License Exception TMP paragraph (a)(10) for firearms controlled under 0A501.a and .b, and shotguns with barrel length less than 18" under 0A502.  DDTC granted similar authorizations without issue for such items. This change would essentially maintain the status quo with DDTC's long-standing practice. Requiring exporters to get licenses from BIS to permanently export items to its affiliates for such joint efforts that are intended to result in products to be returned to the United States would not be efficient.

### B.  Adjust the TMP Limitation to 100 Firearms per Shipment from 75 per Shipment

Revised TMP paragraph (a)(5) states that "paragraph (a) may not be used to export more than 75 firearms per shipment."  This number does not take into account the variety and volume of products that major companies normally export for trade shows.  For example, it is not unusual for nearly 100 variations of a company's product line to be sent to the IWA Show in Germany each year.

RECOMMENDATION V.B.: We ask BIS to increase the number of items allowed for temporary export under paragraph (a)(5) to 100 per shipment to more closely align with commercial expectations and practices. This change will not reduce government visibility into what is exported because revised paragraph (a) would require that "the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES."

### C.   Provide Guidance Regarding the Import of Goods Temporarily Exported

The proposed rule would add the following sentence to section 740.9(b): "No provision of paragraph (b), other than (b)(3), (b)(4), or (b)(5) of this section, may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502."  This would prohibit the use of License Exception TMP paragraphs (b)(1) (exports of items temporarily in the United States) and (b)(2) (items imported for marketing or display at U.S. exhibitions or trade fairs) for exports of firearms and shotguns with less than 18" barrels.

Paragraph (b)(2) relates to temporary imports for exhibition or marketing.  New paragraph (b)(5) essentially replaces (b)(2) insofar as it concerns firearms and certain shotguns.  New paragraph (b)(5) details the process for temporary import and subsequent export of these items.  The proposed process in this regard is fair and reasonable.  It is common practice to cite the regulatory exception for the temporarily imported commodities at the time of import, then

WASHSTATEC000269

reference the import documents at time of return export of the goods. We believe the process as described will not cause any additional burden to exporters.

RECOMMENDATION V.C.: BIS has provided a clear process for temporary imports under the new paragraph (b)(5). However, the regulations are not clear about the process regarding imports of goods temporarily exported under TMP. We recommend BIS provide similar guidance for temporary exports which explains the process for return importation of the commodities.

 D.  Allow TMP paragraph (b)(1) to be Used

Paragraph (b)(1) authorizes the temporary import and subsequent export of "Items moving in transit through the United States." The proposed new sentence in paragraph (b) does not allow this paragraph to be used for firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Currently, these types of transactions are authorized by DDTC on a DSP-61 Temporary Import License. Requiring a BIS export authorization for items moving in-transit through the US to a third country seems unnecessarily burdensome.

RECOMMENTATION V.D.: We ask BIS amend the new sentence in paragraph (b) and allow use of paragraph (b)(1) for firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

## VI. 740.14 Baggage (BAG)

The purpose of this license exception is to allow individuals to travel overseas with personal baggage, and to make allowances for certain types of controlled commodities. The proposed rule adds a new paragraph (e) "Special provisions for firearms and ammunition." The revisions regarding use of license exception BAG include requirements for filing data in the Automated Export System (AES), which is extremely problematic for individuals.

The proposed rule states that "BIS is proposing to modify § 758.1 of the EAR to make clear that **exporters would continue to be required to file** Electronic Export Enforcement (EEI) to the **Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG."** BIS, however, acknowledges the problems related to the requirement for individuals to file data in the AES system when it states that "BIS is aware that U.S. Customs and Border Protection (CBP) has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are 'subject to the ITAR' being exported under 22 CFR 123.17(c), due to operational challenges related to implementation." BIS goes on to state that "Whether and how BIS includes this requirement in a final rule would be **based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published**. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests

an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition."

In 2011, DDTC published a Federal Register notice of proposed rulemaking (76 FR 16353, March 23, 2011) titled "Exemption for the Temporary Export of Chemical Agent Protective Gear" principally revising the exemption related to personal protective equipment, but also including a revision to the firearm exemption as follows: "an exemption for firearms and ammunition is clarified by removing certain extraneous language that does not change the meaning of the exemption." In fact, the proposed change was much more significant and new wording to be included in the exemption was as follows: "The person . . . presents the Internal Transaction Number from submission of the Electronic Export Information in the Automated Export System per §123.22 of this subchapter. . . ." Neither the title nor the summary of the notice mentioned the substantive modification to the procedures regarding the exportation of firearms and ammunition. The only reference to the change to export requirements was a reference to the removal of "extraneous language." The notice actually confused the public by stating in the summary that the meaning of the regulations had not changed. As a result, the public was not informed that changes to the exportation process had been proposed and that they should or could provide comments on these possible changes. The rule was published as final on May 2, 2012 (77 FR 25867).

In 2014, DDTC and CBP began enforcing the change, and it caused a major upheaval for individuals travelling overseas with firearms. As BIS noted in the proposed rule, CBP temporarily suspended the requirement for AES filing due to the implementation issues.

There are several reasons why AES is the wrong system for individuals to use:

1. The system is meant for commercial exports. There are a number of required data fields that are not applicable to exports by individuals carrying personal property.

2. The AES system requires an Employer ID Number (EIN) before a user can submit any data. It does not allow individuals to access the system with a Social Security Number. In fact, the allowance for a SSN was removed by Census in 2010 due to privacy concerns.

3. There is conflicting information on the Census website and the IRS website regarding an individual obtaining an EIN. While both agencies have guidance indicating that individuals may obtain an EIN for purposes of filing in AES, **there is no written policy or regulation to support this**. In fact, when the individual requests an EIN, they must make several assertions in the form that the purpose is for establishing a business concern. They are required to sign the form under penalty of perjury, declaring that all the information is true and correct, when in fact the individual is not establishing a business.

4. There are multiple fields in AES related to commercial exports, including port of export, type of export, license codes, and Harmonized Tariff System (HTS)/Schedule B commodity codes. Individuals generally have no knowledge

of this information and at best can only take guesses at the correct data to input. For example, the port of Los Angeles has five different codes. Which one is correct for that person's travel? For commodity codes, how is an individual supposed to understand the complexity of the numbers and pick the correct one? All this information is a common and ordinary part of commercial exports, but not for personal carries.

5. The AES system is implemented under the Foreign Trade Regulations (FTR) which carries authority for penalties for inaccurate information entered into AES, up to $10,000. Individuals trying to use the AES system are at extremely high risk for penalty because they lack the knowledge to ensure the data is accurately entered in the electronic system. And, as described above, the system is not designed for use by individuals with personal baggage. Therefore, the risk of inadvertent violations is extremely high even with the best compliance intentions.

The BAG exception as revised would thus impose unduly burdensome requirements and compliance traps on hunters, competitive shooters, and other U.S. residents who wish to take firearms out of the country on a temporary basis for lawful purposes. According to American Hunter magazine, there are likely more than 100,000 American hunters who travel abroad every year with their firearms. Typical hunting trips can cost $10,000 to $25,000, or more.

Finally, the AES requirement applies only to new paragraph (e)(3) "Special provisions for firearms and ammunition." Current BAG paragraphs (e)(1) and (e)(2) regarding "Shotguns and Shotgun Shells" are not changed, and do not include a requirement for AES filing of export data. BIS has never required AES filing for temporary exports of shotguns under BAG. Until 2012, DDTC had never previously required AES filing for temporary exports of firearms.

RECOMMENDATION VI: As we proposed to DDTC and CBP in 2014, we recommend an alternate to the AES system as follows:

1. Rather than trying to force the AES system to fit the purposes of this data collection, we recommend that CBP develop a simple online interface that uses the individual's passport number as the reference number. Every person leaving or entering the US must present a passport to CBP, and CBP has an electronic system to review the individual's passport data.

2. Under the current process, individuals travelling overseas with firearms are completing the CBP Form 4457 "Certificate of Registration for Personal Effects Taken Abroad" to register their firearm for export and reentry. This form includes details regarding the property being carried as baggage, including details of the firearm (model, caliber, serial number). There have been indications that CBP is planning to implement an electronic version of this paper form. An electronic Form 4457 could be linked to the passport review system. This would allow CBP officers to see not only the individual's passport information, but also any personal property including firearms being taken out of the U.S. and for review upon re-entry to the U.S.

**VII.    743.4 Conventional Arms Reporting**

This section details the U.S. obligations for special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional Arms. Participating States of the Wassenaar Arrangement exchange information every six months on deliveries to non-participating states of conventional arms set forth in the Wassenaar Arrangement's Basic Documents. Similar, although not identical, information is also reported by the U.S. Government to the United Nations on an annual basis.

The proposed rule would "revise paragraph (c)(1)(i) and (c)(2)(i) to add ECCN **0A501.a and .b (firearms) as commodities that would require Wassenaar Arrangement reporting and United Nations reporting** under this conventional arms reporting section of the EAR . . . the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL."

The EAR does not now require exporters of any other type of item to make any such reports to the Wassenaar Arrangement. The proposed change would thus unfairly focus additional regulatory burdens that do not now exist on the ITAR or the EAR for exporters of firearms. We do not see any policy benefits for this new obligation, particularly since the US government already would have such information and could continue making such reports as it usually does. For example, under the proposed changes to Part 758 "Export clearance requirements," new paragraph 758.1(b)(10) requires electronic export information ("EEI") to be filed for all exports of 0A501 .a or .b firearms in the AES system.  This will include exports under exceptions such as TMP, GOV, and RPL.  AES records data for every export shipment in real time and would be an instantaneous and reliable method for the U.S. Government (not individual exporters) to gather and sort such information.  BIS has reporting responsibility for all exports which the agency approves by export license and therefore already has a process for reporting the required information.  We believe that BIS receives daily updates of AES data which includes exports both by license and license exception, and therefore already has the information necessary to comply with the Wassenaar and UN reporting requirements as related to exports under exceptions.

Moreover, we do not believe that any of the Paperwork Reduction Act requirements have been completed for this proposed new collection and reporting obligation. We do not, for example, believe there is a sufficient description of the plan for how the data would be used or that the proposed method has been properly tested to ensure that there is no net increase in regulatory burdens.  Or, if there is to be an increase in regulatory burden associated with this new requirement, it is impossible to see how the U.S. government could have come up with an accurate estimate of the new burden based on what is described in the proposed rule.  Under Supplement No. 1 to Part 730, it appears that information requests related to Part 743 are included under OMB Collection Number 0694-0137 (License Exceptions and Exclusions).  The proposed rule analyzed that collection number with respect to License Exception STA, but the rule did not address the impact of adding the first items to be required to be reported under section 743.4.  Moreover, as described, the U.S. government is in a far better position to provide

the requested information that it would already have in its files to the international organization than would be U.S. companies.

<u>RECOMMENDATION VII:</u>   We request that BIS delete this new reporting requirement that would impose an unnecessary burden on individual exporters.  BIS could far more easily satisfy its obligations to the Wassenaar Arrangement by collecting, sorting, and presenting this information from data it receives from the AES.  If BIS nonetheless wants to consider imposing such a novel burden on exporters, we ask that it publish a separate proposed rule on the topic in a manner consistent with the requirements of the Paperwork Reduction Act.

## VIII.   Part 758 Export Clearance Requirements

A.   <u>Delete Proposed AES Reporting Requirements</u>

New paragraph 758.1(g)(4) ("Exports of Firearms and Related Items") states that "For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, **you must report the manufacturer, model number, caliber and serial number of the exported items."**  The explanation for the change states this is "to expand the data elements required as part of an AES filing."

We do not agree with the statement in the proposed rule on page 24180 that such additional requirements would not impose additional new paperwork burdens on exporters.  Moreover, we do not believe that this new requirement is compliant with the Paperwork Reduction Act. We do not, for example, believe there is a sufficient description of the plan for how the data would be used or that the proposed method has been properly tested to ensure that there is no net increase in regulatory burdens.  Or, if there is to be an increase in regulatory burden associated with this new requirement, it is impossible to see how the U.S. government could have come up with an accurate estimate of the new burden based on what is described in the proposed rule.

We understand that the proposed rule states that the new burden would "ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations."  We disagree, however, that CBP needs the additional data to verify if the export has been authorized by BIS, either by export license or license exception.  CBP's role is to verify that the shipment consists of commodities approved for export according to the license or exception, not by serial number. Moreover, we question why this data is being required for every export of firearms, and what will be done with the serial number data.  In particular, our industry has concerns that aggregating serial number information in this manner could be the start of a firearm registry.  None of these issues was apparently addressed in BIS's or OMB's PRA analysis. There are many other infirmities with the PRA analysis or the general justification for the new paperwork burden:

1.   CBP has a targeted risk assessment program for identifying export shipments which warrant physical inspection.  When firearm shipments are thus selected, the exporter provides the CBP officer with copies of the export documents, including packing lists with serials numbers.  This is a reasonable basis for review of serial

WASHSTATEC000274

numbers, and industry does not dispute it. However, CBP does not inspect every firearm export shipment and therefore the rationale to require such records for each shipment is unsupported.

2.   Law enforcement agencies, both in the US and abroad, already have an established process with ATF to trace firearms used in crimes. The ATF Tracing Center provides assistance to all international police agencies to assist with their endeavors. Thus, we cannot see why law enforcement would need serial number records of every export shipment of firearms, at the time of export, when the majority of these shipments are never subject to review for illegal activity.

3.   This requirement is only applied to firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502. It does not apply to any other shotguns controlled under ECCN 0A502 which have been under BIS control for decades. Thus, the control is inconsistent with past practice.

4.   The serial number requirement is not included in the proposed changes to the ITAR for Categories I, II and III, and therefore is not required for military items such as fully automatic firearms.

5.   The AES system does not have the capability to input all the required data. New fields would be needed for each data element. In particular, the volume of firearms exported in a particular shipment can be anywhere from 10 to 1000 units. Requiring this data to be input into an electronic system would be a huge burden and would require companies to spend a massive amount of time and money to establish processes within their IT enterprise systems to input such massive amounts of data.

RECOMMENDATION VIII.A.: We strongly request that BIS delete the new requirement for reporting the manufacturer, model number, caliber and serial number of the exported items in the AES system.

B.   Delete Proposed Restrictions in Sections 758.1(c)(1) and 758.10(b)(2)

The proposed change to 758.1(c)(1) would prohibit the use of BAG to export firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, without the submission by individuals of data in AES. The proposed language in new paragraph 758.10(b)(2) would require non-U.S. persons exiting the U.S. to file export information in the AES system. All the arguments set forth above regarding why AES is the wrong system for individuals to use are equally applicable here. We incorporate them by reference.

RECOMMENDATION VIII.B.: We request that BIS delete the new restrictive wording added to paragraph 758.1(c)(1) and wording in 758.10(b)(2) requiring information to be filed in AES. We note that BIS has indicated that it would only include this requirement if the AES system

was appropriately revised and simplified for use by individuals.  Since it is unlikely that such a change could occur prior to publication of a final rule, we request the deletion of the section.

## IX. Part 762 Recordkeeping

### A.  Delete Redundant Recordkeeping Requirements

The proposed revision to section 762.2(a) would add a new subparagraph 11 creating a new recordkeeping requirement for "serial number, make, model, and caliber of 0A501 .a and .b firearms, and shotguns with barrel length less than 18 inches." This new provision would create an unnecessary and redundant regulatory burden.  The Gun Control Act (GCA) is the regulatory framework for records pertaining to firearms.  The recordkeeping requirements include acquisition and disposition of all firearms, regardless of whether they are shipped within the US or overseas.  The GCA requires all Federal Firearm Licensees (FFL's) to maintain firearm records.  In particular, the GCA requires these records to be maintained for 20 years after the date of disposition.  The proposed change requiring records under the EAR is therefore redundant.  Further, it could also cause confusion because the EAR record retention period is 5 years, but the GCA's period is 20 years. In complying with the stated provisions of the EAR, companies may inadvertently violate the GCA.

RECOMMENDATION IX.A:  We ask BIS to delete the new requirement for "serial number, make, model, and caliber of 0A501 .a and .b firearms, and shotguns with barrel length less than 18 inches."  Instead, we suggest the paragraph make a cross-reference to the GCA-mandated recordkeeping provisions and that compliance with these requirements constitutes compliance with the EAR's requirements in this regard.

### B.  Remove Proposed Recordkeeping Requirements for Warranties

Through a proposed exception to existing recordkeeping exemptions in section 762.3(a), BIS would impose recordkeeping requirements "**for a warranty certificate issued for an address outside the US** for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502."  In its preamble, BIS acknowledges that this amendment "would be an **expansion of the EAR recordkeeping requirements**, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items."  We struggle to see any understandable rationale for this requirement.  Such warranties are not related to the export in any way, and a warranty certificate is not an export control document.

Moreover, warranties are issued by the manufacturer, not the exporter. Many manufacturers do not always issue specific "warranty certificates" to individuals.  It is, therefore, not a record kept in the normal course of business.  Most manufacturers provide warranty statements in a broad boilerplate statement included in an instruction manual, or on their website.  There is thus no

WASHSTATEC000276

way to know when that information is accessed by a foreign person or sent to "an address outside the US." There is also the possibility that retaining such information may violate the privacy laws of other countries, such as the General Data Protection Regulation (GDPR) (EU).

RECOMMENDATION IX.B.: BIS has asked for comments on whether the public agrees with the above described changes. We do not agree to the changes and have noted that they represent increased compliance burdens for exporters under the EAR that are not present in the ITAR. BIS has not provided a coherent explanation for why the new recordkeeping burden makes sense, is related to exports, or would be of benefit to the enforcement of the export control laws. We therefore request BIS delete the proposed addition.

## X. Recommendation for Effective Date of Final Rule

Throughout the reform effort and during transitions of items from the USML to the CCL, the relevant final rules for most other categories had an effective date of 180 days after publication. This gave exporters of those commodities sufficient time to reclassify their products and implement changes in their enterprise systems to become compliant with the EAR. The later effective date also allowed those companies to continue to obtain export licenses from DDTC without loss of business in the interim. The regulatory change for firearms and ammunition will affect many exporters and involve a significant number of export licenses. Most of these companies have had little exposure to the EAR and will require significant training and outreach to understand the new regulations. The extended effective date will allow these firearm and ammunition exporters sufficient time to learn and implement EAR-centric processes and procedures while still continuing to do business in the ordinary course.

RECOMMENTATION X: NSSF recommends a 180-day effective date for the final rule.

## XI. Items Controlled for Firearms Convention (FC) Reasons Destined for End Use in Canada

The proposed amendments to section 742.17(f) would require licenses for the export of FC Column 1 items to Organization of American States (OAS) members, including Canada. The items affected are those controlled by ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). 83 Fed. Reg. at 24185. Unchanged would be the licensing policy for such items, which is that they be presumptively approved if their export is supported by an FC Import Certificate or equivalent, unless they are for a proscribed end use or end user. 15 CFR § 742.17.

Given the unique and long-standing defense trade and commercial relationships between the United States and Canada, the EAR generally does not require licenses for the export of items from the United States to Canada for end use in Canada, unless a proscribed person or end use is involved. Indeed, none of the uniquely military items that were formerly ITAR controlled that are now subject to the EAR require a license to export to Canada for end use in Canada. Under the proposed rule, however, non-military, widely available commercial FC-controlled items would have stricter licensing obligations than the same items for export to many other NATO

partners.  The EAR is, thus, internally inconsistent in its licensing policies with respect to Canada.

We appreciate that BIS does not have discretion to remove completely licensing obligations for the export to Canada for end use in Canada of the shotguns and other items referenced in the proposed revisions to section 742.17(f) given the U.S. commitments to the OAS under the Firearms Convention described in the section.  The U.S., however, does have discretion under the convention to define domestically what an OAS-compliant license would be.

RECOMMENDATION XI:  Given that applications to export to Canada FC-controlled items will be presumptively approved if the Canadian government has issued to the importer the required possession and import permits, we ask that a proposed rule be created that would allow BIS to treat such Canadian-issued authorizations as satisfying the U.S. government's obligations under the Firearms Convention.  If the Canadian government has already approved the import and the importer, there is little value-added in the United States authorizing exactly the same transaction separately.  Such a change, we believe, will significantly reduce regulatory burdens -- for both exporters and the U.S. government -- associated with exports to Canada without harming national security objectives or Firearms Convention obligations. Moreover, we do not believe that the creation of such a rule would be a significant burden for BIS because BIS described several times during its weekly conference calls on the reform effort that one had already been created.

* * *

We appreciate your consideration of our comments.  We would be happy to respond to any questions or concerns, or provide additional information.  I can be reached at lkeane@nssf.org.

Sincerely,

Lawrence G. Keane

WASHSTATEC000278

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:15 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946j-87x3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0348
Public Comment 989. Vista Outdoor. Julia Mason. 7-9-18

## Submitter Information

**Name:** Vista Outdoor
**Organization:** Vista Outdoor

## General Comment

RE: Comments on Proposed Rule RIN 0694-AF47 -- Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

Vista Outdoor Inc., (Vista) is a leading global designer, manufacturer and marketer of consumer products in the growing outdoor sports and recreation markets. We serve these markets through our diverse portfolio of well-recognized brands that provide consumers with a range of performance-driven, high-quality and innovative products, including sporting ammunition and firearms, outdoor products, outdoor cooking solutions, outdoor sports optics, hydration systems, golf rangefinders, and accessories. We serve a broad range of end consumers, including outdoor enthusiasts, hunters and recreational shooters, professional athletes, as well as law enforcement and military professionals.

The majority of Vista brands exported that require BIS or DDTC authorizations are: Federal Premium, CCI, Speer ; Firearms: Savage Arms, Bushnell, BLACKHAWK!, Night Optics, all which will be directly impacted by the proposed rules changes. As requested in the proposed rule contained in Federal Register Notice, 83 FR 24166, May 24, 2018, Vista respectfully submits the following comments in the attached file "Comments on proposed rule RIN 0694AF47."

Sincerely,
Vista Outdoor Inc.

## Attachments

Comments on proposed rule RIN 0694AF47

WASHSTATEC000280



VISTA
OUTDOOR

July 9, 2018

Steven Clagett
Office of Nonproliferation and Controls and Treaty Compliance,
Nuclear and Missile technology Division

Bureau of Industry and Security,
U.S. Department of Commerce
14th Street and Pennsylvania Avenue, NW
Washington, DC 20230

Submitted:   via Internet -- Federal eRulemaking, Docket BIS-2017-0004

RE:   Comments on Proposed Rule – RIN 0694-AF47 -- Control of Firearms, Guns,
Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

Dear Mr. Clagett;

Vista Outdoor Inc., (Vista) is a leading global designer, manufacturer and marketer of consumer
products in the growing outdoor sports and recreation markets. We serve these markets through
our diverse portfolio of well-recognized brands that provide consumers with a range of
performance-driven, high-quality and innovative products, including sporting ammunition and
firearms, outdoor products, outdoor cooking solutions, outdoor sports optics, hydration systems,
golf rangefinders, and accessories. We serve a broad range of end consumers, including outdoor
enthusiasts, hunters and recreational shooters, professional athletes, as well as law enforcement
and military professionals.

The majority of Vista brands exported that require BIS or DDTC authorizations are: Federal
Premium®, CCI®, Speer ®; Firearms: Savage Arms™, Bushnell®, BLACKHAWK!®, Night
Optics®, all which will be directly impacted by the proposed rules changes. As requested in the
proposed rule contained in Federal Register Notice, 83 FR 24166, May 24, 2018, Vista
respectfully submits the following comments:

**Specific Comments**

**I.      ECCN 0A501 – Firearms (except 0A502 shotguns) and related commodities as
follows (See List of Items controlled)**

WASHSTATEC000281

A.    Note 1 to 0A501 – Rationalize Controls Over Antique Firearms and Muzzle Loading Black Powder Firearms

The proposed note states, "Antique firearms (i.e. those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball and all other air rifles are EAR99 commodities."

1.    Antique Firearms

The Note defines antique firearms as "those manufactured before 1890 and reproductions thereof." Under the current ITAR, antique firearms are controlled under USML Category I(a), however license exemption 22 CFR § 123.17(b) allows exports of "firearms covered by Category I(a) if manufactured on or **before 1898**, or replicas." BIS's proposed rule will require licensing of various antique rifles that are currently exported under an exemption.

Comment:    We request BIS change the date in the definition of antique firearm in Note 1 from 1890 to 1898 to be consistent with the ITAR exemption.

II.    **0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

A.    License Exception LVS

ECCN 0A502 does not include any list-based license exceptions. The export of, for example, 0A501 trigger or magazine would be eligible for License Exception LVS but the export of a 0A502 trigger or magazine would not. Currently the proposed rule would control low-value parts and components in 0A502 that would be eligible for LVS exports under 0A501.

Comment:    To provide consistent controls and exceptions for like items please allow License Exception LVS for 0A502 parts and components proposed for 0A501 for the same types of items, such as shotgun trigger mechanisms, magazines, and magazine extensions.

Suggested modifications:

i.    Change the ECCN heading to "Shotguns and related commodities as follows (See List of Items controlled), except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use."

ii.    Include in the List of Items Controlled new subparagraphs to separately list breech mechanisms, and the remaining components (e.g., "including complete trigger mechanisms; magazines and magazine extension tubes") with a corresponding Reason for Control which allows for use of exception LVS to the same extent as proposed for 0A501.

III.    **0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled)**

A.    Make License Exception LVS Available for 0A504.g Items

WASHSTATEC000282

The proposed 0A504.g ("Lenses, other optical elements and adjustment mechanisms") does not allow for the use of License Exception LVS.

Comment: to align the availability of the exception for similarly significant items on 0A501, Vista requests that License Exception LVS be available for 0A504.g components (e.g. optical sighting device knobs), which are insignificant relative to the other items in 0A501.

## IV.     0A505 Ammunition as follows (see List of Items Controlled)

### A.     Remove 0A018 and Transfer Controls to 0A505

As detailed in the background section of the proposed rules, BIS provides that all firearms, ammunition and related commodities will be consolidated into a new 500 or 600 series of entries and other similar items would be consolidated to the same areas on the CCL, in order to easily identify items for the exporter. Retaining 0A018 would be counter intuitive to what the essence and spirt of consolidating the like items to the same area.

Comment:  We request that all commercial firearm, ammunition, and related items be in one of the series of new 500 series ECCNs (specifically the 0A505) and not left in the -018 area

### B.     Allow for Use of License Exception LVS

Proposed ECCN 0A505 includes license exception LVS of $100 for subparagraph .x "parts" and "components."  The LVS exception is limited to $100 net value per shipment related to the parts and components of ammunition listed on the CCL.

Comment:  Vista requests the value of the LVS exception as it related to ammunition parts and components be raised to $500 to match that allowed for firearm components.

## V.     Part 758 Export Clearance Requirements

### A.     Delete Proposed AES Reporting Requirements

New paragraph 758.1(g)(4) ("Exports of Firearms and Related Items") states that "For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, **you must report the manufacturer, model number, caliber and serial number of the exported items."**  The explanation for the change states this is "to expand the data elements required as part of an AES filing."

While we do understand the concern and requirement to verify firearms are exported under the correct authorization this proposed rule would be an undue burden on Vista and our U.S. industry competitors, there are already numerous mechanisms and assessment programs in place with other regulatory agencies that monitor the export of firearms, a requirement such as this would not be consistent with prior control.

Comment:  We strongly request that BIS delete the new requirement for reporting the manufacturer, model number, caliber and serial number of the exported items in the AES system.

Page 3 of 4

WASHSTATEC000283

## VI.     Recommendation for Effective Date of Final Rule

Throughout the reform effort and during transitions of items from the USML to the CCL, the final rules for other categories had an effective date of 180 days after publication.
<u>Comment:</u>  Vista recommends a 180-day effective date for the final rule.

*****

Thank you for the consideration and opportunity to provide comments to the proposed rules. Vista commends the joint effort among the Bureau of Industry and Security, Directorate of Defense Trade Controls, and other reviewing agencies in this endeavor and we look forward to the final rules being released.

Vista would be happy to respond to any questions or concerns, or provide additional information, please contact Julia Mason via phone (571) 343-7005 or via email at itoshootingsports@vistaoutdoor.com.

Sincerely,
Vista Outdoor Inc.


Julia Mason
Director, International Trade Operations
Vista Outdoor Inc.

Page 4 of 4

WASHSTATEC000284

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:04 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946l-cmq2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0346
Public Comment 991. Safari Club International. Anna Seidman. 7-9-18

## Submitter Information

**Name:** Anna Seidman
**Organization:** Safari Club International

## General Comment

See attached file(s)

## Attachments

07 08 2018 - Safari Club International Comments on RIN 1400 AE30 and RIN 0694-AF47

WASHSTATEC000285



July 9, 2018

Via http://www.regulations.gov

Office of Defense Trade Controls Policy
Department of State
DDTCPublicComments@state.gov

Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce,
Room 2099B,
14th Street and Pennsylvania Avenue NW,
Washington, DC 20230.

> **Re:** **Safari Club International Comments on Proposed Amendment to the International Traffic in Arms Regulations:  Revision of U.S. Munitions List Categories, I, II and III, Docket RIN 1400 AE30, DOS-2017-0046; and Proposed Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), RIN 0694-AF47, Docket No. 111227796-5786-01.**

Dear Sirs:

Safari Club International (SCI) submits these comments in support of the U.S. Department of State's proposed amendments to the International Traffic in Arms Regulations (ITAR) to revise Categories I, II, and III of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML.  SCI also supports the Department of Commerce, Bureau of Industry and Security's proposed determination that these items no longer warrant control under the U.S. Munitions List (collectively referred to as "proposed regulations").

SCI does not support the proposed regulations' finalization and implementation of a modified procedure for the temporary export of firearms and ammunition by individuals who wish to travel outside the U.S. for recreational hunting and shooting purposes.  The procedure requires travelers to use the Automated Export System (AES) to register their personal firearms and ammunition.  This is an inappropriate and unworkable system for the individual who wishes to temporarily export his/her firearms.  As an alternative, SCI requests that the proposed regulations be modified so that they delete the AES registration requirement and formalize and codify the Form 4457 process to ensure its consistency and use by all Customs and Border Protection (CBP) officials.

WASHSTATEC000286

SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 2 of 6

**Safari Club International**

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has approximately 50,000 members worldwide, many of whom are U.S. residents who travel with their firearms for hunting and recreational shooting around the world. They are individuals, not businesses, who seek only to bring their own property with them when they travel and return to the U.S. with that same property. Their activities are legal and are regulated by the countries they visit to hunt and shoot.

**The Origin of the AES Registration Requirement**

The export of firearms is controlled under the ITAR, which is administered by the U.S. Department of State, Directorate of Defense Trade Controls (DDTC). ITAR regulations have historically included an exemption under 22 CFR §123.17(c) allowing U.S. persons to temporarily export without a license up to three nonautomatic firearms and not more than 1,000 cartridges. This exemption is widely used by hunters and other sportsmen, who travel overseas with firearms to be used for sporting and other legal purposes. To use the exemption, the U.S. person must declare the firearms and/or ammunition to CBP, carry the firearms as part of their baggage, and not transfer ownership while abroad.

In 2011, DDTC published a Federal Register notice of proposed rulemaking that principally revised the exemption related to personal protective equipment, but also included a requirement that those traveling with firearms register through the Automated Export System (AES): "The person. . . presents the Internal Transaction Number from submission of the Electronic Export Information in the Automated Export System per §123.22 of this subchapter…." 76 Fed. Reg. 16353, 163534 (Mar. 23, 2011).

The system required those registering to provide an Employer Identification Number (EIN), available only to commercial enterprises. The registration system also involved procedures far too complicated and burdensome than necessary for individuals seeking only to travel with their personal equipment. Because the registration system imposed registration obligations that would have forced hunters and shooters to make false representations to the Internal Revenue Service, jeopardized their ability to obtain permits to import the wildlife they successfully hunted, and imposed burdensome obligations unnecessary and inappropriate for non-commercial importers, CBP agreed to postpone the implementation of the registration requirements and to continue the use of Form 4457 as the mechanism to facilitate temporary firearms export. Even that solution presented problems. Due to the inconsistencies in the way that CBP personnel issued the forms, U.S. residents have encountered difficulties in taking their firearms to foreign countries (e.g. South Africa) that attribute much greater significance to Form 4457 than does the U.S.

**Collection of Data Through AES Registration is Inappropriate**

Without good reason, the proposed regulations would reactive the AES registration requirement for individuals seeking to temporarily export their firearms and ammunition.

> Consistent with the ITAR requirements previously applicable to temporary
> exports of the firearms and associated ammunition covered by this rule, [Bureau

WASHSTATEC000287

of Industry and Security ("BIS")] is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG.

83 Fed. Reg. 24174. The purpose of the registration system is not to facilitate the temporary export and reimport of firearms and ammunition. According to CBP, the collection of export data through the registration is designed to help with the "compilation of the U.S. position on merchandise trade" and is an "essential component of the monthly totals provided in the U.S. International Trade in Goods and Services (FT900) press release, a principal economic indicator and a primary component of the Gross Domestic Product." https://www.census.gov/foreign-trade/aes/aesdirect/AESDirect-User-Guide.pdf

The government has no need to collect this data. The data, provided by individuals who wish to temporarily export and then re-import the same personally owned equipment, has nothing to do with the "U.S. position on merchandise trade" or the "Gross Domestic Product."

The only purpose for the collection of data from individual hunters who travel with their firearms is likely to enable the government to maintain records on these individuals and their legal activities abroad. In the proposed regulations, the BIS acknowledges that the intention of the AES filing system was to "track such temporary exports of personally-owned firearms and ammunition." SCI strongly opposes this attempt to "follow" and retain records of the individuals who travel with their firearms for hunting purposes. These individuals have taken no actions meriting the government's desire or need to collect and maintain data on their activities. The government should remove the requirement to collect such data.

**The Proposed Regulations Recognize Flaws in the Registration System**

The proposed regulations provide the public with the opportunity to comment on whether CBP has been able to remedy the problems identified when CBP first attempted to activate and implement the new requirement. The drafters also condition the reactivation of the AES registration requirement on CBP's success in remedying the problems that plagued the introduction:

> Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as

WASHSTATEC000288

comments on the current practice of using the CBP Form 4457, as well as any
other suggestions on alternative approaches for tracking such information.

83 Fed. Reg. 24174.  AES registration should not be required as CBP has not remedied the
problems that plagued the initial attempted implementation of the system.

**The AES Registration System Requires Individuals to Provide False Information to the
Internal Revenue Service**

The AES registration system continues to require persons temporarily exporting firearms or
ammunition to present "the Internal Transaction Number from submission of the Electronic
Export Information in the Automated Export System."  The AES system requires an EIN before
a user can submit any data.  The Census Bureau administers the AES system, and their website
still includes the following FAQ:

> **The Internal Revenue Service (IRS) site states that an Employer
> Identification Number (EIN) is for use in connection with business activity
> only. It further states, do not use your EIN in place of a Social Security
> Number. The information provided by the Census Bureau and the IRS is
> conflicting.**
>
> The IRS publication titled "Understanding Your EIN" which is located on their
> webpage (http://www.irs.gov/pub/irs-pdf/p1635.pdf [external link]) states that
> "…Employer Identification Number (EIN) is for use in connection with business
> activity only, do not use your EIN in place of a Social Security Number"….
> However, for the purposes of registering or filing in the AES you can and should
> use your EIN. While it is not specifically stated, an EIN can be obtained for
> government reporting purposes when a person does not own a business."

https://www.census.gov/foreign-trade/regulations/ssnfaqs.html.  The Census Bureau site
expressly tells individual exporters to ignore the IRS's instructions and to misrepresent
themselves as businesses, in order to obtain an EIN.  The IRS site contains no instructions
providing such an exception.

The Census guidelines instruct individuals to select "Sole Proprietorship" as the "type of legal
structure applying for an EIN," which is explained by IRS as: "sole proprietor includes
individuals who are in business for themselves, or household employers."  The individual is
further required to select "started a new business" as the reason why the sole proprietor is
requesting an EIN.  For an individual seeking to travel overseas with their firearms, this
information is confusing, false and entered only to obtain the EIN.

As nothing has changed to remedy this problem since the AES registration requirement was
originally imposed, the regulations should not include this requirement.

**The AES Registration System is Designed for Commercial Operations and Is Overly
Complicated for the Individual Exporter**

WASHSTATEC000289

Despite the years that have passed since CBP's attempt to require individuals to register through the AES system for the temporary export of their firearms, the agency has not made meaningful progress in reducing the overly complicated process for registration. The system is designed for businesses whose repeated use of the system merits the time and patience required for registration. The online AES Direct Users' Guide (which contains no reference to individuals, temporary export, or firearms) is a 39-page manual that an individual would be required to learn in order to register with the system. The registration mechanism is unnecessarily burdensome and complicated for the private individual who does not wish to participate in commercial trade but merely wants to temporarily take his own firearm with him outside the U.S. for a recreational hunt or shoot.

**Individuals Identifying Themselves as a Commercial Enterprise Could Jeopardize Their Ability to Import Legally Hunted Animals**

The requirement that individual hunters obtain an EIN, recognized by the IRS for business purposes only, could potentially jeopardize the ability of hunters to import some sport-hunted trophies from abroad. The U.S. Fish and Wildlife Service (FWS) prohibits the importation of many sport-hunted species for commercial purposes. A hunter who registers as a business for the purpose of leaving the country and exporting the firearms he plans to use to hunt outside the United States, risks the FWS prohibiting the hunter from importing his trophies and otherwise penalizing the hunter.

**The AES Registration System Does Not Replace the Use of Form 4457**

As mentioned above, the proposed regulations did not intend the AES registration requirement to replace CBP Form 4457 for the temporary export and reimport of personally owned firearms. Even with the AES registration requirement, temporary exporters of firearms and ammunition will still need to obtain and complete Form 4457 and display it upon re-entry into the U.S. to prove that they did not acquire the firearms abroad. Because (1) the AES registration requirement and its purpose of tracking the activities of law-abiding hunters and recreational shooters are neither necessary nor appropriate for the temporary export activities of hunters and shooters, and (2) these individuals will continue to need to obtain and display Form 4457, the logical solution would be to abandon the AES registration requirement, retain the Form 4457 practice, and improve the mechanisms for issuing the latter.

**Future Use of Form 4457 Needs to Reflect the Greater Significance of the Document Outside the U.S.**

While CBP has used Form 4457 as primarily a mechanism for determining whether the firearm being imported into the U.S. is the same property the individual exported when he or she left the country, other governments attribute greater significance to the document.

South Africa, for example, treats the form as a pseudo license of a U.S. resident traveling with a firearm. South African police have conditioned import of firearms into their country on the U.S. resident's possession of what South Africa considers to be a valid Form 4457. In 2017, this led

WASHSTATEC000290

SCI Comments on Proposed Regulations Regarding Temporary Export of Firearms
July 9, 2018
Page 6 of 6

to problems for hunters traveling to South Africa when the CBP began issuing Form 4457s with already expired expiration dates.  Although CBP explained that the agency attributes little meaning to the form's expiration date, South African officials considered the forms expired and prohibited hunters from entering the country with their firearms due to the apparent expired appearance of the forms.

The problem was exacerbated by different offices of CBP issuing different versions of the form, which also did not match the form available from CBP's website.  After representatives of SCI and other organizations engaged in numerous discussions on the issue with CBP personnel, CBP adopted a temporary solution of issuing new forms with a future expiration date.  CBP needs to adopt a more permanent solution that addresses the significance of the form in other countries, such as issuing forms without any expiration date.

**SCI's Recommended Resolution and Revision of the Proposed Rules**

SCI recommends that the drafters delete the AES registration requirement entirely for individuals and make it clear that registration is not required for those who wish to temporarily export their firearms from the United States.  No tracking of the legal activities of these hunters and shooters should be conducted and no compilation of data about these individuals should be permitted.  Instead, the drafters should formally codify the use of Form 4457 for individuals and should identify a single consistent standard for the form that contains no date that could be interpreted or misinterpreted by anyone as an expiration date.

Thank you for the opportunity to comment on these proposed regulations, and in particular to advocate for the removal of a process that should not be applied to individuals who wish only to temporarily export their firearms in order to engage in legal activities outside of the United States.  If you have any questions or need anything further, please contact Anna Seidman, Director of Legal Advocacy Resources and International Affairs, aseidman@safariclub.org.

Sincerely,

Paul Babaz
President, Safari Club International

WASHSTATEC000291

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:47 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946m-w8wy
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0341
Public Comment 994. Northrop Grumman. Tom Donovan. 7-9-18

## Submitter Information

**Name:** Tom Donovan

## General Comment

See attached file(s)

## Attachments

RIN 0694-AF47 Comments to DOC for I II III (final)

WASHSTATEC000292



Northrop Grumman Corporation
Corporate Office

Global Trade Management
2980 Fairview Park Drive
Falls Church, VA 22042

July 9, 2018

Regulatory Policy Division
Bureau of Industry and Security
U.S. Department of Commerce
Room 2099B, 14th Street and Pennsylvania Avenue, NW
Washington, DC 20230


ATTN: Mr. Richard E. Ashooh
Assistant Secretary for Export Administration

SUBJECT: RIN 0694-AF47, Request for Comments Regarding Control of Firearms, Guns, Ammunition and Related Articles the President Determines No longer Warrant Control Under the United States Munitions List.


Dear Mr. Ashooh:

Northrop Grumman Corporation wishes to thank the Department of Commerce (DOC) for the opportunity to submit comments in review of the Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML). In response, we provide the following recommendations:

**General:** We recommend the DOC define "firearm" in harmonization with the USML.

**EAR §740.11 – Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV):**

**Note 2 to paragraph (b)(2)** – the phrase "or other sensitive end-users" is vague and ambiguous. We recommend deletion or enumeration of specific types of entities ineligible for the exception.

**EAR §740.14 – Baggage (BAG):**

**§740.14(c)(1)** – Recommend revising to say "Owned by, or for the exclusive use of, the individuals (or by members of their immediate families) or by crew members of exporting carriers on the dates they depart from the United States;"
- EAR §740.1(c)(1) "Limits on eligibility" currently states that the items must be "owned by" the individuals. The criteria currently in the exemption located in ITAR §123.17(c)(3) is related to the person's "exclusive use," so we recommend revising the language in EAR §740.14(c)(1) so the exception may not be interpreted as being more restrictive than the current ITAR exemption criteria.


**ECCN 0A501:**

To avoid redundancy and duplication, we recommend revising the LVS entry as follows: "LVS: $500 for 0A501.c, .d, and .x, $500 for 0A501.e if the ultimate destination is Canada."

WASHSTATEC000293

**Paragraph 0A501.x**:  As currently proposed, paragraph .x would apply to parts, components, accessories, and attachments specifically designed for a commodity classified anywhere on the USML.  We recommend revising as follows:

"Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or USML Category I and not elsewhere specified on the USML or CCL.

**ECCN 0A502:** Rather than having the items controlled contained in the ECCN heading, we recommend enumerating separate sub paragraphs for the different reasons for control for size for the different size shotguns.  Breaking down to this lower level will allow companies to record much easier the classification in an automated system and apply proper controls without having to continually reference back to technical data or notes.

.a      Shotguns with a barrel length less than 18 inches
.b      Shotguns with a barrel length 18 inches to less than 24 inches
.c      Shotguns with a barrel length greater than or equal to 24 inches
.d      Complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms;
Note: this entry does not control equipment used exclusively to treat or tranquilize animals, and arms designed solely for signal, flare, or saluting use

**ECCN 0A505**:

**Paragraph 0A505.a:**  Recommend revising paragraph .a to include ammunition for firearms controlled in USML Category I that may not otherwise be captured, as follows:

Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

**Paragraph 0A505.d:** Recommend adding clarifying language to this paragraph on whether it also controls "dummy rounds" for medium caliber firearms as it only references "blank ammunition" for small caliber firearms.  If this is not intended to control inert dummy ammunition please clarify this category to include that.

**0A505 Related Controls:** Recommend deleting "combat shotguns." The proposed revision to USML Category I only covers fully automatic shotguns, which is already referenced in the "Related Controls" section.

**ECCN 0B602:** Recommend adding clarifying language on examples of specific tooling that have been included in the transfer from the Department of State to the Department of Commerce or, clarifying this in the final rule.  For example, provide clarification by including a note stating that this includes boresights and units made specifically for testing purposes.

**Administrative:** We recommend adopting a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL.

Should clarification or subsequent technical discussions be necessary, please contact either Steve Headley at james.headley@ngc.com, (703-280-4806), or myself at thomas.p.donovan@ngc.com (703-280-4045).

Sincerely,

*Thomas P. Donovan*

Thomas P. Donovan
Director, Export Management
Global Trade Management

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/12/18 4:59 PM |
| **Received:** July 09, 2018 |
| **Status:** Posted |
| **Posted:** July 12, 2018 |
| **Tracking No.** 1k2-946q-6b3d |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** API |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0332
Public Comment 996. F.A.I.R. Trade Group. Johanna Reeves.7-9-18

## Submitter Information

**Name:** Anonymous Anonymous
**Address:**
  1775 I STREET, NW
  SUITE 1150
  Washington,  DC,  20006
**Email:** execdir@fairtradegroup.org
**Phone:** 2025872709
**Organization:** F.A.I.R. TRADE GROUP

## General Comment

F.A.I.R. Trade Group respectfully submits the attached comments to RIN 0694-AF47.

## Attachments

F.A.I.R. Trade Group Comment to BIS Proposed Rule (RIN 0694-AF47)

WASHSTATEC000296



**Firearms & Ammunition Import/Export Roundtable**

July 9, 2018

Attn: Steven Clagett
Office of Nonproliferation Controls and Treaty Compliance
Nuclear and Missile Technology Controls Division

Regulatory Policy Division
Bureau of Industry and Security
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230.

> Subject:    RIN 0694–AF47: Control of Firearms, Guns, Ammunition and Related
> Articles the President Determines No Longer Warrant Control Under the
> United States Munitions List (USML)

Dear Mr. Clagett:

The purpose of this letter is to provide comments to the proposed rule to amend the *Export Administration Regulations* (EAR) to control those items identified to no longer warrant control under United States Munitions List (USML) Category I - Firearms, Close Assault Weapons and Combat Shotguns; Category II - Guns and Armament; and Category III - Ammunition/Ordnance U.S. Munitions List (USML), which the Bureau of Industry and Security (BIS) published in the *Federal Register* on May 24, 2018 (RIN 0694–AF47; 83 FR 24166).

The F.A.I.R. Trade Group ("F.A.I.R.") is a nonprofit organization dedicated to protecting the interests of the firearms and ammunition import and export communities. F.A.I.R. works with many U.S. government agencies, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the U.S. Department of State, Directorate of Defense Trade Controls (DDTC), and the Department of Commerce, Bureau of Industry and Security (BIS) to provide solutions to the concerns of F.A.I.R. members. Our membership includes importers and exporters of firearms, ammunition, and other defense and dual-use articles who rely on licenses issued by ATF, DDTC, and BIS. Many members also hold Type 07 or Type 10 licenses as manufacturers of firearms. Members provide equipment to domestic law enforcement agencies and the U.S. military who require such items to carry out their public safety and national security missions and sell the articles they import to distributors for general commercial sale. A number of our members also produce firearms and ammunition that are exported to foreign governments for their national defense, consistent with the foreign policy of the United States.

F.A.I.R. welcomes the opportunity to provide comment on the proposed revisions to the EAR to capture those items moving from USML Categories I, II, and III. We applaud the continuing efforts by BIS and DDTC to revise the USML so that its scope is limited to those defense articles that

**1775 I Street, N.W., Suite 1150, Washington, DC 20006**

WASHSTATEC000297

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 2 of 6

provide the United States with a critical military or intelligence advantage or are inherently for military end use, and to remove those items that are widely available in retail outlets in the United States and abroad.

Overall, the proposed revisions to the EAR and USML Categories I, II, and III are a positive move to a more rational control of firearms and ammunition, and related parts, components, accessories, and attachments. The transition of certain items to the control of the EAR will serve to right-size license requirements while still maintaining necessary oversight of exports of these items. Additionally, by moving such items to the EAR, many domestic manufacturers who do not conduct exports will be relieved of the significant financial burden of registering under the ITAR.

We provide the following comments for BIS consideration, and are available should BIS or DDTC require additional information or wish to discuss our comments further:

1. **Implementation Period**.

    As noted in the proposed rule, BIS has adopted a delayed effective date of 180 days for previous rules revising entire categories of the USML and moving items to the CCL. BIS has requested comments from industry as to whether this implementation period should be applied to the revised Categories I, II, and III.

    Recommendation: **Split implementation period**. We wish to support the continued delayed effective date of 180 days for those industry members who need make changes to IT systems, technology controls plans, and other business processes necessary to implement the rule. However, there will be a number of domestic companies who, for example, do not engage in the business of exporting but engage in certain gunsmith activities or manufacture firearms parts and components for firearms that transition to the EAR who will wish to immediately implement the new rules in order to be relieved of the financial burden of ITAR registration. Therefore, we recommend DDTC allow for a split implementation period to allow those companies whose entire operations transition to the EAR to immediately shift to those controls while allowing those companies whose operations either remain under the ITAR or are now split between the EAR and the ITAR adequate time to make necessary changes to their businesses. There is precedent for a split implementation period as it was done in the *Federal Register* notice implementing of revisions to USML Category XI and corrections to USML Category VIII (See 79 FR 37536).

2. **Transition Firearm Suppressors (Silencers) to the CCL.**

    DDTC's proposed rule indicates that "[USML Category I] Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components." The proposed rule further indicates that its objective, after the proposed revisions, is to capture only those articles in USML Categories I, II, and III that provide the United States with a critical military or intelligence advantage, or are inherently for military end use. The items proposed for transition to the EAR do not meet this standard, "including many items which *are widely available in retail outlets in the United States and abroad* [emphasis

WASHSTATEC000298

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 3 of 6

added]."  Firearm suppressors (silencers) do not provide a critical military or intelligence advantage and are not inherently for military end use.  Moreover, the hardware and associated technology is widely available throughout the world.  Therefore, based on the litmus test identified in the proposed rule, firearm suppressors (silencers) should not be listed on the USML and should be more appropriately controlled on the CCL in the EAR.

<u>Recommendation</u>:  **Remove Firearm suppressors (silencers) from USML Category I(e) and add them as a controlled item under ECCN 0A501.**

3. **<u>Use of "Combat Shotguns"</u>.**

DDTC proposes to revise USML Category I(d) to read as follows: "*(d) Fully automatic shotguns regardless of gauge."  This proposed revision removes the words "combat shotguns."  While we welcome this change due to the long-standing confusion over this undefined term, the words "combat shogun" are used in the proposed revisions to the EAR, specifically in the Related Controls of proposed ECCN 0A502, which reads: "This entry does not control *combat shotguns* [emphasis added] and fully automatic shotguns.  Those shotguns are "subject to the ITAR."  The Related Control to ECCN 0A502 does not go on to provide a definition for "combat shotgun."  The lack of definition and the removal of the reference in the revised USML Category I(d) causes confusion as to what type of firearm is being referenced.

<u>Recommendation</u>: **Remove the reference to "combat shotguns" in ECCN 0A506 and have the Related Control to reflect the language used in the ITAR.**  The Related Control would read as follows: "*This entry does not control fully automatic shotguns regardless of gauge.  Those shotguns are "subject to the ITAR."*

4. **<u>Automated Export System</u>.**

Currently, when exporting firearms, there is no requirement to enter serial numbers of firearms to be exported into the Automated Export System (AES).  However, in the BIS proposed rule, there is a proposal to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber.  This requirement is overly burdensome and will exponentially lengthen the time required for filing AES entries.  Contrary to the proposed rule, this is not a mere "carrying over" of existing CBP filing requirements for items transferred from the USML to the CCL.  The cited reference to information Department of Homeland Security currently collects under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) applies only to personal firearms temporarily exported.  However, the proposed rule would apply to all exports of items controlled under ECCN 0A501.a or .b and shotguns with a barrel length less than 18 inches controlled under ECCN 0A502.  Consequently, there is a significant change to the information being collected and to the burden hours as a result of this proposed rule.

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 4 of 6

Recommendation: **Remove the expansion of data elements required as part of an AES filing for firearms.** The serial numbers, make, model and caliber of firearms exported, as well as the reference to the export vehicle (*e.g.*, export license, exception) will be maintained by the exporter as part of its acquisition and disposition records required under the Gun Control Act and ATF regulations (27 C.F.R. Pt. 478, Subpart H), which are the same records currently maintained for firearm exports subject to the ITAR. Therefore, there is no loss of oversight or information by transitioning these items to the EAR and thus no need for adding data fields to AES entries. This is not required under the ITAR, and therefore should not now be required under the EAR.

5. <u>**ECCN 0A501**</u>

The BIS proposed rule states in "*Related Controls*" that magazines with a capacity of 50 rounds or greater are "subject to the ITAR." However, the proposed USML Category I(h)(1) references only magazines and drums with a capacity *greater than* 50 rounds (emphasis added).

Recommendation: **Revise ECCN 0501 "Related Controls" so that the capacity round description is consistently with USML Cat. I(h)(1).**

6. <u>**ECCN 0A501.d**</u>

This paragraph includes a reference to "complete breech mechanisms" with no further explanation or note to define the terms. It is unclear what would constitute a complete breech mechanism that is distinct from other parts specifically identified in paragraph .c.

Recommendation: **Revise ECCN 0A501 .d to include a definition or explanation of what constitutes a "complete breech mechanism," and to ensure there is no redundancy with any of the parts referenced in paragraph .c.**

7. <u>**ECCN 0A501.y.**</u>

The proposed rule explains this paragraph would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components." The paragraph indeed lists such items in specifically enumerated subparagraphs .y.1 - .6. Does this mean the .y paragraph controls only those items enumerated in the following subparagraphs .1-.6, or does the umbrella language in .y. serve to capture other parts, components, or attachments that are not specifically enumerated in subparagraphs .y.1 - .6., and not elsewhere specified (such as magazines for less than 16 rounds) ? In other words, does the .y. paragraph itself serve as a catch-all for "parts", "components", "accessories" and "attachments"?

Recommendation: **Revise paragraph .y by replacing the period at the end of the paragraph with the phrase "including" or "as follows:" so as to clarify whether .y is limited to the enumerated subparagraphs, or itself is a control paragraph in which**

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 5 of 6

---

**items can be controlled.** 0A501.y would read as follows: *"Specific "parts,"
"components," "accessories" and "attachments" "specially designed" for a commodity
subject to control in this ECCN or common to a defense article in USML Category I and not
elsewhere specified in the USML or CCL, as follows [or including]:"*

8. **ECCN 0A502**.

The proposed rule states that this ECCN would control both the shotguns currently on the
USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns
and the enumerated "parts" and "components" currently controlled in ECCN 0A984
(barrel length 18 inches or greater). However, the items included in the ECCN header are
separated by semicolons and there is no clear statement that the parts and components listed
in the header are specific to shotguns. For example, because it is not clear that the
enumerated items are specific to shotguns, there could be confusion as to whether 10 round
magazines are controlled in ECCN 0A502, ECCN 0A501.y., or would such items fall to
EAR99?

<u>Recommendation</u>: **Revise ECCN 0A502 to specify the parts and components
enumerated in the ECCN header are SHOTGUN parts and components. We also
recommend defining or explaining what constitutes "complete breech mechanism" (see
comment for ECCN 0A501.d above).**

9. **ECCN 0A505**.

The proposed rule states that ammunition parts and components would be eligible for license
exception LVS with a limit of $100 net value per shipment. This is a reduction in value
compared to the ITAR license exemption currently available under 22 C.F.R. §
123.16(b)(2), which is capped at $500. It is unclear why the transition to the EAR would
result in a reduction in the license exception value limit.

<u>Recommendation</u>: **Revise ECCN 0A505 to increase the value limit for the LVS license
exception for ammunition parts and components in paragraph .x to $500.**

10. **ECCN 0A606**.

The DDTC proposed rule states that "the articles currently controlled in [Category II]
paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), will be on the
CCL in ECCN 0A606." However, there are no proposed corresponding changes to ECCN
0A606 in the BIS proposed rule.
<u>Recommendation</u>: **Revise ECCN 0A606 to clearly identify that engines for self-
propelled guns and howitzers are controlled therein.**

WASHSTATEC000301

Mr. Clagett
RIN 0694–AF47
July 9, 2018
Page 6 of 6

11. **§ 758.10 Entry clearance requirements for temporary imports**.

The proposed rule fails to take into consideration temporary imports by nonresident aliens who are subject to ATF regulations under 27 C.F.R. § 478.115(d). Although the license exception BAG references ATF's jurisdiction with these types of imports, proposed section 758.10 is silent, except for ATF's regulation of *permanent imports* (paragraph (2)).

Recommendation: **Add language to 758.10(a)(2) carving out from the entry clearance requirements for temporary imports by nonresident aliens who temporarily import firearms under the provisions of 27 C.F.R. § 478.115(d).**

12. **§ 762.2 Records to be retained**.

The proposed rule indicates that BIS wishes to make changes to EAR recordkeeping requirements for firearms being moved to the CCL. Specifically, BIS proposes to "add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502." This additional recordkeeping requirement is unnecessary as it is duplicative of the information that is required to be retained in a company's ATF bound books pursuant to the Gun Control Act and ATF regulations. In other words, the information that BIS seeks to retain is already being maintained by companies under ATF rules and regulations.

Recommendation: **Remove the proposal to add paragraph (a)(11).**

\* \* \* \* \*

F.A.I.R. thanks the Departments of State and Commerce for the opportunity to participate in the regulatory revision process. We hope that our comments assist the government in reducing jurisdictional ambiguities and clarifying the articles that will remain subject to the ITAR. For your information, we also provide a copy of the comments submitted in response to the DDTC proposed rule. Should you have any questions, or require additional information as you review public comments received, please do not hesitate to contact me at 202-587-2709 or execdir@fairtradegroup.org.

Sincerely,

Johanna E. Reeves
Executive Director

Enclosure: Comments to DDTC Proposed Rule (RIN 1400–AE30)

WASHSTATEC000302

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:12 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946r-wvlv
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0327
Public Comment 999. Borderview. J VanderHoek.7-9-18

---

## Submitter Information

**Name:** Joel VanderHoek
**Organization:** BORDERVIEW International Firearm Logistics

---

## General Comment

BORDERVIEW appreciates the opportunity to comment on the long-awaited transition of firearms and related
items from the jurisdiction of the Department of State to the Department of Commerce. Please see attached for
our public submission.

---

## Attachments

Borderview comments on BIS Proposed Rule

WASHSTATEC000303



July 9, 2018

Submitted at www.regulations.gov – Docket BIS-2017-0004, and by Email: steven.clagett@bis.doc.gov

Mr. Clagett et. al.,

BORDERVIEW appreciates the opportunity to comment on the long-awaited transition of firearms and related items from the jurisdiction of the Department of State to the Department of Commerce. We have closely followed the efforts since the early days of the Obama administration to complete this phase of Export Control Reform, and applaud the publishing of these proposed rules.

Broadly speaking, we are very supportive of the proposal and would like to underscore the well-laid justifications made in the 'Background' section of the proposed rule, and furthermore in the related 'Myths vs. Facts' release posted on the Department of Commerce website. BORDERVIEW looks forward your publishing of the Final Rule and completion of these longstanding and bipartisan efforts to simply our nation's export control infrastructure to better control the most military-sensitive items, while maintaining appropriate controls on Dual Use items such as firearms.

After careful review of the Proposed Rules, we offer the following comments and recommendations. In particular, we are most concerned about a number of facets of the proposed rule which add new and additional burden, above and beyond that which has historically been imposed by the ITAR and without proportionate benefit to industry or government. We will identify which comments below are as such.

## 1. Eliminate Proposed § 758.1(g)(4) – Expanded Data Elements for EEI filing in AES.

The proposed rules would add required AES data elements of "manufacturer, model number, caliber and serial number" for all exported firearms (to proposed § 758.1(g)(4)). Perhaps most concerning to us as a leading international firearm logistics firm are these burdensome, redundant and unnecessary additional data collection requirements. While it may seem like a relatively simple requirement, we see several problems with imposing this new data collection, and little if any benefit over the existing requirements, particularly with respect to serial number reporting.

First, this adds a new and significant burden over the longstanding requirements, and one which would require exporters to invest significant time and financial resources in re-programming software and AES interfaces, or in repeated and cumbersome manual data entry. Rather than "reducing the procedural burdens and costs of export compliance" as is the stated intent of the proposed rule, this new requirement is one that does just the opposite. As we'll explain below, we believe this new burden is imposed *without* providing any real improvement in the U.S. Government's ability "to enforce export controls for firearms appropriately" or "to make better use of its export control resources."

WASHSTATEC000304



The explanation given for this new requirement in the Proposed Rule is that the "requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations." However, as explained below, we believe this change would affect no substantive improvement in this regard.

<u>Serial Number data element in EEI filing in AES</u>

Serial numbers are generally *not* listed on an export license issued by BIS (except in the rare case they are entered by the applicant at the time of application, which is not required and would be unusual). Therefore, the presence of serial numbers in an AES filing would not assist law enforcement in verifying that items being exported on a given shipment match the items on the related export license. For example, an AES filing noting a Serial Number of "ABC123XYZ" for a given rifle would provide no assistance in matching that particular rifle to the associated export license which does not list the serial number. Furthermore, it should be noted that attempting to address this reality by requiring firearm serial numbers to be listed on export license applications would contradict the very nature of the BIS licensing philosophy – allowing commodity-based predictive license quantities for use over a set time.

Another concern about the mandated electronic collection of serial number data for exported firearms is that it would amount to a de facto electronic government Registry of all exported firearms. Congress has, for many years and in many forms, prohibited the creation of a federal firearms registry. Specifically, the Firearms Owners Protection Act codified this intent of Congress in 18 U.S.C. § 926(a)(3), which states:

> "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or disposition be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation."

To the extent that such a registry may aid law enforcement in the necessary function of tracing firearms, it should be noted that an effective system already exists through the ATF's National Tracing Center (NTC). The NTC relies primarily on the required records kept by Federal Firearms Licensees (FFLs), which already include the data elements of manufacturer, model designation, caliber and serial number, among others. As all U.S. commercial firearm exporters would be FFLs, this data is already kept in a proven system. To require it separately here would be unnecessarily duplicative and burdensome, without additional benefit.

*surprisingly simple.*™

WASHSTATEC000305



<u>Other additional data elements in AES (manufacturer, model number, caliber)</u>

Existing regulations in both the FTR and EAR already require that the item description entered in the AES filing conforms to that shown on the license. Thus, the explicit addition of required data elements of "manufacturer, model number (and) caliber" would provide no further to ability for law enforcement to "effectively verify that firearms exports are properly authorized."

The Foreign Trade Regulations state for 'Commodity description', "If the shipment requires a license, the description reported in the EEI shall conform with that shown on the license." (15 CFR 30.6(a)(13))

The Export Administration Regulations state for 'Exports under a license', "…you must report on the EEI filing to the AES…an item description identical to the item description on the license." (15 CFR 758.1(g)(1))

Therefore, adding new required data elements would be unnecessarily duplicative and burdensome. Exporters are already required to enter data into AES in such a way that it can be matched to the export license by law enforcement verifying a shipment. If there has been a problem with exporters not doing this in the past and thus impeding law enforcement verification, it would be best addressed by educating on and enforcing the existing requirements of the FTR and EAR, rather than adding a new and duplicative information collection requirement specific only to firearms.

Furthermore, like serial numbers, all of these proposed data elements are already kept by Federal Firearms Licensees under the provisions of the Gun Control Act (GCA), and are accessible to law enforcement as needed.

Finally, if after consideration of our comments herein BIS decides to proceed with proposed § 758.1(g)(4) to include model, the wording "model number" should be changed to simply "model", or "model designation (if assigned)" instead. Only a fraction of firearm models are "numbers", while many others are names, and some do not have model designations assigned at all. ATF recognizes this in their Regulations which refer simply to "model", or in some cases "Model Designation (if assigned)."

<u>CBP changes to AES as requested by BIS</u>

The proposed rule notes that such a proposed requirement would only be included in the final rule "if CBP has made such data easily enterable in AES." As explained above, multiple regulations already require the data to be entered in such a manner that law enforcement can match it to the export license.

Yet, if BIS can work with CBP to affect one needed change to the AES, we would suggest allowing a much higher number of characters in the 'Commodity Description' field, which is currently limited to 45. This character count limit is likely a driving factor in any past verification issues experienced which may have compelled BIS to propose adding new data elements.

*surprisingly simple.*™

WASHSTATEC000306



Exporters are already required to report all of the following within the 45-character 'Commodity Description' field for licensed items:

- "item description must be stated in Commerce Control List (CCL) terms" (15 CFR 758.1(g));
- "fully state the name of the commodity in terms that can be identified or associated with the language used in Schedule B or HTSUSA (usually the commercial name of the commodity), and any and all characteristics of the commodity that distinguish it from commodities of the same name covered by other Schedule B or HTSUSA classifications" (15 CFR 30.6(a)(13));
- "If the shipment requires a license, the description reported in the EEI shall conform with that shown on the license." (15 CFR 30.6(a)(13));
- "When exporting under the authority of a license, you must report on the EEI filing to the AES … an item description identical to the item description on the license." (15 CFR 758.1(g)(1)).

As you can imagine, meeting even one of these requirements can use 45 or more characters (especially the "item description *identical* to the item description on the license" requirement). Therefore, simply allowing a much higher number of characters in this field (e.g. 200+) would allow exporters to include all of the required information to meet regulatory compliance requirements, and likely solve many issues. (BIS' SNAP-R system allows up to 1,440 characters for each Export Item's technical description, thus to truly enforce the EAR requirement of identical AES description reporting, it should be 1,440+).

<u>Applicability to Temporary Exports / Imports under TMP</u>

One note to all of this is that such a requirement of mandatory serial number reporting in AES might make sense only for Temporary Exports and Imports under TMP in particular, to allow re-import procedures to be followed and verified. However, the requirements proposed in new § 758.10(b)(1)(ii) and § 740.9(b)(5)(iv)(B) already cover this by requiring serial numbers as part of a complete list to be submitted to CBP at the time of import and/or export.

However, it should be noted that if a firearm is shipped under TMP for repair and then found to need replacement under RPL, then the serial number(s) of re-imported / re-exported items would be different than those originally reported to CBP. Perhaps the final rule could address this by providing certification language for such cases, e.g. "Serial # _____ on this shipment is a one-to-one replacement of defective serial # _____ under the authority of RPL. In accordance with the EAR, no further shipments will be made of the defective item already replaced under RPL."

<u>Paperwork Reduction Act analysis</u>

In the Paperwork Reduction Act (PRA) Requirements analysis in the proposed rule, we note a couple of concerns. The PRA analysis rightly states (emphasis added): "The proposed rule would include a

*surprisingly simple.* ™

WASHSTATEC000307



requirement that, for *all* exports of items controlled under ECCNs 0A501.a…the exporter provide to CBP the serial number, make, model, and caliber for *each* firearm being exported."

However, the analysis goes on to say "The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL." We are not aware of any existing CBP or ITAR requirement for explicit reporting of these data elements within AES, and believe this is a new requirement and new information collection.

Further, the analysis goes on to say "The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651-0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule." Again, we believe this is a new collection and not the same as the existing OMB-approved collection referenced. Specifically, CBP Form 4457 is only used for temporary exports, whereas this proposed rule would require these data elements to be reported for *all* firearm exports. As such, in reality there will be a very substantial increase to the burden hours and a new collection as a result of the proposed rule if published as written.

Even when only considering temporary exports recorded on the CBP Form 4457, explicitly requiring the listed data elements is different than the instrument itself which merely requests "Description of Articles", leaving the format up to the exporter and CBP to record in such a way as will allow their proper identification upon re-import.

Note: these PRA-related comments have also been submitted directly to the designated contact at OMB in accordance with the directive in the proposed rule, but should nonetheless be considered and addressed by BIS in their final rule.

## 2. Change the proposed cut-off year for 'Antique' firearms to match U.S. law, current ITAR, and thus avoid adding additional burden in this rule.

For domestic purposes, U.S. law defines antique firearms (in the Gun Control Act, 27 CFR § 478.11) as those "manufactured in or before 1898". For import purposes, Customs uses the same definition. For export purposes, the same definition and cut-off year has long been used (in the ITAR, 22 CFR 123.17(b)). However, without explanation, this proposed rule would significantly alter the definition of antique firearms by eliminating nine important years of manufacture. In this sense, the proposed rule as written is significantly more burdensome than the ITAR. We export many antique firearms made in the early-to-mid 1890's, such as early Winchester Model 1886, 1892 and 1894 rifles or early Colt Single Action Army revolvers. Under current law, these do not require an export license but can be shipped under exemption. However, changing this definition to "in or before 1890" would significantly and negatively change this, with no added national security benefit. The firearms manufactured in the 1890's do not pose a security threat to our Nation and are merely collector's pieces.

*surprisingly simple.* ™

WASHSTATEC000308



The lack of any explanation on this significant change in the proposed rule makes it seem almost as if it were a mistake or simple typo. It is our hope that this is the case and that the final rule will align this definition with U.S. domestic, import and historical export law instead of creating a new definition of its own. On the other hand, it seems that this change may be an attempt to align the proposed rule with the Wassenaar Arrangement definitions. If indeed this is the case, we still argue that aligning instead with existing U.S. law ("in or before 1898") is the best policy here, to avoid adding additional burden in this rule and to stay consistent with longstanding U.S. definitions of antique firearm. If however for some reason Commerce Department must align with the Wassenaar, then the proposed rule as written is still wrong. The Wassenaar Arrangement Munitions List uses the 1890 cut-off year for handguns, but actually uses "manufactured earlier than 1938" for antique rifles (page 175, ML1.a, Note a,b) and shotguns (page 176, ML1.b, Note a). Therefore, if aligning to Wassenaar, the year for rifles must be changed to "in or before 1938" and a similar definition of non-controlled antique shotguns must be added to 0A502.

Even if not aligning to Wassenaar in the final rule, we do request that the final rule adds a definition and cut-off year for antique shotguns to 0A502, ideally the same "in or before 1898" under other U.S. law. It does not make sense to have such a definition of antique rifles and handguns to allow for export of such items without a license but not have such a definition for antique shotguns. Shotguns are arguably already less military sensitive (thus their long-time inclusion as a dual use item on the EAR rather than on the ITAR). So, to allow for export of a handgun made in 1889 without a license but require a full export license for a sporting shotgun made in the same year does not make sense. This could be accomplished by simply adding a "Note 1 to 0A502" stating such. Or, if the existing "Note 1 to 0A501" is meant to include antique shotguns (it does not explicitly leave them out and states "antique firearms" generally), then it should be made more clear to this end.

### 3. Align availability of LVS at $500 to 0A502 shotgun-related items.

ECCN 0A501 allows a list based license exception for LVS at a $500 threshold for 0A501.c, .d, and .x (and including .e if the ultimate destination is Canada). We greatly appreciate this being brought over from the comparable exemption(s) in the ITAR, and understand the justification for simplifying to a net $500 value (vs. 'wholesale' value under the ITAR).

However, ECCN 0A502 for shotguns does not allow for LVS at any amount for comparable items. While we recognize that many small shotgun parts are not listed and thus EAR99, the proposed rule would control shotgun trigger mechanisms, magazines and magazine extension tubes more stringently than comparable parts for 0A501 rifles and handguns. For example, a $45 two-round extension tube for a Remington 870 shotgun (such as this item) would require an export license, while a case of 0A501.d rifle magazines worth $450 could be exported without a license under LVS.

*surprisingly simple.*™

WASHSTATEC000309



Thus, we suggest aligning availability of LVS at $500 to 0A502 shotgun-related items. Since these parts are currently listed in the ECCN 0A502 heading, the heading could be changed to "Shotguns and related commodities (See List of Items controlled)…" then under the "List of Items Controlled" enumerate the items to include "complete trigger mechanisms", "magazines", and "magazine extension tubes" with corresponding reasons for control allowing LVS for such items to the same $500 limit as for 0A501 items.

### 4. Align dollar value threshold of LVS for 0A505 ammunition components to $500.

We greatly appreciate the inclusion of 0A505.x ammunition components in the LVS exception for that ECCN. However, we find the $100 limit to be low in many instances. Typically, to justify the cost of an international shipment, an order for such items is usually between $100 to $500. Per-unit cost of items such as unprimed brass can also be relatively high, particularly for specialty items likely to be sourced for a small shipment. For example, a recent shipment of Norma USA .470 Nitro Express reloading brass was $5.44 per piece. They come in boxes of 25, so just two small boxes are worth $272. Thus such a shipment would require a license if the LVS threshold is kept at $100. We request that it be aligned to the other related LVS thresholds for firearms-related items at $500 for consistency and usability.

### 5. Define 'Complete Breech Mechanism' (for 0A501 and 0A502).

The ITAR has long used the term "complete breech mechanism" without any definition to guide industry as to the meaning of this non-standard terminology. As this proposed rule continues to use this term, we request that a definition be provided. Over the years we have received varying definitions from representatives of DDTC. Our attempt to obtain an official written definition by means of an Advisory Opinion request was directed to instead be submitted as a request for an item-specific Commodity Jurisdiction. The most clear definition we've received to date is something comparable to a "complete bolt" or "complete bolt carrier group."

To the extent that what is meant by "Complete Breech Mechanism" may possibly be covered by the enumerated items in 0A501.c, it could possibly even be deleted altogether. However, presuming that something additional is meant by this term being kept in a separate 0A501.e (and in the heading of 0A502), a definition is required for industry to properly comply with the proposed rules.

### 6. Add License Exception 'Servicing and replacement (RPL)' as a valid purpose for a temporary import under new § 758.10.

License exception RPL (§ 740.10(b)) allows for 'Servicing and replacement' including overhaul and reconditioning, so long as it does not change the basic characteristics (e.g. accuracy, capability, performance, or productivity) of the commodity. This is similar to comparable ITAR temporary import license exemption found at 22 CFR 123.4(a)(1).

*surprisingly simple.*™

WASHSTATEC000310



So, it is our understanding that a firearm could be sent from a foreign sender to a United States party for servicing – a temporary import. However, the new § 758.10 "Entry clearance requirements for temporary imports" do not address the potential use of RPL for this purpose. Specifically, proposed § 758.10(b)(1)(i) requires a statement to CBP certifying "…This shipment will be exported in accordance with and under the authority of License Exception TMP." However, if it was going under RPL rather than TMP, this statement would be a false certification.

## 7. Clarify the classification of Combination Guns.

From time to time we deal with firearms known as "combination guns". Such firearms have at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel). While our reading of the proposed rules would leave us to believe 0A501 is the best fit for such items, we suggest that BIS add clarity on their proper classification.

This could be accomplished by changing the heading of ECCN 0A501 to instead read "0A501 Firearms (including combination guns, but excluding 0A502 shotguns) …". Or, a "Note 2 to 0A501" could be added to the bottom of that ECCN to ready something like "Combination guns (those with at least one rifled barrel and at least one smoothbore barrel) are controlled by this ECCN." Alternately, if they should instead be classified under 0A502 or otherwise, this should be clearly noted in the final rule.

## 8. Clarify that new § 758.10 requirements do not apply to temporary imports under the provisions of ATF Form 6 NIA (27 CFR 478.115(d)).

The proposed rules appropriately add §740.14(e)(4) to clarify that nonresident aliens leaving the United States may export 0A501 firearms and ammunition that they imported under the provisions of 27 CFR 478.115(d). However, the new § 758.10 "Entry clearance requirements for temporary imports" appears to apply to *all* temporary imports at the time of temporary import.

As the requirements of § 758.10 should not apply to nonresident aliens temporarily importing firearms under the separate provisions of the ATF, this should be clarified in the final rule. Wording to this effect could be added to § 758.10(a), 'Scope', whether within the body of (a) or as a new subparagraph (3). This would eliminate confusion wherein CBP may attempt to enforce the provisions of § 758.10 on nonresident aliens bringing firearms into the U.S. with an approved ATF Form 6 NIA for a hunting trip or shooting competition.

If this was not an oversight but rather the intent of BIS that § 758.10 would apply to such nonresident aliens, we strongly urge BIS to reconsider their position. Much like the challenge of the AES filing requirement for personal firearms being temporarily exported, requiring foreign persons to follow commercial procedures for temporary import and re-export (including AES filing) would be extremely cumbersome. New § 758.10 should not apply to such cases, and it should be made clear as such.

*surprisingly simple.*™

WASHSTATEC000311



## 10. Clarify whether 0A501.y includes only the specific enumerated y.1 through y.6, or all "specially designed" "parts," "components," "accessories" and "attachments".

ECCN 0A501.y lists six specific types of specially designed "parts," "components," "accessories" and "attachments" in various sub-paragraphs y.1 through y.6. However, the .y paragraph is not clear whether these are the only items controlled under .y, or if others not enumerated are included. While we do not believe this is intended to be a 'catch-all' like .x, it is not as clear as the .y sections of other ECCNs which tend to use the wording "as follows" when applicable preceding an enumerated list.

For example, a set of fiber-optic sights for a pistol are not "iron sights" as listed in y.3, but may be "specially designed" "attachments." Would such an item be controlled under .y? Even though Controls only apply to .y for UN and AT purposes, whether such non-enumerated "attachments" require AES filing, etc. for most countries depends on the clarification of this .y sub-paragraph.

## 11. Explicitly clarify the classification of detachable firearm magazines with capacity ≤ 16 rounds.

Another potential "attachment" item that would benefit from explicit clarification in this regard is detachable magazines for 0A501 firearms with a capacity of less than or equal to 16 rounds. While 0A501.d explicitly lists magazines with a capacity of greater than 16 rounds, common magazines with a lesser capacity are sure to be one of the most shipped items related to firearms.

We have already heard varying interpretations from highly reputable firms within the industry as to whether such magazines would be controlled. For example, those who interpret such magazines as an "attachment" (they are not necessary for the operation of a firearm, but do enhance their usefulness), and who understand the .y paragraph to only include those specifically-enumerated items (see above), have stated that such magazines are EAR99. On the other hand, those who interpret .y to include all "specially designed" "attachments" in addition to those specifically enumerated, believe that such magazines are controlled under .y and require AES filings regardless of destination.

To eliminate this confusion, a "Note" could be added to the bottom of the ECCN, such as "Note 3 to 0A501: Detachable magazines with a capacity of less than or equal to 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry are classified as "attachments" and are EAR99 commodities."

## 12. Eliminate duplicative new § 762.2(a)(11) recordkeeping requirement.

Proposed new § 762.2(a)(11) would add as an EAR record the "serial number, make, model and caliber for any firearm controlled in ECCN 0A501.a" and for certain shotguns. However, the Government already requires such records to be kept under the provisions of the Gun Control Act (GCA). Thus, the requirement that exporters maintain such as an EAR record is unnecessarily duplicative and

*surprisingly simple.*™

WASHSTATEC000312



burdensome. Under the time-tested provisions of the GCA, the government already has access to such records for inspection as needed.

## Proposed Effective Date of Final Rule

We suggest that BIS implement a split effective date for the Final Rule, as was done for the 2014 final rule in 79 FR 37535. In the case of the proposed rule now at hand, many companies will require the full 180 days to make changes to their internal systems and classification matrixes. As such, a 180 day effective date should be allowed for such companies. On the other hand, smaller companies who are most burdened by the registration costs and other requirements of the ITAR, will be more agile and able to switch over earlier. For example, gunsmiths who do no exporting but are currently required to register and pay related fees to DDTC would benefit greatly from an immediate (or very short) effective date of the final rule. To the extent possible, a split effective date (immediate / 180 days) would be advisable.

Regardless of the effective date published in the final rule, we respectfully request that BIS and DDTC complete their review of comments and publish a Final Rule as soon as is reasonably possible. Given the long-awaited nature of these rules, prompt publishing of the Final Rule after appropriate review and consideration of all comments would be greatly appreciated and beneficial to both industry and government.

## Summary and Conclusion

While we have raised a number of important concerns specific to the implementation of this proposed rule, we wish to emphasize again our overall support of the transition of these items from the ITAR to the EAR. The justification provided is clear and absolutely sensible. Regardless of recent politicization of the issue by some in Congress and the media, this has truly been an historic bipartisan effort over many years, starting in the earliest days of the Obama administration and now coming to fruition under the current administration.

On a separate but related note, BORDERVIEW also requests the publishing of BIS' already-drafted 'shotgun rule' to allow the Canadian IIC to act as the export authorization for shotguns to Canada.

BORDERVIEW looks forward to your publishing of the Final Rule after careful review of our enclosed comments, and those of other impacted parties. Please do not hesitate to contact me with any questions.

*Joel VanderHoek*

**Joel VanderHoek**
President & Operations Manager
BORDERVIEW │ *International Firearm Logistics*
joel@borderview.com   phone: + 1 (877) 947-4867

*surprisingly simple.* ™

WASHSTATEC000313

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 6/21/18 8:21 AM |
| **Received:** June 12, 2018 |
| **Status:** Posted |
| **Posted:** June 21, 2018 |
| **Tracking No.** 1k2-93op-skgd |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Web |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0075
Public comment 69. Anonymous. 6-12-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Im 60 years old and semi-retired. I operated a gunsmith shop in my early twenties but gave it up to better support
my family. However, I always intended to go back to gunsmithing later in life. Finally that happened, I spent
quite a bit of money that would have funded my retirement starting my business. I had a new building built, I
bought and learned to use 3 manual lathes and a mill with the intention of getting a manufacturers FFL and
making a few custom firearms a year, restoring and selling a few older firearms a year and doing general repairs.
I figured I would make $5000 to $10,000 a year to supplement my retirement while doing a job my community
needed. I probably spent $85,000 or so on my building, equipment and tools.

However, the Obama administration changed the interpretation of the ITAR rules and started requiring holders of
FFL-07 licenses (manufacturing FFL) to send nearly $3000 per year to the state department in ITAR fees. This
could well have been half or more of my yearly profits and meant I had to settle for a type 01 FFL and be a
gunsmith only. At that time, as a gunsmith I could do nearly any repair, customization or improvement for a
customer on his/her firearm but could not improve, customize or refinish a firearm and then sell it as that would
make me a manufacturer. Although this wasnt the future Id worked towards for nearly 40 years, it was better
than nothing.

Then, in July of 2016 the Obama administration again reinterpreted the existing rules and decided to bring
virtually all the jobs gunsmiths do under the ITAR umbrella. This was obviously intended to bankrupt the
nations gunsmiths, and, I suspect to chill the pre-election free speech of Gunsmith/2nd Amendment activists such
as myself. It did not suppress my free speech but it did cause me to start turning away 90% of my potential
customers. Under these rules refinishing firearms and replacing parts is about the only thing a gunsmith is now
allowed to do. According to the 2nd Obama reinterpretation of the ITAR rules even making a screw or stock for
a 150 year-old firearm could be interpreted as a violation.

WASHSTATEC000314

Since these rules took effect in July of 2016 I dont believe I have made a monthly profit, even once. Threading barrels, customizing, , making stocks, dovetailing sight groves, re-chambering, making obsolete parts and the like are all still banned to my knowledge. And, with the exception of the occasional machine shop work, my three lathes and my mill are still idle.

I am again considering closing my shop because of this. My insurance alone is nearly a grand a year and Im not sure how long I can survive while waiting on this to be fixed. Please, lets get the State Department out of the gunsmith business and again allow a gunsmith to make and sell a few custom firearms a year without being bankrupted by ITAR.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 7/12/18 5:50 PM |
| **Received:** July 12, 2018 |
| **Status:** Posted |
| **Posted:** July 12, 2018 |
| **Tracking No.** 1k2-948l-yoa8 |
| **Comments Due:** July 09, 2018 |
| **Submission Type:** Unknown |

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0458
Public comment 978. Brownells. Robert McAllister. 7-9-18

## Submitter Information

## General Comment

See Attached

## Attachments

Public comment 978. Brownells. Robert McAllister. 7-9-18

WASHSTATEC000316



## Proposed Rule 83 FR 24166 : RIN 0694–AF47

Regulatory Policy Division, Bureau of Industry and
Security, U.S. Department of Commerce,
Room 2099B, 14th Street and
Pennsylvania Avenue NW, Washington, DC 20230

Steven Clagett,
Office of Nonproliferation Controls and Treaty Compliance,
Nuclear and Missile Technology Controls Division
(202) 482–1641
*steven.clagett@bis.doc.gov*

It's fair to say Brownells, Inc. has utilized the fullest extent of the ITAR in our industry. We processed thousands of export licenses over the years, covering hundreds of manufacturers and thousands of products. We currently have a very broad WDA including categories I and III with a distribution territory covering nearly all of Europe.

Generally we applaud the changes proposed but have a few comments:

1. Our interpretation of the proposed change regarding firearms magazines is that .x includes magazines under 15 rounds. However, there appears to be no current difference in how .d and .x are controlled (regarding regions, LVS, etc.). State Department licensing policy regarding magazine capacity has often fluctuated within the bounds of the published regulation. Would it be more flexible to remove a regulatory category within the same ECCN that is based on a specific magazine capacity?

2. 0A502 is confusing at first glance (especially in considering the parts of shotguns) - why not incorporate a ".a", ".b", ".c", etc. for shotgun attributes like barrel length?

3. How are accessories of optics, like sunshades or other anti-glare devices to be treated? A simple note might save some time in creating CJs specific to this type of product.

4. Regarding 0B501 .e – What is the definition of "production" equipment? We have many hobbyist customers who wouldn't qualify as a gunsmith let alone as a manufacturer and tools

WASHSTATEC000317



and equipment designed for hobbyists are quite different than manufacturing equipment... Yet we have a concern these tools will be included in 0B501.e because even the hobbyist is "producing" a firearms part.  If there could be some guidance for "production" equipment that clarifies the scope to manufacturing – perhaps "production" would be defined as repeated production of the same or similar parts in multiple quantities per day – this would help clarify the intent a great deal.

5.  Serial number reporting for all firearms will cause an additional burden – especially as this is a duplication of effort for permanent exports FFLs will already recording this in the BATFE required A&D "bound book".  Could this reporting be limited to TMP exports?  Also, the reporting of Make/model/caliber information in AES will be burdensome considering the scope and variety of our daily shipments.

**6.**  On potential issue is with the record keeping requirement of warranty certificates.   An exporter may not have a manufacturer's (or any other) warranty certificate as part of the transaction.  Perhaps some clarification is needed here that this is required only for the manufacturer when they export?

7.  How is "technology" defined for 0E501/505?  For example: shooting chronographs or empty brass cartridge annealing machines "technology"?

Best regards and thank you for your efforts,

Robert McAllister

VP-Strategic Development
Brownells, Inc.

200 South Front Street • Montezuma, IA  50171-1000 USA
Main: 641.623.5401  •  Fax: 641.623.3896  •  Orders: 800.741.0015
**www.brownells.com**

WASHSTATEC000318

Message

---

| | |
|---|---|
| **From:** | Timothy Mooney [Timothy.Mooney@bis.doc.gov] |
| **Sent:** | 7/30/2018 5:28:53 PM |
| **To:** | Monjay, Robert [MonjayR@state.gov] |
| **CC:** | Heidema, Sarah J [HeidemaSJ@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **Subject:** | RE: Comments on Cat I-III rule. How are you guys coming on your comments? (3 of 4) |
| **Attachments:** | Tab 3_Detailed NOT supportive_Commerce firearms comments.pdf |

Here is 3 of 4.

Tim

**From:** Timothy Mooney
**Sent:** Monday, July 30, 2018 1:25 PM
**To:** 'Monjay, Robert' <MonjayR@state.gov>
**Cc:** 'Heidema, Sarah J' <HeidemaSJ@state.gov>; 'Hart, Robert L' <HartRL@state.gov>
**Subject:** RE: Comments on Cat I-III rule. How are you guys coming on your comments? (2 of 4)

Here is 2 of 4.

Tim

**From:** Timothy Mooney
**Sent:** Monday, July 30, 2018 1:20 PM
**To:** 'Monjay, Robert' <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Comments on Cat I-III rule. How are you guys coming on your comments? (1 of 4)

Thanks, Rob.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Tim

**From:** Monjay, Robert <MonjayR@state.gov>
**Sent:** Monday, July 30, 2018 1:00 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Comments on Cat I-III rule. How are you guys coming on your comments?

Tim,

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Rob

**Official - SBU**
UNCLASSIFIED

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Monday, July 30, 2018 9:42 AM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** Comments on Cat I-III rule. How are you guys coming on your comments?

Hi Rob,

████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

███████████████

██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



Thanks,
Tim

WASHSTATEC000321

# PUBLIC SUBMISSION

As of: 7/18/18 9:12 AM
Received: July 02, 2018
Status: Posted
Posted: July 11, 2018
Tracking No. 1k2-941t-jj67
Comments Due: July 09, 2018
Submission Type: Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0246
Bulk comment 60_Representative sample (1)

## Submitter Information

**Name:** Rachel Graber

## General Comment

See attached file for comments

## Attachments

Comment on BIS-2017-0004

WASHSTATEC000322

As a domestic violence prevention advocate, I know full well the toll gun violence takes on women across the world. Abusers' use of firearms to threaten, control, injure, and kill knows no borders or boundaries. I oppose the proposed rule for the following reasons:

1. The proposed rule treats semi-automatic assault rifles as "non-military." But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of firearms, about which comment has been requested, many countries prohibit civilian possession of semi-automatic rifles and handguns, as well as of any larger caliber firearm. Six U.S. states, the District of Columbia, and several large retail chains also prohibit retail sale of semi-automatic assault rifles. Many semi-automatic rifles are also easily converted to fully automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on related human rights concerns, as it recently did on the Philippines and Turkey.[i] Congressional action in 2002 required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to Congress. Items moved to Commerce control would no longer be subject to such notification. In a September 15, 2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate Congressional intent and effectively eliminate Congress' proper role.

3. The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government -- i.e., taxpayers -- will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

4. National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking. That will make it easier for unscrupulous dealers to escape attention.[ii]

5. The rule reduces end-use controls for gun exports. It would eliminate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Government's information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

6. The rule enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printing weapons, the State Department successfully charged him with violating arms export laws, since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is

WASHSTATEC000323

unlikely to make the same argument once those weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, this change could generate many preventable tragedies.

7.  The Commerce Department does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce.[iii] The BIS's enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Moreover, the State Department has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. Commerce does not have these resources.

8.  The proposed change will reduce transparency and reporting on gun exports. The rule would eliminate Congressional and public awareness of the total amount (dollar value and items) of firearms sales authorizations and deliveries around the world, since the Commerce Department annual reports currently only cover about 20 countries.

9.  This rule would transfer gun export licensing to an agency – the Commerce Department - whose principle mission is to promote trade. Firearms, both assault weapons and non-semi-automatic weapons, are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

10. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries.[iv]  The export of these weapons should be subject to more controls, not less.

---

[i] "US lawmakers balk at arms sales to Saudi Arabia, Turkey and Nigeria," *DefenseNews*, Sept. 26, 2017, https://www.defensenews.com/congress/2017/09/26/us-lawmakers-balk-at-arms-sales-to-saudi-arabia-turkey-and-nigeria/

[ii] "Arms Dealer Faces New Charges," *New York Times*, Aug. 23, 2010, https://www.nytimes.com/2010/08/24/us/24arms.html

[iii] Department of Commerce Budget in Brief FY2017, p. 57, http://www.osec.doc.gov/bmi/budget/FY17BIB/AllFilesWithCharts2.pdf

[iv] Ongoing resource on "Cross Border Gun Trafficking: An Ongoing Analysis of the Types of Firearms Illegally Trafficked from the United States to Mexico and Other Latin American and Caribbean Countries as Revealed in U.S. Court Documents," by the Violence Policy Center, http://www.vpc.org/indicted/

WASHSTATEC000324

# PUBLIC SUBMISSION

As of: 7/19/18 9:46 AM
Received: July 09, 2018
Status: Posted
Posted: July 11, 2018
Tracking No. 1k2-946g-ls8t
Comments Due: July 09, 2018
Submission Type: Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0313
Bulk comment 126_Representative sample

## Submitter Information

**Name:** Alice Dahle
**Address:**
  1401 Linmar Dr. NE
  Cedar Rapids, IA, 52402
**Email:** adahle48@gmail.com
**Phone:** 319-364-4999
**Organization:** Amnesty International USA

## General Comment

See attached file(s)

## Attachments

Final Response to weapons sales proposals

WASHSTATEC000325

July 9, 2018

For thirty-five years I have been a member of Amnesty International USA and currently chair our Women's Human Rights Coordination Group. Amnesty International is the world's largest grassroots human rights organization, and our global movement consists of millions of members and activists who defend justice, dignity and freedom for everyone without exception. The Women's Human Rights Coordination Group's particular area of interest is in the human rights of women and girls.

We are concerned about recent proposals to move responsibility for oversight of licensing of international sales of some small arms and light weapons from the Department of State to the Department of Commerce and the removal from the US Munitions List (USML) of several semi-automatic firearms, including AR-15s, some AK-47s and high capacity ammunition cartridges. Since 2014, the U.S. has been one of the world's largest arms dealers, and is responsible for approximately 30 percent of conventional arms transfers with regards to monetary value. Consequently, these changes would make sales of these weapons easier and expand access to them at their destination. They would also reduce accountability for their use in commission of human rights abuses.

It is now recognized that rape and sexual assault are systematically used as weapons of war in conflicts around the world. Attacks on women and girls terrorize families, communities or ethnic groups, humiliating and demoralizing local residents to bring them under control, or causing them to flee from disputed territory

In interviews with women and girls who have survived sexual violence during conflict, a very high number of their stories include descriptions of the torture they endured at the point of a gun. Although the particular models of firearms involved are seldom identified, there is no doubt that a military-style weapon contributed to gross violations of their human rights. Even after a conflict has officially ended, the weapons left behind are used all too often by perpetrators of domestic violence. Colombia receives a large proportion of their weapons from the U.S. These guns are often linked to the patriarchal culture that supports the notion that firearms help men to defend themselves and protect their families. However, these weapons exacerbate violence against women and girls. In Colombia, 2 out of 10 women who are internally displaced identify sexual violence as the primary cause. The exact model of firearm used in violence against women and girls is irrelevant, and all military-style weapons and ammunition currently on the US Munitions List should remain there.

Amnesty International was actively involved for two decades in negotiating the global Arms Trade Treaty (ATT), which went into force in December 2014. This treaty requires that before authorizing a transnational sale of firearms, governments must assess the risk that the weapons under consideration would be used to commit or facilitate serious violations of international humanitarian or human rights law, undermine peace and security, or to engage in transnational organized crime. An "overriding" risk that the arms would be used for these purposes would prohibit the sale.

After intense lobbying by women's human rights organizations and activists during the drafting of the ATT, it became the first treaty that recognized the link between the international arms trade and gender-based violence. Article 7(4) of the treaty made it mandatory for arms exporting countries to assess the risk that weapons being considered for sale would be used to commit or facilitate gender-based violence and deny authorization in the case of an "overriding" risk.

Moving responsibility for authorizing international sales of additional weapons and ammunition from the Department of State to the Department of Commerce would bypass the requirement to assess the risk that the merchandise in question would be used to commit or facilitate human rights violations, including gender-based violence. It is essential that these standards continue to be upheld, and we strongly urge the Government to maintain responsibility for international sales of weapons and ammunition manufactured in the US with the Department of State.

Sincerely,

Alice Dahle, Chair
Women's Human Rights Coordination Group
Amnesty International USA

# PUBLIC SUBMISSION

As of: 7/11/18 3:44 PM
Received: July 09, 2018
Status: Posted
Posted: July 11, 2018
Tracking No. 1k2-946j-2rr6
Comments Due: July 09, 2018
Submission Type: Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0316
Bulk comment 128_Representative sample (1)

---

## Submitter Information

**Name:** Susan Waltz
**Address:** United States,
**Email:** swaltz@umich.edu
**Phone:** 517 980 0309

---

## General Comment

Comments attached. (I believe I previously submitted these but am sending again as I do not have a receipt.)

---

## Attachments

Comment_on_regs_6-30-18

WASHSTATEC000327

30 June 2018

To:        DDTCPublicComments@state.gov
           Office of Defense Trade Controls Policy, Department of State
                 and
           Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of
           Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington DC
           20230

Subject:   ITAR Amendment - Categories I  II, and III
           EAR Amendment - RIN 0694-AF47

I am writing to submit comments on the proposed changes to ITAR (USML) and EAR (CCL) recently
published in the Federal Register. I write in a personal capacity but the views expressed are informed by
my research, policy analysis, and teaching as a professor at the University of Michigan, Gerald R. Ford
School of Public Policy.

By way of a few introductory remarks, I am familiar with the complexities of US arms export laws and
policy, as well as the regulatory framework.  There is a legitimate need for periodic updates of the USML
and—in view of the labyrinth of entangled laws, regulations, and agencies involved in the current
system—I am supportive of the reform initiative.  I am generally more concerned about keeping weapons
out of the hands of those who would misuse them than in making them easier to procure, but that end is not
at odds with the objective of putting in place a single control list and a single administrative agency. The
reform effort has not progressed to that point, however, and I am wary about these proposed regulatory
changes as an interim step. I will also add that I have been following the export control reform project
since it was announced in 2009 and this is the only time I have felt the need to express concerns about the
proposed changes. That is largely due to the particular, complete and recognizable, weapons that are being
considered for change.

**1.       I urge you to delay the effective date of the proposed changes until the Government
Accounting Office or the Library of Congress has publicly reported to the Congress their impact on
numerous statutes referring to "defense articles."**

If enacted, the changes would have implications for several provisions of law.  From my reading of both
sets of proposed regulations, I am not reassured that the implications have been fully considered. The
USML is formally defined in the AECA (22 USC 2778) as a definitive list of defense articles,[1] and from a
quick search of US statutes the term "defense article" appears in some 45 sections,[2] in many instances (but

---

[1] 22 USC 2778(a)(1).

[2] Office of the Law Revision Counsel, United States Code, http://www.uscode.house.gov.

WASHSTATEC000328

not always) explicitly linked to the USML. In addition, several provisions of the AECA itself are explicitly linked to an item's presence on the USML (without necessarily referring to "defense articles"). On a separate statutory track, the Foreign Assistance Act was recently amended to include CCL 600 series items as defense articles, along with all items contained on the USML [22 USC 2304.(d)(2)(C)], but the legislation did not anticipate the new 500 series so there is likely a gap there with regards to Congressional intentions. To complicate things further, the US Munitions Import List (USMIL) makes liberal use of the term "defense article," defined as articles on the USMIL—which currently include the same items that are slated to lose the "defense article" designation that extends from inclusion on the USML – so that items designated as defense articles on the USMIL will not be considered defense articles for purposes of export.[3]

It is very challenging to sort out the tangle.  Some of the instances where terms and definitions are at variance may not prove significant, but others may have far-reaching implications. Due to the disparate definitions and linkages, the proposal to remove specified firearms from the USML raises some important questions about the continuing applicability of provisions of law that refer to "defense articles," a term that currently encompasses such firearms.  In numerous situations the current statutory treatment of non-automatic firearms would be altered – or at least become ambiguous—as a result simply of moving these weapons from Category I of the USML to the 500-series on CCL. Statutory provisions that could be affected by the proposed change range from Export-Import Bank financing of defense article sales to human rights conditionality on security assistance, to the provisions for third-party transfer of grant-supplied defense articles, and various reports to Congress.  (See references in the footnote below.[4]) In some cases, the law in question is not directly linked to arms exports, but the relevant statute refers to defense articles and links the definition to items on the USML. In this way, removing specified firearms from the USML is likely to have a host of unintended and unanticipated repercussions.

Further, if semi-automatic weapons and other non-automatic firearms are removed from the USML it will impact the ability of law enforcement to charge weapons traffickers with violating the AECA as was done in several of the cases cited in a recent report from the Department of Justice on export enforcement.[5]

---

[3] 27 CFR 447.11 and 27 CFR 447.21.

[4] The numerous places where the meaning of "defense article" would be called into question by the proposed rules include:

- Export-Import Bank financing of defense article sales, including multiple end use considerations and other conditions (12 USC 635);
- Requirement to give Congress notice of commercial firearms sales of $1,000,000 or more (22 USC 2776)
- Annual report to Congress on military assistance, and specifically on transfers of USML Category I firearms (22 USC 2415)
- Provisions for supplying defense articles on a grant-basis, and multiple restrictions (22 USC 2314)
- Conditions for third-party transfer of defense articles provided on a grant basis (22 USC 2314)
- Certification of end use as a condition of sale or lease of defense article (22 USC 2753)
- Post-delivery verification of credible reports of misuse of weapons (22 USC 2753)
- Brokers of items included on the USML are required to register and activity must be licensed; exporters of USML items must identify all consignees and freight forwarders in license application (22 USC 2778)

[5] Department of Justice, "Summary Of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018, https://www.justice.gov/nsd/page/file/1044446/download .

WASHSTATEC000329

As Acting Assistant Secretary for Political-Military Affairs Tina Kaidanow explained to the House Foreign Affairs Committee last June,[6] the US arms export architecture is very complex and involves what her predecessors have described as "cradle to grave" oversight of exported US *defense articles*. Removing that designation *defense article* from non-automatic weapons has the effect of detaching them from the US Munitions List and the regulatory framework built around it: there may well be significant unintended consequences.

In the event that consideration of the proposals is not delayed, I would recommend several other changes to the proposed ITAR and EAR revisions.

**2.     Retain existing USML I(a) and (d) unchanged; retain the existing coverage of USML II(a) unchanged; delete proposed 0A501.a and .b; and limit proposed 0A502 to renumbering existing 0A984.**

My concern here is based on principle and definition. Several of the weapons that would be moved to CCL are military-style weapons that are either used in battlefield situations or are substantially comparable to weapons as used in battlefield situations – including semi-automatic assault rifles and bolt-action sniper rifles. All of USML I(a), I(d), and II(a) are currently designated "significant military equipment" due to "their capacity for substantial military utility or capability," per the ITAR definition.[7] The prevalence of armed extremists and insurgents who depend on weapons currently included in USML Categories I and II makes the military utility or capability of these weapons as relevant as ever. Due to their size and long shelf life, firearms are easily diverted and resold on black markets around the world. The Department of Justice's January 2018 summary of major US export enforcement cases noted above includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international on the dark net, and another similar case from Kansas.[8]

While the US military may not derive great advantage from most of these weapons, they still have the military utility and capability of threatening the lives and welfare of many people around the world.   It is in the interest of the US and American citizens to keep the tightest control on them. Indeed, it is for that very reason that the same weapons being proposed for removal from the US Munitions List are expected to remain on the US Munitions *Import* List, where their entry into the US will remain tightly controlled. It is also for that reason that a growing number of states are imposing limitations on the retail availability of these weapons and many retailers are voluntarily removing them from their shelves.  They should remain where they are, on the USML.

**3.     Before proposed regulatory changes are adopted, an opinion should be obtained from the**

---

[6] "Foreign Military Sales: Process and Policy," testimony from Tina S. Kaidanow, Acting Assistant Secretary, Bureau of Political-Military Affairs, Statement Before the Subcommittee on Terrorism, Nonproliferation and Trade, House Foreign Affairs Committee, June 2017. https://www.state.gov/t/pm/rls/rm/2017/271928.htm.
[7] 22 CFR 120.7 at https://www.gpo.gov/fdsys/pkg/CFR-2004-title22-vol1/pdf/CFR-2004-title22-vol1-sec120-7.pdf .

[8] Department of Justice, op. cit..

**Department of Justice concerning the legality of applying ITAR brokering restrictions to exports of firearms transferred from the USML to the CCL. Furthermore, Congress and the public should be informed as to how the proposed arrangements will address the risk of diversion.**

There are several reasons to be concerned about the proposed rules pertaining to brokering. From their origin in the 1930s, a major intent of efforts to regulate arms exports has been to curtail illicit and undesirable trafficking in weapons. In the 1980s and 1990s, illicit flows of small arms flooded international markets, with calamitous effects in every region of the world. The rate of flow may have slowed since the 1990s, but as the 2018 Justice Department report attests, the efforts to supply contraband firearms are very much alive in our own time. From a global perspective, brokering laws are considered a weak link in the regulatory apparatus, to the extent that in the 1990s there was some talk of negotiating an international treaty focused entirely on arms brokering. Provisions written into US law around that time were considered some of the strongest in the world. With the transfer of specified semi-automatic and non-automatic weapons to CCL, the brokering laws would no longer be applied to these weapons (or would be applied only in a much-weakened version) and they would not be available to law enforcement for prosecution purposes.

**My specific concerns with the proposal to apply existing AECA/ITAR brokering rules to items intended for transfer to the CCL are twofold, related to the dubious statutory underpinnings of the proposed rule change and to its practical implications.**

(a) The first concern is a matter of statutory coherence and proper statutory authority. The brokering clauses of the AECA require commercial brokers involved in the transfer of defense articles to register with the State Department and apply for their transactions to be licensed (22 USC 2778).[9] The AECA brokering provisions are explicitly linked to defense articles on the USML (and by implication, ITAR). Because the proposed changes to ITAR and CCL would remove specified non-automatic and semi-automatic firearms from the USML, on the face of it, it would seem that commercial brokers of these items would be released from ITAR registration and brokering requirements. To prevent this outcome, the State Department proposes a patch, by asserting that the AECA brokering provisions will also apply to the US Munitions *Import* List (which, as noted above, will continue to include the items that—for export purpose—are deemed no longer to warrant control under the USML). The intended effect is that brokers wanting to *export* items included on the list of items controlled as defense articles for *import* (but not for export) will be subject to the rules pertaining to the export of such items. The logic is convoluted at best, and it raises questions about the statutory grounding for requiring brokers who are exporting items "no longer warranting control under USML" to register with the State Department and comply with related ITAR requirements. Given the complexity of the issue and the risks associated with brokering activities, it would seem advisable and prudent to seek a legal opinion within the Executive Branch to ensure that the provisions of the AECA pertaining to brokers—including the registration requirement-- can be applied robustly to all involved in the wide range of brokering activities associated with the *export* of items on the

---

[9] Per 22 USC 2778 (b)(1)(A)(i), "...every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President under subsection (a)(1), or in the business of brokering activities with respect to the manufacture, export, import, or transfer of any foreign defense article or defense service (as defined in subclause (IV)), shall register with the United States Government agency charged with the administration of this section, and shall pay a registration fee which shall be prescribed by such regulations.

WASHSTATEC000331

US Munitions Import List.[10] Such a legal opinion should be obtained and considered before the regulatory changes are adopted.

(b) The second issue about brokering rules relates to the practical effects of the numerous proposed changes to ITAR section 129. It is hard to imagine, in the first place, the steps by which the licensing of a transaction will be handled by Commerce and any brokering aspects (including completion of information required by 22 CFR 129.6) will be handled by State. It boggles the mind to consider how this might actually amount to a time-saving simplification of rules. I am primarily concerned about the proposed amendment 129.2(b)(2)(vii), however, which appears to negate the controls on brokering for transactions subject to EAR and open a significant loophole for unscrupulous brokers. If I have understood the proposed changes to Section 129.2 correctly, if a Michigan-based retail sports outlet licensed to sell firearms in the US wanted to sell, say, AR-15 semi-automatic rifles to clients in another country, then so long as the Michigan retailer could secure approval via the BIS licensing process, the various parties involved in shipment, financing, and possibly transshipment would be exempt from any registration and approval requirements. Nor would they necessarily be known to licensing and enforcement agents based in the Commerce Department. What in this scenario would deter an unknown and independent handler from diverting the weapons to unauthorized end-users? I would like to assume that government officials in the State and Commerce Departments have thought through the implications of the proposed rules as they might be bent for nefarious purpose as well as their service for industry cost and convenience, but the published rules do not provide assurance in that regard. **More clarification is needed about how the brokering regulations will be applied, how the inter-agency process will be managed, and the extent to which the proposed arrangements for registering and licensing brokers involved in acquiring, financing and transporting exported firearms will address the risk of diversion to non-authorized end-users.** One effect of transferring non-automatic firearms from the USML to the CCL is to remove them from the remit of the State Department's Blue Lantern program, which otherwise might be engaged to make post-shipment checks. It is not clear whether Commerce has a comparable program or what resources it will assign to monitoring the commerce in semi-automatic firearms.

4. **Amend proposals for EAR Section 734.**

BIS has indicated that items moving "to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to 'development' and 'production,' as well operation, installation, and maintenance 'technology.'" This approach would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology, or text files to produce via CNC milling the firearms removed from USML. Until now, this development has been blocked in the courts via application of ITAR provisions requiring export license. **Either the Department of Commerce should clarify that it views any software instructions for producing controlled firearms already to be within the ambit of the EAR, or EAR Section 734.7 should be amended to bring circulation of open-source, non-proprietary CAD and other electronic files under EAR control - possibly by establishing that electronic files for producing functional firearms are subject to EAR control as production technology.**

---

[10] When questions arose in 1996 as to the authority of the President to restrict munitions imports under the AECA, the Office of Legal Counsel in the Justice Department was asked to provide an opinion. A similar request for opinion is warranted here. See https://www.justice.gov/sites/default/files/olc/opinions/1996/02/31/op-olc-v020-p0049_0.pdf .

WASHSTATEC000332

5.    **Amend provisions for License Control – Crime Control**

Shotguns controlled under 0A502 are subject to the Crime Control because they are not controlled by Wassenaar. It is not evident, however, why items 0A501a are controlled for Regional Security but not Crime Control, as firearms are a main element of crime control equipment used by police and security forces. Moreover, federal statutes explicitly prohibit the export of crime control equipment to police and security forces in countries whose governments have a consistent pattern of gross violations of internationally recognized human rights, with exceptions requiring Presidential certification. **To bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 USC 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], items in 0A501A should be subject to Crime Control.**

6.    **Include information from enhanced reporting on certain firearms exports in annual 655 Report.**

Enhanced reporting of items in the 501 series is potentially one bright spot in the proposed regulations. Several proposed changes are welcome, including: proposed changes in EAR part 748 requiring information about required import licenses; proposed changes in reporting mandated in EAR part 758; the required use of EEI filing for 0A501.a firearms; and the proposed recordkeeping requirement in part 762.

If the proposed rules are ultimately accepted, the information provided to the Wassenaar Arrangement and the UN Register of Conventional Arms will provide more granular information about US commercial exports of firearms, which seemingly could be included without significant additional effort in the annual 655 report mandated by the Foreign Assistance Act, 22 USC 2415.

7. **The balance of costs and benefits significantly favors industry over the taxpayer.**

The two sets of proposed rules include calculations of expected costs and benefits of the changes. Having invested several hours parsing the proposed rules, I suspect that one major benefit of the changes will accrue to the attorneys who help clients wend their way through federal regulations. The registration system as it was initially set up was intended to pay for itself, via modest registration and licensing fees that covered the costs of recording and updating information on US arms manufacturers and reviewing details for proposed transactions. In some sense, it has been a fee-for-service arrangement. The proposed changes significantly alter that approach with regards to firearms proposed for transfer to the CCL.

Except for the presumably few brokers unable to qualify for the firearms registration exemption outlined in proposed changes to ITAR section 129.2, no registration or license fees will be collected. Some of the transactions may be straightforward, but the workload promises to be substantial, with 4000-10,000 applications and virtually every 0A501 transaction subject to at least regional security controls, with no license exceptions available. **Whereas under the current system fees paid by industry and brokers help offset the costs of processing the license applications, under the proposed system the expenses associated with reviewing license applications will be charged to the taxpayer.** In the current political

environment where government hiring is anathema, unless a streamlined new process delivers extraordinary returns, it is difficult to imagine how the tally could come out in the taxpayer's favor without significant sacrifice of quality control. With respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers. **In my view as a taxpayer, the ITAR fee structure is yet one more reason for retaining non-automatic and semi-automatic firearms on the USML, and should these weapons ultimately be transferred to the CCL, I urge public officials at the Commerce Department to explore charging a service fee for processing export license applications.**

### Conclusion

I appreciate the opportunity to comment on these rules. I am disappointed, however, that by and large they downplay the lethality of the weapons currently controlled in ITAR categories I and III. I realize that these documents were prepared for a different purpose than the materials posted to inform the global public about US government programs and policy, but **the difference between the tone and emphasis of the proposed rules and the public presentation of US policy on the export of small arms and light weapons over the past twenty years is striking.** By contrast to the public statements and documents, including the 2017 Congressional testimony by a State Department official, the emphasis in these regulations is on reducing transaction costs for industry rather than promoting the public good, including national security and public safety.

In response to public comments on the proposed regulatory changes, I hope that the Departments of State and Commerce will reconsider the proposal to transfer any complete weapons from the USML to CCL. In the event that the proposed regulations go forward substantially unchanged, I can only hope that other countries will tighten and strictly enforce their own import restrictions to reduce the risk of diversion and misuse.

Thank you,

Susan Waltz
Professor
Gerald R. Ford School of Public Policy
University of Michigan
Ann Arbor, Michigan

swaltz@umich.edu

# PUBLIC SUBMISSION

**As of:** 6/15/18 12:06 PM
**Received:** June 14, 2018
**Status:** Posted
**Posted:** June 15, 2018
**Tracking No.** 1k2-93pw-pup8
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List

**Document:** BIS-2017-0004-0042
Public comment 41. Amnesty International USA. A Akwei. 6-14-18

## Submitter Information

**Name:** Adotei Akwei
**Address:**
 600 Pennsylvania Avenue SE
 Suite 500
 Washington, DC, 20003
**Email:** aakwei@aiusa.org
**Phone:** 2025098148

## General Comment

Please find attached Amnesty International USA's concerns with the proposed changes to
CATI-III

Adotei Akwei
Deputy Director Advocacy and Government Relations
Amnesty International USA

## Attachments

Amnesty International USA Comments on CATI-III 06142018

WASHSTATEC000335



DATE: June 14, 2018

TO:     Directorate of Defense Trade Controls
        U.S. Department of State
        DDTCPublicComments@state.gov

        and

        Regulatory Policy Division
        Bureau of Industry and Security
        U.S. Department of Commerce
        Room 2099B
        14th Street and Pennsylvania Avenue NW
        Washington, DC 20230

FROM: Adotei Akwei, Amnesty International USA, Washington DC

I am writing on behalf of Amnesty International-USA to comment on proposed changes to the *International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III* issued by the Department of State and proposed regulations for the *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)*, both of which were published in the Federal Register on May 24, 2018.

As a global civil society organization focused on the promotion and protection of human rights, Amnesty International does not oppose the arms trade per se but calls for strong legally-binding controls to prevent arms being used for serious violations of international human rights and humanitarian law.  We do document

WASHSTATEC000336

the human rights impact of the irresponsible arms trade, raising concerns or calling for specific transfers that pose significant human rights risks to be halted.

Our comments and questions about the proposed changes to International Traffic in Arms Regulations and the Export Administration Regulations, thus, are all conveyed with potential human rights consequences in mind.  In particular, we are concerned that some of the proposed changes weaken existing controls on transfers, increasing the risk that irresponsible brokers of small arms and light weapons could evade regulation, and arms will be diverted to states or non-state actors with poor human rights records.  There is further risk of undermining US laws restricting transfers to foreign military units that have committed gross violations of human rights. Amnesty International has for many years called attention to the risks associated with untrammeled export of small arms and light weapons around the world. These arms have been associated with the deployment of child soldiers and the rise of insurgent groups.  They are easier to divert than larger weapons and often end up in the illicit market.

The proposed changes to Categories I-III of the ITAR introduced as part of the Export Control Reform Initiative would transfer some specific and completely operable military-style semi-automatic weapons from the USML to the CCL and thereby affect some statutory controls on what are now considered defense articles.  We do not believe that the line drawn between automatic and semi-automatic is as clear as the proposed regulations would suggest, and accordingly we are concerned that the changes would significantly diminish Congressional oversight of the transfer of these weapons.

Below we have elaborated and itemized our concerns for each set of proposed changes.

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

WASHSTATEC000337

**Comment on changes to ITAR proposed by Department of State and relevant to the changes proposed for the EAR/CCL.**

1. Our principal concern here is with the risk of proliferation and diversion that could be exacerbated by the transfer of semi-automatic weapons to the CCL from the USML, where such weapons currently meet the statutory definition of "defense article" and are subject to a number of oversight mechanisms. The term "defense article" is used explicitly in several statutes to require controls on brokering, Congressional notification, and inclusion of an item on the US Munitions Import List controlled by the Bureau of Alcohol, Tobacco and Firearms.  In addition, semi-automatic weapons are currently included as defense articles in Directorate of Defense Trade Control's annual 655 report and are currently included, as defense articles, in the definition of security assistance (22USC 2014 and 22 USC 2304). The explanatory text accompanying the rules proposed by the State Department did not comment on the ancillary effect of removing semi-automatic weapons from the USML, but the implied changes are of concern to us. Several of these concerns are elaborated below.

2. Brokering Laws.  The proposed changes to Categories I, II and III mean that brokers of semi-automatic weapons and related ammunition will be exempt from registration and licensing that is currently triggered by their inclusion as defense articles on the USML.  On many occasions over the past two decades, human rights advocates have called attention to national brokering laws as a weak link in the chain of efforts to curtail illicit market transfers of small arms and light weapons. [See Amnesty International's 2010 report, "Deadly Movements."]

   Since 1996, US brokering laws have been seen among the strongest in the world.  They apply to US agents wherever they are located as well as to foreign nationals operating from within the US; and they cover the full range of facilitating activity--including finance, insurance, transport and

WASHSTATEC000338

trans-shipment (freight-forwarding).  The US statutory provisions on brokering are robust, but their application is directly and specifically linked to the USML.  Regulatory authority over brokers in the Export Administration Regulations that house the CCL is without a clear statutory basis.  Consequently, we are concerned that moving semi-automatic weapons and related ammunition to the CCL – and simultaneously *removing* them from the USML – will lead to the US government relinquishing its regulatory authority over brokers of these weapons.  This is of particular concern because many of the proposed changes to Categories I-III pertain to completely operable weapons or ammunition, and not simply components or software.

We agree with the State Department's past assessment that establishing controls over brokering activity is a major step towards blocking unauthorized and illicit arms transfers that have fueled so many conflicts and serious human rights violations around the world.  In some well-known cases, states have been unable to prosecute notorious arms traffickers because local brokering laws were insufficiently robust.  We strongly support the current requirement for arms brokers to be registered and licensed before arranging deals to transfer these small but still deadly weapons.  For that reason, we oppose transferring semi-automatic weapons and ammunition to the CCL until and unless the continuing application of this requirement can be assured.

3.  The proposed changes do not appear to be in line with established Wassenaar Categories I-III.  Semi-automatic weapons are included in Wassenaar ML1 explicitly as munitions, with exceptions for smooth bore weapons used in hunting and sporting.  From descriptions in the Wassenaar Munitions List, it seems clear that the intention was to differentiate between military and security items, on one hand, and dual-use items on the other.  Semi-automatic weapons used by peacekeepers, military, and

WASHSTATEC000339

police are intended to be controlled as munitions. The proposal to move semi-automatic firearms and large caliber rifles to the 500-series on CCL does not appear to be in line with this designation.

Moreover, we are concerned that the proposed changes may result in increased circulation of plans for non-automatic weapons produced by 3D printing technology, and this may be at odds with Wassenaar expectations, at least with regards to Wassenaar Best Practices Guidelines on Small Arms and Light Weapons.  We are concerned about possible weapons proliferation from 3D printing. We took note of the well-publicized 2012 case where the State Department invoked ITAR (and by extension the USML) to oblige a manufacturer to remove plans for a 3D printable gun from the internet. The Fifth Circuit Court upheld the State Department's view that the device in question was a "defense article" covered by ITAR, but we are concerned that the case might have ended differently if the 3D gun were considered a CCL-500 item rather than a defense article included on the US Munitions List.  From our perspective, this story illustrates the grave dangers of uncontrolled arms proliferation. The combination of internet dissemination and do-it-yourself 3D production is problematic in that the government has no knowledge of or control over the producer or end-user or the purpose to which the weapons will be put. Permitting such transactions would be a significant step backwards in normative development and contrary to US policy over past 25 years.

4.  Registration and End Use Controls (Blue Lantern).  The fact that manufacturers (and brokers) of semi-automatic weapons would no longer be required to register before applying for a license presents an additional concern. As we understand it, registration documents often provide regulators with important information during the licensing phase, and we are concerned that under the new rules the regulators at Commerce would not have access to the same background information that DDTC now uses

WASHSTATEC000340

in the early stages of its monitoring and investigation.  Moreover, we are concerned that Blue Lantern investigations would exclude transfers of semi-automatic weapons.

5.  Waiting period before implementation.  A sufficient amount of time should be allowed for Congress to enact statutory changes to address gaps noted above.

**Additional comments on CCL rules proposed by Department of Commerce.**

6.  It appears that the new 500-series number would add specificity to reports required by the UN and the Wassenaar Arrangement, and that would be welcome.  However, Amnesty International has concerns about changing the designation of semi-automatic weapons so as to exclude them from consideration as "defense articles," elaborated in comments to the State Department above.

7.  While some of the weapons that are proposed for inclusion on the CCL are commercially available in the US, that is not the case globally and – increasingly—state governments in the US seek to limit their sale. In recent months many commercial outlets have discontinued sales of semi-automatic assault weapons, and the proposed rule goes in the opposite, and wrong, direction. Seventeen American states have proposed a total of 56 bills to regulate or ban the sale of assault weapons in the 2018 legislative season.

AMNESTY INTERNATIONAL USA | 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR | WASHINGTON, DC 20003
T 202.544.0200 | F 202.546.7142 | WWW.AMNESTYUSA.ORG

WASHSTATEC000341

8. Amnesty International generally supports strong oversight measures for arms transfers and from that perspective, we welcome detailed digital record-keeping requirements (serial number, model, caliber, and manufacturer) and increased enforcement of end-use controls. However, given the increase in license applications shifted to Commerce combined with the absence of information currently gained through the registration procedure, we are concerned at the likelihood that increased workload without commensurate resources will actually result in less oversight than at present under authority of the State Department.

Thank you for your attention to our concerns.

Sincerely,

Adotei Akwei
Deputy Director Advocacy and Government Relations
Amnesty International USA
600 Pennsylvania Avenue SE Suite 500
Email: aakwei@aiusa.org
Tel: (202) 509-8148

AMNESTY INTERNATIONAL USA I 600 PENNSYLVANIA AVENUE SE, 5TH FLOOR I WASHINGTON, DC 20003
T 202.544.0200 I F 202.546.7142 I WWW.AMNESTYUSA.ORG

WASHSTATEC000342

# PUBLIC SUBMISSION

**As of:** 6/15/18 1:36 PM
**Received:** June 15, 2018
**Status:** Posted
**Posted:** June 15, 2018
**Tracking No.** 1k2-93qh-6j3w
**Comments Due:** July 09, 2018
**Submission Type:** Unknown

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List

**Document:** BIS-2017-0004-0045
Public comment 44. Individual. B Root. 6-11-18

---

## Submitter Information

---

## General Comment

See Attached

---

## Attachments

Public comment 44. Individual. B Root. 6-11-18

WASHSTATEC000343

June 11, 2018

From:      Bill Root, billroot23@gmail.com; tel 517 333 8707
To:        DDTCPublicComments@state.gov; and
           BISPublicComments@bis.doc.gov

Subject:   ITAR Amendment Categories I, II, and III and
           Related EAR Amendment RIN 0694-AF47

These comments relate the combined ITAR and EAR amendments to USG commitments to
multilateral controls. Each of 33 numbered topics is listed in the order that topic appears in the
Wassenaar Munitions List (WML). It is then subdivided into three parts, with the following
number of examples:
a        27 US and multilateral texts are either identical or substantially equivalent;
b        74 US controls omit what WML controls (or WML omits US decontrols); and
c        165 WML omits what US controls (or US omits WML decontrols).
Part b should either be added to US controls or the US should seek removal from WML controls.
Part c should either be deleted from US controls or be proposed by the US to be added to WML.

These three parts omit second order impacts. For example, the number of differences between
WML and US would increase exponentially if each difference in a weapon item was counted
again when tallying the differences for ammunition, each of the types of components, production
equipment, software, and technology related to that weapon difference.

The above a,b,c differences omit 16 examples of "and specially designed components therefor,"
which should be deleted from the proposed revised USML for consistency with the Export
Control Reform intent to transfer insignificant items to the CCL (identified in topic 31 below).

These comments assume deletion of "specially designed" wherever it appears; use of "required"
for software and technology; and a definition of "components" to include parts, accessories,
attachments, and associated equipment.

## 1. Caliber

WML 1      Smooth-bore weapons with a caliber of less than 20 mm, other arms and automatic weapons with a caliber of 12.7 mm (caliber 0.50 inches) or less, as follows

*Note: WML 1 does not apply to:*

a      *Firearms for dummy ammunition incapable of discharging a projectile;*

b      *Firearms to launch tethered projectiles having no high explosive charge or communications link, to a range of less than or equal to 500 m;*

c      *Weapons using non-center fire cased ammunition not fully automatic;*

d      *Deactivated weapons*

a      Rifles and combination guns, handguns, machine, sub-machine and volley guns

     *Note: WML 1.a does not apply to:*

a      *Rifles and combination guns, manufactured earlier than 1938;*

b      *Reproductions of rifles and combination guns, the originals of which were manufactureed earlier than 1890;*

c      *Handguns, volley guns and machine guns, manufactured earlier than 1890 and their reproductions;*

d      *Rifles or handguns to discharge an inert projectile by compressed air or CO2.*

b      Smooth bore weapons as follows::

b1      for military use

b2      other smooth-bore weapons as follows:

b2a      fully automatic;

b2b      semi-automatic or pump-action

*Note: WML 1.b.2 does not apply to weapons to discharge an inert projectile by compressed air or CO2*

*Note: WML 1.b does not apply to:*

a      *Smooth-bore weapons manufactured earlier than 1938;*

b      *Reproductions of smooth-bore weapons, the originals of which were manufactured earlier than 1890;*

c      *Smooth-bore weapons used for hunting or sporting purposes. These weapons must not be for military use or of the fully automatic firing type;*

d      *Smooth-bore weapons for:*

d1      *Slaughtering of domestic animals;*

d2      *Tranquilizing of animals;*

d3      *Seismic testing;*

d4      *Firing of of industrial projectiles; or*

d5      *Disrupting Improvised Explosive Devices (IEDs).*

*N.B. For disruptors, see WML 4 and I.A.6 on the Dual-Use List.*

3

| WML 2 | Smooth-bore weapons with a caliber of 20 mm or more, other weapons or armament with a caliber greater than 12.7 mm (caliber 0.50 inches), projectors ... as follows |
|---|---|
| a | Guns, howitzers, cannon, mortars, anti-tank wapons, projectile launchers, ... rifles, recoilless rifles, smooth-bore weapons ... |

*Note 2: WML 2.a does not apply to weapons as follows:*

| | |
|---|---|
| *a* | *Rifles, smooth-bore weapons and combination guns, manufactured earlier than 1938;* |
| *b* | *Reproductions of rifles, smooth-bore weapons and combination guns, the originals of which were manufactured earlier than 1890;* |
| *c* | *Guns, howitzers, cannons, mortars, manufactured earlier than 1890;* |
| *d* | *Smooth-bore weapons used for hunting or sporting purposes. These weapons must not be for military use or of the fully automatic firing type;* |
| *e* | *Smooth-bore weapons for any of the following:* |
| *e1* | *Slaughtering of domestic animals;* |
| *e2* | *Tranquilizing animals;* |
| *e3* | *Seismic testing;'* |
| *e4* | *Firing of industrial projectiles;* |
| *e5* | *Disrupting Improvised Explosive Devices (IEDs);* |
| *NB* | *For disruptors, see WML 4 and 1.A.6 on the Dual-Use List.* |

| USML I.b | Fully automatic firearms to .50 caliber (12.7 mm) inclusive |
|---|---|
| USML 1.d | Fully automatic shotguns regardless of gauge. |
| USML II.a | Guns and armament greater than .50 caliber (12.7 mm), as follows: |
| a1 | Guns, howitzers, artillery, and cannons; |
| a2 | Mortars; |
| a3 | Rexoiloless rifles; |
| a4 | Grenade launchers; or |
| a5 | Development guns and armament greater than .50 caliber (12.7 mm) funded by DOD |

*Note 1: a5 does not control greater than .50 caliber*

| | |
|---|---|
| *a* | *in production;* |
| *b* | *subject to EAR; or* |
| *c* | *being developed for both civil and military applications* |

*Note 2: Note 1 to a5 does not apply to USML items, whether in production or deve;lopment.*

WASHSTATEC000346

4

| 0A501.a | Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm) |
| 0A501.b | Non-automatic and non-semi-automatic rifles, carbines, revolvers, or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm) |
| 0A602.a | Guns and armament manufactured betweeen 1890 and 1919. |

## 1a Caliber US identical to WML

1-5    WML 2.a/USML II.a1-3 guns, howitzers, cannon, mortars, and recoilless rifles greater than .50 caliber

## 1b Caliber US Omissions from Multilateral Controls

1    US omits WML 1 semi-automatic smooth bore caliber from 12.7 mm to 20 mm.
2    US omits WML non-automatic smooth bore caliber from 18 mm to 20 mm.

     WML 2a rifles greater than .50 caliber is broader than:
3    0A501.b, which is limited to non-automatic and non- semi-automatic rifles, carbines, revolvers, or pistols between caliber .50 and .72; and
4,5    USML II.a5 (and Notes 1 and 2) which applies to developmental guns funded by DOD but not if in production or being developed for both civil and military application;

6-10    US omits explicit WML 1.a mention of combined guns, handguns, machine, sub-machine and volley guns

     WML covers more than US by the following differences in decontrols in:
11    WML 1a Note b or 1b2 Note *vs*. Note 1 to 0A501
     (Rifles or handguns) (weapons) specially designed to discharge an inert projectile by compressed air or CO2 omit portions of BB guns, pellet rifles, paint ball, and all other air rifles
12-14    WML 1b Note a and b and 2a Note 2 a and b *vs*. 0A501 Note 1
a    (Smooth bore weapons) (Rifles, smooth-bore weapons and combination guns) manufactured earlier than 1938;
b    Reproductions of (smooth-bore weapons) (rifles, smooth-bore weapons and combination guns), the originals of which were manufactured earlier than 1890
     omit portions of "antique firearms manufactured before 1890 and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design"

15,16    WML 2.a anti-tank weapons and projectile launchers.

WASHSTATEC000347

5

## 1c Caliber Multilateral Omissions from US Controls

1       WML omits USML I(d) fully automatic shotguns more than .50 caliber.
2-4     WML omits 0A501.b explicit mention of carbines, revolvers, or pistols
5-17    US covers more than WML by omission of decontrols in Notes for WML1, WML 1.a,
        WML 1.b.2, WML 1.b, including US covers more than WML by the following
        differences in deconrrols in:
a       0A501 Note 1 vs. WML 1a Note b or 1b2 Note:
        (BB guns, pellet rifles, paint ball, and all other air rifles omit portions of (rifles or
        handguns) (weapons) to discharge an inert projectile by compressed air or CO2
b       0A501 Note 1 plus 0A602.a vs. WML 1b Note a and b:
        US decontrol of antique firearms manufactured before 1890 and reproductions thereof,
        muzzle loading black powder firearms except weapons of a post 1937 design;
c       0A602.a guns and armament manufactured between 1890 and 1919 omits portions of
        WML decontrol of
        1       Smooth bore weapons manufactured earlier than 1938;
        2       Reproductions of smooth-bore weapons, the originals of which were
                manufactured earlier than 1890

## 2. Firearms using caseless ammunition

WML 1.c     weapons using caseless ammunition
USML I.a    firearms using caseless ammunition

## 2a Firearms using caseless ammunition substantially equivalent

6       WML 1./USML I.a

## 3. Firearms to integrate

USML 1.c Firearms to integrate fire control, automatic tracking, or automatic firing

## 3c Firearms to integrate  Multilateral Omissions from US Controls

18      WML omits USML I.c

6

## 4. Detachable

WML 1.d       detachable cartridge magazines
WML 2.d       detachable cartridge magazines

USML III.a7   Ammunition for fully automatic firearms or guns that fire superposed or stacked
              projectiles
0A501.d       Detachable magazines with a capacity of greater than 16 rounds for 0A501.a or .b

## 4b Detachable US Omissions from Multilateral Controls

17       WML 1.d and 2.d are broader than USML III.a7 or 0A501.d.

## 4c Detachable Multilateral Omissions from US Controls

19       WML omits USML III.a7

## 5. Sound suppressors

WML 1.d       ... sound suppressors or moderators ... for WML 1.a, b, c.

USML I.e      Silencers, mufflers, and sound suppressors ...

WASHSTATEC000349

**<u>5a. Sound suppressors US Omissions from Multilateral Controls</u>**

7        WML 1.d/USML I.e Sound suppressors

**<u>5b. Sound suppressors US Omissions from Multilateral Controls</u>**

18       WML 1.d Sound moderators

**<u>5c. Sound suppressors Multilateral Omissions from US Controls</u>**

20       USML I.e Silencers, mufflers
21       USML 1.e Sound suppressors for other than USML I

**<u>6. Mounts</u>**

WML 1.d        ... gun mountings for WML 1.a,b,c,
WML 2.c        ... weapon sight mounts for military use and for WML.2a;
WML 2.d        Mountings ... for WML 2.a,

USML II.h3     ... automatically stabilize aim (other than gun rests).
USML II.j9i    Mounts for independently powered ammunition handling systems
0A501.c        ... mounting blocks (trunnions) ...

**<u>6b. Mounts US Omissions from Multilateral Controls</u>**

19-21 WML 1.d, 2.c, 2d are broader than USML II.h3, j9i, and 0A501.c

**<u>6c. Mounts Multilateral Omissions from US Controls</u>**

22-23  USML II.h3, j9i, and 0A501c omit for I or II or military use.,

WASHSTATEC000350

8

### 7. **Optical weapon sights**

WML 1.d      ... optical weapon-sights ... for WML 1.a,b,c, except without electronic image
             processing, with a magnification of 9 times or less, provided not for military use
             or incorporate any reticles for military use.
WML 2.c      Weapons sights ... for military use and for ML 2.a

USML II. j2   Sights to orient indirect fire weapons
0A501,y3      Iron sights
0A504 Optical sighting devices for firearms and components as follows:

    a   Telescopic sights;
    b   Holographic sights;
    c   Reflex or "red dot" sights;
    d   Rericle sights;
    e   Other sighting devices that contain optical elements;
    f   Laser aiming devices or laser illuminators for use on firearms, and having an
      operational wavelength exceeding 400 nm but not exceeding 710 nm, except laser
      boresighting devices that must be placed in the bore or chamber to provide a
      refernce for aligning the firearms sights.
    g   Lenses, other optial elements and adjustment mechanisms for articles in a,b,c,d,e,
      or i.
    i   Riflescopes that were not "subject to the EAR" as of (DATE ONE DAY PRIOR
      TO THE EFFECTIVE DATE OF THE FINAL RULE) and are for use in firearms
      that are "subject to the EAR."

### 7b. Sights US Omissions from Multilateral Controls

22,23   WML 1.d and 2.c omit technical limits in USMLII.j2, 0A501.y3, or 0A504.a-i

### 7c. Sights Multilateral Omissions from US Controls

25-34   USML II.j2, 0A501.y3, and 0A504.a-1 omit WML 1.d for WML 1.a,b,c or WML 2.c for
        WML 2.a

### 8. Flash suppressors

WML 1.d      ... flash suppressors
USML II.e     muzzle flash suppression devices

### 8b. Flash suppressors US Omissions from Multilateral Controls

24      WML 1.d omits USML II.e "muzzle"

9

**9. Flame throwers**

WML 2.a        ... military flame throwers

USML II.b      Flame throwers with a minimum effective range of 20 meters (i.e., whether or not
               military) plus

0A602.b        Military flame throwers with an effective range less than 20 meters

**9c Flame throwers Multilateral Omissions from US Controls**

35      US is broader by covering non-military with minimum 20m range.

10

### 10. Discharge type and administer electric shock

0A503 Discharge type arms, non-lethal or less-lethal grenades and projectiles, ... and devices to administer electric shock

### 10c. Discharge type and administer electric shock Multilateral Omissions from US Controls

36      WML omits 0A503

### 11. Signature reduction

WML 2.a      ... signature reduction devices for 2.a
USML II.e:   Signature reduction devices for II a, b, or d

### 11a Signature reduction substantially equivalent

8       WML 2.a/USML II.e

### 12. Liquid propelling charges

WML 2.a Note 1:   WML 2.a includes injectors, metering devices, storage tanks and other components for liquid propelling charges for WML 2.a

### 12b. Liquid propelling charges US Omissions from Multilateral Controls

25-28   US omits WML 2.a Note 1

### 13. Smoke and flares

WML 2.b      Smoke ... projectors or generators for military use

III.d14      Illuminating flares ...
1A984        ... non-irritant smoke flares

### 13b. Smoke and flares US Omissions from Multilateral Controls

29,30   US omits WML 2.b smoke projectors or generators

### 13c Smoke and flares Multilateral Omissions from US Controls

37      WML omits III.d14 illminating flares
28      WML omits 1A984 non-irritant smoke flares

WASHSTATEC000353

11

### 14. Gas

WML 2.b      ... gas ... projectors or generators and
WML 7.e      Equipment ... for the dissemination of ... chemical agents

USML XIV.f1 Equipment for the dissemination of chemical agents.
1A607.c      Equipment for dissemination of riot control agents

### 14a Gas identical

WML 7.e/USML XIV.f1 and 1A607.c

### 14b Gas US Omissions from Multilateral Controls

31,32   US omits WML 2.b projectors or generators

### 15. Pyrotechnic

WML 2.b      ... pyrotechnic projectors or generators for military use

USML III.a6  Ammunition employing pyrotechnic material in the projectile base ...
      d1      Projectiles that use pyrotechnic tracer materials that incorporate any material
              having peak radiance above 710 nm ...;
1A984        ... pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain
              only chemical irritants) having dual military and commercial use;

### 15b Pyrotechnic US Omissions from Multilateral Controls

WML 2.b is broader than 1A984 because:
33      WML omits US exclusion from pyrotechnic articles; and
34      US crime control reason is less restrictive than US national security reason applied to
        other WML- controlled items.

### 15c Pyrotechnic Multilateral Omissions from US Controls

1A984 is broader than WML 2.b because:
39      articles is broader than projectors or generators; and
40      dual military and commercial use is broader than military use
41,42   pyrotechnic material omitted from WML

12

## 16. Signal

WML 2.b Note WML 2.b does not apply to signal pistols
0A503          decontrol arms solely for signal ...use

## 16b Signal US Omissions from Multilateral Controls

35       0A503 "solely" decontrol is narrower than WML 2.b Note decontrol

## 17. Kinetic energy

WML III.a       Ammunition for weapons specified by ... WML 12
WML 12.a        Kinetic energy weapon systems for destruction or effecting mission abort of a
                target
USML II.d       kinetic energy weapon systems for destruction or rendering mission-abort of a
                target .

WML 12 Note 1.c.       WML 12 includes ... target acquisition, tracking, fire control or damage
                       assessment systems
USML II.j15            Kinetic energy weapon target acquisition, tracking fire control, and
                       damage assessment systems

## 17a Kinetic energy substantially equivalent

10       WML 12.a/USML II.d
11       WML 12 Note 1.c/USML II.j15

13

### 18. Metal or plastic

WML 3 Note 1a     WML 3 includes metal or plastic fabrications ...

USML III.a5    Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance

      d1     Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

      d6     Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

      d8     Non-metallic cases, including cases that have only a metallic base, for III.a5;

0A505.x Note 2     0A505.x includes ... metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

### 18b. Metal or plastic parts US Omissions from Multilateral Controls

36,37  WML 3 Note 1.a omits limits in USML III.a5, d1, d6, d8

### 18c. Metal or plastic parts Multilateral Omissions from US Controls

43,44  USML III.a5 and d8 non-metallic is broader than WML 3 Note 1a plastic

### 19. Primer

WML 3 Note 1.a ...WML 3 components include primer anvils

USML III.d10 Primers other than Boxer, Bordan, or shotshell types
        Note: III.d10 does not control caps or primers of any type in use prior to 1890.
0A505.x Note 2 05A505.x includes Bordan and boxer primers.

### 19b. Primer Multilateral Omissions from US Controls

38    US omits primer WML 3 primer anvils

### 19c. Primer US Omissions from Multilateral Controls

45,46  WML omits USML III.d10 and 0A505.x primers

WASHSTATEC000356

14

## 20. Cartridge links and belts

WML 3 Note 1.a WML 3 includes ...cartridge links for WML 1, 2, or 12

USML III.a2    Ammunition preassembled into links or belts;
USML III.d9    Cartridge links and belts for fully automatic firearms controlled in USML I or II

## 20b. Cartridge links and belts US Omissions from Multilateral Controls

39,40    US omits cartridge links for non-automatic or semi-automatic firearms...

## 20c. Cartridge links and belts Multilateral Omissions from US Controls

47        WML omits ammunition preassembled into liks or belts

## 21. Anvils, bullet cups, rotating bands

WML 3 Note 1.a        anvils, bullet cups, rotating bands

## 21b. Anvils, bullet cups, rotating bands US Omissions from Multilateral Controls

41-43    US does not control anvils, bullet cups, or rotating bands

## 22 Safing

WML 3.a Note 1.b      Safing and arming devices, fuzes, sensor and initiation devices
MTCR 2A1f    Weapon or warhead safing, arming, fuzing, and firing mechanisms ...

USML III.d11    Safing, arming, and fuzing components (to include target detection and proximity
                sensing devices) for the ammunitions in this category
USML IV.h9    Missile and rocket safing, arming, fuzing, and firing (SAFF) components (to
                include target detection and proximity sensing devices)

## 22a Safing substantially equivalent

12-15    safing, arming, fuzing, firing WML 3a Note 1b, MTCR 2A1f/USML III.d11, IV.h9

## 22c. Safing Multilateral Omissions from US Controls

48,49    WML and MTCR omit US target detection and proximity sensing devices

15

### 23. Power supplies

WML 3 Note 1.c power supplies with high one-time operational output

USML II,j14   Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components of II.d kinetic weapons

3A226   High-power direct current power supplies producing over 8 hours 100 V or greater with current output of 500 A or greater and current or voltage stability better than 0.1% over 8 hours

3A227   High-voltage direct current power supplies producing over 8 hours 20 kV or greater with current output of 1A or greater and current or voltage stability better than 0.1% over 8 hours.

### 23b. Power supplies US Omissions from Multilateral Controls

44   WML 3 Note 1.c is broader than USML II.j14 and 3A226 and 3A227 by omitting US limits on one time operational output

### 23c. Power supplies Multilateral Omissions from US Controls

50   USML II.j14 includes power supply features other than WML 3 Note 1.c output

### 24. Combustible cases

WML 3 Note 1.d combustible cases for charges

USML III.d7 ... combustible cases for USML II

### 24b. Combustible cases US Omissions from Multilateral Controls

WML 3 Note 1.d for charges is broader than USML III.d7for USML II

16

## 25. Submunitions and terminal guidance

WML 3 Note 1.e        Submunitions including bomblets, minelets and terminally guided
                      projectiles for WML 1, 2, or 12

USML III.d4   Projectiles ... guided or unguided for USML II
USML III,d5   ... sub-munitions (e.g., bomblets or minelets) ...for USML II
USML III.j13  Terminal seeker assemblies for category III

7A611 Military fire control, laser, imaging , and guidance equipment, as follows:
a       Guidance or navigation systems, not elsewhere specified on the USML, that are for a
        defense article on the USML or a 600 series item;
x       Components, including accelerometers, gyros, angular rate sensors, gravity meters
        (gravimeters), and inertial measurement units (IMUs), that are for USML XII or 7A611,
        and that are NOT:
x1      in the USML or elsewhere within 7A611;
x2      Described in 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or
x3      Elsewhere specified in 7A611,y or 3A611,y.

## 25a Submunitions and terminal guidance substantially equivalent

16-18   WML 3 Note 1.e for WML 2 or 12/USML III.d4,5 for II

## 25b Submunitions and terminal guidance US Omissions from Multilateral Controls

        WML 3 Note 1.e terminally guided projectiles for WML 1, 2, or 12 is broader than
        USML III.d4,5 only for II or 7A611 only for USML or 600 series. .

## 26. Electromagnetic

USML III.a8   Electromagnetic armament projectiles or billets for weapons with a design muzzle
              energy exceeding 5 MJ

## 26.b Electromagnetic US Omissions from Multilateral Controls

50      WML omits USML III.a8

### 27 Useless cartridge and shell casings

USML III Note 2 decontrol cartridge and shell casings rendered useless

### 27b Useless cartridge and shell casings US Omissions from Multilateral Controls

51      WML omits USML III Note 2 (WML 1 Note 1.d"Deactivated Firearms" does not apply
        to ammunition)

### 28 Shotgun shells

| | |
|---|---|
| 0A505.b | Buckshot (No.4 .24" diameter and larger) shotgun shells |
| 0A505.c | Shotgun shells (including less than lethal rounds) that do not contain buckshot |
| 1A984 | Shotgun shells that contain chemical irritants |

### 28c Shotgun shells Multilateral Omissions from US Controls

51-53   WML omits 0A505.b,c and 1A984 shotgun shells

### 29 Blank and dummy ammunition

| | |
|---|---|
| WML 3 Note 2 c | decontrol blank and dummy ammunition not incorporating components for live ammunition |
| 0A505.d | Blank ammunition for 0A501 |

### 29c Blank and dummy ammunitions Multilateral Omissions from US Controls

54      US omits WML 3 Note 2.c decontrol
55      WML omits 0A505.d

### 30 Fuse setting devices

WML 3b      Fuse setting devices for WML 3a ammunition for WML 1, 2, or12

USML III.b2   Fuze setting devices for USML III ammunition

### 30a Fuse setting devices substantially equivalent

19      WML 3.b/USML III.b2

18

## 31 Other Components

WML 1, 2, 3 headings each control specially designed components for 1, 2, 3 sub-tems. These are matched by 0A501.x, 0A505.x, and 0A602.x, except for the following 16 examples of specially designed parts and components in proposed USML I, II, III: I.e, I.h1, I.h3, II.a5, II.j4, II.j5, II.j10 II.j13, II.j14, II.j15, III.a10, III.d4, III,d5, III.d11, III.d12, III.d13.
It is recommended that "and specially designed parts and components therefor" be deleted from
    I.e, I.h1, I.h3, II.a5, II.j4, II.j5, II.j10 II.j13, II.j14, II.j15, III.a10, III.d4, III,d5, III.d11,
    III.d12, and III.d13

## 31a Other components substantially equivalent

20-22   WML 1, 2, 3/0A501.x, 0A505.x, 0A602.x (after 16 deletions from USML recommended above)

WASHSTATEC000361

19

**31c Other components Multilateral Omissions from US Controls**

56-124 The other USML I, II, III and 0A501-0A505 components not examined above are:

| | | |
|---|---|---|
| USML I.g | Barrels, receivers (frames), bolts, bolt carriers, slides, or sears for USML I....b ...; | |
| h1 | Drum and other magazines for firearms to .50 caliber with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm; | |
| h2 | Parts and components for conversion of a semi-automatic firearm to a fully automatic firearm; | |
| USML II.j1 | Gun barrels, rails, tubes, and receivers ...; | |
| j3 | Breech blocks; | |
| j4 | Firing mechanisms; | |
| j6 | Servo-electronic and hydraulic elevation adjustment; | |
| j7 | Muzzle brakes; | |
| j8 | Bore evacuators; | |
| j9 | Independently powered ammunition handling and platform interface as follows: | |
| j9i | Carriages; | |
| j9iii | Gun pallets; | |
| j9iv | Hydro-pneumatic equilibration cylinders; or | |
| j9v | Hydro-pneumatic systems scavanging recoil energy to power howitzer functions; | |
| j10 | Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms; | |
| j11 | Independent ammunition handling; | |
| j12 | Ammunition containers/drums, chutes, conveyor elements, and ammunition container/drum entrance and exit units; | |
| j13 | Aircraft/gun interface units with rate of fire greater than 100 rounds per minute; | |
| j16 | Classified | |
| USML III.d3 | projectiles of any calber produced from depleted uranium; | |
| d6 | Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy; | |
| d15 | Classified | |
| 0A501.c | Barrels, cylinders, barrel extensions, ... bolts, bolt carriers, operating rods, gas pistons trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control parts or components (e.g., triggers, hammers, sears, disconnectors) and buttstocks that contain fire control parts or components for 0A501.a or .b or USML I unless listed in I.g or .h | |
| e | Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof for 0A501.a or .b | |
| 0A502 | Shotguns, complete trigger mechanisms, magazines and magazine extension tubes, complete breech mechanisms, except equipment used exclusively to treat or tranquilize animals | |
| 0A505.x | Note 3 The controls on parts and components in 0A505.x include those parts and components that are common to ammunition and ordnance described in 0A505.x and to USML III | |

WASHSTATEC000362

20

## 32 Production

WML 18.a    ... equipment for the production of WML 1, 2, 3
WML 18.b    ... environmental test facilities and equipment therefor, for the certification,
            qualification or testing of WML
Note        WML 18.a and .b include:
a           Continuous nitrators
b           Centrifugal testing ...
c           Dehydration presses
d           Screw extruders for military explosive extrusion
e           Cutting machines for sizing of extruded propellants
f           Sweetie barrels (tumblers) 1.85 m or more in diameteer and having over 227 kg product
            capacity
g           Continuous mixers for solid propellants
h           Fluid energy mills for grinding or milling the ingredients of military explosives
i           Equipment to achieve both sphericity and uniform particle size in metal powder listed in
            WML 8.c.8 (aluminum powder particle size 60 micrometer or less)
J           Convection current converters for the conversion of maerials listed in WML 8.c.3
            (carboranes, decaborane, pentaboranes and their derivatives)

0B501 Test, inspection, and production commodities for development or production of 0A501 or
      USML I, as follows:
a           Small arms chambering machines
b           Small arms deep hole drilling machines and drills therefor
c           Small arms rifling machines
d           Small arms spill boring machines
e           Dies, fixtures, and other tooling

0B505 Test, inspection, and production commodities for development or production of 0A505 or
      USML III, as follows:
a           Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test
            equipment, not USML III* for production of 0A505.a or .x  or USML III
            * No such items in proposed USML III
b           Equipment for production of 0A505.b
c           Equipment for production of 0A505.c
d           Equipment for production of 0A505.d
x           components for 0B505.a

WASHSTATEC000363

| | |
|---|---|
| 0B602 | Test, inspection, and production commodities for development or production of 0A602 or USML II |
| a1 | Gun barrel rifling and broaching machines and tools therefor |
| a2 | Gen barrel rifling machines |
| a3 | Gun barrel trepanning machines |
| a4 | Gun boring and turning mcahines |
| a5 | Gun honing machines of 6 feet stroke or more |
| a6 | Gun jump scew lathes |
| a7 | Gun rifling machines |
| a8 | Gun straightening presses |
| b | Jigs and fixtures and other metal-working implements for manufacture of 0A602 or USML II |
| c | Other tooling and equipment for production of 0A602 or USML II |
| d | Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models for 0A602 or USML II |
| | |
| 1B608.c | Environmental test facilities for certification, qualification, or testing of 1C608 or USML V |

### 32a Production substantially equivalent

| | |
|---|---|
| 23 | WML 18.a for WML 2/0B602.c |
| 24 | WML 18.b/1B608.c |

### 32b Production US Omissions from Multilateral Controls

| | |
|---|---|
| 52, 53 | WML 18.a for WML 1 and 3 is broader than 0B501, 0B505, because "include" in WML 18.a Note makes a-j only non-definitive examples, whereas 0B501 controls only a-e and 0B505 controls only a-d and x. |
| 54-63 | US omits WML 18.a Note a-j |
| 64-66 | US omits WML 18.b for WML 1, 2, 3 |

### 32c Production Multilateral Omissions from US Controls

| | |
|---|---|
| 125-164 | WML omits: test and inspection in 0B501, 0B505, 0B602 development in 0B501 and 0B505 0B501.a-e, 0B505.,a-d, x, 0B602.a1-8, b, d |

22

## 33 Software and Technology

WML 21 Software for:
a1    development, production, operation, or maintenance of WML equipment
a2    development or production of WML material
a3    development, production, operation or maintenance of WML software
b1    military use and modelling, simulating or evaluating military weapon systems
b2    military use and modeling or simulating military operational scenarios
b3    determining the effects of conventional ... weapons
c    enabling equipment not WML-controlled to perform military functions of WML-
      controlled equipment.

WML 22 Technology for
a    development, production, operation, installation, maintenance (checking), repair,
      overhaul, or refurbishing of WML-controlled items.
      *Note 1: development, production, operation, installation, maintenance (checking), repair,*
      *overhaul, or refurbishing of WML-controlled items remains under control even when*
      *applicable to any item not WML-controlled.*
b1    design, assembly, operation, maintenance, or repair of complete installations for WML-
      controlled items, even if the components of such production installations are not  WML-
      controlled
b2    development or production of small arms, even if used to produce reproductions of
      antique small arms
      *Note 2 WML 22 does not apply to:*
*a*    *Technology that is the minimum necessary for the installation, operation, maintenance*
      *(checking), or repair of items not WML-controlled or whose export has been authorized*
*b*    *Technlogy that is "in the public domain," "basic scientific research," or the minimum*
      *necessary information for patent applications.*

USML I.i    Technical data and defense services for I.a,b,d,e,g,h or classified 0A501, 0B501,
            0D501, 0E501
USML II.k    Technical data and defense services for II.a,b,d,e,f  or classified 0A602, 0B602,
            0D602, 0E602
USML III.e    Technical data and defense serivces for III.a,b,d or classified 0A505, 0B505,
            0D505, 0E505.

0D501 Software for development, production, operation, or maintenance of 0A501 or 0B501.
0D505 Software for development, production, operation, or maintenance of 0A505 or 0B505.
0D602 Software for development, production, operation, or maintenance of 0A602 or 0B602.

WASHSTATEC000365

0E501 Technology for development, production, operation, installation, maintenance, repair, or overhaul of 0A501 or 0B501, as follows:

a    Technology for development or production of 0A501 (other than 0A501.y) or 0B501;

b    Technology for operation, installation, maintenance, repair, or overhaul of 0A501 (other than 0A501.y) or 0B501.

0E502 Technology for development or production of 0A502.

0E504 Technology for development or production of 0A504 that incorporate a focal plane array or image intensifier tube.

0E505 Technology for development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of 0A505.

0E602 Technology for development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of 0A602 or 0B602, or 0D602

0E982 Technology for development or production of ... 0A503

**33a Software and technology substantially equivalent**

25-27   WML21a1,2, WML 22a/USML Ii,IIk,IIIe. 0D501,5, 602, 0E501,2,5, 602, 982

**33b Software and technology US Omissions from Multilateral Controls**

67-74   WML21a3,b1-3,c, WML22aNote 1, b1,2

**33c Software and technology Multilateral Omissions from US Controls**

165    0E504

WASHSTATEC000366

WASHSTATEC000367

# PUBLIC SUBMISSION

**As of:** 6/21/18 1:20 PM
**Received:** June 21, 2018
**Status:** Posted
**Posted:** June 21, 2018
**Tracking No.** 1k2-93uf-i2p3
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0078
Public comment 71. Individual. C Tischio. 6-18-18

## Submitter Information

**Name:** Carla Tischio

## General Comment

I urge ATF to finalize its proposed rule clarifying that bump-fire stocks, along with other "conversion devices"
that enable semiautomatic weapons to mimic automatic fire, qualify as "machineguns" under the National
Firearms Act and are generally illegal to possess.

On the night of October 1, 2017, a gunman opened fire from a hotel room on the 32nd floor of the Mandalay Bay
hotel into the 22,000 person crowd at the Route 91 Harvest country music festival in Las Vegas, Nevada, killing
58 people and injuring more than 500. The gunman fired more than 1,100 rounds of ammunition in 11 minutes,
using semiautomatic rifles modified with dangerous firearm accessories designed to dramatically accelerate the
rate of fire, commonly known as "bump-fire stocks." These devices are intended to circumvent the restrictions on
possession of fully automatic firearms in the Gun Control Act of 1968 and the National Firearms Act of 1934 by
allowing an individual to modify a semiautomatic rifle in such a manner that it operates with a similar rate of fire
as a fully automatic rifle. Bump stocks and similar "conversion devices" that accelerate the rate of fire of a
semiautomatic firearm are extremely dangerous and pose a substantial risk to public safety.

In the absence of immediate action by Congress, ATF should finalize its proposed rule, clarifying that conversion
devices like bump-fire stocks are included in the definition of "machinegun" under the National Firearms Act of
1934. And then Congress must act as wellto ensure that manufacturers cannot continue to endanger public safety
by designing devices that imitate machine guns and subvert the law. The continued presence of these dangerous
devices puts all of our communities at risk and both Congress and ATF must take action quickly to address this
threat.

I also am writing in opposition to moving export license oversight for firearms from the Department of State to
the Department of Commerce because the proposed rule change treats semiautomatic assault rifles as "non-
military." This is despite the fact that U.S. troops routinely use their military rifles in semiautomatic mode, these
weapons are used by state and non-state groups in armed conflicts, and the civilian possession of such weapons

WASHSTATEC000368

is prohibited in many countries. The proposed rule also: eliminates Congressional oversight for important gun export deals; transfers the cost of processing licenses from gun manufacturers to taxpayers; and, enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. The proposal reduces transparency and reporting on gun exports and transfers gun export licensing from an agency with a mission to promote stability, conflict reduction, and human rights, to an agency with a mission to promote trade and which lacks the resources to adequately enforce export controls.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not fewer.

# PUBLIC SUBMISSION

**As of:** 6/21/18 1:30 PM
**Received:** June 21, 2018
**Status:** Posted
**Posted:** June 21, 2018
**Tracking No.** 1k2-93uf-r53j
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0080
Public comment 73. Individual. L Bronstein. 6-21-18

## Submitter Information

**Name:** Linda Bronstein

## General Comment

I urge ATF to finalize its proposed rule clarifying that bump-fire stocks, along with other "conversion devices" that enable
semiautomatic weapons to mimic automatic fire, qualify as "machineguns" under the National Firearms Act and are generally
illegal to possess. In the absence of immediate action by Congress, ATF should finalize its proposed rule, clarifying that
conversion devices like bump-fire stocks are included in the definition of "machinegun" under the National Firearms Act of 1934.
And then Congress must act as wellto ensure that manufacturers cannot continue to endanger public safety by designing
devices that imitate machine guns and subvert the law. The continued presence of these dangerous devices puts all of our
communities at risk and both Congress and ATF must take action quickly to address this threat.

WASHSTATEC000370

# PUBLIC SUBMISSION

**As of:** 6/28/18 10:26 AM
**Received:** June 22, 2018
**Status:** Posted
**Posted:** June 28, 2018
**Tracking No.** 1k2-93v5-sj25
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0094
Public comment 86. Individual. E Williams. 6-22-18

## Submitter Information

**Name:** Erick Williams
**Address:**
   1209 Old Hickory
   East Lansing, MI, 48823
**Email:** willnielsen@sysmatrix.net

## General Comment

See attached file(s)

## Attachments

Commerce rule comment, June 22, 2018

WASHSTATEC000371

Erick Williams, JD
1209 Old Hickory
East Lansing, MI  48823

June 22, 2018

Regulatory Policy Division
Bureau of Industry and Security
US Department of Commerce
14th St and Pennsylvania Ave, NW, Room 2099B
Washington, DC 20230
http://www.regulations.gov

Re:  Docket No. BIS-2017-0004; RIN 0694-AF47

Greetings:

These are comments on the Commerce Department proposed rule,
"Control of Firearms, Guns, Ammunition and Related Articles the
President Determines No Longer Warrant Control under the United
States Munitions List."  83 Federal Register 24166, May 24, 2018,
https://www.federalregister.gov/documents/2018/05/24/2018-
10367/control-of-firearms-guns-ammunition-and-related-articles-the-
president-determines-no-longer-warrant

# Background

The rules governing firearm exports should give the police profession a
greater, better-defined role in the evaluation of firearm export license
applications.

15 CFR 738.2 (d) (2) (ii) (A) (CC) provides that items proposed for
export are controlled for "crime control" reasons.  The practice of
controlling exports for crime control reasons reflects a basic principle

1

underlying arms control treaties and statutes. The proliferation of weapons should be controlled because it tends to impair the rule of law.

To assure that the rule of law is not impaired by firearm exports, licensing officials should consider the effect of proposed exports on local communities, public safety, peace officer safety, crime control, and control of civil disturbances.

In several parts of the world, armed gangs are impairing the rule of law, and their activities cross borders. As a major producer of firearms, the USA, through export law enforcement, can help limit the flows of weapons to armed gangs. The police profession, closely associated with the rule of law, is a critical stakeholder in the arms export licensing process.

Unfortunately, neither the current nor the proposed rules governing firearm exports provide for export license applications to be vetted by people with police backgrounds.

Historically, the weapons analysts who vet arms export licenses have been with the Defense Department. Military analysts worry (as they should) about the impact of weapons on the battlefield. But defense analysis does not necessarily evaluate transactions with an eye to the security needs of civilian communities -- public safety, peace officer safety, crime control, and the prevention and management of civil disturbances.

Firearms that "no longer warrant control" by the military can nonetheless destabilize communities, overwhelm peace officers and contribute to civil disorder.

Notorious examples of the adverse effects of firearm proliferation have come from Africa and the Middle East as well as closer to home -- Mexico and Central America.

2

See:  Alec MacGillis, *"America's Wild-West Gun Laws Are Helping Fuel The Border Crisis:  The Unwanted Traffic Between The Us And Central America Goes Both Ways"* (New Republic, July 21, 2014), https://newrepublic.com/article/118759/nra-and-gun-trafficking-are-adding-fuel-border-migrant-crisis

Robert Muggah and Steven Dudley, Op-Ed: *"The Latin American Gun Leak"*, (Los Angeles Times, January 16, 2015), http://www.latimes.com/opinion/op-ed/la-oe-muggah-arming-latin-america-20150118-story.html

*"Attacks Against Peacekeepers"* (United Nations OHCHR, May 2017), https://www.ohchr.org/Documents/Countries/CF/Mapping2003-2015/Factsheet7-EN.pdf

*"Attacks against civilians and MINUSCA peacekeepers in the town of Bangassou in the Central African Republic"* (Office of the Spokesperson for the UN Secretary-General, May 14, 2017) https://www.un.org/sg/en/content/statement/2017-05-14/statement-attributable-spokesman-secretary-general-attacks-against

Alex Yablon, *"American Guns Drive the Migrant Crisis that Trump Wants to Fix with a Wall"* (Trace, May 25, 2017) https://www.thetrace.org/2017/05/gun-trafficking-central-america-immigrant-crisis-trump-wall/

Jonathan Blitzer, *"The Link Between America's Lax Gun Laws and the Violence That Fuels Immigration"* (New Yorker, March 22, 2018), https://www.newyorker.com/news/news-desk/the-link-between-americas-lax-gun-laws-and-the-violence-that-fuels-immigration

Highly destructive weapons should not be exported to civilians.

3

Whatever short term economic benefit those exports may generate is outweighed by the risk those weapons pose to the safety of peace officers and the rule of law.

We suggest a maximum limit on firepower exported to civilians. Firearms with a muzzle energy higher than 5,000 Joules should be barred from export to non-government end-users. (In ballistics, muzzle energy, commonly expressed in Joules or foot-pounds, is a measure of the destructive potential of a firearm or cartridge. Tables comparing the muzzle energies of various firearms are available on the Internet.)

See: *"Clear and Present Danger: National Security Experts Warn About the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians"* (Violence Policy Center, July 2005), http://www.vpc.org/studies/50danger.pdf

Weapons of high destructive potential have no place on any street in the world, and they should be off-limits for export to civilians.

# Policy Recommendations

The following changes should be incorporated in the new rules:

1. Prohibit export of firearms, above a maximum limit of destructiveness, to civilian end-users, world-wide. A muzzle energy of 5,000 Joules (3,688 foot-pounds) is here proposed as the maximum limit.

2. Prohibit exports of firearms with muzzle energies less than 5,000 Joules, to civilian end-users, world-wide, if the firearm is likely to outmatch weapons carried by local peace officers or otherwise impair the efforts of peace officers to control crime and civil disturbance.

4

WASHSTATEC000375

3.  Recognize the police profession as a stakeholder in firearm exports. Give the profession a role in vetting license applications.

# Technical Language

The recommendations above may be translated into the EAR framework using the technical language below.

4.  In 15 CFR Appendix Supplement No 1 to Part 738, the Commerce Country Chart, add a column 4 under crime control.  Mark each country box to indicate that the crime control reason for control applies to all countries.

5.  In 15 CFR 738.2 (d) (1), reason for control item 5.  Amend item 5 to read (changes in CAPS):

> 5: Items warranting national security, CRIME CONTROL, or foreign policy controls at the determination of the Department of Commerce.

6.  In 15 CFR 738.3 (a) (1) add a sentence that reads:  A LICENSE IS REQUIRED FOR ALL DESTINATIONS FOR FIREARMS AND ASSOCIATED EQUIPMENT CONTROLLED UNDER ECCN 0A501, 0A502, 0A504, AND 0A505, WHICH ARE SUBJECT TO 15 CFR 742.7 (b) (2) or (b) (3).

7.  In 15 CFR Appendix Supplement No 1 to Part 774, the Commerce Control List, add crime control as a reason for control under 0A501, 0A502, 0A504, and 0A505.  CC column 4 (referred to above) should apply to each, entire entry.  In each entry, insert:  ALL ITEMS ARE SUBJECT TO THE CRIME CONTROL LICENSING POLICY IN 15 CFR 742.7 (b) (2) or (b) (3).

8.  Amend 15 CFR 742.7 (b) to read as follows (changes in CAPS):

WASHSTATEC000376

(b)  Licensing policy.

(1)  EXCEPT AS DESCRIBED IN (b) (2) and (b) (3) BELOW, applications for items controlled under this section will generally be considered favorably on a case-by-case basis unless there is civil disorder in the country or region or unless there is evidence that the government of the importing country may have violated internationally recognized human rights.  The judicious use of export controls is intended to deter the development of a consistent pattern of human rights abuses, distance the United States from such abuses and avoid contributing to civil disorder in a country or region.

(2)  A LICENSE APPLICATION FOR A FIREARM WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE (AND EQUIPMENT ASSOCIATED WITH THE FIREARM) SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(3)  A FIREARM WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS), AND EQUIPMENT ASSOCIATED WITH THE FIREARM, MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY PEACE OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE USED OR OTHERWISE IMPAIR THE EFFORTS OF PEACE OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

9.  In 15 CFR Appendix Supplement No 2 to Part 730, Technical Advisory Committees, allow creation of a technical advisory committee with representation from the police profession to provide technical

WASHSTATEC000377

advice on matters such as police procedure, public safety, peace officer safety, crime control, and control of civil disorder.  At least two organizations in the United States -- one federal and the other state-based – may be competent to give the Commerce Department technical advice on police standards outside the USA.  They are the International Criminal Investigative Training Assistance Program, https://www.justice.gov/criminal-icitap, and the International Association of Directors of Law Enforcement Standards and Training, https://www.iadlest.org.

Thank you for the opportunity to submit comments on the proposed rules.

Sincerely,

Erick Williams, JD

7

WASHSTATEC000378

# PUBLIC SUBMISSION

**As of:** 6/28/18 12:29 PM
**Received:** June 25, 2018
**Status:** Posted
**Posted:** June 28, 2018
**Tracking No.** 1k2-93x9-woec
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0111
Public comment 103. Individual. P Kober. 6-25-18

## Submitter Information

**Name:** Philip Kober, JD, MD, PhD
**Address:**
    4526 Thurston Ln.
    apt. #2
    Fitchburg,  WI,  53711
**Email:** doclawpmk@live.com
**Phone:** 6088196862
**Fax:** 53711

## General Comment

I am writing in opposition to moving export license oversight for firearms from the Department of State to the Department of Commerce because the proposed rule change treats semiautomatic assault rifles as non-military. This is despite the fact that U.S. troops routinely use their military rifles in semiautomatic mode, these weapons are used by state and non-state groups in armed conflicts, and the civilian possession of such weapons is prohibited in many countries. As a physician, I categorically can state that the harm to human beings is no different between semiautomatic and fully automatic weapons. The energy transferred to the bullet is what is important, along with other characteristics such as yawing of the bullet on impact (tumbling), explosive ammunition, and other such characteristics. The only difference between and automatic weapon and a semiautomatic weapon is that the automatic continues to fire simply by holding the trigger down, whereas the trigger must be pulled for each shot for the semiautomatic. The rest of the mechanical actions involved are the same. They both have high velocity, and characteristics of the ammunition that make them deadly to many, many people over a short period of time. The proposed rule also: eliminates Congressional oversight for important gun export deals; transfers the cost of processing licenses from gun manufacturers to taxpayers; and, enables unchecked gun production in the U.S. and exports abroad by removing the block on 3D printing of firearms. The proposal reduces transparency and reporting on gun exports and transfers gun export licensing from an agency with a mission to promote stability, conflict reduction, and human rights, to an agency with a mission to promote trade and which lacks the resources to adequately enforce export controls. All of these provisions are DEADLY, and should not be adopted.

WASHSTATEC000379

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. They should be subject to more controls, not fewer.

WASHSTATEC000380

# PUBLIC SUBMISSION

**As of:** 6/28/18 12:48 PM
**Received:** June 27, 2018
**Status:** Posted
**Posted:** June 28, 2018
**Tracking No.** 1k2-93yq-r37l
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No
Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0116
Public comment 108. Individuals. W Root and E Williams. 6-27-18 Note: This is a copy of the
comments submitted to the Department of State on the ITAR amendments

## Submitter Information

**Name:** Erick Williams
**Address:**
   1209 Old Hickory
   East Lansing, MI, 48823
**Email:** willnielsen@sysmatrix.net

## General Comment

This is a copy of the comments submitted to the Department of State on the ITAR amendments

## Attachments

ITAR amendment comments June 27, 2018

WASHSTATEC000381

William A. Root
2700 Burcham Drive, Apt 234
East Lansing, MI 48823
billroot23@gmail.com

Erick Williams, JD
1209 Old Hickory
East Lansing, MI 48823
willnielsen@sysmatrix.net

June 27, 2018

US Department of State
Bureau of Political Military Affairs
Directorate of Defense Trade Control
DDTCPublicComments@state.gov
http://www.regulations.gov

Re:  ITAR Amendment—Categories I, II, and III DDTC

Greetings:

These are comments on the Department of State's proposed rule to amend the
International Traffic in Arms Regulations (ITAR) and categories I, II and III of the
US Munitions List (USML).  83 Federal Register 24166, May 24, 2018.

**Background**

The ITAR amendment should be revised to better support the rule of law.

The Arms Control and Disarmament Act, at 22 USC 2551, declares:

> An ultimate goal of the United States is a world … in which the use of force
> has been subordinated to the rule of law …

No profession is more closely identified with the rule of law than the police
profession.  Peace officers are the street-level keepers of the law, all over the
world.  If the United States is committed to "subordinating the use of force to the

1

WASHSTATEC000382

rule of law", it must protect the environment in which peace officers do their work. When armed gangs can overpower local peace officers, local communities become war zones where the rule of law is subordinated to the use of force.

We fail to protect peace officers when we put highly destructive weapons in the hands of civilians who target the police.

The ITAR amendment, as proposed, will make it easier to put firearms in the hands of civilians and armed gangs that are superior to those carried by local peace officers, thus threatening the rule of law in local communities. In several parts of the world, armed gangs are impairing the rule of law, and their activities cross borders. Notorious examples of the adverse effects of firearm proliferation can be seen in Africa and the Middle East, as well as closer to home – in Central America and Mexico, with adverse effects along the southern border of the United States.

See: Alec MacGillis, *"America's Wild-West Gun Laws Are Helping Fuel The Border Crisis: The Unwanted Traffic Between The US And Central America Goes Both Ways"* (New Republic, July 21, 2014), https://newrepublic.com/article/118759/nra-and-gun-trafficking-are-adding-fuel-border-migrant-crisis

Robert Muggah and Steven Dudley, Op-Ed: *"The Latin American Gun Leak"*, (Los Angeles Times, January 16, 2015), http://www.latimes.com/opinion/op-ed/la-oe-muggah-arming-latin-america-20150118-story.html

*"Attacks against Peacekeepers"* (United Nations OHCHR, May 2017), https://www.ohchr.org/Documents/Countries/CF/Mapping2003-2015/Factsheet7-EN.pdf

*"Attacks against civilians and MINUSCA peacekeepers in the town of Bangassou in the Central African Republic"* (Office of the Spokesperson for the UN Secretary-General, May 14, 2017) https://www.un.org/sg/en/content/statement/2017-05-14/statement-attributable-spokesman-secretary-general-attacks-against

Alex Yablon, *"American Guns Drive the Migrant Crisis that Trump Wants to Fix with a Wall"* (Trace, May 25, 2017) https://www.thetrace.org/2017/05/gun-trafficking-central-america-immigrant-crisis-trump-wall/

Jonathan Blitzer, *"The Link Between America's Lax Gun Laws and the Violence That Fuels Immigration"* (New Yorker, March 22, 2018),

2

WASHSTATEC000383

https://www.newyorker.com/news/news-desk/the-link-between-americas-lax-gun-laws-and-the-violence-that-fuels-immigration

See: *"Clear and Present Danger: National Security Experts Warn about the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians"* (Violence Policy Center, July 2005), http://www.vpc.org/studies/50danger.pdf

ITAR should focus more attention on the security needs of local communities where firearms are proposed to be exported.

The Department of State is liberalizing its rules on firearm exports partly because the Department of Defense has determined that so-called semi-automatic firearms are of diminished importance in military conflicts. DoD's determination may well be valid, but it misses the point. Military analysts worry, as they should, about the impact of weapons on the battlefield. But evaluating the impact of firearms on the battlefield gives short shrift to the security needs of civilian communities. To support the rule of law we must consider the impact of firearms on public safety, peace officer safety, crime control, and the prevention and management of civil disturbances. Firearms that "no longer warrant control" by the military may nonetheless overwhelm police patrols and threaten the rule of law in local communities.

ITAR should not treat the US firearms market as the global standard. The United States is proposing to liberalize its rules on firearm exports grounded partly on the false premise that firearms are "widely available in retail outlets ... abroad." That is not true. The US firearms market is unique. Mexico, for example, has more restrictive gun laws than the United States.

See: Topher McDougal, David A. Shirk, Robert Muggah and John H. Patterson, *"The Way of the Gun: Estimating Firearms Traffic Across the US-Mexico Border"* (Trans-Border Institute, University of San Diego, March 2013), https://igarape.org.br/wp-content/uploads/2013/03/Paper_The_Way_of_the_Gun_web2.pdf

Zachary Elkins, Tom Ginsburg & James Melton, "*US Gun Rights Truly Are American Exceptionalism*", (Bloomberg, March 7, 2013), https://www.bloomberg.com/view/articles/2013-03-07/u-s-gun-rights-truly-are-american-exceptionalism

The United States risks alienating friendly foreign nations by projecting its permissive domestic gun laws abroad.

3

The Department of State has access to information about what kinds of weapons are typically carried by patrol officers in foreign countries. The Department has the wherewithal to judge whether a firearm proposed for export is likely to outmatch the firearms carried by local police forces. The Department should use that knowledge -- and make that judgment -- as it evaluates firearm export applications.

In evaluating the suitability of firearm exports, the ITAR should set a maximum limit on the destructive potential of firearms exportable to civilians. Firearms with muzzle energies higher than, for example, 5,000 Joules should be barred from export to non-government end-users. (In ballistics, muzzle energy, commonly expressed in Joules or foot-pounds, is a measure of the destructive potential of a firearm or cartridge.) The risk that a firearm poses to life and property – and the danger it poses to police officers -- depends rather more on the firearm's destructive potential and rather less on whether the firearm is automatic, semi-automatic, non-automatic, not-fully-automatic, or over- or under .50-caliber.

Highly destructive weapons should be off-limits for export to civilians. Whatever short-term economic benefit those exports may generate is outweighed by the risk those weapons pose to the safety of peace officers and the rule of law. No firearm with a muzzle energy of 5,000 J belongs on a street anywhere in the world.

### Policy Recommendations

The following changes should be incorporated in ITAR:

1. Applications for firearm export licenses should be denied when the firearm proposed for export is of such destructive potential as to threaten the safety of local law enforcement officers.

2. Prohibit exports of firearms with muzzle energies less than 5,000 J, to civilian end-users, world-wide, if the firearm is likely to outmatch weapons carried by local peace officers or otherwise impair the efforts of peace officers to control crime and civil disturbance.

3. Prohibit export of firearms with muzzle energies above 5,000 J to civilian end-users world-wide.

4

## Technical Language

The recommendations above may be translated into the ITAR framework using the technical language below.

(1)

22 CFR 120.4

Add a Note 3 to 22 CFR 120.4 as follows:

FOR FIREARMS AND AMMUNITION, PERFORMANCE CAPABILITY INCLUDES DESTRUCTIVE POTENTIAL, AS MEASURED BY MUZZLE ENERGY, COMMONLY EXPRESSED IN JOULES OR FOOT-POUNDS.

(2)

22 CFR 121.1, Category I

Add Note 3 to Category I of 22 CFR 121.1 as follows:

(a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM

5

SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR A FIREARM OR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(c) A FIREARM, AND AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS), AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

(3)

22 CFR 121.1, category II

Add a Note 3 to category II of 22 CFR 121.1, paragraph (a), as follows:

(a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY

6

WASHSTATEC000387

RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF
EXPORT CONTROLS IS INTENDED TO DETER THE
DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN
RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM
SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL
DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR A FIREARM OR
AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES
(3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED
EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT
END-USERS.

(c) A FIREARM, AND AMMUNITION, WITH MUZZLE
ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS),
AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO
NON-GOVERNMENT END-USERS UNLESS THE FIREARM
WOULD TEND TO OUTMATCH WEAPONS NORMALLY
CARRIED BY LAW ENFORCEMENT OFFICERS ON
ROUTINE PATROL IN THE AREA WHERE THE WEAPON
WOULD BE AUTHORIZED FOR USE OR OTHERWISE
IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS
IN THE AREA TO CONTROL CRIME AND CIVIL
DISTURBANCE.

(4)

22 CFR 121.1, category III

Add a new paragraph 4 to notes to category III of 22 CFR 121.1, as
follows:

(a) SUBJECT TO (b) AND (c), APPLICATIONS FOR ITEMS
CONTROLLED UNDER THIS CATEGORY WILL

7

WASHSTATEC000388

GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(b) A LICENSE APPLICATION FOR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT END-USERS.

(c) AMMUNITION, WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS) MAY BE APPROVED TO NON-GOVERNMENT END-USERS UNLESS THE FIREARM WOULD TEND TO OUTMATCH WEAPONS NORMALLY CARRIED BY LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE WEAPON WOULD BE AUTHORIZED FOR USE OR OTHERWISE IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS IN THE AREA TO CONTROL CRIME AND CIVIL DISTURBANCE.

8

(5)

15 CFR 124.14 (c) (9)

Amend 15 CFR 124.14 (c) (9) as follows:

(a)  Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: ''Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained.

(b) SUBJECT TO (c) AND (d), APPLICATIONS FOR ITEMS CONTROLLED UNDER THIS CATEGORY WILL GENERALLY BE CONSIDERED FAVORABLY ON A CASE-BY-CASE BASIS UNLESS THERE IS CIVIL DISORDER IN THE COUNTRY OR REGION OR UNLESS THERE IS EVIDENCE THAT THE GOVERNMENT OF THE IMPORTING COUNTRY MAY HAVE VIOLATED INTERNATIONALLY RECOGNIZED HUMAN RIGHTS.  THE JUDICIOUS USE OF EXPORT CONTROLS IS INTENDED TO DETER THE DEVELOPMENT OF A CONSISTENT PATTERN OF HUMAN RIGHTS ABUSES, DISTANCE THE UNITED STATES FROM SUCH ABUSES AND AVOID CONTRIBUTING TO CIVIL DISORDER IN A COUNTRY OR REGION.

(c) A LICENSE APPLICATION FOR A FIREARM OR AMMUNITION WITH MUZZLE ENERGY OF 5,000 JOULES (3,688 FOOT-POUNDS) OR MORE, OR ASSOCIATED

9

WASHSTATEC000390

EQUIPMENT, SHALL BE DENIED TO NON-GOVERNMENT
END-USERS.

(d) A FIREARM, AND AMMUNITION, WITH MUZZLE
ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS),
AND ASSOCIATED EQUIPMENT, MAY BE APPROVED TO
NON-GOVERNMENT END-USERS UNLESS THE FIREARM
WOULD TEND TO OUTMATCH WEAPONS NORMALLY
CARRIED BY LAW ENFORCEMENT OFFICERS ON
ROUTINE PATROL IN THE AREA WHERE THE WEAPON
WOULD BE AUTHORIZED FOR USE OR OTHERWISE
IMPAIR THE EFFORTS OF LAW ENFORCEMENT OFFICERS
IN THE AREA TO CONTROL CRIME AND CIVIL
DISTURBANCE.

(6)

22 CFR Part 126, Supplement No. 1

In 22 CFR Part 126, Supplement No. 1, category I (a-e) (firearms and
related articles), mark all three country boxes with an X.

In 22 CFR Part 126, Supplement No. 1, category II (a) (guns and
armament), mark all three country boxes with an X.

In 22 CFR Part 126, Supplement No. 1, category III (ammunition and
ordinance), mark all three country boxes with an X.

10

WASHSTATEC000391

(7)

22 CFR 129.7 (b)

Amend 22 CFR 129.7 (b) to add the following:

(b) No person may engage in or make a proposal to engage in brokering activities that involve any country, area, or person referred to in § 126.1 of this subchapter without first obtaining the approval of the Directorate of Defense Trade Controls.  NO PERSON MAY ENGAGE IN OR MAKE A PROPOSAL TO ENGAGE IN BROKERING ACTIVITIES THAT INVOLVE EXPORTING OR TRANSFERRING, TO A NON-GOVERNMENT PERSON, A FIREARM OR AMMUNITION WITH MUZZLE ENERGY GREATER THAN 5,000 JOULES (3,688 FOOT-POUNDS), OR ASSOCIATED EQUIPMENT.  NO PERSON MAY ENGAGE IN OR MAKE A PROPOSAL TO ENGAGE IN BROKERING ACTIVITIES THAT INVOLVE EXPORT OR TRANSFER, TO A NON-GOVERNMENT PERSON, OF A FIREARM OR AMMUNITION WITH MUZZLE ENERGY LESS THAN 5,000 JOULES (3,688 FOOT-POUNDS) OR ASSOCIATED EQUIPMENT IF THE ITEM IS LIKELY TO OUTMATCH LAW ENFORCEMENT OFFICERS ON ROUTINE PATROL IN THE AREA WHERE THE ARTICLE WOULD BE AUTHORIZED FOR USE.

Thank you for the opportunity to submit comments on the ITAR amendment.

Sincerely,


William A. Root
Erick Williams


11

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:11 AM
**Received:** July 02, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-9421-x1wf
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0326
Public Comment 121. Individual. Benita J. Campbell. 7-2-18

## Submitter Information

**Name:** Benita J. Campbell
**Address:**
   23 Hindman Avenue
   Burgettstown,  15021-1165
**Email:** b_j_campbell@yahoo.com
**Phone:** 7249472790

## General Comment

As a citizen of the United States, I have grave concerns about our violent gun culture that does so much harm to
individuals, families, and society at large.

I oppose the proposed rule for the following reasons.

1. The proposed rule treats semi-automatic assault rifles as non-military. But many state and non-state groups in
importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use
rifles in semi-automatic mode an overwhelming amount of the time. Regarding wide retail availability of
firearms, about which comment has been requested, many countries prohibit civilian possession of semi-
automatic rifles and handguns, as well as of any larger caliber firearm. Six U.S. states the District of Columbia,
and several large retail chains also prohibit retail sale of semi-automatic assault rifles. Many semi-automatic
rifles are also easily converted to fully automatic firearms. Because military-style assault rifles clearly have
substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the
statutory framework enacted by the Congress to regulate the export of arms.

2. The proposed rule would eliminate Congressional oversight for important gun export deals. Congress will no
longer be automatically informed about sizable sales of these weapons. That will limit its ability to comment on
related human rights concerns, as it recently did on the Philippines and Turkey.[ii] Congressional action in 2002
required sales of firearms regulated by the US Munitions List valued at $1 million or more be notified to
Congress. Items moved to Commerce control would no longer be subject to such notification. In a September 15,

WASHSTATEC000393

2017, letter, Senators Benjamin Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate Congressional intent and effectively eliminate Congress proper role.

3. The new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and Commerce does not charge any fee for licensing. So the government -- i.e., taxpayers -- will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

4. National laws for brokers and financiers who arrange firearm shipments are a weak link in the chain of efforts to curtail trafficking of small arms and light weapons. There is good reason for concern that firearms brokers will no longer be subject to US brokering law. Although Commerce states it will retain rules on brokering for a State Department list that includes assault rifles, there is no statutory basis for brokers of these weapons to register and obtain a license, increasing the risk of trafficking. That will make it easier for unscrupulous dealers to escape attention.[iii]

5. The rule reduces end-use controls for gun exports. It would eliminate the State Departments Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Governments information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators.End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporters history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

# PUBLIC SUBMISSION

**As of:** 7/12/18 9:45 AM
**Received:** July 03, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-942h-rmq2
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0339
Public Comment 129. Individual. Sandra Spence. 7-3-18

## Submitter Information

**Name:** Sandra Spence
**Address:** United States,
**Email:** sandyspence325@gmail.com

## General Comment

I am submitting this comment in strong opposition to the proposed rule to transfer oversight of small arms (firearms) exports from the State Department to the Commerce Department.

What I don't understand (but have figured out what I believe) is that the Administration has chosen to strengthen its already strong relationship with the NRA and its funders in the gun manufacturing industry to shore up that industry.

Meanwhile the Administration is treating people coming here to escape the escalating violence in their communities in Central America as if they were the criminals, going so far as to separate young children from their parents.

This proposed regulation would only result in even more violence and even more people trying to seek refuge in the U.S. from the violence our own policies would encourage.

This is immoral and should not be allowed.

This rule would make U.S. exports of small arms far more dangerous by transferring controls to an agency that prioritizes doing business over safeguarding national security. The rules elimination of congressional oversight of commercial weapons sales of $1 million or more is also reckless.

This rule has one purpose only: to garner profits for a U.S. gun industry that is faring poorly in the domestic market. It comes after years of lobbying by the NRA and National Shooting Sports Foundation. No one elsed asked for it or wanted it. The NSSF, the trade group for the gun industry, has already boasted the rule would lead

WASHSTATEC000395

to a 20% increase in American gun exports. We see the gun lobbys influence in the rules description of semiautomatic assault rifles like the AR-15 as civilian products. These weapons were not designed for household use, they were designed to kill en masse on the battlefield. That is why they are the weapons of choice for mass shooters.

If you go forward with this disastrous policy, I will do everything in my powerpeacefully and democraticallyto hold your leadership accountable for the resulting global bloodshed. That will include advocating against your budget priorities across-the-board until a new, non-corrupt administration can come in and clean house.

WASHSTATEC000396

# PUBLIC SUBMISSION

**As of:** 7/14/18 11:14 PM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 14, 2018
**Tracking No.** 1k2-944p-9r2i
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0932
Public comment 588. Individual. Sharon Baker. 7-6-18

## Submitter Information

**Name:** Sharon Baker

## General Comment

U.S. firearms exported to Mexican police have been used in massacres and forced disappearances. We need
international background checks to prevent gun exports to military and private groups that use them to commit
violence or collude with organized crime.

At the core of these proposed changes is the mistaken belief that firearms do not merit tighter control because
they are neither high-tech nor provide unique military advantages. In reality, these are some of the weapons most
often used to commit abuses and extend conflict around the world. As such they deserve our highest scrutiny, not
an easier path for sale and one without Congressional oversight.The policy continues the wrong-minded
approach of the Trump administration to treat weapons as any other trade commodity, threatening to undermine
long-term global security and true U.S. national security interests.

"The Trump administration's decision to relax regulations on the export of firearms will make it easier for
terrorists, tyrants and criminal gangs to get their hands on the same dangerous firearms that have been used in
mass shootings in the United States. This is a victory for the NRA and the gun industry and a loss for everyone
else. Relaxing regulations on many firearms by putting them under the jurisdiction of the Commerce Department
rather the the Department of State will make it harder to track where these weapons end up, and therefore easier
for them to be diverted into the wrong hands. To make matters worse, Congress would no longer even be notified
of major firearms exports, making it harder to do things like limit sales to the police in the Philippines who have
been involved in assassinations of their own citizens -- as Sen. Ben Cardin, who blocked such sales in the past,
has noted.

O, let America be America again --
The land that never has been yet --
And yet must be -- the land where every [one] is free.
Langston Hughes, Let America Be America Again

WASHSTATEC000397

WASHSTATEC000398

# PUBLIC SUBMISSION

**As of:** 7/13/18 8:05 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946l-r79w
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0486
Public comment 950. CTP Inc. Anonymous. 7-9-18

## Submitter Information

**Name:** Anonymous Anonymous
**Organization:** CTP, Inc.

## General Comment

BIS has noted in its proposed rule announcement that [t]he EAR does not include a concept of defense services, and the technology related controls are more narrowly focused and apply in limited contexts as compared to the ITAR. Consider that if ECCN 0E501 will control technology for the development, production, operation, installation, maintenance, repair, or overhaul of firearms controlled by new ECCN 0A501, then certain firearms training, which would have previously been an ITAR-controlled defense service, may now be NLR to many destinations.

BIS has also noted, If a gun manufacturer posts a firearms operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be subject to the EAR. Following this logic, consider the fact that if a gun manufacturer posts on the internet for unlimited distribution 0E501 technology for the production of a 0A501 firearm (e.g., 3D printer specs), then it is not an unauthorized technology transfer but rather publicly available information no longer subject to the EAR.

WASHSTATEC000399

# PUBLIC SUBMISSION

**As of:** 7/13/18 7:48 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946n-4h2d
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0477
Public comment 959. Individual. Sayre Weaver. 7-9-18

## Submitter Information

**Name:** Sayre Weaver
**Address:**
  372 Avenida Castilla Unit A
  Laguna Woods, CA, 92637
**Email:** sayre.weaver@gmail.com
**Phone:** 213-924-8755
**Fax:** none

## General Comment

I am a former Deputy District Attorney and a lawyer for more than 30 years who has spent much of her career representing survivors and victims of gun violence and local governments seeking to address gun violence in their jurisdictions through enactment of commonsense firearms laws. I am opposed to the proposed rule changes for all the reasons set forth in my comment submitted to the State Department. In summary, these proposed rule changes are contrary to the Congressional intent in enacting the statutes that govern arms exports, would reduce end-use controls for gun exports, increase the risk of small arms being trafficked by international human rights violators by eliminating registration of firearms exporters. By moving oversight to Commerce the proposed rule changes would effectively end State's successful and necessary Blue Lantern program, eliminate use of the State Department's database for tracking data related to illegal firearms trafficking abroad, and eliminate Congressional oversight for important firearms export deals. The end result of the proposed changes would be to further fuel armed conflict abroad by treating assault weapons as non-military weapons and moving to Commerce's control, a department whose primary mission is to increase trade, the very weapons research shows are the weapons of choice for gun traffickers, drug traffickers, and criminal organizations abroad.

WASHSTATEC000400

Case 2:20-cv-00111-RAJ   Document 106-7   Filed 09/23/20   Page 401 of 514

# PUBLIC SUBMISSION

**As of:** 7/13/18 7:34 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 13, 2018
**Tracking No.** 1k2-946p-o2qu
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0471
Public comment 965. Anonymous. 7-9-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Comments from an individual who works with USMLCategory I exporting every day:
Product migration will create a small cost-savings for my company in registration and licensing fees, but more significantly I do not see a demonstrated equivalent in terms of paperwork reduction or real time savings. Financial savings for smaller manufacturers will be proportionately larger and could increase the pool of available vendors with whom we work, which is a positive. I understand it has been problematic for small companies caught in the registration net due to their manufacturing activities, but whose size/finances cannot absorb the registration fee. This issue is better resolved by changing the definition of manufacturer to add a minimum size requirement..
The licensing process will still involve inter-agency review including staffing out to State Dept. Agencies and DOD. Other than utilizing a different application form and the change in the agency receiving applications, it has not been demonstrated exactly what, if any, process improvement this represents. Caveat: the devil you know is better than the one you don't.
Improvements and savings are quantified using the 43.8 minutes for BIS application vs. the 60 minutes for DDTC application. This metric provides no meaningful data from which to extrapolate total process savings or if any is really generated. It also in no way accounts for the additional significant burden which has been added to the exporting process by increasing the quantity and type of data capture elements which will be required for AES filing, including the need to record individual serial numbers for each firearm. Adding time-consuming elements later in the exporting chain significantly increases the time it takes to complete an export. These new control/requirements are more cumbersome than the current process under the ITAR. They will also increase the burden on an already overloaded CBP.
Recordkeeping changes discuss maintaining warranty certificates for international repair returns. My company does not issue customer specific warranty certificates, and I see this item as an additional record keeping burden which does not relate directly to exporting.
There will be burdens and expenses of transition: reclassification of all product, re-training of all employees, advanced training needed for Compliance personnel. I have not had to utilize SNAP-R previously, nor have I had

WASHSTATEC000401

to deal extensively with Commerce-controlled exporting other than EAR99 product. There will be a substantial amount of time required to achieve comfort level with a new set of regulations. I understand this burden is considered short term, however the provided rationale for this migration has still not clearly demonstrated a substantial process improvement to warrant the expense and time of this transition.

The EAR does not include a concept of defense services and the technology controls are more narrowly focused and apply in limited contexts as compared to the ITAR. This change represents an improvement in terms of my ability to share information needed for marketing firearms and for repairing them internationally, but the same result could be achieved via amendment to the ITAR, factoring in that there have been few substantive changes to basic firearms technology in the past several decades and that most of this information is already available worldwide.

Maintenance of EAR status of previously classified product: The classification status of items that have been previously determined to be EAR99 product in formal CJ determinations is to remain EAR99 for these items. However, the scope mounts, swivels, accessory rails and iron sights enumerated in y.2 , y.3 and y.4 of 0A501 contradicts this statement and places them under .y control. I would appreciate clarifying language regarding EAR99 status and the removal of these items from .y control.

LVS shipments: the positive effect of the amendment made here by raising the value from the $100 of 123.17(a) to $500 is diminished by the change in language from wholesale value to the actual selling price. For relief to be genuine, the $500 increase should be wholesale value and an additional increase to $1000 for shipments to Canada, should also be considered. I do appreciate that receivers and breech mechanisms would be eligible for LVS if the destination is Canada.

I concur with the need for an appropriate 180 day delayed effective date for final rule. This amendment represents a major change in business operations and I will need time to completely identify all business operations requiring attention, create an implementation plan and draft appropriate changes in SOPs with accompanying training.

Finally, the rationale for this transition is based upon products being civilian use vs. military. Given that the debate regarding semi-automatic firearms has not been resolved in this country, we could incur transition expenses only to have the entire process reversed.

WASHSTATEC000402

# PUBLIC SUBMISSION

**As of:** 7/12/18 12:39 PM
**Received:** July 03, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-942q-yy2q
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant
Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0378
Public Comment 980. Deborah Cake. 7-3-18

## Submitter Information

**Name:** Deborah Cake
**Address:**
  60 Harvard St
  Winchester, MA, 01890

## General Comment

July 3, 2018
Comment on The Bureau of Industry and Security (BIS) Proposed Rule: Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions
List (USML)

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to
the U.S. Commerce Department.

I couldnt be more astonished and dismayed that the gun lobby and industries are pushing for a rule change that
would move the handling of export licenses of semiautomatic assault weapons and other powerful firearms from
the U.S. State Department (focused on safeguarding our nation) to the U.S. Commerce Department (focused on
promoting American business).

Firearms are rightfully categorized as military, and are under the regulation of the State Department. Congress
should continue to be automatically informed about sizeable weapons sales and have the authority to stop them
when that poses a risk to our national security or threatens to increase human rights violations by facilitating
weapons sales to oppressive regimes.

No one anywhere should be allowed to make firearms on a 3- printer. Period!
Arms brokers should always be licensed, to try and prevent unlawful trafficking..
And by no means should the State Departments Blue Lantern program, in place since 1940, which carries out
hundreds of pre-license and post-shipment inspections and publicly reports on them, be dismantled.

The existing rules must be maintained and strengthened if switching the regulation of firearms exports from the State Department to the Commerce Department facilitates firearms exports to oppressive regimes, removes safeguards that help keep extra-legal agents like organized crime and terrorist organizations from obtaining weapons, and further fuels violence that destabilizes countries and causes mass migration.

Do not weaken our fire arm protections by a transfer of authority from the State Department to the Commerce Department. Do not feed into the global oppressors and black market by deregulation.

Thank you for taking this letter, my opinion, seriously.
Deborah Cake
01890

# Attachments

I oppose this BIS rule change that would switch the regulations of firearms export from the U

*July 3, 2018*
*Comment on* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, & III
The *Bureau of Industry and Security* (BIS) Proposed Rule: <u>Control of Firearms, Guns,</u>
<u>Ammunition and Related Articles the President Determines No Longer Warrant Control Under</u>
<u>the United States Munitions List (USML)</u>

*I oppose this rule change that would switch the regulations of firearms export from the U.S.*
*State Department to the U.S. Commerce Department.*

I couldn't be more astonished and dismayed that the gun lobby and industries are pushing for
a rule change that would move the handling of export licenses of semiautomatic assault
weapons and other powerful firearms from the U.S. State Department (focused on
safeguarding our nation) to the U.S. Commerce Department (focused on promoting American
business).

Firearms are rightfully categorized as "military", and are under the regulation of the State
Department. Congress should continue to be automatically informed about sizeable weapons
sales and have the authority to stop them when that poses a risk to our national security or
threatens to increase human rights violations by facilitating weapons sales to oppressive
regimes.

No one anywhere should be allowed to make firearms on a 3- printer. Period!
Arms brokers should always be licensed,  to try and prevent unlawful trafficking..
And by no means should the State Department's Blue Lantern program, in place since 1940,
which carries out hundreds of pre-license and post-shipment inspections and publicly reports
on them, be dismantled.

The existing rules must be maintained and strengthened if switching the regulation of firearms
exports from the State Department to the Commerce Department facilitates firearms exports
to oppressive regimes, removes safeguards that help keep extra-legal agents like organized
crime and terrorist organizations from obtaining weapons, and further fuels violence that
destabilizes countries and causes mass migration.

Do not weaken our fire arm protections by a transfer of authority from the State Department to
the Commerce Department. Do not feed into the global oppressors and black market by
deregulation.

Thank you for taking this letter, my opinion, seriously.
Deborah Cake
01890

# PUBLIC SUBMISSION

**As of:** 7/12/18 12:24 PM
**Received:** July 04, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-9431-uzq7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0377
Public Comment 981. Anonymous. 7-4-18

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

See attached file(s)

## Attachments

I oppose this rule change that would switch the regulations of firearms export from the U

WASHSTATEC000406

I oppose this rule change that would switch the regulations of firearms export from the U.S. State Department to the U.S. Commerce Department.

Congress must not be prevented from being automatically informed about sizable weapons sales.  Congress must be able to stop sizable weapons sales in the name of national security, even and especially to countries where there are serious human rights concerns, such as the Philippines and Turkey.  Depriving Congress of this ability to monitor these sales is a terrible, dangerous idea.  It would open the door to firearms traffickers, organized crime, terrorist organizations, and other violent and dangerous agents would face far fewer hurdles to obtaining large caches of American guns and ammunition.

Allowing this country to do such an unconscionable thing is not only unamerican, it would directly contribute to making the world a more dangerous place as well as inviting security breaches here at home.

# PUBLIC SUBMISSION

**As of:** 7/12/18 11:46 AM
**Received:** July 06, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-944k-mi51
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0374
Public Comment 984. Individual. Beth Katz. 7-6-18

## Submitter Information

**Name:** Beth Katz

## General Comment

See attached file(s)

## Attachments

Beth Katz Public Comment Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

WASHSTATEC000408

July 6, 2018

To:     Office of Defense Trade Controls Policy, U.S. Department of State
        Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce

In Reference to **FRN 2018-10366** (State) and **83 FR 24166** (Commerce).
---------------------------------------------------------------------------------------------------------------

I am writing to express my opposition to the proposed regulatory changes published in the Federal Register on May 24, 2018, as "International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III" **(**DOS_FRDOC_0001-4527) and "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)" (83 FR 24166). The proposed changes raise significant concerns for me as a parent, as an American citizen and taxpayer, and as someone who has studied and wrote my graduate thesis on the international small arms trade.

As a parent of a young child, I am deeply concerned about the impact that these changes will have on both global and domestic security for the foreseeable future. The proposed changes would greatly diminish oversight of the export of semi-automatic assault weapons, high capacity ammunition clips and training on such military equipment. The suggested changes would make it more likely that these dangerous weapons will end up in the hands of traffickers, terrorists or cartels and used against US service members.  This increases the likelihood for greater destabilization and conflict worldwide as well as for these weapons to be trafficked back into the U.S. for nefarious uses here.  The new rule also removes the block on 3D printing of firearms. This will facilitate unregulated gun production in the U.S. and abroad by making it possible for anyone, anywhere, with access to a 3D printer to produce a lethal weapon. By effectively eliminating many means to detect firearms, background checks on domestic sales and end-use controls on international exports for such weapons, these changes could generate many preventable tragedies. These proposed changes will create a world that is less safe for my son and other children to grow up in and to live; and therefore should not be adopted.

As an American citizen, I believe that these proposed changes diminish U.S. credibility in the eyes of the international community and compromise our global leadership. The proposed changes call for transfering gun export licensing from the State Department, an agency with a mission to promote stability, conflict reduction, and human rights, to the Commerce Department, an agency with mission to promote trade. In doing this, we are retreating on our global commitment to human rights and acting as though the export of firearms is just another commodity when the impact of these weapons is far more consequential and deadly. Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research shows that the types of weapons being transferred to Commerce control, including AR-15, AK-47, and other military-style assault rifles and their ammunition, are sought out weapons used by criminal organizations in Mexico and other Latin American countries to perpetrate most of the increasing and record levels of homicides in those countries. The U.S. should not be adopting policies like the proposed changes which amplify this. Rather, we should be working collaboratively, as we have under previous administrations, to find ways to prevent and reduce firearms from being used to carry out human rights violations and crime.

As a U.S. taxpayer, I also find these proposed changes to be fiscally irresponsible. The new rule would transfer the cost of processing licenses from gun manufacturers to U.S. taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of

tracking who is manufacturing weapons would no longer apply to manufacturers of semi-automatic weapons, and the Commerce Department does not charge any fee for licensing. This means that U.S. taxpayers, such as me, will absorb the cost of reviewing applications and processing licenses rather than the gun exporters that benefit from these sales. In addition, U.S. taxpayers also will need to shoulder the costs of having to build the capacity and expertise of the Commerce Department to properly administer the proposed changes. The Commerce Department currently does not have resources to enforce export controls, even before the addition of 10,000 firearms export license applicants as a result of this rule predicted by Commerce (see Department of Commerce Budget in Brief FY2017, p. 57, http://www.osec.doc.gov/bmi/budget/FY17BIB/AllFilesWithCharts2.pdf ). The Commerce Department's Bureau of Industry and Security's enforcement office, who would be charged to oversee the new changes, does not have staff in Latin America, Africa, or many other parts of the world and is not equipped to take the same level of preventive measures for end-use controls. In stark contrast, the State Department, who oversees these items while they reside on the USML, has developed extensive data, expertise and institutional relations to implement the Leahy Law for security assistance, which can serve as a critical foundation in both pre-license and post-shipment checks to control and verify end uses and end users. The Commerce Department does not have these resources and developing them will come at a substantial cost to U.S. taxpayers.

Finally, as someone who has studied and researched the international small arms trade, I can confidently say that greater regulation, not less as the proposed rule would enable, is needed to curb the disproportionate impact that these weapons have on fueling conflict, terrorism, and crime around the world. One particularly troubling part of the new rule is its reduction of end-use controls for gun exports. It would eradicate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department within State that compiles the U.S. Government's information on human rights violations, decreasing the ability to effectively stop weapons licenses from going to international human rights violators. End-use controls also are weakened by removing the registration of firearms exporters, a requirement since the 1940s. Under the current rules, registration of exporters lets the State Department check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. Migrating the licensing to the Commerce Department will remove new exporters and brokers of these firearms from the State Department database, losing an important part of the evidentiary trail that enables the prosecution of arms traffickers.

It is for all the reasons listed above that I urge you to reject the proposed changes and to keep the items currently listed on the State Department-administered US Munitions List (USML) intact.

Thank you for your time and consideration.

Sincerely,

Beth Katz
Omaha, Nebraska

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:51 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946f-n3f7
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0355
Public Comment 985. Catholic Health Initiatives. Colleen Scanlon. 7-9-18

## Submitter Information

**Name:** Colleen Scanlon
**Organization:** Catholic Health Initiatives

## General Comment

See attached letter.

## Attachments

CHI_Overseas gun sales_final

WASHSTATEC000411



Catholic Health
Initiatives

*Imagine better health.℠*

198 Inverness Drive West          **P** 303.298.9100
Englewood, CO 80112               catholichealthinitiatives.org

*Submitted via regulations.gov*

July 9, 2018

Wilbur Ross                              Mike Pompeo
Secretary                                Secretary
Regulatory Policy Division               Office of Defense Trade Controls Policy
Bureau of Industry and Security          Directorate of Defense Trade Controls
U.S. Department of Commerce              U.S. Department of State
Room 2099B                               2201 C Street NW
1401 Constitution Avenue NW              Washington, D.C. 20520
Washington, DC 20230

**RE: RIN 0694-AF47 (Commerce) and RIN 1400-AE30 (State)**

Dear Mr. Ross and Mr. Pompeo,

Catholic Health Initiatives appreciates the opportunity to comment on the proposed rules to
address the Control of Firearms, Guns, Ammunition and Related Articles the President
Determines No Longer Warrant Control Under the United States Munitions List (USML).
Catholic Health Initiatives (CHI) is a faith-based nonprofit health system operating in 18 states
with 100 hospitals and numerous other services and facilities that span the inpatient and
outpatient continuum of care. As a Catholic organization, we feel a special call to reduce
violence in our communities and around the world.

While these proposed rule touches many aspects of firearm regulation, sales and oversight, CHI
is particularly concerned about the transfer of weapon sale regulation from the State
Department to the Commerce Department and the negative effect this may have on violence
around the world. Firearms, both assault weapons and non-semi-automatic weapons, are
uniquely and pervasively used in criminal violence around the world. Controlling their export
should be handled by the State Department, which is mandated and structured to address the
potential impacts in importing nations on stability, human security, conflict, and human rights.

Rather, the rule proposes to transfer gun export licensing to the Commerce Department, whose principle mission is to promote trade.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. The types of weapons being transferred to Commerce Department control—including the AR-15, AK-47, and other military-style assault rifles and their ammunition—are among the deadliest personal-use weapons produced in the United States. We also understand they are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries. The export of these weapons should be subject to more controls, not less.

**We should not export American violence solely to boost economic development, competitive advantage, or other commerce-related goals. We strongly urge the Departments of Commerce and State to rescind this proposed rule.**

Thank you for consideration of our comments on this important issue. If you have any questions, please contact me at 303-298-9100 or contact Laura Krausa, Director of Advocacy, at laurakrausa@catholichealth.net.

Sincerely,

Colleen Scanlon, RN, JD
Senior Vice President and Chief Advocacy Officer

WASHSTATEC000413

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:44 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946i-ymie
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0351
Public Comment 986. Violence Policy Center. Kristen Rand. 7-9-18

## Submitter Information

**Name:** Kristen Rand
**Address:**
    1025 Connecticut Ave NW
    Suite 1210
    Washington,  DC,  20036-5421
**Email:** krand@vpc.org
**Phone:** 2023874525
**Organization:** Violence Polcy Center

## General Comment

The comments of the Violence Policy Center are attached.

## Attachments

Exports comments VPC Commerce RIN 0694-AF47

WASHSTATEC000414

**COMMENTS OF THE VIOLENCE POLICY CENTER TO THE U.S. DEPARTMENT OF COMMERCE, BUREAU OF INDUSTRY AND SECURITY**

**RE: RIN 0694-AF47**

<u>**Submitted via eRulemaking Portal**</u>

The Violence Policy Center (VPC) is a national non-profit educational organization working to reduce gun violence through research, public education, and advocacy. The VPC has a particular expertise in researching and monitoring the gun industry and we regularly issue reports and analyses regarding the industry and its products. The VPC has also done extensive research on cross-border gun trafficking.

The VPC has serious concerns regarding the rules proposed by the U.S. Departments of Commerce and State to transfer non-automatic and semi-automatic firearms and ammunition, as well as parts and related defense services currently controlled by Category I, II, or III of the U.S. Munitions List under the International Traffic in Arms Regulations (ITAR), to the control of the Export Administration Regulations (EAR). The proposed transfer would significantly weaken controls on small arms and ammunition and will result in a higher volume of export sales with less transparency and oversight. The ability to prosecute violations will also be impaired. The changes will enhance the risks that lethal weapons widely used for military purposes will end up in the hands of criminal organizations, human rights abusers, and terrorist groups.

The proposed rules treat semi-automatic assault rifles as "non-military." But many state and non-state groups in importing countries use semi-automatic rifles in armed conflicts, causing enormous damage. U.S. troops use rifles in semi-automatic mode an overwhelming amount of the time. VPC research clearly demonstrates that the types of semi-automatic rifles, handguns, sniper rifles, large-capacity ammunition magazines, receivers, and other parts subject to the new rules are the types of weapons and accessories preferred by cross-border gun traffickers.[1] Moreover, many of the sniper rifles subject to the transfer are in use by military forces.[2] One particularly problematic rifle is the 50 caliber anti-armor sniper rifle that is capable of downing

---

[1]      *An Ongoing Analysis of the Types of Firearms Illegally Trafficked from the United States to Mexico and Other Latin American and Caribbean Countries as Revealed in U.S. Court Documents*, Violence Policy Center**:** http://www.vpc.org/indicted/.

[2]      "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon: 5 guns no one wants to go to war against," *The National Interest*, March 11, 2018: http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851.

aircraft on take-off and landing and can pierce light armor.[3] In addition, these rifles have been identified as a national security threat by a number of experts and entities.[4]

The devastation that semi-automatic firearms equipped with large-capacity ammunition magazines can inflict is demonstrated by their common use in mass shootings in the United States.[5]

Regarding whether the items described in the proposed rules are widely available in commercial outlets, an issue about which comment has been requested, many of the items are rapidly becoming less available in the United States. Six U.S. states and the District of Columbia prohibit retail sale of semi-automatic assault rifles. Eight states and the District of Columbia ban large-capacity ammunition magazines. Several large retail chain stores have acted to stop the sales of semi-automatic firearms and large-capacity ammunition magazines. For example, Walmart does not sell semi-automatic assault weapons. The store does not sell handguns, except in Alaska. They also do not sell large-capacity ammunition magazines.[6]

Other large retail outlets, such as Dick's Sporting Goods, have recently acted to stop the sales of semi-automatic assault weapons (which the gun industry euphemistically calls "modern sporting rifles"). Dick's is even destroying its unsold inventory of assault weapons.[7] Finally, many countries prohibit civilian possession of semi-automatic rifles and handguns and the trend is toward prohibiting such weapons. For example, Norway is moving to ban semi-automatic firearms as of 2021. In 2011, Norway experienced one of the worst mass shootings outside of the U.S. The shooter used a Sturm Ruger Mini-14 semi-automatic rifle and a Glock semi-automatic handgun to kill 69 people at a youth camp. Both of these weapons are examples of those that will be transferred to Commerce's control under the proposed rules.

---

[3]     For more information on the capabilities of 50 caliber sniper rifles, see the Violence Policy Center's resource page: http://www.vpc.org/regulating-the-gun-industry/50-caliber-anti-armor-sniper-rifles/.

[4]     *National Security Experts Agree: 50 Caliber Anti-Armor Sniper Rifles Are Ideal Tools for Terrorists*, Violence Policy Center, 2005: http://www.vpc.org/fact_sht/snipersecurityexperts.fs.pdf.

[5]     See, for example, Violence Policy Center list of mass shootings involving high-capacity ammunition magazines: http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

[6]     Walmart Statement on Firearms Policy, accessed on July 3, 2018: https://news.walmart.com/2018/02/28/walmart-statement-on-firearms-policy.

[7]     "Dick's Sporting Goods plans to destroy all the assault rifles it pulled off its shelves," *CNN*, April 19, 2018: https://www.cnn.com/2018/04/19/us/dicks-sporting-goods-guns-trnd/index.html.

WASHSTATEC000416

Many semi-automatic rifles are also easily converted to fully-automatic firearms. Because military-style assault rifles clearly have substantial military utility, transfer of these firearms to Commerce Department control is inconsistent with the statutory framework enacted by the Congress to regulate the export of arms.

The rules will enable the production and distribution of 3D-printed firearms. When Defense Distributed founder Cody Wilson posted online instructions for 3D-printed firearms, the State Department successfully charged him with violating arms export laws since his open-source posting made it possible for anyone with access to a 3D printer, anywhere, to produce a lethal weapon. The Commerce Department is unlikely to take similar action once such weapons are transferred to their control. Unless corrected, the new regulations run the risk of effectively condoning and enabling 3D printing of firearms in the U.S. and around the globe. This change alone could generate many preventable tragedies while changing the landscape of firearm manufacture, distribution and regulation.

The proposed rules would revise License Exception BAG to allow U.S. citizens and permanent resident aliens temporarily leaving the U.S. to take up to three non-automatic and semi-automatic firearms and up to 1,000 rounds of ammunition for such firearms for personal use while abroad (License Exception BAG). Currently, BAG applies only to non-automatic firearms. The proposed rules create a new exception for semi-automatic firearms and also revise the current rule to allow nonresident aliens leaving the U.S. to take firearms "accessories," "attachments," "components," "parts," and ammunition controlled by 0A501 or 0A505, provided that these were lawfully brought into the U.S.

The revision to the License Exception BAG is highly problematic considering that semi-automatic weapons can inflict catastrophic damage. If such a weapon is stolen or lost, there will little that can be done to recover the weapon. It will also be much easier for smugglers to take advantage of these exceptions to facilitate trafficking.

No justification is offered for changes to the current BAG framework. As described previously, semi-automatic weapons are prized by criminal organizations and the proposed change is likely to increase the risk of crime and violence.

The proposed rules would eliminate Congressional oversight for important gun export sales. Congress will no longer be automatically informed about sizable sales of these weapons. This change will limit the ability of Congress to comment on related human rights concerns, as it recently did on the Philippines and Turkey. In 2002, Congress acted to require it be notified of sales of firearms regulated by the U.S. Munitions List valued at $1 million or more. Items moved to Commerce's control would no longer be subject to such notification. In a September 15,

WASHSTATEC000417

2017, letter, Senators Ben Cardin, Dianne Feinstein, and Patrick Leahy explicitly noted that this move would violate congressional intent and effectively eliminate congressional oversight.[8]

The rules reduce end-use controls for gun exports. It would eliminate the State Department's Blue Lantern program for gun and ammunition exports, which carries out hundreds of pre-license and post-shipment inspections and publicly reports on them. It also would move license approval out of the department that compiles the U.S. Government's information on human rights violations, reducing the ability to effectively deny weapons licenses to international human rights violators. End-use controls also are weakened by eliminating registration of firearms exporters, a requirement since the 1940s. Registration of exporters allows the State Department to check an exporter's history whenever a manufacturer or broker requests a license for a particular gun export sale. But the transfer of licensing to Commerce will remove new exporters and brokers of these firearms from the State Department database, weakening enforcement against arms trafficking.

Gun manufacturers are extolling the new rules as an opportunity for increased profits in a climate of declining domestic sales.[9] At the same time, the new rules would transfer the cost of processing licenses from gun manufacturers to taxpayers. Registration fees that since the 1940s have been used to offset the costs to the government of tracking weapons production would no longer apply to manufacturers of semi-automatic firearms. The government and taxpayers will absorb the cost of reviewing applications and processing licenses. Gun exporters that benefit from these sales should shoulder this cost.

**CONCLUSION**

The proposed rules would transfer gun export licensing to an agency – the Commerce Department – the principal mission of which is to promote trade. Firearms are uniquely and pervasively used in criminal violence around the world. Controlling their export should be handled by the State Department, which is mandated and structured to address the potential impacts in importing nations on stability, human security, conflict, and human rights.

Firearms are used to kill a thousand people every day around the world in acts of organized crime, political violence, terrorism, and human rights violations. Research indicates that the

---

[8]      Letter to Secretary of State Rex Tillerson, September 15, 2017.

[9]      "Trump State Department Looks to Stream Line Firearms Exports & Open US Markets," *Ammoland*, May 15, 2018: https://www.ammoland.com/2018/05/trump-state-department-looks-to-stream-line-firearms-exports-open-us-markets/#axzz5KDSk0Jdz.

types of weapons being transferred to the Commerce Department's control – including AR-15, AK-47, and other military-style assault rifles such as 50 caliber sniper rifles as well as their ammunition – are weapons of choice for criminal organizations in Mexico and other Latin American countries and are responsible for most of the increasing and record levels of homicide in those countries. The rules are certain to increase the volume of exports of these firearms. The export of these weapons should be subject to more controls, not fewer.

The proposed rules would significantly weaken export controls and oversight of many military firearms highly prized by terrorists, drug-trafficking organizations, and common criminals. Semi-automatic assault rifles, high-capacity ammunition magazines, sniper rifles (especially 50 caliber sniper rifles), and high-caliber firearms should remain on the United States Munitions List (USML).

The requirement that Congress be notified of all sales of former and USML-controlled firearms of more than $1 million should be retained.

The provision authorizing license-free exports of semi-automatic rifles by citizens and legal permanent residents should be removed.

Respectfully submitted,

Kristen Rand
Legislative Director
Violence Policy Center
1025 Connecticut Ave NW
Suite 1210
Washington, DC 20036

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:40 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946i-gs5d
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0350
Public Comment 987. American Bar Association_Security Assistance Monitor and by Amnesty International USA. John Lindsay-Poland. 7-9-18

## Submitter Information

**Name:** John Lindsay-Poland
**Address:** United States,
**Email:** johnlindsaypoland@gmail.com

## General Comment

The below comment on the proposed rules by the Departments of State and Commerce supplements the comments submitted by the American Bar Association/Security Assistance Monitor and by Amnesty International USA, which we support. Please see the attached version for complete comment, sources, and notes.

The State Department proposed rule states that those weapons that would stay on the USML are inherently for military end use, adding that the items to be removed from the USML do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad. One State Department official reportedly said: We kind of refer to it as the Walmart rule. If its like something you can buy at a Walmart, why should we have control?

The Commerce Departments description of criteria for items to be moved off of the USML concludes: Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items. (p. 4) It adds that: There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. However, the examples given here are not from prospective importing nations, but from the United States: Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their parts, components, accessories and attachments.

Retail availability in the U.S. should not be a criterion, since this is not the market to which exports treated by the proposed rule will be directed. Moreover, the U.S. retail firearms market is qualitatively and quantitatively

different from nearly every market in the world: with 4.4% of the worlds population, the U.S. comprises more than 45% of the worlds firearms in civilian possession.

In addition, the statement neglects another significant portion of the worldwide market for firearms: criminal organizations, illegal armed groups, and armed security forces that commit human rights violations.

In many countries, retail availability of all firearms is substantially limited. In Mexico, for example, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm. In the vast majority countries, according to one of the few studies of firearms regulations, there is a presumption against civilians owning firearms unless certain conditions and requirements are met. (S. Parker, Small Arms Survey, 2011)

Many nations either do not permit or highly restrict civilian use of some or all types of semi-automatic firearms and high-capacity magazines proposed for removal from the USML, and so cannot be said to have any retail availability of these prohibited firearms. Within the United States, semi-automatic rifles and high-capacity magazines are prohibited for retail sale in six states and the District of Columbia. Certain types of handguns and certain calibers of firearms that are included in Category I are also prohibited and not available for retail purchase in some countries.

That purchase and possession of certain types firearms and ammunition are permitted under national legislation does not necessarily indicate that these items are either widely available or feasible for most people to obtain. Many countries deeply restrict retail availability of all firearms through licensing requirements, which are often extensive and time-consuming.

States impose limitations on the retail availability, types of firearms that may be legally purchased, and licensing process for parties seeking to purchase a firearm because they recognize that guns are not like ordinary commercial items that can be purchased at a store. In many countries, legal markets for firearms blend with illegal markets in vast grey areas of stolen and diverted weapons. The potential and actual negative consequences of the ill use of such firearms are devastating. A coherent, ethical, and politically strategic approach to firearm exports would increase controls to help reduce violent harm by both state and non-state actors that will more easily acquire them under the proposed rules.

The proposed rules do not articulate any requirement for a review by State Department experts on human rights and criminal organizations. If that is the proposers intent, the rule should state it clearly, and spell out the scope of license applications subject to such review, concurrences required, specifying from which bureaus and agencies, and the competencies of experts who shall conduct reviews.

John Lindsay-Poland, Global Exchange

# Attachments

GlobalExchange comment 9july2018

WASHSTATEC000421

**Comment on Proposed Rules on Categories i-ii-iii by Depts. of State and Commerce**
John Lindsay-Poland, Global Exchange

The below comment on the proposed rules by the Departments of State and Commerce supplements the comments submitted by the American Bar Association/Security Assistance Monitor and by Amnesty International USA, which we support. This comment focuses on the proposed criterion of wide retail availability for firearms and munitions proposed for transfer from the USML to the Commerce Department, and includes brief comments about inter-agency review and about risks of criminal use.

The State Department proposed rule states that those weapons that would stay on the USML "are inherently for military end use," adding that the items to be removed from the USML "do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad." (p. 5) One State Department official was quoted in a press report about the proposed rule: "We kind of refer to it as the Walmart rule. If it's like something you can buy at a Walmart, why should we have control?"[1]

The Commerce Department's description of criteria for items to be moved off of the USML concludes: "Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items." (p. 4) It adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities." (pp. 6-7) However, the examples given here are not from prospective importing nations, but from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'" (p. 7)

The retail availability in the United States should not be a criterion, since this is not the market to which exports treated by the proposed rule will be directed. Moreover, the U.S. retail firearms market is qualitatively and quantitatively different from nearly every market in the world: the United States, with 4.4% of the world's population,[2] comprises more than 45% of the world's firearms in civilian possession.[3]

In addition, the statement neglects another significant portion of the "worldwide market for firearms": criminal organizations, illegal armed groups, and armed security forces that commit human rights violations.

In many countries, the retail availability of all firearms is substantially limited. In Mexico, for example, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm.[4] In China, firearm purchases are banned for most people, and private gun ownership is almost unheard of.[5] In the vast majority countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning

WASHSTATEC000422

firearms unless certain conditions and requirements are met."[6]

Belize, Colombia, Israel, Japan, Kenya, Turkey, and United Kingdom do not permit any civilian use of some or all types of semi-automatic firearms proposed for removal from the USML, and so cannot be said to have any retail availability of these prohibited firearms.[7] Other nations, including Australia, Canada, Croatia, India, Lithuania, New Zealand, South Africa, Switzerland apply special restrictions to civilian possession of semi-automatic firearms, such as proof that they are needed for self-defense, and so it cannot be said that these firearms are "widely available in retail outlets" there. We emphasize that these examples are from only a selected sample of 28 countries; a full accounting of countries where there is only limited or any retail availability of semi-automatic firearms would certainly show many more.[8] Brazil also prohibits "assault weapons" for civilian purchase, while Chile and Colombia prohibit civilian possession of semi-automatic weapons entirely.[9]

Moreover, within the United States, semi-automatic rifles and high-capacity magazines such as those proposed to be removed from the USML are prohibited for retail sale in six states and the District of Columbia.

Magazines with a capacity of more than 10 rounds are not permitted for civilians in Australia.[10] Brazil, France, Romania, Slovenia, Spain, and Turkey do not permit purchase by ordinary civilians of high-capacity magazines.[11] DDTC policy has reportedly excluded export of high-capacity magazines except to military and law enforcement end users,[12] but nothing in the proposed rule indicates that the Department of Commerce would enact such a policy.

Certain types of handguns and certain calibers of firearms that are included in Category I are also prohibited and not available for retail purchase in some countries. In the Dominican Republic, for example, "certain firearms are considered 'war weapons' and can only be used by government forces, including .45 calibre pistols [and] rifles," according a Small Arms Survey study,[13] while Spain prohibits civilian purchase of firearms with a caliber of 20 mm or higher, which are considered to be "designed for war use."[14] More types – in some cases all types - of handguns are prohibited for civilian purchase in Belize, Canada, Colombia, Japan, Kazakhstan, the Russian Federation, the United Kingdom, and Venezuela.[15]

That purchase and possession of certain types firearms and ammunition are permitted under national legislation does not necessarily indicate that these items are either widely available or feasible for most people to obtain. In addition to prohibitions or restrictions on retail availability of types of firearms, many countries deeply restrict retail availability of all firearms through licensing requirements, which are often extensive and time-consuming. In India, for example, obtaining a license to acquire a firearm requires the applicant to demonstrate training in use of a gun, and often takes years.[16] Japan requires gun buyers to go through 12 processes before purchasing any type of firearm.[17]

States impose limitations on the retail availability, types of firearms that may be legally

purchased, and licensing process for parties seeking to purchase a firearm because they recognize that guns are not like ordinary commercial items that can be purchased at a store. In many countries, legal markets for firearms blend with illegal markets in vast grey areas of stolen and diverted weapons, and of private security companies. The potential and actual negative consequences of the ill use of such firearms are devastating.[18] A coherent, ethical, and politically strategic approach to firearm exports would increase controls to help reduce violent harm by both state and non-state actors that will more easily acquire them under the proposed rules.

Processes for gun exports reflect substantive priorities and as such are integral to policy. The National Sports Shooting Foundation (NSSF) claims that under the proposed rule, "Applications would go through the same interagency review process, including by the Defense Department and the State Department's human rights and other experts."[19] However, the proposed rules do not articulate any requirement for such a review by State Department experts on human rights and criminal organizations. If that is the proposers' intent, the rule should state it clearly, and spell out the scope of license applications subject to such review, concurrences required, specifying from which bureaus and agencies, and the competencies of experts who shall conduct reviews.

---

[1] David Sherfinski, "Trump officials to roll back rules on some gun exports," *The Washington Times*, May 1, 2018, https://m.washingtontimes.com/news/2018/may/1/trump-officials-to-roll-back-rules-on-some-gun-exp/. It should also be noted that Walmart does not operate in more than 100 nations (see: https://corporate.walmart.com/our-story/our-locations and that in the United States Walmart does not sell semi-automatic assault rifles, high capacity magazines, or even (except in Alaska) handguns. See: https://news.walmart.com/2018/02/28/walmart-statement-on-firearms-policy.

[2] https://www.census.gov/popclock/

[3] Aaron Karp, *Estimating Global Civilian-Held Firearms Numbers,* Small Arms Survey, June 2018, at: http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf

[4] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" *The Los Angeles Times*, May 24, 2018, https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html.

[5] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters, October 2, 2015, at: https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002.

[6] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," chapter 9 in *States of Security: Small Arms Survey 2011*, Small Arms Survey, Geneva, p. 6, at: http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf.

[7] Parker, pp. 9-13; Law Library of Congress, *Firearms-Control Legislation and Policy*, 2013, at: http://www.loc.gov/law/help/firearms-control/firearms-control.pdf.

[8] Parker, pp. 2, 9-13.

[9] Lisandra Paraguassu, Ricardo Brito, "U.S. biggest source of illegal foreign guns in Brazil – report," *Reuters*, January 10, 2018, https://af.reuters.com/article/worldNews/idAFKBN1EZ2M3.
David Gacs, Rachel Glickhouse, and Carin Zissis, "Gun Laws in Latin America's Six Largest Economies," Americas Society, January 11, 2013, https://www.as-coa.org/articles/explainer-gun-laws-latin-americas-six-largest-economies.

[10] Law Library of Congress, p. 20.

[11] "Overview of gun laws by nation," at: https://en.wikipedia.org/wiki/Overview_of_gun_laws_by_nation. France: https://www.service-public.fr/particuliers/vosdroits/F2242. Romania: http://www.gandul.info/reportaj/exclusiv-20-000-de-romani-s-au-inarmat-in-2011-fostul-sef-de-la-arme-din-politie-stii-cat-e-valabil-avizul-psihologic-pana-iesi-pe-usa-cabinetului-9375494.

WASHSTATEC000424

[12] Clif Burns, "High Capacity Magazines Exported from U.S. to Norway Shooter," *ExportLaw Blog*, July 28, 2011, at: https://www.exportlawblog.com/archives/3315.

[13] Parker, p. 8.

[14] Law Library of Congress, p. 219.

[15] Parker, pp. 9-13; Gacs, Glickhouse and Zissis.

[16] Rama Lakshmi, "India already had some of the world's strictest gun laws. Now it's tightened them," *Washington Post*, August 1, 2016, https://www.washingtonpost.com/world/asia_pacific/india-had-the-one-of-the-strictest-gun-laws-in-the-world-it-just-got-tighter/2016/08/01/affd9422-51da-11e6-b652-315ae5d4d4dd_story.html?utm_term=.f69ad52bfffc.

[17] 1. Take a firearm class and pass a written exam, which is held up to three times a year. 2. Get a doctor's note saying you are mentally fit and do not have a history of drug abuse. 3. Apply for a permit to take firing training, which may take up to a month. 4. Describe in a police interview why you need a gun. 5. Pass a review of your criminal history, gun possession record, employment, involvement with organized crime groups, personal debt and relationships with friends, family and neighbors. 6. Apply for a gunpowder permit. 7. Take a one-day training class and pass a firing test. 8. Obtain a certificate from a gun dealer describing the gun you want. 9. If you want a gun for hunting, apply for a hunting license. 10. Buy a gun safe and an ammunition locker that meet safety regulations. 11. Allow the police to inspect your gun storage. 12. Pass an additional background review. Audrey Carlsen and Sahil Chinoy, "How to Buy a Gun in 15 Countries," *The New York Times*, March 2, 2018, https://www.nytimes.com/interactive/2018/03/02/world/international-gun-laws.html.

[18] Brazil provides an important example. See Rogert Muggah, "Where do Rio de Janeiro's crime guns come from?" openDemocracy, August 8, 2016, https://www.opendemocracy.net/democraciaabierta/robert-muggah/where-do-rio-de-janeiros-crime-guns-come-from.

[19] Larry Keane, "Why export control reform makes security and business sense," National Shooting Sports Foundation, July 6 2018, https://www.nssf.org/why-export-control-reform-makes-security-and-business-sense/.

WASHSTATEC000425

# PUBLIC SUBMISSION

**As of:** 7/12/18 10:19 AM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946j-v4k9
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0349
Public Comment 988. Security Assistance Monitor Center for International Policy. Colby Goodman. 7-9-18

---

## Submitter Information

**Name:** Colby Goodman
**Address:**
   2000 M St NW
   Suite 720
   Washington,  DC,  20036
**Email:** colby@ciponline.org
**Phone:** 2022323317

---

## General Comment

Please find attached Security Assistance Monitor-Center for International Policy's concerns with the proposed firearms export changes.

Colby Goodman
Director
Security Assistance Monitor

Christina Arabia
Program and Research Associate
Security Assistance Monitor

William D. Hartung
Director
Arms and Security Project

---

## Attachments

SAM-CIP Letter BIS Firearms Rule FINAL

WASHSTATEC000427



**CENTER FOR
INTERNATIONAL POLICY**

Advancing a sustainable, just, and peaceful world

July 9, 2018

Mr. Steven Clagett
Office of Nonproliferation Controls and Treaty Compliance
Nuclear and Missile Technology Controls Division
Bureau of Industry and Security
U.S. Department of Commerce
Room 2099B, 14th Street and Pennsylvania Avenue NW
Washington, DC 20230

**Re: Control of Firearms, Guns, Ammunition and Related Articles the President
Determines No Longer Warrant Control Under the United States Munitions List
(USML), RIN 0694–AF47**

Dear Mr. Clagett,

We are writing to express our concerns about the U.S. Department of Commerce's
proposed rule, published in the Federal Register on May 24, 2018, to transfer certain
firearms, guns, ammunition, and related parts from the U.S. Department of State's U.S.
Munitions List (USML) to the U.S. Department of Commerce's Commerce Control List
(CCL) under a new 500 series designation. While we were pleased to see that the
proposed rule maintained some important controls connected with the USML for the
firearms moving to the CCL, we believe the proposed rule will mean more U.S. firearms
will be exported with less transparency, fewer oversight mechanisms, and a weaker
ability for the U.S. government to prosecute violations.

First, the transfer of certain firearms, guns, and ammunition from USML to the CCL
appears to be fundamentally inconsistent with the scope of statutory authority outlined in
the Arms Export Control Act (AECA). For more than three decades, the U.S. government
has designated many types of firearms and guns that are proposed to move to the CCL as
"Significant Military Equipment" (SME) because of their "substantial military utility or
capability." According to the AECA, all defense articles designated as SME must be on
the USML. While there may be more civilians using these types of weapons now than in
the 1970s, most foreign militaries continue to use these types of firearms as standard
issue and they continue to have substantial military utility. Moreover, the proposed rule's
assertion that the firearms moving over to the CCL, including "Combat Shotguns" and

WASHSTATEC000428

.50 sniper rifles, has "for the most part," "civil, recreational, law enforcement, or other non-military applications" and thus deserve limited controls is highly questionable.

Second, because the term "defense article" is linked to several statutes with national security import, the removal of firearms, guns, ammunition, and certain parts from the USML means there would be many rippling implications of the transfer of items from the USML to the CCL under the AECA and the Foreign Assistance Act (FAA). The AECA is a sophisticated statutory framework that enables the United States to more effectively monitor a large volume of arms exports. The proposed transfer impacts various statutes linked to the AECA more broadly and creates ambiguity with the ability of Congress to monitor U.S. assistance to foreign countries through various notification and reporting requirements found in the AECA and the FAA. The transfer of arms to the CCL would undermine that framework.

As outlined in more detail in the below analysis, the U.S. government or the U.S. policy community would lose many key oversight tools and abilities to help prevent irresponsible or illegal firearms trafficking around the world as a result of these proposed changes. In particular, the U.S. government or U.S. policy community (Congress and the public) would have a limited ability to do the following:

- Halt or modify risky proposed firearms sales valued at $1 million or more to countries such as to Honduras, Turkey, or the Philippines;
- Curb risky exports of pistol grips and magazine clips valued at $500 or less to over 100 countries, including Mexico and Guatemala;
- Review proposed training on how to aim and fire a gun and other types of foreign police training to countries such as Libya or China;
- Stop nonresident aliens leaving the United States via commercial airlines from taking firearms "accessories," "attachments," "components," "parts," and ammunition;
- Better understand U.S. firearms manufacturing and ownership to identify risks within the U.S. firearms industry; and,
- Investigate and prosecute companies for failing to properly provide political contributions and marketing fees aimed at curbing corruption.

Additionally, the AECA only permits the sales of defense articles and services for specific reasons, including primarily for legitimate defense purposes.[1] Section 3 of the AECA requires the State Department to notify Congress when there is credible information that such articles or services were misused.[2] However, there is not a similar requirement connected with the Export Administration Regulations (EAR). The AECA also requires the State Department to publicly report on all authorized and delivered arms exports annually, which has provided Congress and the public with an essential tool to identify potentially illegal trafficking patterns and sales that are inconsistent with U.S.

---

[1] 22 U.S.C. § 2754.
[2] 2753(c)(2), https://www.law.cornell.edu/uscode/text/22/2753; For more information, see https://www.americanbar.org/content/dam/aba/administrative/human_rights/ABACHRAssessment ofArmsSalestoSaudiArabia.authcheckdam.pdf

WASHSTATEC000429

policy. However, the Commerce Department does not have this same requirement nor does it regularly provide the same level of transparency as the State Department.

We are pleased to see that the proposed rule attempts to maintain effective oversight of arms brokers by ensuring that brokers must register and seek a license. These provisions are critical in helping mitigate illegal arms trafficking to major conflict zones and transnational criminal organizations. However, we are concerned that the basis for the State Department's rules is subject to legal challenge because it is not clear that the State Department has the statutory authority to maintain brokering controls if firearms are transferred from the USML. Similarly, we are concerned about the U.S. government's statutory basis to halt arms transfers based on human rights concerns. In 2014, Congress amended the FAA to prohibit the export of Series 600 items to countries "the governments of which engage in a consistent pattern of gross violations of internationally recognized human rights."[3] If the proposed rule moved forward as is, the State Department would no longer have a statutory basis for vetoing a proposed sale on human rights grounds for firearms, guns, ammunition, and related parts that move to the CCL.

Given the potential loss of so many U.S. arms export controls and likely negative impact on curbing irresponsible and illegal arms transfers, we encourage you to wait until the Government Accountability Office finishes its analysis of the risks of moving firearms from the USML to the CCL until you move forward on this proposal. If you have decided you want to move forward with moving some firearms, guns, and related parts over to the CCL, we recommend making the below changes to the proposed rule:

- Recognize that semi-automatic firearms are still a weapon of choice for foreign militaries and of significant military value and place firearms under the 600 Series list on the CCL;
- Maintain the requirement to notify Congress and the public of any proposed firearms sales that reach $1 million or more;
- Limit companies use of the Limited Value Shipments (LVS) license exception to $100 or severally limit the types of parts and components that are available for the $500 threshold value;
- Expand the definition of "technology" to capture defense-service type activities that would otherwise be left unregulated such as private security contractor training to foreign police with firearms. Similarly, 3D printing should be considered technology under the EAR;
- Remove or limit the registration fee for manufactures but keep the requirement for the registration;
- Add a mechanism to the CCL that would retain the reporting requirement on political contributions and marketing fees that were paid as part of arms sales.

---

[3] 22 U.S.C. Sec. 2304. 22 USC 2304(a) establishes that no security assistance can go to a country with consistent pattern of gross human rights. 22 USC 2304(d)(2)(C)(ii) defines security assistance to include a license of 600-series items intended for armed forces, police, intelligence or other internal security forces.

3

WASHSTATEC000430

For more details on some of these concerns, we are pleased to submit the below report, which provides more details on these main concerns and recommendations. We look forward to speaking with you or any of your colleagues about these important issues. Thank you for the opportunity to submit our comments and recommendations.

Sincerely,

Colby Goodman
Director
Security Assistance Monitor

Sincerely,

Christina Arabia
Program and Research Associate
Security Assistance Monitor

William D. Hartung
Director,
Arms and Security Project

4

**Section-by-Section Key Concerns on Proposed Firearms Export Rule**

<u>Congressional Notification Requirement</u>

**Proposed Change**

Under Section 36(c) of the AECA,[4] if a sale of $1 million worth of Category I firearms is authorized for export under the ITAR, the President must formally notify Congress 30 days prior to the approval of the ITAR export authorization. Both this formal notification process and the prior informal one provides Congress with the opportunity to review these proposed sales and ensure they are consistent with U.S. law, policy, and interests. Under the current system, if Congress does not agree with the executive branch decision to license the firearms export, it may block or modify the proposed sale. If Category I items are moved to EAR controls, they will not be subject to the AECA notification requirement.

**Main Concerns**

In the mid 1990s, Congress began requiring the administration to notify it of proposed firearms sales of $1 million or more because of concerns about the role firearms have consistently played in inflicting serious harm on civilians in conflict and non-conflict zones. Since then, the requirement has allowed both Congress and the public to provide important oversight of U.S. firearms exports. Over the past ten years, Congress has also halted or modified several particularly problematic proposed firearms sales. Just last year, for instance, Congress blocked the sale of semi-automatic handguns and assault rifle sales to the Philippines and Turkey because of concerns that they would be used unlawfully against civilians.[5] As these congressional notifications are often provided to the public, they have also given the U.S. foreign policy community an opportunity to provide insights on particular risky U.S. firearms sales.

As U.S. companies continue to propose firearms sales to risky countries, it is critical for Congress to maintain its oversight on major sales. From January to December of 2017, the Trump Administration requested Congress to approve at least $662 million in Category I firearms and ammunition exports to over 15 countries through the congressional notification process.[6] Of these, potential firearms sales to El Salvador, Honduras, Indonesia, Mexico, Thailand, Turkey, and the United Arab Emirates raised concerns amongst the human rights community and required necessary scrutiny by Congress. In the case of Honduras, Congress had raised several questions to help ensure

---

[4] 22 U.S.C. § 2776(c)

[5] http://www.middleeasteye.net/news/us-halts-arms-sales-erdogan-bodyguards-1467964562; https://www.reuters.com/article/us-philippines-usa-rifles-idUSKBN12V2AM

[6] For more details see Security Assistance Monitor's factsheet, "Congressional Notifications for Proposed U.S. Commercial Firearms Exports in 2017," available at http://securityassistance.org/fact_sheet/congressional-notifications-proposed-us-commercial-firearms-exports-2017

5

that U.S. weapons would not be used to fire on civilian protestors. These notifications also helped U.S. civil society identify important trends in U.S. firearms sales such as in licensed production.

**Recommendation**

For these reasons, it is critical that the new rule continue to require the U.S. administration to notify Congress of any proposed firearms sales that reach $1 million or more.

**License Exception LVS (§ 740.3) / License Exception BAG (§ 740.14)**

**Proposed Changes**

Under the proposed rule, U.S. companies are given new opportunities to export certain firearms parts and components without U.S. government prior approval if the net value of the shipment is at or below $500, which is higher than the $100 threshold under ITAR. In particular, U.S. companies can use the Commerce Department's License Exception Shipments of Limited Value (LVS) to avoid the license requirement for exports of certain firearms "parts," "components," "accessories," and "attachments", including pistol grips and detachable magazines, to over 100 countries in Country Group B.[7] Guns and armament and related items controlled under ECCN 0A602 are also eligible for LVS with a limit of $500 net value per shipment. Further, the rule adds a license exception under LVS for ammunition parts and components with a limit of $100 per shipment.

The proposed rule would also revise License Exception BAG to allow U.S. citizens and permanent resident aliens temporarily leaving the United States to take up to three non-automatic *and* semi-automatic firearms under 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under 0A505.a for personal use while abroad. Currently, BAG is authorized only for non-automatic firearms. The proposed rule carves out a new exception for semi-automatic firearms and revises the current framework to allow nonresident aliens leaving the U.S. to take firearms "accessories," "attachments," "components," "parts," and ammunition controlled by 0A501 or 0A505, provided that these were lawfully brought into the United States.

**Main Concerns**

Over the past decade, U.S. criminal prosecutions and research studies have shown how the smuggling of small numbers of firearms on a regular basis can have a large impact on gun violence in Mexico and Central America.[8] Indeed, trafficking experts have long

---

[7] See https://www.bis.doc.gov/index.php/documents/regulation-docs/452-supplement-no-1-to-part-740-country-groups/file.

[8] Small Arms Survey, "Dribs and Drabs: The Mechanics of Small Arms Trafficking from the United States," Issue Brief, March 2016, online at https://www.files.ethz.ch/isn/196408/SAS-IB17-Mechanics-of-trafficking.pdf.

6

WASHSTATEC000433

argued that "small arms and spare parts are the lifeblood of the gray market."[9] Instead of trying to improve U.S. efforts to stop this smuggling, the proposed rule seems more aimed at limiting or complicating U.S. government efforts to stop the smuggling of U.S. firearms and relate parts. The new $500 net value per shipment value under LVS could significantly expand the number of shipments of firearms components such as pistol grips and magazine clips that the U.S. government will not have a chance to review. Similarly, the expansion of the license exception BAG will likely make it harder for the U.S. government to stop the export of potentially problematic exports of semi-automatic firearms at the U.S. border to many countries around the world, including Mexico and in Central America.

*Parts and Components Under LVS*: Under the proposed changes to LVS, U.S. companies could export the following types of firearms parts and components without a U.S. license to over 100 countries, including Guatemala, El Salvador, Mexico, Somalia, South Sudan, Yemen, and the Philippines if the net value per shipment was $500 or less:

1) "barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control ''parts'' or ''components'' (e.g., triggers, hammers, sears, disconnectors) and buttstocks that contain fire control ''parts'' or ''components;'' and,
2) "detachable magazines with a capacity of greater than 16 rounds ''specially designed'' for a commodity controlled by paragraph .a or .b of this entry. "

The rule also allows companies to use the LVS for guns and armament related items under ECCN 0A602 in addition to ammunition parts, which can easily be used to make one's own ammunition.[10] As many of these parts are relatively inexpensive, especially if used, it's possible for companies or individuals to export many items in one shipment without a U.S. license. Following common practice, firearms traffickers may also increase their number of shipments of firearms components that significantly increase lethality such as pistol grips and magazine clips to questionable clients. Taken together, the U.S. government will lose the ability to stop many types of sales to problematic destinations and end-users.

*Semi-Automatic Firearms Under BAG*: Over the past five years, U.S. researchers have highlighted how individuals have successfully trafficked U.S. firearms to Mexico and Central America and beyond via commercial airlines using temporary export licenses similar to the BAG license exception.[11] While anyone traveling on a plane needs to

---

[9] Willian J. Lowell, Comments on Public Notice 7256 Amendment to the International Traffic in Arms Regulations: Revisions of U.S. Munitions List Category VII; and Public Notice 7257 Revisions to the USML (Feb. 7, 2011)
https://www.armscontrol.org/system/files/Lowell_Comments_ExportReform_Feb7_2011.pdf
[10] https://taskandpurpose.com/ammo-expensive-heres-make/; https://www.skilledsurvival.com/how-to-make-your-own-ammo/; https://www.offthegridnews.com/self-defense/guns-ammo/what-will-i-need-to-make-my-own-ammo/
[11] Small Arms Survey, "Dribs and Drabs," March 2016. Colby Goodman, "U.S. Firearms Trafficking to Guatemala and Mexico," Working Paper, Woodrow Wilson Center, April 2013, online at

WASHSTATEC000434

declare their firearm(s) to a U.S. CBP officer at the port of departure, CBP officers do not conduct a risk assessment similar to what the State or Commerce Department would do to help prevent U.S. firearms from being misused or diverted at the destination point. In addition, if a U.S person overseas is robbed of or loses a semi-automatic firearm, there is little recourse from the United States. Nefarious actors who are cognizant of this exception could more easily facilitate semi-automatic firearm transfers abroad acting in concert with a U.S citizen or permanent resident alien.

Not dissimilar from the points mentioned in the section on LVS, it is also troublesome that the BAG exception allows for nonresident aliens leaving the United States to take firearms "accessories," "attachments," "components," "parts," and ammunition controlled by 0A501 or 0A505. The U.S. government lacks jurisdiction over nonresident aliens while abroad. This exception will increase the number of firearms parts and ammunition that are currently allowed to be transported overseas, many of which are already contributing to epidemic levels of violence in Latin America.[12] In fact, as many as a quarter to half of all guns seized by police in Honduras, Guatemala, and El Salvador and submitted for tracing by the Bureau of Alcohol, Tobacco, Firearms and Explosives have been sourced to the United States.[13]

**Recommendation**

For these reasons, we believe the proposed BAG provision authorizing license-free exports of semi-automatic rifles by citizens and legal permanent residents be revised to allow the U.S. government to have more oversight before such a license exception is used. In order to allow the U.S. government to review many risky license requests of firearms components around the world, we also encourage you to limit companies use of LVS to $100 or severally limit the types of parts and components that are available for the $500 threshold value.

**<u>Controls on the Export of Services and 3D Printing</u>**

**Proposed Change**

Under the ITAR, companies must apply for a license with the State Department to export "defense services" to foreign entities. Defense services include items such as providing assistance or training to foreign persons in the design, development, manufacture, production, repair, maintenance, and operation of weapons on the USML. Companies must also request a license if they seek to provide military training to foreign units and forces. However, the Commerce Department's CCL does not have a similar defense services rule for items moving from the USML to the CCL. Instead, EAR controls are

---

      https://www.wilsoncenter.org/sites/default/files/US%20Firearms%20to%20Guatemala%20and%2
0Mexico_0.pdf.
[12] New Data Reinforces Link Between Guns, Violence in Latin America, available at
      https://www.insightcrime.org/news/brief/new-data-reinforces-link-guns-violence-latin-america/.
[13] American Guns Drive the Migrant Crisis That Trump Wants to Fix With a Wall, available at
      https://www.thetrace.org/2017/05/gun-trafficking-central-america-immigrant-crisis-trump-wall/.

WASHSTATEC000435

focused more on technology transfers. Additionally, the new rule would likely mean that the U.S. companies would no longer be prohibited from publishing 3D gun plans on the Internet.

**Main Concerns**

As the current rule is written, the U.S. government will likely lose oversight on many types of defense services that could pose real risks to U.S. national security interests. Today, U.S. defense companies regularly receive U.S. approval to provide over $40 billion in defense services a year to over 100 countries.[14] Under the proposed rule, however, U.S. companies may be able provide a wide range of training activities, design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons without sufficient U.S. oversight. In particular, a U.S. company would likely no longer be required to obtain U.S. government approval before they provided training to foreign security forces around the world on how to aim and fire certain guns. Further, when anyone that has access to 3D printing machines is able to obtain plans on how to build a gun, this circumvents U.S. laws that seek to prevent known criminals from obtaining U.S. firearms.

*Narrow Definition of Technology*: As the proposed rule identifies "the EAR does not include a concept of 'defense services' and the 'technology' related controls are more narrowly focused and apply in limited contexts as compared to the ITAR." The technology "required" for the development, production, or operation of semi-automatic firearms would be controlled. But the definition of "required" as applied to "technology" relates only to that portion of "technology" which is "peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics or functions." Therefore, training a foreign person in the United States or abroad would only require a license if the assistance involved the release of controlled technology. That means companies may be able to provide a wide range of training activities, design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons without sufficient scrutiny and oversight.

*Private Security Contractors:* As U.S. private security contractors continue to pursue training opportunities with foreign security forces in countries such as Libya and China, it remains critical that the U.S. government maintain oversight of U.S. private security contractor activities.[15] At the moment, a U.S. private security contractor seeking to sell training to foreign police units on how to aim and fire semi-automatic weapon must

---

[14] Security Assistance Monitor, Arms Sales Database, Direct Commercial Sales Services, accessed on July 6, 2018, online at http://securityassistance.org/data/country/arms/Direct%20Commercial%20Sales%20Services/2012/2017//Global//all.

[15] Matthew Cole and Jeremy Scahill, "Eric Prince in the Hot Seat," The Intercept, March 24, 2016, online at https://theintercept.com/2016/03/24/blackwater-founder-erik-prince-under-federal-investigation/. Marc Fisher, Ian Shapira, and Emily Rauhala, "Beyond Eric Princes China Venture," The Washington Post, May 4, 2018, online at https://www.washingtonpost.com/news/world/wp/2018/05/04/feature/a-warrior-goes-to-china-did-erik-prince-cross-a-line/?noredirect=on&utm_term=.15fb0693b992

9

WASHSTATEC000436

obtain a license. But, the new rule would likely allow a U.S. company to avoid this license requirement if the company did not also export firearms as part of the training. It also means that some past enforcement actions, such as the deferred prosecution agreement with the private security company formerly known as Blackwater, which included violations related to the export of small arms, ammunition, and training of foreign security forces in Sudan, Iraq, and Afghanistan, could be compromised.[16] The new rule could also create an unfortunate scenario where U.S. private security contractors are able to provide services to foreign security units or militias that are otherwise prohibited from receiving training through U.S. foreign security aid.

**3D Printing:** In Defense Distributed v. United States Department of State, 838 F.3d 451 (5th Cir. 2016), the Fifth Circuit determined that posting 3D gun instructions, which constituted an export of controlled technical data under the ITAR, was not an infringement on the First Amendment. But the proposed BIS rules suggest that information posted on the internet would not be subject to EAR controls. The rules state that *"the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be ''subject to the EAR.'' (See §§ 734.3(b) and 734.7(a).)."* If information published online would not be subject to the EAR, then 3D plans for guns published online would be outside the scope of export controls under the proposed rules. We are greatly concerned about the loss of controls on 3D gun-printing plans, which has increasingly assisted bad actors in enhancing their capabilities to inflict atrocities around the world.

**Recommendations**

We recommend that the final rule expand the definition of "technology" to capture defense-service type activities that would otherwise be left unregulated. More specifically, it will be critical to ensure that a final rule requires U.S. companies to request a license to furnish training on the use of firearms to foreign security forces, support for design and development assistance, testing, and production assistance on firearms and ammunition. To ensure that criminal organizations do not have the capability to easily build firearms, it will be critical that design and development information related to semi-automatic firearms, including 3D printing plans for guns, be considered controlled "technology" under the EAR.

**Registration Requirement for Manufacturers**

**Proposed Change**

---

[16] https://archives.fbi.gov/archives/charlotte/press-releases/2012/academi-blackwater-charged-and-enters-deferred-prosecution-agreement

WASHSTATEC000437

The transfer of certain Category I-III items from the USML to the CCL means that manufacturers and exporters, as well as providers of defense services, of those items will no longer be required to register with the State Department's Directorate of Defense Trade Controls (DDTC) or with any U.S. government entity before engaging in manufacturing or exporting certain firearms, ammunition, and related parts and components. In other words, exporters and manufactures will not longer be subject to the U.S. government requirement under 22 C.F.R. 122.1, which states that "*any person who engages in the United States in the business of manufacturing or exporting or temporarily importing defense articles, or furnishing defense services, is required to register with the DDTC. A manufacturer who does not engage in exporting must nevertheless register.*"

**Main Concerns**

The State Department requirement for companies and individuals to register before they engage in the manufacturing or exporting is an important tool for the U.S. government to better understand the nature of the firearms industry, including who owns and controls key items and technology of significant military value. It provides the U.S. government with valuable data on manufacturers, government contractors, and importers. While some data on exporters will still be available through Commerce Department required export licenses, not all U.S. manufacturers regularly export or are required to submit a license for export. This loss of documented evidence on firearms manufacturing could severely hamper U.S. law enforcement investigations and the prosecution of arms dealers or others found in violation of AECA.

***New Types of Manufacturing***: In 2016, U.S. registration for firearms manufacturing activities was deemed so important that DDTC issued specific guidance providing that the below broad range of activities constitute "manufacturing" and thus require registration. The below activities were likely added because of concerns about illicit firearms trafficking and an inability to identify some new or uncommon types of manufacturing. However, this new guidance will not apply to Category I-III items moving to the CCL.

a) Use of any special tooling or equipment upgrading in order to improve the capability of assembled or repaired firearms;
b) Modifications to a firearm that change round capacity;
c) The production of firearm parts (including, but not limited to, barrels, stocks, cylinders, breech mechanisms, triggers, silencers, or suppressors);
d) The systemized production of ammunition, including the automated loading or reloading of ammunition;
e) The machining or cutting of firearms, e.g., threading of muzzles or muzzle brake installation requiring machining, that results in an enhanced capability;
f) Rechambering firearms through machining, cutting, or drilling;
g) Chambering, cutting, or threading barrel blanks; and
h) Blueprinting firearms by machining the barrel.

WASHSTATEC000438

***Company Acquisition Data***: DDTC registrants are required to notify the State Department within five days of the effectuation of a transaction if the registrant is either a target or a buyer in an acquisition. If a foreign buyer is acquiring a DDTC registrant, a notification must be provided to DDTC 60 days prior to the transaction's effectuation. One of the reasons these notifications are critical is to understand who owns and controls manufacturers of items and technology that could be used to harm U.S. foreign policy interests and, in the case of foreign buyers, pre-notification allows the government to take action and ask questions if there are concerns with a non-U.S. company owning a manufacturer or exporter of controlled items.

## Recommendation

While some U.S. companies may make the argument that the registration fee ($2,250 a year for most exporters) is an economic burden, establishing a threshold for annual revenues could easily solve this issue. If a company does not meet this threshold, their registration fee may be waived. If the proposed rules go into effect, we recommend that the U.S. government establish a registration requirement for manufacturers of the items that are transferring from the USML to the CCL, including the 2016 DDTC guidance, in order to provide for the transparency and accountability needed to identify risk and support U.S. law enforcement investigations.

## Reporting Requirements on Political Contributions and Fees

### Proposed Change

Finally, the transfer of certain Category I, II, and III items from ITAR to EAR control will mean the loss of the reporting requirements outlined in 22 C.F.R. §130. ITAR's Section 130 requires exporters to report payment of certain political contributions, fees, and commissions related to the sale of defense articles and services to the armed forces of a foreign country or international organization to the DDTC. These reporting requirements were implemented to address concerns about the growing use of agents, advisers, and consultants to obtain business in international defense trade.

Section 130.9 mandates that license applicants disclose to the DDTC political contributions in an aggregate of $5,000 or more and fees or commissions in an aggregate of $100,000 or more that the applicant or its vendors have paid or agreed to pay related to the sale for which the license is requested. The same disclosure requirements are imposed upon suppliers, which the regulation defines as "any person who enters into a contract with the Department of Defense" for the sale of defense articles or defense services valued in an amount of $500,000 or more.[17] Section 130.10 requires that applicants and suppliers furnish detailed information related to the sale (such as the total contract price and the name and nationality of each foreign purchaser) and its related political contributions, fees, or commission to the DDTC. Section 130.12 requires vendors to disclose to the applicant or supplier any political contributions, fees, and commissions paid in relation to the sale. Finally, section 130.14 imposes strict recordkeeping

---

[17] *See* 22 C.F.R. §130.7.

12

requirements on each applicant, supplier, and vendor, requiring each to maintain records of any information it furnished or obtained in compliance with Section 130 for at least five years following the date of the report submitted to the DDTC. As the proposed rule will move certain Category I, II, and III items from ITAR control, Section 130 disclosures will no longer be required when obtaining licenses to export those items.

**Main Concerns**

In many countries around the world, corruption is rampant within their arms procurement systems, as foreign officials seek to steal funds from their national budgets for their personal gain. In Nigeria, this type of corruption helped hollow out the military and made it more difficult for them to effectively combat Boko Haram.[18] In response to similar types of concerns, the U.S. Congress adopted the above reporting requirements to help the U.S. government stop bribery and other fraudulent schemes within the international arms trade. However, this is still a challenging task. According to an earlier Commerce Department report, the United States became aware of "significant allegations of bribery by foreign firms in 294 international contract competitions valued at $145 billion."[19] Under the proposed rule, the Commerce Department would limit its ability to obtain useful information on U.S. defense companies and prosecute bribery.

*Transparency:* Section 130 reporting requirements encourage transparency within international defense trade and provide U.S. law enforcement with a useful tool to stop corrupt arms deals. At the moment, Section 130 disclosures are an important information-gathering tool through which the government gains access to useful data about arms trade transactions. Information such as the identities and countries of foreign purchasers and the recipients of donations to foreign governments and campaigns have political and diplomatic uses that extend beyond the arms industry. The loss of required Section 130 disclosures when obtaining licenses to export USML Category I, II, and III items means that the pool of useful data the government can access will become smaller. Just as the access to this data has benefits beyond the arms industry, the decrease in accessible data will have negative repercussions beyond the arms industry.

*Prosecutions and Compliance Systems*: The requirement that U.S. companies disclose payments made to solicit, promote, or secure the sale of defense articles or services to the armed forces of a foreign country or international organization is an effective anti-bribery and anti-corruption mechanism. The same can be said for the reporting requirements imposed upon suppliers. While U.S. companies may expectedly choose to avoid notifying the U.S. government of fees and contributions that could be considered bribery, U.S. law enforcement have used the provisions to pursue U.S. prosecutions against major defense companies. In 2010, for example, BAE Systems pleaded guilty and paid a $400 million fine to the United States after being caught in a scandal to cover up, among other items,

---

[18] Transparency International, "Weaponizing Transparency: Defense Procurement Reform as a Counterterrorism Strategy," May 2017, online at http://ti-defence.org/wp-content/uploads/2017/05/Weaponising_Transparency_Web.pdf.

[19] Paul Holden, "Indefensible: Seven Myths that Sustain the Global Arms Trade," online at https://projectindefensible.org/.

13

WASHSTATEC000440

payments made to "marketing agents" to help it secure arms contracts with Saudi Arabia. The company failed to disclose any fees paid to the agents.[20] The requirement is also a useful tool to encourage U.S. companies to have stronger compliance systems to identify and stop corruption.

**Recommendation**

In order to maintain important transparency and anti-corruption mechanisms on U.S. firearms sales, the U.S. government would benefit by adding a mechanism to the CCL that would retain the reporting requirement of Part 130.

---

[20] U.S. Department of Justice, "BAE Systems PLC Pleads Guilty and Ordered to Pay $400 Million Criminal Fine," March 1, 2010, online at https://www.justice.gov/opa/pr/bae-systems-plc-pleads-guilty-and-ordered-pay-400-million-criminal-fine.

WASHSTATEC000441

# PUBLIC SUBMISSION

As of: 7/12/18 10:10 AM
Received: July 09, 2018
Status: Posted
Posted: July 12, 2018
Tracking No. 1k2-946k-lj8w
Comments Due: July 09, 2018
Submission Type: Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0347
Public Comment 990. Individual. Jeff Abramson. 7-9-18

## Submitter Information

**Name:** Jeff Abramson

## General Comment

I have worked in the nonprofit sector for more than a decade in efforts to promote more responsible trade in conventional weapons and find these proposed regulatory changes to be irresponsible and dangerous. They continue the wrong-minded approach of the Trump administration to treat weapons as any other trade commodity, threatening to undermine long-term global security and true U.S. national security interests.

Please see full comments in the attached document.

## Attachments

ProposedUSMLCatItoIIIChanges_Comments_Abramson

WASHSTATEC000442

Comments re: ITAR Amendment - Categories I II, and III; EAR Amendment - RIN 0694-AF47
Jeff Abramson
July 9, 2018

I have worked in the nonprofit sector for more than a decade in efforts to promote more responsible trade in conventional weapons and find these proposed regulatory changes to be irresponsible and dangerous. They continue the wrong-minded approach of the Trump administration to treat weapons as any other trade commodity, threatening to undermine long-term global security and true U.S. national security interests. While my comments below are as an individual concerned U.S. citizen, they are informed by my work as a senior fellow at the Arms Control Association, coordinator of a global network of professionals engaged on these issues –the Forum on the Arms Trade--, and former leader within the international Control Arms campaign that championed the creation and now implementation of the Arms Trade Treaty.

In addition to these comments, I commend to reviewers the comments by experts listed by the Forum on the Arms Trade, including: Colby Goodman, William Hartung, Christina Arabia; Adotei Akwei (on behalf of Amnesty International USA); and John Lindsay-Poland, which delve into many of these points in much greater detail.

Specific concerns include:

**Loss of Congressional oversight**

In 2002 Congress amended its notification threshold so that it would be informed of potential commercial sales of firearms under USML category I when they were valued at just $1 million, as opposed to $14 million for other major weapons sales. Such notifications have been instrumental in forestalling unwise sales, including last year to Turkey and the Philippines. No similar statutory requirement of congressional notification exists for most arms sales under the CCL, meaning Congress would lose its oversight role on these weapons.

**Public reporting should be improved, not weakened**

The public gains some insight into the transfer of weapons via Congressional notifications, and also through the State Department's 655 report and Blue Lantern investigations report. Those reports could provide much more detail, such as the number of specific weapons involved and other data, rather than broad categorical details (655 report). Commerce reporting provides even less data, with similar reports covering around 20 countries per year. We deserve better transparency, not worse. If this transfer of authority moves forward, the Commerce department should be required to improve its reporting.

**Non-sensical to no longer consider these military weapons/defense articles**

The transfer of regulatory authority to the Commerce Department is claimed to be wise because these weapons no longer "provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use," and further because many "are widely available in retail outlets in the United States and abroad."

Applying this general approach--taken from the larger export reform initiation--falls apart when we are looking at firearms and their ammunition. These weapons are and should be controlled because a

significant amount of violence that occurs, including against U.S. military and law enforcement personnel, is inflicted by small arms. Research indicates that the types of weapons being transferred to Commerce control—AR-15s and AK-47 style assault rifles and their ammunition—are "weapons of choice" of drug trafficking organizations in Mexico and other Latin American countries. Many can also be easily converted to fully automatic weapons, which will remain under USML control. U.S. military members often operate their fully-automatic-capable weapons in a semi-automatic or less-than-automatic mode. Plus, many sniper rifles to be moved to Commerce control are in U.S. military use.

In addition, in many of the countries where these weapons are likely to be marketed, they are considered military weapons and tightly controlled. As currently proposed, they would also remain on the US Munitions Import List (USMIL), which is proper. Why they would therefore not remain on a similar export list is illogical.

Being commercially available in the United States is not a good indicator of whether these weapons merit the oversight of the State Department, which is better tasked with weighing non-commercial concerns. Nor is it proper to consider these weapons somehow safer than others on the USML.

**Upsetting norms on human rights as relates to the arms trade**

The United States maintains strong laws against the provision of arms where certain human rights abuses are of concern (even if we do not always live up to those laws). Some of those laws may not apply to items in the 500 series. And although the State Department will be consulted in licensing decisions, it is difficult to see how this new approach would strengthen the ability of DRL and others concerned about human rights to forcefully insert human rights into arms sales decisions.

At a time where the global community must make the arms trade more responsible, these proposed changes would make its largest arms dealer, the United States, appear less responsible and less concerned about the human rights implications of the arms trade.

**Making 3-D printing easier is dangerous**

It is unfathomable how allowing untraceable 3-D printing of firearms serves U.S.-recognized goals to combat illicit trafficking of firearms. Our country has agreed to support the Program of Action (PoA) on small arms and light weapons and the International Tracing Instument (ITI), has signed accords on arms transfers and tracing in the Americas, and argued for why these efforts are so important. The United States also is the world's largest donor, as I understand it, to helping countries build their ability to trace weapons, secure weapons stockpiles, and to destroy those stocks when warranted. Yet, this transfer of authority to Commerce appears to open the door to unfettered 3D printing, which threatens to undermine nearly all those efforts.

**Overall**

At a fundamental level, U.S. arms are not like any other commodity and should not be treated as such. These are first and foremost killing machines. The over-emphasis on economic security threatens to jeopardize higher priorities, including peace and security concerns. If more weapons flow to countries with poor human rights records, norms around responsible weapons use and transfer will be harder to build and uphold.

WASHSTATEC000444

This analysis is built upon documents and comments currently available at
https://www.forumarmstrade.org/catitoiii.html

Including:

- "Proposed Firearms Export Changes: Key Challenges for U.S. Oversight," (see also attached 14 page document), Center for International Policy, William Hartung, Colby Goodman, Christina Arabia
- Arguments against retail availability criterion (pdf), public comment by John Lindsay-Poland, Global Exchange
- "Examples of Firearms Transferred to Commerce Under New Export Rules (pdf)," Violence Policy Center, contact Kristen Rand
- "Business with A Bang:How the Proposal to Loosen Arms Export Regulations Threatens Human Rights," Nate Smith, Amnesty USA, June 15, 2018 and Public Comment 41 from Adotei Akwei (pdf)
- "Trump Favors Arms Industry in Effort to Loosen Export Controls," Jeff Abramson, Issue Brief, Arms Control Association, June 7, 2018.

# PUBLIC SUBMISSION

**As of:** 7/17/18 3:33 PM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946l-1egk
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0345
Public Comment 992. Giffords Law Center to Prevent Gun Violence. Lindsay Nichols. 7-9-18

## Submitter Information

**Name:** Lindsay Nichols
**Organization:** Giffords Law Center to Prevent Gun Violence

## General Comment

Please see attached

## Attachments

Giffords Exports Letter 7-9-18

WASHSTATEC000446



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats. In sum, we are concerned about potential loss of life. We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHSTATEC000447



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHSTATEC000448



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR."  While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).
[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHSTATEC000449



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHSTATEC000450



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6]With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra.*

WASHSTATEC000451



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.


Sincerely,

*Lindsay Nichols*

Lindsay Nichols
Giffords Federal Policy Director


## ABOUT GIFFORDS LAW CENTER

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHSTATEC000452

# PUBLIC SUBMISSION

**As of:** 7/12/18 5:06 PM
**Received:** July 09, 2018
**Status:** Posted
**Posted:** July 12, 2018
**Tracking No.** 1k2-946q-i32v
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-0334
Public Comment 995. Trinity Health. Tonya Wells. 7-9-18

---

## Submitter Information

**Name:** Tonya Wells
**Organization:** Trinity Health

---

## General Comment

See attached

---

## Attachments

TH comments on transfer of firearms from State to Commerce 7-9-18

WASHSTATEC000453



July 9, 2018

Wilbur Ross
Secretary
Regulatory Policy Division
Bureau of Industry and Security
U.S. Department of Commerce
Room 2099B
1401 Constitution Avenue NW
Washington, DC 20230

Mike Pompeo
Secretary
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2201 C Street NW
Washington, D.C. 20520

**RE: RIN 0694-AF47 (Commerce) and RIN 1400-AE30 (State)**

Dear Mr. Ross and Mr. Pompeo,

Trinity Health values the opportunity to comment on the proposed rules to address the Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML). Trinity Health is one of the largest multi-institutional Catholic health care delivery systems in the nation, serving diverse communities that include more than 30 million people across 22 states. Trinity Health includes 93 hospitals as well as 109 continuing care locations that include PACE, senior living facilities, and home care and hospice services. We are called by our Catholic faith to preserve the sanctity of life, and are working to reduce violence in our communities and around the world.

The proposed rule referenced above addresses many aspects of firearm regulation, sales and oversight, however Trinity Health is especially concerned about the shift of weapon sale regulation from the State Department to the Commerce Department. Our concern stems from the risk we perceive about how this regulatory change could increase the amount of violence caused by weapons around the world. All forms of firearms are used extensively in criminal violence around the world. We believe the world is better served by their export being handled by the State Department, which is required and organized to consider the probable impacts in importing nations on stability, human security, conflict, and human rights. We have great concern about the proposed transfer of the regulation of gun exportation licensing from the State department to the Commerce Department, whose principle mission is to stimulate trade.

Every day around the world firearms are used to kill a thousand people in acts of organized crime, political violence, terrorism, and human rights violations. The proposed rule would transfer the regulation around the sale of weapons – including AR-15, AK-47 and other military-style assault rifles and their ammunition – to the Commerce Department control. These are among the deadliest personal-use weapons produced in the United States, and it is our understanding that they are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries. We believe that the export of these weapons should be subject to greater regulation, not less.

**We believe that the Department of Commerce is effective at advancing the interests and revenues of private businesses in our country, which contributes to a strong economy. However, we believe that firearms and ammunitions should be be viewed as a commodity that should benefit from reduced regulatory oversight. Boosting economic development and competitive advantage at the expense of increased violence including loss of life is**

Sponsored by Catholic Health Ministries | 20555 Victor Parkway • Livonia, MI 48152 • 734-343-1000 • trinity-health.org

WASHSTATEC000454

**unconscionable to us. We strongly urge the Departments of Commerce and State to rescind this proposed rule.**

Thank you for consideration of our comments on this important issue. If you have any questions, please feel free to contact me at wellstk@trinity-health.org or 734-343-0824.

Sincerely,

Tonya K. Wells
Vice President, Public Policy & Federal Advocacy
Trinity Health

2

# PUBLIC SUBMISSION

**As of:** 7/17/18 8:55 AM
**Received:** July 05, 2018
**Status:** Posted
**Posted:** July 17, 2018
**Tracking No.** 1k2-943w-npk0
**Comments Due:** July 09, 2018
**Submission Type:** Web

**Docket:** BIS-2017-0004
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Comment On:** BIS-2017-0004-0001
Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**Document:** BIS-2017-0004-1385
Public Comment 1405. Individual. Elisabeth King. 7-5-18

## Submitter Information

**Name:** Elisabeth King
**Address:**
  23 Greymre Rd
  Brighton,  MA,  02135
**Email:** bking32@aol.com
**Phone:** 617-787-0165

## General Comment

To Secretary of Commerce Mr. Wilbur Ross:

I am registering my dismay at any efforts to increase export of munitions, especially to Mexico, Central America and to any nation that is at all politically unstable. Mexico is the country that I know most about because I volunteer with Greater Boston Trade Justice, a group of citizens in eastern MA working to improve NAFTA. However the dynamics in all these countries are similar.

Access to weapons is critical to the survival of drug cartels, so they love America's current lax gun laws. 70% of guns recovered in crimes in Mexico can be traced to the USA. High caliber rifles are preferred. (Ingraham,Christopher. Why Mexico's Drug Cartels Love America's Gun Laws. Washington Post. Jan. 14th 2016)

At present guns and cash are transported illegally overland along the same routes that drugs are transported north. How much easier would it be if the money obtained from drug sales were to be spent on guns legally imported into their own country? Given the cartels' level of infiltration into local and even federal government, laws regulating legal sales are very weak. (McKibbon,Cameron. Council on Hemispheric Affairs research associate, NAFTA and Drug Trafficking: Perpetuating Violence and the Illicit Supply Chain. COHA publication. March 20, 2015)

Violence related to drug trafficking is currently a huge cause of fear for life in Mexico and Central America.

WASHSTATEC000456

Thus the problem of aliens illegally crossing the border into USA is exacerbated.

Given these facts,how does increasing firearms exports even make sense if you at the same time want to decrease illegal immigration?

In addition, how is this deregulation different than the Fast and Furious program, in which Border Patrol Agent Brian Terry was killed in December 2010? That program was rightly criticized, especially by politicians on the right side of the aisle. But that program at least tried to actually fight criminal activity. Deregulating gun exports would only increase it.

Please reconsider this deregulation.
Sincerely,
Elisabeth King
23 Greymere Rd. Brighton, MA 02135

Sent from AOL Desktop
Liz King 617-787-0165, 857-225-0396 Bking32@aol.com

Greater Boston Trade Justice FB: Greater Boston Trade Justice

Ezekiel cried out to the King of Tyre, in the abundance of your trade you were filled with violence and you sinned (28:16)

WASHSTATEC000457

Message

**From:** Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu]
**Sent:** 7/30/2018 7:24:00 PM
**To:** hartrl@state.gov
**Subject:** 18-0730 Monday "Daily Bugle"

## Monday, 30 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription.  Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. NRC Seeks Comments on Form 405F, 10 CFR Part 95, Facility Security Clearance and Safeguarding of National Security Information and Restricted Data

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. GAO: "Foreign Military Sales: Financial Oversight of the Use of Overhead Funds Needs Strengthening"
5. State/DDTC Temporarily Modifies Category I of the USML
6. EU Amends Union Customs Code Concerning Definition of Exporter
7. EU Amends Restrictive Measures Concerning Iraq
8. Dutch Ministry of Foreign Affairs Posts Factsheet on Export Control in the Cloud

### NEWS

9. Expeditors News: "WCO Publishes 2018 Edition of Safe Framework of Standards"
10. ST&R Trade Report: "Guidance on Product Exclusions for Section 232 Steel and Aluminum Tariffs"

### COMMENTARY

11. M. O'Kane: "Germany Drops Sanctions on Turkey, USA Threatens Turkey Sanctions for Detention of US Pastor"
12. M. Volkov: "Episode 49 - Data Breach Notification in the GDPR Era"

### EX/IM MOVERS & SHAKERS

13. Monday List of Ex/Im Job Openings: 172 Jobs Posted This Week, Including 17 New Jobs

### EX/IM TRAINING EVENTS & CONFERENCES

14. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

### EDITOR'S NOTES

15. Bartlett's Unfamiliar Quotations
16. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
17. Weekly Highlights of the Daily Bugle Top Stories

ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. NRC Seeks Comments on Form 405F, 10 CFR Part 95, Facility Security Clearance and Safeguarding of National Security Information and Restricted Data

(Source: Federal Register, 30 July 2018.) [Excerpts.]

83 FR 36633: Information Collection: 10 CFR Part 95, Facility Security Clearance and Safeguarding of National Security Information and Restricted Data

* AGENCY: Nuclear Regulatory Commission.
* ACTION: Notice of submission to the Office of Management and Budget; request for comment.
* SUMMARY: The U.S. Nuclear Regulatory Commission (NRC) has recently submitted a request for renewal of an existing collection of information to the Office of Management and Budget (OMB) for review. The information collection is entitled, "10 CFR Part 95, Facility Security Clearance and Safeguarding of National Security Information and Restricted Data."
* DATES: Submit comments by August 29, 2018.
* ADDRESSES: Submit comments directly to the OMB reviewer at: OMB Office of Information and Regulatory Affairs (3150-0047), Attn: Desk Officer for the Nuclear Regulatory Commission, 725 17th Street NW, Washington, DC 20503; email: oira_submission@omb.eop.gov.
* FOR FURTHER INFORMATION CONTACT: David Cullison, NRC Clearance Officer, U.S. Nuclear Regulatory Commission, Washington, DC 20555-0001; telephone: 301-415-2084; email: INFOCOLLECTS.Resource@nrc.gov.
* SUPPLEMENTARY INFORMATION: ...
    - The title of the information collection: "10 CFR Part 95, Facility Security Clearance and Safeguarding of National Security Information and Restricted Data."
    - OMB approval number: 3150-0047.
    - Type of submission: Revision.
    - The form number if applicable: NRC Form 405F.
    - Abstract: The NRC-regulated facilities and their contractors who are authorized to access and possess classified matter are required to provide information and maintain records to ensure an adequate level of protection is provided to NRC classified information and material.

  Dated at Rockville, Maryland, this 24th day of July 2018.
  For the Nuclear Regulatory Commission.
David C. Cullison, NRC Clearance Officer, Office of the Chief Information Officer.

back to top

* * * * * * * * * * * * * * * * * * *

–

OTHER GOVERNMENT SOURCES

WASHSTATEC000460

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; ADMINISTRATIVE ORDERS; Lebanon; Continuation of National Emergency (Notice of July 27, 2018) [Publication Date: 31 July 2018.]

* U.S. Customs and Border Protection; PROPOSED RULES; Modernized Drawback [Publication Date: 2 August 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 4. GAO: "Foreign Military Sales: Financial Oversight of the Use of Overhead Funds Needs Strengthening"
(Source: GAO Reports and Testimonies, 30 July 2018.)

*What GAO Found*

The Defense Security Cooperation Agency (DSCA) has established some policies and procedures for financial oversight of Department of Defense (DOD) components' use of Foreign Military Sales (FMS) administrative funds for costs related to processing FMS cases, but GAO found certain deficiencies in its oversight. As part of its oversight, DSCA has taken steps such as clarifying guidance on how administrative funds may be used, and developing procedures for reviewing business processes for the use of these funds. DSCA, however, lacks the reliable funding data it needs to ensure proper spending and to inform its budget decisions. DSCA has not conducted regular reconciliations of the data, with its financial service provider, to identify and correct data reliability issues, including gaps and inconsistencies in reported spending for the Army, the Navy, and the Air Force-the primary recipients of this funding. While DSCA conducts reviews of DOD components' business processes, providing an opportunity for sharing information about positive practices and identifying potential problems, it has not followed its annual minimum requirement for the number of reviews to conduct, or its requirement for tracking corrective action items. For example, DSCA was unable to provide an update on the status of action items from most of its reviews conducted since 2012. Moreover, DSCA does not conduct periodic, targeted financial reviews to verify components' obligations and disbursements of administrative funds, raising the risk of misuse of funds.

WASHSTATEC000461

DSCA also has not developed adequate processes for financial oversight of the use of contract administration services (CAS) funds for costs such as contract management, in accordance with internal control standards. Specifically, DSCA lacks reliable data on DOD components' use of CAS funds. GAO identified inconsistencies in DSCA's data, including no, or low, reported disbursements in some years for three of the four DOD components that received CAS funds in fiscal years 2012 through 2016, which did not align with data that GAO obtained from the components. DSCA has not conducted regular reconciliations of the data, with its financial service provider, to identify and correct data reliability issues. In addition, DSCA does not conduct periodic, targeted financial reviews to verify components' CAS spending. For example, GAO found that at least $89 million in fiscal year 2016 CAS disbursements were incorrectly processed for the Defense Contract Management Agency- the primary recipient of these funds. DSCA periodically communicates with DOD components about problematic issues, but generally does not take steps to verify spending, including reviewing supporting documentation and any actions taken by components to address such issues. As a result, DSCA raises the risk of unallowable or unapproved payments that could lead to fraud, waste, or abuse of funds.

*Why GAO Did This Study*

The U.S. government sells defense equipment and services worth billions of dollars to foreign partners through the FMS program. DSCA has overall management responsibility for the program, and various other DOD components are responsible for implementing and supporting it. DSCA charges purchasers certain overhead fees for FMS operating costs, including the administrative fee and the CAS fee. Overall administrative expenditures were $879 million in fiscal year 2017. Overall CAS expenditures were $182 million in fiscal year 2015-the most recent year available with reliable total balance data. In past audits, GAO and the DOD Office of Inspector General raised questions about DOD's financial oversight of these funds.
House Report 114-537 and Senate Report 114-255 included provisions that GAO review DSCA's use of these funds. This report examines DSCA's financial oversight of DOD components' use of (1) administrative and (2) CAS funds. GAO assessed the reliability of DSCA data for fiscal years 2012 through 2016 (the most recent available) on DOD components' use of these funds. GAO reviewed documentation and conducted interviews with agency officials.

*What GAO Recommends*

GAO is making 11 recommendations for DSCA to improve its financial oversight of administrative and CAS funds, such as by collecting reliable data on DOD components' use of these funds, and conducting periodic, targeted financial reviews. DOD concurred with GAO's 11 recommendations.

For more information, contact Thomas Melito at (202) 512-9601 or MelitoT@gao.gov.

WASHSTATEC000462

The entire report can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC Temporarily Modifies Category I of the USML

(Source: State/DDTC, 27 July 2018.)

Consistent with the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 126.2, the Acting Deputy Assistant Secretary for Defense Trade Controls has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List ("USML") Category I to exclude the following technical data identified in the Settlement Agreement for the matter of *Defense Distributed, et al., v. U.S. Department of State, et al,* Case No. 15-cv-372-RP (W.D. Tex.) (hereinafter "*Defense Distributed*"):

  - "Published Files," i.e., the files described in paragraph 25 of the Second Amended Complaint in *Defense Distributed*.
  - "Ghost Gunner Files," i.e., the files described in paragraph 36 of the Second Amended Complaint in *Defense Distributed*.
  - "CAD Files," i.e., the files described in paragraph 40 of the Second Amended Complaint in *Defense Distributed*.
  - "Other Files," i.e., the files described in paragraphs 44-45 of the Second Amended Complaint in *Defense Distributed*, insofar as those files regard items exclusively: (a) in Category I(a) of the USML, as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.  Military Equipment means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

This temporary modification will remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development.

Please see the Settlement Agreement and the Second Amended Compliant for additional information.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000463

## 6. EU Amends Union Customs Code Concerning Definition of Exporter
(Source: Official Journal of the European Union, 30 July 2018.)

*Regulations:*
* Commission Delegated Regulation (EU) 2018/1063 of 16 May 2018 amending and correcting Delegated Regulation (EU) 2015/2446 supplementing Regulation (EU) No 952/2013 of the European Parliament and of the Council as regards detailed rules concerning certain provisions of the Union Customs Code

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. EU Amends Restrictive Measures Concerning Iraq
(Source: Official Journal of the European Union, 30 July 2018.)

*Regulations:*
* Commission Implementing Regulation (EU) 2018/1066 of 27 July 2018 amending Council Regulation (EC) No 1210/2003 concerning certain specific restrictions on economic and financial relations with Iraq

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Dutch Ministry of Foreign Affairs Posts Factsheet on Export Control in the Cloud
(Source: Rijksoverheid, 30 July 2018.) [In Dutch.]

This factsheet discusses how to handle export-controlled technology in a cloud environment. The factsheet (in Dutch) can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

NEWS

## 9. Expeditors News: "WCO Publishes 2018 Edition of Safe Framework of Standards"
(Source: Expeditors News, 27 July 2018.)

On July 26, 2018, the World Customs Organization ("WCO") published the 2018 edition of the SAFE Framework of Standards, following the June adoption by the WCO's highest decision-making body.

According to the WCO, the Framework provides international standards to secure and facilitate global trade, and is updated every three years to keep it relevant. The 2018 version strengthens the objective of cooperation between Customs administrations through:

   - The exchange of information;
   - Mutual recognition of controls;
   - Mutual recognition of Authorized Economic Operators (AEOs);
   - Mutual administrative assistance.

Included in the latest version is a comprehensive list of AEO benefits.

WCO Secretary General Dr. Kunio Mikuriya said, "All WCO Members and stakeholders should deepen the implementation of the SAFE Framework and its associated tools in an effective and harmonized manner to further strengthen supply chain security and facilitation, by leveraging the collective lessons learned thus far and the new opportunities outlined in the 2018 edition of the Framework."

The WCO press release may be found here.

The 2018 edition of the SAFE Framework of Standards may be found here.

back to top

* * * * * * * * * * * * * * * * * *

## 10. ST&R Trade Report: "Guidance on Product Exclusions for Section 232 Steel and Aluminum Tariffs"
(Source: Sandler, Travis & Rosenberg Trade Report, 30 July 2018.)

The Bureau of Industry and Security and U.S. Customs and Border Protection have made available the following guidance on obtaining and utilizing product exclusions from the 25 percent additional tariff on steel and the 10 percent additional tariff on aluminum being imposed for national security reasons under Section 232 of the Trade Expansion Act of 1962.

(Click here for ST&R's web page providing comprehensive information on all U.S. tariffs imposed under Section 301 and Section 232 as well as the retaliatory tariffs trading partners are levying on U.S. goods.)

**Exclusion Criteria**. A product exclusion will be granted if the article is not produced in the U.S. in a sufficient and reasonably available amount of satisfactory quality or if there is a specific national security consideration warranting an exclusion.

WASHSTATEC000465

**Review Process**. The Department of Commerce reviews each request for conformance with the submission requirements. Once a request is posted there is a 30-day comment period.

If there are no objections, CBP reviews the HTSUS number cited for accuracy. If CBP determines the number is inaccurate the request is denied and the requester is provided with CBP contact information. If the number is accurate the request is approved if there are no national security concerns and the decision is posted on www.regulations.gov.

If objections are submitted the DOC reviews each objection for conformance with the submission requirements. If an objection is posted the DOC reviews the request and the objection(s) and determines whether the item meets the above exclusion criteria.

**Exclusion Notifications**. All product exclusion decisions will be posted on www.regulations.gov. For each exclusion request the DOC will post a decision memo identifying whether the request is granted or denied.

If the request is denied due to an incorrect HTSUS number the memo provides information how on to obtain a correct classification from CBP. After the correct classification is obtained the requester may resubmit the request, noting that it is a resubmission with a revised classification and attaching the CBP determination.

If the request is denied for other reasons the memo will state the reason. If the denial is based on an objection the requester may file a new request and include information documenting the reason the new request should be granted notwithstanding the prior objection(s); e.g., the inability or refusal of the objector(s) to provide the product.

**Using Exclusions**. Granted exclusions will be effective five days after the decision has been posted on www.regulations.gov. An exclusion is generally granted for one year from the date of signature and will not be revoked unless the DOC has determined that submitted information was falsified. The use of an exclusion by any entity other than the organization that filed the original request is prohibited.

CBP will receive a notification from the DOC of any specific company and product to be excluded from the applicable tariff. The approved importer of record's name, address, and IOR number, as well as the associated product exclusion number, must be submitted to CBP before the importer of record submits the exclusion number with entries to CBP. The product exclusion number is based on the last six digits of the product exclusion docket number at www.regulations.gov and should be submitted in the importer additional declaration field (54 record) of the entry summary data based on the following format: STLXXXXXX for steel products and ALUXXXXXX for aluminum products. The corresponding HTSUS Chapter 99 number for the Section 232 duties should not be submitted when the product exclusion number is submitted.

WASHSTATEC000466

Steel importers must also submit mill certificates with their import data as required by 19 CFR 141.89.

**Refunds**. Granted product exclusions are retroactive to the date the request was posted for public comment. For any exclusions approved by DOC prior to June 1, 2018, importers may request a refund by submitting a post-summary correction with the product exclusion number in the importer additional declaration field.

Once products are excluded importers may claim Generalized System of Preferences or African Growth and Opportunity Act duty preferences on GSP and AGOA-eligible goods. If importers did not receive GSP or AGOA duty preferences on previous imports and those imports are now covered by a retroactive exclusion, importers may request a refund of the duties subject to GSP or AGOA preferences through a PSC.

If the entry has already liquidated, importers may protest the liquidation.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

## COMMENTARY

11. M. O'Kane: "Germany Drops Sanctions on Turkey, USA Threatens Turkey Sanctions for Detention of US Pastor" (Source: European Sanctions Blog, 30 July 2018.)

\* Author: Michael O'Kane, Esq., Peters & Peters Solicitors LLP, mokane@petersandpeters.com.

Germany has lifted its economic sanctions on Turkey after Ankara ended its two-year state of emergency. Its sanctions consisted of a €1.5 billion ($1.7 billion) limit on export guarantees to Turkey imposed in July 2017 after the detention of a German human rights campaigner and five other activists, including the head of Amnesty International in Turkey.

Meanwhile last week (26 July), US President Donald Trump tweeted that the US will impose *"large sanctions on Turkey for their long time detainment of Pastor Andrew Brunson"*. Andrew Brunson, an evangelical minister, has been detained on charges of involvement in a failed 2016 coup in Turkey. He has recently been moved to house arrest. In response, Turkey's Ministry of Foreign Affairs issued a press release stating that *"[n]o one can give orders to Turkey and threaten our country. The rhetoric of threat against Turkey is*

WASHSTATEC000467

*unacceptable. ... As regards the Brunson case, necessary information has been provided to our U.S. counterparts on various occasions and it has been clearly expressed that this issue is totally within the competence of the independent Turkish judiciary."*

On 26 July, the US Senate Foreign Relations Committee approved a Bill committing the US to opposing any international credit offers to Turkey. The Bill will now move to the full chamber of the Senate. A similar Bill was also introduced in the US House of Representatives.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. M. Volkov: "Episode 49 - Data Breach Notification in the GDPR Era"
(Source: Volkov Law Group Blog, 29 July 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Global Companies face a complex set of data breach notification requirements.  In the absence of a uniform federal standard, companies have to tailor their data breach notification procedures to meet the requirements of 50 U.S. states.  With respect to European Union residents, global companies have to meet stringent requirements established by the General Data Protection Regulations.

In this episode, Michael Volkov reviews the data breach notification requirements for US person data and for EU residents.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

‒

## EX/IM MOVERS & SHAKERS

## 13. Monday List of Ex/Im Job Openings; 172 Jobs Posted This Week, Including 17 New Jobs
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

\* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

"#" New or amended listing this week

* Aerojet Rocketdyne; Huntsville, AL; International Trade and Compliance Specialist;
* Aerojet Rocketdyne; Camden, AR; International Trade and Compliance Specialist;
* Agility; Atlanta, GA; Air Export Coordinator;
* Agility; Atlanta, GA; Ocean Import Coordinator
* Agility; Bensenville, IL; Ocean Export Coordinator;
* Agility; Basel, Switzerland; International Exhibition Coordinator;
* Agility; Burlingame, CA; Ocean Import Coordinator;
* Agility; East Boston, MA; Customs/Entry Writer Coordinator
* Agility; Houston, TX; Air Freight Export Account Executive
* Agility; Houston, TX; Ocean Export Coordinator
* Agility; Queens, NY; Air Export Coordinator;
* Agility; Queens, NY; Air Export Coordinator;
* Albemarle Corporation; Baton Rouge, LA; Logistics Specialist - Trade Compliance and Marine Specialist;
# Alcoa Group; Knoxville, TN; Trade Compliance Administrator;
* Amazon; Seattle, WA; Head, Global Trade and Product Compliance;
* Amazon; Seattle, WA;  Global Trade Compliance Analyst;
* Amazon; Seattle, WA; US Export Compliance PM;
* Arrow; Houten, Netherlands; Junior Officer Global Trade Management and Compliance - EMEA;
# Arrow; Multiple Locations: Centennial, CO; Phoenix, AZ; Reno, NV; Global Trade Management & Compliance Officer - Trade Compliance Analyst;
* Arrow; Neu-Isenburg, Germany; Sachbearbeiter Export / Global Trade Management & Compliance Officer (m/f) - befristet;
* Arrow; Shanghai, China; Compliance Manager;
* Augusta Westland; Philadelphia, PA; Import/Export Specialist; Requisition ID: 1518
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
# Bass Pro Shops; Springfield, MO; Global Trade Compliance Specialist;
# Boeing; Englewood, CO; Compliance Specialist 4; Requisition ID: 1268;
* Boeing; Zoushan, China; Trade Compliance Manager;
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Curtiss-Wright; Chanhassen, MN; Logistics & Compliance Specialist; Requisition ID: 2835
# Disney Parks & Resorts; Kissimmee, FL; Senior Manager, Trade Compliance; Requisition ID: 552655BR;
# The Dow Chemical Company; Midland, MI; ITO Trade Compliance Manager - Technology;
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Hungary; Manager Global Trade Management EMEA - Imports (in any EMEA location); Requisition ID: 052687

WASHSTATEC000469

\* Eaton; Multiple Locations: Cleveland, Ohio; Moon Township, Pennsylvania; Eden Prairie, Minnesota; Peachtree City, Georgia; Galesburg, Michigan; Manager, Supply Chain Governance, Risk & Compliance; Requisition ID: 054321
\* Eaton; Reynosa, Mexico; Trade Compliance Specialist; Requisition ID: 054044
\* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
\* Edmonds Enterprise Services, Inc.; Washington, D.C.; Compliance Specialist; Department of State; tmarshall@edmondses.com; (703) 778-7070
\* Elbit Systems of America; Fort Worth, TX; Trade Compliance Officer; 2018-5917
\* Eli Lilly and Co.; Indianapolis, IN; Import/Export Trade Associate;
# Embraer; Fort Lauderdale, FL; Compliance Specialist II; Requisition ID: 170685;
\* Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com;
\* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
\* Expeditors; Amsterdam, Netherlands; Regional Compliance SME (Subject-Matter expert) Supervisor On-site;
\* Expeditors; Bangkok, Thailand; Regional Trade Compliance Manager - Indochina & Philippines;
\* Expeditors; Krefeld, Germany; Clerk Import / Export;
\* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
\* Expeditors; Bedfont, United Kingdom; District Trade Compliance Manager;
\* Expeditors; Detroit, MI; US Export Compliance Consultant;
\* Expeditors; Dublin, IE; Consultant - Customs and Trade Compliance;
\* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
\* Expeditors; Frankfurt, Germany; Consultant - Customs and Trade Compliance (m/w), unbefristet und in Vollzeit
;
\* Expeditors; Krefeld, Germany; Clerk, Airfreight Import;
\* Expeditors; Plainfield, IN; District Trade Compliance Manager;
\* Expeditors; Seattle, WA; Supervisor - IS Development, Customs & Compliance;
\* Expeditors; Sunnyvale, CA, USA; Customs Compliance Coordinator;
\* Expeditors; Sunnyvale, CA, USA; Customs Compliance Specialist;
\* Expeditors; Stockholm, SE; District Trade Compliance Manager;
\* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist; info@exportsolutionsinc.com
\* Flash Global; Mountain Lakes, NJ; Import and Export Specialist;
\* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
\* FLIR; Billerica, MA; US Customs Analyst;
\* FLIR; Elkridge, MD; Global Trade Compliance, Traffic Analyst OTS;
\* FLIR; Elkridge, MD; Global Trade Compliance Traffic Analyst Detection;
\* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
\* FLIR; Irving, CA; Sr. Manager Export Compliance;
\* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
\* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
\* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;

WASHSTATEC000470

* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* General Atomics; San Diego, CA; Director, Compliance; Requisition ID: 18549BR
# General Atomics; San Diego, CA; Associate Compliance Specialist; Requisition ID: 19856BR;
# General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 19499BR;
* General Atomics; San Diego, CA; Import/Export Trade Compliance Administrator - Licensing; Requisition ID: 17968BR
* General Atomics; San Diego, CA; Internal Auditor - Senior; Requisition ID: 17524BR
* General Atomics; San Diego, CA; Senior Director of Import/Export Compliance; Requisition ID: 13892BR
# General Atomics; San Diego, CA; Senior Government Compliance Specialist; Requisition ID: 19500BR;
* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID: 2018-1122
# General Electric; Lynn, MA; Senior Export Control Specialist, Aviation; Requisition ID: 3146429
* GHY International; Pembina, ND (or remote); Ocean & Air Import Coordinator;
* Google; Mountain View, CA; Ethics and Compliance Associate Counsel, Export Control;
# Google; Sunnyvale, CA; Logistics Compliance Program Manager, Import Classification;
* Harris Corporation; Palm Bay, FL; Technical Trade Compliance Engineer; Contact Laura Solomon; Requisition ID: ES20171511-22019
* Harris Corporation; Clifton, NJ; Technical Trade Compliance Engineer;
* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist; Requisition ID: ES20180706-25145
* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement Mgr;
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition ID: 18000307
* Honeywell International Inc.; Sunnyvale, CA or Lincolnshire, IL; Sr. Import/Export Analyst; HRD32371
* Hussman; Bridgeton, MO; Trade Compliance Specialist;
* Infineon Technologies; Milpitas, CA; Export Compliance Specialist; Requisition ID: 26988
* Infineon Technologies; Munich, Germany; Manager Export Control;
* Infineon Technologies; Munich, Germany; Specialist Export Control;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Requisition ID: WD30047852135

* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Rquisition ID: WD30047853135
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Tamaulipas, Matamoros, Mexico; Trade Compliance Specialist; Requisition ID: EB00064420180
* Komatsu; Milwaukee, WI; Senior International Trade Compliance Analyst; Requisition ID: 12728
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Lincoln Electric; Cleveland, OH; Trade Compliance Manager;
* Lockheed Martin; Arlington, VA; Senior International Licensing Analyst; ID: 438635BR
* Lockheed Martin; Arlington, VA; International Trade Compliance Senior Analyst; ID: 433621BR
* Lockheed Martin; Arlington, VA; International Trade Compliance Engineer; ID: 439787BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Requisition ID: 433405BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
# Meggit; Akron, OH; Senior Manager Trade Compliance;
* Mercury Systems; Andover, MA; International Trade Compliance Director; Requisition ID: 18-165
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Muscogee International, LLC; Washington, D.C.; DDTC Compliance Specialist II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Policy Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Records Auditor; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Contract Analyst; Apply HERE or contact their recruiting team.

* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk Lead; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support I; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support III; Apply HERE or contact their recruiting team.
# Netflix; Los Angeles, CA; Manager, Trade Compliance;
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 18010381
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Northrop Grumman; McLean, VA; International Trade Compliance Analyst 3; Requisition ID: 18012973
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst 3; Requisition ID: 18007859
* Northrop Grumman; San Diego, CA; International Trade Compliance Analyst 2; Requisition ID: 18012561
* Northrop Grumman; Redondo Beach, CA; or Rancho Bernardo, CA; or Melbourne, FL; or Falls Church, VA; Sr. Manager, International Trade Compliance; Requisition ID: 18012105; Contact Fred Czarske at 310.332.7606, fred.czarske@ngc.com.
* OCR Services, Inc.; Rockville, MD; Business Analyst, Global Trade Compliance;
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
* Optics 1; Bedford NH, Senior Trade Compliance Administrator
* Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N
* Oshkosh Corporation; Greenville, WI; Global Trade Compliance Analyst; Requisition ID: 182405
* Oshkosh Corporation; Greenville, WI; Senior Global Trade Compliance Analyst - Licensing; ID: 183273
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* PerkinElmer, Inc.; Singapore; ITC Specialist; Requisition ID: JR-003936
* Raytheon; Billerica, MA; Mgr I Export-Import Control; Requisition ID: 118298BR
* Raytheon; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 115189BR
* Raytheon; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* Raytheon; El Segundo, CA; Senior Principle, Global Trade Licensing; Requisition ID: 117232BR
* Raytheon; El Segundo, CA; Manager III, Global Trade Licensing; Requisition ID: 117235BR

* Raytheon; El Segundo, CA; Fullerton, CA; Goleta, CA; Aberdeen, MD; Plano, TX; McKinney, TX; Principal Analyst, Global Trade Licensing; Requisition ID: 117247BR
* Raytheon; Tuscon, AZ; Principal Analyst Export Licensing And Compliance; Requisition ID:112176BR
* Raytheon; Woburn, MA; Global Trade Export Licensing & Compliance Advisor; Requisition ID:117939BR
* Raytheon; Woburn, MA; Supply Chain Compliance Advisor; Requisition ID:115557BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;
* Stockholm International Peace Research Institute (SIPRI); Solna, Sweden; Senior Researcher on Dual Use and Arms Trade Controls;
# Spirent; Calabasas, CA; Global Trade Compliance Specialist; Requisition ID: 4088;
* Tech Data Corporation; Miami, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Clearwater, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Groveport, OH; Regulatory Compliance Manager;
* Tech Data Corporation; Duluth, GA; Regulatory Compliance Manager;
* Teva Pharmaceuticals; North Wales, PA; Senior Analyst, Customs & Trade Compliance;
* TLR; San Fransisco, CA; Import CSR; Requisition ID: 1040
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Specialist; Requisition ID: 62176BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com;
* Varian; Paolo Alto, CA; Trade Compliance Analyst; Requisition ID: 13097BR;
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Vigilant; Negotiable Location, USA; Global Trade Account Manager;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
# Watts Water Technologies; Andover, MA; Customs Compliance Specialist;
# World Wide Technology; Edwardsville, IL; International Trade Compliance Specialist;
* Wurth Industry of North America; Indianapolis, IN; International Trade Compliance Officer - Classification
* Xylem, Inc.; Bangalore, Karnataka, India; Third Party Contract & Compliance Coordinator;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist
* Xylem, Inc.; Pewaukee, WI; Logistics Manager/Trade Compliance;
* YETI; Austin, TX; Global Trade Compliance Manager

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

### 14. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * *

--

## EDITOR'S NOTES

### 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Alexis de Tocqueville** (Alexis Charles Henri Clérel, Viscount de Tocqueville; 29 Jul 1805 - 16 Apr 1859) was a French diplomat, political scientist and historian. He was best known for his works *Democracy in America* and *The Old Regime and the Revolution*. *Democracy in America* was published after Tocqueville's travels in the United States and is today considered an early work of sociology and political science.
  - *"Democracy and socialism have nothing in common but one word,*

WASHSTATEC000475

*equality. But notice the difference: while democracy seeks equality in
liberty, socialism seeks equality in restraint and servitude."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in
the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended
in the Federal Register.  The latest amendments to applicable regulations
are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms,
Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns,
Destructive Devices and Certain Other Firearms; Background Checks for
Responsible Persons of a Trust or Legal Entity With Respect To Making or
Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance
Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL
(NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat
program; reporting requirements for Cleared Defense Contractors; alignment
with Federal standards for classified information systems; incorporated and
cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII,
Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List
(UVL); Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts
500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky
Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese
Sanctions Regulations and Amendment of the Terrorism List Government
Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade
Regulations (FTR): Clarification on the Collection and Confidentiality of
Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by
James E. Bartlett III, is available for downloading in Word format. The BAFTR

contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

–

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000479

Message

| | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 7/30/2018 8:49:04 PM |
| **To:** | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| **Subject:** | Defense Distributed Settlement Alerts for 30 July 2018 |



## Defense Distributed Settlement Alerts for 30 July 2018

"20 states take aim at 3D gun company, sue to get files off the Internet", Twenty states announced Monday that they plan to ask a federal judge in Seattle to immediately issue a temporary restraining order against Defense Distributed, a Texas-based group that has already begun making 3D-printer gun files available on its DEFCAD website after a recent legal settlement with the US State Department.

"3D-printed guns could soon pose challenge to regulators", In the U.S., at-home gunsmithing isn't new. Federal law allows anyone to manufacture their own firearm, but does require a license to sell or distribute them. But 3D-printed guns do not require much skill or training; anyone can produce their own gun with ease if they have access to a 3D printer. It would also allow people who might otherwise fail a background check to possess a gun, like convicted felons or domestic abusers.

"US lawmakers protest deal allowing free distribution plans for 3D printed guns", Dozens of US legislators are demanding that the Trump administration explain a recent agreement to allow the free distribution of plans for using 3D printers to make plastic handguns that will be easy to hide and almost impossible to control.

"The age of 3D-printed guns in America is here", A last-ditch effort to block a US organization from making instructions to 3D-print a gun available to download has failed. The template will be posted online on Wednesday (Aug. 1).

"Alyssa Milano: A 3D printed gun is downloadable death", Due to a settlement between the State Department and Defense Distributed -- a Texas based designer of 3D guns -- felons, domestic abusers, terrorists, those adjudicated too mentally ill to own guns and any other person unable to legally purchase firearms will be able to print one at home. Depending on the printer, they can be untraceable and plastic, or they can be metal. People will be able to make anything from novelty guns to AR-15s. And we will never know -- until it is too late.

"Company agrees to block 3D downloadable guns in Pennsylvania", State officials say they've successfully stopped a company that makes 3D downloadable guns from making them internet-accessible in Pennsylvania and from uploading new files.

"Defense Distributed Sues New Jersey, Los Angeles Over Legal Threats", Defense Distributed, founded by Cody Wilson, provides the means for people to make weapons at home via software and 3D-printing and milling machines. Today that company, along with the Second Amendment Foundation, has sued the attorney general of New Jersey and the city attorney of Los Angeles.

"Washington to sue over 3D printed gun plans", The plans for the 3D printed guns are set to be released on August 1, 2018. This is the first lawsuit over the plan, and it will seek a nationwide injunction.

"Data allowing people to print out their own guns temporarily blocked from Internet in Pa. after legal pressure", Josh Blackman, an attorney representing Wilson, Defense Distributed's founder, said he agreed to block Pennsylvanians from accessing the website to avoid a broader injunction. But the Pennsylvania website blackout will only be temporary, he said.

"3-D-printed guns put carnage a click away", The Brady Center to Prevent Gun Violence has filed a Freedom of Information Act request to find out how this senseless decision was reached, and whether groups such as the National Rifle Association were involved. It, along with Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence, tried unsuccessfully Friday to get a federal court in Texas to block what it called a "troubling" and "dangerous" settlement.

"3D-printed 'downloadable' firearms are coming as soon as Wednesday. They could reshape U.S. gun control", Bill Nelson, a Democratic senator from Florida, announced Wednesday he was filing a bill to "severely restrict the publication" of the plans. Another Democrat, Ed Markey, implored Secretary of State Mike Pompeo during a hearing to reconsider the "special exemption" on downloadable guns and keep Defense Distributed from publishing the instructions.

"3D printed gun blueprints allowed to go online", In suddenly reversing its interpretation of the International Trade in Arms Regulations (ITAR), the Trump State Department apparently relied upon a recent Trump directive: 'Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).' The Trump Administration agreement with the company promoting these plastic guns apparently occurred with no public hearing and no prior notice to gun safety groups. I applaud the efforts of gun safety groups to protect our families.

———————————————————

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000481

Message

| | |
|---|---|
| **From:** | Morning Consult [reply@e.morningconsult.com] |
| **Sent:** | 7/31/2018 12:17:32 PM |
| **To:** | kaidanowts@state.gov |
| **Subject:** | Morning Consult Washington, Presented by the Electronic Payments Coalition: Trump Has Reportedly Agreed to Delay Border Wall Fight Until After Midterms |

Morning Consult Washington, Presented by the Electronic Payments Coalition: Trump Has Reportedly Agreed to Delay Border Wall Fight Until After Midterms



By Eli Yokley

# Top Stories

- President Donald Trump has privately agreed to put off a government shutdown or a fight over funding his proposed wall along the U.S.-Mexico border until after the midterm elections, according to an unnamed administration official. As lawmakers on Capitol Hill work to fund the government as much as possible before the new fiscal year begins Oct. 1, the Senate is expected to pass a package of four spending bills this week. (The Wall Street

Journal)

- Trump criticized Charles and David Koch as "a total joke in real Republican circles," and said their network of conservative donors is "highly overrated." The posts on Twitter came after the billionaire brothers' donor network said it would not back the Republican nominee for Senate in North Dakota, Rep. Kevin Cramer. (The Hill)

- Treasury Secretary Steven Mnuchin said his department is studying whether it could use its regulatory power to allow Americans to account for inflation in determining capital gains tax liabilities, a move that would bypass Congress and result in a $100 billion tax cut - which would go mainly to the wealthy. (The New York Times)

## Chart Review

99 Days to Go, and the Midterm Elections Battleground Is Not What Was Expected
**The New York Times**

# Events Calendar (All Times Local)

**TUESDAY**

| | |
|---|---|
| FCC commissioner participates in event on telemedicine | 9 a.m. |
| Senate Judiciary Committee holds hearing on immigration enforcement and family reunification efforts | 10 a.m. |
| Paul Manafort's trial begins in Virginia | 10 a.m. |

WASHSTATEC000484

| Hudson Institute hosts event on reforming the Committee on Foreign Investment in the United States | 12 p.m. |

**WEDNESDAY**

| Senate Environment and Public Works Committee hearing on the EPA's agenda | 10:30 a.m. |

| U.S. Chamber of Commerce hosts event on blockchain | 1 p.m. |

**THURSDAY**

| Senate Foreign Relations Committee hosts hearing on the value of the NATO alliance | 10:45 a.m. |

| Maryland Gov. Hogan participates in Economic Club of Washington, D.C., event | 11:30 a.m. |

**FRIDAY**

No events scheduled

**SPONSORED BY THE ELECTRONIC PAYMENTS COALITION**



## Voters agree: new technology is the future of electronic payments

With over one in three voters saying they use cash less now than they have in the past, more people are starting to rely on electronic payments as a safe and easy way to pay every day. With the popularity of mobile wallets, online payments, and other technologies expected to grow even further, we must continue to prioritize innovation.

WASHSTATEC000486

# General

### U.S. spy agencies: North Korea is working on new missiles
**Ellen Nakashima and Joby Warrick, The Washington Post**

U.S. spy agencies are seeing signs that North Korea is constructing new missiles at a factory that produced the country's first intercontinental ballistic missiles capable of reaching the United States, according to officials familiar with the intelligence. Newly obtained evidence, including satellite photos taken in recent weeks, indicates that work is underway on at least one and possibly two liquid-fueled ICBMs at a large research facility in Sanumdong, on the outskirts of Pyongyang, according to the officials, who spoke on the condition of anonymity to describe classified intelligence.

### FEMA official harassed women, hired some as possible sexual partners for male employees, agency chief say
**Lisa Rein, The Washington Post**

The personnel chief of the Federal Emergency Management Agency - who resigned just weeks ago - is under investigation after being accused of creating an atmosphere of widespread sexual harassment over years in which women were hired as possible sexual partners for male employees, the agency's leader said Monday. The alleged harassment and other misconduct, revealed through a preliminary seven-month internal investigation, was a "systemic problem going on for years," said FEMA Administrator William "Brock" Long.

### At least 8 dead as wildfires continue to rage across California
**Sonali Kohli and Ruben Vives, Los Angeles Times**

Authorities on Monday were hoping that a slight break in the heat this week could help them gain control of a number of wildfires that have so far scorched more than 200,000 acres and killed eight people across California. The Carr fire, which erupted in Shasta County a week ago and spread into the city of Redding, grew to 98,724 acres and was 20% contained as of Monday morning.

### U.S. Supreme Court Refuses to Halt Teenagers' Climate Lawsuit
**Greg Stohr, Bloomberg**

The U.S. Supreme Court refused to halt a novel and sweeping lawsuit pressed by children and teenagers seeking to force the federal government to take steps against climate change. Rejecting a Trump administration request, the high court let the case proceed toward a trial

WASHSTATEC000487

that's scheduled for later this year.

How Alan Friedman, Italy's Professional American, Put Paul
Manafort in Jail
**Jason Horowitz, The New York Times**

Alan Friedman is Italy's professional American. A former journalist with
a baritone voice and perfect, if heavily accented, Italian, he has for
decades provided the American perspective to Italians.

# Presidential

Rudy Giuliani on His Odd Cable News Blitz: I Was Trying to
Kill a New York Times Story
**Asawin Suebsaeng, Daily Beast**

Throughout Monday, President Donald Trump's lawyer and former New
York City mayor Rudy Giuliani went on a chaotic media tour, with each
subsequent interview seeming to atone or clean up for a key element laid
out in a previous appearance. In an interview with The Daily Beast on
Monday night, Giuliani appeared to blame the maelstrom he kicked up
on inquisitive New York Times reporters who he suggested had
compelled him to proactively spin a potentially damaging story that may
or may not actually be real.

Trump Officials to Face Senate Scrutiny Over Family
Separations
**Jennifer Epstein, Bloomberg**

The Trump administration will face tough questions Tuesday at the first
public hearing probing the the president's "zero tolerance" policy that led
to the separation of thousands of migrant children from their parents.
Officials from the Departments of Justice, Homeland Security, and
Health and Human Services are set to testify before the Senate Judiciary
Committee, where members from both parties are expected to be harshly
critical of the separations.

Trump intervenes in FBI headquarters project
**Jonathan O'Connell, The Washington Post**

President Trump has become personally involved in plotting a new FBI
headquarters in downtown Washington, an interest that for now has left
the project in limbo and the agency stranded in a building that no longer
suits its needs, according to officials and people familiar with the
administration's deliberations. For years, FBI officials have raised alarms

that decrepit conditions at its current headquarters, the J. Edgar Hoover Building, constitute serious security concerns.

**In a new book, Bob Woodward plans to reveal the 'harrowing life' inside Donald Trump's White House**
**Manuel Roig-Franzia, The Washington Post**

In the worldwide capital of leaks and anonymous dishing that is Washington, secrets can be almost impossible to keep. But somehow over the past 19 months, the fact that America's most famous investigative journalist was quietly chipping away at a book that delves into the dysfunctions of President Trump's White House remained largely unknown.

# Senate

**Manchin Says He's Undecided on Kavanaugh After Two-Hour Meeting**
**Laura Litvan, Bloomberg**

Senator Joe Manchin of West Virginia became the first Democrat in the chamber to meet with Supreme Court nominee Brett Kavanaugh, and after the two-hour private session Monday the senator said he won't decide how to vote until after a confirmation hearing. "It was a very productive meeting. In two hours, you talk about everything," said Manchin, one of only three Democrats to back President Donald Trump's first Supreme Court pick, Neil Gorsuch, last year.

**'Excruciating': GOP desperately fights to pad Senate majority**
**Burgess Everett, Politico**

As one of a few centrist Republicans in what is effectively a 50-49 Senate, Sen. Lisa Murkowski has enormous sway over the congressional agenda. Sometimes she wishes she had a little less of it.

**Social media posts by consultant to Senate candidate Corey Stewart ridicule NAACP, black neighborhoods**
**Patrick Wilson, Richmond Times-Dispatch**

Republican Senate candidate Corey Stewart has paid more than $100,000 to a campaign consultant who has called the NAACP a "more violent" version of the KKK and said only a "fool" would start a business in a black neighborhood. Stewart's Senate campaign paid Rick Shaftan's company Atlantic Media & Research more than $113,000 for consulting and work on media and radio advertising between May 8 and June 11,

according to the Federal Election Commission.

**McCaskill camp hits back at attack ad resurrecting allegations against husband**
**Ben Kamisar, NBC News**

The Club for Growth is out with a tough new television ad that evokes decades-old domestic violence allegations against the husband of Missouri Democratic Sen. Claire McCaskill. The new spot, which drew a harsh rebuke from McCaskill's campaign, questions whether McCaskill can be an advocate for victims because of allegations made against her husband, Joseph Shepherd, at the end of his first marriage.

# House

**Pelosi Urges House Democrats to 'Own August' Over Recess**
**Simone Pathé, Roll Call**

Democratic recruits across the country may be running away from party leadership in their campaigns this summer, but House Minority Leader Nancy Pelosi has some messaging advice for her colleagues about painting a contrast between the parties ahead of November. In a "Dear Colleague" letter circulated Monday, marking 100 days from the midterms, Pelosi stressed the importance of contrasting the Democratic and Republican economic messages when lawmakers are in their districts over recess.

**Bigfoot Porn Has Become A Major Controversy In A U.S. House Race. Seriously.**
**Dominique Mosbergen, HuffPost**

A Democratic candidate in a hotly contested U.S. House race in Virginia has accused her opponent of supporting white supremacists - oh, and also of liking Bigfoot porn. Democrat Leslie Cockburn sparked a Twitter frenzy on Sunday by sharing a curious drawing, apparently taken from Republican rival Denver Riggleman's Instagram page, showing a Bigfoot-like creature with its genitals obscured by a "censored" sign.

# States

**Eight States Sue to Block Release of Plans for 3D-Printed Firearms**

**Zusha Elinson, The Wall Street Journal**

Eight states filed suit Monday to block a pro-gun group from distributing files online for making firearms with 3D printers. A recent settlement between the group, Defense Distributed, and the State Department that allowed the files to be posted has spurred outcry from gun-control groups and Democratic lawmakers.

The Pension Hole for U.S. Cities and States Is the Size of Japan's Economy
**Sarah Krouse, The Wall Street Journal**

For the past century, a public pension was an ironclad promise. Whatever else happened, retired policemen and firefighters and teachers would be paid.

Georgia Capitol crowd that backed Cagle now signing checks for Kemp
**James Salzer, The Atlanta Journal-Constitution**

Once it became clear Brian Kemp would be the Republican nominee for governor, lobbyists started showing up en masse Tuesday night at the downtown Athens Holiday Inn, where the candidate was celebrating his big win. They strained to be seen by Kemp or his aides, posed for pictures and posted congratulatory notes on social media.

For Democrats, the elusive dream of a blue Georgia hinges on rapidly diversifying Atlanta suburbs
**Fenit Nirappil, The Washington Post**

If a blue electoral wave crests in Georgia in November, it will be pushed by dramatically changing counties like Gwinnett in what once were the Republican strongholds of suburban Atlanta. Georgia's second-largest county has transformed from 56 percent white in 2010 to 62 percent nonwhite last year, stunning longtime residents and shaking up the political environment.

In Florida, Not All Politics Are Local, as Trump Shapes Governor's Race
**Jonathan Martin, The New York Times**

The Sarasota County Republican fair and rally last Saturday left little mystery about what is animating the party this year. There was a "Trump Shop" outside the arena, selling T-shirts extolling the president's dominance.

# Advocacy

## Koch-backed group to target lawmakers who agree to increase spending
**Niv Elis, The Hill**

Americans for Prosperity, the conservative group backed by the Koch brothers, announced a campaign Monday targeting lawmakers who vote for spending increases. "This month, we plan to draw serious attention to our spending problem and show Washington that Americans are indeed sweating this issue. That's why we're calling for a freeze," said Chief Government Affairs Officer Brent Gardner for Americans for Prosperity (AFP).

## 'It's a significant shift in our thinking': Business takes fresh look at Democrats
**Lorraine Woellert and Marianne Levine, Politico**

Business groups, at war with President Donald Trump over trade and immigration, say they're taking steps to rebuild the political center - including taking fresh looks at moderate Democrats. The American Bankers Association this month began airing ads in support of candidates for the first time, including Democrats Sen. Jon Tester of Montana and Rep. Lou Correa of California.

## Tom Steyer's $110 million plan to redefine the Democrats
**Edward-Isaac Dovere, Politico**

Tom Steyer has set plans to spend at least $110 million in 2018, making the billionaire investor the largest single source of campaign cash on the left and placing him on a path to create a parallel party infrastructure with polling, analytics and staffing capabilities that stand to shape and define the issues the party runs on in November. Steyer is building out an operation that's bigger than anyone other than the Koch Brothers - and the billionaire and his aides believe the reservoir of non-traditional voters he's already activated could become the overriding factor in House and other races across the country.

---

**A Message from the Electronic Payments Coalition:**

From making an order online to splitting bills on peer-to-peer payment apps, electronic transactions represent the future of easy and secure shopping. Polling shows increasing numbers of people are using various types of electronic payments every day, with their popularity only

expected to grow.

## Opinions, Editorials and Perspectives

### Trump's Lose-the-House Strategy
**The Editorial Board, The Wall Street Journal**

Does President Trump care if Republicans lose the House of Representatives this November? If that seems like an odd question, consider that Mr. Trump is running a campaign strategy that puts the House at maximum risk while focusing on the Senate.

### Republicans are obstructing a fair vetting of Brett Kavanaugh
**John Podesta and Todd Stern, The Washington Post**

As former White House staff secretaries, we watch with bemusement as Republicans attempt to play down Supreme Court nominee Brett M. Kavanaugh's role in that position when he held it under President George W. Bush. The Republican phrase du jour is that Kavanaugh was just a "traffic cop."

### White threat in a browning America
**Ezra Klein, Vox**

In 2008, Barack Obama held up change as a beacon, attaching to it another word, a word that channeled everything his young and diverse coalition saw in his rise and their newfound political power: hope. An America that would elect a black man president was an America in which a future was being written that would read thrillingly different from our past.

### More Cities and States Should Divest From Private Prisons
**Scott M. Stringer and Javier H. Valdés, The New York Times**

The Trump administration's decision to separate migrant children and their parents at the border and its anemic efforts to reunite families since the reversal of that policy have been widely condemned as cruel. But the president's so-called solution - to imprison immigrants as families in detention centers - is equally abhorrent.

## Research Reports and Polling

### Turnout in this year's U.S. House primaries is up, especially on

the Democratic side

**Drew DeSilver, Pew Research Center**

Americans appear to be more engaged with this year's midterm elections than they typically are. Not only do about half of registered voters report being more enthusiastic than usual about voting, up from 40% in 2014, but turnout has surged in the 31 states that already have held their congressional primaries - particularly among Democrats. In those states, nearly 13.6 million people - or 10.1% of registered voters - have voted in Democratic primaries for the U.S. House of Representatives, according to a Pew Research Center analysis of state election returns.



This email was sent by: Morning Consult
PO Box 27068 Washington, DC, 20038, US

Manage your email preferences

SUBSCRIBE

Message

**From:** Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu]
**Sent:** 7/31/2018 8:12:02 PM
**To:** hartrl@state.gov
**Subject:** 18-0731 Tuesday "Daily Bugle"

## Tuesday, 31 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription.  Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Continues National Emergency with Respect to Lebanon

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DoD/DSCA Posts Policy Memo 18-37
5. DoD/DSS Clarifies Guidance for Access to SAPs
6. DHS/CBP Posts Updated ABI Software Vendors List
7. State/DDTC: (No new postings.)
8. EU Amends Restrictive Measures Concerning Combating Terrorism, Ukraine, Libya, and North Korea

### NEWS

9. BBC: "Brexit: Barnier Rules out Key UK Customs Proposal"
10. Expeditors News: "Senate Passes Miscellaneous Tariff Bill"
11. Guns.com: "Court Rejects Bid by Groups to Block 3-D Firearm Files, States Step In"
12. Reuters: "U.S. Eases Export Controls for High-Tech Sales to India: Ross"

### COMMENTARY

13. M. Volkov: "Criminal Sentencing and Deterrence: White Collar Crime and Corporate Misconduct (Part I of III)"

14. R. Cook, M. Banerji & S. Klemencic: "Successful CFIUS Monitorships"

**EX/IM TRAINING EVENTS & CONFERENCES**

15. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA
16. ECTI Presents "BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time" Webinar, 11 Sep

**EDITOR'S NOTES**

17. Bartlett's Unfamiliar Quotations
18. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
19. Weekly Highlights of the Daily Bugle Top Stories

**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. President Continues National Emergency with Respect to Lebanon

(Source: Federal Register, 31 July 2018.) [Excerpts.]

83 FR 37415: Continuation of the National Emergency with Respect to Lebanon

On August 1, 2007, by Executive Order 13441, the President declared a national emergency with respect to Lebanon pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the actions of certain persons to undermine Lebanon's legitimate and democratically elected government or democratic institutions; to contribute to the deliberate breakdown in the rule of law in Lebanon, including through politically motivated violence and intimidation; to reassert Syrian control or contribute to Syrian interference in Lebanon; or to infringe upon or undermine Lebanese sovereignty. Such actions contribute to political and economic instability in that country and the region.

Certain ongoing activities, such as Iran's continuing arms transfers to Hizballah--which include increasingly sophisticated weapons systems--serve to undermine Lebanese sovereignty, contribute to political and economic instability in the region, and continue to constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared on August 1, 2007, and the measures adopted on that date to deal with that emergency, must continue in effect beyond August 1, 2018. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to Lebanon declared in Executive Order 13441. ...

(Presidential Sig.)
THE WHITE HOUSE,
July 27, 2018.

back to top

* * * * * * * * * * * * * * * * * *

_

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; RULES; Addition of Certain Entities; and Modification of Entry on Entity List [Publication Date: 1 August 2018.]

* Justice; Alcohol, Tobacco, Firearms, and Explosives Bureau; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and

WASHSTATEC000497

Approvals: National Firearms Act Division and Firearms and Explosives Services Division Customer Service Survey [Publication Date: 1 August 2018.]

* U.S. Customs and Border Protection; NOTICES; COBRA Fees to be Adjusted for Inflation in Fiscal Year 2019 [Publication Date: 1 August 2018.]

* U.S. Customs and Border Protection; PROPOSED RULES; Modernized Drawback [Publication Date: 2 August 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/BIS: (No new postings.)

(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. DoD/DSCA Posts Policy Memo 18-37

(Source: DoD/DSCA, 31 July 2018)

* DSCA Policy Memo 18-37 Decrease to Delivery Term Codes Percentage Rates for "Below-the-Line" Transportation on Foreign Military Sales and Building Partnership Capacity cases has been posted.
   - This memo updates Table C9.T4a. Table of Delivery Term Codes and Percentage

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. DoD/DSS Clarifies Guidance for Access to SAPs

(Source: DoD/DSS, 31 July 2018.)

The DoD Special Access Program Central Office provides clarifying guidance for granting access to Special Access Programs. You can find the guidance here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. DHS/CBP Posts Updated ABI Software Vendors List

(Source: CSMS #18-000464, 31 July 2018.)

This notice is to inform the Trade that an updated ABI Software Vendors List is now available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000498

## 7. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. EU Amends Restrictive Measures Concerning Combating Terrorism, Ukraine, Libya, and North Korea
(Source: Official Journal of the European Union, 31 July 2018.)

*Regulations:*
\* Council Implementing Regulation (EU) 2018/1071 of 30 July 2018 implementing Article 2(3) of Regulation (EC) No 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Implementing Regulation (EU) 2018/468
\* Council Implementing Regulation (EU) 2018/1072 of 30 July 2018 implementing Regulation (EU) No 269/2014 concerning restrictive measures in respect of actions undermining or threatening the territorial integrity, sovereignty and independence of Ukraine
\* Council Implementing Regulation (EU) 2018/1073 of 30 July 2018 implementing Article 21(2) of Regulation (EU) 2016/44 concerning restrictive measures in view of the situation in Libya
\* Council Implementing Regulation (EU) 2018/1074 of 30 July 2018 implementing Regulation (EU) 2017/1509 concerning restrictive measures against the Democratic People's Republic of Korea

*Decisions:*
\* Council Decision (CFSP) 2018/1084 of 30 July 2018 updating the list of persons, groups and entities subject to Articles 2, 3 and 4 of Common Position 2001/931/CFSP on the application of specific measures to combat terrorism, and repealing Decision (CFSP) 2018/475
\* Council Decision (CFSP) 2018/1085 of 30 July 2018 amending Decision 2014/145/CFSP concerning restrictive measures in respect of actions undermining or threatening the territorial integrity, sovereignty and independence of Ukraine
\* Council Implementing Decision (CFSP) 2018/1086 of 30 July 2018 implementing Decision (CFSP) 2015/1333 concerning restrictive measures in view of the situation in Libya
\* Council Decision (CFSP) 2018/1087 of 30 July 2018 amending Decision (CFSP) 2016/849 concerning restrictive measures against the Democratic People's Republic of Korea

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

--

WASHSTATEC000499

**NEWS**

## 9. BBC: "Brexit: Barnier Rules out Key UK Customs Proposal"
(Source: BBC, 26 July 2018.)

The EU's chief negotiator has ruled out allowing the UK to collect customs duties on its behalf, a key UK proposal for post-Brexit trade.

Michel Barnier said the UK wanted to "take back control" of its money, law and borders - but so did the EU.

The EU would not delegate "excises duty collection to a non-member", he said.

Both he and UK Brexit Secretary Dominic Raab said progress had been made but "obstacles" remained before reaching a deal in October.

Mr Raab said: "We have agreed to meet again in mid-August and then to continue weekly discussions to clear away all the obstacles that line our path, to a strong deal in October - one that works for both sides."

He replaced David Davis, who quit as Brexit secretary in protest at Theresa May's plans for a future economic relationship between the UK and EU, as set out in the White Paper.

That set out in more detail the government's proposed customs system, the Facilitated Customs Arrangement for goods and agri-foods. The UK's plan involves it collecting some EU tariffs - in a bid to ensure frictionless trade in goods and to avoid a hard border in Northern Ireland. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Expeditors News: "Senate Passes Miscellaneous Tariff Bill"
(Source: Expeditors News, 30 July 2018.)

On July 26, 2018, the U.S. Senate passed the Miscellaneous Tariff Bill Act of 2018 (MTB) with minor amendments. The bill now goes back to the House of Representatives for approval.

The MTB removes expired duty rate reductions in the Harmonized Tariff Schedule of the U.S., and adds duty suspensions and reductions that last through December 31, 2020.

WASHSTATEC000500

The effective date of the bill will be 30 days after the date of the enactment of the MTB.

The Senate's Congressional Record (CR S5438) may be found here.

The MTB (H.R. 4318), as passed by the House on January 16, 2018, may be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. Guns.com: "Court Rejects Bid by Groups to Block 3-D Firearm Files, States Step In"
(Source: Guns.com, 30 July 2018.)

A judge in a Texas federal court last week declined to side with gun control groups trying to stop the planned release of downloadable firearm files as states are mobilizing to block the information themselves.

U.S. Judge Robert Pitman, a sixth-generation Texan and 2014 appointment by President Obama, on Friday, denied a motion by the Brady Campaign, Everytown, and Giffords to intervene in the lawsuit between Austin-based Defense Distributed and the U.S. State Department.

The gun control advocates argued that the settlement reached between DefDist and the government would allow felons and terrorists to download 3-D files that could assist in unregulated firearm manufacturing. Pittman held the groups lacked standing and, declining to grant a request to halt the pending publication of the files, dismissed the case.

  "Just goosed Brady, Gabby and Mike Bloomberg in federal court. Enjoy your weekend," tweeted DefDist founder Cody Wilson in the aftermath of the ruling.

Wilson, who catapulted to controversy in 2013 when he first released online plans for his 3-D printed single-shot .380 Liberator pistol that quickly garnered over 100,000 downloads, has been mired in legal combat with the State Department ever since as the feds argued the availability of the plans, which recognized no borders, was a violation of International Traffic in Arms Regulations.

DefDist filed suit against the Obama administration in 2015 with the help of the Second Amendment Foundation, before the State Department switched gears last month and moved to grant Wilson's company a special exemption to ITAR regulations on Friday, allowing him to post a variety of non-military small arms files on DefCAD.com.

  "The State Department has made a dangerous and baffling mistake," said Nick Suplina, legal policy director for Everytown. "For years, the State Department worked to prevent these deadly designs from going public, and

WASHSTATEC000501

it's difficult to fathom why it suddenly reversed course on an issue with such clear consequences for public safety," he continued. "Allowing unfettered access to these designs will enable felons, terrorists, and domestic abusers to create guns with ease and put public safety at risk."

*States step in*

In response to a threat by New Jersey state Attorney General Gurbir Grewal and Los Angeles City Attorney Mike Feuer last Thursday warning DefDist of pending legal action should the company allow residents in their state to download the controversial files, Wilson fired back Saturday with a lawsuit against the two, arguing they are violating First Amendment free speech protections.

In the 16-page filing, attorneys for DefDist hold that Grewal and Feuer "have waged an ideologically-fueled program of intimidation and harassment against" the company, intending to drag Wilson "before all manner of far-flung criminal and civil tribunals in an effort to silence the organization."

Seeking damages and attorney fees, attorneys Alan Gura and Josh Blackman outline the threats of litigation from Grewal and Feuer also illegally interfere with DefDist's lawful business under the Dormant Commerce Clause, which restricts the powers of states to get involved in federally-protected interstate commerce.

Pending the outcome of the challenge, Wilson's group has blocked IP addresses in Los Angeles, New Jersey, and Pennsylvania- where a similar case was made in a Philadelphia federal court on Sunday- from downloading DefCAD files.

  "Defense Distributed's mission, & the federal gov't abdication of their responsibilities, forces my hand into fighting an obscene proposition," said Pennsylvania Attorney General Josh Shapiro, like Grewal and Feuer a Democrat. "We have laws in place to keep people safe, & during a time when students aren't safe in their own classrooms, we need more help - not less."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. Reuters: "U.S. Eases Export Controls for High-Tech Sales to India: Ross"
(Source: Reuters, 30 July 2018.)

The United States has eased export controls for high technology product sales to India, granting it the same access as NATO allies, Australia, Japan and South Korea, U.S. Commerce Secretary Wilbur Ross said on Monday.

WASHSTATEC000502

Ross, speaking at a U.S. Chamber of Commerce event, said the move to grant Strategic Trade Authorization status STA1 to India reflects its efforts to improve its own export-control regime, its adherence to multilateral export rules and its growing status as a U.S. defense partner.

"STA1 provides India greater supply chain efficiency, both for defense, and for other high-tech products," Ross said, adding that the elevated status would have affected about $9.7 billion worth of Indian goods purchases over the past seven years.

India's ambassador to the United States, Navtej Sarna, told the same forum the U.S. move was a logical step after the United States designated India a major defense partner in 2016.

"It is a sign of trust, not only in the relationship, but also (in) Indian's capabilities as an economy and as a security partner, because it also presupposes that India has the multilateral export control regime in place which would allow the transfer of more sensitive defense technologies," he said.

"It also testifies to the excellent record we have had in maintaining non-proliferation of these technologies," he said. "I certainly think it fleshes out our defense partnership in a big way."

Political and military ties between the countries have expanded significantly in recent years although trade differences have arisen since U.S. President Donald Trump took office in 2017.

Ross's announcement comes ahead of high-level talks between the United States and India in September that will be attended by U.S. Secretary of State Mike Pompeo and Defense Secretary Jim Mattis. The Sept. 6 talks have been twice postponed this year.

India and the United States share an interest in countering China's expanding economic and military weight and the United States has emerged as a top arms supplier to India, selling more than $15 billion of weapons over the past decade as New Delhi modernizes its Soviet-era military.

Washington has offered India the armed version of drones that were originally authorized for sale as unarmed and for surveillance purposes. If the deal comes to fruition, it would be the first time the United States has sold a large armed drone to a country outside the NATO alliance.

back to top

* * * * * * * * * * * * * * * * * * * *

--

COMMENTARY

## 13. M. Volkov: "Criminal Sentencing and Deterrence: White Collar Crime and Corporate Misconduct (Part I of III)"
(Source: Volkov Law Group Blog, 31 July 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

The sentencing of criminal defendants continues to create controversy.  There are so many categories of crime and ranges of punishment - the issue always calls for difficult judgments and inevitably results in vigorous debate.

In this three-part series, I plan to examine some of the issues surrounding sentencing of white-collar defendants and deterrence.  It is often presumed that stiff sentencing of white-collar defendants is an important means to deter other potential criminals from engaging in white-collar crimes.  To be frank, the question itself is difficult to answer because of definitional issues.  What crimes are included in the definition of white-collar crimes?  The analysis becomes even more difficult when you add corporations into the mix and seek to determine what sentences deter corporate white-collar crimes.

Federal judges have broad discretion in determining the appropriate punishment from white-collar defendants.  Specifically, judges are required "to impose a sentence sufficient, but not greater than necessary," to respond to the "seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Such a prescription covers the relevant issues but defining each of these factors is the difficult part of the job.

In focusing on white-collar defendants, judges face a difficult set of considerations.  According to Judge Jed Rakoff (see Here), an outspoken federal judge on these issues, the most effective way to deter white-collar crime is to impose stiff sentences on individual actors.  Judge Rakoff argues that sentencing individuals has more deterrence value than imposing large corporate fines for a criminal conviction, and imposing a deferred prosecution agreement or non-prosecution agreement.

Judge Rakoff contends that corporations that pay large fines and suffer negative publicity have no incentive to change their cultures. In his view, corporate punishments are viewed as a cost of doing business. In criticizing the current DOJ focus on corporate crime, Judge Rakoff suggests that DOJ's focuses on corporate prosecutions instead of individual senior executives because it is easier to prosecute a corporation than to build a criminal case against individual defendants. Judge Rakoff has a point - it takes more time and effort for prosecutors to build cases against individual defendants, and such cases are not always easy to win at trial.

WASHSTATEC000504

A prosecutor has to devote time to building cases against lower-level offenders and "flipping" them to cooperate against higher-level executives in the food chain. To build a case requires time, and carries with it significant risks that such an effort may not be successful.

As a result, federal prosecutors have outsourced prosecution work to large law firms and relied on them to develop evidence sufficient to charge a corporation (or at least threaten the company with criminal charges). Such prosecutions rarely, if ever, go to trial. Prosecutors hold all the cards in these investigations given the broad sweep of respondeat superior and corporate liability.

Along with the focus on corporate crime, prosecutors have applied tools previously used in individual criminal cases - a deferred prosecution or non-prosecution agreement - to corporate prosecutions. Prosecutors have argued that such agreements provide an incentive for companies to change their corporate culture and reduce the risk of misconduct.

Whether such agreements have had a positive impact on corporate cultures is up for debate. No significant research has been completed in this area, and it is an important issue to be resolved.

Notwithstanding these developments, and based on his lengthy career, Judge Rakoff contends that white-collar criminals, almost universally, fear going to prison. He argues that the threat of going to jail is a major deterrent, and is much more effective than corporate prosecutions in preventing corporate misconduct.

Judge Rakoff contends that more than half of white-collar offenders are recidivists.  Based on this fact alone, Rakoff contends that prosecuting corporations instead of individuals has had no significant impact on corporate crime.

Unfortunately, Judge Rakoff's reliance on US Sentencing Commission data to prove his point may not be so persuasive.  According to a recent report issued by the US Sentencing Commission (Here), *The Criminal History of Corporate Offenders*, just over half (52.4 percent) of serious fraud offenders in fiscal year 2016 had a prior criminal record.  However, of the serious fraud offenders, traffic offenses were the most common (44 percent), followed by larceny (41.7 percent), public order (39.1 percent), fraud (36.8 percent) and drug possession (24.8 percent).  To the extent this data supports the claim that many white-collar offenders are recidivists, Judge Rakoff's point has merit - criminal deterrence and stiff prison sentences for individuals falling into this category may be warranted.

*[Editor's Note: The subsequent parts in this series will be included in the Daily Bugle when they are available.]*

back to top

* * * * * * * * * * * * * * * *

WASHSTATEC000505

## 14. R. Cook, M. Banerji & S. Klemencic: "Successful CFIUS Monitorships"
(Source: The Harvard Law School Forum on Corporate Governance and Financial Regulation, July 23, 2018)

* Authors: Randall Cook, Esq., randy.cook@ankura.com, +1 646-291-8545; Mona Banerji, Esq., mona.banerji@ankura.com, +1 212-449-7183; Steven Klemencic, steven.klemencic@ankura.com, +1 202-449-7185.

This post describes critical considerations for a successful monitorship of mitigating controls required by the Committee on Foreign Investments in the United States ("CFIUS" or the "Committee"). CFIUS is an interagency US Government committee that reviews Foreign Direct Investment ("FDI") into the United States to identify and address any consequent national security risks. Growing concern with the impact of foreign countries acquiring national security-critical technologies and other strategic advantages through investment activity has prompted CFIUS to become more active and assertive. Moreover, legislation is pending in both houses of Congress that will significantly expand CFIUS's jurisdiction to review FDI and require mandatory declaration of specified investment types.

When CFIUS identifies possible national security risks arising from a reviewed transaction, the Committee may make implementation of mitigating control measures a condition of allowing the deal to go forward. In order to assure the effectiveness and persistence of such measures, CFIUS often requires the concurrent appointment of an independent third-party monitor ("TPM") to oversee and periodically report on these controls. Indeed, given the increasing demands on scarce CFIUS resources consequent to the policy trends described above, both the Committee and industry are increasingly looking to TPMs to play a critical facilitating role to enable valuable transactions to proceed while addressing national security concerns.

So, what makes for a successful monitorship? Since no two CFIUS related transactions are the same, each monitorship is unique to the facts and dynamics of the transaction on which it is based. However, there are certain features that are foundational to a successful CFIUS monitorship. To best achieve the purposes of CFIUS mitigation agreements, the monitorship needs to be designed, and the TPM selected, with four key considerations in mind: CFIUS experience, technical capability, business cognizance, and trust.

*CFIUS Experience*

CFIUS may require mitigating controls to address risks identified during a national security threat assessment that focuses on the foreign party and a vulnerability assessment that focuses on the US party in a covered transaction. These transactions are becoming increasingly complex in terms of business organization and ownership, the technologies and assets at issue, and the corresponding risks presented to US national security.

WASHSTATEC000506

Depending on the nature of the business and assets involved, these risks may include (among numerous other concerns):

* Access to or influence over critical technologies or infrastructure;
* Sensitive supply chain integrity;
* Access to quantities of personal identifying information (PII) or personal health information (PHI);
* Communication and financial network security; and
* Insight into or the ability to monitor sensitive US security and intelligence operations.

A successful CFIUS monitorship must assure the Committee's designated monitoring agencies that the required controls are being implemented effectively and persistently to address the identified risks. Thus, it is crucial that the TPM have a deep understanding of the process, equities, and concerns that underlie the controls, and how the controls need to operate and be reported to address these issues. It is also enormously helpful for the TPM to be thoroughly familiar with the monitoring agencies' process for keeping tabs on mitigation controls, and know how to effectively and efficiently inform the agencies that the underlying national security risks continue to be addressed.

*Technical Capability*

In order to mitigate complex risks, CFIUS frequently requires a combination of management, technical, and operational controls. Areas where the CFIUS frequently requires mitigating controls include:

* *Access:* Measures intended to limit access to sensitive data, critical technology, and operational information, including:
  - Physical Controls: Limitation of access to company facilities through such measures as electronic badging, camera surveillance, physical barriers, and personnel screening.
  - Systems Controls: Limitation of access to sensitive information and critical controls through such measures as (among numerous others):
        (a) Partition of business technology systems;
        (b) Demonstrated compliance with best practice standards for cybersecurity and technology security (e.g., NIST, ISO);
        (c) Enhanced network security monitoring;
        (d) Persistent suppression and/or deletion of sensitive information in business systems and processes; and
        (e) Active penetration testing of both physical and network environments.
* *Protocols and Procedures:* Comprehensive updates to *company policies, processes, and systems* to integrate the requirements of the mitigation agreement to integrate the requirements of the mitigation agreement into the company's governance, operations, and culture. Examples of protocols that facilitate a CFIUS monitorship include:
  - Management protocols that clearly define roles and duties,
  - Data and cybersecurity governance procedures,
  - Third -party vendor assessment and management procedures,

WASHSTATEC000507

    - Data use and handling policies,
    - Electronic communications protocol, and
    - Incident response protocol.
* *Training:* Programmatic, tailored education of company personnel regarding the purposes and requirements of the mitigation agreement, specifically including individual responsibility for compliance and incident reporting.
* *Incident Response and Reporting:* CFIUS mitigation agreements always require processes to identify, promptly respond to, and notify the Committee of the violation or failure of a mandated control.

A TPM that integrates the right technical competencies with practical experience designing, implementing, auditing, and overseeing compliance with mitigation controls is crucial to success. Required capabilities may include: cybersecurity and response, data and privacy management, data analytics, business process improvement, re-engineering, and automation, forensic auditing and investigations, project management, and regulatory expertise. A seasoned TPM provides critical hands-on guidance and assistance to the company as it works through the practical problems of implementing and integrating mitigation controls. Concurrently, a technically-competent TPM will be able to credibly demonstrate to the CFIUS monitoring agencies the effectiveness of the monitorship program.

*Business Cognizance*

By definition, the original impetus for a CFIUS-reviewed transaction is an underlying business proposition that drives the opportunity for a deal. The mitigating controls and monitorship will operate in the context of what all parties anticipate will be a successful business organization. The controls and monitorship must be effective at addressing the identified national security risks, and they also need to enable the company and its people to successfully operate. A successful TPM will recognize that those twin objectives are frequently best-achieved by working with business leaders and operations teams to integrate compliance requirements into corporate structure, systems, and processes. By uniting CFIUS compliance with organizational DNA, the company and the monitorship have the best opportunity for success. Operationally, the TPM needs to have a good understanding of the business and its commitments, and an innovative, risk-based approach that enables achievement of the monitorship's purposes without unnecessarily exercising the company or the CFIUS monitoring agencies.

*Trust*

Successful CFIUS monitorships are built on a foundation of trust among the parties and the monitoring agencies. The TPM plays the crucial role of honest broker for all equities in this trust relationship. The TPM needs to have the Government's confidence that national security concerns will be addressed with the same energy as would be the case if the monitoring agencies were directly executing the monitorship. Similarly, the TPM needs to have the business's trust that the monitorship's purposes will be

WASHSTATEC000508

addressed with an approach that harnesses innovation and pragmatism to avoid unnecessary friction. To earn and sustain this trust, the TPM needs several characteristics:

* A well-earned reputation for integrity and independence,
* A commitment to transparency and open communications with the parties and monitoring agencies,
* A collaborative, engaging approach to executing the monitorship, and
* Consistent, disciplined, and known processes for identifying and resolving issues and monitorship reporting.

*Conclusion*

The policy dynamics and anticipated statutory changes that are driving increased CFIUS activity are unlikely to abate. Deals involving US companies and FDI with a nexus to national security are increasingly likely to become subject to CFIUS review. When a monitorship is required, integrating the considerations described above in the design of the monitorship and the selection of the TPM will substantially improve the prospects for a successful transaction.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

–

## EX/IM TRAINING EVENTS & CONFERENCES

## 15. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA
(Source: CompTIA)

* What: 12th Annual CompTIA Global Trade Compliance Best Practices Conference
* When: Tuesday, September 18, 2018
* Where: Qualcomm, 10155 Pacific Heights Boulevard, San Diego, California 92121
* Sponsor: CompTIA
* Contact: Ken Montgomery, kmontgomery@comptia.org
* Information & Registration: HERE.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. ECTI Presents "BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time" Webinar, 11 Sep
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time
* When: September 11, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Felice Laird
* Register: Here or Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * * *

---

### EDITOR'S NOTES

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Emily Bronte** (Emily Jane Brontë; 30 Jul 1818 - 19 Dec 1848) was an English novelist and poet who is best known for her only novel, *Wuthering Heights,* now considered a classic of English literature. Emily was the third-eldest of the four surviving Brontë siblings, between the youngest Anne and her brother Branwell. She wrote under the pen name Ellis Bell.)
  - *"A person who has not done one half his day's work by ten o clock, runs a chance of leaving the other half undone."*

* **Milton Friedman** (Milton Friedman; 31 Jul 31, 1912 - 16 Nov, 2006; was an American economist who received the 1976 Nobel Memorial Prize in Economic Sciences for his research on consumption analysis, monetary history and theory, and the complexity of stabilization policy.)
  - *"The government solution to a problem is usually as bad as the problem."*
  - *"Inflation is taxation without legislation."*

Monday is pun day:

* Two atoms are walking down the street together.  One says, "I think I've lost an electron."  The other replies, "Are you sure?"  The first one says, "I'm positive!"
  - *Elizabeth Wortham Hirschhorn*

back to top

* * * * * * * * * * * * * * * * * * *

WASHSTATEC000510

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full

WASHSTATEC000511

Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and

Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu