Message

| | |
|---|---|
| **From:** | Paul, Joshua M [PaulJM@state.gov] |
| **Sent:** | 7/31/2018 9:23:52 PM |
| **To:** | Heidema, Sarah J [HeidemaSJ@state.gov]; Miller, Michael F [Millermf@state.gov]; Hart, Robert L [HartRL@state.gov]; Monjay, Robert [MonjayR@state.gov] |
| **CC:** | Carter, Rachel [CarterR@state.gov]; PM-CPA [PM-CPA@state.gov] |
| **Subject:** | CPA Media Monitoring: The 3D-Gun Debate: Separating Truth from Fiction |



The 3D-Gun Debate: Separating Truth from Fiction
By DAVID FRENCH
July 31, 2018 4:45 PM

Another staggering display of media ignorance about firearms
One of the most bizarre aspects of the modern gun debate is the extent to which it is still dominated by ignorance and misinformation. One of the most important controversies in American public life rages on, yet media gatekeepers and all too many politicians simply don't know the most basic facts. They don't understand the most basic constitutional issues. Even worse, many of them don't seem to care.

If you pay attention to the news, you know that the Internet is blowing up right now with claims that the Trump administration is "now" "permitting" individuals to share plans for 3D-printed guns, and that this move will "now" allow Americans to make guns at home — including plastic guns of the sort that can be used to penetrate airport and school security. Here's a perfect example of the kind of coverage that's rocketing around the Web, as shared by Massachusetts attorney general Maura Healey:

@MassAGO #BREAKING We are suing the State Department to stop the illegal distribution of 3D-printed guns. This is an imminent threat to public safety and we have a responsibility to ensure these guns are never available online in any form.

@MassAGO Everyone needs to know how dangerous downloadable guns are.

Note the key claims in the video:

- "Downloadable guns are a real thing because of the Trump administration."
- "Individuals will now be able to log on to a website and, if they have access to a 3D printer, print fully functional and totally undetectable firearms."
- "All of this is because the Trump administration quietly settled a lawsuit with Cody Wilson, a 3D-gun creator who had sued the federal government for being forced to take down his downloadable 3D guns back in 2013."

The video then urges federal and state governments to mandate the placement of permanent metal components on guns and to "outlaw printable guns."

Healey says she has sued to "stop the illegal distribution of 3D printable guns."

There is so very much wrong with these statements that it's hard to know where to begin. But let's start with some basic facts. The controversy revolves around a case brought by a company called Defense Distributed, together with an advocacy organization called the Second Amendment Foundation. The plaintiffs challenged the Obama administration's decision to apply federal International Traffic in Arms Regulations (ITAR) in order to block Defense Distributed from

WASHSTATEC000515

distributing plans that would permit individuals with a 3D printer to manufacture a plastic handgun (called "the Liberator") and a "fully functional plastic AR-15 lower receiver" — the indispensable portion of an AR that is considered the "firearm" and that typically contains the serial number.

The Obama administration justified its decision to prevent the plaintiffs from posting the files on the grounds that the files would be available for international download and international use. It also argued that the files at issue were not "expressive speech." As the Fifth Circuit explained, printing a fully functional plastic lower receiver or Defense Distributed's single-shot plastic pistol "is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case."

(The federal Undetectable Firearms Act makes it illegal to manufacture or possess a weapon undetectable by walk-through metal detectors.)

Indeed, the international-export aspects of the case were indispensable to court rulings at the district- and circuit-court levels that denied the plaintiffs' motion for a preliminary injunction that would permit it to distribute its files. Specifically, the district court relied on the "public's keen interest in restricting the export of defense articles." The Fifth Circuit held that the district did not abuse its discretion in denying the motion, and it declined to address the question of whether the plaintiff demonstrated a likelihood of success on the merits.

Despite these rulings, the federal government faced a difficult challenge on the merits. The plaintiffs' case was fundamentally a speech case, not a gun case. The plaintiffs weren't distributing guns, they were distributing information, and by blocking the flow of information, the Obama administration had placed a "prior restraint" on the plaintiffs' speech. Prior restraints are among the least-favored government actions in First Amendment jurisprudence.

People have been making homemade guns since before the founding of the Republic. You don't need a license to make a gun for personal use; you need one only if you make a gun for sale or distribution.

In fact, the Obama administration's action was worse than the typical prior restraint in part because it was censoring further distribution of information that was already all over the Internet. That's right, plastic-gun plans are but one Google search away for every man, woman, and child in the United States. Just before I wrote this piece, I typed a single phrase and found plans for multiple guns.

And, by the way, people have been making homemade guns since before the founding of the Republic. You don't need a license to make a gun for personal use; you need one only if you make a gun for sale or distribution. Guns can be made at home easily and cheaply. Home manufacture is common (I'm close to someone who makes better ARs than any manufacturer). Oh, and technology for "undetectable" guns existed long before 3D printing — hence the need for the Undetectable Firearms Act.

What did the Trump administration actually do? Simply put, it entered into a settlement agreement that permitted the plaintiffs to post their designs and required the government to issue a letter indicating that the designs were not subject to the licensing requirements set forth by the International Traffic in Arms Regulations. It did not alter in any way the underlying statutory or regulatory laws governing the manufacture, use, or possession of firearms.

So, let's recap the claims above:

"Downloadable guns are a real thing because of the Trump administration."
- False. 3D-printed guns were legal regardless of the outcome of the case, and plans for 3D-printed guns were widely available online.

"Individuals will now be able to log on to a website, and if they have access to a 3D printer, print fully functional and totally undetectable firearms."

- Misleading. The word "now" is deceptive. Individuals were able to do this before the Trump administration's settlement, and they would have been able to do so even if the Trump administration kept litigating the case. Moreover, it's important to note that possessing "totally undetectable" firearms violates federal law.

"All of this is because the Trump administration quietly settled a lawsuit with Cody Wilson, a 3D-gun creator who had sued the federal government for being forced to take down his downloadable 3D guns back in 2013."

- False. As the Fifth Circuit clearly stated, manufacture and possession of a plastic pistol or plastic lower receiver (subject to the Undetectable Firearms Act) "is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case."

Multiple states are now suing on their own, hoping to replace the Obama administration's prior restraint with one of their own. Here's Pennsylvania attorney general Josh Shapiro:

@PAAttorneyGen:  Tonight, I went to court to prohibit access to new 3D-printable guns in PA. These downloadable firearms were just about to be widely available online. It's an existential threat to our state & we stepped in to stop it. The site is - & will remain - dark throughout PA.

For critics of gun rights, details don't matter because the gun debate is less a policy debate than it is a cultural conflict.

I've got news for Mr. Shapiro: 3D plans are still widely available. They've been widely available. And it's odd to refer to the plans as an "existential threat to our state" when the original justification for the Obama administration's action was concern over arms exports.

Why does this keep happening? Why do media outlets and politicians continue to spread false information and then — when called on it — remain proudly ignorant and instead condemn so-called "gunsplaining"?

My own view is simple. For critics of gun rights, details don't matter because the gun debate is less a policy debate than it is a cultural conflict. The Trump administration's settlement isn't so much an outrage on its own terms as it is a vehicle for a different argument — a broader argument against gun culture. And in that broader attack on gun culture, other essential American liberties must be sacrificed, including freedom of expression. Prior restraints on free speech are a small price to pay when gun control is at stake.

**Official - SBU**

UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | American Security Today [twaitt=americansecuritytoday.com@mail76.sea21.rsgsv.net] |
| on behalf of | American Security Today [twaitt@americansecuritytoday.com] |
| **Sent:** | 8/1/2018 10:20:04 AM |
| **To:** | millermf@state.gov |
| **Subject:** | 3D Guns: What We Know, Facebook Scraps Bad Actors, Shipping Giant Falls Victim to Ransomeware, When Teacher = Child Predator |

3D Guns: What We Know, Facebook Scraps Bad Actors, Shipping Giant Falls Victim to Ransomeware, When Teacher = Child Predator

Cutting-Edge Products and Technologies to help Keep Our Nation Safe, One City at a Time          View this email in your browser

August 1, 2018

WASHSTATEC000518



### *3D Guns: Untraceable, Undetectable & Unstoppable? (Multi-Video)*

Not long ago it was '**science fiction**,' *but now **US officials & lawmakers** are grappling with **a new reality**,* the ability for **citizens to print firearms at home**. On Wed it will **be legal to download instructions** on how to make a **plastic handgun** with a... *Read More*

***ATI Systems in 2018 'ASTORS'***
***Awards (Learn More, Video)***

**ATI Systems** high-performance products
are used by ***colleges***, ***cities***, ***ports***,
***refineries***, ***nuclear power plants***, ***military***
***bases*** & ***homeland security locations*** to
maintain the safety of their operations. **ATI**
**Systems** is a **Proud Sponsor of**
the... ***Read More***



### _Facebook Scraps Accounts Trying to Impact Midterm Elections (Videos)_

**Facebook** _has detected a_ _new coordinated effort_ _to use its_ _social network to influence US politics_ ahead of the **2018 midterm elec-tions**, and **have removed 32 'bad actors' pages & accounts** from **Facebook** & **Insta-gram**, _in an effort to_ **combat**... _Read More_

WASHSTATEC000521

## _Check Out the AST July *Fully Interactive* Magazine (Multi-Video)_

**Feature Articles Include:**

- **AI: New Weapon for Law Enforcement/Modern Security**
- **_REACT5000 Advanced CCU_**
- **Desktop Alert 2018 'ASTORS' Homeland Award Sponsor**
- **_Interpol: 10 Wanted Americans_**
- **American-Made PC Matic**
- **_Fed Data Under Seige, Thales eSecurity's Nick Jovanovic_**

## _Read the AST June Magazine_

WASHSTATEC000522

**_Another Shipping Giant Falls Victim to Ransomware (Learn More, Videos)_**

A **Port of Long Beach** terminal affiliated with **Cosco Shipping** _has been hit by a ransom-ware attack_, leaving the company's **phone lines & email down**, **requiring them to use** temporary **Yahoo** email addresses to conduct **company business** for over... _**Read More**_

### *VA Teacher Gets 23 Yrs for Producing Child Pornography*

**Richard Wellbeloved-Stone**, a fmr **science teacher** at **Charlottesville High School**, was discovered by police after chatting online with an **undercover agent** from the UK **about sexually abusing a young child**. Please call **866-347-2423 if you have**... *Read More*

### *Multi-Agency Effort Nabs Yuma Most Wanted (Learn More, Videos)*

**Jesus Dozal-Castillo**, one of **Yuma Sector's top five most wanted** individuals due to his *extensive involvement in smuggling activity* has been arrested. **Please help by calling 1-866-999-8727 toll-free *to report suspicious activity, anonymously***... *Read More*

WASHSTATEC000524



  

*Copyright © \*AST 2016 - 2018\*, All rights reserved.*

**Our mailing address is:** P.O. Box 1103, Belmar, NJ, 07719

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list

WASHSTATEC000525

*You are receiving this email as a valued member of America's Security Professionals.*
*Thank you for your service!*

*If you would like to unsubscribe from AST 100% Mobile-Friendly Homeland Security Digital Publications,*
*please select the unsubscribe option above.*

WASHSTATEC000526

Message

| | |
|---|---|
| **From:** | American Security Today [twaitt=americansecuritytoday.com@mail218.atl101.mcdlv.net] |
| on behalf of | American Security Today [twaitt@americansecuritytoday.com] |
| **Sent:** | 8/1/2018 11:40:16 AM |
| **To:** | kaidanowts@state.gov |
| **Subject:** | 3D Guns: What We Know, Facebook Scraps Bad Actors, Shipping Giant Falls Victim to Ransomeware, When Teacher = Child Predator |

## 3D Guns: What We Know, Facebook Scraps Bad Actors, Shipping Giant Falls Victim to Ransomeware, When Teacher = Child Predator

Cutting-Edge Products and Technologies to help Keep Our Nation Safe, One City at a Time                    View this email in your browser

August 1, 2018

WASHSTATEC000527

### *3D Guns: Untraceable, Undetect-*

### *able & Unstoppable? (Multi-Video)*

Not long ago it was '**science fiction**,' *but now **US officials** & **lawmakers** are grappling with **a new reality**,* the ability for **citizens to print firearms at home**. On Wed it will be **legal to download instructions** on how to make a **plastic handgun** with a... *Read More*

WASHSTATEC000528

### _ATI Systems in 2018 'ASTORS' Awards (Learn More, Video)_

**ATI Systems** high-performance products are used by _**colleges**_, _**cities**_, _**ports**_, _**refineries**_, _**nuclear power plants**_, _**military bases**_ & _**homeland security locations**_ to maintain the **safety** of their operations. **ATI Systems** is a **Proud Sponsor of the**... _**Read More**_

WASHSTATEC000529

***Facebook Scraps Accounts Trying
to Impact Midterm Elections
(Videos)***

**Facebook** *has detected a* <u>*new
coordinated effort* to use its</u> **social
network to influence US politics** ahead of
<u>the</u> **2018 midterm elec-tions**, and **have
removed** <u>**32 'bad actors' pages &
accounts**</u> from **Facebook** & **Insta-gram**, <u>in
an effort to</u> **combat**... ***Read More***

WASHSTATEC000530

## _Check Out the AST July *Fully Interactive* Magazine (Multi-Video)_

**Feature Articles Include:**

- **AI: New Weapon for Law Enforcement/Modern Security**
- **_REACT5000 Advanced CCU_**
- **Desktop Alert 2018 'ASTORS' Homeland Award Sponsor**
- **_Interpol: 10 Wanted Americans_**
- **American-Made PC Matic**
- **_Fed Data Under Seige, Thales eSecurity's Nick Jovanovic_**

_Read the AST June Magazine_

WASHSTATEC000531

**_Another Shipping Giant Falls Victim to Ransomware (Learn More, Videos)_**

A **Port of Long Beach** terminal affiliated with **Cosco Shipping** **_has been hit by a ransom-ware attack_**, leaving the company's **phone lines & email down**, **requiring them to use** temporary **Yahoo** email addresses to conduct **company business** for over... **_Read More_**

WASHSTATEC000532

### *VA Teacher Gets 23 Yrs for Producing Child Pornography*

**Richard Wellbeloved-Stone**, a fmr **science teacher** at **Charlottesville High School**, was discovered by police after chatting online with an **undercover agent** from the UK **about sexually abusing a young child**. Please call **866-347-2423 if you have**... *Read More*

### *Multi-Agency Effort Nabs Yuma Most Wanted (Learn More, Videos)*

**Jesus Dozal-Castillo**, one of **Yuma Sector's top five most wanted** individuals due to his *extensive involvement in smuggling activity* has been arrested. **Please help by calling 1-866-999-8727** toll-free *to report suspicious activity, anonymously*... *Read More*

WASHSTATEC000533



  

*Copyright © *AST 2016 - 2018*, All rights reserved.*

**Our mailing address is:** P.O. Box 1103, Belmar, NJ, 07719

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list

WASHSTATEC000534

*You are receiving this email as a valued member of America's Security Professionals.*
*Thank you for your service!*

*If you would like to unsubscribe from AST 100% Mobile-Friendly Homeland Security Digital Publications,*
*please select the unsubscribe option above.*

WASHSTATEC000535

Message

---

**From:**      Miller, Michael F [Millermf@state.gov]
**Sent:**      8/1/2018 12:31:17 PM
**To:**        Heidema, Sarah J [HeidemaSJ@state.gov]
**Subject:**   RE: Reopening the Public Comment Period on the Draft CAT I-III Regs

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Tuesday, July 31, 2018 8:24 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Reopening the Public Comment Period on the Draft CAT I-III Regs

**From:** Fite, David (Foreign Relations)
**Sent:** Tuesday, July 31, 2018 8:17 PM
**To:** Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>
**Cc:** Jamie.mccormick@mail.house.gov; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Reopening the Public Comment Period on the Draft CAT I-III Regs

Message

| | |
|---|---|
| **From**: | Morning Consult [reply@e.morningconsult.com] |
| **Sent**: | 8/1/2018 12:40:23 PM |
| **To**: | Kaidanow, Tina S [KaidanowTS@state.gov] |
| **Subject**: | Morning Consult Washington, Presented by the Electronic Payments Coalition: Administration Reportedly Weighing Another Refugee Program Reduction |

Morning Consult Washington, Presented by the Electronic Payments Coalition: Administration Reportedly Weighing Another Refugee Program Reduction



By Eli Yokley

# Top Stories

- The Trump administration is considering another reduction in the number of refugees who can be admitted to the United States following a scale-back of the refugee program in 2017, according to several sources. (The New York Times)

- Senate Majority Leader Mitch McConnell (R-Ky.) said an agreement has been made with Senate Democrats to pass massive

appropriations legislation covering the Departments of Labor, Education and Health and Human Services. Passing the bills could put pressure on House Republicans to agree to the Senate's position, which would mean dropping some controversial policy riders. (The Hill)

- Special counsel Robert Mueller has referred a set of cases involving high-profile lobbyists - including longtime Democratic lobbyist Tony Podesta and former Rep. Vin Weber (R-Minn.) - to the U.S. Attorney's Office for the Southern District of New York, according to people familiar with the matter. The inquiries are reportedly regarding whether they failed to register their work as foreign agents, and none of them have been charged with wrongdoing. (CNN)

## Chart Review

<u>Why We're Sharing 3 Million Russian Troll Tweets</u>
**FiveThirtyEight**



# Events Calendar (All Times Local)

**WEDNESDAY**

| | |
|---|---|
| Senate Environment and Public Works Committee hearing on the EPA's agenda | 10:30 a.m. |
| U.S. Chamber of Commerce hosts event on blockchain | 1 p.m. |

**THURSDAY**

WASHSTATEC000539

| | |
|---|---|
| Senate Foreign Relations Committee hosts hearing on the value of the NATO alliance | 10:45 a.m. |
| Maryland Gov. Hogan participates in Economic Club of Washington, D.C., event | 11:30 a.m. |

**FRIDAY**

No events scheduled

**SPONSORED BY THE ELECTRONIC PAYMENTS COALITION**

## Voters agree: new technology is the future of electronic payments

With over one in three voters saying they use cash less now than they have in the past, more people are starting to rely on electronic payments as a safe and easy way to pay every day. With the popularity of mobile wallets, online payments, and other technologies expected to grow even further, we must continue to prioritize innovation.

# General

### Federal judge in Seattle blocks release of blueprints for 3D-printed guns
**Agueda Pacheco-Flores, Seattle Times**

A federal judge in Seattle has granted a temporary restraining order blocking a Texas man from releasing downloadable blueprints for 3D-printed plastic firearms. U.S. District Court Judge Robert Lasnik's ruling Tuesday comes a day after Washington State Attorney General Bob Ferguson filed a suit challenging the Trump administration's decision last month to allow Texas gun-rights advocate Cody Wilson to post the blueprints, saying the move would provide broad unregulated access to dangerous weapons.

### Russian "Agent" And A GOP Operator Left A Trail Of Cash, Documents Reveal
**Jason Leopold and Anthony Cormier, BuzzFeed News**

A $45,000 payment to an undisclosed law firm. A cash withdrawal for $14,000.

### Steve Bannon's fiery threat to candidates: 'You take Koch money, it's going to be toxic'
**Brian Schwartz, CNBC**

Steve Bannon has a warning for candidates supported by the conservative Koch political donor network - just ahead of crucial midterm elections this fall. "You take Koch money, it's going to be toxic. We are going to let people know that if you take Koch money there's a punishment," Bannon,

former chief White House strategist and Trump campaign chief executive, told CNBC in an exclusive interview.

### Justice Dept. Investigating Claims That Drug Companies Funded Terrorism in Iraq
**Gardiner Harris, The New York Times**

The Justice Department is investigating claims that major drug and medical device companies doing business in Iraq knew that the free medicines and supplies they gave the government to win business there would be used to underwrite terrorist attacks on American troops. In a regulatory filing last week, AstraZeneca, a drugmaker based in Britain, disclosed that it had "received an inquiry from the U.S. Department of Justice in connection with an anti-corruption investigation relating to activities in Iraq."

# Presidential

### Trump's 'Dream' Candidate Leads President in Hypothetical Matchup
**Eli Yokley, Morning Consult**

President Donald Trump recently criticized Joe Biden, calling the former Democratic vice president a "dream" opponent in 2020 who was rescued from "the garbage heap" by former President Barack Obama. But those attacks do not appear to have packed much of a punch.

### Trump criticized for not leading effort to secure elections
**Deb Riechmann, The Associated Press**

As alarms blare about Russian interference in U.S. elections, the Trump administration is facing criticism that it has no clear national strategy to protect the country during the upcoming midterms and beyond. Both Republicans and Democrats have criticized the administration's response as fragmented, without enough coordination across federal agencies.

### Trump Advisers Urge Raising Additional China Tariffs to 25%
**Bob Davis and Lingling Wei, The Wall Street Journal**

As Washington and Beijing struggle to break a trade impasse, some administration advisers are urging President Trump to raise the stakes with a sharp increase in the level of tariffs proposed for $200 billion in Chinese imports targeted for punitive measures. Trump administration

advisers are debating measures that might bring Chinese negotiators to the table.

### Pence, DHS Secretary Say Putin Meddled in Trump's Election
**Alyza Sebenius and Naureen S Malik, Bloomberg**

Vice President Mike Pence and Homeland Security Secretary Kirstjen Nielsen on Tuesday offered public support for U.S. spy agencies' finding that Russia interfered in the 2016 U.S. presidential election. President Donald Trump stirred an uproar with comments at his Helsinki summit with Russian leader Vladimir Putin when he cast doubt on U.S intelligence assessments that Russia was behind cyber-attacks on Democratic organizations and the Hillary Clinton presidential campaign during the 2016 election.

### As Trump Brings Home Korea War Dead, Families Blast U.S. Agency
**David Tweed, Bloomberg**

North Korea's return of about 55 American war dead marks a hopeful milestone in their almost seven-decade journey home. But it could be years before they're reunited with their families, and some families blame the U.S. government agency charged with identifying them. The remains, which U.S. Vice President Mike Pence will formally accept Wednesday in a ceremony in Honolulu, will join hundreds of fallen service members awaiting identification by investigators at Joint Base Pearl Harbor-Hickam.

### 'Everyone talked with Woodward': Trump White House braces for new book
**Annie Karni, Politico**

Bob Woodward, the legendary Washington Post journalist, was sitting on the couch in press secretary Jay Carney's office, presenting Obama administration officials with an offer they couldn't refuse. It was 2011, and Woodward was working on a book chronicling President Barack Obama's debt-ceiling negotiations.

### Trump feud with Koch network exposes rift between populist forces and establishment GOP
**Robert Costa and Sean Sullivan, The Washington Post**

President Trump's tight grip on the Republican Party is being openly challenged by the powerful network of ideological conservatives linked to billionaire industrialist Charles Koch, splaying out long-simmering tensions over the party's future just months before the midterm elections. Trump on Tuesday dismissed the mounting criticism of his trade and

immigration policies from Koch and his allies as the battle cry of a faction that has "become a total joke in real Republican circles."

# Senate

### At Senate immigration hearing, Durbin calls on Nielsen to resign
**Alan Fram, The Associated Press**

A top Democrat called Tuesday for Homeland Security Secretary Kirstjen Nielsen to resign at a Senate Judiciary Committee hearing that saw lawmakers of both parties criticize the Trump administration policy of separating migrant children from their detained parents and its botched efforts to reunite many of them. No. 2 Senate Democratic leader Richard Durbin of Illinois said the policy "shows the extremes this administration will go to, to punish families fleeing horrific gang and sexual violence and seeking refuge in the United States."

### Senate digs through record 1 million pages of documents on Supreme Court nominee Brett Kavanaugh
**Erin Kelly, USA Today**

Senators have begun the deepest dive ever into the writings of a Supreme Court nominee, digging into a record 1 million-plus pages of legal opinions and emails from Brett Kavanaugh's career as a federal judge, White House attorney and assistant to the prosecutor who investigated President Bill Clinton. The volume of Kavanaugh's records dwarfs those of the past two Supreme Court justices to be confirmed: Neil Gorsuch and Elena Kagan.

### In private, Kavanaugh hints at views on Mueller
**Manu Raju, CNN**

Supreme Court nominee Brett Kavanaugh has privately told senators he views the appointment of a special counsel by the Justice Department as appropriate, a comment that could shed new light about his views of Robert Mueller's investigation into Donald Trump's presidential campaign, according to sources familiar with the meetings. But Kavanaugh has also stood by his stated views that question whether a sitting US president can be indicted on criminal charges, instead saying Congress should play the lead role in impeaching and removing a president - and also enact a law ensuring a president can be indicted after leaving office.

WASHSTATEC000544

### Senators Working to Reinstate Mandatory Cyber Training
**Katherine Tully-McManus, Roll Call**

Senate staffers are not required to undergo information security or cybersecurity training, even as hackers target Congress. "The cybersecurity threat is very real, and frankly we haven't stepped up and done what I think we should do to deal with it - which should be an all government response," Senate Majority Whip John Cornyn of Texas said when asked Tuesday about attempted hacks of Senate networks.

## House

### Primary Threat Targets One of Two Jewish Republicans in the House
**Simone Pathé, Roll Call**

The next test of President Donald Trump's endorsement power will come in Tennessee, where a little-known freshman - one of two Jewish Republicans in the House - is being outspent more than 2-to-1 ahead of Thursday's primary. Rep. David Kustoff earned the president's backing in a tweet Friday - less than a week before the 8th District primary against perennial GOP candidate George Flinn, a radiologist and radio station owner who's almost entirely self-funding his campaign.

### Trump jumps into Ohio special election as GOP alarm grows
**Alex Isenstadt and Elena Schneider, Politico**

President Donald Trump will travel to Ohio on Saturday to campaign for Republican special election candidate Troy Balderson, according to a senior party official - a move that comes amid rising GOP fears about the race. A Republican loss, coming after special election defeats in Pennsylvania and Alabama, would be deeply deflating for the conservative base and party donors, and provide more evidence that a wave is building against them heading into the midterms.

### Democrat in Ohio special puts call for 'new leadership' at center of closing argument
**Dan Merica, CNN**

Democrat Danny O'Connor is putting his call for new leadership in both parties front and center in the final days of the Ohio special election and one week after the candidate delivered an unartful answer on his opposition to Rep. Nancy Pelosi as the party's leader in the House. O'Connor's final ad, released first to CNN, comes as Republicans are going on air to highlight Ohio Gov. John Kasich's support for Republican

nominee Troy Balderson to represent the state's 12th Congressional District and are attacking O'Connor's support for energy regulations.

The new 'Dr. No': Rep. Justin Amash, marooned in Congress
**David Weigel, The Washington Post**

House Republicans had a cunning plan. Liberal Democrats, going to extremes, were calling for the abolition of Immigration and Customs Enforcement.

---

# States

Trump campaigns for Ron DeSantis (and himself) in Tampa
**Adam C. Smith and Steve Contorno, Tampa Bay Times**

Declaring himself the most popular Republican in the history of America, President Donald Trump revved up thousands of fans Tuesday night at a rowdy Tampa Bay campaign rally to help gubernatorial candidate Ron DeSantis and, above all, celebrate Donald Trump. "This may be - in fact it probably is - the greatest movement in the history of America," Trump told the overflow crowd of about 10,000 filled with red T-shirts and Make America Great Again caps.

Trump dodges risky Tennessee primary
**Daniel Strauss and Christopher Cadelago, Politico**

Rep. Diane Black is blanketing the air with TV ads claiming she has the White House imprimatur as the true Trump candidate in the Tennessee governor's race. There's just one problem: President Donald Trump has not actually endorsed her and has no plans to get involved in this Thursday's primary, multiple Republicans in Tennessee and Washington with knowledge of the race told POLITICO.

Hogan questions Trump trade policy during visit to blue Montgomery
**Jennifer Barrios, The Washington Post**

Maryland's Republican governor used a visit to Montgomery County on Tuesday as an opportunity to question President Trump's trade policy - and to predict that he will win the deeply blue county in November's gubernatorial election. Hogan, who is being challenged by former NAACP president Ben Jealous (D), called Montgomery "really important" to victory.

---

WASHSTATEC000546

# Advocacy

### Ahead of Asia Trip, Business Lobby Gives Pompeo an Earful on Trade War
**Gardiner Harris, The New York Times**

Secretary of State Mike Pompeo pledged on Monday to ramp up the Trump administration's diplomatic engagement with Asia in a speech that followed a blistering attack on the president's trade policies by a usually stalwart Republican business ally. Thomas J. Donohue, the longtime U.S. Chamber of Commerce president and chief executive, introduced Mr. Pompeo at an Indo-Pacific business forum by criticizing protectionist trade measures that he said led to both the Great Depression and World War II.

---

**A Message from the Electronic Payments Coalition:**

From making an order online to splitting bills on peer-to-peer payment apps, electronic transactions represent the future of easy and secure shopping. Polling shows increasing numbers of people are using various types of electronic payments every day, with their popularity only expected to grow.

---

# Opinions, Editorials and Perspectives

### Crony Capitalists Are Poised to Kill Thousands of Massachusetts Jobs
**Rep. Shaunna O'Connell, Morning Consult**

When the U.S. Department of Interior formally recognized the Mashpee Indian Tribe, whose ancestors famously received the Pilgrims along the coast of New England in the early 17th century, it represented a righting of a historic injustice for native people everywhere: Finally, the Thanksgiving Day Tribe would be empowered to exercise all the sovereign freedoms it had been denied for hundreds of years. And for the local communities that surround the tribe's historic lands, it also represented a dramatic boon to economic prosperity, because with formal government recognition comes the potential for new development, including gaming.

### How Trump Could Be Like Reagan
**Stephen Moore et al., The New York Times**

President Trump won a victory for freer trade last week when he and the president of the European Commission, Jean-Claude Juncker, agreed to find ways to lower tariffs and other barriers to each other's exports. The outlines of the deal are still sketchy, but it calls for the Europeans to buy more American petroleum, soybeans and manufactured goods and for Mr. Trump to reduce his auto and steel tariffs.

Those 'Bad' Koch Brothers
**The Editorial Board, The Wall Street Journal**

Now that Kim Jong Un is his fast friend, President Trump has decided to pick a fight with some truly nefarious operators-the successful American businessmen and political donors Charles and David Koch. At least Mr. Trump and MSNBC now have something in common.

New ad taking aim at Sen. Claire McCaskill is beyond disgusting
**The Editorial Board, The Kansas City Star**

Plenty of political ads are abhorrent because they are so misleading. A new ad running statewide in Missouri against Democratic Sen. Claire McCaskill adds an unsavory ingredient.

Our nation is too strapped to focus on making the rich richer
**Editorial Board, The Washington Post**

Just when it seemed there was no possible way to reduce taxes on wealthy Americans any further, President Trump's economic team has reminded us that nothing is impossible as long as you really, really want to achieve it. The Trump team is considering a proposal, long advocated by Larry Kudlow, director of the National Economic Council, to impose the capital-gains tax only on the inflation-adjusted profit from a sale of assets, rather than the full amount as at present.

# Research Reports and Polling

A Decade of Fortune 100 Dialogue in Congress
**Quorum**

From June 2008-June 2018, mentions of Fortune 100 companies by members of Congress have steadily increased.

## <u>Americans are far more religious than adults in other wealthy nations</u>
**Dalia Fahmy, Pew Research Center**

In 1966, Time magazine famously examined whether the United States was on a path to secularization when it published its now-iconic "Is God Dead?" cover. However, the question proved premature: The U.S. remains a robustly religious country and the most devout of all the rich Western democracies.



This email was sent by: Morning Consult
PO Box 27068 Washington, DC, 20038, US
Manage your email preferences

SUBSCRIBE

WASHSTATEC000549

Message

| From: | Marquis, Matthew R [MarquisMR@state.gov] |
|---|---|
| Sent: | 7/31/2018 8:49:28 PM |
| To: | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| CC: | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| Subject: | Defense Distributed Settlement Alerts for 31 July 2018 |



### Defense Distributed Settlement Alerts for 31 July 2018

"The battle to stop 3D-printed guns, explained", The upcoming publication has terrified lawmakers around the country. State attorneys general are racing to get a court injunction on Wilson's plans to republish the blueprints online. They have also asked the federal government to withdraw from the settlement.

"Trump appears to oppose 3D printed guns despite making blueprints available", One day before blueprints for 3D printed guns were set to be available online because of a decision by Donald Trump's administration, the president questioned whether they should be publicly available.

"Trump says public availability of 3D-printed guns 'doesn't seem to make much sense'", President Donald Trump said Tuesday that he is "looking into" the availability of plans for the 3D printing of guns, writing on Twitter that he had already been in touch with the NRA on the issue.

"Trump Calls For Crackdown On 3D Printed Guns. Here's Why He's Wrong.", First off, as Stephen Gutowski of the Washington Free Beacon points out, it is easy and legal to find gun blueprints online – and it should be, given that the First Amendment problems with barring the ability to post and consume such blueprints are quite serious.

"Trump says he "spoke to NRA" about 3D plastic guns", Mr. Trump spoke after eight states filed suit against the administration, contending the hard-to-trace plastic weapons are a boon to terrorists and criminals and threaten public safety.

"Pelosi blasts Trump administration: Allowing 3D guns is a 'death warrant'", "This decision is a death warrant for countless innocent men, women and children," Pelosi argued in a statement. "For the sake of all our safety and lives, it must be reversed immediately."

"How worried should we be about 3-D-printed plastic guns?", At the moment, plastic guns are just a curiosity; the ones that people have made tend to fall apart after firing a shot or two. And it's already fairly easy to buy almost all the parts to make, say, an AR-15 without going through any background-check process; you'll just have to get a partially machined lower receiver and do a little milling yourself, if you have the right equipment.

"Thousands download 3D-printed gun designs", Blueprints for 3D-printed guns, published online four days early amid last-minute attempts to ban them, have been downloaded thousands of times.

"Attorneys General Sue Trump Administration To Block 3D-Printed Guns", A coalition of attorneys general from eight states and the District of Columbia filed a lawsuit against the Trump administration on Monday to stop a Texas-based company from publishing instructions for 3D-printed guns on its website.

"Lawmakers' bill would outlaw 3D-printed plastic guns", Democratic Reps. Seth Moulton of Massachusetts and David Cicilline of Rhode Island plan to introduce legislation during Tuesday's U.S. House session that would prohibit the manufacture or possession of 3D- printed guns.

"Trump questions 3-D printable guns — which his own administration just helped make available to public", Trump's concern comes after Democratic state officials filed last-minute lawsuits and prepared legislation in a frantic attempt to halt the widespread availability of 3-D printable plastic guns.

"Should downloadable plans for 3D-printed guns be banned?", The company filed its own suit in Texas on Sunday, asserting that it's the victim of an "ideologically-fueled program of intimidation and harassment" that violates the company's First Amendment rights.

"3D-printed guns, technology, government and you", It's long been understood that when there's a social ill, the government should impose a law to curb the occurrences of the ill. The problem with this system today is that technology is undermining the power of law — in increasing fashion.

"3D-printed guns will soon be just a click away", Soon people will be able to manufacture their own guns and gun parts with a 3D printer, and some gun control advocates are describing this a threat to the nation.

"Police: 3-D printed guns will be 'a concern going forward'", "The Trump administration's decision will open the floodgates and allow anyone with access to the internet and a 3-D printer to possess a firearm," Cicilline added. "Even worse, these weapons are virtually undetectable by modern security devices used in airports, schools, and other would-be targets for mass shooters. This is a disaster waiting to happen."

"Celebs Beg Jeff Sessions to Block 3-D Printed Guns", The outcry comes just days before the settlement with Defense Distributed takes effect and follows weeks of Democrat efforts to derail 3-D printed guns via Congressional action. These efforts include Sen. Chuck Schumer's (D-NY) misleading claim that 3-D printed guns open the door to a "fully semiautomatic weapon."

"3-D guns: Untraceable, undetectable and unstoppable?", A State Department spokesman told CNN the settlement came after a national security analysis that determined "certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States."

"When It Comes To The Safety Of 3D Printed Guns, The NRA Is Conspicuously Silent", If you think there are limits to the scale of a 3D printed object, consider an office I visited last year in Dubai, which was created entirely by 3D printing. It might not make sense economically for a criminial to use 3D printing to make small weapons. Large ones could be a different story.

"Backlash on 3D gun tech as lawmakers, states mobilize to outlaw", "I think we're going to have to ban the design as well as the production of them, you know, on a machine," said Pallone. "We might also have something about warnings, you know, that says that, you know, it's illegal under federal law to use this machine for that purpose, so various things that we're thinking up. But basically, it would be banned, yes."

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968

WASHSTATEC000551

e-mail:          *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

Message
_____

**From:**      Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu]
**Sent:**      8/1/2018 8:05:46 PM
**To:**        hartrl@state.gov
**Subject:**   18-0801 Wednesday "Daily Bugle"

## Wednesday, 1 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Continues National Emergency with Respect to Lebanon
2. Justice/ATF Seeks Comments on National Firearms Act Division and Firearms and Explosives Services Division Customer Service Survey
3. DHS/CBP Adjusts COBRA Fees for Inflation in FY 2019

### OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions
5. Commerce/BIS Activates Denial Order Concerning Narender Sharma and Hydel Engineering Products of Middle Bazzar, Rampur Bushahr, India
6. DHS/CBP Releases Notice Concerning In-Bond Enforcement Discretion
7. DoD/DSS Releases Notice for Entities Cleared by DoD under the National Industrial Security Program
8. GAO Ex/Im Reports and Testimonies of Interest
9. State/DDTC Withdraws Temporary Modification of USML Category I that Would Have Permitted Internet Posting of 3D-printed Firearm Plans
10. Treasury/OFAC Issues Ukraine-/Russia-related General License
11. U.S. District Court Issues Temporary Restraining Order in 3-D Printer Gun Case
12. EU Adds 6 Entities to Russia Sanctions List
13. UK OFSI Publishes Guide Concerning Financial Sanctions

### NEWS

14. CTech: "Israeli and U.S. Defense Robotics Companies Quarrel Over China Ties"

WASHSTATEC000553

15. Seattle Times: "Federal Judge in Seattle Blocks Release of Blueprints for 3D-Printed Guns"

### COMMENTARY

16. M. Volkov: "White Collar Criminals and Sending a Message to Deter Misconduct (Part II of III)"
17. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in July 2018"
18. R.C. Burns: "Federal Court Incorrectly Says DDTC Jumped the Gun on Gun Printing Plans"

### EX/IM TRAINING EVENTS & CONFERENCES

19. ECTI Presents "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions" Webinar, 12 Sep

### EDITOR'S NOTES

20. Bartlett's Unfamiliar Quotations
21. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (1 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
22. Weekly Highlights of the Daily Bugle Top Stories

ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. Commerce/BIS Amends EAR, Adds 44 Entities in China to Entity List, Modifies 1 Entry

(Source: Federal Register, 1 Aug 2018.) [Excerpts.]

83 FR 37423-37433: Addition of Certain Entities; and Modification of Entry on the Entity List

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: This rule amends the Export Administration Regulations (EAR) by adding forty-four entities (eight entities and thirty-six subordinate institutions) to the Entity List. The entities that are being added to the Entity List have been determined by the U.S. Government to be acting contrary to the national security or foreign policy interests of the United States. These entities will be listed on the Entity List under the destination of China. This rule also modifies one entry under China to provide additional addresses and names for the entity at issue.
* DATES: **This rule is effective August 1, 2018**. ...
* SUPPLEMENTARY INFORMATION: The Entity List (Supplement No. 4 to part 744) identifies entities reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. The EAR imposes additional license requirements on, and limits the availability of most license exceptions for, exports, reexports, and transfers (in-country) to listed entities. The "license review policy'' for each listed entity is identified in the License Review Policy column on the Entity List and the impact on the availability of license exceptions is described in the Federal Register notice adding entities to the Entity List. BIS places entities on the Entity List pursuant to sections of part 744 (Control Policy: End-User and End-Use Based) and part 746 (Embargoes and Other Special Controls) of the EAR.

   The End-User Review Committee (ERC), composed of representatives of the Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the Treasury, makes all decisions regarding additions to, removals from, or other modifications to the Entity List. The ERC makes all decisions to add an entry to the Entity List by majority vote and all decisions to remove or modify an entry by unanimous vote.

### ERC Entity List Decisions

#### Additions to the Entity List

   This rule implements the decision of the ERC to add forty-four entities (eight entities and thirty-six of their subordinate institutions) to the Entity List. These entities are being added on the basis of Sec. 744.11 (License requirements that apply to entities acting contrary to the national security or foreign policy interests of the United States) of the EAR. All of the entities added as part of this rule are located in China.
   The ERC reviewed Sec. 744.11(b) (Criteria for revising the Entity List) in making the determination to add these entities to the Entity List. Under that paragraph, entities for which there is reasonable cause to believe, based on

WASHSTATEC000555

specific and articulable facts, that the entity has been involved, is involved, or poses a significant risk of being or becoming involved in, activities that are contrary to the national security or foreign policy interests of the United States, and those acting on behalf of such entity, may be added to the Entity List. Paragraphs (b)(1) through (5) of Sec. 744.11 provide an illustrative list of activities that could be contrary to the national security or foreign policy interests of the United States.

The ERC determined that seventeen entities, China Electronic Technology Group Corporation (CETC) 13, and twelve of its subordinate institutions; CETC-55, and two of its subordinate institutions; and Hebei Far East Communication System Engineering, all located in China, be added to the Entity List for actions contrary to the national security or foreign policy interests of the United States. These seventeen entities are being added to the Entity List on the basis of their involvement in the procurement of U.S.-origin items for activities contrary to the national security and foreign policy interests of the United States. Specifically, the ERC determined that there is reasonable cause to believe, based on specific and articulable facts, that all of these entities are involved in the illicit procurement of commodities and technologies for unauthorized military end-use in China.

The ERC determined that twenty-seven entities, China Aerospace Science and Industry Corporation Second Academy, and thirteen of its subordinate institutions; China Electronics Technology Group Corporation 14th Research Institute, and two of its subordinate institutions; China Electronics Technology Group Corporation 38th Research Institute, and seven of its subordinate institutions; China Tech Hi Industry Import and Export Corporation; and China Volant Industry, all located in China, be added to the Entity List for actions contrary to the national security or foreign policy interests of the United States. The ERC determined that for these twenty-seven entities there is reasonable cause to believe, based on specific and articulable facts, that there is an unacceptable risk of use in (or diversion of U.S.-origin items to) military end-use activities in China.

Pursuant to Sec. 744.11(b) of the EAR, the ERC determined that the conduct of all forty-four of these entities raises sufficient concern that prior review of exports, reexports or transfers (in-country) of all items subject to the EAR involving these entities, and the possible imposition of license conditions or license denials on shipments to the entities, will enhance BIS's ability to prevent violations of the EAR.

For all forty-four entities added to the Entity List in this final rule, BIS imposes a license requirement for all items subject to the EAR, and a license review policy of presumption of denial. The license requirements apply to any transaction in which items are to be exported, reexported or transferred (in-country) to any of the entities or in which such entities act as purchaser, intermediate consignee, ultimate consignee, or end-user. In addition, no license exceptions are available for exports, reexports or transfers (in-country) to the entities being added to the Entity List in this rule. The acronym "a.k.a." (also known as) is used in entries on the Entity List to identify aliases and help exporters, reexporters and transferors to better identify entities on the Entity List.

This rule adds the following entities to the Entity List: [see here.] ...

Dated: July 27, 2018.

WASHSTATEC000556

Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * *

## 2. Justice/ATF Seeks Comments on National Firearms Act Division and Firearms and Explosives Services Division Customer Service Survey
(Source: Federal Register, 1 Aug 2018.) [Excerpts.]

83 FR 37520: Agency Information Collection Activities; Proposed eCollection eComments Requested; National Firearms Act Division and Firearms and Explosives Services Division Customer Service Survey

* AGENCY: Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice.
* ACTION: 30-day notice.
* SUMMARY: The Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995. A minor change is being made to the proposed collection OMB 1140-0101 (Firearms and Explosives Services Division (FESD) Customer Service Survey), to include references to the recently established National Firearms Act Division (NFA Division); which was previously a branch in FESD. All survey questions directly relate to customer experience in FESD, NFA Division and their branches. The proposed collection is being published to obtain comments from the public and affected agencies. The proposed information collection was previously published in the Federal Register, on May 30, 2018, allowing for a 60-day comment period.
* DATES: Comments are encouraged and will be accepted for an additional 30 days until August 31, 2018.
* FOR FURTHER INFORMATION CONTACT: If you have additional comments, particularly with respect to the estimated public burden or associated response time, have suggestions, need a copy of the proposed information collection instrument with instructions, or desire any other additional information, please contact Erica Payne, National Firearms Act Division, either by mail at 244 Needy Road, Martinsburg, WV 25405, by email at Erica.payne@atf.gov or by telephone at 304-616-4582. Written comments and/or suggestions can also be directed to the Office of Management and Budget, Office of Information and Regulatory Affairs, Attention Department of Justice Desk Officer, Washington, DC 20503 or sent to OIRA_submissions@omb.eop.gov.
* SUPPLEMENTARY INFORMATION: ...

*Overview of This Information Collection*

  - Type of Information Collection: Extension, with change, of a currently approved collection.

WASHSTATEC000557

- The Title of the Form/Collection: National Firearms Act Division and Firearms and Explosives Services Division Customer Service Survey. ...
- Form number: None. ...
- Abstract: The purpose of this survey is to gather information about customer service provided to the firearms and explosives industry and government agencies, in order to improve service delivery and customer satisfaction. ...

Date: July 27, 2018.
Melody Braswell, Department Clearance Officer for PRA, U.S. Department of Justice.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DHS/CBP Adjusts COBRA Fees for Inflation in FY 2019

(Source: Federal Register, 1 Aug 2018.) [Excerpts.]

83 FR 37509-37511: COBRA Fees To Be Adjusted for Inflation in Fiscal Year 2019

\* AGENCY: U.S. Customs and Border Protection, Department of Homeland Security.
\* ACTION: General notice.
\* SUMMARY: This document announces that U.S. Customs and Border Protection (CBP) is adjusting certain customs user fees and limitations established by the Consolidated Omnibus Budget Reconciliation Act (COBRA) for Fiscal Year (FY) 2019 in accordance with the Fixing America's Surface Transportation Act (FAST Act) as implemented by CBP regulations.
\* DATES: The adjusted amounts of customs COBRA user fees and their corresponding limitations set forth in this notice for Fiscal Year 2019 are required as of October 1, 2018. ...
\* SUPPLEMENTARY INFORMATION: ... On December 4, 2015, the Fixing America's Surface Transportation Act (FAST Act, Pub. L. 114-94) was signed into law. Section 32201 of the FAST Act amended section 13031 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (19 U.S.C. 58c) by requiring certain customs COBRA user fees and corresponding limitations to be adjusted by the Secretary of the Treasury (Secretary) to reflect certain increases in inflation.
Sections 24.22 and 24.23 of title 19 of the Code of Federal Regulations (19 CFR 24.22 and 24.23) describe the procedures that implement the requirements of the FAST Act. Specifically, paragraph (k) in section 24.22 (19 CFR 24.22(k)) sets forth the methodology to determine the change in inflation as well as the factor by which the fees and limitations will be adjusted, if necessary. The fees and limitations subject to adjustment, which are set forth in Appendix A and Appendix B of part 24, include the commercial vessel arrival fees, commercial truck arrival fees, railroad car arrival fees, private vessel arrival fees, private aircraft arrival fees, commercial aircraft and vessel passenger arrival fees, dutiable mail fees,

WASHSTATEC000558

customs broker permit user fees, barges and other bulk carriers arrival fees, and merchandise processing fees, as well as the corresponding limitations. ...

*Announcement of New Fees and Limitations*

   The adjusted amounts of customs COBRA user fees and their corresponding limitations for Fiscal Year 2019 as adjusted by 4.886 percent set forth below are required as of October 1, 2018. Table 1 provides the fees and limitations found in 19 CFR 24.22 as adjusted for Fiscal Year 2019 and Table 2 provides the fees and limitations found in 19 CFR 24.23 as adjusted for Fiscal Year 2019.

WASHSTATEC000559

Tables 1 and 2 setting forth the adjusted fees and limitations for Fiscal Year 2019 will also be maintained for the public's convenience on the CBP website at www.cbp.gov.

  Dated: July 27, 2018.
Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection.

---------
  [FN/2] The Commercial Truck Arrival fee is the CBP fee only, it does not include the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Services agricultural quarantine and inspection (APHIS/AQI) fee that is collected by CBP on behalf of USDA. See 7 CFR 354.3(c) and 19 CFR 24.22(c)(1). Once 19 Single Crossing Fees have been paid and used for a vehicle identification number (VIN)/vehicle in a Decal and Transponder Online Procurement System (DTOPS) account within a calendar year, the payment required for the 20th (and subsequent) single-crossing is only the APHIS/AQI fee and no longer includes the CBP Commercial Truck Arrival fee (for the remainder of that calendar year).

WASHSTATEC000560

[FN/3] The Commercial Truck Arrival fee is adjusted down from 5.77 to the nearest lower nickel. See 82 FR 50523 (November 1, 2017).
[FN/4] See footnote 2 above.
[FN/5] Although the minimum limitation is published, the fee charged is the fee required by 19 U.S.C. 58c(b)(9)(A)(ii).
[FN/6] Only the limitation is increasing; the ad valorem rate of 0.3464% remains the same. See 82 FR 32661 (July 17, 2017).
[FN/7] Id.
[FN/8] For monthly pipeline entries, see: here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

–

## OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* DHS/CBP; PROPOSED RULES; Modernized Drawback [Publication Date: 2 August 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. Commerce/BIS Activates Denial Order Concerning Narender Sharma and Hydel Engineering Products of Middle Bazzar, Rampur Bushahr, India
(Source: Commerce/BIS, 1 Aug 2018.) [Summary.]

\* Respondent: Narender Sharma and Hydel Engineering Products of Rampur Bushahr, India
\* Charges: Violation of one of the probationary conditions relating to the $70,000 suspended portion of the civil penalty and the suspension of the 31 Aug 2017 denial order of Sharma's and Hydel's export privileges. Specifically, Hydel and Sharma did not pay $30,000 that was due by 15 Dec 2017.
\* Penalty: Activation of the $70,000 suspended portion of the civil penalty and activation of denial order including a five-year denial period. The now-activated $70,000 civil penalty amount shall be paid to the U.S. Commerce Department within 15 days of the order.
\* Debarred: 5 years.
\* Date of Order: 30 Jul 2018.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000561

 6.

## DHS/CBP Releases Notice Concerning In-Bond Enforcement Discretion
(Source: CSMS# 18-000466, 1 Aug 2018.)

Due to issues identified with electronic communication for intermodal movement of cargo and other operational issues identified by trade partners, OFO will defer enforcement as identified above for a 6-month period until February 6, 2019.

  - In-bond shipments that arrive into the United States on a mode of transport other than air and are subsequently transferred to air for exportation from the U.S. or movement to a U.S. port of entry may continue to be arrived and exported by CBP.
  - In-bonds that originate in the United States from either bonded warehouses or Foreign Trade Zones and are subsequently exported by air may continue to be arrived and exported by CBP.
  - The use of FIRMS codes at arrival will not be enforced for those reporting electronically.
  - No automated edits in ACE will be implemented avoiding system reject messaging.
  - CBP Officers at the port will assist traders with in-bond arrival and export reporting as needed.
  - Timeframe enforcement for arrival and export reporting beyond the 2 business days specified in the regulations for those reporting electronically will be extended to 4 days.

Ports have been instructed to maintain an evaluation of the Trade's progress in compliance during this period, and a reevaluation will be made within the 6-month period. While ports are instructed to issue warnings rather than penalties during this time, ports will maintain the discretion to fully enforce for egregious or continued violations or a lack of demonstration of good faith efforts. Allowing for an extension until February 6, 2019, will also allow other government agencies an opportunity to further enhance and align their electronic systems with ACE.

Additionally until further notice, CBP will:
  - Provide a stamp or perforation on a CBP Form 7512 verifying exportation upon request of the carrier. The carrier, in order for CBP to stamp or perforate an in-bond document, must provide proof of exportation (or physical verification).
  - CBP will continue to defer enforcement of the submission of the 6 digit HTSUS number indefinitely.

Please direct any questions to CSCWAREHOUSING@CBP.DHS.GOV

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000562



7.

## DoD/DSS Releases Notice for Entities Cleared by DoD under the National Industrial Security Program
(Source: DoD/DSS, 1 Aug 2018.)

In early June 2018, the Director of National Intelligence, in his capacity as the Security Executive Agent, and the Director of the Office of Personnel Management, in his capacity as the Suitability & Credentialing Executive Agent (Executive Agents), jointly issued a memorandum directing the implementation of interim measures intended to mitigate the existing backlog of personnel security investigations at the National Background Investigations Bureau (NBIB). These measures include the deferment of reinvestigations when screening results are favorable and mitigation activities are in place, as directed.

In accordance with the guidance and direction received from the Executive Agents, Defense Security Service (DSS) will adopt procedures to defer the submission of Tier 3 Reinvestigations (T3Rs) and Tier 5 Reinvestigations (T5Rs) for entities cleared under the National Industrial Security Program. Facility Security Officers should continue to submit completed Standard Form 86 and the reinvestigation request, six years from the date of last investigation for the T5Rs and 10 years from the date of the last reinvestigation for the T3Rs. New reinvestigation requests will be screened by DSS using a risk management approach that permits deferment of reinvestigations according to policy. If the determination is made to defer reinvestigations, individuals will be immediately enrolled into the DoD Continuous Evaluation (CE)/Continuous Vetting (CV) capabilities, as required.

The Executive Agents have directed all Federal departments and agencies to reciprocally accept the prior favorable adjudication for deferred reinvestigations that are out of scope (overdue). Existing eligibility remains valid until the individual is removed from CE, no longer has any DoD affiliation, or has their eligibility revoked or suspended.

The Office of the Under Secretary of Defense for Intelligence signed a memorandum on December 7, 2016, reminding DoD Components that personnel security clearances do not expire. Individuals with current eligibility in the Joint Personnel Adjudication System (JPAS), or its successor, should not be denied access based on an out-of-scope investigation. That memorandum is provided here for ease of reference. If you encounter any challenges with this process, please email dss.ncr.dss-isfo.mbx.psmoi@mail.mil for assistance.

These procedures will remain in effect until further notice.  More information is available in the linked frequently asked questions.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000563

## 8. GAO Ex/Im Reports and Testimonies of Interest
(Source: GAO Reports and Testimonies, 1 Aug 2018.)

\* Improved Information Sharing Could Help DOD Determine Whether Items Are Commercial and Reasonably Priced.GAO-18-530: Published: Jul 31, 2018. Publicly Released: Jul 31, 2018.

back to top

* * * * * * * * * * * * * * * * * *

## 9. State/DDTC Withdraws Temporary Modification of USML Category I that Would Have Permitted Internet Posting of 3D-printed Firearm Plans
(Source: Editor, 1 Aug 2018.)

The Directorate of Defense Trade Controls (DDTC) has removed from its website the notice titled "Temporary Modification of Category I of the United States Munitions List," dated July 27, 2018. The notice stated that the Acting Deputy Assistant Secretary for Defense Trade Controls, under authority of 22 C.F.R. § 126.2, had temporarily modified United States Munitions List (USML) Category One to exclude the technical data identified in the Settlement Agreement for the matter of Defense Distributed v. U.S. Department of State.  The DDTC website notice was removed on July 31, 2018, after a Federal court's temporary restraining order blocking the release of downloadable blueprints for 3D-printed firearms that had been agreed to in a settlement between Defense Distributed and the Department of State.

State Department's spokeswoman, Heather Nauert, defended the decision to settle the case, saying that move was based on legal advice from the Justice Department. "The reason that the State Department got involved ... is because of our role in controlling foreign access to U.S. defense technology," she said. "The State Department wants to prevent the wrong people from acquiring weapons overseas."

But, she said, "we were informed that we would have lost this case in court ... based on First Amendment grounds ... The Department of Justice suggested that the State Department and the U.S. government settle this case, and so that is what was done."

back to top

* * * * * * * * * * * * * * * * * *

## 10. Treasury/OFAC Issues Ukraine-/Russia-related General License
(Source: Treasury/OFAC, 31 Jul 2018.)

WASHSTATEC000564

The Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing Ukraine-/Russia-related General License 13C, which replaces and supersedes General License 13B in its entirety.  General License 13C extends the expiration date of the general license to 12:01 a.m. October 23, 2018. OFAC is also replacing references to GL 13B in these FAQs with references to GL 13C.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. U.S. District Court Issues Temporary Restraining Order in 3-D Printer Gun Case

(Source: Editor, 1 Aug 2018.) [Docket numbers and administrative references removed. Copy of original available HERE.]

  UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE STATE OF WASHINGTON, et al., Plaintiffs, v. UNITED STATES DEPARTMENT OF STATE, et al., Defendants.
  Case No. C18-1115RSL
  TEMPORARY RESTRAINING ORDER

This matter comes before the Court on plaintiffs' "Emergency Motion for Temporary Restraining Order (with Notice to Adverse Party)" ... and defendants' oppositions thereto .... On or about June 29, 2018, defendants entered into an agreement whereby the federal government agreed to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of computer aided design ("CAD") files for the automated production of 3-D printed weapons, to announce a temporary modification of the USML to allow such distribution while the final rule is in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The agreement was made public on July 10, 2018, and Defense Distributed is currently allowing individuals to sign up to download specific CAD files on August 1, 2018. DEFCAD, https://defcad.com (visited Jul. 31, 2018).

Prior to the June 29, 2018, agreement, the federal government had taken the position that restrictions on the export of technical data that is indispensable to the creation of guns and their components through a 3-D printing process was an essential part of its efforts to ensure that articles useful for warfare or terrorism do not proliferate and threaten United States interests and security. Under the Arms Export Control Act ("AECA"), the President of the United States is authorized "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). "Defense articles and defense services" includes all firearms up to .50 caliber and all technical data related to such firearms, including information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" the firearms. 22 C.F.R. § 121.1(I)(a) and § 121.10(a).

WASHSTATEC000565

When defendant Defense Distributed posted CAD files for various weapons on its website in December 2012, the federal government requested that they be immediately removed from public access. The government advised Defense Distributed that it could request a determination from the Directorate of Defense Trade Controls ("DDTC") within the United States Department of State regarding whether the files were subject to export control under the International Traffic in Arms Regulations ("ITAR"). [FN/1]  Defense Distributed filed a number of determination requests. It also filed a lawsuit in the United States District Court for the Western District of Texas in which it argued that the export restrictions constituted a prior restraint on and censorship of expression in violation of the First, Second, and Fifth Amendments to the United States Constitution. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). Defense Distributed sought a preliminary injunction precluding the imposition of any prepublication approval requirement for its CAD files. The federal government opposed the motion, arguing that:

  - "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" and "warrant subjecting [the files] to ITAR's export licensing of technical data;"
  - Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"
  - "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and
  - both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole." Id., Dkt. # 32 at 19-20 (internal quotation marks and citations omitted).

The then-Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer.  ...

WASHSTATEC000566

The district court denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "global access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. ... The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of law and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defense Distributed v. U.S. Dep't of State .... Later that month, the parties reached a tentative settlement agreement which, as described in the first paragraph of this order, will allow Defense Distributed to place downloadable CAD files for automated weapons printing on its website. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that alter its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On July 30, 2018, two days before Defense Distributed plans to place downloadable CAD files on its website, eight states and the District of Columbia filed this lawsuit seeking a declaration that the "temporary modification" of the USML is invalid and an injunction requiring the federal defendants to rescind the procedurally defective modification and refrain from acting on it. Having reviewed the papers submitted by the parties along with the record before the Honorable Robert L. Pitman in the United States District Court for the Western District of Texas, and having heard the arguments of counsel, the Court finds as follows:

The procedure for obtaining a temporary restraining order differs from that which is applicable in the preliminary injunction context, but the factors considered by the Court are the same. In order to obtain preliminary injunctive relief, plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (2008). In the Ninth Circuit, "if a plaintiff can only show that there are serious questions going to the merits - a lesser showing than likelihood of success on the merits - then a preliminary injunction may still

issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied." ...

Plaintiffs have shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the "temporary modification" has resulted in the removal of one or more items from the USML.2 The federal government represents that its settlement was the result of a multi-year review process which was completed in May 2018 and resulted in a determination that the type of firearms and related technical data at issue here would not provide a military advantage to adversaries and therefore no longer warrant export control under the AECA and should be removed from the USML. In such circumstances, the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of such reviews be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given. When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense services subject to export control had to have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures.

Plaintiffs have also shown a likelihood of irreparable injury if the downloadable CAD files are posted tomorrow as promised. A side effect of the USML has been to make it more difficult to locate and download instructions for the manufacture of plastic firearms. If an injunction is not issued and the status quo alters at midnight tonight, the proliferation of these firearms will have many of the negative impacts on a state level that the federal government once feared on the international stage. Against this hardship is a delay in lifting regulatory restrictions to which Defense Distributed has been subject for over five years: the balance of hardships and the public interest tip sharply in plaintiffs' favor.

For all of the foregoing reasons, plaintiffs' motion for temporary restraining order is GRANTED.

The federal government defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued.

Pursuant to the limitations set forth in Fed. R. Civ. P. 65, this matter is hereby set for hearing on Friday, August 10, 2018, at 9:00 a.m. in Courtroom 15106 to determine whether this temporary restraining order should be converted to a preliminary injunction. No bond shall be required.

   DATED this 31st day of July, 2018, at 4:35 p.m.

A Robert S. Lasnik, United States District Judge

WASHSTATEC000568

---------
  [FN/1] The President delegated his authority to regulate under the AECA to the State Department, which promulgated the ITAR. The DDTC administers the ITAR
  [FN/2] For purposes of this temporary order, the Court finds that plaintiffs have standing to pursue their claims. Although the restriction of access to technical data within the United States is not the focus or goal of the USML, there is no separation of the internet between domestic and international audiences. Thus, the listing has effectively limited access to the CAD files within the jurisdictions governed by plaintiffs. The States and the District of Columbia have a clear and reasonable fear that the proliferation of untraceable, undetectable weapons will enable convicted felons, domestic abusers, the mentally ill, and others who should not have access to firearms to acquire and use them.]

back to top

* * * * * * * * * * * * * * * * * *


## 12. EU Adds 6 Entities to Russia Sanctions List
(Source: Council of the European Union, 31 Jul 2018.)

The Council added six entities to the list of those subject to restrictive measures over actions undermining or threatening the territorial integrity, sovereignty and independence of Ukraine. They are listed because of their involvement in the construction of the Kerch Bridge, connecting Russia to the illegally annexed Crimean peninsula. Through their actions they supported the consolidation of Russia's control over the illegally annexed Crimean peninsula, which in turn further undermines the territorial integrity, sovereignty and independence of Ukraine.

The measures consist of an asset freeze, meaning that all of the assets in the EU belonging to these entities are frozen and EU persons and entities cannot make any funds available to them.

The decision brings the total number of entities listed by the EU to 44. In addition, the EU imposed a travel ban and an asset freeze on 155 individuals under this sanctions regime.

The legal acts, including the names of the persons concerned, are available in the EU Official Journal of 31 July 2018. They were adopted by the Council by written procedure.

Other EU measures in place in response to the Ukraine crisis include:

  - economic sanctions targeting specific sectors of the Russian economy, currently in place until 31 January 2019;
  - restrictive measures in response to the illegal annexation of Crimea and Sevastopol, limited to the territory of Crimea and Sevastopol, currently in place until 23 June 2019.

back to top

* * * * * * * * * * * * * * * * * *

WASHSTATEC000569

## 13. UK OFSI Publishes Guide Concerning Financial Sanctions
(Source: UK OFSI, 31 Jul 2018.)

The UK Office of Financial Sanctions Implementation (OFSI) has published a guide to the current consolidated list of asset freeze targets, and a list of persons subject to restrictive measures in view of Russia's actions destabilizing the situation in the Ukraine.

The guide is available here.

back to top

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

---

### NEWS

## 14.
## CTech: "Israeli and U.S. Defense Robotics Companies Quarrel Over China Ties"
(Source: CTech, 1 Aug 2018.) [Excerpts.]

Israeli Roboteam sued Massachusetts-based competitor Endeavor Robotics over alleged defamation connecting Roboteam to Chinese attempts to obtain U.S. military technologies

Israeli defense robotics company Robo-Team Ltd. (Roboteam) has sued Massachusetts-based competitor Endeavor Robotics Inc. over alleged defamation connecting Roboteam to the Chinese government. The lawsuit was filed by Roboteam's U.S. subsidiary Robo-Team NA Inc. to a Colombia district court in June 2017. ...

The lawsuit alleges that Endeavor hired defense-focused lobbying firm Sachem Strategies to spread false rumors that Roboteam is controlled by the Chinese government, which uses it to obtain U.S. military technologies. Roboteam alleges that Endeavor's actions were part of the latter's attempt to secure two U.S. military contracts worth hundreds of millions of dollars each. In April, Judge Trevor N. McFadden issued a memorandum opinion dismissing Roboteam's case for lack of personal jurisdiction over the two Massachusetts-based companies. The judge also dismissed Anti-SLAPP (strategic lawsuit against public participation) motions filed by Endeavor and Sachem for the same reason. If granted, the motions would have awarded Endeavor and Sachem all legal costs, pursuant to the District of Columbia's Anti-SLAPP statute, meant to protect defendant's against intimidation suits. ...

WASHSTATEC000570

Israel's technology trade with China is a sensitive issue for the U.S. administration. In 2000, the U.S. prevented a deal that would grant China an advanced Israeli airborne warning system called Phalcon. The cancelation of the deal led to a diplomatic crisis between Israel and China. Four years later the Pentagon attempted to stop Israel from returning several Israeli-made drones which China had sent to Israel for maintenance. In 2005, Israel agreed to a request by the U.S. to enhance its export control mechanisms, to cease all military trade with China, and to submit nonmilitary tech deals with China for review by the U.S. Department of Defense.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

15.

## Seattle Times: "Federal Judge in Seattle Blocks Release of Blueprints for 3D-Printed Guns"
(Source: Seattle Times, 31 Jul 2018.) [Excerpts.]

A federal judge in Seattle has granted a temporary restraining order blocking a Texas man from releasing downloadable blueprints for 3D-printed plastic firearms.

U.S. District Court Judge Robert Lasnik's ruling Tuesday comes a day after Washington State Attorney General Bob Ferguson filed a suit challenging the Trump administration's decision last month to allow Texas gun-rights advocate Cody Wilson to post the blueprints, saying the move would provide broad unregulated access to dangerous weapons.

Ferguson is the lead attorney general in the multistate lawsuit that was filed in federal courts in seven other states, including New York and Oregon, along with the District of Columbia.

The lawsuit challenges the outcome of a 2015 case that began in 2013 when Wilson, head of the nonprofit Defense Distributed, was found to have violated a federal law known as International Traffic in Arms Regulations (ITAR), after publishing downloadable plans for 3D-printed guns online. The files were downloaded more than 100,000 times. ...

The lawsuit was settled this June with the Trump administration, despite opposition from gun-control organizations such as the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence, and Wilson was given permission to make his creations available publicly again. He intended to do so Wednesday. The restraining order issued Tuesday by Lasnik puts that plan on hold for now.

During the Tuesday hearing in Seattle, Eric Soskin, a lawyer for the U.S. Justice Department, said they reached the settlement to allow Defense

WASHSTATEC000571

Distributed to post the material online because the regulations were designed to restrict weapons that could be used in war, and the online guns were no different from the weapons that could be bought in a store.

Since the weapons "did not create a military advantage," he told Lasnik, "how could the government justify regulating the data?"  But the judge countered, "There is a possibility of irreparable harm because of the way these guns can be made."

Afterward, Ferguson issued the following statement: "I am thankful and relieved Judge Lasnik put a nationwide stop to the Trump Administration's dangerous decision to allow downloadable, 3D-printed ghost guns to be distributed online. These ghost guns are untraceable, virtually undetectable and, without today's victory, available to any felon, domestic abuser or terrorist."

According to reporting from The Washington Post, Fred Guttenberg, whose 14-year-old daughter was one of the 17 victims killed at Stoneman Douglas High School in Parkland, Florida, earlier this year, complained that federal lawmakers were "clueless" and unaware a settlement had been signed in June.

Guttenberg and others worry easy access to plastic guns is a public-safety issue and would sidestep current regulations, providing criminals and terrorists with "guns that can't be flagged by metal detectors, don't have serial numbers to trace and don't require the usual background checks."

The settlement agreement allowed Defense Distributed to freely publish its gun designs, but according to Ferguson's office, the agreement, which wasn't made public until July 10, was done "in an arbitrary and capricious" fashion by the Trump administration and violates the Administrative Procedure Act.

 "There is no indication in the settlement agreement or elsewhere that any analysis, study, or determination was made by the government defendants in consultation with other agencies," says the release from the Attorney General's Office.

The multistate lawsuit alleges that the settlement between Wilson, his company and the Trump administration did not get the approval of the Department of Defense, and didn't give Congress 30 days notice before agreeing to allow Defense Distributed to begin publishing 3D gun files, by creating a special exemption for Wilson's company in the ITAR.

The lawsuit also says the settlement infringes on states' rights to regulate firearms, therefore violating the 10th Amendment.

In a tweet Tuesday morning, Trump said he is "looking into" his administration's decision to clear the way for Wilson's actions. "Already spoke to NRA, doesn't seem to make much sense!" he tweeted.

WASHSTATEC000572

However, it was not immediately clear what Trump is prepared to do. He has been a staunch supporter of gun rights and has repeatedly said that he is the best friend of the National Rifle Association, which contributed about $30 million to his presidential campaign.

On Capitol Hill Tuesday morning, Senate Democrats declared that Trump would be responsible for any injuries or deaths resulting from untraceable 3-D plastic guns, and called on him to reverse the policy immediately.

"It's his doing, it's his responsibility and the blood is going to be on his hands," said Sen. Richard Blumenthal, D-Connecticut. "He can tweet from now until the end of his administration but the hard reality is that he can stop needless death and injury in America."

Wilson has maintained that this is a First Amendment case, claiming that the government's attempts to block the publication of the information on the web amounts to prior restraint barred by Supreme Court precedent. Wilson's attorney, Josh Blackman, compared the state government's attempts to block his client's website to the Pentagon Papers case, in which the Nixon administration unsuccessfully tried to stop the New York Times and The Washington Post from publishing the contents of a leaked Vietnam War report.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

--

**COMMENTARY**

16. M. Volkov: "White Collar Criminals and Sending a Message to Deter Misconduct (Part II of III)"
(Source: <u>Volkov Law Group Blog</u>, 1 Aug 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, <u>mvolkov@volkovlaw.com</u>, 240-505-1992.

*[Editor's Note: Part I in this series was included in yesterday's, 31 July 2018, Daily Bugle.  Part III in this series will be included as soon as it is available.]*

When Judge Denny Chin sentenced Bernie Madoff, perhaps the most notorious white-collar criminal, Judge Chin imposed a sentence of 150 years, the maximum possible under the law. Madoff was 71 years old.  His Ponzi scheme resulted in the loss of $64.8 billion.

While Judge Chin may have imposed a lesser sentence without altering the fact that Madoff will die while incarcerated, Judge Chin specifically cited the need to send a message and deter future white-collar criminals. Judge Chin

called Madoff's fraud "extraordinary evil," "unprecedented", and "staggering." Judge Chin also noted that he had not received one letter from family or friends attesting to Madoff's good deeds or positive contributions to society.

Judges face real challenges when sentencing white-collar criminals.  In most cases, there is some evidence of positive behavior by a white-collar defendant that may justify mercy.  As a general matter, however, deterrence has value in the sentencing process because it ensures that a judge does not give into a claim of rehabilitation or that the defendant "has seen the light," and is contrite.

White collar criminals are typically older and better educated with a higher percentage of white males than the overall federal prison population.  While the offenses are non-violent, the impact on victims can be devastating.  For the offenders themselves, a criminal conviction can also have significant collateral consequences due to loss of employment and professional licenses.  In truth, however, white-collar offenses are nothing more than varieties of theft.  In many cases, the offenders understand they have violated the law (although they may rationalize their own intent and understanding of the law and their conduct) and the impact of their criminal conduct on victims.  Fraudsters, however, can easily repeat their criminal activities and carry out their crimes using different fraud schemes.  The old adage usually applies - "once a fraudster, always a fraudster."

Some also claim that recidivism rates understate the actual rate at which white-collar criminals engage in fraud.  White collar crimes are hard to detect, investigate and prosecute because they involve analysis of financial records and regulatory schemes.

There is a common view that white-collar crime is increasing while the rate of prosecution is decreasing. The number of federal fraud case has declined in recent years.  Moreover, there appears to be a real lack of prosecution of senior executives who may have been involved in serious criminal activity.

In this context, deterrence is an important objective to benefit law-abiding society by preventing future misconduct.  Economists often translate the world into a cost-benefit analysis to predict future decision-making and conduct.  From this perspective, deterrence occurs when the benefits of criminal conduct exceed the possible sanction - in other words, if the likelihood of detection and punishment increases, the amount of criminal conduct will decrease.  If there is a low probability of being caught, deterrence has little value.

An interesting question is whether stiff corporate punishment through large fines actually deters misconduct.  At a minimum, however, large fines probably incentivize companies to invest in corporate compliance programs as a means to avoid significant criminal and/or civil penalties.

In other words, companies that invest millions in corporate compliance may avoid multi-million dollar fines by implementing an effective ethics and

WASHSTATEC000574

compliance program.  Such a linkage depends on whether corporate leaders at one company take note of penalties imposed against other companies and view themselves as comparable to the offending company.  The connection is even more remote when one acknowledges that directors and officers do not pay criminal or civil penalties; rather current shareholders bear the brunt of the punishment, and such misconduct usually occurred years in the corporate past.

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 17. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in July 2018"
(Source: Thomsen and Burke LLP, 31 Jul 2018. Available by subscription via maher@t-b.com.) [Excerpts.]

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

This memo summarizes the regulatory and enforcement developments with respect to U.S. and multilateral export controls during the month of July 2018. Changes to the regulations published in the Federal Register are explained at greater length in the Regulatory Summary, as is our custom.   We have also included a reminder to exporters that License Exception ENC reports are due to the Commerce Department's Bureau of Industry and Security (BIS) and the National Security Agency (NSA) no later than August 1, 2018.

**REGULATORY UPDATES**

***BIS has lifted the Denial Order placed on ZTE***

On July 13, 2018, the Bureau of Industry and Security (BIS) lifted its Denial Order on ZTE Corporation and ZTE Kangxun. Effective immediately, these parties are now eligible to receive US-origin goods and services.

ZTE Parsian (Iran) and Beijing 8-Star International Co. (China) remain restricted parties.

This Denial Order lifting is pursuant to a settlement agreement reached by BIS and ZTE, where ZTE agreed, among other things, to pay a $1 billion civil penalty for export control-related violations, deposit $400,000 in escrow, retain a team of special compliance coordinators, and completely replace its Board of Directors and senior leadership.

Web Links:

  - BIS Announcement Lifting Denial Order
  - Official July 13, 2018 BIS Order

WASHSTATEC000575

### *License Exception ENC Encryption Reporting Deadline - August 1, 2018*

A reminder to exporters that License Exception ENC reports are due to the Commerce Department's Bureau of Industry and Security (BIS) and the National Security Agency (NSA) no later than **August 1, 2018**.

Your License Exception ENC Report for applicable encryption commodities, software, components and technology includes encryption items classified in accordance with Sections 740.17(b)(2) and 740.17(b)(3)(iii) of the EAR, exported between January 1 and June 30, 2018 .

This semi-annual report must be received by BIS and the ENC Encryption Request Coordinator at NSA no later than August 1, 2018 .

*Example Reportable Activity:*

  - Exports of "Restricted" network infrastructure equipment
  - Sharing source code classified under ECCN 5D002 with foreign parties
  - Sharing ECCN 5E002 technology with foreign development or manufacturing partners

*BIS Online Information:*

BIS has published some information on its website on how to file the semi-annual encryption report. They also highlighted some common reporting exclusions, such as:

  - Encryption commodities or software with a symmetric key length not exceeding 64 bits.
  - Encryption items exported (or reexported from Canada) via free and anonymous download.
  - Encryption items from or to a U.S. bank, financial institution or its subsidiaries, affiliates, customers or contractors for banking or financial operations.
  - Foreign products developed by bundling or compiling of source code.

Additional reporting information can also be found in Section 740.17(e) of the EAR.

Please let us know if you need assistance with preparing the reports.

### *OFAC Issues Updates and Guidance On North Korea Sanctions*

The U.S. Department of State, with the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) and the U.S. Department of Homeland Security's (DHS) Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE), is issuing this advisory to highlight sanctions evasions tactics used by North Korea that could expose businesses - including manufacturers, buyers, and service providers - to

sanctions compliance risks under U.S. and/or United Nations sanctions authorities. This advisory also assists businesses in complying with the requirements under Title III, the Korean Interdiction and Modernization of Sanctions Act of the Countering America's Adversaries Through Sanctions Act (CAATSA). Businesses should be aware of deceptive practices employed by North Korea in order to implement effective due diligence policies, procedures, and internal controls to ensure compliance with applicable legal requirements across their entire supply chains.

The Guidance:

   (1) Clarifies that the US is not seeking to disrupt the efforts of North Korean refugees and asylum seekers and says that if North Koreans gain another citizenship they are no longer considered North Korean for purposes of US sanctions, in particular, Title III, the Korean Interdiction and Modernization of Sanctions Act of the Countering America's Adversaries through Sanctions Act;
   (2) Provides a list of industries and countries in which North Korean laborers working on behalf of the North Korean Government were present in 2017-18 (at page 3). While the list of countries is long, it at least narrows somewhat the supply chain sourcing concerns to certain parts of Asia, Africa, and the Middle East;
   (3) Provides in Annex 3 a sectoral breakdown of where North Korean laborers are working on behalf of the North Korean Government overseas by sector. While Annex 3 states that it is NOT a comprehensive list of all countries, jurisdictions and industries, it is helpful in highlighting some higher risk jurisdictions by sector. For example, the Information Technology sector is warned about Angola, Bangladesh, China, Laos, Nigeria, Uganda, and Vietnam; and
   (4) Provides in Annex 2 a list of joint ventures that have operated or are currently operating in North Korea established prior to 2016, organized by industry sector. Again, this is not a comprehensive list, nor is it an SDN or blocked parties list, but it is a list that companies evaluating suppliers in Asia and China in particular may wish to check as they evaluate potential suppliers.

The full document can be found on OFAC's website.

***Options for Addressing the new US Tariffs on Chinese-Origin Items***

Over the last several months, the Office of the United States Trade Representative (USTR) has announced multiple rounds of new import tariffs on Chinese-origin items pursuant to a Section 301 action. These tariffs impact a wide range of goods and are at different places in their implementation. We have provided below a summary of the different tariff actions and some potential options available to reduce the impact.

   Round 1

      - 25% ad valorem duty
      - Impacted items in Annex B to 83 FR 28710

- Became effective July 6, 2018
- Stakeholders can now request that specific products be exempted. See 83 FR 32181

Round 2

- 25% ad valorem duty
- Impacted items in Annex C to 83 FR 28710
- Proposed tariffs to become effective ~ August 2018

Round 3

- 10% ad valorem duty
- Impacted items in 83 FR 55608
- Proposed tariffs to become effective ~ September 2018
- Aug. 17: Due date to submit written comments

Companies impacted by these new tariffs have several options to help reduce the impact, including:

- Adjust supply chain operations such that the items are substantially transformed in a country other than China, prior to their import into the United States.
- Import sub-assemblies, rather than finished products, if those sub-assemblies have an HTS classification not impacted by the new tariffs. Perform final assembly in the United States after importation.
- For Round 1 tariffs that are already in effect, submit a request to the USTR that particular products be excluded from the tariffs.  The deadline to submit an exclusion request is October 9, 2018. In making its determination, the USTR may consider: (1) Whether the product is available from a source outside of China, (2) Whether additional duties would cause severe economic harm to requester or other U.S. sources, and (3) Whether the particular product is important or related to Chinese industrial programs, including "Made in China 2025."
- For Round 3 proposed tariffs, submit comments to the USTR requesting that particular HTS codes be removed from the final list. The deadline is August 17th.
- For products that are imported into the United States for future export, utilize a bonded warehouse or a drawback program.

## ENFORCEMENT ACTIONS

### _Connecticut Business Owners Who Profited from Unlawful Exports to Pakistan Are Sentenced_

Father and son, Muhammad and Ismail and Kamran Khan were sentenced this month to 18 months imprisonment followed by three years of supervised release. According to court documents and statements made in court, from at least 2012 to October 2013, Muhammad Ismail, and his two sons, Kamran and Imran Khan, were engaged in a scheme to purchase goods that were controlled under the Export Administration Regulations and to export those goods without a license to Pakistan, in violation of the EAR.

WASHSTATEC000578

Through companies conducting business as Brush Locker Tools, Kauser Enterprises-USA and Kauser Enterprises-Pakistan, the three defendants received orders from a Pakistani company that procured materials and equipment for the Pakistani military, requesting them to procure specific products that were subject to the EAR. When U.S. manufacturers asked about the end-user for a product, the defendants either informed the manufacturer that the product would remain in the U.S. or completed an end-user certification indicating that the product would not be exported.

After the products were purchased, they were shipped by the manufacturer to the defendants in Connecticut. The products were then shipped to Pakistan on behalf of either the Pakistan Atomic Energy Commission ("PAEC"), the Pakistan Space & Upper Atmosphere Research Commission ("SUPARCO"), or the National Institute of Lasers & Optronics ("NILOP"), all of which were listed on the U.S. Department of Commerce Entity List. The defendants never obtained a license to export any item to the designated entities even though they knew that a license was required prior to export. The defendants received the proceeds for the sale of export-controlled items through wire transactions from Value Additions' Pakistan-based bank account to a U.S. bank account that the defendants controlled.

On March 5, 2018, Muhammad Ismail and Kamran Khan each pleaded guilty to one count of international money laundering, for causing funds to be transferred from Pakistan to the U.S. in connection with the export control violations. In pleading guilty, Ismail and Kamran Khan specifically admitted that, between January and July 2013, they procured, received and exported to SUPARCO, without a license to do so, certain bagging film that is used for advanced composite fabrication and other high temperature applications where dimensional stability, adherence to sealant tapes and uniform film gage are essential. The proceeds for the sale of the bagging film was wired from Pakistan to the defendants in the U.S.

Ismail and Kamran Khan are both citizens of Pakistan and lawful permanent residents of the U.S.

back to top

* * * * * * * * * * * * * * * * * * *

18. R.C. Burns: "Federal Court Incorrectly Says DDTC Jumped the Gun on Gun Printing Plans"
(Source: Export Law Blog, 1 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

Just hours before Defense Distributed, pursuant to a Settlement Agreement with the Department of State's Directorate of Defense Trade Controls, planned to upload plans to allow all who can afford a 3-D printer to make their own plastic guns, a federal district court in Seattle entered a preliminary injunction prohibiting the uploading of those plans.   The

WASHSTATEC000579

preliminary injunction was entered at the request of attorneys general from eight states and the District of Columbia.    In entering the preliminary injunction, the court stated that the plaintiffs were likely to prevail on the merits for two reasons - both, frankly, fairly questionable.

The first reason the court thought that plaintiffs would likely prevail is that, in the court's view, the Settlement Agreement effectively removed items from the United States Munitions List ("USML") without the prior thirty-day notice to Congress as required by section 38(f) of the Arms Export Control Act, 22 U.S.C. § 2278(f).  As you probably recall, DDTC and BIS so far have only issued proposed rules.   As noted early on in the export control process, State and Commerce indicated that they would provide the section 38(f) notices to Congress 30 days prior to publishing the final rule.  At this point, only the proposed rules have been issued and the comment period ended on July 9, so it is likely that no section 38(f) notices have been sent to Congress as the court states. Certainly they would not have been sent thirty days before the execution of the Settlement Agreement on June 29 as the Court said should have been done.

The problem with this argument is that the Settlement Agreement did not remove Category I (or any other) items from the USML.  The Settlement Agreement is quite clear that DDTC was not removing anything from the list but, rather, was granting an exemption under ITAR  section 125.4(b)(13).  Under that section, an export of technical data does not require a license if that data has been "approved for public release" by DDTC.  All that DDTC did in the Settlement Agreement was approve public release of specified Defense Distributed plans making their export eligible for the exemption in section 125.4(b)(13).  Nothing has been removed from the USML by the Settlement Agreement, and, thus, no section 38(f) notice was required as a result of the Settlement Agreement.

The other reason relied on by the district court in temporarily blocking the Settlement Agreement was the requirement in Executive Order 11958 that any removal of any item from the USML by DDTC would need the concurrence of the Department of Defense.  The court stated:

> When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense services subject to export control had to have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures.

Apparently, the district court had not bothered to read the initial notice from the Department of Commerce on the proposed removal of Category I firearms from the United States Munitions List to the Commerce Control List.   That notice clearly states:

> The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.

WASHSTATEC000580

Oops.  So even if the Settlement Agreement effectively removed certain Article I items from the USML, which it did not, the DOD had already agreed to that prior to the publication of the initial notices proposing removal of those items.

back to top

* * * * * * * * * * * * * * * * * * *

–

## EX/IM TRAINING EVENTS & CONFERENCES

## 19. ECTI Presents "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions" Webinar, 12 Sep
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions
* When: September 12, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Melissa Proctor
* Register: Here or Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * *

–

## EDITOR'S NOTES

## 20. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Herman Melville** (1 Aug 1819 - 28 Sep 1891; was an American novelist, short story writer, and poet of the American Renaissance period. His best known works include *Typee* (1846), a romantic account of his experiences in Polynesian life, and his whaling novel *Moby-Dick* (1851). His work was almost forgotten during the 30 years of his life.)
  - *"It is better to fail in originality than to succeed in imitation."*
  - *"There is something wrong about the man who wants help. There is somewhere a deep defect, a want, in brief, a need, a crying need, somewhere about that man."*

WASHSTATEC000581

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 21. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 1 Aug 2018: 83 FR 37423-37433: Addition of Certain Entities; and Modification of Entry on the Entity List [Addition of 44 Entities in China to Entity List, Modification of 1 Entry in China.]

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and

approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


## 22. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

WASHSTATEC000583

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



WASHSTATEC000584

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000585

Message

| | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 7/31/2018 8:49:28 PM |
| **To:** | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| **Subject:** | Defense Distributed Settlement Alerts for 31 July 2018 |



### Defense Distributed Settlement Alerts for 31 July 2018

"The battle to stop 3D-printed guns, explained", The upcoming publication has terrified lawmakers around the country. State attorneys general are racing to get a court injunction on Wilson's plans to republish the blueprints online. They have also asked the federal government to withdraw from the settlement.

"Trump appears to oppose 3D printed guns despite making blueprints available", One day before blueprints for 3D printed guns were set to be available online because of a decision by Donald Trump's administration, the president questioned whether they should be publicly available.

"Trump says public availability of 3D-printed guns 'doesn't seem to make much sense'", President Donald Trump said Tuesday that he is "looking into" the availability of plans for the 3D printing of guns, writing on Twitter that he had already been in touch with the NRA on the issue.

"Trump Calls For Crackdown On 3D Printed Guns. Here's Why He's Wrong.", First off, as Stephen Gutowski of the Washington Free Beacon points out, it is easy and legal to find gun blueprints online – and it should be, given that the First Amendment problems with barring the ability to post and consume such blueprints are quite serious.

"Trump says he "spoke to NRA" about 3D plastic guns", Mr. Trump spoke after eight states filed suit against the administration, contending the hard-to-trace plastic weapons are a boon to terrorists and criminals and threaten public safety.

"Pelosi blasts Trump administration: Allowing 3D guns is a 'death warrant'", "This decision is a death warrant for countless innocent men, women and children," Pelosi argued in a statement. "For the sake of all our safety and lives, it must be reversed immediately."

"How worried should we be about 3-D-printed plastic guns?", At the moment, plastic guns are just a curiosity; the ones that people have made tend to fall apart after firing a shot or two. And it's already fairly easy to buy almost all the parts to make, say, an AR-15 without going through any background-check process; you'll just have to get a partially machined lower receiver and do a little milling yourself, if you have the right equipment.

"Thousands download 3D-printed gun designs", Blueprints for 3D-printed guns, published online four days early amid last-minute attempts to ban them, have been downloaded thousands of times.

"Attorneys General Sue Trump Administration To Block 3D-Printed Guns", A coalition of attorneys general from eight states and the District of Columbia filed a lawsuit against the Trump administration on Monday to stop a Texas-based company from publishing instructions for 3D-printed guns on its website.

"Lawmakers' bill would outlaw 3D-printed plastic guns", Democratic Reps. Seth Moulton of Massachusetts and David Cicilline of Rhode Island plan to introduce legislation during Tuesday's U.S. House session that would prohibit the manufacture or possession of 3D- printed guns.

"Trump questions 3-D printable guns — which his own administration just helped make available to public", Trump's concern comes after Democratic state officials filed last-minute lawsuits and prepared legislation in a frantic attempt to halt the widespread availability of 3-D printable plastic guns.

"Should downloadable plans for 3D-printed guns be banned?", The company filed its own suit in Texas on Sunday, asserting that it's the victim of an "ideologically-fueled program of intimidation and harassment" that violates the company's First Amendment rights.

"3D-printed guns, technology, government and you", It's long been understood that when there's a social ill, the government should impose a law to curb the occurrences of the ill. The problem with this system today is that technology is undermining the power of law — in increasing fashion.

"3D-printed guns will soon be just a click away", Soon people will be able to manufacture their own guns and gun parts with a 3D printer, and some gun control advocates are describing this a threat to the nation.

"Police: 3-D printed guns will be 'a concern going forward'", "The Trump administration's decision will open the floodgates and allow anyone with access to the internet and a 3-D printer to possess a firearm," Cicilline added. "Even worse, these weapons are virtually undetectable by modern security devices used in airports, schools, and other would-be targets for mass shooters. This is a disaster waiting to happen."

"Celebs Beg Jeff Sessions to Block 3-D Printed Guns", The outcry comes just days before the settlement with Defense Distributed takes effect and follows weeks of Democrat efforts to derail 3-D printed guns via Congressional action. These efforts include Sen. Chuck Schumer's (D-NY) misleading claim that 3-D printed guns open the door to a "fully semiautomatic weapon."

"3-D guns: Untraceable, undetectable and unstoppable?", A State Department spokesman told CNN the settlement came after a national security analysis that determined "certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States."

"When It Comes To The Safety Of 3D Printed Guns, The NRA Is Conspicuously Silent", If you think there are limits to the scale of a 3D printed object, consider an office I visited last year in Dubai, which was created entirely by 3D printing. It might not make sense economically for a criminial to use 3D printing to make small weapons. Large ones could be a different story.

"Backlash on 3D gun tech as lawmakers, states mobilize to outlaw", "I think we're going to have to ban the design as well as the production of them, you know, on a machine," said Pallone. "We might also have something about warnings, you know, that says that, you know, it's illegal under federal law to use this machine for that purpose, so various things that we're thinking up. But basically, it would be banned, yes."

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968

WASHSTATEC000587

e-mail:   *__MarquisMR@state.gov__* |   Web:   *__www.state.gov/t/pm /__* |Twitter: *__@StateDeptPM__*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000588

| | |
|---|---|
| **Message** | |
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 8/1/2018 8:45:23 PM |
| **To:** | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe,Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger, Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| **Subject:** | Defense Distributed Settlement Alerts for 1 August 2018 |



## Defense Distributed Settlement Alerts for 1 August 2018

"Gun rights activists post plans for 3D firearms after judge's order blocking them", In response, five gun-rights activist groups based in California and Washington state posted a website called Code Is Free Speech, along with what it advertised were CAD blueprints for several high-powered firearms, including the AR-15 semiautomatic rifle, the AR-10 battle rifle and the Beretta 92FS semiautomatic pistol.

"Dems file at least 3 bills in Congress to block 3D printed guns", The brawl over downloadable gun manufacturing code reached Capitol Hill on Tuesday with a group of Democrats in both chambers vowing action.

"A gun advocate who published blueprints for 3D-printed firearms says he's taking inspiration from the armies that defeated Hitler", Wilson said that his goal was to alter the relationship between citizens and the state: "I think the state should be as weak as possible relative to the individual. The proper posture of the state is one that at least is in fear of its citizen, not one that lords over it."

"Massachusetts lawmakers laud order blocking 3D printed firearm blueprint publication, seek further action", Markey pledged to block confirmation of Trump's Assistant Secretary of State nominee -- whom he argued would play a key role in the downloadable gun policy -- until the president reverses the administration's stance on the issue and bans online publication of 3D printable gun blueprints.

"Rep. Hanabusa: 3-D Gun Printing Must Be Stopped", Congresswoman Colleen Hanabusa issued a statement on Monday, July 30, 2018, urging a bipartisan effort to stop the Trump Administration from allowing the proliferation of instructions for making guns at home with a 3-D printer. She is now a co-sponsor of the Untraceable Firearms Act of 2018.

"Those Controversial 3D-Printed Guns, Explained", The U.S. government recognizes the right of citizens to build their own firearms, and all of these parts are readily available in gun shops or online, as they always have been. So all of this is perfectly legal. Where Defense Distributed and the government clashed is over the ability of people in foreign countries to download the files.

"Courts in three states bar release of 3D-printable gun blueprints", Courts in New York, New Jersey and Washington State issued rulings barring Cody Wilson and his company, Defense Distribution, from uploading instructions for making 3D-printable guns at midnight Wednesday – as he had planned to do under a settlement reached in June with the Trump administration

WASHSTATEC000589

"Gun shop owner compares access to 3D gun blueprints to online porn", A gun shop owner on Wednesday argued that people who want to "censor" access to 3D gun blueprints should also limit access to porn, comparing both for potentially causing "irreparable harm."

"3D-printed gun blueprint maker Cody Wilson says "the debate is over"", Wilson's dream of a downloadable library of gun blueprints – and a world where anyone can easily manufacture a deadly weapon at home – stalled Tuesday. A Seattle judge blocked Wilson from publishing new gun files and questioned whether the Trump administration should have granted his company permission in the first place.

"A judge ruled that a website has to suspend downloads for 3D gun plans. But they're already out there", Tuesday's decision is the latest chapter is a years-long struggle between Defense United and gun control advocates who argue that such weapons would be without serial numbers and therefore untraceable; that they could be in some cases undetectable by metal detectors; and that they would enable more people to get guns without submitting to background checks.

"This Parkland dad blames Trump administration for settlement over 3 D printed guns", "What this administration did -- and they did not need to do it -- is they actively rolled back the public safety of citizens in the greatest way ever in my lifetime," Guttenberg told CNN's "New Day" Tuesday morning.

"NC mulls response to 3D-printed gun regulations approved by Trump Administration", North Carolina Attorney General Josh Stein said the Tar Heel State is not among the states that have filed suit against the Trump Administration in an effort to stop the publication of the instructions for 3D-printed guns, but his office says he is looking into the issue.

"Chicago Law Enforcement Concerned Over 3D Printed Guns", Tuesday evening, a judge issued a temporary restraining order blocking the release of the downloadable blueprints – a move welcomed by Chicago Police who say the plastic guns can pose a real threat to law enforcement and the public.

"3D-printed guns are coming to America unless Congress acts. But the NRA doesn't want them to", The State Department's decision to settle with Defense Distributed was reckless, opening up the potential for anybody without a background check — including terrorists, convicted felons, and domestic abusers— to print untraceable death instruments from home. So now we need our elected leaders to step in, pump the brakes and implement common-sense solutions surrounding 3D-printed guns.

"Want to make a gun with a 3-D printer? Here is why gun control groups oppose the practice", In recent years, with the emergence of new technology, questions over whether people should be able to access blueprints to make a firearm using a 3-D printer have become a part of the increasingly polarized gun debate. Opponents argue that it will open the door for criminals to easily access untraceable firearms, while supporters say that efforts to prevent the practice are useless and that there are already enough gun laws on the books.

"The rise of 3D-printed guns in America could have dark implications for Australia", A US court settlement allowing 3D-printable gun plans to be posted online has fuelled calls for a national adoption of the NSW approach to outlawing blueprints.

"3D-printed guns among weapons found at airport security checkpoints, TSA says", Among the thousands of firearms discovered at airport security checkpoints around the country in the past two years, a handful were created with a 3D printer. The TSA told CBS News transportation correspondent Kris Van Cleave there have been at least four incidents at checkpoints involving 3D-printed guns or parts of guns since 2016.

"3D-printed guns not a big threat, say those who've tried it", Evan Malone, founder and president of NextFab — a Philadelphia-based network of workshops stocked with 3D-printers and other tools — agreed that there are

WASHSTATEC000590

easier ways to make untraceable firearms. But he is concerned that advances in 3D printing might put the idea into the heads of those outside the gun-owning community.

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *__MarquisMR@state.gov__* |   Web:  *__www.state.gov/t/pm /__* |Twitter: *__@StateDeptPM__*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

Message

**From**: Marquis, Matthew R [MarquisMR@state.gov]
**Sent**: 8/1/2018 8:45:23 PM
**To**: Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov]
**CC**: PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe,Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger, Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil]
**Subject**: Defense Distributed Settlement Alerts for 1 August 2018



## Defense Distributed Settlement Alerts for 1 August 2018

"Gun rights activists post plans for 3D firearms after judge's order blocking them", In response, five gun-rights activist groups based in California and Washington state posted a website called Code Is Free Speech, along with what it advertised were CAD blueprints for several high-powered firearms, including the AR-15 semiautomatic rifle, the AR-10 battle rifle and the Beretta 92FS semiautomatic pistol.

"Dems file at least 3 bills in Congress to block 3D printed guns", The brawl over downloadable gun manufacturing code reached Capitol Hill on Tuesday with a group of Democrats in both chambers vowing action.

"A gun advocate who published blueprints for 3D-printed firearms says he's taking inspiration from the armies that defeated Hitler", Wilson said that his goal was to alter the relationship between citizens and the state: "I think the state should be as weak as possible relative to the individual. The proper posture of the state is one that at least is in fear of its citizen, not one that lords over it."

"Massachusetts lawmakers laud order blocking 3D printed firearm blueprint publication, seek further action", Markey pledged to block confirmation of Trump's Assistant Secretary of State nominee -- whom he argued would play a key role in the downloadable gun policy -- until the president reverses the administration's stance on the issue and bans online publication of 3D printable gun blueprints.

"Rep. Hanabusa: 3-D Gun Printing Must Be Stopped", Congresswoman Colleen Hanabusa issued a statement on Monday, July 30, 2018, urging a bipartisan effort to stop the Trump Administration from allowing the proliferation of instructions for making guns at home with a 3-D printer. She is now a co-sponsor of the Untraceable Firearms Act of 2018.

"Those Controversial 3D-Printed Guns, Explained", The U.S. government recognizes the right of citizens to build their own firearms, and all of these parts are readily available in gun shops or online, as they always have been. So all of this is perfectly legal. Where Defense Distributed and the government clashed is over the ability of people in foreign countries to download the files.

"Courts in three states bar release of 3D-printable gun blueprints", Courts in New York, New Jersey and Washington State issued rulings barring Cody Wilson and his company, Defense Distribution, from uploading instructions for making 3D-printable guns at midnight Wednesday – as he had planned to do under a settlement reached in June with the Trump administration

"Gun shop owner compares access to 3D gun blueprints to online porn", A gun shop owner on Wednesday argued that people who want to "censor" access to 3D gun blueprints should also limit access to porn, comparing both for potentially causing "irreparable harm."

"3D-printed gun blueprint maker Cody Wilson says "the debate is over"", Wilson's dream of a downloadable library of gun blueprints – and a world where anyone can easily manufacture a deadly weapon at home – stalled Tuesday. A Seattle judge blocked Wilson from publishing new gun files and questioned whether the Trump administration should have granted his company permission in the first place.

"A judge ruled that a website has to suspend downloads for 3D gun plans. But they're already out there", Tuesday's decision is the latest chapter is a years-long struggle between Defense United and gun control advocates who argue that such weapons would be without serial numbers and therefore untraceable; that they could be in some cases undetectable by metal detectors; and that they would enable more people to get guns without submitting to background checks.

"This Parkland dad blames Trump administration for settlement over 3 D printed guns", "What this administration did -- and they did not need to do it -- is they actively rolled back the public safety of citizens in the greatest way ever in my lifetime," Guttenberg told CNN's "New Day" Tuesday morning.

"NC mulls response to 3D-printed gun regulations approved by Trump Administration", North Carolina Attorney General Josh Stein said the Tar Heel State is not among the states that have filed suit against the Trump Administration in an effort to stop the publication of the instructions for 3D-printed guns, but his office says he is looking into the issue.

"Chicago Law Enforcement Concerned Over 3D Printed Guns", Tuesday evening, a judge issued a temporary restraining order blocking the release of the downloadable blueprints – a move welcomed by Chicago Police who say the plastic guns can pose a real threat to law enforcement and the public.

"3D-printed guns are coming to America unless Congress acts. But the NRA doesn't want them to", The State Department's decision to settle with Defense Distributed was reckless, opening up the potential for anybody without a background check — including terrorists, convicted felons, and domestic abusers— to print untraceable death instruments from home. So now we need our elected leaders to step in, pump the brakes and implement common-sense solutions surrounding 3D-printed guns.

"Want to make a gun with a 3-D printer? Here is why gun control groups oppose the practice", In recent years, with the emergence of new technology, questions over whether people should be able to access blueprints to make a firearm using a 3-D printer have become a part of the increasingly polarized gun debate. Opponents argue that it will open the door for criminals to easily access untraceable firearms, while supporters say that efforts to prevent the practice are useless and that there are already enough gun laws on the books.

"The rise of 3D-printed guns in America could have dark implications for Australia", A US court settlement allowing 3D-printable gun plans to be posted online has fuelled calls for a national adoption of the NSW approach to outlawing blueprints.

"3D-printed guns among weapons found at airport security checkpoints, TSA says", Among the thousands of firearms discovered at airport security checkpoints around the country in the past two years, a handful were created with a 3D printer. The TSA told CBS News transportation correspondent Kris Van Cleave there have been at least four incidents at checkpoints involving 3D-printed guns or parts of guns since 2016.

"3D-printed guns not a big threat, say those who've tried it", Evan Malone, founder and president of NextFab — a Philadelphia-based network of workshops stocked with 3D-printers and other tools — agreed that there are

easier ways to make untraceable firearms. But he is concerned that advances in 3D printing might put the idea into the heads of those outside the gun-owning community.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968

e-mail:        *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000594

| Message | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 8/1/2018 8:45:23 PM |
| **To:** | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| **Subject:** | Defense Distributed Settlement Alerts for 1 August 2018 |



## Defense Distributed Settlement Alerts for 1 August 2018

"Gun rights activists post plans for 3D firearms after judge's order blocking them", In response, five gun-rights activist groups based in California and Washington state posted a website called Code Is Free Speech, along with what it advertised were CAD blueprints for several high-powered firearms, including the AR-15 semiautomatic rifle, the AR-10 battle rifle and the Beretta 92FS semiautomatic pistol.

"Dems file at least 3 bills in Congress to block 3D printed guns", The brawl over downloadable gun manufacturing code reached Capitol Hill on Tuesday with a group of Democrats in both chambers vowing action.

"A gun advocate who published blueprints for 3D-printed firearms says he's taking inspiration from the armies that defeated Hitler", Wilson said that his goal was to alter the relationship between citizens and the state: "I think the state should be as weak as possible relative to the individual. The proper posture of the state is one that at least is in fear of its citizen, not one that lords over it."

"Massachusetts lawmakers laud order blocking 3D printed firearm blueprint publication, seek further action", Markey pledged to block confirmation of Trump's Assistant Secretary of State nominee -- whom he argued would play a key role in the downloadable gun policy -- until the president reverses the administration's stance on the issue and bans online publication of 3D printable gun blueprints.

"Rep. Hanabusa: 3-D Gun Printing Must Be Stopped", Congresswoman Colleen Hanabusa issued a statement on Monday, July 30, 2018, urging a bipartisan effort to stop the Trump Administration from allowing the proliferation of instructions for making guns at home with a 3-D printer. She is now a co-sponsor of the Untraceable Firearms Act of 2018.

"Those Controversial 3D-Printed Guns, Explained", The U.S. government recognizes the right of citizens to build their own firearms, and all of these parts are readily available in gun shops or online, as they always have been. So all of this is perfectly legal. Where Defense Distributed and the government clashed is over the ability of people in foreign countries to download the files.

"Courts in three states bar release of 3D-printable gun blueprints", Courts in New York, New Jersey and Washington State issued rulings barring Cody Wilson and his company, Defense Distribution, from uploading instructions for making 3D-printable guns at midnight Wednesday – as he had planned to do under a settlement reached in June with the Trump administration

"Gun shop owner compares access to 3D gun blueprints to online porn", A gun shop owner on Wednesday argued that people who want to "censor" access to 3D gun blueprints should also limit access to porn, comparing both for potentially causing "irreparable harm."

"3D-printed gun blueprint maker Cody Wilson says "the debate is over"", Wilson's dream of a downloadable library of gun blueprints – and a world where anyone can easily manufacture a deadly weapon at home – stalled Tuesday. A Seattle judge blocked Wilson from publishing new gun files and questioned whether the Trump administration should have granted his company permission in the first place.

"A judge ruled that a website has to suspend downloads for 3D gun plans. But they're already out there", Tuesday's decision is the latest chapter is a years-long struggle between Defense United and gun control advocates who argue that such weapons would be without serial numbers and therefore untraceable; that they could be in some cases undetectable by metal detectors; and that they would enable more people to get guns without submitting to background checks.

"This Parkland dad blames Trump administration for settlement over 3 D printed guns", "What this administration did -- and they did not need to do it -- is they actively rolled back the public safety of citizens in the greatest way ever in my lifetime," Guttenberg told CNN's "New Day" Tuesday morning.

"NC mulls response to 3D-printed gun regulations approved by Trump Administration", North Carolina Attorney General Josh Stein said the Tar Heel State is not among the states that have filed suit against the Trump Administration in an effort to stop the publication of the instructions for 3D-printed guns, but his office says he is looking into the issue.

"Chicago Law Enforcement Concerned Over 3D Printed Guns", Tuesday evening, a judge issued a temporary restraining order blocking the release of the downloadable blueprints – a move welcomed by Chicago Police who say the plastic guns can pose a real threat to law enforcement and the public.

"3D-printed guns are coming to America unless Congress acts. But the NRA doesn't want them to", The State Department's decision to settle with Defense Distributed was reckless, opening up the potential for anybody without a background check — including terrorists, convicted felons, and domestic abusers— to print untraceable death instruments from home. So now we need our elected leaders to step in, pump the brakes and implement common-sense solutions surrounding 3D-printed guns.

"Want to make a gun with a 3-D printer? Here is why gun control groups oppose the practice", In recent years, with the emergence of new technology, questions over whether people should be able to access blueprints to make a firearm using a 3-D printer have become a part of the increasingly polarized gun debate. Opponents argue that it will open the door for criminals to easily access untraceable firearms, while supporters say that efforts to prevent the practice are useless and that there are already enough gun laws on the books.

"The rise of 3D-printed guns in America could have dark implications for Australia", A US court settlement allowing 3D-printable gun plans to be posted online has fuelled calls for a national adoption of the NSW approach to outlawing blueprints.

"3D-printed guns among weapons found at airport security checkpoints, TSA says", Among the thousands of firearms discovered at airport security checkpoints around the country in the past two years, a handful were created with a 3D printer. The TSA told CBS News transportation correspondent Kris Van Cleave there have been at least four incidents at checkpoints involving 3D-printed guns or parts of guns since 2016.

"3D-printed guns not a big threat, say those who've tried it", Evan Malone, founder and president of NextFab — a Philadelphia-based network of workshops stocked with 3D-printers and other tools — agreed that there are

easier ways to make untraceable firearms. But he is concerned that advances in 3D printing might put the idea into the heads of those outside the gun-owning community.

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:          202.647.6968
e-mail:          *__MarquisMR@state.gov__* |   Web: *__www.state.gov/t/pm /__* |Twitter: *__@StateDeptPM__*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 8/3/2018 12:10:01 PM |
| **To:** | PM-DTCP-RMA [PM-DTCP-RMA@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; PM-DDTC-Directors-DL [PM-DDTC-Directors-DL@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **Subject:** | CPA Media Monitoring: Reason: The Important but Arcane Procedural Issue That Might Upend the Restraining Order Against Defense Distributed |



**The Important but Arcane Procedural Issue That Might Upend the Restraining Order Against Defense Distributed**
**By Brian Doherty**
**2 August 2018**

As of Tuesday, Defense Distributed, a company dedicated to distributing software and hardware to help people make guns at home, has been under a temporary restraining order (TRO) issued by Judge Robert Lasnik of the U.S. District Court for the Western District of Washington. The TRO requires the company to behave as if a settlement agreement it reached after many years of legal wrangling with the federal government never happened, meaning it has to stop distributing software that can help people make guns at home using 3D printers or CNC mills.

Defense Distributed believed its long court fight for legal permission to distribute those files, which company founder Cody Wilson and his legal team view as constitutionally protected speech no different from a printed book or manual containing gun-making directions, was over when the federal government settled. While the government never conceded any constitutional problems with its ban on Defense Distributed's files, the settlement explicitly allowed the company (and all Americans) to "access, discuss, use, reproduce or otherwise benefit from the technical data."

Judge Lasnik suspended that agreement in response to a lawsuit by eight states and the District of Columbia. Defense Distributed promptly obeyed the TRO, although the files are already all over the internet for anyone who wants them.

According to the TRO, the states were "seeking a declaration that the 'temporary modification' of the USML is invalid and an injunction requiring the federal defendants to rescind the procedurally defective modification and refrain from acting on it." The USML is the United States Munitions List, which defines which items are affected by the Arms Export Control Act (AECA), the law that was used to stop Defense Distributed from uploading its software.

The settlement's impact on the USML is one of the key issues that led Lasnik to issue the TRO:

> Plaintiffs have shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the "temporary modification" has resulted in the removal of one or more items from the USML. The federal government represents that its settlement was the result of a multi-year review process which was completed in May 2018 and resulted in a determination that the type of firearms and related technical data at issue here would not provide a military advantage to adversaries and therefore no longer warrant export control under the AECA and should be removed from the USML.

WASHSTATEC000598

In such circumstances, the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of such reviews be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

In a brief opposing the request on the states' part for the TRO, Josh Blackman, one of Defense Distributed's lawyers, argues that Lasnik's description of the settlement is wrong:

> The Settlement Agreement does not require the removal of anything from the USML...Section 1(a) of the agreement only requires that the State Department commit to draft and fully pursue removal of the technical data at issue in this action from the USML, "to the extent authorized by law (including the Administrative Procedure Act)." The proposed rule explained that the government was expressly complying with the requirements of the notice-and-comment rulemaking process, even though it determined that it was not required to do so....

> The government engaged in a sterling rulemaking process, and more than adequately justified its agency action—the action is certainly not "arbitrary and capricious." In any event, even if the State Department removed the subject technical data from the USML—it didn't—the AECA expressly, clearly, and unequivocally precludes judicial review of such decisions:

> **"(h) Judicial review of designation of items as defense articles or services**
> The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review. 22 U.S.C. § 2778(h)."

> The Plaintiffs contend that this provision is irrelevant because "the States are not challenging the federal defendants' designation of the computer code at issue as defense articles, but instead their decision to remove the code from the USML." We cannot repeat this point enough: Nothing has been removed from the USML! The rule is only in its proposed form.

In short, while the plaintiffs and the judge are acting as if the settlement removed the gun-making files from the USML, Blackman says the government only temporarily stopped treating them as if they were on the USML. It's a subtle point that Lasnik may well reject at the next hearing in the case on August 10. The judge might reason that treating the files as if they are not on the USML is tantamount to removing them from the list.

But as Blackman sees things, the plaintiffs have no reason to believe the State Department will not go through all the legal requirements before officially amending the USML. Only if they fail to do so down the line would they have a legitimate procedural complaint.

That said, that arcane dispute about the niggling specifics of administrative law is far removed from the very important constitutional issues raised by the TRO. As Blackman notes, the TRO imposes "a prior restraint of constitutionally protected speech that is already in the public domain" yet Lasnik's order does not so much as mention the First Amendment.

Link: https://reason.com/blog/2018/08/02/the-important-but-arcane-procedural-issu

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

WASHSTATEC000599

Phone:        202.647.6968

e-mail:       ***MarquisMR@state.gov*** |   Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000600

Message

---

**From:** Marquis, Matthew R [MarquisMR@state.gov]
**Sent:** 8/2/2018 8:45:29 PM
**To:** Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov]
**CC:** PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil]
**Subject:** Defense Distributed Settlement Alerts for 2 August 2018



## Defense Distributed Settlement Alerts for 2 August 2018

"Explanation of Defense Distributed Debate", I mention 3D printing nowhere. That's because it's irrelevant, and most of what you read about 3D printed guns is noise. 3D printing is a relatively immature manufacturing technology, and it won't be making a modern, repeating firearm any time soon.

"How 3-D printed guns are made and the growing security concerns they present", The current concern stems from a legal battle over guns that can be made using 3-D printers. "Building guns out of materials that are undetectable by security screening devices is not necessarily a new concept, but in the past it required someone with specific skills who knew how to do it," said John Cohen, a former police officer and Homeland Security official who is currently an ABC News contributor.

"Legally Speaking: What is the situation regarding 3D-printed guns?", In other words, the AGs are arguing that when the State Department settled with the private company and decided to allow the private company to publish the blueprints it was supposed to give notice to Congress and it did not; as well as get the agreement of the Secretary of Defense, which it did not. As such, it violated the Administrative Procedure Act. In short, it failed to follow the proper procedure.

"Judge's order backfires as activists rush to share 3D gun designs", A judge's attempt to halt the spread of blueprints for 3D-printed guns backfired Wednesday as the plans spread across the internet, posted and shared by people who said they were determined to strike a blow for free speech, to protect gun rights, or just to thumb their nose at the government.

"Plans to print out 3D-printed guns online for years, according to state department", The State Department spokesperson said computer assisted design files to print 3D guns have been available online since at least 2013 for Americans to download legally.

"New York preps pre-emptive strike against 3-D printed guns", Hoylman on Wednesday pre-filed a bill that would outlaw the manufacture of firearms without a gunsmith license, and require each major component of a weapon to be identifiable by a metal detector. But the proposal wouldn't be up for debate until the Senate's next session begins in January — months after Lasnik's Aug. 10 hearing to determine whether the restraining order he filed Tuesday should become permanent.

"Ability to print guns 'critical issue' for law enforcement around the world: Goodale", As controversy swirls in the U.S. over downloadable blueprints for a 3D-printed gun, Canada's public safety minister says the technology is a "critical issue" that's causing concern for law enforcement around the world.

WASHSTATEC000601

"The Very Good Reason Why the 3D-Printed Gun Plans Need to Be Available", This distinction between regulating information about guns and regulating a tool that would automatically allow someone to manufacture a gun matters. There are good reasons why we would want to protect the publication of dangerous technical information, even if we also decide that we want to punish those who use that information to create a weapon, and those who provide ready access to a means to do so.

"The legal fight over 3-D-printed guns isn't about firearms. It's about free speech", A federal judge had good reason to temporarily bar a gun-rights activist this week from distributing software to produce working plastic firearms from 3-D printers, but it was the wrong result. While gun-control advocates are legitimately concerned about the threat posed by this technology, defenders of the 1st Amendment should be wary of where the court battle may go.

"How Trump's State Department permitted 3D-printed gun blueprints to go live online", But the move to shift the 3D-printed guns' technical data outside of the State Department's purview was not without precedent. The government's decision came amid a longstanding but relatively behind-the-scenes administrative project — started under the Obama administration and known as "export control reform" — to restructure the regulations governing exports of weapons and technologies.

"Yes, Washington, The First Amendment Even Protects Firearm Blueprints", For one thing, the USML never actually covered the drawings DefDist sought to make available. The language at issue, cited by the court, includes in "defense articles" information "required for the design, development, [and] production" of firearms. This incredibly broad language, which also includes information on the "maintenance and repair" of firearms, might reasonably be read to include blueprints.

"Judge Issues Futile, Pointless Injunction Against Gun Blueprints", The injunction thus accomplishes nothing of any meaning in the real world, but it does have legal consequences for free speech. A federal judge is trying to block the free flow of information, including instructions as to how to make entirely lawful products. I would say this is dangerous, but given the high likelihood that his order will be overturned, let's just call it irresponsible.

"Yes, Anyone Can Print a Gun at Home. But Not a Very Good One.", The real purpose of Wilson's blueprints is to dramatize the futility of gun control, much like encryption T-shirts were intended to troll those who wanted to ban encryption. Every outrageous article warning of a future where anyone can print deadly weapons serves only to validate his point and increase the hype around printable guns. Wilson's Twitter account proudly retweets every terrifying headline -- His organization couldn't have bought better advertising if they'd wanted to.

"Federal Court Incorrectly Says DDTC Jumped the Gun on Gun Printing Plans", The temporary restraining order was entered at the request of attorneys general from eight states and the District of Columbia.   In entering the order, the court stated that the plaintiffs were likely to prevail on the merits for two reasons — both, frankly, fairly questionable.

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

WASHSTATEC000602



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000603

Message

| | |
|---|---|
| **From:** | Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu] |
| **Sent:** | 8/3/2018 8:34:35 PM |
| **To:** | hartrl@state.gov |
| **Subject:** | 18-0803 Friday "Daily Bugle" |

## Friday, 3 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Amends EAR, Increases Restrictions on Exports to South Sudan
2. Commerce/BIS Amends EAR, Eases Restrictions on Exports to India

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC Announces Start of Registration Period for In-House Seminar

### NEWS

6. American Shipper: "Shippers' Law: When the Cargo is a Cat"
7. Defense Connect: "Review of the Australian Defense Trade Controls Act Roundtables This Month"
8. NU.nl: "Dutch Public Prosecution Office: 'It is a Crime to Develop 3D Weapons in the Netherlands'"
9. The Washington Times: "Judge's Order Backfires as Activists Rush to Share 3-D gun Designs"

### COMMENTARY

10. G.R. Tuttle III: "USTR Announces Potential Increase on List 3 Tariffs from 10% to 25%"
11. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Congress Passes the National Defense Authorization Act"

### EX/IM TRAINING EVENTS & CONFERENCES

12. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
13. List of Approaching Events: 12 New Events Posted This Week

**EDITOR'S NOTES**

14. Bartlett's Unfamiliar Quotations
15. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
16. Weekly Highlights of the Daily Bugle Top Stories



**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. Commerce/BIS Amends EAR, Increases Restrictions on Exports to South Sudan

(Source: Federal Register, 3 Aug 2018.) [Excerpts.]

83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: In this rule, the Bureau of Industry and Security (BIS) is amending the Export Administration Regulations (EAR) to conform to the Department of State's (State) amendment of February 14, 2018 to the International Traffic in Arms Regulations (ITAR) that placed restrictions on

exports of defense articles (and defense services) to the Republic of South Sudan (South Sudan). The State action reflected a policy determination by the Secretary of State that it was in the best interests of U.S. foreign policy to impose such restrictions.

  Consistent with the State action, in this amendment, BIS is updating the EAR to restrict the export and reexport of certain items on the Commerce Control List to South Sudan. Pursuant to established procedure, BIS adds South Sudan to the list of U.S. embargoed countries under the EAR, a list drawn from the list of arms embargoes in the ITAR and State Federal Register notices, and adopts a restrictive license application review policy consistent with State's review policy set forth in the ITAR.

* DATES: This rule is **effective August 3, 2018**. ...

* SUPPLEMENTARY INFORMATION: ... In a rule effective July 9, 2011, the date the United States granted formal recognition to South Sudan, BIS amended the EAR to add the new country to the Commerce Country Chart set forth in Supplement No. 1 to part 740 and imposed controls on exports and reexports of items subject to the EAR to the destination. See 76 FR 41046 (July 13, 2011). In that rule, BIS added South Sudan to Country Group B in Supplement No. 1 to Part 740 (Country Groups), a grouping that rendered the country eligible for certain License Exceptions not available to countries in Country Groups D or E.

  In this rule, BIS amends Supplement No.1 to Part 740 (Country Groups) of the EAR to place South Sudan in Country Group D:5-U.S. Embargoed Countries-to conform with a final rule published by State that revised ITAR §126.1 (Prohibited exports, imports, and sales to or from certain countries) by adding South Sudan in new paragraph (w). See 83 FR 6457 (February 14, 2018). The ITAR amendment reflected a determination by the Secretary of State that it was in the best interests of U.S. foreign policy to impose such restrictions in order to reflect the U.S. government's opposition to the trade of arms to South Sudan and its contribution to the conflict and humanitarian crisis in that country, promote the cessation of hostilities, and to reinforce a unified international response by aligning the United States with existing European Union restrictions on certain exports to South Sudan. As a consequence of the ITAR amendment, a policy of denial applies to applications for licenses or other approvals for the export of defense articles and defense services destined for South Sudan. A license or other approval may be issued on a case-by-case basis for six enumerated categories of defense articles and defense services, as set forth in ITAR §126.1(w) (South Sudan).

  BIS primarily implements such controls through Country Group D:5. Countries listed in Country Group D:5 are subject to additional restrictions in the EAR, including on de minimis U.S. content, license exception availability, and licensing policy for certain items. License applications for the export or reexport of items classified under 9x515 or "600 series" Export Control Classification Numbers to countries in Country Group D:5 are reviewed consistent with the policies in §126.1 of the ITAR, as provided in paragraph (b)(1)(ii) of §742.4 (National security) and paragraph (b)(1) of §742.6 (Regional stability) of the EAR.

  The list of "United States arms embargoed" countries is intended to mirror ITAR §126.1's list of countries subject to U.S. arms embargoes and track Federal Register notices published by State. BIS amends the list of Country Group D:5 countries as needed to conform to amendments to ITAR §126.1

WASHSTATEC000606

that State publishes, including additions or deletions of countries subject to United States arms embargoes. See footnote one to Country Group D:5. In implementing United States embargoes in the EAR, BIS is adopting the policies for each country listed in section 126.1 of the ITAR. See 78 FR 22660, 22675 (April 16, 2013).

  Consistent with new §126.1(w) (South Sudan) of the ITAR, the BIS licensing policy for the export and reexport of 9x515 and "600 series" items on the Commerce Control List, Supp. No. 1 to part 774, destined for South Sudan is a policy of denial that recognizes six categories of case-by-case approval. See ITAR §126.1(w)(1)-(6), which describes these categories in detail.

*Specific Amendment Implementing Revisions To Export and Reexport License Requirements for South Sudan Under the EAR*

  PART 740 OF THE EAR

BIS amends Supplement No. 1 to Part 740 of the EAR to place "South Sudan, The Republic of", in alphabetical order, in Country Group D:5. ...

Dated: July 26, 2018.

  Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * * *

## 2. Commerce/BIS Amends EAR, Eases Restrictions on Exports to India
(Source: Federal Register, 3 Aug 2018.) [Excerpts.]

83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: In this rule, the Bureau of Industry and Security (BIS) amends the Export Administration Regulations (EAR) to formally recognize and implement India's membership in the Wassenaar Arrangement (Wassenaar or WA). Further, BIS removes India from Country Group A:6 and places it in Country Group A:5. This action befits India's status as a Major Defense Partner and recognizes the country's membership in three of the four export control regimes: Missile Technology Control Regime (MTCR), WA and Australia Group (AG). This rule is another in the series of rules that implement reforms to which the United States and India mutually agreed to promote global nonproliferation, expand high technology cooperation and trade, and ultimately facilitate India's full membership in the four multilateral export control regimes (Nuclear Suppliers Group, MTCR, WA, and AG). This rule also makes conforming amendments.
* DATES: This rule is **effective August 3, 2018**. ...
& SUPPLEMENTARY INFORMATION: ... The United States and India continue

WASHSTATEC000607

their commitment to work together to strengthen the global nonproliferation and export control framework and further transform bilateral export control cooperation to recognize the full potential of the global strategic partnership between the two countries. This commitment has been realized in the two countries' mutually agreed upon steps to expand cooperation in civil space, defense, and other high-technology sectors and the complementary steps of the United States to remove India defense and space-related entities from the Entity List, realign India in U.S. export control regulations, and support India's membership in the four multilateral export control regimes (Nuclear Suppliers Group, Missile Technology Control Regime, Wassenaar Arrangement and Australia Group).

To date, with the effective support of the United States, India has been admitted to three of the four multilateral export control regimes: Missile Technology Control Regime (MTCR) on June 27, 2016, the Wassenaar Arrangement (Wassenaar or WA) on December 7, 2017 and the Australia Group (AG) on January 19, 2018. These memberships, important to the two countries' global strategic partnership, are enhanced by the United States' recognition of India as a Major Defense Partner in the India-U.S. Joint Statement of June 7, 2016, entitled, "The United States and India: Enduring Global Partners in the 21st Century." This recognition facilitates and supports India's military modernization efforts with the United States as a reliable provider of advanced defense articles.

Therefore, in this rule, the Bureau of Industry and Security (BIS), formally recognizes under the Export Administration Regulations (EAR) India's membership in the WA multilateral export control regimes and revises the EAR accordingly. Further, in this rule, BIS adds India to Country Group A:1 in Supplement No. 1 to Part 740 (Country Groups) of the EAR to implement under the EAR India's status as a member of the WA. In addition, to export control-related benefits for India as a result of prior amendments to the EAR in furtherance of the U.S.-India global strategic partnership, BIS places India in Country Group A:5, which provides the benefit of greater availability of License Exception Strategic Trade Authorization (STA) for exports and reexports to, and transfers within India under the EAR.

Countries listed in Country Group A:5 are countries included in STA §740.20(c)(1), which authorizes exports, reexports and in-country transfers that are subject to multiple reasons for control. With this rule, India becomes the 37th country to join Country Group A:5.

*Specific EAR Amendments Recognizing and Implementing India's Membership in Wassenaar and Adding India to Country Group A:5*

PART 738
BIS amends Supplement No. 1 to Part 738, Commerce Country Chart, by removing the license requirements for National Security Column 2 (NS2) reasons. Accordingly, this rule removes the "X" in NS Column 2 for India.

PART 740
BIS amends Supplement No. 1 to Part 740 to add, in alphabetical order, India to Country Groups A:1 and A:5.

CONFORMING AMENDMENTS

WASHSTATEC000608

PART 738

Consistent with India's new multilateral export control regime status, this rule also removes the first sentence of footnote 7 to the Commerce Country Chart in Supplement No. 1 to Part 738, related to India. This amendment removes the requirement that exporters file in the Automated Export System when items controlled for Crime Control Columns 1 and 3 reasons, and Regional Stability Column 2 reasons were destined to India. As a conforming change, this rule removes the word "Also" from the second sentence of footnote 7 and capitalizes the "n" in "note" since it begins the sentence.

Also, as a conforming change in Part 738, BIS amends paragraph (b)(3) of §738.4, related to a sample analysis using the Commerce Control List and Country Chart to determine when a license is required, to remove the name "India" and replace it with the name "Chad." The sample analysis used India as an example of a country with NS Column 2 controls. That reason for control no longer applies to India but currently applies to Chad.

PART 740

In adding India to Country Group A:5, BIS removes India from Country Group A:6 to avoid creating conflicting eligibility criteria for STA provisions.

PART 743

As a member of Wassenaar, India now is subject to reporting requirements for items controlled under Wassenaar, as set forth in Part 743, Special Reporting and Notification. Specifically, India is added, in alphabetical order, to Supplement No. 1 to Part 743, Wassenaar Arrangement Participating States.

PART 758

Also, consistent with India's achievements and status as a Major Defense Partner, BIS removes the requirement that exporters file certain Electronic Export Information in AES as set forth in §758.1(b)(9). Specifically, this amendment removes the requirement that exporters file in AES when items controlled for CC Columns 1 and 3 reasons and RS Column 2 reasons are destined to India. This reporting requirement had been instituted when the license requirement for such items was removed (see U.S.-India Bilateral Understanding: Additional Revisions to the U.S. Export and Reexport Controls Under the Export Administration Regulations; January 23, 2015; 80 FR 3463). BIS has determined that this reporting requirement is no longer necessary.

PART 772

In this rule, BIS also adds India, in alphabetical order, to the list of countries under the term Australia Group in §772.1, Definitions of terms as used in the Export Administration Regulations (EAR). This updates the definition consistent with formal recognition of India's membership in the AG in a BIS final rule, entitled "Implementation of the February 2017 Australia Group (AG) Intersessional Decisions and June 2017 Plenary Understandings; Addition of India to the AG" (83 FR 13849, April 2, 2018) ...

Dated: July 31, 2018.

Richard E. Ashooh, Assistant Secretary for Export Administration.

* * * * * * * * * * * * * * * * * *

...

## OTHER GOVERNMENT SOURCES

### 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* State; NOTICES; Specially Designated Global Terrorists:
Abdul Rehman al-Dakhil, aka Dilshad Ahmad, aka Danish Dilshad, aka Amantullah Ali, etc. [Publication Date: 6 Aug 2018.]

back to top

* * * * * * * * * * * * * * * * * *

### 4.
### Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

### 5. State/DDTC Announces Start of Registration Period for In-House Seminar
(Source: State/DDTC, 3 Aug 2018.)

Registration for The Directorate of Defense Trade Controls (DDTC) In-House Seminar for Wednesday, September 19th, 2018 opens August 10th and closes August 31st. Attendees will be identified on a first-come, first-serve basis. Preference will be given to new registrants and small-businesses. A completed registration form must be sent to the DDTC In-House Seminar email, as an attachment, DDTCInHouseSeminars@state.gov.

For more information, please visit the DDTC Outreach Programs page and click the "In-House Seminars" tab.

back to top

* * * * * * * * * * * * * * * * * *

...

## NEWS



6.

## American Shipper: "Shippers' Law: When the Cargo is a Cat"
(Source: American Shipper, 1 Aug 2018.)

The plaintiff in this case purchased an exotic Savannah kitten from a breeder in Florida for $2,300. The buyer, a woman in New York, planned to exhibit the animal, a cross between a domestic cat and an African serval, in cat shows.

The breeder delivered the kitten to Delta Air Lines for transport to New York's LaGuardia Airport.

The buyer said that the day after the cat arrived, she noticed it was in distress. She took it to a veterinarian, who diagnosed it with a broken hip. Veterinary bills amounted to more than $7,000.

The plaintiff sued Delta in New York Supreme Court, Queens County. (In New York state's judiciary, Supreme courts are trial courts for civil matters, the appellate divisions of the Supreme courts hear appeals and the state's highest court is called the Court of Appeals.)

Attorney Kenneth Nankin of the New York law firm Nankin & Verma noted in his firm's blog that the plaintiff alleged causes of action "for negligence/recklessness, trespass to chattels/conversion, bailment and economic damages."

Delta moved for partial summary judgment, arguing that as a matter of federal common law, any liability it may have be limited to $50 pursuant the air waybill's conditions of contra, and Nankin noted, "Delta contended that the liability limit applied even though the plaintiff was the consignee, not the shipper.

"The trial court refused to enforce the liability limit and denied Delta's motion. The court ruled that the cat was not enforceable because the cargo was not 'an inanimate object' and thus should be treated differently from 'ordinary bulk objects,' concluding that Delta had a 'heightened duty of care,'" Nankin said.

The trial judge stated, "The defendant airline wants it both ways: 'We will be paid to take care of your kitten as long as we transport it, but we are absolving ourselves from any negligence in doing so.'"

The trial court's decision was reversed on appeal. (Lentini v. Delta Air Lines Inc. NY App. Div. 2nd Dept. No. 17-00759. March 14.)

The appellate division explained that both before and after the Airline Deregulation Act of 1978 (ADA), "actions against interstate carriers for lost or damaged shipments have been governed by federal common law." It said the ADA contains both a "pre-emption clause" and "saving clause," which when read together, prohibit states from imposing their own substantive standards with respect to rates, routes or services.

As a result, "actions for loss or damage to interstate air shipments are governed by federal common law.

"The air waybill forms the basic contract between a shipper and an air carrier," the court said. "In order to enforce a limited-liability provision contained in an air waybill, a carrier must demonstrate that its contract satisfies the released-valuation doctrine.

"Under the released-valuation doctrine, the shipper 'is deemed to have released the carrier from liability beyond a stated amount' in exchange for a

WASHSTATEC000611

low shipping rate," it said.

A shipper is bound by the limited-liability provision if it has reasonable notice of the rate structure and is given a fair opportunity to pay a higher rate in order to obtain greater protection.

In this instance, the air waybill signed by the plaintiff's shipper demonstrated that the shipper did not declare a value for the kitten and no additional coverage was purchased. The plaintiff "failed to raise a triable issue of fact as to whether she was not given the opportunity to purchase additional coverage."

René Myatt, the attorney for the plaintiff, said her client decided not to further appeal the decision, but noted small shippers are unlikely to be aware of the limitation, which may appear on the back of a waybill, or know that they could pay a higher rate for increased coverage.

From a legal point of view, "there is no question that animals are property. They are treated as cargo," said John Stoesser, director of Wichert Insurance's IDEAL Agriculture & Marine program.

While standard liability limits for domestic shipments appear on the air waybill, he noted that international air shipments are covered by the Montreal Convention, which limits claims to 19 "special drawing rights" (between $26 and $27) per kilo.

However, shippers can purchase mortality insurance to protect themselves if an animal dies or must be destroyed.

The market for insuring animals is well developed, he said, and he has insured everything from research animals at universities to the giant pandas at Zoo Atlanta. He also has insured dogs trained for security, to sniff for bombs or explosives or for search and rescue. The dog may be a mutt, but it might have $10,000 or $20,000 worth of training.

But Stoesser said the biggest market for animal insurance overall is "in commercial animal agriculture. Pigs and cows are everybody's bread and butter, with some poultry thrown in."

The value of a single shipment can be substantial, he explained. "The landed value of a pig shipped by air, good breeding stock to China, is a couple thousand dollars a head. You can get 1,000 of them onto an airplane, on a 747, so that's $2 million."

Generally speaking, he said animal insurance is mortality insurance and does not cover an animal that is injured. For example, he recently insured a bull that was shipped to Thailand for herd improvement. The bull had a severe leg injury and was not able to mount, but because the animal was still alive, not suffering and destroyed, there was no claim.

This is even true of most racehorse insurance policies, he said. Over his 49 years in the business, Stoesser said he has seen specialty insurers try to offer policies for injured animals, but pointed out that companies have not figured out how to make money from such products.

An exception is equine insurance. Stoesser said major equine insurers will include some coverage for emergency colic surgery, although he said it may not pay for the full cost of the horse if it becomes ill.

For export animals, he said there are extensions to policies that will cover the value of an animal if it fails a particular disease test, is put into quarantine and still fails upon retesting and must be euthanized.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000612

 7.

## Defense Connect: "Review of the Australian Defense Trade Controls Act Roundtables This Month"

(Source: Defense Connect, 1 Aug 2018.)

The review into Defense Trade Controls Act is hosting a series of roundtables to discuss the progress and submissions of the review

As part of the review of the Defense Trade Controls Act announced by Minister for Defense Marise Payne in April, Dr Vivienne Thom AM will facilitate a series of roundtables to discuss the process, feedback and next steps of the review process.

Defense administers controls on the export of military and dual-use goods and technologies through four key pieces of legislation. The Defense Trade Controls Act 2012 provides the legislative basis for the controls of the intangible supply, publication and brokering of defense and strategic goods and technology.

The act was enacted in 2012 to strengthen Australia's existing export controls and to align them with international best practice. The act underwent amendments in 2015 following extensive stakeholder consultation. One such amendment included the addition of a mechanism to provide for review of the operation of the act after two years of the offence provisions being commenced, which occurred on 2 April 2016.

**Aim**: The aim of the review is to evaluate the operation of the DTC Act and deliver recommendations that ensure the act is an effective component of Australia's export control regime that appropriately addresses current and future national security requirements.

The review will also aim to ensure the act provides appropriate levels of regulation and security for controlled technologies, aligns with international best practice for export controls, and is not unnecessarily restricting trade, research and international collaboration.

While submissions closed 31 May 2018, Defense aims to continue working closely with the stakeholders as they establish internal compliance arrangements, by providing implementation support through outreach and engagement sessions.

**Scope**: The act is required to be reviewed after two years and is being carried out by Dr Thom, the former inspector-general of intelligence and security and a former deputy Commonwealth ombudsman overseeing law enforcement, immigration, taxation and defense agencies.

The review is mandated by section 74B of the act:

  (1) The minister must cause a review of the operation of this act (other than

WASHSTATEC000613

parts three and four) to be undertaken as soon as possible after the second anniversary of the commencement of section 10 of this act and afterwards at intervals of not longer than five years.

  (2) The persons undertaking the review must give the minister a written report of the review.

  (3) The minister must cause a copy of the report of the review to be tabled in each house of the Parliament within 15 sitting days of that house after the report is given to the minister.

The review is limited to the operation of the act but subsection 74B(1) specifically excludes parts three and four - that relate to the Defense Trade Cooperation Treaty between Australia and the US - from scope of the review.

The review will examine all other parts of the act to provide evidence-based, practical recommendations for improvements to the act and supporting policy. In particular, the review will consider:

  - Whether the act is fit for purpose;
  - Whether there are any gaps in the act's controls;
  - Whether any unintended consequences are resulting from the act's controls; and
  - Any other matters considered relevant.

Roundtable discussions for the review of the Defense Trade Controls Act 2012 are being held on the following dates:

  - Sydney - Monday 6 August;
  - Brisbane - Tuesday 7 August;
  - Melbourne - Monday 13 August;
  - Perth - Wednesday 22 August;
  - Adelaide - Thursday 23 August; and
  - Canberra - Tuesday 28 August.

More information on the review process is available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. NU.nl: "Dutch Public Prosecution Office: 'It is a Crime to Develop 3D Weapons in the Netherlands'"
(Source: NU.nl, 2 Aug 2018.) [Excerpts; translated by editor.]

It is a crime in the Netherlands to make plastic weapons with a 3D printer. The provision of blueprints for this type of weapon can also be punishable. This is what the Public Prosecution Office ("*Openbaar Ministerie*") said in connection with the case involving an American company that wanted to publish blueprints for 3D-printed weapons online. ...

On Wednesday this week, a judge in the U.S. forbade the publication of the blueprints by Defense Distributed because the 3D-printed firearms "could cause irreparable damage to civilians". ...

WASHSTATEC000614

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. The Washington Times: "Judge's Order Backfires as Activists Rush to Share 3-D gun Designs"
(Source: The Washington Times, 1 Aug 2018.)) [Excerpts.]

A judge's attempt to halt the spread of blueprints for 3D-printed guns backfired Wednesday as the plans spread across the internet, posted and shared by people who said they were determined to strike a blow for free speech, to protect gun rights, or just to thumb their nose at the government.

Activists took to Twitter and Facebook to share links where the plans could be found on file-sharing services or sites on the dark web.  One website, CodeIsFreeSpeech.com, posted eight sets of files and reported more than 100,000 hits and nearly 1.5 terabytes of data downloaded by 6 a.m. Wednesday.  "Just in the past 48 hours, I would be shocked if hundreds of thousands of people don't possess these files," said Brandon Combs, president of the Firearms Policy Coalition, which posted the data to CodeIsFreeSpeech.

In a flurry of legal activity late Tuesday, a judge ordered the federal government to reverse itself and reimpose Obama-era export restrictions that limited the availability of the files. That order was aimed at stopping Defense Distributed, a Texas-based organization, from posting blueprints to its website, DEFCAD.com.

Cody Wilson, the site's founder, complied, but much of the rest of the internet stepped in to fill the void. "Do your human duty and share," said one Twitter user who linked to the files on a file-sharing site.  "You can't stop the flow of information," tweeted another user, duudl3, who created a mirror site to host the files Mr. Wilson disabled.

Mr. Combs and duudl3 each said his bandwidth use shot off the charts with the number of downloads. "I've seen this stuff all over, and I suspect by the end of the next couple of days there's just going to be a saturation. They're not going to be able to do anything about it," Mr. Combs told The Washington Times.

The technology of 3D printing and plans would allow people with access to the right machinery and materials to manufacture a working, untraceable firearm in secret. The concept has existed for decades but has just recently begun to reach the mainstream, plowing new ground in the debate over gun rights and government regulations.

Some security specialists worry that the guns could circumvent metal detectors and become a tool for terrorists. Gun control activists say people banned from buying guns, such as felons and domestic abusers, also would be able to cheat the law by printing weapons at home.  Defense Distributed and like-minded groups counter that they are releasing information protected by free speech, not engaging in firearms transactions.

WASHSTATEC000615

They also say the plans have been available for years online and there is little the government can - or should - do. Further, the possession of undetectable guns has been illegal for decades and most blueprints for 3D guns, including those of Defense Distributed, use at least some metal parts to comply with that law.

Mr. Wilson's attorneys filed court papers showing a number of other locations where blueprints for at least one home-manufactured firearm were available in 2007, a decade before Defense Distributed's planned broad release this week.  . . .

Washington Attorney General Bob Ferguson, who led the lawsuit, said those still sharing the blueprints online are breaking federal export laws.  "Anyone who posts downloadable guns to the internet is violating federal law. It is the federal government's job to enforce those laws, and I urge it to enforce them aggressively as to these prohibited items," he said.  . . .

Mr. Combs posted plans for eight firearms assemblies to his website. He said it was too early to say which one was proving most popular and that many users appeared to be downloading all of the files.  He said people are sending him new designs.  "Cody was the pioneer, and all credit goes to him and Defense Distributed," Mr. Combs said. "I just wanted to give the government another target, if that's what they want to do."

Government officials seem conflicted on what to do.  Since 2013, the State Department claimed the blueprints violated export rules, making weapons of war available to foreign actors. Mr. Wilson sued, and after a years-long battle the Justice and State departments reversed and reached a settlement to allow Defense Distributed to move ahead with plans to post the blueprints.

The White House suggested Wednesday that Mr. Trump was blindsided by that decision.  "The Department of Justice made a deal without the president's approval on those regards," White House press secretary Sarah Huckabee Sanders said. "The president's glad this effort was delayed to give more time to review the issue, and this administration supports the decades-old legislation already on the books that prohibits the ownership of a wholly plastic gun."

Still, it's not clear what the government can do at this point. State Department officials said their only role was to prohibit export of the blueprints outside the U.S. "The department has no role in domestic gun control policies and the broader question of this technology's potential," a spokesperson said.  . . .

Nonetheless, lawmakers on Capitol Hill - mostly Democrats, but some Republicans - are demanding that Mr. Trump do something.  Sen. Edward J. Markey, Massachusetts Democrat, said he would try to block the confirmation of a key State Department official until the government returns to the Obama-era export policy.  The nominee, R. Clarke Cooper, has been tapped to be assistant secretary for political-military affairs, which would oversee the export rules in question. "Until the president agrees to reverse this policy and prohibit

WASHSTATEC000616

the online publication of these dangerous blueprints, a decision that is entirely within his authority, I intend to place a hold on your nomination," Mr. Markey told Mr. Cooper. . . .

back to top

* * * * * * * * * * * * * * * * *

‑‑

**COMMENTARY**

## 10. G.R. Tuttle III: "USTR Announces Potential Increase on
## List 3 Tariffs from 10% to 25%"
(Source: Tuttle Law Newsletter, 2 Aug 2018. Available via email address below.)

* Author: George R. Tuttle III, Esq., geo@tuttlelaw.com, (415) 986-8780. Attorney with Law Offices of George R. Tuttle in the San Francisco Bay Area.

On August 1, 2018 the USTR announced it is considering increasing the proposed tariffs on List 3 from 10% to 25%. Published in the July 17, 2018 Federal Register (83 FR 33608 of July 17, 2018) List 3 identified $200 billion worth of Chinese goods imported into the U.S., compromising approximately 6,013 items.

Because of this potential change, the parties wishing to present at the August 20-23 hearings will have until August 13, 2018 to submit hearing requests. The due date for submission of all written comments, including rebuttal comments, is now September 5, 2018.

US Trade Representative Robert Lighthizer stated that the President has directed him to consider increasing the proposed level of additional duty from 10% to 25%. Mr. Lighthizer added that "the increase in the possible rate of the additional duty is intended to provide the Administration with additional options to encourage China to change its harmful policies and behavior and adopt policies that will lead to fairer markets and prosperity for all of our citizens."

To submit comments and request to present testimony at the public hearing, submissions are to be made through the Federal eRulemaking Portal: http://www.regulations.gov. The docket number is USTR-2018-0026.

Comments are to include:

   - The specific tariff subheadings to be subject to increased duties, including whether the subheadings listed in the Annex should be retained or removed, or whether subheadings not currently on the list should be added.

WASHSTATEC000617

- The level of the increase, if any, in the rate of duty.
- The appropriate aggregate level of trade to be covered by additional duties.

In commenting on the inclusion or removal of particular tariff subheadings listed in the Annex, the USTR requests that commenters address specifically whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether maintaining or imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers.

**Written submissions** can also be made through www.regulations.gov at docket USTR-2018-0026. Comments can be made in the "comment now!" field or by uploading an attached Microsoft Word (.doc) or searchable Adobe Acrobat (.pdf) file. File names should reflect the name of the person/entity submitting the document. Any attachments, exhibits, or annexes should be part of the attachment.

Business confidential documents may be submitted. The file name must begin "BC" and the name of the person or entity making the submission should follow. Any page containing confidential information must be clearly marked "BUSINESS CONFIDENTIAL." In requesting business confidential treatment, the submitter must certify in writing that disclosure of such information would endanger trade secrets or profitability, and that the information would not customarily be released to the public. The public version of the document must have a file name beginning with "P" and be followed by the name of the person or entity making the submission.

The USTR will post submissions in the docket for public inspection, except those requesting business confidential treatment. Submissions can be viewed at here by entering USTR-2018-0026 in the search field.

*Section 301 Time Line*

Official notification of the extension dates will be published in the Federal Register shortly.

back to top

* * * * * * * * * * * * * * * * * *

## 11. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Congress Passes the National Defense Authorization Act"

(Source: Thomsen and Burke LLP, 2 Aug 2018. Available by subscription via maher@t-b.com.)

\* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

WASHSTATEC000619

Yesterday, the Senate overwhelmingly passed the John S. McCain National Defense Authorization Act (NDAA) for Fiscal Year 2019 (H.R. 5515). The bill has been sent to the President and he is expected to sign it.

The bill strengthens the Committee on Foreign Investment in the United States (CFIUS), which reviews proposed foreign investments to weigh whether they threaten national security. It includes export control reform provisions requiring Commerce to establish export controls on emerging and foundation technologies, which are sensitive technologies not currently captured by export controls. Finally, the bill includes a government wide ban on procuring equipment or services from the Chinese telecommunications firms ZTE and Huawei. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department. More details below:

*Export Control Reform*

The Export Controls Act of 2018 [Sections 1741-1768 of the NDAA] provides permanent statutory authority for the existing Export Administration Regulations (EAR). The EAR has been operating under emergency authority of the International Emergency Economic Powers Act (IEEPA) for many years, ever since the Export Administration Act of 1979 lapsed. This new authority also adds several noteworthy changes:

  - New export controls on "emerging and foundational technologies", which are not specifically identified in the legislation. Presumably, these could be items and technology that are currently classified as EAR99. [Section 1758]
  - Commerce will revise the duties of the Emerging Technology and Research Advisory Committee to help identify "emerging and foundational technologies" that may be developed over a period of 5 or 10 years. [Section 1758]
  - License applications are now required to be reviewed for impact on the US defense industrial base. Transactions that would have a "significant negative impact" on that defense industrial base can be denied. [Section 1756]
  - New requirement for the government to publish export license details for licenses involving certain terrorism-supporting countries. [Section 1754]
  - Maximum civil penalties per violation have been increased slightly to the greater of $300,000 or twice the value of the transaction. [Section 1760]

The identification of "emerging and foundational technologies" is going to be an important part of this legislation. The general requirements in the current legislation are that the technologies "are essential to the national security of the United States" and shall take into account:

  - the development of emerging and foundational technologies in foreign countries;
  - the effect export controls imposed pursuant to this section may have on the development of such technologies in the United States; and
  - the effectiveness of export controls imposed pursuant to this section on limiting the proliferation of emerging and foundational technologies to foreign countries.

WASHSTATEC000620

*CFIUS Reform*

Congress agreed on its final version of the Foreign Investment Risk Review Modernization Act (FIRRMA) [Sections 1701-1728 of the NDAA], which provides the first update to the Committee on Foreign Investment in the United States (CFIUS) statute in several years. FIRRMA updates and expands CFIUS's review process in many ways, by:

  - Increasing the types of transactions subject to CFIUS's jurisdiction: CFIUS currently only reviews mergers, acquisitions, or takeovers that could result in a takeover of a US business by a foreign person. FIRRMA now expands the purview of CFIUS by adding new types of "covered transactions," including "other investments involving critical infrastructure, critical technologies, or sensitive data." [Section 1706]
  - Extending the CFIUS review timeframes: FIRRMA lengthens the time period of the CFIUS process to 45 days, with a 15-day period extension for extraordinary circumstances, and limits timing for the pre-review process. [Section 1709]
  - Making certain notifications mandatory: These include transactions involving an investment that results in the acquisition, directly or indirectly, of a "substantial interest" in a US business involved in critical infrastructure, critical technology, or sensitive data by a foreign person in which a foreign government has, directly or indirectly, a "substantial interest." [Section 1706]
  - Establishing a process for potentially expedited review and approval of certain transactions: FIRRMA also offers a potential path for some transactions to receive approval on an expedited basis following a shortened notification. [Section 1706]

FIRRMA also allows CFIUS to impose filing fees, which are up to 1% of the transaction value or $300,000. [Section 1723]

*Huawei and ZTE Implications*

Finally, Section 899 of the NDAA also places a government procurement ban on certain telecommunications equipment made by ZTE and Huawei, as well as related services. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department.

back to top

* * * * * * * * * * * * * * * * *

WASHSTATEC000621

**EX/IM TRAINING EVENTS & CONFERENCES**

## 12. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices.  The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via  events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * * *

## 13. List of Approaching Events: 12 New Events Posted This Week
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to John Bartlett, Events & Jobs Editor (email: jwbartlett@fullcirclecompliance.eu), composed in the below format:

>     # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK; CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### *Continuously Available Training*

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

### *Seminars and Conferences*

* Aug 6: Detroit, MI; "Export Compliance and Controls"; Global Trade Academy
* Aug 7: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 7-9: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 7: Orlando, FL; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 8: Orlando, FL; "Export Documentation and Procedures Seminar";

WASHSTATEC000623

International Business Training
* Aug 14-15: Milpitas, CA; "Complying with US Export Controls"; Bureau of Industry and Security
* Aug 14-15: Atlanta, GA; "2018 Trade Symposium"; U.S. Customs and Border Protection
* Aug 15: Minneapolis, MN; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 16: Indianapolis, IN; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 16: Milpitas, CA; "Encryption Controls"; Bureau of Industry and Security
* Aug 16: Minneapolis, MN; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Aug 17: Indianapolis, IL; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Aug 20: Cincinnati, OH; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 21: Leeds, UK; "Understanding Exporting"; Chamber International
* Aug 22: London, UK; "Advanced Exporting"; UK Institute of Export and International Trade
* Aug 22: Minneapolis, MN; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 23: Cincinnati, OH; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 24: Houston, TX; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 29: Leeds, UK; "Understanding Incoterms"; Chamber International
* Sep 3: Edinburgh, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 4: Leeds, UK; "Methods of Payment & Letters of Credit"; Chamber International
* Sep 4: London, UK; "An Introduction to Exporting"; UK Institute of Export and International Trade
* Sep 5: Aberdeen, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 5: Aberdeen, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 6: Aberdeen, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 11-13: Annapolis, MD; "Defense Industry Experts and ITAR/EAR Boot Camp"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com; 866-238-4018
* Sep 11-13: Detroit, MI; "Export Controls Specialist Certification"; Global Trade Academy
* Sep 11: Leeds, UK; "Export Documentation and Export Procedures"; Chamber International

* Sep 12: Buffalo, NY; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of Industry and Security
* Sep 12-19: Chicago, IL; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 13: Buffalo, NY; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 13: Frankfurt, Germany; "BAFA/U.S. Export Control Seminar 2018";
* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International Compliance Professionals Association (ICPA)
* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio State University in Columbus"; Export Compliance Training Institute (ECTI); jessica@learnexportcompliance.com; 540-433-3977
* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 18: Anaheim, CA; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters"; Global Trade Academy
* Sep 18-19: London, UK; "Decoding Trade Controls, Sanctions And Regulations On Dual-Use Goods"; KNect365
* Sep 18: San Diego, CA; "12th Annual CompTIA Global Trade Compliance Best Practices Conference"; CompTIA
* Sep 19: Washington, D.C.; "DDTC In-House Seminar"; Department of State (Registration: Aug 10 - Aug 31; first come, first served)
* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade Academy
* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
* Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
* Sep 20: Pittsburgh, PA; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade Academy
* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade Academy
* Sep 21: Pittsburgh, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR Attorneys
* Sep 24: Seligenstadt, Germany; "Follow-Up Fachtagung"; FALEX
* Sep 25-26; Chicago, IL; "Financial Crime Executive Roundtable"; American Conference Institute
* Sep 25: Kansas City, MO; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 25: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* Sep 25-26: San Francisco, CA; "11th West Coast Conference on FCPA Enforcement and Compliance"; American Conference Institute

WASHSTATEC000625

* Sep 25-26: Toronto, Canada; "4th Forum on Economic Sanctions and Compliance Enforcement"; C5 Group
* Sep 26: Kansas City, MO; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 28: Anaheim, CA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 2: Bruchem, Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective"; Full Circle Compliance
* Oct 2: Leeds, UK; "Export Documentation"; Chamber International
# Oct 2: Manchester, UK; "E-Z CERT: How To Process Your Export Documentation Online" Greater Manchester Chamber of Commerce
* Oct 5: Boston, MA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 5: Boston, MA; " Incoterms: A Strategic Approach"; International Business Training
* Oct 9: New Orleans, LA; "Import Documentation and Procedures Seminar"; International Business Training
# Oct 10: Manchester, UK; "Export Documentation Training Course" Greater Manchester Chamber of Commerce
* Oct 11: New Orleans, LA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 11: Rotterdam, NL; "Trade Compliance Congres;" SDU, Customs Knowledge, and EvoFenedex
* Oct 12: New Orleans, LA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy
* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
# Oct 17: Manchester, UK; "Understanding Tariff Codes" Greater Manchester Chamber of Commerce
# October 17-18; Miami/Fort Lauderdale, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting; albert@abs-consulting.net; 954 218-5285
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates
* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; International Compliance

Professionals Association (ICPA)
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 26: Louisville, KY; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 26: Milwaukee, WI; "Incoterms: A Strategic Approach"; International Business Training
* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Oct 31 - Nov 1: Singapore; "7th Asia Summit on Anti-Corruption"; American Conference Institute
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 7: Detroit, MI; "Advanced Classification of Machinery and Electronics"; Global Trade Academy
# Nov 7: Manchester, UK; "Understanding Incoterms" Greater Manchester Chamber of Commerce
* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions
* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 8-9: Shanghai, China; "ICPA China Conference"; International Compliance Professionals Association
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 16, San Diego, CA; "Incoterms 2010: Terms of Sale Seminar";

WASHSTATEC000627

International Business Training
# Nov 20: Manchester, UK; "How to Claim Duty Relief on Export and Import Processes" Greater Manchester Chamber of Commerce
# Nov 21: Manchester, UK; "Introduction to Exporting" Greater Manchester Chamber of Commerce
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for International Trade
* Dec 6: London, UK; "Beginner's Workshop"; UK Department for International Trad
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Export Documentation Training Course;" Greater Manchester Chamber of Commerce
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Dec 14: Philadelphia, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training

2019

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
# January 21-24, 2019: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; 540-433-3977
* Feb 12-13: Washington, D.C.; "2019 Legislative Summit"; National Association of Foreign Trade Zones (NAFTZ)
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)

**Webinars**

* Aug 8: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Aug 9: Webinar; "Export Compliance Essentials for Shipping"; ECTI; 540-433-3977
* Aug 23: Webinar; "Social Media for Trade and Logistics Professionals"; Foreign Trade Association
* Aug 27: Webinar; "Import Documentation and Procedures"; International

Business Training
# Sep 6: Webinar; "University Export Controls Program: Strength in Numbers"; ECTI; 540-433-3977
# Sep 11: Webinar; "BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time"; ECTI; 540-433-3977
# Sep 12: Webinar; "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions"; ECTI; 540-433-3977
* Sep 19: Webinar; "International Logistics"; International Business Training
* Sep 24: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Sep 25: Webinar; "NAFTA Rules of Origin"; International Business Training
# Sep 26: Webinar; "US Antiboycott Regulations: Clarified & Demystified"; ECTI; 540-433-3977
* Oct 15: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Nov 14: Webinar; "An Export Commodity Classification Number - ECCN"; Foreign Trade Association
* Dec 3: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Dec 4: Webinar; "NAFTA Rules of Origin"; International Business Training
* Dec 5: Webinar; "Import Documentation and Procedures"; International Business Training
* Dec 11: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Dec 20: Webinar; "International Logistics"; International Business Training

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

–

## EDITOR'S NOTES

## 14. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Leo Durocher** (Leo Ernest Durocher; 27 July 1905 - 7 Oct 1991; nicknamed "Leo the Lip", was an American professional baseball player, manager and coach. He played in Major League Baseball as an infielder. Upon his retirement, he ranked fifth all-time among managers with 2,009 career victories, second only to John McGraw in National League history.)
  - *How you play the game is for college ball. When you're playing for money, winning is the only thing that matters.*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Are Your Copies of Regulations Up to Date?

(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in

WASHSTATEC000630

the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

16. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * *

--

EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:

Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

Message

| | |
|---|---|
| **From**: | Shellooe, Ryan P [ShellooeRP@state.gov] |
| **Sent**: | 8/7/2018 6:16:53 PM |
| **To**: | PM-Directors [PM-Directors@state.gov]; PM-DAS's [PM-DASs@state.gov]; PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| **CC**: | PM-CPA [PM-CPA@state.gov] |
| **Subject**: | CPA MEDIA MONITORING: Defense News: Trump's arms sales nominee bogged down by 3D gun debate |



## Trump's arms sales nominee bogged down by 3D gun debate
### Joe Gould
### August 7, 2018

WASHINGTON — A State Department nomination that should have been a victory lap for the Trump administration's efforts to boost U.S. arms sales abroad instead has become caught up in a separate domestic controversy, likely for weeks to come.

Massachusetts Democratic Sen. Ed Markey has a "hold" on R. Clarke Cooper, who is nominated as the next assistant secretary of state for political-military affairs, until the Trump administration reverses a decision to permit an organization from posting blueprints online for 3D-printed guns.

Cooper would oversee State's Directorate of Defense Trade Controls, which is at the center of legal action over the gun blueprints. Mainly, Cooper would be charged with linking the Defense Department with the State Department in areas such as international security, military operations and defense strategy. (Though industry watchers have dinged State for a 30 percent vacancy rate at the directorate.)

Undersecretary for Arms Control and International Security Andrea Thompson, a former national security advisor to Vice President Mike Pence, was named in April and other political appointees at the assistant secretary tier have been seated in recent weeks. Cooper would replace Tina Kaidanow, a career foreign service officer and the acting assistant secretary for political-military affairs.

A diplomat in the Bush administration and combat veteran, Cooper serves as director of intelligence planning for Joint Special Operations Command's Joint Inter-Agency Task Force – National Capital Region, according to a White House bio. It's not mentioned in the bio, but Cooper was chief of Log Cabin Republicans when it challenged the Pentagon's "Don't Ask, Don't Tell" policies toward gay troops.

Aside from President Donald Trump's personal support for international arms deals, his administration has in recent months rolled out new policies to emphasize the benefits of such sales to the U.S. economy: the Conventional Arms Transfer policy and policies governing the international sale, transfer and subsequent use of U.S.-origin military and civil unmanned aerial systems.

American weapons sales have hit record highs in recent months. In the first two quarters of this fiscal year, the U.S. has signed $46.9 billion in weapons sales to foreign partners and allies, smashing past the $41.9 billion figure from all of fiscal 2017.

WASHSTATEC000634

At Cooper's confirmation hearing Aug. 1, Democrats fretted that human rights would get lost in the administration's quest for deals, noting that the new Conventional Arms Transfer Policy deemphasized the human rights records of state recipients of U.S. security assistance.

"I want U.S. companies to be able to sell what they produce anywhere in the world, but when we sell it to an end-user, a country, that uses it outside of internationally recognized standards and applicable law, that's a problem, because then we're complicit in it," said the Senate Foreign Relations Committee's ranking member, Sen. Robert Menendez, D-N.J.

"Human rights are not just a nice gesture, they're absolutely crucial to peace, justice, and the spread of democracy, and therefore stability around the world. We have to ask why we as a nation what we want America to be: A beacon of hope for the oppressed, or simply the biggest arms merchant to the world?"

For his part, Cooper testified that human rights are "a moral and legal obligation for us to consider" in security assistance decisions. "It is a component of every sale and every transfer, it is a broader consideration when we're looking at any activity that is representative of our security interest but also of our values," he said.

Separately, congressional Democrats are pressuring Trump to reverse a decision to allow downloadable-gun promoter Defense Distributed to release blueprints to make untraceable and undetectable 3D-printed plastic guns.

A federal judge late last month stopped the company behind the plans after eight Democratic attorneys general filed a lawsuit seeking to block a settlement between the company and the Directorate of Defense Trade Controls that would allow the blueprints to be posted.

"I appreciate that you are not the person who made this policy, but you are asking us to confirm you to a position where you will be defending the indefensible," Markey told Cooper at his confirmation hearing.

"Until the President agrees to reverse this policy and prohibit the online publication of these dangerous blueprints a decision that is entirely within his authority I intend to place a hold on your nomination."

A senator may place an informal "hold" on a nomination, blocking quick confirmation, but the decision to honor it will ultimately be up to Senate Majority Leader Mitch McConnell, R-Ky.

Link: https://www.defensenews.com/congress/2018/08/07/trumps-arms-sales-nominee-bogged-down-by-3d-gun-debate/?utm_source=twitter.com&utm_campaign=Socialflow&utm_medium=social

Ryan P. Shellooe
Political-Military Affairs
U.S. Department of State
O: (202) 647-3019

**Official**
UNCLASSIFIED

WASHSTATEC000635

Message

| | |
|---|---|
| **From:** | Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu] |
| **Sent:** | 8/7/2018 6:20:51 PM |
| **To:** | hartrl@state.gov |
| **Subject:** | 18-0807 Tuesday "Daily Bugle" |

## Tuesday, 7 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. USTR Extends Deadline for Comments On Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. State/DDTC: (No new postings.)
5. EU Implements Updated Blocking Statute In Response to U.S. Sanctions on Iran

### NEWS

6. Defense Web: "France Looking To Circumvent U.S. Components In Scalp Missile"
7. The Hill: "How 3D Guns Became A Free Speech Issue"
8. Reuters: "Trump Says Firms Doing Business In Iran To Be Barred From U.S. As Sanctions Hit"
9. ST&R Trade Report: "USTR to Review Turkey's GSP Eligibility in Response to Retaliatory Tariffs"

### COMMENTARY

10. M. Lester: "Updated EU Blocking Statute Into Force on 7 Aug"
11. M. Volkov: "The Revolution of Blockchain and Compliance (Part I of II)"

### EDITOR'S NOTES

12. Bartlett's Unfamiliar Quotations

13. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
14. Weekly Highlights of the Daily Bugle Top Stories

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. USTR Extends Deadline for Comments on Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

(Source: Federal Register, 7 Aug 2018.) [Excerpts.]

83 FR 38760-38761: Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

* AGENCY: Office of the United States Trade Representative.
* ACTION: Extension of public comment period.
* SUMMARY: In a notice published on July 17, 2018 (83 FR 33608), the U.S. Trade Representative (Trade Representative) proposed a modification of the action taken in this investigation in the form of an additional 10 percent ad valorem duty on products of China with an annual trade value of approximately $200 billion. The July 17th notice sought public comment and provided notice of a public hearing regarding this proposed modification of the action in the investigation. On August 1, 2018, the Trade Representative announced that the President had directed the Trade Representative to

WASHSTATEC000637

consider raising the level of the additional duty in the proposed supplemental action from 10 percent to 25 percent. In light of this possible increase in the rate of additional duty, the Trade Representative is extending certain comment periods set out in the July 17th notice.

* DATES: To be assured of consideration, you must submit comments and responses in accordance with the following schedule:

  - August 13, 2018: The due date for filing requests to appear and a summary of expected testimony at the public hearing and for filing pre-hearing submissions is extended from July 27 to August 13, 2018.

  - September 6, 2018: The due date for submission of written comments is extended from August 17 to September 6, 2018.

  - August 20-23, 2018: The scheduled start date of the Section 301 hearing (August 20) has not changed. The Section 301 Committee may extend the length of the hearing depending on the number of additional interested persons who request to appear. The Section 301 Committee will convene the public hearing in the main hearing room of the U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436 beginning at 9:30 a.m. on August 20, 2018.

  - September 6, 2018: The due date for submission of post-hearing rebuttal comments is extended from August 30 to September 6, 2018.

* ADDRESSES: USTR strongly prefers electronic submissions made through the Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments in sections E and F of the July 17th notice. The docket number--USTR-2018-0026--has not changed. ...

* SUPPLEMENTARY INFORMATION: ... In the July 17th notice, the Trade Representative proposed modifying the action in this investigation by maintaining the original $34 billion action and the proposed $16 billion action, and by taking a further, supplemental action. In particular, the Trade Representative proposed a supplemental action of an additional 10 percent ad valorem duty on products of China covered in a list of 6,031 tariff subheadings in the Annex to the July 17th notice.

  On August 1, 2018, the Trade Representative announced that the President directed the Trade Representative to consider increasing the proposed level of the additional duty from 10 percent to 25 percent. This additional 25 percent duty would be applied to the proposed list of products in the Annex to the July 17th notice. The possible increase in the proposed rate of the additional duty is intended to provide the Administration with additional options to obtain the elimination of the acts, policies, and practices covered in the investigation. ...

Robert E. Lighthizer, United States Trade Representative.

back to top

* * * * * * * * * * * * * * * * * * *

_

**OTHER GOVERNMENT SOURCES**

2. Items Scheduled for Publication in Future Federal

Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICES; Recruitment of Private-Sector Members:
Emerging Technology Technical Advisory Committee [Publication Date: 8 Aug
2018.]

back to top

* * * * * * * * * * * * * * * * * * * *

3.
Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * * *

4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * * *

5. EU Implements Updated Blocking Statute In Response
to U.S. Sanctions on Iran
(Source: Editor, and Official Journal of the European Union, 7 Aug 2018.)

Today, the EU's updated Blocking Statute enters into force to mitigate the
impact of U.S. sanctions on the interests of EU companies doing legitimate
business in Iran.

What that means:
  (1) The EU aims to sustain the trade and economic relations between the EU
and Iran.
  (2) The Blocking Statute allows EU operators to recover damages arising
from US extraterritorial sanctions from the persons causing them and nullifies
the effect in the EU of any foreign court rulings based on them.
  (3) To help EU companies with the implementation of the updated Blocking
Statute the Commission published a Guidance note to facilitate understanding
of the relevant legal acts.

To read the related press release, see the Daily Bugle of Monday, 6 August
2018, item #6.

*Regulations*
* Commission Delegated Regulation (EU) 2018/1100 of 6 June 2018 amending
the Annex to Council Regulation (EC) No 2271/96 protecting against the
effects of extra-territorial application of legislation adopted by a third country,

WASHSTATEC000639

and actions based thereon or resulting therefrom
* Commission Implementing Regulation (EU) 2018/1101 of 3 August 2018 laying down the criteria for the application of the second paragraph of Article 5 of Council Regulation (EC) No 2271/96 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom

*Decisions*
* Commission Delegated Decision (EU) 2018/1102 of 6 June 2018 amending Annex III to Decision No 466/2014/EU of the European Parliament and of the Council granting an EU guarantee to the European Investment Bank against losses under financing operations supporting investment projects outside the Union, as regards Iran

back to top

* * * * * * * * * * * * * * * * * * *

―

## NEWS

6.
Defense Web: "France Looking To Circumvent U.S. Components In Scalp Missile"
(Source: Defense Web, 7 Aug 2018.) [Excerpts.]

France is looking for a way around the United States' blocking of Scalp cruise missile technology for Egypt, and is exploring the possibility of replacing American components with alternatives so it can deliver the missiles as well as additional Rafale fighters to Egypt.

French Defense Minister Florence Parly recently said in the country's National Assembly that the decision by the United States to use the International Trade in Arms Regulation (ITAR) agreement to block the sale of Scalp missiles to Egypt could be circumvented if domestically-built parts are used instead.

  "In this case, we will not be able to lift the US opposition to the sale of Scalp missiles. The only thing we can do is for MBDA [which makes the missiles] to make some investment in research and development to be able to manufacture similar components that are not covered by ITAR," Parly said last month. "We can do it for the Egyptian Scalp/Rafale in so far as the new missile can be built with a reasonable delay, though the customer might find this delay a bit too long."

  "It is true that we depend on this [US International Traffic in Arms Regulations] mechanism: We are at the mercy of the Americans when our equipment is concerned," she said. Because the United States will not lift its opposition to the sale of Scalp missiles, France has had to come up with

WASHSTATEC000640

alternatives.

Egypt has ordered 24 Rafale jets from France, and is looking to acquire 12 more, but only if it can buy Scalp missiles for them.

It appears earlier reports that the impasse with the United States had been resolved, were premature. La Tribune reported that French President Emmanual Macron broached the Scalp issue during his visit to the United States in April. The newspaper in July reported that licenses had been granted to export components used in the missiles to Egypt while France is also in the process of finding alternative components for the missile that are ITAR-free.

In February it emerged that a plan to acquire 12 Rafales stalled after the United States refused to sell the manufacturer key components of the SCALP missile. The planned Egyptian acquisition of 12 Rafale fighter aircraft has been in the making since November 2017. It was billed to be a follow-up sale to a February 2015 agreement for an Egyptian acquisition of 24 Rafale fighter jets.

The new Egyptian defense minister Mohamed Ahmed Zaki Mohamed visited France in July, with Egypt expressing interest in acquiring 30 Patroller unmanned aerial vehicles and Cougar helicopters for the navy. Egypt was also interested in acquiring two additional Gowind corvettes but apparently negotiations are stalled over pricing and is now looking at German warships.

Forecast International notes that the deepening Egyptian-French relationship comes as the volume of U.S. sales to Egypt has waned after the US put a temporary hold on military sales and assistance to Egypt. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7.
## The Hill: "How 3D Guns Became A Free Speech Issue"
(Source: The Hill, 7 Aug 2018.) [Excerpts.]

In 2012, Defense Distributed, a non-profit organization, began posting online free downloads of computer files -- codes -- that would enable users to easily produce their own firearms and firearm components with 3D printers. In May 2013, the State Department informed Defense Distributed that sharing these files in this particular manner violated provisions of the Arms Export Control Act.

And just like that, 3D-printed guns became a free-speech issue wrapped up in all the societal trappings of a Second Amendment debate.

In short, the underlying dispute was one of interpretation: Were the codes for 3D-printed guns "technical data" for purposes of the United States Munitions List, and did making them available for international download constitute "exportation" of that regulated technical data? Defense Distributed argued that the codes weren't regulated technical data, and that even if they were, the

prohibition on publishing them was an unconstitutional prior restraint on speech. ...

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

back to top

## 8. Reuters: "Trump Says Firms Doing Business In Iran To Be Barred From U.S. As Sanctions Hit"
(Source: Reuters, 7 Aug 2018.) [Excerpt.]

Firms doing business with Iran will be barred from the United States, President Donald Trump said on Tuesday, as new U.S. sanctions took effect in spite of pleas from Washington's allies.

Iran dismissed a last-minute offer from the Trump administration for talks, saying it could not negotiate while Washington had reneged on a 2015 deal to lift sanctions in return for curbs on Iran's nuclear program.

Trump decided this year to pull out of the agreement, ignoring pleas from the other world powers that had co-sponsored the deal, including Washington's main European allies Britain, France and Germany, as well as Russia and China.

European countries, hoping to persuade Tehran to continue to respect the deal, have promised to try to lessen the blow of sanctions and to urge their firms not to pull out. But that has proven difficult: European companies have quit Iran, arguing that they cannot risk their U.S. business.

  "These are the most biting sanctions ever imposed, and in November they ratchet up to yet another level. Anyone doing business with Iran will NOT be doing business with the United States. I am asking for WORLD PEACE, nothing less!" Trump tweeted on Tuesday. ...

*Remove the Knife*

Washington accepts that Iran has complied with the terms of the 2015 deal reached under Trump's predecessor Barack Obama, but says the agreement is flawed because it is not strenuous enough. Iran says it will continue to abide by the deal for now, if other countries can help protect it from the economic impact of Washington's decision to pull out.

Tuesday's sanctions target Iran's purchases of U.S. dollars, metals trading, coal, industrial software and auto sector. Global oil prices rose on Tuesday on concern sanctions could cut world supply, although the toughest measures targetting Iran's oil exports do not take effect for four more months. ...

  "It is a reality check that this is happening and that Iran's oil exports will be hurt when the oil sanctions hit it in November," chief commodities analyst at Commerzbank Bjarne Schieldrop said.

WASHSTATEC000642

In a speech hours before the sanctions were due to take effect, Iran's President Hassan Rouhani rejected negotiations as long as Washington was no longer complying with the deal.

   "If you stab someone with a knife and then you say you want talks, then the first thing you have to do is remove the knife," Rouhani said in a speech broadcast live on state television.

   "We are always in favor of diplomacy and talks...But talks need honesty," Rouhani said. ...

Britain, France, Germany and the EU as a bloc said in a joint statement on Monday: "We deeply regret the reimposition of sanctions by the U.S." ...

Few American companies do much business in Iran so the impact of sanctions mainly stems from Washington's ability to block European and Asian firms from trading there.

Among large European companies that have suspended plans to invest in Iran are France's oil major Total and its big carmakers PSA and Renault.

   "We have ceased our already restricted activities in Iran in accordance with the applicable sanctions", said German car and truck manufacturer Daimler.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. ST&R Trade Report: "USTR to Review Turkey's GSP Eligibility in Response to Retaliatory Tariffs"
(Source: Sandler, Travis & Rosenberg Trade Report, 7 Aug 2018.)

USTR has launched a review of the eligibility of Turkey to participate in the Generalized System of Preferences based on concerns related to its compliance with the GSP market access criterion. This criterion, one of 15 defined by Congress in the statute authorizing the GSP program, covers the extent to which beneficiary countries have assured the U.S. reasonable and equitable access to their markets.

Specifically, USTR believes that Turkey's imposition of additional tariffs on $1.78 billion worth of U.S. imports in response to the United States' additional tariffs on imports of steel and aluminum products may violate the GSP's market access criterion. Deputy U.S. Trade Representative Jerry Gerrish expressed hope that "Turkey will work with us to address the concerns that led to this new review of their duty-free access to the United States." USTR notes that a public hearing and comment period for this review will be announced in an upcoming Federal Register notice.

The U.S. imported $1.66 billion from Turkey under the GSP program last year, representing 17.7 percent of total U.S. imports from that country. The leading GSP import categories were vehicles and vehicle parts, jewelry and precious

metals, and stone articles.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

10. M. Lester: "Updated EU Blocking Statute Into Force on 7 Aug"
(Source: European Sanctions Blog, 6 Aug 2018.)

\* Author: Maya Lester, Esq., Brick Court Chambers,

WASHSTATEC000644

maya.lester@brickcourt.co.uk, +44 20 7379 3550.

The European Commission announced today that the updated EU Blocking Statute (see previous blog) will enter into force on 7 August 2018 (tomorrow), in response to the re-imposition of US sanctions on Iran. They have also issued a document explaining its effect (EU Commission Q&As) which states that:

  (1) The Blocking Statute aims at countering the effects of US sanctions on EU economic operators engaging in lawful activity with third countries.
  (2) It applies with regard to specific legislation listed in its Annex. It forbids EU residents and companies from complying with the listed legislation unless they are exceptionally authorized to do so by the Commission, allows EU operators to recover damages arising from that legislation from the persons or entities causing them, and nullifies the effect in the EU of any foreign court rulings based on it.
  (3) EU operators should inform the European Commission - within 30 days since they obtain the information - of any events arising from listed extra-territorial legislation that would affect their economic or financial interests.
  (4) EU operators can recover "any damages, including legal costs, caused by the application of the laws specified in its Annex or by actions based thereon or resulting therefrom" from "the natural or legal person or any other entity causing the damages or from any person acting on its behalf or intermediary". The action can be brought before the courts of the Member States and the recovery can take the form of seizure and sale of the assets of the person causing the damage, its representatives or intermediaries.
  (5) Implementation of the Blocking Statute, including deciding on effective, proportionate and dissuasive penalties for possible breaches is the competence of Member States. It is also for Member States to enforce those penalties.
  (6) The European Commission gathers information from EU operators on possible cases of application of the listed extra-territorial legislation, liaises with national authorities from EU Member states concerning such cases in their jurisdiction and receives notification from and shares information with Member States on measures taken under the Blocking Statute and other relevant aspects.
  (7) The Commission can also, in exceptional cases, authorize an EU operator to fully or partially comply with the listed extra-territorial legislation if non-compliance would seriously jeopardies the interests of the operator or of the European Union. The Implementing Regulation containing the criteria on the basis of which the Commission will assess such requests for authorization will also be published tomorrow.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. M. Volkov: "The Revolution of Blockchain and Compliance (Part I of II)"
(Source: Volkov Law Group Blog, 6 Aug 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com,

WASHSTATEC000645

240-505-1992.

I am not one to engage in hyperbole.  But when it comes to blockchain technology and the implications for our economy, this is going to be the real deal.  In the world of ethics and compliance, blockchain has many possible applications that could easily transform compliance capabilities.

To show my age, let's go back into time and remember when we all were buying personal computers - not laptops, but personal computers.  Bill Gates, the head of Microsoft, predicted that computing power would eventually move from laptops to the Internet and mobile devices.  In our short lifetime, we have witnessed the transformation of the computer industry from clunky personal computers in our home to cloud computing and rapid-fire access on our mobile phones.

I would suggest that the advent of blockchain will be just as revolutionary a new technology.  Our economy is built on intermediaries that perform a variety of functions that can be replaced through peer-to-peer trustless systems.  As blockchain grows, the role and need for intermediaries will decline.

We often hear the term these days - disruptive economies.  Marketplace innovation occurs so rapidly that we no longer characterize technologies as mature or maturing - new technologies disrupt to the point of making "old" technologies archaic in short periods of time.

In the compliance space, we hear often hear about "regtech," meaning a new technology that solves regulatory and compliance requirements for financial businesses operating in digital markets.  Consumers have become digitally savvy and now demand rapid new technologies in the financial space.  Regtech has developed to meet the need for compliance while offering innovative products to these savvy consumers.

Financial businesses are under pressure to onboard a customer quickly, screen them and their transactions for AML compliance and satisfy the need for customers to engage in markets without any significant delay.  Financial firms are embracing a number of new technologies to meet consumer demand - data analytics, cloud computing, machine learning and blockchain.

Blockchain's potential, however, is not limited to the financial industry.  To the contrary, blockchain will revolutionize ethics and compliance programs.

Let's start with a basic understanding of distributed ledger technologies ("DLT").

A distributed ledger is a database that is shared among multiple sites, locations and institutions. A DLT can be restricted to intra-company locations or it can be permissioned as needed to include business partners (e.g. accounting firm).  Those permissioned to access the blockchain can search the database, examine specific transactions, and "add" to the blockchain by making a new entry.  A user, however, cannot amend, delete or otherwise

WASHSTATEC000646

modify an existing blockchain database.  Every participant has access to an identical copy of the DLT. When a new transaction is added, everyone verifies the transaction, reaches a consensus, and then the blockchain is amended with the new transaction.  It is a shared ledger that is immutable and accessible to all users on a real-time basis.

The real-world application of blockchain will increase efficiency and accuracy of an infinite number of functions.  Blockchain can automate processes that often take days or weeks.  Blockchain automates and verifies trust - there is no need for a third-party intermediary who has to conduct transactions (e.g. banks, accountants, auditors).  The distributed ledger provides access to all transactions and therefore is trustworthy. Transactions can be completed quickly and with lower costs.  All permitted users wherever located will gain access to the same data.

As a consequence, data can be recorded and made available in near real-time.  An authorized user will not have to undergo verification his or her identity because the individual's information will already exist in an encrypted, secure tamper-resistant database.  The bottom line is that a blockchain database will be immutable, immediate and transparent.

back to top

* * * * * * * * * * * * * * * * * * * *

--

## EDITOR'S NOTES

## 12. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **James Branch Cabell** (1879 - 1958; was an American author of fantasy fiction and *belles lettres*. Cabell was well regarded by his contemporaries, including H.L. Mencken, Edmund Wilson, and Sinclair Lewis.)
 - *"There is not any memory with less satisfaction than the memory of some temptation we resisted."*

* **Francois de La Rochefoucauld** (1613 - 1680; was a noted French author.)
  - *Good advice is something a man gives when he is too old to set a bad example.*

back to top

* * * * * * * * * * * * * * * * * * *

## 13. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the

U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25%

WASHSTATEC000648

discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

# 14. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *

–

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to

WASHSTATEC000649

defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

WASHSTATEC000650

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000651

Message

| | |
|---|---|
| **From**: | IISS [do-not-reply@iiss.org] |
| **Sent**: | 8/8/2018 3:38:45 PM |
| **To**: | Kaidanow, Tina S [KaidanowTS@state.gov] |
| **Subject**: | IISS News – 8 August 2018 |

**IISS News**

# How can we stop Iran's space programme threatening the West?

The lack of curbs on Iran's missile programme was cited by President Donald Trump in May 2018 as one of the principal reasons for withdrawing from the 2015 Joint Comprehensive Plan of Action.

With the nuclear accord consequently on life support, it is not too late to pursue diplomatic measures that address the growing challenge posed by Iran's ballistic missiles, argues Michael Elleman in a new report.

WASHSTATEC000652

CYBER REPORT

## **Facebook deletes accounts; NSA watchdog reports on 'deficiencies'; and blueprints for 3D-printed guns**

Sean Kanuck offers his take on efforts to block the release of blueprints for 3D-printed guns in our latest Cyber Report, our weekly round-up of all the cyber news that matters. The report also covers Facebook's efforts to crack down on 'coordinated inauthentic behavior'.

CATCH UP ON THE DEBATE

## **Time to reform and renew the rules-based international order, says Canada's Foreign Minister Freeland**

How should the traditional powers behave in a world they no longer dominate? Watch Minister of Foreign Affairs of Canada Chrystia Freeland offer a robust defence of the international rules-based order as she delivers the IISS Fullerton Lecture in Singapore.

NEW ADELPHI BOOK

WASHSTATEC000653

## _Once and Future Partners: The United States, Russia and Nuclear Non-proliferation_

This fascinating study reaches back to episodes of US–Soviet cooperation on nuclear non-proliferation to identify factors that permitted successful joint action, even in circumstances of profound geopolitical rivalry.

The authors draw on newly declassified material to lift the lid on significant and often overlooked examples of cooperation during the Cold War. They also identify important lessons for policymakers who must navigate the similarly turbulent dynamics of US–Russia relations today.

The International Institute for Strategic Studies

IISS MEMBERSHIP

CAREERS

PRESS ROOM

CONTACT US

© 2018 International Institute for Strategic Studies.

All rights reserved. Registered Charity 206504.

Unsubscribe | Update preferences | Difficulty viewing?



Message

| | |
|---|---|
| **From**: | Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu] |
| **Sent**: | 8/8/2018 6:37:13 PM |
| **To**: | hartrl@state.gov |
| **Subject**: | 18-0808 Wednesday "Daily Bugle" |

### Wednesday, 8 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Seeks New ETTAC Candidates

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DHS/CBP Posts Reminder on CBP Client Representatives Webinar for ABI Brokers and Importer Self-Filers
5. DHS/CBP Voids Inactive Importer of Record Numbers
6. State/DDTC: (No new postings.)
7. USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices
8. Singapore Customs Publishes Circular Concerning Licensed and Zero-GST Warehouses

### NEWS

9. Defense News: "Trump's Arms Sales Nominee Bogged down by 3-D Gun Debate"
10. Reuters: "China, Germany Defend Business with Iran in Face of U.S. Threats"
11. Voice of America News: "New U.S. Slap Against China: Tighter Curbs on Tech Investment"

### COMMENTARY

12. Global Trade News: "Weise Wednesday: Trade Tensions and Tariffs Remain High"
13. M. Volkov: "Real-World Applications of Blockchain to Compliance (Part II of II)"
14. Torres Trade Law: "Latest Developments Regarding Tariffs on China"

**EX/IM TRAINING EVENTS & CONFERENCES**

15. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA

**EDITOR'S NOTES**

16. Bartlett's Unfamiliar Quotations
17. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
18. Weekly Highlights of the Daily Bugle Top Stories





ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. Commerce/BIS Seeks New ETTAC Candidates
(Source: Federal Register, 8 Aug 2018.)

83 FR 39054: Emerging Technology Technical Advisory Committee (ETTAC); Notice of Recruitment of Private-Sector Members

The Bureau of Industry and Security (BIS) is announcing a recruitment for new candidates to serve on the Emerging Technology Technical Advisory Committee (ETTAC) to advise the Department of Commerce and other agency officials on emerging technologies with potential dual-use applications. This advice will include:

(a) The identification of such technologies as early as possible in their developmental stages both within the United States and abroad;
(b) assessing and providing information on emerging technologies, potential "chokepoint technologies" (for example, technologies that, if developed by an adversary prior to development by the United States, could present grave threats to United States national and/or economic security) and trends in technologies of particular interest to BIS;
(c) assessing the potential impact of the Export Administration Regulations (EAR) on research activities, including technical and policy issues relating to controls under the EAR, revisions of the Commerce Control List, including proposed revisions of multilateral controls in which the United States participates, and the issuance of regulations; and
(d) any other matters relating to actions designed to carry out the policy set forth in Section 3(2)(A) of the Export Administration Act of 1979 as well as the directives contained in Section 1758 of H.R. 5515, the John S. McCain National Defense Authorization Act for Fiscal Year 2019.

In its work, the Committee will be forward leaning--focusing both on the current state of emerging technologies and projecting their likely effects five to ten years in the future on national security, the U.S. defense industrial base, and the overall health and competitiveness of the U.S. economy.

The ETTAC will consist of experts drawn from academia, industry, federal laboratories, and pertinent U.S. Government departments and agencies who are engaged in developing and producing cutting edge technology in areas key to maintaining a U.S. forward leaning presence in the world economy. ETTAC members are appointed by the Secretary of Commerce and serve terms of two years, and may not serve more than four consecutive years. The membership term limit reflects the Department's commitment to attaining balance and diversity. As a general rule members will be highly ranked, accomplished and recognized leaders, engineers, and scientists working in their disciplines as researchers and/or program managers. All members must be able to qualify for a Secret security clearance or a security clearance at a level sufficient to perform their work for the committee. The ETTAC will also reach out to other government and non-government experts to ensure a broad and thorough review of the issues. The ETTAC meets approximately four times per year. Members of the Committee will not be compensated for their services.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov.
Deadline: This Notice of Recruitment will close 30 days from its date of publication in the Federal Register.

Yvette Springer, Committee Liaison Officer.

back to top

WASHSTATEC000657

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

—

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* State; NOTICES; Meetings; Defense Trade Advisory Group [Publication Date: 9 August 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. DHS/CBP Posts Reminder on CBP Client Representatives Webinar for ABI Brokers and Importer Self-Filers
(Source: CSMS #18-000473, 8 Aug 2018.)

The CBP Trade Transformation Office, Client Representative Division, is transitioning to a new model for how we assign broker and importer self-filers to client representatives. If you are a broker or importer who uses a software vendor or service center to file your customs ABI data, please join us for the following session for more details. Please note that the webinar does not apply to filers who program their own ABI software.

 - Wednesday, August 8, 2:00 - 3:00 PM ET
 - https://cbp.adobeconnect.com/acewebinar/ (Please note the updated link)
 - Call-In Information: +1 (877) 336-1828, Access Code: 612 4214
 - If the above line is full, please use the following: +1 (877) 336-1829, Access Code: 849 5832

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. DHS/CBP Voids Inactive Importer of Record Numbers
(Source: CSMS# 18-000472, 7 Aug 2018.)

WASHSTATEC000658

This message is a reminder to the trade community that, in accordance with 19 CFR 24.5(e), CBP will void any importer identification number in the Automated Commercial Environment (ACE) that is deemed to be inactive, *i.e.,* not used for a period of one year and does not have an outstanding transaction to which it must be associated.

Additional information, including the process by which a voided importer of record may be reinstated, can be found here.

Should you have questions, please contact CBP's Office of Trade, Commercial Operations, Revenue and Entry (CORE) Division at otentrysummary@cbp.dhs.gov.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices
(Source: USTR, 7 Aug 2018.)

The Office of the United States Trade Representative (USTR) released a list of approximately $16 billion worth of imports from China that will be subject to a 25 percent additional tariff as part of the U.S. response to China's unfair trade practices related to the forced transfer of American technology and intellectual property. This second tranche of additional tariffs under Section 301 follows the first tranche of tariffs on approximately $34 billion of imports from China, which went into effect on July 6.

The list contains 279 of the original 284 tariff lines that were on a proposed list announced on June 15. Changes to the proposed list were made after USTR and the interagency Section 301 Committee sought and received written comments and testimony during a two-day public hearing last month. Customs and Border Protection will begin to collect the additional duties on the Chinese imports on August 23.

In March 2018, USTR released the findings of its exhaustive Section 301 investigation that found China's acts, policies and practices related to technology transfer, intellectual property and innovation are unreasonable and discriminatory and burden U.S. commerce.

Specifically, the Section 301 investigation revealed:

WASHSTATEC000659

- China uses joint venture requirements, foreign investment restrictions, and administrative review and licensing processes to require or pressure technology transfer from U.S. companies.
- China deprives U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations.
- China directs and unfairly facilitates the systematic investment in, and acquisition of, U.S. companies and assets to generate large-scale technology transfer.
- China conducts and supports cyber intrusions into U.S. commercial computer networks to gain unauthorized access to commercially valuable business information.

A formal notice of the $16 billion tariff action will be published shortly in the Federal Register. As in the case of the first tranche of additional tariffs, the notice will announce a process by which interested persons may request the exclusion of particular products covered by a tariff line subject to the additional duties.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Singapore Customs Publishes Circular Concerning Licensed and Zero-GST Warehouses
(Source: Singapore Customs, Circular No. 07/2018, 8 Aug 2018.)

Singapore Customs noted a significant number of incidents where goods which have been stored in the Licensed and Zero-GST warehouses have been removed and exported without a Customs permit. This is not allowed as the requisite permits must be declared prior to the removal of the goods from the Licensed and Zero-GST warehouses.

On this note, Singapore Customs would like to remind all Licensed and Zero-GST Warehouse operators, traders and Declaring Agents (DAs) that it is your responsibility to ensure that the requisite Customs permit is declared prior to the removal of goods from Licensed or Zero-GST warehouses. Removing goods from Licensed or Zero-GST warehouse without a proper Customs permit is an offence which is punishable under the Customs and Goods and Services Tax (GST) Acts. Duty and GST may also be recovered for goods which have been illegally removed from the Licensed and Zero- GST warehouses without a proper customs permit.

Singapore Customs would also like to remind DAs to ensure that all information declared in TradeNet® permits are true and accurate. For more information, please visit the Singapore Customs website at www.customs.gov.sg.

Wan Boon Oon, Head Company Compliance for Director-General of Customs Singapore Customs

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**NEWS**

## 9. Defense News: "Trump's Arms Sales Nominee Bogged down by 3-D Gun Debate"
(Source: Defense News, 7 Aug 2018.) [Excerpts.]

A State Department nomination that should have been a victory lap for the Trump administration's efforts to boost U.S. arms sales abroad instead has become caught up in a separate domestic controversy, likely for weeks to come.

Massachusetts Democratic Sen. Ed Markey has a "hold" on R. Clarke Cooper, who is nominated as the next assistant secretary of state for political-military affairs, until the Trump administration reverses a decision to permit an organization from posting blueprints online for 3D-printed guns.

Cooper would oversee State's Directorate of Defense Trade Controls, which is at the center of legal action over the gun blueprints. Mainly, Cooper would be charged with linking the Defense Department with the State Department in areas such as international security, military operations and defense strategy. (Though industry watchers have dinged State for a 30 percent vacancy rate at the directorate.)

Undersecretary for Arms Control and International Security Andrea Thompson, a former national security advisor to Vice President Mike Pence, was named in April and other political appointees at the assistant secretary tier have been seated in recent weeks. Cooper would replace Tina Kaidanow, a career foreign service officer and the acting assistant secretary for political-military affairs.
...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Reuters: "China, Germany Defend Business with Iran in Face of U.S. Threats"
(Source: Reuters) [Excerpts.]

China and Germany defended their business ties with Iran on Wednesday in the face of President Donald Trump's warning that any companies trading with the Islamic Republic would be barred from the United States.

The comments from Beijing and Berlin signaled growing anger from partners of the United States, which reimposed strict sanctions against Iran on Tuesday, over its threat to penalize businesses from third countries that

continue to operate there. ...

The German government said U.S. sanctions against Iran that have an extra-territorial effect violate international law, and Germany expects Washington to consider European interests when coming up with such sanctions.

The reimposition of U.S. sanctions followed Trump's decision earlier this year to pull out of a 2015 deal to lift the punitive measures in return for curbs on Iran's nuclear program designed to prevent it from building an atomic bomb.

Tuesday's sanctions target Iran's purchases of U.S. dollars, metals trading, coal, industrial software and the auto sector. ...

Trump tweeted on Tuesday: "These are the most biting sanctions ever imposed, and in November they ratchet up to yet another level. Anyone doing business with Iran will NOT be doing business with the United States. I am asking for WORLD PEACE, nothing less!"

EUROPEANS WITHDRAW

European countries, hoping to persuade Tehran to continue to respect the deal, have promised to try to lessen the blow of sanctions and to urge their firms not to pull out. But that has proved difficult: European companies have quit Iran, arguing that they cannot risk their U.S. business. ...

back to top

* * * * * * * * * * * * * * * * * *

## 11. Voice of America News: "New U.S. Slap Against China: Tighter Curbs on Tech Investment"
(Source: Voice of America News, 7 Aug 2018.)

Already threatened by escalating U.S. taxes on its goods, China is about to find it much harder to invest in U.S. companies or to buy American technology in such cutting-edge areas as robotics, artificial intelligence and virtual reality.

President Donald Trump is expected as early as this week to sign legislation to tighten the U.S. government's scrutiny of foreign investments and exports of sensitive technology.

The law, which Congress passed in a rare show of unity among Republicans and Democrats, doesn't single out China. But there's no doubt the intended target is Beijing. The Trump administration has accused China of using predatory tactics to steal American technology.

  "As a policy signal, it speaks with a very loud voice," said Harry Clark, head of the international trade practice at the law firm Orrick. "Leading decision makers and Congress are very concerned about technology transfer to China." ...

back to top

WASHSTATEC000662

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COMMENTARY**

## 12. Global Trade News: "Weise Wednesday: Trade Tensions and Tariffs Remain High"
(Source: Integration Point Blog, 8 Aug 2018.)

Welcome to Weise Wednesday! Twice a month we will share a brief Q&A with the former U.S. Commissioner of Customs, Mr. George Weise. If you have questions, we encourage you to send them to AskGeorge@IntegrationPoint.com.

**Q. Can you update us on recent developments on the trade front?**

A. There have been several new developments relating to United States trade actions discussed in past Weise Wednesdays.

*Section 301 tariffs on China*

First of all, the trade tensions between the U.S. and China over the punitive tariffs imposed by the U.S. continue to mount. As previously discussed, the U.S. imposed an additional 25% tariff on $34 billion worth of Chinese imports on July 7 and was in the process of extending the tariff to an additional $16 billion of Chinese products. China retaliated immediately by imposing a 25% tariff on $34 billion of U.S. goods and threatened to match the U.S. if it implemented the tariffs on the additional $16 billion of Chinese goods.

In July, President Trump responded to the Chinese actions by directing the U.S. Trade Representative (USTR) to develop a new list of Chinese imported products worth $200 billion that would be subject to an additional 10% tariff. USTR was going through the public comment process on that list of products, when late last week, the President directed USTR to consider raising the proposed 10% additional tariff to 25%. A public hearing on the proposed tariff increases will be held in Washington on August 20-23.

China immediately responded by threatening to impose increased tariffs on $60 billion of U.S. imports if the U.S. follows through and implements the new wave of tariff increases.

These actions have created a great deal of stress on global traders and the bilateral trade relationship between the two parties. The U.S. continues to hope that a bilateral trade deal can be reached between the parties to address the fundamental intellectual property rights complaints made by the U.S. in the Section 301 investigation and reduce the significant trade surplus in goods that China has with the U.S. Meanwhile, the trade war continues.

*Section 232 action on steel and aluminum*

In past Weise Wednesdays, I have discussed the U.S. initiative imposing a 25% additional tariff on designated steel products and 10% additional tariff on designated aluminum products. I have also laid out the retaliatory tariffs that have been imposed by a number of countries, including the European Union (EU), Canada and Mexico, adversely impacted by those tariffs. Several countries have also launched formal complaints against the U.S. action at the World Trade Organization (WTO).

With the exception of the trade arrangement between the EU and the U.S. discussed below, not much has changed on this front in recent weeks, and global traders have been forced to deal with the increasing costs of additional tariffs. Negotiations continue to take place between the U.S. and its impacted trading partners to reach bilateral agreements to resolve the underlying issues and remove the additional tariffs. Hopefully, those negotiations will be successful. Meanwhile, trade tensions remain high between the U.S. and its trading partners.

*The EU-U.S. trade "deal"*

On a positive note, after hours of discussion on July 25, President Trump and EU Commission President Jean-Claude Juncker announced in a joint press conference that they had struck a trade "deal." Both sides agreed to "work together toward zero tariffs, zero non-tariff trade barriers, and zero subsidies on non-auto industrial goods."

The EU pledged to increase its purchases of U.S. soy beans and natural gas. The parties also agreed to work together to reform the WTO and address unfair trading practices. Negotiations to address these and other issues are expected to begin immediately, and both parties pledged to refrain from

WASHSTATEC000664

imposing new tariffs and reassessing existing tariffs on steel and aluminum while the negotiations continue.

This is a very positive development in the bilateral relationship between the two parties and seems to have tremendous potential benefit to global traders if the negotiations are successful. We will all need to stay tuned for further developments as the negotiations proceed.

*Section 232 action on automobiles*

As reported in an earlier Weise Wednesday, President Trump initiated a new investigation on May 23 to determine if automobile imports are threatening the national security of the U.S. The investigation is still ongoing. An affirmative finding could result in additional duties and/or quotas on imported automobiles and parts.

As the investigation proceeds, several of our trading partners are gearing up to prepare for the potential consequences of the U.S. imposing new tariffs on imported automobiles and auto parts. Last week trade officials from Canada, Mexico, Japan, South Korea, and the EU met in Geneva to strategize on a coordinated response to such an action by the U.S. The parties are expected to continue their discussion in the coming weeks and months. Again, stay tuned for further developments.

*Conclusion*

These continue to be challenging and uncertain times for global traders. Global traders need to stay actively engaged in monitoring new developments like these and continue to make their views known to government decision makers.

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. M. Volkov: "Real-World Applications of Blockchain to Compliance (Part II of II)"
(Source: <u>Volkov Law Group Blog</u>. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, <u>mvolkov@volkovlaw.com</u>, 240-505-1992.

*[Editor's Note: Part I was published in yesterday's Daily Bugle.]*

The financial industry has embraced the future of blockchain technology. And for good reason. As a regulated industry that is required to provide regulators with large amounts of financial data, blockchain can make that process pain-free.

Financial institutions have to collect, organize and deliver large amounts of risk data to federal regulators. Much of the information has been stored in "older"

information technology systems and/or siloed in different systems. Some of the process may be automated and some manual. Regulators do not have the ability to manage these datasets and focus their review in an efficient manner, impeding their oversight and surveillance efforts.

Blockchain can solve this problem - financial institutions could share their data with regulators and eliminate the need for regulators to reconcile and aggregate the data themselves. The blockchain consists of a documented and immutable audit trail. Every bank and regulator would save on costs and time.

Let's consider for a moment the impact that blockchain could have on due diligence and vendor onboarding. Personal information could be verified and then stored on blockchain. Such information could be subject to screening and then the results maintained on the shared ledger. Once completed, the company would be able to rely on the existing due diligence in the database and then update it as needed for the benefit of all users. Vendor onboarding would be conducted in the same way with a transparent and easy process. Any repetitive task would be replaced by universal access of relevant information to all authorized users.

Blockchain has specific benefits in managing a company's supply chain. A distributed ledger can track items as part of a supply chain, follow the exact path of the item, and provide real-time monitoring of supply chain events.

Another aspect of blockchain holds real promise for compliance. Given real-time recordkeeping, blockchain has the ability to embed rules into its database that can be used to monitor transactions and create real-time alerts. With "smart contracts," the blockchain includes rules that produce a trigger or alert for certain items. As a consequence, the compliance and audit functions can monitor transactions as they occur and receive alerts on a real-time basis. The implications of this for compliance and audit is significant.

Blockchain has the potential to reduce delays from satisfying compliance requirements. A proposed transaction involving a suspected sanctioned individual could be stopped and an alert created to report the transaction. Similarly, a proposed transaction with a third-party who has not completed due diligence could be stopped and appropriate parties notified of the proposed transaction. In both these cases, compliance could quickly intervene and make sure that the transaction is permitted or that it is blocked.

On the financial side, real-time audits and rules can quickly identify anomalies. Internal auditors will have a more efficient way to identify potential fraud and investigate a series of transactions using rules-based surveillance techniques.

To be sure, compliance and audit will have to develop and implement the rules, and they will have to be subject to modification as needed. Access to the rules will be restricted.

I do not mean to suggest that blockchain as a technology is ready to go. There are a lot of issues that are still being addressed, such as the scale of blockchain, the management of access and sharing of ledgers among entities,

and potential security concerns. These issues can be solves, and given the potential benefits on the other side of the ledger, blockchain is poised to bring immediate and significant benefits to compliance.

back to top

* * * * * * * * * * * * * * * * * * *

## 14. Torres Trade Law: "Latest Developments Regarding Tariffs on China"
(Source: Torres Trade Alert, 8 Aug 2018.)

On August 7, 2018, the United States Trade Representative ("USTR") announced it had finalized a list of $16 billion worth of imports from China that will be subject to a 25% additional tariff. [FN/1] These tariffs are in addition to the previously implemented tariffs on $34 billion worth of imports from China,[FN/2] as well as the proposed tariffs on $200 billion more imports from China. All rounds of tariffs have been aimed at stopping China's unfair trade practices related to the forced transfer of American technology and intellectual property.

The announcement came as a bit of a surprise to some due to the USTR's quick turnaround for publishing the final list of products in spite of the large number of public comments received. The list changed very little from the original proposed list and now includes 279 tariff lines, down from the 284 tariff lines that were originally proposed. The updated list comes following a period of public comments, as well as a public hearing in which several parties testified.

Importantly, these additional duties will take effect on August 23, 2018. The USTR will release a Federal Register notice in the next few days which will include the requirements for filing exclusion requests for particular products.

-------------

  [FN/1] Office of the United States Trade Representative, *USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices,* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/ustr-finalizes-second-tranche (last visited August 7, 2018).
  [FN/2] For more information on the $34 billion of tariffs, please see our previous article, *Tariffs: The Never-Ending Saga.* Available here: http://www.torrestradelaw.com/posts/Tariffs%3A-The-Never-Ending-Saga/150.

back to top

* * * * * * * * * * * * * * * * * * *

...

**EX/IM TRAINING EVENTS & CONFERENCES**

WASHSTATEC000667

## 15. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA
(Source: CompTIA)

* What: 12th Annual CompTIA Global Trade Compliance Best Practices Conference
* When: Tuesday, September 18, 2018
* Where: Qualcomm, 10155 Pacific Heights Boulevard, San Diego, California 92121
* Sponsor: CompTIA
* Contact: Ken Montgomery, kmontgomery@comptia.org
* Information & Registration: HERE.

back to top

* * * * * * * * * * * * * * * * * * *

---

**EDITOR'S NOTES**

## 16. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Lord John Russell** (John Russell, 1st Earl Russell, KG, GCMG, PC, FRS (18 Aug 1792 - 28 May 1878; known by his courtesy title Lord John Russell before 1861, was a leading Whig and Liberal politician who served as Prime Minister of the United Kingdom on two occasions during the early Victorian era.)
  - *"A proverb is the wisdom of many and the wit of one."*

back to top

* * * * * * * * * * * * * * * * * * *

## 17. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

WASHSTATEC000668

\* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: <u>83 FR 27380-27407</u>: Air Cargo Advance Screening (ACAS)

\* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM)</u>: DoD 5220.22-M
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

\* <u>EXPORT ADMINISTRATION REGULATIONS (EAR)</u>: 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: <u>83 FR 38021-38023</u>: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and <u>83 FR 38018-38021</u>: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* <u>FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: <u>83 FR 30541-30548</u>: Global Magnitsky Sanctions Regulations; and <u>83 FR 30539-30541</u>: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* <u>FOREIGN TRADE REGULATIONS (FTR)</u>: 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: <u>83 FR 17749-17751</u>: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available <u>here</u>.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance <u>website</u>.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at <u>www.FullCircleCompiance.eu</u>.

\* <u>HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: <u>Harmonized System Update 1809</u>, containing 901 ABI records and 192 harmonized tariff records.

WASHSTATEC000669

- HTS codes for AES are available here.
- HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

18. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * *

--

**EDITORIAL POLICY**

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or

WASHSTATEC000670

are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

–

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000672

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** O727=003   ACTION BUREAU: PM

DATE: JUL 2 7 2018

## IPS:

___X_____ SUBSTANTIVE

___X_____ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____ REPLY FOR SIGNATURE BY Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

**FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:**
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

***BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION***

**Due Date** 7/31/18

ADDITIONAL INSTRUCTIONS:

__X__ Multi-signer Letter: ___House (+12)___

___ Special Instructions: _____

___ EVEREST TASKER# _____

___ Please clear with NSC prior to submission to H

WASHSTATEC000673

**FROM: Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL 27 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

X **Tasked to the** _Pm_ **Bureau for**
**Signature by Mary K. Waters,**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to _____ Bureau for signature by**
**Post or Bureau**

_____ **FYI Only—No Reply Necessary**
**For _____ Bureau**

**Special Actions:**

X **Multi-signer letter:** _House (+12)_

_____ **Special Clearances:**

_____ **For S Staff Review (H Only)**

_____ **Everest Tasker#** _____

_____ **Special Instructions:** _____

_____

WASHSTATEC000674

**Congress of the United States**
**Washington, DC 20515**

RECEIVED
2018 JUL 27 A 10: 32
LEGISLATIVE AFFAIRS

July 26, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Dear Mr. Secretary:

As leaders of the House Gun Violence Prevention Task Force, we urge you to suspend plans to grant Defense Distributed a special license to publish gun blueprints online and to maintain the existing ban on publication of any such gun schematics. The State Department's recent about-face on allowing publication of this dangerous data is both shocking and outside of its lawful authority.

Widespread publication of 3-D-printed gun blueprints would be extremely dangerous because individuals prohibited by law from having guns could easily arm themselves. Convicted felons would be able to skip the dealer licensing system, bypass a criminal background check, and print a gun at home using commercially available technology. Firearm traffickers would be able to print unserialized guns, which are untraceable by law enforcement. And terrorists would be able to make guns entirely out of plastic and sneak them through metal detectors.

Given the clear public safety threat the publication of these blueprints pose, granting this special license makes no sense. As we understand, until recently, the State Department barred publication of 3-D-printed gun blueprints because it violates the Arms Control Export Act of 1974. Please explain why the State Department's understanding of the Arms Control Export Act has changed.

The State Department must return to its well-reasoned position on stopping the publication of 3-D-printed gun blueprints. We look forward to your swift and detailed response.

Sincerely,

MIKE THOMPSON
Member of Congress

DAVID N. CICILLINE
Member of Congress

LMO/DM

PRINTED ON RECYCLED PAPER

**Congress of the United States**
**Washington, DC 20515**

VAL DEMINGS
Member of Congress

ELIZABETH ESTY
Member of Congress

SHEILA JACKSON LEE
Member of Congress

ROBIN KELLY
Member of Congress

GRACE NAPOLITANO
Member of Congress

RICHARD NOLAN
Member of Congress

ED PERLMUTTER
Member of Congress

DAVID PRICE
Member of Congress

KATHLEEN RICE
Member of Congress

BOBBY SCOTT
Member of Congress

JOSE SERRANO
Member of Congress

JACKIE SPEIER
Member of Congress

PRINTED ON RECYCLED PAPER

12

Message

| | |
|---|---|
| **From**: | Hart, Robert L [HartRL@state.gov] |
| **Sent**: | 8/9/2018 4:41:27 PM |
| **To**: | Noonan, Michael J [NoonanMJ@state.gov] |
| **CC**: | Monjay, Robert [MonjayR@state.gov]; Foster, John A [FosterJA2@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov] |
| **Subject**: | RE: I-III Proposed |
| **Attachments**: | OFR Revisions1400-AE30 |

+John/Simon

███████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

---

**From:** Noonan, Michael J
**Sent:** Thursday, August 9, 2018 12:36 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** I-III Proposed

Gentlemen,

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Michael Noonan

Department of State
Directorate of Defense Trade Controls (PM/DDTC/DTCC)
Compliance Specialist (Henderson Group Contractor)
(202) 632-2788

**Official**
UNCLASSIFIED

Message

---

**From:**  Peckham, Yvonne M [PeckhamYM@state.gov]
**Sent:**  5/14/2018 10:59:22 AM
**To:**  Hart, Robert L [HartRL@state.gov]; Monjay, Robert [MonjayR@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov]
**CC:**  Peckham, Yvonne M [PeckhamYM@state.gov]
**Subject:**  OFR Revisions1400-AE30
**Attachments:**  2018-10366_1598405 (1).docx

Good morning,

Proposed rule notice 1400-AE30 is attached for your action.  Do not "accept" the track edits, instead send me an email with your response that you accept or not including any further comments and I will provide your feedback to the Federal Register.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

WASHSTATEC000678

Message

**From:** Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu]
**Sent:** 8/9/2018 7:03:52 PM
**To:** hartrl@state.gov
**Subject:** 18-0809 Thursday "Daily Bugle"

## Thursday, 9 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. State: DTAG to Meet on 25 Oct in Wash DC

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DoD/DSCA Releases Policy Memo Concerning NC Charge Revision for F-35 A/B/C Aircraft and Engines
5. State Imposes Chemical and Biological Weapons Control and Warfare Elimination Act Sanctions on Russia
6. State/DDTC: (No new postings.)
7. India DGFT Posts Updated Rates for Certain HS Codes under MEIS

### NEWS

8. Business Insider UK: "Trump Gives European Countries 'The Willies' About Buying U.S. Weapons, But He's Not Their Only Concern"
9. CNN: "Trump Administration Slaps More Sanctions on Russia After Skripal Poisonings"
10. Defense News: "How Should One Grade Trump's Export Reform Policy?"
11. Expeditors News: "China Implements Changes to Customs Declaration Forms and Filling Rules"

### COMMENTARY

12. G.R. Tuttle III: "And Here It Is - The Final List 2"

WASHSTATEC000679

13. K. Brockman: "3D-Printable Guns and Why Export Controls on Technical Data Matter"
14. K.C. Georgi, M.M. Hassoun & R.K. Alberda: "President Trump Re-Imposes First Wave of Sanctions Against Iran and EU Expands Blocking Regulation to Cover US Secondary Sanctions Legislation on Iran"
15. R.C. Burns: "Sanctions in Name Only Imposed on Russia for Nerve Gas Attack"

**EX/IM TRAINING EVENTS & CONFERENCES**

16. ECTI Presents "United States Export Control (EAR/OFAC/ITAR) Seminar" in Amsterdam, 15-18 Oct

**EDITOR'S NOTES**

17. Bartlett's Unfamiliar Quotations
18. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
19. Weekly Highlights of the Daily Bugle Top Stories

## ITEMS FROM TODAY'S FEDERAL REGISTER



**1. State: DTAG to Meet on 25 Oct in Wash DC**
(Source: Federal Register, 9 Aug 2018.)

83 FR 39492-39493: Defense Trade Advisory Group; Notice of Open Meeting
  The Defense Trade Advisory Group ("DTAG") will meet in open session from 1:00 p.m. until 5:00 p.m. on Thursday, October 25, 2018 at 1777 F Street NW, Washington, DC 20006. Entry and registration will begin at 12:30 p.m. The membership of this advisory committee consists of private sector defense trade representatives, appointed by the Assistant Secretary of State for Political-Military Affairs, who advise the Department on policies, regulations, and technical issues affecting defense trade. The purpose of the meeting will be to discuss current defense trade issues and topics for further study. The following agenda topics will be discussed and final reports presented:

  (1) Oversight of technical data under the ITAR and NISPOM;
  (2) Challenges regulated entities face in advising the Department of ownership changes that implicate existing licenses and foreign persons, and processes the Department may implement to facilitate the provisions of this information;
  (3) Possible schedule for future ongoing periodic review of USML categories;
  (4) Developing a definition for common carrier; and
  (5) Issues that exist with licensing of defense articles, including intelligence related products, related technical data, and defense services to the "Five Eyes" countries of the U.S., UK, Australia, Canada and New Zealand.

Members of the public may attend this open session and will be permitted to participate in the question and answer discussion period following the formal DTAG presentation on each agenda topic in accordance with the Chair's instructions. Members of the public may also, if they wish, submit a brief statement (less than 3 pages) to the committee in writing for inclusion in the public minutes of the meeting. As seating is limited to 125 persons, each member of the public that wishes to attend this plenary session must provide: His/her name and contact information such as email address and/ or phone number and any request for reasonable accommodation to the DTAG Alternate Designated Federal Officer (DFO), Anthony Dearth, via email at DTAG@state.gov by COB Monday, October 8, 2018. If notified after this date, the Department might be unable to accommodate requests due to requirements at the meeting location. One of the following forms of valid photo identification will be required for admission to the meeting: U.S. driver's license, passport, U.S. Government ID or other valid photo ID.
* FOR FURTHER INFORMATION CONTACT: Ms. Barbara Eisenbeiss, PM/DDTC, SA-1, 12th Floor, Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, U.S. Department of State, Washington, DC 20522-0112; telephone (202) 663-2835 or email DTAG@state.gov.

  Anthony M. Dearth, Alternate Designated Federal Officer, Defense Trade Advisory Group, Department of State.

back to top

* * * * * * * * * * * * * * * * * * *

_

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* DHS/CBP; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Free Trade Agreements [Publication Date: 10 Aug 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 4. DoD/DSCA Releases Policy Memo Concerning NC Charge Revision for F-35 A/B/C Aircraft and Engines
(Source: DoD/DSCA, 9 Aug 2018.)

* DSCA Policy Memo 18-39 Nonrecurring Cost (NC) Charge Revision for Joint Strike Fighter (JSF), F-35 A/B/C Aircraft and Engines has been posted. This memo updates Appendix 1 - USML VIII - Aircraft and Associated Equipment.

back to top

* * * * * * * * * * * * * * * * * * *

## 5. State Imposes Chemical and Biological Weapons Control and Warfare Elimination Act Sanctions on Russia
(Source: State, 8 Aug 2018.)

Following the use of a "Novichok" nerve agent in an attempt to assassinate UK citizen Sergei Skripal and his daughter Yulia Skripal, the United States, on August 6, 2018, determined under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (CBW Act) that the Government of the Russian Federation has used chemical or biological weapons in violation of international law or has used lethal chemical or biological weapons against its own nationals.

WASHSTATEC000682

Following a 15-day Congressional notification period, these sanctions will take effect upon publication of a notice in the Federal Register, expected on or around August 22, 2018.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. India DGFT Posts Updated Rates for Certain HS Codes under MEIS
(Source: India Directorate General of Foreign Trade (DGFT), 9 Aug 2018.)

The updated rates for the HS codes in Appendix 3B, Table 2 under the Merchandise Exports from India Scheme ("MEIS") can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

--

## NEWS

## 8. Business Insider UK: "Trump Gives European Countries 'The Willies' About Buying U.S. Weapons, But He's Not Their Only Concern"
(Source: Business Insider UK, 9 Aug 2018.) [Excerpts.]

President Donald Trump's broadsides against NATO are stoking resentment among the US's European allies. ...

Trump's actions have helped build "a narrative in Europe where European leadership says, 'We do need to spend more money on defense. We do need to build up our military capability because we feel we can't depend on the United States,'" said Jim Townsend, [adjunct senior fellow in the Transatlantic Security Program at the Center for a New American Security] who also worked in foreign military sales at the U.S. Defense Security Cooperation Agency. ...

Other decisions by the U.S have led some in Europe to believe they need a non-U.S. avenue through which to develop their defense industries.

In France - one of the biggest arms exporters in the world - frustration has grown over the US withholding clearance for the sale of the Scalp cruise missile, which includes U.S.-made components. The U.S.-made parts are critical for the long-range weapon, and Washington's decision not to authorize the transfer upended a deal for France to sell Rafale fighter jets to Egypt.

The ability to block the sale came through the International Traffic in Arms Regulations, an export-control regulation overseen by the U.S. government.

In response, French officials have said they're looking for a way around ITAR - and to gain more autonomy.

   "It is true that we depend on this (US International Traffic in Arms Regulations) mechanism: We are at the mercy of the Americans when our equipment is concerned," French Armed Forces Minister Florence Parly told legislators in early July, according to Defense News. ...

   "Those kind of things - the F-35 to Turkey, the U.S. under ITAR, the U.S. saying to the French, 'Sorry, we're not going to let you export to Egypt,' and then all this stuff with Trump - all of that is doing nothing but increasing the motivation within Europe to build up their own military capabilities, based on their own industries, and screw the U.S.," said Townsend, referring to a move by Congress that would withhold the transfer of F-35 fighter jets to Turkey. ...

back to top

* * * * * * * * * * * * * * * * * * *

9.
## CNN: "Trump Administration Slaps More Sanctions on Russia After Skripal Poisonings"
(Source: CNN, 9 Aug 2018.) [Excerpts.]

The Trump administration will impose more sanctions on Russia under a chemical and biological warfare law following the poisoning of a former Russian agent and his daughter in the UK earlier this year, the State Department announced Wednesday.

In a statement Wednesday, State Department spokeswoman Heather Nauert said the US had made this decision on Monday, and accused Russia of violating international law. The statement anticipated the sanctions would go into effect around Aug. 22 in line with the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991. ...

The State Department notified Congress on Wednesday of the first of two potential tranches of sanctions required under the 1991 law. Unless Russia takes certain steps, a second set of penalties -- more stringent than this first round -- must follow, according to the law. ...

back to top

* * * * * * * * * * * * * * * * * *



10.

## Defense News: "How Should One Grade Trump's Export Reform Policy?"
(Source: Defense News, 8 Aug 2018.)

An increase in defense exports will be key for judging the effectiveness of President Donald Trump's efforts to make the arms sales process more efficient, but that shouldn't be the only measure of success, said a panel of U.S. government officials, arms control advocates and industry on Aug. 8.

Last month, the president signed off on an implementation plan for the new Conventional Arms Transfer policy, which is aimed at cutting down the red tape associated with the foreign military sales process.

To do that, the U.S. government must move to a more proactive posture, working with Congress and industry to make sure that its export processes are as efficient as possible, said Tina Kaidanow, the State Department's acting assistant secretary of state for political-military affairs, at the Center for Strategic and International Studies.

What all this really ultimately means and what the imitative makes clear is that under this administration, there will be no more active advocate for U.S. sales than the U.S. government itself," she said.

One of the most important metrics, and one that Trump himself will be watching, is whether arms sales continue to grow, said Alex Gray, special assistant to the president for the defense industrial base at the White House Office of Trade and Manufacturing Policy.

  "He would like to see sales that meet the requirements that are laid out in this policy, that are evaluated with all the criteria that the State Department and the interagency deem appropriate. And he would like to see an increase in our defense exports," he said during the panel discussion at CSIS. "He has been a vigorous advocate of doing that."

The president may be able to claim a short term victory this year, as the United States is poised to beat its record for government-to-government arms sales. Lt. Gen. Charles Hooper, head of the Defense Security Cooperation Agency, told Defense News in July. He said that the the U.S. has signed $46.9 billion worth of sales in the first half of fiscal year 2018 - putting it near FY2015's record of $47 billion.

In FY17, the State Department approved $41.9 billion in sales.

Others on the panel said the measure of success needs to be more nuanced than simply looking at the sales statistics.

While boosting the number and value of FMS cases is crucial, the State and Defense departments see that as secondary in importance is making sure that

U.S. allies and partners have the technologies they need to be interoperable with the United States, said Laura Cressey, the State Department's deputy director for regional security and arms transfers.

"We want to make sure that our partners and allies are more capable and able to work with us when we need them to, to be more able to effectively defend themselves," she said. "It's hard to quantify that, and that can be very squishy [...] but it's something that we do need to do."

Cressey also repeated at multiple points during the panel that the State Department wants to continue engaging with industry and other stakeholders to ensure it is making progress.

Last week, for example, was the first meeting of an interagency working group looking at offset policies around the globe.

"In our first meeting, we said one of the first things we wanted to do is reach back out to industry and through the [industry advocacy] associations to find out what is the perception of offsets, what is the perception out there of what the US government should be doing as its offset policy?" she said. "What are the countries out there where offset policies are perceived to be really incredibly onerous, such that our companies cannot effectively compete?"

It's hard to judge whether a new export policy is successful after just a couple months, said Jeff Abramson, a senior fellow at the Arms Control Association. But it's important to evaluate the right metrics, and that should include looking at how foreign nations are using those new weapons and whether U.S. efforts to decrease civilian casualties - for instance - are working.

Abramson argued that the current administration may be over-prioritizing the economic benefits of selling American-made weapons at the expense of human rights considerations.

"We have this sort of belief that if we're partnered with a country, we're going to have control over what they do, but oftentimes, that isn't the case," he said. "I would argue that the Saudis have not been good actors, however much influence we try to have on them, as they are reacting to the situation in Yemen."

Dak Hardwick, assistant vice president for international affairs at the Aerospace Industries Association, ultimately took an optimistic view of the new arms transfer policies.

"Where does all of this lead, ultimately? This is a very competitive market," he said. Foreign countries are looking to take market share away from American companies, but they're also trying to decrease American influence.

"The race we are actually running is a race for global influence," he said. "The question that we have [...] is who is going to make the rules for global influence over the next 50 years? And as an industry, as a country and as a

WASHSTATEC000686

government, we feel like the United States is poised to continue to set the standard to make the rules for the next 50 years."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



11.

Expeditors News: "China Implements Changes to Customs Declaration Forms and Filling Rules"
(Source: Expeditors News, 8 Aug 2018.)

On August 1, 2018, the General Administration of Customs of China (GACC) implemented two previously announced changes to the import and export customs declaration forms, and their filing rules.

The two announcements focused on the filing rules and declaration templates. Some of the critical changes to the requirements include:

   - Changing the HTS code from 10-digits to 13-digits, to fulfill a requirement by the China Inspection and Quarantine (CIQ) division;
   - A reduction in declaration lines per page from 8 to 6 to accommodate the declaration orientation;
   - A requirement for shipping marks and container loading information;
   - A requirement for packing details on the declaration;
   - The addition of an overseas consignee/consignor field.

The official announcements from China Customs may be found here:

- GACC Announcement No. 60 of 2018 Amending the Regulations for the Customs Import and Export Declaration Filing Rules and Requirements
- GACC Announcement No. 61 of 2018 Amending the Customs Declaration Template for Import and Export Goods.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC000687



## COMMENTARY

12.

G.R. Tuttle III: "And Here It Is - The Final List 2"
(Source: Tuttle Law Newsletter, 8 Aug 2018.)

* Author: George R. Tuttle III, Esq., Law Offices of George R. Tuttle, geo@tuttlelaw.com, +1 415-986-8780

On August 7, 2018, the USTR released the 2nd list of HTS numbers to be subject to the additional Section 301 25% sanctions. This list compromises approximately $16 billion worth of imports from China and contains 279 of the original 284 tariff lines. List 2 duty rates will go into effect on **August 23, 2018**. A formal notice will be published shortly in the Federal Register and will announce the process by which interested parties may request an exclusion.

*Update for List 3*

There is a change of date for submission of comments and rebuttal comments. These are now due on September 6, 2018 (83 FR 38760 of August 7, 2018).

*Section 232 Sanction Exclusion Requests*

Section 232 sanction exclusion requests can still be submitted at www.regulations.gov, BIS-2018-002 (aluminum) and BIS-2018-006 (Steel).

*List 1/Annex A*

List 1/Annex A exclusion requests can be submitted up to October 9, 2018 at www.regulations.gov, USTR-2018-0025. You can review our previous newsletters on these lists and submission dates at our publications page.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. K. Brockman: "3D-Printable Guns and Why Export Controls on Technical Data Matter"
(Source: SIPRI, 1 Aug 2018. Reprinted with permission.)

\* Author: Kolja Brockmann, Research Assistant in the Stockholm International Peace Research Institute (SIPRI) Dual-Use and Arms Trade Control program.

*New developments in the 3D-printable gun case have revived the debate on the dangers of 3D-printing of firearms and the sharing of their electronic blueprints online. While these developments may only have a limited immediate impact on the proliferation of small arms, this approach has the potential to undermine controls on 3D printing and export controls on technical data more broadly.*

In 2013, Cody Wilson, an American law student and gun rights activist and his non-profit firm 'Defense Distributed', developed and tested the first 3D-printable gun. The so-called 'Liberator' gun, is made entirely from 3D-printable plastic, a bullet and a nail. When Defense Distributed published the computer-aided design (CAD) files online for anyone to download, the US Department of State ordered the firm to take the files off its website. They argued that making such files available constitutes an export of technical data required for the production or manufacture of an export controlled item on the United States Munitions List (USML). After complying with the order and multiple unsuccessful attempts to obtain the required license, Wilson and other gun-rights advocates sued the Department of State for violating their freedom of speech and right to bear arms under the first and second amendments to the US constitution. In a move that surprised many export control experts, the US Government settled the case in June. The Department of State committed to introduce legislation to amend the existing regulations, while in the meantime enacting a temporary amendment that allows Wilson to publish the files in question without further restraints and to make a payment of nearly US $40 000 to the plaintiffs.

### *Background to Export Controls*

In general, the manufacturing of small arms for personal use is legal in the United States. However, the export of firearms requires registration with the Department of State and an export license under the International Traffic in

WASHSTATEC000689

Arms Regulation (ITAR). This licensing requirement applies to assembled guns, key parts like the lower receiver, as well as to the technical data required to develop, produce, operate or repair an item that is described in the USML.

The USML is based on the Munitions List of the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies, an international regime that prescribes the military items to be covered by export controls in all participating states. Controls on technology have been a central part of export controls dating back to the cold war export control arrangements. Today's Munitions List (ML) of the Wassenaar Arrangement covers technology that is required, among others, for the development, production, operation or repair of an item on the list.  As the 3D-printable guns in question fall under Category I of the USML, the digital build files Defense Distributed wishes to share on its website are covered as technical data required for the production or manufacture of controlled defense articles.

Enforcing controls on intangible transfers of technology, such as the sending of digital files via e-mail or the sharing of data using cloud computing services, is inherently difficult. Making such technical data available for anyone to access and potentially download, including to persons in a different country-rather than actively transferring them-is also covered by export controls. While there has been some debate on the complexity and significance of the technical data necessary to justify the application of controls, CAD files or other digital blueprints that clearly enable the 3D printing of a controlled item have been covered by existing controls.

*The Settlement*

Many news articles have characterized the settlement as a 'loss' for the US government or as a 'win' for the free speech argument brought by Wilson and the other plaintiffs. However, the settlement includes no admission of guilt and at this point it is unclear why the US government decided to settle the case.

Under the settlement agreement, the Directorate of Defense Trade Controls (DDTC), the responsible directorate at the Department of State, commits to propose a draft for a new rule and 'fully pursue' a final rule 'revising USML Category I to exclude the technical data that is subject of the action'. While this suggests that the government pursues a permanent change of this regulation in the future, the settlement also included provisions with a more immediate effect. The Department of State approved the immediate public release of the specific technical data subject to the case using a license exemption and later published an announcement on the DDTC website on 27 July, issuing a temporary modification of USML Category I that excludes the technical data subject to the settlement from controls until a final rule is developed. Wilson in turn announced that he will again make the technical data for several small arms and components thereof available in a database from 1 August, also allowing others to upload their own files. Despite this announcement, Defense Distributed has already started to make some of their files available several days prior to 1 August.

WASHSTATEC000690

Several gun-control activists and groups, as well as a number of US politicians and Attorneys General have initiated legal actions and legislative initiatives since the settlement was made public in July. A federal judge first dismissed the request submitted collectively by gun-control groups to intervene and stop the provisions of the settlement from coming into effect. Several Attorneys General from US states and cities have issued cease and desist orders directing Wilson to block access to the website for their constituents, first resulting in the website being blocked for users in Pennsylvania. On 31 July, a Washington district judge issued a temporary restraining order against the Department of State, stopping it from implementing the modification of USML Category I until a hearing set for 10 August, forcing Wilson to once again take down the files. While the legal battle over the distribution in the US therefore seems to be far from over, it is worth considering what the developments in this case mean for the control of small arms more generally.

*Implications For Small Arms Control*

The potential impact on small arms proliferation depends on how these developments change the current situation and which factors may mitigate its impact. First, although they were no longer hosted in Wilson's database any more, the build files for the Liberator were still available online. When the files were originally posted in 2013 they were downloaded over 100 000 times. After they were removed from the website they continued to be available on many illegal file-sharing websites. Despite their availability, no game-changing developments in the illicit small arms market, terrorist acquisitions, uses in assassinations or for the circumvention of metal-detector controls have been observed.

Second, there is still a lack of capabilities, especially of polymer-based 3D-printed small arms or key parts such as receivers or pressure bearing components. The limited durability of the Liberator only enables it to fire a very small number of shots before components need to exchanged. In addition, the poor handling combined with reliability and safety issues provide an abundance of reason for an actor to choose another option.
Third, the costs of obtaining printers that work with high-quality materials remains high and both the production costs and efforts involved likely still do not provide an adequate substitute for black market acquisitions. Furthermore, illicit small arms in circulation are often neither marked, nor serialized and are thus similarly 'untraceable' as 3D-printed guns. New ways of regulating the sale and serialization of 3D-printed guns should nevertheless be developed.

Finally, the often-cited advantages regarding undetectability only apply for small arms made entirely from plastic and walk-through metal detectors. They do not apply to common X-ray scanners and both ammunitions and necessary metal components make detection more likely. While the availability of 3D-printed gun files may thus only have a limited immediate impact on the proliferation of small arms, it should be considered which implications this approach may have for controls on 3D printing and the control of technical data more broadly, both legally and in terms of the signal it sends.

*Controls On 3d Printing and Sharing Of Technical Data*

WASHSTATEC000691

The broader question underlying the case is on the approach to controls on the distribution of technical data for controlled items, the regulation of which forms one of the key aspects of controls on 3D printing and export controls more generally. Controls on 3D printing currently have three main elements: (*a*) controls on 3D printers, (*b*) controls on materials for 3D printing, and (*c*) controls on technical data for the production or manufacture of controlled items using 3D printing. 3D printers are inherently dual-use (usable both for civilian and military purposes) and are rarely covered by controls. Even if controls on a wider range of printers were to be developed, these would not be able to cover the capability range required for small arms production without creating major adverse effects on the growing 3D printing industry. New controls would most likely use performance parameters that only apply to a very limited range of high-performance printers, designed for other purposes than small arms production. Access to 3D printing is expected to increase significantly, both in terms of lower prices of printers and increasing capabilities of 3D printing services, further limiting their controllability. The materials used to 3D print small arms are also not covered by current controls and find a wide range of civilian applications. The combination of the limited risks that they pose and the possible adverse effects will likely preclude the introduction of controls.

Export controls on the technical data required for the development, production, operation or repair of a controlled item to date provided the main regulatory measure on 3D printing. From an export controls perspective, the removal of such controls on technical data is a worrying development. While the impact may remain low in the area of small arms, if such rulings were to be extended to other areas, such as missile and aerospace technology, the impact could potentially be much more significant. Therefore, retaining controls on electronic transfers and sharing of technical data is an important part of export controls in a broader sense and especially in the context of increasing 3D printing and additive manufacturing capabilities.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

14.

## K.C. Georgi, M.M. Hassoun & R.K. Alberda: "President Trump Re-Imposes First Wave of Sanctions Against Iran and EU Expands Blocking Regulation to Cover US Secondary Sanctions Legislation on Iran"
(Source: Arent Fox LLP, 8 Aug 2018.)

\* Authors: Kay C. Georgi, Esq., kay.georgi@arentfox.com, +1 202-857-6293; Marwa M. Hassoun, Esq., marwa.hassoun@arentfox.com, +1 213-443-7645; and Regan K. Alberda, Esq., regan.alberda@arentfox.com, +1 202-775-5771.  All of Arent Fox LLP.

WASHSTATEC000692

The President issued an Executive Order on August 6, 2018, "Reimposing Certain Sanctions With Respect to Iran" (the New Iran EO), which re-imposes relevant provisions of five Iran sanctions EOs (EOs 13574, 13590, 13622, and 13645). Additionally, the New Iran EO implements provisions in two former EOs (EOs 13716 and 13628) and revokes those EOs.

Additionally, the New Iran EO implements provisions in two former EOs (EOs 13716 and 13628) and revokes those EOs.
**August 6, 2018** marked the end of the 90-day wind-down period following the President's decision to end the United States' participation in the Joint Comprehensive Plan of Action (JCPOA). Effective **August 7, 2018,** the US government can re-impose secondary sanctions that had been suspended under the Iran nuclear deal on persons who engage in specified transactions involving any of the following sectors/activities:

* The purchase or acquisition of US dollar banknotes by the Government of Iran;
* Iran's trade in gold or precious metals;
* The direct or indirect sale, supply, or transfer to or from Iran of graphite, raw, or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes;
* Significant transactions related to the purchase or sale of Iranian rials, or the maintenance of significant funds or accounts outside the territory of Iran denominated in the Iranian rial;
* The purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt; and
* Iran's automotive sector.

Following the end of the 90-day wind-down period on August 6, 2018, the US government is also revoking the below JCPOA-related authorizations under US primary sanctions regarding Iran:

* The importation into the United States of Iranian-origin carpets and foodstuffs and certain related financial transactions pursuant to general licenses under the Iranian Transactions and Sanctions Regulations;
* Activities undertaken pursuant to specific licenses issued in connection with the Statement of Licensing Policy for Activities Related to the Export or Re-export to Iran of Commercial Passenger Aircraft and Related Parts and Services (JCPOA SLP); and
* Activities undertaken pursuant to General License I relating to contingent contracts for activities eligible for authorization under the JCPOA SLP.

The remaining secondary sanctions can be re-imposed on **November 5, 2018,** following the end of the 180-day wind down period on **November 4, 2018,** on persons who engage in specified transactions involving any of the following sectors/activities:

* Iran's port operators, and shipping and shipbuilding sectors, including on the Islamic Republic of Iran Shipping Lines, South Shipping Line Iran, or their affiliates;

WASHSTATEC000693

* Petroleum-related transactions with, among others, the National Iranian Oil Company, Naftiran Intertrade Company, and National Iranian Tanker Company, including the purchase of petroleum, petroleum products, or petrochemical products from Iran;
* Transactions by foreign financial institutions with the Central Bank of Iran and designated Iranian financial institutions under Section 1245 of the National Defense Authorization Act for Fiscal Year 2012;
* The provision of specialized financial messaging services to the Central Bank of Iran and Iranian financial institutions described in Section 104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions and Divestment Act of 2010;
* The provision of underwriting services, insurance, or reinsurance; and
* Iran's energy sector, including a variety of separate specific activities related to the petroleum and petrochemical industries under the Iran Sanctions Act as amended.

Additionally, on or by **November 5, 2018**:

* The US government will revoke the General License H wind-down authorization that had allowed US-owned or-controlled foreign entities to wind down certain activities with the Government of Iran or persons subject to the jurisdiction of the Government of Iran that were previously authorized by General License H; and
* The US government can re-impose, as appropriate, the sanctions that applied to persons removed from the List of Specially Designated Nationals and Blocked Persons (SDN List) and/or other lists maintained by the U.S. government on January 16, 2016.

OFAC's FAQs about the re-imposition of Iran sanctions can be found on OFAC's website.

One question that OFAC answers in its updated FAQs (FAQ 601) is whether the New Iran EO expands the scope of sanctions that were in effect prior to January 16, 2016 (Implementation Day of the JCPOA), and the answer is:
- Yes. The New Iran EO broadens the scope of the sanctions that were in effect prior to January 16, 2016 and provides for greater consistency in the administration of Iran-related sanctions provisions.

OFAC provides a list of added measures, but they are largely in the nature of tweaking the authorities for providing new blocking sanctions and slightly expanding the sanctions that can be imposed for activities involving petroleum and petrochemical sectors in Iran. More specifically, according to OFAC, the new Iran EO:

* Provides new authority for: (i) blocking sanctions on persons who provide material support for, or goods and services in support of, persons blocked for various already existing sanction activities, such as being part of the energy, shipping, or shipbuilding sectors of Iran; (ii) correspondent and payable-through account sanctions on foreign financial institutions determined to have knowingly conducted or facilitated any significant financial transaction on behalf of the persons blocked under the new authorities;

WASHSTATEC000694

\* Expands the menu of sanctions available to impose on persons determined to have engaged in certain significant transactions relating to petroleum, petroleum products, or petrochemicals from Iran by authorizing the imposition of:
  - Visa restrictions on corporate officers, principals, or controlling shareholders of a sanctioned person;
  - Additional sanctions on principal executive officers of a sanctioned person; and
  - Prohibitions on US persons investing in or purchasing significant amounts of equity or debt instruments of a sanctioned person.

\* Expands the prohibition on US-owned or -controlled foreign entities by prohibiting transactions with persons blocked for:
  - Providing material support for, or goods and services in support of, Iranian persons on the SDN List and certain other designated persons; or
  - Being part of the energy, shipping, or shipbuilding sectors of Iran or a port operator in Iran or knowingly providing significant support to certain other persons blocked or on the SDN List.

Since these last activities were already prohibited under Section 218 of the Iran Threat Reduction and Syria Human Rights Act of 2012 and OFAC's implementing regulations, it is unclear whether in fact this last is a true expansion or an adjustment of authority.

*EU Reaction - Amendment of Blocking Regulation*

As anticipated, the EU reacted by publishing, and thereby bringing into effect, an amendment to the Annex to Council Regulation No 2271/96 protecting against the effects of extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom.

The revised Annex increases the number of laws subject to the blocking regulations, including, notably:

\* The energy sanctions contained in the Iran Sanctions Act of 1996 as amended;
\* The Iran Freedom and Counter-Proliferation Act of 2012;
\* The National Defense Authorization Act for Fiscal Year 2012;
\* The Iran Threat Reduction and Syria Human Rights Act of 2012; and
\* The Iranian Transactions and Sanctions Regulations.

According to the guidance published by the EU, the Blocking Statute:

\* Prohibits EU operators from complying with the listed extra-territorial legislation, or any decision, ruling or award based thereon, given that the EU does not recognize its applicability to/effects towards EU operators (Article 5, paragraph 1);
\* Requires EU operators to inform the European Commission within 30 days of any events arising from listed extra-territorial legislation or actions based thereon or resulting thereof, that affect, directly or indirectly, their economic or financial interests;

WASHSTATEC000695

* Nullifies the effect in the EU of any foreign decision, including court rulings or arbitration awards, based on the listed extra-territorial legislation or the acts and provisions adopted pursuant to them (Article 4);
* Allows EU operators to recover damages arising from the application of the listed extra-territorial legislation from the natural or legal persons or entities causing them (Article 6). Damages are defined as 'any damages, including legal costs, caused by the application of the laws specified in its Annex or by actions based thereon or resulting therefrom'; and
* Allows EU operators to request an authorization to comply with the listed extra-territorial legislation, if not doing so would cause serious harm to their interests or the interests of the EU (Article 5, paragraph 2).

The Blocking Regulation applies to the EU subsidiaries of US companies, thereby placing them in a potentially difficult position. Moreover, the EU Guidance specifically states that EU operators cannot, consistent with the EU Blocking Regulations, request licenses from the United States unless they request the European Commission to authorize them to apply for such a license. At the same time, the EU Guidance specifically notes that EU companies remain free to do or not to do business with Cuba and Iran, provided such business decisions are not forced on the EU companies by the listed US legislation.

back to top

* * * * * * * * * * * * * * * * * *

## 15.
## R.C. Burns: "Sanctions in Name Only Imposed on Russia for Nerve Gas Attack"
(Source: Export Law Blog, 8 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC, Clif.Burns@bryancave.com, 202-508-6067.

According to a State Department press release released 8 Aug 2018, the United States has made a determination that Russia used novichok, a chemical warfare agent, in an attack on British soil and, as a result, the US will impose sanctions on Russia under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (the "CBWC Act"), 22 U.S.C. § 5601 et seq.  The text of these sanctions was not released.  Instead, the text will be in a Federal Register notice expected to be published on or around August 22.  The sanctions will be effective as of the date of the publication of that notice.

Because these sanctions are being imposed under the CBWC Act, we can already get a good idea of what these sanctions will be.   The Act contemplates sanctions being imposed in two stages.  The first stage, described in section 5605(a), sets forth the following sanctions, all of which are required to be imposed upon the offending country:

   - Termination of all foreign assistance

WASHSTATEC000696

- Termination of all arms sales
- Termination of all foreign military financing
- Denial of U.S. government credit or assistance
- Termination of all exports of items controlled on the Commerce Control List for NS reasons

To be honest, none of these sanctions will have any significant impact on Russia.  Arms sales to Russia have been prohibited for some time now.   The country chart already has Russia controlled for both columns of NS controls.  Of course, you could say that the new sanctions will mean that NS items will not be considered for licenses under any circumstances.  But I don't think licenses to export NS items to Russia are being readily granted now.  The second stage, if it happens, would take place on November 8 of this year unless the President determines that Russia is no longer using chemical or biological weapons.  If that determination is not made, the President is required to impose three sanctions from a set of six possible sanctions.  Those six possible sanctions are:

- Opposing multilateral bank financial assistance to Russia
- Prohibition of U.S. bank loans to the government of Russia
- Prohibition of all exports of all U.S. goods and technology to Russia
- Downgrading or suspending diplomatic relations with Russia
- Termination of all service to and from the United States by Russian airlines

Whether the President will make the findings necessary to impose this second stage and which three of the six will be imposed is anyone's guess, although I suspect that most people likely have a pretty good guess.   The upcoming Federal Register notice will probably not even address the second stage sanctions.   If the United States does in fact impose the three second stage sanctions, the best guess is probably that he will impose the least restrictive of those, i.e., opposing multilateral bank loans, prohibiting U.S. bank loans, and expelling a few more diplomats.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

--

## EX/IM TRAINING EVENTS & CONFERENCES

## 16. ECTI Presents "United States Export Control (EAR/OFAC/ITAR) Seminar" in Amsterdam, 15-18 Oct
(Source: Jill Kincaid; jill@learnexportcompliance.com.)

\* What: United States Export Control (ITAR/EAR/OFAC) Seminar Series in Amsterdam, NL (for EU, NL and other non-US Companies)
\* When:
- ITAR Seminar: October 15-16, 2018;

WASHSTATEC000697

- EAR/OFAC Seminar: October 17-18, 2018
* Where: Park Plaza Victoria Amsterdam, Damrak 1-5, 1012 Lg, Amsterdam, Netherlands
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker Panel: Scott Gearity, Greg Creeser, Marc Binder, Melissa Proctor and Stephan Müller
* Register: Here, or Jessica Lemon, 540-433-3977, jessica@learnexportcompliance.com

back to top

* * * * * * * * * * * * * * * * * * *

‒

## EDITOR'S NOTES

### 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Izaak Walton** (1593-1683; was an English writer and fishing enthusiast. Best known as the author of *The Compleat Angler*, he also wrote a number of short biographies that have been collected under the title of Walton's Lives. The Izaak Walton League is an American environmental organization founded by a group of sportsmen who wished to protect fishing opportunities for future generations.)
   - *"Good company in a journey makes the way seem shorter."*

back to top

* * * * * * * * * * * * * * * * * * *

### 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
   - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199

WASHSTATEC000698

- Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

WASHSTATEC000699

\* <u>INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: <u>83 FR 6457-6458</u>: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely

WASHSTATEC000700

circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000701

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/9/2018 7:58:07 PM |
| **To**: | Davidson-Hood, Simon [DavidsonHoodS@state.gov] |
| **Subject**: | 20180809 - State Internal Notes on USML I-III Public Comments.xlsx |
| **Attachments**: | 20180809 - State Internal Notes on USML I-III Public Comments.xlsx |

Will drop by to discuss

**Message**

| | |
|---|---|
| **From**: | Monjay, Robert [MonjayR@state.gov] |
| **Sent**: | 8/9/2018 8:30:12 PM |
| **To**: | Noonan, Michael J [NoonanMJ@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **CC**: | Foster, John A [FosterJA2@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov] |
| **Subject**: | Re: I-III Proposed |

████████████████████████████████████████████

Thanks
Rob

Robert Monjay
202-663-2817 (office)
████████(mobile)

---

**From:** Hart, Robert L
**Sent:** Friday, August 10, 2018 1:41:27 AM
**To:** Noonan, Michael J
**Cc:** Monjay, Robert; Foster, John A; Davidson-Hood, Simon
**Subject:** RE: I-III Proposed

+John/Simon

████████████████████████████████

████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Thursday, August 9, 2018 12:36 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** I-III Proposed

Gentlemen,

████████████████████████████████████████

WASHSTATEC000703

Michael Noonan

---------------------------------------------------------------------------------------------------

Department of State
Directorate of Defense Trade Controls (PM/DDTC/DTCC)
Compliance Specialist (Henderson Group Contractor)
(202) 632-2788

**Official**
UNCLASSIFIED

WASHSTATEC000704

Message

| | |
|---|---|
| **From:** | Shellooe, Ryan P [ShellooeRP@state.gov] |
| **Sent:** | 8/9/2018 8:34:30 PM |
| **To:** | PM-DAS's [PM-DASs@state.gov]; PM-Directors [PM-Directors@state.gov]; PM/SA Security Assistance Office [PMSASecurityAssistanceOffice@state.gov]; PM/RSAT Team Leaders [PM_RSATTeamLeaders@state.gov]; PM-DDTC-Directors-DL [PM-DDTC-Directors-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov] |
| **Subject:** | CPA MEDIA MONITORING: Buzzfeed: Facebook blocks sharing of 3D-printed gun files on its platforms |



**Facebook Blocks Sharing Of 3D-Printed Gun Files On Its Platforms**
**Joseph Bernstein**
**August 9, 2018**

Facebook is banning from its platform sites that host digital blueprints to make guns on 3D printers, BuzzFeed News has learned.

The move comes amid a rush by states to block these instructions from being posted. A July settlement between the State Department and Defense Distributed, an open-source organization that created the first completely 3D-printed gun, cleared the way for the group to publish the gun code. However, that was stalled when a federal judge on July 31 granted a temporary nationwide injunction that prevented Defense Distributed from uploading the plans.

In the meantime, Facebook is taking its own stand. "Sharing instructions on how to print firearms using 3D printers is not allowed under our Community Standards," Facebook said in a statement. "In line with our policies, we are removing this content from Facebook."

The injunction prevents Defense Distributed from publishing the plans. But the instructions are widely available online, on sites such as CodeIsFreeSpeech.com — which hosts plans for parts of an AR-15, a Beretta, and Defense Distributed's Liberator. Attempts to post the site on a user's News Feed, through Facebook's Messenger app, or on Instagram (which Facebook owns) produce a variety of error messages.

Other sites that host the files can still be posted through Facebook.

According to a Facebook spokesperson, the company is currently working on scaling up its anti–3D gun policy, but did not provide any additional details about how it would do so. The spokesperson added that 3D-printed guns violate the regulated goods section of the social giant's community standards, which limits gun sales and exchanges to licensed dealers. Facebook did not share when or how the decision was made.

3D-printed gun enthusiasts first noticed that Facebook was banning links to CodeIsFreeSpeech.com last week. In a post on its website, the Firearms Policy Coalition, a pro–Second Amendment nonprofit that is behind CodeIsFreeSpeech, described the ban as "an outrageous display of censorship and bias" and linked to a petition to reverse the block.

"Facebook's complete and total takedown and block on CodeIsFreeSpeech.com is without question a human policy decision by Facebook executives to single us and our speech out for especially disfavorable treatment," the post reads.

So far, eight states have sued the Trump administration to dissolve the settlement, and courts in three states have barred the release of the digital instructions. In a July 31 tweet, President Trump signaled his ambivalence about the weapons, writing, "I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!"

Link: https://www.buzzfeednews.com/article/josephbernstein/facebook-to-ban-3d-printed-gun-files-from-its-platforms?bftwnews&utm_term=4ldqpgc#4ldqpgc

Ryan P. Shellooe
Political-Military Affairs
U.S. Department of State
O: (202) 647-3019

**Official**
UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Alexander Lopes [Alexander.Lopes@bis.doc.gov] |
| **Sent:** | 8/10/2018 1:40:25 PM |
| **To:** | Timothy Mooney [Timothy.Mooney@bis.doc.gov]; Hart, Robert L (HartRL@state.gov) [HartRL@state.gov] |
| **CC:** | Hillary Hess [Hillary.Hess@bis.doc.gov]; Abraham, Liz [LAbraham@doc.gov]; WALL, CHARLES [CWALL@doc.gov]; Steven Clagett [Steven.Clagett@bis.doc.gov] |
| **Subject:** | RE: I would go with this for the one paragraph |
| **Attachments:** | 3D News Article.docx |

███████████████████████████████████████████ Attached was in our BIS ████ News clips today.

████████████████████████████

**From:** Timothy Mooney
**Sent:** Friday, August 10, 2018 9:32 AM
**To:** Hart, Robert L (HartRL@state.gov) <HartRL@state.gov>
**Cc:** Hillary Hess <Hillary.Hess@bis.doc.gov>; Abraham, Liz <LAbraham@doc.gov>; WALL, CHARLES <CWALL@doc.gov>; Alexander Lopes <Alexander.Lopes@bis.doc.gov>
**Subject:** RE: I would go with this for the one paragraph

██████████████████████

Rob,

████████████████████████████████████████████

████████████████████████████████████████████

Thanks,
Tim

**From:** Wall, Charles (Federal) <CWall@doc.gov>
**Sent:** Friday, August 10, 2018 9:26 AM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>; Alexander Lopes <Alexander.Lopes@bis.doc.gov>
**Cc:** Hillary Hess <Hillary.Hess@bis.doc.gov>; Abraham, Liz <LAbraham@doc.gov>
**Subject:** RE: I would go with this for the one paragraph

████████████████████

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, August 10, 2018 8:52 AM
**To:** Lopes, Alexander <Alexander.Lopes@bis.doc.gov>
**Cc:** Hess, Hillary <Hillary.Hess@bis.doc.gov>; Wall, Charles (Federal) <CWall@doc.gov>
**Subject:** RE: I would go with this for the one paragraph

████████████

Tim

**From:** Alexander Lopes
**Sent:** Friday, August 10, 2018 8:45 AM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Hillary Hess <Hillary.Hess@bis.doc.gov>; WALL, CHARLES <CWALL@doc.gov>
**Subject:** Re: I would go with this for the one paragraph



************************************************
This Message was sent from my Mobile Device.
************************************************

On: 09 August 2018 18:22,
"Timothy Mooney" <Timothy.Mooney@bis.doc.gov> wrote:
Loops
Alex,

**Tim**

1. **"3D-Printable Guns and Why Export Controls on Technical Data Matter" |by Kolja Brockmann |Stockholm International Peace Research Institute (SIPRI) | August 2018**

[ HYPERLINK "https://www.sipri.org/commentary/blog/2018/3d-printable-guns-and-why-export-controls-technical-data-matter" ]

*New developments in the 3D-printable gun case have revived the debate on the dangers of 3D-printing of firearms and the sharing of their electronic blueprints online. While these developments may only have a limited immediate impact on the proliferation of small arms, this approach has the potential to undermine controls on 3D printing and export controls on technical data more broadly.*

 In 2013, Cody Wilson, an American law student and gun rights activist and his non-profit firm 'Defense Distributed', [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrESjS3vQdyGikAlwFMk3Ms9QreuZo3kyMDEUWTj6HqgJPMILWZhyUG7lZm-FCQWWDFskbgjgCabrRiURHigOQBWPeINJHhquipqAVyJ8DtKLElVEQ-PCKXR_XNpQlt1FWVXaOPjdqhvnI-8mVbqg6Jmaa-z7A1Kd5U3frYzwLH0NBD_MfP1FJuYFyEBw_3dK0MsAtsSp2rLc32WPWDvbIrRDkeb3k_M3yB5R-n6-sIOjUVpJuz_0PRk7AQ3zy8pXqnH_Mo3-U1keB5D67NKevFg==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ]. The so-called 'Liberator' gun, is made entirely from 3D-printable plastic, a bullet and a nail. When Defense Distributed published the computer-aided design (CAD) files online for anyone to download, the US Department of State [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzr27_koJiQZ3ALwgszsWGJ7xh7Al6TiH27HzNPYVpL_r8JNuraDNDup_m8Lzz07wh2Z3F3m8o0HLJT-0e5_Lr8A441CjabjiT2mvX27ZX_6_nCozQGBtNI_sjKk1EXd80-bsQqIwKcTnk0ofA82oAnwnmPc3YzfWxCNoSuEU-qMiCB2i4wSZhcg2v0LIoTJy_oLWo6P95DEBtaWby1c4vqZmO6xg--zv0wiV9aDHgrfxlOSTvZWT8X9Ld0mGBDgtzvoN_icXoZqlGJgssA-P7juNj1hKJbxil2jGQgkVNXRYqNivXNxZsrmw==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ]. They argued that making such files available constitutes an export of technical data required for the production or manufacture of an export controlled item on the United States Munitions List (USML). After complying with the order and multiple unsuccessful attempts to obtain the required license, Wilson and other gun-rights advocates [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO0r4rbephK9oS7eFHQB5VAVcBN85tTDqHX0or40DTEEcsdUtWQ2RqYFJFWYr9TkEVWGk2KR4cC6k1M_dZl_ruRSZluG7_aDlA2XmxO7y7fHBHrLog7Z_fqqx7j5XcdVbi1V3dhMVl9x4cLFFgyqiqt7TmJYBuhOPTyYeEcZFXd8gNxe2e0Yo9H3r4sxH24vBbdOSeDaElwEsttrjyUlwYJo=&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] for violating their freedom of speech and right to bear arms under the first and second amendments to the US constitution. In a move that surprised many export control experts, [ HYPERLINK

WASHSTATEC000709

"http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-
tLfWpS7hzyBiBo_OskZqO0r4rbephK9oKfFXzXzMzCvqcOrBD_orLq9S1Z5GzSZjGcKYGnzxflYaTPaV8kcouLwl
PVaw2z8IE4oWX0o8uawQxuCE4cgJHldlobauejojg8wClssIeC6NOOBE7nmQ6mQzaedc6UqQpvEakHzMwO
L_mlfc4La2FgOdyeC3dFjykv4iwlC1DjEwmCxDpsYQjFUYJ7XbglrfbJTGKtl0KrY=&c=__sncvYIszxm6kg6Q6M
786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0g
Y2vuHnpCnbNnMQA==" \t "_blank" ] in June. The Department of State committed to introduce
legislation to amend the existing regulations, while in the meantime enacting a temporary
amendment that allows Wilson to publish the files in question without further restraints and to
make a payment of nearly US $40 000 to the plaintiffs.

### Background to Export Controls

 In general, the manufacturing of small arms for personal use is legal in the United States.
However, the export of firearms requires registration with the Department of State and an export
license under the International Traffic in Arms Regulation (ITAR). This licensing requirement
applies to assembled guns, key parts like the lower receiver, as well as to the technical data
required to develop, produce, operate or repair an item that is described in the USML.

 The USML is based on the [ HYPERLINK
"http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-
QxnW3OWtzrVXt5TfHDBy1cHcXIasnwntpqXinDeTEY5K5siLMv33MxJcUoZf-iZ3-
JgK96QQVy3y5u6MdW9ApHXfbsbiWCgiQMHbV5YLn0Edv0ErFZMSgue-
xzJtYq8mQkWUYAEY7g0LM1OyV8bDkko-
LVDuCOrsGpAeRerxPxivJSqT3HFol_TXCQeIoVvDfVK5_9ulWD0JMyZcTT6ZU=&c=__sncvYIszxm6kg6Q6M7
86nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY
2vuHnpCnbNnMQA==" \t "_blank" ] of the [ HYPERLINK
"http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-
tLfWpS7hzyBiBo_OskZqO-
QxnW3OWtzrp7rxf2b0T5dUzUOcABRiXB1KjF0phY5wOlmnyrCl9PeLq6Wty4nA2JM5MN5t
OFq1FBYBqa3DZ1C0YMvgK9gVl_e8YWcETLoxucfTx4Zg6syk6lDpdNLBaw==&c=__sncv
YIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4M
rfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] on Export Controls for
Conventional Arms and Dual-Use Goods and Technologies, an international regime that
prescribes the military items to be covered by export controls in all participating states. Controls
on technology have been a central part of export controls dating back to the cold war export
control arrangements. Today's Munitions List (ML) of the Wassenaar Arrangement covers
technology that is required, among others, for the development, production, operation or repair
of an item on the list.  As the 3D-printable guns in question fall under Category I of the USML,
the digital build files Defense Distributed wishes to share on its website are covered as technical
data required for the production or manufacture of controlled defense articles.

 Enforcing controls on intangible transfers of technology, such as the sending of digital files via
e-mail or the sharing of data using cloud computing services, is inherently difficult. Making such
technical data available for anyone to access and potentially download, including to persons in a
different country-rather than actively transferring them-is also covered by export controls. While
there has been some debate on the complexity and significance of the technical data necessary to

WASHSTATEC000710

justify the application of controls, CAD files or other digital blueprints that clearly enable the 3D printing of a controlled item have been covered by existing controls.

### *The Settlement*

Many news articles have [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrMTtqeR5dHeq8Ekjw2LeeJy-12V1XOKadxVOek8_cg0XdlC1aYvq_nO2fWXFOCss8d5bJjJL3_QvGGK7AaofUpnCU1DpMzqgqGosz6uU_9Mu_t7WCqYSpFaJvJf8r0JzBwzClo3NWU6D0zABnq6ayDJQV9ehcuxk7L1rmwfRv8Qq_Jwb7He7pjA-dq1RDu3wnaoJnnq3i4TGKrsKdm9uQlmtq8n7WcWmicvN5JYzNR5Y=&c=__sncvYlszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHsFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] or as a 'win' for the free speech argument brought by Wilson and the other plaintiffs. However, the settlement includes no admission of guilt and at this point it is unclear why the US government decided to settle the case.

Under the [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO0r4rbephK9oKfFXzXzMzCvqcOrBD_orLq9S1Z5GzSZjGcKYGnzxflYaTPaV8kcouLwlPVaw2z8IE4oWX0o8uawQxuCE4cgJHldlobauejojg8wClssIeC6NOOBE7nmQ6mQzaedc6UqQpvEakHzMwOL_mlfc4La2FgOdyeC3dFjykv4iwlC1DjEwmCxDpsYQjFUYJ7XbglrfbJTGKtI0KrY=&c=__sncvYlszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHsFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ], the Directorate of Defense Trade Controls (DDTC), the responsible directorate at the Department of State, commits to propose a draft for a new rule and 'fully pursue' a final rule 'revising USML Category I to exclude the technical data that is subject of the action'. While this suggests that the government pursues a permanent change of this regulation in the future, the settlement also included provisions with a more immediate effect. The Department of State approved the immediate public release of the specific technical data subject to the case using a license exemption and later published an announcement on the DDTC website on 27 July, issuing a temporary modification of USML Category I that excludes the technical data subject to the settlement from controls until a final rule is developed. Wilson in turn announced that he will again make the technical data for several small arms and components thereof available in a database from 1 August, also allowing others to upload their own files. Despite this announcement, Defense Distributed has already started to make some of their files available several days prior to 1 August.

Several gun-control activists and groups, as well as a number of US politicians and Attorneys General have initiated legal actions and legislative initiatives since the settlement was made public in July. A [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrr8PeCQNBQxq9VhzDuSNaV7ghplcBLi7-WXVPFkM385gj-GV7DtXhLYzYkKnNSdQX-S3EeYZPTyP46ZEFDpWqF8ybf8z2vbjSn5YlfvWTlAbEeaFRT7-6UTsbkprI2dIMMhNA6gE93TtA60dSg7UeaB8rJit7qyllIA4OVEHcwDakygc-SJH-V9HkRYduCTC24Oj5ixWcUq52kspiP2WvQx5Z2y7Qvqaewssdd2yisU4XgqaivWqQnuPLoJmfQ7tqfLhDZugeCV4=&c=__sncvYlszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHsFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] submitted collectively by gun-control groups to intervene and stop the provisions of the settlement from coming into effect. Several Attorneys General from US states and cities have [ HYPERLINK

"http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrdFj_RDOphvhTE4qpYs_J1g-Jh7ArNJryI7CppOjWvqhFp1XT9Um71wa8AUEI2oMHeipdMEEzFBnVunvzJCofg0tbBlcvqUpkLzInIIlgkmS7Zf9cNnnF2XeI2pJRYjAGe3bjK8TIC20VHNFDMXUEvg==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] directing Wilson to block access to the website for their constituents, first resulting in the website being blocked [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrY0iaL1no4-BC4td6aI-_HDeOQFAz_BpIdnYywkZwHafJ7CmDA1OWpaySDX6Xzb86LknI73PHpn7uaFpXIpYJ1zZmKhKpieAwR1q5AWHKZbMmNF-CTOCHFVASZL3skeG4rmOV38OArdCyQWFnjoUH6EfD63fX_ijRBz6thoJBsX5WmT8uGJFYcA==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ]. On 31 July, a Washington district judge [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzr3ZtiJiWjTSwDfAd2VeWiG2zFew3waBETu6rD3eAPKk67WoWjTq01-t1W7uhNGBP8TK169YbDMse3S7J_FteZJqakHly3nS4ZMOSVHGVmsq-mk3GEv5wqV5gXNdUIEgGMJ1sUbeTPkIU88odPfhDkgjqG101zj43ZfpQcvVk9aeMRV7ObP-tg8RtrmpUqZ2LF9JCWm53IeyMawL-P8KUI2Ww2dOruOiWcBHBJx4TAv8=&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ] against the Department of State, stopping it from implementing the modification of USML Category I until a hearing set for 10 August, forcing Wilson to once again take down the files. While the legal battle over the distribution in the US therefore seems to be far from over, it is worth considering what the developments in this case mean for the control of small arms more generally.

### Implications For Small Arms Control

 The potential impact on small arms proliferation depends on how these developments change the current situation and which factors may mitigate its impact. First, although they were no longer hosted in Wilson's database any more, the build files for the Liberator were still available online. When the files were originally posted in 2013 they were [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrXZtE4Rad_JDM-JV9ndZZKOpCb3Jcp8cByuBhFwFqCMCh5i1PYG-BtZ2B0SNkU7xZ008FlenfuhZS-6jQY9B4MQALQdE5oqf1cIOBMn9mvdle1wD14XQ_zAIY65ska5gXr4a4OPrPx1wROqi4302Svvymsz6JUq1ohvGmKarvpUHPYVsxO_FDfqEz7a-AtooavepKbp2qdfhc4sCVv6d1Ups86VuSLijFOFT74Lsisbbrohfe1eOLYMAbKNjXXWGFKMsQZI-9LsjfTjW7soGwy8_-NeJAYiP8GjzB-Zo6tUDOfGqHpaivsA==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUHFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ]. After they were removed from the website they continued to be available on many illegal file-sharing websites. Despite their availability, no game-changing developments in the illicit small arms

WASHSTATEC000712

market, terrorist acquisitions, uses in assassinations or for the circumvention of metal-detector controls have been observed.

Second, [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrBj_LwSB2QTVcKxQ-b_ZzGWfWPTtQLaWm8IK7p05QXnAgYF8YZ-1U2tAVK6jpScIJ9nvc_6_b4ymNf-ufPDSuQXM5TwAGmmZgbMOrn2n_RCFpDxlq8pXhkzb3Wr_R4wFUDXNg-No41g8Mdy2GG5N13zsQkCDYbVNaw310Qiil7cpsQzJ7CBsOvWEQRdoV-w_80daXAkJkSTH9UcE5_SLj3g==&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ], especially of polymer-based 3D-printed small arms or key parts such as receivers or pressure bearing components. The limited durability of the Liberator only enables it to fire a very small number of shots before components need to exchanged. In addition, the poor handling combined with reliability and safety issues provide an abundance of reason for an actor to choose another option.

Third, the costs of obtaining printers that work with high-quality materials remains high and both the production costs and efforts involved likely still do not provide an adequate substitute for black market acquisitions. Furthermore, illicit small arms in circulation are often neither marked, nor serialized and are thus similarly 'untraceable' as 3D-printed guns. New ways of regulating the sale and serialization of 3D-printed guns should nevertheless be developed.

 Finally, the often-cited advantages regarding undetectability [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzr_dr__ndQRa17fcDSyI-F0GYTQ7yTsVzZVgXF4_qggKDHgmc12hkuRq4VKgdcBINCKMigW9zdHVyCUjUr3JtkTHlK4dFEMy8884QnH_RwCAOGJd82quxR8TWJsyCqJp1_OSlAXsvsfE1C_IxXXPHv3mZcWW-KABlqACVkqK2dvJZVAWxGXK0o2L9D28b278HXdO4-a2MbZbm0EdxidF2Ny6rVY2acT-9E&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ]. They do not apply to common X-ray scanners and both ammunitions and necessary metal components make detection more likely. While the availability of 3D-printed gun files may thus only have a limited immediate impact on the proliferation of small arms, it should be considered which implications this approach may have for controls on 3D printing and the control of technical data more broadly, both legally and in terms of the signal it sends.

### *Controls On 3d Printing and Sharing Of Technical Data*

 The broader question underlying the case is on the approach to controls on the distribution of technical data for controlled items, the regulation of which forms one of the key aspects of controls on 3D printing and export controls more generally. Controls on 3D printing currently have three main elements: (*a*) controls on 3D printers, (*b*) controls on materials for 3D printing, and (*c*) controls on technical data for the production or manufacture of controlled items using 3D printing. 3D printers are inherently dual-use (usable both for civilian and military purposes) and are rarely covered by controls. Even if controls on a wider range of printers were to be developed, these would not be able to cover the capability range required for small arms production without creating major adverse effects on the growing 3D printing industry. New

WASHSTATEC000713

controls [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrRkJnUiYCOVkbOPISbAkXElOdJyf_gBOPemQyWEsIFHHKe98XeUeQp3TU3ld45v_RbL3y0VoVUp-Yq1eTHr7VAkxTXayIZMhPMIag6nn7De5PuV2yKM5f2yFILOgWW8crdf345WQlW-BZLnCoIFqveAo5p7sJOH6SVjxzRkP2VAjjaVUvKLhDVmeF8dDRf_-h4HD7Rr3ieSo=&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ], designed for other purposes than small arms production. Access to 3D printing is expected to increase significantly, both in terms of lower prices of printers and increasing capabilities of 3D printing services, further limiting their controllability. The materials used to 3D print small arms are also not covered by current controls and find a wide range of civilian applications. The combination of the limited risks that they pose and the possible adverse effects will likely preclude the introduction of controls.

 Export controls on the technical data required for the development, production, operation or repair of a controlled item to date provided the main regulatory measure on 3D printing. From an export controls perspective, the removal of such controls on technical data is a worrying development. While the impact may remain low in the area of small arms, if such rulings were to be extended to other areas, [ HYPERLINK "http://r20.rs6.net/tn.jsp?f=00183yGGWKzXnlycvX7S3Uf3tLkhdBjmPK-tLfWpS7hzyBiBo_OskZqO-QxnW3OWtzrv5-p5f6-pQlTdXkUyyf8PdpZNl787vR8X7zSP1a3E0f73fuCs_SIdE6ZLjueD50_IGAd5BlfBgNL4p41wRDs7zt-0iu6s8ceZMRzWZXCXPBX2kTGfCsjqHf70omDcFR-dJ8_SlFY79Ki7ItokmuPGlZKN2aF-kdTu1NrkbRyR4nCMU13OKn2m7ecxRDzU5z5psZsQ92P2VTEpwepKjDdFHBGlNwRXkl9&c=__sncvYIszxm6kg6Q6M786nEWJqNcqwlcjJZtPB5m100hQD8zW56wA==&ch=YUhFs1oupGSyV4MrfN0IvyAmhzPMqLWauO7Vb0gY2vuHnpCnbNnMQA==" \t "_blank" ], the impact could potentially be much more significant. Therefore, retaining controls on electronic transfers and sharing of technical data is an important part of export controls in a broader sense and especially in the context of increasing 3D printing and additive manufacturing capabilities.

*Author: Kolja Brockmann, Research Assistant in the Stockholm International Peace Research Institute (SIPRI) Dual-Use and Arms Trade Control program.*

WASHSTATEC000714

Message

| | |
|---|---|
| **From:** | Shellooe, Ryan P [ShellooeRP@state.gov] |
| **Sent:** | 8/14/2018 10:02:00 PM |
| **To:** | Carter, Rachel [CarterR@state.gov]; PM-Strategy [PM-Strategy@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Brown, Stanley L [BrownSL@state.gov]; O'Keefe, Kevin P [OKeefeKP@state.gov]; Miller, Michael F [Millermf@state.gov]; Mak, Daniella [MakD@state.gov]; Martin, Davette T [MartinDT@state.gov]; Dudding, Maria [DuddingM@state.gov]; Litzenberger,Earle D (Lee) [LitzenbergerED@state.gov]; Nute, Kathryn M [NuteKM3@state.gov]; McVerry, James [James.Mcverry.ctr@dla.mil] |
| **Subject:** | CPA MEDIA MONITORING: 14 August 2018 |



<u>Argentine Air Force, ready to help and cooperate.</u> Brigadier General Enrique Víctor Amrein, chief of the Argentine Air Force's (FAA, in Spanish) General Staff, focuses on modernizing the fleet, developing new technologies, and establishing alliances to consolidate FAA as a force in line with the requirements of the future.

<u>Sri Lanka to receive $39 million in Foreign Military Financing from USA.</u> The US State Department has announced that that approximately $39 million in Foreign Military Financing will be made available for Sri Lanka based on congressional approval. A release issued by the US embassy in Sri Lanka notes that the United States looks forward to discussing with the Government of Sri Lanka how this contribution could support the Bay of Bengal initiative, Sri Lanka's humanitarian assistance and disaster response priorities.

<u>Exclusive poll ... Rare consensus across parties: No 3D-printed guns.</u> Eight out of 10 Americans say 3D-printed gun blueprints shouldn't be available on the internet — a rare consensus on gun policy that cuts across party and ideological lines, according to a new Axios/SurveyMonkey poll.
The big picture: The latest poll shows Americans are still more divided on other gun issues. A slight majority disapproves of President Trump's overall gun policies, and his approval rating on guns is similar to his overall job approval rating.

<u>No need for military aid from US when there is no war – Nalaka Thero.</u> Venerable Bengamuwe Nalaka Thero says that there Sri Lanka does not need any military aid from the United States as there is no longer a war in the country. The United States announced Monday it would grant Sri Lanka $39 million to boost maritime security with the funds being provided as "foreign military financing", pending congressional approval.

<u>Donald Trump, Gunrunner for Hire.</u> American weapons makers have dominated the global arms trade for decades. In any given year, they've accounted for somewhere between one-third and more than one-half the value of all international weapons sales. It's hard to imagine things getting much worse—or better, if you happen to be an arms trader—but they could, and soon, if a new Trump rule on firearms exports goes through.

<u>UN says 30,000 ISIS fighters remain in Iraq and Syria.</u> A covert version of ISIS sustained by tens of thousands of members will survive in Iraq and Syria even after the militant group loses the last of its territory, UN experts have warned. At the height of its power, ISIS controlled the major cities of Mosul and Raqqa and ruled over millions of people. Today, it is consigned to a small patch of desert in Iraq's Anbar Province, some settlements along the Euphrates River and a barren volcanic field in southern Syria.

Ryan P. Shellooe
Political-Military Affairs
U.S. Department of State
O: (202) 647-3019

**Official**

UNCLASSIFIED

WASHSTATEC000716

Message

| | |
|---|---|
| **From**: | Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu] |
| **Sent**: | 8/16/2018 6:07:33 PM |
| **To**: | hartrl@state.gov |
| **Subject**: | 18-0816 Thursday "Daily Bugle" |

## Thursday, 16 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. State/DDTC: (No new postings.)

### NEWS

4. Bloomberg: "Trump Asks Judge Not to Block Access to 3-D Gun Instructions"
5. Ekathimerini.com: "American Hellenic Institute Says U.S. Ban on Arms Sales to Cyprus 'Unlawful'"
6. ST&R Trade Report: "Section 301 Tariff Exemption for U.S. Goods Returned Narrowed Significantly"

### EX/IM TRAINING EVENTS & CONFERENCES

7. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep

### EDITOR'S NOTES

8. Bartlett's Unfamiliar Quotations
9. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

10. Weekly Highlights of the Daily Bugle Top Stories

**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * * *

**OTHER GOVERNMENT SOURCES**

1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* State; NOTICES; Designation as a Foreign Terrorist Organization:
  - Abu Sayyaf Group (and Other Aliases); and
  - Boko Haram (and Other Aliases) [Publication Dates: 17 Aug 2018.]

* State; NOTICES; Designation as a Specially Designated Global Terrorist:

- Qassim Abdullah Ali Ahmed, aka Qassim al-Muamen, aka Qassim Al Muamen, aka Qassim Abdullah Ali, aka Qassim Abdullah [Publication Date: 17 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

2.

Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

3.

State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

‒

NEWS

4.

Bloomberg: "Trump Asks Judge Not to Block Access to 3-D Gun Instructions"
(Source: Bloomberg, 16 Aug 2018.) [Excerpts.]

The Trump administration on Wednesday urged a federal judge not to stand in the way of public access to blueprints for making guns using 3-D printers.

Arguing there's no legal basis for the State Department to block availability of the instructions on the internet, and no need for such regulation, the government's position would allow people to make plastic guns at home, bypassing stores and rules and background checks.

Nineteen states and the District of Columbia are suing the administration, arguing the downloadable firearms will be untraceable and easily available to criminals and terrorists.

The State Department said the states "misunderstand" limits on its authority to prevent the harm they warn against. Unless the technology or weapons at issue pose a threat to national security by falling into the hands of

foreigners, the government argued, it's up to other federal agencies and states to regulate them. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

5.

## Ekathimerini.com: "American Hellenic Institute Says U.S. Ban on Arms Sales to Cyprus 'Unlawful'"
(Source: Ekathimerini.com, 16 Aug 2018.) [Excerpts.]

The U.S. prohibition on sales of defense and military technology to Cyprus is "unlawful" and can be removed without the need for legislation, a Greek American lobby group has said.

  "We contend the State Department has the legal authority to remedy what has been, for years, an unlawful prohibition on arms transfers to the Republic of Cyprus," American Hellenic Institute (AHI) president Nick Larigakis said.

  "We urge the State Department to exercise the requisite political will to get this done. It is in the best interests of the United States for the Republic of Cyprus to look to the United States, and not any other nation, to procure its defense materials," he added.

His comments came as the AHI announced the publication of a five-page briefing on the International Traffic in Arms Regulations (ITAR), under which the US has banned the sales of US defense articles and services to Cyprus since 1985. ...

The AHI said that in discussions with State Department officials in June, it had submitted a memorandum on the issue. The officials forwarded the memorandum to the appropriate office for review. The AHI has raised the issue in follow-up meetings with the State Department.

The briefing describes the ITAR, analyzes why the prohibition on Cyprus is unlawful, explains how the State Department itself can remove Cyprus from the application of the ITAR prohibition, and concludes that legislation is not necessary.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

6.

## ST&R Trade Report: "Section 301 Tariff Exemption for U.S. Goods Returned Narrowed Significantly"
(Source: Sandler, Travis & Rosenberg Trade Report, 16 Aug 2018.)

WASHSTATEC000720

Effective Aug. 23, the use of a provision allowing goods assembled abroad from U.S. components to avoid the additional 25 percent tariff imposed on imports from China will be narrowed significantly. This action will affect the $34 billion worth of Chinese products already subject to the tariff (possibly retroactive to July 6) and the $16 billion worth of such goods that will be subject to the tariff as of Aug. 23. However, there are still ways affected companies can reduce or avoid this tariff.

HTSUS 9802.00.80 provides duty-free treatment for imports of goods assembled abroad in whole or in part of U.S. components that (a) are exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity, and (c) have not been subject to operations other than those considered incidental to assembly. Until now goods imported from China and meeting the terms of this provision have been fully exempt from the tariffs referenced above, which were announced after a Section 301 investigation determined that China's acts, policies, and practices related to technology transfer, intellectual property, and innovation are unreasonable and discriminatory.

However, the Office of the U.S. Trade Representative has now issued a notice amending the HTSUS provisions implementing the Section 301 tariff (HTSUS 9903.88.01 and 9903.88.02) to specify that for goods imported under HTSUS 9802.00.80 the tariff will apply to the value of the article less the value of any U.S. components incorporated into the article. Similarly, for goods imported from China under HTSUS 9802.00.40, 9802.00.50, and 9802.60, the additional tariff will be assessed on the value of repairs, alterations, or processing performed abroad but not the underlying U.S. good or material.

Despite USTR's action, there are still ways companies can lower their exposure to the Section 301 tariff. For example, USTR plans to soon announce a process for requesting the exclusion of products on the $16 billion list from the tariff, and a similar process is already in place for goods on the $34 billion list. Other options include tariff engineering to permit reclassification, supply chain modification, and qualification under other HTSUS Chapter 98 provisions.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

_

EX/IM TRAINING EVENTS & CONFERENCES

7. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

* What: The ECS ITAR/EAR Symposium & Boot Camp, Annapolis, MD
* When: September 11-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions & Consulting (ECS)
* ECS Speaker Panel:  Timothy Mooney, Commerce/BIS; Matt Doyle,
Lockheed; Matt McGrath, McGrath Law, Scott Jackson, Curtiss-Wright,
Suzanne Palmer & Mal Zerden.
* Register here for the three-day event or by calling 866-238-4018 or e-
mail spalmer@exportcompliancesolutions.com

back to top

* * * * * * * * * * * * * * * * * * *

_

**EDITOR'S NOTES**

## 8. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Francis Darwin** (Sir Francis Darwin; 16 Aug. 1848 - 19 Sep. 1925; was a
son of the British naturalist and scientist Charles Darwin. He, like his father,
was a botanist.)
 - *"In science, the credit goes to the one who convinces the world, not to
whom the idea first occurs."*

* **Michael Friedman** (born April 2, 1947) is an American philosopher of
science, best known for his work on scientific explanation, philosophy of
physics and Immanuel Kant. Friedman has also done important historical
work on figures in Continental philosophy such as Martin Heidegger and
Ernst Cassirer.)
  - *"The scientific name for an animal that doesn't either run from or fight its
enemies is lunch."*

back to top

* * * * * * * * * * * * * * * * * * *

## 9. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in
the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended
in the Federal Register.  The latest amendments to applicable regulations
are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms,
Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns,
Destructive Devices and Certain Other Firearms; Background Checks for

WASHSTATEC000722

Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 Apr 2018) of Bartlett's Annotated FTR ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
 - Last Amendment: 14 Aug 2018: Harmonized System Update 1812,

WASHSTATEC000723

containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I,
Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the
International Traffic in Arms Regulations: Addition of South Sudan [Amends
ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the
ITAR with all amendments is contained in *Bartlett's Annotated ITAR*
("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to
date, plus a large Index, over 800 footnotes containing amendment histories,
case annotations, practice tips, DDTC guidance, and explanations of errors in
the official ITAR text. Subscribers receive updated copies of the BITAR in Word
by email, usually revised within 24 hours after every ITAR amendment. The
BITAR is available by annual subscription from the Full Circle
Compliance website. BAFTR subscribers receive a 25% discount on
subscriptions to the BITAR, please contact us
to receive your discount code.

                                                                    back to top

       * * * * * * * * * * * * * * * * * *

10. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily
Bugle Top Stories" published here.

                                                                    back to top

       * * * * * * * * * * * * * * * * * *

                            _

 EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled
by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and
Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im
Daily Update is emailed every business day to approximately 8,000 readers
of changes to defense and high-tech trade laws and regulations. We check
the following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified,

WASHSTATEC000724

or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

_

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

WASHSTATEC000725

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000726

Message

| | |
|---|---|
| **From:** | Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu] |
| **Sent:** | 8/17/2018 6:46:10 PM |
| **To:** | hartrl@state.gov |
| **Subject:** | 18-08017 Friday "Daily Bugle" |

## Friday, 17 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. [No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DoD/DSCA Updates SAMM with Clerical and Administrative Changes
4. State/DDTC: (No new postings.)
5. EU Commission Releases Recommendation Related to Identification of Conflict-Affected and High-Risk Areas and Other Supply Chain Risks

### NEWS

6. Al Jazeera: "Turkey Doubles Tariffs on Some U.S. Goods Amid Rising Tensions"
7. Reuters: "U.S. Imposes Sanctions on Myanmar Military Over Rohingya Crackdown"
8. Schenker: "GRI Notice for Far-East to USA & Canada"
9. ST&R Trade Report: "Dates and Deadlines: Tariffs, Origin Ruling, AGOA, CBP Forms, Shipping Rules"
10. The Wall Street Journal: "Law Formalizes Export Control Rules"
11. The Washington Free Beacon: "Justice Dept. Says State AGs Misunderstand Cody Wilson Settlement"

### COMMENTARY

12. The Export Compliance Journal: "Where Denied Parties and Address Screening Intersect"
13. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "State Department to Impose

New Russia Sanctions"
14. R.C. Burns: "To File or Not to File, That Is the $300,000 Question"

## EX/IM TRAINING EVENTS & CONFERENCES

15. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
16. List of Approaching Events: 6 New Events Posted This Week

## EDITOR'S NOTES

17. Bartlett's Unfamiliar Quotations
18. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)
19. Weekly Highlights of the Daily Bugle Top Stories

## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICES; Denial of Export Privileges: Alex Bryukho [Included in the Daily Bugle of 15 Aug 2018; publication Date: 20 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DoD/DSCA Updates SAMM with Clerical and Administrative Changes
(Source: DoD/DSCA, 17 Aug 2018.)

* DSCA Policy Memo 18-40 Security Assistance Management Manual (SAMM), Administrative Changes has been posted.

This memo updates Section C2.1.5.6.4 and Table C11.T6, EDA Legislation Summary.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. EU Commission Releases Recommendation Related to Identification of Conflict-Affected and High-Risk Areas and Other Supply Chain Risks
(Source: Official Journal of the European Union, 17 Aug 2018.)

*Recommendations*

\* Commission Recommendation (EU) 2018/1149 of 10 August 2018 on non-binding guidelines for the identification of conflict-affected and high-risk areas and other supply chain risks under Regulation (EU) 2017/821 of the European Parliament and of the Council

*[Editor's Note: Regulation (EU) 2017/821 of the European Parliament and of the Council of 17 May 2017 laying down supply chain due diligence obligations for Union importers of tin, tantalum and tungsten, their ores, and gold originating from conflict-affected and high-risk areas.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

—

**NEWS**


6.

## Al Jazeera: "Turkey Doubles Tariffs on Some U.S. Goods Amid Rising Tensions"
(Source: Al Jazeera, 15 Aug 2018.)

*Cars, tobacco, and alcohol hit with new tariffs in response to what vice president calls "U.S. attacks" on the economy.*

Turkey doubled tariffs on some imports from the United States - such as passenger cars, alcohol and tobacco - in what it said was retaliation for "deliberate attacks" on its economy.

The development on Wednesday comes amid escalating tensions between Turkey and the US, its NATO ally.

A decree published in Turkey's official gazette and signed by Turkish President Recep Tayyip Erdogan doubled the tariffs on passenger cars to 120 percent, on alcoholic drinks to 140 percent, and on tobacco to 60 percent.

Tariffs were also doubled on goods such as cosmetics, rice, and coal. ...

Erdogan said on Tuesday his country would boycott all American-made electronic products, including U.S.-made iPhones. ...

The crisis came days after U.S. President Donald Trump announced a doubling of steel and aluminum tariffs on Turkey, as Washington pushes Ankara to release Evangelical Christian pastor Andrew Brunson, who is being held on terrorism charges for nearly two years.

A Turkish court on Wednesday rejected an appeal for Brunson's release.

Earlier this month, Erdogan ordered the assets of two U.S. officials frozen in retaliation for sanctions imposed on Turkey's justice and interior ministers over the U.S. pastor's detention. ...

back to top

* * * * * * * * * * * * * * * * * *



## 7.
## Reuters: "U.S. Imposes Sanctions on Myanmar Military Over Rohingya Crackdown"

(Source: Reuters, 17 Aug 2018.) [Excerpts.]

The United States on Friday imposed sanctions on four Myanmar military and police commanders and two army units for involvement in what it called "ethnic cleansing" and other human rights abuses against the country's Rohingya Muslims, the Treasury Department said.

The sanctions marked the toughest U.S. action so far in response to Myanmar's crackdown on the Rohingya minority, which started last year and has driven more than 700,000 people into neighboring Bangladesh and left thousands of dead behind.

But the Trump administration did not target the highest levels of the Myanmar military and also stopped short of calling the anti-Rohingya campaign crimes against humanity or genocide, which has been the subject of debate within the U.S. government.

The measures were announced as Secretary of State Mike Pompeo, according to U.S. officials, prepares to release the findings of an intensive U.S. investigation of alleged atrocities by Myanmar authorities against the Rohingya. ...

In November, following the lead of the United Nations and the European Union, then-Secretary of State Rex Tillerson declared that the Rohingya crisis constituted "ethnic cleansing," a designation that increased pressure on its civilian leader, Nobel peace laureate Aung San Suu Kyi. ...

back to top

* * * * * * * * * * * * * * * * * *



## 8.
## Schenker: "GRI Notice for Far-East to USA & Canada"

(Source: Schenker Inc., 16 Aug 2018.)

Following announcements are issued by major Steamship Lines, here are the intended NEW General Rate Increase (GRI) effective September 15, 2018, for Eastbound cargo from Far East and Indian Sub-Continent origins to destinations in Canada and USA with details as follows:
  - USD 900 per 20' standard container

WASHSTATEC000731

- USD 1000 per 40' standard container (40' x 8'6")
- USD 1125 per 40' high cube container (40' x 9'6")
- USD 1266 per 45' container
- LCL: US$20.00 per w/m. Min US$20.00

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. ST&R Trade Report: "Dates and Deadlines: Tariffs, Origin Ruling, AGOA, CBP Forms, Shipping Rules"
(Source: Sandler, Travis & Rosenberg Trade Report, 17 Aug 2018.)

  Aug. 20 - deadline for comments to FTZ Board on requests for production authority, subzone expansion
  Aug. 20 - USTR hearing on proposal to impose 10 percent tariff on $200 billion in Chinese goods
  Aug. 20 - deadline to seek judicial review of CBP origin ruling on insufflation tubing
  Aug. 22 - effective date of FMC final rule revising regulations on negotiated rate/service arrangements
  Aug. 23 - deadline for comments on annual AGOA eligibility review
  Aug. 23 - deadline for comments to CBP on entry/ID application, ACE cargo release
  Aug. 23 - effective date of additional tariffs on Chinese products
  Aug. 23 - effective date of revision to Section 301 tariff exemption for U.S. goods returned
  Aug. 24 - effective date of DOE final rule to expedite small-scale natural gas exports
  Aug. 24 - deadline for comments to FTZ Board on proposed expansion of Hawaii zone

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The Wall Street Journal: "Law Formalizes Export Control Rules"
(Source: The Wall Street Journal, 17 Aug 2018.) [Excerpts.]

*Commerce Department to use new tools, such as undercover agents and wiretaps, to conduct investigations*

The U.S. Commerce Department has statutory authority for the first time in nearly 25 years to control certain exports, and it will lead a regular, ongoing interagency review of new technology to assess whether the U.S. should restrict its export.

The Export Control Act, signed into law this week by President Trump as part of an annual national defense policy legislation, codified existing rules authorizing the Commerce Department's role in controlling certain exports

WASHSTATEC000732

involving sensitive technology. The authorization process underpinning the rules was handled via executive order subject to an annual renewal since 1994, when the last export-controls legislation expired. ...

Attorneys practicing in the area said that though the law didn't create new rules, it put the export-control regime on sound footing by providing a statutory basis for the existing ones. ...

back to top

⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂

## 11. The Washington Free Beacon: "Justice Dept. Says State AGs Misunderstand Cody Wilson Settlement"
(Source: The Washington Free Beacon, 16 Aug 2018.)

The Department of Justice announced on Thursday that it filed a brief in opposition to a preliminary injunction against a State Department agreement with 3D-printed gun pioneer Cody Wilson. The injunction was requested by a group of state attorneys general in federal court.

In the brief, DOJ accused the Attorney Generals (AGs) of misunderstanding the issue at hand in the settlement. It further claimed that the AGs want the Department of State to exceed the authority granted to them under current law. DOJ said the case was not about the legality of 3D-printed firearms but, rather, about the potential export of technical firearms data to foreign nationals.

 "This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms," DOJ said in the brief. "Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies-and the states-to regulate."

In 2013, the State Department sent a letter to Cody Wilson claiming his publishing of designs for a single-shot 3D-printed firearm known as The Liberator and other firearms or firearms accessories without first obtaining approval from them could be considered an unauthorized export of firearms to foreign nationals that might result in potentially unlimited fines and jail time. Wilson took all gun-related design files down from his website as a result-though the files have remained freely available on dozens of other websites since then. He then joined with the Second Amendment Foundation to sue the State Department claiming it was infringing upon his First Amendment and Second Amendment rights.

On July 15, 2018, Wilson and the Second Amendment Foundation announced that the State Department had given up their claim against the publishing of the gun designs and settled with them. The State Department later told reporters they had settled because of advice from the Department of Justice that they would eventually lose the case.

"This has obviously gone through a legal process," Heather Nauert, State Department spokesperson, told reporters during a briefing. "The Department of Justice was advising the State Department on this entire legal matter. The Department of Justice suggested that the State Department and the U.S. government settle this case, and so that is what was done. We were informed that we would've lost this case in court, or would have likely lost this case in court based on First Amendment grounds. We took the advice of the Department of Justice, and here we are right now."

Gun-control activists were alarmed by the decision to settle the case and allow Wilson to publish the designs. Though efforts by leading gun-control groups to stop the settlement in court failed, eight state AGs were able to get U.S. District Court judge Robert S. Lasnik to grant a temporary restraining order against the State Department to prevent enforcement of the deal. This week's filing by the DOJ is in response to the state AGs' request that the temporary restraining order be turned into a preliminary injunction.

The DOJ said that the argument employed by the state AGs in their request addresses concerns beyond what the State Department has the power to regulate.

"Plaintiffs misunderstand the fundamental limit on the State Department's authority," DOJ said in the brief. "According to Plaintiffs, the Government's export-related determinations-specifically with respect to the export of technical data developed by Defense Distributed-have jeopardized their ability to protect the safety and health of their residents."

DOJ said the AGs are concerned with potential crimes committed by those in the United States if the files published by Wilson were to be downloaded by criminals in their states. However, DOJ said, the State Department's power to regulate the export of firearms does not allow it to ban the publication of information in the United States out of fear that domestic criminals may misuse it.

"The domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law," the DOJ said in the brief. "Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case."

The DOJ did reiterate that the manufacture or possession of completely plastic firearms that can pass through a metal detector or airport X-ray machine undetected is already illegal under federal law. Attorney General Jeff Sessions

said the DOJ would continue to enforce the Undetectable Firearms Act even though it is not at issue in the case.

"Under federal law, it is illegal to manufacture or possess plastic firearms that are undetectable. Violation of this law is punishable by up to five years in prison," Sessions said in a statement. "Such firearms present a significant risk to public safety, and the Department of Justice will use every available tool to vigorously enforce this prohibition. We will work with federal, state and local law enforcement to identify any possible cases for prosecution. We will not stand for the evasion, especially the flaunting, of current law and will take action to ensure that individuals who violate the law by making plastic firearms and rendering them undetectable, will be prosecuted to the fullest extent."

Cody Wilson's Liberator design, which has been at the center of the case and the media firestorm surrounding it, utilizes a metal firing pin and is intended to include a metal plate which make it unlikely to evade a metal detector.

The DOJ said it did not believe the state AGs' argument met the standard necessary to grant a preliminary injunction against the State Department's settlement with Cody Wilson and characterized doing so as being akin to the court substituting its own judgement for that of the executive branch.

"Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the merits of their claims, or that it is in the public interest for the Court to second-guess the national security determinations of the Executive Branch," the DOJ said in the brief.

*back to top*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

–

**COMMENTARY**

12.

## The Export Compliance Journal: "Where Denied Parties and Address Screening Intersect"
(Source: The Export Compliance Journal, 2 Aug 2018.)

Restricted party screening is more than just about screening for names of individuals and companies that appear on denied parties watch lists maintained by governments and other official organizations.

When looked at in its entirety, the screening process represents a mosaic of sanctions, debarments, and embargoes in addition to denied persons. The reasons for these debarments can be for any variety of reasons based on the regulations that apply. These include not only export violations, but also financial, criminal, regulatory, or healthcare violations.

WASHSTATEC000735

As discussed in previous Trade Compliance 101 articles, looking for a name or company is critically important in the due diligence process, and everyone in the organization should be on the lookout to prevent violations. However, there should be another step in the process: Address screening, or address search.

"**But wait**," you say, "**you cannot debar a street, many businesses could operate there!**"

True, but address screening isn't the same as a name or company, where you are looking to match specifically against that entity. Address screening is about verification; it is about preventing or further mitigating the chance of doing business with a debarred party.

### So I have the address, now what?

The best way to mitigate risk is to have an effective compliance solution, and use a reliable source for addresses of the businesses and persons you are screening.

Matching an address for a restricted party, particularly when you do not have a match against the company you entered, could have implications in your overall ability to do business with that company. Is it a coincidence that the address is the same, or appears the same? Are they a subsidiary of the debarred party? What, if any, sanctions or embargoes apply?

It is always possible that the location contains multiple unrelated businesses, and that further review of the addresses and analysis will reveal that there is no connection between your potential customer and the one listed as debarred at that location. You are going to want to be able to prove that though, and have the details showing that you were fully aware of the situation.

### So is the main concern that debarred companies with change their names?

That is one concern, as highlighted in this case, which details Chinese company, ZTE Corporation's, efforts to deceive US suppliers using subsidiaries to facilitate shipments to Iran. Even after publicly admitting to the scheme and claiming to cease operations in Iran, ZTE had simply renamed its Iranian subsidiary, according to the findings.

It appears to have taken several years before the US government authorities caught wind of the practice, but the new subsidiary name was ultimately added to the BIS Entity List.

### Are there other concerns?

There have also been cases where exports or shipping has occurred due to inaccuracy, or possible fraud, related to addresses. Often, it is difficult to determine where the failure actually occurred-was the address incorrect

WASHSTATEC000736

intentionally? Was it a long address that did not follow a conventional format that was difficult to search?

Take a look at North Korea's <u>efforts to avoid the sanctions</u> against that country. Fake addresses are at the core of this entire process. After all, you may be able to debar a named company, even if it is fake, or a real address where the fake company was located. But what about a fake address? If the address is truly forged, and exists in no physical location, that information should be easy enough to unearth. But what if a fake businesses claims to be operating at a real address that doesn't belong to them. Should the location of a neighborhood corner grocer be debarred by the authorities because some phony bank claims the location is theirs?

### *So what do we do?*

The best course of action is simply due diligence, using a denied party screening tool that includes an address-only search function. You could also do it manually-using search engines, maps, and news articles-but this type of page-by-page verification tends to be time-consuming and a waste of precious work resources.

And, of course, document what you're doing and the review you've performed. Unlike the unwitting companies in 2006, who could claim ignorance in order to mitigate the issue, government authorities have long since moved past allowing ignorance as a defense.

Regardless of the overall method, or methods, used, creating a standardized process to verify the location of your business parties will usually lead you down the right path.

### *A Glossary of Ideas In This Article*

  **- Address screening or checking:** Address screening usually refers to the actual process of screening an address (without an individual or organization) against the various restricted party lists. Address checking can either be done through an automated tool, or via a manual process of viewing the location of the party being screened.
  **- Verification:** Verification, when used in the context of Restricted Party Screening, refers to the overall process of ensuring that the data is correct, that details about the party to be screened are true. Verification can take on different forms, from conducting a general web search to ensure that the business name given matches the official one, to checking that addresses are real and accurate.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

13. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "State Department to Impose New Russia Sanctions"
(Source: Thomsen and Burke LLP, 17 Aug 2018. Available by subscription

via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

On August 8, 2018, the Department of State announced plans to impose Chemical and Biological Weapons Control and Warfare Elimination Act sanctions on Russia ("CBW Act"). The sanctions are in response to a determination by the U.S. government that the Russian government used "Novichok", a nerve agent, in an attempt to assassinate UK citizen Sergei Skripal and his daughter Yulia Skripa.

The sanctions under the CBW act are implemented in two phases. The State Department has sent a notification to Congress and the first round of sanctions will be imposed after a 15-day review period. We expect that a Federal Register notice will be published on about August 22nd, implementing the initial sanctions. These sanctions will be:

- a prohibition of exports of national security-sensitive goods and technology,
- the termination of foreign assistance,
- suspension of sales of defense articles or services, and
- the denial of credit or other financial assistance by the US government.

Based on the State Department's background briefing, we believe that the prohibition on the export of national security-sensitive goods and technology applies to items requiring an export license to Russia and not to items eligible for export under a license exception. From the background briefing:

> We notified Congress today that pursuant to this act we intend to impose sanctions against the Russian Federation in a number of respects, the most significant of which is the imposition of a presumption of denial for all national security sensitive goods or technologies that are controlled by the Department of Commerce pursuant to the Export Administration Regulations. These goods are currently subject to a license - a case-by-case license determination, but we are - henceforth, when these sanctions go into effect, we will be presumptively denying such applications.

The second phase of the sanctions will be implemented on approximately November 8th. The second phase will be imposed if the executive branch cannot certify that Russia: (a) is no longer using chemical or biological weapons, (2) has provided reasonable assurances that it will not in the future use such weapons, and (3) that on-site inspections or other reliable means can be used to verify compliance. Under the CBW Act, the President must impose 3 of the following 6 sanctions:

- Further export restrictions including a prohibition on exports to Russia of all other goods and technology (excluding food and other agricultural commodities and products).
- Import restrictions on articles that are the growth, product, or manufacture of Russia.
- Prohibiting U.S. banks from making any loan or providing any credit to the

government of Russia, except for loans or credits for the purpose of purchasing food or other agricultural commodities or products.
  - Downgrading or suspending diplomatic relations between the United States and the government of Russia.
  - Suspending air carriers owned by the government of Russia from transporting to or from the United States and terminating any air service agreement between the United States and Russia (with an exception for emergencies.

The State Department noted that it was looking at carve outs and waivers for the second phase of sanctions. The carve outs will be a policy of case by case licensing, rather than a presumption of denial for licenses for:

  - the provision of foreign assistance to Russia and to the Russian people,
  - the safety of commercial passenger aviation,
  - space flight activities,
  - purely commercial end users for civilian end uses, and
  - exports to wholly-owned subsidiaries of U.S. companies and other foreign companies in Russia.

It is likely that if the President must impose the second set of sanctions, he will impose the least restrictive ones: opposing multilateral bank loans, prohibiting U.S. bank loans, and downgrading diplomatic relations.

back to top

* * * * * * * * * * * * * * * * * * *

14.
R.C. Burns: "To File or Not to File, That Is the $300,000 Question"
(Source: Export Law Blog, 16 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC, Clif.Burns@bryancave.com, 202-508-6067).

The Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), just signed into law as part of the John McCain National Defense Authorization Act of 2018 ("NDAA"), will change significantly the way in which the Committee on Foreign Investment in the United States ("CFIUS") reviews foreign investments. It expands the definition of transactions covered by the process, makes the review process mandatory for certain of these transactions, and imposes a filing fee equal to the lesser of $300,000 or one percent of the value of the transaction.

Before FIRRMA, the definition of a "covered transaction" set forth in section 721(a)(3) of the Defense Production Act was "any merger, acquisition, or takeover ... by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." The new law expands this definition to cover certain real estate transactions. In addition, a covered transaction now includes certain investments, even if they

WASHSTATEC000739

do not result in foreign control, in U.S. businesses that are involved with "critical infrastructure," that have "critical technologies," or that maintain or collect sensitive personal data on U.S. citizens.

The real estate transactions that are covered are those that are part of an air or maritime port or are in close proximity to a military installation and that could result in an opportunity for foreign surveillance of that military installation. Exempted from these covered real estate transactions are purchases of single housing units or transactions in urbanized areas as defined by the Census Bureau.

The investments in critical infrastructure, critical technology companies, or companies with sensitive personal data that are covered are those that will give the foreign entity access to "material non-public technical information." Additionally, these investments will be covered transactions if they will give the foreign entity membership on the board of directors, observer rights or nomination rights. Finally, a non-controlling investment transaction will be a covered transaction if it gives the foreign entity any involvement, other than through voting of shares, in "substantive decision-making" involving sensitive personal data, critical technologies or critical infrastructure.

Of particular interest to readers of this blog is the definition of critical technologies which includes most, but not all, items that are subject to export controls. All items on the United States Munitions List are critical technologies. Most items on the Commerce Control List are critical technologies with the exception of items that are only controlled for anti-terrorism (AT), Firearms Convention (FC), crime control (CC) or encryption (EI). So, companies that make handcuffs (ECCN 0A982) are fair targets for foreign acquisition without CFIUS review but those that make triethanolamine (ECCN 1C350.c.10) for shampoo and cosmetics are not. Critical technologies will also include "emerging and foundational technologies," which is a new and yet unpopulated category of export-controlled items described in the Export Control Reform Act of 2018, which was also enacted as part of the NDAA.

FIRRMA creates a new filing called a "declaration" (as opposed to a "notice," the term both before and after the new legislation for the voluntary filing that commences CFIUS review). The declaration, which is not subject to the $300,000 or 1% fee, is meant to be a short document and no more than 5 pages. And although declarations can be voluntarily filed, they will be mandatory where "a foreign government has, directly or indirectly, a substantial interest" in a covered transaction. Any party required to file the mandatory declaration may, at its own option, file a regular, and longer, notice of the transaction instead. Prior to FIRRMA, involvement by a foreign government would force a 45-day CFIUS investigation after the initial 30-day review period but would not require any mandatory filings.

In response to the declaration, CFIUS may require the filing of the regular written notice (which will require the payment of the new $300,000 or 1% fee), may initiate a unilateral investigation, or may inform the parties that no further review is required. It may also state that it cannot make any decision based on the declaration and merely advise the parties of their right to file the

WASHSTATEC000740

standard written notice. Rather perplexingly, the new law states that CFIUS "may not require a declaration to be submitted ... with respect to a covered transaction more than 45 days before the completion of the transaction." Given that one response to the declaration is the initiation of the normal CFIUS process, which can given the statutory time frame take more than 45 days, it is not clear what this time limit means or how it is enforced.

The time frame for the review process has also been changed by the new legislation. Before the new law, the CFIUS process consisted of a 30-day review process, an optional 45-day investigation after the review, and then 15 days for the President to act after the investigation process was completed. The new law extends the initial review period to 45 days.

During the consideration of the bill in the House and the Senate, the two chambers took different approaches to the issue of "countries of concern," largely in response to concerns about Chinese investment resulting in China pilfering U.S. technology. The House took a naughty list approach, calling out China, Russia, and Venezuela by name, while the Senate took the nice list approach, putting NATO countries and major non-NATO allies, among others, on the nice list. The new law takes the Senate nice list approach, but give CFIUS the authority to decide, based on national security considerations, which countries are on the nice list. The effect of this determination is that non-controlling investments in real estate or involving critical infrastructure, critical technologies or sensitive personal data by companies from countries on the nice list would not be covered transactions.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



EX/IM TRAINING EVENTS & CONFERENCES

## 15. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices.  The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu.

*Register today and get a 10% Early Bird discount on the course fee!*

back to top

* * * * * * * * * * * * * * * * * *

## 16. List of Approaching Events: 6 New Events Posted This Week
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to Alexander Witt, Events & Jobs Editor (email: awitt@fullcirclecompliance.eu), composed in the below format:

    # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK; CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### *Continuously Available Training*

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com

WASHSTATEC000742

* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

### Seminars and Conferences

* Aug 20: Cincinnati, OH; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 21: Leeds, UK; "Understanding Exporting"; Chamber International
* Aug 22: London, UK; "Advanced Exporting"; UK Institute of Export and International Trade
* Aug 22: Minneapolis, MN; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 23: Cincinnati, OH; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 24: Houston, TX; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 24 - 27: New York, NY; "Best Customs Broker Exam Course"; GRVR Attorneys
* Aug 29: Leeds, UK; "Understanding Incoterms"; Chamber International
* Sep 3: Edinburgh, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 4: Leeds, UK; "Methods of Payment & Letters of Credit"; Chamber International
* Sep 4: London, UK; "An Introduction to Exporting"; UK Institute of Export and International Trade
* Sep 5: Aberdeen, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 5: Aberdeen, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 6: Aberdeen, UK; "Licenses Workshop"; UK Department for International Trade
# Sep 11-13: Annapolis, MD; "ITAR/EAR Symposium & Boot Camp Global

Trade Academy"; Export Compliance Solutions (ECS)
* Sep 11-13: Detroit, MI; "Export Controls Specialist Certification"; Global Trade
Academy
* Sep 11: Leeds, UK; "Export Documentation and Export Procedures";
Chamber International
* Sep 12: Buffalo, NY; "Export Documentation and Procedures Seminar";
International Business Training
# Sep 12: Melbourne, Australia; Defence Export Controls Outreach; Australian
Department of Defense
* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of
Industry and Security
* Sep 12-19: Chicago, IL; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 13: Buffalo, NY; "Import Documentation and Procedures Seminar";
International Business Training
* Sep 13: Frankfurt, Germany; "BAFA/U.S. Export Control Seminar 2018";
* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International
Compliance Professionals Association (ICPA)
* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National
Association of Foreign Trade Zones (NAFTZ)
* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio
State University in Columbus"; Export Compliance Training Institute
(ECTI); jessica@learnexportcompliance.com; 540-433-3977
* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade
Academy
* Sep 18: Anaheim, CA; "Import Documentation and Procedures Seminar";
International Business Training
* Sep 18: Kontich, Belgium; "Export Controls Master Class"; Customs4Trade
* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters";
Global Trade Academy
* Sep 18-19: London, UK; "Decoding Trade Controls, Sanctions And
Regulations On Dual-Use Goods"; KNect365
* Sep 18: San Diego, CA; "12th Annual CompTIA Global Trade Compliance
Best Practices Conference"; CompTIA
* Sep 19: Washington, D.C.; "DDTC In-House Seminar"; Department of State
(Registration: Aug 10 - Aug 31; first come, first served)
* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade
Academy
* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
* Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
* Sep 20: Pittsburgh, PA; "Export Documentation and Procedures Seminar";
International Business Training
* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade
Academy
* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade
Academy
* Sep 21: Pittsburgh, PA; "Incoterms 2010: Terms of Sale Seminar";
International Business Training
* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR
Attorneys
* Sep 24: Seligenstadt, Germany; "Follow-Up Fachtagung"; FALEX

* Sep 25-26; Chicago, IL; "Financial Crime Executive Roundtable"; American Conference Institute
* Sep 25: Kansas City, MO; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 25: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* Sep 25-26: San Francisco, CA; "11th West Coast Conference on FCPA Enforcement and Compliance"; American Conference Institute
* Sep 25-26: Toronto, Canada; "4th Forum on Economic Sanctions and Compliance Enforcement"; C5 Group
* Sep 26: Kansas City, MO; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 28: Anaheim, CA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 2: Bruchem, Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective"; Full Circle Compliance
* Oct 2: Leeds, UK; "Export Documentation"; Chamber International
* Oct 2: Manchester, UK; "E-Z CERT: How To Process Your Export Documentation Online" Greater Manchester Chamber of Commerce
* Oct 5: Boston, MA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 5: Boston, MA; " Incoterms: A Strategic Approach"; International Business Training
* Oct 9: New Orleans, LA; "Import Documentation and Procedures Seminar"; International Business Training
* Oct 10: Manchester, UK; "Export Documentation Training Course"; Greater Manchester Chamber of Commerce
* Oct 10: New Orleans, LA; "Tariff Classification Seminar"; Global Learning Centre
* Oct 11: New Orleans, LA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 11: Rotterdam, NL; "Trade Compliance Congres"; SDU, Customs Knowledge, and EvoFenedex
* Oct 12: New Orleans, LA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy

* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
* Oct 16: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 17: Manchester, UK; "Understanding Tariff Codes" Greater Manchester Chamber of Commerce
* October 17-18; Miami/Fort Lauderdale, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting; albert@abs-consulting.net; 954 218-5285
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates
* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; International Compliance Professionals Association (ICPA)
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
# Oct 23: Adelaide, Australia; Defence Export Controls Outreach; Australian Department of Defense
* Oct 23: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 26: Louisville, KY; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 26: Milwaukee, WI; "Incoterms: A Strategic Approach"; International Business Training
* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Oct 30: Singapore; "4th Asia Summit on Economic Sanctions"; American Conference Institute
* Oct 31 - Nov 1: Singapore; " 7th Asia Summit on Anti-Corruption"; American Conference Institute
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 7: Detroit, MI; "Advanced Classification of Machinery and Electronics"; Global Trade Academy
* Nov 7: Manchester, UK; "Understanding Incoterms" Greater Manchester Chamber of Commerce
* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions

WASHSTATEC000746

* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 8-9: Shanghai, China; "ICPA China Conference"; International Compliance Professionals Association
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 16, San Diego, CA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Nov 20: Manchester, UK; "How to Claim Duty Relief on Export and Import Processes" Greater Manchester Chamber of Commerce
# Nov 20: Sydney, Australia; Defence Export Controls Outreach; Australian Department of Defense;
* Nov 21: Manchester, UK; "Introduction to Exporting" Greater Manchester Chamber of Commerce
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for International Trade
* Dec 6: London, UK; "Beginner's Workshop"; UK Department for International Trad
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Export Documentation Training Course;" Greater Manchester Chamber of Commerce
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Dec 14: Philadelphia, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training

2019

WASHSTATEC000747

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
* Jan 21-24, 2019: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; 540-433-3977
# Feb 6-7: Orlando, FL; "Boot Camp: Achieving ITAR/EAR Compliance"; Export Compliance Solutions (ECS)
* Feb 12-13: Washington, D.C.; "2019 Legislative Summit"; National Association of Foreign Trade Zones (NAFTZ)
# Mar 26-27: Scottsdale, AZ; "Seminar Level II: Managing ITAR/EAR Complexities"; Export Compliance Solutions
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)

### Webinars

* Aug 23: Webinar; "Social Media for Trade and Logistics Professionals"; Foreign Trade Association
* Aug 27: Webinar; "Import Documentation and Procedures"; International Business Training
* Sep 6: Webinar; "University Export Controls Program: Strength in Numbers"; ECTI; 540-433-3977
* Sep 11: Webinar; "BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time"; ECTI; 540-433-3977
* Sep 12: Webinar; "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions"; ECTI; 540-433-3977
* Sep 19: Webinar; "International Logistics"; International Business Training
* Sep 24: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Sep 25: Webinar; "NAFTA Rules of Origin"; International Business Training
* Sep 26: Webinar; "US Antiboycott Regulations: Clarified & Demystified"; ECTI; 540-433-3977
* Oct 15: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Nov 14: Webinar; "An Export Commodity Classification Number - ECCN"; Foreign Trade Association
* Dec 3: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Dec 4: Webinar; "NAFTA Rules of Origin"; International Business Training
* Dec 5: Webinar; "Import Documentation and Procedures"; International Business Training
* Dec 11: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Dec 20: Webinar; "International Logistics"; International Business Training

back to top

* * * * * * * * * * * * * * * * * * * *

–

WASHSTATEC000748

**EDITOR'S NOTES**

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **Henry Drummond** (17 Aug. 1851 - 11 March 1897; was a Scottish evangelist, biologist, writer and lecturer.)
 - *"Unless a man undertakes more than he possibly can do, he will never do all he can do."*

**Friday Funnies:**

- All I ask is a chance to prove that money can't make me happy.
- Is it just my imagination, or do buffalo wings taste like chicken?
- One nice thing about egotists: They don't talk about other people.
- What was the greatest thing *before* sliced bread?
- Two can live as cheaply as one, for half as long.
- It's not an optical illusion. It just looks like one.
- Is there another word for synonym?
- Is Marx's tomb a communist plot?
- They told me I was gullible ... and I believed them!

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat

WASHSTATEC000749

program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]

WASHSTATEC000750

- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

...

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before

WASHSTATEC000751

taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

–

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000752

Message

**From**: Davidson-Hood, Simon [DavidsonHoodS@state.gov]
**Sent**: 8/17/2018 9:24:12 PM
**To**: Hart, Robert L [HartRL@state.gov]; Foster, John A [FosterJA2@state.gov]
**CC**: Monjay, Robert [MonjayR@state.gov]
**Subject**: I-III Comments
**Attachments**: 20180725 - State Internal Commentary on USML I-III Public Comments.xlsx; Cat I-III Comments.docx

Hi Rob and John,



See you all on Tuesday.

Best,
SDH

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile:
Email: davidsonhoodS@state.gov

**Official - SBU**
UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Hart, Robert L [HartRL@state.gov] |
| **Sent:** | 8/20/2018 1:29:35 PM |
| **To:** | Monjay, Robert [MonjayR@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject:** | FW: I-III FRN v.1 |

███████████████████████████████████████████

███████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Friday, August 17, 2018 4:54 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Subject:** I-III FRN v.1

████████████████████████████████

Enjoy your weekend


Michael Noonan

Department of State
Directorate of Defense Trade Controls (PM/DDTC/DTCC)
Compliance Specialist (Henderson Group Contractor)
(202) 632-2788


**Official - Transitory**
UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Paul, Joshua M [PaulJM@state.gov] |
| **Sent:** | 8/21/2018 6:54:16 PM |
| **To:** | Kaidanow, Tina S [KaidanowTS@state.gov] |
| **Subject:** | FW: CPA Media Monitoring: New York Times: The Latest: Judge: President, Congress Should Eye 3D Guns |

FYI-

**Official**

UNCLASSIFIED

---

**From:** Marquis, Matthew R
**Sent:** Tuesday, August 21, 2018 2:53 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: New York Times: The Latest: Judge: President, Congress Should Eye 3D Guns



**The Latest: Judge: President, Congress Should Eye 3D Guns**
**By The Associated Press**
**21 August 2018**

SEATTLE — The Latest on a lawsuit aimed at blocking a settlement that allows a company to post online plans for printing 3D guns. (all times local):

**11:30 a.m.**

A federal judge hearing arguments over a settlement that allows a company to post online plans for printing 3D guns said the overall issue of such untraceable plastic weapons should be decided by the president or Congress.

U.S. District Judge Robert Lasnik said Tuesday that he'll rule on the legal issues involving the settlement between the company and the Trump administration.

He added, however, that "a solution to the greater problem is so much better suited" to the president or Congress.

Lasnik recently issued a restraining order blocking the online release of the plans. Nineteen states and the District of Columbia want the judge to make it permanent.

Washington state Assistant Attorney General Jeff Rupert argued that the government's decision to allow Texas-based Defense Distributed to post the 3D gun plans threatens public safety and should be reversed.

A lawyer for the U.S. Justice Department disagreed, saying it's already illegal to possess plastic guns and the government is fully committed to enforcing that law. He argued that the states are focused on the wrong statute.

Lasnik repeatedly questioned that logic, asking how the government can be vigorously enforcing a law banning plastic undetectable guns but not proactively stopping them from being made.

Link: https://www.nytimes.com/aponline/2018/08/21/us/ap-us-3d-gun-lawsuit-the-latest.html?partner=IFTTT

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*


Stay connected with *State.gov*:




**Official**
UNCLASSIFIED



**Official**
UNCLASSIFIED

Message

| | |
|---|---|
| **From**: | Strike, Andrew P [StrikeAP@state.gov] |
| **Sent**: | 8/21/2018 11:29:35 PM |
| **To**: | PM-DDTC-Directors-DL [PM-DDTC-Directors-DL@state.gov]; Rogers, Shana A [RogersSA2@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov] |
| **CC**: | PM-CPA [PM-CPA@state.gov]; Cressey, Laura E [CresseyLE@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **Subject**: | CPA Media Monitoring: AP: States aim to stop internet release of 3D-printed gun plans |

States aim to stop internet release of 3D-printed gun plans
By MARTHA BELLISLE

https://apnews.com/d40d57b456694de4909ca52092c1e978/States-aim-to-stop-internet-release-of-3D-printed-gun-plans
SEATTLE (AP) — A federal judge in Seattle hearing arguments over a settlement that allows a Texas company to post online plans for printing 3D guns said Tuesday the overall issue of such untraceable plastic weapons should be decided by the president or Congress.

U.S. District Judge Robert Lasnik said he'll rule by Monday on the legal issues involving the settlement between the company and the Trump administration. He added, however, that "a solution to the greater problem is so much better suited to the other two branches of government."

Nineteen states and the District of Columbia sued the federal government, alleging it reached a "covert" settlement with the company, Defense Distributed, without notifying Congress or the Department of Defense about changes it made to an export act that prohibited 3D gun plans from being posted online.

The Austin-based company is owned by Cody Wilson, a self-described "crypto-anarchist" who opposes restrictions on gun ownership.

Lasnik granted a restraining order on July 31 that blocked the immediate release of the plans online. The states want him to make it permanent.

Washington state Assistant Attorney General Jeff Rupert argued that the government's decision to allow the posting threatens public safety and should be reversed.

Any felon or terrorist with a laptop and a 3D printer could start making firearms that can't be seen by a metal detector, leaving airports, courthouses, jails and many government buildings and schools — vulnerable, he said.

Lasnik made it clear that he was frustrated that he only had a few days to make decisions on "probably the most significant case that I've handled as a United States District Court judge."

He added, "I really hope and wish that the executive branch and Congress would face up to this."

More than a dozen members of the Washington Chapter of Moms Demand Action for Gun Sense in America filled half the courtroom during the hearing wearing red T-shirts. They later said they agreed that the answer lies in Washington, D.C.

"We do believe in the right to own a gun, but we also believe in this country our rights rest of a foundation of shared responsibility to keep all members of society safe," group spokeswoman Sue Whitecomb said. "And we believe that is the job of Congress."

WASHSTATEC000757

Rupert told the judge that the U.S. State Department put the public at risk when it made changes to a list of weapons that could be exported, opening the door for the online posting of 3D gun plans and the settlement with Defense Distributed.

The federal government fought the release of the plans when they were first posted online in 2013, arguing it was a threat to national security, Rupert said. That threat remains despite the government's decision to deregulate 3D gun printing.

Steven Myers, a lawyer for the U.S. Justice Department disagreed, saying it's already illegal to possess plastic guns and the government is fully committed to enforcing that law. He argued that the states are focused on the wrong statute and the injunction should be denied.

Lasnik questioned that logic, asking how the government can be "vigorously" enforcing a law banning plastic guns but not proactively stopping the undetectable, untraceable guns from being made in the first place.

"People who don't have our best interests in mind can get these guns," which could lead to "shoe bomber" or "911 situations," Lasnik said.

Those who would fail a background check, such as mentally ill people or felons, would be able to make a gun if they had access to a 3D printer, he said.

"We see children shoot other children with what they think are toy guns," he said, "and the 3D guns look even more like toy guns."

The restraining order expires on Aug. 28.

The states suing are Washington, Connecticut, Maryland, New Jersey, New York, Oregon, California, Colorado, Delaware, Hawaii, Illinois, Iowa, Minnesota, North Carolina, Rhode Island, Vermont, Virginia, Massachusetts, Pennsylvania and the District of Columbia.

WASHSTATEC000758

Message

**From:**       Foster, John A [FosterJA2@state.gov]
**Sent:**       8/22/2018 4:50:43 PM
**To:**         Hart, Robert L [HartRL@state.gov]; Monjay, Robert [MonjayR@state.gov]; Noonan, Michael J
                [NoonanMJ@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov]
**Subject:**    Cats I-III Grouped Public Comments
**Attachments:** 20180822 - Grouped USML I-III Public Comments.xlsx; 20180822 - Cats I-III Public Comments by Alpha.xlsx

Gentlemen,

Thanks,
John

**John A. Foster**
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
U.S. Department of State
Tel: 202-663-2816
Email: FosterJA2@state.gov

Message

| | |
|---|---|
| **From:** | Foster, John A [FosterJA2@state.gov] |
| **Sent:** | 8/22/2018 8:09:17 PM |
| **To:** | Davidson-Hood, Simon [DavidsonHoodS@state.gov] |
| **Subject:** | FW: Cats I-III Grouped Public Comments |
| **Attachments:** | 20180822 - Grouped USML I-III Public Comments + State Responses.xlsx |

Hey amigo,

[redacted]

Best,
John

**From:** Hart, Robert L
**Sent:** Wednesday, August 22, 2018 2:20 PM
**To:** Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

[redacted]

[redacted]

[redacted]

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov


**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Wednesday, August 22, 2018 12:51 PM
**To:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J

<NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** Cats I-III Grouped Public Comments

Gentlemen,

[REDACTED]

Thanks,
John

**John A. Foster**
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
U.S. Department of State
Tel: 202-663-2816
Email: FosterJA2@state.gov

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/23/2018 2:43:48 PM |
| **To**: | Hart, Robert L [HartRL@state.gov] |
| **Subject**: | FW: Cats I-III Grouped Public Comments |
| **Attachments**: | 20180823 - Grouped USML I-III Public Comments + State Responses.xlsx |

████████████████████████████████████████████

Best,
John

**From:** Noonan, Michael J
**Sent:** Wednesday, August 22, 2018 5:12 PM
**To:** Foster, John A <FosterJA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>;
Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

RM,

████████████████████████████████████████████

MJN

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Wednesday, August 22, 2018 2:26 PM
**To:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J
<NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

Rob,

████████████████████████████████████████████

Best,
John

**From:** Hart, Robert L
**Sent:** Wednesday, August 22, 2018 2:20 PM
**To:** Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J
<NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

████████████████████████████████████████████

[REDACTED]

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Wednesday, August 22, 2018 12:51 PM
**To:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** Cats I-III Grouped Public Comments

Gentlemen,

[REDACTED]

Thanks,
John

**John A. Foster**
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
U.S. Department of State
Tel: 202-663-2816
Email: FosterJA2@state.gov

WASHSTATEC000764

Message

| | |
|---|---|
| **From:** | Noonan, Michael J [NoonanMJ@state.gov] |
| **Sent:** | 8/24/2018 7:38:22 PM |
| **To:** | Foster, John A [FosterJA2@state.gov]; Hart, Robert L [HartRL@state.gov]; Monjay, Robert [MonjayR@state.gov]; Davidson-Hood, Simon [DavidsonHoodS@state.gov] |
| **Subject:** | RE: Cats I-III Grouped Public Comments |
| **Attachments:** | Copy of 20180823 - Grouped USML I-III Public Comments + State Responses Color-Coded -MJN.xlsx |



**Official**

UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Friday, August 24, 2018 1:08 PM
**To:** Foster, John A <FosterJA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments



**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Thursday, August 23, 2018 12:30 PM
**To:** Noonan, Michael J <NoonanMJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

Gents,

Thanks,
John

**From:** Noonan, Michael J
**Sent:** Wednesday, August 22, 2018 5:12 PM
**To:** Foster, John A <FosterJA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

RM,

███████████████████████████████████████████████████████████

MJN

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Wednesday, August 22, 2018 2:26 PM
**To:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

Rob,

███████████████████████████████████████████████████████████

Best,
John

**From:** Hart, Robert L
**Sent:** Wednesday, August 22, 2018 2:20 PM
**To:** Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: Cats I-III Grouped Public Comments

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**

UNCLASSIFIED

**From:** Foster, John A
**Sent:** Wednesday, August 22, 2018 12:51 PM
**To:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** Cats I-III Grouped Public Comments

Gentlemen,

Thanks,
John

**John A. Foster**
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
U.S. Department of State
Tel: 202-663-2816
Email: FosterJA2@state.gov

Message

| | |
|---|---|
| **From**: | Paul, Joshua M [PaulJM@state.gov] |
| **Sent**: | 8/27/2018 3:08:18 PM |
| **To**: | Rogers, Shana A [RogersSA2@state.gov] |
| **Subject**: | RE: FLASH CLEARANCE - Status of Questions |

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Monday, August 27, 2018 10:57 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; McKeeby, David
I <McKeebyDI@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

Hi everyone,





**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Davidson-Hood, Simon
**Sent:** Friday, August 03, 2018 4:01 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>;

Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

Hi Josh,

Yes, that works well.

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile: ███████████
Email: davidsonhoodS@state.gov
████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Friday, August 3, 2018 3:30 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>; Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

████████████████████

- ████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Friday, August 03, 2018 3:29 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice

M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>;
Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

██████████████████████

- ████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

---

**From:** Davidson-Hood, Simon
**Sent:** Friday, August 03, 2018 3:20 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice
M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>;
Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

Hi Josh,

████████████████████████████████████████████████████████████

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile: ████████████
Email: davidsonhoodS@state.gov
████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Friday, August 3, 2018 3:13 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice

M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>;
Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Davidson-Hood, Simon
**Sent:** Friday, August 03, 2018 2:48 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice
M <KottmyerAM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Foster, John A <FosterJA2@state.gov>;
Loucks, Alicia N <loucksan@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

Hi Josh,

████████████████████████████████████████████████████

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile:████████████
Email: davidsonhoodS@state.gov
████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Friday, August 3, 2018 11:43 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Monjay, Robert
<MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov>; Loucks, Alicia N <loucksan@state.gov>; Heidema, Sarah J
<HeidemaSJ@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

WASHSTATEC000773

███████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Rogers, Shana A
**Sent:** Friday, August 03, 2018 10:45 AM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov>; Loucks, Alicia N <loucksan@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>
**Subject:** RE: FLASH CLEARANCE - Status of Questions

Simon, Sarah, Josh,

████████████████████████████████████████████████

Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
UNCLASSIFIED

**From:** Davidson-Hood, Simon
**Sent:** Thursday, August 02, 2018 6:05 PM
**To:** Rogers, Shana A <RogersSA2@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov>; Loucks, Alicia N <loucksan@state.gov>
**Subject:** FLASH CLEARANCE - Status of Questions

Hi Shana,

███████████████████████████████████████████████████

███████████████████████████████████

**Emails**

- ███████████████████████████████████████████

███████████████████████████████████████████

- ███████████████████████████████████████████████

███████████████████████████████████

- ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████

████████████████

- ████████████████████████████████████████████████

████████████████

- ██████████████████████████████████████████████████

████████████████████████

- ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████

██████████████████████████████████

WASHSTATEC000775



- ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████

- ███████████████████████████████████████████████████████████████████████

██████████████████████████

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile: ███████████
Email: davidsonhoodS@state.gov
█████████████████████████████████

**Official - SBU**
UNCLASSIFIED

WASHSTATEC000777

Message

---

**From:** Foster, John A [FosterJA2@state.gov]
**Sent:** 8/27/2018 4:46:37 PM
**To:** Hart, Robert L [HartRL@state.gov]
**Subject:** 20180824 - Draft 1 Cat I-III Public Comments Summary
**Attachments:** 20180824 - Draft 1 Cat I-III Public Comments Summary.docx

Rob,

Attached is what I wrote on Friday.  Per our conversation, I would appreciate your guidance on style and substance ▮▮▮ move ████████████████████████████████████ Also, I spoke with Noonan at length and understand that I will have merge this with the text of the final rule he's drafting.   Consequently, ██████ ██████████████████████████ n the preamble once we get ready to merge the documents.

Thanks,
John

Message

**From:**      Hart, Robert L [HartRL@state.gov]
**Sent:**      8/27/2018 5:08:37 PM
**To:**      Foster, John A [FosterJA2@state.gov]
**Subject:**    RE: 20180824 - Draft 1 Cat I-III Public Comments Summary
**Attachments:**  20180824 - Draft 1 Cat I-III Public Comments Summary RLH.docx

This looks great, definitely what we're looking for. Having no particular concerns about tone or style, I went through and fixed a few typos and supplemented or edited where I thought it made sense. Please proceed, governor.

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Monday, August 27, 2018 12:47 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Subject:** 20180824 - Draft 1 Cat I-III Public Comments Summary

Rob,

Attached is what I wrote on Friday.  Per our conversation, I would appreciate your guidance on style and substance ██████  Also, I spoke with Noonan at length and understand that I will have merge this with the text of the final rule he's drafting.   Consequently, ██████ ███████████████████████████████████████ once we get ready to merge the documents.

Thanks,
John

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/27/2018 5:09:49 PM |
| **To**: | Hart, Robert L [HartRL@state.gov] |
| **Subject**: | RE: 20180824 - Draft 1 Cat I-III Public Comments Summary |

Fantastic.  Thanks for the quick turn.  I'm on it.

**From:** Hart, Robert L
**Sent:** Monday, August 27, 2018 1:09 PM
**To:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: 20180824 - Draft 1 Cat I-III Public Comments Summary

This looks great, definitely what we're looking for. Having no particular concerns about tone or style, I went through and fixed a few typos and supplemented or edited where I thought it made sense. Please proceed, governor.

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Monday, August 27, 2018 12:47 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Subject:** 20180824 - Draft 1 Cat I-III Public Comments Summary

Rob,

Attached is what I wrote on Friday.  Per our conversation, I would appreciate your guidance on style and substance ███  ████████████████████████████████████████  Also, I spoke with Noonan at length and understand that I will have merge this with the text of the final rule he's drafting.   Consequently, ████████  ██████████████████████████████  n the preamble once we get ready to merge the documents.

Thanks,
John

| Message | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 8/27/2018 8:46:16 PM |
| **To:** | PM-DTCP-RMA [PM-DTCP-RMA@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **Subject:** | CPA Media Monitoring: Statements on Defense Distributed Case |



**Statements on Defense Distributed Case**
**27 August 2018**

### EveryTown for Gun Safety

NEW YORK – Everytown for Gun Safety, the country's largest gun violence prevention organization, today applauded a ruling from a federal court in Seattle extending an injunction that is temporarily blocking the distribution of downloadable guns online. Everytown filed an amicus brief in the case, urging the court to continue to block the Trump Administration's reckless decision to permit online distribution of computer code that can be used to 3D print a firearm.

"Posting the code for downloadable, untraceable guns online is incredibly dangerous," said Nick Suplina, Everytown's managing director for law and policy. "While we are pleased that the court has sided with public safety, Congress must act to keep us safe."

The suit, filed last month by Washington Attorney General Bob Ferguson and the attorneys general of six states and the District of Columbia has since been joined by a bipartisan group of attorneys general from another 12 states. The suit asks the court to bar the government from lifting its prohibitions on online posting of blueprints for downloadable guns. The attorneys general for Connecticut, Maryland, New Jersey, New York, Oregon, California, Colorado, Delaware, Hawaii, Illinois, Iowa, Minnesota, North Carolina, Rhode Island, Vermont, Virginia, Massachusetts, Pennsylvania and the District of Columbia joined Attorney General Ferguson in the suit.

The court's decision comes as public concern over the dangers of downloadable guns mounts. In recent weeks, military veterans, law enforcement officials and survivors of gun violence have all spoken out about the dangers of downloadable guns. Additionally, a recent poll found that a broad, bipartisan majority of Americans agree that downloadable gun blueprints should not be available on the internet.

This public concern spurred Sen. Bill Nelson (D-FL) and Rep. Ted Deutch (D-FL) to introduce federal legislation (S. 3304/H.R. 6649) that would permanently prohibit the posting of any downloadable gun computer code that can be used to automatically program a 3D printer to print a firearm.

### Giffords

Giffords Law Center, the legal arm of the gun safety organization founded by former Congresswoman Gabrielle Giffords and Captain Mark Kelly, applauded the decision of Judge Robert S. Lasnik of the U.S. District Court for the Western District of Washington to maintain a ban on downloadable guns produced by readily available 3D-printers. In his ruling, Judge Lasnik found the State Department's argument to allow downloadable guns "ignores reality and is wholly unpersuasive."

Statement from Adam Skaggs, Chief Counsel at Giffords Law Center

"We applaud Judge Lasnik's well-reasoned opinion that appropriately recognized the severe threats to public safety and national security posed by downloadable guns. In an ill-considered attempt to flout life-saving local, state, and federal gun laws, Cody Wilson and Defense Distributed took the reckless step of making do-it-yourself gun blueprints available on the internet to anyone, regardless of whether they could pass a background check. Worse yet, the Trump Administration abandoned the government's longstanding efforts to stop this threat and gave the green light to guns that cannot be detected by traditional security devices and cannot be traced by law enforcement — making them a gun trafficker's dream come true. Today's victory will stop this threat in its tracks, help save lives, and help to make sure that downloadable guns in the hands of dangerous people don't make our nation's gun violence epidemic even worse."

**<u>Brady Campaign</u>**

Brady Campaign Celebrates Ruling Against 3D-Printed Guns in Washington

Washington, D.C., August 27, 2018 – Nearly two months after the U.S. State Department settled a lawsuit allowing blueprints of 3D-printed guns to be posted online, a federal court in Washington state today issued a preliminary injunction blocking the publication. The Brady Campaign to Prevent Gun Violence, which filed the first legal action to stop dangerous 3D-printed guns and has been a leading voice in the fight to block them, celebrated the ruling and vowed to continue its efforts on the issue.

"Today's decision is an unqualified success for the American public and, indeed, the global community," stated Avery Gardiner, co-president of the Brady Campaign. "3D-printed guns represent a supreme threat to our safety and security, and we are grateful that Judge Lasnik recognized it as such. But we also recognize that the menace does not end here. Already, there have been a wave of dangerous actors seeking to illegally post the blueprints online. We are committed to doing everything in our power to prevent this threat from continuing further."

In support of the lawsuit filed by a bipartisan group of state Attorneys General from throughout the nation, the Brady Campaign filed an amicus brief arguing that the Second Amendment does not grant Defense Distributed the right to publish the blueprints, nor does it protect the right to create or own 3D-printed guns. Brady also sent a letter to Secretary of State Mike Pompeo, calling on him instruct his department to respond to the organization's FOIA request from July 16 to share documents related to the sudden reversal in the Defense Distributed lawsuit. Should that request not be honored, the letter warned that a lawsuit will be forthcoming.

"We applaud this decision, but we also recognize that Sec. Pompeo and the State Department still holds the power to end this threat once and for all," added Brady Campaign co-president Kris Brown. "The State Department is responsible for oversight of firearm exports, meaning that they are able to step in and protect Americans from foreign terrorists and other dangerous people from obtaining the ability to print their own untraceable assault rifles. We renew our call to Sec. Pompeo to take action and put a stop to the publication of 3D-printed gun blueprints, once and for all."

As part of the decision, Judge Robert S. Lasnik wrote:

"Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well."

WASHSTATEC000782

###

**NY A.G. UNDERWOOD ANNOUNCES PRELIMINARY INJUNCTION CONTINUING TO BLOCK TRUMP ADMINISTRATION FROM ALLOWING THE DISTRIBUTION OF 3-D PRINTED GUN FILES**

NEW YORK – Attorney General Barbara D. Underwood released the following statement after a federal judge granted a preliminary injunction in Attorney General Underwood and her fellow AGs' ongoing lawsuit, which seeks to block the Trump administration from allowing the distribution of 3-D printed gun files:
"In yet another victory for common sense and public safety, today a federal court granted our motion for a nationwide preliminary injunction – continuing to block the Trump administration from allowing the distribution of 3-D printed gun files. This decision follows the temporary restraining order we secured last month.
As the court pointed out, we filed suit because of the legitimate fear that adding these undetectable and untraceable guns to the arsenal of available weaponry will only increase the threat of gun violence against our communities.

My office will continue to do what's necessary to protect New Yorkers and ensure our public safety. I thank Attorney General Ferguson and our fellow Attorneys General for our ongoing, successful partnership on this and so much more."

The court's opinion states in part, "The plaintiff States and the District of Columbia, as sovereigns, represent more than 160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding undetectable and untraceable guns to the arsenal of weaponry already available will likely increase the threat of gun violence they and their people experience."

**WA AG FERGUSON: COURT AGREES TO BLOCK 3D-PRINTED GUNS UNTIL CASE IS RESOLVED**

Attorney General Ferguson today issued the following statement after U.S. District Court Judge Robert Lasnik decided to extend his order blocking the Trump Administration's decision to legalize distribution of downloadable files for 3D-printed guns until the matter is resolved in court:

"Once again, I'm glad we put a stop to this dangerous policy," Ferguson said. "But I have to ask a simple question: why is the Trump Administration working so hard to allow these untraceable, undetectable 3D-printed guns to be available to domestic abusers, felons, and terrorists?"

On July 31, Judge Lasnik issued a temporary restraining order (TRO) blocking the pending release of the plans on the internet. A TRO is a short-term order put in place in an emergency. Today, he converted his original TRO to a preliminary injunction, which will remain in place until the case is resolved.

From Judge Lasnik's order:

"Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are likely to befall the States if an injunction is not issued."

Deputy Attorney General Todd Bowers, Complex Litigation Division Chief Jeffrey Rupert, and assistant attorneys general Jeff Sprung, Kristin Beneski and Zach Jones are handling the case for Washington.

Ferguson has now filed 32 lawsuits against the Trump Administration and has not lost a case. Ferguson has 13 legal victories against the Trump Administration. Seven of those cases are finished and cannot be appealed. The Trump Administration has or may appeal the other six, which include lawsuits involving Dreamers, 3D-printed guns, and the transgender military ban. No court to rule on the merits of the Attorney General's arguments in a lawsuit against the Trump Administration has ruled against the office.

## CA Attorney General Becerra, as Part of a Multistate Coalition, Secures Preliminary Injunction Blocking Trump Administration from Distributing Blueprints of 3D-Printed, Untraceable "Ghost" Guns

California Attorney General Xavier Becerra, along with a Washington State-led coalition of 20 Attorneys General, today secured a preliminary injunction to continue blocking the Trump Administration's reckless action to make available blueprints for untraceable so-called "ghost" guns that can be manufactured on a 3D printer.

"When the Trump Administration inexplicably gave the green light to distribute on the internet blueprints of 3D-printed, untraceable ghost guns, it needlessly endangered our children, our loved ones and our men and women in law enforcement," said Attorney General Becerra. "The Trump Administration's actions were dangerous and incompetent. Today's ruling should serve as a wake-up call to the Administration: if you continue to sabotage law enforcement's work to keep communities safe, we will hold you accountable."

On June 29, the Trump Administration – despite two favorable federal court rulings authorizing the government to block the publication of downloadable blueprints for 3D-printed ghost guns – reached a settlement with Defense Distributed, a Texas-based company that distributes blueprints for 3D-printed ghost guns. This agreement became public in late July. On July 30, Attorney General Becerra joined a bipartisan Washington State-led coalition of 20 attorneys general calling on the federal government to change course and block Defense Distributed from posting blueprints online; a coalition of attorneys general filed suit on the same day.

The next day, the U.S. District Court for the Western District of Washington issued a temporary restraining order preventing the Trump Administration from taking steps allowing Defense Distributed to disseminate 3D ghost gun blueprints. Attorney General Becerra joined the Washington State-led coalition in requesting a preliminary injunction on August 10, 2018. The preliminary injunction issued today keeps that ban in place pending resolution of the litigation. This action will prevent the Trump Administration from lifting export controls on downloadable blueprints for 3D-printable ghost weapons. It will also prevent Defense Distributed from posting the blueprints online.

WASHSTATEC000784

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:     202.647.6968
e-mail:      ***MarquisMR@state.gov*** |   Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

**Official**
UNCLASSIFIED

WASHSTATEC000785

Message

| | |
|---|---|
| **From**: | Strike, Andrew P [StrikeAP@state.gov] |
| **Sent**: | 8/28/2018 12:53:04 AM |
| **To**: | PM-DTCP-RMA [PM-DTCP-RMA@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov] |
| **CC**: | PM-CPA [PM-CPA@state.gov]; Miller, Michael F [Millermf@state.gov]; String, Marik A [StringMA@state.gov]; Rogers, Shana A [RogersSA2@state.gov]; Fabry, Steven F [FabrySF@state.gov] |
| **Subject**: | CPA Media Monitoring: AP: Plans on making untraceable 3D guns can't be posted online |

Plans on making untraceable 3D guns can't be posted online
By MARTHA BELLISLE

https://apnews.com/7632e601902048efb9eb84eb6b218ddd/Plans-on-making-untraceable-3D-guns-can't-be-posted-online

A U.S. judge in Seattle blocked the Trump administration Monday from allowing a Texas company to post online plans for making untraceable 3D guns, agreeing with 19 states and the District of Columbia that such access to the plastic guns would pose a security risk.

The states sued to stop an agreement that the government had reached with Austin, Texas-based Defense Distributed, saying guidelines on how to print undetectable plastic guns could be acquired by felons or terrorists.

U.S. District Judge Robert Lasnik extended a temporary restraining order, and his new decision will last until the case is resolved. He said Cody Wilson, owner of Defense Distributed, wanted to post the plans online so that citizens can arm themselves without having to deal with licenses, serial numbers and registrations.

Wilson has said that "governments should live in fear of their citizenry."

"It is the untraceable and undetectable nature of these small firearms that poses a unique danger," Lasnik said. "Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons — both domestically and internationally — rings hollow and in no way ameliorates, much less avoids, the harms that are likely to befall the states if an injunction is not issued."

The State Department had reached the settlement with the company after the agency removed the 3D gun-making plans from a list of weapons or technical data that cannot be exported overseas.

The states argued that the federal agency didn't follow the law when it removed 3D guns from the munitions list. They said the government was supposed to notify Congress and provide a 30-day window before making a change to that list, but it did not.

Lasnik criticized the government for switching its position on the threat posed by the 3D gun-making plans.

Up until April, the government argued the distribution of the guidelines "posed a threat to world peace and the security and foreign policy of the United States," the judge said.

Despite those fears, the government decided that it only needed to restrict the international availability of firearms up to .50 caliber. That's when they reached a settlement with the 3D gun company.

There was no indication the government evaluated the unique characteristics of the plastic guns when it considered deleting that category of weapons from the prohibited list, the judge said.

"Nor is there any reasoned explanation for its change in position," Lasnik said.

WASHSTATEC000786

The federal government declined to comment on the judge's ruling.

A lawyer with the U.S. Justice Department had argued against the injunction, saying possessing 3D plastic guns is already against the law, and the federal government is committed to enforcing that law.

But the judge said it wasn't enough.

"While the court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the state pursues a murder conviction in state court," Lasnik said.

Washington Attorney General Bob Ferguson praised the ruling.

"Once again, I'm glad we put a stop to this dangerous policy," Ferguson said. "But I have to ask a simple question: why is the Trump administration working so hard to allow these untraceable, undetectable 3D-printed guns to be available to domestic abusers, felons and terrorists?"

The Brady Campaign to Prevent Gun Violence, a pro-gun control group that has aggressively fought the online release of the gun plans, praised the judge's ruling "as a tremendous victory for the American public."

Avery Gardiner, co-president of the group, said 3D-printed guns "represent a supreme threat to our safety and security, and we are grateful that Judge Lasnik recognized it as such."

The states suing are Washington, Connecticut, Maryland, New Jersey, New York, Oregon, California, Colorado, Delaware, Hawaii, Illinois, Iowa, Minnesota, North Carolina, Rhode Island, Vermont, Virginia, Massachusetts, Pennsylvania and the District of Columbia.

WASHSTATEC000787

Message

**From**: Foster, John A [FosterJA2@state.gov]
**Sent**: 8/28/2018 8:10:55 PM
**To**: Foster, John A [FosterJA2@state.gov]; Noonan, Michael J [NoonanMJ@state.gov]
**Subject**: 20180828 - Draft 1 Cat I-III Public Comments Summary
**Attachments**: 20180828 - Draft 1 Cat I-III Public Comments Summary.docx

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/28/2018 8:10:20 PM |
| **To**: | Noonan, Michael J [NoonanMJ@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject**: | 20180828 - Grouped USML I-III Public Comments + State Responses Color-Coded.xlsx |
| **Attachments**: | 20180828 - Grouped USML I-III Public Comments + State Responses Color-Coded.xlsx |

WASHSTATEC000789

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/28/2018 8:11:10 PM |
| **To**: | Noonan, Michael J [NoonanMJ@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject**: | 20180822 - Cats I-III Public Comments by Alpha.xlsx |
| **Attachments**: | 20180822 - Cats I-III Public Comments by Alpha.xlsx |

WASHSTATEC000790

Message

| | |
|---|---|
| **From:** | Noonan, Michael J [NoonanMJ@state.gov] |
| **Sent:** | 8/29/2018 4:54:25 PM |
| **To:** | Foster, John A [FosterJA2@state.gov] |
| **Subject:** | I-III FRN 2 |
| **Attachments:** | Cat I-III FR - FRN 2.docx |

Michael Noonan

Department of State
Directorate of Defense Trade Controls (PM/DDTC/DTCC)
Compliance Specialist (Henderson Group Contractor)
(202) 632-2788

**Official**
UNCLASSIFIED

Message

| | |
|---|---|
| **From**: | Jim Bartlett, Full Circle Compliance ("FCC") [jebartlett@fullcirclecompliance.eu] |
| **Sent**: | 8/29/2018 7:06:46 PM |
| **To**: | hartrl@state.gov |
| **Subject**: | 18-0829 Wednesday "Daily Bugle" |

## Wednesday, 29 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Seeks Comments Concerning CWC Provisions of the EAR
2. Justice/ATF Seeks Comments Concerning Application for Explosives License or Permit

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC: (No new postings.)
6. Singapore Customs Releases Notice Concerning TradeXchange

### NEWS

7. AD: "Dutch Customs Never Stopped Shipment for Controversial Russia-Crimea Bridge"
8. Popular Mechanics: "Defense Distributed Is Selling 3D Printed Gun Files -- Through the Mail"
9. ST&R Trade Report: "U.S., Mexico Announce Trade Agreement; Talks with Canada Expected Soon"
10. The Verge: "Inside the United Nations' Effort to Regulate Autonomous Killer Robots"

### COMMENTARY

11. E. McClafferty, L. van der Meer & R. Slack: "Preparing for the Worst: Licenses Needed for UK Export of Dual Use Items"
12. M. Padovan, M. Zinzani & V. Picchiassi: "Iran: The First Package of U.S. Extraterritorial Sanctions and the Update of the EU Blocking Statute"

13. R.C. Burns: "Newsweek Gets Confused by OFAC Travel Rules"

**EX/IM TRAINING EVENTS & CONFERENCES**

14. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

15. Bartlett's Unfamiliar Quotations
16. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)
17. Weekly Highlights of the Daily Bugle Top Stories

**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. Commerce/BIS Seeks Comments Concerning CWC Provisions of the EAR

(Source: Federal Register, 29 Aug 2018.) [Excerpts.]

* AGENCY: Bureau of Industry and Security.
* ACTION: Notice.
* SUMMARY: The Department of Commerce, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other

WASHSTATEC000793

Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995.

* DATES: Written comments must be submitted on or before October 29, 2018.

* ADDRESSES: Direct all written comments to Jennifer Jessup, Departmental Paperwork Clearance Officer, Department of Commerce, 1401 Constitution Avenue NW, Room 6616, Washington, DC 20230 (or via the internet at _docpra@doc.gov._

* FOR FURTHER INFORMATION CONTACT: Requests for additional information or copies of the information collection instrument and instructions should be directed to Mark Crace, BIS ICB Liaison, (202) 482-8093 or at _mark.crace@bis.doc.gov._

* SUPPLEMENTARY INFORMATION: ... The Chemical Weapons Convention (CWC) is a multilateral arms control treaty that seeks to achieve an international ban on chemical weapons (CW). The CWC prohibits, the use, development, production, acquisition, stockpiling, retention, and direct or indirect transfer of chemical weapons. This collection implements the following export provision of the treaty in the Export Administration Regulations (EAR):

  _Schedule 1 notification and report:_ Under Part VI of the CWC Verification Annex, the United States is required to notify the Organization for the Prohibition of Chemical Weapons (OPCW), the international organization created to implement the CWC, at least 30 days before any transfer (export/import) of Schedule 1 chemicals to another State Party. The United States is also required to submit annual reports to the OPCW on all transfers of Schedule 1 Chemicals.

  _Schedule 3 End-Use Certificates:_ Under Part VIII of the CWC Verification Annex, the United States is required to obtain End-Use Certificates for exports of Schedule 3 chemicals to States that are not Party to the CWC to ensure the exported chemicals are only used for the purposes not prohibited under the Convention. ...

  Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval of this information collection; they also will become a matter of public record.

  Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

2. Justice/ATF Seeks Comments Concerning Application for

# Explosives License or Permit
(Source: Federal Register, 29 Aug 2018.) [Excerpts.]

* AGENCY: Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice
* ACTION: 30-Day notice.
* SUMMARY: The Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995.
* DATES: The comment period for the proposed information collection published on June 28, 2018 (83 FR 30457) is reopened. Comments are encouraged and will be accepted for an additional 30 days until September 28, 2018. ...
* SUPPLEMENTARY INFORMATION: The proposed information collection was previously published in the Federal Register, on June 28, 2018 (83 FR 30457), allowing for a 60-day comment period. Written comments and suggestions from the public and affected agencies concerning the proposed collection of information are encouraged.

*Overview of This Information Collection*

  - *Type of Information Collection:* Extension, without change, of a currently approved collection.
  - *The Title of the Form/Collection:* Application for Explosives License or Permit. ...
  - *Form number:* ATF F 5400.13/5400.16.
  - *Component:* Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Department of Justice. ...
  - *Abstract:* Chapter 40, Title 18, U.S.C., provides that any person engaged in the business of explosive materials as a dealer, manufacturer, or importer shall be licensed (18 U.S.C. 842(a)(1)). In addition, provisions are made for the issuance of permits for those who wish to use explosive materials that are shipped in interstate or foreign commerce. ...

If additional information is required contact: Melody Braswell, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE, 3E.405A, Washington, DC 20530.

  Dated: August 24, 2018.
Melody Braswell, Department Clearance Officer for PRA, U.S. Department of Justice.

back to top

* * * * * * * * * * * * * * * * *

–

OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS;
  - RULES; Revisions to Export Administration Regulations Based on 2017 Missile Technology Control Regime Plenary Agreements; and
  - NOTICES; Meetings: Regulations and Procedures Technical Advisory Committee [Publication Dates: 30 Aug 2018.]

* State; RULES; Continued Temporary Modification of Category XI of the United States Munitions List [Publication Date: 30 Aug 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 4.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

## 6. Singapore Customs Releases Notice Concerning TradeXchange
(Source: Singapore Customs, Notice 16/2018, 27 Aug 2018.)

Singapore Customs has announced that all TradeXchange services have been fully migrated and made available on the National Trade Platform (NTP) since May 2018. As such, TradeXchange will be decommissioned on 28 October 2018 at 2359 hours, and access to TradeXchange services will only be available on the NT.

For existing TradeXchange users who have yet to set up your NTP account, please do so immediately. Information on how to set up your NTP account can be found here.

Businesses are required to use their CorpPass to access the NTP and hence you will need to select the "Singapore Customs NTP" e-Service in CorpPass. Find out more and register today here.

back to top

* * * * * * * * * * * * * * * * * *

...

**NEWS**

7.

## AD: "Dutch Customs Never Stopped Shipment for Controversial Russia-Crimea Bridge"

(Source: AD, 29 Aug 2018.) [Excerpts; translation by editor.]

The EU sanctions concerning the Russia-Crimea Bridge were easy to circumvent. Dutch Customs never intercepted shipments, but is now investigating ten to twenty Dutch companies that may have violated EU sanctions regulations.

The European Parliament is concerned. The EU implements sanctions more often, but they seem to lose their strength. "The credibility is at stake", says Member of Parliament Marietje Schaake (D66). For example, a Belgian company previously provided prohibited components of chemical weapons to Syria.

In recent months, Dutch customs authorities carried out an investigation among a total of "ten to twenty" companies based in the Netherlands concerning possible involvement in the construction of the controversial bridge between Russia and Crimea, according to the *Gelderlander*. ...

Whether shipments for the Crimean Bridge are not or not properly controlled via an intermediary in another country or another region, Customs does not want to say. However, a spokeswoman says: "Dutch Customs does not... have any influence on the use or forwarding of these goods after they have reached the specified destination." Companies are obliged to investigate the end-use and end-user of a controlled item. ...

The fact that consignments for the Russia-Crimea Bridge were never stopped can in theory mean Dutch companies are export compliant, according to MEP van D66 Marietje Schaake. However, she finds it "worrisome" that an increasing number of companies acted contrary to the sanctions rules. "The question is whether [these] companies deliberately circumvented the sanctions or whether [regulatory] supervision failed."

back to top

* * * * * * * * * * * * * * * * * *

8.

## Popular Mechanics: "Defense Distributed Is Selling 3D Printed Gun Files -- Through the Mail"
(Source: Popular Mechanics, 28 Aug 2018.) [Excerpts.]

*Becoming the iTunes of gun files instead of the Napster.*

Cody Wilson, founder of Defense Distributed, has announced that while his site will comply with federal orders to halt internationally publishing CAD files of firearms on his website, such compliance comes with a catch. The site will begin selling the files via snail mail instead.

Defense Distributed has undergone a legal battle for years with its publishing of gun-related CAD files. Under President Obama in 2013, the State Department accused Wilon and Defense Distributed of violating the International Traffic in Arms Regulations (ITAR), which are meant to prevent the exporting of defense technology.

Defense Distributed and the State Department wrangled for years over issues of defense and free speech until July 10, 2018, when the federal government offered Defense Distributed a settlement in with the Department of Justice would pay $40,000 of Defense Distributed's legal fees and allow it to restart its business as usual.  ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

9.

## ST&R Trade Report: "U.S., Mexico Announce Trade Agreement; Talks with Canada Expected Soon"
(Source: Sandler, Travis & Rosenberg Trade Report, 29 Aug 2018.)

The presidents of the U.S. and Mexico announced Aug. 27 a preliminary agreement in principle on a bilateral free trade agreement that President Trump indicated will replace NAFTA. The deal is expected to be signed in late November following a 90-day congressional review period. Trump said the U.S. will also begin "pretty much immediately" trade negotiations with Canada that will result in either a separate bilateral FTA or Canada's addition to the U.S.-Mexico agreement.

Companies importing from Mexico should act now to assess the possible impact of these changes on their supply chains. Sandler, Travis & Rosenberg can help companies review their operations and import data to evaluate potential effects and responses.

Arguing that NAFTA has contributed to the growing U.S. goods trade deficit and includes many provisions that do not reflect modern standards, new technologies, or the 21st century global economy, the Office of the U.S. Trade Representative states that the U.S.-Mexico agreement includes the following provisions, among others.

WASHSTATEC000798

*Rules of Origin and Market Access*

- 75 percent of auto content must be made in the U.S. and Mexico
- 40-45 percent of auto content must be made by workers earning at least $16 per hour
- stronger rules of origin, including for industrial products such as chemicals, steel-intensive products, glass, and optical fiber
- procedures that streamline certification and verification of rules of origin and new cooperation and enforcement provisions to help prevent duty evasion before it happens
- new provisions for transparency in import licensing and export licensing procedures
- prohibition on (a) requirements to use local distributors for importation, (b) restrictions on the importation of commercial goods that contain cryptography, and (c) import restrictions on used goods to remanufactured goods
- updated provisions for duty-free temporary admission of goods to cover shipping containers or other substantial holders used in the shipment of goods
- new provisions covering trade in specific manufacturing sectors, including information and communication technology, pharmaceuticals, medical devices, cosmetic products, and chemical substances

*Textiles and Apparel*

- limit on rules that allow for some use of non-NAFTA inputs in textile and apparel trade
- requirement that sewing thread, pocketing fabric, narrow elastic bands, and coated fabric, when incorporated in apparel and other finished products, be made in the region for those finished products to qualify for trade benefits
- textile-specific verification and customs cooperation provisions that provide new tools for strengthening customs enforcement and preventing fraud and circumvention

*Agriculture*

- agreement to not use export subsidies or World Trade Organization special agricultural safeguards for products exported to each other's market
- improved commitments to increase transparency and consultation regarding the use of export restrictions for food security purposes
- when supporting producers, agreement to consider using domestic support measures that have minimal or no trade distorting or production effects
- improved transparency for import checks
- new provisions on geographical indications
- first-ever agreement to protect the confidentiality of proprietary formulas for food products in the same manner for domestic and imported products

*IPR*

- enforcement authorities must be able to stop goods suspected of being pirated or counterfeited at all areas of entry and exit
- enforcement against counterfeits and piracy occurring on a commercial

WASHSTATEC000799

scale
   - first U.S. FTA to require all of the following to protect U.S. rights holders from trade secret theft, including by state-owned enterprises: civil remedies, criminal remedies, prohibition on impeding licensing of trade secrets, protections for trade secrets during the litigation process, and penalties for government officials who wrongfully disclose trade secrets
   - full national treatment for copyright and related rights
   - minimum copyright term extended to 75 years for works like song performances
   - ten years of data protection for biologic drugs and expanded scope of products eligible for protection

*Digital Trade*

   - prohibition on application of customs duties and other discriminatory measures to digital products distributed electronically (e-books, videos, music, software, games, etc.)
   - limit on government ability to require disclosure of proprietary computer source code and algorithms

*De Minimis*

   - Mexico will increase from $50 to $100 the value of shipments that may enter free of customs duties or taxes and with minimal formal entry procedures

*Financial Services*

   - prohibition on local data storage requirements when a financial regulator has the access to data it needs to fulfill its regulatory and supervisory mandate
   - updated provisions to allow for the cross-border transfer of data
   - a separate annex on commitments relating to cross-border trade, including application of the national treatment and market access obligation to an expanded list of cross-border services

*Labor*

   - all labor provisions brought into core of the agreement and made enforceable
   - commitment by Mexico to specific legislative actions to provide for the effective recognition of the right to collective bargaining
   - agreement to take measures to prohibit the importation of goods produced by forced labor, to address violence against workers exercising their labor rights, and to ensure that migrant workers are protected under labor laws

*Environment*

   - all environment provisions brought into core of the agreement and made enforceable
   - prohibition on some of the most harmful fisheries subsidies, such as those that benefit vessels or operators involved in illegal, unreported, and

WASHSTATEC000800

unregulated fishing
  - new protections for marine species like whales and sea turtles, including a prohibition on shark-finning
  - obligations to enhance the effectiveness of customs inspections of shipments containing wild fauna and flora at ports of entry and ensure strong enforcement to combat IUU fishing
  - first-ever articles to improve air quality, prevent and reduce marine litter, support sustainable forest management, and ensure appropriate procedures for environmental impact assessments

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The Verge: "Inside the United Nations' Effort to Regulate Autonomous Killer Robots"
(Source: The Verge, 27 Aug 2018.) [Excerpts.]

Amandeep Gill has a difficult job, though he won't admit it himself. As chair of the United Nations' Convention on Conventional Weapons (CCW) meetings on lethal autonomous weapons, he has the task of shepherding 125 member states through discussions on the thorny technical and ethical issue of "killer robots" - military robots that could theoretically engage targets independently. It's a subject that has attracted a glaring media spotlight and pressure from NGOs like Campaign to Stop Killer Robots, which is backed by Tesla's Elon Musk and Alphabet's Mustafa Suleyman, to ban such machines outright. ...

**There are some governments and NGOs that would like to see a ban of lethal autonomous weapons. Do you see that as a possibility or likelihood?**

The Convention on Conventional Weapons provides a range of possibilities for controlling weapons use, either banning systems in advance or accepting their inevitability but proscribing their use in certain scenarios, or prescribing some ways of exchanging information or warning people on their use, etc. So banning LAWs is one of the possibilities among the options. But there could be yet another option. There are some states that are quite content with leaving this to national regulations, to industrial standards. So at this point in time, there is no consensus on any option. ...

**Unlike nuclear weapons, an issue you've also worked on, the tools to build autonomous weapons are relatively accessible. Does that pose a challenge to controlling this technology?**

Any military system today uses a number of technologies that are available off the shelf. But the international community has found ways to regulate these systems, to control their proliferation, whether it is through technology export control or treaties and conventions that have broader applicability or other ways of working with industry - such as in the area of nuclear security, for example - of managing the risks and unattended consequences.

WASHSTATEC000801

So AI is perhaps not so different from these earlier examples. What is perhaps different is the speed and scale of change, and the difficulty in understanding the direction of deployment. That is why we need to have a conversation that is open to all stakeholders. If we set out to govern these through only one level, let's say the international treaty-making level, ignoring what is done at the national level or by industry, then our chances of success would be not that great. That is my experience of the past couple of years. But if all these different levels move in sync, move in full cognizance of what the other levels are attempting, then we have a better chance of succeeding in managing some of the risks that are associated with AI. ....

*[Editor's Note: To read the entire interview, click on the source link below the item title.]*

back to top

* * * * * * * * * * * * * * * * *

–

COMMENTARY

11.

E. McClafferty, L. van der Meer & R. Slack: "Preparing for the Worst: Licenses Needed for UK Export of Dual-Use Items"
(Source: Trade & Manufacturing Monitor, 28 Aug 2018.)

* Authors: Eric McClafferty, Esq., emcclafferty@kelleydrye.com; and Laura van der Meer, Esq. lvandermeer@kelleydrye.com; and Robert Slack, Esq., rslack@kelleydrye.com. All of Kelley Drye & Warren LLP.

It has always been a possibility that the United Kingdom would crash out of the European Union on 30 March 2019 but "no deal" preparation is now highly recommended by both sides.  For organizations that export dual-use items, the possibility of the UK becoming a "third country" vis-à-vis the EU without an exit agreement or transition period means an overnight need for export licenses where none are required today.

Seasoned international businesses understand that dual use items, which can be used for both civil and military purposes, include far more products than one might assume.  In addition to the more obvious goods that may be used to produce or develop military items, such as machine tools and equipment used for chemical manufacturing, computers, drawings, technology, software, raw materials, and components also may be subject to dual use controls.  Even seemingly mundane items such as protective clothing used in medical laboratories, certain commonly used chemicals, certain ball bearings, and a wide variety of other products are controlled for export and they need to be properly classified to determine if a license would be needed to ship to a UK that has left the EU.  Many entities that have been operating exclusively within

WASHSTATEC000802

the EU could soon be confronted with dual use licensing requirements for the first time and global businesses may be faced with a potentially significant increase in the number of items that need be licensed.

While the export of military items, firearms and goods that may be usable for torture or capital punishment from the UK have been and will continue to be subject to specific licensing requirements, the movement of most dual use items between the 28 Member States of the European Union is possible today without any license. If the UK and EU fail to reach agreement on the UK's exit from the EU or if either the UK or European Parliament rejects the proposed EU-UK deal, the UK will no longer be part of the EU as of 11.00 GMT 30 March 2019 and a license would be needed to export many dual use items from the UK to the EU.  In addition, existing licenses for exports issued by the UK or issued by the EU27 would no longer be valid for exports from the others' territories.

In a series of technical notices released on 23 August 2018 by the UK, exporters are advised to determine what licenses may be needed should the talks fail.  Exporters were advised to put programs and procedures in place to ensure compliance. Importantly, the UK has announced that it will issue a new Open General Export License (OGEL) in advance of leaving the UK that will cover many dual use items, thus reducing the need for individual export licenses. Businesses seeking to use the new OGEL will need to register at a later stage.  The UK further advises that exporters will be able to apply for and obtain any individual licenses that may be needed prior to the end of March 2019. Unfortunately, however, it is unknown how many additional businesses will be affected and whether regulators will be able to keep pace with the demand.  Further information will be forthcoming but action can and should be taken by businesses now to examine their potential exposure and prepare contingency plans to avoid business disruption.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## 12. M. Padovan, M. Zinzani & V. Picchiassi: "Iran: The First Package of U.S. Extraterritorial Sanctions and the Update of the EU Blocking Statute"
(Source: Studio Legale Padovan, 20 Aug 2018.)

* Authors: Marco Padovan, mpadovan@studiopadovan.com; Marco Zinzani, Esq., mzinzani@studiopadovan.com; and Valerio Picchiassi, Esq., vpicchiassi@studiopadovan.com. All of Studio Legale Padovan, Milan and Rome.

The first of the so called 'wind down period' stated by the US administration has expired on Monday 6 August 2018. These wind down periods were established as a result of Trump's pulling out from the Joint Comprehensive Plan Of Action, the 'Iran nuclear deal', on 8 May this year. The original sanctions, which were suspended by effect of the JCPOA, will as consequence revive on 7 August 2018. The new Executive Order "Reimposing certain

*Sanctions With Respect to Iran*", also called "the New Iran E.O.", restores the sanctions which were lifted by the E.O. 13176 of 16 January 2016 and brings to an end the *wind-down general licenses* (GLs). Notably, as asserted by the FAQ 1.2 *Frequently Asked Questions Regarding the Re-Imposition of Sanctions Pursuant to the 8 May 2018 National Security Presidential Memorandum Relating to the Joint Comprehensive Plan of Action (JCPOA)* and by the FAQs 598, 601 and 606, which form part of the additional FAQs "*Regarding Executive Order of 6 August 2018, "Reimposing Certain Sanctions With Respect to Iran*", published simultaneously with the new Executive Order, sanctions are restored and extended for the following activities:

  - sanctions on the purchase or acquisition of US dollar banknotes by the Iranian government, of US Dollars;
  - sanctions on Iran's trade in gold and precious metals;
  - sanctions on the direct or indirect sale, supply or transfer from or to Iran of graphite, raw metals or semi-finished products, such as aluminum and steel, coal and software for integrating industrial processes;
  - sanctions on "*significant*" transactions related to the purchase or sale of Iranian Rials, or the deposit of funds or the maintenance of significant bank accounts outside the territory of Iran in Iranian Rials currency;
  - sanctions on the purchase, subscription to, or facilitation of the issuance of sovereign Iranian debt;
  - sanctions on Iran's automotive sector;
  - sanctions for diverting goods intended for the Iranian population, including food, medical and agricultural products, if they are used for facilitating censorship or human rights abuses.

All of the above-mentioned sanctions bear some extraterritorial profiles. They apply to non-US companies and they apply in absence of a lien between the mentioned activities and the US jurisdiction (i.e. by the subjects involved, commodity traded or method of payment).

On November 5, 2018 a second block of US sanctions will be reinstated. These will particularly hit the port operators, and shipping and shipbuilding sectors, petroleum-related transactions and energy sector. The SDN List will grow by a number of Iranian physical and juridical persons, naming among these almost all of the Iranian banks (the so called "13599").

*The European Union's reply: the updated Blocking Statute, the Implementing Regulation and the Commission's FAQs*

The EU reaffirmed its intention to maintain the JCPOA, clearly opposing the new US position. In particular, the EU considers the extraterritorial effects of US sanctions as a violation of International Law.

The EU published the following documents on September 7, 2018, which have been waited for by business operators in order to understand how to combine the simultaneous application of the Extraterritorial US rules and the EU Blocking Regulation:

  - Commission Delegated Regulation (EU) 2018/1100 of 6 June 2018

WASHSTATEC000804

amending the Annex to Council Regulation (EC) No 2271/96 "protecting against the effects of extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom", modifying the Annex to the Regulation (EC) n. 2271/96 of the European Council ('Blocking Regulation'). The Regulation lists the US Extraterritorial Rules which are considered unlawful by the EU, in order to protect the European operators. On August 7, the new Annex becomes legally binding;

 - Commission Implementing Regulation (EU) 2018/1101 of 3 August 2018 laying down the criteria for the application of the second paragraph of Article 5 of Council Regulation (EC) No 2271/96, thus authorizing the EU operators to comply in all or in part to the Extraterritorial Sanctions.

 - Frequent Questions (FAQs) on Blocking Regulation and Implementing Regulation.

At the end of July 2018, after 22 years, the EU finally defined the procedural rules of the Extra- Territorial Legislation Committee as per the article 8 of the Blocking Regulations; the mentioned Rules replicate the standard EU comitology procedures.

The EU also published a standard Template for applications for authorizations under Article 5 paragraph 2 of Council Regulation (EC) No 2271/96 (for a resume of the newly introduced rues, please see here).

*Our Opinion*

The Blocking Regulation was introduced 22 years ago to cancel, neutralize, block and anyway avoid the extraterritorial effect that could affect some European trading operators. It was adopted to protect against restrictive measures imposed by the USA against Cuba, Libya and Iran. In order to keep up to date the Extraterritorial List of US Rules, which cannot be lawfully executed in the EU, and in order to take into account the evolution of US rules along the years, also in light of Trump's declaration dated May 8, 2018, the EU has now chosen to substitute the whole Annex to the Blocking Regulation.

As we anticipated in our clients' alert last June 2018, the wording of the Annex to the Regulation is subject to some technical remarks: i.e. it is unclear if the automotive extraterritorial sanctions and those sanctions applying to certain blacklisted entities are actually embedded in the definitions of the new Annex.

The Blocking Regulation - which was applied for by our Firm in the event of the 2014 sanctions imposed by the US State Department's against Dettin S.p.A. in relation to activities which were wholly and perfectly lawful according to the National and UE regulations - provides for penalties against any European entity which, in absence of a previous authorization by the European Commission, would give execution to extraterritorial US sanctions (article 5). Furthermore, it prescribes the right to recover any damages, including legal costs, caused by the application of the extraterritorial laws specified in the Annex or by actions based thereon or resulting therefrom (Article 6). In Italy, the administrative sanction is that of the Legislative Decree n. 346 of 1998, with a maximum cap of 92.962,00 Euros.

WASHSTATEC000805

The combined provisions of Article 5 and 6, in fact, provide that if a European company intends to pull out from a contract with European counterparts for supplies in Iran or, in absence of an agreement with the counterparts, modifies the contract terms and conditions on the basis of the sole US Regulations without any authorizations from the European Commission, the company might face a civil action for damages plus the administrative sanction. In Italy, this sanction is imposed by the Ministry for Economic Development (MISE). Therefore, it is advisable to take prudent care in continuing contractual relations with Iranian counterparts that are subject to US sanctions, or in suspending or terminating them.

Pursuant to Article 2 of the Blocking Regulation, whenever the economic and/or financial interests of an European operator are affected, directly or indirectly, by the measures listed in the Annex to the Blocking Regulation, or by actions based thereon or derived therefrom, the operator shall inform the European Commission within thirty days from the event, directly or through the Member States competent authorities.

Subparagraph 2 of Article 5 allows the European Commission to authorize the European operators to comply, fully or in part, with the US extraterritorial sanctions, to the extent that non-compliance would seriously damage their interests or those of the Community.

It is clarified in the FAQs that such authorization is only agreed by way of waiver to the general rule and only in specific and duly motivated circumstances. The request has no suspensive effects. The authorization, granted by an implementing decision, becomes effective by the date of notification to the applicant. Until then, the EU operators are compelled to apply the Blocking Regulation.

Pursuant to Article 3 of the Implementing Regulation of the Commission (EU) n. 2018/1101, applications for an authorization as per Article 5, Subsection 2, of the Regulation (EC) n. 2271/1996 shall be in writing and shall include the name and contact details of the applicants, shall indicate the precise provisions of the listed extra-territorial legislation or the subsequent action at stake, and shall describe the scope of the authorization that is being requested and the damage that would be caused by non-compliance. In their application, the applicants shall also provide sufficient evidence that non-compliance would cause serious damage to at least one protected interest.

Where necessary, the Commission may request additional evidence from the applicants, which shall provide it within a reasonable period set by the Commission. The Commission shall inform the Committee on Extra-territorial Legislation as soon as it receives applications.

It is important to highlight that the Implementing Regulation (EU) n. 2018/1101 establishes the criteria to be considered by the Commission to decide on the seriousness of the damage (for the operators and the EU) in relation to non-compliance with US extraterritorial rules. The non- cumulative criteria include, by way of example:

WASHSTATEC000806

- the existence of an ongoing administrative or judicial investigation against the applicant from, or a prior settlement agreement with, the third country which is at the origin of the listed extra- territorial legislation;

- the existence of a substantial connecting link with the third country which is at the origin of the listed extraterritorial legislation or the subsequent actions; for example the applicant has parent companies or subsidiaries, or participation of natural or legal persons subject to the primary jurisdiction of the third country which is at the origin of the listed extra-territorial legislation or the subsequent actions;

- whether measures could be reasonably taken by the applicant to avoid or mitigate the damage; - the adverse effect on the conduct of economic activity, in particular whether the applicant would face significant economic losses, which could for example threaten its viability or pose a serious risk of bankruptcy;

- whether the applicant's activity would be rendered excessively difficult due to a loss of essential inputs or resources, which cannot be reasonably replaced;

- whether there is a threat to safety, security, the protection of human life and health and the protection of the environment;

- the consequences for the internal market in terms of free movement of goods, persons, services and capital, as well as financial and economic stability or key Union infrastructures;

- the systemic implications of the damage, in particular as regards its spill-over effects into other sectors.

Notably, the Commission's FAQs, which are just an interpretative guideline and not a legal act, dwell about the controlled/subsidiaries of American companies in the EU territory and, vice-versa, about the European subsidiaries in US Territory, distinguishing three situations:

When EU subsidiaries of U.S. companies are formed in accordance with the law of a Member State and have their registered office, central administration or principal place of business within the Union, they are considered EU operators. This implies that they enjoy all the rights and are subject to all the obligations under Union law, including the Blocking Statute.
Branches of U.S. companies in the Union do not fall under the previous paragraph as they do not have distinct legal personality from their parent company. They are not considered EU operators. Therefore, they are not subject to the Blocking Statute.

Subsidiaries of EU companies in the U.S. are subject to the law under which they are incorporated, which is generally that of the U.S. Therefore, they are not considered to be EU operators and are not subject to the Blocking Statue. Nevertheless, their parent company incorporated in the Union is an EU operator and, as such, it is subject to the provisions of the Blocking Statute.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



### 13.

## R.C. Burns: "Newsweek Gets Confused by OFAC Travel Rules"
(Source: Export Law Blog, 29 Aug 2018.) Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC, Clif.Burns@bryancave.com, 202-508-6067.

Last week the State Department changed its travel advisory on Cuba from "reconsider travel" to "exercise increased caution." The "reconsider travel" warning was apparently based on the sonic attacks on diplomats in Cuba.  The decision to change to "exercise increased caution" came after the State Department concluded that sonic attacks on private U.S. citizens was unlikely.

Still this business of travel warnings appear to have little, if any, relation to the actual safety of the destination. There are no warnings about the safety of travel to Belize even though between 2009 and 2016, 16 Americans were murdered in Belize. That put Belize as the seventh most dangerous country for Americans as measured by its death rate of 1.02 per 100,000 American tourists.  During that same period, only two people were killed in Cuba giving it a death rate of 0.08 per 100,000 American tourists, approximately 12 times lower than that of Belize. Of course, given the U.S. homicide rate of 5.3 per 100,000, it's probably safer to travel to Cuba, or even Belize, than to stay home in the United States.

A number of news sites commented on this change. But one of them, namely *Newsweek*, caught my eye when it decided to add this statement about travel to Cuba:

> The only legal way for U.S. citizens to travel there is by applying to the Treasury Department's Office of Foreign Assets Control for a license under one of 12 categories of travel.

Good grief.  Is Google not working at *Newsweek* these days? Those twelve categories mentioned in the quote are for *general licenses*, you know, the ones that do not require a specific OFAC license application.  In case the *Newsweek* reporter wanders by and reads this post, here is the link to the OFAC regulation noting that general licenses are available for each of those categories.

So, as you've heard before, don't believe everything you read on the Internet unless, of course, you read it here.

back to top

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

WASHSTATEC000808



---

## EX/IM TRAINING EVENTS & CONFERENCES

### 14. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices.  The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu.

WASHSTATEC000809

*Register before 2 September and get a 10% Early Bird discount on the course fee!*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

...

## EDITOR'S NOTES

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **John Locke** (29 Aug 1632 - 28 Oct 1704; was an English philosopher and physician, widely regarded as one of the most influential of Enlightenment thinkers and commonly known as the "Father of Liberalism".)
  - *"New opinions are always suspected, and usually opposed, without any other reason but because they are not already common."*
  - *"What worries you, masters you."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

WASHSTATEC000810

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment

WASHSTATEC000811

histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

_

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax

WASHSTATEC000812

or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

–

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC000813



*Congressional*
*Research Service*
Informing the legislative debate since 1914

# The U.S. Export Control System and the Export Control Reform Initiative

**Ian F. Fergusson**
Specialist in International Trade and Finance

**Paul K. Kerr**
Specialist in Nonproliferation

August 9, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R41916

# Summary

Difficulty with striking an appropriate balance between national security and export competitiveness has made the subject of export controls controversial for decades. Through the Arms Export Control Act (AECA), the International Emergency Economic Powers Act (IEEPA), and other authorities, the United States restricts the export of defense articles; dual-use goods and technology; certain nuclear materials and technology; and items that would assist in the proliferation of nuclear, chemical, and biological weapons or the missile technology used to deliver them. U.S. export controls are also used to restrict exports to certain countries on which the United States imposes economic sanctions. The Export Administration Act (EAA) legislated dual-use controls, but it has expired and such controls are presently maintained under IEEPA authorities.

The U.S. export control system is diffused among several different licensing and enforcement agencies. Exports of dual-use goods and technologies—as well as some military items—are licensed by the Department of Commerce, munitions are licensed by the Department of State, and restrictions on exports based on U.S. sanctions are administered by the U.S. Department of the Treasury. Administrative enforcement of export controls is conducted by these agencies, while criminal penalties are issued by units of the Department of Homeland Security and the Department of Justice.

Aspects of the U.S. export control system have long been criticized by exporters, nonproliferation advocates, allies, and other stakeholders as being too rigorous, insufficiently rigorous, cumbersome, obsolete, inefficient, or combinations of these descriptions. In August 2009, the Barack Obama Administration launched a comprehensive review of the U.S. export control system. In April 2010, then-Defense Secretary Robert M. Gates proposed an outline of a new system based on four singularities

- a single export control licensing agency for dual-use, munitions exports, and Treasury-administered embargoes,
- a unified control list,
- a single primary enforcement coordination agency, and
- a single integrated information technology (IT) system.

The rationalization of the two control lists was the Obama Administration's focus. The Administration made no specific proposals concerning the single licensing agency, although the Administration implemented some elements of a future single system, such as a consolidated screening list and harmonization of certain licensing policies.

In considering the future of the U.S. export control system, Congress may weigh the merits of a unified export control system—a chief goal of President Obama's proposal—or the continuation of the present bifurcated system by reauthorizing the EAA or enacting replacement legislation. In doing so, Congress may debate the record of the present dual-use system maintained by emergency authority, the aims and effectiveness of the present nonproliferation control regimes, the maintenance of the defense industrial base, and the balance between maintaining economic competitiveness and preserving national security.

WASHSTATEC000815

# Contents

Overview of the U.S. Export Control System ................................................................................. 1

   The Dual-Use System ................................................................................................................. 2

      The Export Administration Act (EAA) ............................................................................... 2

      Administration ................................................................................................................... 2

      Implementing Regulations ................................................................................................ 3

      Licensing Policy ............................................................................................................... 3

      Enforcement and Penalties ................................................................................................ 4

   Military Export Controls ........................................................................................................... 4

      Arms Export Control Act (AECA) .................................................................................... 4

      Licensing Policy ............................................................................................................... 5

      Administration ................................................................................................................... 6

      Enforcement and Penalties ................................................................................................ 6

   Nuclear Controls ....................................................................................................................... 6

   Defense Technology Security Administration (DTSA) .............................................................. 7

   Enforcement of U.S. Export Controls ....................................................................................... 7

   Multilateral Control Regimes .................................................................................................... 8

President Obama's Export Control Initiative ................................................................................... 9

   The Four Singularities ............................................................................................................. 10

      A Single Licensing Agency ............................................................................................. 10

      The Single Control List .................................................................................................... 13

      The Single Enforcement Structure ................................................................................... 19

      A Single Information Technology System ....................................................................... 20

      Encryption ....................................................................................................................... 21

Legislation in the 115th Congress ................................................................................................ 22

   Export Control Reform Act of 2018 ........................................................................................ 22

# Figures

Figure B-1. Dual-Use Export Licensing Process ........................................................................... 25

# Tables

Table 1. President's Export Control Reform Initiative .................................................................. 11

Table A-1. Export Control Characteristics .................................................................................... 23

# Appendixes

Appendix A. Basic Export Control Characteristics ....................................................................... 23

Appendix B. Dual-Use Export Licensing Process ........................................................................ 25

Appendix C. List of Acronyms ...................................................................................................... 26

WASHSTATEC000816

## Contacts

Author Contact Information ......................................................................................................... 27

WASHSTATEC000817

# Overview of the U.S. Export Control System

The United States restricts the export of defense articles; dual-use goods and technology; certain nuclear materials and technology; and items that would assist in the development of nuclear, chemical, and biological weapons or the missile technology used to deliver them. A defense item is defined by regulation as one that "[m]eets the criteria of a defense article or defense service on the U.S. Munitions List" or "[p]rovides the equivalent performance capabilities of a defense article" on that list.[1] Dual-use goods are commodities, software, or technologies that have both civilian and military applications.

The United States also controls certain exports in adherence to several multilateral nonproliferation control regimes. In addition, U.S. export controls are used to restrict exports to certain countries on which the United States imposes economic sanctions, such as Cuba, Iran, and Syria. Through the Export Administration Act (EAA),[2] the Arms Export Control Act (AECA), the International Emergency Economic Powers Act (IEEPA), and other authorities, Congress has delegated, in the context of broad statutory power, to the executive branch its express constitutional authority to regulate foreign commerce by controlling exports.

Various aspects of the U.S. export control system have long been criticized by exporters, nonproliferation advocates, allies, and other stakeholders as being too restrictive, insufficiently restrictive, cumbersome, obsolete, inefficient, or any combination of these descriptions. Some contend that such controls overly restrict U.S. exports and make firms less competitive. Others argue that U.S. defense and foreign policy considerations should trump commercial concerns. In January 2007, the Government Accountability Office (GAO) designated government programs designed to protect critical technologies, including the U.S. export control system, as a "high-risk" area warranting a "strategic reexamination of existing programs to identify needed changes." GAO's report named poor coordination among export control agencies, disagreements over commodity jurisdiction between the Departments of State and Commerce, unnecessary delays and inefficiencies in the license application process, and a lack of systematic evaluative mechanisms to determine the effectiveness of export controls.[3] A 2017 GAO report cited "progress" with regard to improving the export control system, but added that

> government-wide challenges remain, including the need to adopt a more consistent leadership approach, improve coordination among programs, address weaknesses in individual programs, and implement export control reform[4].

On August 13, 2009, President Barack Obama announced the launch of a comprehensive review of the U.S. export control system; then-Secretary of Defense Robert M. Gates announced key elements of the Administration's agenda for reform in an April 2010 speech, with additional elaborations in subsequent months. Former Secretary Gates proposed a four-pronged approach that would establish

- a single export control licensing agency for both dual-use, munitions and exports licensed to embargoed destinations;
- a unified control list;

---

[1] *International Traffic in Arms Regulations*, 22 C.F.R. 120.3.

[2] The last incremental extension of the Export Administration Act expired in August 2001.

[3] U.S. Government Accountability Office (GAO), *High-Risk Series: An Update*, GAO-07-310, January 2010.

[4] U.S. Government Accountability Office (GAO), *Progress on Many High-Risk Areas, While Substantial Efforts Needed on Others,* GAO-17-317, February 2017.

WASHSTATEC000818

- a single enforcement coordination agency; and
- a single integrated information technology system, which would include a single database of sanctioned and denied parties.

This section describes the characteristics of the dual-use, munitions, and nuclear controls. The information contained in this section also appears in chart form in **Appendix A**.

# The Dual-Use System

## The Export Administration Act (EAA)

The EAA of 1979 (P.L. 96-72) was the underlying statutory authority for dual-use export controls. The EAA, which is currently expired, periodically has been reauthorized for short periods of time. The last incremental extension expired in August 2001. At other times, and currently, the export licensing system created under the authority of the EAA has been continued by a presidential declaration of a national emergency and the invocation of the International Emergency Economic Powers Act (IEEPA; P.L. 95-223).[5] The EAA conferred upon the President the power to control exports for national security, foreign policy, or short-supply purposes. It also authorizes the President to establish export licensing mechanisms for items detailed on the Commerce Control List (CCL) (see below), and it provides guidance and places certain limits on that authority.[6]

Congress has attempted several times to rewrite or reauthorize the EAA. The last comprehensive effort took place during the 107th Congress. The Senate adopted legislation (S. 149) in September 2001, and a House version (H.R. 2581) was developed by the then-House International Relations Committee and the House Armed Services Committee. The full House did not act on this legislation.

The EAA, which was written and amended during the Cold War, was based on strategic relationships, perceived threats to U.S. national security, international business practices, and existing commercial technologies, many of which have changed dramatically in the past 25 years. Some Members of Congress and most U.S. business representatives advocated liberalizing U.S. export regulations to allow American companies to engage more fully in international competition for sales of high-technology goods, some of which may be commercially available from foreign competitors. Other Members and some national security analysts contend that liberalization of export controls over the past decade has contributed to foreign threats to U.S. national security, that some controls should be tightened, and that Congress should weigh further liberalization carefully.

## Administration

The Bureau of Industry and Security (BIS) in the Department of Commerce administers the export licensing and enforcement functions of the dual-use export control system. The Ronald Reagan Administration detached those functions from the International Trade Administration

---

[5] This national emergency was most recently continued "beyond August 17, 2018," by President Donald Trump on August 8, 2018, 83 *Federal Register* 39871, August 13, 2018.

[6] Under IEEPA authority, the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." P.L. 95-223, §203(a)(1)(B).

WASHSTATEC000819

(ITA) in 1985 in order to separate them from the export promotion functions of that agency within the Department of Commerce. BIS also enforces U.S. antiboycott regulations concerning the Arab League boycott against Israel.

## Implementing Regulations

The EAA is implemented by the Export Administration Regulations (EAR; 15 C.F.R. 730 et seq). As noted above, the EAR are continued under IEEPA's authority in times when the EAA is expired. The EAR set forth licensing policy for goods and destinations, the applications process used by exporters, and the CCL, which is the list of specific commodities, technologies, and software controlled by the EAR. The CCL is composed of 10 categories of items

- nuclear materials, facilities, and equipment;
- materials, organisms, microorganisms, and toxins;
- materials processing;
- electronics;
- computers;
- telecommunications and information security;
- lasers and sensors;
- navigation and avionics;
- marine; and
- propulsion systems, space vehicles, and related equipment.

Each of these categories is further divided into functional groups: equipment, assemblies, and components; test, inspection, and production equipment; materials; software; and technology. Each controlled item has an export control classification number (ECCN) based on the above categories and functional groups. Each ECCN is accompanied by a description of the item and the reason for control. In addition to discrete items on the CCL, nearly all U.S.-origin items are "subject to the EAR"; such items may be restricted to a destination based on the end-use or end-user of the product. For example, a commodity that is not on the CCL may be denied if the good is destined for a military end-use or an entity known to be engaged in weapons proliferation.

## Licensing Policy

The EAR set out the licensing policy for dual-use and certain military items; the regulations control items for reasons of national security, foreign policy, or short supply. National security controls are based on a common multilateral control list; however, the designation of countries to which those controls are applied is based on U.S. policy. Foreign policy controls may be unilateral or multilateral in nature. The EAR unilaterally control items for antiterrorism, regional stability, or crime control purposes. Antiterrorism controls proscribe nearly all exports to North Korea and the four countries designated as state sponsors of terrorism by the Secretary of State—Cuba, Iran, Sudan, and Syria. These regulations also impose foreign policy controls on encryption items and on hot section technology, which is "for the development, production, or overhaul of commercial aircraft engines, components, and systems."[7] The EAR include "enhanced controls" on hot section technology and require a license "for exports and reexports to all destinations,

---

[7] Bureau of Industry and Security 2016, *Report on Foreign Policy-Based Export Controls*, U.S. Department of Commerce.

WASHSTATEC000820

except Canada.'"[8] The U.S. government reviews license applications for such technology "on a case-by-case basis to determine whether the proposed export or reexport is consistent with U.S. national security and foreign policy interests.'"[9] Foreign policy-based controls are also based on adherence to multilateral nonproliferation control regimes, such as the Nuclear Suppliers' Group, the Australia Group (chemical and biological precursors), and the Missile Technology Control Regime (MTCR).

The EAR set out timelines for the consideration of dual-use licenses and the process for resolving interagency disputes. Within nine days of receipt, Commerce must refer the license to other agencies (State, Defense, and Energy, as appropriate), grant the license, deny it, seek additional information, or return it to the applicant. If Commerce refers the license to other agencies, the agency to which it is referred must recommend that the application be approved or denied within 30 days. The EAR provide a dispute resolution process for a dissenting agency to appeal an adverse decision. The entire licensing process, to include the dispute resolution process, is designed to be completed within 90 days. This process is depicted graphically in **Appendix B**.

BIS noted in its Fiscal Year 2017 Budget Submission that its increased responsibility for exports as a result of export control reform has increased the burden on the bureau's licensing and enforcement functions.[10]

## Enforcement and Penalties

Because of the expiration of the EAA, current penalties for export control violations are based on those contained in IEEPA (50 U.S.C. 1701 et seq). For criminal penalties, the IEEPA sanctions individuals up to $1 million or up to 20 years imprisonment, or both, per violation (50 U.S.C. 1705(b)). Civil penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74).

Enforcement is carried out by the Office of Export Enforcement (OEE) at BIS. OEE's headquarters is in Washington, DC, and the office has nine U.S. field offices, as well as export control officers in 6 foreign countries. OEE is authorized to carry out investigations domestically and works with DHS to conduct investigations overseas. The office, along with in-country U.S. embassy officials overseas, also conducts prelicense checks and postshipment verifications The Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (P.L. 111-195) reinstated certain enforcement activities undertaken by the Department of Commerce previously authorized by the EAA.

# Military Export Controls

## Arms Export Control Act (AECA)

The AECA of 1976 (P.L. 90-629)[11] provides the President with the statutory authority to control the export of defense articles and services. The AECA also contains the statutory authority for the Foreign Military Sales (FMS) program, under which the U.S. government sells U.S. defense equipment, services, and training on a government-to-government basis. The law also specifies

---

[8] Ibid.

[9] Ibid.

[10] Bureau of Industry and Security, Department of Commerce, *Budget Estimates, President's Submission, Fiscal Year 2017*.

[11] Originally titled The Foreign Military Sales Act.

WASHSTATEC000821

criteria for Direct Commercial Sales (DCS), whereby eligible foreign governments and international organizations purchase some defense articles and services directly from U.S. firms.

The AECA sets out foreign and national policy objectives for international defense cooperation and military export controls. Section 3(a) of the AECA specifies the general criteria for countries or international organizations to be eligible to receive U.S. defense articles and defense services provided under the act. The law also sets express conditions on the uses to which these defense articles may be put. Section 4 of the AECA states that U.S. defense articles and defense services shall be sold to friendly countries "solely" for use in "internal security"; for use in "legitimate self-defense"; to enable the recipient to participate in "regional or collective arrangements or measures consistent with the Charter of the United Nations"; to enable the recipient to participate in "collective measures requested by the United Nations for the purpose of maintaining or restoring international peace and security"; and to enable the foreign military forces "in less developed countries to construct public works and to engage in other activities helpful to the economic and social development of such friendly countries."

## Congressional Requirements

A prominent feature of the AECA is the requirement for congressional consideration of certain foreign defense sales proposed by the President. This procedure includes consideration of proposals to sell major defense equipment and services, or to retransfer such military items to other countries.[12] The procedure is triggered by a formal report to Congress under Section 36 of the AECA. In general, the executive branch, after complying with the terms of the applicable section of U.S. law (usually those contained in the AECA), is free to proceed with the sale unless Congress passes legislation prohibiting or modifying the proposed sale.

Under Section 36(b) of the ACEA, Congress must be formally notified 30 calendar days before the Administration can take the final steps to conclude a government-to-government foreign military sale or issue an export license for commercial sales of major defense equipment valued at $14 million or more, defense articles or services valued at $50 million or more, or design and construction services valued at $200 million or more. In the case of such sales to NATO member states Japan, Australia, or New Zealand, Congress must be formally notified 15 calendar days before the Administration can proceed with the sale. However, the prior notice thresholds are higher for Japan, Australia, and New Zealand. These higher thresholds are $25 million for the sale, enhancement, or upgrading of major defense equipment; $100 million for the sale, enhancement, or upgrading of defense articles and defense services; and $300 million for the sale, enhancement, or upgrading of design and construction services, so long as such sales to these countries do not include or involve sales to a country outside of this group of nations.

## Licensing Policy

The International Traffic in Arms Regulations (ITAR) set out licensing policy for exports (and temporary imports) of U.S. Munitions List (USML) items. A license is required for the export of nearly all items on the USML. There is a limited license exemption for USML items for Canada because the United States considers Canada to be part of the U.S. defense industrial base. In addition, the United States has treaties with the United Kingdom and Australia to exempt certain defense articles from licensing obligations to approved end-users in those countries; the Senate gave its advice and consent to ratification of these treaties in 2010. Unlike some Commerce Department dual-use controls, licensing requirements are based on the nature of the article and not the end-use or end-user of the item. The United States implements a range of prohibitions on

---

[12] For more information, see CRS Report RL31675, *Arms Sales: Congressional Review Process*, by Paul K. Kerr.

WASHSTATEC000822

munitions exports to countries unilaterally or based on adherence to United Nations (U.N.) arms embargoes. In addition, any firm engaged in manufacturing, exporting, or brokering any item on the USML must register with the Directorate of Defense Trade Controls (DDTC) at the State Department and pay a yearly fee whether or not the firm seeks to export during the year.

## Administration

Exports of defense goods and services are administered by DDTC, which is a component of the Department of State's Bureau of Political-Military Affairs and consists of four offices: Management, Policy, Licensing, and Compliance. DDTC also processes commodity jurisdiction requests, which determine the regulatory regime to which an item is subject.

Critics of the defense trade system had previously decried the delays and backlogs in processing license applications at DDTC. A National Security Presidential Directive (NSPD-56), signed by President Bush on January 22, 2008, directed that the review and adjudication of defense trade licenses submitted under ITAR are to be completed within 60 days, except where six "national security exceptions apply."[13] Previously, except for the congressional notification procedures discussed above, DDTC had no defined timeline for the application process.

## Enforcement and Penalties

The AECA provides for criminal penalties of up to $1 million or 20 years of imprisonment, or both, for each violation. The AECA also authorizes civil penalties of up to $500,000 and debarment from future exports. Civil penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). DDTC has an enforcement staff and works with the Defense Security Service and the Customs and Border Protection and Immigration and Customs Enforcement (ICE) units at the Department of Homeland Security (DHS). In addition to adjudicating civil cases, DDTC assists DHS and the Department of Justice (DOJ) in pursuing criminal investigations and prosecutions. DDTC also coordinates the Blue Lantern end-use monitoring program, in which in-country U.S. embassy officials conduct prelicense checks and postshipment verifications of items transferred via DCS. The Department of Defense's Defense Security Cooperation Agency manages the department's Golden Sentry program, which performs an analogous function for FMS transfers.

## Nuclear Controls[14]

A subset of the above-mentioned dual-use and military controls are controls on nuclear items and technology. Controls on nuclear goods and technology are derived from the Atomic Energy Act of 1954 (P.L. 83-703), as amended, as well as from the EAA and the AECA. Controls on nuclear exports are divided among several agencies, based on the product or service being exported. The Nuclear Regulatory Commission (NRC) regulates exports of nuclear facilities and material. The NRC licensing policy and control list are located at 10 C.F.R. 110. BIS licenses "outside the core" civilian power plant equipment and maintains the Nuclear Referral List as part of the CCL. The

---

[13] These are required Congressional notification; failure to submit required government assurances; incomplete end-use checks; incomplete Department of Defense review; a required waiver; "[w]hen a related export policy is under active review and pending final determination by the Department of State." ("Policy on Review Time for License Applications," *Federal Register*, vol. 74, No. 231, December 3, 2009, p. 63497.)

[14] For more information, see CRS Report RS22937, *Nuclear Cooperation with Other Countries: A Primer*, by Paul K. Kerr and Mary Beth D. Nikitin.

WASHSTATEC000823

Department of Energy authorizes the export of nuclear technology. DDTC exercises licensing authority over nuclear items in defense articles under the ITAR.

# Defense Technology Security Administration (DTSA)

A Department of Defense (DOD) Field Activity under the Under Secretary of Defense for Policy, DTSA coordinates the technical and national security review of direct commercial sales export licenses and commodity jurisdiction requests received from the Departments of Commerce and State. It develops the recommendation of DOD on these referred export licenses or commodity jurisdictions based on input provided by the various DOD departments and agencies and represents DOD in the interagency dispute resolution process. Not all licenses from DDTC or BIS are referred to DTSA; memorandums of understanding govern the types of licenses referred from each agency. DTSA coordinates the DOD position with regard to proposed changes to the ITAR and the EAR. It also represents DOD in the interagency process responsible for compliance with multinational export control regimes.

# Enforcement of U.S. Export Controls

Enforcement of the U.S. export control system is undertaken by the agencies responsible for export licensing, the Department of Homeland Security (DHS), the Department of Justice (DOJ) (National Security Division and the Federal Bureau of Investigation [FBI]), and the Defense Criminal Investigative Service (DCIS). Their activities can be summarized as follows:

- **Office of Export Enforcement (OEE) of the Bureau of Industry and Security (BIS), Department of Commerce.** OEE investigates criminal and administrative violations of the dual-use export control regime. OEE is authorized to conduct domestic investigations and works with ICE on investigations of export control violations overseas. OEE refers civil violations to the Office of Chief Counsel of BIS and criminal violations to DOJ.
- **Office of Defense Trade Compliance (ODTC) in DDTC, Department of State.** ODTC primarily administers civil enforcement actions, including charging letters and consent agreements, policies of denial, debarments, transaction exceptions, and reinstatements. ODTC provides agency support to investigations and criminal enforcement actions primarily conducted by ICE and the FBI.
- **Office of Enforcement, Nuclear Regulatory Commission (NRC).** Investigates export control violations of nuclear facilities and material licensed by the NRC's Office of International Programs. The Office of Enforcement refers criminal violations to DOJ.
- **ICE, Department of Homeland Security.** As with its predecessor at the U.S. Customs Service, ICE has been the lead agency for criminal export enforcement activities. The Counter-Proliferation Investigations Unit investigates violations of dual-use and munitions export controls, exports to sanctioned countries, and violations of economic embargoes. ICE supplements and provides enforcement capacity to the export licensing agencies (BIS and DDTC) and undertakes investigations based on its own and other agency intelligence. In addition, export controls are enforced at the port of departure by DHS Customs and Border Protection.
- **National Security Division of DOJ.** The counterespionage section of this division undertakes criminal prosecutions resulting from investigations

WASHSTATEC000824

conducted by the licensing agencies, ICE, and the FBI. An October 2007 DOJ National Export Enforcement Initiative established task forces between the licensing and enforcement agencies and U.S. Attorney's Offices in 20 cities to coordinate export control prosecutions and has facilitated new counterproliferation coordination among law enforcement agencies, export licensing agencies, and the intelligence community.

- **FBI.** The FBI's Weapons of Mass Destruction Directorate receives and analyzes intelligence regarding proliferation networks, provides specialized training on counterproliferation for the National Export Enforcement Initiative, and cooperates with above-mentioned investigative partners and export licensing agencies.

- **DCIS, Department of Defense.** DCIS is the criminal investigative arm of the Inspector General of DOD. Among its varied activities, DCIS investigates the transfer of sensitive defense technologies to proscribed nations and criminal elements.

## Multilateral Control Regimes

In addition to U.S. controls, internationally there are four major multilateral control regimes: the Australia Group, the Missile Technology Control Regime (MTCR), the Nuclear Suppliers Group (NSG), and the Wassenaar Arrangement.[15] The Commerce Department observed on December 9, 2010, that "[m]ost items on the CCL are controlled in accordance with the United States' commitments" to four major multilateral export control regimes.[16] In addition to the controls described in the box below, all of these regimes have catch-all controls, which allow for the control of nonlisted items if they are to be used for a military or proliferation-related purpose.

---

**Multilateral Control Regimes**

- **Australia Group:** a voluntary, informal, export control arrangement founded in 1985 and consisting of 42 members. It has a set of export guidelines, as well as six common control lists. These lists include dual-use chemical manufacturing and biological equipment, chemical weapons precursors, and biological agents.
- **Missile Technology Control Regime (MTCR):** an informal voluntary export control arrangement established in 1987. The 35 members of the regime agree to adhere to common export policy guidelines applied to lists of controlled items. The MTCR guidelines call on each partner country to exercise restraint when considering transfers of equipment or technology, as well as "intangible" transfers, that would provide, or help a recipient country build, a missile capable of delivering a 500 kilogram warhead to a range of 300 kilometers or more. The MTCR annex contains two categories of controlled items. Category I items are the most sensitive. There is "a strong presumption to deny" such transfers, according to the MTCR guidelines. Regime partners have greater flexibility with respect to exports of Category II items.
- **Nuclear Suppliers Group (NSG):** an informal association of nuclear exporters founded in 1975 and currently consisting of 48 members. NSG members voluntarily agree to coordinate exports of civilian nuclear material, as well as nuclear-related equipment and technology, to non-nuclear-weapon states.[17] The group's guidelines

---

[15] For more information about these regimes, see CRS Report RL33865, *Arms Control and Nonproliferation: A Catalog of Treaties and Agreements*, by Amy F. Woolf, Paul K. Kerr, and Mary Beth D. Nikitin.

[16] "Commerce Control List: Revising Descriptions of Items and Foreign Availability," 75 *Federal Register*, No. 236, December 9, 2010.

[17] The Nonproliferation Treaty (NPT) defines a nuclear-weapon state as "one which has manufactured and exploded a nuclear weapon or other nuclear explosive device" prior to January 1, 1967. These states are China, France, Russia, the United Kingdom, and the United States.

WASHSTATEC000825

> include lists of materials and equipment subject to export control, in addition to requiring importers to offer nonproliferation and physical security assurances.
>
> - **Wassenaar Arrangement:** a voluntary export control regime approved in 1996 and currently consisting of 42 members. Its participants agree to control exports and retransfers of items on a munitions list and a list of dual-use goods and technologies. According to its Guidelines and Procedures, the Wassenaar Arrangement is not formally targeted at "any state or group of states," but is designed "to contribute to regional and international security and stability, by promoting transparency and greater responsibility in transfers of conventional arms and dual-use goods and technologies, thus preventing destabilizing accumulations." Participants exchange information regarding transfers and licenses for items covered by the arrangement.

Because the EAA has expired, only one law in force explicitly requires the U.S. government to adhere to a multilateral export control regime. The Arms Export Control Act requires the Secretary of State to maintain, as part of the USML, "a list of all items on the MTCR Annex" that are not controlled pursuant to the EAA. The AECA requires the executive branch to control nuclear-related items, but the law does not explicitly require that these items be the same as those controlled by the NSG.

# President Obama's Export Control Initiative

On August 13, 2009, President Obama announced the launch of a comprehensive review of the U.S. export control system. Then-Defense Secretary Robert M. Gates announced key elements of the Administration's agenda for reform in a speech on April 20, 2010, with additional elaborations in subsequent months. Former Secretary Gates proposed a four-pronged approach that would create a single primary export control licensing agency for both dual-use and munitions exports; adopt a unified control list; establish a single enforcement coordination agency; and create a single integrated information technology system, which would include a single database of sanctioned and denied parties.

The Administration's blueprint envisioned that these changes would be implemented in three phases, with the final phase requiring legislative action. Phase I would undertake preparatory work to harmonize the Commerce Control List (CCL) with the U.S. Munitions List (USML). This phase would also develop standardized licensing processes among the control agencies; it would also create an "Enforcement Fusion Center" to synchronize enforcement, along with a single electronic gateway to access the licensing system. Phase II would implement a harmonized licensing system with two identically-structured tiered control lists, potentially allowing for a reduction in the amount of licenses required by the system. This phase would include moving certain items from the USML to the CCL, for which congressional notification would be required;[18] examining unilateral controls on certain items; and undertaking consultations with multilateral control regime partners to add or remove multilateral controls on certain items.

Under the proposal, the new export control system would debut in Phase III, which would establish a single licensing agency; merge the two harmonized, tiered control lists, with mechanisms for review and updating; merge the two primary export control enforcement agencies, OEE and ICE; and operationalize a single IT system for licensing and enforcement. Changes in agency structure would require legislation.

---

[18] Under Section 38(f) of the Arms Export Control Act, the President may not remove any article from the USML until 30 days after providing notice to the House Foreign Affairs Committee, and the Senate Foreign Relations Committee, including a description of the nature of any subsequent controls on the item.

WASHSTATEC000826

In a February 2011 speech, then-BIS Assistant Secretary Kevin Wolf elucidated seven principles driving the Administration's export control reform efforts

- Controls should focus on a small core set of key items that can pose a serious national security or intelligence threat to the United States and its interests;

- Controls should be fully coordinated with the multilateral export control regimes in order to be effective;

- Unilateral controls must address an existing legal or foreign policy objective;

- Control lists must clearly identify which items are controlled and be easily updated as technology emerges, matures, or becomes widely available;

- Licensing processes must be predictable and timely;

- Enforcement capabilities must be enhanced to address noncompliance and increase capacity to interdict unapproved transfers; and

- Controls must address counterterrorism policy and the need to export items that support homeland security priorities.[19]

# The Four Singularities

## A Single Licensing Agency

In his speech introducing the Administration's reform efforts, then-Secretary Gates described the bureaucratic structure of the U.S. export control system as a "byzantine amalgam of authorities, roles, and missions scattered around different parts of the federal government."[20] As noted above, licensing is divided among the Department of Commerce for dual-use and certain military items, the Department of State for munitions, the Department of the Treasury for certain sanctions, and the Nuclear Regulatory Commission and Department of Energy for certain nuclear materials and technologies. These entities operate under different statutory authorities and enforce different regulations. While there are mechanisms in place for license referrals and to address licensing disagreements, critics have long maintained that the multi-agency structure contributes to institutional disputes among the different agencies responsible for export control licensing. Having one licensing system would also end disputes about commodity jurisdiction over a given item.

On June 30, 2010, then-National Security Adviser General Jim Jones announced that the Obama Administration intended to create an independent licensing agency with Cabinet members from existing control agencies serving as a board of directors. While that Administration did not provide specific details, this new agency is expected to take over the licensing functions of BIS, DDTC, and OFAC; this agency would likely house the civil and administrative enforcement functions of BIS and DDTC. The Obama Administration did not propose moving licensing procedures of the NRC for nuclear materials and of the Department of Energy for nuclear-related technology; an Obama Administration official attributed this decision to the relatively small volume of licensing undertaken by these agencies as well as by the small universe of exporters.[21]

General Jones argued that a unified licensing structure would end the situation in which no agency knew the total of export licenses granted or denied by the U.S. government. Under current

---

[19] Remarks of BIS Assistant Secretary for Export Administration, Kevin Wolf, to Exportkontrolltag 2011, Munich, Germany, February 25, 2011.

[20] Secretary of Defense Robert M. Gates, speech before the Business Executives for National Security, April 20, 2010.

[21] Discussion with National Security Council official, March 18, 2011.

WASHSTATEC000827

referral processes, dual-use and certain military items licenses are referred by BIS to the Department of Defense, the Department of State (Economic Energy and Business Bureau [EEB], International Security and Non-Proliferation Bureau, and the regional bureaus), and the Department of Energy for review. However, BIS licenses are not referred to DDTC. DDTC refers munitions licenses to DOD and to the above-mentioned bureaus at State, and in some instances to Energy, but not to BIS. Some OFAC licenses are referred only to State's EEB. As a result, situations have arisen whereby licenses requested by the same exporter to the same destination have been approved by one license agency and denied by another.

Brian Nilsson, then-Deputy Assistant Secretary of State for Defense Trade Controls, indicated during a February 2016 hearing that that the single information technology system in use by the Departments of Commerce, Energy, and State (see below) has begun to address the lack of agencies' visibility regarding license information.[22] Yet, interagency policy differences may continue to exist because agencies would continue to refer licenses to ensure continued checks and balances.

### Table 1. President's Export Control Reform Initiative

| Phase | Control List | Licensing | Enforcement | Information Technology |
|---|---|---|---|---|
| I | Refine, understand, harmonize definitions to end jurisdictional confusion between two lists; establish new control criteria | Implement regulatory-based improvements to streamline licensing | Synchronize and de-conflict enforcement; create Enforcement Fusion Center | Determine enterprise-wide needs |
| II (requires congressional notification; requires additional funding) | Restructure two lists into identical tiered structures; apply criteria; remove unilateral controls where appropriate; submit proposals multilaterally to add/remove controls | Complete transition to mirrored control list; fully implement licensing harmonization | Expand outreach and compliance | Transition toward a single electronic licensing system |
| III (requires legislation) | Merge two lists into a single list; implement process for updating list | Implement single licensing agency | Consolidate enforcement activities under one agency | Implement a single system for licensing and enforcement |

**Source:** Prepared by Dianne Rennack, CRS, based on White House Fact Sheet, April 20, 2010.

## Dual-Nationals

An issue concerning dual-nationals may provide an example of the effort that will be necessary to create a unified export control system. The White House announced on March 11, 2010, that it would take action to eliminate "obstacles to exporting to companies employing dual nationals."

---

[22] "Export Control Reform: Challenges for Small Business? (Part I)," Hearing Before the House Committee on Small Business, February 11, 2016.

WASHSTATEC000828

Specifically, the Obama Administration announced that it would "begin to harmonize" conflicting standards used by the Departments of Commerce and State to determine a foreign person's nationality—a step that these departments must take in order to make certain export control decisions.[23]

The Commerce Department, according to a 2010 Government Accountability Office (GAO) report, determines "nationality for release of technology to a foreign national" based on that person's "most recent citizenship or permanent residence."[24] The State Department, however, considered not only a foreign national's current citizenship status, but also their country of birth if it differs from the person's country of citizenship or permanent residency. Even if a foreign entity is approved for a manufacturing license agreement or a technical assistance agreement with a U.S. firm, the State Department must approve the transfer of technical data, defense services, and defense articles to dual nationals and third-party nationals employed by the foreign entity.[25] "If a person's country of birth is prohibited from receiving U.S. arms, as are China, Iran, and North Korea, State [collected] additional information to confirm that the individual has no significant ties to his or her country of birth," according to the GAO. However, the State Department stopped using "country of birth" as of 2015, although the department does "consider all current and former citizenships, in addition to current permanent residency."[26]

Both the State Department and private-sector experts argue that these requirements are contentious because, in addition to being administratively burdensome, they are a potential employment discrimination issue in other countries; in order to comply with the regulations, non-U.S. employers may need to limit employment opportunities in potential violation of their countries' employment laws.[27]

After publishing a proposed rule on August 11, 2010,[28] the State Department published a final rule on May 16, 2011, amending the ITAR to allow the transfer of defense articles and technical data to dual or third-party nationals who are "bona fide, regular employees, directly employed by the foreign consignee or end-user."[29] Such transfers

> must take place completely within the physical territory of the country where the end-user is located, where the governmental entity or international organization conducts official business, or where the consignee operates, and be within the scope of an approved export license, other export authorization, or license exemption.

---

[23] For example, determining the appropriateness of releasing technical data to employees of a foreign firm engaged in a defense project with a U.S. firm.

[24] Government Accountability Office, Export Controls: Observations on Selected Countries' Systems and Proposed Treaties, May 2010, GAO-10-557.

[25] The State Department's Directorate of Defense Trade Controls, according to the GAO, "considers a third-country national to be an individual from a country other than the country which is the foreign signatory" to a "technical assistance or manufacturing license agreement. A third-country national may also be a dual national if he or she holds nationality from more than one country." GAO-10-557.

[26] Email from State Department official, January 16, 2018.

[27] "Amendment to the International Traffic in Arms Regulations: Dual Nationals and Third-Country Nationals Employed by End-Users," *Federal Register*, vol. 75, no. 154, August 11, 2010, p. 48625.

[28] Ibid.

[29] "International Traffic in Arms Regulations: Dual Nationals and Third-Country Nationals Employed by End-Users," *Federal Register*, vol. 76, no. 94, May 16, 2011, p. 28174. Paul Conlin, Sebastien Beauregard, R. Luc Beaulieu, and Richard A. Wagner, "Proposed ITAR Amendment Regarding Dual Nationals and Third-Country Nationals," *Mondaq*, August 31, 2010.

WASHSTATEC000829

The end user or consignee must take a variety of measures designed to prevent the diversion of any exports; the final rule includes a requirement for the end user to screen employees for "substantive contacts with restricted or prohibited countries" listed in the ITAR.[30] The rule, which became effective on August 15, 2011, also explains that, although "nationality does not, in and of itself, prohibit access to defense articles or defense services, an employee that has substantive contacts" with persons from prohibited countries "shall be presumed to raise a risk of diversion," unless the State Department determines otherwise.

It is worth noting that, according to the State Department, "most diversions of U.S. Munitions List ... items appear to occur outside the scope of approved licenses, not within foreign companies or organizations providing access to properly screened dual national or third country national employees."[31]

## The Single Control List

The Obama Administration concentrated on rationalizing the control lists to form the basis from which other reforms will flow. The Administration first worked to transform the current USML from a "negative list" characterized by general descriptions of articles and design-intent-based criteria to one resembling the current CCL, a "positive" list of dual-use items that are controlled according to objective criteria or parameters. This is being done through the "bright line" process to determine which items should be controlled as dual-use goods and which should be controlled as munitions. The bright line is being determined at the commodity level, based on technical specification and military needs, and is not an overarching concept or framework. The Obama Administration argued that the bright line is necessary, in part, because of the USML's current reliance on design intent (i.e., whether an item was "specifically designed, modified, or adapted" for military use) and its catch-all controls of parts and components of these items.[32] While the CCL is described as more "positive," it too contains entries containing the term "specially designed" for a specific purpose that may need to be modified to conform to bright line standards.

Each category of the USML has been screened by an interagency team led by DOD; proposed rewrites to each USML category, including certain items proposed to be moved to the CCL, have been published as proposed rulemakings. Originally, each of the items on the resulting USML list was to have been assigned to a tier to determine its level of control. The Obama Administration created three tiers applicable to both the CCL and the USML to categorize a different level of control.[33] However, the Administration postponed this process, reportedly because it would have

---

[30] "Substantive contacts," according to the rule, "include regular travel to such countries, recent or continuing contact with agents, brokers, and nationals of such countries, continued demonstrated allegiance to such countries, maintenance of business relationships with persons from such countries, maintenance of a residence in such countries, receiving salary or other continuing monetary compensation from such countries, or acts otherwise indicating a risk of diversion."

[31] *Federal Register*, vol. 75, no. 154.

[32] "Revisions to the U.S. Munitions List, Advanced Notice of Proposed Rulemaking," 75 *Federal Register* 76935, December 9, 2010, at 76937.

[33] As originally postulated, Tier 1 articles are those that are almost exclusively available from the United States and provide a *critical* military or intelligence advantage. Tier 2 articles are those that are almost exclusively available from countries that are members of the multilateral export control regimes that control such items and (1) provide a *substantial* military or intelligence advantage, or (2) make a substantial contribution to the indigenous development, production, use, or enhancement of a Tier 1 or Tier 2 item. Tier 3 articles are those that provide a *significant* military or intelligence advantage; make a significant contribution to the indigenous development, production, use, or enhancement of a Tier 1, Tier 2, or Tier 3 item; or are otherwise controlled for national security, foreign policy, or human rights reasons.

WASHSTATEC000830

been necessary to decide on the tiers for all USML items prior to publishing any revised USML categories. Deputy Assistant Secretary Nilsson testified that the Obama Administration prioritized revising the categories which have the greatest effect on U.S. military interoperability with allied governments.[34]

To date, the executive branch has completed transferring items in the following categories from the USML to the CCL:

- Category IV (launch vehicles, missiles, rockets, torpedoes, bombs, mines, and other military explosive devices;
- Category V (explosives and energetic materials, propellants, incendiary agents and their constituents);
- Category VI (vessels of war and naval equipment);
- Category VII (tanks and military vehicles);
- Category VIII (aircraft and associated equipment);
- Category IX (military training equipment);
- Category X (protective personal equipment and shelters);
- Category XI (military electronics);
- Category XII (fire control, range finder, optical and guidance and control equipment);
- Category XIII (auxiliary military equipment);
- Category XIV (toxicological agents, including chemical agents, biological agents, and associated equipment);
- Category XV(spacecraft and related articles);
- Category XVI (nuclear weapons related articles);
- Category XVIII (directed energy weapons); and
- Category XX (submersible vessels and oceanic equipment);

The State Department also created a new USML Category XIX (gas turbine engines).[35] Then-Deputy Assistant Secretary Nilsson stated in September 2017 that items would not be moved from USML Categories I-III (firearms, close assault weapons and combat shotguns, guns and armament, ammunition/ordnance) to the CCL until 2018.[36] The executive branch posted the proposed rules on May 14, 2018.

A final rule on a new "0Y521" classification series became effective on April 12, 2013. This series is used for items that are neither identified under an existing ECCN nor controlled under an existing U.S. or multilateral export control regime, but warrant control for foreign policy reasons or because they could provide a significant military or intelligence advantage. According to the EAR, such items "are typically emerging technologies."[37] BIS has subsequently added new items to this series. Items so classified "must be re-classified under another ECCN within one calendar year from the date they are listed" in the relevant part of the EAR. If they are not reclassified, the

---

[34] Hearing Before the House Committee on Small Business, February 11, 2016.

[35] "Revisions to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reforms," 78 *Federal Register* 22740, April 16, 2013.

[36] Defense Trade Advisory Group (DTAG) Plenary Meeting Minutes, September 8, 2017.

[37] Export Administration Regulations Part 742.6 (7).

WASHSTATEC000831

items "are designated as EAR99 items unless either the CCL is amended to impose a control on such items under another ECCN or the ECCN 0Y521 classification is extended."[38] BIS may extend this classification "for two one-year periods, provided that the U.S. Government has submitted a proposal to the relevant multilateral regime(s) to obtain multilateral controls over the item." BIS may further extend the classification "only if the Under Secretary for Industry and Security makes a determination that such extension is in the national security or foreign policy interests of the United States."

According to the Obama Administration, the USML would contain "only those items that provide at least a significant military or intelligence applicability that warrant the controls the AECA requires."[39] The reconstituted Munitions List may then be aligned with the CCL by adopting its A-E commodity organization structure and adding two additional categories: F and G for ITAR specific controls. As a result of this alignment, each USML category will be divided into seven groups: A—equipment, assemblies, and components; B—test, inspection, and production equipment; C—materials; D—software; E—technology; F—defense services; and G—manufacturing and production authorizations.

## "600 Series"

As a result of the bright line process, the Obama Administration moved some USML items to the CCL. Under Section 38(f) of the AECA, the President may not remove any article from the USML until 30 days after providing notice to the House Foreign Affairs Committee, and the Senate Foreign Relations Committee, including a description of the nature of any subsequent controls on the item. Section 38(f)(6) of the AECA requires that "any major defense equipment" on the 600 series "shall continue to be subject to" several "notification and reporting requirements" of the AECA and the Foreign Assistance Act of 1961 (P.L. 87-195).[40]

In order to comply with Section 38(f), the manner in which USML items transferred to the CCL are to be controlled is described in a proposed rulemaking on July 15, 2011,[41] and is part of the "mega rule" issued on April 16, 2013.[42] It involves the creation of a "600 Series" subcategory of Export Control Classification Numbers (ECCNs) for each category on the CCL.[43] This new series is populated by items that are judged not to need the relatively-stricter controls mandated under the USML. Items moved to the CCL in this manner require a license to all destinations except Canada. All items controlled pursuant to multilateral control regimes retain their existing controls. In addition, "600 Series" items will be subject to a general policy of denial to countries subject to a U.S. or U.N. arms embargo. Such items are also subject to the prohibition on Defense Department procurement of "goods and services" on the USML "from any Communist Chinese

---

[38] EAR99 items are subject to the EAR but not specifically listed on the CCL. Such items may require a license if destined for a prohibited or restricted end user, end use, or destination (Supplement No. 4 to Part 774—Commerce Control List Order of Review (a)(6)).

[39] Remarks of BIS Assistant Secretary for Export Administration Kevin Wolf to the Update 2011 Conference; Washington, DC; July 19, 2011.

[40] The AECA defines "major defense equipment" as "any item of significant military equipment on the United States Munitions List having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000."

[41] "Proposed Revisions to the Export Administration Regulations: Control of Items the President Determines No Longer Warrant Control Under the U.S. Munitions List," Proposed Rule, 76 *Federal Register* 41958, July 15, 2011.

[42] "Revisions to the Export Administration Regulations: Initial Implementation of Export Control Reform," 78 *Federal Register* 22660, April 16, 2013.

[43] The 600 Series has also been referred to as the Commerce Munitions List. Series 600 items are to be designated with a 6 in the ECCN. For example, applicable aircraft will have a 9A610 ECCN.

WASHSTATEC000832

military company" mandated by the National Defense Authorization Act for Fiscal Year 2006 (P.L. 109-163).

The rule also places restrictions on the extent to which certain license exceptions can be applied. End-use items transferred to the 600 Series would be eligible for the recently announced Strategic Trade Authorization (STA) license exception (described below) only after a determination is jointly made by the State, Defense, and Commerce Departments that such an exception should be made available for the item in question. Most parts, components, and accessories transferred under this process would be automatically eligible for an STA license exception for exports to the governments of STA-eligible countries. Items expressly defined as "less significant" would be eligible for a license exception for destinations other than those controlled for antiterrorism reasons. "600 Series" items would also be eligible for other preexisting license exceptions.

The U.S. control status of parts and components also is addressed by the 600 Series. Under the EAR, the license requirement is based on the finished product, generally without regard to its parts and components. However, a foreign product containing more than 25% controlled U.S. content (10% controlled U.S. content in the case of a transaction to a country identified as a state sponsor of terrorism) may require a reexport license from the United States. However, for ITAR-controlled items, DDTC has employed a jurisdictional interpretation known as a "see-through" rule, which subjects to ITAR control U.S.-origin parts and components incorporated into end products manufactured overseas. For items migrating to the 600 Series, a 25% rule applies, but no *de minimus* amount would apply to embargoed destinations.

## *"Specially Designed"*

To facilitate the transfer of items from the USML to the CCL, the Obama Administration proposed a new definition of "specially designed." As noted above, the Administration sought to move away from the design-intent standard of the USML and the use of the catch-all phrase "specifically designed" for military use to subject parts and components to ITAR jurisdiction. The Obama Administration argued that new definition was necessary because "specifically designed" in the USML did not have the same meaning as the term "specially designed" which appears in the CCL and also in various multilateral control lists. The Administration also argued that removing the term(s) entirely by enumerating each part and component being moved from the USML to the CCL was infeasible.

The Obama Administration published its final rule on the definition of "specially designed" on April 16, 2013.[44] Some have dubbed the two-part definition as a "catch and release" approach because the first part may capture an item as specially designed for military use and the second part may release the item from control under the definition if it does not qualify under certain parameters. Under the first part of the regulation, an item qualifies as specially designed if

> (1) As a result of "development" has properties peculiarly responsible for achieving or exceeding the performance levels, characteristics, or functions in the relevant ECCN or U.S. Munitions List (USML) paragraph; or
>
> (2) Is a "part," "component," "accessory," "attachment," or "software" for use in or with a commodity or defense article 'enumerated' or otherwise described on the CCL or the USML.

Under the regulation, if neither of these criteria apply to an item, then the item is not specially designed. If one or more of these criteria describes an item, the item is potentially qualified as

---

[44] "Revisions to the Export Administration Regulations: Initial Implementation of Export Control Reform," 78 *Federal Register* 22660, April 16, 2013; 78 *Federal Register* 22740, April 16, 2013.

WASHSTATEC000833

specially designed and is subject to the following six exclusions. The item is excluded from being specially designed if it

> (1) Has been identified to be in an ECCN paragraph that does not contain "specially designed" as a control parameter or as an EAR99 item in a commodity jurisdiction (CJ) determination or interagency-cleared commodity classification (CCATS);

> (2) Is, regardless of 'form' or 'fit,' a fastener (*e.g.*, screw, bolt, nut, nut plate, stud, insert, clip, rivet, pin), washer, spacer, insulator, grommet, bushing, spring, wire, solder;

> (3) Has the same function, performance capabilities, and the same or 'equivalent' form and fit, as a commodity or software used in or with an item that:

> (i) Is or was in "production" (*i.e.*, not in "development"); *and*

> (ii) Is either not 'enumerated' on the CCL or USML, or is described in an ECCN controlled only for Anti-Terrorism (AT) reasons;

> (4) Was or is being developed with "knowledge" that it would be for use in or with commodities or software (i) described in an ECCN *and* (ii) also commodities or software either not 'enumerated' on the CCL or the USML (e.g., EAR99 commodities or software) or commodities or software described in an ECCN controlled only for Anti-Terrorism (AT) reasons;

> (5) Was or is being developed as a general purpose commodity or software, i.e., with no "knowledge" for use in or with a particular commodity (e.g., an F/A-18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool); *or*

> (6) Was or is being developed with "knowledge" that it would be for use in or with commodities or software described (i) in an ECCN controlled for AT-only reasons and also EAR99 commodities or software; or (ii) exclusively for use in or with EAR99 commodities or software."[45]

Under this decision approach, the item is potentially "caught" as specially designed by the first two criteria, but it may be "released" from that definition if any of the six subsequent qualifiers apply. The Commerce regulations apply to the "600 series" of items moved from the USML. The proposed regulation to define specially designed in the ITAR as a replacement for the currently utilized "specifically designed" is similar in nature.

In a speech on July 17, 2012, then-BIS Assistant Secretary Kevin Wolf acknowledged that the specially designed concept is "inherently difficult to apply in reality," and that it is "not consistent with the "ultimate goal of creating a truly positive, objective list of controlled items."[46] However, he noted that, concurrent with this approach, BIS also published an advanced notice of proposed rulemaking in June 2012 seeking comments on the feasibility of enumerating or positively identifying each item determined classified as specially designed on the CCL.[47]

### *Strategic Trade Authorization License Exception*

In 2011, the Obama Administration devised a new license exception known as the Strategic Trade Authorization (STA), which was designed to facilitate transfers to low-risk countries and to promote interoperability to allies in the field.[48] To be eligible, exporters must provide notification

---

[45] Ibid.

[46] Remarks of Kevin Wolf, Assistant Secretary for Export Administration, to the Update 2012 Conference, July 17, 2012. http://www.bis.doc.gov/news/2012/wolf_update_2012.htm.

[47] "Feasibility of Enumerating "Specially Designed" Components," 77 *Federal Register* 36419, June 19, 2012.

[48] "Export Control Reform Initiative: Strategic Trade Authorization License Exception," 76 *Federal Register* 35276,

WASHSTATEC000834

to BIS of the transaction and a destination control statement notifying the foreign consignee of the exception's safeguard requirements; exporters must also obtain from the foreign consignee a statement acknowledging the consignee's understanding and willingness to comply with the requirements of the license exception. STA-eligible recipients of U.S. munitions items contained on the CCL are not allowed to reexport such items without a license. Such recipients are also prohibited from reexporting "STA-eligible items to any destination outside the STA-eligible countries."[49]

Under the final rulemaking, STA is available to 2 groups consisting of 44 countries. To a group of 36 countries made up of NATO partners and members of all 4 multilateral nonproliferation control regimes, dual-use items controlled for national security (NS), chemical or biological weapons, nuclear nonproliferation, regional stability, crime control, or significant items (hot section jet technology) are eligible for an STA. This includes almost all items on the CCL that are not controlled for statutory reasons. An additional eight countries are eligible for exports, reexports, or transfers controlled for NS-only and that are not designated as STA-excluded.[50] The United States-Israel Strategic Partnership Act of 2014 (P.L. 113-296) requires the President, "consistent with the commitments of the United States under international arrangements," to "take steps" to move Israel from the second list of countries to the first list of countries. However, Israel's STA status does not appear to have changed. An August 3, 2018, Commerce Department rule moved India from the second list of countries to the first list of countries.[51]

Dual-use items controlled for missile technology, chemical weapons, short supply, or surreptitious listening are not be eligible for export under an STA. Certain implements of execution and torture, pathogens and toxins, software and technology for "hot-sections" of aero gas-turbine engines, and encryption have also been excluded from the STA.

---

June 16, 2011.

[49] Export Control Reform Initiative Factsheet #4: License Exception "Strategic Trade Authorization" (STA).

[50] The final rule excludes NS controlled items from the Wassenaar Arrangement's Sensitive List to the eight countries.

[51] "U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5," *83 Federal Register 38018*, August 3, 2018.

WASHSTATEC000835

---

### Commercial Communications Satellites

Although most items on either the CCL or the USML were placed there by executive discretion or pursuant to international agreement, one category of items was on the USML by statute: commercial communications satellites (CCS). Prior to 1990, CCS were controlled exclusively by the Department of State under the authority of Section 38 of the Arms Export Control Act (P.L. 90-629). Despite having both military and civilian uses, CCS were considered munitions, as many satellites and associated technologies were originally designed "specifically" for military purposes and continue to have "significant military or intelligence applications as defined by regulation." In 1990, however, President George H. W. Bush ordered a review of dual-use items, including CCS, on the U.S. Munitions List (USML), which resulted in satellites without military performance characteristics being moved to Department of Commerce jurisdiction. In 1996, President Clinton transferred all CCS (along with commercial jet hot section technology) to Commerce jurisdiction with enhanced licensing procedures. Following 1998 revelations by the Cox Committee that U.S. satellite manufacturers provided missile design information and skills to China through the improper transfer of launch failure analysis, Congress passed legislation transferring the authority, effective March 15, 1999, to license exports of CCS to the Department of State (Strom Thurmond National Defense Authorization Act for Fiscal Year 1999; P.L. 105-261).

The satellite industry has argued that this transfer has led to licensing delays and lost sales resulting from regulatory uncertainty, and it has lobbied to revert export controls to Commerce Department jurisdiction. Satellites launched for commercial communication purposes may contain embedded sensitive technology, such as positioning thrusters, signal encryption, mating and separation mechanisms, and multiple satellite/reentry vehicle systems, which as stand-alone items are also controlled under the USML. Industry claims that because of State's "see-through" policy of requiring licenses for parts and components embedded in CCS, foreign satellite manufacturers are designing out U.S. parts and components and advertising them as ITAR-free (i.e., free of munitions licensing requirements). In addition, Tiananmen Square sanctions and other waiver restrictions have precluded U.S. exports to China, a competitive launch destination.

Section 1248 of the 2010 National Defense Authorization Act (P.L. 111-84) directed the Secretaries of State and Defense to conduct a review of U.S. space export control policy, including a risk assessment of removing satellite and related components from the USML. An interim assessment, which was reported to Congress in May 2011, found that CCS, related components, and integration and launch information "with certain exceptions, conditions and limitations" could be removed from the USML and transferred to the CCL "without posing an unacceptable security risk." The final review, which was delivered to Congress on April 18, 2012, recommended that Congress should return export control jurisdiction for CCS to presidential discretion, as well as to authorize the Department of Defense to determine the need for special export control monitoring and oversight services for CCS and authorize DOD to be reimbursed for those services.

Section 1261 of the National Defense Authorization Act of 2013 (P.L. 112-239) repealed P.L. 105-261's provision transferring "satellites and related items" to the USML. But this law contains some restrictions. "Satellites or related items" may not be "exported, reexported, or transferred, directly or indirectly," to China, North Korea, "[a]ny country that is a state sponsor of terrorism," or "any entity or person in or acting for or on behalf of such government, entity, or person." This section also prohibits such items from being launched in any of those countries, even as "part of a launch vehicle owned, operated, or manufactured by the government of such country or any entity or person in or acting for or on behalf of such government, entity, or person." The President may waive this prohibition if the President "determines that it is in the national interest of the United States to do so" and notifies Congress. The law also specifies that licenses for the export of "satellites and related items to a country with respect to which the United States maintains a comprehensive arms embargo shall be subject to a presumption of denial." The Obama Administration moved CCS to the CCL in January 2017.[52]

## The Single Enforcement Structure

The third singularity involves the creation of a streamlined export enforcement system. Under Phase I of the new approach, a single export "fusion center" would be created to "coordinate and de-conflict investigations, serve as a central point of contact for coordinating export control

---

[52] "Revisions to the Export Administration Regulations (EAR): Control of Spacecraft Systems and Related Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML)," *Federal Register*, Vol. 82, No. 6, January 10, 2017, p. 2875; "International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV," *Federal Register*, Vol. 82, No. 6, January 10, 2017, p. 2889.

WASHSTATEC000836

enforcement with Intelligence Community activities, and synchronize overlapping outreach programs."[53] On November 9, 2010, the Obama Administration issued Executive Order 13558, which created the Export Enforcement Coordination Center (EECC). The center officially opened in March 2012 within the Department of Homeland Security and replaced and expanded on the functions of the existing National Export Enforcement Coordination Network in ICE. It consists of a director from the Department of Homeland Security and two deputies appointed from the Departments of Commerce and Justice, with an intelligence community liaison designated by the Director of National Intelligence.

The center functions as the primary forum to coordinate export control enforcement efforts among the Departments of State, the Treasury, Commerce, Defense, Justice, Energy, and Homeland Security and the Director of National Intelligence and to resolve potential conflicts in criminal and administrative export control enforcement. The center is also able to screen all license applications. Previously, the OEE at BIS was the only entity that could screen dual-use licenses, whereas ICE could screen licenses from DDTC and OFAC. The unit will also establish government-wide statistical tracking capabilities for criminal and administrative enforcement activities. Also in March 2012, an Information Triage Unit was established in the Department of Commerce to serve as an information gathering and screening unit among law enforcement agencies, the intelligence community, and the export licensing agencies. The unit is designed to serve as a central point to disseminate relevant information for each license application prior to decisionmaking.[54]

The EECC is not to be confused with the National Export Control Coordinator, housed in the Justice Department, which is "responsible for ensuring full coordination between the Justice Department and the many other US law enforcement, licensing, and intelligence agencies that play a role in export enforcement."[55] The role of the coordinator has been described as the chief prosecutor of export control enforcement with the authority to determine which cases to bring for criminal prosecution.

The Donald Trump Administration may request the movement of the BIS Office of Export Enforcement to ICE. Currently, ICE conducts investigations and criminal enforcement for DDTC and OFAC, and by virtue of its authority under the IEEPA, it shares dual-use investigations with OEE. Removal of OEE to ICE will end this overlap of authority. The Obama Administration envisioned that a consolidated licensing agency would continue to have authority over administrative enforcement actions.[56]

## A Single Information Technology System

The fourth singularity is the creation of a single information technology system for administering the export control system. The Departments of Commerce, State, and Defense have begun using the USXPORTS database, originally used by the Department of Defense to track referred license applications.[57] The reform effort envisions that USEXPORTS will become the platform for a proposed single export license application form to be used by State, Commerce, and the Treasury's Office of Foreign Assets Control. The Department of Energy, Immigration and

---

[53] Speech of General Jim Jones, June 30, 2010.

[54] Department of Commerce, Press Release, March 7, 2012.

[55] Department of Justice Press, Release, June 20, 2007, http://www.justice.gov/opa/pr/2007/June/07_nsd_440.html.

[56] Conversation with NSC Official, March 18, 2011.

[57] GAO-17-317, February 2017.

WASHSTATEC000837

Customs Enforcement, and the Export Coordination Enforcement Center are also to use the database.

The Obama Administration's plan called for the adoption of USXPORTS first for internal communications such as license referrals, while exporters would continue to use the existing SNAP-R and D-Trade electronic license filing portals. The Obama Administration indicated that eventually it wanted to facilitate interoperability between the license portals, the internal system, and Customs' Automated Export System (AES), the information system that tracks actual movement of goods.

In conjunction with the single IT system, the Obama Administration developed a single license application form. To make this possible, the Administration standardized certain definitions between the different regulations, such as the use of the term "technology" in the EAR as opposed to the term "technical data" used in the ITAR.[58] To assist in compliance with U.S. export regulations, the Obama Administration also compiled a consolidated screening list of over 24,000 entities from existing Commerce, Treasury, and State Department screening lists. The list consolidates the BIS Denied Person List, Unverified List, and Entity List; the Department of State's Nonproliferation Sanctions List; the Directorate of Defense Trade Controls Debarred List; and the Office of Foreign Assets Control Specially Designated Nationals List.

## Encryption

While not announced as part of the four singularities, the Obama Administration proposed reforming encryption controls as one of the first deliverables in the export control reform process. The Administration announced on March 11, 2010, that it would change a filing requirement for exporters of products with encryption capabilities. At the time, exporters of such products were required to file for a technical review by the Commerce Department, a process that, according to the White House announcement, could take "between 30-60 days." The announcement advocated replacing this process with "a more efficient one-time notification-and-ship process," which would ensure that the "U.S. government still receives information it needs for its national security requirements while facilitating U.S. exports and innovation for new products and new technologies."[59]

The Commerce Department announced on June 25, 2010, that it was amending the Export Administration Regulations (EAR) as "the first step in the President's effort to reform U.S. encryption export controls."[60] As described by the Commerce Department's Bureau of Industry and Security, the amendment to the EAR includes[61]

- replacing, for encryption products "of lesser national security concern," the "30-day waiting requirement for a technical review" with a "provision that allows

---

[58] "Single Export Application for All Agencies to be Unveiled, White House Official Says," *Export Practitioner*, January 2011, p. 31.

[59] According to an Obama Administration official, controlling the export of products with encryption capabilities differs from controlling other exports because the United States generally wants to obtain information on exported encryption technology rather than prevent its export.

[60] "Encryption Export Controls: Revision of License Exception ENC and Mass Market Eligibility, Submission Procedures, Reporting Requirements, License Application Requirements, and Addition of Note 4 to Category 5, Part 2," 75 *Federal Register* 36481, June 25, 2010.

[61] Quotations describing the June 25 announcement are taken from 75 *Federal Register*, no. 122 and from BIS statements available at http://www.bis.doc.gov/encryption/default.htm.

WASHSTATEC000838

immediate authorization to export and reexport these products" after the exporter submits an electronic encryption registration to BIS;

- similarly replacing the 30-day requirement for most mass-market encryption products;[62]

- an "overarching note to exclude particular products that use cryptography from being controlled as 'information security' items"—a measure that implements changes approved by the Wassenaar Arrangement members in December 2009; this regulatory change eliminates controls under the CCL on "[m]any items in which the use of encryption is ancillary to the primary function of the item"; and

- a provision that makes most encryption technology eligible for export and reexport to nongovernmental end-users in countries other than those of "greater national security concern."

According to the June 2010 announcement of the EAR amendment, the United States "will also review other issues related to encryption controls." Decontrolling additional items would require approval by the members of the Wassenaar Arrangement.

# Legislation in the 115th Congress

## Export Control Reform Act of 2018

On February 15, 2018, Representatives Edward Royce and Eliot Engel introduced H.R. 5040, the Export Control Reform Act of 2018, which provides broad, detailed legislative authority for the President to "establish and maintain lists published by the Secretary of Commerce of [dual-use and military] items that are controlled under this title," as well as "prohibit unauthorized exports, reexports, and transfers of controlled items," and "require licenses or other authorizations ... for exports, reexports, and transfers of controlled items." The bill renews, with some changes, the export control provisions of the EAA, but does not substantially alter the EAA anti-boycott or nonproliferation sanctions provisions.

---

[62] The Commerce Department classifies certain products with encryption capabilities as "mass market" pursuant to a procedure described in the EAR.

WASHSTATEC000839

# Appendix A. Basic Export Control Characteristics

## Table A-1. Export Control Characteristics

| Characteristic | Dual-Use | Munitions | Nuclear |
|---|---|---|---|
| Legislative Authority | Export Administration Act (EAA) of 1979 (expired); International Emergency Economic Powers Act of 1977 (IEEPA) | Arms Export Control Act of 1968, 1976 (AECA) | Atomic Energy Act of 1954 |
| Agency of Jurisdiction | Bureau of Industry and Security (BIS)(Commerce) | Directorate of Defense Trade Controls (DDTC)(State) | Nuclear Regulatory Commission (NRC) (facilities and material) Department of Energy (DOE) (technology) BIS ("outside the core" civilian power plant equipment) DDTC (nuclear items in defense articles) |
| Implementing Regulations | Export Administration Regulations (EAR) (15 C.F.R. 730 et seq) | International Traffic in Arms Regulations (ITAR) (22 C.F.R. 120 et seq) | 10 C.F.R. 110—Export and Import of Nuclear Material and Equipment (NRC) 10 C.F.R. 810—Assistance to Foreign Atomic Energy Activities (DOE) |
| Control List | Commerce Control List (CCL) | Munitions List (USML) | List of Nuclear Facilities and Equipment; List of Nuclear Materials (NRC) Nuclear Referral List (CCL) USML Activities Requiring Specific Authorization (DOE) |
| Relation to Multilateral Controls | Wassenaar Arrangement (dual-use) Missile Technology Control Regime (MTCR) Australia Group (CBW) Nuclear Suppliers' Group | Wassenaar Arrangement (munitions) MTCR | Nuclear Suppliers' Group International Atomic Energy Agency |
| Licensing Policy | Based on item, country, or both. Antiterrorism controls proscribe exports to five countries for nearly all CCL listings | Most Munitions License items require licenses; 20 proscribed countries. | General/Specific Licenses (NRC) General/Specific Authorizations (DOE) |

WASHSTATEC000840

| Characteristic | Dual-Use | Munitions | Nuclear |
|---|---|---|---|
| Licensing Application Timeline | Initial referral within 9 days; agency must approve/deny within 30 days; 90-day appeal process (see **Appendix B**) | 60 days with national security exceptions; congressional notification period for significant military equipment | No timeframe for license applications |
| Enforcement | Office of Export Enforcement (BIS) (OEE) (domestic) Homeland Security (DHS): Immigration and Customs Enforcement (ICE); Customs and Border Protection (CBP) Justice (DOJ): National Security Division; FBI | Office of Defense Trade Compliance (DDTC) Defense Criminal Investigation Service (DCIS)(DOD) Defense Security Service (DOD) DHS: ICE, CBP DOJ: National Security Division; FBI | Office of Enforcement (NRC) BIS-OEE DDTC-ODTC DCIS (DOD) DHS: ICE, CBP DOJ: National Security Division; FBI |
| Penalties | Criminal: $1 million/20 years imprisonment Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). Denial of export privileges. | Criminal: $1 million/20 years imprisonment Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). Denial of export privileges. | Criminal: Individual—$250,000/12 years to life imprisonment; Firm—$500,000 (NRC and DOE) Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). |

**Source:** Congressional Research Service (CRS).

WASHSTATEC000841

# Appendix B. Dual-Use Export Licensing Process

## Figure B-1. Dual-Use Export Licensing Process

(Executive Order 12981, December 1995)



**Source:** Prepared by Ian F. Fergusson, Congressional Research Service (CRS).

**Notes:** [1] The time periods for the appeal procedure reflect a 5-day window of appeal and an 11-day period for each body to make a decision.

[2] A license application must be resolved or appealed to the President within 90 days. The order does place a time limit on a presidential decision.

* SNEC, Sub-Groups on Nuclear Export Policy, MTEC, Missile Technology/Export Control Group; SHIELD Chemical and Biological Weapons Control Group.

WASHSTATEC000842

# Appendix C. List of Acronyms

AECA—Arms Export Control Act

AES—Automated Export System

BIS—Bureau of Industry and Security, Department of Commerce

CBP—Customs and Border Protection, Department of Homeland Security

CCL—Commerce Control List

CML—Commerce Munitions List

CPI—Counter-Proliferation Investigations

DCIS—Defense Criminal Investigation Service

DDTC—Directorate of Defense Trade Controls, Department of State

DHS—Department of Homeland Security

DOJ—Department of Justice

DTSA—Defense Technology Security Administration

EAA—Export Administration Act

EAR—Export Administration Regulations

ECCN—Export Control Classification Number

EECC—Export Enforcement Coordination Center

EEB—Economic, Energy, and Business Bureau, Department of State

FP—Foreign Policy Controls

GAO—Governmental Accountability Office

IEEPA—International Emergency Economic Powers Act

ICE—Immigration and Customs Enforcement Agency, Department of Homeland Security

ISN—International Security and Nonproliferation Bureau, Department of State

ITA—International Trade Administration, Department of Commerce

ITAR—International Traffic in Arms Regulations

MTCR—Missile Technology Control Regime

NRC—Nuclear Regulatory Commission

NS—National Security Controls

NSG—Nuclear Suppliers Group

OEE—Office of Export Enforcement

ODTC—Office of Defense Trade Compliance, DDTC

OFAC—Office of Foreign Assets Control, Department of the Treasury

SI—Significant Items Controls

WASHSTATEC000843

SL—Surreptitious Listening Controls

SS—Short Supply Controls

STA—Strategic Trade Authorization

USML—U.S. Munitions List

## Author Contact Information

Ian F. Fergusson
Specialist in International Trade and Finance
ifergusson@crs.loc.gov, 7-4997

Paul K. Kerr
Specialist in Nonproliferation
pkerr@crs.loc.gov, 7-8693

WASHSTATEC000844

Message

| | |
|---|---|
| **From:** | Noonan, Michael J [NoonanMJ@state.gov] |
| **Sent:** | 8/30/2018 8:08:26 PM |
| **To:** | PM-DTCP-RMA [PM-DTCP-RMA@state.gov] |
| **Subject:** | FW: CPA Media Monitoring: Congressional Research Service: The U.S. Export Control System and the Export Control Reform Initiative |
| **Attachments:** | R41916.pdf |

████████████████████████████████

████████████████████████

**Official**
UNCLASSIFIED

---

**From:** Marquis, Matthew R
**Sent:** Thursday, August 30, 2018 2:57 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Congressional Research Service: The U.S. Export Control System and the Export Control Reform Initiative



**The U.S. Export Control System and the Export Control Reform Initiative**
**By Ian Fergusson & Paul Kerr**
**9 August 2018**

**CPA Note: Full report attached as .pdf**

**Summary**

Difficulty with striking an appropriate balance between national security and export competitiveness has made the subject of export controls controversial for decades. Through the Arms Export Control Act (AECA), the International Emergency Economic Powers Act (IEEPA), and other authorities, the United States restricts the export of defense articles; dual-use goods and technology; certain nuclear materials and technology; and items that would assist in the proliferation of nuclear, chemical, and biological weapons or the missile technology used to deliver them. U.S. export controls are also used to restrict exports to certain countries on which the United States imposes economic sanctions. The Export Administration Act (EAA) legislated dual-use controls, but it has expired and such controls are presently maintained under IEEPA authorities.

The U.S. export control system is diffused among several different licensing and enforcement agencies. Exports of dual-use goods and technologies—as well as some military items—are licensed by the Department of Commerce, munitions are licensed by the Department of State, and restrictions on exports based on U.S. sanctions are administered by the U.S. Department of the Treasury. Administrative enforcement of export controls is conducted by these agencies, while criminal penalties are issued by units of the Department of Homeland Security and the Department of Justice.

Aspects of the U.S. export control system have long been criticized by exporters, nonproliferation advocates, allies, and other stakeholders as being too rigorous, insufficiently rigorous, cumbersome, obsolete, inefficient,

or combinations of these descriptions. In August 2009, the Barack Obama Administration launched a comprehensive review of the U.S. export control system. In April 2010, then-Defense Secretary Robert M. Gates proposed an outline of a new system based on four singularities

- a single export control licensing agency for dual-use, munitions exports, and Treasury-administered embargoes,
- a unified control list,
- a single primary enforcement coordination agency, and
- a single integrated information technology (IT) system.

The rationalization of the two control lists was the Obama Administration's focus. The Administration made no specific proposals concerning the single licensing agency, although the Administration implemented some elements of a future single system, such as a consolidated screening list and harmonization of certain licensing policies.

In considering the future of the U.S. export control system, Congress may weigh the merits of a unified export control system—a chief goal of President Obama's proposal—or the continuation of the present bifurcated system by reauthorizing the EAA or enacting replacement legislation. In doing so, Congress may debate the record of the present dual-use system maintained by emergency authority, the aims and effectiveness of the present nonproliferation control regimes, the maintenance of the defense industrial base, and the balance between maintaining economic competitiveness and preserving national security.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED



*Congressional*
*Research Service*
Informing the legislative debate since 1914

# The U.S. Export Control System and the Export Control Reform Initiative

**Ian F. Fergusson**
Specialist in International Trade and Finance

**Paul K. Kerr**
Specialist in Nonproliferation

August 9, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R41916

CRS REPORT
Prepared for Members and
Committees of Congress

# Summary

Difficulty with striking an appropriate balance between national security and export competitiveness has made the subject of export controls controversial for decades. Through the Arms Export Control Act (AECA), the International Emergency Economic Powers Act (IEEPA), and other authorities, the United States restricts the export of defense articles; dual-use goods and technology; certain nuclear materials and technology; and items that would assist in the proliferation of nuclear, chemical, and biological weapons or the missile technology used to deliver them. U.S. export controls are also used to restrict exports to certain countries on which the United States imposes economic sanctions. The Export Administration Act (EAA) legislated dual-use controls, but it has expired and such controls are presently maintained under IEEPA authorities.

The U.S. export control system is diffused among several different licensing and enforcement agencies. Exports of dual-use goods and technologies—as well as some military items—are licensed by the Department of Commerce, munitions are licensed by the Department of State, and restrictions on exports based on U.S. sanctions are administered by the U.S. Department of the Treasury. Administrative enforcement of export controls is conducted by these agencies, while criminal penalties are issued by units of the Department of Homeland Security and the Department of Justice.

Aspects of the U.S. export control system have long been criticized by exporters, nonproliferation advocates, allies, and other stakeholders as being too rigorous, insufficiently rigorous, cumbersome, obsolete, inefficient, or combinations of these descriptions. In August 2009, the Barack Obama Administration launched a comprehensive review of the U.S. export control system. In April 2010, then-Defense Secretary Robert M. Gates proposed an outline of a new system based on four singularities

- a single export control licensing agency for dual-use, munitions exports, and Treasury-administered embargoes,
- a unified control list,
- a single primary enforcement coordination agency, and
- a single integrated information technology (IT) system.

The rationalization of the two control lists was the Obama Administration's focus. The Administration made no specific proposals concerning the single licensing agency, although the Administration implemented some elements of a future single system, such as a consolidated screening list and harmonization of certain licensing policies.

In considering the future of the U.S. export control system, Congress may weigh the merits of a unified export control system—a chief goal of President Obama's proposal—or the continuation of the present bifurcated system by reauthorizing the EAA or enacting replacement legislation. In doing so, Congress may debate the record of the present dual-use system maintained by emergency authority, the aims and effectiveness of the present nonproliferation control regimes, the maintenance of the defense industrial base, and the balance between maintaining economic competitiveness and preserving national security.

WASHSTATEC000848

# Contents

Overview of the U.S. Export Control System ............................................................................. 1

   The Dual-Use System ........................................................................................ 2

      The Export Administration Act (EAA) ...................................................... 2

      Administration ................................................................................................ 2

      Implementing Regulations ............................................................................ 3

      Licensing Policy ............................................................................................ 3

      Enforcement and Penalties ........................................................................... 4

   Military Export Controls .................................................................................. 4

      Arms Export Control Act (AECA) ............................................................. 4

      Licensing Policy ............................................................................................ 5

      Administration ................................................................................................ 6

      Enforcement and Penalties ........................................................................... 6

   Nuclear Controls .............................................................................................. 6

   Defense Technology Security Administration (DTSA) .................................. 7

   Enforcement of U.S. Export Controls ............................................................ 7

   Multilateral Control Regimes ......................................................................... 8

President Obama's Export Control Initiative .............................................................. 9

   The Four Singularities .................................................................................. 10

      A Single Licensing Agency ....................................................................... 10

      The Single Control List .............................................................................. 13

      The Single Enforcement Structure ............................................................ 19

      A Single Information Technology System ............................................... 20

      Encryption ................................................................................................... 21

Legislation in the 115th Congress ........................................................................... 22

   Export Control Reform Act of 2018 ............................................................ 22

# Figures

Figure B-1. Dual-Use Export Licensing Process ...................................................... 25

# Tables

Table 1. President's Export Control Reform Initiative ............................................. 11

Table A-1. Export Control Characteristics ............................................................... 23

# Appendixes

Appendix A. Basic Export Control Characteristics ................................................... 23

Appendix B. Dual-Use Export Licensing Process ................................................... 25

Appendix C. List of Acronyms ................................................................................. 26

WASHSTATEC000849

## Contacts

Author Contact Information ............................................................................................. 27

WASHSTATEC000850

# Overview of the U.S. Export Control System

The United States restricts the export of defense articles; dual-use goods and technology; certain nuclear materials and technology; and items that would assist in the development of nuclear, chemical, and biological weapons or the missile technology used to deliver them. A defense item is defined by regulation as one that "[m]eets the criteria of a defense article or defense service on the U.S. Munitions List" or "[p]rovides the equivalent performance capabilities of a defense article" on that list.[1] Dual-use goods are commodities, software, or technologies that have both civilian and military applications.

The United States also controls certain exports in adherence to several multilateral nonproliferation control regimes. In addition, U.S. export controls are used to restrict exports to certain countries on which the United States imposes economic sanctions, such as Cuba, Iran, and Syria. Through the Export Administration Act (EAA),[2] the Arms Export Control Act (AECA), the International Emergency Economic Powers Act (IEEPA), and other authorities, Congress has delegated, in the context of broad statutory power, to the executive branch its express constitutional authority to regulate foreign commerce by controlling exports.

Various aspects of the U.S. export control system have long been criticized by exporters, nonproliferation advocates, allies, and other stakeholders as being too restrictive, insufficiently restrictive, cumbersome, obsolete, inefficient, or any combination of these descriptions. Some contend that such controls overly restrict U.S. exports and make firms less competitive. Others argue that U.S. defense and foreign policy considerations should trump commercial concerns. In January 2007, the Government Accountability Office (GAO) designated government programs designed to protect critical technologies, including the U.S. export control system, as a "high-risk" area warranting a "strategic reexamination of existing programs to identify needed changes." GAO's report named poor coordination among export control agencies, disagreements over commodity jurisdiction between the Departments of State and Commerce, unnecessary delays and inefficiencies in the license application process, and a lack of systematic evaluative mechanisms to determine the effectiveness of export controls.[3] A 2017 GAO report cited "progress" with regard to improving the export control system, but added that

> government-wide challenges remain, including the need to adopt a more consistent leadership approach, improve coordination among programs, address weaknesses in individual programs, and implement export control reform[4].

On August 13, 2009, President Barack Obama announced the launch of a comprehensive review of the U.S. export control system; then-Secretary of Defense Robert M. Gates announced key elements of the Administration's agenda for reform in an April 2010 speech, with additional elaborations in subsequent months. Former Secretary Gates proposed a four-pronged approach that would establish

- a single export control licensing agency for both dual-use, munitions and exports licensed to embargoed destinations;
- a unified control list;

---

[1] *International Traffic in Arms Regulations*, 22 C.F.R. 120.3.

[2] The last incremental extension of the Export Administration Act expired in August 2001.

[3] U.S. Government Accountability Office (GAO), *High-Risk Series: An Update*, GAO-07-310, January 2010.

[4] U.S. Government Accountability Office (GAO), *Progress on Many High-Risk Areas, While Substantial Efforts Needed on Others*, GAO-17-317, February 2017.

WASHSTATEC000851

- a single enforcement coordination agency; and
- a single integrated information technology system, which would include a single database of sanctioned and denied parties.

This section describes the characteristics of the dual-use, munitions, and nuclear controls. The information contained in this section also appears in chart form in **Appendix A**.

# The Dual-Use System

## The Export Administration Act (EAA)

The EAA of 1979 (P.L. 96-72) was the underlying statutory authority for dual-use export controls. The EAA, which is currently expired, periodically has been reauthorized for short periods of time. The last incremental extension expired in August 2001. At other times, and currently, the export licensing system created under the authority of the EAA has been continued by a presidential declaration of a national emergency and the invocation of the International Emergency Economic Powers Act (IEEPA; P.L. 95-223).[5] The EAA conferred upon the President the power to control exports for national security, foreign policy, or short-supply purposes. It also authorizes the President to establish export licensing mechanisms for items detailed on the Commerce Control List (CCL) (see below), and it provides guidance and places certain limits on that authority.[6]

Congress has attempted several times to rewrite or reauthorize the EAA. The last comprehensive effort took place during the 107th Congress. The Senate adopted legislation (S. 149) in September 2001, and a House version (H.R. 2581) was developed by the then-House International Relations Committee and the House Armed Services Committee. The full House did not act on this legislation.

The EAA, which was written and amended during the Cold War, was based on strategic relationships, perceived threats to U.S. national security, international business practices, and existing commercial technologies, many of which have changed dramatically in the past 25 years. Some Members of Congress and most U.S. business representatives advocated liberalizing U.S. export regulations to allow American companies to engage more fully in international competition for sales of high-technology goods, some of which may be commercially available from foreign competitors. Other Members and some national security analysts contend that liberalization of export controls over the past decade has contributed to foreign threats to U.S. national security, that some controls should be tightened, and that Congress should weigh further liberalization carefully.

## Administration

The Bureau of Industry and Security (BIS) in the Department of Commerce administers the export licensing and enforcement functions of the dual-use export control system. The Ronald Reagan Administration detached those functions from the International Trade Administration

---

[5] This national emergency was most recently continued "beyond August 17, 2018," by President Donald Trump on August 8, 2018, 83 *Federal Register* 39871, August 13, 2018.

[6] Under IEEPA authority, the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." P.L. 95-223, §203(a)(1)(B).

WASHSTATEC000852

(ITA) in 1985 in order to separate them from the export promotion functions of that agency within the Department of Commerce. BIS also enforces U.S. antiboycott regulations concerning the Arab League boycott against Israel.

## Implementing Regulations

The EAA is implemented by the Export Administration Regulations (EAR; 15 C.F.R. 730 et seq). As noted above, the EAR are continued under IEEPA's authority in times when the EAA is expired. The EAR set forth licensing policy for goods and destinations, the applications process used by exporters, and the CCL, which is the list of specific commodities, technologies, and software controlled by the EAR. The CCL is composed of 10 categories of items

- nuclear materials, facilities, and equipment;
- materials, organisms, microorganisms, and toxins;
- materials processing;
- electronics;
- computers;
- telecommunications and information security;
- lasers and sensors;
- navigation and avionics;
- marine; and
- propulsion systems, space vehicles, and related equipment.

Each of these categories is further divided into functional groups: equipment, assemblies, and components; test, inspection, and production equipment; materials; software; and technology. Each controlled item has an export control classification number (ECCN) based on the above categories and functional groups. Each ECCN is accompanied by a description of the item and the reason for control. In addition to discrete items on the CCL, nearly all U.S.-origin items are "subject to the EAR"; such items may be restricted to a destination based on the end-use or end-user of the product. For example, a commodity that is not on the CCL may be denied if the good is destined for a military end-use or an entity known to be engaged in weapons proliferation.

## Licensing Policy

The EAR set out the licensing policy for dual-use and certain military items; the regulations control items for reasons of national security, foreign policy, or short supply. National security controls are based on a common multilateral control list; however, the designation of countries to which those controls are applied is based on U.S. policy. Foreign policy controls may be unilateral or multilateral in nature. The EAR unilaterally control items for antiterrorism, regional stability, or crime control purposes. Antiterrorism controls proscribe nearly all exports to North Korea and the four countries designated as state sponsors of terrorism by the Secretary of State—Cuba, Iran, Sudan, and Syria. These regulations also impose foreign policy controls on encryption items and on hot section technology, which is "for the development, production, or overhaul of commercial aircraft engines, components, and systems."[7] The EAR include "enhanced controls" on hot section technology and require a license "for exports and reexports to all destinations,

---

[7] Bureau of Industry and Security 2016, *Report on Foreign Policy-Based Export Controls*, U.S. Department of Commerce.

WASHSTATEC000853

except Canada.'"[8] The U.S. government reviews license applications for such technology "on a case-by-case basis to determine whether the proposed export or reexport is consistent with U.S. national security and foreign policy interests."[9] Foreign policy-based controls are also based on adherence to multilateral nonproliferation control regimes, such as the Nuclear Suppliers' Group, the Australia Group (chemical and biological precursors), and the Missile Technology Control Regime (MTCR).

The EAR set out timelines for the consideration of dual-use licenses and the process for resolving interagency disputes. Within nine days of receipt, Commerce must refer the license to other agencies (State, Defense, and Energy, as appropriate), grant the license, deny it, seek additional information, or return it to the applicant. If Commerce refers the license to other agencies, the agency to which it is referred must recommend that the application be approved or denied within 30 days. The EAR provide a dispute resolution process for a dissenting agency to appeal an adverse decision. The entire licensing process, to include the dispute resolution process, is designed to be completed within 90 days. This process is depicted graphically in **Appendix B**.

BIS noted in its Fiscal Year 2017 Budget Submission that its increased responsibility for exports as a result of export control reform has increased the burden on the bureau's licensing and enforcement functions.[10]

## Enforcement and Penalties

Because of the expiration of the EAA, current penalties for export control violations are based on those contained in IEEPA (50 U.S.C. 1701 et seq). For criminal penalties, the IEEPA sanctions individuals up to $1 million or up to 20 years imprisonment, or both, per violation (50 U.S.C. 1705(b)). Civil penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74).

Enforcement is carried out by the Office of Export Enforcement (OEE) at BIS. OEE's headquarters is in Washington, DC, and the office has nine U.S. field offices, as well as export control officers in 6 foreign countries. OEE is authorized to carry out investigations domestically and works with DHS to conduct investigations overseas. The office, along with in-country U.S. embassy officials overseas, also conducts prelicense checks and postshipment verifications The Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (P.L. 111-195) reinstated certain enforcement activities undertaken by the Department of Commerce previously authorized by the EAA.

# Military Export Controls

## Arms Export Control Act (AECA)

The AECA of 1976 (P.L. 90-629)[11] provides the President with the statutory authority to control the export of defense articles and services. The AECA also contains the statutory authority for the Foreign Military Sales (FMS) program, under which the U.S. government sells U.S. defense equipment, services, and training on a government-to-government basis. The law also specifies

---

[8] Ibid.

[9] Ibid.

[10] Bureau of Industry and Security, Department of Commerce, *Budget Estimates, President's Submission, Fiscal Year 2017.*

[11] Originally titled The Foreign Military Sales Act.

WASHSTATEC000854

criteria for Direct Commercial Sales (DCS), whereby eligible foreign governments and international organizations purchase some defense articles and services directly from U.S. firms.

The AECA sets out foreign and national policy objectives for international defense cooperation and military export controls. Section 3(a) of the AECA specifies the general criteria for countries or international organizations to be eligible to receive U.S. defense articles and defense services provided under the act. The law also sets express conditions on the uses to which these defense articles may be put. Section 4 of the AECA states that U.S. defense articles and defense services shall be sold to friendly countries "solely" for use in "internal security"; for use in "legitimate self-defense"; to enable the recipient to participate in "regional or collective arrangements or measures consistent with the Charter of the United Nations"; to enable the recipient to participate in "collective measures requested by the United Nations for the purpose of maintaining or restoring international peace and security"; and to enable the foreign military forces "in less developed countries to construct public works and to engage in other activities helpful to the economic and social development of such friendly countries."

## Congressional Requirements

A prominent feature of the AECA is the requirement for congressional consideration of certain foreign defense sales proposed by the President. This procedure includes consideration of proposals to sell major defense equipment and services, or to retransfer such military items to other countries.[12] The procedure is triggered by a formal report to Congress under Section 36 of the AECA. In general, the executive branch, after complying with the terms of the applicable section of U.S. law (usually those contained in the AECA), is free to proceed with the sale unless Congress passes legislation prohibiting or modifying the proposed sale.

Under Section 36(b) of the ACEA, Congress must be formally notified 30 calendar days before the Administration can take the final steps to conclude a government-to-government foreign military sale or issue an export license for commercial sales of major defense equipment valued at $14 million or more, defense articles or services valued at $50 million or more, or design and construction services valued at $200 million or more. In the case of such sales to NATO member states Japan, Australia, or New Zealand, Congress must be formally notified 15 calendar days before the Administration can proceed with the sale. However, the prior notice thresholds are higher for Japan, Australia, and New Zealand. These higher thresholds are $25 million for the sale, enhancement, or upgrading of major defense equipment; $100 million for the sale, enhancement, or upgrading of defense articles and defense services; and $300 million for the sale, enhancement, or upgrading of design and construction services, so long as such sales to these countries do not include or involve sales to a country outside of this group of nations.

## Licensing Policy

The International Traffic in Arms Regulations (ITAR) set out licensing policy for exports (and temporary imports) of U.S. Munitions List (USML) items. A license is required for the export of nearly all items on the USML. There is a limited license exemption for USML items for Canada because the United States considers Canada to be part of the U.S. defense industrial base. In addition, the United States has treaties with the United Kingdom and Australia to exempt certain defense articles from licensing obligations to approved end-users in those countries; the Senate gave its advice and consent to ratification of these treaties in 2010. Unlike some Commerce Department dual-use controls, licensing requirements are based on the nature of the article and not the end-use or end-user of the item. The United States implements a range of prohibitions on

---

[12] For more information, see CRS Report RL31675, *Arms Sales: Congressional Review Process*, by Paul K. Kerr.

WASHSTATEC000855

munitions exports to countries unilaterally or based on adherence to United Nations (U.N.) arms embargoes. In addition, any firm engaged in manufacturing, exporting, or brokering any item on the USML must register with the Directorate of Defense Trade Controls (DDTC) at the State Department and pay a yearly fee whether or not the firm seeks to export during the year.

## Administration

Exports of defense goods and services are administered by DDTC, which is a component of the Department of State's Bureau of Political-Military Affairs and consists of four offices: Management, Policy, Licensing, and Compliance. DDTC also processes commodity jurisdiction requests, which determine the regulatory regime to which an item is subject.

Critics of the defense trade system had previously decried the delays and backlogs in processing license applications at DDTC. A National Security Presidential Directive (NSPD-56), signed by President Bush on January 22, 2008, directed that the review and adjudication of defense trade licenses submitted under ITAR are to be completed within 60 days, except where six "national security exceptions apply."[13] Previously, except for the congressional notification procedures discussed above, DDTC had no defined timeline for the application process.

## Enforcement and Penalties

The AECA provides for criminal penalties of up to $1 million or 20 years of imprisonment, or both, for each violation. The AECA also authorizes civil penalties of up to $500,000 and debarment from future exports. Civil penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). DDTC has an enforcement staff and works with the Defense Security Service and the Customs and Border Protection and Immigration and Customs Enforcement (ICE) units at the Department of Homeland Security (DHS). In addition to adjudicating civil cases, DDTC assists DHS and the Department of Justice (DOJ) in pursuing criminal investigations and prosecutions. DDTC also coordinates the Blue Lantern end-use monitoring program, in which in-country U.S. embassy officials conduct prelicense checks and postshipment verifications of items transferred via DCS. The Department of Defense's Defense Security Cooperation Agency manages the department's Golden Sentry program, which performs an analogous function for FMS transfers.

## Nuclear Controls[14]

A subset of the above-mentioned dual-use and military controls are controls on nuclear items and technology. Controls on nuclear goods and technology are derived from the Atomic Energy Act of 1954 (P.L. 83-703), as amended, as well as from the EAA and the AECA. Controls on nuclear exports are divided among several agencies, based on the product or service being exported. The Nuclear Regulatory Commission (NRC) regulates exports of nuclear facilities and material. The NRC licensing policy and control list are located at 10 C.F.R. 110. BIS licenses "outside the core" civilian power plant equipment and maintains the Nuclear Referral List as part of the CCL. The

---

[13] These are required Congressional notification; failure to submit required government assurances; incomplete end-use checks; incomplete Department of Defense review; a required waiver; "[w]hen a related export policy is under active review and pending final determination by the Department of State." ("Policy on Review Time for License Applications," *Federal Register*, vol. 74, No. 231, December 3, 2009, p. 63497.)

[14] For more information, see CRS Report RS22937, *Nuclear Cooperation with Other Countries: A Primer*, by Paul K. Kerr and Mary Beth D. Nikitin.

WASHSTATEC000856

Department of Energy authorizes the export of nuclear technology. DDTC exercises licensing authority over nuclear items in defense articles under the ITAR.

## Defense Technology Security Administration (DTSA)

A Department of Defense (DOD) Field Activity under the Under Secretary of Defense for Policy, DTSA coordinates the technical and national security review of direct commercial sales export licenses and commodity jurisdiction requests received from the Departments of Commerce and State. It develops the recommendation of DOD on these referred export licenses or commodity jurisdictions based on input provided by the various DOD departments and agencies and represents DOD in the interagency dispute resolution process. Not all licenses from DDTC or BIS are referred to DTSA; memorandums of understanding govern the types of licenses referred from each agency. DTSA coordinates the DOD position with regard to proposed changes to the ITAR and the EAR. It also represents DOD in the interagency process responsible for compliance with multinational export control regimes.

## Enforcement of U.S. Export Controls

Enforcement of the U.S. export control system is undertaken by the agencies responsible for export licensing, the Department of Homeland Security (DHS), the Department of Justice (DOJ) (National Security Division and the Federal Bureau of Investigation [FBI]), and the Defense Criminal Investigative Service (DCIS). Their activities can be summarized as follows:

- **Office of Export Enforcement (OEE) of the Bureau of Industry and Security (BIS), Department of Commerce.** OEE investigates criminal and administrative violations of the dual-use export control regime. OEE is authorized to conduct domestic investigations and works with ICE on investigations of export control violations overseas. OEE refers civil violations to the Office of Chief Counsel of BIS and criminal violations to DOJ.

- **Office of Defense Trade Compliance (ODTC) in DDTC, Department of State.** ODTC primarily administers civil enforcement actions, including charging letters and consent agreements, policies of denial, debarments, transaction exceptions, and reinstatements. ODTC provides agency support to investigations and criminal enforcement actions primarily conducted by ICE and the FBI.

- **Office of Enforcement, Nuclear Regulatory Commission (NRC).** Investigates export control violations of nuclear facilities and material licensed by the NRC's Office of International Programs. The Office of Enforcement refers criminal violations to DOJ.

- **ICE, Department of Homeland Security.** As with its predecessor at the U.S. Customs Service, ICE has been the lead agency for criminal export enforcement activities. The Counter-Proliferation Investigations Unit investigates violations of dual-use and munitions export controls, exports to sanctioned countries, and violations of economic embargoes. ICE supplements and provides enforcement capacity to the export licensing agencies (BIS and DDTC) and undertakes investigations based on its own and other agency intelligence. In addition, export controls are enforced at the port of departure by DHS Customs and Border Protection.

- **National Security Division of DOJ.** The counterespionage section of this division undertakes criminal prosecutions resulting from investigations

WASHSTATEC000857

conducted by the licensing agencies, ICE, and the FBI. An October 2007 DOJ National Export Enforcement Initiative established task forces between the licensing and enforcement agencies and U.S. Attorney's Offices in 20 cities to coordinate export control prosecutions and has facilitated new counterproliferation coordination among law enforcement agencies, export licensing agencies, and the intelligence community.

- **FBI.** The FBI's Weapons of Mass Destruction Directorate receives and analyzes intelligence regarding proliferation networks, provides specialized training on counterproliferation for the National Export Enforcement Initiative, and cooperates with above-mentioned investigative partners and export licensing agencies.

- **DCIS, Department of Defense.** DCIS is the criminal investigative arm of the Inspector General of DOD. Among its varied activities, DCIS investigates the transfer of sensitive defense technologies to proscribed nations and criminal elements.

## Multilateral Control Regimes

In addition to U.S. controls, internationally there are four major multilateral control regimes: the Australia Group, the Missile Technology Control Regime (MTCR), the Nuclear Suppliers Group (NSG), and the Wassenaar Arrangement.[15] The Commerce Department observed on December 9, 2010, that "[m]ost items on the CCL are controlled in accordance with the United States' commitments" to four major multilateral export control regimes.[16] In addition to the controls described in the box below, all of these regimes have catch-all controls, which allow for the control of nonlisted items if they are to be used for a military or proliferation-related purpose.

---

**Multilateral Control Regimes**

- **Australia Group:** a voluntary, informal, export control arrangement founded in 1985 and consisting of 42 members. It has a set of export guidelines, as well as six common control lists. These lists include dual-use chemical manufacturing and biological equipment, chemical weapons precursors, and biological agents.
- **Missile Technology Control Regime (MTCR):** an informal voluntary export control arrangement established in 1987. The 35 members of the regime agree to adhere to common export policy guidelines applied to lists of controlled items. The MTCR guidelines call on each partner country to exercise restraint when considering transfers of equipment or technology, as well as "intangible" transfers, that would provide, or help a recipient country build, a missile capable of delivering a 500 kilogram warhead to a range of 300 kilometers or more. The MTCR annex contains two categories of controlled items. Category I items are the most sensitive. There is "a strong presumption to deny" such transfers, according to the MTCR guidelines. Regime partners have greater flexibility with respect to exports of Category II items.
- **Nuclear Suppliers Group (NSG):** an informal association of nuclear exporters founded in 1975 and currently consisting of 48 members. NSG members voluntarily agree to coordinate exports of civilian nuclear material, as well as nuclear-related equipment and technology, to non-nuclear-weapon states.[17] The group's guidelines

---

[15] For more information about these regimes, see CRS Report RL33865, *Arms Control and Nonproliferation: A Catalog of Treaties and Agreements*, by Amy F. Woolf, Paul K. Kerr, and Mary Beth D. Nikitin.

[16] "Commerce Control List: Revising Descriptions of Items and Foreign Availability," 75 *Federal Register*, No. 236, December 9, 2010.

[17] The Nonproliferation Treaty (NPT) defines a nuclear-weapon state as "one which has manufactured and exploded a nuclear weapon or other nuclear explosive device" prior to January 1, 1967. These states are China, France, Russia, the United Kingdom, and the United States.

WASHSTATEC000858

include lists of materials and equipment subject to export control, in addition to requiring importers to offer nonproliferation and physical security assurances.

- **Wassenaar Arrangement:** a voluntary export control regime approved in 1996 and currently consisting of 42 members. Its participants agree to control exports and retransfers of items on a munitions list and a list of dual-use goods and technologies. According to its Guidelines and Procedures, the Wassenaar Arrangement is not formally targeted at "any state or group of states," but is designed "to contribute to regional and international security and stability, by promoting transparency and greater responsibility in transfers of conventional arms and dual-use goods and technologies, thus preventing destabilizing accumulations." Participants exchange information regarding transfers and licenses for items covered by the arrangement.

Because the EAA has expired, only one law in force explicitly requires the U.S. government to adhere to a multilateral export control regime. The Arms Export Control Act requires the Secretary of State to maintain, as part of the USML, "a list of all items on the MTCR Annex" that are not controlled pursuant to the EAA. The AECA requires the executive branch to control nuclear-related items, but the law does not explicitly require that these items be the same as those controlled by the NSG.

# President Obama's Export Control Initiative

On August 13, 2009, President Obama announced the launch of a comprehensive review of the U.S. export control system. Then-Defense Secretary Robert M. Gates announced key elements of the Administration's agenda for reform in a speech on April 20, 2010, with additional elaborations in subsequent months. Former Secretary Gates proposed a four-pronged approach that would create a single primary export control licensing agency for both dual-use and munitions exports; adopt a unified control list; establish a single enforcement coordination agency; and create a single integrated information technology system, which would include a single database of sanctioned and denied parties.

The Administration's blueprint envisioned that these changes would be implemented in three phases, with the final phase requiring legislative action. Phase I would undertake preparatory work to harmonize the Commerce Control List (CCL) with the U.S. Munitions List (USML). This phase would also develop standardized licensing processes among the control agencies; it would also create an "Enforcement Fusion Center" to synchronize enforcement, along with a single electronic gateway to access the licensing system. Phase II would implement a harmonized licensing system with two identically-structured tiered control lists, potentially allowing for a reduction in the amount of licenses required by the system. This phase would include moving certain items from the USML to the CCL, for which congressional notification would be required;[18] examining unilateral controls on certain items; and undertaking consultations with multilateral control regime partners to add or remove multilateral controls on certain items.

Under the proposal, the new export control system would debut in Phase III, which would establish a single licensing agency; merge the two harmonized, tiered control lists, with mechanisms for review and updating; merge the two primary export control enforcement agencies, OEE and ICE; and operationalize a single IT system for licensing and enforcement. Changes in agency structure would require legislation.

---

[18] Under Section 38(f) of the Arms Export Control Act, the President may not remove any article from the USML until 30 days after providing notice to the House Foreign Affairs Committee, and the Senate Foreign Relations Committee, including a description of the nature of any subsequent controls on the item.

WASHSTATEC000859

In a February 2011 speech, then-BIS Assistant Secretary Kevin Wolf elucidated seven principles driving the Administration's export control reform efforts

- Controls should focus on a small core set of key items that can pose a serious national security or intelligence threat to the United States and its interests;
- Controls should be fully coordinated with the multilateral export control regimes in order to be effective;
- Unilateral controls must address an existing legal or foreign policy objective;
- Control lists must clearly identify which items are controlled and be easily updated as technology emerges, matures, or becomes widely available;
- Licensing processes must be predictable and timely;
- Enforcement capabilities must be enhanced to address noncompliance and increase capacity to interdict unapproved transfers; and
- Controls must address counterterrorism policy and the need to export items that support homeland security priorities.[19]

# The Four Singularities

## A Single Licensing Agency

In his speech introducing the Administration's reform efforts, then-Secretary Gates described the bureaucratic structure of the U.S. export control system as a "byzantine amalgam of authorities, roles, and missions scattered around different parts of the federal government."[20] As noted above, licensing is divided among the Department of Commerce for dual-use and certain military items, the Department of State for munitions, the Department of the Treasury for certain sanctions, and the Nuclear Regulatory Commission and Department of Energy for certain nuclear materials and technologies. These entities operate under different statutory authorities and enforce different regulations. While there are mechanisms in place for license referrals and to address licensing disagreements, critics have long maintained that the multi-agency structure contributes to institutional disputes among the different agencies responsible for export control licensing. Having one licensing system would also end disputes about commodity jurisdiction over a given item.

On June 30, 2010, then-National Security Adviser General Jim Jones announced that the Obama Administration intended to create an independent licensing agency with Cabinet members from existing control agencies serving as a board of directors. While that Administration did not provide specific details, this new agency is expected to take over the licensing functions of BIS, DDTC, and OFAC; this agency would likely house the civil and administrative enforcement functions of BIS and DDTC. The Obama Administration did not propose moving licensing procedures of the NRC for nuclear materials and of the Department of Energy for nuclear-related technology; an Obama Administration official attributed this decision to the relatively small volume of licensing undertaken by these agencies as well as by the small universe of exporters.[21]

General Jones argued that a unified licensing structure would end the situation in which no agency knew the total of export licenses granted or denied by the U.S. government. Under current

---

[19] Remarks of BIS Assistant Secretary for Export Administration, Kevin Wolf, to Exportkontrolltag 2011, Munich, Germany, February 25, 2011.

[20] Secretary of Defense Robert M. Gates, speech before the Business Executives for National Security, April 20, 2010.

[21] Discussion with National Security Council official, March 18, 2011.

WASHSTATEC000860

referral processes, dual-use and certain military items licenses are referred by BIS to the Department of Defense, the Department of State (Economic Energy and Business Bureau [EEB], International Security and Non-Proliferation Bureau, and the regional bureaus), and the Department of Energy for review. However, BIS licenses are not referred to DDTC. DDTC refers munitions licenses to DOD and to the above-mentioned bureaus at State, and in some instances to Energy, but not to BIS. Some OFAC licenses are referred only to State's EEB. As a result, situations have arisen whereby licenses requested by the same exporter to the same destination have been approved by one license agency and denied by another.

Brian Nilsson, then-Deputy Assistant Secretary of State for Defense Trade Controls, indicated during a February 2016 hearing that that the single information technology system in use by the Departments of Commerce, Energy, and State (see below) has begun to address the lack of agencies' visibility regarding license information.[22] Yet, interagency policy differences may continue to exist because agencies would continue to refer licenses to ensure continued checks and balances.

#### Table 1. President's Export Control Reform Initiative

| Phase | Control List | Licensing | Enforcement | Information Technology |
|---|---|---|---|---|
| I | Refine, understand, harmonize definitions to end jurisdictional confusion between two lists; establish new control criteria | Implement regulatory-based improvements to streamline licensing | Synchronize and de-conflict enforcement; create Enforcement Fusion Center | Determine enterprise-wide needs |
| II (requires congressional notification; requires additional funding) | Restructure two lists into identical tiered structures; apply criteria; remove unilateral controls where appropriate; submit proposals multilaterally to add/remove controls | Complete transition to mirrored control list; fully implement licensing harmonization | Expand outreach and compliance | Transition toward a single electronic licensing system |
| III (requires legislation) | Merge two lists into a single list; implement process for updating list | Implement single licensing agency | Consolidate enforcement activities under one agency | Implement a single system for licensing and enforcement |

**Source:** Prepared by Dianne Rennack, CRS, based on White House Fact Sheet, April 20, 2010.

### Dual-Nationals

An issue concerning dual-nationals may provide an example of the effort that will be necessary to create a unified export control system. The White House announced on March 11, 2010, that it would take action to eliminate "obstacles to exporting to companies employing dual nationals."

---

[22] "Export Control Reform: Challenges for Small Business? (Part I)," Hearing Before the House Committee on Small Business, February 11, 2016.

WASHSTATEC000861

Specifically, the Obama Administration announced that it would "begin to harmonize" conflicting standards used by the Departments of Commerce and State to determine a foreign person's nationality—a step that these departments must take in order to make certain export control decisions.[23]

The Commerce Department, according to a 2010 Government Accountability Office (GAO) report, determines "nationality for release of technology to a foreign national" based on that person's "most recent citizenship or permanent residence."[24] The State Department, however, considered not only a foreign national's current citizenship status, but also their country of birth if it differs from the person's country of citizenship or permanent residency. Even if a foreign entity is approved for a manufacturing license agreement or a technical assistance agreement with a U.S. firm, the State Department must approve the transfer of technical data, defense services, and defense articles to dual nationals and third-party nationals employed by the foreign entity.[25] "If a person's country of birth is prohibited from receiving U.S. arms, as are China, Iran, and North Korea, State [collected] additional information to confirm that the individual has no significant ties to his or her country of birth," according to the GAO. However, the State Department stopped using "country of birth" as of 2015, although the department does "consider all current and former citizenships, in addition to current permanent residency."[26]

Both the State Department and private-sector experts argue that these requirements are contentious because, in addition to being administratively burdensome, they are a potential employment discrimination issue in other countries; in order to comply with the regulations, non-U.S. employers may need to limit employment opportunities in potential violation of their countries' employment laws.[27]

After publishing a proposed rule on August 11, 2010,[28] the State Department published a final rule on May 16, 2011, amending the ITAR to allow the transfer of defense articles and technical data to dual or third-party nationals who are "bona fide, regular employees, directly employed by the foreign consignee or end-user."[29] Such transfers

> must take place completely within the physical territory of the country where the end-user is located, where the governmental entity or international organization conducts official business, or where the consignee operates, and be within the scope of an approved export license, other export authorization, or license exemption.

---

[23] For example, determining the appropriateness of releasing technical data to employees of a foreign firm engaged in a defense project with a U.S. firm.

[24] Government Accountability Office, Export Controls: Observations on Selected Countries' Systems and Proposed Treaties, May 2010, GAO-10-557.

[25] The State Department's Directorate of Defense Trade Controls, according to the GAO, "considers a third-country national to be an individual from a country other than the country which is the foreign signatory" to a "technical assistance or manufacturing license agreement. A third-country national may also be a dual national if he or she holds nationality from more than one country." GAO-10-557.

[26] Email from State Department official, January 16, 2018.

[27] "Amendment to the International Traffic in Arms Regulations: Dual Nationals and Third-Country Nationals Employed by End-Users," *Federal Register*, vol. 75, no. 154, August 11, 2010, p. 48625.

[28] Ibid.

[29] "International Traffic in Arms Regulations: Dual Nationals and Third-Country Nationals Employed by End-Users," *Federal Register*, vol. 76, no. 94, May 16, 2011, p. 28174. Paul Conlin, Sebastien Beauregard, R. Luc Beaulieu, and Richard A. Wagner, "Proposed ITAR Amendment Regarding Dual Nationals and Third-Country Nationals," *Mondaq*, August 31, 2010.

WASHSTATEC000862

The end user or consignee must take a variety of measures designed to prevent the diversion of any exports; the final rule includes a requirement for the end user to screen employees for "substantive contacts with restricted or prohibited countries" listed in the ITAR.[30] The rule, which became effective on August 15, 2011, also explains that, although "nationality does not, in and of itself, prohibit access to defense articles or defense services, an employee that has substantive contacts" with persons from prohibited countries "shall be presumed to raise a risk of diversion," unless the State Department determines otherwise.

It is worth noting that, according to the State Department, "most diversions of U.S. Munitions List ... items appear to occur outside the scope of approved licenses, not within foreign companies or organizations providing access to properly screened dual national or third country national employees."[31]

## The Single Control List

The Obama Administration concentrated on rationalizing the control lists to form the basis from which other reforms will flow. The Administration first worked to transform the current USML from a "negative list" characterized by general descriptions of articles and design-intent-based criteria to one resembling the current CCL, a "positive" list of dual-use items that are controlled according to objective criteria or parameters. This is being done through the "bright line" process to determine which items should be controlled as dual-use goods and which should be controlled as munitions. The bright line is being determined at the commodity level, based on technical specification and military needs, and is not an overarching concept or framework. The Obama Administration argued that the bright line is necessary, in part, because of the USML's current reliance on design intent (i.e., whether an item was "specifically designed, modified, or adapted" for military use) and its catch-all controls of parts and components of these items.[32] While the CCL is described as more "positive," it too contains entries containing the term "specially designed" for a specific purpose that may need to be modified to conform to bright line standards.

Each category of the USML has been screened by an interagency team led by DOD; proposed rewrites to each USML category, including certain items proposed to be moved to the CCL, have been published as proposed rulemakings. Originally, each of the items on the resulting USML list was to have been assigned to a tier to determine its level of control. The Obama Administration created three tiers applicable to both the CCL and the USML to categorize a different level of control.[33] However, the Administration postponed this process, reportedly because it would have

---

[30] "Substantive contacts," according to the rule, "include regular travel to such countries, recent or continuing contact with agents, brokers, and nationals of such countries, continued demonstrated allegiance to such countries, maintenance of business relationships with persons from such countries, maintenance of a residence in such countries, receiving salary or other continuing monetary compensation from such countries, or acts otherwise indicating a risk of diversion."

[31] *Federal Register*, vol. 75, no. 154.

[32] "Revisions to the U.S. Munitions List, Advanced Notice of Proposed Rulemaking," 75 *Federal Register* 76935, December 9, 2010, at 76937.

[33] As originally postulated, Tier 1 articles are those that are almost exclusively available from the United States and provide a *critical* military or intelligence advantage. Tier 2 articles are those that are almost exclusively available from countries that are members of the multilateral export control regimes that control such items and (1) provide a *substantial* military or intelligence advantage, or (2) make a substantial contribution to the indigenous development, production, use, or enhancement of a Tier 1 or Tier 2 item. Tier 3 articles are those that provide a *significant* military or intelligence advantage; make a significant contribution to the indigenous development, production, use, or enhancement of a Tier 1, Tier 2, or Tier 3 item; or are otherwise controlled for national security, foreign policy, or human rights reasons.

---

WASHSTATEC000863

been necessary to decide on the tiers for all USML items prior to publishing any revised USML categories. Deputy Assistant Secretary Nilsson testified that the Obama Administration prioritized revising the categories which have the greatest effect on U.S. military interoperability with allied governments.[34]

To date, the executive branch has completed transferring items in the following categories from the USML to the CCL:

- Category IV (launch vehicles, missiles, rockets, torpedoes, bombs, mines, and other military explosive devices;
- Category V (explosives and energetic materials, propellants, incendiary agents and their constituents);
- Category VI (vessels of war and naval equipment);
- Category VII (tanks and military vehicles);
- Category VIII (aircraft and associated equipment);
- Category IX (military training equipment);
- Category X (protective personal equipment and shelters);
- Category XI (military electronics);
- Category XII (fire control, range finder, optical and guidance and control equipment);
- Category XIII (auxiliary military equipment);
- Category XIV (toxicological agents, including chemical agents, biological agents, and associated equipment);
- Category XV(spacecraft and related articles);
- Category XVI (nuclear weapons related articles);
- Category XVIII (directed energy weapons); and
- Category XX (submersible vessels and oceanic equipment);

The State Department also created a new USML Category XIX (gas turbine engines).[35] Then-Deputy Assistant Secretary Nilsson stated in September 2017 that items would not be moved from USML Categories I-III (firearms, close assault weapons and combat shotguns, guns and armament, ammunition/ordnance) to the CCL until 2018.[36] The executive branch posted the proposed rules on May 14, 2018.

A final rule on a new "0Y521" classification series became effective on April 12, 2013. This series is used for items that are neither identified under an existing ECCN nor controlled under an existing U.S. or multilateral export control regime, but warrant control for foreign policy reasons or because they could provide a significant military or intelligence advantage. According to the EAR, such items "are typically emerging technologies."[37] BIS has subsequently added new items to this series. Items so classified "must be re-classified under another ECCN within one calendar year from the date they are listed" in the relevant part of the EAR. If they are not reclassified, the

---

[34] Hearing Before the House Committee on Small Business, February 11, 2016.

[35] "Revisions to the International Traffic in Arms Regulations: Initial Implementation of Export Control Reforms," 78 *Federal Register* 22740, April 16, 2013.

[36] Defense Trade Advisory Group (DTAG) Plenary Meeting Minutes, September 8, 2017.

[37] Export Administration Regulations Part 742.6 (7).

WASHSTATEC000864

items "are designated as EAR99 items unless either the CCL is amended to impose a control on such items under another ECCN or the ECCN 0Y521 classification is extended."[38] BIS may extend this classification "for two one-year periods, provided that the U.S. Government has submitted a proposal to the relevant multilateral regime(s) to obtain multilateral controls over the item." BIS may further extend the classification "only if the Under Secretary for Industry and Security makes a determination that such extension is in the national security or foreign policy interests of the United States."

According to the Obama Administration, the USML would contain "only those items that provide at least a significant military or intelligence applicability that warrant the controls the AECA requires."[39] The reconstituted Munitions List may then be aligned with the CCL by adopting its A–E commodity organization structure and adding two additional categories: F and G for ITAR specific controls. As a result of this alignment, each USML category will be divided into seven groups: A—equipment, assemblies, and components; B—test, inspection, and production equipment; C—materials; D—software; E—technology; F—defense services; and G—manufacturing and production authorizations.

### *"600 Series"*

As a result of the bright line process, the Obama Administration moved some USML items to the CCL. Under Section 38(f) of the AECA, the President may not remove any article from the USML until 30 days after providing notice to the House Foreign Affairs Committee, and the Senate Foreign Relations Committee, including a description of the nature of any subsequent controls on the item. Section 38(f)(6) of the AECA requires that "any major defense equipment" on the 600 series "shall continue to be subject to" several "notification and reporting requirements" of the AECA and the Foreign Assistance Act of 1961 (P.L. 87-195).[40]

In order to comply with Section 38(f), the manner in which USML items transferred to the CCL are to be controlled is described in a proposed rulemaking on July 15, 2011,[41] and is part of the "mega rule" issued on April 16, 2013.[42] It involves the creation of a "600 Series" subcategory of Export Control Classification Numbers (ECCNs) for each category on the CCL.[43] This new series is populated by items that are judged not to need the relatively-stricter controls mandated under the USML. Items moved to the CCL in this manner require a license to all destinations except Canada. All items controlled pursuant to multilateral control regimes retain their existing controls. In addition, "600 Series" items will be subject to a general policy of denial to countries subject to a U.S. or U.N. arms embargo. Such items are also subject to the prohibition on Defense Department procurement of "goods and services" on the USML "from any Communist Chinese

---

[38] EAR99 items are subject to the EAR but not specifically listed on the CCL. Such items may require a license if destined for a prohibited or restricted end user, end use, or destination (Supplement No. 4 to Part 774—Commerce Control List Order of Review (a)(6)).

[39] Remarks of BIS Assistant Secretary for Export Administration Kevin Wolf to the Update 2011 Conference; Washington, DC; July 19, 2011.

[40] The AECA defines "major defense equipment" as "any item of significant military equipment on the United States Munitions List having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000."

[41] "Proposed Revisions to the Export Administration Regulations: Control of Items the President Determines No Longer Warrant Control Under the U.S. Munitions List," Proposed Rule, 76 *Federal Register* 41958, July 15, 2011.

[42] "Revisions to the Export Administration Regulations: Initial Implementation of Export Control Reform," 78 *Federal Register* 22660, April 16, 2013.

[43] The 600 Series has also been referred to as the Commerce Munitions List. Series 600 items are to be designated with a 6 in the ECCN. For example, applicable aircraft will have a 9A610 ECCN.

WASHSTATEC000865

military company" mandated by the National Defense Authorization Act for Fiscal Year 2006 (P.L. 109-163).

The rule also places restrictions on the extent to which certain license exceptions can be applied. End-use items transferred to the 600 Series would be eligible for the recently announced Strategic Trade Authorization (STA) license exception (described below) only after a determination is jointly made by the State, Defense, and Commerce Departments that such an exception should be made available for the item in question. Most parts, components, and accessories transferred under this process would be automatically eligible for an STA license exception for exports to the governments of STA-eligible countries. Items expressly defined as "less significant" would be eligible for a license exception for destinations other than those controlled for antiterrorism reasons. "600 Series" items would also be eligible for other preexisting license exceptions.

The U.S. control status of parts and components also is addressed by the 600 Series. Under the EAR, the license requirement is based on the finished product, generally without regard to its parts and components. However, a foreign product containing more than 25% controlled U.S. content (10% controlled U.S. content in the case of a transaction to a country identified as a state sponsor of terrorism) may require a reexport license from the United States. However, for ITAR-controlled items, DDTC has employed a jurisdictional interpretation known as a "see-through" rule, which subjects to ITAR control U.S.-origin parts and components incorporated into end products manufactured overseas. For items migrating to the 600 Series, a 25% rule applies, but no *de minimus* amount would apply to embargoed destinations.

## *"Specially Designed"*

To facilitate the transfer of items from the USML to the CCL, the Obama Administration proposed a new definition of "specially designed." As noted above, the Administration sought to move away from the design-intent standard of the USML and the use of the catch-all phrase "specially designed" for military use to subject parts and components to ITAR jurisdiction. The Obama Administration argued that new definition was necessary because "specifically designed" in the USML did not have the same meaning as the term "specially designed" which appears in the CCL and also in various multilateral control lists. The Administration also argued that removing the term(s) entirely by enumerating each part and component being moved from the USML to the CCL was infeasible.

The Obama Administration published its final rule on the definition of "specially designed" on April 16, 2013.[44] Some have dubbed the two-part definition as a "catch and release" approach because the first part may capture an item as specially designed for military use and the second part may release the item from control under the definition if it does not qualify under certain parameters. Under the first part of the regulation, an item qualifies as specially designed if

> (1) As a result of "development" has properties peculiarly responsible for achieving or exceeding the performance levels, characteristics, or functions in the relevant ECCN or U.S. Munitions List (USML) paragraph; or
>
> (2) Is a "part," "component," "accessory," "attachment," or "software" for use in or with a commodity or defense article 'enumerated' or otherwise described on the CCL or the USML.

Under the regulation, if neither of these criteria apply to an item, then the item is not specially designed. If one or more of these criteria describes an item, the item is potentially qualified as

---

[44] "Revisions to the Export Administration Regulations: Initial Implementation of Export Control Reform," 78 *Federal Register* 22660, April 16, 2013; 78 *Federal Register* 22740, April 16, 2013.

WASHSTATEC000866

specially designed and is subject to the following six exclusions. The item is excluded from being specially designed if it

> (1) Has been identified to be in an ECCN paragraph that does not contain "specially designed" as a control parameter or as an EAR99 item in a commodity jurisdiction (CJ) determination or interagency-cleared commodity classification (CCATS);
>
> (2) Is, regardless of 'form' or 'fit,' a fastener (*e.g.*, screw, bolt, nut, nut plate, stud, insert, clip, rivet, pin), washer, spacer, insulator, grommet, bushing, spring, wire, solder;
>
> (3) Has the same function, performance capabilities, and the same or 'equivalent' form and fit, as a commodity or software used in or with an item that:
>
> (i) Is or was in "production" (*i.e.*, not in "development"); *and*
>
> (ii) Is either not 'enumerated' on the CCL or USML, or is described in an ECCN controlled only for Anti-Terrorism (AT) reasons;
>
> (4) Was or is being developed with "knowledge" that it would be for use in or with commodities or software (i) described in an ECCN *and* (ii) also commodities or software either not 'enumerated' on the CCL or the USML (e.g., EAR99 commodities or software) or commodities or software described in an ECCN controlled only for Anti-Terrorism (AT) reasons;
>
> (5) Was or is being developed as a general purpose commodity or software, i.e., with no "knowledge" for use in or with a particular commodity (e.g., an F/A-18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool); *or*
>
> (6) Was or is being developed with "knowledge" that it would be for use in or with commodities or software described (i) in an ECCN controlled for AT-only reasons and also EAR99 commodities or software; or (ii) exclusively for use in or with EAR99 commodities or software."[45]

Under this decision approach, the item is potentially "caught" as specially designed by the first two criteria, but it may be "released" from that definition if any of the six subsequent qualifiers apply. The Commerce regulations apply to the "600 series" of items moved from the USML. The proposed regulation to define specially designed in the ITAR as a replacement for the currently utilized "specifically designed" is similar in nature.

In a speech on July 17, 2012, then-BIS Assistant Secretary Kevin Wolf acknowledged that the specially designed concept is "inherently difficult to apply in reality," and that it is "not consistent with the "ultimate goal of creating a truly positive, objective list of controlled items."[46] However, he noted that, concurrent with this approach, BIS also published an advanced notice of proposed rulemaking in June 2012 seeking comments on the feasibility of enumerating or positively identifying each item determined classified as specially designed on the CCL.[47]

### Strategic Trade Authorization License Exception

In 2011, the Obama Administration devised a new license exception known as the Strategic Trade Authorization (STA), which was designed to facilitate transfers to low-risk countries and to promote interoperability to allies in the field.[48] To be eligible, exporters must provide notification

---

[45] Ibid.

[46] Remarks of Kevin Wolf, Assistant Secretary for Export Administration, to the Update 2012 Conference, July 17, 2012. http://www.bis.doc.gov/news/2012/wolf_update_2012.htm.

[47] "Feasibility of Enumerating "Specially Designed" Components," 77 *Federal Register* 36419, June 19, 2012.

[48] "Export Control Reform Initiative: Strategic Trade Authorization License Exception," 76 *Federal Register* 35276,

WASHSTATEC000867

to BIS of the transaction and a destination control statement notifying the foreign consignee of the exception's safeguard requirements; exporters must also obtain from the foreign consignee a statement acknowledging the consignee's understanding and willingness to comply with the requirements of the license exception. STA-eligible recipients of U.S. munitions items contained on the CCL are not allowed to reexport such items without a license. Such recipients are also prohibited from reexporting "STA-eligible items to any destination outside the STA-eligible countries."[49]

Under the final rulemaking, STA is available to 2 groups consisting of 44 countries. To a group of 36 countries made up of NATO partners and members of all 4 multilateral nonproliferation control regimes, dual-use items controlled for national security (NS), chemical or biological weapons, nuclear nonproliferation, regional stability, crime control, or significant items (hot section jet technology) are eligible for an STA. This includes almost all items on the CCL that are not controlled for statutory reasons. An additional eight countries are eligible for exports, reexports, or transfers controlled for NS-only and that are not designated as STA-excluded.[50] The United States-Israel Strategic Partnership Act of 2014 (P.L. 113-296) requires the President, "consistent with the commitments of the United States under international arrangements," to "take steps" to move Israel from the second list of countries to the first list of countries. However, Israel's STA status does not appear to have changed. An August 3, 2018, Commerce Department rule moved India from the second list of countries to the first list of countries.[51]

Dual-use items controlled for missile technology, chemical weapons, short supply, or surreptitious listening are not be eligible for export under an STA. Certain implements of execution and torture, pathogens and toxins, software and technology for "hot-sections" of aero gas-turbine engines, and encryption have also been excluded from the STA.

---

June 16, 2011.

[49] Export Control Reform Initiative Factsheet #4: License Exception "Strategic Trade Authorization" (STA).

[50] The final rule excludes NS controlled items from the Wassenaar Arrangement's Sensitive List to the eight countries.

[51] "U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5," *83 Federal Register 38018*, August 3, 2018.

WASHSTATEC000868

### Commercial Communications Satellites

Although most items on either the CCL or the USML were placed there by executive discretion or pursuant to international agreement, one category of items was on the USML by statute: commercial communications satellites (CCS). Prior to 1990, CCS were controlled exclusively by the Department of State under the authority of Section 38 of the Arms Export Control Act (P.L. 90-629). Despite having both military and civilian uses, CCS were considered munitions, as many satellites and associated technologies were originally designed "specifically" for military purposes and continue to have "significant military or intelligence applications as defined by regulation." In 1990, however, President George H. W. Bush ordered a review of dual-use items, including CCS, on the U.S. Munitions List (USML), which resulted in satellites without military performance characteristics being moved to Department of Commerce jurisdiction. In 1996, President Clinton transferred all CCS (along with commercial jet hot section technology) to Commerce jurisdiction with enhanced licensing procedures. Following 1998 revelations by the Cox Committee that U.S. satellite manufacturers provided missile design information and skills to China through the improper transfer of launch failure analysis, Congress passed legislation transferring the authority, effective March 15, 1999, to license exports of CCS to the Department of State (Strom Thurmond National Defense Authorization Act for Fiscal Year 1999; P.L. 105-261).

The satellite industry has argued that this transfer has led to licensing delays and lost sales resulting from regulatory uncertainty, and it has lobbied to revert export controls to Commerce Department jurisdiction. Satellites launched for commercial communication purposes may contain embedded sensitive technology, such as positioning thrusters, signal encryption, mating and separation mechanisms, and multiple satellite/reentry vehicle systems, which as stand-alone items are also controlled under the USML. Industry claims that because of State's "see-through" policy of requiring licenses for parts and components embedded in CCS, foreign satellite manufacturers are designing out U.S. parts and components and advertising them as ITAR-free (i.e., free of munitions licensing requirements). In addition, Tiananmen Square sanctions and other waiver restrictions have precluded U.S. exports to China, a competitive launch destination.

Section 1248 of the 2010 National Defense Authorization Act (P.L. 111-84) directed the Secretaries of State and Defense to conduct a review of U.S. space export control policy, including a risk assessment of removing satellite and related components from the USML. An interim assessment, which was reported to Congress in May 2011, found that CCS, related components, and integration and launch information "with certain exceptions, conditions and limitations" could be removed from the USML and transferred to the CCL "without posing an unacceptable security risk." The final review, which was delivered to Congress on April 18, 2012, recommended that Congress should return export control jurisdiction for CCS to presidential discretion, as well as to authorize the Department of Defense to determine the need for special export control monitoring and oversight services for CCS and authorize DOD to be reimbursed for those services.

Section 1261 of the National Defense Authorization Act of 2013 (P.L. 112-239) repealed P.L. 105-261's provision transferring "satellites and related items" to the USML. But this law contains some restrictions. "Satellites or related items" may not be "exported, reexported, or transferred, directly or indirectly," to China, North Korea, "[a]ny country that is a state sponsor of terrorism," or "any entity or person in or acting for or on behalf of such government, entity, or person." This section also prohibits such items from being launched in any of those countries, even as "part of a launch vehicle owned, operated, or manufactured by the government of such country or any entity or person in or acting for or on behalf of such government, entity, or person." The President may waive this prohibition if the President "determines that it is in the national interest of the United States to do so" and notifies Congress. The law also specifies that licenses for the export of "satellites and related items to a country with respect to which the United States maintains a comprehensive arms embargo shall be subject to a presumption of denial." The Obama Administration moved CCS to the CCL in January 2017.[52]

## The Single Enforcement Structure

The third singularity involves the creation of a streamlined export enforcement system. Under Phase I of the new approach, a single export "fusion center" would be created to "coordinate and de-conflict investigations, serve as a central point of contact for coordinating export control

---

[52] "Revisions to the Export Administration Regulations (EAR): Control of Spacecraft Systems and Related Items the President Determines No Longer Warrant Control Under the United States Munitions List (USML)," *Federal Register*, Vol. 82, No. 6, January 10, 2017, p. 2875; "International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XV," *Federal Register*, Vol. 82, No. 6, January 10, 2017, p. 2889.

WASHSTATEC000869

enforcement with Intelligence Community activities, and synchronize overlapping outreach programs."[53] On November 9, 2010, the Obama Administration issued Executive Order 13558, which created the Export Enforcement Coordination Center (EECC). The center officially opened in March 2012 within the Department of Homeland Security and replaced and expanded on the functions of the existing National Export Enforcement Coordination Network in ICE. It consists of a director from the Department of Homeland Security and two deputies appointed from the Departments of Commerce and Justice, with an intelligence community liaison designated by the Director of National Intelligence.

The center functions as the primary forum to coordinate export control enforcement efforts among the Departments of State, the Treasury, Commerce, Defense, Justice, Energy, and Homeland Security and the Director of National Intelligence and to resolve potential conflicts in criminal and administrative export control enforcement. The center is also able to screen all license applications. Previously, the OEE at BIS was the only entity that could screen dual-use licenses, whereas ICE could screen licenses from DDTC and OFAC. The unit will also establish government-wide statistical tracking capabilities for criminal and administrative enforcement activities. Also in March 2012, an Information Triage Unit was established in the Department of Commerce to serve as an information gathering and screening unit among law enforcement agencies, the intelligence community, and the export licensing agencies. The unit is designed to serve as a central point to disseminate relevant information for each license application prior to decisionmaking.[54]

The EECC is not to be confused with the National Export Control Coordinator, housed in the Justice Department, which is "responsible for ensuring full coordination between the Justice Department and the many other US law enforcement, licensing, and intelligence agencies that play a role in export enforcement."[55] The role of the coordinator has been described as the chief prosecutor of export control enforcement with the authority to determine which cases to bring for criminal prosecution.

The Donald Trump Administration may request the movement of the BIS Office of Export Enforcement to ICE. Currently, ICE conducts investigations and criminal enforcement for DDTC and OFAC, and by virtue of its authority under the IEEPA, it shares dual-use investigations with OEE. Removal of OEE to ICE will end this overlap of authority. The Obama Administration envisioned that a consolidated licensing agency would continue to have authority over administrative enforcement actions.[56]

## A Single Information Technology System

The fourth singularity is the creation of a single information technology system for administering the export control system. The Departments of Commerce, State, and Defense have begun using the USXPORTS database, originally used by the Department of Defense to track referred license applications.[57] The reform effort envisions that USEXPORTS will become the platform for a proposed single export license application form to be used by State, Commerce, and the Treasury's Office of Foreign Assets Control. The Department of Energy, Immigration and

---

[53] Speech of General Jim Jones, June 30, 2010.

[54] Department of Commerce, Press Release, March 7, 2012.

[55] Department of Justice Press, Release, June 20, 2007, http://www.justice.gov/opa/pr/2007/June/07_nsd_440.html.

[56] Conversation with NSC Official, March 18, 2011.

[57] GAO-17-317, February 2017.

WASHSTATEC000870

Customs Enforcement, and the Export Coordination Enforcement Center are also to use the database.

The Obama Administration's plan called for the adoption of USXPORTS first for internal communications such as license referrals, while exporters would continue to use the existing SNAP-R and D-Trade electronic license filing portals. The Obama Administration indicated that eventually it wanted to facilitate interoperability between the license portals, the internal system, and Customs' Automated Export System (AES), the information system that tracks actual movement of goods.

In conjunction with the single IT system, the Obama Administration developed a single license application form. To make this possible, the Administration standardized certain definitions between the different regulations, such as the use of the term "technology" in the EAR as opposed to the term "technical data" used in the ITAR.[58] To assist in compliance with U.S. export regulations, the Obama Administration also compiled a consolidated screening list of over 24,000 entities from existing Commerce, Treasury, and State Department screening lists. The list consolidates the BIS Denied Person List, Unverified List, and Entity List; the Department of State's Nonproliferation Sanctions List; the Directorate of Defense Trade Controls Debarred List; and the Office of Foreign Assets Control Specially Designated Nationals List.

## Encryption

While not announced as part of the four singularities, the Obama Administration proposed reforming encryption controls as one of the first deliverables in the export control reform process. The Administration announced on March 11, 2010, that it would change a filing requirement for exporters of products with encryption capabilities. At the time, exporters of such products were required to file for a technical review by the Commerce Department, a process that, according to the White House announcement, could take "between 30-60 days." The announcement advocated replacing this process with "a more efficient one-time notification-and-ship process," which would ensure that the "U.S. government still receives information it needs for its national security requirements while facilitating U.S. exports and innovation for new products and new technologies."[59]

The Commerce Department announced on June 25, 2010, that it was amending the Export Administration Regulations (EAR) as "the first step in the President's effort to reform U.S. encryption export controls."[60] As described by the Commerce Department's Bureau of Industry and Security, the amendment to the EAR includes[61]

- replacing, for encryption products "of lesser national security concern," the "30-day waiting requirement for a technical review" with a "provision that allows

---

[58] "Single Export Application for All Agencies to be Unveiled, White House Official Says," *Export Practitioner*, January 2011, p. 31.

[59] According to an Obama Administration official, controlling the export of products with encryption capabilities differs from controlling other exports because the United States generally wants to obtain information on exported encryption technology rather than prevent its export.

[60] "Encryption Export Controls: Revision of License Exception ENC and Mass Market Eligibility, Submission Procedures, Reporting Requirements, License Application Requirements, and Addition of Note 4 to Category 5, Part 2," 75 *Federal Register* 36481, June 25, 2010.

[61] Quotations describing the June 25 announcement are taken from 75 *Federal Register*, no. 122 and from BIS statements available at http://www.bis.doc.gov/encryption/default.htm.

WASHSTATEC000871

immediate authorization to export and reexport these products" after the exporter submits an electronic encryption registration to BIS;

- similarly replacing the 30-day requirement for most mass-market encryption products;[62]

- an "overarching note to exclude particular products that use cryptography from being controlled as 'information security' items"—a measure that implements changes approved by the Wassenaar Arrangement members in December 2009; this regulatory change eliminates controls under the CCL on "[m]any items in which the use of encryption is ancillary to the primary function of the item"; and

- a provision that makes most encryption technology eligible for export and reexport to nongovernmental end-users in countries other than those of "greater national security concern."

According to the June 2010 announcement of the EAR amendment, the United States "will also review other issues related to encryption controls." Decontrolling additional items would require approval by the members of the Wassenaar Arrangement.

# Legislation in the 115ᵗʰ Congress

## Export Control Reform Act of 2018

On February 15, 2018, Representatives Edward Royce and Eliot Engel introduced H.R. 5040, the Export Control Reform Act of 2018, which provides broad, detailed legislative authority for the President to "establish and maintain lists published by the Secretary of Commerce of [dual-use and military] items that are controlled under this title," as well as "prohibit unauthorized exports, reexports, and transfers of controlled items," and "require licenses or other authorizations ... for exports, reexports, and transfers of controlled items." The bill renews, with some changes, the export control provisions of the EAA, but does not substantially alter the EAA anti-boycott or nonproliferation sanctions provisions.

---

[62] The Commerce Department classifies certain products with encryption capabilities as "mass market" pursuant to a procedure described in the EAR.

WASHSTATEC000872

# Appendix A. Basic Export Control Characteristics

## Table A-1. Export Control Characteristics

| Characteristic | Dual-Use | Munitions | Nuclear |
|---|---|---|---|
| Legislative Authority | Export Administration Act (EAA) of 1979 (expired); International Emergency Economic Powers Act of 1977 (IEEPA) | Arms Export Control Act of 1968, 1976 (AECA) | Atomic Energy Act of 1954 |
| Agency of Jurisdiction | Bureau of Industry and Security (BIS)(Commerce) | Directorate of Defense Trade Controls (DDTC)(State) | Nuclear Regulatory Commission (NRC) (facilities and material)<br><br>Department of Energy (DOE) (technology)<br><br>BIS ("outside the core" civilian power plant equipment)<br><br>DDTC (nuclear items in defense articles) |
| Implementing Regulations | Export Administration Regulations (EAR) (15 C.F.R. 730 et seq) | International Traffic in Arms Regulations (ITAR) (22 C.F.R. 120 et seq) | 10 C.F.R. 110—Export and Import of Nuclear Material and Equipment (NRC)<br><br>10 C.F.R. 810—Assistance to Foreign Atomic Energy Activities (DOE) |
| Control List | Commerce Control List (CCL) | Munitions List (USML) | List of Nuclear Facilities and Equipment; List of Nuclear Materials (NRC)<br><br>Nuclear Referral List (CCL)<br><br>USML<br><br>Activities Requiring Specific Authorization (DOE) |
| Relation to Multilateral Controls | Wassenaar Arrangement (dual-use)<br><br>Missile Technology Control Regime (MTCR)<br><br>Australia Group (CBW)<br><br>Nuclear Suppliers' Group | Wassenaar Arrangement (munitions)<br><br>MTCR | Nuclear Suppliers' Group<br><br>International Atomic Energy Agency |
| Licensing Policy | Based on item, country, or both. Antiterrorism controls proscribe exports to five countries for nearly all CCL listings | Most Munitions License items require licenses; 20 proscribed countries. | General/Specific Licenses (NRC)<br><br>General/Specific Authorizations (DOE) |

WASHSTATEC000873

*The U.S. Export Control System and the Export Control Reform Initiative*

| Characteristic | Dual-Use | Munitions | Nuclear |
|---|---|---|---|
| Licensing Application Timeline | Initial referral within 9 days; agency must approve/deny within 30 days; 90-day appeal process (see **Appendix B**) | 60 days with national security exceptions; congressional notification period for significant military equipment | No timeframe for license applications |
| Enforcement | Office of Export Enforcement (BIS) (OEE) (domestic) Homeland Security (DHS): Immigration and Customs Enforcement (ICE); Customs and Border Protection (CBP) Justice (DOJ): National Security Division; FBI | Office of Defense Trade Compliance (DDTC) Defense Criminal Investigation Service (DCIS)(DOD) Defense Security Service (DOD) DHS: ICE, CBP DOJ: National Security Division; FBI | Office of Enforcement (NRC) BIS-OEE DDTC-ODTC DCIS (DOD) DHS: ICE, CBP DOJ: National Security Division; FBI |
| Penalties | Criminal: $1 million/20 years imprisonment Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). Denial of export privileges. | Criminal: $1 million/20 years imprisonment Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). Denial of export privileges. | Criminal: Individual— $250,000/12 years to life imprisonment; Firm— $500,000 (NRC and DOE) Civil: Penalties increase annually pursuant to Section 701 of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (P.L. 114-74). |

**Source:** Congressional Research Service (CRS).

WASHSTATEC000874

# Appendix B. Dual-Use Export Licensing Process

**Figure B-1. Dual-Use Export Licensing Process**

(Executive Order 12981, December 1995)



**Source:** Prepared by Ian F. Fergusson, Congressional Research Service (CRS).

**Notes:** [1] The time periods for the appeal procedure reflect a 5-day window of appeal and an 11-day period for each body to make a decision.

[2] A license application must be resolved or appealed to the President within 90 days. The order does place a time limit on a presidential decision.

* SNEC, Sub-Groups on Nuclear Export Policy, MTEC, Missile Technology/Export Control Group; SHIELD Chemical and Biological Weapons Control Group.

WASHSTATEC000875

# Appendix C. List of Acronyms

AECA—Arms Export Control Act

AES—Automated Export System

BIS—Bureau of Industry and Security, Department of Commerce

CBP—Customs and Border Protection, Department of Homeland Security

CCL—Commerce Control List

CML—Commerce Munitions List

CPI—Counter-Proliferation Investigations

DCIS—Defense Criminal Investigation Service

DDTC—Directorate of Defense Trade Controls, Department of State

DHS—Department of Homeland Security

DOJ—Department of Justice

DTSA—Defense Technology Security Administration

EAA—Export Administration Act

EAR—Export Administration Regulations

ECCN—Export Control Classification Number

EECC—Export Enforcement Coordination Center

EEB—Economic, Energy, and Business Bureau, Department of State

FP—Foreign Policy Controls

GAO—Governmental Accountability Office

IEEPA—International Emergency Economic Powers Act

ICE—Immigration and Customs Enforcement Agency, Department of Homeland Security

ISN—International Security and Nonproliferation Bureau, Department of State

ITA—International Trade Administration, Department of Commerce

ITAR—International Traffic in Arms Regulations

MTCR—Missile Technology Control Regime

NRC—Nuclear Regulatory Commission

NS—National Security Controls

NSG—Nuclear Suppliers Group

OEE—Office of Export Enforcement

ODTC—Office of Defense Trade Compliance, DDTC

OFAC—Office of Foreign Assets Control, Department of the Treasury

SI—Significant Items Controls

WASHSTATEC000876

SL—Surreptitious Listening Controls

SS—Short Supply Controls

STA—Strategic Trade Authorization

USML—U.S. Munitions List

## Author Contact Information

Ian F. Fergusson
Specialist in International Trade and Finance
ifergusson@crs.loc.gov, 7-4997

Paul K. Kerr
Specialist in Nonproliferation
pkerr@crs.loc.gov, 7-8693

WASHSTATEC000877

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/30/2018 9:04:12 PM |
| **To**: | Monjay, Robert [MonjayR@state.gov] |
| **CC**: | Hart, Robert L [HartRL@state.gov]; Noonan, Michael J [NoonanMJ@state.gov] |
| **Subject**: | Cats I-III Draft Preamble |
| **Attachments**: | 20180830 - Draft 1 Cat I-III Public Comments Summary.docx |

Monjay,

Per Sarah's request, attached is the first draft of the preamble.

Best,
John

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 8/30/2018 9:10:14 PM |
| **To**: | Foster, John A [FosterJA2@state.gov] |
| **Subject**: | 20180828 - Grouped USML I-III Public Comments.xlsx |
| **Attachments**: | 20180828 - Grouped USML I-III Public Comments.xlsx |

Message

| | |
|---|---|
| **From**: | Noonan, Michael J [NoonanMJ@state.gov] |
| **Sent**: | 8/30/2018 9:19:11 PM |
| **To**: | Foster, John A [FosterJA2@state.gov]; Monjay, Robert [MonjayR@state.gov] |
| **CC**: | Hart, Robert L [HartRL@state.gov] |
| **Subject**: | RE: Cats I-III Draft Preamble |
| **Attachments**: | Cat I-III FR - FRN 2.docx |

███████████████████████████████████████████

**Official**

~~UNCLASSIFIED~~

**From:** Foster, John A
**Sent:** Thursday, August 30, 2018 5:04 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>
**Subject:** Cats I-III Draft Preamble

Monjay,

Per Sarah's request, attached is the first draft of the preamble.

Best,
John

Message

| | |
|---|---|
| **From:** | Monjay, Robert [MonjayR@state.gov] |
| **Sent:** | 8/31/2018 6:07:05 PM |
| **To:** | Noonan, Michael J [NoonanMJ@state.gov]; Hart, Robert L [HartRL@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject:** | RE: Cats I-III Draft Preamble |
| **Attachments:** | Cat I-III FR - FRN 2 RJM.docx |

**Official - SBU**
UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Friday, August 31, 2018 10:33 AM
**To:** Hart, Robert L <HartRL@state.gov>; Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

**Official**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Friday, August 31, 2018 10:29 AM
**To:** Noonan, Michael J <NoonanMJ@state.gov>; Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Thursday, August 30, 2018 5:19 PM
**To:** Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

**Official**
UNCLASSIFIED

**From:** Foster, John A
**Sent:** Thursday, August 30, 2018 5:04 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>
**Subject:** Cats I-III Draft Preamble

Monjay,

Per Sarah's request, attached is the first draft of the preamble.

Best,
John

Message

| | |
|---|---|
| **From:** | Hart, Robert L [HartRL@state.gov] |
| **Sent:** | 8/31/2018 6:48:18 PM |
| **To:** | Monjay, Robert [MonjayR@state.gov]; Noonan, Michael J [NoonanMJ@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject:** | RE: Cats I-III Draft Preamble |
| **Attachments:** | Cat I-III FR - FRN 2 RJM RLH.docx |

████████████████████████████████████████████████

Thanks,

Rob Hart

202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** Monjay, Robert
**Sent:** Friday, August 31, 2018 2:07 PM
**To:** Noonan, Michael J <NoonanMJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

████████████████████████████████████████████████

**Official - SBU**
UNCLASSIFIED

**From:** Noonan, Michael J
**Sent:** Friday, August 31, 2018 10:33 AM
**To:** Hart, Robert L <HartRL@state.gov>; Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

████████████████████████████████████████████████

**Official**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Friday, August 31, 2018 10:29 AM
**To:** Noonan, Michael J <NoonanMJ@state.gov>; Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

███████████████████████████████████████████████

███████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

---

**From:** Noonan, Michael J
**Sent:** Thursday, August 30, 2018 5:19 PM
**To:** Foster, John A <FosterJA2@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Cats I-III Draft Preamble

███████████████████████████████████████████████

**Official**
UNCLASSIFIED

---

**From:** Foster, John A
**Sent:** Thursday, August 30, 2018 5:04 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>
**Subject:** Cats I-III Draft Preamble

Monjay,

Per Sarah's request, attached is the first draft of the preamble.

Best,
John

Message

___

**From**:   Hart, Robert L [HartRL@state.gov]
**Sent**:   8/31/2018 6:53:15 PM
**To**:   Heidema, Sarah J [HeidemaSJ@state.gov]; Rogers, Shana A [RogersSA2@state.gov]
**CC**:   Monjay, Robert [MonjayR@state.gov]; Noonan, Michael J [NoonanMJ@state.gov]; Foster, John A [FosterJA2@state.gov]
**Subject**:   preview of I-III final preamble
**Attachments**:   Cat I-III FR preamble.docx

Sarah/Shana,

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

Thanks,
Rob
**Official**
UNCLASSIFIED

Message

| | |
|---|---|
| **From**: | Heidema, Sarah J [HeidemaSJ@state.gov] |
| **Sent**: | 8/31/2018 7:02:01 PM |
| **To**: | Miller, Michael F [Millermf@state.gov] |
| **Subject**: | FW: preview of I-III final preamble |
| **Attachments**: | Cat I-III FR preamble.docx |

FYSA

**Official**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Friday, August 31, 2018 2:53 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** preview of I-III final preamble

Sarah/Shana,

Thanks,
Rob
**Official**
UNCLASSIFIED

WASHSTATEC000886