Message

| From: | Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu] |
|---|---|
| Sent: | 9/11/2019 6:10:15 PM |
| To: | khawamjn@state.gov |
| Subject: | 19-0911 Wednesday "Daily Bugle" |

## Wednesday, 11 September 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DHS/CBP Publishes Update on Drawback Claim Dates & Mandatory DIS Uploads
4. State/DDTC: (No new postings.)

### NEWS

5. American Shipper: "More Questions Than Answers for Huawei Export Controls
6. Bloomberg: "Hong Kong May Be Weak Link for U.S. Technology, Senators Warn"
7. GAO is Reviewing U.S. University Export Controls Compliance

### COMMENTARY

8. The Hill: "Restore Controls Over Dangerous Gun Exports"
9. R. Bickerstaff: "Post-Brexit Software Exports between the EU and the UK"

### EX/IM TRAINING EVENTS & CONFERENCES

10. ECTI Presents Encryption Export Controls 2019 Edition Webinar: October 8, 2019
11. FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in

Bruchem, the Netherlands

**EDITOR'S NOTES**

12. Bartlett's Unfamiliar Quotations
13. Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (21 Aug 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (30 Aug 2019), DOT/FACR/OFAC (9 Sep 2019), HTSUS (3 Sep 2019)
14. Weekly Highlights of the Daily Bugle Top Stories

WASHSTATEC002868

## ITEMS FROM TODAY'S FEDERAL REGISTER

—

[No items of interest today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register, 11 September 2019.)

\* President; EXECUTIVE ORDERS; Terrorism, Efforts To Combat; Modernization of Sanctions (EO 13886) [Pub. Date: 12 Sep 2019.]

\* Treasury/OFAC; NOTICES; Blocking or Unblocking of Persons and Properties [Pub. Date: 12 Sep 2019.]

\* State; NOTICES; Department of State Sanctions Actions Pursuant to Executive Order 13846 of August 6, 2018; Correction [Pub. Date: 12 Sep 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DHS/CBP Publishes Update on Drawback Claim Dates & Mandatory DIS Uploads
(Source: DHS/CBP, 11 Sep 2019.) [Excerpts.]

Trade Policy Update:

REMINDER: A complete drawback claim shall consist of a successful claim acceptance in ACE and the successful upload of mandatory documents into the Digital Image System (DIS). Documents must be uploaded within 24 hours of claim acceptance in order to maintain the claim date generated by the ACE submission. Otherwise, the claim date is subject to change. ...

WASHSTATEC002869

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---



## NEWS



## 5. American Shipper: "More Questions Than Answers for Huawei Export Controls
(Source: American Shipper, 10 Sep 2019.) [Excerpts.]

Export compliance experts find little new in the Bureau of Industry and Security's FAQs answers related to the Chinese telecom's placement on the Entity List and temporary general license.

The Commerce Department's Bureau of Industry and Security (BIS) on Sept. 9 published two lists of frequently asked questions (FAQs) related to compliance with current U.S. export controls for Huawei Technology Co. Ltd. of China.

The FAQs specifically address Huawei's placement on the Entity List and the application of the temporary general license (TGL) for U.S. exports to the Chinese telecommunications company.

However, most of the FAQs lack new information for compliance experts who have been dealing with the Huawei export controls since the spring. ...

On May 14, BIS added Huawei and 68 overseas affiliates to the Entity List for their alleged threat to U.S. national security and foreign policy. Three weeks ago, the agency added another 46 overseas affiliates of Huawei to the Entity List. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



## 6. Bloomberg: "Hong Kong May Be Weak Link for U.S. Technology, Senators Warn"
(Source: Bloomberg, 11 Sep 2019.) [Excerpts.]

WASHSTATEC002870

A bipartisan group of senators has told the Trump administration that they're concerned about whether U.S. export controls are strong enough to prevent China from getting sensitive American technology through Hong Kong. ...

The move comes as more U.S. lawmakers question the special trading relationship with Hong Kong that underpins its economy as pro-democracy protests throw the financial hub into turmoil. While dual-use technology with consumer and military applications represent some 2 percent of U.S. exports to Hong Kong, restricting sales could potentially do irreparable harm to the city's image as a safe hub for global business. ...

The U.S. senators say they are also concerned about the export of police equipment, such as tear gas, rubber bullets and batons, "which may be used to suppress legitimate civil dissent." ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. GAO is Reviewing U.S. University Export Controls Compliance
(Source: Editor)

The U.S. Government Accountability Office is currently conducting a study of compliance with export controls at U.S. colleges and universities. The project is designed to review export control license data and agency guidance, outreach materials, and regulations update processes from the State Department's Directorate of Defense trade Controls (DDTC) and the Commerce Department's Bureau of Industry & Security (BIS). GAO will interview staff at selected universities, funding agencies, and law enforcement agencies about their roles and responsibilities concerning export control guidance, implementation, and enforcement.

Research objectives for this project are:
   (1) What processes are in place at BIS and DDTC to ensure that export controls are current?
   (2) What guidance have Federal agencies and other relevant entities provided to help U.S. universities understand and comply with export laws and regulations?
   (3) How closely do security practices developed by universities align with agency export control guidelines?
   (4) What challenges do universities face in implementing export control regulations?

GAO plans to compare university practices with DDTC and BIS export compliance guidelines. GAO expects to publish the report in early 2020.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

WASHSTATEC002871

## COMMENTARY

8. The Hill: "Restore Controls Over Dangerous Gun Exports"
(Source: The Hill, 10 Sep 2019.)

\* Author: William D. Hartung, Director, Arms and Security Project, Center for International Policy

One of the most ill-advised decisions made by the Trump administration is to transfer oversight of the export of firearms from the State Department to the Department of Commerce. The new policy will make it easier for terrorists, tyrants and criminal gangs to get access to U.S.-made semi-automatic pistols, assault-style firearms, sniper rifles and ammunition. To add insult to injury, it would also end the practice of notifying Congress of major firearms exports, thereby thwarting its ability to stop dangerous sales.

This reckless approach to firearms exports should not be allowed to stand. Congress has a chance to reverse the current policy and restore executive branch and congressional oversight through this year's National Defense Authorization Act (NDAA). Incorporating House-approved language(D-Calif.) into the NDAA would block the Trump administration's plan to transfer authority over foreign firearms transfers from the State Department to the Department of Commerce. The NDAA will be finalized within the next week or so, so time is of the essence.

The negative consequences of gutting firearms controls cannot be overstated. In the past, Congress has taken advantage of the notifications it receives on gun exports to block sales to the Philippine police, who have been implicated in the deaths of their own citizens, and to Turkey, whose security officials attacked peaceful demonstrators on U.S. soil. Much more needs to be done.

Congress and the administration should redouble efforts to keep U.S.-origin weapons out of the hands of the corrupt and repressive Mexican police and security forces. And sales of hundreds of millions of dollars of firearms to Saudi Arabia and the United Arab Emirates should be terminated given the role of those two nations in killing thousands of civilians and provoking the world's worst humanitarian catastrophe in their war in Yemen.

The ability of Congress or the administration to take action against the kinds of deals cited above will be much diminished if regulation of gun sales is taken away from the State Department, which has the legal tools and expertise to do the job, unlike the Department of Commerce, which is ill-equipped to do so.

The proposal will also increase the risk of exports to unauthorized end users

WASHSTATEC002872

in conflict zones as the Commerce Department, charged with promoting sales, will gather less information about those engaged in the arms trade and neglect pre-license checks.

Overall, Congress already has a robust framework for arms transfers, embedding important human rights and other critical provisions in two central statutes: the Arms Export Control Act and the Foreign Assistance Act. The provisions of these laws generally apply to items on the State Department's U.S. Munitions List. Removing firearms from this list and transferring them to Commerce jurisdiction will exempt them from these important legal restraints.

The administration's rule changes would also transfer control of the technical information for potentially undetectable 3-D-printed guns from the State Department to Commerce, a move that could facilitate printing of 3-D guns worldwide. This would make these weapons readily available to terrorist groups and other criminal elements - and endanger American embassies, military bases and civilian aircraft at home and abroad.

Proponents of the administration's proposed approach argue that small arms are "less dangerous" because many can be bought in U.S. retail outlets, but the truth is that armies are built from these firearms, and they are in essence weapons of mass destruction in places such as Myanmar, Mexico, Congo and Central America.

There is broad public support for retaining State Department and congressional oversight of firearms exports, as evidenced by a letter to Congress by a broad coalition over 100 peace, arms control and anti-gun violence groups in support of the Torres amendment. Just as Congress must take up the urgent issue of imposing strict background checks on individuals to prevent mass shootings and daily gun violence, it should preserve the ability to vet the security forces of nations that might use U.S.-supplied firearms to abuse human rights or undermine U.S. security.

It is rare that Congress has the opportunity to take effective action that will both save lives and enhance U.S. security. Blocking the administration's changes in U.S. firearms export policy is one such opportunity, and it should not be missed.

back to top

* * * * * * * * * * * * * * * * * *

9. R. Bickerstaff: "Post-Brexit Software Exports between the EU and the UK"
(Source: Bird&Bird, 9 Sep 2019.) [Excerpts.]

Author: Roger Bickerstaff, Esq., Bird&Bird UK, roger.bickerstaff@twobirds.com, +44 (0)20 7415 6000.

WASHSTATEC002873

The export of certain categories of software, and particularly encryption software, is controlled by export control regulations in the UK and the EU. Following Brexit, exporters of software (including where software is embedded in physical products) will have to consider the added dimension of export and import of controlled software between the EU and UK and vice versa.

This issue is relevant to software companies which distribute software between the UK and the EU (and vice versa). These companies will need to ensure that their software distribution arrangements are compliant with the export regulations. It is also relevant to software licensees. A great many software licences require the software licensee to comply with applicable software licensing law. A breach of the export regulations may result in a breach of the terms of a software license.

Post Brexit, both software suppliers and user companies that have operations in both the UK and EU-27 countries may need to obtain export licences or to take administration steps in order to achieve compliance. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EX/IM TRAINING EVENTS & CONFERENCES

10. ECTI Presents Encryption Export Controls 2019 Edition Webinar:  October 8, 2019
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

\* What: Encryption Export Controls 2019 Edition
\* When: October 8, 2019; 1:00 p.m. (EDT)

* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Felice Laird
* Register here or Danielle Hatch, 540-433-3977.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in Bruchem, the Netherlands

(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This training course is designed for compliance officers, managers, and other professionals who aim to enhance their organization's compliance efforts. The course will cover multiple topics and tackle various key questions, including but not limited to:
- Setting the Scene: ensuring compliance in the export control and sanctions arena
- What is expected from your organization? A closer look at the official frameworks and guidelines from U.S. and European government agencies
- Key elements of an ICP
- Best practice tips for enhancing your current compliance efforts
- Internal controls samples (policies, procedures, instructions)
- Strategic benefits of having an ICP.
**\* What:** Designing an Internal Compliance Program (ICP) for Export Controls & Sanctions
**\* Date:** Tuesday, 1 Oct 2019
**\* Location:** Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, The Netherlands
**\* Times:**
  - Registration and welcome: 9.00 am - 9.30 am
  - Training course hours: 9.30 am - 4.30 pm
**\* Level**: Intermediate
**\* Target Audience:**  the course provides valuable insights for both compliance professionals, employees and (senior / middle) management working in any industry subject to U.S. and/or EU (member state) export control laws and sanctions regulations.
\* Instructors: Drs. Ghislaine C.Y. Gillessen RA and Marco M. Crombach MSc.
\* Information & Registration: click here or contact us at events@fullcirclecompliance.eu or 31 (0)23 - 844 - 9046.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

‾

EDITOR'S NOTES

WASHSTATEC002875

## 12. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\* O. Henry** (William Sydney Porter; 11 Sep 1862 - 5 Jun 1910; was an American short story writer. His stories are known for their surprise endings. Among his most famous stories are *The Gift of the Magi,* about a young couple, Jim and Della, who are short of money but desperately want to buy each other Christmas gifts. Unbeknownst to Jim, Della sells her most valuable possession, her beautiful hair, in order to buy a platinum fob chain for Jim's watch; while unbeknownst to Della, Jim sells his own most valuable possession, his watch, to buy jeweled combs for Della's hair; and *The Ransom of Red Chief*, in which two men kidnap a boy of ten. The boy turns out to be so bratty and obnoxious that the desperate men ultimately pay the boy's father to take him back.
- "*She plucked from my lapel the invisible strand of lint (the universal act of woman to proclaim ownership).*"

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. Are Your Copies of Regulations Up to Date?
(Source: Editor)

\* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

\* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 21 August 2019: 84 FR 43493-43501: Addition of Certain Entities to the Entity List and Revision of Entries on the Entity List and 84 FR 43487-43493: Temporary General License: Extension of Validity, Clarifications to Authorized Transactions, and Changes to Certification Statement Requirements

\* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (4 July 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR is a 152-page Word document containing all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised

WASHSTATEC002876

copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 30 Aug 2019: 84 FR 45652, Adjustment of Controls for Lower Performing Radar and Continued Temporary Modification of Category XI of the United States Munitions List.
  - The only available fully updated copy (latest edition: 30 August 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 371-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please

WASHSTATEC002877

contact us to receive your discount code.

* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): **31 CFR,**
**Parts 500-599, Embargoes, Sanctions, Executive Orders.**
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
- Last Amendment: 9 Sep 2019: 84 FR 47121-47123 - Cuban Assets Control
Regulations

* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS,
HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S.
International Trade Commission. ("HTS" and "HTSA" are often seen as
abbreviations for the Harmonized Tariff Schedule of the United States
Annotated, shortened versions of "HTSUSA".)

 - Last Amendment: 4 Sep 2019: Harmonized System Update (HSU) 1915
 - HTS codes for AES are available here.
 - HTS codes that are not valid for AES are available here.

back to top

* * * * * * * * * * * * * * * * * * *

14. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle
Top Stories" published  here.

back to top

* * * * * * * * * * * * * * * * * * *

–

**EDITORIAL POLICY**

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; and Assistant Editor, Alexander Witt. The Ex/Im
Daily Update is emailed every business day to approximately 7,500 readers of
changes to defense and high-tech trade laws and regulations. We check the
following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or
are published with permission of private contributors, and may be freely
circulated without further permission, provided attribution is given to "*The*

WASHSTATEC002878

*Export/Import Daily Bugle* of (date)". Any further use of contributors'
material, however, must comply with applicable copyright laws.  If you would
to submit material for inclusion in the *The Export/Import Daily Update ("Daily
Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or
expert advice.  Consult your own legal counsel or compliance specialists
before taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this
communication, it was not intended or written by the author or sender for tax
or legal advice, and cannot be used for the purpose of avoiding penalties
under the Internal Revenue Code or promoting, marketing, or recommending
to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present
is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ khawamjn@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC002879

Message

**From:**     Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu]
**Sent:**     9/11/2019 6:10:05 PM
**To:**        hartrl@state.gov
**Subject:**  19-0911 Wednesday "Daily Bugle"

## Wednesday, 11 September 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DHS/CBP Publishes Update on Drawback Claim Dates & Mandatory DIS Uploads
4. State/DDTC: (No new postings.)

### NEWS

5. American Shipper: "More Questions Than Answers for Huawei Export Controls
6. Bloomberg: "Hong Kong May Be Weak Link for U.S. Technology, Senators Warn"
7. GAO is Reviewing U.S. University Export Controls Compliance

### COMMENTARY

8. The Hill: "Restore Controls Over Dangerous Gun Exports"
9. R. Bickerstaff: "Post-Brexit Software Exports between the EU and the UK"

### EX/IM TRAINING EVENTS & CONFERENCES

10. ECTI Presents Encryption Export Controls 2019 Edition Webinar: October 8, 2019

11. FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in Bruchem, the Netherlands

## EDITOR'S NOTES

12. Bartlett's Unfamiliar Quotations
13. Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (21 Aug 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (30 Aug 2019), DOT/FACR/OFAC (9 Sep 2019), HTSUS (3 Sep 2019)
14. Weekly Highlights of the Daily Bugle Top Stories

WASHSTATEC002881

## ITEMS FROM TODAY'S FEDERAL REGISTER

...

[No items of interest today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register, 11 September 2019.)

\* President; EXECUTIVE ORDERS; Terrorism, Efforts To Combat; Modernization of Sanctions (EO 13886) [Pub. Date: 12 Sep 2019.]

\* Treasury/OFAC; NOTICES; Blocking or Unblocking of Persons and Properties [Pub. Date: 12 Sep 2019.]

\* State; NOTICES; Department of State Sanctions Actions Pursuant to Executive Order 13846 of August 6, 2018; Correction [Pub. Date: 12 Sep 2019.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DHS/CBP Publishes Update on Drawback Claim Dates & Mandatory DIS Uploads
(Source: DHS/CBP, 11 Sep 2019.) [Excerpts.]

Trade Policy Update:

REMINDER: A complete drawback claim shall consist of a successful claim acceptance in ACE and the successful upload of mandatory documents into the Digital Image System (DIS). Documents must be uploaded within 24

WASHSTATEC002882

hours of claim acceptance in order to maintain the claim date generated by the ACE submission. Otherwise, the claim date is subject to change. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

‒

| NEWS |
| --- |

5. American Shipper: "More Questions Than Answers for Huawei Export Controls
(Source: American Shipper, 10 Sep 2019.) [Excerpts.]

Export compliance experts find little new in the Bureau of Industry and Security's FAQs answers related to the Chinese telecom's placement on the Entity List and temporary general license.

The Commerce Department's Bureau of Industry and Security (BIS) on Sept. 9 published two lists of frequently asked questions (FAQs) related to compliance with current U.S. export controls for Huawei Technology Co. Ltd. of China.

The FAQs specifically address Huawei's placement on the Entity List and the application of the temporary general license (TGL) for U.S. exports to the Chinese telecommunications company.

However, most of the FAQs lack new information for compliance experts who have been dealing with the Huawei export controls since the spring. ...

On May 14, BIS added Huawei and 68 overseas affiliates to the Entity List for their alleged threat to U.S. national security and foreign policy. Three weeks ago, the agency added another 46 overseas affiliates of Huawei to the Entity List. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

6. Bloomberg: "Hong Kong May Be Weak Link for U.S. Technology, Senators Warn"

(Source: Bloomberg, 11 Sep 2019.) [Excerpts.]

A bipartisan group of senators has told the Trump administration that they're concerned about whether U.S. export controls are strong enough to prevent China from getting sensitive American technology through Hong Kong. ...

The move comes as more U.S. lawmakers question the special trading relationship with Hong Kong that underpins its economy as pro-democracy protests throw the financial hub into turmoil. While dual-use technology with consumer and military applications represent some 2 percent of U.S. exports to Hong Kong, restricting sales could potentially do irreparable harm to the city's image as a safe hub for global business. ...

The U.S. senators say they are also concerned about the export of police equipment, such as tear gas, rubber bullets and batons, "which may be used to suppress legitimate civil dissent." ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. GAO is Reviewing U.S. University Export Controls Compliance
(Source: Editor)

The U.S. Government Accountability Office is currently conducting a study of compliance with export controls at U.S. colleges and universities. The project is designed to review export control license data and agency guidance, outreach materials, and regulations update processes from the State Department's Directorate of Defense trade Controls (DDTC) and the Commerce Department's Bureau of Industry & Security (BIS). GAO will interview staff at selected universities, funding agencies, and law enforcement agencies about their roles and responsibilities concerning export control guidance, implementation, and enforcement.

Research objectives for this project are:
   (1) What processes are in place at BIS and DDTC to ensure that export controls are current?
   (2) What guidance have Federal agencies and other relevant entities provided to help U.S. universities understand and comply with export laws and regulations?
   (3) How closely do security practices developed by universities align with agency export control guidelines?
   (4) What challenges do universities face in implementing export control regulations?

GAO plans to compare university practices with DDTC and BIS export compliance guidelines. GAO expects to publish the report in early 2020.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC002884

COMMENTARY

8. The Hill: "Restore Controls Over Dangerous Gun Exports"
(Source: The Hill, 10 Sep 2019.)

* Author: William D. Hartung, Director, Arms and Security Project, Center for International Policy

One of the most ill-advised decisions made by the Trump administration is to transfer oversight of the export of firearms from the State Department to the Department of Commerce. The new policy will make it easier for terrorists, tyrants and criminal gangs to get access to U.S.-made semi-automatic pistols, assault-style firearms, sniper rifles and ammunition. To add insult to injury, it would also end the practice of notifying Congress of major firearms exports, thereby thwarting its ability to stop dangerous sales.

This reckless approach to firearms exports should not be allowed to stand. Congress has a chance to reverse the current policy and restore executive branch and congressional oversight through this year's National Defense Authorization Act (NDAA). Incorporating House-approved language(D-Calif.) into the NDAA would block the Trump administration's plan to transfer authority over foreign firearms transfers from the State Department to the Department of Commerce. The NDAA will be finalized within the next week or so, so time is of the essence.

The negative consequences of gutting firearms controls cannot be overstated. In the past, Congress has taken advantage of the notifications it receives on gun exports to block sales to the Philippine police, who have been implicated in the deaths of their own citizens, and to Turkey, whose security officials attacked peaceful demonstrators on U.S. soil. Much more needs to be done.

Congress and the administration should redouble efforts to keep U.S.-origin weapons out of the hands of the corrupt and repressive Mexican police and security forces. And sales of hundreds of millions of dollars of firearms to Saudi Arabia and the United Arab Emirates should be terminated given the role of those two nations in killing thousands of civilians and provoking the world's worst humanitarian catastrophe in their war in Yemen.

The ability of Congress or the administration to take action against the kinds of deals cited above will be much diminished if regulation of gun sales is taken away from the State Department, which has the legal tools and

WASHSTATEC002885

expertise to do the job, unlike the Department of Commerce, which is ill-equipped to do so.

The proposal will also increase the risk of exports to unauthorized end users in conflict zones as the Commerce Department, charged with promoting sales, will gather less information about those engaged in the arms trade and neglect pre-license checks.

Overall, Congress already has a robust framework for arms transfers, embedding important human rights and other critical provisions in two central statutes: the Arms Export Control Act and the Foreign Assistance Act. The provisions of these laws generally apply to items on the State Department's U.S. Munitions List. Removing firearms from this list and transferring them to Commerce jurisdiction will exempt them from these important legal restraints.

The administration's rule changes would also transfer control of the technical information for potentially undetectable 3-D-printed guns from the State Department to Commerce, a move that could facilitate printing of 3-D guns worldwide. This would make these weapons readily available to terrorist groups and other criminal elements - and endanger American embassies, military bases and civilian aircraft at home and abroad.

Proponents of the administration's proposed approach argue that small arms are "less dangerous" because many can be bought in U.S. retail outlets, but the truth is that armies are built from these firearms, and they are in essence weapons of mass destruction in places such as Myanmar, Mexico, Congo and Central America.

There is broad public support for retaining State Department and congressional oversight of firearms exports, as evidenced by a letter to Congress by a broad coalition over 100 peace, arms control and anti-gun violence groups in support of the Torres amendment. Just as Congress must take up the urgent issue of imposing strict background checks on individuals to prevent mass shootings and daily gun violence, it should preserve the ability to vet the security forces of nations that might use U.S.-supplied firearms to abuse human rights or undermine U.S. security.

It is rare that Congress has the opportunity to take effective action that will both save lives and enhance U.S. security. Blocking the administration's changes in U.S. firearms export policy is one such opportunity, and it should not be missed.

back to top

* * * * * * * * * * * * * * * * * *

## 9. R. Bickerstaff: "Post-Brexit Software Exports between the EU and the UK"
(Source: Bird&Bird, 9 Sep 2019.) [Excerpts.]

Author: Roger Bickerstaff, Esq., Bird&Bird UK,
roger.bickerstaff@twobirds.com, +44 (0)20 7415 6000.

The export of certain categories of software, and particularly encryption software, is controlled by export control regulations in the UK and the EU. Following Brexit, exporters of software (including where software is embedded in physical products) will have to consider the added dimension of export and import of controlled software between the EU and UK and vice versa.

This issue is relevant to software companies which distribute software between the UK and the EU (and vice versa). These companies will need to ensure that their software distribution arrangements are compliant with the export regulations. It is also relevant to software licensees. A great many software licences require the software licensee to comply with applicable software licensing law. A breach of the export regulations may result in a breach of the terms of a software license.

Post Brexit, both software suppliers and user companies that have operations in both the UK and EU-27 countries may need to obtain export licences or to take administration steps in order to achieve compliance. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

_

**EX/IM TRAINING EVENTS & CONFERENCES**

## 10. ECTI Presents Encryption Export Controls 2019 Edition Webinar: October 8, 2019
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: Encryption Export Controls 2019 Edition
* When: October 8, 2019; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Felice Laird
* Register here or Danielle Hatch, 540-433-3977.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 11. FCC Presents "Designing an ICP for Export Controls & Sanctions", 1 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This training course is designed for compliance officers, managers, and other professionals who aim to enhance their organization's compliance efforts. The course will cover multiple topics and tackle various key questions, including but not limited to:
- Setting the Scene: ensuring compliance in the export control and sanctions arena
- What is expected from your organization? A closer look at the official frameworks and guidelines from U.S. and European government agencies
- Key elements of an ICP
- Best practice tips for enhancing your current compliance efforts
- Internal controls samples (policies, procedures, instructions)
- Strategic benefits of having an ICP.
* **What:** Designing an Internal Compliance Program (ICP) for Export Controls & Sanctions
* **Date:** Tuesday, 1 Oct 2019
* **Location:** Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, The Netherlands
* **Times:**
  - Registration and welcome: 9.00 am - 9.30 am
  - Training course hours: 9.30 am - 4.30 pm
* **Level**: Intermediate
* **Target Audience:**  the course provides valuable insights for both compliance professionals, employees and (senior / middle) management working in any industry subject to U.S. and/or EU (member state) export control laws and sanctions regulations.
* Instructors: Drs. Ghislaine C.Y. Gillessen RA and Marco M. Crombach MSc.
* Information & Registration: click here or contact us at events@fullcirclecompliance.eu or 31 (0)23 - 844 - 9046.

back to top

* * * * * * * * * * * * * * * * * * *

WASHSTATEC002888

## EDITOR'S NOTES

### 12. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\* O. Henry** (William Sydney Porter; 11 Sep 1862 - 5 Jun 1910; was an American short story writer. His stories are known for their surprise endings. Among his most famous stories are *The Gift of the Magi,* about a young couple, Jim and Della, who are short of money but desperately want to buy each other Christmas gifts. Unbeknownst to Jim, Della sells her most valuable possession, her beautiful hair, in order to buy a platinum fob chain for Jim's watch; while unbeknownst to Della, Jim sells his own most valuable possession, his watch, to buy jeweled combs for Della's hair; and *The Ransom of Red Chief*, in which two men kidnap a boy of ten. The boy turns out to be so bratty and obnoxious that the desperate men ultimately pay the boy's father to take him back.
- "*She plucked from my lapel the invisible strand of lint (the universal act of woman to proclaim ownership)*."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### 13. Are Your Copies of Regulations Up to Date?
(Source: Editor)

\* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

\* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
  - Last Amendment: 21 August 2019: 84 FR 43493-43501: Addition of Certain Entities to the Entity List and Revision of Entries on the Entity List and 84 FR 43487-43493: Temporary General License: Extension of Validity, Clarifications to Authorized Transactions, and Changes to Certification Statement Requirements

\* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.

- The latest edition (4 July 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR is a 152-page Word document containing all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

* DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* DOJ ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: 84 FR 9239-9240: Bump-Stock-Type Devices

* DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 30 Aug 2019: 84 FR 45652, Adjustment of Controls for Lower Performing Radar and Continued Temporary Modification of Category XI of the United States Munitions List.
  - The only available fully updated copy (latest edition: 30 August 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 371-page Word document containing all ITAR amendments to date, plus a large Index, over 800

WASHSTATEC002890

footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please contact us to receive your discount code.

\* DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
- Last Amendment: 9 Sep 2019: 84 FR 47121-47123 - Cuban Assets Control Regulations

\* USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)

- Last Amendment: 4 Sep 2019: Harmonized System Update (HSU) 1915
- HTS codes for AES are available here.
- HTS codes that are not valid for AES are available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published  here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; and Assistant Editor, Alexander Witt. The Ex/Im Daily Update is emailed every business day to approximately 7,500 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries

and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

WASHSTATEC002892

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC002893

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/12/2019 1:20:13 PM |
| **To**: | Kovar, Jeffrey D [KovarJD@state.gov] |
| **CC**: | Minarich, Christine M [MinarichCM@state.gov] |
| **Subject**: | AM Package Recommendation |
| **Attachments**: | Rulemaking Brainstorming.docx |

ATTORNEY WORK PRODUCT

Jeff: As mentioned, attached is my the document that I shared with DDTC (John Foster) ████████████
████

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov
████████████████████

SBU - Legal

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 9/12/2019 1:41:38 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | AM Package |
| **Attachments**: | USML Cat I-III Final FRN - AM to T.docx; Tab 1 - Cat I-III Final FRN.docx; Tab 2 - Rule Statement on Cat I-III Final FRN.pdf; Tab 3 - 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf |

**John A. Foster**
Office of Defense Trade Controls Compliance
U.S. Department of State
Tel: 202-663-2811
Email: FosterJA2@state.gov

SBU - Legal

WASHSTATEC002895

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2) Proliferation of 3D Gun Printing Technical Information

There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEC002898

**Message**

| | |
|---|---|
| **From**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent**: | 9/12/2019 8:19:21 PM |
| **To**: | Miller, Michael F [Millermf@state.gov] |
| **CC**: | Heidema, Sarah J [HeidemaSJ@state.gov]; Hamilton, Catherine E [HamiltonCE@state.gov] |
| **Subject**: | RE: A/S Staff Meeting for tomorrow |

Mike,

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

Unclassified

**From:** Koelling, Richard W
**Sent:** Thursday, September 12, 2019 12:45 PM
**To:** Miller, Michael F <Millermf@state.gov>
**Subject:** A/S Staff Meeting for tomorrow

Mike,

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

Unclassified

**From:** Hart, Robert L <HartRL@state.gov>
**Sent:** Thursday, September 12, 2019 12:12 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** FW: [Non-DoD Source] USML/CCL review


Rob Hart
202.736.9221 | hartrl@state.gov


Unclassified

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Tuesday, September 10, 2019 5:47 PM
**To:** Miller, Michael F <Millermf@state.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike.

███████████████████████████████████████████████████████████████

Matt

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Tuesday, September 10, 2019 12:52 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review
**Importance:** High

Thanks Matt.

███████████████████████████████████████████████████████

In related news, would like to get feedback from you on Cats 1-2-3.████████████
████████████████████████████████████████████████████████████████

Thanks,
Mike

**Mike Miller** | Acting Deputy Assistant Secretary
Bureau of Political-Military Affairs | U.S. Department of State
☎ *Desk:* (202) 663-2861
✉ *OpenNet:* MillerMF@state.gov                    ███████████████

SBU - Deliberative Process

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Monday, September 09, 2019 3:33 PM
**To:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike L.

███████████████████████████

**From:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>
**Sent:** Monday, September 09, 2019 12:51 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** Re: [Non-DoD Source] USML/CCL review

+Taurus, Tracy, Susan

Matt, I am at an offsite til Thursday. Please follow up with Taurus on your request below.

Vr

Mike

Sent from my iPhone

On Sep 9, 2019, at 12:08 PM, Matthew Borman <Matthew.Borman@bis.doc.gov> wrote:

Mike,



Thanks.

Matt

Message

**From**: Kovar, Jeffrey D [KovarJD@state.gov]
**Sent**: 9/12/2019 8:31:21 PM
**To**: Miller, Michael F [Millermf@state.gov]
**Subject**: Cats I-III

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

Mike:

Matt Borman called me and filled me in.  Please call me about next steps.

Jeff


\*\*\*\*\*\*
*Jeffrey D. Kovar*
*Assistant Legal Adviser for Political-Military Affairs*
*U.S. Department of State*
*2201 C ST NW*
*Washington DC 20520-6805*
*(o) 202-647-9288*
*(c)* ███████


SBU - Legal

**Message**

| | |
|---|---|
| **From**: | Miller, Michael F [Millermf@state.gov] |
| **Sent**: | 9/12/2019 10:18:05 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Subject**: | RE: A/S Staff Meeting for tomorrow |

SBU — DELIBERATIVE PROCESS

Rick – let's please discuss – my cell is ████████  Alternately, we can discuss in the early AM tomorrow.  Given the complexity of this, would prefer we brief CC in person, tomorrow afternoon if possible (say, 3pm).

MM

Unclassified

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 12, 2019 12:45 PM
**To:** Miller, Michael F <Millermf@state.gov>
**Subject:** A/S Staff Meeting for tomorrow

Mike,

████████████████████████████████████████████████████

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

Unclassified

**From:** Hart, Robert L <HartRL@state.gov>
**Sent:** Thursday, September 12, 2019 12:12 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** FW: [Non-DoD Source] USML/CCL review

Rob Hart
202.736.9221 | hartrl@state.gov

Unclassified

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Tuesday, September 10, 2019 5:47 PM
**To:** Miller, Michael F <Millermf@state.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (USA) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike.

Matt

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Tuesday, September 10, 2019 12:52 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review
**Importance:** High

Thanks Matt.

In related news, would like to get feedback from you on Cats 1-2-3.

Thanks,
Mike

**Mike Miller** | Acting Deputy Assistant Secretary
Bureau of Political-Military Affairs | U.S. Department of State
☎ *Desk:* (202) 663-2861
✉ *OpenNet:* MillerMF@state.gov   *ClassNe*

SBU - Deliberative Process

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Monday, September 9, 2019 3:33 PM
**To:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>

**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike L.



---

**From:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>
**Sent:** Monday, September 09, 2019 12:51 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Brackett, Taurus L CIV DTSA LD (USA)
<taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan
G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** Re: [Non-DoD Source] USML/CCL review


+Taurus, Tracy, Susan

Matt, I am at an offsite til Thursday. Please follow up with Taurus on your request below.

Vr

Mike

Sent from my iPhone

On Sep 9, 2019, at 12:08 PM, Matthew Borman <Matthew.Borman@bis.doc.gov> wrote:

> Mike,

Thanks.

Matt

**Message**

**From:**      Koelling, Richard W [KoellingRW@state.gov]
**Sent:**      9/12/2019 10:19:59 PM
**To:**      Miller, Michael F [Millermf@state.gov]
**Subject:**      Re: A/S Staff Meeting for tomorrow

Mike, copy. Not in a position to chat at the moment. Will be in a few though. Concerned Josh will bring up himself.

Get Outlook for iOS

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Thursday, September 12, 2019 6:18:05 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** RE: A/S Staff Meeting for tomorrow

SBU -- DELIBERATIVE PROCESS

Rick -- let's please discuss -- my cell is ▮▮▮▮▮▮   Alternately, we can discuss in the early AM tomorrow.  Given the complexity of this, would prefer we brief CC in person, tomorrow afternoon if possible (say, 3pm).

MM

Unclassified
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 12, 2019 12:45 PM
**To:** Miller, Michael F <Millermf@state.gov>
**Subject:** A/S Staff Meeting for tomorrow

Mike,

███████████████████████████████████████

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

Unclassified
**From:** Hart, Robert L <HartRL@state.gov>
**Sent:** Thursday, September 12, 2019 12:12 PM

**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** FW: [Non-DoD Source] USML/CCL review

Rob Hart
202.736.9221 | hartrl@state.gov

Unclassified

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Tuesday, September 10, 2019 5:47 PM
**To:** Miller, Michael F <Millermf@state.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Matt

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Tuesday, September 10, 2019 12:52 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review
**Importance:** High

Thanks Matt.

███████████████████████████████████████████████████████

In related news, would like to get feedback from you on Cats 1-2-3. ███████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Thanks,
Mike

**Mike Miller** | Acting Deputy Assistant Secretary
Bureau of Political-Military Affairs | U.S. Department of State
☎ *Desk:* (202) 663-2861
✉ *OpenNet:* MillerMF@state.gov  ███████████████████████████

SBU - Deliberative Process

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Monday, September 9, 2019 3:33 PM
**To:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike L.



**From:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>
**Sent:** Monday, September 09, 2019 12:51 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** Re: [Non-DoD Source] USML/CCL review

+Taurus, Tracy, Susan

Matt, I am at an offsite til Thursday. Please follow up with Taurus on your request below.

Vr

Mike

Sent from my iPhone

On Sep 9, 2019, at 12:08 PM, Matthew Borman <Matthew.Borman@bis.doc.gov> wrote:

Mike,

Thanks.

Matt

Message
_____

**From:**      Heidema, Sarah J [HeidemaSJ@state.gov]
**Sent:**      9/13/2019 10:32:27 AM
**To:**        Koelling, Richard W [KoellingRW@state.gov]
**Subject:**   Re: Senate and USML Categories I,II, III Follow-up

███████████████████████████████

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 13, 2019 5:30:15 AM
**To:** Miller, Michael F <Millermf@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** Fwd: Senate and USML Categories I,II, III Follow-up

Mike, even more of a reason for the five of us (you, me, josh, Sarah, and A/S Cooper to meet up at three this afternoon). While Sarah will be the only one on the phone, I will still get a conference call number in case A/S Cooper decides to bring in a sixth party. ████████████████████████████████
████████████████████████████

VR Rick

Get Outlook for iOS

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002910

Message
_____

**From:**     Koelling, Richard W [KoellingRW@state.gov]
**Sent:**     9/13/2019 11:11:33 AM
**To:**       Heidema, Sarah J [HeidemaSJ@state.gov]
**Subject:**  RE: Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████████████████████████████

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU
_____
**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Friday, September 13, 2019 6:32 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Re: Senate and USML Categories I,II, III Follow-up

███████████████████████████████████

_____
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 13, 2019 5:30:15 AM
**To:** Miller, Michael F <Millermf@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** Fwd: Senate and USML Categories I,II, III Follow-up

Mike, even more of a reason for the five of us (you, me, josh, Sarah, and A/S Cooper to meet up at three this afternoon). While Sarah will be the only one on the phone, I will still get a conference call number in case A/S Cooper decides to bring in a sixth party. ████████████████████████████████████████████
█████████████████████████████████

VR Rick

Get Outlook for iOS

_____
**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up



**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>;
Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up


Dear Richard,

Sincerely,
Clarke


**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

Message

**From:**     Heidema, Sarah J [HeidemaSJ@state.gov]
**Sent:**     9/13/2019 12:22:17 PM
**To:**       Koelling, Richard W [KoellingRW@state.gov]
**Subject:**  Re: Senate and USML Categories I,II, III Follow-up

Ok ███████████████████████████████████████████████

---

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 13, 2019 7:46:21 AM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** FW: Senate and USML Categories I,II, III Follow-up

Mel,
Please let me know what you need from my end.
As a note, for this proposed meeting, as Mike mentions, Sarah will be calling in. I'm not sure of Jeff's availability, but if it may be by phone, then we may want to consider a conference line to accommodate both.


Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU - Deliberative Process
**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 13, 2019 7:22 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up
**Importance:** High


Sensitive but Unclassified/Deliberative Process/Pre-decisional

Sir,

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



Thank you,
Mike

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

SBU - Deliberative Process

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

WASHSTATEC002914

Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002915

Message

**From**: Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Sent**: 9/13/2019 12:37:30 PM
**To**: Koelling, Richard W [KoellingRW@state.gov]
**Subject**: I am in the office this morning. Give me a call and I will update you on Cat I-III rule.



Message

**From:**      Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:**      9/13/2019 12:53:39 PM
**To:**        Khawam, Joseph N [KhawamJN@state.gov]
**Subject:**   FW: Senate and USML Categories I,II, III Follow-up

SBU - Deliberative Process

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 7:46 AM
**To:** Miller, Michael F <Millermf@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Minus Cooper.



Happy to discuss further, see you all later this afternoon, calendaring permitting.

J

SBU - Deliberative Process

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 13, 2019 7:22 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up
**Importance:** High

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Sir,

Thank you,
Mike

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

SBU - Deliberative Process

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

███████████████████████████████████████████

Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

████████████████████
CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

**Message**

| | |
|---|---|
| **From**: | Kovar, Jeffrey D [KovarJD@state.gov] |
| **Sent**: | 9/13/2019 12:54:01 PM |
| **To**: | String, Marik A [StringMA@state.gov]; Dorosin, Joshua L [DorosinJL@state.gov] |
| **Subject**: | FW: Senate and USML Categories I,II, III Follow-up |
| **Importance**: | High |

SBU - Deliberative Process

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 13, 2019 7:22 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up
**Importance:** High

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Sir,

Thank you,
Mike

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

SBU - Deliberative Process

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>;
Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

---

## Message

**From:**       Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:**       9/13/2019 12:57:23 PM
**To:**         Koelling, Richard W [KoellingRW@state.gov]; Windecker, Melissa A [WindeckerMA@state.gov]
**CC:**         Heidema, Sarah J [HeidemaSJ@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Brown, Stanley L
                [BrownSL@state.gov]
**Subject:**    RE: Senate and USML Categories I,II, III Follow-up


I'm happy to join in person.  Just let me know the room #


SBU - Deliberative Process

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 13, 2019 7:46 AM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M
<PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** FW: Senate and USML Categories I,II, III Follow-up
**Importance:** High

Mel,

Please let me know what you need from my end.
As a note, for this proposed meeting, as Mike mentions, Sarah will be calling in. I'm not sure of Jeff's availability, but if it
may be by phone, then we may want to consider a conference line to accommodate both.


Very respectfully,


Rick


Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU - Deliberative Process

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 13, 2019 7:22 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M
<PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up
**Importance:** High

Sensitive but Unclassified/Deliberative Process/Pre-decisional


Sir,

Thank you,
Mike

---

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up



SBU - Deliberative Process

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002924

Appointment

| | |
|---|---|
| **From**: | Paul, Joshua M [PaulJM@state.gov] |
| **Sent**: | 9/13/2019 2:03:53 PM |
| **To**: | Cooper, R. Clarke [CooperRC@state.gov] |

| | |
|---|---|
| **Subject**: | Accepted: Senate and USML Cats I,II,III Follow Up |
| **Location**: | 6212 |

| | |
|---|---|
| **Start**: | 9/13/2019 7:00:00 PM |
| **End**: | 9/13/2019 7:30:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Recurrence**: | (none) |

WASHSTATEC002925

Appointment

**From**:        Kovar, Jeffrey D [KovarJD@state.gov]
**Sent**:        9/13/2019 2:12:08 PM
**To**:          Cooper, R. Clarke [CooperRC@state.gov]

**Subject**:     Accepted: Senate and USML Cats I,II,III Follow Up
**Location**:    6212

**Start**:       9/13/2019 7:00:00 PM
**End**:         9/13/2019 7:30:00 PM
**Show Time As**: Busy


**Recurrence**:  (none)

WASHSTATEC002926

Appointment

---

**From**:       Koelling, Richard W [KoellingRW@state.gov]
**Sent**:       9/13/2019 2:39:38 PM
**To**:         Celin, Liliana E [CelinLE@state.gov]

**Subject**:    Accepted: Senate and USML Cats I,II,III Follow Up
**Location**:   6212

**Start**:      9/13/2019 7:00:00 PM
**End**:        9/13/2019 7:30:00 PM
**Show Time As**: Busy

**Recurrence**:    (none)

Mel,

Conference call info is as follows (I will shoot this information out to all shortly):

Dial In: USA Toll-Free: ███████

USA Caller Paid/International Toll: ████████

ACCESS CODE: ██████

Host: █████

Message

| | |
|---|---|
| **From:** | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent:** | 9/13/2019 2:41:48 PM |
| **To:** | Cooper, R. Clarke [CooperRC@state.gov]; Miller, Michael F [Millermf@state.gov]; Kovar, Jeffrey D [KovarJD@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov] |
| **Subject:** | RE: Senate and USML Cats I,II,III Follow Up |

All, please note if you are unable to attend in person, we've established the following conference call line:

Dial In: USA Toll-Free: ████████████

USA Caller Paid/International Toll ████████████

ACCESS CODE ███████

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

-----Original Appointment-----
**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, September 13, 2019 10:03 AM
**To:** Cooper, R. Clarke; Miller, Michael F; Kovar, Jeffrey D; Koelling, Richard W; Paul, Joshua M; Heidema, Sarah J
**Subject:** Senate and USML Cats I,II,III Follow Up
**When:** Friday, September 13, 2019 3:00 PM-3:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** 6212

DDTC please provide the call in data for your office conference line.

Thanks!
Mel

SBU

**Message**

| | |
|---|---|
| **From**: | Kovar, Jeffrey D [KovarJD@state.gov] |
| **Sent**: | 9/13/2019 2:45:24 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **CC**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | RE: 1-3 status |
| **Attachments**: | Rulemaking Brainstorming.docx |

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

Rick —



- Jeff

SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 13, 2019 10:29 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** RE: 1-3 status

Mike, Sarah,

Again, we are working toward a 3:30 time for the call, to allow us time at the COR meeting prior to. I've reached out to Mel, who is trying to confirm that time.

More to come.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)

Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Friday, September 13, 2019 9:17 AM
**To:** Miller, Michael F <Millermf@state.gov>
**Cc:** Kovar, Jeffrey D <KovarJD@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** 1-3 status



Happy to do a call 3pm.  If need be, I could also probably come in for a meeting, just let me know.


Happy Friday the 13th!


Sarah

WASHSTATEC002930

WASHSTATEC002931

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/13/2019 3:48:54 PM |
| **To**: | DiNapoli, Emma K [DiNapoliEK@state.gov] |
| **Subject**: | Here is the document I mentioned this morning |
| **Attachments**: | Tab 1 - Cat I-III Final FRN.docx |

SBU - Legal

Message

| | |
|---|---|
| **From:** | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent:** | 9/13/2019 5:32:28 PM |
| **To:** | Heidema, Sarah J [HeidemaSJ@state.gov] |
| **Subject:** | FW: AM Package |
| **Attachments:** | USML Cat I-III Final FRN - AM to T.docx; Tab 1 - Cat I-III Final FRN.docx; Tab 2 - Rule Statement on Cat I-III Final FRN.pdf; Tab 3 - 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf |

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Foster, John A <FosterJA2@state.gov>
**Sent:** Friday, September 13, 2019 11:06 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** AM Package

**John A. Foster**
Office of Defense Trade Controls Compliance
U.S. Department of State
Tel: 202-663-2811
Email: FosterJA2@state.gov

SBU

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

WASHSTATEC002934

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2) Proliferation of 3D Gun Printing Technical Information

There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control.  Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEC002936

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/13/2019 5:40:52 PM |
| **To**: | Minarich, Christine M [MinarichCM@state.gov] |
| **Subject**: | FW: AM Package |
| **Attachments**: | USML Cat I-III Final FRN - AM to T.docx; Tab 1 - Cat I-III Final FRN.docx; Tab 2 - Rule Statement on Cat I-III Final FRN.pdf; Tab 3 - 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf |

Here's what John sent.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Foster, John A <FosterJA2@state.gov>
**Sent:** Thursday, September 12, 2019 9:42 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** AM Package

**John A. Foster**
Office of Defense Trade Controls Compliance
U.S. Department of State
Tel: 202-663-2811
Email: FosterJA2@state.gov

SBU - Legal

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

JAMES E. RISCH, IDAHO, CHAIRMAN

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

WASHSTATEC002938

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2) <u>Proliferation of 3D Gun Printing Technical Information</u>
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

WASHSTATEC002939

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEC002940

Message
_____

**From:** Cooper, R. Clarke [CooperRC@state.gov]
**Sent:** 9/13/2019 5:48:13 PM
**To:** Miller, Michael F [Millermf@state.gov]; Windecker, Melissa A [WindeckerMA@state.gov]
**CC:** Heidema, Sarah J [HeidemaSJ@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Kovar, Jeffrey D [KovarJD@state.gov]; Brown, Stanley L [BrownSL@state.gov]
**Subject:** RE: Senate and USML Categories I,II, III Follow-up


Mike,

████████████████████████████████████████████████████████

Regards,
Clarke

**R. Clarke Cooper**
**Assistant Secretary of State**
**Political Military Affairs Bureau**

202.647.9022, front office

████████████████████

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.


SBU - Deliberative Process
**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 13, 2019 7:22 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Brown, Stanley L <BrownSL@state.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up
**Importance:** High

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Sir,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Thank you,
Mike

---

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22:12 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up



SBU - Deliberative Process

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,







Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

████████████████████
CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

Message
| | |
|---|---|
| **From:** | Cooper, R. Clarke [CooperRC@state.gov] |
| **Sent:** | 9/13/2019 6:06:33 PM |
| **To:** | Richard Ashooh [Richard.Ashooh@bis.doc.gov] |
| **CC:** | Kaldahl, Ryan M [KaldahlRM@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Miller, Michael F [Millermf@state.gov]; Heidema, SarahJ [HeidemaSJ@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Jessica Curyto [Jessica.Curyto@bis.doc.gov]; Petrina Chase [Petrina.Chase@bis.doc.gov]; Darrach, Tamara A [DarrachTA@state.gov]; Windecker, Melissa A [WindeckerMA@state.gov] |
| **Subject:** | MONDAY- Senate and USML Categories I,II, III Follow-up |

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16 September.**

████████████████████████████████████████████████████████████████

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

████████████████████

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process
**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████████████████████████████

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>;

Heidema, Sarah J <<u>HeidemaSJ@state.gov</u>>; Koelling, Richard W <<u>KoellingRW@state.gov</u>>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke

**R. Clarke Cooper**
*Assistant Secretary of State*
*Political Military Affairs Bureau*

<u>CooperRC@state.gov</u>

ENGAGE. ENHANCE. ENABLE.

Appointment

**From:** Miller, Michael F [Millermf@state.gov]
**Sent:** 9/13/2019 6:25:48 PM
**To:** Cooper, R. Clarke [CooperRC@state.gov]

**Subject:** Accepted: Senate and USML Cats I,II,III Follow Up
**Location:** 6212

**Start:** 9/13/2019 7:00:00 PM
**End:** 9/13/2019 7:30:00 PM
**Show Time As:** Busy


**Recurrence:** (none)

WASHSTATEC002946

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/13/2019 7:32:00 PM |
| **To**: | Minarich, Christine M [MinarichCM@state.gov] |
| **Subject**: | FW: AM Package |
| **Attachments**: | Tab 1 - Cat I-III Final FRN.docx; Tab 2 - Rule Statement on Cat I-III Final FRN.pdf; Tab 3 - 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf; USML Cat I-III Final FRN - AM to T.docx |

Here is the draft AM with my track changes edits.  Please feel free to add any edits/comments as appropriate.   Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Foster, John A <FosterJA2@state.gov>
**Sent:** Thursday, September 12, 2019 9:42 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** AM Package



**John A. Foster**
Office of Defense Trade Controls Compliance
U.S. Department of State
Tel: 202-663-2811
Email: FosterJA2@state.gov


SBU - Legal

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) <u>Removal of Firearms Exports from Congressional Information and Review</u>
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

WASHSTATEC002948

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2)  Proliferation of 3D Gun Printing Technical Information
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control.  Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEC002950

Message

---

**From**: Minarich, Christine M [MinarichCM@state.gov]
**Sent**: 9/13/2019 7:47:50 PM
**To**: Khawam, Joseph N [KhawamJN@state.gov]
**Subject**: RE: AM Package
**Attachments**: USML Cat I-III Final FRN - AM to T CM cmts.docx

Thanks.  Here are a few minor additional thoughts.

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 3:32 PM
**To:** Minarich, Christine M <MinarichCM@state.gov>
**Subject:** FW: AM Package

Here is the draft AM with my track changes edits.  Please feel free to add any edits/comments as appropriate.   Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Foster, John A <FosterJA2@state.gov>
**Sent:** Thursday, September 12, 2019 9:42 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** AM Package

**John A. Foster**
Office of Defense Trade Controls Compliance
U.S. Department of State
Tel: 202-663-2811
Email: FosterJA2@state.gov

SBU - Legal

Message

**From:**        Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:**         9/13/2019 8:33:00 PM
**To:**            Paul, Joshua M [PaulJM@state.gov]
**Subject:**     RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

███████████████████████

SBU

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 4:21 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** FW: [Non-DoD Source] RE: USML Categories 1-3 Briefing
**Importance:** High

FYSA ███████████████████████████████████████████████
██████████

████████████████████████████████████████████████████████████████

SBU

**From:** Paul, Joshua M
**Sent:** Friday, September 13, 2019 4:16 PM
**To:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil>; 'LKluttz@doc.gov' <LKluttz@doc.gov>
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil>; Smagula, Nicholas <SmagulaN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil>; 'Anne Teague' <Anne.Teague@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing
**Importance:** High

Hi – ███████████████████████████████████████████████████
██████████████████████████████████████████

SBU

**From:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil>
**Sent:** Friday, September 13, 2019 3:20 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; 'LKluttz@doc.gov' <LKluttz@doc.gov>
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil>; Smagula, Nicholas <SmagulaN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil>; 'Anne Teague' <Anne.Teague@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Josh,

FYSA – ████████████████████████████████████████████████████████

WASHSTATEC002952

Appreciate hearing back on question below when you have a chance.

Thanks so much,

Katherine

---

**From:** Lebegue, Katherine E CIV DTSA MD (USA)
**Sent:** Friday, September 13, 2019 12:17 PM
**To:** 'Paul, Joshua M' <PaulJM@state.gov>; 'LKluttz@doc.gov' <LKluttz@doc.gov>
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil>; Smagula, Nicholas <SmagulaN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil>; 'Anne Teague' <Anne.Teague@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Good Afternoon,

████████████████████████████████████

Would State and Commerce be interested in having our LA to ask if the Committee is willing to accept the briefing by email instead of in-person?

Thanks,

Katherine

Katherine Lebegue
Defense Technology Security Administration (DTSA)
Management Directorate, Strategy, Integration, and Engagements Team
Chief, Integration & Compliance
Suite 07F09
4800 Mark Center Dr
Alexandria VA 22350-1600
Phone:  571 372 2442
katherine.e.lebegue.civ@mail.mil


The committee directs the Secretary of Defense, the Secretary of Commerce,
and Secretary of State to provide a briefing to the Committee
on Armed Services of the House of Representatives and the
Committee on Foreign Affairs of the House of Representatives by
September 30, 2017, detailing how current export controls on firearms
and ammunition, to include the processing of licenses for direct
commercial sales, may impact U.S. businesses, U.S. national
security and foreign policy interests, and provide for effective monitoring
of the end-uses of USML-controlled firearms.

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Tuesday, August 27, 2019 3:17 PM
**To:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil>; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil>
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil>; 'LKluttz@doc.gov' <LKluttz@doc.gov>; Smagula, Nicholas <SmagulaN@state.gov>; Darrach, Tamara A

<DarrachTA@state.gov>
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

---

Can we do so without prompting them to ask for it?

Unclassified

**From:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil>
**Sent:** Tuesday, August 27, 2019 3:01 PM
**To:** Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil>
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil>; 'LKluttz@doc.gov' <LKluttz@doc.gov>; Smagula, Nicholas <SmagulaN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Angela,
Is there a way to find out if the briefing is still relevant to the committees?
Katherine

**From:** Lebegue, Katherine E CIV DTSA MD (USA)
**Sent:** Tuesday, August 27, 2019 2:27 PM
**To:** Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > >; Paul, Joshua M <PaulJM@state.gov < Caution-mailto:PaulJM@state.gov > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov > >
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Thanks Josh.

It's a matter of getting it off our overdue reporting list.

████████████████████████

Thanks so much,

Katherine

---

**From:** Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > >
**Sent:** Tuesday, August 27, 2019 2:26 PM

**To:** Paul, Joshua M <PaulJM@state.gov < Caution-mailto:PaulJM@state.gov > >; Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov > >
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Hi Josh,

I haven't received any requests from the Hill for this briefing.

Very respectfully,
ANGELA M. TAPIA, Lt Col, USAF
Special Assistant
Office of the Assistant Secretary of Defense, Legislative Affairs
703-614-8692 (office)
███████████ (mobile)
224-8692 (DSN)
angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil >


**From:** Paul, Joshua M <PaulJM@state.gov < Caution-mailto:PaulJM@state.gov > >
**Sent:** Tuesday, August 27, 2019 2:15 PM
**To:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov > >
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

---

████████████████████████████████████ Is anyone on the Hill pressing for the briefing?


SBU

**From:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil > >
**Sent:** Tuesday, August 27, 2019 1:24 PM
**To:** Paul, Joshua M <PaulJM@state.gov < Caution-mailto:PaulJM@state.gov > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov > >

**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov > >
**Subject:** RE: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Hi Paul,
Checking back for an update.
Thanks,
Katherine

**From:** Paul, Joshua M <PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov > > >
**Sent:** Monday, August 19, 2019 8:33 AM
**To:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov > > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-Caution-mailto:LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-mailto:LKluttz@doc.gov > > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-Caution-mailto:SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov %3c Caution-Caution-mailto:SmagulaN@state.gov > > >
**Subject:** [Non-DoD Source] RE: USML Categories 1-3 Briefing

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

---

Hi,

Sorry for the delay in responding as I have been out of office on unplanned leave; let me check status internally and get back to you.

Thanks,

Josh

**Official**
UNCLASSIFIED

**From:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil  > > >
**Sent:** Monday, August 12, 2019 1:25 PM
**To:** Paul, Joshua M <PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov  > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov  > > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  > > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-Caution-mailto:LKluttz@doc.gov < Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-mailto:LKluttz@doc.gov  > > >; Smagula, Nicholas <SmagulaN@state.gov < Caution-Caution-mailto:SmagulaN@state.gov < Caution-mailto:SmagulaN@state.gov %3c Caution-Caution-mailto:SmagulaN@state.gov  > > >
**Subject:** RE: USML Categories 1-3 Briefing

Paul,
Would appreciate an update.  Can you provide several timeslots so we can schedule this meeting.  We are months overdue.
Thanks,
Katherine

**From:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil  < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil  %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil  > > > >
**Sent:** Tuesday, August 6, 2019 12:20 PM
**To:** 'Paul, Joshua M' <PaulJM@state.gov < Caution-Caution-Caution 'mailto:PaulJM@state.gov  < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  %3c Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov  > > > >; 'Darrach, Tamara A' <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  %3c Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov  > > > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  %3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  > > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-

Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  > > > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov  < Caution-Caution-Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  < Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  %3c Caution-Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  > > > >; 'Smagula, Nicholas' <SmagulaN@state.gov < Caution-Caution-Caution-mailto:SmagulaN@state.gov  < Caution-Caution-Caution-mailto:SmagulaN@state.gov %3c Caution-Caution-Caution-mailto:SmagulaN@state.gov  < Caution-mailto:SmagulaN@state.gov %3c Caution-Caution-Caution-mailto:SmagulaN@state.gov  %3c Caution-Caution-mailto:SmagulaN@state.gov %3c Caution-Caution-Caution-mailto:SmagulaN@state.gov  > > > >
**Subject:** RE: USML Categories 1-3 Briefing


Good Afternoon Paul,
Is State ready to schedule the briefing?  If so, please provide several timeslots.  If not, would appreciate status with expected timeframe for the briefing.
Thanks again,
Katherine

---

**From:** Lebegue, Katherine E CIV DTSA MD (USA)
**Sent:** Monday, July 29, 2019 12:14 PM
**To:** 'Paul, Joshua M' <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  %3c Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  > > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  > > > >; 'Darrach, Tamara A' <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  %3c Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  > > > >; 'LKluttz@doc.gov' <LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov  < Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  < Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  %3c Caution-Caution-mailto:LKluttz@doc.gov %3c Caution-Caution-Caution-mailto:LKluttz@doc.gov  > > > >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  < Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  %3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil  > > > >
**Subject:** RE: USML Categories 1-3 Briefing


Good Afternoon,
Wondering if we can start looking at rescheduling a time to brief the Hill - Aug/Sep timeframe?
Thanks,
Katherine

WASHSTATEC002958

**From:** Lebegue, Katherine E CIV DTSA MD (USA)
**Sent:** Tuesday, July 23, 2019 10:16 AM
**To:** 'Paul, Joshua M' <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov _ < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov _%3c Caution-Caution-Caution-mailto:PaulJM@state.gov _ > > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil _ < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil _ < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil _%3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil _ > > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov _ < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov _ < Caution-mailto:DarrachTA@state.gov _%3c Caution-Caution-Caution-mailto:DarrachTA@state.gov _ > > > >;LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov >
**Cc:** DTSA MC-ALEX MD List Strategic Integration Team <dtsa.mc-alex.md.list.strategic-integration-team@mail.mil < Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil _ < Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil _ < Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil %3c Caution-Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil _%3c Caution-Caution-mailto:dtsa.mc-alex.md.list.strategic-integration-team@mail.mil _ > > > >
**Subject:** RE: USML Categories 1-3 Briefing

Good Morning,

Checking in to see if there is any movement to provide a briefing to the HASC on Cats I-III.
Thanks,

Katherine

Katherine Lebegue
Defense Technology Security Administration (DTSA)
Management Directorate, Strategy, Integration, and Engagements Team
Chief, Integration & Compliance
Suite 07F09
4800 Mark Center Dr
Alexandria VA 22350-1600
Phone:  571 372 2442
katherine.e.lebegue.civ@mail.mil < Caution-mailto:katherine.e.lebegue.civ@mail.mil > < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil > < Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil >


**From:** Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov _ < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov _%3c Caution-Caution-Caution-mailto:PaulJM@state.gov _ > > > >
**Sent:** Monday, June 3, 2019 8:14 AM
**To:** Blake, Victoria C CIV DTSA MD (USA) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil _ < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil _ < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-

WASHSTATEC002959

Caution-mailto:victoria.c.blake.civ@mail.mil_%3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil_ > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov_ < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov_ < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov_ > > >;LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov >

**Cc:** Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ %3c Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ > > >

**Subject:** [Non-DoD Source] RE: USML Categories 1-3 Briefing


Still standing by ██████████████████████████████████████Thanks.

-----Original Message-----
From: Blake, Victoria C CIV DTSA MD (USA) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil_ < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil_ < Caution-mailto:victoria.c.blake.civ@mail.mil_ %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil_ > > >
Sent: Friday, May 31, 2019 11:36 AM
To: Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov_ < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov_ < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov_ > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_ > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov_ < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov_ < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov_ > > >;LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov >
Cc: Lebegue, Katherine E CIV DTSA MD (USA) <katherine.e.lebegue.civ@mail.mil < Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ < Caution-mailto:katherine.e.lebegue.civ@mail.mil %3c Caution-Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ < Caution-Caution-mailto:katherine.e.lebegue.civ@mail.mil_ > > >
Subject: RE: USML Categories 1-3 Briefing

Good Morning All,

This is still hanging over DoD to provide a briefing to the HASC on Cat I-III.  Commerce had to postpone our last scheduled briefing so I wanted to check ████████████████████████████ so that we can look to reschedule in the next upcoming weeks.

Also I have cc'd my colleague that is taking over this portfolio.

Regards,

Vicky

-----Original Message-----
From: Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov > > > >
Sent: Tuesday, March 12, 2019 1:52 PM
To: Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov > > > >; Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil > > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov > > > >
Cc: Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil < Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil > > > >;LKluttz@doc.gov < Caution-Caution-Caution-mailto:LKluttz@doc.gov >
Subject: [Non-DoD Source] RE: USML Categories 1-3 Briefing

█████████████████████████████████████████████████████

Also, tomorrow will be my last day at the Department of Commerce. I've cc'd my colleague Lawson here, he will be the leg POC for this issue moving forward. Thanks much.

-----Original Message-----
From: Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov > > > >
Sent: Tuesday, March 12, 2019 1:14 PM
To: Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil > > > >; Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > > > >; Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov > > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-

mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov_  > > > >
Cc: Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil   < Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil_  > > > >
Subject: RE: USML Categories 1-3 Briefing

Hi,

███████████████████████████████████████████████████████████

Josh

-----Original Message-----
From: Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil   < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil_  > > > >
Sent: Tuesday, March 12, 2019 12:41 PM
To: Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil   < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil_  > > > >; Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov   < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  %3c Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov_  > > >; Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov   < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  %3c Caution-Caution-mailto:PaulJM@state.gov_  > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov   < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov_  > > >
Cc: Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil   < Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil_  > > > >
Subject: RE: USML Categories 1-3 Briefing

All,

Can we start looking at dates to reschedule this brief to the Hill?

Vicky

-----Original Message-----
From: Tapia, Angela M Lt Col USAF OSD OASD LA (USA)
Sent: Monday, March 4, 2019 5:13 PM
To: Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov   < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov_  > > >; Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil   < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-

WASHSTATEC002962

Caution-mailto:victoria.c.blake.civ@mail.mil  %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  > > > >; Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  > > > >; Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  > > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov  > > > >
Cc: Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil < Caution-Caution-mailto:michael.r.laychak.civ@mail.mil < Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil  < Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil  > > > >
Subject: RE: USML Categories 1-3 Briefing

Kim,

Thank you for the update. I will let the Hill know we need to postpone this briefing.

Very respectfully,
ANGELA M. TAPIA, Lt Col, USAF
Special Assistant
Office of the Assistant Secretary of Defense, Legislative Affairs
703-614-8692 (office)
███████(mobile)
224-8692 (DSN)
angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil >


-----Original Message-----
From: Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov  > > > >
Sent: Monday, March 4, 2019 4:57 PM
To: Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil  > > > >; Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil  > > > >; Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  < Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil  > > > >; Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov  < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov  %3c Caution-Caution-mailto:PaulJM@state.gov  > > > >; Darrach, Tamara A

<DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov > > > >

Cc: Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil < Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil < Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil < Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-mailto:michael.r.laychak.civ@mail.mil > > > >

Subject: [Non-DoD Source] RE: USML Categories 1-3 Briefing

Colleagues- I very much apologize for the last minute change, but Commerce is requesting we postpone this briefing. We hope to be able to support in the near future, but this week is likely not feasible. Again, I'm very sorry.

Lt. Col. Tapia, happy to work with you on times to reschedule in the next few weeks.

-----Original Message-----
From: Tapia, Angela M Lt Col USAF OSD OASD LA (USA) <angela.m.tapia2.mil@mail.mil < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil %3c Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > > > >

Sent: Monday, March 04, 2019 9:41 AM
To: Blake, Victoria C CIV DTSA PD (US) <victoria.c.blake.civ@mail.mil < Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil < Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-mailto:victoria.c.blake.civ@mail.mil %3c Caution-Caution-Caution-mailto:victoria.c.blake.civ@mail.mil > > > >; Nesterczuk, Oksana D CIV DTSA PD (US) <oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil < Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil < Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil %3c Caution-Caution-mailto:oksana.d.nesterczuk.civ@mail.mil > > > >; Paul, Joshua M <PaulJM@state.gov < Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-Caution-mailto:PaulJM@state.gov %3c Caution-Caution-Caution-mailto:PaulJM@state.gov < Caution-mailto:PaulJM@state.gov %3c Caution-Caution-mailto:PaulJM@state.gov > > > >; Darrach, Tamara A <DarrachTA@state.gov < Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-Caution-mailto:DarrachTA@state.gov < Caution-mailto:DarrachTA@state.gov %3c Caution-Caution-mailto:DarrachTA@state.gov > > > >; Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov < Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov < Caution-mailto:Kimberly.Ekmark@bis.doc.gov %3c Caution-Caution-mailto:Kimberly.Ekmark@bis.doc.gov > > > >

Cc: Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil < Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil < Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil < Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-mailto:michael.r.laychak.civ@mail.mil %3c Caution-Caution-Caution-mailto:michael.r.laychak.civ@mail.mil > > > >

Subject: RE: USML Categories 1-3 Briefing

Good morning,

Circling back to make sure we are good to go for tomorrow's briefing. I've updated the invite below to reflects briefers. I also extended the invite to SASC PSMs but they have not confirmed attendance. Did HFAC PSMs confirm attendance?

Very respectfully,
ANGELA M. TAPIA, Lt Col, USAF
Special Assistant
Office of the Assistant Secretary of Defense, Legislative Affairs
703-614-8692 (office)
███████ (mobile)

224-8692 (DSN)
angela.m.tapia2.mil@mail.mil < Caution-mailto:angela.m.tapia2.mil@mail.mil > < Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil > < Caution-Caution-Caution-mailto:angela.m.tapia2.mil@mail.mil >

-----Original Appointment-----
From: Tapia, Angela M Lt Col USAF OSD OASD LA (USA)
Sent: Thursday, February 28, 2019 11:43 AM
To: Tapia, Angela M Lt Col USAF OSD OASD LA (USA); Blake, Victoria C CIV DTSA PD (US); Nesterczuk, Oksana D CIV DTSA PD (US)
Cc: Laychak, Michael R SES DTSA EO (US); Darrach, Tamara A; McKeeby, David I; PM-CPA;MPlatt@doc.gov < Caution-Caution-Caution-mailto:MPlatt@doc.gov > ; Paul, Joshua M; 'Kimberly Ekmark'; Stringfield, Cynthia D CIV DTSA EO (USA); Oukrop, Kenneth Jeffrey (Ken) CIV DTSA LD (US); Daoussi, Susan G CIV DTSA LD (US); Minnifield, Tracy J CIV DTSA LD (US); 'Strike, Andrew P'
Subject: USML Categories 1-3 Briefing
When: Tuesday, March 5, 2019 3:00 PM-4:00 PM (UTC-05:00) Eastern Time (US & Canada).
Where: RHOB 2212

WHO:   HASC PSMs:  Mark Morehouse, Halimah Locke, Eric Snelgrove, Joshua Stiefel, Stephanie Halcrow
       HFAC PSMs:
       SASC PSMs Invited to Attend: Ozge Guzelsu and Dustin Walker
       Executive Branch Reps:  Mike Laychak (DTSA), Rob Monjay (State), Steve Clagett (Commerce)
       OSD/LA: Lt Col Angela Tapia
WHAT:  FY2018 NDAA
WHERE:  RHOB 2212
WHEN:  5 Mar, 3-4 p.m.
CLEARANCE LEVEL: Unclassified
TRANSPORTATION:  Mr. Laychak will be driving. Lt Col Tapia will take the shuttle and wait outside Rayburn Horseshoe (South Capitol) and can be reached at ████████

**Official**

UNCLASSIFIED

Message

**From:** Richard Ashooh [Richard.Ashooh@bis.doc.gov]
**Sent:** 9/16/2019 1:33:27 PM
**To:** Cooper, R. Clarke [CooperRC@state.gov]
**CC:** Kaldahl, Ryan M [KaldahlRM@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Miller, Michael F [Millermf@state.gov]; Heidema, SarahJ [HeidemaSJ@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Jessica Curyto [Jessica.Curyto@bis.doc.gov]; Petrina Chase [Petrina.Chase@bis.doc.gov]; Darrach, Tamara A [DarrachTA@state.gov]; Windecker, Melissa A [WindeckerMA@state.gov]
**Subject:** RE: MONDAY- Senate and USML Categories I,II, III Follow-up



Again, lets chat by phone, but wanted to make sure you had this update.

Do you have a scheduler we can work with?

Rich

---

**From:** Richard Ashooh
**Sent:** Friday, September 13, 2019 2:14 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Re: MONDAY- Senate and USML Categories I,II, III Follow-up

Ok let's do the 1600 slot. Thanks Clarke

***********************************************
This Message was sent from my Mobile Device.
***********************************************

On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16 September.**

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

█████████████████████

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up



**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

Sincerely,
Clarke

**R. Clarke Cooper**

*Assistant Secretary of State*

*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

Message

| | |
|---|---|
| **From:** | Paul, Joshua M [PaulJM@state.gov] |
| **Sent:** | 9/16/2019 2:18:38 PM |
| **To:** | Heidema, Sarah J [HeidemaSJ@state.gov]; Miller, Michael F [Millermf@state.gov]; Koelling, Richard W [KoellingRW@state.gov] |
| **Subject:** | FW: MONDAY- Senate and USML Categories I,II, III Follow-up |

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SBU

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Monday, September 16, 2019 9:33 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: MONDAY- Senate and USML Categories I,II, III Follow-up



Again, lets chat by phone, but wanted to make sure you had this update.

Do you have a scheduler we can work with?

Rich

**From:** Richard Ashooh
**Sent:** Friday, September 13, 2019 2:14 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Re: MONDAY- Senate and USML Categories I,II, III Follow-up

Ok let's do the 1600 slot. Thanks Clarke

************************************************
This Message was sent from my Mobile Device.
************************************************

On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines. **0730 or 1600 work on 16 September.**

████████████████████████████████████████████████████████

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

████████████████████████

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process
**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████████████████████

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

████████████████████████████████████████████████████████



Sincerely,
Clarke

**R. Clarke Cooper**

*Assistant Secretary of State*

*Political Military Affairs Bureau*



CooperRC@state.gov


ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002971

Message

**From**: Shin, Jae E [ShinJE@state.gov]
**Sent**: 9/16/2019 2:43:40 PM
**To**: Miller, Michael F [Millermf@state.gov]
**CC**: Hamilton, Catherine E [HamiltonCE@state.gov]; Koelling, Richard W [KoellingRW@state.gov]
**Subject**: (SBU) 09/16/19 DAS Huddle Readout

(SBU) On Cat. I, II, and III,



Jae Shin
Director
Office of Defense Trade Controls Compliance
U.S. Department of State
202-632-2107


SBU

Message

| | |
|---|---|
| **From**: | DiNapoli, Emma K [DiNapoliEK@state.gov] |
| **Sent**: | 9/16/2019 6:38:15 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | RE: Here is the document I mentioned this morning |
| **Attachments**: | ITAR - Side by Side Comparison.docx; ITAR Rule Change - Arguments Against.docx; ITAR Rule Change - Arguments For.docx |

Hi Joe,

███████████████████████████████████████████████

Best,
Emma

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 11:49 AM
**To:** DiNapoli, Emma K <DiNapoliEK@state.gov>
**Subject:** Here is the document I mentioned this morning

SBU - Legal

WASHSTATEC002973

Message

| | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 9/16/2019 7:18:04 PM |
| **To:** | PM-DTCP-Tasking-DL [PM-DTCP-Tasking-DL@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **Subject:** | CPA Media Monitoring: The Hill: 3D-printable guns will require us to rethink our approach on gun safety |



**3D-printable guns will require us to rethink our approach on gun safety**
**By Rep. Madeleine Dean & former Rep. Steve Israel**
**16 September 2019**

Lost in the debate over gun safety is a technology that will force us to consider new ways to keep people safe: 3D-printable guns.

Until now, the gun safety debate has focused on balancing the legitimate rights of sportsmen and other law-abiding gun owners with keeping firearms out of unsafe hands – criminals, terrorists, and other prohibited purchasers. We've made progress. In February, a new majority in Congress passed long-overdue legislation to require universal background checks and close the Charleston loophole, which would lengthen the background check review period.

Background checks are supported by over 90 percent of the American people, and we urge the Senate to bring these bills up for consideration soon.

But there's a stealth issue, hardly discussed. It's 3D printers that now allow anyone with an internet connection to download a computer-aided design (CAD) file and print a working firearm at home. These guns are untraceable and – depending on the materials used to build them – undetectable by security systems in airports and elsewhere.

While 3D printing technologies are new, undetectable firearms are not. In the 1980's, lawmakers found themselves confronting the Glock 17 and other pistols made from lightweight polymers. Legislators knew that if security screening devices in airports and elsewhere could not detect a weapon, then the country was far more vulnerable to terrorism and other security risks. In 1988, Congress passed the Undetectable Firearms Act, effectively making it illegal to produce, possess, or transfer a gun with less than 3.7 ounces of metal.

Today, however, gunmakers with a 3D printer can produce firearms that nominally meet this standard while evading its purpose. Their trick? Pack most or all of the metal into a detachable block, one that isn't necessary to fire the gun and can be removed at any time.

These concerns aren't theoretical.

In 2013, Defense Distributed produced the "Liberator" – a working 3D-printable handgun. The company posted the gun's digital design files online, and they were downloaded more than 100,000 times – in two days. Then, the State Department stepped in, forcing Defense Distributed to take the files down because they violated export laws. Defense Distributed founder Cody Wilson sued the federal government, and State reversed course – settling the lawsuit and permitting digital gun files to appear online once again. In response, a coalition of 19 state attorneys general and Washington, D.C. filed a separate suit, successfully winning a restraining order to keep the files offline.

WASHSTATEC002974

Today, 3D-printable guns are in legal limbo. While Defense Distributed is currently barred from posting files online, digital firearm blueprints have found their way into circulation through other channels. For several weeks last fall, a book featuring the Liberator blueprints was available for purchase on Amazon. And digital firearm files have also appeared on CAD repositories and torrent sites.

In 2013, Rep. Israel co-led a successful effort (along with a conservative Republican and a progressive Democrat) to renew the original Undetectable Firearms Act and laid a foundation for legislation to address today's challenges.

It's time to carry those efforts forward. In January, Rep. Dean introduced the Undetectable Firearms Modernization Act, which prohibits the possession of any firearm that is undetectable by airport-level detection devices. H.R. 869 requires any firearm with all of its major components attached to generate a gun-shaped image in the detection systems, and it expands the scope of airport security detection.

This legislation honors our Second Amendment rights while protecting travelers and communities from new threats posed by undetectable weapons. In other words, it strikes the right balance – and it deserves a vote in Congress.

Link: https://thehill.com/blogs/congress-blog/lawmaker-news/461166-3d-printable-guns-will-require-us-to-rethink-our-approach

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       MarquisMR@state.gov |   Web:  PM Homepage |Twitter: @StateDeptPM

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

Unclassified

Message

| | |
|---|---|
| **From:** | Petrina Chase [Petrina.Chase@bis.doc.gov] |
| **Sent:** | 9/16/2019 8:21:45 PM |
| **To:** | Cooper, R. Clarke [CooperRC@state.gov] |
| **Subject:** | RE: Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up |

Good afternoon Mr. Clarke,

Is it possible to do the call at 2:45 – 3:15 tomorrow?  Mr. Ashooh's calendar is pretty tight tomorrow.

Petrina Chase
U.S. Department of Commerce
Administrative Support Specialist
Bureau of Industry and Security
Office of the Assistant Secretary for Export Administration
Washington, DC 20230
(202) 482-5491 (Direct)
(202) 482-3911 (Fax)

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Monday, September 16, 2019 4:16 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** Celin, Liliana E <CelinLE@state.gov>; Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up

Rich,

████████████████████████████████████████

Looping in Liliana Celin, who can secure us a quick call time for us within 1200- 1430 tomorrow.

Regards,
Clarke

SBU - Legal

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Monday, September 16, 2019 9:33 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: MONDAY- Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████



**From:** Richard Ashooh
**Sent:** Friday, September 13, 2019 2:14 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Re: MONDAY- Senate and USML Categories I,II, III Follow-up

On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16 September.**

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up



**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke

**R. Clarke Cooper**

*Assistant Secretary of State*

*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

Message

| | |
|---|---|
| **From:** | Paul, Joshua M [PaulJM@state.gov] |
| **Sent:** | 9/16/2019 8:33:06 PM |
| **To:** | Miller, Michael F [Millermf@state.gov]; Koelling, Richard W [KoellingRW@state.gov] |
| **Subject:** | FW: Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up |

███████████████████████████████

https://www.cbsnews.com/news/gun-control-legislation-trump-expected-to-announce-proposal-next-week-but-substance-is-a-mystery-2019-09-14/

SBU

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Monday, September 16, 2019 4:29 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Celin, Liliana E <CelinLE@state.gov>; Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up

████████████████████████████████████████████████████

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Monday, September 16, 2019 4:16 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** Celin, Liliana E <CelinLE@state.gov>; Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up

Rich,

██████████████████████████████████████████████

Looping in Liliana Celin, who can secure us a quick call time for us within 1200- 1430 tomorrow.

Regards,
Clarke

SBU - Legal

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Monday, September 16, 2019 9:33 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: MONDAY- Senate and USML Categories I,II, III Follow-up



Rich

**From:** Richard Ashooh
**Sent:** Friday, September 13, 2019 2:14 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Re: MONDAY- Senate and USML Categories I,II, III Follow-up



On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16 September.**

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process



**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,

Sincerely,
Clarke

**R. Clarke Cooper**

*Assistant Secretary of State*

*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002983

Message

| | |
|---|---|
| **From:** | Celin, Liliana E [CelinLE@state.gov] |
| **Sent:** | 9/16/2019 8:52:54 PM |
| **To:** | Richard Ashooh [Richard.Ashooh@bis.doc.gov] |
| **CC:** | Kaldahl, Ryan M [KaldahlRM@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Miller, Michael F [Millermf@state.gov]; Heidema, SarahJ [HeidemaSJ@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Jessica Curyto [Jessica.Curyto@bis.doc.gov]; Petrina Chase [Petrina.Chase@bis.doc.gov]; Darrach, Tamara A [DarrachTA@state.gov]; Windecker, Melissa A [WindeckerMA@state.gov] |
| **Subject:** | Phone call on Tuesday, 9/17 --- Senate and USML Categories I,II, III Follow-up |

Sir, Please let me know if we could schedule this call at 12:30 or 1:00 pm.  Thank you

Sincerely,



Executive Assistant to Assistant Secretary
R. Clarke Cooper
Bureau of Political- Military Affairs
HST - Rm 6212
2201 C St NW, Washington, DC 20520
Tel Direct 202.647.9022
celinle@state.gov

---

SBU - Legal

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Monday, September 16, 2019 4:16 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** Celin, Liliana E <CelinLE@state.gov>; Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Follow-up: MONDAY- Senate and USML Categories I,II, III Follow-up

Rich,

████████████████████████████████████████

Looping in Liliana Celin, who can secure us a quick call time for us within 1200- 1430 tomorrow.

Regards,
Clarke

---

SBU - Legal

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Monday, September 16, 2019 9:33 AM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A

<DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>;
**Subject:** RE: MONDAY- Senate and USML Categories I,II, III Follow-up



**From:** Richard Ashooh
**Sent:** Friday, September 13, 2019 2:14 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Kaldahl, Ryan M <KaldahlRM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F
<Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica
Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>; Darrach, Tamara A
<DarrachTA@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** Re: MONDAY- Senate and USML Categories I,II, III Follow-up



On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16
September.**

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

SBU - Deliberative Process

**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

Clarke – I hope you're well. You are probably aware there is now movement on this issue and it might make sense for us to chat. Let me know if you'd like to schedule a call before Tuesday.

Best,

Rich

---

**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke

**R. Clarke Cooper**

*Assistant Secretary of State*

*Political Military Affairs Bureau*

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.

WASHSTATEC002987

Message

**From**:      Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Sent**:      9/16/2019 8:54:36 PM
**To**:        Koelling, Richard W [KoellingRW@state.gov]
**CC**:        Nancy Kook [Nancy.Kook@bis.doc.gov]; Sharron Cook [Sharron.Cook@bis.doc.gov]; Hillary Hess
               [Hillary.Hess@bis.doc.gov]
**Subject**:   Cat I-III (firearms) rule



Message

---

**From:**   Koelling, Richard W [KoellingRW@state.gov]
**Sent:**   9/16/2019 9:04:22 PM
**To:**   Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**CC:**   Nancy Kook [Nancy.Kook@bis.doc.gov]; Sharron Cook [Sharron.Cook@bis.doc.gov]; Hillary Hess [Hillary.Hess@bis.doc.gov]
**Subject:**   Re: Cat I-III (firearms) rule

Tim, thank you for the update. As you can imagine, we are tracking this closely.

Kind Regards, Rick

Get Outlook for iOS

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Monday, September 16, 2019 4:54:36 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Nancy Kook <Nancy.Kook@bis.doc.gov>; Sharron Cook <Sharron.Cook@bis.doc.gov>; Hillary Hess <Hillary.Hess@bis.doc.gov>
**Subject:** Cat I-III (firearms) rule



Thanks,
Tim

Appointment

| | |
|---|---|
| **From:** | Celin, Liliana E [CelinLE@state.gov] |
| **Sent:** | 9/16/2019 9:25:38 PM |
| **To:** | Windecker, Melissa A [WindeckerMA@state.gov] |

| | |
|---|---|
| **Subject:** | Rich Ashooh , Department of Commerce (CATS I,II,III) |
| **Location:** | They will call us at 202-647-9022 |

| | |
|---|---|
| **Start:** | 9/17/2019 6:45:00 PM |
| **End:** | 9/17/2019 7:15:00 PM |
| **Show Time As:** | Tentative |

| | |
|---|---|
| **Recurrence:** | (none) |


Ok let's do the 1600 slot. Thanks Clarke

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This Message was sent from my Mobile Device.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On: 13 September 2019 14:06, "Cooper, R. Clarke" <CooperRC@state.gov> wrote:

Rich,

Let's definitely touch base Monday on the way ahead and anticipated timelines.  **0730 or 1600 work on 16 September.**

[redacted]

Regards,
Clarke

**R. Clarke Cooper**
Assistant Secretary of State
Political Military Affairs Bureau

202.647.9022, front office

[redacted]

CooperRC@state.gov

ENGAGE. ENHANCE. ENABLE.


SBU - Deliberative Process
**From:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Sent:** Thursday, September 12, 2019 6:22 PM
**To:** Cooper, R. Clarke <CooperRC@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Jessica Curyto <Jessica.Curyto@bis.doc.gov>; Petrina Chase <Petrina.Chase@bis.doc.gov>
**Subject:** RE: Senate and USML Categories I,II, III Follow-up

WASHSTATEC002990



**From:** Cooper, R. Clarke <CooperRC@state.gov>
**Sent:** Friday, August 23, 2019 7:04 PM
**To:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Cc:** James.Sullivan@trade.gov; Wilson, Patrick (Federal) <pwilson@doc.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** Senate and USML Categories I,II, III Follow-up

Dear Richard,



Sincerely,
Clarke


**R. Clarke Cooper**

WASHSTATEC002991

Appointment

| | |
|---|---|
| **From:** | Celin, Liliana E [CelinLE@state.gov] |
| **Sent**: | 9/16/2019 9:25:46 PM |
| **To**: | Cooper, R. Clarke [CooperRC@state.gov] |

| | |
|---|---|
| **Subject**: | Accepted: Rich Ashooh , Department of Commerce (CATS I,II,III) |
| **Location**: | They will call us at 202-647-9022 |

| | |
|---|---|
| **Start**: | 9/17/2019 6:45:00 PM |
| **End**: | 9/17/2019 7:15:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Recurrence**: | (none) |

WASHSTATEC002992

Appointment

**From**: Koelling, Richard W [KoellingRW@state.gov]
**Sent**: 9/17/2019 11:28:23 AM
**To**: Ross, Paula E [RossPE@state.gov]

**Subject**: CATS I-III Sync
**Location**: EEOB 374

**Start**: 9/18/2019 8:00:00 PM
**End**: 9/18/2019 9:30:00 PM
**Show Time As**: Tentative

**Recurrence**: (none)

Sir, forwarding invite again. Appears as though my first attempt failed.

V/r, Rick

Get Outlook for iOS

WASHSTATEC002993

Appointment

| | |
|---|---|
| **From**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent**: | 9/17/2019 11:28:23 AM |
| **To**: | Cooper, R. Clarke [CooperRC@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Minarich, Christine M [MinarichCM@state.gov] |
| **CC**: | Windecker, Melissa A [WindeckerMA@state.gov]; Kovar, Jeffrey D [KovarJD@state.gov] |
| **Subject**: | CATS I-III Sync |
| **Location**: | EEOB 374 |
| **Start**: | 9/18/2019 8:00:00 PM |
| **End**: | 9/18/2019 9:30:00 PM |
| **Show Time As**: | Tentative |
| **Recurrence**: | (none) |

Sir, forwarding invite again. Appears as though my first attempt failed.


V/r, Rick


Get Outlook for iOS

WASHSTATEC002994

Appointment

| | |
|---|---|
| **From**: | Minarich, Christine M [MinarichCM@state.gov] |
| **Sent**: | 9/17/2019 1:14:14 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | FW: CATS I-III Sync |
| **Location**: | EEOB 374 |
| **Start**: | 9/18/2019 8:00:00 PM |
| **End**: | 9/18/2019 9:30:00 PM |
| **Show Time As**: | Tentative |
| **Recurrence**: | (none) |

-----Original Appointment-----
**From:** Biery, Meghan N. EOP/NSC <Meghan.N.Biery@nsc.eop.gov>
**Sent:** Tuesday, September 17, 2019 7:28 AM
**To:** Biery, Meghan N. EOP/NSC; Cooper, R. Clarke; Paul, Joshua M; Heidema, Sarah J; Minarich, Christine M; Ruggiero, Anthony J. EOP/NSC; Tully, Ryan M. EOP/NSC; Shellooe, Ryan P. EOP/NSC; Menashi, Steven J. EOP/WHO; Bulgrin, Julie K. EOP/NSC; Richard Ashooh; Miller, Michael F; Koelling, Richard W; Williams, Michael B. EOP/WHO; Ehrsam, Lauren E. EOP/NSC; Ellis, Michael J. EOP/WHO; Lichter, Jennie B. EOP/WHO; Comstock, Earl (Federal)
**Cc:** Windecker, Melissa A; Kovar, Jeffrey D
**Subject:** CATS I-III Sync
**When:** Wednesday, September 18, 2019 4:00 PM-5:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** EEOB 374

Sir, forwarding invite again. Appears as though my first attempt failed.


V/r, Rick


Get Outlook for iOS

Appointment

**From**:          Heidema, Sarah J [HeidemaSJ@state.gov]
**Sent**:          9/17/2019 3:00:17 PM
**To**:            Biery, Meghan N. EOP/NSC [Meghan.N.Biery@nsc.eop.gov]

**Subject**:       Accepted: CATS I-III Sync
**Location**:      EEOB 374

**Start**:         9/18/2019 8:00:00 PM
**End**:           9/18/2019 9:30:00 PM
**Show Time As**: Busy


**Recurrence**:    (none)

Appointment

**From**: Koelling, Richard W [KoellingRW@state.gov]
**Sent**: 9/17/2019 7:00:29 PM
**To**: Diggs, Yolanda M [DiggsYM@state.gov]

**Subject**: Accepted: Pre-brief on CATS I-III Sync
**Location**: DAS' office

**Start**: 9/18/2019 7:00:00 PM
**End**: 9/18/2019 7:30:00 PM
**Show Time As**: Busy

**Recurrence**: (none)

---

Message

---

**From:** Koelling, Richard W [KoellingRW@state.gov]
**Sent:** 9/17/2019 7:24:32 PM
**To:** Paul, Joshua M [PaulJM@state.gov]; Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]
**CC:** Kovar, Jeffrey D [KovarJD@state.gov]; Khawam, Joseph N [KhawamJN@state.gov]
**Subject:** RE: Brief Readout - Ashooh

Adding Joe.

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Tuesday, September 17, 2019 3:21 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** Brief Readout - Ashooh

INTERNAL-PREDECISIONAL; ATTORNEY-CLIENT PRIVILEGE.



**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.7878 | ▭ BlackBerry: ▮▮▮▮▮ | 🖨 Fax: 202.647.4055
✉ e-mail:     *PaulJM@State.Gov* | ☞ Web: *www.state.gov/t/pm/*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



SBU - Legal

Appointment

| | |
|---|---|
| **From**: | Kovar, Jeffrey D [KovarJD@state.gov] |
| **Sent**: | 9/18/2019 12:31:40 AM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | Fw: CATS I-III Sync |
| **Location**: | EEOB 374 |
| **Start**: | 9/18/2019 8:00:00 PM |
| **End**: | 9/18/2019 9:30:00 PM |
| **Show Time As**: | Tentative |
| **Recurrence**: | (none) |

Sent from my BlackBerry 10 smartphone.

**From:** Biery, Meghan N. EOP/NSC <Meghan.N.Biery@nsc.eop.gov>
**Sent:** Tuesday, September 17, 2019 4:28 AM
**To:** Cooper, R. Clarke; Paul, Joshua M; Heidema, Sarah J; Minarich, Christine M
**Cc:** Windecker, Melissa A; Kovar, Jeffrey D
**Subject:** CATS I-III Sync

Sir, forwarding invite again. Appears as though my first attempt failed.

V/r, Rick

Get Outlook for iOS

Message

| | |
|---|---|
| **From:** | Marquis, Matthew R [MarquisMR@state.gov] |
| **Sent:** | 9/18/2019 12:27:03 PM |
| **To:** | PM-DTCP-Tasking-DL [PM-DTCP-Tasking-DL@state.gov]; Legal-PM-DL [Legal-PM-DL@state.gov] |
| **CC:** | PM-CPA [PM-CPA@state.gov]; Miller, Michael F [Millermf@state.gov] |
| **Subject:** | CPA Media Monitoring: Fox 7 Austin: 'Ole Miss' researching tracing the 'untraceable' 3D-printed plastic guns |



**'Ole Miss' researching tracing the 'untraceable' 3D-printed plastic guns**
**By Casey Claiborne**
**17 September 2019**

Cody Wilson: a self-proclaimed "open source activist."

The former UT law student has been in the national spotlight since he put blueprints for a 3D-printed plastic gun called "The Liberator" online back in 2013.

It was all plastic except for the metal firing pin. The legal battles between Wilson, his company "Defense Distributed" and the federal government went on for years.

In a 2018 press conference Wilson announced a recent order only stopped him from giving the files away so instead he would sell them, e-mail them or use a secure transfer. "I will be doing all of those things now.  My congratulations to the Attorneys General for saving America," Wilson said.

Last week Wilson was sentenced to seven years of deferred adjudication probation for having sex with an under aged girl.  Different story.

As for plastic guns, the undetectable nature of them can be a challenge. The TSA happened to catch one they called a "replica" in a carry-on bag in Nevada back in 2016.  Armed with live ammo.

Plastic guns are also untraceable with no serial numbers.

According to the University of Mississippi, 'Ole Miss' chemistry professor James Cizdziel and graduate student Oscar Black are researching methods for analyzing the type of polymer used in the guns from flecks or smears of plastic on bullets or gunshot residue on clothing.

The researchers say the work is useful for investigating crimes involving 3D-printed guns -- including a "growing reference library" of polymers for law enforcement to check.

Austin second amendment advocate Michael Cargill says that research is important if you don't know who committed the crime. He's not a fan of plastic guns though.

In his experience guns like Wilson's "Liberator" are unstable. "I don't know anyone that is a fan of those.  People want reliable firearms.  They want something that when they pull the trigger it's going to go 'bang,' they don't want something that could blow up in their hands or their face," Cargill said.

WASHSTATEC003000

But he points out, 3D-printing of guns and in general...is not going anywhere. "We've seen it in episodes of Star Trek: you go to the machine, you ask for 'Tea, Earl Grey, hot' it spits it out.  It is the way of the future, it's going to happen, so we might as well brace ourselves because it's coming."

Ole Miss says the graduate student involved graduated in May but the research is ongoing -- including the expansion of that polymer reference library.

Link: http://www.fox7austin.com/news/-ole-miss-researching-tracing-the-untraceable-3d-printed-plastic-guns

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *PM Homepage* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
UNCLASSIFIED

Unclassified

WASHSTATEC003001

---

**Message**

---

**From:**      Koelling, Richard W [KoellingRW@state.gov]
**Sent:**      9/18/2019 1:50:43 PM
**To:**        Miller, Michael F [Millermf@state.gov]
**CC:**        Heidema, Sarah J [HeidemaSJ@state.gov]
**Subject:**   FW: USML/CCL review

Mike,

███████████████████████████████████████ Presently, HR is still working the paperwork shuffle with the candidate, Chris Weil. Latest estimate is that Chris will be on board January 18. However, there will of course be a breaking-in period to follow.

Should an emergency arise, however, we will take the appropriate actions as best as we can with the staff we have currently.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

Unclassified

**From:** Memos, Nicholas <MemosNI@state.gov>
**Sent:** Wednesday, September 18, 2019 9:44 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** FW: USML/CCL review

Rick,

████████████████████████████████████████

Thanks,
Nick

Unclassified

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Wednesday, September 11, 2019 3:44 PM
**To:** Memos, Nicholas <MemosNI@state.gov>
**Subject:** RE: USML/CCL review

Thanks Nick.  Please have a chat with Rick and let's convene.

Unclassified

**From:** Memos, Nicholas <MemosNI@state.gov>
**Sent:** Wednesday, September 11, 2019 1:35 PM

**To:** Miller, Michael F <Millermf@state.gov>
**Subject:** FW: USML/CCL review

Mike,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Thanks,
Nick

---

Unclassified

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Tuesday, September 10, 2019 5:47 PM
**To:** Miller, Michael F <Millermf@state.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike.

███████████████████████████████████████████████████████████

Matt

---

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Tuesday, September 10, 2019 12:52 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>; Memos, Nicholas <MemosNI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review
**Importance:** High

Thanks Matt.

███████████████████████████████████████████████████████████

In related news, would like to get feedback from you on Cats 1-2-3. ████████████████████████████████████████████████████████████████████████████████████████████████████████

Thanks,
Mike

**Mike Miller** | Acting Deputy Assistant Secretary
Bureau of Political-Military Affairs | U.S. Department of State
☎ *Desk:* (202) 663-2851
✉ *OpenNet:* MillerMF@state.gov

SBU - Deliberative Process

**From:** Matthew Borman <Matthew.Borman@bis.doc.gov>
**Sent:** Monday, September 9, 2019 3:33 PM
**To:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** RE: [Non-DoD Source] USML/CCL review

Thanks Mike Ł.

**From:** Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>
**Sent:** Monday, September 09, 2019 12:51 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Brackett, Taurus L CIV DTSA LD (USA) <taurus.l.brackett.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (USA) <susan.g.daoussi.civ@mail.mil>
**Cc:** Miller, Michael F <Millermf@state.gov>; Richard Ashooh <Richard.Ashooh@bis.doc.gov>
**Subject:** Re: [Non-DoD Source] USML/CCL review

+Taurus, Tracy, Susan

Matt, I am at an offsite til Thursday. Please follow up with Taurus on your request below.

Vr

Mike

Sent from my iPhone

On Sep 9, 2019, at 12:08 PM, Matthew Borman <Matthew.Borman@bis.doc.gov> wrote:

Mike,



Thanks.

Matt

WASHSTATEC003005

Message

| | |
|---|---|
| **From:** | Minarich, Christine M [MinarichCM@state.gov] |
| **Sent:** | 9/18/2019 8:16:38 PM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject:** | Recommendations for Administrative Record |
| **Attachments:** | Rulemaking Guidance.docx |

Joe,

Christine

Christine Minarich
Attorney-Adviser (L/PM)
U.S. Department of State
M,W,F: (202) 485-1646
Tu,Th: (202) 663-2915

SBU - Legal

Appointment

**From**:        Koelling, Richard W [KoellingRW@state.gov]
**Sent**:        9/18/2019 9:54:15 PM
**To**:          Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Paul, Joshua M
                 [PaulJM@state.gov]; Khawam, Joseph N [KhawamJN@state.gov]; Foster, John A [FosterJA2@state.gov]

**Subject**:     Cats I-III Telcon

**Start**:       9/19/2019 2:00:00 PM
**End**:         9/19/2019 3:00:00 PM
**Show Time As**: Tentative

**Recurrence**:   (none)

All per our discussion Wed. evening. I'll dial in as host. Note, there is another telcon using this same number at 1100, so
we have a hard stop.

v/r, Rick

Dial In: USA Toll-Free: ███████████

USA Caller Paid/International Toll: ███████████

ACCESS CODE: █████████

Appointment

**From**:         Khawam, Joseph N [KhawamJN@state.gov]
**Sent**:         9/18/2019 9:55:37 PM
**To**:           Koelling, Richard W [KoellingRW@state.gov]

**Subject**:      Accepted: Cats I-III Telcon

**Start**:        9/19/2019 2:00:00 PM
**End**:          9/19/2019 3:00:00 PM
**Show Time As**: Busy

**Recurrence**:   (none)

WASHSTATEC003008

Appointment

**From**:       Koelling, Richard W [KoellingRW@state.gov]
**Sent**:       9/18/2019 9:57:23 PM
**To**:         Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Paul, Joshua M
                [PaulJM@state.gov]; Khawam, Joseph N [KhawamJN@state.gov]; Foster, John A [FosterJA2@state.gov]; Wrege,
                Karen M [WregeKM@state.gov]

**Subject**:    Cats I-III Telcon

**Start**:      9/19/2019 2:00:00 PM
**End**:        9/19/2019 3:00:00 PM
**Show Time As**: Tentative

**Recurrence**:   (none)

All per our discussion Wed. evening. I'll dial in as host. Note, there is another telcon using this same number at 1100, so we have a hard stop.

Adding in Karen Wrege for her potential role.

v/r, Rick

Dial In: USA Toll-Free: ██████████

USA Caller Paid/International Toll: ██████████

ACCESS CODE: ███████

Message

**From:**       Koelling, Richard W [KoellingRW@state.gov]
**Sent:**       9/18/2019 10:03:26 PM
**To:**         Wrege, Karen M [WregeKM@state.gov]
**Subject:**    RE: Cats I-III Telcon

Karen,
We'll fill you in in the morning. But Mike will be asking you to potentially reach out to Customs on this topic. He felt you were in the best position to do so.

Cheers,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 5:55 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** RE: Cats I-III Telcon

Thanks, Rick.  Should we ask Karen Wrege to join as well so she can help with the outreach to Customs?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

-----Original Appointment-----
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Wednesday, September 18, 2019 5:54 PM
**To:** Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Khawam, Joseph N; Foster, John A
**Subject:** Cats I-III Telcon
**When:** Thursday, September 19, 2019 10:00 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

All per our discussion Wed. evening. I'll dial in as host. Note, there is another telcon using this same number at 1100, so we have a hard stop.

v/r, Rick

Dial In: USA Toll-Free: ███████████

USA Caller Paid/International Toll: ████████████

ACCESS CODE:

SBU

WASHSTATEC003011

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/18/2019 10:06:14 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Subject**: | RE: Cats I-III Telcon |
| **Attachments**: | Cats I-III |

Thanks, Rick. I think the attached email is the one. I'll plan on reviewing it tomorrow.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Wednesday, September 18, 2019 6:01 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III Telcon

Joe, I'll provide you a copy of Monjay's edits if you don't have a copy handy.

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 5:55 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** RE: Cats I-III Telcon

Thanks, Rick. Should we ask Karen Wrege to join as well so she can help with the outreach to Customs?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

-----Original Appointment-----
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Wednesday, September 18, 2019 5:54 PM
**To:** Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Khawam, Joseph N; Foster, John A
**Subject:** Cats I-III Telcon
**When:** Thursday, September 19, 2019 10:00 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

All per our discussion Wed. evening. I'll dial in as host. Note, there is another telcon using this same number at 1100, so we have a hard stop.

v/r, Rick

Dial In: USA Toll-Free ███████████

USA Caller Paid/International Toll: ██████████

ACCESS CODE: ████████

SBU

WASHSTATEC003013

Message

---

**From**:          Monjay, Robert [MonjayR@state.gov]
**Sent**:          8/22/2019 11:35:24 AM
**To**:            Khawam, Joseph N [KhawamJN@state.gov]; Minarich, Christine M [MinarichCM@state.gov]
**CC**:            Hart, Robert L [HartRL@state.gov]; Foster, John A [FosterJA2@state.gov]; Koelling, Richard W
                [KoellingRW@state.gov]
**Subject**:       Cats I-III
**Attachments**:   Tab 1 - Cat I-III Final FRN BIS controls on 3D printing in preamble.docx

**Flag**:          Follow up

Joe and Christine,
I revised the Cats I-III rule ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████

Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile:* ███████████
*Email: MonjayR@state.gov*
████████████████████████

**Official - SBU**
UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent:** | 9/18/2019 10:24:50 PM |
| **To:** | Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Foster, John A [FosterJA2@state.gov]; Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject:** | Tab 1 - Cat I-III Final FRN BIS controls on 3D printing in preamble |
| **Attachments:** | Tab 1 - Cat I-III Final FRN BIS controls on 3D printing in preamble.docx |

ALCON,
Here is the rule

--Rick





WASHSTATEC003016

WASHSTATEC003017



WASHSTATEC003018



SBU

WASHSTATEC003019

Appointment

**From**:          Miller, Michael F [Millermf@state.gov]
**Sent**:          9/18/2019 10:36:44 PM
**To**:            Koelling, Richard W [KoellingRW@state.gov]

**Subject**:       Accepted: Cats I-III Telcon

**Start**:         9/19/2019 2:00:00 PM
**End**:           9/19/2019 3:00:00 PM
**Show Time As**: Busy


**Recurrence**:    (none)

Message

---

**From**:     Wrege, Karen M [WregeKM@state.gov]
**Sent**:     9/18/2019 11:29:41 PM
**To**:       Koelling, Richard W [KoellingRW@state.gov]
**Subject**:  Re: Cats I-III Telcon

Thanks for the heads up.

Get Outlook for iOS

---

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Wednesday, September 18, 2019 6:03:26 PM
**To:** Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: Cats I-III Telcon

Karen,
We'll fill you in in the morning. But Mike will be asking you to potentially reach out to Customs on this topic. He felt you were in the best position to do so.

Cheers,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 5:55 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** RE: Cats I-III Telcon

Thanks, Rick. Should we ask Karen Wrege to join as well so she can help with the outreach to Customs?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

-----Original Appointment-----
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Wednesday, September 18, 2019 5:54 PM
**To:** Miller, Michael F; Heidema, Sarah J; Paul, Joshua M; Khawam, Joseph N; Foster, John A
**Subject:** Cats I-III Telcon
**When:** Thursday, September 19, 2019 10:00 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

All per our discussion Wed. evening. I'll dial in as host. Note, there is another telcon using this same number at 1100, so we have a hard stop.

v/r, Rick

Dial In: USA Toll-Free █████████████

USA Caller Paid/International Toll ███████████████

ACCESS CODE: █████████

SBU

WASHSTATEC003022

Message

| | |
|---|---|
| **From:** | Paul, Joshua M [PaulJM@state.gov] |
| **Sent:** | 9/19/2019 11:45:48 AM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov]; Darrach, Tamara A [DarrachTA@state.gov] |
| **CC:** | Foster, John A [FosterJA2@state.gov]; H_Staffers [H_Staffers@state.gov] |
| **Subject:** | RE: Cats I-III CN and Correspondence |
| **Attachments:** | 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf |

Here's the "incoming" from Menendez on this topic.  Based on his letter it seems like the 38(f) notification Joseph is seeking would be dated 4 February, or shortly before then, if that helps.


SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 6:07 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

H colleagues:  Following up on the email chain below and my conversation with Tamara on Friday, would be able to send over the final congressional notifications for the Cats I-III rule, as well as any correspondence with the Hill (just formal letters – both incoming and outgoing) on this issue by cob tomorrow?  There unfortunately is now some urgency in gathering these materials.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, September 13, 2019 5:04 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Joe - For final packages that went to the Hill, the staffers would have those.  Copying them on this thread.

For correspondence, are talking formal letters or emails too?

Thanks,
Tamara


SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 4:27 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Understood, based on a convo with Jeff just now.

For the finals of anything going to the Hill I'd have to refer you to H; adding Tamara for that purpose.

Josh


SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 12:13 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III CN and Correspondence

Hi Josh:  We were looking to get a copy of the final CN on Cats I-III that went to the Hill, as well as all of the correspondence with members of Congress on this issue (both incoming and outgoing).  Would you have these available to send to us, and if not, would you know who would?  I'd be happy to explain why we're asking for them if you'd like to give me a call (x7-8546).

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov


SBU - Legal

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

## United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) <u>Removal of Firearms Exports from Congressional Information and Review</u>
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

WASHSTATEC003025

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

## 2)  Proliferation of 3D Gun Printing Technical Information

There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

WASHSTATEC003026

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/19/2019 3:29:57 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Subject**: | RE: Tech data as "items" |
| **Attachments**: | 095 - Order Granting PI.pdf |

Thanks, Rick. ████████████████████████████████████

████████████████████████████████████████████████████

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 11:24 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Tech data as "items"

Joe,

████████████████████████████████████████████████████

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
7                          AT SEATTLE

8   STATE OF WASHINGTON, *et al.*,

9                    Plaintiffs,
                                              NO. C18-1115RSL
10        v.

11  UNITED STATES DEPARTMENT OF               PRELIMINARY INJUNCTION
    STATE, *et al.*,
12
                     Defendants.
13

14

15        This matter comes before the Court on the "Plaintiff States' Motion for Preliminary

16  Injunction." Dkt. # 43. A temporary restraining order was entered on July 31, 2018, enjoining

17  the federal defendants[1] from implementing or enforcing a "Temporary Modification of Category

18  I of the United States Munitions List" and a July 27, 2018, letter issued by the U.S. Department

19  of State to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation. The

20  order also required the federal defendants to preserve the status quo *ex ante* as if the

21  modification had not occurred and the letter had not been issued. Pursuant to the limitations set

22  forth in Fed. R. Civ. P. 65, the matter was set for hearing on August 10, 2018, but the restraining

23  order was extended by agreement of the parties to August 28, 2018, to accommodate an August

24

25

26        [1] The federal defendants are the United States Department of State, Michael R. Pompeo, the
27  Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema.

28  PRELIMINARY INJUNCTION - 1

21, 2018, hearing date.

Having considered the memoranda, declarations, and exhibits submitted by the parties, as well as the amicus curiae submissions of the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Electronic Frontier Foundation,[2] and having heard the arguments of counsel, the Court finds as follows:

**PRELIMINARY INJUNCTION STANDARD**

The standard for issuing a preliminary injunction is identical to the standard the Court used when granting the temporary restraining order in this case. Thus, for purposes of the current motion, the Court considers the more developed record to determine whether plaintiffs (1) are likely to succeed on the merits of their APA claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). In the alternative, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).[3]

---

[2] The requests for leave to file amicus curiae briefs (Dkt. # 46, # 47, and # 58) are GRANTED.

[3] The Court finds that the injunction plaintiffs seek is prohibitory in nature, rather than mandatory. A prohibitory injunction maintains the status quo, which is generally described as the last, uncontested status which preceded the present controversy. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). In this case, the status quo existed before the federal defendants issued

PRELIMINARY INJUNCTION - 2

## BACKGROUND AND PROCEDURAL HISTORY

Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of computer aided design ("CAD") data files that would allow the creation of guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

---

the temporary modification and letter on July 27, 2018.

PRELIMINARY INJUNCTION - 3

WASHSTATEC003031

system of prior restraints that was applied in an arbitrary manner in violation of Defense Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed wanted to publish on the internet were technical data subject to the ITAR.

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-

PRELIMINARY INJUNCTION - 4

Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The Honorable Robert L. Pitman denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or

PRELIMINARY INJUNCTION - 5

WASHSTATEC003033

terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex). Later that month, the parties reached a tentative settlement agreement. Pursuant to the settlement, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On May 24, 2018, the federal defendants published the promised rulemaking notice, with the public comment period ending on July 9, 2018. 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed.

PRELIMINARY INJUNCTION - 6

WASHSTATEC003034

Reg. 24,166 (May 24, 2018). The settlement agreement was signed on June 29, 2018, in the midst of the public comment period, but not made public until July 10, 2018. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the United States Constitution.[4] After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the temporary modification resulted in the removal of one or more items from the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018, and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor.

## DISCUSSION

Plaintiffs' request for a preliminary injunction is centered on its claim that the federal defendants violated the APA. The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a

---

[4] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

PRELIMINARY INJUNCTION - 7

WASHSTATEC003035

temporary modification were procedurally defective in that the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1) and failed to obtain the concurrence of the Secretary of Defense as required by the President when he delegated his removal authority to the Secretary of State in Executive Order 13637, § 1(n)(i).[5] Plaintiffs also argue that, to the extent the temporary modification permits "any United States person" to use the CAD files at issue, the federal government's action impermissibly conflicts with state and federal laws limiting access to guns. Finally, plaintiffs challenge the decision to allow the CAD files to be published on the internet as arbitrary and capricious because the State Department failed to articulate any explanation for its decision to allow the publication of the CAD files on the internet or to alter its earlier factual findings and representations regarding the harms such publication will likely cause.

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States lack standing, while the private defendants argue that this lawsuit is an impermissible collateral attack on the outcome of the litigation in the Western District of Texas.[6]

---

[5] Plaintiffs, citing a presidential tweet and a White House press briefing, also suggest that the State Department exceeded its authority over the USML because the President disagrees with the way in which that authority was exercised. Plaintiffs acknowledge, however, that the President has delegated USML designations to the State Department. That delegation was not conditioned on obtaining the President's prior approval of or subsequent acquiescence to a listing decision. To the extent the President believes that allowing printable gun files to be published on the internet is not sensible, he has the power to influence, if not outright direct, the State Department's decision-making in this matter. He has not yet done so.

[6] The private defendants' § 701 argument is discussed below.

PRELIMINARY INJUNCTION - 8

WASHSTATEC003036

## 1. Standing

In order to present a justiciable case or controversy under Article III of the U.S. Constitution, plaintiffs must have standing to challenge defendants' conduct and pursue the relief requested.

> [The] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted). In an APA action, a State alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision that is allegedly causing harm. Mass. v. Envt'l Protection Agency, 549 U.S. 497, 517 (2007). In addition, a State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation. Dep't of Fair Emp't & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

Plaintiffs allege that the federal defendants failed to provide notice of their intent to remove technical data related to the manufacture of 3D guns from the USML and have made a wholly unsupported - and therefore arbitrary and capricious - decision which, in the State Department's own words, will make anyone in possession of a commercially-available 3D printer capable of automatically generating a lethal firearm that would be virtually undetectable

PRELIMINARY INJUNCTION - 9

WASHSTATEC003037

in metal detectors and other security equipment. The federal defendants assert that the alleged failures are harmless or are causally unrelated to any harm the States might suffer because the federal government's regulatory authority under the AECA is limited to exports and the plaintiffs' concerns are purely domestic. Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well.

The Court finds that plaintiffs have not only alleged harm to their legally protectable sovereign interests under the traditional standing analysis, but have also alleged a procedural APA claim where there is a possibility that compelling compliance with the specified procedures will prompt the agency to reconsider its decision. Forcing the federal defendants to give Congress thirty days' notice of the removal of the CAD files from the USML and to seek the concurrence of the Department of Defense would afford other executive branch entities (including the President) an opportunity to impact the decisionmaking process and would give both Congress and the States a chance to generate any statutes or regulations deemed necessary to address the regulatory void the delisting would create. Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the

PRELIMINARY INJUNCTION - 10

WASHSTATEC003038

USML. There is, at the very least, a possibility that the States would benefit from the relief requested in this litigation.

Plaintiffs have standing to pursue the relief requested in the amended complaint. Plaintiffs have alleged an injury in fact that is directly threatened by the federal defendants' proposed delisting of the technical data contained in Defense Distributed's CAD files and that could be ameliorated, if not avoided entirely, as a result of this litigation.

### 2. Collateral Attack

The private defendants argue that this lawsuit is an impermissible collateral attack on the dismissal with prejudice of the Western District of Texas litigation. They reason that, had the States moved to intervene in the prior litigation in order to object to the proposed settlement or to seek a preliminary injunction precluding its execution, the motion would have been denied and the States cannot, therefore, obtain such relief here. The conclusion does not follow from the premise. The reasons the States would likely not have been permitted to intervene in the prior litigation is that they were not necessary parties, they had no right to appear simply because they were interested in its outcome, their claim had nothing to do with the facts or law at issue between the existing parties, and their APA-based objections could be heard and their interests protected in a separate litigation with the federal defendants. See Fed. R. Civ. P. 19 and 24. The district court's likely refusal to allow plaintiffs to appear and/or intervene in the Western District of Texas litigation is not relevant to, much less dispositive of, plaintiffs' right to seek relief in this litigation.

If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. If the remedy afforded in this litigation impinges on the federal

PRELIMINARY INJUNCTION - 11

defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are challenging the adequacy of agency action. Defendants offer no case law suggesting that violations of the APA can be shielded from judicial review by simply incorporating them into a private settlement agreement.

**B. Likelihood of Success on the Merits**

    **1. Congressional Notice**

    The AECA authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The President has the power to designate "defense articles and defense services:" the items so designated constitute the USML. Id. The USML identifies categories of defense articles and services that are subject to export controls. The list is "organized by paragraphs and subparagraphs" that "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments; and technical data and defense services directly related to the defense articles of that USML category." 22 C.F.R. § 121.1(a). The USML, Category I, includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the CAD files Defense Distributed seeks to publish are subject to the export controls of ITAR. The Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has

PRELIMINARY INJUNCTION - 12

WASHSTATEC003040

provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." 22 U.S.C. § 2778(f)(1).

Plaintiffs have shown a likelihood of success on the merits of their APA claim because the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.[7] Assuming that is the case, the federal defendants acknowledge that the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of the review be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

The Department of State argues that its decision to allow the publication of previously-regulated CAD files does not trigger the Congressional notice requirement because it has not removed an "item" from the USML. Defendants argue that the notice requirement applies only

---

[7] The federal defendants refused to produce the administrative record of the agency's decision (Dkt. # 49) and instead rely on the declaration of the Director of the Office of Defense Trade Control Policy within the DDTC (Dkt. # 64-1) to explain how and why the decision was made to reverse the CJ determination regarding the CAD files at issue. This tactic has placed plaintiffs and the Court at a decided disadvantage in evaluating what the government relied upon when concluding that the State Department's prior findings regarding the national security risks posed by plastic, untraceable, undetectable guns should be overruled. For purposes of the procedural APA claim, however, the declaration confirms that notice to Congress will be given as required by 22 U.S.C. § 2778(f) if and only if a final rule is issued. Dkt. # 64-1 at ¶ 24.

PRELIMINARY INJUNCTION - 13

when a whole group or category of defense articles described in the USML, such as

"nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R.

§ 121.1(I)(a), is removed and that that has not yet happened. This argument conflates "category"

with "item." As described in the statute, the USML is a list of items designated by the President

as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an

exhaustive list of every individual article or service that is subject to export control under the

AECA, the Department of State opted to populate the USML with generally descriptive

categories. Those categories describe end-items, however, and it is those items that are the

"defense articles and defense services" that are subject to export control under the AECA. 22

C.F.R. § 121.1. See also Fact Sheet on President's Export Control Reform Initiative (April 20,

2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-

control-reform-initiative (visited August 21, 2018) (noting that the United States' system of

export control involved an "extensive list of controlled items which resulted in almost 130,000

licenses" in 2009). The congressional review and notice requirements specifically apply to items,

not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms

that it is the removal of a particular article or service - i.e., an item rather than a category - that

triggers the review and notice requirements. The Department describes the CJ procedure as a

means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions

List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions

List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations

reiterate that the "Department must provide notice to Congress at least 30 days before any item

is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the

statute and implementing regulations, the Court finds that plaintiffs are likely to prevail on their

PRELIMINARY INJUNCTION - 14

argument that the terms "item" and "category" are distinct and that Congressional notice is required whenever a previously-designated defense article or service is to be removed from the AECA's reach.

As noted above, the DDTC made an express determination that certain CAD files that can be used with a 3D printer to manufacture guns and/or their components are "defense articles" or "defense services" under the USML. Defendants attempted to revoke that designation through the issuance of the "temporary modification" described in the settlement agreement in the Western District of Texas litigation, thereby removing the CAD files from the USML and lifting all export controls.[8] Congress was not notified prior to the removal. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of any final rule removing firearms up to .50 caliber from the USML. The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[9]

### 2. Concurrence of the Secretary of Defense

When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense

---

[8] The Court rejects the private defendants' attempt to distinguish the terms "remove" and "exclude" in this context.

[9] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification, its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

PRELIMINARY INJUNCTION - 15

services subject to export control have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures. Plaintiffs are not likely to succeed on the merits of this aspect of its claim, however, because the relevant executive order expressly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Executive Order 13637, § 6(c).

### 3. Abrogation of State and Federal Law

In response to the States' objections regarding the scope of the purported authorization for "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from the CAD files at issue, both the federal and private defendants disavow any intent to alter or in any way impact existing federal prohibitions or limitations on the possession of firearms. The federal defendants also recognize the continuing viability of state law gun control measures. Plaintiffs do not address this argument in their reply memorandum.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the files. The federal defendants state that the change was the result of a multi-year review process which led to the determination that firearms up to .50 caliber "do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML." Dkt. # 64-1 at ¶ 24. Even if the Court accepts that the

PRELIMINARY INJUNCTION - 16

undisclosed administrative record will support this argument,[10] there is no indication that the Department considered the unique properties of 3D plastic guns or evaluated the factors Congress deemed relevant when the Department decided to authorize the posting of the CAD files on the internet as of July 27, 2018.

Until April 2018, the federal government took the position that technical data related to the design and production of weapons using a commercially-available 3D printer posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic. Because they were virtually undetectable in metal detectors and other security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.

Against these findings related to the specific defense articles at issue in this litigation, the federal defendants state only that restricting the international availability of firearms up to .50 caliber will not provide the United States with a critical military or intelligence advantage. There

---

[10] Plaintiffs' motion to strike arguments based on the administrative record is DENIED.

PRELIMINARY INJUNCTION - 17

WASHSTATEC003045

is no indication that the Department evaluated the unique characteristics and qualities of plastic guns when it was considering the deletion of the small firearms category from the USML. Statements made at oral argument affirmatively suggest that it did not do so prior to July 27, 2018. Nor is there any reasoned explanation for its change in position regarding the harms that publication of the regulated technical data will engender. The State Department also appears to have evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Congress, however, directed the Department to consider how the proliferation of technical data and related weaponry would impact world peace, national security, and foreign policy. When President Obama initiated the multi-year review of the export control system on which defendants rely, the stated goals of the review included "enhanc[ing] U.S. national security" and updating the Cold War era system "to address the threats we face today and the changing economic and technological landscape." Fact Sheet on the President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export -control-reform-initiative (visited August 21, 2018). Based on the existing record, plaintiffs have raised serious questions regarding the merits of their claim that the federal defendants failed to consider aspects of the problem which Congress deemed important, failed to articulate a reasonable explanation for this particular decision in light of its prior findings and representations, and engaged in arbitrary and capricious agency action.

**5. Agency Discretion**

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to

PRELIMINARY INJUNCTION - 18

agency discretion as a matter of law: the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML, which Congress chose not to make unreviewable.

"Over the years, [the Supreme Court has] read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 191 (1993). Thus, an express legislative bar such as that found in § 2778(h) is not a prerequisite to a finding that an action is committed to agency discretion by law. The Supreme Court has found that an agency's decision not to initiate enforcement proceedings, not to grant reconsideration of agency action, or how to allocate funds from a lump-sum budget allocation are presumptively unreviewable because those decisions often involve complicated balancing of factors within the agency's expertise, Congress imposed no relevant requirements or restrictions, and there is no adequate standard by which the judiciary could evaluate the agency action. Id. at 191-93. Those factors do not apply here. Plaintiffs are challenging the federal defendants' failure to comply with certain procedures that Congress and the courts have imposed when making removal decisions under AECA. "The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable." Batalla Vidal v. Duke, 295 F. Supp.3d 127, 148 (E.D.N.Y. 2017).

**6. First Amendment**

The private defendants argue that the CAD files are protected speech under the First Amendment, that restrictions on their ability to publish the files constitute a prior restraint that is presumed to be unconstitutional, and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the

PRELIMINARY INJUNCTION - 19

WASHSTATEC003047

publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to or otherwise invalidate plaintiffs' claims against the federal defendants. To the extent the private defendants' speech is impacted, their First Amendment interests are considered in the balancing of hardships and public interest section below.

## C. Irreparable Harm

Plaintiffs have submitted evidence, including declarations and the federal defendants' prior findings, showing that the States will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3D printer are published on the internet. Many of the same concerns that prompted the DDTC to conclude that the CAD files are "defense articles" within the scope of the USML apply with equal force to the States. A gun made from plastic is virtually undetectable in metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings. The portability and ease of a manufacturing process that can be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing, possessing, and/or using guns to more easily evade those limitations. The publication of the technical data would subvert the domestic laws of states with more restrictive firearm controls and threaten the peace and security of the communities where these guns proliferate.

PRELIMINARY INJUNCTION - 20

In addition, the States have certain public safety, law enforcement, and proprietary interests that were not of particular concern to the United States when considering the effects the technical data would have if exported to other countries. The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if, as the private defendants advocate, every person owns a plastic gun.

The plaintiff States and the District of Columbia, as sovereigns, represent more than 160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding

PRELIMINARY INJUNCTION - 21

WASHSTATEC003049

undetectable and untraceable guns to the arsenal of weaponry already available will likely increase the threat of gun violence they and their people experience.

Defendants do not argue that any of these injuries are reparable. Rather, defendants argue that the injuries are not causally connected to the State Department's decision to overturn its prior CJ determination and remove the CAD files from the USML. The federal defendants assert that, because the AECA regulates the export of defense articles, a change in their regulatory stance cannot be the cause of the domestic effects of which plaintiffs complain. As discussed in the standing analysis, this argument ignores reality and is wholly unpersuasive. The inclusion of the CAD files on the USML prevented the technical data from being posted on the internet. Because there is no "domestic" internet, the ban had the collateral effect of making it more difficult to locate and download instructions for the manufacture of plastic firearms both domestically and internationally. It takes virtually no imagination to perceive the direct connection between removing the CAD files from the USML, the internet publication of the technical data, and the likelihood of the irreparable injuries plaintiffs have identified.

The private defendants, for their part, argue that the causal connection is broken because nine[11] of the CAD files at issue are already on the internet (Defense Distributed posted them again for good measure on July 27, 2018, as soon as the temporary modification and authorizing letter were issued, but took them down when the temporary restraining order was entered). Nevertheless, plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction. First, it is not clear how available the nine files are: the possibility that a

---

[11] In their memorandum and at oral argument, the private defendants state that they published ten CAD files pursuant to the authorizations they received as part of the settlement. The file pertaining to the Ghost Gunner 2 assembly files were not covered by the USML and not subject to ITAR control. Dkt. # 29-1 at 82 and # 63-1 at 8.

PRELIMINARY INJUNCTION - 22

cybernaut with a BitTorrent protocol will be able to find a file in the dark or remote recesses of the internet does not make the posting to Defense Distributed's site harmless. Second, there is no information regarding when these files were posted and whether they were posted with the approval of the relevant government agency. Absent such approval, the files remain "technical data" subject to ITAR control because they are not in the "public domain" for purposes of the AECA. 22 C.F.R. § 120.10(b) and § 120.11(a)(7). Third, many of the files have not yet been released, including files created by third parties and any files Defense Distributed will develop in the future. Fourth, the private defendants' dogged pursuit of the right to publish these files - and the evident alarm with which the proposed publication has been met in the Congress, in the White House, amongst advocacy groups, and in state houses all over the country - suggest that further publication is not harmless.

Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are

PRELIMINARY INJUNCTION - 23

likely to befall the States if an injunction is not issued.

**D. Balance of Hardships and Public Interest**

Against the likelihood that the States will suffer the various harms discussed above, the federal defendants identify no hardship of their own, but argue that the public interest in allowing the Executive to exercise its discretion in determining how best to promote national security weighs against preliminary injunctive relief. That discretion must, however, be exercised through the procedures established by Congress and not in an arbitrary and capricious manner.

The private defendants raise the more substantive argument that a preliminary injunction will impair their First Amendment rights, a loss which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). The First Amendment argument raises a number of challenging issues. Is computer code speech? If yes, is it protected under the First Amendment? To answer those questions, one would have to determine what the nature of the files at issue here is: are they written and designed to interact solely with a computer in the absence of the intercession of the mind or will of the recipient or is it an expressive means for the exchange of information regarding computer programming and/or weapons manufacturing? Are the export controls of the ITAR a prior restraint giving rise to a presumption that they are unconstitutional? Is the AECA a general regulatory statute not intended to control the content of speech but only incidentally limiting its unfettered exercise? Or is the government attempting to regulate distribution of the CAD files because of the message they convey? Depending on which level of scrutiny applies, does the regulation advance important governmental interests unrelated to the suppression of free speech and avoid burdening more speech than necessary or is the regulation narrowly tailored to promote a

PRELIMINARY INJUNCTION - 24

compelling Government interest?

The Court declines to wade through these issues based on the limited record before it and instead presumes that the private defendants have a First Amendment right to disseminate the CAD files. That right is currently abridged, but it has not been abrogated. Regulation under the AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within the United States. The Court finds that the irreparable burdens on the private defendants' First Amendment rights are dwarfed by the irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that, overall, the public interest strongly supports maintaining the status quo through the pendency of this litigation.

For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED. The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court.

Dated this 27th day of August, 2018.

*Robt S Lasnik*

Robert S. Lasnik
United States District Judge

PRELIMINARY INJUNCTION - 25

Message

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/19/2019 4:08:59 PM |
| **To**: | Kottmyer, Alice M [KottmyerAM@state.gov] |
| **Subject**: | Cats I-III |
| **Attachments**: | Tab 1 - Cat I-III Final FRN.docx |

Hi Alice:  I wanted to see if you might have 5 minutes for a quick chat about the Cats I-III FRN.  We have some updates on how to proceed, and I thought it would be prudent to loop you in sooner rather than later.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

███████████████

SBU - Legal

Message

**From**: Kottmyer, Alice M [KottmyerAM@state.gov]
**Sent**: 9/19/2019 4:11:05 PM
**To**: Khawam, Joseph N [KhawamJN@state.gov]
**CC**: Kottmyer, Alice M [KottmyerAM@state.gov]
**Subject**: RE: Cats I-III

Sure.  I'm at █████████████

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, September 19, 2019 12:09 PM
**To:** Kottmyer, Alice M <KottmyerAM@state.gov>
**Subject:** Cats I-III

Hi Alice:  I wanted to see if you might have 5 minutes for a quick chat about the Cats I-III FRN.  We have some updates on how to proceed, and I thought it would be prudent to loop you in sooner rather than later.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov
███████████████████████

SBU - Legal

Message

| | |
|---|---|
| **From:** | Kottmyer, Alice M [KottmyerAM@state.gov] |
| **Sent:** | 9/19/2019 5:03:17 PM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov] |
| **CC:** | Kovar, Jeffrey D [KovarJD@state.gov]; Minarich, Christine M [MinarichCM@state.gov]; Johnson, Clifton M [JohnsonCM5@state.gov]; Kottmyer, Alice M [KottmyerAM@state.gov] |
| **Subject:** | AE30 -- Guns and Ammo |

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

That's all I have for now.


Thanks
Alice


SBU - Deliberative Process

WASHSTATEC003056

---

Message

---

**From:**       Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**       9/19/2019 6:39:23 PM
**To:**         Kovar, Jeffrey D [KovarJD@state.gov]
**Subject:**    Draft AM Package on Cats I-III
**Attachments:** AM for T - USML Cat I-III Final FRN.docx; Tab 1 - Cat I-III Final FRN.docx; Tab 2 - Rule Statement on Cat I-III Final FRN.pdf; Tab 3 - 02-22-19 Menendez Letter on Hold on CAT I-III Transfer.pdf; Tab 10a - Preliminary Injunction Decision.pdf; Tab 10b - Plaintiffs' MSJ.pdf; Tab 10c - Federal Defendants' MSJ.pdf; Tab 10d - Plaintiffs' Reply.pdf; Tab 10e - Federal Defendants' Reply.pdf; Tab 11a - District Court.pdf; Tab 11b - 5th Circuit.pdf; Tab 11c - 5th Circuit En Banc.pdf; Tab 11d - SCOTUS.pdf; Tab 11e - Settlement Agreement.pdf; Tab 11f - Stipulation of Dismissal.pdf; Tab 12 - Federal Register Notice for Department of State Proposed Rule.pdf; Tab 13 - Federal Register Notice for Department of Commerce Proposed Rule.pdf; Tab 14a - Defendants' Opposition to Motion for a Preliminary Injunction.pdf; Tab 14b - Aguirre Declaration ISO Defendants' Opposition to Motion for a Preliminary Injunction.pdf; Tab 14c - Defendants' Motion to Dismiss.pdf; Tab 7 - Summary of Criticisms and Concerns.docx

Jeff:  Attached please find the draft AM for your review. ████████████████████████
██████████ The rest of the tabs are attached just for your awareness.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov
████████████████████████████


SBU - Legal

JAMES E. RISCH, IDAHO, CHAIRMAN

MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
CORY GARDNER, COLORADO
MITT ROMNEY, UTAH
LINDSEY GRAHAM, SOUTH CAROLINA
JOHNNY ISAKSON, GEORGIA
JOHN BARRASSO, WYOMING
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY
TODD YOUNG, INDIANA
TED CRUZ, TEXAS

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

February 22, 2019

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, D.C. 20520

Dear Secretary Pompeo:

On February 4, 2019, I received a congressional notification from the Department for a proposal to transfer responsibility for the export control of firearms and ammunition from the United States Munitions list (USML) to the Commerce Control List (CCL). I write to inform you that I am placing a hold on the congressional notification, pursuant to the authority of Section 38(f) of the Arms Export Control Act (AECA).

I am deeply concerned about this proposed transfer. As you no doubt are aware, firearms and ammunition – especially those derived from military models and widely used by military and security services – are uniquely dangerous. They are easily modified, diverted, and proliferated, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more, not less, rigorous export controls and oversight.

Combat rifles, including those commonly known as "sniper rifles," should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment, ammunition, or associated manufacturing equipment, technology, or technical data.

Consequently, my hold will remain in place until such time as the issues identified below are sufficiently addressed.

1) Removal of Firearms Exports from Congressional Information and Review
The AECA enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy interests. Congress took action in 2002 to ensure that the sale and export of these weapons would receive stringent oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would directly

contradict congressional intent and effectively eliminate congressional oversight and potential disapproval of exports of these weapons. Congressional oversight must be retained.

2) Proliferation of 3D Gun Printing Technical Information
There is a serious risk that this transfer will open the floodgates of information for the 3D printing of nearly-undetectable firearms and components by foreign persons and terrorists that intend to harm U.S. citizens and interests. The Department of Commerce claims that it cannot, by its own regulations, prevent the publication, including on the Internet for global consumption, of technical information and blueprint files that would enable this 3D production, if such information has once been published, even illegally. This is outrageous and simply unacceptable given the dangers it poses to U.S. citizens and interests.

Moreover, it may also be at variance with recent law. Section 1758 of the Export Control Reform Act of 2018 authorizes the Secretary of Commerce to control "emerging and foundational technologies" that (A) are essential to the national security of the United States; and (B) are not critical technologies described in clauses (i) through (v) of section 721(a)(6)(A) of the Defense Production Act of 1950. 3D printing has been identified by this Administration as an emerging technology of concern, and the Department of Commerce itself used 3D printing as an example of "emerging technology" in its November 19, 2018 Federal Register notice seeking public comment on what constitutes emerging technologies pursuant to this new statutory charge. Then-Secretary of Defense Mattis twice mentioned the challenges of 3D printing in congressional testimony, and Director of National Intelligence Coats, in his 2018 Worldwide Threat Assessment of the U.S. Intelligence Community, stated that, "[a]dvances in manufacturing, particularly the development of 3D printing, almost certainly will become even more accessible to a variety of state and non-state actors and be used in ways contrary to our interests."

It would seem axiomatic that the capability to 3D-print lethal weaponry that cannot easily or reliably be detected by metal detectors at airports, schools, governmental or other facilities (including the U.S. Capitol and the Department of State) would qualify as an emerging technology in need of regulatory control. Yet, the Commerce Department has told my staff that the interagency process to identify emerging and foundational technologies to be controlled has not been completed, and is unlikely to be completed for months. By proceeding with the transfer of firearms, including 3D printing technical information, to Commerce, the Administration is acting recklessly and endangering innocent lives. It should go without saying that we collectively need to understand the threat and have a plan to address this issue before making the regulatory change.

Moreover, the Department of Commerce would seem to have adequate additional regulatory authority to control 3D gun printing information, at least temporarily. Commerce can control any item for foreign policy reasons under the miscellaneous category of 0Y521, according to a final rule issued by Commerce in 2012. Preventing foreign terrorists and thugs from acquiring

WASHSTATEC003059

the means to print undetectable guns to use against U.S. citizens is a sufficient foreign policy justification to control this technology from public release.

Ultimately, the specific provision of the Export Administration Regulations is cited as preventing Commerce from controlling the publication of 3D Printed guns in the longer term needs to be rewritten to permit this control. Until that occurs, or until Commerce determines that such technical information can and will be controlled, this technical information cannot and should not be transferred from USML to the CCL.

I look forward to your prompt response to my concerns.

Sincerely,

Robert Menendez
Ranking Member

CC: The Honorable Wilbur Ross, U.S. Secretary of Commerce

WASHSTATEC003060

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

                Plaintiffs,

                v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

                Defendants.

NO. C18-1115RSL

PRELIMINARY INJUNCTION

      This matter comes before the Court on the "Plaintiff States' Motion for Preliminary Injunction." Dkt. # 43. A temporary restraining order was entered on July 31, 2018, enjoining the federal defendants[1] from implementing or enforcing a "Temporary Modification of Category I of the United States Munitions List" and a July 27, 2018, letter issued by the U.S. Department of State to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation. The order also required the federal defendants to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued. Pursuant to the limitations set forth in Fed. R. Civ. P. 65, the matter was set for hearing on August 10, 2018, but the restraining order was extended by agreement of the parties to August 28, 2018, to accommodate an August

_____

[1] The federal defendants are the United States Department of State, Michael R. Pompeo, the Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema.

PRELIMINARY INJUNCTION - 1

WASHSTATEC003061

21, 2018, hearing date.

Having considered the memoranda, declarations, and exhibits submitted by the parties, as well as the amicus curiae submissions of the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Electronic Frontier Foundation,[2] and having heard the arguments of counsel, the Court finds as follows:

## PRELIMINARY INJUNCTION STANDARD

The standard for issuing a preliminary injunction is identical to the standard the Court used when granting the temporary restraining order in this case. Thus, for purposes of the current motion, the Court considers the more developed record to determine whether plaintiffs (1) are likely to succeed on the merits of their APA claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). In the alternative, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).[3]

---

[2] The requests for leave to file amicus curiae briefs (Dkt. # 46, # 47, and # 58) are GRANTED.

[3] The Court finds that the injunction plaintiffs seek is prohibitory in nature, rather than mandatory. A prohibitory injunction maintains the status quo, which is generally described as the last, uncontested status which preceded the present controversy. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). In this case, the status quo existed before the federal defendants issued

PRELIMINARY INJUNCTION - 2

WASHSTATEC003062

1

## BACKGROUND AND PROCEDURAL HISTORY

2

3    Since at least 2013, the federal government had taken the position that the Arms Export

4    Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of

5    computer aided design ("CAD") data files that would allow the creation of guns and their

6    components with a 3D printer. When defendant Defense Distributed posted CAD files for

7    various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls

8    ("DDTC"), which is part of the Department of State, notified Defense Distributed that the

9    publication may have been unauthorized and in violation of the AECA's implementing

10   regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The

11   DDTC explained that making the CAD files available on the internet constituted a disclosure or

12   transfer of technical data to foreign persons and was considered an "export" subject to the

13   AECA and ITAR. The government advised Defense Distributed to remove the files from its

14   website and, if it believed the files were not properly subject to export control, to utilize the

15   commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

16

17   Defense Distributed filed a number of determination requests. When the DDTC failed to

18   make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for

19   the Western District of Texas. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D.

20   Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one

21   side against the Department of State, the DDTC, and various federal employees on the other.

22   Defense Distributed challenged the federal government's power to regulate its publication of the

23   CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

24

25

26   _____

27   the temporary modification and letter on July 27, 2018.

28   PRELIMINARY INJUNCTION - 3

WASHSTATEC003063

system of prior restraints that was applied in an arbitrary manner in violation of Defense

Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was

filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed

wanted to publish on the internet were technical data subject to the ITAR.

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to

preclude the federal government from imposing prepublication approval requirements on any of

its CAD files. The federal government opposed the motion, arguing that:

> ! "export of Defense Distributed's CAD files could cause serious harm to U.S.
>
> national security and foreign policy interests" that "warrant subjecting [the files] to
>
> ITAR's export licensing of technical data;"
>
> ! Defense Distributed's "CAD files constitute the functional equivalent of defense
>
> articles: capable, in the hands of anyone who possesses commercially available 3D
>
> printing equipment, of 'automatically' generating a lethal firearm that can be easily
>
> modified to be virtually undetectable in metal detectors and other security equipment;"
>
> ! "The State Department is particularly concerned that [Defense Distributed's]
>
> proposed export of undetectable firearms technology could be used in an assassination,
>
> for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla
>
> groups, or to compromise aviation security overseas in a manner specifically directed at
>
> U.S. persons;" and
>
> ! both the government and the public "have a strong interest in curbing violent
>
> regional conflicts elsewhere in the world, especially when such conflict implicates the
>
> security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-

PRELIMINARY INJUNCTION - 4

Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The Honorable Robert L. Pitman denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or

PRELIMINARY INJUNCTION - 5

WASHSTATEC003065

terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex). Later that month, the parties reached a tentative settlement agreement. Pursuant to the settlement, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On May 24, 2018, the federal defendants published the promised rulemaking notice, with the public comment period ending on July 9, 2018. 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed.

PRELIMINARY INJUNCTION - 6

WASHSTATEC003066

Reg. 24,166 (May 24, 2018). The settlement agreement was signed on June 29, 2018, in the midst of the public comment period, but not made public until July 10, 2018. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the United States Constitution.[4] After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the temporary modification resulted in the removal of one or more items from the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018, and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor.

## DISCUSSION

Plaintiffs' request for a preliminary injunction is centered on its claim that the federal defendants violated the APA. The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a

_____

[4] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

PRELIMINARY INJUNCTION - 7

WASHSTATEC003067

temporary modification were procedurally defective in that the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1) and failed to obtain the concurrence of the Secretary of Defense as required by the President when he delegated his removal authority to the Secretary of State in Executive Order 13637, § 1(n)(i).[5] Plaintiffs also argue that, to the extent the temporary modification permits "any United States person" to use the CAD files at issue, the federal government's action impermissibly conflicts with state and federal laws limiting access to guns. Finally, plaintiffs challenge the decision to allow the CAD files to be published on the internet as arbitrary and capricious because the State Department failed to articulate any explanation for its decision to allow the publication of the CAD files on the internet or to alter its earlier factual findings and representations regarding the harms such publication will likely cause.

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States lack standing, while the private defendants argue that this lawsuit is an impermissible collateral attack on the outcome of the litigation in the Western District of Texas.[6]

---

[5] Plaintiffs, citing a presidential tweet and a White House press briefing, also suggest that the State Department exceeded its authority over the USML because the President disagrees with the way in which that authority was exercised. Plaintiffs acknowledge, however, that the President has delegated USML designations to the State Department. That delegation was not conditioned on obtaining the President's prior approval of or subsequent acquiescence to a listing decision. To the extent the President believes that allowing printable gun files to be published on the internet is not sensible, he has the power to influence, if not outright direct, the State Department's decision-making in this matter. He has not yet done so.

[6] The private defendants' § 701 argument is discussed below.

PRELIMINARY INJUNCTION - 8

WASHSTATEC003068

### 1. Standing

In order to present a justiciable case or controversy under Article III of the U.S. Constitution, plaintiffs must have standing to challenge defendants' conduct and pursue the relief requested.

> [The] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted). In an APA action, a State alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision that is allegedly causing harm. Mass. v. Envt'l Protection Agency, 549 U.S. 497, 517 (2007). In addition, a State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation. Dep't of Fair Emp't & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

Plaintiffs allege that the federal defendants failed to provide notice of their intent to remove technical data related to the manufacture of 3D guns from the USML and have made a wholly unsupported - and therefore arbitrary and capricious - decision which, in the State Department's own words, will make anyone in possession of a commercially-available 3D printer capable of automatically generating a lethal firearm that would be virtually undetectable

PRELIMINARY INJUNCTION - 9

WASHSTATEC003069

in metal detectors and other security equipment. The federal defendants assert that the alleged failures are harmless or are causally unrelated to any harm the States might suffer because the federal government's regulatory authority under the AECA is limited to exports and the plaintiffs' concerns are purely domestic. Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well.

The Court finds that plaintiffs have not only alleged harm to their legally protectable sovereign interests under the traditional standing analysis, but have also alleged a procedural APA claim where there is a possibility that compelling compliance with the specified procedures will prompt the agency to reconsider its decision. Forcing the federal defendants to give Congress thirty days' notice of the removal of the CAD files from the USML and to seek the concurrence of the Department of Defense would afford other executive branch entities (including the President) an opportunity to impact the decisionmaking process and would give both Congress and the States a chance to generate any statutes or regulations deemed necessary to address the regulatory void the delisting would create. Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the

PRELIMINARY INJUNCTION - 10

WASHSTATEC003070

USML. There is, at the very least, a possibility that the States would benefit from the relief requested in this litigation.

Plaintiffs have standing to pursue the relief requested in the amended complaint. Plaintiffs have alleged an injury in fact that is directly threatened by the federal defendants' proposed delisting of the technical data contained in Defense Distributed's CAD files and that could be ameliorated, if not avoided entirely, as a result of this litigation.

**2. Collateral Attack**

The private defendants argue that this lawsuit is an impermissible collateral attack on the dismissal with prejudice of the Western District of Texas litigation. They reason that, had the States moved to intervene in the prior litigation in order to object to the proposed settlement or to seek a preliminary injunction precluding its execution, the motion would have been denied and the States cannot, therefore, obtain such relief here. The conclusion does not follow from the premise. The reasons the States would likely not have been permitted to intervene in the prior litigation is that they were not necessary parties, they had no right to appear simply because they were interested in its outcome, their claim had nothing to do with the facts or law at issue between the existing parties, and their APA-based objections could be heard and their interests protected in a separate litigation with the federal defendants. See Fed. R. Civ. P. 19 and 24. The district court's likely refusal to allow plaintiffs to appear and/or intervene in the Western District of Texas litigation is not relevant to, much less dispositive of, plaintiffs' right to seek relief in this litigation.

If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. If the remedy afforded in this litigation impinges on the federal

PRELIMINARY INJUNCTION - 11

defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are challenging the adequacy of agency action. Defendants offer no case law suggesting that violations of the APA can be shielded from judicial review by simply incorporating them into a private settlement agreement.

**B. Likelihood of Success on the Merits**

**1. Congressional Notice**

The AECA authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The President has the power to designate "defense articles and defense services:" the items so designated constitute the USML. Id. The USML identifies categories of defense articles and services that are subject to export controls. The list is "organized by paragraphs and subparagraphs" that "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments; and technical data and defense services directly related to the defense articles of that USML category." 22 C.F.R. § 121.1(a). The USML, Category I, includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the CAD files Defense Distributed seeks to publish are subject to the export controls of ITAR. The Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has

PRELIMINARY INJUNCTION - 12

WASHSTATEC003072

provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." 22 U.S.C. § 2778(f)(1).

Plaintiffs have shown a likelihood of success on the merits of their APA claim because the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.[7] Assuming that is the case, the federal defendants acknowledge that the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of the review be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

The Department of State argues that its decision to allow the publication of previously-regulated CAD files does not trigger the Congressional notice requirement because it has not removed an "item" from the USML. Defendants argue that the notice requirement applies only

_____

[7] The federal defendants refused to produce the administrative record of the agency's decision (Dkt. # 49) and instead rely on the declaration of the Director of the Office of Defense Trade Control Policy within the DDTC (Dkt. # 64-1) to explain how and why the decision was made to reverse the CJ determination regarding the CAD files at issue. This tactic has placed plaintiffs and the Court at a decided disadvantage in evaluating what the government relied upon when concluding that the State Department's prior findings regarding the national security risks posed by plastic, untraceable, undetectable guns should be overruled. For purposes of the procedural APA claim, however, the declaration confirms that notice to Congress will be given as required by 22 U.S.C. § 2778(f) if and only if a final rule is issued. Dkt. # 64-1 at ¶ 24.

PRELIMINARY INJUNCTION - 13

when a whole group or category of defense articles described in the USML, such as "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R. § 121.1(I)(a), is removed and that that has not yet happened. This argument conflates "category" with "item." As described in the statute, the USML is a list of items designated by the President as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an exhaustive list of every individual article or service that is subject to export control under the AECA, the Department of State opted to populate the USML with generally descriptive categories. Those categories describe end-items, however, and it is those items that are the "defense articles and defense services" that are subject to export control under the AECA. 22 C.F.R. § 121.1. See also Fact Sheet on President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative (visited August 21, 2018) (noting that the United States' system of export control involved an "extensive list of controlled items which resulted in almost 130,000 licenses" in 2009). The congressional review and notice requirements specifically apply to items, not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms that it is the removal of a particular article or service - i.e., an item rather than a category - that triggers the review and notice requirements. The Department describes the CJ procedure as a means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations reiterate that the "Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the statute and implementing regulations, the Court finds that plaintiffs are likely to prevail on their

PRELIMINARY INJUNCTION - 14

WASHSTATEC003074

argument that the terms "item" and "category" are distinct and that Congressional notice is required whenever a previously-designated defense article or service is to be removed from the AECA's reach.

As noted above, the DDTC made an express determination that certain CAD files that can be used with a 3D printer to manufacture guns and/or their components are "defense articles" or "defense services" under the USML. Defendants attempted to revoke that designation through the issuance of the "temporary modification" described in the settlement agreement in the Western District of Texas litigation, thereby removing the CAD files from the USML and lifting all export controls.[8] Congress was not notified prior to the removal. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of any final rule removing firearms up to .50 caliber from the USML. The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[9]

**2. Concurrence of the Secretary of Defense**

When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense

---

[8] The Court rejects the private defendants' attempt to distinguish the terms "remove" and "exclude" in this context.

[9] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification, its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

PRELIMINARY INJUNCTION - 15

WASHSTATEC003075

services subject to export control have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures. Plaintiffs are not likely to succeed on the merits of this aspect of its claim, however, because the relevant executive order expressly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Executive Order 13637, § 6(c).

### 3. Abrogation of State and Federal Law

In response to the States' objections regarding the scope of the purported authorization for "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from the CAD files at issue, both the federal and private defendants disavow any intent to alter or in any way impact existing federal prohibitions or limitations on the possession of firearms. The federal defendants also recognize the continuing viability of state law gun control measures. Plaintiffs do not address this argument in their reply memorandum.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the files. The federal defendants state that the change was the result of a multi-year review process which led to the determination that firearms up to .50 caliber "do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML." Dkt. # 64-1 at ¶ 24. Even if the Court accepts that the

PRELIMINARY INJUNCTION - 16

WASHSTATEC003076

undisclosed administrative record will support this argument,[10] there is no indication that the Department considered the unique properties of 3D plastic guns or evaluated the factors Congress deemed relevant when the Department decided to authorize the posting of the CAD files on the internet as of July 27, 2018.

Until April 2018, the federal government took the position that technical data related to the design and production of weapons using a commercially-available 3D printer posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic. Because they were virtually undetectable in metal detectors and other security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.

Against these findings related to the specific defense articles at issue in this litigation, the federal defendants state only that restricting the international availability of firearms up to .50 caliber will not provide the United States with a critical military or intelligence advantage. There

---

[10] Plaintiffs' motion to strike arguments based on the administrative record is DENIED.

PRELIMINARY INJUNCTION - 17

WASHSTATEC003077

is no indication that the Department evaluated the unique characteristics and qualities of plastic guns when it was considering the deletion of the small firearms category from the USML. Statements made at oral argument affirmatively suggest that it did not do so prior to July 27, 2018. Nor is there any reasoned explanation for its change in position regarding the harms that publication of the regulated technical data will engender. The State Department also appears to have evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Congress, however, directed the Department to consider how the proliferation of technical data and related weaponry would impact world peace, national security, and foreign policy. When President Obama initiated the multi-year review of the export control system on which defendants rely, the stated goals of the review included "enhanc[ing] U.S. national security" and updating the Cold War era system "to address the threats we face today and the changing economic and technological landscape." Fact Sheet on the President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export -control-reform-initiative (visited August 21, 2018). Based on the existing record, plaintiffs have raised serious questions regarding the merits of their claim that the federal defendants failed to consider aspects of the problem which Congress deemed important, failed to articulate a reasonable explanation for this particular decision in light of its prior findings and representations, and engaged in arbitrary and capricious agency action.

### 5. Agency Discretion

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to

PRELIMINARY INJUNCTION - 18

WASHSTATEC003078

agency discretion as a matter of law: the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML, which Congress chose not to make unreviewable.

"Over the years, [the Supreme Court has] read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 191 (1993). Thus, an express legislative bar such as that found in § 2778(h) is not a prerequisite to a finding that an action is committed to agency discretion by law. The Supreme Court has found that an agency's decision not to initiate enforcement proceedings, not to grant reconsideration of agency action, or how to allocate funds from a lump-sum budget allocation are presumptively unreviewable because those decisions often involve complicated balancing of factors within the agency's expertise, Congress imposed no relevant requirements or restrictions, and there is no adequate standard by which the judiciary could evaluate the agency action. Id. at 191-93. Those factors do not apply here. Plaintiffs are challenging the federal defendants' failure to comply with certain procedures that Congress and the courts have imposed when making removal decisions under AECA. "The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable." Batalla Vidal v. Duke, 295 F. Supp.3d 127, 148 (E.D.N.Y. 2017).

**6. First Amendment**

The private defendants argue that the CAD files are protected speech under the First Amendment, that restrictions on their ability to publish the files constitute a prior restraint that is presumed to be unconstitutional, and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the

PRELIMINARY INJUNCTION - 19

WASHSTATEC003079

publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to or otherwise invalidate plaintiffs' claims against the federal defendants. To the extent the private defendants' speech is impacted, their First Amendment interests are considered in the balancing of hardships and public interest section below.

**C. Irreparable Harm**

Plaintiffs have submitted evidence, including declarations and the federal defendants' prior findings, showing that the States will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3D printer are published on the internet. Many of the same concerns that prompted the DDTC to conclude that the CAD files are "defense articles" within the scope of the USML apply with equal force to the States. A gun made from plastic is virtually undetectable in metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings. The portability and ease of a manufacturing process that can be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing, possessing, and/or using guns to more easily evade those limitations. The publication of the technical data would subvert the domestic laws of states with more restrictive firearm controls and threaten the peace and security of the communities where these guns proliferate.

PRELIMINARY INJUNCTION - 20

In addition, the States have certain public safety, law enforcement, and proprietary interests that were not of particular concern to the United States when considering the effects the technical data would have if exported to other countries. The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if, as the private defendants advocate, every person owns a plastic gun.

The plaintiff States and the District of Columbia, as sovereigns, represent more than 160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding

PRELIMINARY INJUNCTION - 21

WASHSTATEC003081

undetectable and untraceable guns to the arsenal of weaponry already available will likely

increase the threat of gun violence they and their people experience.

Defendants do not argue that any of these injuries are reparable. Rather, defendants argue

that the injuries are not causally connected to the State Department's decision to overturn its

prior CJ determination and remove the CAD files from the USML. The federal defendants assert

that, because the AECA regulates the export of defense articles, a change in their regulatory

stance cannot be the cause of the domestic effects of which plaintiffs complain. As discussed in

the standing analysis, this argument ignores reality and is wholly unpersuasive. The inclusion of

the CAD files on the USML prevented the technical data from being posted on the internet.

Because there is no "domestic" internet, the ban had the collateral effect of making it more

difficult to locate and download instructions for the manufacture of plastic firearms both

domestically and internationally. It takes virtually no imagination to perceive the direct

connection between removing the CAD files from the USML, the internet publication of the

technical data, and the likelihood of the irreparable injuries plaintiffs have identified.

The private defendants, for their part, argue that the causal connection is broken because

nine[11] of the CAD files at issue are already on the internet (Defense Distributed posted them

again for good measure on July 27, 2018, as soon as the temporary modification and authorizing

letter were issued, but took them down when the temporary restraining order was entered).

Nevertheless, plaintiffs have shown that they are likely to suffer irreparable harm in the absence

of an injunction. First, it is not clear how available the nine files are: the possibility that a

---

[11] In their memorandum and at oral argument, the private defendants state that they published ten CAD files pursuant to the authorizations they received as part of the settlement. The file pertaining to the Ghost Gunner 2 assembly files were not covered by the USML and not subject to ITAR control. Dkt. # 29-1 at 82 and # 63-1 at 8.

PRELIMINARY INJUNCTION - 22

cybernaut with a BitTorrent protocol will be able to find a file in the dark or remote recesses of the internet does not make the posting to Defense Distributed's site harmless. Second, there is no information regarding when these files were posted and whether they were posted with the approval of the relevant government agency. Absent such approval, the files remain "technical data" subject to ITAR control because they are not in the "public domain" for purposes of the AECA. 22 C.F.R. § 120.10(b) and § 120.11(a)(7). Third, many of the files have not yet been released, including files created by third parties and any files Defense Distributed will develop in the future. Fourth, the private defendants' dogged pursuit of the right to publish these files - and the evident alarm with which the proposed publication has been met in the Congress, in the White House, amongst advocacy groups, and in state houses all over the country - suggest that further publication is not harmless.

Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are

PRELIMINARY INJUNCTION - 23

WASHSTATEC003083

likely to befall the States if an injunction is not issued.

**D. Balance of Hardships and Public Interest**

Against the likelihood that the States will suffer the various harms discussed above, the federal defendants identify no hardship of their own, but argue that the public interest in allowing the Executive to exercise its discretion in determining how best to promote national security weighs against preliminary injunctive relief. That discretion must, however, be exercised through the procedures established by Congress and not in an arbitrary and capricious manner.

The private defendants raise the more substantive argument that a preliminary injunction will impair their First Amendment rights, a loss which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). The First Amendment argument raises a number of challenging issues. Is computer code speech? If yes, is it protected under the First Amendment? To answer those questions, one would have to determine what the nature of the files at issue here is: are they written and designed to interact solely with a computer in the absence of the intercession of the mind or will of the recipient or is it an expressive means for the exchange of information regarding computer programming and/or weapons manufacturing? Are the export controls of the ITAR a prior restraint giving rise to a presumption that they are unconstitutional? Is the AECA a general regulatory statute not intended to control the content of speech but only incidentally limiting its unfettered exercise? Or is the government attempting to regulate distribution of the CAD files because of the message they convey? Depending on which level of scrutiny applies, does the regulation advance important governmental interests unrelated to the suppression of free speech and avoid burdening more speech than necessary or is the regulation narrowly tailored to promote a

PRELIMINARY INJUNCTION - 24

1  compelling Government interest?

2      The Court declines to wade through these issues based on the limited record before it and

3  instead presumes that the private defendants have a First Amendment right to disseminate the

4  CAD files. That right is currently abridged, but it has not been abrogated. Regulation under the

5  AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed,

6  securely transmitted, or otherwise published within the United States. The Court finds that the

7  irreparable burdens on the private defendants' First Amendment rights are dwarfed by the

8  irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that,

9  overall, the public interest strongly supports maintaining the status quo through the pendency of

10  this litigation.

11

12

13

14      For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is

15  GRANTED. The federal defendants and all of their respective officers, agents, and employees

16  are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I

17  of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and

18  the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018,

19  and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter

20  had not been issued until further order of the Court.

21

22

23      Dated this 27th day of August, 2018.

24      

25

26      Robert S. Lasnik
        United States District Judge

27

28  PRELIMINARY INJUNCTION - 25

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW JERSEY;
STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OREGON;
COMMONWEALTH OF PENNSYLVANIA;
STATE OF RHODE ISLAND; STATE OF
VERMONT and COMMONWEALTH OF
VIRGINIA,

               Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

               Defendants.

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
APRIL 19, 2019**[1]

---

[1] The briefing schedule for this motion is set by the Case Management Order (Dkt. # 115).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003086

***TABLE OF CONTENTS***

I.   INTRODUCTION AND RELIEF REQUESTED ........................................................ 1

II.  STATEMENT OF UNDISPUTED FACTS ............................................................... 2

    A.   AECA and ITAR Govern Export Control of Weapons and Related Technical Data .............................................................................................................. 2

    B.   The Subject Files Can Produce Functional Weapons Using a 3D Printer ................. 2

    C.   The State Department Defends Its Regulation of the Subject Files, Defeating Defense Distributed at Every Stage of the Litigation ................................ 3

    D.   Reversing Its Position, the State Department Settles with Defense Distributed by Agreeing to Remove the Subject Files from the U.S. Munitions List ................. 5

    E.   This Court Preliminarily Enjoins the Temporary Modification and Letter .............. 7

    F.   The State Department Offers Shifting, Unsupported Rationales for Its Actions ....... 7

    G.   Final Rules Are Forthcoming, According to the Federal Defendants ..................... 8

III. ARGUMENT .......................................................................................... 9

    A.   Legal Standard ................................................................................... 9

    B.   The State Department Failed to Provide the Required 30 Days' Notice to Congress and Exceeded Its Regulatory Authority ........................................ 10

    C.   The State Department's Actions Were Arbitrary and Capricious ......................... 12

        1.   The administrative record fails to explain or support the agency's asserted rationales for abruptly reversing its position. .................................. 12

        2.   The agency failed to consider the specific properties of 3D-printed guns and disregarded the unique threats they pose. ......................................... 15

        3.   The agency's stated rationales are pretextual as applied to 3D-printable firearm files. ..................................................................................... 18

    D.   The Court Should Vacate the State Department's Actions and Enjoin It from Further Attempts to Unlawfully Deregulate the Files ..................................... 20

IV.  CONCLUSION ...................................................................................... 24

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003087

## I. INTRODUCTION AND RELIEF REQUESTED

This lawsuit challenges the State Department's "temporary" deregulation of 3D-printable computer files for the automatic production of undetectable, untraceable plastic firearms. The subject files include specific files that Defense Distributed plans to release on the internet if they are exempted from federal export control, as well as files that may be created in the future and other unknown, unreviewed files. If the files are allowed to be published online, they will be permanently available to virtually anyone inside or outside the United States—including terrorists, assassins, violent criminals, mentally ill persons, and unsupervised children.

The State Department, which has regulated the subject files for years by including them on the U.S. Munitions List pursuant to the Arms Export Control Act (AECA), abruptly attempted to deregulate the files via a "Temporary Modification of Category I" of the Munitions List ("Temporary Modification") and a letter to Defense Distributed ("Letter"). It did so pursuant to a private settlement agreement, without following statutorily mandated procedures or providing any public notice, as a *fait accompli* before promulgating any final rule (or even considering public comments on a proposed rule). It also did so without considering the unique properties of 3D-printable firearms or the national and domestic security implications of permitting their "unlimited" release. The State Department's actions were unlawful, *ultra vires*, arbitrary and capricious, and unconstitutional, as established by the administrative record and other undisputed evidence. Its reckless and covert deregulation evaded Congress's "particularly rigorous oversight of the Munitions List" and public scrutiny as to an issue of national significance.

The Plaintiff States ask the Court to enter summary judgment in their favor, vacate the Temporary Modification and Letter, and permanently enjoin the Federal Defendants from removing the subject files from the Munitions List without following AECA's procedural requirements. The only potentially lawful way to remove the files is to comply with all mandatory procedures. In fact, the Federal Defendants say a compliant final rule is forthcoming, implicitly conceding the point even as they continue to defend the indefensible.

1

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003088

## II.    STATEMENT OF UNDISPUTED FACTS

The filed administrative record is consistent with the undisputed facts alleged and established by the States at earlier stages of this litigation, as set forth below.

### A.    AECA and ITAR Govern Export Control of Weapons and Related Technical Data

The Arms Export Control Act (AECA) authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Items he designates as "defense articles and defense services" constitute the U.S. Munitions List. *Id.* The President delegated his authority to designate Munitions List items to the State Department, *see* Executive Order 13637 § 1(n)(i), and the Department promulgated the International Traffic in Arms Regulations (ITAR), which are administered by its Directorate of Defense Trade Controls.[2] 22 C.F.R. §§ 120–130; *see* Dkt. # 64 (Fed. Defs' Opp. to PI) at 2.

Category I of the Munitions List includes all firearms up to .50 caliber and related "technical data," 22 C.F.R. § 121.1(I)(a), i.e., data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms, *id.* § 120.10(a). In cases where it is unclear whether a particular item is a defense article subject to ITAR, the Department makes an individualized "commodity jurisdiction" (CJ) determination using a procedure set forth in the ITAR. *See id.* § 120.4; Dkt. # 64 at 3.[3]

### B.    The Subject Files Can Produce Functional Weapons Using a 3D Printer

The files at issue in this case are Defense Distributed's 3D-printable Computer Aided Design (CAD) files that can be used to produce the "Liberator" pistol and other defense articles, plus other unidentified files that Defense Distributed "has and will continue to create and

---

[2] The Department, the Directorate, Michael R. Pompeo, Mike Miller, and Sarah Heidema are collectively referred to as the "State Department" or the "Federal Defendants."

[3] *See also* Declaration of Kristin Beneski, Ex. A (Aguirre Declaration), ¶¶ 19–20 (describing the CJ determination procedure).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003089

possess" in the future and any "similar files generated by its members and others."[4] A functional Liberator pistol can be made almost entirely of plastic using the CAD files and a commonly available 3D printer, with "considerably less know-how" than is needed to manufacture a firearm using "conventional technical data."[5] As then-Director of the Office of Defense Trade Controls Management Lisa V. Aguirre stated in a 2015 declaration, the "'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States" because it "is a plastic firearm which can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures such as metal detectors."[6] In addition to being undetectable, privately manufactured 3D-printed weapons can be untraceable by law enforcement because they lack serial numbers.[7]

From 2013 to April 2018, the Department considered the Liberator files and other 3D-printable firearm files to be "ITAR-controlled technical data" that cannot be exported (including by posting on the borderless internet) without prior authorization.[8] In 2015, the Directorate conducted an individualized CJ review of Defense Distributed's files and confirmed that they are "technical data under Category I(i) of the [Munitions List]" and subject to ITAR regulation.[9]

## C.  The State Department Defends Its Regulation of the Subject Files, Defeating Defense Distributed at Every Stage of the Litigation

In May 2015, Defense Distributed sued the State Department in a Texas federal district court, seeking to enjoin it from regulating the files. *Def. Distributed v. U.S. Dep't of State*, Case

---

[4] Ex. L (*Def. Distributed*: Second Amended Complaint), ¶¶ 25, 36, 40, 44–45 (referenced in Ex. B (Temporary Modification) and Ex. C (Settlement Agreement), ¶ 12).

[5] Ex. A (Aguirre Declaration), ¶ 29(b).

[6] *Id.* ¶ 35; *see also id.* n.9 (the Liberator's detectable metal component "can be removed without rendering it inoperable"); Ex. D (*Def. Distributed*: Opp. to Mot. for PI) at 10 n.6 ("the Liberator remains operable without the inserted metal"); Ex. E (*Def. Distributed*: Mot. to Dismiss) at 1 (Defense Distributed's CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms . . ."); Dkt. # 112 (Answer), ¶ 39 (admitting that "the Liberator is a plastic firearm" that is undetectable by walk-through metal detectors when it does not contain a removable piece of steel); *infra* at 22–23 & n.57.

[7] *See* Dkt. # 43-2 at 29–39 (McCord Decl.), ¶¶ 29–30, 33; *id.* at 40–44 (Kyes Decl.), ¶ 8; *id.* at 4–18 (Graham Decl.), ¶ 35.

[8] Ex. A, Ex. 2 (CJ letter dated 5/8/13); *see* Ex. E (filed 4/6/18).

[9] Exs. F, G (CJ determinations).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003090

No. 15-cv-372-RP (W.D. Tex.). In opposing Defense Distributed's motion for a preliminary

injunction, the State Department argued that its regulation of the files was proper (and

furthermore, vital) because, *inter alia*:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."[10]

In a supporting declaration, then-Director Aguirre explained that the unrestricted export

of Defense Distributed's CAD files would result in the production of fully operable and

undetectable plastic firearms, that their use to commit terrorism, piracy, assassinations, or other

crimes would cause serious and long-lasting harm to the foreign policy and national security

interests of the United States, that efforts to restrict the availability of defense articles to enemies

of the United States would fail, that the proliferation of weapons and related technologies would

contribute to a more dangerous international environment, and that their export would undercut

the domestic laws of nations that have more restrictive firearm controls and the United States'

foreign relations with those nations would suffer.[11]

The district court denied Defense Distributed's motion for a preliminary injunction,

noting that the company's avowed purpose is to facilitate "*global* access to, and the collaborative

---

[10] Ex. D at 10–11.
[11] Ex. A, ¶ 35.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003091

production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through AECA.[12] The Fifth Circuit affirmed, citing both the national security implications of the CAD files and the permanent nature of the internet, and found the State Department had "asserted a very strong public interest in national defense and national security."[13]

On April 6, 2018, the State Department moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability."[14] According to the State Department, the CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad" and the Department "has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted."[15]

**D.      Reversing Its Position, the State Department Settles with Defense Distributed by Agreeing to Remove the Subject Files from the U.S. Munitions List**

By April 30, 2018, the State Department had "reached a tentative settlement agreement" with Defense Distributed,[16] which was ultimately approved by Department officials.[17] Pursuant to the Settlement Agreement, the State Department changed course, abandoning its prior regulatory and litigation positions and permitting Defense Distributed to post the subject files on

---

[12] Ex. H (*Def. Distributed*: Order denying PI) at 8–9.
[13] Ex. I (*Def. Distributed*: 5th Cir Opinion) at 10, 12–13.
[14] Ex. E at 1.
[15] *Id.* at 1, 3, 7.
[16] Ex. M (*Def. Distributed*: Mot. to Stay) (filed 4/30/18).
[17] Ex. N (*Def. Distributed*: Joint Settlement Status Rpt.) (filed 6/28/18).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003092

the internet and distribute them to "any United States person." Specifically, the Department agreed to: (a) "draft and . . . fully pursue" a notice of proposed rulemaking (NPRM) and final rule revising Munitions List Category I to exclude the "technical data that is the subject of the Action"; (b) announce a "temporary modification" of Category I to exclude the data while the final rule is "in development"; (c) issue a letter to Defense Distributed advising that its files are "approved for public release (i.e., unlimited distribution)" and exempt from ITAR; and (d) acknowledge and agree that the Temporary Modification "permits any United States person" to "access, discuss, use, reproduce, or otherwise benefit from" the data, and that the Letter "permits any such person to access, discuss, use, reproduce or otherwise benefit from" Defense Distributed's files.[18] The Settlement Agreement contains no findings of fact or other information that could explain the Department's change of position or invalidate its prior analysis as to the security implications of "unlimited distribution" of the files.[19]

The State Department fulfilled each of these terms. On May 24, 2018, it published the promised NPRM in the Federal Register, with a public comment period ending on July 9. 83 Fed. Reg. 24,198. The NPRM does not specifically mention 3D-printed guns. *See id.* The Settlement Agreement was signed on June 29, in the midst of the comment period, but was not made public until July, when the comment period ended.[20] On July 27, the Department issued the Temporary Modification and the Letter. The Temporary Modification states that the Department "has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify United States Munitions List (USML) Category I to exclude" the subject files. The "temporary" removal of these files was to "remain in effect while the final rule referenced in paragraph 1(a) of the Settlement Agreement is in development."[21] The Letter states

---

[18] Ex. C, ¶ 1(a)–(d).
[19] *See generally* Ex. C. The Settlement Agreement expressly states that it does not "reflect any agreed-upon purpose other than the desire of the Parties to reach a full and fair conclusion of the Action, and to resolve the Action without the time and expense of further litigation." *Id.* ¶ 5.
[20] Dkt. # 95 (Preliminary Injunction) at 7; Dkt. # 112 (Answer), ¶ 53 (admitting the Settlement Agreement was "made public in July 2018").
[21] Ex. B.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003093

1  that the Department "approve[s]" Defense Distributed's files "for public release (i.e., unlimited

2  distribution)," but offers no rationale for this.[22] Those actions prompted this lawsuit.

3  **E.      This Court Preliminarily Enjoins the Temporary Modification and Letter**

4         The Court granted the States' motion for a temporary restraining order, then converted

5  the order to a preliminary injunction.[23] The Court ruled that the States had standing to challenge

6  the Temporary Modification and Letter, were likely to succeed on the merits of their APA claim

7  that the Department removed items from the Munitions List "without the required Congressional

8  notice," "raised serious questions regarding the merits" of their claim that the Department's

9  actions were arbitrary and capricious, and established that the public interest "strongly supports"

10  an injunction to prevent irreparable harm caused by the files' public release on the internet.[24]

11  **F.      The State Department Offers Shifting, Unsupported Rationales for Its Actions**

12         In this litigation, the Federal Defendants offered a new and different reason for the State

13  Department's deregulation of the subject files. Contrary to the Temporary Modification's

14  assertion that the deregulation was "in the interest of the security and foreign policy of the United

15  States,"[25] the Federal Defendants conceded at oral argument that "undetectable plastic firearms

16  are a serious security threat."[26] Their new rationale is that "the Department determined" that non-

17  automatic and semi-automatic firearms under .50 caliber and related technical data "do not

18  provide the United States with a critical military or intelligence advantage" because these items

19  are "already commonly available," as stated in the August 15, 2018 Declaration of Sarah J.

20  Heidema.[27] But at oral argument, the Federal Defendants conceded as follows:

21         THE COURT: Of course you cannot buy a 3D-printed gun in any firearms

22  _____

23         [22] Ex. J (Letter) at 2.
         [23] Dkt. # 23 (TRO); Dkt. # 95.
         [24] Dkt. # 95 at 9–11, 12–15, 16–18, 20–24, 25.
24         [25] Ex. B.
         [26] Ex. K (Verbatim Report of Proceedings on Aug. 21, 2018) at 35:4–8; *see also id.* at 24:12–14 ("The
25  federal government agrees that undetectable plastic firearms pose a significant risk to domestic public safety.").

26         [27] Dkt. # 64-1 (Heidema Decl.) ¶¶ 19, 21; Dkt. # 64 (Fed. Defs' Opp. to PI) at 22. The "critical military or
   intelligence advantage" rationale also appears in the preamble to the 2018 NPRM, which is part of the Supplemental
   Record, but the NPRM does not specifically mention 3D-printed guns or the subject files.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003094

store in the United States that's undetectable and untraceable, can you?

    MR. MYERS: No, Your Honor, if it were undetectable and untraceable, that would be a violation of the Undetectable Firearms Act.[28]

On October 19, 2018, the Federal Defendants submitted their designated "Administrative Record."[29] The States challenged the sufficiency of that record and moved to supplement it.[30] In response, the Federal Defendants agreed to partially supplement the record as requested,[31] and they filed supplemental materials (the "Supplemental Record") on December 20, 2018.[32]

Neither the Administrative Record nor the Supplemental Record contains any evidence to support either of the State Department's purported "determin[ations]" regarding the subject files.[33] The Supplemental Record contains over 3,000 public comments on the May 24, 2018 NPRM.[34] Although the NPRM does not specifically mention 3D-printed firearms, approximately 386 of the public comments do; of those, all are opposed to the NPRM.[35] The Federal Defendants represented in this litigation that they did not consider the 2018 NPRM comments in enacting the Temporary Modification and Letter.[36]

## G. Final Rules Are Forthcoming, According to the Federal Defendants

The State Department's May 24, 2018 NPRM proposes to remove all non-automatic and semi-automatic firearms under .50 caliber and related technical data from the Munitions List, which would instead be governed by the Commerce Department's Export Administration Regulations (EAR). 83 Fed. Reg. 24,198. Unlike the ITAR, the EAR do not allow for regulation of items that have been posted on the internet—even for national security reasons. *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4) (excluding from EAR regulatory jurisdiction any "published"

---

[28] Ex. K at 32:5–21.
[29] Dkt. # 116.
[30] Dkt. # 132. The Motion to Supplement is pending as of the filing of this motion.
[31] *See* Dkt. # 152 at 3.
[32] Dkt. # 158.
[33] *See generally id.*
[34] *See* Declaration of Jennifer D. Williams ¶ 4(25); Dkt. ## 158-5, 158-6, 158-7.
[35] Williams Decl. ¶ 4(25).
[36] *See* Dkt. # 152 at 6–7 (arguing that the original Administrative Record was "complete" and there was "no reason" for the Department to have considered the 2018 NPRM comments).

8

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003095

information and software, including that made available for "[p]ublic dissemination (i.e., unlimited distribution) in any form . . . including posting on the Internet on sites available to the public . . . .". The Commerce Department's May 24, 2018 companion NPRM explains that, for example, "if a gun manufacturer posts a firearm's operation and maintenance manual on the internet," the "manual would no longer be 'subject to the EAR.'" 83 Fed. Reg. 24,166, 24,167 (May 24, 2018) (citing 15 C.F.R. §§ 734.3(b), 734.7(a)).

As of the filing of this brief, neither State nor Commerce has issued a final rule. The Federal Defendants have represented in this litigation that final rules are forthcoming, Dkt. # 131, but offered "no details regarding the substance" of these rules, Dkt. # 169 (Order) at 2, including whether they will be consistent with the NPRMs as applied to the subject files.

### III. ARGUMENT

#### A. Legal Standard

Under the APA, courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Where the material facts are not genuinely disputed and the questions before the Court are purely legal, the Court can resolve an APA challenge on a motion for summary judgment. Fed. R. Civ. P. 56; *King County v. Azar*, 320 F. Supp. 3d 1167, 1171 (W.D. Wash. 2018), *appeal dismissed*, 2018 WL 5310765 (9th Cir. Sept. 20, 2018) (citing *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)).

"[I]n APA cases, the Court's role is to determine whether, as a matter of law, evidence in the administrative record supports the agency's decision." *King County*, 320 F. Supp. 3d at 1171 (citing *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Review is based on "the whole record," 5 U.S.C. § 706, which "consists of all documents and material directly or *indirectly* considered by the agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). Courts may also consider extra-record evidence when necessary to determine whether the agency

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003096

has considered all relevant factors and explained its decision, has relied on documents not in the filed record, or has acted in bad faith. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

## B. The State Department Failed to Provide the Required 30 Days' Notice to Congress and Exceeded Its Regulatory Authority

AECA prohibits the State Department from removing any item from the Munitions List "until 30 days after the date on which [it] has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate" in accordance with established notification procedures. 22 U.S.C. § 2778(f)(1). The notice requirement furthers Congress's "particularly rigorous oversight of the Munitions List," *United States v. Zheng*, 590 F. Supp. 274, 278–79 (D.N.J. 1984), *vacated on other grounds*, 768 F.2d 518 (3d Cir. 1985), and was strengthened in 2002 in response to perceived attempts to evade that oversight, *see* H.R. Rep. No. 107-57, at 86–87 (2001).

The Federal Defendants concededly failed to provide this 30-day notice before issuing the Temporary Modification and Letter.[37] This failure is confirmed by the Administrative Record and the Supplemental Record, which contain no evidence that such notice was given.[38] Based on this statutory violation alone, the Court should invalidate the Temporary Modification and Letter. *See* 5 U.S.C. § 706(2)(A), (C), (D) (a reviewing court "shall . . . hold unlawful and set aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law").

The Federal Defendants previously sought to justify their failure to provide notice by claiming that the Temporary Modification did not remove an "item" from the Munitions List, but the Court has already correctly ruled as a matter of law that the subject files at issue here are

---

[37] *See* Dkt. # 95 (Preliminary Injunction) at 12–13 & n.7 (noting that Federal Defendants "acknowledge" the notice requirement and that the Heidema Declaration "confirms" the notice was not given); Dkt. # 64-1 ¶ 30 (stating that "Congress will receive the necessary notifications" only in connection with a final rule).

[38] *See generally* Dkt. # 116 (Admin. Record); Dkt. # 133 (Williams Decl.) ¶ 4 (summarizing contents of Administrative Record); Dkt. # 158 (Supp. Record; Second Williams Decl.) ¶ 4 (summarizing contents of Supplemental Record).

10

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003097

1   "items" or "articles" to which the notice requirement applies. Dkt. # 95 at 14–15; *see* 22 U.S.C.

2   § 2778(a)(1) (designated "defense articles" are "items" that "constitute the United States

3   Munitions List"); 22 C.F.R. § 121.1 (Munitions List does not enumerate every controlled

4   "article" or "item," but describes "categories" of items); *United States v. Zhen Zhou Wu*, 711

5   F.3d 1, 12 (1st Cir. 2013) (the Munitions List is "a series of categories describing the kinds of

6   items that qualify as 'defense articles'"). AECA's 30-day notice requirement therefore applies,

7   and was not followed in this case. The Temporary Modification and Letter are procedurally

8   defective and must be set aside for this reason alone.

9        In addition to violating AECA's procedural requirements, the Temporary Modification

10   and Letter exceeded the State Department's delegated authority under AECA and violated the

11   limits on federal power established by the Tenth Amendment by purporting to authorize "*any*

12   United States person" to "use" the files to print their own undetectable and untraceable weapons,

13   and to permit "unlimited distribution" of the files.[39] The States have numerous laws restricting

14   the possession and use of firearms by "United States persons" and others, including laws

15   prohibiting ineligible persons from possessing firearms, requiring background checks as a

16   condition of acquiring firearms, and regulating the manufacture of firearms. *See* Dkt. # 29

17   (FAC), ¶¶ 68–217 (citing state gun-safety laws). Several of the Plaintiff States have also enacted

18   or proposed laws that specifically regulate 3D-printed guns. *See* N.J. SB 2465; Wash. SB 5061;

19   D.C. B23-0018; R.I. S0084; Md. SB 8. The Department's overly broad authorization well

20   exceeds the scope of its authority under AECA to regulate exports, and on its face purports to

21   abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth

22   Amendment. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the

23   Constitution . . . are reserved to the States respectively, or the people."); *Bond v. United States*,

24   572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public

25   good—what we have often called a 'police power.'"); *cf. District of Columbia v. Heller*, 554

26

---

[39] Ex. C, ¶ 1(d) (emphasis added); Ex. J at 2.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003098

U.S. 570, 626–27 (2008) (acknowledging validity of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"). The States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of "any United States person" to "use" the files to print their own undetectable and untraceable weapons.

## C.    The State Department's Actions Were Arbitrary and Capricious

In addition to violating both AECA and the U.S. Constitution, the Temporary Modification and Letter are arbitrary and capricious, and should be invalidated for that independent reason. Agency action is "arbitrary and capricious," and must be set aside, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is also arbitrary and capricious if it is not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 42–43 (citation and internal quotation marks omitted). When an agency reverses position, it must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy," *F.C.C. v. Fox Television Studios, Inc.*, 556 U.S. 502, 516 (2009), and "must show that there are good reasons for the new policy," *id.* at 515. In short, to survive arbitrary-and-capricious review, agency action must be demonstrably "logical and rational." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

### 1.    The administrative record fails to explain or support the agency's asserted rationales for abruptly reversing its position.

Judicial review of agency action "is based on the administrative record and the basis for

---

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003099

the agency's decision must come from the record." *Ass'n of Irritated Residents v. E.P.A.*, 790 F.3d 934, 942 (9th Cir. 2015); *see also, e.g., Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive APA review, "the facts on which the agency purports to have relied" must "have some basis in the record") (internal quotation marks omitted). Absent compliance with this basic requirement, a reviewing court would be unable to measure agency action against the relevant governing standard. *See, e.g., U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the final agency decision reflect[ed] the rational outcome of the agency's consideration of all relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact considered by the agency").

Here, the Temporary Modification itself is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearm files.[40] Neither the Letter nor the Settlement Agreement, nor any other part of the filed record, memorializes the Department's "determin[ation]" or offers any reasoning to support it.[41] The Temporary Modification asserts, with no explanation or elaboration, that the State Department "has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify the United States Munitions List to exclude" the subject files. Simply stating that the Department "has determined" that permitting dissemination via the internet is somehow "in the interest" of U.S. national security and foreign policy is insufficient to survive judicial review. The Department must explain *why* it made this determination, demonstrating a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. But the filed record is completely devoid of any relevant "facts found," much less a "rational connection" to the decision to deregulate the subject files.

---

[40] *See* Ex. B; *see generally* Dkt. ## 116 (Admin. Record), 158 (Supp. Record).

[41] *See* Ex. J; Ex. C; Dkt. # 95 at 6 ("No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests."); *see generally* Dkt. ## 116, 158.

13

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003100

1    The absence of evidence or explanation is unsurprising, since the Federal Defendants

2    conceded in this litigation that 3D-printable firearms *do* pose a "serious security threat," and

3    offered a *different* explanation for the deregulation: that the subject files do not provide a "critical

4    military or intelligence[] advantage" because they are "already commonly available[.]"[42] This new

5    explanation, which is supported only by the *post hoc* Heidema Declaration, merits no

6    consideration because "[t]he focal point for judicial review should be the administrative record

7    already in existence, not some new record made initially in the reviewing court." *Fla. Power &*

8    *Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *San Luis & Delta-Mendota Water Auth. v. Jewell*,

9    747 F.3d 581, 602 (9th Cir. 2014) (same). In any case, neither the Heidema Declaration itself

10   nor any part of the administrative record provides a reasoned explanation for the new rationale

11   as applied to the subject files. In fact, the Federal Defendants conceded in these proceedings that

12   undetectable and untraceable 3D-printable firearms are *not* commonly available.[43]

13   Furthermore, far from acknowledging that the Temporary Modification and Letter

14   represent a reversal of its regulatory position or offering a rational explanation for this (as is

15   required), the State Department concealed the reversal until it was a *fait accompli*. *See Fox*

16   *Television Stations*, 556 U.S. at 515 ("the requirement that an agency provide reasoned

17   explanation for its action would ordinarily demand that it display awareness that it *is* changing

18   position"); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) ("To

19   provide a satisfactory explanation, an agency must acknowledge and explain any departure from

20   its precedents."). The State Department privately reached the tentative settlement in the *Defense*

21   *Distributed* case in April 2018, which became final on June 29. Meanwhile, the comment period

22   for the NPRM (which does not even mention 3D-printed firearms) was still open through July

23   9. The Settlement Agreement was not publicly disclosed until July. The Department issued the

24   Temporary Modification and Letter on July 27 without the required notice to Congress or any

25

26   _____

[42] Dkt. # 64 at 22; Dkt. # 64-1 ¶¶ 19, 21.
[43] *See* Ex. K at 32:5–21.

14

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003101

1    other advance warning or opportunity for public input on the reversal.

2        In sum, neither the original rationale asserted in the Temporary Modification, nor the

3    new rationale asserted in this case, finds any factual support or rational explanation in the record.

4    Instead of acknowledging or explaining its reversal, the Department concealed it, and would

5    have entirely evaded oversight and review if not for this lawsuit. These basic failures render the

6    Temporary Modification and Letter arbitrary and capricious.

7        **2.    The agency failed to consider the specific properties of 3D-printed guns and disregarded the unique threats they pose.**

8

9        Not only are the State Department's shifting rationales entirely unsupported, but the

10   administrative record also demonstrates that the Department failed to consider the specific

11   properties of 3D-printed guns and their unique threats to world peace, national security, and

12   foreign policy. In ignoring these issues, the Department disregarded the factors Congress deemed

13   relevant to export control, as well as the evidence supporting the Department's previous

14   regulation of the subject files to further AECA's stated purposes.

15       An agency's action is arbitrary and capricious where it "entirely failed to consider an

16   important aspect of the problem" or "offered an explanation for its decision that runs counter to

17   the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. The agency must consider all

18   "relevant factors," *id.* at 42—in particular, the factors "Congress intended" the agency to

19   consider, *id.* at 55. And the agency cannot pick and choose what evidence to rely on and disregard

20   the rest; judicial review is based on the "whole" record, i.e., "all documents and material directly

21   or *indirectly* considered by the agency decision-makers," including "evidence contrary to the

22   agency's position." *Thompson*, 885 F.2d at 555.

23       Congress directed that export regulation under AECA must be "[i]n furtherance of world

24   peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The

25   State Department based its previous regulation of the subject files squarely on fulfilling these

26   purposes, invoking threats to "U.S. national security, U.S. foreign policy interests, or

15

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003102

international peace and stability" in its April 6, 2018 motion to dismiss in the *Defense Distributed* case.[44] Elsewhere in its briefing, the Department emphasized the unique dangers posed by the subject files, which "constitute the functional equivalent of defense articles" and can be used to "automatically" generate a "lethal firearm" that is "virtually undetectable in metal detectors and other security equipment."[45] The Department expressed its particular concern that such "undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."[46] The Supplemental Record amply supports the conclusion that the subject files pose unique threats to U.S. national security and foreign policy, as reflected in the Department's own CJ determinations, the Aguirre Declaration, and the Department's briefing in the *Defense Distributed* case.[47] Moreover, hundreds of the public comments on the 2018 NPRM, which the Department received before issuing the Temporary Modification and letter on July 27, 2018 (but admittedly did not consider), oppose the rule on the grounds that it would deregulate 3D-printable firearms.[48]

Despite this evidence, the Department decided to deregulate the subject files sometime during a three-week period in April 2018, providing no "reasoned explanation" for disregarding the facts and circumstances supporting its previous position. *Fox Television Studios*, 556 U.S. at 516; *see also SNR Wireless*, 868 F.3d at 1029 (D.C. Cir. 2017); *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."). As of April 6, 2018, the Department's position was that distributing the subject files on the internet would "threaten U.S. national security, U.S. foreign policy interests, or

---

[44] Ex. E at 1.
[45] Ex. D at 10.
[46] *Id.*
[47] *See* Exs. A, D, E, F, G.
[48] *See* Williams Decl., ¶ 4(25).

16

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003103

1 international peace and stability." By April 30, 2018, the Department had reached the settlement

2 agreement that resulted in the Temporary Modification and Letter, which deregulated the subject

3 files and approved them for "unlimited distribution."

4      Even though the Department was well aware of the characteristics and qualities of

5 undetectable firearms that render them uniquely dangerous, as reflected in its own CJ

6 determinations and its position in the *Defense Distributed* proceedings, there is no indication in

7 the record that it considered them in connection with the deregulation. This is consistent with

8 the Federal Defendants' statements at oral argument indicating that they did not consider these

9 unique factors until they took a "further look" at the issue in light of this Court's TRO:

10      MR. MYERS: Your Honor, since Your Honor entered the TRO, the
government has been further studying and further looking into this issue, as the
11 press secretary I think indicated she was -- or the President was welcoming that
opportunity. That further look has concluded. And the government's position on
12 this issue has not changed.[49]

13 Further, the Department admitted it did not consider the public comments on the 2018 NPRM—

14 even the hundreds of comments that oppose the rule due to its implications for 3D-printed guns,

15 which merit a meaningful response. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36

16 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to

17 significant points raised by the public.").

18      As noted above, the Federal Defendants' *post hoc* rationale for deregulating the subject

19 files—that they do not provide a "critical military or intelligence advantage"—need not be

20 considered because it is not reflected or supported anywhere in the filed record. But even taking

21 it at face value, this explanation fails to account for all of the factors Congress directed the

22 Department to consider. A defense article can threaten "world peace and the security and foreign

23 policy of the United States"—as the subject files do—regardless of whether it provides a "critical

24 military or intelligence advantage." Yet as the Court previously noted, the Department "appears

25 to have evaluated the export controls on small caliber firearms only through the prism of whether

26      [49] Ex. K at 34:3–8.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003104

restricting foreign access would provide the United States with a military or intelligence advantage." Dkt. # 95 at 18. This is borne out by the filed record, which contains no evidence whatsoever that any other factors were considered. The Department's asserted rationale fails to account for the national security and foreign policy factors Congress directed it to consider. "Such a failure to address 'an important aspect of the problem' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43)).

### 3. The agency's stated rationales are pretextual as applied to 3D-printable firearm files.

The available evidence strongly suggests that the State Department's asserted rationales for deregulating the subject files are pretextual. "[C]ourts have not hesitated to find that reliance on a pretextual justification violates the APA." *New York v. U.S. Dep't of Commerce*, --- F. Supp. 3d ----, 2019 WL 190285, at *112 (S.D.N.Y. Jan. 15, 2019) (citing, *inter alia*, *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior motive")). Because the basis for the agency's action must be disclosed in the record, "[i]t follows that a court cannot sustain agency action founded on a pretextual or sham justification that conceals the true 'basis' for the decision." *Id.* The *New York* court concluded, based on a number of factors, that the Commerce Department's rationale for adding a citizenship question to the U.S. Census was pretextual. *See id.* at *112–115. Many similar factors are also present here.

First, the Temporary Modification and Letter were highly procedurally irregular. As discussed above, they were issued without the required notice to Congress, or any other advance notice that would have afforded an opportunity for public scrutiny, and they partially effectuated a non-final proposed rulemaking. This concealed the deregulation from public view until it was complete, and deprived Congress of its right to exercise its "particularly rigorous oversight" of the Munitions List. *See New York*, 2019 WL 190285, at *112 ("conspicuous procedural

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003105

irregularities" supported finding of pretext, as did a "failure to disclose" that prevented subject matter experts from "conducting rigorous testing").

Second, the evidence shows that the State Department decided to deregulate the subject files abruptly, sometime during the three-week period from April 6 to April 30, 2018, in connection with the *Defense Distributed* settlement. Even if the global state of affairs had somehow changed drastically during the three-week period in which the reversal occurred—an improbable scenario for which there is no evidence—this short period would not have afforded enough time to reach a reasoned "determin[ation]" that permanent deregulation no longer presented a national security or foreign policy threat. The Federal Defendants have sought to justify the Temporary Modification and Letter by asserting they are of a piece with the May 24, 2018 NPRM, but this only underscores their irregularity, since the NPRM was not (and as of this filing, still is not) final, and the deregulation decision was made months before the NPRM comment period closed. *See New York*, 2019 WL 190285, at *112 (finding pretext where decision was made before the alleged basis for the decision occurred).

Third, evidence outside the filed record indicates that the Department's decision was based on a reason not disclosed in the record. Heather Nauert, then the State Department spokesperson, stated at a July 31, 2018 press briefing that the "Department of Justice suggested that the State Department and the U.S. Government settle this [*Defense Distributed*] case, and so that is what was done. . . . We took the advice of the Department of Justice, and here we are right now."[50] This "following DOJ's advice" rationale does not appear anywhere in the filed record. At the same time, Ms. Nauert acknowledged that the State Department still had "equity" in the matter of 3D-printed guns because it "wants to prevent the wrong people from acquiring weapons overseas."[51] This is inconsistent with deregulation being "in the interest of" U.S. national security and foreign policy and is further evidence of pretext. *See New York*, 2019 WL

---

[50] Dkt. # 35-1 at 5 of 46.
[51] *Id.*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003106

190285, at *112 (extra-record statements by Commerce Department official contradicted agency's stated rationale for its decision, supporting finding that this rationale was pretextual); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (consideration of extra-record evidence is appropriate where the record "does not disclose the factors that were considered" or the agency's "construction of the evidence").

Fourth, the original Administrative Record filed by the State Department failed to include evidence that was before it when it made its decision, including the Department's own CJ determinations related to the subject files, the Aguirre Declaration, and complete records from the *Defense Distributed* litigation in which the Department's regulation of the files was directly at issue. *See New York*, 2019 WL 190285, at *113, *48 ("curated and highly sanitized nature" of initial administrative record suggested intent to conceal true basis for decision).

In sum, the stated bases for the State Department's deregulation of the subject files—that deregulation is "in the interest of" U.S. national security and foreign policy, or that the subject files "do not provide a critical military or intelligence advantage"—are pretextual. "Because [the State Department's] stated rationale was not [its] actual rationale, [it] did not comply with the APA's requirement that [it] 'disclose the basis of [its] decision.'" *New York*, 2019 WL 190285, at *115 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–168 (1962)).

**D.  The Court Should Vacate the State Department's Actions and Enjoin It from Further Attempts to Unlawfully Deregulate the Files**

The Temporary Modification and Letter should be vacated. When agency action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the APA provides that the reviewing court "shall . . . hold unlawful and set aside" the agency action. 5 U.S.C. § 706(2). Vacatur is the "normal remedy" for unlawful agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Failure to provide required notice of the agency action is a "fundamental flaw," *id.*, and failure to address important aspects of the problem and ignoring relevant evidence are "major shortcomings," *Humane Soc'y*, 865 F.3d at

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003107

614, that make vacatur the appropriate remedy. Here, the Temporary Modification and Letter suffer from all of these fatal deficiencies and more. Further, this is not a case in which "the egg has been scrambled," *Allina*, 746 F.3d at 1110–1111; vacatur would simply restore the status quo and "allow the [pending final rule] to take effect," *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017)—assuming a final rule is lawfully promulgated.[52]

The States additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent "temporary modification" or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA.[53] Where vacatur of a deregulation decision is not "sufficient to redress [plaintiffs'] injury," a court may issue an injunction that has a "meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Here, absent a permanent injunction prohibiting further procedurally defective agency actions, the State Department may attempt another end-run around AECA's requirements before any final rule goes into effect. *See New York*, 2019 WL 190285, at *122 (permanent injunction was "necessary to make . . . vacatur effective, as it prevents [the agency] from arriving at the same decision *without* curing the problems" with its initial action). The States could once again face an abrupt final deregulation that threatens immediate, serious, and irreparable harm, and leaves them with no remedy aside from seeking another emergency TRO. Notably, the Department's position is that congressional notice was not required, *see* Dkt. # 64 at 18–20, and it has continued to defend this lawsuit without ever acknowledging the impropriety of its use of ITAR's "temporary modification"

---

[52] The States anticipate that any final rule that removes the subject files from the Munitions List would be arbitrary and capricious for many of the same reasons discussed herein. Of course, the issue is not ripe at this time, since no final rule has been published.

[53] The Private Defendants have previously opposed the entry of injunctive relief. *See* Dkt. ## 8, 11, 63. Their theories regarding the constitutionality of regulating the subject files are at best tangential to this case, in which the States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require the State Department to follow the law in making regulatory changes that affect the subject files. Federal regulation of Munitions List items has repeatedly survived constitutional challenge, *see United States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012), but to the extent there are any constitutional implications with respect to the subject files, they are not squarely presented here and the Court need not consider them.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003108

procedure to bypass the notice requirement and prematurely effectuate a non-final rule. *See United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ("defendant's recognition of the wrongful nature of its conduct" is a factor in whether a permanent injunction should issue). Even if a final rule that complies with the notice requirement is published in the near future, it may not go into effect until six months later. *See* 83 Fed. Reg. 24,200 (May 24, 2018) (rules revising Munitions List categories typically have a "delayed effective date of 180 days"). Another procedurally improper deregulation in the meantime would again leave the states with no option other than filing yet another complaint and seeking yet another TRO.

The standards for permanent and preliminary injunctions are "essentially the same," except that to obtain permanent relief, the plaintiff must show "actual success" on the merits rather than a likelihood of success. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Success on the merits, including as to procedural defectiveness, is established above. The irreparable harm the States will suffer if the files are permitted to be published online, and the strong public interest in preventing this, is also well established in the record of these proceedings. *See* Dkt. # 95 at 20–25; Dkt. # 43 at 19–24 & accompanying citations. Anyone with access to a public or commercially available, relatively inexpensive 3D printer[54]—regardless of their age, mental health status, or criminal history—would be able to download and instantly use the files to make functional weapons, fulfilling Defense Distributed co-founder Cody Wilson's "crypto-anarchist" vision of "evading and disintermediating" gun-safety regulations.[55] 3D-printed weapons will only become deadlier as the technology continues to evolve.[56]

3D-printable firearms pose substantial threats to public health and safety. The Liberator and other weapons made of plastic can evade metal detectors,[57] which are one of the most

---

[54] Patel Decl., ¶¶ 9, 17–18, 26; Scott Decl., ¶¶ 4–5; Racine Decl., ¶¶ 3–6. Unless otherwise indicated, all declarations cited in this section are filed at Dkt. # 43-2. An index of these declarations is filed at Dkt. # 43-1.

[55] *See* Dkt. # 44 (Rupert Decl.), Ex. 16.

[56] *See* Patel Decl., ¶¶ 21–26 (discussing emerging materials and technology that could be used to make deadlier weapons).

[57] McCord Decl., ¶¶ 11–13; Hosko Decl., ¶ 14; Bisbee Decl., ¶ 18; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 7; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 7; Coyne Decl., ¶ 4; Camper Decl., ¶ 7; Kyes Decl., ¶ 17.

22

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003109

1    significant forms of protection for public facilities such as airports, stadiums, courthouses and

2    other government buildings, schools,[58] and prisons.[59] For example, 3D-printable weapons will

3    make it possible for students to manufacture their own weapons that could be used in a school

4    shooting (and could evade metal detectors that some schools are installing to prevent such

5    shootings).[60] 3D-printed weapons such as the Liberator do not always look like conventional

6    firearms, and children may mistake them for toys and play with them—a common reason for

7    accidental gun deaths among children.[61]

8         3D-printable firearms would compromise law-enforcement efforts. They can be privately

9    manufactured with no serial numbers,[62] hampering law enforcement's ability to "trace" a firearm

10   to its original seller and subsequent purchasers, which can be used to solve crimes and combat

11   gun trafficking.[63] Untraceable "ghost guns" of the non-3D-printed variety are already

12   increasingly popular[64]—and increasingly being used to commit horrific crimes, including

13   multiple mass shootings in California.[65] 3D-printed weapons would also undermine law

14   enforcement efforts to forensically match bullets used to commit crimes with the gun from which

15   they are shot, both because plastic weapons do not leave "ballistic fingerprints" on a bullet or

16   casing,[66] and because the firing conditions cannot be reliably or safely replicated since the gun

17   is unstable and dangerous even to the shooter.[67] For many of these reasons, 3D-printed weapons

18   may be particularly attractive to criminal enterprises, which would likely embrace the technology

19

20       [58] McCord Decl., ¶¶ 7–8, 13, 18–21; Camper Decl., ¶ 7; Rivara Decl., ¶ 7; Hemenway Decl., ¶ 21;
     Wintemute Decl., ¶ 14.
21       [59] See generally Herzog Decl.
         [60] Rivara Decl., ¶ 7; see also Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.
22       [61] Rivara Decl., ¶ 6; Hemenway Decl., ¶ 20; Wintemute Decl., ¶ 13.
         [62] McCord Decl., ¶¶ 29–30, 33; Kyes Decl., ¶ 8; Graham Decl., ¶ 35.
23       [63] Hosko Decl., ¶¶ 11, 11; McCord Decl., ¶¶ 30–32, 34, 40; Bisbee Decl., ¶¶ 17–18; Camper Decl., ¶¶ 6,
     8; Kyes Decl., ¶¶ 8, 11, 13, 15–16; Graham Decl., ¶¶ 16, 32; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 8.
24       [64] Graham Decl., ¶¶ 17–18; id. ¶ 30 (noting increase in prohibited persons who possess ghost guns).
         [65] Id., ¶¶ 25(a)–(t), 33.
25       [66] Camper Decl., ¶ 12; see also McCord Decl., ¶ 35 ("law enforcement agencies and prosecutors will not
     be able to rely on forensic experts to match bullets used to commit crimes with [3D-printed] firearms").
26       [67] Camper Decl., ¶¶ 12–13; see Dkt. # 29, ¶¶ 74, 95, 109–10, 126, 131, 142, 150, 154, 157–58, 165,
     170–71, 180–82, 207 (citing States' laws establishing background-check requirements).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003110

for use in engaging in the violence, proceeds-collection, and retaliation that commonly attends the work of those organizations.[68]

3D-printable firearms also create a heightened risk of terrorist attacks, as the State Department has acknowledged.[69] Undetectable and untraceable firearms could be used by foreign terrorist organizations for attacks within the United States, including against persons residing in or visiting the Plaintiff States.[70] The apparent effectiveness of metal detectors in hindering such attacks would become meaningless if undetectable weapons became widely available; for example, "the 72,000 fans who pack CenturyLink for a Seahawks game suddenly become much more vulnerable to terrorists who seek to cause as much bloodshed as possible."[71]

Such "ongoing and concrete harm to [the States'] law enforcement and public safety interests . . . constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., as Circuit Justice). In opposing entry of a preliminary injunction, the Federal Defendants "d[id] not argue that any of these injuries are reparable." Dkt. # 95 at 22. The Federal Defendants would be unharmed by entry of a permanent injunction, which will merely prevent them from circumventing AECA's procedural requirements and ensure that any future agency action affecting export control of the subject files is AECA-compliant.

## IV.  CONCLUSION

For the reasons above, the Plaintiff States respectfully request that the Court enter summary judgment in their favor, vacate and set aside the Temporary Modification and Letter, and permanently enjoin the State Department from taking any other action to permit export of the subject files absent compliance with AECA.

---

[68] Hosko Decl., ¶¶ 15–16; McCord Decl., ¶¶ 39–41; Graham Decl., ¶ 37.
[69] Ex. D at 10–11.
[70] McCord Decl., ¶¶ 14–22; *see also* Dkt. # 44-1, Ex. 9 (Sen. Menendez letter 8/8/2018). These concerns are perhaps particularly salient for the District of Columbia, which is entirely urban, densely populated, hosts hundreds of heavily attended events each year, including numerous political marches and protests, and is filled with thousands of high-ranking federal officials and diplomats from around the world. *Id.*, Ex. 20 (Lanier Decl.), ¶¶ 13–15; *see also id.*, Ex. 21 (Op-ed by former Chief of U.S. Capitol Police and Senate Sergeant at Arms).
[71] McCord Decl., ¶¶ 17–18, 22.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003111

DATED this 15th day of February, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Jeffrey Rupert*
JEFFREY RUPERT, WSBA #45037
Division Chief
TODD BOWERS, WSBA #25274
Deputy Attorney General
KRISTIN BENESKI, WSBA #45478
JEFFREY T. SPRUNG, WSBA #23607
ZACHARY P. JONES, WSBA #44557
Assistant Attorneys General
JeffreyR2@atg.wa.gov
ToddB@atg.wa.gov
JeffS2@atg.wa.gov
KristinB1@atg.wa.gov
ZachJ@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS, *admitted pro hac vice*
Deputy Attorney General
Nelson.Richards@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHIL WEISER
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
Matt.Grove@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Maura Murphy Osborne*
MAURA MURPHY OSBORNE, *admitted pro hac vice*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003112

Assistant Attorney General
Maura.MurphyOsborne@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ilona M. Kirshon*
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.Kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Robyn Bender*
ROBYN BENDER, *admitted pro hac vice*
Deputy Attorney General
JIMMY ROCK, *admitted pro hac vice*
Assistant Deputy Attorney General
ANDREW J. SAINDON, *admitted pro hac vice*
Senior Assistant Attorney General
Robyn.Bender@dc.gov
Jimmy.Rock@dc.gov
Andy.Saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii

*/s/ Robert T. Nakatsuji*
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

*/s/ Brett E. Legner*

26

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003113

BRETT E. LEGNER, *admitted pro hac vice*
Deputy Solicitor General
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
BLegner@atg.state.il.us
ERobersonYoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa

/s/ Nathanael Blake
NATHANAEL BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
JULIA DOYLE BERNHARDT, *admitted pro hac vice*
JEFFREY PAUL DUNLAP, *admitted pro hac vice*
Assistant Attorneys General
JBernhardt@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

/s/ Jonathan B. Miller
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003114

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Jacob.Campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM, *admitted pro hac vice*
Assistant Attorney General
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

*/s/ Steven Wu*
STEVEN WU, *admitted pro hac vice*
Deputy Solicitor General
Steven.Wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

JOSH SHAPIRO
Attorney General of Commonwealth of Pennsylvania

*/s/ Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN, *admitted pro hac vice*
Executive Deputy Attorney General
MICHAEL J. FISCHER, *admitted pro hac vice*
Chief Deputy Attorney General
JGoldman@attorneygeneral.gov
MFischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Scott.Kaplan@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac vice*
Solicitor General
Benjamin.Battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of the Commonwealth of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*
Deputy Attorney General
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC003116

The Honorable Robert S. Lasnik

1

2

3

4

5

6

7  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF WASHINGTON
8  AT SEATTLE

9
   STATE OF WASHINGTON, et al.,                )   No. 2:18-cv-1115-RSL
10                                              )
        Plaintiffs,                             )   **FEDERAL DEFENDANTS'**
11           v.                                 )   **CONSOLIDATED OPPOSITION**
                                                )   **TO PLAINTIFFS' MOTION**
12  UNITED STATES DEPARTMENT OF                 )   **FOR SUMMARY JUDGMENT**
    STATE, et al.,                              )   **AND CROSS-MOTION FOR**
13                                              )   **SUMMARY JUDGMENT**
        Defendants.                             )
14  _____        )   **NOTED FOR: April 19, 2019**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

## INTRODUCTION

Manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

Indeed, this case is not about the regulation of U.S. persons who wish to utilize a 3D printer to produce their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provide a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

Plaintiffs' Amended Complaint, as well as their motion for summary judgment, misunderstands the nature of the Department of State's authority. But the Court need not reach Plaintiffs' claims under the Administrative Procedure Act ("APA") or the Tenth Amendment because Plaintiffs lack standing to assert their claims and fall outside the relevant statute's zone of interests. And in any event, Plaintiffs' claims fail on the merits. Accordingly, and for the reasons set forth below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

## BACKGROUND

### I. Statutory And Regulatory Background

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 1
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003118

States" to "control the *import* and the *export* of defense articles and defense services" and to promulgate regulations accordingly. 22 U.S.C. § 2778(a)(1) (emphasis added). The President has delegated this authority to the Department of State ("Department") in relevant part, and the Department has accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are administered by the Department's Directorate of Defense Trade Controls ("DDTC"). *See* Exec. Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130. At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the ITAR. *See* 22 C.F.R. Part 121. As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *Id.* § 121.1(I)(a), (i). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a)(1). Section 2778 of the AECA authorizes the President to (1) designate those defense articles and services to be included on the USML; (2) require licenses for the export of items on the USML; and (3) promulgate regulations for the import and export of such items on the USML. 22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary imports." The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States," *id.* § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

In certain cases where it is unclear whether a particular item is a defense article or defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using a procedure set forth in the ITAR. *See id.* § 120.4. Upon written request, DDTC will provide applicants with a determination as to whether the article, service, or data is within the scope of

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003119

the ITAR. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article, service, or data is covered by the USML, provides the equivalent performance capabilities of a defense article on the USML, or has a critical military or intelligence advantage. *See id.* § 120.4(d).

While the AECA and ITAR do not provide the Department with authority to prohibit the domestic manufacture or possession of 3D-printed guns, another federal statute deals with this topic. The Undetectable Firearms Act bars the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No. 113-57, 127 Stat. 656 (2013). Under that statute, firearms manufactured or sold in the United States must generally be capable of being detected by metal detectors and by x-ray machines. *See* 18 U.S.C. § 922(p)(1). Those requirements are not in any way affected by the actions challenged in this case, nor are the separate federal prohibitions on the possession of firearms by felons, persons subject to restraining orders, or the mentally ill. *See id.* § 922(g)(1) (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders); *id.* § 922(g)(4) (persons adjudicated as mentally ill). The Government continues to enforce these laws in order to address domestic safety issues related to undetectable firearms. The Department's determination under the ITAR at issue here will not affect those enforcement efforts.

## II. The Government's Settlement With Defense Distributed

In 2012, Defense Distributed published on the Internet "privately generated technical information regarding a number of gun-related items." *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization. *See id.* Defense Distributed removed the technical data and submitted a CJ request. *Id.* The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003120

publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. *Id.* at 701. For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment. *Id.* at 691-92. Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits. *Id.* at 695.

The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights. *Id.* at 458-59. The panel majority "decline[d] to address the merits" because the failure by plaintiffs to meet any single requirement for a preliminary injunction would require affirmance of the district court. *See id.* at 456-58. A dissent from the panel opinion did address the merits. *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding that "the State Department's application of its 'export' control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138 S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in district court. In April 2018, the Government moved to dismiss plaintiffs' second amended complaint. *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92. Meanwhile, the district court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003121

initiating a process under which the parties were able to reach a settlement before briefing on the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[1]

(b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . [ITAR], 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d) Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018. *See* Declaration of Sarah Heidema ("Heidema Decl."), Dkt.

---

[1] *See* Section III, *infra*. At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued. *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically"). Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013). By January 20, 2017, this export reform process had been completed for USML categories IV through XX.

[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

---

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003122

No. 64-1, ¶¶ 27, 29. The Settlement Agreement states that Defendants deny that they violated plaintiffs' constitutional rights. *See id.* ¶ 28.

## III. The Government's Rulemaking

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*. *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018). In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML." 83 Fed. Reg. at 24,198. As proposed, the items removed from the USML—which encompass the technical data at issue in *Defense Distributed* and this litigation—would no longer be subject to the ITAR's authorization requirements, i.e., no license from the Department of State would be required for their export. *See* Heidema Decl. ¶ 21; *see generally* 83 Fed. Reg. at 24,198. The Department of State "received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms." Heidema Decl. ¶ 23.

## IV. Procedural History

On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed. Compl., Dkt. No. 1. Plaintiffs alleged that the Government's settlement with Defense Distributed adversely affected their public safety laws, in violation of the APA and the Tenth Amendment. *Id.* at 21-41. Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court granted on July 31, 2018, Dkt. No. 23 ("Order"). Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43. The Court granted Plaintiffs' motion on August 27, 2018. Dkt. No. 95 ("Prelim. Inj."). Pursuant to the preliminary injunction issued by the Court, the Government is enjoined from "implementing or enforcing the

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003123

'Temporary Modification of Category I of the United States Munitions List' and the letter to

Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the

U.S. Department of State on July 27, 2018," and the Federal Defendants must "preserve the

status quo *ex ante* as if the modification had not occurred and the letter had not been issued

until further order of the Court." *Id.* at 25.

The Federal Defendants produced the administrative record on October 19, 2018, Dkt.

No. 116, and filed supplementary materials on December 20, 2018, Dkt. No. 158. Plaintiffs

moved for summary judgment on February 15, 2019. Dkt. No. 170 ("Pls.' MSJ").

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "Generally, judicial review of agency action is limited to review of the record

on which the administrative decision was based." *Partridge v. Reich*, 141 F.3d 920, 926 n.4

(9th Cir. 1998). "[T]he function of the district court is to determine whether or not as a matter

of law the evidence in the administrative record permitted the agency to make the decision it

did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). "[I]n a case involving

review of a final agency action under the [APA] . . . summary judgment becomes the

mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review." *San Joaquin

River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011)

(citation omitted).

### A. Plaintiffs Are Not Within The AECA's Zone Of Interests.[3]

"[A] person suing under the APA must satisfy not only Article III's standing

requirements, but an additional test: The interest he asserts must be arguably within the zone of

interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe*

---

[3] The Court did not previously address the Federal Defendants' zone-of-interests argument. *See* Prelim. Inj. at 8-12. Moreover, for the reasons provided in the Federal Defendants' opposition to Plaintiffs' motion for a preliminary injunction, the Federal Defendants maintain that Plaintiffs lack Article III standing to assert their claims. *See* Dkt. No. 64 ("Defs.' PI Opp.") at 13-16.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 7
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003124

*v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted). While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, Plaintiffs—whose Amended Complaint focuses on the Federal Defendants' compliance with the AECA's congressional notification provision, 22 U.S.C. §2778(f)(1)—do not fall within the zone of interests protected by the statute. *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the particular provision of law upon which the plaintiff relies"). The AECA "is designed to protect against the national security threat created by the unrestricted flow of military information abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C. § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports"). The primary concerns of the statute are thus national security and foreign relations. In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees. As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation." H.R. Rep. No. 97-58, at 21-22 (1981). Thus Plaintiffs—states who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters unrelated to foreign relations, fail to meet the zone of interests test. *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 8
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003125

and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

**B.      Plaintiffs' APA Claims Fail.**

According to Plaintiffs, the Department exceeded its statutory authority in not providing advance notice to Congress about the actions undertaken in connection with the settlement agreement.  Pls.' MSJ at 10-11.  But as the Federal Defendants have previously explained, Defs.' PI Opp. at 18-19, the statutory provision on which Plaintiffs rely requires such notice only with respect to the *removal* of *items* from the USML.  *See* 22 U.S.C. § 2778(f)(1) (providing that "the President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees).  Because the subject files are not specifically enumerated on the USML and therefore are not items, and because the Department effectuated only a temporary modification, not a removal, the Department's actions were in accord with its delegated authority.  *But see* Prelim. Inj. at 12-15.

The Court should also reject Plaintiffs' claim that the Temporary Modification and Letter were arbitrary and capricious.  As the Federal Defendants explained in their opposition to Plaintiffs' preliminary injunction motion, items belong on the United States Munitions List if they "provide[] a critical military or intelligence advantage." 22 C.F.R. § 120.3(b).  Here, the administrative record reveals that the government had determined that small-caliber firearms do not satisfy that standard.  *See generally* Defs.' PI Opp. at 22 (citing State and Commerce NPRMs).[4]

Defendants acknowledge that the Court previously suggested that Defendants failed to sufficiently "consider[] the unique properties of 3D plastic guns," Prelim. Inj. at 17, or to provide a "reasoned explanation for its change in position," *id.* at 18.  Defendants nonetheless respectfully maintain that they satisfied their obligations.  *See generally* Defs.' PI Op. at 21-22.

---

[4] Plaintiffs' suggestion that "the Temporary Modification is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearms files," Pls.' MSJ at 13, is therefore not correct. When an agency's decision is properly before the Court, it "review[s] the entire administrative record." *Epsilon Elec., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control*, 857 F.3d 913, 924 (D.C. Cir. 2017).

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 9
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003126

Specifically, Defendants maintain that it sufficed to consider the need to regulate small-caliber firearms generally, as undetectable firearms are separately regulated by other agencies under the Undetectable Firearms Act. *See id.* at 10.

In any case, even if the Court were to find the Federal Defendants' rationale inadequate, it should reject Plaintiffs' contention that the Federal Defendants' rationale was pretextual. Plaintiffs suggest that the Temporary Modification and Letter were procedurally irregular because they were issued without notice to Congress, but Defendants respectfully maintain that no such notice was required. *See id.* at 18-19; *but see* Prelim. Inj. at 12-15. While Plaintiffs further suggest that the Department's decision was made "abruptly, sometime during the three-week period from April 6 to April 30, 2018," Pls.' MSJ at 19, the Federal Defendants have explained that the decision was made following the District Court of the Western District of Texas's instruction to the parties to exchange written settlement demands, *see* Defs.' PI Opp. at 5; it is no secret that the Temporary Modification and Letter arose from a settlement of the *Defense Distributed* litigation. *Cf.* Pls.' MSJ at 19. Last, Plaintiffs complain that certain documents were initially omitted from the administrative record, *see* Pls.' MSJ at 20, but those documents were omitted from the record because they were not among the documents considered by the agency decision-maker. *See generally* Defs.' Opp. at Pls.' Mot. to Compel, Dkt. No. 152. In any case, Defendants agreed to supplement the record with these documents for the Court's convenience in determining whether to rely on the materials as extra-record evidence and the convenience of the parties. *See* Dkt. No. 158.

### C. Plaintiffs' Tenth Amendment Claim Fails.

Plaintiffs fare no better in arguing that the Department's actions constitute a violation of the Tenth Amendment to the Constitution. *See* Pls.' MSJ at 11-12. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Under the Tenth Amendment, 'the Federal Government may not compel States to implement, by legislation or executive action, federal regulatory programs.'" *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (quoting *Printz v. United States*,

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 10
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003127

521 U.S. 898, 925 (1997)). "The crucial proscribed element is coercion; the residents of the State or municipality must retain 'the ultimate decision' as to whether or not the State or municipality will comply with the federal regulatory program." *Id.* (quoting *New York v. United States*, 505 U.S. 144, 168 (1992)).

Here, Plaintiffs claim that "[t]he Department's overly broad authorization well exceeds the scope of its authority under AECA to regulate exports, and on its face purports to abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth Amendment." Pls.' MSJ at 11; *see also id.* at 12 (arguing that "[t]he States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of 'any United States person' to 'use' the files to print their own undetectable and untraceable weapons"). To be abundantly clear, however, the Government does not suggest, and has never suggested, that the settlement agreement conflicts with or otherwise preempts such state laws. To the contrary, the Department has consistently emphasized that its actions are taken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity. *See Def. Distributed*, 121 F. Supp. 3d at 695. The protections for state law legislated by Congress in the Gun Control Act remain in force, *see* 18 U.S.C. § 927, as well as the laws invoked by Plaintiffs, remain unaffected by the settlement agreement. Nor is there any basis to substitute Plaintiffs' understanding of the agreement for the far more reasonable interpretation of the Government.

Moreover, Plaintiffs fall well short of establishing any element of a violation of the Tenth Amendment. "[T]here is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program. Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals." *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015). Absent such a program or compulsion, the Court should reject Plaintiffs' Tenth Amendment claim. *See id.*; *see also, e.g.*, *Envtl. Def. Ctr.*, 344 F.3d at 845 (holding agency action "does not violate the Tenth Amendment, because it directs no unconstitutional coercion").

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 11
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003128

The two cases cited by Plaintiffs are not to the contrary. *See* Pls.' MSJ at 11-12. First, Plaintiffs point to the Supreme Court's general statement in *Bond v. United States* that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.'" 572 U.S. 844, 854 (2014). But the Federal Defendants do not even purport to infringe upon that power, let alone coerce Plaintiffs into complying with a federal program. Likewise, in *District of Columbia v. Heller*, the Supreme Court noted that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful[.]" 554 U.S. 570, 626-27 & n.26 (2008). Yet *Heller* concerned the Second Amendment, not the Tenth, and nothing in *Heller* indicates that the Department's exercise of its export authority, which does not involve commandeering State funds or entities, can give rise to a Tenth Amendment violation.

### D. An Injunction Is Unwarranted.

As Plaintiffs correctly note, Pls.' MSJ at 20, in the APA context, "[v]acatur is the standard remedy for unlawful agency decisions," *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1239 (N.D. Cal. 2015); *see* 5 U.S.C. § 706(2)(A) (requiring court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Nevertheless, in the event the Court finds that the challenged agency actions were inconsistent with the APA, Plaintiffs "additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent 'temporary modification' or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA." Pls.' MSJ at 21. Plaintiffs' request is unfounded and should be denied.

"A court's decision to issue an injunction constitutes an unwarranted 'extraordinary remedy' if a less drastic remedy, such as vacatur, could sufficiently redress plaintiff's injury. *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1247 (quoting *Monsanto Co. v. Geertson*

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 12
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003129

*Seed Farms*, 561 U.S. 139, 165-66 (2010)). Here, there is no basis to conclude that vacatur would be insufficient to redress Plaintiffs' alleged injuries. Plaintiffs' Amended Complaint and motion for summary judgment make clear that at issue are not the substantive policies underlying the challenged actions, but rather the procedures used by the agency in taking those actions. *See* Am. Compl. ¶¶ 230-40 (alleging failure to provide congressional notification and failure to adequately explain basis for actions); Pls.' MSJ at 10-18 (same). Vacatur and remand would appropriately allow the Federal Defendants to cure any deficiencies with respect to those procedures. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007) ("[I]f the EPA's action was arbitrary and capricious, . . . the proper course would have been to remand to the Agency for clarification of its reasons."); *Se. Ak. Conservation Council v. U.S. Army Corps of Engineers*, 486 F.3d 638, 654-55 (9th Cir. 2007), *rev'd and remanded on other grounds sub nom. Coeur Ak., Inc. v. Se. Ak. Conservation Council*, 557 U.S. 261 (2009) ("Under the APA . . . a court should 'vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.'" (citation omitted)).

The rationale underlying Plaintiffs' request confirms that an injunction is not appropriate. According to Plaintiffs, such relief is warranted to "prohibit[] further procedurally defective agency actions." Pls.' MSJ at 21; *see also id.* at 21 n.53 ("[T]he States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require the State Department to follow the law in making regulatory changes that affect the subject files."). Yet "[t]he Supreme Court has warned against 'sweeping injunctions to obey the law' and has cautioned courts about their 'duty to avoid' such orders." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. 11-cv-1062, 2016 WL 8861712, at *7 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F. App'x 1 (9th Cir. 2018) (quoting *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905)); *accord Cuviello v. City of Oakland*, No. 06-cv-5517, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (explaining that "courts have held that not only vague injunctions but also injunctions that simply require a defendant to 'obey the law' fail to comply with Rule 65(d)").[5]

---

[5] Indeed, based on Plaintiffs' request, it is difficult to discern the marginal relief provided by an injunction, as vacatur itself would involve setting aside the challenged actions, and any future challenges would be considered in light of a new administrative record.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 13
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003130

The cases relied on by Plaintiffs do not compel a different result. For instance, in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), cited in Pls.' MSJ at 21, the district court "enjoin[ed] Defendants from adding a citizenship question to the 2020 census questionnaire based on Secretary Ross's March 26, 2018 memorandum or based on any reasoning that is substantially similar to the reasoning contained in that memorandum." *Id.* at 676-77. The court entered this injunction in part because "an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion," which the court found necessary "given the looming [census] printing deadline." *Id.* at 676. Here, however, no similar temporal constraints exist to justify injunctive relief, and in any event the Department should be permitted to address any concerns the Court might have without the need for an injunction. *Cf. Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005) ("[T]he usual rule is that, with or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand."). Plaintiffs likewise cannot persuasively rely on *United States v. Laerdal Manufacturing Corp.*, 73 F.3d 852 (9th Cir. 1995), cited in Pls.' MSJ at 22, as that case did not involve a challenge to government action under the APA, and therefore did not discuss whether vacatur would be an adequate remedy.

Nor have Plaintiffs demonstrated that the injunction factors weigh in their favor. "The equitable remedy of an injunction—whether preliminary or permanent–is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *JPMorgan Chase Bank, N.A. v. Yamassee Tribal Nation*, No. 1:17-cv-00759, 2018 WL 3629940, at *6 (E.D. Cal. July 30, 2018) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiffs fall short of meeting this standard. All of the concerns identified are harms that might result from the domestic availability of 3D-printed guns in the United States, but such concerns have little to do with whether particular files should be regulated for foreign export on national security grounds. Further, their relation to the Department's exercise of authority and the settlement agreement is speculative. At best, Plaintiffs have only identified harms that may result from

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 14
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003131

3D-printed guns *generally*, not from the challenged actions regulating foreign exports. But there are already laws aimed at domestic conduct that seek to prevent such harms. And as the Ninth Circuit has made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is relevant for the injunction analysis. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs simply cannot tie their fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially when there are separate statutes governing domestic manufacture, possession, and sale that remain unaffected by the challenged actions. *See also* Defs.' PI Opp. at 9-13.

The single case Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), cited in Pls.' MSJ at 24—is inapposite. In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari. 567 U.S. at 1301. Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests." *Id.* As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries[.]" *Id.* Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 15
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003132

1    Dated:  March 15, 2019                          Respectfully submitted,

2                                                    JOSEPH H. HUNT

3                                                    Assistant Attorney General

4                                                    BRETT A. SHUMATE

5                                                    Deputy Assistant Attorney General

6                                                    JOHN R. GRIFFITHS

7                                                    Director, Federal Programs Branch

8                                                    ANTHONY J. COPPOLINO
                                                     Deputy Director, Federal Programs Branch

9                                                    */s/ Stuart J. Robinson*

10                                                   STUART J. ROBINSON
                                                     STEVEN A. MYERS

11                                                   ERIC J. SOSKIN

12                                                   Trial Attorneys
                                                     U.S. Department of Justice

13                                                   Civil Division, Federal Programs Branch
                                                     450 Golden Gate Ave.

14                                                   San Francisco, CA 94102

15                                                   (415) 436-6635 (telephone)
                                                     (415) 436-6632 (facsimile)

16                                                   stuart.j.robinson@usdoj.gov

17                                                   *Attorneys for the Federal Defendants*

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 16
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003133

**CERTIFICATE OF SERVICE**

     I hereby certify that on March 15, 2019, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: March 15, 2019

                                     /s/ Stuart J. Robinson
                                     Stuart J. Robinson

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 17
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003134

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF CONNECTICUT; STATE OF MARYLAND; STATE OF NEW JERSEY; STATE OF NEW YORK; STATE OF OREGON; COMMONWEALTH OF MASSACHUSETTS; COMMONWEALTH OF PENNSYLVANIA; DISTRICT OF COLUMBIA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MINNESOTA; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; and COMMONWEALTH OF VIRGINIA. | NO. 2:18-cv-01115-RSL |

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

NOTED FOR CONSIDERATION: JUNE 7, 2019[1]

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,

Defendants.

---

[1] *See* Dkt. # 183.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS ..................................... 1

    A.   The Federal Defendants Supplement the Record in Response to the Court's
         Order ................................................................................................................ 1

    B.   The Revised Second Supplement Reveals That "Nothing Changed" from the
         State Department's Perspective Regarding 3D-Printable Guns ............................... 3

    C.   The State Department Admittedly Failed to Consider Public Comments on the
         NPRMs *and* the Challenged Actions Themselves .................................................. 5

    D.   No Final Rules Have Been Published ....................................................................... 8

III.  ARGUMENT ....................................................................................................... 8

    A.   The Plaintiff States Have Standing, as the Court Already Ruled ............................. 9

    B.   The Temporary Modification and Letter Are Contrary to Law ............................... 10

         1.   The Temporary Modification and Letter violate AECA. .................................. 10

         2.   The Temporary Modification and Letter violate the Tenth Amendment. ......... 11

    C.   The Temporary Modification and Letter Are Arbitrary and Capricious ................. 12

    D.   Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief ....... 17

    E.   The Private Defendants' Arguments Do Not Require a Different Result ............... 18

         1.   The Private Defendants' jurisdictional arguments lack merit. ......................... 19

         2.   The Private Defendants' constitutional theories do not preclude the Court
            from setting aside unlawful agency actions. .................................................... 20

         3.   The Private Defendants' APA arguments do not explain, let alone justify,
            the Federal Defendants' abrupt regulatory about-face. .................................... 23

IV.  CONCLUSION .................................................................................................. 24

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003136

This brief is a combined reply in support of the States' Motion for Summary Judgment (Dkt. # 170) ("SMSJ") and opposition to the Federal Defendants' Cross-Motion for Summary Judgment (Dkt. # 173) ("FDMSJ") and the Private Defendants' Motion for Summary Judgment (Dkt. # 174) ("PDMSJ").

## I.    INTRODUCTION

The Temporary Modification and Letter deregulating 3D-printed firearm files violate AECA's congressional notice provisions and must be vacated as contrary to law. In addition, these actions are arbitrary and capricious and were pretextually rationalized after the fact in violation of the APA. After multiple supplementations of the administrative record in this case, including the most recent Revised Second Supplementation on May 6, 2019, the evidence shows that the State Department failed to consider the national security implications of deregulation in light of the unique properties of untraceable, undetectable, 3D-printable plastic firearms, and did not independently "determine" that deregulation was "in the interest of the security and foreign policy of the United States," as asserted. It is now more clear than ever that the State Department's abrupt reversal of its longstanding regulation of the subject files—as President Trump tweeted on July 31, 2018—"doesn't seem to make much sense!" Dkt. # 15-2.

The Court should grant summary judgment in the States' favor, vacate and set aside the unlawful Temporary Modification and Letter, and enjoin the Federal Defendants from attempting any further "temporary" deregulation of 3D-printable firearms that illegally evades Congress's oversight.

## II.    SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS

Much of the relevant background is set forth in the States' Motion for Summary Judgment (Dkt. # 170, Part II). This section covers factual developments since February 2019.

### A.    The Federal Defendants Supplement the Record in Response to the Court's Order

On March 19, 2019, the Court granted the States' Motion to Supplement the Administrative Record; incorporated Dkt. # 158 (First Supplement) into the administrative

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003137

record; and ordered the Federal Defendants to (1) certify the production of a *complete* administrative record that includes "all materials [the State Department] considered, directly or indirectly" in taking the challenged actions and (2) supplement the administrative record with a privilege log and with settlement-related communications and materials generated in *Defense Distributed v. U.S. Dep't of State*, Case No. 15-cv-372-RP (W.D. Tex.).[2] The Court also granted the States "leave to take discovery aimed at establishing whether the pre-July 27, 2018, comments to the NPRMs were directly or indirectly considered when issuing the temporary modification and letter."[3] As discussed below (Part II.C), this discovery revealed that the State Department did *not* consider the comments.

On April 16, 2019, the Federal Defendants filed a Second Supplement (Dkt. # 179),[4] and on May 6, 2019, they filed a Revised Second Supplement (Dkt. # 184) of the administrative record. According to the Certifications, these supplemental materials consist of 4,150 previously unfiled documents, of which 904 are filed publicly and 3,246 are logged as privileged and withheld in full.[5] The revised privilege log (Dkt. ## 184-13 & 184-14) reflects documents with a number of questionable redactions. For example, an email from New Hampshire Governor Chris Sununu to State Department officials lobbying on behalf of a New Hampshire-based multinational firearms manufacturer was redacted, purportedly under the deliberative process privilege,[6] as were numerous post-decisional communications and communications with internal public relations staff. Because of these and other irregularities and omissions, the States do not concede that the record is complete or that the privilege claims are proper. Nevertheless, because the record in its current form amply demonstrates that the Federal Defendants' covert

---

[2] Dkt. # 175 at 8.
[3] *Id.* at 7. By way of response to the States' discovery request pursuant to the Order, the Federal Defendants submitted the Declaration of Michael F. Miller and the Declaration of Robert Monjay. *See* Dkt. # 179 at 2.
[4] The original privilege log filed on April 16, 2019 was deficient, as hundreds of pages' worth of entries did not indicate any basis for withholding whatsoever. Second Declaration of Kristin Beneski, Ex. O (Ltr. dated April 25, 2019); Dkt. # 184-1, ¶ 11.
[5] Dkt. # 179-1 (Certification of Second Supplement), ¶ 21 (3,240 documents withheld; 910 produced); Dkt. # 184-1 (Certification of Revised Second Supplement), ¶¶ 5–10 (30 additional privilege claims, 6 withheld in full).
[6] Ex. P (WASHAR0035756); Dkt. No. 184-14 at 606.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003138

deregulation of 3D-printable guns was unlawful for multiple reasons, this case is ripe for determination by summary judgment.

**B.** **The Revised Second Supplement Reveals That "Nothing Changed" from the State Department's Perspective Regarding 3D-Printable Guns**

Despite the questionable validity of the withholding and redactions, the Revised Second Supplement is far more complete than the cherry-picked record the Federal Defendants initially filed in October 2018. Among other documents, it includes samples of the *more than 106,000 emails* from members of the public between July 23 and July 27, 2018, urging the Department not to exempt 3D-printable guns from regulation via the "temporary" modification; multiple letters from Congressional leaders urging reconsideration of the deregulation of 3D-printable gun files; detailed comment letters from U.S. Senators and public policy organizations; and approximately 155 documents and communications related to the settlement of the *Defense Distributed* litigation.[7]

One document in the Revised Second Supplement in particular sheds new light on the decision to deregulate 3D-printable firearms: on July 26, 2018—the day before the State Department issued the Temporary Modification and Letter—a Senate Foreign Relations staffer emailed State Department personnel to request an analysis as to why the Department had changed the position it took in its April 4, 2018 motion to dismiss in the *Defense Distributed* case.[8] Joshua M. Paul of the State Department replied that this was a "technical legal question" that should be directed to the Department of Justice.[9] In a following internal email exchange, Defendant Sarah Heidema—the Director within DDTC who in this case certified that the original, cherry-picked administrative record filed was "complete" and asserted, absent any record evidence, that the State Department "determined" that 3D-printable firearms "pose little national security concern"[10]—argued that it was actually "a question for us [the State

---

[7] *See* Second Declaration of Jennifer D. Williams, ¶ 4.
[8] Ex. Q (WASHAR0000212).
[9] *Id.*
[10] Dkt. # 64-1 (Heidema Decl.), ¶ 19; Dkt. # 116 (Certification), ¶ 4; *see also* Dkt. # 175 (Order) at 3–6.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Department]" about "why we stopped arguing that the technology subject to the case, if released, would harm national security or foreign policy[.]"[11] But Paul stated that the reason for the planned deregulation was "fundamentally a DOJ question" because "nothing changed on our side" as to those issues.[12] Paul's statements are consistent with contemporaneous remarks by Heather Nauert, who told the press that the State Department still had "equity" in the matter of 3D-printable guns, but that it "took the advice of the Department of Justice" to settle the case by agreeing to deregulate them.[13] Paul's and Nauert's statements are *inconsistent* with the Federal Defendants' assertion in this case that the Department "determined" that deregulating 3D-printable firearms was "in the interest of" U.S. national security and foreign policy. *See* SMSJ at 19.

Another email exchange between Paul and a Senate Foreign Relations staffer starkly reveals the Federal Defendants' failure to consider the particular problems posed by 3D-printed guns before issuing the Temporary Modification and Letter. On July 20, 2018, the staffer wrote to Paul to ask about "the law enforcement and counter-terrorism implications of" the deregulation, noting that "[e]nabling the widespread acquisition of undetectable or largely-undetectable firearms" would potentially undermine "protection of domestic and international airline flights from terrorist hijacking/attacks."[14] The staffer further asked: "What changes will be required by TSA here and abroad to deal with this?"[15] Paul was unable to answer these basic questions. Instead, he admitted that the State Department "would need to refer you to TSA or other law enforcement organizations on this question."[16] Paul suggested that the State Department could not answer these key national security questions because its "nexus on this issue was/is limited to [its] role in controlling exports of tech data[.]"[17] Paul's statements, made

---

[11] Ex. Q (WASHAR0000211).
[12] *Id.*
[13] SMSJ at 19 (citing Dkt. # 35-1 at 5 of 46).
[14] Ex. R (WASHAR0000221).
[15] *Id.*
[16] *Id.* (WASHAR0000220).
[17] *Id.*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003140

just a week before the Federal Defendants issued their Temporary Modification, highlight the extent to which they utterly failed to consider the national security implications of their plan to deregulate 3D-printable guns.

Yet another email from Paul undermines one of the Federal Defendants' *post hoc* arguments concerning the deregulation of 3D-printable guns. In a July 25, 2018, email thread discussing public talking points on the Defense Distributed settlement, a staffer notes that the Department of Justice has requested language indicating that the "3-D files at issue" do not violate the Undetectable Firearms Act because Defense Distributed's "design . . . requires adding metal after printing."[18] In response, Paul states: "I think that's legally valid but not particularly useful in a public/Congressional context, as the pin can be removed and put in your other pocket."[19] Paul's response confirms the obvious: the State Department is well aware that allowing the unlimited distribution of 3D-printable gun files will make it much easier for anyone who wants to evade the Undetectable Firearms Act to do so.

**C.    The State Department Admittedly Failed to Consider Public Comments on the NPRMs *and* the Challenged Actions Themselves**

In addition to the revelations discussed above, the Miller Declaration (Dkt. # 179-2) shows that the decision to enact the Temporary Modification and Letter was taken *solely* "pursuant to an action memorandum recommending to the Under Secretary of State for Arms Control and International Security that she approve the temporary modification to the ITAR."[20] The redacted "action memo" states that approval of the Temporary Modification and Letter is "required to comply with the Defense Distributed settlement agreement."[21] No other rationale is provided. *See also* SMSJ at 5–6, 16–17, 19; FDMSJ at 10 ("[I]t is no secret that the Temporary Modification and Letter arose from a settlement of the *Defense Distributed* litigation."). Despite

---

[18] Ex. S (WASHAR0035889–90).

[19] *Id.*

[20] Dkt. # 179-2 (Miller Decl.) ¶ 7.

[21] *Id.*, Ex. 1. The action memo's redactions are for "Deliberative - Predecisional Intra-agency Discussion" and "Attorney-Client Privilege." Dkt. # 184-13 at 1 of 47 (Privilege Log).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

5

WASHSTATEC003141

the Court's statement that it "seems likely that a reasonable decisionmaker would be interested in reviewing comments regarding a related rule change proposal before announcing a temporary modification of the same rule,"[22] the Miller Declaration confirms that State Department staff **"did not rely on the comments to the NPRM in preparing the memorandum."**[23] This means that the Department failed to consider or account for over 3,600 public comments, including the nearly 400 that specifically opposed the new rule on the ground that it would deregulate 3D-printable gun files. Dkt. # 170 at 8.

Some of the comments the State Department ignored came from key experts—including several that were significant enough to merit special mention by the State Department staffer in charge of comment review[24]—warning of the dangerous sweep of the Federal Defendants' covert deregulation of 3D-printable guns. For example, Professor Susan Waltz of the University of Michigan's Gerald R. Ford School of Public Policy pointed out that the State Department's proposed rule "would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology . . . the firearms removed from USML."[25] Professor Waltz suggested a few simple ways the State Department could address this glaring problem— none of which the Department adopted.[26] Another comment, from the Brady Campaign to Prevent Gun Violence, warned that, "under the proposed rules," companies like Defense Distributed "would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States)."[27] The State Department also disregarded comments from hundreds of individuals warning that "[t]he rule change would make the world a far more dangerous place" by

---

[22] Dkt. # 175 at 7.
[23] Dkt. # 179-2 (Miller Decl.) ¶ 7 (emphasis added).
[24] Dkt. # 179-3 (Monjay Decl.) ¶ 4.
[25] Dkt. # 179-3 at 14 of 44 (Monjay Decl. Ex. B at 5).
[26] *Id.*
[27] Dkt. # 179-3 at 39 of 44 (Monjay Decl. Ex. D (part 2) at 8).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003142

"effectively enabling 3D printing of firearms in the U.S. and around the globe."[28] The Federal Defendants concede that all of these comments and more were ignored entirely.

Not only did the State Department ignore comments received during the formal rulemaking comment period, but it also admittedly failed to consider public input *specifically opposing the challenged actions themselves* during the week prior to July 27, 2018, once word of their impending issuance had gotten out.[29] These additional materials included letters from members of Congress and over 106,000 emails from individuals. For example:

- A July 20, 2018, letter from then-Ranking Member (now Chairman) of the House Foreign Affairs Committee, Rep. Eliot Engel,[30] urging Secretary Pompeo not to deregulate 3D-printable gun files. As Rep. Engel warned, deregulation was "exceptionally dangerous," as it would make "undetectable" weapons "available to anyone with a laptop and a 3-D printer," and "defeat[] US laws which require background checks on the sale of weaponry." Rep. Engel further noted that the State Department was "mis-using authority under Section 126.2 of the [ITAR] to 'temporarily' remove this technical information from the [USML]" when, "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it." This misuse of Section 126.2 "suggests the Department officials sought a way to avoid complying with Section 38(f) of the [AECA], which requires advance notification to Congress for any removal from the USML."

- A July 25, 2018, letter from Ranking Member of the Senate Foreign relations Committee, Sen. Robert Menendez,[31] urging Secretary Pompeo to halt the "worldwide release" of 3D-printable gun files, which "would allow any foreign or domestic persons, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively 'download' a gun." As Senator Menendez noted, the State Department's "temporary" deregulation "appears to evade statutory requirements and skirts an ongoing regulatory review process." Moreover, echoing AECA's statutory standards, Senator Menendez's letter pointed out that it was "hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States."

---

[28] *See, e.g.*, Ex. T; *see generally* Second Williams Decl. ¶ 4(1) & n.1.

[29] FDMSJ at 10 ("[D]ocuments . . . initially omitted from the administrative record . . . were not among the documents considered by the agency decision-maker.").

[30] Ex. U (CWASHAR0000413–14).

[31] Ex. V (WASHAR0003424-25). On July 23, 2018, five Senators sent a similar letter to then-Attorney General Jeff Sessions, urging dismay with the Department's settlement of the *Defense Distributed* suit. Ex. W.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003143

"This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks."

- Hundreds of individual emails[32] from Americans who were "deeply disturbed" by the State Department's decision to allow "blueprints . . . online [that] will be used by criminals and terrorists to easily and cheaply mass-manufacture all-plastic weapons that can defeat security checkpoints" and "are difficult if not impossible to trace";[33] who urged the Department to "[s]top the special exemption for downloading printable 3D guns" which "will, without a doubt, be used in illegal, violent activity";[34] and who were "begging [the Department] to use common sense" and prevent "individuals who can't pass background checks —terrorists, felons, and domestic abusers" from obtaining "functioning guns . . . on demand."[35]

- 105,555 emails received from visitors to Everytown.org in a single five-day period,[36] urging the Department to "stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers."

The Revised Second Supplementation also includes a breakdown of comments on the Commerce Department's companion NPRM. Of the roughly 3,000 comments received by the Department, 2,945—98%—opposed the rule.[37] It appears the State Department did not consider these comments, either.

**D.      No Final Rules Have Been Published**

As a further factual update, as of this filing, neither the State Department nor the Commerce Department has issued the final rules that they indicated would be forthcoming.[38]

### III.      ARGUMENT

The Federal Defendants mostly repeat arguments that the Court has already correctly rejected, pointing to nothing in the several-times-supplemented administrative record to support

---

[32] Dkt. # 184-12 at WASHAR0036607–37068.
[33] *Id.* at WASHAR0036611.
[34] *Id.* at WASHAR0036612.
[35] *Id.* at WASHAR0036621.
[36] *Id.* at WASHAR0037069–74. The States agreed that the 105,555 emails referenced in this "Summary of Duplicative Materials" could be incorporated into the administrative record by reference.
[37] Ex. X (WASHAR0000903–04).
[38] *See* SMSJ at 9; Dkt. # 131 (Fed. Defs' Mot. to Stay).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003144

their position, and otherwise offering no valid reason why they should prevail. The Court should vacate the Temporary Modification and Letter and permanently enjoin any future attempt to "temporarily" deregulate 3D-printable guns that bypasses congressional review and oversight.

## A.   The Plaintiff States Have Standing, as the Court Already Ruled

The Court has already correctly ruled that the States have standing. The Federal Defendants ask the Court to revisit that conclusion, but offer no new reason to do so: instead, they rehash and incorporate meritless arguments made in opposing preliminary injunctive relief. FDMSJ at 7–9 & n.3.[39] The Court should reject these recycled arguments and find that the States have standing for the same reasons it did so previously. *See* Dkt. # 95 (Preliminary Injunction) at 9–11.

The Federal Defendants argue that the States are not within the "zone of interests" protected by AECA. FDMSJ at 7–9. This test, which "is not meant to be especially demanding," asks whether the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute" at issue. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (citations and quotations omitted). Its purpose is to "exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987). Thus, "[t]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225; *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 n.5 (9th Cir. 2018) (same). The test is applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable," and requires no "indication of congressional purpose to benefit" the plaintiff. *Match-E-Be-Nash-She-Wish*, 567

---

[39] *Compare* Dkt. # 64 (Fed. Defs' Opp. to Mot. for PI) at 16–18. To the extent the Federal Defendants incorporate their prior briefing on the motion for preliminary injunction by reference, the States likewise incorporate their own prior briefing. *See* Dkt. # 43 (Mot. for PI) at 9–10; Dkt. # 68 (Reply ISO Mot. for PI) at 11–12. The States' previous briefing also addresses the Private Defendants' already-rejected challenges to standing. *Compare* PDMSJ at 7–8 *with* Dkt. # 63 (Pvt. Defs' Opp. to Mot. for PI) at 12–13.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003145

1   U.S. at 225. Any doubts about zone-of-interests standing must be resolved in the plaintiff's favor.

2   *Id.* ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that

3   the benefit of any doubt goes to the plaintiff.").

4        The States easily satisfy this test: their significant safety and security interests are not

5   only consistent with, but fall *squarely within*, AECA's purpose of protecting "the security . . . of

6   the United States." 22 U.S.C. § 2778(a)(1); *see* FDMSJ at 8 (acknowledging that "national

7   security" is a "primary concern" of AECA). The States' domestic security concerns are part and

8   parcel of "national security." *See, e.g.*, *United States v. U.S. Dist. Court*, 407 U.S. 297, 321

9   (1972) (recognizing the "domestic aspects of national security"); *Hodges v. Abraham*, 253 F.

10  Supp. 2d 846, 868 (D.S.C. 2002) (federal government using "national" and "domestic" security

11  interchangeably). Because the States seek to "vindicate some of the same concerns that underlie"

12  AECA—namely, concerns about security and safety—their claims fall squarely "within the

13  statute's zone of interests." *Havasupai Tribe*, 906 F.3d at 1167.

14       Not only are the States' interests fully consistent with AECA's purpose, but this lawsuit

15  expressly seeks to enforce the statute's terms. In contrast to *Cheney* (FDMSJ at 8–9), in which

16  the State of Illinois challenged the validity of a statute governing the closure of military

17  installations in furtherance of interests "completely inconsistent" with that statute, the States here

18  do not seek to usurp any authority that properly "rests with Congress." *People ex rel. Hartigan*

19  *v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989). Rather, the States seek to *vindicate* the statute

20  and Congress's intent by challenging *ultra vires* executive actions that unlawfully bypassed the

21  statute's congressional notice requirement. This lawsuit furthers AECA's purposes in every

22  sense; it is the Federal Defendants, not the States, who sought to "frustrate" AECA by evading

23  congressional review and oversight of their deregulatory effort.

24  **B.**     **The Temporary Modification and Letter Are Contrary to Law**

25      **1.**     **The Temporary Modification and Letter violate AECA.**

26       As with standing, the Federal Defendants recycle their meritless argument that the State

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003146

1  Department did not violate AECA's congressional notice requirement because the subject files

2  are not "items," and can therefore be removed from the Munitions List without notice. FDMSJ

3  at 9. But as the Court has already correctly ruled, this argument conflates "category" with "item,"

4  contrary to the "language, structure, and purpose of the statute and implementing regulations[.]"

5  Dkt. # 95 at 14; *see also* Dkt. # 43 at 11–13; Dkt. # 68 at 4–5. Furthermore, the challenged actions

6  were not "only" a "temporary" modification, as asserted (FDMSJ at 9); rather, the Temporary

7  Modification was to "remain in effect while the final rule . . . is in development"—leapfrogging

8  the entire notice-and-comment rulemaking process. *See* Dkt. # 95 at 15 ("The temporary

9  modification was an effort to implement the removal immediately, without waiting for the rule

10 to become final and without giving Congress notice and an opportunity to exercise its oversight

11 role."). Moreover, as the Court has already found, even a "temporary" deregulation would allow

12 "immediate" distribution of the subject files and cause "irreparable" harms to the States. *Id.* at

13 13, 20–25. Public commenters (whom the State Department ignored) pointed this out as well.[40]

14 As for the Letter, it was not "temporary" even by its own terms, as it purported to approve the

15 subject files for "public release (i.e., unlimited distribution)" immediately and with no time

16 limitation.[41] The State Department's failure to comply with AECA's 30-day congressional notice

17 requirement before issuing the Temporary Modification and Letter, on its own, renders these

18 actions unlawful and requires that they be set aside. *See* SMSJ at 10–11.[42]

19  **2.  The Temporary Modification and Letter violate the Tenth Amendment.**

20  The Federal Defendants' litigation position that the Temporary Modification and Letter

21 do not "conflict[] with or otherwise preempt[]" state laws is belied by the text of those

22 documents, which on their face expressly authorize "any United States person" to "use" the

---

[40] *See, e.g.*, Ex. U (Rep. Eliot Ltr.) (modification of the Munitions List was not "temporary" because "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it").

[41] Ex. J.

[42] The Private Defendants argue that Congress received notice after the fact. PDMSJ at 18. The Court has already correctly rejected this argument, ruling that *post hoc* notice does not satisfy AECA. Dkt. # 95 at 15.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003147

subject files to 3D-print untraceable and undetectable weapons, and expressly authorize the "unlimited distribution" of such files. SMSJ at 11–12; *cf. Price v. Stevedoring Serv. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012) (no deference owed to agency's *post hoc* litigation position; agency actions must be adjudged on the record). These federal authorizations are inconsistent with, and on their face purport to preempt and undermine, state gun-safety laws that *restrict* certain persons from possessing and manufacturing firearms and/or that regulate the distribution of CAD files for 3D-printed firearms. SMSJ at 11–12. Such laws are concededly within the police powers reserved to the States and protected by the Tenth Amendment. *Id.*; FDMSJ at 12. That the Federal Defendants disavow any preemptive intent for litigation purposes is small comfort given the plain language of the operative Temporary Modification and Letter.

The anti-commandeering cases on which the Federal Defendants rely (FDMSJ at 10–11) confirm that the Tenth Amendment has the force of law and meaningfully protects states from interference that exceeds the limits of the federal government's powers. Commandeering state officials to enforce federal laws is by no means the only way in which the federal government can violate the Tenth Amendment, and the Federal Defendants cite no support for that view. Their authority is distinguishable, as this is not a case in which the federal government is merely encouraging (but not coercing) states to implement federal programs, as in *Environmental Defense Center, Inc. v. U.S. E.P.A.*, 344 F.3d 832 (9th Cir. 2003), *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). Here, the State Department is intruding into the States' sphere of authority by exercising a power it does not have—the power to authorize any adult or child in the United States to access and "use" 3D-printable files to produce illegal and dangerous weapons—in a way that deprives the States of their ability to exercise their sovereign police powers and enforce their gun-safety laws. This federal usurpation of state authority is unconstitutional.

## C. The Temporary Modification and Letter Are Arbitrary and Capricious

The States' Motion details *numerous* ways in which the Temporary Modification and

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003148

1    Letter are arbitrary and capricious as a matter of law. SMSJ at 12–20. This is substantiated by

2    the Revised Second Supplement, which reveals that the State Department's decision to

3    deregulate 3D-printable guns was made *solely* to settle a lawsuit, without any apparent

4    consideration for how the proliferation of undetectable, untraceable guns would affect "world

5    peace and the security and foreign policy of the United States." 22 U.S.C. § 2278(a)(1).

6         The Federal Defendants have little to say in response: they argue that the challenged

7    actions are lawful because (1) "the government had determined that small-caliber firearms" do

8    not provide a "critical military or intelligence advantage"; and (2) untraceable, undetectable, 3D-

9    printable firearms are no different than "small-caliber firearms generally" for purposes of export

10   regulation. FDMSJ at 9–10. These conclusory arguments are fatally flawed for several reasons.

11        First of all, the exclusive focus on "critical military or intelligence advantage" ignores

12   the "important aspect[s] of the problem" that the State Department "entirely failed to consider":

13   namely, the specific properties of 3D-printed guns and the unique threats they pose to world

14   peace, national security, and foreign policy. SMSJ at 15–18. The Federal Defendants do not

15   address these issues at all; this tacitly conceded failure to consider them alone renders the

16   Department's actions arbitrary and capricious. *See id*; *Motor Vehicle Mfrs. Ass'n of U.S. v. State*

17   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 1983) (agency must consider all "relevant factors,"

18   particularly those "Congress intended" the agency to consider); *Humane Soc'y of U.S. v. Zinke*,

19   865 F.3d 585, 606 (D.C. Cir. 2017) (failure to address record evidence on an "important aspect

20   of the problem" renders agency action arbitrary and capricious); *see also Jenkins v. Cty. of*

21   *Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (noting that a party "abandoned . . . claims by

22   not raising them in opposition to [a] . . . motion for summary judgment"). Furthermore, the Miller

23   Declaration confirms that the Department failed to consider or account for hundreds of public

24   comments that opposed the 2018 NPRMs *precisely* because they would deregulate 3D-printed

25   guns, and therefore threaten safety and security in the United States. The Department concededly

26   failed to consider these or the remainder of the 3,600 comments opposing the NPRMs, or the

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003149

1    desperate pleas of over 106,000 members of the public and Congress seeking to stop the

2    "temporary" deregulation in the final days before it was effectuated. The Department completely

3    failed to fulfill its obligation to "'consider and respond to significant comments received during

4    the period for public comment.'" *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1251

5    (9th Cir. 2018) (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)); *see also*

6    *Tesoro Alaska Petrol. Co. v. F.E.R.C.*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency

7    answers objections that on their face appear legitimate, its decision can hardly be said to be

8    reasoned.").

9         Second, merely reiterating the Department's conclusory "determin[ation]" (FDMSJ at 9)

10   is far from adequate: to survive judicial review, the Federal Defendants must show that the

11   determination was a *reasoned* one that is "logical and rational" and supported by the

12   administrative record. SMSJ at 12–15. Otherwise, judicial review would be meaningless, for an

13   agency would always be able to defend an irrational decision by stating the tautology that it

14   "determined" the decision was justified. *See id.* This is not what the APA prescribes. A reviewing

15   court's "'inquiry into the facts is to be searching and careful,'" *ASSE Int'l, Inc. v. Kerry*, 803

16   F.3d 1059, 1072 (9th Cir. 2015) (quoting *Overton Park v. Volpe,* 401 U.S. 402 at 416), and courts

17   "shall" invalidate arbitrary and capricious agency actions. 5 U.S.C. § 706. Here, the only asserted

18   basis for the State Department's "determination" is the 2018 NPRMs. FDMSJ at 9. That rationale

19   is circular: the NPRMs are *proposed* rules published at the beginning of the rulemaking process,

20   before the agencies received any public comments, and they do not even mention 3D-printed

21   guns. Yet the "temporary" modification purported to implement the NPRMs before the

22   rulemaking process was complete, and the State Department admittedly did not consider *any* of

23   the public comments. Remarkably, even as they ignore a mountain of comments and evidence

24   that contradict their position, the Federal Defendants point to *nothing* in the filed administrative

25   record that would support a determination that 3D-printable firearms somehow no longer pose

26   unique risks or that authorizing their publication on the internet poses no problems. Even after

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003150

1  multiple supplementations, the record contains no such support.

2  Third, the notion that 3D-printable guns are no different than "small-caliber firearms

3  generally" (FDMSJ at 10) cannot be credited because it lacks any support in the record. *See*

4  SMSJ at 12–13 (citing case law explaining that "the basis for the agency's decision must come

5  from the record"). In fact, although the Federal Defendants have repeatedly characterized the

6  Temporary Modification and Letter as an outgrowth of a decade-long export reform effort,[43] the

7  Revised Second Supplement confirms that the federal government did not consider 3D-printable

8  firearms or the export of CAD files via the domestic/international internet *at all* when it

9  developed the proposed rules. Specifically, in a news article circulated within the State

10  Department on May 24, 2018, the Commerce Department official who was leading the

11  development of those regulations as of 2012 stated that the NPRMs **"have literally absolutely**

12  **nothing to do with domestic gun control . . ."**[44] The Federal Defendants' *post hoc* litigation

13  position also contradicts thousands of public comments opposing the rules on the grounds that

14  they would deregulate 3D-printable firearms—comments that the Department admittedly did not

15  consider and failed to address.[45] Likewise, Department official Joshua M. Paul admitted that he

16  could not answer basic questions regarding how TSA or other law enforcement agencies would

17  deal with a proliferation of 3D-printed firearms because the State Department's consideration

18  "was/is limited to [its] role in controlling exports of tech data[.]"[46] Moreover, the Federal

19  Defendants' *post hoc* litigation position contradicts the Department's *own admissions*—both

20  before and after the *Defense Distributed* settlement, and in this litigation—that 3D-printable

21  firearms *do* pose unique security threats. *See* SMSJ at 14, 15–16, 17, 19–20. State Department

22  communications recently filed as part of the Revised Second Supplement make this strikingly

23  clear: on July 27, 2018, Paul stated that **"nothing changed on our side"** regarding the national

---

[43] FDMSJ at 5 n.1; Dkt. # 64 at 5 n.1; Dkt. # 131 at 1.
[44] Ex. Y (WASHAR0035627) (emphasis added).
[45] Dkt. # 179-2 (Miller Decl.) ¶ 7; *see also* FDMSJ at 10 ("[D]ocuments . . . initially omitted from the administrative record . . . were not among the documents considered by the agency decision-maker.").
[46] Ex. R (WASHAR0000220).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003151

1    security and foreign policy threats posed by 3D-printable firearms.[47]

2          Further, the idea that 3D-printed firearms may be regulated by "other agencies" (FDMSJ

3    at 10) does not make it rational for the State Department to unilaterally authorize functional CAD

4    files to be exported and published on the internet, allowing anyone in the world to download and

5    use them to create untraceable and undetectable weapons that could drastically threaten safety

6    and security. *See* Dkt. # 95 at 23 ("Promising to detect the undetectable while at the same time

7    removing a significant regulatory hurdle to the proliferation of these weapons—both

8    domestically and internationally—rings hollow and in no way ameliorates, much less avoids, the

9    harms that are likely to befall the States . . ."). Indeed, the State Department has privately

10   conceded that allowing for the distribution of 3D-printable guns will make it easy to evade the

11   Undetectable Firearms Act.[48]

12         A finding of pretext or bad faith is not necessary for the States to prevail on their claim

13   that the challenged actions are arbitrary and capricious. But the evidence that the Department's

14   stated rationale was pretextual is overwhelming; its shifting and inconsistent explanations are

15   well documented in the record. SMSJ at 7–8, 13–14, 18–20. The Revised Second Supplement—

16   which contains documents that were improperly withheld for over six months after the Federal

17   Defendants certified an incomplete administrative record—provides further evidence that the

18   real reason for the deregulation of 3D-printable firearms was a directive from the Department of

19   Justice, not a rational and evidence-based determination by the State Department. The Revised

20   Second Supplement reveals the State Department's understanding that **"nothing changed on**

21   **our side"** with respect to the national security implications of 3D-printable guns, and that the

22   reason for the *Defense Distributed* settlement was "fundamentally a DOJ question[.]"[49]

23         In sum, the Temporary Modification and Letter are both contrary to law and arbitrary

24   and capricious, and should be set aside. 5 U.S.C. § 706.

25   _____
     [47] Ex. Q.
26   [48] Ex. S (WASHAR0035889–90) (discussed *supra*, Part II.B).
     [49] Ex. Q.

PLAINTIFF STATES' COMBINED                16        ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                               Complex Litigation Division
JUDGMENT AND OPP TO                                         800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                     Seattle, WA 98104-3188
2:18-cv-01115-RSL                                               (206) 474-7744

WASHSTATEC003152

**D.      Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief**

The Federal Defendants agree that vacatur is the appropriate remedy in the event the Court finds the Temporary Modification and Letter to be contrary to law and/or arbitrary and capricious. FDMSJ at 12. Remand *without* vacatur, as discussed in *National Association of Home Builders* (FDMSJ at 13), is inappropriate because this is not a case in which "clarification" would resolve the issues with the State Department's actions; rather, the Temporary Modification and Letter are fundamentally deficient because they are contrary to law and arbitrary and capricious, as discussed above. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 657–58 (2007) (courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but must vacate agency actions that violate the APA).

The Federal Defendants disagree that injunctive relief is warranted. FDMSJ at 12–15. But the States are not improperly seeking a "vague" or "sweeping injunction[] to obey the law," as the Federal Defendants suggest. *Id.* at 13. The States are seeking to prevent the same type of "temporary" deregulation with no warning as occurred in July 2018, which required the States to act swiftly to file this lawsuit and obtain emergency relief to prevent irreparable harm. Thus, this case in fact presents "temporal constraints" similar to those supporting the injunction in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019). FDMSJ at 14. The Federal Defendants appear to raise the possibility of addressing the States' concern by some means other than a permanent injunction, but have not proposed any such solution to the States or the Court. *See id.* (suggesting that "the Department should be permitted to address any concerns the Court might have without the need for an injunction," but making no proposal).

The Federal Defendants also argue that the *Winter* factors are not met. FDMSJ at 14–15. But their contention that the States' evidence of irreparable harm caused by the international and domestic availability of 3D-printed guns is somehow unrelated to the State Department's deregulation of 3D-printable gun files fails for the same reasons the Court has already articulated. The Court found that "Defendants' argument is so myopic and restrictive as to be unreasonable.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003153

1   Whatever defendants' statutory authority, the fact is that the internet is both domestic and

2   international. . . . Thus, the alleged failures to provide notice and to make a reasonable evaluation

3   of the risks and benefits of the proposed action not only impact national security but have

4   domestic repercussions as well." Dkt. # 95 at 10; *see also id.* at 20–24 (discussing likelihood of

5   irreparable harm and balance of hardships weighing in favor of the States and the public).

6        The Private Defendants, for their part, rely on Justice Thomas' concurring opinion in

7   *Trump v. Hawaii*, which every other justice declined to join, to argue against the concept of

8   nationwide injunctions generally. PDMSJ at 23–24 (citing *Trump v. Hawaii*, 138 S. Ct. 2392,

9   2424–29 (2018) (Thomas, J., concurring)). But injunctions against unlawful federal agency

10  actions are "commonplace in APA cases" and supported by an "uncontroverted line of

11  precedent." *E. Bay Sanctuary Covenant*, 909 F.3d at 1256; *see also New York*, 351 F. Supp. 3d

12  at 677 ("Because the Secretary's *decision* was universal, APA relief directed at that decision

13  may—indeed, arguably must—be too.") (citing 5 U.S.C. § 706(2) and *Califano v. Yamasaki*, 442

14  U.S. 682, 702 (1979)). The Private Defendants fail to explain how a less-than-nationwide

15  injunction—one that somehow prohibits the Federal Defendants from attempting another

16  unconstrained "temporary" deregulation of export-controlled items as to some areas of the

17  United States but not others—would even function. Practically speaking, such an injunction

18  would quickly become obsolete, because once files are posted on the internet from *any* location,

19  they can be accessed virtually anywhere. Moreover, an injunction without regard to location is

20  appropriate because *any* "temporary" modification of the Munitions List "would almost certainly

21  run afoul" of AECA. *New York*, 351 F. Supp. 3d at 678.

22  **E.      The Private Defendants' Arguments Do Not Require a Different Result**

23       The Private Defendants oppose summary judgment in the States' favor for a host of

24  meritless reasons: from an asserted lack of personal jurisdiction (which was waived long ago) to

25  novel constitutional theories that have little relevance to this case and have never been accepted

26  by any court. This Court has already rejected many of these theories, and should do so again.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003154

**1.    The Private Defendants' jurisdictional arguments lack merit.**

The Private Defendants challenge both the Court's personal jurisdiction over them and its subject matter jurisdiction over this case. PDMSJ at 4–12. Their challenge to personal jurisdiction is waived because they failed to preserve it when they filed a motion under Rule 12. *See* Fed. R. Civ. P. 12(h)(1)(A) (a party waives the defense of lack of personal jurisdiction by "omitting it from a motion" under Rule 12). Plaintiffs' Rule 12(c) motion (Dkt. # 114) did not assert any lack of personal jurisdiction, and their convoluted non-waiver theory misreads Rule 12(h)(1)(A) by conflating it with Rule 12(g)(2). *See* PDMSJ at 8 n.7. The Court may disregard the Private Defendants' lengthy argument against personal jurisdiction (*id.* at 8–12), since they have waived that defense. *See Schnabel v. Lui*, 302 F.3d 1023, 1034 (9th Cir. 2002) (declining to examine personal jurisdiction over defendant that "waived any defense of lack of personal jurisdiction . . . by failing to raise the defense in its first motion" under Rule 12). The Private Defendants' objections to personal jurisdiction lack merit in any event. Defense Distributed's website is not "passive" (PDMSJ at 9), but instead actively invites visitors to download CAD files. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper."). And the Private Defendants' contention that any downloads of Defense Distributed's files are purely conjectural is patently inconsistent with their claims that the files have been downloaded "millions" of times. *Compare* PDMSJ at 10–11 *with* PDMSJ at 2 n.2.

The Private Defendants' multi-pronged challenge to subject matter jurisdiction—which the Federal Defendants notably have never joined—fails for the same reasons it failed previously. *Compare* PDMSJ at 4–7 *with* Dkt. # 63 at 10–12 *and* Dkt. # 69 (Pvt. Defs' Notice of Supp. Auth. re Tucker Act). Their assertion that executive actions under AECA are *never*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003155

reviewable (PDMSJ at 4, 5–6) relies on the same inapposite case law they cited previously[50] and ignores cases that *have* reviewed agency action under AECA. Dkt. # 68 at 12 & nn. 26–27. Their observation that the *designation* of Munitions List items is not subject to judicial review under 22 U.S.C. § 2778(h) (PDMSJ at 4) has no applicability to the *removal* of items from the Munitions List at issue here. *See* Dkt. # 68 at 12; Dkt. # 95 at 13 ("the temporary modification . . . constitutes the *removal* of one or more items from the USML . . .") (emphasis added).[51] And the Tucker Act (PDMSJ at 6–7) plainly doesn't apply to the *statutory* (not contractual) challenges to agency action in this case. *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985); *contra Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (Tucker Act bars claims that are "contractually-based, not statutorily-based"). As the Private Defendants have already acknowledged, this is not a contract case: "the [*Defense Distributed*] settlement agreement is not this action's true subject and this action will neither assail nor protect the Private Defendants' interest therein." Dkt. # 114 at 5; *see* Dkt. # 95 at 11–12 (this lawsuit is not a "collateral attack" on the dismissal of the *Defense Distributed* lawsuit pursuant to the settlement agreement).

### 2. The Private Defendants' constitutional theories do not preclude the Court from setting aside unlawful agency actions.

The Private Defendants argue that setting aside the unlawful agency actions at issue would offend the First Amendment. PDMSJ at 19–23. This argument is doubly flawed because (i) the First Amendment is inapposite to the merits of this APA case and (ii) the Private Defendants' novel and expansive First Amendment theory fails on its merits.

### (i) *The First Amendment is irrelevant*.

It is a "simple but fundamental" rule of administrative law that the propriety of agency

---

[50] *Corrie v. Caterpillar, Inc.* (PDMSJ at 6) is likewise inapposite, as it did not involve a challenge to agency action, but was a private lawsuit against a supplier of equipment to the Israeli Defense Forces. 503 F.3d 974 (9th Cir. 2007. As *Corrie* itself cautions, "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* at 982 (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

[51] For the same reasons, their argument that the State Department's actions here are unreviewable under the APA (PDMSJ at 12) lack merit.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003156

1    action is judged "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S.

2    194, 196 (1947). Neither the court nor the other parties may "supply a reasoned basis . . . that

3    the agency itself has not given." *Id*. at 196. However emphatically the Private Defendants invoke

4    the First Amendment, the Federal Defendants have never asserted it as a basis for the Temporary

5    Modification or the Letter. To the contrary, they have consistently maintained—both in this case

6    and throughout the *Defense Distributed* proceedings in Texas—that the Department's regulation

7    of the subject files under ITAR never violated Defense Distributed's First Amendment rights.[52]

8    The Private Defendants may wish to inject the First Amendment into these proceedings, but the

9    Federal Defendants have never invoked it as a basis for the challenged actions. It therefore does

10   not bear on the legal merits of this APA case.

11          The Private Defendants' dogged efforts to be dismissed from this case at multiple stages

12   further undercuts any notion that their purported First Amendment rights are directly

13   implicated.[53] *See* PDMSJ at 4–12 (seeking dismissal on jurisdictional grounds); Dkt. # 114 at 4–

14   7 (seeking dismissal on the grounds that "The Private Defendants Have No Interest Protected By

15   this Action").[54] While the Private Defendants are wrong on the merits for the many reasons

16   discussed herein, they are right about one thing: they have "no interest" directly at issue in this

17   APA case. The Private Defendants' issue, at bottom, is not with the States' challenge to unlawful

18   agency action, but with federal export regulation of the subject files. They challenged such

19   regulation by suing the regulator in the *Defense Distributed* case. The State Department prevailed

20   at every stage. Then, the Private Defendants chose to settle in exchange for the State

21

22          [52] *See, e.g.*, Heidema Decl. (Dkt. # 64-1), ¶ 28.

23          [53] If, on the other hand, the Private Defendants are making constitutional arguments in the abstract, they
     lack standing to effectively seek to block judicial enforcement of AECA on such grounds. *See Hein v. Freedom
     From Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) ("The federal courts are not empowered to seek out and
24   strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit
     solely, to decide on the rights of individuals, and must refrain from passing upon the constitutionality of an act
25   unless obliged to do so . . . when the question is raised by a party whose interests entitle him to raise it." (internal
     citations and markings omitted)).

26          [54] The Court ruled that, contrary to the Private Defendants' disclaimer of interest, "their actions show
     otherwise." Dkt. # 130 (Order Denying 12(c) MTD) at 3.

PLAINTIFF STATES' COMBINED                    21          ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                    Complex Litigation Division
JUDGMENT AND OPP TO                                               800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                          Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                     (206) 474-7744

WASHSTATEC003157

Department's agreement to deregulate 3D-printable firearm files—subject to the express caveat that such deregulation would proceed only "to the extent authorized by law (including the Administrative Procedure Act) . . ."[55] Now that the caveat is in play, the Private Defendants renew their dubious constitutional arguments in this Court—curiously, even as they seek to escape its jurisdiction. As the Private Defendants' own actions underscore, this lawsuit, with the parties positioned as they are, is an improper place for a constitutional challenge.

(ii) *The First Amendment does not require the Court to uphold the unlawful deregulation*.

The Private Defendants' constitutional arguments are meritless in any event. First, although the First Amendment's inapplicability to the subject files was briefed previously (*see* Dkt. # 43 at 17–18; Dkt. # 47-1), the Private Defendants fail to point to *any* case in *any* jurisdiction in which a court has *ever* held that click-and-print firearm files are "speech" entitled to any level of constitutional protection. On the other hand, courts have held that computer files that "induce action without the intercession of the mind or the will of the recipient"—as the subject files do[56]—are not entitled to any level of constitutional protection. *CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (no First Amendment protection for automatic stock trading system that used language to operate "in an entirely mechanical way"; "The point was not to convey information or to assert values," so "[n]one of the reasons for which speech is thought to require protection above and beyond that accorded to non-speech behavior" were implicated) (brackets and ellipses removed); *see generally* Dkt. # 47-1 (*Amicus* Br. of Everytown for Gun Safety) at 4–9 (extensively analyzing why the subject files "lack any expressive value for the First Amendment to protect"). Notably, although the subject files themselves are not protectable speech, the Private Defendants are not and have never been restricted in any way from speaking *about* 3D-printed guns, including advocating for policy changes related to 3D-printed guns or criticizing gun-safety laws that apply to the subject files.

---

[55] Ex. C, ¶ 1(a).
[56] *See* SMSJ at 22 & nn. 54–56.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003158

Even if the Court were to find some merit in the Private Defendants' novel constitutional theories, the Private Defendants fail to show that the Constitution precludes the relief requested here. Again, the States merely ask the Court to set aside unlawful agency action, as required by the APA. The Temporary Modification and Letter are procedurally defective in violation of AECA's plain language, among other flaws. Preventing these unlawful agency actions from taking effect does not permanently deprive the Private Defendants of any purported rights: it simply requires the State Department to follow AECA's mandatory procedures and comply with the APA if it wishes to remove 3D-printable firearm files from the Munitions List. Moreover, federal law does not prohibit the Private Defendants from distributing the subject files in a manner that does not involve export. Now as before, correcting the State Department's unlawful power grab does not abrogate any rights of the Private Defendants. *See* Dkt. # 95 at 25.

The Private Defendants try to spin a constitutional argument from the alleged fact that others are (illegally) distributing 3D-printable gun files via the internet. PDMSJ at 2–3, 23. But even if others are violating federal law at their peril, that does not somehow create a violation of the Private Defendants' First Amendment rights. *Cf. Wayte v. United States*, 470 U.S. 598 (1985) (upholding conviction for failure to register for selective service against First Amendment and Equal Protection challenges to government's "passive enforcement policy," under which it prosecuted only those reported as having violated the law, generally the draft's most vocal opponents). Nor does the widespread violation of federal law alleged—but not proven—by the Private Defendants somehow justify the Federal Defendants' broad, unlawful deregulation (and certainly the Federal Defendants do not make this argument). In short, the Private Defendants' novel constitutional arguments do not provide a reasoned basis for the unlawful deregulation of 3D-printable guns via the Temporary Modification and Letter.

### 3. The Private Defendants' APA arguments do not explain, let alone justify, the Federal Defendants' abrupt regulatory about-face.

Since 2013 (when the Federal Defendants apparently became aware of Defense

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003159

1  Distributed's 3D-printable gun files) until April 2018 (when the *Defense Distributed* case was

2  abruptly settled), the Federal Defendants consistently maintained their position that 3D-printable

3  gun files were and ought to be subject to regulation under AECA and ITAR. Dkt # 95 at 3–4;

4  *see also* Dkt. # 29 (FAC) ¶¶ 39–41 & Dkt. # 112 (Fed Defs' Answer) ¶¶ 39–41. As explained

5  above and in the States' Motion for Summary Judgment, the Federal Defendants have failed

6  adequately to explain their total regulatory about-face, failed to consider the specific dangers of

7  3D-printable gun files, and offered only pretextual rationales for their sudden reversal. *See S*MSJ

8  at 12–20. The Private Defendants fare no better in trying to defend the indefensible.

9      The Private Defendants' argument relies primarily on memoranda from the Department

10  of Justice discussing various potential limits of ITAR. PDMSJ at 14–16. As an initial matter, the

11  Federal Defendants have not purported to rely on any of these statements, so they cannot possibly

12  "supply a reasoned basis" for the Federal Defendants' decision. *Chenery Corp.*, 332 U.S. at 196.

13  Moreover, these general statements about the limits of ITAR do not contemplate the subject files,

14  which were not made public until late 2012,[57] and which are not protected speech, as discussed

15  above. The Private Defendants also try to rely on a "legal analysis . . . performed by Defense

16  Distributed's legal counsel" as evidence of the Federal Defendants' supposed basis for its

17  regulatory about-face. PDMSJ at 17. But obviously, the mere fact that the government's files

18  contained Defense Distributed's self-serving analysis does not prove the government based its

19  decision on that analysis, particularly where the government has never claimed to do so.

20                                   **IV.   CONCLUSION**

21      For the reasons above and in their Motion for Summary Judgment, the States respectfully

22  request that the Court grant summary judgment in their favor, deny Defendants' motions for

23  summary judgment, and grant the States' requests for vacatur and a permanent injunction.

24  _____

25  [57] The Private Defendants assert the Federal Defendants' initial action to regulate the files came in response
    to the devastating December 2012 murder of 26 people, mostly children, at Sandy Hook Elementary School. PDMSJ
    at 14. In fact, the timing was driven by when Defense Distributed posted its files online—December 2012, the same
26  month as the Sandy Hook massacre. PDMSJ at n.2; *see* Ex. A (Aguirre Decl.) ¶¶ 24–25 (DDTC initiated regulatory
    action "[a]s a result" of media reports that Defense Distributed had posted executable CAD files online).

PLAINTIFF STATES' COMBINED                  24            ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                  Complex Litigation Division
JUDGMENT AND OPP TO                                             800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                        Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                    (206) 474-7744

WASHSTATEC003160

1  DATED this 24th day of May, 2019.

2

3        ROBERT W. FERGUSON
         Attorney General of Washington

4
        */s/ Jeffrey Rupert*
5        JEFFREY RUPERT, WSBA #45037
        Division Chief
6        TODD BOWERS, WSBA #25274
        Deputy Attorney General
7        JEFFREY T. SPRUNG, WSBA #23607
8        KRISTIN BENESKI, WSBA #45478
        ZACHARY P. JONES, WSBA #44557
9        Assistant Attorneys General
        JeffreyR2@atg.wa.gov
10       ToddB@atg.wa.gov
11       JeffS2@atg.wa.gov
        KristinB1@atg.wa.gov
12       ZachJ@atg.wa.gov
        *Attorneys for Plaintiff State of Washington*

13

14       WILLIAM TONG
        Attorney General of Connecticut
15
        */s/ Maura Murphy Osborne*
16       MAURA MURPHY OSBORNE, *admitted pro*
        *hac vice*
17       Assistant Attorney General
18       Maura.MurphyOsborne@ct.gov
        *Attorneys for Plaintiff State of Connecticut*
19

20       BRIAN E. FROSH
        Attorney General of Maryland
21
        */s/ Julia Doyle Bernhardt*
22       JULIA DOYLE BERNHARDT, *admitted pro*
23       *hac vice*
        JEFFREY PAUL DUNLAP, *admitted pro hac*
24       *vice*
        Assistant Attorneys General
25
26       JBernhardt@oag.state.md.us

PLAINTIFF STATES' COMBINED    25    ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY       Complex Litigation Division
JUDGMENT AND OPP TO         800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS       Seattle, WA 98104-3188
2:18-cv-01115-RSL          (206) 474-7744

WASHSTATEC003161

jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM, *admitted pro hac vice*
Assistant Attorney General
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

*/s/ Steven Wu*
STEVEN WU, *admitted pro hac vice*
Deputy Solicitor General
Steven.Wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

*/s/ Jonathan B. Miller*
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General of Commonwealth of Pennsylvania

*/s/ Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN, *admitted pro hac vice*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003162

Executive Deputy Attorney General
MICHAEL J. FISCHER, *admitted pro hac vice*
Chief Deputy Attorney General
JGoldman@attorneygeneral.gov
MFischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Robyn Bender*
ROBYN BENDER, *admitted pro hac vice*
Deputy Attorney General
JIMMY ROCK, *admitted pro hac vice*
Assistant Deputy Attorney General
ANDREW J. SAINDON, *admitted pro hac vice*
Senior Assistant Attorney General
Robyn.Bender@dc.gov
Jimmy.Rock@dc.gov
Andy.Saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Senior Assistant Attorney General
scott.kaplan@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS, *admitted pro hac vice*
Deputy Attorney General
Nelson.Richards@doj.ca.gov
*Attorneys for Plaintiff State of California*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003163

PHIL J. WEISER
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
matt.grove@coag.gov
*Attorneys for Plaintiff State of Colorado*

KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ilona M. Kirshon*
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*

CLARE E. CONNORS
Attorney General of Hawaii

*/s/ Robert T. Nakatsuji*
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

*/s/ Elizabeth Roberson-Young*
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
erobersonyoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003164

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Minnesota Attorney General's Office
Solicitor General's Division
jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Special Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*


THOMAS J. DONOVAN, JR.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC003165

Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac vice*
Solicitor General
benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*


MARK R. HERRING
Attorney General of the Commonwealth of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*
Deputy Attorney General, Civil Litigation
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

30

WASHSTATEC003166

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **REPLY IN SUPPORT OF** |
| | **MOTION FOR SUMMARY** |
| UNITED STATES DEPARTMENT OF STATE, et al., | **JUDGMENT** |
| Defendants. | **NOTED FOR: June 7, 2019** |

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003167

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

In their motion for summary judgment, the Federal Defendants explained that Plaintiffs lack standing to challenge the actions undertaken by the Department of State in connection with the Government's settlement with Defense Distributed, and that in any event Plaintiffs' claims under the Tenth Amendment and the Administrative Procedure Act ("APA") fail on the merits. Federal Defs.' Consolidated Opp'n to Pls.' Mot. for Summ. J. & Cross-Mot. for Summ J., ECF No. 173 ("Fed. Defs.' MSJ"), at 7-12. Plaintiffs' opposition brief, which raises the same points previously litigated in this case, does not compel a different conclusion. Pls.' Combined Reply in Support of Mot. for Summ. J. & Opp'n to Defs.' Cross-Mots. for Summ. J., ECF No. 186 ("Pls.' Opp'n").

In light of the parties' extensive prior briefing and the Court's familiarity with the issues presented in this matter, the Federal Defendants incorporate the arguments previously advanced in their prior briefing. The Federal Defendants acknowledge that the Court has rejected some of those arguments, but respectfully maintain their position and disagreement with the Court's earlier rulings. For present purposes, the Federal Defendants emphasize only the following points.

First, Plaintiffs fail to establish that they fall within the zone of interests of the relevant provision of the Arms Export Control Act ("AECA"). Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing. Pls.' Opp'n at 10. By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents. No authority supports such a sweeping proposition; to the contrary, "[t]he national security . . . is the primary responsibility and purpose of the Federal Government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting). Moreover, Plaintiffs fail to address the legislative history regarding 22 U.S.C. § 2778(f)(1), which establishes that Congress enacted that provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation." H.R. Rep. No. 97-58, at 21-22

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003168

(1981). As Plaintiffs appear to agree that they neither exercise congressional oversight of the Department of State nor function as would-be exporters—but instead raise purely domestic, non-military concerns unrelated to foreign relations, Pls.' Opp'n at 10—their claims do not fall within the zone of interests of the AECA, and they therefore lack standing to assert their claim. *See* Fed. Defs.' MSJ at 8-10.

Second, Plaintiffs continue to contend that the Federal Defendants acted in "bad faith" and have misrepresented or provided "pretext[ual]" justifications for the Government's settlement with Defense Distributed. Pls.' Opp'n at 16. This argument is plainly meritless. The mere fact that Plaintiffs "may disagree with the policy and process" is not "enough to justify a claim of bad faith." *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (Mem.), 202 L. Ed. 2d 306 (2018) (Gorsuch, J., concurring). Nor do Plaintiffs' allegations of "inconsistent explanations," Pls.' Opp'n at 16, suffice for the "strong showing" of "willful misconduct" required to establish that an agency acted in bad faith. *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1250, 1260-61 (E.D. Cal. 1997) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Even if the Federal Defendants had made "inconsistent" statements in representing that the challenged decision was made as part of a court-initiated settlement process in litigation in the District Court of the Western District of Texas (culminating in a June 29, 2018 settlement agreement), "[a] change of position is not enough," as a legal matter, to meet the bad-faith standard. *See Guidiville Rancheria of Cal. v. United States*, 2013 WL 6571945 at *8 (N.D. Cal. Dec. 13, 2013). Nor are public comments received after this settlement agreement was reached, *see* Pls.' Opp'n at 13-14, indicative of pretext or bad faith. *Cf. Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments" received after its decision has been made).[1] In short, Plaintiffs' allegation of bad faith in either the settlement agreement

---

[1] In making this argument, and elsewhere, Plaintiffs conflate the comments received regarding the decision to enter into a settlement agreement with Defense Distributed (which Plaintiffs acknowledge was "temporary" in scope) and the comments received regarding the Notice of Proposed Rulemaking, which sets forth plans for permanent changes in agency regulations. Even if Plaintiffs were correct—and the Federal Defendants respectfully maintain otherwise— that the agency was required to provide notice or take into account public comments on the

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003169

or the compilation of the administrative record should be rejected as a matter of both fact and law.[2]

Third, Plaintiffs fault the Federal Defendants for failing to consider various comments contending that the Department of State should continue to regulate 3D-printed firearms. Yet many of the comments were not addressing the temporary modification and letter challenged in this litigation, but rather a distinct notice of proposed rulemaking proposing to amend the United States Munitions List, 83 Fed. Reg. 24,198 (May 24, 2018). *See* Pls.' Opp'n at 6-7 (citing comments on the proposed rule submitted by Professor Susan Waltz and the Brady Campaign to Prevent Gun Violence). In addition, while Plaintiffs accuse the Federal Defendants of failing to consider certain comments specifically urging the Federal Defendants not to issue the temporary modification and letter, they neglect to mention that those comments were submitted after the Department of State executed the June 29, 2018 settlement agreement obligating it to take those steps. *See* Pls.' Opp'n at 7 (citing comments from members of Congress, submitted on July 20 and 25, 2018); *id.* at 8 (citing "[h]undreds of individual emails," all of which were submitted in late July 2018); *id.* (citing "105,555 emails received from visitors to Everytown.org" between July 23 and July 27, 2018). By the time these comments were received, the Department of State had already committed to issuing the temporary modification and letter.

Fourth and finally, Plaintiffs have failed to demonstrate that the Federal Defendants' actions conflict with the Tenth Amendment. Notably, Plaintiffs offer no support for their vague theory that "the State Department is intruding into the States' sphere of authority by exercising a power it does not have." Pls.' Opp'n at 12. The fact remains that "there is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program.

---

temporary modification, any comments the agency received regarding the NPRM would not be relevant to a finding of pretext or bad faith.

[2] Plaintiffs also acknowledge that their argument regarding "pretext or bad faith is not necessary" if the Court continues to reject, as it has previously, the Federal Defendants' arguments that the agency's rationale was adequate. Pls.' Opp'n at 16; *see* Fed. Defs.' MSJ at 9-10 (explaining that the Federal Defendants maintain the decision was proper, but acknowledging that the Court previously concluded otherwise).

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003170

Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals." *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015). Nor can Plaintiffs salvage their argument by mischaracterizing the Government's actions undertaken in connection with the settlement agreement as a "*post hoc* litigation position." Pls.' Opp'n at 12. As the Federal Defendants have previously explained, Fed. Defs.' MSJ at 11, the Government has never suggested that the settlement agreement conflicts with or otherwise preempts any state laws, but rather was undertaken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity, *see Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 695 (N.D. Text. 2015). *See also* Prelim. Inj., ECF No. 95, at 16 ("The federal defendants also recognize the continuing viability of state law gun control measures.").

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003171

1    Dated:  June 7, 2019                    Respectfully submitted,

2                                           JOSEPH H. HUNT
3                                           Assistant Attorney General

4                                           JOHN R. GRIFFITHS
5                                           Director, Federal Programs Branch

6                                           ANTHONY J. COPPOLINO
                                            Deputy Director, Federal Programs Branch
7
                                            */s/ Stuart J. Robinson*
8                                           STUART J. ROBINSON
9                                           STEVEN A. MYERS
                                            ERIC J. SOSKIN
10                                          Trial Attorneys
                                            U.S. Department of Justice
11                                          Civil Division, Federal Programs Branch
                                            450 Golden Gate Ave.
12                                          San Francisco, CA 94102
                                            (415) 436-6635 (telephone)
13                                          (415) 436-6632 (facsimile)
                                            stuart.j.robinson@usdoj.gov
14
15                                          *Attorneys for Federal Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC003172

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2019, I electronically filed the foregoing reply using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: June 7, 2019                                  */s/ Stuart J. Robinson*
                                                     Stuart J. Robinson

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC003173

121 F.Supp.3d 680
United States District Court,
W.D. Texas,
Austin Division.

DEFENSE DISTRIBUTED, et al., Plaintiffs,
v.
UNITED STATES DEPARTMENT
OF STATE, et al., Defendants.

No. 1–15–CV–372 RP.
|
Signed Aug. 4, 2015.

**Synopsis**
**Background:** Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms brought action against Department of State, Secretary of State, Directorate of Defense Trade Controls (DDTC) and DDTC employees, alleging that prepublication approval requirement for technical data organization published on internet violated their rights to free speech under the First Amendment, their right to keep and bear arms under the Second Amendment, and their due process rights under the Fifth Amendment, seeking preliminary injunction enjoining DDTC from enforcing the requirement.

**Holdings:** The District Court, Robert L. Pitman, J., held that:

[1] plaintiffs failed to meet burden of showing substantial threat that failure to grant preliminary injunction outweighed damage that injunction would cause and that injunction would not disserve public interest;

[2] plaintiffs were unlikely to succeed on merits of claim that DDTC acted beyond scope of its authority;

[3] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirements violated right to free speech;

[4] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirement violated association members' Second Amendment rights;

[5] term "defense articles" was not void for vagueness; and

[6] term "export" was not void for vagueness.

Motion denied.

West Headnotes (37)

[1]     **Injunction**
         Extraordinary or unusual nature of remedy
         A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

         Cases that cite this headnote

[2]     **Injunction**
         Grounds in general;  multiple factors
         A party seeking a preliminary injunction may be granted relief only if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest; the party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief.

         Cases that cite this headnote

[3]     **Injunction**
         Prima facie showing
         To show a substantial likelihood of success on the merits, as required to be granted a preliminary injunction, a plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment.

         Cases that cite this headnote

[4]     **Injunction**

WASHSTATEC003174

Weapons and explosives

**Weapons**
Violation of right to bear arms

Second Amendment protects intangible and unquantifiable interests and a deprivation of Second Amendment rights is thus considered an irreparable injury justifying a grant of a preliminary injunction. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

[5]   **Injunction**
Weapons and explosives

**War and National Emergency**
Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted right to keep and bear arms failed to meet burden of showing substantial threat that failure to grant preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that organization intended to publish on internet, which DDTC alleged were "defense articles," as defined under the Arms Export Control Act (AECA), outweighed any damage that the injunction would cause and that the injunction would not disserve the public interest; public had interest in restricting export of defense articles, and President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

1 Cases that cite this headnote

[6]   **United States**
Necessity of waiver or consent

A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit.

Cases that cite this headnote

[7]   **Public Employment**
Sovereign immunity, and relation of official immunity thereto

**United States**
Sovereign immunity, and relation of official immunity thereto

The "ultra vires exception" to sovereign immunity provides that, where an officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions, or ultra vires his authority, and thus not protected by sovereign immunity.

Cases that cite this headnote

[8]   **Public Employment**
Sovereign immunity, and relation of official immunity thereto

**United States**
Sovereign immunity, and relation of official immunity thereto

To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must do more than simply allege that the actions of a government officer are illegal or unauthorized; rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority.

Cases that cite this headnote

[9]   **Injunction**
Weapons and explosives

**War and National Emergency**
Export restrictions

Non-profit organization that promoted right to keep and bear arms was unlikely to succeed on merits of claim that Directorate of Defense Trade Controls (DDTC) acted beyond scope of its authority in imposing requirement that group obtain approval from DDTC prior to publishing technical information on printing machine that

WASHSTATEC003175

could be used to manufacture firearm parts, on internet, as required to be entitled to preliminary injunction enjoining enforcement of the prepublication approval requirement; DDTC had authority, under Arms Export Control Act (AECA), to regulate export of defense articles, based on inter alia, consideration of increase of possibility of escalation of conflict, and organization's purpose of facilitating global access to three-dimensional printing of arms increased possibility of outbreak or escalation of conflict. Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. § 120.1(a).

Cases that cite this headnote

**[10]**    **Constitutional Law**
    👉 Freedom of Speech, Expression, and Press
    **Constitutional Law**
    👉 Property and Events

In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[11]**    **Constitutional Law**
    👉 Freedom of Speech, Expression, and Press

First Amendment protection is broad, covering works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[12]**    **Constitutional Law**
    👉 Presumption of invalidity

Prior restraints on speech face a presumption against their constitutionality. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[13]**    **Constitutional Law**
    👉 Prior Restraints

A system of prior restraints on speech avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[14]**    **Constitutional Law**
    👉 Prior Restraints

The heavy presumption against the constitutional validity of prior restraint on speech is not a standard of review, and judicial decisions analyzing prior restraints apply different standards of review depending on the restraint at issue. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[15]**    **Constitutional Law**
    👉 Narrow tailoring requirement; relationship to governmental interest
    **Constitutional Law**
    👉 Existence of other channels of expression

Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[16]**    **Constitutional Law**
    👉 Strict or exacting scrutiny; compelling interest test

Content-based restrictions on speech are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. U.S.C.A. Const.Amend. 1.

WASHSTATEC003176

Cases that cite this headnote

**[17]  Constitutional Law**
         Content-Based Regulations or Restrictions

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[18]  Constitutional Law**
         Content-Based Regulations or Restrictions

A regulation on speech is not content based merely because the applicability of the regulation depends on the content of the speech; rather, determination of whether regulation of speech is content-based requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[19]  Constitutional Law**
         Government information

International Traffic in Arms Regulation (ITAR), which regulates disclosure of technical data relating to "defense articles," was a content-neutral regulation of speech, and was thus subject to intermediate scrutiny, rather than strict scrutiny, since regulation did not regulate disclosure of technical data based on the message that was communicated, but rather was intended to satisfy a number of foreign policy and national defense goals related to preventing arms races, aiding in the development of weapons of mass destruction, and an increase in the possibility of outbreak of escalation of conflict. U.S.C.A. Const.Amend. 1; Arms Export Control Act, § 38(a)(1, 2), 22 U.S.C.A. § 2778(a)(1, 2); 22 C.F.R. § 120.1(a).

2 Cases that cite this headnote

**[20]  Civil Rights**
         Preliminary Injunction

**War and National Emergency**
         Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted right to keep and bear arms were unlikely to succeed on merits of claim that requirement, under International Traffic in Arms Regulation (ITAR), that organization obtain approval from Directorate of Defense Trade Controls (DDTC) prior to publishing technical information on printing machine that could be used to manufacture firearm parts, on internet, violated organization's right to free speech, as required to be entitled to preliminary injunction enjoining enforcement of the prepublication approval requirement; requirement furthered substantial government interest in regulating dissemination of military information outside national borders and did not impose insurmountable burden on organization's ability to disseminate information domestically, and ITAR provided method for determining whether information was subject to its export control. U.S.C.A. Const.Amend 1; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[21]  Federal Courts**
         Case or Controversy Requirement

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[22]  Federal Civil Procedure**
         In general;  injury or interest

**Federal Courts**
         Injury, harm, causation, and redress

One element of the case-or-controversy requirement of Article III of the Constitution is that plaintiffs, based on their complaint, must establish that they have standing to sue; this requirement, like other jurisdictional requirements, is not subject to waiver and

WASHSTATEC003177

demands strict compliance. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[23]    **Federal Civil Procedure**
          In general; injury or interest
        **Federal Civil Procedure**
          Causation; redressability

To meet Constitutional standing requirement a plaintiff must show: (1) she has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision; the party invoking federal jurisdiction bears the burden of establishing these elements. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[24]    **Federal Civil Procedure**
          In general; injury or interest

A litigant is generally limited to asserting standing only on behalf of himself. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[25]    **Associations**
          Actions by or Against Associations

Standing for an association to bring suit on behalf of its members requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[26]    **Weapons**
          Violation of right to bear arms

Inability of members of association that promoted the right to keep and bear arms to download computer files from internet containing technical information on printing machine that could be used to manufacture firearm parts constituted injury in fact that was clearly traceable to Directorate of Defense Trade Controls (DDTC) enforcement of requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing the information on the internet, and association thus had standing to assert a claim for violation of the Second Amendment on its members behalf. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

[27]    **Weapons**
          Violation of right to bear arms

The first step in addressing a claim under the Second Amendment is to determine whether the challenged law impinges upon a right protected by the Second Amendment, i.e., whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee, and the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

[28]    **Weapons**
          Violation of right to bear arms

The appropriate level of scrutiny in evaluating the constitutionality of a firearms regulation depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the Second Amendment right. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

WASHSTATEC003178

**[29]** **Weapons**
    Violation of right to bear arms

Intermediate scrutiny, rather than strict scrutiny, applied in evaluating Directorate of Defense Trade Controls' (DDTC) enforcement requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts on internet, violated Second Amendment rights of members of association that promoted right to keep and bear arms; enforcement did not prohibit association members from manufacturing their own firearms or from keeping and bearing those firearms, and members were not prohibited from acquiring the computer files at issue directly from the non-profit organization. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[30]** **Injunction**
    Weapons and explosives

**War and National Emergency**
    Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms were unlikely to succeed on merits of claim that requirement, under International Traffic in Arms Regulation (ITAR), that organization obtain approval from Directorate of Defense Trade Controls (DDTC) prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts, on internet, violated association members' Second Amendment rights, as required to be entitled to preliminary injunction enjoining enforcement of requirement; regulatory scheme of Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) advanced legitimate

governmental interest regulating dissemination of military information outside national borders in a not unduly burdensome fashion. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[31]** **Constitutional Law**
    Certainty and definiteness; vagueness

An enactment is void for vagueness under the Fifth Amendment if its prohibitions are not clearly defined. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[32]** **Constitutional Law**
    Vagueness

The Fifth Amendment prohibits the enforcement of vague criminal laws. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[33]** **Constitutional Law**
    Certainty and definiteness; vagueness

The threshold for declaring a law void for vagueness, in violation of the Fifth Amendment, is high. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[34]** **Constitutional Law**
    Certainty and definiteness; vagueness

A statute is not void for vagueness under the Fifth Amendment if it sets out an ascertainable standard. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[35]** **Constitutional Law**
    Certainty and definiteness; vagueness

A statute is void for vagueness under the Fifth Amendment only if it wholly fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

WASHSTATEC003179

standardless that it authorizes or encourages seriously discriminatory enforcement. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[36] **Constitutional Law**
&#10148; War and National Security

**War and National Emergency**
&#10148; Constitutional and statutory provisions

Term "defense articles" as used in the Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was specifically defined to include items on AECA's Munitions List, which contained 21 categories of governed articles, as well as information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, and did not include any subjective terms, but rather identified items with significant specificity. U.S.C.A. Const.Amend. 5; Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. §§ 120.1(a), 120.4, 120.6.

1 Cases that cite this headnote

[37] **Constitutional Law**
&#10148; War and National Security

**War and National Emergency**
&#10148; Export restrictions

Term "export" as used in the International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was defined to include disclosing or transferring technical data to a foreign person, whether in the United States or abroad, and persons of ordinary intelligence were clearly on notice that posting, on the internet, for free download, of files which included directions for the 3-D printing of firearms, would fall within definition of export. U.S.C.A. Const.Amend. 5; 22 C.F.R. § 120.17(a) (4).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*686** Alan Gura, Gura & Possessky, PLLC, Alexandria, VA, David S. Morris, W. Thomas Jacks, Fish & Richardson, P.C., Austin, TX, Joshua Michael Blackman, Josh Blackman LLC, Houston, TX, Matthew A. Goldstein, Matthew A. Goldstein, PLLC, Washington, DC, William B. Mateja, Fish & Richardson, Dallas, TX, for Plaintiffs.

Eric J. Soskin, Stuart Justin Robinson, U.S. Department of Justice, Civil Division, Washington, DC, Zachary Carl Richter, United States Attorney's Office, Austin, TX, for Defendants.

### *ORDER*

ROBERT L. PITMAN, District Judge.

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 8) and the responsive pleadings thereto. The Court conducted a hearing on the motion on July 6, 2015. Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

## I. BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines

WASHSTATEC003180

and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute **\*687** the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir.2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related items (the "Published Files"). (Compl. ¶¶ 22–24). Plaintiffs allege that, on May 8, 2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its

3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id.* ¶¶ 26–29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files"). [1] Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the **\*688** Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR–15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28–33).

[1]  According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Defense Distributed has

WASHSTATEC003181

sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34–36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II. STANDARD OF REVIEW

[1]  [2]  [3]  A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir.1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* 710 F.3d 579, 582 (5th Cir.2013). *See also Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir.2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed.

1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985).

## *689 III. ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims.

### A. Injury and Balancing of Interests

[4]  Defendants suggest Plaintiffs' contention that they face irreparable injury absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.,* 579 F.3d 502, 506 (5th Cir.2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir.2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

[5]  The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

WASHSTATEC003182

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir.2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir.2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir.2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" **\*690** ); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir.2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp contrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary

injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

## B. Ultra Vires

[6]  [7]  [8]    Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones,* 652 F.3d 577, 581 (5th Cir.2011) (citing *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos,* 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate

WASHSTATEC003183

regulations for the import and export
of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part,
as including "[d]isclosing (including oral or visual disclosure)
or transferring technical data to a foreign person whether
in the United States or abroad." 22 C.F.R. § 120.17(a)(4).
Plaintiffs argue this definition falls outside Congressional
**\*691** intent in authorizing restriction of export of defense
articles because, as interpreted by Defendants, it includes
public speech within the United States.

[9]    Notably, Plaintiffs do not suggest Defendants lack
authority under the AECA to regulate export of defense
articles. Further, under the AECA, decisions are required to

take into account whether the export
of an article would contribute to an
arms race, aid in the development of
weapons of mass destruction, support
international terrorism, increase the
possibility of outbreak or escalation of
conflict, or prejudice the development
of bilateral or multilateral arms control
or nonproliferation agreements or
other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its
purpose is "facilitating *global* access to, and the collaborative
production of, information and knowledge related to the
three-dimensional ("3D") printing of arms." (Compl. ¶ 1)
(emphasis added). Facilitating global access to firearms
8 undoubtedly "increase[s] the possibility of outbreak or
escalation of conflict." Defense Distributed, by its own
admission, engages in conduct which Congress authorized
Defendants to regulate. Plaintiffs have not, therefore, shown
that Defendants are acting without any "colorable basis for the
exercise of authority." Accordingly, they have not shown a
likelihood of success on their ultra vires challenge.

## C. First Amendment

[10]    Plaintiffs next argue Defendants' interpretation of the
AECA violates their First Amendment right to free speech.
In addressing First Amendment claims, the first step is to
determine whether the claim involves protected speech, the

second step is to identify the nature of the forum, and the third
step is to assess whether the justifications for exclusion from
the relevant forum satisfy the requisite standard. *Cornelius
v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788,
797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

[11]    As an initial matter, Defendants argue the computer
files at issue do not constitute speech and thus no
First Amendment protection is afforded. First Amendment
protection is broad, covering "works which, taken as a whole,
have serious literary, artistic, political, or scientific value,
regardless of whether the government or a majority of the
people approve of the ideas these works represent." *Miller
v. California,* 413 U.S. 15, 34, 93 S.Ct. 2607, 37 L.Ed.2d
419 (1973). *See also Brown v. Entm't Merchants Ass'n,* ——
U.S. ——, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011)
(video games' communication of ideas and social messages
suffices to confer First Amendment protection). Defendants,
however, maintain the computer files at the heart of this
dispute do not warrant protection because they consist merely
of directions to a computer. In support, they rely on a Second
Circuit opinion which held that computer instructions that
"induce action without the intercession of the mind or the
will of the recipient" are not constitutionally protected speech.
*Commodity Futures Trading Comm'n v. Vartuli,* 228 F.3d 94,
111 (2nd Cir.2000).

As Plaintiffs point out, one year later, the Second Circuit
addressed the issue of whether computer code constitutes
speech at some length in *Universal City Studios, Inc. v.
Corley,* 273 F.3d 429 (2nd Cir.2001).[2] The court made
clear the fact that **\*692** computer code is written in a
language largely unintelligible to people was not dispositive,
noting Sanskrit was similarly unintelligible to many, but
a work written in that language would nonetheless be
speech. Ultimately, the court concluded "the fact that a
program has the capacity to direct the functioning of
a computer does not mean that it lacks the additional
capacity to convey information, and it is the conveying of
information that renders instructions 'speech' for purposes
of the First Amendment." *Id.* at 447 (discussing other
examples of "instructions" which qualified as speech under
First Amendment). Similarly, the Sixth Circuit has found
"[b]ecause computer source code is an expressive means
for the exchange of information and ideas about computer
programming ... it is protected by the First Amendment,"
even though such code "has both an expressive feature and a
functional feature." *Junger v. Daley,* 209 F.3d 481, 485 (6th
Cir.2000).

WASHSTATEC003184

2    Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli*. However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed. That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient." *Corley,* 273 F.3d at 449 (quoting *Vartuli,* 228 F.3d at 111). Plaintiffs here have not so marketed or described the files at issue.

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source." That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consider the files as subject to the protection of the First Amendment.

[12]   [13]   In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint. Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City– Parish Consol. Gov't,* 731 F.3d 488, 493 (5th Cir.2013). *See also Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) ("Any prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth,* 382 F.3d 529, 539 (5th Cir.2004) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

[14]   The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman,* 764 F.3d 409, 438 (5th Cir.2014). *See, e.g.,*

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); **\*693** *Perry v. McDonald,* 280 F.3d 159, 171 (2nd Cir.2001) (context in which prior restraint occurs affects level of scrutiny applied); 192 F.3d 742, 749 (7th Cir.1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

[15]   [16]   No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC,* 520 U.S. 180, 213–14, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

[17]   [18]   Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert,* ── U.S. ──, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott,* 696 F.3d 454, 459 (5th Cir.2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed,* 135 S.Ct. at 2227. *See also Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

WASHSTATEC003185

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley,* ⸺ U.S. ⸺, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans,* 753 F.3d 560, 562 (5th Cir.2014), *cert. denied,* ⸺ U.S. ⸺, 135 S.Ct. 1403, 191 L.Ed.2d 361 (2015) (upholding regulation *694 requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson,* 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson,* 696 F.3d at 460.

**[19]** The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak,* 683 F.3d 1126, 1135 (9th Cir.2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny 13 standard. *Compare Ward,* 491 U.S. at 798, 109 S.Ct. 2746 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), *with Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), *and Turner,* 520 U.S. at 189, 117 S.Ct. 1174 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Circuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson,* 667 F.3d 630, 641 (5th Cir.2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest *695 otherwise. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not

WASHSTATEC003186

sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking necessary approval. *Chi Mak,* 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project,* 561 U.S. at 29, 130 S.Ct. 2705 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)). [3]

[3]  The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.,* 579 F.2d 516, 521 (9th Cir.1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

[20]  Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private

forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data **\*696** that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey,* 864 F.2d 1487, 1496–97 (9th Cir.1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesting expedited processing. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed.Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

WASHSTATEC003187

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

**D. Second Amendment**
Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

**a. Standing**
[21]  [22]  [23]  Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines*, 521 U.S. at 819, 117 S.Ct. 2312; *Lewis v. Casey*, 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir.2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir.2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

[24]  Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising **\*697** its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally

limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

4    No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("vendors and those in like positions ... have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir.2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

5    Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public,* such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

[25]  Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous.*

WASHSTATEC003188

*Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc.* **\*698** *v. Tex. Med. Bd.,* 627 F.3d 547, 550–51 (5th Cir.2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 191 (5th Cir.2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right. Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future. In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme. (Plf. Reply Exs. 3–4). This testimony satisfies the "injury in fact" portion of the standing inquiry.

[26] Defendants further contend any injury is not fairly traceable to their conduct. They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed. But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing. *See Davis v. United States,* 564 U.S. 229, 131 S.Ct. 2419, 2434, n. 10, 180 L.Ed.2d 285 (2011) (one must not "confus [e] weakness on the merits with absence of Article III standing"). In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants. The Court therefore finds SAF

has standing to assert a claim of a violation of the Second Amendment. *See Nat'l Rifle Ass'n,* 700 F.3d at 192 (NRA had standing, on behalf of its members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18–to–20–year–olds); *Ezell v. City of Chicago,* 651 F.3d 684, 696 (7th Cir.2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city); *Mance v. Holder,* 74 F.Supp.3d 795, 802–03 (N.D.Tex.2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

[27] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n,* 700 F.3d at 194.

**\*699** In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller,* 554 U.S. at 577–628, 128 S.Ct. 2783). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology, [6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins

WASHSTATEC003189

of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintiffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller,* the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

6    Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 582, 128 S.Ct. 2783.

**[28]**    The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n,* 700 F.3d at 195 (emphasis added).

**[29]**    The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id.* at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205–07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense

Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw,* 719 F.3d 338, 347–48 (5th Cir.2013), *cert. denied* **\*700** , —— U.S. ——, 134 S.Ct. 1365, 188 L.Ed.2d 297 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18–20–year–olds from carrying handguns in public).

**[30]**    As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw,* 719 F.3d at 348 (statute limiting under 21–year–olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n,* 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

### E. Fifth Amendment

**[31]**  **[32]**  **[33]**  **[34]**  **[35]**  Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have

WASHSTATEC003190

rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir.2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project*, 561 U.S. at 20, 130 S.Ct. 2705 (quoting *Williams*, 553 U.S. at 306, 128 S.Ct. 1830). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

**\*701** **[36]** To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the 23 term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical

data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R. § 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

**[37]** The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the definition of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

## IV. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. # 7) is hereby **DENIED**.

**All Citations**

121 F.Supp.3d 680

838 F.3d 451
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment
Foundation, Incorporated, Plaintiffs–Appellants
v.
UNITED STATES DEPARTMENT OF STATE; John
F. Kerry, In His Official Capacity as the Secretary
of the Department of State; Directorate of Defense
Trade Controls, Department of State Bureau of
Political Military Affairs; Kenneth B. Handelman,
Individually and in His Official Capacity as the
Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political–Military
Affairs; C. Edward Peartree, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division; Sarah
J. Heidema, Individually and in Her Official
Capacity as the Division Chief, Regulatory and
Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and
in His Official Capacity as the Senior Advisor, Office
of Defense Trade Controls, Defendants–Appellees

No. 15–50759
|
Filed September 20, 2016

**Synopsis**

**Background:** Non-profit organization that designed firearms
that could be downloaded from internet and printed with
a 3-D printer and association that promoted the right to
keep and bear arms brought action against Department
of State, Secretary of State, Directorate of Defense Trade
Controls (DDTC) and DDTC employees, alleging that
prepublication approval requirement for technical data
organization published on internet violated their rights to
free speech under the First Amendment, their right to keep
and bear arms under the Second Amendment, and their
due process rights under the Fifth Amendment, seeking
preliminary injunction enjoining DDTC from enforcing the
requirement. The United States District Court for the Western
District of Texas, Robert L. Pitman, J., 121 F.Supp.3d 680,
denied motion. Plaintiffs appealed.

**Holdings:** The Court of Appeals, W. Eugene Davis, Circuit
Judge, held that:

[1] public interest, when compared with plaintiffs' private
interests, weighed against entry of injunction, and

[2] balance of harms weighed against entry of injunction.

Affirmed.

Jones, Circuit Judge, issued dissenting opinion.

West Headnotes (3)

[1]     **War and National Emergency**
        Export restrictions
        **War and National Emergency**
        Import restrictions
        The United States "Munitions List," as found in
        the Arms Export Control Act (AECA), is not
        a compendium of specific controlled items, but
        rather, is a series of categories describing the
        kinds of items qualifying as "defense articles"
        subject to import and export control by the
        President. 22 U.S.C.A. § 2778(a)(1).

        2 Cases that cite this headnote

[2]     **Injunction**
        Weapons and explosives
        Non-profit organization that designed firearms
        which can be downloaded from internet and
        printed with a 3-D printer, as well as association
        that promoted right to keep and bear arms,
        failed to show that a failure to grant preliminary
        injunction enjoining enforcement of requirement
        that Directorate of Defense Trade Controls
        (DDTC) approve computer files containing
        technical data on firearms that could be printed
        on 3-D printers that organization intended to
        publish on internet, which DDTC alleged were
        "defense articles" as defined under the Arms
        Export Control Act (AECA), outweighed any
        damage that the injunction would cause to

WASHSTATEC003192

public's interest in restricting export of defense articles, and, thus, entry of injunction was not appropriate; in addition, President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

7 Cases that cite this headnote

[3] **Injunction**
  ⮫ Weapons and explosives
  Balance of harms weighed against entry of preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that non-profit organization, which designed firearms downloadable from Internet and printable with 3-D printer, intended to publish on Internet, as DDTC alleged files were "defense articles" as defined under the Arms Export Control Act (AECA); although organization's constitutional rights might be temporarily harmed by denial of injunction, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim, thereby harming forever government's interest in national defense and national security. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

8 Cases that cite this headnote

**\*453** Appeal from the United States District Court for the Western District of Texas, Robert L. Pitman, J.

**Attorneys and Law Firms**

Alan Gura, Gura & Possessky, P.L.L.C., Alexandria, VA, Joshua Michael Blackman, Houston, TX, Matthew Goldstein, Washington, DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX, David Scott Morris, Fish & Richardson, P.C., Austin, TX, for Plaintiffs–Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of Justice, Michael S. Raab, U.S. Department of Justice, Civil Division,

Appellate Section, Eric J. Soskin, U.S. Department of Justice, Civil Division Federal Programs Branch, Washington, DC, for Defendants–Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the Press, Washington, DC, for Amici Curiae Reporters Committee for Freedom of the Press, Thomas Jefferson Center for the Protection of Free Expression.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute, Washington, DC, for Amicus Curiae Cato Institute.

Raffi Melkonian, Wright & Close, L.L.P., Houston, TX, for Amici Curiae Representative Thomas Massie, Representative Brian Babin, Representative K. Mike Conaway, Representative Jeff Duncan, Representative Blake Farenthold, Representative John Fleming, Representative Paul Gosar, Representative Walter Jones, Mike Kelly, Representative Steve King, Representative Raul Labrador, Representative Jeff Miller, Representative Bill Posey, Representative Todd Rokita, Representative Daniel Webster.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David T. Hardy, Tucson, AZ, for Amicus Curiae Madison Society Foundation, Incorporated.

Kit Walsh, Electronic Frontier Foundation, San Francisco, CA, for Amicus Curiae Electronic Frontier Foundation.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank Rome, L.L.P., New York, NY, for Amicus Curiae Brady Center to Prevent Gun Violence.

Robert E. Henneke, Joel Stonedale, Texas Public Policy Foundation, Austin, TX, for Amicus Curiae Texas Public Policy Foundation.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs–Appellants Defense Distributed and Second Amendment Foundation, Inc. have sued Defendants–Appellees, the United States Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs–Appellants' interest in

WASHSTATEC003193

protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

**\*454 I. Background**

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR–15 rifles. [1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

[1]   The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F.Supp.3d 680, 686–88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically in .stl format; for CNC machines, text files setting out coordinates **\*455** and functions to direct a drill. [2]

[2]      Plaintiffs–Appellants' Original Brief on Appeal.

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR–15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR–15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published

WASHSTATEC003194

Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).
>
> [1] The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ─── U.S. ───, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC **\*456** "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.* [3]

3    *See Def. Distributed v. U.S. Dep't of State,* 121 F.Supp.3d 680, 687–88 (W.D. Tex. 2015).

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR–15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

### District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs–Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments. Plaintiffs–Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

4    The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR–15

WASHSTATEC003195

lower receivers with it, as well as all 3D printing files
used to produce prohibited weapons and weapon parts.

Plaintiffs–Appellants sought a preliminary injunction against
the State Department, essentially seeking to have the district
court suspend enforcement of ITAR's prepublication approval
requirement pending final resolution of this case. The district
court denied the preliminary injunction, and Plaintiffs–
Appellants timely filed this appeal. We review the denial of a
preliminary injunction for abuse of discretion, but we review
any questions of law de novo. [5]

> To obtain a preliminary injunction, the applicant must show
> (1) a substantial likelihood that he will prevail on the
> merits, (2) a substantial threat that he will suffer irreparable
> injury if the injunction **\*457** is not granted, (3) that
> his threatened injury outweighs the threatened harm to
> the party whom he seeks to enjoin, and (4) that granting
> the preliminary injunction will not disserve the public
> interest. "We have cautioned repeatedly that a preliminary
> injunction is an extraordinary remedy which should not be
> granted unless the party seeking it has 'clearly carried the
> burden of persuasion' on all four requirements." [6]

[5]    *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d
535, 545 (5th Cir. 2005) (footnotes omitted)

[6]    *Id.*

We have long held that satisfying one requirement does not
necessarily affect the analysis of the other requirements. In
*Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d
185 (5th Cir. Unit B 1982), for example, the district court had
denied a preliminary injunction solely because it found that
the movant, Robbins & Myers, failed to satisfy the balance of
harm requirement. On appeal, Robbins & Myers argued that
it had clearly shown a substantial likelihood of success on the
merits, and satisfying that requirement should give rise to a
presumption of irreparable harm and a presumption that the
balance of harm tipped in its favor. We disagreed:

> Because we dispose of this case on
> the balance of harm question, we
> need not decide and we express no
> views upon whether a presumption
> of irreparable injury as a matter of law is
> appropriate once a party demonstrates
> a substantial likelihood of success on
> the merits of an infringement claim. In

other words, even assuming arguendo
that Robbins & Myers has shown a
substantial likelihood of success on
the merits of its infringement claim
and that irreparable injury should be
presumed from such a showing (two
issues not addressed by the district
court in this case), we still uphold
the district court's decision, which
rested solely on the balance of harm
factor. We agree that Robbins & Myers
has failed to carry its burden of
showing that the threatened harm to
it from the advertisement outweighs
the harm to Southern Monorail from
the intercept. In addition, we expressly
reject Robbins & Myers' suggestion
that we adopt a rule that the balance of
harm factor should be presumed in the
movant's favor from a demonstration
of a substantial likelihood of success
on the merits of an infringement claim.
Such a presumption of the balance
of harm factor would not comport
with the discretionary and equitable
nature of the preliminary injunction
in general and of the balance of
harm factor in particular. *See Ideal
Industries, Inc. v. Gardner Bender,
Inc.*, 612 F.2d 1018, 1026 (7th Cir.
1979), *cert. denied*, 447 U.S. 924,
100 S.Ct. 3016, 65 L.Ed.2d 1116
(1980) (district court obligated to
weigh relative hardship to parties in
relation to decision to grant or deny
preliminary injunction, even when
irreparable injury shown). [7]

[7]    *Id.* at 187–88.

The district court concluded that the preliminary injunction
should be denied because Plaintiffs–Appellants failed to
satisfy the balance of harm and public interest requirements,
which do not concern the merits. (Assuming without
deciding that Plaintiffs–Appellants have suffered the loss
of First and Second Amendment freedoms, they have
satisfied the irreparable harm requirement because any such
loss, however intangible or limited in time, constitutes

WASHSTATEC003196

irreparable injury.[8]) In extensive **\*458** dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs–Appellants failed to show a likelihood of success on the merits. Plaintiffs–Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs–Appellants continue to bear the burden of persuasion on appeal.

[8]    *See Def. Distributed*, 121 F.Supp.3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

### Analysis

Because the district court held that Plaintiffs–Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs–Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs–Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs–Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

> Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

[9]    *Id.* at 689.

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals —including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs–Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs–Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n **\*459** this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

> While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority— of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v.*

WASHSTATEC003197

*Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.] [11]

10      *Id.*

11      *Id.* at 689–90.

**[2]** Plaintiffs–Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs–Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs–Appellants. We cannot say the district court abused its discretion on these facts.

**[3]** Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs–Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs–Appellants argue that this result is absurd **\*460** because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs–Appellants would allow them to share online not only the Published Files but also any new, previously unpublished

files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs–Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR–15 lower receivers and additional 3D–printed weapons and weapon parts. Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs–Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs–Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs–Appellants have demonstrated a substantial likelihood of success on the merits. [12]

12      The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs–Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs–Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that

WASHSTATEC003198

it would be legal. The question presented in this case is whether Plaintiffs–Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs–Appellants previously made available online. Plaintiffs–Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs–Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs–Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs–Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs–Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

**\*461** We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs–Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

**Conclusion**

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

**I.**

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle–15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different than technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

[1]   The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR–15, a registered trademark of Colt's Inc. AR–15, Registration No. 0,825,581.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology drew considerable press attention[2] **\*462** and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

WASHSTATEC003199

DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Pursuant to § 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

2       According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took the government entities two years to refuse to exempt most of the files from the licensing regime.

3       Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet

publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

4       To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). **\*463** Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

5       *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we

WASHSTATEC003200

may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

## II.

### A. Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services ... and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

**\*464** The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain." 22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community." 22 C.F.R. § 120.11(a). [6]

[6]    This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id.*

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). [7]

[7]    Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in

WASHSTATEC003201

Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release **465** (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely

failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] ... items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

[8]    While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action ... and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, ____ U.S. ____, 136 S.Ct. 2131, 2142, 195 L.Ed.2d 423 (2016) (Agency "shenanigans" are "properly reviewable ... under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a) (1). There is a nominal 60–day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who attempted to deliver WMD materials to North Korea, who sought to

WASHSTATEC003202

distribute drone and missile schematics to China, and who attempted to *466 license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See, e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

[9]      *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO–RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/documents/OngoingExportCaseFactSheet.pdf.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six-and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See, e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

**B. Discussion**

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

[10]      For simplicity only, I do not here address plaintiffs' vagueness claim.

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export, Black's Law Dictionary* (10th ed. *467 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country"). As the court explained in *Ehsan*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145, 23 S.Ct. 702, 47 L.Ed. 984 (1903) (the "legal notion...of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

[11]      It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S.Ct. 2164, 2171–72, 150 L.Ed.2d 292 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly

WASHSTATEC003203

as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell,* —— U.S. ——, 135 S.Ct. 2480, 2495, 192 L.Ed.2d 483 (2015) (internal quotation omitted). Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the **\*468** "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is

potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond v. United States,* —— U.S. ——, 134 S.Ct. 2077, 2090, 189 L.Ed.2d 1 (2014) ("[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see also id.* at 574–75, 108 S.Ct. 1392 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance] ... is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout

WASHSTATEC003204

the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, ––– U.S. ––––, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does **\*469** not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S.Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S.Ct. 2705, 2723–24, 177 L.Ed.2d 355 (2010), in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only unspecialized knowledge" it is permissible. *Humanitarian Law Proj.*, 130 S.Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items— jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation. [12]

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S.Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, *Mak*'s prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

**\*470** The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [ ] interference with

WASHSTATEC003205

ingress or egress, [ ] visual clutter, or [ ] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department: its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S.Ct. 501, 511, 116 L.Ed.2d 476 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that citizens have no intention of assisting foreign enemies directly, communications **\*471** about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project*. Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations ... [or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S.Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information

WASHSTATEC003206

would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

[13]    See Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

**\*472** The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The

possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis...." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment—Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S.Ct. 2395, 2402–03, 120 L.Ed.2d 101 (1992).

Second, content-based [14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a **\*473** specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir.

WASHSTATEC003207

2003) (citing *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego,* 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

14    As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland.*

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data. [15]

15    Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S.Ct. at 2150–51. Like the "illusory 'constraints' " in *Lakewood, id.* at 769, 108 S.Ct. 2138, 2144, the ITAR prepublication review scheme

offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770, 108 S.Ct. 2138, 2144. *Cf. Humanitarian Law Project,* 130 S.Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45–day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly **\*474** brief. *See Teitel Film Corp. v. Cusack,* 390 U.S. 139, 141, 88 S.Ct. 754, 756, 19 L.Ed.2d 966 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D–4, LLC,* 541 U.S. 774, 781, 124 S.Ct. 2219, 2224, 159 L.Ed.2d 84 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas,* interpreting *Freedman* 's "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C. The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's

WASHSTATEC003208

mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730, 91 S.Ct. 2140 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

> the protection as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.... [n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S.Ct. 2766, 2781–82, 69 L.Ed.2d 640 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security). No such exceptional circumstances have been presented in this case. Indeed, all that the majority can muster to support the government's position here is that

the State Department's stated interest in preventing foreign nationals—including **\*475** manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require prepublication approval of all USML-related technical data. This is clearly not what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H–Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

[16]   The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists. The Liberator, however, requires a metal firing pin.

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

[17]   The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project* ) is dangerous and unprecedented.

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for

WASHSTATEC003209

the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

[18]    DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, **\*476** or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F.Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot

be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure) ... to a foreign person ... in the United States or abroad." *Id.* § 120.17(a)(4).

* * *

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML. This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

**All Citations**

838 F.3d 451

---

WASHSTATEC003210

865 F.3d 211
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment
Foundation, Incorporated, Plaintiffs-Appellants
v.
UNITED STATES DEPARTMENT OF STATE; John
F. Kerry, In His Official Capacity as the Secretary
of the Department of State; Directorate of Defense
Trade Controls, Department of State Bureau of
Political Military Affairs; Kenneth B. Handelman,
Individually and in His Official Capacity as the
Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political-Military
Affairs; C. Edward Peartree, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division; Sarah
J. Heidema, Individually and in Her Official
Capacity as the Division Chief, Regulatory and
Multilateral Affairs, Office of Defense Trade
Controls Policy; Glenn Smith, Individually and in
His Official Capacity as the Senior Advisor, Office
of Defense Trade Controls, Defendants-Appellees

No. 15-50759
|
Filed March 15, 2017

Appeal from the United States District Court for the Western
District of Texas

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

**Attorneys and Law Firms**

Alan Gura, Gura, P.L.L.C., Alexandria, VA, Joshua Michael
Blackman, Houston, TX, Matthew Goldstein, Washington,
DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX,
David Scott Morris, Fish & Richardson, P.C., Austin, TX, for
Plaintiffs-Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of
Justice, Michael S. Raab, U.S. Department of Justice,
Civil Division, Appellate Section, Washington, DC, for
Defendants-Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the
Press, Washington, DC, Amicus Curiae for REPORTERS
COMMITTEE FOR FREEDOM OF THE PRESS, THOMAS
JEFFERSON CENTER FOR THE PROTECTION OF FREE
EXPRESSION.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute,
Washington, DC, Amicus Curiae for CATO INSTITUTE.

Raffi Melkonian, Wright & Close, L.L.P.,
Houston, TX, Amicus Curiae for REPRESENTATIVE
THOMAS MASSIE, REPRESENTATIVE BRIAN
BABIN, REPRESENTATIVE K. MIKE CONAWAY,
REPRESENTATIVE JEFF DUNCAN, REPRESENTATIVE
BLAKE FARENTHOLD, REPRESENTATIVE **\*212**
JOHN FLEMING, REPRESENTATIVE PAUL GOSAR,
REPRESENTATIVE WALTER JONES, MIKE KELLY,
REPRESENTATIVE STEVE KING, REPRESENTATIVE
RAUL LABRADOR, REPRESENTATIVE JEFF MILLER,
REPRESENTATIVE BILL POSEY, REPRESENTATIVE
TODD ROKITA, REPRESENTATIVE DANIEL
WEBSTER.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David
T. Hardy, Tucson, AZ, Amicus Curiae for MADISON
SOCIETY FOUNDATION, INCORPORATED.

Kit Walsh, Electronic Frontier Foundation, San Francisco,
CA, Amicus Curiae for ELECTRONIC FRONTIER
FOUNDATION.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank
Rome, L.L.P., New York, NY, Amicus Curiae for BRADY
CENTER TO PREVENT GUN VIOLENCE.

Robert E. Henneke, Texas Public Policy Foundation,
Austin, TX, Amicus Curiae for TEXAS PUBLIC POLICY
FOUNDATION.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, UNITED STATES CIRCUIT JUDGE

The Court having been polled at the request of one of its
members, and a majority of the judges who are in regular
service and not disqualified not having voted in favor (Fed.
R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing
En Banc is DENIED. In the en banc poll, five judges voted in
favor of rehearing (Judges Jones, Smith, Clement, Owen and

WASHSTATEC003211

Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing en banc.

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits —which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits—calling it "arguably the most important factor." *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); **\*213** *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on

the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (*en banc*); *see also N.Y. Times*, 403 U.S. at 730, 91 S.Ct. 2140 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively ... operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569–70, 96 S.Ct. 2791. The Government contends that the gun designs at issue could potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing

WASHSTATEC003212

such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to **\*214** Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, 838 F.3d at 463 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719, 91 S.Ct. 2140 (Black, J., concurring). Unfortunately, that is exactly what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

**All Citations**

865 F.3d 211 (Mem)

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEC003213

Defense Distributed v. Department of State, 138 S.Ct. 638 (Mem) (2018)

199 L.Ed.2d 527, 86 USLW 3323, 86 USLW 3330

138 S.Ct. 638
Supreme Court of the United States

DEFENSE DISTRIBUTED, et al., petitioners,
v.
DEPARTMENT OF STATE, et al.

No. 17–190.
|
Jan. 8, 2018.

**Synopsis**

Case below, 838 F.3d 451.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

138 S.Ct. 638 (Mem), 199 L.Ed.2d 527, 86 USLW 3323, 86 USLW 3330

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEC003214

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

(a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by

law (including the Administrative Procedure Act), the publication in the Federal

Register of a notice of proposed rulemaking and final rule, revising USML

Category I to exclude the technical data that is the subject of the Action.

(b)    Defendants' announcement, while the above-referenced final rule is in

development, of a temporary modification, consistent with the International

WASHSTATEC003215

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHSTATEC003217

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHSTATEC003218

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

WASHSTATEC003219

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this

Settlement Agreement with their counsel, who has explained these documents to them

and that they understand all of the terms and conditions of this Settlement Agreement.

Plaintiffs further acknowledge that they have read this Settlement Agreement, understand

the contents thereof, and execute this Settlement Agreement of their own free act and

deed. The undersigned represent that they are fully authorized to enter into this

Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,

each of which shall be deemed an original, and all of which together constitute one and

the same instrument, and photographic copies of such signed counterparts may be used in

lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly

drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax

requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and

Defendants agree that nothing in this Settlement Agreement waives or modifies federal,

state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHSTATEC003221

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

_____
Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEC003222

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,    §
    Plaintiffs,    §
        §
v.    §              No. 1:15-cv-372-RP
        §
U.S. DEPARTMENT OF STATE, et al.,    §
    Defendants.    §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018

Respectfully submitted,

Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

WASHSTATEC003223

703.835.9085/Fax 703.997.7665

alan@guraplc.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHSTATEC003224

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

[Public Notice 10094]

RIN 1400–AE30

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:
- *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."
- *Internet: at www.regulations.gov,* search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.*, "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

**Revision of Category I**

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USML (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USML that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USML for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA– ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

WASHSTATEC003226

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at *OIRA_Submission@omb.eop.gov* or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St. NW, Washington, DC 20503.

List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

**PART 121—THE UNITED STATES MUNITIONS LIST**

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§ 121.1   The United States Munitions List.**

\*      \*      \*      \*      \*

**Category I—Firearms and Related Articles**

\*(a) Firearms using caseless ammunition.

\*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

\*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

**Note to paragraph (c):** Integration does not include only attaching to the firearm or rail.

\*(d) Fully automatic shotguns regardless of gauge.

\*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-

WASHSTATEC003228

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.,* black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a):** This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.,* ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.,* muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

Note to paragraph (a)(4): Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

Note 1 to paragraph (a)(10): This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

Note 2 to paragraph (a)(10): Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

Note 3 to paragraph (a)(10): This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

Note to paragraph (d)(2): This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

Note to paragraph (d)(10): This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.).

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

Notes to Category III: 1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*      \*      \*      \*      \*

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

Authority: Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

WASHSTATEC003230

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

§ 123.15    Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

*    *    *    *    *

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

§ 123.16    Exemptions of general applicability.

*    *    *    *    *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

*    *    *    *    *

(6) For exemptions for personal protective gear, refer to § 123.17.

*    *    *    *    *

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

§ 123.17    Exemption for personal protective gear.

*    *    *    *    *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

*    *    *    *    *

§ 123.18    [Removed and Reserved]

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

Authority: Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

§ 124.14    Exports to warehouses or distribution points outside the United States.

*    *    *    *    *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

Authority: Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

§ 126.1    Prohibited exports, imports, and sales to or from certain countries.

*    *    *    *    *

(s) Zimbabwe. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe,

except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

*    *    *    *    *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

Authority: Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

§ 129.1    Purpose.

*    *    *    *    *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:

■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding "; or" in its place; and

■ c. Adding paragraph (b)(2)(vii).

The addition reads as follows:

§ 129.2    Definitions.

*    *    *    *    *

(b) * * *

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

*    *    *    *    *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

§ 129.4    Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (see § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (see 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6   Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**

## DEPARTMENT OF COMMERCE

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 111227796–5786–01]**

**RIN 0694–AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule describes how articles the President determines no longer warrant control under the United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by July 9, 2018.

**ADDRESSES:** You may submit comments by any of the following methods:

• Submit comments via Federal eRulemaking Portal: *http:// www.regulations.gov*. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS–2017–0004.

• By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694–AF47.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@ bis.doc.gov*.

**SUPPLEMENTARY INFORMATION:**

## Background

This proposed rule describes how articles the President determines no longer warrant control under the United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns

and Armament; and Category III— Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a

letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in

Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USML or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USML under the AECA, 22 U.S.C. 2778 *et seq.*, for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.*, unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR." (*See* §§ 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (*See* § 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. 2778(f)(1).

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

**Creation of New ECCNs**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and Related Commodities*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

—Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);
—Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);
—Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;
—Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and
—Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope

mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.*, subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would

be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503: Discharge Type Arms, and Certain Other Commodities*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia*, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the

FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only "parts" and "components" would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States. This rule proposes adding three notes to clarify the scope of "parts" and "components" for

ammunition classified under ECCN 0A505. Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*New ECCN 0A602: Guns and Armament*

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

*New ECCN 0B501: Test, Inspection and Production Equipment for Firearms*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: Small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505: Test, Inspection and Production Equipment for Ammunition*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and

fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items are exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for Firearms and Certain Related Commodities*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for Ammunition and Certain Related Commodities*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism

controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for Guns and Armament and Certain Related Items*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for Shotguns*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" "required" for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" "required" for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based

solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for Certain Optical Sighting Devices*

New ECCN 0E504 would replace existing ECCN 0E987, which controls "technology" "required" for the "development," or "production" of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

*New ECCN 0E505: Technology for Ammunition and Related Items*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components"); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for Guns and Armament, Including Technology for Test, Inspection and Production Equipment and Software for Guns and Armament*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to Seven ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c). BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606. This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602. It would remove paragraph .n, because the commodities listed in that paragraph would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule. It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606. It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501. The commodities described in the MT control in ECCN 2B018 currently listed as MT are controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

*Revisions to ECCN 2D018*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018. As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of Nine ECCNs**

*Removal of ECCN 0A918*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19a(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986*

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun

shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987. As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

**Conforming Change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms were previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition That Would Be Added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United

States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

**Availability of License Exceptions**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception: Shipments of Limited Value (LVS)*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3. Firearms "parts", "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with

a limit of $500 on net value per shipment. In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This proposed rule would amend the regulations at § 740.9 to state that

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or

ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.*, the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S. government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)—to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception: Baggage (BAG)*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. BIS is aware that U.S. Customs and Border Protection (CBP)

has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation. *See* the following CBP website page for additional information: *https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C*. BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition. Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: *http://www.cbp.gov/xp/cgov/toolbox/ports/*.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.,* those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime

members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Would Be Limited to the Authorized End Use and End Users**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization. This existing

requirement of BIS licenses is specified in § 750.7(a) on the boiler plate text included on all BIS licenses. These requirements would also be applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization. BIS does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional

Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization. This rule also adds contact information for these reports.

## Changes to Export Clearance Requirements for Firearms Being Moved to the CCL

In part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

## Entry Clearance Requirements for Temporary Imports

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USML in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the export after a temporary import. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP. A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP. BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USML items that should be incorporated into the Commerce final rule.

## Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL

In part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR. These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

## Alignment With the Wassenaar Arrangement Munitions List

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production

equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate Delayed Effective Date for a Final Rule**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal *www.regulations.gov* or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.

WASHSTATEC003244

**24178**       **Federal Register** / Vol. 83, No. 101 / Thursday, May 24, 2018 / Proposed Rules

Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours of 2,810 hours. The reduction in

burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for

the Automated Export System (AES) Program (control number 0607–0152).

This proposed rule would affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule. Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

This proposed rule would also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule would make to part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely

be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.*, Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under control number 0694–0093. Second, this proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694–0093.

Third, this proposed rule would affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions List (USML) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exception TMP. BIS would not impose a license requirement for such imports, but collecting this information would be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 would also conform to the requirement in License Exception TMP under § 740.9(b)(5), so

providing this information to CBP at the entry after a temporary import would facilitate the export phase of a temporary import under License Exception TMP. At the time of entry for a temporary import, the importer would need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exception TMP. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR. The importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this rule would make to part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to

WASHSTATEC003246

moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@ omb.eop.gov,* or by fax to (202) 395–7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a

substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and

components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed

rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and

would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign-made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the

EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

WASHSTATEC003248

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730–774) are proposed to be amended as follows:

## PART 736—GENERAL PROHIBITIONS

■ 1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59009, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## Supplement No. 1 to Part 736—General Orders

\*      \*      \*      \*      \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), then the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\*      \*      \*      \*      \*

## PART 740—LICENSE EXCEPTIONS

■ 3. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 4. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);
The additions read as follows:

### § 740.9   Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\*      \*      \*      \*      \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured

in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\*      \*      \*      \*      \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*      \*      \*      \*      \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition,

demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of the export.

***Note 1 to paragraph (b)(5):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\*     \*     \*     \*     \*

■ 5. Section 740.11 is amended by:
■ a. Adding a sentence at the end of the introductory text;
■ b. Adding Note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

### §740.11   Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\*   \*   \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) and solely for U.S. government official use of this section.

\*     \*     \*     \*     \*

***Note 2 to paragraph (b)(2):*** *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\*     \*     \*     \*     \*

■ 6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

### §740.14   Baggage (BAG).

\*     \*     \*     \*     \*

(b) \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\*     \*     \*     \*     \*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

\*     \*     \*     \*     \*

### §740.16   [Amended]

■ 7. Section 740.16 is amended by removing "0A987" from paragraph (b)(2)(iv) and adding in its place "0A504".

■ 8. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### §740.20   License Exception Strategic Trade Authorization (STA).

\*     \*     \*     \*     \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*     \*     \*     \*     \*

■ 9. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K = SMCR.

(6) German model G41 = SMCR.

(7) German model G43 = SMCR.

(8) IZH–94.

(9) LOS–7, bolt action.

(10) MC–7–07.

(11) MC–18–3.

(12) MC–19–07.

(13) MC–105–01.

(14) MC–112–02.

(15) MC–113–02.

(16) MC–115–1.

(17) MC–125/127.

(18) MC–126.

(19) MC–128.

(20) Saiga.

(21) Soviet Model 38 carbine = SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle = SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle = SMCR.

(30) Sever—double barrel.

(31) IZH18MH single barrel break action.

(32) MP–251 over/under rifle.

(33) MP–221 double barrel rifle.

(34) MP–141K.

(35) MP–161K.

(36) MTs 116–1.

(37) MTs 116M.

(38) MTs 112–02.

(39) MTs 115–1.

(40) MTs 113–02.

(41) MTs 105–01.

(42) MTs 105–05.

(43) MTs 7–17 combination gun.

(44) MTs 7–12–07 rifle/shotgun.

(45) MTs 7–07.

(46) MTs 109–07 rifle.

(47) MTs 109–07 rifle.

(48) MTs 106–07 combination.

(49) MTs 19–97.

(50) MTs 19–09.

(51) MTs 18–3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut–2.

(56) Berkut–2M1.

(57) Berkut–3.

(58) Berkut–2–1.

(59) Berkut–2M2.

(60) Berkut–3–1.

(61) Ots–25.

(62) MTs 20–07.

(63) LOS–7–1.

(64) LOS–7–2.

(65) LOS–9–1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars—4–1.

(69) Saiga.

(70) Saiga–M.

(71) Saiga–308.

(72) Saiga–308–1.

(73) Saiga–308–2.

(74) Saiga–9.

(75) Korshun.

(76) Ural–5–1.

(77) Ural 6–1.

(78) Ural–6–2.

(79) SM–2.

(80) Biatlon–7–3.

(81) Biatlon–7–4.

(82) Rekord–1.

(83) Rekord–2.

(84) Rekord–CISM.

(85) Rekord–1–308.

(86) Rekord–2–308.

(87) Rekord–1–308–CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioner.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44–1.

(94) TOZ 78–01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99–01.

(98) TOZ 55–01 Zubr.

(99) TOZ 55–2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 10. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 11. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### § 742.6 Regional stability.

\*   \*   \*   \*   \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \*  \*  \* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*   \*   \*   \*   \*

■ 12. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### § 742.7 Crime control and detection.

(a) \*  \*  \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979, 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License

Requirements'' section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

■ 13. Section 742.17 is amended by:
■ a. Revising the first sentence of paragraph (a); and
■ b. Revising paragraph (f) to read as follows:

### §742.17   Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \*   \*   \*

\*     \*     \*     \*     \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\*     \*     \*     \*     \*

### §742.19   [AMENDED]

■ 14. Section 742.19(a)(1) is amended by:
■ a. Removing ''0A986'' and adding in its place ''0A505.c''; and
■ b. Removing ''0B986'' and adding in its place ''0B505.c''.

### PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 15. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR,

2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 16. Section 743.4 is amended by adding paragraphs (c)(1)(i) and (c)(2)(i) and revising paragraph (h) to read as follows:

### §743.4   Conventional arms reporting.

\*     \*     \*     \*     \*

(c) \*   \*   \*
(1) \*   \*   \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(2) \*   \*   \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482–4188, Fax: (202) 482–4145.

### PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 17. The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

### §744.9   [AMENDED]

■ 18. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) and (b) and adding in its place ''0A504''.

### PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 19. The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O.

12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### §746.3   [AMENDED]

■ 20. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

### §746.7   [AMENDED]

■ 21. Section 746.7 is amended in paragraph (a)(1) by:
■ a. Adding ''0A503'' immediately before ''0A980''; and
■ b. Removing ''0A985''.

### PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 22. The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 23. Section 748.12 is amended by:
■ a. Revising the heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
The revisions and additions read as follows:

### §748.12   Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in §748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that

WASHSTATEC003252

are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\* \* \* \* \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

## PART 758—EXPORT CLEARANCE REQUIREMENTS

■ 24. The authority citation for part 758 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 25. Section 758.1 is amended as follows:

■ a. By revising paragraphs (b)(7), (8) and (9) and adding paragraph (b)(10); and

■ b. By revising paragraph (c)(1); and

■ c. By adding paragraph (g)(4) to read as follows:

### § 758.1   The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\* \* \* \* \*

■ 26. Add § 758.10 to read as follows:

### § 758.10   Entry clearance requirements for temporary imports.

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United

States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

**Note 1 to paragraph (b)(1):** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova,*

*Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).*

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR on the USMIL was temporarily imported. *See* also the additional requirements inspection in § 758.1(g)(4).

## PART 762—RECORDKEEPING

■ 27. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 28. Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2   Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

■ 29. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3   Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with

barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772—DEFINITIONS OF TERMS

■ 30. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### § 772.1   [AMENDED]

■ 31. In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774—THE COMMERCE CONTROL LIST

■ 32. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 33. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

### Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

**0A018   Items on the Wassenaar Munitions List (see List of Items Controlled).**

License Requirements

*Reason for Control:* NS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000 for 0A018.b, $1,500 for 0A018.c and .d
*GBS:* N/A
*CIV:* N/A

List of Items Controlled

*Related Controls:* (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b–d), and X(a). (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a. (3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV

protection and ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were classified under ECCN 0A018.d and 0A988. (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.
*Related Definitions:* N/A
*Items:*

a. [RESERVED]
b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130)

***Note to 0A018.b:*** *0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*
*a. Ammunition crimped without a projectile (blank star);*
*b. Dummy ammunition with a pierced powder chamber;*
*c. Other blank and dummy ammunition, not incorporating components designed for live ammunition.*
c. [RESERVED]
d. [RESERVED]

■ 34. In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501   Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

License Requirements

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $500 for 0A501.c, .d, and .x, $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

WASHSTATEC003254

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e. Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

***Note 1 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502   Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A503   Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles;** except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 For a Description of All License Exceptions)**

*LVS:* N/A

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504   Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A

*GBS:* N/A

**Federal Register** / Vol. 83, No. 101 / Thursday, May 24, 2018 / Proposed Rules    **24189**

*CIV:* N/A

## List of Items Controlled

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

> *Note 1 to 0A504.f:* 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

> *Note 2 to paragraph i:* For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

## 0A505   Ammunition as follows (see List of Items Controlled).

### License Requirements

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d and .x. | AT Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to 0A505.c. | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $100 for items in 0A505.x

*GBS:* N/A

*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

### List of Items Controlled

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

> *Note 1 to 0A505.c:* Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

> *Note 2 to 0A505.x:* The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

> *Note 3 to 0A505.x:* The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

■ 35. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

## 0A602   Guns and Armament as follows (see List of Items Controlled).

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

### List of Items Controlled

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:*

a. Guns and armament manufactured between 1890 and 1919.

b. Military flame throwers with an effective range less than 20 meters.

c. through w. [Reserved]

x. "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

> *Note 1 to 0A602:* "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.

> *Note 2 to 0A602:* Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.

**Supplement No. 1 to Part 774— [Amended]**

■ 36. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 37. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501    Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    a. Small arms chambering machines.
    b. Small arms deep hole drilling machines and drills therefor.
    c. Small arms rifling machines.
    d. Small arms spill boring machines.
    e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505    Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.
    b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.
    c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.
    d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.
    e. through .w [Reserved]
    x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 38. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602    Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:
    a.1. Gun barrel rifling and broaching machines and tools therefor;
    a.2. Gun barrel rifling machines;
    a.3. Gun barrel trepanning machines;
    a.4. Gun boring and turning machines;
    a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
    a.6. Gun jump screw lathes;
    a.7. Gun rifling machines; and
    a. 8. Gun straightening presses.
    b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
    c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
    d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774— [Amended]**

■ 39. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 40. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501    "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 41. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A
*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:*
a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.

**License Requirements**

*Reason for Control:* CC, UN

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**24192**    **Federal Register** / Vol. 83, No. 101 / Thursday, May 24, 2018 / Proposed Rules

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "Technology" "required" for the "development," or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774— [Amended]**

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| Control(s) | |
|---|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) | |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774—[Amended]**

■ 46. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 47. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984    Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 48. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004    Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See ECCN *2D001* for software for items controlled under this entry. (2) See ECCNs *2E001* ("development"), *2E002* ("production"), and *2E101* ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, *2B104* and *2B204*. (5) Also see ECCNs *2B117* and *2B999.a.*
*Related Definitions:* N/A
*Items:*

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

*Technical Note: The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

■ 49. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018    Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 50. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018    "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

■ 51. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001    "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also 2E101, 2E201, and 2E301
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.
   **Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

■ 52. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002    "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
Items: The list of items controlled is contained in the ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611    Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1,500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*
   a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
   b. to w. [RESERVED]
   x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:
   1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
   2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated: May 4, 2018.

**Richard E. Ashooh,**
*Assistant Secretary for Export Administration.*

[FR Doc. 2018–10367 Filed 5–21–18; 8:45 am]

**BILLING CODE 3510–33–P**

WASHSTATEC003262