UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

WASHSTATEC003263

# TABLE OF CONTENTS

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** ........................................................................... 1

**BACKGROUND** ......................................................................................................... 3

    **I.**    Statutory and Regulatory Framework.............................................. 3

    **II.**   Defendants' Regulation of Plaintiffs' Conduct .............................. 4

**LEGAL STANDARD** ................................................................................................ 7

**ARGUMENT** .............................................................................................................. 7

    **I.**    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied. ................ 7

        A.    Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury. ............................................................ 8

        B.    The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs. ................................................ 10

        C.    The Public Interest Would be Disserved By a Preliminary Injunction. ........................................................................ 11

    **II.**   Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits. ............................................................................... 11

        A.    The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech. ............................................................ 11

        B.    Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims. ................................................................ 14

            1.   ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights. ................................................ 15

            2.   ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint. ...................................................... 18

            3.   ITAR's Export Controls Are Not Unconstitutionally Overbroad. ................................................................... 21

        B.    Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims. ............................................................... 22

            1.   Plaintiffs Lack Standing for Their Second Amendment Claims........ 22

            2.   Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims. ................................................... 25

WASHSTATEC003264

C.  Defendants Are Likely to Prevail on Plaintiffs' Other Claims. ................ 27

1.  ITAR's Standards Are Not Void for Vagueness. .............................. 27

2.  Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress. ................................................................................................ 28

**CONCLUSION** .......................................................................................................... **31**

WASHSTATEC003265

# TABLE OF AUTHORITIES

<u>Cases</u>

*AF Holdings, LLC. v. Does 1-1058,*
   752 F.3d 990 (D.C. Cir. 2014) ................................................................ 6
*Alexander v. U.S.,*
   509 U.S. 544 (1993) ................................................................................ 18
*Bernstein v. U.S. Dep't of Justice,*
   176 F.3d 1132 (9th Cir. 1999) .............................................................. 13
*Bonds v. Tandy,*
   457 F.3d 409 (5th Cir. 2006) ................................................................ 24
*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973) ................................................................................ 21
*Brockett v. Spokane Arcades,*
   472 U.S. 491 (1985) .......................................................................... 21, 22
*Brown v. District of Columbia,*
   888 F. Supp. 2d 28 (D.D.C. 2012) ........................................................ 9
*Brown v. Entm't Merchants Ass'n,*
   131 S. Ct. 2729 (2011) ........................................................................... 12
*Brown v. Town of Cary,*
   706 F.3d 294 (4th Cir. 2013) ................................................................ 28
*Bullfrog Films v. Wick,*
   646 F. Supp. 492 (C.D. Cal. 1986) ...................................................... 14
*Canal Auth. of State of Fla. v. Callaway,*
   489 F.2d 567 (5th Cir. 1974) .................................................................. 8
*Capital Cities/ABC, Inc. v. Brady,*
   740 F. Supp. 1007 (S.D.N.Y. 1990) ................................................ 16, 19
*Carey v. Population Servs. Int'l,*
   431 U.S. 678 (1977) ................................................................................ 25
*City of Lakewood v. Plain Dealer Pub. Co.,*
   486 U.S. 750 (1988) ........................................................ 18, 19, 20, 21
*City of Littleton v. Z.J. Gifts D-4,*
   541 U.S. 774 (2004) ................................................................................ 20
*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) ................................................................................ 15
*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971) ................................................................................ 28
*Corrosion Proof Fittings v. EPA,*
   947 F.2d 1201 (5th Cir. 1991) .............................................................. 25
*Ctr. for Biological Diversity v. Salazar,*
   706 F.3d 1085 (9th Cir. 2013) ................................................................ 8
*DaimlerChrysler v. Cuno,*
   547 U.S. 332 (2006) ................................................................................ 23
*Dole v. Petroleum Treaters,*
   876 F.2d 518 (5th Cir. 1989) ................................................................ 30
*Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.,*

545 F.3d 4 (D.C. Cir. 2008) ..................................................................... 16

*Escamilla v. M2,*
Tech., 2013 WL 4577538 (E.D. Tex. 2013) ............................................ 11

*Faculty Senate of Fla. Int'l U. v. Winn,*
477 F. Supp. 2d 1198 (S.D. Fla. 2007) .................................................... 9

*Feit v. Ward,*
886 F.2d 848 (7th Cir. 1989) .................................................................... 1

*Forsyth Cnty., Ga. v. Nationalist Movement,*
505 U.S. 123 (1992) ................................................................................ 21

*Frank v. Relin,*
1 F.3d 1317 (2d Cir. 1993) ........................................................................ 1

*Freedman v. Maryland,*
380 U.S. 51 (1965) ........................................................................... 19, 20

*Gonannies, Inc. v. Goupair.Com, Inc.,*
464 F. Supp. 2d 603 (N.D. Tex. 2006) ..................................................... 9

*Haig v. Agee,*
453 U.S. 280 (1981) ................................................................................ 14

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) .............................................................. 27

*Henderson v. Stalder,*
287 F.3d 374 (5th Cir. 2002) .................................................................. 23

*Holy Land Found. v. Ashcroft,*
219 F. Supp. 2d 57 (D.D.C. 2002), ......................................................... 11

*House the Homeless v. Widnall,*
94 F.3d 176 (5th Cir. 1996) ........................................................ 7, 12, 13

*Huitron-Guizar,*
678 F.3d 1169 ......................................................................................... 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
515 U.S. 557 (1995) ................................................................................ 12

*In re Iraq & Afg. Detainees Litig.,*
479 F. Supp. 2d 85 (D.D.C. 2007) ............................................................ 2

*Johnson v. Moore,*
958 F.2d 92 (5th Cir. 1992) .................................................................... 24

*Junger v. Daley,*
209 F.3d 481 (6th Cir. 2000) .................................................................. 13

*Karn v. Dep't of State,*
925 F.Supp. 1 (D.D.C.1996) ................................................................... 13

*Katt v. Dykhouse,*
983 F.2d 690 (6th Cir. 1992) .................................................................. 17

*Kirby v. City of Elizabeth,*
388 F.3d 440 (4th Cir. 2004) .................................................................... 1

*Kleindienst v. Mandel,*
408 U.S. 753 (1972) ................................................................................ 18

*Kleinman v. City of San Marcos,*
597 F.3d 323 (5th Cir. 2010) .................................................................. 17

WASHSTATEC003267

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.*,
   604 F. Supp. 280 (D.D.C. 1984) ............................................................ 14
*Linick v. U.S.*,
   104 Fed. Cl. 319 (Fed. Cl. 2012) ......................................................... 18
*Lorillard v. Pons*,
   434 U.S. 575 (1978) ............................................................................... 30
*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................... 24
*Mance v. Holder*,
   2015 WL 567302 (N.D. Tex. Feb. 11, 2015) ....................................... 25
*Marchese v. California*,
   545 F.2d 645 (9th Cir. 1976) ............................................................... 26
*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ...................................................... passim
*Milena Ship Mgmt. Co. v. Newcomb*,
   804 F. Supp. 846 (E.D. La. 1992) .......................................................... 8
*Miss. State Democratic Party v. Barbour*,
   529 F.3d 538 (5th Cir. 2008) ............................................................... 23
*Munn v. Ocean Springs, Miss.*,
   763 F.3d 437 (5th Cir. 2014) ......................................................... 27, 28
*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1987) ................................................................................... 21
*NAACP v. Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) ............................................................... 23
*Nation Magazine v. Dep't of Def.*,
   762 F. Supp. 1558 (S.D.N.Y. 1991) .................................................... 14
*Nat'l Rifle Ass'n v. ATF*,
   700 F.3d 185 (5th Cir. 2012) ............................................ 24, 25, 26, 27
*Near v. State of Minn.*,
   283 U.S. 697 (1931) ............................................................................... 20
*Osterweil v. Edmonson*,
   424 F. App'x 342 (5th Cir. 2011) ........................................................ 24
*Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*,
   692 F.3d 343 (5th Cir. 2012) ...................................................... 2, 7, 14
*Promotions v. Conrad*,
   420 U.S. 546 (1975) ............................................................................... 20
*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) ............................................................... 23
*Reeves v. McConn*,
   631 F.2d 377 (5th Cir. 1980) ............................................................... 28
*Reliable Consultants, Inc. v. Earle*,
   517 F.3d 738 (5th Cir. 2008) ............................................................... 25
*RTM Media, L.L.C. v. City of Houston*,
   584 F.3d 220 (5th Cir. 2009) ............................................................... 17
*Scott v. Flowers*,
   910 F.2d 201 (5th Cir. 1990) ................................................................. 1

WASHSTATEC003268

*Sec'y State of Md. v. Munson*,
    467 U.S. 947 (1984) ................................................................................ 22
*Siegel v. Lepore*,
    234 F.3d 1163 (11th Cir. 2000) ............................................................... 9
*Spence v. Washington*,
    418 U.S. 405 (1974) ................................................................................ 12
*Teague v. Reg'l Comm'r of Customs*,
    404 F.2d 441 (2d Cir. 1968) .................................................................... 20
*Texas v. Johnson*,
    491 U.S. 397 (1989) ................................................................................ 12
*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ................................................................................ 21
*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ....................................................................... 9
*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................................ 15
*U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*,
    413 U.S. 548 (1973) ................................................................................ 28
*U.S. v. 12 200-Ft. Reels*,
    413 U.S. 123 (1972) ................................................................................ 14
*U.S. v. Bell*,
    414 F.3d 474 (3d Cir. 2005) .................................................................... 17
*U.S. v. Chi Mak*,
    683 F.3d 1126 (9th Cir. 2012) ......................................................... passim
*U.S. v. Edler Indus.*,
    579 F.2d 516 (9th Cir. 1978) ........................................................... passim
*U.S. v. Gurrola-Garcia*,
    547 F.2d 1075 (9th Cir. 1976) ................................................................ 26
*U.S. v. Hicks*,
    980 F.2d 963 (5th Cir. 1992) .................................................................. 21
*U.S. v. Hoffman*,
    10 F.3d 808  (9th Cir. 1993) .................................................................... 17
*U.S. v. Huitron-Guizar*,
    678 F.3d 1164 (10th Cir. 2012) .............................................................. 16
*U.S. v. Mandel*,
    914 F.2d 1215 (9th Cir. 1990) ................................................................ 18
*U.S. v. Martinez*,
    904 F.2d 601 (11th Cir. 1990) ................................................................ 18
*U.S. v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ..................................................................... 26
*U.S. v. Merkt*,
    794 F.2d 950 (5th Cir. 1986) .................................................................... 2
*U.S. v. O'Brien*,
    391 U.S. 367 (1968) .......................................................................... 12, 17
*U.S. v. Posey*,
    864 F.2d 1487 (9th Cir. 1989) ........................................................... 17, 18

WASHSTATEC003269

*U.S. v. Ramsey,*
    431 U.S. 606 (1977)..............................................................................................2, 3
*U.S. v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) .......................................................................................11
*U.S. v. W.T. Grant Co.,*
    345 U.S. 629 (1953)....................................................................................................9
*U.S. v. Yakou,*
    428 F.3d 241 (D.C. Cir. 1995)....................................................................................30
*Voting for Am. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) .......................................................................................16
*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.,*
    302 F. Supp. 2d 672 (S.D. Tex. 2004) .........................................................................9
*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)............................................................................................15, 21
*Warth v. Seldin,*
    422 U.S. 490 (1975)....................................................................................................21
*Water Keeper Alliance v. Dep't of Def.,*
    152 F. Supp. 2d 155 (D.P.R. 2001),.............................................................................11
*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008)...............................................................................................7, 8, 11
*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.,*
    No. 3:05-CV-0094, 2006 WL 1540587 (N.D. Tex. June 6, 2006) .................................9
*Wolfe v. Strankman,*
    392 F.3d 358 (9th Cir. 2004) ........................................................................................1

## Statutes

22 U.S.C. § 2751 et seq.,.............................................................................................3
22 U.S.C. § 2778(a)(1)...........................................................................3, 11, 15, 29
50 U.S.C. § 5(b) (1964) ...........................................................................................20
22 U.S.C. § 2778(a)(2).............................................................................................29
22 U.S.C. § 2778(b)(1)(A)(i) ...................................................................................29
22 U.S.C. § 2778(b)(2) .............................................................................................29

## Regulations

22 C.F.R. § 120.10 ..............................................................................................19, 21
22 C.F.R. § 120.10(a)................................................................................................28
22 C.F.R. § 120.10(a)(1) .............................................................................................7
22 C.F.R. § 120.10(a)(5) ...........................................................................................22
22 C.F.R. § 120.16 ......................................................................................................4
22 C.F.R. § 120.17(a)(1) .............................................................................................4
22 C.F.R. § 120.17(a)(3) .............................................................................................4
22 C.F.R. § 120.17(a)(4) .............................................................................................4
22 C.F.R. § 120.3 ......................................................................................................27
22 C.F.R. § 120.4 ........................................................................................................4
22 C.F.R. § 120.4(d)(1)-(2)..........................................................................................5

WASHSTATEC003270

22 C.F.R. § 121.1(I)(a)............................................................................................................. 3
22 C.F.R. § 125.11 ................................................................................................................. 28
22 C.F.R. § 125.11(a)(1) ....................................................................................................... 30
22 C.F.R. §§ 120-130 .............................................................................................................. 4
22 C.F.R. Part 120 ................................................................................................................. 16
22 C.F.R. Part 121 ............................................................................................................. 3, 19

## **Executive Orders**

Executive Order 12637 ............................................................................................................. 4

WASHSTATEC003271

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

At issue in this litigation is the United States' system of export controls for weapons—laws and regulations that seek to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, foreign policy, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files that are indispensable to the creation of guns and their components through a three-dimensional ("3D") printing process. There is no dispute that the Government does not restrict Plaintiffs from sharing CAD files domestically or from using CAD files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek a mandatory preliminary injunction to bar the Government from preventing the *export* of these design files, which can be easily used to manufacture arms overseas. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—the CAD files unquestionably control the functioning of a 3D printer and cause it to manufacture firearms. Whatever informational value there may be in the process by which 3D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' motion for a preliminary injunction should be denied.[1]

---

[1] Injunctive relief designed to affect the conduct of a government entity is available only from official-capacity defendants. *See Scott v. Flowers*, 910 F.2d 201, 213 n.25 (5th Cir. 1990); *accord Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004); *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989); *In re Iraq & Afg. Detainees Litig.*, 479 F. Supp. 2d 85, 118-19 (D.D.C. 2007). This brief is therefore filed only on behalf of Defendants in their official

WASHSTATEC003272

The Fifth Circuit and the Supreme Court have set forth a demanding four-part test to obtain a preliminary injunction and require that a party seeking such an "extraordinary remedy . . . clearly carr[y] the burden of persuasion" on each element. *Planned Parenthood Ass'n of Hidalgo Cnty. Tex. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). Plaintiffs here have not even attempted to demonstrate: (1) "a substantial threat of irreparable injury if the injunction were not granted," (2) "that their substantial injury outweigh[s] the threatened harm to the party whom they [seek] to enjoin," or (3) "that granting the preliminary injunction would not disserve the public interest." *Id.* As Defendants show below, while Plaintiffs face little immediate harm, entry of an injunction would be likely to irrevocably harm national security and foreign policy and damage the public interest. Under these circumstances, Plaintiffs' failure to address the legal requirements for a preliminary injunction alone warrants the straightforward denial of their motion without addressing the legal issues raised by Plaintiffs' arguments on the merits.

Nonetheless, Plaintiffs also have no likelihood of success on the merits. The International Traffic in Arms Regulations ("ITAR") regulate only the export of defense articles and defense services for the legitimate and important purpose of protecting national security and U.S. foreign policy interests. "Control of one's borders . . . is an essential feature of national sovereignty," *U.S. v. Merkt*, 794 F.2d 950, 955 (5th Cir. 1986), and it is well established that the United States has authority to regulate the trafficking of articles, particularly military articles, across those borders. *See U.S. v. Ramsey*, 431 U.S. 606, 619 (1977) ("border search" exception to Fourth Amendment rooted in "different rules of constitutional law" than apply domestically).

Plaintiffs characterize the cross-border transmission of digital instructions that automatically generate firearms as the "publication" of expression and claim that any licensing requirement on such export is an impermissible prior restraint on speech. But that claim is wrong both factually and legally. The Government does not seek to limit Plaintiffs from spreading ideas or information *about* 3D printing, but rather seeks to apply the generally applicable conduct regulation on exports of arms to CAD files that indisputably control the

---

capacities, and the term "Defendants," as used herein, does not include the individual-capacity Defendants in this action.

WASHSTATEC003273

functioning of a 3D printer and direct it to manufacture firearms.  For these reasons, as other courts have concluded, the claim that the First Amendment forbids application of ITAR's export requirements to these items is meritless.

There is also no dispute that Plaintiffs may use these CAD files to make or acquire firearms in connection with their right to keep and bear arms under the Second Amendment. That Plaintiffs have not done so because they wish to "facilitat[e] *global* access to arms," Complaint ("Compl."), ECF No. 1 at ¶ 1,[2] calls into doubt whether their Second Amendment rights are even at issue, and in any case, Plaintiffs' Second Amendment and other claims likewise fail to satisfy the essential minimums of the legal theories that Plaintiffs assert.  The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

## I.    Statutory and Regulatory Framework

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States" to "control the import and the export of defense articles and defense services" and to promulgate regulations accordingly.  22 U.S.C. § 2778(a)(1).  At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the AECA.  22 C.F.R. Part 121.  Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms.  *See* 22 C.F.R. § 121.1(I)(a).  Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."  *Id.* § 120.10(a).[3]  Section 2778(a) of the AECA authorizes the

---

[2] *See* Mem. in Support of Pls. Mot. for Prelim. Injunction, ECF No. 8 ("Pl. Br."), Ex. 1 ¶ 2 (Decl. of Cody Wilson); *id.* at App. 270 (deposit from prospective foreign "Ghost Gunner" buyer).
[3] Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and broadly exempts information already in the public domain, as defined in Section 120.11.  *Id.* § 120.10.  On June 3, 2014, the State Department issued a Notice of Proposed Rulemaking to update, *inter alia*, the definitions of "technical data" in the ITAR, the scope of the "public domain" exemption, and the application of ITAR to technical data on the Internet.  *See* 80 Fed. Reg. 31525; Aguirre Decl. ¶ 11.  The proposal would clarify that CAD files are a form of "technical data" and make explicit that providing technical data on a publicly accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers.  80 Fed. Reg. 31525.  As relevant here, the clarified definitions in this NPRM

3

WASHSTATEC003274

President: (1) to designate those defense articles and services to be included on the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate regulations for the import and export of such items on the USML. *Id.* The President has delegated to the State Department this authority, and the Department has accordingly promulgated the ITAR, which is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.

Importantly, ITAR does not regulate any activities except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons. ITAR's definition of exports includes, in relevant part: (1) "[s]ending or taking a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[d]isclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government," *id.* § 120.17(a)(3); and (3) "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

In the vast majority of circumstances, there is no doubt as to whether a particular item to be exported is a defense article or defense service. *See* Declaration of Lisa V. Aguirre ("Aguirre Decl.") ¶ 19. For those cases in which there is doubt, however, ITAR contains a "commodity jurisdiction" ("CJ") procedure. Upon written request, the DDTC will provide potential exporters with a determination as to whether the item, service, or data is within the scope of ITAR. 22 C.F.R. § 120.4. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *See id.* § 120.4(d).

## II. Defendants' Regulation of Plaintiffs' Conduct

On May 8, 2013, shortly after learning about Defense Distributed's unrestricted posting of CAD files to the Internet, the DDTC's Enforcement Division sent a letter to Defense Distributed noting that "it is unlawful to export any defense article or technical data for which a

---

would simply confirm that treatment of the Plaintiffs' posting of the CAD files to the Internet under the current regulations would remain the same, and thus Defendants do not anticipate the NPRM would impact application of the ITAR to the files at issue in this case.

WASHSTATEC003275

license or written approval is required without first obtaining the required authorization from the DDTC." Pl. Br. at App. 14; *see* Ex. 1.  Observing that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export," DDTC requested that Defense Distributed submit CJ determination requests for ten CAD files and that Defense Distributed "treat [this] technical data as ITAR-controlled" until DDTC could "provide[] Defense Distributed with final CJ determinations." Pl. Br. at App. 14-15.  These files included "a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named 'The Liberator.'" Pl. Br. at App. 1, ¶ 3.  DDTC therefore suggested that the technical data be removed from Defense Distributed's website—*i.e.*, a location in which it would be disclosed without limitation to a foreign person, *see* 22 C.F.R. § 120.16, should any foreign person visit Defense Distributed's website and download the file, during the review process.  Defendants did not suggest in any way that Defense Distributed's CAD files could not be provided to U.S. persons within the U.S. or otherwise used, altered, or discussed in ways that would not constitute "exports."

On June 21, 2013, Defense Distributed filed CJ requests for the ten items identified in the DDTC letter.  Defense Distributed described its submissions as "data files" that are "essentially blueprints that can be read by CAD software . . . [as] a means of creating physical 3D models of objects." Pl. Br. at App. 208.  These data files instruct 3D printers to create:

> (1) sixteen . . . parts and components of the ["Liberator"] pistol [which] could be assembled into a single shot .380 caliber firearm;
> (2) a barrel and grip for a .22 caliber pistol;
> (3) a solid piece of plastic in the shape of [a 125 mm BK-14M High Explosive Anti-Tank ("HEAT") Warhead];
> (4) a plastic piece in the shape of [a 5.56/.223] muzzle brake;
> (5) nineteen . . . components of a pistol slide for the Springfield XD-40;
> (6) a slip-on sound moderator for an air gun;
> (7) "The Dirty Diane" . . . an oil filter silencer adapter;
> (8) a model of a sub-caliber insert [for] a cylinder with a .22 bore;
> (9) Voltock Electronic Black Powder System . . . models of cylinders of various bores;
> (10)     a model of a sight for a VZ-58 rifle.

Pl. Br. at App. 210.

At no time did Defense Distributed inquire about whether ITAR would affect its distribution of CAD files to U.S. persons within the United States or would limit its ability, or

5

that of other U.S. persons, to use the CAD files in 3D printing.[4]

While the Government reviewed Defense Distributed's first CJ ten requests, Defense Distributed submitted an additional request on January 2, 2015, seeking a determination on: (1) the "Ghost Gunner," a "3-axis, computer-numerically-controlled [machine] . . . designed, developed, and manufactured by Defense Distributed to *automatically manufacture* publicly available designs with nearly zero user interaction." Pl. Br. at App. 267 (emphasis added). On April 15, 2015, DDTC provided a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State (although "project files, data files, or any form of technical data for producing a defense article" would be subject to ITAR jurisdiction). *Id.* at App. 280-81.

On June 4, 2015, review of Defense Distributed's first ten requests was completed and DDTC provided CJ determinations for the requested items. *See* Aguirre Decl. ¶ 28. As explained in DDTC's determination letter, the Department of State determined that only six of the CAD files were subject to ITAR control: those for the "Liberator pistol," ".22 [caliber] electric [pistol]," "5.56/.223 muzzle brake," "Springfield XD-40 tactical slide assemble," "sub-caliber insert," and "VZ-58 front sight." *Id.* In finding the CAD files to be within the commodity jurisdiction of the State Department, DDTC classified the CAD files as technical data under Category I, subsection (i) of the USML, relying on the definition of technical data in § 120.10(a)(1). As DDTC's letter explained, these determinations require that a "license or other approval . . . pursuant to the ITAR" be obtained before any export of these CAD files. *Id.*

As to the items determined to be within ITAR's commodity jurisdiction, the CJ review process concluded that Defense Distributed's CAD files constitute electronic data that can be used, in conjunction with a 3D printer, to automatically, and without further human intervention, generate a defense article or a component of a defense article identified on the USML. *See*

---

[4] ITAR jurisdiction is limited to *exports* of defense articles and related technical data and does not prohibit the transmission of defense articles from one U.S. person to another known to be a U.S. person within the U.S. Although DDTC's May 8, 2013 letter expressed DDTC's concerns about Defense Distributed's unrestricted postings to the Internet, the availability of online material to users outside the U.S. can be limited in a number of ways. For example, Internet users can be generally located using their Internet Protocol addresses. *See generally AF Holdings, v. Does 1-1058*, 752 F.3d 990, 996 (D.C. Cir. 2014) (discussing geolocation services).

6

WASHSTATEC003277

Aguirre Decl. ¶¶ 29-30. The CAD files are "technical data" that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, a plaintiff seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that their substantial injury outweighed the threatened harm to the party whom they sought to enjoin, and (4) that granting the preliminary injunction would not disserve the public interest." *Suehs*, 692 F.3d at 348. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Due to its "extraordinary" nature, no preliminary injunction should be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (internal quotation omitted).

Here, Plaintiffs' burden is even higher, given the nature of the injunction they seek. Plaintiffs ask this Court to enjoin Defendants "from enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations." Proposed Order, ECF No. 7, at 1. This request constitutes "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted). Such relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Id.* (citations omitted); *see also Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 852-55 (E.D. La. 1992).

## ARGUMENT

### I.     Plaintiffs' Motion for a Preliminary Injunction Should Be Denied.

Plaintiffs must persuasively demonstrate that each of the four conditions for a preliminary

7

WASHSTATEC003278

injunction is met, not just a single element of their choosing.  *See Winter*, 555 U.S. at 20.  This requirement serves interests of critical importance; among them, "preserv[ation] of the court's ability to render a meaningful decision on the merits" based on a fully developed record and the reasoned and considered arguments of the parties.  *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).  Nevertheless, Plaintiffs have elected to rely on only one element of the standard: their likelihood of success.  They give short shrift—less than one page in a brief for which the Court granted leave to extend the page limits to thirty—to the three other elements.  Plaintiffs' failure to address these other elements alone warrants denial of their motion.

A.  **Plaintiffs Have Failed to Carry Their Burden of Demonstrating Irreparable Injury**.

As the Supreme Court explained in *Winter*, because "[a] preliminary injunction is an extraordinary remedy," courts must consider the actual "effect on each party of the granting or withholding" of relief and do so "[i]n each case."  555 U.S. at 24.  But Plaintiffs have disregarded this principle and offered no specifics to support their claim of irreparable harm other than the allegation that Defendants have infringed upon their constitutional rights.  *See* Pl. Br. at 29.  This *pro forma* statement—particularly in light of Defendants' demonstration below that Plaintiffs' rights have not been violated—is insufficient to carry Plaintiffs' burden to obtain a mandatory injunction.

The presumption that alleged violations of constitutional rights can be sufficient to presume irreparable injury for purposes of injunctive relief should only be made "where there is an 'imminent likelihood that *pure speech* will be chilled or prevented altogether'," and the circumstances presented here undercut Plaintiffs' argument that such injury has occurred. *Faculty Senate of Fla. Int'l U. v. Winn*, 477 F. Supp. 2d 1198 (S.D. Fla. 2007) (declining to find irreparable harm in limits on foreign academic research) (quoting *Siegel v. Lepore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc)).  First, Plaintiffs' claim of imminent irreparable injury is significantly undermined by their delay in seeking judicial relief.  Plaintiffs challenge the State Department's application of the ITAR to unrestricted postings of technical data on their website—an application of which they have been aware since receiving the State Department's

8

WASHSTATEC003279

May 8, 2013 letter. *See* Compl. ¶¶ 25-27. Nearly two years later, on May 6, 2015, Plaintiffs filed this lawsuit. ECF No. 1. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (quoting *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*, No. 3:05-CV-0094, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)). The two-year delay between the challenged action and the filing of this lawsuit seriously "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citation omitted); *see Brown v. District of Columbia*, 888 F. Supp. 2d 28, 32 (D.D.C. 2012) (noting as relevant to the irreparable harm analysis the fact that plaintiff waited almost seven months to file lawsuit).

Second, irreparable harm can be "neither speculative nor remote," but must be "actual and imminent." *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). As discussed above, the State Department's jurisdiction over Defense Distributed's technical data extends only to its export, and the State Department has not suggested that ITAR imposes any limitation on Plaintiffs' actual distribution of technical data to U.S. persons in the United States. Yet despite actual knowledge of U.S. persons interested in obtaining this technical data, allegedly including co-Plaintiff Second Amendment Foundation ("SAF") and some of its members, Defense Distributed has apparently done nothing to distribute the technical data in a manner that would not constitute an export. Nor have Plaintiffs made any inquiry of Defendants about any measures Defense Distributed could take that would allow it to post the technical data on the Internet without violating ITAR. Plaintiffs' apparent failure to exercise these options undermines their claim that they have incurred an actual, imminent, and irreparable harm. In these circumstances, Plaintiffs' brief citation to inapposite case law does not demonstrate "irreparable injury," let alone satisfy the heightened standard for a mandatory injunction.[5]

---

[5] The cases relied on by Plaintiffs presented immediate instances of harm not illustrated in Plaintiffs' threadbare allegations here. For example, in *Deerfield Med. Ctr. v. Deerfield Beach*, irreparable harm existed with respect to an abortion clinic denied zoning privileges and its

WASHSTATEC003280

**B.** **The Threatened Harm to the National Security and Foreign Policy Interests of the United States From an Injunction Outweighs any Irreparable Harm to Plaintiffs.**

As explained in detail in the Declaration of Lisa V. Aguirre, Director of the Office of Defense Trade Controls Management, the Department of State has concluded that: (1) export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests; and (2) a preliminary injunction in this case would be likely to cause such harm.

As Plaintiffs described in their submissions to Defendants, their CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of "automatically" generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment. *See* Aguirre Decl. ¶ 35; Pl. Br. at App. 208-59.[6] The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries—particularly those countries with stricter firearms regulations that may not have the same security preparedness as the United States—presents a serious risk of acts of violence in those countries. The State Department is particularly concerned that Plaintiffs' proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons.[7] *See* Aguirre Decl. ¶ 35. As with the export of firearms themselves, these potential risks to U.S. foreign policy and national security interests warrant subjecting Defense Distributed's CAD files to ITAR's export licensing of technical data.

**C.** **The Public Interest Would be Disserved By a Preliminary Injunction**.

The threat of harm to U.S. foreign policy and national security interests tilts the public

---

"physician and those women for whom he would otherwise perform the operation in the meantime." 661 F.2d 328, 338 (5th Cir. 1981). Similarly, in *Elrod v. Burns*, the Court found irreparable injury where challenged patronage requirements imposed on plaintiffs an obligation to "pledge [] allegiance to another political party" and avoid "associat[ing] with others of [their] political persuasion." 427 U.S. 347, 355-56 (1976).
[6] Indeed, in part for this reason, the Liberator design includes the insertion a sufficient amount of metal into the resulting firearm to ensure its detectability. *See* Aguirre Decl. ¶ 35. Although this instruction promotes users' compliance with federal law prohibiting the manufacture of undetectable firearms, federal law does not prevent the manufacture of undetectable firearms by users outside the United States, and the Liberator remains operable without the inserted metal.
[7] The harm is reinforced by the fact that entry of an injunction is likely to bring attention to the availability of the CAD files on the Internet. *See* Aguirre Decl. ¶ 37.

WASHSTATEC003281

interest factor heavily in the Government's favor, particularly in the context of a mandatory injunction. *See Winter*, 555 U.S. at 24; *U.S. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) ("injury to the nation's foreign policy" weighs in favor of the United States in public interest inquiry); *accord Water Keeper Alliance v. Dep't of Def.*, 152 F. Supp. 2d 155, 163 (D.P.R. 2001), *aff'd* 271 F.3d 21, 34-35 (1st Cir. 2001). This is true even where, as here, the harms from an injunction are likely to be felt abroad rather than domestically, because—as recognized by Congress in enacting the AECA, *see* 22 U.S.C. § 2778(a)(1)—"[b]oth the Government and the public have a strong interest in curbing" violent regional conflicts elsewhere in the world, especially when such conflict implicates "the security of the United States and the world as a whole." *Holy Land Found. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd* 333 F.3d 156 (D.C. Cir. 2003). Plaintiffs' barebones discussion of the public interest cannot supersede the demonstrated possibility of harm to national security and foreign policy provided by Defendants. *See Escamilla v. M2 Tech.*, 2013 WL 4577538 (E.D. Tex. 2013) (injunction that would harm "issues of national security," even "indirectly," would disserve public interest).[8]

## II. Plaintiffs' Motion for a Preliminary Injunction Should Be Denied Because Plaintiffs Have Not Shown a Substantial Likelihood of Success on the Merits.

Plaintiffs have also failed to demonstrate either a likelihood of success on the merits for a preliminary injunction or that "the facts and law clearly favor" their claims; accordingly, they have failed to meet their burden for a mandatory injunction. *See Martinez*, 544 F.2d at 1243.

### A. The Export of CAD Files That Function to Automatically Create a Firearm or its Components is Not the Publishing of an Item of Expressive Speech.

Underpinning Plaintiffs' First Amendment claims is the assumption that Plaintiffs seek to "publish" CAD files for 3D printers and that doing so is no different than the "publication of an idea." Pl. Br. at 14-15. Plaintiffs themselves recognize this is a critical threshold issue on which they must succeed, *see id.*, but they have failed to make the requisite showing on the merits to obtain a mandatory preliminary injunction.

---

[8] Importantly, because ITAR restricts only exports, any public interest in persons in the U.S. obtaining Defense Distributed's CAD files, whether to manufacture a firearm or for any other lawful purpose, is not affected by the absence of an injunction. The possibility of such a public interest therefore does not weigh against the Government's interests in regulating the export of the CAD files.

11

WASHSTATEC003282

Although "speech" under the First Amendment is not limited to written or spoken words, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), the Supreme Court has made clear that the First Amendment does not encompass all types of conduct. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have rejected 'the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea'" (quoting *U.S. v. O'Brien,* 391 U.S. 367, 376 (1968))). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley*, 515 U.S. at 569; *Spence v. Washington*, 418 U.S. 405, 409 (1974))). *Cf. Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (First Amendment protects video games because they "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)"). The ITAR regulations at issue govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad.

The CJ requests submitted by Defense Distributed to DDTC themselves illustrate that the mere publication of ideas is not at issue. According to the CJ requests, the CAD files are functional: "essentially blueprints that can be read by CAD software," Pl. Br. at App. 208, to "automatically" generate firearms, firearms components, or other defense articles, *id.* at 267.[9] Further, in its commodity jurisdiction requests, Defense Distributed characterized its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun." *Id.* at 211. Plaintiffs' own description of the items and planned course of conduct thus fails to establish that the export of CAD files is mere "speech" for First Amendment purposes.

The cases on which Plaintiffs rely fail to establish that the law clearly favors their claim

---

[9] In the CJ determinations, Defendants concluded that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within the commodity jurisdiction of ITAR.

WASHSTATEC003283

that export of CAD files is an act of protected speech. Plaintiffs rely primarily on *Universal City Studios, Inc. v. Corley*, a Second Circuit copyright decision holding that computer code and computer programs can qualify for First Amendment protection. 273 F.3d 429, 445-49 (2d Cir. 2001). Yet *Corley* expressly distinguished, and thereby recognized the continuing validity of, a prior Second Circuit opinion, *CFTC v. Vartuli*, which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. 228 F.3d 94, 111 (2d Cir. 2000); *see Corley*, 273 F.3d 448 at n.20 (distinguishing from its holding *Vartuli* and other situations where "a human's mental faculties do not intercede in executing the instructions"), *id.* at 449 (confirming that code used to communicate to a program user is "not necessarily protected" and that code used to communicate to a computer is "never protected"). Importantly, *Vartuli* held that the fact that some users of the computer instructions at issue might interact with those instructions, rather than simply following them, did not change the constitutional analysis: it was the functionality of the code, not its use, that determined whether the regulations were consistent with the First Amendment.[10]  *See Vartuli*, 228 F.3d at 110-12. Plaintiffs' failure to prove a substantial likelihood of success on this issue alone would be a sufficient basis to deny their motion. *See Suehs*, 692 F.3d at 348.

Further, Plaintiffs' stated intent to distribute their CAD designs abroad or across U.S. national boundaries also suggests that the First Amendment's application may be limited here. "It is less [than] clear . . . whether even American citizens are protected specifically by the First Amendment with respect to their activities abroad." *Laker Airways, Ltd. v. Pan Am. World*

---

[10]  The other two cases cited by Plaintiffs also indicate that code that is purely functional does not warrant First Amendment protection. In *Bernstein v. U.S. Dep't of Justice*, 176 F.3d 1132, 1139-43 (9th Cir. 1999) and *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), the courts held that First Amendment protections extended to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See also Karn v. Dep't of State*, 925 F.Supp. 1, 9 n.19 (D.D.C. 1996) (computer source code alone is "merely a means of commanding a computer to perform a function"). Even assuming, *arguendo*, that conclusion were correct as to the source code of software here it is undisputed that the CAD files control the functioning of a device. Indeed, here, the CAD files do not merely cause a computer to function generally, but specifically direct a machine to manufacture a firearm and defense articles. Plaintiffs' reliance on these cases also ignores that the Ninth Circuit opinion in *Bernstein* was subsequently withdrawn and rehearing granted, *see Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999), and that, after remand, the plaintiff in *Junger* stipulated to dismissal with prejudice. *See* Notice of Dismissal, *Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Ohio Nov. 16, 2000).

13

*Airways, Inc.*, 604 F. Supp. 280 (D.D.C. 1984) (finding that aliens have no First Amendment rights abroad); *see Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986) ("No Supreme Court case squarely holds that the First Amendment applies abroad."); *cf. U.S. v. 12 200-Ft. Reels*, 413 U.S. 123, 125 (1972) (explaining that adjudication of rights at "national borders" implicates "considerations and different rules of constitutional law from domestic regulations"). Even courts that have applied the First Amendment to international speech have recognized that overseas speech or conduct that endangers national security may be outside First Amendment protection. *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 308 (1981) (even "assuming . . . that First Amendment protections reach beyond our national boundaries," likelihood of damage to national security rendered speech by a former CIA employee "not protected by the Constitution"); *accord Bullfrog Films*, 646 F. Supp. at 502. Here, where Plaintiffs deliberately seek to use the Internet to distribute CAD files abroad and have made no effort to engage in purely domestic distribution, whether on the Internet or otherwise, their foreign distribution of CAD files may not be protected by the First Amendment.

In any event, the Court need not resolve finally the constitutional question at this stage in light of Plaintiffs' failure to meet their burden with regard to the other required elements for an injunction. *Cf. Nation Magazine v. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (refraining from deciding, absent "a full record," constitutional questions regarding the First Amendment and military interests abroad). Moreover, as explained below, even assuming that Defense Distributed's files constitute protected speech, Defendants may properly restrict their export, consistent with the First Amendment.

**B.      Even If Limiting the Export of CAD Files Implicates the First Amendment, Defendants Are Likely to Prevail on Plaintiffs' First Amendment Claims.**

Plaintiffs' First Amendment theory relies heavily on the notion that the Internet is merely a means of "publication" of ideas, but this characterization misleads when describing CAD files that generate defense articles and/or their parts with minimum human intervention. Plaintiffs consistently use the terms "publish" or "publication," *see, e.g.*, Pl. Br. at 1, 5, 8, 13, 14, but in fact it is an "export" that is at issue. ITAR does not prohibit Plaintiffs from distributing these

WASHSTATEC003285

files to U.S. persons in the United States. Similarly, Defendants have not restricted Plaintiffs'
rights to use the Internet to discuss 3D printing, firearms, the Second Amendment, or engage in
other expression. Rather, the narrow issue here is Plaintiffs' alleged desire to "facilitat[e] global
access" to the CAD files, *i.e.*, to disseminate the automatic ability to make firearms worldwide.

### 1. ITAR's Export Controls Are a Valid, Content-Neutral Regulation of Plaintiffs' Conduct That Do Not Infringe First Amendment Rights.

Plaintiffs contend that ITAR's export controls on technical data should be subject to strict
scrutiny, Pl. Br. at 23-24, but this argument is in error. "[R]egulations that are unrelated to the
content of speech" receive less demanding First Amendment scrutiny because they ordinarily
"pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). And where the Government's
purpose in imposing a regulation is "justified without reference to the content of the regulated
speech," such regulation is content-neutral. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.
288, 293 (1984). It is the Government's purpose, not other factors, that is the "controlling
consideration" in this determination. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

ITAR regulates the conduct of exporting defense articles for the purpose of "further[ing]"
world peace [and] the [national] security and foreign policy interests" of the United States, 22
U.S.C. § 2778(a)(1), and Defense Distributed's files function to "automatically" produce such
articles or their components. Pl. Br. at App. 267. ITAR's regulation of technical data,
particularly Defense Distributed's CAD files, is part and parcel of its regulation of the export of
defense articles, a regulation unrelated to the suppression of free expression. *See U.S. v. Chi
Mak*, 683 F.3d 1126, 1134-35 (9th Cir. 2012) ("AECA prohibits export without a license of
items on the USML without regard to content or viewpoint . . . , defines [] technical data based
on its *function*," and is therefore "content-neutral") (emphasis in original); *U.S. v. Edler Indus.*,
579 F.2d 516, 520 (9th Cir. 1978) (recognizing the equivalence for arms control purposes of
"military equipment" and the "blueprints specifying the construction of the very same
equipment"). The overarching policy objective set forth by Congress and the State Department
is to control the spread of defense articles abroad (and related services and technical data)

15

WASHSTATEC003286

because munitions and materiel can be used to jeopardize the United States' security interests, a content-neutral interest.[11] *See Emergency Coal. to Defend Educ. Travel v. Dep't of Treas.*, 545 F.3d 4, 13-14 (D.C. Cir. 2008).

Plaintiffs' CAD files directly instruct a device to automatically carry out the specified task of manufacturing a defense article. Whatever expressive value may exist in the theory of the CAD files, they indisputably function to create a weapon. Thus, the ITAR may restrict their export on the basis of the *literal* functionality to create the very defense articles that could also indisputably be restricted for export. Moreover, the AECA and ITAR do not attempt in any way to restrict the free flow of public information and ideas about CAD files or 3D printing, either domestically or internationally. *See* Aguirre Decl. ¶ 30; 22 C.F.R. Part 120. This regulatory scheme is obviously not the product of government hostility toward the spread of ideas about 3D printing of firearms, but rather against the very *means* to easily do so. Accordingly, ITAR's limits on the export of Defense Distributed's CAD files are not directed at the content of expression. *See Chi Mak*, 683 F.3d at 1135; *cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (holding content-neutral a licensing requirement applied to U.S. TV network's broadcasts from Cuba, as part of overall scheme regulating imports and exports).[12] For this reason, strict scrutiny does not apply to a First Amendment analysis of export controls on these CAD files.[13]

---

[11] The government's interest in limiting the distribution of firearms abroad also does not implicate the Second Amendment. *Cf. U.S. v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (rejecting attempt by non-U.S. person to assert Second Amendment rights).

[12] Should the Court conclude, as Defendants contend above, that Plaintiffs' exports are not expressive at all, *see supra* Part II.A, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Voting for Am. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

[13] Also suggesting that the applicable First Amendment protections are reduced is Plaintiffs' characterization of those to whom they wish to supply their CAD files as "customers," Pl. Br. at 27, and Plaintiffs' allegation that their Internet postings of CAD files are intended to "generate revenue." Compl. ¶ 22; *see id.* ¶ 24 (Internet postings would have "generated advertising revenue"). Plaintiffs also discuss "offering . . . items for sale," such as "jigs and code." Pl. Br. at App. 3-4, n.1. Restrictions on "particular type[s] of commercial transaction[s]" are generally treated as regulations of conduct, not speech, *see, e.g., Katt v. Dykhouse*, 983 F.2d 690, 695-96 (6th Cir. 1992); *U.S. v. Bell*, 414 F.3d 474 (3d Cir. 2005). Even if treated as speech, it is well-established that "commercial speech enjoys lesser, intermediate-scrutiny constitutional protection." *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009).

16

WASHSTATEC003287

Under intermediate scrutiny, the Government's regulation of "'speech' and 'non-speech'
elements [] united in a course of conduct" must be sustained if it is "within the constitutional
power of the government; it furthers an important or substantial governmental interest; the
government interest is unrelated to the suppression of free expression; and the incidental
restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance
of that interest." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (quoting
*O'Brien*, 391 U.S. at 376). As the Ninth Circuit held in *Chi Mak*, these standards are met by the
"AECA and its implementing regulations," including ITAR. 683 F.3d at 1135. Regulation of
arms trafficking is an "important interest" of the Government with "unquestionable legitimacy."
*Id.* (quoting *Edler*, 579 F.2d at 520). "The technical data regulations substantially advance that
interest, unrelated to the suppression of expression, because they set forth clear procedures for
seeking approval for export licenses and policies for limiting USML-designation." *Id.* Nor is
the restriction greater than essential: "ITAR makes a point to specifically exclude numerous
categories from designation, such as general scientific, mathematical, or engineering papers," as
well as other materials in the public domain. *Chi Mak*, 683 F.3d at 1135; *see U.S. v. Hoffman*, 10
F.3d 808 at *4 (9th Cir. 1993) (unpublished disposition) (if defense articles are "in the public
domain, then the AECA does not prohibit their exportation"). Accordingly, even if subjected to
a heightened standard of review under the First Amendment, ITAR's regulation of technical data
exports is constitutional. *See id.*; *see also U.S. v. Posey*, 864 F.2d 1487 (9th Cir. 1989).[14]

Importantly, the government interests at issue here are the type that merit great deference,
even in the context of a First Amendment challenge. *See Kleindienst v. Mandel*, 408 U.S. 753,
766-69 (1972). Courts have recognized that the decision on whether to control a particular
commodity for export is one that inherently involves national security and foreign policy
judgments that should be left to the discretion of the Executive branch. *See U.S. v. Martinez*, 904

---

[14] Defendants do not concede that application of strict scrutiny would be fatal to the application
of ITAR to Defense Distributed's CAD files, particularly given that Plaintiffs themselves
acknowledge the government interests at issue here as "compelling." *See* Pl. Br. at 28. In light
of the arguments set forth herein, however, Plaintiffs have not met the high burden of persuasion
required to obtain a mandatory injunction even under a lesser standard of review. *See Martinez*,
544 F.2d at 1243.

WASHSTATEC003288

F.2d 601, 602 (11th Cir. 1990); *U.S. v. Mandel*, 914 F.2d 1215, 1223 (9th Cir. 1990).  Under

Plaintiffs' broad First Amendment theory, export restrictions on the designs to build a rocket, or

software that controls a radar, or technical data concerning missile systems, would all be subject

to strict scrutiny on the theory that each such item has informational content as well.  *See* Pl. Br.

at 23-24.  It is no answer to suggest, as Plaintiffs do, that the question turns on whether

information is "classified."  *See, e.g.*, Pl. Br. at 11.  Courts have squarely rejected this argument:

> if the government wished to prevent technical data from being sent to foreign powers, it
> would be required to suppress the information altogether, at home as well as abroad.
> This outcome would blur the fact that national security concerns may be more sharply
> implicated by the export abroad of military data than by the domestic disclosure of such
> data.  Technical data that is relatively harmless . . . when available domestically may,
> when sent abroad, pose unique threats to national security.  It would hardly serve First
> Amendment values to compel the government to purge the public libraries of every scrap
> of data whose export abroad it deemed for security reasons necessary to prohibit.

*Posey*, 864 F.2d at 1496-97.  *Cf. Linick v. U.S.*, 104 Fed. Cl. 319, 321 (Fed. Cl. 2012) (Patent

Office may "order that an invention be kept secret" if "divulgence might harm national security,"

regardless of whether the "Government itself [has] any interest in the invention").

### 2.    ITAR's Export Controls Are Not a Facially Unconstitutional Prior Restraint.

Plaintiffs also have no likelihood of success on the merits of their theory that restrictions

on the export of the CAD files constitute an unlawful prior restraint on speech.  "The doctrine of

prior restraint originated in the common law of England, where prior restraints of the press were

not permitted, but punishment after publication was."  *Alexander v. U.S.*, 509 U.S. 544, 553

(1993).  The classic administrative prior restraint is what is often described as a licensing scheme

for speech, where the plaintiff's right to speak is conditioned on prior approval from the

government.  *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988).  Such a

prior restraint is contrasted with prohibitions on certain speech enforced by punishment *after* the

fact, which is not a prior restraint.  *See id.* at 764 (distinguishing between statute imposing

prohibition on speech and one conditioning speech on obtaining a license or permit).  A licensing

requirement for conduct that incidentally impacts expression is not such a classic prior restraint,

however, and courts have so concluded in the context of the AECA and ITAR, and other

prohibitions on imports and exports.  *See, e.g.*, *Edler Indus.*, 579 F.2d at 521; *Chi Mak*, 683 F.3d

WASHSTATEC003289

1136. *Cf. Capital Cities/ABC*, 740 F. Supp. 1007 (upholding against First Amendment challenge licensing requirements applied to international television broadcasts without concluding such a licensing system constituted a prior restraint).[15]

Plaintiffs rely heavily on *Freedman v. Maryland*, 380 U.S. 51 (1965)—the case that generally defines the requirements for licensing schemes that affect expression—but both the nature of ITAR and the circumstances here demonstrate that ITAR differs significantly from the prior restraint considered in that case. The "censorship statute" at issue in *Freedman* made it unlawful to exhibit any motion picture unless a state Board of Censors judged the film to be "moral and proper" and not "tend[ing] . . . to debase or corrupt morals or incite to crimes." 380 U.S. at 52 & n.2. Unlike in *Freedman*, ITAR's export licensing requirement is not directed at a vast and open-ended category of expressive speech like films, but instead governs the act of providing defense articles or related technical data to those outside the United States (or to foreign persons inside the United States), a much narrower category of conduct that is not characteristically expressive nor remotely comparable to the licensing of adult films domestically. *Compare* 22 C.F.R. Part 121 (the USML) *and* 22 C.F.R. § 120.10 (defining technical data) *with* 380 U.S. at 52; *see also Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 446 (2d Cir. 1968) (application of Trading with the Enemy Act, 50 U.S.C. § 5(b) (1964) to academic publications imported from Cuba did not constitute a prior restraint in light of broader regulatory purpose of Act). The Ninth Circuit in *Edler* thus concluded that ITAR's licensing requirements for technical data, as long as such data is "significantly and directly related to specific articles on the USML," constitute an appropriate means to "control the conduct of

---

[15] Plaintiffs' reliance on opinions of the Department of Justice's Office of Legal Counsel ("OLC"), Pl. Br. at 3, 18, to support their prior restraint claims is misplaced. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. *See* Pl. Br. at App. 139 (OLC opinions do not "purport to determine the constitutionality of all possible applications of the ITAR"). Thus, Plaintiffs' lengthy quotation of OLC's July 1, 1981 opinion regarding "dissemination of technical data," Pl. Br. at 18, is inapposite. As the July 1, 1981 opinion made clear, its discussion focused on domestic distribution of technical data to foreign persons who might subsequently take that data abroad, for example, "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest," *id.* at App. 127-28, not a situation like the present where Plaintiffs seek to themselves engage in the overseas transmission of technical data.

WASHSTATEC003290

assisting foreign enterprises to obtain military equipment and related technical expertise," and "not an unconstitutional prior restraint on speech." 579 F.2d at 521.[16]

ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that "the institutional bias of a censorship board . . . [will] lead to the suppression of speech that should be permitted." *Freedman*, 380 U.S. at 57. In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004) (upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Indeed, the regulation of the export of technical data in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. And the vast majority of ITAR licensing applications are approved, *see* Aguirre Decl. ¶ 33, demonstrating that there is no "institutional bias of a censor" at issue here. *See id.*[17]

---

[16] Prior restraints are traditionally disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint. *See Near v. State of Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Promotions v. Conrad*, 420 U.S. 546, 558-59 (1975). Here, however, such an approach is apt to be inadequate because the ITAR licensing system is intended to prevent irreversible harm to national security and foreign policy that may ensure from export. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure"). In the export context, after-the-fact punishment is likely available only for the exporter because foreign actors making harmful use of military data are likely often to be beyond the reach of U.S. prosecution.

[17] For similar reasons, these statutory criteria are precise enough to avoid the dangers of "a licensing statute placing unbridled discretion" in the hands of DDTC. Pl. Br. at 20-21 (quoting *Lakewood*, 486 U.S. at 757). The unbridled discretion doctrine applies only where a statute or regulation lacks "narrow, objective, and definite standards to guide the licensing authority," and the Supreme Court has explained that such standards do not require "perfect clarity and precise guidance." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *Ward*, 491

20

WASHSTATEC003291

3.      **ITAR's Export Controls Are Not Unconstitutionally Overbroad.**

Plaintiffs also raise an "overbreadth" challenge to ITAR's regulation of technical data. *See* Pl. Br. at 16-17.  Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  In circumstances where a regulation is alleged to be so broad that it is incapable of *any* permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens others not before the court.  *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).  Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep."  *Id.* at 615.

Here, Plaintiffs' overbreadth claim cannot meet these standards.  First, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'"  *U.S. v. Hicks*, 980 F.2d 963, 969 (5th Cir. 1992) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 504 (1985)).  Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves.  *Id.* Here, as the Supreme Court observed in *Brockett*, "[t]here is . . .  no want of a proper party to challenge the [regulations], no concern that the attack on the [regulations] will be unduly delayed or protected speech discouraged."  472 U.S. at 504.  And, indeed, an overbreadth challenge should not properly lie if the regulations have been applied *permissibly* to Plaintiffs, which they have for the reasons outlined above. *See Sec'y State of Md. v. Munson*, 467 U.S. 947, 958 (1984).

Second, even if the merits of Plaintiffs' overbreadth claim are reached, ITAR's export

---

U.S. at 794.  As the Ninth Circuit has recognized, the listing of defense articles in the USML and the definition of technical data "delineate narrowly the scope of information subject to arms controls" and thus do not violate the First Amendment.  *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.10 (defining technical data as the matter "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation"); USML Category I(a) (defining included firearms).  These criteria provide "adequate standards to guide the official's decision." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

WASHSTATEC003292

controls on technical data have a substantially permissible purpose. Plaintiffs have nowhere demonstrated that the regulations have been applied in a substantial number of impermissible ways.[18] To the contrary, the regulations serve the vital purpose of preventing the circumvention of export controls on munitions by the method of providing foreign powers the technical know-how, instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See* Aguirre Decl. ¶ 14. Further, the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(a)(5). For this reason, there is simply no substantial overbreadth here, and Plaintiffs are not likely to succeed on this claim. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge).

## B.     Defendants Are Likely to Prevail on Plaintiffs' Second Amendment Claims.

Plaintiffs are also unable to carry their burden for a mandatory preliminary injunction for their Second Amendment claims because the Court lacks subject matter jurisdiction over these claims, and Plaintiffs have not established that the facts and law are clearly in their favor.

### 1.     Plaintiffs Lack Standing for Their Second Amendment Claims.

According to Plaintiffs, Defendants have infringed upon "two complimentary [sic] guarantees" of the Second Amendment: "the right to acquire arms, and the right to make arms." Compl. ¶ 49; Pl. Br. at 25-29. Yet none of the Plaintiffs have demonstrated that they have standing to pursue such Second Amendment claims. To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted). Plaintiffs must also demonstrate standing for each claim asserted. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352-53 (2006).

With respect to Defense Distributed, Plaintiffs have failed to establish an injury associated with their claims because they have not set forth any facts indicating that Defense

---

[18] Indeed, Plaintiffs plead precisely the opposite. *See* Compl. ¶ 24 ("At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.").

WASHSTATEC003293

Distributed's ability to manufacture or acquire arms has been or imminently will be restricted in any way. Rather, Plaintiffs have alleged only a restriction on Defense Distributed's ability to post certain files on its website. *See* Compl. ¶¶ 22-37. Plaintiffs acknowledge that Defense Distributed is in possession of the CAD files that it could use to manufacture firearms or components. *See* Compl. ¶ 37. And Cody Wilson, the "co-founde[r] and now lead[er] [of] Defense Distributed," Pl. Br. at App. 1 ¶ 2, possesses an ATF license to manufacture firearms. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, Listing of Federal Firearms Licensees at lines 61673 & 61675 (May 2015), *available at* https://www.atf.gov/file/83411/ (last accessed June 3, 2015).[19] Plaintiffs have therefore failed to set forth specific facts indicating that Defense Distributed's alleged Second Amendment rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

Plaintiffs have likewise failed to demonstrate that SAF has direct standing to pursue its Second Amendment claims.[20] "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002) (citation and internal quotation marks omitted). Plaintiffs do not claim that SAF seeks to manufacture or acquire arms, nor is the suggestion that SAF "would expend its resources to publish and promote" CAD files, Compl. ¶ 38, indicative of a "concrete and demonstrable" injury related to these ostensible Second Amendment rights. *Cf. NAACP v. Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Nor is the alleged injury to SAF fairly traceable to Defendants' conduct, which directly affected Defense Distributed only.

To the extent SAF asserts associational Second Amendment claims, its standing fares no better. *See* Pl. Br. at 28, App. 7; *see also* Compl. ¶ 2. An association lacks standing to bring a claim on behalf of its members unless "its members would otherwise have standing to sue in their own right." *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 191 (5th Cir. 2012) (*NRA*) (citation omitted). SAF cannot meet this test. The members' alleged "keen interest" in the CAD files, *see*

---

[19] This monthly report is published by ATF as an online spreadsheet. Updates are made available at https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs.
[20] It is unclear from Plaintiffs' Complaint and motion whether they contend that SAF has direct standing or is asserting associational standing only.

23

WASHSTATEC003294

Compl. ¶ 38; *see also* Pl. Br. at App. 6-11, is insufficient to demonstrate that their Second

Amendment rights have been injured "in a personal and individual way" as required by Article

III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). This is particularly true for

the injunctive relief sought here: SAF members' allegations of future injury, *see* Pl. Br. at App.

9, 11, are purely speculative. *See Lujan*, 504 U.S. at 564; *Osterweil v. Edmonson*, 424 F. App'x

342, 344 (5th Cir. 2011); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

 Plaintiffs have also failed to establish traceability for any injury to SAF's members to

Defendants' actions. Accessing and sharing 3D printing files, *see* Pl. Br. at App. 9, 11, is neither

a necessary nor sufficient precondition to manufacturing or acquiring arms. Further, Plaintiffs

plead that SAF has members "nationwide" only, Compl. ¶ 2, and ITAR does not limit the ability

of Defense Distributed or SAF to distribute CAD files directly to U.S. persons within the United

States (or otherwise prevent SAF members from acquiring the CAD files). *See* Aguirre Decl. ¶

16; *cf. Huitron-Guizar*, 678 F.3d at 1169-70. Therefore, any alleged violation of SAF's

members' Second Amendment rights is not fairly traceable to any action taken by Defendants.[21]

 Nor can Plaintiffs obtain standing by "assert[ing] the Second Amendment rights of their

customers and website visitors." Pl. Br. at 27. Plaintiffs have failed to satisfy the requirements

for such third-party standing because they have: (1) failed to adequately allege that they

themselves suffered an injury in fact; (2) never demonstrated that they have "a close relation" to

the unspecified "customers and website visitors"; and (3) not described any hindrance to these

customers' and website visitors' ability to protect their own interests. *See Bonds v. Tandy*, 457

F.3d 409, 416 n.11 (5th Cir. 2006). In contrast to the cases cited by Plaintiffs, no commercial

transaction has occurred and no vendor-vendee relationship appears to exist between Plaintiffs

and their "customers." *Compare* Compl. ¶¶ 5-6 *with Carey v. Population Servs. Int'l*, 431 U.S.

678 (1977) (vendor relationship) *and Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir.

2008) (commercial transactions). More importantly, however, the Fifth Circuit has explained

---

[21] Although SAF's members assert that they have been unable to "locate [firearms files] on
Defense Distributed's website," they make no allegation that they have attempted to request files
from Defense Distributed through other channels, an activity outside the purview of ITAR. *See*
Pl. Br. at App. 8-11.

WASHSTATEC003295

that "*Carey . . .* gives *jus tertii* standing to a party only if the party directly affected is incapable of asserting its own interests." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1210 n.6 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991) (citations omitted). There is no reason to doubt that Plaintiffs' unspecified "customers and website visitors" are "independent entit[ies], fully capable of asserting their own rights." *See id.*

### 2. Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claims.

Assuming Plaintiffs could establish their standing, they have failed to consistently identify the nature of the Second Amendment right that they seek to enforce or a likelihood of success on these claims. Plaintiffs primarily focus on the claim that the Second Amendment encompasses a right to make or acquire arms. Compl. ¶¶ 48-51; Pl. Br. at 26. Elsewhere, they describe the right as "constitutional protection" of "any components necessary to the functioning of one's constitutionally-protected firearm." Pl. Br. at 26. At another point, they assert their Second Amendment claim as an infringement on the right to "operate a business that provides Second Amendment services." Compl. ¶ 49 (quoting *Mance v. Holder*, 2015 WL 567302, at *15 n.8 (N.D. Tex. Feb. 11, 2015); Pl. Br. at 27 (same). Regardless of the Second Amendment right claimed, however, Defendants have at most restricted Defense Distributed's ability to *export* arms-related technical data, and the Second Amendment does not provide such a right.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. 570, 635-36 (2008). In holding that the Second Amendment secures an individual right, the Court emphasized that the "central right" secured is "to defend oneself in one's home," a right that "is not unlimited." *NRA*, 700 F.3d at 193-94; *Heller*, 554 U.S. at 635.

The Fifth Circuit, like other Courts of Appeals, has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to

WASHSTATEC003296

determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). "To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster." *Id.* at 195 (citing *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). "If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-end scrutiny." *Id.*

Here, the Court's inquiry can end at Step One because the challenged regulations do not impose any burden, let alone a substantial burden, on conduct historically protected by the Second Amendment. The Second Amendment's "central right" is the right to use arms in self-defense in the home, not to export arms across international borders. *Cf. U.S. v. Gurrola-Garcia*, 547 F.2d 1075, 1079 n.6 (9th Cir. 1976) ("Certainly the Second Amendment guarantee of 'the right of the people to keep and bear Arms' . . . does not protect the efforts of a person to take munitions across an international border and into a foreign country" (citing *Marchese v. California*, 545 F.2d 645, 647 (9th Cir. 1976))). Restrictions on arms-related exports are "firmly historically rooted," and therefore harmonize with historic tradition. *See NRA*, 700 F.3d at 204. For example, prior to the Revolution, it was high treason for British subjects to sell arms to the King's enemies. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 82-83 (1769). The early republic similarly placed restrictions on arms-related exports. In 1794, just three years after ratification of the Bill of Rights, "the exportation of munitions of war was prohibited for a year." 7 JOHN BASSETT MOORE, A DIGEST OF INTERNATIONAL LAW, § 1098 (1906). These restrictions have also been used to advance foreign policy interests during times of peace. In 1902, for example, Congress ratified a treaty with Britain that prevented the export of firearms to certain regions of the Pacific in order to promote international "humanitarian purposes." 2 MOORE, § 229. These historical restrictions therefore confirm that the "activities covered" by the challenged ITAR provisions are "presumptively not protected from regulation by the Second Amendment." *NRA*, 700 F.3d at 196 (quoting *Heller v. District of Columbia*, 670

26

WASHSTATEC003297

F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*)).

Even if the Court concludes that Plaintiffs' claims implicate conduct protected by the Second Amendment, the challenged provisions readily withstand intermediate scrutiny. The Fifth Circuit has applied intermediate scrutiny to laws that, like ITAR's export controls, do not prevent a "law-abiding, responsible adult" from "possess[ing] and us[ing] a handgun to defend his or her home and family," *See id.* at 195 (citations omitted). In applying intermediate scrutiny, the relevant inquiry is "whether there is a reasonable fit between the law and an important government objective." *Id.* at 207. Here, for the same reasons that ITAR's limits on technical data satisfy intermediate scrutiny under the First Amendment, the regulations survive such review under the Second Amendment. *See supra* Part II.B.[22] For these reasons, Plaintiffs are unlikely to succeed on their Second Amendment claims.

**C.      Defendants Are Likely to Prevail on Plaintiffs' Other Claims.**

> **1.      ITAR's Standards Are Not Void for Vagueness.**

Plaintiffs are also unlikely to succeed in their vagueness challenge to the ITAR's restrictions on the export of defense articles, including "components and parts for firearms" and "technical data" relating to those firearms, components, and parts. These restrictions neither "fail[] to provide [people] of ordinary intelligence fair notice of what is prohibited [n]or . . . authorize[] . . . discriminatory enforcement." *Munn v. Ocean Springs, Miss.*, 763 F.3d 437, 439 (5th Cir. 2014). As explained above, the State Department has enumerated the categories of defense articles for which export is prohibited in the USML, and ITAR specifically defines "technical data" as that which is "required for the design development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles . . . includ[ing] . . . blueprints, drawings, photographs, plans, instructions and documentation." 22

---

[22] In the nomenclature supplied by *NRA*, ITAR: (1) is "focused on a particular problem," namely, unauthorized exports that pose a danger to national security or foreign policy; (2) implicates a concededly compelling government interest; and (3) employs "means that were reasonably adapted to achieving the objective," by compiling and maintaining on the USML those defense articles and defense services that pose a danger to national security and foreign policy, and reasonably defining "export" to address the ways that items can be disseminated. *See NRA*, 700 F.3d at 208-09; 22 C.F.R. § 120.3, 120.17; *see also* Pl. Br. at 11 ("Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export."), 28 (acknowledging that interest is compelling).

WASHSTATEC003298

C.F.R. § 120.10(a). This definition, which accords with the ordinary meaning of the words "technical" and "data," constitutes a "comprehensible normative standard" in which a "standard of conduct is specified." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). If "technical data" as so defined nevertheless "lack[s] the clarity [Plaintiffs] would insist on, it is because . . . 'we can never expect mathematical certainty from our language.'" *Brown v. Town of Cary*, 706 F.3d 294, 306 (4th Cir. 2013); *accord Munn*, 763 F.3d at 440. In addition, even if an individual were truly uncertain about the definition of "technical data," that person can apply for a license or submit a CJ request to DDTC. Thus, no one need risk criminal prosecution or civil sanction because it is possible to get an advance determination as to the application of ITAR. *See U.S. Civil Service Comm. v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973).

Plaintiffs' contention that the exclusion of information in the public domain from ITAR renders the regime unconstitutionally vague is even less well-founded. The purpose of the vagueness doctrine in the First Amendment context is to protect against enactments that would limit "the free dissemination of ideas." *Reeves v. McConn*, 631 F.2d 377, 383 (5th Cir. 1980). Inclusion of the public domain exception in ITAR explicitly promotes the values of free speech and protects First Amendment interests, not the opposite. Similarly, repeal of ITAR's previous requirement that "[t]he burden for obtaining . . . approval for the publication of technical data . . . is on the [entity] seeking publication," 49 Fed. Reg. 47,682 (Dec. 6, 1984), *see* 22 C.F.R. § 125.11 n.3 (1978), lessens any First Amendment harms caused by ITAR, and does not thereby demonstrate that ITAR's straightforward regulation of exports is impermissibly vague.

2. **Application of ITAR's Export Requirements to Plaintiffs' CAD Files Does Not Exceed the Statutory Authority Granted by Congress**.

Plaintiffs' claim that Congress has not provided the authority to regulate their transmittal of automated firearms assembly techniques ignores the plain text of the statute. The AECA provides that "the President is authorized to control the import and the export of defense articles and defense services . . . [and] is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall

28

constitute the USML." 22 U.S.C. § 2778(a)(1). In doing so, Congress authorized the President to "take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." *Id.* § 2778(a)(2). In addition, the statute requires that "every person . . . who engages in the business of manufacturing, exporting, or importing any defense articles or defense services designated by the President under subsection (a)(1) of this section shall register with the United States Government agency charged with the administration of this section." *Id.* § 2778(b)(1)(A)(i). And "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1)…, no defense articles or defense services designated by the President under subsection (a)(1) . . . may be exported or imported without a license for such export or import." *Id.* § 2778(b)(2). The plain text of the statute therefore directly authorizes the export licensing scheme at issue here.

Plaintiffs concede that this language provides "authority under the AECA to . . . regulate the export of certain technical data," and that "uploading files to the Internet can[] be viewed . . . as an export," but contend that reading these two authorities together—as authorization to regulate technical data on the Internet—is "not what Congress had in mind." Pl. Br. at 12. But that argument cannot possibly be sustained under a plain reading of the statutory authority. As Defense Distributed itself described in its "Ghost Gunner" application, the technical data in files for that device functions "to automatically find, align, and mill" firearms and their components. *Id.* at App. 267. In the crafting of the AECA, Congress expressed specific concern that "arms transfers [not] become an automatic, unregulated process." H.R. Rep. No. 94-1144, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1378, 1388. The regulation of Defense Distributed's technical data thus fits with Congress's intent "that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List." *Edler Indus.*, 579 F.2d at 521 (noting that the legislative history of AECA's predecessor statute announced Congress's direct intention to "allow[] control of munitions, 'including relevant technical data.'") (quoting S. Rep. No. 83-1799, at 57 (1954), *reprinted in* U.S.C.C.A.N. 3175, 3244). Thus, Plaintiffs'

WASHSTATEC003300

*ultra vires* argument is unpersuasive because it would permit the automatic, "virtual export" of defense articles by anyone willing to undertake the expedient of creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients to "automatically" create an unlimited number of identical copies of the original defense article.[23] *Cf. Edler*, 579 F.2d at 520 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.").

Nor do the opinions issued to the State Department by OLC demonstrate that ITAR's regulations of technical data exceed the scope of authority granted by Congress. To the contrary, the July 1, 1981 OLC opinion recognizes that, under ITAR, the State Department has "*traditionally undertaken* to regulate the export of technical *information*" through the technical data provisions. *Id.* Although OLC acknowledged as "somewhat unclear" the delegation of technical data authority, *see* Pl. Br. at App. 125, 129 & nn.7, 11, these opinions are drafted at a high level of generality and nowhere do they state that authority is lacking to regulate matters similar to the CAD files at issue here.[24]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

---

[23] As Plaintiffs note, the State Department's administration of ITAR and the USML has long subjected technical data, including computer code, to export controls. *See* Pl. Br. at 3; *see also Edler*, 579 F.2d at 519. Congress has repeatedly ratified the USML, incorporating its definitions into subsequent enactments and requiring the Executive to report to Congress in advance of the removal "of any item from the Munitions List." *See* P.L. 107-228 § 1406; *id.* § 1403; *see also, e.g.,* PL 104-64 § 573 (relying on USML to restrict scope of antiterrorism assistance provided to foreign countries); Omnibus Diplomatic Security and Antiterrorism Act of 1986, P.L. 99-399 § 509(a) (prohibiting export of items on USML to countries providing support for international terrorism). "Congressional actions after the interpretation by the [Executive Branch] . . . indicate acquiescence" where Congress "revisit[s] a statute without "seek[ing] . . . to change the [] definition." *Dole v. Petroleum Treaters*, 876 F.2d 518, 522 (5th Cir. 1989); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Congress has elsewhere ratified ITAR's definitions of persons subject to its requirements. *See, e.g., U.S. v. Yakou*, 428 F.3d 241, 243-44 (D.C. Cir. 1995).

[24] Neither the 1980 official guidance, nor the amendment to ITAR published on December 6, 1984, *see* 49 Fed. Reg. 47,682, indicates that Defendants lack the authority to regulate Plaintiffs' *export* of technical data via the Internet. *See* Compl. ¶¶ 19-20. The former makes clear that it is addressing the "publication of data *within the United States.*" The language removed from ITAR by the latter amendment fell within the public domain exemption to ITAR, and concerned only "the publication of technical data" for purposes of placing such data in the public domain. *See* 22 C.F.R. § 125.11(a)(1) n.3 (1978); Pl. Br. App. 200. As explained *supra* Part II.B, publication of technical data is not equivalent to the *export* of such data.

30

WASHSTATEC003301

Dated: June 10, 2015

Respectfully submitted,

RICHARD L. DURBIN, JR.
Acting United States Attorney
Western District of Texas

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ZACHARY C. RICHTER
Assistant United States Attorney
Western District of Texas

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ *Eric J. Soskin*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
Phone: (202) 514-9239;
Fax: (202) 616-8460
Email: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

31

WASHSTATEC003302

## CERTIFICATE OF SERVICE

I certify that on June 10, 2015, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapossessky.com
William B. Mateja, mateja@fr.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew Goldstein, matthew@goldsteinpllc.com
*Attorneys for Plaintiffs*

In addition, I have dispatched this document using the United States Postal Service to the following, who is not listed as a CM/ECF participant:

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002


*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Trial Attorney

WASHSTATEC003303

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

# Exhibit A: Declaration of Lisa V. Aguirre

WASHSTATEC003304

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

## DECLARATION OF LISA V. AGUIRRE

I, Lisa Aguirre, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.    I am the Director of the Office of Defense Trade Controls Management (DTCM),

    one of four directors within the Directorate of Defense Trade Controls (DDTC),

    Bureau of Political-Military Affairs at the Department of State. I have held this

    position since June, 2013. My roles and responsibilities in this position include

    managing, overseeing or supporting all DDTC activities.

2.    Prior to holding my current position, I was Director of the Office of Defense

    Trade Controls Compliance in DDTC for over three years, during which time I

    oversaw numerous DDTC activities, including the management and processing of

    registration applications and registration fee submissions, reviews of export

    licenses for prohibited parties, the DDTC Company Visit Program (CVP), a

    program in which State Department officials visit arms exporters or end users to

    gather information on compliance with the Arms Export Control Act (AECA) and

    the International Traffic in Arms Regulations (ITAR), and reviews under the

WASHSTATEC003305

Committee on Foreign Investment in the United States (CFIUS). As Compliance Director, I also oversaw civil enforcement actions and provided support to criminal enforcement matters under ITAR. In these capacities at DDTC, I have become familiar with the application of the AECA and ITAR as part of DDTC's mission and the full range of DDTC activities in support of its mission.

3.    Since joining DDTC, first as a contractor in June 2007, and then through appointment to the federal service in July 2008, I have served continuously in defense trade controls roles.

4.    This declaration is submitted in support of the opposition to a motion for preliminary injunction to be filed by the official capacity defendants in the above-captioned case. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

**Directorate of Defense Trade Controls**

5.    The Directorate of Defense Trade Controls (DDTC) is part of the Department of State's Bureau of Political-Military Affairs (PM), which reports to the Under Secretary for Arms Control and International Security. DDTC controls the export and temporary import and brokering of defense articles and services covered by the United States Munitions List (USML), in accordance with 22 U.S.C. §§ 2778-2780 of the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR) (22 CFR Parts 120-130).

2

WASHSTATEC003306

6. DDTC's mission is to carry out the purposes of the AECA to further world peace and the national security and foreign policy of the United States, including by ensuring that commercial defense exports support key objectives of U.S. national security and foreign policy, including weapons nonproliferation, support for allies, and preservation of human rights. DDTC also seeks to ensure that regulation keeps pace with innovation, that U.S. industry and foreign partners comply with applicable policies and requirements, and that the munitions export process is reliable and predictable. DDTC also serves as a resource to the U.S. government, industry, and foreign counterparts on defense trade matters.

7. As part of its mission, DDTC licenses the export and temporary import and brokering of items subject to the International Traffic in Arms Regulations ("ITAR") and seeks to ensure appropriate compliance with, and enforcement of, these regulations. DDTC also maintains, reviews, and clarifies the U.S. Munitions List (USML), and oversees the Commodity Jurisdiction process.

8. The Office of Defense Trade Controls Policy (DTCP) within the Directorate of Defense Trade Controls oversees the development of policy and guidance related to exports of defense articles and services on the USML and subject to the ITAR and the AECA. DTCP manages the interagency Commodity Jurisdiction process, which determines whether or not certain items are controlled on the USML when questions arise concerning whether or not an item is subject to the licensing jurisdiction of the Department of State. DTCP also prepares all changes to the ITAR, which are published in the Federal Register, manages bilateral defense

3

WASHSTATEC003307

trade agreements, such as the United Kingdom and Australia Defense Trade Cooperation Treaties, and provides export control policy and regulatory guidance to exporters, defense manufacturers, and foreign allies and partners.

**Statutory and Regulatory Framework**

9.  The Arms Export Control Act (AECA), Section 38(a)(1) (22 U.S.C. 2778(a)(1)), authorizes the President "in furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List."

(a)  The statutory authority of the President to "promulgate regulations for the import and export of such articles and services" has been delegated to the Secretary of State by Executive Order 13637, § 1(n). This delegation requires that "Designations, including changes in designations, by the Secretary of State of items or categories of items that shall be considered as defense articles and defense services subject to export control under section 38 (22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

4

(b) The authorities under the AECA delegated to the Secretary of State have been

further delegated pursuant to Department of State Delegation of Authority

293-2, *Delegation of Authority by the Secretary of State to Officers of the*

*Department of State and the Administrator of the U.S. Agency for*

*International Development of Authorities under the Foreign Assistance Act of*

*1961 and Other Related Acts* (Oct. 23, 2011), which delegates to the Under

Secretary for Arms Control and International Security "the functions

conferred on the Secretary by Executive Order 13637 relating to sales and

exports under the Arms Export Control Act (22 U.S.C. 2751 *et seq.*)."

10.     The ITAR, 22 C.F.R. Chapter I, Subchapter M, Parts 120-130, as amended, 79

Fed. Reg. 77884 (Dec. 29, 2014), implements the AECA.  Section 120.1 of the

ITAR sets forth how the ITAR is administered:

(a) Section 38 of the Arms Export Control Act (22 U.S.C. 2778), as amended,

authorizes the President to control the export and import of defense articles

and defense services. The statutory authority of the President to promulgate

regulations with respect to exports of defense articles and defense services is

delegated to the Secretary of State by Executive Order 13637. This subchapter

implements that authority, as well as other relevant authorities in the Arms

Export Control Act (22 U.S.C. 2751 *et seq.*).  By virtue of delegations of

authority by the Secretary of State, these regulations are primarily

administered by the Deputy Assistant Secretary of State for Defense Trade

Controls, Bureau of Political-Military Affairs.

WASHSTATEC003309

11. The ITAR provides what particular activities constitute an export. Section 120.17 defines an "export" to mean:

> (1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or
>
> (2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or
>
> (3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or
>
> (4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or
>
> (5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.
>
> (6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services."[1]

---

[1] On June 3, 2015, the Department of State published in the Federal Register a Notice of Proposed Rulemaking (NPRM) proposing revisions to the ITAR. Among other proposed changes, the Department proposed to clarify the definition of "technical data" by

6

WASHSTATEC003310

12. Part 121 of the ITAR sets out those "articles, services, and related technical data" that have been designated as defense articles and defense services pursuant to sections 38 and 47(7) of the AECA. These items make up the USML. There are 21 categories on the USML under which a particular item may be designated as a defense article.

13. As relevant to this litigation, under Category I, *Firearms, Close Assault Weapons and Combat Shotguns*, the following items are designated as defense articles:

    (a) Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

    (b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

    (c) Firearms or other weapons (*e.g.*, insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

    (d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

    (e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

    (f) Riflescopes manufactured to military specifications. (See category XII(c) for controls on night sighting devices.)

    (g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

    (h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

---

specifying that technical data may take the form of, inter alia, CAD files. In addition, to make more explicit the existing control on exports, the Department proposed to add a paragraph specifying that providing technical data on a publicly-accessible network, such as the Internet, is an export because of its inherent accessibility to foreign powers. The Department has requested that interested parties submit comments on these and other elements of the proposed rulemaking between June 3 and August 3, 2015. *See* Exhibit 7.

WASHSTATEC003311

(i) Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

    (1)  A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

    (2)  A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

    (3)  A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

    (4)  A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

    (5)  A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

    (6)  A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

14.  In addition to the inclusion of "technical data" for Category I defense articles on the USML, there are several other provisions of the ITAR related to "technical data."

    a.  Section 120.10 of the ITAR defines "technical data" as "(a)(1) Information, other than software as defined in § 120.10(a)(4) which is required for the design, development, production, manufacture,

8

WASHSTATEC003312

assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation[:] (2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List; (3) Information covered by an invention secrecy order; or (4) Software (see § 120.45(f)) directly related to defense articles.[2] (b)[3] The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in § 120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles."

b. Section 120.6 of the ITAR defines a "defense article" as "any item or technical data designated in § 121.1 of this subchapter. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 of this subchapter. It also includes forgings, castings, and other unfinished products, such as

---

[2] This sentence added by 79 FR 61226 (Oct. 10, 2014).
[3] Amended by 79 FR 27180 (May 13, 2014, effective Nov. 10, 2014), as corrected by 79 FR 66608 (Nov. 10, 2014).

WASHSTATEC003313

extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles.[4] It does not include basic marketing information on function or purpose or general system descriptions."

c. Section 120.9 of the ITAR defines a "defense service" as "(1) The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles; (2) The furnishing to foreign persons of any technical data controlled under this subchapter (see § 120.10), whether in the United States or abroad; or (3) Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice. (See also § 124.1.)"

d. Collectively, the "technical data" provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such

---

[4] This sentence was added to the definition of defense article by 79 FR 61226 (Oct. 10, 2014).

10

WASHSTATEC003314

export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR.

15.     The ITAR also sets forth the policy on designating and determining how a specific article or service may be designated as a defense article or defense service.

         a.    Pursuant to section 120.3, a particular article or service will be designated as a defense article if it: "(1) Meets the criteria of a defense article or defense service on the U.S. Munitions List; or (2) Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List."

         b.    Section 120.3 also provides that a specific article or service "shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control" under the ITAR.

11

WASHSTATEC003315

c. Section 120.3 also specifies that the "intended use of the article or service after its export (*i.e.*, for a military or civilian purpose), by itself, is not a factor in determining whether the article or service is subject to the controls of this subchapter."

16. ITAR jurisdiction extends only to the export of defense articles, defense services, and technical data. For this reason, ITAR does not limit the ability of Defense Distributed or others to distribute CAD files to U.S. persons within the United States for domestic use.

## The Commodity Jurisdiction (CJ) process

17. Commodity Jurisdictions, commonly referred to as "CJs," are the determination made by the Department of State identifying the export control jurisdiction of goods, services and information.

18. The purpose of these determinations is to reach a conclusion as to whether, for purposes of export controls, goods, services, or information are under the jurisdiction of the Department of State pursuant to ITAR or under the jurisdiction of the Department of Commerce, which administers the Export Administration Regulations (EAR).[5]

---

[5] A few categories of goods, services, or information are under the jurisdiction of the Department of Energy, Department of Homeland Security, or another Executive Branch agency. Goods, services, or information may also be within the public domain and not subject to export controls at all.

12

WASHSTATEC003316

19.     Section 120.4 of the ITAR establishes the CJ procedure,[6] which "is used with the

U.S. Government if doubt exists as to whether an article or service is covered by

the U.S. Munitions List. It may also be used for consideration of a re-designation

of an article or service currently covered by the U.S. Munitions List. The

Department must provide notice to Congress at least 30 days before any item is

removed from the U.S. Munitions List." As required by Section 120.4, the

determination "entails consultation among the Departments of State, Defense,

Commerce, and other U.S. Government agencies and industry in appropriate

cases." In the vast majority of circumstances, the CJ procedure is unnecessary

because there is no doubt as to whether an item to be exported is a defense article

or defense service.

20.     Section 120.4 of the ITAR sets forth the criteria for making a CJ determination:

A designation that an article or service meets the criteria of a defense article or

defense service, or provides the equivalent performance capabilities of a defense

article on the U.S. Munitions List set forth in this subchapter, is made on a case-

by-case basis by the Department of State, taking into account:

(i) The form and fit of the article;[7] and

---

[6] *See* 58 FR 39283, July 22, 1993, as amended at 71 FR 20536, Apr. 21, 2006; 75 FR
46843, Aug. 4, 2010; 78 FR 22753, Apr. 16, 2013; 79 FR 8084, Feb. 11, 2014.

[7] The form of a commodity is defined by its configuration (including the geometrically
measured configuration), material, and material properties that uniquely characterize it.
The fit of a commodity is defined by its ability to physically interface or connect with or

13

WASHSTATEC003317

(ii) The function and performance capability of the article.[8]

21. Section 120.4(f) further requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case."

22. Section 120.4(g) provides an avenue for appeal of a CJ determination:

A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls. The Deputy Assistant Secretary's determination of the appeal will be provided, in writing, within 30 days of receipt of the appeal. If desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant Secretary for Political-Military Affairs.

23. DTCP considers a variety of information in its consideration of CJ requests, including the information attached to the request (such as product brochures, technical specifications and/or blue prints, sales information, etc.), the USML category in which an item most likely may fit, previous CJs on the technology or related matters, and previously-issued export licenses for similar items.

---

become an integral part of another commodity. [*See* Note 1 to paragraph (d), section 120.4 of the ITAR.

[8] The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency).

14

WASHSTATEC003318

After DTCP prepares a preliminary analysis, the CJ request and preliminary analysis are circulated to the relevant interagency partners for consultation.

**Defense Distributed's CJ Requests**

24.     In early May, 2013, DTCP became aware through media reports that Defense Distributed (DD), a pending 501(c)(3) non-profit corporation located in Austin, Texas, had placed on an unrestricted website executable Computer Aided Design (CAD) files enabling the manufacture of plastic firearm components, accessories, and attachments with a 3D printer.  *See, e.g.*, Exhibit 1.

25.     As a result, the Department of State's Office of Defense Trade Controls Compliance (DTCC) became concerned that these files might be subject to the ITAR, in which case DD might be exporting these files without authorization. DTCC therefore sent a letter to DD, suggesting that they remove the files from their website and submit CJ requests to determine whether the files were controlled by the ITAR.  *See* Exhibit 2.  DD complied with the request and on June 21, 2013, submitted ten CJ requests.  *See* Exhibit 3.

26.     In its CJ submission, DD identified a number of publicly available sources for information on how to manufacture firearms and related components, including books on gunsmithing and gun design blueprints and schematics available in a variety of media, including on the Internet.  DD asserted that their CAD files were no different from any other medium that contains basic manufacturing "know

15

WASHSTATEC003319

how" for firearms, and that these files should be found to be in the public domain and not controlled under the ITAR. *See* Exhibit 3.

27.   In addition to conferring with other agencies in accordance with ITAR Section 120.4, DTCP sought to better understand additive manufacturing and 3D printing hardware and technology and its evolution and diffusion, the impact of the availability of CAD files (and other, similar data files) on the enforcement of export controls, and the application of multilateral export control regime, particularly the Wassenaar Arrangement on Export Controls on Conventional Arms and Dual-use Goods and Technologies, to such files and technologies. DTCP consulted other State Department offices and U.S. government agencies to benefit from their expertise and consideration of these technologies and issues. In addition, DTCP organized a conference on additive manufacturing/3D printing technology in March 2014.

28.   In January 2015, while consideration of DD's June, 2013 CJ requests was ongoing, DD submitted a CJ request for the "Ghost Gunner," a computer numerically controlled (CNC) press for milling metal firearms components. *See* Exhibit 4.  On April 15, 2015, DDTC responded by providing a CJ determination to Defense Distributed, finding that the Ghost Gunner would not be subject to the jurisdiction of the Department of State. *See* Exhibit 5.  In the course of consideration of the Ghost Gunner, DTCP determined that project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR jurisdiction.

16

Resolution of the Ghost Gunner CJ request also helped DTCP conclude the CJ process for DD's June 21, 2013 CJ requests. On June 4, 2015, DTCP provided CJ determinations for the requested items. *See* Exhibit 6.

**DDTC's CJ Determination**

29. In making its CJ determination, DDTC identified several factors that warrant treatment of DD's CAD files as technical data subject to ITAR jurisdiction.

    a. The central function of DD's executable CAD files appears to be to enable the manufacture of end-items that are ITAR-controlled defense articles.

    b. As DD described in its Ghost Gunner CJ request, DD's CAD files can be used to "automatically find, align, and mill" a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials.

    c. Although DD contended that the technical data constituted published data already in the public domain, the existing material in the public domain identified by DD did not include CAD files that could be used to automatically generate defense articles. Because CAD files provide the

17

WASHSTATEC003321

additional functionality described above, DD's CAD files are a meaningful step beyond previous, public-domain material.

d.   In addition, because DD's CAD files are information similar to "blueprints, drawings, photographs, plans, instructions or documentation" that can be used to automatically manufacture defense articles, DDTC concluded that the regulations place them within ITAR commodities jurisdiction.

30.   Based on these considerations, its consultations with other State Department offices and U.S. government agencies, its own expertise, and the text of the AECA and ITAR, DDTC concluded that DD's CAD files fall within the jurisdiction of the ITAR as technical data under Category I, subsection (i) of the USML, relying on the definition of technical data in 22 C.F.R. § 120.10(a)(1). DDTC concluded that other information, including a "read-me" file submitted by DD for a CJ determination, did not fall within the jurisdiction of the ITAR. Accordingly, DDTC's determination does not restrict DD from discussing information and ideas about 3D printing, either domestically or internationally, as long as such discussions do not include the export of technical data.

31.   Classification of DD's CAD files as within the jurisdiction of the ITAR is not an outright prohibition on the export of these files.  Rather, ITAR requires that DD obtain a "license or other approval . . . pursuant to the ITAR prior to any export" for these CAD files.

18

WASHSTATEC003322

32.    Should DD submit an application for approval to export its CAD files, DDTC will
        review the proposed export, including its intended recipients and the type, form,
        and scope of the export. DDTC will consider the application in accordance with
        the factors enumerated in 22 C.F.R. § 126.7, including whether such export is
        prohibited "by any statute of the United States." 22 C.F.R. § 126.7(a), whether
        such export would be "in furtherance of world peace, the national security or the
        foreign policy of the United States." 22 C.F.R. § 126.7(a)(1), whether "[a]n
        applicant, any party to the export or agreement, any source or manufacturer of the
        defense article or defense service or any person who has a significant interest in
        the transaction has been debarred, suspended, or otherwise is ineligible to receive
        an export license or other authorization from any agency of the U.S. government."
        *id.* § 126.7(a)(6). In addition, there are numerous countries to which exports of
        some or all categories of defense articles are prohibited. *See, e.g.,* 22 C.F.R. §
        126.1.

33.    In my experience, the overwhelming majority of ITAR licensing applications are
        approved outright or approved with conditions intended to safeguard the defense
        article being exported from use in a way that would damage world peace or the
        national security or foreign policy interests of the United States. Of course, any
        given licensing application will only be approved if the application satisfies the
        standards required under 22 C.F.R. § 126.7.

19

WASHSTATEC003323

### Likely Effects of the Preliminary Injunction Sought by Plaintiffs

34.     The entry of a preliminary injunction authorizing the posting of DD's CAD files
        to the Internet without restriction would make those files available worldwide to
        any Internet user, thereby permitting the export of those files to any foreign
        person or foreign power with access to DD's website.  Such an injunction would
        deny DDTC the opportunity to consider, among other things, whether any specific
        export of DD's CAD files would violate the law or would cause significant harm
        to the national security or foreign policy interests of the United States.

35.     Absent a specific request for an export license, I have considered the likely
        impacts of an unrestricted export of DD's CAD files to any interested person,
        entity, or foreign power and concluded that the likely effect of a preliminary
        injunction would be to cause significant harm to the national security and foreign
        policy interests of the United States.  Although a comprehensive enumeration of
        the possible harms would be difficult, I can identify the following as among the
        most concerning:

        a.  The "Liberator" firearm included in DD's CAD designs presents a specific
            and unique risk to the national security and foreign policy interests of the
            United States.  The Liberator is a plastic firearm which can be produced in
            a way as to be both fully operable and virtually undetectable by
            conventional security measures such as metal detectors.  police and
            security services, could particularly, (though not uniquely) cause damage
            U.S. foreign policy interests.  If U.S.-origin CAD files were used to

20

WASHSTATEC003324

manufacture an undetectable "Liberator" in a foreign country, and that

weapons was then used to commit an act of terrorism, piracy,

assassination, or other serious crime (e.g., to compromise aviation security

overseas), the act itself – or the interests of a foreign country in holding

the United States accountable – could cause serious and long-lasting harm

to the foreign policy and national security interests of the United States.[6]

b. The United States and other countries rely on international arms

embargoes, export controls, and other measures to restrict the availability

of defense articles sought by terrorist organizations. Making DD's CAD

files available through unrestricted access on the Internet would provide

any such organization with defense articles, including firearms, at its

convenience, subject only to its access to a 3D printer, an item that is

widely commercially available. Terrorist groups and other actors could

then potentially manufacture and use such weapons against the United

States or its allies.

c. Making DD's CAD files available through unrestricted access on the

Internet would likewise provide access to the firearms components and

replacement parts to armed insurgent groups, transnational organized

criminal organizations, and states subject to U.S. or UN arms embargoes.

---

[6] Undetectable firearms are unlawful in the United States pursuant to the Undetectable Firearms Act of 1988. See 18 U.S.C. § 922(p). Although the "Liberator" design includes insertion of a six-ounce piece of metal to make it detectable by metal detectors, this metal content can be removed without rendering it inoperable, thereby permitting it to be both operable and undetectable.

21

WASHSTATEC003325

Access to weapons technology coupled with the uncontrolled and increasingly ubiquitous means of production (i.e., 3D printers or other similar manufacturing technology capable of executing CAD files) could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies. U.S leadership in these areas also would suffer, contributing overall to a more dangerous international environment.

d. Many countries, including important U.S. allies, have more restrictive firearms laws than the United States and have identified firearms CAD files for 3D printers as a threat to domestic firearms laws. For example, both the United Kingdom and Japan have arrested individuals for manufacturing or attempting to use firearms CAD files and 3D printers to manufacture firearms. *See, e.g.,* http://www.bbc.com/news/technology-27322947, accessed, June 6, 2015. Unrestricted exports from the United States of munitions or technical data, such as DD's CAD files, which could be used to automatically manufacture a firearm or other defense article, would undercut the domestic laws of these nations, increase the risk of domestic violence in those countries, and thereby damage U.S. foreign relations with those countries and foreign policy interests.

22

WASHSTATEC003326

36.     In my judgment, the entry of a preliminary injunction in this matter would
        increase the risk of all of the foregoing harms.  Indeed, such an injunction could
        reasonably be expected to bring attention to DD's CAD files, making awareness
        of their capabilities and accessibility known more widely to individuals, entities,
        and foreign powers that would make use of DD's CAD files to the detriment of
        U.S. foreign policy and national security interests.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2015.

_____

Lisa V. Aguirre

23

# EXHIBIT

# 1

WASHSTATEC003328

the guardian

# 3D-printable guns are just the start, says Cody Wilson

The inventor of 'The Liberator' plastic firearm believes in an open future and the 'complete explosion' of all gun law

Alex Rayner

Monday 6 May 2013 11.56 EDT

Cody Wilson is a polite, 25-year-old law student at the University of Texas in Austin, with dark, close-cropped hair and a forward, affable charm. This week he plans to release the blueprint for a gun that can be downloaded from the internet and produced using a 3D printer.

He and his friends have spent almost a year developing the Liberator, a "Wiki weapon" that can be assembled from components made on an $8,000 (£5,150) printer that they bought on eBay. Using files shared online, the machine creates the solid parts from layers of plastic.

Wilson's group, Defense Distributed, thinks everyone should have access to a gun and is working to make it possible through Defcad.org, a depository for weapons designs. It was set up in December after its files were removed from another site following the Sandy Hook elementary school shootings. In March, Wilson was issued a federal firearms licence, allowing him to make guns legally.

"I come from a typical middle class family, for the United States in the south: religious parents, conservative values, though we didn't own a lot of firearms," he says. "We had one shotgun that we never really used."

Despite buying a shotgun shortly after turning 21, Wilson says it was his studies, first as an English literature major, then as a law student, that started his interest in the politics of weapons ownership. "I read [19th-century French anarchist theorist Pierre-Joseph] Proudhon," he says, "I like Jean Baudrillard. I like their critiques of mass culture."

He admits that, given current technology, printing a gun is the least effective way of obtaining a firearm, and that it is easier to simply fashion a gun from the contents of any hardware store.

Yet he half hopes, half believes that soon, thanks to the convergence of file-sharing and 3D printing, there will come about "a complete explosion of all available gun laws. I think we should be allowed to own automatic weapons; we should have the right to own all the

WASHSTATEC003329

terrible implements of war, as [American political philosopher] Tench Coxe said, and I think this principle probably applies globally."

A self-described child of the internet age, Wilson is an admirer of Julian Assange and Kim Dotcom. "I number myself among them, at least in spirit," he says. "I think the future is openness to the point of the eradication of government. The state shouldn't have a monopoly on violence; governments should live in fear of their citizenry."

His ambitions don't stop at firearms. Ultimately, he wants to turn Defcad into "the world's first unblockable open-source search engine for all 3D printable parts", a Pirate Bay-style archive not only for printable pistols, but for everything from prosthetic limbs to drugs and birth-control devices.

More features

## Topics

US gun control

WASHSTATEC003330

theguardian

# Shots fired from world's first 3D-printed handgun

Cody Wilson, 25, successfully tested plastic handgun built by his Texas firm Defense Distributed using an $8,000 3D printer

Adam Gabbatt in New York

Monday 6 May 2013 14.43 EDT

The world's first gun made almost entirely by a 3D plastic printer has been successfully fired in Texas.

The successful test of the plastic handgun, which was built by Defense Distributed using an $8,000 3D printer, came after a year of development. The company, which is run by 25-year-old Cody Wilson, now plans to publish the blueprints for the gun online.

Wilson and a companion successfully fired the gun for the first time in Austin, Texas, at the weekend, Forbes reported. A video published online shows the gun held in place by a metal stand, with yellow string attached to its trigger. By yanking on the string, the pair were able to pull the trigger from 20ft away, successfully discharging a .380 caliber bullet.

Defense Distributed's device is controversial because of the way it is made. Fifteen of its 16 pieces were constructed in a second-hand Stratasys Dimension SST 3D printer, Forbes said. The final piece, the firing pin, is a common nail available from any hardware store. The printer used ABS plastic to create the gun parts, which were then slotted together by Wilson. After Forbes's revelation, the BBC filmed a later test, in which Wilson successfully fired the gun by hand.

The Undetectable Firearms Act of 1988 makes it illegal to manufacture in the US any firearm that is not detectable by walk-through metal detectors. To combat this, Wilson inserted a 6oz piece of steel into the body of his gun, making it legal.

How long the law stays this way remains to be seen, however. On Sunday, New York senator Charles Schumer called for legislation to make building a gun with a 3D printer illegal, and said he and the New York congressman Steve Israel would introduce the Undetectable Firearms Modernisation Act, which would ban weapons like Wilson's.

Such an act would not be the first setback for Wilson, a law student at the University of Texas. An attempt to raise money for the 3D printed gun project through Indiegogo was thwarted when the crowdfunding website took his pitch offline, citing a breach of rules. After Wilson raised $20,000 through Bitcoin donations, he was hindered again when

WASHSTATEC003331

Stratys seized back his printer.

Defense Distributed acquired a second-hand Stratys, however, and carried on experimenting. Wilson successfully made and tested parts of an AR-15 semi-automatic rifle - the weapon which has been used in a number of mass shootings in the US - before turning his attention to a plastic handgun.

More news

## Topics

US gun control
3D printing
3D

WASHSTATEC003332

# EXHIBIT

## 2

WASHSTATEC003333



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 0 8 2013

In reply refer to
DTCC Case: 13-0001444

Mr. Cody Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705

Dear Mr. Wilson:

    The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

    DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

    Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

- 2 -

It is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data. To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations. All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled. This means that all such data should be removed from public access immediately. Defense Distributed should also review the remainder of the data made public on its website to

WASHSTATEC003335

- 3 -

determine whether any additional data may be similarly controlled and proceed
according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense
Distributed follows to determine the classification of its technical data, to include the
aforementioned technical data files. We ask that you provide your procedures for
determining proper jurisdiction of technical data within 30 days of the date of this letter
to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address
below:

> Office of Defense Trade Controls Compliance
> PM/DTCC, SA-1, Room L132
> 2401 E Street, NW
> Washington, DC 20522
> Phone: 202-663-3323.

We appreciate your full cooperation in this matter. Please note our reference
number in any future correspondence.

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

WASHSTATEC003336

# EXHIBIT

# 3

WASHSTATEC003337

# WILLIAMS MULLEN

Jahna M. Hartwig
Direct Dial: 202.293-8145
jhartwig@williamsmullen.com

June 21, 2013

Ms. Sarah Heidema
U.S. Department of State
Directorate of Defense Trade Controls
PM/DDTC, SA-1, Room 1200
2401 E Street, NW
Washington, DC 20037

Subject:   Commodity Jurisdiction Requests for Data Files Posted by Defense Distributed

Enclosures:   (1) Printouts of Drawings from Files Posted at DEFCAD.org
              (2) Wikipedia Page for 125mm BK-14M HEAT
              (3) Thingiverse Page for Sound Moderator
              (4) Thingiverse Page for VZ-58 Front Sight
              (5) Examples of Solvent Trap Adapters
              (6) Examples of CAD Files for .22 Pistols
              (7) Examples of CAD Files for Muzzle Brakes
              (8) Examples of CAD Files for Slide Assemblies
              (9) Examples of CAD Files for Voltlock System

Dear Ms. Heidema:

Defense Distributed has been requested by DTCC/END to submit requests for
commodity jurisdiction determinations in connection with Case No. 13-0001444 for ten sets of
data files posted to DEFCAD.org. As demonstrated below, the files are primarily Computer
Aided Design (CAD) data files and should be considered public domain information that is
excluded from the ITAR pursuant to Section 120.11. Defense Distributed therefore respectfully
requests a determination that these files are not subject to the ITAR.

## COMMODITY DESCRIPTIONS

Each of these Commodity Jurisdiction requests relates to data files, almost all of which
are essentially blueprints that can be read by CAD software. A description of each file or set of
files is set out below. The files are in one of the following formats:

  • STL (STereoLithography or Standard Tessellation Language) is a file format
    native to the stereolithography CAD software and can be used with some 3D
    printers. "Stereolithography" is a means of creating physical 3D models of objects
    using resin or carefully cut and joined pieces of paper. STL files describe only

WASHSTATEC003338

the surface geometry of a three dimensional object without any representation of
color, texture or other common CAD model attributes.

- The IGS (Initial Graphics Exchange Specification) file format is the standard
  format for transferring three-dimensional models between CAD programs. IGS
  files can store wireframe models, surface or solid object representations, circuit
  diagrams, and other objects.
- SLDPRT is the proprietary image file format associated with the SolidWorks
  brand CAD software. SLDPRT files contain three-dimensional images of one
  specific part of a product.
- SKP is the CAD drawing format for Google Sketchup, which is a quick, entry-
  level 3D drawing program.

There are also a small number of Word (.DOC), text (.TXT) or image (.JPG or .BMP) files. A
printout of each file is attached to the relevant DS-4076.

As explained further below, each of these files either was previously placed in the public
domain or contains only public domain information.

### 1.  Liberator Pistol Data Files

The files for the Liberator Pistol include sixteen STL files for the various parts and
components of the pistol, two "read me" text files that explain how to lawfully assemble the
pistol, a diagram of a pistol, and a permissive software license. If printed on a 3D printer, the
parts could be assembled into a single shot .380 caliber firearm.

### 2.  .22 Electric Data Files

The files for the .22 Electric are two stereolithography (STL) CAD files for models of a
barrel and grip for a .22 caliber pistol. If printed, the barrel would be a plastic cylinder with a .22
mm bore and the grip would be a plastic piece with two 5mm diameter holes. If those pieces
were printed in plastic and used with an electronic system and firing mechanism, the barrel
would be expected to fail upon firing.

### 3.  125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File

The file is a STL CAD file for a model of a BK-14M high explosive anti-tank warhead
without fins. The model, if printed on a 3D printer, would be a solid piece of plastic in the shape
of the warhead, but would not be capable of functioning as a warhead.

### 4.  5.56/.223 Muzzle Brake Data Files

The data files are three different CAD file formats (.IGS, .SLDPRT, and .STL) for a
model of a 5.56/.223 muzzle brake. If printed on a 3D printer, the model would be a plastic
piece in the shape of the muzzle brake, but would be expected to fail if used with a weapon.

### 5.  Springfield XD-40 Tactical Slide Assembly Data Files

The files are nineteen Computer Aided Design (CAD) data files in the SolidWorks
.SLDPRT file format for models of components of a pistol slide for the Springfield XD-40. The

WASHSTATEC003339

components, if printed on a 3D printer, would be plastic pieces in the shape of the components of the slide assembly, but would be expected to fail if used with a weapon.

### 6. Sound Moderator – Slip On File

The file is a stereolithography CAD file for a model of a slip-on sound moderator for an air gun. The model, if printed on a 3D printer, would work with an air gun, but would likely melt if used with a firearm.

### 7. "The Dirty Diane" ½-28 to ¾-16 STP S3600 Oil Filter Silencer Adapter Files

The file is a CAD data file in the SolidWorks .SLDPRT file format for a model of an oil filter silencer adapter that is typically produced in stainless steel. If printed on a 3D printer, this item could be used as a solvent trap adapter, which is used to catch solvents that are used in the process of cleaning a gun. While a metal solvent trap adapter could be used as a silencer, a plastic adapter would likely melt if used with a weapon as a silencer.

### 8. 12 Gauge to .22 CB Sub-Caliber Insert Files

The files are a SKP CAD file for a model of a sub-caliber insert, two renderings of the sub-caliber insert, and a "read me" text file providing information about the National Firearms Act and the Undetectable Firearms Act. This item, if printed on a 3D printer, would be a plastic cylinder with a .22 bore, and would be expected to fail if used with a weapon.

### 9. Voltlock Electronic Black Powder System Files

The files are twelve CAD files for models of cylinders of various bores with a touch hole. Eleven of the files are in the STL file format and one is in the IGS format. If those pieces were printed on a 3D printer and used with an electronic ignition, the barrel would be expected to fail.

### 10. VZ-58 Front Sight Files

The files are a SolidWorks CAD file in the .SLDPRT file format and a rendering of a model of a sight for a VZ-58 rifle. If printed on a 3D printer and used with a weapon, the sight would be expected to fail.

### DATA ORIGIN

With the exception of item 1 (Liberator Pistol Data Files), each of these files was provided to Defense Distributed by the creator of the files identified in the DS4076. In addition, as explained below, many of these files were originally posted to www.thingiverse.com or other internet sites, and were freely available to any person with access to the internet.

The Liberator Pistol CAD files were developed by Defense Distributed. The Liberator pistol was designed as a combination of already extant and working files and concepts. The pistol frame, trigger housing, and grip specifications were all taken directly from an AR-15 lower receiver file that is in the public domain. The spring file is taken from a toy car file available on Thingiverse. The hammer relies on striking a common roofing nail, and the barrel is a cylinder bored for .380. The gun functions because of the properties of the .380 cartridge – the brass

WASHSTATEC003340

casing itself is relied on to act as a breech. The printed and assembled gun is a simple improvised weapon, not as complex as many of the improvised weapons of the 20th century, those available in Army manuals, etc. All of the technologies used to create the Liberator data files are widely available in the public domain.

## IDENTICAL & SIMILAR FILES

The Liberator Pistol data files are for an improvised firearm that is similar to and based on numerous items that are available on the internet as well as in various books. The Library of Congress online catalog lists numerous books on gunsmithing, including

- Clyde Baker, Modern gunsmithing; a manual of firearms design, construction, and remodeling for amateurs & professionals (1959)
- John E. Traister, Clyde Baker's Modern gunsmithing : a revision of the classic (1981)
- Frank de Haas, Mr. Single Shot's gunsmithing idea book (1983)
- Roy F. Dunlop, Gunsmithing (1996),
- Franklin Fry, Gunsmithing fundamentals : a guide for professional results (1988),
- James Virgil Howe, The modern gunsmith : a guide for the amateur and professional gunsmith in the design and construction of firearms, with practical suggestions for all who like guns (1982),
- Gérard Métral, A do-it-yourself submachine gun: it's homemade, 9mm, lightweight, durable, and it'll never be on any import ban lists! (1995),
- Jack Mitchell, The Gun digest book of pistolsmithing (1980),
- J. Parrish Stelle, The gunsmith's manual; a complete handbook for the American gunsmith (1883), and
- Patrick Sweeney, Gunsmithing: pistols & revolvers (2009),

among many others. Examples of online sources include:

- http://www.weaponscombat.com/zip-pipe-and-pen-guns
- http://www.infinitearms.com/images2/v/manuals/Misc+Gun+Plans
- http://thehomegunsmith.com
- http://www.scribd.com/doc/24445441/Pen-Gun-Mk1-Blueprint
- https://www.google.com/search?q=zip+gun+blueprints&rlz=1C1SKPM_enUS43 6US489&source=lnms&tbm=isch&sa=X&ei=9t-oUZybJILm8wSx0YHoBg&ved=0CAoQ_AUoAQ&biw=1600&bih=837
- http://ebookbrowse.com/gu/guns-homemade

Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun.

A drawing of the 125 BK-14M HEAT (Item 3), including measurements, is currently available on Wikipedia at http://en.wikipedia.org/wiki/File:125mm_BK-14m_HEAT.JPG.

The Sound Moderator CAD file (Item 6) was published on Thingiverse on March 3, 2011 and is still available on that site at http://www.thingiverse.com/thing:6808. The VZ-58 Front Sight (Item 10) was also published to Grabcad on December 14, 2012 and is still available on that site at http://grabcad.com/library/front-sight-for-vz-dot-58-rifle.

The Oil Filter Silencer Adapter is identical to Solvent Trap Adapters, which are produced by numerous manufacturers and available as commercial products on many websites, including amazon.com. (see http://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Dautomotive&field-keywords=solvent+trap+adapter&rh=n%3A15684181%2Ck%3Asolvent+trap+adapter.) These items appear to be commercial products that would be subject to the EAR. As such, any related technologies or technical data would also be subject to the EAR.

Examples of CAD files similar to the .22 Electric Pistol (Item 2), Muzzle Brake (Item 4), Slide Assembly (Item 5), and Voltlock Electronic Black Powder System (Item 9) that are currently available on the internet are attached to the relevant DS4076.

As demonstrated above, all of the technical information included in the data files posted to DEFCAD.org was previously available in the public domain. As such, this information is excluded from the definition of "technical data" by 22 C.F.R. § 120.10(a)(5). For these reasons, Defense Distributed respectfully requests that the Department determine that the subject data files posted to DEFCAD.org are not subject to the ITAR.

This submission contains Defense Distributed confidential business information. We respectfully request that the submission be kept confidential. If you need additional information regarding this submission, please contact me at 202-293-8145 or jhartwig@williamsmullen.com.

Sincerely,

Jahna M. Hartwig

WASHSTATEC003342

# EXHIBIT

# 4

WASHSTATEC003343

MATTHEW A. GOLDSTEIN, PLLC
1019 14TH STREET NW, SUITE 620
WASHINGTON DC 20005

**VIA ELECTRONIC FILING**

January 2, 2015

PM/DDTC, SA-1, 12th Floor
Office of Defense Trade Controls
Bureau of Political Military Affairs
U.S. Department of State
Washington, D.C. 20522-0012

**SUBJECT:** **Commodity Jurisdiction Request for Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software** (Defense Distributed, Inc., PM/DDTC Code M-34702)

Dear Sir or Madam:

Pursuant to Section 120.4 of the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Sections 120-130), Defense Distributed requests a commodity jurisdiction determination from the Directorate of Defense Trade Controls ("DDTC") on the Ghost Gunner machine (the "Ghost Gunner"), its plastic mounting jig, user instructions, and software for production, operation, and use of the Ghost Gunner.

The Ghost Gunner is an approximately one-foot-cubed black box that uses a drill bit mounted on a head that moves in three dimensions to automatically carve digitally-modeled shapes into polymer, wood or aluminum. It functions as a 3-axis computer-numerically-controlled ("CNC") press that can be used to manufacture parts to firearms controlled under U.S. Munitions List ("USML") Category I. It can also be used to manufacture items that are not controlled under the USML. The machine was designed, developed, and manufactured by Defense Distributed to automatically manufacture publicly available designs with nearly zero user interaction.

As discussed below, the Department of Defense recommended that Defense Distributed submit this commodity jurisdiction request.

Export jurisdiction over the Ghost Gunner, Jig, software, and instructions is uncertain because, although the Department of Commerce Export Administration Regulations ("EAR") maintain a control listing for jigs, fixtures, and other metal-working items "exclusively designed for use in the manufacture of firearms" under Commerce Control List ("CCL") Export Control Number ("ECCN") 2B018.n, there is no corresponding carve-out for these items and related software and technical information otherwise controlled by USML Category I generally; and Category I(i) controls technical data and defense services directly related to firearms, with technical data directly related to the manufacture or production of firearms designated as Significant Military Equipment.

Please note that a letter from Defense Distributed authorizing my law firm to file this request was uploaded with this DS-4076 submission. Please direct any questions and all correspondence related to this request to my office. Communications to me at matthew@goldsteinpllc.com are preferred.

www.GoldsteinPLLC.com

WASHSTATEC003344

## I.   BACKGROUND

### A.   Defense Distributed

Defense Distributed is a Texas corporation, registered with the Department of State under PM/DDTC Code M-34702. The company has developed technical information that can be used to produce, manufacture, and assemble various parts components, accessories, and attachments to firearms controlled under USML Category I. This includes information for the design and production of the Ghost Gunner, software necessary to operate Ghost Gunner, and code that allows production of certain items by the Ghost Gunner.[1]

Following notification from DDTC in May 8, 2013, that the agency requires U.S. Government prior approval before publications of otherwise ITAR-controlled technical data into the public domain (Attachment 1), Defense Distributed has submitted requests for U.S. Government clearance of technical data to the Department of Defense Office of Prepublication and Security Review ("DOPSR").[2] On October 1, 2014, DOPSR returned a Defense Distributed request for clearance of technical information on the Ghost Gunner for public release, stating that commodity jurisdiction over the item was uncertain and recommending that Defense Distributed submit a commodity jurisdiction request. See Attachment 2.

### B.   The Ghost Gunner

Existing CNC machines are expensive or too inaccurate to manufacture firearms for the casual user. Defense Distributed developed the Ghost Gunner to address this problem by miniaturizing the build envelope to just large enough to mill common firearm receivers, which in turn improves rigidity, reduces material cost and simultaneously relaxes certain design limits, allowing Defense Distributed to sell an inexpensive machine with more than enough accuracy to manufacture firearms.

The first design tested on the Ghost Gunner was for an AR-15 lower receiver and the Ghost Gunner was able to automatically find, align, and mill a so-called "80%" lower receiver, which was not a firearm prior to milling. The Ghost Gunner has since undergone several design revisions to reduce machine chatter, backlash, and jitter, all with the goal of keeping total design cost low.

Photographs of Ghost Gunner are provided at Attachment 3 and rendered images of the machine with the plastic jig are provided at Attachment 4.

---

[1] This commodity jurisdiction request seeks a determination of the code necessary to operate Ghost Gunner. It does not seek a determination on the various project files specific to production of certain items by the Ghost Gunner.

[2] In complying with DDTC prepublication review requirements on publication of technical information into the public domain, Defense Distributed does not intent to, nor should it be considered to, waive any defense, claim or right under law.

WASHSTATEC003345

Commodity Jurisdiction Request
January 2, 2015
Page 3 of 9

A schematic drawing for the Ghost Gunner is provided at Attachment 5.

Ghost Gunner form, fit, function, and performance characteristics include the following:

* It uses a compact, powder coated A36 steel frame and thick stainless T-slot rail, with preloaded ball bearings for maximum rigidity. Linear motion is achieved with low-backlash direct-drive ball screws mounted in-line with the cutting surface, thus preventing torsional gantry chatter while machining.

* It incorporates an electronic probe that automatically detects when the machine comes into contact with the work piece, allowing automatic part discovery and alignment. Ghost Gunner requires conductive parts if auto-discovery and alignment are used.

* It can manually machine nonconductive materials, but this requires manual calibration of a part to the machine - following a few simple instructions - as is required with existing CNC machines.

* Its moving parts are entirely sealed from chip debris. All bearings are sealed and contain wipers to prevent foreign contaminate entry. The rails are stainless steel and are factory lubricated, but do require periodic wiping to prolong life. End Mills dull over time and are considered a consumable.

* To contain aluminum chips, it includes a chip collection tray and all moving components are fully enclosed.

* It is capable of manufacturing deep pockets due to its horizontal gantry, which allows gravity to pull chips away from the cutting surface before they can build up and dull the end mill, as is the case on traditional CNC designs.

* It uses industry standard ER-11 collets, and ships with both 1/4" and 5/32" collets.

* It uses a standard IEC power cord and is compatible with any 110/220V circuit. No external power brick is used; the machine is entirely self-contained.

* It has two ports: Power (IEC standard) and USB (Type 'B').

* Its machinable dimensions are 140 x 75 x 60mm (~5.50 x 2.95 x 2.35")

* Its maximum part dimensions are 230 x 90 x 100mm (~9.05 x 3.50 x 3.90")

* Its overall footprint is 330 x 280mm (~13 x 11")

* Its weight is 20kg (~45 pounds)

WASHSTATEC003346

- Its Spindle Speed is 10,000+ RPM (Final Value TBD)

- Its software requirements are Windows 7 or higher. Mac version TBD

As noted above, Ghost Gunner is capable of manufacturing more than just firearm receivers. With Defense Distributed's open source Physibles Development SDK ("pDev"), designers can distribute files via the company's '.dd' file format, which contains all installation and assembly instructions, any required jig files to hold a part in place (that users can print with a 3D printer), and all machine definitions and code to physically manufacture a particular design. To a casual user, the .dd file is a one-stop solution to manufacturing any aluminum physible that the public can design to fit into the build envelope. Defense Distributed will be developing in and supporting this format.

The .dd file format is itself open source and not constrained to the Ghost Gunner or Defense Distributed; any user can define any existing machine's specific parameters via the machine parameters list. A single file can contain specific code and installation instructions for any number of machines. A user with both a Ghost Gunner and a Tormach P1100 could manufacture a particular .dd file on either machine and manufacture the same physible with zero additional user knowledge, as only the instructions required for a particular machine are revealed to the end user. The .dd file format is a CNC response to 3D printing's universal .stl file format. However, Ghost Gunner will also accept TinyG code from any CAM program.

In operation, users provide the parts for milling. They can then simply plug their computer into the Ghost Gunner, install the Ghost Gunner software, and download any compatible .dd design file. 3D printable jigs are used to hold each part in place as each milling step is performed. For example, milling an eighty percent AR-15 lower receiver requires two jig pieces to secure the lower in place while the trigger pocket is milled, and then two more jig pieces are installed to drill the trigger pinholes. As most eighty percent firearms require deep pocket milling, Ghost Gunner's mounting table is parallel to the end mill shaft. This orientation maximizes 3D printed jig strength, minimizes jig complexity, and mechanically aligns the part to the machine upon insertion into the Maker Slide-patterned, Open Source T Slot stainless rails.

Defense Distributed expects its typical order fulfillment will contain the fully assembled Ghost Gunner CNC, plastic mounting jig designed to secure 80% AR-15 receivers, operating software and instructions. Defense Distributed also intends to place instructions and computer code needed to build and use Ghost Gunner into the public domain as Open Source technology.

Block 13 ("Sales information) is not provided with this request because the Ghost Gunner is still in development as Defense Distributed awaits arrival of various production pieces and continues to make any required changes to the product. As such, the company has not yet delivered any machines (i.e., no completed sales). However, the company has accepted 469 pre-orders and 413 advance deposits from prospective purchasers. Each of these orders, except for one, are intended for domestic sale. In addition, consistent with U.S. law, final sales will carry conditions that limit purchases to private use (i.e., not for commercial or military use).

WASHSTATEC003347

### C. User Instructions and Operating Software for the Ghost Gunner

The current draft User Instructions for the Ghost Gunner accompanies this commodity jurisdiction request at Attachment 6. It contains information on how to attach a "80%" lower receiver to Ghost Gunner, such that Ghost Gunner can mill and drill all required holes to transform the lower receiver into a firearm. Ghost Gunner presents numerous User Instructions, User Graphics, and User Selections to the operator. Ghost Gunner performs work via Calibration Code and Milling Code. Ghost Gunner also assists the user in creating 3D printable Jigs, if needed.

The software necessary to produce and operate the Ghost Gunner includes AutoDesk Inventor and a simple executable application that can interpret CNC part files and TinyG code. Additional information detailing the purpose, function, and capability of the software, as requested by DDTC's DS-4076 Commodity Jurisdiction (CJ) Guidance for Software, accompanies this commodity jurisdiction request at Attachment 7.

## II. COMMODITY JURISDICTION STANDARD

The standard applicable to Department of State and other agency considerations of commodity jurisdiction is set forth at ITAR Section 120.3. ITAR Subsection 120.3(a) extends Department of State jurisdiction to any item that meets the criteria of a defense article described on the USML or that provides equivalent performance capabilities; and ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

### A. Relevant USML Control Listings

Subparagraph (h) to USML Category I controls components, parts, accessories, and attachments for firearms to .50 caliber inclusive. The Ghost Gunner does not meet the Category I(h) criteria because it is not a component or part to a firearm. Rather, it is a machine that can be used for the manufacture of such articles.

Subparagraph (i) to USML Category I controls technical data, to include "software" as defined at Section 120.45(f), and defense services directly related to the firearms and components, parts, accessories, and attachments for firearms to .50 caliber inclusive. Technical data directly related to the manufacture or production of firearms controlled in Category I is designated as Significant Military Equipment.

The USML does not contain a control listing that describes items used for the manufacture of firearms. Instead, that listing is contained on the EAR Commerce Control List ("CCL") entry for ECCN 2B018.n, which controls "Jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms. ECCN 2D018 controls software" for the "development", "production" or "use" of equipment controlled by 2B018; and ECCN 2E018, in turn, controls "Technology" for the "use" of equipment controlled by 2B018.

WASHSTATEC003348

The scope of the CCL controls on firearms manufacturing equipment and technology is unclear because the EAR only controls items not described on the USML and Category I does not contain any carve-out from ITAR control for software or technology controlled under ECCNs 2D018 and 2E018. To the contrary, if literally applied, USML Category I(i) treats such technical information as Significant Military Equipment.

Because there is no specific carve-out in Category I or elsewhere in the USML for software or technology controlled by 2D018 and 2E018, it is very difficult to distinguish between technical data for the manufacture or production of firearms controlled in Category I and technology for the development, production, and use of equipment used to manufacture firearms controlled at 2D018 and 2E018. This is a primary concern of the present commodity jurisdiction request.

Nevertheless, EAR control is consistent with U.S. Implementation of Wassenaar Controls. Specifically, ECCNs 2B018, ECCN 2E018, and 2B018 are Wassenaar Arrangement-based controls, subject to the National Security reason for control and which correspond to Category 2 of the Wassenaar Arrangement List of Dual-Use Items. In fact, 2B018 is titled, "Equipment on the Wassenaar Arrangement Munitions List."

Although relevant text of the ITAR and EAR control listings lack clarity, it appears that the U.S. Government decided to implement export controls on firearms manufacturing equipment and associated technical information in the EAR when it first implemented the Wassenaar Arrangement controls for such items. Accordingly, Defense Distributed believes that the Ghost Gunner does not meet criteria of a defense article described on the USML and that it does not provide equivalent performance capabilities to an article described on the USML.

Defense Distributed further notes that the DDTC should consider amending USML Category I to provide an express carve-out for EAR items controlled under ECCNs 2B018.n, ECCN 2E018, and 2B018. Alternatively, if DDTC intends to control firearms manufacturing equipment under the USML, it should make this clear in the regulations. Towards this end, any determination on the instant request that imposes ITAR control should be widely disseminated and shared with the firearms manufacturing industry.

### B.  Ghost Gunner Does Not Provide a Critical Military or Intelligence Advantage.

As noted above, ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

The function and performance of the Ghost Gunner does not provide a critical military or intelligence advantage. Rather, it is essentially a jig press based on a simple design that is easily replicated by any skilled machinist. In fact, the Ghost Gunner can be produced by persons with no formal engineering background.

WASHSTATEC003349

In addition, Ghost Gunner builds on technology readily available in the Open Source community, including the gshield 3 axis motion hardware (http://synthetos.myshopify.com/products/gshield-v5), the grbl g-code parser and motion controller (https://github.com/grbl/grbl), and the Arduino microcontroller (http://arduino.cc).

Further, instructions and/or electronic files for production of jig presses with similar form, fit, and function to the Ghost Gunner are publicly available for download at a variety of web addresses, to include the following:

http://aresarmor.com/store/Item/Polymer-80-Black
http://www.thingiverse.com/thing:160266
https://github.com/DefiantCad/defcad-repo/tree/master/Rifles/AR-
15_80_percent_lower_v5-shadowfall/AR-15_80_percent_Lower_Drill_Jig_v1-Shadowfall
http://www.advancedrifles.com/3d-printed-jig-version-2-0/
http://www.80percentarms.com/products/80-ar-15-easy-jig
http://www.sierranevadaarms.com/jig.pdf
http://www.rockethub.com/projects/24384-80-lower-receiver-ar15-ar10-rudius-1911

## III.  CONCLUSION

Considering the apparent intent of the U.S. Government in implementing relevant Wassenaar Arrangement controls in the EAR, Defense Distributed believes that the Ghost Gunner does not meet the criteria of an article described on the USML. In addition, the Ghost Gunner does not provide a critical military or intelligence advantage. Accordingly, Defense Distributed respectfully requests that the Department of State issue a commodity jurisdiction determination stating that the Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions do not meet the criteria of ITAR 120.3 and are subject to Department of Commerce jurisdiction under the EAR.

Defense Distributed authorizes the release for general publication of the information contained in Block 5 of the DS-4076 Form. However, other information in this request and documents submitted with Defense Distributed's DS-4076 Submission contain sensitive business information that is proprietary, confidential, and exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552, and is also protected under the Trade Secrets Act, 18 U.S.C. Section 1905. Accordingly, pursuant to ITAR Section 130.15, Defense Distributed requests that information in this submission other than that contained in Block 5 be withheld in the event of a request for its disclosure.

WASHSTATEC003350

Thank you for your prompt attention to this matter and please contact me at 202-550-0040 or at matthew@goldsteinpllc.com if any additional information is needed.

Yours truly,

Matthew A. Goldstein
Legal Counsel

COMPANY CERTIFICATION:

Cody Wilson, the Principal of Defense Distributed, certifies that he is the duly authorized representative of Defense Distributed; and that in such capacity, he certifies that he has carefully read the foregoing Commodity Jurisdiction request; and that the contents of the request are true and correct to the best of his knowledge, information and belief after reasonable inquiry into the matters discussed.

Signature                                                      1/2/2015
                                                              Date

ATTACHMENTS TO LETTER OF EXPLANATION:

Attachment 1        May 8, 2013 DDTC Letter to Defense Distributed

Attachment 2        October 1, 2014 DOPSR Letter to Defense Distributed

Attachment 3        Photographs of Ghost Gunner Machine

Attachment 4        Rendered Images of Ghost Gunner Machine

Attachment 5        Ghost Gunner Schematics

Attachment 6        Ghost Gunner User Instructions

Attachment 7        Answers to DS-4076 Commodity Jurisdiction (CJ) Guidance for Software

www.GoldsteinPLLC.com

Scanned by CamScanner

WASHSTATEC003351

**OTHER ATTACHMENTS INCLUDED WITH DS-4076 SUBMISSION:**

DD_DS4076.pdf

DD_Attorney_Authorization_Letter_Block_2-1.pdf

[Instant document] DD_Cover_Ltr_Block_6-1.pdf

DD_Certification_Block_19-1.pdf

WASHSTATEC003352

# EXHIBIT

# 5

WASHSTATEC003353



United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

In Reply refer to

APR 15 2015

DDTC Case CJ 1083-14 (RE-ISSUE)

YOUR SUBMISSION DATED: January 2, 2015

COMMODITY JURISDICTION DETERMINATION FOR: **Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software**

The product described in your submission is a one cubic foot box that functions as a 3-axis, computer-numerically-controlled (CNC) press capable of automatically milling parts out of various materials through software designs.

A technical review of your commodity jurisdiction (CJ) request has been concluded by the requisite agencies of the United States Government. A split jurisdiction determination of this request has been determined, as follows:

> The Department of State has determined that the **Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions are not subject to the jurisdiction of the Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

> The Department of State has determined that the **project files, data files, or any form of technical data for producing a defense article, including an 80% AR-15 lower receiver, are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are

Continued on Page Two

Cody R. Wilson
Defense Distributed, Inc.
1101 W 34th Street, #340
Austin, TX 78705
crw@defdist.org

Page Two

In Reply refer to
DDTC Case CJ 1083-14

designated as technical data under Category I(i) of the United States Munitions List (USML). A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not agree with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not agree with this determination and have no additional facts to present, you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

WASHSTATEC003355

# EXHIBIT

# 6

WASHSTATEC003356



United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

In Reply refer to
DDTC Cases CJ 651-13 through 660-13                    JUN 04 2015

YOUR SUBMISSION DATED: June 21, 2013

COMMODITY JURISDICTION DETERMINATIONS FOR: **Liberator Pistol
Data Files, .22 Electric Data Files, 125 mm BK-14M High Explosive Anti-
Tank Warhead Model Data File, 5.56/.223 Muzzle Brake Data Files,
Springfield XD-40 Tactical Slide Assembly Data Files, Sound Moderator - Slip
On Data File, "The Dirty Diane" Oil Filter Silencer Adapter Data File, 12
Gauge to .22 CB Sub-Caliber Insert Data Files, Voltlock Electronic Black
Powder System Data Files, and VZ-58 Front Sight Data Files**

The data described in your submission are Computer Aided Design (CAD) data
files that can be used in a 3D printer to produce physical models of the associated
item.

A technical review of your commodity jurisdiction (CJ) request has been
concluded by requisite agencies of the United States Government. The findings of
that technical review are:

The Department of State has determined that the **125 mm BK-14M High
Explosive Anti-Tank Warhead Model Data File, Sound Moderator - Slip On
Data File, and "The Dirty Diane" Oil Filter Silencer Adapter Data File are
not subject to the jurisdiction of the Department of State.** The Department of
Commerce (DOC) advises that these items are classified as EAR99. Please consult
the DOC Office of Exporter Services at (202) 482-4811 to satisfy applicable
requirements prior to export.

The Department of State has determined that the **Voltlock Electronic Black
Powder System Data Files are not subject to the jurisdiction of the**

Continued on Page Two

Cody R. Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705
crw@defdist.org

Page Two

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

**Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

The Department of State has determined that the **Liberator Pistol Data Files, .22 Electric Data Files, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, 12 Gauge to .22 CB Sub-Caliber Insert Data Files (except for "read me" text file), and VZ-58 Front Sight Data Files are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are designated as technical data under Category I(i) of the United States Munitions List (USML) pursuant to §120.10 of the ITAR. A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not concur with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not concur with this determination and have no additional facts to present, then you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Sam Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

WASHSTATEC003358

# EXHIBIT

# 7

WASHSTATEC003359


hearing," which are conducted pursuant to the provisions of 5 U.S.C. 556 and 557. The CSA sets forth the criteria for scheduling a drug or other substance and for removing a drug or substance from the schedules of controlled substances. Such actions are exempt from review by the Office of Management and Budget (OMB) pursuant to section 3(d)(1) of Executive Order 12866 and the principles reaffirmed in Executive Order 13563.

*Executive Order 12988*

This regulation meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988 Civil Justice Reform to eliminate drafting errors and ambiguity, minimize litigation, provide a clear legal standard for affected conduct, and promote simplification and burden reduction.

*Executive Order 13132*

This rulemaking does not have federalism implications warranting the application of Executive Order 13132. The rule does not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or the distribution of power and responsibilities among the various levels of government.

*Executive Order 13175*

This rule does not have tribal implications warranting the application of Executive Order 13175. This rule does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

*Regulatory Flexibility Act*

The Administrator, in accordance with the Regulatory Flexibility Act (5 U.S.C. 601–612) (RFA), has reviewed this proposed rule and by approving it certifies that it will not have a significant economic impact on a substantial number of small entities. The purpose of this proposed rule is to remove [¹²³I]ioflupane from the list of schedules of the CSA. This action will remove regulatory controls and administrative, civil, and criminal sanctions applicable to controlled substances for handlers and proposed handlers of [¹²³I]ioflupane. Accordingly, it has the potential for some economic impact in the form of cost savings.

If finalized, the proposed rule will affect all persons who would handle, or propose to handle, [¹²³I]ioflupane. Due to the wide variety of unidentifiable and

unquantifiable variables that potentially could influence the distribution and administration rates of new molecular entities, the DEA is unable to determine the number of entities and small entities which might handle [¹²³I]ioflupane.

Although the DEA does not have a reliable basis to estimate the number of affected entities and quantify the economic impact of this proposed rule, a qualitative analysis indicates that, if finalized, this rule is likely to result in some cost savings for the healthcare industry. The affected entities will continue to meet existing Federal and/ or state requirements applicable to those who handle radiopharmaceutical substances, including licensure, security, recordkeeping, and reporting requirements, which in many cases are more stringent than the DEA's requirements. However, the DEA estimates cost savings will be realized from the removal of the administrative, civil, and criminal sanctions for those entities handling or proposing to handle [¹²³I]ioflupane, in the form of saved registration fees, and the elimination of additional physical security, recordkeeping, and reporting requirements.

Because of these facts, this rule will not result in a significant economic impact on a substantial number of small entities.

*Unfunded Mandates Reform Act of 1995*

On the basis of information contained in the "Regulatory Flexibility Act" section above, the DEA has determined and certifies pursuant to the Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. 1501 *et seq.*, that this action would not result in any federal mandate that may result "in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted for inflation) in any one year * * *." Therefore, neither a Small Government Agency Plan nor any other action is required under provisions of UMRA.

*Paperwork Reduction Act*

This action does not impose a new collection of information requirement under the Paperwork Reduction Act, 44 U.S.C. 3501–3521. This action would not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

List of Subjects in 21 CFR part 1308

Administrative practice and procedure, Drug traffic control, Reporting and recordkeeping requirements.

For the reasons set out above, 21 CFR part 1308 is proposed to be amended to read as follows:

## PART 1308—SCHEDULES OF CONTROLLED SUBSTANCES

■ 1. The authority citation for 21 CFR part 1308 continues to read as follows:

**Authority:** 21 U.S.C. 811, 812, 871(b), unless otherwise noted.

■ 2. In § 1308.12, revise paragraph (b)(4) to read as follows:

**§ 1308.12  Schedule II.**

\* \* \* \* \*

(b) * * *

(4) Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include:

(i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or

(ii) [¹²³I]ioflupane.

\* \* \* \* \*

Dated: May 6, 2015.

Michele M. Leonhart,
*Administrator.*

[FR Doc. 2015-13455 Filed 6–2–15; 8:45 am]

BILLING CODE 4410-09-P

---

## DEPARTMENT OF STATE

**22 CFR Parts 120, 123, 125, and 127**

[Public Notice 9149]

RIN 1400–AD70

**International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain; Definition of Product of Fundamental Research; Electronic Transmission and Storage of Technical Data; and Related Definitions**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** As part of the President's Export Control Reform (ECR) initiative, the Department of State proposes to amend the International Traffic in Arms

WASHSTATEC003360

Regulations (ITAR) to update the definitions of "defense article," "defense services," "technical data," "public domain," "export," and "reexport or retransfer" in order to clarify the scope of activities and information that are covered within these definitions and harmonize the definitions with the Export Administration Regulations (EAR), to the extent appropriate. Additionally, the Department proposes to create definitions of "required," "technical data that arises during, or results from, fundamental research," "release," "retransfer," and "activities that are not exports, reexports, or retransfers" in order to clarify and support the interpretation of the revised definitions that are proposed in this rulemaking. The Department proposes to create new sections detailing the scope of licenses, unauthorized releases of information, and the "release" of secured information, and revises the sections on "exports" of "technical data" to U.S. persons abroad. Finally, the Department proposes to address the electronic transmission and storage of unclassified "technical data" via foreign communications infrastructure. This rulemaking proposes that the electronic transmission of unclassified "technical data" abroad is not an "export," provided that the data is sufficiently secured to prevent access by foreign persons. Additionally, this proposed rule would allow for the electronic storage of unclassified "technical data" abroad, provided that the data is secured to prevent access by parties unauthorized to access such data. The revisions contained in this proposed rule are part of the Department of State's retrospective plan under Executive Order 13563 first submitted on August 17, 2011.

**DATES:** The Department of State will accept comments on this proposed rule until August 3, 2015.

**ADDRESSES:** Interested parties may submit comments within 60 days of the date of publication by one of the following methods:

• Email: *DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Revisions to Definitions; Data Transmission and Storage."

• Internet: At *www.regulations.gov,* search for this notice by using this rule's RIN (1400–AD70).

Comments received after that date may be considered, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of

confidentiality is asserted because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls Web site at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself. Comments submitted via *www.regulations.gov* are immediately available for public inspection.

**FOR FURTHER INFORMATION CONTACT:** Mr. C. Edward Peartree, Director, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–1282; email *DDTCResponseTeam@ state.gov.* ATTN: ITAR Amendment— Revisions to Definitions; Data Transmission and Storage. The Department of State's full retrospective plan can be accessed at *http:// www.state.gov/documents/organization/ 181028.pdf.*

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles" and "defense services," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations ("EAR," 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR.

BIS is concurrently publishing comparable proposed amendments (BIS companion rule) to the definitions of "technology," "required," "peculiarly responsible," "published," results of "fundamental research," "export," "reexport," "release," and "transfer (in-country)" in the EAR. A side-by-side comparison on the regulatory text proposed by both Departments is available on both agencies' Web sites: *www.pmddtc.state.gov* and *www.bis.doc.gov.*

## 1. Revised Definition of Defense Article

The Department proposes to revise the definition of "defense article" to clarify the scope of the definition. The current text of § 120.6 is made into a new paragraph (a), into which software is added to the list of things that are a "defense article" because software is being removed from the definition of "technical data." This is not a substantive change.

A new § 120.6(b) is added to list those items that the Department has determined should not be a "defense article," even though they would otherwise meet the definition of "defense article." All the items described were formerly excluded from the definition of "technical data" in § 120.10. These items are declared to be not subject to the ITAR to parallel the EAR concept of "not subject to the EAR" as part of the effort to harmonize the ITAR and the EAR. This does not constitute a change in policy regarding these items or the scope of items that are defense articles.

## 2. Revised Definition of Technical Data

The Department proposes to revise the definition of "technical data" in ITAR § 120.10 in order to update and clarify the scope of information that may be captured within the definition. Paragraph (a)(1) of the revised definition defines "technical data" as information "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article," which harmonizes with the definition of "technology" in the EAR and the Wassenaar Arrangement. This is not a change in the scope of the definition, and additional words describing activities that were in the prior definition are included in parentheticals to assist exporters.

Paragraph (a)(1) also sets forth a broader range of examples of formats that "technical data" may take, such as diagrams, models, formulae, tables, engineering designs and specifications, computer-aided design files, manuals or documentation, or electronic media, that may constitute "technical data." Additionally, the revised definition includes certain conforming changes intended to reflect the revised and newly added defined terms proposed elsewhere in this rule.

The proposed revised definition also includes a note clarifying that the modification of the design of an existing item creates a new item and that the "technical data" for the modification is "technical data" for the new item.

Paragraph (a)(2) of the revised definition defines "technical data" as

WASHSTATEC003361

also including information that is enumerated on the USML. This will be "technical data" that is positively described, as opposed to "technical data" described in the standard catch-all "technical data" control for all "technical data" directly related to a "defense article" described in the relevant category. The Department intends to enumerate certain controlled "technical data" as it continues to move the USML toward a more positive control list.

Paragraph (a)(3) of the revised definition defines "technical data" as also including classified information that is for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article" or a 600 series item subject to the EAR. Paragraph (a)(5) of the revised definition defines "technical data" as also including information to access secured "technical data" in clear text, such as decryption keys, passwords, or network access codes. In support of the latter change, the Department also proposes to add a new provision to the list of violations in § 127.1(b)(4) to state that any disclosure of these decryption keys or passwords that results in the unauthorized disclosure of the "technical data" or software secured by the encryption key or password is a violation and will constitute a violation to the same extent as the "export" of the secured information. For example, the "release" of a decryption key may result in the unauthorized disclosure of multiple files containing "technical data" hosted abroad and could therefore constitute a violation of the ITAR for each piece of "technical data" on that server.

Paragraph (b) of the revised definition of "technical data" excludes non-proprietary general system descriptions, information on basic function or purpose of an item, and telemetry data as defined in Note 3 to USML Category XV(f) (§ 121.1). Items formerly identified in this paragraph, principles taught in schools and "public domain" information, have been moved to the new ITAR § 120.6(b).

The proposed definition removes software from the definition of "technical data." Specific and catch-all controls on software will be added elsewhere throughout the ITAR as warranted, as it will now be defined as a separate type of "defense article."

### 3. Proposed Definition of Required

The Department proposes a definition of "required" in a new § 120.46. "Required" is used in the definition of "technical data" and has, to this point,

been an undefined term in the ITAR. The word is also used in the controls on technology in both the EAR and the Wassenaar Arrangement, as a defined term, which the Department is now proposing to adopt:

. . . [O]nly that portion of [technical data] that is peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions. Such required [technical data] may be shared by different products.

The proposed definition of "required" contains three notes. These notes explain how the definition is to be applied.

Note 1 provides that the definition explicitly includes information for meeting not only controlled performance levels, but also characteristics and functions. All items described on the USML are identified by a characteristic or function. Additionally, some descriptions include a performance level. As an example, USML Category VIII(a)(1) controls aircraft that are "bombers" and contains no performance level. The characteristic of the aircraft that is controlled is that it is a bomber, and therefore, any "technical data" peculiar to making an aircraft a bomber is "required."

Note 2 states that, with the exception of "technical data" specifically enumerated on the USML, the jurisdictional status of unclassified "technical data" is the same as that of the commodity to which it is directly related. Specifically, it explains that "technical data" for a part or component of a "defense article" is directly related to that part or component, and if the part or component is subject to the EAR, so is the "technical data."

Note 3 establishes a test for determining if information is peculiarly responsible for meeting or achieving the controlled performance levels, characteristics or functions of a "defense article." It uses the same catch-and-release concept that the Department implemented in the definition of "specially designed." It has a similarly broad catch of all information used in or for use in the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of a "defense article." It has four releases that mirror the "specially designed" releases, and one reserved paragraph for information that the Department determines is generally insignificant. The first release is for information identified in a commodity jurisdiction determination. The second release is reserved. The third release is for information that is identical to information used in a non-defense

article that is in "production," and not otherwise enumerated on the ITAR. The fourth release is for information that was developed with knowledge that it is for both a "defense article" and a non-defense article. The fifth release is information that was developed for general purpose commodities.

In the companion rule, BIS proposes to make Note 3 into a stand-alone definition for "peculiarly responsible" as it has application outside of the definition of "required." The substance of Note 3 and the BIS definition of "peculiarly responsible" are identical. DDTC asks for comments on the placement of this concept.

### 4. Proposed Definitions of Development and Production

The Department proposes to add § 120.47 for the definition of "development" and § 120.48 for the definition of "production." These definitions are currently in Notes 1 and 2 to paragraph (b)(3) in § 120.41, the definition of "specially designed." Because "technical data" is now defined, in part, as information "required" for the "development" or "production" of a "defense article," and these words are now used in the definition of a "defense service," it is appropriate to define these terms. The adoption of these definitions is also done for the purpose of harmonization because these definitions are also used in the EAR and by the Wassenaar Arrangement.

### 5. Revised Definition of Public Domain

The Department proposes to revise the definition of "public domain" in ITAR § 120.11 in order to simplify, update, and introduce greater versatility into the definition. The existing version of ITAR § 120.11 relies on an enumerated list of circumstances through which "public domain" information might be published. The Department believes that this definition is unnecessarily limiting in scope and insufficiently flexible with respect to the continually evolving array of media, whether physical or electronic, through which information may be disseminated.

The proposed definition is intended to identify the characteristics that are common to all of the enumerated forms of publication identified in the current rule—with the exception of ITAR § 120.11(a)(8), which is addressed in a new definition for "technical data that arises during, or results from, fundamental research"—and to present those common characteristics in a streamlined definition that does not require enumerated identification

WASHSTATEC003362

within the ITAR of every current or future qualifying publication scenario. Additionally, the proposed definition incorporates phrases such as "generally accessible" and "without restriction upon its further dissemination" in order to better align the definition found in the EAR and more closely aligned with the definition in the Wassenaar Arrangement control lists.

The proposed definition requires that information be made available to the public without restrictions on its further dissemination. Any information that meets this definition is "public domain." The definition also retains an exemplary list of information that has been made available to the public without restriction and would be considered "public domain." These include magazines, periodicals and other publications available as subscriptions, publications contained in libraries, information made available at a public conference, meeting, seminar, trade show, or exhibition, and information posted on public Web sites. The final example deems information that is submitted to co-authors, editors, or reviewers or conference organizers for review for publication to be "public domain," even prior to actual publication. The relevant restrictions do not include copyright protections or generic property rights in the underlying physical medium.

Paragraph (b) of the revised definition explicitly sets forth the Department's requirement of authorization to release information into the "public domain." Prior to making available "technical data" or software subject to the ITAR, the U.S. government must approve the release through one of the following: (1) The Department; (2) the Department of Defense's Office of Security Review; (3) a relevant U.S. government contracting authority with authority to allow the "technical data" or software to be made available to the public, if one exists; or (4) another U.S. government official with authority to allow the "technical data" or software to be made available to the public.

The requirements of paragraph (b) are not new. Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled "technical data," as defined in § 120.10. A release of "technical data" may occur by disseminating "technical data" at a public conference or trade show, publishing "technical data" in a book or journal article, or posting "technical data" to the Internet. This proposed provision will enhance

compliance with the ITAR by clarifying that "technical data" may not be made available to the public without authorization. Persons who intend to discuss "technical data" at a conference or trade show, or to publish it, must ensure that they obtain the appropriate authorization.

Information that is excluded from the definition of "defense article" in the new § 120.6(b) is not "technical data" and therefore does not require authorization prior to release into the "public domain." This includes information that arises during or results from "fundamental research," as described in the new § 120.49: general scientific, mathematical, or engineering principles commonly taught in schools, and information that is contained in patents.

The Department also proposes to add a new provision to § 127.1 in paragraph (a)(6) to state explicitly that the further dissemination of "technical data" or software that was made available to the public without authorization is a violation of the ITAR, if, and only if, it is done with knowledge that the "technical data" or software was made publicly available without an authorization described in ITAR § 120.11(b)(2). Dissemination of publicly available "technical data" or software is not an export-controlled event, and does not require authorization from the Department, in the absence of knowledge that it was made publicly available without authorization.

"Technical data" and software that is made publicly available without proper authorization remains "technical data" or software and therefore remains subject to the ITAR. As such, the U.S. government may advise a person that the original release of the "technical data" or software was unauthorized and put that person on notice that further dissemination would violate the ITAR.

## 6. Proposed Definition of Technical Data That Arises During, or Results From, Fundamental Research

The Department proposes to move "fundamental research" from the definition of "public domain" in ITAR § 120.11(a)(8) and define "technical data that arises during, or results from, fundamental research" in a new ITAR § 120.49. The Department believes that information that arises during, or results from fundamental research is conceptually distinguishable from the information that would be captured in the revised definition of "public domain" that is proposed in this rule. Accordingly, the Department proposes to address this concept with its own definition. The new definition of

"technical data that arises during, or results from, fundamental research" is consistent with the prior ITAR § 120.11(a)(8), except that the Department has expanded the scope of eligible research to include research that is funded, in whole or in part, by the U.S. government.

## 7. Revised Definition of Export

The Department proposes to revise the definition of "export" in ITAR § 120.17 to better align with the EAR's revised definition of the term and to remove activities associated with a defense article's further movement or release outside the United States, which will now fall within the definition of "reexport" in § 120.19. The definition is revised to explicitly identify that ITAR §§ 126.16 and 126.17 (exemptions pursuant to the Australia and UK Defense Trade Cooperation Treaties) have their own definitions of "export," which apply exclusively to those exemptions. It also explicitly references the new § 120.49, "Activities that are Not Exports, Reexports, or Retransfers," which excludes from ITAR control certain transactions identified therein.

Paragraph (a)(1) is revised to parallel the definition of "export" in proposed paragraph (a)(1) of § 734.13 in the EAR. Although the wording has changed, the scope of the control is the same. The provision excepting travel outside of the United States by persons whose personal knowledge includes "technical data" is removed, but the central concept is unchanged. The "release" of "technical data" to a foreign person while in the United States or while travelling remains a controlled event.

Paragraph (a)(2) includes the control listed in the current § 120.17(a)(4) (transfer of technical data to a foreign person). The proposed revisions replace the word "disclosing" with "releasing," and the paragraph is otherwise revised to parallel proposed paragraph (a)(2) of § 734.13 of the EAR. "Release" is a newly defined concept in § 120.50 that encompasses the previously undefined term "disclose."

Paragraph (a)(3) includes the control listed in the current § 120.17(a)(2) (transfer of registration, control, or ownership to a foreign person of an aircraft, vessel, or satellite). It is revised to parallel proposed paragraph (a)(3) of § 734.13 of the EAR.

Paragraph (a)(4) includes the control listed in the current § 120.17(a)(3) (transfer in the United States to foreign embassies). Paragraph (a)(5) maintains the control on performing a "defense service." Paragraph (a)(6) is added for the "release" or transfer of decryption keys,

passwords, and other items identified in the new paragraph (a)(5) of the revised definition of "technical data" in § 120.10. This paragraph makes "release" or transfer of information securing "technical data" an "export." Making the release of decryption keys and other information securing technical data in an inaccessible or unreadable format an export allows the Department to propose that providing someone with encrypted "technical data" would not be an "export," under certain circumstances. Provision of a decryption key or other information securing "technical data" is an "export" regardless of whether the foreign person has already obtained access to the secured "technical data." Paragraph (a)(6) of the definitions of export and reexport in this rule and the BIS companion rule present different formulations for this control and the agencies request input from the public on which language more clearly describes the control. The agencies intend, however, that the act of providing physical access to unsecured "technical data" (subject to the ITAR) will be a controlled event. The mere act of providing access to unsecured technology (subject to the EAR) will not, however, be a controlled event unless it is done with "knowledge" that such provision will cause or permit the transfer of controlled "technology" in clear text or "software" to a foreign national.

Paragraph (a)(7) is added for the release of information to a public network, such as the Internet. This makes more explicit the existing control in (a)(4), which includes the publication of "technical data" to the Internet due to its inherent accessibility by foreign persons. This means that before posting information to the Internet, you should determine whether the information is "technical data." You should review the USML, and if there is doubt about whether the information is "technical data," you may request a commodity jurisdiction determination from the Department. If so, a license or other authorization, as described in § 120.11(b), will generally be required to post such "technical data" to the Internet. Posting "technical data" to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read the "technical data."

Paragraph (b)(1) is added to clarify existing ITAR controls to explicitly state that disclosing "technical data" to a foreign person is deemed to be an "export" to all countries in which the

foreign person has held citizenship or holds permanent residency.

## 8. Revised Definition of Reexport

The Department proposes to revise the definition of "reexport" in ITAR § 120.19 to better align with the EAR's revised definition and describe transfers of items subject to the jurisdiction of the ITAR between two foreign countries. The activities identified are the same as those in paragraphs (a)(1) through (4) of the revised definition of "export," except that the shipment, release or transfer is between two foreign countries or is to a third country national foreign person outside of the United States.

## 9. Proposed Definition of Release

The Department proposes to add § 120.50, the definition of "release." This term is added to harmonize with the EAR, which has long used the term to cover activities that disclose information to foreign persons. "Release" includes the activities encompassed within the undefined term "disclose." The activities that are captured include allowing a foreign person to inspect a "defense article" in a way that reveals "technical data" to the foreign persons and oral or written exchanges of "technical data" with a foreign person. The adoption of the definition of "release" does not change the scope of activities that constitute an "export" and other controlled transactions under the ITAR.

## 10. Proposed Definition of Retransfer

The Department proposes to add § 120.51, the definition of "retransfer." "Retransfer" is moved out of the definition of "reexport" in § 120.19 to better harmonize with the EAR, which controls "exports," "reexports" and "transfers (in country)" as discrete events. Under this new definition, a "retransfer" occurs with a change of end use or end user within the same foreign territory. Certain activities may fit within the definition of "reexport" and "retransfer," such as the disclosure of "technical data" to a third country national abroad. Requests for both "reexports" and "retransfers" of "defense articles" will generally be processed through a General Correspondence or an exemption.

## 11. Proposed Activities That Are Not Exports, Reexports, or Retransfers

The Department proposes to add § 120.52 to describe those "activities that are not exports, reexports, or retransfers" and do not require authorization from the Department. It is not an "export" to launch items into

space, provide "technical data" or software to U.S. persons while in the United States, or move a "defense article" between the states, possessions, and territories of the United States. The Department also proposes to add a new provision excluding from ITAR licensing requirements the transmission and storage of encrypted "technical data" and software.

The Department recognizes that ITAR-controlled "technical data" may be electronically routed through foreign servers unbeknownst to the original sender. This presents a risk of unauthorized access and creates a potential for inadvertent ITAR violations. For example, email containing "technical data" may, without the knowledge of the sender, transit a foreign country's Internet service infrastructure en route to its intended and authorized final destination. Any access to this data by a foreign person would constitute an unauthorized "export" under ITAR § 120.17. Another example is the use of mass data storage (i.e., "cloud storage"). In this case, "technical data" intended to be resident in cloud storage may, without the knowledge of the sender, be physically stored on a server or servers located in a foreign country or multiple countries. Any access to this data, even if unintended by the sender, would constitute an "export" under ITAR § 120.17.

The intent of the proposed ITAR § 120.52(a)(4) is to clarify that when unclassified "technical data" transits through a foreign country's Internet service infrastructure, a license or other approval is not mandated when such "technical data" is encrypted prior to leaving the sender's facilities and remains encrypted until received by the intended recipient or retrieved by the sender, as in the case of remote storage. The encryption must be accomplished in a manner that is certified by the U.S. National Institute for Standards and Technology (NIST) as compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2). Additionally, the Department proposes that the electronic storage abroad of "technical data" that has been similarly encrypted would not require an authorization, so long as it is not stored in a § 126.1 country or in the Russian Federation. This will allow for cloud storage of encrypted data in foreign countries, so long as the "technical data" remains continuously encrypted while outside of the United States.

## 12. Revised Exemption for the Export of Technical Data for U.S. Persons Abroad

The Department proposes to revise § 125.4(b)(9) to better harmonize controls on the "release" of controlled information to U.S. persons abroad and to update the provisions. The most significant update is that foreign persons authorized to receive "technical data" in the United States will be eligible to receive that same "technical data" abroad, when on temporary assignment on behalf of their employer. The proposed revisions clarify that a person going abroad may use this exemption to "export" "technical data" for their own use abroad. The proposed revisions also clarify that the "technical data" must be secured while abroad to prevent unauthorized "release." It has been long-standing Department practice to hold U.S. persons responsible for the "release" of "technical data" in their possession while abroad. However, given the nature of "technical data" and the proposed exception from licensing for transmission of secured "technical data," the Department has determined it is necessary to implement an affirmative obligation to secure data while abroad.

## 13. Proposed Scope of License

The Department proposes to add § 123.28 to clarify the scope of a license, in the absence of a proviso, and to state that authorizations are granted based on the information provided by the applicant. This means that while providing false information to the U.S. government as part of the application process for the "export", "reexport," or "retransfer" of a "defense article" is a violation of the ITAR, it also may void the license.

## 14. Revised Definition of Defense Service

Proposed revisions of the "defense service" definition were published on April 13, 2011, RIN 1400–AC80 (see "International Traffic in Arms Regulations: Defense Services," 76 FR 20590) and May 24, 2013 (see 78 FR 31444, RIN 1400–AC80). In those rules, the Department explained its determination that the scope of the current definition is overly broad, capturing certain forms of assistance or services that no longer warrant ITAR control.

The Department reviewed comments on that first proposed definition and, when the recommended changes added to the clarity of the regulation, the Department accepted them. For the Department's evaluation of those public comments and recommendations regarding the April 13, 2011, proposed

rule (the first revision), see 78 FR 31444, May 24, 2013. The Department's evaluation of the written comments and recommendations in response to the May 24, 2013 proposed rule (the second revision) follows.

Parties commenting on the second revision expressed concern that the definition of "defense service" in paragraph (a)(1) was premised on the use of "other than public domain information." The observation was made that with the intent of removing from the definition of a "defense service" the furnishing of assistance using "public domain" information, but not basing the assistance on the use of "technical data," the Department was continuing to require the licensing of activities akin to those that were based on the use of "public domain" information. The Department has fully revised paragraph (a)(1) to remove the use of the "other than public domain information" or "technical data" from the determination of whether an activity is a "defense service." Furthermore, the Department has added a new provision declaring that the activities described in paragraph (a)(1) are not a "defense service" if performed by a U.S. person or foreign person in the United States who does not have knowledge of U.S.-origin "technical data" directly related to the "defense article" that is the subject of the assistance or training or another "defense article" described in the same USML paragraph prior to performing the service. A note is added to clarify that a person will be deemed to have knowledge of U.S.-origin "technical data" if the person previously participated in the "development" of a "defense article" described in the same USML paragraph, or accessed (physically or electronically) that "technical data." A note is also added to clarify that those U.S. persons abroad who only received U.S.-origin "technical data" as a result of their activities on behalf of a foreign person are not included within the scope of paragraph (a)(1). A third note is added to clarify that DDTC-authorized foreign person employees in the United States who provide "defense services" on behalf of their U.S. employer are considered to be included with the U.S. employer's authorization, and need not be listed on the U.S. employer's technical assistance agreement or receive a separate authorization for those services. The Department also removed the activities of design, development, and engineering from paragraph (a)(1) and moved them to paragraph (a)(2).

Commenting parties recommended revising paragraph (a)(1) to remove the

provision of "technical data" as a "defense service," because there are already licensing requirements for the "export" of "technical data." The Department confirms that it eliminated from the definition of a "defense service" the act of furnishing "technical data" to a foreign person. Such activity still constitutes an "export" and would require an ITAR authorization. New paragraph (a)(1) is concerned with the furnishing of assistance, whereas the "export" of "technical data" alone, without the furnishing of assistance, is not a "defense service." The "export" of "technical data" requires an authorization (Department of State form DSP–5 or DSP–85) or the use of an applicable exemption.

Commenting parties recommended the definition be revised to explicitly state that it applies to the furnishing of assistance by U.S. persons, or by foreign persons in the United States. The Department partially accepted this recommendation. However, the Department notes that ITAR § 120.1(c) provides that only U.S. persons and foreign governmental entities in the United States may be granted a license or other approval pursuant to the ITAR, and that foreign persons may only receive a "reexport" or "retransfer" approval or approval for brokering activities. Therefore, approval for the performance of a defense service in the United States by a foreign person must be obtained by a U.S. person, such as an employer, on behalf of the foreign person. Regarding a related recommendation, the Department also notes that the furnishing of a type of assistance described by the definition of a "defense service" is not an activity within the Department's jurisdiction when it is provided by a foreign person outside the United States to another foreign person outside the United States on a foreign "defense article" using foreign-origin "technical data."

In response to commenting parties, the Department specified that the examples it provided for activities that are not "defense services" are not exhaustive. Rather, they are provided to answer the more frequent questions the Department receives on the matter. The Department removed these examples from paragraph (b) and included them as a note to paragraph (a).

A commenting party recommended that paragraphs (a)(5) and (a)(6), regarding the furnishing of assistance in the integration of a spacecraft to a launch vehicle and in the launch failure analysis of a spacecraft or launch vehicle, respectively, be removed, and that those activities be described in the USML categories covering spacecraft

and launch vehicles, on the basis that a general definition should not have such program-specific clauses. As discussed in the May 13, 2014 interim final rule revising USML Category XV (79 FR 27180), the Department accepted this recommendation and revised paragraph (f) of USML Category XV and paragraph (i) of USML Category IV accordingly. The revision includes the recommendation of commenting parties to specifically provide that the service must be provided to a foreign person in order for it to be a licensable activity.

Commenting parties recommended the Department define the term "tactical employment," so as to clarify what services would be captured by paragraph (a)(3). The Department determined that employment of a "defense article" should remain a controlled event, due to the nature of items now controlled in the revised USML categories. After ECR, those items that remain "defense articles" are the most sensitive and militarily critical equipment that have a significant national security or intelligence application. Allowing training and other services to foreign nationals in the employment of these "defense articles" without a license would not be appropriate. Therefore, the Department removed the word "tactical" and converted the existing exemption for basic operation of a "defense article," authorized by the U.S. government for "export" to the same recipient, into an exclusion from paragraph (a)(3).

A commenting party recommended the Department address the instance of the integration or installation of a "defense article" into an item, much as it addressed the instance of the integration or installation of an item into a "defense article." Previously, the Department indicated this would be the subject of a separate rule, and addressed the "export" of such items in a proposed rule (see 76 FR 13928), but upon review the Department accepted this recommendation, and revised paragraph (a)(2), the note to paragraph (a)(2), and the note to paragraph (a) accordingly. In addition, the Department has changed certain terminology in the paragraph; instead of referring to the "transfer" of "technical data," the paragraph is premised on the "use" of "technical data." This change is consistent with removing from the definition of a "defense service" the furnishing of "technical data" to a foreign person when there is not also the furnishing of assistance related to that "technical data."

A commenting party requested clarification of the rationale behind

selectively excepting from the "defense services" definition the furnishing of services using "public domain" information. The Department did so in paragraph (a)(1), and now excludes those services performed by U.S. persons who have not previously had access to any U.S. origin "technical data" on the "defense article" being serviced. In contrast, the Department did not do so in paragraphs (a)(2) and (a)(3) and former paragraphs (a)(5) and (a)(6). In the case of paragraph (a)(2), the rationale for not doing so is that the activities involved in the development of a "defense article," or in integrating a "defense article" with another item, inherently involve the advancement of the military capacity of another country and therefore constitute activities over which the U.S. government has significant national security and foreign policy concerns. To the extent that an activity listed in paragraph (a)(2), such as modification or testing, is done in the "development" of a "defense article," such activities constitute "development" and are within the scope of paragraph (a)(2). With regard to paragraph (a)(3), the furnishing of assistance (including training) in the employment of a "defense article" is a type of activity that the Department believes warrants control as a "defense service," due to the inherently military nature of providing training and other services in the employment of a "defense article" (changes to paragraph (a)(3) are described above). The services described in former paragraphs (a)(5) and (a)(6) (and now in USML Categories IV(i) and XV(f)) are pursuant to Public Law 105–261.

A commenting party recommended limiting paragraph (a)(2) to the integration of ECCN 9A515 and 600 series items into defense articles, saying that the regulations should focus on items subject to the EAR with a military or space focus. The Department's focus with this provision is in fact the "defense article." Items that are to be integrated with a "defense article," which may not themselves be defense articles, may be beyond the authority of the Department to regulate. The Department did not accept this recommendation.

A commenting party recommended limiting the definition of integration to changes in the function of the "defense article," and to exclude modifications in fit. For the purposes of illustration, this commenting party used one of the examples provided by the Department in the note to paragraph (a)(2): The manufacturer of the military vehicle will need to know the dimensions and electrical requirements of the dashboard

radio when designing the vehicle. In this instance, paragraph (a)(2) would not apply, as this example addresses the manufacture of a "defense article," which is covered by paragraph (a)(1). If the radio is to be installed in this vehicle is subject to the EAR, the provision to the manufacturer of information regarding the radio is not within the Department's licensing jurisdiction. In an instance of a service entailing the integration of an item with a "defense article," where there would be modification to any of the items, the Department believes such assistance would inherently require the use of "technical data." Therefore, this exclusion would be unacceptably broad. However, the Department has accepted the recommendation to clarify the definition and exclude changes to fit to any of the items involved in the integration activity, provided that such services do not entail the use of "technical data" directly related to the "defense article." Upon review, changes to fit are not an aspect of integration, which is the "engineering analysis needed to unite a 'defense article' and one or more items," and therefore are not captured in paragraph (a)(2). The modifications of the "defense article" to accommodate the fit of the item to be integrated, which are within the activity covered by installation, are only those modifications to the "defense article" that allow the item to be placed in its predetermined location. Any modifications to the design of a "defense article" are beyond the scope of installation. Additionally, while minor modifications may be made to a "defense article" without the activity being controlled under (a)(2) as an integration activity, all modifications of defense articles, regardless of sophistication, are activities controlled under (a)(1) if performed by someone with prior knowledge of U.S.-origin "technical data." "Fit" is defined in ITAR § 120.41: "The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity" (see, Note 4 to paragraph (b)(3)).

Commenting parties recommended revising paragraph (a)(2) to provide that such assistance described therein would be a "defense service" only if U.S.-origin "technical data" is exported. The law and regulations do not mandate this limitation. Section 38 of the Arms Export Control Act provides that the President is authorized to control the "export" of defense articles and defense services. The ITAR, in defining "defense article," "technical data," and "export," does not provide the qualifier "U.S.-

WASHSTATEC003366

origin" (see ITAR §§ 120.6, 120.10, and 120.17, respectively). In the instance described by the commenting party, of the integration of a commercial item into a foreign-origin "defense article," the Department retains jurisdiction when the service is provided by a U.S. person.

A commenting party recommended revising paragraph (a)(2) so that the paragraph (a)(1) exception of the furnishing of assistance using "public domain" information is not nullified by paragraph (a)(2), as most of the activities described in paragraph (a)(1) involve integration as defined in the note to paragraph (a)(2). The Department believes each of the activities described in paragraphs (a)(1) and (a)(2) are sufficiently well defined to distinguish them one from the other. Therefore, the Department does not agree that paragraph (a)(2) nullifies the intention of paragraph (a)(1), and does not accept this recommendation.

A commenting party requested clarification that providing an item subject to the EAR for the purposes of integration into a "defense article" is not a "defense service." The provision of the item in this instance, unaccompanied by assistance in the integration of the item into a "defense article," is not within the scope of "the furnishing of assistance," and therefore is not a defense service.

Commenting parties recommended clarification on whether the servicing of an item subject to the EAR that has been integrated with a "defense article" would be a "defense service." The Department notes that such activity is not a "defense service," provides it as an example of what is not a "defense service" in the note to paragraph (a), and also notes that it would be incumbent on the applicant to ensure that in providing this service, "technical data" directly related to the "defense article" is not used.

Commenting parties expressed concern over the potential negative effect of paragraph (a)(2) and the definition in general on university-based educational activities and scientific communication, and recommended clarification of the relationship between the definition of "defense services" and the exemption for the "export" of "technical data" at ITAR § 125.4(b)(10). Disclosures of "technical data" to foreign persons who are bona-fide and full time regular employees of universities continue to be exports for which ITAR § 125.4(b)(10) is one licensing exemption. The Department believes that, in most cases, the normal duties of a university employee do not encompass the

furnishing of assistance to a foreign person, in the activities described in paragraph (a). Therefore, in the context of employment with the university, the Department does not perceive that the foreign person's use of the "technical data" would be described by ITAR § 120.9(a)(2), or any part of paragraph (a).

In response to the recommendation of one commenting party, the Department added a note clarifying that the installation of an item into a "defense article" is not a "defense service," provided no "technical data" is used in the rendering of the service.

A commenting party recommended clarification of the licensing process for the "export" of an EAR 600 series item that is to be integrated into a "defense article." The Department of Commerce has "export" authority over the 600 series item, and the exporter must obtain a license from the Department of Commerce, if necessary. The exporter must also obtain an approval from the Department of State to provide any "defense service," including integration assistance pursuant to paragraph (a)(2).

A commenting party recommended removing "testing" as a type of "defense service," stating it was not included in the definition of "organizational-level maintenance." In including testing as part of the former definition but not of the latter, the Department does not perceive an inconsistency or conflict. To the extent that certain testing is within the definition of organization-level maintenance, that testing is explicitly excluded, as organizational-level maintenance is not covered under the definition of a "defense service." However, all other testing remains a "defense service." The Department intends for the furnishing of assistance to a foreign person, whether in the United States or abroad, in the testing of defense articles to be an activity requiring Department approval under the conditions of paragraph (a)(1). The Department did not accept this recommendation.

Commenting parties provided recommendations for revising the definitions of "public domain" information and "technical data." Those definitions are proposed in this rule as well. To the extent that evaluation of the proposed changes to "defense services" hinges on these terms, the Department invites commenting parties to submit analyses of the impact of these revised definitions on the revised "defense service" definition in this proposed rule.

Commenting parties recommended clarification of the regulation regarding the furnishing of assistance and training

in organizational-level (basic-level) maintenance. The Department harmonized paragraph (a)(1) and the example regarding organizational-level maintenance by revising the Note to Paragraph (a), which sets forth activities that are not "defense services," so that it specifically provides that "the furnishing of assistance (including training) in organizational-level (basic-level) maintenance of a defense article" is an example of an activity that is not a defense service.

In response to commenting parties, the Department clarifies that the example of employment by a foreign person of a natural U.S. person as not constituting a "defense service" is meant to address, among other scenarios, the instance where such a person is employed by a foreign defense manufacturer, but whose employment in fact does not entail the furnishing of assistance as described in ITAR § 120.9(a)(2). By "natural person," the Department means a human being, as may be inferred from the definition of "person" provided in ITAR § 120.14.

In response to the recommendation of a commenting party, the Department confirms that, as stated in a Department of Commerce notice, "Technology subject to the EAR that is used with technical data subject to the ITAR that will be used under the terms of a Technical Assistance Agreement (TAA) or Manufacturing License Agreement (MLA) and that would otherwise require a license from [the Department of Commerce] may all be exported under the TAA or MLA" (see 78 FR 22660). In DDTC publication *Guidelines for Preparing Electronic Agreements (Revision 4.2)*, Section 20.1.d., the following conditions are stipulated: The technology subject to the EAR will be used with "technical data" subject to the ITAR and described in the agreement, and the technology subject to the EAR will be used under the terms of a TAA or MLA (see http://www.pmddtc.state.gov/licensing/agreement.html).

## Request for Comments

The Department invites public comment on any of the proposed definitions set forth in this rulemaking. With respect to the revisions to ITAR § 120.17, the Department recognizes the increasingly complex nature of telecommunications infrastructure and the manner in which data is transmitted, stored, and accessed, and accordingly seeks public comment with special emphasis on: (1) How adequately the proposed regulations address the technical aspects of data transmission and storage; (2) whether

WASHSTATEC003367

the proposed regulations mitigate unintended or unauthorized access to transmitted or stored data; and (3) whether the proposed regulations impose an undue financial or compliance burden on the public.

The public is also asked to comment on the effective date of the final rule. Export Control Reform rules that revised categories of the USML and created new 600 series ECCN have had a six-month delayed effective date to allow for exporters to update the classification of their items. In general, rules effecting export controls have been effective on the date of publication, due to the impact on national security and foreign policy. As this proposed rule and the companion proposed rule from the Bureau of Industry and Security revise definitions within the ITAR and the EAR and do not make any changes to the USML or CCL, the Department proposes (should the proposed rule be adopted) a 30-day delayed effective date to allow exporters to ensure continued compliance.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the U.S. government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA, the Department is publishing this rule with a 60-day provision for public comment and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, there is no requirement for an analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a major rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in: (1) An annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

The Department does not believe this rulemaking will have an annual effect on the economy of $100,000,000 or more, nor will it result in a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions, or have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets. The proposed means of solving the issue of data protection are both familiar to and extensively used by the affected public in protecting sensitive information.

### Executive Orders 12372 and 13132

This proposed amendment will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this proposed amendment does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this proposed amendment.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The executive orders stress the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the proposed rule has been reviewed by the Office of Management and Budget (OMB).

### Executive Order 12988

The Department of State has reviewed the proposed amendment in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

### Executive Order 13175

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

### Paperwork Reduction Act

This rule does not impose any new reporting or recordkeeping requirements subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35; however, the Department of State seeks public comment on any unforeseen potential for increased burden.

## List of Subjects

### 22 CFR 120 and 125

Arms and munitions, Classified information, Exports.

### 22 CFR 123

Arms and munitions, Exports, Reporting and recordkeeping requirements.

### 22 CFR Part 127

Arms and munitions, Exports, Crime, Law, Penalties, Seizures and forfeitures.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 120, 123, 125, and 127 are proposed to be amended as follows:

## PART 120—PURPOSE AND DEFINITIONS

■ 1. The authority citation for part 120 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2794; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 120.6 is amended by designating the current text as paragraph (a), revising the first sentence of newly designated paragraph (a), and adding paragraph (b) to read as follows:

§ 120.6 Defense article.

(a) *Defense article* means any item, software, or technical data designated in § 121.1 of this subchapter. * * *

(b) The following are not defense articles and thus not subject to the ITAR:

(1) [Reserved]

(2) [Reserved]

(3) Information and software that:

(i) Are in the public domain, as described in § 120.11;

(ii) Arise during, or result from, fundamental research, as described in § 120.46;

(iii) Concern general scientific, mathematical, or engineering principles commonly taught in schools, and released by instruction in a catalog course or associated teaching laboratory of an academic institution; or

(iv) Appear in patents or open (published) patent applications available from or at any patent office, unless covered by an invention secrecy order.

Note to paragraph (b): Information that is not within the scope of the definition of technical data (see § 120.10) and not directly related to a defense article, or otherwise described on the USML, is not subject to the ITAR.

■ 3. Section 120.9 is revised to read as follows:

§ 120.9 Defense service.

(a) *Defense service* means:

(1) The furnishing of assistance (including training) to a foreign person (see § 120.16), whether in the United States or abroad, in the production, assembly, testing, intermediate- or depot-level maintenance (see § 120.38), modification, demilitarization, destruction, or processing of a defense article (see § 120.6), by a U.S. person or foreign person in the United States, who has knowledge of U.S.-origin technical data directly related to the defense article that is the subject of the assistance, prior to performing the service;

Note 1 to paragraph (a)(1): "Knowledge of U.S.-origin technical data" for purposes of paragraph (a)(1) can be established based on all the facts and circumstances. However, a person is deemed to have "knowledge of

U.S.-origin technical data" directly related to a defense article if the person participated in the development of a defense article described in the same USML paragraph or accessed (physically or electronically) technical data directly related to the defense article that is the subject of the assistance, prior to performing the service.

Note 2 to paragraph (a)(1): U.S. persons abroad who only receive U.S.-origin technical data as a result of their activities on behalf of a foreign person are not included within paragraph (a)(1).

Note 3 to paragraph (a)(1): Foreign person employees in the United States providing defense services as part of Directorate of Defense Trade Controls-authorized employment need not be listed on the U.S. employer's technical assistance agreement or receive separate authorization to perform defense services on behalf of their authorized U.S. employer.

(2) The furnishing of assistance (including training) to a foreign person (see § 120.16), whether in the United States or abroad, in the development of a defense article, or the integration of a defense article with any other item regardless of whether that item is subject to the ITAR or technical data is used;

Note to paragraph (a)(2): "Integration" means any engineering analysis (see § 125.4(c)(5) of this subchapter) needed to unite a defense article and one or more items. Integration includes the introduction of software to enable operation of a defense article, and the determination during the design process of where an item will be installed (e.g. integration of a civil engine into a destroyer that requires changes or modifications to the destroyer in order for the civil engine to operate properly; not plug and play). Integration is distinct from "installation." Installation means the act of putting an item in its predetermined place without the use of technical data or any modifications to the defense article involved, other than to accommodate the fit of the item with the defense article (e.g., installing a dashboard radio into a military vehicle where no modifications (other than to accommodate the fit of the item) are made to the vehicle, and there is no use of technical data. The "fit" of an item is defined by its ability to physically interface or connect with or become an integral part of another item. (see § 120.41).

(3) The furnishing of assistance (including training) to a foreign person (see § 120.16), regardless of whether technical data is used, whether in the United States or abroad, in the employment of a defense article, other than basic operation of a defense article authorized by the U.S. government for export to the same recipient;

(4) Participating in or directing combat operations for a foreign person (see § 120.16), except as a member of the regular military forces of a foreign

nation by a U.S. person who has been drafted into such forces; or

(5) The furnishing of assistance (including training) to the government of a country listed in § 126.1 of this subchapter in the development, production, operation, installation, maintenance, repair, overhaul or refurbishing of a defense article or a part component, accessory or attachments specially designed for a defense article.

Note to paragraph (a): The following are examples of activities that are not defense services:

1. The furnishing of assistance (including training) in organizational-level (basic-level) maintenance (see § 120.38) of a defense article;

2. Performance of services by a U.S. person in the employment of a foreign person, except as provided in this paragraph;

3. Servicing of an item subject to the EAR (see § 120.42) that has been integrated or installed into a defense article, or the servicing of an item subject to the EAR into which a defense article has been installed or integrated, without the use of technical data, except as described in paragraph (a)(5) of this section;

4. The installation of any item into a defense article, or the installation of a defense article into any item;

5. Providing law enforcement, physical security, or personal protective services (including training and advice) to or for a foreign person (if such services necessitate the export of a defense article a license or other approval is required for the export of the defense article, and such services that entail the employment or training in the employment of a defense article are addressed in paragraph (a)(3) of this section);

6. The furnishing of assistance by a foreign person not in the United States;

7. The furnishing of medical, logistical (other than maintenance), translation, financial, legal, scheduling, or administrative services;

8. The furnishing of assistance by a foreign government to a foreign person in the United States, pursuant to an arrangement with the Department of Defense; and

9. The instruction in general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities.

(b) [Reserved]

■ 4. Section 120.10 is revised to read as follows:

§ 120.10 Technical data.

(a) *Technical data* means, except as set forth in paragraph (b) of this section:

(1) Information required for the development (see § 120.47) (including design, modification, and integration design), production (see § 120.48) (including manufacture, assembly, and integration), operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article. Technical data may be in any tangible or intangible form, such as written or

oral communications, blueprints, drawings, photographs, plans, diagrams, models, formulae, tables, engineering designs and specifications, computer-aided design files, manuals or documentation, electronic media or information gleaned through visual inspection;

Note to paragraph (a)(1): The modification of an existing item creates a new item and technical data for the modification is technical data for the development of the new item.

(2) Information enumerated on the USML (i.e., not controlled pursuant to a catch-all USML paragraph);

(3) Classified information for the development, production, operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article or a 600 series item subject to the EAR;

(4) Information covered by an invention secrecy order; or

(5) Information, such as decryption keys, network access codes, or passwords, that would allow access to other technical data in clear text or software (see § 127.1(b)(4) of this subchapter).

(b) Technical data does not include:

(1) Non-proprietary general system descriptions;

(2) Information on basic function or purpose of an item; or

(3) Telemetry data as defined in note 3 to USML Category XV(f) (see § 121.1 of this subchapter).

■ 5. Section 120.11 is revised to read as follows:

§ 120.11  Public domain.

(a) Except as set forth in paragraph (b) of this section, unclassified information and software are in the public domain, and are thus not technical data or software subject to the ITAR, when they have been made available to the public without restrictions upon their further dissemination such as through any of the following:

(1) Subscriptions available without restriction to any individual who desires to obtain or purchase the published information;

(2) Libraries or other public collections that are open and available to the public, and from which the public can obtain tangible or intangible documents;

(3) Unlimited distribution at a conference, meeting, seminar, trade show, or exhibition, generally accessible to the interested public;

(4) Public dissemination (i.e., unlimited distribution) in any form (e.g., not necessarily in published form), including posting on the Internet on sites available to the public; or

(5) Submission of a written composition, manuscript or presentation to domestic or foreign co-authors, editors, or reviewers of journals, magazines, newspapers or trade publications, or to organizers of open conferences or other open gatherings, with the intention that the compositions, manuscripts, or publications will be made publicly available if accepted for publication or presentation.

(b) Technical data or software, whether or not developed with government funding, is not in the public domain if it has been made available to the public without authorization from:

(1) The Directorate of Defense Trade Controls;

(2) The Department of Defense's Office of Security Review;

(3) The relevant U.S. government contracting entity with authority to allow the technical data or software to be made available to the public; or

(4) Another U.S. government official with authority to allow the technical data or software to be made available to the public.

Note 1 to § 120.11: Section 127.1(a)(6) of this subchapter prohibits, without written authorization from the Directorate of Defense Trade Controls, U.S. and foreign persons from exporting, reexporting, retransferring, or otherwise making available to the public technical data or software if such person has knowledge that the technical data or software was made publicly available without an authorization described in paragraph (b) of this section.

Note 2 to § 120.11: An export, reexport, or retransfer of technical data or software that was made publicly available by another person without authorization is not a violation of this subchapter, except as described in § 127.1(a)(6) of this subchapter.

■ 6. Section 120.17 is revised to read as follows:

§ 120.17  Export.

(a) Except as set forth in § 120.52, § 126.16, or § 126.17 of this subchapter, export means:

(1) An actual shipment or transmission out of the United States, including the sending or taking of a defense article outside of the United States in any manner;

(2) Releasing or otherwise transferring technical data or software (source code or object code) to a foreign person in the United States (a "deemed export");

(3) Transferring by a person in the United States of registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR to a foreign person;

(4) Releasing or otherwise transferring a defense article to an embassy or to any

agency or subdivision of a foreign government, such as a diplomatic mission, in the United States;

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad;

(6) Releasing or otherwise transferring information, such as decryption keys, network access codes, passwords, or software, or providing physical access, that would allow access to other technical data in clear text or software to a foreign person regardless of whether such data has been or will be transferred; or

(7) Making technical data available via a publicly available network (e.g., the Internet).

(b) Any release in the United States of technical data or software to a foreign person is a deemed export to all countries in which the foreign person has held citizenship or holds permanent residency.

■ 7. Section 120.19 is revised to read as follows:

§ 120.19  Reexport.

(a) Except as set forth in § 120.52, reexport means:

(1) An actual shipment or transmission of a defense article from one foreign country to another foreign country, including the sending or taking of a defense article to or from such countries in any manner;

(2) Releasing or otherwise transferring technical data or software to a foreign person of a country other than the foreign country where the release or transfer takes place (a "deemed reexport");

(3) Transferring by a person outside of the United States of registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR to a foreign person outside the United States; or

(4) Releasing or otherwise transferring outside of the United States information, such as decryption keys, network access codes, password, or software, or providing physical access, that would allow access to other technical data in clear text or software to a foreign person regardless of whether such data has been or will be transferred.

(b) [Reserved]

§ 120.41  [Amended]

■ 8. Section 120.41 is amended by reserving Note 1 to paragraph (b)(3) and Note 2 to paragraph (b)(3).

■ 9. Section 120.46 is added to read as follows:

§ 120.46  Required.

(a) As applied to technical data, the term required refers to only that portion

of technical data that is peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions. Such required technical data may be shared by different products.

Note 1 to paragraph (a): The references to "characteristics" and "functions" are not limited to entries on the USML that use specific technical parameters to describe the scope of what is controlled. The "characteristics" and "functions" of an item listed are, absent a specific regulatory definition, a standard dictionary's definition of the item. For example, USML Category VIII(a)(1) controls aircraft that are "bombers." No performance level is identified in the entry, but the characteristic of the aircraft that is controlled is that it is a bomber. Thus, any technical data, regardless of significance, peculiar to making an aircraft a bomber as opposed to, for example, an aircraft controlled under ECCN 9A610.a or ECCN 9A991.a, would be technical data required for a bomber and thus controlled under USML Category VIII(i).

Note 2 to paragraph (a): The ITAR and the EAR often divide within each set of regulations or between each set of regulations:

1. Controls on parts, components, accessories, attachments, and software; and

2. Controls on the end items, systems, equipment, or other items into which those parts, components, accessories, attachments, and software are to be installed or incorporated.

With the exception of technical data specifically enumerated on the USML, the jurisdictional status of unclassified technical data is the same as the jurisdictional status of the defense article or item subject to the EAR to which it is directly related. Thus, if technology is directly related to the production of an ECCN 9A610.x aircraft component that is to be integrated or installed in a USML Category VIII(a) aircraft, the technology is controlled under ECCN 9E610, not USML Category VIII(i).

Note 3 to paragraph (a): Technical data is "peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions" if it is used in or for use in the development (including design, modification, and integration design), production (including manufacture, assembly, and integration), operation, installation, maintenance, repair, overhaul, or refurbishing of a defense article unless:

1. The Department of State has determined otherwise in a commodity jurisdiction determination.

2. [Reserved]

3. It is identical to information used in or with a commodity or software that:

i. is or was in production (i.e., not in development); and

ii. Is not a defense article;

4. It was or is being developed with knowledge that it is for or would be for use in or with both defense articles and commodities not on the U.S. Munitions List; or

5. It was or is being developed for use in or with general purpose commodities or software (i.e., with no knowledge that it would be for use in or with a particular commodity).

(b) [Reserved]

■ 10. Section 120.47 is added to read as follows:

§ 120.47  Development.

*Development* is related to all stages prior to serial production, such as: design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, and layouts. Development includes modification of the design of an existing item.

■ 11. Section 120.48 is added to read as follows:

§ 120.48  Production.

*Production* means all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. This includes "serial production" where commodities have passed production readiness testing (i.e., an approved, standardized design ready for large scale production) and have been or are being produced on an assembly line for multiple commodities using the approved, standardized design.

■ 12. Section 120.49 is added to read as follows:

§ 120.49  Technical data that arises during, or results from, fundamental research.

(a) *Technical Data arising during, or resulting from, fundamental research.* Unclassified information that arises during, or results from, fundamental research and is intended to be published is not technical data when the research is:

(1) Conducted in the United States at an accredited institution of higher learning located; or

(2) Funded, in whole or in part, by the U.S. government.

Note 1 to paragraph (a): The inputs used to conduct fundamental research, such as information, equipment, or software, are not "technical data that arises during or results from fundamental research" except to the extent that such inputs are technical data that arose during or resulted from earlier fundamental research.

Note 2 to paragraph (a): There are instances in the conduct of research, whether fundamental, basic, or applied, where a researcher, institution, or company may decide to restrict or protect the release or publication of technical data contained in research results. Once a decision is made to

maintain such technical data as restricted or proprietary, the technical data becomes subject to the ITAR.

(b) *Prepublication review.* Technical data that arises during, or results from, fundamental research is intended to be published to the extent that the researchers are free to publish the technical data contained in the research without any restriction or delay, including U.S. government-imposed access and dissemination controls or research sponsor proprietary information review.

Note 1 to paragraph (b): Although technical data arising during or resulting from fundamental research is not considered "intended to be published" if researchers accept restrictions on its publication, such technical data will nonetheless qualify as technical data arising during or resulting from fundamental research once all such restrictions have expired or have been removed.

Note 2 to paragraph (b): Research that is voluntarily subjected to U.S. government prepublication review is considered intended to be published for all releases consistent with any resulting controls.

Note 3 to paragraph (b): Technical data resulting from U.S. government funded research which is subject to government-imposed access and dissemination or other specific national security controls qualifies as technical data resulting from fundamental research, provided that all government-imposed national security controls have been satisfied.

(c) *Fundamental research definition.* Fundamental research means basic or applied research in science and engineering, the results of which ordinarily are published and shared broadly within the scientific community. This is distinguished from proprietary research and from industrial development, design, production, and product utilization, the results of which ordinarily are restricted for proprietary or national security reasons.

(1) *Basic research* means experimental or theoretical work undertaken principally to acquire new knowledge of the fundamental principles of phenomena or observable facts, not primarily directed towards a specific practical aim or objective.

(2) *Applied research* means the effort that:

(i) Normally follows basic research, but may not be severable from the related basic research;

(ii) Attempts to determine and exploit the potential of scientific discoveries or improvements in technology, materials, processes, methods, devices, or techniques; and

(iii) Attempts to advance the state of the art.

WASHSTATEC003371

■ 13. Section 120.50 is added to read as follows:

## § 120.50  Release.

(a) Except as set forth in § 120.52, technical data and software are released through:

(1) Visual or other inspection by foreign persons of a defense article that reveals technical data or software to a foreign person; or

(2) Oral or written exchanges with foreign persons of technical data in the United States or abroad.

(b) [Reserved]

■ 14. Section 120.51 is added to read as follows:

## § 120.51  Retransfer.

Except as set forth in § 120.52 of this subchapter, a *retransfer* is a change in end use or end user of a defense article within the same foreign country.

■ 15. Section 120.52 is added to read as follows:

## § 120.52  Activities that are not exports, reexports, or retransfers.

(a) The following activities are not exports, reexports, or retransfers:

(1) Launching a spacecraft, launch vehicle, payload, or other item into space;

(2) While in the United States, releasing technical data or software to a U.S. person;

(3) Shipping, moving, or transferring defense articles between or among the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands or any territory, dependency, or possession of the United States as listed in Schedule C, Classification Codes and Descriptions for U.S. Export Statistics, issued by the Bureau of the Census; and

(4) Sending, taking, or storing technical data or software that is:

(i) Unclassified;

(ii) Secured using end-to-end encryption;

(iii) Secured using cryptographic modules (hardware or software) compliant with the Federal Information Processing Standards Publication 140–2 (FIPS 140–2) or its successors, supplemented by software implementation, cryptographic key management and other procedures and controls that are in accordance with guidance provided in current U.S. National Institute for Standards and Technology publications; and

(iv) Not stored in a country proscribed in § 126.1 of this subchapter or the Russian Federation.

(b) For purposes of this section, end-to-end encryption means the provision of uninterrupted cryptographic

protection of data between an originator and an intended recipient, including between an individual and himself or herself. It involves encrypting data by the originating party and keeping that data encrypted except by the intended recipient, where the means to access the data in unencrypted form is not given to any third party, including to any Internet service provider, application service provider or cloud service provider.

(c) The ability to access technical data or software in encrypted form that satisfies the criteria set forth in paragraph (a)(4) of this section does not constitute the release or export of such technical data or software.

Note to § 120.52: See § 127.1 of this subchapter for prohibitions on the release or transfer of technical data or software, in any form, to any person with knowledge that a violation will occur.

## PART 123—LICENSES FOR THE EXPORT AND TEMPORARY IMPORT OF DEFENSE ARTICLES

■ 16. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec. 1205(a), Pub. L. 107–228; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 17. Section 123.28 is added to read as follows:

## § 123.28  Scope of a license.

Unless limited by a condition set out in a license, the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the license application and any letters of explanation. DDTC grants licenses in reliance on representations the applicant made in or submitted in connection with the license application, letters of explanation, and other documents submitted.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 18. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 19. Section 124.1 is amended by adding paragraph (e) to read as follows:

## § 124.1  Manufacturing license agreements and technical assistance agreements.

\*      \*      \*      \*      \*

(e) Unless limited by a condition set out in an agreement. the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the agreement, license, and any letters of explanation. DDTC approves agreements and grants licenses in reliance on representations the applicant made in or submitted in connection with the agreement, letters of explanation, and other documents submitted.

## PART 125—LICENSES FOR THE EXPORT OF TECHNICAL DATA AND CLASSIFIED DEFENSE ARTICLES

■ 20. The authority citation for part 125 continues to read as follows:

**Authority:** Secs. 2 and 38, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778); 22 U.S.C. 2651a; E.O. 13637, 78 FR 16129.

■ 21. Section 125.4 is amended by revising paragraph (b)(9) to read as follows:

## § 125.4  Exemptions of general applicability.

\*      \*      \*      \*      \*

(b) \*    \*    \*

(9) Technical data, including classified information, regardless of media or format, exported by or to a U.S. person or a foreign person employee of a U.S. person, travelling or on temporary assignment abroad subject to the following restrictions:

(i) Foreign persons may only export or receive such technical data as they are authorized to receive through a separate license or other approval.

(ii) The technical data exported under this authorization is to be possessed or used solely by a U.S. person or authorized foreign person and sufficient security precautions must be taken to prevent the unauthorized release of the technology. Such security precautions include encryption of the technical data. the use of secure network connections, such as virtual private networks, the use of passwords or other access restrictions on the electronic device or media on which the technical data is stored, and the use of firewalls and other network security measures to prevent unauthorized access.

(iii) The U.S. person is an employee of the U.S. government or is directly employed by a U.S. person and not by a foreign subsidiary.

(iv) Technical data authorized under this exception may not be used for foreign production purposes or for defense services unless authorized through a license or other approval.

(v) The U.S. employer of foreign persons must document the use of this exemption by foreign person employees.

WASHSTATEC003372


including the reason that the technical data is needed by the foreign person for their temporary business activities abroad on behalf of the U.S. person.

(vi) Classified information is sent or taken outside the United States in accordance with the requirements of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case such guidance must be followed).

\* \* \* \* \*

## PART 127—VIOLATIONS AND PENALTIES

■ 22. The authority citation for part 127 continues to read as follows:

**Authority:** Sections 2, 38, and 42, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2791); 22 U.S.C. 401; 22 U.S.C. 2651a; 22 U.S.C. 2779a; 22 U.S.C. 2780; E.O. 13637, 78 FR 16129.

■ 23. Section 127.1 is amended by adding paragraphs (a)(6) and (b)(4) to read as follows:

### § 127.1  Violations.

(a) \* \* \*

(6) To export, reexport, retransfer, or otherwise make available to the public technical data or software if such person has knowledge that the technical data or software was made publicly available without an authorization described in § 120.11(b) of this subchapter.

(b) \* \* \*

(4) To release or otherwise transfer information, such as decryption keys, network access codes, or passwords, that would allow access to other technical data in clear text or to software that will result, directly or indirectly, in an unauthorized export, reexport, or retransfer of the technical data in clear text or software. Violation of this provision will constitute a violation to the same extent as a violation in connection with the export of the controlled technical data or software.

\* \* \* \* \*

Dated: May 20, 2015.

**Rose E. Gottemoeller,**

*Under Secretary, Arms Control and International Security, Department of State.*

[FR Doc. 2015–12844 Filed 6–2–15; 8:45 am]

**BILLING CODE 4710-25-P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Parts 91 and 576

[Docket No. FR–5474–N–02]

RIN 2506–AC29

### Emergency Solutions Grants (ESG) Program, Solicitation of Comment on Specific Issues

**AGENCY:** Office of the Assistant Secretary for Community Planning and Development, HUD.

**ACTION:** Regulatory review; request for comments.

**SUMMARY:** On December 5, 2011, HUD published an interim rule entitled "Homeless Emergency Assistance and Rapid Transition to Housing: Emergency Solutions Grants Program and Consolidated Plan Conforming Amendments" (interim rule). The comment period for the interim rule ended on February 3, 2012. Because recipients and subrecipients have now had more experience implementing the interim rule, HUD recognizes that they may have additional input and comments for HUD to consider in its development of the ESG final rule (final rule). Therefore, this document takes comments for 60 days to allow additional time for public input, and for HUD to solicit specific comment on certain issues.

**DATES:** *Comment due date:* August 3, 2015.

**ADDRESSES:** Interested persons are invited to submit comments responsive to this request for information to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 7th Street SW., Room 10276, Washington, DC 20410–7000. Communications must refer to the above docket number and title and should contain the information specified in the "Request for Comments" of this notice.

*Electronic Submission of Comments.* Interested persons may submit comments electronically through the Federal eRulemaking Portal at *http:// www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available to the public. Comments submitted electronically through the *http:// www.regulations.gov* Web site can be viewed by interested members of the public. Commenters should follow instructions provided on that site to submit comments electronically.

*Submission of Hard Copy Comments.* Comments may be submitted by mail or hand delivery. To ensure that the information is fully considered by all of the reviewers, each commenter submitting hard copy comments, by mail or hand delivery, should submit comments or requests to the address above, addressed to the attention of the Regulations Division. Due to security measures at all federal agencies, submission of comments or requests by mail often result in delayed delivery. To ensure timely receipt of comments, HUD recommends that any comments submitted by mail be submitted at least 2 weeks in advance of the public comment deadline. All hard copy comments received by mail or hand delivery are a part of the public record and will be posted to *http:// www.regulations.gov* without change.

**Note:** To receive consideration as public comments, comments must be submitted through one of the two methods specified above. Again, all submissions must refer to the docket number and title of the rule.

*No Facsimile Comments.* Facsimile (fax) comments are not acceptable.

*Public Inspection of Comments.* All comments submitted to HUD regarding this notice will be available, without charge, for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the above address. Due to security measures at the HUD Headquarters building, an advance appointment to review the documents must be scheduled by calling the Regulation Division at 202–708–3055 (this is not a toll-free number). Copies of all comments submitted will also be available for inspection and downloading at *http:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Norm Suchar, Director, Office of Special Needs Assistance Programs, Office of Community Planning and Development, Department of Housing and Urban Development, 451 7th Street SW., Room 7262, Washington, DC 20410–7000, telephone number (202) 708–4300 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

WASHSTATEC003373

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
     Plaintiffs,

v.                                   No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
     Defendants.

---

**<u>DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>**

WASHSTATEC003374

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................................1

ARGUMENT............................................................................................................................2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed..............................................2

        A.    The First Amendment Does Not Apply To The Export Of CAD
               Files That Function To Automatically Create A Firearm Or Its
               Components ...............................................................................................2

        B.    If the First Amendment Applies, This Regulation Survives First
               Amendment Scrutiny. ...............................................................................5

        C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad................................8

        D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.....................10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed.........................................13

        A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge............................13

               1.    Defense Distributed Has Not Suffered a Harm to Second
                      Amendment Interests. ...............................................................................14

               2.    SAF and Conn Williamson Have Failed to Plead Sufficient
                      Allegations of Injury and Any Second Amendment Injury is Not
                      Traceable to Defendants' Acts. ...............................................................15

        B.    Plaintiffs' Second Amendment Challenge Fails on the Merits....................................16

III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...........................................19

CONCLUSION.........................................................................................................................20

WASHSTATEC003375

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ........................................................................ 15

*Bernstein v. U.S. Dep't. of Justice*,
  192 F.3d 1308 (9th Cir. 1999) ....................................................................... 4

*Bernstein v. U.S. Dep't. of Justice*,
  176 F.3d 1132 (9th Cir. 1999) ....................................................................... 4

*Bonds v. Tandy*,
  457 F.3d 409 (5th Cir. 2006) ........................................................................ 14

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .................................................................................. 8, 9

*Brockett v. Spokane Arcades*,
  472 U.S. 491 (1985) ..................................................................................... 9

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) .................................................................................... 17

*Brown v. Livingston*,
  524 F. Appx. 111 (5th Cir. 2013) ................................................................ 15

*Bullfrog Films v. Wick*,
  646 F. Supp. 492 (C.D. Cal. 1986) ............................................................... 4

*Capital Cities/ABC, Inc. v. Brady*,
  740 F. Supp. 1007 (S.D.N.Y. 1990) ............................................................ 11

*Catholic Leadership Coal. of Tex. v. Reisman*,
  764 F.3d 409 (5th Cir. 2014) ....................................................................... 10

*CFTC v. Vartuli*,
  228 F.3d 94 (2d Cir. 2000) ......................................................................... 3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ........................................................................... 10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
  541 U.S. 774 (2004) ............................................................................... 11, 12

WASHSTATEC003376

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ................................................................................3

*Def. Distributed v. Dep't of State,*
    121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ...........................................*passim*

*Def. Distributed v. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
    rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
    *certiorari* denied, 138 S. Ct. 638 (2018) ....................................................*passim*

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...........................................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) .........................................................................16

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ........................................................................13, 14

*Fontenot v. McCraw,*
    777 F.3d 741 (5th Cir. 2015) .............................................................................14

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ...........................................................................................11

*Freedman v. State of Md.,*
    380 U.S. 51 (1965) .............................................................................................11

*FW/PBS v. City of Dallas,*
    493 U.S. 215 (1990) ...........................................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988) ...........................................................................................10

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................................4, 5, 6

*Hotze v. Burwell,*
    784 F.3d 984 (5th Cir. 2015) .............................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) .............................................................................................3

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ...............................................................................5

WASHSTATEC003377

*Karn v. U.S. Dept. of State,*
   925 F.Supp. 1 (D.D.C. 1996) ................................................................................................. 10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
   604 F. Supp. 280 (D.D.C. 1984) ............................................................................................... 4

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................................................... 14

*Mance v. Sessions,*
   880 F.3d 183 (5th Cir. 2018) .......................................................................................... *passim*

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) ............................................................................................................. 6

*Mather v. Central Pac. Bank,*
   2014 WL 5580963 (D. Haw. 2014) ....................................................................................... 15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ................................................................................................................. 9

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) ................................................................................................. 10

*Miss. State Democratic Party v. Barbour,*
   529 F.3d 538 (5th Cir. 2008) ................................................................................................. 14

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) ..................................................................................................................... 8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
   700 F.3d 185 (5th Cir. 2012) ..................................................................................... 15, 16, 17

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ......................................................................................................... 11, 12

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) ............................................................................................................... 11

*Oller v. Roussel,*
   609 F. App'x 770 (5th Cir. 2015) ........................................................................................... 12

*Petro-Chem Processing v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ............................................................................................... 16

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) ............................................................................................... 8, 18

iv

WASHSTATEC003378

*Pub. Citizen, Inc. v. Bomer,*
  274 F.3d 212 (5th Cir. 2001) ................................................................. 14, 15

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015) ............................................................................ 5, 6

*S. Utah Wild. Alliance v. Palma,*
  2011 WL 2565198 (D. Utah 2011) ............................................................ 15

*Sec'y of State of Md. v. Munson,*
  467 U.S. 947 (1984) ................................................................................... 9

*Second Amendment Arms v. City of Chicago,*
  135 F. Supp. 3d 743 (N.D. Ill. 2015) ........................................................ 14

*Shelby Cty. v. Holder,*
  133 S. Ct. 2612 (2013) .............................................................................. 17

*Se. Promotions v. Conrad,*
  420 U.S. 546 (1975) .................................................................................. 12

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) .............................................................................. 14

*Stagg P.C. v. U.S. Dep't of State,*
  158 F. Supp. 3d 203 (S.D.N.Y. 2016),
  *aff'd,* 673 F. App'x 93 (2d Cir. 2016),
  *cert. denied,* 138 S. Ct. 721 (2018) ......................................................... 6, 9

*Teixeira v. County of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ........................................................... 13, 14, 17

*Texas v. Johnson,*
  491 U.S. 397 (1989) .................................................................................... 2

*U.nited States v. Hicks,*
  980 F.2d 963 (5th Cir. 1992) ...................................................................... 8, 9

*United States v. Hsu,*
  364 F.3d 192 (4th Cir. 2004) ........................................................................ 20

*United States v. Chi Mak,*
  683 F.3d 1126 (9th Cir. 2012) ................................................................ *passim*

*United States v. Edler Indus., Inc.,*
  579 F.2d 516 (9th Cir. 1978) ..................................................................... 6, 11

v

WASHSTATEC003379

*United States v. Martinez*,
  904 F.2d 601 (11th Cir. 1990) ...................................................................................... 7

*United States v. Posey*,
  864 F.2d 1487 (9th Cir. 1989) ...................................................................................... 6

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................................... 20

*United States v. Zhen Zhou Wu*,
  711 F.3d 1 (1st Cir. 2013),
  *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013) .............. 2, 20

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) ......................................................................................... 4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*,
  454 U.S. 464 (1982) .................................................................................................... 16

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ...................................................................................................... 9

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ................................................................................ 3, 4, 9

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................................... 8

*Williams-Yulee v. Florida Bar*,
  135 S. Ct. 1656 (2015) .................................................................................................. 8

## STATUTES

18 U.S.C. § 2339B ............................................................................................................. 5

22 U.S.C. § 2778…………….. ................................................................................... *passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.* ................................................................................................... 2

22 C.F.R. § 120.4 .......................................................................................................... 2, 8

22 C.F.R. § 120.6 ...................................................................................................... 2, 7, 20

22 C.F.R. § 120.10 ..................................................................................................... *passim*

vi

22 C.F.R. § 120.11 .......................................................................................................... 7, 11

22 C.F.R. § 120.17 ............................................................................................................ 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) .......................................................................... 8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
    5 Op. O.L.C. 202 (1981)…………………………………………………………13

WASHSTATEC003381

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
      Plaintiffs,

v.                                   No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
      Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7.  On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHSTATEC003382

*I'*). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.   Plaintiffs' First Amendment Claims Should Be Dismissed.**

A. The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

WASHSTATEC003383

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

3

WASHSTATEC003384

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

WASHSTATEC003385

manufacturing firearms and defense articles.[6]

    B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

    "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

    The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

    In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

5

WASHSTATEC003386

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

WASHSTATEC003387

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

WASHSTATEC003388

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants'

interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the

commodity jurisdiction request process for determining whether information is subject to its export

controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding

statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as

here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative

term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply

associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively

narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis,

concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion

incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported

distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-

71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not

dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d

372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness

can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla.

Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's

regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

### C.  ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See*

SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may

only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In

circumstances where a regulation is alleged to be so broad that it is incapable of any permissible

application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper,
as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb
'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u>
created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th
ed. 2014) (emphasis added).

8

WASHSTATEC003389

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987);

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly

and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged

"overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's

plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First

Amendment facial challenges as "daunting").

     First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA

and ITAR are not directed at speech, but rather to the export of defense articles and related

technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003)

("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not

specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of

City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts

need not entertain an overbreadth challenge 'where the parties challenging the statute are those who

desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d

at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth

challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are

"essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth

challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See

Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit

purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC

¶ 1— the ITAR is being applied directly in its intended manner.

     Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on

technical data have a substantially permissible purpose. Specifically, these regulations prevent the

circumvention of export controls on munitions by proscribing the export of instructions, blueprints,

or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F.

Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the

regulations have been applied in a substantial number of impermissible ways. To the contrary, they

plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

WASHSTATEC003390

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC
¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of
technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps
ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs'
overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge);
*Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the
ITAR's 'technical data' provision] are not genuine").

    D.  <u>ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.</u>

    Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-
45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the
Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different
standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting
*Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a
prior restraint involving "a facially content-based restriction on political speech in a public forum" is
subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is
constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192
F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited
in *Catholic Leadership Coal.*, 764 F.3d at 438.

    The licensing scheme at issue here could not plausibly give rise to the sort of censorship that
has caused courts to invalidate prior restraints on news publications or public rallies. Heightened
concerns about prior restraints arise when "a licensing law gives a government official or agency
substantial power to discriminate based on the content or viewpoint of speech by suppressing
disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759
(1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to
conduct commonly associated with expression, to pose a real and substantial threat of . . .
censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct
commonly associated with expression and do not permit licensing determinations to be made on the
basis of ongoing expression or the words about to be spoken[] carry with them little danger of

WASHSTATEC003391

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

WASHSTATEC003392

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

12

WASHSTATEC003393

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II. Plaintiffs' Second Amendment Claims Should Be Dismissed.

A. Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

WASHSTATEC003394

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

14

WASHSTATEC003395

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

      2.   SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
          <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

      Associational standing is available for Second Amendment claims under the same standards

as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,

700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that

"its members would otherwise have standing to sue in their own right,"[11] including by pleading that

they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

      Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their

alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such

files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion

that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would

keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the

usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v.

Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that

Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at

698. But the Court recognized this standard had been met not by the original Complaint, but by

supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory

allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF

No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as

to standing and have failed to cure this defect through two amended complaints, the Court should

dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac.

Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified"

as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

      Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it
seeks to protect are germane to the organization's purpose; and [that] . . . the participation of
individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med.
Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Defendants are not aware of any reason to believe that the
Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at
issue here or that participation of SAF's members would be required in this action.

WASHSTATEC003396

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

B.    Plaintiffs' Second Amendment Challenge Fails on the Merits.

In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

WASHSTATEC003397

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

17

WASHSTATEC003398

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

_____

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

18

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III. Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

WASHSTATEC003400

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHSTATEC003401

Dated: April 6, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        Civil Division

                                        JOHN F. BASH
                                        United States Attorney

                                        ANTHONY J. COPPOLINO
                                        Deputy Branch Director
                                        Federal Programs Branch

                                        */s/ ERIC J. SOSKIN*
                                        ERIC J. SOSKIN
                                        Pennsylvania Bar No. 200663
                                        STUART J. ROBINSON
                                        California Bar No. 267183
                                        Trial Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., NW, Room 7116
                                        Washington, DC 20530
                                        Phone: (202) 353-0533
                                        Fax: (202) 616-8470
                                        Email: Eric.Soskin@usdoj.gov

                                        *Attorneys for U.S. Government Defendants*

21

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel

Message
_____

| | |
|---|---|
| **From:** | Darrach, Tamara A [DarrachTA@state.gov] |
| **Sent:** | 9/19/2019 7:22:58 PM |
| **To:** | Paul, Joshua M [PaulJM@state.gov]; Khawam, Joseph N [KhawamJN@state.gov] |
| **CC:** | Foster, John A [FosterJA2@state.gov]; H_Staffers [H_Staffers@state.gov] |
| **Subject:** | RE: Cats I-III CN and Correspondence |
| **Attachments:** | H20180726=000 (Menendez incoming).pdf; H20180726=000 (Menendez response).pdf; H20180727=004 (Markey incoming2).pdf; H20180727=004 (Markey response).pdf; H20190801=003 (Cotton - incoming).pdf; H20190801=003 Reply (Cotton).pdf |

Hi Joe,

Apologies for the delay.  I've attached the letters we responded to regarding CATS I-III/3D guns.

Best,
Tamara


SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Thursday, September 19, 2019 7:46 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Here's the "incoming" from Menendez on this topic.  Based on his letter it seems like the 38(f) notification Joseph is seeking would be dated 4 February, or shortly before then, if that helps.


SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 6:07 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

H colleagues:  Following up on the email chain below and my conversation with Tamara on Friday, would be able to send over the final congressional notifications for the Cats I-III rule, as well as any correspondence with the Hill (just formal letters – both incoming and outgoing) on this issue by cob tomorrow?  There unfortunately is now some urgency in gathering these materials.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, September 13, 2019 5:04 PM

**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Joe - For final packages that went to the Hill, the staffers would have those.  Copying them on this thread.

For correspondence, are talking formal letters or emails too?

Thanks,
Tamara


SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 4:27 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Understood, based on a convo with Jeff just now.

For the finals of anything going to the Hill I'd have to refer you to H; adding Tamara for that purpose.

Josh


SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 12:13 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III CN and Correspondence

Hi Josh:  We were looking to get a copy of the final CN on Cats I-III that went to the Hill, as well as all of the correspondence with members of Congress on this issue (both incoming and outgoing).  Would you have these available to send to us, and if not, would you know who would?  I'd be happy to explain why we're asking for them if you'd like to give me a call (x7-8546).

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal

WASHSTATEC003406

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** O726=OOO   ACTION BUREAU: _PM_

DATE: _JUL 2 6 2018_

# IPS:

___X_____ SUBSTANTIVE

___X_____ IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____✓_____ REPLY FOR SIGNATURE BY **Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

**FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:**
_http://diplopedia.state.gov/index.php?title=Bureau_ *of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

**Due Date** _7/31_

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHSTATEC003407

**FROM: Mary K. Waters (H)**
## Congressional Correspondence Recommendation
JUL 2 6 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

_X_ **Tasked to the _Pm_ Bureau for Signature by Mary K. Waters, Assistant Secretary, Legislative Affairs**

_____ **Tasked to _____ Bureau for signature by Post or Bureau**

_____ FYI Only—No Reply Necessary For _____ Bureau

Special Actions:

_____ Multi-signer letter:

_____ Special Clearances:

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____

_____ Special Instructions: _____

_____

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

July 25, 2018

RECEIVED
2018 JUL 26  A 7 46
LEGISLATIVE AFFAIRS

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member



United States Department of State

*Washington, D.C. 20520*

SEP 2 4 2018

The Honorable
Robert Menendez
United States Senate
Washington, DC 20510

Dear Senator Menendez:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive information.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

-2-

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Charles S. Faulkner
Acting Assistant Secretary
Legislative Affairs

Incoming H20180726=000 Menendez:
file://esocoecntap101.washdc.state.sbu/hpublic$/Office/H%20Congressional%20Library/CCU/Images/Original_Documents/H20180726=000.pdf


Approved:     PM: Tina Kaidanow, Acting

Drafted:      PM/CPA Josh Paul x7-7878/█████████

Cleared:      PM/FO - LLitzenberger
              PM/DDTC – MMiller         OK
              PM/DTCP – SHeidema        OK
              H – TDarrach              OK
              P – SRavi                 OK
              S/P – MUrena              OK
              D – JShufflebarger        OK
              T – EAbisellan            OK
              L/PM – SRogers            OK

WASHSTATEC003413

# Congressional Correspondence

<u>UNCLASSIFIED</u>

SUBJECT:   Writing concerning the Department's settlement in the matter of Defense Distributed
vs. United States

H20180726=000                    Menendez                    9/7/18
~~07/31/18~~

Waters_____

Faulkner_____

Cleared by

Tamara Darrach

WASHSTATEC003414

NO DISCERNIBLE CLASSIFICATION

**Reed, Roxanne**

| | |
|---|---|
| **From:** | H Taskers <dont_reply_SP2010@state.gov> |
| **Sent:** | Tuesday, July 31, 2018 12:02 PM |
| **To:** | Reed, Roxanne |
| **Subject:** | H Task Clearance (P) has completed on H20180726=000 Menendez-Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act.. |

# *H Task Clearance (P)* has completed on H20180726=000 Menendez-Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act..

H Task Clearance (P) on H20180726=000 Menendez-Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act. has successfully completed. All participants have completed their tasks.

Approved by Darrach, Tamara A

View the workflow history.

NO DISCERNIBLE CLASSIFICATION

WASHSTATEC003415

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** _09 27 = 004_ ACTION BUREAU: _Pm_

DATE: _JUL 27 2018_

## IPS:

___X_____ SUBSTANTIVE

___X_____ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

__✓_____ REPLY FOR SIGNATURE BY **Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

**FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:**
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

***BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION***

**Due Date** _7/31/18_

ADDITIONAL INSTRUCTIONS:

_X_Multi-signer Letter: ____ Senate (+ 8) ____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHSTATEC003416

**FROM: Mary K. Waters (H)**
**Congressional Correspondence**
**Recommendation**

JUL 2 7 2018

_____ **For Signature by Secretary Pompeo**
**For draft by** _____ **Bureau**

X\_\_\_\_\_ **Tasked to the** *PM* \_\_\_\_ **Bureau for**
**Signature by Mary K. Waters,**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to** \_\_\_\_\_ **Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

X Multi-signer letter: *Senate (+8)*

_____ Special Clearances:

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____
_____ Special Instructions: _____

_____

WASHSTATEC003417

# United States Senate

WASHINGTON, DC 20510

July 26, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

WASHSTATEC003418

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints. Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Secretary Pompeo
Page 4 of 4

Distributed —— but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator

WASHSTATEC003421



United States Department of State

*Washington, D.C. 20520*

The Honorable
Edward J. Markey
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Markey:

In response to your letter regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain

WASHSTATEC003422

firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed.   A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction.  The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary of State
Legislative Affairs



**United States Department of State**

*Washington, D.C. 20520*

AUG 16 2018

The Honorable
Bill Nelson
United States Senate
Washington, DC 20510

Dear Senator Nelson:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Richard Blumenthal
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Blumenthal:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Christopher S. Murphy
United States Senate
Washington, DC 20510

AUG 1 6 2018

Dear Senator Murphy:

In response to your letter of July 26 regarding the settlement agreement with Defense Distributed, the Department of State (Department) reached this settlement in consultation with the Department of Justice and with careful consideration of the security and foreign policy interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The Department regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA). The Department has never regulated the downloading or dissemination of CAD files for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to remember and understand the exclusive reason for the Department's involvement in this matter, which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24, 2018—before the Department of State entered into a settlement agreement with Defense Distributed—proposing to transfer oversight from the Department of State to the Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the Department briefed staff from Senate Foreign Relations Committee, Senate Committee on Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to modernize the U.S. export control regulations to create a simpler, more robust system that improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets. By contrast, the interagency, including the Department of Defense, determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, are of a type that do not offer a critical military or intelligence advantage to the United States, and therefore warrant export licensing requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is the subject of the *Defense Distributed* settlement agreement is technical data related to certain firearms and other USML items that would transfer to the Department of Commerce under the proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

AUG 16 2018

The Honorable
Dianne Feinstein
United States Senate
Washington, DC 20510

Dear Senator Feinstein:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

-2-

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Elizabeth Warren
United States Senate
Washington, DC 20510

AUG 16 2018

Dear Senator Warren:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

WASHSTATEC003432

-2-

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed.  A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction.  The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable                                                        AUG 16 2018
Patrick Leahy
United States Senate
Washington, DC 20510

Dear Senator Leahy:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

-2-

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed.  A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction.  The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable                                                AUG 1 6 2018
Richard J. Durbin
United States Senate
Washington, DC 20510

Dear Senator Durbin:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs



United States Department of State

*Washington, D.C. 20520*

The Honorable
Benjamin L. Cardin                             AUG 16 2018
United States Senate
Washington, DC 20510

Dear Senator Cardin:

In response to your letter of July 26 regarding the settlement agreement with Defense
Distributed, the Department of State (Department) reached this settlement in consultation with
the Department of Justice and with careful consideration of the security and foreign policy
interests of the United States.

As an initial matter, it may be helpful to put the settlement agreement in broader context. The
Department regulates the export of defense articles, including related manufacturing
technologies and information, as an integral part of safeguarding U.S. national security and
furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act
(AECA). The Department has never regulated the downloading or dissemination of CAD files
for 3-D printed guns by U.S. persons within the United States. Accordingly, it is important to
remember and understand the exclusive reason for the Department's involvement in this matter,
which is its control of the export of technical data.

Furthermore, the Departments of State and Commerce published proposed rules on May 24,
2018—before the Department of State entered into a settlement agreement with Defense
Distributed—proposing to transfer oversight from the Department of State to the Department of
Commerce of exports of firearms and related items that do not provide the United States with a
critical military or intelligence advantage or, in the case of weapons, are not inherently for
military end use, including many items that are widely available in retail outlets in the United
States and abroad. Prior to the publication of the proposed rules, on May 14, 2018, the
Department briefed staff from Senate Foreign Relations Committee, Senate Committee on
Banking, Housing, and Urban Affairs, and House Foreign Affairs Committee on the scope of the
proposed rules. The proposed rules are the product of a larger effort ongoing since 2010 to
modernize the U.S. export control regulations to create a simpler, more robust system that
improves enforceability and better protects America's most sensitive technologies.

Under the proposed rules, the Department of State will retain export-licensing control over
firearms and related articles that are inherently for military end use or that are not otherwise
widely available in retail outlets. By contrast, the interagency, including the Department of
Defense, determined that certain firearms and related items that are widely available for
commercial sale, and technical data related to those items, are of a type that do not offer a critical
military or intelligence advantage to the United States, and therefore warrant export licensing
requirements under the U.S. Department of Commerce's jurisdiction. The technical data that is
the subject of the *Defense Distributed* settlement agreement is technical data related to certain
firearms and other USML items that would transfer to the Department of Commerce under the
proposed rules, if finalized as contemplated in the NPRM.

-2-

As you likely know, on July 30, the Attorney General for Washington State, with Attorneys General from seven other states and the District of Columbia, filed a lawsuit in the U.S. District Court for the Western District of Washington challenging certain actions the Department of State took in compliance with the *Defense Distributed* settlement agreement. The Western District of Washington issued a Temporary Restraining Order, and, as of July 31, 2018, in compliance with that order, the Department of State is not implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" that was posted to the DDTC website on July 27, 2018 and has since been removed. A hearing is scheduled for August 21 to determine whether the temporary restraining order should be converted to a preliminary injunction. The Department of State will work with the Department of Justice to determine appropriate future actions as this litigation evolves.

We take your concerns seriously and will answer any additional questions that you or your staff may have, to the extent possible given the ongoing litigation.

Sincerely,

Mary K. Waters

Mary K. Waters
Assistant Secretary
Legislative Affairs

-3-

Approved:      H – Mary K Waters

Drafted:       H/RGF:  Tamara Darrach, ext. 78763, 8/2/18
               PM/CPA Josh Paul x7-7878, ███████████

Cleared:       PM/FO – TKaidanow  (ok)
               H – CFaulkner (ok)
               P – SRavi (info)
               S/P – MUrena
               D – JShufflebarger (ok)
               T – EAbisellan (ok)
               L/PM – SRogers ()

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL#**H2019** ___0801=003___ ACTION BUREAU: ___PM___

DATE: ___AUG 0 1 2019___

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

___✗___ REPLY FOR SIGNATURE BY **Mary Elizabeth Taylor, Assistant Secretary, Bureau of Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

## Due Date  8-6-19

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions: _____

___EVEREST TASKER# _____

___Please clear with NSC prior to submission to H

**FROM: A/S Mary Elizabeth Taylor (H)**

**Congressional Correspondence**

**Recommendation**

AUG 0 1 2019

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

X **Tasked to the** _PM_ **Bureau for**

**Signature by Mary Elizabeth Taylor**

**Assistant Secretary, Legislative**

**Affairs**

_____ **Tasked to _____ Bureau for signature by**

**Post or Bureau**

_____**Request for Briefing_____ Bureau**

_____ **FYI Only—No Reply Necessary**

**For _____ Bureau**

**Special Actions:**

**Multi-signer letter:**_____

_____

**Special Clearances:**_____

**Everest Tasker#** _____

**Special Instructions:**_____

_____

WASHSTATEC003442

TOM COTTON
ARKANSAS

326 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
PHONE: (202) 224-2353

## United States Senate

COMMITTEES
ARMED SERVICES
BANKING, HOUSING, AND
URBAN AFFAIRS
JOINT ECONOMIC COMMITTEE
SELECT COMMITTEE ON INTELLIGENCE

July 31, 2019

The Honorable Michael R. Pompeo
Secretary
U.S. Department of State
2201 C St NW
Washington, DC 20520

The Honorable Wilbur Ross
Secretary
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

Dear Gentlemen,

I am writing regarding the transfer of export licensing authority for sporting and commercial firearms and ammunition products currently on Categories I, II, and III of the United States Munitions List (USML) from the Department of State – Directorate of Defense Trade Controls (DDTC) to the Department of Commerce – Bureau of Industry and Security (BIS) where the products would be controlled on the Commerce Control List (CCL) and the Export Administration Regulations (EAR). I urge you both publish the new rules for this transfer as soon as is practicable.

The export of Category I, II, or III items under the CCL process is extremely important to the domestic firearms and ammunition industry, primarily because it reduces the export approval timeline. The ability to rapidly reply to international business opportunities allows U.S. companies to remain competitive in the global market and creates high-quality manufacturing jobs at home. Furthermore, some North Atlantic Trade Organization (NATO) allies have indicated a desire not to purchase small arms from U.S. vendors due to the overly burdensome process required to receive an exemption for the sale under the International Traffic in Arms Regulations (ITAR). This creates an environment where foreign countries can compete unfettered for our military small arms programs while many foreign nations are restricting US companies from competing in theirs. This regulation has not only been prohibitive for initial sales to allies but additionally creates excessively burdensome procedures for follow-on maintenance contracts.

Therefore, I am requesting the Departments of State and Commerce to publish the final rules to streamline the export licensing process in support of our domestic firearms and ammunition industry. I urge you to move forward with this process to ensure our competitiveness in the global market.

Sincerely,

Tom Cotton
United States Senator

JONESBORO
300 SOUTH CHURCH, SUITE 338
JONESBORO, AR 72401
(870) 933-6223

SPRINGDALE
1108 SOUTH OLD MISSOURI ROAD, SUITE B
SPRINGDALE, AR 72764
(479) 751-0879

LITTLE ROCK
1401 WEST CAPITOL AVENUE, SUITE 225
LITTLE ROCK, AR 72201
(501) 223-9081

EL DORADO
106 WEST MAIN STREET, SUITE 410
EL DORADO, AR 71730
(870) 864-8582

WASHSTATEC003443



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Tom Cotton
United States Senate
Washington, DC 20510

AUG 2 2 2019

Dear Senator Cotton:

Thank you for your July 31 letter expressing continued support for the Department of State's efforts to modernize the U.S. export control system.

The Departments of State and Commerce have worked to harmonize the International Traffic in Arms Regulations (ITAR) with the Export Administration Regulations (EAR) to ensure that ITAR controls only those significant defense articles and services that provide the United States with a critical military or intelligence advantage. Thus far, the Administration has revised 18 of the 21 United States Munitions List (USML) Categories under the ITAR and, as a result, have shifted numerous items from the USML to the Commerce Control List (CCL) under the EAR.

On May 24, 2018, the Department issued a notice of proposed rulemaking to update the three remaining USML Categories: I, II, and III, which, respectively, control firearms, close assault weapons, and combat shotguns; guns and armament; and ammunition and ordnance. Issuance of a final rule is the next step in the process. Once published in the *Federal Register,* the final rule will transfer from the USML to the CCL defense articles from Categories I, II, and III that no longer provide the United States with a critical military or intelligence advantage. These categories include many articles widely available in retail outlets throughout the United States and abroad.

We hope this information is helpful to you. Please let us know if we may be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Approved:     PM/FO R. Clarke Cooper    RCC

Drafted:      PM/DTCP – John Foster, ext. 3-2811

Clearances:    PM/FO: Stan Brown – OK
               PM/FO: Cat Hamilton for Mike Miller – OK
               PM/DTCP: Rick Koelling – OK
               PM/DTCC: Dan Cook – OK
               PM/DTCL: Cat Hamilton – OK
               PM/CPA: Christienne Carroll – OK
               L/PM: Joe Khawam – OK
               H: Tamara Darrach – OK
               T: Maureen Tucker – OK

WASHSTATEC003445

# H FRONT OFFICE ROUTING SLIP

Classification: UNCLASSIFIED

Subject: Letter expressing continued support for the
Department of State's efforts to modernize the U.S.
export control system

8/21/2019 9:48 AM

H20190801=003 Cotton

Logged by: Roxanne Reed

☒ Format   ☒ Clearances
☒ Headers/Footers   ☐ Attachments
☐ Transmittal Letters
On H Package: ☐ High Side or ☒ Low
Side

| | INITIALS | DATE |
|---|---|---|
| PMcNerney | | |
| PRademacher | | |
| KHarris | | |
| GGiannangeli | GG | 8/21 |
| JMoore | | |
| HSpecialAsst | PT | 8/21 |
| RKaldahl | | |
| CBarz | CB | 8/21 |
| ME Taylor | MET | 8/22 |

AUTOPEN
AUTHORIZED

RUSH JUSTIFICATION:

WASHSTATEC003446

Message
_____

**From:**      Dorosin, Joshua L [DorosinJL@state.gov]
**Sent:**      9/19/2019 9:28:33 PM
**To:**        Kovar, Jeffrey D [KovarJD@state.gov]; String, Marik A [StringMA@state.gov]
**CC:**        Khawam, Joseph N [KhawamJN@state.gov]; Minarich, Christine M [MinarichCM@state.gov]
**Subject:**   RE: 3-D Printed Guns


Jeff -- Thanks for the update.  Best, Josh



SBU - Legal
..................................................................................
**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Thursday, September 19, 2019 5:10 PM
**To:** String, Marik A <StringMA@state.gov>; Dorosin, Joshua L <DorosinJL@state.gov>
**Cc:** Khawam, Joseph N <KhawamJN@state.gov>; Minarich, Christine M <MinarichCM@state.gov>
**Subject:** 3-D Printed Guns

Marik and Josh:

ATTORNEY WORK PRODUCT / DELIBERATIVE

(SBU)



Jeff

******
*Jeffrey D. Kovar*
*Assistant Legal Adviser for Political-Military Affairs*
*U.S. Department of State*
*2201 C ST NW*
*Washington DC 20520-6805*
*(o) 202-647-9288*


SBU - Legal

Message

**From**:        Foster, John A [FosterJA2@state.gov]
**Sent**:        9/19/2019 10:26:15 PM
**To**:          Koelling, Richard W [KoellingRW@state.gov]
**Subject**:     20190913 - National Security Justification Points
**Attachments**: 20190913 - National Security Justification Points.docx

Rick,

Please find my first (very rough) crack at this attached.  I'm happy to discuss as soon as you're free tomorrow morning.

Best,
John

SBU

Message

**From**:       Khawam, Joseph N [KhawamJN@state.gov]
**Sent**:       9/19/2019 11:43:18 PM
**To**:         Minarich, Christine M [MinarichCM@state.gov]
**Subject**:    Draft FRN
**Attachments**: Tab 1 - Cat I-III Final FRN BIS controls on 3D printing in preamble.docx

Hi Christine:  As mentioned, attached please find the draft FRN. ████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 9/20/2019 1:25:57 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | CATS I-III MYTHS V FACTS Final Rule w revised narrative from PM webite |
| **Attachments**: | CATS I-III MYTHS V FACTS Final Rule w revised narrative from PM webite.DOCX |

Unclassified

Message

**From**: Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Sent**: 9/20/2019 2:48:26 PM
**To**: Koelling, Richard W [KoellingRW@state.gov]; Foster, John A [FosterJA2@state.gov]
**Subject**: RE: Cats I-III
**Attachments**: 2019-9-18 Commerce Cat I-III firearms final rule_0694-AF47 with docket number for printing for signature.docx



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ██████████████ In addition to email, I can be reached at ████████ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

WASHSTATEC003452

Message
_____

**From:** Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:** 9/20/2019 3:09:42 PM
**To:** Khawam, Joseph N [KhawamJN@state.gov]
**Subject:** RE: Draft AM Package on Cats I-III
**Attachments:** AM for T - USML Cat I-III Final FRN.docx


Joe – thanks for putting all this together.  I've made some initial edits to the AM ████████
████████     Let's discuss. ████████████████████████████████ - Jeff


SBU - Legal
..........................................................................................
**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, September 19, 2019 2:39 PM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** Draft AM Package on Cats I-III

Jeff:  Attached please find the draft AM for your review. ████████████████████████████
████████ The rest of the tabs are attached just for your awareness.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov
████████████████████████████


SBU - Legal

Message

| | |
|---|---|
| **From:** | H_Staffers [H_Staffers@state.gov] |
| **Sent:** | 9/20/2019 3:10:10 PM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov]; Darrach, Tamara A [DarrachTA@state.gov]; Paul, Joshua M [PaulJM@state.gov] |
| **CC:** | Foster, John A [FosterJA2@state.gov]; H_Staffers [H_Staffers@state.gov] |
| **Subject:** | RE: Cats I-III CN and Correspondence |
| **Attachments:** | Notification (Arm Control).pdf |

Attached are copies of the letters and summary. We do not have a scanned copy of the rest of what was sent, but I just sent you on the high side an email that includes PDF copies of the other documents that would have been sent (and the AM that approved sending the entire package).

Darin Christensen
H Staff Assistant
Bureau of Legislative Affairs
202 647-8802
Room 7805, HST

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 20, 2019 8:55 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Thanks, Tamara.

H staffer, would it be possible to send the final 38(f) notification letters this morning? We need to incorporate them into an AM package.

Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Thursday, September 19, 2019 4:40 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

I do not. Our H staffers should be able to provide.

Best,
Tamara

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Date:** September 19, 2019 at 4:26:35 PM EDT
**To:** Darrach, Tamara A <DarrachTA@state.gov>, Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>, H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Thanks, Tamara.  Much appreciated!  Would you also have a copy of the 38(f) notifications that were submitted?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Thursday, September 19, 2019 3:23 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Hi Joe,

Apologies for the delay.  I've attached the letters we responded to regarding CATS I-III/3D guns.

Best,
Tamara


SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Thursday, September 19, 2019 7:46 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Here's the "incoming" from Menendez on this topic.  Based on his letter it seems like the 38(f) notification Joseph is seeking would be dated 4 February, or shortly before then, if that helps.


SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 6:07 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

H colleagues:  Following up on the email chain below and my conversation with Tamara on Friday, would be able to send over the final congressional notifications for the Cats I-III rule, as well as any correspondence with the Hill (just formal letters -- both incoming and outgoing) on this issue by cob tomorrow?  There unfortunately is now some urgency in gathering these materials.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

---

SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, September 13, 2019 5:04 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Joe - For final packages that went to the Hill, the staffers would have those.  Copying them on this thread.

For correspondence, are talking formal letters or emails too?

Thanks,
Tamara

---

SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 4:27 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Understood, based on a convo with Jeff just now.

For the finals of anything going to the Hill I'd have to refer you to H; adding Tamara for that purpose.

Josh

---

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 12:13 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III CN and Correspondence

Hi Josh:  We were looking to get a copy of the final CN on Cats I-III that went to the Hill, as well as all of the correspondence with members of Congress on this issue (both incoming and outgoing).  Would you have these available to send to us, and if not, would you know who would?  I'd be happy to explain why we're asking for them if you'd like to give me a call (x7-8546).

Thanks,
Joe

Joseph N. Khawam

Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal



**United States Department of State**

*Washington, D.C. 20520*

The Honorable                                                      FEB 0 4 2019
James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



United States Department of State

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
As stated.

WASHSTATEC003459



**United States Department of State**

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Michael McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

FEB 0 4 2019

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.

<u>Summary of Revisions to USML Categories I, II, and III</u>

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape. This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL). A key strategy in the reform effort is to construct the lists so they positively identify the items they control. Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories). All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the jurisdiction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories. In May 2018, the Department of State published proposed revisions of the final three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls. Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

**Category I—Firearms and Related Articles**

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use

1

WASHSTATEC003462

caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN 0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category

2

WASHSTATEC003463

XII and are described in the purchase documentation submitted with the application.

### Category II—Guns and Armament

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

3

WASHSTATEC003464

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

### Category III— Ammunition and Ordnance

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

4

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will *not* be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii). Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom). Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception. However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement. Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request. If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future. If the

5

departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

WASHSTATEC003467

Message

**From:**      Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Sent:**      9/20/2019 4:12:01 PM
**To:**        Koelling, Richard W [KoellingRW@state.gov]; Foster, John A [FosterJA2@state.gov]
**Subject:**   RE: Cats I-III
**Attachments:** 2018-11-30 final FW: Folders for Briefing on Tuesday afternoon



**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:05 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Tim,
Thank you, my friend.

Cheers,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU
**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM

WASHSTATEC003468

**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████████ In addition to email, I can be reached at ███████ today.

Are you in today?

Tim

---

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

Message

| | |
|---|---|
| **From:** | Monjay, Robert [MonjayR@state.gov] |
| **Sent:** | 1/29/2019 9:42:51 PM |
| **To:** | Timothy Mooney [Timothy.Mooney@bis.doc.gov]; Susan Daoussi [susan.g.daoussi.civ@mail.mil] |
| **Subject:** | 2018-11-30 final FW: Folders for Briefing on Tuesday afternoon |
| **Attachments:** | USML Cat I-III 38(f) - Commerce control text.pdf; USML Cat I-III 38(f) - Line-in Line-out Comparison.pdf; USML Cat I-III 38(f) - MDE List.pdf; USML Cat I-III 38(f) - Revised Control Text.pdf; USML Cat I-III 38(f) - Summary.pdf; Key Points of Transfer for Final Rule.docx; CATS I-III MYTHS V FACTS Final Rule w revised narrative from PM webite.DOCX |

Tim and Susan,

Attached are the documents that we will be bringing for the staffers.

Thanks

Rob

**Official - SBU**

UNCLASSIFIED

---

**From:** Monjay, Robert
**Sent:** Tuesday, January 29, 2019 4:41 PM
**To:** Ross, Paula E <RossPE@state.gov>
**Subject:** Folders for Briefing on Tuesday afternoon

Paula,

Can you please put together 15 folders with the attached documents?

It should be

On the left: Key points, Cats I-III Myths V Facts, Line-in Line-out Comparison, and MDE List

On the right: Summary, Revised Control Text, and Commerce Control Text

Thanks

Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile:* ▮▮▮▮▮▮▮
*Email: MonjayR@state.gov*
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Official - SBU**

UNCLASSIFIED

Message

| | |
|---|---|
| **From:** | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent:** | 9/20/2019 4:16:02 PM |
| **To:** | Timothy Mooney [Timothy.Mooney@bis.doc.gov]; Foster, John A [FosterJA2@state.gov] |
| **Subject:** | RE: Cats I-III |

Tim,
Much obliged. Thank you!

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 12:12 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:05 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Tim,
Thank you, my friend.

Cheers,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████ In addition to email, I can be reached at ████████ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

WASHSTATEC003472

Message

**From**:        Foster, John A [FosterJA2@state.gov]
**Sent**:        9/20/2019 7:27:38 PM
**To**:          Koelling, Richard W [KoellingRW@state.gov]
**Subject**:     20190920 - National Security Justification Points
**Attachments**: 20190920 - National Security Justification Points.docx

SBU

Message

| | |
|---|---|
| **From:** | Foster, John A [FosterJA2@state.gov] |
| **Sent:** | 9/20/2019 8:10:41 PM |
| **To:** | Koelling, Richard W [KoellingRW@state.gov] |
| **Subject:** | FW: Cats I-III |
| **Attachments:** | AM for T - USML Cat I-III Final FRN.docx |

SBU

**From:** Foster, John A
**Sent:** Friday, September 20, 2019 3:52 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Subject:** FW: Cats I-III

SBU

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 20, 2019 2:00 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

The draft AM is ready for your review.  It is located in the following folder:

███████████████████████████████████████████████████████████████████

Please note that the tabs in that folder still need fixing.  I just wanted to get the AM to you asap for your review.  Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:04 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** FW: Cats I-III

Mike, Sarah,
WRT the AM to T and the rule, we expect to have some draft language for you both to review this weekend before we depart at the end of the day.

Toward that end, John and I reached out to Tim, who returned today, to get answers on several items to include the following:

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

WASHSTATEC003474



Again, our intent is to forward you draft language for both of these documents by EOD.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████ In addition to email, I can be reached at ███████████ today.

Are you in today?

Tim


**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

WASHSTATEC003475

Tim,

When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

WASHSTATEC003476

Message

| | |
|---|---|
| **From**: | Foster, John A [FosterJA2@state.gov] |
| **Sent**: | 9/20/2019 8:10:24 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Subject**: | FW: Cats I-III |
| **Attachments**: | AM for T - USML Cat I-III Final FRN.docx |

SBU

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 20, 2019 2:00 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

The draft AM is ready for your review.  It is located in the following folder:

█████████████████████████████████████████████████

Please note that the tabs in that folder still need fixing.  I just wanted to get the AM to you asap for your review.  Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:04 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** FW: Cats I-III

Mike, Sarah,
WRT the AM to T and the rule, we expect to have some draft language for you both to review this weekend before we depart at the end of the day.

Toward that end, John and I reached out to Tim, who returned today, to get answers on several items to include the following:



Again, our intent is to forward you draft language for both of these documents by EOD.

v/r, Rick

Richard W. Koelling, Jr.

Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████. In addition to email, I can be reached at ███████ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)

Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

WASHSTATEC003479

Message

| | |
|---|---|
| **From**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent**: | 9/20/2019 8:28:12 PM |
| **To**: | Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov] |
| **CC**: | Foster, John A [FosterJA2@state.gov]; Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | RE: Cats I-III |
| **Attachments**: | AM for T - USML Cat I-III Final FRN.docx; 20190920 - National Security Justification Points.docx |

Mike, Sarah,
Here's where we stand:



Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Koelling, Richard W
**Sent:** Friday, September 20, 2019 3:11 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Sarah,
I'm not sure if the specific interchange you reference will take place prior to COB, but it's definitely on our radar. To be clear, what I'm planning to provide you and Mike later this afternoon will be a work in progress, in the literal sense. It won't be anything near final form—but given the enormity of what we're trying to accomplish in light of all of the challenges, we felt it prudent to provide you two a sense of where we are and where we're headed with respect to these two documents (i.e., the AM to T and the rule preamble). I figure an absence of anything even this early into the process won't make for a restful weekend.

To that end, we'll try to note the key pieces that are still left for us to pursue ████████████

███████████████████████████ As of 3:09, we're yet to receive anything from BIS on this front. We're still waiting. That said, Joe and John have accomplished an extraordinary amount in these last couple of days, even without a SOC to reference.

I hope this clarifies.

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU
**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Friday, September 20, 2019 2:06 PM
**To:** Miller, Michael F <Millermf@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Re: Cats I-III

Thanks Rick!  Was Joe going to talk to BIS ████████████████████████████████████

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 20, 2019 2:03:47 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Excellent, thanks Rick.

MM


SBU
**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:04 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** FW: Cats I-III

Mike, Sarah,
WRT the AM to T and the rule, we expect to have some draft language for you both to review this weekend before we depart at the end of the day.

Toward that end, John and I reached out to Tim, who returned today, to get answers on several items to include the following:



Again, our intent is to forward you draft language for both of these documents by EOD.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████████ In addition to email, I can be reached at ████████ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>

**Cc:** Foster, John A <<u>FosterJA2@state.gov</u>>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

Message

| | |
|---|---|
| **From**: | Minarich, Christine M [MinarichCM@state.gov] |
| **Sent**: | 9/20/2019 8:56:03 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | RE: Draft FRN |
| **Attachments**: | Tab 1 - Cat I-III Final FRN BIS controls on 3D printing in preamble.docx |

Here you go.

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, September 19, 2019 7:43 PM
**To:** Minarich, Christine M <MinarichCM@state.gov>
**Subject:** Draft FRN

Hi Christine:  As mentioned, attached please find the draft FRN. ███████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov
█████████████████████████

SBU - Legal

**Message**

| | |
|---|---|
| **From**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent**: | 9/20/2019 9:36:14 PM |
| **To**: | Koelling, Richard W [KoellingRW@state.gov]; Miller, Michael F [Millermf@state.gov]; Heidema, Sarah J [HeidemaSJ@state.gov] |
| **CC**: | Foster, John A [FosterJA2@state.gov]; Minarich, Christine M [MinarichCM@state.gov] |
| **Subject**: | RE: Cats I-III |
| **Attachments**: | Tab 1 - Cat I-III Final FRN updated.docx |

Attached please find the updated draft FRN.  I reviewed the document, but had only very minor edits, ███████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 4:28 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Mike, Sarah,
Here's where we stand:

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Koelling, Richard W
**Sent:** Friday, September 20, 2019 3:11 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Sarah,

I'm not sure if the specific interchange you reference will take place prior to COB, but it's definitely on our radar. To be clear, what I'm planning to provide you and Mike later this afternoon will be a work in progress, in the literal sense. It won't be anything near final form—but given the enormity of what we're trying to accomplish in light of all of the challenges, we felt it prudent to provide you two a sense of where we are and where we're headed with respect to these two documents (i.e., the AM to T and the rule preamble). I figure an absence of anything even this early into the process won't make for a restful weekend.

To that end, we'll try to note the key pieces that are still left for us to pursue ████████████████████████████
██████████████████████████████████████████████ As of 3:09, we're yet to receive anything from BIS on this front. We're still waiting. That said, Joe and John have accomplished an extraordinary amount in these last couple of days, even without a SOC to reference.

I hope this clarifies.

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Friday, September 20, 2019 2:06 PM
**To:** Miller, Michael F <Millermf@state.gov>; Koelling, Richard W <KoellingRW@state.gov>

WASHSTATEC003486

Cc: Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Re: Cats I-III

Thanks Rick!  Was Joe going to talk to BIS ███████████████████████████████

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 20, 2019 2:03:47 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

_Sensitive but Unclassified/Deliberative Process/Pre-decisional_

Excellent, thanks Rick.

MM


SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:04 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** FW: Cats I-III

Mike, Sarah,
WRT the AM to T and the rule, we expect to have some draft language for you both to review this weekend before we depart at the end of the day.

Toward that end, John and I reached out to Tim, who returned today, to get answers on several items to include the following:



Again, our intent is to forward you draft language for both of these documents by EOD.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ▇▇▇▇▇▇▇▇▇▇▇▇ In addition to email, I can be reached at ▇▇▇▇▇ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

Message

**From:** Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:** 9/20/2019 10:12:18 PM
**To:** Nightingale, Robert L [NightingaleRL@state.gov]
**CC:** Legal-PM-DL [Legal-PM-DL@state.gov]
**Subject:** L/PM Weekly



7.   **(SBU) ITAR Cats I – III:**

SBU

Appointment

**From**:         Koelling, Richard W [KoellingRW@state.gov]
**Sent**:        9/20/2019 11:32:41 PM
**To**:          Biery, Meghan N. EOP/NSC [Meghan.N.Biery@nsc.eop.gov]

**Subject**:     Declined: CATS I-III Small Group Sync
**Location**:    EEOB 374: SMS Exec

**Start**:       9/26/2019 5:00:00 PM
**End**:         9/26/2019 6:30:00 PM
**Show Time As**: Busy


**Recurrence**:  (none)

Message

| | |
|---|---|
| **From:** | Heidema, Sarah J [HeidemaSJ@state.gov] |
| **Sent:** | 9/22/2019 4:52:44 PM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov]; Foster, John A [FosterJA2@state.gov]; Koelling, Richard W [KoellingRW@state.gov] |
| **CC:** | Miller, Michael F [Millermf@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **Subject:** | My comments on the rule |
| **Attachments:** | Tab 1 - Cat I-III Final FRN updated copy.docx |

Here are my comments on the rule that Joe edited (thanks for that Joe!). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

WASHSTATEC003491

Message

| | |
|---|---|
| **From:** | Heidema, Sarah J [HeidemaSJ@state.gov] |
| **Sent:** | 9/22/2019 4:54:17 PM |
| **To:** | Khawam, Joseph N [KhawamJN@state.gov]; Miller, Michael F [Millermf@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Foster, John A [FosterJA2@state.gov] |
| **CC:** | Kovar, Jeffrey D [KovarJD@state.gov]; Minarich, Christine M [MinarichCM@state.gov] |
| **Subject:** | Re: Call with DOJ Today |

Thanks for the read great read out Joe!

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 20, 2019 9:02:02 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Cc:** Kovar, Jeffrey D <KovarJD@state.gov>; Minarich, Christine M <MinarichCM@state.gov>
**Subject:** Call with DOJ Today

**ATTORNEY CLIENT PRIVILEGED / ATTORNEY WORK PRODUCT / SENSITIVE BUT UNCLASSIFIED**



Thanks, and have a nice weekend,

Joe

WASHSTATEC003493

Message

**From:** Khawam, Joseph N [KhawamJN@state.gov]
**Sent:** 9/23/2019 12:38:20 PM
**To:** Minarich, Christine M [MinarichCM@state.gov]
**Subject:** FW: My comments on the rule
**Attachments:** Tab 1 - Cat I-III Final FRN updated copy.docx

████████████████████████████████████████████

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 12:53 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Foster, John A <FosterJA2@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** My comments on the rule

Here are my comments on the rule that Joe edited (thanks for that Joe!). ████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████ I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

Message

| | |
|---|---|
| **From:** | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent:** | 9/23/2019 12:48:54 PM |
| **To:** | Darrach, Tamara A [DarrachTA@state.gov]; H_Staffers [H_Staffers@state.gov]; Paul, Joshua M [PaulJM@state.gov] |
| **CC:** | Foster, John A [FosterJA2@state.gov]; H_Staffers [H_Staffers@state.gov] |
| **Subject:** | RE: Cats I-III CN and Correspondence |
| **Attachments:** | FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED |

Thanks again for your assistance.  I had the AM package (which is SBU) moved over to the low side (attached).  Could you please confirm which of the tabs we provided to the Hill?  Was it Tabs 1-6?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, September 20, 2019 11:22 AM
**To:** H_Staffers <H_Staffers@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Joe - I believe press reports at the time indicated that the package that was sent to the Hill still had "draft" water markings on the regulations. Happy to chat more.

Best,
Tamara



**From:** H_Staffers <H_Staffers@state.gov>
**Date:** September 20, 2019 at 11:10:13 AM EDT
**To:** Khawam, Joseph N <KhawamJN@state.gov>, Darrach, Tamara A <DarrachTA@state.gov>, Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>, H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Attached are copies of the letters and summary.  We do not have a scanned copy of the rest of what was sent, but I just sent you on the high side an email that includes PDF copies of the other documents that would have been sent (and the AM that approved sending the entire package).


Darin Christensen
H Staff Assistant
Bureau of Legislative Affairs
202  647-8802
Room 7805, HST

WASHSTATEC003495

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 20, 2019 8:55 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Thanks, Tamara.

H staffer, would it be possible to send the final 38(f) notification letters this morning?  We need to incorporate them into an AM package.

Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Thursday, September 19, 2019 4:40 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

I do not. Our H staffers should be able to provide.

Best,
Tamara


**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Date:** September 19, 2019 at 4:26:35 PM EDT
**To:** Darrach, Tamara A <DarrachTA@state.gov>, Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>, H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Thanks, Tamara.  Much appreciated!  Would you also have a copy of the 38(f) notifications that were submitted?

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Thursday, September 19, 2019 3:23 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

WASHSTATEC003496

Hi Joe,

Apologies for the delay.  I've attached the letters we responded to regarding CATS I-III/3D guns.

Best,
Tamara

SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Thursday, September 19, 2019 7:46 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Here's the "incoming" from Menendez on this topic.  Based on his letter it seems like the 38(f) notification Joseph is seeking would be dated 4 February, or shortly before then, if that helps.

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Wednesday, September 18, 2019 6:07 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

H colleagues:  Following up on the email chain below and my conversation with Tamara on Friday, would be able to send over the final congressional notifications for the Cats I-III rule, as well as any correspondence with the Hill (just formal letters -- both incoming and outgoing) on this issue by cob tomorrow?  There unfortunately is now some urgency in gathering these materials.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, September 13, 2019 5:04 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; H_Staffers <H_Staffers@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Joe - For final packages that went to the Hill, the staffers would have those.  Copying them on this thread.

For correspondence, are talking formal letters or emails too?

Thanks,
Tamara

SBU - Legal

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, September 13, 2019 4:27 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats I-III CN and Correspondence

Understood, based on a convo with Jeff just now.

For the finals of anything going to the Hill I'd have to refer you to H; adding Tamara for that purpose.

Josh

---

SBU - Legal

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Friday, September 13, 2019 12:13 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III CN and Correspondence

Hi Josh:  We were looking to get a copy of the final CN on Cats I-III that went to the Hill, as well as all of the correspondence with members of Congress on this issue (both incoming and outgoing).  Would you have these available to send to us, and if not, would you know who would?  I'd be happy to explain why we're asking for them if you'd like to give me a call (x7-8546).

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal

Message

| | |
|---|---|
| **From:** | IT Service Center [IMCEAEX-_O=CLASSSTATE_OU=CBPC+20ADMINISTRATIVE+20GROUP_CN=RECIPIENTS_CN=ITSERVICECENTER@namprd09.prod.outlook.co |
| **Subject:** | FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED |
| **Attachments:** | (F_496764) 201837662-FD.pdf; (FT_496765) 201837662-FD_Tab-1.pdf; (FT_496766) 201837662-FD_Tab-2.pdf; (FT_496767) 201837662-FD_Tab-3.pdf; (FT_496768) 201837662-FD_Tab-4.pdf; (FT_496769) 201837662-FD_Tab-5.pdf; (FT_496770) 201837662-FD_Tab-6.pdf; (FT_496771) 201837662-FD_Tab-7.pdf |

**From:** Khawam, Joseph N
**Sent:** Friday, September 20, 2019 6:04 PM
**To:** IT Service Center
**Subject:** FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED

Hello:  I'd like to request transfer of the attachments to this email to the unclassified system.  Please let me know if anything further is needed.  Below is the certification that IT has requested in the past.  Thanks.

**Office Symbol: IRM/IA/CIC**

# Certification for Unclassified/SBU Document Transfer from ClassNet to OpenNet

Requestor acknowledges that he/she has conducted a thorough review of the attached document(s) and no classified or NOFORN information was found.

Requestor approves the transfer of the attached file(s) from ClassNet to OpenNet.

███████████████████████

Please forward the unclassified transferred file(s) to <u>KhawamJN@state.gov</u> on OpenNet.

**Official - SBU**
**UNCLASSIFIED**

**From:** Christensen, Darin S
**Sent:** Friday, September 20, 2019 11:10 AM
**To:** Khawam, Joseph N; Darrach, Tamara A; Paul, Joshua M
**Cc:** Foster, John A; H_Staffers
**Subject:** FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED

This is the email I referenced on the low side that has the attachments that would have been sent with the 38(f) notifications.

Darin Christensen
Staff Assistant
Bureau of Legislative Affairs
(202) 647-8802
Room 7805, HST


**Official - SBU**
UNCLASSIFIED

**From:** Darrach, Tamara A
**Sent:** Friday, February 01, 2019 10:20 AM
**To:** H_Staffers
**Subject:** FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED

Approved AM to T. I am about to hand you the letters for this notification. Please note that the letters must go to the Hill on Monday, February 4. Thank you!


**Official - SBU**
UNCLASSIFIED

**From:** Monjay, Robert
**Sent:** Friday, February 01, 2019 10:02 AM
**To:** Paul, Joshua M; Darrach, Tamara A
**Subject:** FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED


**Official - SBU**
UNCLASSIFIED

**From:** PM-Staffers Mailbox
**Sent:** Thursday, January 03, 2019 12:53 PM
**To:** DDTC Tasker DL
**Cc:** Windecker, Melissa A
**Subject:** FW: Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED

FYSA on final. T approved.

Samantha Sison
PM/FO SharePoint
X70561

**From:** EverestMail
**Sent:** Thursday, January 03, 2019 12:40 PM
**To:** Everest_C; Everest_D; Everest_E; Everest_H; Everest_INR; Everest_ISN; Everest_J; Everest_L; Everest_M; Everest_P; Everest_PA; Everest_PM; Everest_R; Everest_S; SES_FrontOfficeOnly; SES-Line_Only; Everest_SP; Everest_T; SES_FrontOfficeOnly; PF-EverestE-Mail@state.sgov.gov
**Subject:** Final: PM/AM/T - Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List. 201837662 UNCLASSIFIED

FINAL ACTION has been taken on Package 201837662 Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List.

**FOR:** T
**ORGANIZATION:** PM
**CO-DRAFTER BUREAU:**
**PACKAGE SUBJECT:** Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export Control Act, of the Removal of Certain Items from the U.S. Munitions List.
**DOCTYPE:** Action Memo

**LINK:** 201837662 FINAL DOCUMENT (READ-ONLY)

**Official - SBU**
UNCLASSIFIED

REC1|APPROVE|1-3-2019
REC2|APPROVE|1-3-2019



201837662
**United States Department of State**

*Washington, D.C.  20520*



SENSITIVE BUT UNCLASSIFIED                                    December 18, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:          PM – Marik String, Senior Bureau Official

SUBJECT:    (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
                      Control Act, of the Removal of Certain Items from the U.S. Munitions List.

**BLUF:**       (SBU) PM seeks to notify Congress of removals from the United States Munitions
                     List (USML) as part of the on-going effort to ensure the USML includes only
                     items that merit the most stringent export control.  Notification will consist of an
                     informal 30 calendar-day period initiated by the PM/DTCP Office Director,
                     followed by a 30 calendar-day period formally notified by H.

**Recommendations**
(SBU) That you:
   (1) Approve the PM/DTCP Office Director to electronically transmit to House Foreign
        Affairs and Senate Foreign Relations Committees the draft attached letters to initiate
        informal notification of a removal from the USML, pursuant to the Department's
        arrangement with the Congress.  (Approve/Disapprove by 12/19/18)

   (2) Approve H, upon notice from PM/DTCP that the informal period initiated in paragraph
        (1) is concluded, to transmit the signed copies of the attached letters to the Congress in
        order to provide formal notification, as required by Section 38(f)(1) of the Arms Export
        Control Act, of the State Department's intent to remove certain items from the USML
        that no longer warrant control under this Act.  (Approve/Disapprove by 12/19/18)

**Background**
(U) Since 2009, the Department has been engaged in an effort to review the U.S. export control
system and revise the USML into a "positive" list that describes controlled items using objective
criteria, rather than broad, subjective, or design intent-based criteria.  As part of this
effort, items determined to no longer warrant control on the USML are being transferred to the
Department of Commerce's Commerce Control List (CCL).  Those non-objective criteria are
still found in three of the 21 categories of the USML, the only remaining tranche of USML
reforms that have been delayed for years due to political sensitivities surrounding firearms.

(U) After consultation with the Departments of Defense and Commerce, solicitation and review
of public comments, and interagency review, the Department of State has drafted a final rule to
revise the three USML Categories that have yet to be reformed:  I (firearms and related articles),
II (guns and armaments), and III (ammunition and ordnance).  Through this review, the

SENSITIVE BUT UNCLASSIFIED

Department identified and will continue to control on the USML those items that provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML.  The result of the review is that certain items currently on the USML not meeting this standard will transition to the CCL.  This reform has also been a key element of the President's Conventional Arms Transfer Policy Implementation Plan. ████████████████████████████████████████
███████

(U) The items that will transition to the CCL include: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic to a fully automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces.  Section 38(f)(1) of the Arms Export Control Act provides that the President may not remove items from the USML until 30 days after the date on which notice of the proposed removal is provided to the House Committee on Foreign Affairs and the Senate Foreign Relations Committee.

(SBU) Pursuant to a process communicated to Congress in 2011, the Department provides the draft final rules and a summary of the resulting removals to the Committees for a 30-day informal review period.  Congress has not attempted to stop or slow down previous removals from the USML through the Congressional notification process, unlike the Congressional holds that are commonly placed on arms sale notifications.  However, a Member could request that State not proceed with the formal notification or publication of this rule removing items from the USML. ████████████████████████████████████

(SBU) Our oversight committees were previously briefed on the proposed State and Commerce rules to revise USML Categories I-III and move certain items to the CCL, and additional briefings will be offered upon the start of informal Congressional Notification of the rule change.
████████████████████████████████████████████████████████████ The Department continues to defend a legal challenge to the public release of technical data to enable 3-D printing of firearms and has sought a stay of the litigation, pending completion of this rulemaking process.  This rule would transition certain technical data, including the data for semi-automatic and non-automatic firearms, to the CCL, where it can be publically released without authorization under Commerce rules.  The lawsuit and the movement of firearms and ammunition from the USML to the CCL have generated substantial public and congressional interest, which may result in additional scrutiny of this notification.

WASHSTATEC003503

(U) 

(U) Once these items are removed from the USML, they will be controlled by the Department of Commerce in new Export Control Classification Numbers (ECCNs) on the CCL in the Export Administration Regulations (EAR). Most of the physical items that are removed, including all of the firearms (with the exception of firearms manufactured prior to 1898), will have a world-wide Commerce Department license requirement, and the State Department will continue to review all export license applications for firearms for policy concerns.

(U) One defense article to be removed from the USML is designated as Major Defense Equipment (which requires separate notification and higher scrutiny under the ITAR), the M855A1 cartridge, the lead-free replacement for the 5.56x45 mm NATO, M855 standard ball cartridge. Therefore, the notification package will include a table delineating the proposed controls of Major Defense Equipment.

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML. The President delegated this authority to the Secretary of State in Executive Order 13637. This authority may be exercised by the Undersecretary of State for Arms Control and International Security Affairs pursuant to Delegation of Authority 293-2.

Attachments:
    Tab 1: Notification Letters to the Congress
    Tab 2: Revised USML Categories I, II, and III
    Tab 3: Line-in/Line-out Comparison of Current USML Categories I, II, and III with these USML Categories as Revised;
    Tab 4: Revised Department of Commerce Companion Control Text;
    Tab 5: Summary of Revisions to USML Categories I, II, and III; and
    Tab 6: Proposed Controls for Major Defense Equipment in Category III
    Tab 7: Roll-Out Plan

WASHSTATEC003504

SENSITIVE BUT UNCLASSIFIED

Approved:      PM – Marik String, SBO        MS

Drafted:       PM/DTCP:  Rob Monjay, ext. 3-2817 and cell: ███████████

Clearances:
|  |  |
|---|---|
| D | Jamie Shufflebarger – OK |
| P | Jamie Gusack – OK |
| S/P | Michael Urena – OK |
| PM/DDTC | Michael Miller – OK |
| PM/DTCP | Sarah Heidema – OK |
| PM/DTCC | Jae Shin – OK |
| PM/DTCL | Catherine Hamilton – OK |
| PM/DTCM | Anthony Dearth – OK |
| L/PM | Shana Rogers – OK |
| L/M | Alice Kottmyer – OK |
| PM/CPA | Dave McKeeby – OK |
| ISN/CATR | Thomas Kruger – OK |
| T | Ed Abisellan – OK |
| H | Collin Christopherson – OK |

SENSITIVE BUT UNCLASSIFIED

Message

**From:**      Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**      9/23/2019 12:52:06 PM
**To:**        Heidema, Sarah J [HeidemaSJ@state.gov]; Koelling, Richard W [KoellingRW@state.gov]; Miller, Michael F
               [Millermf@state.gov]
**CC:**        Foster, John A [FosterJA2@state.gov]
**Subject:**   RE: Cats I-III

Jeff and I will likely have some edits to the national security tab.  I'll do my best to get these back to the group by the
end of the day.  Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 1:10 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Re: Cats I-III

Gents-

Both these write-ups look great.  Thanks much for your work on this

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 4:28:12 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Mike, Sarah,
Here's where we stand:



Very respectfully,

Rick

WASHSTATEC003506

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Koelling, Richard W
**Sent:** Friday, September 20, 2019 3:11 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Sarah,

I'm not sure if the specific interchange you reference will take place prior to COB, but it's definitely on our radar. To be clear, what I'm planning to provide you and Mike later this afternoon will be a work in progress, in the literal sense. It won't be anything near final form—but given the enormity of what we're trying to accomplish in light of all of the challenges, we felt it prudent to provide you two a sense of where we are and where we're headed with respect to these two documents (i.e., the AM to T and the rule preamble). I figure an absence of anything even this early into the process won't make for a restful weekend.

To that end, we'll try to note the key pieces that are still left for us to pursue— ███████████████████████ ██████████████████████████████████████████████████ As of 3:09, we're yet to receive anything from BIS on this front. We're still waiting. That said, Joe and John have accomplished an extraordinary amount in these last couple of days, even without a SOC to reference.

I hope this clarifies.

Very respectfully,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

SBU

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Friday, September 20, 2019 2:06 PM
**To:** Miller, Michael F <Millermf@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Re: Cats I-III

Thanks Rick!  Was Joe going to talk to BIS ███████████████████████████████

**From:** Miller, Michael F <Millermf@state.gov>
**Sent:** Friday, September 20, 2019 2:03:47 PM

**To:** Koelling, Richard W <KoellingRW@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>;
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Cats I-III

Sensitive but Unclassified/Deliberative Process/Pre-decisional

Excellent, thanks Rick.

MM


SBU

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Friday, September 20, 2019 12:04 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** FW: Cats I-III

Mike, Sarah,
WRT the AM to T and the rule, we expect to have some draft language for you both to review this weekend before we depart at the end of the day.

Toward that end, John and I reached out to Tim, who returned today, to get answers on several items to include the following:



Again, our intent is to forward you draft language for both of these documents by EOD.

v/r, Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, September 20, 2019 10:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III



**From:** Timothy Mooney
**Sent:** Friday, September 20, 2019 9:40 AM
**To:** 'Koelling, Richard W' <KoellingRW@state.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Cats I-III

Rick,

I am back today ███████████████ In addition to email, I can be reached at ████████ today.

Are you in today?

Tim

**From:** Koelling, Richard W <KoellingRW@state.gov>
**Sent:** Thursday, September 19, 2019 1:13 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Cc:** Foster, John A <FosterJA2@state.gov>
**Subject:** Cats I-III

Tim,
When you have time after your return next week, would appreciate an opportunity to touch base with you on the subject issue. Adding John Foster from our Compliance shop.

Thanks,

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828


SBU

---

Message
_____

**From:**        Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**        9/23/2019 1:17:46 PM
**To:**          Kottmyer, Alice M [KottmyerAM@state.gov]
**Subject:**     FW: My comments on the rule
**Attachments:** Tab 1 - Cat I-III Final FRN updated copy.docx


Alice:  Attached is the draft final rule that I mentioned to you last week. ██████████████████
████████████████████████████████████████████████████████████████████ Please feel free to
give me a ring if you'd like an update on the other issues we discussed last week (x7-8546).

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal
_____
**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 12:53 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Foster, John A <FosterJA2@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** My comments on the rule

Here are my comments on the rule that Joe edited (thanks for that Joe!). ████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████ I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can
Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

Message

| | |
|---|---|
| **From:** | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent:** | 9/23/2019 3:09:02 PM |
| **To:** | Heidema, Sarah J [HeidemaSJ@state.gov]; Foster, John A [FosterJA2@state.gov]; Koelling, Richard W [KoellingRW@state.gov] |
| **CC:** | Miller, Michael F [Millermf@state.gov]; Hart, Robert L [HartRL@state.gov] |
| **Subject:** | RE: My comments on the rule |
| **Attachments:** | Tab 1 - Cat I-III Final FRN updated copy.docx |

Thanks, Sarah.  Attached is a slightly updated version of the FRN ████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

I spoke to Liz Abraham this morning.  A few items of note for you:

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 12:53 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Foster, John A <FosterJA2@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** My comments on the rule

Here are my comments on the rule that Joe edited (thanks for that Joe!).  ████████████████████████

████████████████████████████████████████████████████████████████  I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can

Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

**Message**

| | |
|---|---|
| **From**: | Hart, Robert L [HartRL@state.gov] |
| **Sent**: | 9/23/2019 3:15:20 PM |
| **To**: | Heidema, Sarah J [HeidemaSJ@state.gov]; Khawam, Joseph N [KhawamJN@state.gov]; Foster, John A [FosterJA2@state.gov]; Koelling, Richard W [KoellingRW@state.gov] |
| **CC**: | Miller, Michael F [Millermf@state.gov] |
| **Subject**: | Re: My comments on the rule |
| **Attachments**: | Tab 1 - Cat I-III Final FRN updated copy.docx |

I just got through Sarah's version ███████████████████████████████████
███████████████████████ Hopefully they show up correctly, I'm using the iOS version of Word, let me know if there's any issue.

Rob Hart

202.736.9221 | hartrl@state.gov

_____

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 6:52 PM
**To:** Khawam, Joseph N; Foster, John A; Koelling, Richard W
**Cc:** Miller, Michael F; Hart, Robert L
**Subject:** My comments on the rule

Here are my comments on the rule that Joe edited (thanks for that Joe!). ███████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████ I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

**Message**

**From:**        Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**        9/23/2019 4:53:38 PM
**To:**          Heidema, Sarah J [HeidemaSJ@state.gov]; Foster, John A [FosterJA2@state.gov]; Koelling, Richard W
                 [KoellingRW@state.gov]
**CC:**          Miller, Michael F [Millermf@state.gov]; Hart, Robert L [HartRL@state.gov]
**Subject:**     RE: My comments on the rule
**Attachments:** FW: CATS I-III Small Group Sync

[REDACTED]

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Khawam, Joseph N
**Sent:** Monday, September 23, 2019 11:09 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Foster, John A <FosterJA2@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: My comments on the rule

Thanks, Sarah.  Attached is a slightly updated version of the FRN. [REDACTED]

[REDACTED]

I spoke to Liz Abraham this morning.  A few items of note for you:

[REDACTED]

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SBU - Legal

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Sunday, September 22, 2019 12:53 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Foster, John A <FosterJA2@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** My comments on the rule

Here are my comments on the rule that Joe edited (thanks for that Joe!). ███████████████████
██████████████████████████████████████████████████████████████████████████████████ d
███████████████████████████████
██████████████████████████████ I would suggest a call tomorrow with Liz A to get it on their radar.  Also, can Hart and or Alice K take a quick look at this tomorrow too?

I also touched base with OMB on this and they are aware and may come to the Thursday meeting

Message
_____

**From:**      Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**      9/23/2019 5:56:14 PM
**To:**        Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:**   RE: Comments on Proposed Rule

Thanks!

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal
_____

**From:** Abraham, Liz (Federal) <LAbraham@doc.gov>
**Sent:** Monday, September 23, 2019 1:16 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** Comments on Proposed Rule

Joe,
Comments on the proposed rule are available on the BIS website.  Go to: https://efoia.bis.doc.gov/index.php/electronic-foia/index-of-documents.  Under public comments, you'll find 5 files with the comments on the firearms rule.  The last set is the representative bulk comments.

At times, the website can be slow. (Same excerpted below in case the links work.)

Best,
Liz


Record of Public Comments on the Proposed Rulemaking: "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United State Munitions List (USML)

--Record of Public Comments Commerce proposed Cat I-III firearms rule and Myths V Facts (PDF)
--Public comments 1 to 385 on Commerce Cat I-III firearms rule 1 of 5 (PDF)
--Public comments 386 to 770 on Commerce Cat I-III firearms rule 2 of 5 (PDF)
--Public comments 771 to 1155 on Commerce Cat I-III firearms rule 3 of 5 (PDF)
--Public comments 1156 to 1540 on Commerce Cat I-III firearms rule 4 of 5 (PDF)
--Bulk comments 1 to 130 representative samples on Commerce Cat I-III firearms rule 5 of 5 (PDF)

**R. Elizabeth Abraham**
Senior Counsel
U.S. Department of Commerce
Office of Chief Counsel for Industry and Security
14th & Constitution Ave., NW, Room 3839
Washington, DC 20230

Main: 202-482-5301
Direct:  202-482-8050
Fax: 202-482-0085
LAbraham@doc.gov

Confidentiality Notice:  This e-mail message is intended only for the named recipients.  It contains information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law.  If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited.  Please notify us immediately that you have received this message in error, and delete the message.

WASHSTATEC003516

Message

| | |
|---|---|
| **From:** | Khawam, Joseph N [KhawamJN@state.gov] |
| **Sent:** | 9/23/2019 6:19:50 PM |
| **To:** | Kovar, Jeffrey D [KovarJD@state.gov] |
| **Subject:** | RE: Draft AM Package on Cats I-III |
| **Attachments:** | 20190920 - National Security Justification Points.docx |

Jeff:  Attached please find the national security justification for the transfer.  As discussed, this will be a critical part of the AM package ██████████████████████████████████████ I've added my edits to the document, and it is ready for your review.  If you have any questions, please let me know.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal
**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Friday, September 20, 2019 11:10 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Draft AM Package on Cats I-III

Joe – thanks for putting all this together. I've made some initial edits to the AM, ██████████████████ ██████████ Let's discuss ████████████████████████████████ Jeff


SBU - Legal
**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, September 19, 2019 2:39 PM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** Draft AM Package on Cats I-III

Jeff: Attached please find the draft AM for your review. ████████████████████████████████
The rest of the tabs are attached just for your awareness.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal

WASHSTATEC003518

Message
_____

**From:**      Kovar, Jeffrey D [KovarJD@state.gov]
**Sent:**      9/23/2019 6:31:02 PM
**To:**        Khawam, Joseph N [KhawamJN@state.gov]
**Subject:**   RE: Draft AM Package on Cats I-III


Thanks -- will take a look.


SBU - Legal
_____
**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Monday, September 23, 2019 2:20 PM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** RE: Draft AM Package on Cats I-III

Jeff:  Attached please find the national security justification for the transfer.  As discussed, this will be a critical part of the AM package ███████████████████████████████████ I've added my edits to the document, and it is ready for your review.  If you have any questions, please let me know.

Thanks,
Joe


Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SBU - Legal
_____
**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Friday, September 20, 2019 11:10 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: Draft AM Package on Cats I-III

Joe – thanks for putting all this together. I've made some initial edits to the AM ████████████████████████ ███████████ Let's discuss. ████████████████████████████████ Jeff


SBU - Legal
_____
**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, September 19, 2019 2:39 PM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** Draft AM Package on Cats I-III

Jeff: Attached please find the draft AM for your review. ████████████████████████████████
The rest of the tabs are attached just for your awareness.

Thanks,
Joe


Joseph N. Khawam
Attorney-Adviser
U.S. Department of State

Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520
Office: (202) 647-8546
Opennet: KhawamJN@state.gov

SBU - Legal

Message

| | |
|---|---|
| **From**: | Koelling, Richard W [KoellingRW@state.gov] |
| **Sent**: | 9/23/2019 6:36:38 PM |
| **To**: | Miller, Michael F [Millermf@state.gov] |
| **CC**: | Heidema, Sarah J [HeidemaSJ@state.gov]; Diggs, Yolanda M [DiggsYM@state.gov]; Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | Prep Meeting for Cats I-III |

Mike,

████████████████████████████████████████ She has asked if it is possible that we set up a one hour prep meeting from 1130-1230 that morning. This would require you abbreviating the Team Lead meeting you have with RSAT that morning, plus turning the proposed prep session into a working lunch.

If you're okay with this change, I will work with Yolanda to make this happen. Since John and I are out that day, attendees would be you, Sarah, and Joe and/or Jeff. Would you prefer I add Josh in the mix?

v/r, Rick

SBU

Message

| | |
|---|---|
| **From:** | Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu] |
| **Sent:** | 9/23/2019 7:30:45 PM |
| **To:** | hartrl@state.gov |
| **Subject:** | 19-0923 Monday "Daily Bugle" |

## Monday, 23 September 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DoD/DSCA Publishes Policy Memo of Interest 19-07: "Case Description Field in an Amendment or Modification Document to a LOA"
4. State/DDTC: (No new postings.)
5. EU Amends Restrictive Measures Against the Central African Republic

### NEWS

6. Center Square: "Florida 'Ghost Gun' Bill Would Require Plastic Firearms to Contain at Least 4 Ounces of Metal"
7. Courier Post: "Prison Term, Deportation for Atco Businessman in Military Parts Scheme"
8. Telegraph: "Britain Will Impose Sanctions on Authoritarian Regimes that Arrest or Intimidate Dissident Journalists, Under Foreign Secretary Plans"
9. Expeditors News: "EU to Transition to Online AEO System"
10. ST&R Trade Report: "Trade Could See Impact from New Anti-Terrorism Framework"

### COMMENTARY

11. J.A. Lee, J. Fernandez & A. Smith: "Proposed CFIUS Regulations: The U.S. Remains Open for Business...but Read the Fine Print"

12. M. Moore: "Non-Tariff Supply-Chain Restrictions on IT/Telecom Products and Services"
13. SR. Whitten, B.D. Weimer & E.S. Tierney: "CFIUS Proposes Rules to Implement FIRRMA"

**EX/IM MOVERS & SHAKERS**

14. Monday List of Ex/Im Jobs: 145 Openings Posted This Week; 18 New Openings

**EX/IM TRAINING EVENTS & CONFERENCES**

15. ECS Presents "ITAR/EAR Boot Camp: Achieving Compliance" on 8-9 Oct in Savannah, GA
16. FCC Presents "U.S. Export Controls: ITAR from a non-U.S. Perspective", 26 Nov in Bruchem, the Netherlands

**EDITOR'S NOTES**

17. Bartlett's Unfamiliar Quotations
18. Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (5 Apr 2019), DOC/EAR (21 Aug 2019), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (14 Mar 2018), DOS/ITAR (30 Aug 2019), DOT/FACR/OFAC (9 Sep 2019), HTSUS (3 Sep 2019)
19. Weekly Highlights of the Daily Bugle Top Stories



ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest today.]

back to top

* * * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal

WASHSTATEC003524

Register Editions
(Source: Federal Register, 23 Sep 2019.)

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DoD/DSCA Publishes Policy Memo of Interest 19-07: "Case Description Field in an Amendment or Modification Document to a LOA"
(Source: DoD/DSCA, Sep 22 2019.)

DSCA Policy Memo 19-07 Case Description Field in an Amendment or Modification Document to a Letter of Offer and Acceptance (LOA) has been posted.

The current policy mandates that detailed information regarding the changes in an Amendment or Modification to an LOA be included in the case description field. Strict interpretation of the policy has led to Implementing Agencies including a statement for each individual case line that had a change in the document. The requirement for the case description field will now be:

(1) The identification of the major program involved
(2) A summary of the change(s) that are included in the document
(3) The reason(s) for the change(s)
(4) Identification of previous unaccepted amendments, if any
(5) Indication that it is a restated document (if applicable)

This memo updates Row 2 in Table C6.T9. Instructions for Preparing an Amendment or Modification.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC003525

## 5. EU Amends Restrictive Measures Against the Central African Republic
(Source: Official Journal of the European Union, 23 Sep 2019.)

*Regulations*
* Council Implementing Regulation (EU) 2019/1574 of 20 September 2019 implementing Article 17(3) of Regulation (EU) No 224/2014 concerning restrictive measures in view of the situation in the Central African Republic

*Decisions*
* Council Implementing Decision (CFSP) 2019/1576 of 20 September 2019 implementing Decision 2013/798/CFSP concerning restrictive measures against the Central African Republic

back to top

* * * * * * * * * * * * * * * * * * *

---

**NEWS**

## 6. Center Square: "Florida 'Ghost Gun' Bill Would Require Plastic Firearms to Contain at Least 4 Ounces of Metal"
(Source: The Center Square, 19 Sep 2019.) [Excerpts.]

By John Haughey, 23 Sep.  Florida could join a spate of states set to consider 2020 bills proposing to regulate or ban untraceable, undetectable "ghost guns," self-assembled hard plastic firearms that can be built from kits or molded from 3D-printer blueprints.

Florida Senate Bill 310 ... would prohibit anyone from printing, transferring, importing into Florida, and anyone from possessing or giving to another person in Florida, a 3D-printed firearm that contains less than 4 ounces of metal.  "People don't realize what is out there already on the internet, and what people are able to do without even going to buy a gun," Stewart said in a statement accompanying the bill. "The blueprints are on the internet."

Hard plastic 3D-printed firearms are referred to as "ghost guns" because they do not come with a serial number and are untraceable. They pose a safety risk because they can elude metal detectors, critics say. Stewart's bill exempts 3D firearms that contain at least 4 ounces of metal, the threshold where they can be identified by a metal detector.

The proposal filed by Stewart - expected to propose an "assault weapons" ban in 2020 - is one of at least seven gun control and "red flag" bills pre-filed for the next legislative session, which convenes Jan. 14.  "We talk about background checks and registration and all that - this particular weapon can

WASHSTATEC003526

be made by anybody, and they can get through metal detectors," Stewart said.

Blueprints for 3D guns have been available online since 2013 when Defense Distributed, a Texas nonprofit committed to publishing open source gun designs, made printable blueprints of a plastic 3-D printed pistol, the Liberator, available for downloading on its website.

The U.S. State Department in 2015 successfully sued to prohibit Defense Distributed from posting its Liberator blueprints on its website because doing so, it claimed, violated the International Traffic in Arms Regulation (ITAR) treaty.  Defense Distributed challenged the prohibition on First and Second amendment grounds and in July 2018, the U.S. Justice Department settled in Defense Distributed v. United States Department of State, essentially giving Defense Distributed license to publish its blueprints online.  Within a month, a federal district judge in Seattle issued an injunction against the sharing of 3-D-printed gun blueprints online.

Instead of pulling its free blueprints from its website, however, Defense Distributed offered them for sale, reasoning the injunction prevented it from giving the specs away for free, but didn't forbid it from selling them.  Another lawsuit was filed and the same federal judge in Washington state issued an injunction blocking any 3D plastic gun designs from being posted online. ...

Under the federal "Undetectable Firearms Act" (UFA), all firearms must be detectable by metal detectors "after removal of grips, stocks, and magazines." Federal law also requires all major components of firearms - defined to include "the barrel, the slide or cylinder, or the frame or receiver" - must be detectable by x-ray machines.  However, the UFA does not specify what portion of the firearm must be detectable by a metal detector. Critics say this could allow an individual to create a mostly plastic but technically compliant firearm using a 3D printer because metal in an extraneous part of the firearm could be removed prior to entering a security area.

There are numerous pending federal bills seeking to ban "ghost guns," including June's House Resolution 3265 introduced by Rep. Ted Deutch, D-Boca Raton, and 45 co-sponsors. A similar Senate measure filed by Sens. Bob Menendez, D-NJ, and Edward Markey, D-Mass, has 26 Democrat co-sponsors, but has stalled.  Meanwhile, bills specifically addressing plastic firearms have been gaining traction in state houses the last few years, with California's 2016 "ghost gun" law imposing requirements on anyone who manufactures or assembles a firearm, but not banning them.

New York and Washington are among states that have adopted laws outlawing some components of 3D gun-manufacturing, but as technology outpaces the capacity to regulate, those laws are riddled with alleged "loopholes."  New Jersey's April 2018 law is regarded as the most comprehensive in banning the distribution "by any means, including the Internet, to a person in New Jersey who is not registered or licensed as a [gun] manufacturer ... of digital instructions in the form of computer-aided design files or other code or instructions stored and displayed in electronic

WASHSTATEC003527

format as a digital model that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, magazine, or firearm component."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. Courier Post: "Prison Term, Deportation for Atco Businessman in Military Parts Scheme"
(Source: Courier Post, 18 Sep 2019.) [Excerpts.]

An Atco man has received a 42-month prison term for his role in a family-based scheme to bilk the U.S. Department of Defense.

Oben Cabalceta, 53, defrauded the military under contracts to provide parts for aircraft and other equipment between August 2004 and March 2016, the U.S. Attorney's Office for New Jersey said Tuesday.

The Defense Department paid $1.9 million for the subpar parts, it said.

Calbaceta, a Costa Rica citizen who overstayed his tourist visa in 2000, also admitted he obtained access to technical data and drawings intended for use only by U.S. citizens and people in the country lawfully. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Telegraph: "Britain Will Impose Sanctions on Authoritarian Regimes that Arrest or Intimidate Dissident Journalists, Under Foreign Secretary Plans"
(Source: The Telegraph, 22 Sep 2019.) [Excerpts.]

Britain will impose sanctions on authoritarian regimes that harass and imprison dissident journalists and campaigners, as part of its role as a "good global citizen" after Brexit, Dominic Raab declares today.

Writing in The Sunday Telegraph, the Foreign Secretary pledges that the Government will use new legislation to "provide a layer of UK accountability" against "those who target journalists, whistle-blowers and human rights campaigners with impunity in their own countries".

The move follows calls by MPs for ministers to use economic sanctions, such as asset freezes and travel bans, to punish foreign officials involved in "violating media freedom". ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WASHSTATEC003528

## 9. Expeditors News: "EU to Transition to Online AEO System"
(Source: Expeditors News, 19 Sep 2019.)

On October 1, 2019, the European Union (EU) will begin requiring applications for Authorized Economic Operator (AEO) status to be submitted electronically through the EU Trader Portal.

According to a press release issued by the European Commission's Taxation and Customs Union, the EU Trader Portal will deploy in two phases:

Phase 1 - Submission of AEO applications and the decision-making process, which will deploy on October 1, 2019;
Phase 2 - Other subsequent processes, which will deploy on December 15, 2019. AEO applications may continue to be submitted in a paper format until September 30, 2019.

The EU press release may be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. ST&R Trade Report: "Trade Could See Impact from New Anti-Terrorism Framework"
(Source: Sandler, Travis & Rosenberg Trade Report, 23 Sep 2019.)

The Department of Homeland Security introduced recently a new Strategic Framework for Countering Terrorism and Targeted Violence that explains how the DHS will use its tools and expertise to protect the U.S. from both foreign and domestic terrorist organizations and activities. The framework recognizes the potential of trade-related activities and infrastructure to be used for terrorist purposes and outlines further actions to prevent such outcomes.

One of the framework's strategic goals is denying terrorists and other hostile actors the opportunity to exploit the U.S. trade, immigration, and domestic and international travel systems. To achieve that goal the framework outlines a number of priority actions, including the following.

- working to enhance end-to-end visibility into supply chains

- implementing technological solutions to more effectively segment risk among millions of daily transactions

- better aligning targeting efforts to detect and disrupt illicit financial operations

- continually refining screening procedures for cargo prior to departure and proactively identifying and addressing vulnerabilities that can be exploited by

WASHSTATEC003529

terrorists

- working to enhance capabilities to detect and interdict the shipment of weapons of mass destruction, components, and related materials through technical detection and other targeting efforts at and between ports of entry

DHS states that it will follow this strategy with an action plan explaining in greater detail how it plans to achieve these and other objectives.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

### 11. J.A. Lee, J. Fernandez & A. Smith: "Proposed CFIUS Regulations: The U.S. Remains Open for Business...but Read the Fine Print"
(Source: Gibson Dunn, 20 Sep 2019.) [Excerpts.]

* Authors: Judith Alison Lee, Co-Chair, International Trade Practice, jalee@gibsondunn.com; Jose Fernandez, Esq., jfernandez@gibsondunn.com; and Adam Smith, Esq., asmith@gibsondunn.com; all of Gibson Dunn.

On September 17, 2019, the U.S. Department of the Treasury issued over 300 pages of proposed regulations to implement the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), legislation that expanded the scope of inbound foreign investment subject to review by the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee"). FIRRMA expanded-subject to the promulgation of these implementing regulations-the Committee's jurisdiction beyond transactions that could result in foreign control of a U.S. business. The Committee's jurisdiction will now include non-passive but non-controlling investments, direct or indirect, in U.S. businesses involved in specified ways with critical technologies, critical infrastructure, or sensitive personal data (referred to as "TID U.S. businesses" for technology, infrastructure, and data) and certain real estate transactions. The comment period will conclude on October 17, 2019, and as required by FIRRMA, the final regulations will become effective no later than February 13, 2020.

To date, only certain provisions of FIRRMA have been fully implemented. In late 2018, CFIUS launched a pilot program to require mandatory filings in higher risk "critical technology" investments. For the past year, the pilot program has served as a regulatory laboratory for the Committee-allowing it to experiment with the use of a short-form "declaration" and better assess the issues that arise in non-controlling but non-passive investments. Notably, the pilot program will remain in place for the foreseeable future, and the new

WASHSTATEC003530

proposed regulations will implement the remainder of the Committee's expanded authority under FIRRMA. Other developments are still to come- including the publication of a list of excepted foreign countries from which certain investors will receive less scrutiny.

Key developments are described below. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 12. M. Moore: "Non-Tariff Supply-Chain Restrictions on IT/Telecom Products and Services"
(Source: Moore Compliance Law, 14 Sep 2019.) (Part 1 of 3: Supply-Chain Rules Under DFARS Subpart 239.73)

* Author: Matthew Moore, Esq., matthew@moorecompliancelaw.com, 256-924-2979, Moore Compliance Law, P.C.

In the ongoing trade war between the U.S. and China, the U.S. Government's Section 301 tariffs on Chinese-origin goods has received most of the attention, and rightfully so. Effective September 1, 2019, these tariffs generally impact all Chinese-origin goods imported into the United States, including all information technology and telecommunications equipment ("Equipment"). However, there have also been a number of recent developments in U.S. law, relating to non-tariff restrictions on foreign-origin Equipment, with a particular focus on Chinese-origin products. This is the first installment of a three-part series on this topic. The purpose of this series is to provide a summary of several developments impacting U.S. IT and telecom enterprises.

First on the list, the Defense Federal Acquisition Supplement ("DFARS") has contained the supply-chain rules contained at DFARS Subpart 239.73, and related Clauses 252.239-7017 and 252.239-7018, since November 18, 2013. These rules were scheduled to expire on September 30, 2018. On September 19, 2018, the Department of Defense ("DoD") issued a Class Deviation (the "Class Deviation") that removed the sunset provision and made these rules permanent, while not amending the substance of the rules. Most recently, DoD issued a final rule effective February 15, 2019, that amended the DFARS consistent with the Class Deviation.

## What These Rules Apply to:

These rules, which are embodied in DFARS Clauses 252.239-7017 and 252.239-7018, apply to all DoD procurements of "information technology" that is either (i) a "covered system," (ii) a part of a "covered system," or (iii) in support of a "covered system."

## Key Definitions:

WASHSTATEC003531

The important definitions are as follows:

"Information technology" is defined to mean "any equipment, or interconnected system(s) or subsystem(s) of equipment, that is used in the automatic acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the agency."

And "covered system" is defined to mean "any national security system," which includes all information systems/networks that are used to store classified information, as well as:

"any telecommunications system, used or operated by an agency or by a contractor of an agency, or other organization on behalf of an agency-

(1) The function, operation, or use of which-

   (i) Involves intelligence activities;

   (ii) Involves cryptologic activities related to national security;

   (iii) Involves command and control of military forces;

   (iv) Involves equipment that is an integral part of a weapon or weapons system; or

   (v) Is critical to the direct fulfillment of military or intelligence missions but this does not include a system that is to be used for routine administrative and business applications, including payroll, finance, logistics, and personnel management applications."

Finally, "supply chain risk" is defined to mean "the risk that an adversary may sabotage, maliciously introduce unwanted function, or otherwise subvert the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of a covered system so as to surveil, deny, disrupt, or otherwise degrade the function, use, or operation of such system." Note that neither China nor any other country is identified by name here. But, as discussed in the later installments of this article, the U.S. Government is obviously very concerned about Chinese-origin products/services being used in U.S. data infrastructure, and presumably would be more likely viewed as a "supply chain risk."

**The Clauses**

With these definitions as background, DFARS Clause 252.239-7017 authorizes the procuring DoD agency to consider information relating to an offeror's supply chain in the agency's evaluation of the offeror's bid/proposal-i.e., in the procurement decision. This Clause specifically authorizes the agency to consider both public and non-public information, including "all-source intelligence," on the offeror's supply chain. Moreover, if the Government exercises its statutory authority (10 U.S.C. § 2339a) to limit disclosure of any

WASHSTATEC003532

such information, the decision will not be subject to review in a bid protest.

DFARS Clause 252.239-7018 adds the obligation for the offeror/contractor to "mitigate supply chain risk in the provision of supplies and services to the Government." No additional clarification is provided regarding the contractor's duty to mitigate risk. However, contractors should exercise all reasonable diligence here, as a contractor's failure to adequately "mitigate supply chain risk" during contract performance could potentially be used by the Government to support a termination for default or a negative past performance review.

Finally, these DFARS Clauses are not mandatory flow-downs to subcontractors. However, given DoD's purpose to regulate "supply chains" for these products, prime contractors should flow these down.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. R. Whitten, B.D. Weimer & E.S. Tierney: "CFIUS Proposes Rules to Implement FIRRMA"
(Source: National Law Review, 20 Sep 2019) [Excerpts.]

\* Authors: Reid Whitten, Esq., rwhitten@sheppardmullin.com, 202-469-4968; Brian D. Weimer, Esq., bweimer@sheppardmullin.com, 202-469-4904; and Eamon S. Tierney, Esq., etierney@sheppardmullin.com, 202-747-2191; all of Sheppard, Mullin, Richter & Hampton LLP.

The Treasury Department is scheduled to published "Provisions Pertaining to Certain Investments in the United States by Foreign Persons: in the Federal Register on 09/24/2019.

Key Takeaways:
  -- Technology Infrastructure and Data. CFIUS will focus its review on investments in critical Technology, critical Infrastructure, and sensitive personal Data ("TID Businesses").
  -- "Critical Technologies" is defined to include certain items subject to export controls along with emerging and foundational technologies under the Export Control Reform Act of 2018.
  -- CFIUS provides a very helpful list of critical infrastructure and functions to help assess whether any business is a TID Business. We reproduce most of this list at the end of this blog article. (Sneak preview: telecom, utilities, energy, and transportation dominate the list.)
  -- The proposed regulations provide much-needed guidance on what constitutes sensitive personal data and also seek to limit the reach of the definition so it does not cast too wide a net over transactions in which CFIUS really should have no national security concern.
  -- Exceptions for Certain Countries. Investors from certain countries may be excepted from CFIUS jurisdiction when making non-controlling investments.
  -- New Set of Rules for Real Estate. In a companion piece, CFIUS proposed

for the first time a detailed set of rules related to investments in real estate. We will cover this in a separate blog article to be published in the near future.

   -- Expansion of Short-Form Declaration Use. The proposed rules provide parties the choice to use a short-form declaration for any transaction under CFIUS jurisdiction in lieu of a long-form notice.

   -- Comments Due by October 17, 2019. Members of the public may submit comments on the proposed regulations any time between now and October 17, 2019. Final regulations must be adopted by CFIUS and become effective no later than February 13, 2020. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

## EX/IM MOVERS & SHAKERS

### 14. Monday List of Ex/Im Job Openings: 145 Openings Posted This Week, Including 18 New Openings
(Source: Events & Jobs Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

\* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

"#" New or amended listing this week

\* 3M; Maplewood, MN; Trade Compliance Counsel; Requisition ID; R00990035
# \* Aerotek; Centennial, CO; Global Import & Export Clerk; Requiaition ID: 6939031
# \* Agility; Queens, NY; Air Import Supervisor;

# * Agility; Boston, MA; Air Import Coordinator;
# * Agility; Carson, CA; Air Import Coordinator;
# * Agility; Denver, CO; Air / Ocean Import / Export Coordinator;
# * Agility; Dallas, TX; Ocean Import Coordinator;
# * Agility; San Diego; Import/Export Operations Coordinator;
* Airbus Defense and Space, Inc.; Herndon VA; Export and Trade Compliance Manager;
* Ajilon; Houston, TX; Export Admin;
* AM General; Auburn Hills, MI; International Compliance Analyst
* Arrowhead Products; Los Alamitos, CA; Trade Compliance Specialist
* BAE Systems; Arlington, VA; Director International Trade and Compliance/Senior Counsel; Requisition ID: 52758BR
* BAE Systems; Arlington, VA; International Trade Manager I (Compliance); Requisition ID: 52578BR
* Baker Hughes; Houston, TX; Trade Compliance Classification Analyst; Requisition ID: 1919330
* BASF; Mannheim, Germany; Manager Global Export Control; Requisition ID: EN57992009_ONLE_1
# * Bell Textron Inc; Fort Worth, TX; Trade Compliance Specialist;
# * Boeing; Arlington or Fairfax, VA; or Seattle, WA; Senior Manager for Licensing, Policy and Sanctions, Global Trade Controls (GTC); Job ID: 00000147764
# * Boeing; Arlington, VA; Senior Trade Control Specialist (Licensing and Policy); Job ID: 00000147754
* Bose; Framingham, MA; Senior Customs & Trade Compliance Lead; Requisition ID: R12731
* Bunge; Chesterfield, MO; Customs Compliance Manager - North America;
* Butler Aerospace & Defense; New Brighton, MN; HSE and Compliance Coordinator;
* C4ATS; Orlando, FL; Defense Import-Export Compliance Manager; Ivette De Jesus
* CACI; Chantilly, VA; Trade Compliance Analyst; Requisition ID: 223627_20151
* CACI; Reston, VA; Trade Compliance Specialist; Requisition ID: 225842
* Cargill; Jakarta, Indonesia; Global Trade Operations & Compliance
* CGI Federal Inc., Fairfax, VA; Trade Compliance Analyst ; Ann Runfola; Requisition ID: J0919-0237
* Cobham Advanced Electronic Solutions; Exeter, NH; Export Compliance Administrator; Requisition ID: req2614
* Cobham Advanced Electronic Solutions; New York; Contracts Manager; Requisition ID: 00S2L
* Cobham Advanced Electronic Solutions; San Diego; Manager, USG Compliance; Requisition ID: req2730
* Collins Aerospace; Windsor Locks, CT; International Trade Compliance Intern (Summer 2020); Requisition ID: 01348159
* Comtech EF Data; Tempe, AZ or Germantown, MD; Vice President Compliance; Requisition ID: 2503
* Crowell Moring; Washington D.C.; Government Contracts & International Trade Associate (Export Controls)
* Curtiss-Wright; Cheswick, PA; Sr. Manager, Global Trade

Compliance; Kirsty.harris@curtisswright.com; Requisition ID: 5272
* Danaher - Leica Microsystems; Wetzlar, Germany; Chief Compliance Officer; Requisition ID: LEI004530
* Danaher - SCIEX; Framingham, MA; Senior Manager Global Trade Compliance; Requisition ID: SCI003363
* DHL; Duisburg, Germay; Compliance Manager; Requisition ID: req73899
* DHL; Kuala Lumpur, Malaysia; Export Control Expert Asia Pacific; Requisition ID: req81427
* DHL; Singapore; Trade Compliance Manager APAC; Requisition ID: req74719
* Dorel Home; Wright City, MO; Sr. Manager of Logistics and Customs Trade Compliance;
* Eaton; Menomonee Falls, WI; Senior Analyst- Purchasing Compliance; Requisition ID: 076684
* Eaton; Peachtree City, GA; Director of Trade Compliance
* Elastic; St. Louis, MO; Export Control Manager;
* Elbit Systems of America; Merrimack, NH; Senior Manager, Trade Compliance; Requisition ID: 2019-7120
* Embraer; Melbourne, FL; Sr. Trade Compliance Specialist; Requisition ID: 176896
*Emerson; San Jose, Costa Rica; Trade Compliance Analyst I; Requisition ID: 19011754
* Epiroc; Garland, TX; Americas Trade Compliance Manager
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk
* Expeditors; Rozenburg, the Netherlands; Import en Export control medewerker
* Expolanka; El Segundo, CA; Export/Import Compliance Analyst;
* Fircroft; Telford, United Kingdom; Export Controller
* FIS Gobal; Brown Deer, WI; Compliance Analyst Senior (ECCN & Trade Sanctions);
* FLIR; Billerica, MA; Sr. Manager, Global Export Licensing - US Government & Defense Requisition ID: REQ12113
* FLIR; Täby, Sweden; Director, Global Export Compliance EMEA; Requisition ID: REQ12627
* Fluke Electronics; Everett, WA; Trade Compliance Analyst
* Fortive; Irvine, CA; Global Trade Compliance Analyst; Requisition ID: ADV000243
* General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 23607BR
* General Atomics; San Diego, CA; Government Regulatory Compliance Specialist; Requisition ID: 25215BR
* General Atomics; San Diego, CA; Import/Export Administrator; Requisition ID: 24614BR
* Google LLC; Mountain View, CA; Associate Export Compliance Counsel
* Harris Corporation; Arlington, VA; Manager, Trade Compliance; Requisition ID:CHQ20192008-32912
* Harvey John; Frankfurt am Main, Germany; Global Customs & Trade - Legal Counsel; Requisition ID: JR6805
* HRL Laboratories, LLC; Malibu, CA, Trade Compliance Specialist; Requisition ID: #95
* Illumina; Great Abington, United Kingdom; Compliance Specialist;

WASHSTATEC003536

Requisition ID: 18249-JOB
# * Integra Life Sciences; Plainsboro, NJ; Import/Export Compliance Specialist (Part-time); Requisition ID: 2019-32234
# * IPG Photonics; Oxford, MA; Trade Compliance Manager; Requisition ID: 285450196
* Irving; Halifax, Canada; Export Compliance Specialist; Requisition ID: 19003115
* Itron; Raleigh, NC; Sr Manager Information Security - Audit and Compliance; Requisition ID: 1901000
* ITW; Norwood, MA; Export Compliance Officer;
# * JBT; Chicago, IL; Manager of Trade Compliance; Requisition ID: 2019-4740
# * Johnson & Johnson; Markham, Canada; Team Lead Trade Compliance; Requisition ID: 4289190909
* Johnson Controls; Milwaukee, WI; Director, Global Trade Compliance; Requisition ID: WD30055791295;
* Johnson Controls; Wash DC; Senior Manager, Global Customs Compliance; Requisition ID: WD30076209195
* Koch Chem Tech; Tulsa, OK; Import/Export Compliance Specialist; Requisition ID: 052017
* L3Harris; Clifton, NJ; Senior Trade Compliance Specialist; Requisition ID: SAS20190509-33185
* Lenovo; Guandong, China; AP Trade Compliance Specialist; Requisition ID: 73183
* Leonardo DRS; Melbourne, FL; Senior Manager, Trade Compliance; Requisition ID:  94784
* Leonardo DRS; Melbourne, FL; Senior Supply Chain Analyst - Small Business Compliance; Requisition ID: 91669
* Levi Strauss & Co.; San Francisco, CA; Trade Compliance Specialist, Process Documentation & Education
* Lexacount; Denver, CO; Trade Sanctions and Compliance Associate
* Lexacount; Washington DC; Export Controls Associate; Requisition ID: 6522
* Lockheed Martin Aeronautics; Arlington, VA; International Licensing Analyst; Requisition ID: 493288BR
* Lockheed Martin Aeronautics; Fort Worth, TX; Global Trade Compliance Analyst; Requisition ID: 489782BR
* Lockheed Martin Aeronautics; Fort Worth, TX; International Trade Compliance Empowered Official; Requisition ID: 486710BR
* Lockheed Martin Aeronautics; Fort Worth, TX; International Trade Compliance Intern; Requisition ID: 487961BR
* Lockheed Martin Rotary and Mission Systems; Liverpool, NY, Moorestown, NJ, Owego, NY, Stratford, CT; Intl Licensing Analyst Stf; Requisition ID: 483502BR
* Lufthansa; Frankfurt am Main, Germany; Director Operations Compliance & Administration
* Lufthansa; Frankfurt am Main, Germany; Manager Compliance
* Lutron Electronics Co; Lehigh Valley, PA; Trade Compliance Coordinator; Requisition ID: 4025;
* Marshall; Cambridge, UK; Export Compliance;
* Medtronic; Columbia Hights, MN; Associate Export Controls Analyst; Requisition ID: 19000EXL

WASHSTATEC003537

* Medtronic; Sao Paulo, Brazil; Import/Export Coord III; Requisition ID: 19000C9M
* Meggitt; Fareham, United Kingdom; Trade Compliance Officer; Requisition ID: 39513
* Miller Canfield; Troy, MI; Corporate Attorney - International Trade; brennans@millercanfield.com
* Morson Group; Glasgow, UK; Export Control Officer Investigations
* NASA/JPL; Pasadena, CA; Export Compliance Advisor; Requisition ID: 10778
* Netflix; Los Angeles, CA; Coordinator, Trade Compliance;
* Netflix; Los Angeles, CA; Specialist, Trade Compliance
* NIKE Inc.; Beaverton, OR; North America Customs Compliance Manager; Requisition ID: 00455981
# * Northrop Grumman; Herndon, VA; International Trade Compliance Analyst; Requisition ID: 19026257
* Northop Grumman; Linthicum, MD; Principal International Due Diligence Analyst; Requisition ID: 19025076
* Northrop Grumman, Multiple Locations; International Trade Compliance Manager 2; Requistion ID: 19027198
* Pacific Northwest National Laboratory Location: Richland, WA; Export Control Professional; Elaine King; Requisition ID: 309752
* Paraxel; Quakertown, PA; Global Trade Compliance Coordinator; Requisition ID: 53257BR
# * Pattonair; Fort Worth, TX; Trade & Regulatory Compliance Manager;
# * Pattonair; Wroclaw, Poland; Trade and Compliance Manager;
* Pinpoint Pharma; Lincolnshire, IL; Export Compliance Specialist; Requisition ID: 351
* PolyOne; Avon Lake, OH; Trade Compliance Analyst
* Plexus Corp.; Neenah, WI; Trade Compliance Analyst Sr.; Jillian Schooley; Requisition ID: R001823
* PwC - McLean, VA; Regulations and Export Controls Director; Stephanie Andrews; Requisition ID: 96216WD
* PwC - McLean, VA; Regulations and Export Controls Manager; Stephanie Andrews; Requisition ID: 96185WD
* Raytheon; Andover, MA; Andover, MA; Global Trade (GT) Licensing Manager And Empowered Official; Requisition ID: 141742BR
* Raytheon; Andover, MA; Andover, MA; Global Trade (GT) Licensing Manager And Empowered Official; Requisition ID: 143920BR
* Raytheon; Broughton, UK; Export Control Manager; Requisition ID: 146798BR
* Raytheon, Cambridge, MA; Sr Global Trade Licensing Analyst; Requisition ID: 139427BR
* Raytheon; Tucson, AZ; Empowered Official; Requisition ID: 141847BR
* Raytheon; Tucson, AZ; Export Licensing and Compliance Specialist; Requisition ID: 143962BR
* Raytheon; Tucson, AZ; Sr. Trade Compliance Investigator; Requisition ID: 147211BR
* Raytheon; Waddington, UK; Export Control Manager; Requisition ID: 146798BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance;

WASHSTATEC003538

Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* SAP; Newtown Square, PA; Export Control - Senior Specialist; Requisition ID: 226489
* SAP; Walldorf, GER; Regional Export Control Coordinator (RECC) for EMEA; Requisition ID: 226695
* Satair; Asburn, VA; Export and Trade Compliance Specialist; Requisition ID: 1184847
* Saudi Aramco; Dhahran, Saudi Arabia; Paralegal; Requisition ID: 17184BR
* Siegwerk; Siegburg, Germany; Manager Global Customs & International Trade & Compliance
* Siemens; Munich, Germany; Intern Regulatory Compliance; Requisition ID: 116687
* Sierra Nevada Corporation; Arlington, VA; International Trade Compliance Analyst II; Requisition ID: R0007996
* Solvay; Lyon, France; SBS Export Compliance Expert (m/f); Requisition ID: 9501
# * Sophos; Multiple Locations; Senior Manager, Trade Compliance;
* Synopsys Inc.; Remote, U.S.; Director, Global Trade Compliance; Requisition ID: 20358BR
* Thales; Crawley, UK; Trade Compliance Officer; Requisition ID: R0071081
* Thales; Brest, France; Export Control Manager (H/F); Requisition ID: R0069297
* Thales; Gennevilliers, France; Senior Trade Compliance Manager H/F; Requisition ID: R0064439
* Thales; Valence, France; Trade Compliance Manager (H/F); Requisition ID: R0069297
* Thomas Jones Consulting; Washington, DC; Jr. International Trade, Export Controls & Economic Sanctions Associate
* Tiffany & Co; Parsippany, NJ; Director, Trade & Logistics - Americas
* TJX; Marlborough, MA; Senior Import & Customs Compliance Specialist;
* Torres Law, PLLC; Dallas, TX; Import/Export Consultant-Legal; info@torrestradelaw.com
* Varian Medical Systems; Austin, TX; Global Trade Analyst; Requisition ID: 16361BR
* Viasat; Carlsbad, CA; Global Trade Analyst; Requisition ID: 2824
* Vodafone; Bucharest, Romania; Legal Sanctions and Trade Analyst; Requisition ID: 258811
* Walt Disney; Kissimmee, FL; Customs Compliance Specialist; Requisition ID: 698918BR
* Wealth Ocean; Newport Beach, CA; Marketing & International Trade Specialist
* World Wide Technology; Edwardsville, IL; International Trace Compliance Specialist; Requisition ID: 19-0772
* World Wide Technology; Edwardsville, IL; International Trade Compliance Supervisor; Requisition ID: 19-0795
* Yaskawa; Eschborn, Germany; Zoll & Export Control Specialist EMEA

back to top

* * * * * * * * * * * * * * * * * * *

WASHSTATEC003539

## EX/IM TRAINING EVENTS & CONFERENCES

15. ECS Presents "ITAR/EAR Boot Camp: Achieving Compliance" on 8-9 Oct in Savannah, GA
(Source: ECS)

* What:  ECS ITAR/EAR Boot Camp:  Achieving Compliance
* When:  October 8-9, 2019
* Where: Westin Savannah Harbor Golf Resort & Spa
* Sponsor:  Export Compliance Solutions & Consulting (ECS)
* ECS Instructors:  Suzanne Palmer, Mal Zerden
* Register here or by calling 866-238-4018 or
email spalmer@exportcompliancesolutions.com.

back to top

* * * * * * * * * * * * * * * * * * *

16. FCC Presents "U.S. Export Controls: The ITAR from a non-U.S. Perspective", 26 Nov, in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

This intermediate-level training course is specifically designed for compliance professionals and those in a similar role who aim to stay up-to-date with the latest International Traffic in Arms Regulations (ITAR) requirements that apply to non-U.S. transactions.

The course will cover multiple topics relevant for organizations outside the U.S. that are subject to the International Traffic in Arms Regulations, including but not limited to: the U.S. regulatory framework, key ITAR concepts and definitions, tips regarding classification and licensing, essential steps to ensure an ITAR compliant shipment, how to handle a (potential) non-compliance issue, recent enforcement trends, and the latest regulatory amendments, including the latest U.S. Export Control Reform developments. Participants will receive a certification upon completion of the training.

**Details**
* What: U.S. Export Controls: The International Traffic in Arms Regulations (ITAR) from a non-U.S. Perspective
* When: Tuesday, 26 Nov 2019
 - Welcome and Registration: 9.00 am - 9.30 am
 - Training hours: 9.30 am - 4.30 pm
* Where: Full Circle Compliance, Landgoed Groenhoven, Dorpsstraat 6, Bruchem, the Netherlands
* Information & Registration: via the event page or contact FCC at events@fullcirclecompliance.eu or + 31 (0)23 - 844 - 9046
* This course can be followed in combination with "U.S. Export Controls: The Export Administration Regulations (EAR) from a non-U.S. Perspective" (27

WASHSTATEC003540

Nov 2019), and/or "The ABC of Foreign Military Sales" (29 Nov 2019). Please see the event page for our combo pricing deals.

back to top

* * * * * * * * * * * * * * * * * * * *

...

## EDITOR'S NOTES

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Philip Stanhope**, 4th Earl of Chesterfield (22 Sep 1694 - 24 March 1773; was a British statesman, diplomat, man of letters, and an acclaimed wit of his time.)
  - *"Know the true value of time; snatch, seize, and enjoy every moment of it. No idleness, no laziness, no procrastination: never put off till tomorrow what you can do today."*
  - *"Good humor is the health of the soul, sadness is its poison."*

* **Bruce Springsteen** (Bruce Frederick Joseph Springsteen; born September 23, 1949; is an American singer and songwriter, whose career that has spanned over 50 years.  Springsteen has become known for his poetic and socially conscious lyrics and lengthy, energetic stage performances, earning the nickname "The Boss". He has recorded both rock albums and folk-oriented works, and his lyrics often address the experiences and struggles of working-class Americans.)
  - *"Talk about a dream, try to make it real."*
  - *"When it comes to luck, you make your own."*

**Monday is pun day.**
* I ordered 2,000 lbs. of Chinese soup. It was Won Ton.
* Two huge windmills in a field were talking, and one asks the other, "What kind of music do you like?"  The other says, "I'm a big metal fan."
* A courtroom artist was arrested today for an unknown reason... details are sketchy.

back to top

* * * * * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

WASHSTATEC003541

* DHS CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199.  Implemented by Dep't of Homeland Security, U.S. Customs & Border Protection.
  - Last Amendment: 5 Apr 2019:  5 Apr 2019: 84 FR 13499-13513: Civil Monetary Penalty Adjustments for Inflation

* DOC EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774. Implemented by Dep't of Commerce, Bureau of Industry & Security.
- Last Amendment: 21 August 2019: 84 FR 43493-43501: Addition of Certain Entities to the Entity List and Revision of Entries on the Entity List and 84 FR 43487-43493: Temporary General License: Extension of Validity, Clarifications to Authorized Transactions, and Changes to Certification Statement Requirements

* DOC FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30.  Implemented by Dep't of Commerce, U.S. Census Bureau.
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (4 Jul 2019) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR is a 152-page Word document containing all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M. Implemented by Dep't of Defense.
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* DOE ASSISTANCE TO FOREIGN ATOMIC ENERGY ACTIVITIES: 10 CFR Part 810; Implemented by Dep't of Energy, National Nuclear Security Administration, under the Atomic Energy Act of 1954.
  - Last Amendment: 23 Feb 2015: 80 FR 9359, comprehensive updating of regulations, updates the activities and technologies subject to specific authorization and DOE reporting requirements. This rule also identifies destinations with respect to which most assistance would be generally authorized and destinations that would require a specific authorization by the Secretary of Energy.

WASHSTATEC003542

* <u>DOE EXPORT AND IMPORT OF NUCLEAR EQUIPMENT AND MATERIAL</u>; 10 CFR Part 110; Implemented by Dep't of Energy, U.S. Nuclear Regulatory Commission, under the Atomic Energy Act of 1954.
  - Last Amendment: 20 Nov 2018, 10 CFR 110.6, Re-transfers.

* <u>DOJ ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War.  Implemented by Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives.
  - Last Amendment: 14 Mar 2019: <u>84 FR 9239-9240</u>: Bump-Stock-Type Devices

* <u>DOS INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130. Implemented by Dep't of State, Directorate of Defense Trade Controls.
  - Last Amendment: 30 Aug 2019: <u>84 FR 45652-45654</u>, Adjustment of Controls for Lower Performing Radar and Continued Temporary Modification of Category XI of the United States Munitions List.
  - The only available fully updated copy (latest edition: 30 August 2019) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR is a 371-page Word document containing all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a $25 discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

* <u>DOT FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders.
Implemented by Dep't of Treasury, Office of Foreign Assets Control.
- Last Amendment: 9 Sep 2019: <u>84 FR 47121-47123</u> - Cuban Assets Control Regulations

* <u>USITC HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2019: 19 USC 1202 Annex. Implemented by U.S. International Trade Commission. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 Sep 2019: <u>Harmonized System Update (HSU) 1915</u>
  - HTS codes for AES are available <u>here</u>.
  - HTS codes that are not valid for AES are available <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle
Top Stories" published  here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; and Assistant Editor, Alexander Witt. The Ex/Im
Daily Update is emailed every business day to approximately 7,500 readers of
changes to defense and high-tech trade laws and regulations.

We check the following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or
are published with permission of private contributors, and may be freely
circulated without further permission, provided attribution is given to "*The
Export/Import Daily Bugle* of (date)". Any further use of contributors'
material, however, must comply with applicable copyright laws.  If you would
to submit material for inclusion in the *The Export/Import Daily Update ("Daily
Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or
expert advice.  Consult your own legal counsel or compliance specialists
before taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this
communication, it was not intended or written by the author or sender for tax
or legal advice, and cannot be used for the purpose of avoiding penalties
under the Internal Revenue Code or promoting, marketing, or recommending
to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present
is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top



Stay Connected

The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2019. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ hartrl@state.gov

Forward this email | Update Profile | About our service provider

Sent by jebartlett@fullcirclecompliance.eu

WASHSTATEC003545