# DEPARTMENT OF COMMERCE

## Bureau of Industry and Security

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

[Docket No. 111227796–5786–01]

RIN 0694–AF47

### Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule describes how articles the President determines no longer warrant control under the United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by July 9, 2018.

**ADDRESSES:** You may submit comments by any of the following methods:
• Submit comments via Federal eRulemaking Portal: *http://www.regulations.gov*. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS–2017–0004.
• By mail or delivery to Regulatory Policy Division, U.S. Department of Commerce, Bureau of Industry and Security, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694–AF47.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@bis.doc.gov*.

**SUPPLEMENTARY INFORMATION:**

## Background

This proposed rule describes how articles the President determines no longer warrant control under the United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns

and Armament; and Category III—Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a

letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in

Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.,* for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national

security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.,* unlimited distribution), the operation and maintenance information included in

that published operation and maintenance manual would no longer be "subject to the EAR." (*See* §§ 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (*See* § 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. 2778(f)(1).

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

WASHSTATEC023038

**Detailed Description of Changes Proposed by This Rule**

**Creation of New ECCNs**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and Related Commodities*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

—Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

—Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

—Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

—Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

—Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.,* subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503: Discharge Type Arms, and Certain Other Commodities*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia,* that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the

FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only "parts" and "components" would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States. This rule proposes adding three notes to clarify the scope of "parts" and "components" for

ammunition classified under ECCN 0A505. Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*New ECCN 0A602: Guns and Armament*

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

*New ECCN 0B501: Test, Inspection and Production Equipment for Firearms*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: Small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505: Test, Inspection and Production Equipment for Ammunition*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and

fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items are exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for Firearms and Certain Related Commodities*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for Ammunition and Certain Related Commodities*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism

controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for Guns and Armament and Certain Related Items*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for Shotguns*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based

WASHSTATEC023041

solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for Certain Optical Sighting Devices*

New ECCN 0E504 would replace existing ECCN 0E987, which controls "technology" "required" for the "development," or "production" of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

*New ECCN 0E505: Technology for Ammunition and Related Items*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for Guns and Armament, Including Technology for Test, Inspection and Production Equipment and Software for Guns and Armament*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or

refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to Seven ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c). BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606. This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602. It would remove paragraph .n, because the commodities listed in that paragraph

would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule. It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606. It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501. The commodities described in the MT control in ECCN 2B018 currently listed as MT are controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

*Revisions to ECCN 2D018*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018. As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of Nine ECCNs**

*Removal of ECCN 0A918*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986*

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun

shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987. As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

**Conforming Change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition That Would Be Added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United

States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

**Availability of License Exceptions**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception: Shipments of Limited Value (LVS)*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3. Firearms "parts", "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with

a limit of $500 on net value per shipment. In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This proposed rule would amend the regulations at § 740.9 to state that

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or

ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.,* the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S. government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)—to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception: Baggage (BAG)*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. BIS is aware that U.S. Customs and Border Protection (CBP)

has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation. *See* the following CBP website page for additional information: *https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C*. BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition. Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: *http://www.cbp.gov/xp/cgov/toolbox/ports/*.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.,* those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime

members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Would Be Limited to the Authorized End Use and End Users**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization. This existing

requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses. These requirements would also be applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization. BIS does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional

WASHSTATEC023046

Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization. This rule also adds contact information for these reports.

**Changes to Export Clearance Requirements for Firearms Being Moved to the CCL**

In part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

**Entry Clearance Requirements for Temporary Imports**

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USML in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the export after a temporary import. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP. A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP. BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USML items that should be incorporated into the Commerce final rule.

**Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL**

In part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR. These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

**Alignment With the Wassenaar Arrangement Munitions List**

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production

equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate Delayed Effective Date for a Final Rule**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal *www.regulations.gov* or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.

WASHSTATEC023048

Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting payers, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in

burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for

the Automated Export System (AES) Program (control number 0607–0152).

This proposed rule would affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule. Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

This proposed rule would also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule would make to part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely

be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under control number 0694–0093. Second, this proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694–0093.

Third, this proposed rule would affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions List (USML) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exception TMP. BIS would not impose a license requirement for such imports, but collecting this information would be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 would also conform to the requirement in License Exception TMP under § 740.9(b)(5), so

providing this information to CBP at the entry after a temporary import would facilitate the export phase of a temporary import under License Exception TMP. At the time of entry for a temporary import, the importer would need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exception TMP. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR. The importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this rule would make to part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to

moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@ omb.eop.gov,* or by fax to (202) 395–7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a

substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and

components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed

rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and

would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign-made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the

EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

List of Subjects

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

WASHSTATEC023052

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730–774) are proposed to be amended as follows:

## PART 736—GENERAL PROHIBITIONS

■ 1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## Supplement No. 1 to Part 736—General Orders

\*   \*   \*   \*   \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), then the item shall remain designated EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\*   \*   \*   \*   \*

## PART 740—LICENSE EXCEPTIONS

■ 3. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 4. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

### § 740.9   Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\*   \*   \*   \*   \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured

in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\*   \*   \*   \*   \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*   \*   \*   \*   \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition,

demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (b)(5):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

■ 5. Section 740.11 is amended by:
■ a. Adding a sentence at the end of the introductory text;
■ b. Adding Note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

### § 740.11   Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) and solely for U.S. government official use of this section.

\* \* \* \* \*

***Note 2 to paragraph (b)(2):*** *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\* \* \* \* \*

■ 6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

### § 740.14   Baggage (BAG).

\* \* \* \* \*

(b) \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the

firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

\* \* \* \* \*

### § 740.16   [Amended]

■ 7. Section 740.16 is amended by removing "0A987" from paragraph (b)(2)(iv) and adding in its place "0A504".

■ 8. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### § 740.20   License Exception Strategic Trade Authorization (STA).

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503, 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\* \* \* \* \*

■ 9. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.
(3) British Enfield rifle = SMCR.
(4) CM2, .22 target rifle (also known as SM2, .22).
(5) German model 98K = SMCR.
(6) German model G41 = SMCR.
(7) German model G43 = SMCR.
(8) IZH–94.
(9) LOS–7, bolt action.
(10) MC–7–07.
(11) MC–18–3.
(12) MC–19–07.
(13) MC–105–01.
(14) MC–112–02.
(15) MC–113–02.
(16) MC–115–1.
(17) MC–125/127.
(18) MC–126.
(19) MC–128.
(20) Saiga.
(21) Soviet Model 38 carbine = SMCR.
(22) Soviet Model 44 carbine-SMCR.
(23) Soviet Model 91/30 rifle = SMCR.
(24) TOZ 18, .22 bolt action.
(25) TOZ 55.
(26) TOZ 78.
(27) Ural Target, .22lr.
(28) VEPR rifle.
(29) Winchester Model 1895, Russian Model rifle = SMCR.
(30) Sever—double barrel.
(31) IZH18MH single barrel break action.
(32) MP–251 over/under rifle.
(33) MP–221 double barrel rifle.
(34) MP–141K.
(35) MP–161K.
(36) MTs 116–1.
(37) MTs 116M.
(38) MTs 112–02.
(39) MTs 115–1.
(40) MTs 113–02.
(41) MTs 105–01.
(42) MTs 105–05.
(43) MTs 7–17 combination gun.
(44) MTs 7–12–07 rifle/shotgun.
(45) MTs 7–07.
(46) MTs 109–07 rifle.
(47) MTs 109–07 rifle.
(48) MTs 106–07 combination.
(49) MTs 19–97.
(50) MTs 19–09.
(51) MTs 18–3M.
(52) MTs 125.
(53) MTs 126.
(54) MTs 127.
(55) Berkut–2.
(56) Berkut–2M1.
(57) Berkut–3.
(58) Berkut–2–1.
(59) Berkut–2M2.
(60) Berkut–3–1.
(61) Ots–25.
(62) MTs 20–07.
(63) LOS–7–1.
(64) LOS–7–2.
(65) LOS–9–1.
(66) Sobol (Sable).
(67) Rekord.
(68) Bars–4–1.
(69) Saiga.
(70) Saiga–M.
(71) Saiga–308.
(72) Saiga–308–1.
(73) Saiga–308–2.
(74) Saiga–9.
(75) Korshun.
(76) Ural–5–1.
(77) Ural 6–1.
(78) Ural–6–2.
(79) SM–2.
(80) Biatlon–7–3.
(81) Biatlon–7–4.
(82) Rekord–1.
(83) Rekord–2.
(84) Rekord–CISM.
(85) Rekord–1–308.
(86) Rekord–2–308.
(87) Rekord–1–308–CISM.
(88) VEPR.
(89) VEPR Super.
(90) VEPR Pioner.
(91) VEPR Safari.
(92) TOZ 109.
(93) KO 44–1.
(94) TOZ 78–01.
(95) KO 44.
(96) TOZ 99.
(97) TOZ 99–01.
(98) TOZ 55–01 Zubr.
(99) TOZ 55–2 Zubr.
(100) TOZ 120 Zubr.
(101) MTs 111.
(102) MTs 109.
(103) TOZ 122.
(104) TOZ 125.
(105) TOZ 28.
(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 10. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 11. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### § 742.6   Regional stability.

\*    \*    \*    \*    \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \*  \*  \* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*    \*    \*    \*    \*

■ 12. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### § 742.7   Crime control and detection.

(a) \*  \*  \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979, 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License

Requirements'' section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

■ 13. Section 742.17 is amended by:
■ a. Revising the first sentence of paragraph (a); and
■ b. Revising paragraph (f) to read as follows:

### § 742.17  Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \*  \*  \*

\*     \*     \*     \*     \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\*     \*     \*     \*     \*

### § 742.19  [AMENDED]

■ 14. Section 742.19(a)(1) is amended by:
■ a. Removing "0A986" and adding in its place "0A505.c"; and
■ b. Removing "0B986" and adding in its place "0B505.c".

## PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 15. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR,

2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 16. Section 743.4 is amended by adding paragraphs (c)(1)(i) and (c)(2)(i) and revising paragraph (h) to read as follows:

### § 743.4  Conventional arms reporting.

\*     \*     \*     \*     \*

(c) \*  \*  \*
(1) \*  \*  \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(2) \*  \*  \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482–4188, Fax: (202) 482–4145.

## PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 17. The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp. p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

### § 744.9  [AMENDED]

■ 18. Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

## PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 19. The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O.

12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### § 746.3  [AMENDED]

■ 20. Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

### § 746.7  [AMENDED]

■ 21. Section 746.7 is amended in paragraph (a)(1) by:
■ a. Adding "0A503" immediately before "0A980"; and
■ b. Removing "0A985".

## PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 22. The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 23. Section 748.12 is amended by:
■ a. Revising the heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
The revisions and additions read as follows.

### § 748.12  Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that

WASHSTATEC023056

are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\* \* \* \* \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

## PART 758—EXPORT CLEARANCE REQUIREMENTS

■ 24. The authority citation for part 758 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 25. Section 758.1 is amended as follows:

■ a. By revising paragraphs (b)(7), (8) and (9) and adding paragraph (b)(10); and

■ b. By revising paragraph (c)(1); and

■ c. By adding paragraph (g)(4) to read as follows:

### § 758.1   The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\* \* \* \* \*

■ 26. Add § 758.10 to read as follows:

### § 758.10   Entry clearance requirements for temporary imports.

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United

States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

**Note 1 to paragraph (b)(1):** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova,*

WASHSTATEC023057

Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR on the USMIL was temporarily imported. See also the additional requirements inspection in § 758.1(g)(4).

## PART 762—RECORDKEEPING

■ 27. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 28. Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2   Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

■ 29. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3   Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with

barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772—DEFINITIONS OF TERMS

■ 30. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### § 772.1   [AMENDED]

■ 31. In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774—THE COMMERCE CONTROL LIST

■ 32. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c; 22 U.S.C. 3201 et seq.; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 33. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

### Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

**0A018   Items on the Wassenaar Munitions List (see List of Items Controlled).**

#### License Requirements

Reason for Control: NS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

LVS: $3,000 for 0A018.b, $1,500 for 0A018.c and .d
GBS: N/A
CIV: N/A

#### List of Items Controlled

Related Controls: (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b–d), and X(a). (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a. (3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV

protection and ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were classified under 0A018.d and 0A988. (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.

Related Definitions: N/A

Items:

a. [RESERVED]

b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

***Note to 0A018.b:*** 0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:

a. Ammunition crimped without a projectile (blank star);

b. Dummy ammunition with a pierced powder chamber;

c. Other blank and dummy ammunition, not incorporating components designed for live ammunition;

d. [RESERVED]

* * * * *

■ 34. In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 as follows:

**0A501   Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

#### License Requirements

Reason for Control: NS, RS, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

LVS: $500 for 0A501.c, .d, and .x, $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
GBS: N/A
CIV: N/A

#### Special Conditions for STA

STA: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

List of Items Controlled

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e. Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

**Technical Note 1 to 0A501:** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

**Note 1 to 0A501:** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502   Shotguns; complete trigger mechanisms; magazines and magazine** extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.

License Requirements

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

List of Items Controlled

*Related Controls:* This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A503   Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles;** except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.

License Requirements

*Reason for Control:* CC, UN

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 For a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

List of Items Controlled

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504   Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

License Requirements

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, .d, .e, .g and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

**Note 1 to 0A504.f:** *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

**Note 2 to paragraph i:** *For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."*

**0A505   Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d and .x. | AT Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| AT applies to 0A505.c. | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $100 for items in 0A505.x

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:** *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

**Note 2 to 0A505.x:** *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

**Note 3 to 0A505.x:** *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

■ 35. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602   Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:*

a. Guns and armament manufactured between 1890 and 1919.

b. Military flame throwers with an effective range less than 20 meters.

c. through w. [Reserved]

x. "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

**Note 1 to 0A602:** *"Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

**Note 2 to 0A602:** *Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

**Supplement No. 1 to Part 774—[Amended]**

■ 36. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 37. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501   Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated in or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Small arms chambering machines.
b. Small arms deep hole drilling machines and drills therefor.
c. Small arms rifling machines.
d. Small arms spill boring machines.
e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated in or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.
b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.
c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.
d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.
e. through .w [Reserved]
x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 38. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:
a.1. Gun barrel rifling and broaching machines and tools therefor;
a.2. Gun barrel rifling machines;
a.3. Gun barrel trepanning machines;
a.4. Gun boring and turning machines;
a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
a.6. Gun jump screw lathes;
a.7. Gun rifling machines; and
a. 8. Gun straightening presses.
b. Jigs and fixtures and other metalworking implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774—[Amended]**

■ 39. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 40. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501   "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 41. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A
*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:*
a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.

**License Requirements**

*Reason for Control:* CC, UN

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "Technology" "required" for the "development," or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774—[Amended]**

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| Control(s) |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

WASHSTATEC023063

**Supplement No. 1 to Part 774— [Amended]**

■ 46. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 47. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| CC applies to entire entry. | CC Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 48. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004   Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See ECCN *2D001* for software for items controlled under this entry. (2) See ECCNs *2E001* ("development"), *2E002* ("production"), and *2E101* ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, *2B104* and *2B204*. (5) Also see ECCNs *2B117* and *2B999.a.*
*Related Definitions:* N/A
*Items:*

  a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*
  b. Having any of the following:
  b.1. A maximum working pressure exceeding 207 MPa;
  b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*
  b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

***Technical Note:*** *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

■ 49. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

  No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 50. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018   "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

  No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

■ 51. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001   "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also 2E101, 2E201, and 2E301
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.
   **Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

■ 52. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002   "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611   Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1,500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*
   a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
   b. to w. [RESERVED]
   x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for a defense article controlled by USML Category XII or items controlled by 7A611, and that are NOT:
   1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
   2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated: May 4, 2018.

**Richard E. Ashooh,**
*Assistant Secretary for Export Administration.*

[FR Doc. 2018–10367 Filed 5–21–18; 8:45 am]

**BILLING CODE 3510–33–P**

WASHSTATEC023066

# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 5th, 2018

Secretary Mike Pompeo             Secretary Wilbur Ross
Department of State                Department of Commerce
2201 C Street NW                  1401 Constitution Avenue NW
Washington, DC 20230              Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department. Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments. Exporters must be registered with the State Department and end-users are monitored under the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers. Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking. Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

WASHSTATEC023067

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.

Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** O726 = OOO   ACTION BUREAU: PM

DATE: JUL 2 6 2018

## IPS:

___X____SUBSTANTIVE

___X____IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

____✓____REPLY FOR SIGNATURE BY **Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs**

_____ADDRESS ENVELOPE TO DISTRICT OFFICE

_____DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____FYI ONLY/NO RESPONSE NECESSARY

_____REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau* *of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

**Due Date** 7/31

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHSTATEC023069

**FROM: Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL 2 6 2018

_____ **For Signature by Secretary Pompeo**

**For draft by** _____ **Bureau**

✗ **Tasked to the** _Pm_ **Bureau for**
**Signature by Mary K. Waters,**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to** _____ **Bureau for signature by**
**Post or Bureau**

_____ **FYI Only—No Reply Necessary**

**For** _____ **Bureau**

**Special Actions:**

_____ **Multi-signer letter:**

_____ **Special Clearances:**

_____ **For S Staff Review (H Only)**

_____ **Everest Tasker#** _____

_____ **Special Instructions:** _____

WASHSTATEC023070

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510–6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

conviction, to build their own gun.  These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act.  Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

# United States Senate

WASHINGTON, DC 20510

July 26, 2018

2018 JUL 27   A 11:46

LEGISLATIVE AFFAIRS

RECEIVED

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML, and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

WASHSTATEC023074

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints. Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

WASHSTATEC023075

Secretary Pompeo
Page 4 of 4

Distributed — but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

                                        Sincerely,

_____          _____
Edward J. Markey                          Bill Nelson
United States Senator                     United States Senator


_____          _____
Richard Blumenthal                        Christopher S. Murphy
United States Senator                     United States Senator


_____          _____
Dianne Feinstein                          Elizabeth Warren
United States Senator                     United States Senator


_____          _____
Patrick Leahy                             Richard J. Durbin
United States Senator                     United States Senator


_____
Benjamin L. Cardin
United States Senator

WASHSTATEC023076

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL#**H2019** 0801=003 ACTION BUREAU: _PM_

DATE: _AUG 0 1 2019_

# IPS:

___X_____SUBSTANTIVE

___X_____IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

____✗____REPLY FOR SIGNATURE BY **Mary Elizabeth Taylor, Assistant Secretary, Bureau of Legislative Affairs**

_____ADDRESS ENVELOPE TO DISTRICT OFFICE

_____DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____FYI ONLY/NO RESPONSE NECESSARY

_____REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

## Due Date  8-6-19

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHSTATEC023077

**FROM: A/S Mary Elizabeth Taylor (H)**
**Congressional Correspondence**
**Recommendation**

AUG 0 1 2019

_____ **For Signature by Secretary Pompeo**
**For draft by _____ Bureau**

☒ **Tasked to the** _PM_ **Bureau for**
**Signature by Mary Elizabeth Taylor**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to _____ Bureau for signature by**
**Post or Bureau**

_____ **Request for Briefing_____ Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

Multi-signer letter:_____
_____

Special Clearances:_____

Everest Tasker#_____
Special Instructions:_____
_____

WASHSTATEC023078

TOM COTTON
ARKANSAS

326 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
PHONE: (202) 224-2353

## United States Senate

COMMITTEES
ARMED SERVICES
BANKING, HOUSING, AND
URBAN AFFAIRS
JOINT ECONOMIC COMMITTEE
SELECT COMMITTEE ON INTELLIGENCE

July 31, 2019

The Honorable Michael R. Pompeo
Secretary
U.S. Department of State
2201 C St NW
Washington, DC 20520

The Honorable Wilbur Ross
Secretary
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

Dear Gentlemen,

  I am writing regarding the transfer of export licensing authority for sporting and commercial firearms and ammunition products currently on Categories I, II, and III of the United States Munitions List (USML) from the Department of State – Directorate of Defense Trade Controls (DDTC) to the Department of Commerce – Bureau of Industry and Security (BIS) where the products would be controlled on the Commerce Control List (CCL) and the Export Administration Regulations (EAR). I urge you both publish the new rules for this transfer as soon as is practicable.

  The export of Category I, II, or III items under the CCL process is extremely important to the domestic firearms and ammunition industry, primarily because it reduces the export approval timeline. The ability to rapidly reply to international business opportunities allows U.S. companies to remain competitive in the global market and creates high-quality manufacturing jobs at home. Furthermore, some North Atlantic Trade Organization (NATO) allies have indicated a desire not to purchase small arms from U.S. vendors due to the overly burdensome process required to receive an exemption for the sale under the International Traffic in Arms Regulations (ITAR). This creates an environment where foreign countries can compete unfettered for our military small arms programs while many foreign nations are restricting US companies from competing in theirs. This regulation has not only been prohibitive for initial sales to allies but additionally creates excessively burdensome procedures for follow-on maintenance contracts.

  Therefore, I am requesting the Departments of State and Commerce to publish the final rules to streamline the export licensing process in support of our domestic firearms and ammunition industry. I urge you to move forward with this process to ensure our competitiveness in the global market.

Sincerely,

Tom Cotton
United States Senator

JONESBORO
300 SOUTH CHURCH, SUITE 338
JONESBORO, AR 72401
(870) 933-6223

SPRINGDALE
1108 SOUTH OLD MISSOURI ROAD, SUITE B
SPRINGDALE, AR 72764
(479) 751-0879

LITTLE ROCK
1401 WEST CAPITOL AVENUE, SUITE 225
LITTLE ROCK, AR 72201
(501) 223-8901

EL DORADO
106 WEST MAIN STREET, SUITE 410
EL DORADO, AR 71730
(870) 864-8892

WASHSTATEC023079

| Message | |
|---|---|
| **From:** | Heidema, Sarah J [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=988657ebed564d51a4569d583b8c4e81-Heidema, Sa] |
| **Sent:** | 1/3/2019 1:58:55 PM |
| **To:** | Tom_Callahan@foreign.senate.gov; Doug.Anderson@mail.house.gov; Fite, David [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4e75d0c227b0493b8222ee24ec16dd2d-David_Fite]; Rice, Edmund [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=8f85c92e4487428c991b36baf154d6e5-edmund.rice]; Stacie_Oliver@foreign.senate.gov |
| **CC:** | Miller, Michael F [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=33a069765bf540bd9e0f8e8da2dbb5b6-Miller, Mic]; String, Marik A [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=1cd382a5c0224f26866472ee10c25e5c-String, Mar]; Paul, Joshua M [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu]; Lorman, Amanda L [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c0783659bd1a462f8bbaa8df038bfef0-Lorman, Ama]; Laychak, Michael R SES DTSA EO (US) [michael.r.laychak.civ@mail.mil]; Matthew Borman [Matthew.Borman@bis.doc.gov] |
| **Subject:** | Informal notification for removal of items from the U.S. Munitions List |
| **Attachments:** | USML Cat I-III 38(f) - MDE List.pdf; USML Cat I-III 38(f) - Line-in Line-out Comparison.pdf; USML Cat I-III 38(f) - Commerce control text.pdf; USML Cat I-III 38(f) - Notification Letters.pdf; USML Cat I-III 38(f) - Revised Control Text.pdf |

This email provides the documents that begin the 30-day informal notification period for the removal of items from the U.S. Munitions List (USML) Categories I-III.  This notification proceeds the statutorily required 30-day notification period for removals of items from the USML pursuant to AECA section 38(f).  This package of documents contains the draft letters that will transmit the formal notification, a summary of the revisions to USML Categories I-III, copies of the revised USML Category I-III; line-in/line-out comparisons of the current USML Categories I-III and the revised version; and a copy of the Department of Commerce's companion regulatory text describing new or revised Export Control Classification Numbers (ECCNs) that will control the transitioning items.

Department of State personnel, along with our interagency colleagues, are available to answer any questions you may have related to the attached and would be please to provide you a briefing on the changes outlined in these rules.

Regards,

Sarah Heidema
Director
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
Department of State
202-663-2809

**Official**
UNCLASSIFIED

*[December 20, 2018]*

Billing Code: 3510-33-P

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No.    ]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

**AGENCY:**  Bureau of Industry and Security, Department of Commerce.

**ACTION:**  Final rule.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774 of the Export Administration Regulations (15 CFR parts 730-774) are amended as follows:

**PART 736 – GENERAL PROHIBITIONS**

1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017);  Notice of May 9, 2018, 83 FR 21839 (May 10, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

**SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS**

\* \* \* \* \*

  (e) \* \* \*

  (3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for

WASHSTATEC023081

[December 20, 2018]

purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

## PART 740 – LICENSE EXCEPTIONS

3. The authority citation for 15 CFR part 740 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

4. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

## § 740.2 Restrictions on all license exceptions.

(a) \*  \*  \*

(21)  The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2)(*i.e.*, parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm.  (*See* USML Category I(h)(2)).  In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

5. Section 740.9 is amended by:

a.  Adding five sentences at the end of paragraph (a) introductory text;

*[December 20, 2018]*

b.  Adding one sentence at the end of paragraph (b)(1) introductory text;

c.  Adding paragraph (b)(5); and

d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\* \* \* \* \*

(a)  \*  \*  \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair").  In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment.  In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES.  In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this section, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

\* \* \* \* \*

(b)  \*  \*  \*

(1) \*  \*  \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4),

*[December 20, 2018]*

or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.*  This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter

WASHSTATEC023084

*[December 20, 2018]*

or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

6. Section 740.10 is amended by:

a. Adding one sentence at the end of paragraph (b)(1); and

b. Adding paragraph (b)(4).

The additions read as follows:

## § 740.10 Servicing and replacement of parts and equipment (RPL)

\* \* \* \* \*

*(b)* \* \* \*

(1) \*   \*   \* The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraphs (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

\* \* \* \* \*

(4) *Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement.* This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraphs (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740;

WASHSTATEC023085

*[December 20, 2018]*

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(4): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

7.  Section 740.11 is amended by:

a. Adding two sentences at the end of the introductory text;

b. Adding Note 2 to paragraph (b)(2); and

c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

*[December 20, 2018]*

**§ 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).**

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

\* \* \* \* \*

*Note 2 to paragraph (b)(2): Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (e.g., contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.*

\* \* \* \* \*

8. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

**§ 740.14 Baggage (BAG).**

\* \* \* \* \*

(b) \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or

WASHSTATEC023087

[December 20, 2018]

"attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

* * * * *

## § 740.16 [AMENDED]

9. Section 740.16 is amended by:

a. Revising paragraph (a)(2);

b. Revising paragraphs (b)(2)(iv) and (v); and

*[December 20, 2018]*

c.  Adding paragraph (b)(2)(vi);

The revisions and addition read as follows:

## § 740.16 Additional permissive reexports (APR).

\*  \*  \*  \*  \*

(a)  \*  \*  \*

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003, 6A990; or commodities classified under a 0x5zz ECCN; and

\*  \*  \*  \*  \*

(b)  \*  \*  \*

(2)  \*  \*  \*

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCNs 6A002 or 6A990; or

(vi) Commodities classified under a 0x5zz ECCN.

\*  \*  \*  \*  \*

10.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

## § 740.20 License Exception Strategic Trade Authorization (STA).

\*  \*  \*  \*  \*

(b)  \*  \*  \*

(2)  \*  \*  \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*  \*  \*  \*  \*

11. Add Supplement No. 4 to part 740 to read as follows:

## SUPPLEMENT NO. 4 TO PART 740 - ANNEX A FIREARM MODELS

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.

(2) IZH 34M, .22 Target pistol.

WASHSTATEC023089

*[December 20, 2018]*

(3) IZH 35M, .22 caliber Target pistol.

(4) Mauser Model 1896 pistol = SMCR.

(5) MC-57-1 pistol.

(6) MC-1-5 pistol.

(7) Polish Vis Model 35 pistol = SMCR.

(8) Soviet Nagant revolver = SMCR.

(9) TOZ 35, .22 caliber Target pistol.

(10) MTs 440.

(11) MTs 57-1.

(12) MTs 59-1.

(13) MTs 1-5.

(14) TOZ-35M (starter pistol).

(15) Biathlon-7K.

(b) *Rifles.*

(1) BARS-4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K =SMCR.

(6) German model G41 = SMCR.

(7) German model G43=SMCR.

(8) IZH-94.

(9) LOS-7, bolt action.

(10) MC-7-07.

(11) MC-18-3.

(12) MC-19-07.

(13) MC-105-01.

(14) MC-112-02.

(15) MC-113-02.

(16) MC-115-1.

(17) MC-125/127.

*[December 20, 2018]*

(18) MC-126.

(19) MC-128.

(20) Saiga.

(21) Soviet Model 38 carbine=SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle=SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle=SMCR.

(30) Sever – double barrel.

(31) IZH18MH single barrel break action.

(32) MP-251 over/under rifle.

(33) MP-221 double barrel rifle.

(34) MP-141K.

(35) MP-161K.

(36) MTs 116-1.

(37) MTs 116M.

(38) MTs 112-02.

(39) MTs 115-1.

(40) MTs 113-02.

(41) MTs 105-01.

(42) MTs 105-05.

(43) MTs 7-17 combination gun.

(44) MTs 7-12-07 rifle/shotgun.

(45) MTs 7-07.

(46) MTs 109-12-07 rifle.

(47) MTs 109-07 rifle.

(48) MTs 106-07 combination.

*[December 20, 2018]*

(49) MTs 19-97.

(50) MTs 19-09.

(51) MTs 18-3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut-2.

(56) Berkut-2M1.

(57) Berkut-3.

(58) Berkut-2-1.

(59) Berkut-2M2.

(60) Berkut-3-1.

(61) Ots-25.

(62) MTs 20-07.

(63) LOS-7-1.

(64) LOS -7-2.

(65) LOS-9-1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars-4-1.

(69) Saiga.

(70) Saiga-M.

(71) Saiga 308.

(72) Saiga-308-1.

(73) Saiga 308-2.

(74) Saiga-9.

(75) Korshun.

(76) Ural-5-1.

(77) Ural 6-1.

(78) Ural-6-2.

(79) SM-2.

WASHSTATEC023092

*[December 20, 2018]*

(80) Biatlon-7-3.

(81) Biatlon-7-4.

(82) Rekord-1.

(83) Rekord-2.

(84) Rekord-CISM.

(85) Rekord-1-308.

(86) Rekord-2-308.

(87) Rekord-1-308-CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioneer.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44-1.

(94) TOZ 78-01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99-01.

(98) TOZ 55-01 Zubr.

(99) TOZ 55-2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742 – CONTROL POLICY—CCL BASED CONTROLS

12.  The authority citation for part 742 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210;

*[December 20, 2018]*

Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

13.  Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

§742.6 Regional stability.

*   *   *   *   *

(b)  *   *   *

(1)  *   *   *

(i)  Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. *   *   * When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

*   *   *   *   *

14.  Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

§ 742.7 Crime control and detection.

(a)  *   *   *

[*December 20, 2018*]

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

(c)  *Contract sanctity*.  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

15.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a); and

b. Revising paragraph (f) to read as follows:

WASHSTATEC023095

*[December 20, 2018]*

### § 742.17  Exports of firearms to OAS member countries.

(a)  *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  \*   \*   \*

\*   \*   \*   \*   \*

(f) *Items/Commodities.*   Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No. 1 to part 774 of the EAR).

\*   \*   \*   \*   \*

### § 742.19 [AMENDED]

16. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

### PART 743 – SPECIAL REPORTING AND NOTIFICATION

17. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

18. Section 743.4 is amended by:

a. Adding four sentences to the end of paragraph (a);

b. By redesignating Note to paragraph (a) as Note 1 to paragraph (a);

c. Revising paragraph (b);

d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

e. By redesignating Note to paragraph (e)(1)(ii) as Note 2 to paragraph (e)(1)(ii);

e. Revising paragraph (h); and

f. Adding paragraph (i) to read as follows:

### § 743.4 Conventional arms reporting.

(a) \*   \*   \*   This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section.  The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(10).

*[December 20, 2018]*

Because of the requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method.  The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

     ***Note 1 to paragraph (a):*** *   *   *

(b) *Requirements.*   You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

(c) *   *   *

(1) *   *   *

     (i) ECCN 0A501.a and .b.

*   *   *   *   *

(2) *   *   *

     (i) ECCN 0A501.a and .b.

*   *   *   *   *

(h) *Alternative submission method.*  This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section.  The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(10), to include the six character ECCN classification (*i.e.*, 0A501.a or 0A501.b) as the first text to appear in the Commodity description block.  If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S. Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting.  An exporter that complies with the requirements in § 758.1(g)(4)(ii) does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482-0092, Fax: (202) 482-4094.  Information concerning the reporting

*[December 20, 2018]*

requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482-4188, Fax: (202) 482-4145.

## PART 744 – CONTROL POLICY: END-USER AND END-USE BASED

19.  The authority citation for 15 CFR part 744 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of September 19, 2018, 83 FR 47799 (September 20, 2018).

## § 744.9 [AMENDED]

20.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

## PART 746 – EMBARGOES AND OTHER SPECIAL CONTROLS

21.  The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2018, 83 FR 21839 (May 10, 2018); Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

## § 746.3 [AMENDED]

22.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

*[December 20, 2018]*

### § 746.7 [AMENDED]

23. Section 746.7 is amended in paragraph (a)(1) by:

a. Adding "0A503," immediately before "0A980"; and

b. Removing "0A985,".

## PART 748 – APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

24. The authority citation for 15 CFR part 748 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

25. Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text;

c. Revising paragraphs (a) introductory text and (a)(1);

d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

e. Adding paragraph (e).

The revisions and additions read as follows.

### § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

*[December 20, 2018]*

\*   \*   \*   \*   \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states*. If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

     **Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

     26. Supplement No. 2 to part 748 (Unique Application and Submission Requirements) is amended by adding paragraph (z) to read as follows:

## SUPPLEMENT NO. 2 TO PART 748 - UNIQUE APPLICATION AND SUBMISSION REQUIREMENTS

\*   \*   \*   \*   \*

(z) *Exports of firearms and certain shotguns temporarily in the United States.*

(1) *Certification*. If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.*, for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

     The firearms in this license application will not be shipped from or manufactured in

WASHSTATEC023100

*[December 20, 2018]*

Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. I and the parties to this transaction will comply with the requirements specified in paragraph (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements.* Each approved license for commodities described under paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (z):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

WASHSTATEC023101

*[December 20, 2018]*

## PART 758 – EXPORT CLEARANCE REQUIREMENTS

27.  The authority citation for part 758 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

28.  Section 758.1 is amended by:

a. Revising paragraphs (b)(7), (8), and (9) and adding paragraph (b)(10);

b. Revising paragraph (c)(1);

c. Adding Note 1 to paragraph (c)(1);

c. Adding paragraph (g)(4); and

d. Redesignating Note to paragraph (h)(1) as Note 2 to paragraph (h)(1); to read as follows:

## § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

* * * * *

(b) * * *

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports, except for exports authorized under License Exception BAG, as set forth in §740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) * * *

(1) License Exception Baggage (BAG), as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

[December 20, 2018]

*Note 1 to paragraph (c)(1):* See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in §740.14 of the EAR.

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* This paragraph (g)(4) includes two separate requirements under paragraph (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR. Paragraph (g)(4)(i) is limited to certain EAR authorizations. Paragraph (g)(4)(ii) applies to all EAR authorizations that require EEI filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES.* For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items. The requirements of this paragraph also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.*, 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. (*See* § 743.4(h) for the use of this information for conventional arms reporting).

*Note 3 to paragraph (g)(4):* If a commodity described in paragraph (g)(4) is exported under License Exception TMP under § 740.9(a)(6) for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity

WASHSTATEC023103

*must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii).  For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned.  If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization.  The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.*

\* \* \* \* \*

29.  Add § 758.10 to read as follows:

**§ 758.10  Entry clearance requirements for temporary imports.**

(a) *Scope*.  This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21), except for firearms "subject to the EAR" that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these firearms "subject to the EAR").  These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.  Items that are temporarily exported under the EAR must have met the export clearance requirements specified in § 758.1 of the EAR.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL.  Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

 (2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports*.  To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

*[December 20, 2018]*

(i) Provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

(A) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States;

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

***Note 1 to paragraph (b)(1):*** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740), or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from*

WASHSTATEC023105

*[December 20, 2018]*

*Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).*

***Note 2 to paragraph (b)(1):*** *In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740), or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR.*

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. *See* also the additional requirements in § 758.1(g)(4).

> 30.  Add § 758.11 to read as follows:

**§ 758.11  Export clearance requirements for firearms and related items.**

(a)  *Scope.*  The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in §740.14.

(b) *Required form.*  Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to the U.S. Customs  and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

WASHSTATEC023106

*[December 20, 2018]*

(1) Where to obtain the form?  The CBP Certification of Registration Form 4457 can be found on the following CBP website:

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

(2) Required "description of articles" for firearms to be included on the CBP Form 4457.  For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457*?

*See* the following CBP website page for additional information:

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

(d) *Return of items exported pursuant to this section*.  The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section of the EAR.

## PART 762 – RECORDKEEPING

31.  The authority citation for part 762 is revised to read as follows:

**Authority:** Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

32.  Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

## § 762.2 Records to be retained.

(a)  *  *  *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been

WASHSTATEC023107

*[December 20, 2018]*

exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

\* \* \* \* \*

33.  Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) \*  \*  \*

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

\* \* \* \* \*

**PART 772 – DEFINITIONS OF TERMS**

34.  The authority citation for part 772 is revised to read as follows:

**Authority:**  Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

**§ 772.1 – [AMENDED]**

35.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c"; and the definition of "complete breech mechanisms" is added as set forth below:

**§ 772.1 Definitions of terms as used in the Export Administration Regulations (EAR).**

\* \* \* \* \*

*Complete breech mechanisms*.  The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

\* \* \* \* \*

**PART 774 - THE COMMERCE CONTROL LIST**

36. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:**  Pub. L. 115-232, Title XVII, Subtitle B. 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

*[December 20, 2018]*

37.  In Supplement No. 1 to part 774, Category 0, remove Export Control Classification Number (ECCN) 0A018.

**Supplement No. 1 to Part 774 – The Commerce Control List**

\* \* \* \* \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

No items currently are in this ECCN.  See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b.

38.  In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*  $500 for 0A501.c, .d, and .x.

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

WASHSTATEC023109

*[December 20, 2018]*

be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  Also see ECCN 0A502 for shot-pistols.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items:*

a.      Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

**Note 1 to paragraph 0A501.a:** *'Combination pistols' are controlled under ECCN 0A501.a.  A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).*

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

**Note 2 to paragraph 0A501.d:** *Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.*

e.      Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or

WASHSTATEC023110

*[December 20, 2018]*

CCL.

y.      Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

    y.1.      Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

    y.2.      Scope mounts or accessory rails;

    y.3.      Iron sights;

    y.4.      Sling swivels;

    y.5.      Butt plates or recoil pads;

    y.6.      Bayonets; and

    y.7.      Firearms manufactured from 1890 to 1898 and reproductions thereof.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

    ***Note 3 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

    ***Note 4 to 0A501:*** *Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.*

**0A502 Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

    *Reason for Control*:   RS, CC, FC, UN, AT, NS

WASHSTATEC023111

[December 20, 2018]

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*   $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

   $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes, "complete breech mechanisms" if the ultimate destination is Canada.

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

WASHSTATEC023112

*[December 20, 2018]*

*Related Controls*:  Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** *Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.*

**Technical Note:** *Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502.  Slug guns are also controlled under ECCN 0A502.*

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:*  CC, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*  N/A

*GBS:*  N/A

*CIV:*  N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to

*[December 20, 2018]*

enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g, and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A504.g.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a.     Telescopic sights.

b.     Holographic sights.

*[December 20, 2018]*

c.       Reflex or "red dot" sights.

d.       Reticle sights.

e.       Other sighting devices that contain optical elements.

f.       Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

　　　*Note 1 to 0A504.f:* *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g.       Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h.       [Reserved]

i.       Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

　　　*Note 2 to paragraph i:*  For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

**0A505  Ammunition as follows (see List of Items Controlled).**

**License Requirements**

　　　*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d,  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing |

WASHSTATEC023115

*[December 20, 2018]*

|  | requirements for this entry.  See §742.19 of the EAR for additional information. |
|--|--|

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b. (*i.e.*, "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR."  (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

*Items*:

a.       Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b.       Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.       Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:**  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

WASHSTATEC023116

*[December 20, 2018]*

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

>    ***Note 2 to 0A505.x:*** *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

>    ***Note 3 to 0A505.x:*** *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

>    ***Note 4 to 0A505:*** *Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, i.e., contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.*

39.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

>    *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

>    *LVS:* $500

>    *GBS:* N/A

WASHSTATEC023117

[December 20, 2018]

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.  (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.

*Related Definitions*:  N/A

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.       "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1 to 0A602.x: Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.*

*Note 2 to 0A602:  "Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

*Note 3 to 0A602:  Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.*

**Supplement No. 1 to Part 774 – [AMENDED]**

40.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

41.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988  Conventional military steel helmets.**

*[December 20, 2018]*

No items currently are in this ECCN.  See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

42.  In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:*  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:*  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.   Small arms chambering machines.

b.   Small arms deep hole drilling machines and drills therefor.

c.   Small arms rifling machines.

*[December 20, 2018]*

d.     Small arms spill boring machines.

e.     Production equipment (including dies, fixtures, and other tooling) "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs  .a, .d, and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.     Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are

WASHSTATEC023120

"specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w     [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

43.   In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

WASHSTATEC023121

*[December 20, 2018]*

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.     The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

a.1.     Gun barrel rifling and broaching machines and tools therefor;

a.2.     Gun barrel rifling machines;

a.3.     Gun barrel trepanning machines;

a.4.     Gun boring and turning machines;

a.5.     Gun honing machines of 6 feet (183 cm) stroke or more;

a.6.     Gun jump screw lathes;

a.7.     Gun rifling machines; and

a.8.     Barrel straightening presses.

b.     Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.     Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.     Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774 – [AMENDED]**

44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

45. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or | NS Column 1 |

[December 20, 2018]

| | |
|---|---|
| equipment in ECCN 0B501 for commodities in ECCN 0A501.y | |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*: "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

**0D505  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |

| | |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls*: "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

46. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

WASHSTATEC023124

*[December 20, 2018]*

**Special conditions for STA**

 *STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

 *Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR".   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

 *Related Definitions*:  N/A

 *Items*:  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

 47.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

 48.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

**License Requirements**

 *Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

 *CIV*:  N/A

 *TSR*:  N/A

**Special conditions for STA**

 *STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

*[December 20, 2018]*

be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

    *Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

    *Related Definitions*: N/A

    *Items*:

a.      "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.      "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502  "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.**

**License Requirements**

    *Reason for Control*:  CC, UN

| *Controls* | *Country Chart (See Supp. No. 1 part 738)* |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV:*   N/A

    *TSR:*   N/A

**List of Items Controlled**

    *Related Controls*: Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

    *Related Definitions*: N/A

    *Items*: The list of items controlled is contained in the ECCN heading.

**0E504 "Technology" "required" for the "development" or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

    *Reason for Control:* RS, UN, AT

| *Controls* | *Country Chart (See Supp. No. 1 part 738)* |
|---|---|
| RS applies to entire entry | RS Column 1 |

| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
|---|---|
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

> *CIV:*   N/A
>
> *TSR:*   N/A

**List of Items Controlled**

> *Related Controls*: N/A
>
> *Related Definitions*: N/A
>
> *Items*: The list of items controlled is contained in the ECCN heading.

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.**

**License Requirements**

> *Reason for Control:* NS, RS, UN, CC, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505 | RS Column 1 |

*[December 20, 2018]*

| | |
|---|---|
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

   *CIV*:  N/A

   *TSR*:  N/A

**Special conditions for STA**

   *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

   *Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".

   *Related Definitions*: N/A

   *Items*: The list of items controlled is contained in this ECCN heading.

   49.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

   *Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEC023128

| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

> *CIV*:  N/A

> *TSR*:  N/A

**Special conditions for STA**

> *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

> *Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

> *Related Definitions*: N/A

> *Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774 – [AMENDED]**

> 50.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

> 51.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

> *Reason for Control*:   CC

| Control(s) |
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information.) |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

> *CIV*:   N/A

> *TSR*:   N/A

*[December 20, 2018]*

**List of Items Controlled**

>    *Related Controls*: N/A

>    *Related Definitions*: N/A

>    *Items*:

The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774 – [AMENDED]**

>    52.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

>    53.  In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

>    *Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

>    *LVS:*   N/A

>    *GBS:*   N/A

>    *CIV:*   N/A

**List of Items Controlled**

>    *Related Controls*: N/A

>    *Related Definitions*: N/A

>    *Items*:

The list of items controlled is contained in the ECCN heading.

>    54.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items**

[December 20, 2018]

Controlled, and "specially designed" "components" and "accessories" therefor.

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS*:   N/A

*GBS*:   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009.  (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

WASHSTATEC023131

*[December 20, 2018]*

**Technical Note:**  *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

55.   In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

56.   In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

57.   In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to "technology" for items | NS Column 1 |

*[December 20, 2018]*

| | |
|---|---|
| controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | |
| MT applies to "technology"  for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology"  for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to

WASHSTATEC023133

*[December 20, 2018]*

the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: See also <u>2E101</u>, <u>2E201</u>, and <u>2E301</u>

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

58. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control*: NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009 | NS Column 1 |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, | NP Column 1 |

WASHSTATEC023134

*[December 20, 2018]*

| | |
|---|---|
| 2B209, 2B225 to 2B233 for NP reasons | |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

59. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

[December 20, 2018]

*Reason for Control*: NS, MT, RS, AT, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $1500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls*:  (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR.  (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103.  (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment.  (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are

WASHSTATEC023136

"specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

    y.1 [RESERVED]

WASHSTATEC023137

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**§ 121.1 The United States Munitions List.**

* * * * *

**Category I—Firearms** and Related Articles, ~~Close Assault Weapons and Combat Shotguns~~

   *(a) Firearms using caseless ammunition~~Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)~~.

   *(b) Fully automatic firearms to .50 caliber ~~inclusive~~ (12.7 mm) inclusive.

   *(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms)~~or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber~~.

   *Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

   *(d) Fully automatic shotguns regardless of gauge.~~Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.~~

   *(e) Silencers, mufflers, and sound ~~and flash~~ suppressors~~for the articles in (a) through (d) of this category and their specifically designed, modified~~

WASHSTATEC023138

~~or adapted components and parts~~.

(f) [Reserved]~~Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)~~

*(g) Barrels, ~~cylinders,~~ receivers (frames) bolts, bolt carriers, slides, or sears~~or complete breech mechanisms~~ specially designed for the articles in paragraphs (a) through (d) of this category.

(h) ~~Components, p~~Parts, components, accessories, and attachments~~ .~~, as follows:~~for the articles in paragraphs (a) through (g) of this category.~~

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (~~as defined in~~see §120.10 of this subchapter) and defense services (~~as defined in~~see §120.9 of this subchapter) directly related to the defense articles described in ~~paragraphs (a) through (h) of~~ this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)~~Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are~~

2

designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

(x) Commodities, software, and technology subject to the EAR (see § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*: Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

WASHSTATEC023140

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit. This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

**Category II—Guns and Armament**

*(a) Guns and armament greater than over-caliber .50 (*i.e.,* 12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

WASHSTATEC023141

*(4) Grenade launchers; or~~whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers~~

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm): (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

5

WASHSTATEC023142

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with an effective range greater than or equal to 20 meters.~~specifically designed or modified for military application.~~

(c) [Reserved]~~Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.~~

*(d) Kinetic energy weapon systems specially ~~specifically~~ designed ~~or modified~~ for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices ~~control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment~~ specially ~~specifically~~ designed~~, developed, configured, adapted or modified to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro-optical, acoustic) of~~ for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices)~~defense articles controlled by this category~~.

6

WASHSTATEC023143

*(f) – (i) [Reserved]~~Engines specifically designed or modified for the~~ ~~self-propelled guns and howitzers in paragraph (a) of this category.~~

~~(g) Tooling and equipment specifically designed or modified for the~~ ~~production of defense articles controlled by this category.~~

~~(h) Test and evaluation equipment and test models specifically designed~~ ~~or modified for the articles controlled by this category. This includes but is~~ ~~not limited to diagnostic instrumentation and physical test models.~~

~~(i) Autoloading systems for electronic programming of projectile~~ ~~function for the defense articles controlled in this Category.~~

(j) ~~All other components, p~~Parts, components, accessories, and attachments, as follows: ~~and associated equipment specifically designed or~~ ~~modified for the articles in paragraphs (a) through (i) of this category. This~~ ~~includes but is not limited to mounts and carriages for the articles controlled~~ ~~in this category.~~

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

7

WASHSTATEC023144

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

8

WASHSTATEC023145

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* as defined in §120.10 of this subchapter) and defense services (*see* as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and through (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that

9

WASHSTATEC023146

are designated as Significant Military Equipment (SME) shall itself be designated SME.

(l) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:

(1) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:

(i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;

(ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel-handling equipment; and the electrical interfaces between power supply gun and other turret electric drive function;

(iii) Target acquisition, tracking fire control or damage assessment systems; and

(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(3) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application.

10

WASHSTATEC023147

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition/ and Ordnance

*(a) Ammunition/, as follows:ordnance for the articles in Categories I and II of this section.

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

11

WASHSTATEC023148

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

  (b) Ammunition/ordnance handling equipment specially ~~specifically~~ designed ~~or modified~~ for the articles controlled in this category, as follows:~~,~~ ~~such as, belting, linking, and de-linking equipment.~~

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

12

WASHSTATEC023149

(c) [Reserved]~~Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.~~

(d) ~~Components, p~~Parts and components, ~~accessories, attachments and associated equipment specifically designed or modified~~ for the articles in this category, as follows:

\*(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive~~Guidance and control components for the articles in paragraph (a) of this category~~;

\*(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;~~Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category; and~~

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;~~All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.~~

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

13

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

14

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* ~~as defined in~~ §120.10 of this subchapter) and defense services (*see* ~~as defined in~~ §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), and ~~through~~ (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.) ~~Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.~~

(f) – (w) [Reserved] ~~The following explains and amplifies the terms used in this category and elsewhere in this subchapter:~~

~~(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions therefor), boosters, firing components therefor, primers, and other detonating devices for the defense articles controlled in this category.~~

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

15

WASHSTATEC023152

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* (2) This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting or popping.

(3) Equipment and tooling in paragraph (c) of this category does not include equipment for hand-loading ammunition.

(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been designed or manufactured using technical data and defense services controlled by this category.

(5) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

16

WASHSTATEC023153

Categories I, II, and III MDE Transitioning to the CCL

| ITEM DESCRIPTION | CCL CONTROL | |
|---|---|---|
| Cartridge, 5.56mm M855A1 | CCL | ECCN 0A505.a |

WASHSTATEC023154

The Honorable
Robert P. Corker, Jr., Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

    Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

    The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

    Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III;, the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

    We hope this information is helpful.  Please let us know if we can be of further assistance.

                    Sincerely,

                    Mary Elizabeth Taylor
                    Assistant Secretary
                    Legislative Affairs

Enclosure:
    As stated.

WASHSTATEC023155

The Honorable
Robert Menendez
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,


Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs


Enclosure:
        As stated.

The Honorable
Edward R. Royce, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,


Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs

Enclosure:
        As stated.

WASHSTATEC023157

The Honorable
Eliot L. Engel
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Engel:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), I am transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations.  In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities.  When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Attached for your reference are the following documents:  a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,


Mary Elizabeth Taylor
Assistant Secretary
Legislative Affairs

Enclosure:
         As stated.

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.


**§ 121.1 The United States Munitions List.**

* * * * *

**Category I—Firearms and Related Articles**

   *(a) Firearms using caseless ammunition.

   *(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

   *(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms).

   *Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

   *(d) Fully automatic shotguns regardless of gauge.

   *(e) Silencers, mufflers, and sound suppressors.

   (f) [Reserved]

   (g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

   (h) Parts, components, accessories, and attachments, as follows:

   (1) Drum and other magazines for firearms to .50 caliber (12.7 mm)

inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

2

WASHSTATEC023160

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE**

3

**ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

4

WASHSTATEC023162

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

5

WASHSTATEC023163

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

6

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

7

WASHSTATEC023165

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c)

8

identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

9

WASHSTATEC023167

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

\*(15) Any part, component, accessory, attachment, equipment, or system that:

10

WASHSTATEC023168

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the

11

WASHSTATEC023169

possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

12



**United States Department of State**

*Washington, D.C. 20520*

The Honorable                                                FEB 0 4 2019
James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find
enclosed the Department of State's notification of the intention to transfer jurisdictional control
of certain classes of items currently on the United States Munitions List (USML) to the
Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control
of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the
Export Administration Regulations.  In accordance with new regulatory and policy procedures
instituted by the Department of Commerce, export activities pertaining to these items will
continue to be prudently controlled in the interests of U.S. national security and foreign policy
priorities.  When it is published, the Department of State will forward its final rule implementing
this change to the Congress and the Comptroller General, pursuant to the Congressional Review
Act.

Enclosed for your reference are the following documents:  a summary of the revisions to the
USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the
current and revised USML Categories I, II and III; the Department of Commerce's revised
companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful.  Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.

WASHSTATEC023171



**United States Department of State**

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



**United States Department of State**

*Washington, D.C. 20520*

FEB 0 4 2019

The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
    As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable                                        FEB 0 4 2019
Michael McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), please find enclosed the Department of State's notification of the intention to transfer jurisdictional control of certain classes of items currently on the United States Munitions List (USML) to the Commerce Control List.

The Secretary of State, with the concurrence of the Secretary of Defense, is transferring control of various items currently controlled by USML Categories I, II, and III to the jurisdiction of the Export Administration Regulations. In accordance with new regulatory and policy procedures instituted by the Department of Commerce, export activities pertaining to these items will continue to be prudently controlled in the interests of U.S. national security and foreign policy priorities. When it is published, the Department of State will forward its final rule implementing this change to the Congress and the Comptroller General, pursuant to the Congressional Review Act.

Enclosed for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the control for major defense equipment.

We hope this information is helpful. Please let us know if we can be of further assistance.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosure:
        As stated.

## Summary of Revisions to USML Categories I, II, and III

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape. This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL). A key strategy in the reform effort is to construct the lists so they positively identify the items they control. Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories). All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the jurisdiction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising eighteen of the twenty-one USML categories. In May 2018, the Department of State published proposed revisions of the final three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls. Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

### Category I—Firearms and Related Articles

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use

1

caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN 0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category

2

WASHSTATEC023176

XII and are described in the purchase documentation submitted with the application.

### Category II—Guns and Armament

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501. Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

3

WASHSTATEC023177

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

### Category III— Ammunition and Ordnance

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

4

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will *not* be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii). Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom). Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception. However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement. Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request. If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future. If the

5

WASHSTATEC023179

departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

WASHSTATEC023180

May 14, 2019

Dear Member of Congress:

The undersigned organizations write in strenuous opposition to the Administration's proposal to significantly weaken regulation and oversight of firearms exports. The transfer of export controls of semi-automatic pistols, assault-style firearms, sniper rifles, and ammunition from the United States Munitions List under the authority of the Department of State to the less-stringent controls of the Department of Commerce[1] will thwart congressional oversight and create new and unacceptable risks of exacerbating gun violence, human rights abuses, and armed conflict.

The Administration's proposal guts Congress' authority to provide oversight of firearms exports. Currently, Congress is notified of firearms sales authorized by the State Department valued at $1 million or more. No such notification requirements will exist if these weapons are transferred to Commerce control. In recent years, Congressional notification has been an important backstop, helping forestall firearms transfers to repressive forces, such as those in Turkey and the Philippines.[2]

The proposal would also transfer control of the technical information and blueprints for potentially undetectable 3D-printed guns from State to Commerce, a move that could facilitate printing of 3D guns worldwide, make these weapons readily available to terrorist groups and other criminal elements, and endanger American embassies, military bases, and passenger aircraft at home and abroad.[3]

Although proponents of the proposed changes argue that small arms are "less dangerous" because many can be bought in U.S. retail outlets, the fact is that armies are built from these firearms. Small arms are the weapons of mass destruction in countries and regions such as Congo, Burma, Mexico, and Central America.  AR- and AK-type rifles and their ammunition that would be transferred to Commerce control are weapons of choice for criminal organizations in Mexico and other Central American countries, contributing to the humanitarian catastrophe that drives many migrants north as guns flow south.[4]

Under the proposed changes, fully automatic firearms would properly remain under State Department control, but semi-automatic weapons would move to the Commerce Department's control. Practically, however, the difference between these types of weapons is meaningless. For example, soldiers in Cameroon last summer – in two separate incidents captured on video – used semi-automatic rifles to execute several men, two women, and two small children.[5] In Mexico, local police in Guerrero State responsible for the forced disappearance of 43 students in 2014 were armed with semi-automatic rifles.[6] Many sniper rifles and semiautomatic firearms that would be moved to the Commerce Department's control are currently in active use by the U.S. military, and many semi-automatic firearms can also easily be converted to fully automatic weapons, further illustrating the false dichotomy of arguments in support of this change.

WASHSTATEC023181

The proposal will also increase the risk of exports to unauthorized end users and conflict zones as the Commerce Department, charged with promoting sales, will gather less information about those engaged in the arms trade and rely on post-shipment monitoring, rather than pre-license checks. Overall, Congress already has a robust framework for arms transfers, embedding important human rights and other critical provisions in two central statutes: the Arms Export Control Act and the Foreign Assistance Act. The provisions of these laws, generally speaking, apply to defense articles listed on the U.S. Munitions List. Removing weapons from this list exempts them from related statutory constraints.[7]

Ultimately, the weapons and ammunition that currently are controlled under U.S. Munition List Categories I-III belong there and should stay there. The best way to move forward is to prohibit transfer of these weapons out of the U.S. Munitions List and maintain congressional oversight, as is currently proposed in H.R. 1134 and S. 459.[8] A prohibition on transfers out of the U.S. Munitions List could be included in other legislation, such as the National Defense Authorization Act. We urge you to support these measures.

Sincerely,

Alianza Americas
Alliance for Gun Responsibility
Alliance of Baptists
American Federation of Teachers
American Friends Service Committee
American Medical Student Association
Americans for Democratic Action
Amnesty International-USA
Arizonans for Gun Safety
Arms Control Association
Baptist Peace Fellowship of North America
BAYAN USA
Blue Future
Brady
The Campaign to Keep Guns off Campus
Center for American Progress
Center for Civilians in Conflict (CIVIC)
Center for International Policy
Church of the Brethren Office of
    Peacebuilding and Policy
Coalition Against Gun Violence
Coalition for Peace Action
Coalition to Stop Gun Violence
Colorado Ceasefire Legislative Action

Committee in Solidarity with the People of
    El Salvador (CISPES)
Congregation of Our Lady of Charity of the
    Good Shepherd, US Provinces
CT Against Gun Violence
Delaware Coalition Against Gun Violence
    Educational Fund
Desert Southwest Conference UMC, Board
    of Church and Society
Episcopal Peace Fellowship
Fellowship of Reconciliation
Franciscan Action Network
Friends Committee on National Legislation
Friendship Office of the Americas
Georgians for Gun Safety
Giffords Law Center to Prevent Gun
    Violence
Global Exchange
Global Justice Institute, Metropolitan
    Community Churches
Granite State Progress
Grey Nuns of the Sacred Heart
Gun Violence Prevention Center of Utah
Hoosiers Concerned About Gun Violence

WASHSTATEC023182

Humanity & Inclusion
Interfaith Council for Peace and Justice
International Coalition for Human Rights in the Philippines-United States
Jewish Center for Justice
Joint Action Committee
Jr Newtown Action Alliance
Just Foreign Policy
Latin America Working Group
Leadership Conference of Women Religious
Maryknoll Office for Global Concerns
Million Hoodies Movement for Justice
MomsRising
Monmouth Center for World Religions and Ethical Thought
National Advocacy Center of the Sisters of the Good Shepherd
National Coalition Against Domestic Violence
National Council of Churches
National Lawyers Guild, International Committee
Network in Solidarity with the People of Guatemala
New Mexicans to Prevent Gun Violence
Newtown Action Alliance
Nicaragua Center for Community Action
North Carolina Council of Churches
Oakland Catholic Worker
One Pulse for America
Orange Ribbons for Gun Safety
Pax Christi USA
Pax Christi International
Pax Christi Metro Washington, DC and Baltimore
Pax Christi Pacific Northwest
Philippines-U.S. Solidarity Organization - Southern California

Presbyterian Church (USA)
San Diegans for Gun Violence Prevention
School of Americas Watch
School of Americas Watch - East Bay
Sister Parish, Inc.
Sisters of Charity of the Blessed Virgin Mary
Sisters of St. Francis of the Neumann Communities
States United to Prevent Gun Violence
Stop Handgun Violence
Survivors Empowered Action Fund
Survivors Lead
Task Force on the Americas
The United Methodist Church – General Board of Church and Society
United Nations Association of the National Capital Area
Violence Policy Center
Vision Quilt
War Resisters League
Washington Office on Latin America
WAVE Educational Fund
We the People for Sensible Gun Laws
Win Without War
Women Against Gun Violence
Women's Action for New Directions
Woman's National Democratic Club

Non-US groups:
Action on Armed Violence
Center for Ecumenical Studies
Colombian Campaign To Ban LandMines
Corruption Watch UK
Human Security Network in Latin American and the Caribbean (SEHLAC)
Igarapé Institute
Public Policy Association (APP)

---

[1] Department of Commerce, Industry and Security Bureau, "Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)," *Federal Register*, May 24, 2018, p. 24181, at: https://www.federalregister.gov/documents/2018/05/24/2018-10367/control-of-firearms-guns-ammunition-and-related-articles-the-president-determines-no-longer-warrant;

WASHSTATEC023183

and Government Accountability Office, "EXPORT CONTROLS: State and Commerce Should Share Watch List Information If Proposed Rules to Transfer Firearms Are Finalized," GAO-19307, March 1, 2019, at https://www.gao.gov/products/GAO-19-307.

[2] Joe Gould, "US lawmakers balk at arms sales to Saudi Arabia, Turkey and Nigeria," *Defense News*, September 26, 2017, at: https://www.defensenews.com/congress/2017/09/26/us-lawmakers-balk-at-arms-sales-to-saudi-arabia-turkey-and-nigeria/.

[3] Emily Dreyfuss, "3D Printed Gun Blueprints Are Back, And Only New Laws Can Stop Them," *Wired*, August 29, 2018, at: https://www.wired.com/story/3-d-printed-gun-blueprints-return-laws-injunction/.

[4] Violence Policy Center, "Cross-Border Gun Trafficking," at www.vpc.org/indicted; Alex Yablon, "Trump is Sending Guns South as Migrants Flee North," *Foreign Policy*, March 8, 2019, at: https://foreignpolicy.com/2019/03/08/trump-guns-honduras-central-america/.

[5] Susan Waltz, testimony before House Foreign Affairs Subcommittee on Oversight and Investigations, March 26, 2019, at: https://www.forumarmstrade.org/uploads/1/9/0/8/19082495/3-26_testimony_waltz.pdf.

[6] Mexican Commission for the Defense and Promotion of Human Rights, *Gross Human Rights Violations: The Legal and Illegal Gun Trade in Mexico*, 2018, p. 16, at: https://stopusarmstomexico.org/gross-human-rights-abuses-the-legal-and-illegal-gun-trade-to-mexico/.

[7] Susan Waltz testimony, *op.cit*, and Colby Goodman, Christina Arabia, and William Hartung, "Proposed Firearms Export Changes: Key Challenges for U.S. Oversight," Center for International Policy, July 9, 2018, at: https://securityassistance.org/publication/proposed-firearms-export-changes-key-challenges-us-oversight.

[8] See legislative texts at: https://www.congress.gov/bill/116th-congress/house-bill/1134 and https://www.congress.gov/bill/116th-congress/senate-bill/459/.

WASHSTATEC023184

**Implications of Proposed Changes to Firearms Export Regulations[1]**

The Administration has notified Congress of its intent to change firearms export regulations by reclassifying several kinds of firearms and ammunition – from their current designation as military weapons (defense articles) to commercial items.   Semi-automatic and non-automatic firearms are the main items slated for change.[2]   Included in this class of weapons are the high-powered assault rifles–including the semi-automatic AR-15--that have been used in several mass shootings in the US, as well as armor-piercing sniper rifles and sidearms used by the US military.[3]

The proposed regulatory change involves moving items from one list (the US Munitions List) to another (the Commerce Control List), but the two lists are subject to different statutory provisions and the implications are significant.   Legislative action is needed to ensure that stringent rules remain in place to regulate the export of these lethal firearms and suspend further sales to individuals or governments who misuse US weapons or transfer them to criminal or terrorist organizations.

Why the proposed changes matter:

1. **Failure to appreciate the military significance of semi-automatic weapons**
   At the heart of the proposed changes is a faulty proposition that semi-automatic weapons are fundamentally a commercial product.  Semi-automatic rifles such as the AR-15 are currently classified within the US export regime as "assault rifles."  (The key difference between a fully automatic and a semi-automatic weapon is that for semi-automatic firearms, the trigger must be continuously activated to release bullets, whereas a fully automatic weapon only requires a single pull of the trigger to fire a continuous stream.  In practical reality, there may be little difference between the two, inasmuch as a semi-automatic weapon can typically fire 45 rounds per minute and soldiers in combat often elect to use fully automatic weapons in a semi-automatic mode.)   Category I on the US Munitions List (USML) is currently titled "Firearms, Close Assault Rifles and Combat Shotguns," but if the proposed changes go forward, the sanitized title will become simply "Firearms and Related Articles."   Assault rifles as a category – on either list – will disappear, marking a significant change in the way we think about, and categorize, military-style weapons.

   What Congress should do:  Enact legislation such as H.R. 1134 or S. 459 to prevent the transfer of assault rifles and other semi-automatic weapons from the US Munitions List (USML) to the Commerce Control List (CCL).

2. **Certain Assault Rifles will no longer be subject to the human rights provisions of the Foreign Assistance Act**
   Under the current system, Congress is notified when large sales of semi-automatic weapons are proposed for countries such as the Philippines, where government forces have used such weapons in extrajudicial killings or where there is a history of diversion from local security forces to cartels, such as Guatemala.  After the proposed rule is adopted, there will be no legal barrier to transferring these weapons to countries with a consistent pattern of gross violations of human rights.[4]

---

[1] Prepared by Susan Waltz, Professor, Gerald R. Ford School of Public Policy, University of Michigan swaltz@umich.edu, February 2019.  Thanks to Brittany Benowitz, Chief Counsel, American Bar Association for Human Rights, for reviewing a draft.

[2] Items scheduled to remain on the military control list include automatic firearms and firearms that use caseless ammunition, silencers, high-capacity magazines, belted ammunition, mortars, cannons, recoilless rifles, and grenade launchers.  Flame throwers with a range exceeding 20 feet would also be explicitly controlled by the munitions list.  In addition to semi-auto and non-auto firearms, grenades containing non-lethal or less lethal projectiles will be under CCL jurisdiction as 500-series items.

[3] See "Comments of the Brady Center and Brady Campaign to Prevent Gun Violence on the Department of State Proposed Rule to Amend the International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III and the Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List," 2018, for a detailed list of firearms that would be released from USML controls.

[4] For further details, see American Bar Association Center for Human Rights, WHITE PAPER: Proposals to Relax Export Controls for Significant Military Equipment January 14, 2013; Comments from the Center for International Policy Re: Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), RIN 0694–AF47 (2018); and Comments by Susan Waltz on ITAR Amendment Categories I, II and III and EAR Amendment RIN 0694-AF47.

WASHSTATEC023185

This is one of the provisions that derives from a statutory definition of terms such as *defense article*, *security assistance*, or *military equipment*. Where such terms are defined by statute, they are usually linked to the presence of an item on the USML.   Congress recently expanded the definition of defense article to include "600-series" items previously moved to the CCL [22 USC 2304(d)(2)(C)], but no provision has been made regarding the items under consideration here, which are intended to be designated as "500-series" items. Moving an item off the USML now could still affect the scope of the various laws that refer to defense articles or security assistance.

Of greatest concern in this regard are the links to human rights conditionality on security assistance and provision of military equipment [22 USC 2304(d)(2)(C) and 10 USC 362]; vetting of foreign military units that receive training and equipment (22 USC 2378d); provisions for third-party transfer of grant-supplied defense articles (22 USC 2314); and various reports to Congress (22 USC 2776 and 22 USC 2415).   If the changes go forward without adjustment, arms deals involving the sale or transfer of semi-automatic weapons would escape various statutory constraints.

What Congress should do:

- Continue to hold implementation of the new rule until the Government Accountability Office has completed its review of the current oversight regime and the Congress has had the opportunity to hold hearings.
- To ensure that **human rights protections** remain in place with regard to the potential sale or transfer of semi-automatic weapons, Congress should either enact legislation to ensure that weapons and ammunition currently listed in Categories I-III of the USML remain on the USML, or amend the definition of "security assistance" and "defense article" (22 USC 2304) to include weapons transferred to Commerce Department control (i.e. the "500 Series").
- Further, to **prevent the diversion to unauthorized users or those engaged in atrocities**, Congress should ensure that such security assistance is subject to relevant oversight provisions, including Sections 2314 (diversion), 2378d (vetting) and 2776 (Congressional notification of proposed sales).
- To ensure that Congress continues to receive **a comprehensive annual report on US arms sales**, the Arms Export Control Act (22 USC 2778) should be amended to clarify that "defense articles" includes any 500-series items on the CCL.[5]

**3.** __Retaining authority to monitor end use and block further sales if equipment is misused__

What's in an asterisk?  Some of the items included on the US Munitions List are marked with an asterisk (*) to signify that they are considered significant military equipment (SME), defense articles "for which special export controls are warranted because of the capacity of such articles for substantial military utility or capability."[6]  Semi-automatic firearms are currently classified as SME, but that would change if the current proposals go forward.  All of the provisions covering defense articles (discussed above) apply to SME.  In addition, there are a few statutory provisions that apply specifically to SME.   The most relevant of these applies to end use controls, which could be significantly weakened by the proposed changes.   As provided by 22 USC 2753, re-transfers of SME require explicit authorization.  A special form for end-use control (DSP-83) is currently required for SME weapons transfers (22 CFR 123.10), and suppliers must provide precise information about the transferred equipment along with a certification by the foreign government at destination that the equipment will not be re-transferred without prior written approval of the US government.  Under current law, if significant military equipment is re-transferred without permission or used against anything other than a legitimate military target, the President must notify the Congress and suspend further transfers.  The proposed rule would eliminate these oversight provisions.

---

[5] The BIS regulatory proposal includes several changes to Export Administration Regulations (EAR) that affect record keeping on firearms transactions (namely EAR parts 743, 748, 758, and 762).   If the proposed regulations go forward, AECA reporting provisions (22 USC 2776) should be amended to ensure that statistical information about firearms transactions collected for other purposes, including compliance with multilateral agreements, should also be supplied directly to Congress.
[6] 22 USC 2794(9).

What Congress should do if the proposal moves forward:   Amend the Arms Export Control Act (notably 22 USC 2753) to ensure that all items currently designated as significant military equipment remain subject to end use monitoring and retain the prohibition on further sales or deliveries in the event of a violation of an end use agreement.

4.   **Risk of Diversion via unscrupulous brokering.**

In 2010, 24-year old Efraim Diveroli was arrested for efforts to arrange munitions shipments to Afghanistan without proper authorization.[7]  Because the middle men who arrange arms deals are a significant source of diversion of weapons to criminal and terrorist organizations, Congress has imposed strict requirements for registration and licensing of brokers who supply defense articles (22 USC 2778).  The State Department has asserted that it will continue to claim jurisdiction over such activities but if the proposed changes are enacted it would no longer have a statutory basis for doing so and therefore may face significant legal challenges to the assertion of this authority. Further, one provision of the changes proposed in May 2018 anticipates a regulatory modification [specifically, 129.2(b)(2)(vii)], which by narrowing the interpretation of "brokering activities" would open the door to lawful transactions that bypass scrutiny of the middlemen who ship, finance, or possibly transship semi-automatic rifles.[8]

In addition to these concerns about the increased risk of diversion, the capacity for monitoring sale and delivery of firearms may be jeopardized by the proposed changes.  End use monitoring of such weapons is currently overseen by the State Department's Blue Lantern program, which reports annually to Congress. Although the Commerce Department checks on export compliance through its Sentinel Program, relatively little is known about the operations or effectiveness of this program.  It is unclear what resources the Commerce Department would be able to devote to monitoring transfers of 500-series weapons listed on the CCL.

What Congress should do if the proposed regulations are put in place:  Adopt legislation making clear that the current statutory definition of brokering activity will remain applicable for middle men involved in the transfer of items formerly controlled by the State Department, and ensure that all brokers of such items are required to register and secure licenses pursuant to Section 2778.

5.   **Criminal Prosecution.**

The Department of Justice's January 2018 summary of major US export enforcement cases includes recent smuggling of semi-automatic assault rifles (and other firearms) to Dominican Republic, the Gambia, Russia via Latvia, Thailand and other destinations. In addition, the report documents the case of two men in Georgia attempting to export firearms to a range of international buyers on the dark net, and another similar case from Kansas.[9]  If semi-automatic weapons and other non-automatic firearms are removed from the US Munitions List, where they are now considered defense articles and significant military equipment, it will impact the ability of law enforcement to charge weapons traffickers with the serious offense of violating the Arms Export Control Act.

What Congress should do:  Keep all weapons with substantial military utility – including semi-automatic weapons – on the US Munitions List where they are subject to provisions of the AECA.

---

[7] See "Supplier Under Scrutiny on Arms for Afghans," New York Times, March 27, 2008, and "Arms Dealer Faces New Charges," New York Times, August 23, 2010.  The arms brokering adventures of Diveroli and his partner David Packouz are the story behind the 2016 film *War Dogs*.

[8] As of February 2019 it is not clear whether those changes are being advanced, because they are not referenced in available documents.

[9] Department of Justice, "Summary of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases," January 2018.

WASHSTATEC023187

6. **3-D Printed Weapons**.

By moving non-automatic and semi-automatic weapons oversight to the Commerce Department, individuals will no longer need prior approval before publishing or posting designs to produce plastic and untraceable guns using 3D-printing technology or CNC milling.

What Congress should do: Enact legislation, such as S. 459, which would extend restrictions on the publication of plans for printing untraceable 3-D printed weapons.

7. **Weakening Control Procedures (Registration and Licensing)**.

Procedures to authorize the export of weapons on the USML are overseen by the Department of State and involve two steps: registration and licensing.  This system was put in place by Congress several decades ago to ensure adequate oversight of weapons transfers.   The two-step procedure allows background scrutiny and close review of transactions before they are made – to ensure that unscrupulous deals do not go forward.   While the Commerce Department will require licensing on items transferred, it does not have any way to track manufacturers of these weapons, removing an important opportunity to ensure that those required to obtain licenses are in fact doing so.

What Congress should do if the proposed regulatory changes are implemented:  Require the concurrence of the Secretary of State for exports of articles and services that were previously controlled by the State Department.

WASHSTATEC023188

Editorial Board

# Don't Ease Gun Export Rules

The Trump administration has a dangerous plan to sell guns with less oversight.

By Editorial Board
April 17, 2019, 9:30 AM EDT



Sold in America. *Photographer: Spencer Platt/Getty Images North America*

President Donald Trump, who has received <u>unprecedented</u> support from America's gun lobby, seems determined to make it easier to export firearms and harder to keep track of whether they're destined for terrorists or rogue regimes. He proposes to do this by shifting oversight of the export of semi-automatic and non-automatic firearms, as well as of various gun components and some types of ammunition, from the Department of State to the Department of Commerce.

The change threatens to undermine national security and public safety around the world. Congress should stop it from taking effect.

WASHSTATEC023189

The U.S. is already the world's biggest firearms exporter, shipping roughly $7.5 billion worth of guns, artillery and ammunition from 2013 to 2017. Some of this equipment has <u>ended up</u> with al-Qaeda fighters and other terrorists, undermining the struggle to keep lethal weapons out of the hands of America's enemies.

Under the current system, State Department licensing officers <u>too often</u> approve export applications that lack required information, a department inspector general has found. In one instance, approval was granted to sell 400,000 rifles, along with more than 500 million rounds of ammunition and other equipment, to the Philippines Bureau of Customs – without notification to Congress, as required by law. Subsequent investigation found that licensing information was missing and the transaction's intermediary had "disappeared."

If licensing responsibility shifts to the Commerce Department, such lapses stand to become more frequent. Commerce lacks the specialized staff and expertise to vet arms sales, and has no plan to acquire them. Commerce officials have already indicated they will not feel obligated to notify Congress, as the State Department must, when gun exports are valued at more than $1 million. It's unclear whether the Commerce Department would even suspend sales to a buyer found to be operating illegally or in contravention of U.S. foreign policy aims.

The Trump administration also plans to end State Department oversight of the publication of computer code enabling 3-D printable guns. That would make it easier for people inside and outside the U.S. to make untraceable firearms at home and, like the change to gun-export authority, make guns more plentiful and difficult to regulate.

Democratic Representatives Eliot Engel and Norma Torres are <u>proposing legislation</u> to block the changes to oversight of weapons for export and 3-D printable guns. Congress should pass it without delay.

To contact the senior editor responsible for Bloomberg Opinion's editorials: David Shipley at <u>davidshipley@bloomberg.net</u> .

COMMENTS

 17

WASHSTATEC023190

Terms of Service  Trademarks  Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices     Contact Us Help

WASHSTATEC023191

LAWFARE

TRADE AND SECURITY

# Assessing the Trump Administration's Proposed Changes to the Small-Arms Export Regime

By Eric Halliday, Rachael Hanna      Monday, December 2, 2019, 9:16 AM

The National Defense Authorization Act (NDAA) for fiscal 2020 is currently in House-Senate Conference Committee reconciliation negotiations. Among the several differences between the House and Senate versions is an amendment that could decide whether a Trump administration proposal to loosen export controls on firearms goes into effect. On Nov. 21, the Trump administration gave formal notification to Congress of the proposed rule changes, which could go into effect as early as Dec. 20 if Congress does not block the initiative within 30 days.

The United States exports firearms and related technology on a massive scale. During fiscal 2013 to 2017, the State Department reviewed approximately 69,000 commercial export license applications for firearms, artillery and ammunition reported at a value of $7.5 billion. Roughly two-thirds of these applications were for firearms, mostly nonautomatic and semiautomatic guns.

The Trump administration's proposal would transfer control over the export of firearms and related technology from the State Department to the Commerce Department. The differences between the current and proposed regimes—which are discussed below—could have significant implications for the global trade in small arms, particularly in conflicts across Latin America and the Middle East.

## Current Small-Arms Export Control Regime

Under the current export control regime, the State Department oversees the export of weapons included in the United States Munitions List (USML). Established by the Arms Export Control Act (AECA) of 1976, the list outlines 21 different categories of weapons, ranging from small arms like handguns and shotguns (Category I) to chemical agents (Category XIV).

The AECA dictates that weapons and related technology included on the USML be designated as "defense articles" and "defense services"—technology that has national security implications. The purpose of the USML is to ensure that the federal government keeps a tight leash on all sales of sensitive military technology or other weapons that could threaten national security if found in the wrong hands.

The AECA empowers the president to regulate the export of defense articles and services, but presidents have historically delegated that power to the State Department.

The State Department has implemented an extensive series of regulations governing the export of items included on the USML. First, manufacturers that wish to export any defense article or service must register with the State Department's Directorate of Defense Trade Controls (DDTC) and pay an annual fee. Then, registered exporters must apply for and receive a license from the DDTC before they can proceed with any proposed sales. The licenses are valid for four years. Finally, before receiving approval, the manufacturer must provide extensive information about the proposed sale. The information required depends on whether or not the design of the defense article is classified but includes, at a bare minimum, complete purchase documentation, identifying information of the end user (the ultimate recipient of the weapons), and identifying information of any foreign entities that will assist in the transfer of the export to the end user.

If, for any reason, the defense article will be transferred to an end user other than the one included in the application, the DDTC must approve that change before the transfer is made.

Exporters who avoid the export requirements imposed by the State Department or provide false information on their application paperwork face strict criminal penalties: a fine of up to $1,000,000 and a maximum prison sentence of 20 years.

Finally, the AECA requires the State Department to notify Congress of any proposed sale of $1,000,000 or more of firearms included in Category I of the USML. Examples of Category I weapons include nonautomatic and fully automatic handguns and rifles, combat shotguns, silencers, and rifle scopes. The congressional oversight requirement is discussed in more detail below.

This regime is already porous in practice. In February 2019, the State Department's Office of the Inspector General (OIG) released an audit report on the department's DDTC Export Licensing Process, which reviews and approves export licenses for defense articles covered by the USML. Over the course of the audit, OIG reviewed 21 firearms export license applications filed with the DDTC in the previous year. Of those, 20 had been approved despite the applications lacking required information. Most notably, 62 percent of the audited applications were submitted with purchase orders that did not have required information on the end use or end user of the firearms. Congressional Democrats have also raised concerns that shifting firearms export control to Commerce will mean even fewer end-user checks on firearms exports.

WASHSTATEC023192

Beyond the enforcement mechanisms enforced by State, perhaps the most powerful check in the current regime is the ability of Congress to oversee and, to a certain extent, control small-arms sales. As noted above, under the AECA (22 U.S.C. § 2776(c)) and the current arms classification regime, State is required to notify Congress only when it is set to approve firearm sales of $1,000,000 or more. For sales to most countries, State must provide Congress with formal notification 30 days prior to the transaction being executed. Only 15 days' prior notice is required for sales to NATO members, Japan, Australia, South Korea, Israel and New Zealand. Upon receiving formal notification of the pending sale, Congress must take legislative action, either by joint resolution or by other legislation, before the arms are delivered if it wants to block the sale. In many cases, such legislation will need to have the support of two-thirds of Congress to override a likely presidential veto.

Given the logistical challenges of drafting and passing legislation in fewer than 30 days and the political implications of blocking a sale for bilateral relationships, an informal, classified notification process has also been in place since 1976. Under that informal system, the executive branch notifies the House and Senate foreign affairs committees to gauge if there is any pushback on large firearms sales. In 2012, the State Department implemented a revised version of this informal notification process that provides the foreign affairs committees with notice of 20–40 calendar days, depending on the arms and destination, before triggering the formal notification process.

State includes the proposed seller's license applications for commercial arms sales as part of its informal notification to the committees. This allows the administration and the committees to address any concerns confidentially to protect the relevant bilateral relationship. If any concerns cannot be resolved, State will often cancel the sale before triggering the formal notification process in order to avoid a fight with Congress.

In emergency scenarios, the president has the authority to waive the statutory review periods under the AECA. By formally notifying Congress, the president can state that an emergency situation requires the firearms sale to be executed without delay to protect national security interests. Under 22 U.S.C. § 2776(c)(2)(C), the president's notification must include a "detailed justification for his determination, including a description of the emergency circumstances" that necessitated immediate action and a "discussion of the national security interests involved."

In two recent episodes, Congress has used its oversight authority to block controversial small-arms deals. In 2016, Sen. Ben Cardin, ranking member of the Senate Foreign Relations Committee, opposed a proposed sale of approximately 26,000 assault rifles to the Philippines National Police, causing the State Department to abort the transaction. Cardin cited concerns about human rights abuses by the Philippines government in its war on drugs as the reason for blocking the sale. In 2017, the State Department informally notified Congress of a $1.2 million proposed sale of Sig Sauer semiautomatic handguns to the Turkish government a day before Turkish President Recep Erdogan's bodyguards violently attacked protesters outside the White House during Erdogan's state visit. In response, Cardin and Rep. Edward Royce, chairman of the House Foreign Affairs Committee, voiced their opposition to selling the 1,600 handguns to Turkey, and the State Department promptly scuttled the sale.

### The Trump Administration's Proposed Small-Arms Export Regime

The Trump administration's proposal—announced through rule changes simultaneously released by the Commerce Department and the State Department in May 2018— would substantially overhaul the current regime. The centerpiece of the proposal is the transfer of most defense articles included in Categories I, II and III from the USML to the Commerce Control List (CCL). Category I covers small arms like semiautomatic handguns and rifles, fully automatic weapons up to .50 caliber in size, assault rifles, combat shotguns, silencers, rifle scopes, and other related small-arms technology. Category II includes weapons over .50 caliber such as howitzers, mortars and grenade launchers. Category III covers all ammunition and ordnance for the defense articles included in Categories I and II. Under the proposal, only fully automatic firearms, shotguns, and their ammunition and related technology would remain under State's control.

The goal of the proposal is to "limit the items that State controls to those that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." Items that do not meet these criteria, including firearms, will be transferred to Commerce's control.

Under the Commerce Department, exports of these weapons will be subject to a less rigorous approval process. At the request of Congress, the U.S. Government Accountability Office (GAO) issued a report in March 2019 detailing how this shift from State to Commerce would impact export controls, including licensing, registration, end-use monitoring and congressional notification requirements currently in place.

According to the GAO, items in Commerce's jurisdiction are subject to different AECA requirements for registration, licensing and end-use monitoring than are those in State's jurisdiction. The AECA mandates that manufacturers, exporters and brokers of USML items register with the State Department's DDTC, but it does not contain a similar registration requirement for manufacturers, exporters and brokers of items on the CCL. Commerce does not have its own registration requirements for those entities either.

WASHSTATEC023193

With regard to licensing, a Government Accountability Office (GAO) report from June 2019 also noted that it does not have access to the relevant State watchlists, which are likely to be more comprehensive because State had been responsible for maintaining negative information about exporters and end users of these items. Consequently, the GAO report warns that "critical information needed to effectively screen applicants and target licenses for end use monitoring may be unavailable to Commerce unless State shares its watch list data."

Moreover, while State allows license exceptions only for certain exports to Canada, the United Kingdom, and Australia, Commerce has license exceptions—called Strategic Trade Authorization (STA) exemptions—for exports to numerous countries. Commerce organizes countries that receive STA benefits into different tiers; within each tier are different sublevels, all of which denote the array of trade benefits the selected countries receive. The highest range of STA benefits are awarded to the countries listed on level A:5 of the Tier 1 List, which includes NATO partners and other close allies, a total of 37 countries. Level A:5 provides the broadest range of STA benefits, including exports of items that would otherwise be controlled for reasons of national security, regional stability and crime control. Commerce estimates that several hundred license applications for items transferred from State's to Commerce's oversight would be approved under STA exemptions. As a NATO ally, Turkey is automatically on the Tier 1 list; notably, Argentina is also included in the Tier 1 list. Those exemptions would not apply under the current regime. As noted above, Congress recently used its oversight powers to terminate an arms sale to Turkey. Without congressional oversight and with the benefits of Tier 1 STA benefits, such a sale would have been more likely to go through.

State and Commerce also conduct end-use monitoring of selected controlled exports differently. State relies primarily on embassy staff to conduct end-use checks, while Commerce typically assigns that duty to export control officers (ECOs) based overseas. However, the ECOs do not provide global coverage like that provided by U.S. embassy staff. Commerce, for example, has no ECOs positioned in the Western Hemisphere, where from 2013 to 2017 the State Department conducted more than 40 percent of its firearms-related end-use checks. Moreover, Commerce does not plan to create a new ECO position or assign a current ECO responsibility for the Western Hemisphere. Instead, Commerce will rely primarily on its Bureau of Industry and Security special agents to travel to countries outside of ECO coverage to conduct end-use checks. Also, no ECO is responsible for Afghanistan, where end-use control is extremely difficult.

Finally, Commerce's end-user certification requirements are less systematic than the equivalent required by State. For firearms and ammunition, State's export controls require applicants to provide a written certification from end users that they will not reexport, resell or otherwise dispose of the commodity outside of the designated country on the license. In comparison, Commerce does not require end-user certification for items on the CCL unless it has not verified an end user's legitimacy or on a case-by-case basis.

Echoing the concerns of other critics and congressional Democrats with the proposed changes, Rep. Ami Bera, chairman of the House Foreign Affairs Subcommittee on Oversight and Investigations, noted that while the current regime "is not perfect, the State Department is more equipped to ensure that our national security interests come first when it comes to firearm exports," and that elimination of congressional notification of "certain weapons exports that raise national security or human rights concerns" will undermine Congress's ability to "conduct effective oversight."

### Background and Legislative History of the Trump Administration's Proposal

President Obama originally floated a similar proposal during his presidency, but Secretary of State John Kerry shelved it in 2016 after pushback from Senate Democrats, who wanted export control to remain under State's control.

With its different view on gun control, the Trump administration has signaled that it would pursue such changes since 2017. In its proposal, the administration argues that the weapons that would be switched from the Munitions List to the Commerce List are "essentially commercial items widely available in retail outlets and less sensitive military items." The administration has explained the rule change by touting the economic benefits of increased exports, with one anonymous official telling Reuters in 2017 that its proposal would allow "more leeway to do arms sales" and "turn the spigot [of small-arms sales] on if you do it the right way."

Secretary of State Mike Pompeo formally notified Congress of the proposed rule change on Feb. 4. In response, Sen. Robert Menendez, the ranking member of the Senate Foreign Relations Committee, placed a 30-day hold on the proposal beginning on Feb. 26 by refusing to accept formal congressional notification, a procedural move that temporarily halted the shift of control from the Department of State to the Department of Commerce.

During the congressional negotiations in July over the NDAA for fiscal 2020, the House of Representatives passed a version with an amendment that would prevent the Trump administration from transferring firearms export control from the State Department to the Commerce Department. The amendment's sponsor, Rep. Norma Torres, stated that the purpose of trying to prevent the oversight transfer was to keep "deadly weapons from falling into the hands of drug cartels and terrorists." No senators have specifically addressed the issue in the NDAA. It remains unclear whether the final version of the fiscal 2020 bill will include this amendment or similar language. However, the Trump administration succeeding in giving formal congressional notification on Nov. 21, which triggered the 30-day period Congress has to take legislative action to prevent the changes from going into effect.

Many international observers, including the United Nations, have repeatedly noted the widespread availability of small arms as a "key enabler" of conflicts around the world. Despite calls for states to exercise tighter arm controls, the Trump administration is proposing to do just the opposite. In light of the potential opening of the "spigot," to quote the anonymous Trump official in 2017, it is worth exploring the potential downstream effects of the proposal with regard to organized crime in Latin America and terrorism in the Middle East and Central Asia, regions that have been flooded with U.S. guns during recent periods of protracted violence.

*Gun Violence in Latin America*

The Trump administration's proposal has potentially enormous implications for organized crime in Latin America. Mexican drug cartels, street gangs like MS-13 and Barrio 18 in El Salvador, and Brazilian narco-trafficking groups all rely on firearms to carry out their illegal activities. There is a strong correlation between such groups and high crime rates in those countries. After years of widespread violence and instability, Mexico's homicide rate rocketed to an all-time high of an average of 91 murders a day in 2018, with much of that violence attributable to cartels battling for territory. Similarly, a 2016 study of global gun deaths found that El Salvador had the highest rate, with 39.2 firearm deaths per 100,000 residents, while Mexico was 15th, with a rate of 10.2 per 100,000.

The surprising truth hidden among these statistics is that, on the whole, Latin American countries have strict gun control regimes. A 2003 Brazilian law restricted the carrying of firearms to members of law enforcement agencies, the armed forces and certain private security companies. In Mexico, there is only one gun store in the entire country, and it's located on a military base in Mexico City, where potential customers must first provide six different identification documents before entering the premises.

The bridge between those tight gun control regulations and high rates of homicide by firearm is often American-made guns. A 2016 GAO study determined that, from 2009 to 2014, 70 percent of all firearms (73,684 in total) seized in Mexico were U.S.-made. In fact, an American gun is more likely to be used in a homicide in Mexico than in the U.S. In 2018, the Brazilian Federal Police pointed to the United States as the largest source of illegal small arms seized by police. A 2016 report by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives noted that 49 percent of all guns seized in El Salvador were manufactured in the U.S.

A large portion of the U.S.-made weapons found in Latin America are smuggled illegally out of the country. For example, in June 2019 Argentinian officials captured a massive arsenal of illegal weapons, including 2,500 firearms, the bulk of which had been smuggled out of the U.S. Yet many other weapons are legally exported to Latin American governments, only for corrupt officials to then sell them to organized criminal groups. The nonprofit group ATT Monitor, which studies issues relating to the global Arms Trade Treaty (ATT), has documented the forging of end-use agreements by corrupt officials in the region who then pass on the arms to unapproved users.

Even with the flow of American-made weapons into Latin American countries, these nations do not have comparatively high gun ownership rates. A 2017 study by the Graduate Institute of International and Development Studies in Geneva found that the rate of guns—legally and illegally owned—per 100 civilians was low throughout the region. Mexico had a rate of 12.7 guns per 100 civilians, Honduras was similarly situated at 14.1, while Brazil's rate was even lower, at 8.3. For comparison, Serbia's rate was 39.1 and Canada's was 34.7; the United States was overwhelmingly first, at 120.5.

Low gun ownership rates throughout Latin America—even with the current flow of American arms into the region—could leave the region vulnerable to the flood of legally available weapons envisioned by the Trump administration's proposal. Because the U.S. is the largest single supplier of guns in the world, including to Latin American countries, the expected increase in those exports, which a gun industry lobbying group has estimated could hit 20 percent, could cause a corresponding increase in the historic rates of gun ownership and firearms violence plaguing those states with unstable security situations. Should the Trump administration's proposal be enacted, analysts will be watching to see if increased gun sales to Latin American countries result in even more guns falling into the hands of organized criminal groups that are already responsible for hundreds of thousands of homicides every year.

*Armed Conflict in the Middle East and Central Asia*

Independent observers have voiced similar concerns about an increase in de facto unsupervised weapons exports to countries in the Middle East and Central Asia that are wracked by terrorist and armed rebel groups. In countries marked by terrorism and insurgency, easier access to weapons manufactured and exported by the U.S. would increase the capacity of armed groups to continue fighting.

The status of the United States as the leading global small-arms exporter is also relevant to the Middle East because a significant portion of its annual exports are sent to the region. From 2017 to 2018, total U.S. firearms exports increased by more than 12 percent, from $662 million to $759 million. Saudi Arabia alone accounted for $579 million and the United Arab Emirates (UAE) for another $32 million in firearm sales.

WASHSTATEC023195

In the Arabian Peninsula, both Saudi Arabia and the UAE have repeatedly been accused by others of transferring legally exported U.S. weapons, including assault rifles, to militias they support in Yemen. Meanwhile, as militias backed by the Saudi-coalition have created alliances with al-Qaeda in the Arabian Peninsula (AQAP), American weapons have landed in the hands of U.S. enemies. The demand for American guns on the Yemeni black market is high, with arms dealers selling to AQAP, the Houthi rebels and other groups.

In the fight against the Islamic State, the United States attempted to bolster both Iraqi security forces and moderate Syrian rebel groups with funds and arms. However, between 2014 and 2018, many U.S. M16 assault rifles that were exported to Iraq as part of security assistance programs fell into the hands of various jihadist groups. In 2018, al-Qaeda-linked militants in Syria were selling U.S. assault rifles to other jihadists in the country.

According to a 2016 study by Action on Armed Violence, over the course of 14 years, the United States has supplied the military and police forces of Iraq and Afghanistan with almost 1 million assault rifles, 266,000 pistols and nearly 112,000 machine guns—a total of 1.45 millions small arms. At the time of the study, the Pentagon could account for fewer than half, highlighting the shortcomings of existing end-user controls.

In Afghanistan, significant numbers of those missing guns have ended up in the hands of Afghan and Pakistani Taliban militants. A major portion of U.S. weapons for American and Afghan troops are delivered into the country over land from Karachi, Pakistan. Long-standing ties between the Pakistani security services and Taliban militants result in the theft of many U.S. guns in transit. As a result, U.S. M4s are commonly sold on the open market in the Pakistani cities of Quetta and Peshawar and in the Federally Administered Tribal Areas, where both the Pakistani and Afghan Taliban have a significant presence.

With Congress's oversight capacity eliminated and Commerce's limited capacity to run end-user checks, critics warn the proposed rule change will likely increase the flow of American guns into protracted conflicts in the Middle East and Central Asia and, ultimately, the number of those arms that end up in the hands of some of the United States's most deadly enemies.

*Editor's Note: A previous version of this article mistakenly categorized Mexico as a Central American country.*

**Topics: Trade and Security**

**Tags: firearms, Trump Administration**

Eric Halliday is a student at Harvard Law School. Before law school, Eric worked for two years at Mintz Levin, where he focused on white collar, anti-money laundering, and pro bono domestic violence matters. He graduated from Tufts University with a B.A. in Political Science and Italian Studies.

Rachael Hanna is a student at Harvard Law School. Prior to law school, Rachael spent two years working at Mintz Levin, where she focused on white collar and anti-money laundering matters. She holds an A.B. in Government from Harvard College.

WASHSTATEC023196




## Donald J. Trump ✔
@realDonaldTrump

Follow

I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!

5:03 AM - 31 Jul 2018

**9,120** Retweets  **48,349** Likes



💬 19K      🔁 9.1K      48K


**Christopher Zullo** @ChrisJZullo · 31 Jul 2018

Replying to @realDonaldTrump

Republican philosophy of more guns creating less civilian gun violence is just asinine. Don't let criminals, domestic abusers or mentally ill pass background checks. Limit high capacity military style weaponry. Invest in medicaid and social service programs

💬 143      🔁 129      1.3K


**Christopher Zullo** @ChrisJZullo · 31 Jul 2018

When a kid on the playground throws a rock at another kid do you arm all the kids with rocks expecting less to be thrown? Republican policy of more guns creating less gun violence isn't just asinine but why United States has highest rate of civilian gun deaths

💬 111      🔁 209      1.2K


**Christopher Zullo** @ChrisJZullo · 31 Jul 2018

Why I #RESIST

Tax Scam Bill
Net Neutrality
Trade Wars
Pre-Existing Conditions
SCOTUS
Russia
March For Our Lives
No Tolerance ICE
Environment

WASHSTATEC023197

116TH CONGRESS
1ST SESSION

# H. R. 2500

---

# AN ACT

To authorize appropriations for fiscal year 2020 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

WASHSTATEC023198

1      (1) The term "unaccompanied alien children"

2 has the meaning given such term in section 462 of

3 the Homeland Security Act of 2002 (6 U.S.C. 279)).

4      (2) The term "Flores settlement agreement"

5 means the stipulated settlement agreement filed on

6 January 17, 1997, in the United States District

7 Court for the Central District of California in Flores

8 v. Reno, CV 85–4544–RJK.

**SEC. 1050. UNITED STATES MUNITIONS LIST.**

10     The President may not remove from the United

11 States Munitions List any item that was included in cat-

12 egory I, II, or III of the United States Munitions List,

13 as in effect on August 31, 2017.

**SEC. 1050A. LIMITATION ON USE OF FUNDS FOR REIM-**
**BURSEMENT OF EXPENSES AT CERTAIN**
**PROPERTIES.**

17     (a) LIMITATION.—None of the funds made available

18 for the Department of Defense may be obligated or ex-

19 pended to the following properties or to an entity with an

20 ownership interest in such property:

21      (1) Trump Vineyard Estates.

22      (2) Trump International Hotel & Tower, Chi-

23 cago.

24      (3) Mar-A-Lago Club.

25      (4) Trump Grande Sunny Isles.

WASHSTATEC023199

REVIEWED|10-18-2019|S reviewed 10/18.



201921859
**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                              October 18, 2019
<u>DELIBERATIVE PROCESS/PRE-DECISIONAL</u>

☐ Read by _____

**INFORMATION MEMO FOR THE SECRETARY**

FROM:          PM – R. Clarke Cooper
               H – Mary Elizabeth Taylor

SUBJECT:       (SBU) Providing Regulatory Relief with Rules Transferring Controls for Exports
               of Certain Firearms and Ammunition from State to Commerce

**BLUF:**      (SBU) The Departments of State and Commerce will proceed with final steps
               toward publication of rules transferring controls for exports of certain firearms
               and ammunition from State to Commerce.  The rules will include Commerce
               controls on 3D-printed firearm files.

(SBU) In the near future, State and Commerce will proceed to complete the steps for publication
of final rules revising the International Traffic in Arms Regulations (ITAR) and Export
Administration Regulations to transfer firearms and related items that do not confer a "critical
military or intelligence advantage" from State to Commerce.  Because the Commerce proposed
rule has changed, the Administration will resubmit a formal 30-day notification to Congress on
the transfer of Categories I, II, and III from State to Commerce prior to publication.  The new
notification will effectively replace the February formal notification and, in a change from the
previously notified version, will include Commerce controls on the publication of 3D-printed
firearm files (i.e., computer files that enable a 3D printer to produce components of an operable
firearm) under its regulations.  The publication of the rules had been paused ███████████
████████████████████████████████████████████████████████████████████████
████████████████████  Publication of the final rules that transfer control of certain firearms and
ammunition from State to Commerce will be greeted with relief by many small manufacturers
around the country, but is also likely to elicit strong political objections and legal challenges.

(SBU) **Export Control Implications and Regulatory Relief:**  Publication of the final rule will
complete the first comprehensive review of the ITAR's U.S. Munitions List (USML), which
commenced a decade ago.  Review of the USML to remove those items that no longer merit the
stringent controls of the ITAR continues to be a key line of effort for the Implementation Plan
under the President's Conventional Arms Transfer (CAT) Policy.  This effort enjoys broad
support from the U.S. defense, space, electronics, and other export-oriented industries.  This rule
in particular will impact a large number of small manufacturers and gunsmiths around the

<u>SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL</u>

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL
-2-

country, most of whom are non-exporting, who will no longer have to register with State and pay the annual $2,250 fee with these regulatory changes.

(SBU) **Path Forward and Congressional Implications:**  When State notified Congress of intent to publish the firearms rules, Senator Menendez (D-NJ) requested the Department hold until two issues are "sufficiently addressed":  (1) congressional oversight of exports of firearms over specified value thresholds is maintained, and (2) the public release of 3D gun printing technical information remains controlled.  In addition, the House adopted an amendment offered by HFAC Chairman Engel (D-NY) to FY 2020 National Defense Authorization Act (NDAA) that would prevent the Department from shifting controls over firearms to Commerce, perhaps reflecting broader concerns that the rule will result in the global proliferation of U.S.-origin guns.

(SBU) The process for congressional notification of rules that would remove items from the USML typically involves a 30-day informal consultation with Congress and a formal 30-day congressional notification as required by Section 38(f) of the AECA.  In this case, however, after we notified Congress of the firearm rules in February, Commerce changed its draft rule to establish controls over the publication of 3D gun files.  The current congressional rollout plan includes a briefing for SFRC and HFAC staff prior to delivering the formal notification.

(SBU)

(SBU) At the expiration of the 30-day notification period, absent congressional holds, State and Commerce plan to publish our rules simultaneously, with an effective date that is 45 days after publication in order to allow for an orderly transition of the items from State to Commerce.  In

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL

WASHSTATEC023201

the likely event the committees seek to assert a basis to "hold" this action, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ When the rules are final, State and
Commerce must forward them to the House, the Senate, and GAO pursuant to the Congressional
Review Act. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(SBU) **Litigation Implications:**  In 2018, State settled a lawsuit, *Defense Distributed v.
U.S. Department of State*, in which the plaintiff asserted a First, Second, and Fifth Amendment
challenge to the control of certain technical data for the 3D printing of firearms under the ITAR.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ After the Department entered into a settlement agreement, which permitted
publication of Defense Distributed's data on the internet, a number of states then sued the
Department to block implementation of the settlement agreement (*Washington v.
U.S. Department of State*), arguing that the Department's temporary amendment of the ITAR
called for by the settlement agreement was not properly notified to Congress pursuant to section
38(f) of the Arms Export Control Act (AECA).  The court in *Washington* entered a preliminary
injunction enjoining the Department from complying with the settlement agreement in *Defense
Distributed*, and the court is currently considering cross motions for summary judgment.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(SBU) **Messaging and Engagement:**  PM is working with colleagues in the Department and
interagency partners to prepare for the rollout of the rules, as amended, as well as any potential
litigation challenges. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

WASHSTATEC023202

SENSITIVE BUT UNCLASSIFIED – DELIBERATIVE PROCESS/PRE-DECISIONAL
-4-

Approved:     PM – R. Clarke Cooper          [RCC]
              H – Mary Elizabeth Taylor       [MET]

Drafted:      PM/CPA:  Josh Paul, ext. 7-7878 and cell: ████████

Cleared:      PM/FO          Stan Brown              OK
              PM/DDTC        Michael Miller          OK
              D              Brett Eggleston         OK
              P              Melanie Carter          OK
              M              Lareina Ockerman        OK
              S/P            Michael Urena           OK
              L              Josh Dorosin            OK
              T              Maureen Tucker          OK
              H              Tamara Darrach          OK

WASHSTATEC023203

REC1|APPROVE|11-12-2019|S approved



201922930
**United States Department of State**

*Washington, D.C.  20520*



<u>UNCLASSIFIED</u>                                                          November 8, 2019

**ACTION MEMO FOR THE SECRETARY**

FROM:          PM – R. Clarke Cooper
                     H – Mary Elizabeth Taylor

SUBJECT:    (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
                     Control Act (AECA), of the Transfer of Certain Items from the U.S. Munitions
                     List (USML)

**BLUF:**        (SBU) PM seeks to notify Congress of changes in the nature of controls over
                     technical data being removed from the USML and transferred to control on the
                     Commerce Control List (CCL).

**Recommendations**
(SBU) That you authorize H to transmit the attached letters to Congress to provide a new
notification, pursuant to Section 38(f)(1) of the AECA, of the Department's intent to remove
certain items from the USML that no longer warrant State control under this Act.
(Approve/Disapprove by 11/19/19)


**Background**
(U) Since 2010, the Department engaged in revising the USML into a "positive" list that
describes export controlled items using objective criteria, rather than broad, open-ended,
subjective, or design intent-based criteria.  Items not providing the United States with critical
military advantage and determined to no longer warrant USML control are being transferred to
the Department of Commerce.  As the most recent step in this effort, PM seeks your approval to
formally re-notify Congress of the proposed transfer of certain items from Categories I
(Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armaments), and III
(Ammunition/Ordnance) from the USML to the CCL.  Section 38(f) of the AECA requires the
Department, as delegated from the President, to report to the Speaker of the House of
Representatives and to the Committee of Foreign Relations and the Committee on Banking,
Housing, and Urban Affairs of the Senate, items that no longer warrant State continued control
under the International Traffic in Arms Regulation (ITAR), including a description of the nature
of any controls to be imposed on such items under any other provision of law.  After the
Congressional Notification (CN) is complete, we will seek approval to publish the final rule, to
be effective 45 days after publication.  Commerce would publish their final rule simultaneously.

(SBU) PM previously notified Congress of the Department's intent to transfer jurisdictional
control over these items on February 4.  We are submitting a new notification because the
Commerce amended its draft companion rule to provide controls over 3-D printing technology
and software for certain items.  AECA Section 38(f)(1) requires that CNs regarding the removal

WASHSTATEC023204

UNCLASSIFIED
UNCLASSIFIED
-2-

of items from the USML "describe the nature of any controls to be imposed on that item under any other provision of law."

██████████████████████████████████████████████████████████

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML.  The President delegated this authority to the Secretary of State in E.O. 13637.

Attachments:
      Tab 2:  Revised USML Categories I, II, and III
      Tab 3:  Line-in/Line-out Comparison of Current USML Categories I, II, and III with these USML Categories as Revised
      Tab 4:  Revised Commerce Companion Control Text
      Tab 5:  Summary of Revisions to USML Categories I, II, and III
      Tab 6:  Proposed Controls for Major Defense Equipment in Category III
      Tab 7:  AM to T, Notification to Congress, dated 4 February 2019
      Tab 8:  Summary of Conclusions for Small Group Meeting on Transfer of Categories I-III, 18 September 2019
      Tab 9:  Summary of Conclusions for Small Group Meeting on Transfer of Categories I-III, 27 September 2019
      Tab 10: Reuters Article on Gun Exports

WASHSTATEC023205

Approved:      PM – R. Clarke Cooper

Drafted:       PM/DTCP:  Rick Koelling, ext. 3-2828 and cell: █████████

Clearances:    D              Brett Eggleston – OK
               P              Melanie Carter – OK
               S/P            Michael Urena – OK
               PM/DDTC        Michael Miller – OK
               PM/DTCP        Sarah Heidema – OK
               PM/DTCC        Julia Tulino – OK
               PM/DTCL        Catherine Hamilton – OK
               L/PM           Joe Khawam – OK
               L/M            Alice Kottmyer – OK
               PM/CPA         Josh Paul – OK
               ISN/CATR       Thomas Krueger – OK
               T              Maureen Tucker – OK
               H              Tamara Darrach – OK

WASHSTATEC023207

WASHSTATEC023208

WASHSTATEC023209

WASHSTATEC023210

WASHSTATEC023211

WASHSTATEC023212

WASHSTATEC023213

WASHSTATEC023214

WASHSTATEC023215

WASHSTATEC023216

WASHSTATEC023217

WASHSTATEC023218

WASHSTATEC023219

WASHSTATEC023220

WASHSTATEC023221

WASHSTATEC023222

WASHSTATEC023223

WASHSTATEC023224

WASHSTATEC023225

WASHSTATEC023226

WASHSTATEC023227

WASHSTATEC023228

WASHSTATEC023229

WASHSTATEC023230

WASHSTATEC023231

WASHSTATEC023232

WASHSTATEC023233

WASHSTATEC023234

WASHSTATEC023235

WASHSTATEC023236

WASHSTATEC023237

WASHSTATEC023238

WASHSTATEC023239

WASHSTATEC023240

WASHSTATEC023241

WASHSTATEC023242

WASHSTATEC023243

WASHSTATEC023244

WASHSTATEC023245

WASHSTATEC023246

WASHSTATEC023247

WASHSTATEC023248

WASHSTATEC023249

WASHSTATEC023250

WASHSTATEC023251

WASHSTATEC023252

WASHSTATEC023253

WASHSTATEC023254

WASHSTATEC023255

WASHSTATEC023256

WASHSTATEC023257

WASHSTATEC023258

WASHSTATEC023259

WASHSTATEC023260

WASHSTATEC023261

WASHSTATEC023262

WASHSTATEC023263

WASHSTATEC023264

WASHSTATEC023265

WASHSTATEC023266

WASHSTATEC023267

WASHSTATEC023268

WASHSTATEC023269

WASHSTATEC023270

WASHSTATEC023271

WASHSTATEC023272

WASHSTATEC023273

WASHSTATEC023274

WASHSTATEC023275

WASHSTATEC023276

WASHSTATEC023277

WASHSTATEC023278

WASHSTATEC023279

WASHSTATEC023280

WASHSTATEC023281

WASHSTATEC023282

WASHSTATEC023283

WASHSTATEC023284

WASHSTATEC023285

WASHSTATEC023286

WASHSTATEC023287

WASHSTATEC023288

WASHSTATEC023289

WASHSTATEC023290

WASHSTATEC023291

WASHSTATEC023292

WASHSTATEC023293

WASHSTATEC023294

WASHSTATEC023295

WASHSTATEC023296

WASHSTATEC023297

WASHSTATEC023298

WASHSTATEC023299

WASHSTATEC023300

WASHSTATEC023301

WASHSTATEC023302

WASHSTATEC023303

WASHSTATEC023304

WASHSTATEC023305

WASHSTATEC023306

WASHSTATEC023307

WASHSTATEC023308

WASHSTATEC023309

WASHSTATEC023310

WASHSTATEC023311

WASHSTATEC023312

WASHSTATEC023313

WASHSTATEC023314

WASHSTATEC023315

WASHSTATEC023316

WASHSTATEC023317

WASHSTATEC023318

WASHSTATEC023319

WASHSTATEC023320

WASHSTATEC023321

WASHSTATEC023322

WASHSTATEC023323

WASHSTATEC023324

WASHSTATEC023325

WASHSTATEC023326

WASHSTATEC023327

WASHSTATEC023328

WASHSTATEC023329

WASHSTATEC023330

WASHSTATEC023331

WASHSTATEC023332

WASHSTATEC023333

WASHSTATEC023334

WASHSTATEC023335

WASHSTATEC023336

WASHSTATEC023337

WASHSTATEC023338

WASHSTATEC023339

WASHSTATEC023340

WASHSTATEC023341

WASHSTATEC023342

REC1|APPROVE|1-3-2019
REC2|APPROVE|1-3-2019



201837662
**United States Department of State**

*Washington, D.C.  20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                                    December 18, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:          PM – Marik String, Senior Bureau Official

SUBJECT:     (SBU) Notification to Congress, Pursuant to Section 38(f)(1) of the Arms Export
                     Control Act, of the Removal of Certain Items from the U.S. Munitions List.

**BLUF:**        (SBU) PM seeks to notify Congress of removals from the United States Munitions
                     List (USML) as part of the on-going effort to ensure the USML includes only
                     items that merit the most stringent export control.  Notification will consist of an
                     informal 30 calendar-day period initiated by the PM/DTCP Office Director,
                     followed by a 30 calendar-day period formally notified by H.

**Recommendations**
(SBU) That you:
   (1) Approve the PM/DTCP Office Director to electronically transmit to House Foreign
        Affairs and Senate Foreign Relations Committees the draft attached letters to initiate
        informal notification of a removal from the USML, pursuant to the Department's
        arrangement with the Congress.  (Approve/Disapprove by 12/19/18)

   (2) Approve H, upon notice from PM/DTCP that the informal period initiated in paragraph
        (1) is concluded, to transmit the signed copies of the attached letters to the Congress in
        order to provide formal notification, as required by Section 38(f)(1) of the Arms Export
        Control Act, of the State Department's intent to remove certain items from the USML
        that no longer warrant control under this Act.  (Approve/Disapprove by 12/19/18)


**Background**
(U) Since 2009, the Department has been engaged in an effort to review the U.S. export control
system and revise the USML into a "positive" list that describes controlled items using objective
criteria, rather than broad, subjective, or design intent-based criteria.  As part of this
effort, items determined to no longer warrant control on the USML are being transferred to the
Department of Commerce's Commerce Control List (CCL).  Those non-objective criteria are
still found in three of the 21 categories of the USML, the only remaining tranche of USML
reforms that have been delayed for years due to political sensitivities surrounding firearms.

(U) After consultation with the Departments of Defense and Commerce, solicitation and review
of public comments, and interagency review, the Department of State has drafted a final rule to
revise the three USML Categories that have yet to be reformed:  I (firearms and related articles),
II (guns and armaments), and III (ammunition and ordnance).  Through this review, the

<u>SENSITIVE BUT UNCLASSIFIED</u>

WASHSTATEC023343

SENSITIVE BUT UNCLASSIFIED
-2-

Department identified and will continue to control on the USML those items that provide the United States with a critical military or intelligence advantage or, in the case of weapons, perform an inherently military function and thus warrant control on the USML.  The result of the review is that certain items currently on the USML not meeting this standard will transition to the CCL.  This reform has also been a key element of the President's Conventional Arms Transfer Policy Implementation Plan. ██████████████████████████████████ ██████.

(U) The items that will transition to the CCL include: 1) most semi-automatic and non-automatic firearms; 2) most firearm parts and components, other than silencers, magazines greater than 50 rounds, parts and components to convert a semi-automatic to a fully automatic firearm, and accessories or attachments for automatic targeting or stabilization; 3) most firearm ammunition, unless belted or linked; and 4) many of the minor parts and components of large guns, such as howitzers and artillery pieces.  Section 38(f)(1) of the Arms Export Control Act provides that the President may not remove items from the USML until 30 days after the date on which notice of the proposed removal is provided to the House Committee on Foreign Affairs and the Senate Foreign Relations Committee.

(SBU) Pursuant to a process communicated to Congress in 2011, the Department provides the draft final rules and a summary of the resulting removals to the Committees for a 30-day informal review period.  Congress has not attempted to stop or slow down previous removals from the USML through the Congressional notification process, unlike the Congressional holds that are commonly placed on arms sale notifications.  However, a Member could request that State not proceed with the formal notification or publication of this rule removing items from the USML. ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

(SBU) Our oversight committees were previously briefed on the proposed State and Commerce rules to revise USML Categories I-III and move certain items to the CCL, and additional briefings will be offered upon the start of informal Congressional Notification of the rule change. ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████The Department continues to defend a legal challenge to the public release of technical data to enable 3-D printing of firearms and has sought a stay of the litigation, pending completion of this rulemaking process. This rule would transition certain technical data, including the data for semi-automatic and non-automatic firearms, to the CCL, where it can be publically released without authorization under Commerce rules.  The lawsuit and the movement of firearms and ammunition from the USML to the CCL have generated substantial public and congressional interest, which may result in additional scrutiny of this notification.

SENSITIVE BUT UNCLASSIFIED

(U) 

(U) Once these items are removed from the USML, they will be controlled by the Department of Commerce in new Export Control Classification Numbers (ECCNs) on the CCL in the Export Administration Regulations (EAR). Most of the physical items that are removed, including all of the firearms (with the exception of firearms manufactured prior to 1898), will have a world-wide Commerce Department license requirement, and the State Department will continue to review all export license applications for firearms for policy concerns.

(U) One defense article to be removed from the USML is designated as Major Defense Equipment (which requires separate notification and higher scrutiny under the ITAR), the M855A1 cartridge, the lead-free replacement for the 5.56x45 mm NATO, M855 standard ball cartridge. Therefore, the notification package will include a table delineating the proposed controls of Major Defense Equipment.

(U) Section 38(a)(1) of the AECA authorizes the President to designate the defense articles and defense services which constitute the USML. The President delegated this authority to the Secretary of State in Executive Order 13637. This authority may be exercised by the Undersecretary of State for Arms Control and International Security Affairs pursuant to Delegation of Authority 293-2.

Attachments:
Tab 1:  Notification Letters to the Congress
Tab 2:  Revised USML Categories I, II, and III
Tab 3:  Line-in/Line-out Comparison of Current USML Categories I, II, and III with these USML Categories as Revised;
Tab 4:  Revised Department of Commerce Companion Control Text;
Tab 5:  Summary of Revisions to USML Categories I, II, and III; and
Tab 6:  Proposed Controls for Major Defense Equipment in Category III
Tab 7:  Roll-Out Plan

WASHSTATEC023345

SENSITIVE BUT UNCLASSIFIED

Approved:     PM – Marik String, SBO     MS

Drafted:      PM/DTCP:  Rob Monjay, ext. 3-2817 and cell: █████████

Clearances:

| | | |
|---|---|---|
| D | Jamie Shufflebarger – OK |
| P | Jamie Gusack – OK |
| S/P | Michael Urena – OK |
| PM/DDTC | Michael Miller – OK |
| PM/DTCP | Sarah Heidema – OK |
| PM/DTCC | Jae Shin – OK |
| PM/DTCL | Catherine Hamilton – OK |
| PM/DTCM | Anthony Dearth – OK |
| L/PM | Shana Rogers – OK |
| L/M | Alice Kottmyer – OK |
| PM/CPA | Dave McKeeby – OK |
| ISN/CATR | Thomas Kruger – OK |
| T | Ed Abisellan – OK |
| H | Collin Christopherson – OK |

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023346



WASHSTATEC023347

WASHSTATEC023348

# Exclusive: Trump administration moves closer to easing gun exports

WASHINGTON (Reuters) - The Trump administration has passed a key milestone in a long-delayed rule change that would make it easier to sell U.S. firearms outside the United States, including assault rifles and ammunition, people briefed on the matter told Reuters.

FILE PHOTO: AR-15 rifles are displayed for sale at the Guntoberfest gun show in Oaks, Pennsylvania, U.S., October 6, 2017. REUTERS/Joshua Roberts/File Photo

The proposed rule changes, which would move oversight of commercial firearm exports from the U.S. Department of State to the Department of Commerce, could be enacted as soon as the end of this year, the sources said late on Wednesday.

The move by President Donald Trump's administration may generate business for gun makers such as American Outdoor Brands (AOBC.O) and Sturm Ruger & Company (RGR.N) while increasing the sale of deadly weapons abroad. A relaxing of rules could increase foreign gun sales by as much as 20%, the National Shooting Sports Foundation (NSSF) has estimated.

While the State Department is primarily concerned with international threats to stability and maintains tight restrictions on weapons deals, the Commerce Department typically focuses on making it easier for U.S. companies to sell products overseas.

Since taking office, Trump has been a far more outspoken booster of U.S. weapons sales abroad than his recent predecessors, acting almost as a salesman for the U.S. defense industry, analysts have said. Any move that would boost arms sales is also likely to earn enthusiastic support from the influential National Rifle Association as Trump's re-election campaign heats up.

Critics, including some lawmakers and arms control advocates, have expressed concern that any easing of export rules could make powerful weapons of the type often used in U.S. mass shootings more accessible to criminal gangs and militant groups that Trump has vowed to fight.

"This change will undermine congressional oversight, exacerbate the risk of international gun violence, human rights abuses, and armed conflict, and put U.S. servicemen and women at risk from U.S. weapons that have fallen into the wrong hands," Rachel Stohl, a managing director at the Washington think tank the Stimson Center, said in a statement.

A review of the rules by multiple U.S. agencies including the Pentagon and the Department of Homeland Security concluded this week, the people said. Government records show the final rule was formally transmitted to the White House Office of Management and Budget on Oct. 23.

This week's close of the interagency comment period was a key milestone that enables the Trump administration to put lawmakers on notice of the intent to transfer formal oversight to the weapons sales from State to Commerce. Top officials at both departments still need to sign off on the issue before legislators can be notified.

Reuters first reported on the Trump administration's interest in the oversight shift in 2017 here The action is part of a broader Trump administration overhaul of weapons export policy here

The effort to streamline U.S. small arms export controls dates back to an Obama administration initiative begun in 2009 that was never translated into policy.

"The move would reduce the regulatory burden and make industry members more competitive in the global marketplace with out reducing oversight," said Lawrence Keane, head of government and public affairs for the NSSF trade group, adding "there is more oversight at the Commerce Department."

Representatives from the Commerce Department and budget office declined to comment.

# BEAT THE CLOCK

"The Administration continues to work through the interagency process with the Departments of State, Commerce, Homeland Security, Justice, and other stakeholders to reexamine longstanding polices and regulations to ensure that U.S. industries have every advantage in the global marketplace," a State Department spokesman said.

The U.S. House of Representatives has passed legislation that would prohibit the transfer of firearms export oversight to the Department of Commerce. But the bill containing the language, an annual defense policy bill called the National Defense Authorization (NDAA), has not passed the Senate and is not yet law.

If the Trump administration moves to notify legislators of the planned change in the coming weeks, it could be enacted before passage of the NDAA, one of the people said.

The Senate's version of the NDAA does not contain the same language as the House bill. The measure is being discussed by legislative staffs, the person said.

Domestic gun sales have risen in the past three months, according to estimates released on Tuesday by research consultancy Small Arms Analytics & Forecasting. Sales are flat at 10.8 million units when compared to the same period a year earlier, SAAF said in the estimate.

Reporting by Mike Stone and David Shapardson in Washington, D.C.; Editing by Chris Sanders and Bill Berkrot

Our Standards:The Thomson Reuters Trust Principles.



United States Department of State

*Washington, D.C. 20520*

The Honorable
James E. Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, D.C. 201510

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
        As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Robert Menendez, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

NOV 1 2 2019

Dear Senator Menendez:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
        As stated.



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Eliot L. Engel, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. Chairman:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
        As stated.

WASHSTATEC023354



**United States Department of State**

*Washington, D.C. 20520*

The Honorable
Michael T. McCaul, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

NOV 1 2 2019

Dear Mr. McCaul:

Pursuant to Section 38(f)(1) of the Arms Export Control Act (22 U.S.C. 2778(f)(1)), the Department is transmitting herewith notification of the intention to transfer jurisdictional control of certain classes of item currently on the United States Munitions List (USML) to the Commerce Control List (CCL).

Attached for your reference are the following documents: a summary of the revisions to the USML; the final regulatory text of Categories I, II and III; line-in/line-out comparison of the current and revised USML Categories I, II and III; the Department of Commerce's revised companion regulatory text; and a summary of the controls for major defense equipment.

Sincerely,

Mary Elizabeth Taylor
Assistant Secretary
Bureau of Legislative Affairs

Enclosures:
      As stated.

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:**  Department of State.

**ACTION:**  Final rule.

**§ 121.1 The United States Munitions List.**

\* \* \* \* \*

**Category I—Firearms and Related Articles**

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms).

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors.

WASHSTATEC023356

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter

2

WASHSTATEC023357

for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II—Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

3

WASHSTATEC023358

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

4

SENSITIVE BUT UNCLASSIFIED

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flamethrowers with an effective range greater than or equal to 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023360

modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

6

WASHSTATEC023361

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

7

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023362

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

8

WASHSTATEC023363

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition and Ordnance**

9

WASHSTATEC023364

(a) Ammunition, as follows:

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

10

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023365

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

11

WASHSTATEC023366

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

12

WASHSTATEC023367

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

13

WASHSTATEC023368

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

14

WASHSTATEC023369

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

*Note 3 to Category III:* Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023370

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10603]**

**RIN 1400-AE30**

**International Traffic in Arms Regulations: U.S. Munitions List**

**Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Final rule.

**§ 121.1 The United States Munitions List.**

\* \* \* \* \*

**Category I—Firearms** and Related Articles

~~**, Close Assault Weapons and Combat Shotguns**~~

   \*(a) Firearms using caseless ammunition~~Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)~~.

   \*(b) Fully automatic firearms to .50 caliber ~~inclusive~~ (12.7 mm) inclusive.

WASHSTATEC023371

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms)~~or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.~~

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

~~Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.~~

*(e) Silencers, mufflers, and sound ~~and flash~~ suppressors ~~for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.~~

(f) [Reserved]

~~Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)~~

*(g) Barrels, ~~cylinders,~~ receivers (frames) bolts, bolt carriers, slides, or sears~~or complete breech mechanisms~~ specially designed for the articles in paragraphs (a), (b), and ~~through~~ (d) of this category.

2

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023372

(h) ~~Components, p~~Parts, components, accessories, and attachments~~.~~, as follows:

~~for the articles in paragraphs (a) through (g) of this category.~~

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm;

(3) Parts and components specially designed for defense articles described in paragraphs (c) and (e); or

(4) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (~~as defined in~~*see* §120.10 of this subchapter) and defense services (~~as defined in~~*see* §120.9 of this subchapter) directly related to the defense articles described in ~~paragraphs (a) through (h) of~~this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.)

3

WASHSTATEC023373

Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) – (w) [Reserved] The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

(x) Commodities, software, and technology subject to the EAR (see

4

WASHSTATEC023374

§ 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*: Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

*Note to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant;

(2) A fully automatic firearm or shotgun is any firearm or shotgun that shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger; and

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

~~: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not~~

5

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023375

~~manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).~~

**Category II—Guns and Armament**

\*(a) Guns and armament greater than ~~over~~ caliber .50 (~~i.e.,~~ 12.7 mm), as follows:

\*(1) Guns, howitzers, artillery, and cannons;

\*(2) Mortars;

\*(3) Recoilless rifles;

\*(4) Grenade launchers; or ~~whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons, recoilless rifles, and grenade launchers~~

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and

6

WASHSTATEC023376

components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm); (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated [**INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER**], or later.

*Note 1 to paragraph (a):* This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; black powder guns and armaments manufactured between 1890 and 1919 controlled on the

7

WASHSTATEC023377

CCL under ECCN 0A602; or black powder guns and armaments manufactured earlier than 1890.

*Note 2 to paragraph (a):* Guns and armament when integrated into their carrier (*e.g.*, surface vessels, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame-throwers with an effective range greater than or equal to 20 meters.~~specifically designed or modified for military application.~~

(c) [Reserved]~~Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.~~

*(d) Kinetic energy weapon systems specially ~~specifically~~ designed ~~or modified~~ for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

8

WASHSTATEC023378

(e) Signature <u>reduction devices</u> ~~control materials (e.g., parasitic,~~ ~~structural, coatings, screening) techniques, and equipment~~ <u>specially</u> ~~specifically~~ designed~~, developed, configured, adapted or modified to alter or~~ ~~reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual,~~ ~~laser/electro-optical, acoustic) of~~ <u>for the guns and armament controlled in</u> <u>paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression</u> <u>devices)</u>~~defense articles controlled by this category~~.

<u>*</u>(f) <u>– (i) [Reserved]</u>~~Engines specifically designed or modified for the~~ ~~self-propelled guns and howitzers in paragraph (a) of this category.~~

~~(g) Tooling and equipment specifically designed or modified for the~~ ~~production of defense articles controlled by this category.~~

~~(h) Test and evaluation equipment and test models specifically designed~~ ~~or modified for the articles controlled by this category. This includes but is~~ ~~not limited to diagnostic instrumentation and physical test models.~~

~~(i) Autoloading systems for electronic programming of projectile~~ ~~function for the defense articles controlled in this Category.~~

(j) ~~All other components, p~~Parts, <u>components,</u> accessories, <u>and</u> attachments<u>, as follows:</u> ~~and associated equipment specifically designed or~~ ~~modified for the articles in paragraphs (a) through (i) of this category. This~~

9

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023379

~~includes but is not limited to mounts and carriages for the articles controlled in this category.~~

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(10) Components for independently powered ammunition handling systems and platform interface, as follows:

(i) Mounts;

(ii) Carriages;

10

WASHSTATEC023380

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(10):* For weapons mounts specially designed for surface vessels and special naval equipment, *see* Category VI. For weapons mounts specially designed for ground vehicles, *see* Category VII.

(11) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition feeder systems, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Systems and equipment for the guns and armament controlled in paragraphs (a) and (d) of this category for use in programming ammunition, and specially designed parts and components therefor;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Recoil systems specially designed to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

11

WASHSTATEC023381

(15) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(16) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(17) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* as defined in §120.10 of this subchapter) and defense services (*see* as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a)-, (b), (d), (e), and through

12

WASHSTATEC023382

(j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.) ~~Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.~~

(l) – (w) [Reserved] ~~The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:~~

~~(1) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:~~

~~(i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;~~

~~(ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel-handling equipment; and the electrical interfaces between power supply gun and other turret electric drive function;~~

13

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023383

(iii) Target acquisition, tracking fire control or damage assessment systems; and

(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(3) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application.

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Category III—Ammunition/ and Ordnance**

*(a) Ammunition/, as follows:ordnance for the articles in Categories I and II of this section.

14

WASHSTATEC023384

*(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

*(2) Ammunition preassembled into links or belts;

*(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

*(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4):* Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

*(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

*(6) Ammunition employing pyrotechnic material in the projectile base or any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

*(7) Ammunition for fully automatic firearms that fire superposed or stacked projectiles or for guns that fire superposed or stacked projectiles;

15

WASHSTATEC023385

*(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

*(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition: (a) in production; (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter); or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated **[INSERT DATE ONE YEAR AFTER PUBLICATION IN THE FEDERAL REGISTER]**, or later.

16

WASHSTATEC023386

(b) Ammunition/ordnance handling equipment specially ~~specifically~~ designed ~~or modified~~ for the articles controlled in this category, as follows:~~,~~ ~~such as, belting, linking, and de-linking equipment.~~

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]~~Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.~~

(d) ~~Components, p~~Parts and components,~~ accessories, attachments and associated equipment specifically designed or modified~~ for the articles in this category, as follows:

\*(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary or explosive~~Guidance and control components for the articles in paragraph (a) of this category;~~

\*(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;~~Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category; and~~

17

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023387

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium; ~~All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.~~

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Projectiles that employ tips (*e.g.*, M855A1 Enhanced Performance Round (EPR)) or cores regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases specially designed for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

18

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023388

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):* This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or

19

WASHSTATEC023389

predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see*~~as defined in~~ §120.10 of this subchapter) and defense services (*see*~~as defined in~~ §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), and ~~through~~ (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)~~Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.~~

(f) – (w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles. ~~The following explains and amplifies the terms used in this category and elsewhere in this subchapter:~~

~~(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or~~

20

WASHSTATEC023390

~~other propellant charges), bullets, jackets, cores, shells (excluding shotgun~~

~~shells), projectiles (including canister rounds and submunitions therefor),~~

~~boosters, firing components therefor, primers, and other detonating devices~~

~~for the defense articles controlled in this category.~~

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

*Note 1 to Category III:* This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

*Note 2 to Category III:* ~~(2)~~ This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting or popping.~~(3) Equipment and tooling in paragraph (c) of this category does not include equipment for hand-loading ammunition.~~

~~(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been~~

21

WASHSTATEC023391

~~designed or manufactured using technical data and defense services~~

~~controlled by this category.~~

~~(5) The articles specifically designed or modified for military application~~

~~controlled in this category include any article specifically developed,~~

~~configured, or adapted for military application~~

*Note 3 to Category III:* Grenades containing non-lethal or less lethal

projectiles are under the jurisdiction of the Department of Commerce.

\* \* \* \* \*

22

WASHSTATEC023392

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 191107-0079]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

**AGENCY:**  Bureau of Industry and Security, Department of Commerce.

**ACTION:**  Final rule.

1. The authority citation for 15 CFR part 732 is revised to read as follows:

**Authority:**  50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

2. Section 732.2 is amended by adding one sentence to the end of the paragraph (b) introductory text to read as follows:

**§ 732.2 Steps regarding scope of the EAR.**

\* \* \* \* \*

WASHSTATEC023393

(b) *  *  *   The following also remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c)).

*  *  *  *  *

## PART 734 – SCOPE OF THE EXPORT ADMINISTRATION REGULATIONS

3. The authority citation for 15 CFR part 734 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

4. Section 734.7 is amended by:

a. Revising paragraph (a) introductory text; and

b. Adding paragraph (c) to read as follows:

## § 734.7 Published.

(a) Except as set forth in paragraph (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

2

WASHSTATEC023394

\* \* \* \* \*

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to produce the firearm frame or receiver or complete firearm.

\* \* \* \* \*

## PART 736 – GENERAL PROHIBITIONS

5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

WASHSTATEC023395

**SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS**

\* \* \* \* \*

  (e) \* \* \*

  (3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

**PART 740 – LICENSE EXCEPTIONS**

  7. The authority citation for 15 CFR part 740 is revised to read as follows:

  **Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*;  22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228;  E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

  8. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

WASHSTATEC023396

**§ 740.2 Restrictions on all license exceptions.**

(a) \*   \*   \*

(21)  The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not "subject to the ITAR," but would otherwise meet the criteria in USML Category I(h)(2)(*i.e.*, parts and components specially designed for conversion of a semiautomatic firearm to a fully automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with "knowledge" the part or component will be subsequently incorporated into the firearm.  (*See* USML Category I(h)(2)).  In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

9. Section 740.9 is amended by:

a.  Adding five sentences at the end of paragraph (a) introductory text;

b.  Adding one sentence at the end of paragraph (b)(1) introductory text;

WASHSTATEC023397

c.  Adding paragraph (b)(5); and

d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\*   \*   \*   \*   \*

(a)  \*   \*   \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair").  In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment.  In accordance with the requirements in § 758.1(b)(9) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES.  In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this section, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country,, or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan

6

WASHSTATEC023398

(except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740);); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

*   *   *   *   *

(b)   *   *   *

(1) *   *   * No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

*   *   *   *   *

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

7

WASHSTATEC023399

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License cException TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

WASHSTATEC023400

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

*   *   *   *   *

10. Section 740.10 is amended by:

a.  Adding one sentence at the end of paragraph (b)(1); and

b.  Adding paragraph (b)(4).

The additions read as follows:

**§ 740.10 Servicing and replacement of parts and equipment (RPL)**

*   *   *   *   *

*(b)* * * *

(1) *   *   * The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for

9

servicing and replacement may be exported under paragraphs (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

\* \* \* \* \*

(4) *Exports of firearms and certain shotguns temporarily in the United States for servicing and replacement.*  This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraphs (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740;

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

10

WASHSTATEC023402

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement.

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (b)(4): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\*   \*   \*   \*   \*

11.  Section 740.11 is amended by:

a. Adding two sentences at the end of the introductory text;

b. Adding Note 2 to paragraph (b)(2); and

WASHSTATEC023403

c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

**§ 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).**

*   *   *   Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section.  Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

*   *   *   *   *

*Note 2 to paragraph (b)(2):*  *Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (e.g., contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.*

*   *   *   *   *

12. Section 740.14 is amended by revising paragraph (b)(4) introductory text, revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

**§ 740.14 Baggage (BAG).**

12

\* \* \* \* \*

(b) \* \* \*

(4) *Tools of trade*. Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section.  For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section.  For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

13

WASHSTATEC023405

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception.  All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

14

\* \* \* \* \*

## § 740.16 [AMENDED]

13.  Section 740.16 is amended by:

a.  Revising paragraph (a)(2);

b.  Revising paragraphs (b)(2)(iv) and (v); and

c.  Adding paragraph (b)(2)(vi);

The revisions and addition read as follows:

## § 740.16 Additional permissive reexports (APR).

\* \* \* \* \*

(a)  \*  \*  \*

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003; or commodities classified under a 0x5zz ECCN; and

\* \* \* \* \*

(b)  \*  \*  \*

(2)  \*  \*  \*

WASHSTATEC023407

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCN 6A002; or

(vi) Commodities classified under a 0x5zz ECCN.

\* \* \* \* \*

14.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

§ 740.20 License Exception Strategic Trade Authorization (STA).

\* \* \* \* \*

(b)  \* \* \*

(2)  \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\* \* \* \* \*

15. Add Supplement No. 4 to part 740 to read as follows:

SUPPLEMENT NO. 4 TO PART 740 - ANNEX A FIREARM MODELS

16

WASHSTATEC023408

(a) *Pistols/revolvers.*

(1) German Model P08 Pistol = SMCR.

(2) IZH 34M, .22 Target pistol.

(3) IZH 35M, .22 caliber Target pistol.

(4) Mauser Model 1896 pistol = SMCR.

(5) MC-57-1 pistol.

(6) MC-1-5 pistol.

(7) Polish Vis Model 35 pistol = SMCR.

(8) Soviet Nagant revolver = SMCR.

(9) TOZ 35, .22 caliber Target pistol.

(10) MTs 440.

(11) MTs 57-1.

(12) MTs 59-1.

(13) MTs 1-5.

(14) TOZ-35M (starter pistol).

(15) Biathlon-7K.

17

WASHSTATEC023409

(b) *Rifles.*

(1) BARS-4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K =SMCR.

(6) German model G41 = SMCR.

(7) German model G43=SMCR.

(8) IZH-94.

(9) LOS-7, bolt action.

(10) MC-7-07.

(11) MC-18-3.

(12) MC-19-07.

(13) MC-105-01.

(14) MC-112-02.

(15) MC-113-02.

(16) MC-115-1.

WASHSTATEC023410

(17) MC-125/127.

(18) MC-126.

(19) MC-128.

(20) Saiga.

(21) Soviet Model 38 carbine=SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle=SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle=SMCR.

(30) Sever – double barrel.

(31) IZH18MH single barrel break action.

(32) MP-251 over/under rifle.

(33) MP-221 double barrel rifle.

WASHSTATEC023411

(34) MP-141K.

(35) MP-161K.

(36) MTs 116-1.

(37) MTs 116M.

(38) MTs 112-02.

(39) MTs 115-1.

(40) MTs 113-02.

(41) MTs 105-01.

(42) MTs 105-05.

(43) MTs 7-17 combination gun.

(44) MTs 7-12-07 rifle/shotgun.

(45) MTs 7-07.

(46) MTs 109-12-07 rifle.

(47) MTs 109-07 rifle.

(48) MTs 106-07 combination.

(49) MTs 19-97.

(50) MTs 19-09.

WASHSTATEC023412

(51) MTs 18-3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut-2.

(56) Berkut-2M1.

(57) Berkut-3.

(58) Berkut-2-1.

(59) Berkut-2M2.

(60) Berkut-3-1.

(61) Ots-25.

(62) MTs 20-07.

(63) LOS-7-1.

(64) LOS -7-2.

(65) LOS-9-1.

(66) Sobol (Sable).

(67) Rekord.

WASHSTATEC023413

(68) Bars-4-1.

(69) Saiga.

(70) Saiga-M.

(71) Saiga 308.

(72) Saiga-308-1.

(73) Saiga 308-2.

(74) Saiga-9.

(75) Korshun.

(76) Ural-5-1.

(77) Ural 6-1.

(78) Ural-6-2.

(79) SM-2.

(80) Biatlon-7-3.

(81) Biatlon-7-4.

(82) Rekord-1.

(83) Rekord-2.

(84) Rekord-CISM.

WASHSTATEC023414

(85) Rekord-1-308.

(86) Rekord-2-308.

(87) Rekord-1-308-CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioneer.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44-1.

(94) TOZ 78-01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99-01.

(98) TOZ 55-01 Zubr.

(99) TOZ 55-2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

23

WASHSTATEC023415

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742 – CONTROL POLICY—CCL BASED CONTROLS

16.  The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018).

17.  Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

## §742.6 Regional stability.

*   *   *   *   *

24

(b) * * *

(1) * * *

(i)  Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. *  *  * When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

*  *  *  *  *

18.  Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

## § 742.7 Crime control and detection.

(a) * * *

WASHSTATEC023417

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in

26

WASHSTATEC023418

each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

(c) *Contract sanctity*. Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\* \* \* \* \*

19.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a); and

b. Revising paragraph (f) to read as follows:

## § 742.17  Exports of firearms to OAS member countries.

(a) *License requirements*. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  \*  \*  \*

\* \* \* \* \*

(f) *Items/Commodities*.   Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No. 1 to part 774 of the EAR).

\* \* \* \* \*

27

WASHSTATEC023419

**§ 742.19 [AMENDED]**

20. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

**PART 743 – SPECIAL REPORTING AND NOTIFICATION**

21. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*;  50 U.S.C. 1701 *et seq.*; E.O.

13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014

Comp., p. 223; 78 FR 16129; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

22. Section 743.4 is amended by:

a. Adding four sentences to the end of paragraph (a);

b. By redesignating Note to paragraph (a) as Note 1 to paragraph (a);

c. Revising paragraph (b);

d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

e. By redesignating Note to paragraph (e)(1)(ii) as Note 2 to paragraph (e)(1)(ii);

e. Revising paragraph (h); and

28

f. Adding paragraph (i) to read as follows:

## § 743.4 Conventional arms reporting.

(a) *   *   *   This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section.  The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(9).  Because of the requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method.  The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

   *Note 1 to paragraph (a):* *   *   *

(b) *Requirements.*   You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

(c) *   *   *

29

WASHSTATEC023421

(1) *   *   *

   (i) ECCN 0A501.a and .b.

*   *   *   *   *

(2) *   *   *

   (i) ECCN 0A501.a and .b.

*   *   *   *   *

(h) *Alternative submission method.*  This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section.  The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(9), to include the six character ECCN classification (*i.e.*, 0A501.a or 0A501.b) as the first text to appear in the Commodity description block.  If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S. Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting.  An exporter that complies with the requirements in § 758.1(g)(4)(ii) does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482-0092, Fax: (202) 482-4094.  Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the

WASHSTATEC023422

Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482-4188, Fax: (202) 482-4145.

## PART 744 – CONTROL POLICY: END-USER AND END-USE BASED

23.  The authority citation for 15 CFR part 744 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4582; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of September 19, 2018, 83 FR 47799 (September 20, 2018); Notice of November 8, 2018, 83 FR 56253 (November 9, 2018); Notice of January 16, 2019, 84 FR 127 (January 18, 2019).

## § 744.9 [AMENDED]

24.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

## PART 746 – EMBARGOES AND OTHER SPECIAL CONTROLS

25.  The authority citation for 15 CFR part 746 is revised to read as follows:

31

WASHSTATEC023423

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018); Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

## § 746.3 [AMENDED]

26.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

## § 746.7 [AMENDED]

27.  Section 746.7 is amended in paragraph (a)(1) by:

a. Adding "0A503," immediately before "0A980"; and

b. Removing "0A985,".

## PART 748 – APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

28.  The authority citation for 15 CFR part 748 is revised to read as follows:

WASHSTATEC023424

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

29.  Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text;

c. Revising paragraphs (a) introductory text and (a)(1);

d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

e. Adding paragraph (e).

The revisions and additions read as follows.

**§ 748.12 Firearms import certificate or import permit.**

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraph (e) of this section.

WASHSTATEC023425

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1)  *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

\*   \*   \*   \*   \*

(e)  *Requirement to obtain an import certificate or permit for other than OAS member states.*  If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

WASHSTATEC023426

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

*Note 2 to paragraph (e).* Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.

30. Supplement No. 2 to part 748 (Unique Application and Submission Requirements) is amended by adding paragraph (z) to read as follows:

## SUPPLEMENT NO. 2 TO PART 748 - UNIQUE APPLICATION AND SUBMISSION REQUIREMENTS

\*   \*   \*   \*   \*

(z) *Exports of firearms and certain shotguns temporarily in the United States.*

(1) *Certification.*  If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.*, for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in

Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or

WASHSTATEC023427

Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740.  I and the parties to this transaction will comply with the requirements specified in paragraph (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements*.  Each approved license for commodities described under paragraph (z) must comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

WASHSTATEC023428

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

*Note 1 to paragraph (z): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

## PART 758 – EXPORT CLEARANCE REQUIREMENTS

31.  The authority citation for part 758 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

32.  Section 758.1 is amended by:

a. Revising paragraphs (b)(7) (8), and adding paragraph (b)(9);

b. Revising paragraph (c)(1);

c. Adding Note 1 to paragraph (c)(1);

c. Adding paragraph (g)(4); and

WASHSTATEC023429

d. Redesignating Note to paragraph (h)(1) as Note 3 to paragraph (h)(1); to read as follows:

## § 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).

\* \* \* \* \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination; or

(9) For all exports, except for exports authorized under License Exception BAG, as set forth in §740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

*Note 1 to paragraph (c)(1): See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18*

38

*inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505,*

*authorized under License Exception BAG, as set forth in §740.14 of the EAR.*

\* \* \* \* \*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.*  This paragraph (g)(4) includes two separate

requirements under paragraph (g)(4)(i) and (ii) of this section that are used to better identify

exports of certain end item firearms under the EAR.  Paragraph (g)(4)(i) is limited to certain

EAR authorizations.  Paragraph (g)(4)(ii) applies to all EAR authorizations that require EEI

filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI*

*filing in AES.*  For any export authorized under License Exception TMP or a BIS license

authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with

a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other

required data for the associated EEI filing, you must report the manufacturer, model, caliber, and

serial number of the exported items.  The requirements of this paragraph also apply to any other

export authorized under a BIS license that includes a condition or proviso on the license

requiring the submission of this information specified in paragraph (g) of this section when the

EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the*

*EEI filing in AES.*  For any export of items controlled under ECCNs 0A501.a or .b, or shotguns

with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other

WASHSTATEC023431

required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.*, 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES.  (*See* § 743.4(h) for the use of this information for conventional arms reporting).

      *Note 2 to paragraph (g)(4): If a commodity described in paragraph (g)(4) is exported under License Exception TMP under § 740.9(a)(6) for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii).  For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned.  If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization.  The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.*

\*   \*   \*   \*   \*

    33.  Add § 758.10 to read as follows:

## § 758.10  Entry clearance requirements for temporary imports.

(a) *Scope*.  This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR

40

WASHSTATEC023432

447.21), except for firearms "subject to the EAR" that are temporarily brought into the United

States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27

CFR part 478 (*See* § 740.14(e) of License Exception BAG for information on the export of these

firearms "subject to the EAR").  These firearms are controlled in ECCN 0A501.a or .b or

shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.  Items that are

temporarily exported under the EAR must have met the export clearance requirements specified

in § 758.1 of the EAR.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are

"subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL.

Temporary imports of firearms described in this section must meet the entry clearance

requirements specified in paragraph (b) of this section.

 (2) Permanent imports are regulated by the Attorney General under the direction of the

Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts

447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.*  To the satisfaction of U.S.

Customs and Border Protection, the temporary importer must comply with the following

procedures:

(1) At the time of entry into the U.S. of the temporary import:

    (i) Provide one of the following statements specified in paragraphs (b)(1)(i)(A), (B), or

(C) of this section to U.S. Customs and Border Protection:

41

WASHSTATEC023433

(A) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR.  This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States;

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement).

WASHSTATEC023434

*Note 1 to paragraph (b)(1):* In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740;); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

*Note 2 to paragraph (b)(1):* In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740;); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured inin Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748 paragraph (z) of the EAR.

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(9) of the EAR file the export information with CBP by filing EEI in AES, noting the

WASHSTATEC023435

applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported.  *See* also the additional requirements in § 758.1(g)(4).

34.  Add § 758.11 to read as follows:

**§ 758.11  Export clearance requirements for firearms and related items.**

(a)  *Scope.*  The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in §740.14.

(b) *Required form.*  Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section of the EAR.

(1) Where to obtain the form?  The CBP Certification of Registration Form 4457 can be found on the following CBP website:

WASHSTATEC023436

https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad

(2) Required "description of articles" for firearms to be included on the CBP Form 4457.  For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457?*
*See* the following CBP website page for additional information:

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.

(d) *Return of items exported pursuant to this section*.  The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651-0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section of the EAR.

## PART 762 – RECORDKEEPING

35.  The authority citation for part 762 is revised to read as follows:

WASHSTATEC023437

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

36.  Section 762.2 is amended by removing "and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a)  *   *   *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

*   *   *   *   *

37.  Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a)  *   *   *

46

WASHSTATEC023438

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

*  *  *  *  *


## PART 772 – DEFINITIONS OF TERMS

38.  The authority citation for part 772 is revised to read as follows:

**Authority:**  50 U.S.C. 4801-4852; 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

## § 772.1 – [AMENDED]

39.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c"; and the definition of "complete breech mechanisms" is added as set forth below:

## § 772.1 Definitions of terms as used in the Export Administration Regulations (EAR).

*  *  *  *  *

*Complete breech mechanisms*.  The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

*  *  *  *  *

47

WASHSTATEC023439

## PART 774 - THE COMMERCE CONTROL LIST

40. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:** 50 U.S.C. 4801-4852; 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 8, 2018, 83 FR 39871 (August 13, 2018).

41.  In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

**Supplement No. 1 to Part 774 – The Commerce Control List**

\*   \*   \*   \*   \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

No items currently are in this ECCN.  See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b.

WASHSTATEC023440

42.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x.

49

WASHSTATEC023441

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  Also see ECCN 0A502 for shot-pistols.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items:*

a.     Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

WASHSTATEC023442

*Note 1 to paragraph 0A501.a:* 'Combination pistols' are controlled under ECCN 0A501.a.  A 'combination pistol' (a.k.a., a combination gun) has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

*Note 2 to paragraph 0A501.d:* Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.

e.      Receivers (frames) and "complete breech mechanisms," including castings, forgings stampings, or machined items thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

51

WASHSTATEC023443

x.   "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y.   Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor.

y.1.   Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

y.2.   Scope mounts or accessory rails;

y.3.   Iron sights;

y.4.   Sling swivels;

y.5.   Butt plates or recoil pads;

y.6.   Bayonets; and

y.7.   Firearms manufactured from 1890 to 1898 and reproductions thereof.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

52

WASHSTATEC023444

*Note 3 to 0A501:*  Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.

*Note 4 to 0A501:* Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not "specially designed" for military use and are not "subject to the ITAR" nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.

**0A502 Shotguns; shotguns "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes; "complete breech mechanisms;" except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:*   RS, CC, FC, UN, AT, NS

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel | RS Column 1 |

53

| | |
|---|---|
| length less than 18 inches (45.72 cm) | |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   $500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun "parts" and "components," consisting of complete trigger mechanisms; magazines and magazine extension tubes, "complete breech

WASHSTATEC023446

mechanisms" if the ultimate destination is Canada.

*GBS:*   N/A

*CIV:*   N/A


**List of Items Controlled**

*Related Controls*:  Shotguns that are fully automatic are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** *Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.*

**Technical Note:** *Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502.  Slug guns are also controlled under ECCN 0A502.*


**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**


**License Requirements**

*Reason for Control:*  CC, UN

WASHSTATEC023447

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

> *LVS:*   N/A
>
> *GBS:*   N/A
>
> *CIV:*   N/A

**List of Items Controlled**

> *Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.
>
> *Related Definitions*: N/A
>
> *Items*: The list of items controlled is contained in the ECCN heading.

56

WASHSTATEC023448

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g, and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A504.g.

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in

57

WASHSTATEC023449

0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a.      Telescopic sights.

b.      Holographic sights.

c.      Reflex or "red dot" sights.

d.      Reticle sights.

e.      Other sighting devices that contain optical elements.

f.      Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f: 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g.      Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h.      [Reserved]

i.      Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

58

WASHSTATEC023450

*Note 2 to paragraph i:*  For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."

**0A505  Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d,  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

WASHSTATEC023451

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER], were classified under 0A018.b. (*i.e.*, "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130))

*GBS*: N/A

*CIV*: N/A


**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.


**List of Items Controlled**

*Related Controls*: (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*: N/A

60

*Items*:

a.      Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b.      Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.      Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

   ***Note 1 to 0A505.c:***  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

   ***Note 2 to 0A505.x:*** *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

61

WASHSTATEC023453

*Note 3 to 0A505.x:*   *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

*Note 4 to 0A505: Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99.  A 'dummy round or drill round' is a round that is completely inert, i.e., contains no primer, propellant, or explosive charge.  It is typically used to check weapon function and for crew training.*

43.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

62

WASHSTATEC023454

| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.  (3) See ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.

WASHSTATEC023455

*Related Definitions*:  N/A

*Items*:

a.       Guns and armament manufactured between 1890 and 1919.

b.       Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.        "Parts" and "components" that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

   *Note 1 to 0A602.x: Engines that are "specially designed" for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.*

   *Note 2 to 0A602:  "Parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

   *Note 3 to 0A602:  Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.*

**Supplement No. 1 to Part 774 – [AMENDED]**

WASHSTATEC023456

44.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

45.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988  Conventional military steel helmets.**

No items currently are in this ECCN.  See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

46.  In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment | NS Column 1 |

65

| | |
|---|---|
| for ECCN 0A501.y | |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

WASHSTATEC023458

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

d.      Small arms spill boring machines.

e.      Production equipment (including dies, fixtures, and other tooling) "specially designed"

for the "production" of the items controlled in 0A501.a through .x. or USML Category I.


**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**


**License Requirements**

  *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs  .a, .d, and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of |

67

WASHSTATEC023459

| | these items to North Korea for anti-terrorism reasons. |
|---|---|

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:*  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.      Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

68

c.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w    [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

47.  In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEC023461

| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.     The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

a.1.     Gun barrel rifling and broaching machines and tools therefor;

a.2.     Gun barrel rifling machines;

70

WASHSTATEC023462

a.3.    Gun barrel trepanning machines;

a.4.    Gun boring and turning machines;

a.5.    Gun honing machines of 6 feet (183 cm) stroke or more;

a.6.    Gun jump screw lathes;

a.7.    Gun rifling machines; and

a.8.    Barrel straightening presses.

b.    Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.    Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.    Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774 – [AMENDED]**

48. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

49. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

71

**0D501  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

WASHSTATEC023464

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

**0D505  "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
|  |  |

WASHSTATEC023465

| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
|---|---|
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

74

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

50. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

75

WASHSTATEC023467

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:    Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR".   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

WASHSTATEC023468

51.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

52.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

77

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a.      "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.      "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

WASHSTATEC023470

**0E502  "Technology" "required" for the "development" or "production" of commodities controlled by 0A502.**

**License Requirements**

   *Reason for Control*:  CC, UN

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

   *CIV:*   N/A

   *TSR:*   N/A

**List of Items Controlled**

   *Related Controls*: Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".

   *Related Definitions*: N/A

   *Items*: The list of items controlled is contained in the ECCN heading.

WASHSTATEC023471

**0E504 ''Technology'' ''required'' for the ''development'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

80

WASHSTATEC023472

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.**

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in | RS Column 1 |

81

WASHSTATEC023473

| | |
|---|---|
| 0B505 and for "software" for those commodities and that equipment in 0D505 | |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

WASHSTATEC023474

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

53.  In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |

WASHSTATEC023475

| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

WASHSTATEC023476

**Supplement No. 1 to Part 774 – [AMENDED]**

    54.  In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

    55.  In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

    *Reason for Control:*   CC

| *Control(s)* |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information.) |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

WASHSTATEC023477

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774 – [AMENDED]**

56.  In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

57.  In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less;**

86

WASHSTATEC023478

**smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

87

WASHSTATEC023479

58.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS*:   N/A

*GBS*:   N/A

88

WASHSTATEC023480

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 0B501, 0B602, 0B606, 1B003, 9B004, and 9B009.  (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

89

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

*Technical Note:  The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

59.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018  Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of

WASHSTATEC023482

the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

60. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

61. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

91

WASHSTATEC023483

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | CB Column 2 |

92

WASHSTATEC023484

| AT applies to entire entry | AT Column 1 |
|---|---|

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

WASHSTATEC023485

**List of Items Controlled**

*Related Controls*: See also 2E101, 2E201, and 2E301

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:**  *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

62.  In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment | NS Column 1 |

WASHSTATEC023486

| | |
|---|---|
| controlled by 2A001, 2B001 to 2B009 | |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

95

WASHSTATEC023487

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

96

WASHSTATEC023488

63. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, MT, RS, AT, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

97

WASHSTATEC023489

*LVS:* $1500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls*:  (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR.  (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103.  (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment.  (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

WASHSTATEC023490

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated:

**Richard E. Ashooh**

*Assistant Secretary for Export Administration.*

WASHSTATEC023491

<u>Summary of Revisions to USML Categories I, II, and III</u>

In 2009, the interagency began a review of the U.S. export control system, with the goal of strengthening national security and the competitiveness of key U.S. manufacturing and technology sectors by focusing on current threats, as well as adapting to the changing economic and technological landscape.  This review determined that the then-current export control system was overly complicated, contained too many redundancies, and, in trying to protect too much, diminished our ability to focus our efforts on the most critical national security priorities.

To this end, the Departments of State and Commerce have been reviewing and revising the two primary lists of controlled items, i.e., the United States Munitions List (USML) and the Commerce Control List (CCL).  A key strategy in the reform effort  has been to construct the lists so they positively identify the items they control.  Thus, for example, the USML lists the specific types of parts, components, accessories, and attachments that warrant control under the International Traffic in Arms Regulations (ITAR) rather than all generic "parts," "components," "accessories and attachments" that are in any way "specifically designed, modified, adapted, or configured" for a defense article, regardless of military significance (as is currently the case for unrevised USML categories).  All other generic parts, components, accessories, and attachments and the technology for their "production," "development," or "use" that are "specially designed" for an item formerly on the USML but not specifically identified on the USML will become subject to the jurisdiction of the Export Administration Regulations (EAR) and identified on its CCL.

In connection with this effort, the Department of State has published 26 final, or interim final, rules revising 18 of the 21 USML categories.  In May 2018, the Department of State published proposed revisions of the remaining three USML Categories, including Category I (firearms and related articles), II (guns and armaments) and III (ammunition and ordnance), which follow this model of utilizing a "positive list" for controls.  Articles that are not positively identified on the USML will continue to be controlled, albeit under the jurisdiction of the EAR.

In February 2019, the Department of State formally notified Congress of the transfer of jurisdictional control of certain classes of items in Categories, I, II, and III. The Department of State is submitting a new notification to Congress because the Department of Commerce has amended certain controls in its draft companion rule. In particular, in order to address concerns raised by some members of Congress and the public regarding certain access to 3D printing technology and

1

WASHSTATEC023492

software for firearms, the Department of Commerce has revised its draft final rule to make certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances. The Department of State has not made any changes to the classes of items in Categories I, II, or III that it is proposing to remove from the USML from the time that the Department of State notified Congress in February 2019.

### Category I—Firearms and Related Articles

Paragraph (a) is revised by limiting the scope of the control to firearms using caseless ammunition. Non-automatic and semi-automatic firearms that do not use caseless ammunition will be controlled in Export Control Classification Number (ECCN) 0A501 on the CCL, except for firearms manufactured prior to 1890.

Paragraph (b) is non-substantively revised.

Paragraph (c) is revised by limiting the scope to firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms). Other weapons that were controlled here will be controlled in ECCN 0A501.

Paragraph (d) is revised by limiting the scope to fully automatic shotguns. Other shotguns that were controlled here will be controlled in ECCN 0A502.

Paragraph (e) is revised by removing flash suppressors and moving certain parts and components for the remaining items in paragraph (e) to paragraph (h)(3). Flash suppressors will be controlled in ECCN 0A501.

Paragraph (f) is reserved. Riflescopes with night vision or infrared were moved to USML Category XII(c)(2) in 2016 through 81 FR 70340. All other rifle scopes that were controlled here will be controlled in ECCN 0A504.

Paragraph (g) is revised to more clearly delineate the major components of USML firearms that are controlled. The major parts and components of firearms that transition to the CCL will be controlled in ECCN 0A501.

Paragraph (h) is revised by adding four subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments of firearms that transition to the CCL will be controlled in ECCN

2

WASHSTATEC023493

0A501, as will any parts, components, accessories, and attachments of USML firearms that are not listed in paragraphs (g) or (h).

Paragraph (i) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category I, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category II—Guns and Armament**

Paragraph (a) is revised by adding five subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development guns and armaments and their specially designed parts and components. Two notes are added to paragraph (a) in order to exclude from the control certain items that do not warrant control on the USML. Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) will be controlled under ECCN 0A501. Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

Paragraph (b) is revised to control flame throwers based on the technical parameter of a range 20 meters or greater.

Paragraph (c) is reserved. The items that were controlled in this paragraph that warrant USML control are now described in paragraph (a)(4) and the rest are controlled in ECCN 0A602.

Paragraph (d) is revised to control specially designed kinetic energy weapons.

Paragraph (e) is revised to more specifically describe the items warranting control under this paragraph. Items that were controlled in this paragraph as being

3

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023494

for guns and armaments controlled in paragraph (c) that did not move to paragraph (a)(4) are controlled in ECCN 0A602.

Paragraph (f) is reserved. The items that were controlled here will be controlled in ECCN 0A606.

Paragraph (g) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (h) is reserved. The items that were controlled here will be controlled in ECCN 0B602.

Paragraph (i) is reserved. The items that were controlled that continue to warrant USML control are moved to paragraphs (j)(9) and components therefor to (j)(10) and the rest will be controlled in ECCN 0B602.

Paragraph (j) is revised by adding seventeen subparagraphs to specifically enumerate the articles controlled. The parts, components, accessories, and attachments that are not listed in paragraph (j) will be controlled in ECCN 0A602.

Paragraph (k) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

**Category III— Ammunition and Ordnance**

Paragraph (a) is revised by adding ten subparagraphs to specifically enumerate the articles controlled, including adding a control for DOD-funded development ammunition. Ammunition not described will be controlled under ECCN 0A505.  Black powder guns and armaments manufactured between 1890 and 1919 will be controlled under ECCN 0A602, except for black powder guns and armaments manufactured earlier than 1890.

4

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023495

Paragraph (b) is revised to more specifically describe the items warranting control under this paragraph by identifying those items in two subparagraphs. Items that were controlled in this paragraph but do not meet the more specific description will be controlled in ECCN 0B505.

Paragraph (c) is reserved. The items that were controlled in this paragraph will be controlled in ECCN 0B505.

Paragraph (d) is revised by adding fifteen subparagraphs to specifically enumerate the articles controlled. Parts and components of USML ammunition that are not described will be controlled in ECCN 0A505.

Paragraph (e) is revised to add control for the classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data.

A new paragraph (x) has been added to USML Category II, allowing ITAR licensing on behalf of the Department of Commerce for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category XII and are described in the purchase documentation submitted with the application.

A new note is added to Category III to provide that ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber are not on the USML. These items will be controlled in ECCN 0A505. An additional new note is added to provide that grenades containing non-lethal or less lethal projectiles are not on the USML. These grenades will be controlled in ECCN 0A505.

For items that have transitioned to the CCL in a 600 series entry, transactions destined for countries subject to a U.S. arms embargo will *not* be eligible for license exceptions, except for License Exception GOV under EAR §740.11(b)(2)(ii).  Multilateral regime-controlled items moved from the USML to the CCL will retain their regime control parameters and reasons for control.

The Department of Commerce has created a License Exception Strategic Trade Authorization (STA, §740.20), which authorizes the export, re-export, and transfer (in-country) of certain items on the CCL to "countries of least concern" without a license (i.e., Argentina, Australia, Austria, Belgium, Bulgaria, Canada,

5

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023496

Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Netherlands, New Zealand, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, Turkey, and the United Kingdom).  Parts, components, accessories and attachments controlled under subparagraph "x" of the relevant ECCNs will be automatically available for this exception.  However, end-items that will be controlled under the new ECCNs will be subject to a "first time" license requirement.  Exporters will be able to request a determination on STA eligibility for these items concurrent with a license request.  If the Departments of State, Defense, and Commerce all agree, the end-item would be separately posted, by model number, as eligible for STA in the future.  If the departments cannot reach consensus, the end-item would continue to require a license to all destinations except Canada.

Existing License Exceptions LVS (§740.3), TMP (§740.9), RPL (§740.10), and GOV (§740.11(b)(2)(ii) or (b)(2)(iii)) will be eligible for use for items controlled by these ECCNs.

SENSITIVE BUT UNCLASSIFIED

WASHSTATEC023497

UNCLASSIFIED

Categories I, II, and III MDE Transitioning to the CCL

| ITEM DESCRIPTION | CCL CONTROL | |
|---|---|---|
| Cartridge, 5.56mm M855A1 | CCL | ECCN 0A505.a |

UNCLASSIFIED

WASHSTATEC023498

| 116TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>116–xxx |
|---|---|---|

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

———

## CONFERENCE REPORT

TO ACCOMPANY

## S. 1790



DECEMBER XX, 2019.—Ordered to be printed

WASHSTATEC023499

NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

WASHSTATEC023500

| 116TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>116–xxx |
| --- | --- | --- |

# NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2020

## CONFERENCE REPORT

TO ACCOMPANY

## S. 1790



DECEMBER XX, 2019.—Ordered to be printed

U.S. GOVERNMENT PUBLISHING OFFICE

38–396

WASHINGTON : 2019

WASHSTATEC023501

*Transfer of certain items included in categories I, II, and III of the United States Munitions List to the Commerce Control List*

The House amendment contained a provision (sec. 1050) that would prohibit the President from removing from the United States Munitions List any item that was included in category I, II, or III of the United States Munitions List, as in effect on August 31, 2017.

Senate bill contained no similar provision.

The House recedes.

*Limitation on use of funds for reimbursement of expenses at certain properties*

The House amendment contained a provision (sec. 1050A) that would prohibit the obligation or expenditure of funds made available for the Department of Defense at a list of properties or to an entity with an ownership interest in such properties.

The Senate bill contained no similar provision.

The House recedes.

*Limitation on use of funds for exhibition of parade of military forces and hardware for review by the President*

The House amendment contained a provision (sec. 1050B) that would prohibit the use of funds authorized by this Act or otherwise appropriated for Fiscal Year 2020 for the Department of Defense from being obligated or expended for any exhibition or parade of military forces and hardware, with the exception of ceremonial honors and customary ceremonial duties, for review by the President outside authorized military operations.

The Senate bill contained no similar provision.

The House recedes.

*Prohibition on use of DOD equipment, personnel, and facilities for ICE detention*

The House amendment contained a provision (sec. 1050C) that would prohibit the use of facilities, equipment, or personnel of the Department of Defense to house or to construct housing for foreign nationals in the custody of U.S. Immigration and Customs Enforcement.

The Senate bill contained no similar provision.

The House recedes.

*Report on joint force plan for implementation of strategies of the Department of Defense for the Arctic*

<u>SETTLEMENT AGREEMENT</u>

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(e) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHSTATEC023506

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHSTATEC023508

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHSTATEC023510

121 F.Supp.3d 680
United States District Court,
W.D. Texas,
Austin Division.

DEFENSE DISTRIBUTED, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF STATE, et al., Defendants.

No. 1–15–CV–372 RP.
|
Signed Aug. 4, 2015.

## Synopsis

**Background:** Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms brought action against Department of State, Secretary of State, Directorate of Defense Trade Controls (DDTC) and DDTC employees, alleging that prepublication approval requirement for technical data organization published on internet violated their rights to free speech under the First Amendment, their right to keep and bear arms under the Second Amendment, and their due process rights under the Fifth Amendment, seeking preliminary injunction enjoining DDTC from enforcing the requirement.

**Holdings:** The District Court, Robert L. Pitman, J., held that:

[1] plaintiffs failed to meet burden of showing substantial threat that failure to grant preliminary injunction outweighed damage that injunction would cause and that injunction would not disserve public interest;

[2] plaintiffs were unlikely to succeed on merits of claim that DDTC acted beyond scope of its authority;

[3] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirements violated right to free speech;

[4] plaintiffs were unlikely to succeed on merits of claim that prepublication approval requirement violated association members' Second Amendment rights;

[5] term "defense articles" was not void for vagueness; and

[6] term "export" was not void for vagueness.

Motion denied.

West Headnotes (37)

**[1]** **Injunction**
    Extraordinary or unusual nature of remedy

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

Cases that cite this headnote

**[2]** **Injunction**
    Grounds in general;  multiple factors

A party seeking a preliminary injunction may be granted relief only if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest; the party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief.

Cases that cite this headnote

**[3]** **Injunction**
    Prima facie showing

To show a substantial likelihood of success on the merits, as required to be granted a preliminary injunction, a plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment.

Cases that cite this headnote

**[4]** **Injunction**

WASHSTATEC023511

⯎ Weapons and explosives

**Weapons**
⯎ Violation of right to bear arms

Second Amendment protects intangible and unquantifiable interests and a deprivation of Second Amendment rights is thus considered an irreparable injury justifying a grant of a preliminary injunction. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

[5]  **Injunction**
⯎ Weapons and explosives

**War and National Emergency**
⯎ Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted right to keep and bear arms failed to meet burden of showing substantial threat that failure to grant preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that organization intended to publish on internet, which DDTC alleged were "defense articles," as defined under the Arms Export Control Act (AECA), outweighed any damage that the injunction would cause and that the injunction would not disserve the public interest; public had interest in restricting export of defense articles, and President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

1 Cases that cite this headnote

[6]  **United States**
⯎ Necessity of waiver or consent

A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit.

Cases that cite this headnote

[7]  **Public Employment**
⯎ Sovereign immunity, and relation of official immunity thereto

**United States**
⯎ Sovereign immunity, and relation of official immunity thereto

The "ultra vires exception" to sovereign immunity provides that, where an officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions, or ultra vires his authority, and thus not protected by sovereign immunity.

Cases that cite this headnote

[8]  **Public Employment**
⯎ Sovereign immunity, and relation of official immunity thereto

**United States**
⯎ Sovereign immunity, and relation of official immunity thereto

To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must do more than simply allege that the actions of a government officer are illegal or unauthorized; rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority.

Cases that cite this headnote

[9]  **Injunction**
⯎ Weapons and explosives

**War and National Emergency**
⯎ Export restrictions

Non-profit organization that promoted right to keep and bear arms was unlikely to succeed on merits of claim that Directorate of Defense Trade Controls (DDTC) acted beyond scope of its authority in imposing requirement that group obtain approval from DDTC prior to publishing technical information on printing machine that

WASHSTATEC023512

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

could be used to manufacture firearm parts, on internet, as required to be entitled to preliminary injunction enjoining enforcement of the prepublication approval requirement; DDTC had authority, under Arms Export Control Act (AECA) to regulate export of defense articles, based on inter alia, consideration of increase of possibility of escalation of conflict, and organization's purpose of facilitating global access to three-dimensional printing of arms increased possibility of outbreak or escalation of conflict. Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. § 120.1(a).

Cases that cite this headnote

[10]     **Constitutional Law**
⇨ Freedom of Speech, Expression, and Press
**Constitutional Law**
⇨ Property and Events
In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[11]     **Constitutional Law**
⇨ Freedom of Speech, Expression, and Press
First Amendment protection is broad, covering works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[12]     **Constitutional Law**
⇨ Presumption of invalidity
Prior restraints on speech face a presumption against their constitutionality. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[13]     **Constitutional Law**
⇨ Prior Restraints
A system of prior restraints on speech avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[14]     **Constitutional Law**
⇨ Prior Restraints
The heavy presumption against the constitutional validity of prior restraint on speech is not a standard of review, and judicial decisions analyzing prior restraints apply different standards of review depending on the restraint at issue. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[15]     **Constitutional Law**
⇨ Narrow tailoring requirement; relationship to governmental interest
**Constitutional Law**
⇨ Existence of other channels of expression
Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[16]     **Constitutional Law**
⇨ Strict or exacting scrutiny; compelling interest test
Content-based restrictions on speech are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. U.S.C.A. Const.Amend. 1.

WASHSTATEC023513

Cases that cite this headnote

[17]    **Constitutional Law**
         Content-Based Regulations or Restrictions

Government regulation of speech is content
based if a law applies to particular speech
because of the topic discussed or the idea or
message expressed. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

[18]    **Constitutional Law**
         Content-Based Regulations or Restrictions

A regulation on speech is not content based
merely because the applicability of the regulation
depends on the content of the speech; rather,
determination of whether regulation of speech
is content-based requires a court to consider
whether a regulation of speech on its face draws
distinctions based on the message a speaker
conveys. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

[19]    **Constitutional Law**
         Government information

International Traffic in Arms Regulation (ITAR),
which regulates disclosure of technical data
relating to "defense articles," was a content-
neutral regulation of speech, and was thus
subject to intermediate scrutiny, rather than
strict scrutiny, since regulation did not regulate
disclosure of technical data based on the message
that was communicated, but rather was intended
to satisfy a number of foreign policy and national
defense goals related to preventing arms races,
aiding in the development of weapons of mass
destruction, and an increase in the possibility
of outbreak of escalation of conflict. U.S.C.A.
Const.Amend. 1; Arms Export Control Act, §
38(a)(1, 2), 22 U.S.C.A. § 2778(a)(1, 2); 22
C.F.R. § 120.1(a).

2 Cases that cite this headnote

[20]    **Civil Rights**
         Preliminary Injunction

**War and National Emergency**
   Export restrictions

Non-profit organization that designed firearms
that could be downloaded from internet and
printed with a 3-D printer and association
that promoted right to keep and bear arms
were unlikely to succeed on merits of claim
that requirement, under International Traffic
in Arms Regulation (ITAR), that organization
obtain approval from Directorate of Defense
Trade Controls (DDTC) prior to publishing
technical information on printing machine that
could be used to manufacture firearm parts,
on internet, violated organization's right to
free speech, as required to be entitled to
preliminary injunction enjoining enforcement
of the prepublication approval requirement;
requirement furthered substantial government
interest in regulating dissemination of military
information outside national borders and did not
impose insurmountable burden on organization's
ability to disseminate information domestically,
and ITAR provided method for determining
whether information was subject to its export
control. U.S.C.A. Const.Amend 1; Arms Export
Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)
(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

[21]    **Federal Courts**
         Case or Controversy Requirement

Article III of the Constitution limits the
jurisdiction of federal courts to cases and
controversies. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[22]    **Federal Civil Procedure**
         In general;  injury or interest
        **Federal Courts**
         Injury, harm, causation, and redress

One element of the case-or-controversy
requirement of Article III of the Constitution
is that plaintiffs, based on their complaint,
must establish that they have standing to
sue; this requirement, like other jurisdictional
requirements, is not subject to waiver and

WASHSTATEC023514

demands strict compliance. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[23]    **Federal Civil Procedure**
         In general; injury or interest
        **Federal Civil Procedure**
         Causation; redressability

To meet Constitutional standing requirement a plaintiff must show: (1) she has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision; the party invoking federal jurisdiction bears the burden of establishing these elements. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[24]    **Federal Civil Procedure**
         In general; injury or interest

A litigant is generally limited to asserting standing only on behalf of himself. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[25]    **Associations**
         Actions by or Against Associations

Standing for an association to bring suit on behalf of its members requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

[26]    **Weapons**
         Violation of right to bear arms

Inability of members of association that promoted the right to keep and bear arms to download computer files from internet containing technical information on printing machine that could be used to manufacture firearm parts constituted injury in fact that was clearly traceable to Directorate of Defense Trade Controls (DDTC) enforcement of requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing the information on the internet, and association thus had standing to assert a claim for violation of the Second Amendment on its members behalf. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

[27]    **Weapons**
         Violation of right to bear arms

The first step in addressing a claim under the Second Amendment is to determine whether the challenged law impinges upon a right protected by the Second Amendment, i.e., whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee, and the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

[28]    **Weapons**
         Violation of right to bear arms

The appropriate level of scrutiny in evaluating the constitutionality of a firearms regulation depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the Second Amendment right. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

WASHSTATEC023515

**[29]**   **Weapons**
    Violation of right to bear arms

Intermediate scrutiny, rather than strict scrutiny, applied in evaluating Directorate of Defense Trade Controls' (DDTC) enforcement requirement that non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer obtain approval from DDTC prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts on internet, violated Second Amendment rights of members of association that promoted right to keep and bear arms; enforcement did not prohibit association members from manufacturing their own firearms or from keeping and bearing those firearms, and members were not prohibited from acquiring the computer files at issue directly from the non-profit organization. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[30]**   **Injunction**
    Weapons and explosives
**War and National Emergency**
    Export restrictions

Non-profit organization that designed firearms that could be downloaded from internet and printed with a 3-D printer and association that promoted the right to keep and bear arms were unlikely to succeed on merits of claim that requirement, under International Traffic in Arms Regulation (ITAR), that organization obtain approval from Directorate of Defense Trade Controls (DDTC) prior to publishing computer files containing technical information on printing machine that could be used to manufacture firearm parts, on internet, violated association members' Second Amendment rights, as required to be entitled to preliminary injunction enjoining enforcement of requirement; regulatory scheme of Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) advanced legitimate

governmental interest regulating dissemination of military information outside national borders in a not unduly burdensome fashion. U.S.C.A. Const.Amend. 2; Arms Export Control Act, § 38(a)(2), 22 U.S.C.A. § 2778(a)(2); 22 C.F.R. §§ 120.1(a), 120.4.

Cases that cite this headnote

**[31]**   **Constitutional Law**
    Certainty and definiteness; vagueness

An enactment is void for vagueness under the Fifth Amendment if its prohibitions are not clearly defined. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[32]**   **Constitutional Law**
    Vagueness

The Fifth Amendment prohibits the enforcement of vague criminal laws. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[33]**   **Constitutional Law**
    Certainty and definiteness; vagueness

The threshold for declaring a law void for vagueness, in violation of the Fifth Amendment, is high. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[34]**   **Constitutional Law**
    Certainty and definiteness; vagueness

A statute is not void for vagueness under the Fifth Amendment if it sets out an ascertainable standard. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[35]**   **Constitutional Law**
    Certainty and definiteness; vagueness

A statute is void for vagueness under the Fifth Amendment only if it wholly fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

WASHSTATEC023516

standardless that it authorizes or encourages seriously discriminatory enforcement. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[36]     Constitutional Law**
       ◆ War and National Security
       **War and National Emergency**
       ◆ Constitutional and statutory provisions

Term "defense articles" as used in the Arms Export Control Act (AECA) and International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was specifically defined to include items on AECA's Munitions List, which contained 21 categories of governed articles, as well as information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, and did not include any subjective terms, but rather identified items with significant specificity. U.S.C.A. Const.Amend. 5; Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. §§ 120.1(a), 120.4, 120.6.

1 Cases that cite this headnote

**[37]     Constitutional Law**
       ◆ War and National Security
       **War and National Emergency**
       ◆ Export restrictions

Term "export" as used in the International Traffic in Arms Regulation (ITAR) was not void for vagueness under the Fifth Amendment; term was defined to include disclosing or transferring technical data to a foreign person, whether in the United States or abroad, and persons of ordinary intelligence were clearly on notice that posting, on the internet, for free download, of files which included directions for the 3-D printing of firearms, would fall within definition of export. U.S.C.A. Const.Amend. 5; 22 C.F.R. § 120.17(a)(4).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*686**   Alan Gura, Gura & Possessky, PLLC, Alexandria, VA, David S. Morris, W. Thomas Jacks, Fish & Richardson, P.C., Austin, TX, Joshua Michael Blackman, Josh Blackman LLC, Houston, TX, Matthew A. Goldstein, Matthew A. Goldstein, PLLC, Washington, DC, William B. Mateja, Fish & Richardson, Dallas, TX, for Plaintiffs.

Eric J. Soskin, Stuart Justin Robinson, U.S. Department of Justice, Civil Division, Washington, DC, Zachary Carl Richter, United States Attorney's Office, Austin, TX, for Defendants.

*ORDER*

ROBERT L. PITMAN, District Judge.

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. # 8) and the responsive pleadings thereto. The Court conducted a hearing on the motion on July 6, 2015. Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

**I. BACKGROUND**

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines

WASHSTATEC023517

and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute **\*687** the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir.2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related items (the "Published Files"). (Compl. ¶¶ 22–24). Plaintiffs allege that, on May 8, 2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id.* ¶¶ 26–29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files"). [1] Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the **\*688** Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR–15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28–33).

[1]   According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Defense Distributed has

WASHSTATEC023518

sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34–36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II. STANDARD OF REVIEW

**[1] [2] [3]** A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir.1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* 710 F.3d 579, 582 (5th Cir.2013). *See also Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir.2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed.

1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985).

## *689 III. ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims.

### A. Injury and Balancing of Interests

**[4]** Defendants suggest Plaintiffs' contention that they face irreparable injury absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.,* 579 F.3d 502, 506 (5th Cir.2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago,* 651 F.3d 684, 699 (7th Cir.2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

**[5]** The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

WASHSTATEC023519

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir.2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir.2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir.2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" **\*690** ); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir.2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary

injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

## B. Ultra Vires

[6]  [7]  [8]  Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones,* 652 F.3d 577, 581 (5th Cir.2011) (citing *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos,* 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate

WASHSTATEC023520

regulations for the import and export
of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs argue this definition falls outside Congressional **\*691** intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

 **[9]**    Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles. Further, under the AECA, decisions are required to

take into account whether the export
of an article would contribute to an
arms race, aid in the development of
weapons of mass destruction, support
international terrorism, increase the
possibility of outbreak or escalation of
conflict, or prejudice the development
of bilateral or multilateral arms control
or nonproliferation agreements or
other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms." (Compl. ¶ 1) (emphasis added). Facilitating global access to firearms 8 undoubtedly "increase[s] the possibility of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

## C. First Amendment

 **[10]**    Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the

second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

 **[11]**    As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California,* 413 U.S. 15, 34, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See also Brown v. Entm't Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli,* 228 F.3d 94, 111 (2nd Cir.2000).

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley,* 273 F.3d 429 (2nd Cir.2001). [2] The court made clear the fact that **\*692** computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonetheless be speech. Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id.* at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment). Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming ... it is protected by the First Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley,* 209 F.3d 481, 485 (6th Cir.2000).

WASHSTATEC023521

2      Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli*. However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed. That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient." *Corley,* 273 F.3d at 449 (quoting *Vartuli,* 228 F.3d at 111). Plaintiffs here have not so marketed or described the files at issue.

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source." That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consider the files as subject to the protection of the First Amendment.

[12]     [13]    In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint. Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City–Parish Consol. Gov't,* 731 F.3d 488, 493 (5th Cir.2013). *See also Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) ("Any prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth,* 382 F.3d 529, 539 (5th Cir.2004) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

[14]    The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman,* 764 F.3d 409, 438 (5th Cir.2014). *See, e.g.,*

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *\*693 Perry v. McDonald,* 280 F.3d 159, 171 (2nd Cir.2001) (context in which prior restraint occurs affects level of scrutiny applied); 192 F.3d 742, 749 (7th Cir.1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

[15]     [16]    No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC,* 520 U.S. 180, 213–14, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

[17]     [18]    Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert,* —— U.S. ——, 135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott,* 696 F.3d 454, 459 (5th Cir.2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed,* 135 S.Ct. at 2227. *See also Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

WASHSTATEC023522

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley,* —— U.S. ——, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans,* 753 F.3d 560, 562 (5th Cir.2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 1403, 191 L.Ed.2d 361 (2015) (upholding regulation **\*694** requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson,* 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson,* 696 F.3d at 460.

**[19]** The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak,* 683 F.3d 1126, 1135 (9th Cir.2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny 13 standard. *Compare Ward,* 491 U.S. at 798, 109 S.Ct. 2746 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner,* 520 U.S. at 189, 117 S.Ct. 1174 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Circuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson,* 667 F.3d 630, 641 (5th Cir.2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest **\*695** otherwise. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not

WASHSTATEC023523

sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking necessary approval. *Chi Mak,* 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project,* 561 U.S. at 29, 130 S.Ct. 2705 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)). [3]

[3]    The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.,* 579 F.2d 516, 521 (9th Cir.1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

[20]    Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private

forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data **\*696** that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey,* 864 F.2d 1487, 1496–97 (9th Cir.1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesting expedited processing. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed.Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

WASHSTATEC023524

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

**D. Second Amendment**

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot prevail on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

**a. Standing**

[21]  [22]  [23]  Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines,* 521 U.S. at 819, 117 S.Ct. 2312; *Lewis v. Casey,* 518 U.S. 343, 349 n. 1, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.,* 499 F.3d 382, 385 (5th Cir.2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n,* 274 F.3d 924, 929 (5th Cir.2001) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

[24]  Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising **\*697** its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally

limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer,* 543 U.S. 125, 129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

4   No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("vendors and those in like positions ... have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle,* 517 F.3d 738, 743 (5th Cir.2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

5   Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public,* such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

[25]  Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous.*

WASHSTATEC023525

*Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc.* **\*698** *v. Tex. Med. Bd.,* 627 F.3d 547, 550–51 (5th Cir.2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 191 (5th Cir.2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right. Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future. In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme. (Plf. Reply Exs. 3–4). This testimony satisfies the "injury in fact" portion of the standing inquiry.

 **[26]**  Defendants further contend any injury is not fairly traceable to their conduct. They argue the ITAR does not prevent SAF members in the United States from accessing the files directly from Defense Distributed. But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing. *See Davis v. United States,* 564 U.S. 229, 131 S.Ct. 2419, 2434, n. 10, 180 L.Ed.2d 285 (2011) (one must not "confus [e] weakness on the merits with absence of Article III standing"). In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants. The Court therefore finds SAF

has standing to assert a claim of a violation of the Second Amendment. *See Nat'l Rifle Ass'n,* 700 F.3d at 192 (NRA had standing, on behalf of its members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18–to–20–year–olds); *Ezell v. City of Chicago,* 651 F.3d 684, 696 (7th Cir.2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city); *Mance v. Holder,* 74 F.Supp.3d 795, 802–03 (N.D.Tex.2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

 **[27]**  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n,* 700 F.3d at 194.

 **\*699**  In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller,* 554 U.S. at 577–628, 128 S.Ct. 2783). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins

WASHSTATEC023526

of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintiffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller,* the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

6    Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 582, 128 S.Ct. 2783.

[28]    The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n,* 700 F.3d at 195 (emphasis added).

[29]    The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id.* at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205–07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense

Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw,* 719 F.3d 338, 347–48 (5th Cir.2013), *cert. denied* **\*700** , —— U.S. ——, 134 S.Ct. 1365, 188 L.Ed.2d 297 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18–20–year–olds from carrying handguns in public).

[30]    As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw,* 719 F.3d at 348 (statute limiting under 21–year–olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n,* 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

### E. Fifth Amendment

[31]    [32]    [33]    [34]    [35]    Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have

WASHSTATEC023527

Defense Distributed v. U.S. Dept. of State, 121 F.Supp.3d 680 (2015)

rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu,* 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu,* 364 F.3d 192, 198 (4th Cir.2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project,* 561 U.S. at 20, 130 S.Ct. 2705 (quoting *Williams,* 553 U.S. at 306, 128 S.Ct. 1830). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

**\*701** [36]   To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the 23 term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical

data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R. § 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

[37]   The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the definition of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

## IV. CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. # 7) is hereby **DENIED.**

**All Citations**

121 F.Supp.3d 680

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEC023528

838 F.3d 451
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment
Foundation, Incorporated, Plaintiffs–Appellants
v.
UNITED STATES DEPARTMENT OF STATE; John
F. Kerry, In His Official Capacity as the Secretary
of the Department of State; Directorate of Defense
Trade Controls, Department of State Bureau of
Political Military Affairs; Kenneth B. Handelman,
Individually and in His Official Capacity as the
Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political–Military
Affairs; C. Edward Peartree, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division; Sarah
J. Heidema, Individually and in Her Official
Capacity as the Division Chief, Regulatory and
Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and
in His Official Capacity as the Senior Advisor, Office
of Defense Trade Controls, Defendants–Appellees

No. 15–50759
|
Filed September 20, 2016

## Synopsis

**Background:** Non-profit organization that designed firearms
that could be downloaded from internet and printed with
a 3-D printer and association that promoted the right to
keep and bear arms brought action against Department
of State, Secretary of State, Directorate of Defense Trade
Controls (DDTC) and DDTC employees, alleging that
prepublication approval requirement for technical data
organization published on internet violated their rights to
free speech under the First Amendment, their right to keep
and bear arms under the Second Amendment, and their
due process rights under the Fifth Amendment, seeking
preliminary injunction enjoining DDTC from enforcing the
requirement. The United States District Court for the Western
District of Texas, Robert L. Pitman, J., 121 F.Supp.3d 680,
denied motion. Plaintiffs appealed.

**Holdings:** The Court of Appeals, W. Eugene Davis, Circuit
Judge, held that:

[1] public interest, when compared with plaintiffs' private
interests, weighed against entry of injunction, and

[2] balance of harms weighed against entry of injunction.

Affirmed.

Jones, Circuit Judge, issued dissenting opinion.

West Headnotes (3)

[1]     **War and National Emergency**
        ⇨ Export restrictions
        **War and National Emergency**
        ⇨ Import restrictions
        The United States "Munitions List," as found in
        the Arms Export Control Act (AECA), is not
        a compendium of specific controlled items, but
        rather, is a series of categories describing the
        kinds of items qualifying as "defense articles"
        subject to import and export control by the
        President. 22 U.S.C.A. § 2778(a)(1).

        2 Cases that cite this headnote

[2]     **Injunction**
        ⇨ Weapons and explosives
        Non-profit organization that designed firearms
        which can be downloaded from internet and
        printed with a 3-D printer, as well as association
        that promoted right to keep and bear arms,
        failed to show that a failure to grant preliminary
        injunction enjoining enforcement of requirement
        that Directorate of Defense Trade Controls
        (DDTC) approve computer files containing
        technical data on firearms that could be printed
        on 3-D printers that organization intended to
        publish on internet, which DDTC alleged were
        "defense articles" as defined under the Arms
        Export Control Act (AECA), outweighed any
        damage that the injunction would cause to

WASHSTATEC023529

public's interest in restricting export of defense articles, and, thus, entry of injunction was not appropriate; in addition, President and Congress had interest and authority in matters of foreign policy and export. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

7 Cases that cite this headnote

[3]     **Injunction**
     ⬢ Weapons and explosives
Balance of harms weighed against entry of preliminary injunction enjoining enforcement of requirement that Directorate of Defense Trade Controls (DDTC) approve computer files containing technical data on firearms that could be printed on 3-D printers that non-profit organization, which designed firearms downloadable from Internet and printable with 3-D printer, intended to publish on Internet, as DDTC alleged files were "defense articles" as defined under the Arms Export Control Act (AECA); although organization's constitutional rights might be temporarily harmed by denial of injunction, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim, thereby harming forever government's interest in national defense and national security. Arms Export Control Act, § 38(a)(1), 22 U.S.C.A. § 2778(a)(1); 22 C.F.R. § 120.1(a).

8 Cases that cite this headnote

**\*453** Appeal from the United States District Court for the Western District of Texas, Robert L. Pitman, J.

**Attorneys and Law Firms**

Alan Gura, Gura & Possessky, P.L.L.C., Alexandria, VA, Joshua Michael Blackman, Houston, TX, Matthew Goldstein, Washington, DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX, David Scott Morris, Fish & Richardson, P.C., Austin, TX, for Plaintiffs–Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of Justice, Michael S. Raab, U.S. Department of Justice, Civil Division,

Appellate Section, Eric J. Soskin, U.S. Department of Justice, Civil Division Federal Programs Branch, Washington, DC, for Defendants–Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the Press, Washington, DC, for Amici Curiae Reporters Committee for Freedom of the Press, Thomas Jefferson Center for the Protection of Free Expression.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute, Washington, DC, for Amicus Curiae Cato Institute.

Raffi Melkonian, Wright & Close, L.L.P., Houston, TX, for Amici Curiae Representative Thomas Massie, Representative Brian Babin, Representative K. Mike Conaway, Representative Jeff Duncan, Representative Blake Farenthold, Representative John Fleming, Representative Paul Gosar, Representative Walter Jones, Mike Kelly, Representative Steve King, Representative Raul Labrador, Representative Jeff Miller, Representative Bill Posey, Representative Todd Rokita, Representative Daniel Webster.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David T. Hardy, Tucson, AZ, for Amicus Curiae Madison Society Foundation, Incorporated.

Kit Walsh, Electronic Frontier Foundation, San Francisco, CA, for Amicus Curiae Electronic Frontier Foundation.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank Rome, L.L.P., New York, NY, for Amicus Curiae Brady Center to Prevent Gun Violence.

Robert E. Henneke, Joel Stonedale, Texas Public Policy Foundation, Austin, TX, for Amicus Curiae Texas Public Policy Foundation.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs–Appellants Defense Distributed and Second Amendment Foundation, Inc. have sued Defendants–Appellees, the United States Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs–Appellants' interest in

WASHSTATEC023530

protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

## *454 I. Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR–15 rifles. [1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

[1]     The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F.Supp.3d 680, 686–88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically in .stl format; for CNC machines, text files setting out coordinates *455 and functions to direct a drill. [2]

[2]     Plaintiffs–Appellants' Original Brief on Appeal.

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR–15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR–15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published

WASHSTATEC023531

Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

> [1] The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* —— U.S. ——, 134 S.Ct. 365, 187 L.Ed.2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC **\*456** "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.* [3]

3
  *See Def. Distributed v. U.S. Dep't of State,* 121 F.Supp.3d 680, 687–88 (W.D. Tex. 2015).

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR–15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

### District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs–Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online. [4] They also claim violations of the Second and Fifth Amendments. Plaintiffs–Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

4
  The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR–15

WASHSTATEC023532

lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

Plaintiffs–Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs–Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo. [5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury **\*457** if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." [6]

[5]     *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6]     *Id.*

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

> Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In

other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown). [7]

[7]     *Id.* at 187–88.

The district court concluded that the preliminary injunction should be denied because Plaintiffs–Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs–Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time, constitutes

WASHSTATEC023533

irreparable injury.[8]) In extensive *458 dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs–Appellants failed to show a likelihood of success on the merits. Plaintiffs–Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs–Appellants continue to bear the burden of persuasion on appeal.

[8]   See Def. Distributed, 121 F.Supp.3d at 689 (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 506 (5th Cir. 2009); Ezell v. City of Chicago, 651 F.3d 684, 699 (7th Cir. 2011)).

**Analysis**

Because the district court held that Plaintiffs–Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs–Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs–Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs–Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012); see also Jackson Women's Health Org. v. Currier, 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

[9]   Id. at 689.

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals —including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs–Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs–Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n *459 this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24–25, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority— of the President and Congress in matters of foreign policy and export. See Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); United States v. Pink, 315 U.S. 203, 222–23, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); Spectrum Stores, Inc. v.

WASHSTATEC023534

*Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.] [11]

[10]    *Id.*

[11]    *Id.* at 689–90.

**[2]** Plaintiffs–Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs–Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs–Appellants. We cannot say the district court abused its discretion on these facts.

**[3]** Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs–Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs–Appellants argue that this result is absurd **\*460** because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs–Appellants would allow them to share online not only the Published Files but also any new, previously unpublished

files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs–Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR–15 lower receivers and additional 3D–printed weapons and weapon parts. Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs–Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs–Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs–Appellants have demonstrated a substantial likelihood of success on the merits. [12]

[12]    The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs–Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs–Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that

WASHSTATEC023535

it would be legal. The question presented in this case is whether Plaintiffs–Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs–Appellants previously made available online. Plaintiffs–Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs–Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs–Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs–Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs–Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

**\*461** We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs–Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

### I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle–15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different than technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

[1]   The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR–15, a registered trademark of Colt's Inc. AR–15, Registration No. 0,825,581.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology drew considerable press attention[2]   **\*462** and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

WASHSTATEC023536

DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Pursuant to § 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

2       According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took the government entities two years to refuse to exempt most of the files from the licensing regime.

3       Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

4       To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). **\*463** Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

5       *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we

WASHSTATEC023537

may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

## II.

### A. Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services ... and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

**\*464** The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain." 22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community." 22 C.F.R. § 120.11(a). [6]

[6]     This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id.*

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). [7]

[7]     Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in

WASHSTATEC023538

Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release **\*465** (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely

failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] ... items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

[8]   While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action ... and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, ―― U.S. ――, 136 S.Ct. 2131, 2142, 195 L.Ed.2d 423 (2016) (Agency "shenanigans" are "properly reviewable ... under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60–day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who attempted to deliver WMD materials to North Korea, who sought to

WASHSTATEC023539

distribute drone and missile schematics to China, and who attempted to *466 license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See, e.g., United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

[9]     *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO–RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/documents/OngoingExportCaseFactSheet.pdf.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See, e.g.,* Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

**B. Discussion**

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

[10]     For simplicity only, I do not here address plaintiffs' vagueness claim.

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export, Black's Law Dictionary* (10th ed. *467 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country"). As the court explained in *Ehsan*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145, 23 S.Ct. 702, 47 L.Ed. 984 (1903) (the "legal notion...of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

[11]     It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S.Ct. 2164, 2171–72, 150 L.Ed.2d 292 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly

WASHSTATEC023540

as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, —— U.S. ——, 135 S.Ct. 2480, 2495, 192 L.Ed.2d 483 (2015) (internal quotation omitted). Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the **\*468** "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is

potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond v. United States*, —— U.S. ——, 134 S.Ct. 2077, 2090, 189 L.Ed.2d 1 (2014) ("[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see also id.* at 574–75, 108 S.Ct. 1392 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance] ... is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout

WASHSTATEC023541

the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does  **\*469**  not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S.Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S.Ct. 2705, 2723–24, 177 L.Ed.2d 355 (2010), in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only unspecialized knowledge" it is permissible. *Humanitarian Law Proj.*, 130 S.Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items— jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation. [12]

[12]  The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134– 35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S.Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, *Mak*'s prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

 **\*470**  The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [ ] interference with

WASHSTATEC023542

ingress or egress, [ ] visual clutter, or [ ] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department: its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S.Ct. 501, 511, 116 L.Ed.2d 476 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that citizens have no intention of assisting foreign enemies directly, communications **\*471** about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project.* Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations ... [or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S.Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information

WASHSTATEC023543

would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

[13]    See Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

**\*472** The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The

possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis...." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment—Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S.Ct. 2395, 2402–03, 120 L.Ed.2d 101 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a **\*473** specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir.

WASHSTATEC023544

2003) (citing *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

14 As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data. [15]

15 Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S.Ct. at 2150–51. Like the "illusory 'constraints'" in *Lakewood, id.* at 769, 108 S.Ct. 2138, 2144, the ITAR prepublication review scheme

offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770, 108 S.Ct. 2138, 2144. *Cf. Humanitarian Law Project*, 130 S.Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45–day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly **\*474** brief. *See Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141, 88 S.Ct. 754, 756, 19 L.Ed.2d 966 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D–4, LLC*, 541 U.S. 774, 781, 124 S.Ct. 2219, 2224, 159 L.Ed.2d 84 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman* 's "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C. The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's

WASHSTATEC023545

mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730, 91 S.Ct. 2140 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

> the protection as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.... [n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S.Ct. 2766, 2781–82, 69 L.Ed.2d 640 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security). No such exceptional circumstances have been presented in this case. Indeed, all that the majority can muster to support the government's position here is that

the State Department's stated interest in preventing foreign nationals— including **\*475** manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else. [16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require prepublication approval of all USML-related technical data. This is clearly not what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H–Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

[16]   The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists. The Liberator, however, requires a metal firing pin.

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms. [17]

[17]   The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project* ) is dangerous and unprecedented.

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for

WASHSTATEC023546

the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

[18]   DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, **\*476** or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F.Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot

be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure) ... to a foreign person ... in the United States or abroad." *Id.* § 120.17(a)(4).

\* \* \*

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML. This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

**All Citations**

838 F.3d 451

End of Document      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WASHSTATEC023547

865 F.3d 211
United States Court of Appeals, Fifth Circuit.

DEFENSE DISTRIBUTED; Second Amendment Foundation, Incorporated, Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; John F. Kerry, In His Official Capacity as the Secretary of the Department of State; Directorate of Defense Trade Controls, Department of State Bureau of Political Military Affairs; Kenneth B. Handelman, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. Edward Peartree, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; Sarah J. Heidema, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; Glenn Smith, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls, Defendants-Appellees

No. 15-50759
|
Filed March 15, 2017

Appeal from the United States District Court for the Western District of Texas

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

**Attorneys and Law Firms**

Alan Gura, Gura, P.L.L.C., Alexandria, VA, Joshua Michael Blackman, Houston, TX, Matthew Goldstein, Washington, DC, William Bryan Mateja, Esq., Polsinelli, P.C., Dallas, TX, David Scott Morris, Fish & Richardson, P.C., Austin, TX, for Plaintiffs-Appellants.

Daniel Bentele Hahs Tenny, Esq., U.S. Department of Justice, Michael S. Raab, U.S. Department of Justice, Civil Division, Appellate Section, Washington, DC, for Defendants-Appellees.

Bruce D. Brown, Reporters Committee for Freedom of the Press, Washington, DC, Amicus Curiae for REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION.

Ilya Shapiro, Esq., Randal John Meyer, Cato Institute, Washington, DC, Amicus Curiae for CATO INSTITUTE.

Raffi Melkonian, Wright & Close, L.L.P., Houston, TX, Amicus Curiae for REPRESENTATIVE THOMAS MASSIE, REPRESENTATIVE BRIAN BABIN, REPRESENTATIVE K. MIKE CONAWAY, REPRESENTATIVE JEFF DUNCAN, REPRESENTATIVE BLAKE FARENTHOLD, REPRESENTATIVE **\*212** JOHN FLEMING, REPRESENTATIVE PAUL GOSAR, REPRESENTATIVE WALTER JONES, MIKE KELLY, REPRESENTATIVE STEVE KING, REPRESENTATIVE RAUL LABRADOR, REPRESENTATIVE JEFF MILLER, REPRESENTATIVE BILL POSEY, REPRESENTATIVE TODD ROKITA, REPRESENTATIVE DANIEL WEBSTER.

Leif A. Olson, Olson Firm, P.L.L.C., Humble, TX, David T. Hardy, Tucson, AZ, Amicus Curiae for MADISON SOCIETY FOUNDATION, INCORPORATED.

Kit Walsh, Electronic Frontier Foundation, San Francisco, CA, Amicus Curiae for ELECTRONIC FRONTIER FOUNDATION.

John Devereux Kimball, Esq., Martin Simon Krezalek, Blank Rome, L.L.P., New York, NY, Amicus Curiae for BRADY CENTER TO PREVENT GUN VIOLENCE.

Robert E. Henneke, Texas Public Policy Foundation, Austin, TX, Amicus Curiae for TEXAS PUBLIC POLICY FOUNDATION.

Before DAVIS, JONES, and GRAVES, Circuit Judges.

**Opinion**

W. EUGENE DAVIS, UNITED STATES CIRCUIT JUDGE

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen and

WASHSTATEC023548

Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing en banc.
The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits —which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits—calling it "arguably the most important factor." *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); **\*213** *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (*en banc*); *see also N.Y. Times*, 403 U.S. at 730, 91 S.Ct. 2140 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively ... operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569–70, 96 S.Ct. 2791. The Government contends that the gun designs at issue could potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing

WASHSTATEC023549

such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to **\*214** Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, 838 F.3d at 463 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719, 91 S.Ct. 2140 (Black, J., concurring). Unfortunately, that is exactly what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

**All Citations**

865 F.3d 211 (Mem)

WASHSTATEC023550

138 S.Ct. 638
Supreme Court of the United States

DEFENSE DISTRIBUTED, et al., petitioners,
v.
DEPARTMENT OF STATE, et al.

No. 17–190.
|
Jan. 8, 2018.

**Synopsis**

Case below, 838 F.3d 451.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

138 S.Ct. 638 (Mem), 199 L.Ed.2d 527, 86 USLW 3323, 86 USLW 3330

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WASHSTATEC023551

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § Case No. 15-CV-372-RP |
| | § |
| | § SECOND AMENDED |
| Plaintiffs, | § COMPLAINT |
| | § |
| v. | § |
| | § |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| Defendants. | § |
| | § |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The prior restraint system challenged here cannot overcome its presumption of invalidity.

1

WASHSTATEC023552

Contrary to the Justice Department's warning that such actions are unconstitutional,

Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120

*et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open

forums, regarding arms in common use for lawful purposes. Defendants' censorship of

Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is

applied, violate the First, Second, and Fifth Amendments to the United States Constitution.

Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this

prior restraint scheme, and to recover money damages to compensate for the harm such

application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of

the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place

of business is located in Austin, Texas. Defense Distributed was organized and is operated for

the purpose of defending the civil liberty of popular access to arms guaranteed by the United

States Constitution through facilitating global access to, and the collaborative production of,

information and knowledge related to the three-dimensional ("3D") printing of arms; and to

publish and distribute, at no cost to the public, such information and knowledge on the Internet

in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit

membership organization incorporated under the laws of Washington with its principal place of

business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide,

including in Texas. The purposes of SAF include promoting, securing, and expanding access to

the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHSTATEC023553

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.      Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.      Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.      Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.      Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.      Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.      Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHSTATEC023554

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id*.

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

WASHSTATEC023555

15.     The scope of technical data subject to ITAR control, as described on the U.S.

Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants

constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity

jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the

ITAR imposed a prepublication approval requirement on publications of privately generated

ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S.

Government approval for the publication of technical data falling within the definition in §

125.01, including such data as may be developed under other than U.S. Government contract, is

on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel

issued a series of written opinions advising Congress, the White House, and the Department of

State that the use of the ITAR to impose a prior restraint on publications of privately generated

unclassified information into the public domain violated the First Amendment of the United

States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to

Defendant DDTC, issued official guidance providing that "[a]pproval is not required for

publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to

Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR,

expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

5

WASHSTATEC023556

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

WASHSTATEC023557

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

7

WASHSTATEC023558

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015—nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case—Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHSTATEC023559

38.     Defense Distributed submitted another commodity jurisdiction request for the
Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction
request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software,
data files, project files, coding, and models for producing a defense article, to include 80% AR-
15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with
[the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it
did seek a determination as to whether the software necessary to build and operate the Ghost
Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the
machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related
to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to
DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted
the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated
December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was
made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and
Enforcement Division for further questions on public release of the CAD files. However,
because this is not the DDTC division responsible for issuing licenses or other forms of DDTC
authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for
guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

9

WASHSTATEC023560

43. To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

### Prior Restraint on Other Files

44. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45. Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

### High Price Tag for Public Speech Licenses

46. The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47. DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

48. The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49. But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50. DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51. Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52. The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

11

WASHSTATEC023562

COUNT TWO

RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

12

WASHSTATEC023563

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW—U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution  requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

13

WASHSTATEC023564

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

14

WASHSTATEC023565

6.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                     Respectfully submitted,

/s/ Alan Gura                               /s/ William B. Mateja
Alan Gura                                   William B. Mateja
Virginia Bar No. 68842*                     Texas State Bar No. 13185350
Gura PLLC                                   POLSINELLI P.C.
916 Prince Street, Suite 107                2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                  Dallas, Texas 75201
703.835.9085/Fax 703.997.7665               214.397.0030/Fax 214.397.0033
alan@gurapllc.com                           Mateja@polsinelli.com

/s/ Matthew Goldstein                       /s/ Josh Blackman
Matthew Goldstein                           Josh Blackman
D.C. Bar No. 975000*                        Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                  1303 San Jacinto Street
1875 Connecticut Avenue, N.W.               Houston, Texas 77002
10th Floor                                  202.294.9003/Fax: 713.646.1766
Washington, DC 20009                        joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                              *Admitted pro hac vice

15

WASHSTATEC023566

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
     Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
     Defendants.

No. 1:15-cv-372-RP

---

## **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

WASHSTATEC023567

## TABLE OF CONTENTS

BACKGROUND ....................................................................................................................1

ARGUMENT .........................................................................................................................2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed............................................2

     A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ..........................................................................................................2

     B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ....................................................................................5

     C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad................................8

     D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.....................10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed.......................................13

     A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge...........................13

         1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests. ..............................................................................14

         2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts. ...........................................................15

     B.    Plaintiffs' Second Amendment Challenge Fails on the Merits....................................16

III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ............................19

CONCLUSION....................................................................................................................20

WASHSTATEC023568

# TABLE OF AUTHORITIES

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ................................................................. 15

*Bernstein v. U.S. Dep't. of Justice,*
192 F.3d 1308 (9th Cir. 1999) ................................................................. 4

*Bernstein v. U.S. Dep't. of Justice,*
176 F.3d 1132 (9th Cir. 1999) ................................................................. 4

*Bonds v. Tandy,*
457 F.3d 409 (5th Cir. 2006) ................................................................. 14

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ................................................................. 8, 9

*Brockett v. Spokane Arcades,*
472 U.S. 491 (1985) ................................................................. 9

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) ................................................................. 17

*Brown v. Livingston,*
524 F. Appx. 111 (5th Cir. 2013) ................................................................. 15

*Bullfrog Films v. Wick,*
646 F. Supp. 492 (C.D. Cal. 1986) ................................................................. 4

*Capital Cities/ABC, Inc. v. Brady,*
740 F. Supp. 1007 (S.D.N.Y. 1990) ................................................................. 11

*Catholic Leadership Coal. of Tex. v. Reisman,*
764 F.3d 409 (5th Cir. 2014) ................................................................. 10

*CFTC v. Vartuli,*
228 F.3d 94 (2d Cir. 2000) ................................................................. 3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ................................................................. 10, 11, 12

*City of Littleton v. Z.J. Gifts D-4,*
541 U.S. 774 (2004) ................................................................. 11, 12

ii

WASHSTATEC023569

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ................................................................3

*Def. Distributed v. Dep't of State*,
  121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ...............................*passim*

*Def. Distributed v. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
  rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
  *certiorari* denied, 138 S. Ct. 638 (2018) ..........................................*passim*

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..........................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) .......................................................16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .....................................................13, 14

*Fontenot v. McCraw*,
  777 F.3d 741 (5th Cir. 2015) ...........................................................14

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ..........................................................................11

*Freedman v. State of Md.*,
  380 U.S. 51 (1965) ............................................................................11

*FW/PBS v. City of Dallas*,
  493 U.S. 215 (1990) ..........................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ..........................................................................10

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................................4, 5, 6

*Hotze v. Burwell*,
  784 F.3d 984 (5th Cir. 2015) ...........................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ............................................................................3

*Junger v. Daley*,
  209 F.3d 481 (6th Cir. 2000) .............................................................5

WASHSTATEC023570

*Karn v. U.S. Dept. of State,*
   925 F.Supp. 1 (D.D.C. 1996) ........................................................................................ 10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
   604 F. Supp. 280 (D.D.C. 1984) ................................................................................... 4

*Lewis v. Casey,*
   518 U.S. 343 (1996) .................................................................................................... 14

*Mance v. Sessions,*
   880 F.3d 183 (5th Cir. 2018) ............................................................................... *passim*

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .................................................................................................. 6

*Mather v. Central Pac. Bank,*
   2014 WL 5580963 (D. Haw. 2014) ............................................................................ 15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ...................................................................................................... 9

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) ...................................................................................... 10

*Miss. State Democratic Party v. Barbour,*
   529 F.3d 538 (5th Cir. 2008) ...................................................................................... 14

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) .......................................................................................................... 8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
   700 F.3d 185 (5th Cir. 2012) ........................................................................... 15, 16, 17

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ............................................................................................... 11, 12

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) .................................................................................................... 11

*Oller v. Roussel,*
   609 F. App'x 770 (5th Cir. 2015) ............................................................................... 12

*Petro-Chem Processing v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ................................................................................... 16

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) .................................................................................... 8, 18

WASHSTATEC023571

*Pub. Citizen, Inc. v. Bomer*,
274 F.3d 212 (5th Cir. 2001) .................................................................... 14, 15

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) ................................................................................. 5, 6

*S. Utah Wild. Alliance v. Palma*,
2011 WL 2565198 (D. Utah 2011) ................................................................. 15

*Sec'y of State of Md. v. Munson*,
467 U.S. 947 (1984) ......................................................................................... 9

*Second Amendment Arms v. City of Chicago*,
135 F. Supp. 3d 743 (N.D. Ill. 2015) .............................................................. 14

*Shelby Cty. v. Holder*,
133 S. Ct. 2612 (2013) .................................................................................... 17

*Se. Promotions v. Conrad*,
420 U.S. 546 (1975) ........................................................................................ 12

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .................................................................................... 14

*Stagg P.C. v. U.S. Dep't of State*,
158 F. Supp. 3d 203 (S.D.N.Y. 2016),
*aff'd*, 673 F. App'x 93 (2d Cir. 2016),
*cert. denied*, 138 S. Ct. 721 (2018) ............................................................ 6, 9

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017) ............................................................. 13, 14, 17

*Texas v. Johnson*,
491 U.S. 397 (1989) .......................................................................................... 2

*United States v. Hicks*,
980 F.2d 963 (5th Cir. 1992) ......................................................................... 8, 9

*United States v. Hsu*,
364 F.3d 192 (4th Cir. 2004) ........................................................................... 20

*United States v. Chi Mak*,
683 F.3d 1126 (9th Cir. 2012) ................................................................. *passim*

*United States v. Edler Indus., Inc.*,
579 F.2d 516 (9th Cir. 1978) ....................................................................... 6, 11

WASHSTATEC023572

*United States v. Martinez,*
  904 F.2d 601 (11th Cir. 1990) ............................................................................................7

*United States v. Posey,*
  864 F.2d 1487 (9th Cir. 1989) ...........................................................................................6

*United States v. Williams,*
  553 U.S. 285 (2008) .........................................................................................................20

*United States v. Zhen Zhou Wu,*
  711 F.3d 1 (1st Cir. 2013),
  *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013) .............................. 2, 20

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ...............................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
  454 U.S. 464 (1982) .........................................................................................................16

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ...........................................................................................................9

*Voting for Am., Inc. v. Steen,*
  732 F.3d 382 (5th Cir. 2013) ........................................................................................ 3, 4, 9

*Warth v. Seldin,*
  422 U.S. 490 (1975) ...........................................................................................................8

*Williams-Yulee v. Florida Bar,*
  135 S. Ct. 1656 (2015) .......................................................................................................8

**STATUTES**

18 U.S.C. § 2339B ...............................................................................................................5

22 U.S.C. § 2778 ……………...........................................................................................*passim*

**REGULATIONS**

22 C.F.R. § 120.1 *et seq.* ....................................................................................................2

22 C.F.R. § 120.4 ............................................................................................................ 2, 8

22 C.F.R. § 120.6 ........................................................................................................ 2, 7, 20

22 C.F.R. § 120.10 .......................................................................................................*passim*

vi

WASHSTATEC023573

22 C.F.R. § 120.11 ............................................................................................................... 7, 11

22 C.F.R. § 120.17 ................................................................................................................. 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) ................................................................................. 8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
     5 Op. O.L.C. 202 (1981) ................................................................................. 13

vii

WASHSTATEC023574

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
  Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
  Defendants.

No. 1:15-cv-372-RP

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHSTATEC023575

*I'*). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138 S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.  Plaintiffs' First Amendment Claims Should Be Dismissed.**

A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function <u>To Automatically Create A Firearm Or Its Components</u>.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

WASHSTATEC023576

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

WASHSTATEC023577

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

WASHSTATEC023578

manufacturing firearms and defense articles.[6]

    B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

WASHSTATEC023579

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

WASHSTATEC023581

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

### C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u> created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

WASHSTATEC023582

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

WASHSTATEC023583

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

### D. ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

WASHSTATEC023585

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

WASHSTATEC023586

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II. Plaintiffs' Second Amendment Claims Should Be Dismissed.

A. Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

WASHSTATEC023587

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

       To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

       Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

WASHSTATEC023588

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

> 2.  SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
> <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

15

WASHSTATEC023589

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

B. Plaintiffs' Second Amendment Challenge Fails on the Merits.

In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

WASHSTATEC023590

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

17

WASHSTATEC023591

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

WASHSTATEC023592

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III. Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

19

WASHSTATEC023593

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHSTATEC023594

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

WASHSTATEC023595

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel

WASHSTATEC023596