1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                           AT SEATTLE

8   STATE OF WASHINGTON, *et al.*,

9                    Plaintiffs,

                                              NO. C18-1115RSL
10                   v.

11  UNITED STATES DEPARTMENT OF                PRELIMINARY INJUNCTION
    STATE, *et al.*,
12
                     Defendants.
13

14

15        This matter comes before the Court on the "Plaintiff States' Motion for Preliminary

16  Injunction." Dkt. # 43. A temporary restraining order was entered on July 31, 2018, enjoining

17  the federal defendants[1] from implementing or enforcing a "Temporary Modification of Category

18  I of the United States Munitions List" and a July 27, 2018, letter issued by the U.S. Department

19  of State to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation. The

20  order also required the federal defendants to preserve the status quo *ex ante* as if the

21
22  modification had not occurred and the letter had not been issued. Pursuant to the limitations set

23  forth in Fed. R. Civ. P. 65, the matter was set for hearing on August 10, 2018, but the restraining

24  order was extended by agreement of the parties to August 28, 2018, to accommodate an August

25

26  ─────────────────

27        [1] The federal defendants are the United States Department of State, Michael R. Pompeo, the
    Directorate of Defense Trade Controls, Mike Miller, and Sarah Heidema.

28  PRELIMINARY INJUNCTION - 1

WASHSTATEC023597

21, 2018, hearing date.

Having considered the memoranda, declarations, and exhibits submitted by the parties, as well as the amicus curiae submissions of the Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety, and Electronic Frontier Foundation,[2] and having heard the arguments of counsel, the Court finds as follows:

## PRELIMINARY INJUNCTION STANDARD

The standard for issuing a preliminary injunction is identical to the standard the Court used when granting the temporary restraining order in this case. Thus, for purposes of the current motion, the Court considers the more developed record to determine whether plaintiffs (1) are likely to succeed on the merits of their APA claim; (2) are likely to suffer irreparable harm in the absence of preliminary relief; (3) have shown that the balance of equities tips in their favor, and (4) have shown that an injunction is in the public interest. Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). In the alternative, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).[3]

---

[2] The requests for leave to file amicus curiae briefs (Dkt. # 46, # 47, and # 58) are GRANTED.

[3] The Court finds that the injunction plaintiffs seek is prohibitory in nature, rather than mandatory. A prohibitory injunction maintains the status quo, which is generally described as the last, uncontested status which preceded the present controversy. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000). In this case, the status quo existed before the federal defendants issued

PRELIMINARY INJUNCTION - 2

WASHSTATEC023598

**BACKGROUND AND PROCEDURAL HISTORY**

Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of computer aided design ("CAD") data files that would allow the creation of guns and their components with a 3D printer. When defendant Defense Distributed posted CAD files for various weapons on its website at the end of 2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of State, notified Defense Distributed that the publication may have been unauthorized and in violation of the AECA's implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files available on the internet constituted a disclosure or transfer of technical data to foreign persons and was considered an "export" subject to the AECA and ITAR. The government advised Defense Distributed to remove the files from its website and, if it believed the files were not properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to obtain an official determination from the DDTC.

Defense Distributed filed a number of determination requests. When the DDTC failed to make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for the Western District of Texas. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one side against the Department of State, the DDTC, and various federal employees on the other. Defense Distributed challenged the federal government's power to regulate its publication of the CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

---

the temporary modification and letter on July 27, 2018.

PRELIMINARY INJUNCTION - 3

WASHSTATEC023599

system of prior restraints that was applied in an arbitrary manner in violation of Defense

Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was

filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed

wanted to publish on the internet were technical data subject to the ITAR.

     Defense Distributed filed a motion for preliminary injunction in the Texas litigation to

preclude the federal government from imposing prepublication approval requirements on any of

its CAD files. The federal government opposed the motion, arguing that:

> !      "export of Defense Distributed's CAD files could cause serious harm to U.S.
> national security and foreign policy interests" that "warrant subjecting [the files] to
> ITAR's export licensing of technical data;"

> !      Defense Distributed's "CAD files constitute the functional equivalent of defense
> articles: capable, in the hands of anyone who possesses commercially available 3D
> printing equipment, of 'automatically' generating a lethal firearm that can be easily
> modified to be virtually undetectable in metal detectors and other security equipment;"

> !      "The State Department is particularly concerned that [Defense Distributed's]
> proposed export of undetectable firearms technology could be used in an assassination,
> for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla
> groups, or to compromise aviation security overseas in a manner specifically directed at
> U.S. persons;" and

> !      both the government and the public "have a strong interest in curbing violent
> regional conflicts elsewhere in the world, especially when such conflict implicates the
> security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-

PRELIMINARY INJUNCTION - 4

WASHSTATEC023600

Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The Honorable Robert L. Pitman denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or

PRELIMINARY INJUNCTION - 5

WASHSTATEC023601

terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex). Later that month, the parties reached a tentative settlement agreement. Pursuant to the settlement, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On May 24, 2018, the federal defendants published the promised rulemaking notice, with the public comment period ending on July 9, 2018. 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed.

PRELIMINARY INJUNCTION - 6

WASHSTATEC023602

Reg. 24,166 (May 24, 2018). The settlement agreement was signed on June 29, 2018, in the midst of the public comment period, but not made public until July 10, 2018. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the Administrative Procedure Act ("APA") and the Tenth Amendment to the United States Constitution.[4] After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the temporary modification resulted in the removal of one or more items from the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not issue because Defense Distributed had announced its intent to make the CAD files downloadable from its website on August 1, 2018, and that the balance of hardships and the public interest tipped sharply in plaintiffs' favor.

## DISCUSSION

Plaintiffs' request for a preliminary injunction is centered on its claim that the federal defendants violated the APA. The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a

---

[4] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

PRELIMINARY INJUNCTION - 7

temporary modification were procedurally defective in that the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1) and failed to obtain the concurrence of the Secretary of Defense as required by the President when he delegated his removal authority to the Secretary of State in Executive Order 13637, § 1(n)(i).[5] Plaintiffs also argue that, to the extent the temporary modification permits "any United States person" to use the CAD files at issue, the federal government's action impermissibly conflicts with state and federal laws limiting access to guns. Finally, plaintiffs challenge the decision to allow the CAD files to be published on the internet as arbitrary and capricious because the State Department failed to articulate any explanation for its decision to allow the publication of the CAD files on the internet or to alter its earlier factual findings and representations regarding the harms such publication will likely cause.

**A. Jurisdiction**

Both the federal and private defendants challenge the Court's jurisdiction over this matter. The federal defendants argue that the States lack standing, while the private defendants argue that this lawsuit is an impermissible collateral attack on the outcome of the litigation in the Western District of Texas.[6]

---

[5] Plaintiffs, citing a presidential tweet and a White House press briefing, also suggest that the State Department exceeded its authority over the USML because the President disagrees with the way in which that authority was exercised. Plaintiffs acknowledge, however, that the President has delegated USML designations to the State Department. That delegation was not conditioned on obtaining the President's prior approval of or subsequent acquiescence to a listing decision. To the extent the President believes that allowing printable gun files to be published on the internet is not sensible, he has the power to influence, if not outright direct, the State Department's decision-making in this matter. He has not yet done so.

[6] The private defendants' § 701 argument is discussed below.

PRELIMINARY INJUNCTION - 8

WASHSTATEC023604

### 1. Standing

In order to present a justiciable case or controversy under Article III of the U.S. Constitution, plaintiffs must have standing to challenge defendants' conduct and pursue the relief requested.

> [The] constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks, citations, and alterations omitted). In an APA action, a State alleging a procedural violation has standing if there is a possibility that the relief requested will prompt the agency to reconsider the decision that is allegedly causing harm. Mass. v. Envt'l Protection Agency, 549 U.S. 497, 517 (2007). In addition, a State has a legally protectable interest if it has a sovereign, quasi-sovereign, or proprietary interest that would be impacted by the litigation. Dep't of Fair Emp't & Hous. v. Lucent Techs., 642 F.3d 728, 753 n.5 (9th Cir. 2011).

Plaintiffs allege that the federal defendants failed to provide notice of their intent to remove technical data related to the manufacture of 3D guns from the USML and have made a wholly unsupported - and therefore arbitrary and capricious - decision which, in the State Department's own words, will make anyone in possession of a commercially-available 3D printer capable of automatically generating a lethal firearm that would be virtually undetectable

PRELIMINARY INJUNCTION - 9

WASHSTATEC023605

in metal detectors and other security equipment. The federal defendants assert that the alleged failures are harmless or are causally unrelated to any harm the States might suffer because the federal government's regulatory authority under the AECA is limited to exports and the plaintiffs' concerns are purely domestic. Defendants' argument is so myopic and restrictive as to be unreasonable. Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. The federal defendants' determination that the 3D files at issue are subject to regulation under ITAR and could not, therefore, be published on the internet reduced risks of the proliferation of untraceable and undetectable weapons, assassinations, aviation and other security breaches, and violations of gun control laws both abroad and at home. Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well.

The Court finds that plaintiffs have not only alleged harm to their legally protectable sovereign interests under the traditional standing analysis, but have also alleged a procedural APA claim where there is a possibility that compelling compliance with the specified procedures will prompt the agency to reconsider its decision. Forcing the federal defendants to give Congress thirty days' notice of the removal of the CAD files from the USML and to seek the concurrence of the Department of Defense would afford other executive branch entities (including the President) an opportunity to impact the decisionmaking process and would give both Congress and the States a chance to generate any statutes or regulations deemed necessary to address the regulatory void the delisting would create. Forcing the federal defendants to evaluate the effect of the proposed delisting on world peace, national security, and the foreign policy of the United States (factors which Congress intended the President or his designee to consider) may also prompt a reconsideration of the decision to remove the CAD files from the

PRELIMINARY INJUNCTION - 10

WASHSTATEC023606

USML. There is, at the very least, a possibility that the States would benefit from the relief requested in this litigation.

Plaintiffs have standing to pursue the relief requested in the amended complaint. Plaintiffs have alleged an injury in fact that is directly threatened by the federal defendants' proposed delisting of the technical data contained in Defense Distributed's CAD files and that could be ameliorated, if not avoided entirely, as a result of this litigation.

**2. Collateral Attack**

The private defendants argue that this lawsuit is an impermissible collateral attack on the dismissal with prejudice of the Western District of Texas litigation. They reason that, had the States moved to intervene in the prior litigation in order to object to the proposed settlement or to seek a preliminary injunction precluding its execution, the motion would have been denied and the States cannot, therefore, obtain such relief here. The conclusion does not follow from the premise. The reasons the States would likely not have been permitted to intervene in the prior litigation is that they were not necessary parties, they had no right to appear simply because they were interested in its outcome, their claim had nothing to do with the facts or law at issue between the existing parties, and their APA-based objections could be heard and their interests protected in a separate litigation with the federal defendants. See Fed. R. Civ. P. 19 and 24. The district court's likely refusal to allow plaintiffs to appear and/or intervene in the Western District of Texas litigation is not relevant to, much less dispositive of, plaintiffs' right to seek relief in this litigation.

If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. If the remedy afforded in this litigation impinges on the federal

PRELIMINARY INJUNCTION - 11

WASHSTATEC023607

defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are challenging the adequacy of agency action. Defendants offer no case law suggesting that violations of the APA can be shielded from judicial review by simply incorporating them into a private settlement agreement.

**B. Likelihood of Success on the Merits**

    **1. Congressional Notice**

    The AECA authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The President has the power to designate "defense articles and defense services:" the items so designated constitute the USML. Id. The USML identifies categories of defense articles and services that are subject to export controls. The list is "organized by paragraphs and subparagraphs" that "usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories, and attachments; and technical data and defense services directly related to the defense articles of that USML category." 22 C.F.R. § 121.1(a). The USML, Category I, includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the CAD files Defense Distributed seeks to publish are subject to the export controls of ITAR. The Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has

PRELIMINARY INJUNCTION - 12

provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." 22 U.S.C. § 2778(f)(1).

Plaintiffs have shown a likelihood of success on the merits of their APA claim because the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. The federal government represents that its settlement with the private defendants was the result of a multi-year review process in which the Departments of Defense, Commerce, and State determined that firearms up to .50 caliber would not provide a military advantage to adversaries and therefore no longer warrant export control and should be removed from the USML.[7] Assuming that is the case, the federal defendants acknowledge that the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of the review be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given.

The Department of State argues that its decision to allow the publication of previously-regulated CAD files does not trigger the Congressional notice requirement because it has not removed an "item" from the USML. Defendants argue that the notice requirement applies only

---

[7] The federal defendants refused to produce the administrative record of the agency's decision (Dkt. # 49) and instead rely on the declaration of the Director of the Office of Defense Trade Control Policy within the DDTC (Dkt. # 64-1) to explain how and why the decision was made to reverse the CJ determination regarding the CAD files at issue. This tactic has placed plaintiffs and the Court at a decided disadvantage in evaluating what the government relied upon when concluding that the State Department's prior findings regarding the national security risks posed by plastic, untraceable, undetectable guns should be overruled. For purposes of the procedural APA claim, however, the declaration confirms that notice to Congress will be given as required by 22 U.S.C. § 2778(f) if and only if a final rule is issued. Dkt. # 64-1 at ¶ 24.

PRELIMINARY INJUNCTION - 13

when a whole group or category of defense articles described in the USML, such as "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R. § 121.1(I)(a), is removed and that that has not yet happened. This argument conflates "category" with "item." As described in the statute, the USML is a list of items designated by the President as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an exhaustive list of every individual article or service that is subject to export control under the AECA, the Department of State opted to populate the USML with generally descriptive categories. Those categories describe end-items, however, and it is those items that are the "defense articles and defense services" that are subject to export control under the AECA. 22 C.F.R. § 121.1. See also Fact Sheet on President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative (visited August 21, 2018) (noting that the United States' system of export control involved an "extensive list of controlled items which resulted in almost 130,000 licenses" in 2009). The congressional review and notice requirements specifically apply to items, not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms that it is the removal of a particular article or service - *i.e.*, an item rather than a category - that triggers the review and notice requirements. The Department describes the CJ procedure as a means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations reiterate that the "Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the statute and implementing regulations, the Court finds that plaintiffs are likely to prevail on their

PRELIMINARY INJUNCTION - 14

WASHSTATEC023610

argument that the terms "item" and "category" are distinct and that Congressional notice is required whenever a previously-designated defense article or service is to be removed from the AECA's reach.

As noted above, the DDTC made an express determination that certain CAD files that can be used with a 3D printer to manufacture guns and/or their components are "defense articles" or "defense services" under the USML. Defendants attempted to revoke that designation through the issuance of the "temporary modification" described in the settlement agreement in the Western District of Texas litigation, thereby removing the CAD files from the USML and lifting all export controls.[8] Congress was not notified prior to the removal. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of any final rule removing firearms up to .50 caliber from the USML. The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[9]

**2. Concurrence of the Secretary of Defense**

When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense

_____

[8] The Court rejects the private defendants' attempt to distinguish the terms "remove" and "exclude" in this context.

[9] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification, its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." Tuan Thai v. Ashcroft, 366 F.3d 790, 798 (9th Cir. 2004).

PRELIMINARY INJUNCTION - 15

WASHSTATEC023611

services subject to export control have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures. Plaintiffs are not likely to succeed on the merits of this aspect of its claim, however, because the relevant executive order expressly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Executive Order 13637, § 6(c).

### 3. Abrogation of State and Federal Law

In response to the States' objections regarding the scope of the purported authorization for "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from the CAD files at issue, both the federal and private defendants disavow any intent to alter or in any way impact existing federal prohibitions or limitations on the possession of firearms. The federal defendants also recognize the continuing viability of state law gun control measures. Plaintiffs do not address this argument in their reply memorandum.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA and/or to overrule or even address its earlier findings justifying regulation of the files. The federal defendants state that the change was the result of a multi-year review process which led to the determination that firearms up to .50 caliber "do not provide the United States with a critical military or intelligence advantage, and therefore do not warrant continued control on the USML." Dkt. # 64-1 at ¶ 24. Even if the Court accepts that the

PRELIMINARY INJUNCTION - 16

WASHSTATEC023612

undisclosed administrative record will support this argument,[10] there is no indication that the Department considered the unique properties of 3D plastic guns or evaluated the factors Congress deemed relevant when the Department decided to authorize the posting of the CAD files on the internet as of July 27, 2018.

Until April 2018, the federal government took the position that technical data related to the design and production of weapons using a commercially-available 3D printer posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic. Because they were virtually undetectable in metal detectors and other security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would cause serious and long-lasting harm to its foreign policy.

Against these findings related to the specific defense articles at issue in this litigation, the federal defendants state only that restricting the international availability of firearms up to .50 caliber will not provide the United States with a critical military or intelligence advantage. There

---

[10] Plaintiffs' motion to strike arguments based on the administrative record is DENIED.

PRELIMINARY INJUNCTION - 17

WASHSTATEC023613

is no indication that the Department evaluated the unique characteristics and qualities of plastic guns when it was considering the deletion of the small firearms category from the USML. Statements made at oral argument affirmatively suggest that it did not do so prior to July 27, 2018. Nor is there any reasoned explanation for its change in position regarding the harms that publication of the regulated technical data will engender. The State Department also appears to have evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Congress, however, directed the Department to consider how the proliferation of technical data and related weaponry would impact world peace, national security, and foreign policy. When President Obama initiated the multi-year review of the export control system on which defendants rely, the stated goals of the review included "enhanc[ing] U.S. national security" and updating the Cold War era system "to address the threats we face today and the changing economic and technological landscape." Fact Sheet on the President's Export Control Reform Initiative (April 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export -control-reform-initiative (visited August 21, 2018). Based on the existing record, plaintiffs have raised serious questions regarding the merits of their claim that the federal defendants failed to consider aspects of the problem which Congress deemed important, failed to articulate a reasonable explanation for this particular decision in light of its prior findings and representations, and engaged in arbitrary and capricious agency action.

**5. Agency Discretion**

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to

PRELIMINARY INJUNCTION - 18

agency discretion as a matter of law: the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML, which Congress chose not to make unreviewable.

"Over the years, [the Supreme Court has] read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" Lincoln v. Vigil, 508 U.S. 182, 191 (1993). Thus, an express legislative bar such as that found in § 2778(h) is not a prerequisite to a finding that an action is committed to agency discretion by law. The Supreme Court has found that an agency's decision not to initiate enforcement proceedings, not to grant reconsideration of agency action, or how to allocate funds from a lump-sum budget allocation are presumptively unreviewable because those decisions often involve complicated balancing of factors within the agency's expertise, Congress imposed no relevant requirements or restrictions, and there is no adequate standard by which the judiciary could evaluate the agency action. Id. at 191-93. Those factors do not apply here. Plaintiffs are challenging the federal defendants' failure to comply with certain procedures that Congress and the courts have imposed when making removal decisions under AECA. "The process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements regardless of whether the substance of the rule is itself reviewable." Batalla Vidal v. Duke, 295 F. Supp.3d 127, 148 (E.D.N.Y. 2017).

**6. First Amendment**

The private defendants argue that the CAD files are protected speech under the First Amendment, that restrictions on their ability to publish the files constitute a prior restraint that is presumed to be unconstitutional, and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the

PRELIMINARY INJUNCTION - 19

publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to or otherwise invalidate plaintiffs' claims against the federal defendants. To the extent the private defendants' speech is impacted, their First Amendment interests are considered in the balancing of hardships and public interest section below.

**C. Irreparable Harm**

Plaintiffs have submitted evidence, including declarations and the federal defendants' prior findings, showing that the States will likely suffer irreparable injury if the technical data for designing and producing undetectable weapons using a commercially-available 3D printer are published on the internet. Many of the same concerns that prompted the DDTC to conclude that the CAD files are "defense articles" within the scope of the USML apply with equal force to the States. A gun made from plastic is virtually undetectable in metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings. The portability and ease of a manufacturing process that can be set up virtually anywhere would allow those who are, by law, prohibited from manufacturing, possessing, and/or using guns to more easily evade those limitations. The publication of the technical data would subvert the domestic laws of states with more restrictive firearm controls and threaten the peace and security of the communities where these guns proliferate.

PRELIMINARY INJUNCTION - 20

In addition, the States have certain public safety, law enforcement, and proprietary interests that were not of particular concern to the United States when considering the effects the technical data would have if exported to other countries. The instability and inaccuracy of 3D printed firearms pose threats to the citizens of the plaintiff States, including both users and bystanders, while the toy-like appearance increases the risk of unintentional discharge, injury, and/or death. Guns that have no identifying information, guns that are undetectable, and guns that thwart the use of standard forensic techniques to link a particular projectile to a particular weapon will hamper law enforcement efforts to prevent and/or investigate crime within the States' respective jurisdictions. And to the extent a State itself utilizes metal detectors in its courthouses, jails, prisons, or public buildings, it will have to expend additional time or money in an effort to maintain security if, as the private defendants advocate, every person owns a plastic gun.

The plaintiff States and the District of Columbia, as sovereigns, represent more than160 million people, many of whom have seen the threat level of their daily lives increase year after year. The District of Columbia, New York, California, Virginia, Maryland, Minnesota, New Jersey, and Pennsylvania have all endured assassinations or assassination attempts. School shootings involving students of all ages have occurred in Colorado, Oregon, Washington, Connecticut, Illinois, California, Virginia, Pennsylvania, North Carolina, Massachusetts, Maryland, Iowa, Hawaii, Minnesota, New York, and New Jersey during the past twenty years. During the same time frame, California, Colorado, Connecticut, Illinois, Minnesota, Hawaii, Massachusetts, Maryland have experienced workplace shootings with multiple victims. And, of course, hijackers were able to crash airplanes into fields and buildings in Pennsylvania, New York, and the District of Columbia/Virginia in 2001. Plaintiffs have a legitimate fear that adding

PRELIMINARY INJUNCTION - 21

WASHSTATEC023617

undetectable and untraceable guns to the arsenal of weaponry already available will likely increase the threat of gun violence they and their people experience.

Defendants do not argue that any of these injuries are reparable. Rather, defendants argue that the injuries are not causally connected to the State Department's decision to overturn its prior CJ determination and remove the CAD files from the USML. The federal defendants assert that, because the AECA regulates the export of defense articles, a change in their regulatory stance cannot be the cause of the domestic effects of which plaintiffs complain. As discussed in the standing analysis, this argument ignores reality and is wholly unpersuasive. The inclusion of the CAD files on the USML prevented the technical data from being posted on the internet. Because there is no "domestic" internet, the ban had the collateral effect of making it more difficult to locate and download instructions for the manufacture of plastic firearms both domestically and internationally. It takes virtually no imagination to perceive the direct connection between removing the CAD files from the USML, the internet publication of the technical data, and the likelihood of the irreparable injuries plaintiffs have identified.

The private defendants, for their part, argue that the causal connection is broken because nine[11] of the CAD files at issue are already on the internet (Defense Distributed posted them again for good measure on July 27, 2018, as soon as the temporary modification and authorizing letter were issued, but took them down when the temporary restraining order was entered). Nevertheless, plaintiffs have shown that they are likely to suffer irreparable harm in the absence of an injunction. First, it is not clear how available the nine files are: the possibility that a

---

[11] In their memorandum and at oral argument, the private defendants state that they published ten CAD files pursuant to the authorizations they received as part of the settlement. The file pertaining to the Ghost Gunner 2 assembly files were not covered by the USML and not subject to ITAR control. Dkt. # 29-1 at 82 and # 63-1 at 8.

PRELIMINARY INJUNCTION - 22

WASHSTATEC023618

cybernaut with a BitTorrent protocol will be able to find a file in the dark or remote recesses of the internet does not make the posting to Defense Distributed's site harmless. Second, there is no information regarding when these files were posted and whether they were posted with the approval of the relevant government agency. Absent such approval, the files remain "technical data" subject to ITAR control because they are not in the "public domain" for purposes of the AECA. 22 C.F.R. § 120.10(b) and § 120.11(a)(7). Third, many of the files have not yet been released, including files created by third parties and any files Defense Distributed will develop in the future. Fourth, the private defendants' dogged pursuit of the right to publish these files - and the evident alarm with which the proposed publication has been met in the Congress, in the White House, amongst advocacy groups, and in state houses all over the country - suggest that further publication is not harmless.

Finally, the federal defendants argue that the States will not be harmed at all because the United States is committed to enforcing the Undetectable Firearms Act of 1988. While the Court appreciates the earnestness with which this commitment was made at oral argument, it is of small comfort to know that, once an undetectable firearm has been used to kill a citizen of Delaware or Rhode Island or Vermont, the federal government will seek to prosecute a weapons charge in federal court while the State pursues a murder conviction in state court. The very purpose for which the private defendants seek to release this technical data is to arm every citizen outside of the government's traditional control mechanisms of licenses, serial numbers, and registration. It is the untraceable and undetectable nature of these small firearms that poses a unique danger. Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons - both domestically and internationally - rings hollow and in no way ameliorates, much less avoids, the harms that are

PRELIMINARY INJUNCTION - 23

WASHSTATEC023619

likely to befall the States if an injunction is not issued.

**D. Balance of Hardships and Public Interest**

Against the likelihood that the States will suffer the various harms discussed above, the federal defendants identify no hardship of their own, but argue that the public interest in allowing the Executive to exercise its discretion in determining how best to promote national security weighs against preliminary injunctive relief. That discretion must, however, be exercised through the procedures established by Congress and not in an arbitrary and capricious manner.

The private defendants raise the more substantive argument that a preliminary injunction will impair their First Amendment rights, a loss which, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976). The First Amendment argument raises a number of challenging issues. Is computer code speech? If yes, is it protected under the First Amendment? To answer those questions, one would have to determine what the nature of the files at issue here is: are they written and designed to interact solely with a computer in the absence of the intercession of the mind or will of the recipient or is it an expressive means for the exchange of information regarding computer programming and/or weapons manufacturing? Are the export controls of the ITAR a prior restraint giving rise to a presumption that they are unconstitutional? Is the AECA a general regulatory statute not intended to control the content of speech but only incidentally limiting its unfettered exercise? Or is the government attempting to regulate distribution of the CAD files because of the message they convey? Depending on which level of scrutiny applies, does the regulation advance important governmental interests unrelated to the suppression of free speech and avoid burdening more speech than necessary or is the regulation narrowly tailored to promote a

PRELIMINARY INJUNCTION - 24

WASHSTATEC023620

compelling Government interest?

The Court declines to wade through these issues based on the limited record before it and instead presumes that the private defendants have a First Amendment right to disseminate the CAD files. That right is currently abridged, but it has not been abrogated. Regulation under the AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within the United States. The Court finds that the irreparable burdens on the private defendants' First Amendment rights are dwarfed by the irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that, overall, the public interest strongly supports maintaining the status quo through the pendency of this litigation.

For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED. The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court.

Dated this 27th day of August, 2018.



Robert S. Lasnik
United States District Judge

PRELIMINARY INJUNCTION - 25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

            Defendants.

NO. C18-1115RSL

ORDER INVALIDATING JULY 27,
2018, TEMPORARY
MODIFICATION AND LETTER

      This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. #170, #173, and #174. Plaintiffs seek a summary determination that the federal defendants violated the Administrative Procedures Act ("APA") when they modified the United States Munitions List ("USML") and issued a letter authorizing the on-line publication of certain computer aided design ("CAD") data files in July 2018. They request that the Court vacate the agency action and permanently enjoin the federal defendants from removing the CAD files at issue from the USML unless and until they comply with the statutory procedural requirements.

## BACKGROUND AND PROCEDURAL HISTORY

      Since at least 2013, the federal government had taken the position that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorizes restrictions on the internet publication of

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 1

WASHSTATEC023622

CAD files that allow users to create guns and their components with a 3D printer. When

defendant Defense Distributed posted CAD files for various weapons on its website at the end of

2012, the Directorate of Defense Trade Controls ("DDTC"), which is part of the Department of

State, notified Defense Distributed that the publication may have been unauthorized and in

violation of the AECA's implementing regulations, the International Traffic in Arms

Regulations ("ITAR"), 22 C.F.R. §§ 120-30. The DDTC explained that making the CAD files

available on the internet constituted a disclosure or transfer of technical data to foreign persons

and was considered an "export" subject to the AECA and ITAR. The government advised

Defense Distributed to remove the files from its website and, if it believed the files were not

properly subject to export control, to utilize the commodity jurisdiction ("CJ") procedure to

obtain an official determination from the DDTC.

       Defense Distributed filed a number of determination requests. When the DDTC failed to

make timely rulings, Defense Distributed filed a lawsuit in the United States District Court for

the Western District of Texas. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP (W.D.

Tex). That litigation pitted Defense Distributed and the Second Amendment Foundation on one

side against the Department of State, the DDTC, and various federal employees on the other.

Defense Distributed challenged the federal government's power to regulate its publication of the

CAD files on the internet, arguing that the regulation subjected its gun-related speech to a

system of prior restraints that was applied in an arbitrary manner in violation of Defense

Distributed's First, Second, and Fifth Amendment rights. A month after the Texas litigation was

filed, the DDTC determined that some, but not all, of the CAD data files Defense Distributed

wanted to publish on the internet were technical data subject to the AECA and ITAR.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 2

Defense Distributed filed a motion for preliminary injunction in the Texas litigation to preclude the federal government from imposing prepublication approval requirements on any of its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. #32 at 19-20 (W.D. Tex.) (internal quotation marks and citations omitted). The then-Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of these articles to enemies of the United

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 3

WASHSTATEC023624

States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. #32-1 at ¶ 35.

The Honorable Robert L. Pitman denied Defense Distributed's motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. #43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's claims in the Texas litigation, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." C15-0372RP, Dkt. #92 at 1 (W.D. Tex). Later that month, the parties reached a

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 4

WASHSTATEC023625

tentative settlement agreement. Pursuant to the settlement, which was not signed until July 29, 2018, the Department of State changed course, abandoning its prior regulatory and litigation positions and allowing the private defendants, Defense Distributed, the Second Amendment Foundation, and Conn Williamson, to publish on the internet CAD files for the automated production of 3D-printed weapons. The federal government specifically agreed, among other things, to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") that would allow the distribution of the CAD files, to announce a temporary modification of the USML to allow immediate distribution while the final rule was in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The federal defendants also acknowledged and agreed that the temporary modification and letter "permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from" the CAD files. The announcement of the temporary modification and the issuance of the letter were to occur on or before July 27, 2018. No findings of fact or other statements are provided in the settlement agreement that address, much less invalidate, the federal government's prior analysis regarding the likely impacts of publication on national security or world peace or that otherwise explain the federal government's change of position.

On May 24, 2018, the Department of State published a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in the litigation. The NPRM proposed an amendment to the ITAR to, *inter alia*, remove certain Category I items (primarily small caliber weapons and their related technical data) from the USML, thereby lifting the requirement to obtain a license for their export. 83 Fed. Reg. 24,198 (May 24, 2018). Although the NPRM did

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 5

not explicitly mention 3D-printed firearms or their related technical data, approximately 12% of the comments received in response to the NPRM did, and all of them opposed lifting the license requirement. The public comment period end on July 9, 2018. The settlement agreement was made public the following day. The temporary modification was published and the letter to the private defendants was issued on July 27, 2018. The temporary modification contains an assertion that the DDTC "has determined that it is in the interest of the security and foreign policy of the United States" to immediately modify Category I of the USML to exclude the technical data at issue in the Texas litigation. Dkt. #171-2 at 2. The public comments opposing exclusion were not considered by the agency when it issued the temporary modification and letter. Dkt. #179-2 at ¶ 7.

Three days after the temporary modification was published, eight states and the District of Columbia filed this lawsuit, alleging that the federal defendants' conduct was *ultra vires* and in violation of the APA and the Tenth Amendment to the United States Constitution.[1] In response to plaintiffs' motion for preliminary injunctive relief, the federal defendants justified the deregulation of the CAD files (along with the delisting of other items within Category I of the USML) by pointing to a Department of Defense determination that the items "do not provide the United States with a critical military or intelligence advantage" and "are already commonly available and not inherently for military end-use." Dkt. #64-1 at 10. After an expedited hearing, the Court found that plaintiffs had shown a likelihood of success on the merits of their APA claim insofar as the temporary modification resulted in the removal of one or more items from

---

[1] An amended complaint, adding eleven more States/Commonwealths as plaintiffs, was filed on August 2, 2018. Dkt. # 29.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 6

WASHSTATEC023627

the USML, that plaintiffs had shown a likelihood of irreparable injury if an injunction did not

issue because Defense Distributed had announced its intent to make the CAD files downloadable

from its website on August 1, 2018,[2] and that the balance of hardships and the public interest

tipped sharply in plaintiffs' favor. The federal defendants were enjoined from implementing or

enforcing the temporary modification of the USML and/or the July 27th letter and were required

to preserve the status quo *ex ante* as if the modification had not occurred and the letter had not

been issued. Dkt. #23 and #95.

In the context of the States' challenge to the issuance of the temporary modification and

letter, the federal defendants produced and supplemented the administrative record on which the

decision to issue the temporary modification and letter was based.[3] Plaintiffs now seek an order

invalidating the temporary modification and letter under the APA and permanently enjoining the

federal defendants from removing the computer files at issue from the USML unless and until

they comply with the governing procedural requirements. The federal and private defendants

oppose plaintiffs' motion and request judgment in their favor.

## DISCUSSION

### A. Jurisdiction

Both the federal and private defendants challenge the Court's jurisdiction over this

matter. The federal defendants argue that the States cannot meet prudential standing

---

[2] The private defendants now assert that they published the subject CAD files to the internet immediately upon receipt of the letter and the issuance of the temporary modification. Dkt. #174-1 at 5-6. The publication does not change the following analysis.

[3] Plaintiffs do not concede that the record, as supplemented, is complete or that defendants' various claims of privilege are proper.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 7

WASHSTATEC023628

requirements. The private defendants argue that the issuance of the temporary modification and letter are "committed to agency discretion by law" and not subject to judicial review under 5 U.S.C. § 701(a)(2) and 22 U.S.C. § 2278(h), that listing on the USML is a political question over which the Court lacks subject matter jurisdiction, and that the claims are barred by the Tucker Act.[4]

## 1. Zone of Interests

The question of standing involves both constitutional limitations imposed by Article III of the U.S. Constitution and prudential limitations imposed by the judiciary to limit the exercise of federal jurisdiction. See Warth v. Seldin, 422 U.S. 490, 498 (1975); Allen v. Wright, 468 U.S. 737, 751 (1984). To present a justiciable case or controversy under Article III, plaintiffs must demonstrate an "injury in fact" that is "fairly traceable" to the actions of the defendants and that will likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The prudential limitations are "founded in concern about the proper - and properly limited - role of the courts in a democratic society." Warth, 422 U.S. at 498. The prudential requirement at issue here is that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision on which the claim is based. See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).

The zone-of-interests test is a standing requirement of general applicability, but "the zone of interests of a statute for purposes of obtaining judicial review of administrative action under

---

[4] Defendants also incorporate by reference arguments made in the preliminary injunction context regarding Article III standing and this lawsuit being an impermissible collateral attack on the outcome of the litigation in the Western District of Texas. Those arguments are again rejected. See Dkt. #95 at 9-12.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 8

the generous review provisions of the APA" is fairly expansive. <u>Bennett v. Spear</u>, 520 U.S. 154, 163 (1997) (internal quotation marks and citations omitted). The test "is not meant to be especially demanding" in the APA context, and the Supreme Court applies "the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012) (internal quotation marks and citations omitted). Plaintiffs need not establish a congressional purpose to benefit them through passage of the underlying statute, they need simply have interests that relate to and are not inconsistent with the purposes implicit in the statute. <u>Id.</u> The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." <u>Id.</u>

The AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States." <u>U.S. v. Chi Mak</u>, 683 F.3d 1126, 1134 (9th Cir. 2012) (quoting 22 U.S.C. § 2778(a)(1)). In keeping with the goals of the statute, the federal government has, in the past, justified subjecting the CAD files at issue to ITAR's export licensing scheme based on their characteristics and functionality, which make them especially dangerous to U.S. national security and foreign policy interests. The agency properly focused its analysis on the factors specified in the AECA and deemed it important to keep plastic, undetectable firearms out of foreign hands where they were not subject to U.S. laws and controls. The agency's focus on exports, national security, and world peace does not, however, mean that the States' domestic interests are unrelated or marginally related to the AECA's purposes. The State Department found that the firearms generated by the subject CAD files "can be easily modified to be

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 9

virtually undetectable in metal detectors and other security equipment," could be used in assassinations or terrorist activities "specifically directed at U.S. persons," and could lead to violent regional conflicts that implicate the security of the United States. <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. #32 at 19-20 (W.D. Tex). Given that the CAD files and the resulting weapons can be transported, undetected, virtually anywhere in the world, these same impacts would likely arise within the United States even if the plastic weapons are manufactured abroad. The States' interests in curbing violence, assassinations, terrorist threats, aviation and other security breaches, and violations of gun control laws within their borders are at least marginally related to the interests protected or regulated by the AECA. The state and federal interests, while not identical, are aligned and not in any way inconsistent. Because the States' grievance arguably falls within the zone of interests protected or regulated by the AECA, there is no judicially-imposed limit on the Court's exercise of jurisdiction in this matter.

## 2. Agency Discretion and Judicial Review

The private defendants argue that this Court lacks jurisdiction over plaintiffs' APA claims because the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The AECA expressly commits one type of decision to agency discretion, namely the decision to designate an item as a defense article or defense service. 22 U.S.C. § 2778(h). The decision at issue here, however, is the removal of an item from the USML. Plaintiffs are challenging the federal defendants' failure to comply with statutory procedures and/or to consider certain congressionally-specified factors when making removal decisions under AECA. Congress did not expressly make such removal decisions unreviewable.

Even absent a statutory bar to judicial review, certain agency decisions have traditionally

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 10

been considered wholly discretionary and beyond review. To be sure, the AECA confers broad

discretion on the President when determining whether to add or remove items from the USML,

but that discretion is not unbounded: Congress has imposed both procedural and substantive

benchmarks to guide the agency's action. In order to honor the "basic presumption of judicial

review" embodied in the APA and to "give effect to the command that courts set aside agency

action that is an abuse of discretion," the Supreme Court has "read the § 701(a)(2) exception for

action committed to agency discretion quite narrowly, restricting it to those rare circumstances

where the relevant statute is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion" and has "generally limited the exception to

certain categories of administrative decisions that courts traditionally have regarded as

committed to agency discretion, . . . such as a decision not to institute enforcement proceedings .

. . or a decision by an intelligence agency to terminate an employee in the interest of national

security . . . ." Dep't of Commerce v. N.Y., __ U.S. __, 139 S. Ct. 2551, 2567-68 (2019)

(internal quotation marks and citations omitted).

The procedural and substantive requirements at issue in this case are clearly stated, and

whether the agency complied with those requirements can be judicially evaluated without fear of

treading on any matter that implicates agency expertise, involves a complicated balancing of

factors, or has been traditionally regarded as beyond judicial review. The Court finds that the

process through which defendants removed items from the USML in July 2018, defendants'

compliance with the standards furnished by the AECA, and the adequacy of the agency's

analysis of and explanation for its decision are subject to judicial review under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 11

### 3. Political Question

The private defendants also argue that the regulation or deregulation of defense articles or services under the AECA is a political question that is nonjusticiable under the separation of powers doctrine. This argument fails for much the same reasons as the agency discretion and judicial review arguments. While the decision to include an item on the USML or to grant or deny an export license for a listed item is statutorily excluded from judicial review and/or requires an exercise of discretion within the agency's expertise, whether the agency complied with clear procedural requirements and considered factors Congress deemed relevant when removing an item from the USML is neither a political question nor one committed to the agency's discretion as a matter of statute or case law.

### 4. Tucker Act

Finally, the private defendants assert that the Court of Federal Claims has exclusive jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Plaintiffs seek to invalidate agency action under the APA because it violates the procedural requirements of the AECA and/or is arbitrary and capricious. These claims are statutory and, as plaintiffs point out, the Tucker Act has no application in this context. Dkt. #186 at 22. The private defendants abandoned this argument in reply.

## B. Administrative Procedures Act Claims

The APA authorizes judicial review of final agency action and provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 12

excess of statutory jurisdiction, authority, or limitations; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue that the federal government's efforts to immediately remove items from the USML through issuance of a temporary modification and letter were not in accordance with law and were without observance of procedure required by law insofar as the State Department failed to give thirty days' notice to the Congressional foreign relations committees specified in 22 U.S.C. § 2778(f)(1). Plaintiffs also seek to invalidate the decision to allow the CAD files to be published on the internet on the ground that the temporary modification violates the limitations on federal power imposed by the Tenth Amendment. Finally, plaintiffs argue that the agency action was arbitrary and capricious because the agency failed to consider the factors identified by Congress and because the delisting is not supported by substantial evidence in the administrative record.

### 1. Congressional Notice

The AECA requires that the President or his designee periodically review the items on the USML to ensure that export controls are warranted. 22 U.S.C. § 2778(f)(1). The results of the review must be reported to Congress, and the Department "may not remove any item from the Munitions List until 30 days after the date on which [it] has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate . . . ." Id. The federal defendants argue that the Congressional notice requirement does not apply because the CAD files at issue here are not specifically enumerated on the USML and are therefore not "items" for purposes of § 2778(f)(1). This argument was rejected at the preliminary injunction stage, and the Court sees no reason to reconsider its decision.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 13

WASHSTATEC023634

The President has the power to designate "defense articles and defense services" and to control their import and export "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The articles and services (*i.e.*, items) so designated constitute the USML. Id. See also 22 C.F.R. § 121.1(a) (describing the organization of the USML and noting each USML category is composed of related defense articles). Category I of the USML includes all firearms up to .50 caliber (22 C.F.R. § 121.1(I)(a) and (b)) and all technical data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms (22 C.F.R. § 120.10(a)). Through the CJ process, the Department of State specifically determined that the subject CAD files are subject to the export controls of ITAR.

The Department of State argues that its decision to immediately allow the unlicensed export of previously-regulated items does not trigger the Congressional notice requirement because the temporary modification did not deregulate a whole group or category of defense articles described in the USML, such as "nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," 22 C.F.R. § 121.1(I)(a). This argument conflates "category" with "item." As described in the statute, the USML is a list of items designated by the President as "defense articles and defense services." 22 U.S.C. § 2778(a)(1). Rather than generate an exhaustive list of every individual article or service that is subject to export control under the AECA, the Department of State opted to populate the USML with generally descriptive categories. Those categories describe actual items, however, and it is those items that are the "defense articles and defense services" subject to export control under the AECA. 22 C.F.R. § 121.1.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 14

The congressional review and notice requirements specifically apply to items, not categories of items. 22 U.S.C. § 2778(f). The Department's CJ regulation further confirms that it is the removal of a particular article or service - an item rather than a category - that triggers the review and notice requirements. The Department describes the CJ procedure as a means of resolving doubts "as to whether an article or service is covered by the U.S. Munitions List" and to seek "redesignation of an article or service currently covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Immediately after the reference to redesignation, the regulations reiterate that the "Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List." Id. Given the language, structure, and purpose of the statute and implementing regulations, the Court finds that the attempt to revoke the listing of an item previously covered by the USML through the issuance of a "temporary modification," thereby lifting all export controls under the AECA and ITAR, triggers the congressional notice requirement of the statute.

It is undisputed that Congress was not notified prior to the removal of the subject CAD files from the USML. This procedural failure cannot be rectified by providing Congressional notice thirty days in advance of making the "temporary" removal "final:" the temporary modification implemented the removal immediately, without waiting for the proposed rule to become final and without giving Congress notice and an opportunity to exercise its oversight role. Because the removal to which the States object occurred as of July 27, 2018, a subsequent notice is obviously not timely under the statute.[5]

---

[5] To the extent the federal defendants are relying on 22 C.F.R. § 126.2 as authority for the temporary modification (see Dkt. #173 at 6), its use of that procedure to immediately redesignate an item that was previously covered by the USML without Congressional notice violates the governing

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 15

WASHSTATEC023636

The Court finds that the temporary modification of the USML to allow immediate publication of the previously-regulated CAD files constitutes the removal of one or more items from the USML without the required Congressional notice. Because the agency action was "without observance of procedure required by law," it must be held unlawful and set aside under § 706 of the APA.

### 2. Tenth Amendment Claim

As part of the settlement agreement in the Texas litigation, the federal defendants agreed that the temporary modification that would be issued on or before July 27, 2018, would permit "any United States person" including the private defendants' customers and members, "to access, discuss, use, reproduce, or otherwise benefit from the technical data" contained in the CAD files at issue. Dkt. #171-2 at 6. Plaintiffs argue that this provision exceeds the limits imposed on the federal government by the Tenth Amendment in that it conflicts with, and presumably abrogates, state laws restricting certain persons from possessing, manufacturing, owning, and/or using firearms in general or 3D-printed firearms in particular. Plaintiffs therefore argue that the temporary modification must be invalidated as "otherwise not in accordance with law" under the APA.

Both the federal and private defendants have, at various times during this litigation, disavowed any intent to alter or in any way impact existing prohibitions or limitations on the possession of firearms, and the federal defendants recognize the continuing viability of state law gun control measures. Plaintiffs find no comfort in these statements "given the plain language of

---

statute. "It is beyond dispute that a federal regulation cannot empower the Government to do what a federal statute prohibits it from doing." <u>Tuan Thai v. Ashcroft</u>, 366 F.3d 790, 798 (9th Cir. 2004).

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 16

the operative Temporary Modification and Letter." Dkt. #186 at 14. A review of the notice of temporary modification and letter shows, however, that neither communication expressly permits "any United States person" to "use" the CAD files or 3D-printed firearms. Nor do they contain a reference incorporating the settlement agreement or the promises set forth therein. Without assistance from the parties, the Court declines to determine whether a contractual provision regarding the intended meaning of a promised, future statement would have any effect on state law or be otherwise enforceable when the statement, when finally issued, contains no language regarding the subject matter.

### 4. Arbitrary and Capricious

Plaintiffs allege that the federal defendants' decision to allow Defense Distributed to upload to the internet CAD files containing 3D printing instructions for the manufacture of undetectable weapons was arbitrary and capricious because the State Department failed to consider the factors set forth in the AECA, failed to offer an explanation supported by substantial evidence in the administrative record, and/or has asserted justifications that are pretextual. In determining whether agency action was arbitrary and capricious, the Court's scope of review is "narrow" and focused on determining whether the agency "examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." Dep't of Commerce, 139 S. Ct. at 2569 (citing Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In order for the Court to be able to determine whether the agency has acted within the bounds imposed by the governing statute, the agency is required to disclose the basis for its action, making the findings necessary to support the decision, and

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 17

produce an administrative record that substantially supports those findings. <u>Burlington Truck Lines, Inc. v. U.S.</u>, 371 U.S. 156, 168 (1962).

The federal defendants, citing 22 C.F.R. § 120.3(b), argue that only items that "provide[] a critical military or intelligence advantage" belong on the USML and that a multi-year, inter-agency review process led to the determination that firearms up to .50 caliber do not satisfy that standard. There are a number of problems with this argument. First, the regulation cited states that articles or services that provide "a critical military or intelligence advantage" "shall be" included on the USML. Items that fit that description must be on the USML, but they are not the only items that can be included. Thus, an agency determination that small-caliber firearms do not provide critical military or intelligence advantages does not explain why those previously-controlled items were removed from the list.

Second, Congress granted the President and his designees the discretion to remove an item from the USML in light of certain considerations and factors. Congress directed the agency to consider how the proliferation of weaponry and related technical data would impact world peace, national security, and foreign policy. The State Department essentially concedes that, despite the specified statutory considerations, it evaluated the export controls on small caliber firearms only through the prism of whether restricting foreign access would provide the United States with a military or intelligence advantage. Because the delisting was not "based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," it must be invalidated under the APA. <u>Motor Vehicle Mfrs.</u>, 463 U.S. at 42.

Third, given the agency's prior position regarding the need to regulate 3D-printed

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 18

firearms and the CAD files used to manufacture them, it must do more than simply announce a contrary position.

> [T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. . . . [T]he agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . [But s]ometimes it must - when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy . . . . It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009) (emphasis in original). Until April 2018, the federal government regulated technical data related to the design and production of weapons using a 3D printer because the data and weapons posed a threat to world peace and the security and foreign policy of the United States. Some of its concerns related specifically to the undetectable nature of a gun made from plastic: because they could slip through conventional security equipment, the State Department feared that they could be used in assassination attempts, hijackings, piracy, and terrorist activities. Other concerns related to the portability and ease of a manufacturing process that would allow terrorist groups and embargoed nations to evade sanctions, repair weapons, restock arms supplies, and fuel violent regional conflicts. Both aspects of the technical data at issue would, the State Department feared, subvert the domestic laws of nations with restrictive firearm controls, impairing the United States' foreign relations with those nations. Overall, the Department of State concluded that the worldwide publication of computerized instructions for the manufacture of undetectable firearms was a threat to world peace and the national security interests of the United States and would

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 19

WASHSTATEC023640

cause serious and long-lasting harm to its foreign policy. Against these findings, the federal

defendants offer nothing: no analysis of the potential impacts of removing the CAD files for 3D-

printed firearms from the USML, no response to the public comments raising concerns about

such a removal, no acknowledgment in the NPRMs of its change in position with regards to the

CAD files, and no justification in the temporary modification, the letter, or the administrative

record for the change.[6]

　　　The federal defendants argue that the agency appropriately evaluated whether import and

export restrictions on small caliber firearms were warranted and that the results of the multi-year

inter-agency review apply to 3D-printed guns and the technical data related to them. The only

parts of the administrative record cited in support of this argument are the NPRMs issued by the

Departments of State and Commerce regarding the delisting of certain items in Category I of the

USML. A review of those documents shows that:

　　　● the goal of the proposed revisions is to limit Category I to only those items "that
　　　provide the United States with a critical military or intelligence advantage or, in

---

[6] The private defendants point to a PowerPoint presentation made at an Additive Manufacturing Symposium in February 2014 and a law review article written by their former counsel that same year as support for the agency's 2018 decision to remove the subject CAD files from the USML. The law review article merely raises constitutional arguments against the regulation of 3D-printed guns and is seemingly unrelated to any justification the agency has offered for its action. The symposium presentation includes two slides related to 3D-printed guns, one displaying a picture of a 3D-printed gun (courtesy of Cody Wilson) and another including text stating that export controls offer no benefit to U.S. manufacturing or national security. Dkt. #116-1 at 32. There is no indication that the agency actually relied on this document when issuing the temporary modification in 2018: in fact, it tacitly concedes that it did not because the multi-year review upon which the decision was apparently based focused on small caliber firearms generally, not 3D-printed guns specifically. Just as importantly, the slides do not reflect consideration of the factors Congress intended the agency to consider or constitute a "reasoned explanation" for disregarding the agency's prior findings regarding the impact of 3D-printed weapons on world peace, national security, and foreign policy. Fox Television Stations, 556 U.S. at 516.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 20

WASHSTATEC023641

the case of weapons, are inherently for military end use" (83 Fed. Reg. 24,198);[7]

● the revised Category I will no longer cover small-caliber non-automatic and semi-automatic firearms (Id.);

● the revised Category I will no longer cover "commercial items widely available in retail outlets and less sensitive military items" (83 Fed. Reg. 24,166);

● the proposed changes are based on an inter-agency review (Id.).

These statements are merely descriptions of the changes proposed and the process used, not an analysis of or justification for the changes. The Department of Commerce goes on to say that it believes that, unless an item provides a critical military or intelligence advantage to the United States or is generally unavailable at retail outlets for civil and recreational activities, the burdens of subjecting U.S. manufacturers to the obligations of the ITAR are not warranted by any proportionate benefits to national security or foreign policy objectives. 83 Fed. Reg. 24,167.

Whatever the merits of this analysis with regards to the rim fire rifles, pistols, and other popular shooting implements specifically mentioned in the NPRMs, it does not provide a "reasoned explanation" for the action with regards to the CAD files and 3D-printed weapons at issue here. Less than two months before the NPRMs were published, the State Department had taken the position that 3D-printed weapons posed unique threats to world peace, national

---

[7] The descriptions of what will be covered by the revised Category I vary in the NPRMs. The Department of State asserts that the revised Category I will cover "only defense articles that are inherently military or that are not otherwise widely available for commercial sale." 83 Fed. Reg. 24, 198. The Department of Commerce describes Category I items under the amended USML as those which are "inherently military and otherwise warrant control on the USML" or "possess parameters or characteristics that provide a critical military or intelligence advantage to the United States[] and are almost exclusively available from the United States." 83 Fed. Reg. 24,166.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 21

WASHSTATEC023642

security, and the foreign policy of the United States: the agency's specific concerns regarding the proliferation of these weapons are well-documented in the administrative record. The NPRMs neither display an awareness that the agency is changing its position with regards to the data files, nor provide a reasoned explanation for a new policy that necessarily "rests upon factual findings that contradict those which underlay its prior policy." Fox Television Stations, 556 U.S. at 515-16. The agency has simply abandoned, without acknowledgment or analysis, its previous position and has sub silentio found that the delisting is consistent with world peace, national security, and U.S. foreign policy despite explicit, recent findings to the contrary. See Motor Vehicles Mfrs. Ass'n, 463 U.S. at 46-51 (acknowledging that an agency need not consider and reject all policy alternatives when reaching a decision, but noting that where an alternative is within the ambit of the existing standard or policy, "it may not be abandoned without any consideration whatsoever").[8] Because it is arbitrary and capricious to ignore the contradiction in these circumstances, the agency action must be invalidated.

The Court finds that the agency action is arbitrary and capricious in two, independent respects. First, the agency failed to consider aspects of the problem which Congress deemed important before issuing the temporary modification and letter on July 27, 2018. Second, the agency failed to identify substantial evidence in the administrative record explaining a change of position that necessarily contradicts its prior determinations and findings regarding the threats posed by the subject CAD files and the need to regulate the same under the AECA. Because the agency action was arbitrary and capricious, it is unlawful and must be set aside under § 706 of

_____

[8] In addition, there are no findings (and no evidence in the administrative record) that the CAD files at issue here were widely available before the agency abruptly deregulated them on July 27, 2018.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 22

the APA.[9]

## C. The Private Defendants' Other Arguments

### 1. Motion to Dismiss

The private defendants incorporate by reference a motion to dismiss that was denied almost a year ago. Having offered no reason to reconsider the prior ruling and no explanation for the delay in seeking reconsideration, the motion is denied.

### 2. Personal Jurisdiction

Defense Distributed argues that the Court lacks jurisdiction over its person. Such a defense can be, and has been, waived. Although Defense Distributed asserted a personal jurisdiction defense in its answer, it omitted it from the motion to dismiss it filed on October 11, 2018, and has therefore waived the defense under Fed. R. Civ. P. 12(h)(1)(A).

### 3. First Amendment Justification for Agency Action

The private defendants argue that the CAD files are protected speech under the First Amendment and assert that the files were removed from the USML in order to avoid constitutional problems. The agency, however, has not relied on the First Amendment as justification for its action, and neither the Court nor the private defendants may supply a basis for the decision that the agency itself did not rely upon. Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 683-84 (2007).

### 4. First Amendment Violation

The private defendants again assert that restrictions on their ability to publish the files

---

[9] Because the agency action must be invalidated on other grounds, the Court has not considered whether the agency's justifications were pretextual or whether such a finding would warrant invalidation under the APA.

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 23

constitute a prior restraint that is presumed to be unconstitutional and that the regulations should be subjected to strict scrutiny. Whether or not the First Amendment precludes the federal government from regulating the publication of technical data under the authority granted by the AECA is not relevant to the merits of the APA claims plaintiffs assert in this litigation. Plaintiffs allege that the federal defendants failed to follow prescribed procedures and acted in an arbitrary and capricious manner when they issued the temporary modification and letter authorizing the immediate publication of the CAD files. The State Department has not attempted to justify its action as compelled by the First Amendment, nor have the private defendants shown that their First Amendment interests are a defense to plaintiffs' claims or a talisman that excuses the federal defendants' failures under the APA.

**D. Remedy**

The presumptive remedy for unlawful agency action is vacatur and remand. All. for the Wild Rockies v. United States Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018). Plaintiffs also seek an injunction preventing the federal defendants from again issuing a temporary modification purporting to deregulate the subject CAD files with no warning. Plaintiffs have not shown that the harm they fear is likely to occur, however. There is no indication that the federal defendants are poised to immediately modify the USML as soon as their previous efforts are invalidated or are otherwise inclined to ignore the procedural and substantive requirements of the AECA discussed in this order. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 24

WASHSTATEC023645

**CONCLUSION**

For all of the foregoing reasons, plaintiffs' motion for summary judgment (Dkt. #170) is GRANTED in part and DENIED in part. The July 27, 2018, "Temporary Modification of Category I of the United States Munitions List" and letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation were unlawful and are hereby VACATED. Defendants' motions for summary judgment (Dkt. #173 and #174) are DENIED.

Dated this 12th day of November, 2019.

Robert S. Lasnik
United States District Judge

ORDER INVALIDATING TEMPORARY
MODIFICATION AND LETTER - 25



The Honorable Robert S. Lasnik

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

STATE OF WASHINGTON; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MINNESOTA; STATE OF NEW JERSEY;
STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OREGON;
COMMONWEALTH OF PENNSYLVANIA;
STATE OF RHODE ISLAND; STATE OF
VERMONT and COMMONWEALTH OF
VIRGINIA,

              Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

              Defendants.

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
APRIL 19, 2019**[1]

---

[1] The briefing schedule for this motion is set by the Case Management Order (Dkt. # 115).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023647

***TABLE OF CONTENTS***

I.    INTRODUCTION AND RELIEF REQUESTED ........................................ 1

II.   STATEMENT OF UNDISPUTED FACTS ............................................ 2

      A.   AECA and ITAR Govern Export Control of Weapons and Related Technical
           Data .................................................................. 2

      B.   The Subject Files Can Produce Functional Weapons Using a 3D Printer .... 2

      C.   The State Department Defends Its Regulation of the Subject Files, Defeating
           Defense Distributed at Every Stage of the Litigation ................. 3

      D.   Reversing Its Position, the State Department Settles with Defense Distributed
           by Agreeing to Remove the Subject Files from the U.S. Munitions List . 5

      E.   This Court Preliminarily Enjoins the Temporary Modification and Letter . 7

      F.   The State Department Offers Shifting, Unsupported Rationales for Its Actions. 7

      G.   Final Rules Are Forthcoming, According to the Federal Defendants ...... 8

III.  ARGUMENT ............................................................... 9

      A.   Legal Standard ....................................................... 9

      B.   The State Department Failed to Provide the Required 30 Days' Notice to
           Congress and Exceeded Its Regulatory Authority ...................... 10

      C.   The State Department's Actions Were Arbitrary and Capricious ......... 12

           1.   The administrative record fails to explain or support the agency's
                asserted rationales for abruptly reversing its position. ....... 12

           2.   The agency failed to consider the specific properties of 3D-printed guns
                and disregarded the unique threats they pose. ................. 15

           3.   The agency's stated rationales are pretextual as applied to 3D-printable
                firearm files. ................................................. 18

      D.   The Court Should Vacate the State Department's Actions and Enjoin It from
           Further Attempts to Unlawfully Deregulate the Files ................. 20

IV.   CONCLUSION ............................................................ 24

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023648

## I.     INTRODUCTION AND RELIEF REQUESTED

This lawsuit challenges the State Department's "temporary" deregulation of 3D-printable computer files for the automatic production of undetectable, untraceable plastic firearms. The subject files include specific files that Defense Distributed plans to release on the internet if they are exempted from federal export control, as well as files that may be created in the future and other unknown, unreviewed files. If the files are allowed to be published online, they will be permanently available to virtually anyone inside or outside the United States—including terrorists, assassins, violent criminals, mentally ill persons, and unsupervised children.

The State Department, which has regulated the subject files for years by including them on the U.S. Munitions List pursuant to the Arms Export Control Act (AECA), abruptly attempted to deregulate the files via a "Temporary Modification of Category I" of the Munitions List ("Temporary Modification") and a letter to Defense Distributed ("Letter"). It did so pursuant to a private settlement agreement, without following statutorily mandated procedures or providing any public notice, as a *fait accompli* before promulgating any final rule (or even considering public comments on a proposed rule). It also did so without considering the unique properties of 3D-printable firearms or the national and domestic security implications of permitting their "unlimited" release. The State Department's actions were unlawful, *ultra vires*, arbitrary and capricious, and unconstitutional, as established by the administrative record and other undisputed evidence. Its reckless and covert deregulation evaded Congress's "particularly rigorous oversight of the Munitions List" and public scrutiny as to an issue of national significance.

The Plaintiff States ask the Court to enter summary judgment in their favor, vacate the Temporary Modification and Letter, and permanently enjoin the Federal Defendants from removing the subject files from the Munitions List without following AECA's procedural requirements. The only potentially lawful way to remove the files is to comply with all mandatory procedures. In fact, the Federal Defendants say a compliant final rule is forthcoming, implicitly conceding the point even as they continue to defend the indefensible.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023649

## II.     STATEMENT OF UNDISPUTED FACTS

The filed administrative record is consistent with the undisputed facts alleged and established by the States at earlier stages of this litigation, as set forth below.

### A.     AECA and ITAR Govern Export Control of Weapons and Related Technical Data

The Arms Export Control Act (AECA) authorizes the President of the United States "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Items he designates as "defense articles and defense services" constitute the U.S. Munitions List. *Id.* The President delegated his authority to designate Munitions List items to the State Department, *see* Executive Order 13637 § 1(n)(i), and the Department promulgated the International Traffic in Arms Regulations (ITAR), which are administered by its Directorate of Defense Trade Controls.[2] 22 C.F.R. §§ 120–130; *see* Dkt. # 64 (Fed. Defs' Opp. to PI) at 2.

Category I of the Munitions List includes all firearms up to .50 caliber and related "technical data," 22 C.F.R. § 121.1(I)(a), i.e., data "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" such firearms, *id.* § 120.10(a). In cases where it is unclear whether a particular item is a defense article subject to ITAR, the Department makes an individualized "commodity jurisdiction" (CJ) determination using a procedure set forth in the ITAR. *See id.* § 120.4; Dkt. # 64 at 3.[3]

### B.     The Subject Files Can Produce Functional Weapons Using a 3D Printer

The files at issue in this case are Defense Distributed's 3D-printable Computer Aided Design (CAD) files that can be used to produce the "Liberator" pistol and other defense articles, plus other unidentified files that Defense Distributed "has and will continue to create and

---

[2] The Department, the Directorate, Michael R. Pompeo, Mike Miller, and Sarah Heidema are collectively referred to as the "State Department" or the "Federal Defendants."

[3] *See also* Declaration of Kristin Beneski, Ex. A (Aguirre Declaration), ¶¶ 19–20 (describing the CJ determination procedure).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023650

possess" in the future and any "similar files generated by its members and others."[4] A functional Liberator pistol can be made almost entirely of plastic using the CAD files and a commonly available 3D printer, with "considerably less know-how" than is needed to manufacture a firearm using "conventional technical data."[5] As then-Director of the Office of Defense Trade Controls Management Lisa V. Aguirre stated in a 2015 declaration, the "'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States" because it "is a plastic firearm which can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures such as metal detectors."[6] In addition to being undetectable, privately manufactured 3D-printed weapons can be untraceable by law enforcement because they lack serial numbers.[7]

From 2013 to April 2018, the Department considered the Liberator files and other 3D-printable firearm files to be "ITAR-controlled technical data" that cannot be exported (including by posting on the borderless internet) without prior authorization.[8] In 2015, the Directorate conducted an individualized CJ review of Defense Distributed's files and confirmed that they are "technical data under Category I(i) of the [Munitions List]" and subject to ITAR regulation.[9]

## C. The State Department Defends Its Regulation of the Subject Files, Defeating Defense Distributed at Every Stage of the Litigation

In May 2015, Defense Distributed sued the State Department in a Texas federal district court, seeking to enjoin it from regulating the files. *Def. Distributed v. U.S. Dep't of State*, Case

---

[4] Ex. L (*Def. Distributed*: Second Amended Complaint), ¶¶ 25, 36, 40, 44–45 (referenced in Ex. B (Temporary Modification) and Ex. C (Settlement Agreement), ¶ 12).

[5] Ex. A (Aguirre Declaration), ¶ 29(b).

[6] *Id.* ¶ 35; *see also id.* n.9 (the Liberator's detectable metal component "can be removed without rendering it inoperable"); Ex. D (*Def. Distributed*: Opp. to Mot. for PI) at 10 n.6 ("the Liberator remains operable without the inserted metal"); Ex. E (*Def. Distributed*: Mot. to Dismiss) at 1 (Defense Distributed's CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms . . ."); Dkt. # 112 (Answer), ¶ 39 (admitting that "the Liberator is a plastic firearm" that is undetectable by walk-through metal detectors when it does not contain a removable piece of steel); *infra* at 22–23 & n.57.

[7] *See* Dkt. # 43-2 at 29–39 (McCord Decl.), ¶¶ 29–30, 33; *id.* at 40–44 (Kyes Decl.), ¶ 8; *id.* at 4–18 (Graham Decl.), ¶ 35.

[8] Ex. A, Ex. 2 (CJ letter dated 5/8/13); *see* Ex. E (filed 4/6/18).

[9] Exs. F, G (CJ determinations).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023651

No. 15-cv-372-RP (W.D. Tex.). In opposing Defense Distributed's motion for a preliminary injunction, the State Department argued that its regulation of the files was proper (and furthermore, vital) because, *inter alia*:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" that "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."[10]

In a supporting declaration, then-Director Aguirre explained that the unrestricted export of Defense Distributed's CAD files would result in the production of fully operable and undetectable plastic firearms, that their use to commit terrorism, piracy, assassinations, or other crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that their export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer.[11]

The district court denied Defense Distributed's motion for a preliminary injunction, noting that the company's avowed purpose is to facilitate "*global* access to, and the collaborative

---

[10] Ex. D at 10–11.
[11] Ex. A, ¶ 35.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023652

production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through AECA.[12] The Fifth Circuit affirmed, citing both the national security implications of the CAD files and the permanent nature of the internet, and found the State Department had "asserted a very strong public interest in national defense and national security."[13]

On April 6, 2018, the State Department moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability."[14] According to the State Department, the CAD files "unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad" and the Department "has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted."[15]

**D.    Reversing Its Position, the State Department Settles with Defense Distributed by Agreeing to Remove the Subject Files from the U.S. Munitions List**

By April 30, 2018, the State Department had "reached a tentative settlement agreement" with Defense Distributed,[16] which was ultimately approved by Department officials.[17] Pursuant to the Settlement Agreement, the State Department changed course, abandoning its prior regulatory and litigation positions and permitting Defense Distributed to post the subject files on

---

[12] Ex. H (*Def. Distributed*: Order denying PI) at 8–9.
[13] Ex. I (*Def. Distributed*: 5th Cir Opinion) at 10, 12–13.
[14] Ex. E at 1.
[15] *Id.* at 1, 3, 7.
[16] Ex. M (*Def. Distributed*: Mot. to Stay) (filed 4/30/18).
[17] Ex. N (*Def. Distributed*: Joint Settlement Status Rpt.) (filed 6/28/18).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023653

the internet and distribute them to "any United States person." Specifically, the Department

agreed to: (a) "draft and . . . fully pursue" a notice of proposed rulemaking (NPRM) and final

rule revising Munitions List Category I to exclude the "technical data that is the subject of the

Action"; (b) announce a "temporary modification" of Category I to exclude the data while the

final rule is "in development"; (c) issue a letter to Defense Distributed advising that its files are

"approved for public release (i.e., unlimited distribution)" and exempt from ITAR; and (d)

acknowledge and agree that the Temporary Modification "permits any United States person" to

"access, discuss, use, reproduce, or otherwise benefit from" the data, and that the Letter "permits

any such person to access, discuss, use, reproduce or otherwise benefit from" Defense

Distributed's files.[18] The Settlement Agreement contains no findings of fact or other information

that could explain the Department's change of position or invalidate its prior analysis as to the

security implications of "unlimited distribution" of the files.[19]

The State Department fulfilled each of these terms. On May 24, 2018, it published the

promised NPRM in the Federal Register, with a public comment period ending on July 9. 83 Fed.

Reg. 24,198. The NPRM does not specifically mention 3D-printed guns. *See id.* The Settlement

Agreement was signed on June 29, in the midst of the comment period, but was not made public

until July, when the comment period ended.[20] On July 27, the Department issued the Temporary

Modification and the Letter. The Temporary Modification states that the Department "has

determined that it is in the interest of the security and foreign policy of the United States to

temporarily modify United States Munitions List (USML) Category I to exclude" the subject

files. The "temporary" removal of these files was to "remain in effect while the final rule

referenced in paragraph 1(a) of the Settlement Agreement is in development."[21] The Letter states

---

[18] Ex. C, ¶ 1(a)–(d).

[19] *See generally* Ex. C. The Settlement Agreement expressly states that it does not "reflect any agreed-upon purpose other than the desire of the Parties to reach a full and fair conclusion of the Action, and to resolve the Action without the time and expense of further litigation." *Id.* ¶ 5.

[20] Dkt. # 95 (Preliminary Injunction) at 7; Dkt. # 112 (Answer), ¶ 53 (admitting the Settlement Agreement was "made public in July 2018").

[21] Ex. B.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023654

that the Department "approve[s]" Defense Distributed's files "for public release (i.e., unlimited distribution)," but offers no rationale for this.[22] Those actions prompted this lawsuit.

## E.    This Court Preliminarily Enjoins the Temporary Modification and Letter

The Court granted the States' motion for a temporary restraining order, then converted the order to a preliminary injunction.[23] The Court ruled that the States had standing to challenge the Temporary Modification and Letter, were likely to succeed on the merits of their APA claim that the Department removed items from the Munitions List "without the required Congressional notice," "raised serious questions regarding the merits" of their claim that the Department's actions were arbitrary and capricious, and established that the public interest "strongly supports" an injunction to prevent irreparable harm caused by the files' public release on the internet.[24]

## F.    The State Department Offers Shifting, Unsupported Rationales for Its Actions

In this litigation, the Federal Defendants offered a new and different reason for the State Department's deregulation of the subject files. Contrary to the Temporary Modification's assertion that the deregulation was "in the interest of the security and foreign policy of the United States,"[25] the Federal Defendants conceded at oral argument that "undetectable plastic firearms are a serious security threat."[26] Their new rationale is that "the Department determined" that non-automatic and semi-automatic firearms under .50 caliber and related technical data "do not provide the United States with a critical military or intelligence advantage" because these items are "already commonly available," as stated in the August 15, 2018 Declaration of Sarah J. Heidema.[27] But at oral argument, the Federal Defendants conceded as follows:

THE COURT: Of course you cannot buy a 3D-printed gun in any firearms

---

[22] Ex. J (Letter) at 2.
[23] Dkt. # 23 (TRO); Dkt. # 95.
[24] Dkt. # 95 at 9–11, 12–15, 16–18, 20–24, 25.
[25] Ex. B.
[26] Ex. K (Verbatim Report of Proceedings on Aug. 21, 2018) at 35:4–8; *see also id.* at 24:12–14 ("The federal government agrees that undetectable plastic firearms pose a significant risk to domestic public safety.").
[27] Dkt. # 64-1 (Heidema Decl.) ¶¶ 19, 21; Dkt. # 64 (Fed. Defs' Opp. to PI) at 22. The "critical military or intelligence advantage" rationale also appears in the preamble to the 2018 NPRM, which is part of the Supplemental Record, but the NPRM does not specifically mention 3D-printed guns or the subject files.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023655

1    store in the United States that's undetectable and untraceable, can you?

2         MR. MYERS: No, Your Honor, if it were undetectable and untraceable, that
3    would be a violation of the Undetectable Firearms Act.[28]

4    On October 19, 2018, the Federal Defendants submitted their designated "Administrative

5    Record."[29] The States challenged the sufficiency of that record and moved to supplement it.[30] In

6    response, the Federal Defendants agreed to partially supplement the record as requested,[31] and

7    they filed supplemental materials (the "Supplemental Record") on December 20, 2018.[32]

8         Neither the Administrative Record nor the Supplemental Record contains any evidence

9    to support either of the State Department's purported "determin[ations]" regarding the subject

10   files.[33] The Supplemental Record contains over 3,000 public comments on the May 24, 2018

11   NPRM.[34] Although the NPRM does not specifically mention 3D-printed firearms, approximately

12   386 of the public comments do; of those, all are opposed to the NPRM.[35] The Federal Defendants

13   represented in this litigation that they did not consider the 2018 NPRM comments in enacting

14   the Temporary Modification and Letter.[36]

15   **G.    Final Rules Are Forthcoming, According to the Federal Defendants**

16        The State Department's May 24, 2018 NPRM proposes to remove all non-automatic and

17   semi-automatic firearms under .50 caliber and related technical data from the Munitions List,

18   which would instead be governed by the Commerce Department's Export Administration

19   Regulations (EAR). 83 Fed. Reg. 24,198. Unlike the ITAR, the EAR do not allow for regulation

20   of items that have been posted on the internet—even for national security reasons. *See* 15 C.F.R.

21   §§ 734.3(b)(3), 734.7(a)(4) (excluding from EAR regulatory jurisdiction any "published"

---

22   [28] Ex. K at 32:5–21.
23   [29] Dkt. # 116.
     [30] Dkt. # 132. The Motion to Supplement is pending as of the filing of this motion.
     [31] *See* Dkt. # 152 at 3.
24   [32] Dkt. # 158.
     [33] *See generally id.*
25   [34] *See* Declaration of Jennifer D. Williams ¶ 4(25); Dkt. ## 158-5, 158-6, 158-7.
     [35] Williams Decl. ¶ 4(25).
26   [36] *See* Dkt. # 152 at 6–7 (arguing that the original Administrative Record was "complete" and there was
     "no reason" for the Department to have considered the 2018 NPRM comments).

8

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023656

1  information and software, including that made available for "[p]ublic dissemination (i.e.,

2  unlimited distribution) in any form . . . including posting on the Internet on sites available to the

3  public . . . ."). The Commerce Department's May 24, 2018 companion NPRM explains that, for

4  example, "if a gun manufacturer posts a firearm's operation and maintenance manual on the

5  internet," the "manual would no longer be 'subject to the EAR.'" 83 Fed. Reg. 24,166, 24,167

6  (May 24, 2018) (citing 15 C.F.R. §§ 734.3(b), 734.7(a)).

7        As of the filing of this brief, neither State nor Commerce has issued a final rule. The

8  Federal Defendants have represented in this litigation that final rules are forthcoming, Dkt.

9  # 131, but offered "no details regarding the substance" of these rules, Dkt. # 169 (Order) at 2,

10  including whether they will be consistent with the NPRMs as applied to the subject files.

## III.  ARGUMENT

### A.  Legal Standard

13        Under the APA, courts "shall . . . hold unlawful and set aside agency action" that is

14  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

15  § 706. Where the material facts are not genuinely disputed and the questions before the Court

16  are purely legal, the Court can resolve an APA challenge on a motion for summary judgment.

17  Fed. R. Civ. P. 56; *King County v. Azar*, 320 F. Supp. 3d 1167, 1171 (W.D. Wash. 2018), *appeal*

18  *dismissed*, 2018 WL 5310765 (9th Cir. Sept. 20, 2018) (citing *Fence Creek Cattle Co. v. U.S.*

19  *Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)).

20        "[I]n APA cases, the Court's role is to determine whether, as a matter of law, evidence

21  in the administrative record supports the agency's decision." *King County*, 320 F. Supp. 3d at

22  1171 (citing *Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Review

23  is based on "the whole record," 5 U.S.C. § 706, which "consists of all documents and material

24  directly or *indirectly* considered by the agency decision-makers and includes evidence contrary

25  to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

26  Courts may also consider extra-record evidence when necessary to determine whether the agency

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023657

has considered all relevant factors and explained its decision, has relied on documents not in the filed record, or has acted in bad faith. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).

## B.   The State Department Failed to Provide the Required 30 Days' Notice to Congress and Exceeded Its Regulatory Authority

AECA prohibits the State Department from removing any item from the Munitions List "until 30 days after the date on which [it] has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate" in accordance with established notification procedures. 22 U.S.C. § 2778(f)(1). The notice requirement furthers Congress's "particularly rigorous oversight of the Munitions List," *United States v. Zheng*, 590 F. Supp. 274, 278–79 (D.N.J. 1984), *vacated on other grounds*, 768 F.2d 518 (3d Cir. 1985), and was strengthened in 2002 in response to perceived attempts to evade that oversight, *see* H.R. Rep. No. 107-57, at 86–87 (2001).

The Federal Defendants concededly failed to provide this 30-day notice before issuing the Temporary Modification and Letter.[37] This failure is confirmed by the Administrative Record and the Supplemental Record, which contain no evidence that such notice was given.[38] Based on this statutory violation alone, the Court should invalidate the Temporary Modification and Letter. *See* 5 U.S.C. § 706(2)(A), (C), (D) (a reviewing court "shall . . . hold unlawful and set aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law").

The Federal Defendants previously sought to justify their failure to provide notice by claiming that the Temporary Modification did not remove an "item" from the Munitions List, but the Court has already correctly ruled as a matter of law that the subject files at issue here are

---

[37] *See* Dkt. # 95 (Preliminary Injunction) at 12–13 & n.7 (noting that Federal Defendants "acknowledge" the notice requirement and that the Heidema Declaration "confirms" the notice was not given); Dkt. # 64-1 ¶ 30 (stating that "Congress will receive the necessary notifications" only in connection with a final rule).

[38] *See generally* Dkt. # 116 (Admin. Record); Dkt. # 133 (Williams Decl.) ¶ 4 (summarizing contents of Administrative Record); Dkt. # 158 (Supp. Record); Second Williams Decl.) ¶ 4 (summarizing contents of Supplemental Record).

10

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023658

"items" or "articles" to which the notice requirement applies. Dkt. # 95 at 14–15; *see* 22 U.S.C. § 2778(a)(1) (designated "defense articles" are "items" that "constitute the United States Munitions List"); 22 C.F.R. § 121.1 (Munitions List does not enumerate every controlled "article" or "item," but describes "categories" of items); *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013) (the Munitions List is "a series of categories describing the kinds of items that qualify as 'defense articles'"). AECA's 30-day notice requirement therefore applies, and was not followed in this case. The Temporary Modification and Letter are procedurally defective and must be set aside for this reason alone.

In addition to violating AECA's procedural requirements, the Temporary Modification and Letter exceeded the State Department's delegated authority under AECA and violated the limits on federal power established by the Tenth Amendment by purporting to authorize "*any* United States person" to "use" the files to print their own undetectable and untraceable weapons, and to permit "unlimited distribution" of the files.[39] The States have numerous laws restricting the possession and use of firearms by "United States persons" and others, including laws prohibiting ineligible persons from possessing firearms, requiring background checks as a condition of acquiring firearms, and regulating the manufacture of firearms. *See* Dkt. # 29 (FAC), ¶¶ 68–217 (citing state gun-safety laws). Several of the Plaintiff States have also enacted or proposed laws that specifically regulate 3D-printed guns. *See* N.J. SB 2465; Wash. SB 5061; D.C. B23-0018; R.I. S0084; Md. SB 8. The Department's overly broad authorization well exceeds the scope of its authority under AECA to regulate exports, and on its face purports to abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth Amendment. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people."); *Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good—what we have often called a 'police power.'"); *cf. District of Columbia v. Heller*, 554

---

[39] Ex. C, ¶ 1(d) (emphasis added); Ex. J at 2.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023659

U.S. 570, 626–27 (2008) (acknowledging validity of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"). The States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of "any United States person" to "use" the files to print their own undetectable and untraceable weapons.

## C.    The State Department's Actions Were Arbitrary and Capricious

In addition to violating both AECA and the U.S. Constitution, the Temporary Modification and Letter are arbitrary and capricious, and should be invalidated for that independent reason. Agency action is "arbitrary and capricious," and must be set aside, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is also arbitrary and capricious if it is not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 42–43 (citation and internal quotation marks omitted). When an agency reverses position, it must provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy," *F.C.C. v. Fox Television Studios, Inc.*, 556 U.S. 502, 516 (2009), and "must show that there are good reasons for the new policy," *id.* at 515. In short, to survive arbitrary-and-capricious review, agency action must be demonstrably "logical and rational." *Allentown Mack Sales & Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998).

### 1.    The administrative record fails to explain or support the agency's asserted rationales for abruptly reversing its position.

Judicial review of agency action "is based on the administrative record and the basis for

12

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023660

the agency's decision must come from the record." *Ass'n of Irritated Residents v. E.P.A.*, 790 F.3d 934, 942 (9th Cir. 2015); *see also, e.g., Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive APA review, "the facts on which the agency purports to have relied" must "have some basis in the record") (internal quotation marks omitted). Absent compliance with this basic requirement, a reviewing court would be unable to measure agency action against the relevant governing standard. *See, e.g., U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the final agency decision reflect[ed] the rational outcome of the agency's consideration of all relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact considered by the agency").

Here, the Temporary Modification itself is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearm files.[40] Neither the Letter nor the Settlement Agreement, nor any other part of the filed record, memorializes the Department's "determin[ation]" or offers any reasoning to support it.[41] The Temporary Modification asserts, with no explanation or elaboration, that the State Department "has determined that it is in the interest of the security and foreign policy of the United States to temporarily modify the United States Munitions List to exclude" the subject files. Simply stating that the Department "has determined" that permitting dissemination via the internet is somehow "in the interest" of U.S. national security and foreign policy is insufficient to survive judicial review. The Department must explain *why* it made this determination, demonstrating a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. But the filed record is completely devoid of any relevant "facts found," much less a "rational connection" to the decision to deregulate the subject files.

---

[40] *See* Ex. B; *see generally* Dkt. ## 116 (Admin. Record), 158 (Supp. Record).
[41] *See* Ex. J; Ex. C; Dkt. # 95 at 6 ("No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that address, much less invalidate, its prior analysis regarding the likely impacts of publication on the United States' national security interests."); *see generally* Dkt. ## 116, 158.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023661

The absence of evidence or explanation is unsurprising, since the Federal Defendants conceded in this litigation that 3D-printable firearms *do* pose a "serious security threat," and offered a *different* explanation for the deregulation: that the subject files do not provide a "critical military or intelligence advantage" because they are "already commonly available[.]"[42] This new explanation, which is supported only by the *post hoc* Heidema Declaration, merits no consideration because "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (same). In any case, neither the Heidema Declaration itself nor any part of the administrative record provides a reasoned explanation for the new rationale as applied to the subject files. In fact, the Federal Defendants conceded in these proceedings that undetectable and untraceable 3D-printable firearms are *not* commonly available.[43]

Furthermore, far from acknowledging that the Temporary Modification and Letter represent a reversal of its regulatory position or offering a rational explanation for this (as is required), the State Department concealed the reversal until it was a *fait accompli. See Fox Television Stations*, 556 U.S. at 515 ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position"); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) ("To provide a satisfactory explanation, an agency must acknowledge and explain any departure from its precedents."). The State Department privately reached the tentative settlement in the *Defense Distributed* case in April 2018, which became final on June 29. Meanwhile, the comment period for the NPRM (which does not even mention 3D-printed firearms) was still open through July 9. The Settlement Agreement was not publicly disclosed until July. The Department issued the Temporary Modification and Letter on July 27 without the required notice to Congress or any

---

[42] Dkt. # 64 at 22; Dkt. # 64-1 ¶¶ 19, 21.
[43] *See* Ex. K at 32:5–21.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023662

other advance warning or opportunity for public input on the reversal.

In sum, neither the original rationale asserted in the Temporary Modification, nor the new rationale asserted in this case, finds any factual support or rational explanation in the record. Instead of acknowledging or explaining its reversal, the Department concealed it, and would have entirely evaded oversight and review if not for this lawsuit. These basic failures render the Temporary Modification and Letter arbitrary and capricious.

> **2.** **The agency failed to consider the specific properties of 3D-printed guns and disregarded the unique threats they pose.**

Not only are the State Department's shifting rationales entirely unsupported, but the administrative record also demonstrates that the Department failed to consider the specific properties of 3D-printed guns and their unique threats to world peace, national security, and foreign policy. In ignoring these issues, the Department disregarded the factors Congress deemed relevant to export control, as well as the evidence supporting the Department's previous regulation of the subject files to further AECA's stated purposes.

An agency's action is arbitrary and capricious where it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. The agency must consider all "relevant factors," *id.* at 42—in particular, the factors "Congress intended" the agency to consider, *id.* at 55. And the agency cannot pick and choose what evidence to rely on and disregard the rest; judicial review is based on the "whole" record, i.e., "all documents and material directly or *indirectly* considered by the agency decision-makers," including "evidence contrary to the agency's position." *Thompson*, 885 F.2d at 555.

Congress directed that export regulation under AECA must be "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The State Department based its previous regulation of the subject files squarely on fulfilling these purposes, invoking threats to "U.S. national security, U.S. foreign policy interests, or

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023663

international peace and stability" in its April 6, 2018 motion to dismiss in the *Defense Distributed* case.[44] Elsewhere in its briefing, the Department emphasized the unique dangers posed by the subject files, which "constitute the functional equivalent of defense articles" and can be used to "automatically" generate a "lethal firearm" that is "virtually undetectable in metal detectors and other security equipment."[45] The Department expressed its particular concern that such "undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."[46] The Supplemental Record amply supports the conclusion that the subject files pose unique threats to U.S. national security and foreign policy, as reflected in the Department's own CJ determinations, the Aguirre Declaration, and the Department's briefing in the *Defense Distributed* case.[47] Moreover, hundreds of the public comments on the 2018 NPRM, which the Department received before issuing the Temporary Modification and letter on July 27, 2018 (but admittedly did not consider), oppose the rule on the grounds that it would deregulate 3D-printable firearms.[48]

Despite this evidence, the Department decided to deregulate the subject files sometime during a three-week period in April 2018, providing no "reasoned explanation" for disregarding the facts and circumstances supporting its previous position. *Fox Television Studios*, 556 U.S. at 516; *see also SNR Wireless*, 868 F.3d at 1029 (D.C. Cir. 2017); *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."). As of April 6, 2018, the Department's position was that distributing the subject files on the internet would "threaten U.S. national security, U.S. foreign policy interests, or

---

[44] Ex. E at 1.
[45] Ex. D at 10.
[46] *Id.*
[47] *See* Exs. A, D, E, F, G.
[48] *See* Williams Decl., ¶ 4(25).

16

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023664

1    international peace and stability." By April 30, 2018, the Department had reached the settlement

2    agreement that resulted in the Temporary Modification and Letter, which deregulated the subject

3    files and approved them for "unlimited distribution."

4            Even though the Department was well aware of the characteristics and qualities of

5    undetectable firearms that render them uniquely dangerous, as reflected in its own CJ

6    determinations and its position in the *Defense Distributed* proceedings, there is no indication in

7    the record that it considered them in connection with the deregulation. This is consistent with

8    the Federal Defendants' statements at oral argument indicating that they did not consider these

9    unique factors until they took a "further look" at the issue in light of this Court's TRO:

10           MR. MYERS: Your Honor, since Your Honor entered the TRO, the
             government has been further studying and further looking into this issue, as the
11           press secretary I think indicated she was -- or the President was welcoming that
             opportunity. That further look has concluded. And the government's position on
12           this issue has not changed.[49]

13   Further, the Department admitted it did not consider the public comments on the 2018 NPRM—

14   even the hundreds of comments that oppose the rule due to its implications for 3D-printed guns,

15   which merit a meaningful response. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36

16   (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to

17   significant points raised by the public.").

18           As noted above, the Federal Defendants' *post hoc* rationale for deregulating the subject

19   files—that they do not provide a "critical military or intelligence advantage"—need not be

20   considered because it is not reflected or supported anywhere in the filed record. But even taking

21   it at face value, this explanation fails to account for all of the factors Congress directed the

22   Department to consider. A defense article can threaten "world peace and the security and foreign

23   policy of the United States"—as the subject files do—regardless of whether it provides a "critical

24   military or intelligence advantage." Yet as the Court previously noted, the Department "appears

25   to have evaluated the export controls on small caliber firearms only through the prism of whether

26   ───────────────
     [49] Ex. K at 34:3–8.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023665

restricting foreign access would provide the United States with a military or intelligence advantage." Dkt. # 95 at 18. This is borne out by the filed record, which contains no evidence whatsoever that any other factors were considered. The Department's asserted rationale fails to account for the national security and foreign policy factors Congress directed it to consider. "Such a failure to address 'an important aspect of the problem' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43)).

### 3. The agency's stated rationales are pretextual as applied to 3D-printable firearm files.

The available evidence strongly suggests that the State Department's asserted rationales for deregulating the subject files are pretextual. "[C]ourts have not hesitated to find that reliance on a pretextual justification violates the APA." *New York v. U.S. Dep't of Commerce*, --- F. Supp. 3d ----, 2019 WL 190285, at *112 (S.D.N.Y. Jan. 15, 2019) (citing, *inter alia*, *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994) (setting aside agency action because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior motive")). Because the basis for the agency's action must be disclosed in the record, "[i]t follows that a court cannot sustain agency action founded on a pretextual or sham justification that conceals the true 'basis' for the decision." *Id.* The *New York* court concluded, based on a number of factors, that the Commerce Department's rationale for adding a citizenship question to the U.S. Census was pretextual. *See id.* at *112–115. Many similar factors are also present here.

First, the Temporary Modification and Letter were highly procedurally irregular. As discussed above, they were issued without the required notice to Congress, or any other advance notice that would have afforded an opportunity for public scrutiny, and they partially effectuated a non-final proposed rulemaking. This concealed the deregulation from public view until it was complete, and deprived Congress of its right to exercise its "particularly rigorous oversight" of the Munitions List. *See New York*, 2019 WL 190285, at *112 ("conspicuous procedural

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023666

1    irregularities" supported finding of pretext, as did a "failure to disclose" that prevented subject

2    matter experts from "conducting rigorous testing").

3          Second, the evidence shows that the State Department decided to deregulate the subject

4    files abruptly, sometime during the three-week period from April 6 to April 30, 2018, in

5    connection with the *Defense Distributed* settlement. Even if the global state of affairs had

6    somehow changed drastically during the three-week period in which the reversal occurred—an

7    improbable scenario for which there is no evidence—this short period would not have afforded

8    enough time to reach a reasoned "determin[ation]" that permanent deregulation no longer

9    presented a national security or foreign policy threat. The Federal Defendants have sought to

10   justify the Temporary Modification and Letter by asserting they are of a piece with the May 24,

11   2018 NPRM, but this only underscores their irregularity, since the NPRM was not (and as of this

12   filing, still is not) final, and the deregulation decision was made months before the NPRM

13   comment period closed. *See New York*, 2019 WL 190285, at *112 (finding pretext where

14   decision was made before the alleged basis for the decision occurred).

15         Third, evidence outside the filed record indicates that the Department's decision was

16   based on a reason not disclosed in the record. Heather Nauert, then the State Department

17   spokesperson, stated at a July 31, 2018 press briefing that the "Department of Justice suggested

18   that the State Department and the U.S. Government settle this [*Defense Distributed*] case, and

19   so that is what was done. . . . We took the advice of the Department of Justice, and here we are

20   right now."[50] This "following DOJ's advice" rationale does not appear anywhere in the filed

21   record. At the same time, Ms. Nauert acknowledged that the State Department still had "equity"

22   in the matter of 3D-printed guns because it "wants to prevent the wrong people from acquiring

23   weapons overseas."[51] This is inconsistent with deregulation being "in the interest of" U.S.

24   national security and foreign policy and is further evidence of pretext. *See New York*, 2019 WL

25   _____

     [50] Dkt. # 35-1 at 5 of 46.
26   [51] *Id.*

                                                   19

PLAINTIFF STATES' MOTION FOR                          ATTORNEY GENERAL OF WASHINGTON
SUMMARY JUDGMENT                                            Complex Litigation Division
2:18-cv-01115-RSL                                              7141 Cleanwater Drive SW
                                                                    PO Box 40111
                                                              Olympia, WA 98504-0111
                                                                   (360) 709-6470

WASHSTATEC023667

190285, at *112 (extra-record statements by Commerce Department official contradicted agency's stated rationale for its decision, supporting finding that this rationale was pretextual); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (consideration of extra-record evidence is appropriate where the record "does not disclose the factors that were considered" or the agency's "construction of the evidence").

Fourth, the original Administrative Record filed by the State Department failed to include evidence that was before it when it made its decision, including the Department's own CJ determinations related to the subject files, the Aguirre Declaration, and complete records from the *Defense Distributed* litigation in which the Department's regulation of the files was directly at issue. *See New York*, 2019 WL 190285, at *113, *48 ("curated and highly sanitized nature" of initial administrative record suggested intent to conceal true basis for decision).

In sum, the stated bases for the State Department's deregulation of the subject files—that deregulation is "in the interest of" U.S. national security and foreign policy, or that the subject files "do not provide a critical military or intelligence advantage"—are pretextual. "Because [the State Department's] stated rationale was not [its] actual rationale, [it] did not comply with the APA's requirement that [it] 'disclose the basis of [its] decision.'" *New York*, 2019 WL 190285, at *115 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–168 (1962)).

**D.  The Court Should Vacate the State Department's Actions and Enjoin It from Further Attempts to Unlawfully Deregulate the Files**

The Temporary Modification and Letter should be vacated. When agency action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the APA provides that the reviewing court "shall . . . hold unlawful and set aside" the agency action. 5 U.S.C. § 706(2). Vacatur is the "normal remedy" for unlawful agency action. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). Failure to provide required notice of the agency action is a "fundamental flaw," *id.*, and failure to address important aspects of the problem and ignoring relevant evidence are "major shortcomings," *Humane Soc'y*, 865 F.3d at

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023668

614, that make vacatur the appropriate remedy. Here, the Temporary Modification and Letter suffer from all of these fatal deficiencies and more. Further, this is not a case in which "the egg has been scrambled," *Allina*, 746 F.3d at 1110–1111; vacatur would simply restore the status quo and "allow the [pending final rule] to take effect," *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017)—assuming a final rule is lawfully promulgated.[52]

The States additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent "temporary modification" or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA.[53] Where vacatur of a deregulation decision is not "sufficient to redress [plaintiffs'] injury," a court may issue an injunction that has a "meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Here, absent a permanent injunction prohibiting further procedurally defective agency actions, the State Department may attempt another end-run around AECA's requirements before any final rule goes into effect. *See New York*, 2019 WL 190285, at *122 (permanent injunction was "necessary to make . . . vacatur effective, as it prevents [the agency] from arriving at the same decision *without* curing the problems" with its initial action). The States could once again face an abrupt final deregulation that threatens immediate, serious, and irreparable harm, and leaves them with no remedy aside from seeking another emergency TRO. Notably, the Department's position is that congressional notice was not required, *see* Dkt. # 64 at 18–20, and it has continued to defend this lawsuit without ever acknowledging the impropriety of its use of ITAR's "temporary modification"

---

[52] The States anticipate that any final rule that removes the subject files from the Munitions List would be arbitrary and capricious for many of the same reasons discussed herein. Of course, the issue is not ripe at this time, since no final rule has been published.

[53] The Private Defendants have previously opposed the entry of injunctive relief. *See* Dkt. ## 8, 11, 63. Their theories regarding the constitutionality of regulating the subject files are at best tangential to this case, in which the States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require the State Department to follow the law in making regulatory changes that affect the subject files. Federal regulation of Munitions List items has repeatedly survived constitutional challenge, *see United States v. Chi Mak*, 683 F.3d 1126, 1136 (9th Cir. 2012), but to the extent there are any constitutional implications with respect to the subject files, they are not squarely presented here and the Court need not consider them.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023669

procedure to bypass the notice requirement and prematurely effectuate a non-final rule. *See United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ("defendant's recognition of the wrongful nature of its conduct" is a factor in whether a permanent injunction should issue). Even if a final rule that complies with the notice requirement is published in the near future, it may not go into effect until six months later. *See* 83 Fed. Reg. 24,200 (May 24, 2018) (rules revising Munitions List categories typically have a "delayed effective date of 180 days"). Another procedurally improper deregulation in the meantime would again leave the states with no option other than filing yet another complaint and seeking yet another TRO.

The standards for permanent and preliminary injunctions are "essentially the same," except that to obtain permanent relief, the plaintiff must show "actual success" on the merits rather than a likelihood of success. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Success on the merits, including as to procedural defectiveness, is established above. The irreparable harm the States will suffer if the files are permitted to be published online, and the strong public interest in preventing this, is also well established in the record of these proceedings. *See* Dkt. # 95 at 20–25; Dkt. # 43 at 19–24 & accompanying citations. Anyone with access to a public or commercially available, relatively inexpensive 3D printer[54]—regardless of their age, mental health status, or criminal history—would be able to download and instantly use the files to make functional weapons, fulfilling Defense Distributed co-founder Cody Wilson's "crypto-anarchist" vision of "evading and disintermediating" gun-safety regulations.[55] 3D-printed weapons will only become deadlier as the technology continues to evolve.[56]

3D-printable firearms pose substantial threats to public health and safety. The Liberator and other weapons made of plastic can evade metal detectors,[57] which are one of the most

---

[54] Patel Decl., ¶¶ 9, 17–18, 26; Scott Decl., ¶¶ 4–5; Racine Decl., ¶¶ 3–6. Unless otherwise indicated, all declarations cited in this section are filed at Dkt. # 43-2. An index of these declarations is filed at Dkt. # 43-1.

[55] *See* Dkt. # 44 (Rupert Decl.), Ex. 16.

[56] *See* Patel Decl., ¶¶ 21–26 (discussing emerging materials and technology that could be used to make deadlier weapons).

[57] McCord Decl., ¶¶ 11–13; Hosko Decl., ¶ 14; Bisbee Decl., ¶ 18; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 7; Dkt. # 29-1, Ex. 3 (Best Decl.), ¶ 7; Coyne Decl., ¶ 4; Camper Decl., ¶ 7; Kyes Decl., ¶ 17.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023670

1    significant forms of protection for public facilities such as airports, stadiums, courthouses and

2    other government buildings, schools,[58] and prisons.[59] For example, 3D-printable weapons will

3    make it possible for students to manufacture their own weapons that could be used in a school

4    shooting (and could evade metal detectors that some schools are installing to prevent such

5    shootings).[60] 3D-printed weapons such as the Liberator do not always look like conventional

6    firearms, and children may mistake them for toys and play with them—a common reason for

7    accidental gun deaths among children.[61]

8         3D-printable firearms would compromise law-enforcement efforts. They can be privately

9    manufactured with no serial numbers,[62] hampering law enforcement's ability to "trace" a firearm

10   to its original seller and subsequent purchasers, which can be used to solve crimes and combat

11   gun trafficking.[63] Untraceable "ghost guns" of the non-3D-printed variety are already

12   increasingly popular[64]—and increasingly being used to commit horrific crimes, including

13   multiple mass shootings in California.[65] 3D-printed weapons would also undermine law

14   enforcement efforts to forensically match bullets used to commit crimes with the gun from which

15   they are shot, both because plastic weapons do not leave "ballistic fingerprints" on a bullet or

16   casing,[66] and because the firing conditions cannot be reliably or safely replicated since the gun

17   is unstable and dangerous even to the shooter.[67] For many of these reasons, 3D-printed weapons

18   may be particularly attractive to criminal enterprises, which would likely embrace the technology

19

20   _____

     [58] McCord Decl., ¶¶ 7–8, 13, 18–21; Camper Decl., ¶ 7; Rivara Decl., ¶ 7; Hemenway Decl., ¶ 21;
     Wintemute Decl., ¶ 14.

21        [59] See generally Herzog Decl.
          [60] Rivara Decl., ¶ 7; see also Hemenway Decl., ¶ 21; Wintemute Decl., ¶ 14.

22        [61] Rivara Decl., ¶ 6; Hemenway Decl., ¶ 20; Wintemute Decl., ¶ 13.
          [62] McCord Decl., ¶¶ 29–30, 33; Kyes Decl., ¶ 8; Graham Decl., ¶ 35.

23        [63] Hosko Decl., ¶¶ 11, 11; McCord Decl., ¶¶ 30–32, 34, 40; Bisbee Decl., ¶¶ 17–18; Camper Decl., ¶¶ 6,
     8; Kyes Decl., ¶¶ 8, 11, 13, 15–16; Graham Decl., ¶¶ 16, 32; Dkt. # 29-1, Ex. 2 (Johanknecht Decl.), ¶ 8.

24        [64] Graham Decl., ¶¶ 17–18; id. ¶ 30 (noting increase in prohibited persons who possess ghost guns).
          [65] Id., ¶¶ 25(a)–(t), 33.

25        [66] Camper Decl., ¶ 12; see also McCord Decl., ¶ 35 ("law enforcement agencies and prosecutors will not
     be able to rely on forensic experts to match bullets used to commit crimes with [3D-printed] firearms").

26        [67] Camper Decl., ¶¶ 12–13; see Dkt. # 29, ¶¶ 74, 95, 109–10, 126, 131, 142, 150, 154, 157–58, 165,
     170–71, 180–82, 207 (citing States' laws establishing background-check requirements).

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023671

1  for use in engaging in the violence, proceeds-collection, and retaliation that commonly attends

2  the work of those organizations.[68]

3        3D-printable firearms also create a heightened risk of terrorist attacks, as the State

4  Department has acknowledged.[69] Undetectable and untraceable firearms could be used by

5  foreign terrorist organizations for attacks within the United States, including against persons

6  residing in or visiting the Plaintiff States.[70] The apparent effectiveness of metal detectors in

7  hindering such attacks would become meaningless if undetectable weapons became widely

8  available; for example, "the 72,000 fans who pack CenturyLink for a Seahawks game suddenly

9  become much more vulnerable to terrorists who seek to cause as much bloodshed as possible."[71]

10        Such "ongoing and concrete harm to [the States'] law enforcement and public safety

11  interests . . . constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts,

12  C.J., as Circuit Justice). In opposing entry of a preliminary injunction, the Federal Defendants

13  "d[id] not argue that any of these injuries are reparable." Dkt. # 95 at 22. The Federal Defendants

14  would be unharmed by entry of a permanent injunction, which will merely prevent them from

15  circumventing AECA's procedural requirements and ensure that any future agency action

16  affecting export control of the subject files is AECA-compliant.

17  ## IV.   CONCLUSION

18        For the reasons above, the Plaintiff States respectfully request that the Court enter

19  summary judgment in their favor, vacate and set aside the Temporary Modification and Letter,

20  and permanently enjoin the State Department from taking any other action to permit export of

21  the subject files absent compliance with AECA.

22

23  [68] Hosko Decl., ¶¶ 15–16; McCord Decl., ¶¶ 39–41; Graham Decl., ¶ 37.

   [69] Ex. D at 10–11.

24  [70] McCord Decl., ¶¶ 14–22; *see also* Dkt. # 44-1, Ex. 9 (Sen. Menendez letter 8/8/2018). These concerns
are perhaps particularly salient for the District of Columbia, which is entirely urban, densely populated, hosts

25  hundreds of heavily attended events each year, including numerous political marches and protests, and is filled with
thousands of high-ranking federal officials and diplomats from around the world. *Id.*, Ex. 20 (Lanier Decl.), ¶¶ 13–

26  15; *see also id.*, Ex. 21 (Op-ed by former Chief of U.S. Capitol Police and Senate Sergeant at Arms).
   [71] McCord Decl., ¶¶ 17–18, 22.

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023672

DATED this 15th day of February, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Jeffrey Rupert*
JEFFREY RUPERT, WSBA #45037
Division Chief
TODD BOWERS, WSBA #25274
Deputy Attorney General
KRISTIN BENESKI, WSBA #45478
JEFFREY T. SPRUNG, WSBA #23607
ZACHARY P. JONES, WSBA #44557
Assistant Attorneys General
JeffreyR2@atg.wa.gov
ToddB@atg.wa.gov
JeffS2@atg.wa.gov
KristinB1@atg.wa.gov
ZachJ@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS, *admitted pro hac vice*
Deputy Attorney General
Nelson.Richards@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHIL WEISER
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
Matt.Grove@coag.gov
*Attorneys for Plaintiff State of Colorado*

WILLIAM TONG
Attorney General of Connecticut

*/s/ Maura Murphy Osborne*
MAURA MURPHY OSBORNE, *admitted pro hac vice*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023673

Assistant Attorney General
Maura.MurphyOsborne@ct.gov
*Attorneys for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ Ilona M. Kirshon
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.Kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Robyn Bender
ROBYN BENDER, *admitted pro hac vice*
Deputy Attorney General
JIMMY ROCK, *admitted pro hac vice*
Assistant Deputy Attorney General
ANDREW J. SAINDON, *admitted pro hac vice*
Senior Assistant Attorney General
Robyn.Bender@dc.gov
Jimmy.Rock@dc.gov
Andy.Saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii

/s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

/s/ Brett E. Legner

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023674

BRETT E. LEGNER, *admitted pro hac vice*
Deputy Solicitor General
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
BLegner@atg.state.il.us
ERobersonYoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

THOMAS J. MILLER
Attorney General of Iowa

/s/ Nathanael Blake
NATHANAEL BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
JULIA DOYLE BERNHARDT, *admitted pro hac vice*
JEFFREY PAUL DUNLAP, *admitted pro hac vice*
Assistant Attorneys General
JBernhardt@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

/s/ Jonathan B. Miller
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of Massachusetts*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023675

KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Jacob.Campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM, *admitted pro hac vice*
Assistant Attorney General
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

*/s/ Steven Wu*
STEVEN WU, *admitted pro hac vice*
Deputy Solicitor General
Steven.Wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

JOSH SHAPIRO
Attorney General of Commonwealth of Pennsylvania

*/s/ Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN, *admitted pro hac vice*
Executive Deputy Attorney General
MICHAEL J. FISCHER, *admitted pro hac vice*
Chief Deputy Attorney General
JGoldman@attorneygeneral.gov
MFischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023676

SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Scott.Kaplan@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac vice*
Solicitor General
Benjamin.Battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of the Commonwealth of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*
Deputy Attorney General
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

PLAINTIFF STATES' MOTION FOR
SUMMARY JUDGMENT
2:18-cv-01115-RSL

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Drive SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

WASHSTATEC023677

The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | No. 2:18-cv-1115-RSL |
| Plaintiffs, | **FEDERAL DEFENDANTS'** |
| v. | **CONSOLIDATED OPPOSITION** |
| | **TO PLAINTIFFS' MOTION** |
| UNITED STATES DEPARTMENT OF | **FOR SUMMARY JUDGMENT** |
| STATE, et al., | **AND CROSS-MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| Defendants. | |
| | **NOTED FOR: April 19, 2019** |

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023678

**INTRODUCTION**

Manufacture or possession of plastic guns that are undetectable is a serious federal crime, punishable by up to five years in prison. Among other statutes, the Undetectable Firearms Act prohibits the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p). The Department of Justice, among other agencies, enforces that prohibition, and will continue to do so vigorously. Neither those enforcement efforts nor the prohibition itself is affected in any way by the actions challenged in this case.

Indeed, this case is not about the regulation of U.S. persons who wish to utilize a 3D printer to produce their own small-caliber firearms. Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provide a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies—and the states—to regulate.

Plaintiffs' Amended Complaint, as well as their motion for summary judgment, misunderstands the nature of the Department of State's authority. But the Court need not reach Plaintiffs' claims under the Administrative Procedure Act ("APA") or the Tenth Amendment because Plaintiffs lack standing to assert their claims and fall outside the relevant statute's zone of interests. And in any event, Plaintiffs' claims fail on the merits. Accordingly, and for the reasons set forth below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

**BACKGROUND**

**I. Statutory And Regulatory Background**

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 1
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023679

States" to "control the *import* and the *export* of defense articles and defense services" and to promulgate regulations accordingly. 22 U.S.C. § 2778(a)(1) (emphasis added). The President has delegated this authority to the Department of State ("Department") in relevant part, and the Department has accordingly promulgated the International Traffic in Arms Regulations ("ITAR"), which are administered by the Department's Directorate of Defense Trade Controls ("DDTC"). *See* Exec. Order No. 13637(n)(i), 78 Fed. Reg. 16,129 (Mar. 8, 2013); 22 C.F.R. §§ 120-130. At the heart of the AECA is the United States Munitions List ("USML"), an extensive listing of materials that constitute "defense articles and defense services" under the ITAR. *See* 22 C.F.R. Part 121. As relevant here, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *Id.* § 121.1(I)(a), (i). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a)(1). Section 2778 of the AECA authorizes the President to (1) designate those defense articles and services to be included on the USML; (2) require licenses for the export of items on the USML; and (3) promulgate regulations for the import and export of such items on the USML. 22 U.S.C. § 2778.

The ITAR does not regulate any transfers of defense articles except those that constitute "exports," *i.e.*, the transfer of defense articles abroad or to foreign persons, and "temporary imports." The ITAR's definition of exports includes, in part (1) "[s]ending or taking of a defense article out of the United States in any manner," 22 C.F.R. § 120.17(a)(1); (2) "[r]eleasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States," *id.* § 120.17(a)(4); and (3) "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')," *id.* § 120.17(a)(2).

In certain cases where it is unclear whether a particular item is a defense article or defense service, the Department makes a "commodity jurisdiction" ("CJ") determination using a procedure set forth in the ITAR. *See id.* § 120.4. Upon written request, DDTC will provide applicants with a determination as to whether the article, service, or data is within the scope of

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023680

the ITAR. These assessments are made on a case-by-case basis through an inter-agency process, evaluating whether the article, service, or data is covered by the USML, provides the equivalent performance capabilities of a defense article on the USML, or has a critical military or intelligence advantage. *See id.* § 120.4(d).

While the AECA and ITAR do not provide the Department with authority to prohibit the domestic manufacture or possession of 3D-printed guns, another federal statute deals with this topic. The Undetectable Firearms Act bars the manufacture, possession, sale, import, or transfer of undetectable firearms. *See* 18 U.S.C. § 922(p); An Act to Extend the Undetectable Firearms Act of 1988 for 10 Years, Pub. L. No. 113-57, 127 Stat. 656 (2013). Under that statute, firearms manufactured or sold in the United States must generally be capable of being detected by metal detectors and by x-ray machines. *See* 18 U.S.C. § 922(p)(1). Those requirements are not in any way affected by the actions challenged in this case, nor are the separate federal prohibitions on the possession of firearms by felons, persons subject to restraining orders, or the mentally ill. *See id.* § 922(g)(1) (felons and certain state-law misdemeanants); *id.* § 922(g)(8) (court-issued restraining orders); *id.* § 922(g)(4) (persons adjudicated as mentally ill). The Government continues to enforce these laws in order to address domestic safety issues related to undetectable firearms. The Department's determination under the ITAR at issue here will not affect those enforcement efforts.

## II. The Government's Settlement With Defense Distributed

In 2012, Defense Distributed published on the Internet "privately generated technical information regarding a number of gun-related items." *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687 (W.D. Tex. 2015). In May 2013, DDTC sent Defense Distributed a letter stating that Defense Distributed may have released ITAR-controlled technical data without the required authorization. *See id.* Defense Distributed removed the technical data and submitted a CJ request. *Id.* The company, however, and in conjunction with another non-profit, the Second Amendment Foundation, ultimately brought a lawsuit against, *inter alia*, the Department and DDTC, claiming that the requirement to obtain authorization prior to

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023681

publishing the subject files on its website violated plaintiffs' rights under the First, Second, and Fifth Amendments and exceeded the Department's statutory authority. *Id.* at 688.

In August 2015, the U.S. District Court for the Western District of Texas denied Defense Distributed's motion for a preliminary injunction. *Id.* at 701. For purposes of the preliminary injunction analysis, the district court considered the files to be subject to the protection of the First Amendment. *Id.* at 691-92. Applying intermediate scrutiny, the court concluded that "because the AECA and ITAR do not prohibit domestic communications" and plaintiffs remained "free to disseminate the computer files at issue domestically," they had not shown a substantial likelihood of success on the merits. *Id.* at 695.

The Fifth Circuit affirmed in a split decision. *See* 838 F.3d 451 (5th Cir. 2016). Focusing narrowly on the question of the non-merits requirements for preliminary relief, the panel majority concluded that the "Department's stated interest in preventing foreign nationals . . . from obtaining technical data on how to produce weapons and weapon parts" outweighed plaintiffs' interest in their constitutional rights. *Id.* at 458-59. The panel majority "decline[d] to address the merits" because the failure by plaintiffs to meet any single requirement for a preliminary injunction would require affirmance of the district court. *See id.* at 456-58. A dissent from the panel opinion did address the merits. *See id.* at 461 (Jones, J. dissenting). "[F]or the benefit of the district court on remand," the dissent set forth an analysis concluding that "the State Department's application of its 'export' control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." *Id.* at 463-64.

After plaintiffs' petitions for rehearing *en banc* and for certiorari were denied, *see* 138 S. Ct. 638 (2018); 865 F.3d 211 (5th Cir. 2017) (5 dissenting judges), proceedings resumed in district court. In April 2018, the Government moved to dismiss plaintiffs' second amended complaint. *See Def. Distributed*, No. 1:15-cv-372-RP, Dkt. No. 92. Meanwhile, the district court ordered the parties to exchange written settlement demands, *see id.,* Dkt. No. 88, thereby

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023682

initiating a process under which the parties were able to reach a settlement before briefing on the motion to dismiss was complete, *see id.*, Dkt. Nos. 93, 95.

Pursuant to the settlement and as relevant here, the Government agreed to the following:

(a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.[1]

(b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . [ITAR], 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.[2]

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

(d) Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

The parties executed the agreement on June 29, 2018, and the Government complied with (b) and (c) on July 27, 2018. *See* Declaration of Sarah Heidema ("Heidema Decl."), Dkt.

---

[1] *See* Section III, *infra*. At the time settlement negotiations began, the parties had long expected such a Notice of Proposed Rulemaking ("NPRM") to be issued. *See* 78 Fed. Reg. 22,740, 22,741 (April 16, 2013) (announcing that "[t]he Department intends to publish final rules implementing the revised USML categories and related ITAR amendments periodically"). Reflecting nearly a decade of efforts to carry out a reform of export regulations and pursuant to a "comprehensive review" of the U.S. export control system, the Government has undertaken an Export Control Reform Initiative ("ECRI") that was proposed in April 2010, *see* Fact Sheet on the President's Export Control Reform Initiative (Apr. 20, 2010), https://obamawhitehouse.archives.gov/the-press-office/fact-sheet-presidents-export-control-reform-initiative, and facilitated by Executive Order No. 13637, 78 Fed. Reg. 16,129 (Mar. 8, 2013). By January 20, 2017, this export reform process had been completed for USML categories IV through XX.
[2] Pursuant to 22 C.F.R. § 126.2, "[t]he Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States."

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC023683

No. 64-1, ¶¶ 27, 29. The Settlement Agreement states that Defendants deny that they violated plaintiffs' constitutional rights. *See id.* ¶ 28.

## III.    The Government's Rulemaking

On May 24, 2018—after the initial exchange of settlement offers but more than one month prior to the settlement with Defense Distributed—the Departments of State and Commerce each issued a notice of proposed rulemaking ("NPRM") that implicated the technical data at issue in *Defense Distributed*. *See* 83 Fed. Reg. 24,198 (May 24, 2018); 83 Fed. Reg. 24,166 (May 24, 2018). In those NPRMs, the Government proposed amending the ITAR "to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the [USML] to describe more precisely the articles warranting export and temporary import control on the USML." 83 Fed. Reg. at 24,198. As proposed, the items removed from the USML—which encompass the technical data at issue in *Defense Distributed* and this litigation—would no longer be subject to the ITAR's authorization requirements, i.e., no license from the Department of State would be required for their export. *See* Heidema Decl. ¶ 21; *see generally* 83 Fed. Reg. at 24,198. The Department of State "received more than 3,500 comments in response to the NPRM, including comments related to 3D-printed firearms." Heidema Decl. ¶ 23.

## IV.    Procedural History

On July 30, 2018, Plaintiffs filed the instant action against, *inter alia*, the Department, the Secretary of State, DDTC, and Defense Distributed. Compl., Dkt. No. 1. Plaintiffs alleged that the Government's settlement with Defense Distributed adversely affected their public safety laws, in violation of the APA and the Tenth Amendment. *Id.* at 21-41. Also on July 30, 2018, Plaintiffs moved for a temporary restraining order against Defendants, Mot. for TRO, Dkt. No. 2, which the Court granted on July 31, 2018, Dkt. No. 23 ("Order"). Plaintiffs amended their complaint on August 2, 2018, Am. Compl., Dkt. No. 29, and moved for a preliminary injunction on August 9, 2018, Dkt. No. 43. The Court granted Plaintiffs' motion on August 27, 2018. Dkt. No. 95 ("Prelim. Inj."). Pursuant to the preliminary injunction issued by the Court, the Government is enjoined from "implementing or enforcing the

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023684

'Temporary Modification of Category I of the United States Munitions List' and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018," and the Federal Defendants must "preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued until further order of the Court." *Id.* at 25.

The Federal Defendants produced the administrative record on October 19, 2018, Dkt. No. 116, and filed supplementary materials on December 20, 2018, Dkt. No. 158. Plaintiffs moved for summary judgment on February 15, 2019. Dkt. No. 170 ("Pls.' MSJ").

## ARGUMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based." *Partridge v. Reich*, 141 F.3d 920, 926 n.4 (9th Cir. 1998). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). "[I]n a case involving review of a final agency action under the [APA] . . . summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011) (citation omitted).

### A. Plaintiffs Are Not Within The AECA's Zone Of Interests.[3]

"[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe*

---

[3] The Court did not previously address the Federal Defendants' zone-of-interests argument. *See* Prelim. Inj. at 8-12. Moreover, for the reasons provided in the Federal Defendants' opposition to Plaintiffs' motion for a preliminary injunction, the Federal Defendants maintain that Plaintiffs lack Article III standing to assert their claims. *See* Dkt. No. 64 ("Defs.' PI Opp.") at 13-16.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 7
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023685

*v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted). While the zone of interests test is not "demanding," it nevertheless forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, Plaintiffs—whose Amended Complaint focuses on the Federal Defendants' compliance with the AECA's congressional notification provision, 22 U.S.C. §2778(f)(1)—do not fall within the zone of interests protected by the statute. *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasizing that zone of interests test is applied in the context of "the particular provision of law upon which the plaintiff relies"). The AECA "is designed to protect against the national security threat created by the unrestricted flow of military information abroad." *United States v. Posey*, 864 F.2d 1487, 1495 (9th Cir. 1989); *accord United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012) (AECA "was intended to authorize the President to control the import and export of defense articles and defense services in 'furtherance of world peace and the security and foreign policy of the United States.'" (quoting 22 U.S.C. § 2778(a)(1))); *see also* Am. Compl. ¶ 27 (acknowledging that "[t]he purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports"). The primary concerns of the statute are thus national security and foreign relations. In this context Congress enacted 22 U.S.C. § 2778(f)(1), which provides that "[t]he President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to" certain congressional committees. As the legislative history makes clear, Congress enacted this provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation." H.R. Rep. No. 97-58, at 21-22 (1981). Thus Plaintiffs—states who neither exercise congressional oversight of the Department nor function as would-be exporters, and whose alleged harms concern purely domestic, non-military matters unrelated to foreign relations, fail to meet the zone of interests test. *Cf. People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 8
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023686

and Realignment Act, because, as here, the state "is not the subject of the Secretary's action" and "states have no constitutional or statutory role in federal military policy").

### B. Plaintiffs' APA Claims Fail.

According to Plaintiffs, the Department exceeded its statutory authority in not providing advance notice to Congress about the actions undertaken in connection with the settlement agreement. Pls.' MSJ at 10-11. But as the Federal Defendants have previously explained, Defs.' PI Opp. at 18-19, the statutory provision on which Plaintiffs rely requires such notice only with respect to the *removal* of *items* from the USML. *See* 22 U.S.C. § 2778(f)(1) (providing that "the President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal" to the appropriate congressional committees). Because the subject files are not specifically enumerated on the USML and therefore are not items, and because the Department effectuated only a temporary modification, not a removal, the Department's actions were in accord with its delegated authority. *But see* Prelim. Inj. at 12-15.

The Court should also reject Plaintiffs' claim that the Temporary Modification and Letter were arbitrary and capricious. As the Federal Defendants explained in their opposition to Plaintiffs' preliminary injunction motion, items belong on the United States Munitions List if they "provide[] a critical military or intelligence advantage." 22 C.F.R. § 120.3(b). Here, the administrative record reveals that the government had determined that small-caliber firearms do not satisfy that standard. *See generally* Defs.' PI Opp. at 22 (citing State and Commerce NPRMs).[4]

Defendants acknowledge that the Court previously suggested that Defendants failed to sufficiently "consider[] the unique properties of 3D plastic guns," Prelim. Inj. at 17, or to provide a "reasoned explanation for its change in position," *id.* at 18. Defendants nonetheless respectfully maintain that they satisfied their obligations. *See generally* Defs.' PI Op. at 21-22.

---

[4] Plaintiffs' suggestion that "the Temporary Modification is the *only* document in the filed administrative record that reflects any reason for the State Department's reversal of its position on 3D-printable firearms files," Pls.' MSJ at 13, is therefore not correct. When an agency's decision is properly before the Court, it "review[s] the entire administrative record." *Epsilon Elec., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control*, 857 F.3d 913, 924 (D.C. Cir. 2017).

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 9
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023687

Specifically, Defendants maintain that it sufficed to consider the need to regulate small-caliber firearms generally, as undetectable firearms are separately regulated by other agencies under the Undetectable Firearms Act. *See id.* at 10.

In any case, even if the Court were to find the Federal Defendants' rationale inadequate, it should reject Plaintiffs' contention that the Federal Defendants' rationale was pretextual. Plaintiffs suggest that the Temporary Modification and Letter were procedurally irregular because they were issued without notice to Congress, but Defendants respectfully maintain that no such notice was required. *See id.* at 18-19; *but see* Prelim. Inj. at 12-15. While Plaintiffs further suggest that the Department's decision was made "abruptly, sometime during the three-week period from April 6 to April 30, 2018," Pls.' MSJ at 19, the Federal Defendants have explained that the decision was made following the District Court of the Western District of Texas's instruction to the parties to exchange written settlement demands, *see* Defs.' PI Opp. at 5; it is no secret that the Temporary Modification and Letter arose from a settlement of the *Defense Distributed* litigation. *Cf.* Pls.' MSJ at 19. Last, Plaintiffs complain that certain documents were initially omitted from the administrative record, *see* Pls.' MSJ at 20, but those documents were omitted from the record because they were not among the documents considered by the agency decision-maker. *See* generally Defs.' Opp. at Pls.' Mot. to Compel, Dkt. No. 152. In any case, Defendants agreed to supplement the record with these documents for the Court's convenience in determining whether to rely on the materials as extra-record evidence and the convenience of the parties. *See* Dkt. No. 158.

C.     **Plaintiffs' Tenth Amendment Claim Fails.**

Plaintiffs fare no better in arguing that the Department's actions constitute a violation of the Tenth Amendment to the Constitution. *See* Pls.' MSJ at 11-12. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Under the Tenth Amendment, 'the Federal Government may not compel States to implement, by legislation or executive action, federal regulatory programs.'" *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (quoting *Printz v. United States*,

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 10
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023688

521 U.S. 898, 925 (1997)).  "The crucial proscribed element is coercion; the residents of the State or municipality must retain 'the ultimate decision' as to whether or not the State or municipality will comply with the federal regulatory program."  *Id.* (quoting *New York v. United States*, 505 U.S. 144, 168 (1992)).

Here, Plaintiffs claim that "[t]he Department's overly broad authorization well exceeds the scope of its authority under AECA to regulate exports, and on its face purports to abrogate the states' police powers to enforce their gun-safety laws in violation of the Tenth Amendment."  Pls.' MSJ at 11; *see also id.* at 12 (arguing that "[t]he States' ability and authority to enforce their gun-safety laws is undermined by the State Department's purported authorization of 'any United States person' to 'use' the files to print their own undetectable and untraceable weapons").  To be abundantly clear, however, the Government does not suggest, and has never suggested, that the settlement agreement conflicts with or otherwise preempts such state laws.  To the contrary, the Department has consistently emphasized that its actions are taken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity.  *See Def. Distributed*, 121 F. Supp. 3d at 695.  The protections for state law legislated by Congress in the Gun Control Act remain in force, *see* 18 U.S.C. § 927, as well as the laws invoked by Plaintiffs, remain unaffected by the settlement agreement.  Nor is there any basis to substitute Plaintiffs' understanding of the agreement for the far more reasonable interpretation of the Government.

Moreover, Plaintiffs fall well short of establishing any element of a violation of the Tenth Amendment.  "[T]here is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program.  Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals."  *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015).  Absent such a program or compulsion, the Court should reject Plaintiffs' Tenth Amendment claim.  *See id.*; *see also, e.g.*, *Envtl. Def. Ctr.*, 344 F.3d at 845 (holding agency action "does not violate the Tenth Amendment, because it directs no unconstitutional coercion").

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 11
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023689

The two cases cited by Plaintiffs are not to the contrary.  *See* Pls.' MSJ at 11-12.  First, Plaintiffs point to the Supreme Court's general statement in *Bond v. United States* that "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.'"  572 U.S. 844, 854 (2014).  But the Federal Defendants do not even purport to infringe upon that power, let alone coerce Plaintiffs into complying with a federal program.  Likewise, in *District of Columbia v. Heller*, the Supreme Court noted that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful[.]"  554 U.S. 570, 626-27 & n.26 (2008).  Yet *Heller* concerned the Second Amendment, not the Tenth, and nothing in *Heller* indicates that the Department's exercise of its export authority, which does not involve commandeering State funds or entities, can give rise to a Tenth Amendment violation.

### D.    An Injunction Is Unwarranted.

As Plaintiffs correctly note, Pls.' MSJ at 20, in the APA context, "[v]acatur is the standard remedy for unlawful agency decisions," *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1239 (N.D. Cal. 2015); *see* 5 U.S.C. § 706(2)(A) (requiring court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Nevertheless, in the event the Court finds that the challenged agency actions were inconsistent with the APA, Plaintiffs "additionally ask the Court to enjoin the Federal Defendants from issuing any subsequent 'temporary modification' or otherwise removing the subject files from the Munitions List or permitting their export without providing congressional notice as required by AECA."  Pls.' MSJ at 21.  Plaintiffs' request is unfounded and should be denied.

"A court's decision to issue an injunction constitutes an unwarranted 'extraordinary remedy' if a less drastic remedy, such as vacatur, could sufficiently redress plaintiff's injury.  *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1247 (quoting *Monsanto Co. v. Geertson*

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 12
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023690

*Seed Farms*, 561 U.S. 139, 165-66 (2010)).  Here, there is no basis to conclude that vacatur would be insufficient to redress Plaintiffs' alleged injuries.  Plaintiffs' Amended Complaint and motion for summary judgment make clear that at issue are not the substantive policies underlying the challenged actions, but rather the procedures used by the agency in taking those actions.  *See* Am. Compl. ¶¶ 230-40 (alleging failure to provide congressional notification and failure to adequately explain basis for actions); Pls.' MSJ at 10-18 (same).  Vacatur and remand would appropriately allow the Federal Defendants to cure any deficiencies with respect to those procedures.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007) ("[I]f the EPA's action was arbitrary and capricious, . . . the proper course would have been to remand to the Agency for clarification of its reasons."); *Se. Ak. Conservation Council v. U.S. Army Corps of Engineers*, 486 F.3d 638, 654-55 (9th Cir. 2007), *rev'd and remanded on other grounds sub nom. Coeur Ak., Inc. v. Se. Ak. Conservation Council*, 557 U.S. 261 (2009) ("Under the APA . . . a court should 'vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.'" (citation omitted)).

     The rationale underlying Plaintiffs' request confirms that an injunction is not appropriate.  According to Plaintiffs, such relief is warranted to "prohibit[] further procedurally defective agency actions."  Pls.' MSJ at 21; *see also id.* at 21 n.53 ("[T]he States merely ask the Court to invalidate procedurally defective and unlawful agency actions and require the State Department to follow the law in making regulatory changes that affect the subject files.").  Yet "[t]he Supreme Court has warned against 'sweeping injunctions to obey the law' and has cautioned courts about their 'duty to avoid' such orders." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. 11-cv-1062, 2016 WL 8861712, at *7 (C.D. Cal. Nov. 22, 2016), *aff'd*, 745 F. App'x 1 (9th Cir. 2018) (quoting *Swift & Co. v. United States*, 196 U.S. 375, 401 (1905)); *accord Cuviello v. City of Oakland*, No. 06-cv-5517, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (explaining that "courts have held that not only vague injunctions but also injunctions that simply require a defendant to 'obey the law' fail to comply with Rule 65(d)").[5]

---

[5] Indeed, based on Plaintiffs' request, it is difficult to discern the marginal relief provided by an injunction, as vacatur itself would involve setting aside the challenged actions, and any future challenges would be considered in light of a new administrative record.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 13
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023691

The cases relied on by Plaintiffs do not compel a different result. For instance, in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), cited in Pls.' MSJ at 21, the district court "enjoin[ed] Defendants from adding a citizenship question to the 2020 census questionnaire based on Secretary Ross's March 26, 2018 memorandum or based on any reasoning that is substantially similar to the reasoning contained in that memorandum." *Id.* at 676-77. The court entered this injunction in part because "an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion," which the court found necessary "given the looming [census] printing deadline." *Id.* at 676. Here, however, no similar temporal constraints exist to justify injunctive relief, and in any event the Department should be permitted to address any concerns the Court might have without the need for an injunction. *Cf. Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005) ("[T]he usual rule is that, with or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand."). Plaintiffs likewise cannot persuasively rely on *United States v. Laerdal Manufacturing Corp.*, 73 F.3d 852 (9th Cir. 1995), cited in Pls.' MSJ at 22, as that case did not involve a challenge to government action under the APA, and therefore did not discuss whether vacatur would be an adequate remedy.

Nor have Plaintiffs demonstrated that the injunction factors weigh in their favor. "The equitable remedy of an injunction—whether preliminary or permanent−is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *JPMorgan Chase Bank, N.A. v. Yamassee Tribal Nation*, No. 1:17-cv-00759, 2018 WL 3629940, at *6 (E.D. Cal. July 30, 2018) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiffs fall short of meeting this standard. All of the concerns identified are harms that might result from the domestic availability of 3D-printed guns in the United States, but such concerns have little to do with whether particular files should be regulated for foreign export on national security grounds. Further, their relation to the Department's exercise of authority and the settlement agreement is speculative. At best, Plaintiffs have only identified harms that may result from

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 14
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023692

3D-printed guns *generally*, not from the challenged actions regulating foreign exports. But there are already laws aimed at domestic conduct that seek to prevent such harms. And as the Ninth Circuit has made clear, it is the likelihood of harm from the actions that are sought to be enjoined that is relevant for the injunction analysis. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs simply cannot tie their fear of *domestic* irreparable injury to a statutory regime dealing with *foreign* export, especially when there are separate statutes governing domestic manufacture, possession, and sale that remain unaffected by the challenged actions. *See also* Defs.' PI Opp. at 9-13.

The single case Plaintiffs cite—*Maryland v. King*, 567 U.S. 1301 (2012), cited in Pls.' MSJ at 24—is inapposite. In *Maryland*, Chief Justice Roberts, sitting as Circuit Justice, granted a stay of judgment overturning a criminal conviction pending disposition of the State's petition for a writ of certiorari. 567 U.S. at 1301. Chief Justice Roberts wrote that a stay was appropriate because "there is . . . an ongoing and concrete harm to Maryland's law enforcement and public safety interests." *Id.* As is made clear in the subsequent sentences omitted by Plaintiffs, however, such irreparable harm arose from the fact that, as a result of the judgment, "Maryland may not employ a duly enacted statute [its DNA Collection Act] to help prevent [serious] injuries[.]" *Id.* Here, by contrast, the Department's settlement has not prevented any of Plaintiffs from employing their public safety statutes.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 15
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023693

1  Dated: March 15, 2019                    Respectfully submitted,

2                                            JOSEPH H. HUNT
3                                            Assistant Attorney General

4                                            BRETT A. SHUMATE
5                                            Deputy Assistant Attorney General

6                                            JOHN R. GRIFFITHS
7                                            Director, Federal Programs Branch

8                                            ANTHONY J. COPPOLINO
                                             Deputy Director, Federal Programs Branch

9                                            */s/ Stuart J. Robinson*
10                                           STUART J. ROBINSON
                                             STEVEN A. MYERS
11                                           ERIC J. SOSKIN
                                             Trial Attorneys
12                                           U.S. Department of Justice
13                                           Civil Division, Federal Programs Branch
                                             450 Golden Gate Ave.
14                                           San Francisco, CA 94102
                                             (415) 436-6635 (telephone)
15                                           (415) 436-6632 (facsimile)
16                                           stuart.j.robinson@usdoj.gov

17                                           *Attorneys for the Federal Defendants*

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 16
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023694

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2019, I electronically filed the foregoing brief using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: March 15, 2019                    /s/ Stuart J. Robinson
                                         Stuart J. Robinson

FEDERAL DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - 17
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023695

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; STATE OF
CONNECTICUT; STATE OF MARYLAND;
STATE OF NEW JERSEY; STATE OF NEW
YORK; STATE OF OREGON;
COMMONWEALTH OF
MASSACHUSETTS; COMMONWEALTH
OF PENNSYLVANIA; DISTRICT OF
COLUMBIA; STATE OF CALIFORNIA;
STATE OF COLORADO; STATE OF
DELAWARE; STATE OF HAWAII; STATE
OF ILLINOIS; STATE OF IOWA; STATE
OF MINNESOTA; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND;
STATE OF VERMONT; and
COMMONWEALTH OF VIRGINIA.

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

        Defendants.

NO. 2:18-cv-01115-RSL

**PLAINTIFF STATES' COMBINED
REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

NOTED FOR CONSIDERATION:
JUNE 7, 2019[1]

---

[1] *See* Dkt. # 183.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023696

*TABLE OF CONTENTS*

I.    INTRODUCTION ........................................................................................ 1

II.   SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS ..................... 1

      A.   The Federal Defendants Supplement the Record in Response to the Court's
           Order ............................................................................................... 1

      B.   The Revised Second Supplement Reveals That "Nothing Changed" from the
           State Department's Perspective Regarding 3D-Printable Guns .............. 3

      C.   The State Department Admittedly Failed to Consider Public Comments on the
           NPRMs *and* the Challenged Actions Themselves ............................... 5

      D.   No Final Rules Have Been Published .................................................. 8

III.  ARGUMENT .......................................................................................... 8

      A.   The Plaintiff States Have Standing, as the Court Already Ruled .............. 9

      B.   The Temporary Modification and Letter Are Contrary to Law ............... 10

           1.   The Temporary Modification and Letter violate AECA. ................. 10

           2.   The Temporary Modification and Letter violate the Tenth Amendment........ 11

      C.   The Temporary Modification and Letter Are Arbitrary and Capricious ........... 12

      D.   Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief....... 17

      E.   The Private Defendants' Arguments Do Not Require a Different Result .............. 18

           1.   The Private Defendants' jurisdictional arguments lack merit. ......................... 19

           2.   The Private Defendants' constitutional theories do not preclude the Court
                from setting aside unlawful agency actions. .................................................. 20

           3.   The Private Defendants' APA arguments do not explain, let alone justify,
                the Federal Defendants' abrupt regulatory about-face. .................................. 23

IV.   CONCLUSION ...................................................................................... 24

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023697

This brief is a combined reply in support of the States' Motion for Summary Judgment (Dkt. # 170) ("SMSJ") and opposition to the Federal Defendants' Cross-Motion for Summary Judgment (Dkt. # 173) ("FDMSJ") and the Private Defendants' Motion for Summary Judgment (Dkt. # 174) ("PDMSJ").

## I.  INTRODUCTION

The Temporary Modification and Letter deregulating 3D-printed firearm files violate AECA's congressional notice provisions and must be vacated as contrary to law. In addition, these actions are arbitrary and capricious and were pretextually rationalized after the fact in violation of the APA. After multiple supplementations of the administrative record in this case, including the most recent Revised Second Supplementation on May 6, 2019, the evidence shows that the State Department failed to consider the national security implications of deregulation in light of the unique properties of untraceable, undetectable, 3D-printable plastic firearms, and did not independently "determine" that deregulation was "in the interest of the security and foreign policy of the United States," as asserted. It is now more clear than ever that the State Department's abrupt reversal of its longstanding regulation of the subject files—as President Trump tweeted on July 31, 2018—"doesn't seem to make much sense!" Dkt. # 15-2.

The Court should grant summary judgment in the States' favor, vacate and set aside the unlawful Temporary Modification and Letter, and enjoin the Federal Defendants from attempting any further "temporary" deregulation of 3D-printable firearms that illegally evades Congress's oversight.

## II.  SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS

Much of the relevant background is set forth in the States' Motion for Summary Judgment (Dkt. # 170, Part II). This section covers factual developments since February 2019.

### A.  The Federal Defendants Supplement the Record in Response to the Court's Order

On March 19, 2019, the Court granted the States' Motion to Supplement the Administrative Record; incorporated Dkt. # 158 (First Supplement) into the administrative

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023698

1  record; and ordered the Federal Defendants to (1) certify the production of a *complete*

2  administrative record that includes "all materials [the State Department] considered, directly or

3  indirectly" in taking the challenged actions and (2) supplement the administrative record with a

4  privilege log and with settlement-related communications and materials generated in *Defense*

5  *Distributed v. U.S. Dep't of State*, Case No. 15-cv-372-RP (W.D. Tex.).[2] The Court also granted

6  the States "leave to take discovery aimed at establishing whether the pre-July 27, 2018,

7  comments to the NPRMs were directly or indirectly considered when issuing the temporary

8  modification and letter."[3] As discussed below (Part II.C), this discovery revealed that the State

9  Department did *not* consider the comments.

10      On April 16, 2019, the Federal Defendants filed a Second Supplement (Dkt. # 179),[4] and

11  on May 6, 2019, they filed a Revised Second Supplement (Dkt. # 184) of the administrative

12  record. According to the Certifications, these supplemental materials consist of 4,150 previously

13  unfiled documents, of which 904 are filed publicly and 3,246 are logged as privileged and

14  withheld in full.[5] The revised privilege log (Dkt. ## 184-13 & 184-14) reflects documents with

15  a number of questionable redactions. For example, an email from New Hampshire Governor

16  Chris Sununu to State Department officials lobbying on behalf of a New Hampshire-based

17  multinational firearms manufacturer was redacted, purportedly under the deliberative process

18  privilege,[6] as were numerous post-decisional communications and communications with internal

19  public relations staff. Because of these and other irregularities and omissions, the States do not

20  concede that the record is complete or that the privilege claims are proper. Nevertheless, because

21  the record in its current form amply demonstrates that the Federal Defendants' covert

---

[2] Dkt. # 175 at 8.
[3] *Id.* at 7. By way of response to the States' discovery request pursuant to the Order, the Federal Defendants submitted the Declaration of Michael F. Miller and the Declaration of Robert Monjay. *See* Dkt. # 179 at 2.
[4] The original privilege log filed on April 16, 2019 was deficient, as hundreds of pages' worth of entries did not indicate any basis for withholding whatsoever. Second Declaration of Kristin Beneski, Ex. O (Ltr. dated April 25, 2019); Dkt. # 184-1, ¶ 11.
[5] Dkt. # 179-1 (Certification of Second Supplement), ¶ 21 (3,240 documents withheld; 910 produced); Dkt. # 184-1 (Certification of Revised Second Supplement), ¶¶ 5–10 (30 additional privilege claims, 6 withheld in full).
[6] Ex. P (WASHAR0035756); Dkt. No. 184-14 at 606.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023699

deregulation of 3D-printable guns was unlawful for multiple reasons, this case is ripe for determination by summary judgment.

**B.** **The Revised Second Supplement Reveals That "Nothing Changed" from the State Department's Perspective Regarding 3D-Printable Guns**

Despite the questionable validity of the withholding and redactions, the Revised Second Supplement is far more complete than the cherry-picked record the Federal Defendants initially filed in October 2018. Among other documents, it includes samples of the *more than 106,000 emails* from members of the public between July 23 and July 27, 2018, urging the Department not to exempt 3D-printable guns from regulation via the "temporary" modification; multiple letters from Congressional leaders urging reconsideration of the deregulation of 3D-printable gun files; detailed comment letters from U.S. Senators and public policy organizations; and approximately 155 documents and communications related to the settlement of the *Defense Distributed* litigation.[7]

One document in the Revised Second Supplement in particular sheds new light on the decision to deregulate 3D-printable firearms: on July 26, 2018—the day before the State Department issued the Temporary Modification and Letter—a Senate Foreign Relations staffer emailed State Department personnel to request an analysis as to why the Department had changed the position it took in its April 4, 2018 motion to dismiss in the *Defense Distributed* case.[8] Joshua M. Paul of the State Department replied that this was a "technical legal question" that should be directed to the Department of Justice.[9] In a following internal email exchange, Defendant Sarah Heidema—the Director within DDTC who in this case certified that the original, cherry-picked administrative record filed was "complete" and asserted, absent any record evidence, that the State Department "determined" that 3D-printable firearms "pose little national security concern"[10]—argued that it was actually "a question for us [the State

---

[7] *See* Second Declaration of Jennifer D. Williams, ¶ 4.
[8] Ex. Q (WASHAR0000212).
[9] *Id.*
[10] Dkt. # 64-1 (Heidema Decl.), ¶ 19; Dkt. # 116 (Certification), ¶ 4; *see also* Dkt. # 175 (Order) at 3–6.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023700

Department]" about "why we stopped arguing that the technology subject to the case, if released, would harm national security or foreign policy[.]"[11] But Paul stated that the reason for the planned deregulation was "fundamentally a DOJ question" because "nothing changed on our side" as to those issues.[12] Paul's statements are consistent with contemporaneous remarks by Heather Nauert, who told the press that the State Department still had "equity" in the matter of 3D-printable guns, but that it "took the advice of the Department of Justice" to settle the case by agreeing to deregulate them.[13] Paul's and Nauert's statements are *inconsistent* with the Federal Defendants' assertion in this case that the Department "determined" that deregulating 3D-printable firearms was "in the interest of" U.S. national security and foreign policy. *See* SMSJ at 19.

Another email exchange between Paul and a Senate Foreign Relations staffer starkly reveals the Federal Defendants' failure to consider the particular problems posed by 3D-printed guns before issuing the Temporary Modification and Letter. On July 20, 2018, the staffer wrote to Paul to ask about "the law enforcement and counter-terrorism implications of" the deregulation, noting that "[e]nabling the widespread acquisition of undetectable or largely-undetectable firearms" would potentially undermine "protection of domestic and international airline flights from terrorist hijacking/attacks."[14] The staffer further asked: "What changes will be required by TSA here and abroad to deal with this?"[15] Paul was unable to answer these basic questions. Instead, he admitted that the State Department "would need to refer you to TSA or other law enforcement organizations on this question."[16] Paul suggested that the State Department could not answer these key national security questions because its "nexus on this issue was/is limited to [its] role in controlling exports of tech data[.]"[17] Paul's statements, made

---

[11] Ex. Q (WASHAR0000211).
[12] *Id.*
[13] SMSJ at 19 (citing Dkt. # 35-1 at 5 of 46).
[14] Ex. R (WASHAR0000221).
[15] *Id.*
[16] *Id.* (WASHAR0000220).
[17] *Id.*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

4

WASHSTATEC023701

just a week before the Federal Defendants issued their Temporary Modification, highlight the

extent to which they utterly failed to consider the national security implications of their plan to

deregulate 3D-printable guns.

Yet another email from Paul undermines one of the Federal Defendants' *post hoc*

arguments concerning the deregulation of 3D-printable guns. In a July 25, 2018, email thread

discussing public talking points on the Defense Distributed settlement, a staffer notes that the

Department of Justice has requested language indicating that the "3-D files at issue" do not

violate the Undetectable Firearms Act because Defense Distributed's "design . . . requires adding

metal after printing."[18] In response, Paul states: "I think that's legally valid but not particularly

useful in a public/Congressional context, as the pin can be removed and put in your other

pocket."[19] Paul's response confirms the obvious: the State Department is well aware that

allowing the unlimited distribution of 3D-printable gun files will make it much easier for anyone

who wants to evade the Undetectable Firearms Act to do so.

## C. The State Department Admittedly Failed to Consider Public Comments on the NPRMs *and* the Challenged Actions Themselves

In addition to the revelations discussed above, the Miller Declaration (Dkt. # 179-2)

shows that the decision to enact the Temporary Modification and Letter was taken *solely*

"pursuant to an action memorandum recommending to the Under Secretary of State for Arms

Control and International Security that she approve the temporary modification to the ITAR."[20]

The redacted "action memo" states that approval of the Temporary Modification and Letter is

"required to comply with the Defense Distributed settlement agreement."[21] No other rationale is

provided. *See also* SMSJ at 5–6, 16–17, 19; FDMSJ at 10 ("[I]t is no secret that the Temporary

Modification and Letter arose from a settlement of the *Defense Distributed* litigation."). Despite

---

[18] Ex. S (WASHAR0035889–90).

[19] *Id.*

[20] Dkt. # 179-2 (Miller Decl.) ¶ 7.

[21] *Id.*, Ex. 1. The action memo's redactions are for "Deliberative - Predecisional Intra-agency Discussion" and "Attorney-Client Privilege." Dkt. # 184-13 at 1 of 47 (Privilege Log).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

5

WASHSTATEC023702

the Court's statement that it "seems likely that a reasonable decisionmaker would be interested in reviewing comments regarding a related rule change proposal before announcing a temporary modification of the same rule,"[22] the Miller Declaration confirms that State Department staff **"did not rely on the comments to the NPRM in preparing the memorandum."**[23] This means that the Department failed to consider or account for over 3,600 public comments, including the nearly 400 that specifically opposed the new rule on the ground that it would deregulate 3D-printable gun files. Dkt. # 170 at 8.

Some of the comments the State Department ignored came from key experts—including several that were significant enough to merit special mention by the State Department staffer in charge of comment review[24]—warning of the dangerous sweep of the Federal Defendants' covert deregulation of 3D-printable guns. For example, Professor Susan Waltz of the University of Michigan's Gerald R. Ford School of Public Policy pointed out that the State Department's proposed rule "would appear to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce via 3D-printing technology . . . the firearms removed from USML."[25] Professor Waltz suggested a few simple ways the State Department could address this glaring problem— none of which the Department adopted.[26] Another comment, from the Brady Campaign to Prevent Gun Violence, warned that, "under the proposed rules," companies like Defense Distributed "would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States)."[27] The State Department also disregarded comments from hundreds of individuals warning that "[t]he rule change would make the world a far more dangerous place" by

---

[22] Dkt. # 175 at 7.
[23] Dkt. # 179-2 (Miller Decl.) ¶ 7 (emphasis added).
[24] Dkt. # 179-3 (Monjay Decl.) ¶ 4.
[25] Dkt. # 179-3 at 14 of 44 (Monjay Decl. Ex. B at 5).
[26] *Id.*
[27] Dkt. # 179-3 at 39 of 44 (Monjay Decl. Ex. D (part 2) at 8).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

6

WASHSTATEC023703

1   "effectively enabling 3D printing of firearms in the U.S. and around the globe."[28] The Federal

2   Defendants concede that all of these comments and more were ignored entirely.

3        Not only did the State Department ignore comments received during the formal

4   rulemaking comment period, but it also admittedly failed to consider public input *specifically*

5   *opposing the challenged actions themselves* during the week prior to July 27, 2018, once word

6   of their impending issuance had gotten out.[29] These additional materials included letters from

7   members of Congress and over 106,000 emails from individuals. For example:

- A July 20, 2018, letter from then-Ranking Member (now Chairman) of the House Foreign Affairs Committee, Rep. Eliot Engel,[30] urging Secretary Pompeo not to deregulate 3D-printable gun files. As Rep. Engel warned, deregulation was "exceptionally dangerous," as it would make "undetectable" weapons "available to anyone with a laptop and a 3-D printer," and "defeat[] US laws which require background checks on the sale of weaponry." Rep. Engel further noted that the State Department was "mis-using authority under Section 126.2 of the [ITAR] to 'temporarily' remove this technical information from the [USML]" when, "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it." This misuse of Section 126.2 "suggests the Department officials sought a way to avoid complying with Section 38(f) of the [AECA], which requires advance notification to Congress for any removal from the USML."

- A July 25, 2018, letter from Ranking Member of the Senate Foreign relations Committee, Sen. Robert Menendez,[31] urging Secretary Pompeo to halt the "worldwide release" of 3D-printable gun files, which "would allow any foreign or domestic persons, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively 'download' a gun." As Senator Menendez noted, the State Department's "temporary" deregulation "appears to evade statutory requirements and skirts an ongoing regulatory review process." Moreover, echoing AECA's statutory standards, Senator Menendez's letter pointed out that it was "hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States."

---

[28] *See, e.g.*, Ex. T; *see generally* Second Williams Decl. ¶ 4(1) & n.1.

[29] FDMSJ at 10 ("[D]ocuments . . . initially omitted from the administrative record . . . were not among the documents considered by the agency decision-maker.").

[30] Ex. U (CWASHAR0000413–14).

[31] Ex. V (WASHAR0003424-25). On July 23, 2018, five Senators sent a similar letter to then-Attorney General Jeff Sessions, urging dismay with the Department's settlement of the *Defense Distributed* suit. Ex. W.

PLAINTIFF STATES' COMBINED          7         ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                        Complex Litigation Division
JUDGMENT AND OPP TO                            800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                        Seattle, WA 98104-3188
2:18-cv-01115-RSL                                  (206) 474-7744

WASHSTATEC023704

"This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks."

- <u>Hundreds of individual emails</u>[32] from Americans who were "deeply disturbed" by the State Department's decision to allow "blueprints . . . online [that] will be used by criminals and terrorists to easily and cheaply mass-manufacture all-plastic weapons that can defeat security checkpoints" and "are difficult if not impossible to trace";[33] who urged the Department to "[s]top the special exemption for downloading printable 3D guns" which "will, without a doubt, be used in illegal, violent activity";[34] and who were "begging [the Department] to use common sense" and prevent "individuals who can't pass background checks —terrorists, felons, and domestic abusers" from obtaining "functioning guns . . . on demand."[35]

- <u>105,555 emails received from visitors to Everytown.org in a single five-day period</u>,[36] urging the Department to "stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers."

The Revised Second Supplementation also includes a breakdown of comments on the Commerce Department's companion NPRM. Of the roughly 3,000 comments received by the Department, 2,945—98%—opposed the rule.[37] It appears the State Department did not consider these comments, either.

**D.     No Final Rules Have Been Published**

As a further factual update, as of this filing, neither the State Department nor the Commerce Department has issued the final rules that they indicated would be forthcoming.[38]

### III.     ARGUMENT

The Federal Defendants mostly repeat arguments that the Court has already correctly rejected, pointing to nothing in the several-times-supplemented administrative record to support

---

[32] Dkt. # 184-12 at WASHAR0036607–37068.
[33] *Id.* at WASHAR0036611.
[34] *Id.* at WASHAR0036612.
[35] *Id.* at WASHAR0036621.
[36] *Id.* at WASHAR0037069–74. The States agreed that the 105,555 emails referenced in this "Summary of Duplicative Materials" could be incorporated into the administrative record by reference.
[37] Ex. X (WASHAR0000903–04).
[38] *See* SMSJ at 9; Dkt. # 131 (Fed. Defs' Mot. to Stay).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

their position, and otherwise offering no valid reason why they should prevail. The Court should vacate the Temporary Modification and Letter and permanently enjoin any future attempt to "temporarily" deregulate 3D-printable guns that bypasses congressional review and oversight.

## A. The Plaintiff States Have Standing, as the Court Already Ruled

The Court has already correctly ruled that the States have standing. The Federal Defendants ask the Court to revisit that conclusion, but offer no new reason to do so: instead, they rehash and incorporate meritless arguments made in opposing preliminary injunctive relief. FDMSJ at 7–9 & n.3.[39] The Court should reject these recycled arguments and find that the States have standing for the same reasons it did so previously. *See* Dkt. # 95 (Preliminary Injunction) at 9–11.

The Federal Defendants argue that the States are not within the "zone of interests" protected by AECA. FDMSJ at 7–9. This test, which "is not meant to be especially demanding," asks whether the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute" at issue. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (citations and quotations omitted). Its purpose is to "exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987). Thus, "[t]he test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225; *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 n.5 (9th Cir. 2018) (same). The test is applied "in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable," and requires no "indication of congressional purpose to benefit" the plaintiff. *Match-E-Be-Nash-She-Wish*, 567

---

[39] *Compare* Dkt. # 64 (Fed. Defs' Opp. to Mot. for PI) at 16–18. To the extent the Federal Defendants incorporate their prior briefing on the motion for preliminary injunction by reference, the States likewise incorporate their own prior briefing. *See* Dkt. # 43 (Mot. for PI) at 9–10; Dkt. # 68 (Reply ISO Mot. for PI) at 11–12. The States' previous briefing also addresses the Private Defendants' already-rejected challenges to standing. *Compare* PDMSJ at 7–8 *with* Dkt. # 63 (Pvt. Defs' Opp. to Mot. for PI) at 12–13.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023706

1    U.S. at 225. Any doubts about zone-of-interests standing must be resolved in the plaintiff's favor.

2    *Id.* ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that

3    the benefit of any doubt goes to the plaintiff.").

4        The States easily satisfy this test: their significant safety and security interests are not

5    only consistent with, but fall *squarely within*, AECA's purpose of protecting "the security . . . of

6    the United States." 22 U.S.C. § 2778(a)(1); *see* FDMSJ at 8 (acknowledging that "national

7    security" is a "primary concern" of AECA). The States' domestic security concerns are part and

8    parcel of "national security." *See, e.g.*, *United States v. U.S. Dist. Court*, 407 U.S. 297, 321

9    (1972) (recognizing the "domestic aspects of national security"); *Hodges v. Abraham*, 253 F.

10   Supp. 2d 846, 868 (D.S.C. 2002) (federal government using "national" and "domestic" security

11   interchangeably). Because the States seek to "vindicate some of the same concerns that underlie"

12   AECA—namely, concerns about security and safety—their claims fall squarely "within the

13   statute's zone of interests." *Havasupai Tribe*, 906 F.3d at 1167.

14       Not only are the States' interests fully consistent with AECA's purpose, but this lawsuit

15   expressly seeks to enforce the statute's terms. In contrast to *Cheney* (FDMSJ at 8–9), in which

16   the State of Illinois challenged the validity of a statute governing the closure of military

17   installations in furtherance of interests "completely inconsistent" with that statute, the States here

18   do not seek to usurp any authority that properly "rests with Congress." *People ex rel. Hartigan*

19   *v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989). Rather, the States seek to *vindicate* the statute

20   and Congress's intent by challenging *ultra vires* executive actions that unlawfully bypassed the

21   statute's congressional notice requirement. This lawsuit furthers AECA's purposes in every

22   sense; it is the Federal Defendants, not the States, who sought to "frustrate" AECA by evading

23   congressional review and oversight of their deregulatory effort.

24   **B.    The Temporary Modification and Letter Are Contrary to Law**

25       **1.    The Temporary Modification and Letter violate AECA.**

26       As with standing, the Federal Defendants recycle their meritless argument that the State

PLAINTIFF STATES' COMBINED                      10              ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                        Complex Litigation Division
JUDGMENT AND OPP TO                                                  800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                              Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                        (206) 474-7744

WASHSTATEC023707

Department did not violate AECA's congressional notice requirement because the subject files are not "items," and can therefore be removed from the Munitions List without notice. FDMSJ at 9. But as the Court has already correctly ruled, this argument conflates "category" with "item," contrary to the "language, structure, and purpose of the statute and implementing regulations[.]" Dkt. # 95 at 14; *see also* Dkt. # 43 at 11–13; Dkt. # 68 at 4–5. Furthermore, the challenged actions were not "only" a "temporary" modification, as asserted (FDMSJ at 9); rather, the Temporary Modification was to "remain in effect while the final rule . . . is in development"—leapfrogging the entire notice-and-comment rulemaking process. *See* Dkt. # 95 at 15 ("The temporary modification was an effort to implement the removal immediately, without waiting for the rule to become final and without giving Congress notice and an opportunity to exercise its oversight role."). Moreover, as the Court has already found, even a "temporary" deregulation would allow "immediate" distribution of the subject files and cause "irreparable" harms to the States. *Id.* at 13, 20–25. Public commenters (whom the State Department ignored) pointed this out as well.[40] As for the Letter, it was not "temporary" even by its own terms, as it purported to approve the subject files for "public release (i.e., unlimited distribution)" immediately and with no time limitation.[41] The State Department's failure to comply with AECA's 30-day congressional notice requirement before issuing the Temporary Modification and Letter, on its own, renders these actions unlawful and requires that they be set aside. *See* SMSJ at 10–11.[42]

## 2. The Temporary Modification and Letter violate the Tenth Amendment.

The Federal Defendants' litigation position that the Temporary Modification and Letter do not "conflict[] with or otherwise preempt[]" state laws is belied by the text of those documents, which on their face expressly authorize "any United States person" to "use" the

---

[40] *See, e.g.*, Ex. U (Rep. Eliot Ltr.) (modification of the Munitions List was not "temporary" because "as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it").

[41] Ex. J.

[42] The Private Defendants argue that Congress received notice after the fact. PDMSJ at 18. The Court has already correctly rejected this argument, ruling that *post hoc* notice does not satisfy AECA. Dkt. # 95 at 15.

<table>
<tr><td>PLAINTIFF STATES' COMBINED<br>REPLY ISO MOTION FOR SUMMARY<br>JUDGMENT AND OPP TO<br>DEFENDANTS' CROSS-MOTIONS<br>2:18-cv-01115-RSL</td><td>11</td><td>ATTORNEY GENERAL OF WASHINGTON<br>Complex Litigation Division<br>800 5th Avenue, Suite 2000<br>Seattle, WA 98104-3188<br>(206) 474-7744</td></tr>
</table>

WASHSTATEC023708

1   subject files to 3D-print untraceable and undetectable weapons, and expressly authorize the

2   "unlimited distribution" of such files. SMSJ at 11–12; *cf. Price v. Stevedoring Serv. of Am., Inc.*,

3   697 F.3d 820, 830 (9th Cir. 2012) (no deference owed to agency's *post hoc* litigation position;

4   agency actions must be adjudged on the record). These federal authorizations are inconsistent

5   with, and on their face purport to preempt and undermine, state gun-safety laws that *restrict*

6   certain persons from possessing and manufacturing firearms and/or that regulate the distribution

7   of CAD files for 3D-printed firearms. SMSJ at 11–12. Such laws are concededly within the

8   police powers reserved to the States and protected by the Tenth Amendment. *Id.*; FDMSJ at 12.

9   That the Federal Defendants disavow any preemptive intent for litigation purposes is small

10  comfort given the plain language of the operative Temporary Modification and Letter.

11          The anti-commandeering cases on which the Federal Defendants rely (FDMSJ at 10–11)

12  confirm that the Tenth Amendment has the force of law and meaningfully protects states from

13  interference that exceeds the limits of the federal government's powers. Commandeering state

14  officials to enforce federal laws is by no means the only way in which the federal government

15  can violate the Tenth Amendment, and the Federal Defendants cite no support for that view.

16  Their authority is distinguishable, as this is not a case in which the federal government is merely

17  encouraging (but not coercing) states to implement federal programs, as in *Environmental*

18  *Defense Center, Inc. v. U.S. E.P.A.*, 344 F.3d 832 (9th Cir. 2003), *Printz v. United States*, 521

19  U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). Here, the State Department

20  is intruding into the States' sphere of authority by exercising a power it does not have—the

21  power to authorize any adult or child in the United States to access and "use" 3D-printable files

22  to produce illegal and dangerous weapons—in a way that deprives the States of their ability to

23  exercise their sovereign police powers and enforce their gun-safety laws. This federal usurpation

24  of state authority is unconstitutional.

25  **C.      The Temporary Modification and Letter Are Arbitrary and Capricious**

26          The States' Motion details *numerous* ways in which the Temporary Modification and

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

12

WASHSTATEC023709

Letter are arbitrary and capricious as a matter of law. SMSJ at 12–20. This is substantiated by the Revised Second Supplement, which reveals that the State Department's decision to deregulate 3D-printable guns was made *solely* to settle a lawsuit, without any apparent consideration for how the proliferation of undetectable, untraceable guns would affect "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2278(a)(1).

The Federal Defendants have little to say in response: they argue that the challenged actions are lawful because (1) "the government had determined that small-caliber firearms" do not provide a "critical military or intelligence advantage"; and (2) untraceable, undetectable, 3D-printable firearms are no different than "small-caliber firearms generally" for purposes of export regulation. FDMSJ at 9–10. These conclusory arguments are fatally flawed for several reasons.

First of all, the exclusive focus on "critical military or intelligence advantage" ignores the "important aspect[s] of the problem" that the State Department "entirely failed to consider": namely, the specific properties of 3D-printed guns and the unique threats they pose to world peace, national security, and foreign policy. SMSJ at 15–18. The Federal Defendants do not address these issues at all; this tacitly conceded failure to consider them alone renders the Department's actions arbitrary and capricious. *See id*; *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 1983) (agency must consider all "relevant factors," particularly those "Congress intended" the agency to consider); *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (failure to address record evidence on an "important aspect of the problem" renders agency action arbitrary and capricious); *see also Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (noting that a party "abandoned . . . claims by not raising them in opposition to [a] . . . motion for summary judgment"). Furthermore, the Miller Declaration confirms that the Department failed to consider or account for hundreds of public comments that opposed the 2018 NPRMs *precisely* because they would deregulate 3D-printed guns, and therefore threaten safety and security in the United States. The Department concededly failed to consider these or the remainder of the 3,600 comments opposing the NPRMs, or the

PLAINTIFF STATES' COMBINED REPLY ISO MOTION FOR SUMMARY JUDGMENT AND OPP TO DEFENDANTS' CROSS-MOTIONS 2:18-cv-01115-RSL

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023710

1  desperate pleas of over 106,000 members of the public and Congress seeking to stop the

2  "temporary" deregulation in the final days before it was effectuated. The Department completely

3  failed to fulfill its obligation to "'consider and respond to significant comments received during

4  the period for public comment.'" *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1251

5  (9th Cir. 2018) (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)); *see also*

6  *Tesoro Alaska Petrol. Co. v. F.E.R.C.*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("Unless an agency

7  answers objections that on their face appear legitimate, its decision can hardly be said to be

8  reasoned.").

9        Second, merely reiterating the Department's conclusory "determin[ation]" (FDMSJ at 9)

10  is far from adequate: to survive judicial review, the Federal Defendants must show that the

11  determination was a *reasoned* one that is "logical and rational" and supported by the

12  administrative record. SMSJ at 12–15. Otherwise, judicial review would be meaningless, for an

13  agency would always be able to defend an irrational decision by stating the tautology that it

14  "determined" the decision was justified. *See id.* This is not what the APA prescribes. A reviewing

15  court's "'inquiry into the facts is to be searching and careful,'" *ASSE Int'l, Inc. v. Kerry*, 803

16  F.3d 1059, 1072 (9th Cir. 2015) (quoting *Overton Park v. Volpe,* 401 U.S. 402 at 416), and courts

17  "shall" invalidate arbitrary and capricious agency actions. 5 U.S.C. § 706. Here, the only asserted

18  basis for the State Department's "determination" is the 2018 NPRMs. FDMSJ at 9. That rationale

19  is circular: the NPRMs are *proposed* rules published at the beginning of the rulemaking process,

20  before the agencies received any public comments, and they do not even mention 3D-printed

21  guns. Yet the "temporary" modification purported to implement the NPRMs before the

22  rulemaking process was complete, and the State Department admittedly did not consider *any* of

23  the public comments. Remarkably, even as they ignore a mountain of comments and evidence

24  that contradict their position, the Federal Defendants point to *nothing* in the filed administrative

25  record that would support a determination that 3D-printable firearms somehow no longer pose

26  unique risks or that authorizing their publication on the internet poses no problems. Even after

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023711

1    multiple supplementations, the record contains no such support.

2         Third, the notion that 3D-printable guns are no different than "small-caliber firearms

3    generally" (FDMSJ at 10) cannot be credited because it lacks any support in the record. *See*

4    SMSJ at 12–13 (citing case law explaining that "the basis for the agency's decision must come

5    from the record"). In fact, although the Federal Defendants have repeatedly characterized the

6    Temporary Modification and Letter as an outgrowth of a decade-long export reform effort,[43] the

7    Revised Second Supplement confirms that the federal government did not consider 3D-printable

8    firearms or the export of CAD files via the domestic/international internet *at all* when it

9    developed the proposed rules. Specifically, in a news article circulated within the State

10   Department on May 24, 2018, the Commerce Department official who was leading the

11   development of those regulations as of 2012 stated that the NPRMs **"have literally absolutely**

12   **nothing to do with domestic gun control . . ."**[44] The Federal Defendants' *post hoc* litigation

13   position also contradicts thousands of public comments opposing the rules on the grounds that

14   they would deregulate 3D-printable firearms—comments that the Department admittedly did not

15   consider and failed to address.[45] Likewise, Department official Joshua M. Paul admitted that he

16   could not answer basic questions regarding how TSA or other law enforcement agencies would

17   deal with a proliferation of 3D-printed firearms because the State Department's consideration

18   "was/is limited to [its] role in controlling exports of tech data[.]"[46] Moreover, the Federal

19   Defendants' *post hoc* litigation position contradicts the Department's *own admissions*—both

20   before and after the *Defense Distributed* settlement, and in this litigation—that 3D-printable

21   firearms *do* pose unique security threats. *See* SMSJ at 14, 15–16, 17, 19–20. State Department

22   communications recently filed as part of the Revised Second Supplement make this strikingly

23   clear: on July 27, 2018, Paul stated that **"nothing changed on our side"** regarding the national

24   ───────────────

         [43] FDMSJ at 5 n.1; Dkt. # 64 at 5 n.1; Dkt. # 131 at 1.
25       [44] Ex. Y (WASHAR0035627) (emphasis added).
         [45] Dkt. # 179-2 (Miller Decl.) ¶ 7; *see also* FDMSJ at 10 ("[D]ocuments . . . initially omitted from the
26   administrative record . . . were not among the documents considered by the agency decision-maker.").
         [46] Ex. R (WASHAR0000220).

PLAINTIFF STATES' COMBINED                          15                 ATTORNEY GENERAL OF WASHINGTON
REPLY ISO MOTION FOR SUMMARY                                                  Complex Litigation Division
JUDGMENT AND OPP TO                                                           800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                                        Seattle, WA 98104-3188
2:18-cv-01115-RSL                                                                  (206) 474-7744

WASHSTATEC023712

security and foreign policy threats posed by 3D-printable firearms.[47]

Further, the idea that 3D-printed firearms may be regulated by "other agencies" (FDMSJ at 10) does not make it rational for the State Department to unilaterally authorize functional CAD files to be exported and published on the internet, allowing anyone in the world to download and use them to create untraceable and undetectable weapons that could drastically threaten safety and security. *See* Dkt. # 95 at 23 ("Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons—both domestically and internationally—rings hollow and in no way ameliorates, much less avoids, the harms that are likely to befall the States . . ."). Indeed, the State Department has privately conceded that allowing for the distribution of 3D-printable guns will make it easy to evade the Undetectable Firearms Act.[48]

A finding of pretext or bad faith is not necessary for the States to prevail on their claim that the challenged actions are arbitrary and capricious. But the evidence that the Department's stated rationale was pretextual is overwhelming; its shifting and inconsistent explanations are well documented in the record. SMSJ at 7–8, 13–14, 18–20. The Revised Second Supplement— which contains documents that were improperly withheld for over six months after the Federal Defendants certified an incomplete administrative record—provides further evidence that the real reason for the deregulation of 3D-printable firearms was a directive from the Department of Justice, not a rational and evidence-based determination by the State Department. The Revised Second Supplement reveals the State Department's understanding that **"nothing changed on our side"** with respect to the national security implications of 3D-printable guns, and that the reason for the *Defense Distributed* settlement was "fundamentally a DOJ question[.]"[49]

In sum, the Temporary Modification and Letter are both contrary to law and arbitrary and capricious, and should be set aside. 5 U.S.C. § 706.

---

[47] Ex. Q.
[48] Ex. S (WASHAR0035889–90) (discussed *supra*, Part II.B).
[49] Ex. Q.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023713

**D.      Vacatur and a Permanent Injunction Are Needed to Provide Complete Relief**

The Federal Defendants agree that vacatur is the appropriate remedy in the event the Court finds the Temporary Modification and Letter to be contrary to law and/or arbitrary and capricious. FDMSJ at 12. Remand *without* vacatur, as discussed in *National Association of Home Builders* (FDMSJ at 13), is inappropriate because this is not a case in which "clarification" would resolve the issues with the State Department's actions; rather, the Temporary Modification and Letter are fundamentally deficient because they are contrary to law and arbitrary and capricious, as discussed above. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 657–58 (2007) (courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but must vacate agency actions that violate the APA).

The Federal Defendants disagree that injunctive relief is warranted. FDMSJ at 12–15. But the States are not improperly seeking a "vague" or "sweeping injunction[] to obey the law," as the Federal Defendants suggest. *Id.* at 13. The States are seeking to prevent the same type of "temporary" deregulation with no warning as occurred in July 2018, which required the States to act swiftly to file this lawsuit and obtain emergency relief to prevent irreparable harm. Thus, this case in fact presents "temporal constraints" similar to those supporting the injunction in *New York v. U.S. Department of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019). FDMSJ at 14. The Federal Defendants appear to raise the possibility of addressing the States' concern by some means other than a permanent injunction, but have not proposed any such solution to the States or the Court. *See id.* (suggesting that "the Department should be permitted to address any concerns the Court might have without the need for an injunction," but making no proposal).

The Federal Defendants also argue that the *Winter* factors are not met. FDMSJ at 14–15. But their contention that the States' evidence of irreparable harm caused by the international and domestic availability of 3D-printed guns is somehow unrelated to the State Department's deregulation of 3D-printable gun files fails for the same reasons the Court has already articulated. The Court found that "Defendants' argument is so myopic and restrictive as to be unreasonable.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023714

Whatever defendants' statutory authority, the fact is that the internet is both domestic and international. . . . Thus, the alleged failures to provide notice and to make a reasonable evaluation of the risks and benefits of the proposed action not only impact national security but have domestic repercussions as well." Dkt. # 95 at 10; *see also id.* at 20–24 (discussing likelihood of irreparable harm and balance of hardships weighing in favor of the States and the public).

The Private Defendants, for their part, rely on Justice Thomas' concurring opinion in *Trump v. Hawaii*, which every other justice declined to join, to argue against the concept of nationwide injunctions generally. PDMSJ at 23–24 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring)). But injunctions against unlawful federal agency actions are "commonplace in APA cases" and supported by an "uncontroverted line of precedent." *E. Bay Sanctuary Covenant*, 909 F.3d at 1256; *see also New York*, 351 F. Supp. 3d at 677 ("Because the Secretary's *decision* was universal, APA relief directed at that decision may—indeed, arguably must—be too.") (citing 5 U.S.C. § 706(2) and *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The Private Defendants fail to explain how a less-than-nationwide injunction—one that somehow prohibits the Federal Defendants from attempting another unconstrained "temporary" deregulation of export-controlled items as to some areas of the United States but not others—would even function. Practically speaking, such an injunction would quickly become obsolete, because once files are posted on the internet from *any* location, they can be accessed virtually anywhere. Moreover, an injunction without regard to location is appropriate because *any* "temporary" modification of the Munitions List "would almost certainly run afoul" of AECA. *New York*, 351 F. Supp. 3d at 678.

**E.      The Private Defendants' Arguments Do Not Require a Different Result**

The Private Defendants oppose summary judgment in the States' favor for a host of meritless reasons: from an asserted lack of personal jurisdiction (which was waived long ago) to novel constitutional theories that have little relevance to this case and have never been accepted by any court. This Court has already rejected many of these theories, and should do so again.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**1.      The Private Defendants' jurisdictional arguments lack merit.**

The Private Defendants challenge both the Court's personal jurisdiction over them and its subject matter jurisdiction over this case. PDMSJ at 4–12. Their challenge to personal jurisdiction is waived because they failed to preserve it when they filed a motion under Rule 12. *See* Fed. R. Civ. P. 12(h)(1)(A) (a party waives the defense of lack of personal jurisdiction by "omitting it from a motion" under Rule 12). Plaintiffs' Rule 12(c) motion (Dkt. # 114) did not assert any lack of personal jurisdiction, and their convoluted non-waiver theory misreads Rule 12(h)(1)(A) by conflating it with Rule 12(g)(2). *See* PDMSJ at 8 n.7. The Court may disregard the Private Defendants' lengthy argument against personal jurisdiction (*id.* at 8–12), since they have waived that defense. *See Schnabel v. Lui*, 302 F.3d 1023, 1034 (9th Cir. 2002) (declining to examine personal jurisdiction over defendant that "waived any defense of lack of personal jurisdiction . . . by failing to raise the defense in its first motion" under Rule 12). The Private Defendants' objections to personal jurisdiction lack merit in any event. Defense Distributed's website is not "passive" (PDMSJ at 9), but instead actively invites visitors to download CAD files. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper."). And the Private Defendants' contention that any downloads of Defense Distributed's files are purely conjectural is patently inconsistent with their claims that the files have been downloaded "millions" of times. *Compare* PDMSJ at 10–11 *with* PDMSJ at 2 n.2.

The Private Defendants' multi-pronged challenge to subject matter jurisdiction—which the Federal Defendants notably have never joined—fails for the same reasons it failed previously. *Compare* PDMSJ at 4–7 *with* Dkt. # 63 at 10–12 *and* Dkt. # 69 (Pvt. Defs' Notice of Supp. Auth. re Tucker Act). Their assertion that executive actions under AECA are *never*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023716

reviewable (PDMSJ at 4, 5–6) relies on the same inapposite case law they cited previously[50] and ignores cases that *have* reviewed agency action under AECA. Dkt. # 68 at 12 & nn. 26–27. Their observation that the *designation* of Munitions List items is not subject to judicial review under 22 U.S.C. § 2778(h) (PDMSJ at 4) has no applicability to the *removal* of items from the Munitions List at issue here. *See* Dkt. # 68 at 12; Dkt. # 95 at 13 ("the temporary modification . . . constitutes the *removal* of one or more items from the USML . . .") (emphasis added).[51] And the Tucker Act (PDMSJ at 6–7) plainly doesn't apply to the *statutory* (not contractual) challenges to agency action in this case. *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985); *contra Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (Tucker Act bars claims that are "contractually-based, not statutorily-based"). As the Private Defendants have already acknowledged, this is not a contract case: "the [*Defense Distributed*] settlement agreement is not this action's true subject and this action will neither assail nor protect the Private Defendants' interest therein." Dkt. # 114 at 5; *see* Dkt. # 95 at 11–12 (this lawsuit is not a "collateral attack" on the dismissal of the *Defense Distributed* lawsuit pursuant to the settlement agreement).

### 2. The Private Defendants' constitutional theories do not preclude the Court from setting aside unlawful agency actions.

The Private Defendants argue that setting aside the unlawful agency actions at issue would offend the First Amendment. PDMSJ at 19–23. This argument is doubly flawed because (i) the First Amendment is inapposite to the merits of this APA case and (ii) the Private Defendants' novel and expansive First Amendment theory fails on its merits.

### (i) *The First Amendment is irrelevant.*

It is a "simple but fundamental" rule of administrative law that the propriety of agency

---

[50] *Corrie v. Caterpillar, Inc.* (PDMSJ at 6) is likewise inapposite, as it did not involve a challenge to agency action, but was a private lawsuit against a supplier of equipment to the Israeli Defense Forces. 503 F.3d 974 (9th Cir. 2007. As *Corrie* itself cautions, "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* at 982 (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)).

[51] For the same reasons, their argument that the State Department's actions here are unreviewable under the APA (PDMSJ at 12) lack merit.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023717

1    action is judged "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S.

2    194, 196 (1947). Neither the court nor the other parties may "supply a reasoned basis . . . that

3    the agency itself has not given." *Id.* at 196. However emphatically the Private Defendants invoke

4    the First Amendment, the Federal Defendants have never asserted it as a basis for the Temporary

5    Modification or the Letter. To the contrary, they have consistently maintained—both in this case

6    and throughout the *Defense Distributed* proceedings in Texas—that the Department's regulation

7    of the subject files under ITAR never violated Defense Distributed's First Amendment rights.[52]

8    The Private Defendants may wish to inject the First Amendment into these proceedings, but the

9    Federal Defendants have never invoked it as a basis for the challenged actions. It therefore does

10   not bear on the legal merits of this APA case.

11           The Private Defendants' dogged efforts to be dismissed from this case at multiple stages

12   further undercuts any notion that their purported First Amendment rights are directly

13   implicated.[53] *See* PDMSJ at 4–12 (seeking dismissal on jurisdictional grounds); Dkt. # 114 at 4–

14   7 (seeking dismissal on the grounds that "The Private Defendants Have No Interest Protected By

15   this Action").[54] While the Private Defendants are wrong on the merits for the many reasons

16   discussed herein, they are right about one thing: they have "no interest" directly at issue in this

17   APA case. The Private Defendants' issue, at bottom, is not with the States' challenge to unlawful

18   agency action, but with federal export regulation of the subject files. They challenged such

19   regulation by suing the regulator in the *Defense Distributed* case. The State Department prevailed

20   at every stage. Then, the Private Defendants chose to settle in exchange for the State

21

22   ───────────────
     [52] *See, e.g.*, Heidema Decl. (Dkt. # 64-1), ¶ 28.

23   [53] If, on the other hand, the Private Defendants are making constitutional arguments in the abstract, they
     lack standing to effectively seek to block judicial enforcement of AECA on such grounds. *See Hein v. Freedom*

24   *From Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) ("The federal courts are not empowered to seek out and
     strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit

25   solely, to decide on the rights of individuals, and must refrain from passing upon the constitutionality of an act
     unless obliged to do so . . . when the question is raised by a party whose interests entitle him to raise it." (internal
     citations and markings omitted)).

26   [54] The Court ruled that, contrary to the Private Defendants' disclaimer of interest, "their actions show
     otherwise." Dkt. # 130 (Order Denying 12(c) MTD) at 3.

PLAINTIFF STATES' COMBINED                    21
REPLY ISO MOTION FOR SUMMARY                                 Complex Litigation Division
JUDGMENT AND OPP TO                                          800 5th Avenue, Suite 2000
DEFENDANTS' CROSS-MOTIONS                                    Seattle, WA 98104-3188
2:18-cv-01115-RSL                                            (206) 474-7744

WASHSTATEC023718

Department's agreement to deregulate 3D-printable firearm files—subject to the express caveat that such deregulation would proceed only "to the extent authorized by law (including the Administrative Procedure Act) . . ."[55] Now that the caveat is in play, the Private Defendants renew their dubious constitutional arguments in this Court—curiously, even as they seek to escape its jurisdiction. As the Private Defendants' own actions underscore, this lawsuit, with the parties positioned as they are, is an improper place for a constitutional challenge.

       (ii) *The First Amendment does not require the Court to uphold the unlawful deregulation*.

       The Private Defendants' constitutional arguments are meritless in any event. First, although the First Amendment's inapplicability to the subject files was briefed previously (*see* Dkt. # 43 at 17–18; Dkt. # 47-1), the Private Defendants fail to point to *any* case in *any* jurisdiction in which a court has *ever* held that click-and-print firearm files are "speech" entitled to any level of constitutional protection. On the other hand, courts have held that computer files that "induce action without the intercession of the mind or the will of the recipient"—as the subject files do[56]—are not entitled to any level of constitutional protection. *CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (no First Amendment protection for automatic stock trading system that used language to operate "in an entirely mechanical way"; "The point was not to convey information or to assert values," so "[n]one of the reasons for which speech is thought to require protection above and beyond that accorded to non-speech behavior" were implicated) (brackets and ellipses removed); *see generally* Dkt. # 47-1 (*Amicus* Br. of Everytown for Gun Safety) at 4–9 (extensively analyzing why the subject files "lack any expressive value for the First Amendment to protect"). Notably, although the subject files themselves are not protectable speech, the Private Defendants are not and have never been restricted in any way from speaking *about* 3D-printed guns, including advocating for policy changes related to 3D-printed guns or criticizing gun-safety laws that apply to the subject files.

---

[55] Ex. C, ¶ 1(a).
[56] *See* SMSJ at 22 & nn. 54–56.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023719

Even if the Court were to find some merit in the Private Defendants' novel constitutional theories, the Private Defendants fail to show that the Constitution precludes the relief requested here. Again, the States merely ask the Court to set aside unlawful agency action, as required by the APA. The Temporary Modification and Letter are procedurally defective in violation of AECA's plain language, among other flaws. Preventing these unlawful agency actions from taking effect does not permanently deprive the Private Defendants of any purported rights: it simply requires the State Department to follow AECA's mandatory procedures and comply with the APA if it wishes to remove 3D-printable firearm files from the Munitions List. Moreover, federal law does not prohibit the Private Defendants from distributing the subject files in a manner that does not involve export. Now as before, correcting the State Department's unlawful power grab does not abrogate any rights of the Private Defendants. *See* Dkt. # 95 at 25.

The Private Defendants try to spin a constitutional argument from the alleged fact that others are (illegally) distributing 3D-printable gun files via the internet. PDMSJ at 2–3, 23. But even if others are violating federal law at their peril, that does not somehow create a violation of the Private Defendants' First Amendment rights. *Cf. Wayte v. United States*, 470 U.S. 598 (1985) (upholding conviction for failure to register for selective service against First Amendment and Equal Protection challenges to government's "passive enforcement policy," under which it prosecuted only those reported as having violated the law, generally the draft's most vocal opponents). Nor does the widespread violation of federal law alleged—but not proven—by the Private Defendants somehow justify the Federal Defendants' broad, unlawful deregulation (and certainly the Federal Defendants do not make this argument). In short, the Private Defendants' novel constitutional arguments do not provide a reasoned basis for the unlawful deregulation of 3D-printable guns via the Temporary Modification and Letter.

### 3. The Private Defendants' APA arguments do not explain, let alone justify, the Federal Defendants' abrupt regulatory about-face.

Since 2013 (when the Federal Defendants apparently became aware of Defense

---

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023720

Distributed's 3D-printable gun files) until April 2018 (when the *Defense Distributed* case was abruptly settled), the Federal Defendants consistently maintained their position that 3D-printable gun files were and ought to be subject to regulation under AECA and ITAR. Dkt # 95 at 3–4; *see also* Dkt. # 29 (FAC) ¶¶ 39–41 & Dkt. # 112 (Fed Defs' Answer) ¶¶ 39–41. As explained above and in the States' Motion for Summary Judgment, the Federal Defendants have failed adequately to explain their total regulatory about-face, failed to consider the specific dangers of 3D-printable gun files, and offered only pretextual rationales for their sudden reversal. *See S*MSJ at 12–20. The Private Defendants fare no better in trying to defend the indefensible.

The Private Defendants' argument relies primarily on memoranda from the Department of Justice discussing various potential limits of ITAR. PDMSJ at 14–16. As an initial matter, the Federal Defendants have not purported to rely on any of these statements, so they cannot possibly "supply a reasoned basis" for the Federal Defendants' decision. *Chenery Corp.*, 332 U.S. at 196. Moreover, these general statements about the limits of ITAR do not contemplate the subject files, which were not made public until late 2012,[57] and which are not protected speech, as discussed above. The Private Defendants also try to rely on a "legal analysis . . . performed by Defense Distributed's legal counsel" as evidence of the Federal Defendants' supposed basis for its regulatory about-face. PDMSJ at 17. But obviously, the mere fact that the government's files contained Defense Distributed's self-serving analysis does not prove the government based its decision on that analysis, particularly where the government has never claimed to do so.

## IV. CONCLUSION

For the reasons above and in their Motion for Summary Judgment, the States respectfully request that the Court grant summary judgment in their favor, deny Defendants' motions for summary judgment, and grant the States' requests for vacatur and a permanent injunction.

---

[57] The Private Defendants assert the Federal Defendants' initial action to regulate the files came in response to the devastating December 2012 murder of 26 people, mostly children, at Sandy Hook Elementary School. PDMSJ at 14. In fact, the timing was driven by when Defense Distributed posted its files online—December 2012, the same month as the Sandy Hook massacre. PDMSJ at 2 n.2; *see* Ex. A (Aguirre Decl.) ¶¶ 24–25 (DDTC initiated regulatory action "[a]s a result" of media reports that Defense Distributed had posted executable CAD files online).

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023721

DATED this 24th day of May, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Jeffrey Rupert
JEFFREY RUPERT, WSBA #45037
Division Chief
TODD BOWERS, WSBA #25274
Deputy Attorney General
JEFFREY T. SPRUNG, WSBA #23607
KRISTIN BENESKI, WSBA #45478
ZACHARY P. JONES, WSBA #44557
Assistant Attorneys General
JeffreyR2@atg.wa.gov
ToddB@atg.wa.gov
JeffS2@atg.wa.gov
KristinB1@atg.wa.gov
ZachJ@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

WILLIAM TONG
Attorney General of Connecticut

/s/ Maura Murphy Osborne
MAURA MURPHY OSBORNE, *admitted pro hac vice*
Assistant Attorney General
Maura.MurphyOsborne@ct.gov
*Attorneys for Plaintiff State of Connecticut*

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
JULIA DOYLE BERNHARDT, *admitted pro hac vice*
JEFFREY PAUL DUNLAP, *admitted pro hac vice*
Assistant Attorneys General
JBernhardt@oag.state.md.us

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023722

jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

GURBIR GREWAL
Attorney General of New Jersey

*/s/ Jeremy M. Feigenbaum*
JEREMY M. FEIGENBAUM, *admitted pro hac vice*
Assistant Attorney General
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
Attorney General of New York

*/s/ Steven Wu*
STEVEN WU, *admitted pro hac vice*
Deputy Solicitor General
Steven.Wu@ag.ny.gov
*Attorneys for Plaintiff State of New York*

MAURA HEALEY
Attorney General of Commonwealth of
Massachusetts

*/s/ Jonathan B. Miller*
JONATHAN B. MILLER, *admitted pro hac vice*
Assistant Attorney General
Jonathan.Miller@state.ma.us
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

JOSH SHAPIRO
Attorney General of Commonwealth of
Pennsylvania

*/s/ Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN, *admitted
pro hac vice*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023723

Executive Deputy Attorney General
MICHAEL J. FISCHER, *admitted pro hac vice*
Chief Deputy Attorney General
JGoldman@attorneygeneral.gov
MFischer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*


KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Robyn Bender*
ROBYN BENDER, *admitted pro hac vice*
Deputy Attorney General
JIMMY ROCK, *admitted pro hac vice*
Assistant Deputy Attorney General
ANDREW J. SAINDON, *admitted pro hac vice*
Senior Assistant Attorney General
Robyn.Bender@dc.gov
Jimmy.Rock@dc.gov
Andy.Saindon@dc.gov
*Attorneys for Plaintiff District of Columbia*


ELLEN F. ROSENBLUM
Attorney General of Oregon

*/s/ Scott J. Kaplan*
SCOTT J. KAPLAN, WSBA #49377
Senior Assistant Attorney General
scott.kaplan@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*


XAVIER BECERRA
Attorney General of California

*/s/ Nelson R. Richards*
NELSON R. RICHARDS, *admitted pro hac vice*
Deputy Attorney General
Nelson.Richards@doj.ca.gov
*Attorneys for Plaintiff State of California*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023724

PHIL J. WEISER
Attorney General of Colorado

*/s/ Matthew D. Grove*
MATTHEW D. GROVE, *admitted pro hac vice*
Assistant Solicitor General
matt.grove@coag.gov
*Attorneys for Plaintiff State of Colorado*


KATHLEEN JENNINGS
Attorney General of Delaware

*/s/ Ilona M. Kirshon*
ILONA M. KIRSHON, *admitted pro hac vice*
Deputy State Solicitor
PATRICIA A. DAVIS, *admitted pro hac vice*
Deputy Attorney General
Ilona.kirshon@state.de.us
PatriciaA.Davis@state.de.us
*Attorneys for Plaintiff State of Delaware*


CLARE E. CONNORS
Attorney General of Hawaii

*/s/ Robert T. Nakatsuji*
ROBERT T. NAKATSUJI, *admitted pro hac vice*
Deputy Attorney General
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*


KWAME RAOUL
Attorney General of Illinois

*/s/ Elizabeth Roberson-Young*
ELIZABETH ROBERSON-YOUNG, *admitted pro hac vice*
Deputy Solicitor General
erobersonyoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023725

THOMAS J. MILLER
Attorney General of Iowa

*/s/ Nathan Blake*
NATHAN BLAKE, *admitted pro hac vice*
Deputy Attorney General
Nathan.Blake@ag.iowa.gov
*Attorneys for Plaintiff State of Iowa*


KEITH ELLISON
Attorney General of Minnesota

*/s/ Jacob Campion*
JACOB CAMPION, *admitted pro hac vice*
Minnesota Attorney General's Office
Solicitor General's Division
jacob.campion@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


JOSHUA H. STEIN
Attorney General of North Carolina

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN, *admitted pro hac vice*
Deputy General Counsel
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


PETER F. NERONHA
Attorney General of Rhode Island

*/s/ Justin Sullivan*
JUSTIN SULLIVAN, *admitted pro hac vice*
Special Assistant Attorney General
JJSullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*


THOMAS J. DONOVAN, JR.

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

WASHSTATEC023726

Attorney General of Vermont

*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES, *admitted pro hac vice*
Solicitor General
benjamin.battles@vermont.gov
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of the Commonwealth of Virginia

*/s/ Samuel T. Towell*
SAMUEL T. TOWELL, *admitted pro hac vice*
Deputy Attorney General, Civil Litigation
STowell@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

PLAINTIFF STATES' COMBINED
REPLY ISO MOTION FOR SUMMARY
JUDGMENT AND OPP TO
DEFENDANTS' CROSS-MOTIONS
2:18-cv-01115-RSL

30

WASHSTATEC023727

1    The Honorable Robert S. Lasnik

2

3

4

5

6

7              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
8                      AT SEATTLE

9    STATE OF WASHINGTON, et al.,          )    No. 2:18-cv-1115-RSL
                                           )
10         Plaintiffs,                     )    **FEDERAL DEFENDANTS'**
                                           )    **REPLY IN SUPPORT OF**
11              v.                         )    **MOTION FOR SUMMARY**
                                           )    **JUDGMENT**
12   UNITED STATES DEPARTMENT OF           )
     STATE, et al.,                        )
13                                         )
           Defendants.                     )    **NOTED FOR: June 7, 2019**
14   _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC023728

## FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

In their motion for summary judgment, the Federal Defendants explained that Plaintiffs lack standing to challenge the actions undertaken by the Department of State in connection with the Government's settlement with Defense Distributed, and that in any event Plaintiffs' claims under the Tenth Amendment and the Administrative Procedure Act ("APA") fail on the merits. Federal Defs.' Consolidated Opp'n to Pls.' Mot. for Summ. J. & Cross-Mot. for Summ J., ECF No. 173 ("Fed. Defs.' MSJ"), at 7-12. Plaintiffs' opposition brief, which raises the same points previously litigated in this case, does not compel a different conclusion. Pls.' Combined Reply in Support of Mot. for Summ. J. & Opp'n to Defs.' Cross-Mots. for Summ. J., ECF No. 186 ("Pls.' Opp'n").

In light of the parties' extensive prior briefing and the Court's familiarity with the issues presented in this matter, the Federal Defendants incorporate the arguments previously advanced in their prior briefing. The Federal Defendants acknowledge that the Court has rejected some of those arguments, but respectfully maintain their position and disagreement with the Court's earlier rulings. For present purposes, the Federal Defendants emphasize only the following points.

First, Plaintiffs fail to establish that they fall within the zone of interests of the relevant provision of the Arms Export Control Act ("AECA"). Plaintiffs' attempt to characterize the AECA as designed to protect "domestic security" rather than "national security" is unavailing. Pls.' Opp'n at 10. By Plaintiffs' reasoning, any national security determination made by the Government would be subject to second-guessing by Plaintiffs because it affects their residents. No authority supports such a sweeping proposition; to the contrary, "[t]he national security . . . is the primary responsibility and purpose of the Federal Government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting). Moreover, Plaintiffs fail to address the legislative history regarding 22 U.S.C. § 2778(f)(1), which establishes that Congress enacted that provision in response to "legitimate industry concerns" by exporters, and cautioned the Executive Branch to "avoid unnecessary export regulation." H.R. Rep. No. 97-58, at 21-22

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023729

(1981). As Plaintiffs appear to agree that they neither exercise congressional oversight of the Department of State nor function as would-be exporters—but instead raise purely domestic, non-military concerns unrelated to foreign relations, Pls.' Opp'n at 10—their claims do not fall within the zone of interests of the AECA, and they therefore lack standing to assert their claim. *See* Fed. Defs.' MSJ at 8-10.

Second, Plaintiffs continue to contend that the Federal Defendants acted in "bad faith" and have misrepresented or provided "pretext[ual]" justifications for the Government's settlement with Defense Distributed. Pls.' Opp'n at 16. This argument is plainly meritless. The mere fact that Plaintiffs "may disagree with the policy and process" is not "enough to justify a claim of bad faith." *In re Dep't of Commerce*, 139 S. Ct. 16, 17 (Mem.), 202 L. Ed. 2d 306 (2018) (Gorsuch, J., concurring). Nor do Plaintiffs' allegations of "inconsistent explanations," Pls.' Opp'n at 16, suffice for the "strong showing" of "willful misconduct" required to establish that an agency acted in bad faith. *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1250, 1260-61 (E.D. Cal. 1997) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Even if the Federal Defendants had made "inconsistent" statements in representing that the challenged decision was made as part of a court-initiated settlement process in litigation in the District Court of the Western District of Texas (culminating in a June 29, 2018 settlement agreement), "[a] change of position is not enough," as a legal matter, to meet the bad-faith standard. *See Guidiville Rancheria of Cal. v. United States*, 2013 WL 6571945 at *8 (N.D. Cal. Dec. 13, 2013). Nor are public comments received after this settlement agreement was reached, *see* Pls.' Opp'n at 13-14, indicative of pretext or bad faith. *Cf. Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments" received after its decision has been made).[1] In short, Plaintiffs' allegation of bad faith in either the settlement agreement

---

[1] In making this argument, and elsewhere, Plaintiffs conflate the comments received regarding the decision to enter into a settlement agreement with Defense Distributed (which Plaintiffs acknowledge was "temporary" in scope) and the comments received regarding the Notice of Proposed Rulemaking, which sets forth plans for permanent changes in agency regulations. Even if Plaintiffs were correct—and the Federal Defendants respectfully maintain otherwise—that the agency was required to provide notice or take into account public comments on the

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 2
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023730

or the compilation of the administrative record should be rejected as a matter of both fact and law.[2]

Third, Plaintiffs fault the Federal Defendants for failing to consider various comments contending that the Department of State should continue to regulate 3D-printed firearms. Yet many of the comments were not addressing the temporary modification and letter challenged in this litigation, but rather a distinct notice of proposed rulemaking proposing to amend the United States Munitions List, 83 Fed. Reg. 24,198 (May 24, 2018). *See* Pls.' Opp'n at 6-7 (citing comments on the proposed rule submitted by Professor Susan Waltz and the Brady Campaign to Prevent Gun Violence). In addition, while Plaintiffs accuse the Federal Defendants of failing to consider certain comments specifically urging the Federal Defendants not to issue the temporary modification and letter, they neglect to mention that those comments were submitted after the Department of State executed the June 29, 2018 settlement agreement obligating it to take those steps. *See* Pls.' Opp'n at 7 (citing comments from members of Congress, submitted on July 20 and 25, 2018); *id.* at 8 (citing "[h]undreds of individual emails," all of which were submitted in late July 2018); *id.* (citing "105,555 emails received from visitors to Everytown.org" between July 23 and July 27, 2018). By the time these comments were received, the Department of State had already committed to issuing the temporary modification and letter.

Fourth and finally, Plaintiffs have failed to demonstrate that the Federal Defendants' actions conflict with the Tenth Amendment. Notably, Plaintiffs offer no support for their vague theory that "the State Department is intruding into the States' sphere of authority by exercising a power it does not have." Pls.' Opp'n at 12. The fact remains that "there is simply no evidence that [Plaintiffs were] compelled to enact or enforce any federal regulatory program.

---

temporary modification, any comments the agency received regarding the NPRM would not be relevant to a finding of pretext or bad faith.

[2] Plaintiffs also acknowledge that their argument regarding "pretext or bad faith is not necessary" if the Court continues to reject, as it has previously, the Federal Defendants' arguments that the agency's rationale was adequate. Pls.' Opp'n at 16; *see* Fed. Defs.' MSJ at 9-10 (explaining that the Federal Defendants maintain the decision was proper, but acknowledging that the Court previously concluded otherwise).

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 3
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023731

Nor is there any evidence that [Plaintiffs were] compelled to assist in the enforcement of federal statutes regulating private individuals." *See City of Tombstone v. United States*, No. 11-cv-00845, 2015 WL 11120851, at *19 (D. Ariz. Mar. 12, 2015). Nor can Plaintiffs salvage their argument by mischaracterizing the Government's actions undertaken in connection with the settlement agreement as a "*post hoc* litigation position." Pls.' Opp'n at 12. As the Federal Defendants have previously explained, Fed. Defs.' MSJ at 11, the Government has never suggested that the settlement agreement conflicts with or otherwise preempts any state laws, but rather was undertaken only pursuant to its authority to regulate the United States' system of export controls, not domestic activity, *see Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 695 (N.D. Text. 2015). *See also* Prelim. Inj., ECF No. 95, at 16 ("The federal defendants also recognize the continuing viability of state law gun control measures.").

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the Federal Defendants' motion for summary judgment, and enter judgment in favor of the Federal Defendants.

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 4
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
**Civil Division, Federal Programs Branch**
**450 Golden Gate Ave.**
**San Francisco, CA 94102**
**Tel: (415) 436-6635**

WASHSTATEC023732

Dated: June 7, 2019     Respectfully submitted,

           JOSEPH H. HUNT
           Assistant Attorney General

           JOHN R. GRIFFITHS
           Director, Federal Programs Branch

           ANTHONY J. COPPOLINO
           Deputy Director, Federal Programs Branch

           */s/ Stuart J. Robinson*
           STUART J. ROBINSON
           STEVEN A. MYERS
           ERIC J. SOSKIN
           Trial Attorneys
           U.S. Department of Justice
           Civil Division, Federal Programs Branch
           450 Golden Gate Ave.
           San Francisco, CA 94102
           (415) 436-6635 (telephone)
           (415) 436-6632 (facsimile)
           stuart.j.robinson@usdoj.gov

           *Attorneys for Federal Defendants*

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 5
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023733

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on June 7, 2019, I electronically filed the foregoing reply using the

3

Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

4

5
Dated: June 7, 2019                                   */s/ Stuart J. Robinson*
                                                      Stuart J. Robinson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 6
*State of Washington, et al. v. Dep't of State, et al.*, 2:18-cv-1115-RSL

**U.S. DEPARTMENT OF JUSTICE**
Civil Division, Federal Programs Branch
450 Golden Gate Ave.
San Francisco, CA 94102
Tel: (415) 436-6635

WASHSTATEC023734

UNCLASSIFIED

## Readout:  Cats I-III Roundtable with NGOs/Advocacy Organizations
## Thursday, December 12, 2019

As part of the Cats I-III rollout plan, PM/CPA organized an off-the-record roundtable discussion with NGOs/advocacy organizations concerned about the proposed changes.  Acting DAS Mike Miller led the engagement, which included representatives from the Departments of State, Commerce and Defense (DTSA).  Topics included identifying and halting problematic firearms exports, pre and post end use monitoring, human rights concerns, and public transparency.

## Participants

### USG
A/DAS Mike Miller, PM/DDTC, State
Sarah Heidema, Director, PM/DTCP, State
Douglas R. Hassebrock, Acting Assistant Secretary for Export Enforcement, Commerce
Timothy Mooney, Senior Export Policy Analyst, Commerce
Steven Clagett, Director of the Nuclear and Missile Technology Controls Division, Commerce
Michael Laychak, Deputy Director, DTSA
Tracy Minnifield, Director of Licensing, DTSA

### NGOs/Advocacy Organizations
Amnesty International USA
Arms Control Association
American Bar Association
Transparency International Defence and Security
Brady Campaign
Stimson Center

## Key Points:  NGOs/Advocacy Groups

Identifying and Halting Problematic Firearms Exports
- NGOs are concerned about the misuse of items by intended users.
- Many mercenaries are still operating globally and are looking for opportunities.
- NGOs are glad to see DTSA is involved but are still concerned about the loss of the Department of State's tools in the licensing process.
- Concern exists about the government possessing limited pre-end use intelligence on potential bad actors; planning from INR on patterns of misuse could be used to focus enforcement efforts.
- NGOs would like to see a DIA assessment on diversion of licensed AR15s.
- NGOs questioned why the changes are being proposed now.  "What has changed?  We sat around the same table three years ago having the same conversation.  It wasn't the right time then, so what has changed to make it the right time now?"
- NGOs view the proposed changes as a "de-control" of potentially very lethal items.
- "This is different than every other USML category and it translates into:  The U.S. wants to sell more guns."

UNCLASSIFIED

WASHSTATEC023735

UNCLASSIFIED

Pre and Post End Use Monitoring
- Concern that following the transfer to Commerce not enough focus will be placed on pre-end use monitoring.
- Concern that Commerce does not possess as much intelligence as State regarding potential bad actors.
- Concern that Commerce's lack of a registration process will result in limited data on foreign affiliates.
- Concern about limited reporting on end use monitoring and that a reduction in registration fees will result in less resources available to provide oversight.
- NGOs request a more robust report from Commerce focused on the end use monitoring of firearms.

Public Transparency
- Public transparency regarding firearms sales will be reduced.  Commerce isn't mandated to complete similar reporting as State or Congressional Notifications—though reporting by international organizations will continue.
- NGOs use defense trade reports to help identify arms trafficking trends and networks—and are hamstrung without them.
- NGOs recommended establishing a plan to assess the impact of the transfer one year after implementation; and to also wait a year to identify registration trends as companies might continue to register with State during the transition period.

Senator Menendez's Hold
- NGO's expressed concern that not all of Senator Menendez's hold concerns have been fully addressed.
- Understanding exists that Senator Menendez will place another hold, but this information has not been made public.

Human Rights
- There are consequences and impact with regards to diversion and human rights abuses.
- The feeling is that this is a step in the wrong direction.
- It is alarming that the United States has withdrawn from the ATT.
- This drives a lot of the civil society groups' concerns.

**Key Points:  State, Commerce and Defense (DTSA)**

**State** noted Senator Menendez's initial letter and that many of the concerns have been addressed. (Also, briefings have been held, amendments made, etc.)  State commented that the Hill is encouraged to see the Department's reaction on 3-D printing concerns and on diminished Congressional oversight.  They also noted that Congress hasn't legislated oversight for these types of transfers for Commerce but could do so if they deem it necessary.  State agreed that systems evolve, and actors are looking for loopholes.  "There's always room for improvement, and we want your input."  In response to the GAO report recommendation earlier this year, State confirmed they are in the process of sharing the Watchlist with Commerce (and Commerce will share with State).  "The paperwork has been signed and State is now working on the first data

WASHSTATEC023736

UNCLASSIFIED

transfer to Commerce, to make sure it's working.  State is trying to make changes in areas where people have identified things could be done better."

**Commerce** provided specific updates and clarification on changes in the recently notified text (compared to the original) and reassured that appropriate oversight would continue.  Moving Categories I-III is part of an ongoing effort to rationalize export controls and group "like" products.  They underscored that it is their Export Enforcement Office's job to make sure laws are enforced.  "No one wants anything bad to happen."  They reaffirmed licensing officers can take information from all sources.  The bona fides for applicants are checked, and the data is kept forever.  Each person applying for a license is given a unique number and information is collected and added.  Anyone can provide information.  The Watchlist includes derogatory data, and Commerce has a robust monitoring program.  The Commerce "Entity List" serves as a powerful deterrent for any potential bad actors, as once an applicant is placed on the list, they can suffer significant economic consequences.  With regards to more robust end use monitoring reporting, Commerce indicated they were open to it and would bring the idea back to look at it further.

**DTSA** stressed that they are not talking about opening loopholes.  They explained that a level playing field exists between the Departments, and there is a licensing requirement and policy review.  "There are multiple sources of information used in the clearance process and we reserve the right to ask more questions as needed."  They noted that there may be even more law enforcement analysis.  DTSA said they are very interested in hearing where the system of export review has failed and where a diversion has happened.  "We want this information.  If you are aware of gaps or diversions, let us know."

UNCLASSIFIED

WASHSTATEC023737

Message

**From**:        Heidema, Sarah J [HeidemaSJ@state.gov]
**Sent**:        1/2/2020 8:54:53 PM
**To**:          Miller, Michael F [Millermf@state.gov]; Paul, Joshua M [PaulJM@state.gov]; Hamilton, Catherine E
                 [HamiltonCE@state.gov]; Hart, Robert L [HartRL@state.gov]; Khawam, Joseph N [KhawamJN@state.gov]
**Subject**:     A/M for S on the rule with the line

The A/M for S to sign the Cats 1-3 rule is with the Line.  Big step!

WASHSTATEC023738

Message
_____

**From:**          Khawam, Joseph N [KhawamJN@state.gov]
**Sent:**          1/6/2020 4:54:16 PM
**To:**            Kovar, Jeffrey D [KovarJD@state.gov]
**Subject:**       RE: A/M to S: Cats I-III
**Attachments:**   RE_ FLASH Clearance - by 2 P_M_ today_ Jan_ 31_ Cats_ I-III.msg

Yes.  Attached is the email chain with Mel if you'd like more detail.  I hope it's been resolved, but I'm standing by if another problem arises.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SENSITIVE BUT UNCLASSIFIED

**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Monday, January 6, 2020 11:51 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: A/M to S: Cats I-III

OK thanks.  Was it bounced because of all the attachments?


SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Monday, January 6, 2020 11:36 AM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** RE: A/M to S: Cats I-III

The AM is with the line as of this morning.  Note that the AM requests that he sign the FRN on January 10 – i.e., this Friday.  ████████████████████████████████████████  I'll send an email to Josh Paul asking that he provide us updates so we can keep L/FO in the loop as appropriate.

One thing to flag for your awareness – I worked with Amanda Wall and PM Specials last week to make sure the line was aware the package was large and needed to be kept together.  The duty officer agreed not to bounce it.  Nonetheless, on Friday afternoon, the line did bounce it.  It sounds like the message may not have been communicated to the person working on the line on Friday afternoon.  PM Specials followed up with the line, and as of this morning, the package has been resubmitted.  We're hoping it doesn't get bounced again, but if it does, I may need to reach out to Robby for additional assistance.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)


SENSITIVE BUT UNCLASSIFIED

**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Monday, January 6, 2020 11:26 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: A/M to S: Cats I-III

Hi Joe – what's the status of this as of today?

WASHSTATEC023739

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, January 2, 2020 11:26 AM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Cc:** Minarich, Christine M <MinarichCM@state.gov>; Jones, Elisabeth B <JonesEB@state.gov>
**Subject:** FW: A/M to S: Cats I-III

Just FYI, this is the AM package that went to the PM/FO.  DDTC had to condense the AM a little to get within the 2-page limit. ██████████████████████████ I'm working with PM/FO staffers to ensure all of the attachments are included in the package uploaded to Everest.  Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Thursday, January 2, 2020 10:41 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** A/M to S: Cats I-III



SENSITIVE BUT UNCLASSIFIED

Message
_____

| | |
|---|---|
| **From:** | Windecker, Melissa A [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3286EE3BF06A42DA8FE9770036D77326-WINDECKER,] |
| **Sent:** | 1/6/2020 2:34:21 PM |
| **To:** | Khawam, Joseph N [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=bbc7413dfe294640bd6b8f64eacac3cd-Khawam, Jos]; Wall, Amanda J [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e9a6a9817cb747f29d06fe23e185b01f-Wall, Amand]; PM-Staffers Mailbox [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5dbda1392805455385e88547d0df2086-PM-Staffers] |
| **CC:** | Heidema, Sarah J [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=988657ebed564d51a4569d583b8c4e81-Heidema, Sa] |
| **Subject:** | RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III |

Hi Joseph,

It's back with the line; we have our fingers crossed!

Mel

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Monday, January 6, 2020 9:33 AM
**To:** Wall, Amanda J <WallAJ@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Mel—Just wanted to check in to see if we're all good on this, or if you need anything further from L.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Wall, Amanda J <WallAJ@state.gov>
**Sent:** Friday, January 3, 2020 5:29 PM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Mel –

Of course, here it is.

SENSITIVE BUT UNCLASSIFIED

**From:** Windecker, Melissa A <WindeckerMA@state.gov>
**Sent:** Friday, January 3, 2020 4:31 PM
**To:** Wall, Amanda J <WallAJ@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Amanda, Joe,

It seems that the Line was not fully briefed on this agreement as the package has been bounced back to us. Would you please let us know who on the line approved the tab number/size, and forward us the email, so we can revert to the line with that email.

Thanks!
Mel

SENSITIVE BUT UNCLASSIFIED

**From:** Wall, Amanda J <WallAJ@state.gov>
**Sent:** Tuesday, December 31, 2019 3:01 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Joe –

████████████████████████████████████████████ I plan to call S Specials and flag it for them as well so they don't get annoyed.

Best,
Amanda

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Tuesday, December 31, 2019 2:58 PM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Wall, Amanda J <WallAJ@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Thanks, Mel.  Apologies, I should have noted that our (Acting) Special Assistant (Amanda Wall – copied here) was able to contact the line and confirmed they would accept the package.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Windecker, Melissa A <WindeckerMA@state.gov>
**Sent:** Tuesday, December 31, 2019 2:55 PM

**To:** Khawam, Joseph N <KhawamJN@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Hi Joe,

Before we do this, let's make sure the line is willing to accept a multi-thousand page tab and your FO has gotten seventh floor concurrence on this...I don't want L or PM to spend a lot of time working up (and flipping) a document that they don't want us to send.

Thanks,
Mel

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Tuesday, December 31, 2019 2:54 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Hi Ashley:  I spoke to the duty officer and some others, and it appears that nobody knows exactly what the limit is, but they believe Everest does allow for uploading large document.  I'm happy to cut the document into smaller file sizes, but it may also work to upload the larger document.  Would you have a moment to chat on the phone so we can discuss what make sense?  I'm at 7-8546.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Sent:** Tuesday, December 31, 2019 1:54 PM
**To:** Khawam, Joseph N <KhawamJN@state.gov>; Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Hi Joseph,

I did not receive email 1 of 2. Did the line say they would like to receive such large attachments? If so, did you confirm file size limits with the line to ensure these will upload to Everest?

Thanks,
Ashley

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Tuesday, December 31, 2019 1:39 PM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

WASHSTATEC023743

Email 2 of 2

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N
**Sent:** Tuesday, December 31, 2019 1:37 PM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

PM Staffers:  Following up on the Cats I-III email below, the L Special Assistant is calling the 7th Floor now to give them a heads up about the size of the package and explain why we need to maintain all of the documents in the package so that it doesn't get bounced.  As mentioned, there are two attachments to Tab 3 that are large files – **Tab 3 Attachment 5** (4621 pages) and **Tab 3 Attachment 7** (1761 pages).  I will send two emails following this email with these documents broken up into smaller PDFs.  Please let me know if they have been received and if there's anything further you need.  If you'd like me to email the other attachments, I'm happy to do so.

Thanks,
Joe

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N
**Sent:** Tuesday, December 31, 2019 12:24 PM
**To:** Windecker, Melissa A <WindeckerMA@state.gov>
**Subject:** RE: FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Melissa:  L/PM has been working on the Cats I-III package with DDTC over the last few months.

Thanks,
Joe

Joseph N. Khawam
Attorney-Adviser
U.S. Department of State
Office of the Legal Adviser (L/PM)
2201 C Street NW, Suite 6420
Washington, DC 20520

(202) 647-8546 (T, W, T)
(202) 663-2915 (M)
(202) 663-3097 (F)
Opennet: KhawamJN@state.gov

███████████████████

SENSITIVE BUT UNCLASSIFIED

**From:** Noonan, Michael J <NoonanMJ@state.gov>
**Sent:** Tuesday, December 31, 2019 11:22 AM
**To:** Shufflebarger, Jamie <ShufflebargerJ@state.gov>; Carter, Melanie R <CarterMR@state.gov>; Urena, Michael A <UrenaMA@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Shin, Jae E <ShinJE@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Kringel, Neal F <KringelNF@state.gov>; Dorosin, Joshua L <DorosinJL@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>; Kovar, Jeffrey D <KovarJD@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>; Pompian, Shawn M <PompianSM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Krueger, Thomas G <KruegerTG@state.gov>; Tucker, Maureen E <TuckerME@state.gov>; Goulding, Tamara D <GouldingTD@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov>; Shinnick, Julianne <ShinnickJ@state.gov>; Blaha, Charles O <BlahaCO@state.gov>
**Cc:** Nanavatty, Katharine B <NanavattyKB@state.gov>; P/EUR Duty Officer <P-EURDuty@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; T_SpecAssts <T_SpecAssts@state.gov>; Tulino, Julia K <TulinoJK@state.gov>
**Subject:** FLASH Clearance - by 2 P.M. today, Jan. 31. Cats. I-III

Clearance is requested on the attached by 2 p.m. today, January 31st for Action Memo to S requesting publication of Cats. I-III.  Also attached for clearance is the Overview of Department activities related to the rule.

Due to the short turn around, request comments/questions, if any, be directed directly to the drafters.

Michael Noonan

-------------------------------------------------------------------------------

Department of State
Directorate of Defense Trade Controls (PM/DDTC/DTCC)
Compliance Analyst (CNB Contractor)
(202) 632-2788

SENSITIVE BUT UNCLASSIFIED

Message

| | |
|---|---|
| **From**: | Kovar, Jeffrey D [KovarJD@state.gov] |
| **Sent**: | 1/6/2020 4:58:09 PM |
| **To**: | Khawam, Joseph N [KhawamJN@state.gov] |
| **Subject**: | RE: A/M to S: Cats I-III |

thx

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Monday, January 6, 2020 11:54 AM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** RE: A/M to S: Cats I-III

Yes.  Attached is the email chain with Mel if you'd like more detail.  I hope it's been resolved, but I'm standing by if another problem arises.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Monday, January 6, 2020 11:51 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: A/M to S: Cats I-III

OK thanks.  Was it bounced because of all the attachments?

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Monday, January 6, 2020 11:36 AM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Subject:** RE: A/M to S: Cats I-III

The AM is with the line as of this morning.  Note that the AM requests that he sign the FRN on January 10 – i.e., this Friday. ████████████████████████████████████████ I'll send an email to Josh Paul asking that he provide us updates so we can keep L/FO in the loop as appropriate.

One thing to flag for your awareness – I worked with Amanda Wall and PM Specials last week to make sure the line was aware the package was large and needed to be kept together.  The duty officer agreed not to bounce it.  Nonetheless, on Friday afternoon, the line did bounce it.  It sounds like the message may not have been communicated to the person working on the line on Friday afternoon.  PM Specials followed up with the line, and as of this morning, the package has been resubmitted.  We're hoping it doesn't get bounced again, but if it does, I may need to reach out to Robby for additional assistance.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Kovar, Jeffrey D <KovarJD@state.gov>
**Sent:** Monday, January 6, 2020 11:26 AM
**To:** Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** RE: A/M to S: Cats I-III

Hi Joe – what's the status of this as of today?

SENSITIVE BUT UNCLASSIFIED

**From:** Khawam, Joseph N <KhawamJN@state.gov>
**Sent:** Thursday, January 2, 2020 11:26 AM
**To:** Kovar, Jeffrey D <KovarJD@state.gov>
**Cc:** Minarich, Christine M <MinarichCM@state.gov>; Jones, Elisabeth B <JonesEB@state.gov>
**Subject:** FW: A/M to S: Cats I-III

Just FYI, this is the AM package that went to the PM/FO.  DDTC had to condense the AM a little to get within the 2-page limit. ████████████████████████████ I'm working with PM/FO staffers to ensure all of the attachments are included in the package uploaded to Everest.  Thanks.

Joseph N. Khawam
Office of the Legal Adviser (L/PM)

SENSITIVE BUT UNCLASSIFIED

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Thursday, January 2, 2020 10:41 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Khawam, Joseph N <KhawamJN@state.gov>
**Subject:** A/M to S: Cats I-III



SENSITIVE BUT UNCLASSIFIED