UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

Defendants.

NO. C18-1115RSL

TEMPORARY RESTRAINING
ORDER

This matter comes before the Court on plaintiffs' "Emergency Motion for Temporary Restraining Order (with Notice to Adverse Party)" (Dkt. # 2) and defendants' oppositions thereto (Dkt. # 11, # 14, and # 16). On or about June 29, 2018, defendants entered into an agreement whereby the federal government agreed to publish a notice of proposed rulemaking and final rule revising the United States Munitions List ("USML") to allow the distribution of computer aided design ("CAD") files for the automated production of 3-D printed weapons, to announce a temporary modification of the USML to allow such distribution while the final rule is in development, and to issue a letter to Defense Distributed and other defendants advising that the CAD files are approved for public release and unlimited distribution. The agreement was made public on July 10, 2018, and Defense Distributed is currently allowing individuals to sign up to

TEMPORARY RESTRAINING ORDER - 1

download specific CAD files on August 1, 2018. <u>DEFCAD</u>, https://defcad.com (visited Jul. 31, 2018).

Prior to the June 29, 2018, agreement, the federal government had taken the position that restrictions on the export of technical data that is indispensable to the creation of guns and their components through a 3-D printing process was an essential part of its efforts to ensure that articles useful for warfare or terrorism do not proliferate and threaten United States interests and security. Under the Arms Export Control Act ("AECA"), the President of the United States is authorized "to control the import and the export of defense articles and defense services" "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). "Defense articles and defense services" includes all firearms up to .50 caliber and all technical data related to such firearms, including information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of" the firearms. 22 C.F.R. § 121.1(I)(a) and § 121.10(a).

When defendant Defense Distributed posted CAD files for various weapons on its website in December 2012, the federal government requested that they be immediately removed from public access. The government advised Defense Distributed that it could request a determination from the Directorate of Defense Trade Controls ("DDTC") within the United States Department of State regarding whether the files were subject to export control under the International Traffic in Arms Regulations ("ITAR").[1] Defense Distributed filed a number of determination requests. It also filed a lawsuit in the United States District Court for the Western District of Texas in which it argued that the export restrictions constituted a prior restraint on

---

[1] The President delegated his authority to regulate under the AECA to the State Department, which promulgated the ITAR. The DDTC administers the ITAR.

TEMPORARY RESTRAINING ORDER - 2

and censorship of expression in violation of the First, Second, and Fifth Amendments to the United States Constitution. Defense Distributed v. U.S. Dep't of State, C15-0372RP (W.D. Tex). Defense Distributed sought a preliminary injunction precluding the imposition of any prepublication approval requirement for its CAD files. The federal government opposed the motion, arguing that:

- "export of Defense Distributed's CAD files could cause serious harm to U.S. national security and foreign policy interests" and "warrant subjecting [the files] to ITAR's export licensing of technical data;"

- Defense Distributed's "CAD files constitute the functional equivalent of defense articles: capable, in the hands of anyone who possesses commercially available 3D printing equipment, of 'automatically' generating a lethal firearm that can be easily modified to be virtually undetectable in metal detectors and other security equipment;"

- "The State Department is particularly concerned that [Defense Distributed's] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerrilla groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons;" and

- both the government and the public "have a strong interest in curbing violent regional conflicts elsewhere in the world, especially when such conflict implicates the security of the United States and the world as a whole."

Id., Dkt. # 32 at 19-20 (internal quotation marks and citations omitted). The then-Director of the Office of Defense Trade Controls Management, Lisa V. Aguirre, concluded that the unrestricted export of Defense Distributed's CAD files would result in the production of plastic firearms that

TEMPORARY RESTRAINING ORDER - 3

WASHAR0000003

are fully operable and virtually undetectable by conventional security measures, that their use to commit terrorism, piracy, assassinations, or other serious crimes would cause serious and long-lasting harm to the foreign policy and national security interests of the United States, that efforts to restrict the availability of defense articles to enemies of the United States would fail, that the proliferation of weapons and related technologies would contribute to a more dangerous international environment, and that the export would undercut the domestic laws of nations that have more restrictive firearm controls and the United States' foreign relations with those nations would suffer. Id., Dkt. # 32-1 at ¶ 35.

The district court denied the motion for preliminary injunction, noting that Defense Distributed's avowed purpose is to facilitate "*global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ('3D') printing of arms," and that such activities "undoubtedly increase[] the possibility of outbreak or escalation of conflict" and are of the type Congress authorized the President to regulate through the AECA. Id., Dkt. # 43 at 8-9 (emphasis in original). The Fifth Circuit affirmed, finding that "the State Department's stated interest in preventing foreign nationals - including all manner of enemies of this country - from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016).

In April 2018, the federal government moved to dismiss Defense Distributed's lawsuit, reiterating that what was at stake was "the United States' ability to control the export of weapons - a system of law and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S.

TEMPORARY RESTRAINING ORDER - 4

WASHAR0000004

national security, U.S. foreign policy interests, or international peace and stability." <u>Defense Distributed v. U.S. Dep't of State</u>, C15-0372RP, Dkt. # 92 at 1 (W.D. Tex). Later that month, the parties reached a tentative settlement agreement which, as described in the first paragraph of this order, will allow Defense Distributed to place downloadable CAD files for automated weapons printing on its website. No findings of fact or other statements are provided in the agreement that could explain the federal government's dramatic change of position or that alter its prior analysis regarding the likely impacts of publication on the United States' national security interests.

On July 30, 2018, two days before Defense Distributed plans to place downloadable CAD files on its website, eight states and the District of Columbia filed this lawsuit seeking a declaration that the "temporary modification" of the USML is invalid and an injunction requiring the federal defendants to rescind the procedurally defective modification and refrain from acting on it. Having reviewed the papers submitted by the parties along with the record before the Honorable Robert L. Pitman in the United States District Court for the Western District of Texas, and having heard the arguments of counsel, the Court finds as follows:

The procedure for obtaining a temporary restraining order differs from that which is applicable in the preliminary injunction context, but the factors considered by the Court are the same. In order to obtain preliminary injunctive relief, plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." <u>Short v. Brown</u>, 893 F.3d 671, 675 (9th Cir. 2018) (2008). In the Ninth Circuit, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two <u>Winter</u> factors

TEMPORARY RESTRAINING ORDER - 5

WASHAR0000005

are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).

Plaintiffs have shown a likelihood of success on the merits of their Administrative Procedure Act claim insofar as the "temporary modification" has resulted in the removal of one or more items from the USML.[2] The federal government represents that its settlement was the result of a multi-year review process which was completed in May 2018 and resulted in a determination that the type of firearms and related technical data at issue here would not provide a military advantage to adversaries and therefore no longer warrant export control under the AECA and should be removed from the USML. In such circumstances, the governing statute, 22 U.S.C. §2778(f)(1), requires that the results of such reviews be reported to Congress and precludes the removal of any item from the USML until thirty days after such notice is given. When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense services subject to export control had to have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures.

Plaintiffs have also shown a likelihood of irreparable injury if the downloadable CAD files are posted tomorrow as promised. A side effect of the USML has been to make it more

---

[2] For purposes of this temporary order, the Court finds that plaintiffs have standing to pursue their claims. Although the restriction of access to technical data within the United States is not the focus or goal of the USML, there is no separation of the internet between domestic and international audiences. Thus, the listing has effectively limited access to the CAD files within the jurisdictions governed by plaintiffs. The States and the District of Columbia have a clear and reasonable fear that the proliferation of untraceable, undetectable weapons will enable convicted felons, domestic abusers, the mentally ill, and others who should not have access to firearms to acquire and use them.

TEMPORARY RESTRAINING ORDER - 6

WASHAR0000006

Case 2:18-cv-01115-RSL Document 107-1 Filed 09/29/20 Page 7 of 538

difficult to locate and download instructions for the manufacture of plastic firearms. If an injunction is not issued and the status quo alters at midnight tonight, the proliferation of these firearms will have many of the negative impacts on a state level that the federal government once feared on the international stage. Against this hardship is a delay in lifting regulatory restrictions to which Defense Distributed has been subject for over five years: the balance of hardships and the public interest tip sharply in plaintiffs' favor.

For all of the foregoing reasons, plaintiffs' motion for temporary restraining order is GRANTED. The federal government defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo *ex ante* as if the modification had not occurred and the letter had not been issued.

Pursuant to the limitations set forth in Fed. R. Civ. P. 65, this matter is hereby set for hearing on Friday, August 10, 2018, at 9:00 a.m. in Courtroom 15106 to determine whether this temporary restraining order should be converted to a preliminary injunction. No bond shall be required.

DATED this 31st day of July, 2018, at 4:35 p.m.

*Mark S Lasnik*

Robert S. Lasnik
United States District Judge

TEMPORARY RESTRAINING ORDER - 7

WASHAR0000007

| | |
|---|---|
| **From:** | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
| **Sent:** | Wednesday, July 25, 2018 12:23 PM |
| **To:** | Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Cc:** | Carter, Rachel <CarterR@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Willbrand, Ryan T <WillbrandRT@state.gov> |
| **Subject:** | Defense Distributed Email Campaign Directed at DDTC Response Team |

As an update to what I reported at the DAS Huddle, the CIRT action to block the domain name has now been countered by the creation of a new domain name so the emails have started again.  Further, the DDTC response team phones are blowing up and regular customers cannot get through.

Karen Wrege, who had a similar experience at the FCC on net neutrality, it assembling a working group to work with CIRT and others on how best to address the issue.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**(SBU) Email Campaign Directed at DDTC Response Team**:  On Monday July 23, 2018 after 6:00 PM, the ddtcresponseteam@state.gov began receiving emails from the domain *everytown.org*.When the DDTC Response Team arrived on Tuesday morning, over 4,000 emails were received, and DDTC IT quickly notified IRM (#6228346), Spam@state.gov and CIRT. The emails contained the subject line "[*Name*] in [*5 digit number*]: please stop the release of downloadable guns" and had the same body of text

"Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

[*Name*] in [*5 digit number*]"

By 11:00 AM the DDTC Response Team had received over 45,000 emails. DDTC IT created a rule to delete all emails in the existing email box and any new emails containing the subject line "please stop the release of downloadable guns". The IRM firewall team and CIRT were able to completely block emails from the domain *everytown.org* being sent to ddtcresponseteam@state.gov on Tuesday July 24, 2018 around 5:00 PM. At that time there were over 52,800 emails. The spam emails continue to be blocked by IRM. However, these emails are no longer being received by the ddtcresponseteam@state.gov email box.

**Official**

WASHAR0000008

UNCLASSIFIED

WASHAR0000009

| From: | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
|---|---|
| Sent: | Wednesday, July 25, 2018 2:30 PM |
| To: | Carter, Rachel <CarterR@state.gov> |
| Subject: | FW: Defense Distributed Email Campaign Directed at DDTC Response Team |

Rachel,

In our phone calls with IRM/CIO, they have assigned this action to IRM/SES and they asked if T had been informed.  I do not want to usurp TK's prerogative on what to up channel but if you can bend her ear it might be a good idea to let Maureen or someone on T staff know.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

---

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 12:23 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Carter, Rachel <CarterR@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Willbrand, Ryan T <WillbrandRT@state.gov>
**Subject:** Defense Distributed Email Campaign Directed at DDTC Response Team

As an update to what I reported at the DAS Huddle, the CIRT action to block the domain name has now been countered by the creation of a new domain name so the emails have started again.  Further, the DDTC response team phones are blowing up and regular customers cannot get through.

Karen Wrege, who had a similar experience at the FCC on net neutrality, it assembling a working group to work with CIRT and others on how best to address the issue.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

---

**(SBU) Email Campaign Directed at DDTC Response Team**:  On Monday July 23, 2018 after 6:00 PM, the ddtcresponseteam@state.gov began receiving emails from the domain *everytown.org*.When the DDTC Response Team arrived on Tuesday morning, over 4,000 emails were received, and DDTC IT quickly notified IRM (#6228346), Spam@state.gov and CIRT. The emails contained the subject line "[*Name*] in [*5 digit number*]: please stop the release of downloadable guns" and had the same body of text

"Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make

untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

[*Name*] in [*5 digit number*]"

By 11:00 AM the DDTC Response Team had received over 45,000 emails. DDTC IT created a rule to delete all emails in the existing email box and any new emails containing the subject line "please stop the release of downloadable guns". The IRM firewall team and CIRT were able to completely block emails from the domain *everytown.org* being sent to ddtcresponseteam@state.gov on Tuesday July 24, 2018 around 5:00 PM. At that time there were over 52,800 emails. The spam emails continue to be blocked by IRM. However, these emails are no longer being received by the ddtcresponseteam@state.gov email box.

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Dearth, Anthony M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ABDBE9661E4C4F68BE7B23BB03F058CB-DEARTH, ANT> |
| **Sent:** | Thursday, July 26, 2018 10:18 AM |
| **To:** | Pritchard, Edward W <PritchardEW@state.gov> |
| **Subject:** | RE: 3D Response Team Events |

You are still calling them spam.

V/R, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls


**Official**
**UNCLASSIFIED**


**From:** Pritchard, Edward W
**Sent:** Thursday, July 26, 2018 10:16 AM
**To:** Dearth, Anthony M <DearthAM@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Cc:** Willbrand, Ryan T <WillbrandRT@state.gov>
**Subject:** 3D Response Team Events

Here is an updated summary of the events that occurred to the ddtcresponseteam@state.gov. I have also included copies of the spam email for reference.

**Monday July 23, 2018**

    After 6:00 PM, the ddtcresponseteam@state.gov began receiving emails from the domain *everytown.org*.

        DDTC Response Team had already left for the day.

        emails contained the subject line "[*Name*] in [*5 digit number*]: please stop the release of downloadable guns" and had the same body of text, see **Appendix A**.

**Tuesday July 24, 2018**

    DDTC Response Team arrived on Tuesday morning, 4,000+ emails were received from *everytown.org*.

        IT quickly notified IRM and Spam@state.gov.

    11:00 AM, 45,000+ emails were received from *everytown.org*.

        IT reached out to IRM who could not find initial IT Service Center ticket number and created a new one ((#6228346).

        IT then notified CIRT.

    Attempts by Edward Pritchard and Ryan Willbrand were made to create a rule to move the emails to another folder.

        efforts failed as there were too many emails coming in, which froze Outlook on the user's computer.

    DDTC IT worked with Adebayo, Adeyinka of IRM/OPS/ENM/OPS and with CIRT

        *.org* emails sent to ddtcresponseteam@state.org were added to the "email scanning appliance blacklist", which bounces the emails back to the sender.

    4:30 PM, emails from *everytown.org* stopped.

,800+ emails were received in the ddtcresponseteam@state.org email box from *everytown.org*.

**Wednesday July 25, 2018**

DDTC IT deleted all 52,800+ emails received from *everytown.org*.

Around 9:00 AM the DDTC Response Team started noticing an increase in calls relating to the 3D Guns.

Karen Wrege reached out to Glenn Johnson, Deputy CIO for Operations; Lysa Giuliano, Executive Assistant (CIO office); and Dion Herbert, Cyber Monitoring and Operations, Acting Director (DS/CTS/CMO)

Karen Wrege also requested Response Team phone call statistics from TWD.

DDTC Response Team alerted DDTC IT that new emails related to the 3D guns were being received

IT informed CIRT, IRM, Dion Herbert about these new emails.

CIRT requested that DDTC create a rule and move all related emails about the 3D guns to another folder.

rule looks for emails with the following words in the body of the text:

exemption

At 4:30 PM the email rule was created and 165 emails were relocated to the new DDTC Response Team email folder, "3D Emails"

**Thursday July 26, 2018**

8:30 AM, 400+ emails relating to the 3D guns have been moved to the "3D Emails" folder

Karen Wrege discussed with Legal (Shana Rogers)

Karen Wrege updated Lysa Giuliano, Executive Assistant (CIO office) with status

Currently waiting on further guidance from Legal.
Recommendation is to have CIRT quarantine all licenses related to the 3D guns, including the everytown.org and any other emails that are being bounced back.

**Appendix A**

"Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

[*Name*] in [*5 digit number*]"

By 11:00 AM the DDTC Response Team had received over 45,000 emails. DDTC IT created a rule to delete all emails in the existing email box and any new emails containing the subject line "please stop the release of downloadable guns". The IRM firewall team and CIRT were able to completely block emails from the domain ***everytown.org*** being sent to ddtcresponseteam@state.gov on Tuesday July 24, 2018 around 5:00 PM. At that time there were over 52,800 emails. The spam emails continue to be blocked by IRM. However, these emails are no longer being received by the ddtcresponseteam@state.gov email box.

**Official - SBU**
**UNCLASSIFIED**

Please let me know if you have any questions.

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU**
**UNCLASSIFIED**

**Official - SBU**
**UNCLASSIFIED**

| From: | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
|---|---|
| Sent: | Wednesday, July 25, 2018 3:37 PM |
| To: | Carter, Rachel <CarterR@state.gov> |
| Subject: | RE: Defense Distributed Email Campaign Directed at DDTC Response Team |

We do not need action from T, but since the entire T office is serviced by IRM/SES (for primary political staff – like the GOLD standard of service) it is likely her staff will find out about the problem.  Probably better she hears it from us first.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

**From:** Carter, Rachel
**Sent:** Wednesday, July 25, 2018 3:29 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** RE: Defense Distributed Email Campaign Directed at DDTC Response Team

Tony,
OK. I will try to find time to speak with the Ambassador and see if she is OK with following IRM's recommendation to inform T.

What would T have the ability to do that we as a bureau would not, out of curiosity?

Thanks,
Rachel

**Official**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 2:30 PM
**To:** Carter, Rachel <CarterR@state.gov>
**Subject:** FW: Defense Distributed Email Campaign Directed at DDTC Response Team

Rachel,

In our phone calls with IRM/CIO, they have assigned this action to IRM/SES and they asked if T had been informed.  I do not want to usurp TK's prerogative on what to up channel but if you can bend her ear it might be a good idea to let Maureen or someone on T staff know.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs

United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 12:23 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Carter, Rachel <CarterR@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Willbrand, Ryan T <WillbrandRT@state.gov>
**Subject:** Defense Distributed Email Campaign Directed at DDTC Response Team

As an update to what I reported at the DAS Huddle, the CIRT action to block the domain name has now been countered by the creation of a new domain name so the emails have started again.  Further, the DDTC response team phones are blowing up and regular customers cannot get through.

Karen Wrege, who had a similar experience at the FCC on net neutrality, it assembling a working group to work with CIRT and others on how best to address the issue.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**(SBU)** **Email Campaign Directed at DDTC Response Team**:  On Monday July 23, 2018 after 6:00 PM, the ddtcresponseteam@state.gov began receiving emails from the domain *everytown.org*.When the DDTC Response Team arrived on Tuesday morning, over 4,000 emails were received, and DDTC IT quickly notified IRM (#6228346), Spam@state.gov and CIRT. The emails contained the subject line "*[Name]* in *[5 digit number]*: please stop the release of downloadable guns" and had the same body of text

"Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

*[Name]* in *[5 digit number]*"

By 11:00 AM the DDTC Response Team had received over 45,000 emails. DDTC IT created a rule to delete all emails in the existing email box and any new emails containing the subject line "please stop the release of downloadable guns". The IRM firewall team and CIRT were able to completely block emails from the domain *everytown.org* being sent to ddtcresponseteam@state.gov on Tuesday July 24, 2018 around 5:00 PM. At that time there were over 52,800 emails. The spam emails continue to be blocked by IRM. However, these emails are no longer being received by the ddtcresponseteam@state.gov email box.

WASHAR0000016

**Official**
**UNCLASSIFIED**

WASHAR0000017

| From: | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
|---|---|
| Sent: | Thursday, April 5, 2018 12:43 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 05, 2018 12:28 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** FW: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 5, 2018 12:23 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

WASHAR0000019

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement



**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

WASHAR0000022

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

WASHAR0000023

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
| **Sent:** | Thursday, April 5, 2018 12:53 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |
| **Attach:** | 22 USC 2717 Current.docx |



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 12:23 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert

**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>

**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM

**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

## §2717. Defense trade controls registration fees

For each fiscal year, 100 percent of the registration fees collected by the Office of Defense Trade Controls of the Department of State shall be credited to a Department of State account, to be available without fiscal year limitation. Fees credited to that account shall be available only for payment of expenses incurred for-

(1) contract personnel to assist in the evaluation of defense trade controls license applications, reduction in processing time for license applications, and improved monitoring of compliance with the terms of licenses;

(2) the automation of defense trade controls functions, including compliance and enforcement activities, and the processing of defense trade controls license applications, including the development, procurement, and utilization of computer equipment and related software; and

(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.

WASHAR0000032

| | |
|---|---|
| **From:** | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
| **Sent:** | Thursday, April 5, 2018 2:33 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 1:58 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Thursday, April 05, 2018 12:53 PM
**To:** Cavnar, Anna; Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 12:23 PM

**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

---

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement





**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

WASHAR0000039

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Dearth, Anthony M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=abdbe9661e4c4f68be7b23bb03f058cb-Dearth, Ant> |
| **Sent:** | Thursday, April 5, 2018 12:42 PM |
| **To:** | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Thursday, April 05, 2018 12:38 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 5, 2018 12:28 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** FW: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 5, 2018 12:23 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>

WASHAR0000041

**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>;
Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

WASHAR0000045



**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement



**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint

Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

## §2717. Defense trade controls registration fees

For each fiscal year, 100 percent of the registration fees collected by the Office of Defense Trade Controls of the Department of State shall be credited to a Department of State account, to be available without fiscal year limitation. Fees credited to that account shall be available only for payment of expenses incurred for-

(1) contract personnel to assist in the evaluation of defense trade controls license applications, reduction in processing time for license applications, and improved monitoring of compliance with the terms of licenses;

(2) the automation of defense trade controls functions, including compliance and enforcement activities, and the processing of defense trade controls license applications, including the development, procurement, and utilization of computer equipment and related software; and

(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.

WASHAR0000049

| From: | Heidema, Sarah J <HeidemaSJ@state.gov> |
|---|---|
| Sent: | Wednesday, July 11, 2018 10:20 AM |
| To: | Paul, Joshua M <PaulJM@state.gov> |
| Cc: | McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Subject: | Cody Wilson's claims on settlement |

Josh-

The settlement agreement with DD has not been concluded yet, however, Cody when back to Wired for a nice fluff piece on how he fought the government and won. We're confirming now with DOJ on the status of the settlement offer, that said, the article raises some concerns that we need to address:

1) **It gives the impression they won in court:** Beyond being untrue, this is dangerous as it gives the impression that our controls on ITAR tech data have been defeated in court. We chose to settle the case because the Cody made an offer to us to settle and given the imminent nature of the Cat 1-3 change and the fact that a government national security and foreign policy review had already determined that the technical data no longer merited USML control it seemed appropriate that we would agree to release only specific identified tech data from USML control prior to its anticipate move to Commerce and subsequent removal from control.

2) **They lie about the scope of the tech data subject to the settlement:** They assert that lots of tech data is released into the public domain, again this is dangerous, beyond being just untrue and could lead to further violations of the ITAR.

Looking to your team to help us figure out how we address this issue. We'll let you know what we hear back from DOJ

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not

seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkleman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

WASHAR0000052

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire <u>online community of DIY gunmakers</u>. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of <u>3-D-printable semiautomatics</u> who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called <u>Crypto Wars of the 1990s</u>. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance, he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, <u>Daniel Bernstein, sued the government</u> with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

WASHAR0000053

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era when Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is *really really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
Official
UNCLASSIFIED

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 2:41 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun' |
| Attach: | Brady Motion to Intervene filing and NOA-20180726T183612Z-001.zip |



**Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'**
**By Nick Wing**
**26 July 2018**

**CPA Note: Legal filings attached as .zip file**

The nation's leading gun safety groups are asking a judge to block an online company's plan to publish downloadable blueprints for 3D-printed plastic firearms, information that they say would open the door for people to secretly produce fully functional, untraceable weapons.

In a Thursday filing in the U.S. District Court for the District of Western Texas, the organizations questioned the federal government's recent decision to settle a lawsuit with Defense Distributed. The settlement allows the Texas-based digital firearms nonprofit company to post its controversial gun blueprints online, which it will begin doing on Aug. 1, according to the Defense Distributed website.

Defense Distributed celebrated the decision, saying it would soon bring upon the "age of the downloadable gun." But in a letter to the judge this week, gun safety groups called the agreement "troubling," "dangerous" and "potentially illegal," while claiming it could have a "significant and permanent impact" on national security and public safety. The three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence — are now seeking an emergency injunction to halt the publication of the blueprints. They want the court to have additional time to consider their concerns. A hearing is reportedly scheduled for Thursday afternoon.

In recent years, gun violence prevention advocates and lawmakers have raised fears about the rise of so-called "ghost guns" — homemade, often meticulously manufactured plastic or metal firearms made without serial numbers. As 3D printing technology becomes more widely accessible, they worry that this ghost gun ecosystem will only grow. And with advances in printing materials and an ever-expanding library of gun blueprints just a click away, they say the line between homemade firearms and professionally manufactured ones could become increasingly indistinct.

When police find guns at a crime scene, the Bureau of Alcohol, Tobacco, Firearms and Explosives can typically trace an attached serial number on the firearm back to a federally licensed dealer. This can help authorities identify suspects, crack down on bad actors and glean other vital information about how guns end up in the hands of criminals. But with ghost guns, there's no method of tracking and no way to deny a purchase by a prohibited individual because there's no point of sale.

Thursday's court filing request marks the latest chapter in a legal saga that began in 2013 when Defense Distributed founder and self-described anarchist Cody Wilson shot his way into headlines with a YouTube

WASHAR0000055

video. In the video, he shows off "the Liberator," a single-shot .380 caliber handgun made almost entirely of 3D-printed plastic.

A Liberator pistol appears on July 11, 2013 next to the 3D printer on which its components were made. The single-shot handgun was the first firearm made entirely with plastic components forged with a 3D printer and computer-aided design (CAD) files downloaded from the Internet.

The Liberator may look like a gun best suited for a Lego man, but it has since been shown to be able to fire a number of rounds without failing, so long as it's printed with a strong plastic. Months after Wilson released his video, Israeli reporters smuggled a weapon based on his design through a metal detector and into an event featuring Prime Minister Benjamin Netanyahu. Although the Liberator contains a small strip of metal — which Wilson included to make it compliant under a U.S. law banning undetectable firearms — the journalists were reportedly able to get it through unnoticed.

With media outlets around the world covering the Liberator, it quickly caught the government's attention. The State Department took action against Wilson in 2013, accusing him of violating arms export control laws by releasing "technical data" related to prohibited munitions. It demanded that he take down blueprints for the Liberator and nine other firearms posted on the Defense Distributed website. By the time Wilson complied, more than 100,000 people had already downloaded the files, ensuring that they'd live on forever in darker corners of the web.

In 2015, Wilson sued the State Department, claiming the motion against him had violated his First Amendment right to free speech. At first, Wilson appeared to be facing an uphill battle. Federal courts batted down his team's request for a preliminary injunction against the State Department in 2015. The case was eventually kicked up to the Supreme Court, where it was denied earlier this year. As recently as April, the government seemed prepared to see their defense through.

Then late last month, the feds changed course, entering into a settlement with Defense Distributed that said the company could post its gun blueprints online after all. The government also agreed to reimburse Defense Distributed for nearly $40,000 in legal fees.

In the settlement, lawyers for the Justice Department said that under a recent proposal to loosen foreign arms trafficking regulations, Wilson's "technical data" — in this case, computer-aided design models of firearms — would be exempted from stricter licensing requirements.

But gun safety groups have raised issue with that claim. Although the Trump administration published notice of the proposed rule change in May, the groups point out it hasn't officially gone into effect yet.

This discrepancy is an example of the administration "putting the cart before the horse," Avery Gardiner, co-president of the Brady Campaign, told HuffPost. She also raised broader questions about the nature of the settlement, saying the government had done "a complete about face." It didn't solicit input from any gun safety group before making the decision, Gardiner added, saying it has yet to offer a detailed explanation for what prompted the shift.

The State Department has said little publicly about the settlement, except to note that it was voluntary and agreed upon by both parties. Neither Defense Distributed nor the law firm representing the company immediately responded to HuffPost's request for comment.

Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Part of what we're asking the judge to do is to keep the status quo as it is until we can get more information

WASHAR0000056

about what caused the government to change its mind and to see if that's proper," said Gardiner.

"This isn't the way we're supposed to govern," she added. "We're supposed to govern by having open and transparent processes."

Ghost gun technology has evolved rapidly since the early days of Wilson's Liberator. Defense Distributed has already developed schematics for an AR-15 — or technically for each of the dozens of components needed to construct one of the semi-automatic rifles — which they intend to make available to the public. With these blueprints, anyone with a 3D printer and the ability to follow directions could build their own military-style rifle without anyone else's knowledge.

The surreptitiousness of DIY gunsmithing is a draw for some firearms enthusiasts. Defense Distributed has profited off and propelled the practice by selling a $1,500 "Ghost Gunner" milling machine that can be programmed to construct individual firearm components out of metal to be assembled by the user.

With conventional firearms already being so easy to get ahold of in the U.S., whether legally or illegally, concerns about 3D-printed ghost guns may not be at the forefront of many people's minds. 3D printers are still expensive, and models capable of printing a functional gun can range from several thousand dollars to more than $500,000. Although that may be a deterrent now, Wilson has said his ultimate vision is to develop blueprints that will deliver working firearms even on the cheapest 3D printers.

"Anywhere there's a computer and an Internet connection, there would be the promise of a gun," he told Forbes in 2012.

That prospect has raised alarm among gun safety groups and law enforcement alike. So far, these weapons rarely factor into crimes. Although, they have been used in a few deadly shootings, including one by a convicted felon in California who otherwise would have been barred from purchasing guns through legal channels.

Unfettered access to 3D-printed gun blueprints could also have much broader implications overseas, the gun safety groups say, where people could use them to circumvent tougher gun laws or establish another arms pipeline to criminals or terrorists.

Wilson meanwhile seems to be reveling in the idea that his campaign could disrupt efforts to regulate firearms in the U.S. and abroad. In a tweet after the announcement of the settlement this month, he appeared to celebrate the death of "American gun control."

Wilson later told Wired that he was on the verge of unleashing a "Cambrian explosion" of digital content related to firearms. He hoped it could extinguish the current youth-led movement for stronger gun laws that emerged in response to routine gun violence and high-profile mass shootings in places like Las Vegas or Parkland, Florida.

"All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable," Wilson said. "No amount of petitions or die-ins or anything else can change that."

Over the past few days, congressional lawmakers have called for hearings on 3D-printed guns, as well as new legislation to block the release of Wilson's blueprints. At a Senate hearing on Wednesday, Secretary of State Mike Pompeo said he'd "take a look" at his department's policy on sharing that sort of data.

But with Aug. 1 rapidly approaching, Gardiner said she's worried the time to act is running out.

"We need to block this settlement from going into effect so that Congress can hold hearings and do its job as a check on the executive branch," said Gardiner. "It's unlikely that this all gets figured out and resolved unless

there's a delay of the settlement going into effect."

Link: https://www.huffingtonpost.com/entry/3d-printed-guns-lawsuit_us_5b589e43e4b0de86f4929ea8?qp

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:          202.647.6968
e-mail:          *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION FOR LEAVE TO
INTERVENE BY THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered The Brady Campaign to Prevent Gun Violence, Everytown

for Gun Safety Fund Action, Inc., and Giffords' Joint Emergency Motion for Leave to Intervene

finds that Intervenor's motions should be GRANTED.

IT IS SO ORDERED that:

The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Fund Action,

Inc., and Giffords are Granted leave to intervene.

The Court Orders the clerk to file the original attachment, Complaint in Intervention.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

# Exhibit B

WASHAR0000060

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, <br><br> Plaintiffs, <br><br> BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., and GIFFORDS, <br><br> Plaintiffs-Intervenors, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, <br><br> Defendants. | CIVIL ACTION NO: 1:15-cv-372-RP |

## COMPLAINT IN INTERVENTION

WASHAR0000061

Plaintiffs-Intervenors Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (hereinafter "Intervenors") submit this Complaint in Intervention and allege, upon information and belief, the following:

## INTRODUCTION

1.     "At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defendants' Motion to Dismiss Second Amended Complaint at 1, filed Apr. 6, 2018 (ECF No. 92) ("Motion to Dismiss").

2.     Defense Distributed develops Computer Aided Design ("CAD") files for the purpose of enabling anyone to automatically manufacture guns on 3-D printers.  The company's stated objective is to ensure global, unrestricted access to firearms by postings its files online.  Due to the Government's recent about-face in this case, Defense Distributed is set to do just that:



WASHAR0000062

3.      According to the Government's previous submissions to this Court, making Defense Distributed's CAD files "available online through unrestricted access to the Internet would provide any [terrorist organization] with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is commercially available. Terrorist groups and other actors could then potentially manufacture and use such weapons against the United States or its allies." Declaration of Lisa V. Aguirre, ¶ 35(b), Exhibit A to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF Nos. 32, 32-1) ("Aguirre Decl.").

4.      As recently as April of this year, the Government stressed to this Court the potentially devastating national security implications if Defense Distributed's files were made available online.  The Government represented to this Court that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

5.      However, mere weeks after the Government urged this Court to dismiss this lawsuit citing the national security concerns raised by the possibility of foreign nationals or terrorists acquiring the Plaintiffs' CAD files, they offered a settlement agreement to the Plaintiffs (the "Settlement Agreement") which gave the Plaintiffs everything they asked for, and more.

6.      Pursuant to the terms of the Settlement Agreement, in exchange for dismissing the lawsuit, the Government has agreed to: (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from the jurisdiction of the International Traffic in Arms Regulations ("ITAR"); (ii) temporarily modify Category I of the United States Munitions List

WASHAR0000063

("USML") to exclude the files at issue from ITAR; (iii) issue a letter to the Plaintiffs that their files are exempt from ITAR; (iv) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue; and (v) pay the Plaintiffs almost $40,000.

7.      As a direct consequence of the Settlement Agreement, Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018.  According to news reports, in addition to the older gun models, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons." "The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable." According to Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms." Wilson says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."



WASHAR0000064

8.      The Government entered into the Settlement Agreement in contravention of the statutes and regulations which govern the export designation process.  Among other things, upon information and belief, the State Department: (i) has not provided the relevant Congressional committees with the 30 days-notice to "temporarily" modify the munitions lists; (ii) has not received the concurrence of the Secretary of Defense to "temporarily" change the designation of the files at issues; and (iii) has not followed established commodity jurisdiction procedures before agreeing to temporarily exempt the CAD files at issue from ITAR.

9.      The "temporary modification" of USML Category I is especially troubling because it involves making Defense Distributed's files available on the internet, which largely overrides the later need to formally modify the relevant rules.  Moreover, the Settlement Agreement covers not only the files that were developed by Defense Distributed at the beginning of this litigation, but also new files that have been developed since that time – which the Government has presumably not even seen.

10.      In addition, the Government has acted in an arbitrary and capricious manner, and has abused its discretion, by (i) failing to consider evidence relevant to ITAR jurisdiction over the CAD files; (ii) drastically changing long-established practice and policy without any explanation; and (iii) failing to study the national security implications of exempting the CAD files from ITAR.  The Settlement Agreement does not make any reference whatsoever to a determination by the Government regarding the national security implications of the agreement.

11.      Tellingly, even the notices of proposed rules, which the Departments of State and Commerce published on May 24, 2018 to amend the ITAR, make no mention of the dangers posed by the files falling into the hands of terrorist organizations, insurgent groups, transnational organized criminal organizations, or states subject to the U.S. or U.N. arms embargoes.

WASHAR0000065

12.     For all these reasons, and others detailed below, the Government Defendants have violated the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers.   This complaint seeks to declare the Settlement Agreement invalid, and to enjoin the Plaintiffs and Government Defendants from giving effect to the agreement, to the extent it permits Defense Distributed to make its files available online.

## JURISDICTION AND VENUE

13.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201 and 2202.

14.     Venue is premised on the principal place of business for Plaintiff Defense Distributed, which is located within the Western District of Texas.

## PARTIES

15.      Plaintiff Defense Distributed is a Texas corporation, whose principal place of business is located in Austin, Texas.  Defense Distributed develops CAD files to enable anyone to automatically manufacture firearms on 3-D printers.  The company also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is "designed to allow its owner to carve gun parts out of [  ] aluminum."  Defense Distributed is a party to the Settlement Agreement.

16.     Defense Distributed was started by Cody Wilson, a self-proclaimed anarchist, who believes that "governments should live in fear of their citizenry."  The company's objective is for everyone in the world to have access to guns and to make gun regulations impossible. After publicizing the Settlement Agreement, Wilson said that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun Control."

WASHAR0000066

17.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  It is a party to the Settlement Agreement.  In a press release announcing the settlement, SAF founder Alan M. Gottlieb declared it to be "a devastating blow to the gun prohibition lobby[.]"

18.     Upon information and belief, Conn Williamson is a natural person and a citizen of the United States and the State of Washington.  He is a party to the Settlement Agreement.

19.     Defendant the United States Department of State  ("State Department") is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act ("AECA").   The State Department is a party to the Settlement Agreement in this case.

20.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.   The Secretary of State is a party to the Settlement Agreement in this case.

21.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The DDTC is a party to the Settlement Agreement in this case.

22.     Plaintiff-Intervenor the Brady Campaign to Prevent Gun Violence ("The Brady Campaign") is a nation-wide gun violence prevention organization with members spread across all fifty states and the District of Columbia, and established membership groups in Austin, TX and Houston, TX. The Brady Campaign is headquartered in Washington, DC and was founded in

WASHAR0000067

1974 as the National Council to Control Handguns. The Brady Campaign took its current name in 2001, in honor of former White House Press Secretary Jim Brady, who was shot during the assassination attempt on Ronald Reagan, and his wife Sarah Brady.

23.     The Brady Campaign seeks a safer future for every American where hundreds of gun injuries and deaths a day are no longer normal. It focuses on three impact-driven solutions to further its mission of reducing gun deaths: 1) Strengthening gun laws, with a particular focus on the national background check system; 2) reducing the flow of crime guns to urban communities most impacted by gun violence; and 3) meaningfully communicating to gun owners about the dangers of loaded, unlocked guns in the home. The Brady Campaign's sister organization, The Brady Center to Prevent Gun Violence, is a non-profit organization dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence.  It filed an amicus brief in this case on February 18, 2016. In addition, the Brady Campaign and Brady Center submitted comments to the proposed rule changes implicated in the Settlement Agreement. The Brady Campaign also filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement.

24.     Plaintiff-Intervenor Everytown for Gun Safety Action Fund, Inc. is a nation-wide gun violence prevention organization, with members spread across all fifty states.  Everytown is headquartered in New York, NY. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 8 Texas cities are part of the Mayors Against Illegal Guns

WASHAR0000068

coalition. Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws. Immediately upon learning of the Settlement Agreement in this case, Everytown submitted a federal Freedom of Information Act request seeking disclosure of documents pertaining to the settlement.

25.     Plaintiff-Intervenor Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut.   Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws.   Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence.   Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

26.     Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in

- 9 -

WASHAR0000069

an increase in the number of untraceable firearms in circulation." *See* Giffords comment re
Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at*
http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

## FACTS

***The Statutory and Regulatory Framework***

27.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the
President, "[i]n furtherance of world peace and the security and foreign policy of the United
States . . . to control the import and the export of defense articles and defense services." 22
U.S.C. § 2778(a)(1). The purpose of the AECA is to reduce the international trade in arms and
avoid destabilizing effects abroad through arms exports. 22 U.S.C. § 2751.

28.     Under the AECA, "[t]he President is authorized to designate those items which
shall be considered as defense articles and defense services for the purposes of this section and to
promulgate regulations for the import and export of such articles and services." 22 U.S.C. §
2778(a)(1). Items designated as defense articles or services constitute the United States
Munitions List ("USML"). *Id.* at § 2778(a)(1). Category I of the USML lists articles, services,
and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

29.     Among other things, Category I of the USML includes all firearms up to .50
caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a).
"Technical data" is information that "is required for the design, development, production,
manufacture, assembly, operation, repair, testing, maintenance or modification of defense
articles." *Id.* § 120.10(a). Technical data includes information in the form of blueprints,
drawings, photographs, plans, instructions or documentation," and exempts information already
in the public domain, as defined in Section 120.11. *Id.* § 120.10.

- 10

WASHAR0000070

30.　"[T]he 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR." Aguirre Decl. ¶ 14.

31.　Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department. In turn, the State Department has promulgated the ITAR, which is administered by the DDTC. *See* 22 C.F.R. §§ 120-130. Among other things, the DDTC is tasked with maintaining, reviewing and clarifying the USML.

32.　Pursuant to Executive Order 13637, §1(n), "[d]esignations including changes in designations, by the Secretary of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 ( 22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

33.　In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1). Such notification must be made in accordance with the procedures applicable to reprogramming notifications under § 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. *Id.*

WASHAR0000071

34.     ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation.  However, it may do so only "in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

35.     For situations where there is doubt that a particular item to be exported falls on the USML, ITAR contains a commodity jurisdiction "CJ" procedure.  22 C.F.R. § 120.4.  Upon written request, the DDTC will provide a determination as to whether a certain item, service, or data is within the scope of ITAR.  *Id.*

36.     The "CJ" determination "entails consultation among the Department of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases."  *Id.*  Assessments are made on a case-by-case basis, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application.  *Id.*  A determination made pursuant to the commodity jurisdiction process takes into account "(i) [t]he form and fit of the article; and (ii) [t]he function and performance capability of the article."  Aguirre Decl. ¶ 20.

37.     22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures.  State shall notify Defense and Commerce of the initiation and conclusion of each case."

**The Computer Files at Issue**

38.     In or around early May 2013, Defense Distributed posted a number of CAD Files on DefCad.org, a website it created to serve as an open-source repository for weapons designs, including data to automatically manufacture the "Liberator" pistol.  The Liberator is a plastic firearm which contains 6-oz piece of steel, which can be easily removed, enabling it to avoid detection in walk-through metal detectors.

WASHAR0000072

39.     These CAD files are "data files" that are "essentially blueprints that can be read by CAD software."  Letter from Jahna M. Hartwig on behalf of Defense Distributed to the DDTC, dated June 21, 2013.  They are "indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components." Motion to Dismiss at 1.

40.     On May 8, 2013, the Office of Defense Trade Controls Compliance, which is responsible for compliance with and civil enforcement of the AECA and ITAR, sent Defense Distributed a letter noting that "it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC."

41.     The letter explained that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR."  It requested that Defense Distributed remove ten specific CAD files from public access "immediately" and submit them for CJ determination. Defense Distributed filed a request for CJ determinations for these files on June 21, 2015.

42.     In January 2015, while consideration of Defense Distributed's original CAD file submission was ongoing, Defense Distributed submitted a CJ request for the "Ghost Gunner," an automated firearms metal milling machine.  In April 2015, the DDTC determined that the Ghost Gunner was not subject to the jurisdiction of the State Department, but that the "project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR regulation."  Aguirre Decl. ¶ 28.

43.     The DDTC completed its review of Defense Distributed's original requests on June 4, 2015 and determined that six of the files were subject to ITAR control: (i) the Liberator

WASHAR0000073

pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD-40 tactical slide assemble; (v) the sub-caliber insert;  and (vi) the VZ-58 front sight.

44.     In making its CJ determination, the DDTC noted that the CAD files at issue "can be used to 'automatically find, align, and mill' a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials." Aguirre Decl. ¶ 29(c).

**The Current Lawsuit**

45.     The Plaintiffs filed this action in May 2015, alleging that the Government Defendants' actions violated the First, Second and Fifth Amendments.  In addition, the Plaintiffs alleged that the Government Defendants had engaged in *ultra vires* conduct.   Among other things, the Plaintiffs sought an injunction to prevent the Government Defendants and "all persons in active concert with them" from barring Defense Distributed's export of CAD files.

46.     In response to the Plaintiffs' motion for a preliminary injunction, the Government Defendants argued, *inter alia,* that they were "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

47.     The Government Defendants argued that "[t]he CAD files are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a

- 14 -

WASHAR0000074

foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations." *Id.* at 7.

48.     Along with its opposition to Plaintiffs' preliminary injunction motion, the Government Defendants submitted an affidavit from Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management.  Among other things, Director Aguirre concluded that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]cess to weapons technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35.

49.     Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests.  *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).  This Court found that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Id.* at 691 (internal quotations omitted).  In addition, this Court noted that the Plaintiffs had "not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

50.     On appeal, the Fifth Circuit upheld this Court's preliminary injunction ruling. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  In so doing, the

WASHAR0000075

Fifth Circuit focused on the national security implications and the permanent nature of the internet, explaining that:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . **Because those files would never go away**, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. **Thus, the national defense and national security interest would be harmed forever**.

*Id.* at 461 (emphasis added).

51.     On January 8, 2018, the Supreme Court denied the Plaintiffs' petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

52.     After the Supreme Court denied certiorari, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90.

53.     On April 6, 2018, the Government Defendants filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

54.     The Government Defendants explained to the Court that the files at issue "directly facilitate the manufacture of weapons" through "automated processes." *Id.* at 1, 9.

55.     The Government Defendants urged this Court to dismiss the Plaintiffs' lawsuit because:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United

WASHAR0000076

> States to other countries (or otherwise provided to foreigners) without
> authorization, where, beyond the reach of U.S. law, they could be used to
> threaten U.S. national security, U.S. foreign policy interests, or
> international peace and stability.

*Id.* at 1.

56.     Mere weeks after the Government stressed the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement, filed Apr. 30, 2018 (ECF No. 93).

57.     According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted." Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

58.     On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018." (ECF No. 95).

59.     As of the date of this filing, the parties have not yet filed a stipulation of dismissal with this Court.

***The Settlement Agreement***

60.     The Settlement Agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the Plaintiffs.

61.     What appears to be an accurate copy of the agreement is now available on the internet. *See* https://www.exportlawblog.com/docs/Defense%20Distributed%

WASHAR0000077

20Settlement%20Agreement.pdf. A copy of the posted agreement is provided with this

Complaint as **Exhibit C.**

62.     Pursuant to the Settlement Agreement, in consideration for the Plaintiffs'

dismissing the action, the Government Defendants have agreed to:

a. "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b. "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

c. "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

d. "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

e. Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

63.     Importantly, par. 1(a), (b) and (d) cover the broad category of files referred to as

"the technical data that is the subject of this Action." This term is defined in the Settlement

Agreement to include "Other Files," as long as those files "regard items exclusively: (a) in

Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the

USML that are components of such items; or (b) items covered by Category I(h) of the USML

solely by reference to Category I(a), excluding Military Equipment." *Id.* ¶ 12.

WASHAR0000078

64.     "Other Files" are those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions[.]"   Second Amended Complaint, ¶ 44, filed Mar. 6, 2018 (ECF No. 90).  In other words, they are files that the Government has presumably not seen yet.

65.     Under the Settlement Agreement, the Department of Justice is prohibited from filing a stipulation of dismissal any earlier than five business days after announcement of the "temporary" modification to the USML Category I and issuance of a letter to Plaintiffs that their files are approved for public release in any form and exempt from ITAR.   Id. ¶ 2.  In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.

66.     The Settlement Agreement does not indicate that any analysis, study or determination was made by the Government Defendants, in consultation with other agencies, before the Government Defendants agreed to remove the CAD Files from the USML Category I. In fact, the Settlement Agreement states that it "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

67.     Upon information and belief, neither the House Committee on Foreign Relations (formerly known as the International Relations of the House of Representatives), nor the Committee on Foreign Relations of the Senate received the required 30-days advance notice of the "temporary modifications" described in pars. 1(b) or (d) of the Settlement Agreement.

68.     In addition, there is no indication in the Settlement Agreement that the Secretary of Defense has concurred in the changes to designation agreed to in the Settlement Agreement, as required by Executive Order 13637.  There is also no indication that the Government

- 19 -

WASHAR0000079

Defendants have followed the established procedures for making a CJ determination before allowing Defense Distributed to export its data.

69.     Upon publicizing the Settlement Agreements, the Plaintiffs have repeatedly and adamantly made claims about the impact of the agreement on all gun violence prevention efforts. Among other things, Cody Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated that "[a]ll this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns . . .No amount of petitions or die-ins or anything else can change that."

**The Notices of Proposed Rulemaking**

70.     As promised, on May 24, 2018, the government published notices of proposed rulemaking by the State and Commerce Departments, which would remove Plaintiffs' CAD files from the USML Category I.  *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and II, 83 Fed. Reg. 24,198 (May 24, 2018); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (May 24, 2018).

71.     According to the Department of State's Notice of Proposed Rule, it "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."  According to the State Department, the articles that would be removed from the list "do not meet this standard."   For this reason, the notice proposes to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the USML under the jurisdiction of the State Department, and move jurisdiction over these

WASHAR0000080

products over to the Commerce Department, which, due to its looser export controls,[1] do not typically take action to prohibit the publication of the data.

72.     The Department of Commerce's Proposed Rule, filed the same day, describes how its Export Administration Regulations ("EAR") will apply to items no longer controlled under the USML. Although the Department of Commerce would not comprehensively restrict the export of technology related to firearms, it would have authority to impose a restriction on a case-by-case basis if it determines the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.   But the Department of Commerce cannot restrict the export of technology already in the public domain, including through posting on publicly available sites on the Internet.   *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4).   If the terms of the Settlement Agreement take effect and Defense Distributed makes its repository of files available online, the Department of Commerce will be unable to make an independent determination about whether national security or other concerns warrant restricting the unlimited dissemination of those files in accordance with the EAR.

73.     The public comment period for both notices concluded on July 9, 2018, the day before the Plaintiffs went public with the Settlement Agreement.

---

[1]     ITAR requires any exporter of items of the Munitions List to register with the State Department, *see* 22 C.F.R. 122.1(a), but Commerce Department regulations include no similar registration requirement.

WASHAR0000081

## CAUSES OF ACTION

### COUNT I
#### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
#### *ULTRA VIRES* CONDUCT
(Against Plaintiffs[2] and Defendants)

74.     Intervenors repeat and reallege paragraphs 1-73.

75.     Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.     The Government Defendants' agreement to and execution of the Settlement Agreement constitutes a final agency action and is *ultra vires* conduct which should be set aside by the Court.

77.     The Government Defendants may only exercise the authority conferred to them by statute.  However, neither the AECA nor ITAR confer upon the Government Defendants the power to modify the USML Category I, temporarily or otherwise, without 30 days-notice to the relevant Congressional committees and without concurrence of the Defense Department.

78.     Here, upon information and belief, the Government Defendants did not provide advance notice of the proposed temporary removal to the House Committee on Foreign Affairs and to the Committee on Foreign Relations of the Senate, and did not receive the concurrence of the Secretary of Defense.

79.     According to Rep. Engel, Ranking Member of the House Committee on Foreign Affairs, notice of the terms of the settlement has not been provided by the President or the State Department.  *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

---

[2]     For this, and all other counts in this Complaint in Intervention, the Intervenors name the Plaintiffs pursuant to Rule 19(a) of the Federal Rules of Civil Procedure for the limited purpose of ensuring that a full remedy may be ordered.

WASHAR0000082

Release (July 20, 2018), *available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

80.     The Government Defendants also lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the "established procedures" for commodity jurisdiction.  This is especially relevant here, because, in effect, the "temporary modifications" at issue will negate – in large part – the need for final rulemaking with respect to the data at issue, because once the data is on the internet, the damage to national security concerns will be irreparable.

81.     In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

82.     Here, the temporary modification agreed to by the Settlement Agreement is not in the interest of the security and foreign policy of the United States, and, upon information and belief, the Government Defendants have made no determination otherwise.

83.     In addition, the Government Defendants lack statutory authority to allow "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints. *See* Settlement Agreement, ¶ 1(d).

84.     Neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement.  However, the ordinary meaning of these terms implies that this provision purports to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision can be interpreted to violate numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by

WASHAR0000083

minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). It also violates numerous analogous state criminal statutes.

85.     The Government Defendants do not have the statutory authority to amend, rescind or waive any portion of the Gun Control Act, or analogous state statutes.

86.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

**COUNT II**
VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
AGENCY ACTION NOT IN ACCORDANCE WITH LAW
(Against Plaintiffs and Government Defendants)

87.     Intervenors repeat and reallege paragraphs 1-86.

88.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     As alleged above, upon information and belief, the Government Defendants did not give 30 days-notice to the required Congressional Committees or receive concurrence from the Secretary of Defense before agreeing, through the Settlement Agreement, to temporarily modify USML Category I to remove the data files at issue from ITAR regulation.  *See* Settlement Agreement, ¶¶1(b), (d).

90.     In addition, upon information and belief, the Government Defendants did not follow established procedures before granting the Plaintiffs an exception to ITAR jurisdiction.

91.     Furthermore, the Government Defendants cannot permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's

WASHAR0000084

automated blueprints, because "use" or "otherwise benefit" may be read to allow prohibited individuals to possess, manufacture or sell firearms made from the computer files at issue. *See* Settlement Agreement, ¶ 1(d); Gun Control Act, 18 U.S.C. 921 *et seq.*

92.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online. Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### ARBITRARY AND CAPRICIOUS AGENCY ACTION
(Against Plaintiffs and Government Defendants)

93.     Intervenors repeat and reallege paragraphs 1-92.

94.     Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

95.     A court may hold that an agency action is arbitrary and capricious when an agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action. In addition, an agency's departure from prior practice can serve as an additional basis for finding an agency's interpretation to be arbitrary and capricious.

96.     Here, upon information and belief, the Government Defendants have provided no explanation for their shift in policies, which they have repeatedly articulated to this Court. They have released no reports, no studies or analysis in connection with the Settlement Agreement to explain why the files at issue should be removed from ITAR regulation. It appears that the

WASHAR0000085

Government Defendants have also entirely failed to consider or to acknowledge the serious national security concerns created by the export of the CAD files.

97.     In fact, according to par. 5 of the Settlement Agreement, the agreement "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

98.     Here, the Government Defendants have agreed to (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from ITAR regulation; (ii) temporarily modify the USML Category I list to exclude the files at issue from ITAR regulations; and (iii) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue."

99.     These agency actions are arbitrary and capricious because the Government Defendants have not offered a reasoned explanation for ignoring or countermanding their earlier factual determinations or representations to this Court, the Fifth Circuit and the United States Supreme Court.  They are also arbitrary and capricious because they are contrary to the purposes of the AECA which requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms export.  *See* 22 U.S.C. § 2751.

100.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

WASHAR0000086

## COUNT IV
## VIOLATION OF SEPARATION OF POWERS
### (Against Plaintiffs and Government Defendants)

101.      Intervenors repeat and reallege paragraphs 1-100.

102.      The Constitution vests the power to legislate to Congress, not the Executive Branch

103.      Here, in the Settlement Agreement, the Government Defendants have agreed to temporarily modify the USML Category I to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.

104.      Because neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement, this provision may be interpreted to allow "any United States person" to manufacture, sell and possess firearms made from the files. If so, this provision violates numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). As discussed above, the Government Defendants do not have the power to nullify or amend the provisions of the Gun Control Act.

105.      For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online. Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed the Plaintiffs to make its files available online.

WASHAR0000087

**REQUESTED RELIEF**

WHEREFORE, Intervenors pray that this Court:

a)        Declare the Settlement Agreement unlawful to the extent it permits Defense Distributed to make its files available online;

b)        Enjoin the Plaintiffs and Defendants from putting any provision of the Settlement Agreement into effect to the extent that such permission purports to permit Defense Distributed to make its files available online;

c)        Enjoin the Plaintiffs from making their files available online; and

d)        Grant such other relief as the Court may deem just and proper.


Dated: July 25, 2018                        Respectfully Submitted,

                                            /s/ J. David Cabello
                                            BLANK ROME LLP
                                            J. David Cabello
                                            Texas Bar No. 03574500
                                            717 Texas Avenue
                                            Suite 1400
                                            Houston, TX 77002
                                            (713) 632-8696
                                            dcabello@blankrome.com

                                            John D. Kimball (pending pro hac vice)
                                            N.Y. Bar No. 1416031
                                            The Chrysler Building
                                            405 Lexington Ave.
                                            New York, NY 10174
                                            (212) 885-5000

WASHAR0000088

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX OF FACTS IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

Pursuant to Local Rule CV-7(d)(1), Proposed Intervenors submit this appendix of factual

bases relied upon.

**A. The Proposed Intervenors**

Proposed Intervenors are all nonprofit organizations committed to eliminating gun violence

through sensible gun control laws.[1]

**B. The Government's Restriction of Defense Distributed's Illegal Dissemination and
Export of Weapons Under ITAR.**

This Court previously made preliminary findings which were approved by the Fifth Circuit.

Dkt. 43; *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 460-61 (5th Cir. 2016).

---

[1] The Brady Campaign to Prevent Gun Violence develops and implements extensive public health and safety programs. It represents victims of gun violence in cases against irresponsible gun sellers and owners. Through its public health and safety programs, it inspires safer attitudes and behaviors around the existing guns in homes and communities nationwide and new gun purchases taking place every day.

Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws.

WASHAR0000089

A detailed factual background of this litigation has been fully briefed. *See* Dkt. 32, pp. 3-7; *see also* Dkt. 43, pp. 1-4. A short summary of the relevant facts and the procedural background of the case is provided here.

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The goal of the AECA is to ensure that articles used in warfare or terrorism are not exported from the United States to other countries, where they could be a threat to United States national security, foreign policy, or international stability. The President has delegated the authority to implement these regulations to the State Department, which promulgated ITAR to implement the regulations. *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130. ITAR is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *Id.*

The U.S. Munitions List ("USM"), part of the AECA, identifies materials that constitute "defense articles and defense services" under the AECA. 22 C.F.R. Part 121. Category 1 of the

---

Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production of 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

WASHAR0000090

USML includes (1) all firearms up to .50 caliber, and (2) all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(1)(a). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." *Id.* § 120.10(a).

In 2012, Defense Distributed began exporting technical data related to firearms through the publication of Computer Aided Design ("CAD") files, without restriction, on the Internet. Dkt. 32, p. 1; Dkt. 8, pp. 5-6. These CAD files are essentially blueprints for the creation of guns and gun components via a three-dimensional ("3D") printer. Dkt. 32, p. 5. In May 2013, the DDTC advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the ITAR, specifically because the CAD files were being made available outside the United States. Over the next two years, the DDTC conducted a commodity jurisdiction procedure ("CJ review") and concluded that several of the published CAD files were subject to regulation under ITAR because they were technical data under Category 1 of the USML. Dkt. 32, pp. 5-7. To make the CAD files available outside the United States, ITAR required Defense Distributed to seek preapproval of publication from the DDTC.

## C. The Current Litigation

On May 6, 2015, plaintiffs initiated the present action, seeking a declaration that the DDTC's preapproval requirement for privately generated unclassified information was an unconstitutional *ultra vires* government action and violated the First, Second, and Fifth Amendments. Dkt. 1. Plaintiffs also sought to enjoin the DDTC from enforcing the prepublication approval requirement against them. *See* Dkt. 1, p. 14; *see generally* Dkt. 8. After a hearing, this Court denied plaintiffs request for preliminary injunction. Dkt. 43. The Fifth Circuit affirmed this

WASHAR0000091

Court's denial of preliminary injunction. *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016). The Supreme Court denied writ of *certiorari*. Dkt. 76.

The parties continued litigating the merits of the case. However, on April 30, 2018, plaintiffs suddenly notified this Court that the parties had reached a tentative settlement agreement and requested a stay of the case, which was granted. Dkt. 93. On June 28, 2018, the parties informed the Court that the appropriate government actors had approved the parties' settlement agreement and that the parties would submit a stipulation of dismissal to the Court, on or before August 4, 2018. Dkt. 95.

**D. Motivation to Intervene.**

1. The Settlement Agreement; an unjustified reversal of course.

Earlier this month, the Brady Campaign submitted a Freedom of Information Act request to the State Department to obtain a copy of the parties' Settlement Agreement. Proposed Intervenors received a full copy of the Settlement Agreement, which was posted on the internet on or around July 12, 2018. The Settlement Agreement contains several disturbing provisions that are an affront to the United States' system of governance and violate the APA. *See* Ex. 2. First, the Settlement Agreement contractually obligates the Government to revise ITAR to specifically exclude Defense Distributed's Ghost Gunner Files, CAD files, and Other Files[2] from the list of technical data in USML. Ex. A, p. 1, Section 1(a). In other words, the Government has promised a private party that it will use its executive power to amend federal regulations for the benefit of that specific party.

Second, the Government has contractually agreed to publicly announce a temporary modification of ITAR on the DDTC website. This temporary modification, which also exempts

---

[2] "Ghost Gunner Files," "CAD Files," and "Other Files" are defined to include the files the State Department determined were subject to ITAR. *See* Exhibit A, p.7; Dkt. 90, ¶¶ 36, 40, 44-45.

WASHAR0000092

Defense Distributed's files from regulation by ITAR, will be effective in the period prior to finalization of the revised ITAR provisions promised by the Government.

Finally, the Government has agreed to issue a letter, on or before July 27, 2018, authorizing Defense Distribution to begin the public release of its files, prior to dismissal of the suit. Notably, as drafted, the Settlement Agreement seeks to bypass any review, input, or approval by this Court as to the terms therein.

2.  The threat to national security.

Defense Distributed's files are defense articles that will allow individuals across the globe to generate lethal firearms that are untraceable and that can be modified to be virtually undetectable in metal detectors. Dkt. 32, p. 8. This is particularly concerning to the State Department, because many foreign countries do not have sufficient security resources, and because this technology could be used by terrorist and guerrilla groups directing violence at the United States. *Id.* The State Department's recognition of the national security threat posed by the unrestricted publishing of these files is what caused the State Department to admonish Defense Distributed and conduct a review of these files beginning in 2013.

This Court is not a stranger to the national security issues raised by Defense Distributed's conduct. *See Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015) ("Defense Distributed admits its purpose is facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional printing of arms. Facilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict.") (internal citations and quotations omitted). And the Fifth Circuit, affirming this court's denial of plaintiffs request for a preliminary injunction, recognized the irreparable harm US national security would suffer if plaintiffs continued publication of its files:

5

WASHAR0000093

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and be freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. ***Because those files would never go away***, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. ***Thus, the national defense and national security interest would be harmed forever.***

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (emphasis added).

Numerous media channels have recognized the implications of Defense Distributed's files. For example, Fox News stated that after Defense Distributed's first publication of files in 2013, the countries with the most downloads of those files were Spain, the United States, Brazil, and Germany, proving that the publication of these files will have an international effect.[3] Fox News also noted that the 3D printers required to create functional guns cost as little as $2,000 and will make gun control "practically impossible."[4]

---

[3] John R. Lott, *This marks the end of gun control*, FOX NEWS, (July 21, 2018), http://www.foxnews.com/opinion/2018/07/20/this-marks-end-gun-control.html.
[4] *Id.*

6

Dated:  July 25, 2018

Respectfully submitted,

*/s/* David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ M'Liss Hindman*
M'Liss Hindman
Paralegal

WASHAR0000095

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION BY PROPOSED INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., AND GIFFORDS**

WASHAR0000096

Pursuant to Fed. R. Civ. P. 65 Proposed Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") respectfully and urgently moves the Court to:

A. Enter a temporary restraining order enjoining Defendants from performing under the Settlement Agreement (**Exhibit A**) discussed below, as this would cause immediate and irreparable harm to United States national security directly affecting the safety of individual U.S. citizens;

B. Enter a temporary restraining order enjoining the Plaintiffs from publishing the Published Files, Ghost Gunner Files, CAD Files, and Other Files (the "Weapon Schematics"), as defined in the Settlement Agreement, in order to prevent the immediate and irreparable harm that would result from publishing these files;

C. Enter a preliminary injunction enjoining the parties from performing the settlement agreement; and

D. Grant such other and further relief as may be appropriate.

In support of their motion, Proposed Intervenors would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

The factual and procedural background of this case have been briefed in the Appendix to Proposed Intervenors' Joint Emergency Motion to Intervene, which was filed contemporaneously with this Motion.

2

WASHAR0000097

**LEGAL STANDARD FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND MOTION FOR SAME**

To establish the need for a temporary restraining order and preliminary injunction pursuant FRCP 65, the movant has to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010).

**A. Proposed Intervenors are likely to succeed on the merits; the Proposed Intervenors satisfy the requisite elements of a claim under the APA.**

To make out an APA violation, the Plaintiffs must show that rulemaking through the terms of the settlement are arbitrary and capricious. 5 U.S.C.A. § 706(2)(A); *Taylor v. Fed. Aviation Admin.*, No. 16-1302, 2018 WL 3320874 (D.C. Cir. July 6, 2018). To obtain APA standing, a party must show that its grievance falls within the zone of interests protected by the Arms Export Control Act. In addition, the party will need to show that it would suffer an injury-in-fact to obtain standing under Article III of the U.S. Constitution. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

1. The Proposed Intervenors have standing.

The APA allows a person adversely affected by an agency action, including new rulemaking, to challenge that action. The court will set aside new regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ." 5 U.S.C. § 702. Only final agency actions can be challenged. 5 U.S.C. § 704.

Proposed Intervenors are adversely affected by the temporary removal of small arms and associated technology from the USML because (1) the removal will allow for the release of

3

WASHAR0000098

firearms technology by Defense Distributed that enable violations of state and federal law that impact public safety, (2) the safety and security of state residents is compromised by the proliferation of unregistered firearms within the state, and (3) the safety and security of state residents who travel abroad is compromised by the proliferation of small arms and associated technology to produce small arms in other countries. In addition, according to the Plaintiffs, implementation of the Settlement Agreement will directly undermine the work of Proposed Intervenors.

We understand that as matter of judicial self-governance, courts review prudential considerations with regard to standing to limit parties to those which are directly affected by an action. Prudential standing in an APA claim looks to whether "the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). That is to say, the party's interest must have a "rough correspondence" with the purpose of the underlying statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013). Thus, at least to some degree, the interests of a party must line up with the purpose of the AECA.

In this regard, it is noteworthy that the "zone of interests" test is not meant to be "especially demanding." *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." Hence, the zone of interest test only "requires some indicia – however slight – that the litigant before the court was intended to be protected, benefited or

4

WASHAR0000099

regulated by the statute under which suit is brought." *Public Citizen v. FTC*, 869 F.2d 1541, 1547 (D.C. Cir. 1989); see *Autolog Corp. v. Regan*, 731 F.2d 25, 29-30 (D.C. Cir. 1984) ("Courts should give broad compass to a statute's 'zone of interests' in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court").

Here, the Proposed Intervenors clearly meet this test, as associations promoting gun safety laws to minimize violence and injuries with members who would be directly affected by release of this information in the United States and when traveling abroad. The Proposed Intervenors are vulnerable to the precise sort of harm that ITAR's assault on international terrorism is intended to shield.

2. The temporary removal of items from the USML through the settlement is arbitrary and capricious.

The Proposed Intervenors can satisfy the above-delineated requirements to state a claim under APA Section 7, because the consequences of allowing the Settlement Agreement to become effective include: (1) direct contradiction of the legislative intent underlying the AECA and amending the AECA to codify the then-existing classifications of items of on the USML, (2) State Department and other agencies' failure to study or otherwise consider the national security and international stability effects of these actions, in violation of the purpose of the AECA, (3) release of this information to the Internet as a result of the settlement before completing its APA rulemaking after receiving comments on the NPRM, and (4) inexplicable, unjustified reversal of the position of the U.S. Government with regard to the national security ramifications of allowing the online distribution of files to enable the 3-D printing by reference to the Weapons Schematics.

     i.    Violation of AECA purpose.

The AECA requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C.

WASHAR0000100

§ 2751. Neither the settlement agreement nor the proposed rulemaking to finalize the reclassification of small arms technology off of the USML address how these rule changes will impact the international trade in arms or potentially destabilizing effects. This total lack of consideration of the central purpose of the AECA demonstrates that the government's action was ill-considered: "Deference is not owed when the agency has completely failed to address some factor of consideration of which was essential to [making an] informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation marks and citation omitted).

ii.  Failure to study.

In previous rulemakings removing certain items from the USML, the Department of State undertook significant efforts to understand the ramifications to national security interests. For example, before removing certain Global Position System receivers from the USML, the State Department headed an interagency working group to review the regulation of commercial satellites and related technology and whether removal would jeopardize national security interests. Amendment to the ITAR, 57 Fed. Reg. 41,077 (Sept. 9, 1992). An agency's rulemaking is arbitrary and capricious if the agency cannot explain a connection between the logic of the rule and its purported factual basis. *See We Who Care, Inc. v. Sullivan*, 756 F. Supp. 42, 46-47 (D. Me. 1991) (finding that revised regulation establishing $1,500 as the maximum equity in an automobile that an individual could have to obtain benefits under the Aid to Families with Dependent Children program was arbitrary and capricious because the survey on which the change was based was unavailable and the agency was unable to provide basic information about how the survey was conducted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

WASHAR0000101

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

        iii.   <u>Failure to follow procedural requirements.</u>

The AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), notice of the terms of the settlement has not been provided by the President or the State Department.

Although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, they may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. As Congressman Engel noted: "[i]t stretches credulity to believe that release of this information is in the U.S. interest." *Engel Decries State Department Policy to Allow 3-D Gun Printing*, Press Release (July 20, 2018),

WASHAR0000102

*available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

Here, the release of the information as a result of the settlement, prior to the completion of the required APA rulemaking process, essentially circumvents the entire rulemaking process, without providing any justification for such action, and is thus clearly tantamount to arbitrary and capricious action in contravention of the APA.

Indeed, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Where an agency makes a determination to remove a protection from a regulatory scheme, an adequate basis and explanation for that rescission is expected. *See* 15 U.S.C.A. §§ 1381 et seq., 1392(a), (b), (f)(1,3,4); 5 U.S.C.A. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983).

Here, the terms of the settlement directly contradict the arguments made by the U.S. Government parties in seeking to dismiss Defense Distributed's challenge.

    iv.    <u>The terms of the settlement are a final agency action.</u>

The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. Agency action is "final" if two conditions are met. First, the action must mark the end of the agency's decision-making process. Second, the action must be one by which "rights or obligations have been determined," or from "which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 247 (3d Cir.

WASHAR0000103

2011).[1] A settlement agreement can qualify as final agency action. *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

The executive branch cannot hide behind Presidential powers to achieve a particular domestic objective. When it does so, the executive branch exceeds the statutory authority granted to it by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -- it directs that a presidential policy be executed in a manner prescribed by the President."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), vacated and remanded on other grounds, 471 U.S. 1113 (1985) ("The Court in Youngstown was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs."); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 296 (4th Cir. 2018) ("In sum, the President claims the authority to indefinitely set his own

---

[1] In *Minard*, an oil company obtained a preliminary injunction against implementation of a settlement agreement between the Forest Service and environmental groups. That settlement required the Forest Service to conduct an environmental analysis before issuing a "Notice to Proceed" ("NTP") to mineral rights owners in the Alleghany National Forest. An NTP is required to proceed with extraction activity. In implementing the settlement, the Forest Service placed a moratorium on issuance of NTPs. The Third Circuit found that the moratorium constituted a final agency action, while the settlement agreement itself was an "intermediate agency action", which, under the APA, is "subject to review on the review of the final agency action." *Id.* at 249, n. 7 (quoting 5 U.S.C. § 704). The Third Circuit found that the Forest Service had failed to abide by APA rulemaking requirements in implementing its new policy on issuing NTPs. *Id.* The Third Circuit upheld the district court's preliminary injunction: the district court's injunction enjoined the Forest Service from requiring the environmental analysis before issuing NTPs, ended the moratorium, and prevented further implementation of the settlement agreement. *See Minard Run Oil Co. v. United States Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009). Here, the settlement action must be considered final agency action, because the settlement will have immediate and substantial effect through release of the information to the internet. As noted by the Fifth Circuit in affirming this Court's denial for a preliminary injunction, the files would be "freely available worldwide...Thus, the national defense and national security interest would be harmed forever."

9

WASHAR0000104

immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration").

**3. There is a threat of irreparable injury if the injunction is denied.**

The threat of irreparable injury to the United States and its citizens has been briefed in the Motion to Intervene and accompanying Appendix 1. If the Government is permitted to perform under the Settlement Agreement, despite the numerous and blatant APA violations in the Settlement Agreement, United States national security will suffer irreparable injury.

**4. The threatened injury outweighs any prejudice the injunction might cause the parties.**

This Court has already found that the Plaintiff's interest in protecting its constitutional rights does not outweigh "the public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015).

**5. The injunction will not disserve the public interest.**

An injunction will not disserve the public interest. On the contrary, the primary aim of the injunction is to serve the public interest by enjoining plaintiffs and defendants from taking action that will irreparably harm the security of the United States and its citizens. *See id.* ("Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling 'export' of such materials stands in sharp contrast to Defendants' assertion of the public interest.").

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request the Court grant a temporary restraining order and schedule a hearing concerning the motion for preliminary injunction.

WASHAR0000105

Dated:  July 25, 2018

Respectfully submitted,

*/s/* David Cabello

J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/M'Liss Hindman*

M'Liss Hindman
Paralegal

11

WASHAR0000106

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY ACTION FUND, INC, AND GIFFORDS' NOTICE OF APPEARANCE OF LEAD COUNSEL J. DAVID CABELLO**

Intervenors The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (collectively "Intervenors") notify the Court that J. David Cabello of Blank Rome, LLP, has entered this action as Lead Attorney on their behalf. In connection with this notice, Mr. Cabello requests that all future pleadings and other papers filed under Fed. R. Civ. P. 5 be served on him at the below address and contact information.

**J. David Cabello**
**Blank Rome LLP**
**717 Texas Avenue, Suite 1400**
**Houston, TX 77002**
**Telephone: (713) 228-6601**
**Facsimile: (713) 228 6605**
**E-mail: dcabello@blankrome.com**

1

WASHAR0000107

July 25, 2018

Respectfully submitted,

/s/ J. David Cabello
J. David Cabello
Attorney-in-Charge
Texas State Bar No. 03574500
Blank Rome LLP
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

/s/ M'Liss Hindman
M'Liss Hindman
Paralegal

WASHAR0000108

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS' REQUEST FOR AN EMERGENCY HEARING FOR
TEMPORARY RESTRAINING ORDER**

Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords, (collectively "Intervenors") file this Request for an Emergency Hearing on their Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). As fully briefed in the Motion for Temporary Restraining Order and Preliminary Injunction, time is of the essence. Plaintiffs will publish their Weapon Schematics as early as Friday July 27, 2018. Once these files are published on the Internet, United States national security and its citizens will be irreparably harmed. For this reason, Intervenors respectfully request this Court to grant an emergency hearing on **Thursday July 26, 2018**. For cause, Intervenors show the following:

1. As detailed in the Motion, Plaintiffs and Defendants (the Government) have entered into a Settlement Agreement. This Settlement Agreement permits Plaintiffs to publish, including on the Internet, files that can be used to print firearms and firearm components with a three-dimensional ("3D") printer.

2. The Government had previously deemed these files to fall within the scope of ITAR and, until very recently, vigorously defended its position against Plaintiffs. Now,

the Government has entered into this Settlement Agreement. Several provisions of the Settlement Agreement violate the Administrative Procedure Act ("APA"). Intervenors can show a strong likelihood of success on the merits of claims of APA violations by the Government.

3. Publication of these files on the Internet will cause irreparable harm to the United States and its citizens, as it will allow the global community unfettered access to blueprints for the creation of untraceable and undetectable weapons, which will threaten the security of the United States and its citizens. Due to the nature of the modern Internet, once these files are publicly released, the damage cannot be undone. The balance of harm and the public interest favors granting a temporary restraining order and preliminary injunction.

Intervenors respectfully submit this request to set their Motion for an emergency hearing as requested herein, and for such and other relief as it may be entitled.

Dated:  July 25, 2018

Respectfully submitted,

/s/ David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

/s/ M'Liss Hindman
M'Liss Hindman
Paralegal

WASHAR0000111

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR LEAVE TO INTERVENE BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, Intervenors The Brady Campaign to Prevent Gun

Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc.

("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") seek leave to

intervene in this litigation. In support, Proposed Intervenors file 1) a Memorandum of Law in

support of their request to intervene (**Exhibit A**), 2) a Complaint in Intervention (**Exhibit B**), and

3) an Appendix of Facts. Proposed Intervenors are contemporaneously filing a motion for

temporary restraining order and preliminary injunction and requesting a hearing for the same.

WASHAR0000112

Dated:  July 25, 2018

Respectfully submitted,

_/s/ David Cabello_
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

_/s/M'Liss Hindman_
M'Liss Hindman
Paralegal

WASHAR0000113

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING REQUEST FOR AN EMERGENCY HEARING BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords' Emergency Motion for Hearing on

Temporary Restraining Order and Preliminary Injunction, finds that Intervenor's motions should

be GRANTED.

IT IS SO ORDERED that

The Court will hold a hearing on Intervenors' Motion for Preliminary Injunction and

Temporary Restraining Order on _____, July _____, 2018 at _____

a.m./p.m.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0000114

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER AND MOTION
FOR PRELIMINARY INJUNCTION**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords Joint Emergency Motion for

Temporary Restraining Order, and Motion for Preliminary Injunction, finds that Intervenors'

motions should be GRANTED.

IT IS SO ORDERED that

1. Until further order of this Court, pending hearing on Intervenors' motion for

   preliminary injunction, Plaintiffs are temporarily enjoined from publishing and/or

   exporting the Published Files, Ghost Gunner Files, CAD Files, and Other Files, as

   defined in the Settlement Agreement executed by the Plaintiffs and Defendants on

   June 29, 2018; and

2. Until further order of this Court, pending hearing on Intervenors' motion for

   preliminary injunction, Plaintiffs and Defendants are enjoined from performing under

   the Settlement Agreement.

WASHAR0000115

The Court shall hold a hearing on Intervenors' Motion for Preliminary Injunction on

_____, 20_____ at ____ a.m./p.m.


_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0000116

# Exhibit A

WASHAR0000117

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS THE BRADY CAMPAIGN
TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC. AND GIFFORDS**

WASHAR0000118

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, The Brady Campaign to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords (collectively "Proposed Intervenors") respectfully and urgently move the Court to:

A. Permit the Proposed Intervenors to intervene in this litigation and file the Complaint in Intervention annexed as **Exhibit B**;[1] and

B. Grant such other and further relief as may be appropriate.

If the Court grants intervention, Proposed Intervenors also request by separate motion, filed contemporaneously with this motion, a temporary restraining order and preliminary injunction. Injunctive relief is necessary to prevent the irreparable harm to the security of the United States and its citizens that will result from the performance of the Settlement Agreement (attached as **Exhibit C**) and Defense Distributed's publication of Weapon Schematics on the Internet.

## BACKGROUND

This case began because the United States government correctly found that the publication on the internet of Defense Distributed's blueprints for the 3-D printing of certain weapons threatened national security. As stated by the Fifth Circuit:

> The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiff-Appellants very strong constitutional rights under these circumstances…[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

---

[1] If this Court determines that the Proposed Intervenors do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Proposed Intervenors request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief).

2

WASHAR0000119

With no justification whatsoever and in violation of the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers, the Government has capitulated to plaintiffs' position and agreed to completely abandon the numerous valid reasons it had asserted for blocking the export of Defense Distributed's plans. This Court previously found that the Government's position was likely to succeed. It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security. The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community.

Plaintiffs and the Government have agreed to settle all issues in this litigation by August 4, 2018. The terms of the Settlement Agreement allow Defense Distributed to publicly upload blueprints of firearms and firearm components to the Internet, so that any terrorist group or individual in the world with access to the Internet and a three-dimensional ("3D") printer can create guns and gun components, with modifications that make these weapons untraceable and undetectable. Specifically, the Settlement Agreement permits Defense Distribution to begin publishing these files on July 27, 2018, even though the parties are not set to enter a stipulation of dismissal until August 4, 2018.

Most alarmingly, the Government, which up until a few months ago was vigorously defending this suit and fighting to prevent Defense Distributed from publishing these files, has suddenly done a complete about-face and contractually obligated itself to exempt Defense Distributed's files from the International Traffic in Arms Regulations, 22 C.F.R Part 120 et seq. ("ITAR"), despite the State Department's official determination in 2015 that the disputed files are subject to ITAR. Due to the nature of the modern Internet, the harm from Defense Distributed's publication of these files is irreversible. A temporary restraining order and preliminary injunction

3

WASHAR0000120

to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens.

Proposed Intervenors are asking the Court to preserve the status quo and simply seek to continue down the sensible path that the Government, until recently, was advocating and this Court found was likely to succeed.

The procedural and factual record relied upon is attached as Appendix 1.

**POINT ONE**
**INTERVENORS HAVE STANDING TO INTERVENE**

**A. Standard for intervention.**

FRCP 24 establishes the criteria for intervention, and is to be liberally construed. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citing *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015)). Courts "should allow intervention when no one would be hurt and the greater justice could be attained." *Id.* Rule 24 establishes two kinds of intervention: intervention of right and permissive intervention. *See* FED. R. CIV. P. 24(a)-(b).

Federal Rule of Civil Procedure 24(a)(2) provides that, upon timely application, a party shall be permitted to intervene as a matter of right when the party:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).

Under this standard, four criteria must be satisfied to support intervention as of right: (1) the motion to intervene must be timely; (2) the applicant must have a cognizable interest in the action; (3) the applicant must be so situated that the disposition of the action may, as a practical

4

WASHAR0000121

matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a). "'Rule 24 is to be construed liberally . . . and doubts resolved in favor of the proposed intervenor.'" *See Poynor v. Chesapeake Energy Ltd. P'ship (In re Lease Oil Antitrust Litig.)*, 570 F.3d 244, 248 (5th Cir. 2009) (internal citations omitted). Proposed Intervenors satisfy these requirements and should be permitted to intervene.

    1. <u>The Motion to Intervene is timely.</u>

Proposed Intervenors have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018. Proposed Intervenors had not intervened here previously because they agreed with the Government's position. The Fifth Circuit has held, as is the case here, that by filing of a motion to intervene, "less than one month after learning of their interest in [the] case, [movants] discharged their duty to act quickly." *See Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977)).

With respect to the second factor, the Fifth Circuit has emphasized that the relevant prejudice is that created by the intervenor's *delay* in seeking to intervene after it learns of its interest, not prejudice to existing parties if intervention is allowed. *See Ceres Gulf v. Cooper,* 957 F.2d 1199, 1203 (5th Cir. 1992). As noted, the Proposed Intervenors did not unduly delay the filing of this Motion, and acted promptly after learning of its need to defend its interest in this matter. Prior to obtaining a copy of the Settlement Agreement, which revealed the parties current intentions, Proposed Intervenors were operating under the information and belief, supported by the Court docket and pleadings filed in this matter, that the Government defendants had been and were representing their interests and national security.

5

139718.00601/110549050v.6

WASHAR0000122

Under the third factor, the Proposed Intervenors would be severely prejudiced and suffer irreparable harm if not allowed to intervene.  Importantly, once Defense Distributed weapon's data is released to the internet, the damage to national security will be irreversible.

Lastly, there are no unusual circumstances here which weigh against intervention.  Rather, the Government's sudden abandonment of its longstanding position and the national security issues that are at stake, are both unusual circumstances that weigh heavily in favor of intervention.

2.  The Proposed Intervenors have a cognizable interest in the instant litigation.

The inquiry under the second requirement of Rule 24(a), "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *See Texas*, 805 F.3d at 657 (5th Cir. 2015).    Accordingly, an interest that is "concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658.  Specifically, the Fifth Circuit has concluded that a party has "a legally protectable interest in the regulatory scheme" when the party or their membership are the "intended beneficiaries" of the policy under challenge." *See Wal-Mart*, 834 F.3d at 566-67 (5th Cir. 2016).  The Fifth Circuit has also held that "public spirited" civic organizations that successfully petition adoption of a law may intervene to vindicate their "particular interest" in protecting that law. *Id.* (citing *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)).  Proposed Intervenors meet this test.

The Plaintiffs have declared that because of the Settlement Agreement, the work that Proposed Intervenors are dedicated to will be imeasureably more difficult, if not impossible. Proposed Intervenors and their members work to pass and enforce gun safety laws in Congress and throughout the country.  Upon publication of the Settlement Agreement, Cody Wilson, the president of Defense Distributed announced that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun

6

WASHAR0000123

Control." Plaintiff Second Amendment Foundation declared that that Settlement Agreement is a "a devastating blow to the gun prohibition lobby[.]" Proposed Intervenors have a concrete, personalized, and legally protectable interest in this litigation because the intent of the Plaintiffs, through the Settlement Agreement, is to make Proposed Intervenors' work untenable. As a result of the Settlement Agreement, Proposed Intervenors will be forced to expend additional resources to protect their respective missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (where defendant's alleged conduct "perceptibly impaired" an organizational plaintiff's ability to carry out its mission and caused a "drain on the organization's resources – there can be no question that the organization has suffered the requisite injury in fact."); *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D Tex. 2015) ("An organization can demonstrate injury 'by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and perceptibly impaired the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'") (quoting *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)). In this case, because Proposed Intervenors assert a "procedural interest" to protect their "concrete interest," they "can assert that right without meeting all the normal standards for redressbility and immediacy" required for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992).

3. The Disposition of the action threatens to create a practical impediment to the Proposed Intervenors' ability to protect its members' interest.

Proposed Intervenors would be seriously prejudiced if this Motion is not granted, as the implementation of the Settlement Agreement would undermine their stated mission statements and seriously impact members' interest and safety. The release of Defense Distributed's weapon's data via the internet, once permitted, cannot be reversed, mitigated, or undone, and would cause direct, substantial, and irreversible harm to the Proposed Intervenors and its members.

7

139718.00601/110549050v.6

WASHAR0000124

As the Government has advocated throughout this matter, the dissemination of such information will negatively impact the national security of the United States and its citizens. Therefore, because Proposed Intervenors' and their members' interests would be practically impeded if the Settlement Agreement were implemented, Proposed Intervenors should be permitted to intervene at this juncture.

4. <u>No existing party adequately represents the Proposed Intervenors' interest.</u>

Clearly the Government no longer adequately represents the Proposed Intervenors' interest.

**B. Alternatively, permissive intervention is warranted under Rule 24(b).**

If this Court decides that Proposed Intervenors are not entitled to intervene as of right, they should be permitted to intervene under Rule 24(b). Under Rule 24(b)(1)(B), the Court may, in its discretion, permit intervention on a timely motion when the potential intervenor "has a claim or defense that shares with the main action a common question of law or fact." *See Graham v. Evangeline Par. Sch. Bd.*, 132 F. App'x 507, 511 (5th Cir. 2005). The "claim or defense" portion of Rule 24(b)(2) has been construed liberally by the Fifth Circuit. *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Moreover, "it is settled law in this circuit that permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991) (internal citation omitted). Proposed Intervenors satisfy these factors, and this Court is within its discretion to permit them to intervene.

**C. Proposed Intervenor's are not required to establish independent standing to intervene.**

The Fifth Circuit has ruled that "Article III does not require intervenors to independently possess standing where the intervention is into a *subsisting* and *continuing* Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

8

WASHAR0000125

subsisting party with standing to do so." *See Steward v. Abbott*, 189 F. Supp. 3d 620, 625 (W.D.

Tex. 2016) (emphasis added) (internal citations omitted); *see also Newby v. Enron Corp.*, 443 F.3d

416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (agreeing with "the

better reasoning in cases which hold that Article III does not require intervenors to possess

standing"). This Court has acknowledged it is "tasked with safeguarding separation of powers"

and held that "[p]rovided that such a case or controversy exists, it is immaterial to the court's

jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements

of Article III." *Steward*, 189 F. Supp. 3d at 626 (W.D. Tex. 2016) (internal citation omitted).

Accordingly, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction

vests," and "[t]he presence of additional parties, although they alone could independently not

satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *See*

*Ruiz*, 161 F.3d at 832 (5th Cir. 1998) (rejecting argument that intervenor required standing to

invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's

jurisdiction in [the] case ha[d] already been invoked by the original parties").[2]

---

[2] Even if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to establish the necessary elements of injury, causation, and redressability. *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("The three well-known components of standing are injury in fact, causation, and redressability"). "For an issue to be ripe for adjudication, a plaintiff must show that he 'will sustain immediate injury" and "that such injury would be redressed by the relief requested,'" *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994) (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2635, 57 L. Ed. 2d 595 (1978)).

 Here, as described above, the Proposed Intervenors would be immediately and irreparably injured by the implementation of the Settlement Agreement and the dissemination of Defense Distributed's weapons data via the internet, as once the information is released online, it cannot be reversed, nor can its potential effects be mitigated, or undone. *Def. Distributed*, 838 F.3d at 461 (5th Cir. 2016) (emphasis added). In spite of the Government's prior strong defense of this matter, the Settlement Agreement now abandons those same pressing national security concerns raised by the possibility of foreign nationals or terrorists acquiring Defense Distributed's weapons files. Accordingly, Proposed Intervenors' injury would be directly caused by the implementation of the recent Settlement Agreement reached by the parties. *Id.* at 431 (5th Cir. 2011) ("[t]he

9

WASHAR0000126

**CONCLUSION**

The Court should enter an order permitting Proposed Intervenors to file a Complaint in

Intervention.

---

causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable,'" to the parties and/or the conduct at issue); Dkt. 32-1. Additionally, it is clear that the intervention and the requested injunction, if granted, will prevent the immediate and irreparable harm to the Proposed Intervenors, among others, caused by the possibly illegal implementation of the Settlement Agreement and the irreversible dissemination of Defense Distributed's blueprints for untraceable lethal weapons via the internet. *Id.*

Proposed Intervenors may also establish associational standing to intervene on behalf of their individual members. An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" or associational standing on behalf of its members, if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Steward*, 189 F. Supp. 3d at 630-31 (W.D. Tex. 2016) (internal citations omitted). Here, Proposed Intervenors' members are American citizens and the intended beneficiaries of gun control and anti-terror laws enacted by this country. By virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Proposed Intervenors' members is directly threatened. As the Government has previously cited, Proposed Intervenors' members will be subjected to increase risk from terroristic and violent threats, at home, in public places, and while traveling abroad if Defense Distributed's data is released. *See* Dkt. 32, 32-1. Second, the interests that Proposed Intervenors and their individual members seek to protect relate to the prevention of gun violence, which is germane to each organization's purpose, and which is essential to each of their individual members. Finally, it is undisputed that the interests which Proposed Intervenors and their individual members seek to assert do not require direct participation by the individual members in the lawsuit. The Government defendants have previously and adequately represented the individual members' interests in this litigation for over three (3) years without the members' direct participation in this case. Proposed Intervenors will represent the interests of their individual members that have now been abandoned by the Government defendants by virtue of the Settlement Agreement.

10

WASHAR0000127

Dated:  July 25, 2018                          Respectfully submitted,

                                        _/s/ David Cabello_____
                                        J. David Cabello
                                        Blank Rome LLP
                                        Texas State Bar No. 03574500
                                        717 Texas Avenue
                                        Suite 1400
                                        Houston, TX 77002
                                        Telephone: (713) 228-6601
                                        Facsimile: (713) 228 6605
                                        E-mail: dcabello@blankrome.com

                                        John D. Kimball (pending _pro hac vice_)
                                        Blank Rome LLP
                                        N.Y. Bar No. 1416031
                                        The Chrysler Building
                                        405 Lexington Ave.
                                        New York, NY 10174
                                        (212) 885-5000

                                        **Attorneys for The Brady Campaign to**
                                        **Prevent Gun Violence, Everytown for Gun**
                                        **Safety Action Fund, Inc., and Giffords**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

                                        _/s/ M'Liss Hindman_____
                                        M'Liss Hindman
                                        Paralegal

139718.00601/110549050v.6

WASHAR0000128

# Exhibit A

WASHAR0000129

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

      (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by

            law (including the Administrative Procedure Act), the publication in the Federal

            Register of a notice of proposed rulemaking and final rule, revising USML

            Category I to exclude the technical data that is the subject of the Action.

      (b)    Defendants' announcement, while the above-referenced final rule is in

            development, of a temporary modification, consistent with the International

WASHAR0000130

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d) Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e) Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000131

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000132

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

WASHAR0000133

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

WASHAR0000134

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

WASHAR0000135

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this
Settlement Agreement without reliance on any representation by Defendants as to the
application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-    The phrase "*Published Files*" means the files described in paragraph 25 of
     Plaintiffs' Second Amended Complaint.

-    The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of
     Plaintiffs' Second Amended Complaint.

-    The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs'
     Second Amended Complaint.

-    The phrase "*Other Files*" means the files described in paragraphs 44-45 of
     Plaintiffs' Second Amended Complaint.

-    The phrase "*Military Equipment*" means (1) Drum and other magazines for
     firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds,
     regardless of jurisdiction of the firearm, and specially designed parts and
     components therefor; (2) Parts and components specially designed for conversion
     of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or
     attachments specially designed to automatically stabilize aim (other than gun
     rests) or for automatic targeting, and specially designed parts and components
     therefor.

-    The phrase "*technical data that is the subject of the Action*" means: (1) the
     Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other
     Files insofar as those files regard items exclusively: (a) in Category I(a) of the
     United States Munitions List (USML), as well as barrels and receivers covered by
     Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000136

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

_____

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

_____

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

# Exhibit C

WASHAR0000138

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0000139

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000140

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000141

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000142

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
    of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
    agreement or understanding, oral or written, which is not contained therein, shall be
    recognized or enforced. Plaintiffs acknowledge and agree that no promise or
    representation not contained in this Settlement Agreement has been made to them and
    they acknowledge and represent that this Settlement Agreement contains the entire
    understanding between Plaintiffs and Defendants and contains all terms and conditions
    pertaining to the compromise and settlement of the disputes referenced herein. Nor does
    the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
    other than the desire of the Parties to reach a full and final conclusion of the Action, and
    to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an
    instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
    be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the
    benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
    assigns and personal representatives, including any persons, entities, departments or
    agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0000143

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000144

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000145

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000146

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 5:01 PM |
| To: | Kaidanow, Tina S <KaidanowTS@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Subject: | DD Settlement: Cong/Pub State of Play |
| Attach: | Defense Distributed Settlement Alerts for 25 July 2018.msg; Defense Distributed - S contingency QA (5).docx |

Dear AMB Kaidanow,

This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**

- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached).  In the event, he told SEN Markey he'd "take a look at it".  The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance.  We hope to provide the response in advance of tomorrow's signing of the Settlement letter.
- In addition, SEN Menendez issued a statement calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**

- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's On Point dedicated to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a petition on Change.org has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Tends chart for worldwide searches on 3D guns is as follows:



Thanks,

Josh

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 📱   BlackBerry: 202.679.6724 | 📠   Fax: 202.647.4055
✉ e-mail:      ***PaulJM@State.Gov*** | 🖰 Web: ***www.state.gov/t/pm /***

📶 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is ***UNCLASSIFIED***, per E.O. 12958

**Official - SBU**
**UNCLASSIFIED**

WASHAR0000148

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 4:49 PM |
| **To:** | Steffens, Jessica L <SteffensJL@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| **Subject:** | Defense Distributed Settlement Alerts for 25 July 2018 |



### Defense Distributed Settlement Alerts for 25 July 2018

"Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'", Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

"Editorial: Homemade 3-D printer guns should be regulated like any gun", Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

"WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons", Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

"What You Need to Know About the 3D Printing of Guns on Demand", While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

"LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL", Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1.

"MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS", U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

"Debating the Permissibility of Printable Guns", Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun.  Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry.  Deadly weapons shouldn't fall into the wrong hands.

"We Have to Take a Stand on 3D Printed Guns", You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

"Government Admits AR-15s Are Not Weapons of War", Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement. The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

"Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1", A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

"THE DANGERS OF 3D-PRINTED GUNS", The Trump Administration's ruling will recklessly allow anyone to post their gun blueprints online for anyone to download. That means people who are unable to pass a background check—like terrorists, convicted felons, and domestic abusers—will be able to 3D-print a gun out of the same type of plastic used to make LEGOs—without any attached serial numbers. This could have severe repercussions a decade from now if we allow weapons of this kind to multiply.

"Email NOW: Stop the Threat of Downloadable Guns", Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

"The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really", The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0000151

**SFRC Hearing**
**Q&A on 3D Printing of Firearms Settlement**

IF ASKED: Will you postpone implementation of the settlement on 3D-printed firearms

- **I am aware of Congress' concerns on this matter, though I would observe that the Department's role in regulating firearms relates only to our control of exports.**

IF PRESSED: Will you postpone implementation of the settlement?

- **I am not in a position to comment on pending litigation.**

Background (*not for public use*):

In 2013 the Department became aware of the presence of Computer Aided Design (CAD) files for the 3-D printing of certain firearms and related parts and components on the webpage of Defense Distributed (DD), and directed that they be taken down pending a review to determine if the files were subject to the International Traffic in Arms Regulations (ITAR).  The possession of these firearms and components is not unlawful in the United States, and the federal government does not separately regulate the 3-D printing of firearms.  Further, the 3-D files at issue are for a firearms design that requires adding metal after printing and thus does not violate the Undetectable Firearms Act of 1988.  DD ultimately sued the Department, alleging violations of the First, Second, and Fifth Amendments, and asserting that regulating posting files to internet web pages exceeds the scope of the Department's authority under the Arms Export Control Act (AECA) and ITAR.  In close consultation with the Department of Justice, the Department of State recently concluded a settlement agreement, but the case has not yet been dismissed.  Under the settlement, the Department would authorize for public release the CAD files that are the subject of the litigation. ███████████████████████████████████
███████████████████████

The Department's determination to settle the suit was made based on the outcome of the interagency review to support the drafting of the proposed rules that, if made final, would revise the ITAR's controls on firearms and related items.  .  This review determined that certain technical data, such as the CAD files that are the subject of the litigation, provided no intelligence or military advantage such that control on ITAR's the United States Munitions List (USML) continued to be warranted. ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

| | |
|---|---|
| **From:** | Miller, Michael F <Millermf@state.gov> |
| **Sent:** | Friday, July 27, 2018 5:59 PM |
| **To:** | Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Cc:** | Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Tucker, Maureen E <TuckerME@state.gov>; String, Marik A <StringMA@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | Defense Distributed settlement close-out |

Ambassador,

Wanted to let you know that I have signed out the letter to Defense Distributed in my official capacity as Acting DAS as directed by U/S Thompson in her memo of 7/26, and as re-affirmed via T staff this evening via separate email on ClassNet, after a consultation with T re: the status of the IM-S on this subject this afternoon.   My thanks to Ed for that additional consultation this evening.

The letter is being scanned and sent to DOJ for transmission to the plaintiff (we are also mailing a hard copy tonight) and DDTC will post a notice to its website, as required by the agreement.

Cheers,
Mike

+++++++++++++
**Mike Miller**
Acting Deputy Assistant Secretary
Bureau of Political-Military Affairs
U.S. Department of State
202-663-2861

**Official**
**UNCLASSIFIED**

**From:**     Paul, Joshua M <PaulJM@state.gov>

**Sent:**     Wednesday, July 25, 2018 10:52 AM

**To:**     McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Shin, Jae E <ShinJE@state.gov>; Miller, Michael F <Millermf@state.gov>

**Cc:**     PM-CPA <PM-CPA@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>

**Subject:**     Flagging: Multi-Senator Letter to DOJ

---

Just posted by the co-signers:

DOJ provides us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to settle a dangerous extremist.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bizzanter of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

**Official - SBU**
**UNCLASSIFIED**

WASHAR0000155

| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
|---|---|
| **Sent:** | Thursday, July 26, 2018 11:32 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | FW: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion |

FYI—the Court has ordered a hearing on the TRO motion for today at 2:30 PM.

**Official**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Thursday, July 26, 2018 11:29 AM
**To:** Rogers, Shana A; Soskin, Eric (CIV)
**Subject:** Fwd: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion
**Importance:** High

Shana, FYI

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: TXW_USDC_Notice@txwd.uscourts.gov
Date: 7/26/18 8:22 AM (GMT-08:00)
To: cmecf_notices@txwd.uscourts.gov
Subject: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court [LIVE]

### Western District of Texas

## Notice of Electronic Filing

The following transaction was entered on 7/26/2018 at 10:21 AM CDT and filed on 7/26/2018
**Case Name:**          Defense Distributed et al v. United States Department of State et al

**Case Number:** 1:15-cv-00372-RP
**Filer:**
**Document Number:** 101

**Docket Text:**
**ORDER Setting Telephonic Hearing on [98] MOTION for Hearing re [97] MOTION for Temporary Restraining Order , [96] MOTION to Intervene, [97] MOTION for Temporary Restraining Order : Motion Hearing set for 7/26/2018 at 02:30 PM before Judge Robert Pitman. Signed by Judge Robert Pitman. (dl)**

**1:15-cv-00372-RP Notice has been electronically mailed to:**

Alan Gura     alan@gurapllc.com, a1@alangura.com

David S. Morris     dmorris@fr.com, hart@fr.com, litz@fr.com

Eric J. Soskin     eric.soskin@usdoj.gov

J. David Cabello     dcabello@blankrome.com, jwatkins@blankrome.com, mhindman@blankrome.com

Joshua Michael Blackman     joshblackman@gmail.com, me@joshblackman.com

Matthew A. Goldstein     matthew@goldsteinpllc.com

Stuart Justin Robinson     stuart.j.robinson@usdoj.gov

W. Thomas Jacks     jacks@fr.com, edockets@fr.com, litz@fr.com

William B. Mateja     bmateja@sheppardmullin.com, dpuente@sheppardmullin.com, jhoggan@sheppardmullin.com

**1:15-cv-00372-RP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1080075687 [Date=7/26/2018] [FileNumber=19613803-0] [55798c8db5bb5990f2dd11f849a2da4b47d7ff39b5351b99f835068a53d68eb3cf 54e5e2f898da311079935bfded59bdb3f8b194c8b5add4e9fb40438e59050f]]

WASHAR0000157

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by

        law (including the Administrative Procedure Act), the publication in the Federal

        Register of a notice of proposed rulemaking and final rule, revising USML

        Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in

        development, of a temporary modification, consistent with the International

WASHAR0000158

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000160

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000161

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

WASHAR0000162

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement.* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000163

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000164

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000165

| | |
|---|---|
| **From:** | Miller, Michael F <Millermf@state.gov> |
| **Sent:** | Friday, July 20, 2018 4:40 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |
| **Attach:** | 07-20-18 Letter to Secretary Pompeo Regarding 3-D Printed Arms.pdf |

Inbound...

**Official**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 4:35 PM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David <david_fite@foreign.senate.gov>; Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Mike, et.al.:

I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H. Rep. Engel has directed that the letter be released to the public. As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.

Ed

Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

WASHAR0000166

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0000167

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

WASHAR0000168

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 10:14 AM |
| To: | Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov> |
| Subject: | FW: Reported State Department Spokesperson Statement on 3D Guns |

Please see below email exchange.  Does DDTC or L/PM object to providing Fite with a copy of our DOJ-cleared press points?  There is extensive precedent for doing so, but in this case I want to make sure you have no objections.  I can see nothing in these lines that would be harmful – indeed, we've used them extensively with the media.

**Toplines**

- The United States strictly regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR).

- This was a voluntary settlement entered into following negotiations between the Department of State and the plaintiffs.  The court did not rule in favor of the plaintiffs in this case.  In other contexts, courts have upheld ITAR controls on technical data.

**Additional Points**

- The settlement in this case comes as the U.S. Government is reviewing comments on new proposed regulations to transfer oversight from the U.S. Department of State to the U.S. Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad.

- These proposed regulations are part of an ongoing effort to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies.

- In addition to reducing regulatory burden on U.S. industry, these proposed regulations would eliminate the ITAR requirements at issue in this case, including the ITAR requirement to obtain U.S. Government authorization to post to the Internet technical data related to certain firearms and related items that are commercially available, such as those at issue in this case.

- In the course of formulating these proposed regulations, the U.S. Government conducted a national security analysis in the context of the rulemaking effort.  Based on this analysis, it was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States, per section 120.3 of the ITAR, and therefore warrants export licensing requirements under the U.S. Department of Commerce's jurisdiction.

Official - SBU
UNCLASSIFIED

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 10:09 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

Can I get a copy of the statement?

---

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 27, 2018 10:08 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

This is a mischaracterization – and a misquoting – of our statements to the press on this matter.  What we have told media is that "the settlement in this case comes *as* the U.S. Government is reviewing comments on new proposed regulations" (emphasis mine), not *because* of the regulations – this line is intended to provide context, not cause.

**Official - SBU**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 9:57 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** Reported State Department Spokesperson Statement on 3D Guns

So there was this ABC news story that said this:

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies."   https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

Is this is accurate, it would seem to be an admission of an intent to circumvent the CATs I-III regulatory legal process. What exactly did the State Dept person say?

# BLANKROME

717 Texas Avenue | Suite 1400 |Houston, TX 77002
blankrome.com

| | |
|---|---|
| *Phone:* | *(713) 632-8696* |
| *Fax:* | *(713) 228-6605* |
| *Email:* | *dcabello@blankrome.com* |

July 24, 2018

<u>**Via Hand Delivery**</u>

The Honorable Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

> Re:   *Defense Distributed et al v. United States Department of State et al.,*
> (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

We write on behalf of the Brady Center to Prevent Gun Violence ("Brady Center"), Everytown for Gun Safety ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords"), the leading organizations dedicated to the prevention of gun violence in America.

We submitted an *amicus curiae* brief in the Fifth Circuit appeal in this matter on behalf of the Brady Center, and the Court's opinion invited us to remain involved as follows:

> The amicus briefs submitted in this case were very helpful and almost all supported Plaintiff-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

Earlier this month, Giffords and the Brady Center submitted public comments on proposed rule changes by the State and Commerce Departments that would deregulate the posting of blueprints for the production of 3D printed guns like that planned by Defense Distributed here.[1]

---

[1] Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), available at http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf. A copy of both comments is attached as <u>**Exhibit A.**</u>

WASHAR0000171

BLANKROME

July 24, 2018
Page 2

Giffords and Brady expressed concern that the proposed rules would not adequately protect the nation's national security, foreign policy and anti-terrorism interests, and also questioned whether the proposed rules adequately addressed around the contemplated changes. Giffords noted in particular that the proposed changes would "result in an increase in the number of untraceable firearms" made with "3D printing technology" and questioned the effect of the proposed changes on this ongoing litigation.

We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement recently executed by the parties. Immediately upon learning about the settlement, Everytown and the Brady Center submitted Freedom of Information Act ("FOIA") requests to the Department of Justice and the Department of State for additional information about the settlement and the surrounding circumstances. Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world. These are the very concerns which prompted the government's intervention in the first place.

We appreciate the unusual nature of this letter and wish to advise that we are working diligently to take legal action in this Court, including seeking immediate injunctive relief. We intend to do so by July 26, 2018. In this regard, as this Court may be aware, pursuant to the now-public settlement agreement in this matter, plaintiff Defense Distributed intends to make all of its firearms-related Computer Assisted Design ("CAD") files available via its website within a matter of days, by August 1, 2018, if not sooner. It is highly unlikely that the Government will provide any additional documents regarding this settlement pursuant to the Brady Center's FOIA requests before the parties implement the key terms of this settlement. Given the extremely short time frame and the potentially significant and permanent impact to national security and public safety of making the CAD files available online, we feel compelled to bring this issue to Your Honor's attention as soon as practicably possible, so that this Court has the opportunity to take any steps it deems proper to see that justice is done while this matter is still pending, *see* Fed. R. Civ. P. 1, including but not limited to calling the parties in to discuss the issues laid out below.

<u>Background</u>

As this Court is aware, the plaintiffs filed this action in 2015, seeking, *inter alia*, an injunction to prevent the government from barring Defense Distributed's export of CAD files. These files "directly facilitate the manufacture of weapons" through "automated processes."

BLANKROME

July 24, 2018
Page 3

Defendants' Motion to Dismiss Second Amended Complaint at 1,9, filed Apr. 6, 2018 (ECF No. 92). The Government strenuously objected to the plaintiffs' request for an injunction, arguing that it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).  Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. The Fifth Circuit upheld this Court's ruling, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and the Supreme Court denied the Plaintiffs' petition for a writ of certiorari earlier this year. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

After the Supreme Court denied cert, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018.  *See* ECF Nos. 77, 88 and 90.  On April 6, 2108, the Government filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7 (ECF No. 92).  The Government told this Court that:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

Mere weeks after the Government stressed to this Court the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority."  Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement filed Apr. 30, 2018 (ECF No. 93). According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they

WASHAR0000173

BLANKROME

July 24, 2018
Page 4

wanted."[2]  On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018." (ECF No. 95).

The settlement agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the plaintiffs.[3]  What appears to be an accurate copy of the agreement is now available on the internet.[4]  A copy of the posted agreement is attached hereto as **Exhibit B.**

Pursuant to the Settlement Agreement, in consideration for the plaintiffs' dismissing the action, the Government has agreed to:

a.  "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.   The   announcement   will   appear   on   the   DDTC website,www.pmddtc.state.gov, on or before July 27, 2018."

c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD DFiles are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

---

[2]     Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018), *available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[3]     *See e.g.,* Greenberg, *supra* n.1; Josh Blackman, "DOJ, Second Amendment Foundation Reach Settlement in Defense Distributed Lawsuit," Josh Blackman's Blog (Jul. 10, 2018), *available at* http://joshblackman.com/blog/2018/07/10/doj-second-amendment-foundation-reach-settlement-in-defense-distributed-lawsuit/.

[4]     *See* "Settlement Agreement," https://www.exportlawblog.com/docs/Defense%20Distributed%20Settlement%20Agreement.pdf ; Alexander Bosch, "The Daily Bugle Weekly Highlights: Week 28 (9-13 Jul 2018), Full Circle Compliance, https://fullcirclecompliance.eu/the-daily-bugle-weekly-highlights-week-28-9-13-jul-2018/.

BLANKROME

July 24, 2018
Page 5

    d.   "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

    e.   Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

    Pursuant to the terms of the Settlement Agreement, counsel for the Government is prohibited from filing a stipulation of dismissal with this Court any earlier than 5 business days after announcement of the "temporary" modification to the USML Category I list and issuance of a letter to the plaintiffs that their files are approved for public release in any form and exempt from ITAR. *Id.* ¶ 2. In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018. This timing is critical because Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. *See* https://defdist.org/ ("The age of the downloadable gun formally begins.").

    In addition to previously posted files for making firearms, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons."[5] Throughout the litigation, Defense Distributed has "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s."[6] The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable."[7] The database of blueprints "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines."[8] According to Wilson: "What's about to happen is a Cambrian explosion of

---

[5]    Greenberg, *supra* at n. 1.

[6]    Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.

[7]    Greenberg, *supra* at n.1. (emphasis added)

[8]    *Id.*

BLANKROME

July 24, 2018
Page 6

the digital content related to firearms."[9] He says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."[10]

As promised, on May 24, 2018, the Government published notices of proposed rulemaking by the State and Commerce Departments, which would remove plaintiffs' data from the USML Category I list.[11]  Neither notice mentions Defense Distributed or the role that the Settlement Agreement played in promulgation of the notices. The public comment period for both notices concluded on July 9, 2018, the day before the plaintiffs in this action went public with the Settlement Agreement.[12]

Discussion

Under the Administrative Procedure Act ("APA"), final agency action may be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Here, the Government's sudden and complete about-face on the national security and national defense implications in this case raises numerous questions as to APA and other potential violations of law.  We summarize just a few of the most urgent potential violations here which will be elaborated upon in further detail in our forthcoming legal submissions and request for immediate injunctive relief.

First, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Here, there is nothing contained in either the Settlement Agreement or the proposed rules explaining why the Government no longer believes that firearms manufactured from the plaintiffs' CAD files "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."  Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

---

[9]      *Id.*

[10]     *Id.*

[11]     International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 Fed. Reg. 24198 (proposed May 24, 2018) (to be codified at 22 C.F.R. 121, 123, 124, 126, and 129); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the USML, 83 Fed. Reg. 24166 (proposed May 24, 2018) (to be codified at 15 C.F.R. 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774).

[12]     *Id.*

WASHAR0000176

BLANKROME

July 24, 2018
Page 7

In addition, the Government's promise of a "temporary modification" as of July 27, 2018 to exempt Defense Distributed's data from the Category I list, while the revised proposed rule is pending, is deeply troubling. As the Government is surely aware, when it comes to the internet, there is no such thing as "temporary." Once the files are available for download online, the damages to national security concerns will be irreparably done. Thus, even if the State Department and Commerce Department ultimately decide not to promulgate the new proposed regulations, all of Defense Distributed's files will already be in the public domain. In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, the government may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. In short, this is for all practical purposes "final agency action" which makes this action subject to challenge now. As Congressman Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), recently noted: "it stretches credulity to believe that release of this information is in the U.S. interest."[13]

Furthermore, the AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Rep. Engel, notice of the terms of the settlement have not been provided to the House Committee by the President or the State Department.[14]

Additionally, the settlement agreement raises serious questions as to whether it is "in accordance with law" because it can be read to authorize violation of multiple provisions of the federal Gun Control Act, 18 U.S.C. § 921 *et seq.* Provision 1(d) of the Settlement Agreement purports to permit "any United States person" to "use, reproduce, or otherwise benefit from" the Defense Distributed files. If a minor, felon, domestic abuser or an individual who has been adjudicated mentally incompetent "uses" or "otherwise benefits" the files by possessing or manufacturing firearms, then the Gun Control Act is violated (as well as innumerable similar state

---

[13]    Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018), available at https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

[14]    *Id.*

WASHAR0000177

BLANKROME

July 24, 2018
Page 8

laws). *See, e.g.,* 18 U.S.C. §§ 922(x)(2) and 922(g) (prohibiting categories of person from possessing a firearm).  The State Department of course has no power to override the mandates of a federal criminal statute.

These are just a few of the many troubling potential APA and other legal violations that may have occurred in connection with the settlement of this matter.

<u>Conclusion</u>

We are aware that under ordinary circumstances, a settlement agreement resulting in a voluntary stipulation of dismissal is not subject to review or inquiry by the Court.  However, this settlement is far from ordinary.  It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order.  It is also, we believe, illegal.  For these reasons, the undersigned attorneys are currently exploring legal action asserting that the Settlement Agreement violates the Administrative Procedure Act, the Arms Export Control Act, the International Traffic in Arms Regulations, the Gun Control Act, and the Separation of Powers required by the United States Constitution.  However, given the short time frame before Defense Distributed's repository is set to go live, we urge this Court to consider calling the parties before it to explain these extraordinary, dangerous and potentially unlawful developments.  As noted, we intend to file legal papers and a request for immediate injunctive relief.

BLANKROME

July 24, 2018
Page 9

Respectfully submitted,

BLANK ROME LLP
J. David Cabello
Texas Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
(713) 632-8696

John D. Kimball
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

cc:   Alan Gura (counsel for Plaintiff) (Via E-mail)
      David S. Morris (counsel for Plaintiff)
      Joshua Michael Blackman (counsel for Plaintiff)
      W. Thomas Jacks (counsel for Plaintiff)
      William Mateja (counsel for Plaintiff)
      Eric J. Soskin (counsel for Defendants)
      Stuart Justin Robinson (counsel for Defendants)

WASHAR0000179

# **Exhibit A**

WASHAR0000180



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats. In sum, we are concerned about potential loss of life. We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHAR0000181



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHAR0000182



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).

[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHAR0000183



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

**4**   giffordslawcenter.org



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6] With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra*.

WASHAR0000185



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.

Sincerely,

*Lindsay Nichols*

Lindsay Nichols
Giffords Federal Policy Director

---

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHAR0000186



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via
http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States.  Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America.  We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1]  These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

WASHAR0000188

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

### 1. Types of Firearms that Would be Released from State Department Control

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| <ul><li>M40A5 (used by US Marines)</li><li>M24 (used by US Army)</li></ul> | <ul><li>L115A3 (used by UK Armed Forces)</li><li>Barrett M82 (used by multiple armies including US)</li></ul> | <ul><li>Knight's Armament M110 (used by US Army)</li></ul> |
| **Sidearms Used by Armed Forces** | | |
| <ul><li>Sig Sauer XM17 and XM 18 pistols (used by US Army)</li><li>Glock M007 (Glock 19M) pistol (used by US Marines)</li></ul> | <ul><li>Heckler & Koch Mk 23 pistol (used by US Special Forces)</li></ul> | <ul><li>SIG Sauer Mk 25 (used by Navy Seals)</li></ul> |
| **Semi-automatic Assault Rifles** | | |
| <ul><li>Bushmaster XM15 (AR-type rifle)</li><li>Daniel Defense M4A1 rifles (AR-type rifle)</li><li>IWI TAVOR</li><li>Kalashnikov KR-9 (AK-type rifle)</li></ul> | <ul><li>Kel-Tec Sub-2000</li><li>Mossberg MMR Tactical rifles (AR-type rifle)</li><li>POF USA P415 (AR-type rifle)</li></ul> | <ul><li>SIG Sauer MCX rifles</li><li>SKS assault rifle (predecessor to the AK-47)</li><li>Sturm, Ruger & Co. AR-556 rifles (AR-type rifle)</li></ul> |
| **Semiautomatic Assault Pistols** | | |
| <ul><li>Bushmaster SquareDrop pistol</li><li>CZ Scorpion pistol</li></ul> | <ul><li>CORE Rifle Systems Core 14 Roscoe pistol</li><li>Daniel Defense MH18 pistol</li></ul> | <ul><li>PAP M92 pistol</li></ul> |

3

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers. They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military. Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

### 2. The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export. Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments." AECA § 1. In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest." EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making. The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security. Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review. Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions. The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

4

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors. Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses. It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3.  The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3] The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons. By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

WASHAR0000191

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4. Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5. The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHAR0000192

items and any related steps that will be taken to confirm compliance with the ITAR. The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary. In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities. Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government. As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### 6. Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress. This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more." *See* ITAR § 123.15(a)(3). The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11] Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests. For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors. Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns. In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns. This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5. "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHAR0000193

**7.** **The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS. *See* EAR § 734.3(b)(3). Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical. In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR. In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS. If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code. However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls. *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR. *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**8.** **The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

8

WASHAR0000194

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

### **9.** **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHAR0000196

# **Exhibit B**

WASHAR0000197

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1. *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by

        law (including the Administrative Procedure Act), the publication in the Federal

        Register of a notice of proposed rulemaking and final rule, revising USML

        Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in

        development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000199

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000200

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000201

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0000202

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000203

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000204

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000205

| | |
|---|---|
| **From:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Sent:** | Tuesday, July 24, 2018 5:17 PM |
| **To:** | DDTC Tasker DL <DDTCTaskerDL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Subject:** | New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD |
| **Attach:** | Template - QAs.docx |

Dear all:

Please see new PM tasker for Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD.

Please submit by Friday, July 27 at noon.

Please follow instructions in the tasker and use proper templates.

All OpenNet taskers can be found here.

Please let us know if you have any questions.

Best,

Alicia Loucks
X76604

This email is UNCLASSIFIED.

This email is UNCLASSIFIED.

---

**From:** Carter, Rachel
**Sent:** Tuesday, July 24, 2018 4:47 PM
**To:** PM-Staffers Mailbox
**Cc:** Chandler, Karen R
**Subject:** Tasker for A/S Cooper Nomination Package

Hi Staffers,
Would you please task a Q/A for A/S Cooper on the Defense Distributed protest issue to CPA?  The Q/A should be cleared by DDTC.

Thank you!

Best,
Rachel

**Official**
**UNCLASSIFIED**

WASHAR0000206

| | |
|---|---|
| **From:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Sent:** | Thursday, April 12, 2018 5:38 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Subject:** | PDAS cleared: DD offer |

PDAS cleared with no edits.

Samantha Sison
PM/FO SharePoint
202-647-0561

**Official**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 12, 2018 4:44 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** For immediate review: DD offer

Staffers:

Attached is the draft of the Defense Distributed settlement offer that we clear. ███████████████████████████████████████████████████████████████████████████████████████████████████████ Please send any questions to the folks copied here.  L needs to send back the document to DOJ tomorrow morning, so please clear it back to all on this distro NLT 10am tomorrow.

I am out tomorrow, however, I can be reached at ███████ and L folks (Steve, Jeremy and Anna- copied here) should be able to address any questions.

Sarah

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 8:07 AM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: "Temporary Suspension" |

What I told him in response to that is that the fact of the clearance process shouldn't be used to infer ownership, only interest.

**Official**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, July 26, 2018 7:59 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** Re: "Temporary Suspension"

In all seriousness, with regard to his first follow-up question, the "interagency nature" obviously has to do with DOJ's role in the settlement (to which the original question pertained) and defending us in litigation, not in interpreting the ITAR.

Rob Hart
202.736.9221 | hartrl@state.gov

**From:** Heidema, Sarah J
**Sent:** Thursday, July 26, 2018 7:41:16 AM
**To:** Paul, Joshua M; Miller, Michael F
**Cc:** Hart, Robert L
**Subject:** RE: "Temporary Suspension"

Do it... : )

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 7:40 AM
**To:** Miller, Michael F <Millermf@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: "Temporary Suspension"

Fighting off the urge to reply "We have not asked the Secret Service whether placing files on the internet constitutes an export."

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 8:18 PM

**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

Has the Secret Service been consulted for its views on this matter?

---

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 7:49 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Re: "Temporary Suspension"

Which raises two interesting questions:

1) does State/L have the right to definitively interpret the ITAR or not regarding my first set of questions;

2) regarding my second set of questions, does State, Justice, or both have the final say in what the settlement requires?

Sent from my iPhone

On Jul 25, 2018, at 6:01 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

> Dear David,
>
> It has been our aim to respond to your (and Ed's) questions today, but due in part to the interagency nature of this matter, I regret that we will not be able to do so.
>
> Josh
>
> **Official**
> **UNCLASSIFIED**
>
> **From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
> **Sent:** Wednesday, July 25, 2018 12:19 PM
> **To:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
> **Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
> **Subject:** RE: "Temporary Suspension"
>
> Just so I know, will State answer these questions today?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 10:52 AM
**To:** 'Miller, Michael F (Millermf@state.gov)' <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; 'Paul, Joshua M (PaulJM@state.gov)' <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect?  The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means?  For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process?  Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

---

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 9:20 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** "Temporary Suspension"

How long is "temporary" under ITAR 126.2?  Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

| From: | Heidema, Sarah J <HeidemaSJ@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 9:07 AM |
| To: | Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| Subject: | RE: 18.04.06 DOJ MTD.pdf |

As I read this, he wants to know why we stopped arguing that the technology subject to the case, if released, would harm national security or foreign policy

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:01 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

He wants to know what changed in DOJ's opinion between the point where it was arguing vociferously against DD to make the USG pursue a settlement. That's fundamentally a DOJ question – nothing changed on our side, to my knowledge?

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:00 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

This is actually a question for us...

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>;
Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice.
Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A
<DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by
the end of April?

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 9:21 AM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: 18.04.06 DOJ MTD.pdf |

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Friday, July 27, 2018 9:18 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

███████████████████████████████████████████
███████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:07 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

As I read this, he wants to know why we stopped arguing that the technology subject to the case, if released, would harm national security or foreign policy

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:01 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

He wants to know what changed in DOJ's opinion between the point where it was arguing vociferously against DD to make the USG pursue a settlement.  That's fundamentally a DOJ question – nothing changed on our side, to my knowledge?

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:00 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

This is actually a question for us...

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice. Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

THE SECRETARY OF STATE
WASHINGTON

December 16, 2011

The Honorable
John F. Kerry, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 2050

Dear Chairman Kerry:

I appreciate your attention to issues that I raised with you in my March 25, letter on streamlining and improving consultation and notification processes for both proposed arms sales and changes to the U.S. Munitions List (USML), in accordance with the Arms Export Control Act (AECA). I sincerely regret that my prior efforts to schedule a meeting on this have not been successful. Fortunately, in the interim, my staff has met and discussed with yours plans that the Department has refined for proceeding more systematically and effectively with consultations and notification on proposed changes to the USML, as well as on proposed arms sales. Detailed plans concerning both processes, including envisioned timelines, have also been shared.

I am aware of Congress' continued interest in the consistency of our proposals with the law and precedent. I believe that the new processes for consulting and notifying both USML changes and arms sales are fully consistent with the AECA and will prove to be constructive and efficient. The processes will also provide Congress with a great deal more time than the law requires, allowing for thorough analytic review and oversight. Specifically, the planned processes aim to afford greater time for Congressional advance review where arms sales involve less closely allied nations and more sensitive items, and similarly where less routine, broader USML revisions – comprising part of our reform initiative's effort to comprehensively rebuild a control list – are put forward. We are now poised to begin implementing these new processes for consulting and notifying arms sales commencing in January, and for the notification of USML under Section 38(f) of the AECA commencing early in the second quarter of 2012. We intend to continue discussing these processes with you and your staff as we proceed.

- 2 -

These steps will help ensure that both arms sales and USML revisions proceed apace, constructively and efficiently with Congressional input and oversight, so as to further our goals of a transparent, predictable, and timely export control system. They will serve to maintain our security, improve our military interoperability with allies and partners, bolster our defense industrial base, and ensure a security of supply for our own military – to the good of our workforce. In sum, as General Dempsey noted in his recent letter, these approaches will further our national security and economic goals while maintaining Congress' vital role in these matters.

I am making senior Department officials available immediately to respond in the first instance to any questions, and look forward to working closely with you as we proceed in this endeavor.

Sincerely yours,

Hillary Rodham Clinton

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

| | |
|---|---|
| **From:** | Paul, Joshua M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FE0AF1773ED642DF9120291EA0A8C588-PAUL, JOSHU> |
| **Sent:** | Friday, July 20, 2018 2:24 PM |
| **To:** | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Cc:** | McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Subject:** | RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms |

I will pass back these questions to our team, and we look forward to discussing them with you in person to the extent that they fall within the context of our responsibilities under the AECA.

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 2:10 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

But it's State's changes that are allowing this to be implemented right? And it's these changes that State will take, especially pursuant to the authority in 126.2, that will allow this information to be disseminated worldwide without a license, without penalty, right?

Do you mean to tell us this question did not arise or was not fully considered during the (presumably) interagency deliberation on the settlement agreement? Or do you have answers to these questions, but State isn't willing to tell us?

Additionally, State is about take an action to suspend the application of ITAR restrictions on the publication of controlled information/technology on the Internet for a temporary period of time, BEFORE the reg change transferring the defense items that the information/tech pertains to becomes final. And what if that reg change does not become final, or is different from the draft rule? In that instance, State will have allowed the worldwide transfer of export-controlled information "in the interest of the security and foreign policy of the United States"?

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 2:01 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Hi David,

We would need to refer you to TSA or other law enforcement organizations on this question. The DDTC nexus on this issue was/is limited to our role in controlling exports of tech data, which is the only reason we got involved in the first place.

WASHAR0000220

Josh

**Official - SBU**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 1:38 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Also, what are the law enforcement and counter-terrorism implications of this change?  Enabling the widespread acquisition of undetectable or largely-undetectable firearms would seem to be a bad idea, especially in protection of domestic and international airline flights from terrorist hijacking/attacks.  What changes will be required by TSA here and abroad to deal with this?

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 11:42 AM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Understood, and that's helpful information.  We'll round back and be in touch.

**Official**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 11:32 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

A phone call would be only a first step for we four.  I expect that as news of this settlement spreads, there will be a requirement to brief a number of Congressional staff and then Members.

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 11:21 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Hello,

We've actually been in the process of putting together a briefing for you on this – with the intent being to provide a phone call early next week.  Would that work?

Josh

**Official**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 11:10 AM
**To:** 'Rice, Edmund' <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

As well as State's view of State's legal liability to this suit in the first place.

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 11:03 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua <pauljm@state.gov>; Darrach, Tamara <darrachta@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** Request briefing on proposed ITAR change on 3-D printing software for plastic firearms
**Importance:** High

Mike, et.al.:

This is to request a briefing on the terms of the settlement (attached) that the State Department entered into June 29th regarding Defense Distributed et al v. United States Department of State et al, Western District of Texas, Civil Docket # 1:15-cv-00372-RP. This is the suit brought by several persons who want to make available online software for manufacture via 3-D printing of firearms, including plastic firearms.

In particular, item 1(b) indicates that State will amend the ITAR to remove the subject software from the USML by July 27th.   Several House Members have brought this matter to Rep. Engel's attention and I have been asked to look into this ASAP. I expect that Jamie, David and Stacie also would need to know about this.

Perhaps this could be covered at our July 25th arms transfer meeting.  One way or another, I need a briefing on this prior to July 27th.

Ed


Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

| **From:** | Paul, Joshua M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FE0AF1773ED642DF9120291EA0A8C588-PAUL, JOSHU> |
|---|---|
| **Sent:** | Friday, July 20, 2018 11:21 AM |
| **To:** | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Cc:** | McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Subject:** | RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms |

Hello,

We've actually been in the process of putting together a briefing for you on this – with the intent being to provide a phone call early next week.  Would that work?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 11:10 AM
**To:** 'Rice, Edmund' <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

As well as State's view of State's legal liability to this suit in the first place.

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 11:03 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua <pauljm@state.gov>; Darrach, Tamara <darrachta@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** Request briefing on proposed ITAR change on 3-D printing software for plastic firearms
**Importance:** High

Mike, et.al.:

This is to request a briefing on the terms of the settlement (attached) that the State Department entered into June 29th regarding Defense Distributed et al v. United States Department of State et al, Western District of Texas, Civil Docket # 1:15-cv-00372-RP. This is the suit brought by several persons who want to make available online software for manufacture via 3-D printing of firearms, including plastic firearms.

In particular, item 1(b) indicates that State will amend the ITAR to remove the subject software from the USML by July 27th.   Several House Members have brought this matter to Rep. Engel's attention and I have been asked to look into this ASAP. I expect that Jamie, David and Stacie also would need to know about this.

WASHAR0000223

Perhaps this could be covered at our July 25th arms transfer meeting.  One way or another, I need a briefing on this prior to July 27th.

Ed


Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

| | |
|---|---|
| **From:** | McKeeby, David I <McKeebyDI@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 4:17 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Cody Wilson's claims on settlement |
| **Attach:** | 0711 Contingency Points--DDTC--Defense Distributed.docx |

Anna:

█████████████████████████████████████████████████████

Thanks,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | 📠   BlackBerry:  202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | ✋ Web: *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*

Stay connected with *State.gov:*

🏛 🏛 🏛 🏛 🏛 🏛

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 4:02 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

████████████████████████████████████████

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah.

████████████████████████████████████

Thanks,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | 📠   BlackBerry:  202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | ✋ Web: *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*

Stay connected with *State.gov:*

🏛 🏛 🏛 🏛 🏛 🏛

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Dave-

████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob:



Please advise and thanks,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 📱  BlackBerry:  202.550.3482 |
✉ e-mail:     *mckeebydi@state.gov* | 🖥  Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

📧 📧 📧 📧 📧 📧

---

**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement



Best,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 📱  BlackBerry:  202.550.3482 |

✉ e-mail:   mckeebydi@state.gov | ⚲ Web: www.state.gov/r/pm/ |[Twitter: @StateDeptPM

Stay connected with State.gov:

🔲 🔲 🔲 🔲 🔲 🔲

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

Josh-

The settlement agreement with DD has not been concluded yet, however, Cody when back to Wired for a nice fluff piece on how he fought the government and won.  We're confirming now with DOJ on the status of the settlement offer, that said, the article raises some concerns that we need to address:

1) **It gives the impression they won in court:** Beyond being untrue, this is dangerous as it gives the impression that our controls on ITAR tech data have been defeated in court.  We chose to settle the case because the Cody made an offer to us to settle and given the imminent nature of the Cat 1-3 change and the fact that a government national security and foreign policy review had already determined that the technical data no longer merited USML control it seemed appropriate that we would agree to release only specific identified tech data from USML control prior to its anticipate move to Commerce and subsequent removal from control.

2) **They lie about the scope of the tech data subject to the settlement:** They assert that lots of tech data is released into the public domain, again this is dangerous, beyond just untrue and could lead to further violations of the ITAR.

Looking to your team to help us figure out how we address this issue.  We'll let you know what we hear back from DOJ

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-

15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war

WASHAR0000228

aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner.

*Michelle Groskopf*

WASHAR0000229

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally

approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 5:18 PM |
| To: | Kaidanow, Tina S <KaidanowTS@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Subject: | RE: DD Settlement: Cong/Pub State of Play |

By way of a late breaking update, Dave just received the following from a media source – Los Angeles and the Manhattan DA are stepping into the issue, though it does not seem they are taking any legal actions.



For Immediate Release                                    July 25, 2018

**PAGV CO-CHAIRS TO STATE DEPARTMENT: BLOCK RELEASE OF DOWNLOADABLE BLUEPRINTS FOR DO-IT-YOURSELF, 3D-PRINTED GUNS**

**Los Angeles, CA and New York, NY** : Los Angeles City Attorney Mike Feuer and Manhattan District Attorney Cyrus Vance, Jr.,, co-chairs of Prosecutors Against Gun Violence, today released the following joint statement urging the U.S. State Department to block the online release of blueprints for do-it-yourself, 3D-printed guns:

"In a matter of days, the State Department is preparing to allow unlimited online access to schematic designs that enable 3D printing of untraceable guns. In a complete reversal of longstanding regulatory oversight, the State Department has decided to provide a special exemption to a private company, Defense Distributed, to post its gun blueprints online.

"**No one is safer if criminals can print untraceable guns on demand.** Allowing this exemption from federal rules would be an unconscionable mistake, making it all-too-easy for anyone with a dangerous history – including terrorists and domestic abusers who cannot pass a background check – to download files and print a functional gun with 3D printers available to any consumer. This decision undermines the critical public safety laws that prosecutors enforce day in and day out.

"Invisible to metal detectors, these plastic guns could easily be smuggled onto airplanes, and into concerts, festivals, and government buildings. Untraceable, they would undermine the work of law enforcement by crippling criminal investigations before they even began. The State Department must not allow this company to have a special exemption to these rules. These blueprints should not be published under any circumstances."

-30-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:01 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** DD Settlement: Cong/Pub State of Play

Dear AMB Kaidanow,

This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**
- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached). In the event, he told SEN Markey he'd "take a look at it". The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance. We hope to provide the

response in advance of tomorrow's signing of the Settlement letter.

- In addition, SEN Menendez issued a statement calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**

- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's On Point dedicated to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a petition on Change.org has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Trends chart for worldwide searches on 3D guns is as follows:



Thanks,

Josh

_____
**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:    202.647.7878 | 📱 BlackBerry: 202.679.6724 | 🖨 Fax: 202.647.4055
✉ e-mail:    *PaulJM@State.Gov* | 🖱 Web: *www.state.gov/t/pm /*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is *UNCLASSIFIED*, per E.O. 12958

**Official - SBU**
**UNCLASSIFIED**

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 6:03 PM |
| To: | Kaidanow, Tina S <KaidanowTS@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Subject: | RE: DD Settlement: Cong/Pub State of Play |

Final update (hopefully) for the evening, now that the S Hearing is over – here's Bill Nelson on the floor of the US Senate, pledging to fight "tooth and nail."

https://twitter.com/SenBillNelson/status/1022239621621706753

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:18 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** RE: DD Settlement: Cong/Pub State of Play

By way of a late breaking update, Dave just received the following from a media source – Los Angeles and the Manhattan DA are stepping into the issue, though it does not seem they are taking any legal actions.



For Immediate Release                                        July 25, 2018

**PAGV CO-CHAIRS TO STATE DEPARTMENT: BLOCK RELEASE OF DOWNLOADABLE BLUEPRINTS FOR DO-IT-YOURSELF, 3D-PRINTED GUNS**

**Los Angeles, CA and  New York, NY** : Los Angeles City Attorney Mike Feuer and Manhattan District Attorney Cyrus Vance, Jr., co-chairs of Prosecutors Against Gun Violence, today released the following joint statement urging the U.S. State Department to block the online release of blueprints for do-it-yourself, 3D-printed guns:

"In a matter of days, the State Department is preparing to allow unlimited online access to schematic designs that enable 3D printing of untraceable guns. In a complete reversal of longstanding regulatory oversight, the State Department has decided to provide a special exemption to a private company, Defense Distributed, to post its gun blueprints online.

"**No one is safer if criminals can print untraceable guns on demand.** Allowing this exemption from federal rules would be an unconscionable mistake, making it all-too-easy for anyone with a dangerous history – including terrorists and domestic abusers who cannot pass a background check – to download files and print a functional gun with 3D printers available to any consumer. This decision undermines the critical public safety laws that prosecutors enforce day in and day out.

"Invisible to metal detectors, these plastic guns could easily be smuggled onto airplanes, and into concerts, festivals, and government buildings. Untraceable, they would undermine the work of law enforcement by crippling criminal investigations before they even began. The State Department must not allow this company to have a special exemption to these rules. These blueprints should not be published under any circumstances."

-30-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:01 PM

**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** DD Settlement: Cong/Pub State of Play

Dear AMB Kaidanow,

This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**
- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached).  In the event, he told SEN Markey he'd "take a look at it".  The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance.  We hope to provide the response in advance of tomorrow's signing of the Settlement letter.
- In addition, SEN Menendez issued a statement calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**
- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's On Point dedicated to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a petition on Change.org has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Tends chart for worldwide searches on 3D guns is as follows:



Thanks,

Josh

_____
**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 📱 BlackBerry: 202.679.6724 | 📠 Fax: 202.647.4055
✉ e-mail:     PaulJM@State.Gov | 🖰 Web: www.state.gov/t/pm /

 http://twitter.com/StateDeptPM

Stay connected with *State.gov.*



This message is **_UNCLASSIFIED_**, per E.O. 12958

**Official - SBU**
**UNCLASSIFIED**

WASHAR0000236

**MATTHEW A. GOLDSTEIN, PLLC**
**INTERNATIONAL TRADE**
1875 CONNECTICUT AVE NW, 10TH FL
WASHINGTON, D.C. 20009

**BY ELECTRONIC MAIL**
(c/o Eric.Soskin@usdoj.gov)

April 17, 2018

Mr. Eric Soskin
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, D.C. 20530

**SUBJECT:    Acceptance of Response to Offer of Settlement**
                    Case No. 15-cv-372-RP

Dear Mr. Soskin:

Our understanding is that the scope of "technical data that is the subject of this matter," as defined in the DEFENDANTS' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP includes the Published Files, the Ghost Gunner Files, and the CAD Files.

We further understand that the scope of "technical data that is the subject of this matter" further includes the Other Files insofar as those files regard items exclusively in Category I(a) of the United States Munitions List (USML), or items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

We further understand that Category I(a) includes non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm), to include barrels and receivers that would comprise such arms.

Based on the above understandings, Plaintiffs accept Defendants' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP.

Further pursuant to the terms of Defendants' RESPONSE TO OFFER OF SETTLEMENT, please advise on the Department of Justice's final approval of the settlement.

Very truly yours,

Matthew A. Goldstein

cc:    Stuart Robinson, Department of Justice (Stuart.J.Robinson@usdoj.gov)

WASHAR0000237

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Wednesday, July 18, 2018 4:17 PM |
| **To:** | Hart, Robert L <HartRL@state.gov> |
| **Cc:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Defense Distributed Case |

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:54 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:53 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FW: Defense Distributed Case

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 3:30 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Defense Distributed Case

Dear all,

Josh

**Official - SBU**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 3:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Case

As far as I can tell, DDTC essentially exempted the information in these particular files from the USML. The settlement says that DDTC approved the technical data in question for public release, but I don't t think it gives a reason for this determination.

Please note as a threshold matter that we assume the below questions pertain to settlement item 1(c).

1. Is that characterization correct? The Published Files, Ghost Gunner Files, and CAD files (as defined in the Settlement Agreement), by virtue of having been approved for public release pursuant to ITAR §125.4(b)(13), are to be exempt from ITAR licensing requirements.
2. Are the data in question applicable to Category I(a) items? The data in question is defined within the Settlement Agreement, and constitutes a range of computer-aided design files that pertain to Category I (a), I(g), or I(h) articles.
3. Why were the data approved for public release? The Department, in coordination with interagency partners, has recently conducted a national security analysis of USML Category I in the context of drafting and publishing a proposed rule that would move certain defense articles (including technical data) to Department of Commerce jurisdiction. Since the data in question was determined in the context of that effort not to provide a critical military or intelligence advantage (*see* ITAR §120.3(b)), the Department – in coordination with the Department of Defense – further determined that it was appropriate to approve the data for public release.

Thanks,
Paul

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Wednesday, July 18, 2018 8:08 AM
**To:** Kerr, Paul <PKERR@crs.loc.gov>
**Subject:** RE: Defense Distributed Case

Yes, please do; not sure what we will be able to answer, but by all means ask.

**Official**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 7:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed Case

Josh,

Could I send a question or two about it? It's gotten some attention up here.

Thanks,
Paul

WASHAR0000254

| | |
|---|---|
| **From:** | Monjay, Robert <MonjayR@state.gov> |
| **Sent:** | Wednesday, July 18, 2018 4:20 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: Defense Distributed Case |

███████████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 18, 2018 4:17 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case

███████████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:54 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case

█████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:53 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FW: Defense Distributed Case

█████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 3:30 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Defense Distributed Case

Dear all,

██████████████████████████████████████████████████████

Josh

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 3:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Case

As far as I can tell, DDTC essentially exempted the information in these particular files from the USML. The settlement says that DDTC approved the technical data in question for public release, but I don't t think it gives a reason for this determination.

Please note as a threshold matter that we assume the below questions pertain to settlement item 1(c).

1. Is that characterization correct? The Published Files, Ghost Gunner Files, and CAD files (as defined in the Settlement Agreement), by virtue of having been approved for public release pursuant to ITAR §125.4(b)(13), are to be exempt from ITAR licensing requirements.
2. Are the data in question applicable to Category I(a) items? The data in question is defined within the Settlement Agreement, and constitutes a range of computer-aided design files that pertain to Category I (a), I(g), or I(h) articles.
3. Why were the data approved for public release? The Department, in coordination with interagency partners, has recently conducted a national security analysis of USML Category I in the context of drafting and publishing a proposed rule that would move certain defense articles (including technical data) to Department of Commerce jurisdiction. Since the data in question was determined in the context of that effort not to provide a critical military or intelligence advantage (*see* ITAR §120.3(b)), the Department – in coordination with the Department of Defense – further determined that it was appropriate to approve the data for public release.

Thanks,
Paul

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Wednesday, July 18, 2018 8:08 AM
**To:** Kerr, Paul <PKERR@crs.loc.gov>
**Subject:** RE: Defense Distributed Case

Yes, please do; not sure what we will be able to answer, but by all means ask.

**Official**
**UNCLASSIFIED**

WASHAR0000256

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 7:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed Case

Josh,

Could I send a question or two about it? It's gotten some attention up here.

Thanks,
Paul

WASHAR0000257

# BLANKROME

717 Texas Avenue | Suite 1400 | Houston, TX 77002
blankrome.com

| *Phone:* | *(713) 632-8696* |
| *Fax:* | *(713) 228-6605* |
| *Email:* | *dcabello@blankrome.com* |

July 24, 2018

**<u>Via Hand Delivery</u>**

The Honorable Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

        Re:    *Defense Distributed et al v. United States Department of State et al.,*
                  (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

    We write on behalf of the Brady Center to Prevent Gun Violence ("Brady Center"), Everytown for Gun Safety ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords"), the leading organizations dedicated to the prevention of gun violence in America.

    We submitted an *amicus curiae* brief in the Fifth Circuit appeal in this matter on behalf of the Brady Center, and the Court's opinion invited us to remain involved as follows:

> The amicus briefs submitted in this case were very helpful and almost all supported Plaintiff-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

    Earlier this month, Giffords and the Brady Center submitted public comments on proposed rule changes by the State and Commerce Departments that would deregulate the posting of blueprints for the production of 3D printed guns like that planned by Defense Distributed here.[1]

---

[1] Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), available at http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf. A copy of both comments is attached as **<u>Exhibit A.</u>**

WASHAR0000258

BLANKROME

July 24, 2018
Page 2

Giffords and Brady expressed concern that the proposed rules would not adequately protect the nation's national security, foreign policy and anti-terrorism interests, and also questioned whether the proposed rules adequately addressed around the contemplated changes. Giffords noted in particular that the proposed changes would "result in an increase in the number of untraceable firearms" made with "3D printing technology" and questioned the effect of the proposed changes on this ongoing litigation.

We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement recently executed by the parties. Immediately upon learning about the settlement, Everytown and the Brady Center submitted Freedom of Information Act ("FOIA") requests to the Department of Justice and the Department of State for additional information about the settlement and the surrounding circumstances. Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world. These are the very concerns which prompted the government's intervention in the first place.

We appreciate the unusual nature of this letter and wish to advise that we are working diligently to take legal action in this Court, including seeking immediate injunctive relief. We intend to do so by July 26, 2018. In this regard, as this Court may be aware, pursuant to the now-public settlement agreement in this matter, plaintiff Defense Distributed intends to make all of its firearms-related Computer Assisted Design ("CAD") files available via its website within a matter of days, by August 1, 2018, if not sooner. It is highly unlikely that the Government will provide any additional documents regarding this settlement pursuant to the Brady Center's FOIA requests before the parties implement the key terms of this settlement. Given the extremely short time frame and the potentially significant and permanent impact to national security and public safety of making the CAD files available online, we feel compelled to bring this issue to Your Honor's attention as soon as practicably possible, so that this Court has the opportunity to take any steps it deems proper to see that justice is done while this matter is still pending, *see* Fed. R. Civ. P. 1, including but not limited to calling the parties in to discuss the issues laid out below.

<u>Background</u>

As this Court is aware, the plaintiffs filed this action in 2015, seeking, *inter alia*, an injunction to prevent the government from barring Defense Distributed's export of CAD files. These files "directly facilitate the manufacture of weapons" through "automated processes."

WASHAR0000259

BLANKROME

July 24, 2018
Page 3

<u>Defendants' Motion to Dismiss Second Amended Complaint</u> at 1,9, filed Apr. 6, 2018 (ECF No. 92). The Government strenuously objected to the plaintiffs' request for an injunction, arguing that it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32). Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. The Fifth Circuit upheld this Court's ruling, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and the Supreme Court denied the Plaintiffs' petition for a writ of certiorari earlier this year. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

After the Supreme Court denied cert, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90. On April 6, 2108, the Government filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." <u>Motion to Dismiss</u> at 3,7 (ECF No. 92). The Government told this Court that:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

Mere weeks after the Government stressed to this Court the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." <u>Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement</u> filed Apr. 30, 2018 (ECF No. 93). According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they

BLANKROME

July 24, 2018
Page 4

wanted."[2]  On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

The settlement agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the plaintiffs.[3]  What appears to be an accurate copy of the agreement is now available on the internet.[4]  A copy of the posted agreement is attached hereto as **Exhibit B.**

Pursuant to the Settlement Agreement, in consideration for the plaintiffs' dismissing the action, the Government has agreed to:

a.  "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.   The   announcement   will   appear   on   the   DDTC website,www.pmddtc.state.gov, on or before July 27, 2018."

c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD DFiles are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

---

[2]      Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[3]      *See e.g.,* Greenberg, *supra* n.1; Josh Blackman, "DOJ, Second Amendment Foundation Reach Settlement in Defense Distributed Lawsuit," Josh Blackman's Blog (Jul. 10, 2018), *available at* http://joshblackman.com/blog/2018/07/10/doj-second-amendment-foundation-reach-settlement-in-defense-distributed-lawsuit/.

[4]      *See* "Settlement Agreement," https://www.exportlawblog.com/docs/Defense%20Distributed%20Settlement%20Agreement.pdf ; Alexander Bosch, "The Daily Bugle Weekly Highlights: Week 28 (9-13 Jul 2018), Full Circle Compliance, https://fullcirclecompliance.eu/the-daily-bugle-weekly-highlights-week-28-9-13-jul-2018/.

WASHAR0000261

BLANKROME

July 24, 2018
Page 5

    d.   "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

    e.   Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

Pursuant to the terms of the Settlement Agreement, counsel for the Government is prohibited from filing a stipulation of dismissal with this Court any earlier than 5 business days after announcement of the "temporary" modification to the USML Category I list and issuance of a letter to the plaintiffs that their files are approved for public release in any form and exempt from ITAR. *Id.* ¶ 2. In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018. This timing is critical because Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. *See* https://defdist.org/ ("The age of the downloadable gun formally begins.").

In addition to previously posted files for making firearms, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons."[5] Throughout the litigation, Defense Distributed has "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s."[6] The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable."[7] The database of blueprints "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines."[8] According to Wilson: "What's about to happen is a Cambrian explosion of

---

[5]    Greenberg, *supra* at n. 1.

[6]    Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.

[7]    Greenberg, *supra* at n.1. (emphasis added)

[8]    *Id.*

BLANKROME

July 24, 2018
Page 6

the digital content related to firearms."[9] He says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."[10]

  As promised, on May 24, 2018, the Government published notices of proposed rulemaking by the State and Commerce Departments, which would remove plaintiffs' data from the USML Category I list.[11]   Neither notice mentions Defense Distributed or the role that the Settlement Agreement played in promulgation of the notices. The public comment period for both notices concluded on July 9, 2018, the day before the plaintiffs in this action went public with the Settlement Agreement.[12]

Discussion

  Under the Administrative Procedure Act ("APA"), final agency action may be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Here, the Government's sudden and complete about-face on the national security and national defense implications in this case raises numerous questions as to APA and other potential violations of law.  We summarize just a few of the most urgent potential violations here which will be elaborated upon in further detail in our forthcoming legal submissions and request for immediate injunctive relief.

  First, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Here, there is nothing contained in either the Settlement Agreement or the proposed rules explaining why the Government no longer believes that firearms manufactured from the plaintiffs' CAD files "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."  Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

---

[9]   *Id.*

[10]   *Id.*

[11]   International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 Fed. Reg. 24198 (proposed May 24, 2018) (to be codified at 22 C.F.R. 121, 123, 124, 126, and 129); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the USML, 83 Fed. Reg. 24166 (proposed May 24, 2018) (to be codified at 15 C.F.R. 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774).

[12]   *Id.*

WASHAR0000263

BLANKROME

July 24, 2018
Page 7

In addition, the Government's promise of a "temporary modification" as of July 27, 2018 to exempt Defense Distributed's data from the Category I list, while the revised proposed rule is pending, is deeply troubling. As the Government is surely aware, when it comes to the internet, there is no such thing as "temporary." Once the files are available for download online, the damages to national security concerns will be irreparably done. Thus, even if the State Department and Commerce Department ultimately decide not to promulgate the new proposed regulations, all of Defense Distributed's files will already be in the public domain. In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, the government may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. In short, this is for all practical purposes "final agency action" which makes this action subject to challenge now. As Congressman Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), recently noted: "it stretches credulity to believe that release of this information is in the U.S. interest."[13]

Furthermore, the AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Rep. Engel, notice of the terms of the settlement have not been provided to the House Committee by the President or the State Department.[14]

Additionally, the settlement agreement raises serious questions as to whether it is "in accordance with law" because it can be read to authorize violation of multiple provisions of the federal Gun Control Act, 18 U.S.C. § 921 *et seq.* Provision 1(d) of the Settlement Agreement purports to permit "any United States person" to "use, reproduce, or otherwise benefit from" the Defense Distributed files. If a minor, felon, domestic abuser or an individual who has been adjudicated mentally incompetent "uses" or "otherwise benefits" the files by possessing or manufacturing firearms, then the Gun Control Act is violated (as well as innumerable similar state

---

[13]   Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018), available at https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

[14]   *Id.*

BLANKROME

July 24, 2018
Page 8

laws).  *See, e.g.,* 18 U.S.C. §§ 922(x)(2) and 922(g) (prohibiting categories of person from possessing a firearm).  The State Department of course has no power to override the mandates of a federal criminal statute.

These are just a few of the many troubling potential APA and other legal violations that may have occurred in connection with the settlement of this matter.

<u>Conclusion</u>

We are aware that under ordinary circumstances, a settlement agreement resulting in a voluntary stipulation of dismissal is not subject to review or inquiry by the Court.  However, this settlement is far from ordinary.  It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order.  It is also, we believe, illegal.  For these reasons, the undersigned attorneys are currently exploring legal action asserting that the Settlement Agreement violates the Administrative Procedure Act, the Arms Export Control Act, the International Traffic in Arms Regulations, the Gun Control Act, and the Separation of Powers required by the United States Constitution.  However, given the short time frame before Defense Distributed's repository is set to go live, we urge this Court to consider calling the parties before it to explain these extraordinary, dangerous and potentially unlawful developments.  As noted, we intend to file legal papers and a request for immediate injunctive relief.

BLANKROME

July 24, 2018
Page 9


Respectfully submitted,

BLANK ROME LLP
J. David Cabello
Texas Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
(713) 632-8696

John D. Kimball
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000


cc:   Alan Gura (counsel for Plaintiff) (Via E-mail)
      David S. Morris (counsel for Plaintiff)
      Joshua Michael Blackman (counsel for Plaintiff)
      W. Thomas Jacks (counsel for Plaintiff)
      William Mateja (counsel for Plaintiff)
      Eric J. Soskin (counsel for Defendants)
      Stuart Justin Robinson (counsel for Defendants)

WASHAR0000266

# **Exhibit A**

WASHAR0000267



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats. In sum, we are concerned about potential loss of life. We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

**1**   giffordslawcenter.org

WASHAR0000268



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHAR0000269



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR."  While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).

[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHAR0000270



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHAR0000271



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6] With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra*.

WASHAR0000272



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.

Sincerely,

*Lindsay Nichols*

Lindsay Nichols
Giffords Federal Policy Director

---

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHAR0000273



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via*
*http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States.  Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America.  We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1]  These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

WASHAR0000275

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.  Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
| --- | --- | --- |
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

**2.   The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR**

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.   The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

4

WASHAR0000277

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors.  Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses.  It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3.   The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.   Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

WASHAR0000278

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4.   Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5.   The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHAR0000279

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### **6.**   **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11]  Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules.  *See* EAR §§ 743.5.; 772.1.

WASHAR0000280

**7.** **The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS. *See* EAR § 734.3(b)(3). Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical. In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR. In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS. If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code. However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls. *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR. *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**8.** **The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

8

WASHAR0000281

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

### **9.** **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

WASHAR0000282

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4.  Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR.  Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product.  With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1.  However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR.  As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines.  Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction.  This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy.  Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHAR0000283

# Exhibit B

WASHAR0000284

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000286

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000287

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000288

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0000289

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000290

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000291

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000292

**From:**       Freeman, Jeremy B <FreemanJB@state.gov>
**Sent:**       Wednesday, July 25, 2018 5:31 PM
**To:**         Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; PM-Staffers
                Mailbox <PM-StaffersMailbox@state.gov>; Carter, Rachel <CarterR@state.gov>
**Cc:**         Heidema, Sarah J <HeidemaSJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>
**Subject:**    RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S
                Nominee R. Clarke Cooper's Hearing, TBD

███████████████████████

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:13 PM
**To:** Hart, Robert L; PM-Staffers Mailbox; Carter, Rachel
**Cc:** Heidema, Sarah J; Rogers, Shana A; Freeman, Jeremy B
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

███████████████████████████

**Official**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 5:09 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Carter, Rachel <CarterR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Re: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

---

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:05:03 PM
**To:** PM-Staffers Mailbox; Carter, Rachel
**Cc:** Heidema, Sarah J; Hart, Robert L
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Wednesday, July 25, 2018 5:04 PM
**To:** Carter, Rachel <CarterR@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Josh, Rachel,



Alicia Loucks
X76604


This email is UNCLASSIFIED.

---

**From:** PM-Staffers Mailbox
**Sent:** Wednesday, July 25, 2018 9:39 AM
**To:** Hart, Robert L; PM-Staffers Mailbox
**Cc:** Heidema, Sarah J; Dearth, Anthony M; Carter, Rachel; Paul, Joshua M
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Alicia Loucks
X76604


This email is UNCLASSIFIED.

---

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 9:28 AM
**To:** PM-Staffers Mailbox
**Cc:** Heidema, Sarah J; Dearth, Anthony M
**Subject:** FW: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Thanks,

Rob Hart

WASHAR0000294

202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, July 24, 2018 5:17 PM
**To:** DDTC Tasker DL <DDTCTaskerDL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Dear all:

Please see new PM tasker for Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD.

Please submit by Friday, July 27 at noon.

Please follow instructions in the tasker and use proper templates.

All OpenNet taskers can be found here.

Please let us know if you have any questions.

Best,

Alicia Loucks
X76604


This email is UNCLASSIFIED.




This email is UNCLASSIFIED.


─────────────────────────────────

**From:** Carter, Rachel
**Sent:** Tuesday, July 24, 2018 4:47 PM
**To:** PM-Staffers Mailbox
**Cc:** Chandler, Karen R
**Subject:** Tasker for A/S Cooper Nomination Package

Hi Staffers,
Would you please task a Q/A for A/S Cooper on the Defense Distributed protest issue to CPA?  The Q/A should be cleared by DDTC.

Thank you!

Best,

WASHAR0000295

Rachel

**Official**
**UNCLASSIFIED**

WASHAR0000296

| From: | Cavnar, Anna <CavnarA@state.gov> |
|---|---|
| Sent: | Thursday, April 5, 2018 12:23 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |
| Attach: | MTD SAC (DRAFT 20180405 18.40).docx |

Sara, Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Anna-

Sarah

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna

WASHAR0000297

**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>

**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob –



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

WASHAR0000300

Rob,



Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**

WASHAR0000301

**UNCLASSIFIED**

---

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>

**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| From: | Cavnar, Anna <CavnarA@state.gov> |
|---|---|
| Sent: | Tuesday, April 3, 2018 9:10 AM |
| To: | Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |

Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM

**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>;
Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob –



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>

WASHAR0000306

**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

███████████████████████████████████████████████████

Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant

202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox

WASHAR0000308

**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| **From:** | Freeman, Jeremy B <FreemanJB@state.gov> |
|---|---|
| **Sent:** | Monday, April 2, 2018 10:27 AM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |
| **Attach:** | DDTC DD Counteroffer v4.docx |

Rob –



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement



Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>

**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**

WASHAR0000311

UNCLASSIFIED

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Best,
Anna

**Official - SBU**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case. That additional info should go up along with this approval request.
Thanks.

WASHAR0000313

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| From: | Freeman, Jeremy B <FreemanJB@state.gov> |
|---|---|
| Sent: | Thursday, March 29, 2018 4:21 PM |
| To: | Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |
| Attach: | DDTC DD Counteroffer v3.docx; Defense Distributed - Second Amended Complaint.pdf |

Rob,



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>;

WASHAR0000316

Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>

WASHAR0000317

**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.


**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

WASHAR0000319

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

WASHAR0000320

Contrary to the Justice Department's warning that such actions are unconstitutional,

Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120

*et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open

forums, regarding arms in common use for lawful purposes. Defendants' censorship of

Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is

applied, violate the First, Second, and Fifth Amendments to the United States Constitution.

Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this

prior restraint scheme, and to recover money damages to compensate for the harm such

application has already caused.

### *The Parties*

1.     Plaintiff Defense Distributed is a Texas corporation organized under the laws of

the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place

of business is located in Austin, Texas. Defense Distributed was organized and is operated for

the purpose of defending the civil liberty of popular access to arms guaranteed by the United

States Constitution through facilitating global access to, and the collaborative production of,

information and knowledge related to the three-dimensional ("3D") printing of arms; and to

publish and distribute, at no cost to the public, such information and knowledge on the Internet

in promotion of the public interest.

2.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit

membership organization incorporated under the laws of Washington with its principal place of

business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide,

including in Texas. The purposes of SAF include promoting, securing, and expanding access to

the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHAR0000321

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.     Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.     Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.     Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.     Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.     Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0000322

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.      The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.      Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.      The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id*.

14.      The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

WASHAR0000323

15.     The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHAR0000324

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on

private, non-classified speech, the requirement was ostensibly removed in 1984.

      21.     In 1995, Defendant the United States Department of State conceded in federal

court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable

interpretation of the provision, one that people of ordinary intelligence are <u>least</u> likely to assume

is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S.

Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

      22.     Prior to May 2013, Defendant the United States Department of State had not only

disavowed the prior restraint in public notices and in federal court, it had never publicly enforced

a prior restraint under the ITAR.

*The Published Files*

      23.     Posting technical data on the Internet is perhaps the most common and effective

means of creating and disseminating information. A cursory search on Google and other Internet

search engines evidences that ITAR-controlled technical data is freely published in books,

scientific journals, and on the Internet.

      24.     Plaintiff Defense Distributed publishes files on the Internet as a means of

fulfilling its primary missions to promote the right to keep and bear arms and to educate the

public.

      25.     Defense Distributed privately generated technical information regarding a number

of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles,

and a handgun (the "Published Files").

WASHAR0000325

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHAR0000326

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0000327

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHAR0000328

43. To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45. Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46. The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47. DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

WASHAR0000329

48.      The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49.      But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.      DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51.      Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.      The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

WASHAR0000330

COUNT TWO

RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

12

WASHAR0000331

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution  requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

WASHAR0000332

Case 1:15-cv-00372-RP Document 90 Filed 03/16/18 Page 14 of 25

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.    An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

14

WASHAR0000333

6.      An order permanently enjoining Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

of the injunction, from enforcing the prepublication approval requirement against Plaintiffs'

public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                      Respectfully submitted,

/s/ Alan Gura                                /s/ William B. Mateja
Alan Gura                                    William B. Mateja
Virginia Bar No. 68842*                      Texas State Bar No. 13185350
Gura PLLC                                    POLSINELLI P.C.
916 Prince Street, Suite 107                 2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                   Dallas, Texas 75201
703.835.9085/Fax 703.997.7665                214.397.0030/Fax 214.397.0033
alan@gurapllc.com                            Mateja@polsinelli.com

/s/ Matthew Goldstein                        /s/ Josh Blackman
Matthew Goldstein                            Josh Blackman
D.C. Bar No. 975000*                         Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                   1303 San Jacinto Street
1875 Connecticut Avenue, N.W.                Houston, Texas 77002
10th Floor                                   202.294.9003/Fax: 713.646.1766
Washington, DC 20009                         joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                               *Admitted pro hac vice

15

WASHAR0000334

| | |
|---|---|
| **From:** | Fabry, Steven F <FabrySF@state.gov> |
| **Sent:** | Wednesday, March 28, 2018 5:59 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 5:22 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart

202 736 9221 | hartrl@state.gov

**From:** Cavnar, Anna <CavnarA@state.gov>
**Date:** March 28, 2018 at 10:34:11 AM EDT
**To:** Hart, Robert L <HartRL@state.gov>, Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>, Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

████████████████████████████████████████████████

Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

████████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

WASHAR0000337

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov


**Official - SBU**
**UNCLASSIFIED**

| **From:** | Cavnar, Anna <CavnarA@state.gov> |
|---|---|
| **Sent:** | Wednesday, March 28, 2018 10:34 AM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |
| **Attach:** | DDTC DD Counteroffer RLH JF v2.docx |

Rob,



Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

WASHAR0000340

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| From: | Dearth, Anthony M <DearthAM@state.gov> |
|---|---|
| Sent: | Thursday, April 5, 2018 12:53 PM |
| To: | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |
| Attach: | 22 USC 2717 Current.docx |

Anna,



V/R, Tony

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 12:23 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Sara, Rob,

Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Anna-



Sarah

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F
<FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J

**Subject:** RE: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████████████████

Thanks,

Rob Hart

202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob –

███████████████████████████████████████████████████████████

Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████████████████

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
UNCLASSIFIED

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Best,
Anna

**Official - SBU**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
UNCLASSIFIED

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM

WASHAR0000346

**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.


**Official - Transitory**
**UNCLASSIFIED**


**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart

WASHAR0000348

Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

### §2717. Defense trade controls registration fees

For each fiscal year, 100 percent of the registration fees collected by the Office of Defense Trade Controls of the Department of State shall be credited to a Department of State account, to be available without fiscal year limitation. Fees credited to that account shall be available only for payment of expenses incurred for-

(1) contract personnel to assist in the evaluation of defense trade controls license applications, reduction in processing time for license applications, and improved monitoring of compliance with the terms of licenses;

(2) the automation of defense trade controls functions, including compliance and enforcement activities, and the processing of defense trade controls license applications, including the development, procurement, and utilization of computer equipment and related software; and

(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.

WASHAR0000350

| | |
|---|---|
| **From:** | Dearth, Anthony M <DearthAM@state.gov> |
| **Sent:** | Thursday, April 5, 2018 2:33 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |

███████████████████████████

V/R, Tony

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 1:58 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Thursday, April 05, 2018 12:53 PM
**To:** Cavnar, Anna; Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Anna,

███████████████████████████████████████████████

V/R, Tony

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Thursday, April 05, 2018 12:23 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>

**Cc:** Miller, Michael F <<u>Millermf@state.gov</u>>; Dearth, Anthony M <<u>DearthAM@state.gov</u>>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Sara, Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Tuesday, April 03, 2018 9:18 AM
**To:** Cavnar, Anna; Hart, Robert L; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert
**Cc:** Miller, Michael F; Dearth, Anthony M
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Anna-

Sarah

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Tuesday, April 3, 2018 9:10 AM
**To:** Hart, Robert L <<u>HartRL@state.gov</u>>; Freeman, Jeremy B <<u>FreemanJB@state.gov</u>>; Fabry, Steven F <<u>FabrySF@state.gov</u>>; Monjay, Robert <<u>MonjayR@state.gov</u>>
**Cc:** Heidema, Sarah J <<u>HeidemaSJ@state.gov</u>>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Best,
Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Monday, April 02, 2018 10:34 AM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Freeman, Jeremy B
**Sent:** Monday, April 2, 2018 10:27 AM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>;
Monjay, Robert <MonjayR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob –

Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,



Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>;
Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**


**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.


**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes

WASHAR0000357

PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**OFFER OF SETTLEMENT**

Case No. 15-CV-372-RP

Pursuant to the Court's March 12, 2018 Scheduling Order, Plaintiffs hereby submit this Offer of Settlement to the Defendants in the above-captioned matter, offering to settle this matter upon the following terms and conditions:

1.  Defendants' stipulation to entry of an order by the Court in the above-captioned matter, and entry of a stipulated order by the Court, ordering that the Department of State and the Department of Justice shall not, directly or indirectly, under the Arms Export Control Act of 1976 or the International Traffic in Arms Regulations (ITAR), impose, enforce or otherwise attempt to maintain a prior restraint on public speech, to include public speech consisting of Internet publications of computer aided design files for the manufacture of firearms.

2.  Defendants join Plaintiffs in filing a motion for entry of the stipulated order in which Defendants admit the allegations of Plaintiffs' Complaint, as amended, and in which Defendants expressly acknowledge that the Arms Export Control Act of 1976 and the ITAR do not require U.S. Government approval for publishing technical data on the Internet or for other public speech.

3.  Defendants' posting of a letter at www.pmddtc.state.gov in a manner that is easily accessible to all members of the public with Internet access, that is addressed to the Defendants, issued on Department of State letterhead with the official agency seal, is signed and dated by the Secretary of State, and that contains the following official statement from the Secretary of State:

    Other than in its May 8, 2013 letter to Cody Wilson of Defense Distributed, the Department of State has never imposed a prior restraint on public speech under the Arms Export Control Act of 1976 or its implementing regulations under the International Traffic in Arms Regulations (ITAR).

    The Department of State, through its May 8, 2013 letter to Mr. Wilson, singled out and specifically targeted the speech by Mr. Wilson and Defense Distributed with a prior restraint based on the U.S. Government's disagreement with the content, to include certain messages, of that speech.

    The Department of State further acknowledges multiple instances of prior Department of Justice legal advice to the Department of State and legal opinions to the Department of State, to the White House, and to Congress in which the U.S. Government's own legal counsel warned that the Department of State's application of the ITAR to public speech would violate the United States Constitution.

WASHAR0000359

By this letter, the Department of State provides advance notice to the public that it will in no way seek to enforce a prior restraint under the Arms Export Control Act of 1976 or the ITAR or otherwise attempt to impose the ITAR on public speech.

Within 60 days, the Department of State will issue a final rule on the Federal Register repeating this policy. The final rule will rescind the supplementary information to 80 Fed. Reg. 31525 (June 3, 2015) in which the Department of State claimed there was an ITAR prior restraint on public speech and proposed to explicitly impose ITAR control over Internet postings of technical data and other public speech.

4. Defendants' issuance, within 60 days of Defendants' acceptance of this Offer of Settlement, of a final rule in the Federal Register with the following supplemental information and making the following ITAR amendment, without any editorial language or other qualification added by the Department of State:

SUPPLEMENTAL INFORMATION:

The Department of State revises the definition of "public domain" at § 120.11 of the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130) by adding a note to paragraph (a) and adding a new paragraph (b) in order to clearly confirm that the ITAR does not control public speech. The Department does not require authorization to release technical data into the public domain. The Arms Export Control Act of 1976 was never intended to control public speech, of any kind. Therefore, the Department will in no way seek to enforce a prior restraint under the Arms Export Control Act of 1976 or the ITAR. The Department hereby rescinds the supplementary information provided in its proposed rule under 80 Fed. Reg. 31525 (June 3, 2015), wherein the agency claimed that the ITAR controls public speech.

AMENDMENT (adding a new note to paragraph (a) and a new paragraph (b) to ITAR § 120.11):

Section 120.11 is revised to read as follows:

WASHAR0000360

### § 120.11  Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

WASHAR0000361

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

**Note to paragraph (a):** This paragraph provides an exemplary list of public forums. They are provided as examples only and do not constitute an exhaustive list of public forums recognized under this subchapter.

(b) Unclassified technical data, to include software, may be posted to any public forum, to include the Internet, in any format, without prior approval from the Department of State or any other U.S. Government agency. This subchapter does not control publications of technical data into public forums or any other form of public speech, regardless of whether foreign persons will have access to the published information.

5. Defendants' agreement that they will never, in any way, attempt to narrow or alter the substance of the above amendment.

6. Defendants' acknowledgment and agreement that the terms and conditions above are made for the benefit of any member of the public, to include Defense Distributed's customers and Second Amendment Foundation's members, who are intended third-party beneficiaries of this Offer of Settlement and who shall have the individual and/or collective rights to enforce the terms and conditions of this Offer of Settlement.

7. Defendants' payment of all attorneys' fees and costs incurred by Cody Wilson and Defense Distributed in responding to the Department of State's May 8, 2013 letter, to include fees incurred in preparing and submitting ten commodity jurisdiction requests and the costs of multiple Department of State annual registration fees.

8. Defendants' payment of all attorneys' fees and costs incurred by the Plaintiffs in the above-captioned lawsuit.

This Offer of Settlement is made under Rule 408 of the Federal Rules of Evidence. Pursuant to the Court's Scheduling Order, it will remain open until March 30, 2018. If this offer is not accepted before that time, it shall be deemed withdrawn.

———————

| | |
|---|---|
| **From:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Sent:** | Thursday, July 26, 2018 7:01 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Davis, Terry L <DavisTL@state.gov>; Shin, Jae E <ShinJE@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Dearth, Anthony M <DearthAM@state.gov> |
| **Cc:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov> |
| **Subject:** | T approved AM on DD |

T approved all four recommendations on AM about Defense Distributed. Final sent on high side.

Best,

Samantha Sison
PM/FO SharePoint
202-647-0561

| | |
|---|---|
| **From:** | Rob Hart <robhart@gmail.com> |
| **Sent:** | Monday, April 9, 2018 11:25 AM |
| **To:** | Hart, Robert L <HartRL@state.gov> |
| **Subject:** | |

https://www.defensenews.com/land/2018/04/09/orbital-atk-tests-partially-3d-printed-warhead-for-hypersonic-weapons/?utm_medium=Socialflow&utm_source=Twitter

WASHAR0000364

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed fireams would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th. I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 5:01 PM |
| To: | Kaidanow, Tina S <KaidanowTS@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Subject: | DD Settlement: Cong/Pub State of Play |
| Attach: | Defense Distributed Settlement Alerts for 25 July 2018.msg; Defense Distributed - S contingency QA (5).docx |

Dear AMB Kaidanow,
This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**
- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached). In the event, he told SEN Markey he'd "take a look at it". The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance. We hope to provide the response in advance of tomorrow's signing of the Settlement letter.
- In addition, SEN Menendez issued a statement calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**
- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's On Point dedicated to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a petition on Change.org has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Trends chart for worldwide searches on 3D guns is as follows:





Thanks,
Josh



**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.7878 | 📱 BlackBerry: 202.679.6724 | 📠 Fax: 202.647.4055
✉ e-mail: PaulJM@State.Gov | 🌐 Web: www.state.gov/t/pm /
🌐 http://twitter.com/StateDeptPM
Stay connected with State.gov:

This message is UNCLASSIFIED, per E.O. 12958
**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 4:49 PM |
| **To:** | Steffens, Jessica L <SteffensJL@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| **Subject:** | Defense Distributed Settlement Alerts for 25 July 2018 |



### Defense Distributed Settlement Alerts for 25 July 2018

"Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'", Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

"Editorial: Homemade 3-D printer guns should be regulated like any gun", Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

"WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons", Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

"What You Need to Know About the 3D Printing of Guns on Demand", While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

"LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL", Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1.

"MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS", U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

WASHAR0000368

"Debating the Permissibility of Printable Guns", Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun.  Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry.  Deadly weapons shouldn't fall into the wrong hands.

"We Have to Take a Stand on 3D Printed Guns", You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

"Government Admits AR-15s Are Not Weapons of War", Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement. The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

"Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1", A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

"THE DANGERS OF 3D-PRINTED GUNS", The Trump Administration's ruling will recklessly allow anyone to post their gun blueprints online for anyone to download. That means people who are unable to pass a background check—like terrorists, convicted felons, and domestic abusers—will be able to 3D-print a gun out of the same type of plastic used to make LEGOs—without any attached serial numbers. This could have severe repercussions a decade from now if we allow weapons of this kind to multiply.

"Email NOW: Stop the Threat of Downloadable Guns", Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

"The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really", The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0000370

| From: | Rogers, Shana A <RogersSA2@state.gov> |
|---|---|
| Sent: | Thursday, March 16, 2017 7:33 AM |
| To: | Nilsson, Brian H <NilssonBH@state.gov>; Peartree, C Edward <PeartreeCE@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; sarah.j.heidema.civ@gc.ndu.edu; Smith, Glenn E <SmithGE2@state.gov>; Kenneth B. Handelman <kenneth.b.handelman.civ@mail.mil>; Dearth, Anthony M <DearthAM@state.gov>; Davis, Terry L <DavisTL@state.gov>; Shulman, Arthur <ShulmanA@state.gov> |
| Cc: | Monjay, Robert <MonjayR@state.gov>; Noonan, Michael J <NoonanMJ@state.gov> |
| Subject: | Defense Distributed -- en banc petition denied |
| Attach: | order denying rehearing en banc.pdf |

All,

More good news on the litigation front. The Fifth Circuit denied rehearing en banc. The order is attached, including the dissenting opinion of five of the judges.

For context, here is a quick recap of the litigation. The plaintiffs filed their complaint with the District Court for the Western District of Texas. In addition to the complaint, they filed a motion for preliminary injunction, which would have prevented the Department from enforcing any prepublication approval requirement while the case was decided on the merits. The District Court denied the motion for preliminary injunction in August 2015, and the plaintiffs appealed the decision to the Fifth Circuit Court of Appeals. The Fifth Circuit heard arguments on the case in June 2016 and affirmed the District Court's denial of the preliminary injunction in September 2016. In November 2016, plaintiffs filed a petition with the Fifth Circuit requesting that the full Court consider the preliminary injunction decision—the rehearing en banc. The Court has now denied that petition.

From here, plaintiffs can either appeal the Fifth Circuit decision by filing a petition for certiorari with the U.S. Supreme Court within 90 days or the case will return to the District Court for the Western District of Texas for proceedings on the merits.

Happy to discuss.

Thanks,
Shana

Shana Rogers
Attorney-Adviser, L/PM
U.S. Department of State
(202) 647-8546 (office)
(202) 256-8812 (cell)
rogerssa2@state.gov
**Official - SBU**
**UNCLASSIFIED**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 15-50759

————————

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

      Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

      Defendants - Appellees

————————

Appeal from the United States District Court
for the Western District of Texas

————————

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

WASHAR0000372

No. 15-50759

Before DAVIS, JONES, and GRAVES, Circuit Judges.

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen and Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

ENTERED FOR THE COURT:

/s/ W. Eugene Davis

W. EUGENE DAVIS
UNITED STATES CIRCUIT JUDGE

2

WASHAR0000373

Case: 15-50759     Document: 00513913565     Page: 3     Date Filed: 03/15/2017
Case 2:20-cv-00111-RAJ   Document 107-1   Filed 09/23/20   Page 360 of 538

No. 15-50759

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing *en banc*:

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits—which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits—calling it "arguably the most important factor." *Tesfamichael v. Gonzalez*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v.*

WASHAR0000374

Case: 15-50759    Document: 00513913565    Page: 4    Date Filed: 03/15/2017
Case 2:20-cv-00111-RAJ    Document 107-1    Filed 09/23/20    Page 361 of 538

No. 15-50759

*Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, No. 15-50759, slip op. at 10 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the

4

WASHAR0000375

Case: 15-50759    Document: 00513913565    Page: 5    Date Filed: 03/15/2017
Case 2:20-cv-00111-RAJ    Document 107-1    Filed 09/23/20    Page 362 of 538

No. 15-50759

imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (*en banc*); *see also N.Y. Times*, 403 U.S. at 730 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively . . . operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569–70. The Government contends that the gun designs at issue could potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary

WASHAR0000376

No. 15-50759

injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, slip op. at 17 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719 (Black, J., concurring). Unfortunately, that is exactly what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

6

WASHAR0000377



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON,DC 20301-1155

December 22, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is a clarification to the enclosed September 25, 2014, correspondence providing public release approval of the indicated documents titled:

• "AR-15 Lower Receiver"

The Defense Office of Prepublication and Security Review (DOPSR) desires to clarify the previous approval for public release was in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

In other words, only the **rendered images** previously requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release as previously stated in our 25 September letter, *however, to clarify,* public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Tuesday, March 27, 2018 9:50 AM |
| **To:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Cc:** | Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Defense Distributed offer of settlement |
| **Attach:** | DDTC DD Counteroffer RLH.docx |

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov


**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Wednesday, August 2, 2017 2:54 PM |
| **To:** | Nilsson, Brian H <NilssonBH@state.gov>; Peartree, C Edward <PeartreeCE@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Smith, Glenn E <SmithGE2@state.gov> |
| **Cc:** | Shulman, Arthur <ShulmanA@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Davis, Terry L <DavisTL@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Defense Distributed v. U.S. Department of State: Petition for Certiorari |
| **Attach:** | 34372 pdf Gura.pdf |

Brian,

Today the plaintiffs in the <u>Defense Distributed</u> case filed a petition for certiorari with the U.S. Supreme Court. The petition asks the Supreme Court to review the Fifth Circuit's decision affirming the district court's denial of a preliminary injunction. The plaintiffs sought a preliminary injunction that would have prevented the government from "enforcing any prepublication approval requirement against unclassified information under the International Traffic in Arms Regulations," including any requirement applicable either to the files that Defense Distributed had submitted for commodity-jurisdiction review or to any other files that Defense Distributed might create in the future. One judge dissented from the Fifth Circuit opinion.

DOJ will coordinate with us as they draft a brief in opposition to the petition.

Thanks,

Shana

**Official - SBU (Attorney-Client Privilege)**
**UNCLASSIFIED**

WASHAR0000389

No. 17-_____

In The
# Supreme Court of the United States

———————◆———————

DEFENSE DISTRIBUTED, ET AL.,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,

*Respondents.*

———————◆———————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Fifth Circuit**

———————◆———————

**PETITION FOR A WRIT OF CERTIORARI**

———————◆———————

MATTHEW GOLDSTEIN
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Ave., N.W.
10th Floor
Washington, D.C. 20009
202.550.0040

WILLIAM B. MATEJA
POLSINELLI PC
2950 N. Harwood,
   Suite 2100
Dallas, TX 75201
214.397.0030

ALAN GURA
   *Counsel of Record*
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

JOSH BLACKMAN
1303 San Jacinto Street
Houston, TX 77002
202.294.9003

DAVID S. MORRIS
FISH & RICHARDSON P.C.
111 Congress Ave., Suite 810
Austin, TX 78701
512.472.5070

August 2017

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

WASHAR0000390

## QUESTIONS PRESENTED

Petitioners sought to enjoin the government's demand that they obtain an arms-export license prior to publishing otherwise lawful speech whenever that speech is published in a manner accessible by foreigners.

This Court instructs that judges must consider the plaintiff's likelihood of success in weighing a preliminary injunction. Ten circuits agree that a First Amendment plaintiff's likelihood of success on the merits is an essential, often dispositive preliminary injunction factor. But a divided Fifth Circuit panel below expressly declined to consider the merits of Petitioners' claims, and sustained the content-based prior restraint only upon the assertion of a regulatory interest. Additionally, five circuits agree that enforcing the Constitution's requirements is in the public interest. But the majority below held that enforcing constitutional requirements may not serve the public interest as much as the government's application of a content-based prior restraint. The questions presented are:

1.   Whether a court weighing a preliminary injunction must consider a First Amendment plaintiff's likelihood of success on the merits.

2.   Whether it is always in the public interest to follow constitutional requirements.

3.   Whether the Arms Export Control Act of 1976, 22 U.S.C. § 2278, et seq., and its implementing International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, may be applied as a prior restraint on public speech.

WASHAR0000391

## RULE 29.6 DISCLOSURE STATEMENT

No parent or publicly owned corporation owns 10% or more of the stock in Defense Distributed or Second Amendment Foundation, Inc.

## LIST OF PARTIES

The petitioners are Defense Distributed and Second Amendment Foundation, Inc., who are plaintiffs and appellants below.

Respondents are the United States Department of State; Rex Tillerson, in his official capacity as Secretary of the Department of State; Directorate of Defense Trade Controls; Brian Nilsson, in his official capacity as Deputy Assistant Secretary of State for Defense Trade Controls; Kenneth B. Handelman, individually; C. Edward Peartree, individually and in his official capacity as the Director of the Office of Defense Trade Controls Policy Division; Sarah J. Heidema, individually and in her official capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; and Glenn Smith, individually and in his official capacity as the Senior Advisor, Office of Defense Trade Controls. All respondents are defendants and appellees below.[1]

---

[1] Rex Tillerson has substituted for John Kerry as Secretary of State, and Brian Nilsson has substituted for Kenneth B. Handelman as Deputy Assistant Secretary of State for Defense Trade Controls.

WASHAR0000392

iii

## TABLE OF CONTENTS

Page

QUESTION PRESENTED.................................. i

RULE 29.6 DISCLOSURE STATEMENT........... ii

LIST OF PARTIES .............................................. ii

TABLE OF AUTHORITIES................................ vi

INTRODUCTION ................................................ 1

OPINIONS AND ORDERS BELOW.................... 3

JURISDICTION.................................................... 3

CONSTITUTIONAL AND STATUTORY
   PROVISIONS INVOLVED ............................... 4

STATEMENT....................................................... 4

  A.  Statutory and Regulatory Scheme ........... 4

  B.  The Government Applies the Regulations
     as a Content-Based Prior Restraint on
     Speech....................................................... 7

  C.  District Court Proceedings........................ 13

  D.  The Panel Majority's Opinion.................... 15

  E.  Judge Jones's Panel Dissent...................... 16

  F.  Judge Elrod's Dissent From Denial Of Re-
     hearing...................................................... 22

WASHAR0000393

iv

## TABLE OF CONTENTS—Continued

Page

REASONS FOR GRANTING THE PETITION.....   25

I. The Lower Court's Refusal to Address Petitioners' Likelihood of Success in Vindicating First Amendment Rights Directly Contradicts This Court's Precedent, and Conflicts with the Precedent of Ten Circuits ..........................................................   25

II. The Lower Court's Holding that It May Not Be in the Public Interest to Enforce the Constitution Conflicts with the Precedent of Five Circuits and Raises Issues of Exceptional Significance ...........................   30

III. The Lower Court's Constructive Approval of a Content-Based Prior Restraint, Under the Artifice of Treating Any Speech that Foreigners Might Hear or Read as an "Export," Calls for This Court's Review ..........   32

IV. The Erroneous Decision Below Destabilizes the Law and Raises Serious Questions About the Judiciary's Mission ..........   34

V. This Case Presents an Excellent Vehicle For Resolving the Issues Presented ..........   37

CONCLUSION......................................................   41

APPENDIX

APPENDIX A—Court of Appeals Opinion filed September 20, 2016.................................................1a

APPENDIX B—District Court Order filed August 4, 2015 ..........................................................56a

WASHAR0000394

v

TABLE OF CONTENTS—Continued

Page

APPENDIX C—Court of Appeals Denial of Re-
hearing filed March 15, 2017 ................................91a

APPENDIX D—Constitutional and Statutory
Provisions Involved ...............................................98a

APPENDIX E—Letter from Respondent Nilsson
to William O. Wade, June 12, 2017 .....................116a

WASHAR0000395

vi

## TABLE OF AUTHORITIES

Page

### CASES

*Ashcroft* v. *ACLU*, 542 U.S. 656 (2004).......................25

*Awad* v. *Ziriax*, 670 F.3d 1111 (10th Cir. 2012) .........31

*Boumediene* v. *Bush*, 553 U.S. 723 (2008) ..................30

*Child Evangelism Fellowship of Minn.* v. *Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996 (8th Cir. 2012)...........................................................28

*Dish Network Corp.* v. *FCC*, 653 F.3d 771 (9th Cir. 2011) .................................................................29

*Expressions Hair Design* v. *Schneiderman*, 137 S. Ct. 1144 (2017)....................................................40

*Gordon* v. *Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........31

*Higher Soc'y of Ind.* v. *Tippecanoe Cty.*, 858 F.3d 1113 (7th Cir. 2017).................................................28

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010).......................................................................21

*Int'l Refugee Assistance Project* v. *Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc)...........................36

*Joelner* v. *Village of Wash. Park*, 378 F.3d 613 (7th Cir. 2004).........................................................28

*Korte* v. *Sibelius*, 735 F.3d 654 (7th Cir. 2013)...........32

*Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682 (6th Cir. 2014)..............................................27, 28, 31

*N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483 (2d Cir. 2013)....................................................26, 38

TABLE OF AUTHORITIES—Continued

Page

*New York Times Co.* v. *United States*, 403 U.S. 713 (1971) .................................................. 24, 31, 32

*Packingham* v. *North Carolina*, 137 S. Ct. 1730 (2017) .................................................................... 33

*Pashby* v. *Delia*, 709 F.3d 307 (4th Cir. 2013) ............ 27

*Planned Parenthood Ass'n of Utah* v. *Herbert*, 828 F.3d 1245 (10th Cir. 2016) .......................... 29, 31

*Pursuing America's Greatness* v. *FEC*, 831 F.3d 500 (D.C. Cir. 2016) .......................................... 28, 31

*Reed* v. *Town of Gilbert*, 135 S. Ct. 2218 (2015) ......... 20

*Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008) ......................................................... 35

*Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ........................................... 38, 39

*Schweiker* v. *Hansen*, 450 U.S. 785 (1981) .................. 40

*Scott* v. *Roberts*, 612 F.3d 1279 (11th Cir. 2010) .... 29, 32

*Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*, 699 F.3d 1 (1st Cir. 2012) ......................... 26

*Smith* v. *Allwright*, 321 U.S. 649 (1944) ..................... 36

*Sole* v. *Wyner*, 551 U.S. 74 (2007) ............................... 25

*Southern Monorail Co.* v. *Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982) ................. 29, 30

*Stagg P.C.* v. *United States Dep't of State*, 673 Fed. Appx. 93 (2d Cir. 2016) (summary order) ....... 37

*Stagg P.C.* v. *United States Dep't of State*, 158 F. Supp. 3d 203 (S.D.N.Y. 2016) .............................. 38

WASHAR0000397

viii

TABLE OF AUTHORITIES—Continued

Page

*Stilp* v. *Contino*, 613 F.3d 405 (3d Cir. 2010)........26, 27

*United States* v. *Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978)......................................................9

*United States* v. *O'Brien*, 391 U.S. 367 (1968)............36

*United States* v. *Windsor*, 133 S. Ct. 2675 (2013) ......38

*Verlo* v. *Martinez*, 820 F.3d 1113 (10th Cir. 2016) ....................................................................28

*Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566 (9th Cir. 2014) ................................................................29

*Wayte* v. *United States*, 470 U.S. 598 (1985)...............36

*WV Ass'n of Club Owners & Fraternal Servs., Inc.* v. *Musgrave*, 553 F.3d 292 (4th Cir. 2009) .......27

*Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017)....................36

CONSTITUTION

U.S. Const. amend. I ...........................................*passim*

STATUTES, REGULATIONS, AND RULES

22 U.S.C. § 2278(a)(1) ....................................................4

22 U.S.C. § 2778(c) ........................................................4

22 U.S.C. § 2778(e) ........................................................4

28 U.S.C. § 1254(1)........................................................4

28 U.S.C. § 1331 ..........................................................13

28 U.S.C. § 1343 ..........................................................13

22 C.F.R. Parts 120-130 .................................................4

WASHAR0000398

TABLE OF AUTHORITIES—Continued

Page

22 C.F.R. § 120.10 ....................................................4, 5

22 C.F.R. § 120.10(b)......................................................7

22 C.F.R. § 120.11(a)......................................................7

22 C.F.R. § 120.11(a)(7)..................................................7

22 C.F.R. § 120.17(a)(2)..................................................5

22 C.F.R. § 120.17(a)(4) (2013) ......................................5

22 C.F.R. § 120.4(a)........................................................6

22 C.F.R. § 120.41 ..........................................................5

22 C.F.R. § 121.1 ............................................................5

22 C.F.R. § 126.7(a)(1)....................................................6

22 C.F.R. § 126.7(b)........................................................7

22 C.F.R. § 128.1 ............................................................7

Sup. Ct. R. 10(a)....................................................25, 26

OTHER AUTHORITIES

49 Fed. Reg. 47,682 (Dec. 6, 1984)................................8

80 Fed. Reg. 31,525 (June 3, 2015)........................12, 33

82 Fed. Reg. 3,168 (Jan. 11, 2017)................................4

"Final Commodity Jurisdiction Determinations,"
   https://www.pmddtc.state.gov/commodity_
   jurisdiction/determination.html (last visited
   July 28, 2017)............................................................6

WASHAR0000399

1

No. 17-_____

──────────◆──────────

In The
## Supreme Court of the United States

──────────◆──────────

DEFENSE DISTRIBUTED, ET AL.,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,

*Respondents.*

──────────◆──────────

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Fifth Circuit**

──────────◆──────────

## PETITION FOR A WRIT OF CERTIORARI

Defense Distributed and Second Amendment Foundation, Inc., respectfully petition this Court to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case below.

──────────◆──────────

## INTRODUCTION

Is the Constitution's implementation in the public interest? When deciding whether to enjoin a content-based prior restraint on speech, must federal courts assess the merits of the First Amendment claim?

WASHAR0000400

2

Until the decision below, these were not controversial questions. The Constitution, amendments and all, is the Nation's highest law. And without examining a claim's merits, judges are in no position to balance the equities, assess irreparable harm, or determine what outcome serves the public interest.

Yet without meaningfully responding to pointed dissents at the panel and en banc rehearing stages, the court below refused to examine the merits of Petitioners' motion to preliminarily enjoin a content-based prior restraint on speech. It simply declared that the government's asserted interests outweighed the interest in securing constitutional rights, the enforcement of which may not serve the public interest.

This decision raises the specter of summary reversal. As this Court has instructed, considering the merits of preliminary injunction motions is not optional. Of all contexts, the merits cannot be optional in First Amendment cases. It should ordinarily go without saying—and so it must now be said—that federal courts cannot dismiss the Constitution's primacy in our legal system. Nor can judges decide that some speakers will have their claims addressed on the merits, while rubber-stamping the denial of disfavored claims based only on the government's mere assertion of a regulatory interest. The government can be relied upon to assert the necessity of every prior restraint. The public must be able to rely on the courts to test these assertions for constitutional compliance.

WASHAR0000401

Apart from conflicting with this Court's instructions, the decision below conflicts with the precedents of ten circuits that affirm the protection of First Amendment rights via preliminary injunction, and five circuits that hold the Constitution to be in the public interest per se. The context of this startling departure from judicial norms is itself noteworthy: the Executive Branch's abrupt reversal of nearly forty years of policy against imposing arms-control regulations as a prior restraint on Americans' public speech.

The danger posed to First Amendment rights by the decision below is plain enough. But there is no reason to suppose the mischief would remain so confined. The decision below warrants this Court's review.

———————◆———————

## OPINIONS AND ORDERS BELOW

The Fifth Circuit's opinion (App., *infra*, 1a-55a) is reported at 838 F.3d 451. The Fifth Circuit's order denying rehearing en banc, including Judge Elrod's dissent from that order (App., *infra*, 91a-97a), is unreported, and appears at 2017 WL 1032309, 2017 U.S. App. LEXIS 4587. The district court's opinion (App., *infra*, 56a-90a) is reported at 121 F. Supp. 3d 680.

———————◆———————

## JURISDICTION

The court of appeals entered its judgment on September 20, 2016. Petitioners timely filed a petition for

WASHAR0000402

rehearing en banc, which a divided court of appeals denied on March 15, 2017. On April 26, 2017, Justice Thomas extended the time for filing this petition to and including August 2, 2017. The Court has jurisdiction under 28 U.S.C. § 1254(1).

————————◆————————

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment, and relevant provisions of the Arms Export Control Act of 1976 and its implementing International Traffic in Arms Regulations, are reproduced at App. 98a-115a.

————————◆————————

## STATEMENT

### A.  Statutory and Regulatory Scheme

1.  "In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services. . . ." 22 U.S.C. § 2278(a)(1). This act is implemented through the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, which contain the "United States Munitions List" ("USML")—the items controlled as "defense articles" and "defense services." 22 C.F.R. § 121.1. Unauthorized exports are punishable by up to twenty years in prison, fines of up to $1,000,000, and civil penalties up to $1,111,908. 22 U.S.C. §§ 2778(c) and (e); 82 Fed. Reg. 3,168, 3,169 (Jan. 11, 2017).

5

The USML includes "technical data" such as "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," although it excludes "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain. . . ." 22 C.F.R. § 120.10.

Congress has not defined "export" within this statutory scheme. Respondents define "export" to include "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')." *Id.* § 120.17(a)(2). At the time of the events giving rise to this case, Respondents defined "export" as "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4) (2013); App. 27a.

Figuring out whether one's information is controlled can be complicated. The USML utilizes terms such as "military application," *id.* § 121.1, which is undefined and "specially designed," whose definition exceeds 900 words, *id.* § 120.41; and concludes with an open-ended catch-all provision encompassing "Articles, Technical Data, and Defense Services Not Otherwise Enumerated," *id.* § 121.1 at USML Category XXI.

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," respondent Directorate of Defense Trade Controls ("DDTC") may provide a "commodity jurisdiction" determination. *Id.*

§ 120.4(a). Over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Nonpublic National Security Council guidelines establish a sixty-day deadline for DDTC to render a commodity jurisdiction determination. R.144.[2] But reports by the Government Accountability Office, Office of Inspector General and DDTC show that these guidelines are routinely disregarded, as requests often await final determinations for well over a year. R.163-68, 211-13, 221.

If information qualifies as "technical data," people must obtain approval from the Department of Defense Office of Prepublication and Security Review ("DOPSR") or another cognizant government agency before publishing it. However, no rule or law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

An ITAR export license application "may be disapproved, and any license or other approval or exemption granted . . . may be revoked, suspended, or amended without prior notice whenever . . . [t]he Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a)(1) (emphasis added). "The reasons for the

---

[1] "Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html (last visited July 28, 2017).

[2] Citations to "R.p" refer to pages of the Fifth Circuit record on appeal.

WASHAR0000405

action will be stated as specifically as security and foreign policy considerations permit." *Id.* § 126.7(b). Decisions to grant, revoke, suspend, or amend a license are not subject to judicial review under the Administrative Procedure Act. *Id.* § 128.1.

## B.   The Government Applies the Regulations as a Content-Based Prior Restraint on Speech

1.   Americans speak and publish an ever-expanding array of technical information arguably subject to ITAR control. As the Department of Justice reported to Congress, "manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes" can easily assist the pursuit of unlawful ends. R.287. "Such information is also readily available to anyone with access to a home computer equipped with a modem." *Id.* ITAR's "public domain" exclusion, 22 C.F.R. § 120.10(b), includes eight categories of "information which is published and which is generally accessible or available to the public." *Id.* § 120.11(a).

This exclusion leaves unaddressed the question of how information created by a speaker or author typically *enters* the public domain in the first instance. To be sure, one class of information ITAR deems to be in the public domain is information publicly released "after approval by the cognizant U.S. government department or agency." *Id.* § 120.11(a)(7). Otherwise, under Respondents' view, Americans are at risk of unlawfully "exporting" "technical data" whenever speaking or publishing scientific or technical information in venues open to foreigners.

WASHAR0000406

8

2.   This has not always been the case. Decades ago, footnote 3 to former ITAR Section 125.11 implied a prior restraint on all public speech that happened to fall within ITAR's definition of "technical data":

> The burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication.

R.327.

Beginning in 1978, in response to concerns raised by this language, the Office of Legal Counsel ("OLC") issued a series of opinions advising Congress, the White House, and the State Department that ITAR's use as a prior restraint on the dissemination of privately generated, unclassified information violates the First Amendment. R.226-323. And in 1980, respondent DDTC's predecessor agency issued official guidance providing that "[a]pproval is not required for publication of data within the United States . . . Footnote 3 to Section 125.11 does not establish a prepublication review requirement." R.332.

Finally, in 1984, the State Department removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) ("Concerns were expressed, for example, on licensing requirements as

WASHAR0000407

they relate to the First Amendment to the Constitution. The revision seeks to reflect these concerns. . . .").

By then, the problem of using ITAR as a prior restraint on speech had reached the Ninth Circuit, which avoided the First Amendment problem by reading a scienter requirement into the regulatory scheme. "If the information could have both peaceful and military applications . . . the defendant must know or have reason to know that its information is intended for the prohibited use." *United States* v. *Edler Industries, Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (citation omitted). "So confined, the statute and regulations are not overbroad. For the same reasons the licensing provisions of the Act are not an unconstitutional prior restraint on speech." *Id.*

Following *Edler*, OLC warned the State Department of "serious constitutional questions" were ITAR applied to the transmission of "technical data" absent scienter. R.248. "For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations." R.256.

The Department of Justice reiterated these concerns to Congress, counseling that prior restraints against Internet publication of potentially dangerous information is unconstitutional absent scienter. R.283. Consistent with these concerns, the State Department had previously represented to federal courts that it does not regulate the placement of scientific and technical information into the public domain. See C.A. Pl. Addendum 23, 26, 29-30. In fact, the State Department

WASHAR0000408

conceded that reading ITAR as a prior restraint "is by far the most ***un***-reasonable interpretation of the provision, one that people of ordinary intelligence are *least* likely to assume is the case." *Id.* at 30.

3.    Beginning in 2012, petitioner Defense Distributed published on the Internet various computer-aided design ("CAD") files related to the lawful production of firearms and firearm components. "A CAD file is a data set defining the geometric representation of a bounded volume." R.975, ¶ 38. "Viewed on a computer, [CAD files] display and project an image in three-dimensions, similar to a model sculpted out of clay. The files can be viewed and manipulated in various contexts without an intent to ever manufacture anything." R.978, ¶ 44. As such, the files have proven artistic and political utility. C.A. Br. 21-22.

Three-dimensional printers may also read CAD files as blueprints for producing the objects described by the files. The files are not themselves executable, and the production process requires human intervention and guidance. R.975-76, ¶ 39. But the files do enable a person, using a machine, to make a described object.

Defense Distributed's files were downloaded hundreds of thousands of times. R.129, ¶ 4. But in May 2013, Respondents ordered that "all such data should be removed from public access immediately," because the files might constitute ITAR-controlled technical data. R.129, ¶ 5; 140-42. Respondents further directed Defense Distributed to seek a "commodity jurisdiction" determination as to whether the files are controlled. R.129, ¶ 7; 141.

WASHAR0000409

Defense Distributed complied. It took its files down from the Internet, and on June 21, 2013, filed ten commodity jurisdiction requests covering the published files. R.129, ¶ 7; 335-86. Nearly two years later—after Petitioners filed this lawsuit—Respondents determined that six of the ten files were ITAR-controlled. *Id.* at 500-01. Despite Defense Distributed's request, Respondents failed to provide guidance as to the commodity jurisdiction review process for other CAD files. R.131, ¶ 11; 433-56.

Defense Distributed also sells a machine, the "Ghost Gunner," which can be used to mill various objects, including lawful firearm parts. The machine uses computer numeric control ("CNC") technology, which reads data files to direct a drill. As with CAD files, "CNC code is expressive in that it can be read and edited by humans, who can also understand and adjust its output—i.e., what it will cause the mill to machine." R.976-77, ¶ 41. Upon Defense Distributed's commodity jurisdiction request, Respondents determined that the machine's project files—the CNC instructions for milling particular items—are controlled. R.130, ¶ 9; 407-08.

Defense Distributed also has other files described in the USML that it intends to publish. R.103; 131, ¶ 13; 1082, ¶ 37.

4. After Petitioners brought this action challenging ITAR's use as a prior restraint, Respondents proposed to amend ITAR's "public domain" definition to unambiguously impose a prior restraint: "the revised

WASHAR0000410

definition explicitly sets forth the Department's requirement of authorization to release information into the 'public domain.'" 80 Fed. Reg. 31,525, 31,528 (June 3, 2015). Respondents now insist that ITAR has imposed a prior restraint all along:

> The requirements . . . are not new. Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled "technical data," as defined in § 120.10.

*Id.* at 31,528.

Under Respondents' view, Americans risk significant penalties for speaking or publishing scientific or technical information—"releas[ing] 'technical data'"—"by disseminating 'technical data' at a public conference or trade show, publishing 'technical data' in a book or journal article, or posting 'technical data' to the Internet." *Id.* "Posting 'technical data' to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read [it]." *Id.* at 31,529.

Respondents' proposed codification of ITAR as a content-based prior restraint on speech drew over 9,000 comments. Most commentators opposed the proposal, including technology industry leaders (*e.g.*, IBM, GE), former State Department employees, the Association of American Universities, the Association of Public and Land-grant Universities, and the Council on

Government Relations. R.728-29, 739, 765, 773, 796-98, 817, 825. While the proposed codification has not yet been adopted, it reflects Respondents' position that codification would be merely a formality.

## C.   District Court Proceedings

Petitioners sought to preliminarily enjoin ITAR's implementation as a content-based prior restraint, alleging that this use of ITAR is ultra vires, and violates the First, Second, and Fifth Amendments. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

The district court "ha[d] little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury." App. 63a. But it found that the importance of protecting constitutional rights is outweighed by national security concerns, suggesting that the government's "authority . . . in matters of foreign policy and export" are "largely immune" from judicial review. App. 64a (quotations omitted). The court further held that because Respondents "clearly believe" that posting files to the Internet is an "export," Petitioners did not prove that allowing such posting serves the public interest. App. 65a.

"Nonetheless, in an abundance of caution," *id.*, the district court addressed Petitioners' likelihood of success on the merits. Although it concluded that Respondents are authorized to bar speech as an "export," App. 67a, the court considered the files to be protected by the First Amendment, App. 70a. But it then held

WASHAR0000412

that while ITAR "unquestionably regulates speech concerning a specific topic," it "does not regulate disclosure of technical data based on the message it is communicating." App. 74a. The court thus "conclude[d] the regulation is content-neutral and thus subject to intermediate scrutiny." *Id.* (citation omitted).

Applying intermediate scrutiny, the court asserted that Respondents' prior restraint would survive because Petitioners have other means of distributing their speech domestically, App. 77a, presumably by screening listeners' citizenship. The court also apparently rejected Petitioners' argument that prohibiting Americans from communicating on the Internet, while allowing other forms of domestic speech, does not materially advance the goal of barring foreigners' access to that speech. App. 77a-78a.

And notwithstanding the government's findings that commodity jurisdiction timelines are routinely ignored, the fact that Defense Distributed waited nearly two years to receive a response to its commodity jurisdiction requests concerning the censored files, and the undisputed lack of procedural safeguards in Respondents' licensing process, the court held that Petitioners "have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations." App. 78a. The district court also found that Respondents would likely defeat the Second Amendment claim at step two of an intermediate scrutiny analysis, App. 8a, and that ITAR likely does not violate the Fifth Amendment due to vagueness, App. 90a.

## D. The Panel Majority's Opinion

A divided Fifth Circuit panel affirmed. The majority began by stating that it would affirm denial of the preliminary injunction on a balancing of interests—but without examining Petitioners' claims. "[W]e decline to address the merits requirement." App. 12a. After asserting that Petitioners "failed to give *any* weight to the public interest in national defense and national security," App. 13a,[3] the majority declared that as far as the public interest is concerned, the government's security concerns might well override the Constitution:

> Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security.

App. 13a.

The majority did not question the district court's finding, App. 64a, that the public interest in security outweighed the public interest in exercising constitutional rights. At most, the majority offered only that "both public interests asserted here are strong." App.

---

[3] It is unclear whether the majority claimed that Petitioners denied the existence of a regulatory interest. Petitioners did not. See, *e.g.*, R.862-63 ("We happily concede that the Government has an interest . . . the Government has an interest in controlling the export of technical data."); see also R.105, 117-18, 122, 936; C.A. Br. at 38, 58, 68-69.

16a. The majority thus "[found] it most helpful to focus on the balance of harm requirement. . . ." *Id.* Petitioners had argued that lifting the prior restraint would not harm the public, in part because their files continue to be made available by others on the Internet. But the majority found this to be an argument in favor of denying preliminary injunctive relief, as any newly-created file would likewise become and remain widely available even were a permanent injunction later denied. App. 16a-17a.

The majority clarified that it would affirm the denial of a preliminary injunction on "the balance of harm and the public interest," but "decline to reach the question of whether [Petitioners] have demonstrated a substantial likelihood of success on the merits." App. 18a. Reiterating that "we take no position" with the dissent's "extensive discussion" of the First Amendment merits, the majority offered, "[e]ven a First Amendment violation does not necessarily trump the government's interest in national defense." App. 18a-19a n.12.

### E.   Judge Jones's Panel Dissent

1.   Judge Jones dissented from the panel majority's "failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand." App. 20a.

The dissent emphasized the common nature of Petitioners' speech. "This case poses starkly the question of the national government's power to impose a prior

WASHAR0000415

restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the 'export' of 'defense articles.'" *Id.* While CAD files could be used in printing firearms,

> [n]one of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers.

App. 20a-21a.

The dissent also found troubling the government's departure from decades of policy disclaiming ITAR's use as a prior restraint, and the new prior restraint's expansive scope. "In a nearly forty-year history of munitions 'export' controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet," App. 22a, adding that there is "little certainty that the government will confine its censorship to Internet publication," App. 23a. "Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information." *Id.*

Judge Jones chided the majority for "overlook[ing]" the serious threat to free speech "with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary

WASHAR0000416

Executive Branch pronouncements." App.23a. "This preliminary injunction request deserved our utmost care and attention." *Id.* While Judge Jones focused her discussion on the merits of the First Amendment claim, she found "non-frivolous" Petitioners' claims "premised on ultra vires, the Second Amendment and procedural due process." App. 23a n.4

Judge Jones noted that "[i]nterference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury," App. 23a (citations omitted), and that "Defense Distributed has been denied publication rights for over three years," App. 24a. She then found it "a mystery" why the majority was "unwilling to correct" the district court's "obvious error" in applying only intermediate scrutiny to the content-based prior restraint at issue. *Id.* That error had "fatally affected [the district court's] approach to the remaining prongs of the test for preliminary injunctive relief." *Id.*

> Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction—the district court's balancing of harms went awry. We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

*Id.* (citation and footnote omitted).

"Since the majority are close to missing in action, and for the benefit of the district court on remand,"

Judge Jones proceeded to explain why the State Department's conduct "appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." App. 25a.

2.   a.   The dissent held that whether Congress's use of "export" extends to domestic censorship of the Internet "is at least doubtful," and that "construing the State Department's regulations for such a purpose renders them incoherent and unreasonable." App. 32a. The ordinary meaning of "export," a statutorily undefined but unambiguous term, would "normally resolve the case" at *Chevron* step one. App. 34a. "For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well." *Id.*

"There is embedded ambiguity, and disturbing breadth," in the State Department's claimed prior restraint, such that "[t]he regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of 'export.'" App. 34a-35a. The dissent's examination of Respondents' regulatory interpretation invoked the terms "unreasonable," "*ipse dixit*," "incoherent," and "irrational and absurd." App. 35a. "The root of the problem is that the State Department's litigating position puts more weight on 'export' than any reasonable construction of the statute will bear." App. 36a.

b.   Turning to the First Amendment, Judge Jones noted the process Respondents apply "is a

content-based restriction on the petitioners' domestic speech 'because of the topic discussed.'" App. 38a (quoting *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)). "The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment." *Id.* (citation omitted). "Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation." App. 39a (footnote omitted).

The dissent rejected the claim that the regulation is aimed at secondary effects, App. 40a, and likewise found the claim that the prior restraint is not content-based because it targets "'functional'" speech "flawed factually and legally," *id.* Applying strict scrutiny, the dissent credited the government's compelling interest in arms control, but found the prior restraint "significantly overinclusive." App. 41a (internal quotation marks omitted). "In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press." App. 44a.

c. Judge Jones also faulted Respondents for imposing an unconstitutional content-based prior restraint on speech. "To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural

WASHAR0000419

protections." App. 47a. The "regulations' virtually un-bounded coverage . . . combined with the State Depart-ment's deliberate ambiguity in what constitutes the 'public domain,' renders application of ITAR regula-tions anything but 'narrow, objective, and definite.' " *Id.*

"Just as troubling is the stark lack of the three re-quired procedural protections in prior restraint cases." App. 48a. "[T]he alleged 45-day regulatory deadline for [commodity jurisdiction] determinations seems to be disregarded in practice," as Defense Distributed had to wait nearly two years for a response. *Id.* "Further, the prescribed time limit for licensing decisions, 60 days, is not particularly brief." *Id.* "The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet." *Id.* (citations omitted). And absent judicial review, the government could not bear its burden to seek it. *Id.*

d. Finally, the dissent rejected the majority's balancing paradigm. "[T]he Executive's mere incanta-tion of 'national security' and 'foreign affairs' interests do not suffice to override constitutional rights." App. 49a. "Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented." App. 52a n.17 (referencing *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010)).

Indeed, Judge Jones doubted the government's "sincerity . . . based on the determined ambiguity of its litigating position," questioning how Respondents could simultaneously claim national security concerns over Petitioners' speech while suggesting it can be "freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and at libraries"—so long as no foreigner accesses it. App. 53a-54a. "After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been 'exported' just like the Internet posts. . . ." App. 54a.

"[T]he majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights." *Id.* While "[t]oday's target is unclassified, lawful technical data about guns . . . [t]omorrow's targets may be drones, cybersecurity, or robotic devices. . . . This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable." *Id.*

## F.  Judge Elrod's Dissent From Denial Of Rehearing

The Fifth Circuit voted 9-5 against rehearing the case en banc. App. 92a. Judge Elrod dissented, joined by three of her colleagues.

WASHAR0000421

"The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint." App. 93a. Agreeing with "Judge Jones's cogent panel dissent," Judge Elrod wrote "to highlight three errors that warrant *en banc* review." *Id.*

> First, the panel opinion fails to review the likelihood of success on the merits—which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm.

*Id.*

"Strikingly . . . the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*." App. 94a. "A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights." *Id.* (citations omitted).

"[T]he mere assertion of a national security interest" is also insufficient. App. 95a. "Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the

WASHAR0000422

First Amendment. . . ." *Id.* (citing *New York Times Co.* v. *United States*, 403 U.S. 713, 714 (1971)).

> Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

App. 96a. Judge Elrod also took issue with the panel majority's minimization of Defense Distributed's harm as "temporary," as even short deprivations of First Amendment rights are understood to impose irreparable harm. *Id.*

> We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." Unfortunately, that is exactly what the panel opinion has done.

App. 96a-97a (quoting *New York Times*, 403 U.S. at 719 (Black, J., concurring)).

—————◆—————

## REASONS FOR GRANTING THE PETITION

**I.  The Lower Court's Refusal to Address Petitioners' Likelihood of Success in Vindicating First Amendment Rights Directly Contradicts This Court's Precedent, and Conflicts with the Precedent of Ten Circuits.**

The refusal to consider the merits of a preliminary injunction motion that seeks to secure First Amendment rights provides a definitive example of a decision that "has so far departed from the accepted and usual course of judicial proceedings . . . as to call for an exercise of this Court's supervisory power." Sup. Ct. R. 10(a).

This Court's precedents are unambiguous. "In deciding whether to grant a preliminary injunction, a district court *must* consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits." *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004) (citation omitted) (emphasis added); see also *Sole* v. *Wyner*, 551 U.S. 74, 84 (2007).

There is nothing optional about the word "must." Nor can there be any doubt as to the wisdom of this Court's mandate to examine a claim's merits when parties seek preliminary injunctions. Courts that refuse to consider a plaintiff's likelihood of success on the merits perforce cannot fully assess irreparable harm; nor can they balance the equities, which would be unknown. Nor can courts that ignore the merits of a constitutional case comprehend (let alone determine)

WASHAR0000424

the public interest, which by definition cannot contradict the Constitution itself.

Not surprisingly, because the court below "has so far departed from the accepted and usual course of judicial proceedings," it has also "entered a decision in conflict with the decision of another United States court of appeals on the same important matter." Sup. Ct. R. 10(a). Indeed, on this crucial point, the court below stands in conflict with no fewer than ten circuits, which hold that the merits prong is not merely critical, but often dispositive.

> In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis . . . [it is] incumbent upon the district court to engage with the merits before moving on to the remaining prongs of its analysis.

*Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012). "Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not dispositive factor." *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

When "suppression of speech in violation of the First Amendment [is alleged], we focus our attention on the first factor, i.e., whether [plaintiff] is likely to succeed on the merits of his constitutional claim." *Stilp* v. *Contino*, 613 F.3d 405, 409 (3d Cir. 2010). In *Stilp*, the Third Circuit accepted a defendant's concession

WASHAR0000425

"that, if we find that [plaintiff] is likely to succeed on the merits, the other requirements for a preliminary injunction are satisfied." *Id.* As "irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim," the Fourth Circuit "focus[es] [its] review on the merits of Plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc.* v. *Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Likelihood of success on the merits may, where appropriate, "satisf[y] the public interest prong." *Pashby* v. *Delia*, 709 F.3d 307, 330 (4th Cir. 2013).

"In the context of a First Amendment claim, the balancing of these [four required] factors is skewed toward an emphasis on the first factor," which "often will be the determinative factor." *Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) (quotations omitted).

> In cases implicating the First Amendment, the other three factors often hinge on this first factor. The determination of where the public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights. Similarly, because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the

crucial inquiry often is . . . whether the stat-
ute at issue is likely to be found constitu-
tional.

*Id.* (internal quotation marks and punctuation omit-
ted).

The Seventh Circuit agrees that "[i]n First
Amendment cases, the likelihood of success on the mer-
its will often be the determinative factor." *Higher Soc'y
of Ind.* v. *Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir.
2017) (quotations omitted); *id.* ("So the analysis begins
and ends with the likelihood of success on the merits
of the First Amendment claim") (internal quotation
marks and punctuation omitted). "[I]t is *sometimes*
necessary to inquire beyond the merits." *Joelner* v. *Vil-
lage of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)
(emphasis added).

The Eighth Circuit is in accord. A "likely First
Amendment violation further means that the public
interest and the balance of harms (including irrepara-
ble harm to [plaintiff]) favor granting the injunction."
*Child Evangelism Fellowship of Minn.* v. *Minneapolis
Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir.
2012) (citation omitted).

The Tenth and D.C. Circuits agree that the merits
prong will "often be the determinative factor" in First
Amendment preliminary injunction cases. *Verlo* v.
*Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (inter-
nal quotation marks omitted) (noting "the seminal im-
portance of the interests at stake"); *Pursuing America's
Greatness* v. *FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016);

WASHAR0000427

see also *Planned Parenthood Ass'n of Utah* v. *Herbert*, 828 F.3d 1245, 1265-66 (10th Cir. 2016) (likelihood of success establishes public interest in enjoining unconstitutional conduct).

The Eleventh Circuit goes one step further. Owing to "the severity of burdens on speech" and the fact that "the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law," a First Amendment plaintiff "is entitled to relief if his claim is likely to succeed." *Scott* v. *Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (citations omitted).

The en banc dissenters, who noted that the preceding ten circuits would not countenance the panel majority's approach, App. 93a, might have added the Ninth Circuit's output to this parade of conflicting precedent. "[A] First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations," even if "proving the likelihood of such a claim" is by itself insufficient to obtain an injunction. *Dish Network Corp.* v. *FCC*, 653 F.3d 771, 776 (9th Cir. 2011) (internal quotation marks omitted). Accordingly, the Ninth Circuit requires the merits analysis that it acknowledges could tilt the irreparable harm and public interest assessments. *Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566, 577 (9th Cir. 2014).

Without acknowledging the overwhelming weight of contrary precedent, the panel majority rested its discordant decision on an old trademark case cited neither by the District Court nor Respondents, *Southern Monorail Co.* v. *Robbins & Myers, Inc.*, 666 F.2d 185

WASHAR0000428

(5th Cir. Unit B 1982). The *Southern Monorail* court had refused to presume irreparable harm even were the plaintiff likely to prevail, contrary to the practice in constitutional cases where irreparable harm is presumed, and upheld the denial of an injunction solely on a balancing of the equities.

That very thin reed cannot bear the weight of the majority's departure from judicial norms. A federal appellate court's refusal to analyze the merits of a significant First Amendment challenge to a content-based prior restraint, in direct contravention of this Court's precedent and in irreconcilable conflict with the precedent of ten other circuits, calls out for review.

## II. The Lower Court's Holding that It May Not Be in the Public Interest to Enforce the Constitution Conflicts with the Precedent of Five Circuits and Raises Issues of Exceptional Significance.

The lower court offered that "[o]rdinarily . . . the protection of constitutional rights *would* be the highest public interest." App. 13a. But "[t]hat is not necessarily true here," because "the State Department has *asserted* a very strong interest in national defense and national security." *Id.* (emphasis added).

There is no conflict between the public interest and the Constitution. "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene* v. *Bush*, 553

WASHAR0000429

U.S. 723, 798 (2008). If Petitioners' speech truly threatened national security, if it would "surely result in direct, immediate, and irreparable damage to our Nation or its people," *New York Times*, 403 U.S. at 730 (Stewart, J., concurring), the government would have a compelling interest to sustain the censorship's constitutionality. But how could a court know this, absent the merits inquiry that the majority refused to undertake? Because the State Department "asserted" so? If the first prong weighed against Petitioners, Respondents would have less reason to worry under the fourth.

But once constitutional rights are at stake, at least five circuits would not consider other public interests. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad* v. *Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (internal quotation marks omitted); *accord Planned Parenthood of Utah*, 828 F.3d at 1266.

That "enforcement of an unconstitutional law is always contrary to the public interest" is "obvious." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (citations omitted). "[I]t may be assumed that the Constitution is the ultimate expression of the public interest." *Id.* (internal quotation marks omitted). The D.C. Circuit has no trouble applying this rule to secure First Amendment rights. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing America's Greatness*, 831 F.3d at 511. The Sixth, Seventh, and Eleventh Circuits agree. *Liberty Coins*, 748

WASHAR0000430

F.3d at 690; *Korte* v. *Sibelius*, 735 F.3d 654, 666 (7th Cir. 2013); *Scott*, 612 F.3d at 1297.

The prevailing standard holds that it is "always" in the public interest to enforce the Constitution. Not "probably," not "maybe," not "usually, unless the government asserts an interest," but "always." As Judge Elrod offered in dissent, "there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment." App. 95a.

National uniformity may at times be undesirable or elusive. With respect to the Constitution's relevance, it should be restored.

## III. The Lower Court's Constructive Approval of a Content-Based Prior Restraint, Under the Artifice of Treating Any Speech that Foreigners Might Hear or Read as an "Export," Calls for This Court's Review.

The Pentagon Papers were, without question, militarily and diplomatically sensitive. Many foreigners could purchase an American newspaper. Yet the preceding four decades of First Amendment doctrine could scarcely be imagined had this Court approved of censoring the *New York Times*'s Vietnam War coverage for lack of an export license. Should the government have argued that the prior restraint against the *Times* was acceptable because the newspaper did not restrict its distribution to American citizens?

WASHAR0000431

Plain meaning has never supported Respondents' usage of "export" as a synonym for "speak" or "publish." The majority erred in deferring to the government's novel redefinition. And while Petitioners' speech relates to recent technology, the First Amendment concepts here are timeless. The Internet, and 3D printing, did not exist during the many years when the Executive Branch warned repeatedly that ITAR's use as a prior restraint on speech was unconstitutional, and the State Department disclaimed any such application. Today, "cyberspace" provides "the most important places (in a spatial sense) for the exchange of views." *Packingham* v. *North Carolina*, 137 S. Ct. 1730, 1735 (2017). Courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id.*

Yet the majority below went much farther than even that. The content-based prior restraint to which the panel majority turned a blind eye constrains Petitioners' speech generally and everywhere. Judge Jones noted that the prior restraint covers meetings, trade shows, and even library books. App. 54a. Respondents' proposed codification of their current practice confirms that anyone wishing to express scientific or technical information in a "public conference or trade show . . . a book or journal article [or on] the Internet" risks committing an export violation. 80 Fed. Reg. 31,525, 31,528.

The scope and depth of Respondents' content-based prior restraint are severe. The decision below "degrades First Amendment protections and implicitly

WASHAR0000432

sanctions the State Department's tenuous and aggressive invasion of citizens' rights"—and there is no telling where this adventure will end. App. 54a. This censorship program appears destined for this Court's review. Given the law's skepticism of content-based prior restraints, and the severe harms involved, the Court should address the matter now.

## IV.   The Erroneous Decision Below Destabilizes the Law and Raises Serious Questions About the Judiciary's Mission.

The decision below has unsettled the established norms for adjudicating preliminary injunction requests. Gone is this Court's careful balancing test, with its reliance on the merits. In its place, a wholly arbitrary system: The court will consider the merits, when it wishes to do so. Whether the merits might reveal a constitutional violation is less important, because the court will enforce the Constitution only when it seems to be a good idea. What are courts, attorneys, and the public to make of this innovation?

Critics of this or that opinion often allege that a court has followed an extra-constitutional agenda. For a court to declare that it has done just that—in ignoring a content-based prior restraint no less—raises basic questions about the judiciary's function. The public is left with no way of knowing when a judge would declare some interest more important than the Constitution, or even bother hearing the merits of plainly significant pleas to enjoin unconstitutional conduct.

WASHAR0000433

35

Absent a merits inquiry, a court balancing the un-known equities is reduced, as was the majority below, to declaring whether an abstract interest in constitu-tional rights is more or less important than an equally abstract government interest. And if the court then decides, as did the majority below, that *security > free-dom*, that ends the matter. The logic is inescapable; where applied, it bars any injunctive relief.

Yet courts would be hard-pressed to approach *all* proposed free speech injunctions in this manner. For example, the lower court holds that the Due Process Clause secures a right to sex toys. *Reliable Consult-ants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008). Suppose that Saudi Arabia refused the United States essential military cooperation, so long as Saudi citizens could ac-cess Americans' online files aiding such devices' design and manufacture. Would the court below simply de-clare that "national security" justifies the State De-partment in ordering Americans to take down their web sites hosting such files, nevermind the merits of their First Amendment claims or the public's interest in the Constitution itself?

Or is it just that Petitioners, their speech, and their interests found the court's disfavor? Whose speech gets the familiar four-prong treatment, and whose gets the new rubber stamp? The majority did not explain. What remains is the unavoidable suspi-cion that the majority blinded itself to the merits be-cause it feared, as Judge Jones's unchallenged dissent laid out, that Petitioners would prevail. But as this Court warned, "national-security concerns must not

WASHAR0000434

become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1862 (2017) (internal quotation marks omitted).

Alas, the tickets punched below—allowing courts to disregard the constitutional merits of injunction requests and find public interests greater than the Constitution itself—are far too judge-empowering to remain "restricted . . . good for this day and this train only." *Smith* v. *Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting). Nor will the damage remain confined to the First Amendment. Dissenting from a judgment affirming an injunction against President Trump's executive order regarding immigration, some cited this case for the proposition that "although the public interest generally favors the protection of constitutional rights, that interest must sometimes yield to the public interest in national security. . . ." *Int'l Refugee Assistance Project* v. *Trump*, 857 F.3d 554, 657 (4th Cir. 2017) (en banc) (Shedd, J., dissenting), *cert. granted*, 137 S. Ct. 2080 (2017).

Confusing the matter, the *IRAP* dissent explained that "constitutional protections of any sort have little meaning" absent national security. *Id.* (quoting *Wayte* v. *United States*, 470 U.S. 598, 612 (1985)). But *Wayte*'s language merely recognized national defense as a legitimate interest under the second prong of *United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). Nobody questioned that here. And this Court has never come close to suggesting that national security overrides the public interest in the Constitution itself.

WASHAR0000435

## V.   This Case Presents an Excellent Vehicle For Resolving the Issues Presented.

This dispute comes before the Court on clear splits of circuit authority, and a comprehensive and robust record. The case has faced the rigor of a strongly-divided panel and rehearing process. Nor is there a question of a ripe case or controversy—Respondents have gagged Defense Distributed and declared its speech unfit for general publication.

Petitioners are constrained to note that this case is not only an excellent vehicle in its own right, but better suited for resolution than other efforts at attacking Respondents' prior restraint. Nearly three months after the district court's decision below, an attorney representing his own professional corporation (acting, essentially, in pro se) brought suit arguing that Respondents' practice precludes him from using unspecified "technical data" in his marketing presentations. In an unpublished summary order, the Second Circuit affirmed the denial of the law firm's motion for preliminary injunction. *Stagg P.C.* v. *United States Dep't of State*, 673 Fed. Appx. 93 (2d Cir. 2016) (summary order), *cert. petition pending*, No. 17-94 (filed July 17, 2017).

The district court, and the Second Circuit, both had difficulty with the law firm's refusal to identify the technical data it proposed to release. Absent that information, the courts "assume[d] the worst case scenario" and fully credited the government's concerns. *Id.* at

WASHAR0000436

95.[4] Additionally, the law firm's reticence "depriv[ed] the DDTC of the opportunity to end this controversy by confirming its suspicion the materials" are not controlled. *Stagg P.C.* v. *United States Dep't of State*, 158 F. Supp. 3d 203, 208 (S.D.N.Y. 2016) (footnote omitted).

Obviously, these problems are not present here. The only appellate judges who reached the merits—based on the extensive record—easily concluded that an injunction should issue. Moreover, while Petitioners appreciate that others are impacted by the prior restraint, "prudential considerations demand that the Court insist upon that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *United States* v. *Windsor*, 133 S. Ct. 2675, 2687 (2013) (internal quotation marks omitted). Unlike Stagg, Petitioners bring the "[c]oncrete injury" that "adds the essential dimension of specificity to the dispute." *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974).

> This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. Such authoritative presentations are an integral part of the judicial process, for a court must rely on the

---

[4] Contrary to Stagg's petition, the courts assessed the merits of his claim as best they could. The Second Circuit would not have followed the approach below here. See *N.Y. Progress*, 733 F.3d at 488.

parties' treatment of the facts and claims be-
fore it to develop its rules of law.

*Id.* at 221.

Notwithstanding Petitioners' on-going, particular-
ized injury, Stagg theorizes that his inchoate dispute is
a better vehicle for addressing Respondents' prior re-
straint. See Petition for Certiorari, No. 17-94 at 36-37.
But Stagg's petition fails to disclose that he is no
stranger to *this* case. When Respondents threatened
Defense Distributed, the organization turned to its
then-counsel, Williams Mullen—where Stagg worked
as an attorney for Defense Distributed regarding the
issue. Defense Distributed disapproves of the adverse
position its former attorney now takes against it re-
specting the same matter. The conflict is reason
enough to deny Stagg's petition, if it is not withdrawn.

Stagg's attacks on his former client's case are also,
at best, misleading. First, as Judge Jones's dissent and
Respondents' regulations make clear, the issue is not
limited to the Internet—although, as *Packingham*
demonstrates, that would offer reason enough to re-
view the case were it so. Second, regardless of "Con-
gress's understanding," Stagg Pet. at 37, Respondents
are not about to allow Petitioners to speak. While a
task force is "considering the possibility" of excluding
"most commercial firearms and related activities from
the ITAR," App. 117a, that theoretical exclusion would
not protect Petitioners' plainly non-commercial speech.
The potential—always present—that the government
might voluntarily cease censoring applies equally to

WASHAR0000438

Stagg, and it is no reason to leave the matter in the government's hands.

Finally, the notion that a lawyer's marketing presentations are "pure speech," but Internet publishing isn't, Stagg Pet. at 37, is incoherent. Stagg's marketing might well rely upon his former client's censored files to test the prior restraint, but Stagg's First Amendment claim cannot be "stronger" than or "superior" to that of his former client. *Id.*

This case presents the Court with multiple avenues of redressing the errors below. Judge Jones's exhaustive dissent, if not the panel majority, engaged the parties' specific and well-defined controversy on the merits, affording this Court a basis to decide the critical question of whether this particular content-based prior restraint is constitutional. But the magnitude of the lower court's errors in refusing to consider the merits prong, and elevating unexamined assertions of governmental interest over the Constitution itself, suggests the possibility of summary reversal. Even were the First Amendment's application here in doubt, the law of preliminary injunctions "is settled and stable, the facts are not in dispute, and the decision below is clearly in error." *Schweiker* v. *Hansen*, 450 U.S. 785, 791 (1981) (Marshall, J., dissenting).

This case merits a decision that adheres to this Court's established preliminary injunction framework. Whether that decision is made here, or whether it should come, in the first instance, from a court "of first view," *Expressions Hair Design* v. *Schneiderman*, 137

S. Ct. 1144, 1151 (2017) (internal quotation marks omitted), certiorari is appropriate.

————————◆————————

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

MATTHEW GOLDSTEIN
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Ave., N.W.
10th Floor
Washington, D.C. 20009
202.550.0040

WILLIAM B. MATEJA
POLSINELLI PC
2950 N. Harwood,
  Suite 2100
Dallas, TX 75201
214.397.0030

ALAN GURA
  *Counsel of Record*
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

JOSH BLACKMAN
1303 San Jacinto Street
Houston, TX 77002
202.294.9003

DAVID S. MORRIS
FISH & RICHARDSON P.C.
111 Congress Ave., Suite 810
Austin, TX 78701
512.472.5070

August 2017

WASHAR0000440

1a

## APPENDIX A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

―――――――――――

No. 15-50759

―――――――――――

DEFENSE DISTRIBUTED; SECOND
AMENDMENT FOUNDATION, INCORPORATED,

 Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE;
JOHN F. KERRY, In His Official Capacity as the
Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS,
Department of State Bureau of Political Military
Affairs; KENNETH B. HANDELMAN, Individually
and in His Official Capacity as the Deputy Assistant
Secretary of State for Defense Trade Controls in
the Bureau of Political-Military Affairs;
C. EDWARD PEARTREE, Individually and in
His Official Capacity as the Director of the Office
of Defense Trade Controls Policy Division;
SARAH J. HEIDEMA, Individually and in
Her Official Capacity as the Division Chief,
Regulatory and Multilateral Affairs, Office of
Defense Trade Controls Policy; GLENN SMITH,
Individually and in His Official Capacity as the
Senior Advisor, Office of Defense Trade Controls,

 Defendants-Appellees

---

Appeal from the United States District Court
for the Western District of Texas

---

(Filed Sep. 20, 2016)

Before DAVIS, JONES, and GRAVES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs-Appellants Defense Distributed and Second Amendment Foundation, Inc. have sued Defendants-Appellees, the United States Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs-Appellants' interest in protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

## I. Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and

WASHAR0000442

knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR-15 rifles.[1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a

---

[1] The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.
>
> Both technologies require some instruction set or "recipe" – in the case of 3D printers,

WASHAR0000444

computer aided design ("CAD") files, typically in .stl format; for CNC machines, text files setting out coordinates and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR-15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on

---

[2] Plaintiffs-Appellants' Original Brief on Appeal.

WASHAR0000445

the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States*, ___ U.S. ___, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an

WASHAR0000446

effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking

---

[3] *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

WASHAR0000447

down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

### District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments.

---

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

WASHAR0000448

Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the

---

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

burden of persuasion' on all four require-
ments."[6]

We have long held that satisfying one requirement
does not necessarily affect the analysis of the other re-
quirements. In *Southern Monorail Co. v. Robbins &
Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for ex-
ample, the district court had denied a preliminary
injunction solely because it found that the movant,
Robbins & Myers, failed to satisfy the balance of harm
requirement. On appeal, Robbins & Myers argued that
it had clearly shown a substantial likelihood of success
on the merits, and satisfying that requirement should
give rise to a presumption of irreparable harm and a
presumption that the balance of harm tipped in its fa-
vor. We disagreed:

> Because we dispose of this case on the balance
> of harm question, we need not decide and we
> express no views upon whether a presumption
> of irreparable injury as a matter of law is ap-
> propriate once a party demonstrates a sub-
> stantial likelihood of success on the merits of
> an infringement claim. In other words, even
> assuming arguendo that Robbins & Myers
> has shown a substantial likelihood of success
> on the merits of its infringement claim and
> that irreparable injury should be presumed
> from such a showing (two issues not ad-
> dressed by the district court in this case), we
> still uphold the district court's decision, which
> rested solely on the balance of harm factor. We
> agree that Robbins & Myers has failed to

---

[6] *Id.*

WASHAR0000450

carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time, constitutes irreparable

_____

[7] *Id*. at 187-88.

WASHAR0000451

injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

WASHAR0000452

13a

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

> Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals – including all manner of enemies of this country – from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national

---

[9] *Id*. at 689.

14a

defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

> While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of

---

[10] *Id.*

the President and Congress in matters of for-
eign policy and export. *See Haig v. Agee*, 453
U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640
(1981) (matters relating to conduct of foreign
relations "are so exclusively entrusted to the
political branches of government as to be
largely immune from judicial inquiry or inter-
ference"); *United States v. Pink*, 315 U.S. 203,
222-23, 62 S. Ct. 552, 86 L. Ed. 796 (1942)
(conduct of foreign relations "is committed
by the Constitution to the political depart-
ments of the Federal Government"); *Spectrum
Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d
938, 950 (5th Cir. 2011) (matters implicating
foreign relations and military affairs gener-
ally beyond authority of court's adjudicative
powers).

As to Plaintiff's second contention, that an in-
junction would not bar Defendants from con-
trolling the export of classified information,
it is significant that Plaintiffs maintain the
posting of files on the Internet for free down-
load does not constitute "export" for the pur-
poses of the AECA and ITAR. But Defendants
clearly believe to the contrary. Thus, Plaintiffs'
contention that the grant of an injunction per-
mitting them to post files that Defendants
contend are governed by the AECA and ITAR
would not bar Defendants from controlling
"export" of such materials stand in sharp [con-
trast] to Defendants' assertion of the public
interest. The Court thus does not believe
Plaintiffs have met their burden as to the fi-
nal two prongs necessary for granting Plain-
tiffs a preliminary injunction. Nonetheless, in

WASHAR0000455

an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new,

---

[11] *Id*. at 689-90.

WASHAR0000456

previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry

their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

_____

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue,

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

---

we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

20a

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

————

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

### I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to

_____

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

WASHAR0000460

contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

22a

Defense Trade Controls (DDTC), a violation of the ITAR.

Pursuant to § 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took the government entities two years to refuse to exempt most of the files from the licensing regime.

---

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

23a

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295-97 (5th Cir.

---

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

WASHAR0000463

2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits – arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005) – the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185-86. Second, "the district court denied the

WASHAR0000464

25a

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

## II.

### A. Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

_____

injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

WASHAR0000465

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain." 22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published

and shared broadly in the scientific community." 22 C.F.R. § 120.11(a).[6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4).[7]

---

[6] This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id*.

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id*. § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of

WASHAR0000467

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)-(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests

─────────

Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

WASHAR0000468

that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1.[8]

---

[8] While 22 U.S.C. § 2778(h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion

WASHAR0000469

30a

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may

---

clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES (*January 2009 to the present: updated August 12, 2015*) 3, 11, 86 (2015), *available at* https://

WASHAR0000470

prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrint-Board.com (Nov. 23, 2015) (site visited 9/14/2016).

## B. Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based

---

www.pmddtc.state.gov/compliance/documents/OngoingExportCase FactSheet.pdf.

WASHAR0000471

regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

### 1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987));

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227-28, 121 S. Ct. 2164, 2171-72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

WASHAR0000472

*Export*, *Black's Law Dictionary* (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country"). As the court explained in *Ehsan*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145 (1903) (the "legal notion . . . of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859-60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted).

WASHAR0000473

Pursuant to *Chevron*, where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of [sic] abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful,

WASHAR0000474

non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

WASHAR0000475

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.'" Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574-75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance] . . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its

WASHAR0000476

constitutional significance, throughout the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2.  The First Amendment – Content-based speech restriction.

"Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense

WASHAR0000477

38a

Distributed's files, this process is a content-based re-
striction on the petitioners' domestic speech "because
of the topic discussed." *Reed*, 135 S. Ct. at 2227. Particu-
larly relevant to this case is *Holder v. Humanitarian
Law Proj.*, 561 U.S. 1, 27-28, 130 S. Ct. 2705, 2723-24
(2010), in which the Supreme Court held that as ap-
plied, a criminal statute forbidding the provision of
material support and resources to designated terrorist
organizations was content based and required strict
scrutiny review. The Court there rejected the govern-
ment's assertion that although the plaintiffs were go-
ing to provide legal training and political advocacy to
Mideast terrorist organizations, the statute criminal-
ized "conduct" and only incidentally affected "speech."
Rejecting this incidental burden argument for inter-
mediate scrutiny review, the Court stated the obvious:
"[p]laintiffs want to speak to the PKK and the LTTE,
and whether they may do so under § 2239B depends on
what they say:" if their speech concerns "specialized
knowledge" it is barred, but it [sic] "if it imparts only
general or unspecialized knowledge" it is permissible).
*Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-
related files and other technical data are speech pro-
tected by the First Amendment. *See Universal City
Studios, Inc. v. Corley*, 273 F.3d 429, 445-49 (2d Cir.
2001) (discussing level of scrutiny owed for "speech" in
the form of a decryption computer program). There
are CAD files on the Internet and designs, drawings,
and technical information about myriad items – jew-
elry, kitchen supplies, model airplanes, or clothing, for

WASHAR0000478

example – that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require pre-publication approval or licensing. This is pure content-based regulation.[12]

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies

_____

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134-35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

WASHAR0000479

because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163-64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners – foreign nationals – from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department: its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide

know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley*, 273 F.3d at 449-55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that

citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project*. Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations . . . [or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36-39, 130 S. Ct. at 2729-30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the

WASHAR0000482

government would not definitively answer whether the State Department would purport to regulate the posting of such unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i)

---

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

WASHAR0000483

44a

(technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The possibility that an Internet site could also

WASHAR0000484

be used to distribute the technical data domestically does not alter the analysis. . . ." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these over-inclusive regulations cannot be narrowly tailored and fail strict scrutiny.

### 3.   The First Amendment – Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108

S. Ct. 2138, 2144 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402-03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires [sic] three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193-94 (5th Cir. 2003) (citing *Freedman v. Maryland*, 380 U.S. 51, 58-59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby*

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

WASHAR0000486

*Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a)(1) (emphasis added).

not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150-51. Like the "illusory 'constraints' " in *Lakewood*, *id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project*, 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of

the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C. The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the

WASHAR0000489

*Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945-1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

> the protection as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases. . . . [n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306-08, 101 S. Ct. 2766, 2781-82 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security). No such exceptional circumstances have been presented in this case. Indeed,

WASHAR0000490

all that the majority can muster to support the government's position here is that

> the State Department's stated interest in preventing foreign nationals – including manner of enemies of this country – from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require prepublication approval of all USML-related technical data. This is clearly not what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists. The Liberator, however, requires a metal firing pin.

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that pre-publication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face

———————

here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

WASHAR0000492

First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is

---

[18] DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5-7, 19-29 (1997).

WASHAR0000493

subject to doubt, based on the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure) . . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

***

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be

WASHAR0000494

55a

implicated on the USML. This abdication of our deci-sionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censor-ship.

**APPENDIX B**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, | § | |
| ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 1-15-CV-372 RP |
| | § | |
| UNITED STATES | § | |
| DEPARTMENT OF | § | |
| STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**ORDER**

(Filed Aug. 4, 2015)

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #8) and the responsive pleadings thereto. The Court conducted a hearing on the motion on July 6, 2015. Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

WASHAR0000496

## I.   BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied*

WASHAR0000497

*sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related items (the "Published Files"). (Compl. ¶¶ 22-24). Plaintiffs allege that, on May 8,

2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id.* ¶¶ 26-29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1]

---

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28-33). In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Defense Distributed has sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34-36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also

WASHAR0000500

contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II.   STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales*, 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is

WASHAR0000501

entitled to summary judgment." *Daniels Health Sciences, L.L.C.* v. *Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III. ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims [sic].

### A. Injury and Balancing of Interests

Defendants suggest Plaintiffs' contention that they face irreparable injuy [sic] absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

WASHAR0000502

*Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)

WASHAR0000503

(district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222-23 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

WASHAR0000504

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast [sic] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

## B.  Ultra Vires

Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute,

WASHAR0000505

his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign

WASHAR0000506

person whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs argue this definition falls outside Congressional intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles. Further, under the AECA, decisions are required to

> take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms." (Compl. ¶ 1) (emphasis added). Facilitating global access to firearms undoubtedly "increase[s] the possibiliity of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

WASHAR0000507

68a

## C. First Amendment

Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973). *See also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are

not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2nd Cir. 2000).

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001).[2] The court made clear the fact that computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonethless [sic] be speech. Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id.* at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment). Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First

---

[2] Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli.* However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed. That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient." *Corley*, 273 F.3d at 449 (quoting *Vartuli*, 228 F.3d at 111). Plaintiffs here have not so marketed or described the files at issue.

WASHAR0000509

Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source." That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consder [sic] the files as subject to the protection of the First Amendment.

In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint. Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013). *See also Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes

WASHAR0000510

place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014). *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *Perry v. McDonald*, 280 F.3d 159, 171 (2nd Cir. 2001) (context in which prior restraint occurs affects level of scrutiny applied);, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213-14 (1997);

WASHAR0000511

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. *See also Ward*, 491 U.S. at 791 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning

WASHAR0000512

the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding regulation requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson*, 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

WASHAR0000513

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson*, 696 F.3d at 460.

The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny standard. *Compare Ward*, 491 U.S. at 798 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with

WASHAR0000514

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner*, 520 U.S. at 189 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Circuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest otherwise. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not sufficiently tailored so as to only incidentally restrict their freedom of expression. The

WASHAR0000515

only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking necessary approval. *Chi Mak*, 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 29 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)).[3]

---

[3] The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

WASHAR0000516

Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military

WASHAR0000517

data than by the domestic disclosure of such data. Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey*, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing [sic] expedited processsing [sic]. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed. Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

WASHAR0000518

### D. Second Amendment

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

### a. Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines*, 521 U.S. at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir. 2007); *Fla. Dep't of Ins. v. Chase Bank of Tex.*

*Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position

---

[4] No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

WASHAR0000520

by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) ("vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (court need not decide third-party standing question, "[f]or we

---

[5] Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

WASHAR0000521

have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right. Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future. In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme. (Plf. Reply

WASHAR0000522

Exs. 3-4). This testimony satisfies the "injury in fact" portion of the standing inquiry.

Defendants further contend any injury is not fairly traceable to their conduct. They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed. But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing. *See Davis v. United States*, 131 S. Ct. 2419, 2434, n.10 (one must not "confus[e] weakness on the merits with absence of Article III standing"). In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants. The Court therefore finds SAF has standing to assert a claim of a violation of the Second Amendment. *See Nat'l Rifle Ass'n*, 700 F.3d at 192 (NRA had standing, on behalf of its members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18-to-20-year-olds); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city); *Mance v. Holder*, 2015 WL 567302, at *5 (N.D. Tex. Feb. 11, 2015) (nonprofit organization dedicated to promoting Second Amendment rights had associational standing to bring

WASHAR0000523

action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment – that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n*, 700 F.3d at 194.

In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges

WASHAR0000524

on the ability to manufacture one's own firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintffs' [sic] logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However,

---

[6] Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

WASHAR0000525

the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n*, 700 F.3d at 195 (emphasis added).

The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id.* at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205-07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc.*

*v. McCraw*, 719 F.3d 338, 347-48 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1365 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18-20-year-olds from carrying handguns in public).

As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw*, 719 F.3d at 348 (statute limiting under 21-year-olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n*, 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

### E.  Fifth Amendment

Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court

WASHAR0000527

to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have rejected due process challanges [sic] to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme – which has remained in place for more than a quarter century – is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

WASHAR0000528

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10 (a) (defining technical data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R.

§ 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the defintion [sic] of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

## IV.  CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. #7) is hereby **DENIED**.

**SIGNED** on August 4, 2015.

/s/ Robert Pitman
ROBERT L. PITMAN
UNITED STATES
DISTRICT JUDGE

WASHAR0000530

## APPENDIX C

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

—————————

No. 15-50759

—————————

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

Defendants-Appellees

WASHAR0000531

---

Appeal from the United States District Court
for the Western District of Texas

---

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

(Filed Mar. 15, 2017)

Before DAVIS, JONES, and GRAVES, Circuit Judges.

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen and Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

ENTERED FOR THE COURT:

/s/ W. Eugene Davis

W. EUGENE DAVIS
UNITED STATES CIRCUIT JUDGE

---

WASHAR0000532

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing *en banc*:

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits – which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits – calling it "arguably the most important factor." *Tesfamichael v. Gonzalez*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*,

WASHAR0000533

699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies

Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, No. 15-50759, slip op. at 10 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) *(en banc)*; *see also N.Y. Times*, 403 U.S. at 730 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively . . . operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569-70. The Government contends that the gun designs at issue could

WASHAR0000535

potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, slip op. at 17 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719 (Black, J., concurring). Unfortunately, that is exactly

WASHAR0000536

what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc.*

———————————————

WASHAR0000537

## APPENDIX D

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

———

**22 U.S.C. § 2278   Control of arms exports and imports**

**(a)   Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information**

(1)   In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

WASHAR0000538

\*     \*     \*

### (c)   Criminal violations; punishment

Any person who willfully violates any provision of this section, section 2779 of this title, a treaty referred to in subsection (j)(1)(C)(i), or any rule or regulation issued under this section or section 2779 of this title, including any rule or regulation issued to implement or enforce a treaty referred to in subsection (j)(1)(C)(i) or an implementing arrangement pursuant to such treaty, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both.

\*     \*     \*

### (e)   Enforcement powers of President

In carrying out functions under this section with respect to the export of defense articles and defense services, including defense articles and defense services exported or imported pursuant to a treaty referred to in subsection (j)(1)(C)(i), the President is authorized to exercise the same powers concerning violations and enforcement which are conferred upon departments, agencies and officials by subsections (c), (d), (e), and (g) of section 11 of the Export Administration Act of 1979 [50 U.S.C. 4610(c), (d), (e), and (g)], and by subsections (a) and (c) of section 12 of such Act [50

WASHAR0000539

U.S.C. 4614(a) and (c)], subject to the same terms and conditions as are applicable to such powers under such Act [50 U.S.C. 4601 et seq.], except that section 11(c)(2)(B) of such Act shall not apply, and instead, as prescribed in regulations issued under this section, the Secretary of State may assess civil penalties for violations of this chapter and regulations prescribed thereunder and further may commence a civil action to recover such civil penalties, and except further that the names of the countries and the types and quantities of defense articles for which licenses are issued under this section shall not be withheld from public disclosure unless the President determines that the release of such information would be contrary to the national interest. Nothing in this subsection shall be construed as authorizing the withholding of information from the Congress. Notwithstanding section 11(c) of the Export Administration Act of 1979, the civil penalty for each violation involving controls imposed on the export of defense articles and defense services under this section may not exceed $500,000.

\*       \*       \*

**(h)   Judicial review of designation of items as defense articles or services**

The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense

WASHAR0000540

services for purposes of this section shall not be subject to judicial review.

*        *        *

————

## 22 C.F.R. § 120.2  Designation of defense articles and defense services

The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of import or export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the U.S. Munitions List specified in part 121 of this subchapter. Defense articles on the U.S. Munitions List specified in part 121 of this subchapter that are also subject to permanent import control by the Attorney General on the U.S. Munitions Import List enumerated in 27 CFR part 447 are subject to temporary import controls administered by the Secretary of State. Designations of defense articles and defense services are made by the Department of State with the concurrence of the Department of Defense. The scope of the U.S. Munitions List shall be changed only by amendments made pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778). For a designation or

WASHAR0000541

determination on whether a particular item is enumerated on the U.S. Munitions List, see §120.4 of this subchapter.

—————

**22 C.F.R. § 120.3   Policy on designating or determining defense articles and services on the U.S. Munitions List**

(a)   For purposes of this subchapter, a specific article or service may be designated a defense article (see §120.6 of this subchapter) or defense service (see §120.9 of this subchapter) if it:

(1)   Meets the criteria of a defense article or defense service on the U.S. Munitions List; or

(2)   Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List.

(b)   For purposes of this subchapter, a specific article or service shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control under this subchapter.

NOTE TO PARAGRAPHS (a) AND (b): An article or service determined in the future pursuant to this subchapter as a defense article or defense service, but not currently on the U.S. Munitions List, will be placed in U.S. Munitions List Category XXI until the appropriate U.S. Munitions List category has been amended to provide the necessary entry.

WASHAR0000542

(c)   A specific article or service is not a defense article or defense service for purposes of this subchapter if it:

(1)   Is determined to be under the jurisdiction of another department or agency of the U.S. Government (see §120.5 of this subchapter) pursuant to a commodity jurisdiction determination (see §120.4 of this subchapter) unless superseded by changes to the U.S. Munitions List or by a subsequent commodity jurisdiction determination; or

(2)   Meets one of the criteria of §120.41(b) of this subchapter when the article is used in or with a defense article and specially designed is used as a control criteria (see §120.41 of this subchapter).

NOTE TO §120.3: The intended use of the article or service after its export (i.e., for a military or civilian purpose), by itself, is not a factor in determining whether the article or service is subject to the controls of this subchapter.

———

**22 C.F.R. § 120.4   Commodity jurisdiction**

(a)   The commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List. It may also be used for consideration of a redesignation of an article or service currently covered by the U.S. Munitions List. The Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List. Upon electronic

WASHAR0000543

submission of a Commodity Jurisdiction (CJ) Determination Form (Form DS-4076), the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List. The determination, consistent with §§120.2, 120.3, and 120.4, entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases.

*          *          *

(e)   The Directorate of Defense Trade Controls will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction. If after 45 days the Directorate of Defense Trade Controls has not provided a final commodity jurisdiction determination, the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing.

*          *          *

———

## 22 C.F.R. § 120.6   Defense article

*Defense article* means any item or technical data designated in §121.1 of this subchapter. The policy described in §120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in §121.1 of this subchapter. It

WASHAR0000544

also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles. It does not include basic marketing information on function or purpose or general system descriptions.

———

**22 C.F.R. § 120.10   Technical data**

(a)   Technical data means, for purposes of this subchapter:

(1)   Information, other than software as defined in §120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2)   Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List;

(3)   Information covered by an invention secrecy order; or

(4)   Software (see §120.45(f)) directly related to defense articles.

WASHAR0000545

(b)   The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in §120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

———

## 22 C.F.R. § 120.11   Public domain

(a)   Public domain means information which is published and which is generally accessible or available to the public:

(1)   Through sales at newsstands and bookstores;

(2)   Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3)   Through second class mailing privileges granted by the U.S. Government;

(4)   At libraries open to the public or from which the public can obtain documents;

(5)   Through patents available at any patent office;

(6)   Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7)   Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8)   Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i)   The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

WASHAR0000547

108a

(ii)   The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

\*        \*        \*

———

**22 C.F.R. § 120.17   Export**

(a)   Except as set forth in §126.16 or §126.17, export means:

(1)   An actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner;

(2)   Releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export");

\*        \*        \*

(b)   Any release in the United States of technical data to a foreign person is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency.

———

WASHAR0000548

**22 C.F.R. § 121.1   The United States Munitions List**

*       *       *

**Category I – Firearms, Close Assault Weapons and Combat Shotguns**

\*(a)   Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

\*(b)   Fully automatic firearms to .50 caliber inclusive (12.7 mm).

\*(c)   Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

\*(d)   Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

\*(e)   Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

(f)   Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

\*(g)   Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

(h)   Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

WASHAR0000549

110a

(i)   Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j)   The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1)   A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2)   A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3)   A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4)   A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5)   A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6)   A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

NOTE: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

*        *        *

**Category XXI – Articles, Technical Data, and Defense Services Not Otherwise Enumerated**

*(a)   Any article not enumerated on the U.S. Munitions List may be included in this category until such time as the appropriate U.S. Munitions List category is amended. The decision on whether any article may be included in this category, and the designation of the defense article as not Significant Military Equipment

WASHAR0000551

(*see* §120.7 of this subchapter), shall be made by the Director, Office of Defense Trade Controls Policy.

(b)   Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles covered in paragraph (a) of this category.

———

## 22 C.F.R. § 126.7   Denial, revocation, suspension, or amendment of licenses and other approvals

(a)   *Policy*. Licenses or approvals shall be denied or revoked whenever required by any statute of the United States (see §§ 127.7 and 127.11 of this subchapter). Any application for an export license or other approval under this subchapter may be disapproved, and any license or other approval or exemption granted under this subchapter may be revoked, suspended, or amended without prior notice whenever:

(1)   The Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable; or

\*      \*      \*

(b)   *Notification*. The Directorate of Defense Trade Controls will notify applicants or licensees or other appropriate United States persons, of actions taken pursuant to paragraph (a) of this section. The

WASHAR0000552

reasons for the action will be stated as specifically as security and foreign policy considerations permit.

*        *        *

―――――

**22 C.F.R. § 127.1(a)(1)   Violations**

(a)   Without first obtaining the required license or other written approval from the Directorate of Defense Trade Controls, it is unlawful:

(1)   To export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required by this subchapter;

*        *        *

―――――

**22 C.F.R. §127.3   Penalties for violations.**

Any person who willfully:

(a)   Violates any provision of §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or any rule or regulation issued under either §38 or §39 of the Act, or any undertaking specifically required by part 124 of this subchapter; or

(b)   In a registration, license application, or report required by §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or by any rule or regulation issued under either section, makes any untrue

statement of a material fact or omits a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be subject to a fine or imprisonment, or both, as prescribed by 22 U.S.C. 2778(c).

————

## 22 C.F.R. § 127.10   Civil penalty

(a)

(1)   The Assistant Secretary of State for Political-Military Affairs is authorized to impose a civil penalty, as follows:

(i)   For each violation of 22 U.S.C. 2778, an amount not to exceed $1,111,908;

(ii)   For each violation of 22 U.S.C. 2779a, an amount not to exceed $808,458; and

(iii)   For each violation of 22 U.S.C. 2780, an amount not to exceed $962,295.

(2)   The civil penalty may be either in addition to, or in lieu of, any other liability or penalty which may be imposed.

\*         \*         \*

————

## 22 C.F.R. § 128.1   Exclusion of functions from the Administrative Procedure Act

The Arms Export Control Act authorizes the President to control the import and export of defense articles and services in furtherance of world peace and the

security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used. It also authorizes the Secretary of State to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action to be advisable. The administration of the Arms Export Control Act is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the Administrative Procedure Act and is thereby expressly exempt from various provisions of that Act. Because the exercising of the foreign affairs function, including the decisions required to implement the Arms Export Control Act, is highly discretionary, it is excluded from review under the Administrative Procedure Act.

## APPENDIX E

[LOGO]   **United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20520-0112*

JUN 12 2017

Mr. William O. Wade
Chair, Defense Trade Advisory Group
Vice President, International Licensing & Compliance
L-3 Communications
201 12th St., Suite 800
Arlington, VA 22202

Dear Mr. Wade:

Since the last Defense Trade Advisory Group (DTAG) plenary meeting in March 2017, the Directorate of Defense Trade Controls (DDTC) has determined that it can benefit from input from the various working groups of the DTAG on the issues addressed in the attached.

The DTAG should be prepared to present its recommendations at one of the next two DTAG plenary sessions, which will be provisionally scheduled in early September and early December. Please provide the DTAG recommendation for which topics should be presented in which upcoming plenary so DDTC can plan accordingly.

As we did in advance of the March meeting, we would be pleased to meet with you to walk through each of the topics in the attached.

117a

Sincerely,

/s/ Brian H. Nilsson
    Brian H. Nilsson
    Deputy Assistant Secretary
      of State for Defense Trade
      Controls
    Designated Federal Official

1 Attachment – DDTC Issued DTAG Tasks (June 2017)

———

**DDTC Issued DTAG Tasks (June 2017)**

\*    \*    \*

## 3. <u>Definition of Manufacturing (post-revision of firearms rule)</u>

**Tasking:** Considering the possibility of revisions of Cats I-III and removal of most commercial firearms and related activities from the ITAR, DDTC requests DTAG to review and provide feedback to accurately and effectively define "manufacturing" (and distinguish from other related activities like assembly, integration, installment, various services) for remaining defense articles and services.

\*    \*    \*

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL#**H2017** _1003=007_ ACTION BUREAU: _PM_

DATE: OCT 3 2017

## IPS:

___X___ **SUBSTANTIVE**

___X___ **IMAGE ENTIRE DOCUMENT**

## BUREAU:

**BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN 2 DAYS**

___✓___ **REPLY FOR SIGNATURE BY Charles S. Faulkner, Bureau of Legislative Affairs**

_____ **ADDRESS ENVELOPE TO DISTRICT OFFICE**

_____ **DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE. PHONE 7-1608 WHEN COMPLETED**

_____ **FYI ONLY/NO RESPONSE NECESSARY**

_____ **REPLY FOR SIGNATURE DIRECTLY BY BUREAU**

_____ **OTHER ACTION:** _____

**FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:**
_http://diplopedia.state.gov/index.php?title=Bureau_ of Legislative Affairs Reference Documents#Yellow Border

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

**Due Date** _10/10/17_

**ADDITIONAL INSTRUCTIONS:**

___✗___ **Multi-signer Letter:** _GIANFORTE_

_____

___ **Please clear with NSC prior to submission to H**

WASHAR0000558

EVEREST TASKER#

**FROM: Charles S. Faulkner (H)**
**Congressional Correspondence**
**Recommendation** OCT  3 2017

_____ **For Signature by Secretary**
**For draft by** _____ **Bureau**

_____ **For Signature by Charles S. Faulkner**
**For draft by** _____ **Bureau**

_X_ **Tasked to the** _PM_ **Bureau for**
**Signature by Charles S. Faulkner,**
**Bureau of Legislative Affairs**

_____ **Tasked to** _____ **Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

_X_ Multi-signer letters GIANFORTE

_____ Special Clearances

_____ For S Staff Review (H Only)

_____ Everest Tasker#

WASHAR0000559

## Congress of the United States
### Washington, DC 20515

September 22, 2017

The Honorable Rex Tillerson
Secretary of State
U.S. Department of State
2201 C Street, NW
Washington, D.C. 20520

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, D.C. 20230

Dear Secretary Tillerson and Secretary Ross:

We are strong supporters of the Export Control Reform initiative (ECR) and respectfully urge
you to complete it as soon as possible. Once finalized, it will save taxpayer dollars, create
American jobs and strengthen our national security. The time to act is now for the completion of
this critical initiative.

In 2009, a comprehensive review of the United States' export control system was undertaken
with the goal of strengthening national security and the competitiveness of key domestic
manufacturing and technology sectors. The review found that the current export control system is
overly complicated and duplicative. This not only undermines the American economy, it also
diminishes the ability of the United States government to focus its resources on the most critical
national security priorities. Ultimately, the review led to the creation of ECR, which aimed to
overhaul our nation's export control system.

A stated goal of ECR is, "Improving the long-term health and competitiveness of the U.S.
industrial base, which includes maintaining and expanding jobs." While much of the work has
been completed, there are still some important steps to take to ensure maximum efficiency.
Categories one, two, and three of the United States Munitions List (USML) still need to be
published as final rules. These three categories cover firearms, guns, and ammunition, which in
turn affect the world-class firearm and ammunition manufacturers in Montana.

Thank you for your timely consideration of completing ECR. Finishing this much-needed reform
will resolve unintended and unnecessary burdens currently placed on Montanan business and
innovation, while also bolstering the security of the United States. We appreciate your efforts
and look forward to seeing this commonsense initiative come to a prompt conclusion.

WASHAR0000560

Sincerely,

STEVE DAINES
United States Senator

GREG GIANFORTE
Member of Congress

WASHAR0000561